ORIGINAL

FILED
CLERK, U.S. DISTRICT COURT

JUN 20 2006

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO:  CR 02-220(B)-DT |
| Plaintiff, | ) | |
| | ) | CRIMINAL |
| vs. | ) | |
| | ) | Los Angeles, California |
| IOURI MIKHEL, | ) | |
| JURLIUS KADAMOVAS, | ) | Monday, June 12, 2006 |
| PETRO KRYLOV, | ) | (1:42 p.m. to 3:48 p.m.) |
| NATALYA SOLOVYEVA, | ) | |
| | ) | |
| Defendants. | ) | |

**SEE PAGE 2 FOR CALENDARED MOTIONS**

BEFORE THE HONORABLE DICKRAN TEVRIZIAN,
UNITED STATES DISTRICT COURT JUDGE

EXCEPTIONAL REPORTING SERVICES, INC
14493 SOUTH PADRE ISLAND DRIVE
SUITE A-400
CORPUS CHRISTI, TX 78418-5940
361 949-2988



DOCKETED ON CM

JUL 3 2006

BY _____ 184

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | CASE NO:  CR 02-220(B)-DT |
| Plaintiff, | ) | |
| | ) | CRIMINAL |
| vs. | ) | |
| | ) | Los Angeles, California |
| IOURI MIKHEL, | ) | |
| JURLIUS KADAMOVAS, | ) | Monday, June 12, 2006 |
| PETRO KRYLOV, | ) | (1:42 p.m. to 3:48 p.m.) |
| NATALYA SOLOVYEVA, | ) | |
| | ) | |
| Defendants. | ) | |

SEE PAGE 2 FOR CALENDARED MOTIONS

BEFORE THE HONORABLE DICKRAN TEVRIZIAN,
UNITED STATES DISTRICT COURT JUDGE

EXCEPTIONAL REPORTING SERVICES, INC
14493 SOUTH PADRE ISLAND DRIVE
SUITE A-400
CORPUS CHRISTI, TX 78418-5940
361 949-2988

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | CASE NO:  CR 02-220(B)-DT |
| Plaintiff, | ) | |
| | ) | CRIMINAL |
| vs. | ) | |
| | ) | Los Angeles, California |
| IOURI MIKHEL, | ) | |
| JURLIUS KADAMOVAS, | ) | Monday, June 12, 2006 |
| PETRO KRYLOV, | ) | (1:42 p.m. to 3:48 p.m.) |
| NATALYA SOLOVYEVA, | ) | |
| | ) | |
| Defendants. | ) | |

SEE PAGE 2 FOR CALENDARED MOTIONS

BEFORE THE HONORABLE DICKRAN TEVRIZIAN,
UNITED STATES DISTRICT COURT JUDGE

Appearances:    (See page 3)

Court Recorder:        Lori Muraoka

Courtroom Deputy:      Jake Yerke

Transcribed by:        Exceptional Reporting Services, Inc.
                       14493 S. Padre Island Drive
                       Suite A-400
                       Corpus Christi, TX 78418-5940
                       361 949-2988

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

EXCEPTIONAL REPORTING SERVICES, INC

2

CALENDARED MOTIONS:

DEFENDANT IOURI MIKHEL'S MOTION FOR INDIVIDUAL SEQUESTERED VOIR DIRE PENALTY QUALIFICATION OF JURORS (FILED 5/17/06);

DEFENDANT IOURI MIKHEL'S RENEWED MOTION FOR SEVERANCE, OR IN THE ALTERNATIVE, MOTION FOR "SEQUENTIAL" PENALTY HEARINGS IF FOUND GUILTY OF A CAPITAL OFFENSE (FILED 5/17/06);

DEFENDANT IOURI MIKHEL'S MOTION IN LIMINE TO PRECLUDE "OTHER ACT" EVIDENCE DURING THE GUILTY PHASE OF TRIAL (FILED 5/17/06);

DEFENDANT IOURI MIKHEL'S MOTION FOR RECONSIDERATION OF ORDER DENYING MOTION FOR CONTINUANCE OF TRIAL DATE, OR IN THE ALTERNATIVE, MOTION TO STAY TRIAL PROCEEDINGS PENDING RESOLUTION OF APPEAL (FILED 5/17/06);

GOVERNMENT'S MOTION IN LIMINE TO PRECLUDE EVIDENCE OF ALLEGED MISCONDUCT ON THE PART OF THE VICTIMS IN THIS CASE (FILED 5/17/06);

GOVERNMENT'S MOTION TO PERMIT VICTIM WITNESSES TO OBSERVE THIS TRIAL (FILED 5/17/06);

GOVERNMENT'S MOTION TO EMPANEL AN ANONYMOUS JURY (FILED 5/17/06);

GOVERNMENT'S MOTION TO ADMIT AT TRIAL THE THREE VIDEOTAPED DEPOSITIONS AUTHORIZED PURSUANT TO FRCP 15 (FILED 5/17/06);

GOVERNMENT'S MOTION AND MEMO OF LAW RE:  SELECTING A JURY IN A CAPITAL CASE (FILED 5/17/06)

3

APPEARANCES FOR:

Plaintiff:                      DEBRA W. YANG, ESQ
                                United States Attorney
                                JACKIE CHOOLJIAN, ESQ
                                Assistant United States Attorney
                                Chief, Criminal Division
                                SUSAN DeWITT, ESQ
                                KIM MEYER, ESQ
                                ROBERT DUGDALE, ESQ
                                Assistant United States Attorney
                                312 North Spring Street
                                Los Angeles, CA 90012

Iouri Mikhel:                   RICHARD M. CALLAHAN, JR, ESQ
                                230 E. Colorado Blvd., Suite 1200
                                Pasadena, CA 91101

                                DALE MICHAEL RUBIN, ESQ
                                2275 Huntington Dr., Suite 902
                                San Marino, CA 91108

Jurlius Kadamovas:              SONIA E. CHAHIN, ESQ
                                2222 Foothill Blvd., Suite E-278
                                La Canada, CA 91011

                                RICHARD P. LASTING, ESQ
                                1717 Fourth Street, Third Floor
                                Santa Monica, CA 90401

Petro Krylov:                   GEORGE W. BUEHLER, ESQ
                                350 S. Grand Avenue, 39th Floor
                                Los Angeles, CA 90071

Natalya Solovyeva:              MICHAEL M. CRAIN, ESQ
                                P.O. Box 3730
                                Santa Monica, CA 90408

                                TERRY AMDUR, ESQ

Russian Interpreters:           Ludmilla Genn
                                Alex J. Levoff

EXCEPTIONAL REPORTING SERVICES, INC

4

**Los Angeles, California; Monday, June 12, 2006; 1:42 p.m.**

**(Interpreters Utilized for Translation)**

**(Call to Order)**

THE COURT: Good afternoon.  Please be seated.

SEVERAL ATTORNEYS:  Good afternoon, your Honor.

THE CLERK:  Calling Item Three, Criminal 02-220(B), *United States of America versus Iouri Mikhel, Jurlius Kadamovas, Petro Krylov and Natalya Solovyeva.*

Counsel, if you would please state your appearances for the record.

MR. DUGDALE:  Good afternoon, your Honor.  Robert Dugdale, Susan DeWitt and Kim Meyer for the United States Attorney's Office on behalf of the United States of America.

MR. CALLAHAN:  Your Honor, good afternoon.  Richard Callahan and Dale Rubin on behalf of Iouri Mikhel.  He is present in custody.

MR. RUBIN:  Good afternoon, your Honor.

MR. CRAIN:  Your Honor, good afternoon.  Michael Crain for Natalya Solovyeva.  Mr. Amdur's in another court. We're ready to proceed and he'll be here in a while, if that's all right with the Court.

MR. LASTING:  Good afternoon, your Honor.  Richard Lasting and Sonia Chahin for Jurlius Kadamovas.

MR. BUEHLER:  Good afternoon, your Honor.  George Buehler for Mr. Krylov.  Mr. Evans is not here today, your

Honor, due to a medical emergency that first developed last week and is a point at which I will need to address the Court at some time.

THE COURT: All right. We have a series of motions and we'll take them up in the following order:

We'll start with Defendant Mikhel's Motion for Individual Sequestered Jury Voir Dire with regard to the penalty qualification of the jurors.

I have reviewed the paperwork, as well as the cases that were cited in the Moving Papers and the Opposition. With respect to the case, it is my view that individual voir dire should be implemented in this particular case. What I was going to do is -- and have done -- is send out the prescreening question that I indicated that I was going to do and gave copies to you of the letter that went out. The letter has gone out to approximately 11,000 plus potential jurors based upon the length of the trial.

When we get the responses back I hope to have 250 plus individuals that may be qualified to serve on the jury for the length of time. Those jurors will be brought into the courtroom on July the 11th, at which time I will read a copy of the Indictment to them. I will also give them the jury questionnaire that I circulated last time. I did not receive any objections from any of the attorneys, so presumably we will use that jury questionnaire.

6

The jurors will be asked to fill out the questionnaire and then they will go home.  I will bring them back the following week in small groups.  When they come back in the small groups, we will question them individually with regard to the death qualifying aspects of the trial dealing with the penalty phase questions, which are I think under *Witherspoon* and *Morgan* and the *Hovey* case, although my research has indicated that *Hovey* is no longer the practice of procedure that is utilized in the Superior Court of the State of California for the County Of Los Angeles, nor in any of the other counties with the exception of Alameda County.

So while *Hovey* has been cited by both the Prosecution and Defense and utilized by Judge Carter in the cases that he's tried, the present practice in the California state system is not to have individual questions of the jurors dealing with death qualifications.  However, I am from the old school and I think it's a good idea to get a fair, unbiased jury with regard to penalty.  So I will do the questioning with regard to -- I think there are four specific questions that should be asked of the jurors outside the presence of the other jurors.

I think that the sequestered voir dire has practical and effective benefits and it is for that reason that I would question them individually.  I think jurors may be forthright, more forthright, in revealing in their responses if done on an individual basis.

So what we would do is after the first week when we have all the jury responses to the questionnaire is bring them back in small groups, anywhere from 20 to 25 per day, depending on, you know, the time, how much time it takes. And then once we get the panel and I bring them all back and then collectively ask the questions of the jurors once we put them in the jury box.

It's my intention to have not only the 12 jurors but to have alternate jurors. And I think I'm going to have -- let me think; let me count the number of spots I have available...

**(Pause)**

I think I would probably have 13 alternate jurors.

Now, with regard to -- based upon these estimates -- and, you know, I really truly believe that your estimates are exaggerated in this trial.

I think we have to talk, also -- although it's not in any of the papers before the Court -- with regard to the peremptory strikes that will be allowed to each side. And by "side" I mean the Prosecution is one side, the Defense jointly is another side. And I would probably allow 36 peremptory challenges per side.

All right. So with regard to Defendant Mikhel's Motion for Individual Sequestered Voir Dire Penalty Qualification of Jurors, I would be prepared to grant that.

Now, who wants to be heard? All right, Mr. Dugdale.

8

MR. DUGDALE: Thank you, your Honor.

THE COURT: You're going to ask the Government Counsel to prepare an Order for my signature, which will memorialize all of the rulings today in court.

MR. DUGDALE: We will do so, your Honor. Thank you.

The Government did not object and, in fact, joined in -- sort of joined in the motion. So the Government has no problems with the Court's position on this. The only thing that we would ask is for some sort of estimation as to when we would bring the jurors back for general voir dire after this process. If we're talking 250 jurors, 25 a day, I guess we can estimate 10 court days as far as it getting done.

The reason why this is important is because general voir dire is going to go very fast compared to this individual questioning of the jurors on the death qualification issue. And we just want to make sure that we have our witnesses in place and have some sort of idea of a firm start date. Because we're bringing people from out of town.

THE COURT: I understand that and I think you can do the math based upon my guess here as to how long it's going to take. I think we can do 20 a day.

MR. DUGDALE: In Judge Carter's cases in the Mexican Mafia cases in which I participated in, in selecting the jury, it was 20 to 25 a day.

THE COURT: And I --

MR. DUGDALE: That was quite a bit of work, too.

THE COURT: Yeah. It works.

MR. DUGDALE: Okay, your Honor. Is the Court going to tell the jurors the particular day to come back or is there going to be -- or are we going to see how the process works and then --

THE COURT: We're going to give them a date certain and then works towards that date certain to bring them back and allow some leeway as to when we'll finished with the individualized voir dire.

MR. DUGDALE: That's fine, your Honor. I guess our question is before we reconvene, I guess, to figure out what that date certain is so then we can --

THE COURT: Well, let me --

MR. DUGDALE: -- make our arrangements.

THE COURT: Let me give you some help. We will not meet on Mondays and we will meet on Tuesday, Wednesday, Thursday and Fridays. So divide 25 into 250; that's ten days. And then --

MR. DUGDALE: Then we'll have a day. Okay. Thank you, your Honor.

MR. RUBIN: May I be heard briefly, your Honor?

THE COURT: All right.

MR. RUBIN: Good afternoon, your Honor. Dale Rubin. Just as procedure matters are concerned, I would make

a couple of points:

The first is, is that the jury's response to the questionnaire is one of the things that I think is the most important to all of the counsel that are going to be trying the case.  And the more complete, the longer they have to fill in the questionnaire, the better.  My experience has been when the jurors have questionnaires that are handed out and they're told to go complete them and then when they bring them back they can go home for the day, what we end up is getting a lot of people doing them very quickly to get out of court and to go home.

I would suggest that it's a good idea to let the jurors take the questionnaires home overnight and bring them back the next day.  Now, I know that that's --

THE COURT:  I don't like that at all.  I think that's a bad idea because of the fact that, you know, you don't know what happens when they go home; who they talk with, who's helping, who's coaching.  And I like to be able to supervise the jurors in filling out the questionnaire.

MR. RUBIN:  I have had it done in the past and the Judge merely says that, "You are to do it by yourself, you're not to get any help with it," and I assume they do everything that you tell them to do.

THE COURT:  I'm not so sure of that.

MR. RUBIN:  Okay.  The second thing that I would suggest is that when the jurors do complete the questionnaire

and turn it in to whoever they turn it in to, at that point there's a list of the days that we're going to be having and they be given a date for their individual sequester right there.

So what ends up happening is if we know what jurors are coming up on what dates we can put our questionnaires in the proper order and we're ready to go with the jurors that are coming in for that date.

THE COURT:  We're going to have to work out some of the logistics as we get close and closer to that July 11th date.  But I think that's a very good suggestion.  When we get down to some of the other issues that are before the Court today and the motions that are presented, I think we'll be able to solve some of these concerns that you have.

MR. RUBIN:  The last thing that I would bring to the Court --

THE COURT:  For example, if we decide to use an anonymous jury and the jurors are given numbers, then we can use the numbering system to have those jurors with numbers, let's say, 1 through 25 come on a specific day.

MR. RUBIN:  Right.

THE COURT:  And it's easy to keep track of.

MR. RUBIN:  Yes, sir.

THE COURT:  But let's just --

MR. RUBIN:  That's a good idea.

12

THE COURT:  Let these motions, you know, be decided --

MR. RUBIN:  All right.

THE COURT:  -- on a motion-by-motion basis.

MR. RUBIN:  The only other thing that I would bring up which I think was important, I was involved in the same trial in front of Judge Carter four years ago.  And one of the things that we did do was we decided that if there were any issues that were brought up from general voir dire, not specifically the death penalty, but that were of a sensitive nature and that we could then go into that during the sequestered voir dire instead of doing it again during general voir dire.  And what ended up happening is that they're -- basically, general voir dire went very quickly and there was very little examination that was done during general voir dire.  Because by the time we got there we had already made up our minds as to who it was we wanted and liked and didn't like.

And I would suggest that for the little bit of extra time it may take during the sequestered voir dire to go into those areas.  That's probably the best place to do that.

THE COURT:  In other words, when the jury questionnaires come back there may be some issues that you would like to question of a sensitive nature of that juror and you do not want to do it at the time of the general voir dire.

MR. RUBIN:  Right.  It would be better to go into

13

that during the sequestered phase.

THE COURT: All right. I think what we would do is we would see how, you know, we're fixed for time, you know. If we're going to bring 20 to 25 in a day and you divide the number into the hours that we're going to work, then we have to see, you know, how comprehensive this individualized examination is going to be.

Now, under the *Hovey* examination that is usually confined to four questions. If, in fact, the jury questionnaires result in information being gleaned from their examination that you wish to question, I think what you're going to have to do is to bring in that specific juror and notify me as to what area that you want the Court to inquire in or if you wish to specifically ask questions yourself.

I'm not in favor of having counsel here in the federal court ask questions of jurors because many times the questions that are asked really don't go to bias and prejudice; it goes to, you know, how the juror's going to vote. And so I'm reluctant to break away from the tradition that I've followed here in the federal court allowing only Court voir dire as opposed to jury voir dire. We're going to have to wait and see how that unfolds, as well.

MR. RUBIN: That was going to be my last area, which was the fact that part of the motion for sequestered voir dire included the fact of having actually attorney voir dire. The

reason is, is because the questionnaire in itself and the Court's questions in and of themselves do not necessarily -- it gives direction towards the feelings of the jury.  But it doesn't go into specifics.  And we have to be able to go into those areas and ask specific questions because --

THE COURT:  Such as?

MR. RUBIN:  Well, your Honor, as I put in my motion, it is very easy for a juror to say when the Court says "Can you weigh and consider evidence and mitigation and include that in your determination  process," and the juror says, "Yes, of course, I can."

And then when counsel asks, they find out that the juror thinks that if you had a bad childhood that shouldn't affect anything or that they don't believe that there's such a thing as a mental defect and they don't believe that there's in psychiatrists testimony or that sort of thing, we end up finding jurors who are life challenged when it comes to their ability.

THE COURT:  Again, here's what I would suggest that you do, is that you draft up a series of questions that you would like the Court to ask if you cannot be permitted to ask these questions so that I can cover these specific questions.

MR. RUBIN:  In that first -- in that line in the case in front of Judge Carter we were allowed attorney voir dire.

THE COURT:  I understand but, you know --

MR. RUBIN:  The second --

THE COURT:  Carter is spelled T-e-v-r-i-z-i-a-n.

(Laughter)

MR. RUBIN:  Yes.  I understand that.  But again, in most of the cases where you do get a sequestered voir dire you do get attorney examination.

The reason that I say that is -- let's look at it this way:  We're going to get 250 or more questionnaires, hopefully.  You're going to supply them to us on July 12th, I'm assuming the day after the questionnaires are turned in.  They have to be photocopied.  And then we're coming back, I believe, on the 18th.  So we have really five days.

THE COURT:  We may do it on the 18th or we may do it on the 25th.  It depends.

MR. RUBIN:  Oh.

THE COURT:  You know, again, you can't press me here a little bit because we're going too far ahead here.

MR. RUBIN:  Well, but I want the Court to understand what's involved.  That means that for counsel if you're talking about an eight-hour day, we're going to be during those five days reviewing 60 questionnaires a day.  To then turn around and -- that's like ten minutes a questionnaire, quite frankly.

You then want us to turn around and start submitting individualized questions for each juror.

THE COURT:  No, no, no, no, no.  What I'm suggesting

to you is this:  That you give me these individualized questions so that I can use them as a standard question that I ask of all of these jurors.

MR. RUBIN:  Perhaps what we can do in the meantime since I now understand the Court's position in this area, is give the Court an additional pleading regarding just the provision for attorney voir dire, even limited attorney voir dire, during this period and perhaps we can talk about it again.

THE COURT:  Well, I can limit it by questions and I can limit it by time.  So I do have, you know, safeguards available.

MR. RUBIN:  Right.  I assume it is limited by time, your Honor.  If we bring in 25 jurors a day and we start at 9:00 in the morning and we end at 4:00 in the afternoon, we're limited by time.

THE COURT:  No.  But I mean with regard to the individualized questions.  If I were to permit counsel to ask, I could limit it to number of questions and/or the time per attorney asking questions.

MR. RUBIN:  I could live with that determination.

THE COURT:  See, I don't want to get into a situation where, you know, the attorneys are asking the same question --

MR. RUBIN:  No.

THE COURT:  -- over and over again.

17

MR. RUBIN:  What my experience is, is that -- and again, I don't want to give the Court any hope -- but my experience is that in the morning of a specific day we will come in probably with a list of jurors that we think should be excluded just based on their questionnaires.  The Government's going to come in with a list of potential jurors that they believe should be excluded because of their questionnaire.  We sit down with them and we talk about it and a number of jurors are stipulated to just because of their questionnaire.

So I don't think that anyone is going to be in a position of abusing the ability to question a juror.  And it's just a matter of using what we know in order to bring out whether or not a juror can be fair.

THE COURT:  Look.  I've always been practical --

MR. RUBIN:  All right.

THE COURT:   -- in my approach.  And some of the questions you're asking me today, you know, we're going to have to go by trial and error to --

MR. RUBIN:  Yes.

THE COURT:  -- see how it works.

MR. RUBIN:  All right.  Thank you, your Honor.

THE COURT:  Before you sit down though, any problem with 36 peremptories per side?

MR. RUBIN:  Well, considering that ours are all joint, we would ask for more (laughs).  I'm sorry.

18

**THE COURT:** It's been deemed raised and denied.

**MR. RUBIN:** Thank you.

**THE COURT:** All right. The next motion is a motion brought by Defendant Mikhel for severance or, in the alternative, for sequential penalty hearings if found guilty of a capital offense.

This was an interesting motion because the procedure that was requested in Mr. Mikhel's reply was interesting. And as I understand it, let's assume that the guilt phase is tried and there are guilty verdicts that come in and we go to the penalty phase. My understanding is what you're suggesting is that the Government put on its case against all Defendants with regard to the penalty. Then each Defendant will go separately. Defendant One, let's call it, will then put on its mitigating factors. The Government then would be given rebuttal as against Defendant One only.

At the conclusion of the Government's rebuttal as against Defendant One, the Government would argue its case as against Defendant One. The Defendant would argue its case for the mitigating factors. The Government would then be given its rebuttal against Defendant One, and the jury would be instructed as to Defendant One and the jury would go out and deliberate the penalty phase with regard to Defendant One. The verdict would be obtained as against Defendant One.

Then the procedure would go against Defendant Two.

The Defendant Two would then put on its mitigating factors.
The Government would then offer rebuttal.  The Government would
then argue its case against Defendant Two, and Defense would
argue the mitigating factors.  And then the jury would be
instructed and the jury would return a verdict as against
Defendant Two.

The same would apply to Defendant Three.  And one
Defendant is not to be found death eligible, so we don't have
to worry about that one in the event of a guilty verdict.

I didn't see a problem with that, Mr. Dugdale.

**MR. DUGDALE:**  Ms. DeWitt will address this, your
Honor.

**THE COURT:**  Okay.  But before you argue, do I
understand what was being proposed as I articulated it?

**MR. CALLAHAN:**  You did.  You understood it properly,
yes.

**THE COURT:**  Ms. DeWitt?

**MS. DeWITT:**  Your Honor, I'm not going to reargue our
papers.  But to start with, I wanted to say for the record I
believe that there is no grounds for a severance of the penalty
phase to begin with.  The presumption is against such a thing.
In this particular case it's particularly not appropriate
because of the nature of the conspiracy and the overlapping
evidence.  But in terms of what you're specifically focusing
on, here's the problem with doing it that way:

20

The first problem is, is that if you have us put on our entire case and the Defense, Mr. Mikhel, puts on his case, I presume what you would do in that scenario if I understand what Mr. Callahan is proposing, is that the other two Defendants are no longer involved in the trial.

So what that means is, is that they have no opportunity, those Defendants, to cross examine any witnesses that are put on by their Codefendant; they're not allowed to have the benefit even of, you know, responding or hearing or listening to evidence sitting in court.  But they have no participation in that portion.  And that evidence may be appropriately relevant to their consideration and relevant to them in the sense that they would want to ask questions, whether they might want to do follow up or do cross examination.

The second issue that it doesn't address if you parse it out that way is the Government --

**THE COURT:**  Well, let me stop you.  They would be getting a daily and they could always recall that witness to testify.

**MS. DeWITT:**  They will not have the opportunity, however, to respond to that witness in terms of cross examination at the time.  And they will not have the same opportunity with respect to a rebuttal case that the Government would be putting on.

So, essentially, what's going to happen is, is if there's anything that's relevant in that period of time, the jury's going to hear it anyhow, so it doesn't solve the problem. In fact, it creates a problem that the jury is, in essence, not hearing all the information that it would need to have a complete picture as to all of the Defendants. It's getting it in piecemeal. And you're requiring, basically, duplication, because if there is something that's particularly relevant to them, what the Defendant is going to be sitting in court listening but not allowed to ask cross examination questions.

I mean dailies are not sufficient in terms of the Defendant himself having the opportunity to hear and listen to and be involved in the process and ask the questions. So, essentially, what you're going to create is a repetition of any type of evidence that might be relevant to the other Defendants. You're not going to solve any of the problems of prejudice and, quite frankly, if you -- and the repetition necessary of any kind of rebuttal evidence, which could be quite significant with respect to certain defenses that could be raised here.

And if you start from the very beginning, the basic premise that severance is not what is the presumption is the appropriate procedure to follow. The presumption is, is that doing it together is the right way to do it because it allows

the jury to have the full picture as to all of the Defendants.

And they have not submitted any evidence here that would suggest other than hypothetically there might be some evidence that comes in.  Any evidence here that would meet the requirements under the law for severance, which would be specifically a serious risk that a joint trial would compromise a specific trial right or prevent the jury from making --

THE COURT:  We're only talking now about the penalty phase, not the guilt phase.  I would deny this motion with regard to the guilt phase.  We're only talking about the penalty phase.

MS. DeWITT:  The same standard applies in the penalty phase, however.  I mean really what they're getting at is -- I mean the serious right that they arguably would say is at risk here is the ability of the jury to make a fair judgment and to make a fair and individualized sentencing determination.

And I would respectfully submit that just because there might be some piece of evidence that Mr. Krylov or Mr. Kadamovas might introduce that they don't like, that does not -- that's not tantamount to preventing the jury from making a reasonable and fair and individualized determination.

The presumption is, is that you tell the jury they have to consider the evidence individually and that they're able to follow that instruction.  What they're not entitled to under the law is, basically, you know, to ask the Court to cut

the deck and take all the aces out. That's not what they're entitled --

THE COURT: Wait. They're also arguing this, too. They're also arguing that they're going to have individualized deliberations on the penalty phase as to each Defendant. They're also arguing that what the Government is going to be doing is gaining an advantage because the Defendants are then going to be fighting it out to see which one is more culpable than the other. And so the Government can, you know, sit back and, basically, pick them up. That's what I think that the Defendants are arguing on the other side of the coin here.

MS. DeWITT: Two responses to that, your Honor:

First of all, the jury is responsible for making culpability decisions. And they are responsible for saying: Is this Defendant worse than somebody else, including his Codefendants? That's an appropriate thing for the jury to assess and make a decision about.

And with all due respect, I think it's better for the jury to make that decision with complete information. You don't get a better decision out of a jury by saying they're not smart enough to handle all the evidence, so we're going to keep some of it from them and have incomplete evidence in front of the jury.

It's our position that you give the jury complete information. You make sure that there isn't anything that's

specific prejudicial.  They haven't identified anything specifically that would be prejudicial here.  It's just sort of generic.  This wouldn't be a good thing because you'd have this, you know, finger pointing.

I would respectfully submit that that just is not enough.  And, frankly, the cases say that this is the preferred way to do it for exactly that reason, your Honor, so the jury can consider all the evidence and they can actually make those assessments based upon all the information and based upon Mr. Krylov having an opportunity to cross examine Mr. Mikhel's witnesses and Mr. Kadamovas having a right to cross examine our witnesses and not have to sit in the back and say:  Well, I'm going to recall this witness and try to redo this or try to recreate some issue that they would be able to do in the normal course.

So I would respectfully submit they have not met the burden; that, in fact, what they're suggesting would do the opposite of what they are attempting to accomplish, which is it would prevent the jury from making the most accurate, full, fair and complete determination of relative culpability and assess and make accurate individualized sentencing determinations.

THE COURT:  All right.  This motion was also joined in, as I understand it, by Mr. Krylov.

All right, Mr. Callahan?

25

**MR. CALLAHAN:** Just a few points, your Honor.

I think, if I heard Ms. DeWitt correctly, she misunderstands a little bit, with all due respect, of the process of the penalty phase. The Court interrupted her and indicated regarding her statement that Defense Counsel, one Defendant could not cross examine another Defendant's witnesses. And you said a witness could always be recalled. I think that's an appropriate point.

But it goes even further than that because, as the Court knows, in a penalty phase we are not dealing with guilt or innocence. We are talking about individualized mitigating factors, which would apply, let's say, to Mr. Mikhel first in which Mr. Krylov and/or Mr. Kadamovas, if indeed this situation ends up applying to them, would have any reason to cross examine.

So from a procedural standpoint, I think it's a red herring to a degree. And if the circumstance did arise where another Codefendant wanted to cross examine a witness that, for example, Mr. Mikhel if found guilty puts on in litigation, then they could recall him. So it would not extend the trial and it would not make it any more confusing.

The evidence that would be presented to the jury -- and I disagree with Ms. DeWitt strongly on this -- would be complete. And I think it would be more complete and more accurate if it's done collectively, which from my reading of

the law on it and a number of commentaries, indicates it turns into a potential circus.  The individualized penalty phase determination is the only fair way to have individualized determination.

**THE COURT:**  Yeah, but aren't you getting individualized consideration by the jury when you give them separate verdict forms and they fill out the verdict form as to each Defendant with regard to the penalty phase?

**MR. CALLAHAN:**  The primary reason -- although I think there are a number of reasons; simple fairness is one -- but the primary reason this motion was drafted was because of what we perceive -- and I think with good faith -- to be a pending crossing -- in other words, I think to use a vernacular, there's going to be some fragging going on during the penalty phase between Defendants, at least as it gets a little farther down the letterhead.

The only possible way of avoiding dual prosecutions, in other words, having one Codefendant and the Government pointing fingers at one Defendant collectively, is to do these things separately.  And as the Court has pointed out, it --

**THE COURT:**  What about the argument that has been made by Ms. DeWitt that there is nothing that has been articulated on a specific basis to show at the penalty phase that there are going to be inconsistencies?  That's one.

The other issue is this:  If I should deny this

motion today, can't you renew it again after the Court has heard the evidence in the case to determine whether or not separate penalty phases -- separate trials should be conducted at the penalty phase?

MR. CALLAHAN: In theory, I think that's possible. The reason these were presented --

THE COURT: One of the big disadvantages that I have is I don't know anything about this case other than what I've read in the Indictment. I'm not privy to any of the discovery in this case. I haven't been privy to all of the other information that was made available to Judge Manella other than what I have read in the pleadings and in her prior Orders.

So, you know, while this motion is very unique, I'm not so sure it should be ruled upon today.

MR. CALLAHAN: Respectfully, I don't believe -- and this may sound a little cavalier -- I don't believe the Court needs to have a detailed understanding of all the facts to understand the significance of a sequential penalty.

THE COURT: Yeah, but what I'm telling you is this: I think it's maybe premature and maybe I should defer ruling on this until the first phase of the trial has been completed. Because you're asking me, see, to go way out into the future to make a decision and you know, I don't know whether or not we'll ever get to that point. And if we do get to that point, maybe I would have to reconsider any ruling I made today.

So what I'm suggesting to you is, shouldn't this motion, the ruling on this motion, be deferred until after the first phase of the trial has been completed?

MR. CALLAHAN:  Well, if you're asking me if I would like it to be deferred, the answer is "no."  But I mean you clearly have that right.

The only point I would make, in addition, is I don't believe that Ms. DeWitt's point was accurate in terms of the practical reality of how these sequential penalty hearings are held.  I believe there's been an affidavit filed indicating that almost two-thirds of capital cases use some sort of sequential penalty presentation.

So I understand the Court's position, but I do think notwithstanding a detailed understanding of the case as it currently stands -- and I understand the Court was only recently on this matter -- but I do think it will be a matter if the Court doesn't wish to rule on it today will come up again very quickly, I'm sure.

THE COURT:  All right.  Mr. Lasting?

MR. LASTING:  Yes, your Honor.

Your Honor, we filed a joinder, also, requesting that the Court grant the sequential penalty trials.  And it seems to me that the overriding concern here is for individualized determination as to each Defendant, if in fact there comes to be that there's a penalty trial in this case.  And in my view

there is only two ways to accomplish that:

One is to have separate juries, which is a procedure which is frequently utilized in the State Court. I don't know that it's been utilized in the Federal Court with any great regularity. But I know that in some State Court capital cases there have even been three juries. So that would be one approach, and I'm sure that the Court does not look particularly favorably upon that solution.

But the other is to use the sequential penalty trials. And it seems to me that there are two overriding concerns here:

Number one is, as alluded to by Mr. Callahan, that in the penalty trial if it's a joint penalty trial with all Defendants participating, that we're going to have a situation where the lawyers for a Codefendant, in effect, become Co-Prosecutors during the penalty trial urging that their client deserves a lesser sentence than one or both of the other Defendants. And it seems to me that that dramatically undercuts the individualized determination. It also undercuts the ability to prepare for that type of thing.

And secondly, if there is a joint penalty trial, the mitigating evidence as to one Defendant, which does not exist for a Codefendant, in effect, becomes aggravating evidence. Because the jurors -- let's say, for example, that Mr. Mikhel, there's indications that Mr. Mikhel has attempted to take his

life at some point and that evidence is presented about the mental condition of Mr. Mikhel. I don't know if it is going to be or it's not going to be. But just assume that it is. And the jurors look upon that and they say, "Wait a second. Mr. Kadamovas doesn't have that type of evidence."

And so they begin to compare and contrast the evidence in mitigation for one Defendant, and the absence of similar mitigation evidence for another is seen by the jurors as an aggravating factor are a reason not to give that Defendant a sentence less than death. And the way to avoid this is the sequential penalty trials.

The issue that Ms. DeWitt raised about Mr. Kadamovas' lawyers not being able to cross examine the mitigation witnesses presented by, for example, Mr. Mikhel and Mr. Krylov, is something which I think is, I suppose in some theory it could come to pass; but I can't imagine myself ever asking any questions of a witness called in mitigation by one of the other Codefendants. I mean it's their time to present their evidence and to make their case for the jury as to what factors in mitigation should be considered by the jury in assessing their culpability and in reaching the appropriate penalty verdict. And I can't imagine that the defense counsel for another Defendant is going to interfere with that and jump into it.

So the issue of us not being able to cross examine those mitigation witnesses is, I think, a non issue. And it

31

seems to me that this is an issue that should be resolved at this point. I mean I can understand if the Court decides you're going to wait. But in terms of our continuing preparation, it's something that we would like to have the answer to.

Thank you, your Honor.

**THE COURT:** Ms. DeWitt?

**MS. DeWITT:** Just briefly, your Honor.

This argument is exactly what the problem is, is he suggests that mitigation may become aggravation and then he turns around and says we're not going to ask questions about your mitigating factors.

Well, the fact of the matter is, your Honor, is by the time they get to Mr. Krylov under their proposal, they're going to have heard all this evidence but they're not going to have heard it where they'd had the benefit of asking questions or having considered the full and complete evidence with respect to Mr. Mikhel. Or when they get to Mr. Krylov then they're not going to have had the benefit of having the cross examination or other, you know, interplay that is part and partial to our adversary system. That's exactly what the problem is.

And the other problem that you have here is exactly the point that your Honor raised, which is, that you're making this ruling, in essence, in a vacuum because you don't know and

I don't know, frankly, what their penalty phase evidence is going to be because they haven't given it to us and they haven't given us notice of those things even though we've ask for it and been told we should get it already.

But my recommendation, your Honor, because I think that they have not met the burden that is very clearly set out in Supreme Court opinions on this, and they have not met the presumption, is that the Court deny this motion with the understanding that they can renew it if they have and if they can come forward to the Court with some specific evidence.

And maybe they file it under seal and maybe they file it in camera.  But tell the Court at the point where it becomes relevant if there is, in fact, something that really creates this problem instead of talking in these hypotheticals and asking the Court to rule in a vacuum.

So I would respectfully ask that the Court deny the motion with the understanding that they can renew it if and when they can come up with some specific evidence and some specific reasons why there may be prejudice as a result of not doing some kind of sequential severance of the penalty phase.

THE COURT:  All right.  What I'm going to do in this motion is to defer ruling until the first phase is completed. I will state that the procedure that has been offered by the defense is most interesting.  So I'm going to defer ruling until the first phase is completed.

Now, this motion was Mikhel's motion but it was joined in by Defendant Krylov, and Mr. Lasting also indicated that Defendant Kadamovas has also joined in.

Is that correct, Mr. Lasting?

MR. LASTING: Yes, it is, your Honor. We filed a joinder and it specifically referred to...

THE COURT: With regard to the first motion that I heard today, Defendant Mikhel's Motion for Individual Sequestered Voir Dire Penalty Qualification of Jurors, was that also joined in by all Defendants?

MR. LASTING: It was joined in on behalf of Mr. Kadamovas.

MR. BUEHLER: It's also joined by Mr. Krylov, your Honor.

THE COURT: All right.

(Pause)

All right. The next motion is Defendant Mikhel's Motion to Preclude "Other Act" Evidence During the Guilt Phase of the Trial.

Now, was this also joined in by other Defendants? And, if so, which ones?

MR. LASTING: Your Honor, that motion is also joined in and a joinder filed by Mr. Kadamovas.

MR. BUEHLER: Your Honor, the motion is joined in with respect to only one aspect as explained in the pleading

filed.  And that aspect is now moot because of the Court's rulings about --

THE COURT:  Let me do this.  Let me assume that all motions are joined in unless there is a specific opt out.

MR. BUEHLER:  There is an opt out in this one except as we explained in our Papers.

THE COURT:  All right.  Is that agreeable with Defendant Mikhel?

MR. RUBIN:  Yes.

THE COURT:  Defendant Kadamovas?

MR. LASTING:  Yes it is, your Honor.

And so we won't need to actually file the written joinders any more?

THE COURT:  Correct.

MR. LASTING:  Thank you.

THE COURT:  Any motion that's been made will be deemed joined by the others.

Is that agreeable with Krylov?

MR. BUEHLER:  Yes, your Honor.

THE COURT:  And agreeable with Solovyeva?  Am I pronouncing that correctly?

MR. CRAIN:  Solovyeva.

THE COURT:  Solovyeva.

MR. CRAIN:  It is, although the bulk of these motions don't have anything to do with us.

THE COURT:  I understand us.  But just to protect the record, unless you specifically opt out I'm going to assume that you're joining in these motions.

MR. CRAIN:  Very well.

THE COURT:  All right.  With regard to the Motion to Preclude "Other Act" Evidence During the Guilt Phase of the Trial, the specific items were:

Weapons found in the residence, Item One;

Item Two:  Mobile kidnapping kit;

Item Three:  Discussions about committing future hostage takings;

Item Four:  Uncharged murder in Cyprus;

Item Five:  Uncharged murder in Turkey; and

Item Six:  Uncharged hostage taking of Armand Gee (phonetic).

Now, based on prior rulings, Items Four, Five and Six, the uncharged murders in Cyprus and Turkey and the uncharged hostage taking of Armand Gee, the Government has indicated that they're not going to offer any evidence with regard to Armand Gee; and the Court has ruled on the uncharged murders in Cyprus and Turkey.

So the only three remaining issues are Items One, Two and Three, which are the weapons found in the residence; the mobile kidnapping kit and the discussions about committing future hostage taking.

I am prepared to deny the motion with regard to Items One, Two and Three because of the fact that the items seeking to be suppressed or the facts that are being offered with regard to those items are all integral to the allegations contained in the operative indictment, which is the Second Superseding Indictment.  So I think that it would be error for me to keep that out of the evidence in this case.

Who wants to be heard?

**MR. CALLAHAN:**  Your Honor, we in our reply papers indicated that, in essence, we withdrew our opposition to the weapons, the specific weapons that the Government has mentioned that they intend to introduce.  We are withdrawing that objection.

The only two issues that remain, I just want to take a brief minute on because I do think they're critical.

The first one, the so-called mobile kidnapping kit which was found allegedly in a bonnet of a Ferrari in England, I just think from a standpoint -- I want to just as a forewarning of the Court -- if I read the statement correctly by the proposed witness, it is going to be based almost exclusively on speculation.

**THE COURT:**  Well, but that's what your cross examination is all about here.

**MR. CALLAHAN:**  But I think from an initial standpoint, from an Offer of Proof, before we pay airfare from

England here and back I think the Government should have to make a more sufficient showing that even as an Offer of Proof, here's what this gentleman will say.  Because as it stands, I think the Court would sustain almost every objection and would make this whole witness moot.

THE COURT:  Well, that could be true.  But until the evidence is before the Court in the form of the question, I can't do that.  Based upon the relevancy at this point, it is relevant.  Now, whether or not it comes in over various specific objections, that I can't tell you until that witness is on the stand and we get what it's all about.

But you also have this girlfriend's testimony, as well, where she, you know, corroborates certain of the information.  So I don't think you can, you know, you can have me grant this motion at this time.  You may be absolutely correct.  The evidence may never come in based upon specific objections that are made at the time the evidence is sought to be proffered.

MR. CALLAHAN:  The only -- just reply briefly.  The only -- as far as I recall, the only corroboration that the woman gives to this whole episode is the fact that there was a gun in the bag.  And we are not objecting to the weapons anyway.  So I think that corroboration does not overcome the prejudice of these other items that we're going to be in no position to cross examine.

The other issue, which I just want to make a follow-up point to the reply papers, is the proposed testimony of two of the cooperating Defendants regarding proposed future activities, to use that moniker.

The one point I want to make to the Court as to why I think this is a Rule 403, more prejudicial than probative analysis, is very simply this:

The cases cited by the Government talking about future conduct or future endeavors, usually are in the context of narcotics cases in which you are trying to demonstrate some other aspect of the case.  It has nothing to do with the fact that they're going to be committing crimes in the future.  It has to do with the fact that discussion of those factors helps prove either intent, notice, cooperation or participation in the conspiracy.  It's not to show future efforts, which is, in my opinion, in a capital case strictly something that should be argued at penalty.

And in the two witnesses they have here that are going to be coming up, both are going to be talking about specific events that if believed by the jury will be more than sufficient to connect the Defendants to this conspiracy, if the jury believes them.  So that any discussion about future conduct is, I think, redundant and also just more prejudicial.

THE COURT:  Well, the way this is charged in the Superseding Indictment, it appears that the Government is

39

alleging that these individuals were -- this is a business enterprise, continuing business enterprise, just as a narcotics business is a continuing business.

This is not just sort of a, you know, one specific crime. This was a series of crimes of a continuing nature. So I think it is relevant. Whether or not it comes in, you know, we have to wait and see the specific question, who the witness is and the form of the question.

MR. CALLAHAN: Just if I can finish the point. Because I appreciate the Court's comment on that because I think that may be the determining factor.

But if the jury believes these two individuals, that comment, that testimony, will add nothing to their testimony and will be highly prejudicial. If the jury doesn't believe these people, then what they say about future conduct will also be disregarded. It adds nothing to either one of these witnesses when they get up on the stand, and it could be very prejudicial and more unduly so, which is why I think Rule 403 applies here.

THE COURT: Who's going to argue this for the Government?

MR. DUGDALE: I will, your Honor. Thank you.

Your Honor, I think you hit the nail right in the head as far as how this evidence relates to the actual charges in the case. All of this, the discussions about their plans to

40

kidnap and take other people hostage, is inextricably intertwined with the charged offense here, which is basically charging the Defendants with a conspiracy whereby they made it their business to go out, to seek out wealthy people, to hold them hostage, to collect ransom money, to kill them and then to try and collect more ransom money.

What we're talking about in these comments are comments that were, in some cases, actually made during the time that the hostage --

THE COURT: In the corporate world if this is to be believed, it is their business model.

MR. DUGDALE: Correct. And that's, basically, what the Government will establish is that this is their business. This is the only way they made a living. Every piece of -- their mortgage was paid this way, their cars were paid for this way, every item that they had in their life was paid through the ransom money that they collected as a result of engaging in this so-called business.

And what will be illustrated through this testimony is that this business was an ongoing venture, and their arrests were really the only thing that stopped it from becoming an ongoing venture. And they were constantly scheming and plotting to kidnap other people. So it's extremely relevant to the conspiracy charge that's been charged here.

The defense counsels' attempt to have the Court

prejudge the reliability of these witnesses is unfair.  The Court hasn't heard the testimony of either one of these witnesses and it really is for the jury to determine their credibility.

THE COURT:  Well, but credibility is only one factor.  There is admissibility.  There is an admissibility factor.  We have to, you know, determine that before you can argue credibility.

MR. DUGDALE:  Absolutely, your Honor.  But as far as its relevance in admissibility, we're talking about how the case is charged as to conspiracy to engage in this sort of business that your Honor described.  This goes to the heart of it, the fact that they were in the midst of their hostage takings thinking about other victims who they could get and planning and scheming to do more.

THE COURT:  The relevant inquiry should be number one, is the evidence relevant?  And the next is, is it admissible?  Before we even get to credibility.

MR. DUGDALE:  Right.

THE COURT:  So there's still the admissibility hurdle that the Government has in this case.

MR. DUGDALE:  Yes.  And I'm sure when these specific questions come up and the Court has these questions in context with the other testimony that the Court will hear sometime down the road in the case, the Court will be able to make that

42

determination and we'll make a proffer.

THE COURT: All right. I'm going to deny the motion.

All right. The next motion is the Motion for Reconsideration of the Order Denying the Motion for the Continuance of the Trial Date, Or, In the Alternative, Motion to Stay the Trial Proceedings Pending Resolution of Appeal.

This motion seems to appear every time we have a hearing in this case. I think I've addressed this motion on two prior occasions. There have been now some recent filings since the initial motions were worked on by the Court.

I received a document that was filed on July 12th by Defendant Kadamovas entitled "Defendant Kadamovas' Request for Reconsideration of Motion for Continuance of the Trial Date and the Declaration."

And I received, also, on June the 9th the Government's Response to Defendant Krylov's Joinder to Defendant Mikhel's motion to continue the trial date or to stay trial pending resolution of the Defendant's pending interlocutory appeal.

You know, again, I have reviewed the paperwork. I'm not persuaded that the trial should be continued. This case is four years old.

Who wants to argue? And I've read the paperwork.

MR. CALLAHAN: I'm sure the Court feels that it's getting one of these motions every appearance. I understand

43

that.

THE COURT: And I need a Dramamine pill because I'm getting motion sickness.

(Laughter)

MR. CALLAHAN: The only reason we filed this was because when the original Motion to Continue was filed it was filed anticipating Judge Manella would hear it. So it wasn't -- we didn't spend a lot of detail going through the issue on the appeal that is really the focus of this.

But my dilemma is this, and the same applies to Mr. Rubin. It's almost just a law school trial strategy issue, and I don't want to go into too much detail, but so the Court understands.

We have, as I perceive it, a critical piece of evidence, which is in limbo. It has what I perceive to be both positive and negative connotations for the defense in this case, without a doubt. If this trial proceeds before the Circuit rules, I am in a position of either fronting a letter to the jury in opening statement so as to appear that I'm being open and magnanimous. If I take a gamble and don't mention the letter, then if it's admitted by the Circuit and it's agreed to --

THE COURT: The Circuit can't admit the letter.

MR. CALLAHAN: I'm sorry. If the Circuit agrees that it can be disclosed and admitted --

44

THE COURT:  It's the trial court that admits the evidence in the first instance.

MR. CALLAHAN:  Let me --

THE COURT:  I mean, you know, there may be a ruling that even if it's disclosed it won't be admitted.

MR. CALLAHAN:  Agreed.  We don't know.  That's my dilemma.  That's why my hands are tied.  But it would be -- they're going to rule whether it's a Fourth Amendment violation and whether it can be disclosed.  Those are the issues that are hanging around in San Francisco.

But if I don't front and then this letter comes in, it could appear to the jury I was hiding.  So contrary to what the Government puts in their papers, which is to really re-litigate the merits of whether this is going to win or not in San Francisco, that's really, in my opinion, not the point.

The point is, I need to know.  And I can't structure an opening statement, I can't even begin to structure some cross examinations until I have a firm word whether this document is going to be part of this case or not.

And I also, in conclusion, just want to add one brief point.  There was an intimation in the Government's papers that this is some last-minute effort to take an appeal or writ to the Circuit to delay the trial.  This original motion was filed, I think, 15 months ago.  The Court stayed -- Judge Nora Manella stayed the proceedings, not formally, but reserved

45

ruling until such time as a case out of Arizona was decided by the Circuit, which is *U.S. versus Austin*.

We waited, I think, four to five months. *Austin* was decided. *Austin* is cited in both of our papers on an issue. The Court expressly reserved ruling on the fundamental issue for which we were waiting to hear.

Then there was another two-month delay before the Order from Judge Manella after the arguments in October finally came down. The minute it did, we appealed. That was December of '05.

This has not been an effort to try to derail the train going down the tracks for July 11th, your Honor. This is a bona fide issue. We stipulated that it would be litigated first in this case because it was of such paramount concern.

So I just wanted the Court to be aware that this is not some effort to dispel the proceedings. This is critical to how I start this case and likely finish it.

THE COURT: Who's going to argue for the Government?

MR. DUGDALE: I will, your Honor.

THE COURT: See, I read Judge Manella's Order over. I don't think the appeal has any merit, to be very frank with you. This is not attorney-client, this is not a Fourth Amendment issue in the -- you know, just because somebody puts down "attorney-client matter" or "privileged matter" doesn't make it, because you could put that on every document, you

know, and there would be an argument in every case.

MR. CALLAHAN: Respectfully, your Honor, that issue is not going to be pursued on appeal. We're only pursuing joint defense and the Fourth Amendment.

MR. BUEHLER: Your Honor, I'd like to be heard on behalf of Mr. Krylov.

Should I go before the Government?

THE COURT: Yes. Let's get all the defense arguments first.

MR. BUEHLER: Your Honor, I think this issue presents a somewhat different problem for Mr. Krylov. I've never seen the 12-page letter. I consider a 12-page letter by the lead Defendant in the case as a potentially important piece of evidence. And I consider it particularly important since I've heard -- although I've never seen the letter -- I've heard that there may be portions of the letter that are exculpatory for Mr. Krylov.

So that raises a possibility that irrespective of whether it would come in against Mr. Mikhel, we may want it to come in for purposes of Mr. Krylov's defense. And that can depend on what the ruling in the Ninth Circuit is; that can happen in a number of different ways.

But if, for example, the Ninth Circuit decides in favor of Judge Manella's ruling --

THE COURT: Well, but the letter is after the fact

so, you know, there's a real issue as to whether or not you can even introduce it should the letter have been disclosed as an exculpatory statement by a Defendant.

MR. BUEHLER: But there may be, your Honor. But the problem is since we haven't seen the letter and we don't know what it says -- I don't know what it says; the Court may know what it says.

THE COURT: I don't know what it says.

MR. BUEHLER: But since we haven't seen it, then it's impossible for us to really even frame and argue the issues relating to its admissibility. And if it's a piece of evidence that would turn out to be admissible on behalf of Mr. Krylov, then that's something we would like to know before this trial starts.

For example, if it turns out that it's not admissible against Mr. Mikhel, that certainly raises the question of whether it's fair for Mr. Krylov to be tried in the same trial as Mr. Mikhel when in that trial a piece of evidence exculpatory for Mr. Krylov is being excluded.

And, of course, we also have the same problems of opening statement and beginning a trial when we have what, again, potentially could be a key piece of evidence. And we haven't even seen it. So we can't in any way frame our trial strategy, our opening statement, our motions about severance and so forth around that key piece of evidence.

And I think it is important for the Court to realize that unlike what the Court may perceive about other motions for continuance that have been made or the grounds that have been asserted, this is something that was raised long ago in front of Judge Manella and for other reasons, particularly the delay in the ruling because of another case in the Ninth Circuit.

THE COURT: I read her ruling and it's a well, you know, written, you know, legal analysis of what is involved here and --

MR. BUEHLER: But I'm not taking issue with that, your Honor. My point simply is that at this point I can't see the letter and we don't know really whether it's going to be admissible or not and I can't weigh what impact it has on my client's case and my client's defense and what we're going to do. And that, I think, puts us in a real bind.

THE COURT: Mr. Dugdale, are you going to argue?

MR. CRAIN: Your Honor? Excuse me.

THE COURT: Yeah. Mr. Crain?

MR. CRAIN: I'd like to clarify the record, because you deemed that we would be joining in anything that was not objected to. And our position with regard to any motion to continue by the Codefendants on any ground we object to and we're ready to proceed.

MR. LASTING: Excuse me, your Honor, could I --

THE COURT: Mr. Lasting? Go ahead.

**MR. LASTING:** Thank you.

(Pause)

Your Honor, the Court alluded to a request that I filed around noon today in the Clerk's office requesting that this Court reconsider its ruling on Ms. Chahin's Motion to Continue and in that request for reconsideration at Paragraph 12 I mentioned that one of the reasons that we request this continuance is because of the ongoing appellate litigation with regard to this letter that was seized from Mr. Mikhel.

I have seen the letter. It was delivered to me by mistake. I think what happened is after this letter was seized it was turned over to Ms. DeWitt, who I think immediately realized that this may be attorney/client materials and she turned it over to another member of the U.S. Attorney's Office and they put a firewall U.S. Attorney in place who handled the litigation with regard to this letter.

Because the letter was addressed to Urak (ph.s.), who was believed to be Mr. Kadamovas, it was initially believed that that letter had in fact been delivered to Mr. Kadamovas and was given to me, I think, my mistake. But nevertheless, as a result of that I've seen it. And there were discussions at the time that if this letter is going to be evidence that's going to be introduced in the case, that Mr. Kadamovas would file a request for a severance based on the letter. And that has been held in abeyance. I think it was agreed among all

counsel that until Judge Manella's ruling was final that that one remaining issue with regard to severance would be held in abeyance.

So there is still that issue pending and along with the other reasons I set forth in my request for the Court to reconsider we also join in this and ask that the case be continued until there is a final resolution so we all know what's going to happen with this letter.

Thank you.

**THE COURT:** Mr. Dugdale?

**MR. DUGDALE:** To briefly address Mr. Kadamovas' argument and Mr. Krylov's argument, it's difficult to imagine what could be in this letter that could be admissible on their behalf. Even if there is a statement in the letter that says, for instance, Mr. Mikhel admits responsibility for the crimes here but says Mr. Krylov and Mr. Kadamovas had nothing to do with it, it's still hearsay. It's not admissible, it can't be admitted by Krylov or Kadamovas. Even if you consider it a statement against penal interest, really the only statement against penal interest is the one Mikhel makes, as opposed to "My Codefendants didn't do it."

But even if you lob that over to "My Codefendants didn't do it," the Defendants would still have to show under Rule 804(b)(3) that the statement was not -- was corroborated by some other circumstances that clearly indicated the

51

trustworthiness of the statement.  And it's difficult to imagine anything more untrustworthy than a Codefendant and friends sitting in a cell at MDC writing a letter saying "My Codefendants had nothing to do with it."  I mean that's nothing, that's not corroborated by anything in this case, that's not admissible, and it doesn't fall under the exception for a statement against penal interest or any other exception. It's all hearsay as it relates to every other Defendant so it can't possible provide a basis for a severance in this case or be admitted to the benefit of either of the Codefendants.

As far as Mr. Mikhel's argument is concerned, the Court hit upon the major issue, which is the merit of the appeal, which is the primary factor perhaps that the Court should consider when deciding whether to grant a stay pending an appeal.  And right here we have a extremely detailed and well thought out opinion by Judge Manella which the Ninth Circuit's going to review.  And the two issues again are the validity of the joint defense privilege applying to an inmate-to-inmate communication where no lawyer is privy to what is going on.  And there's never been any Court that has held that such a communication is covered by joint defense privilege.  In fact, every Court that has considered the issue has held that it's not covered by a joint defense privilege.  So there is an extremely high hurdle that Mr. Callahan is going to face in front of the Ninth Circuit when this case is argued.

52

And the Fourth Amendment issue is the same.  Again, there was a very detailed ruling by Judge Manella explaining why the document was not suppressed because of a violation of the Fourth Amendment.  And that's not even a proper issue to raise in interlocutory appeal; it can only be raised upon a final decision by the Court.

So we have two issues that don't have any merit where there's going to be an uphill battle by Mr. Callahan when he hits the Ninth Circuit, because every case has gone against him on this issue, even though the Ninth Circuit hasn't ruled specifically on the first issue, the joint defense issue.

Second, of course, the Court has to consider the hardships to the parties by granting a stay, not only to the parties here but also to the Court.  I mean the Court has already started this process in motion by sending out the thousand plus juror letters here.

THE COURT:  Eleven thousand.

MR. DUGDALE:  Eleven thousand juror letters.  It's difficult at this point to put that train back in the station.  And when we're talking about hardships, Mr. Callahan has an advantage over the Government counsel in this case, because at least he's seen the letter.  We have voluntarily foregone seeing this letter, so I don't even what's in it.  But if I were in Mr. Callahan's position, given Judge Manella's ruling, given the uphill battle in the Ninth Circuit, I think the

53

assumption should be that someday the jury might hear that.  I think that's a safe assumption and the assumption he should take, given that there's already been a ruling on this issue. But it's really the Government that's being hurt by this, and also the Court and the whole process by halting it in its tracks at this point in time.

So with that, your Honor, I'll submit, unless the Court has any questions.

THE COURT:  I have no questions.  I'm going to deny this motion.

MR. LASTING:  Excuse me, your Honor.  Could I just respond just very briefly to something Mr. Dugdale --

THE COURT:  All right, Mr. Lasting.  For the record.

MR. LASTING:  I think the inference of Mr. Dugdale's remarks were that Mr. Kadamovas would want to use this letter, and that's incorrect.  And based upon the analysis presented by Mr. Dugdale, if he's correct that Mr. Callahan faces an uphill battle, that he's going to lose in the Ninth Circuit, that the letter is going to be admissible, then there is going to be a motion for severance on behalf of Mr. Kadamovas.  Not because the letter helps him, but because there are things in that letter which I would submit to the Court, and I think the Court may have the letter in its translated fashion, you can look at it and see that there would be a basis for a severance motion on behalf of Mr. Kadamovas.  We can't do that until the letter

54

is fully disclosed.

So we're the ones that are at a disadvantage here in terms of pursuing an appropriate remedy with regard to what may become admissible evidence in the case, which is at this present time simply in limbo.

THE COURT: All right, I still am going to deny the motion.

MR. BUEHLER: Your Honor, may I just -- I don't mean to reargue that, but I think it would be appropriate for the Court, since the letter I believe is under seal with the Court, for the Court to look at it and see if anything in there gives the Court some further insight --

THE COURT: I will look at it.

MR. BUEHLER: Thank you.

THE COURT: All right, the next motion is the Government's Motion in Limine to Preclude Evidence of Alleged Misconduct on the Part of the Victims in this Case.

Now, let me tell you what my tentative ruling is with regard to this motion and then you can argue and convince me if I'm in error. I'm prepared to grant, unless the Defendants can make an offer of proof that links any of the purported misconduct by the victim that would be relevant to the victim's abduction and murder. As of now this purported information I believe is totally irrelevant.

MR. CALLAHAN: Your Honor, I think it might simply be

55

a question of semantics. Whether you grant or deny it, the issue is that we understand our obligation to prior to introducing any of this very difficult evidence and if indeed that day comes we have to front it and we intend to do that with an offer of proof to the Court. But that day should not be today.

THE COURT: And that's why I'm saying what I said, the motion is granted unless it shows that it's relevant to the abduction and murder of the victim.

For example, let's assume that one of the victims is a big drug dealer, I'm just making this assumption for purposes of discussion, and the Defendants knew that this person, you know, had large sums of money due to drug dealing and they decided, you know, to kidnap this person and ransom this person off because of the fact that this person, you know, gained its assets or money by illegal means. That's irrelevant.

So -- I mean that's -- the nature of the victim is -- you know, you take your victim as you find the victim. I mean that's I think the rule of the road.

MR. CALLAHAN: I'm not sure we're disagreeing, so --

THE COURT: Okay.

MR. CALLAHAN: -- but we'll bring it up when the time comes with the appropriate offer.

THE COURT: Okay.

Mr. Dugdale?

MR. DUGDALE: Just very briefly, your Honor. I just want to make sure that the Court's ruling applies not only to the Defendants seeking to admit evidence perhaps in their case-in-chief but also to cross-examination questions. If there is a witness on the stand, for instance, who knows the victim that this ruling applies to preclude the Defendants from asking about these supposed aspects of the victim's background.

THE COURT: And I'm sure you're going to stand up there and object --

MR. DUGDALE: I will.

THE COURT: -- and I will sustain the objection.

MR. DUGDALE: Thank you, your Honor.

THE COURT: The next motion is the Government's Motion to Permit Victim Witnesses to Observe the Trial.

Now, I am prepared to grant the motion, however during the guilty or penalty phase of the trial any victim or relative of victim may observe the trial if that person is going to testify in the guilt phase -- well, let me back up here. During the guilt or penalty phase of the trial any victim or relative of victim may observe the trial. Now, if that person is going to testify in the guilt phase of the trial, that witness will be excluded until called as a witness. After testifying that witness may remain. During the penalty phase the same procedure will be followed.

Any problem with that?

57

MR. DUGDALE:  Respectfully, your Honor, I think that misses a little bit the point of the motion.  Under the Crimes Victim Act the victim's family should be permitted to sit through the trial --

THE COURT:  I have no problem with --

MR. DUGDALE:  -- before or after they testify.

THE COURT:  I have no -- well, not before they testify.

MR. DUGDALE:  Well that's what the point of the Act is, that they can attend the testimony -- they can attend the trial prior to their testimony unless the Defense shows by clear and convincing evidence that their testimony would be influenced by attending the trial.  That's the point of the Victims Crime Act.

THE COURT:  Yeah.  But here you have a situation where, you know, if the witnesses listen to each other's testimony there is an argument that it could be collusive.

MR. DUGDALE:  Well I'll submit that -- well first of all, the Defense didn't even object to this -- object to this motion.  They want procedures in place, but they did not object to the preclusion of these victim witnesses' family members. And our point in our papers was there can't be collusion in this case.  We produced discovery concerning all of these family members and what they will say and obviously the Defense knows what they're going to say at this point, and there is not

58

going to be variance from what they say from what was in the report at this point in time.

And, you know, for instance, let's take the most involved witness -- family victim witnesses in this case, the Umansky family.  What happened in this case, your Honor, was after Alexander Umansky was kidnapped, who was the son of Ruben Umansky and Elizabeth Umansky, and the brother of Michael Umansky, all three were contacted by the kidnappers -- were contacted by first Mr. Umansky when he was alive to demand the ransom payment for his release and subsequently the kidnappers and then an associate of the kidnappers.  Their testimony is locked in as to what it is.  There have been reports on this issue, there are tapes of the recorded ransom calls and the like, they don't who the Defendants are, they have never met the Defendants, they can't finger the Defendants, they just know that their son was missing and there was this ransom demanded from them.

And that is a common occurrence with all of these victim witnesses -- when I say "victim witnesses," I mean the family members of the victims in this case obviously.  They don't' know the Defendants.  They never met the Defendants before.  What they will testify is about the timeline of when their loved one disappears and if it occurred the ransom demands that came thereafter.  And also some other kind of laying the foundation type things.

For instance, members of the Safiev family will testify about the handwriting of Mr. Safiev, one of the victims in this case, because there was a handwritten ransom note made by him that was discovered at Mr. Mikhel's place, and they will be able to identify that ransom note as something that is in Mr. Safiev's handwriting.

There have been reports on all of this. Their testimony is not going to vary on these issues. And for that reason they shouldn't be excluded, especially since the Defendants haven't met their burden under the Act.

**THE COURT:** I'm not excluding them. What I'm saying is that, you know, it's better to call them after they've testified in the case.

**MR. DUGDALE:** I understand, your Honor, but the Act allows them not to be excluded at all, to be present throughout the entire trial unless the Defense can show by clear and convincing evidence that there would be some influence in their testimony by the fact that they're here.

For some of these victim family members, as the Court can probably understand --

**THE COURT:** Like, for example, if the Umansky family wants to be present in court during testimony involving another victim, I have no problem with that. But if the Umansky family is going to testify as to the Umansky victim, then the Umansky family should remain outside until they have testified. And

once they've testified, then they can remain.

MR. DUGDALE:  Well that's difficult to carve out in part also.  For instance -- getting back to my point.  I mean some of these victim family members have been really -- they've been waiting for this moment for four and a half years, your Honor.

THE COURT:  I understand.

MR. DUGDALE:  To sit there and to listen to the opening statement, to hear Mr. Altmanis, the coconspirator, testify about how their loved one dies, we don't share information with the family members about what happened in this case because we don't want to taint their testimony any sort of way.  They'll hear it for the first time in some instances when they hear it in this courtroom.  And it's, from my perspective, unfair to deny them the chance, the opportunity, to sit here and listen to this evidence in an open proceeding where an Act specifically provides that they have this access.

THE COURT:  Again, you know, I've been a judge 30-something years and many times in these cases it's so emotional that during the time that the victim family is in the courtroom, you know, we have incidents, we have people stand up, we have people yell, we have people moan, we have people, you know, shake their heads; I mean it becomes very, very difficult, you know, for a trial judge to watch the victims, as well as the Defendants, the interplay that goes on back and

61

forth.  So that's why what I'm saying to you is once they testify -- and I'm always worried about, you know, collusive testimony.  I think that's one safeguard that a judge should always, you know, be concerned about.  So that's why I say --

MR. DUGDALE:  Of course, your Honor.  But, again, this Act is two years old.  This Act was passed in 2004.  It's a new law.  It was applied in the Johnson Court in a death penalty case under very similar if not identical circumstances as this, where family members testified, but again their testimony was in reports that had already been produced to the Defense, it was pretty much set in stone, and this is a special circumstance in the Act.

THE COURT:  I'm going to stick with my ruling.  Now you've got something to go up on an interlocutory appeal on.

MR. DUGDALE:  That's exciting, your Honor.  Thank you.

(Laughter)

MR. RUBIN:  Good afternoon, your Honor.  Dale Rubin for Mr. Mikhel.

Your Honor, we agree with the Court as far as its tentative ruling.  I would like to bring something else up to the Court's attention that the Defense was concerned about, and we have approached the Prosecution about it as well.

We were fortunate enough to have a meeting a couple of weeks ago with Gerald Zurkin (ph.s.), who was one of the

Moussaoui Defense attorneys. And in that trial, because of literally the number of potential victims and their family who wanted to view the trial it was decided by the Judge in that case that a separate courtroom would be set up with a closed circuit TV for the public to watch the trial. And even though that occurred there were still a number of incidents in which members of the public and families of the victims came into contact with the jurors in the case and there were subsequent hearings about it.

THE COURT: Well --

MR. RUBIN: I know that I'm --

THE COURT: -- I'm not prepared to do that now. If in fact there are incidents, then I will have to consider alternative means, but I'm not going to consider the alternative means just because something happened in the Moussaoui trial.

MR. RUBIN: I would also point out that in the recent Aryan Brotherhood case in front of Judge Carter, he did the exact same thing. He set up a separate courtroom next to his courtroom with a closed circuit television. It ended up that after about three weeks of trial no one was coming to see the trial and they closed it down.

But it just seems to me that the concerns that the Court has regarding the victims' family and the jury right here and things that happen, they're interested in Mr. Altmanis'

testimony, they're interested in the coroner's testimony, they're interested in seeing pictures and seeing what happened; it's going to be brutal, it's going to be very gruesome. And there's no way to undo something that happens --

THE COURT: Right now I have not had any incidents. If I have an incident then we'll revisit this and I have alternative means to employ.

MR. RUBIN: I just want the Court to understand that if in fact there is an incident, that may end up ending the whole trial --

THE COURT: I'm sure the Government's going to be talking with me on that.

MR. RUBIN: One other thing I do want to -- I see Mr. Dugdale standing up because he can't wait to get a word in -- but one other thing I do want to bring to the Court's attention is the fact that pursuant to the Penalty Phase Discovery Motion which this Court granted and ordered compliance as of May 31st, we do not have anything written in stone regarding any testimony from victims as far as victim impact is concerned. What we have are we have one paragraph summaries prepared by the Government of what these individuals are going to say. And I can just assume that after hearing the Government's witnesses in this case, including Mr. Altmanis, and seeing the evidence in the guilt phase of the case, that it will definitely have some effect on the victim impact testimony

64

that we get in penalty.  And I think that the Court should consider whether or not either that testimony is so important that it has to be produced that the witnesses should be excluded from trial or, on the other hand, let them sit through the trial and exclude victim impact.

THE COURT:  No, the ruling that I made is that, you know, it's a two-phase trial, once they've testified in the guilt phase they can sit in for that aspect.  And then if they're going to be called in the penalty phase, the same procedure will be followed:  if they're going to be called to testify they sit outside until they testify, then they can come in.

MR. RUBIN:  I understand.  The problem is that the collusion that the Court is concerned about would have occurred in that situation for penalty phase during the guilt phase.

THE COURT:  No, I don't --

MR. RUBIN:  Fine.

THE COURT:  -- buy into that.

MR. RUBIN:  Thank you, your Honor.

THE COURT:  Mr. Dugdale, anything further?

MR. DUGDALE:  Thank you, your Honor.

Just one quick thing to add, and that's about the witness order.  The Court's ruling really drastically affects in some instances the ability of the family members to see the trial.  We've already kind of structured the order that we're

going to present this case in and some of these people will not testify until -- for a couple months down the road and we can't really jeopardize our case by switching the witness order. We've put a lot of thought into the way we're doing it.

If the Court would consider the remedy used by Judge Carter which was mentioned by Mr. Rubin, and that's to at least give them access through a closed circuit TV somewhere, that would -- there won't be any disruptions that way, they will be sitting apart from where the jury is, but they'll get to observe at least something that's relevant to the trial that again these folks are interested in seeing. And again, there's been nothing specifically that's shown witness "X's" testimony is going to be influenced by hearing witness "Y" or anything like that. It at least gives them an opportunity to see what happens during the course of the trial, which again, just from a compassionate point of view, I think they're entitled to.

THE COURT: I don't think you listened to what I was saying.

MR. DUGDALE: I understand what you're saying.

THE COURT: I said, for example, if the Umansky family is here on a certain day and we're talking about another victim, I have no problem with the Umansky family listening to that testimony coming in the courtroom. But if the Umansky family is here and you're talking about the Umansky victims, then the Umansky family should be excluded until they've

testified.

MR. DUGDALE: Okay. What about the case with Mr. Altmanis, for instance, who testifies regarding all the victims and how they died? I mean the Umansky family frankly is not going to be that concerned about what happened to the other victim family members in this case. They're concerned obviously, but what interests them the most is what the Court is telling them they can't listen to. And again, there's been nothing to show that their testimony would be influenced by hearing anything else. So that's the problem, your Honor.

THE COURT: Well it's going to be a problem that, you know, that I've got to work with and I think I've laid out the ground rules.

MR. DUGDALE: Thank you, your Honor.

THE COURT: All right, the next motion is the Government's Motion to Empanel an Anonymous Jury.

And I think that that is appropriate. I've read the documentation that has been furnished and I think that we can utilize numbers and those numbers would be how the juror is referred to. And then once the jury is put into the jury box, it would be Juror Number 1, Juror Number 2, Juror Number 3, all the way through 12, and then Alternate 1, Alternate 2, Alternate 3.

Anybody want to be heard?

MR. DUGDALE: The Government will submit, your Honor.

Thank you.

THE COURT: All right. The motion then is granted.

The next motion is the Government's Motion to Admit at Trial Three Videotaped Depositions Authorized Pursuant to Federal Rules of Civil Procedure Rule 15. This is where Judge Manella set the ground rules for these depositions.

I'm prepared to grant the Government's motion and set dates for the objections to be ruled upon. Today is the 12th of June and I think we could do this by the 26th of June.

Anybody want to be heard?

MS. DeWITT: No, your Honor. Just could you clarify exactly what procedure you want us to? What we anticipated is that we would have a deadline and they would have a deadline to make any objections to any portions, and then we would meet and confer and then file something with the Court. Is that how you --

THE COURT: That's exactly right. What you would do is you would meet and confer and then those areas in which there were still ongoing disputes, you would highlight those in a transcript given to the Court and I would have you all come into court and I would look at those, allow you to argue those objections, and rule upon them so those would -- they would be done in advance.

MS. DeWITT: Okay. And so if you want the hearing on the 26th, your Honor, when would you like us to submit that so

68

that you have time --

THE COURT: You're going to have to sit and talk with each other and get it all done.

MS. DeWITT: Sometime prior to the 26th?

THE COURT: I need it by the Friday before, so I can take it home that weekend and review it over that weekend.

MS. DeWITT: That's what I was asking, your Honor, is how much time you need. So we'll file it by the end of the day on Friday and --

THE COURT: Not the end of the day, it's got to be filed by 10:00 o'clock.

MS. DeWITT: 10:00 o'clock?

THE COURT: Yeah.

MS. DeWITT: That's fine, your Honor. 10:00 o'clock on --

THE COURT: And file it here. If you file it across the street it takes three days to get here, so --

(Laughter)

-- I need it in my chambers.

MS. DeWITT: Along those lines, your Honor, it's come to my attention that your courtesy box is someplace other than your chambers; it's someplace up on the first floor. And one of my filing people brought to my attention the fact that there apparently is a lot of things that are backing up there. I don't if that is because of the change in your clerk or if

69

there's some confusion.  I left a message with your clerk to that effect.

THE COURT:  Let me ask my clerk here.

(To Clerk):  Do you know anything about that?

THE CLERK:  I don't.

THE COURT:  My courtesy box is you bring it to my door.  You buzz; you come in and give it to my secretary.

MS. DeWITT:  I will make sure that it's brought directly to your clerk.

THE COURT:  Yeah.  I know Judge --

MS. DeWITT:  But I do believe that there's some belief by the filing people that there's a different courtesy box someplace else, and that's what the confusion is.

MR. CALLAHAN:  There is, your Honor.

THE COURT:  For me?

MR. RUBIN:  Yes.

THE COURT:  Where?

MR. RUBIN:  Downstairs, right outside the Clerk's office.

MR. SPEAKER:  There's a lot of stuff there.

MR. RUBIN:  And it's full of stuff.

(Laughter)

THE COURT:  See, this is the problem we've had.  There are Judges on this floor that will not accept courtesy copies.  And my procedure is I want those courtesy copies

EXCEPTIONAL REPORTING SERVICES, INC

70

delivered to me so they don't get lost.  Now I find out they've all been lost.

MS. DeWITT:  I totally agree with you, your Honor, and I will give -- when we file things I will give specific instructions that they be brought directly to your door and that somebody ring on the door, or if it's possible even, your Honor, if it's not something voluminous --

THE COURT:  And I'm going to instruct --

MS. DeWITT:  -- we can fax it to you as well.

THE COURT:  -- I'm going to instruct the clerk that I have here in the courtroom today, who's a temporary clerk because my regular clerk is out, is to make sure that all courtesy copies are delivered to the courtroom; pull that box from downstairs, put a sign up there that says that I accept courtesy copies in chambers.

Thank you for bringing that to my attention.

MS. DeWITT:  And one further thing, your Honor.  For the 26th is there a particular time that you wanted to set?  If you said that, I didn't catch it.  I'm sorry.

THE COURT:  It will be at 1:30.

MS. DeWITT:  Thank you, your Honor.

THE COURT:  All right, the next motion --

MR. RUBIN:  Your Honor?  I'm sorry.

THE COURT:  Oh, I'm sorry, I didn't see you, Mr. --

MR. RUBIN:  Yes.  Just briefly, if I can.

71

THE COURT:  -- Mr. Rubin.

MR. RUBIN:  We filed an opposition to the Government's motion regarding the admission of the depositions. And the -- if I can kind of summarize what the opposition was is that --

THE COURT:  Lack of confrontation --

MR. RUBIN:  Yes, sir.  And the fact that the attorneys were not properly prepared.  So we have a dual violation of the Sixth Amendment; we have lack of confrontation and inadequate assistance of counsel.

I would point out that the depositions for Agueev and Liapine occurred -- I think Mr. Callahan and I had been appointed on the case for about a month and a half.  Now, I do know that the Government had indicated that there were about 500 pages of discovery that were produced to the Defense the end of July just before the depositions of Mr. Agueev and Mr. Liapine were concerned regarding what the deposition -- or directed to the deposition.  Unfortunately what the Government didn't do is they didn't tell you that in addition on July 3rd, 2003, which is a year later, they provided additional materials regarding Agueev and Liapine.  In addition, I have the letter here.

THE COURT:  I know.  It's all in your --

MR. RUBIN:  Yes, it is.

THE COURT:  -- hidden papers I see.

**MR. RUBIN:**  In addition, your Honor, there had been a very little, if no discovery, regarding an individual named Ephonin (ph.s.).  And the Ephonin information, because he was working with Agueev and Liapine, was really necessary in order to properly cross-examine Mr. Agueev and Liapine.

Now, Agueev and Liapine had never been in this country until they were brought into the country by the FBI from Dubai.  They were here, and they were originally charged. But at the time of their depositions, they were being held as material witnesses.

Now, you know, the Government, in their reply, says that what were they supposed to do hold them forever.  And the answer is, "No."  But again, as the Court indicates, this has been four years that we have been receiving a steady issuance of discovery materials from the Prosecution on almost a monthly basis for four years.  How were the attorneys supposed to be prepared and ready to take a deposition by a month and a half after their being appointed when really nobody knew anything about the case at that point?

And when we get to the Tezhik depo, I think it's doubly a problem because from Mr. Tezhik there was no ability to face and confront.  And I'd like to talk about that for a minute, because the face and confront that is guaranteed by the Constitution is not "We have a TV screen here and a TV screen here.  And the defendant can see the examination, and the

witness can see the Defendants sitting there."

The Constitution views a face and confrontation issue as being an issue of procedural method to show credibility of a witness. And it's something that occurs before the jury. So what you have is you have the direct and cross-examination of the witness on the witness stand with the Defendants looking on and the jury looking on. And it's not a fact that you get a flavor of that out of a tape. You get nothing of that out of the tape. And the jury doesn't get a chance to see that occurring.

In addition on Mr. Tezhik, we have the same situation. Within months after the deposition, additional discovery materials are presented to the Defense regarding notes, agent's notes that were taken. It just seems to me that there is no way of getting around the problem of a violation of Defendant's constitutional right by letting these in. And I submit it.

**MR. LASTING:** Your Honor, could I (indiscernible)?

**THE COURT:** Mr. Lasting.

Before you argue, Mr. Lasting, let me ask the Government is the Government intending to have these witnesses brought in during the trial?

**MS. DeWITT:** The whole reason that we took these depositions, your Honor, the whole reason that we moved to admit these depositions is because we can't bring these

witnesses to trial.  If we could, we would love to have them testify at trial.  But we can't.

THE COURT:  Have you --

MS. DeWITT:  We have reached out to them.  We tried to contact them.  They have either -- in one instance, we're unable to locate the person anymore.  And the other two instances, they've refused to come to trial.

They're beyond the subpoena power.  We've established their unavailability through declarations.

THE COURT:  This was all before Judge Manella.  And she ruled on that, the procedure as well as the --

MS. DeWITT:  Absolutely.

THE COURT:  -- authority to conduct the depositions?

MS. DeWITT:  Absolutely, your Honor.

And before we filed the motion, we made an attempt again to confirm that they remain unavailable.  And that's why we made the motion, because we were able to confirm that they remain unavailable for trial.  And that's why we want and need to introduce their deposition testimony.

THE COURT:  What is Agueev going to testify to?

MS. DeWITT:  Mr. Agueev is -- Mr. Agueev and Mr. Liapine -- let me just handle them together, because they're interrelated -- were the individuals who essentially received the ransom money paid on behalf of Mr. Umansky.  They took that money and essentially laundered it on behalf of Mr. Mikhel and

his Co-Defendants.  And eventually, although initially it went into accounts that were controlled by Mr. Agueev, eventually that money filtered its way back into accounts that were controlled by the Defendants in this case.  So they're critical testimony about receipt of that money and the subsequent laundering of that money back to the Defendants in this case.

THE COURT:  And Mr. Tezhik?

MS. DeWITT:  Mr. Tezhik is going to testify about a number of things, including the conversations that he had in connection with the abduction and ransoming of Mr. Safiev and Mr. Kharabadze, the payment -- the initial payment of ransom money.  We have the subsequent attempts to compel him to pay further ransom payments.

He also did very important things like identify voice recordings that he made of conversations with the Defendants in this case.  He did voice identification.  There's a number of things that he testified about.

And the reason why the Defendants are fighting so fervently against having this introduced is because he is such an incredibly important and relevant witness.  And that's all detailed in our papers, your Honor.

MR. LASTING:  Yes, your Honor.  Thank you.

We've also joined in the motion filed on behalf of Mr. Mikhel with regard to the depositions and with regard to Agueev and Liapine.

Those individuals were arrested.  They were brought from, I think, the Arab Emirates into the United States, initially as Defendants.  They were then deemed material witnesses.  And that deposition was taken, I think, in early August of 2002.

At that time Ms. Chahin, of course, wasn't on the case.  I'd been on the case for, like Mr. Rubin said, about a month and a half.  And the inference that was presented was that those two individuals made their first appearance in the United States when they were brought here by the FBI after their arrest in the Arab Emirates.

Subsequent to that deposition with discovery that was produced after an FBI interview that took place in November of 2002, it turns out that there is evidence to suggest that at least one of those individuals had been in the United States and, in fact, had been at a location within probably a 1,000 yards of the Umansky hard wire business prior to his claiming that he was brought back to the United States for the first time.  And as Mr. Rubin said, the relationship of these individuals to Alexander Ephonin, who at the time of that deposition I was informed by -- this may not be a good source of information -- but by a reporter for the L.A. Times who attended one of the proceedings, that there was an international warrant outstanding for Mr. Ephonin.

Subsequently, the FBI and, I believe, the U.S.

77

Attorneys went to Russia. They interviewed Ephonin. And there's information in that interview which is extremely relevant with regard to the circumstances and the relationships of Agueev and Liapine and to the other people involved in this case. And the Defense is at a tremendous disadvantage if the Court allows that deposition testimony to be introduced in this trial because of a substantial body of material and evidence and discovery that was produced subsequent to the taking of the deposition.

It seems to me the Government makes a choice when they determine to treat these individuals as material witnesses rather than as Defendants. They take a deposition, at their insistence, within a month and a half after the lawyers are appointed on the case. Our familiarity with the case was minimal. We relied upon representations that we had the discovery. We didn't.

And I think when you look at it in the complete context, that the Court should rule out those depositions. With regard to the Tezhik deposition, I would submit it on the basis asserted by Mr. Rubin.

THE COURT: All right. I'm going to grant the Government's motion to admit the three videotaped depositions, specifically Agueev, Liapine, and Tezhik. And the date is the 26th of June at 1:30 where we'll discuss the objections. And you'll have submitted those objections to me by 10:00 a.m.

Friday, June 23rd.

Now, the next request or motion is the Government's motion regarding selecting a jury in a capital case. And I briefly touched upon that today. And I think what I'm going to do is we'll further discuss this on June the 26th at 1:30 as well.

The other matter that I want to bring up is the fact that the Government filed a proposed jury questionnaire on May 17th, 2006, but never set it for formal hearing. And when they filed that jury questionnaire, I had already worked on my own jury questionnaire, which I submitted to you, I believe, at our last hearing and requested that if you had any objections that you would furnish those objections to me. And I have not received any objections. I plan to use the questionnaire that I prepared.

Mr. Dugdale, you want to discuss this?

**MR. DUGDALE:** No, your Honor. That's fine. I believe I filed it before the Court appearance where we got this however.

But this is fine. This covers Morgan, Witt (ph.s.), and Witherspoon and the death penalty questions, which I think is the most important aspect.

**THE COURT:** Any Defendants want to say anything?

**MR. RUBIN:** Your Honor, my only request would be if we could put the issue over until the 26th of June. The reason

79

for that --

THE COURT:   I am.

MR. RUBIN:   Thank you.

THE COURT:   That was something that was left over.

MR. RUBIN:   Yes.

THE COURT:   And I wanted to talk about that questionnaire with reference to what I'm going to bring up on the 26th with regard to the motion regarding selecting the jury in a capital case.

MR. RUBIN:   Thank you.  The reason, just briefly, on the 30th we had a meeting in San Francisco and I --

THE COURT: 30th of --

MR. RUBIN:   Of May.

THE COURT:   May.

MR. RUBIN:   And I discussed with Mr. Evans getting together and working on the jury motion regarding jury procedures and the questionnaire.  Mr. Evans has been ill and has not been available.  So we have just not responded to that in any way.  And I don't know what Mr. Evans' status is at this point.  But we'll put something together and have either objections or not for that date, if that's permissible.

THE COURT:   Mr. Buehler?

MR. BUEHLER:   Yes, your Honor.  I do need to raise with the Court the question of Mr. Evans' status, my co-counsel.

80

Mr. Evans developed a serious medical problem last week. First, he thought he had a bad ear infection. And then he went to see the doctor last Tuesday and was told that he has a condition which has caused a complete loss of hearing in his left ear. And it's a condition that I understand at this point may or may not be correctable.

The difficulty is that not only can't he hear in his left ear, but the condition is causing nausea, vertigo. He can't -- it's hard for him to stay on his feet, a lot of dizziness. And he's, to put it bluntly, simply not in a position to be participating in the preparation of this case at this point.

He's at the doctor's again this afternoon. And so I anticipate that within the next few days, your Honor, we will submit to the Court declarations from the doctors.

But to be blunt, what I've heard at this point is that the doctor is telling him that he should not be doing anything of a strenuous nature for three to four months.

THE COURT: Well, I'm not going to continue the case. I guarantee you that.

MR. BUEHLER: Your Honor, I'm simply coming -- I'm the bearer of bad news. And I realize it's bad news. But I've got no control over it. But I also have no control over the fact that my client is entitled to have two lawyers represent him in this case. I am not -- I have never tried a death

penalty case myself.

THE COURT:  If Mr. Evans is totally incapacitated and cannot try the case, I will sever your client out and continue the case against the others and make sure that Mr. Evans no longer gets a major case like this again based upon the fact that he is ill.

MR. BUEHLER:  Well, I would disagree with the fairness of the latter statement, your Honor.

THE COURT:  Well, I --

MR. BUEHLER:  But I'm just delivering the facts, your Honor.

THE COURT:  I understand.

MR. BUEHLER:  And obviously, I'm concerned that my client get the representation he's entitled to.  And that is the situation now.

THE COURT:  If I have to replace Mr. Evans, he cannot physically handle another big case as far as I'm concerned. And I would make that recommendation to the Court.

MR. BUEHLER:  Well, the condition is not a permanent condition.

THE COURT:  Loss of hearing is not a permanent --

MR. BUEHLER:  Loss of hearing is one thing.  The effects of what he's dealing with now, I do not think will be permanent: Nausea, dizziness, vertigo.  Those are the things -- it's not -- if it was just the loss of hearing, I assume that

EXCEPTIONAL REPORTING SERVICES, INC

he could adjust to that. But it's the other aspects of it.

THE COURT: I'm sure he should go to Dr. House, and Dr. House will take care of him.

MR. BUEHLER: I don't know Dr. House, but I'll suggest that to him.

UNIDENTIFIED SPEAKER: It's on TV.

THE COURT: No. The House Ear Institute.

MR. BUEHLER: He is there. He's seeing Dr. Jose Fied (ph.s.) at the House Ear institute.

THE COURT: All right. Anything further?

MR. DUGDALE: No, your Honor. Thank you.

MR. RUBIN: No. Thank you.

MR. DUGDALE: Oh, I'm sorry, your Honor. There is one issue. And this relates to penalty phase discovery from the Defense.

We have asked for some sort of firm commitment as far as the presentation of mental health defense information in the penalty phase of the trial.

THE COURT: All right. We went through that, I believe, on prior occasions.

MR. DUGDALE: Correct.

THE COURT: And one of the problems that was raised was the fact that the experts that the Defense has consulted -- I think it was Mr. Mikhel's psychologist or psychiatrist -- couldn't get in. And I made sure that that was changed. And

he has, I believe, examined Mr. Mikhel on the 24th of May, if I'm not wrong. So that information should be presented to you momentarily.

Let's find out when it's going to be sent over.

MR. RUBIN: My understanding of the Court's order -- when the motion of the Prosecution dealt with the admission of mental health evidence in the guilt phase and the Court's order was is that if we intended to do it, we had to give that information to the Prosecution by May 31st. And we have not, because we are not done yet. But it did not mention anything about penalty.

And this trial is going to be going on for a period of time. And we are continuing to look into those areas --

THE COURT: And I understand. And maybe I got a little confused here too. It was the -- I'm more concerned right now with the guilt phase than I am with the penalty phase. The penalty phase --

MR. RUBIN: We have not met the Court's deadline.

THE COURT: Okay. Now, one other issue that I want to talk about the -- now, when you don't meet the court's deadline that means that you defaulted.

MR. DUGDALE: That's fine, your Honor. The separate issue is in the penalty phase. What Judge Manella had ordered originally was that the Defense produce to the Government, 100 days before trial, notice of their intent to introduce this

84

type of evidence, this mental health defense in the penalty phase. So the Government would then have time to get its own experts and to have a Defendant examined prior to the start of the trial.

Now, we're four weeks away from the trial. We don't have a firm commitment as to anything along this line.

THE COURT: We will have that for you on the -- prior to the 11th of July.

MR. DUGDALE: Thank you, your Honor.

But at that point in time, we'll need to examine the Defendant, or we'll have a right to examine the Defendant --

THE COURT: I understand that.

MR. DUGDALE: -- based upon that.

Obviously, it's not ideal to do it during the course of the trial.

THE COURT: You stood up here and told me this case is going to last anywhere from five to nine months.

MR. DUGDALE: We are working our way down, your Honor.

THE COURT: Okay. I'm sure that there'll be a weekend or so that the Defendant can be examined.

MR. DUGDALE: Thank you, your Honor.

MR. RUBIN: Your Honor, if I might respond. It may be just a semantics problem. But we're all used to talking about guilt and guilt issues dealing with presenting either

evidence that incriminates someone or raises a defense.  For purposes of penalty, mitigation evidence does not raise a defense.  Mitigation evidence is not considered a defense.

THE COURT:  I understand that.

But remember there has been a ruling in this case by Judge Manella, as Mr. Dugdale stated, that the diminished capacity, the mental evidence, would be turned over prior to the trial.  And that's all I'm saying is that you're going to turn it over prior to trial.

MR. RUBIN:  And again, I would remind the Court we are now in a slightly different situation, because Mr. Mikhel is present at MDC.  But for the past two and a half years, Mr. Mikhel has been in a situation where it has been -- because of where he's been located and the administration of the SAMS -- almost impossible for us to do what it is we want to do.

THE COURT:  That brings me to the next issue that we're going to talk about.

MR. RUBIN:  Should I stay here?

THE COURT:  Yeah, stay here.  Because you had lodged on or filed on June the 2nd a document called ex parte request for modification of special administrative measures.  And then on June the 9th, you filed an ex parte request for transportation of legal materials and personal property.

MR. RUBIN:  Yes, my understanding --

THE COURT:  In the latter filing you indicated that

his housing has been moved.

MR. RUBIN:  It has been moved.

THE COURT:  So that --

MR. RUBIN:  He's at MDC.

THE COURT:  So those issues that were raised on June 2nd, 2006 are no longer --

MR. RUBIN:  Except for the -- I don't remember what I raised.  If I asked about the investigator being allowed to go in unaccompanied, that is not changed.

THE COURT:  All right.  That's what I wanted to discuss today.  That's why I didn't sign anything or modify the order.

MR. RUBIN:  As far as the ex parte request that was recently signed, my understanding is that the materials have now been transported from West valley to MDC.  But they're not -- the materials, the legal materials have to go through some process before they're given to Mr. Mikhel.  So although they are present at MDC, he doesn't have them.

THE COURT:  Mr. Dugdale is going to arrange with the MDC to expedite that so that it can get to your client so that he has adequate time to prepare the case for trial.

MR. RUBIN:  Thank you.

MS. DeWITT:  Your Honor, just briefly.

The first I heard of this was when I got the ex parte application from Mr. Rubin.  It might expedite things if he'd

call me first, because I will do exactly what you said. And in fact, I did do exactly what you said as soon as I got the ex parte application from him. I called West Valley Detention Center. I called the legal department over at MDC. I called the U.S. Marshals. And I made arrangements for his property to get to him.

There's a difference between his personal property. It's been delivered to MDC. They have a right to go through that property and make sure there's nothing, you know, dangerous in it. And given Mr. Mikhel's prior history, that's extremely prudent here.

The discovery is a different issue. I understand, however, that Mr. Mikhel has or will get access to the computer at MDC. And all his discovery is now on disk, so I don't see that there's an issue there. It's been taken care of. We've done everything that we could. And we did so as soon as we found out about the problem.

I have to reiterate though, your Honor, Mr. Rubin keeps telling the Court and keeps saying on the record that we have impeded his right to get people in to see his client. And that simply is not true. It never has been true. And it continues to not be true. And I want that very clear on the record.

MR. RUBIN: Well, let's put very clear on the record the fact that for two years I have constantly complained to Ms.

Dewitt --

THE COURT:  This is getting interesting now.

MR. RUBIN:  Yes.  I have constantly complained about specific problems with the administration of the SAMS.  And every time I did, the response that I got back was, "No."  So now we have Ms. Dewitt --

THE COURT:  I can hear you Mr. Rubin.

MR. RUBIN:  We now have Ms. Dewitt standing up and saying, "Oh, just have Mr. Rubin call me.  And I'm happy to work with him."  And it hasn't happened for two and a half years.  And so now the record's clear.

As far as Mr. Mikhel's materials, I am working with Mr. Benshoon (ph.s.) trying to get a computer, a laptop computer into the institution --

THE COURT:  And he's the gentleman that you have to get the cooperation from --

MR. RUBIN:  Yes.

THE COURT:  -- and he's cooperating?

MR. RUBIN:  Yes, sir.

And the problem is that their procedures -- and I know.  I've spoken to him.  We had a meeting.  And the problem is their procedures that they use take a certain amount of time.

THE COURT:  Well, they'll put it on an expedited basis.

MR. RUBIN: I hope so.

THE COURT: You can tell the representative from the MDC that the judge has ordered it to be done on an expedited basis.

MR. RUBIN: All right. The only other thing -- and I have also brought this to the attention of Mr. Benshoon and to the warden as well. And that is the fact that we are very close to trial. We will be in trial in less than a month. There will be times during the trial where Mr. Callahan and I will not only be working during the day, but we will be returning to our offices after court and working at night. And we won't be able to get to Mr. Mikhel; because although he's going back to MDC, we don't have the time to go. And so we want to be able to send our investigator. The investigator --

THE COURT: And that's what I'm prepared to discuss with you today.

MR. RUBIN: Thank you.

THE COURT: Now, the investigator though -- you have requested that they be allowed to meet with your client, you know, face to face and not through screen or a glass.

MR. RUBIN: At MDC on 8 North, We are escorted from the lobby up to 8 North. There are three rooms that are, basically, what look like at one time were libraries. There's a large table in them with a number of chairs. And in each of them, one wall is one way class. And they all look from what

you'd call the security area into the room.  That's the only room available.

So the bottom line is that West Valley Detention Center was not giving us contact visits.  We are now getting contact visits at West Valley Detention.

THE COURT:  You're --

MR. RUBIN:  I'm sorry.  At MDC, too many letters.  Mr. --

THE COURT:  Define what you mean as a contact visit.

MR. RUBIN:  We all sit down at a table together locked in a room.

THE COURT:  And that's what you want to have done without the presence of the Attorney and just with the licensed investigator?

MR. RUBIN:  Yes, sir.

THE COURT:  It's the same licensed investigator?

MR. RUBIN:  It's -- yeah, he's here.  It's (indiscernible).

THE COURT:  You don't switch them off.  It's only one?

MR. RUBIN:  No.  We only have two investigators on the case.

THE COURT:  Let me ask Mr. Dugdale.

Any problem with that, Mr. Dugdale, once the trial starts, or actually between now and during the trial?

91

MR. DUGDALE: No, your Honor. That's fine.

THE COURT: Okay. All right.

How come you can't work these out together?

MR. RUBIN: Your Honor --

THE COURT: Everybody seems agreeable when you're in the courtroom.

MR. RUBIN: I know. It's your influence or my yelling, one or the other.

May I prepare such an order --

THE COURT: I can assure you it's not your yelling.

MR. RUBIN: Well, I'm normally, outside of court, so sweet.

Can I prepare an order to that effect, your Honor?

THE COURT: Certainly.

MR. RUBIN: Thank you very much, your Honor.

THE COURT: But have Mr. Dugdale approve its form and content before you send it.

MR. RUBIN: I will send it to them first. Thank you.

THE COURT: I see here --

MR. LASTING: Your Honor, can I raise one more (indiscernible)?

Your Honor, we continue to have problems with Mr. Kadamovas having sufficient access to the computer that has the discovery on it. And I believe that MDC is attempting to be as accommodating as they can. But the fact is that with three

rooms up there and Mr. Mikhel there, Mr. Krylov there,

Defendants in other cases there that are about to start trial;

that the reality of the situation is that Mr. Kadamovas is not

getting access to the computer.

And since we last raised this issue in Court and the

Court directed MDC to comply with the stipulation that had

previously been reached that had not been complied with, we

continue to have these problems.  So I'm asking again for the

Court --

THE COURT:  What do you want me to specifically do

though?

MR. LASTING:  I'd like for the Court to do one of two

things:  To order that Mr. Kadamovas be allowed to use the non-

contact interview room at MDC for 10 hours a day with a table

and a chair to work on this case or that arrangements be made

for him like have been made for the Defendants in the Arian

Brotherhood case to have the computer full time in their cell.

One or the other.  It's the only thing that's going to happen

that's going to allow him to use the computer.  He's written --

THE COURT:  When you say use the computer, is this a

computer that takes a disk and then transmits information

that's on the disk through the computer?

MR. LASTING:  It is, your Honor.  It's a Dell laptop

computer.  The discovery in this case has been put into a

format so that a Russian translation program can read it.  It's

a computer that, with the blessing of the MDC, I purchased and gave it to Mr. Kadamovas some time ago.

THE COURT: Do you have a problem with that --

MR. LASTING: But his access has been extremely limited.

THE COURT: -- Ms. Dewitt?

MS. DeWITT: Yes, your Honor.

I would remind your Honor that the last time that this issue was raised -- and I will quote you, because I think I can get it correct, although I'm always leery of quoting somebody verbatim -- is that you found this motion to border on bad faith because of the evidence we submitted to you that Mr. Kadamovas was not using the computer even anywhere close to --

THE COURT: No. I remember that.

MS. DeWITT: Now, the second thing is, your Honor, is that he's talking -- he's mixing apples and oranges here. And he's raising something without briefing it so that he's hoping, I think, to be able to get something by you. So let me just explain what I know about the situation with respect to the people that are down at Terminal Island --

THE COURT: No. Because if I'm uncertain as to making a ruling, I'm just going to defer it to the 26th and then have him put it in writing so I can see. That's why I asked the question --

MS. DeWITT: Let me --

THE COURT:  -- what specifically do you want.

MS. DeWITT:  What I would really like is to not have to re-litigate every single issue that's been re-litigated in this case six times.  But what I think the Court needs to know in order to make that decision that it doesn't need to re-litigate this yet again is that down at TI, the Marshals got special money to set up special cells --

THE COURT:  TI is what?

MS. DeWITT:  Terminal Island.

THE COURT:  Okay.

MS. DeWITT:  They got special money to set up special cells and to put electricity in there because of those Defendants --

THE COURT:  Time out.

MS. DeWITT:  -- alone.

THE COURT:  Is he housed at TI?

MS. DeWITT:  No, he's not.  And that's the problem.

THE COURT:  Okay.

MS. DeWITT:  That's a completely different situation:  Different set of a funding, different set of logistical problems, and procedures that had to be go through and approvals that had to be go through in order to accommodate that particular situation.

What we have here is at MDC -- and they're there because they want them to be there.  They want these Defendants

95

to be there and close and so they can come to court and there's less security issues etc.  We don't have cells that have electricity in them.  We have laptops that have to be plugged in, because then you have problems --

THE COURT:  Can't you have a battery?

MS. DeWITT:  Then you have issues with the battery and the battery breaks down or the battery doesn't have more than two or three hours of life.  And then they complain because somehow the discovery's been screwed up.  Then you have a dangerous object, which is a battery, in the person's cell who's already in a high-security unit.  You have the guards who are already responsible for dangerous people being responsible --

THE COURT:  Well, what's your suggestion?

MS. DeWITT:  -- for batteries and charging the batteries etcetera.

THE COURT:  What solution do you have?

MS. DeWITT:  First of all, they have two attorneys.  They've had four years.  And they're making an issue out of a something that is not an issue.

Second of all, they have a right to look at discovery in their cell.  Third, they've been given access to a computer so that they can look at that computer.  Now, yes, it's not 24 hours a day.  Yes, it's not in their cell.  Yes, it's not at the Taj Mahal or some hotel where they can have the luxury of

doing it however they want to do it. But they do have access to it. And they don't even use that access.

This is all a red herring, your Honor.

THE COURT: Yeah, I understand that's what we discussed previously; the fact that they gave me detailed information as to what his prior use of the computer was. And it was negligible, if any.

MR. LASTING: Your Honor, Mr. Kadamovas has written a letter to the Court. It's in Russian. I'm going to have it translated. I'll present it to the Court. But the reality of the situation is Mr. Kadamovas, every time I meet with him, raises the issue of his lack of access to the case materials. And yes, he can work on it in his cell, but he doesn't read English. So he needs the computer to translate the discovery.

There is a defendant at the MDC who has access to a computer constantly. If they want to do it, they can to it. They always find a reason. They've made promises to us that haven't been kept. It's not a red herring. It is a legitimate concern of Mr. Kadamovas. It's a legitimate concern of (indiscernible). He needs to work on the case.

THE COURT: I'll tell you what I'm going to do. Either by the end of this week or early next week, I will personally go over to the MDC, and I will meet with warden Benshoon and the Attorney then and see what the issues are and what accommodations can be made. And when we return on the

26th of June, I'll be in a better position; because I will have seen for myself what obstacles there are.

MR. LASTING:  I appreciate that, your Honor.  Thank you.

MS. DeWITT:  That's fine, your Honor.  Thank you.

THE COURT:  All right.  We will stand in recess. Thank you.

(This proceeding was adjourned at 3:48 p.m.)

98

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


_____                          June 15, 2006

Signed                                              Dated



*TONI HUDSON*

FEDERALLY-CERTIFIED TRANSCRIBER