ORIGINAL

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

FILED
CLERK, U.S. DISTRICT COURT

JUN 2 0 2006

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO:  CR 02-220(B)-DT |
| | ) | |
| Plaintiff, | ) | CRIMINAL |
| | ) | |
| vs. | ) | Los Angeles, California |
| | ) | |
| IOURI MIKHEL, | ) | |
| JURLIUS KADAMOVAS, | ) | Wednesday, May 31, 2006 |
| PETRO KRYLOV, | ) | (9:28 a.m. to 10:42 a.m.) |
| NATALYA SOLOVYEVA, | ) | |
| | ) | |
| Defendants. | ) | |

DEFENDANT MIKHEL'S MOTION TO MODIFY CONDITIONS OF CONFINEMENT

BEFORE THE HONORABLE DICKRAN TEVRIZIAN,
UNITED STATES DISTRICT COURT JUDGE

DOCKETED ON CM

JUL 3 2006

BY _____ 184

EXCEPTIONAL REPORTING SERVICES, INC
14493 SOUTH PADRE ISLAND DRIVE
SUITE A-400
CORPUS CHRISTI, TX 78418-5940
361 949-2988

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | CASE NO:  CR 02-220(B)-DT |
| Plaintiff, | ) | |
| | ) | CRIMINAL |
| vs. | ) | |
| | ) | Los Angeles, California |
| IOURI MIKHEL, | ) | |
| JURLIUS KADAMOVAS, | ) | Wednesday, May 31, 2006 |
| PETRO KRYLOV, | ) | (9:28 a.m. to 10:42 a.m.) |
| NATALYA SOLOVYEVA, | ) | |
| | ) | |
| Defendants. | ) | |

DEFENDANT MIKHEL'S MOTION TO MODIFY CONDITIONS OF CONFINEMENT

BEFORE THE HONORABLE DICKRAN TEVRIZIAN,
UNITED STATES DISTRICT COURT JUDGE

Appearances:     (See page 2)

Disclaimer:      (See Certification page)

Transcribed by:          Exceptional Reporting Services, Inc.
                         14493 S. Padre Island Drive
                         Suite A-400
                         Corpus Christi, TX 78418-5940
                         361 949-2988

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

2

<u>APPEARANCES FOR</u>:


Plaintiff:                       DEBRA W. YANG, ESQ
                                 United States Attorney
                                 JACKIE CHOOLJIAN, ESQ
                                 Assistant United States Attorney
                                 Chief, Criminal Division
                                 SUSAN DeWITT, ESQ
                                 KIM MEYER, ESQ
                                 ROBERT DUGDALE, ESQ
                                 Assistant United States Attorney
                                 312 North Spring Street
                                 Los Angeles, CA 90012


Iouri Mikhel:                    RICHARD M. CALLAHAN, JR, ESQ
                                 230 E. Colorado Blvd., Suite 1200
                                 Pasadena, CA 91101

                                 DALE MICHAEL RUBIN, ESQ
                                 2275 Huntington Dr., Suite 902
                                 San Marino, CA 91108


Jurlius Kadamovas:               SONIA E. CHAHIN, ESQ
                                 2222 Foothill Blvd., Suite E-278
                                 La Canada, CA 91011

                                 RICHARD P. LASTING, ESQ
                                 1717 Fourth Street, Third Floor
                                 Santa Monica, CA 90401


Petro Krylov:                    GEORGE W. BUEHLER, ESQ
                                 350 S. Grand Avenue, 39th Floor
                                 Los Angeles, CA 90071

                                 DAVID R. EVANS, ESQ
                                 600 S. Lake Avenue
                                 Pasadena, CA 91106


Russian Interpreters:            Zoya Spivakovsky
                                 Rimma Yuryeva


Court Recorder:                  Hilda Avila


Courtroom Deputy:                Debra L. O'Neill

3

**Los Angeles, California; Wednesday, May 31, 2006; 9:28 a.m.**

(Interpreter Used for Translation)

(Call to Order)

THE COURT:  Good morning.

THE CLERK:  Please be seated.

Criminal Docket Number 02-220B-DT; *United States of America versus Louri Mikhel, Jurlius Kadamovas, and Petro Krylov.*

Please state your appearances for the record.

MS. DeWITT:  Good morning, your Honor.

Susan Dewitt and Kim Meyer on behalf of the Government.

MS. MEYER:  Good morning, your Honor.

MS. CHAHIN:  Good morning, your Honor.

Sonia Chahin with Richard Lasting for Jurlius Kadamovas, who is present in custody.

MR. LASTING:  Good morning.

THE COURT:  Good morning.

MR. EVANS:  Good morning, your Honor.

David Evans and George Buehler on behalf of Petro Krylov.

MR. BUEHLER:  Good morning, your Honor.

MR. CALLAHAN:  Your Honor, good morning.

Richard Callahan and Dale Rubin on behalf of Mr. Mikhel, who is present in custody.

EXCEPTIONAL REPORTING SERVICES, INC

MR. RUBIN:  Good morning, your Honor.

THE COURT:  Good morning.

All right.  The one Defendant requested not to appear.  That was Ms. Solovyeva; I believe it is.

All right a couple of matters that I want to discuss. First with regard to trial preparation, the clothing to be worn, I received a memo from the United States Marshals Office and will provide you with a copy of the memo.  It reads as follows:

"In order to properly prepare all Defendants for the upcoming trial date of July 11th, counsel for the Defendants must provide to the Federal Bureau of Prisons Metropolitan Detention Center all trial clothing.  Clothing must be delivered prior to June 12th, the last hearing before trial, to allow Defendants to arrive as they would for trial and the time for the Court to work out any issues."

So the clothing has got to be delivered prior to June 12th.

MR. LASTING:  That's to MDC, your Honor?

THE COURT:  That's to the MDC, the Federal Bureau of Prison Metropolitan detention Center.  Now --

MR. RUBIN:  Your Honor I'm sorry.  Is that clothes for Mikhel as well?

THE COURT:  Everybody.

MR. RUBIN:  He's not housed at MDC.

5

THE COURT: Well, deliver it to MDC.

MR. RUBIN: Okay.

THE COURT: Everything is to be -- that's going to be the clearing house.

MR. RUBIN: Thank you.

THE COURT: Now, I'm going to be on vacation June 26th through July fourth. So if there's any ex parte issues or motions, don't schedule anything during that period of time.

Now, with regard to restraints, I received a memo from the Marshal it reads as follows:

"The following is a brief description of the Defendants' appearance for the upcoming trial scheduled for July 11th. All Defendants will be dressed and ready for trial upon entering the courtroom. Defendants will be brought into court handcuffed behind the back and with leg restraints on. Defendants will then be seated one at a time in the wooden chairs provided by the Court. A lap restraint will be placed over the defendants' legs and then the handcuffs will be removed to allow Defendants movement of upper body. Any restraints worn during court proceedings will be covered in a thick plastic to prevent any metallic noise."

That's the way it's going to be, except if a Defendant is to testify in the trial. Then he will be completely unshackled and be placed in the witness chair prior to the jury coming into the room. All of the Defendants will

6

be brought into the courtroom outside the presence of the jury.

MR. RUBIN:  Your Honor, may I make comment about that?

THE COURT:  Yes.

MR. RUBIN:  Can I do it from here?

THE COURT:  Yes.  I have no problem.  The only thing is, you know, I don't have a court reporter.  I have a recording device.  When you talk from there, you're not going to be recorded as well as you would be at one of the lecterns.  Also that second microphone actually --

No.  The one I'm pointing to.

No, the other one.  Yes.

-- should be placed on the back table.  And that way you could be seated at counsel table and pick everything up.

MR. RUBIN:  They take everything from me, your Honor.  Thank you your Honor.  Dale Rubin on behalf on Mr. Mikhel.

We had an incident that occurred this morning.  Apparently for the first time since the beginning of case, Mr. Mikhel has been transported from the West Valley Detention Center in San Bernardino by the San Bernardino Sheriffs with his hands handcuffed behind him and using the black box handcuffs.  Every other time he has been brought to Court, it has been with his hands in front with the waist chains.

The reason that this is -- and I understand according to the U.S. Marshal that San Bernardino's policy -- sometimes

7

they do it one way.  Sometimes they do it another.  I can understand that there's a difference between transporting an inmate from the West Valley Detention Center to the San Bernardino Courthouse for a State Court appearance than it is from the West Valley Detention Center for the 45-minute to one-hour drive to downtown Los Angeles.

Mr. Mikhel has been in those handcuffs from the time that he's gotten out of his cell in the morning to come here, which is now four hours.  The cuffs are very tight.  And it is an uncomfortable situation to say the least.

THE COURT:  I agree.  That's a reasonable request.

What I'll do is if he's going to be transported for any period of time, in excess of 15 minutes, it will have to be in front of him rather than behind him.

MR. RUBIN:  Thank you very much, your Honor.

THE COURT:  That's a reasonable request.

MR. RUBIN:  Thank you.

MS. CHAHIN:  Your Honor, at some point I'd like to bring up with the Court the status of my trial before Judge Anderson.

THE COURT:  I've talked to Judge Anderson.

MS. CHAHIN:  Very well, your Honor.

THE COURT:  And he's going to continue that trial.

MS. CHAHIN:  Your Honor, he did continue it to June 20th.

THE COURT: Yes.

MS. CHAHIN: And we have a trial estimate by the Government of one month and by the Defense of one week. I just wanted warn the Court.

THE COURT: Well, I've got, you know, priority over that case. This is an older case. I'm a senior judge. We'll finish.

MS. CHAHIN: Your Honor, I'm sorry. That trial's going to commence before this trial.

THE COURT: I understand. He'll finish that trial. He told me he was going to finish it.

MS. CHAHIN: Very well.

THE COURT: Otherwise, I'll return this case to the wheel. Because I'm trying to help the Court out by taking the case.

All right. Now, we have a motion which is Defendant Mikhel's motion to modify his conditions of confinement. And he offers the following facts as I've been able to ascertain.

In August 2003, pursuant to 28 CFR Section 501.3, the Government instituted special administrative measures, which were the SAMS regarding the pretrial confinement of Mr. Mikhel. The Government required Defense Counsel to execute an acceptance of the SAMS acknowledging its contents and agreeing to abide by its restrictions.

However, before signing the acceptance counsel

objected to having to sign onto the SAMS. The Government then threatened to restrict counsel's access to Mikhel if they refuse to execute the SAMS conditions. All defense expert witnesses must execute the same acknowledgement agreeing to abide by the SAM conditions -- those are the special administrative measures -- and must be pre-cleared by the case prosecutors before being given access to him.

The special administrative measures provide that Mr. Mikhel's pre-cleared paralegal may meet with Mr. Mikhel without the presence of Defense Counsel. However, an appointed licensed investigator may not meet with Mr. Mikhel unless accompanied by a pre-cleared lawyer or paralegal. The special administrative measures preclude Mr. Mikhel from taking part in any joint defense meetings with Co-Defendants and their lawyers.

The restrictions also direct prison officials to frequently search his cell and take the appropriate disciplinary action for any infractions. Mr. Mikhel, according to the Defendants -- the Defense Counsel, is not allowed any visitors except for his Defense Team. He is allowed no contact with any other inmate or person except jail personnel.

He's being housed in a special housing unit, which is referred to as the shoe at the West Valley Detention Center in San Bernardino County. The area contains approximately four separate cells, a day room with television, and shower

facilities.  Mr. Mikhel, according to Defense Counsel, is the only inmate currently been being housed in the unit.  The special housing unit is under constant surveillance by at least two deputy sheriffs.  The unit is segregated from the remainder of the jail population.  And Mr. Mikhel has no contact with any person other than the deputy sheriffs, his attorneys, investigators, and mitigation specialist.

Defense counsel argues that although Mr. Mikhel has no opportunity to meet with other inmates, he is maintained under lock down 23 hours per day.  Mr. Mikhel has permitted only one hour per day in the day room.  This is the only time he is allowed to review his discovery materials, which are kept in an adjoining cell.  He is not permitted to keep the discovery material in his cell.

The time allotted has proven insufficient, according to Defense Counsel, for Mr. Mikhel to review the discovery and therefore has prevented Mr. Mikhel from assisting his counsel in the preparation for trial and presentation of a defense.

Pursuant to the SAM recommendations, the special administrative measures, of frequent cell searches, Defense Counsel argues that Mr. Mikhel is subjected to a strip search two times per day.  It's alleged that his cell is subjected to shake down during the search.  The shake down searches include his cell and the discovery kept in the adjoining cell.

These searches are conducted at each shift change,

11

morning and night.  The searches are conducted even if Mr. Mikhel had not left the Unit during the day or had access to his discovery materials.  Because the evening shift change occurs at night, Mr. Mikhel is allegedly wakened if he is sleeping so that the Bureau of Prison personnel can conduct the search.  The result of the search of the discovery materials is that pages are out of order and materials are allegedly missing.

Mr. Mikhel, according to Defense Counsel, is permitted to have a radio pursuant to the special administrative measures.  After months of negotiations with a lieutenant Trotter, it's alleged that Mr. Mikhel was provided with a tape player/radio so that he could listen to discovery audio tapes.

However, after a telephone call from a Government Attorney, Lieutenant Trotter allegedly removed the radio.  Mr. Mikhel has been unable to listen to the audio tape discovery at times.

Defense counsel has allegedly been informed that Mr. Mikhel has written numerous letters to counsel since June 2005. However, counsel has not allegedly received one of these letters.  Counsel has also written Mr. Mikhel on several occasions where Mr. Mikhel has not received his legal mail.

At the suggestion of a lieutenant Trotter, counsel mailed a letter -- that's Defense Counsel mailed a letter to

12

Mikhel from his office on November 19th, 2005. This exercise was allegedly used to determine how long it took for attorney mail to be delivered. Defense counsel argues that as of the date of the motion, January 25th, 2006, the letter still had not been received by Mr. Mikhel.

Defense Counsel argues that the restrictions on Mr. Mikhel, including this solitary confinement; his inability to communicate with counsel, except face to face; and the problems of receiving legal mail were the subject of the letter sent to Lieutenant Trotter on December 10th, 2005. There has also been negotiation to replace the hard copy discovery materials with CDs so that the discovery materials can be read by a computer. This would allow Mr. Mikhel to have access to the materials and would avoid the necessity of constant shake down searches of the hard copies.

In order to be taken to meetings with his Defense Team, the jail facility must be locked down because Mr. Mikhel can have no contact with other inmates. Once that is accomplished, Mr. Mikhel is allegedly placed on a wheel chair and his eyes are covered with a blindfold. Defense counsel argues that although the special administrative measures permit contact visits with counsel, the West valley Detention Center refuses to allow them. Permitting contact visits would mean that counsel could meet with Mr. Mikhel in the special housing unit day room and would mean that he would not have to be

moved.

Upon direction from the United States Attorney General, the defense argues that the Bureau of Prisons may authorize SAMS, special administrative measures, reasonably necessary to protect persons against the risk of death or serious bodily injury. These procedures may be implemented upon written notification that there is a substantial risk that a person's communications or contacts with persons could result in death or serious bodily injury to persons or substantial damage to property. That would entail the risk of death or serious bodily injury to persons as set forth in 28 CFR 501.3(a).

These special administrative measures ordinarily may include housing an inmate, administrative detention, and/or limiting certain privileges, including but not limited to correspondence, visitors, interviews with representatives of the news media, and the use of the telephone as is reasonably necessary to protect persons against the risk of acts of violence or terrorism.

The effected inmate must be notified in writing as promptly as possible of the restrictions imposed and the basis for the restrictions. The inmate must sign for and receive a copy of the notification. That's -- the notice requirement is 28 CFR 501.2(b).

Here Defense Counsel argues that no such notice has

14

been provided to either Mr. Mikhel or his Defense Counsel.

Initially, the restrictions may be imposed for up to 120 days or for a period of one year, if approved by the Attorney General. The restrictions may be extended in further increments of not longer than one year upon receipt of written notification from the Attorney General or at his direction if there continues to be substantial risk that the inmate's communications or contacts with other persons could result in death or serious bodily injury. That's set forth in 28 CFR 501.3(c).

All right. Now, the Government has offered the following facts in opposition to the motion. And these facts and contentions are drawn from the Government's amended opposition filed on February 13th, 2006.

The Government argues that Mikhel's conditions of confinement are governed by the Code of Federal Regulations. And that the special administrative measures placed on him in June of 2003 and August of 2003 are permitted. 28 CFR 501.3 permits the Attorney General to authorize the implementation of special administrative measures that are reasonably necessary to protect persons against the risk of death or serious bodily injury upon notification that prisoner's communications or contacts with persons could result in death or serious bodily injury.

While awaiting trial at the Metropolitan Detention

Center, the Government argues that Mr. Mikhel, among others, arranged for Sabrina, Tom, and Michael Tinen (phonetic), and others, including a number of MDC inmates to assist him in an elaborate escape attempt. All three of the Tinens pled guilty to a conspiracy to assist in an escape attempt. During an investigation of the escape plot, investigators discovered a variety of escape paraphernalia in Mr. Mikhel's cell, including bolt cutters and cell phones.

In April of 2002 prior to the escape attempt, Mr. Mikhel asked his girlfriend Olga A-l-m-a-n-s-k-a-y-a by way of two letters to obtain five identical Russian English dictionaries. He allegedly intended to use the dictionaries for covert communications between himself, his girlfriend, Ms. A-l-m-a-n-s-k-a-y-a, Mr. Kadamovas, Mr. Krylov, and Maria K-a-r-o-g-o-d-i-n-a.

In one letter Mr. Mikhel stated that the dictionaries were important to establish communications with others to attempt to get out of the MDC. The Government has also learned that a G-i-t-t-e Lellan, L-e-l-l-a-n, a paralegal, conspired with Mr. Mikhel to launder money. Specifically, Lellan was charged with using her position as a paralegal to gain access to Mikhel while he was in custody and assist him in laundering ransom proceeds. Ms. Lellan has subsequently pled guilty to those charges.

Now besides the crimes alleged in the second

superseding indictment, the operative complaint or the operative pleading, the Government has also given notice of four additional criminal acts committed by Mr. Mikhel.  Among them Mr. Mikhel is charged with participating in a second attempt to escape custody, this time while incarcerated at the San Bernardino County Jail.  This second escape attempt occurred in January of 2004 well after the original special administrative measures directive was issued in June and August of 2003.

The deputies at the jail, the San Bernardino Jail, discovered a letter that Mr. Mikhel had attempted to smuggle out of the prison with the assistance of a fellow inmate.  The letter was hidden in a Russian newspaper in a trash can.  The letter contained a detailed escape plan and a homemade map of the reception yard of the jail.  It was allegedly written to solicit help from others outside the jail --

(Off the record discussion)

THE COURT:  All right.  One of the interpreters' mike is too loud.  It's interfering.  So maybe we should use the interpreter's mike that is not causing the problem.

Which one is causing the problem?

THE INTERPRETER:  There's only one mike, your Honor.

THE COURT:  Only one mike?

THE INTERPRETER:  Only one mike.

(Off the record discussion)

17

THE COURT:  Right.  They're having trouble with your use of the microphone, but not the other interpreter's use of the microphone.

THE INTERPRETER:  It's only one interpreter at a time, your Honor.

THE COURT:  I understand that.  But whenever you're using the microphone, there's no problem.

What do you have in your hand there?

THE INTERPRETER:  That's to hear you, your Honor.

THE COURT:  No, the other hand.

THE INTERPRETER:  My glasses.

THE COURT:  No, the right hand.

THE INTERPRETER:  The mike.

THE COURT:  That's the microphone you're using?

THE INTERPRETER:  This is the only one microphone we have.

THE COURT:  All right.  What I'm going to do then is get two court reporters for this trial.  I can't use a recording device because this -- I've never seen what's happening here happen in the 20 years that I've been on the bench.  Let's just proceed the best we can now.

(Pause)

THE COURT:  All right. I think I was at the point where I said the letter contained a detailed escape plan and a homemade map of the recreation yard of the jail.  It was

18

written to solicit help from others outside the jail.  The letter allegedly pledged substantial payment; contained detailed information concerning the guards who worked at the facility, including the times of their shifts and Mr. Mikhel's assessment of which guards he considered lazy; and included a diagram illustrating how a lock on the gate at the facility could be picked.

Now, in March of 2003, after the MDC staff uncovered an escape attempt involving Mr. Mikhel and Mr. Kadamovas and Mr. Krylov and various other inmates, all three were placed in this administrative detention.  In June of 2003, the Attorney General placed all three under the special administrative measure orders.  The original orders have been extended annually.

Mr. Mikhel's order places restrictions on the mail, the media, the telephone, and visitors.  Under the special administrative measures, Mr. Mikhel is allowed contact only with immediate family members and criminal Defense Counsel and legal staff, including paralegals, investigators, and interpreters.

All legal staff must be pre-cleared by the FBI prior to having contact with Mr. Mikhel and must sign an affirmation that they have read and will comply with the terms of the special administrative measures order.  The special administrative measures order does not prohibit telephone calls

19

by Mr. Mikhel to his family or his legal staff, nor does the order prohibit non-legal visits with immediate family members.

Furthermore, the special administrative measures order does not authorize the monitoring of attorney-client communications. And it does not authorize the reading of Mr. Mikhel's legal mail to and from his attorneys. Copies of the special administrative measures order were provided to Defense Counsel, as well as copies of each extension of the order. Mr. Mikhel has also allegedly been given written notification of the special administrative measures order including the 2005 extension.

Now, without going into the detailed analysis of the law cited by the Defendant, the moving party, I'll mention them though for the record: *Bell versus Wolfish*, W-o-l-f-i-s-h, 441 US 520; *Turner versus Safley* (phonetic); *U.S. Reed*, 214 F.2d 84; *Walters versus National Association of Radiation Survivors*, 473 US 305.

These are the cases that the moving party, Defendant, relies upon for the proposition that the due process clause requires that pretrial detainees be subjected to only those restrictions and deprivations which in here in their confinement itself or which are justified by compelling necessities and jail administration. And it's up to the Court to determine if defendant's conditions of confinement violate any expressed constitutional guarantees and whether any of

20

those conditions amount to punishment in violation of the due process clause.

In the *Turner versus Safley* case, the Supreme Court identified two key considerations that govern the acceptable conditions of confinement: One, whether the regulation was reasonably related to a penalogical concern; and second, whether the condition was an exaggerated response to those concerns.

And in the *Turner* case there were certain issues that the Court must look to when a prison regulation allegedly impinges on inmates' constitutional rights. A regulation is valid if it is reasonably related to legitimate penalogical interests, as I stated. And in the *Turner* case, the Supreme Court laid out four factors to guide Courts in their determination of whether a Government policy is reasonably related to a legitimate penalogical interest.

One, there must be a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it; two, whether there are alternative means of exercising the constitutional right that remain open to the inmate; three, the impact accommodation of the asserted constitutional right will have on guards and other inmates and the allocation of prison resources generally; and finally, whether there exist obvious, easy alternatives to the regulation.

Defense Counsel also argues that that right to effective assistance of counsel has also been affected in this matter by the imposition of the special administrative measures.

Now, the Government has also filed legal opposition, as well as well as the factual opposition. And the Government argues that to determine whether a condition of confinement implicates a constitutional claim, the Court must determine whether the regulation is reasonably related to legitimate penalogical interests, also cited *Turner* and also citing a case entitled *U.S. L-Hage*, L dash H-a-g-e, 213 F.3d 74, where the SAM conditions were upheld on a pretrial detainee; also *U.S. versus Philippe*, 148, F.3d 101.

The *Philippe* case is interesting in that it required Defendant to exhaust his administrative remedies prior to raising an issue regarding his conditions of confinement with the Court. Also citing *U.S. Ali*, A-l-i, 396 F.Supp.2d 703; in the *Ali* case, the District Court denied the defendant's motion for relief from his special administrative measures order because the defendant's claimed was not ripe due to his failure to pursue and exhaust his administrative remedies.

However, the *Ali* Court did nevertheless address the merits of the claim, which I'm going to do here as well.

MR. LASTING: Excuse me. I don't mean to interrupt, but Mr. Kadamovas indicates he's having some difficulty

understanding the translation.

THE COURT:  In what way?  Can't hear it?

(Pause)

(Off the record discussion)

MR. LASTING:  Your Honor, I'm not sure I clearly follow this.  But Mr. Kadamovas indicates that --

THE COURT:  I can't -- when you're talking, you're turning the other way, and I can't hear.

MR. LASTING:  If I understood correctly, Mr. Kadamovas indicates that some of the translation is using English words.  And he's not understanding the words that are being spoken by the translator.

THE COURT:  Is it both translators, or just the one translator?

MR. LASTING:  I believe it's just the translator who is still seated.

THE COURT:  All right.  Then we'll have to defer to the other translator that is here.

MR. LASTING:  He indicated just the interpreter that was translating at that moment.

THE COURT:  All right.  The other translator then is going to have to do all the translation.

Now, the Government also cites Casey versus Lewis, 4 F.3d 1516, indicating that the burden is on the inmate to show that the challenged regulation is unreasonable and that the

23

prison officials' concern for prison security are entitled to significant deference.

Now, in analyzing the four factors that I mentioned earlier, I believe the analysis demonstrates that the special administrative measures order is reasonable, and it does not impinge on Mr. Mikhel's due process rights. Here the Attorney General directed the Bureau of Prisons to implement the special administrative measures because he found that there was a substantial risk that Mr. Mikhel's communications or contacts with persons could result in death or serious bodily injury.

There is a legitimate governmental interest in limiting Mr. Mikhel's contacts and communications. And that interest is rationally related to the imposition of the Special administrative measures. There is also a valid, rational connection between the order and the governmental interests in ensuring the institutional safety.

The restrictions, I believe, are both reasonable and necessary. Mr. Mikhel's legal mail has neither been intercepted nor read. All legal mail is logged. The address and sender's name is verified. And the mail is then forwarded to Mr. Mikhel. Mr. Mikhel has not been denied access to a telephone. Mr. Mikhel has called his attorney, Dale Rubin, the one time he requested use of the phone. While Mr. Mikhel is frequently searched, it is only for security safety reasons. And the frequency of the searches has been reduced at his

request.

Although not obligated to provide access to one, the West Valley Detention Center has agreed to provide Mr. Mikhel with access to a laptop computer for up to four hours per day. Although at least one staff member at the West valley Detention Center improperly restricted Mr. Mikhel's access to discovery for some period of time, that problem has since been addressed.

Even though Mr. Mikhel is no longer permitted to have a radio, no other inmate at the West valley Detention Center is allowed to have a real either. Mr. Mikhel does have access to a television, books, and other reading material. He also has a cassette player in his cell which he can listen to audio tape discovery.

In addition, the imposition of the special administrative measures has not resulted in any interference with Mr. Mikhel's right of access to the courts or to legal counsel and has not impeded his ability to prepare a defense. The security concerns raised in this case, I believe, warrant the imposition of the restrictions for this period of time.

The Defendant has not even offered any alternative that would adequately address the security concerns and issues. His proposal is simply to eliminate the special administrative measures. But I'm not willing to do it.

What I have done though is any time there has been an ex parte request filed by counsel in this case, I've promptly -

- and I mean promptly, within 24 hours -- acted upon it and have implemented the order -- I believe, last week one of the experts dealing with psychiatric or mental examination wanted access within -- I believe it was on the 24th of May.  And I signed an order on the 23rd, and I believe it was carried out on the 24th.

MR. RUBIN:  Yes, sir.

THE COURT:  So I'm sort of a fail safe system here in order to remedy any problems that come up on the day-to-day administration of the special administrative measures.

I do note for the record that Mr. Mikhel did file a reply to the Government's opposition, both the factual and the legal.  And I read that as well.  But I do not believe that I'm going to change the special administrative measures at this time, because I don't have a large calendar and I can address concerns that are raised on ex parte application by Defense Counsel and remedy the situation within 24 hours.

MR. RUBIN:  Can I be heard briefly?

THE COURT:  Yes.

MR. RUBIN:  Thank you.  And good morning again, your Honor.  Dale Rubin on behalf of Mr. Mikhel.

Your Honor, I would like to start out because, unfortunately, this is a situation that has been going on for a period of several years.  The motion was initially filed in January of this year and has been pending originally before

Judge Manella for some time.

Prior to that time, we had been attempting to work out the problems and live with the SAMS by dealing with the authorities at the West Valley Detention Center and with the prosecution in this case. Some changes have been made since this motion and the opposition and the reply have been filed. The Court has indicated that the number of cell searches has been reduced, and that is true.

The situation regarding the blind fold and hood and wheelchair spin, which is something that has originally been brought to the government's attention well over a year and a half ago; in which when I observed it, I was in the attorney room waiting for Mr. Mikhel to come, in which they brought him in a wheelchair with a hood and a blindfold and helped him out of the chair into the attorney room with his complaints that he was nauseous. I sent immediately this information to the prosecution. And my reply was that I was wrong. And that is the way that the problems with the applications of the SAMS have been going.

To point out that in all of the things that the Court read about Mr. Mikhel's attempt at escape at MDC and with Ms. Lellan, none of the Defense Team was ever involved in any of that. Ms. Lellan was a paralegal for Victor Sherman. And there has been no indication and no argument by the Government at any time that any member of the present Defense Team has

done anything wrong.

THE COURT: I think that's an accurate assessment. But the problem is this; your client hasn't been --

MR. RUBIN: He hasn't been a good boy.

THE COURT: Yes.

MR. RUBIN: I understand. But, you know, your Honor, there are a lot of inmates in the jail facilities that haven't been good boys. And they're not covered by the SAMS. If I could give the Court an example, the Arian Brotherhood, which is the 15 or 8 or so Defendants that have ending in front of Judge Klausner, were housed at the West Valley Detention Center. These are eight individuals who had --

THE COURT: In called the over the hill gang?

MR. RUBIN: They are now.

These individuals in the 1980's actually accomplished a mass escape from the San Bernardino CDC and actually got out of the facility and were caught in Riverside, charged, and convicted of that escape attempt.

THE COURT: But let's be smart here. Your client is a sophisticated individual and with regard to escape planning and caring out the escapes. I mean it's just not a situation where he's, you know, put it on paper and done nothing.

MR. RUBIN: Yes.

THE COURT: He has been done lots of things and influenced and bought off and, you know, involved guards.

28

MR. RUBIN: But he never got out.

THE COURT: He didn't get out, but --

MR. RUBIN: He didn't get out.

THE COURT: You know he --

MR. RUBIN: But if we can go to --

THE COURT: It involved a lot of people.

MR. RUBIN: In the Government's opposition, they included a declaration by Lieutenant Jack Trotter. Lieutenant Trotter is in the Sheriff's Administration. He is the one who basically oversees the federal inmates that are being housed there. And I have been working very closely with Lieutenant Trotter since the beginning of this year regarding the SAMS.

According to his declaration -- and right now Mr. Mikhel is no longer in the hospital chute. Last week he was moved. He is now in a Unit Five of the West Valley Detention Center, underground. He's still one story underground in a basically one-man cell by himself. There's no one else housed there.

THE COURT: But he's also on suicide watch too.

MR. RUBIN: He is. Now, he has no day room, no facility to get out and walk around. And he's basically locked down in his cell 24 hours a day. He has no television. He has no phone. And he is down there by himself.

Lieutenant Trotter has indicated that whether the SAMS were in effect or not, West Valley would be treating him

almost the same. They would be housing him in the same location. They would be searching him the same way. They would be restricting his contact with the others.

And by the way, no one has, in the two years that he's been at West Valley Detention Center, no member of the public has attempted to see Mr. Mikhel, because his family is all deceased. There's no immediate family to come see him.

The problem is in the application of the SAMS. It only affects the Defense Team and to the extent that I don't understand it. I don't understand -- and to this day it still is in effect -- why I can't have --

THE COURT: Here's the thing. Let me be, again, rather blunt with you.

MR. RUBIN: Yes, sir.

THE COURT: You haven't given me any alternative so that I can fashion something to aid you and your Defense Team to having access to your client. I mean, you know, I can't dream up something. And I'm not going to take the SAMS off. If you have a workable solution, you present it to me. I will then look at it, make the determination whether or not it should be implemented or things can be adjusted. But I have nothing to work with.

MR. RUBIN: There are three areas really that I think the Court should give specific attention to. The first is that although it was one individual's incorrect interpretation of

30

the SAMS, it applied for a year and a half.  So the Defendant was getting an hour a day to review the discovery materials for a year and a half.

THE COURT:  Well, it's up now.  It's been for a long time four hours.

MR. RUBIN:  Since mid March.  I worked out a different method with Lieutenant Trotter in which the jail facility provided a laptop.  I provided a 10-hour battery.  And they gave him four hours to review it.  The laptop, I've been informed, has broken down.

THE COURT:  This has been a subject of a hearing that we had before.  And he's gotten all that equipment, but he hasn't been using it.

MR. RUBIN:  Oh, no.  Mr. Mikhel has been devoting his four hours a day.  The problem is, is that at the beginning -- the second week in May, the computer supplied by West Valley has broken down.  And we have been attempting to --

THE COURT:  But here's to the point that I'm trying to make.  When you have made suggestions to the West Valley people, they have accommodated you.

MR. RUBIN:  Well --

THE COURT:  When you make suggestions to me, I may accommodate you.  But what you're asking for now is for me to just lift the special administrative measures, and I'm not willing to do that.

MR. RUBIN:    I understand.

THE COURT:    I'm willing to consider alternatives.

MR. RUBIN:    The alternatives that I mentioned in the three areas, again, that were providing us a difficulty in preparing for trial were the lack of the ability to review the discovery, the lack of being able to meet face to face with Mr. Mikhel.  And the fact that I had to baby sit my investigator every time he wanted to meet with Mr. Mikhel.  And there is no reason why my investigator cannot go out and meet with Mr. Mikhel by himself.  We have brought this up with the Government in an attempt to resolve the matter and have been faced with no and no and no.  Those are the problems and --

THE COURT:    But see what I have to be careful about is I cannot let you or your client dictate how these meetings are going to take place, what areas they're going to take place, in what facility they're going to take place.  I'm willing to consider these meetings.  But I'm not willing to consider without a specific proposal being discussed with the Government and with the West Valley people.

MR. RUBIN:    According to Lieutenant Trotter --

THE COURT:    During the trial of this case, I don't believe he should be housed at the West Valley, because, you know, that's almost an hour drive depending on traffic back and forth.  So, you know, when the trial starts, I think arrangements should be made to move him closer to this

facility.

MR. RUBIN: Well, I have a good idea of what the arrangements are.

THE COURT: Well, that's one of the things that I wanted to talk about today. Right now I'm not going to do anything with the special housing unit or the special administrative measures. I'm going to keep them in place the way they are. But you are free to make suggested alternative changes to the Government and to the people at the institution. If that fails, then you come and see me.

MR. RUBIN: Well, the position that we're in now, your Honor, is unfortunately this motion's been pending for six months. So in addition to the two years that we've had --

THE COURT: I only picked it up --

MR. RUBIN: I understand. But we're now at a position where the damage has been done. We are about to start trial. The ability to meet with him is basically going to be gone.

THE COURT: Yeah. But this case has been pending for four years.

MR. RUBIN: Yes, sir. I've heard that from the Court before.

THE COURT: All right.

Ms. Dewitt?

MS. DeWITT: Your Honor, I don't want to re-litigate.

33

I think that you've made clear what your position is.  And I'm not going to go over it, because I think the papers fully cover the Government's position.

But there is one issue that I'm very concerned about, and I want to raise.  I'm very grateful for the fact that we have a judge who has the time to deal with these issues and deal with them expeditiously.  Because frankly, the Government's interest is to get this going and get the trial started.

In that respect, we are completely in total agreement with you.  But this last request that was filed with you, as the fail safe to this problem, was never served on us.  And that is wrong.  There should not be ex parte contact between the Defense Counsel and you where we don't have an opportunity to respond to it.

Now, granted you have enough experience to figure out what's the right thing to do.  But there may be some information that we have that might be important for you to know in making those decisions.  And I would respectfully ask that we have at least an opportunity when it's appropriate.

THE COURT:  I have no problem with that.  But the last one was a result of a hearing that we had, I think, about two days before I signed the May 24th order -- May 23rd order that ordered the psychological examination to take place within 10 days.

MS. DeWITT: I understand that, your Honor. And I appreciate the fact that what you're trying to do is both expedite things and also eliminate any excuse for not going forward.

THE COURT: I'm trying to do the right thing.

MS. DeWITT: But I will tell you that that request was, I believe, with all due respect to Defense Counsel, based upon a false premise, a false -- I mean a false representation in a sense to you that we have somehow impeded their ability to get experts in or somehow delayed their right to get experts in.

THE COURT: No.

MS. DeWITT: And that's just simply --

THE COURT: I didn't hear it that way. I viewed it as the time clock was running, and they wanted to get that expert in there to make the examination. And that was the only day that he had available. That's what I looked at it. And I analyzed it under that premise.

MS. DeWITT: There's two things that the Defense Counsel has to do to get an expert in. One of them is to give us some basic background information like a date of birth, so we can run a very cursory background check on those people. I would think that everyone would agree that's in everyone's interest to do that. We weren't allowed to do that in this case. And in the past, without almost any exception -- I think

there was only one or two times over the last three years where we've been delayed on that.

THE COURT: Yes.

MS. DeWITT: We've turned that around within 24 hours.

THE COURT: Okay. Stop there.

Didn't I sign an order that was presented to me, and I modified that in my own handwriting that all the other experts have to have 24 hours written notice?

MS. DeWITT: But what you said was that it has to be 24 hours notice to West Valley, not to us. And West Valley isn't in a position to run a background check. It's the FBI that does the background --

THE COURT: Doesn't West Valley call you when this happens?

MS. DeWITT: No. That's the problem. We didn't even know that this order had been issued.

THE COURT: All right. Well, we'll change that. It will be to West Valley and the U.S. Attorney's Office.

MS. DeWITT: And, your Honor, the second thing is that -- I mean, we don't even have the information to do --

THE COURT: I'm really surprised that you're standing there saying that west valley doesn't call you up and say, "Hey, listen. The judge signed this order. What do you think about it?"

MS. DeWITT:  I'm in fairly close contact with West Valley, but, your Honor, I do not talk to them on a daily basis.  I did tell --

THE COURT:  But I'm sure when they get an order, they're going to pick up the phone and call you.  I mean it just doesn't make any sense they wouldn't.

MS. DeWITT:  No, they don't, your Honor.  Because they're housing thousands of inmates.  I do talk to Lieutenant Trotter.  And I told Lieutenant Trotter that I anticipated they would be requesting some such order and that if he got some such order, even though I personally believe that that order is in violation of the SAMS, that they were to follow your order.  But no I did not know that they were going in.  I still --

THE COURT:  Well --

MS. DeWITT:  Even if I had known that they were going in, I don't have the background information I need to have a proper clearance done.  And that's all I'm asking is that they give me some basic background information --

THE COURT:  We'll do it the same way.  Whenever they notify West Valley, they'll notify you.

MS. DeWITT:  And can that notification provide me with enough information so that my FBI Agents can do a clearance on them?

THE COURT:  Well, they'll give you the name.  They'll give the guy's Social Security number, date of birth, whatever

else you need.

MS. DeWITT:  The second thing, your Honor, and again, I don't want to belabor this.  But the second thing that the SAM requires is that these experts sign an affirmation that says they will abide by the SAM order.  And the reason that I think --

THE COURT:  I didn't change that.

MS. DeWITT:  Well, that hasn't been done, your Honor. That's my problem.  That hasn't been done with these people. And as far as I know, I don't know whether it will ever be done.

THE COURT:  I think this is the devil's always in the details.  I didn't change the fact that they had to sign an affirmation.  I had to get this expert in there, because I put a time limit on him so that they could raise this defense. Otherwise, they can't raise this defense.

MS. DeWITT:  I appreciate that.  And I just wanted to have it clarified that we are allowed to do pre-clearance and that they are still required to get an affirmation.

THE COURT:  I never, with the exception of this one witness, changed your pre-clearance.

MS. DeWITT:  Thank you, your Honor.

MR. RUBIN:  Your Honor, just so that the details are complete.  We had a hearing in court in which the Court suggested that I had previously filed some ex parte requests,

which the Court immediately handled and that I do it again because we had a problem. And I filed the ex parte the next day. At the same time, Ms. Dewitt contacted my co-counsel, Mr. Callahan, by email asking for the information. She was supplied with the name of the individual. And we had the individual read the SAMS, sign onto the SAM. And that was emailed to the Government at the same time. So the bottom line is we are not going around anything.

THE COURT: We're not circumventing the SAM. All we're doing here -- I'm trying to get this case to trial. And I imposed certain time limitations on the defense so that they would identify their experts, identify whether or not they're going to offer insanity or diminished capacity defense, an alibi. You know, I can only do so much.

MR. RUBIN: Well, again, and I -- just that the Government is surprised that I want to meet face to face with my client, that I want my investigator to meet with my client without having to be babysat by me; that that surprises the Government is just amazing to me.

THE COURT: All right. Let me ask you --

MR. RUBIN: We've been discussing it for two years.

THE COURT: Let me ask you this question. Let me ask this question. When your investigator and you meet with your client --

MR. RUBIN: Yes, sir

THE COURT:  -- is there a screen between you and your client?

MR. RUBIN:  Yes, sir.

THE COURT:  All right.  Then if there's a screen between your client so that nothing can be passed through the screen, I don't see why you have to be present when your investigator is there.

MR. RUBIN:  The SAMS indicate that the defense investigator, who is licensed in the state of California to be an investigator, must at all times be babysat by Defense Counsel.

THE COURT:  Do you have to give 24 hours notice before you go visit with your client?

MR. RUBIN:  Well, the way West Valley works is they do an appointment process.  It's always better to do more than 24 hours and to get on the book.  Because we're vying for a few attorney rooms that are also being used by the San Bernardino Public Defenders and private counsel to see their clients.  I have found that it's better if I know in advance to let them know a week in advance, make the appointment.  And then always get there on time so that I can get my chance into that booth.  Otherwise, we have had situations where we've had to wait.

THE COURT:  Yeah, I don't want to have a situation where you or your investigator go there unannounced.  So I think that there should be --

MR. RUBIN:  No, they won't let us see him unannounced.

THE COURT:  All right.  At least 24 hours notice --

MR. RUBIN:  Yes, sir.

THE COURT:  -- to both the Government and West Valley.

MR. RUBIN:  Yes, sir.

THE COURT:  And I don't see the need to have you there if you're sending your investigator.  I mean why should the judicial funds used to pay for the defense here for you to baby sit your investigator

MR. RUBIN:  That's been my position all along.

THE COURT:  If you just present me with reasonable alternatives, I try to solve the problem.

MR. RUBIN:  All right.

Does the Court want me to a fashion some kind of order.  I'll give it to the Government.

THE COURT:  Please.

MR. RUBIN:  Okay.  Thank you, your Honor.

THE COURT:  All right.  Anything further?

We'll stand in recess.

MR. EVANS:  Your Honor, may I very briefly?

THE COURT:  Mr. Evans.

MR. EVANS:  These are two housekeeping issues.

THE COURT:  Tell me --

MR. EVANS:   I'm David Evans on behalf of Petro Krylov, your Honor.

First is -- does the Court have any objection to Defense Counsel bringing in chairs with back support for extended trial these are -- and I don't mean to be critical of the design or anything, but I -- an air on chair or something? I have a bad back.

THE COURT:   Then you can bring in whatever chair you want; just so the Marshal checks it out.

MR. EVANS:   Fine.  The second issue, your Honor, is, is it possible to get a third table so that the Defendants are separated or some division?

THE COURT:   I can't bring in a third table.  It's impossible.

MR. EVANS:   Is this the seating arrangement that the Court contemplates with Mr. Mikhel and Krylov in the back

THE COURT:   Yes.

MR. EVANS:   Is there anything I could say to persuade the Court to another arrangement?

THE COURT:   This is the biggest courtroom in the whole --

MR. EVANS:   I'm not talking about the courtroom, your Honor.  I'm talking about the seating arrangements in the --

THE COURT:   In the building, this is the largest.  I mean you've seen the other Courtrooms.

42

MR. EVANS:  I'm just talking about the seating arrangements at these tables, your Honor.

THE COURT:  They're the best I can do.

MR. EVANS:  Could we be moved to the front table?

THE COURT:  Well, normally what I do during the trial of the case is we rotate so that the focus is never on any one Defendant.

MR. EVANS:  Very well.  That makes sense to me, your Honor.

MS. CHAHIN:  Your Honor, can other counsel as well bring in chairs with the Marshal's approval?

THE COURT:  Just make sure the Marshal checks them all out.

MS. CHAHIN:  Thank you, your Honor.

THE COURT:  All right.  We'll stand in recess.

(Case recessed at 12:27 p.m.)

(Case recalled at 12:28 p.m.)

THE CLERK:  Okay.  We're going back on the record.  Everybody resume their positions.

THE COURT:  All right.  Mr. Rubin you asked that we go back on the record because your client wants to address the Court?

MR. RUBIN:  Mr. Mikhel has advised me he has something to say to the Court.

THE COURT:  Have you talked to him about it?

MR. RUBIN:  No.

THE COURT:  You tell him that he has a right -- Mr. Mikhel, you have a right to remain silent.  Anything you tell me can and will be used against you.  You should clear anything you want to say with your attorney before you speak to the Court.

DEFENDANT MIKHEL:  Just I would like to suggest with your permission for whatever the name for this procedure, a private conference --

THE COURT:  Wait.  Let me stop a minute.  We have to put a microphone in front of you, because we're not going to record you.

DEFENDANT MIKHEL:  My apology.  I don't know the name for this particular procedure for this kind of talk, like private conference or something like that, so the kind that address --

THE COURT:  Well, let me ask you this question.

You want me to have the other Defendants excluded?

DEFENDANT MIKHEL:  No.  It doesn't matter to me.

THE COURT:  We don't have private conferences.  Everything is done in the open court on the record.  Under the American system of justice, we don't do things behind closed doors.  Everything's done in the open.

DEFENDANT MIKHEL:  Fine.  So I can talk? I can address the --

THE COURT: Well, again, I would -- talk to your lawyer and tell him the subject matter before you start talking. Because everything we say is taken down here.

DEFENDANT MIKHEL: I have a little difficulty discussing the issues with my attorney. Because I have discovered that the two have separate, different view and an ethics issue. See I've been told by my attorneys that they -- and I agree with them. They do abide by (IND.) However, the two have a very (IND). I would say that.

It's okay for them to say -- tell me that they can do that or they can't do that. Namely, when the prosecution team goes on the stand and call them liars. And I must, you know, why don't you go there and say that's just simply not true. Instead we have to be nice to them. We have to go (IND). We can't -- we can't just tell the truth. We agree, "Well, we'll put them in the paper and send me to the Court." That's what they're telling me.

However, it's okay for the prosecution. I really admire them. They go on the stand. It's not necessarily -- sometimes we do it for the lack of information, but to go on the stand, lie there to you. But they do it boldly. I really admire that. And that makes it true. And that's fine.

Everything you hear in here, even from the motions of my Defense Team, regarding my confinement is completely untrue. My confinement is much more harsh and much more severe than

indicated in the papers.  The persecution -- I don't know what to believe too.  I'm not accusing the persecution for lying for example.  They didn't supply the discovery materials.  I can't judge that.  I saw the -- I have seen first time the discovery materials were delivered to MDC when I was still in MDC two years ago.  And I still have it.

And they're all talking about the discovery materials and my access to them.  And I would like to confirm that, yes, the discovery materials is about five feet from me in the next cell.  However, they're always forgetting to mention that I never got to that cell, ever.

So how can I possibly -- well, once again it's on the issue of the impending criminal trials.  How can I possibly even start discussing with my attorneys issues of probably needs to be addressed?  And I never have seen the discovery.

THE COURT:  All right.  What --

DEFENDANT MIKHEL:  Now come to that --

THE COURT:  What you're doing is you're re-arguing what's in the papers --

DEFENDANT MIKHEL:  Yeah, but I would like --

THE COURT:  -- that your attorneys have prepared.

DEFENDANT MIKHEL:  Yeah, but I would like to go on the record so you hear that from the person.

THE COURT:  You've made your record.  You've made your record.

**DEFENDANT MIKHEL:** Another thing --

**THE COURT:** Look. There's going to be a lot of what they call aggressive advocacy on both sides. The Government's going to be puffing their side up. You're going to be puffing your side up. And a trier of facts is going to make a decision.

In the discovery issues here, I'm the trier of fact. During the trial of the case, the jury's going to be the trier of fact. You're not happy. The Government's not happy. And I can only do the best that I can do.

And I hear and see through the written materials that are presented to me, the Government's position and you position on all these issues that are presented. And I make a determination. And that's what I've done in this case.

**DEFENDANT MIKHEL:** May I continue?

**THE COURT:** If you want to.

**DEFENDANT MIKHEL:** Yes, please. On the issue of the arguments presenting them to the jury for the last two years my Defense Team would try and get the joint agreement with my co-Defendants. And it's actually what I did is we got together with their attorneys present, of course, and translated to them to understand the issues like to discuss the whole issues and to prepare the joint defense and to discuss the possibility of putting one of the Defendants, one of my Co-Defendants, on the stand to testify.

However, it was denied.  And it was denied in a very, very interesting issue.  The Government's problem with that was, they said, "Oh, they will get together.  They will make up a story."  Well, from what you said just now, it should be like we'll present our story.  They will present their story and let's decide -- let the jury decide whose story holds merit.

THE COURT:  Well, it's based on the evidence, not on whose story.  And the stories are part of the testimony in the case.  And the testimony is evidence.

DEFENDANT MIKHEL:  Well --

THE COURT:  But there's also physical evidence.  There's pictures.  There's scientific evidence, all sorts of evidence.

DEFENDANT MIKHEL:  Well, what can I say?  If the trial will go just by the evidence so I wouldn't have worried about that.

THE COURT:  Well, the Government has the burden of proof.  They've got to prove their case beyond a reasonable doubt to the finder of fact.  It's the Government's burden.  The defense doesn't even have to present any evidence.  It's the Government's burden of proof.

DEFENDANT MIKHEL:  But I understand that theory.  But the problem I am having is that the Government is doing more not to collect any proof because it's not my (IND).  But all they are trying to do during the last three years is to prevent

me (IND) to prevent me from any possibility of presenting other side of the story.

THE COURT:  All right.

DEFENDANT MIKHEL:  For example, last three years, these issues, the SAMS issue, they trying to indicate this and they using the press extensively in the documents I've seen; proclivity to violence, etcetera, etcetera.

How come this issue never came up when we were arrested and already charged with this terrible crimes?  We didn't have any -- nobody had any problems with our violence or something like that, and we go in the general population.

However, when escape was discovered, all of the sudden we become violent and everything else.  And I do believe to just use the issue, the escape issue as an excuse to apply the SAMS for completely different reason.  Because without my Defense Team -- I can't remember.  Some other people did some research for me.  And they said no one in this country will ever (IND).  So how come -- what's so special about me?  I've never been explained.

THE COURT:  Anything else you want to say?

DEFENDANT MIKHEL:  Yes, I would like to say another -- there is another issue I have a problem about.  Because one of my -- in my team (IND).  That's an issue on three years ago. And actually it was mentioned the last time that the prosecution -- it was the longest time in the history of the

49

death penalty in this country.  The longest period of time it took for the Government to decide whether to seek the death penalty or not, like two and a half years or something.

Well, you possibly several times indicated my -- when it was the issue of the throwing of (IND) you said how much (IND) do you need?  (Indiscernible) what we're talking about. It shouldn't be any problem with that.  And it's actually have me thinking, "Yes, why did they took two and a half years to do that?"

And the answer came from the very, very interesting issue, the point one of my Defense Team members told you.  Mr. Ruscroft (phonetic), two years ago was having a lot of -- two years ago was having a lot of pressure from the minority members, which were protesting against that so many minorities was executed and not enough whites.  And there is a possibility, maybe -- I don't know (IND) but maybe there is a possibility that the prosecution team -- actually they know their star witness is lying.  Well, how much time they took (IND).  That's fine.  I'm not accusing them (IND).   I haven't been.

However, maybe they were reluctant.  And finally -- I mean two and a half years to decide to execute people for five murders or not.  I don't know.  It's kind of funny to me.  If I killed those people, shoot me now.

So would it be possible that the whole thing -- the

whole issue of the death penalty was raised on the political level? I would like to have that kind of investigation (IND).

THE COURT: These are all philosophical arguments, sir, that you're making right now. And --

DEFENDANT MIKHEL: Well, another -- no. Last issue as far as an ability to participate in trial, I would like to make a personal request. Please I understand that you're not allow Mr. Krylov not to be in trial. And I do understand that you're worried about that. It's the case of the death penalty and everything else.

However, I would like to request to excuse me from these procedures. Because I do not see how my attorneys can go in the trial with their efforts and present me knowing that there is no way they can defend me.

THE COURT: All right. Your request --

DEFENDANT MIKHEL: Because they --

THE COURT: Your request is denied. I don't think we're making any headway here, sir. You're just talking to talk. You're not really --

DEFENDANT MIKHEL: Okay. I'll give you --

THE COURT: You're not making any points other than philosophical observations.

DEFENDANT MIKHEL: I'll give you facts. I've been requesting for my attorneys to prepare some job for months now. It's never been done. How can I go to trial without that?

51

First of all, there is a -- it's the key of this trial.  It's the testimony of Mr. Altminus (phonetic), who is a star witness of the prosecution.  The testimony of Mr. Altminus were on inaudible tapes.  After that, they were transcripted.  However, they were transcripted only in English.  There is no transcript in Russian exist.  There is no translation of this transcript in Russian exist in discovery.  It's never been done.

Also, once, again, I would like to point out, I never read the discoveries.  The computer which was provided in March broke down a couple of months later.  I was using the computer every day.  You confused me with the issue (IND).  I was using the computer every day.  I read 23,000 pages.  After that, computer broke.  I never been provided new one.

THE COURT:  Anything else you want to say?

DEFENDANT MIKHEL:  No.  I would just like to repeat that trial -- I disagree with my attorneys about how they work and I --

THE COURT:  Your objection is noted.  And your attorneys will remain.

And the Court is in recess.

(This proceeding was adjourned at 10:42 a.m.)

## CERTIFICATION

** Disclaimer:  Mr. Mikhel was difficult to discern because of his Russian accent.

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____
Signed

June 10, 2006

Dated

*TONI HUDSON*

FEDERALLY-CERTIFIED TRANSCRIBER