ORIGINAL

FILED
CLERK, U.S. DISTRICT COURT

JUN 2 0 2006

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | CASE NO:  CR 02-220(B)-DT |
| ) | |
|        Plaintiff, ) | CRIMINAL |
| ) | |
|   vs. ) | Los Angeles, California |
| ) | |
| IOURI MIKHEL, ) | Monday, May 22, 2006 |
| JURLIUS KADAMOVAS, ) | (1:40 p.m. to 4:27 p.m.) |
| PETRO KRYLOV, ) | |
| NATALYA SOLOVYEVA, ) | |
| ) | |
|       Defendants. ) | |

SEE PAGES 2 AND 3 FOR CALENDARED MOTIONS

BEFORE THE HONORABLE DICKRAN TEVRIZIAN,
UNITED STATES DISTRICT COURT JUDGE



DOCKETED ON CM

JUL 3 2006

BY _____ 184

EXCEPTIONAL REPORTING SERVICES, INC
14493 SOUTH PADRE ISLAND DRIVE
SUITE A-400
CORPUS CHRISTI, TX 78418-5940
361 949-2988

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | CASE NO:  CR 02-220(B)-DT |
| Plaintiff, | ) | |
| | ) | CRIMINAL |
| vs. | ) | |
| | ) | Los Angeles, California |
| IOURI MIKHEL, | ) | |
| JURLIUS KADAMOVAS, | ) | Monday, May 22, 2006 |
| PETRO KRYLOV, | ) | (1:40 p.m. to 4:27 p.m.) |
| NATALYA SOLOVYEVA, | ) | |
| | ) | |
| Defendants. | ) | |

SEE PAGES 2 AND 3 FOR CALENDARED MOTIONS


BEFORE THE HONORABLE DICKRAN TEVRIZIAN,
UNITED STATES DISTRICT COURT JUDGE


Appearances:    (See pages 4 and 5)

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

EXCEPTIONAL REPORTING SERVICES, INC

2

CALENDARED MOTIONS:

GOVERNMENT'S MOTIONS:

1    Government's Motion to Preclude Defendants
     from offering evidence of mental health or defect
     during the guilt phase of the trial;

2    Government's Motion to Preclude alibi witnesses
     and to compel further responses from defendants
     to government request for notice of alibi;

3    Government Motion regarding admissibility of foreign
     bank records.

DEFENDANT KRYLOV'S MOTIONS:

1    To preclude the introduction of latent fingerprint
     identification evidence;

2    To suppress statements made to law enforcement
     after an alleged escape attempt.

DEFENDANT KADAMOVAS' MOTIONS:

1    To suppress statements obtained in violation
     of 5th Amendment;

2    For a bill of particulars with respect to uncharged
     murders, attempted murders, and other serious acts
     of violence in notice of intent to seek the death penalty;

3    To strike unadjudicated allegations of violence
     set forth as non-statutory factors in aggravation
     in the government notice of intent to seek
     the death penalty.

3

CALENDARED MOTIONS:    (Cont'd)


DEFENDANT MIKHEL'S MOTIONS:

1    To preclude proposed "expert" testimony,
     request for Daubert hearing;

2    To strike unadjudicated allegations of violence
     set forth as non-statutory factors in aggravation
     in the government notice of intent to seek
     the death penalty;

3    To dismiss Counts 1 - 4 of 2nd superseding indictment
     based upon the unconstitutionality of the hostage taking
     statute;

4    To suppress statements made to law enforcement
     after an alleged escape attempt; and

     Defendant Solovyeva's Joinder in Defendant Mikhel's Motion
     to Dismiss Counts 1 through 4 of the 2nd Superseding
     Indictment Based Upon Unconstitutionality
     of the Hostage Taking Statute (Filed 4-21-06)

4

<u>APPEARANCES FOR:</u>

Plaintiff:                          DEBRA W. YANG, ESQ
                                    United States Attorney
                                    JACKIE CHOOLJIAN, ESQ
                                    Assistant United States Attorney
                                    Chief, Criminal Division
                                    SUSAN DeWITT, ESQ
                                    KIM MEYER, ESQ
                                    ROBERT DUGDALE, ESQ
                                    Assistant United States Attorney
                                    312 North Spring Street
                                    Los Angeles, CA 90012

                                    James Davidson, FBI

Iouri Mikhel:                       RICHARD M. CALLAHAN, JR, ESQ
                                    230 E. Colorado Blvd., Suite 1200
                                    Pasadena, CA 91101

                                    DALE MICHAEL RUBIN, ESQ
                                    2275 Huntington Dr., Suite 902
                                    San Marino, CA 91108

Jurlius Kadamovas:                  SONIA E. CHAHIN, ESQ
                                    2222 Foothill Blvd., Suite E-278
                                    La Canada, CA 91011

                                    RICHARD P. LASTING, ESQ
                                    1717 Fourth Street, Third Floor
                                    Santa Monica, CA 90401

Petro Krylov:                       GEORGE W. BUEHLER, ESQ
                                    350 S. Grand Avenue, 39th Floor
                                    Los Angeles, CA 90071

                                    DAVID R. EVANS, ESQ
                                    600 S. Lake Avenue
                                    Pasadena, CA 91106

Natalya Solovyeva:                  TERRY AMDUR, ESQ

                                    MICHAEL M. CRAIN, ESQ
                                    P.O. Box 3730
                                    Santa Monica, CA 90408

APPEARANCES:    (Cont'd)


Russian Interpreters:        Ludmilla Genn
                             Varvara Olson

Court Recorder:              Hilda Avila

Courtroom Deputy:            Debra L. O'Neill

Transcribed by:              Exceptional Reporting Services, Inc.
                             14493 S. Padre Island Drive
                             Suite A-400
                             Corpus Christi, TX 78418-5940
                             361 949-2988

6

<u>Los Angeles, California; Monday, May 22, 2006; 1:40 p.m.</u>

(Interpreter Utilized for Translation)

(Call to Order)

THE COURT:  Good afternoon.  Please be seated.

THE CLERK:  Criminal Docket Number 02-220(B)-DT, *United States of America versus Iouri Mikhel, Jurlius Kadamovas, Petro Krylov, and Natalya Solovyeva.*

Please state your appearances for the record.

MR. DUGDALE:  Good afternoon, your Honor.  Robert Dugdale, Susan DeWitt, and Kim Meyer on behalf of the United States.  And also present at counsel table is Special Agent James Davidson of the FBI.

MS. SPEAKER:  Good afternoon, your Honor.

MS. CHAHIN:  Good afternoon, your Honor.  Sonia Chahin on behalf of Jurlius Kadamovas.  Also with me at counsel table is Richard Lasting.  And Mr. Kadamovas is presently in custody.

MR. LASTING:  Good afternoon, your Honor.

MR. CRAIN:  Good afternoon, your Honor.  Michael M. Crain for Ms. Solovyeva.  And Mr. Terry Amdur also.

MR. EVANS:  Good afternoon, your Honor.  David Evans and George Buehler on behalf of Petro Krylov, who is not present.  There is a waiver on file, your Honor.

THE COURT:  I understand that there is a waiver on file with respect to that Defendant, but being a capital case I

don't like to have the Defendant not present in court on these motions. I want him present. I saw the waiver and I'll accept it for today, but in the future I don't want a problem coming up where the Defendant says that "I really didn't know what was happening, I wasn't here, I didn't know about the waiver, I didn't know about what was going on in my absence." So --

MR. EVANS: I understand, your Honor.

MR. CALLAHAN: Your Honor, good afternoon. Richard Callahan on behalf of Defendant Iouri Mikhel. Also present is capital counsel Dale Rubin.

THE COURT: All right, last time we were here I gave everyone a letter that I had prepared -- I gave you two letters to look at. I did not receive any objections from any of the attorneys so this morning I notified the jury commissioner to send out the form of the letter that I'm going to give you today. It's one of the two that I gave you last time, but this is the one that I finally selected. So I will be giving you these at this time. And one will be filed with the original file in this case.

In addition I know we have a hearing coming up, I believe it's June --

MR. DUGDALE: It's June 12th, your Honor.

THE COURT: -- June 12th. One of the issues to be covered at that hearing is a jury questionnaire that was submitted to me by the Government for my review. I appreciate

8

that and I will look at it, but in the meantime I had already prepared a jury questionnaire that I would like to use. It's one that I drafted. I like it because of the fact that I think it's a very neutral questionnaire, not geared towards a market research type analysis where you predict what a juror is going to do, rather it's designed to determine whether or not there's any grounds to challenge a juror for cause. So I'll give you a copy of the juror questionnaire that I would like to use in the case and I will have one also placed in the permanent record. I'll give each one of the counsel this to look at as well. And we'll discuss the questionnaire that I have prepared as well as the questionnaire that the Government has submitted for the Court's analysis.

But in looking at the questionnaire that the Government prepared I have some problems with the wording in certain of the questions. I think it reinforces some of the allegations in the Indictment, the operative Indictment in this case, the Second Superseding Indictment. And I want to get away from that and make the questionnaire as neutral as possible.

All right, we have a series of motions to take up today.

THE INTERPRETER: Excuse me, your Honor. May the Interpreter relocate?

THE COURT: Well I like the interpreters in the

EXCEPTIONAL REPORTING SERVICES, INC

9

middle here, so we have no problem. I don't want to have the trial driven by the interpreters; I'd rather have it driven by the evidence in the case.

All right, the first motion I'm going to take up today is the Government's motion regarding admissibility of foreign bank records.

Basically my analysis has indicated that during the course of its prosecution of the Defendants the Government requested various records, including bank and other business records. These requests were made pursuant to the Mutual Legal Assistance Treaties between the United States and various countries. In addition a formal request was made to the appropriate legal authorities of other countries which do not have the Mutual Legal Assistance Treaty with the United States but who did agree to cooperate with the Government's formal request for documents. The requested records were returned with sworn certificates of authenticity and subsequently made available to Defendants through discovery. The Government has given written notice of its intention to introduce these records, which were obtained through the Mutual Legal Assistance Treaties or formal request for documents from Samoa and for which the Government obtained foreign certification.

I believe these records are self-authenticating and my tentative ruling would be to admit those records.

Does the Government wish to say anything further

10

before I ask Defense to comment?

**MS. DeWITT:**  No, your Honor.

**THE COURT:**  All right, who wants to comment from the Defense?

**(No audible response)**

All right, the Defense then is submitting on their written opposition.  I've reviewed --

**MR. CALLAHAN:**  Your Honor, excuse me?

**THE COURT:**  Oh, Mr. Callahan, I didn't see you.

**MS. DeWITT:**  Your Honor, I'm not aware of any Defense opposition being filed for this motion.

**THE COURT:**  You're correct.  No Defendant had filed opposition to the motion.

**MR. CALLAHAN:**  Your Honor, I have no objection to these documents being self-authenticated, as is the purpose of the statute, but I do think perhaps on a document-by-document basis.  There may be situations where multiple hearsay issues arise.

**THE COURT:**  And I would agree.  We're not talking about admissibility at this point; we're talking about the foundation for the introduction of those documents.  Obviously just because a document has been identified doesn't mean it is necessarily going to be introduced in the course of the trial. You've got to show relevancy and there's all other issues that I assume that you are raising.  I was just talking about the

11

admissibility for purposes of laying a proper foundation where you don't come in and object at the point, "Well, there's no custodian of records present."

MR. CALLAHAN:  Understood.  Thank you.

MS. CHAHIN:  Your Honor?  I'm sorry.  On behalf of Mr. Kadamovas, for the record, can we request that all objections be deemed joint unless we ask otherwise?

THE COURT:  I thought I did that last time in order to save time as well, that these objections would be joint objections unless certain counsel wished to withdraw.  I did that on the written motions as well, that, you know, you need not file a formal joinder, or if you do just join in and adopt the points and authorities and the argument that was made and if you wish to supplement it, you could.  But I don't want everybody to reinvent the wheel on each motion.

MS. CHAHIN:  Thank you, your Honor.

THE COURT:  All right, the next motion I want to talk about is the Defendants Kadamovas, Krylov, and Mikhel's motion to suppress statements made to law enforcement officers after an escape attempt.

The Defendants are offering the following in support of their motion, Mr. Kadamovas specifically:

He was arrested on February 19th, 2002.  He's been held in custody without Mr. Kadamovas was incarcerated in the general population at the Metropolitan Detention Center.  On

March 7th, 2003 he was transferred to the Secure Housing Unit, the SHU Unit, on 8 North of the MDC, the Metropolitan Detention Center.  He's been held in the SHU since his transfer.

About two weeks after his transfer an MDC officer allegedly came to Mr. Kadamovas' cell and handcuffed him.  The officer allegedly took Mr. Kadamovas to a small room and began questioning him.  The officer made Mr. Kadamovas remain seated and allegedly handcuffed during the entire interrogation.  At no point it's alleged that Mr. Kadamovas' handcuffs were removed.  The officer allegedly asked Mr. Kadamovas questions and he answered them, however Mr. Kadamovas claims that he was never advised of his right to remain silent, he was never told that he had a right to refuse to answer the officer's questions, and this interrogation was related to Mr. Kadamovas' purported involvement in an alleged escape attempt.  Even though Mr. Kadamovas was represented by counsel at the time of the interrogation, his attorneys were never contacted.

Mr. Krylov also offers the following facts in support of his joinder in the motion:

On March 7th, 2003 Mr. Krylov was transferred to the SHU on 8 North because of his alleged part in an escape attempt.  On March 13th, 2006, shortly after having been moved into the highly restricted -- that should be March 13th, 2003 -- moved into the highly restricted SHU area, 24-hour lockdown conditions were imposed.  He was taken by several

13

officers and a man in a suit to the lieutenant's office in the SHU. He was then interrogated about the alleged escape attempt. Immediately prior to the interrogation Mr. Krylov had been visited by one of his attorneys, Mr. Buehler. Mr. Krylov was advised during the interrogation that Mr. Buehler had just left and was still in the building. Mr. Krylov allegedly requested that MDC arrange to have his attorney return and be present for the questioning, however the officers declined and ignored his request, according to Mr. Krylov.

Mr. Krylov found himself in a small office allegedly with the door closed surrounded by several officers who treated him in an alleged very threatening manner. Mr. Krylov could allegedly discern there was no video surveillance in the office, unlike the other areas of the SHU. The officer allegedly told him that he would never see his family again and they would not let him use the telephone anymore and that they would never let him see daylight again and he would be placed in an underground cell for the next 10 years all alone and that they would make his life a nightmare.

Mr. Krylov alleges that the officers never advised him that he was free to leave or that he was not required to answer their questions, that he could remain silent, or that he could have his counsel present. The officers allegedly actually denied his request for counsel, who was still in the building at the time.

14

Now, Mr. Mikhel has the following to supplement the present motion:

When the case was originally indicted in February of 2002 the Defendants Mikhel, Kadamovas, and Krylov were all housed in the general population at the Metropolitan Detention Center. They remained there for one year. On March 7th, 2003 staff at the MDC conducted a search of Mr. Mikhel's prison cell in connection with what was believed to be an escape attempt. A number of items were recovered from the search, including bolt cutters and a cell phone. Mr. Mikhel was immediately removed from his cell and moved to the SHU. The FBI was notified.

On March 13th, 2003 Mr. Mikhel was approached in his cell allegedly by several correctional officers, as well as a lieutenant standing outside the cell. One of the officers allegedly yelled for Mikhel to cuff up. Mikhel complied by putting his hands together. Once handcuffed, Mr. Mikhel was ordered out of his cell. He allegedly was never told where he was going nor was he informed that he had a right to refuse to go.

Mr. Mikhel then was allegedly escorted by correctional staff to an office approximately 60 feet away. Mr. Mikhel was ordered allegedly to sit in a chair in the middle of the room. He was surrounded by a number of unfamiliar correctional staff members, as well as Lieutenant

15

Harlene and M.J. Battley (ph.s.) of the Bureau of Prisons. Since he had never been in the SHU before Mr. Mikhel was extremely distracted and disoriented.  At no time was Mikhel Mirandized.  Mr. Mikhel's counsel was never notified about the interrogation and Mr. Mikhel made admissions concerning both the alleged escape attempt, as well as about certain aspects of the underlying charges in the case.

On April 11th, 2003 FBI Agents Sotelo and Medrano, who were investigating the hostage taking charges, allegedly arrived at the MDC to interrogate Mikhel.  No effort was allegedly made to contact Mikhel's counsel.  Mikhel was presented with an FD-395 Advice of Rights Form, which he signed.  Mikhel repeated much of the same information in the FBI interrogation that he had provided to prison staff during the initial interrogation.

Now, the Government also has offered some information.  I'm not going to elaborate at this time, but just mention some of it.

The Government maintains that on March 7th, 2003 officials at the MDC discovered an elaborate escape attempt in which Mikhel, Kadamovas, and Krylov were implicated.  On March 13th, 2003 Mikhel and Krylov were interviewed separately by Bureau of Prisons officials.  On March 17th, 2003 Kadamovas was interviewed by BOP, Bureau of Prisons, officials.  All three confessed to conspiring to escape from the MDC.  On

16

April 11th, 2003 Mikhel waived his Miranda rights and agreed to speak with agents from the FBI.  He also confessed during the interview.

The Government maintains that while the Government may not use the statements made to the Bureau of Prisons officials in the Government's case-in-chief, the Government should be permitted to use such statements for impeachment purposes should Defendants choose to testify.  And the Government maintains that these statements being used for impeachment evidence to the extent Defendants choose to testify are because the Defendant made these statements voluntarily.  And the Government cites *Pollard v. Galaza*, G-A-L-A-Z-A, 290 F.3d 1030.  That case denied the use of a statement in violation of Miranda in the Government's case-in-chief, but allowed the use of such a statement for impeachment purposes to the extent it was made voluntarily.  And,

> "Before a criminal defendant's statement can be used against him, the Government must prove its voluntariness by a preponderance of the evidence."
> That's *U.S. v. Leon-Guerrero*, 847 F.2d 1363.

The test for voluntariness is whether under the totality of the circumstances the Government obtained the statement by physical and psychological coercion or by improper inducement so that the suspect's will was overborne.

The Government maintains, as is clear from the

Harlene Declaration, the circumstances surrounding Defendants' statements were not coercive. None of the interviews lasted longer than 30 to 40 minutes. Only Harlene and Battley conducted the interviews and were the only ones present during the interviews. Neither Harlene nor Battley threatened any Defendant nor raise their voices. Contrary to statements by Krylov and Kadamovas the lieutenant's office where the interview was conducted is not small; rather it is approximately four times the size of a cell. While the Defendants were handcuffed behind their backs throughout the interviews, this is in keeping with routine SHU procedures. When SHU -- that's Special Housing Unit -- when SHU inmates are out of their cells they must be handcuffed. Being handcuffed is not inherently coercive. The Government's citing the case of _U.S. v. Orso_, 266 F.3d 1030, also _U.S. v. Williams_, 435 F.3rd 1148.

The Defendants, the Government maintains, at no time had their legs restrained. Absent any physical or psychological coercion, the Defendants' statements to the Bureau of Prisons officials must be considered voluntary. Citing _Burwell v. Teats_ (ph.s.), 245 F.2d 154.

The Government also maintains that statements Mikhel made to FBI agents regarding the escape attempts should not be suppressed because formal charges regarding this offense had not yet been filed. Mikhel concedes he waived his Miranda

18

rights before being interviewed by the FBI.

All right, with regard to this motion, which Defendant wishes to speak first?

MR. BUEHLER: If I may, your Honor? George Buehler on behalf of Petro Krylov.

The position we've taken in our papers, your Honor, is the one that we're taking. Obviously the Government is conceding that the lack of Miranda Warnings made the statements inadmissible in their case-in-chief. We agree with that of course. Insofar as their contention that the statements would be admissible for impeachment purposes, that raises a factual issue of voluntariness, which we would be entitled to -- first of all, they would have the burden of proof on it and we would be entitled to contest it by cross examination of the agents and perhaps also having our client testify. Now, whether or not that will be necessary will depend upon whether or not Mr. Krylov testifies.

THE COURT: Obviously.

MR. BUEHLER: So we suggest that the most efficient thing to do would be to hold that hearing in abeyance pending that decision later.

THE COURT: I agree with you. I think here the Government is indicating that during their case-in-chief they're not going to utilize the statements. Now, should be opportunity present itself, the Court would allow you to

examine for the voluntariness of the statement outside the presence of the jury. But this motion may be either premature or moot, depending upon the Defense strategy in this particular case.

So having said that, my tentative ruling would be to withhold making any permanent ruling on this case until the issue of voluntariness is decided, and only if it becomes relevant to utilize the statements for impeachment purposes, not in the case-in-chief of the Government but rather depending upon what the Defense strategy in this case is.

MR. BUEHLER: Thank you, your Honor.

THE COURT: Who's going to argue this for the Government?

MS. SPEAKER: Your Honor, the Government concurs on that.

THE COURT: All right. Then that would be the ruling, so the ruling is accurate.

And by the way, the Government should be keeping track of these rulings so you prepare an order for my signature, a proposed order for my signature.

MS. MEYER: Yes, your Honor.

THE COURT: And the Defendant Kadamovas, Krylov, and Mikhel's motion to suppress statements made to law enforcement officers after their alleged escape attempt, the motion will be granted insofar as the Government's case-in-chief is concerned,

but withhold making a ruling for impeachment purposes until such time as the need arises.

Mr. Callahan, you wanted --

MR. CALLAHAN:  Your Honor, with respect to Mr. Mikhel there's a secondary issue, which is a second interrogation that was conducted by the FBI of Mr. Mikhel approximately a month after this initial set of un-Mirandized interrogations.  That issue is also still before the Court.

THE COURT:  Well, if that interrogation incorporates the first interrogation we're going to have a problem again with the case-in-chief, because it's piggybacked on to the second interrogation -- would appear to be piggybacked on to the -- the second interrogation is piggybacked on to the first interrogation.  So it would be the same ruling with regard to the second set of statements.

MR. CALLAHAN:  Thank you.

MS. MEYER:  Your Honor, may the Government be heard on that issue?

THE COURT:  Yes.

MS. MEYER:  Your Honor, with respect to the statements that Mr. Mikhel made to Agent Sotelo on March 13th, 2003, the Government believes that the Government should be entitled to introduce those statements in its case-in-chief.  Number one; Defendant Mikhel did waive his Fifth Amendment rights when Mr. Sotelo went in to interview him.  Secondly,

Mr. Sotelo immediately said, "We are not here to discuss the reason why you're here in jail, we're here to discuss the escape, why you had the tools, what you were going to do with the tools." And the entire interview is premised upon the circumstances surrounding the escape.

THE COURT: Let me interrupt you a minute here.

My understanding is that there was an initial interrogation that took place with Bureau of Prisons officials first about the escape. And if the Bureau of Prisons officials wrote any reports or contacted the FBI and then the FBI came in and piggybacked on to that initial interview as a follow up, I think there's a problem there. And that's what I have determined, that during the case-in-chief none of the interviews regarding the escape attempt should be utilized because the Government has conceded that the first set of interviews with the Defendants, there was no proper advisement of rights.

MS. MEYER: That's correct, your Honor. Your Honor, I believe I actually misspoke. The original interview by MDC personnel of Defendant Mikhel was on March 13th. The subsequent interview by the FBI took place almost a month later on April 11th. I don't quite understand the Government's -- I'm sorry -- the Court's comments about the second interview being piggybacked, but the case law, Supreme Court case law, makes clear that because there was no outstanding charge

against Defendant Mikhel for any escape attempt the Government should be entitled to introduce those statements in its case-in-chief because the Defendant did waive his Fifth Amendment rights.

THE COURT: Mr. Callahan, do you want to --

MR. CALLAHAN: I do.

THE COURT: -- respond?

MR. CALLAHAN: Your Honor, this is an area of the law that has been quite a great deal in flux the last couple of years. I concur with the Court's initial opinion, that there is a piggybacking affect. I believe that's true and there's a factual determination whether these two interrogations were proximate enough in time so that the piggyback theory would be appropriate.

But even notwithstanding that, your Honor, I've also sought to have that second statement excluded primarily for what I perceive to be a remarkably prejudicial aspect of the second statement, which is dealing with his motivation for wanting to escape. He did confess in that second statement; there's no question about it. But a question was asked which directly implicates the underlying hostage taking charges for which the Sixth Amendment did apply. We agree with the Government's interpretation of the offense's specific nature.

THE COURT: The content of the statement refers to the underlying offense.

**MR. CALLAHAN:** The statement, it's "Why did you get out?" and he, in answering and not being too specific, talks about seeing some of the people who are responsible for him being there. And I think that that directly implicates the Sixth Amendment for which counsel had been appointed and no phone call was made to either Mr. Rubin or myself.

**MS. MEYER:** One moment.

Your Honor, I believe it's been fully briefed in the Government's papers with respect to the statements that Defendant made about why he intended to escape. But the other statements the Defendant did make to Agent Sotelo included the fact that the tools were his, that he used two other cells to bring those tools into the institution, and that one of those cells belonged to an inmate, Presiado (ph.s.). The Government believes that even if you take out the statements about why he intended to escape, the fact that the tools were his and how he accomplished bringing those tools in the institution is something that the Government could bring in in its case-in-chief.

**THE COURT:** Well I'm going to be very cautious here and I'm going to deny the use of those statements in the Government's case-in-chief and we'll revisit this issue if the Defense strategy in the case is to call the Defendants to testify. The Defendants obviously have a right not to testify should they desire not to testify. And then the statements, if

they were voluntary, would be used for impeachment purposes only.

All right, the next set of motions --

**(Pause)**

This is a motion brought by Defendant Kadamovas for a bill of particulars with respect to uncharged murders, attempted murders, and other serious acts of violence in the Government's notice of intent to seek the death penalty.

Here Defendant Kadamovas offers the following facts in support of his motion:

On July 29th, 2004 a Federal Grand Jury returned a seven-count Second Superseding Indictment in this case.  Counts One through Four allege capital offenses pursuant to 18, United States Code, Section 1203.  Mr. Kadamovas is charged with one count of conspiracy to engage in hostage taking resulting in death and three counts of hostage taking resulting in death.

On August the 3rd, 2004 the Government filed a notice of intent to seek the death penalty for, among others, Defendant Kadamovas, on each of Counts One through Four.  The notice of intent re-alleges the statutory aggravating factors found by the Grand Jury.  But the Government also alleged the following non-statutory aggravating factors --

In addition, Defendant Krylov has joined in the present motion.

-- here are the non-statutory aggravating factors:

25

Apart from the offenses charged in the Second Superseding Indictment, Mr. Kadamovas, among others, was involved in other murders and other serious acts of violence which are not reflected in his criminal record, specifically:

One, between November 5th, 2000 and November 17th, 2000 in Istanbul, Turkey Mr. Kadamovas allegedly participated in a hostage taking resulting in the death of Anult Papsuishavco (ph.s.).

And between May 29th, 2001 and June 16th, 2001 in Paphos (ph.s.), Cyprus and elsewhere Mr. Kadamovas allegedly participated in a hostage taking resulting in the death of Valari Papou (ph.s.).

And between November 14th, 2001 and November 17th, 2001 Mr. Kadamovas allegedly participated in the hostage taking of Armand, and it's G-Y-U-R-D-Z-H-I-Y-A-N-T-S.

The notice of intent, which was filed on August 3rd, 2004, according to Mr. Kadamovas provides no specificity regarding the manner in which Mr. Kadamovas is allegedly to have participated in these acts. Mr. Kadamovas claims that he cannot possibly be prepared to present a defense to these acts at trial because he cannot determine the acts that the Government believes he committed which form the basis of his criminal liability or even when or where they specifically occurred. Mr. Kadamovas requests that the Government file a written bill of particulars listing the exact date, time, and

26

location of each act that the Government alleges constitutes Mr. Kadamovas' participation in the hostage taking resulting in the deaths that were alleged and the hostage taking involving Mr. G-Y-U-R-D-Z-H-I-Y-A-N-T-S.

Now, the Government briefly indicates the following:

On August 3rd, 2004 they did in fact file their notice of intent against Mr. Kadamovas. The notice of intent alleges that Kadamovas committed four crimes charged in the Second Superseding Indictment that make him eligible for the death penalty. It alleges the statutory portionality factors enumerated under 18, United States Code, Section 3591(a)(2)(A) through (D) that apply to this case and that the Government will prove at trial. It alleges four statutory aggravating factors that apply to each Defendant's death eligible crimes that the Government will prove at trial and it lists six non-statutory aggravating factors that the Government indicates that they will attempt to prove during the penalty phase.

The notice provides in pertinent part that apart from the offenses charged in the Second Superseding Indictment, the Defendant has been involved in other murders and serious acts of violence which are not reflected in his criminal record, which I a moment ago read into the record.

The Government indicates that it has provided all of the discovery in its possession, custody, and control concerning these crimes. The discovery includes:

1) statements from each witness the Government currently intends to call at trial; 2) The entire investigative file consisting of several thousand pages that was generated by the Cypriot police reflecting their investigation into the abduction of the victim, Papou, P-A-P-O-U; and pertinent evidence seized from the Defendant's residences that relate to the three crimes alleged in the notice. This discovery, according to the Government, described in detail the evidence the Government expects to present at trial. The Government has also provided a summary of these three crimes in its consolidated opposition to Mikhel and Kadamovas' motion to strike the unadjudicated crimes.

Now, the hostage taking that took place in Cyprus and in Istanbul, Turkey are also the subject of other motions that have been brought by the Defendants. My tentative ruling in this particular case is obviously those are not charged offenses so they would not come in during the case-in-chief. The issue is whether or not during the penalty phase I would allow this information of non-adjudicated crimes to come in. With the exception of the individual by the name of Armand G-Y-U-R-D-Z-H-I-Y-A-N-T-S, I believe these are highly prejudicial and there is a significant problem with allowing this information to come before the jury in the event the Defendants are found guilty during the guilt phase and the evidence is used during the penalty phase. In effect it

does -- it requires this Court to try the Defendants for the Istanbul, Turkey alleged murder and the Cyprus -- the Paphos, Cyprus murder, which I am not willing to do. I think it's collateral. There are four alleged victims in this particular case and I think it's just cumulative to allow the Government in the penalty phase to utilize the commission of the crimes in Istanbul, Turkey and Paphos, Cyprus.

I also have another problem, and that is the reliability of the witnesses. I think the judicial resources that would be expended are going to cause significant problems.

So my inclination is not to allow evidence of the uncharged murders that took place in the foreign country of Turkey and Cyprus. I would allow the Government, though, during the penalty phase to present evidence regarding the abduction of Mr. G-Y-U-R-D-Z-H-I-Y-A-N-T-S.

Who wants to talk for the Government? Mr. Dugdale?

**MR. DUGDALE:** Your Honor, thank you.

**THE COURT:** All right.

**MR. DUGDALE:** I understand the Court's thinking on this issue, and I want to address specifically the two points raised by your Honor.

First, the judicial resources issue. This is something that will be done quickly, if allowed by the Court. These crimes are not as involved, at least as far as an evidentiary standpoint for what the Government has to present,

29

as the five hostage takings and murders that will be the subject of the guilt phase. I estimate that in the course of this seven-month trial or so, I guess it was -- whatever the month amount --

THE COURT: First of all, I don't -- let's not talk about a seven-month trial, because I don't understand how it's going to take seven months to try this case.

MR. DUGDALE: I understand. I understand. And that is not -- that was on the outside range of what the Court gave to the jurors. And we have been working very hard, your Honor, to confine it to be much, much quicker than that.

But I believe that this is something the Government can accomplish in less than three days, putting on evidence of all three of these crimes. This is not something that's going to drag on for a number of days or weeks on top of that. So that's the issue concerning judicial resources, because frankly the evidence and the type of evidence is different than the evidence that we have for the murders that occurred here. There's not forensic evidence, like there is an abundance of in this case for what happened here in California. There are --

THE COURT: Yeah, but the real issue is if in fact the Defendants are found guilty of the four murders in this case, why do --

MR. DUGDALE: It's five.

THE COURT: Five. Why do you have to complicate this

30

case by bringing in facts and events that took place in foreign countries where reliability is going to be a major question regarding the criminal justice system of Turkey and the criminal justice system of Cyprus and, you know, what is done there? I just think it causes nothing but confusion and a waste of judicial resources.

MR. DUGDALE: Let me answer that question, your Honor, by making three quick points.

First of all, to address the Court's issue what do these additional murders add here that we don't already have with the five murders that were committed here in California? Well it adds a couple of things that are important in the context of determining the appropriate punishment in the death penalty phase for these Defendants. First, it shows that these crimes -- the Defendants' crime spree lasted much longer than the four-month period which is charged in the Indictment here. It shows that these Defendants basically did this for a living, because the crimes at issue here started in -- the overseas crimes started in the year 2000. The crimes at issue in the guilt phase started in late 2001. And what it shows, your Honor, is completely relevant and not collateral to what the jury has to determine here, and that's what the character is of these Defendants and what the appropriate punishment should be as a result of their background and their character. What it shows is that these Defendants made a living doing what

they did here.

THE COURT: Yeah, but you're going to be showing that during the guilt phase of the trial with regard to the five murders that took place in this particular case.  And so you're just, you know, adding tax, tip, and service charge in the event that they are found guilty of five murders in this case.

MR. DUGDALE: Your Honor, it adds something in addition, and that's it eliminates the chance that there is going to be a misimpression of the jury of what these Defendants are about.  The jury, when they go back to deliberate the death penalty phase of this case, one question they're naturally going to ask themselves is did these guys do anything like this before this four-month period starting in October of 2001?  If you eliminate the evidence that the Government has -- and I would submit it's overwhelming evidence.  For the Cyprus murder we find personal belongings of the victim in Mr. Mikhel's home over 10,000 miles away from where the crime took place.  For the Turkey murder the $750,000 in ransom money that was paid is tracked to Defendants Kadamovas and Mikhel.  These are immutable pieces of evidence. They are pretty hard to explain unless the Defendants were involved in these crimes.

But in any event, the jury's going to ask did these guys do anything like this before, which is a proper question that they should be asking when determining whether the

Defendant should live or die.  It's in fact a statutory mitigating factor for the Defense to show the Defendant had no previous criminal activity.  Now, if this evidence is not allowed the jury's going to have a misimpression of what the true nature of these Defendants are.  They're going to believe perhaps that there was nothing in that effect.

Another thing that -- another issue, your Honor, is until the Defendants present a mitigating case, a case of mitigation, and we have to presume that they will present a case in mitigation, it's impossible to know how this evidence is going to play out.  But we do know a couple things that are sure to happen in this case.  First of all, they are going to blame Mr. Armadas (ph.s.), that cooperated in this case.  They are going to say he had a superior role from the Defendants and that they were -- and that because he will not be executed in this case that they should not be executed either.  That's one argument you can guarantee that they will make in this case and it would be ineffective assistance of counsel for anybody not to make that argument.

What's significant about the Cyprus and the Turkey murders, which preceded the five murders alleged in this case, is that Mr. Armadas wasn't involved in either one of those.  He wasn't in Turkey and he wasn't in Cyprus when these horrible murders took place.  That negates that argument, which is an argument the Defendants are definitely going to make, that they

should not receive the death penalty because Mr. Armadas is not receiving it either and that they are less culpable than Mr. Armadas. What these two crimes show in spades is that that is not the case. And that's another thing the jury should be able to consider and must consider when determining whether these Defendants live or die.

Again, this is the individual determination that they have to make as to each Defendant, and that requires that the jury probe into the backgrounds of each one of these Defendants here. If they're denied access to information, extremely pertinent information like they killed people before they killed people here, that is going to make the reliability of that determination impossible. It's not going to be reliable because they're not going to have all the information that they need to consider the appropriate punishment and to consider the mitigating --

THE COURT: Yeah, but these are not adjudicated crimes that took place in Turkey and in Cyprus, they're unadjudicated, and that's one of the problems that I have. If this was a situation where they had been convicted of murder in Cyprus and Turkey, it would be a different situation. But you're really doing the work for the Turkish government and Cyprus government -- Cypriot government.

MR. DUGDALE: Well we have to, your Honor, because what they did was they arranged the conspiracy from here in Los

Angeles, they went to these countries, they met the people, they killed them, they came immediately back.  There is an arrest warrant out for Defendants Kadamovas and Mikhel in Cyprus.  Obviously they can't do anything about it because we have the Defendants here.  Similarly in Turkey, there is no arrest warrant out there for them, but I bet dollars to doughnuts when the Turkish government and the Russian government get information they have requested concerning these crimes that will be the case as well.

So, I mean, obviously if they were in -- if these crimes had been charged in Cyprus or Turkey we wouldn't have the Defendants right now and they would have to do our work because we would have our crimes over here.  I mean the Defendants shouldn't be allowed to get away with murder essentially and not have that considered by the jury here because they were so cunning and sophisticated that they were able to lure victims overseas to foreign countries to commit their acts.

And as far as it being unadjudicated criminal conduct, again there are dozens of cases that are cited in the Government's motion and the Defendants' motion as well that say that there is no per se bar to considering this evidence here.  The fact it's unadjudicated doesn't make any difference.  In fact, a number of the cases have considered much more extravagant evidence than what we are proposing here.  There's

one I believe in which 13 additional crimes, including a number of murders and racketeering activities, were allowed by a Court. The fact that they were unadjudicated doesn't mean anything as long as the Government can present relevant and reliable information to show that these crimes occurred. And again, that evidence exists here. All the ransom money for the Turkey murder is traced to the Defendants here. That's no accident. The fact that the personal belonging for Mr. Papou are found in Mr. Mikhel's place, again no accident. And it's no accident that the last people who the victims saw in their lifetimes, the people who they were scheduled to meet with, were Mr. Kadamovas and Mr. Mikhel, again no accident.

So really, your Honor, it should be a matter for the jury to determine. I know the Court's sentiment about the five murders versus the seven murders, but again keeping this entire context it's appropriately very difficult for the Government to successfully bring a death penalty case. In fact, there has not been a death penalty sentence imposed in this District since the 1940s. And again that's perfectly appropriate and the way it should be, that it should be difficult. But that is why the Government has an obligation to bring to the jury as much relevant and reliable information that it has concerning the background of these Defendants, so the jury can make the appropriate individualized consideration of each Defendant as to whether they should live or die, probably the most important

decision most of these jurors will ever make. And they're not going to be able to make that decision reliably if they do not know about the background of these Defendants and in fact are given an inaccurate portrayal of the background of these Defendants. It's going to be impossible thing for them to do.

And again, it's something the Government can do quickly. It's something the Government can present -- in less than three days we'll be able to present evidence concerning all three of these. And it is, for the reasons recited in our papers and the reasons I've recited today, reliable and relevant information. It's relevant to show the character of these Defendants, it's to show their backgrounds, to show the kind of pattern of activity that they engaged in.

So unless the Court has any other questions, I'll submit. I may have additional comments when the Court makes its final ruling. But I appreciate the time. Thank you, your Honor.

THE COURT: All right, which Defense counsel wishes to comment?

MR. RUBIN: Good afternoon, your Honor. Dale Rubin on behalf of Mr. Mikhel.

Your Honor, briefly, because we also have the issue of the Defense request for discovery on the issues of penalty phase and these crimes as well, I will try to brief. And I'm also not going to address Armand G. I am directing my

attention specifically to the allegations of conduct that are alleged to have occurred in Istanbul, Turkey and Paphos, Cyprus.

As far as the Russian Federation and the Moscow authorities are concerned the disappearance -- Mr. Papsuishavco is listed as a missing person. As far as the Istanbul, Turkey authorities are concerned, they have not even -- no one has alleged that a crime has been committed regarding Mr. Papsuishavco in Istanbul, Turkey. What they have done is replied to some MLAT requests from the Government seeking information. As far as Mr. Papou is Cyprus is concerned, there is a -- it is a murder investigation, with everything that is involved in a murder investigation that happens in this jurisdiction.

Without knowing who the Government is going to be calling from those jurisdictions to prove its case it's really impossible for the Defense to respond to this will only take three days. I have found that prosecutors tend to think that defense attorneys don't ask a lot of questions or don't cross examine witnesses and they can't guess how long cross examination is going to take. However, there may be other witnesses that the Government is not going to be presenting that the Defense will need to present because in fact they present a defense. And what the Government is not telling you is that we're only going to be calling witnesses that help us

prove our case, we're not going to be bringing everyone who has information over in order to determine whether or not there is truth to these charges or not. And for that reason it creates a real problem for the Defense, because we don't have the same ability that the Government has to get people here and to bring people to this jurisdiction in order to respond to these charges.

Lastly, I will point out to the Court, for whatever purpose it may mean, and that is that in Turkey there is no death penalty and if there was a crime committed in Turkey and if there was an allegation that a crime was committed in Turkey and if warrants were issued for the Defendants, they could not face the death penalty there. Likewise in Cyprus there is no death penalty, so the Defendants further would not be looking at the death penalty in the charge alleging the murder of Mr. Papou.

Now, the question is what does that have to do with it? Well, it seems to me that you take another jurisdiction's evidence, you bring some of it here to tell to a jury so that you can then convince them to do something that wouldn't happen in that jurisdiction. And I think that's a problem.

The Defense will have to at this point be laying out substantial resources in order to fight these charges. And again that's assuming that the Court orders the Government to provide discovery so we know who they're calling and so we can

conduct our investigation. The Government seems to think for some reason that when they give us discovery we read it and that's all there is to it, but we have to respond to it. And by responding to it we have to then conduct our own investigation.

And if I -- at this point if I can take one step backwards, because after we left here on May 3rd, after the Court ruled on the Motion to Continue, something occurred which bothered me more than a little. And when we were here and the Court was informing us that haven't you had enough time and hasn't four years been enough time and two years been enough time, and the Government got up and the Government repeated to the Court that they had enough time. What the Government didn't the Court was that on that very morning they sent out another discovery letter to the Defense indicating in that discovery letter that another 2300 pages of discovery was available to be picked up at CopyPro, which we have now just received, which also contains information regarding Cyprus and Turkey. In addition to that there is other information that is in there. And again, 2300 pages of discovery, if the Defense reads a page a minute, is about another 40 to 50 hours of work. In addition to that some pages take longer. In addition to that we may then have to respond to that.

And I'm telling the Court that with the time that the Court has provided and the Court's authority that's been given

40

to conduct the investigation, there isn't enough time to do it before trial starts. And I think that that has to then at some point go back to the Prosecution and has to be held against the Prosecution. And we're going to start at some point asking that information be excluded because of late discovery.

I would also point out that we received yesterday and a few days before that supplemental notices of experts that they intend to use in trial. It's very interesting, their cutoff date for experts was a year ago May.

THE COURT: You're going far apart --

MR. RUBIN: Well I said I was stepping backwards a little bit.

THE COURT: -- far a field --

MR. RUBIN: Yes.

THE COURT: -- from the motion here.

MR. RUBIN: I just want the Court to understand that when the Government does something just to the point of giving us information, we have to respond to that. There is no time to do that anymore.

As far as Turkey and Cyprus go, they can -- the Government can think it's going to take three days. It's going to be a lot longer than three days. A lot longer.

THE COURT: The time is not the issue. It's whether or not it's really collateral, it's reliable admissible evidence that I'm looking at, and I think what's going to

41

happen is you're going to lose focus of the underlying crimes that are charged in this Indictment by brining in issues that occurred in Cyprus and in Turkey.

Anybody else for the Defense want to comment?

MR. RUBIN:  Thank you, your Honor.

MR. LASTING:  Good afternoon, your Honor.

THE COURT:  Mr. Lasting.

MR. LASTING:  Yes, Richard Lasting for Mr. Kadamovas.

Your Honor, I think the Court's exactly right with the focus on the fact that these are unadjudicated crimes. These are -- with regard to Papsuishavco, from what I've read, there's a question as to whether it's even a crime.  There are some indications in some of the reports that Papsuishavco was a organized crime figure in Russia.  There are some indications in reports I have read that Papsuishavco might have wanted to disappear.  There are indications in reports from interviews that the Government had with Russian law enforcement agents that there was a question as to whether he ever boarded a plane in Moscow to go to Turkey.  There are questions as to whether he ever arrived in Turkey.  And it is a very complicated situation with regard to Papsuishavco which the Defense is at a tremendous disadvantage to prepare a defense to an alleged murder taking place in Turkey of an individual who was from Russia who may or may not have ever traveled to Turkey.

It is an issue that the jury -- I think if it was

42

presented as a charge in a case-in-chief it would be very difficult for the Government to get a conviction on that charge. Unfortunately I think what would happen, and this is where the fact that it's an unadjudicated crime and where I can understand the Government's position that they could do this quickly in three days, because they will be presenting this evidence in a penalty trial with a different standard of admissibility of evidence, they will be presenting it to a jury because we're in a penalty trial who has found the Defendant, Mr. Kadamovas, guilty of at least one murder and possibly five, and they're going to be predisposed to find this evidence to be true. It would be supportive of the verdict they've already reached. And I believe that the heightened sense of reliability that's required in the capital sentencing procedure is tremendously diminished if the Court were to allow them to proceed in this fashion.

Likewise with the murder of Valari Papou in Cyprus, there are some indications in the Government's discovery that Mr. Papou was in Cyprus, that he left Cyprus, that Mr. Kadamovas was in Cyprus and left Cyprus, and that Mr. Papou then returned to Cyprus and Mr. Kadamovas was back in the United States. And again there are issues related to what happened, how it happened, why it happened. There are other indications that Mr. Papou was also an individual that was involved in criminal activities in the former Soviet Union. I

believe he was from, if I'm not mistaken, from Belarussia.

And these are issues that are going to be I think complicated and difficult for the jurors to sort out if they were presented initially to a jury that was completely unbiased as they went about their responsibilities of trying to determine if this evidence -- or if these crimes have been proved by the Government beyond a reasonable doubt.  Coupled with that, the tremendous difficulties that the Defense faces in investigating and preparing to defend alleged murders that occurred in Turkey and in Cyprus.  We have none of the support that the Government has.  We don't have the MLAT treaties and we don't have the other access to government officials that they do.

And I think the Court's exactly right in its analysis that this evidence is collateral, it's virtually impossible for the Defendants to defend, and --

THE COURT:  It may be speculative to the point that there is just absolutely no reliability.

MR. LASTING:  I think that's the issue, your Honor.  And I'll submit on that basis.

THE COURT:  Mr. Evans, Mr. Buehler, Mr. Callahan?

MR. BUEHLER:  No, thank you, your Honor.

MR. CALLAHAN:  Nothing, your Honor.  Thank you.

THE COURT:  All right, I'm going to stand with the tentative ruling, and that is not to allow any evidence in the

guilt phase or the penalty phase of the murders that allegedly place in Istanbul, Turkey or Paphos, Cyprus.

MR. DUGDALE:  Your Honor, regretfully I have one comment concerning that.

THE COURT:  All right.  For the record.

MR. DUGDALE:  Just for the record, your Honor.  And this is more of a heads up.  This is an issue that I have to address with my superiors in the office as far as what to do concerning this ruling.  I'm not saying that it will be appealed or anything like that.

THE COURT:  Look it, I've been a trial judge 30-something years.  I understand I'm low person on this -- in the system.

MR. DUGDALE:  Well you're the highest one here, so --

THE COURT:  Well, you know, they put erasers at the end of pencils because people make mistakes, and that's what I look at an Appellate Court as, as an eraser.  But in this one I think that if you were to go up I think I'd be affirmed on this because of the fact that I think the Appellate Court would view this as the same -- with the same view that I have, that it's very, very speculative information and evidence that you are seeking to introduce.  And I question the reliability of the evidence.

MR. DUGDALE:  I understand your Honor's position.  There's a secondary issue, and that's as to whether this

45

information could be charged and indicted by the Government here, and the Government believes that it has jurisdiction to do so. And so there is the possibility, again I'm not saying it's a probability or it's going to happen or anything like this, because the Government's biggest interest, as in common with the Court's interest, is to get this thing going. We don't want to do anything to delay the trial. But --

THE COURT: I mean you've waited four years; you're going to file now a Third Superseding Indictment?

MR. DUGDALE: I'm just saying it's an issue that I have an obligation to raise with my superiors.

THE COURT: I understand.

MR. DUGDALE: I'm not saying that I'm going to do it. Again, our interests are in common as far as getting this thing going. I don't want to do anything to jeopardize that. But I wanted to give the Court that heads up, because this call might not necessarily be mine.

Thank you.

THE COURT: All right. The next motion I'm going to take up is the Government's motion to preclude the Defendants from offering any mental health and defect evidence during the guilt phase of the trial or, in the alternative, to compel Defendant Mikhel to provide immediately a proper notice in discovery concerning his intent to offer such evidence and to permit the Government to conduct a mental health examination.

46

Now, the Government has offered the following facts in support of its motion:

On July 12th, 2002, a First Superseding Indictment was filed against Defendants, Mikhel, Kadamovas, Krylov, Solovyeva and against Markovskis charging them with conspiracy to engage in hostage taking resulting in the death -- and three counts of hostage taking resulting in death.

On July 29th, 2004, a Grand Jury returned a Second Superseding Indictment.  The Second Superseding Indictment added additional charges against Mikhel, Kadamovas and Krylov, including conspiracy to escape custody.

The Second Superseding Indictment also alleged the statutory factors that make Mikhel, Kadamovas and Krylov eligible for the death penalty.

In an effort to insure that pretrial issues were addressed in an orderly manner the Government and Defendants agreed to Scheduling Orders to split pretrial issues into four separate phases of motions and deadlines.

One of the issues regulated by these Orders was a deadline by which Defendants were to provide notices of an intent to raise a mental health defense during the guilt phase. In the original Scheduling Order the date Defendants were to file this notice was September 6th, 2005.  The date was later continued to January 27th, 2006 in response to Defendants' request to extend the date by which to file all Phase 3

motions.

On January 27th, 2006, Mikhel filed what he styled a "Notice of Intent to Offer Evidence Relating to Mental Health or Defect Pursuant to Federal Rule of Criminal Procedure Rule 12.2(b)."  In that Notice Mr. Mikhel states that he may introduce expert evidence relating to a mental disease or defect on the issue of guilt.  Specifically, he contends that he may suffer from an unidentified neurological disease that could impair his behavior and mental functioning.  But Mikhel admits that he has not yet undergone any neuropsychological testing that could assess the validity of raising a mental health defense.

Mikhel claims that this testing has not been done because Defendants are waiting until Defendants' Joint Ex Parte Application for Protective Order requiring that preclearance of defense experts and consultants be conducted by walled off agents and prosecutors.  Therefore, according to the Government, the Notice does not identify with any specificity any mental defect Mikhel will claim that he suffers from that bears on the issue of guilt, nor does Mikhel's Notice disclose any expert opinion relevant to a mental health defense that he intends on relying upon during the guilt phase.

In order to determine whether the Government needed to file the instant motion the Government lawyers contacted Defense Counsel on February 10th, 2006 to determine if and when

48

Mikhel intended on providing the Notice of Discovery required.

Defense Counsel told the Government that Mikhel had not obtained approval from the Court to retain the neuropsychologist who Defendant wanted to examine him.  Defense Counsel also said that it would provide the Government with an estimation the following week concerning when the testing would take place.

On February 14th, 2006, Defense Counsel disclosed that the neuropsychologist who Defendant was seeking to conduct the testing was Dr. Kyle Boone.  Defense Counsel provided the Government with a copy of Dr. Boone's resume.

On February 17th, 2006, Defense Counsel told the Government that the earliest date that the examination could be conducted was March 21st, 2006.  As of February 22nd, 2006, Defendant had not completed the steps necessary to clear Dr. Boone to visit Mikhel.

Mikhel offers the following facts in opposition to the Government motion.  And the Defendant has combined his factual background with his argument that he has good cause in providing the belated notice of an intention to present mental health evidence.

The Defendant Mikhel argues that the First Superseding Indictment was filed on June 12th, 2002, with allegations that made Defendant death eligible.  The Government then took over two years to decide to seek the death penalty

49

against Mikhel.

The Second Superseding Indictment was filed on July 29th, 2004. During the period between the filing of the First Superseding Indictment and the Second Superseding Indictment the Court denied Mikhel's request to appoint experts regarding penalty issues.

The Court indicated -- that would be Judge Manella -- that if the Government did end up seeking the death penalty the Defense would be given sufficient time and opportunity to conduct its penalty phase investigation. Mental health is traditionally a penalty phase issue. Therefore, the Defense almost lost two-and-a-half years of investigation and preparation time waiting for the Government's decision.

In June of 2003 after discovering an alleged escape attempt involving Mikhel, special administrative measures were put in place curtailing Mr. Mikhel's contact with others, placing him in solitary confinement and limiting his lawyers' access to him.

Mikhel's medical records show that he became extremely depressed and was placed on anti-depressants and other medications. After being placed on these medications Mikhel's ability to assist his lawyers allegedly suffered. Counsel indicated that it was obvious to them that Defendant was drugged and nonresponsive when they met with him.

On January the 20th, 2004, Mikhel attempted suicide.

50

Defendant was then placed on suicide watch requiring visual checks at 15-minute intervals.

On January the 3rd, 2004, Dr. Jose Flores Lopez, a psychiatrist at the San Bernardino County Jail, wrote that Mikhel requires a higher level of psychiatric care than is currently being provided. He remains suicidal and depressed. Mikhel requires a 24-hour suicide watch, as well as daily psychiatric consultations. He exhibits severe mood swings and depression. Mikhel has been observed discarding his voluntary psychiatric medications. As a result, Mikhel is a strong candidate for involuntarily medication.

The facility, according to the doctor, cannot accommodate such a patient. Dr. Flores Lopez concluded that it is crucial that Mikhel be transferred to a facility where his medical needs could be addressed.

On February the 2nd, 2004, this letter was forwarded by the U.S. Marshal to Assistant United States Attorney Ms. DeWitt indicating that Mikhel must leave the facility. The Government opposed the transfer to a psychiatric BOP facility and succeeded in having Defendant placed in the SHU -- that's special housing unit hospital -- at the WVDC. This move guaranteed that Mikhel would not obtain the proper examination, care or treatment. It also prevented any chronicling of Mikhel's mental and emotional condition by a qualified psychiatric staff.

51

For the next year, according to the Defense, Mikhel was treated at the WVDC with the administration of anti-depressant and psychotropic drugs.  Because of the medication his ability has allegedly -- to assist counsel has been limited.  Successful psychiatric testing has been impossible, according to the Defense, because of his drug condition.

On April 15th, 2005, Mikhel again attempted to take his life.  During this period Defense Counsel traveled to Russia attempting to locate records of Defendant's personal history such as his childhood medical records.  This information would not only be useful in psychiatric review of Defendant's mental and emotional condition but is usually required by expert psychiatric witnesses.

In July 2005, Mikhel expressed an interest in assisting in his defense and requested that his medication dosage be lowered.  Over a period of many months Mikhel's medication was reduced.  He also expressed an interest in reviewing the discovery materials but allegedly was stymied because of the SAM restrictions.  The Defense sought to change these restrictions but the Government has opposed.

In July 2005, the Defense began a search for mental health experts to examine Mikhel and report on his condition.

In August 2005, the Defendants obtained the appointment of Dr. Samuel Miles, a forensic psychiatrist. Dr. Miles recommended that Mikhel be examined by a

psychologist, be given a battery of psychological tests and have the tests scored before he, Dr. Miles, examined Mikhel and reviewed the case materials.

In August 2005, an appointment was also sought for Dr. Dale Watson, Ph.D, a forensic psychologist.  Dr. Watson was appointed by the Ninth Circuit but the Court cut his requested fee from $300 per hour to $200.  That would be Judge Manella.  Dr. Watson refused to work for that rate.

The concerns of the Ninth Circuit prove to be a stumbling block in locating a forensic psychologist with sufficient credentials to accept appointment.  The Defense maintains that the Government has no such concerns and can hire anyone it chooses at any rate.

In mid February 2006, Dr. Kyle Boone, Ph.D was appointed to conduct psychological testing of Defendant.  Although Dr. Boone agreed to the $200 per hour rate, the Ninth Circuit cut the number of hours Dr. Boone requested in half.  Because of the SAM restrictions -- that's the housing restrictions -- WVDC has refused to allow contact visits with Mikhel.  The examination and testing must take place through a wire mesh.  But the examination and testing cannot be accomplished, according to the Defense, under these conditions.

The Government has interpreted the restrictions to require Defense Counsel be present with the expert at the time of the interviews.  However, the examination and testing,

according to the Defense, can only be accomplished if the doctor and Defendant meet alone.

The Defense has scheduled its first psychological examination and testing for March 21st, 2006. The Assistant United States Attorney, Ms. DeWitt, has indicated that there may not be enough time to conduct the background check and obtain approval for a contact visit without a defense counsel being present. The Government received five weeks' notice of this examination.

In January of 2005, when Defendant originally agreed to the notice date, there was no way for counsel to anticipate all the circumstances that have occurred which have now affected Defendant's ability to meet the deadline. But counsel still attempted to file the spirit of the notice order and has allegedly provided information in his possession with an agreement to update that information when it becomes known.

Now, the Federal Rules of Criminal Procedure are very specific. Under Rule 12.2, there's an obligation for the Defendant to provide a notice of an insanity defense, 12.2(a); or expert evidence on mental health issues, Rule 12.2(b); and provides for examination of the Defendant by a Government expert in certain circumstances, Rule 12.2(c).

The time of the notices under subsections (a) or (b) are within the time provided for filing pretrial motions or any later time the Court sets. But the Court may also for good

cause allow Defendant to file notice late.

Now, the Court's authority to order a mental examination is defined in Rule 12.2(c)(1). Under subsection (A) the Court may order the Defendant to undergo a competency examination under 18 United States Code, Section 4241.

Under subsection (B), if the Defendant provides notice under Rule 12.2(a), the Court must order the Defendant examined under 18 United States Code, Section 4242. However, if the Defendant provides notice under Rule 12.2(b), the Court may order the Defendant examined under specific procedures ordered by the Court.

Therefore, if the Defendant intends on offering expert evidence on guilt rather than an insanity defense, the Government examination is discretionary and subject to conditions set by the Court. It is the Defendant's notice that triggers the Government's request for the examination and until such notice is given the Government has no right to examine the Defendant.

The substance of the notice determines the Government's right to an examination. Those rights, therefore, cannot be determined until and unless notice is given. The Government is seeking to divest Mikhel of the possibility of providing notice under Rule 12.2 before the statute states the right is lost, according to the Defense.

Now, in this case the Defendant appears to continue

55

to offer no indication of whether he actually intends on asserting a mental health defense during the guilt phase or when the Government should expect such a decision. Rather, the Defendant complains that the deadline to provide notice was arbitrary and blames the Government, his custodians and even the Court for why he still remains unable to comply with Rule 12.2 notice requirements.

The deadline was not arbitrary. The latest deadline was well beyond the date when Defendant first agreed to provide notice and it was a date that provided an extremely generous amount of time for Defendant to determine whether he should raise such a defense. And it was a date that the Defendant needed to meet in order to provide the Government with a fair opportunity to rebut any evidence put on by the Defendant.

None of this blame shifting explains Mikhel's failure to meet the deadline. For example, the Defendant's complaints concerning the time of the Government's decision to seek the death penalty and this Court's decision not to sanction the appointments of penalty experts until the Government made its decision do not explain Defendant's failure to give timely notice of any mental health expert it intends on calling during the guilt phase of the trial.

Here Defendant seeks to blame everyone from the Government to this Court for his failure to meet the deadline. But none of these excuses really amount to good cause. The

timing of the Defendant's [sic] decision to seek the death penalty did not restrict in any way Defendant's ability to investigate the mental health issues he may raise during the guilt phase.

Furthermore, this Court's decision, that is, Judge Manella's decision, not to prematurely appoint penalty phase experts, had no impact on Defendant's ability to ask the Court to appoint experts to be used during the guilt phase. Accordingly, Defendant's claim that his ability to investigate mental health issues was affected by the timing of the Government's decision to seek the death penalty appears to be without merit.

Mikhel does not explain how his transfer to San Bernardino County Jail and his purported mental health state at that time rendered counsel unable to seek a mental health professional to examine him.

There is evidence that confirms that Defendant was quite alert and in touch with his surroundings prior to January 20th, 2004. Just one day prior deputies at the San Bernardino Jail caught Mikhel trying to pass a note to another inmate. The note contained a detailed escape plan, including a hand drawn map of the jail, a proposed escape route, a diagram of how to disable the lock on one of the gates and a detailed assessment of the guards at the jail, which noted their shift times, their habits and which guards Mikhel

believed were lazy or inattentive.

There is also no explanation of how Mikhel's transfer to the SHU, special housing unit, at the WVDC rather than a BOP psychiatric facility infringed in any way on his counsel's ability to secure a mental health expert to examine him.

Defendant was moved to WVDC because it had a medical and psychiatric unit that could provide Defendant with the care he needed. Defense Counsel requested Defendant not be transferred outside the district because such a transfer would impact on their ability to meet with him. Defendant also objected to having the Government conduct any mental health testing of him so the Defense could conduct its own psychiatric examination.

The Government argues that even if Defendant's efforts to have himself examined were thwarted because of cost, it does not account for why over three-and-one-half years passed before he sought to retain his initial mental health expert and over six months before his replacement was retained.

The Government has also argued that the Defendant offers no proof that any mental health defect claim that he may raise has any merit. In order to excuse the failure to comply with Rule 12.2 in a timely manner, the Government argues the Defendant must not only show that his failure was a result of good cause but must also show that his mental health defense has merit. Here Defense, according to the Government, makes no

attempt at this showing.

Even though it is mere months before the trial -- weeks actually -- Defendant has offered no proof that he suffers from a mental health defect or condition relevant to the issue of his guilt.  Accordingly, according to the Government, the Defendant has not made the required showing to forgive his failure to comply with the requirements of Federal Rule of Criminal Procedure 12.2.

The Government also indicates that it needs an expeditious opportunity to conduct a mental health evaluation of the Defendant in the event he does provide notice.  Because the Defendant's failure to provide timely notice or any notice as of yet, the Government indicates it has no idea of whether Defendant will present expert testimony, either at the guilt phase or the penalty phase.  Therefore, the Government requests permission to have a mental health expert of its own choosing immediately examine Defendant in the event that he belatedly provides notice and this Court decides not to preclude such evidence.

The Defendant has pointed to no reason why the Government should be denied such an opportunity.  The Government indicates that it does not dispute that it has no such right to an examination unless Defendant provides notice of an intent to introduce a mental health defense.

The real issue in this case is the Government is

confused and the Court is confused.

Is the Defendant Mikhel going to offer a mental defect or mental health defense during the guilt phase and/or the penalty phase?  I need a definitive answer and proper notice.

(Pause)

MR. RUBIN:  Good afternoon again, your Honor.  Dale Rubin on behalf of Mr. Mikhel.

Your Honor, the problem with attaching or going into this Motion at this time is that it is linked to the Defense's request to modify the terms and -- or the conditions of Mr. Mikhel's incarceration --

THE COURT:  No, don't -- delink them.

MR. RUBIN:  I'm sorry?

THE COURT:  Delink.

MR. RUBIN:  Well, the problem -- I understand.  If the Government doesn't understand -- the answer to the Court's question is we still haven't gotten a definitive answer because we can't get the people in to see Mr. Mikhel.  We have had Dr. Boone in to see Mr. Mikhel.  Dr. Boone has prepared a report.

We are now in a situation where I had talked to Lieutenant Trotter about getting the psychiatrist and another psychologist who was appointed in to see Mr. Mikhel.  And we are having problems doing that because we have gotten back to

60

the stage that we are not allowing Mr. Mikhel to have contact visits.

THE COURT:  Well, but see -- you know, there's a -- I'm judging the case.

MR. RUBIN:  Yes, sir.

THE COURT:  Nobody has ever asked me to intercede in this case since I've had the case.

MR. RUBIN:  Well, excuse me --

THE COURT:  You know when I --

MR. RUBIN:  The question on the SAMS has --

THE COURT:  Well, I'm not going to --

MR. RUBIN:  -- been pending since January.

THE COURT:  Yeah.  I am not going to change his housing.  That's out of the question.  So I'll tell you that --

MR. RUBIN:  I'm not asking the Court in that motion to change his housing.  It's the conditions under which that is.

THE COURT:  No.  His conditions are set by the people that have custody over him, and I'm not going to interfere with that.

MR. RUBIN:  That isn't true.  The conditions that he is presently under with the special administrative measures were set by the Government, not West Valley Detention Center.

And the Government is the one that is requiring that there be no contact visits.  The Government is requiring that

all of the defense experts go through an FBI check. The Government is requiring that I have to babysit my investigator every time the investigator goes and sees him. Those are the Government's requirements.

THE COURT: I'm talking here now about mental health issues.

MR. RUBIN: Yes, sir.

THE COURT: Leave everything else aside. Let's delink from that. Let's not even get involved there.

MR. RUBIN: If I can't get the experts in to see my client --

THE COURT: I can --

MR. RUBIN: -- to examine my client, I don't know how to answer the Court's question.

THE COURT: Because I can get those experts in. I can bypass through an Order.

When I became a federal judge, Manny Real was the Chief Judge. He gave me a pen and he said to me, "With this pen you can stop a speeding locomotive."

So I can get the expert in there. I can work around for that specific expert. I am not inclined to change any of the other conditions of housing. But if it needs to have an expert get in there and meet one-on-one with him, that can be done providing the expert clears the background check of the -- the FBI background check.

**MR. RUBIN:**  I understand.  And that's what takes time is getting them sign on to the special administrative measures and go through the background check.  And there's no way to avoid that.

**THE COURT:**  See, right now --

**MR. RUBIN:**  Again, I want the Court to understand that we have been trying to deal with this before this Court with Judge Manella since the beginning of this year.  And that motion has been pending since the beginning of this year.

**THE COURT:**  But that motion really goes far afield from what the present issue that I'm deciding, and that is, whether or not you're going to request a mental health -- or you're going to put forward a mental health or insanity defense at the guilt phase and/or the penalty phase.

**MR. RUBIN:**  If after the examinations occur an expert says that Mr. Mikhel has a mental defect or a mental disease that prevents him from forming a specific intent that's required for the Government to prove in this case, then that will be offered in guilt.  If the expert doesn't offer -- I can't guess what the expert is going to say.

**THE COURT:**  Let's do this.  You have presented me, the Defense Counsel, with numerous ex parte motions since I've handled the case, under seal, which I have signed.  If you need to get an expert in there on a one-on-one basis to meet with your client, I can do that.  But I have not been ever presented

with that. It's always been part and parcel of other extraneous issues. I don't want it --

MR. RUBIN: The reason for the other extraneous issues is because they explain when all put together why the Defense is not ready for trial.

THE COURT: See, now we're changing into another area.

MR. RUBIN: Well, you know, I learned how to dance a long time ago.

THE COURT: I know.

But you're not on my dance card.

(Laughter)

MR. RUBIN: Your Honor, I can only do -- between dealing with the Government and dealing with Lieutenant Trotter at the West Valley Detention Center, we have been trying to get these people in and --

THE COURT: You specifically identify the individual.

MR. RUBIN: Yes, sir.

THE COURT: Give the name so their background check can be handled. And give me the times that they would like to get our there, and I will take care of that.

MR. RUBIN: Yes, sir.

THE COURT: In the form of an Order.

MR. RUBIN: Yes, sir.

THE COURT: But only the experts that we're talking

64

about.

MR. RUBIN: Yes, sir.

THE COURT: Nothing else.

MR. RUBIN: Yes, sir.  Thank you.

THE COURT: But I need this done --

MR. RUBIN: Yes, sir.

THE COURT: -- in the next 14 days.

MR. RUBIN: All right.  Well, we actually had one of the individuals who was just appointed by the Ninth Circuit who wanted to come out as early as this Wednesday and --

THE COURT: You get me an Order tomorrow morning and I'll have it signed.

MR. RUBIN: Yes, sir.  Thank you.

THE COURT: And faxed to the facility.

MR. RUBIN: Thank you.

MR. DUGDALE:  Can I briefly be heard, your Honor?

THE COURT: Yes.

MR. EVANS:  Your Honor, may I briefly step out of the courtroom?  Mr. Buehler will be here in my stead on behalf of --

THE COURT: All right.

MR. DUGDALE:  I just have to respond to that, your Honor, because there's a reason why the Courts have not been provided, either yourself or Judge Manella, with the type of thing that the Court is requesting here.  And that's because it

hasn't been needed.

There hasn't been one expert that any Defendant has asked to meet with their client that the Government has denied access to. And there has not been one instance where -- there have been instances involving all the Defendants, I believe, where we have allowed contact visits. The only thing that's needed is that we get a waiver when the Department of Justice -- a waiver of the SAMS order on this.

So this is a bunch of nonsense as far as the efforts that have been made to have people meet with Mr. Mikhel. They've come to us twice within the past six months as far as having people meet with him. And at both times we've allowed the meetings to take place exactly how they wanted them to take place.

So this SAMS thing is a complete red herring. The Government realizes -- and it's done everything it can. We want to get this case to go to trial. We don't want delays in the trial because, you know, because of some late disclosure about a complicated mental health defect or something to that effect. So every time they've asked for it, we've allowed it.

The only thing that is -- that we required of the SAMS is that we pre-clear these people, which we usually do within a couple of days. And that if they want something like a contact visit that we get a waiver to allow that to happen. And that has happened in every case so far. There hasn't been

one case --

THE COURT:  And now I've figured out why this case, as you indicate, is going to take five to seven months to try. Because everybody has to just keep going on and on.

I think we've solved the issue.  Right now I'm not going to grant the Government's Motion to Preclude until this examination has taken place.  And then once the examination has taken place, after the examination has taken place, they will have ten days, ten court days -- that's two weeks -- to indicate whether or not they're going to have a mental defense during the guilt phase and/or penalty phase.

MR. DUGDALE:  Thank you, your Honor.  That's all the Government wants is --

THE COURT:  All right.

MR. DUGDALE:  Thank you.

THE COURT:  All right.  The next motion is Defendant Mikhel's Motion to Dismiss Counts One through Four of the Second Superseding Indictment that's been joined in by Defendants, Krylov and Kadamovas, as well.  And I believe Defendant Solovyeva joined the motion insofar as it applies to Counts One, Three and Four.

Here the Defendants offer the following facts in support of their motion to dismiss counts in question of the Second Superseding Indictment:

The Federal Hostage Taking Act codified at 18 United

States Code, Section 1203(a) provides, in pertinent part:

> "Whoever, whether inside or outside the United States, seizes or detains and threatens to kill, to injure or to continue to detain another person in order to compel a third person or a governmental organization to do or abstain from doing any act as an explicit or implicit condition for the release of the person detained or attempts or conspires to do so, shall be punished by imprisonment for any term of years or for life and, if the death of any person results, shall be punished by death or life imprisonment."

Now, the Defendants have argued that the Federal Hostage Taking Act is unconstitutional because "if death results" element fails to require other mens rea or proximate cause. Section 1203, according to the Defense, sets forth two different degrees of hostage taking offenses:

The baseline statutory punishment for a violation of 1203 is any term or for life imprisonment, 18 United States Code, Section 1203(a). However, if death of any person results, the statutory punishment is elevated to either death or life imprisonment. In the instant case the Government has opted to seek death.

Now, the Defense argues to prove a conventional hostage taking offense, the Government must prove, beyond a

reasonable doubt, that the Defendant:

One, seized or detained another person;

Two, threatened to kill or injure or to continue to detain another person;

Three, with the specific intent to compel a third person to do or abstain from doing any act as an explicit or implicit condition for the release of the person detained. The Defense cites *U.S. versus Xui Fei Lin*, X-u-i F-e-i L-i-n, 139 F.3d 1303.

Here, according to the Defense, in Counts One through Four, the Government alleges not only did conventional hostage taking occur but the death of several hostages resulted. The Defense argues that when 1203 was amended as part of the Federal Death Penalty Act in 1994 Congress intended that if the death of any person results provision to act as a penalty enhancement determined by the Trial Court using the preponderance of the evidence standard it was not intended to be an element of the crime. As a result, on its face, the provision contains neither a mens rea nor a proximate cause requirement.

The Defense argues that because the addition of the death results provision causes the statutory maximum sentence to be enhanced, *Apprendi versus New Jersey* and its prodigy now mandate that the death of any person results provision be treated as an element of the offense because other than the

fact of prior conviction any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved, beyond a reasonable doubt. According to Defense, Congress has failed to fix the obvious deficiencies of the provision after *Apprendi* was decided.

The Defense argues that when the conventional hostage taking statute is supplemented by the death results provision the provision transforms 1203 into a felony murder statute. However, according to the Defense, 1203 is a drastically different homicide statute because it improperly attempts to impose criminal liability without texturally requiring proof of culpability with respect to the homicidal element.

On its face the Defendant argues that 1203 mandates life imprisonment or death when death results regardless of whether a defendant (1) intended to kill; (2) committed an act as reas that led to the death of the named victim; (3) proximately caused the death of any hostage; or (4) had malice aforethought.

Despite these deficiencies and different quanta of proof, the punishment for violating 1203 is exactly the same as is authorized for a violation of the felony murder statute codified in 18 United States Code, Section 1111(a).

The Defense argues that the primary difference between 1203 and 1111(a) is that malice aforethought and proximate causation are necessary components that the

70

Government must prove for every federal murder case, citing *O'Malley* (ph.s.), Federal Jury Practice and Instructions, Section 4503, 4506, 4515.

The Defense argues that the application of a strict liability statute to a nonregulatory offense raises a myriad of due process issues. The application to the common law crime with which Mikhel is charged would deprive him of due process of law as the existence of mens rea is the rule of rather than the exception to the principles of Anglo-American criminal jurisprudence, citing *Dennis versus U.S.*, 341 U.S. 494.

The Defense argues that the FHTA violates the Fifth and Eighth Amendments because it is unconstitutionally vague and ambiguous regarding the "if death of any person results" element. The Federal Hostage Taking Act is "FHTA."

The Defense argues that the statute is void for vagueness as it fails to define the criminal offense with sufficient definitiveness that ordinary people can understand what conduct is prohibited and the manner that does not encourage arbitrary or discriminatory enforcement, citing *Anderson versus Morrow* (ph.s.), 371 F.3d 1027. Also citing *U.S. versus Hockings*, H-o-c-k-i-n-g-s, 129 F.3d 1069, *U.S. versus Wyatt*, W-y-a-t-t, 408 F.3d 1257.

The Defense finally argues that the addition of the death results provision renders the law vague because if fails to draw any causal connection between the Defendant's alleged

conduct and the death of any of the hostages sufficient to permit criminal prosecution. There is no guidance as to what "results" means in this context, as the law is written if a hostage dies for any reason the Defendant could be subject to the death penalty regardless of lack of any personal culpability in that death.

Now, the Government, let me try and articulate their arguments. The Government, basically, argues that the motion should be denied because the language in Section 1203 does not violate any constitutional provision. In any felony murder charge malice aforethought is established by proving intent to commit the underlying crime, citing *U.S. versus Chischilly*, C-h-i-s-c-h-i-l-l-y, 30 F.3d 1144.

Felony murder requires only the commission of an enumerated felony with the requisite mens rea for the underlying offense.

In Section 1203, the necessary intent requirement, the intent necessary to satisfy malice aforethought is established by showing Defendant's intent to commit the underlying hostage taking.

The Government argued that several Courts have addressed sentence enhancement provisions with language similar to 1203 and have upheld it as constitutional, citing *U.S. versus Mayhew*, 30 F.2d 936; *U.S. versus Rebmann*, R-e-b-m-a-n-n, 226 F.3d 521; *U.S. versus Poindexter*, 44 F.3d

406; *U.S. versus Allen* (ph.s.), 247 F.3d 741.

In *Mayhew* the Court refuted that if death results clause is an element that does not entail a mens rea requirement, just as any other statute akin to felony murder do not requiring a finding of intent to kill, the Government must prove only intent to commit the underlying felony. The fact that the sentence enhancement element did not contain a mens rea requirement did not render the statute unconstitutional, nor did the language implicate any constitutional concerns regarding proof of causation.

In *U.S. versus Park*, 411 F.2d 846, the Court also considered a similar constitutional challenge to the enhancement language in 18 United States Code, Section 2113, which provides for the death penalty for death resulting from a bank robbery. The Court there compared 2113 to other felony murder statutes and explained that a death, even if accidental, that resulted from a commission of the offense was sufficient to establish the requisite malice aforethought. The Defendant need only to have intended to commit the underlying felony.

And the Government also argues that the constitutional felony murder statute is well settled. Felony murder laws require a mens rea element for the underlying crime. None is required to establish the enhanced punishment with death results.

Now, the Ninth Circuit has not addressed the precise

issue raised here, but it has upheld convictions under statutes with similar language against challenges to their constitutionality.

In *United States versus Carbajal*, C-a-r-b-a-j-a-l, 290 F.3d 277, the Defendant challenged the application of Sentencing Guideline Section 2D1.1(a)(2), which provides for an enhancement for a defendant convicted of drug trafficking, pursuant to 21 United States Code, Section 841, where the conviction established that death or serious bodily injury resulted from the use of the distributing controlled substance. The Ninth Circuit concluded that the enhancement provisions created no proximate cause requirement. The Ninth Circuit concluded that the District Court had not erred when it declined to apply a proximate cause test to the enhancement. The Court then stated:

"A number of Courts have had occasion to interpret similar language in 21 United States Code, Section 841(b)(1)(C), which prescribes a minimum 20-year prison term if death or serious bodily injury results from the use of drugs sold by the Defendant. These Courts have uniformly held that 841(b)(1)(C) applies without regard for common law proximate cause concepts. Relying on the plain language of the statute, the Courts determined that the statute does not explicitly impose a reasonably foreseeable

74

requirement and found no reason to create such a requirement."

Also, *U.S. versus Houston,* 406 F.3d 1121.  There the Court, the Ninth Circuit, held that the Government did not have to prove that the resulting death was reasonably foreseeable, only that the drug delivered by the Defendant caused the death of Defendant.  The Ninth Circuit also held that proximate cause is not a necessary element of every crime and that the addition of a proximate cause element relating to the sentencing enhancement provision in 841(b)(1)(C) was inconsistent with the statutory language of our circuits' related precedent and the conclusions of every other Federal Court of Appeals to consider the issue.

The Ninth Circuit then stated:

"We, therefore, join our sister circuits in holding that proximate cause is not a required element for conviction at sentencing under 841(b)(1)(C).  All that is necessary under the statutory language is that death results from the offense described in 841(a)(1).  Cause, in fact, is required by the results language with proximate cause at least insofar as requires that the death had been foreseeable is not a required element."

The Government also cites *U.S. versus Cedena,* *C-e-d-e-n-a, Garcia*, 362 F.3d 663, and *U.S. versus Matus*

M-a-t-u-s, Leva, L-e-v-a, 311 F.3d 1214.

The Government also argues that the "with death resulting" language is not vague or ambiguous and, therefore, is not unconstitutional.

In the *Matus Leva* case, the Ninth Circuit addressed the issue of vagueness when it considered the resulting language in 8 United States Code, Section 1324. Section 1324(a)(1)(B)(iv) provides for increased penalties when alien smuggling results in the death of any person.

The Defendant argued that "resulting in death" was unconstitutionally vague. The Ninth Circuit held:

"First, the use of the word 'resulting' means that there is an increased penalty only if a death occurred in the course of smuggling and was related to the smuggling. The term 'resulting' incorporates a causation requirement and, thus, puts persons of ordinary intelligence on notice that increased penalties may apply if they allow those that they are smuggling to be exposed to life threatening conditions during the smuggling process.

"Second, there is no danger that this section will chill constitutionally protected conduct or that it will be used to subject persons engaging in wholly innocent conduct to criminal liability. Subsection (a)(1)(B)(iv) only provides increased penalties to

those who are criminally smuggled aliens in violation of the immigration laws, thus, breaches no constitutionally protected or innocent conduct."

I take the position announced in the *Matus Leva* case and the other cases cited by the Government in this that the "with resulting death" language is not vague or ambiguous and, therefore, is not unconstitutional. And for that reason I would deny the Defendant's Motion to Dismiss Counts One Through Four of the Second Superseding Indictment.

Now, having said that, who wants to make the record?

**(Pause)**

**MR. CALLAHAN:** Your Honor, you've been a judge for 30 plus years. I've been doing this from the lectern for about 25. And I don't think I've ever had a case where when the Judge said, "Does any defense attorney wish to make a record," I was going to change that Court's mind.

But that being said, I just want to take a moment, because I think there is something very profound about this issue.

**THE COURT:** This is not -- I mean this is a statutory construction issue.

**MR. CALLAHAN:** It is, but the problem is it's a different statute now. I mean that's really the whole focus of my argument. Because after *Apprendi,* suddenly the rules changed. And this language "resulting in death" became

something the jury had to decide.  And in that context, when that element went away from the Court and to the jury, it became, in essence, a federal murder statute with almost strict liability.

The Court has indicated just a moment ago that you didn't find the statute, even as modified or enhanced by *Apprendi*, to be vague and ambiguous.  And I just point out to the Court again -- I put a couple of examples in the reply paper -- where it's almost as if there has been a defacto modification of 1203 and that we've already got a felony murder statute, which is Section 1111, which mandates much higher standards in front of this trial jury than this newly defacto felony murder statute 1203 does.  Just two examples, and I'll repeat it with the Court's indulgence.

Section 1111 mandates an unlawful killing.  Section 1203 only mandates a death.  Now, maybe at first impression that might sound similar, but they are not.  "Killing" implies an intentional act.  A "death" could be anything.  It could be a heart attack by the hostage, it could be the hostage struck by lightning as he's held in a room.  It could be anything.  It is not explained in the statute because it wasn't supposed to be in front of the jury.  It was supposed to be for you, and you could deal with these issues.

But now it is in front of the jury.  We're walking around here with absolutely no guidance.  And some of these

other cases that the Government cites, well, they are helpful to a degree but none of them are 1203. And most of them aren't felony murder statutes.

And what the Government's asking this Court to do is to, basically, say: Well, come on. We've got some other cases that have talked about "resulting." Let's take a piece from this case and let's take a piece from this case. We can kind of put a new doctrine together to try to execute these Defendants.

I think Congress -- I think it's incumbent upon Congress to clarify this confusion, this ambiguity. Because I think it's fundamentally unfair for us to be piecing together a statute. And I will make a prediction, your Honor, and that is, when it comes time for jury instructions, this same issue is going to come up again because we're going to be having to determine what are we going to tell these folks about what "resulting in death" means.

And the cases that the Government cites, one of them says we don't need proximate cause but you need foreseeability. The next one says we need foreseeability but not probable cause. I mean they go back and forth. We're going to be creating piecemeal, an interpretation of the statute in a capital case. I think it's fundamentally unfair, and I submit.

Thank you.

THE COURT: Mr. Callahan, let me ask you a question.

79

What about the manner in which the killing occurred?

MR. CALLAHAN: I'm not sure I understand the Court's question.

THE COURT: The manner in which the death of the victim took place. Is that something that solves that issue? In other words, that the person didn't heart attack, was beat up, say shot, strangled or stabbed?

MR. CALLAHAN: If by one of the Defendants?

THE COURT: Yes.

MR. CALLAHAN: Well, I think it solves part of the problem. However, it still makes -- the statute is no more clear. I think that the statute is still vague on its face because it doesn't provide enough notice of what conduct is prohibited or not. So I don't think we can -- with all due respect, I don't think we can go backwards and try to ducktail back by showing that the Government can prove this, but the statute doesn't help us define it. I think we have to look first at the statute, your Honor, and not look at the alleged conduct.

THE COURT: Ms. DeWitt?

MS. DE WITT: I'll be brief, your Honor.

The Defendant's motion is predicated on the broad premise that either the Court has required -- either the Congress or the Courts could have contemplated that *Apprendi* would have created a new defacto vehicle for capital

prosecutions. They call this a judicial (IND).

In fact, Congress passed a statute. It's very clear that Congress passed a statute and it's very clear what Congress said in that statute, because we have the written statute. And what Congress intended by that written statute was in a hostage taking situation that resulted in death to provide for an enhanced penalty of death or life. They did that on a number of statutes, approximately 60 statutes, because they wanted and legislatively extended the reach of the death penalty statute.

What *Apprendi* does is not create any new law, does not create any new statute, does not do anything except for one simple thing, and that is, that it changes the burden of proof with respect to the sentencing enhancement provision. Before it was a preponderance of evidence; now it's beyond a reasonable doubt. It doesn't change the legislative intent, it doesn't change the law, it doesn't change anything except for the Government's burden of proof.

There is no difference between you figuring out what the law is and you figuring out what the law is and instructing a jury what that law is. Yes, we may have a little bit of a debate about how to word that jury instruction. I anticipate that that's going to happen. We'll submit a jury instruction to you; we'll tell you what law we think supports it. They'll submit a jury instruction to you, and you will do the right

thing in terms of instructing the jury.

But, otherwise, every single Court that has considered this issue by analogy, under similar statutes, has found no constitutional problem. They found that there's not an issue with mens rea, there's not an issue with vague and ambiguous nature of the statute. They found it's not vague and ambiguous, although some of them admittedly have interpreted the more subtle legal standards differently. They have found that there is no problem with respect to causation. And there is no authority that would suggest that this Court should do anything different.

With that, your Honor, I would submit.

THE COURT: Also, in *Apprendi* what the Supreme Court stated, as I understand it, is that certain factual findings should be made by a jury. And in this case the jury is going to make those factual findings.

MS. DE WITT: That's correct, your Honor.

MR. BUEHLER: Your Honor, could I make --

THE COURT: All right. Mr. Buehler, go ahead.

MR. BUEHLER: This is in response to the Court's question about does it matter the manner of the killing.

I just want to point out to the Court that it could well be that the jury will face the state of the evidence or will find certain facts in a way where they would face the state of the evidence where they would find that one or more of

the Defendants may not have been aware of, intended or foreseen killings from some of the events in this case. So you could -- the jury could conceivably end up viewing the evidence from the respect of one or more of the Defendants as the killings having been perhaps in the nature of lightning or something that was unexpected. So I don't think that factor is removed from --

THE COURT: Well, let me ask --

MR. BUEHLER: -- the Court's consideration.

THE COURT: Let me ask you this question:

The verdict form in this case will not be a general verdict form. It will be a special verdict form and the jury will be asked to answer certain specific questions.

Doesn't that solve all the problems here?

MR. BUEHLER: Well, I'm not sure where the -- I didn't have the burden of preparing this motion and maybe thinking it out as clearly as cocounsel did. But I thought the Court's question went to the issue of us having to develop the jury instructions and whether or not that could really be done in this case with the statute where it is not clear that Congress has really decided these questions, as opposed to just imposing sort of a non-causal as long as there is the event of death than a certain result comes.

So I just wanted to make sure the Court understood that it is not at all clear that if the jury finds guilt in this case that it's going to be -- as to all the Defendants --

83

it's just going to be ipso facto that there must have been an intent to murder somebody.

THE COURT: Well, but that issue is taken care of in a verdict form, isn't it? Your concern is taken care of in a verdict form.

MR. BUEHLER: It may be, your Honor.

THE COURT: Because it's not a -- you know, a verdict that the jury returns. It's not a general verdict as to each Defendant; it will be a specified verdict with specialized findings made by the jury.

MR. BUEHLER: That may be true, your Honor. All I'm saying is that when we come to instructions and crafting a jury form, I think there's going to be a lot of complexity in --

THE COURT: There always is. I agree.

MR. BUEHLER: Very well.

THE COURT: All right. The Defendant's --

MR. CALLAHAN: One more thing, your Honor. I'm sorry, one more thing.

THE COURT: Mr. Callahan?

MR. CALLAHAN: The Court's last point regarding special verdict, I believe, only reinforces the dilemma we're facing. What is that special verdict form going to say? Defendant Mikhel, this element, this element and did death of a person result? Yes, no. That's the dilemma we're still looking at. What does that mean? What does "death of a person

84

result" mean?  That's the ambiguity of the statute that a jury instruction can't fix.  And that's the point I wanted to make.

THE COURT:  All right.  Defense, collectively, Motions to Dismiss Counts One Through Four of the Second Superseding Indictment is denied.

(Pause)

All right.  The next motion is the Government's motion to preclude alibi witnesses and to compel a further response from Defendants to the Government's request for notice of alibi.  I'll try and summarize this now.

The Defendants, Mikhel, Kadamovas and Krylov, were arrested on February 19th, 2002.  They were named in the initial Indictment filed on March 5th, 2002.

On June 12th, 2002, a First Superseding Indictment was filed against Mikhel, Kadamovas and Krylov and against two new Defendants, Solovyeva and Markovskis.  The First Superseding Indictment charged Defendants with conspiracy to engage in hostage taking resulting in death and three counts of hostage taking resulting in death.

On July 29th, 2004, a Grand Jury returned the Second Superseding Indictment.

In an effort to insure that the pretrial issues were addressed, the Government and Defense Counsel agreed to the Scheduling Order that I previously discussed, with the deadlines.

One of the issues regulated by the Orders was the deadline by which Defendants had to provide notice of any alibi defense they intended to present during the guilt phase of the trial. In the Order originally stipulated to by the parties and adopted by the Court, Judge Manella, Defendants were to file this notice on September 6th, 2005. This date was later continued by agreement of the parties and by order of the Court to January the 17th, 2006. Ultimately, Judge Manella continued the date to January 27th, 2006 in response to Defendants' request to extend the date to file all Phase 3 motions.

On January the 6th, 2006, the Government filed a demand for alibi notice on Defendants relating to their involvement in the abduction and murders of Muskatel, Pekler, Umansky, Kharabadze and Safiev, as set forth in Counts One through Four of the Second Superseding Indictment.

The Government also demanded notice of an alibi for the abduction and murders of Popsi Shopko (ph.s.) and Popof (ph.s.) and the abduction and hostage taking of Armond Gee (ph.s.), as set forth in the Notice of Intent to Seek the Death Penalty.

As required by Federal Rule of Criminal Procedure 12.1(a), the Government demand specified the time, date and place of the offenses described.

Krylov and Solovyeva did not file any notice of intent to rely on an alibi defense, nor did they seek an

extension of the deadline.

Mikhel and Kadamovas filed responses stating that it is not possible to provide the required notice at this time because of the need for additional time to investigate the case.  Both of those Defendants argued that they are not required to give notice of their intentions to rely on alibi defenses for offenses charged as nonstatutory aggravating factors in the death penalty notice.

Now, that has now become moot with regard to the uncharged murders of Shopko and Popof, the one in Turkey and in the country of Cyprus.

Now, the Defendants have offered the following facts in opposition.  This is Defendants, Kadamovas, joined in, I believe, by Krylov -- no, Mikhel.

Kadamovas maintains that he is engaged in the time consuming and tedious effort of careful review of the documents and records, which may spark a recollection and, hopefully, lead to the location of a credible alibi witness or witnesses. This process, he indicates, is made more difficult as a result of incomplete discovery production by the Government; Defendant's isolation in the SHU; Defendant's continued denial by custody officials of sufficient meaningful acts as to the computer, which enables him to translate or read discovery; SAMS, which preclude his ability to communicate with any human other than his defense representatives; the difficulty inherent

in physically locating potential defense and/or alibi witnesses from foreign countries; and the responsiveness of potential witnesses to request to locate and review their records which may support an alibi defense.

Counsel for Kadamovas indicates that the ongoing process -- there's an ongoing process of investigation, trial preparation and at such time as an alibi -- as an intended alibi witness is identified the Defense will provide written notice to the Government of the information.

Krylov adds to this, indicating that on January 27th, 2006, Krylov served and filed his response to the Government's request for a notice of alibi under Rule 12.1. He states that as of yet he is currently unable to determine his intention with respect to whether to offer alibi evidence because of the volume and complexity of the evidence and extensive investigation which is being conducted.

Krylov also noted the highly restrictive conditions under which is he presently being confined as a reason why he is unable to provide notice at this time.

Mikhel has also offered some explanation:

On January the 6th, 2006, the Government filed a request for notice of an alibi defense pursuant to Federal Rule of Criminal Procedure 12.1. The Government sought a detailed accounting of the whereabouts of the Defendants over a wide range of dates and times relevant to the underlying charges and

information relating to any possible alibi for the uncharged acts alleged in the Notices of Intent.

Mikhel filed his response to the Government's request indicating that more time was necessary before complying with the request because:

One:  Mikhel was still in the process of investigating the charges;

Two:  The Government was still in the process of producing discovery relating to the underlying Indictment; and

Three:  An appeal was pending on a crucial evidentiary issue that would have profound impact on defense strategies.

I did receive a notice from the Court of Appeal dated May 10th, I believe it was, denying the appeal.

Mikhel's response, also, indicates that if it was determined that an alibi defense was in order that such information would be provided at the earliest possible time to the Government.

Now, as I see it, the Defendants have failed to comply with their obligations under Rule 12.1(a)(2).  Either you have an alibi or you don't have an alibi.  You can't, you know, keep this thing in suspense.  You've got to respond.  You know, discovery in a criminal case is reciprocal discovery. The Federal Rules of Criminal Procedure are specific.  They have a notice requirement.  The Government has asked for it,

and the Defense so far has -- they used the word "danced."

I'm inclined to preclude an alibi witness defense unless by this Friday you comply. And that is Defendants, collectively, individually, comply with the requirements that are set forth in the Federal Rules of Criminal Procedure.

Who is going to step up to the plate first?

(Pause)

MR. LASTING: Your Honor, I think the difficulty -- in fact, I know the difficulty that we're having on behalf of Mr. Kadamovas, is that it is simply impossible for an individual to remember where they were and who they were with at the wide ranging periods of times that the Government has identified that they're requesting notice of an alibi for.

And part of this is that we are somewhat at the mercy of other people. The situation, I would compare it to unless you know that you need an alibi for a particular time, you don't --

THE COURT: I've eliminated a major obstacle, and that is, the alleged killings in Turkey and in Cyprus.

MR. LASTING: I appreciate that, your Honor. And I'm only addressing as to the homicides that occurred in the United States. Because I recognize that the other stuff is --

THE COURT: Here's the problem I'm having. I'm going to be very blunt. This case is a 19 -- I'm sorry -- a 2002 case. I mean, it's not like anybody has forced you into trial,

you know, on a short -- with a short fuse. This has been a long standing case. There's been plenty of opportunity to develop an alibi defense in this particular situation.

MR. LASTING: Part of it relates to going through voluminous records and looking, for example, through phone records to see at particular times who he may have been talking to on the phone and then try to locate those people; and then to discuss with those people whether or not they have records as to particular contact they had with the Defendant at a relevant time. And that's part of what we've been doing.

And from some of those people, we haven't gotten responses. I mean, we don't have the ability to set the timetable with which someone responds to us. Some people are very difficult to locate. We're talking about people who have traveled back and forth to the United States, some people that are out of the United States.

And it seems to me that the Federal Rule recognizes that it's sometimes difficult to determine if you have an alibi; and that the rule, therefore, requires a continuing duty to disclose it.

And my thought is this, your Honor, that if it turns out that we have a witness that relates to an alibi that we want to present to the jury, I think it's incumbent upon us to explain to the Court why the disclosure was made at the time it is offered. Then the Court can make a decision as to whether

or not we have been trying to hide something from the Government to put them at a disadvantage or whether or not there is a legitimate basis for the late disclosure.

THE COURT:  I understand.  But what you're doing is you're asking me to carve out a judicial exception to the Federal Rule of Criminal Procedure.

MR. LASTING:  No, I'm asking the Court to recognize that at times one simply cannot learn of the alibi in a simple fashion.  And that if it exists, we're going to disclose it. We're not going to hide it.  And the Court can then make an assessment as to whether or not the efforts that were made and the reasons for the late disclosure -- or actually for the prompt disclosure upon learning it -- but the disclosure beyond the date that the Government demanded it is appropriate.

THE COURT:  Well, here's what I'm going to do, Mr. Lasting.  I forgot this coming weekend is Memorial Day.  So instead of it being due on Friday the 26th, I'll make it due on Wednesday the 31st.

All right.  The --

MR. RUBIN:  Yes, your Honor.

THE COURT:  Mr. Rubin --

MR. RUBIN:  I'm Dale Rubin on behalf of Mr. Mikhel, again.  I can't let go --

MR. AMDUR:  Can I --

MR. RUBIN:  Oh.

MR. AMDUR:  Your Honor, I have an emergency dentist appointment.  And my client doesn't have any objection if I leave.  Mr. Crain will remain.

THE COURT:  All right.

MR. AMDUR:  Thank you.

THE COURT:  Your client is well represented in your absence as well.

MR. RUBIN:  Thank you.  There's nothing worse than getting ready to tell a joke and having it stopped right in the middle.  It had to do with dancing.

Your Honor, in this situation, the Defense has been prepared, and had been prepared up, until last March of 2005 to give notice regarding the knowledge that we had regarding a potential alibi defense.  In March of 2005, the Government went abroad and interviewed a defense witness.

The Government gave that defense witness a queen for a day letter.  The Government interviewed that witness with the British authorities there present as well.  It was a very long interview.  It was about five or six hours.  Two months later, the British authorities went back and conducted an interview of that witness again.  And since that time, that witness has been out of touch with us.

This Court has recently provided that the Defense can go back and re-interview this person again.  And we intend to do that within the next two or three weeks.  I would ask that -

93

- and again, it's one witness.

I would point out that the Government knows exactly what the witness said. The Government knows exactly what dates the witness alibied the Defendant. The Government knows what dates, what the witness has talked about.

And I just, at this point, need an opportunity to attempt to contact this witness. If she is not available to us any longer, then there is no alibi defense. But I can't do it by the 31st of May.

THE COURT: Well --

MR. RUBIN: Because we must still -- we have a court hearing on the 30th of May that I have to be at. I can't get there. I can't get to England that quickly.

THE COURT: There is a telephone.

MR. RUBIN: The problem is --

THE COURT: There's videoconferencing.

MR. RUBIN: If the witness is not -- my position is the witness has been placed in fear. And because of it, the witness isn't contacting us any longer. So I can't do it by phone. If I could, it would be easy. You're right.

THE COURT: I still have to stick with my order here.

The Government want to say anything for the record?

MR. DUGDALE: No, your Honor. Thank you.

MR. RUBIN: My only question, your Honor is --
well --

THE COURT: The Government's motion will be granted to the extent that the alibi witness will be precluded unless specifically identified pursuant to all the provisions in compliance with the Federal Rule of Criminal Procedure 12. All right.

Our next set of motions have to deal with Defendant Mikhel's motion to preclude proposed expert testimony and a request for a *Daubert* hearing.

The Government, as I understand it, is going to offer expert testimony and has furnished a CV for each witness and a summary of each of witnesses' expert -- intended expert testimony. The experts are a DNA expert, a question document, a handwriting expert, a latent print expert, a tool mark expert, a dental comparison expert, toxicological expert, a money laundering expert, a blood expert, and a forensic chemist.

Can't this be handled during cross-examination of the witness?

I mean *Daubert* talks about really qualifying experts that are dealing with junk science or science outside the regularly taught disciplines. And here the experts that the Government tends to call are experts that are normally utilized.

And the real issue is, you know, how competent are these witnesses. And that usually is for cross-examination or

voir dire and not really a *Daubert* hearing.  Because these experts are not on the fringe; they're in the main stream.

So who wants to tackle this issue?

MR. CALLAHAN:  Your Honor, I think your point is correct in principle.  I don't think -- and I hope our papers didn't so indicate that we were trying to challenge, necessarily, the areas of expertise.  That wasn't the point.

Because all we got from the Government -- even though it was a lot of pages to it, what we have are the resumes of these people, which is fine.  And we have very conclusory reports saying this fingerprint belongs to this person, etc.

We have about 2500 pages of indecipherable work papers.  But the one thing we're missing is that step between the resumes and the conclusions.  It's what they did; it's not the fact this is a DNA expert.

It's what did the person do and what exactly -- we have some information about what tests were conducted.  But what did they do?  How do we know that that test was conducted according to proper principle, for example?

All we're asking for -- and maybe I can forestall some lengthy argument on this point.  The fundamental dispute, I think we have -- and the reason I filed this -- is that the Government and the Defense has a fundamental disagreement as to what is required from the standpoint of proving their methodology; how they did what they did.

We've got the beginning.  We've got the end.  But I think -- and I cited a case, this *Wilkerson* case that basically lays out some elements that all experts -- at least in that particular case -- should satisfy.

There's nine of them:  Where'd you get it?  What did you do with it?  Where'd you put it?  I mean, it's very basic requirements.   And with a number of our experts here, we're missing that information.

**THE COURT:**  Well, but, you know what you're really suggesting is that you be entitled to take their deposition before they testify.  And that's not in the cards.

You know, the cross-examination of the witness is going to answer and fill in the blanks.  The expert will get up there, and they will qualify the expert.  Once the expert is qualified, then they'll ask them what they did and how they did it and what conclusions they reached.

That's how it's done.  And if they're outside the mainstream, then we go into the *Daubert*.  But these people are all going to be within the mainstream.  I'm sure that most of these experts have qualified in other jurisdictions many, many times.

**MR. CALLAHAN:**  I'm sure that's true.

But what we're asking for is -- like I said, we're not challenging the fact this is a DNA expert.  It's what did they do in their testing.  And I disagree with the Court to a

degree.  We're not asking for a deposition or that type of information.

I think Federal Rules of Evidence and Discovery Rule, Federal Rule 16 of the Criminal Procedure Rules mandates that we get the bases and methodology used by each expert.  We don't have that.  And our experts cannot make -- basically, we cannot hire experts to go through what the Government has done with their experts until we know what they did.  Our experts don't have any ability to, you know, research and critique what the Government experts have done until they testify at trial.

We're willing to do that, but it just seems a little bit time wasting, for example, not to have the ability to look and see if there's even a reason to pursue an expert defense witness instead of having to hire them and wait for trial and have to go through that expense.

We should have a short report, four to five pages from each one of these people, similar to what Ms. DeWitt prepared in her opposition papers but authored by the individual experts themselves.  We don't even have that.

What we have now is the U.S. Attorney representation as to what these people did, but I can't -- and none of the other defense counsel can -- use that really to impeach these people.  So I think it's incumbent upon the Government to call these 21 or 22 people and just have them tell us what they did.  That's all that I want.

THE COURT: Who's going to talk about this in the Government?

MS. DEWITT: Interestingly enough, your Honor, the cases cited by the Defendant, the *Wilkerson* case itself says that the work papers and the underlying reports are not required -- the Government's not required to produce those.

Yet here the Government, contrary to what the allegations made by Defense, has done more than it's obligated to under the rules. It's given them the reports. It's summarized the reports. It's given incredibly detailed -- I mean, the most detailed expert notice I've ever given in a case in Federal Court, we gave in this Court in this case. And that is before your Honor.

I mean, you can see for yourself how incredibly detailed the notice is. If you look at the reports themselves, they say we ran a PCR test. This is the kit that we used. I mean, the allegation that they don't have enough information to challenge these is just not supported by the record and what's been produced in this case.

It's also sort of obviously supported by the fact that Mr. Krylov hired --

THE COURT: Any opposition to pages -- I believe it was 12 through 17. You've listed everything according to the classification of each expert as to what they're going to do.

MS. DEWITT: Just for the record, not every single

expert, but every one that they actually -- there's a couple that were not listed in there. There was another fingerprint expert, etcetera. But yes, basically we covered every single one.

We gave detailed -- in case it wasn't good enough already, we gave even more notice as to the bases and summarized it for them. I don't know what else can be done here.

Just because Mr. Callahan, with all due respect to Mr. Callahan, finds this stuff indecipherable, it is not indecipherable. If you look at it and you go through it, it tells you exactly what these experts did. It tells you exactly what tests they ran.

And their own experts -- Mr. Krylov's expert was able to look at those reports. He was able to hire an expert and figure out what they meant and what bases and whether or not there was any problems with the analysis that was done.

A *Daubert* hearing or a *Daubert* Challenge is limited to two things: Is it scientifically reliable and is it relevant. They don't even dispute the relevance of this. I think the relevance speaks for itself.

It's obvious that the information that we're going to introduce through our experts is relevant. And the scientific basis for these experts -- because of the nature of the experts that we're going to call -- are so regularly accepted, so

within the norm; that it's beyond question that these would suffice in terms of a *Daubert* challenge.

And one thing I would disagree with is although I think it's appropriate for them to ask cross-examination questions about what these particular experts actually do, it isn't appropriate for them to get into purely *Daubert* issues on cross-examination. We shouldn't be wasting the Court's time or the jury's time about scientific reliability. We should be talking to the jury and asking questions about what did this particular expert do. If they want to do that, that's perfectly appropriate. But, again, I would hope that the Court won't allow them to waste time in going into *Daubert* issues when the court's already made a determination that it's reliable and relevant in this case.

THE COURT: All right. I'm prepared to deny Defendant Mikhel's motion to preclude proposed expert testimony and also deny the request for a *Daubert* hearing. I don't believe one is necessary.

MR. BUEHLER: I'd like to be heard as well, your Honor.

THE COURT: Go ahead.

You have another motion coming up. Yours is the latent fingerprints, I believe.

MR. BUEHLER: Yes, it is, your Honor. But the --

THE COURT: That's Defendant Petro Krylov's motion to

preclude the introduction of latent fingerprint identification evidence. And you want an evidentiary hearing. You indicate that Defendant has not complied with reliability and have filed a document showing some certain protocol you alleged was not followed.

**MR. BUEHLER:** Yes, your Honor. By way of moving into that motion, if that's what the Court intends; I just wanted to respond --

**THE COURT:** The next to last motion I have.

**MR. BUEHLER:** I did want to respond to what counsel for the Government just said about what *Daubert* requires. Because I think it's quite clear that *Daubert* requires a third showing as a condition for admissibility. And that's -- and it's in rule 702.

You know, in addition to the fact that the testimony is the product of reliable principles and in addition to the fact that it's relevant; the Government's also required to show that the witness has applied the principles and methods reliably to the facts of the case.

So you can have a perfectly valid mainstream science and yet have it misapplied in the particular case. You can have a witness, an expert witness, who has testified many times to admissible diagnoses and so forth and yet in a particular case have the witness going through analysis that is a misapplication of the particular science or methodology.

And that's one of the things the Government's required to show before the experts can testify.  And there is no way, with respect to any of these experts, that the Defense can challenge that point unless we are given more than just the conclusion of the expert, which is all that's been given.

And Government Counsel makes much about the mountains of paper they've produced.  Well, I can assure the Court that with respect to the fingerprint evidence, all the mountains of paper are nothing but hand written notations that tell you nothing other than the fact that the -- on different days the fingerprint expert did certain things, took certain things out, looked at them.  And then it tells you the conclusion: Identified the number four finger of this Defendant to this print.

But it tells you nothing about what thought process the expert went through, how many points of identification the expert found, whether it was three, whether it was 18, whether or not the expert identified --

**THE COURT:**  Let's stop.  Let's stop.

I don't think you're entitled to preview the person's testimony that's going to testify as an expert witness.  That's what a deposition is all about, and you're not entitled to a deposition in the case.  I mean you're entitled to examine it and cross-examine -- not examine.  You're entitled to cross-examine the witness as to what the witness did.

The Government, when they call a witness, is going to examine that witness and tell you everything that the person did. And on cross-examination you're going to test that with your knowledge of what they did or didn't do. And if they didn't follow certain protocol, you'll bring that out in the cross-examination. And that will undermine, you know, the expert's opinion.

Remember there's a jury instruction that says to the jury that, you know, you don't have to accept this testimony of this expert.

MR. BUEHLER: I understand, your Honor, that's the way it can be done. And if this Court so directs, that's the way it will be done here.

As I read *Daubert* --

THE COURT: The old fashioned way.

MR. BUEHLER: *Daubert* sets up what everyone calls now the gate keeping function. And if it's already come in, then we just say the jury now decide; then the gate keeping function has not been performed.

THE COURT: I disagree with you.

*Daubert* goes to -- as Ms. DeWitt says -- the unorthodox, junk science, the lack of credible, reliable scientific evidence. That's what *Daubert* is about. It's not the established areas of expertise. It's those individuals and that branch of science that's on the fringe. That's what

104

*Daubert's* about.

MR. BUEHLER: Well, I respectfully disagree, your Honor. And I point to the codification of the *Daubert* requirements in the Federal Rules of Evidence.

THE COURT: All right. What I'm going to do then is deny your motion, which is the motion to preclude the introduction of latent fingerprint identification evidence and a request for an evidentiary hearing.

I misspoke. There's one other motion. That is Defendant Mikhel's motion for penalty phase discovery.

Now, I have --

MR. BUEHLER: Your Honor --

THE COURT: -- limited what the Government can introduce in these uncharged murders. So that, I think, takes a lot of the issues out of the present motion.

With regard to penalty phase discovery, I think the Government has indicated they've given you everything that they're going to utilize in this case. I'm going to deny this motion, because I think it's moot.

MR. RUBIN: Your Honor, can I be heard?

THE COURT: Go ahead.

MR. RUBIN: Thank you, your Honor. Dale Rubin.

I don't think the motion is moot, your Honor. There are a number of issues that are still pending before the Court. The notice of intent lists victim impact evidence. I have no

idea of who they're calling as victim impact evidence.  I have no statements for victim impact evidence.  In fact, the Government in their motion said they don't believe they're required to give me that information.

There are -- there's an allegation of future dangerousness without anything else.  What are they talking about?  Is that limited to the escape attempt or is there something else that they're going to be bringing in?

The purpose of discovery is to let me know what it is they're going to be doing.  They note a continuing pattern of violence.  I --

THE COURT:  You've got five factors that they've enumerated: future dangerousness; A, continuing pattern of violence; B, escape risk and institutional misconduct; any lack of remorse --

MR. RUBIN:  If we have the -- the escape risk, I understand if what we're talking --

THE COURT:  Let me try to save some time here.

Who from the Government's going to be addressing this?

MS. MEYER:  I am, your Honor.

THE COURT:  All right.  These are the following non-statutory factors in aggravation.

One, future dangerousness; A, a continuing pattern of violence; B, escape risk and institutional misconduct; and C,

lack of remorse.

Now, have you given all of the information to the Defense that you're going to utilize as evidence on those -- issue number one, future dangerousness?

MS. MEYER:  Yes, your Honor.

The only caveat is with respect to inmates that the Government is in the process of determining whether or not they will testify.  As I was preparing for this over the weekend, I started to determine whether or not we had provided all the updated rap sheets, for example.  And I want to have an opportunity to finish doing that to make sure all that is completed.

THE COURT:  You're not going to have any jailhouse informants, are you?

MS. MEYER:  No.

THE COURT:  All right.  These are people who observed certain things that you're going to call as witnesses?

MS. MEYER:  That's correct, your Honor.

THE COURT:  All right. Well, give them, as soon as possible -- and I think I used the date May 31st -- those rap sheets.

MR. RUBIN:  Your Honor, again, I have no information concerning any incidents that occurred in custody that would be used for --

THE COURT:  You're going to get it May 31st.  I'm

trying to help you here.

MR. RUBIN: Yes, sir. Thank you.

THE COURT: B, Uncharged murders, attempted murders, and other serious acts of violence.

Whatever you intend to utilize -- now, remember the uncharged murders in Turkey and in Cyprus are out. So if there's any other information, give it to them by the 31st of May.

Three, Contemporaneous convictions for multiple murders and other serious acts of violence.

Well, you know, you should have that. That's on the rap --

MR. RUBIN: I'm assuming that's the charges in this case.

THE COURT: Okay.

Four, that the alleged victims were killed to eliminate as possible witnesses to Defendants' crimes.

That's just a theory that the Government's going to be arguing.

MR. RUBIN: I understand, your Honor, on that one.

THE COURT: Five, Defendants displayed an indifference to the emotional suffering of the alleged victims.

Whatever they have, they're going to have to give to you.

Six, the impact the murders had on the alleged

108

victims' families, friends, and co-workers.

There, all they have to do is give you a list of which of the alleged victims' family, friends, and co-workers you intend to call.

MR. RUBIN:  And could we get identifying information so that we can --

THE COURT:  If they have a rap sheet, I'll give you a rap sheet.

MR. RUBIN:  That's not the information.  I don't believe that that --

THE COURT:  Well, they're not going to give you the names, the addresses, the telephone numbers of these --

MR. RUBIN:  How am I supposed to have my investigator interview them?

THE COURT:  What you'll do is make a request to interview them.  And the Government will furnish them to you at a neutral site.

MR. RUBIN:  Your Honor --

THE COURT:  If they don't want to meet with you, you can't force them.

MR. RUBIN:  Well, if they don't want to meet with me, that's fine.  But it's different than telling the Government that I don't want to meet with them --

THE COURT:  No.

MR. RUBIN:  -- or me --

109

THE COURT: They're not going to do that. They're going to give you the names. And you're going to request that you be allowed, through your investigator or yourself, to interview them at a neutral site. And you will draft a letter, and they will deliver that letter. And they're not going to say, "You don't have to go if you don't want to."

MR. RUBIN: All right.

Your Honor, as long as I'm here, may I make one more request of the Court?

THE COURT: All right.

MR. RUBIN: We have a hearing on one more motion that the Court set for May 30th.

THE COURT: Which one was that?

MR. RUBIN: That's the motion regarding the conditions of confinement.

THE COURT: Yes?

MR. RUBIN: I was wondering if it would be possible to advance that to a sooner date. I am hoping to be out of the country by that time. And the reason is is that we have another round of motions on June 12th.

THE COURT: Why don't we put that over to June 12?

MR. RUBIN: Um --

THE COURT: Because as we get -- as you get --

MR. RUBIN: We could put it over until we're at trial, and then it won't matter, I guess.

EXCEPTIONAL REPORTING SERVICES, INC

110

THE COURT: No. As you get closer to trial, you know, I'm going to be more flexible with the housing. Because I want you to be -- you know, have as much contact with your clients as possible.

MR. RUBIN: I understand. I'll leave it on the 30th, your Honor, please.

THE COURT: Anything further from the Government?

MR. DUGDALE: No, your Honor. Thank you.

THE COURT: Anything further from Defense counsel?

Mr. Evans?

MR. EVANS: Thank you, your Honor. David Evans on behalf of Petro Krylov.

These are just a couple of housekeeping matters, your Honor. Since this is a capital matter -- I don't believe it's been previously addressed -- we'd be requesting daily transcripts.

THE COURT: You can request them. I'll give them to you.

MR. EVANS: I'm sorry?

THE COURT: I'll give them to you.

MR. EVANS: Great. Thank you.

And these hearings as well, if that's possible, your Honor.

THE COURT: I'll give you these hearings too.

MR. EVANS: Thank you, your Honor.

EXCEPTIONAL REPORTING SERVICES, INC

111

Secondly --

THE COURT:  The hearings before me, not with anyone --

MR. EVANS:  No.  I understand that.

I understand from inquiries directed to the Clerk and other staff that the trial is scheduled to proceed in your courtroom.

THE COURT:  Yes.

MR. EVANS:  And I have always appreciated being in your courtroom, because you maintain it in virtually pristine fashion.  I remember being admonished not to leave a cup on the table, very vigorously by the Court in another trial.

I am concerned -- there's a lot of shackles in this case and, in addition, a staggering amount of discovery.  And we're all using computers.  I'm concerned about the ability to maintain that around these tables.

I'm also somewhat concerned -- as the Court's aware, there's certain disruptions from certain of the Defendants in this case that are ongoing.  I don't necessarily think they're intentional, but it happens.  The room across the hall would allow for --

THE COURT:  I hate that place across the hall.  It's a mess.

MR. DUGDALE:  So do I.

MR. EVANS: I also wanted just to advise the Court -- and none of them will get up and say it -- but the Marshals kind of like that place too; that it gives them more control over the situation.

THE COURT: It's not -- you know, it doesn't look like a courtroom, number one. This is a very accommodating courtroom.

MR. EVANS: No, I agree, your Honor.

The other thing I was going to ask was also, though it does not directly affect my client, was regard to the May 30th hearing date requested by Mr. Rubin. That's the day after the Memorial Day weekend. Because the issues affect -- the SAMS restrictions affect all the Defendants, I think we all want to be here and participate in the conversation or at least witness it.

Would it be possible to hear it Thursday of this week or --

THE COURT: They asked me to try to settle a case involving BIG. Ever heard of that case?

MR. EVANS: Sure, sure. That's a big one.

Or the following Wednesday?

THE COURT: I mean, the following Wednesday would be --

MR. EVANS: The 31st.

THE COURT: If you give me chance to go off the

113

bench, I could look to see what I have on May 31st.

MR. EVANS:  Thank you, your Honor.

THE COURT:  Hold on.  I'll return in the minute.

(Pause)

(Off the record discussion)

THE COURT:  I can do it --

Where'd Mr. Evans's go?

Mr. Evans?

MR. EVANS:  Yes, sir?

THE COURT:  Okay.  I can do it in the morning of May 31st.

MR. EVANS:  Is that convenient to other counsel?

MR. CRAIN:  Your Honor, could I clarify something?

Ms. Solovyeva is not under the SAMS restrictions. Therefore, we don't need to be here.

THE COURT:  You don't need to be here on that motion.

MR. CRAIN:  So we'd like to make sure that she's not brought in.

THE COURT:  All right.

MR. EVANS:  That would be preferable to us.  I understand the Government's rising in concern about the date.

MR. DUGDALE:  I won't be here on at the 31st, your Honor.  I'll be out of town doing something on this case, but the Government will be represented.  So it's not a problem.

MR. RUBIN:  It's (IND) --

114

MS. DEWITT: I just want to make sure I --

MR. RUBIN: We're going to England.

MS. DEWITT: The motion that was scheduled for the 30th is now going to be heard on the 31st?

THE COURT: Correct.

MS. DEWITT: At what time?

THE COURT: It will be heard at nine o'clock.

MS. DEWITT: Nine o'clock, okay.

MR. RUBIN: I'm sorry, Judge. Is it possible to do it on the 29th instead of the 31st?

THE COURT: What's the 29th?

MR. RUBIN: The 29th is a Monday.

MR. LASTING: It's Memorial Day.

MS. DEWITT: It's a holiday.

MR. RUBIN: Well, I'll be here.

THE COURT: All right. The 31st then at nine o'clock.

MR. EVANS: Thank you very much, your Honor. Thank you.

MR. LASTING: Your Honor, can I raise one other issue?

THE COURT: Yes.

(Off the record discussion)

MR. LASTING: Your Honor, Richard Lasting on behalf of Mr. Kadamovas.

115

With regard to the Court's order that the Government provide us penalty trial discovery by the 31st, I'd just like to be clear about two things. Number one, does that include if the Government's going to call an expert on the future dangerousness that they give us the name of that expert and the anticipated testimony of that individual?

THE COURT: Yes.

MR. LASTING: And secondly, with regard to the victim impact evidence, I believe the Court had indicated that they should give us the names of family members that would testify --

THE COURT: Or friends.

MR. LASTING: Whoever's going to testify on victim impact.

THE COURT: Right.

MR. LASTING: Would the Court include within that order that we be provided, at a minimum, a summary of what that testimony's going to be?

I mean just a name is meaningless to us unless we have some information as to what that person's going to say about the alleged victim.

THE COURT: All right. Not more than a paragraph, that's all the summary will be. And if they have a rap sheet, you'll get that too.

MR. LASTING: All right. Thank you very much, your

EXCEPTIONAL REPORTING SERVICES, INC

Honor.

MR. CALLAHAN: Your Honor, briefly just a logistical matter. I'm sort of acting as a --

THE COURT: It will be a redacted rap sheet, so that you don't have Social Security number, addresses, things like that.

MR. DUGDALE: Well, I don't believe we're calling anybody who has a rap sheet. But we will try and do so, your Honor.

MR. CALLAHAN: When this matter was before Judge Manella the Marshal's Office asked us, through the Court, not to schedule matters for Mondays because of the amount of traffic. And so we abided by that.

In this last set of motions, I forgot and noticed it for a Monday. I don't know what the Court's practice is.

THE COURT: No. Monday is fine with me.

MR. CALLAHAN: But I don't think it is for the Marshals.

THE COURT: Well --

MR. CALLAHAN: They would prefer a day other than Monday. I'm simply acting as a proxy. But you love Mondays.

THE COURT: Monday is the best day of the week to do this.

MR. CALLAHAN: Thank you, your Honor.

THE COURT: I'm a senior judge now, so they have to

117

accommodate me.

MR. CALLAHAN: And they're thrilled to do so. I can see it on their faces.

THE COURT: Listen they get overtime or compensatory time.

All right. Thank you.

MR. CALLAHAN: Thank you, Judge.

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____                    June 10, 2006

            Signed                                      Dated

*TONI HUDSON*

**FEDERALLY-CERTIFIED TRANSCRIBER**