

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

FILED
CLERK, U.S. DISTRICT COURT

JUN 2 0 2006

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

UNITED STATES OF AMERICA,           )
                                    )        CASE NO:  CR 02-220(B)-DT
                 Plaintiff,         )
                                    )           CRIMINAL
       vs.                          )
                                    )     Los Angeles, California
IOURI MIKHEL,                       )
JURLIUS KADAMOVAS,                  )     Wednesday, May 3, 2006
PETRO KRYLOV,                       )     (3:47 p.m. to 5:56 p.m.)
NATALYA SOLOVYEVA,                  )
                                    )
                 Defendants.        )

DEFENDANT KADAMOVAS' MOTION TO CONTINUE TRIAL DATE;
JOINDERS BY DEFENDANTS MIKHEL AND KRYLOV

DEFENDANT KADAMOVAS' RENEWED MOTION FOR COURT ORDER
FOR DAILY USE OF COMPUTER AT MDC

BEFORE THE HONORABLE DICKRAN TEVRIZIAN,
UNITED STATES DISTRICT COURT JUDGE

EXCEPTIONAL REPORTING SERVICES, INC
14493 SOUTH PADRE ISLAND DRIVE
SUITE A-400
CORPUS CHRISTI, TX 78418-5940
361 949-2988

DOCKETED

JUL 3 2006

BY _____  184

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | CASE NO:  CR 02-220(B)-DT |
| Plaintiff, | ) | |
| | ) | CRIMINAL |
| vs. | ) | |
| | ) | Los Angeles, California |
| IOURI MIKHEL, | ) | |
| JURLIUS KADAMOVAS, | ) | Wednesday, May 3, 2006 |
| PETRO KRYLOV, | ) | (3:47 p.m. to 5:56 p.m.) |
| NATALYA SOLOVYEVA, | ) | |
| | ) | |
| Defendants. | ) | |

DEFENDANT KADAMOVAS' MOTION TO CONTINUE TRIAL DATE;
JOINDERS BY DEFENDANTS MIKHEL AND KRYLOV

DEFENDANT KADAMOVAS' RENEWED MOTION FOR COURT ORDER
FOR DAILY USE OF COMPUTER AT MDC

BEFORE THE HONORABLE DICKRAN TEVRIZIAN,
UNITED STATES DISTRICT COURT JUDGE

Appearances:    (See next page)

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

EXCEPTIONAL REPORTING SERVICES, INC

2

APPEARANCES FOR:

Plaintiff:                      DEBRA W. YANG, ESQ
                                United States Attorney
                                JACKIE CHOOLJIAN, ESQ
                                Assistant United States Attorney
                                Chief, Criminal Division
                                SUSAN DeWITT, ESQ
                                KIM MEYER, ESQ
                                ROBERT DUGDALE, ESQ
                                Assistant United States Attorney
                                312 North Spring Street
                                Los Angeles, CA 90012

Iouri Mikhel:                   RICHARD M. CALLAHAN, JR, ESQ
                                230 E. Colorado Blvd., Suite 1200
                                Pasadena, CA 91101

                                DALE MICHAEL RUBIN, ESQ
                                2275 Huntington Dr., Suite 902
                                San Marino, CA 91108

Jurlius Kadamovas:              SONIA E. CHAHIN, ESQ
                                2222 Foothill Blvd., Suite E-278
                                La Canada, CA 91011

                                RICHARD P. LASTING, ESQ
                                1717 Fourth Street, Third Floor
                                Santa Monica, CA 90401

Petro Krylov:                   GEORGE W. BUEHLER, ESQ
                                350 S. Grand Avenue, 39th Floor
                                Los Angeles, CA 90071

                                DAVID R. EVANS, ESQ
                                600 S. Lake Avenue
                                Pasadena, CA 91106

Natalya Solovyeva:              TERRY AMDUR, ESQ

Russian Interpreters:           Ludmilla Genn
                                Zoya Spivakovsky

3

APPEARANCES:   (Cont'd)


Court Recorders:            Ramona LaChapelle
                           Hilda Avila

Courtroom Deputy:          Debra L. O'Neill

Transcribed by:            Exceptional Reporting Services, Inc.
                           14493 S. Padre Island Drive
                           Suite A-400
                           Corpus Christi, TX 78418-5940
                           361 949-2988

4

Los Angeles, California; Wednesday, May 3, 2006; 3:47 p.m.

(Interpreter Used for Translation)

(Call to Order)

THE COURT:  Good afternoon.  Please be seated.

THE CLERK:  Criminal Docket Number 02-220B-DT, *United States of America versus Louri Mikhel, Jurlius Kadamovas, Petro Krylov, and Natalya Solovyeva.*

Counsel, please state their appearances for the record.

MR. DUGDALE:  Good afternoon, your Honor.

Robert Dugdale on behalf of the United States.

MS. DeWITT:  Susan Dewitt on behalf of the United States.

MS. MEYER:  Kim Meyer on behalf of the United States.

MR. DUGDALE:  And also present at counsel table is Special Agent Louis Perez of the Federal Bureau of Investigation.

MR. EVANS:  Good Afternoon, your Honor.

George Buehler and David Evans on behalf of Mr. Krylov.

MR. AMDUR:  Good Afternoon, your Honor.

Terry Amdur on behalf of Natalya Solovyeva.  My co-counsel, Michael Crain is in San Francisco today and will not be making an appearance.

MS. CHAHIN:  Good Afternoon, your Honor.

5

Sonia Chahin and Richard Lasting on behalf of Mr. Kadamovas, who's present in captivity.

MR. LASTING:  Good afternoon, your Honor.

MR. RUBIN:  Good afternoon, your Honor.

Dale Rubin on behalf of Louri Mikhel.  And also appearing on behalf of Mr. Mikhel is Richard Callahan.

And I want to thank the Court for adjusting the schedule to work out with my trial.

THE COURT:  Let me ask you, in the future is it necessary for both counsel to appear at each one of these conferences?  Or can we do it just with one counsel present for each of the Defendants that has two counsel?

MR. RUBIN:  Well, it may or may not be.  Unfortunately, I felt that my appearance here was important.

THE COURT:  Well, today was the initial appearance before me, so I can understand that.  But in the future, unless there's some extraordinary reason, we would proceed in the absence of both attorneys for any designated Defendant.

MR. RUBIN:  Understood.  Thank you.

THE COURT:  Now, again, as I said, this is the first time I've had the parties before the Court.  I have reviewed the files that were given to me by Judge Manella.  And I believe I'm up to speed.

There's one factor though that I must establish.  And that is whether or not any of the Defendants in this case are

not citizens of the United States.

Are the Defendants citizens or non-Citizens?

**MR. AMDUR:** Ms. Solovyeva is not a citizen.

**MR. EVANS:** Mr. Krylov is not a citizen, your Honor. David Evans --

**MS. CHAHIN:** Sonia Chahin, your Honor.

Mr. Kadamovas is not a citizen.

**MR. CALLAHAN:** Nor is Mr. Mikhel, your Honor.

**THE COURT:** All right.

Now, the question then -- because of treaty, has the consulate of the country of origin of each of the Defendants been notified of the existence of these proceedings?

**MR. DUGDALE:** Yes, your Honor

**THE COURT:** And you have documented that?

**MR. DUGDALE:** We have. And in fact we have received communications from the consulate of several of the -- on behalf of some of these Defendants.

**THE COURT:** Now, the other issue that I wanted to bring up was Defendant Mikhel had made a request to calendar his motion for modification with conditions of confinement. That was lodged on April 27, 2006. I believe I scheduled that for hearing on May 30th, 2006. So this application, I'm going to deny.

I'll put this in the file, please, to be filed not used.

All right.  Another issue that I want to bring up is that because three of the Defendants in this case have been found to be subject to the death penalty in the event of a conviction, I'm going to have to send out a letter to get a jury impaneled.  The letter merely indicates that the trial in this case is going to take five to seven months.

I've prepared a copy of the proposed letter.  It's not in final form.  But this is the type of letter I would like to use to prescreen the prospective jury pool to get at least 250 perspective jurors.  I'm going to have the Clerk pass out to each of you a copy of the letter.

There's an attachment on one of the letters and that attachment will be on the other form of the letter as well.  It asks only one question and that is to prescreen for time.

So I'll let you have that at this point.  And I'd ask the Clerk to give me back unused copies.

**(Clerk passing out letter to attorneys)**

**THE COURT:**  In Judge Carter's case that he's in trial on now in Orange County, he indicated that they sent out 11,000 of these letters in order to obtain 250 jurors.  So we will probably do the same in this case.

Now, the Second Superseding Indictment was filed on July 29th, 2004.  The original Indictment was issued in the year 2002.

On calendar today, we have two motions.  One is

Defendant Kadamovas' renewed motion for the daily use of the computer at the Metropolitan Detention Center. There was a joinder of Defendant Petro Krylov in a renewed motion, also Jurlius Kadamovas, for order to use the computer at the Metropolitan Detention Center. And there's a motion by Defendant Kadamovas to continue the trial date. And that was joined in by Defendants Mikhel and Krylov.

I think we'll take up first the motion for the continuance. I have read all of the moving papers, the opposition, the reply that has been filed in this particular case. And I'm going to try and summarize it as follows:

The moving party has offered the following facts in support of the motion for the continuance of the trial. The trial is set for July 11th, 2006 at 9:00 a.m. And Defendant Kadamovas has moved for the continuance.

He wishes to have the trial continued until at least January the 9th, 2007. And he seeks to extend all dates relating to the filing and hearing of all remaining phase-four motions, which are currently scheduled to be filed by April 17th, 2006; March 24th, 2006 -- I'm sorry -- to be file by April 17th, 2006. On March 24th, 2006, the Court vacated all dates relating to the filing of phase-four motions. That was in a minute order dated March 24th, 2006.

**UNIDENTIFIED SPEAKER:** I'm sorry, your Honor. It's hard to hear.

THE COURT: Pardon?

UNIDENTIFIED SPEAKER: It's hard to hear the (IND).

THE COURT: Well, you're going to have to reposition yourself with the consent of the Marshals.

Now, Mr. Kadamovas is charged with conspiracy to engage in hostage taking resulting in death; three counts of hostage taking that resulted in death; conspiracy to launder money; and conspiracy to escape from custody. The Government has filed a notice of intent to seek the death penalty. In that notice, the Government proposes to prove that a death sentence is warranted based on the fact that Mr. Kadamovas alleged participation in two additional uncharged foreign murders and one additional hostage taking in Los Angeles County occurred.

The Defense has indicated that the Defendant must be prepared to defend himself against the charges alleging seven murders. In addition, Defense Counsel, Sonia Chahin, was appointed to represent Mr. Kadamovas, on November the 28th, 2005 and was appointed to relieve, I believe, Marcia Brewer, who was appointed originally.

Now, the Defendant has made the following contentions. He contends that the continuance should be granted because of the factual, legal complexities of the case and the seriousness of the charges. He also indicates that because the Indictment charges seven murders alone, this

10

renders the case atypical.  The Defendant indicates that he must defend against each one of the murders as if he was being tried in seven different murder cases.

The complexities that the Defendant has cited indicate that the Government is going to be calling among others the following experts: a DNA expert, two nuclear DNA experts, trace evidence expert, two handwriting experts, two fingerprint experts, a tool mark expert, four coroners, a toxicologist; and a money laundering expert.

The Defense maintains that the voluminous nature of the discovery and materials, with some of the materials in foreign languages, necessitates a continuance.  A review of the discovery material is not the end, but rather the beginning of Defense Counsel's work, according to the Defense.

After a complete review of the materials, the Defense Counsel indicates it will need time to analyze materials; complete any additional investigation, including in other countries; and formulate a theory of Defense.  Defense Counsel indicates while they have been diligent -- or while she has been diligent in her preparation and review of the materials, the sheer volume has reduced that task impossible by the date that is currently set.

The Government has produced the following discovery material:  Documentary materials exceeding 75,000 pages; the master index of the non-documentary discovery materials spans

51 pages and includes materials contained on 139 CD ROMs, electronic media, floppy disk, numerous hard drive disks, 121 audiotapes, 117 videotapes, 29 DVDs. And the amount of information contained in each of the items varies from a few photos to hundreds of pages of financial records. Additional materials not contained in the 51-page master discovery index include transcripts and DVDs of depositions of certain Government witnesses.

The Defense also maintains that not all discovery materials that have been ordered by Copy Pro that were ordered in January of 2006 have been provided. Defense Counsel also indicates that it has obligations in other District Court cases.

Ms. Chahin indicates that she has a trial scheduled to begin on May 30th before Judge Anderson alleging two homicides and other serious charges. And that the trial is scheduled to last at least three weeks.

The Government is seeking the death penalty and has had several years to prepare the case and has three USA's, Assistant United States Attorneys assisting the case. And the Defense maintains that a continuance of six months is not unreasonable.

The Government has indicated that witnesses' memories will fade. The Government also states that it is lucky because Defendants left behind -- I'm quoting now -- "immutable trail

of evidence that will conclusively demonstrate guilt."

Now, the Defense maintains if witnesses' memories fade, the Government can use interview memoranda produced after the witnesses were interviewed to refresh memories.  The Defense also maintains that although counsel has relied upon co-counsel for some things, co-counsel's primary duty is to represent their own clients.  If co-counsel discovers information helpful to Kadamovas but harmful to his or her client, co-counsel might not share that information with Defendant Kadamovas.

INTERPRETER GLENN:  Excuse me, your Honor.  The interpreters cannot hear you.  (Indiscernible).

THE COURT:  Then I want the interpreters to sit right in the middle there.

INTERPRETER GLENN:  Where do you want?  Where was that?

THE COURT:  I'll have the Marshal help you put your chairs right in the middle, so that you can hear every word that I say.

(Pause)

INTERPRETER SPIVAKOVSKY:  Thank you, your Honor.

THE COURT:  Can you hear now?  Can you hear?

INTERPRETER SPIVAKOVSKY:  Yes.  Thank you.

THE COURT:  Defense also maintains that any preparation already done by co-counsel was undertaken to

13

analyze whether his or her client participated in the crimes charged or was guilty of those crimes.  The Defense maintains that knowledge that the capital counsel and prior counsel have acquired from use of investigation cannot be transferred to new counsel, Ms. Chahin.

The Defense maintains that the Government's inconvenience of informing the witnesses of a new date pales in comparison to the task that face Defense Counsel in figuring out what the 100 plus witnesses have to say.

Defense also maintains that in a capital case where a Defendant's life is at stake, the calendars of the other counsel should not be the determinative factor in deciding whether his or her counsel should be afforded sufficient time to prepare for trial.  The trial in most cases may also be changed.

Now, the law with regard to this is set forth, I believe, in *U.S. versus Shirley*, 884 F.2d 1130; *Newberry versus Wingo*, 449 F.2d 344; *Powell versus Alabama*, 287 US 45; *Dillon versus Duckworth*, 751 F.2d 895; *U.S. versus Fussell*, 531 F.2d 1275; *Locket versus Ohio*, 438 US 586; *Fugate versus Commonwealth*, 72 S.W.2d 47, a Kentucky case.

In essence, the District Court has the discretion to grant a Defendant's request to continue a previously scheduled trial where the interest of justice require it.  The relevant factors the Court should consider are:  One, the extent of

14

Defendant's diligence in readying a Defense; Second, the likelihood the continuance would satisfy the Defendant's needs; Third, the inconvenience to the Court; and Fourth, the extent to which the Defendant may be harmed if the continuance is not granted. In addition, the right to due process and to have assistance of counsel have been interpreted to mean effective assistance of counsel.

Now, the Government has filed opposition. And I'm going to try to summarize that as well.

The Defendant's motion to continue should be denied, according to the Government, because further delays in the case would jeopardize the Government's right to a fair trial and create logistical problems because the Government has relied upon this trial date for now over eight months.

The Government cites *US versus Garrett*, 179 F.3d 1143. Although a District Court must consider the effects of its decision upon a Defendant's Sixth Amendment right to counsel where the motion arguably implicates that right, the Court need not find a compelling reason before denying a request to continuance. And not every restriction on a Counsel's time or opportunity to investigate or otherwise prepare for trial violates a Defendant's Sixth Amendment right to counsel, citing *Morris versus Slappy*, 461 US 1. Only an unreasonably and arbitrary insistence upon the expedience ness in the face of a justifiable request for delay violates the

right to counsel.

Now, except for the events surrounding the attempt at escape in this case, all the events in issue took place between November 2000 and February 2002. Therefore, according to the Government, by July of 2006, at least 4.5 years will have elapsed between the events occurring and witnesses testifying about them. Because witnesses' memories fade, at some point the Government's right to a fair trial is affected by the delays.

The Government also argues that since the Indictment was brought, two witnesses have died and five others have moved their residences outside the country and that further delays might bring with it more deaths and movement of witnesses.

The Government, as I stated earlier, has relied upon the July trial date for over eight months. That's July 11th, 2006. The Government has informed witnesses it plans on calling at trial that the trial is set to begin in July of 2006. The Government has subpoenaed most of the 100 witnesses it plans on calling. And the Government maintains that moving the trial at this time will create a logistical nightmare for the Government.

In addition, the Government argues that the family members of the victim's have a statutory right not to have the proceedings barred by unreasonable delays. Under 18 United States Code, Section 3771, crime victims have a right to have

the proceedings free from unreasonable delay and that further delays will prevent closure for family members.

The Government argues the Defendants' motion should be denied because the motion overlooks the substantial resources that counsel has available to them; and that while Ms. Chahin has only been involved in the case since November of 2005, she has co-counsel who has been working on the case for four years. Presumably, a substantial amount of the work necessary for the case to be tried has been done prior to her appointment.

The Government also indicates that Ms. Chahin's co-counsel has been diligently preparing for trial and can assist her. Co-counsel, Mr. Lasting, has been representing Mr. Kadamovas for more than four years. Counsel for Mikhel has been working on this case for four years and has a joint defense agreement with Kadamovas' counsel.

Presumably when Ms. Chahin was appointed, the Government maintains that a substantial amount of work had been done by prior counsel. And the Government also argues that Ms. Chahin knew, when she accepted appointment, when the trial was set for and must have accepted the assignment with the expectation that she could prepare by the July 2006 trial date. The Government also indicates that it's even willing to meet with Ms. Chahin to help her narrow her need to review certain materials in the case.

The Defendant's motion to continue the trial to January 2007, according to the Government, should be denied because if the trial is continued until then it will not actually commence in January. Two of the attorneys in this case, Mr. Rubin and Mr. Crain, are scheduled to be in a six-month federal death penalty trial on October the 3rd, 2006, before Judge Klausner, next door, in the case of *US versus John Williams Stenson, et al.* That's also a 2002 case.

Now, Mr. Krylov has also joined in the motion. Mr. Krylov's arguments can be summarized as follows:

The Defendant maintains that the Government deceptively equates the desires of the victim's family members with the statutory rights of crime victims. The Defendant argues that while the Government maintains that its right to a fair trial has been jeopardized because two witnesses have died and five have left the country, the Government never identifies who any of those witnesses are; what testimony they would offer; where those witnesses moved to; when those witnesses died or left the country; or why a continuance would cause others to reconsider testifying.

Counsel for Defendant Krylov indicates that he is aware of no witnesses who have left the country since the Government filed its notice of an intent to seek the death penalty. Krylov's Counsel also indicates that over a year ago, the Defendants requested that the Government produce the

results of the FBI examination of certain computer material. The Government has refused this request according to this Defendant.

Now, the Government, according to Mr. Krylov, has delayed responding to other discovery requests as well. For example, Mr. Krylov maintains that on January 24th, 2006; Counsel, Mr. Buehler, requested information relating to a witness and alleged victim who claims to have been kidnapped and held for ransom in October of 2001 and then released after his parents paid a $50,000 ransom. The alleged victim entered into a plea deal with the United States District Court for the District of Idaho.

The Government has not responded to a discovery request. The alleged kidnapping is cited in the notice of the intent to seek the death penalty as to each capital Defendant; and thus discovery concerning its victim is, according to Mr. Krylov, highly relevant.

Neither Mr. Evans nor Mr. Buehler are prepared to go to trial in July. Mr. Evans is currently engaged in four other capital murder cases.

Mr. Mikhel also has joined in Mr. Kadamovas' motion. And I'll try and summarize that as well.

As of July 25th, 2005, the date when the Court ordered the present trial date, the Government disclosed 60,000 pages of documents. That order was based in part on the

Court's assessment of the amount of time that would be sufficient for Defendants to prepare for trial. Almost 15,000 new pages of paper discovery have been provided, along with a substantial amount of information contained on various media materials. Much of this additional material has been provided since the beginning of 2006, according to Mr. Mikhel.

Mr. Mikhel also indicates that in July of 2005 Defendants requested that the Government provide penalty phase discovery regarding homicides alleged to have been committed in Turkey and Cyprus. When the Government stated that the discovery produced was current, it knew that the Defense had a trip scheduled to investigate these charges.

However, since the Defense return from its investigatory trip, the Government has supplied additional discovery regarding these alleged homicides that had been in the Government's possession previously. And this late disclosure, according to Mr. Mikhel, will result in another trip abroad to investigate new materials.

Mr. Mikhel also indicates that even though the Government claims that 4.5 years have elapsed since the alleged events occurred, it took the Government over two years to decide to seek the death penalty. After the notice was filed, all discovery should have been provided Defense Counsel immediately, according to Mr. Mikhel. Yet the Defense continues to receive new and substantial discovery up to the

20

time of the joinder of this motion.

And he cites, for example, in March of 2005, the Government interviewed Mikhel's wife, Marina Karakadina in Redding, England.  Recordings of the five-hour interview were only provided to Counsel one month ago.  Copies of the agreement between the Government and Karakadina to extend immunity for the interview has been requested on numerous occasions, but according to Mr. Mikhel, has not been provided.

The special administrative measures imposed on Mikhel, according to Mr. Mikhel, have made it impossible for him to adequately review the discovery materials.  Mr. Mikhel has indicated that he has been provided less than one hour per day to review materials.  Therefore, he claims that he's been unable to properly assist his counsel in preparation for trial.  This situation, according to Mr. Mikhel, is only remedied in the last few months.

Mr. Mikhel also indicates that he has two appeals pending before the Ninth Circuit.  The first appeal deals with the constitutionality of the *Federal Death Penalty Act*.  And the second appeal is in regards to Judge Manella's ruling denying Mikhel's motion to preclude disclosure of a handwritten letter found in his prison cell.  And I recently received something from the Ninth Circuit indicating that they would not entertain an interlocutory appeal in this case.

Defendant Solovyeva also has a position.  And that's

21

summarized as follows.

She objects to any continuance of the trial beyond the date of September 30th, 2006.  And she indicates that if the trial date is continued --

MS. CHAHIN:  Your Honor, Mr. Kadamovas says he cannot hear the interpreter.  Apparently, the transmitter is not working.

THE COURT:  If the transmitter's not working, either the battery is bad, or we have plenty of them up here.

MS. CHAHIN:  Thank you, your Honor.

(Pause)

THE COURT:  Make sure if you borrow any of my receivers that you put them back; those receivers assigned to this court room that you put them back.  I know the interpreters bring their own.  I can assure you we'll have no glitches next time we meet.

MS. CHAHIN:  He's now able to hear, your Honor.

THE COURT:  All right.

Defendant Solovyeva takes the position that if the trial is continued past September the 30th, 2006; she's going to be seeking a severance.

Now, the Government's also filed a response to Defendants Mikhel and Krylov's joinder in the motion.  The Government maintains as of the currently scheduled trial date, with the exception of Ms. Chahin, every attorney will have

22

served on this case for more than four years.  By the time trial commences, Defendants Mikhel, Kadamovas, and Krylov will have been on notice for approximately two years of the allegations contained in the death penalty notices and for approximately one year, if the trial would begin on July 11th of 2006.

The Government maintains that further continuances threaten the Government's right to a fair trial given the length of time that has passed since the events charged and the increased possibility that witnesses may not be able to testify.  For example, S-a-g-i-f-a, Sagifa Sief (ph.s.), mother of the victim George Sief, has passed away and was supposed to serve as a victim impact witness and was supposed to testify as to several matters in the guilt phase.

The Government cites yet another example.  Arthur Bets (ph.s.) received requests for large sums of money from victim Valery Popov after Popov was abducted.  He has died and was supposed to testify about the requests.

The five witnesses who have relocated from the United States are Dr. John Cooper, the forensic pathologist who conducted the autopsy of Mia Muskatell (ph.s.); Gary Apothnic (ph.s.), who allowed Krylov to use a bank account to launder ransom proceeds; FBI Agent Brian Tepper who identifies the telephone seized in this case; Elena Cocoviva (ph.s.) a nanny to George Sief's children who helps establish the timeline when

Mr. Sief was abducted; and Robert Nirockus (ph.s.), the person who introduced Kadamovas to victim Popov.

The family members of the victims are crime victims under Section 3771(c) and have a statutory right to proceedings free from unreasonable delay. That's 18 USC 3771.

The Government maintains that the Defendants cannot show that they require a continuance based on any late discovery produced by the Government. The Government maintains that it's produced all of the discovery in its possession, custody, and control to which the Defendants are entitled and has done so in an expeditious manner.

The Government maintains that it's produced witness statements from every witness it currently intends to call, provided access to every item seized in this case, and with minor exception disclosed all of the expert witnesses it intends on calling almost one full year ago. The Government maintains that it's gone beyond its discovery obligations by producing material not required under Federal Rule of Criminal Procedure Rule 16, Brady/Giglio, or the *Jencks Act*.

The Government maintains with rare exception the materials produced since July of 2005 were produced not long after the Government came into possession of them. The Government maintains that contrary to what Krylov argues the Government has made all of the computer evidence seized in this case available to Defendants on September the 25th, 2002, so

that Defendants could conduct whatever analysis they chose.

The Government maintains that it provided reports generated by the FBI's CART Group detailing the results of its analysis of these computers. These reports were referenced in the Government's expert witness disclosure dated May 31st, 2005; and were dated April 26th, 2002; December 5th, 2002; November 12th, 2003; January 14th, 2004; and September the 28th, 2004.

The Government maintains that it's not required to review this evidence for Defendants and point out, at this time, what specific documents contained on these computers it intends on utilizing as trial exhibits. The Government does indicate that it will provide Defendants with documents extracted from Defendants' computers that include the current universe of computer files the Government intends of relying upon as trial exhibits. The fact that the Government did not voluntarily agree to do this work earlier does not provide an excuse to continue the trial.

The Government maintains that Defendant Krylov's complaints concerning the Giglio information relating to an individual by the name of G-y-u-r-d-z-h-i-h-i-y-a-n-t-s, requested on January 24th, 2006, does not provide for a basis for a continuance. This information consisting mainly of a plea signed by this individual and pleadings filed in connection with his sentence had to be recovered from archived

files by an Assistant United States Attorney in another district and could not be disclosed to Defendants until a motion to unseal some of these documents was granted by the judge sitting in Idaho.

This material has now been produced. Because the material is not voluminous and because the witness will not testify for at least nine months, the production of this discovery does not provide a basis for a continuance.

The Government maintains that Mikhel's assertion that discovery relating to murders alleged in the death penalty notices was produced in a tardy manner is not correct. The Government began producing discovery regarding these crimes years ago even before it reached the decision to seek the death penalty.

For example, on August 24th, 2004, promptly after the Government received the entire investigatory file compiled by the Cypriot Police concerning the abduction and murder of Valery Popov, it produced the material to the Defendants.

The Government maintains there were two interviews conducted of Marina Karakadina in England. One of the interviews was conducted on March 23rd, 2005, in the presence of U.S. law enforcement authorities and another on May 16th, 2005, conducted solely by British officials. The recordings of the first interview were produced on June 23rd, 2005. The recordings of the second interview were produced on September

26

17th, 2005.

The Government produced transcripts of these interviews December the 19th, 2005.  The Government maintains that the claim by Mikhel's capital counsel that the recordings were not produced until one month ago is simply not correct.  More importantly, the Government does not intend on calling Karakadina as a witness nor does her interview contain any information discoverable under Brady.

The Government maintains that work related conflicts of the attorneys do not provide a valid basis to continue this case.  All counsel have been on notice of the trial date for at least a year.  This provided all counsel with ample notice to clear their calendars for this trial.

The existence of the special administrative measures, the SAMS, does not provide a basis to continue the trial.  The SAMS restrictions infringe in no way on Mikhel's access to his counsel to assist in his own Defense.  The Government maintains that it has properly balanced the institutional security concerns posed by Mikhel against the need to provide him with every resource necessary to defend himself.

The Government also maintains that the pending appeals filed by Mikhel do not provide an excuse to delay the trial.  The existence of these interlocutory appeals does not and should not stay the trial.  It cites the case of *Plotkin*, P-l-o-t-k-i-n, *versus Pacific Tel & Tel*, 688 F.2d 1291.

27

All right.  I think I've articulated all of the arguments made by both counsel in this case.  I've looked at the file.  The case has been pending for a long period of time, and I'm surprised that it hasn't been tried before the scheduled trial date of July 11th, 2006.

My inclination in this particular case is to deny all requests for a continuance; hold the July 11th trial date as a firm trial date.

And having said that, which Counsel wants to be heard further?

MS. CHAHIN:  I would, your Honor.

THE COURT:  All right.  Ms. Chahin?

MS. CHAHIN:  Thank you. Your Honor, the Court has accurately identified and outlined all arguments that I've made on behalf of Mr. Kadamovas.  And as I came here, I was trying to figure out how best I could convey to the Court the magnitude of the materials that I have to review.

THE COURT:  It's not as if you're alone though.  You have had Mr. Lasting on here for four years.

MS. CHAHIN:  That is true, your Honor.  The problem, as I point out in my motion, is that, you know, I can't incorporate his knowledge that he's acquired in four years in the structuring of the cross examination.  I'm sure the Court has, and I have as well, seen an attorney conduct an examination who is not familiar with all the discovery

EXCEPTIONAL REPORTING SERVICES, INC

materials. It's like navigating a mine field.

I envision myself being put in the position of trying to examine a witness, perhaps an expert, where perhaps the answer to the question that I'm asking is not -- you know, was in the maybe the 50 CD ROMs that I didn't have time to review before the trial start.

So in order to demonstrate to the Court in some fashion, in some visible fashion, how much discovery there is; I compiled this folder. This folder contains the CD ROMs that pertain to this case. Each one of these leaflets contains eight CD ROMs. As I pointed out in my motion, one of these CD ROMs alone has 800 pages. Two of them have 134 conversations in a foreign language. This does not even account for 20 -- I'm sorry -- 19 computer hard drives that contain evidence that we need to review, and we need to go through. So, yes, Mr. Lasting has been on this case for some time, but that doesn't help me in my preparation.

When the Court relieved prior counsel, the Court found that there was good cause to do so. And at that point, she appointed me to take on this case. When I agreed to take on this case, did I know that there were 70,000 pages? Yes, I knew that. Did I know that there was a 51-page index containing non-documentary discovery? No, your Honor, I did not. I was not aware of that fact, because if I had known of that fact; I can tell the Court that I would not have agreed to

take that case.

I'm an experienced attorney, your Honor, but I do not know of any lawyer who could be ready to try this case based on the quantity of materials involved, just the sheer quantity. The problem, your Honor, is that even, let's say, if I were able to review all of these CD ROMs, the 75,000 pages, the 19 computer hard drives by the July 11th date; that's not the end of my preparation, your Honor.

That's the beginning. Because after reviewing the materials is when counsel have to develop an investigative plan, conduct investigations, interview witnesses. So reviewing these materials doesn't mark the end of my participation in the case but rather the beginning. And from there I have to work to conduct investigations with Mr. Lasting and do -- as I say, that is when the work begins.

Your Honor, I have been diligently preparing this case. This is not a situation where I've been dilatory. Both Mr. Lasting and I have been working exhaustively. But as I point out in my motion, I cannot -- my preparation cannot be confined to sitting in my office and reviewing discovery for eight hours a day. There are experts to talk to. There are locations to be seen. There are interviews to take place. I have to meet with Mr. Kadamovas. I have to meet with the paralegal. I have to meet with experts. So it's not a situation where I've been dilatory or I'm doing this for

purposes of the delay.

The problem that I find myself in is if the Court does not order this continuance, Mr. Kadamovas will effectively only have one attorney at the trial, Mr. Lasting. Because I'm going to be in a position where, you know, I'm not going to be able to ask that question because, as I say --

THE COURT: It's not like Mr. Lasting is an inexperienced attorney. He's a very experienced capital attorney. Look I've tried a lot of cases involving the death penalty. I don't know. I think I was going to try one in the Federal Court, but I tried a lot in the State Court. It's just like any other case, to be very frank with you.

And for some reason I don't even know why this case is going to take five to seven months to complete. It's not that difficult -- I don't think -- of a case. So I question, you know, the time estimate of five to seven months it's been given to the prior judge in this case.

MS. CHAHIN: Your Honor, I'm lucky to have Mr. Lasting as a co-counsel. He's a very able attorney.

The statute though provides a capital defendant in Federal Court to have two attorneys. And effectively if the Court forces me to trial -- because that is the Court's power to force me to trial before I've had a chance to do all of these things that I feel that I need to do, especially representing someone in a death case.

But he will effectively only have one attorney. Because I'm going to be in a position where I will not be able to ask questions or have any meaningful participation, because I haven't had a chance to go through these hundreds and hundreds of CD ROMs, computer hard drives, and other materials.

That's the situation that I find myself in, your Honor. And that's why I'm requesting additional time.

THE COURT: Any other Defense Counsel wish to make a record?

(Pause)

MR. RUBIN: Good afternoon, your Honor. Dale Rubin on behalf of Mr. Mikhel. I am his capital counsel, your Honor.

Your Honor, I would like to take a different slant on the issue of the continuance, if I can, for a moment. And I'm sorry to have to disagree with the Court, but as capital counsel I don't think any capital case is an easy case. I'm --

THE COURT: Maybe the use of the word easy was inappropriate. It's not that complicated of a case.

MR. RUBIN: Well, let me explain to the Court why this case is. First of all, it took the Government 31 months for its death penalty submission to the Department of Justice, for the department to make a decision. That is the longest death penalty submission to the DOJ since the death penalty has been reinstated. I would like to think that one of the reasons for that is the complexity of the case, which means that I

32

haven't had four and a half years to prepare for the penalty aspects of the case. I have only had since August of 2004 when the notice of intent was filed.

Our trial judge at the time had made a decision that no death penalty experts were going to be appointed, including litigation specialist or any medical individuals, until after the Government had made its decision. And if the Court looks at the sealed requests that were made to Judge Manella, the Court will see that they were all denied. And Judge Manella wrote on the bottom of each one of them that we are not to worry, we will have plenty of time to prepare for the capital case should the Government file a notice of intent.

THE COURT: Yeah, but two years. I mean I can't understand why, you know, it hadn't been done.

MR. RUBIN: Let me handle that --

THE COURT: One in August of 2004; July of 2006, the present trial date --

MR. RUBIN: That's correct.

THE COURT: That's almost two years.

MR. RUBIN: Yes, sir.

And there're two problems that come to the front of that. The first is that the additional homicides that are alleged in the notice of intent are out of the country. They occurred on foreign soil, which makes them extremely difficult to investigate. The second problem and the reason that I ask

the Court to --

THE COURT: How do you know I'm going to allow that in?

MR. RUBIN: Well, if the Court -- you would take a great weight off of my chest if that -- I have to assume it's coming in at this point.

THE COURT: Well, you assume it's coming in, but how do -- you know you've also got to take the other prong. And that is you may move to exclude that because of the fact that it could be collateral to the issues in this case.

I mean there're what five deaths in this particular case?

MR. RUBIN: Yes, sir.

THE COURT: All right. I mean how many more do they need?

MR. RUBIN: I guess from the Government's standpoint there's never enough. The other aspect and the reason that I asked for our motion regarding the modification of his custodial conditions to be calendared now is because they really relate to the issue of continuance. And the reason is because of the SAMS that are in place for Mr. Mikhel really interfere with our ability to --

THE COURT: Let's stop a minute and think about that argument. It was the Defendants who allegedly came up with this comprehensive, complex plan to escape that resulted in the

imposition of the SAMS.

MR. RUBIN: That's correct. And I am not -- and in the motion I did not say that the Government's purpose in attempting to secure Mr. Mikhel was improper.

But what it has resulted in -- Mr. Mikhel is housed in the West Valley Detention Center, one story below ground right now. He is the only one in his unit. We cannot meet with him face to face. We have to do it through bars. Up until about two months ago, he was restricted to discovery review of one hour a day. That has changed now because of my negotiations with Lieutenant Trotter at the West Valley Detention Center. He's now getting four hours a day. I believe that is insufficient to prepare for discovery.

My investigator who could meet with Mr. Mikhel on an every other day or a daily basis cannot meet with him without my being there. He is restricted to being babysat by me. So that means every time my investigator wants to go out, I have to go there and waste my time.

These are just some of the issues that are brought up by the SAMS. In addition any doctors, any individuals that we wanted to examine Mr. Mikhel had to go through a Government approval. And it was because of his location at West Valley. Until lieutenant Trotter got involved a couple of months ago, it was impossible for us to get our witnesses, our experts, to him.

35

So it's not only the preparation of the case for trial -- to go back again to penalty, one of the things that I am supposed to do -- and I have had a mitigation specialist on the case since the time of the notice of intent.  My client was born in St. Petersburg, Russia.  And he was born at a time when it was still part of the Soviet Union and getting to establish and create a social history for my client including records, school records, medical records those kinds of things have been very difficult.

The Defense Mitigation Team, between myself, my investigator, and my mitigation specialist; I've been to St. Petersburg trying to work on this on two occasions.  The mitigation specialist has been there at least once.  It is difficult enough for us to do our job when family, friends, and records are here.  But when you take and you put them in the Soviet Union, or now in the Russian Federation, getting cooperation, finding records since perestroika is really just possible.  And it has been difficult.

So instead of looking at this as I've been working on the case for four years, I've been working on the case for two years.  And I take that part of it very seriously.  I assume we will be in penalty.  I assume we will be putting on penalty Information.

I would also point out to the Court that we have a penalty discovery motion pending before this Court later this

month.  In its reply or its opposition to our penalty discovery motion, the Government indicates that it has not provided witness statements regarding victim impact evidence.  And it doesn't believe it needs to.

So when the Government tells this Court that we've given them everything and we've given them everything that they need -- regarding my client's wife Karakadina, it took the Government six months.  Because the recordings that we received were intelligible.  Every two seconds or three seconds there was some voice giving the time.  And you couldn't understand what was being said, so they all had to go back and be enhanced.  And we just got those at the beginning of the year.

So it's yes; we've done this.  We've had this.  It hasn't done us any good.  And we need to be able to address these issues.

Now, one of the things that the Government has repeatedly said when we were in front of other bench officers is that it will be four or five or six months before the Defense starts the penalty phase anyway, and counsel can work on that through trial.  It doesn't account for the fact that we have a motion scheduled that requires me to give notices on witnesses and make motions before trial starts or else I'm precluded.

It also is -- in any seminar that anyone goes to regarding capital defense, every person that lectures tells you

your penalty phase must be prepared at the beginning of the trial. I don't want to see my client executed. On the other hand, I don't want to necessarily see that my client doesn't get executed because his attorney was incompetent. And that is why we need the time to prepare this.

If the Government wants to get rid of the death penalty and would be happy with life without possibility of parole, then half of this case is gone and half of the problems before this Court is gone.

**THE COURT:** You're violating Rule 11 now, because you're negotiating a plea in front of the Judge.

**MR. RUBIN:** All I'm saying is if they're complaining about the time that it takes -- when the Government goes abroad to investigate its case abroad, they go with the U.S. Attorney's Office. They go with the FBI; they go with IRS Agents; they go with Los Angeles Police Officers; they go with FBI Interpreters.

They have -- because of the various agreements that the United States has with other countries, they go out and get cooperation. They go, and the authorities there sit down with them and assist them. When I go, I have to twist arms to get someone in authority to make time for me. I don't have the same benefit that they have. So it is not putting us on the same level playing field.

All I want to be able to do is prepare this case for

trial so that my client gets a fair trial and all of the evidence comes out.  The reason that I believe that I will not be able to do that if we start in July is that I won't be able to conduct all of the investigation that I need to do.

I certainly will respond to any other questions the Court has.

THE COURT:  The other Defense Counsel wish to make a record?

MR. RUBIN:  Thank you, your Honor.

THE COURT:  Mr. Evans?

MR. EVANS:  Good afternoon, your Honor.  David Evans appearing on behalf of Petro Krylov.

Your Honor, to a large extent, what I want to say the Court has already addressed.  I know my recollection is -- the Court spoke of its experience with death penalty cases going back in State Court.  My recollection from perhaps my experience as a criminal defense attorney was the Court's been doing this since the early '80s.  And then on the federal bench, you've seen what began as a trickle and is now a river of Habeas Petitions from state cases coming through.  I know the Court sees those on a regular basis and knows the standards which have been imposed.  And the evolving standards imposed on capital counsel.

When the Court summarized the arguments of the various parties, the Court identified, in the Government's

39

response to Mr. Kadamovas' motion for continuance, a few cases: *United States versus Garrett* and *Morris versus Slappy*, both of which stood for the proposition, as the Court summarized it, that the Court had broad discretion in determining whether or not to grant a continuance. And we're not contesting the Court's broad discretion.

THE COURT: But look at it from this point of view. What abuse of discretion is there to deny a request for continuance when the case has been pending for this period of time?

This is not one where it's a rocket docket. This case has been around since 2002. And the death penalty's been sought since 2004. It's not like we're pushing you to trial, either Judge Manella or myself.

MR. EVANS: I understand that, your Honor.

But as co-counsel, Mr. Rubin, just enunciated, we did not have -- let me back up for a second. In its response to Mr. Krylov's joinder in the motion for continuance, the Government uses some interesting language. They talk about the army of defense experts that we have. They talk about each Defendant has a mitigation experts. In its notice of experts filed by the Government, they identified, by my count, 36 forensic specialists and other experts that the Government intends to use.

It's true after the notice of intent to seek death

penalty was imposed, we got a mitigation expert.  And we're talking to other experts and other investigators.  We don't have 36 experts, not one of us.  Not one of the counsel over here -- not one of the Defendants over here has three lawyers, two FBI Agents, two LAPD Officers, and however many other experts that the Government has at its command.

The cases the Government cited, *Garrett* and *Slappy versus Morris*, involve requests for continuance filed on the eve of trial.  In *Slappy versus Morris*, which was a Habeas Petition, the trial lawyer told -- over the objection of the Defendant, told the trial court that he was ready for trial and ready to go and a continuance would be of no benefit to him.

This Court has spoken about the experience and expertise of Mr. Lasting.  Mr. Lasting has been trying death penalty cases since before he and Sentwid (ph.s.) did Ford and VanBelus (ph.s.).  I believe he has more than 10 trials.

**THE COURT:**  My knowledge of Mr. Lasting goes back to the time that he was a young Deputy Public Defender, and I was in the Municipal Court.  So I know Mr. Lasting is an outstanding lawyer based upon my observations of him.  I look at Mr. Callahan, Mr. Rubin, Mr. Buehler, yourself -- your father was a professor in law school -- Mr. Amdur.  So I mean when you tell me that this group of Defense Counsel is not, you know, prepared, I have to take a second look at that.

**MR. EVANS:**  Well, my point, your Honor, was that of

the capital counsel on this case, Mr. Lasting, who has -- as the Court noted -- more than 10 capital trials under his belt; Mr. Rubin, who I believe has 15 or close to that. As the Court is aware, I taught death penalty law for more than five years at Loyola Law School. Each of us is saying to the Court, more than two months before the trial is scheduled to commence, we will not be ready at that time.

THE COURT: You say --

MR. EVANS: And your Honor -- I'm sorry I didn't mean to interrupt the question.

THE COURT: -- less than two months before the trial's beginning, but more than four years after the case was filed.

MR. EVANS: I understand that, your Honor.

But we're not frivolous. We're really not. We've been working on this case very hard. We're not doing it to delay. We really aren't doing this to delay. The Government has shown -- has arguments about what it calls a tipping point; it calls about the loss of witnesses who left the country before they filed their notice of intent to seek the death penalty. They've never told us why those witnesses are not now available; why they will not respond to subpoenas; what they have to say. They won't even tell us where they are so we can go talk to them.

THE COURT: If they'll talk to you.

MR. EVANS: Isn't that their decision?

THE COURT: It's the decision of the witness, not the Government.

MR. EVANS: But the Government can give us that information, can't they? They can tell us where they are so we can go talk to them or ask them if they'll talk to us.

The Court has very graciously acknowledged that we're experienced lawyers. And we try very hard. This is a death penalty case. The Court knows the standards that are here. We're saying we're not ready. We're not trying to delay this case.

I understand the Court's desire to move it. I respect this Court very much. But we're not there. And we believe that we will be there by January. And there'll be no further continuances.

The Government -- as I believe the Court is now aware, the Government's claim that this case will be delayed even longer than that is not viable. Mr. Rubin is no longer counsel in the case before Judge Klausner, so there'll be no need to delay that assuming that that even goes at that time.

We're working on this case extremely hard. Neither Mr. Buehler nor I have taken a case in more than a year. And Mr. Buehler is in a prestigious, private firm. He's turning away cases. I've been doing the same thing. Mr. Amdur's furious at me because I'm not taking other panel cases because

I'm trying to prepare this case.

We're not ready now, Judge.  We want to be.  We want to present a fair trial, both to the Court and for the other Defendants who --

THE COURT:  Mr. Amdur's furious with you also because of the fact that you're seeking continuance, and he wants to go to trial not wait until September of 2006.

MR. EVANS:  That's it, your Honor.  Thank you.

THE COURT:  Mr. Amdur?

MR. AMDUR:  Your Honor, my client is the one Defendant who's not facing the death penalty, however there are still two lawyers representing her.  We had indicated we had no objection to a continuance to the end of September.  And the reason I indicated that was because I am due to commence a trial before Judge Hatter on August 1st.  It's a case that's been continued three years.  It's a multi-defendant stock fraud case, it's going to go about six weeks, and I think it's certain to begin there.  As I say, it's been continued several years.

If the Court intends to start in July, Mr. Crain will have to try the case by himself, and I think he's able to do that.  But the reason I had indicated no objection until the end of September is I would be available at that to assist him.  But if the case starts in July I would not.

THE COURT:  Remember, your client, as you said, is

not facing the death penalty.

M. AMDUR:  I'm aware of that.

THE COURT:  Mr. Dugdale?

MR. DUGDALE:  Yes, your Honor.  I think the Court correctly identified the issues in this case related to the continuance, mainly the fact that this case has been ongoing for over four years at this point in time.  On the other side over here we have eight extremely experienced Defense counsel, seven of which have been on the case for some in excess of four years already.  Even if you factor in Mr. Rubin's argument about the time of the notice of the death penalty, it's not a particularly good argument to begin with because part of the reason for the delay in when we announced our intention was to provide the Defendants with as much opportunity as they had to meet with the Attorney General and the Death Penalty Committee and to meet with us to present their case.  That was one of the reasons for the long delay.  That still means that there's two years that will have passed before this trial starts in the time that the death penalty notice was filed in this case.  So it's difficult to fathom how, with the resources that we have here to my left, the experienced counsel mitigation experts that they have, the other experts that they've employed, that they can't be ready four years after the case has been filed, four and a half years, and two years after the death penalty notices have been sought.

I wish to correct a couple things that Mr. Rubin said, just to be clear about some of the points that he makes.

As far as the SAMs restrictions are a concern, he doesn't and can't contest the fact that the SAMs here were justifiably put on the Defendant by the Government.  There was an elaborate escape attempt, as your Honor noted, that justified putting the SAMs in place here.  These are extremely dangerous individuals over here and three participated in this escape plot at the MDC.  But the SAM does not restrict in any way any Defendant's ability to meet with his counsel, no way whatsoever.  To call his counsel is not restricted in any sort of way.

This idea of this -- this idea of the one hour and the four hours that was talked about by Mr. Rubin, he doesn't have four hours to look at his discovery, he has an unlimited amount of time to look at his discovery.  He can have as much discovery as he wants in his cell right now and review it for as long as he wants.  The four hours relates to the amount of time that he has a computer in his cell right now.  And that restriction is only in place because --

THE COURT:  We're going to hear that motion in a moment.

MR. DUGDALE:  Sure.  The computer is run on a battery and the battery expires after four hours.  So that's the four hours.  The Defendant has as much time to look at the discovery

46

that he wants right now.  There is no restriction on that at all.  And a claim to the contrary is false.

Insofar as the discovery is concerned, again as stated in our papers, the Government's produced everything once it comes into our possession and custody and control.  If we take a close look at Mr. Rubin's claims, they don't hold up.  For instance his claim about the Kerr Debena (ph.s.) interview, those tapes were produced back in June.  Some of the tapes were difficult to hear and had to be enhanced, but that wasn't true of all of them.  And all these tapes now have been given to the Defendant.  And this is a red herring in any event because there was nothing about these tapes that was ever discoverable.

The concerns about the information from Turkey and Cyprus are the same.  The Cyprus file was produced almost two years ago at this point in time, the entire case file.  What has been produced subsequently has basically consisted of some translations of parts of that file, in addition to the initial translations that were initially provided from Defense counsel. The Turkey file was all produced prior to October 1st of last year, with the exception of one eight-page report, in which really only one page is relevant, which discusses where the Defendant was staying while he was in Turkey, which was information that was seized from the Defendant's house and produced in discovery four years ago.

So there's not one piece of evidence that's been

47

produced by the Government in a dilatory way here, one piece of evidence that should affect the Defendant's ability to investigate anything --

THE COURT: Yeah, but one of the questions that I'm going to address somewhere in this case is in the event of verdicts of guilty, why is the Government in the penalty phase going to be seeking to try a case involving an alleged murder in Cyprus and an alleged murder in Turkey? I mean to me it's going to introduce collateral issues unnecessary I think in this case --

MR. DUGDALE: I understand your point, and I'll address that in 30 seconds. That is a motion that's pending before the Court, which will be heard on May 22nd. But as the Court will note when it reviews the papers on this matter, the Supreme Court and every Circuit that's really addressed the issue and every District Court that has addressed the issue has said that a jury should be given as much information as possible when making the decision of whether a defendant should be executed or receive a life sentence. And basically some of the most important information a jury should receive is information concerning the defendant's criminal behavior and criminal past. It's basically like when your Honor would sentence any defendant your Honor would want to know as much information as possible about that defendant and his criminal past.

THE COURT: Yeah, but we look at convictions, not allegations.

MR. DUGDALE: That's true. But under the law of the Supreme Court and the Circuits and every published District Court case in the country this previously uncharged criminal conduct is conduct that can be brought to the attention of the jury.

THE COURT: No, I understand that, but I raised an issue and we'll discuss that and decide it in the latter part of this month.

MR. DUGDALE: Of course, your Honor. We will be prepared to address those issues at that time.

But in short the Court has it dead on. It's surprising after four and half years that this case has not seen witness one hit the witness stand yet. I don't there's many cases pending in this Court right now that have had this longevity and have gotten just to this point right now. Enough time has passed. The 75 CD ROMs that Ms. Chahin has here, it's difficult to imagine that other counsel to my left have not looked at those 75 CDs to figure out what is relevant out of them. And what is relevant and really will actually be presented at trial is probably a sliver of what she has there.

THE COURT: Well one of things that impressed me when I looked at the file in this case, number one it was voluminous, but more important I think that Judge Manella was

49

very meticulous as to what she did with respect to her rulings. They were well written, articulated, she laid it all out, you know, she was -- and the commission of the file that I received from her, I mean it had 30 or 40 volumes and each volume was, you know, organized and laid out. I had no trouble going through this.

MR. DUGDALE: Nor should anyone else, your Honor. We have intentionally structured this case in this way. We broke it up into motion phases so things could be resolved in timely and orderly fashion, so we would ultimately resolve all the issues that we have to resolve prior to trial. There is only two more phases of motions left, one to be heard, basically all the briefing is done, and then one to be set, which are basically motions in limine and motions related to the jury, such as the jury questionnaires and a motion for an anonymous jury that the Government will be making here. But that's it. Those issues -- we filed a status report, which detailed all the rulings made by Judge Manella, and they are voluminous. And they all have been working towards this point where we can have a trial in this case.

And that point, your Honor, should be now. Four years, four and a half years, is long enough. It's long enough for Defense to have been ready. It's certainly long enough for the Government to have to wait to present its evidence in the case. And it's certainly long enough for the victims' family

members in this case, many of whom are in the courtroom today, to wait until a jury can hear the case involving the people who are accused of killing their loved ones. It's unfair to ask them to wait any longer. It's unfair to ask anyone to wait any longer in this case.

THE COURT: All right, I'm ready to rule.

MR. DUGDALE: Thank you, your Honor.

THE COURT: The motion of Defendant Kadamovas to continue the trial date, joined in by Defendants Mikhel and Krylov, is denied. He trial date of July 11th, 2006 will stand.

Now, the other motion is Mr. Kadamovas' motion for an order for the daily use of a computer at the Metropolitan Detention Center, and let me go through that one at this time.

Here, Mr. Kadamovas offers the following facts in support of his renewed motion for a Court order for daily use of a computer at the MDC:

Mr. Kadamovas I believe at the present time is confined in the Segregated Housing Unit, that's the SHU, at the MDC. He indicates that the discovery in this case is voluminous, over 75,000 pages of documents, there are audiotapes, videotapes, taped transcripts, DVD recordings of witness depositions, forensic reports, photographs, CD ROMs, and multiple computer hard drives. Defense counsel has repeatedly attempted to find a means for Mr. Kadamovas to have

access to written discovery in a form in which he can read and understand it. Defense counsel has also repeatedly attempted to arrange for Mr. Kadamovas to have access to the media discovery.

On November the 16th, 2005 Mr. Kadamovas filed a notice of motion for Court order for daily use of a computer at the MDC. On November the 28th, 2005 a stipulation was entered into which was intended to provide Mr. Kadamovas with access to his laptop computer to the maximum practical event. Mr. Kadamovas anticipated having the use of the laptop between the hours of 7:00 a.m. to 3:15 p.m. Monday through Friday, subject to institutional safety, security, and operational need.

On January the 6th, 2006 counsel for Mr. Kadamovas wrote to the MDC, Warden Benoff (ph.s.), Michael Benoff, advising him of the MDC's consistent failure to honor the November 28th, 2005 stipulation. According to Defense counsel no response from the warden has been received. Although there was one put on file when the renewed motion was filed, which I have read, reviewed, and considered in this case.

Now, the Government offers the following in opposition to Mr. Kadamovas' motion:

While awaiting trial at the MDC Mr. Kadamovas, Mr. Mikhel, and Mr. Krylov allegedly arranged an elaborate escape attempt with the aid of other inmates and persons on the

outside.  Their accomplices were able to smuggle escape equipment into the MDC.  Investigators discovered a variety of escape paraphernalia in Mr. Mikhel's cell, including bolt cutters, hacksaw blades, and other items.  Mr. Kadamovas has been designated a high security threat because of his history of violence, criminal associations, and his willingness to commit new crimes.  Because of the Defendant's security level the MDC policy requires the presence of three correctional officers and a lieutenant whenever Mr. Kadamovas is moved from his cell.  Mr. Kadamovas' access to the laptop is limited to either attorney meeting rooms or the law library.  His access is not unlimited because the requisite number of personnel required to move him to those locations is not always available nor are the rooms always available.

Now, Mr. Kadamovas' counsel cites:  *McMann v. Richardson*, 397 U.S. 759; *Strickland v. Washington*, 466 U.S. 668; *Ake (A-K-E) v. Oklahoma*, 470 U.S. 68; *Griffin v. Illinois*, 351 U.S. 12; *Gideon v. Wainright*, 372 U.S. 335; *Douglas v. California*, 372 U.S. 353; *Roberts v. LaVallee*, 389 U.S. 40; *Bounds v. Smith*, 430 U.S. 817; *U.S. v. Mosquera* (M-O-S-Q-U-E-R-A), 816 F.Supp 168, out of the Eastern District of New York; *Faretta v. California*, 422 U.S. 806; *Smith v. O'Grady*, 312 U.S. 329; *Beck v. Alabama*, 447 U.S. 625.

Basically Mr. Kadamovas is arguing that the Defendant's Sixth Amendment right to be informed of the nature

53

and cause of the accusation and to effective assistance of counsel are being violated by the Government's denial of access to his laptop. The Sixth Amendment, according to Mr. Kadamovas, is that the right to counsel exists to protect the fundamental right to a fair trial and the right to counsel includes the right to effective assistance of counsel, and this right can be violated by counsel's failure to render adequate assistance or by the governmental interference with counsel's ability to prepare a defense. Defendant Kadamovas argues that effective assistance of counsel is impaired when the Defendant is subjected to conditions of incarceration that deny him the ability to know the evidence against him.

Mr. Kadamovas' counsel cites the Supreme Court to the effect that the Supreme Court has long recognized that mere access to the courthouse doors does not by itself assure a proper functioning of the adversary process and that a criminal trial is fundamentally unfair if the state proceeds against an indigent defendant without making certain that he has access to the raw materials integral to the building of an effective defense.

Mr. Kadamovas also argues that the purpose of the Sixth Amendment's right to be informed about the proceedings is to insure the defendant's ability to assist in his own defense and effective assistance of counsel is impossible unless the client can provide his or her attorney with intelligent

54

informed input.

He also argues that a criminal defendant has a fundamental right to have a rational understanding of the evidence he will confront at trial.

He argues that the due process clause bars the trial of a defendant who is unable to understand the proceedings, to consult with his attorney, or to assist in the preparation of his defense.

Mr. Kadamovas also argues that a defense counsel's effectiveness is diminished if the client does not have an understanding of the facts supporting the charge. The significance of discovery may not be apparent to the lawyer, yet the discovery may be of great significance to the accused because of his familiarity with the witnesses and the circumstances surrounding the case. Here Mr. Kadamovas argues that because his native language is Russian without translation the vast quantity of English discovery is beyond his comprehension.

MS. CHAHIN: Excuse me. I'm sorry, your Honor. We're having problems with the transmitter.

(Pause)

THE INTERPRETER: Your Honor, there seems to be interference with this specific area and I'm not sure what's causing that.

THE COURT: Well, we'll have to take care of it next

55

time.

THE INTERPRETER: Maybe a cell phone or something like that. It's not an earphone issue.

THE COURT: Move him out about two feet.

MR. EVANS: Your Honor, may I step out for a moment? I'm supposed to be picking up my son and I just --

(Court nods affirmatively)

MR. EVANS: Thank you. I need to make a phone call.

THE COURT: We'll have to wait for your return. As well as, I think, Mr. --

MR. RUBIN: I'm here, Judge. Thank you.

(Pause)

MS. CHAHIN: Your Honor, there continues to be a problem. I asked the interpreter if she might be orally able to translate for him here and she said she could do that. Can we proceed in that fashion?

THE COURT: That's fine. The only problem's going to be in the future we're going to have to get this logistics taken care of, so whoever is responsible from the interpreter's office -- maybe just turning this infrared device here.

MS. CHAHIN: Thank you, your Honor.

THE COURT: All right, Mr. Evans has returned. I believe all counsel are present, all --

MR. EVANS: Thank you, your Honor.

THE COURT: -- parties are in court.

56

All right.  I believe that I left off saying that Mr. Kadamovas maintains that his native language is Russian and without translation the vast quantity of the English discovery is beyond his comprehension.  Also without translation the Russian language discovery is beyond counsel's comprehension. A laptop with translation software has been provided to the MDC for the exclusive use of Mr. Kadamovas, however restrictions to computer access have negated the opportunity for the Defendant to effectively review the voluminous case discovery according to Mr. Kadamovas.

In addition, Mr. Kadamovas argues that where life is at stake the Supreme Court has consistently held that defendants are entitled to special consideration, citing *Beck v. Alabama*, 447 U.S. 625.  Mr. Kadamovas argues that he will be denied his right to effective assistance of counsel unless the Court directs Warden Benoff at the MDC to make necessary arrangements ensuring the Defendant's access to his laptop.

Now, the Court has relied heavily on the Declaration that was submitted by counsel at the MDC, Eliezer Benshmuel. It's E-L-I-E-Z-E-R B-E-N-S-H-M-U-E-L.  But I'm going to try and summarize the Government's position.

The Government argues that the Defendant's motion should be denied because he has been provided with extensive access to discovery at the MDC, including written discovery, in

57

his cell at any time virtually daily Monday through Friday from approximately 7:00 or 8:00 a.m. to 3:00 or 3:30 p.m. to discovery on a laptop computer and in attorney visitation room or in the law library, audiotape discovery, and the use of an audio cassette recorder in his cell at any time, and reasonable access to a videotape player upon request.

Here, according to the Government, the Defendant has had more then four years to review the discovery and has had two attorneys and support staff assisting him.  The Government maintains that the Defendant claims he needs more access to his laptop because it contains a translation program.  However, the Government maintains a significant portion of the written discovery consists of bank documents and phone records which do not need to be translated and could easily be reviewed in his cell.  The Government notes that while English may not be the Defendant's first language he has lived in this country since 1997.  He's opened his own business, purchased property, opened bank accounts, opened credit card accounts, and has opened phone accounts.  Presumably, according to the Government, he is able to understand the bills and documents associated with those items and transactions.

The Government maintains an additional portion of the discovery is in Russian or is visual in nature, such as photographs, thus no translation is necessary.  The Government maintains that much of the audiotape discovery, such as wiretap

calls, is in Russian. Several thousand pages of discovery were seized from the Defendant's home and presumably this discovery does not need to be translated.

The Government maintains that while the Defendant argues that he needs his computer to review the DVDs of the three witnesses' depositions, he was allowed to sit in on these depositions. Additionally all three witnesses were deposed in Russian. Furthermore, Mr. Kadamovas declined to attend two of the three depositions.

The Government maintains that the Defendant has not availed himself of the access to his laptop that has been provided. Specifically from January through March of 2006 the Defendant has only requested to use his laptop on three occasions. And that was also set forth in Mr. Benshmuel's Declaration. Given Defendant's failure to take advantage of the access provided, the Government maintains that the current request is a sham designed either to manufacture an issue for appellate purposes or to create a further reason to delay the trial.

The Government maintains the Defendant's argument that his right to effective assistance of counsel and due process requires 10 hours of access is both factually and legally unsupported. The Sixth Amendment requires only that a defendant be provided with reasonable access to the tools necessary to prepare a defense. That access may be limited by

59

legitimate institutional security, concerns, *Milton v. Morris*, 767 F.3d 1443; *U.S. v. Robinson*, 913 F.2d 712; and *Lindquist v. Idaho State Board of Corrections*, 776 F.2d 851. The Sixth Amendment demands that an incarcerated defendant be afford reasonable access to law books, witnesses, or other tools to prepare a defense. That's the *Sarno* case. But that right of access must be balanced against legitimate security needs or resource constraints of the prison. Also the *Sarno* case. The *Sarno* Court found no due process violation where the defendant had only about 20 hours to review 250,000 pages of discovery and was provided with only 140 hours of library usage time. A defendant can draw upon the efforts of codefendants and skilled counsel.

Here Mr. Kadamovas differs from *Sarno* in that *Sarno* was proceeding pro se and did not have the resources of two attorneys and other support staff. Also, according to the Government, Mr. Kadamovas has had more than four years to review most of the discovery.

The Government also takes the position that the cases cited by Defendant are not applicable. *Ake*, A-K-E, was cited for the proposition that raw materials integral to building an effective defense must be provided to a defendant, 470 U.S. at Page 77. But *Ake* involved an indigent defendant who was denied psychiatric assistance even though there were competency and sanity issues. Kadamovas has not been denied access to any

60

particular resources, according to the Government; rather the Government has paid for multiple experts for Mr. Kadamovas. In addition Mr. Kadamovas, according to the Government, has been given counsel and legal support, unlike the *Gideon* case. And unlike the defendants in *Mosquera* who were denied the right to understand the charges against them because critical documents such as the Indictment were not translated, Kadamovas has had a Russian interpreter at every court appearance and counsel for Defendant has had the right to request the use of translators for all meetings with him and has requested translation of all original evidence.

Now, Mr. Kadamovas has also filed a reply, and I'll summarize that as well.

The Government's claim that it has made every reasonable accommodation to permit Defendant Kadamovas to participate in the preparation of his defense Mr. Kadamovas claims is without factual support. Mr. Kadamovas indicates that he's only been allowed only sporadic access to his computer and it comes at the cost of forfeiting other personal needs and/or reasonable access to toilets. Mr. Kadamovas indicates that counsel has been advised of other high security inmates alleged to be part of the Aryan Brotherhood are allowed 24-hour access to laptops in their cells. Mr. Benshmuel has acknowledged that Mr. Kadamovas has no access to a toilet while he's using his laptop in either visitation rooms or the

library.

And the Government's reliance on *Sarno*, according to Mr. Kadamovas, is misplaced because the *Sarno* defendant was a law school graduate and only a small fraction of the discovery was relevant to him. According to Mr. Kadamovas, *Sarno* also had personal knowledge of relevant facts. Here Mr. Kadamovas is a citizen of a foreign country, has limited ability to speak English, has no legal experience, is accused of seven murders and other crimes -- it's actually six murders -- and the discovery is voluminous and his access to other persons is restricted by the SAMs that are in place. And he also faces the death penalty.

All right, again I did indicate that I relied heavily on Mr. Benshmuel's Declaration that outlines what specific steps the government institution that Mr. Kadamovas is housed in has taken to provide him with access. The other Defendants in this case, specifically Krylov, has also joined in this motion.

All right, who's going to argue this?

**MR. LASTING:** I will, your Honor.

**THE COURT:** Mr. Lasting?

**MR. LASTING:** Yes, your Honor.

Your Honor, good afternoon. We've been trying for several years to have Mr. Kadamovas be able to have access to the written discovery in this case in a language that he can

understand.  We started by making requests for a handheld translator device that you would actually individually type a word into or a sentence and the device would then translate it into Russian.  We asked for a Quicktionary pen, which you could run over words and highlight them and it would translate them into Russian.  And those requests were repeatedly denied, essentially the reason being because the devices cost more than a hundred dollars they wouldn't be allowed into the MDC, or with regard to the handheld translator because it had the capability to have some games that could be played on it.

Finally in April of 2005 Warden Benoff agreed that Mr. Kadamovas' attorneys could purchase for him a laptop computer.  I bought the laptop computer, I took it to the MDC, and it turned out that the laserfiche discovery that the Russian translation program was designed to translate from English into Russian wouldn't work.  So we then got authorization from the Court to purchase a -- I'm sorry -- to have CopyPro transform the discovery, all of the discovery, into an OCR format.  Then it turned out that Mr. Kadamovas' computer needed Microsoft Word on it to work with OCR discovery.  And finally in about I'm guessing around August of 2005 Mr. Kadamovas was given access to the computer -- was given it, but he was given limited time with it.  And in September of 2005 Mr. Kadamovas actually went on a hunger strike because of his frustration in his inability to be able

63

to work on the case.

The only thing he's wanted to do from the start was to be able to look at the discovery to understand it so he could discuss it with his attorneys and work on the case.

There was a discussion that took place at MDC after Mr. Kadamovas stopped eating.  I met with Dave Taylor, who I understood to be the Unit manager on the SHU for 8 North.  Dave Taylor informed me, "Look, if he starts eating again we'll let him have the computer, because we've got this room here we never use."  And the room was a non-contact visiting area.  I said to Mr. Kadamovas, "I've worked this out with the MDC. You're going to have the computer for as long as you want." And this area was right across from where the correctional offices are so that Mr. Kadamovas could be taken to the bathroom, because the other tradeoff he had to make was if he wanted to use the computer there was no toilet facility he could get to.  Then if he wanted to use the toilet, they weren't going to take him back into the room to use the computer again.  The ability to access the computer in the visiting rooms was sporadic because of their use as visiting rooms for other inmates and attorneys.

I actually have a note that I found in Mr. Kadamovas' medical records, I mentioned this to Mr. Benshmuel earlier today, in which Dave Taylor wrote a letter to other members at the MDC regarding Mr. Kadamovas dated September the 21st in

which -- I'll read it.  It says:

"It has been agreed that Inmate Kadamovas would be placed in the non-contact visiting room to review his legal work when the room isn't in use."

I was told it was in use about one day a month.

"For this to occur there needs to be a plastic chair and table placed in the room."

That never happened.

So after, again, being assured that this was going to take place it didn't occur.  In November I filed a motion asking the Court, because it became apparent that the only way Mr. Kadamovas is ever going to get to look at the discovery in this case and sufficiently have the opportunity to review it and consider it was if the Court made an order.  I filed a motion with the Court.  The Court responded, Judge Manella responded, "See if you can work this out among yourselves." Ms. DeWitt and I talked.  I spoke with Mr. Benshmuel.  There's a letter that the warden wrote indicating that he's going to be allowed it essentially from 7:00 o'clock in the morning until 3:00 o'clock in the afternoon, or 3:30 in the afternoon, subject to institutional security concerns.  That didn't happen.

So I wrote the warden a letter on January the 6th asking that -- and specified a log -- I related in this letter a log that Mr. Kadamovas had been keeping as to the minimal

65

time that he was being given the computer and the failure of the MDC to comply with the agreement that was the stipulation worked out in response to Judge Manella's request. I never got a response to it. And I think out of frustration Mr. Kadamovas stopped submitting the written requests, he still made oral requests, and his opportunities to use the room and have access to the computer have been sporadic, limited, and nonexistent.

And so I filed a motion and I'm asking this Court to step in and do what's necessary to make sure that Mr. Kadamovas can use his computer. And he needs the computer because it has this program on it that translates English language documents into Russian so he can essentially understand them and then we can talk about them. And if the Court doesn't do it, he's never going to have the opportunity to sufficiently work on the case. And based on the Court's ruling just moments ago, this is a date which is drawing much too close.

And I mentioned to Mr. Benshmuel this morning that it's come to my attention the Defendants in what's called the Aryan Brotherhood case are given access to laptop computers purchased not by their attorneys but by the Bureau of Prisons or by the Government 24 hours a day, seven days week. So here are guys who speak English who are given the right to have access to their discovery all day long where they can use the bathroom, they can still have their meals, and Mr. Kadamovas, who needs the computer because it's the only way he can look at

the English language documents and translate them into Russian and go back and compare things and look at them, is denied the same opportunity.

I don't know what else I could -- I mean we've tried to work this out. My goal was not to make the Court -- or bring the Court as a party into this. It hasn't worked. And if the Court doesn't make the order it's not going to work. So I would very much appreciate the Court's consideration on this issue and make the order to the MDC that Mr. Kadamovas have the computer for 10 hours a day every day and that he be granted immediate access to a bathroom, that he doesn't have to give up the right to use the bathroom in order to work on the case, and that he doesn't have to not be able to eat to work on the case, or the Court order that he have the laptop computer in his cell.

THE COURT:  All right, let me read part of the Declaration of Mr. Benshmuel into the record here.  And I'll pick up Paragraph 3.

"I've read the motion submitted by counsel for Inmate Kadamovas requesting that he be provided with access to his laptop computer for 10 hours per day in order to review his discovery.  I have spoken with the MDC staff responsible for the Special Housing Unit, the SHU, where Mr. Kadamovas is currently housed and have reviewed documents pertaining to the

access issue.  As a result I am submitting this Declaration in opposition to the inmate's motion and ask that the motion be denied.

"I have spoken and worked with Richard Lasting, counsel for Inmate Kadamovas, in an effort to both accommodate his client's needs and the safety, security, and management needs of this institution. Specifically, working with counsel the MDC staff have made arrangements to insure that Inmate Kadamovas is permitted to work on his computer in one of the visiting rooms or in the law library up in the SHU.

"As noted in Paragraph 10 below of Mr. Lasting's Declaration, Inmate Kadamovas has been authorized to have a laptop computer since April of 2005.  This authorization was given so that Mr. Kadamovas could use a translation program to facilitate his review of the discovery in this case.  Although authorized to do so in April, Inmate Kadamovas' attorneys actually installed the translation program on his laptop in September of 2005.

"From my review of the records in the SHU and my discussions with BOP staff in the SHU, it appears that staff ask Inmate Kadamovas every weekday whether he wishes to use his laptop computer.  Specifically, according to Lieutenant Fontanez (ph.s.), who is the

ranking officer during day watch on the SHU, Inmate Kadamovas' daily routine is as follows:

"All of the inmates are fed beginning at 6:15 a.m. At approximately 6:45 a.m. staff begins providing shower and recreation time to inmates classified as three-man inmates.  Three-man inmates are those individuals who can only be moved when accompanied by three correctional officers and a lieutenant. Mr. Kadamovas usually takes his recreation time between 7:00 a.m. and 8:00 a.m.  At approximately 8:00 a.m. Mr. Kadamovas starts his shower.  On weekdays when his shower is completed staff ask Mr. Kadamovas if he wants the opportunity to review his discovery on his laptop.  If he elects to use his laptop, Mr. Kadamovas is asked to fill out a written request for record keeping purposes and is then taken to an available visiting room or to the SHU law library to review his discovery.  Once in the law library or visiting room staff brings the laptop computer to Inmate Kadamovas and he is permitted to review his discovery at his own pace.  To facilitate that work staff feed lunch to Inmate Kadamovas in the law library or visiting room.

"Furthermore, staff is aware of the inmate's complaints about using the restroom.  As a result

when the inmate asks to use the restroom, staff make an effort to move him as quickly as practical given his security status. To insure that Inmate Kadamovas does not suffer any accidents, staff have provided him with a bedpan. It bears emphasis however that this item is provided in the event of an emergency and is not intended to be a substitute for normal restroom facilities.

"Since November of 2005 Inmate Kadamovas has been authorized to use his laptop computer up until 3:15 p.m., subject to some limits. Specifically, as there is limited space up in the SHU there have been a handful of days in which the visiting room that Inmate Kadamovas was using to review discovery was needed by another inmate in order to have a legal visit or to conduct legal research in the law library. In these limited circumstances the room is made available to the other inmate.

"The gravamen of Inmate Kadamovas' complaint is that he needs to have access to his laptop computer every day, including weekends and holidays, for 10 hours per day. This request is not logistically feasible and under the circumstances described below wholly unwarranted.

"To begin with, Inmate Kadamovas is a three-man

70

inmate.  This means that all of his movement requires that he be subjected to the maximum level of security available at MDC.  Mr. Kadamovas must be fully restrained and accompanied by three correctional officers and a lieutenant during all movement.  While sufficient staff is available to move

Inmate Kadamovas during day watch from 6:00 a.m. to 2:00 p.m. and evening watch from 2:00 p.m. to 10:00 p.m., moving him on weekends and holidays is far more difficult because staff must leave other posts in order to facilitate the move.  While MDC staff could be tasked to provide such access if there was a genuine need, the expenditure of these resources is wholly unwarranted given the circumstances described below.

"As described in Paragraph 5 above, Inmate Kadamovas was asked to put his requests to use the laptop in writing.  Staff do so to insure that there is a record of his requests.  Attached to this Declaration are true and correct copies of these requests from November 2005 through the end of March 2006.  In addition, most of these requests contain a notation of when and for how long Inmate Kadamovas was provided access to his computer.  These documents show that Inmate Kadamovas asked for and received

access to his computer seven times in November of 2005, 13 times in December of 2005, once in January of 2006, and twice in March 2006. He did not make any requests for February of 2006. Thus Inmate Kadamovas asked to use his laptop a total of three times between January 1st, 2006 and March 31st, 2006. These documents also show that Inmate Kadamovas has been permitted to review his discovery after 3:15 p.m. See the requests for November 8th, December 12th and 13th, 2005. In addition, virtually all of these review sessions were terminated at the inmate's own request. See requests for November 8th, December 5th, 9th, 12th, 13th, 14th, 15th, 16th, 19th, 20th, 21st, and January the 9th."

That's 2005 to 2006.

"According to Lieutenant Fontanez, on most days Inmate Kadamovas does not ask to use his computer and actively refuses staff offers to allow him to do so.

"Thus the reality is that Mr. Kadamovas has regular access to his discovery, both on his laptop and in paper form at his cell. Further, even without the laptop he has the opportunity to review audio recordings on cassette and hard copies of documents while in his cell. As shown by the infrequency of his requests, Inmate Kadamovas has chosen not to take

advantage of the opportunities provided to him to use his computer. Absent a showing that these opportunities are insufficient, there is no basis for providing Inmate Kadamovas with any relief.

"Much of the information contained in this Declaration was provided to me by Lieutenant Fontanez, who is available to provide the Court with further information to permit resolution of this motion.

"Finally, MDC staff have worked with Inmate Kadamovas' counsel in an effort to accommodate the inmate's need in defending himself and the institution's safety and security requirements. For example, while it is true that Inmate Kadamovas was not permitted to have the handheld translator he would prefer, this denial was only issued because the translator was worth well in excess of the value of the devices permitted into MDC."

I mean what am I going to do?

MR. LASTING: Your Honor, I think that Mr. Kadamovas should be accorded the opportunity to have the computer either in his cell or the MDC should abide by the commitment that was made back in September when Dave Taylor indicated to Mr. Kadamovas and -- indicated to me and I told Mr. Kadamovas that he would be allowed to use the non-contact visiting room

73

every day and that he would be immediately taken to use the toilet facilities. I mean I can --

THE COURT: But there's no pattern that, you know, he's in there, you know, the times that he's permitted to be in there. You know, it seems that this is really not a good faith request.

MR. LASTING: Your Honor, I don't know how it could be more good faith. This is a request that we've been working on and I've been in contact with Mr. Benshmuel, I've talked to Dave Taylor, I've offered to meet with the warden, this has been an ongoing thing for years. And the delay between April, the approval, which I think was the end of April, and August was to get the program, to get the documents that were OCR'd by CopyPro, to get the money from the Court. The Court did pay for the conversion program. The Court did pay for the discovery from CopyPro. I mean I --

THE COURT: It's not the Court that pays it; it's the funds that are available --

MR. LASTING: I'm sorry --

THE COURT: -- under the -- in the Justice Act.

MR. LASTING: -- the Government.

THE COURT: In the Justice Act.

MR. LASTING: I compared the inmate requests with the dates that I told Warden Benoff in my letter of January 6th, and there are dates that Mr. Kadamovas had the computer that

74

are missing.  I mean I don't know about the record keeping, but it appears that they've got some reports; they don't have others.  There are days that Mr. Kadamovas has asked for the computer orally and he doesn't get it.

After January 6th, when it appeared that he had to trade off in working on the computer when he could get it with the ability to use the bathroom or to have recreation time or to eat, we were waiting for a response from the warden.  It never came.  It never came.  I waited and sent messages, tried to work this out, and then in March I finally filed a motion with the Court renewing this opportunity -- or renewing this request for the Court to provide this opportunity to Mr. Kadamovas.  It's just not going to happen if the Court doesn't make the order.

And frankly I don't think that Mr. Kadamovas should be in a different position than these other individuals pending capital cases who have access to a computer 24 hours a day. Here's a guy who without the computer can't read the English language discovery in a comprehensive way, in a way that's understandable.  He is denied the opportunity to have the computer 24 hours a day; others get it.  It's not right.

THE COURT:  Let me hear from Mr. Dugdale.

MR. DUGDALE:  Ms. DeWitt will address this, your Honor.

THE COURT:  Okay.  Ms. DeWitt?

75

**MS. DeWITT:** Your Honor, in addition to the information presented in the Government's papers, I'd like to also bring to your attention that since the Government filed its opposition Mr. Kadamovas has only made one additional request in the month of April for access to his computer. Although it's clear under the case law that access to a laptop computer is not required in the due process of the Sixth Amendment, the MDC has nevertheless agreed to make access to a laptop available to him and they have made reasonable accommodations to make that available to him. And he clearly, though he knows that he has -- how to get access to that computer, has not chosen to utilize the available opportunities.

There is no reason, based upon the factual bases before the Court, to do anything other than what has been done already, which is a good faith effort by the Metropolitan Detention Center to enter into a stipulation which they have honored and which they continue to honor. And in fact they have done more than honor it, because they have allowed him to use the laptop even after the 3:15 agreed upon day. They've made all of these accommodations and have worked with counsel and there simply is no record to establish that this access has been denied.

**THE COURT:** All right, I'm ready to rule. I'm going to deny the Motion to Modify the Stipulation. The Stipulation

will remain in full force and effect.  The Government will prepare an Order for my signature on this motion, as well as the previous motion.

MR. BUEHLER:  Your Honor?

THE COURT:  This will be placed in the file.  Not used.

Mr. Buehler?

MR. BUEHLER:  On the basis that it's related to Mr. Krylov, may I be heard?

THE COURT:  All right, I'll let you make a record as well.

MR. BUEHLER:  Your Honor, on behalf of Mr. Krylov, his situation is a little bit different from Mr. Kadamovas'. We first requested a computer for Mr. Krylov back last fall, so some seven, eight months ago began to talk to Mr. Benshmuel about that.  I provided the Court with correspondence we followed up with to the warden seeking a computer.  And it wasn't until last week that we got authorization to bring a laptop in for Mr. Krylov to use.  And so as things now stand Mr. Krylov would have the same rights --

THE COURT:  He's under the same Stipulation, so he --

MR. BUEHLER:  But the difficulty I have is this, and this is the added point that I presented to the Court in the papers we filed, is that, again, given Mr. Kadamovas' experience and given the fact now that we have two Defendants

in this case who need to have access to a computer -- and I understand there are one or two others on 8 North who have the right to use a computer in the visitation room.  But even if you didn't have others, if you just had two, and I and all the Defense lawyers here have plenty of experience going up to 8 North to visit clients, there are only three rooms up there to visit them.  I've been turned away at times when I wanted to go up there because all three of those rooms were busy.  And I do not see, you know, setting aside what one side says in the Declaration and what Mr. Kadamovas or Mr. Krylov says their experience is, I think it's clear that when you've got three rooms and two men who need to use the computer and on an accelerated basis, it's just not going to work logistically. There's not going to be enough time for Mr. Krylov to have access to the laptop in the visitation room in order to have the chance to review the discovery in the way that we, his lawyers, need him to do with the assistance of translation software in order to meet a July 11th trial date.

Now, it's not -- we didn't just start working on this.  We've been trying to address this.  We've been watching what's going on with Mr. Kadamovas.  And frankly if I could just add, your Honor, I think there's a certain disconnect between -- just from what I hear from clients who are housed on 8 North and from what I observe when I'm up there, I think there's a certain disconnect between what is represented to

78

Mr. Benshmuel and other officers of MDC and what actually happens in practice, because I hear things about how --

THE COURT: Well Mr. Benshmuel is in court. I see him sitting there.

MR. BUEHLER: I know he is. And I would not doubt the good faith of what he says.

THE COURT: But I'm going to admonish him that he's going to go back and personally investigate this and if there's any variance from what he's put in his Declaration or how it's been carried out he'll bring it to my attention and I'll step in and modify the Stipulation. But right now there's really no need to modify the Stipulation.

MR. BUEHLER: Except, your Honor, the point that, unless lawyers are not going to be visit their clients because you've got two men in this case using the visitation rooms for access to their computer, I just don't see how that's going to work.

THE COURT: Yeah, but, you know, there is no perfect trial. It's a fair trial. And in this particular situation, you know, we have to be cognizant of certain limitations. And there are limitations.

And we also have another problem in this case. It's mentioned, it surfaces every so often, that these individuals participated in an elaborate scheme to escape from the facilities.

MR. BUEHLER:  Your Honor, I realize those allegations have been made and we will have -- on behalf my client, there will be additional information provided on that when we get to trial.  But it's getting to trial and being able to be ready and have the clients' full assistance in that that we're concerned about now.

THE COURT:  I understand.

MR. BUEHLER:  And for that reason -- and just to reemphasize a point Mr. Lasting was making, it's clear the Bureau of Prisons, if they're required to, can make provisions for computer use in a defendant's cell.  And I just think they could do that here and that that would not be going beyond what's reasonable to ask in this kind of case, with the volume of things and the language problem that these men deal with in terms of -- I don't care about reading bank records, but there's all kinds of interviews in this case of people who I don't even recognize who they are.  I have to dig around to figure out who these people are.  And Mr. Krylov can add a lot of information to me, to my knowledge of the case, when he can read these things in Russian.  And it would be impossible for us to sit up there with a translator and go through all these things with him.

Thank you, your Honor.

MS. DeWITT:  Your Honor, may I just put one quick thing on for the record?  I don't want to belabor this, but

80

just to bring to the Court's attention the first request for a computer from Mr. Krylov was made in November. MDC, as is indicated by the exhibits that are attached to their reply brief, responded to that request in early December. They asked for additional information in order to figure out what was needed and what was being asked --

THE COURT: This is in 2005?

MS. DeWITT: In 2005. They did not hear back from Mr. Krylov's attorneys until the middle of February of this month and now apparently have worked out the logistics of this. So to the extent that the record is left ambiguous as to the efforts that have been made by the MDC and their responsiveness to the request, I think that's not accurate. I just want to make sure the record clearly reflects their good faith efforts to accommodate his request and to allow him access to a laptop computer.

Yes, it's going to be -- there's going to be some limitations, because it's not perfect. The room's not always going to be available. They've made that clear to him. But they've made every effort and I believe they will continue to make every effort to make this laptop available to both Defendants.

MR. BUEHLER: Your Honor, may I just -- for the sake of the accuracy of the record --

THE COURT: All right.

MR. BUEHLER:  -- we didn't --

THE COURT:  I'll just let you make a record.

MR. BUEHLER:  We didn't drop the request.  The request has been on the table, it's been the subject of telephone calls between me and Mr. Benshmuel throughout that period.  Counsel is correct that there was a certain letter that was sent in -- March, February, I'm not sure when it was -- February, I believe.  But those weren't the only communications.  We have an outstanding request that was granted last week.  And we need now to use -- we have a limited time to use the computer and we want to have it set up in a way that Mr. Krylov would have meaningful access to (IND)

THE COURT:  All right.  Now, with regard to our next appearance, there are motions coming up I believe on May the 22nd and May the 30th?

MR. DUGDALE:  That's correct, your Honor.

THE COURT:  Okay.  I'll see you back here then.

Anything else today?

MR. SPEAKER:  Thank you, your Honor.

THE COURT:  Oh, by the way, I gave you those letters. I need a response within five court days, that's a week from today, as to which one of those letters I can send out to approximately 11,000 jurors to answer the one question with regard to are they available for a trial that's going to last five to seven months.

82

MS. CHAHIN: Your Honor? If I could, I just wanted to put on the record, your Honor; I am scheduled to start a trial, as the Court is aware, May 30th before Judge Anderson. Initially the trial estimate was three weeks. The Prosecutor says now that it could take as long as two months, depending upon the cross-examination to be conducted by Defense attorneys. I just wanted to alert the Court because I know that the Court is going to send out all of these questionnaires and is going to set a date certain for them to return. At this point I don't know how long that trial will take, but it's possible that it could extend into the time that's set for this case to begin.

THE COURT: I seriously doubt it. If it does, we'll just have to trial this one on a --

MS. CHAHIN: Very well, your Honor.

THE COURT: -- day-to-day basis.

MS. CHAHIN: I just wanted to alert the Court to that. Thank you.

MR. CALLAHAN: Thank you, your Honor.

THE COURT: All right.

MR. BUEHLER: Thank you, your Honor.

THE COURT: Also, if you are thinking of using a jury questionnaire, I think you should start drafting one up. I am hesitant to use jury questionnaires because a lot of lawyers draft them up as a market research tool and not to determine

83

whether or not there's any bias or prejudice to use for challenging a juror for cause. Also, my understanding is that the news media wants access to these jury questionnaires and it's none of their business, but that's an issue that, you know, comes up. So we'll take these up as we get closer as to whether or not we're going to use a jury questionnaire or not.

MR. DUGDALE: That's fine, your Honor.

One thing that was contemplated was we would have four phases of motion hearings. The hearings on the 22nd deal with the third phase. The fourth phase was going to deal with issues concerning the jury. Would you like us to try and work out a schedule for a hearing date on these issues?

THE COURT: Yes. And I'd like it to be sometime either in late May or early June.

MR. DUGDALE: As far as the filing of such --

THE COURT: Well if you're going to file them, make sure they're filed within a week of today's date.

MR. DUGDALE: We can work on that, your Honor. Thank you.

MR. CALLAHAN: Your Honor. Forgive me. I think that's not possible. Only because the Court took Phase 4 off the calendar, which dealt specifically with two aspects of the preparation: (1) all jury issues, (2) all motions in limine. They cannot all be prepared in a week. I think we need --

THE COURT: I'll give you two weeks. Two weeks.

84

MR. SPEAKER:  Thank you, your Honor.

MR. CALLAHAN:  If I keep talking, will the Court suggest --

(Laughter)

MR. RUBIN:  How about if I take over?

(Laughter)

THE COURT:  Thank you.

(This proceeding was adjourned at 5:56 p.m.)

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____                    June 10, 2006

Signed                                             Dated

*TONI HUDSON*

**FEDERALLY-CERTIFIED TRANSCRIBER**