GEORGE S. CARDONA
Acting United States Attorney
THOMAS P. O'BRIEN
Assistant United States Attorney
Chief, Criminal Section
ROBERT E. DUGDALE (SBN: 167258)
Deputy Chief, Organized Crime & Terrorism Section
SUSAN J. DEWITT (SBN: 132462)
KAREN I. MEYER (SBN: 220554)
Assistant United States Attorneys
Organized Crime and Terrorism Section
     1500 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone:  (213) 894-4685/4496/8559
     Facsimile:  (213) 894-3713
     e-mail:  robert.dugdale@usdoj.gov
              susan.dewitt@usdoj.gov
              kim.meyer@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

                UNITED STATES DISTRICT COURT

           FOR THE CENTRAL DISTRICT OF CALIFORNIA

                     WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | No. CR 02-220(B)-DT |
| | ) | |
| Plaintiff, | ) | GOVERNMENT'S MOTION TO QUASH |
| | ) | SUBPOENA SERVED ON JONATHAN |
| v. | ) | BOWMAN; MEMORANDUM OF POINTS |
| | ) | AND AUTHORITIES; DECLARATION OF |
| IOURI MIKHEL, | ) | ROBERT E. DUGDALE; EXHIBITS |
| JURIJUS KADAMOVAS, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

     Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California, hereby files this motion to quash the subpoena served by defendant Iouri Mikhel on Special Agent Jonathan Bowman of the Federal Bureau of Investigation.  The subpoena requires the witness to provide testimony during the

defendant's upcoming presentation of evidence at the penalty phase currently on-going in this case.  The government's motion to quash the subpoena is based on the attached Memorandum of Points and Authorities, the declaration of Robert Dugdale, the attached exhibits, the files and records of this case, and any further evidence or argument that may be presented at any hearing on this motion.

DATED: January 26, 2007    Respectfully submitted,

GEORGE S. CARDONA
Acting United States Attorney

THOMAS O'BRIEN
Assistant United States Attorney
Chief, Criminal Division


_____
ROBERT E. DUGDALE
SUSAN J. DEWITT
KAREN I. MEYER
Assistant United States Attorneys
Organized Crime & Terrorism Section


        Attorneys for Plaintiff
        UNITED STATES OF AMERICA

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.

### INTRODUCTION

On January 22, 2007, defendant Iouri Mikhel ("defendant") served a subpoena (the "subpoena") directing Federal Bureau of Investigation ("FBI") Special Agent ("SA") Jonathan Bowman to testify during the defendant's upcoming presentation of evidence at the penalty phase currently on-going in this case.  The government agreed to accept service of the subpoena issued to SA Bowman, which is attached as Exhibit A to the declaration of Robert Dugdale ("Dugdale Decl.").  (See Exhibit A).

As set forth below, the subpoena should be quashed because the sought-after testimony is: (1) not a matter relevant to the sentence, including mitigating factors that may be presented to, and considered by, the jury (18 U.S.C. §§ 3592 and 3593(c)); (2) of such a nature that its probative value, if any, is outweighed by the danger of creating unfair prejudice, confusing the issues, and/or misleading the jury (18 U.S.C. § 3593(c)); and (3) does not serve to rebut the victim-impact, nor any other information, presented by the government during its opening case (18 U.S.C. § 3593(c)).  Accordingly, the subpoena should be quashed.

### II.

### BACKGROUND

Based on discussions between counsel for the parties, it is the government's understanding that defendant intends to seek testimony from SA Bowman regarding information provided to him in May 2002 by a confidential informant ("CI") concerning George Safiev ("Safiev"), one of the victims in this case whose death

1

the jury has already decided was caused by defendant. (Dugdale Decl. ¶ 2). More specifically, in May 2002, SA Bowman was then stationed in Moscow, Russia, where he participated in the FBI investigation of the disappearance of Safiev. (Dugdale Decl. ¶ 3). During that investigation, a CI relayed the following information, among other information, to SA Bowman that he/she had heard from various third party sources, some named and some unnamed:

1.   The CI told SA Bowman that Safiev was a wealthy and powerful individual who owned, at various points in time, a computer business, significant portions of major Russian banks, and a clothing company named "Caesars" with 38 stores in Moscow, and whose personal wealth was around $150 million. CI told SA Bowman that Safiev moved much of this money offshore. (Id.).

2.   The CI told SA Bowman that an American, named Paul Tatum was murdered in Moscow in 1996 after approaching Safiev for protection from a Moscow criminal who feared Safiev. (Id.).

3.   The CI told SA Bowman that he/she believed a director of Caesars was responsible for Safiev's murder because Safiev owed him $18 million in profits from Caesars. The CI told SA Bowman that this director of Caesars contracted Alexander Afonin to commit Safiev's murder and that Afonin thereafter hired people in the United States to commit the murders. (Id.).

4.   The CI told SA Bowman that just prior to moving to Los Angeles he/she was in London where he/she brokered $50 million in stock investments for a number of high-level Russian investors. The CI stated that the Russian organized criminal who Tatum sought protection from invested $10 million through Safiev as

2

part of this scheme.  The CI added that after the September 11th terrorist attacks, Safiev lost $25 million, and after Safiev's death this Russian organized criminal attempted to get this $10 million from Safiev's family.  (Id.).

5.    The CI told SA Bowman that in the past Safiev had helped approximately twenty Russians obtain Greek passports. (Id.).

6.    The CI told SA Bowman that he/she heard that when Safiev moved to Los Angeles he started using cocaine that he obtained from Nick Kharabadze.  (Id.).[1]

Safiev has never been charged with any criminal offense to the government's knowledge, let alone convicted of any criminal offense.  (Id.).

## III.

## ARGUMENT

## THE SUBPOENA SHOULD BE QUASHED BECAUSE IT SEEKS TESTIMONY WHICH IS IRRELEVANT AND INADMISSIBLE

## A.    APPLICABLE LAW

Rule 17(c) of the Federal Rules of Criminal Procedure governs the use of subpoenas in criminal cases.  The decision to enforce or quash a subpoena under Rule 17(c) is in the discretion of the district court and will be disturbed on appeal only if the

---

[1]    The CI in question approached SA Bowman with the understanding his/her identity would not be revealed, and he/she believes that his/her life will be placed in great danger if his/her identity is revealed in light of the fact he/she discussed the activities of various Russian organized criminals with SA Bowman who will seek retribution against him/her for speaking with law enforcement.  The CI lives in Russia and the United States government has no ability to protect him/her. (Dugdale Decl. ¶ 3f n.2).

3

action was clearly arbitrary or without support in the record. See United States v. Nixon, 418 U.S. 683, 702 (1974); United States v. Mackey, 647 F.2d 898, 901 (9th Cir. 1981). Moreover, a party seeking to use a Rule 17(c) subpoena "must show: (1) relevancy, (2) admissibility, and (3) specificity" for the documents and/or testimony being sought. United States v. Eden, 659 F.2d 1376, 1381 (9th Cir. 1981), cert. denied, 455 U.S. 949 (1982); see also United States v. Reed, supra, 726 F.2d at 577.

Although there is little explicit guidance regarding the interplay between Rule 17(c) and the penalty phase of a capital case, there is clear guidance regarding the appropriate evidence to be presented to the jury at that stage of the proceeding. During the penalty phase of a capital case, "information may be presented as to any matter relevant to the sentence, including any mitigating or aggravating factor permitted or required to be considered under Section 3592" of Title 18 of the United States Code, which sets forth the mitigating and aggravating factors to be considered in determining whether a sentence of death is justified. 18 U.S.C. § 3593(c).

And with regard to the admissibility of such evidence, "information is admissible regardless of its admissibility under the rules governing admission of evidence at criminal trials except that the information may be excluded if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury." 18 U.S.C. § 3593(c) (emphasis added). As such, although a capital defendant is entitled to submit any relevant mitigating evidence in support of a sentence other than death, Payne v. Tennessee,

4

501 U.S. 808, 822 (1991), and although the Constitution requires that a defendant must be permitted to raise any aspect of defendant's record character or background and the circumstances of the offense as a mitigating factor, Penry v. Lynaugh, 492 U.S. 302, 319-28 (1989); Lockett v. Ohio, 438 U.S. 586, 604 (1978); see also 18 U.S.C. § 3592(a)(8), it is equally as clear that defendant does not have an unfettered right to present any and all evidence of his choosing during the penalty phase.

Indeed, to the extent a court is required to grant defendant wide latitude with regard to the evidence he may present, this latitude is limited to evidence pertaining to defendant himself and the charged offenses, Roper v. Simmons, 543 U.S. 551, 568 (2005), as opposed to his victims.  Although the relevance standard applicable to mitigating evidence in capital cases is addressed in the most expansive terms, McCoy v. North Carolina, 494 U.S. 433, 440-41 (1990), relevance in this context is no different from any other so that the general evidentiary standard applies, namely, "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Id. (quoting New Jersey v. T.L.O, 469 U.S. 325, 345 (1985); see also Tennard v. Dretke, 542 U.S. 274, 274 (2004) (low relevancy threshold satisfied by evidence that "tends to logically prove or disprove some fact or circumstance which a fact-finder could reasonably deem to have mitigating value").  Moreover, as the Supreme Court cautioned in Lockett, "[n]othing in this opinion limits the traditional authority of a court to exclude, as irrelevant, evidence not bearing on the defendant's character,

prior record, of the circumstances of his offense." <u>Lockett</u>, 438 U.S. at 604 n.12.

**B.    FACTUAL AND LEGAL BASIS FOR COURT TO QUASH SUBPOENA**

As set forth above, defendant Mikhel has served a subpoena on SA Bowman seeking testimony to be given during the defendant's presentation of evidence at the penalty phase.  Defendant, however, has not made, and cannot make, the required threshold showing of either relevancy or admissibility and is therefore not entitled to the testimony sought by the subpoena.  Thus, the Court should exercise its discretion and quash the subpoena.

<u>First</u>, the sought-after testimony of SA Bowman regarding the alleged criminal activities of victim Safiev and his association with criminals in Russia -- wholly unrelated to the charged offenses for which defendant has now been convicted -- is not a matter relevant to defendant's sentence, including the mitigating factors that defendant may present to the jury.  More specifically, defendant has not made any showing, as he must, that SA Bowman's testimony is relevant to the mitigating factors set forth in 3592(a), which include: (1) impaired capacity; (2) duress; (3) minor participation; (4) equally culpable defendants; (5) no prior criminal record; (6) disturbance; and (7) victim's consent.  Moreover, under the mitigating factor catch-all of "other factors" set forth in Section 3592(a)(8), the plain language of the statute limits the information to "[o]ther factors in the defendant's background, record, or character or any other circumstance of the offense that mitigate against imposition of the death sentence."  Here, defendant has not established, nor could he, that evidence regarding the alleged

6

unrelated criminal activities of victim Safiev have any bearing on defendant's background, record or character, or on any other circumstance of the charged offenses.

Second, the testimony of SA Bowman is of such a nature that its probative value, if any, is outweighed by the danger of creating unfair prejudice, confusing the issues, and/or misleading the jury. 18 U.S.C. § 3593(c). Although the Rules of Evidence are inapplicable to a penalty phase, a court is still empowered under Section 3593(c), as it should be, to be the gatekeeper of what evidence is, and is not, admissible. The probative value of SA Bowman's hearsay testimony regarding alleged unrelated criminal activities of victim Safiev lacks any probative value regarding issues relevant to defendant's sentencing. The information provided to SA Bowman is wholly uncorroborated, having been provided to him by a confidential informant who apparently obtained the information from mostly unnamed third-party sources. There is simply no way for the jury to ascertain the reliability of this information. Indeed, as a result of Safiev having been found dead, the FBI never had any reason to pursue an investigation regarding Safiev's alleged criminal activities, and thus the FBI itself (including SA Bowman) cannot inform the jury regarding the accuracy of the allegations.

At most, hearsay testimony about alleged criminal acts of Safiev that were never investigated by the FBI – aside from its wholesale unreliability – would serve only one illegitimate purpose. Namely, a bare attempt by defendant to disparage victim

7

Safiev in a desperate effort to somehow convince the jury that Safiev's death at the hands of defendant was something less than tragic and that, therefore, defendant's life should now be spared. Plainly, there is no probative value to such testimony.

To the extent the Court believes that there may be some probative value to SA Bowman's testimony notwithstanding the government's position, the testimony should nonetheless be excluded because any perceived probative value is clearly outweighed by the danger of creating unfair prejudice, confusing the issues and misleading the jury. Indeed, testimony regarding uninvestigated and uncorroborated hearsay allegations regarding victim Safiev would unfairly prejudice the government because it will have no meaningful way to rebut such unreliable evidence. Presentation of SA Bowman's testimony will also prejudice victim Safiev, who is obviously unable to defend his name. Moreover, SA Bowman's testimony would confuse the issues and mislead the jury because whether or not victim Safiev was a good or bad person is simply not relevant to defendant's sentence and/or defendant's efforts to present mitigating evidence regarding his own background, record, or character, or any other circumstance of the charged offenses. Instead, SA Bowman's testimony would create a distracting sideshow regarding allegations that bear little or no relevance to the issues at sentencing and that, as a result, would confuse and mislead the jury.

Finally, SA Bowman's testimony would not serve to rebut any information presented by the government during its opening case regarding victim Safiev, including the victim-impact testimony from his surviving daughter. 18 U.S.C. § 3593(c). The testimony

offered by Safiev's daughter pertained to the nature of her and her family's relationship with Safiev, the impact of Safiev's death on her and her family, and a description of the loss that she and her family have suffered.  The government did not seek to present evidence regarding Safiev's good character through his grieving daughter.  Indeed, to the extent Safiev's daughter testified about her recollection of the nature and personality of her father, her testimony was not intended to establish and/or bolster the good character of victim Safiev.  Rather, her testimony was focused on the daughter's sense of loss and to show the jury how her father's death has deeply affected her and her family, who, like Safiev, are victims of defendant's crimes. Thus, defendant is not now entitled to seek to rebut her victim-impact testimony by portraying Safiev – through wholly unreliable evidence – as a criminal.  As such, SA Bowman's testimony is not properly admissible as rebuttal evidence.

Accordingly, defendant has not made any showing, as he must, regarding the relevancy and/or admissibility of SA Bowman's testimony and, therefore, the subpoena should be quashed.

**IV.**

**CONCLUSION**

For the foregoing reasons, the government respectfully requests that the Court quash the subpoena.

DATED: January 26, 2007     Respectfully submitted,

GEORGE S. CARDONA
Acting United States Attorney

THOMAS O'BRIEN
Assistant United States Attorney
Chief, Criminal Division


_____
ROBERT E. DUGDALE
SUSAN J. DEWITT
KAREN I. MEYER
Assistant United States Attorneys
Organized Crime & Terrorism Section


                   Attorneys for Plaintiff
                   UNITED STATES OF AMERICA

10

DECLARATION OF ROBERT DUGDALE

I, ROBERT DUGDALE, declare as follows:

1. I am an Assistant United States Attorney ("AUSA") in the United States Attorney's Office for the Central District of California assigned to the prosecution of United States v. Iouri Mikhel, CR 02-220(B)-DT. I make this declaration in support of the government's motion to quash subpoena.

2. On January 17, 2007, I and the other members of the prosecution met with the members of the defense team to discuss the penalty phase of this case. At this meeting, Richard Lasting, counsel for defendant Kadamovas, advised the government that the defense might wish to subpoena Special Agent Jonathan Bowman of the Federal Bureau of Investigation ("SA Bowman"). I informed counsel for defendants that the United States Attorney's Office would accept a subpoena directed to SA Bowman on his behalf. On January 22, 2007, I received a subpoena for SA Bowman via electronic mail from Dale Rubin, counsel for defendant Mikhel (attached hereto as Exhibit A).

3. In May 2002, SA Bowman was stationed in Moscow, Russia, and he participated in the FBI investigation of the disappearance of Safiev. During that investigation, a confidential informant (the "CI") relayed the following information to SA Bowman that he/she had heard from various third party sources, some named and some unnamed:

a. The CI told SA Bowman that Safiev was a wealthy and powerful individual who owned, at various points in time, a computer business, significant portions of major Russian banks, and a clothing company named "Caesars" with 38 stores in Moscow,

1

and whose personal wealth was around $150 million.  CI told SA Bowman that Safiev moved much of this money offshore.

b.    The CI told SA Bowman that an American, named Paul Tatum was murdered in Moscow in 1996 after approaching Safiev for protection from a Moscow criminal who feared Safiev.

c.    The CI told SA Bowman that he/she believed a director of Caesars was responsible for Safiev's murder because Safiev owed him $18 million in profits from Caesars.  The CI told SA Bowman that this director of Caesars contracted Alexander Afonin to commit Safiev's murder and that Afonin thereafter hired people in the United States to commit the murders.

d.    The CI told SA Bowman that just prior to moving to Los Angeles he/she was in London where he/she brokered $50 million in stock investments for a number of high-level Russian investors.  The CI stated that the Russian organized criminal who Tatum sought protection from invested $10 million through Safiev as part of this scheme.  The CI added that after the September 11th terrorist attacks, Safiev lost $25 million, and after Safiev's death this Russian organized criminal attempted to get this $10 million from Safiev's family.

e.    The CI told SA Bowman that in the past Safiev had helped approximately twenty Russians obtain Greek passports.

f.    The CI told SA Bowman that he/she heard that when Safiev moved to Los Angeles he started using cocaine that he obtained from Nick Kharabadze.[2]

---

[2]    The CI in question approached SA Bowman with the understanding his/her identity would not be revealed, and he/she believes that his/her life will be placed in great danger if

2

4.    To the government's knowledge, Safiev has never been charged with any criminal offense, let alone convicted of any criminal offense.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this _____ day of January 2007, at Los Angeles, California.

_____
Robert Dugdale

his/her identity is revealed in light of the fact he/she discussed the activities of various Russian organized criminals with SA Bowman who will seek retribution against him/her for speaking with law enforcement.  The CI lives in Russia and the United States government has no ability to protect him/her.

3