RICHARD P. LASTING, SBN 53950
1717 Fourth Street 3rd Floor
Santa Monica, California 9040-3319
Telephone:    (310) 576-6242
Facsimile:    (310) 576-6247
e-mail:       rplasting@sbcglobal.com

SONIA E. CHAHIN, SBN 136604
2222 Foothill Boulevard, #E-278
La Canada, California 91011
Telephone:    (818) 549-0149
Facsimile:    (818) 549-0990
e-mail:       sechahin@aol.com

Attorneys for Defendant
JURIJUS KADAMOVAS

FILED
CLERK, U.S. DISTRICT COURT

JAN 30 2007

CENTRAL DISTRICT OF CALIFORNIA
BY                          DEPUTY

## UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR. No. 02-220(B)-DT |
| Plaintiff, | |
| v. | DEFENDANT JURIJUS KADAMOVAS' MOTION FOR A NEW TRIAL |
| JURIJUS KADAMOVAS, | |
| Defendant. | |

<u>Table of Contents</u>

Table of Contents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . I

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

Memorandum of Points and Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

I.    STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

II.   IOURI MIKHEL'S TESTIMONY REGARDING JURIJUS KADAMOVAS' PARTICIPATION IN THE CHARGES, AND OTHER CRIMES AND BAD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

III.  MR. KADAMOVAS SUBMITS THAT THE PREJUDICIAL EFFECT OF IOURI MIKHEL'S TESTIMONY AS DESCRIBED ABOVE HAS TO DEPRIVED MR. KADAMOVAS OF DUE PROCESS AND A FAIR TRIAL IN THIS MATTER AND THAT MANIFEST NECESSITY REQUIRES THAT A NEW TRIAL BE ORDERED . . . . . . . . . . . . . . . . . . . . . . . . . . 18

IV.   CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Table of Authorities

Bruton v. United States
     391 U.S. 123 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Greer v. Miller
     483 U.S. 756 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 18

Krulewitch v. United States
     336 U.S. 440 (1949) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

United States v. Arias-Villanueva,
     998 F.2d 1491,  (9th Cir.), cert. denied, 510 U.S. 1001(1993) . . . . . . . . . . . . 18

United States v. Escalante
     637 F. 2d 1197,  (9th Cir.), cert. denied, 449 U.S. 856(1980)  . . . . . . . . . . . . 18

United States v. Clarke
     343 F.2d. 90 (3rd Cir. 1965) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

United States v. Gray
     468 F.2d. 257 (3rd Cir. 1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Mora v. United States
     190  F.2d.749 (5th Cir. 1951) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

United States v. Nemeth
     430 F.2d. 704 (6th Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

United States v. Rudolph
     403 F.2d. 805 (6th Cir. 1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

United States v. Owens
     953 F.2d. 391 (8th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Maestas v. United States
     341 F.2d. 493 (10th Cir. 1965) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Rules and Statutes

Rule 33 of the Federal Rules of Criminal Procedure . . . . . . . . . . . . . . . . . . . 2, 3,

RICHARD P. LASTING, SBN 53950
1717 Fourth Street 3rd Floor
Santa Monica, California 9040-3319
Telephone:    (310) 576-6242
Facsimile:    (310) 576-6247
e-mail:        rplasting@aol.com

SONIA E. CHAHIN, SBN 136604
2222 Foothill Boulevard, #E-278
La Canada, California 91011
Telephone:    (818) 549-0149
Facsimile:    (818) 549-0990
e-mail:        sechahin@aol.com

Attorneys for Defendant
JURIJUS KADAMOVAS

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,              )      CR. No. 02-220(B)-DT
                                       )
              Plaintiff,               )
                                       )      DEFENDANT JURIJUS
       v.                              )      KADAMOVAS' MOTION FOR A
                                       )      NEW TRIAL
JURIJUS KADAMOVAS,                     )
                                       )
              Defendant.               )
                                       )
_____)

       Defendant JURIJUS KADAMOVAS, by and through his counsel of record,

Richard P. Lasting and Sonia E. Chahin, hereby requests that this Honorable Court

order a new trial in this matter pursuant to Federal Rule of Criminal Procedure 33.

       Mr. JURIJUS KADAMOVAS submits that a new trial is required because

he was denied a fair trial based on his prejudicial joinder to co-defendant IOURI

MIKHEL, who (1) rested his case, and later was permitted to testify after Mr.

KADAMOVAS had completed presentation of his defense, and ( 2) who in such

testimony made numerous highly prejudicial statements implicating JURIJUS

KADAMOVAS in the commission of the offenses charged in this case, as well as implicating Mr. KADAMOVAS in a variety of other bad acts.   The prejudicial effect of these statements was compounded by co-defendant IOURI MIKHEL's refusal to submit himself to cross-examination, as required by the Confrontation Clause of the United States Constitution.

Although, Mr. KADAMOVAS is cognizant that the Court ordered the testimony of defendant IOURI MIKHEL stricken, and admonished the jury to disregard it,  he submits the testimony  was so highly prejudicial, and of such a duration, that a curative instruction is simply  insufficient to cure the prejudice  to JURIJUS KADAMOVAS.  Mr. KADAMOVAS submits that because there is an "overwhelming probability" that the jury will be unable to follow the court's instructions and a strong likelihood that the effect of the evidence was "devastating" to the defendant, a new trial is required in the interests of justice. Greer v. Miller,  483 U.S. 756, 766 n.8, (1987); see Rule 33 of the Federal Rules of Criminal Procedure.

/
/
/
/
/
/
/
/
/
/
/
/

- 2 -

This request is based upon Rule 33 of the Federal Rules of Criminal Procedure, the attached Memorandum of Points and Authorities, all files and records in this case, and such evidence and argument as may be presented to the court at the hearing on this motion.

DATED: January 30, 2007                    Respectfully submitted,


RICHARD P. LASTING
Attorney for Defendant
JURIJUS KADAMOVAS


SONIA E. CHAHIN
Attorney for Defendant
JURIJUS KADAMOVAS

- 3 -

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.

### STATEMENT OF FACTS

After the Government rested, and completed the presentation of evidence in their case, co-defendant IOURI MIKHEL presented his defense case. He called witnesses to testify and decided to forego providing his own testimony in his defense. On December 13, 2006, defendant MIKHEL rested and defendant KADAMOVAS presented his case. Mr. MIKHEL then requested permission to use the Christmas break to prepare his testimony with his attorneys so that he could testify in his own defense on return from the Christmas break. The Court granted this request.

Mr. MIKHEL testified over the course of 3 days, January 3rd, 4th and 5th, 2007. His testimony was highly prejudicial to Mr. KADAMOVAS in that it directly implicated JURIJUS KADAMOVAS in the commission of the charges alleged in the indictment, as well as in the commission of a number of other unrelated and uncharged crimes.

At various points during the course of co-defendant MIKHEL's testimony, counsel for Mr. KADAMOVAS requested the Court grant a mistrial. In arguing the mistrial motion, Mr. Lasting explained to the Court, that the devastating nature of Mr. MIKHEL's testimony on the defense of Mr. Kadamovas could not be overestimated. Mr. Lasting reminded the Court that this fact had been recognized by the Government, when Mr. Dugdale himself, had characterized Mr. MIKHEL's testimony as absurd, noting that, "the last thing he would want to do is strike this

-4-

testimony". [RT 1/9/07, Pg 9]

After three days of testimony on direct examination, Mr. KADAMOVAS and the Government were given the opportunity to cross-examine Mr. MIKHEL. Mr. MIKHEL, however, refused to answer questions asked on cross-examination, either by Mr. KADAMOVAS' counsel, or by the Government.

Mr. KADAMOVAS found himself in a situation, where his co-defendant Mr. MIKHEL, had provided substantial prejudicial and damaging testimony against him, but refused to submit himself for cross-examination. Faced with the denial of his Sixth Amendment right to confront the witnesses against him, Mr. KADAMOVAS availed himself of the only remedy available to him, a motion to strike the testimony, and later, a renewal of his previous motion for a mistrial. The Court granted Mr. KADAMOVAS' motion to strike the testimony in its entirety, but denied the motion for a mistrial. [RT 1/9/07, Pg 28]. Upon ordering the testimony stricken, the Court instructed the jury in the following manner with regard to IOURI MIKHEL's testimony

> THE COURT: All right.
> Ladies and gentlemen, I'm going to grant the motion to strike all of the testimony of Mr. Mikhel. You are not to consider it in any matter against Mr. Mikhel or against Mr. Kadamovas in this case. The entire testimony will be struck. [RT 1/9/07, Pg 28]

During the charge to the jury, the Court instructed the jury in the following manner with regard to Mr. MIKHEL's testimony:

> "Due to Defendant Iouri Mikhel's refusal to subject himself to cross

-5-

examination, the Court struck all of the testimony of Defendant Iouri Mikhel on his direct examination. You are, therefore, specifically -- you are, therefore, specific instructed that you are not to consider or discuss any statement made by Defendant Iouri Mikhel here in Court for any purpose whatsoever."

You are instructed, as a matter of law, that Defendant Iouri Mikhel should be considered as not testifying in this matter. A defendant in a criminal case has a Constitutional right not to testify. No presumption of guilt may be raised and no inference of any kind may be drawn from the fact that Defendant Iouri Mikhel did not testify.

You are further instructed that you are not to draw any inference or inferences about the guilt or innocence of any other defendant from the testimony which was struck by the Court.

Despite the curative instruction, Mr. KADMOVAS submits that the character of the testimony was such, that it created so strong an impression on the minds of the jurors, that they were unable to disregard it in their consideration of the case, although admonished to do so.

## II.

## IOURI MIKHEL'S TESTIMONY REGARDING JURIJUS KADAMOVAS' PARTICIPATION IN THE CHARGES, AND OTHER CRIMES AND BAD ACTS

IOURI MIKHEL testified over the course of a three day period of time. He testified regarding many subject matters, and many crimes, both related and unrelated to the charges in the indictment.

-6-

He testified on numerous instances regarding Mr. KADAMOVAS' participation in the offenses.  His testimony, on its face, if believed, could serve as proper basis to convict Mr. KADAMOVAS as a conspirator of many of the charges alleged in the indictment.  Mr. KADAMOVAS, however,  was deprived of his opportunity to test the validity of these statements before the jury, since IOURI MIKHEL refused to submit himself for cross-examination.  The damaging testimony is summarized below.

1.    Testimony Related to  JURIJUS KADAMOVAS' Involvement In the Sale of a An Emerald and Discussion With Individuals Who Were Attempting to Locate Safiev

a.    The Testimony

According to IOURI MIKHEL, JURIJUS KADAMOVAS told MIKHEL that he had a number of precious stones, which he identified as emeralds, and that KADAMOVAS asked his assistance in facilitating their sale.  [RT 1/4/07, Pg 118] MIKHEL testified they traveled to Antwerp where MIKHEL found a person who was interested in the stone.  They met that person in Antwerp, but were unable to agree upon a price.  [RT 1/4/07, Pg 121]

A few months later, IOURI MIKHEL testified that he  and JURIJUS KADAMOVAS flew to London to meet with various individuals regarding selling the emerald.  [RT 1/5/07, Pg 11-13]  An individual named  Aleev showed up at that meeting, and he came with three additional people.   Aleev told MIKHEL that before they started discussing the emerald there was another matter of great interest. [RT 1/5/07, Pg 13] They told MIKHEL that they were interested in obtaining information about Safiev and actually meeting him. [ RT 1/4/07, Pg 121,  1/5/07, Pg 14]

- 7 -

According to MIKHEL, Aleev told him there were very diverse people after Safiev. A week later they concluded their transaction with Aleev. [RT 1/5/07, Pg 16] They sold an emerald to Aleev for $1.2 million in cash. [RT 1/5/07, Pg 17] MIKHEL identified exhibit 3047 as a photograph of JURIJUS KADAMOVAS and himself, on the day of their departure from London, standing next to two boxes tied with flex ties, which contained one-half of the 1.2 million dollars in cash from the sale of the emerald. [RT 1/5/07, Pg 19-20]

b.      The Prejudice

This testimony is highly prejudicial for two reasons. Initially, it places JURIJUS KADAMOVAS at a meeting with IOURI MIKHEL and three individuals who were interested in locating Safiev. It sets the stage for the later testimony implicating JURIJUS KADAMOVAS as a conspirator with regards to the abductions of Rita Pekler, Nick Kharabadzhe, and George Safiev.

The second prejudicial aspect of this testimony is that portion of the testimony which relates to JURIJUS KADAMOVAS' sale of an emerald or other precious stone. As the Court will recall, the Government introduced into evidence a mini-disk which contained a conversation between a person identified as George Safiev, and a person identified as JURIJUS KADAMOVAS. In the conversation, there is a discussion between the two persons, related to later using a story related to the sale of an emerald, as a cover story, if it became necessary. Aside from the references in IOURI MIKHEL's testimony, the jury did not hear any other evidence that JURIJUS KADAMOVAS was involved with the sale of gem stones or emeralds.

2.      Testimony Implicating Jurijus Kadamovas in the Abduction of Rita Pekler

-8-

a.    The Testimony

IOURI MIKHEL testified that while he was in London, he attempted to verify the location where George Safiev lived.  He contacted Jeff Dabbs who determined that Safiev's house was transferred to a holding company that Rita Pekler was associated with.  [RT 1/5/07, Pg 17-19]   In proceeding with his plan to try to "have a conversation with Safiev", IOURI MIKHEL testified that he had the idea of talking to Rita Pekler first.   [RT 1/5/07, Pg 55]

IOURI MIKHEL asked JURIJUS KADAMOVAS go to the office and arrange the meeting with her. JURIJUS KADAMOVAS went there, with AINAR ALTMANIS.  IOURI MIKHEL testified that he specifically instructed JURIJUS KADAMOVAS to dress as nice as he could.  They went to the office and JURIJUS KADAMOVAS realized that no conversation could be conducted in the office as it was very small, and there was no privacy whatsoever. According MIKHEL, JURIJUS KADAMOVAS returned and reported that information to MIKHEL. [RT 1/5/07, Pg 55]   According to IOURI MIKHEL, the purpose of meeting Rita Pekler was to talk to her and ask her to arrange the meeting with Safiev. [RT 1/5/07, Pg 56]

During their meeting IOURI MIKHEL told Ms. Pekler that the people "we are representing" would like to meet with Mr. Safiev and discuss a few discrepancies in his business operations.  According to MIKHEL, he told Ms. PEKLER she would be paid for arranging the meeting. [RT 1/5/07, Pg 57] MIKHEL testified he asked Ms. Pekler to call Safiev and when she finally reached him, Safiev indicated that he was at the airport and leaving the country for the week, and he would call her upon his return.  MIKHEL testified that they came to an agreement that Rita Pekler would be paid and the money would be delivered to her in a day or two.  IOURI MIKHEL and JURIJUS KADAMOVAS left and they

-9-

asked AINAR ALTMANIS to drive Rita Pekler wherever she needed to be driven [RT 1/5/07, Pg 60]

b.     The Prejudice

The prejudice of this testimony is readily apparent. IOURI MIKHEL's statements place JURIJUS KADAMOVAS as a direct participant in the series of events which led to Ms. PEKLER's abduction and resulting death. This testimony was particularly damaging in light of the fact that Mr. KADAMOVAS' defense was to attempt to create a reasonable doubt as to whether Mr. KADAMOVAS' was in fact the person who went to Rita Pekler's office and identified himself as "Volodia". MIKHEL's testimony destroyed any such defense and placed Mr. KADAMOVAS at the very location where his attorneys sought to argue he had never been.

3.     Testimony Implicating Jurijus Kadamovas in the Abduction of Nick Kharabadzhe and George Safiev

a.     The Testimony

In regard to victim Nick Kharabadzhe, IOURI MIKHEL testified that since Pekler was not around, he next decided to use the information which Pekler provided him during their general conversation about Safiev's associates. [RT 1/5/07, Pg 78] . MIKHEL testified that based on the description given to him by Pekler, he knew that Kharabadzhe would never refuse any kind of contact with a female. IOURI MIKHEL testified that he asked JURIJUS KADAMOVAS to have his wife call and arrange the meeting at Design Water World. MIKHEL testified that Natalya Solovyeva called and arranged the meeting and he came to the office . [RT 1/5/07, Pg 79]

- 10 -

Although MIKHEL's testimony surrounding the interactions with George Safiev and Nick Kharabadzhe was confused and rambling, he describes that Safiev and Kharabadzhe were relocated to the Colombia Hotel, where they were supposed to stay until they were able to obtain a passport for Safiev, and after that, "Safiev was supposed to disappear".[RT 1/5/07, Pg 90-91] MIKHEL describes that Altmanis, Aleev, and JURIJUS KADAMOVAS were at the hotel, and that they left Safiev, Kharabadzhe and Aleev at the hotel, while JURIJUS KADAMOVAS drove to get some money from the safe house. IOURI MIKHEL testified that he and AINAR ALTMANIS drove back to Los Angeles. MIKHEL testified that when he last saw Kharabadzhe and Safiev, Kharabadzhe was drunk, and Safiev was sick. [RT 1/5/07, Pg 91-92]

b.     The Prejudice

Once again, the testimony places JURIJUS KADAMOVAS as a direct participant and conspirator in the events which led to the abductions and killings of Nick Kharabadzhe and George Safiev. Further, the testimony places JURIJUS KADAMOVAS within just miles of the location where the victims bodies were later recovered. Mr. KADAMOVAS submits that this is the type of testimony which the jury is incapable of disregarding. Because the curative instruction was insufficient, a new trial should be ordered.

4.     Testimony Implying that Jurijus Kadamovas Has Guilty Knowledge of the Abduction and Hostage Taking of Meyer Muscatel

a.     The Testimony

IOURI MIKHEL testified that there was an individual who cheated his business associates out of some money, and that one of MIKHEL's business associates approached MIKHEL and wanted to have AINAR ALTMANIS break

Meyer Muscatel legs. According to MIKHEL, ALTMANIS would be paid $5,000. [RT 1/5/07, Pg 29-30] MIKHEL testified he relayed the proposition to ALTMANIS, and provided him the address, and this was to be done at ALTMANIS' convenience. [RT 1/5/07, Pg 30-31] According to MIKHEL, sometime later ALTMANIS showed up at his house with Meyer Muscatel lying in the back seat of his car. ALTMANIS wanted to leave Muscatel at the Oakview house while he drove to the location of the to make sure that there was no blood or any kind of marks left at the place of the occurrence of the beating. [RT 1/5/07, Pg 34]

As regards JURIJUS KADAMOVAS, IOURI MIKHEL testified that after AINAR ALTMANIS brought Meyer Muscatel over to the Oakview residence, he called JURIJUS KADAMOVAS and told him what had occurred, and he purportedly expressed the displeasure at the initiative that ALTMANIS had taken upon himself. MIKHEL expressed concern because the incident had occurred in his house, and told KADAMOVAS that they needed to drive the money to the safe house [RT 1/5/07, Pg 38-39] According to IOURI MIKHEL, JURIJUS KADAMOVAS agreed that they would drive to the safe house near Modesto the following day. [RT 1/5/07, Pg 39]

According to IOURI MIKHEL, JURIJUS KADAMOVAS arrived and entered the house with his own key , while AINAR ALTMANIS was still there with Meyer Muscatel. IOURI MIKHEL was trying to ignore ALTMANIS, and either he or KADAMOVAS told ALTMANIS that they were taking a trip today, and that they were busy, so he should not bother them. Then according to MIKHEL, he and JURIJUS KADAMOVAS got into the car and left. [RT 1/5/07, Pg 40]

/

- 12 -

b.    The Prejudice

This testimony is extremely prejudicial because, if believed, it implies to the jury that JURIJUS KADAMOVAS is such a callous individual who was more interested in the money at the safe house, than any injured person in the Oakview house. The testimony is also prejudicial in that it purports to establish that JURIJUS KADAMOVAS had a key to the Oakview residence, a fact which was not established by any other evidence. Further, it also directly implicates JURIJUS KADAMOVAS in events surrounding the abduction and murder of Meyer Muscatel.

5.    Testimony Implicating Jurijus Kadamovas In a Plot to Kill an FBI Agent and Kidnaping and Extortion of Armen Gyurdzhiyants

a.    The Testimony

IOURI MIKHEL described that he had various conversations with Vladimir Paniouchkine who told him that there was an individual who was "cruising around," and looking for somebody who will kill the FBI agent who set his brother up. Panouchkine told MIKHEL that the brother was in prison, and the FBI agent was going to testify against him, and that an individual, later identified as Armen, wanted the FBI agent dead. [RT 1/5/07, Pg 43]

According to MIKHEL, he was very curious and told Panouchkine to try arrange a meeting with this individual, Armen, the next time he was in Los Angeles. [RT 1/5/07, Pg 44] According to IOURI MIKHEL, a meeting took place in October of 2001, which MIKHEL did not attend. MIKHEL testified that he asked JURIJUS KADAMOVAS to drive to the meeting and arrange the meeting at the different time. There was a subsequent meeting sometime later when JURIJUS KADAMOVAS once again drove to the meeting with Armen and brought Armen

- 13 -

to MIKHEL's house for the meeting. [RT 1/5/07, Pg 44]

At that meeting IOURI MIKHEL was asking Armen what exactly he wanted to do, and Armen explained to him that he wanted the FBI agent dead. IOURI MIKHEL testified that he told Armen that they were not ready or capable to do that, but that they would pass the information people who may be interested in that kind of request. Because those people could not meet with Armen, they needed Armen to send those people a message on a videotape. [RT 1/5/07, Pg 45-46] MIKHEL testified that JURIJUS KADAMOVAS made the videotape, and that they then sold the videotape back to Armen for $50,000 in cash. [RT 1/5/07, Pg 48] Of this $50,000, MIKHEL gave $10,000 to Altmanis; he gave $5,000 to Krylov, he gave $10,000 to Panouchkine, and the rest of the money was put in a little box they had at Designed Water World as petty cash. [RT 1/5/07, Pg 49] According to MIKHEL, after Armen, it occurred to him, "that why don't we try to see if it's possible to talk to Mr. Safiev in the same way". [RT 1/5/07, Pg 54]

b.    The Prejudice

IOURI MIKHEL's testimony implicates JURIJUS KADAMOVAS as an active participant in a potential plot to murder an FBI agent. What could be more prejudicial than evidence which places Mr. KADAMOVAS in meetings and making videotapes of a solicitation of the murder of an FBI Agent, particularly in a case which has been primarily investigated by the FBI, and in which numerous agents have been called to testify. This is the type of evidence which a jury cannot disregard despite a curative instruction. Further, absent IOURI MIKHEL's testimony, the jury would not have heard this evidence.

/

/

- 14 -

6.   Testimony Implicating JURIJUS KADAMOVAS in a Money Laundering Transaction in Cyprus with Mr. Popov about Which Mikhel Testified That the Transaction Was Not Completed, and That Mr. Popov "Drowned"

a.   The Testimony

According to IOURI MIKHEL, in April 2001, JURIJUS KADAMOVAS organized a meeting with his Lithuanian associate, Mr. Nagrokis, who knew that MIKHEL was interested in bank contacts and who offered his help to initiate contact with a bank contact with whom he worked. [RT 1/4/07, Pg 123]

Mr. Nagrokis offered his help to establish a new connection with the bank, who could facilitate the transactions which interested IOURI MIKHEL, accepting the deposit of cash and converting the cash money into electronic cash. [RT 1/4/07, Pg 126]

MIKHEL testified that Mr. Nagrokis' bank contact was a person who lives in Cyprus and was closely associated with a bank. [RT 1/4/07, Pg 127] According to MIKHEL, Mr. Nagrokis was very protective of his contact and had difficulties obtaining a visa to return to the United States.  MIKHEL testified that in order to protect his interests, he delegated JURIJUS KADAMOVAS to fly in his stead to Cyprus as a protector of his interests, because everybody wanted to make money out of this introduction. According to MIKHEL, JURIJUS KADAMOVAS went to Cyprus with MIKHEL acting to represent Mr. Nagrokis' interest.  According to MIKHEL, they met with the person in Cyprus and reached an agreement about the transaction that was to be done.  The cash was going to be coming to Cyprus from one of the Soviet Republics by boat. [RT 1/4/07, Pg 129-130]  According to MIKHEL the transaction was supposed to be in the amount of

- 15 -

2 million dollars. There were delays because this individual, who he identified as Mr. Popov, was not actually prepared for the transaction, and it would take him an extended period of time to complete the transaction.[RT 1/4/07, Pg 138] According to MIKHEL, they gave Mr. Popov an opportunity to offer a solution, which he was unable to do. MIKHEL then excluded himself from the transaction, and left, leaving Mr. Popov to deal directly with the people on the boat. [RT 1/4/07, Pg 139-141] According to MIKHEL, he was later told by Mr. Nagrockis that the transaction never went through and Popov drowned. [RT 1/4/07, Pg 143]

b.    The Prejudice

IOURI MIKHEL's testimony implicates JURIJUS KADAMOVAS in the commission of another crime, but beyond that the testimony is highly prejudicial based on the fact that MIKHEL testified that Mr. POPOV, a participant in this transaction "drowned" in Cyprus. In this instance once again, absent IOURI MIKHEL's testimony, the jury would not have heard this evidence

7.    Testimony Related Miscellaneous Other Crimes

a.    The Testimony
1.    Illegal Transportation of Large Sums of Money to London and Turkey.

IOURI MIKHEL testified that JURIJUS KADAMOVAS was involved in assisting him illegally transport money, by strapping it on his body. IOURI MIKHEL testified that first they took the money (approximately $800,000.00) from Los Angeles to London, and then from London to Istanbul. [RT 1/4/07, Pg 88]

In regard to JURIJUS KADAMOVAS' purported participation in this crime, IOURI MIKHEL identified a photograph of himself and JURIJUS KADAMOVAS in exhibit 3031. He described this as a picture of JURIJUS KADAMOVAS with him at a location in London, sitting and waiting for the person who needed that transaction. [RT 1/4/07, Pg 96]

IOURI MIKHEL identified photographic exhibit 3032 as depicting the time that they [IOURI MIKHEL and JURIJUS KADAMOVAS] were sitting in Turkey and waiting for, "that person". He describes that the picture was taken in the Central square named Takisman in Istanbul. [RT 1/4/07, Pg 99-100]

### 2. Illegal Transportation of Money and Travel to the Country of Cuba

According to IOURI MIKHEL, he and JURIJUS KADAMOVAS traveled to Cuba, and they smuggled cash into Cuba to hand over to an individual there. MIKHEL identified exhibit 3034 as a photograph of himself, JURIJUS KADAMOVAS and Vladimir Sobolev at a tourist area in the old city of Havana. . [RT 1/4/07, Pg 112-114]

### b. The Prejudice

The law circumscribes the evidence of unrelated crimes which can be introduced at a trial, because such evidence, by its very nature is prejudicial. In this case, IOURI MIKHEL testified to instance upon instance of Mr. KADAMOVAS' purported involvement in crimes unrelated to the charges in the indictment. Because this prejudice could not be cured by a curative instruction, a new trial should be ordered.

/

- 17 -

# III.

## MR. KADAMOVAS SUBMITS THAT THE PREJUDICIAL EFFECT OF IOURI MIKEHEL'S TESTIMONY AS DESCRIBED ABOVE HAS TO DEPRIVED MR. KADAMOVAS OF DUE PROCESS AND A FAIR TRIAL IN THIS MATTER AND THAT MANIFEST NECESSITY REQUIRES THAT A NEW TRIAL BE ORDERED

### 1.    The Law

When a jury has heard inadmissible or improper testimony, a limiting instruction is generally sufficient to cure any prejudice to the defendant and to avoid a mistrial. United States v. Arias-Villanueva, 998 F.2d 1491, 1502 (9th Cir.), cert. denied, 510 U.S. 1001(1993).  "Mistrial is appropriate only where there has been so much prejudice that an instruction is unlikely to cure it." United States v. Escalante, 637 F.2d 1197, 1201 (9th Cir.), cert. denied, 449 U.S. 856 (1980).

Courts "normally presume that a jury will follow an instruction to disregard inadmissible evidence . . . unless there is an 'overwhelming probability' that the jury will be unable to follow the court's instructions." United States of America v. Owens, 953 F.2d 391, 393-4 (8th Cir. 1992);  Greer v. Miller, 483 U.S. 756, 766, (1987).  See also United States v. Adams, 799 F.2d 665, 671 (11th Cir. 1986) (when district court withdraws evidence from the jury with an instruction to disregard it, "'the error is cured unless the evidence is so highly prejudicial as to render the error incurable'") (quoting United States v. Benz, 740 F.2d 903, 916 (11th Cir. 1984), cert. denied, 474 U.S. 817 (1987).

- 18 -

In <u>United States of America v. Gray</u>, 468 F.2d 257, 260; (3rd Cir. 1972), the Court of Appeals reversed a conviction where it found that a prosecutor's improper question to a criminal defendant was so prejudicial that no cautionary instruction could purge the jury's mind and memory of the devastating impact of the question. The court noted that the question irretrievably seared itself into the conscious and subconscious minds of the jury, and that the most valiant striving on the part of a conscientious juror to comply with the trial judge's admonition to "strike it from your minds entirely"; "just force it out"; "pay no attention to it whatsoever"; could in the case of some jurors only be an exercise in futility. To hold that the cautionary instruction was an effective detergent which completely laundered out of the jury's mind the impact of the prosecutor's question, is unrealistic and little less than phantasmagoria. A trial judge can "strike" evidence from notes of testimony; it is something else again to "strike" its searing impress from a juror's mind. <u>United States of America v. Gray</u>, 468 F.2d 257, 260; (3rd Cir. 1972)

In the <u>Gray</u> case, the Court was faced with the prejudicial impact of a single question, while in Mr. KADAMOVAS' case, the prejudicial testimony lasted three days. Further, the Supreme Court has held, that the type of prejudicial testimony given by IOURI MIKHEL in this case, is precisely the type of testimony which cannot be erased from a juror's mind with a cautionary instruction. IOURI MIKHEL's testimony implicated JURIJUS KADAMOVAS in the commission of the offenses charged in the indictment. His refusal to subject himself to cross-examination created a <u>Bruton</u> type confrontation problem. The Supreme Court has held that cautionary admonitions of a trial judge are ineffective to erase from the minds of a jury the effects of prejudicial testimony. <u>Bruton v. United States</u>, 391 U.S. 123 (1968). The <u>Bruton</u> court held that a jury instruction is insufficient to cure the prejudicial effect of an inadmissible co-conspirator's statement

- 19 -

implicating a co-defendant since the co-defendant is entitled to confront the declarant and engage him in full and effective cross-examination.  In Bruton, the Court, quoted the following statement in Justice Jackson's concurrence in Krulewitch v. United States, 336 U.S. 440, 453 (1949):

"The naive assumption that prejudicial effects can be overcome by instructions to the jury . . . all practicing lawyers know to be unmitigated fiction. . . ." (footnote omitted).

Other Courts have also found, under varying circumstances, that jury instructions to a jury to disregard inadmissible prejudicial testimony could not operate to cure the error of its introduction.  See United States v. Clarke, 343 F.2d 90 (3rd Cir. 1965);  United States v. Nemeth, 430 F.2d 704, 706 (6th Cir. 1970); United States v. Rudolph, 403 F.2d 805, 807 (6th Cir. 1968); Maestas v. United States, 341 F.2d 493, 495-496 (10th Cir. 1965); Mora v. United States, 190 F.2d 749, 752-753 (5th Cir. 1951).

In holding that a cautionary instruction does not cure prejudice, Chief Judge Weick, speaking for the Court in United States v. Rudolph, supra, said:

"It must be remembered that after the saber thrust, the withdrawal of the saber still leaves the wound."

In Maestas, the Court said (341 F.2d p. 496):

". . . where the character of the testimony is such that it will create so strong an impression on the minds of the jurors that they will be unable to disregard it in their consideration of the case, although admonished to do so, a mistrial should be ordered."

- 20 -

Mr. KADAMOVAS submits that this is just such a case. The testimony of IOURI MIKHEL, over the course of three days, created such a strong and prejudicial impression on the minds of the jurors that they were unable to disregard it in their consideration of the case. A new trial should be ordered as it is required in the interests of justice.

## IV.

## CONCLUSION

For the foregoing reasons, JURIJUS KADAMOVAS hereby requests that this Honorable Court enter an order vacating the conviction in this matter, and ordering that a new trial date be set.

DATED: January 30, 2007

RICHARD P. LASTING
Attorney for Defendant
JURIJUS KADAMOVAS

DATED: January 30, 2007

SONIA E. CHAHIN
Attorney for Defendant
JURIJUS KADAMOVAS

## CERTIFICATE OF SERVICE

I, Sonia E. Chahin hereby state and declare:

That I am employed in the County of Los Angeles, State of California; that my business address is 2222 Foothill Blvd., #E-278, La Canada, California 91011; that I am over the age of eighteen and not a party to the within entitled action; that I am a member of the bar of this Court.

On January 30, 2007, I served a copy of:

DEFENDANT JURIJUS KADAMOVAS' MOTION FOR A NEW TRIAL

Service was:

[ ]    Placed in a sealed envelope and mailed via United States Mail, addressed as follows:
[x]    By hand delivery addressed as follows:
[ ]    By facsimile as follows:
[ ]    By messenger as follows:

AUSA Robert E. Dugdale           [SERVED IN COURT]
AUSA Susan Dewitt
AUSA Kim Meyer
1500 United States Courthouse
312 North Soring Street
Los Angeles, CA 90012

Service was:

[ ]    Placed in a sealed envelope and mailed via United States Mail, addressed as follows:
[x]    By hand delivery addressed as follows:
[ ]    By facsimile as follows:
[ ]    By e-mail as follows

Richard Callahan, Esq.           [SERVED IN COURT]
230 E. Colorado Blvd., Suite 1200
Pasadena, CA  91101
(626) 202-4060 Office
(626) 794-4676 FAX
rmcallahanjr@earthlink.com

SEE ATTACHED SERVICE LIST

This Certificate is executed on January 30, 2007, at Glendale, California. I certify under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

SONIA E. CHAHIN

<u>United States v. Iouri Mikhel et al.</u>
CR No. 02-220(B)-DT

Richard Lasting (Capital Counsel)          [SERVED IN COURT]
1717 4th Street, Suite 300
Santa Monica, CA 90401
(310) 576-6242 Office
(310) 576-6247 FAX
richardplasting@sbcglobal.net

Dale M. Rubin, Esq. (Capital Counsel)      [SERVED IN COURT]
Law Offices
2275 Huntington Drive, Suite 902
San Marino, CA 91108
(800) 695-3717 Office
(413) 228-0521 FAX
drubin@socal.rr.com