GEORGE S. CARDONA
Acting United States Attorney
THOMAS P. O'BRIEN
Assistant United States Attorney
Chief, Criminal Section
ROBERT E. DUGDALE (California State Bar No. 167258)
Deputy Chief - Organized Crime and Terrorism Section
SUSAN J. DE WITT (California State Bar No. 132462)
KAREN I. MEYER (California State Bar No. 220554)
Assistant United States Attorneys
Organized Crime and Terrorism Section
       1500 United States Courthouse
       312 North Spring Street
       Los Angeles, California 90012
       Telephone:  (213) 894-4685/4496/8559
       Facsimile:  (213) 894-3713
       e-mail:    robert.dugdale@usdoj.gov
                  susan.dewitt@usdoj.gov
                  kim.meyer@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA


                UNITED STATES DISTRICT COURT

           FOR THE CENTRAL DISTRICT OF CALIFORNIA

                     WESTERN DIVISION


| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | No. CR 02-220(B)-DT |
| | ) | |
| Plaintiff, | ) | GOVERNMENT'S OPPOSITION TO |
| | ) | DEFENDANT JURIJUS KADAMOVAS |
| v. | ) | SUPPLEMENTAL MOTION FOR A NEW |
| | ) | TRIAL |
| IOURI MIKHEL and | ) | |
| JURIJUS KADAMOVAS, | ) | Hearing Date:  3/12/07 |
| | ) | Time:         1:30 p.m. |
| Defendants. | ) | |
| | ) | Courtroom of the Honorable |
| | ) | Dickran Tevrizian |
| | ) | |

Plaintiff, United States of America, by and through its attorneys of record, hereby files its opposition to defendant Jurijus Kadamovas' Supplemental Motion for a New Trial. The government's opposition is based upon the attached Memorandum of Points and Authorities, the accompanying exhibits, the accompanying declaration of Special Agent Louis Perez, the complete files and records in this case, and any argument that may be presented at the hearing on this motion.

DATED: March 5, 2007

Respectfully submitted,

GEORGE S. CARDONA
Acting United States Attorney

THOMAS P. O'BRIEN
Assistant United States Attorney
Chief, Criminal Division

ROBERT E. DUGDALE
SUSAN J. DE WITT
KAREN I. MEYER
Assistant United States Attorney
Organized Crime and Terrorism Section

Attorneys for Plaintiff
United States of America

2

TABLE OF CONTENTS

PAGE

Table of Authorities . . . . . . . . . . . . . . . . . . ii

I.   INTRODUCTION . . . . . . . . . . . . . . . . . . . . 1

II.  ARGUMENT . . . . . . . . . . . . . . . . . . . . . . 3

     A.   THIS COURT ACTED WELL WITHIN ITS DISCRETION WHEN
          IT DID NOT HALT THE PENALTY PHASE TRIAL FOR
          SEVERAL WEEKS AT A TIME NEAR ITS COMPLETION SO
          DEFENDANT KADAMOVAS COULD SECURE THE PRESENCE OF
          WITNESSES HE MADE NO DILIGENT EFFORT TO HAVE
          APPEAR FOR TRIAL . . . . . . . . . . . . . . . . 3

          1.   The Facts Surrounding Kadamovas' Purported
               Need for a Continuance . . . . . . . . . . . 3

          2.   This Court Acted Well Within Its Discretion
               When It Denied The Continuance Requested By
               Kadamovas Near the Conclusion of The Penalty
               Phase of the Trial . . . . . . . . . . . . . 6

     B.   THE JURY WAS NOT OBLIGATED TO FIND ANY OF THE
          MITIGATING FACTORS KADAMOVAS PROFFERED AT TRIAL
          AND WAS NOT REQUIRED TO GIVE ANY WEIGHT TO THE
          MITIGATING EVIDENCE HE PRESENTED  . . . . . . . . 12

     C.   DEFENDANT KADAMOVAS WAS NOT DENIED DUE PROCESS
          BY THIS COURT'S DENIAL OF HIS REQUEST FOR
          SEQUENTIAL PENALTY PHASE HEARINGS . . . . . . . . 18

III. CONCLUSION . . . . . . . . . . . . . . . . . . . . . 24

## TABLE OF AUTHORITIES

**FEDERAL CASES**                                                        **PAGE(S)**

Boyde v. California,
    494 U.S. 370 (1990) . . . . . . . . . . . . . . . . . 16

Buchanan v. Angelone,
    522 U.S. 269 (1998) . . . . . . . . . . . . . . . . . 15

Eddings v. Oklahoma,
    455 U.S. 104 (1982) . . . . . . . . . . . . . . . . . 15

Graham v. Collins,
    506 U.S. 461 (1993) . . . . . . . . . . . . . . . . . 16

Gregg v. Georgia,
    428 U.S. 153 (1976) . . . . . . . . . . . . . . . . . 16

Johnson v. Wainwright,
    778 F.2d 623 (11th Cir. 1985) . . . . . . . . . . . . 16

Lockett v. Ohio,
    438 U.S. 586 (1978) . . . . . . . . . . . . . . . . . 14

Morris v. Slappy,
    461 U.S. 1 (1983) . . . . . . . . . . . . . . . . . . 6

Raulerson v. Wainwright,
    732 F.2d 803 (11th Cir. 1984) . . . . . . . . . . . . 14

Richardson v. Marsh,
    481 U.S. 200 (1987) . . . . . . . . . . . . . . . 19, 22

United States v. Bernard,
    299 F.3d 467 (5th Cir. 2002) . . . . . . . . . . . . 21

United States v. Causey,
    185 F.3d 407 (5th Cir. 1999) . . . . . . . . . . . . 21

United States v. Cuozzo,
    962 F.2d 945 (9th Cir. 1992) . . . . . . . . . . . . 21

TABLE OF AUTHORITIES (Cont'd)

FEDERAL CASES                                                   PAGE(S)

United States v. Davis,
      663 F.2d 824 (9th Cir. 1982) . . . . . . . . . . . . . .  19

United States v. Disla,
      805 F.2d 1340 (9th Cir. 1986) . . . . . . . . . . . . .  20

United States v. Gaines,
      563 F.2d 1352 (9th Cir. 1977) . . . . . . . . . . . . .  19

United States v. Garrett,
      179 F.3d 1143 (9th Cir. 1999) . . . . . . . . . . . . .  6

United States v. Hernandez,
      952 F.2d 1110 (9th Cir. 1991) . . . . . . . . . . . . .  20

United States v. Higgs,
      353 F.3d 281 (4th Cir. 2003) . . . . . . . . . . . . .  13

United States v. Johnson,
      223 F.3d 665 (7th Cir. 2000) . . . . . . . . . . . . .  17

United States v. Mariscal,
      939 F.2d 884 (9th Cir. 1991) . . . . . . . . . . . . .  19

United States v. Paul,
      217 F.3d 989 (8th Cir. 2000) . . . . . . . . . . . . .  13

United States v. Rivera,
      363 F. Supp. 2d 814 (E.D. Va. 2005) . . . . . . . . . .  22

United States v. Taylor,
      293 F. Supp. 2d 884 (N.D. Ind. 2003) . . . . . . . . .  21

United States v. Tipton,
      90 F.3d 861 (4th Cir. 1996) . . . . . . . . . . . . . .  21

United States v. Tootick,
      952 F.2d 1078 (9th Cir. 1991) . . . . . . . . . . . . .  20

United States v. Vaccaro,
      816 F.2d 443 (9th Cir. 1987) . . . . . . . . . . . .  19, 20

United States v. Zamora-Hernandez,
      222 F.3d 1046 (9th Cir. 2000) . . . . . . . . . . . . .  6

Wainwright v. Lockhart,
      80 F.3d 1226 (8th Cir. 1996) . . . . . . . . . . . . .  17

## TABLE OF AUTHORITIES (Cont'd)

**FEDERAL CASES**                                                    PAGE(S)

Zafiro v. United States,
        506 U.S. 534 (1993) . . . . . . . . . . . . . . . . . . . 20, 21

**FEDERAL STATUTES**

18 U.S.C. § 3592(a)(8) . . . . . . . . . . . . . . . . . . 15

**RULES**

Federal Rule of Criminal Procedure 14 . . . . . . . . . . . . . 19

iv

I.

INTRODUCTION

Having been convicted on all counts alleged against him and now facing the death penalty as a result of the jury's findings during the penalty phase of the trial, defendant Jurijus Kadamovas ("Kadamovas") seeks a new trial, or alternatively, a new penalty phase trial, claiming (1) the Court erred by not continuing the penalty phase of the trial to allow Kadamovas time to secure the presence of three members of his family he abandoned several years ago in Lithuania when he relocated to the United States; (2) the jury committed "misconduct" by failing to find mitigating factors in his favor; and (3) this Court erred by failing to hold sequential penalty phases rather than a joint penalty trial. Each of these claims is without merit.

First, this Court acted well within its discretion when it denied Kadamovas' motion to continue the penalty phase of the trial for several weeks after it had already begun and was nearing its eventual conclusion. Kadamovas had ample time to prepare for a possible penalty phase in this case, ample time to obtain the presence of his witnesses, and every reason to know that the penalty phase in this trial would start no later than when it did. Kadamovas' requested continuance was not supported by a showing that the witnesses in question acted diligently in their efforts to attend the trial, a showing that the requested continuance would have ultimately secured their appearance at trial, or any offer of proof showing how Kadamovas' case would be prejudiced by the denial of his requested continuance. In light of these facts, and the incredible inconvenience to all involved

1

that would have resulted by halting the penalty phase for several weeks at a time it was approaching its final days, this Court was well within its discretion when it denied Kadamovas' factually and legally deficient motion for a continuance.

Second, contrary to Kadamovas' argument, the jury was not obligated to make any findings in his favor or to treat any of the evidence he offered in the penalty phase as mitigating; and the jury's verdict confirms it followed the Court's instructions and weighed the aggravating and mitigating evidence it heard as required. The fact the jury did not assign any value to the mitigation evidence Kadamovas proffered at trial was entirely its prerogative. The Constitution only affords a defendant with an opportunity to present mitigating evidence to a jury; it does not compel jurors to find that facts offered at trial are, in fact, mitigating, even when such facts are not disputed by the government.

Finally, this Court did not err by rejecting Kadamovas' request to hold sequential penalty trials for him and defendant Iouri Mikhel. Rather than impeding individualized assessments of culpability during the penalty phase, the joint penalty proceeding that took place allowed the relative culpability of both defendants to be more accurately gauged by the jury. Moreover, Kadamovas cannot show that he was prejudiced as a result of being tried jointly with Mikhel during the penalty phase, and the steps this Court took to insure that each defendant received individual consideration from the jury evicerated any issues that arose as a result of holding a joint penalty trial.

2

II.

ARGUMENT

A.    THIS COURT ACTED WELL WITHIN ITS DISCRETION WHEN IT DID NOT HALT THE PENALTY PHASE TRIAL FOR SEVERAL WEEKS AT A TIME NEAR ITS COMPLETION SO DEFENDANT KADAMOVAS COULD SECURE THE PRESENCE OF WITNESSES HE MADE NO DILIGENT EFFORT TO HAVE APPEAR FOR TRIAL

1.    The Facts Surrounding Kadamovas' Purported Need for a Continuance

Defendant Kadamovas was arrested in the instant case on February 19, 2002.  In June 2002, upon the filing of charges that made Kadamovas eligible for the death penalty, he was provided with the assistance of capital counsel, attorney Richard Lasting. On August 3, 2004, the government filed its Notice of Intent to Seek the Death Penalty as to defendant Kadamovas.

The trial in this case began with jury selection on July 11, 2006.  On December 14, 2006, Kadamovas rested his defense case, and a two week holiday recess of the case began.  At that time, the Court informed the parties that the closing arguments in the guilt phase of the case could commence as soon as January 3, 2007, when the parties returned from this recess.

On January 17, 2007, the jury returned guilty verdicts as to each count alleged against both defendants, including those counts that made both eligible for the death penalty.  At that time, the Court informed the parties that the penalty phase of the trial would begin on January 24, 2007.

On January 19, 2007, Mr. Lasting, counsel for defendant Kadamovas, for the first time, asked for the government's assistance in obtaining visas for three of Kadamovas' relatives who he abandoned in Lithuania years ago -- Kadamovas' wife, his

3

sister, and his son -- to allow them to travel to the United States for the trial. (See Declaration of Special Agent Louis Perez at ¶ 2). Special Agent Louis Perez advised Mr. Lasting the next day that these individuals would have to make an appointment to come to the United States Embassy in Lithuania to start the process involved in applying for visas to travel to the United States. (Id.). Special Agent Perez further advised Mr. Lasting that there would be a charge for processing the visas. (Id.).[1]

Four days later, on January 24, 2007, counsel for Kadamovas informed Special Agent Perez that Kadamovas' family lacked the funds to pay for the visas and that he would have to wire transfer these funds to them. (Id. at ¶ 3). Special Agent Perez informed Mr. Lasting that these family members needed to put in their visa applications immediately, and he informed him that money for the visas would not be due until the visas were issued. (Id.). Finally, Special Agent Perez encouraged counsel for Kadamovas to contact him immediately if he ran into any problems with this process. (Id.).

On January 25, 2007, Special Agent Perez asked Mr. Lasting if Kadamovas' family members had applied for their visas yet. (Id. at ¶ 4). Mr. Lasting told Special Agent Perez that they had not, but that he would wire them the money for the visas and advise the family to apply for the visas. (Id.).

The witnesses from Lithuania who defendant Kadamovas wished

---

[1] On January 19, 2007, Special Agent Perez forward the names and information concerning Kadamovas' family members to an FBI Legal Attache covering the territory of Lithuania so he could inform the United States Consulate in Lithuania of the situation and attempt to expedite the process of obtaining visas for defendant Kadamovas' family members. (Id. at ¶ 2).

4

to come to the United States to testify did not apply for visas to travel to the United States until February 5, 2007, two and one-half weeks after they were advised of the process that would be required before they could travel to the United States and one day before defendant Kadamovas ultimately started his penalty phase presentation. (Id. at ¶ 5). Not surprisingly, this did not afford enough time to conduct the background checks that were required to issue the required visas and their applications to travel to the United States were denied as a result. (Id.).

Kadamovas' family members in Lithuania were well aware even before this trial began of the procedures necessary to apply for a visa to the United States and the difficulty in obtaining such a visa. Kadamovas' wife, Jurate Kadamoviene, has applied for visas twice in the past to travel to the United States, and she has been denied permission to travel on both of these occasions. (Id. at ¶ 6).

Finally, there were ways for Kadamovas to provide the jury with information concerning his family, or even testimony from his family members, without the necessity of them traveling to the United States. This Court advised the parties that it was willing to permit overseas witnesses to testify via videoconference.[2] Furthermore, Kadamovas had a "social history" expert he had retained, Dr. Olga Tuller, who had spoken to Kadamovas' family members and was available to provide the jury with the information they had provided to her. At the end of the

---

[2] Special Agent Perez discussed the possibility of having these family members testify via videoconference with Mr. Lasting. (Id. at ¶ 7). Mr. Lasting informed Special Perez he was not going to do this. (Id.).

5

day, however, Kadamovas elected not to attempt to secure the testimony of his family members via videoconference or to call Dr. Tuller as a witness.

> 2. This Court Acted Well Within Its Discretion When It Denied The Continuance Requested By Kadamovas Near the Conclusion of The Penalty Phase of the Trial

A trial court enjoys broad discretion in ruling on a motion for a continuance, and such discretion is only limited where a refusal to grant a continuance infringes upon a constitutional right. See, e.g., Morris v. Slappy, 461 U.S. 1, 11-12 (1983); United States v. Garrett, 179 F.3d 1143, 1144-45 (9th Cir. 1999) (en banc). Accordingly, "[o]nly an unreasoning and arbitrary 'insistence upon expeditiousness in the face of a justifiable request for delay.'" rises to the level of a constitutional violation." Morris, 461 U.S. at 11-12 (quoting Ungar v. Sarafite, 376 U.S. 575, 589 (1964)).

The Ninth Circuit has recognized that four factors should guide the case-specific issue of whether a requested continuance should be granted: (1) the diligence exercised to avoid the need for the continuance; (2) whether the continuance would have satisfied the purported need for the continuance; (3) the inconvenience the continuance would have caused; and (4) the extent the defendant was harmed by the denial of the requested continuance. United States v. Zamora-Hernandez, 222 F.3d 1046, 1049 (9th Cir. 2000). At the time of his requested continuance, defendant Kadamovas did not address a single one of these factors, let alone make any showing they favored granting him a continuance. Accordingly, this Court properly denied Kadamovas' factually and legally deficient request to halt the penalty phase

and continue it for a number of weeks.

In light of the facts described above, there was little, if any, diligence accompanying the efforts to secure the presence of these purported witnesses at trial. Although by the time the penalty phase of this trial began this case had been pending for almost five years, the first time the government was ask to assist in the process of securing visas for Kadamovas' family members was on January 19, 2007. Moreover, Kadamovas' family members, who were well aware of the procedures involved in obtaining visas to travel to the United States, did not even start the process of apply for visas until February 5, 2007, weeks after the penalty phase of the trial began. In light of these facts, it is hard to see how there was a serious effort to secure the presence of these individuals at trial.

The lack of value that Kadamovas saw to the testimony of the family members he abandoned years ago in Lithuania is not only evident by the lack of diligence accompanying the efforts to secure their travel to the United States, it is also evident by the lack of effort that was made to put evidence concerning these individuals before the jury in any format. Although the Court informed counsel that it would allow overseas witnesses for the defense to testify via videoconference, Kadamovas made no effort to secure the testimony of these witnesses through this means. Moreover, Kadamovas had the ability to put information concerning the family he abandoned in Lithuania through a "social history" expert he had retained, Dr. Olga Tuller. Similar to the "social history" experts retained by defendant Mikhel, Dr. Tuller had met with the family members defendant Kadamovas abandoned in

7

Lithuania and could have provided testimony concerning them. However, Kadamovas made an apparently strategic choice not to call Dr. Tuller at trial to provide the information she had learned concerning Kadamovas' family.

Second, there is nothing to indicate that a continuance would have ultimately secured the presence of Kadamovas' overseas family members at the trial.  The consulate had twice before denied applications from the wife Kadamovas abandoned in Lithuania to travel to the United States because the Consulate was not satisfied that she would return to Lithuania.  Those same concerns apparently existed when her application, as well as those of Kadamovas' son and sister, were denied on February 5, 2007.  In light of the failure of these witnesses to secure arrangements to travel to the United States when they had years to prepare to do so, it is hard to see how they would have met with any greater success in this endeavor if provided with even more time.

Third, continuing the ongoing penalty phase trial for several weeks, as suggested by Kadamovas, so a further effort could be made to accomplish something that apparently could not be accomplished despite the years that were allowed to prepare this case for trial, would have caused a tremendous inconvenience to the Court, all counsel, and the jury.  When defendant Kadamovas made his request for a continuance, the penalty phase of the trial had already been ongoing for two weeks and was days away from concluding.  Moreover, by February 6, 2007, the date of Kadamovas' requested continuance, the jury in this case had already been impaneled for over six months, long past when the

8

jurors had been advised the trial would conclude. Halting the trial for several weeks time when its conclusion was days away would have been patently unfair to the jury and all others involved in this process.

Finally, at the time Kadamovas filed his belated continuance motion, he made no specific showing concerning how he would be prejudiced if the Court denied the motion. Kadamovas never provided the Court or the government with an offer of proof concerning the testimony his three overseas witnesses could provide. Indeed, apart from the notes of Dr. Tuller referenced below, it does not appear that statements made by these witnesses concerning their prospective testimony have ever been memorialized in any form that could be presented to the government or the Court. Since the defense could not even proffer what these individuals would testify to at trial at the time of Kadamovas' belated continuance motion, it is difficult to see how this Court could have concluded that Kadamovas was prejudiced by the denial of his continuance motion based on the record this Court had before it when this motion was raised.

In fact, the lack of diligence that Kadamovas' overseas witnesses displayed in arranging to travel to the United States for trial is reflective of the fact that their appearance at trial would have likely proven unhelpful for the defense, as there are many aspects of Kadamovas' personal life that would not have portrayed him in a positive light to the jury. Indeed, had the witnesses at issue testified at trial the government was prepared to present evidence that (1) Kadamovas experienced a

9

relatively privileged upbringing in Lithuania; (2) Kadamovas coldly abandoned his family in Lithuania a number of years ago when he moved to the United States; (3) Kadamovas engaged in numerous extramarital affairs with other woman, including two he fathered children with; (4) Kadamovas was abusive toward woman; and (5) Kadamovas had a violent temper and a severe drinking problem.

First, it is unlikely that any testimony his wife, Jurate, could have provided on defendant's behalf would have been very persuasive to the jury given the apparent ongoing unhappiness of their marriage and relationship.  Not only had Kadamovas started a new family with Natalya Solovyeva at the time of the events in question in this case, Kadamovas was very clear that he no longer loved Jurate and had intended to divorce her formally around the time of his arrest in this case.

Defendant Kadamovas told Dr. Tuller that he married Jurate because it seemed that everyone was getting married at the time.[3] He also told Dr. Tuller that he did not know if he ever loved her.  He also told Dr. Tuller that he had not loved Jurate or "anyone else in his life," apparently in a romantic sense.  He said he cannot understand how "real life" love, versus the love that is portrayed in books, compare to each other because he has never experienced such strong love.  He told Dr. Tuller that love "is not consistent enough to be sustained," and that he does not

---

[3] Defendant Kadamovas spoke extensively to Dr. Tuller about the family he abandoned in Lithuania.  Defense counsel, in compliance with discovery orders by the court, produced to the government notes taken by Dr. Tuller of her interviews with defendant.

10

think that love can exist for more than 10 to 15 years.

Defendant Kadamovas told Dr. Tuller that Jurate was a good housewife, and he "liked her for her ability to cook and look after the house." Jurate apparently developed a problem with alcohol abuse sometime after she and Kadamovas were married, a problem she blamed on Kadamovas. Kadamovas told Dr. Tuller that he might have pursued the relationship with Natalya Solovyeva to ensure that he would not return to Jurate. Kadamovas also told Dr. Tuller that around the time of his arrest he had planned to divorce Jurate and try to bring his son Gabriel to the United States. Svetlana, Kadamovas' sister, also spoke to Dr. Tuller when Dr. Tuller visited Lithuania. She told Dr. Tuller that it was fine with Jurate if Kadamovas engaged in extramarital affairs when he traveled, as long as he did not have a "relationship."

Likewise, although it is clear that defendant Kadamovas loved his son, Gabriel, he had spent very little time with Gabriel during his formative years. Defendant Kadamovas told Dr. Tuller that Gabriel was a planned child. He came at a time when everyone seemed to also be having sons. Kadamovas said he did not want so much a "parental" relationship with his son, as much as to be his friend. Gabriel, who was born in June of 1991, was about six or seven years of age when Kadamovas left Jurate and Gabriel behind in Lithuania. According to Svetlana, following Kadamovas' arrest in this case, Gabriel learned that Kadamovas had another child in the United States with Natalya Solovyeva,

11

and he was devastated.[4]

In light of all these facts, the lack of diligence that Kadamovas displayed in obtaining the presence of these witnesses is readily understandable, as their absence from trial appears to be as much a strategic choice as anything else. Regardless of whether this is the case or not, defendant Kadamovas failed to make any of the required showings justifying the continuance he sought when he sought this continuance from this Court.

B.    THE JURY WAS NOT OBLIGATED TO FIND ANY OF THE MITIGATING FACTORS KADAMOVAS PROFFERED AT TRIAL AND WAS NOT REQUIRED TO GIVE ANY WEIGHT TO THE MITIGATING EVIDENCE HE PRESENTED

Kadamovas argues that he is entitled to a new penalty phase trial because the jury allegedly committed "misconduct" by purportedly ignoring the Court's instructions and refusing to weigh the aggravating and mitigating factors to determine a proper sentence. At the heart of this argument is Kadamovas' assertion that the jury was required to find that certain mitigating factors existed in this case because the government did not dispute certain facts that supported some of the mitigating factors Mikhel proffered. This argument is completely without merit. The jury was not obligated to make any findings in Kadamovas' favor or to treat any of the evidence he offered as mitigating; and the jury's verdict confirms it followed the

---

[4] Natalya Solovyeva would have also reaffirmed a number of negative aspects of Kadamovas' character in the event he attempted to portray himself as any kind of a loving father and husband. She would have testified that Kadamovas abused alcohol, was physically abusive to her, and was generally a horrible, uncaring father. Her opinions in this regard were corroborated by intercepted wiretap conversations in this case, which revealed an incident  that Kadamovas became extremely intoxicated and physically abusive toward Solovyeva during a party thrown by defendant Mikhel.

12

Court's instructions and weighed the aggravating and mitigating evidence as required. The fact the jury chose to assign no weight to the flimsy mitigation evidence offered by Kadamovas when balancing it against the overwhelming aggravating evidence offered by the government was something that was certainly within the jury's prerogative.

Contrary to Kadamovas' claim, the jury was not required to find any particular facts in his favor, and his challenge to the jury's verdict is improper. The case law is clear on this point. **There is no constitutional or statutory requirement that a jury find a mitigating factor offered by a defendant in a death penalty case, even when it is supported by uncontradicted evidence.** United States v. Higgs, 353 F.3d 281, 327 (4th Cir. 2003) (recognizing that a jury is not required to give mitigating effect or weight to any particular evidence, including evidence that is uncontradicted by the government); United States v. Paul, 217 F.3d 989, 999-1000 (8th Cir. 2000) (same).[5] The Constitution only requires that a jury be allowed to *consider* evidence that is proffered as mitigating evidence, and a defendant does not present a cognizable claim attacking a jury's factual findings absent a showing that there was a reasonable likelihood that the

---

[5] In both Higgs and Paul, the defendants raised one of the precise claims advanced by defendant here -- that their death sentences should be overturned because their respective juries failed to unanimously find as a relevant mitigating factor that co-defendants involved in their charged crimes did not receive the death penalty. Id. These courts concluded that the failure of these defendants' juries to find this mitigating fact did not warrant overturning the defendants' death sentences, recognizing that these defendants only had a right to have their juries consider mitigation, not a right to have their juries make particular findings in their favor. Id.

13

jurors believed themselves *precluded* from considering relevant mitigating evidence proffered by a defendant.  See generally Lockett v. Ohio 438 U.S. 586, 605 (1978) (plurality); see also Boyde v. California, 493 U.S. at 277-78 (recognizing the Constitution merely requires that "a jury be able to consider and give effect to all relevant mitigating evidence offered by [the defendant]"); Raulerson v. Wainwright, 732 F.2d 803, 807 (11th Cir. 1984) (holding that "the Constitution prescribes only that the sentencer hear and consider all the evidence a defendant chooses to offer in mitigation" and that "[t]here is no requirement that the [sentencer] agree with the defendant's view that it is mitigating").  Here, Kadamovas does not suggest that the Court's instructions prevented the jury from giving effect to the evidence he offered during the penalty phase.  Therefore, his quibbles with the jury's findings simply do not state a proper claim for relief from the jury's decision.

Moreover, the jury's conclusions concerning the mitigating factors offered by Kadamovas clearly signaled nothing more than the fact the jury did not believe that the factors offered by the defense were, in fact, mitigating.  The jury clearly had the prerogative to make this decision.

Courts have recognized that there is a two-step inquiry in determining whether proffered mitigating factors exist in a case: (1) whether the proponent has satisfied his burden of establishing the factor as a factual matter; and (2) whether the proffered factor is indeed mitigating.  The Federal Death Penalty Act ("FDPA") recognizes as much, insofar as it defines non-statutory mitigating factors (quite apart from the final weighing

14

process), like those proffered by Kadamovas here, as "factors in the defendant's background, record, or character or any other circumstance of the offense that mitigate against imposition of the death sentence." 18 U.S.C. § 3592(a)(8).[6] Accordingly, a jury's finding, like the findings made by the jury here, that proffered facts offered by a defendant are not, in fact, mitigating raises no legitimate grounds for complaint by a defendant. Although the Supreme Court has stated that the sentencer in a capital case may not "refuse to consider, as a matter of law, any relevant mitigating evidence," Eddings v. Oklahoma, 455 U.S. 104, 113-114 (1982), this does not mean that a sentencer may not decide for itself whether proffered evidence is indeed mitigating as a prerequisite to weighing the evidence as a mitigating factor.

Indeed, in Buchanan v. Angelone, 522 U.S. 269 (1998), the Supreme Court confirmed that a jury may be granted broad discretion to determine whether a proffered fact is mitigating. Specifically, the Court recognized:

> In the selection phase, our cases have established that the sentencer may not be precluded from considering, and may not refuse to consider, any constitutionally

---

[6] Prior to being asked to find purported "mitigating factors" offered by Kadamovas, the jury was given this definition of "mitigating factors" in the jury instructions. See Court's Jury Instruction No. 1. The jury was also advised that "mitigating factors are those that suggest that life in prison without the possibility of release is an appropriate sentence in this case." See Court's Jury Instruction No. 2. Lastly, the jury was advised in Jury Instruction No. 20 that "[a] mitigating factor is a fact about the defendant's life or character, or about the circumstances surrounding the offenses that would suggest, in fairness, that a sentence of death is not the most appropriate punishment, or that a sentence of life without the possibility of release is the most appropriate punishment."

15

relevant mitigating evidence.  However, the State may shape and structure the jury's consideration of mitigation so long as it does not preclude the jury from giving effect to any relevant mitigating evidence. Our consistent concern has been that restrictions on the jury's sentencing determination not preclude the jury from being able to give effect to mitigating evidence.  Thus, in <u>Boyde v. California</u>, 494 U.S. 370, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990), we held that the standard for determining whether jury instructions satisfy these principles was "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." But we have never gone further and held that the state must affirmatively structure in a particular way the manner in which juries consider mitigating evidence. And indeed, our decisions suggest that complete jury discretion is constitutionally permissible.  <u>See</u> <u>Tuilaepa v. [California</u>, 512 U.S. 967,] 978-79, 114 S.Ct. [2630], 2630-2639 [(1994)] (noting that at the selection process, the State is not confined to submitting specific propositional questions to the jury and may indeed allow the jury unbridled discretion); [Zant v.] Stephens, [462 U.S. 862] 875, 103 S.Ct. [2733] 2741-42 [(1983)] (rejecting the argument that a scheme permitting the jury to exercise "unbridled discretion" in determining whether to impose the death penalty after it has found the defendant eligible is unconstitutional, and noting that accepting that argument would require the Court to overrule <u>Gregg v.</u> [Georgia, 428 U.S. 153, 96 S.Ct. 2909 (1976)].

<u>Buchanan</u>, 522 U.S. 276-77 (citations omitted).

Thus, a sentencing jury's decision not to give weight to proffered non-statutory mitigating factors on the ground they are not mitigating is perfectly appropriate and hardly constitutes "misconduct" on the part of the jury.  <u>Johnson v. Wainwright</u>, 778 F.2d 623, 629 (11th Cir. 1985); <u>accord</u> <u>Graham v. Collins</u>, 506 U.S. 461, 490 (1993) (Thomas, J., concurring) ("By requiring that sentencers be allowed to "consider" all "relevant" mitigating circumstances, we cannot mean that the decision whether to impose the death penalty must be based upon all of the defendant's evidence, or that such evidence must be considered the way the

16

defendant wishes"). The mere fact that defense counsel identifies a series of circumstances that defense counsel deems mitigating, and the government does not dispute that the proffered propositions are <u>factually</u> supported in some respects, hardly dictates to the jury that it must, as Kadamovas argues, give any mitigating weight to those factors and balance them against aggravating evidence proven by the government.

Moreover, courts that have reviewed special jury verdicts returned in capital cases have recognized that, regardless of how a jury votes as to particular mitigating factors, a court must look to the "the bottom line" of how the jury reached its verdict to determine if the jury reached its verdict in an appropriate manner. Specifically, courts reviewing jury votes concerning mitigating factors, where the logic of such votes is questionable, have looked to "the bottom line" decision of whether the jury ultimately concluded, in unanimous fashion, that the aggravating factors presented sufficiently outweighed the mitigating factors presented. In cases where the jury's verdict reflected that this "bottom line" decision was made, courts have rejected challenges to death verdicts, even in cases where juries' votes concerning mitigating factors indicated confusion as to whether a mitigating factor was found to exist or not. <u>See</u> <u>United States v. Johnson</u>, 223 F.3d 665, 676 (7th Cir. 2000) (upholding a death verdict where the import of the "bottom line" result reached by the jury was clear from its ultimate conclusion that the death penalty was justified); <u>Wainwright v. Lockhart</u>, 80 F.3d 1226, 1231-32 (8th Cir. 1996) (same).

Here, the "bottom line" reflected in the jury's verdict is

that the jury believed the aggravating evidence offered by the government substantially outweighed the mitigating evidence presented by Kadamovas.  It was completely within the jury's prerogative to make this decision, and it is hard to look at the evidence in this case objectively and conclude that the jury arbitrarily reached a decision that was unsupported by the evidence or that the jury committed any sort of "misconduct" in its decisionmaking.  Defendant Kadamovas received the benefit of a conscientious "death-qualified" jury that was properly instructed as to its duties, the able assistance of counsel at trial, and an opportunity to have the jury consider the weak mitigation evidence he could muster in the face of an overwhelming amount of aggravating evidence presented by the government.  In light of these facts, Kadamovas has no legitimate basis to complain about the jury's findings.

C.   DEFENDANT KADAMOVAS WAS NOT DENIED DUE PROCESS BY THIS COURT'S DENIAL OF HIS REQUEST FOR SEQUENTIAL PENALTY PHASE HEARINGS

Defendant Kadamovas also argues that this Court erred because it was obligated to grant him a separate penalty phase hearing from that of defendant Mikhel and that he was somehow prejudiced because this Court did not order sequential penalty trials in this case.  The notion that a Court is legally required to sever penalty phase hearings in cases involving co-defendants simultaneously facing the death penalty is plainly incorrect, and Kadamovas was not unfairly prejudiced when his penalty trial was joined with that of his co-defendant.

The law of severance in the Ninth Circuit is well defined. Co-defendants jointly charged are, <u>prima facie</u>, to be jointly

18

tried.  United States v. Mariscal, 939 F.2d 884, 885 (9th Cir. 1991).  This strong preference reflects several principles, as the Supreme Court has forcefully stated:

> It would impair both the efficiency and the fairness of the criminal justice system to require . . . that prosecutors bring separate proceedings, presenting the same evidence again and again, requiring victims and witnesses to repeat the inconvenience (and sometimes trauma) of testifying, and randomly favoring the last-tried defendants who have the advantage of knowing the prosecution's case beforehand.  Joint trials generally serve the interests of justice by avoiding inconsistent verdicts and enabling more accurate assessment of relative culpability – advantages which sometimes operate to the defendant's benefit.  Even apart from these tactical considerations, joint trials generally serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts.

Richardson v. Marsh, 481 U.S. 200, 210 (1987).

This presumption in favor of a joint trial "expedites the administration of justice, reduces the congestion of trial dockets, conserves judicial time, lessens the burden upon citizens to sacrifice time and money to serve on juries, and avoids the necessity of recalling witnesses who would otherwise be called upon to testify only once."  United States v. Gaines, 563 F.2d 1352, 1355 (9th Cir. 1977).

When a motion to sever is brought under Federal Rule of Criminal Procedure 14, the defendant bears the "heavy burden" of showing prejudice from a joint trial.  United States v. Davis, 663 F.2d 824, 832 (9th Cir.), rev'd on other grounds, 714 F.2d 896 (9th Cir. 1983) (severance is proper only when defendant carries the "difficult burden of demonstrating prejudice").  However, the test for severance is not simply prejudice.  The Ninth Circuit in United States v. Vaccaro, 816 F.2d 443, 448 (9th Cir. 1987), recognized that "[s]ince some prejudice is inherent

19

in any joinder of defendants, if only 'some' prejudice is all that need be shown, few, if any, multiple defendant trials could be held."  Moreover, defendants are not entitled to severance merely because they may have a better chance of a favorable result in a separate proceeding.  Zafiro v. United States, 506 U.S. 534, 540 (1993); see United States v. Hernandez, 952 F.2d 1110, 1116 (9th Cir. 1991); see also United States v. Tootick, 952 F.2d 1078, 1080 (9th Cir. 1991) ("Merely showing that a comparative advantage would result from separate trials will not satisfy this burden.").  Rather,

> [W]hen defendants properly have been joined under Rule 8(b), a district court should grant a severance under Rule 14 only if there is a **serious risk** that a joint trial would **compromise** a specific trial right of one of the defendants, or **prevent** the jury from making a reliable judgment about guilt or innocence.

Zafiro 506 U.S. at 539 (emphasis added); see also Vaccaro, 816 F.2d at 449 (the prejudice must violate a defendant's fair trial rights:  i.e., unavailability of full cross-examination, lack of opportunity to present an individual defense, denial of the right of confrontation, lack of separate counsel among defendants with conflicting interests, or failure to instruct the jury properly on the admissibility of evidence as to each defendant).

The party bearing the burden must establish that joinder was "so manifestly prejudicial that it outweighed the dominant concern of judicial economy and compelled exercise of the court's discretion to sever."  United States v. Disla, 805 F.2d 1340, 1353 (9th Cir. 1986).  A defendant seeking reversal of a decision denying severance has the burden of proving "such 'clear,' 'manifest,' or 'undue' prejudice that the accused is denied a

20

fair trial". See United States v. Cuozzo, 962 F.2d 945, 949 (9th Cir. 1992). Moreover, even in those rare instances when a defendant establishes a "high" risk of prejudice, "less drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice." Zafiro, 506 U.S. at 539.

Although capital cases are subject to constitutional scrutiny, motions for severance of capital sentencing hearings are generally subject to the same principles that apply to severance of guilt/innocence trials. "The same considerations of efficiency and fairness to the Government (and possibly the accused as well) that militate in favor of joint trials of jointly-charged defendants in the guilt phase, see Lockhart v. McCree, 476 U.S. 162, 181 (1986); Richardson v. Marsh, 481 U.S. 200, 210 (1987), must remain generally in play at the penalty phase." United States v. Tipton, 90 F.3d 861, 892-93 (4th Cir. 1996); see also United States v. Taylor, 293 F. Supp. 2d 884 (N.D. Ind. 2003) (the "mere fact that a case may result in the death penalty does not require severance in the guilt or penalty phase of trial."), citing United States v. Bernard, 299 F.3d 467 (5th Cir. 2002); United States v. Causey, 185 F.3d 407 (5th Cir. 1999), and Tipton, 90 F.3d at 892-93.

In Tipton, the court held that three jointly tried defendants were not entitled to severance of the penalty phase of a capital murder trial and specifically concluded that appropriate jury instructions would effectively safeguard the right to an individualized assessment at a joint capital sentencing hearing under most circumstances. Id. at 892; see also United States v. Bernard, 299 F.3d 467, 475-76 (5th Cir.

21

2002) (upholding denial of severance in capital case and finding defendant's claim that co-defendant's introduction of mitigating evidence for which defendant had no comparable evidence did not establish prejudice warranting severance where district court had instructed jury to consider each defendant's punishment separately); United States v. Rivera, 363 F. Supp. 2d 814 (E.D. Va. 2005)("the threat posed to individualized consideration will best be addressed by a joint penalty phase governed by the Court's limiting instructions and careful application of the appropriate rules of evidence").

Ignoring the foregoing authority, Kadamovas argues, in a completely conclusory fashion, that this Court's refusal to grant sequential penalty phases resulted in the jury returning a reliable verdict.  In fact, a severence in the penalty phase of this trial would have impaired both judicial efficiency and fairness.  Rather than impeding individualized assessments of culpability, the joint penalty proceeding allowed the relative culpability of two related defendants to be more accurately assessed by the jury.  See Richardson v. Marsh, 481 U.S. at 210. In contrast, sequential penalty phases of the trial would have imposed undue burdens on the prosecution, witnesses, the court, and scarce judicial resources.  Severance would have also given the last tried defendant an unfair advantage.  Moreover, the purportedly antagonistic defenses between Kadamovas and Mikhel did not justify severance as a matter of law.

To this end, Kadamovas fails in his motion to establish that he was prejudiced by being tried jointly in the penalty phase of the trial with Mikhel.  Although he claims that he was

22

somehow prejudiced by defendant Mikhel's behavior in the penalty phase, such as his decision to absent himself from the trial, he provides no explanation how this is so.  Indeed, had this jury ever doubted that Kadamovas crimes warranted the death penalty, one would have suspected that defendant Kadamovas would have benefitted from any comparison between the way he conducted himself during the trial as opposed to how Mikhel conducted himself during the trial, so it difficult to see how defendant Mikhel's actions had any negative effect on him.

In addition, this Court took ample steps to insure that both defendants received individualized consideration from the jury during the penalty phase of the trial.  The Court instructed the jury that it was required to give such individualized consideration as to each defendant when making its sentencing decision, and to emphasize this point, the jury was required to fill out separate special verdict forms as to each defendant when reaching its verdicts in the penalty phase.

The jury is presumed to have properly followed the Court's instructions in this regard.  The fact that the jury concluded that both defendants should receive the death penalty hardly means that the jury ignored these instructions.  It means no more than the jury believed both defendants were entitled to the same punishment as both were equally culpable participants in the heinous crimes charged in this case.[7]

---

[7] Without further explanation, defendant Kadamovas states that he joins in the arguments raised in defendant Mikhel's motion for a new penalty phase trial.  For the reasons set forth in the government's opposition to defendant Mikhel's motion, each of the arguments defendant Kadamovas is joining is without merit.

23

III.

CONCLUSION

For each of the foregoing reasons, Kadamovas' motion for a new trial should be denied.

24