## United States District Court
## Central District of California

UNITED STATES OF AMERICA vs.

Docket No. __CR-02-0220-(B)-DT__

Defendant __Jurijus Kadamovas__

akas: _____

Social Security No. N  O  N  E
(Last 4 digits)

### JUDGMENT AND PROBATION/COMMITMENT ORDER

In the presence of the attorney for the government, the defendant appeared in person on this date.

| MONTH | DAY | YEAR |
|---|---|---|
| 03 | 12 | 07 |

**COUNSEL** — [X] **WITH COUNSEL** __Sonia Chahin, appointed counsel /Richard Lasting, appointed counsel__
(Name of Counsel)

**PLEA** — [ ] GUILTY, and the court being satisfied that there is a factual basis for the plea. [ ] **NOLO CONTENDERE** [ ] **NOT GUILTY**

**FINDING** — There being a finding/verdict of [X] GUILTY, defendant has been convicted as charged of the offense(s) of: Conspiracy to Take Hostages Resulting in Death; Hostage Taking Resulting in Death; Conspiracy to Launder Monetary Instruments; Conspiracy to Escape from Custody and Criminal Forfeiture in violation of Title 18 USC 1203; 1956(h); 371; 981(a)(1)(C), 21USC 853 and 28 USC 2461(c) as charged in the 7 Count Second Superseding Indictment.

**JUDGMENT AND PROB/ COMM ORDER** — The Court asked whether defendant had anything to say why judgment should not be pronounced. Because no sufficient cause to the contrary was shown, or appeared to the Court, the Court adjudged the defendant guilty as charged and convicted and ordered that: Pursuant to the Sentencing Reform Act of 1984, it is the judgment of the Court that the defendant is hereby committed to the custody of the Bureau of Prisons to be imprisoned for a term of:

Guilt phase verdict as to the defendant Jurijus Kadamovas was unanimously delivered by the jury and published, filed and recorded by the Court on January 17, 2007.

Penalty phase verdict as to the defendant Jurijus Kadamovas was unanimously delivered by the jury and published, filed and recorded by the Court on February 13, 2007.

Forfeiture phase verdict as defendant Jurijus Kadamovas was unanimously delivered by the jury and published, filed and recorded by the Court on February 21, 2007.

Pursuant to 18 USC 3593(c) which states: "Nothwithstanding Rule 32 of the F.R.C.P., when a defendant is found guilty or pleads to an offense under Section 3592, no pre-sentence report shall be prepared." The Court, therefore, pronounces sentence as follows:

It is ordered that the defendant Jurijus Kadamovas shall pay to the United States a special assessment of $700 ($100 per count), which is due immediately pursuant to statute. Pursuant to section 5E.1 of the Guidelines, all fines are waived as it is found that the defendant does not have the ability to pay a fine since all of his assets have been forfeited to the United States and the Court is concurrently entering a monetary judgment of forfeiture against said defendant.

Pursuant to Section 18 USC 3591 et seq and the Sentencing Reform Act of 1984, it is the judgment of the Court that the defendant Jurijus Kadamovas, is hereby committed on Count 5 and Count 6 of the Second Superseding Indictment to the custody of the Bureau of Prisons to be imprisoned for a term of two hundred and forty (240) months. This term consists of two hundred and forty (240) months on count 5 and sixty (60) months on Count 6 to be served concurrently with each other and concurrently to any other sentence imposed by this Court on the remaining counts, specifically, counts 1,2,3, & 4. In effect, the sentences imposed on counts 5 & 6 are merged by operation of law with the sentences imposed on counts 1,2,3, & 4 hereunder.

**CR-02-0220-(B)-DT: UNITED STATES OF AMERICA -V- 2) JURIJUS KADAMOVAS**
**JUDGMENT AND COMMITMENT ORDER**
**MARCH 12, 2007**

With regard to counts 1,2,3 & 4, the Court finds that the jury has unanimously made the requisite special findings required by law with respect to 18 USC 3592, 3593(d), 3593(e), and 3593(f).

Therefore, the Court imposes the following sentence pursuant to 18 USC 3594. Upon unanimous recommendation under 18 USC 3593(e) that the defendant Jurijus Kadamovas should be sentenced to death, the Court hereby sentences you to the ultimate penalty of death. Specifically, pursuant to the Federal Death Penalty Act of 1994, 18 USC 3591-3596 and the Special Findings of the jury, returned on February 13, 2007, and the jury's unanimous vote recommending that you Jurijus Kadamovas shall be sentenced to death on Counts 1,2,3, & 4 of the Second Superseding Indictment, it is the judgment of the Court that Jurijus Kadamovas is sentenced to death separately on Counts 1,2,3 & 4 of the Second Superseding Indictment. You shall, pursuant to 18 USC 3593, be committed to the custody of the Attorney General of the United States until exhaustion of the procedures for appeal of the judgment of conviction and for review of the sentence in accordance with 18 USC 3595. When the sentence is to be implemented, the Attorney General shall release you to the custody of the United States Marshal, who shall supervise implementation of the sentence in the manner prescribed by the law of the state (California) in which the sentence is imposed. If the state of California does not provide for the implementation of a sentence of death, the Court shall designate another state, the law of which does provide for the implementation of a sentence of death, and the sentence shall be implemented in the latter state in the manner prescribed by such law. Pursuant to 18 USC 981(a)(1)(C), 21 USC 853 and 28 USC 2461(c), and count 7 of the Second Superseding Indictment, defendant shall forfeit to the United States all right, title, and interest in any and all property, real or personal, which constitutes or is derived from proceeds traceable to the violations of 18 USC 1203 (i.e. counts 1 through 4) for which defendant has been convicted. Moreover, the jury by special verdict, has found that a total of $1,203,628.00 constitutes or is derived from proceeds traceable to the violations of 18 USC 1203 (i.e., counts 1 through 4) for which defendant has been convicted. Pursuant to that special verdict, as reduced by the net amount already forfeited in related civil and administrative forfeiture proceedings, a personal money judgment in the amount of $1,039,716.46 has been contemporaneously entered against defendant. With regard to Count 7, the criminal forfeiture count, the Court enters judgment against you, as stated herein, individually, jointly and severally in the total sum of $1,203,628.00. Finally the defendant is to cooperate with the B.O.P authorities and personnel in the collection of a DNA sample from defendant's person. Defendant is advised of his appeal rights and the Court instructs defendant's counsel to file a notice of appeal. Further, a copy of the transcript of this proceeding is to accompany this judgment and commitment order.

MARCH 13, 2007
_____
Date

_____
U. S. District Judge

It is ordered that the Clerk deliver a copy of this Judgment and Probation/Commitment Order to the U.S. Marshal or other qualified officer.

Sherri R. Carter, Clerk

3-13-07
_____
Filed Date

By _____
Deputy Clerk

1082

CR-02-0220-(B)-DT:  UNITED STATES OF AMERICA -V- 2) JURIJUS KADAMOVAS
JUDGMENT AND COMMITMENT ORDER
MARCH 12, 2007

Defendant delivered on _____ to _____

Defendant noted on appeal on _____

Defendant released on _____

Mandate issued on _____

Defendant's appeal determined on _____

Defendant delivered on _____ to _____

at _____

the institution designated by the Bureau of Prisons, with a certified copy of the within Judgment and Commitment.

United States Marshal

_____          By _____
Date                                                       Deputy Marshal

## CERTIFICATE

I hereby attest and certify this date that the foregoing document is a full, true and correct copy of the original on file in my office, and in my legal custody.

Clerk, U.S. District Court

_____          By _____
Filed Date                                                 Deputy Clerk

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO:  CR-02-220(B)-DT |
| | ) | |
| Plaintiff, | ) | CRIMINAL |
| | ) | |
| vs. | ) | Los Angeles, California |
| | ) | |
| JURIJUS KADAMOVAS, | ) | Monday, March 12, 2007 |
| | ) | (8:49 a.m. to 10:16 a.m.) |
| Defendant. | ) | |

SENTENCING
ON JURY VERDICT

BEFORE THE HONORABLE DICKRAN TEVRIZIAN,
UNITED STATES DISTRICT JUDGE

EXCEPTIONAL REPORTING SERVICES, INC
14493 SOUTH PADRE ISLAND DRIVE
SUITE A-400
CORPUS CHRISTI, TX 78418-5940
361 949-2988

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO:  CR-02-220(B)-DT |
| | ) | |
| Plaintiff, | ) | CRIMINAL |
| | ) | |
| vs. | ) | Los Angeles, California |
| | ) | |
| JURIJUS KADAMOVAS, | ) | Monday, March 12, 2007 |
| | ) | (8:49 a.m. to 10:16 a.m.) |
| Defendant. | ) | |

SENTENCING
ON JURY VERDICT

BEFORE THE HONORABLE DICKRAN TEVRIZIAN,
UNITED STATES DISTRICT JUDGE

Appearances:            See next page

Courtroom Deputy:       Debra L. O'Neill

Court Recorder:         Tanya Durant

Transcribed by:         Exceptional Reporting Services, Inc.
                        14493 S. Padre Island Drive
                        Suite A-400
                        Corpus Christi, TX 78418-5940
                        361 949-2988

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

2

APPEARANCES FOR:


The Government:              GEORGE S. CARDONA, ESQ
                            Acting United States Attorney
                            THOMAS P. O'BRIEN, ESQ
                            Assistant United States Attorney
                            Chief, Criminal Division
                            SUSAN DeWITT, ESQ
                            KIM MEYER, ESQ
                            ROBERT DUGDALE, ESQ
                            Assistant United States Attorney
                            312 North Spring Street
                            Los Angeles, CA 90012

Jurijus Kadamovas:          SONIA E. CHAHIN, ESQ
                            2222 Foothill Blvd., Suite E-278
                            La Canada, CA 91011

                            RICHARD P. LASTING, ESQ
                            1717 Fourth Street, Third Floor
                            Santa Monica, CA 90401

Russian Interpreter:        Alex Levoff

3

<u>Los Angeles, CA; Monday, March 12, 2007; 8:49 a.m.</u>

(Interpreter Utilized for Translation)

(Call to Order)

THE CLERK:  Please remain seated and come to order.

THE COURT:  All right, once again, it appears that we've got the technical problems solved.

Record should indicate that defendant Kadamovas is present; all counsel are present.

All right, with regard to today's date.  This is the time set for the Motion for New Trial as well as sentencing in this matter.

Ms. Chahin, Mr. Lasting, do you know of any legal cause or reason why the Court should not proceed at this point?

MR. LASTING:  No, your Honor.

THE COURT:  All right.  Mr. Kadamovas filed two motions for new trial; one that was filed on the 30th of January, 2007, dealing with the guilt phase; and then there was another filing made on February the 20th, 2007, which was entitled, 'A Supplemental Filing in Support of a New Trial and/or Alternatively Requesting a New Penalty Trial and Joinder in Motion of Co-Defendant Mikhel for a New Penalty Phase Trial Pursuant to Federal Rule of Criminal Procedure, Rule 33.

Let's take up the motions that were filed by Mr. Kadamovas.

In addition, for the record, Mr. Kadamovas did in

4

fact file as of today a reply to the Government's Opposition to Supplemental Motion for New Trial, so I'll instruct the Clerk to process that document.

With regard to Mr. Kadamovas's Motion for New Trial, he claims that he was denied a fair trial based upon a prejudicial joinder with defendant Mikhel. Specifically, Mr. Mikhel rested and was later permitted to testify after defendant Kadamovas had completed presentation of his, that is Kadamovas's, case.

Defendant Mikhel, according to Mr. Kadamovas, made numerous, highly prejudicial statements allegedly implicating defendant Kadamovas during Mikhel's testimony even though the testimony was struck and the jury admonished to disregard the testimony based upon Mr. Mikhel's refusal to be cross examined.

The defendant also indicates that he was denied a fair trial because the Court did not order sequential trials for each defendant in the penalty phase.

Mr. Kadamovas also indicates that he was denied a continuance to obtain visas for his family members residing in Lithuania so that they could testify in his penalty phase of the trial.

Mr. Kadamovas also asserts that the jury allegedly failed to follow the Court's Jury Instructions, and, again, the Court failed to order sequential trials for each defendant in the penalty phase.

5

Now, in looking at the law that was cited, the Court is of the opinion that Mr. Kadamovas has failed to meet a heavy burden that he be granted a new trial on extraordinary circumstances.

The Government has filed a brief in which they cite several cases.  *United States versus Pimentel*, 654 Fed.2d 538; *U.S. versus Rush*, 749 Fed.2d 1369; *U.S. versus Graner*, 520 Fed.2d 962; *U.S. versus Marabellis*, 724 Fed.2d 1374, for the proposition that defendant Kadamovas has failed to meet the heavy burden that he must meet in order to be granted the extraordinary remedy of a new trial.

Also, the Government cites additional cases: *U.S. versus Angurin*, 271 Fed.3d 786; *U.S. versus Sherlock*, 962 Fed.2d 1349; *U.S. versus Tootick*, 952 Fed.2d 1078; *U.S. versus Throckmorton*, 87 Fed.3d 1069; *Zaphiro versus U.S.*, 506 U.S. 534, for the proposition that the testimony of Mikhel was not antagonistic to defendant Kadamovas; there was no evidence that the purported statements of Mikhel were irreconcilable and mutually exclusive to defendant Kadamovas; and in any event, all of Mikhel's testimony was struck and the Court admonished the jury accordingly.

Now, in essence, the Government argues that the Court acted well within its discretion in denying defendant Kadamovas's request for a new trial, citing *Morris versus Slappy*, 461 U.S. at 1; *U.S. versus Garrett*, 179 Fed.3d, 1143;

6

*Ungar versus Sarafite*, 376 U.S. 575; *U.S. versus Zamora Hernandez*, 222 Fed.3d 1046.

The Government argues that the jury was not obligated to find any of the mitigating factors defendant Kadamovas presented at the penalty phase to warrant a sentence of life without the possibility of release.  The Government cites there *U.S. versus Higgs*, 353 Fed.3d 281; *U.S. versus Paul*, 217 Fed.3d 989.

The Government also argues that the jury considered but rejected all of Mr. Kadamovas's arguments, and that's all that is required, citing *Boyde versus California*, 493 U.S. 277; *Raulerson versus Wainwright*, 732 Fed.2d 803; *Eddings versus Oklahoma*, 455 U.S. 104, which only requires a jury to consider but not necessarily find the mitigating circumstances.

The Government argues that there is a broad discretion for the jury to determine whether a proffered fact is a mitigating factor and that the jury did not commit any misconduct.

The Government also argues that defendant Kadamovas was not denied due process by the Court's refusal to grant his request for sequential penalty phase trials.  There's no error; there's no prejudice.  The defendants were jointly charged and tried during the guilt phase.  No authority mandating separate penalty phase trials is required, and in fact, the contrary is true, according to the Government citing *U.S. versus Mariscal*,

7

939 Fed.2d 884; *Richardson versus Marsh*, 481 U.S. 200; and *U.S. versus Gaines*, 563 Fed.2d 1352.

The Government argues when defendants have been properly joined under Rule 8(b), a District Court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants or prevent the jury from making a reliable judgment about guilt or innocence.

And here, taking the case as a whole, all of the evidence that was introduced during this trial really was joint evidence. There was no way that this case could have been severed at the guilt phase and/or the penalty phase.

Having said that, Mr. Lasting or Ms. Chahin, which one is going to argue?

MR. LASTING: I am, your Honor.

THE COURT: All right.

MR. LASTING: Your Honor, our positions are set out in the papers that we filed and the reply, so I'm not going to belabor this at any length.

But, initially, I think what confronted Mr. Kadamovas in this trial in terms of the joint trial were the actions of Mr. Mikhel. I think they're somewhat unprecedented, at least in my experience.

We're talking about a situation that occurred here where Mr. Mikhel testified over a period of days. I think he

EXCEPTIONAL REPORTING SERVICES, INC

8

was on the witness stand on his direct examination for three days.  It was testimony that in some sense was marked by disbelief of his own counsel in his examination of Mr. Mikhel. He made comments such as, 'I'm just trying to get through this', and a series of comments in response to either inquiries from the Court or just prefacing questions to Mr. Mikhel which indicated that his counsel didn't want Mr. Mikhel to testify and suggested to the jurors that the testimony was unworthy of belief.

In that regard, Mr. Mikhel did testify in a fashion which completely undercut the defense of Mr. Kadamovas.  He involved Mr. Kadamovas in every crime that was charged in this case while at the same time extricating himself, purportedly, in his testimony.  He brought up crimes that were never ruled to be admissible by this Court, and presented information regarding other murders to this jury and involved Mr. Kadamovas in those crimes.  And then, after his lengthy direct testimony, all of it or a substantial portion of it negative to Mr. Kadamovas, refused to answer a single question of Ms. Chahin so that what he said with regard to Mr. Kadamovas was never tested by cross examination.

It's true that the Court granted our motion to strike his testimony, but the reality is that three days of testimony and the various incriminating statements he made about Mr. Kadamovas were not going to be erased from the jurors'

9

minds.  And I think that became very clear, both in the speed with which the jury returned a verdict of guilt and the speed with which the jury returned the penalty verdict.

Among the things that Mr. Mikhel did in his testimony, in addition to disparaging Mr. Kadamovas and undercutting his defense was, he disparaged the victims in the case.  I think at one point he referred to Nick Kharabadze as a 'leech', and he made other comments which, in the context of these proceedings, could only have infuriated the jury and inflamed them.  And the jurors' ability, any human being's ability to disregard that and wipe it out of their minds is an impossibility.  It's a legal fiction to think that the Court's instructions are going to be followed.

This is not a case where there was an answer or there was a particular response of a witness which the jury was instructed to disregard and which, hopefully, they would be able to disregard.  We're talking about days of testimony here.  And I think as a result of that, that it did infect the proceedings with regard to Mr. Kadamovas, and the reality of what happened here is he was denied due process, he was denied a fair trial, and he was denied individual consideration, both in terms of the trial itself to determine whether he's guilty or not guilty and in the penalty trial.

THE COURT:  Well, one thing that you're forgetting, and that is that the evidence in this case was very, very

10

compelling.  I've never seen a case in which the evidence on the issue of guilt was as thorough a presentation by the Government as I've ever seen.

MR. LASTING:  Your Honor, the Government marshaled a lot of evidence and called a lot of witnesses.  And in terms of Mr. Mikhel, I would agree with the Court that the case was overwhelming.

I think that there is a distinction with Mr. Kadamovas, though, and I don't think there is that overwhelming nature of the case.  It's not a case in which there was a confession.  It's not a case in which there were admissions.  It's a case as to Mr. Kadamovas, particularly in terms of who was involved in the actual murders, in which the Government relies exclusively on the testimony of cooperating witnesses, as they refer to them.

And you have to believe the testimony of Altmanis and Solovyeva and Markovskis to determine that Mr. Kadamovas was involved in killing anybody.

THE COURT:  But all of that testimony was corroborated by physical evidence; physical and scientific evidence.

MR. LASTING:  There is not one piece of physical evidence; there is not one piece of scientific evidence that ties Mr. Kadamovas to the killing of anyone.  There is not any DNA evidence; there is not any evidence which implicates him in

11

physically committing a murder.  There is only the testimony of those individuals; either by Mr. Altmanis's claims as to what he observed or the statements and claims of Mr. Markovskis and Solovyeva as to what they were told.

THE COURT:  What about the photographs and video of Mr. Kadamovas and Mr. Krylov purchasing the cell phones that were used in the tracing that took place up and down the state of California showing the movement up to the New Melonis dam and then back from the New Melonis dam?

MR. LASTING:  Your Honor, I would disagree that the evidence was at all compelling in terms of that video as an argument that was made to the jury, apparently unsuccessfully, but I would dispute that there's any compelling evidence that Mr. Kadamovas bought any telephones.

And even assuming that he did, and I don't mean to accept that by this statement, but even assuming that he did, that doesn't mean that he is physically involved in killing someone.

Mr. Kadamovas, the evidence in this case clearly showed that Mr. Kadamovas was a hard-working individual prior to the time that he met Iouri Mikhel, and that Mr. Mikhel set up a business; Mr. Mikhel financed that business; and Mr. Kadamovas undoubtedly did things at Mr. Mikhel's request and assisted him in various matters that are unrelated to killing people.  And if Mr. Mikhel had asked Mr. Kadamovas, 'Go

12

get me a phone', or 'Go get me a phone card', he's going to do it. He's not going to interrogate him or ask him questions or make Mr. Mikhel explain to him what that's all about.

I would totally disagree with the Court's analysis that, as to Mr. Kadamovas, that the facts of this case were overwhelming. And I think that given what happened, which as I say, in my experience, and I've been doing this a long time, extremely unique to have a witness get on the witness stand and testify, or a co-defendant testify for three days to implicate someone else that he's jointly charged with and then just walk off the stand and refuse to answer any questions, the jury can't forget that. It's impossible.

THE COURT: All right, Mr. Dugdale, you going to argue?

MR. DUGDALE: Yes, your Honor.

MR. LASTING: Excuse me, your Honor, I don't mean -

THE COURT: Okay. I thought you had finished.

MR. LASTING: I was just going to - Do you want to do this sequentially in terms of the trial and then the penalty?

THE COURT: No, do the whole thing.

MR. LASTING: Okay, that's -

THE COURT: That's what I did when I made my analysis.

MR. LASTING: Thank you, your Honor.

With regard to the penalty trial, I think our

13

positions are set forth, again, but just briefly with regard to these issues of the failure to obtain visas for Mr. Kadamovas's family to attend these proceedings and to testify.

It turns out that the visas were denied, and I find that to be something that, in my view, is unconscionable; that the Government, in wanting to obtain a death penalty against someone, then denies visas for critical witnesses for the defense at the penalty trial to come to this country and testify. And the reason they give is the basest of reasons: that their financial situation precludes them getting a visa to enter the United States. And I think that that alone should concern the Court, and it should concern the Court to the extent that the Court should order a new trial, a new penalty trial, so that evidence can be fully presented and that it can be properly considered by the jury.

And that's the other aspect of what happened in this penalty trial is, the jury never considered the mitigation evidence. And I don't disagree that the jurors can reject it and that the jurors can weigh it and, in the balance, the jurors can determine that the aggravating factors sufficiently outweigh the mitigating evidence and then go about reaching their penalty decision. But what the jurors can't do, what they are precluded from doing is what they did in this case, and that is they never even determined whether or not the mitigating factors that were presented by Mr. Kadamovas had

14

been proved to be true by a preponderance of the evidence, and that's what the Court's instructions require them to do.

First you determine 'has this evidence been proved', and then those jurors who find that the evidence has been established by a preponderance of the evidence, weigh it and consider it.

Here, the jurors never got into part two of weighing and considering because they rejected the proof, and that is something which I think bears upon whether or not the jurors properly fulfilled their duties in reaching the very serious decision as to whether somebody was going to be sentenced to death or not.

There is no doubt that Mr. Kadamovas, and I'll just select this one example and not go through every mitigating factor that was selected and presented to this jury, because, unlike Mr. Mikhel, we didn't present a laundry list of 20 factors, and we didn't take one factor and try to break it into four different parts.

But, every single fact that we presented to this jury as mitigation was one, true, and two, proved, I would contend, beyond a reasonable doubt, but it was certainly proved by a preponderance of the evidence. And the simplest example of all is the issue of Mr. Kadamovas not having a prior criminal record. We presented to the jury a document from the government of Lithuania, a certified copy that specified that

15

he had no prior record in Lithuania, and clearly, he has no record in the United States.  So, prior to his arrest here, he had no criminal history.  That is a statutory mitigating factor which, if established, must be considered by the jury.

This jury did not consider it because nobody found it to be proved by a preponderance of the evidence, and that to me is the jury abdicated their responsibilities, their fundamental responsibilities to look at the evidence, decide what is true here, and then what are we going to weigh against the aggravating factors.  They didn't do that.

The penalty proceedings, in terms of the way the jury conducted themselves was completely improper, and for those reasons Mr. Kadamovas is entitled to a new penalty trial.

I appreciate the Court's consideration.  Thank you, your Honor.

THE COURT:  Mr. Dugdale?

MR. LASTING:  Oh, just one other thing, your Honor.

THE COURT:  Yes.

MR. LASTING:  The way the proceedings, the sentencing is being done, if the Court denies our motion for new trial or for a new penalty trial, I understand that Mr. Mikhel's attorneys will be arguing this afternoon, and there are some aspects of their motion that we just joined in, and I'd like to also join in whatever arguments they present on the issues that are jointly available.

16

**MR. DUGDALE:**  Thank you, your Honor.

I'll address all three arguments very briefly, because I think the Government filed very thorough papers on this, and I did not want to repeat our argument.

Starting with the severance, counsel is wrong both as a matter of law and his recitation of some of the facts here, too.  Severance is obviously the exception rather than the rule, and the cases that the Government cites show that even in a case where parties take an adverse position to each other, that doesn't necessarily require severance.  It's only in a case where the conviction of one defendant would necessarily - I'm sorry, the acquittal of one defendant would necessarily lead to the conviction of another defendant that severance is even required or really should even be considered.

In this case here, I think there's been a mischaracterization of what Mr. Mikhel's testimony was about to begin with, but the most important aspect of his testimony is the fact that it was struck by this Court, and this Court instructed the jury on numerous occasions how to deal with that testimony and in fact, really how not to deal with that testimony by not considering it at all.

First about the testimony itself, there were not instances where defendant Mikhel at all directly implicated defendant Kadamovas in the crimes that have been charged in this case.  In fact, his testimony exculpated both himself and

EXCEPTIONAL REPORTING SERVICES, INC

17

Mr. Kadamovas from those crimes. He did not blame him for the murder of Meyer Muscatel; he blamed Ainar Altmanis exclusively for that. He did not blame him for the murder of Ms. Pekler; he claimed that Ms. Pekler was left alive when he and the defendant departed that day. He didn't blame defendant Kadamovas for Umansky's murder; he said he had nothing to do with it, and neither had anything to do with it. He didn't blame him for Ms. Safiev and Mr. Kharabadze's murder either; they were both alive when Mikhel says they were last seen by either him or the defendant. So, there was nothing here as far as finger pointing and blaming defendant Kadamovas exclusively for these crimes and trying to exculpate himself. That's not what the testimony was.

But more importantly is the fact that the Court struck the testimony and instructed the jury when it struck the testimony that it wasn't to consider it at all; repeated that instruction several times; and repeated it again when the jury was finally charged in the case. And it's clear, as the law in the cases cited in the Government's brief, that the jury is presumed to have followed those instructions.

And not only were they given those instructions, but then when they made their guilt determination and their penalty phase determination, they were given separate special jury verdict forms, meaning that the jury had to separately consider both guilt and penalty as to both of these defendants.

18

And when it comes to the penalty phase, it's difficult to see how defendant Mikhel's antics could have possibly prejudiced defendant Kadamovas's rights here. If anything, one would think that defendant Kadamovas would have benefited from how defendant Mikhel acted in several respects, because the jury would be able to distinguish him from defendant Mikhel and how he was acting here.

And defendant Kadamovas, of course, didn't take the stand and not refuse to answer questions. He showed up for trial every day; he showed up for trial every day well dressed in his street clothes. So, if anything, this probably benefited defendant Kadamovas, but it didn't benefit him in the long run because both defendant Kadamovas and defendant Mikhel were equally culpable in this offense, or practically equally culpable, and they were worthy of the same punishment.

And in fact, defendant Kadamovas in many aspects was probably even more worthy of the death penalty for some reasons, including the fact that he brought more of the co-conspirators into the operation than defendant Mikhel did, having recruited Altmanis, having recruited his own wife to participate in this. There are aspects of this that make defendant Kadamovas even worse than defendant Mikhel.

And the Court's analysis about the overwhelming nature of the evidence in this case is dead on right. And I'm not going to repeat it because I don't have two days here; I

19

have 20 minutes according to Judge Otero, basically.

The evidence against the defendant, the tape recording of the victim's voice that was found at defendant Kadamovas's apartment with defendant Kadamovas talking to Mr. Safiev. The footprint found on the Parrot's Ferry Bridge that was defendant's footprint from his gym shoes. I mean, all these things, and the testimony of numerous witnesses that implicate him directly in the hostage-takings and the murders here, it was simply overwhelming, and that, of course, continued with the penalty phase.

The aggravating evidence in this case not only sufficiently outweighed the mitigating evidence, it completely overwhelmed it to such an extent that the jury properly found that none of the mitigating evidence presented by the defense was worthy of any weight at all when related to the weight of the evidence presented by the Government. So, as far as severance is concerned, neither the law nor the facts in this case favored granting the severance.

On the continuance motion, I just want to make one point clear. The defense has not disputed the timeline that the Government put together in its papers, and what that timeline shows is a complete lack of diligence on the part of these witnesses to get here to be here for this trial. They showed up at the American Embassy, your Honor, the day before the defendant was supposed to put together his penalty phase

20

evidence.  The day before.  They showed up, I believe it was on February 5th of 2007, with the expectation that they would be here the next day.  I mean, this is such a lack of diligence it's almost invited error here by the defense.

THE COURT:  There's also the Government's position that Mr. Kadamovas lost touch with his family for many, many years, even before calling them at the last minute for this trial.

MR. DUGDALE:  That is correct, your Honor.  At the end of the day, what the Court has to consider is this four-part test for a continuance that the Government laid out in its papers.

First of all, the diligence exercised.  There was none.  When you show up at the Embassy the day before expecting to travel to the United States from a country like Lithuania, you can't possibly expect that you're going to be given that permission.

And Special Agent Perez went out of his way here, and the Government went out of its way to try to facilitate any arrangements it could make for these witnesses, but when given information at the last minute, when people show up at the last day, it's not going to happen.

And the other thing to make very clear here is that nobody associated with this case had any role at all in the decision to deny the visas for these people.  That decision was

21

made by the U.S. Consulate in Lithuania without any prompting or influence at all by the Government.  We had nothing to do with that.

And the decision to deny a person to travel from Lithuania to here because they don't have financial resources in that country is not an uncommon thing it's my understanding. They do that because they want to make sure that the people leaving are going to come back.  And if you have some sort of way to show that; one of the ways to show that is that you have financial ties to that country; that you're just not abandoning it; that you have some reason to come back, and that was the decision that was made.  But again, there was nothing that could be done about this at that point in time.

I mean, this is a case where capital charges were pending against this defendant for four and a half years.  They had four and a half years to figure out a way to get these people over here if they wanted to have them here, if they really wanted to have them here.  Even after all that time passed, they had other options, like the video conferencing option discussed by the Court, or having their mitigation expert who, I don't know how much money they spent on, Dr. Toller (phonetic), who interviewed these family members, testify about those interviews.

They had a way to put this evidence in front of the jury even if these people never stepped foot in the United

22

States, and they chose not to do it. That was a tactical decision, and for the reasons that we point out in our papers, it seems obvious to us why that tactical decision was made in the way it was.

If these people did show up, your Honor, the Government was prepared to meet that testimony about, if it was that he was a good father or good husband, with testimony that would have shown to the contrary. At the end of the day, it's the Government's position, this would have made the defendant look worse than better at the end of the day, because the facts are that he abandoned these people in Lithuania. He had contact with them; that is for sure. He still did have contact with them, but he came here, he got a new girlfriend; he had a child with the girlfriend. In fact, he had other children or another child outside of his marriage as well.

So, if the goal was to make the defendant look like a philanderer, there were other aspects of his personality which would have been brought out as a result of this, such as his drinking, his temper, his anti-Semitism. There were a number of other things about the defendant that are not particularly attractive about his personality that I'm sure the defense considered and did not want this jury to hear. And that, at the end of the day, could explain why these people showed up at the Embassy the day before they were supposed to come here and testify at trial.

23

So, as far as the first factor is concerned, there was no reasonable diligence to get these people here.

Second, there's no showing that, even had they shown up weeks beforehand, that they ultimately would have been granted this visa, and that's why these other alternatives should have been explored in the four and a half years that the trial was pending.

We had a case, as the Court will know, with Mr. Tezhik, where Mr. Tezhik was refusing to come to the United States, and we didn't want to sit here during the trial and look during the guilt phase at the door all the time wondering if Mr. Tezhik was going to decide to change his mind and show up, so we went overseas and took a deposition, at great expense to the Government.  We videotaped that deposition so it could be used at trial.  We did video conference it back here so the defendants could watch it with their counsel here.  We took these steps because we anticipated these problems with our overseas witnesses.  The same standard should have been held to the defense here if they really were interested in getting these people here.

And there's no showing that any continuance granted by the Court would have helped the situation.

As far as the inconvenience to the parties, the third factor, and to the Court and to the jury, how long a continuance were we talking about here?  We had a jury that had

24

already been sitting for over six months here; a jury that showed up every single day and, despite the disparaging comments that have been made about this jury by defense counsel, showed up on time every day, paid attention to the evidence every day. To expect them to take three weeks off, four weeks off, in the middle, really near the conclusion of the death penalty case, would have been unfair to the jury; it would have been unfair to the Court; would have been unfair to the Government to space its case so far away from the ultimate verdict in this case, especially considering now we're in another trial right now. I don't know how we could have done both things simultaneously had this case been continued as recommended by the defense.

And lastly, there was no showing at the time that this continuance motion was made as to how it even harmed the defense. They didn't submit any proffer to show what these people would say. They still haven't submitted any proffer as to what these people would say, not that it would make any difference now. But, as the Court has indicated before, the Court's not a mind reader. What was the harm that was shown? There was nothing shown to justify the continuance request at the time it was made.

So, the continuance, obviously this is a matter that the Court has really an overwhelming sense of discretion on as to how to conduct its trial and the timing of its trial. Judge

25

Otero reminds us of that constantly, telling us we have to be at his court at 10:00 o'clock.  But, in any event, for those reasons, that should be denied.

And the last issue, the issue with the jury.  The jury wasn't obligated to find any -

THE COURT:  You've got two issues; one is the sequential trials -

MR. DUGDALE:  Correct, your Honor.

THE COURT:  - in the penalty phase, and second would be the jury issue.

MR. DUGDALE:  Again, insofar as the sequential penalty trials, *United States versus Tipton* is a death penalty case which talks about the fact that this is not required in a death penalty case, by any means.  It really is another matter that's within the discretion of the Court here.

And in this case, we have two equally culpable defendants, basically; that's what the evidence showed here.  They were involved in the same crimes together; they really both assumed the same kind of leadership role in the case; and again, for the reasons I cited, defendant Kadamovas actually had some things that were against him.

Defendant Mikhel obviously had other aspects of the crimes that he was more involved with than defendant Kadamovas, but they both were really, basically, equally culpable defendants who assumed a leadership role in this crime, so

26

trying them together was appropriate.

And the jury, despite the fact that they were tried jointly, again, the Court did what it had to do and what it was supposed to do to make sure that they got the individualized consideration that was required in a death penalty trial.  The jury was instructed on several occasions in the final charge.

THE COURT:  There were two separate verdict forms.

MR. DUGDALE:  Correct.

THE COURT:  One for the guilt phase, and two separate verdict forms for the penalty phase as well.

MR. DUGDALE:  Correct.  As far as the instructions itself, the Court explicitly instructed the jury that they had to give individual consideration as to both of these defendants.  The Court instructed them separately as to the mitigation that was presented as to each and the aggravation presented as to each.  The aggravating factors obviously overlap, but even though they overlap, the Court instructed separately as to aggravating factors for both defendants.

And then, as the Court noted, ultimately what the Court did to ensure that there would be this separate consideration is, they had separate jury verdict forms.  So, this jury was required to sit back there and fill out the verdict form for each defendant separately and to give that separate consideration.

THE COURT:  In the penalty phase aspect of the trial,

27

the verdict forms that were used by the Court set forth in detail each defendant's proposed mitigating factors.

MR. DUGDALE: Correct, your Honor.

The verdict forms did and also the instructions set out what each mitigating factors were for the defense, so they were repeated.

And the fact the jury came back after a couple hours of deliberation really doesn't show anything other than the fact that this was an overwhelming case, both for guilt and for death in this case.

It just so happened, your Honor, on the same exact day of this trial, there was a trial in Virginia, the one that Dr. Cunningham testified in ultimately, and that verdict was delivered on the same day. Now, it's a different case; that jury came back in less than an hour. So, fast decisions in penalty cases are not anything that's unusual.

There was a case two weeks ago the District Attorney's office tried; jury came back in less than an hour.

This jury had six months to consider the evidence in this case and weeks to consider the penalty phase evidence; an entire weekend after the arguments in this case, and then time to deliberate amongst themselves about this evidence. The fact they came back quick, again, only shows that it was an overwhelming case, as the Court has pointed out, both for guilt and for penalty as well.

28

And as far as the consideration of the fact -

THE COURT:  I don't think you can ignore the fact that the jury heard compelling evidence as to five deaths and the manner in which the deaths occurred.  They were brutal murders.

MR. DUGDALE:  That's absolutely the case.  And again, this was a uniquely brutal crime involving uniquely brutal defendants which warranted a unique penalty, and that's why they came back in the manner that they did, your Honor.

And it also reflects their special findings as well. Again, the law is not on the defendant's side on this issue either.  The law is clear that even in a case where there's uncontradicted evidence concerning a mitigating factor, that does not obligate the jury to make any findings in their favor. Not at all.

So, what the jury's verdict ultimately reflects is, they found zero weight for the mitigation that was presented for the defense.  And really, they didn't consider these facts to be mitigating at all when compared to - well, they weren't mitigating at all, and particularly when you compare it to the aggravating evidence that you have in the case.

Again, as the Court noted, the five murders; they didn't even hear about the other two murders, but they heard about these five murders.  They heard about the manner that they were committed in; they heard about the motivation for

these murders, the fact it was done for the shameful reasons that it was done for, just so they could buy mink coats and nice houses and things like that, and just the brutal nature of the killings here.  Again, the jury wasn't obligated to find anything in either party's favor.  That's exclusively something that was within the provenance of the jury and their discretion here.

And what their verdict really just reflects is nothing more than they engaged in the two-step process they were supposed to; first of all seeing if there were facts supporting mitigating factors, and second, to determine whether in fact that was mitigating or not.  And what their bottom line result was, and it's something that's supported by the overwhelming nature of the evidence here, is that the mitigation evidence really amounted to nothing when you compared it to the aggravating evidence.

And unless the Court has any questions, I'll submit. Thank you.

THE COURT:  I'm going to deny defendant Kadamovas's motion for new trial on both the guilt phase and the penalty phase.  There's no evidence before the Court that the jury did not follow the instructions of the Court in arriving at verdicts in both phases of the trial.

Now, with regard to sentencing in this matter, Mr. Lasting, Ms. Chahin, is there anything you wish to say on

30

behalf of your client?

MR. LASTING:  Your Honor, the Court having denied our motions for new trial, I don't believe there's anything to be said in terms of the sentencing.

THE COURT:  Does Mr. Kadamovas wish to address the Court prior to sentencing?

(The Interpreter conveys the Court's request to defendant Kadamovas)

THE COURT:  We can move you up to the front seat if you wish, or the lectern, or you can take one of the microphones and put it in front of you.  I think the one on this end of the table can be moved over there.

(Pause)

(Mr. Kadamovas addresses the Court through the Interpreter)

DEFENDANT KADAMOVAS:  First of all, I want to say that I was given an opportunity to speak here.

First of all, I would like to say that the trial wasn't fair.  It wasn't fair for at least two reasons.  The first reason is that one of my attorneys, Ms. Chahin, wasn't ready for the trial.  She joined the case only half a year before the proceedings started, and she admitted herself that she cannot defend me because she wasn't familiar with the case enough.

And the second reason, and maybe the most important

31

reason for me, is that I wasn't given an opportunity to prepare myself for the trial.  I didn't have an opportunity to familiarize myself with the facts of the case.  At this moment, I know only about 15 percent of the discovery that was introduced in this case.  If I'm not mistaken, the discovery contains somewhere between 85 and 90,000 pages, and there are also a lot of other video, audio, and computer materials with information stored on computer disks.

The fact that I didn't have an opportunity to familiarize myself with those materials caused the fact that I wasn't able to discuss those facts with my defense attorneys.

I would like to show one example of the fact that I wasn't - of the fact of the influence that I wasn't given an opportunity to familiarize myself with the materials of the case, and there are three things.  First of all, that I wasn't able to read the materials in time.  I wasn't able to discuss it with my attorneys.

The second is that the attorneys didn't notice those facts in the materials of the case.

And the third fact is that the Government and FBI were involved in direct counterfeiting of the materials and changing the facts to feed their case.

I have five pages that I would like to show and explain my points.

THE COURT:  Go ahead.

32

THE INTERPRETER:  It's working.

MS. DeWITT:  I think it's on, Sonia.

MS. CHAHIN:  Your Honor, does this appear on the Court's monitor?

THE COURT:  It will.

DEFENDANT KADAMOVAS:  You can't see very well on this monitor, but on this single page there are at least three big mistakes.  Today I would like to speak only of one example.

Please pay attention to the call that was made at 10:15 a.m.  I can't see clear on this monitor.

Maybe Ms. Chahin will help me.

MS. CHAHIN:  You're referring to page 2 or on this page here?

DEFENDANT KADAMOVAS:  This page.

THE COURT:  No.  Go to the other side.  That's it.

It's right underneath the blue.  It says 10:14 a.m., and then there's a 10:15 a.m.

No.  You're going the wrong way.  Move to the other side.

MS. CHAHIN:  Which way, your Honor?  This way?

THE COURT:  That's it.  Perfect.  You've got it, 10:15.

DEFENDANT KADAMOVAS:  Could you move a little bit on the other side.  There's something said 9:15, over there.

MS. CHAHIN:  This way?

33

DEFENDANT KADAMOVAS:  Yeah, where the mark on the page.

Could you expand it a little bit, magnify?

MS. CHAHIN:  Smaller?  Larger?

DEFENDANT KADAMOVAS:  Bigger, magnify.

No.  Other way.

MS. CHAHIN:  That's it.

THE COURT:  There's a focus over there on your ...

Tell me what you're trying to explain.  I think it's easier that way.

DEFENDANT KADAMOVAS:  The Government contends that at 10:15 a.m. I was in Bakersfield.  And this table was shown to the jury.  I started --

THE COURT:  Let me interrupt you a minute.

They don't claim that you were in Bakersfield.  Their claim that the call was picked up on a device in Bakersfield at 10:15.

DEFENDANT KADAMOVAS:  It doesn't really matter at this point whether I was there or my telephone was there.  On the other hand, you are right.  You can't say exactly in whose possession my telephone was.

When I started checking telephone calls -- I would like to ask Ms. Chahin to put the second page on the screen.

THE COURT:  Now, these items that you're giving to me are all exhibits in the trial of the case that were introduced

EXCEPTIONAL REPORTING SERVICES, INC

34

during the guilt phase of the trial.

**DEFENDANT KADAMOVAS:**  Unfortunately, I don't have a computer right here.  The computer was taken away two weeks ago.  And I can't tell the numbers.

This is a page from my telephone bill.  Where the mark is between those two telephone calls there should be either incoming or outgoing call.  But there is no incoming or outgoing calls between those two calls.

I started checking and started to -- tried to find out why my phone is showing as being in that area.

I would like to show the next page.

There was a table in the evidence.  The table was compiled by the FBI agents showing where I was at this point.  Please look at the call number 173.  It shows the telephone was made from Altmanis' telephone to my telephone.

And I would like to show next page.

This is a detailed printout used by the FBI agents to pinpoint times and the location of telephones.  This shows that Altmanis' phone with a number 818-209-3555 was making a call to my phone 323-428-1630.

I would like to show the next page.

**THE COURT:**  You're just re-arguing all of the evidence in this case.  You haven't addressed the issue that I asked you to speak to, and that is on sentencing.

**DEFENDANT KADAMOVAS:**  This is the telephone bill of

35

Altmanis.  And the call number 21 shows that in reality the call made in 10:15 in the morning -- but it shows that Altmanis made a call not to my cell phone but to somebody else's.  I don't even know whose phone it is.

MR. DUGDALE:  Your Honor, I'm sorry.  I have to excuse myself.  But Ms. DeWitt will handle the remainder of the sentencing.

THE COURT:  That's fine.

MR. DUGDALE:  I will just add, however, that this point that he's making here he's totally wrong about this.  And the reason that the phone calls don't show up on bills is because this was a zero duration call.  So he wouldn't be billed for it.  So I don't know.  This exercise seems to be a waste in time in large part.  But the analysis is totally wrong.

Thank you, your Honor.

DEFENDANT KADAMOVAS:  What the prosecutor just said is not quite correct.  Because if we look at the previous page, you will see that Altmanis was waiting for about 14 seconds when he was trying to connect to my phone.

And it shows that Altmanis wasn't dialing my phone at that time.  He was dialing somebody else's phone.  But for some reason, the Government shows in their colored table that Altmanis was calling to me, and I was in Bakersfield at that time.

36

This is only one example out of a large number of examples that I could have shown.  But I don't believe it's an appropriate time now to go into that.

The more I go into the details of the case, the more I find cases which should have been mentioned during the case. But I couldn't have done that, because I simply didn't know about it.

But the attorneys even if they looked through the whole evidence of the case, which I doubt, they couldn't find a lot of things.  Because they didn't know what it relayed to. It was my job to find those things and point it to them.

Another thing is the management of MDC.  A person who represents MDC is present here.  I would like to say how I was prevented from accessing the computer and why it had happened.

Starting from 2003 I kept asking that the materials of the case were either translated to me or I was given an electronic means of translation so I could have done it myself. At some point my attorney convinced the management of MDC that my having a computer with a interpreting or translating program would be very helpful for the case.

At some point in 2005 my attorney purchased a computer for me, installed a necessary, all necessary software, and sent it to MDC.  From that point on I was starting keeping track of all occasions when I was given access to the computer and how much time I spent working on the computer.

37

From May 2005 to the beginning of the trial, I spent on the computer approximately 209 hours.  It takes me about five, six minutes to read a single page.  Because the computer program has to transform the page into a different format and translate it into Russian.  And only after that, I can read the page.

During those 209 hours, I was able to familiarize myself only with 3 to 5,000 pages of the entire discovery.  In addition to that, 234 pages were translated by the court interpreter.

Starting from August 2005, I was given less and less access to the computer.  I was explained that the rooms where I could do that were occupied by the meetings of other inmates with their attorneys.  I started complaining to my attorney.

At that time I had a different attorney.  A woman named Marcia Brewer.  At one of these meetings with her, she told me that she had been told by MDC that I myself don't wish to work with the computer.

I told her that this wasn't true.  And I gave her about 25 pages and asked her to write in her own hand a request for each day of the month for me to access the computer.  Marcia did what I asked her.  I signed every page.  And she herself gave that stack of paper to one of the wardens on the eighth floor.

That month I wasn't given a single chance to work on

38

the computer.  My situation was so desperate that I couldn't find another solution than to go on hunger strike.  That was my second hunger strike.  The first one lasted for 29 days; the second one for 14.

I have a piece of paper, and I would like to show it to you, a piece of paper that I would put against the glass on my door with three demands regarding my hunger strike.

THE COURT:  Ms. Chahin, you're going to put it on the overhead projector so I can see it?

MS. CHAHIN:  Yes, your Honor.

DEFENDANT KADAMOVAS:  On the first day of my hunger strike --

THE COURT:  Well, let me read what he's put on.

"Protest hunger strike.  Let me working on my case and let me learn English.  Give me a medical care."

That was the sign.

DEFENDANT KADAMOVAS:  On the second day of my hunger strike, one of the lieutenants walked into my camera and turned over the water and took away all drinking water.  They told me that if I'm not going to eat I wouldn't be able to drink either.

In the first hunger strike, they wouldn't give me any liquid for four days.  During this hunger strike, they didn't give me any drink for 24 hours.  They checked my blood pressure, and they weighed me.

39

Next day after 24 hours, they took me again to measure my blood pressure and to weigh me. When they weighed me, the doctor was surprised that I am losing weight so fast. I think it was three pounds during the 24 hours.

In my broken English, I explained to the doctor that I am not given any liquids. The doctor said that I was supposed to be given as much water as I need to. And the doctor said it in the presence of the lieutenant. And the lieutenant promised that I would be given water.

Later they started giving me one liter of water a day, one bottle of water. And that lasted for 10 days.

At some moment I was visited by 10 people from MDC management, including Ben-Schmul (phonetic) who is present here. And my attorney Marcia Brewer was also present. We discussed the situation. They asked me to stop the hunger strike. And I asked them to give me an opportunity to use the computer.

Ben-Schmul showed me a separate room. It was a small room designed for special visits. And he said that I would be given an opportunity to work on the computer in that room every day. I knew I would be deceived.

But next day my attorney Richard Lasting came to me. He personally spoke to Mr. Taylor, the counsel. And he promised that I would be given the computer every day for the whole day, and I would be given an opportunity to work.

40

I believed them and stopped hunger strike.  But I have never been given that room and an opportunity to work there.  Later, right before the trial was supposed to start, when they brought me here to MDC, they started giving me an opportunity to work in this particular room.  Because Mikhel was in other wing of the building, and we couldn't meet.

But the fact that they gave me an opportunity to work in that room shows that they could have given it to me half a year earlier.  Then they came up with different explanations why they couldn't give me a computer.  One of them was that they didn't have electricity.

THE COURT:  I'm going to have to ask you to wrap up here.  Because you're just wandering and complaining and not addressing what I asked you.  And that is do you have anything to say on behalf of yourself with regard to sentencing in this matter.

DEFENDANT KADAMOVAS:  I understand.

In short I want to remind again that I wasn't given an opportunity to prepare for the trial and to get familiar with the discovery of the case.  I would like to say couple of words about the second phase of the trial and regarding my family from Lithuania, which wasn't present here.

THE COURT:  All right.

DEFENDANT KADAMOVAS:  The Government wants to show me as some kind of villain who abandoned the family in Lithuania,

41

and they didn't really want to come here.

First of all, it's not true that I abandoned my family.  Every month as long as I was free, I was sending them money and packages.  And they didn't have -- they had everything that they needed.  During the last four years, they wouldn't let me make calls to Lithuania.  And I didn't have any connection to my family.

I just want to give one example.  Three and a half years ago, through my attorney, I sent to my wife all papers necessary for the divorce.  She still has not divorced me.

Let's make it simple.  Let's dial the number in Lithuania and let them tell us what kind of relations I had with my family and what they think about me.

That's about it; I want to tell at this point.  I was not prepared for it, because only yesterday I was told that I would be given an opportunity to speak.

Thank you.

THE COURT:  All right.

With regard to the Second Superseding Indictment, Count One charges a violation of 18, United States Code, Section 1203, conspiracy to take hostages resulting in death.  Counts Two, Three, and Four allege a violation of 18, United States Code, Section 1203, hostage taking resulting in death.  Count Five is the violation of 18, United States Code, Section 1956(h), conspiracy to launder monetary instruments.  Count Six

42

is a violation of 18, United States Code, Section 371, conspiracy to escape from custody.  Count Seven is a violation of 18, United States Code, Section 981(a)(1)(C); 21, United States Code, Section 853; and 28, United States Code, Section 2461(c), criminal forfeiture.

This is a death penalty case under 18, United States Code, Section 3591, et seq.  Under Section 3593(d), there was a return of special findings unanimously by the jury under Section d, e, and f of 3593.

Under Section 3594, that requires a sentence.  3595 is the appeal process.  And 3596 is implementation.

Now, in Count One of the Second Superseding Indictment the victims were Myer Muscatel, Rita Pekler, Alexander Umansky, Nick Kharabadze, and George Safiev.  In Count Two the victim was Alexander Umansky.  In Count Three the victim was Nick Kharabadze.  And in Count Four the victim was George Safiev.

The guilt phase verdicts as to Defendants Iouri Mikhel and Jurijus Kadamovas were unanimously delivered by the jury and published, filed, and recorded by the Court on January 17th, 2007.  The penalty phase verdicts as to Defendants Iouri Mikhel and Jurijus Kadamovas were unanimously delivered by the jury and published, filed, and recorded by the Court on February 13th, 2007.  The forfeiture phase verdicts as to Defendants Iouri Mikhel and Jurijus Kadamovas were unanimously

43

delivered by the jury and published, filed, and recorded by the Court on February 21st, 2007.

Pursuant to 18, United States Code, Section 3593(c), which states "not withstanding Rule 32 of the Federal Rules of Criminal Procedure, when a defendant is found guilty or pleads to an offense under Section 3592, no presentence report shall be prepared."

The Court therefore pronounces sentence as follows:

It is ordered that the Defendant Jurijus Kadamovas shall pay to the United States a special assessment of $700. That's a hundred dollars per count, which is due immediately pursuant to statute. Pursuant to Section 5e1.2 of the Guidelines, all fines are waived as it is found that the Defendant does not have the ability to pay a fine since all of his assets have been forfeited to the United States. And the Court is concurrently entering a monetary judgment of forfeiture against Mr. Kadamovas.

Pursuant to 18, United States Code, Section 3591, et seq. and the *Sentencing Reform Act of 1984*, it is the judgment of the Court that Defendant Jurijus Kadamovas is hereby committed on Count Five and Count Six of the Second Superseding Indictment to the custody of the Bureau of Prisons to be imprisoned for a term of 240 months.

This term consist of 240 months on Count Five and 60 months on Count Six to be served concurrently with each other

44

and concurrently to any other sentence imposed by this Court on the remaining counts, specifically Counts One, Two, Three, and Four.  In effect the sentences imposed on Counts Five and Six are merged by operation of law with the sentences imposed on Counts One, Two, Three, and Four hereunder.

With regard to Counts One, Two, three, and Four; the Court finds that the jury has unanimously made the requisite special findings required by law with respect to 18, United States Code, Section 3592, 3593(d), 3593(e), and 3593(f).

Therefore, the Court imposes the following sentence pursuant to 18, United States Code, Section 3594, upon a unanimous recommendation under 18, United States Code, Section 3593(e) that the Defendant Jurijus Kadamovas should be sentenced to death.  The Court hereby sentences you to the ultimate penalty of death.

Specifically, pursuant to the *Federal Death Penalty Act of 1994*; 18, United States Code, Section 3591 through 3596; and the special findings of the jury returned on February 13th, 2007; and the jury's unanimous vote recommending that you, Jurijus Kadamovas, shall be sentenced to death on Counts One, Two, Three, and Four of the Second Superseding Indictment; it is the judgment of the Court that Mr. Kadamovas is sentenced to death  separately on Counts One, Two, Three, and Four of the Second Superseding Indictment.

You shall, pursuant to 28, United States Code,

45

Section 3593, be committed to the custody of the Attorney General of the United States until exhaustion of the procedures for appeal of the judgment of conviction and for review of the sentence in accordance with 18, United States Code, Section 3595.

When the sentence is to be implemented, the Attorney General shall release you to the custody of the United States Marshal who shall supervise implementation of the sentence in the manner prescribed by the law of the state -- that is California -- in which the sentence is imposed.

If the state of California does not provide for the implementation of a sentence of death, the Court shall designate another state, the law of which does provide for the implementation of a sentence of death. And the sentence shall be implemented in the latter state in the manner prescribed by such law.

Pursuant to Title 18, United States Code, Section 981(a)(1)(C); Title 21, United States Code, Section 853; and Title 28, United States Code, Section 2461(C); and Count Seven of the Second Superseding Indictment, Defendant shall forfeit to the United States all right, title, and interest in any and all property, real or personal, which constitutes or is derived from proceeds traceable to the violations of Title 18, United States Code, Section 1203. That is Counts One through Four for which Defendant has been convicted.

46

Moreover, the jury by special verdict has found that the total of $1,203,628 constitutes or is derived from proceeds traceable to the violations of Title 18, United States Code, Section 1203.  That's Counts One through Four for which Defendant has been convicted.

Pursuant to that special verdict as reduced by the net amount already forfeited in related civil and administrative forfeiture proceedings, a personal money judgment in the amount of $1,039,716.46 has been contemporaneously entered against Defendant.

With regard to Count Seven, the criminal forfeiture count, the Court enters judgment against you as stated herein individually, jointly, and severally in the total sum of $1,203,628.

Finally, the Defendant is to cooperate with the Bureau of Prisons' authorities and personnel in the collection of a DNA sample from Defendant's person.

I'm going to order the court recorder to prepare a transcript of the sentencing proceedings, which is incorporated herein by reference.  A copy of the transcript and the statement of the Court as set forth herein shall be included in the commitment order and judgment.

Now, Mr. Kadamovas, you have the statutory right to appeal your sentence and your judgment of conviction.  With few exceptions, any notice of appeal must be filed within 10 days

47

of judgment being entered in your case.

If you're unable to pay the cost of an appeal or filing fee, you may apply for leave to appeal in forma pauperis.  If you do not have counsel to act on your behalf if you so request, the Clerk of the Court will prepare and file a notice of appeal on your behalf.

I'm going to also instruct the attorneys in this case to file a notice of appeal on behalf of Mr. Kadamovas.

MS. DeWITT:  Your Honor, just one thing.  We had initially proposed in the language for the J and C that you also include that the sentence be implemented pursuant to the laws of the state of Indiana as a specific alternative.  And the reason for that is because that is where it is most likely that, at least based upon our current information, that any sentence will be carried out.  And it might avoid having to go back and --

THE COURT:  Well, a lot of things can change by the time this appeal is finally final.  And that's why I did not utilize Indiana.  I just said in a state that the death penalty is still valid.

MS. DeWITT:  Thank you, your Honor.

THE COURT:  All right.  The Defendant then is committed for execution of sentence and judgment in this case.

I have in fact signed the personal money judgment of forfeiture against Jurijus Kadamovas in open court this date.

48

Thank you.

THE CLERK:  The Court's in recess?

THE COURT:  No.  We have another case.

(Off the record discussion)

MS. DeWITT:  Your Honor, this isn't intended for us?

THE COURT:  Yes -- oh, wait.

Before you leave, I brought to the table those jury questionnaires.  The ones at the counsel table for the Government are to be taken by the Government.  There are two boxes on defense counsel table.  One box is for Defendant Kadamovas.  And one box is for Defendant Mikhel.

Mr. Rubin is here.  So he'll take one of the boxes. Ms. Chahin or Mr. Lasting will take the other box.

It's a complete set.

(This procedure was adjourned at 10:16 a.m.)

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____                    March 13, 2007

Signed                                                        Dated


TONI HUDSON

FEDERALLY-CERTIFIED TRANSCRIBER

# NOTICE PARTY SERVICE LIST

Case No.    __CR-02-0220-(B)-DT__        Case Title   USA -v- 2) Jurijus Kadamovas

Title of Document    __Judgment and commitment order__

| | | |
|---|---|---|
| | Atty Sttlmnt Officer Panel Coordinator | |
| | BAP (Bankruptcy Appellate Panel) | |
| | Beck, Michael J (Clerk, MDL Panel) | |
| | **BOP (Bureau of Prisons)** | |
| | CA St Pub Defender (Calif. State PD) | |
| X | CAAG (California Attorney General's Office - Keith H. Borjon, L.A. Death Penalty Coordinator) | |
| | Case Asgmt Admin (Case Assignment Administrator) | |
| | Catterson, Cathy (9th Circuit Court of Appeal) | |
| | Chief Deputy Admin | |
| | Chief Deputy Ops | |
| | Clerk of Court | |
| | Death Penalty H/C (Law Clerks) | |
| | Dep In Chg E Div | |
| | Dep In Chg So Div | |
| | Federal Public Defender | |
| | **Fiscal Section** | |
| | Intake Section, Criminal LA | |
| | Intake Section, Criminal SA | |
| | Intake Supervisor, Civil | |
| | Interpreter Section | |
| | PIA Clerk - Los Angeles (PIALA) | |
| | PIA Clerk - Riverside (PIAED) | |
| | PIA Clerk - Santa Ana (PIASA) | |
| | **PSA - Los Angeles (PSALA)** | |
| | **PSA - Riverside (PSAED)** | |
| | **PSA - Santa Ana (PSASA)** | |
| | Schnack, Randall (CJA Supervising Attorney) | |

| | | |
|---|---|---|
| | Statistics Clerk | |
| | US Attorneys Office - Civil Division -L.A. | |
| | US Attorneys Office - Civil Division - S.A. | |
| | US Attorneys Office - Criminal Division -L.A. | |
| | US Attorneys Office - Criminal Division -S.A. | |
| | US Bankruptcy Court | |
| | **US Marshal Service - Los Angeles (USMLA)** | |
| | **US Marshal Service - Riverside (USMED)** | |
| | **US Marshal Service -Santa Ana (USMSA)** | |
| | **US Probation Office (USPO)** | |
| | US Trustee's Office | |
| | Warden, San Quentin State Prison, CA | |

**ADD NEW NOTICE PARTY**
**(if sending by fax, mailing address must also be provided)**

Name:

Firm:

Address (*include suite or floor*):

*E-mail:

*Fax No.:

* For CIVIL cases only

**JUDGE / MAGISTRATE JUDGE (list below):**

**Initials of Deputy Clerk** ⟍⟋