THOMAS P. O'BRIEN
United States Attorney
CHRISTINE C. EWELL
Assistant United States Attorney
Chief, Criminal Section
ROBERT E. DUGDALE (California State Bar No. 167258)
Chief, Violent and Organized Crime Section
SUSAN J. DE WITT (California State Bar No. 132462)
KAREN I. MEYER (California State Bar No. 220554)
Assistant United States Attorneys
MONICA E. TAIT (California State Bar No. 157311)
Assistant United States Attorney
Asset Forfeiture Section
    1500 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone:  (213) 894-4685/4496/8559/2931
    Facsimile:  (213) 894-3713/7177
    e-mail:    robert.dugdale@usdoj.gov
            susan.dewitt@usdoj.gov
            kim.meyer@usdoj.gov
            monica.tait@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>            Plaintiff,<br><br>     v.<br><br>IOURI MIKHEL<br>JURIJUS KADAMOVAS,<br><br>           Defendants. | No. CR 02-220 SJO<br><br>PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR AN ORDER AMENDING FORFEITURE ORDER TO INCLUDE SUBSTITUTE ASSETS AND TRACEABLE ASSETS, PURSUANT TO FED. R. CRIM. P. 32.2(e); MEMORANDUM OF POINTS AND AUTHORITIES, DECLARATIONS AND EXHIBITS IN SUPPORT<br><br>DATE: MAY 18, 2009<br>TIME: 10:00 A.M.<br>PLACE: Roybal 880 |

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE THAT on May 18, 2009 at 10:00 a.m., in

Courtroom 880 of the United States District Court, 255 East

Temple St., 8th Floor, Los Angeles, California, before the Honorable S. James Otero, United States District Judge, the United States of America will move and hereby does move pursuant to Fed. R. Crim. P. 32.2 (e) for entry of an order amending the March 1, 2007 order of forfeiture ("Forfeiture Order") in this matter (1) to include substitute assets and certain directly traceable crime proceeds described in the Forfeiture Order that have become available to be forfeited, and (2) applying these assets toward satisfaction of the personal money judgments of forfeiture entered against defendants Iouri Mikhel and Jurijus Kadamovas.

This motion is based on this notice of motion and motion, the accompanying Memorandum of Points and Authorities and Exhibits, the attached Declarations, and such other and further argument and evidence as the court may receive in any hearing conducted on the motion.

DATE: April _____, 2009          Respectfully submitted,

THOMAS P. O'BRIEN
United States Attorney
CHRISTINE C. EWELL
Chief, Criminal Division
ROBERT E. DUGDALE
Chief, Violent and Organized Crime Section
SUSAN J. DE WITT
KAREN I. MEYER
Assistant United States Attorneys

/s/ _____
MONICA E. TAIT
Assistant United States Attorney
Asset Forfeiture Section

Attorneys for Plaintiff
UNITED STATES OF AMERICA

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   INTRODUCTION

On January 17, 2007, defendants Iouri Mikhel and Jurijus Kadamovas were found guilty of hostage-taking and conspiracy to commit hostage-taking, and other crimes (Counts One through Six of the Second Superseding Indictment ("Indictment")).  At trial, the government proved that the defendants kidnapped and killed four people and received more than $1.2 million in ransom payments from the families or associates of two of the victims.

On March 1, 2007, based upon the jury's special verdicts regarding the amount of forfeiture to be ordered, the court entered a Forfeiture Order forfeiting all proceeds of the crimes for which defendants were convicted pursuant to 18 U.S.C. § 981(a)(1)(C), 28 U.S.C. § 2461(c), and 21 U.S.C. § 853.  Ex. 1. On March 12, 2007, the court entered judgment forfeiting all proceeds of the hostage-taking offenses and imposing a money judgment against defendants Mikhel and Kadamovas in the amount of $1,039,716.46.  Ex. 2 (Judgment and Commitment Order), and Ex. 3 (money judgment against Iouri Mikhel).[1]  The government considers $229,440.40 of the $1,039,716.46 to have been satisfied by the forfeiture of funds the government seized from the accounts of Sierra Technologies and Stenmark Ventures, entities controlled by defendant Mikhel.  Accordingly, the outstanding uncollected

---

[1]  In its special verdicts, the jury found that the proceeds of the hostage-takings of Alexander Umansky, George Safiev and Nick Kharabadze equaled $1,203,628.00, consisting of the ransom money paid by their friends and families ($234,628.00 paid on behalf of Mr. Umansky and $969,000 paid on behalf of Mr. Safiev and Mr. Kharabadze).  The reduced money judgment amount entered ($1,039,716.46) reflected a deduction for crime proceeds the government had already forfeited.

1

amount of the money judgment is $810,276.06.  Tait Decl., ¶ 2.

The government seeks to amend the forfeiture order to accomplish the forfeiture of the following assets:

(A)  $179,813.43 in bank funds ("the U.K. Funds"), formerly in the custody of Marina Karagodina (girlfriend of Iouri Mikhel) and transferred to the custody of the Federal Bureau of Investigation ("FBI") by government officials in the United Kingdom, plus interest earned thereon;

(B)  All funds in account no. 1-469-0010392-0001 ("Glenstream/Latvia funds") at Aizkraukles Banka, Latvia in the name of Glenstream Ventures or all funds held by the government of Latvia traceable to this account (approximately $15,112.38); and

(C)  All funds in account no. 03868-01517 at Bank of America ("BOFA Funds") in the name of Iouri Mikhel and Natalia Alifanova (approximately $2,510.98).

The amendment is sought on the grounds that a portion of the U.K. Funds and all of the Latvian funds constitute or are traceable to proceeds of hostage-taking which should be forfeited according to the existing Forfeiture Order.  The remaining funds are sought to be forfeited as substitute assets for portions of the ransom money that are now unrecoverable because such funds were transferred to third parties.  21 U.S.C. § 853(p)(1)(A).

2

## II.   FACTS

At trial, the government proved the following, <u>inter alia</u>:

### A.   <u>The Umansky Hostage-Taking</u>.

The defendants kidnapped and murdered Alexander Umansky. The jury found that the proceeds of the crime equaled $234,628.00.  This was the amount of ransom money the family of Alexander Umansky paid with hopes of securing his safe release.

### B.   <u>The Safiev/Kharabadze Hostage-Taking</u>.

The defendants kidnapped and murdered Nick Kharabadze and George Safiev.  The jury found that the proceeds of these crimes equaled $969,000.00, representing the money paid by the family and associates of George Safiev to secure the release of the victims.

### C.   <u>At least $338,428.00 of the Safiev Ransom Money Was Transferred to Third Parties and Remains Unrecovered</u>

In its special verdicts, the jury found that the proceeds of the hostage-takings of Alexander Umansky, George Safiev and Nick Kharabadze totaled $1,203,628.00.  As part of its presentation at trial, the government explained its efforts to trace the ransom money paid by the victims' families and associates.[2]

---

[2]   The purpose of this motion is limited:  to prove entitlement to forfeit assets worth about $200,000.00.  For brevity's sake, the government has restricted the discussion in this memorandum to only a portion of the unrecovered Safiev ransom money.  This motion does not concede or imply that the amounts described herein constitute the full extent of the unrecovered Safiev ransom money.  Gogley Decl., ¶ 3.  Indeed, the amount of unrecovered money is well in excess of the amounts described here.  For example, substantial amounts of the funds were converted to cash and not recovered.  <u>Id</u>.  Other amounts were transferred to the defendant's own accounts and spent.  <u>Id</u>. Moreover, a substantial amount of the Umansky ransom money has also not been recovered.  <u>Id</u>.  Thus, should the government locate additional assets belonging to the defendants, the additional

3

Safiev's business associate, Konstantine Tezhik, testified that on January 23, 2002, he wired $969,000.00 as demanded by the defendants to an account at Capital Solutions. Special Agent Aaron Gogley of the Internal Revenue Service testified that the government obtained records from several foreign and domestic financial institutions to trace the Safiev ransom money. Gogley Decl., ¶ 2. Based upon his review of such records, and other records obtained during the investigation, SA Gogley testified that he created three charts mapping the movement of the Safiev funds. Gogley Decl., Exs. 1000-D, 1000-E, and 1000-F.[3]

The initial $969,000 transfer initiated by K. Tezhik was deposited to an account with Capital Solutions in Jamaica in the name of Thomas Noms (an alias name). Gogley Decl., ¶¶ 4-5, and Ex. 1000-D. The majority of the funds from the Capital Solutions account ($850,000.00) were deposited to an account at First Global Bank, Jamaica, in the name of a nominee, Ricardo Azon. Gogley Decl., ¶ 5. From the First Global account, the funds were disbursed via accounts bearing alias names to diverse accounts in Jamaica, Barbados, the United States, Latvia, Switzerland, Luxembourg, and the United Kingdom, some controlled by the defendants and some controlled by third parties at the direction of at least one of the defendants. Id., Exs. 1000-D, 1000-E, and 1000-F. Several of these further transfers are shown on separate

---

unrecovered funds not described in this memorandum could form the basis of a future application for the substitution of additional assets.

[3] These exhibits were introduced at trial as Exhibits 1000-D, 1000-E, and 1000-F, and the government retains that numbering here.

4

charts prepared by SA Gogley which followed the trail of portions of the Safiev ransom money after large blocks of the funds were transferred to accounts in the name of Glenstream Ventures Inc. in Latvia (Ex. 1000-E) and also in Switzerland (Ex. 1000-F). Gogley Decl., ¶ 5.

The three Charts prepared by SA Gogley, coupled with his investigation of the payees, show that, at a minimum, the following amounts were transferred to accounts in the names of third parties:

**EXHIBIT 1000-D: SELECTED TRANSFERS OF SAFIEV RANSOM FUNDS TO THIRD PARTIES**

| AMOUNT | DATE | THIRD PARTY RECIPIENT | TRANSFEREE'S ROLE OR PURPOSE OF TRANSFER |
|---|---|---|---|
| $28,477 | 2/19/02 | G. Birnbaum | Rent for Mikhel's aquarium business |
| $5,000 | 2/19/02 | Litchfield Imports Ltd U.K. | High-end car dealer in U.K. |
| $51,270 | 2/19/02 | Anton Eidaka-Kasuza | Stepfather of co-conspirator Ainar Altmanis |
| $48,703 | 2/12/02 | Anita Eidaka-Kasuza | Altmanis' mother |
| $14,368 | 2/12/02 | Marina Karagodina (Barclays Bank) | Mikhel's girlfriend |
| $48,730 | 5/28/02 | Gite Lellan | Mikhel's associate, convicted of money laundering for this transaction |
| *$196,548* | *SUBTOTAL FOR EXHIBIT 1000-D* | | |

5

**EXHIBIT 1000-E: SELECTED TRANSFERS OF SAFIEV RANSOM FUNDS TO THIRD PARTIES**

| AMOUNT | DATE | THIRD PARTY RECIPIENT | TRANSFEREE'S ROLE OR PURPOSE OF TRANSFER |
|---|---|---|---|
| $6,977 | 2/7/02 | Land Rover Encino, Inc. | Down payment for leased vehicle |
| $2,500 | 2/7/02 | Elite Family Dogs | Deposit for purchase of dogs; some funds were refunded to M. Karagodina, but none recovered by the government |
| $14,968 | 2/7/02 | Mrs. Alexsejus Markovsis | Relative of co-conspirator Markovsis. (Markovsis later paid $15,000 in restitution, but from a different source) |
| $25,000 | 2/7/02 | Laden Nasseri | Girlfriend of Jeff Dabbs (a real estate agent who assisted the defendants) |
| $900 | 2/7/02 | Alexander Tsesas | An associate of co-conspirator Petro Krylov. Tsesas actually received $31,500 on this date, but paid $30,600 in cash to Krylov. |
| $10,215 | 2/11/02 | Osta Marketing | Vladimir Sobolev's account, through which other third parties received funds at Mikhel's direction |
| $13,932 | 2/11/02 | Life Source Water Systems | Water filtration system; most of these funds were later remitted to the account of Sherman & Sherman (Mikhel's former counsel) |

6

EXHIBIT 1000-E: SELECTED TRANSFERS OF SAFIEV RANSOM FUNDS
TO THIRD PARTIES

| AMOUNT | DATE | THIRD PARTY RECIPIENT | TRANSFEREE'S ROLE OR PURPOSE OF TRANSFER |
|---|---|---|---|
| $5,620 | 2/11/02 | Hillis of Snowmass | Fur coat retailer |
| $9,260 | 2/11/02 | Steve G. Plumbing Co. | Plumber who worked on Mikhel's property |
| $4,200 | 2/14/02 | Altour Classic LLC | Travel agency; for Marina Karagodina's travel |
| $4,700 | 2/14/02 | Elite Financial | This firm helped the defendants obtain mortgages on their properties |
| $98,272 | SUBTOTAL FOR EXHIBIT 1000-E | | |

EXHIBIT 1000-F: SELECTED TRANSFERS OF SAFIEV RANSOM FUNDS
TO THIRD PARTIES

| AMOUNT | DATE | THIRD PARTY RECIPIENT | TRANSFEREE'S ROLE OR PURPOSE OF TRANSFER |
|---|---|---|---|
| $10,000 | 2/14/02 | Barton Worldwide Enterprises | Purpose unknown (the receiving account was overseas, and the government was unable to obtain its records) |
| $19,244 | 2/12/03 | Sabrina Tynan (via UK account) | Assisted with conspiracy to escape from prison |
| $6,364 | 2/18/03 | Sherman & Sherman (via UK account) | These funds were later sent to Sabrina Tynan and used to aid prison escape attempt |
| $35,608 | SUBTOTAL FOR EXHIBIT 1000-F | | |

7

Gogley Decl., ¶ 6.  Thus, the total amount of money transferred to third parties from the Safiev ransom money is at least $338,428.00 (the grand total of the amounts in the three charts above).  Id. ¶ 7.

Defendant Mikhel controlled or directed the activity in all of the accounts from which the transfers to third parties were initiated, with the possible exception of the account from which the transfers to Sabrina Tynan and Sherman and Sherman were made. Id. ¶ 8 and Ex. 1000-F.  This latter account was controlled by Marina Karagodina, but she stated that she arranged these transfers as directed by defendant Mikhel.  Id. ¶ 8.  As the government's investigators proved at trial, these transfers were for the purpose of aiding defendants' conspiracy to attempt to escape from prison, for which they were also convicted.  Id.

D.    The Subject Assets

1.    The UK Funds

The UK Funds are partly traceable to the Safiev ransom money via the Glenstream Ventures Inc./Switzerland account described above and in Exhibits 1000-D and 1000-F, and are therefore directly forfeitable as proceeds of the crimes to that extent.

Specifically, as proved at trial, $176,320.00 of the Safiev ransom money was transferred to the Glenstream Ventures Inc. account in Switzerland on January 30, 2002.  Gogley Decl. ¶ 9, and Exhibit 1000-D.  On October 1, 2002, $85,033.00 was transferred to an account at HSBC in the United Kingdom held in the names of Mikhel and his girlfriend, Marina Karagodina. Gogley Decl. ¶ 9 and Ex. 1000-F.  After conversion to pounds sterling, the amount deposited to the receiving bank was

8

£ 53,701.85.  Gogley Decl. ¶ 9.  On October 4, 2002, the account was closed and £ 53,805.31 withdrawn (reflecting an increase for interest earned).  Id.  These funds were in turn deposited on January 1, 2003 to another HSBC account (no. xxxx9908) held in the names of Karagodina and Alisa Mikhel (the daughter of Karagodina and defendant Mikhel).  Id.  From this account, £ 16,000 was withdrawn and wired to a third party in the United States (Sabrina Tynan, directly and via Sherman & Sherman), leaving at least £ 37,805.31 of directly traceable ransom money in the HSBC account as of September 17, 2004.  Id. and Ex. 1000-F (lower right).

In 2005, US and UK investigators interviewed Karagodina in the United Kingdom.  Gogley Decl., ¶ 10.  Karagodina agreed to turn over the funds remaining in the HSBC account to law enforcement officials in the U.K., and in addition agreed to turn over other funds her mother was holding that Karagodina had received from the sale of a Ferrari belonging to defendant Mikhel.  Id.[4]  Law enforcement officials in the U.K. took custody of all the funds Karagodina released to them, and wired the funds (a total of £ 87,343.19) to the Federal Bureau of Investigation on November 1, 2007.  Id.; Declaration of Daniel M. Parker, ¶ 2. Thus, approximately £ 37,805.31 of these funds is directly traceable to the Safiev ransom proceeds (i.e., the funds remaining from the money received from Glenstream, as described in the preceding paragraph).  Gogley Decl. ¶ 10.  Based on the

---

[4]  According to the seller's records, in 2003 the seller paid £ 40,557.87 to Karagodina from the sale of the Ferrari, which was purchased by Mikhel prior to the Umansky and Safiev abductions.  Gogley Decl., ¶ 10.

bank's exchange rate at the time the funds were first transferred to the FBI's account (1 GBP = 2.058 USD, <u>see</u> Parker Decl., ¶ 2), $77,803.32 of the U.K. funds is thus directly forfeitable (£ 37,805.31 x 2.058= $77,803.32).  The government seeks to forfeit the remaining $102,010.11 as a substitute for a portion of the $338,428.00 of unrecovered ransom money transferred to third parties, pursuant to 21 U.S.C. § 853(p)(2).

2.  <u>The Glenstream/Latvia Funds</u>

As proved at trial, $173,680.00 of the Safiev ransom money was transferred on February 6, 2002 to an account at Aizkraukles Banka, Latvia, in the name Glenstream Ventures, Inc.  Gogley Decl. ¶ 12 and Ex. 1000-D.  From this account, payments to numerous third parties were made (including those described in the charts above), as well as payments to the defendants.  Ex. 1000-E.  By February 14, 2002, only $15,112.38 remained in the account, all of which is traceable to the Safiev ransom funds. It is the government's understanding that this amount has been frozen or removed by Latvian officials.  Gogley Decl. ¶ 12.  The government seeks to amend the forfeiture order to include the funds as a directly traceable asset.  Once amended, the order will be presented to authorities in Latvia for collection.

3.  <u>The BOFA Funds</u>

This account is held jointly in the names of Iouri Mikhel and Natalia Alifanova (Mikhel's ex-wife).  Gogley ¶ 13.  The last known balance was $2,510.98; it is the government's understanding that BOFA froze the account after learning of this investigation. <u>Id</u>.  The government seeks to forfeit the funds as a substitute for a portion of the unrecovered ransom money, pursuant to 21

10

U.S.C. § 853(p)(2).

## II.  ARGUMENT

A.  The Forfeiture Order in this Case May be Amended

If the government demonstrates to the court that property directly subject to forfeiture "has been transferred or sold to, or deposited with, a third party" as a result of any act or omission of the defendant, "the court shall order the forfeiture of any other property of the defendant, up to the value of any property" so transferred or sold.  21 U.S.C. § 853(p)(1)(B) and (p)(2) (applicable here pursuant to 28 U.S.C. § 2461(c) (2000), which provides, "the court shall order the forfeiture of the property in accordance with the procedures set forth in section 413 of the Controlled Substances Act (21 U.S.C. § 853), other than subsection (d) of that section.")

Rule 32.2(e) of the Federal Rules of Criminal Procedure describes the procedure for amending a prior order of forfeiture to add additional directly forfeitable property and/or substitute assets:

(e) Subsequently Located Property; Substitute Property.

(1) In General. On the government's motion, the court may at any time enter an order of forfeiture or amend an existing order of forfeiture to include property that:
(A) is subject to forfeiture under an existing order of forfeiture but was located and identified after that order was entered; or
(B) is substitute property that qualifies for forfeiture under an applicable statute.

(2) Procedure. If the government shows that the property is subject to forfeiture under Rule 32.2(e)(1), the court must:
(A) enter an order forfeiting that property, or amend an existing preliminary or final order to include it; and
(B) if a third party files a petition

11

claiming an interest in the property, conduct an ancillary proceeding under Rule 32.2(c).

(3) <u>Jury Trial Limited</u>. There is no right to a jury trial under Rule 32.2(e).

Because Rule 32.2(e)(1) authorizes the district court to amend the Forfeiture Order "at any time," the court may do so where, as here, appeals of the defendants' convictions and sentences are pending. <u>See, e.g.</u>, <u>United States v. Hurley</u>, 63 F.3d 1, 23-24 (1st Cir. 1995) (taking appeal does not divest district court of jurisdiction to amend forfeiture order to add substitute assets).

B.   <u>The Government Has Proved That up to $338,428.00 in Substitute Assets Are Forfeitable</u>

To obtain an order forfeiting substitute assets, the Government must satisfy the court that the conditions set forth in Section 853(p) have been met. <u>See</u>, <u>e.g.</u>, <u>United States v. Candelaria-Silva</u>, 166 F.3d 19, 42-43 (1st Cir. 1999) (the Government satisfied requirements of section 853(p) by submitting motion and affidavit reciting its efforts to trace defendant's drug proceeds). The forfeiture of substitute assets is solely a matter for the court, not a jury. Rule 32.2(e)(3); <u>Candelaria-Silva</u>, 166 F.3d at 43 (forfeiture of substitute assets is solely a matter for the court; the defendant's only right is to have the jury determine the amount of the money judgment, which puts an upper limit on the amount that may be forfeited as a substitute asset).

The court may also order the forfeiture of substitute assets to satisfy a money judgment where the money judgment represents the value of the proceeds of the offense that cannot be forfeited directly for one of the reasons set forth in Section 853(p). <u>Candelaria-Silva</u>, 166 F.3d at 42-43 (once the Government has

12

obtained a money judgment, it may forfeit defendant's real property in partial satisfaction of that judgment); <u>United States</u> <u>v. Baker</u>, 227 F.3d 955, 970 (7th Cir. 2000) (same).

As demonstrated by the Declaration of Aaron Gogley, at least $338,428.00 of proceeds of the hostage-taking offenses described in the Forfeiture Order were "transferred or sold to, or deposited with, a third party" as a result of acts committed by defendants Mikhel and/or Kadamovas.  Pursuant to 21 U.S.C. § 853(p)(1)(E) and (p)(2), the forfeiture of substitute assets is therefore mandatory to the extent of $338,428.00.

> C. <u>Portions of the U.K. Funds and All of the Glenstream/Latvia Funds are Directly Forfeitable</u>

The Forfeiture Order in this case did not identify any specific assets to be forfeited.  Rather, the order generally forfeited "[a]ll right, title, and interest in any and all property, real or personal, which constitutes or is derived from proceeds traceable to the violations of Title 18, United States Code, Section 1203 (<u>i.e.</u>, Counts One through Four of the Indictment) for which defendants have been convicted." Forfeiture Order, Section I.B(1).  "[T]he term 'proceeds' means property of any kind obtained directly or indirectly as a result of the commission of the offense giving rise to the forfeiture, and any property traceable thereto, and is not limited to the net gain or profit realized from the offense."  18 U.S.C. § 981(a)(2)(A).  The Gogley Declaration establishes that £ 37,805.31 (<u>i.e.</u>, $77,803.32) of the U.K. Funds and all of the Glenstream/Latvia funds constitute or are traceable to the Safiev hostage taking proceeds.

Pursuant to Fed. R. Crim. P. 32.2(e)(1)(A), the March 1,

13

2007 Forfeiture Order should be amended to specifically designate these assets as Forfeitable Property under Section I of the Order because they were not "located and identified" at the time of entry of the Order. As to the U.K. funds, at the time the Forfeiture Order was entered law enforcement authorities in the U.K. maintained some control over the U.K. funds, but those authorities were unable to release the funds to the United States. Gogley Decl. ¶ 11. Months after entry of the Forfeiture Order, the funds became available to the government when they were transferred to the custody of the FBI on November 1, 2007. Id.; Parker Decl. ¶¶ 2-3. These funds thus constitute property that was "located and identified" after the entry of the order of forfeiture, making this motion to amend the general forfeiture order to list these assets as forfeitable proceeds appropriate. Fed. R. Crim. P. 32.2(e)(1)(A).

Similarly, at the time the Forfeiture Order was entered the Glenstream/Latvia funds were believed to have been frozen and/or seized by the government of Latvia, but the repatriation of those funds to the United States was (and remains) uncertain. Gogley Decl., at ¶ 12. To this day, the government does not know where the funds are held, and therefore the funds still have not been "located and identified" within the meaning of Rule 32(e)(1)(A). Nevertheless, the government's undersigned counsel believes, based on training and experience with international forfeiture matters, that if the Forfeiture Order were amended to specifically include the Glenstream/Latvia funds, wherever they may be located, the likelihood that the Latvian government will honor the order and release the funds to the United States will

14

be increased.[5]  The court has jurisdiction to enter a forfeiture order without regard to the location of the property.  21 U.S.C. § 853(l).

## IV.   THE MECHANICS OF THE PROPOSED AMENDED FORFEITURE ORDER

The proposed order submitted by the government provides that the government has the right to forfeit substitute assets valued at $338,428.00, and orders the forfeiture of the BOFA Funds and $102,010.11 of the U.K. Funds (and the interest earned on the entire amount transferred to the FBI) as substitute assets.  In addition, the proposed order provides that the remaining $77,803.32 of the U.K. Funds and all of the Glenstream/Latvia funds constitute or are traceable to the Safiev hostage-taking proceeds, and amends the prior Forfeiture Order to specify that these assets are forfeited as crime proceeds pursuant to Section I.B(1) of the Forfeiture Order.

### A.   Seizure

The entry of a forfeiture order, including an order forfeiting substitute assets, authorizes the government to seize the specific property subject to forfeiture.  21 U.S.C. § 853(g); Rule 32.2(b)(3); see also United States v. Friend, 2006 WL 1966594, *2 (D. Or. 2006) (substitute assets may be seized post-conviction); United States v. Numisgroup Intl. Corp., 169 F. Supp.2d 133 (E.D.N.Y. 2001) (same).  Accordingly, the United States requests, pursuant to Title 21, United States Code,

---

[5]  If the court were to decline to amend the general Forfeiture Order pursuant to Rule 32.2(e)(1)(A) to specify the Glenstream/Latvia funds as a directly forfeitable asset, the funds would nevertheless be forfeitable as a substitute asset for a portion of the $338,428.00 transferred to third parties.  Rule 32(e)(1)(B).

15

Section 853(g), that it be empowered to seize the subject assets (to the extent it does not already have possession of those assets) and to take any other steps deemed warranted to preserve the availability of those assets for forfeiture. Once the property is in custody, the United States will initiate proceedings necessary to protect any third party interests in the substitute property.

   B.   Determining Third Party Rights, if Any

   After the court enters an order forfeiting specific assets, third parties have a right to contest the forfeiture by asserting an ownership interest superior to that of the defendants in an ancillary proceeding, pursuant to 21 U.S.C. § 853(n). Rule 32.2(e)(2). Section II.C of the current Forfeiture Order already sets forth the procedures for notifying and determining the interests of third parties in specific property to be forfeited in this matter, and the proposed Amended Order incorporates those provisions. If a third party files a claim, the filing will trigger an ancillary proceeding to determine whether the third party has an interest in any part of the subject assets. 21 U.S.C. § 853(n)(2)-(7); Fed. R. Crim. P. 32.2(c).

V.   CONCLUSION

   Based upon all of the foregoing, the government respectfully requests that the Court amend the Forfeiture Order to add the specific traceable assets; provide for the substitution of assets in the amount requested; authorize the government to seize specific assets (to the extent they are not already in the government's possession); and commence proceedings governing third-party rights. Fed. R. Crim. P. 32.2(b)(3), (e); 21 U.S.C.

16

§ 853(n)(1).  Following notification to third-parties and completion of any necessary ancillary proceedings, the government will submit, as appropriate, a final order of forfeiture pursuant to Fed. R. Crim. P. 32.2(c).

DATE: April ___, 2009                    Respectfully submitted,

                                         THOMAS P. O'BRIEN
                                         United States Attorney
                                         CHRISTINE C. EWELL
                                         Chief, Criminal Division
                                         ROBERT E. DUGDALE
                                         Chief, Violent and Organized Crime
                                         Section
                                         SUSAN J. DE WITT
                                         KAREN I. MEYER
                                         Assistant United States Attorneys

                                         /s/_____
                                         MONICA E. TAIT
                                         Assistant United States Attorney
                                         Asset Forfeiture Section

                                         Attorneys for Plaintiff
                                         UNITED STATES OF AMERICA

17