<u>DECLARATION OF AARON GOGLEY</u>

I, Aaron Gogley, do hereby declare as follows:

1.   I am Senior Special Agent for the Internal Revenue Service-Criminal Investigation ("IRS-CI").  I have been a Special Agent for IRS-CI since 1998.  I hold a Bachelor of Science degree in accounting.  I have experience in a wide range of financial investigations including criminal tax, identity theft, narcotics, government fraud, public corruption and money laundering violations.  At the trial of the matter <u>United States v. Iouri Mikhel and Jurijus Kadamovas</u>, I testified as an expert in the area of money laundering, and I described the extensive financial analysis I performed as the lead financial investigator in the case.  The following is based on my personal knowledge and on the files and records I have reviewed as part of my position as lead financial investigator for this case.

2.   One of my tasks in this case was to trace the funds paid by the families and associates of the victims of the hostage takings committed by the defendants.  To that end, the government obtained thousands of pages of foreign and domestic financial institution records for more than 100 accounts, and I reviewed and analyzed the financial transactions shown by these records. I prepared spreadsheets based on my review of these voluminous records, and ultimately prepared exhibits for trial summarizing some of these records.  Attached as Exhibits 1000-D, 1000-E, and 1000-F are copies of three trial exhibits I prepared based on some of these voluminous records, which were admitted at the trial of this case and as to which I testified extensively.  I also reviewed records showing the co-conspirators' purchases,

*X*

36

their credit card statements, and evidence obtained from search warrants executed by government personnel in this matter.  I also interviewed dozens of witnesses, and traveled to Switzerland, Barbados, Jamaica, the United Kingdom, Cyprus, and Russia in furtherance of my financial investigation and in order to trace the disposition of the victims' funds.

3.    The purpose of this declaration is (1) to support the tracing of certain assets to the proceeds of the hostage taking offenses, and (2) to support the government's motion for an order permitting the forfeiture of substitute assets for some of proceeds of defendants' crimes.  To accomplish these purposes, I discuss herein some of the evidence I reviewed tracing some of the funds paid by an associate of George Safiev.  I do not concede or imply that the amounts described herein constitute the full extent of the unrecovered Safiev ransom money.  In fact, the amount of unrecovered money is well in excess of the amounts I describe here.  For example, the financial records the government has obtained show that substantial amounts of the funds were converted to cash and not recovered.  Other amounts were transferred to the defendants' own accounts and spent.  Moreover, I do not describe here the disposition of the ransom money paid by the family of Alexander Umansky (a substantial amount of which remains unrecovered).

TRACING THE SAFIEV RANSOM PROCEEDS TO THIRD PARTIES

4.    I learned that on January 23, 2002, Konstantine Tezhik wired $969,000.00 as demanded by the defendants to an account at Capital Solutions.  Based upon my review of financial institution records and other records obtained during the investigation, I

2

37

created three charts (Exhibits 1000-D, 1000-E, and 1000-F) mapping the movement of the Safiev funds.  The following paragraphs describe some of the information set forth in these charts as it relates to the transfer of the crime proceeds to selected third parties.

5.    The initial $969,000 transfer initiated by K. Tezhik was deposited to an account with Capital Solutions in Jamaica in the name of Thomas Noms (an alias name).  The majority of the funds from the Capital Solutions account ($850,000.00) were deposited to an account at First Global Bank, Jamaica, in the name of a nominee, Ricardo Azon.  From the First Global account, the funds were disbursed via accounts bearing alias names to diverse accounts in Jamaica, Barbados, the United States, Latvia, Switzerland, Luxembourg, and the United Kingdom, some controlled by the defendants and some controlled by third parties at the direction of at least one of the defendants.  Several of these further transfers are shown on Exhibits 1000-E and 1000-F, which follow the trail of portions of the Safiev ransom money after large blocks of the funds were transferred to accounts in the name of Glenstream Ventures Inc. in Latvia and also in Switzerland.

6. My investigation and the records I have reviewed and summarized shows that at least the following amounts were transferred to accounts in the names of third parties for the purposes indicated:

//

//

//

3

38

**EXHIBIT 1000-D: SELECTED TRANSFERS OF SAFIEV RANSOM FUNDS TO THIRD PARTIES**

| AMOUNT | DATE | THIRD PARTY RECIPIENT | TRANSFEREE'S ROLE OR PURPOSE OF TRANSFER |
|---|---|---|---|
| $28,477 | 2/19/02 | G. Birnbaum | Rent for Mikhel's aquarium business |
| $5,000 | 2/19/02 | Litchfield Imports Ltd U.K. | High-end car dealer in U.K. |
| $51,270 | 2/19/02 | Anton Eidaka-Kasuza | Stepfather of co-conspirator Ainar Altmanis |
| $48,703 | 2/12/02 | Anita Eidaka-Kasuza | Altmanis' mother |
| $14,368 | 2/12/02 | Marina Karagodina (Barclays Bank) | Mikhel's girlfriend |
| $48,730 | 5/28/02 | Gite Lellan | Mikhel's associate, convicted of money laundering for this transaction |
| *$196,548* | *SUBTOTAL FOR EXHIBIT 1000-D* | | |

//
//
//
//
//
//
//
//
//
//
//
//

**EXHIBIT 1000-E: SELECTED TRANSFERS OF SAFIEV RANSOM FUNDS TO THIRD PARTIES**

| AMOUNT | DATE | THIRD PARTY RECIPIENT | TRANSFEREE'S ROLE OR PURPOSE OF TRANSFER |
|---|---|---|---|
| $6,977 | 2/7/02 | Land Rover Encino, Inc. | Downpayment for leased vehicle |
| $2,500 | 2/7/02 | Elite Family Dogs | Deposit for purchase of dogs; some funds were refunded to M. Karagodina, but none recovered by the government |
| $14,968 | 2/7/02 | Mrs. Alexsejus Markovsis | Relative of co-conspirator Markovsis. (Markovsis later paid $15,000 in restitution, but from a different source) |
| $25,000 | 2/7/02 | Laden Nasseri | Girlfriend of Jeff Dabbs (a real estate agent who assisted the defendants) |
| $900 | 2/7/02 | Alexander Tsesas | An associate of co-conspirator Petro Krylov. Tsesas actually received $31,500 on this date, but paid $30,600 in cash to Krylov. |
| $10,215 | 2/11/02 | Osta Marketing | Vladimir Sobolev's account, through which other third parties received funds at Mikhel's direction |
| $13,932 | 2/11/02 | Life Source Water Systems | Water filtration system; most of these funds were later remitted to the account of Sherman & Sherman (Mikhel's former counsel) |

5

40

**EXHIBIT 1000-E: SELECTED TRANSFERS OF SAFIEV RANSOM FUNDS TO THIRD PARTIES**

| AMOUNT | DATE | THIRD PARTY RECIPIENT | TRANSFEREE'S ROLE OR PURPOSE OF TRANSFER |
|---|---|---|---|
| $5,620 | 2/11/02 | Hillis of Snowmass | Fur coat retailer |
| $9,260 | 2/11/02 | Steve G. Plumbing Co. | Plumber who worked on Mikhel's property |
| $4,200 | 2/14/02 | Altour Classic LLC | Travel agency; for Marina Karagodina's travel |
| $4,700 | 2/14/02 | Elite Financial | This firm helped the defendants obtain mortgages on their properties |
| **$98,272** | **SUBTOTAL FOR EXHIBIT 1000-E** | | |

**EXHIBIT 1000-F: SELECTED TRANSFERS OF SAFIEV RANSOM FUNDS TO THIRD PARTIES**

| AMOUNT | DATE | THIRD PARTY RECIPIENT | TRANSFEREE'S ROLE OR PURPOSE OF TRANSFER |
|---|---|---|---|
| $10,000 | 2/14/02 | Barton Worldwide Enterprises | Purpose unknown (the receiving account was overseas, and the government was unable to obtain its records) |
| $19,244 | 2/12/03 | Sabrina Tynan (via UK account) | Assisted with conspiracy to escape from prison |
| $6,364 | 2/18/03 | Sherman & Sherman (via UK account) | These funds were later sent to Sabrina Tynan and used to aid prison escape attempt |
| **$35,608** | **SUBTOTAL FOR EXHIBIT 1000-F** | | |

6

41

7. The total amount of money transferred to third parties from the Safiev ransom money is at least $338,428.00 (the grand total of the amounts in the three charts above).

8. Based upon my analysis of the records and the information I have learned in this investigation, I believe defendant Mikhel controlled all of the accounts initiating the above transfers to third parties, with the possible exception of the account in the United Kingdom from which the February 2003 transfers to Sabrina Tynan and Sherman & Sherman were made. This account was controlled by Marina Karagodina, Mikhel's girlfriend. I have interviewed Ms. Karagodina in the United Kingdom. She stated that she arranged these transfers as directed by defendant Mikhel. My further investigation of these transfers indicates that these transfers were performed for the purpose of aiding defendants' conspiracy to escape from prison, for which they were also convicted at trial.

TRACING SOME OF THE SAFIEV RANSOM PROCEEDS TO FUNDS

MARINA KARAGODINA RELINQUISHED TO U.K. AUTHORITIES

9. Exhibit 1000-D shows that I traced $176,320.00 of the Safiev ransom money to a Glenstream Ventures Inc. account in Switzerland. On October 1, 2002, $85,033.00 was transferred from this account to an account at HSBC in the United Kingdom held in the names of Mikhel and his girlfriend, Marina Karagodina. See Ex. 1000-F. After conversion to pounds sterling, the amount deposited to the receiving bank was £ 53,701.85. On October 4, 2002, the account was closed and £ 53,805.31 withdrawn (reflecting an increase for interest earned). These funds were in turn deposited on January 1, 2003 to another HSBC account (no.

42

92499908) held in the names of Karagodina and Alisa Mikhel (the daughter of Karagodina and defendant Mikhel). From this account, £ 16,000 was withdrawn and wired to third parties in the United States (Sabrina Tynan and Sherman & Sherman), leaving at least £ 37,805.31 of directly traceable ransom money in the HSBC account as of September 17, 2004. See Ex. 1000-F (lower right).

10. In 2005, I and other U.S. investigators interviewed Karagodina, together with U.K. investigators, in the United Kingdom. Karagodina agreed to turn over the funds remaining in the HSBC account to law enforcement officials in the U.K., and in addition agreed to turn over other funds her mother was holding that Karagodina said she had received from Litchfield Imports as a result of the sale of a Ferrari that Mikhel owned prior to the Safiev and Umansky abductions. (I have reviewed records from Litchfield Imports, the seller of the Ferrari, showing that in 2003 Litchfield paid £ 40,557.87 to Karagodina from the sale of the Ferrari.) Based on information I received from Detective John Richards of the Metropolitan Police, it is my understanding that law enforcement officials in the U.K. (specifically, Detective Richards) collected the funds relinquished by Karagodina and placed them into a type of trust account. Thus, approximately £ 37,805.31 of the funds relinquished by M. Karagodina is directly traceable to the Safiev ransom proceeds (i.e., the funds remaining from the money received from Glenstream, as described in the preceding paragraph).

11. Based on my communications with Detective Richards, at the time the forfeiture orders were entered in this case (early 2007), the U.K. authorities were not able to release the funds to

the United States.  It is my understanding that the U.K. authorities ultimately caused the funds they collected from Karagodina to be transferred to the FBI.

TRACING SOME OF THE SAFIEV RANSOM PROCEEDS TO FUNDS IN AN ACCOUNT AT AIZKRAUKLES BANKA, LATVIA, IN THE NAME GLENSTREAM VENTURES, INC.

12.  Exhibit 1000-D shows that I traced $173,680.00 of the Safiev ransom money to account no. 1-469-0010392-0001 at Aizkraukles Banka, Latvia (the "Glenstream/Latvia funds").  From this account, I traced outgoing payments to numerous third parties (including those described in the charts above), as well as to the defendants.  Ex. 1000-E.  According to bank records I reviewed, by February 14, 2002, only $15,112.38 remained in the account, all of which is traceable to the Safiev ransom funds. It is my understanding that this balance may have been frozen or removed by Latvian officials, but I do not know where the funds are presently held.

MIKHEL'S ACCOUNT AT BANK OF AMERICA

13.  During my investigation, I reviewed financial institution records relating to an account at Bank of America held jointly in the names of Iouri Mikhel and Natalia Alifanova (Mikhel's ex-wife), bearing account no. 03868-01517 (the "BOFA Funds").  As of the last date for which I have records, the

//
//
//
//
//

9

44

balance in the account was $2,510.98.  It is my understanding that BOFA froze the account after learning of this investigation.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this _2nd_ day of April, 2009, in Houston, Texas.

AARON GOGLEY

10

45