UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

- - -

THE HONORABLE NORA M. MANELLA, JUDGE PRESIDING

```
UNITED STATES OF AMERICA,  )
              Plaintiff,   )
     vs.                   )
                           )  CR-02-220-NM
IOURI MIKHEL, et al.,      )
              Defendants.  )
---------------------------)
```

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Los Angeles, California

January 27, 2003


SHARON A. SEFFENS, RPR
United States Courthouse
411 West 4th Street, Room 1-1053
Santa Ana, CA  92701
(714) 543-0870

APPEARANCES OF COUNSEL:

For the Plaintiff:

JOHN S. GORDON
United States Attorney
RONALD L. CHENG
Assistant United States Attorney
Acting Chief, Criminal Division
SUSAN DEWITT
BEVERLY REED O'CONNELL
Assistant United States Attorneys
1100 United States Courthouse
312 North Spring Street
Los Angeles, CA  90012
(213) 894-2434


For Defendant IOURI MIKHEL:

DALE RUBIN
DALE RUBIN LAW OFFICES
2275 Huntington Drive, Suite 902
San Marino, CA  91108
(800) 695-3717

For Defendant PETRO KRYLOV:

GEORGE W. BUEHLER
BUEHLER & KASSABIAN
350 West Colorado Boulevard
Pasadena, CA  91105
(626) 817-5092

DAVID R. EVANS
DAVID R. EVANS LAW OFFICES
7462 North Figueroa Street, Suite 201
Los Angeles, CA  90041
(323) 257-5100

For Defendant JURIJUS KADAMOVAS:


RICHARD LASTING
RICHARD P. LASTING LAW OFFICES
318 East 8th Street, Suite 801
Los Angeles, CA  90014
(213) 489-9025

MARCIA BREWER
MARCIA J. BREWER APLC
400 Corporate Pointe, Suite 800
Culver City, CA  90230
(310) 670-5325

For Defendant NATALYA SOLOVYEVA:


MICHAEL M. CRAIN
MICHAEL M. CRAIN LAW OFFICES
P.O. Box 3730
Santa Monica, CA  90408
(310) 571-3324


For Defendant ALEKSEJUS MARKOVSKIS:

DOMINIC CANTALUPO
DOMINIC CANTALUPO LAW OFFICES
100 Wilshire Boulevard, Suite 950
Santa Monica, CA  90401-1145
(310) 397-2637

ALSO PRESENT:

Russian Interpreter

LOS ANGELES, CALIFORNIA; JANUARY 27, 2003; P.M. SESSION

THE CLERK:  Item No. 7, CR-02-220-NM, United States of America versus Iouri Mikhel, Jurijus Kadamovas, Petro Krylov, Natalya Solovyeva, and Aleksejus Markovskis.

Counsel, please state your appearances.

MS. DEWITT:  Good afternoon, Your Honor.  Susan DeWitt on behalf of the government.

MS. O'CONNELL:  Good afternoon, Your Honor. Beverly Reed O'Connell on behalf of the United States.

THE COURT:  Good afternoon.

MR. RUBIN:  Good afternoon, Your Honor.  Dale Rubin on behalf of Mr. Mikhel, who is present in this courtroom.  I am also making a special appearance for Mr. Callahan who has a conflicting issue.

THE COURT:  Good afternoon, Mr. Rubin.

MS. BREWER:  Good afternoon, Your Honor.  Marcia Brewer and --

MR. LASTING:  -- Richard Lasting --

MS. BREWER:  -- on behalf of Mr. Kadamovas.

THE COURT:  Good afternoon.

MR. BUEHLER:  Good afternoon, Your Honor.  George Buehler on behalf of Mr. Krylov, who is present.

MR. EVANS:  Good afternoon, Your Honor.  David Evans on behalf of Mr. Krylov.

MR. CANTALUPO:  Good afternoon, Your Honor.

Dominic Cantalupo for Aleksejus Markovskis, who is present, as his capital counsel.

MR. CRAIN:  Good afternoon, Your Honor.  Michael Crain for Ms. Solovyeva, and I am standing in for Terry Amdur, who may be here.  He is in Judge Baird's courtroom right now.

THE COURT:  All right.  And all the defendants are present; correct?

MS. BREWER:  That's correct.  Mr. Kadamovas is present, and he requires the services of the Russian language interpreter, who I believe is present.

THE COURT:  All right.  We're here for a status conference, and the report to me by the government attempted to incorporate the defense's position insofar as counsel were able, and I also have a separate submission by Mr. Bennett which the government submitted as well.

First of all, I understand Ms. Solovyeva's and Mr. Markovskis's death penalty submissions have been provided to the U.S. Attorney's Office.

Have they been forwarded to the Department of Justice?

MS. DEWITT:  No, they have not, Your Honor, though I do anticipate that that will happen shortly.

THE COURT:  Are we talking about the end of the month?

6

MS. DEWITT:  As soon as they can meet.  We have given them dates that include this week and next week, so I would imagine it would be shortly thereafter.

THE COURT:  All right.  Mr. Kadamovas according to your report has requested an additional 60 days to submit his presentation to the U.S. Attorney's Office.  Is that correct, Ms. Brewer and Mr. Lasting?

MR. LASTING:  Yes, it is, Your Honor.

THE COURT:  With respect to Messrs. Mikhel and Krylov, do we have some proposed dates for those submissions?  I guess I will address this to Mr. Rubin and then Messrs. Buehler and Evans.

MR. BUEHLER:  Your Honor, on behalf of Mr. Krylov, I think we would be looking at the end of -- mid March, Your Honor, which I guess is 60 days.  Frankly, the government's position that the forensic evidence will not be available for a year came as somewhat of a surprise to us, but given that the trial date is going to have to go out so far in light of that, then by asking for 60 days, we are taking a little bit more time than we had anticipated asking for, but it seems to me that now that the scheduling of the case is getting pushed out to that extent that our taking this 60 days should not be a problem.

THE COURT:  How about for Mr. Mikhel?

MR. RUBIN:  Yes, Your Honor.  We're probably in

the same position.  The most recent discovery compliance, which we have actually not gotten yet but I understand is with the copy service, is also the most relevant information.  It's information that we need to review and digest before we can understand all of the facts and circumstances of the crime and our client's alleged participation in order to address those issues in the death penalty presentation.

THE COURT:  Everybody seems to think 60 days will do it; correct?

MR. RUBIN:  I think so.

THE COURT:  All right.  Then in the absence of something extraordinary coming up, I'm going to ask then that those death penalty submissions be made to the U.S. Attorney's Office on behalf of the remaining three defendants no later than March 28th.

Now, I understand owing I guess to the voluminousness of the physical evidence that's going to be about a year -- it's going to take about a year for the forensic analysis to be completed unless that can be expedited.  Based on that, the government is estimating about six months for its case-in-chief on the guilt phase. Mr. Bennett on behalf of Mr. Markovskis estimates that it will be double that amount of time in total.  Obviously it would depend on the number of defendants.

The government has proposed setting schedules for motions, dividing them really into three categories -- wiretap motions, suppression motions based on non-wiretap evidence, and other motions which would be possibly procedural motions, which I assume the government will include severance motions and others.

The government is also suggesting that those wiretap motions be filed within the next 30 to 45 days followed by the non-wiretap suppression motions with additional scheduling of other motions to be set later and proposing a status conference in about four months.

Mr. Markovskis's submission by Mr. Bennett indicates a probable motion to sever.  As I read Mr. Bennett's submission, it suggested that a decision on the death penalty should precede those motions.

So I guess one question is -- before I get to that, actually, let me go back to Ms. DeWitt and Ms. Reed O'Connell.  In your experience, at least in this administration, how long has it been taking the Department of Justice to make decisions in death penalty cases after the submissions have been made by the local U.S. Attorney's Office?

MS. DEWITT:  Your Honor, the government's trial estimate is actually three months.  The six months would be a combination of -- we estimate our case-in-chief to take

three months.

THE COURT: That's what I thought. If I said otherwise, I misspoke. It was Mr. Bennett who had estimated three to six months.

MS. DEWITT: My understanding is -- and this is not based on personal experience but representations that have been made to me -- that it takes somewhere between six to eight weeks, although there is some indication that they might be done quicker now that this administration has sort of settled in. The process may be a little quicker than that, but I would not find six to eight weeks to be an unreasonable estimate.

THE COURT: I guess my question is should -- how do the parties feel with respect to the timing of the motions? Particularly I want to ask defense counsel do you feel it makes sense to start the motions before the death penalty decision has been made because those motions will have to be resolved anyway, and we might as well get started on them, or whether the decision whether to file those motions will depend on the death penalty decision made by Washington?

Mr. Cantalupo.

MR. CANTALUPO: Thank you, Your Honor. I would prefer to have the decision on death rendered before any motions are filed. There are a number of reasons. If the

Court would like, we can approach in-camera and I can explain those, but it would be better for Mr. Markovskis' defense if those motions were filed after the death penalty decision was reached.

THE COURT:  Let me ask it in a very broad way. Are there motions that you would feel compelled to bring before the death penalty decision is made that you might not bring otherwise after the death penalty decision is made?

MR. CANTALUPO:  Yes.

THE COURT:  Let me ask other defense counsel do you have an opinion on the subject?  Mr. Rubin?

MR. RUBIN:  Yes.  Dale Rubin on behalf of Mr. Mikhel.  Your Honor, I have discussed this with Mr. Callahan, and he indicated that if we had to he has already started working on the suppression on the wiretaps. However, it seems to me that the better kind of course to take is to wait until the decision regarding the death penalty has been made and we have received either that it's not a death case or the other, in which case the government is going to go back to the grand jury and is going to get a superseding indictment, and that will then bring up new issues that have to be resolved and addressed.  It seems to me that it may be a waste of time to do motions twice.

In addition --

THE COURT:  I think we can all agree it's a waste

11

to do them twice.

MR. RUBIN:  Well, I like doing motions I've already lost again.

THE COURT:  You're a glutton for punishment.

MR. RUBIN:  That's right.  Well, the second time is not as hard.  The only other thing that I wanted to address was the issue on the forensic evidence.  It very well could be that the results of this forensic testing will either result in the defense then asking to conduct its own forensic testing on the same items; or on the other hand, depending on what the test results are, it may be that if there's an issue that is important to the seeking of the death penalty, then we might be at that point asking again for another presentation to the Department of Justice in Washington.

THE COURT:  You know, that's possible, but I have to say -- and I realize there haven't been so many of these cases in the federal system, but I guess I do see the submission of a death penalty as not being a mini-trial on the merits.  I mean, submission on a death penalty is assuming your client did what he's alleged to have done should the death penalty be applied.

I understand there may be reasons why you want to go back and say, well, the evidence isn't as strong as you think it is, but nevertheless, because that is a preliminary

determination, at some point, we have to say there is enough here for the Department of Justice to make its determination.

I understand -- it is certainly conceivable that something would come up and you would say, hey, if the government had known what we know now from our tests or even from their own tests, we think the decision would have been different. I don't think it's going to take the government very long to decide whether that's true or not, but I think we can jump off that bridge when we get to it, but I understand your point.

MR. RUBIN: Yes. The situation is -- in the Mexican Mafia case, we actually went back to Washington on the issue of the death penalty while we were still in trial because of things that had changed. The problem is at that point where we thought we could work out the disposition because the status -- or the evidence in the case had changed, the trial judge was not willing to go along with it.

So it is -- Mr. Ashcroft has informed the defense bar that the door to his office is always open on the issue of the death penalty. If we think things have changed or are different, we can always go back and ask again. There comes a point, though, where going back and asking even if we're successful doesn't make a difference.

THE COURT:  Ms. O'Connell, do you want to speak?

MS. O'CONNELL:  Yes, Your Honor.  I would just add as a practical matter the government's submission with respect to the forensic evidence as it stands right now benefits the defense.  The uncertainty as to any DNA testing or fingerprints or fiber analysis right now is as though -- is uncertain.  So the only benefit to the defense would be let's say that there is no physical evidence --

THE COURT:  If they come up with a print later after the death penalty determination has been made, they might want to challenge it, but as the evidence stands before the DOJ now, there are no prints.

MS. O'CONNELL:  Well, in essence, if there is a print that comes up later, it would actually strengthen the government's case.

THE COURT:  Right.  I understand that.  But you're saying that the position right now is that in the absence of that forensic evidence that might match, the assumption is we don't have anything to match.

MS. O'CONNELL:  Right, which is exactly the benefit.  Now, that as it stands -- that determination the government believes is separate and apart as to whether there was probable cause to issue a wiretap, whether there was any recklessly disregarded facts either misrepresented or not in the wiretap affidavit, or any motions to suppress

any particular evidence.  We understand that strategically a defendant may not want to challenge a particular search if there is no evidence linking him or her to that particular place which later may due to their forensic analysis -- you know, there may be some inculpatory evidence.

But certainly with the wiretap stuff, it is what is right now, and the standing is what it is right now. It's not going to change based on any determination by the Department of Justice whether or not to seek the death penalty.

THE COURT:  All right.  I understand, Mr. Rubin, that you and Mr. Callahan would be -- you don't necessarily disagree with Ms. O'Connell's assessment as to the fact that the wiretap issue is ripe to be litigated.  You would prefer to wait until -- a little bit more time for that.

MR. RUBIN:  Yes.  I would indicate that -- and Mr. Callahan is here now, and he has indicated that that's correct.

THE COURT:  Okay.

MR. RUBIN:  The only other thing that I would point out, Your Honor, is that in my experience going through the death penalty presentation process at a very early stage, the government tends to rely heavily on evidence of what we would call snitches, and we have that in this case.  What ends up happening is down the road after a

year or so of investigation, we tend to know a lot more about the credibility of that source than we are able to put in at this point in time.

THE COURT:  All right, thank you.

Anyone else from the defense side that wants to weigh in on the timing of motions?

MR. LASTING:  Yes, Your Honor.

THE COURT:  Mr. Lasting.

MR. LASTING:  Your Honor, just with regard to the timing of motions, not necessarily the wiretap but all of them, the discovery in this case is voluminous.  I think the Court can see from the government's position papers that it's about 25,000 pages.  There's another several thousand pages to come.  Additionally, there are computer hard drives that still have to be supplied to the government, and we have to make determinations as to what's on there.  There are numerous cassette tape recordings and data tapes.  Some of this discovery was just recently received, at least by Ms. Brewer and myself on behalf of Mr. Kadamovas.

Additionally, a lot of the discovery we still have to -- we're trying to cull through this to minimize the cost and the expense, but a lot of this discovery we would like to have translated into the Russian language so that he can review it, and we can discuss it with him, and he can have a chance to look at it before we meet with him.  The process

of doing all of this, as the Court can imagine, is quite lengthy and time-consuming.

So it would seem to me that before we start having hearings with regard to motions that the Court is going to have to resolve, it's a better position for the defense to have the opportunity to go through this voluminous discovery, digest it, and then make determinations as to what motions are appropriate.

For that reason, I think that -- although granted the decision as to whether the government is going to seek the death penalty or not is not particularly controlling as to what motions are going to be brought, I think just in terms of the timing of it to use that as a period of time at which after that decision is made we will then set the dates for the motions would be appropriate so that the discovery can be fully reviewed and determinations can be made as to what motions apply.

THE COURT:  Okay.  Thank you, Mr. Lasting.

Anyone else wish to be heard on the subject before I turn to the government?

Ms. O'Connell and Ms. DeWitt, I understand the government's position I think, which is just from a purely legal standpoint that whatever issues may be raised with respect to wiretap can be decided now.

Then maybe, Mr. Cantalupo, if you do want to file

something in-camera on that subject, you may do so.

To the extent that the determination of whether the government is going to seek the death penalty is obviously a tremendously significant one, not only with the defendants individually but for the defense strategy going forward, I guess the question is why not wait until we at least have that threshold decision by the DOJ. I think we can say there is clearly not much of a rush to judgment here.

MS. DEWITT: No, there's not going to be a rush to judgment, Your Honor, but a couple things I think you need to factor in here is, first of all, there were approximately 44 search warrants that were executed in this case, and I think just as a practical matter we need to begin the review process of any challenges that may be made to those suppression motions, or we're going to be here until the next decade. We've just got to get these things here before you.

Also, although the discovery in this matter is quite voluminous, the search warrant evidence was produced -- almost virtually all of it was produced quite some time ago, and it is a much more discrete set of documents. Although there is voluminous discovery in this matter, a lot of the discovery is toll records and bank records.

A lot of the other written documentary evidence is

stuff that was in the possession of the defendants, and it would be a little hard, I think, for them to really argue that those need to be translated to the extent that they had them in their own possession and were able to read and understand them.  So I don't think that the translation issue is as genuine an ordeal or as dramatic in terms of the timing on going forward with the search warrants.

I think -- not unlike the wiretap motions or the forensic analysis that Ms. O'Connell just talked about, it's in their interest to get the search warrant issues resolved because that may work to their benefit as well.  If anything, if they are successful in those motions, that reduces the evidence the government may have against them, so I see that as really cutting both ways.

Our suggestion in moving forward, which I had understood most defense counsel agreed with until today, was in order to keep this on track, to space it out so that it wasn't an undue burden for any of the parties, and to make sure that the Court also wasn't overburdened with --

THE COURT:  Oh, don't worry.  The Court will be.

MS. DEWITT:  Right, but it would be worse if it's not --

THE COURT:  I understand, and I appreciate your feeling that we ought not to be sort of letting time go by that could be used productively.

MS. DEWITT: Right. And I think to the extent that they really think that there are particular search warrants where they need more time, then let them identify those search warrants, but otherwise we're going to wait until six months or another six weeks, and then they're going to ask for more time. I just see that if we don't begin to set deadlines now they will continue to slip.

THE COURT: Mr. Evans.

MR. EVANS: If I might very briefly, Your Honor, I'm always concerned when the government is solicitous. I find that oftentimes we go in different directions, and that what I perceive to be productive use of my time is not what they consider it to be.

There is voluminous discovery in this case. Mr. Buehler and I met with the FBI agent to review search warrant materials I believe at the end of last summer. We were told that that evidence was going to be submitted for forensic evaluation within a matter of weeks. Now we're told it's going to be a year before it comes back. Whatever actions we take or need to take are going to be contingent to some degree on what the outcome of those tests bear out. I agree there are some motions that could be brought before others, but there's a lot of stuff. Mr. Lasting's comments are very germane, and we would hope that the Court would consider them.

THE COURT:  Well, let's just look at the wiretaps, okay, because that's past, and we're not talking about any kind of forensic analysis that would affect that.

Doesn't it make some sense to at least get those motions heard as expeditiously as possible?  Mr. Rubin.

MR. RUBIN:  I'm sorry.  I was just getting my calendar.  I had the feeling there was something I had to write down.

THE COURT:  Mr. Callahan.

MR. CALLAHAN:  I spoke with Ms. DeWitt over the last couple of weeks trying to coordinate this schedule.  I did believe it was appropriate to do the motions in waves.  Forgive me for coming in late.  I had the audacity to have a judge with senior status, so I had to go there first.

I was unaware at the time that the forensic evidence was a year away from being finalized.  I agree with the Court and I agree with the government to the degree that we shouldn't let time pass, but I think seriously about the only thing we could do pending resolution of forensic evidence at this point is the wiretap motion.  I indicated to Ms. DeWitt that I thought at least from my own standpoint -- I'm not speaking for other counsel -- that I would most likely be taking the laboring ore on that motion anyway and that I felt it was fine and appropriate for us to move that motion forward.  That was my point.  I don't want

to misspeak as to anybody else's position.

THE COURT:  In the meantime, just with respect to the wiretap, not with respect to non-wiretap motions, is there anyone who feels that they would be severely disadvantaged or unable to proceed with those motions?

I see no hands.

Well, Mr. Callahan, since you I guess have broached the subject with Ms. DeWitt, I think the government is suggesting that those motions be filed within, as I recall, it was 45 to 60 or 30 to 45 days.

MS. DEWITT:  30 to 45 days.

THE COURT:  Mr. Callahan, since you're the one who's here, do you want to be heard?

MR. CALLAHAN:  The perils of coming in late.  My recollection from my conversation with Ms. DeWitt was that she indicated to me -- and forgive me if I am repeating what she has already said -- that the majority of discovery would be complied with and disclosed to the defense within a month, plus or minus.  I said after that date it made sense for perhaps two months from that point for the wiretaps to be due.

Since a lot of this material -- again, I go back to this forensic evidence disclosure date.  I mean, there are only so many things we can do.  I don't see why 45 days as opposed to 90 days is going to really make that much

difference, but it could for us.  So to the extent we can do certain things in the next year, I don't see why it has to be that soon.

THE COURT:  Okay.  Am I correct that -- again, I understood the government's position is that with respect to the wiretap evidence at least that's been turned over.

MS. DEWITT:  They've had the tapes from all the wiretaps for quite some time and certainly the affidavits for I believe it's six months.  I could be wrong about that, but if it's not six months, it's close to that.

THE COURT:  Well, Mr. Callahan, I both agree with the notion that we ought to be moving along and deciding what we can get decided.  I see no reason particularly to jam you.  We're not on the eve of trial, and I'd much rather get through the government's last-minute papers that have been hastily put together.

Do you think that 90 days is enough time?

MR. CALLAHAN:  I think yes.  Actually Ms. DeWitt indicated that we have the tapes.  A lot of that material is in Russian.  I'm not sure we have all the English translations of those recordings.

THE COURT:  Well, I assume -- we've been authorizing payments for them.  I just assumed you had them.

MS. DEWITT:  We have identified a good number of what we consider at least at this stage to be the relevant

23

calls.  I understand that the translations for most of them will be done very soon.  Many of them are already done. They're just being finalized.

Again, to get back to -- any challenge to the wiretaps is going to be based on the affidavit.  It's not going to be based on what the fruits of the wiretaps were. So what they get from them is really not --

THE COURT:  I think their extended challenge may depend on the fruits.

MS. DEWITT:  I would be very surprised if they wouldn't want to challenge them regardless given the consequences of any potential evidence against their client, but, yes, I do understand that that is certainly a relevant factor.  It's not obviously the key legal issue that is going to be dispositive.

THE COURT:  Sure.  I understand that.

How about April 30th, Mr. Callahan?

MR. CALLAHAN:  That sounds fine, Your Honor.

THE COURT:  I think we'll obviously apply this to all, but I will set April 30th as the deadline to file any motions challenging the wiretaps.

Ms. Dewitt, I don't know whether you want me to set responsive dates for the government and replies or wait until we see what comes in.  Do you have a preference?

MS. O'CONNELL:  Your Honor, I'm comfortable with

-- the government's comfortable with two weeks to respond to any wiretap motion. I think that will give us sufficient time, especially speaking with Mr. Callahan. If there is some surprise, I'm sure we can stipulate to an adequate briefing schedule, but two weeks should be plenty.

THE COURT: All right. Now, I'm thinking -- the motions are due April 30th. I will give you until May 16th, which is a Friday, with any replies due May 29th.

As for a hearing date, it's hard to say at this point, but it will probably be -- I'm going to set it for hearing on July 7th at 1:30 p.m. As I say, if the filings are voluminous or if the government needs additional time, I would probably be able to be flexible on the hearing date as well.

MS. O'CONNELL: Thank you, Your Honor.

THE COURT: All right. Now, if we are looking at submissions for the remaining defendants on the death penalty by March 28th -- Ms. DeWitt, do you think -- if it's taking a couple of months for the Department of Justice, is there any need to have a hearing before our July 7th hearing?

MS. DEWITT: No, Your Honor, I don't believe so.

THE COURT: Any defense counsel think we need to have contact before then? Hopefully by that time we'll certainly have a decision from the DOJ, but we will simply

25

expect to reconvene then on Monday, July 7, at 1:30 p.m., unless that date is changed to respond to any motions with respect to the wiretaps.

All right, Ms. Brewer.

MS. BREWER:  There is one more issue, Your Honor, with respect to the government's status conference.  That is the issue of these hard drives.  We have received a letter from the government requesting, I think, about 14 hard drives of various sizes.  If each individual set of counsel acquired 14 hard drives, it's going to be rather expensive.

So I caucused counsel this afternoon, and what we have decided to do collectively is to ask the Court to approve the cost for one set of hard drives that would be submitted to the government.  I will take the responsibility for keeping them at my office and doling them out to counsel if they want to look at them.

I brought the set because I was going to be submitting an order to the Court, which -- I will determine how much it's going to cost by shopping and then submit to the Court the total cost.

THE COURT:  You would be like the librarian.

MS. BREWER:  I will be the librarian, yes.

THE COURT:  I assume the government doesn't care one way or the other.

MS. BREWER:  They don't care.  I think they're

delighted that they don't have to duplicate this five times.

MS. DEWITT:  I think it's an excellent idea, Your Honor -- the government does -- but we would ask that each defense -- defendant waive any objections that they would have to doing it in that way because we certainly don't want to hear later that they had any problem with it because they don't have their own personal copy.

THE COURT:  So basically we would have one set for all defendants to use as they saw fit of these hard drives?

MS. BREWER:  Right.  The reason I bring it up is I'm not going to go shopping without the money from the Court.

THE COURT:  That's a good idea.

Let me hear from counsel for everyone.

MR. EVANS:  Your Honor, for Mr. Krylov, we conceded to this when it was proposed and thought it was quite a good idea.  I'm a little bit concerned about waiving any future problems that may arise out of this issue about not having it.  We're more than happy to try this if it will save time and money.

THE COURT:  Let me just ask this.  Is there any defendant at this point who thinks it is not a good idea or has any objection to Ms. Brewer submitting this proposed request in anticipation that one copy will be enough without obviously binding themselves forever?  Does anyone object to

that?

I see no hands.  All right, I will expect to get that.

Ms. DeWitt, if before the July 7th hearing you have determinations as to what the Department has decided to do, it would be helpful if the Court was simply informed.

MS. O'CONNELL:  With respect to this hearing both from the government's side and the defense side, is Your Honor going to be prepared -- are we going to be prepared to select a trial date at our July 7th status conference, or did you want to talk preliminarily about a trial date now?

Quite frankly, we will keep moving forward as quickly as we can with all of the forensics and other investigation that we're doing, but certainly with a trial date in front of us, we will have more concrete timelines to give all of the arms of the government that is working on this case.

THE COURT:  I don't think I have the power to make a forensic analysis go any faster.  I assume that all the people doing the analysis are working diligently toward it. I don't know how I or frankly any defense counsel could possibly suggest a realistic trial date given there are so many uncertainties ahead of us.  Not one of us has caused this extraordinary long period of time that the government anticipates to get the forensics done.  I think it's a

little premature, and I think a date would be largely illusory.

As to your direct question, will we know more on July 7?  I mean, you'll be in a better position to tell me than I am to speculate.

MS. DEWITT:  In the meantime, Your Honor, we will do everything we can to expedite the forensics and other discovery.

THE COURT:  All right.  Just for purposes of the Speedy Trial Act, do we have some requests for continuances here?

MR. RUBIN:  Yes.

THE COURT:  All right.  Mr. Rubin, are you on behalf of your client asking that I put this matter over -- do we have a trial date now?

MS. BREWER:  No.

THE COURT:  Well, someone ought to speak.  Don't leave it all entirely up to me.

MR. RUBIN:  I think realistically we certainly aren't anywhere close to a trial date or being able to determine when we'll be ready to try the case.

THE COURT:  Anyone disagree with that assessment?  Any defense counsel disagree?

MS. BREWER:  No, Your Honor.

THE COURT:  All right.  I just want good cause to

SHARON SEFFENS, U.S. COURT REPORTER

continue on with the case which is complex and extraordinarily so, and obviously I will give defense counsel the time they need to adequately prepare.

MS. O'CONNELL:  Thank you, Your Honor.

MS. BREWER:  Thank you, Your Honor.

MR. RUBIN:  Thank you.

*(Thereupon, the proceeding was concluded.)*

-oOo-

30

CERTIFICATE


        I hereby certify that pursuant to Section 753,

Title 28, United States Code, the foregoing is a true and

correct transcript of the stenographically reported

proceedings held in the above-entitled matter and that the

transcript page format is in conformance with the

regulations of the Judicial Conference of the United States.


Date:  April 19, 2009


                         Sharon A. Seffens        4/19/09
                         _____
                         SHARON A. SEFFENS, U.S. COURT REPORTER