1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

- - -

THE HONORABLE NORA M. MANELLA, JUDGE PRESIDING

UNITED STATES OF AMERICA,   )
              Plaintiff,    )
      vs.                   )
                            ) CR-02-220-NM
IOURI MIKHEL, et al.,       ) CR-02-126-NM
              Defendants.   )
--------------------------)

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Los Angeles, California

April 22, 2002

SHARON A. SEFFENS, RPR
United States Courthouse
411 West 4th Street, Room 1-1053
Santa Ana, CA  92701
(714) 543-0870

2

APPEARANCES OF COUNSEL:

For the Plaintiff:

JOHN S. GORDON
United States Attorney
RONALD L. CHENG
Assistant United States Attorney
Acting Chief, Criminal Division
CAROLE C. PETERSON
KAREN I. MEYER
Assistant United States Attorneys
1100 United States Courthouse
312 North Spring Street
Los Angeles, CA  90012
(213) 894-2434

For Defendant IOURI MIKHEL:

VICTOR SHERMAN
SHERMAN & SHERMAN LAW FIRM
2115 Main Street
Santa Monica, CA  90405-2215
(310) 399-3259

For Defendant ANDREI LIAPINE:

EDWARD M. ROBINSON
21515 Hawthorne Boulevard, Suite 665
Torrance, CA  90503
(310) 316-6442

ALSO PRESENT:

Russian Interpreter

3

LOS ANGELES, CALIFORNIA; APRIL 22, 2002; P.M. SESSION

THE CLERK:  Item No. 9, CR-02-220-NM, United States of America versus Iouri Mikhel.

Counsel.

MS. PETERSON:  Good afternoon, Your Honor.  Carole Peterson and Karen Meyer for the government.

MS. MEYER:  Good afternoon, Your Honor.

MR. SHERMAN:  Good afternoon, Your Honor.  Victor Sherman for the defendant, who is present.  I apologize for being late, Your Honor.  I was in front of Judge Morrow, and there is nothing I could have done.

THE COURT:  I understand.

This is really in both the matter of Mr. Mikhel and Mr. Agueev because I want to take up first the conflict issue.  So just so we are clear, we are on the record in both.  I think Agueev is CR-02-126.

THE CLERK:  Yes.

THE COURT:  And the defendants are here?

MR. SHERMAN:  Yes, they are.

THE COURT:  All right.  Are they being assisted by an interpreter?

MR. SHERMAN:  Mr. Agueev is.  Mr. Mikhel actually speaks English, so I don't think he needs an interpreter unless he indicates to the contrary.

THE COURT:  All right.  But we will need the

interpreter for Mr. Agueev since this affects them both. Okay. They've got their headphones I assume.

MR. SHERMAN: Yes.

THE COURT: Okay. Essentially Mr. Sherman ceased to represent both Mr. Agueev, who's charged with receiving the kidnapping proceeds, and Mr. Mikhel, who's charged in the Umansky kidnapping itself.

I think it's undisputed that Mr. Agueev provides a link in the chain between the kidnapping proceeds and Mikhel. Mr. Agueev admits receiving the moneys from Mr. Afonin, and the records show Mikhel in phone contact with Afonin during the period of the kidnapping and the ransom demands.

I have reviewed the pleadings submitted by both parties, including the supplemental pleadings submitted by the government as well as the reply by Mr. Sherman. Mr. Sherman, I will tell you, and I am prepared to explain on the record why, that I think you have at the very least a serious potential conflict of interest and arguably under the Ninth Circuit definition of that term, an actual conflict of interest.

If there is something you'd like to add to or elaborate with respect to the pleadings you filed, I will certainly give you an opportunity.

MR. SHERMAN: I prefer to reply after I hear the

Court's reasoning.  Then I might have a more complete understanding of what the Court believes is the actual conflict.

THE COURT:  Well, the initial argument was that there was no potential conflict, first, because they weren't charged in the same indictment, and then because they didn't know each other.  Obviously that won't do it as the cases are quite clear that that's not the standard.

The argument seems to be that because Mr. Agueev may now be prepared to be debriefed, there is no potential conflict, but I don't see it that way.  If anything, I think the problem is exacerbated.  The fact that Mr. Agueev links Mr. Mikhel to the ransom proceeds means that Mr. Mikhel's attorney must have free reign to question and attempt to discredit all or any part of Mr. Agueev's story.

The issue is not what tactic Mr. Mikhel's attorney will ultimately take but whether you can take on the representation of Mr. Mikhel, having -- without tactics that would otherwise be available to you.  I don't think you can essentially remove from your quiver of tactics an arrow that would otherwise be available to you and would continue to be available to any other attorney representing Mr. Mikhel.  We can deal with the proposal for somebody else to cross-examine him, but I think that's fairly silly.

As for information that Mr. Mikhel may have, you

6

have stated to this Court that you have avoided questioning Mr. Mikhel, so you obviously don't know what information he has.  He similarly -- and I assume you have not discussed Mr. Agueev's case with him, so Mr. Mikhel is in no position to know what Mr. Agueev may have that may or may not be useful in the government's case against Mr. Mikhel.  So Mr. Mikhel is certainly in no position to make any kind of a knowing and voluntary waiver.

The Supreme Court has pointed out how difficult it is for any attorney to know at the beginning of a case particularly from his client the entire truth, much less what evidence the government has and what the government's witnesses will ultimately say on the stand.  And this is particularly true with respect to what you know of Mr. Mikhel's case since you haven't talked to him about it.

MR. SHERMAN:  May I respond?

THE COURT:  Yes.

MR. SHERMAN:  First of all, Your Honor, what Mr. Agueev could potentially say against Mr. Mikhel is in fact known by Mr. Mikhel because in the complaint filed against each of them, there is the summary of Mr. Agueev's statement.  So it's not that I had discussed with Mr. Mikhel what Mr. Agueev could potentially say.  The government has put forth that in writing, so it's known by Mr. Mikhel from in essence a pleading in this case.

THE COURT:  Well, he knows some of what Mr. Agueev has said.  He certainly doesn't know the universe of things that Mr. Agueev may know or may say.

MR. SHERMAN:  Well, I can only represent that I have the discovery in Mr. Agueev's case, and it's no different than what has already been disclosed by the government in the pleadings in both of their respective cases.

The main point that I tried to make in my response, Your Honor, is that whatever Mr. Agueev would say or could say is documented by the banking records that the government is in possession of, and that his testimony as to what he did or didn't do in no way adds anything beyond what the banking records already show other than the fact that Mr. Agueev gave money to Mr. Liapine.  Mr. Liapine, who has already given a statement -- that is also included within the complaint filed against the respective defendants -- that he then gave that money to Mr. Afonin.

Then what Mr. Afonin did is documented by the records, the banking records, and Mr. Agueev has no knowledge at all about what Mr. Afonin did with the funds. It's all in the record what Mr. Afonin did with the funds.

THE COURT:  If you're simply saying you would decide as a matter of trial strategy not to contest information that Mr. Agueev has provided, that's a matter of

trial strategy, but that doesn't answer the question of a conflict.  The question isn't whether Mr. Agueev is prepared to point the finger at Mr. Mikhel.  The cases are quite clear on that point.  It's a link in the chain.

That's what Wheat was all about.  Wheat didn't know Bravo; Bravo didn't know Wheat.  The Court's concern was that information might be provided by one that could ultimately provide a link in the chain to the other, and the lawyer for the other would be essentially deprived of the opportunity to discredit all or part of the first one's -- in this case, Bravo's -- testimony.

MR. SHERMAN:  Well, in the Wheat case, one of the defendants that Mr. Iredale had previously represented had already pled guilty.

THE COURT:  It doesn't matter.  It doesn't matter.  The potential for testimony providing information useful to the government's case against the other defendant is what creates the conflict.

MR. SHERMAN:  I understand that.  First of all, the Supreme Court said in the Wheat case that it was a close call and that if the Court had gone the other way, it would have been just as reasonable.  That's what the --

THE COURT:  I think what the Court said is we're not saying that every Court would have had to go that way.  I personally -- I wouldn't have considered Wheat a close

call myself, and certainly after Wheat it's not a close call.

MR. SHERMAN:  Second of all, in that case, Iredale was proposing to represent three defendants, not two defendants.

THE COURT:  But I'm just focusing on the Bravo-Wheat representation.  That's what I'm focusing on. Clearly the Supreme Court's decision didn't depend on the third defendant in that case.

MR. SHERMAN:  But in the Wheat case, they didn't really set forth the exact fact that one of the defendants may be able to testify against the other.  They pointed out in broad strokes that --

THE COURT:  I agree.  I think Wheat is a harder case than this one because in this case we know Mr. Agueev has provided evidence to the government that the government will use to link the ransom proceeds to Mr. Mikhel.

MR. SHERMAN:  Well, I disagree with the Court.  I think this case is easier to call -- well, in that sense, I agree with the Court it's easier to call because we know exactly what Agueev presumably could say, so we know what the facts are, where in the Wheat case --

THE COURT:  We know at least some of what Mr. Agueev will say.

MR. SHERMAN:  Okay.  But in this case, the facts

that Mr. Agueev could put forth are not disputed facts really, and the banking records I have indicated already indicate how Mr. Mikhel got the funds.  It's undisputed, I believe, based upon the government's knowledge of this case, that not only did Agueev and Mikhel not know each other, but they never had any contact with each other.

THE COURT:  And we know that that's irrelevant.  Wheat makes that irrelevant.  In fact, in Kenney, the Ninth Circuit said even though both clients claim not to have anything useful to the government, they could not tell what might be useful and counsel could not advise both of them about testifying against the other without a severe conflict of interest.

MR. SHERMAN:  But that's exactly the situation here.  We know -- obviously the one fact that they don't know each other -- in a conspiracy case, for instance, all the conspirators do not have to know each other.  It's the fact that the Court considered in determining -- in looking at all of the facts whether or not there is an actual conflict or a potential conflict.

THE COURT:  Assume I have looked at it.  It's not dispositive.  He's a link in the chain.  It's not -- I don't want to repeat myself.  It's not a question of whether he literally says, yeah, he pulled the trigger on the gun.  That's just not the proper inquiry.

11

MR. SHERMAN:  Well, you know, Your Honor, obviously I don't want to stay on the case if the Court feels that I have a conflict.  I guess my -- it seems like the big question would be not in the fear that I would represent Agueev, that somehow his rights would be compromised.  The fear would be that later on if Agueev should be a witness against Mr. Mikhel, then somehow Mikhel's rights would be compromised because I wouldn't be able to effectively cross-examine Agueev.

THE COURT:  I think both of their rights could be compromised.

MR. SHERMAN:  I don't see how.  How am I compromising Agueev's rights under any circumstances?

THE COURT:  How are you going to get up and argue at sentencing, if you chose to do so and if anyone who represented Mr. Agueev might choose to do so, that relative to other people who were involved in this kidnapping in one way or the other, he is relatively less culpable?

MR. SHERMAN:  Your Honor, they're not charged all with the same crime.

THE COURT:  It doesn't matter.  They don't have to be.

MR. SHERMAN:  The guidelines -- or what the situation is for Mr. Agueev is -- the facts are very clear.

THE COURT:  Don't you think anyone getting up and

12

arguing for Mr. Agueev at sentencing would want to argue the relatively minimal nature of his involvement compared to other people?  Isn't Mr. Agueev, if he elects to cooperate, going to be doing so in exchange for an understanding of a reduced sentence, and that reduced sentence will be based on information he provides to the government which may be useful in linking the ransom proceeds to Mikhel?

MR. SHERMAN:  Your Honor, we have made that offer from the beginning, and Mr. Agueev himself made that offer in essence when he was first arrested, saying, "I will tell you whatever I know."

THE COURT:  I have some question as to whether that in and of itself hasn't essentially disqualified you from representing Mr. Mikhel.  According to Kenney, you can't even negotiate.  You can't even advise clients about testifying without a severe conflict of interest.  That's the language of Kenney.

MR. SHERMAN:  Your Honor, I would think it would be depend upon the specific facts of the case.  I don't think that I have done anything to compromise Agueev's representation.  I am prepared to go ahead, as the Court knows from the paper that we have filed, that Mr. Agueev can be debriefed to the government's -- to whatever they want, because in essence they already know exactly what he's going to say.  I have looked at all the discovery, and I have

discussed Mr. Agueev's case with him obviously, and whatever he has to say, he said.

But I am certainly happy to have him be debriefed by the government.  I still feel that in the end the only one that potentially might have a problem would be Mr. Mikhel, and he's certainly willing to waive the limited fact of my cross-examining Mr. Agueev if that should ever become a problem, but I don't see it ever becoming a problem.

It's not just a tactic.  It's that if we would cross-examine Agueev, it would be beneficial to Mr. Mikhel rather than detrimental to Mr. Mikhel, because the only thing Agueev could say is he doesn't know anything about the money.  He certainly did not consult with Mr. Mikhel about that.  He gave the money to Liapine, and what Liapine did with it after that is unknown to him.

So there is nothing that Agueev could say that would be of any harm to Mr. Mikhel under any theory.

THE COURT:  We just understand this case differently, Mr. Sherman.

MR. SHERMAN:  Okay.

THE COURT:  I am not going to do a written order. However, I do want to put on the record my thinking.

Does the government have anything it wishes to offer?

MS. PETERSON:  No, Your Honor.

14

THE COURT:  All right.  As I mentioned initially, the argument was that there was no conflict because these defendants, Mr. Agueev and Mr. Mikhel, were not in the same indictment.  Obviously under Kenney and Christakis, that wasn't dispositive.  Then there was the argument that they don't know each other.  That didn't matter either, as the Wheat case makes clear.

Then it was claimed that neither client had anything useful against the either, but that's clearly something neither of them could know.  On the basis of what we do know, Mr. Agueev does have information which is material in the links that the government wishes to make connecting Mr. Mikhel to the kidnapping proceeds themselves or what are alleged to be the kidnapping proceeds.

As the Supreme Court observed, what Mr. Sherman knows now is simply not dispositive because it's a rare attorney who will be fortunate enough to learn the entire truth from his own client, much less be fully apprised before trial of what each of the government's witnesses will say.

The idea that anyone representing Mr. Mikhel would not want to cross-examine Mr. Agueev strikes me as disingenuous.  Mr. Agueev links Mikhel to the kidnapping proceeds and to a third party with whom Mikhel allegedly can be shown to have been in contact during the period of the

15

kidnapping and the ransom demands.

This was precisely the prospect that the Court faced in the Wheat case, where Bravo had information concerning deliveries of drugs to third parties that the government could eventually link to Wheat. And the lawyer representing both could have found himself in the untenable position of having to cross-examine one client in order to undermine his other client's link to the drug proceeds.

The Supreme Court made very clear that the District Court is not required to permit this kind of, some would say, perversion of the defendant's Sixth Amendment right to counsel to occur. Here it seems to me the conflict is even more obvious because Mr. Sherman has proffered that Mr. Agueev is prepared to be debriefed. Given the link that Agueev provides between the ransom proceeds, the source of those proceeds, Mr. Afonin and Mr. Mikhel, I think there is at the very minimum an extremely serious potential for conflict.

Indeed if, as the Ninth Circuit has held, having an interest in seeing that one client is not implicated by the testimony of another client constitutes an actual conflict as the Court held in Christakis, but this is more than just a potential conflict. It's an actual conflict.

Other Courts, including the Tenth Circuit in the Cook case, have held that an actual conflict exists in any

16

situation in which defense counsel owes conflicting duties to him and to some other party.  The suggestion that Mr. Mikhel could hire someone else to cross-examine Mr. Agueev I think is unrealistic, to put it tactfully.  Mr. Sherman would essentially be debriefing him and effectively acting against his own client's interest and at the end of the day simply shadow cross-examining his own client.

Moreover, this would do nothing to eliminate the problems with conflict at sentencing, which have not been fully addressed, I think, in the defense papers.  Obviously a common issue at sentencing is culpability vis-a-vis others.  I don't think Mr. Sherman could argue that Agueev should benefit because he was less culpable than Mr. Sherman's other client, Mr. Mikhel, or vice versa.

In fact, the Ninth Circuit has repeatedly stated that an actual conflict exists when a defendant is placed at odds with co-defendants who were, in fact, more culpable.  I realize Mr. Sherman's argument is that they are not charged in the same indictment, but I don't think that would change the general proposition.

Moreover, even if one were to assume that Mr. Agueev could be cross-examined by another attorney, certainly Mr. Sherman couldn't stand up at Agueev's sentencing and argue that his credibility was not damaged by the cross conducted by his other client.  Nor at Mikhel's

sentencing could he stand up and claim that Agueev, his other client, had been lying.  Yet any lawyer who individually represented these defendants would have the option of making those arguments.

I think Mikhel's counsel must be free to attempt to discredit any or all parts of Mr. Agueev's testimony that proves helpful to the government in its case against Mr. Mikhel.  Similarly, Agueev's counsel must be able to negotiate, if he wishes to do so, a reduced sentence based on any useful information that Mr. Agueev may have, even if that information is adverse to Mr. Mikhel.  Were Mr. Sherman to represent both, I don't believe he could effectively represent either.

With respect to the proffered waivers -- and waivers have been proffered -- I find them largely ineffectual and pretty much meaningless.  The fact that neither client recognizes a conflict just simply highlights their inability to make knowing and intelligence waivers.

Mr. Sherman concedes that in order to protect his right to represent Mr. Agueev conflict free, he has assiduously avoided discussing Mr. Mikhel's case and, I presume, Mr. Agueev's case as well with Mr. Mikhel.  So Mr. Mikhel himself knows little or nothing of what Agueev may ultimately say and how it ultimately might affect Mr. Mikhel.

I don't believe Mr. Sherman is really in any proper position to advise Mr. Mikhel on the potential conflict, and Mr. Mikhel in turn is in no position to make a knowing and voluntary and intelligent waiver.  Moreover, given, I guess, the difference of opinion as to whether or not there is a conflict, I am not sure Mr. Sherman can adequately advise Mr. Agueev on that either.

But in any event, as the Supreme Court made clear in Wheat, the government need not accept such waivers when the Court believes that to do so would effectively deprive them of their right to conflict-free counsel.

Not to put too fine a point on it, but obviously Mr. Sherman's judgment on what is and isn't conflicting representation has at least been found to be fallible in the past.  The Christakis case came up last time.  In that case, the Ninth Circuit did find an actual conflict where Mr. Sherman had actively represented conflicting interests. This was based on a finding that he had an interest in protecting one client -- I guess Mr. DiCesara -- from being implicated in a crime in which the other, Mr. Christakis, was charged.

The most that Mr. Sherman points out in his reply is that nobody seemed to notice the conflict at the time, but as the Advisory Committee notes avoiding a conflict-of-interest situation is in the first instance the

19

responsibility of the attorney, but the Ninth Circuit had no difficulty finding an actual conflict and did remand it for a hearing on the question of whether the actual conflict had adversely affected the representation of Mr. Christakis.

Now, as I understand from Mr. Sherman at the last hearing, the District Court recently denied the 2255, but that's hardly relevant to this Court's inquiry since this Court's responsibility is to avoid setting the stage for a Section 2255 by ensuring that both clients receive conflict-free representation.

Judge Oakes of the Second Circuit remarked in the Mari case that essentially by the time a case such as the present one gets to the appellate level, the harm to the appearance of justice has been already been done whether or not reversal occurs.

By the way, Mr. Sherman, did you look back at that Garfias case?

MR. SHERMAN:  It was me.

THE COURT:  It was?  Well, again, not to put too fine a point on it, but here, too, the Court found that counsel was representing conflicting interests.

MR. SHERMAN:  Your Honor, may I respond to both of these things in a moment?

THE COURT:  Sure.  Sure.  I am simply pointing out that I don't question Mr. Sherman's sincerity in his

20

representation, but his judgment has been found fallible at least in terms of recognizing such conflicts, one might say, from sea to shining sea since Garfias was a case out of Massachusetts. That is certainly not dispositive. I am just pointing out that the Court need not defer to counsel's judgment as to what constitutes a potential for conflict or an actual conflict or the likelihood that such a conflict will develop.

Finally, Mr. Mikhel obviously hasn't developed much of a relationship with Mr. Sherman at this point because Mr. Sherman has prudently avoided discussing Mr. Mikhel's case with him. Earlier today I had the unpleasant job of disqualifying a lawyer from representing a client because the lawyer had been convicted of three felonies in this court and was facing imminent disbarment. In that case, at the very least the lawyer could say, "I have known this fellow most of his life. I've represented him in past cases with both native speakers, the same language -- not being English -- and I have this unique relationship with him." It wasn't enough to overcome the fact that he was about to be disbarred.

But in this case, we don't even have those kinds of circumstances. Certainly it is fairly early in the case and Mr. Mikhel will be free to secure other counsel without giving up some unique relationship that he has developed

with Mr. Sherman.

Mr. Sherman.

MR. SHERMAN:  Thank you.  First of all, Your Honor, I don't want the Court to misunderstand.  This debriefing that Mr. Agueev is willing to undergo for the government is not part of any kind of a plea agreement that the defendant is in any way admitting any kind of a guilt or it's intended for that purpose.  Mr. Agueev is maintaining his innocence completely in this case.

THE COURT:  That's fine.

MR. SHERMAN:  So I don't want the Court to misunderstand.

THE COURT:  I am not taking it as a given that he is.

MR. SHERMAN:  Or anything of that nature, or that he is going to the government hat in hand because he has something to offer them, that he expects something in return.  That's not the purpose of this debriefing at all.  The purpose of the debriefing is to try to convince the government that what they know about Mr. Agueev is what there is and he's innocent.

THE COURT:  That may be, but that doesn't change the fact that whoever represents Mr. Agueev must be in the position to be able to argue to the government, should the time come when the government determines that Mr. Agueev has

something useful to offer them, that he is going to get something in return, even if what he ends up offering is adverse to the interests of Mr. Mikhel.

MR. SHERMAN:  Okay.  All I'm trying to indicate to you is I just didn't want that in the record that the Court misunderstood the purpose of any kind of a debriefing.

THE COURT:  Okay.  I understand that perfectly.  I am not assuming that this is for the purpose of entering a guilty plea.

MR. SHERMAN:  Second of all, when the Court says that my judgment about conflict from sea to shining sea, in the Garfias matter, Your Honor, the defendant in that case made an allegation which I was never contacted about and was given no opportunity to say yay or nay about it, and the Court in the Garfias matter made that decision solely upon a declaration from the defendant that my fee was paid by somebody else.

So for the Court to say that my judgment is somehow impacted in that case, because the Court had both sides of the story in that case, is totally not accurate. It was strictly upon an allegation made by a defendant.

I am sure the Court is aware that 2255s are filed by many defendants after they don't like the results in their case and make all kinds of allegations which may or may not be true.  The only thing the Court in the Garfias

case said is, well, if in fact these facts are true, then there might have been a problem.  I was never contacted by anybody in that case to say what really occurred.  So my viewpoint in that case has never been disclosed.

Second of all, as far as the Christakis matter, Your Honor, that was a situation, when you say that nobody bothered to know whether there was a conflict there or not, again a situation where the defendant received a very heavy sentence from the Court and then years later raised the situation of, well, why couldn't I have cooperated?  The Court found, after I testified, that that was not one of the issues that Mr. Christakis could have reasonably related to at that point because his attitude was such that he wanted to go to trial, et cetera.  So the Court found there was no actual conflict.

THE COURT:  That's fine, and I accepted your representation at the hearing last week or whenever it was. I think you said Judge Rafeedie had ultimately denied that.

MR. SHERMAN:  Well, I just kind of react to the Court saying that somehow my judgment in these conflict situations has been not of the best, according to what the Court is saying when it made its comment.

THE COURT:  That's a fair assessment, and that's what I read in the Ninth Circuit's opinion.  I mean, there are two things that have to happen before the 2255 gets

granted.  Not only must there be an actual conflict, but it must have adversely affected counsel's representation.  It sounds to me as though what you're saying is Judge Rafeedie found it didn't.  That doesn't change the fact that the Ninth Circuit held there was an actual conflict.

MR. SHERMAN:  The Ninth Circuit said given the fact that Christakis had represented to the Court.  I mean, again --

THE COURT:  Well, they also relied on your declaration.  "I'm sure that one of the reasons I did not discuss this option with Mr. Christakis was because of my relationship with Mr. DiCesara."

MR. SHERMAN:  That's true.

THE COURT:  And later on the Court says:  "All that Christakis must show here to demonstrate adverse effect, having already found an actual conflict, is that Sherman's actual conflict probably influenced his decision not to advise Christakis to consider the option of cooperating with the government in exchange for a reduced sentence.  Sherman's declaration essentially states this."

MR. SHERMAN:  Okay.  And when it came back before the Court, the government testified that under no circumstances would they have made any offer to Christakis for him to cooperate.

THE COURT:  That may be, Mr. Sherman.  It seems to

25

me that affects the ultimate question of did it adversely affect.  But that doesn't affect the question of was there a conflict.  And, Mr. Sherman, don't get me wrong.  It's not a challenge to your integrity.  It's simply a point that the Court need not rely on counsel's assessment of whether there's a conflict for the reasons I think more eloquently stated by the chief justice in Wheat.  It's very hard to predict at these early stages and to know exactly what the ultimate testimony may be.

Bottom line, I think the Sixth Amendment clearly guarantees a criminal defendant the right to be represented by counsel whose loyalties are undivided.  The Supreme Court has observed that a possible conflict of interest adheres in almost every instance of multiple representation.

The Ninth Circuit has found and has defined an actual conflict is one in which an attorney actively represents conflicting interests.  The Circuit has found that an attorney represents conflicting interests when one client possesses information that he could use to implicate the other client in exchange for a reduced sentence.

Here the conflict, whether characterized as actual or potential, seems to me quite apparent.  Mr. Sherman cannot give his full and undivided loyalty to either of his clients, number one, when the testimony of one may implicate the other; number two, when he could not possibly

cross-examine one client even if to do so would be in the best interest of the other; three, when he could not argue relative culpability at sentencing; and four, when he could not negotiate for a reduced sentence for one based on information provided against the other.

As I said, I don't think the ultimate question is what the best tactic will be. It's whether an attorney can take on joint representation when doing so deprives him of negotiating, trial, and sentencing options that would otherwise be available to him.

As the Supreme Court has noted, in the case of joint representation of conflicting interests, the evil is in what the advocate finds himself compelled to refrain from doing not only at trial but also as to pretrial plea negotiations and in the sentencing process.

Under these circumstances where I am convinced that joint representation by Mr. Sherman of both Mr. Agueev and Mr. Mikhel would deprive each of counsel's undivided loyalty and create an overwhelming risk that they would be deprived of their Sixth Amendment right to effective assistance of counsel, I believe I have the discretion not to accept any proffered waivers of such conflict of interest.

For that reason, I am not going to accept those proffers, and I am going to disqualify Mr. Sherman from

continued representation of Mr. Mikhel.  He may, of course, continue to represent Mr. Agueev.

Mr. Sherman, I know you considered that possibility.  I don't know if you know what Mr. Mikhel's plans are.

MR. SHERMAN:  Yes, Your Honor.  I did discuss it with him at length, and he would like approximately three weeks to see about securing other counsel.  Now, I believe that counsel for one of the other defendants is going to make a motion to be relieved.

THE COURT:  Is it really going to take him three weeks just to get new counsel?

MR. SHERMAN:  I believe it's going to take him that long, Your Honor.  There are significant financial hurdles.

THE COURT:  Okay.  That's fair.

MR. SHERMAN:  Anyway, that's what he has asked me to represent to the Court.

THE COURT:  Okay.  Thank you.

MR. SHERMAN:  But I can tell you that co-counsel -- I think it's Mr. Weiss -- is going to make a motion to be relieved for Mr. Kadamovas.

THE COURT:  All right.  Is Mr. Weiss present?

MR. SHERMAN:  No, he is not.

THE COURT:  Okay.

MR. SHERMAN:  But he has called my office, and I talked to him about it, and that's what he told me his intentions are.

THE COURT:  All right, let's do this then -- and I suppose that -- we have a May trial date, which I assume is a sort of fictitious trial date.  In fact, I think it's about the 14th, isn't it, something like that?

THE CLERK:  Yes.

THE COURT:  Well, what I would propose, I think all counsel -- of course, we don't know who's going to represent them, so that will be very helpful.

MR. SHERMAN:  The Court does have a status conference on that case on May the 6th.

THE COURT:  Well, then, maybe that's the best thing.

Mr. Mikhel, there will be a status conference on May 6th.  If you can secure counsel by that time, you should do so and have your counsel present.  Do you understand?

DEFENDANT MIKHEL:  I will try my best.

THE COURT:  All right.  If you need additional time, I'm not going to force you to go to trial without a lawyer.

All right.  Our status conference is already on. We'll keep it on.

Let us turn to the motion to dismiss which affects

Mr. Agueev and Mr. Liapine, not Mr. Mikhel.

MR. ROBINSON:  Your Honor, excuse me.  I haven't made an appearance yet.  Just my name.

THE COURT:  Yes, Mr. Robinson.  Go ahead.

MR. ROBINSON:  Edward Robinson on behalf of Mr. Liapine, who is present in court.  He is in custody.  He is being assisted by the Russian language interpreter.

THE COURT:  I now know who Mr. Mikhel is.  Could Mr. Agueev and Mr. Liapine just identify themselves for me so I know which is which.

MR. SHERMAN:  Your Honor, this is Mr. Agueev that I am pointing to right now.

THE COURT:  Okay.  Thank you.  Mr. Liapine has the mustache.  Okay, thank you.

This is then in CR-02-126, three motions, all of them related.  The defendant's motion to dismiss, the defendant's motion for a Bill of Particulars, and the defendant's motion in-limine.  Although Mr. Agueev, I think, made the initial motions, Mr. Robinson has joined, I believe, in all of them and filed his own papers with respect to some of them.

The defendants move to dismiss the indictment based on the government's contention that 18 USC Section 1202(b) does not by its terms require a defendant to know that the proceeds with which he is dealing are the result of

30

a kidnap and punishable under state law that have crossed state or international boundaries, but merely according to the government requires that he know the proceeds to have been unlawfully obtained as the statute on its face states.

The defendants argue that the statute should not be so construed and that if it is, it is unconstitutionally vague on its face and as applied.

Relying on principally the same theory, the defense has moved for a Bill of Particulars and filed a motion in-limine asking the Court to determine the nature of the government's proof and the elements of the offense, which the government must prove beyond a reasonable doubt.

Again, I am happy to hear from counsel to supplement what is in the papers.  I suppose the defense ought to address the plain-language argument, and I guess I am not sure I concur with the defense's reading of the cases on the money-laundry statutes.  I am familiar with what's in the papers, but I'll be happy to hear from counsel.

MR. ROBINSON:  Your Honor, not to jump in here, but did the Court receive my reply?

THE COURT:  Yes.

MR. ROBINSON:  Your Honor, with respect to my reply on the motion to dismiss on behalf of Mr. Liapine -- and I have had some time to think about it and I have talked with Ms. Meyer and Ms. Peterson from the government -- I

think just to cut to the chase with respect to the sufficiency of the indictment and the language that is used to plead this case, as far as Mr. Liapine is concerned and Mr. Agueev, in simple terms there is no way we can properly prepare to defend this case unless we know with some degree of specificity what the unlawful activity is or the genesis of the alleged unlawful proceeds.

What concerns me now, and I have asked for time to respond or to renew this motion, is that if this case was presented to the grand jury in a fashion where the grand jurors heard evidence of organized Russian criminal activity or things along those lines, the very real probability that Mr. Liapine gets convicted on a crime that was never presented to a grand jury or voted on by a grand jury exists.

And while there is still additional discovery that is being produced, and this comes up after we have had some time to discuss in very vague terms what the parameters of the discovery is in this case, I think that the indictment on its face without any factual allegation whatsoever as to how Mr. Liapine would have known that these proceeds were unlawfully garnered in some fashion, that it's impossible for him to properly defend himself, and his constitutional trial rights, including the right to be tried on a valid indictment presented to the grand jury with this indictment

alone, are impermissibly impacted.

And I did cite to the Court some cases that talk about how an open discovery policy and a Bill of Particulars can't cure an invalid indictment, and neither can jury instructions, because we get to the point in this case, if this case does go to trial, where in the end we are still speculating on theories of government prosecution to which we have to respond.

And unless Mr. Liapine is completely advised as to what facts support the government's position that he should have known that these proceeds were unlawfully obtained, we are really on a worldwide goose chase trying to figure out whether banking practices in the Emirates are consistent with lawful banking activity, what the nature of a free-trade zone is in the Emirates, what the banking practices in the Baltic states are like, because the government has agreed that there is no evidence to show that Mr. Liapine and Mr. Agueev have any real connection or knowledge of the kidnapping.

So it is a guessing game at this stage, and I think that before the Court can even discuss whether --

THE COURT:  Suppose there is a phone conversation in which somebody says, "You know what we're doing is illegal; don't you?"

MR. ROBINSON:  Well, if that were the case --

33

THE COURT:  That's really all they need; right?

MR. ROBINSON:  Well, I'm not going to --

THE COURT:  I guess you take a different view of that.

MR. ROBINSON:  Well, I'm not going to concede that.  But the fact of the matter is we don't have that.  If the Court takes the government's initial representation that discovery is complete in this case -- there is nothing anywhere close to that.

Now, the Los Angeles Times had an article concerning Mr. Afonin where there were representations in the paper made that he has no criminal history and that he appears to be a legitimate businessman.  And I may be overstating the fact, but there is no criminal history and no suggestion outwardly that he's connected with any organized crime.  There has been no discovery produced to suggest otherwise, and rightfully.

Ms. Peterson and Ms. Meyer have agreed that Mr. Afonin's lack of criminal history is relevant to what Mr. Liapine would have known concerning the source or the genesis of these proceeds and whether they were unlawfully obtained or not.

So assuming that discovery is complete as represented by the government in their response and that now the only additional discovery that is going to be presented

to the defense is that Mr. Afonin has no criminal history or no apparent connection to Russian organized crime and there is nothing more than that, we are still left with defending a case where the vague suspicious nature of the transaction, when looked at through American eyes, through possibly an American jury's eyes, without any factual allegations to respond to where we have to present a blanket presentation as to what is acceptable concerning banking practices in the United Arab Emirates and maybe some Baltic states, we can't respond.

THE COURT:  I think that overstates it, Mr. Robinson.  It's still the government's burden of proof to show beyond a reasonable doubt that they knew the proceeds they were dealing with were from an unlawful activity, right, even under the government's interpretation?

MR. ROBINSON:  And if I may, Your Honor, taking the Court's statement, we're in trial and we have nothing more than we have right now, and the government presents a case that is essentially this transaction where money is taken from a business account into a personal account and shipped to Latvia and then sent over to the United States is suspicious, and therefore Mr. Liapine should have known that --

THE COURT:  Aren't there cases saying that should have known isn't enough?

MR. ROBINSON:  Or even that he knew.

THE COURT:  If you knew, then I think according to the government's theory of what the statute requires, that is enough.  That gets back to my hypothetical.  If you were on the phone and said, "You know what we're doing is illegal," I think under the government's theory of what the statute requires, that would be enough, and they wouldn't have to show how he knew or what particular crime he thought it was, in what way the proceeds were unlawfully obtained.

MR. ROBINSON:  And I'm going to defer to Mr. Sherman on that, because I think that his reply directly addresses how the knowledge element of the offense should be read.  But with respect to my position that Mr. Liapine's trial rights are impermissibly impacted by the vague nature of the indictment, we can't prepare for trial.

And the cases that I have cited to the Court and the cases that the government relied on, Robertson and Giese, all involve situations where either the indictment was so bereft of facts that a defendant could not prepare adequately for trial and use his compulsory process rights -- his right to counsel, his right to confront and cross-examine, and his right to be tried on a case that is presented to a grand jury, or they involve cases where the District Court properly denied an application for a Bill of Particulars because the indictment set forth what facts in

the means section of the conspiracy allegation or in the overt act section such that there was really no issue as to what transaction was being defended.

But in this case, the indictment that is before the Court does not in any way, shape, or form set forth any facts whatsoever with respect to the knowledge element, and therefore we are left to speculate.  And given at a minimum the geographical scope of the allegations in this indictment and given the difficulty with which we as the defense have to act in order to get information from the Emirates or from the Baltic states in an effort to --

THE COURT:  I mean, I understand, Mr. Robinson. And I don't think it is your job to go around disproving their knowledge of violating every banking or trade regulation.  I don't think that is.

MR. ROBINSON:  It's not, but we have to disprove their knowledge -- we have to confront the allegation that they knew these proceeds were unlawfully obtained.  And there are no facts --

THE COURT:  Can't they stand on their innocence? Can't they say, "Here's what happened"?  "Here's how we got them.  This is what we knew.  This is all we knew."  And it's the government's burden of proof.

MR. ROBINSON:  After sitting in custody either for the statutory minimum period of time, you know, they could

do that.  But, Your Honor, what happens if we don't agree to a continuance or we want to get this case to trial based upon what you have just stated; and then all of a sudden we're in trial and the theory of the government starts to take some shape?

THE COURT:  I suppose, Mr. Robinson, it's always the case that if the Court concludes that the government has sandbagged, that the government has come up with some surprise theory that the defense could not possibly have prepared for, then the defense can request a continuance.

MR. ROBINSON:  But, Your Honor, in fairness and in deference to the Court, I am not suggesting the government is sandbagging.  In fact, the government has been very up-front with us, with me at least, about the fact that they don't intend on presenting any evidence concerning Russian organized crime activity in this case, and their theory is that the nature of the transaction was suspicious.

THE COURT:  Well, I mean, I suppose that I would have to look at those cases, but I believe there are certainly some cases out there saying not enough.  So maybe your best argument is a Rule 29 argument.

MR. ROBINSON:  But why should it get that far, Your Honor, when this indictment --

THE COURT:  Because a Rule 29 argument is made, you know, at the end of the evidence.

MR. ROBINSON:  I understand when a Rule 29 is made, and I understand it deals with the sufficiency of the evidence.  But the fact of the matter is how do you prepare to defend yourself against an allegation that does not have any fact with which to confront?

THE COURT:  Well, Mr. Robinson, the government's theory is from everything they did.  Suppose they operated under cover of darkness.  Suppose they wore masks over their heads.  Suppose they used false names.  Suppose they did everything possible to conceal what they were doing.  Suppose that the overwhelming evidence was that they knew they were engaging in something that was unlawful.  Couldn't the government put on that case?

MR. ROBINSON:  Without conceding Mr. Sherman's point, they could.

THE COURT:  Right.  Exactly.

MR. ROBINSON:  They could, but there is no discovery provided that shows anything like that.

THE COURT:  Well, then, it seems to me you want to go to trial and put the government to its burden of proof.  That's not a basis for dismissing an indictment.

MR. ROBINSON:  Your Honor, the Court I think is taking my position and saying you have a great sufficiency-of-the-evidence argument at the close of the government's case under Rule 29.  I might.  I might.

THE COURT:  That doesn't result necessarily in a dismissal of the indictment.

MR. ROBINSON:  Well, but Rule 7 says that --

THE COURT:  I understand what Rule 7 says.

MR. ROBINSON:  -- Russell stands for the proposition that in order to effectively use his trial rights, the defendant has to be aware of not just the statutory language but some facts --

THE COURT:  I assume the government will be providing you in their discovery, if they haven't done so, with the evidence on which they intend to rely in order to argue that this shows the defendant knew that what he was dealing with were proceeds that were unlawfully obtained. Is that a fair assumption, Ms. Meyer and Ms. Peterson?

MS. MEYER:  Yes, it is, Your Honor.

THE COURT:  All right.  That will be your evidence, and you'll have it.  And for each bit of that evidence that you know because the government has told you, we are going to rely on the fact that this shows overwhelmingly what any reasonable juror would conclude beyond a reasonable doubt is the defendant's knowledge that these proceeds were unlawfully obtained.

You will be in a position to refute that, to either show why those facts that the government will have disclosed to you don't show that, or what other legitimate

explanation the defendant had for his conduct.  There are all sorts of things that the government proves by circumstantial evidence, and knowledge is probably more often than not shown by circumstantial evidence.

MR. ROBINSON:  Curtis and Cecil both stand for the proposition that no Bill of Particulars, no open discovery policy, and no jury instruction can cure an indictment that doesn't give the defendant any notice with respect to what facts he has to defend himself against.

THE COURT:  I understand your argument, Mr. Robinson.  From what you're saying, I don't see how it affects the validity of the indictment.

MR. ROBINSON:  With that in mind, Your Honor -- and I haven't discussed this with the government, so I apologize for bringing it up here.  I think in order to thoroughly address the sufficiency of the indictment issue, we need to have the grand jury transcripts because --

THE COURT:  Well, take that up with the government.  I'm deciding this motion that is here before me today.  So after this hearing you can take that up with the government, but I am not delaying this hearing so that you can negotiate with the government over a discovery issue.

MR. ROBINSON:  Okay.  It's more than that, but I will bring it up.

THE COURT:  All right.  Thank you, Mr. Robinson.

Mr. Sherman, do you want to address the merits of the motion to dismiss?

MR. SHERMAN:  I would like to discuss the merits of the overall concept here since the motions pretty much go to the same concept.

First of all, Your Honor, under the government's theory there is a distinction between 18 USC 1202(a) and (b), that somehow the standard of proof under (a) is much more difficult than the standard of proof under (b).

THE COURT:  Well, there is no question that linguistically there is a difference.

MR. SHERMAN:  Okay.  Well, I don't particularly read the statute that way, linguistically.  I think that if you refer to proceeds in (b), obviously you're talking about proceeds of a kidnapping.  If you add the words "of a kidnapping" after the word "proceeds" in (b), then it makes clear that the defendant has to know that the proceeds of which he's dealing with have to be proceeds of a kidnapping, and he has to know that.

THE COURT:  I don't think so.  I frankly found the argument not particularly persuasive.  But even if you read proceeds to be proceeds that are factually of a kidnapping, that doesn't change the meaning of the statute.  It's not inconsistent with the government's position that the proceeds themselves must in fact be those of a kidnapping.

MR. SHERMAN:  But it has the word "knowing" in 1202(b).  If you add the words "of a kidnapping" in the third from the bottom line where you see the word "proceeds" and it has the word "knowing" before it -- it says "knowing the proceeds of a kidnapping."

THE COURT:  Which, in fact, are of a kidnapping to have been unlawfully obtained.  I mean, I don't think your even adding those words helps your argument particularly. At most, it could make the words "of a kidnapping" are unlawfully obtained redundant since there's no such thing as a legal kidnapping.

MR. SHERMAN:  Your Honor, then let's go back to the other argument.  Why in the world would Congress make the distinction between 1202(a) and 1202(b) and say, well, under 1202(a) when you have those particular facts, it's much more difficult to prove because you have to prove this extra knowledge element, and somehow under 1202(b) you don't?

THE COURT:  Congress is constitutionally entitled to do just that.  Any question about that?

MR. SHERMAN:  Whether they could do it?

THE COURT:  Right.

MR. SHERMAN:  I suppose they could do it.  The question is:  Is there any logic to think that that's what they intended to do?

43

THE COURT:  Well, the law says that when Congress includes particular language in one section of a statute but omits it in another section of the same act, it's generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.

MR. SHERMAN:  Well, Your Honor, I think you could read the statute.  I would assume the Court might agree that you could read 1202(b) either way.  Maybe linguistically one could say, well, maybe you could read it more in line with the government.  I don't agree with that, but maybe one could say that, but certainly you have to look at the logic.  It's ransom money having to do with kidnapping.  Why would Congress intentionally linguistically say --

THE COURT:  When does a Court start out the process of statutory interpretation by saying, "Why would Congress do this?"

MR. SHERMAN:  Well, you have to use common sense.

THE COURT:  But that has never -- not since I've been in law school many years ago was that the initial canon of statutory construction.  The initial canon is you read the language.

MR. SHERMAN:  Well, you read the language with a common --

THE COURT:  When it stands on its face, you look no further.  Moreover, the second canon of statutory

44

construction is that when Congress uses different language in different sections, it means different things.  That's exactly what Congress did in this case.

MR. SHERMAN:  Okay.  In 1202(a) they mention fine before imprisonment, and in (b) they put imprisonment before fine.

Does that mean that Congress intended to make a difference in the two statutes?

THE COURT:  If it results in it, then I think the tenets of statutory interpretation say yes.

MR. SHERMAN:  Well, Your Honor, there has to be some logic and common sense when you read 1202(a) and (b) and -- we know it's their kidnapping statutes, and they know it has to do with ransom money.  And you're saying that Congress intentionally -- because obviously you have to come to the conclusion that Congress intentionally wanted to make a distinction.

THE COURT:  I think one has to look at what Congress did.  If that results in a distinction, then one does not sit to second-guess why Congress made the distinction.

MR. SHERMAN:  I am not asking why, but you have to --

THE COURT:  You just told me we have to ask why, and I'm telling you, no, we don't.

MR. SHERMAN:  But only in the why in looking at the language, how to interpret the language.  Obviously words can mean different things to different people.  We are saying that it's a ransom statute having to do with a federal kidnapping or a state kidnapping.

Now, when I use the word "why," I am saying in reading the language does it make sense to read the language in such a way that Congress would have meant, well, if you kidnap somebody and have them cross state lines and it's a particular protective type of person, which presumably is more important, that it would be more difficult to convict a defendant under those facts than under 1202(b)?

THE COURT:  Is there any question they could make that choice?

MR. SHERMAN:  Congress can pass laws.

THE COURT:  Is there any question that Congress passes laws every day with which you and I probably disagree?

MR. SHERMAN:  Your Honor, if we have a law in one part of the book and then something completely unrelated in a different part of the book, and we could say, yeah, Congress can pass the law here one way, and years later or months later or weeks later in some other subject matter pass another law, we could certainly say, yeah, Congress had the right to do that.  No question about it.  But this is a

law that was passed at the same time under --

THE COURT:  And they still have the right to do it; right?  You're not arguing that it's unconstitutional?

MR. SHERMAN:  I'm not arguing that it's unconstitutional, but I am arguing that in reading something, we have to use our common sense, and we have to say does the language indicate that there was any intent or is it a logical way to read the statute that the Congress would make that kind of distinction.  It would make no sense to read the language that they would make that kind of distinction.  The key words, "unlawfully obtained," when we're talking about ransom -- in our brief, we've talked about the phrase "unlawfully obtained" has to do with the kind of ransom rather than the proceeds, because under --

THE COURT:  First of all, the word "ransom" appears nowhere in 1202(b).

MR. SHERMAN:  We're talking about proceeds.

THE COURT:  And I don't think there is such a thing as a legal kidnapping.

MR. SHERMAN:  We're not talking about legal kidnapping, but we're talking about the way that moneys could be paid.  It's under the ransom money.  Section 1202 at the top says ransom money.  It doesn't say ransom money referring only to (a).  Obviously ransom --

THE COURT:  The word "ransom" appears nowhere in

47

1202(b), and I wouldn't necessarily buy your notion that the term ransom is commonly understood to be both legal and illegal proceeds, but even if it were, that word just doesn't appear in 1202(b).

MR. SHERMAN:  Okay.  Well, why is this Section 1202 entitled "Ransom Money"?  At the top, it says --

THE COURT:  Congress made a choice to entitle it with that, but in reading the language of 1202(b), the word "ransom" does not appear.

MR. SHERMAN:  Well, isn't it more likely when they said ransom money under 1202 they didn't say only refer to 1202(a)?  It was intended to cover the Section 1202(a) and 1202(b)?  Why have a title saying "Ransom Money" --

THE COURT:  Mr. Sherman, I think I am bound by what the Supreme Court says about statutory construction, and the Supreme Court says we have stated time and again that Courts must presume that a legislature says in the statute what it means and means in the statute what it says there.  When the words of a statute are unambiguous, then this first canon is also the last.  Judicial inquiry is complete.

I do not believe it is the purview of this Court to ask why Congress would have set forth different scienter requirements in Sections (a) and (b) if by the very terms of the language it did so.

MR. SHERMAN:  Well, of course, if you come to the conclusion before you've reached the question of whether there is some ambiguity --

THE COURT:  No.  I start with the language of the statute.  I start with my understanding of the English language, Mr. Sherman.  Frankly, throughout my life, I've been pretty capable of finding ambiguities in things.  That's how you do well in law school.  We all know that, but in this case, I must say I find the language quite clear.

MR. SHERMAN:  Your Honor, the Court asked co-counsel about the situation of what if.  Let's take a what if in this situation, because basically what we're saying is that we expect the government to have to prove that the illegal activity that the defendants knew about was this kidnapping.  What if the defendants -- because, first of all, we're dealing with foreigners in a foreign country.  If, as an example, they may have received the money and thought that Mr. Afonin was sending the money because he was doing something in Russia.

For instance, you know, maybe in Russia in order to get contracts you have to grease an official.  Maybe he was arranging for money to be sent to Mr. Liapine and Mr. Agueev because he had some plan to do something in Russia regarding that money, and he wanted to go through the bank account, and they had no idea that this money -- you know,

presumably unlawfully obtained or illegal activity, you would have to think it would have to be under United States law.

If they thought that Mr. Afonin was doing something in Russia that had nothing to do with the United States and certainly nothing to do with any, quote, "illegal conduct," unquote, or specific unlawful activity, and they took the money because they thought this was the way that Mr. Afonin was doing something in Russia because -- for whatever reason and this is their state of mind, can they be guilty of a crime under United States law under the theory of the proceeds to have been unlawfully obtained?

I mean, we're talking about their state of mind and their banking practices.  It's a whole different culture.  I think one of the things Mr. Robinson was saying and the reason that, although I do not want to delay the trial, one may have to do that in order to look at the banking practices in the Emirates is because in order to get a bank account in the Emirates, it's a very difficult thing to do when you have to go through this entire long process. It's not like you can just go to a bank and open a bank account.  There is a whole process that you have to go through to get a banking account.

So it may have been very logical to these individuals to think, well, Mr. Afonin needs to use my bank

account, you know, immediately because he doesn't have time to get his own bank account because it may take six months. You have to be sponsored by somebody locally, things of that nature.  So what they see as logical and makes sense may not be logical and make sense to somebody in America who is dealing with an American bank account.

So it's a whole different concept, and that's one of the reasons we're saying, well, if their state of mind is such, well, we understood why Mr. Afonin had to do this, because he his own reasons, et cetera --

THE COURT:  It sounds like a good defense, Mr. Sherman.

MR. SHERMAN:  Okay.  But it also requires the defendants to have to get on the stand and testify to give this kind of information where the government may --

THE COURT:  Wait a minute, Mr. Sherman.  Anytime that the government has as a burden of proof a knowledge element, it can choose to put on that element and generally does through circumstantial evidence.  If the defendant then concludes that in order to rebut the inference which he believes the jury will draw from that circumstantial evidence, he can choose to take the stand.  That's not a test of whether an indictment is sufficient.

MR. SHERMAN:  Your Honor, I'm not only talking about the indictment being deficient.  We're also talking

about the Bill of Particulars and the motion in-limine. We're not talking about banking practices in the United States.  We're talking about something 10,000 miles away under a whole different concept of ways of doing business.

So, you know, right away these people are going to be judged presumably by jurors that you have no understanding of how, you know, our common sense about how we do business in this country versus how they may do business in either a third-world country or a country that has a whole different kind of concept in the Emirates of doing business among Russia, Latvia, that part of the world. It's a whole different --

THE COURT:  Mr. Sherman, I have a lot of trials involving defendants from foreign countries, and it's not at all uncommon for their defenses to tap into their own cultural norms.

MR. SHERMAN:  But has the Court had criminal cases --

THE COURT:  Could we perhaps get back to the issue before this Court?

MR. SHERMAN:  Well, that's why we're talking about the Bill of Particulars.  We're talking about the fact that -- the state of mind of the defendants when you're talking about unlawfully obtained.  What we are basically saying is what are you talking about?  What are you saying is the

52

illegal activity that the defendants had to know about?

THE COURT:  And your argument is that the statute requires that it be specified, and the government's argument is that it doesn't.  And you rely on the money-laundering statute which, it seems to me, doesn't help you because the case is --

MR. SHERMAN:  Well, we don't rely upon it.  We just rebutted their argument.  And in the jury instruction on the money-laundering argument, in order to do the jury instructions you have to put in the jury instruction the specific --

THE COURT:  You would agree that the Ninth Circuit itself doesn't modify what the statute requires or what the Ninth Circuit has held that the statute requires; right?

MR. SHERMAN:  That's correct.

THE COURT:  Okay.  Because the Ninth Circuit has been pretty clear on that, even in the cases that you rely on.  There are cases in which -- and I think these are the cases you rely on -- in which there was no question about the defendant knowing what the prior specified criminal activity was because that defendant was charged with that crime.  That was the only one it could be.  In that case, the Courts inserted in essence the prior crime, which was mail fraud I think in both Sayakhom and Stein.  But even in Sayakhom the Court went on to note later in the opinion that

to prove the requisite intent, the government must show that the defendant knew the property involved in the transaction represented the proceeds of some form of unlawful activity. So, I mean, I think the government has a pretty good argument as to what the statutes that use that language mean.

MR. ROBINSON:  Your Honor, on an unrelated matter, I need to call home.  I need to call my wife.

THE COURT:  All right.  Want to take a five-minute break?

MR. ROBINSON:  I only need one minute, if I may.

THE COURT:  Okay.

(Recess taken)

THE COURT:  We are back on the record in the Agueev and Liapine cases.

MR. SHERMAN:  May I just say one more thing?

THE COURT:  Yes.  Mr. Sherman.

MR. SHERMAN:  First of all, Ms. Sherman pointed out to me that I may have agreed with the Court that -- that we are agreeing that somehow we don't think the statute is unconstitutional if it doesn't provide for a knowledge element.

THE COURT:  Then you are.  I understand that.

MR. SHERMAN:  Okay.  Second of all, that on our bill-of-particular argument, basically our argument is that

54

there is nothing in the indictment that even remotely tells us what the government's theory is.  I would think that the Court would or may agree that at least at so point prior to trial we have to know what the government's theory is as to what knowledge the defendants had as to the type of unlawful conduct.

I mean, we're not going to go to trial, I wouldn't think, that the government never has to specify what the defendants thought they were doing was wrong, what conduct they thought they were doing wrong.  What was the illegal activity?

THE COURT:  Well, unlawfully obtained, I think, is the operative term; right?

MR. SHERMAN:  Correct, Your Honor.  Right.

THE COURT:  And --

MR. SHERMAN:  Somehow that implies unlawfully obtained from what the illegal conduct was that resulted in the proceeds being unlawfully obtained.  You know, we can't defend against -- and this is Mr. Robinson's argument.  We can't defend against the argument that it's something.  You know, that, for instance, in the example I gave, well, maybe they thought that Mr. Afonin had obtained the proceeds unlawfully in Russia because he was doing something wrong in Russia, that's what their state of mind was.

That isn't sufficient for them to be convicted in

the United States for violating United States law, so that's why we think the bill of particular is so important, at least to make the government put down its theory as to what the defendants believed the proceeds derived from what kind of unlawful activity, therefore showing that it was unlawfully obtained; that they can't later on come in and say, well, you know, if Mr. Afonin was doing something -- again the same example -- illegal in Russia, that that's enough to convict under this indictment.

This indictment obviously went to the grand jury with a concept of, I would think, that the defendants understood that the proceeds came from the kidnapping or some activity revolving around the kidnapping and not that Mr. Afonin was bribing officials in Russia, for instance. That would be a whole different crime.

THE COURT:  I get the argument, Mr. Sherman.  Ms. Meyer or Ms. Peterson.

MS. MEYER:  Your Honor, just in brief, everything that Mr. Sherman has said, as the Court has already pointed out, goes to a defense.  It does not go to whether or not the indictment is valid or invalid.  So the fact is that the government is required to prove three things:  that defendants possessed proceeds of a kidnapping under California law; that those proceeds crossed state lines or United States boundary; and that the defendant must have

known that the proceeds were unlawfully obtained.

In our indictment, we track those elements as well as identify when the kidnapping occurred, that it qualifies as a felony kidnapping under California law.  So simply because Mr. Sherman and Mr. Robinson have raised evidentiary issues really is beside the point and does not go to the validity of the indictment.

THE COURT:  Well, Ms. Meyer, obviously I take it from Mr. Robinson's and Mr. Sherman's comments, the government is not prepared to suggest that its theory is that Mr. Agueev and Mr. Liapine knew these were kidnapping proceeds; is that correct?

MS. MEYER:  That's correct, Your Honor.

THE COURT:  Okay.  And the government thinks that it has evidence that they -- how else did they know that those were unlawfully obtained, these proceeds?

MS. MEYER:  Your Honor, this has to do with comments made by Mr. Afonin to both defendants, and those comments were relayed to us in interviews with our agents. And those comments indicate that this is something highly unusual, that they took steps to try and conceal the way that these proceeds flowed, both -- well, generally out of Dubai; and the interaction between Agueev and Liapine in getting that money out of the accounts and into other locales, including Latvia and the United States.

57

THE COURT:  So it's sort of the equivalent of my hypothetical -- people walking around with hoods and operating under cover of darkness, et cetera?

MS. MEYER:  Correct, Your Honor.

THE COURT:  You think that their conduct demonstrates knowledge that the proceeds they were dealing with and trying to transfer they knew to be from some kind of unlawful activity?

MS. MEYER:  That's correct, Your Honor.

THE COURT:  And you have turned over the discovery, substantially all the discovery?

MS. MEYER:  Yes, Your Honor.  However, in reviewing the discovery in the other case at the end of last week, we discovered that there might be a few more pages that we'll turn over tomorrow.

THE COURT:  And the comments allegedly made by Afonin to Liapine and Mr. Agueev, that's been turned over?

MS. MEYER:  Yes.  Those come from the defendants themselves.

MR. ROBINSON:  May I inquire, Your Honor?

THE COURT:  Yes.

MR. ROBINSON:  The statements made by Afonin to Mr. Liapine and Mr. Agueev -- and I am seeking direction if I may -- are those from the statements of Mr. Liapine and Mr. Agueev?

58

MS. MEYER:  Yes, Your Honor.

MR. ROBINSON:  And there are no statements from Afonin that you have currently?

MS. MEYER:  That's correct.

THE COURT:  Well, okay.  What you know of what Afonin said is based on what you know of what Liapine and Agueev said; correct?

MS. MEYER:  That's correct, Your Honor.

THE COURT:  Okay.

MR. SHERMAN:  Your Honor, in that regard, first of all, when you say hoods over their head in the middle of the night, the funds were transferred to Mr. Liapine's account. There was no hoods over the head --

THE COURT:  Mr. Sherman, I am not here to try the case.  If you think you have such a strong case on the legal merits, you can waive jury and I will be happy to be the trier of fact, but I'm not trying it today.

MR. SHERMAN:  I understand that.  But the government gets up and recites the facts that may have some impact upon your granting or not granting the Bill of Particulars and leaves the impression that somehow the way the transactions were done somehow make it clear that defendants knew that something unlawful was going on.

THE COURT:  And I think that's their theory of the case.

MR. SHERMAN:  Much to the contrary, those are not the facts, and it may impact the Court's decisions on the Bill of Particulars.

THE COURT:  Not to worry, Mr. Sherman.  If the government says essentially we're relying on circumstantial evidence that the defendants knew what they were doing was unlawful, you'll know exactly what to defend against.  You can we weren't doing anything unlawful.  And to the extent you're relying on the facts and the discovery you've turned over to us to suggest that we knew we were, we're not; we weren't.

MR. SHERMAN:  Well, then, I would like a trial date as soon as possible.

MR. ROBINSON:  Let me speak to Mr. Sherman if I may, Your Honor.

THE COURT:  All right.

*(Defense counsel conferring)*

MR. SHERMAN:  Your Honor, I think the only issue -- I had thought that they had already submitted a 6(e) request to release the grand jury transcripts.  The government says they have not.

THE COURT:  I haven't seen one.

MR. SHERMAN:  We would like to have those grand jury transcripts as soon as possible, and they have indicated they would be willing to turn those over to us.

THE COURT:  All you have to do is give me the order and I'll sign it.

MS. MEYER:  Yes, Your Honor.  I think Mr. Robinson was suggesting that that take place before the Court sets a trial date.

MR. ROBINSON:  And I haven't discussed it with Mr. Sherman or with anyone, so I'll bring it up here.

THE COURT:  Okay.

MR. ROBINSON:  If we can get those grand jury transcripts as soon as possible, then I think we can make an intelligent decision on whether we need an immediate trial -- would like an immediate trial date within the period, whether we're actually going to have to do the overseas investigation to rebut the government's theory.

THE COURT:  I understand that.

MR. SHERMAN:  Could we continue this just one week and get the grand jury transcripts between now and then if the government submits a 6(e) order, possibly tomorrow?

HE COURT:  You mean in lieu of the 6th?

MR. SHERMAN:  Yes, and come back just in one week.

THE COURT:  Just on this case?  I don't have a problem with that.  Oh, I'm sorry.  It was the other case that was on for the 6th.

MR. SHERMAN:  Right.

THE COURT:  Sorry.  It's okay with me.

MS. MEYER:  The government has no objection.

THE COURT:  It's going to be a packed house, but we'll get to you eventually.

Go ahead, Mr. Robinson.

MR. ROBINSON:  Do you always set your hearings at 3:30, Your Honor?

THE COURT:  No.  Generally I start at 1:30.  Today was an exception because of other matters.

MR. SHERMAN:  The other matter -- well, I take it the Court is going to make a formal ruling regarding the other motion?

THE COURT:  I am.  I don't want to cut you off before you've said everything you have to say on the subject.

MR. SHERMAN:  I have nothing further to say about the motions.  I did want to bring up this discovery motion that we have tried to file a couple of times.  It keeps getting sent back to us, and we thought we followed the court rules.

THE COURT:  No, and I suggest you read the criminal trial order.  I am not interested in boilerplate discovery.  I'm not interested in any discovery motion in which defense counsel has not sat down and gone through with the government each and every time that defense counsel believes he or she is entitled to, gotten an answer from the

government on each and every item.  If there are remaining items on which you can't agree, I will then take up a motion.  But that's not what I saw.  That's not the discovery motion I saw.

MR. SHERMAN:  We thought it was narrowed down primarily to the idea of the documents that were seized from the defendants that the local police in the Emirates may have that --

THE COURT:  I didn't look at it carefully, but it was certainly not --

MR. SHERMAN:  We'll redo it.

THE COURT:  Okay, thank you.

Anything further on the motions that are before the Court now?

MS. MEYER:  No, Your Honor.

THE COURT:  Okay.  With respect to the motion to dismiss, on its face, 1202(b) clearly distinguishes between what the government must show about the proceeds themselves, i.e., that they are the proceeds of a kidnapping punishable under state law by imprisonment for more than a year that have been transmitted in interstate or foreign commerce; and what the government must show about the defendants' state of mind, i.e., knowing the proceeds to have been unlawfully obtained.  The plain language of that section creates no ambiguity, and I believe it's easily understood.

The fact that 1202(a) has a different scienter requirement only enforces this reading.  As the Ninth Circuit noted just last year in the Andrew versus Ashcroft case -- this is the language I quoted earlier -- that where Congress includes language in a particular section of a statute but omits it in another section, it's presumed that Congress acted intentionally and purposely.

The exception to this rule applies only if giving the plain meaning to one section would render the other section meaningless.  I don't think that argument can be made here.  Neither individual section is rendered meaningless by construing it according to the plain words used by Congress; nor is there any need to resort to legislative history.

Moreover, were the Court inclined to disregard the Supreme Court's mandate not to go outside the language of the statute when it's unambiguous, nothing in I believe it was Exhibit A to the defense motion in-limine which is largely unidentified but appears to be some sort of a summary -- nothing in that sheds any particular light on congressional intent, even if it were the proper subject of inquiry in light of the plain language of the statute.

The money-laundering statute, 18 USC Section 1956, which also contains a requirement that a defendant know the funds involve some sort of lawful activity, supports the

64

government's interpretation of 1202(b).  The Second Circuit pointed out in the Maher case -- which I'm not sure either side cited, at 108 F.3d 1513 -- it's a 1997 case.  That was a case in which the defendant claimed that his plea lacked a factual basis because although he admitted knowing the proceeds were from some form of unlawful activity, he denied knowing that they were drug proceeds.  The Court rejected that argument, relying on the language of 1956(c)(1) itself.

The Ninth Circuit is in accord.  The Circuit has repeatedly approved jury instructions in money-laundering cases, stating that the defendant must know "that the property involved in the transaction represented proceeds from some form, though not necessarily which form, of activity that constitutes a felony under state or federal law.  The Ninth Circuit so held in the Knapp case in 1997, in the Golb case in 1995.

And they did it most recently in an unpublished decision called Double in which they apparently thought the proposition was so well settled that they didn't feel the need to publish.  They said -- they approved the jury instruction in which the Court advised that in order to convict the defendant, it had to find that he knew he was laundering the proceeds from some prior unlawful activity as opposed to the proceeds from a specific crime.  And the Court observed that not only did the language mirror that of

65

the statute itself, but it said the Ninth Circuit -- we have approved substantially similar language in previous cases.

As I have indicated, I don't think either the Stein case or the Sayakhom cases relied upon by the defendants change the law of this Circuit. Those are both cases in which of the defendants themselves were charged and convicted of the underlying predicate offenses. There was no question about their knowledge, and the issue raised in this case simply wasn't before the Court.

Indeed in upholding the money-laundering convictions in Sayakhom, the Court noted that to prove the requisite intent, the government must show that the defendant knew the property involved in the transaction represented the proceeds of some form of unlawful activity.

Similarly, the Waters case from the Northern District of Alabama I think doesn't help defendants' case much. As the Court observed there, Count Two of that indictment had charged the secretary, Ms. Burlingame, with knowing of the extortion activity. And in reversing the case for lack of evidence, the -- or I guess it's the Northern District of Alabama, so I don't know whether it set the conviction aside. But the Court noted that not only did the government not show that Ms. Burlingame knew that the particular check was the result of an extortion activity, but it couldn't show that she knew the check was the result

of any kind of felonious activity.

Obviously the Ninth Circuit's own model instructions can't change what the circuit itself has held to be the law of this Circuit.  And while there may well be cases in which there is no question as to the defendant's knowledge of the underlying predicate offense and it therefore may be appropriate to include it, that doesn't change the actual requirements of the statute.

I don't believe the statute is void for vagueness.  The statute is -- I don't think any statute is void for vagueness if it provides adequate notice in terms a reasonable person of ordinary intelligence would understand that his conduct is prohibited.

Obviously 1202(b) doesn't implicate First Amendment concerns, so the challenge is limited to an as-applied basis.  1202(b) prohibits a person from receiving, possessing, concealing, or disposing of any proceeds of a kidnapping after such proceeds have crossed a state or U.S. boundary and knowing the proceeds to have been unlawfully obtained.  I don't think the terms are particularly vague nor are they particularly difficult to understand.

The indictment itself is more specific as it does provide the defendants with the date of the alleged kidnapping whose proceeds are the subject of the indictment

67

and the brief period of time during which the defendants allegedly violated the statute and the places to and from which the proceeds were allegedly transferred.

Finally, the requirement that the defendants be shown to have known the proceeds to have been unlawfully obtained militates against any threat that a person might unwittingly stumble into a violation of 1202(b).  If the evidence in this case fails to show beyond a reasonable doubt that Mr. Agueev and Mr. Liapine knew that the proceeds were unlawfully obtained, then they will obviously be entitled to an acquittal or judgment of acquittal even on a Rule 29, so I don't find the statute unconstitutionally vague.

For similar reasons, I think the indictment is sufficiently specific to put the defendants on notice of the crimes with which they're charged and to permit them to prepare their defenses.  With respect to, I think, the specificity of the indictment with respect to the time and place of the crime itself and the particular kidnapping eliminate any concerns with double jeopardy.  Certainly the discovery that's been provided since the indictment was returned adds additional flesh on the bones of the indictment itself.

I don't believe the cases relied upon by defendants support the granting -- supporting or granting a

Bill of Particulars are particularly relevant here.  For the most part they did involve conspiracies or complex transactions not particularly comparable to the charges alleged here.  Accordingly, I am going to deny the Bill of Particulars.

And as the parties have acknowledged, the motion in-limine was predicated on the arguments relating to the motion to dismiss and for a Bill of Particulars, and I think the Court's denial of the motion to dismiss and for the Bill of Particulars largely disposes of the motion in-limine.

If the government gets the 6(e) order to the Court, I will sign it promptly.  I can tell you right now I am going to sign it, so you can assume it will be signed and start copying.  I will see counsel next Monday at 1:30 p.m. or as soon thereafter as we can get through the rest of it.

MR. SHERMAN:  Thank you, Your Honor.

MR. ROBINSON:  Thank you, Your Honor.

MS. MEYER:  Thank you, Your Honor.

THE COURT:  Thank you.

What's our trial date in this case?

MR. ROBINSON:  We don't have one.

THE COURT:  What's our T-max?

THE CLERK:  I have 4/22, but you said it was tolled because of the motions.

THE COURT:  Well, in that case, Ms. Meyer and Ms.

Peterson, you may want to calculate what our T-max is that was tolled during the pendency of the motions, but I don't know exactly when they were filed.

MS. PETERSON:  We will do that and file an order with the Court with regard to the excludable time.

THE COURT:  All right.  Thank you, Counsel.

*(Thereupon, the proceeding was concluded.)*

-oOo-

CERTIFICATE


I hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.


Date:  April 19, 2009



Sharon A. Seffens        4/19/09
_____
SHARON A. SEFFENS, U.S. COURT REPORTER