UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

– – –

THE HONORABLE NORA M. MANELLA, JUDGE PRESIDING

```
UNITED STATES OF AMERICA,  )
               Plaintiff,  )
     vs.                   )
                           )  CR-02-220-NM
IOURI MIKHEL, et al.,      )
               Defendants. )
---------------------------)
```

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Los Angeles, California

July 7, 2003

SHARON A. SEFFENS, RPR
United States Courthouse
411 West 4th Street, Room 1-1053
Santa Ana, CA  92701
(714) 543-0870

SHARON SEFFENS, U.S. COURT REPORTER

APPEARANCES OF COUNSEL:

For the Plaintiff:

JOHN S. GORDON
United States Attorney
RONALD L. CHENG
Assistant United States Attorney
Acting Chief, Criminal Division
KAREN I. MEYER
SUSAN DEWITT
BEVERLY REED O'CONNELL
Assistant United States Attorneys
1100 United States Courthouse
312 North Spring Street
Los Angeles, CA  90012
(213) 894-2434

For Defendant IOURI MIKHEL:

DALE RUBIN
DALE RUBIN LAW OFFICES
2275 Huntington Drive, Suite 902
San Marino, CA  91108
(800) 695-3717

RICHARD M. CALLAHAN, JR.
RICHARD M. CALLAHAN, JR., LAW OFFICES
225 South Lake Avenue, Suite 300
Pasadena, CA  91101
(626) 202-4060

For Defendant PETRO KRYLOV:

GEORGE W. BUEHLER
BUEHLER & KASSABIAN
350 West Colorado Boulevard
Pasadena, CA  91105
(626) 817-5092

For Defendant JURIJUS KADAMOVAS:

RICHARD LASTING
RICHARD P. LASTING LAW OFFICES
318 East 8th Street, Suite 801
Los Angeles, CA  90014
(213) 489-9025

3

MARCIA BREWER
MARCIA J. BREWER APLC
400 Corporate Pointe, Suite 800
Culver City, CA  90230
(310) 670-5325

For Defendant NATALYA SOLOVYEVA:


MICHAEL M. CRAIN
MICHAEL M. CRAIN LAW OFFICES
P.O. Box 3730
Santa Monica, CA  90408
(310) 571-3324

TERRY J. AMDUR
TERRY J. AMDUR LAW OFFICES
1939 Rose Villa Street
Pasadena, CA  91107
(626) 449-9254


For Defendant ALEKSEJUS MARKOVSKIS:

DOMINIC CANTALUPO
DOMINIC CANTALUPO LAW OFFICES
100 Wilshire Boulevard, Suite 950
Santa Monica, CA  90401-1145
(310) 397-2637

TERRENCE J. BENNETT
TERRENCE J. BENNETT LAW OFFICES
P.O. Box 709
Pasadena, CA  91102-0709
(626) 792-5868

ALSO PRESENT:

Russian Interpreter

SHARON SEFFENS, U.S. COURT REPORTER

LOS ANGELES, CALIFORNIA; JULY 7, 2003; P.M. SESSION

THE CLERK:  Item No. 4, CR-02-220(A)-NM, United States of America versus Iouri Mikhel, Jurijus Kadamovas, Petro Krylov, Natalya Solovyeva, Aleksejus Markovskis.

Counsel.

MS. O'CONNELL:  Good afternoon, Your Honor. Beverly Reed O'Connell on behalf of the United States.

MS. DEWITT:  Susan DeWitt on behalf of the government.

MS. MEYER:  Karen Meyer on behalf of the United States.

MR. CALLAHAN:  Your Honor, good afternoon. Richard Callahan on behalf of Iouri Mikhel.  Mr. Mikhel is present and in custody.

THE COURT:  Good afternoon.

MR. RUBIN:  Good afternoon, Your Honor.  Dale Rubin on behalf of Mr. Mikhel.

THE COURT:  Good afternoon.

MR. AMDUR:  Good afternoon, Your Honor.  Terry Amdur on behalf of Ms. Solovyeva, who is present.  She is being assisted by the official court interpreter.

THE COURT:  Good afternoon.

MR. CRAIN:  Good afternoon, Your Honor.  Michael Crain, C-r-a-i-n, for Ms. Solovyeva.

THE COURT:  Good afternoon, Mr. Crain.

MS. BREWER:  Good afternoon, Your Honor.  Marcia Brewer appearing on behalf of Mr. Kadamovas, who is present in the back over here.  He requires the service of the Russian interpreter.

THE COURT:  Ms. Brewer, do we have a signed declaration from your client yet?

MS. BREWER:  Your Honor, I don't know if the Court is aware of this.  We have run into what is called special administrative measures, so we had to file one without signature, but Mr. Lasting says he filed one on Thursday.

MR. LASTING:  Good afternoon, Your Honor.  Richard Lasting.

THE COURT:  Good afternoon, Mr. Lasting.

MR. LASTING:  I filed it on Thursday.  I left a courtesy copy here for the Court on Thursday morning as well.

MS. O'CONNELL:  Your Honor, I have an extra copy that the Court can have.

THE COURT:  Sure, just so I'm clear.  I trust you.  I assume this is identical to the one that was filed before that's signed.

MR. LASTING:  It is, Your Honor.

THE COURT:  Okay.  All right, thank you.

MR. BUEHLER:  Good afternoon, Your Honor.  George Buehler for Petro Krylov.

THE COURT:  Good afternoon.

MR. CANTALUPO:  Good afternoon, Your Honor. Dominic Cantalupo for Aleksejus Markovskis, who is present in custody.

THE COURT:  Good afternoon.

MR. BENNETT:  Terrence Bennett on behalf of Mr. Markovskis as well, Your Honor.  Good afternoon.

THE COURT:  Good afternoon.  Mr. Buehler, is Mr. Evans here today, or are you it?

MR. BUEHLER:  I'm it today, Your Honor.

THE COURT:  Okay.  All right, we are here on the motion initially filed by Mr. Mikhel and joined in by defendants Kadamovas, Krylov, and Solovyeva, to suppress evidence derived from two wiretaps authorized in this case.

First of all, let me indicate those two wiretaps occurred obviously on different dates.  The first was authorized by Judge Cooper on December 31st, 2001; the second authorized by Judge Hatter on February 13th, 2002.

With respect to standing, I believe Mr. Mikhel has established standing as to Target Telephones 1, 2, and 3 of the second wiretap, that is, the February 13th, 2002, wiretap authorized by Judge Hatter.  Mr. Mikhel has established that he was the person in whose name all three of those different phones were registered.

I believe Ms. Solovyeva has established standing

to challenge the conversation involving Target Telephone 1 of the February 13th, 2002, wiretap.  She indicates she was a participant in the February 22nd, 2002, conversation.  I believe Mr. Kadamovas has established standing to challenge conversations intercepted on Target Telephone 2 of the February 13th wiretap, indicating he participated in the conversations on that phone.

I believe Mr. Krylov has established standing with respect to a conversation intercepted on February 15th of 2002 over Target Telephone 1 of the February 13th, 2002, wiretap.  No one has claimed to have any interest in or to have been intercepted on Target Telephone No. 4 of the second wiretap, that is, the February 13th, 2002, wiretap.

So far as I have been able to determine, no one claims to have any interest in or to have been intercepted on any of the three target telephones on which the first wiretap of December 31st, 2001, was authorized by Judge Cooper.

Anyone wish to be heard as to that?  That's my observation and, I guess, my conclusions with respect to standing as to the defendants before me.  Does anyone take a different position?

I see no hands.

All right, we can proceed.  I am obviously familiar with the papers filed by counsel and adjoiners

therein.  The real issue in this case is necessity.

Mr. Callahan, I think I understand your argument. Ms. O'Connell, Ms. Meyer, Ms. DeWitt, I think I understand the government's position.

Mr. Callahan, anything you would like to add or perhaps emphasize?

MR. CALLAHAN:  Thank you, Your Honor.  I will not repeat the papers or any points that have been set forth as clearly as possible.  What I do want to do because of the lateness of the hour, however, is simply bring one additional fact to the Court's attention, basically an observation, and, of course, I will entertain whatever questions the Court has.

I was troubled dealing solely with the second application, and it's something that has been troubling me for quite a few weeks.  I was unable to actually figure out exactly what the issue was until about 3:00 this morning, which is often when these sometimes wise revelations come to mind.  I'm not sure this is going to be one, but it sure felt like it at the time.

I think one of the underlying themes in the second application, and also as articulated by Ms. O'Connell in her opposition, is that the purpose of this second wiretap was to gain evidence, but much more important was the protection and the hopeful recovery of the kidnapped victims or

hostages in this case.

What troubled me was the timing of it, and it took until 3:00 this morning, so some of these documents aren't before the Court, but I can refer to them, I think, in a general way. I think the evidence is clear that when you look at this affidavit -- and I think it's simply human nature to look at it under the circumstances in which the agents indicated they found themselves.

They had people missing. They felt that lives were in jeopardy. Therefore, even though maybe not all the possible investigative techniques were utilized, they did the best they could because time was of the essence. And, you know, phrases such as "exigency" or "exigent circumstances" were used frequently in the affidavit by Ms. O'Connell.

But the thing that I found interesting is that it became clear to me that the purpose of the second wiretap was not for the procurement of human life but rather simply as a tool to gather evidence. I want to say first and foremost there is nothing wrong with that. That's one of the most legitimate purposes for which a wiretap is properly applied for and found by the Court as a perfect reason to have a wiretap, to obtain evidence in order to help obtain a conviction at trial. That's why it was created.

What I see here is I think by not doing everything

they would in a traditional case -- I think it's almost a sense that implicit throughout the affidavit is we didn't have time.  We didn't have time.  People's lives were in jeopardy.  We didn't have time.  So we couldn't interview these witnesses.  We couldn't keep going with these phone calls.  We needed this tap.

Now, what was curious about that, though -- and here is the infamous 3:00-in-the-morning reflection -- every piece of evidence that supported this affidavit by Special Agent Davidson was used four days later to support 14 individual searches and the accompanying arrests of most of the defendants if not all of the defendants in this case.

What that means is -- it's almost, in fact, a carbon copy in many ways.  What that means to me is that they had in their own mind -- the government's collective mind, as it were -- they had probable cause on February 13th, the day that this wiretap was applied for and approved.  That same probable cause carried over four days later when they went to do the searches and made the arrests.

My observation is, therefore, if they in their mind believed that they had probable cause when they applied for this, if safety was the ultimate concern for the wiretap, they could have gone in and done exactly what they did that following week.  They could have done that on the

13th.

THE COURT:  You don't think a few days with the wiretaps -- that counts for nothing?

MR. CALLAHAN:  The few days of wiretaps did not even appear in the search warrant affidavit.

THE COURT:  No, I'm saying for purposes of the investigation.  What you're saying is that they were willing to go out and do some additional search warrants four days later, and we can pretty much eliminate any need for the wiretap.

MR. CALLAHAN:  I am not saying that they were necessarily unwarranted.  What I'm saying is under the guise of we're trying to protect human life, I think that the wiretaps would have little or no impact on that.  The purpose of wiretaps in my experience -- and I think if questioned the agents would probably say so -- is that the wiretap in this case would be the perfect opportunity to in a sense flesh out the government's proof, not locate victims.

What the wiretap would be beneficial for from the government's standpoint is not for the people, not for the lives.  It would be to present and prepare a case for trial. They would get hopefully evidence showing intent, knowledge of the underlying operation, that type of information.  It's sort of to put the bow around the picnic basket for them.

That would be the purpose of the wiretap.

I'm not saying -- and I don't want it to be misinterpreted by Ms. O'Connell -- that I am claiming that the government didn't care about the lives.  I think that was an utmost priority for them.  But simply looking at the wiretap as an independent investigative tool, which we must, the purpose for the tap -- if they had the ability to save human lives the same way on the 13th as they did when they applied for the search warrants four days later, they could have gone in on the 13th to each of those residences and made the arrests.

So the only logical explanation is that they were trying to get additional evidence, and I just wanted to bring that to the Court's attention.  Like I said, there is nothing wrong with doing that.  When you take away the aspect of exigency from the wiretap and realize that it's simply an investigative tool -- I think it's funny how the Davidson affidavit of February 13th begins to not look quite as critical as it was before.  Some of the deficiencies and the necessity become a little more pronounced because you take away the argument that we were trying to do what we could quickly to save human lives and instead looking at it as a very objective in a sense run-of-the-mill wiretap as an evidence-seeking device.

When you do that, that's when you start looking

closer at why didn't they seek more witnesses, and why didn't they do more phone calls and traces and taps and informants and this and that.  All of those questions that the Court and most Courts would traditionally ask in a case like this the government seems to sort of put by the wayside under the guide of exigency.  It's my position that the exigency is not there for the wiretap.  It might have been there for the case.  In fact, I am sure it was.  But for obtaining the wiretaps in and of itself, the purpose -- the overriding purpose was to get evidence for trial.

That was the observation I wanted to add to the papers.  And, of course, I will answer any questions that the Court has.

THE COURT:  So if I can distill your early morning epiphany, basically if they were prepared to go in four days later with search warrants, why couldn't they have done that before they got the wiretap?

MR. CALLAHAN:  They could have done that, and at least that would justify doing it for -- as the primary motivation being the safety of the victims.

THE COURT:  Ms. O'Connell.

MS. O'CONNELL:  I think before beginning, Your Honor, we first have to look at the lens through which Your Honor has to look at this order of one of your colleagues, and that is the deferential standard.  The lens with which

you view this affidavit is the abuse of discretion standard. Factually, Special Agent Davidson had numerous goals in the investigation, which are articulated in our papers, which is to build a case regarding the kidnapping of these four victims and to fully flesh out the conspiracy.

Now, that's important because the 371 charge is one of the goals in Special Agent Davidson's affidavit at page 5, paragraph 8, a violation of 371, conspiracy to commit an offense and kidnapping and receipt of ransom proceeds.  And when he lists the goals in this case, they are innumerable, including the location of the victims, the condition of the victims; but in addition, the manner, scope, and extent to which they're being used to facilitate the kidnapping and/or extortion schemes, the identity of the individuals involved in the kidnapping.

Now, looking at those goals -- and there is no case law that says you have to just look at one goal.  There are many goals articulated.  Looking at those goals, there absolutely was necessity.  We have to take a common-sense approach to viewing necessity and a practical approach. United States versus McGuire tells us that when we're looking at conspiracy, there is specialty weight given, and there is a long quote in the government's paper about the Greek Hydra -- that's one part of it -- and the conspiracy begins anew.

Really in this case there was necessity.  The cases that are cited, including Ashley -- and let me just say that Ippolito asks this Court to look at the affidavit as a whole, and that's what we're asking this Court to do. Look at what the agents in this case were doing at the time. The standard is not they should have, could have, done particular investigative techniques.  The standard is did the Court abuse its discretion in finding there was in fact necessity?  The government responds to that, no.

Now, Judge Hatter did not abuse his discretion when he granted these wiretaps.  There were many things going on.  The pin registers did not give the identities of the conversations.  All of the things that they were doing were being funneled together, and a conspiracy this Court is entitled to look at -- just because there is some evidence -- and I'm quoting from McGuire now, Your Honor. The government's possession of evidence sufficient to indict some conspirators does not bar it from seeking evidence against others.  Most certainly that was the case in this high-moving, fast case investigation.

Moreover, the cases cited by defense counsel as to conclusory allegations and boilerplate, if you look at the facts of those cases, they're absolutely distinguishable and far different from this case with Special Agent Davidson. For example, in Spagnuolo, the necessity portion only

detailed a confidential informant's description of gambling activities.  In Santora, the necessity relied upon the affidavit that was incorporated previously therein.  But in Carneiro, there were many factual misstatements which we do not have here nor any allegation of factual misstatements here.

Same with Blackmon, Your Honor.  The defense primarily relies upon the Blackmon decision.  The Blackmon case is different from this case and is more like the McGuire case because there were factual misstatements in that case.  They detail surveillance of necessity, you know, to support necessity, but the agent forgot to tell the Court that the surveillance took place eight months prior and did not involve Blackmon.

That's not the case here.  Special Agent Davidson gave a full and complete statement of the investigation to date.  A kidnapping conspiracy which involved numerous countries including Russia, Latvia, Dubai where the money was going is very different than the Blackmon importation case, and that's what McGuire tells us to do, is look at this, take a common-sense approach.

Every single case tells this Court to take a common-sense approach.  But when you look at it in a common-sense fashion, Your Honor, you will realize that these agents were doing everything.  Yes, they were

attempting to build a case. That was one of their goals. But as I believe Agent Davidson said, the overriding concern was the safe return of these victims, which unfortunately did not happen.

So with that, Your Honor, the government submits that there is necessity, that Your Honor should view Judge Hatter's decision with deference, and doing so under the precepts of the McGuire case should find there was necessity to intercept the wire communications.

THE COURT: Would you like to address Mr. Callahan's early hour epiphany?

MS. O'CONNELL: Well, that goes to the goals of the investigation, Your Honor. There were numerous goals to the investigation. The defendants in this case were arrested on February 19th, some six days after the order issued.

First of all, as Your Honor pointed out, that does not negate the six days in which wiretapping interceptions took place. To take away an exigency, as it were, the government -- you can't take away that this was a kidnapping extortion investigation with multiple countries involved and multiple players involved. That's sort of the Greek Hydra of McGuire, and that's what the government was doing. And McGuire says to us that even if you have a case against these defendants, the government is still entitled to build

18

a case against the entire conspiracy.  So that concerns the contrary case law of the Ninth Circuit notwithstanding Mr. Callahan's epiphany.

The government was entitled to arrest whom they could arrest and continue to investigate this conspiracy with everyone else.  Even if you take away a kidnapping exigency, the return of the persons, the victims in this case, you still cannot take away the government's ability to build a case of extortion conspiracy.  That's the Blackmon case.  That's the McGuire case.  That's the Ippolito case, and that's the Commito case.  They all tell us pre-Blackmon and post-Blackmon that the government is allowed to do this.

THE COURT:  All right, thank you.

Do other defense counsel wish to be heard?  Anything further, Mr. Callahan?

MR. CALLAHAN:  Only briefly, Your Honor, because of the hour.  I had a three-hour rebuttal planned.  I notice again that Ms. O'Connell indicates this was a furious and fast-paced investigation.  I just keep going back and remind the Court that the first victims in this case were actually reported missing over two months before this application came through.

Second of all, although she indicates this is a very high-speed, high-intensity, hostage-taking, kidnapping case, it's also interesting that Mr. Davidson in his

affidavit notes that in hostage-taking cases such as this there are eight common investigative techniques that are usually utilized.  In this case, I believe there were only three that were even attempted, let alone given a real chance to succeed.

What is now being called my epiphany, which is actually better than a revelation, I find still to be an operative issue.  I don't want to have Ms. O'Connell or the Court misunderstand.  The government is more than entitled to a build a case, but once we understand that exigency is no longer the operative factor, I think the Court has to look at this affidavit in a much more objective light without the fear of hearing this clock ticking in the back of your mind as you determine whether or not the government adequately went through the legal hurdles necessary to satisfy the necessity standard.

As far as the boilerplate allegations go, I think while Ms. O'Connell tries to distinguish each case individually, the points are still correct as a matter of law.  Generic statements about why certain aspects of an investigative technique would not be sufficient in a particular case have to be particular.

What happened with Mr. Davidson, in addition to adopting -- cutting and pasting large portions of the earlier Wilson affidavit is that the conclusions he drew as

to why certain investigative techniques would not work had nothing to do with this case.  It was based on generic things such as in my training and experience, that sort of information.  It had nothing to with why in this investigation those techniques would not work, and that's what the law demands, and that simply was not satisfied in this case.

THE COURT:  Thank you.

Anything further, Ms. O'Connell?

MS. O'CONNELL:  Yes, Your Honor.  I would note that the victims' bodies were found after the arrests of the defendants in this case.

THE COURT:  I think we all agree that at the time this wiretap was authorized the victims had not been located.  Certainly the fact that any of them had been killed prior to this time was not known to the government.

Anything further?

MR. CALLAHAN:  Nothing further, Your Honor.

THE COURT:  All right.  I think I have indicated who has standing to challenge what, and no one has established standing to challenge the 12/31/01 wiretap authorization by Judge Cooper or Target Telephone 4 of the second wiretap authorization by Judge Hatter on February 13th.

With respect to the validity of the February 13th

wiretap authorization, Special Agent Davidson's affidavit of February 13th is 52 pages in length.  It does set forth in detail evidence relating to the disappearance of four individuals -- Ms. Peckler, Mr. Umansky, Mr. Safiev, and Mr. Kharabadze -- and chronicles the investigation of law enforcement aimed at identifying the perpetrators and locating the victims.

No one disputes that the affidavit contains facts sufficient to establish probable cause to believe that the four target telephones were being used and would be used by the perpetrators in connection with the kidnapping of the victims and the ransom demands made with respect to Mr. Umansky and Mr. Safiev.

The defense challenge to the validity of the wiretap is based on a claim that the government failed adequately to show necessity.  The defense also asserts that the Davidson affidavit contains too much of the same language as used in the Wilson affidavit when the first wiretap of December 31, 2001, was authorized, but this is all part of the necessity argument.

As Ms. O'Connell has just alluded to, the Ninth Circuit has recently reiterated in the McGuire case just last year that while a wiretap should not ordinarily be the initial step in an investigation, law enforcement officials need not exhaust every conceivable alternative before

22

obtaining a wiretap.  Indeed, as the Ninth Circuit indicated in the Smith case, a wiretap need not be a last resort.  The Circuits also made clear that a finding of necessity is tested in a practical and common-sense fashion.

Here Judge Hatter made an explicit finding that -- and I quote, "Normal investigative procedures have been tried and have failed, reasonably appear unlikely to succeed if tried, or are too dangerous to employ."  The question is whether the affidavit supports that finding and specifically whether Judge Hatter abused his discretion in making that finding.  Clearly the affidavit does support that finding, and I believe Judge Hatter did not abuse his discretion in so finding.

The 52-page affidavit of Special Agent Davidson sets forth in detail the traditional investigative techniques used up until that time by law enforcement to identify the kidnappers, discover their plan, and to locate the victims as well as trace the ransom money.

Indeed, after identifying the target phones, the next 35 pages of the affidavit are devoted to outlining the evidence gathered in this particular case using traditional investigative techniques.  These include:  many interviews with the victims' families, many interviews with the victims' business associates, reviews of computer databases to identify subscribers of various phones, reviews of

Department of Motor Vehicle records and Immigration & Naturalization Service records to identify and locate specific targets, analysis of phone toll information, use of pin registers, execution of several search warrants of selected residences and automobiles or an automobile which law enforcement believed would not come to the attention of the kidnappers, physical surveillance of identified targets, and international investigatory efforts including interviews and record checks.

Really the only methods not used were grand juries and the introduction of an undercover agent or a confidential informant.  As for the grand jury, the defense does not argue and there is nothing to suggest that the government had access to any witnesses whose testimony before the grand jury could have advanced the investigation.

With respect to the use of an undercover agent or a CI, as Special Agent Davidson's affidavit makes clear, neither was a feasible option in this particular case.  It was unlikely that a close-knit group of persons associated with organized crime involved in an international kidnapping-for-ransom conspiracy would divulge their secrets to a newly introduced stranger, whether that person be a CI or an undercover agent.

As Special Agent Davidson explained in paragraph A-2 of his affidavit, which seems to be a considerable

understatement, and I quote, "I believe that any UCA introduced to the subjects of this investigation would be putting them in an extremely dangerous situation." Additionally, as Special Agent Davidson explained, the likely compromise of any UCA would also jeopardize the safety of any remaining victims.

Contrary to the defense contention, I don't believe there is a contradiction in Special Agent Davidson's assertions that while he had no information that the subjects had actual knowledge of the ongoing law enforcement investigation, there was certainly -- and I quote -- "the possibility that the subjects might be aware of it."

Indeed, it seems to me unwise to assume that after four kidnappings any group would be unaware of the possibility of law enforcement involvement, and that fact may render the introduction of an undercover agent even more problematic in this particular case.

All these considerations apply to the use of a CI but with extra force. The danger was the same. The difficulty of infiltration was the same. But here Special Agent Davidson made clear that law enforcement simply did not have any source capable of infiltrating the organization who would be willing to do so or willing to testify if he or she were successful.

The fact that Special Agent Davidson reached the

same conclusion on the February 13th, 2002, affidavit as Special Agent Wilson had reached on the December 31st, 2001, affidavit is neither surprising nor damaging to the validity of the affidavit. This was, after all, the same investigation. Two more people had gone missing. More ransom demands had been made, and the situation was possibly even more dangerous than before as more lives were in jeopardy.

There are, it seems to me, only so many ways of saying in an affidavit we would be crazy to try to send in an undercover agent, and we don't have any informants with contacts to Russian organized crime who are willing to try to ingratiate themselves with the members of an ongoing international kidnapping-for-ransom conspiracy. So I find nothing suspect or in any way deficient about the fact that both Special Agent Wilson and Special Agent Davidson came to that conclusion when they did.

This is not a case where there were material misrepresentations which when excised from the affidavit revealed nothing but conclusory assertions unsupported by a specific fact. The facts set forth in the affidavit, the veracity of which is not challenged, virtually compel the conclusion that introduction of an undercover agent or a CI simply was not feasible.

Similarly, I don't think Special Agent Davidson

26

relied too heavily on his training and experience when making the case for a wiretap.  He would have been remiss not to bring his training and experience to bear on this investigation in evaluating the probability of the success of various investigative techniques.

As the First Circuit noted in the Ashley case, an issue in court may properly take into account affirmations which are found in part on the experience of specially trained agents.  Here Special Agent Davidson relied not only on his training and experience but on -- and I quote -- "the facts and circumstances presented in this affidavit."

On the facts presented in the affidavit, I would venture that one probably need not even be a trained FBI agent to conclude that normal investigative techniques utilized until then had failed and that only electronic surveillance was likely to be successful in the future.

In short, Special Agent Davidson's affidavit set forth sufficient facts to establish not only probable cause to believe the target telephones were being and would continue to be used to further an ongoing criminal kidnap-for-ransom conspiracy, but also that traditional investigative techniques had been tried but had failed to produce direct evidence of the conspiracy and its members, the details of the scheme, and the location of the victims, as well as the disposition of the ransom money and the

conspirators' future plans for the victims.

Judge Hatter's determination that the government had adequately shown the necessity for electronic interception was amply supported by the affidavit, and I find he did not abuse his discretion in authorizing the wiretap and specifically the finding of necessity.

As I mentioned, no defendant has established standing to challenge Judge Cooper's authorized wiretap of December 31st, 2001, based on the affidavit of Special Agent Wilson.  I have reviewed that order and affidavit as well, and my conclusion would be the same.  I believe the necessity for the wiretap was adequately shown and Judge Cooper properly authorized that on December 31st.

Indeed, as of December 31st, the date of the first wiretap authorization, law enforcement did not even have a name of identifiable subjects.  What they had at that point were two kidnapping victims, Ms. Peckler and Mr. Umansky; an extortion demand; threats to harm Mr. Umansky or his family that engaged in any form of self-help; and three telephones used in connection with the Peckler and Umansky kidnappings and ransom demands.

As of December 31st, law enforcement had tried interviews with the victims' families, interviews with business associates, consensual monitoring of phone conversations, physical surveillance, examination of toll

records, use of a canine to detect one of the victims' scents, coordination with local law enforcement officers, review of bank records, review of DMV records, review of authorized pin registers, and the execution of a search warrant on one of the victims' cars located at LAX.

At this point, the FBI still didn't know who the kidnappers were, much less where the victims were, and where the ransom moneys had wound up, or what the kidnappers' next step would be.  Clearly law enforcement had no place to go at this point but to electronic surveillance.

Accordingly, based on those findings that neither Judge Hatter nor Judge Cooper abused her or his discretion in finding necessity for each of the wiretaps, the defense motion to suppress the evidence derived from those wiretaps is respectfully denied.

Do we have a subsequent date in this case, a next date?

MS. O'CONNELL:  Well, Your Honor, at the risk of being laughed at, the government would request a trial date and a briefing scheduled on any additional motions.  We have spoken during other proceedings while waiting to appear about the ability to brief additional motions and have those decided, one of which is a search warrant for the homes of the defendants in this case.  I would note for the Court that they are based on predominantly one affidavit of

Special Agent Davidson.  There is a second affidavit for a supplemental search, and we would ask that the Court set a briefing schedule to have a hearing date.

THE COURT:  You're sure they're going to be challenged?

MS. O'CONNELL:  Well, Your Honor, we certainly have heard rumblings that at least counsel for Mikhel is going to challenge them.  I have not inquired of all the other counsel, but I am assuming, A, have standing to challenge their residence; and, B, challenge whatever was seized from those residences.

Of course, I'm sure you'll want to inquire, Your Honor, but if we do set a hearing date, the marshals have asked for a Tuesday or a non-Monday hearing date given the transportation issues involved in this case.

THE COURT:  Well, let me turn to the defense.

What additional motions are you contemplating, Mr. Callahan?

MR. CALLAHAN:  Your Honor, we have been meeting amongst ourselves and also we have talked to the government about trying to maximize the time that we have, knowing that the forensic evidence is still a ways off and tentative at best for January.  In order just to get something going and get some of these matters out of the way, we thought it best to basically start now with the residence searches to the

extent they can be done.  Indeed, if something happens with the forensics that affects these searches, then perhaps they could be revisited at that time.

THE COURT:  I really don't want to do this twice.

MR. CALLAHAN:  I understand.  We're also just trying to maximize the time for the Court.  If you prefer to do them all at one time, that will be fine, but that will be sometime next year.

THE COURT:  The only thing I do want to avoid is either deciding a motion that would be mooted by the discovery of some forensic evidence or deciding a motion which will turn out not to have decided anything in light of subsequent discovery evidence.  I am trying to avoid that.

I certainly have no problem in not doing all the motions at one time.  Can you give me a hint as to how the forensic evidence you think would affect any motions to suppress what's seized?  I mean, obviously what they discover after the fact can't be used to bolster the probable cause for the searches themselves.

MR. CALLAHAN:  Well, I guess hypothetically -- I mean, there are some vehicle searches here, too, but specifically with the residences, carpet fibers, if it turns up something and it turns out to be beyond the scope of the warrant -- I'm just thinking outloud here, but it's possible that the forensics could affect the way in which a search

motion would be made, although as far as the issue -- Ms. O'Connell and I talked about this, the issue of probable cause would be --

THE COURT:  It's going to have to be decided, period.

MR. CALLAHAN:  Right.  It will be done with the law of the case, and as far as that goes, we can move on.

THE COURT:  Okay.  Mr. Callahan, do you have any proposed date by which you think -- and maybe -- I'm sorry. Let me just ask a few other people.  Ms. Brewer, did you plan on bringing such a motion as well?

MS. BREWER:  Yes, Your Honor.

THE COURT:  Okay.  Mr. Buehler.

MR. BUEHLER:  Yes, Your Honor, definitely.

THE COURT:  Mr. Amdur.

MR. AMDUR:  Haven't decided yet, Your Honor.

THE COURT:  Okay.  Mr. Cantalupo and Mr. Bennett.

MR. CANTALUPO:  Haven't decided yet.

THE COURT:  Okay.  Mr. Callahan, when would you plan or be able to file such a motion?

MR. CALLAHAN:  We contemplated with the Court's acquiescence that the defense would file the motions on or before August 18th.  The government would be allowed two weeks to oppose, which would be September 2nd.  And the defense reply would be September 15th.  Knowing the Court's

preference for a bit of a protracted hearing date, maybe a hearing in the early part of October.

THE COURT:  All right.  And you think what makes sense at this point is to -- is there anything else we should take up at that time, or just basically the motions to suppress with respect to the residences will keep all counsel sufficiently busy?

MR. BUEHLER:  Let me consult with counsel, Your Honor.

(Defense counsel conferring.)

MR. CALLAHAN:  The only other matter that I think we can take up from a motion standpoint -- I think the Court is painfully aware as are all the parties, attorneys, and the marshals, of these new requirements, security measures that have been imposed as effective today.

This is the first experience I have had and I think most counsel in this case.  It's a relatively new phenomenon after 911, but it appears that the requirements imposed go far beyond what the Court sees here today -- the separation aspect, the extra security.  It's only the tip of the iceberg, because the requirements for the special events rate of measures under the CFR go dramatically farther than that, including restrictions on visitations with counsel, their investigators, and the defendants; possible placement of microphones near the inmate's cell.

33

There are a number of issues that I think could be challenged either informally, which we will clearly do first, but if that is unsuccessful, I would contemplate in the near future, in the next week or 10 days, a motion to basically challenge that entire sound provision on constitutional grounds, plus request the Court's interference or indulgence in going through some of these more imposing restrictions.

THE COURT:  Are these restrictions imposed by the CFRs?

MR. CALLAHAN:  CFRs, and I think it's also in conjunction with the BOP and the Department of Justice.

THE COURT:  Okay, because I am not really familiar with this -- they do not come to my attention otherwise.  I certainly think it does make sense for counsel to see what they can work out.  As I said, I'm just not familiar with the provisions themselves, so --

MR. RUBIN:  Your Honor, if I may address the Court.

THE COURT:  Yes, Mr. Rubin.

MR. RUBIN:  We received at the beginning of June a letter from the United States Attorney indicating that through the Attorney General's Office on behalf of the United States Marshal and the BOP, there were certain security measures that were being undertaken.  We were

requested to -- and this is them, by the way.  It's a large document.  Some of it includes actually getting involved in the attorney/client relationship and what we can do as far as talking to our clients is concerned.  I am willing to work under any system of rules that a custodial facility establishes in order for me to meet with my client and to do my job.

I was asked and it was asked again today to sign an affirmation in essence affirming that I would conduct myself according to these rules.  I have not done that at this point, and as of today, I assume -- or actually before today -- I'm not allowed to talk to my client.  The marshals told me today that I could not talk to my client.  I am not going to be allowed to visit him, and this is at a time when we are preparing to give our presentation to the local office.

I don't mean to bring the Court into this mess, but the reality is I don't have to agree to something that I believe is unethical in order to do my job with my client.  After 28 years of practice and as an officer of this court, I think I know how to do my job and follow the rules of any custodial facility, including the San Bernardino Sheriff's lockup, but at this point --

THE COURT:  I'm just trying to figure out, Mr. Rubin, is the thing you're asked to sign -- is it the

contents of that you find objectionable, or is it just the signing of the document because you have indicated you don't have a problem complying with the rules of a facility?

MR. RUBIN:  I do not believe that I have to sign anything.  The Court has appointed me.  I'm capital counsel. He is my client.  I will follow the rules of any facility, and I don't believe that I have to sign anything in order to get in to see my client, but this also includes the defense investigator and any other members of the defense team.  In fact, according to these, the defense investigator cannot see the client by himself.

THE COURT:  All right.  I think this is going to require some fairly intense consultation between government counsel and defense counsel.  I expect government counsel to look at these things with the same scrutiny that any Court would look at them.  That's about all I can tell you at this point.

I'm not familiar with the regs and what they call for.  The government should be looking at them, as I say, with the same objective, scrutiny, that anyone else would.

MS. DEWITT:  Your Honor, I agree with that, but just to give you a little bit of background, special administrative measures are instituted only after they have been approved by the Attorney General, and they're restrictions that are in place in order to -- in situations

where you think there is a substantial risk created by the inmate communicating essentially with persons outside the institution or even other inmates within the institution, so it limits those communications.  It is not intended to interfere with the attorney/client relationship, but it does impose some restrictions in terms of communications with third parties.

These are what they call SAMs, which stands for special administrative measures.  They are employed pursuant to 28 CFR Section 501.3.  If this is litigated, of course, the Court could be provided with a copy of them.  They are actually not that lengthy.  They're about 14 pages, the restrictions.

THE COURT:  Does a finding have to be made with respect to an individual defendant?

MS. DEWITT:  Yes.  They are applied -- they're only approved defendant specific, and although they are not -- these are not things that the Department of Justice routinely employs, but I can tell you that they do use them in instances where there is a perceived threat situation.  The language in them has been used in many instances and in many different contacts.  It's not limited -- although it's been suggested -- to just sort of terrorist situations, although it's also used in that context.

THE COURT:  And does it apply to every defendant

in this case or just Mr. Mikhel?

MS. DEWITT:  It applies to three of the defendants in this case.

THE COURT:  Okay.  Would that be Mr. Krylov, Mr. Mikhel, and Mr. Kadamovas?

MS. DEWITT:  Yes.

THE COURT:  And does the U.S. Attorney's Office or someone else apply to the Attorney General to have this determination made?

MS. DEWITT:  Yes.  We requested it.

THE COURT:  Okay.

MR. RUBIN:  Your Honor, I would point out that included in the SAMS document is eavesdropping allowances, allowances for the placement of microphones for the purpose of eavesdropping, and potential eavesdropping on an attorney/client relationship, on attorney/client meetings, and attorney/client phone conversations.

If the government wants to do that, I think that they should embark on doing that without asking me to sign an affirmation agreeing to it.

THE COURT:  These regulations are relatively new?

MS. DEWITT:  No, they are not relatively new. They have been in place for at least a number of years that I'm aware of.  I cannot speak to what changes have been made in the regulations over the years, but I know that our

office has used them in a number of cases over the past five or six years.

MR. CALLAHAN:  Your Honor, a month after 911 my understanding is that 501.3 of the CFRs was amended to make it dramatically broader.  This is what came out some time ago when a lot of defense attorneys across the country were up in arms over the possibility of having attorney/client conversations recorded.

THE COURT:  Right.  And I thought there was a big brouhaha maybe 18 months ago or so.

MR. CALLAHAN:  That's about right.

THE COURT:  Something happened, but I'm not sure what.

MS. DEWITT:  I can't speak to the changes because I'm not a historian on this particular -- I do disagree with the characterization that defense counsel has made as to what exactly the SAM does, although I don't think that this is necessarily the appropriate time to get into that.

THE COURT:  Well, I think it does perhaps emphasize the need for counsel to get together.  If you disagree as to what it actually provides, you may be able to find some --

MS. DEWITT:  I have requested to counsel that if there are some particular provisions in the SAM that they have issues with to raise those with me because there are --

in some limited circumstances, we may be able to ask for amendments or some allowances.  Counsel has been talking to me about it as they become familiar with it.

They have also been advised that -- and they were given fair notice -- that the rules require that they sign an affirmation saying that they got the SAMs, that they've read the SAMs, and that they will comply with the SAMs, and that they have to do that.  Another step, which is to get cleared -- pre-cleared is what it's called in the document -- by the FBI before they are allowed to meet with their clients.

Technically, Your Honor, they shouldn't be meeting with their clients today because they haven't been pre-cleared because I couldn't get them to get the affirmations back to me and the information to clear them, although many of them have now, and we're working diligently to try to get that taken care of so that we don't interfere with their attorney/client relationship.

Some of them have not gotten me their affirmation, so I haven't gotten the information to get them cleared, and I can't do it until they do that.

THE COURT:  Mr. Rubin.

MR. RUBIN:  Your Honor, at the request of my lead counsel, I did supply the government with my date of birth, my social security number, my home phone, my home address,

40

my office address, and I think my shirt size as well.  I have no problems with going through any kind of a screening process where my background is examined.  What I am saying is that if the government, the BOP, and the U.S. Marshals want to institute certain security measures, I should not have to sign on to something saying that it's okay with me in order to see my client.

THE COURT:  Well, I'm not sure they're asking you to endorse it or whether you would vote for it if you were a legislator, but as I understand from Ms. DeWitt, it's whether you agree to abide by those measures.

MR. RUBIN:  I don't agree to --

MS. DEWITT:  The affirmation specifically says that this does not serve as an endorsement of it or of the conditions or serve to attesting to any of the factors set forth.  It specifically says that in the affirmation that they are requested to sign.

MR. RUBIN:  The affirmation says that "I agree to abide by the provisions, particularly those that relate to contact between the inmate and his attorney and the attorney's staff."

THE COURT:  Right.  But if I understand what they're saying is these are the rules.  You will abide by the rules.  You don't have to like the rules.  You don't have to endorse the rules.  You don't have to think that the

SHARON SEFFENS, U.S. COURT REPORTER

rules are a good idea.

MR. RUBIN:  If my conversation with my client at some future time is recorded and that is sought to be admitted at trial for some reason and I argue that it should be suppressed, and they come up and they say, Your Honor, I have an affirmation; counsel said it was okay -- all I am saying is that I will follow the rules.  I have never in the 28 years that I have gone into any jail facility or a state facility or a federal jail facility been asked to specifically sign on before I can see my client.  I will conduct myself as an attorney at all times.

THE COURT:  All right.  At this point, all I can suggest is that counsel get together.  If you cannot resolve it and somebody has to file a motion, then you'll have to file a motion.  Obviously I can't rule on it now.

With respect to the suppression motion, though, I think the proposal that Mr. Callahan has made and I think with the government's concurrence is fairly sensible.  I can't give you at this point a hearing date, so I think it will be in October, probably early in October.  But I think the notion of filing by August 18th with government opposition due September 2nd and replies due the 15th will be fine.

When we get that motion, we will incorporate that briefing schedule into it and set a hearing date, likely

October 6.  I'm not going to commit to that at all because frankly I haven't seen the motion yet.

MS. O'CONNELL:  Your Honor, we would reiterate the request of the Marshal's Service to please do it on a non-Monday.

THE COURT:  I understand what you're saying. Maybe even the 14th.  That's the day after a holiday.

MS. O'CONNELL:  That would be the functional equivalent of a Monday.

THE COURT:  Oh, because a lot of judges go ahead and do their motions then, so that won't help.

I hesitate to ask even, but where are we or where is the government in the process?

MS. O'CONNELL:  Yes, Your Honor.  I assume you're inquiring about the death penalty determinations.  We have recently received two determinations.  We will not be seeking a death penalty against Ms. Solovyeva or Mr. Markovskis.  We have set a -- which Mr. Rubin referred to in his comments -- we have set a meeting between our office and the remaining defendants for July 21st.  I am being told by Washington to expect a response, including any presentation that the defense counsel may want to make in Washington, D.C., within 60 to 90 days from when we send back our final paperwork.

THE COURT:  All right.

MS. O'CONNELL:  That puts us squarely within October somewhere if everything goes according to plan, which we certainly hope.

THE COURT:  I take it you expect that any recommendation made to Washington by your office would be made relatively promptly after the July 21st meeting?

MS. O'CONNELL:  Yes, Your Honor.

THE COURT:  Okay.  Well, I still assume that that would possibly affect a lot.  Am I wrong?  Let me go back a minute.  I think that Mr. Rubin and Mr. Callahan mentioned forensic evidence.  I think Mr. Callahan indicated it's not all been completed and may not be completed until January.

MS. O'CONNELL:  We are hopeful that it will be before January, Your Honor, and they are certainly proceeding.  We were given an estimate before to November-ish, and so we think January, given -- we are hopeful that in January all the forensics will be back.

THE COURT:  So that's consistent with Mr. Callahan; is that right?

MS. O'CONNELL:  Yes.  For this point, we are consistent with Mr. Callahan.

THE COURT:  It does seem to me that a prerequisite to trial is getting all the evidence in, including the forensic results, and people knowing what they're looking at.

44

MS. O'CONNELL:  Absolutely.

THE COURT:  I just find it a little difficult to believe any trial date set for next year has much validity right now.  I mean, I could set it for April, but I'm not sure that --

MS. O'CONNELL:  Your Honor, we were discussing amongst ourselves dates.  Assuming the forensics come back in January, we were looking at a -- and the government -- to be fair to defense counsel, defense counsel was looking at the fall, and the government was looking at July of 2004.  I think that accurately represents most of our discussions, so no one is really looking at April, Your Honor.

THE COURT:  Okay.  And I hesitate to ask the trial length?

MS. O'CONNELL:  Your Honor, the government's case-in-chief --

THE COURT:  Don't -- in other words, don't be optimistic.  I want the worst case scenario.

MS. O'CONNELL:  Absolutely.  For any penalty phase, our case-in-chief, Your Honor, the government would say at least two months.  We would certainly endeavor to get it in well under that.

THE COURT:  Well, all right.  I think I just need to know a little bit more, and I think counsel needs to know a little bit more, particularly with respect to the

45

forensics coming back. I, too, would be happy to get this case tried towards the latter part of next year, whether that means July/August or whether that means October/November. I think everybody ought to be thinking in those terms.

Let me just ask defense counsel. Are you better off with my setting a date or not? Let me get a feeling from defense counsel.

MR. LASTING: Your Honor, on behalf of Mr. Kadamovas, I think that it makes more sense to wait until we get the determinations as to whether the government is going to seek death as to the other three defendants, and also that we have the reports back on the forensic evidence.

THE COURT: Okay. Any other views on the subject?

MR. CALLAHAN: I agree with Mr. Lasting, Your Honor.

MR. RUBIN: Your Honor, could I just address one other issue getting back to the special administrative measures for a second?

THE COURT: Okay.

MR. LASTING: I would just like to point out to the Court that in discussions with Ms. DeWitt today here in the courtroom, I did return the affirmations agreeing to abide by those terms and, as counsel pointed out, with the understanding that it's not an endorsement or an acceptance

46

of them.

There are some provisions of them that I think we're going to have to have a hearing on because informally in discussions here this afternoon, we were not able to agree with regard to the scope of the restrictions.  But the one thing that does disturb me in addition to those matters that we will later bring to the Court's attention is the idea that counsel now have to be pre-cleared before they can continue to represent the defendants -- or I shouldn't say to represent them but to meet with them and engage in purposeful discussions.

I don't know how long that's going to take.  I'm told that it could just be a couple days.  It may be a day.  But I had intended to meet with Mr. Kadamovas on Wednesday.  Apparently if I am not approved for meeting with him as of that time, I will not be permitted to meet with him.  If the Russian interpreter has not been approved -- although even if I'm approved, I can meet with him, but it would be a pointless meeting because we wouldn't be able to have a discussion.

THE COURT:  How long ago did you provide Ms. DeWitt or the government with the information that the government needs to process a preclearance?

MR. LASTING:  Your Honor, today, but the letter I got from Ms. DeWitt was I think last Friday.

MS. DEWITT:  It was from Ms. O'Connell.

MR. LASTING:  I'm sorry -- from Ms. O'Connell but it was to respond to Ms. DeWitt.  It said to return it at my earliest convenience.  I did return it today on behalf of myself and our paralegal.  I asked the Russian interpreter to review the special administrative measures and sign it, and I presented all of those.

The problem is that until this clearance takes place apparently we're not going to be permitted to go into MDC.  I think that's an interference with the attorney/client relationship.

THE COURT:  Well, Mr. Lasting, at this point, I don't begin to have enough information to turn to Ms. DeWitt and say "forget the regulation."  I don't have that information in front of me.  I can't possibly do that.  I mean, if you have provided the information today, Ms. DeWitt has indicated that she will process it as quickly as possible, but if it's not done by Wednesday, you're not going to get relief from this Court between now and Wednesday.

MR. LASTING:  All right.  In somemeasure, then, the continued meetings with the defendant are on hold until --

THE COURT:  As far as I know.  I mean, obviously you're free to challenge those, but it sounds as though at

48

least in your case you're willing to sign the affirmation, and you're willing to give the information --

MR. LASTING:  Yes.

THE COURT:  -- and what you think is going to happen is that hopefully in fairly short order you will be pre-cleared, and I think this issue will be mooted.  You will miss that Wednesday, but that's just the way it goes.

MS. DEWITT:  Your Honor, I think the clearance in at least most of the cases is only going to take a matter of a couple of days to run the indices checks and things like that.  The agents have represented that they will expedite them to the best of their ability and let them know as soon as they can.

THE COURT:  All right.

MS. DEWITT:  Your Honor, if I might represent, I continue to remain open to any discussions that they have if we can resolve them informally.  I assume that in some instances we're not going to be able to resolve them informally.  What I would encourage them to do is that we just submit a stipulation with a proposed briefing schedule so that we can have all the issues raised at the same time and allow the Court sufficient time to review the papers.

THE COURT:  That would be fine, but I will ask that every defense counsel personally consult with Ms. DeWitt and see what you can work out before you do that and

try to reserve for my determination those that you haven't resolved and cannot resolve.

All right, I'm not going to set -- we have actually -- we don't have a trial date; do we?

MS. O'CONNELL:  No, Your Honor.  I submitted a proposed speedy trial order which was signed by the Court finding excludable time up until today.

THE COURT:  All right.

MS. O'CONNELL:  What I might suggest, Your Honor, is if we do set a hard hearing date on the Fourth Amendment issues, we could make that a status conference and have a speedy trial excludable order run to that day.

THE COURT:  Is everyone amenable to that?  Let me ask defense counsel.  Anyone not amenable?

All right, I think what would happen is that when the motions are filed then and a briefing schedule is set, Ms. O'Connell, I would rely on you to use that hearing date set as a triggering device to submit the speedy trial order.

MS. O'CONNELL:  Yes, Your Honor.

THE COURT:  All right.  And that would essentially provide that the time from now until the next hearing date would be excludable.  Anyone disagree with that?

MS. O'CONNELL:  Your Honor, for excluding specific set time periods --

THE COURT:  Obviously from the filing of the

50

motions -- I guess it would -- technically from the filing of motions, it would be excludable anyway, but -- excluding the time between now and then.

MS. O'CONNELL:  Yes, but I'm sure that defense counsel would agree that they need additional time given the complex nature of this case.

THE COURT:  That's what I understood Mr. Callahan, Mr. Rubin, and Mr. Lasting to be saying.

Anyone disagree that the defense needs additional time?

Counsel, here's what I think I'm going to do. This is largely for timekeeping purposes.  I am going to go ahead and set a trial date in August 2004.  This will allow us to have a date set.  I think the government's view is that people can be ready by then.  The defendants will be in a better position hopefully after all the forensic evidence is in and certain motions have been decided to decide whether that's realistic or not.  But at least we have a date from which to calculate, and I think August is not an unreasonable date based on what I have in front of me.

So let me ask counsel.  First of all, with respect to the government, does the government have any objection to setting a trial for August 3rd, 2004?

MS. O'CONNELL:  No objection from the government, Your Honor.

51

THE COURT:  How about from the defense?  I see no hands.  Is it fair to say, Mr. Callahan, that you will need at least up until then to prepare?

MR. CALLAHAN:  Yes, Your Honor.

THE COURT:  Does any other defense counsel feel differently with respect to his or her preparation?

Let me address the defendants individually.  Mr. Mikhel, as you have heard, counsel have been discussing when this case might go to trial.  Currently the trial max in this case is August 20th of this year.  I don't think anyone is going to be ready to go to trial by then.

Your counsel have asked for additional time to prepare, and I am prepared to grant that additional time until August 3rd of 2004, with the understanding that I keep an open mind as to whether additional continuances might be necessary.

Mr. Mikhel, do you understand your right to a speedy trial?

DEFENDANT MIKHEL:  Yes.

THE COURT:  And do you give up that right and agree the trial in this matter may be continued to August 3rd, 2004?

DEFENDANT MIKHEL:  Yes.

THE COURT:  All right.  Mr. Kadamovas, do you understand your right to a speedy trial?

DEFENDANT KADAMOVAS:  Yes.

THE COURT:  And do you waive that right and agree that your trial may be continued to August 3rd, 2004?

DEFENDANT KADAMOVAS:  Yes.

THE COURT:  And where is Mr. Krylov?  Mr. Krylov, do you understand your right to a speedy trial?

DEFENDANT KRYLOV:  Yes.

THE COURT:  Do you waive that right and agree that your trial may be continued to August 3rd, 2004?

DEFENDANT KRYLOV:  Yes.

THE COURT:  Mr. Markovskis, do you understand your right to a speedy trial?

DEFENDANT MARKOVSKIS:  Yes.

THE COURT:  And do you waive that right and agree that your trial may be continued to August 3rd, 2004?

DEFENDANT MARKOVSKIS:  Yes.

THE COURT:  All right.  Ms. Solovyeva, do you understand your right to a speedy trial?

DEFENDANT SOLOVYEVA:  Yes.

THE COURT:  And do you give up that right and agree that your trial may be continued to August 3rd, 2004?

DEFENDANT SOLOVYEVA:  Yes.

THE COURT:  Thank you.  Ms. O'Connell, if you'll prepare the order.

MS. O'CONNELL:  Yes, Your Honor, I will.

THE COURT:  All right, anything further today? All right, thank you very much.

*(Thereupon, the proceeding was concluded.)*

-oOo-

54

CERTIFICATE


        I hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.


Date:  April 19, 2009


                         Sharon A. Seffens        4/19/09
                         _____
                         SHARON A. SEFFENS, U.S. COURT REPORTER