UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

- - -

THE HONORABLE NORA M. MANELLA, JUDGE PRESIDING

```
UNITED STATES OF AMERICA,  )
               Plaintiff,  )
      vs.                   )
                            )  CR-02-220-NM
IOURI MIKHEL, et al.,       )
               Defendants.  )
---------------------------)
```

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Los Angeles, California

August 26, 2002

SHARON A. SEFFENS, RPR
United States Courthouse
411 West 4th Street, Room 1-1053
Santa Ana, CA  92701
(714) 543-0870

2

APPEARANCES OF COUNSEL:

For the Plaintiff:

JOHN S. GORDON
United States Attorney
RONALD L. CHENG
Assistant United States Attorney
Acting Chief, Criminal Division
KAREN I. MEYER
SUSAN DEWITT
Assistant United States Attorneys
1100 United States Courthouse
312 North Spring Street
Los Angeles, CA  90012
(213) 894-2434


For Defendant IOURI MIKHEL:

DALE RUBIN
DALE RUBIN LAW OFFICES
2275 Huntington Drive, Suite 902
San Marino, CA  91108
(800) 695-3717

For Defendant PETRO KRYLOV:

GEORGE W. BUEHLER
BUEHLER & KASSABIAN
350 West Colorado Boulevard
Pasadena, CA  91105
(626) 817-5092

DAVID R. EVANS
DAVID R. EVANS LAW OFFICES
7462 North Figueroa Street, Suite 201
Los Angeles, CA  90041
(323) 257-5100

For Defendant JURIJUS KADAMOVAS:


RICHARD LASTING
RICHARD P. LASTING LAW OFFICES
318 East 8th Street, Suite 801
Los Angeles, CA  90014
(213) 489-9025

MARCIA BREWER

MARCIA J. BREWER APLC
400 Corporate Pointe, Suite 800
Culver City, CA   90230

(310) 670-5325

For Defendant NATALYA SOLOVYEVA:

TERRY J. AMDUR
TERRY J. AMDUR LAW OFFICES
1939 Rose Villa Street
Pasadena, CA   91107
(626) 449-9254

For Defendant ALEKSEJUS MARKOVSKIS:

DOMINIC CANTALUPO
DOMINIC CANTALUPO LAW OFFICES
100 Wilshire Boulevard, Suite 950
Santa Monica, CA   90401-1145
(310) 397-2637

TERRENCE J. BENNETT
TERRENCE J. BENNETT LAW OFFICES
P.O. Box 709
Pasadena, CA   91102-0709
(626) 792-5868

ALSO PRESENT:

Russian Interpreter

4

LOS ANGELES, CALIFORNIA; AUGUST 26, 2002; P.M. SESSION

THE CLERK:  Item No. 4, CR-02-220-NM, United States of America versus Iouri Mikhel, Jurijus Kadamovas, Petro Krylov, Natalya Solovyeva, and Aleksejus Markovskis.

Counsel.

MS. DEWITT:  Good afternoon.  Susan DeWitt and Karen Meyer on behalf of the government.

THE COURT:  Good afternoon.

MR. RUBIN:  Good afternoon, Your Honor.  Dale Rubin, capital counsel for Mr. Mikhel.  I am also standing in for lead counsel, Richard Callahan.

THE COURT:  Good afternoon, Mr. Rubin.

MR. BENNETT:  Good afternoon, Your Honor. Terrence Bennett, capital counsel for Mr. Markovskis.

THE COURT:  Good afternoon, Mr. Bennett.

MR. CANTALUPO:  Good afternoon, Your Honor. Dominic Cantalupo, trial counsel for Mr. Markovskis.

THE COURT:  Good afternoon.

MR. LASTING:  Good afternoon, Your Honor.  Richard Lasting, capital counsel for Mr. Kadamovas.

THE COURT:  Good afternoon.

MS. BREWER:  Good afternoon, Your Honor.  Marcia Brewer on behalf of Mr. Kadamovas, who is present in court. He requires the services of the Russian interpreter.

THE COURT:  Thank you.

MR. AMDUR:  Good afternoon, Your Honor.  Terry Amdur on behalf of Natalya Solovyeva.  I am specially appearing for capital counsel, Michael Crain.

THE COURT:  Good afternoon.

MR. EVANS:  Good afternoon, Your Honor.  David Evans appearing as capital counsel on behalf of Petro Krylov.

THE COURT:  Good afternoon.

MR. BUEHLER:  Good afternoon, Your Honor.  George Buehler appearing as counsel for Petro Krylov.

THE COURT:  All right.  Good afternoon, all. We're here for a status conference, and I didn't ask for a report beforehand.  I do know that -- I am not sure if it's since the last time we met.  I know that -- I gather the depositions took place of the, by that point, I guess, material witnesses, and that has been completed; is that correct, Ms. DeWitt?

MS. DEWITT:  Yes, Your Honor.

THE COURT:  Okay.  So why don't, maybe starting with you, Ms. DeWitt, why don't you tell me where we stand. Are we in a position to set a trial date?

MS. DEWITT:  Your Honor, I have conferred, I think, with most if not all counsel prior to the status conference, and I think everyone is in agreement that at this time the appropriate thing would be to set another

6

status conference.  And I did not get any consensus on when that should be.

Let me just advise the Court of one issue that would play a little bit into that.  We recently were able to get defense counsel over to review all of the physical evidence, much of which has been sent or is in the process of being sent out for forensic examination.  We have produced most but not all of the discovery other than the physical discovery in the case, and we anticipate having the bulk of what we have in our possession produced within the next week or so.

One of the outstanding issues that we have is counsel's presentation of their position with respect to the death penalty vis-a-vis their respective clients.  We had originally asked --

THE COURT:  Their presentation back in Washington?

MS. DEWITT:  Their presentation to our Death Penalty Counsel Committee here.

THE COURT:  Okay.

MS. DEWITT:  Which was then -- that presentation to the extent that it's written would be forwarded to Washington, and then Washington's decision as to whether they actually meet with them is, I guess, up to them.

THE COURT:  Okay.  And those presentations have not yet been made locally; correct?

MS. DEWITT:  They have not been made.  We had asked for them to make those presentations at the end of July, early August.  All counsel requested additional time to do so.  And in light of the depositions going forward, we certainly understood why there was some difficulty doing both at the same time.

We have gotten various estimates from counsel as to how much time they need in order to prepare that presentation, and there is a little bit of, I would say, tension between their position in how much time they need and the government's position in terms of how much time is appropriate.

We would ask that they have all of their presentations prepared and ready to be made by the end of October, which I think is a very generous amount of time even in light of the fact that some of the discovery has not been produced.

Ms. Brewer has represented to me on behalf of her client that she in particular and her co-counsel have a particularly difficult schedule between now and then, and I have advised her that we could certainly accommodate her and her co-counsel a couple of weeks in terms of the presentation because of her particularly unusual trial schedule over the next few months.

But we're going to ask that all counsel be

prepared to make their presentations by the end of October so that we can schedule anything further in early November before the holidays are upon us and we are further delayed. Counsel knows or at least they've been told in the past that it will take at least 60 days for us to get a final decision from Washington after everything is done.  That's assuming that everything is completed in November.  So it puts us out a little ways in terms of getting a final resolution on that issue.

So that plays a little bit in when the Court thinks it will be appropriate to have a further status conference, and I am not sure what the answer to that is myself.

THE COURT:  All right.  Let me just ask defense counsel as a whole.  Any major disagreements with Ms. DeWitt's summary?

MR. LASTING:  Your Honor, Richard Lasting, capital counsel for Mr. Kadamovas.

THE COURT:  Yes.

MR. LASTING:  No disagreement with the summary that she provided.  However, Ms. Brewer and I did request that the presentation with regard to whether they would seek capital punishment against our clients be deferred until January, that we have that amount of time to prepare for it. There are a number of reasons for it.  One is that both Ms.

Brewer and I do have trials that are going to commence in September.

In addition to that, there is with our client the necessity to speak with him through the Russian interpreter. There are numerous documents that we need to have translated into Russian to be able to discuss with him.  There are also tapes that he needs to listen to which are in the Russian language so that we may discuss that with him.  Also, the difficulty in commencing and conducting a background investigation on someone that was born in the former Soviet Union.

So there are a number of factors that come into play that I think make this a little bit more difficult than would ordinarily be the case or absent those specific factors.  And I would request, although I appreciate the offer of the U.S. Attorney to push it back for us until November, I would ask that the Court grant us until early January to prepare for that so that we could have the rest of this year to prepare for the presentation to the Justice Department.

THE COURT:  Let me just clarify something as to those defendants who are availing themselves of the Russian interpreter.  I keep having multiple spellings.  Is it Kadamovas or Kadanovas?

MR. LASTING:  It's Kadamovas, Your Honor.

10

THE COURT:  With an "m."  Thank you.  I know Mr. Kadamovas is.

How about Mr. Krylov?

MR. EVANS:  No, Your Honor.

THE COURT:  No.  Okay.

Mr. Mikhel I think not, correct, Mr. Mikhel, because we have spoken?

DEFENDANT MIKHEL:  (Nods head).

THE COURT:  Okay.  Ms. Solovyeva.  Is Ms. Solovyeva needing the interpreter?  I just want to clarify who is utilizing the interpreter and who is not.

MR. AMDUR:  Yes, she needs it.

THE COURT:  All right.  And Mr. Markovskis.

MR. BENNETT:  No, Your Honor.

THE COURT:  Okay.

MR. EVANS:  Your Honor, if I might interject, for more complicated --

THE COURT:  I understand.  I am just trying to get my own sense of where we are.

So, Ms. DeWitt, you are anticipating that for -- and let me just ask.  This issue is as to all defendants?

MS. DEWITT:  Yes, Your Honor.

THE COURT:  Okay.  All right.

MS. DEWITT:  I'm sorry.  I didn't understand the question.  Each of the defendants who is currently indicted

is facing a death penalty --

THE COURT:  A decision has to be made?

MS. DEWITT:  Yes.

THE COURT:  Right.  Okay.  Am I safe in assuming that, Mr. Rubin, as to your client, and, Mr. Evans and Mr. Buehler, as to yours, and Mr. Amdur, as to yours, and Mr. Bennett and Mr. Cantalupo, as to yours, do you think you can get those presentations in by Halloween, October 31st?

MR. RUBIN:  Your Honor, whatever hoops you make us jump through, we will attempt to comply.  But I think the Court has to understand that the preparation of the penalty investigation is far greater than the amount of discovery that we just have for the local crime.

We've got to investigate our client's entire life, and much of that wasn't even in this country.  So there are roadblocks that are being put up just because of distances and different languages.  In addition, we do not have all of the discovery compliance, and it is very difficult to put together a presentation when you don't have the coroner's protocols and you don't have the local police reports, and we're trying to fit our client's role and positions into all of these different things.

If we're ordered to do it, we will attempt to do it.  This is such an important proceeding because the recommendation that the U.S. Attorney's Office makes to

12

Justice Main is generally followed at Justice Main unless they're recommending not to seek death.  And then my understanding is about 60 percent of the time Mr. Ashcroft is overruling them anyway.

THE COURT:  I have some familiarity with the process, although not under this particular administration.

MR. RUBIN:  Certainly we can save this Court and the government a lot of money and effort if we do this properly at this stage.  So that's kind of a long answer to your short question.

THE COURT:  You don't have to convince me of the importance of it.  A, I am familiar with the process; B, I think it's self-evident what the importance is.  I'm just trying to set up dates that will be realistic.

Ms. DeWitt, let me address something with respect to Mr. Kadamovas.  As a practical matter, you really can't go forward in this until a decision has been made as to all defendants; isn't that correct?

MS. DEWITT:  I don't know what you mean by go forward.

THE COURT:  I mean, not to say that you'll be deciding all of them on the same day, but until the decision is made as to the last of the defendants who is death penalty eligible.

MS. DEWITT:  It certainly affects decisions that

SHARON SEFFENS, U.S. COURT REPORTER

have to be made down the road in terms of notice and things like that, the trial date, excludable time.  It has a domino effect on a number of issues if you have one who's not on the same or roughly the same time frame as the others.

THE COURT:  Okay.  Well, here's what I am prepared to do, I think.  I am prepared to say that as for Messrs. Mikhel and Krylov and Markovskis and Ms. Solovyeva I think the presentation or the paperwork should be in to the U.S. Attorney's Office no later than November 15th.  As to Mr. Kadamovas, I would like to see that presentation in by the end of the year, namely, by the 31st of December.

Do counsel have any ideas on when we could next have a profitable status conference?  Is there a point, Ms. DeWitt, at which you think we can do something useful before the decision has been made by main justice?  I mean, obviously I am available if something comes up and the parties want to schedule a hearing, but I don't want to drag you in here for no particular purpose.  Obviously we all know that the deep threshold issue here is going to be what the department decides to do.

MR. EVANS:  May we confer briefly, Your Honor?

THE COURT:  Sure.

MS. DEWITT:  It sounds to me like defense counsel is suggesting something in February.  I would actually suggest something a little earlier than that, perhaps

14

something in January.

MR. RUBIN:  How about January 27th?

THE COURT:  January 27th, Mozart's birthday.  I'll expect you to come forward and tell me how old he'll be on that day.  I'll give you a hint.  He was born in 1756.  You have until now to figure out how many years that is.

MR. RUBIN:  I don't have my calculator.

THE COURT:  All right.  Can I construe that there is a motion by defense counsel to continue this matter, then, until the 27th of January 2003?

MS. BREWER:  Yes.

THE COURT:  All defense counsel join?

*(Affirmative reply by all defense counsel)*

THE COURT:  All right.  And am I correct in assuming that all counsel agree that you need this additional time obviously to allow a determination as to what penalty will be sought in order to adequately prepare a defense?

MS. BREWER:  Yes, Your Honor.

MR. EVANS:  Yes, Your Honor.

MR. RUBIN:  Yes, Your Honor.

MR. BENNETT:  Yes, Your Honor.

THE COURT:  Anyone disagree?  All right, then.  I will make the finding under 3161(h)(8)(A) and grant the defense request for a continuance, finding the ends of

SHARON SEFFENS, U.S. COURT REPORTER

15

justice will be served by such action, specifically allowing defense adequate opportunity to make their presentation to the U.S. Attorney's Office and to permit the government to make its evaluation of the appropriate penalty to be sought.

MS. DeWitt, if you would prepare the speedy trial order.

MS. DEWITT:  I will do that, Your Honor.

THE COURT:  And I will set this for a status conference then on Monday, the 27th of January.  It would be helpful, I suppose, if I could just have a brief joint status report a week before just to give me a clue.

MS. DEWITT:  I suggest that.

THE COURT:  And then if there's anything -- I would like to know beforehand if there is something you would like me to address at that hearing.

MS. BREWER:  Perhaps at that time we could also give the Court some estimate as to when we think --

THE COURT:  We can actually be looking at a trial date.

MS. BREWER:  -- we could have a trial date.

THE COURT:  Right.

MS. BREWER:  I think the parties are going to want to be able to plan that.

THE COURT:  Yes.  All right.

MS. BREWER:  We should have at least a guestimate

at that time.

THE COURT:  Okay.  And that will be at 1:30 p.m. And I will just ask for a joint status report perhaps by the 17th because the 20th is a holiday.  So that will be a joint status report due 1/17; status conference January 27th at 1:30 p.m.

MS. DEWITT:  Obviously if anything else comes up before that --

THE COURT:  You can let you know.

MS. DEWITT:  Your Honor, there are two issues that I will take the Court's time now to address.  One of them is the agents in this case want to be able to release the victims' cars.  I believe all counsel at this time has had an opportunity to inspect those cars.  Anything of evidentiary value that I am aware of other than just the fact that they exist and is viewed as being reflected for processing and forensic examination.  If there is no objection from any counsel, I would like to have those returned.

THE COURT:  Is that correct?  Any counsel have a problem with that?

MS. BREWER:  Your Honor, we went to see the evidence, and the agents didn't mention cars impounded at all.  Just looked at.  They talked about stuff that was refrigerated that was not in the Westwood location.

THE COURT:  Presumably they didn't refer to the vehicle.

MS. BREWER:  No.  No one mentioned cars.  There were three of us that went.  I would defer to Mr. Lasting. Maybe he recalls something, but I don't.

THE COURT:  Well, if you want to take a look, I would suggest you set something up with the government over the next couple of weeks.

MS. DEWITT:  We could set a deadline, that they let me know by a certain date.  If we don't hear any objection, can we assume that they don't?

THE COURT:  All right. Let's do this.  Here is the deal.  If there is no objection, then I am going to allow the government to dispose of the cars by September 26th.  If that's a problem for counsel or something comes up and you haven't been able to see it and you definitely want to get in, come to us and we will give you a hearing.

Something else, Ms. DeWitt?

MS. DEWITT:  There is one other issue that I would like to raise with the Court very briefly.  Mr. Rubin has asked that that be done at sidebar.

THE COURT:  Okay.

(Sidebar conference)

MS. DEWITT:  There were various representations made by Mr. Sherman as well as various actions he has taken

on his part that he desires -- at least he's represented that he intends to come back into the case.  Although that does not at the present time create a problem, we see that it certainly raises potential problems down the road.

He is to our knowledge meeting with Mr. Mikhel, so he has contact with him, including contact with him during the deposition of his current client, Mr. Agueev.  We are just concerned how that conflict may affect representation of him by his current counsel in the future.

I am not exactly sure how that issue should be brought to the Court, but I am just concerned about the future ramifications.

MR. RUBIN:  The discussions I have had with Mr. Callahan are that there have been a number of occasions of him visiting with Mr. Mikhel at MDC when Mr. Sherman has come in and asked if he could interrupt to talk to Mr. Mikhel, at which point he said, no, I will finish first.  I talked to Mr. Callahan, who apparently has noticed also there are a lot -- at least one or two days a week Mr. Sherman is visiting with Mr. Mikhel.

Now, I don't know that there is anything that we can do about it other than asking him to stop.  What our concern is at this point is we are both just establishing a relationship with Mr. Mikhel.  I don't know what to do about it.  I am concerned because I don't know if the

19

conversations he's having with Mr. Mikhel are actually covered by attorney/client privilege.

THE COURT:  Are you sure he is not representing him?

MR. RUBIN:  That's my concern.

THE COURT:  I would assume that if he is representing -- can anyone come in and meet with someone at MDC?

MS. MEYER:  They can log in as a visitor.

MS. DEWITT:  No, he is logging in as an attorney.

MS. MEYER:  During these visits with Mr. Mikhel, he's discussing Agueev, so he would log in as an attorney.

THE COURT:  Obviously one of the difficulties at this point is that I don't know obviously what happened at the depositions.  I don't know what information that Mr. Agueev and Mr. Liapine gave after I disqualified Mr. Sherman from representing Mr. Mikhel.  It was based on a lot of things that could happen in the course of this litigation.

I think Justice Rehnquist points out in either Wheat or one of those cases we are all looking through a glass trying to figure out what might happen.  My concern is if Mr. Sherman would want to come back he still has a debt of loyalty to Mr. Agueev, let's just assume, his former client.

MR. RUBIN:  He said he would come back to defend

20

Mr. Agueev.

MS. DEWITT:  Both have so advised us they would come back and testify at trial.  In all honesty, I don't know if they would do that.  It raises the issue of not only -- first of all, I think there is a continuing debt of loyalty.  You have the issue of who represents this person that may come up at trial just based on the deposition.

You have what if this client asks his advice about whether or not he should come back?  That puts him in a conflict.  There are any number of ways that the conflict is continuing, not the least of which was amply demonstrated at the deposition.

THE COURT:  Obviously the state of the record right now is that Mr. Sherman does not represent Mr. Mikhel.  He has not asked to come back and represent him.  If he were to do so, I would frankly ask for briefing on the subject to address the issues that we all perceive.  I don't know what it is because I wasn't at the deposition, and I'm clearly not quite sure what to do about what he is doing now.

MR. RUBIN:  Perhaps the Assistant U.S. Attorney can contact the warden at MDC and indicate that he does not represent Mr. Mikhel and is not authorized to visit with him.  We just don't want to get in between our client and someone else's relationship.

MS. DEWITT:  It kind of puts us in the same

position.

THE COURT:  It is certainly the case that if Mr. Sherman is not the attorney of record for Mr. Mikhel and to the extent he may be visiting with him at MDC either under the representation that he is or MDC's misunderstanding that he is, then I think it's perfectly appropriate to enlighten the officials at MDC he is a private citizen.  I don't know what the rules are regarding visiting.  That's another bailiwick.  To the extent they are letting him in because they think Mr. Sherman is Mr. Mikhel's lawyer, I think it's proper to disabuse them of that notion.

MS. DEWITT:  We can do that.

THE COURT:  Frankly, I am not sure why people are pussy-footing around.  If Mr. Sherman thinks the conflict that I perceive is no longer there, the appropriate thing is to ask him to come in and brief it, and I will decide.

*(End of sidebar conference)*

THE COURT:  All right, anything further?

MS. BREWER:  Yes.  May I have a minute, Your Honor?

THE COURT:  Yes.  Sure.

MR. CANTALUPO:  Your Honor, Dominic Cantalupo.

THE COURT:  Yes, Mr. Cantalupo.

MR. CANTALUPO:  While Ms. Brewer is conferring, may I take up a matter?  Mr. Markovskis is the only

defendant in this case not being housed at the MDC.  Given the --

MR. BENNETT:  That's not true.

MR. CANTALUPO:  Oh, I'm sorry.  I misspoke.  But given the -- most of the defendants are being housed at MDC.  Given the nature of the discovery in the case and the penalties involved here, it's important to have face-to-face meetings, review tapes and other materials, which is impossible to do in the state facility, as I am sure the Court is aware and has had this request many times.  But I would ask that the Court consider directing the marshals to house Mr. Markovskis at the MDC.

THE COURT:  You know, Mr. Cantalupo, I just don't interfere.  I just really don't do that.  I let the marshals do their jobs.  I am not unaware of the inconvenience, and it is indeed a travesty that there is so little space for the number of detainees that we have.  But -- and there may come a time when we are closer to trial that I might reconsider that.  But at this point, I am just not going to tell the marshals where to house their various people.

MR. CANTALUPO:  I have not yet communicated a request to the marshals, and most times it's a successful request that they do transfer defendants to the MDC.  I am going to make that request --

THE COURT:  I have no objection.  I think the

23

government has some separation orders that would obviously still have to be honored.  Am I correct on that, Ms. Meyer?

MS. MEYER:  That's correct, Your Honor.

THE COURT:  But, you know, you're always free to ask, and I certainly wouldn't intervene to have them deny that.

Ms. Brewer, yes.

MS. BREWER:  My client and Mr. Lasting and I would like to meet with Mr. Mikhel and his lawyers at MDC, and they are separatees.  I have asked the prosecutors if they would agree to it, and they said no.  We would like to have a joint meeting to discuss the case between -- I guess there will either be six of us or four of us, depending on how many counsel are there.  So I would request that the Court allow us to have one meeting at MDC and order that the separatee order be lifted for that particular meeting.  We will make arrangements through the staff at MDC to go in at certain times so they'll know when it's going to occur.

THE COURT:  Let me hear from the government, please.

MS. DEWITT:  Your Honor, the government's position on this is the same as it's been the last three times Ms. Brewer has made a similar request.  The security issues that have caused us to ask for separatee orders still exist, and we are still concerned about those issues.  It's

particularly complicated by the fact that -- I understand what they're saying, that if the attorneys are there, it should be okay.

But their client, one, speaks a language that none of them understand, and it puts them in an awkward position if there are any issues that come up while they're present, which I don't know how they would handle given their attorney/client relationship.  None of the security issues that we raised before have changed.  If anything, those issues become greater as time goes on.

THE COURT:  You're going to have to spell that out a little more for me, Ms. DeWitt.  I don't know whether your concern is collusion or --

MS. DEWITT:  Our concern is, one, collusion with respect to threats for witnesses who are not in custody and witnesses who are in custody, and collusion --

THE COURT:  So you want whatever they communicate to their counsel to be communicated from counsel to counsel and then to client to avoid the possibility that their clients will independently communicate to one another, something that they ought not to?

MS. DEWITT:  Yes.

THE COURT:  Well, Ms. Brewer, that seems not an illegitimate concern, especially given the nature of the case.

MS. BREWER:  Well, Your Honor, first of all, Mr. Mikhel speaks English.

THE COURT:  Presumably he would not be compelled to do so with Mr. Kadamovas.

MS. BREWER:  Presumably the assumption is that he would speak to Mr. Kadamovas in Russian, and nobody would know what was being said.  However, my client and Mr. Lasting cannot communicate with Mr. Kadamovas unless he has a Russian interpreter.  So there will be a Russian interpreter as part of this meeting who would translate for us any conversation between the two gentlemen.  If there was any kind of inappropriate conversation between the two of them with regard to posing a possible threat against witnesses, we would know about it.

THE COURT:  Although she might not know what they were communicating if they were doing so in a way more subtle than she would necessarily detect.

MS. BREWER:  Well, I think the Russian interpreters are pretty savvy.  And the Court is aware of how the interpreters work.  They're, you know, generic, so they're all over the place, so they've heard both sides of everything.  So they would know, I think, and particularly this interpreter that we're working with.  Her first name is Julia.  Her last name -- I am not even going to try to pronounce her last name.  She's a pretty savvy person, and I

think if there is any kind of coded conversation and reference, she's going to pick up on it.

I really think that we're now bordering on the defendants' constitutional right to defend themselves and to prepare that defense. We're asking for a meeting, and I think that there are enough safeguards with the interpreter there -- and if the Court wants, we could have two interpreters there if that would be the condition for the meeting so either one of them could possibly pick up any kind of coded language between the two of them.

And the Court needs to know that neither one of these defendants are housed on 8 North. I hope this certainly doesn't change their status. They're all in general population at the MDC. In the general population, they have access to the phones. If there were going to be any threats made to witnesses or any outside sources contacted to make threats to those witnesses, either one of these gentlemen could have made phones calls from the prison to contact somebody on the outside.

So having an hour or a two-hour meeting in which they may talk to one another in the meeting, I can't understand why that would then become a threat to a witness that couldn't have already been made.

THE COURT: Ms. DeWitt, do you want to address the -- am I correct then that they have contact with one another

27

in general population as it is?

MS. BREWER:  No.  They are in general population.
Because of the separatee order, they are not housed in the
same unit, nor can they come down to the visiting room at
the same time, because they've got to be kept away from one
another.

THE COURT:  Okay.  So the collusion that Ms.
DeWitt is concerned about is not a threat or a concern that
already exists by their both being --

MS. BREWER:  No, because they've been in no
contact with one another.  So she thinks that we're going to
have a meeting and they're going to talk to each other in
code that two interpreters, for example, couldn't pick up on
and say, well, wait a minute, these guys are saying certain
things that looks like they're planning something.  It just
seems like their concern over security is just nonexistent,
and it doesn't have any really substantial factual basis.

MS. DEWITT:  Your Honor, we're concerned about
even having the defendants sitting next to the each other in
the courtroom because we've had problems with communications
between them while they're in lockup that relate to specific
threats.

So it's ridiculous to suggest that somebody has a
constitutional right to meet with their co-defendant to plan
out their defense.  It's simply not supported by any case

law that I am aware of.  They have every opportunity to do anything within -- with their attorneys in order to present a defense.  We have legitimate security and safety issues here that have done nothing but gotten worse over time.

THE COURT:  All right.

MS. BREWER:  If I could briefly respond.

THE COURT:  Ms. Brewer.

MS. BREWER:  If they have been together when they have been transported here to the building for the hearings -- and they have been together downstairs just this morning because, as the Court knows, they're up at 3:00 in the morning, and they're transported at 7:00 -- that they have been sitting downstairs in close proximity to one another or, you know, within talking distance if they're not in the same cell, and they've been sitting here in court since about 1:30, which is now an hour, and there has been no facts -- I am looking for facts here as to what happened after all the times we have been in court when they have been here as to who got a threat, who got a phone call, who got a visit from somebody, a witness to prove that there is a security issue, because there has been opportunity for them to speak with one other, ample opportunity since coming to court.

So we're asking for a meeting that probably will take a couple hours.  In light of the contact that they've

had previous to today and there have been no specific facts that the government can come forth with that says this person received a phone call on this date -- this was shortly after this appearance in court, shortly after they were transported to court, this person received a letter -- we are talking about nonspecific things to keep these gentlemen from talking to one another about their case.

THE COURT:  It seems to me that the government's concerns are not fanciful or manufactured, so the real question is whether the failure of the defendants to be able to meet face to face with one another is going to really impinge on their ability to prepare their defense.  At this point, I don't think it is, so I am going to keep the separation order in effect, and I am going to deny the defense request for a face-to-face meeting between their clients.

Certainly counsel are free to speak with their respective clients and to communicate with each other.

Mr. Buehler.

MR. BUEHLER:  Your Honor, I just had one concern about some of the discovery in the case.  There's a couple of files of materials that were seized from my client's residence pursuant to search warrant.

THE COURT:  That's Mr. Krylov; right?

MR. BUEHLER:  Yes.  I understood, I think, a month

30

ago from the FBI agents that they would make available copies of that material well before now, and they haven't done so.  I think it's all caught up in a much larger copying effort that they're making.  So I just would like to enlist the Court's aid in perhaps asking the government for a commitment as to when we can have that relatively small volume of documents copied.

THE COURT:  These are documents taken from your client's home during the search?

MR. BUEHLER:  Yes, and his car.

THE COURT:  And his car.

MR. BUEHLER:  And it's particularly relevant to some of the investigation we're doing.

THE COURT:  Okay.  Ms. DeWitt, do you know just from his description which particular set of documents Mr. Buehler is talking about?

MS. DEWITT:  I know in a generic sense what he's talking about.  Just so the Court knows, the reason that these documents have not been -- one, it's very time-consuming just to copy these kinds of documents by the nature of the documents.  Some of them are physical evidence and -- I mean, the stuff that's out there is for the most part physical evidence.  It's not easy to copy.  But the copying was further delayed by the fact that we were asking the parties to come for several months now to inspect these

31

items before they were -- before we could get them copied and processed, and that delayed the copying process, not only --

THE COURT:  Okay.  I am not here to assess blame, and I don't think Mr. Buehler was either.  When do we think we can get Mr. Buehler those documents?

MS. DEWITT:  The agents are working diligently to try to copy all of the documents.  If that particular set of documents is something that Mr. Buehler wants me to expedite, I will do my best to do that.

THE COURT:  Okay.  Do you have any assessment -- I think you said earlier that most of the discovery had been produced and, if I understood you correctly, that you were working on the final batch.  Is that --

MS. DEWITT:  All of the non-search-warrant evidence, Your Honor, what I was referring to, should be produced within the next week or two that's in our custody, including the coroner's report and things like that.  The search-warrant-related items, the process of copying them is much more difficult, both because of the volume and as to the nature of the items.

I know that that has been in progress for several weeks now.  I don't know about that particular -- where they are with that particular subset of documents.  I can certainly find out and advise Mr. Buehler as to an estimate

32

of when that will be available, and I can make every effort to expedite it.

I have not attempted in the past to interfere with the order in which they're copying documents because I have wanted them to copy them all as quickly as they could and in the most expeditious way that they could.

THE COURT:  All right.  Well, I think that your offer seems reasonable.  If you can inquire and it is possible to determine where that subset is and give it to Mr. Buehler, and if it's possible to expedite it without mucking up the other order of operation, let's try and do that.

MR. BUEHLER:  Very well.  Thank you, Your Honor.

THE COURT:  Okay.  Anything further?  Thank you very much.

*(Thereupon, the proceeding was concluded.)*

-oOo-

SHARON SEFFENS, U.S. COURT REPORTER

33

CERTIFICATE

I hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Date:  April 20, 2002

Sharon A. Seffens        8/20/02
_____
SHARON A. SEFFENS, U.S. COURT REPORTER