UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

- - -

THE HONORABLE NORA M. MANELLA, JUDGE PRESIDING

UNITED STATES OF AMERICA,  )
                Plaintiff,  )
     vs.                    )
                            )  CR-02-220-NM
IOURI MIKHEL, et al.,       )
                Defendants. )
--------------------------)

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Los Angeles, California

April 8, 2002

SHARON A. SEFFENS, RPR
United States Courthouse
411 West 4th Street, Room 1-1053
Santa Ana, CA  92701
(714) 543-0870

SHARON SEFFENS, U.S. COURT REPORTER

APPEARANCES OF COUNSEL:

For the Plaintiff:

JOHN S. GORDON
United States Attorney
RONALD L. CHENG
Assistant United States Attorney
Acting Chief, Criminal Division
CAROLE C. PETERSON
KAREN I. MEYER
Assistant United States Attorneys
1100 United States Courthouse
312 North Spring Street
Los Angeles, CA  90012
(213) 894-2434

For the Defendant IOURI MIKHEL:

VICTOR SHERMAN
SHERMAN & SHERMAN LAW FIRM
2115 Main Street
Santa Monica, CA  90405-2215

(310) 399-3259

For Defendant JURIJUS KADAMOVAS:


JEFFREY WEISS
MURPHY & GOLD
4640 Lankershim Boulevard, Suite 699
North Hollywood, CA  91602-1818
(818) 509-0311

For Defendant PETRO KRYLOV:


GEORGE W. BUEHLER
BUEHLER & KASSABIAN
350 West Colorado Boulevard
Pasadena, CA  91105
(626) 817-5092

ALSO PRESENT:

Russian Interpreter

LOS ANGELES, CALIFORNIA; APRIL 8, 2002; P.M. SESSION

THE CLERK:  Case No. CR-02-220-NM, United States of America versus Iouri Mikhel, Jurijus Kadamovas, and Petro Krylov.

MS. PETERSON:  Good afternoon, Your Honor.  Carole Peterson and Karen Meyer for the government.

MR. SHERMAN:  Good afternoon, Your Honor.  Victor Sherman on behalf of Iouri Mikhel, who is present.

THE COURT:  Good afternoon, Mr. Sherman.

MR. WEISS:  Good afternoon, Your Honor.  Jeffrey Weiss on behalf of Mr. Kadamovas, who is present.

THE COURT:  Good afternoon, Mr. Weiss.

THE INTERPRETER:  Good afternoon, Your Honor.  Russian interpreter, Alex Arzoumanian.  My oath is on file.

THE COURT:  Thank you.

MR. BUEHLER:  Good afternoon, Your Honor.  George Buehler appearing on behalf of Mr. Petro Krylov.

THE COURT:  Good afternoon.

Are all the defendants being assisted by the interpreter?

MR. SHERMAN:  Well, Mr. Mikhel actually speaks English, Your Honor.

THE COURT: All right.  We are limited in what we can do today, ladies and gentlemen, because we don't have Mr. Agueev.  I think that precludes us from doing much, but

I am not sure frankly based on what I have seen filed to date we could have gotten much beyond that.

There is a trial set in this case for the 30th, but there are some issues to be taken up.

MR. SHERMAN:  Your Honor, I talked to my co-counsel in this matter.  And although Mr. Buehler wants to keep it within the speedy trial time period until he sees the discovery, he is prepared to put it over until, I believe it would be, May 14th.

MR. BUEHLER:  May 14th or May 20th, Your Honor.

MR. SHERMAN:  Or 21st.

THE COURT:  I don't think --

MR. SHERMAN:  It's not our anticipation that the case will be tried at that time.  It's just at this point before he receives the discovery he is reluctant to agree to a time beyond the Speedy Trial Act.

THE COURT:  Which I see being 5/14, although there is a motion filed, so actually it's been told, but --

MR. SHERMAN:  We would be prepared to put it off to the 14th with a status conference obviously earlier than that so we can resolve this situation between Mr. Agueev and Mr. Mikhel.

THE COURT:  Right.  Let me just ask this.  What's the government's trial estimate?

MS. PETERSON:  Your Honor, the government believes

it will take approximately three weeks.

THE COURT: Just for your case or total?

MS. PETERSON: For our case, Your Honor.

THE COURT: What's the defense think their total case will take?

MR. SHERMAN: We have no discovery in this case at all. I would say three weeks is not long enough, however.

THE COURT: All right.

What's the government's view about the 5/14 date?

MS. PETERSON: Your Honor, is that for a status conference?

THE COURT: No. I think they asked that for a trial date.

MS. PETERSON: For a trial date. No objection to setting it for now.

MS. MEYER: We will presumably have a status conference prior to that day. No objection to that now.

THE COURT: Then let me do this. Does everyone agree that that falls within the Speedy Trial Act as we currently have it?

MR. SHERMAN: Yes, Your Honor.

MR. BUEHLER: Yes, Your Honor.

MR. WEISS: Yes, Your Honor.

THE COURT: Okay. I will continue the trial in this matter to May 14. And I am going to set some

6

additional dates, but let me get to that in just a moment.

Let me address -- even though Mr. Agueev isn't here, and I realize the motion was filed in connection with his case -- obviously it affects Mr. Mikhel even more than Mr. Agueev arguably, because if Mr. Sherman is disqualified from representing Mr. Mikhel, Mr. Agueev will still presumably have him but Mr. Mikhel won't.  And Mr. Mikhel is here in court today.

I am going to need additional briefing from the government on this, but let me just tell you where we are. My understanding is that Mr. Mikhel is alleged to have participated in a kidnapping of Mr. Umansky.  And it's further alleged that the ransom proceeds that were at one time allegedly in Mr. Agueev's account in the United Arab Emirates were eventually transferred to Mr. Mikhel's account, his B of A account, which I think, by the way, is mentioned as being a Studio City account, but it is in fact a Sherman Oaks branch of B of A; is that correct?

MS. PETERSON:  That's correct, Your Honor.

THE COURT:  All right.  Because just for the record, I believe the B of A account in Studio City is where my account is.  I don't think I would recuse myself on that basis, but from I read of the government's papers, I believe the actual duty account is in Sherman Oaks.  But I am just notifying counsel that that's where my account is.  If you

want to raise that as a basis for recusal, you're on notice.

The government has requested a hearing.  It hasn't made an effort to show what the conflict, actual or potential, might be.  It has raised the issue of fees.

Now, Mr. Sherman has submitted a declaration attesting that he is being paid separately by Mr. Agueev and by Mr. Mikhel; that he is being paid directly by Mr. Mikhel for his representation, or in Agueev's case by his wife; and that no third parties are paying for their representation. Is that correct, Mr. Sherman?

MR. SHERMAN:  That is correct.

THE COURT:  All right.  So I guess my question to the government is:  Is there any issue left on that issue with respect to fees?

MS. PETERSON:  I don't believe so, Your Honor.

THE COURT:  Okay.  With respect to the representation of both, there are obviously still outstanding issues, and let me front with you my concerns. I can certainly imagine the scenario, and I don't know if this is the scenario the government is looking at because the government hasn't done any analysis of the facts to the issues of conflict.  But I can certainly imagine a scenario in presenting a serious potential conflict that is somewhat analogous to the one the Supreme Court addressed in Wheat.

In Wheat, both Mr. Wheat and Mr. Bravo were

alleged to be part of a drug conspiracy.  They were represented or they wanted to be represented by the same lawyer.  The Indictment charged that the drugs delivered by Mr. Bravo to a third party were eventually transferred to Mr. Wheat, and the government argued that Bravo had information concerning the deliveries of drugs to third parties that they could eventually link to Mr. Wheat.

The prospect that the government might after his guilty plea call Bravo to give that information, thus putting his lawyer in the untenable position of having to cross-examine his own client, Bravo, in order to reduce the government's ability to in essence connect the dots to his other client, Wheat, was enough to create a serious potential conflict that justified the trial Court's refusal to accept any waivers of such conflict.

The Supreme Court or the chief justice noted in Wheat how notoriously hard to predict conflicts are at the pretrial stages.  Also, the Supreme Court recognized that defense counsel may be in no position to fully understand certainly what the government's witnesses will say and to know how the government may link one defendant with another defendant, and this is true whether they're charged in same indictment or not.

I think Mr. Sherman represented at the last hearing that he hadn't even spoken with Mr. Mikhel about his

case, prudently recognizing that he may not be representing Mr. Mikhel.  Clearly the fact that Mr. Mikhel and Mr. Agueev don't know each other is not dispositive.  Neither did Bravo and Wheat.  I think neither did Kenney and Lindsey in the Kenney case in the Ninth Circuit.  They may not even know what information the government has that will ultimately link the kidnapping that Mr. Mikhel is accused of participating in with the ransom proceeds that Mr. Agueev and Mr. Liapine are accused of having received.

It seems clear to me, for example, that if Mr. Agueev decided to plead guilty and tell all he knows about where the money came from, he could end up giving information that would help the government link -- that could ultimately help the government link up the crime to Mr. Mikhel.

If the government then wants to call Mr. Agueev to testify to that link in the chain, Mr. Sherman will be in the impossible position of having to choose whether to vigorously cross-examine his first client, Agueev, and try to destroy any link to his second client, Mr. Mikhel; or whether to go easy on his first client in dereliction of his duty to his second client.

The same could work in reverse if Mr. Mikhel should elect to plead guilty and provide information which the government could use to ultimately link the ransom

proceeds to Mr. Agueev.  And that's true regardless of either, number one, whether Agueev and Mikhel know each other; whether either of them knows what information they have that might help in the government's chain of events; and regardless of whether Mr. Sherman knows of that potential conflict.

In addition, there could be conflicts at sentencing where Mr. Sherman might have to argue the relative culpability of one client against the other.  But all of this is simply my perception of where those conflicts could lie.  I do believe the government has to do more than simply say a conflict could occur here.

I realize the government was simply asking for an evidentiary hearing, but there is no point in having a hearing without the government having given thought, looking at Wheat and Kenney and Allen and Christakis -- I believe a case with which you're familiar, Mr. Sherman.

MR. SHERMAN:  I am pretty familiar with that case.

THE COURT:  You may want to look at that one as well.  So I am going to order the government to provide additional briefing on the subject of this conflict.

As you can tell, Mr. Sherman, I am very concerned about what the Supreme Court has referred to as, I believe, nascent conflicts.  I can see all sorts of scenarios in which you would be unable frankly to give your full loyalty

to both of the defendants.

MR. SHERMAN:  Your Honor, the only -- the difference, I think, in this case compared with the cases the Court cited is that Mr. Agueev gave a statement prior to my representation where he specifically said exactly the facts as to where the money came from and his involvement. So I would feel much more uncomfortable if, in fact, he had not given that statement, and therefore we would be coming up with some new information after I represented him.

But he did give a statement which I have no reason to disbelieve and I don't think the government has any reason to disbelieve, and he set forth exactly what the source of the funds were.

THE COURT:  Mr. Sherman, when you crawl back up on that turnip truck, we can talk about what the government can believe or not believe.  That's fine, but it hardly precludes the possibility that things that might change in the future.  Many a defendant has given a statement that has not turned out to be ultimately the statement that he relies on either at trial or in his plea, et cetera.

MR. SHERMAN:  Except I think in this matter, Your Honor, the government has corroborated that statement.  But I certainly understand the conflict, and that's why I have been very cautious throughout this.

THE COURT:  By the way, Mr. Sherman, did you

represent Alfonso Garfias in that District of Massachusetts case?  Different Victor Sherman?  District of Massachusetts, 1995, drug conspiracy.

MR. SHERMAN:  There's another Victor Sherman in Massachusetts?

THE COURT:  It was a California case.

MR. SHERMAN:  I have never represented anybody in Massachusetts.

THE COURT:  No.  It was a drug conspiracy in California.  The habeas was brought in Massachusetts.

MR. SHERMAN:  Can I have the cite of the case and I'll look at it?

THE COURT:  You know, I would give it to you if I had it.  It's a District of Massachusetts -- oh, yeah, I see I do.  It's 894 F. Supp. 37.

MR. SHERMAN:  And the defendant's name was?

THE COURT:  Garfias, G-a-r-f-i-a-s.  And the other person -- I can't remember the name of the other one right now.  Just curious.  I didn't think there were that many -- and it was tied to California.  I realize there are probably a number of Victor Shermans, but this was linked to a California case.

MR. SHERMAN:  It doesn't ring a bell, but I'll look at it.  I would also indicate the judge in the Christakis case just ruled that there was no conflict in my

representation in that case.

THE COURT:  And I'm sure he was delighted to have had to go through -- jump through those hoops.

So here's what I think is going to have to happen in this case.  I would like the government's briefing.  Can you get that in by the end of the week, Ms. Peterson and Ms. Meyer?

MS. PETERSON:  Yes.

THE COURT:  All right.  Mr. Sherman, if you have anything to add to that, I would want to give you an opportunity to do so.

MR. SHERMAN:  Could I have until the 18th?

THE COURT:  All right.  Then we won't take this up probably -- in fact, I think it's unlikely we will take up the other matters on the 22nd unless it's very, very late in the afternoon on the 22nd.

MR. SHERMAN:  If the Court doesn't mind, we could do it sometime after the 22nd, because, you know, depending upon your ruling on the 22nd in the Agueev case about standard of proof, et cetera, that might resolve that case in any event.

THE COURT:  That's true, but I am not sure I am going to get to that on the 22nd.  So the real question is whether -- I guess does the government agree -- let's just suppose for the sake of argument that Mr. Sherman and Mr.

Robinson prevail.  Is that going to affect the government's ability to proceed against Mr. Agueev?

MS. PETERSON:  Your Honor, we have not reached that decision.  It's certainly something that we're considering seriously, but we have not reached a decision as to whether or not that would impact it.

THE COURT:  Okay.  Here's what I'm going to do for the moment.  I'm going to put this on for the 22nd, but I'll be quite candid with counsel that this may move as well as those other motions.  So I apologize for not being able to give you greater certainty.  If it looks like I can decide it based on the briefing that I have seen, I will go ahead and do so.  So we'll set it for April 22nd.  I am going to say actually, since -- I'm going to say 3:00.

MR. SHERMAN:  I would just like the Court to know that I have a hearing before Judge Morrow at 3:00, too.

THE COURT:  That's fine.  We'll wait.

MR. SHERMAN:  Fine.  So everybody doesn't have to wait, can we say 3:30?

THE COURT:  That's fine.  That's fine.

MR. BUEHLER:  Your Honor, what is the scope of that hearing?

THE COURT:  The scope of that hearing is -- and it's really in Agueev as well as this -- is the potential conflict.  I don't know that it's going to affect the rest

of you.  Any reason for them to be here, Mr. Sherman?

MR. SHERMAN:  Not as far as I'm concerned.

THE COURT:  But I think Mr. Mikhel, well, obviously he'll be here because it does affect him even though the motion is filed in the Agueev case.

MR. SHERMAN:  The only reason the others might want to be here, Your Honor, is we might have some discovery by then, and Mr. Buehler would be in a position to know whether or not he wants to keep the trial date.

THE COURT:  Well, I was going to say, we would have another status conference anyway, and I would set that probably for -- well, that would have to be set for the 29th.

Here's what I'm going to do then -- when does the government plan on getting some discovery out?

MS. MEYER:  Your Honor, I received seven volumes of discovery prior to this proceeding, so that will go out within the next couple of days.  And 84 tapes are going to be made available at Copy Pro this week as well.  But they are all in Russian, so we are also working on the draft translations of those as well.  So the first installment will be this week.  The second installment will be next week.

MR. SHERMAN:  I think, Your Honor, from our defense point of view, May 6th would be soon enough because

realistically that May 14th day is out of the question.

THE COURT:  All right.  Let's put a status conference for May 6th at 1:30 p.m., status conference for everybody concerned.  Again, if we can do it on the 22nd, we will.  If I can't, I will notify counsel.

And since you're all here and Mr. Agueev is in custody, although he is not here right now, to the extent I am able to take up the other motions on the 22nd in Mr. Agueev's case, let's put those at 3:30 as well.  So you don't have to be here for 1:30 for the first --

MR. SHERMAN:  I will tell Mr. Robinson.

THE COURT:  Okay.  Thank you, Mr. Sherman.

And I think I am getting something from the government today on those motions; correct?

MS. MEYER:  Your Honor, that's been filed, and a courtesy copy has been provided to you as well.

THE COURT:  Thank you.  Anything further for now?

MR. WEISS:  Your Honor, what are the times on the 6th?

THE COURT:  On the 6th it's 1:30 p.m.  And on the 14th the trial date would be at 8:30.

MS. MEYER:  I'm sorry, Your Honor.  I was conferring with Mr. Sherman.  What was the last one?

THE COURT:  Status conference on May 6th is 1:30 p.m., and the trial date of May 14th would be at 8:30 a.m.

17

MS. MEYER:  Thank you, Your Honor.

MR. SHERMAN:  Your Honor, we do have one other matter.  I apologize.  We just received notice from the government today that they obtained a search warrant which they intend to execute on Wednesday which is asking for five items from the defendants while they're in custody, including blood, scalp hair, pubic hair, saliva samples, and fingerprints.

This is the first that we had ever heard that the government had obtained a search warrant, and it was signed by Magistrate Ike, and they intend to take these samples by force, if necessary, apparently.  So we have not had an opportunity until just before court to even know there was a search warrant, and we have now seen the affidavit in support of the search warrant.  We intend to oppose this motion.  So I'm not sure if it should be heard before Your Honor of Magistrate Ike, but they intend to go ahead on Wednesday.

THE COURT:  Well, I would suggest you might want to go before the magistrate judge who issued it.

MS. PETERSON:  Because this is a search warrant, the government would submit that the appropriate remedy would be for the defense attorneys to submit whatever motion to suppress they wanted to suppress and have the Court take it up as a matter of whether or not the evidence obtained by

SHARON SEFFENS, U.S. COURT REPORTER

the government as a result of the search warrant should ultimately be admitted at trial.

The government would submit at this point it would be premature and inappropriate for them to challenge the search warrant because these search warrants aren't challenged in advance. And the only reason they know that it's going to be executed is because the government believed based on case law that it was appropriate to notify them that they were going to be seeing their clients and seeking this evidence from them.

MR. SHERMAN: Well, Your Honor, I'm trying to avoid a confrontation. You know, I have never had this filed against a client of mine in custody where they didn't call us up in advance and ask if we had any opposition to these type samples being taken and where I have always worked it voluntarily. This is the first time I have seen a search warrant being issued where the government is saying we're going to do this whether your clients consent to it or not. And if necessary, we're going to do it by force.

Now, obviously we don't have enough time between now and Wednesday morning to do the necessary work to suppress this search warrant, and I don't know if we have the legal authority to do it.

THE COURT: I'm not sure you do either. In most instances, people aren't notified that a search warrant is

19

going to be executed.

MR. SHERMAN:  We may or may not have the authority.  Obviously it's one thing to search somebody's house and another thing to try to forcibly take something from their person.  So at least we need some time to research this question to see whether we have the authority.

Now, obviously the clients aren't going anywhere. They're in custody.  So whether it's done Wednesday or a week from Wednesday, I can't see it makes any difference. But I am asking that we set this down for some type of procedure where we can have a hearing in court if we --

THE COURT:  Well, I'm not going to do that now, Mr. Sherman.  If you want to take it up with the magistrate judge, you can.  As Ms. Peterson said, you always have the right to seek to suppress whatever evidence is obtained. That is the normal course.

MR. SHERMAN:  Well, I am indicating to the government now my client is not going to voluntarily submit, and I don't think it's appropriate to try to force the issue without at least giving us an opportunity to research the question of whether or not we can resist that.  I don't want a confrontation.  But if the government is going to force the issue, that's what's going to happen.

MR. BUEHLER:  Your Honor, if I could also add, it seems to me that since the defendants are already indicted

20

and they're in custody, the appropriate procedure would have been to come to this Court to obtain the permission to go through these procedures.

THE COURT:  I don't think that's where a search warrant is usually obtained.

MR. BUEHLER:  I understand, Your Honor, but search warrants in my experience are usually obtained prior to people being indicted.  I think that's what places this in a rather unusual situation where it may warrant at least us having the opportunity to research the legal issues that it raises.

THE COURT:  Well, what I would suggest is that you get together with government counsel if you think on the basis of -- you know, you're all experienced criminal trial lawyers -- if you think that you may have a basis.  I mean, we all know that there's no Fifth Amendment right to various bodily fingerprints, et cetera, et cetera.  I mean, we've all been through this.  I think we all know that.

If you think you have some legal basis for opposing it, I'd bring that to the government's attention. If the government agrees that you have some colorable basis and also agrees that they won't be in any way prejudiced by putting it off, then they might consider doing that.  But I suggest you take it up with them.

MR. BUEHLER:  Thank you, Your Honor.

MR. WEISS:  One last thing, Your Honor.  I may be making a motion prior to the date that we put this over to, May 6th, to be relieved as counsel.  There has been a change of circumstances from when I was first retained on this case.  I just want to point that out to the Court because there is that possibility.

THE COURT:  Would you be substituting out in favor of somebody else?

MR. WEISS:  I'm not sure yet, Your Honor.  I have to communicate with my client on that and make some decisions.  I may have to substitute without bringing someone else in.

THE COURT:  All right.  Thank you for bringing that to the Court's attention, Mr. Weiss.  And if you do make that motion, I would just ask that you get it on file as soon as you make a determination.

MR. WEISS:  I understand, Your Honor.  Thank you.

THE COURT:  Thank you very much, counsel.

*(Thereupon, the proceeding was concluded.)*

-oOo-

22

CERTIFICATE


I hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.


Date:  April 19, 2009


                        Sharon A. Seffens        4/19/09
                        _____
                        SHARON A. SEFFENS, U.S. COURT REPORTER