UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

- - -

THE HONORABLE NORA M. MANELLA, JUDGE PRESIDING

```
UNITED STATES OF AMERICA,  )
                Plaintiff,  )
      vs.                   )
                            )  CR-02-220-NM
IOURI MIKHEL, et al.,       )
                Defendants. )
----------------------------)
```

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Los Angeles, California

June 6, 2002

SHARON A. SEFFENS, RPR
United States Courthouse
411 West 4th Street, Room 1-1053
Santa Ana, CA  92701
(714) 543-0870

APPEARANCES OF COUNSEL:

For the Plaintiff:

JOHN S. GORDON
United States Attorney
RONALD L. CHENG
Assistant United States Attorney
Acting Chief, Criminal Division
CAROLE C. PETERSON
KAREN I. MEYER
SUSAN DEWITT
Assistant United States Attorneys
1100 United States Courthouse
312 North Spring Street
Los Angeles, CA  90012
(213) 894-2434


For Defendant AINAR ALTMANIS:

ELLEN M. BARRY
ELLEN M. BARRY LAW OFFICES
316 West 2nd Street, Suite 1202
Los Angeles, CA  90012
(213) 621-1662


ALSO PRESENT:

Russian Interpreter

LOS ANGELES, CALIFORNIA; THURSDAY, JUNE 6, 2002; 8:30 A.M.

THE CLERK:  Item No. 1, CR-02-220-NM, United States of America versus Ainar Altmanis.

Counsel, please state your appearances.

MS. PETERSON:  Good afternoon, Your Honor.  Carole Peterson, Susan DeWitt, and Karen Meyer for the government.

THE COURT:  Good afternoon.

MS. BARRY:  Good afternoon, Your Honor.  Ellen Barry on behalf of Ainar Altmanis, who is being assisted by the Russian language interpreter.

THE COURT:  Good afternoon.

The government has filed or will be filing shortly a plea agreement for Mr. Altmanis, attached to which is a First Superseding Information.  The plea agreement also incorporates the factual basis for the plea.

Essentially the First Superseding Information as to which Mr. Altmanis waived indictment earlier today -- actually the information itself was separately filed; wasn't it?

MS. PETERSON:  It was, Your Honor.

THE COURT:  All right.  That separately filed information is a four-count information charging Mr. Altmanis with four counts of violations of 18 United States Code Section 1203.  The first count is a conspiracy to take hostages resulting in death.  The second and third counts

4

are each hostage-taking resulting in death with respect to the victims Alexander Umansky, Nick Kharabadze, and George Safiev, respectively.

First of all, Ms. Barry, I understand that your client wishes to enter guilty pleas to the four counts of the First Superseding Information; is that correct?

MS. BARRY:  That's correct, Your Honor.  Do you want us to go to the podium?

THE COURT:  Yes, if you would, please.  The First Superseding Information which was filed today I am going to briefly summarize just to make sure we have a clear record of what the charges now are against Mr. Altmanis, and we will get to the plea agreement in just a minute.

As I indicated earlier, the first charge is a conspiracy charge under 18 USC Section 1203.  It charges Mr. Altmanis with conspiring with Iouri Mikhel, Jurijus Kadamovas, and Petro Krylov to target individuals believed to be wealthy or to have contacts with such wealthy persons in order to seize such persons, hold them hostage, and demand money in exchange for their release.

Mr. Altmanis is alleged to have participated in the formulation of the plans, including the plans to demand ransom money as a condition of the victims' release, to have assisted in the actual abductions of the victims, to have guarded the victims while they were being held hostage, and

SHARON SEFFENS, U.S. COURT REPORTER

5

to have participated in the killing of victims Umansky and Kharabadze.

MS. BARRY: Your Honor, could you slow down just a little because of the translation?

THE COURT: Okay. Will do. Count Two is the hostage taking charge with respect to Mr. Umansky. Mr. Altmanis is charged along with his co-defendants with seizing and detaining Mr. Umansky on or about December 13th of 2001 under the threat to kill, injure, or detain him for the purpose of compelling the Umansky family to pay ransom money to obtain his release. It is further alleged that the act of seizing and detaining Mr. Umansky resulted in his death.

Count Three is the hostage-taking count with respect to Mr. Kharabadze. Mr. Altmanis is charged along with his co-defendants with seizing and detaining Nick Kharabadze on or about January 20th of 2002 under a threat to kill, injure, or detain him for the purpose of luring George Safiev to meet Mr. Kharabadze at a location where Safiev in turn could be held hostage in order that a business associate of Mr. Safiev would then pay money to obtain the men's release. It is further alleged that the act of seizing and detaining Mr. Kharabadze resulted in his death.

Finally, the Fourth Count of the First Superseding

Information, the hostage-taking charge with respect to Mr. Safiev, charges that Mr. Altmanis along with his co-defendants seized and detained George Safiev and held him hostage in order to compel his business associate to pay ransom money to obtain his release.  It's further alleged that the act of seizing and detaining Mr. Safiev resulted in his death.

First of all, Mr. Altmanis, has this First Superseding Information been translated to you in Russian?

DEFENDANT ALTMANIS:  Yes.

THE COURT:  And do you understand the charges contained in this First Superseding Information?

DEFENDANT ALTMANIS:  Yes.

THE COURT:  And has the plea agreement also been translated to you in Russian?

DEFENDANT ALTMANIS:  Yes.

THE COURT:  And do you understand the terms of that plea agreement?

DEFENDANT ALTMANIS:  Yes.

THE COURT:  All right.  Ms. Barry, waive reading of the First Superseding Information?

MS. BARRY:  Yes, Your Honor.

THE COURT:  All right.  I will ask the clerk to please swear Mr. Altmanis.

*(Defendant sworn)*

THE COURT:  Mr. Altmanis, the clerk has placed you under oath in order to emphasize to you the importance of giving truthful answers to the questions I am about to ask. Should you give less than truthful answers, you could subject yourself to an additional prosecution for perjury. Do you understand that?

THE DEFENDANT:  Yes.

THE COURT:  How old are you, sir?

THE DEFENDANT:  Forty-three -- I will be 43.

THE COURT:  And what is your educational background?  That is, how much formal schooling have you had?

THE DEFENDANT:  I graduated from high school.

THE COURT:  Do you easily read and understand Russian?

THE DEFENDANT:  Yes.

THE COURT:  All right.  Now, Ms. Barry, have you discussed with your client his constitutional rights and the consequences of giving up those rights in order for him to enter these guilty pleas?

MS. BARRY:  Yes, I have, Your Honor.

THE COURT:  All right.  Mr. Altmanis, as you know from your conversations with counsel, you have certain constitutional rights that you will be giving up by entering these guilty pleas.  I am going to explain them to you to

8

ensure you understand precisely what they are and what you are giving up by entering these guilty pleas.

First of all, you have the right to a public trial by a jury. At that trial, you would be presumed innocent. The government would be required to prove your guilt as to each element of each offense beyond a reasonable doubt. All 12 jurors would have to agree unanimously that the government had met its burden of proof before you could be found guilty.

In the alternative, you have the right to a trial by this Court. Again, the government's burden of proof would be beyond a reasonable doubt, but instead of 12 jurors being the triers of fact, I would be the finder of fact.

Whether you had a trial by Court or by jury, you have the right to the assistance of counsel throughout the proceedings, the right to call witnesses, subpoena documents, and put on evidence in your own behalf; the right to confront and cross-examine any witnesses against you; the right to testify in your own behalf; and perhaps most importantly, the right not to testify or to incriminate yourself in any way.

Mr. Altmanis, do you understand each of these rights?

THE DEFENDANT: Yes.

THE COURT: And do you understand that if you

enter your guilty pleas to these four counts of this First Superseding Information, there will be no trial, and you will be giving up each of those rights with the exception of your right to counsel which you will retain?

THE DEFENDANT:  Yes.

THE COURT:  And is that what you wish to do?

THE DEFENDANT:  Yes.

THE COURT:  Any questions so far, Mr. Altmanis?

THE DEFENDANT:  No.

THE COURT:  Mr. Altmanis, you will be sentenced under the Sentencing Reform Act and its attendant guidelines.  I will determine the guideline range for your sentence after reviewing the presentence report which will be prepared by the Probation Office.

Do you understand that neither your attorney nor the government's attorney can tell you precisely what the guideline range for your sentence will be?

THE DEFENDANT:  Yes.

THE COURT:  Moreover, that range is not binding and the Court can in some circumstances depart from the guideline range to impose a sentence higher or lower than the sentencing guideline range.  If the guideline range is not what you anticipated or if I should elect to depart from that range to impose a higher sentence, do you understand that your disappointment in any sentence imposed would not

10

be a basis for withdrawing your guilty pleas?

THE DEFENDANT:  Yes.

THE COURT:  All right.  Ms. Peterson, are you taking the speaking order here?

MS. PETERSON:  I am, Your Honor.

THE COURT:  All right.  Then am I correct that Mr. Altmanis will be pleading guilty to all four of the counts in the First Superseding Information?

MS. PETERSON:  That is correct, Your Honor.

THE COURT:  All right.  And if you would state the elements of the offense, please, or offenses.  I guess both the conspiracy and the substantive counts are all contained in 1203; correct?

MS. PETERSON:  That's right.  For the defendant to be guilty of Count One, which charges him with conspiring to commit hostage-taking that results in death --

MS. BARRY:  Wait one second, please.  Your Honor, we have a written translation.  I just want for it to be easier for Mr. Altmanis to go along.

THE COURT:  Sure.  That's fine.

MS. BARRY:  We just need to get it ready.

THE COURT:  Thank you.

MS. PETERSON:  In order to prove Count One, the conspiracy count, the government must show, first, that there was an agreement between defendant and others who were

11

not nationals of the United States to knowingly abduct hostages and threaten to kill, injure, or continue to detain those hostages, all to compel the action of a third party as a condition of release of the hostages in violation of 18 USC Section 1203; secondly, that the defendant became a member of this conspiracy knowing of its object and intending to help accomplish if.

In order for the defendant to be guilty of Counts Two, Three, and Four, which charge him with hostage-taking resulting in death in violation of 18 USC Section 1203, the government must show, first, that defendant seized or detained another person; second, the defendant threatened to kill, injure, or continue to detain that person; third, the defendant did so with the purpose of compelling a third person or governmental entity to act in some way or to refrain from acting in some way as a condition of release of the victim; and, four, the defendant is not a citizen or a national of the United States.

Additionally, in this case, the information alleges factors that enhance the penalty for all four counts alleged in the information.  And to prove those factors the government must prove that in the course of committing Section 1203 violations described in Counts One through Four, the deaths of the victims -- Rita Peckler, Alexander Umansky, Nick Kharabadze, and George Safiev -- resulted.

12

THE COURT:  Ms. Peckler is not actually named in any of the substantive counts; correct?

MS. PETERSON:  No.  Only in Count One, the conspiracy.

THE COURT:  All right.  And the statutory maximum for each offense and the total, please.

MS. PETERSON:  The statutory maximum sentence that the Court can impose for each violation of 18 USC Section 1203 is death or life imprisonment without the possibility of release; a five-year period of supervised release; a fine of $250,000, or twice the gross gain or gross loss resulting from the offense, whichever is greatest; and a mandatory special assessment of $100.

Therefore, the total maximum sentence for all offenses to which defendant is pleading guilty is death for all four counts or life imprisonment without release; a five-year period of supervised release; a fine of $1 million, or twice the gross gain or gross loss resulting from the offenses, whichever is greatest; and a mandatory special assessment of $400.

THE COURT:  There is also a statutory minimum sentence; isn't there?

MS. PETERSON:  That is right, Your Honor.  For each violation of 18 USC Section 1203 where the death of any person results, the mandatory minimum is life imprisonment.

13

THE COURT:  All right.  Is restitution a possibility as well?

MS. PETERSON:  It certainly is, Your Honor.  And by signing this plea agreement, the defendant has pledged it's his understanding that he will be required to pay full restitution to the victims of his offenses.

THE COURT:  Mr. Altmanis, did you understand the statutory maximum penalties that the prosecutor just stated?

THE DEFENDANT:  Yes.

THE COURT:  All right.  And, Ms. Peterson, I gather, then -- we'll get to this later in the plea agreement -- that there is a possibility of a 5K1, but absent that, the statutory mandatory minimums would apply, correct?

MS. PETERSON:  That's correct, Your Honor.

THE COURT:  Is that your understanding as well, Ms. Barry?

MS. BARRY:  It is, Your Honor.

THE COURT:  All right.  Mr. Altmanis, do you understand then that in the absence of a motion by the government that could result in a sentence below the mandatory minimum, the statutory mandatory minimum sentence that you would be facing on each of these four counts is a mandatory minimum sentence of life imprisonment?  Do you understand that?

SHARON SEFFENS, U.S. COURT REPORTER

THE DEFENDANT:  Yes.

THE COURT:  All right.  Now, there is no parole in the federal system, Mr. Altmanis.  If you were sentenced to prison and if for any reason your sentence was something other than life imprisonment without the possibility of parole, you might get time off for good behavior, but you would serve at least 85 percent of any sentence imposed.  Do you understand that?

THE DEFENDANT:  Yes.

THE COURT:  Moreover, if as you stand here today, Mr. Altmanis, you happen to be on parole, probation, or supervised release for some previous offense, your convictions here today could subject you to revocation of that parole, probation, or supervised release, and you could go back to prison on those prior offenses.  Do you understand that?

MS. BARRY:  Can you give me a minute, Your Honor?

THE COURT:  Sure.

*(Defense counsel conferring with defendant)*

THE DEFENDANT:  Yes.

THE WITNESS:  All right.  If for any reason you are sentenced to a period of less than life imprisonment without release, you could be placed on what is called supervised release.  What that means is that following any time in prison, you would be released subject to the

15

continued supervision of this Court.  Do you understand that?

THE DEFENDANT:  Yes.

THE COURT:  And if you were to violate the terms and conditions of that supervised release, you could be returned to prison for all or part of that term of supervised release.  Do you understand that?

THE DEFENDANT:  Yes.

THE COURT:  And of what country are you a citizen, sir?

THE DEFENDANT:  Latvia.

THE COURT:  Do you understand that even in the event you were not sentenced to life in prison without the possibility of release, you could be deported from the United States as a result of these convictions?

THE DEFENDANT:  Yes.

THE COURT:  Do you understand as well that any assets associated with this offense could -- and in fact it is the contemplation of this plea agreement -- will be subject to civil forfeiture?  Do you understand that?

THE DEFENDANT:  Yes.

THE COURT:  Mr. Altmanis, have you received any medication within the past three days?

THE DEFENDANT:  No.

THE COURT:  Do you suffer from any condition that

might affect your judgment or your ability to hear and understand what we are doing in court today?

THE DEFENDANT:  No.

THE COURT:  Have you understood everything so far?

THE DEFENDANT:  Yes.

THE COURT:  As you stand here today, is your mind clear?

THE DEFENDANT:  Yes.

THE COURT:  All right.  Ms. Barry, did you speak utilizing the interpreter with your client today before approaching the lectern?

MS. BARRY:  Yes, Your Honor.

THE COURT:  And from your discussions with him here today, does he appear to you to be in full possession of his faculties, competent to understand these proceedings, and capable of freely and voluntarily entering his pleas of guilty?

MS. BARRY:  Yes, he does, Your Honor.

THE COURT:  All right.  On the basis of Mr. Altmanis's and Ms. Barry's representations and my own observations of Mr. Altmanis this morning and now, I do find him in possession of his faculties and competent to enter his plea.

Mr. Altmanis, I have the plea agreement before me. Let me just confirm again was this plea agreement translated

to you through the Russian interpreter, and did you have an opportunity to discuss it with your attorney?

THE DEFENDANT:  Yes.

THE COURT:  And is that your signature that appears on page 14 of the plea agreement with the date of June 5th?

THE DEFENDANT:  Yes.

THE COURT:  Do you understand the terms of the plea agreement?

THE DEFENDANT:  Yes.

THE COURT:  Do you have any questions about its provisions or need any additional time to discuss it with your counsel?

THE DEFENDANT:  No.

THE COURT:  Let me just go through a few of the more salient features of the plea agreement.  I think we have already referred to the statutory maximum and as well to the mandatory minimum sentence of life without the possibility of -- actually is it life without release, or is the mandatory minimum just life?

MS. PETERSON:  Just life, Your Honor.

THE COURT:  Okay -- a mandatory minimum of life absent a motion from the government to go below that mandatory minimum.  We've already discussed the fact that the defendant will be required to pay restitution and may be

18

subject to deportation.

Mr. Altmanis, you understand that you are agreeing as well not to profit financially from any of the crimes contained in this information?  Do you understand that?

THE DEFENDANT:  Yes.

THE COURT:  And you further have agreed to disclose to the government all assets -- including any moneys, properties, or assets of any kind -- derived from or acquired as a result of or used to facilitate the commission of the illegal activities?

THE DEFENDANT:  Yes.

THE COURT:  Ms. Peterson, with respect to paragraph 20-G, I assume to prevent the disbursement means to prevent the disbursement to anyone but the government of all assets.

MS. PETERSON:  That is correct, Your Honor.

THE COURT:  Is that your understanding as well, Ms. Barry?

MS. BARRY:  Yes, Your Honor.

THE COURT:  Do you further understand, Mr. Altmanis, your obligation to cooperate fully with governmental authorities, including the United States Attorney's Office, the FBI, the District Attorney's Office, the LAPD, or any other federal, state, local, or foreign law enforcement agency?  Do you understand that?

THE DEFENDANT:  Yes.

THE COURT:  Now, Ms. Peterson, my understanding is that provided that the defendant complies with all of his obligations under the agreement and responds truthfully and completely to all questions put before him that it is the government's intention not to seek the death penalty against this defendant; is that correct?

MS. PETERSON:  That is correct.

THE COURT:  And furthermore, to provide any assistance that may be necessary with respect to witness security or a similar program?

MS. PETERSON:  That is also correct.

THE COURT:  It's further my understanding that the government at this point does contemplate filing a 5K1 motion; is that correct?

MS. PETERSON:  That's also correct.

THE COURT:  Now, just so we're clear, paragraph 22 details the government's obligations, including the anticipation of the 5K1.  However, paragraph 23 indicates -- and I am looking at particularly paragraph C -- that Mr. Altmanis cannot withdraw his guilty pleas if the U.S. Attorney's Office does not make a motion pursuant to 5K1.1. Can you clarify that for me?

MS. PETERSON:  Your Honor, at this point, based upon the substantial assistance the defendant has already

provided to the government, the government does intend to make file a 5K1.1 motion to the Court absent our discovery of any additional false or misleading statements.  If we were to discover that, that might otherwise void that paragraph.

THE COURT:  That's what I assume.  So, Mr. Altmanis, just so you're clear, do you understand that in paragraph 23-C, if the government should discover that you have not been truthful or candid with them, they would thereby have the right not to make a motion pursuant to Section 5K1.1 of the Sentencing Guidelines for a reduced sentence?  Do you understand that?

THE DEFENDANT:  Yes.

THE COURT:  And if they elect not to make that motion, that would not -- nevertheless your guilty pleas to these four counts would stand, and you would face that mandatory minimum sentence of life imprisonment.  Do you understand that?

THE DEFENDANT:  Yes.

THE COURT:  Moreover, if the government makes that motion, it's still up to the Court to decide whether to grant such a motion.  So do you understand, as set forth in paragraph 23-C, that even if the government should make such a motion and the Court should decline to grant that motion for a reduced sentence, your guilty pleas would still stand

and you would be facing that mandatory minimum life sentence on each of the four counts?

THE DEFENDANT:  Yes.

THE COURT:  Just to recap, do you understand that if you fail to perform any of your obligations under the plea agreement, the U.S. Attorney's Office may declare the agreement breached and they would be relieved of their obligations under the agreement, but you would not be allowed to withdraw your guilty plea?  Do you understand that?

THE DEFENDANT:  I don't understand.

MS. BARRY:  Can you give me a minute, please, Your Honor?

THE COURT:  Sure.

*(Defense counsel conferring with defendant)*

MS. BARRY:  Thank you, Your Honor.

THE COURT:  All right.  I am not sure I can repeat verbatim what I just said.  Essentially, Mr. Altmanis, if you fail to perform any of your obligations under this plea agreement and the United States Attorney's Office deems the agreement breach, they are not bound by any of the terms of this agreement; however, your guilty pleas would still stand.  Do you understand that?

THE DEFENDANT:  Yes.

MS. BARRY:  Your Honor, with one technical caveat,

which is that the Court would have to find in fact that he had breached the agreement.  It's not just the government's declaration that the agreement has been breached.

THE COURT:  That's true.  I'm sorry.  Did I get an answer from him?

THE DEFENDANT:  Yes.

THE COURT:  Okay.  And just to make sure we understand the worst care scenario, I guess if the government were to believe that Mr. Altmanis had breached the agreement, it would be free to seek any sentence up to the statutory maximum, including the death penalty.  Is that the government's construction of this agreement?

MS. PETERSON:  That is, Your Honor.

THE COURT:  And you understand that as well, Ms. Barry?

MS. BARRY:  Yes, I do.

THE COURT:  And, Mr. Altmanis, you understand that as well?

THE DEFENDANT:  Yes.

THE COURT:  All right.  Finally, should Mr. Altmanis make any false statements, the government would also be free to prosecute him on charges in addition to those contained in this information, including obstruction of justice and perjury based on any knowingly false or misleading statements.  Do you understand that?

23

THE DEFENDANT:  Yes.

THE COURT:  Finally, anything that you may have said to the government up until now the government would be free to use against you, including any interviews.  Do you understand that, Mr. Altmanis?

THE DEFENDANT:  Yes.

THE COURT:  Finally, in paragraph 25 entitled Waiver of Appeal and Collateral Attack, Mr. Altmanis, you're giving up the right to appeal any sentence imposed by the Court, including any order of restitution, and the manner in which that sentence is determined provided that the sentence is within the statutory maximum which we've stated on the record and is constitutional.  Do you understand that you are giving up your right to appeal any sentence imposed provided these conditions are met?

MS. BARRY:  Give me a minute, please, Your Honor.

(Defense counsel conferring with defendant)

THE DEFENDANT:  Yes.

THE COURT:  All right.  Do you have any questions concerning waiving your right to appeal or need any additional time to discuss it with your attorney?

THE DEFENDANT:  No.

THE COURT:  Now, Mr. Altmanis, I am not a party to this plea agreement.  This is an agreement between you and the United States.  When you return for sentencing, the

24

government, as I have indicated to you, may make recommendations which I may or may not follow.  As I previously indicated to you, even I were to decline to follow the government's recommendation and impose a sentence higher than that recommended, that would not be a grounds for your withdrawing your pleas of guilty.  Do you understand that?

THE DEFENDANT:  Yes.

THE COURT:  Okay.  Finally, do you understand that this agreement supersedes any prior agreements that you may have had with the United States Attorney's Office, including any letter agreements?

THE DEFENDANT:  Yes.

THE COURT:  Based on the understandings expressed by the defendant, I do accept the plea agreement and order the agreement filed.  I will also order the substance of the plea agreement incorporated into the hearing record.

Now, Mr. Altmanis, apart from the representations made in this plea agreement, has anyone offered you anything or promised you anything in exchange for your pleas of guilty to these four counts?

THE DEFENDANT:  No.

THE COURT:  Has anyone threatened you directly or indirectly or threatened any member of your family in order to get you to enter these pleas of guilty?

THE DEFENDANT:  No.

THE COURT:  Are you pleading guilty to these four charges -- a charge of conspiracy and then the substantive charges of hostage-taking resulting in death -- because you are in fact guilty of those four charges?

THE DEFENDANT:  Yes.

THE COURT:  I am going to ask the prosecutor, Ms. Peterson, to state what facts the government would show if this case were to go to trial.  I'm going to ask you to listen carefully to what she has to say because when she's finished, I'm going to ask you whether you agree with what she said or whether you have any corrections or variations to her version of the events.

Ms. Peterson.

MS. PETERSON:  Your Honor, beginning sometime in the fall of 2001, defendant Ainar Altmanis agreed to assist co-defendant Iouri Mikhel and Jurijus Kadamovas in collecting money from an American named Meyer Muscatel.  The three men devised a plan to lure Muscatel to Mikhel's residence in Encino, California, within the Central District of California.

THE COURT:  Do you have a written translation?

MS. BARRY:  We do.  It's right here, but we also have our interpreter saying what she's saying just after she is saying it.

THE COURT:  Okay, so go slow.

MS. PETERSON:  Kadamovas and Altmanis waited at Mikhel's residence for Mikhel to bring Muscatel to the residence.  Altmanis and Kadamovas grabbed Muscatel when he entered.  Muscatel fought them, so Mikhel hit Muscatel over the head with a gun to subdue him.

Defendant assisted Mikhel and Kadamovas in binding the man.  Mikhel and Kadamovas demanded money from the man for his release.  Mikhel and Kadamovas began to check the balances in his bank accounts by calling the banks.  They forced Muscatel to call his business partner on or about October 12, 2001, to ask the business partner to consolidate Muscatel's money into one account.

They also forced Muscatel to call an employee at his bank to ask her to transfer money from his account to an account that did not belong to Muscatel.  Defendant took guard over Muscatel when Mikhel and Kadamovas were not at the house and also cleaned the area in the foyer where Muscatel had bled when Mikhel hit Muscatel on the head with the firearm.

Approximately two days after Muscatel's abduction, defendant went to Mikhel's residence in the morning. Kadamovas told defendant, quote, "It was over."  Defendant saw Muscatel lying on the ground next to Kadamovas's van. Both of Muscatel's hands were tied behind his back, his neck

was tied, and there was a plastic bag over his head wrapped with duct tape to seal it.  Because the man was still convulsing, Mikhel placed a bigger plastic bag over his held and also held the victim's nose.

Defendant assisted Mikhel and Kadamovas in putting Muscatel's body in Kadamovas's van and covering it up with items from Mikhel's garage.  Mikhel and Kadamovas drove away in the van to dispose of the body, and defendant cleaned Mikhel's residence, including the room where Muscatel had been held.  When Mikhel and Kadamovas returned, they told defendant they had disposed of Muscatel's body over a bridge on a lake.

In late 2001 defendant, Mikhel, and Kadamovas formulated a plan to kidnap an accountant named Rita Peckler, who conducted business with many members of the Russian community.  Mikhel and Kadamovas believed that because Peckler handled certain aspects of the business belonging to a wealthy businessman and film producer named George Safiev she would be able to induce Safiev to come to a location where the men could abduct him.

In early December 2001, Kadamovas posed as a wealthy businessman who wanted to buy property in order to lure Peckler to a house he had just purchased in Sherman Oaks within the Central District of California.  When Peckler walked into the house, she was met by Petro Krylov,

Mikhel, and defendant.  Mikhel persuaded Peckler to call Safiev and use a pretext to get him to meet her.  Peckler called Safiev to try to arrange a meeting, but Safiev was preparing to leave the United States for Moscow that evening, and he could not meet her.

Peckler was concerned that she would not be released because she had not been able to arrange the meeting with Safiev.  Mikhel and Kadamovas told Peckler they were going to give her a shot of Dimedrol to put her to sleep and that they would then leave her somewhere to wake up.

Defendant did not stay at the house that evening and did not witness Peckler's murder.  At some point, Mikhel and Kadamovas took Peckler's body to the New Melones Reservoir in Northern California.  Defendant did not accompany Mikhel and Kadamovas to dispose of the body.  Mikhel and Kadamovas later told defendant they had disposed of Peckler's body in the same place where they had disposed of the body of the American.

Shortly after the kidnapping and murder of Peckler, Mikhel and Kadamovas began searching for a new person to abduct.  Krylov told Mikhel about Alexander Umansky, the owner of a car electronics shop from which Krylov had been fired.  Krylov told Mikhel that Umansky had money.  Mikhel became very interested in this, and he,

Kadamovas, Krylov, and defendant began to formulate a plan to kidnap Umansky.  In mid December 2001, Mikhel made an appointment for Umansky to meet him, posing as someone who was interested --

MS. BARRY:  Excuse me.  There's more Russian words than there are American words, so it slows it down.

MS. PETERSON:  I will slow down.

MS. BARRY:  Thanks.

MS. PETERSON:  In mid December 2001, Mikhel made an appointment for Umansky to meet him.  He posed as someone who was interested in having electronics installed in his car.  Mikhel lured Umansky to Kadamovas's house in Sherman Oaks that day under this pretext.

Umansky was taken to the same room where Peckler had been held, and he was tied to a chair.  Mikhel and Kadamovas took Umansky's cell phone and all of his credit and bank cards.  Mikhel forced Umansky to make telephone calls to family members to ask them to pay money for his ransom.

Krylov stripped Umansky's car of its audio and visual equipment.  Defendant drove Umansky's car to an airport parking lot and left it there.  Krylov picked defendant up on a street outside the airport.  Defendant and Krylov were instructed by Mikhel and Kadamovas to throw away all of the electronic equipment, but defendant kept some of

it.  This equipment was later found hidden in defendant's couch in his apartment when it was searched by the FBI.

Umansky was kept alive for several days while the men waited for a call confirming that the ransom money had been paid by Umansky's family.  Once the men were reassured that it was paid, Mikhel, Kadamovas, and defendant killed Umansky by suffocating him.  Defendant, Mikhel, and Kadamovas took Umansky's body to Northern California where it was deposited in the New Melones Reservoir.  The body was weighed down with weights that were attached to Umansky's body with flex cuffs.  Defendant went with the others to the reservoir in the back of the van.  Once they got to the bridge, it took all three men to throw Umansky's body into the water.

After Umansky's murder, Kadamovas and Mikhel remained intent on kidnapping Safiev.  Ultimately Mikhel, Kadamovas, Krylov, and defendant decided to use Nick Kharabadze to lure Safiev to a place where they could abduct him.  The men had heard that Kharabadze had recently returned from Russia where he had partied with a lot of girls.

On or about January 20th, 2002, Mikhel and Kadamovas had Kadamovas's girlfriend, Natalya Solovyeva, call Kharabadze to tell him that she had met him in Moscow, was now in Los Angeles, and wanted to see him again.

Kharabadze agreed to meet Natalya at a bar.  Natalya directed Kharabadze to Designed Water World, which is a business owned by Mikhel and Kadamovas on Ventura Boulevard in Encino.

This meeting occurred on the night of the Golden Globe Awards.  The layout of Designed Water World included a cocktail table by the front door and a billiards table in the middle of the room.  A bar was against the back wall.  All of the men played a different role that night.  Kadamovas acted as a bartender.  Krylov sat at the cocktail table, and Mikhel sat at the bar.  Mikhel's gun was covered by a coat on the stool next to him.

Another man, Aleksejus Markovskis, stood near the billiards table.  Defendant and Markovskis acted as though they were playing pool.  Natalya met Kharabadze just outside of Designed Water World.  There was no visible sign on the door of the business to identify it.  Natalya walked in first with Kharabadze behind her.  They walked to the bar, and Krylov used his foot to close the door behind them.

Natalya excused herself and walked to the back, out the back door, and left.  Kharabadze was still sitting at the bar.  At that moment, all of the men came at Kharabadze.  The men cuffed him to a chair.  Mikhel and Kadamovas told Kharabadze that there was nothing he needed to fear because they didn't want him.  They wanted Safiev.

32

They told Kharabadze to call Safiev and tell him to come to Designed Water World.

Ultimately Safiev came to Designed Water World. Krylov waited outside and reported to the other men when Safiev arrived. All the men resumed their places with Kharabadze sitting on a chair bound to it. Safiev came in and walked toward Kharabadze, and all the men moved in on Safiev. Safiev remained calm and sat down. Defendant heard Safiev say at one point that he knew Kharabadze was in trouble and that was why he agreed to come.

Defendant, Kadamovas, and Markovskis took Kharabadze to Kadamovas's residence. Kadamovas then went back to Designed Water World to get Mikhel, Krylov, and Safiev. When the men returned to the residence, Safiev was taken to the same room in which Umansky and Peckler had been kept. Kharabadze was kept in a separate room. Mikhel, Kadamovas, Krylov, defendant, and Markovskis took turns guarding the men while Mikhel and Kadamovas tried to obtain ransom money for Safiev and Kharabadze.

Mikhel and Kadamovas forced Safiev to call his business associate to arrange for money to be sent. Mikhel and Kadamovas made phone calls to Safiev's business associate informing him that if ransom money was paid, Safiev would be released unharmed. In other phone calls made during the same time period, they inquired about the

33

payment of the ransom money and also reported that Safiev and Kharabadze were still alive.

Additionally, they directed a co-conspirator to send e-mails to the business associate demanding that ransom money be pay within three days and informing the business associate that Safiev and Kharabadze were still alive.  A few days after the two men were abducted, defendant drove Kharabadze and Krylov to Tuolumne County in California. Safiev was driven by Mikhel and Kadamovas in Kadamovas's van.

Mikhel, Kadamovas, and Krylov left and went into the woods with Safiev.  Defendant waited in his car with Kharabadze in a parking lot at a local hotel.  Mikhel, Kadamovas, and Krylov killed Safiev and carried his body in the van to the Stevenot Bridge which spans the New Melones Reservoir where they through the body.

When Mikhel returned to defendant's car, he transferred Kharabadze into the van.  Mikhel told Kharabadze that Safiev was waiting for him at a hotel.  Mikhel, Kadamovas, Krylov, and defendant then left with Kharabadze in the van.  Kadamovas was driving.  A short time later Kadamovas pulled the van off onto a little road and backed into a secluded area.  All four men bound Kharabadze and suffocated him to death.  After Kharabadze died, defendant tied weights to Kharabadze's body.  When defendant did not

34

do this to Mikhel's satisfaction, Mikhel did it himself.

MS. BARRY:  Wait one second.  They just need to catch up.

(Brief pause)

MS. BARRY:  Go ahead.  I'm sorry.  Thank you.

MS. PETERSON:  All four men got back in the car and drove to the Stevenot Bridge back toward the New Melones Reservoir.  They waited for all cars to be out of sight, and it took all four men to throw Kharabadze's body over the side.

On or about October 18th, 2001, Muscatel's body was recovered by the Calaveras County Sheriff's Department. The bodies of Kharabadze and Safiev were recovered on March 17th, 2002, in the New Melones Reservoir near the Stevenot Bridge.  On March 18th, 2002, the bodies of Umansky and Peckler were recovered from the New Melones Reservoir near the Parrots Ferry Road Bridge.  The two bridges are located approximately three miles apart.

With regard to each of the five victims, defendant assisted in intentionally inflicting serious bodily injury that resulted in the death of the victim or intentionally participated in an act contemplating that the life of the victim would be taken or intending that lethal force would be used in connection with the victim, and the victim died as a direct result.  The defendant is not and never has been

a citizen or a national of the United States.

THE COURT:  Mr. Altmanis, is what government counsel has just said true?

THE DEFENDANT:  Yes.

THE COURT:  Is there anything she said that is not true or that is incorrect?

MS. BARRY:  Your Honor, there were some technical variances.  Mr. Altmanis is a very precise person and has in his previous conversations with government been very meticulous about what his perceptions were.  I have explained to him that counsel has condensed a much longer statement into a few pages, so he just wanted the Court to know -- he has expressed to me that he wants the Court to know that there's not every detail in here.

THE COURT:  Right.  My question isn't so much whether this statement contains everything, but rather whether anything it does contain is incorrect.  Is there anything Ms. Peterson said that is not true?

MS. BARRY:  There was a reference to Safiev being taken into the woods.

THE COURT:  Right.

MS. BARRY:  He didn't understand that he was taken into the woods.  He was taken away.

THE COURT:  All right.  And did you observe Mr. Safiev being taken away?

MS. BARRY:  By car.

THE COURT:  Did you observe Mr. Safiev being taken away by car?

THE DEFENDANT:  Yes.

THE COURT:  All right.  You just didn't know that it was into the woods; is that correct?

THE DEFENDANT:  Yes.

THE COURT:  All right.  And with respect to the killing of Mr. Safiev, is the basis of your information about that what you were told by Messrs. Mikhel and Kadamovas and Krylov?

THE DEFENDANT:  Yes.

THE COURT:  Other than that, was there anything Ms. Peterson said that was not correct?

MS. BARRY:  There was a verb used by government counsel, that is, that Kharabadze was grabbed.  Mr. Altmanis wanted to clarify that Mr. Kharabadze was quite calm, and the use of the word "grabbed" to him makes it seem as if there was a struggle there.  All four men did, however, participate in binding him and strangling him, each playing a different role.

THE COURT:  Okay.  We are now talking not about the time when Mr. Kharabadze was detained at the club but when he was actually killed?

MS. BARRY:  That's correct, Your Honor.

37

THE COURT:  All right.  Anything else?  Any other clarifications or corrections?

THE DEFENDANT:  No.

THE COURT:  Now, Ms. Barry, have you had adequate time to discuss this case with your client, including the pleas that he is about to enter?

MS. BARRY:  Yes, Your Honor.

THE COURT:  Have you reviewed the discovery in this case, discussed it with your client, and considered any potential defenses he might have?

MS. BARRY:  Yes, Your Honor.

THE COURT:  Do you believe it's in your client's best interest to enter these guilty pleas?

MS. BARRY:  Yes, Your Honor.

THE COURT:  Do you believe there is a factual basis for each of the guilty pleas?

MS. BARRY:  Yes, Your Honor.

THE COURT:  Do you believe your client is entering each of these pleas freely and voluntarily?

MS. BARRY:  Yes, Your Honor.

THE COURT:  Mr. Altmanis, having in mind everything we have talked about -- the rights you will be giving up, the potential sentence, the mandatory minimum sentence of life imprisonment in the absence of a motion for a reduction and the granting of that motion by the Court,

38

the possibility that the Court could impose a sentence higher than the guideline range -- do you still wish to enter your pleas of guilty to Counts One through Four of this First Superseding Information?

THE DEFENDANT:  Yes.

THE COURT:  All right.  Then I will ask you with respect to Count One, how do you now plead to the charge of conspiracy to take hostages resulting in death in violation of 18 United States Code Section 1203?  Guilty or not guilty?

THE DEFENDANT:  Yes.

THE COURT:  You have to indicate guilty or not guilty.

THE DEFENDANT:  Guilty.

THE COURT:  And with respect to Count Two under the same statute, 18 USC Section 1203, how do you now plead to the charge of hostage taking resulting in the death of Alexander Umansky?  Guilty or not guilty?

THE DEFENDANT:  Guilty.

THE COURT:  And with respect to Count Three under the same statute, the charge of hostage taking resulting in the death of Nick Kharabadze, guilty or not guilty?

THE DEFENDANT:  Guilty.

THE COURT:  With respect to Count Four under the same statute, the charge of hostage taking resulting in the

death of George Safiev, guilty or not guilty?

THE DEFENDANT:  Guilty.

THE COURT:  I do find Mr. Altmanis's pleas each to have a factual basis.  I find the pleas each to have been freely, knowingly, and voluntarily made with a full understanding of the nature of the charges and the consequences of the pleas.  The pleas are accepted and entered.

With respect to Mr. Altmanis, the trial date is vacated.  I am assuming you want a trial date sometime in the future, more distant than less distant.

MS. BARRY:  You mean a sentencing date?

THE COURT:  A sentencing date.  Sorry.

MS. PETERSON:  Yes, Your Honor.

THE COURT:  I honestly don't know what a realistic trial date in the underlying case is.

MS. PETERSON:  Would the Court prefer for us to take this matter up at a later date?

THE COURT:  Yes.  We can just pick a date now that we think will be after the trial.  As the trial goes on, we'll just vacate and move this date.

MS. BARRY:  Your Honor, can we pick a date that's at least nine months to a year out given the fact that, as I understand it, at least one of the defendants does not now have a lawyer.  If this case goes forward and it's a death

40

penalty case, there is a certain lag time involved with Washington, D.C.  It just seems that that would be more realistic.

THE COURT:  You would know better than I, Ms. Peterson, because you know what's planned in the other case.

MS. PETERSON:  Your Honor, we have agreed that perhaps we should set it out for a year.  If for some reason it does go sooner than that, we can move it up if that conforms with the Court's calendar.

THE COURT:  How about June 2nd, 2003?  That's a Monday.

MS. PETERSON:  I think Probation will be very happy with that.

MS. BARRY:  I can guarantee you I don't have anything scheduled for that day, Your Honor.

THE COURT:  That does conform, yes, with my calendar.  Let's say June 2nd, Monday, at 1:30 p.m.

I believe I already said so, but if I have not, I will order the plea agreement filed.

I'm not sure it's necessary, but I'll remind the parties to comply with Federal Rule of Criminal Procedure 32(b) and make sure you get your position papers in promptly.  I am not too concerned about that in this case.

Anything further or anything else that counsel would like on the record or to further clarify?

MS. BARRY:  No.  Thank you, Your Honor.

MS. PETERSON:  No, Your Honor.

THE COURT:  All right.  Mr. Altmanis, have you understood everything that has gone on today?

THE DEFENDANT:  Yes.

THE COURT:  Do you have any questions?

THE DEFENDANT:  No.

THE COURT:  All right.  Thank you very much, counsel.

*(Thereupon, the proceeding was concluded.)*

-oOo-

SHARON SEFFENS, U.S. COURT REPORTER

42

CERTIFICATE


        I hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.


Date:  April 19, 2009




                        Sharon A. Seffens        4/19/09
                        _____
                        SHARON A. SEFFENS, U.S. COURT REPORTER