UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

- - -

THE HONORABLE NORA M. MANELLA, JUDGE PRESIDING

```
UNITED STATES OF AMERICA,  )
               Plaintiff,  )
     vs.                   )
                           )  CR-02-220-NM
IOURI MIKHEL, et al.,      )
               Defendants. )
---------------------------)
```

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Los Angeles, California

July 22, 2002

SHARON A. SEFFENS, RPR
United States Courthouse
411 West 4th Street, Room 1-1053
Santa Ana, CA  92701
(714) 543-0870

APPEARANCES OF COUNSEL:

For the Plaintiff:

JOHN S. GORDON
United States Attorney
RONALD L. CHENG
Assistant United States Attorney
Acting Chief, Criminal Division
SUSAN DEWITT
Assistant United States Attorneys
1100 United States Courthouse
312 North Spring Street
Los Angeles, CA  90012
(213) 894-2434


For Defendant IOURI MIKHEL:

DALE RUBIN
DALE RUBIN LAW OFFICES
2275 Huntington Drive, Suite 902
San Marino, CA  91108
(800) 695-3717

RICHARD M. CALLAHAN, JR.
RICHARD M. CALLAHAN, JR., LAW OFFICES
225 South Lake Avenue, Suite 300
Pasadena, CA  91101
(626) 202-4060

For Defendant PETRO KRYLOV:

GEORGE W. BUEHLER
BUEHLER & KASSABIAN
350 West Colorado Boulevard
Pasadena, CA  91105
(626) 817-5092

For Defendant JURIJUS KADAMOVAS:


MARCIA BREWER
MARCIA J. BREWER APLC
400 Corporate Pointe, Suite 800
Culver City, CA  90230
(310) 670-5325

SHARON SEFFENS, U.S. COURT REPORTER

For Defendant NATALYA SOLOVYEVA:

MICHAEL M. CRAIN
MICHAEL M. CRAIN LAW OFFICES
P.O. Box 3730
Santa Monica, CA  90408
(310) 571-3324

For Defendant ALEKSEJUS MARKOVSKIS:

DOMINIC CANTALUPO
DOMINIC CANTALUPO LAW OFFICES
100 Wilshire Boulevard, Suite 950
Santa Monica, CA  90401-1145
(310) 397-2637

TERRENCE J. BENNETT
TERRENCE J. BENNETT LAW OFFICES
P.O. Box 709
Pasadena, CA  91102-0709
(626) 792-5868

ALSO PRESENT:

Russian Interpreter

4

LOS ANGELES, CALIFORNIA; JULY 22, 2002; P.M. SESSION

THE CLERK:  Item No. 6, CR-02-220-NM, United States of America versus Iouri Mikhel, Jurijus Kadamovas, Petro Krylov, Natalya Solovyeva, and Aleksejus Markovskis.

Counsel.

MS. DEWITT:  Good afternoon, Your Honor.  Susan DeWitt on behalf of the government.

THE COURT:  Good afternoon.

MR. CALLAHAN:  Your Honor, good afternoon. Richard Callahan and Dale Rubin for Mr. Mikhel.  He is present in custody.

THE COURT:  Good afternoon, gentlemen.

MR. BUEHLER:  Good afternoon, Your Honor.  George Buehler for Petro Krylov.

THE COURT:  Good afternoon, Mr. Buehler.

MS. BREWER:  Good afternoon, Your Honor.  Marcia Brewer appearing on behalf of Jurijus Kadamovas.  He is present in court and requires the services of the Russian interpreter.  I have one inquiry.

THE COURT:  Could we get the other appearances first?

MS. BREWER:  Oh, I'm sorry.  My co-counsel I don't think received notice from the Court, and I unfortunately didn't call him until this morning.  That's my problem, but I am just inquiring if all notice are being sent to all

counsel.

THE COURT:  Apparently what happened is the address that we had for him was inaccurate, and that was returned, so my courtroom deputy just advised me that she called him and said that she would send it out again.  So I think we now have his current address.

MS. BREWER:  So I don't think he's going to be here this afternoon, but that's Richard Lasting for the record.

THE COURT:  All right.  Thank you.

MR. BENNETT:  Good afternoon, Your Honor.  Terrence Bennett.  I'm co-counsel with Mr. Cantalupo for Mr. Markovskis.

THE COURT:  Good afternoon, Mr. Bennett.

MR. CRAIN:  Good afternoon, Your Honor.  Michael Crain for Natalya Solovyeva.  Mr. Amdur is before Judge Morrow at this time.  He may make it before the end of the hearing, but I don't think so.

THE COURT:  All right.  Well, we're here largely on a ministerial matter.  The depositions of Mr. Agueev and Mr. Liapine I gather have been set for the end of the month, first of next month.

MS. DEWITT:  For August 1st and 2nd, Your Honor.

THE COURT:  All right.  And the only issue is the handling of objections; is that correct?

6

MS. BREWER:  That was the issue that I raised.  I have another issue to address with the Court at the end of the hearing that pertains to my client.

THE COURT:  As far as I'm concerned, what makes the most sense is the parties just simply reserve all objections except for those as to the form of the question, and all objections are reserved.  Nobody is going to waive any rights to object later on to the admission of testimony if the belief is that it was hearsay or in some other way objectionable.

MS. BREWER:  I think that counsel assume that that would have happened, Your Honor, but I think logistically what we're concerned about is the fact that if the government is allowed to ask questions without any interruptions for objections, that there's going to be a dialogue and there's going to be answers to questions that if we object to part of them, I don't know how we're going to do this, I mean, in the videotape.  What we may end up doing is that the Court may rule on the objections and say, all right, the first part of the answer is fine; the second part of the answer is --

THE COURT:  We'll jump off that bridge when we get to it.  I mean, if worse comes to worse, deposition testimony can be read into the record.  A, I just don't see any way around that; B, I don't see any reason that the

depositions should degenerate into a series of objections back and forth when it's certainly a lot easier and more efficient to let the witness just answer the question, and you can later raise any objections you want.  And if the government is stuck with an answer that it's going to have to figure out how to edit the tape, well, that will be the government's problem.

MS. BREWER:  All right.  Then how does the Court propose that we voice our objections to the Court?  By collectively watching the videotape here in court and making the objections and the Court ruling on them as we go along, or a variety?

THE COURT:  It won't come up until they're ready to be introduced at trial.

MS. DEWITT:  Well, Your Honor, also just for the record, we do intend to have a court reporter present.  So, I mean, typically when this has happened to me in the past, the government will give notice as to which portions of the deposition they wish to introduce.  Defense counsel can indicate what, if any, portions they think are objectionable, and the Court just looks at the transcript.  So it's easiest for everyone.

THE COURT:  I think that's right.

MS. BREWER:  I think I am -- if I am speaking out of turn for anybody, I invite counsel to jump in here with

8

me.  I am assuming that since we're videotaping this, that the government intends to play the videotape at the time at trial if they intend to use either one of these as witnesses.

THE COURT:  Maybe they do or maybe they don't. I'm certainly not going to make them commit to it at this point.

MS. BREWER:  I know that.  I'm not asking the Court to.  But I'm just saying that if they do intend to use the videotape and we do have objections to portions of the answers, I guess, like you said, it's the government's problem after the Court makes the ruling to edit the videotape to remove any objectionable part.

THE COURT:  If part of an answer is objected to and the Court deems that objection sustainable, then that's right.  That will be the government's problem.

MS. BREWER:  Okay.  Well, we still would like to go on record as being able to make the objection not individually but collectively.  If one objection is made by one counsel, it's deemed made by all.

THE COURT:  All objections are reserved.  You don't waive any objections, so you don't have to say anything, and the record will assume that you object to everything for every possible reason with the exception as to the form of the question.

MS. BREWER:  All right.

MR. BENNETT:  So Your Honor is saying with the exception as to the form of the question?

THE COURT:  Right.  If it's compound, object then.

MR. BENNETT:  Okay.  So form objections should be made at the time.

THE COURT:  Yes.  All right, anything further? Ms. Brewer, there was something else you wanted to mention?

MS. DEWITT:  Your Honor, two logistical issues I wanted to raise.  One of them is it's absolutely critical even as to the form-of-the-question objections that everybody understand they have to wait until -- that they speak one at a time.

The problems that I have had in the past with these types of depositions where we have translators is that they try to make the objection while the translator is still translating, and you have multiple people talking at the same time.  I will endeavor to do that; the government will endeavor to do that.  We will ask the translator to only translate and then stop so that everybody knows we have to wait until nobody else is talking before you start talking. Everybody has to give everybody a chance to make that particular objection.

The second issue is -- and I assume nobody has any problem with that, but it's been a problem in the past, so I

10

wanted to raise it.  The second issue is I'm not sure logistically how we order the defendants to the depositions. We have arranged to have use of the secured courtroom over at Roybal, which is Courtroom 890.  We have arranged for a videographer to be there.  We have arranged for a court reporter to be there.

We can make arrangements ourselves to have the agents bring up the two witnesses.  But normally you would have, I guess, a writ or something to bring the defendants up to the deposition, and I am not sure --

THE COURT:  Well, they're not defendants anymore are they?  They're just material witnesses.

MS. DEWITT:  I'm talking about their clients.

THE COURT:  Okay.

MS. DEWITT:  That's why -- we can take care of the witnesses -- the material witnesses through the marshals. But the marshals weren't sure exactly what would be necessary in order to get the defendants to be present at the depositions.  As far as I understood, none of them had waived their right to be present.

THE COURT:  Well, I assume the marshals are going to have to accompany them separately from anybody else going into any other courtroom.  My courtroom deputy will check with the marshals and see what makes the most sense. Certainly your proposal seems a reasonable alternative.

11

MS. DEWITT:  And she will just let me know if I need to do anything else?

THE COURT:  Yes.

MS. DEWITT:  Thank you.

THE COURT:  All right, thank you.

Anything further?

MS. BREWER:  There is a separatee order between the various defendants, and myself and Mr. Callahan are requesting that the separatee order be lifted as to Mr. Kadamovas and Mr. Mikhel.

I have discussed this with government's counsel, and they have refused to do that.  I'm requesting that the Court order that that separatee order be lifted between those two gentlemen.  They have a right -- my client has a right to prepare his defense, and there has been allegations made in the statements by Mr. Altmanis about what actions were taken by my client and Mr. Mikhel.

Mr. Mikhel and my client had a business relationship prior to their arrest in this case, so they need to discuss with one another the allegations against them and the documents that are being provided to the Court in discovery.

A second reason for this request is that my client does not read or speak English.  Mr. Mikhel does, and he can help my client to look at some of the documents and review

them with him.  Because Mr. Mikhel reads English, he can then translate them into Russian for my client.

Mr. Mikhel and I -- when I was talking to my client, Mr. Mikhel commented that the interpretation that he's getting in Russian is not -- he doesn't think it's a good one.  So that would be a benefit, too, because that will save a tremendous amount of money in the translation.

Otherwise, I am going to have to come to the Court and have almost every single document translated from English to Russian for my client.  With him being able to work with Mr. Mikhel may save a lot of those documents being translated because it may turn out that a lot of them are not that important to my client.

THE COURT:  Ms. DeWitt.

MS. DEWITT:  Your Honor, there are several reasons why we oppose this request.  The first and foremost is because of security issues.  Obviously just the nature of the charges is such that that creates a security issue.  We have had ongoing security concerns with respect to outstanding witnesses and witnesses who are cooperating in this case, and that continues to be a concern.

THE COURT:  Are you talking about collusion between Mr. Mikhel and Mr. Kadamovas?

MS. DEWITT:  I'm talking about collusion not only with respect to the defendants but also collusion with

13

respect to the possible press against other witnesses.  In addition, Your Honor, the issue raised by Ms. Brewer as to them preparing their defense, certainly both have defense counsel, and any communication that's necessary with respect to preparing the defense can be done through counsel.

With respect to translation of documents, quite frankly I think it would be in everyone's interest if they had a problem with the translations to get adequate and accurate translations that don't depend upon a co-defendant. I don't think cost should be a concern here for somebody who is facing the possible penalties that are at issue here.  If he needs better translations, we should get him the translations.

THE COURT:  All right, anything further, Ms. Brewer?

MR. CALLAHAN:  Your Honor, the one thing I was going to add is --

THE COURT:  This is on the same issue, I take it.

MR. CALLAHAN:  Yes.  I am standing in for her temporarily until she gets her voice back.  One of the things I'm most concerned about -- and it seems to be a newer practice of the U.S. Attorney's Office -- is to separate defendants to avoid what they call collusion in order to somehow put a defense together by meeting together.

Ms. DeWitt is correct that counsel can meet

separately and discuss a joint defense, but it does make it much more difficult. If the Court consider the situation where the government is not allowed to have its agents talk to each other -- it puts the defendants in a similar position to the extent they have a joint defense.

THE COURT: But the agents and the defendants are in a considerably different posture as we go into a criminal trial.

MR. CALLAHAN: I would say even if they remain separatees upstairs, MDC will not allow us even being present downstairs and have them meet with us, so that if collusion is the concern of the U.S. Attorney's Office, Ms. Brewer and I could be sitting down there in the visiting room and talk to them directly and be there as officers of the court, but MDC will not even allow that. I do think that we should be entitled to have some situation exist to where we can sit down collectively with our clients at one time even if they're still deemed separatees in the housing unit upstairs.

THE COURT: Anything further, Ms. Brewer?

MS. BREWER: Yes. I would join Mr. Callahan in that request as well. It really limits a client's ability to discuss the statements made by this other cooperating witness between the two of them who were around this person supposedly and discuss with them and come up with

information that they both might work on together that they could give counsel to do investigation on.  I really think that this is a violation of my client's right to prepare for trial.  In a sense, it's a violation of his right to effective assistance of counsel.

The government assumes collusion.  We don't know -- that's an assumption that I think is a wrong assumption. I don't think you can assume that these two people are going to collude together to come up with some kind of story. They need to go over the facts; they need to go over the evidence; they need to see what they can come up with to assist us in their meeting together, the few times that they might meet together, because they're on different units. They can't just talk to each other because they will not be in the same unit.  So they need to come together in the library occasionally, and that's not going to happen that often for them, based upon the time that each unit can use the library.

The threats against the other witnesses, I don't quite understand that position.  They can make threats against the witnesses regardless of whether they meet together or not.  If they wanted to make threats against witnesses, they could do that individually.  They don't need to meet together to do that.

Security issues, that's for the MDC to decide

16

whether or not there are security issues.  They are not housed on 8 North, and if they were a high security risk, they would be on 8 North.  For example, all the --

THE COURT:  I don't need to have a lengthy --

MS. BREWER:  Okay.  They are not on 8 North, and they're allowed to come down to the visiting room.  So that tells me from my experience with MDC that they are not security risks to MDC.

THE COURT:  Ms. DeWitt, did you want to respond to Mr. Callahan's argument with respect to meetings with counsel?

MS. DEWITT:  No, Your Honor.  I just don't believe that there is a right that they have to meet together, the two defendants.  And I will submit that there's security issues and that there is no countervailing justification to have them meet together personally.

THE COURT:  Okay.  I am not going do modify the separatee order at this time.  I think the government has some legitimate concerns.  To the extent the concerns raised by Ms. Brewer and Mr. Callahan have legitimacy, I think they can be satisfied through the assistance of counsel and through the assistance of competent interpreters and translators.

Anything further?

MR. CALLAHAN:  Nothing further, Your Honor.

MS. BREWER:  Nothing further, Your Honor.

THE COURT:  All right.  Thank you very much, Counsel.

I think we are next getting together when, or do we have a date?

MS. BREWER:  August 26th.

THE COURT:  Thank you very much.

Ms. DeWitt, how are we on speedy trial orders?

MS. DEWITT:  I think we have one outstanding to you.

THE COURT:  Perhaps.

MS. DEWITT:  I will check when I get back to my office.  I thought one was submitted while I was out.  If has not been, I will make sure it is taken care of.

THE COURT:  Well, let me tell you.  The T-max is now October 9th, according to the last order which was lodged July 11th and signed the 12th, so I think we're okay.

MS. DEWITT:  And that's a T-max based upon our last hearing, not on the last order that you signed?

THE COURT:  This was based on a stipulation filed by all parties.  This was filed -- it was lodged July 11th and filed July 12th.

MS. DEWITT:  That's when I was on vacation.  So we should be up to date on all the speedy trial orders.

THE COURT:  Okay.  And we now have a T-max of

18

October 9th, just for your records.

All right.  Thank you very much.

*(Thereupon, the proceeding was concluded.)*

-oOo-

SHARON SEFFENS, U.S. COURT REPORTER

19

CERTIFICATE


I hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.


Date:  April 19, 2009



Sharon A. Seffens        4/19/09
_____
SHARON A. SEFFENS, U.S. COURT REPORTER