UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

HONORABLE S. JAMES OTERO, JUDGE PRESIDING

UNITED STATES OF AMERICA, )
)
)
)
                    Plaintiff,    )
)
)
)
        Vs.                       )   No. CR 02-220 (B) SJO
)
)
)
PETRO KRYLOV,                     )
)
)
)
                    Defendant.    )
)
_____  )

REPORTER'S TRANSCRIPT OF TRIAL PROCEEDINGS

LOS ANGELES, CALIFORNIA

FRIDAY, APRIL 20, 2007

LEANDRA AMBER, CSR 12070, RPR
OFFICIAL U.S. DISTRICT COURT REPORTER
312 NORTH SPRING STREET, # 442
LOS ANGELES, CALIFORNIA 90012
(213) 613-0179

UNITED STATES DISTRICT COURT

**A P P E A R A N C E S**


**IN BEHALF OF THE PLAINTIFF,**
**UNITED STATES OF AMERICA:**        U.S. DEPARTMENT OF JUSTICE
                                    U.S. ATTORNEY'S OFFICE
                                    BY:  SUSAN J. DeWITT, AUSA
                                         MR. DUGDALE, AUSA
                                         MS. MEYER, AUSA
                                    312 NORTH SPRING STREET
                                    12TH FLOOR
                                    LOS ANGELES, CALIFORNIA 90012
                                    (213) 894-4496
                                    susan.dewitt@usdoj.gov
                                    robert.dugdale@usdoj.gov
                                    kim.meyer@usdoj.gov


**IN BEHALF OF THE DEFENDANT,**     LAW OFFICES OF GEORGE W.
**PETRO KRYLOV:**                   BUEHLER
                                    BY:  GEORGE W. BUEHLER, ESQ.
                                    350 SOUTH GRAND AVENUE
                                    SUITE 3900
                                    LOS ANGELES, CALIFORNIA 90071
                                    (213) 625-1600
                                    buehler@geragos.com


                                    LAW OFFICES OF DAVID R. EVANS
                                    BY:  DAVID R. EVANS, ESQ.
                                    600 SOUTH LAKE AVENUE
                                    SUITE 506
                                    PASADENA, CALIFORNIA 91106
                                    (626) 432-5100
                                    dre@drelaw.org


**ALSO APPEARING:**
        SOPHIA VELEN, COURT-CERTIFIED RUSSIAN INTERPRETER
        VARVARA OLSON, COURT-CERTIFIED RUSSIAN INTERPRETER
        JAMES S. DAVIDSON, FBI SPECIAL AGENT
        LOUIS PEREZ, FBI SPECIAL AGENT
        SCARLET NERAD, MITIGATION SPECIALIST

UNITED STATES DISTRICT COURT

3

**I N D E X**

| | PAGE |
| --- | --- |
| JURY NOTE | 4 |

UNITED STATES DISTRICT COURT

4

LOS ANGELES, CALIFORNIA; FRIDAY, APRIL 20, 2007; 8:47 A.M.

-o0o-

(Out of the presence of the jury.)

THE CLERK:  Please remain seated and come to order. This Court is again in session.

THE COURT:  Okay.  We're back on the record on United States versus Krylov.  The defendant is present with the interpreters and counsel.

And the Government is present.

Final matters:  We have the jury instructions, a copy for each juror.  I've informed that everyone has reviewed the set or each set to be given to each juror, and they're approved by all counsel.  We have a special verdict form that the Court has reviewed, reviewed by all counsel, and is approved by everyone as I understand it.  It is agreed that the second superseding indictment as redacted would be given to the jury.  That's been approved by all counsel.

The Government has prepared a -- an exhibit list in binder form to be given to the jury to assist the jury in reviewing all the exhibits that have been received into evidence.  Does the defendant have an exhibit list?

THE CLERK:  It's there, judge.  I attached it there.

THE COURT:  Is it included inside?

THE CLERK:  It's right here.

UNITED STATES DISTRICT COURT

(An off-the-record discussion was held.)

THE COURT:  And the defendant's or defense has also provided a -- an exhibit list to assist the jury in reviewing the defense exhibits received into evidence.  In terms of the exhibits, we've discussed yesterday that certain of the exhibits would not be provided to the jury including the firearms and biohazardous material.

I'll inform the jury of that.  And if there's any exhibit not given to them, they can request it and review that exhibit here in open court with everyone present.

We've made arrangements to have the -- because the exhibits cannot -- do not fit into the jury room with all the jurors there, we have a -- an annex or auxiliary room next to the jury room where the exhibits will be placed, and they can review the exhibits in the annex.  When they review the exhibits in the annex, they will be accompanied by the bailiff.

Are there any other issues to discuss?

MR. DUGDALE:  Just a couple, your Honor.  Just to give the Court a heads up concerning one issue with the exhibits, it's probably not completely pertinent right now.  This is kind of a subset, and there were some additions to the exhibits in the Mikhel case.

What we did in the Mikhel case was take custody of all the exhibits with the understanding that we would reunite

them with the exhibits in this case when we were done so the Court -- the clerk of the Court could keep custody of those which is important because they're now facing a death sentence.  So we want to make sure they're kept in a facility that the clerk of the Court has custody over.

So whenever we conclude with the case, just to let the Court know, we have a whole slew of other exhibits that we will reunite them and have the clerk of the Court pick them up wherever it will be.  Here or --

THE COURT:  But that's an internal matter, an internal administrative matter, not for the jury.

MR. DUGDALE:  Correct.  I don't think that has anything to do with what we're doing today, but I just wanted to give the Court a heads up with that.

Two other issues:  There's one exhibit that's a stipulation that needs to be retyped.  It's a defense exhibit.  I will have that to the Court in five minutes when we are done here, and I will give that to Mr. Cruz to bring back to the jury.

Two other quick matters concerning the penalty phase in this trial, the possible penalty phase, one issue concerning some witnesses:  There's one Government witness that this effects and I understand several defense witnesses. These are witnesses who are overseas and are unable to come to testify for one reason or another.

The Government witness is George Safiev's sister, who resides in Moscow, who has a severely ill child and who is unable to attend the trial.  I've discussed this with defense counsel, and this applies to their witness as well.  As far as an agreement to allow them -- these witnesses to testify by videoconferencing -- and the parties will be everything to arrange this as far as having the facilities overseas and the facilities set up here, but of course we need the Court's blessings for this to happen.  But again this is something that the parties agreed to that there is not a confrontation clause issue with allowing the testimony to proceed in this way.

There wouldn't be for the Government's witness in any event because the death penalty statute provides that you can prove victim impact not only through testimony but through impact statements so you can have statements.  So there shouldn't be a problem with the videoconference in light of that fact.

But I wanted to give the Court a heads up on that issue.  We will make all the arrangements.  It won't affect the scheduling of the trial in any way, but we're working very diligently on that right now to make sure that it goes off without any technical hitch and it will fit within the Court's schedule when this happens.

THE COURT:  Well, if it's agreeable to the

Government and to defense counsel and Mr. Krylov, if it will assist Mr. Krylov in terms of with presenting his witnesses also, it makes sense to the Court.  So I'll just leave it up to counsel.

MR. DUGDALE:  Thank you, your Honor.

The second issue is -- I understand we're starting the penalty phase right away if there is a conviction, and it is for a capital offense.  I'm going to start preparing potential jury instructions for that right now.  In order to do that, I'm going to need a list from the defense counsel regarding whatever their statutory mitigating factors are that they intend to prove and nonstatutory mitigating factors that they intend to prove.  And I would just ask that such a list be provided as soon as possible.

I understand that -- I'm not asking for something that's binding.  I'm just asking for something and that will allow me to help me prepare the jury instructions.

MR. EVANS:  Your Honor, I'll need to confer with him this afternoon to provide him with everything that we've got.  I obviously don't have it with me, but we've been working on that without -- by the end of the day he'll have everything and a rough draft earlier than that.

THE COURT:  Okay.  So by the end of today?  Is that the --

MR. DUGDALE:  That's fine, your Honor.  I'm sorry.

I can have jury instructions -- proposed jury instructions for the penalty phase filed by Monday morning then.

THE COURT:  Is there anything further?  If we have the jury -- do we have everyone present?

THE CLERK:  I don't know.

MS. DeWITT:  Your Honor, if you could just advise the jury because I think this jury seems to be very detail oriented, the exhibit list that we provided to --

THE COURT:  Certain of them can also read lips.  So remember that.

MS. DeWITT:  And body language apparently.

THE COURT:  And body language.

MS. DeWITT:  The exhibit list -- the way that we prepared it is that the entire exhibit list is in a binder. In the front pocket is a separate list that we prepared of the biohazard items.  So if they get to an item and it's missing, can you just explain to them that it's probably on that list or on the list on the back so they know that there's a separate list that's prepared for them that -- that's the guns.  One of them is the guns and the firearms, and the other list is the biohazards.

The other thing is -- is that there's certain items that are so large that we put them on a separate cart.  You can see that they're on the end down here -- on this end cart down here.  So if they're looking for an exhibit and they

can't find it, it's because it's either a biohazard, a gun, or it's a large item and was placed on a different cart, and it's therefore out of order because of that.

THE COURT:  I see the list that has been identified as "Biohazard Exhibits."  Is there a -- is there a list that --

MS. DeWITT:  It's in the -- one's in the front pocket, and one is in the back pocket, your Honor.

THE COURT:  The weapons are identified in a different list?

MS. DeWITT:  Yes.

THE COURT:  Okay.  And I would just ask counsel for the Government if they have reviewed all of the exhibits to make sure that all the biohazard exhibits have been so identified and have been removed from the exhibits that will be placed in the room for the jury.

MS. DeWITT:  That's correct, your Honor.

THE COURT:  You've done a final check to make sure that's been done?

MS. DeWITT:  We've done a final check.  And Miss --

MS. NERAD:  "Nerad."

MS. DeWITT:  Nerad --

I'm sorry.

-- spent several hours last night going through every single exhibit from beginning to end to make sure that

this set is appropriate to go back to the jury.

THE COURT:  Okay.

THE CLERK:  We're short.

THE COURT:  I'm sorry.  We're short a juror.

THE CLERK:  We're short four jurors right now.

MS. DeWITT:  And one last thing, your Honor.  I don't know whether there's any reason why the jury would move these carts but if you could just warn them that these carts are very -- even though we tried, they're a little bit precarious because of the weight frankly.  So they should be very careful because we've had them spill at least twice today.

THE COURT:  Okay.

MS. DeWITT:  We'll make an effort to put them up against a wall and make sure that they're stable.  We've actually switched them out to try to get better carts.

THE COURT:  And maybe it probably would be a good idea for defense counsel and the Government to view the room that we've set up for -- for the exhibits to make sure that there's nothing in that room that anyone would consider to be prejudicial to their respective side.

MS. DeWITT:  I'm not sure where they want us to put the defense exhibits.  They're right here but --

MR. EVANS:  Presumably it should be on something separate if that's possible.  I would think the setter of

deliberations would be appropriate.  They're too issues two your Honor, that I have.

THE COURT:  Yes.

MR. EVANS:  One is I'm not -- we had -- we've talked about this several times.  It -- was Exhibit 2053 ever finished?  I think that's really directed to Mr. Dugdale. That's Mr. --

MR. DUGDALE:  That's the one that's missing.  You will have that five minutes after --

MR. EVANS:  Okay.  And that needs to be inserted. That was a stipulation that was read.  It was relatively minor but should be included.  Secondly I don't know what the Court's policy is, but the charges that we're submitting, as the Court noted, are simply a redacted version of the indictment.

Does the Court give -- I know it was included in the general instructions, but in some instruction saying that these were merely the charges again when it goes to the jury or --

THE COURT:  I -- I can inform the jury that they'll get a copy of the redacted indictment and again advise them that the indictment is not evidence of anything.

MR. EVANS:  Thank you.

Thank you, your Honor.  I think we're ready.

THE CLERK:  Should I -- at this moment may I take

counsel and show them where the --

THE COURT:  Yes.

THE CLERK:  All right.

THE COURT:  We'll have the -- counsel will inspect the room where the exhibits will be placed.

THE CLERK:  And you would just follow me, counsel, please.

MR. EVANS:  May I go through the well, your Honor?

THE COURT:  Please.  Go ahead.

MS. DeWITT:  And another thing, your Honor, you may want to tell the jury -- I don't know that you want to encourage them, but if there's anything that's an audio or anything -- that's another thing that they would have to come back into court to have played.

THE COURT:  That's a good point.

(Whereupon, at 8:57 a.m., all counsel exited the courtroom.)

(A break was taken at this time.)

(Out of the presence of the jury.)

THE COURT:  Let's go on the record.

We're back on the record.  Counsel has had an opportunity to review the room where the exhibits will be placed.  And are there any comments?

MR. BUEHLER:  Your Honor, one concern we have is the -- placing the exhibits in a separate room could really

slow down the deliberations and inhibit the jury's ready access to the jurors.  They might decide not to look at something simply because they have to go through -- simply having someone going in and bringing them in.  And there's so many exhibits.

So we discussed the possibilities.  And apparently it is possible that many of the exhibits -- most of them can be placed in the room where the jurors are actually deliberating.  That seems to be far preferable.

THE COURT:  That's a joint request?  Government requests?

MR. DUGDALE:  The Government has no problem with that.

THE COURT:  Then we'll place all of the exhibits in the jury room.

MR. BUEHLER:  Thank you.

THE COURT:  With the exception of the weapons and the biohazard exhibits.

MS. DeWITT:  And, your Honor, if they don't all fit, we also don't have any objection with the what I've identified as the large ones which is on the last cart other than the one -- the one bail bucket which we stole from the U.S. Postal Service.  That was a joke.

Those could go -- those could go in the room in the other room if they for some reason they don't fit because

of --

THE COURT:  We'll provide all the exhibits in the jury room.

I'll be unavailable on Monday after 2:00 o'clock.

I'm informed by the clerk that Juror Number 29 took his notebook home last night and typed up all his notes and has placed his notes in a binder.  Does -- is -- is there anyone requesting that the Court inquire from that juror?

MR. DUGDALE:  No, your Honor.

MR. EVANS:  Your Honor, I think the Court has to, and I apologize.  I'm sorry.  I think it's necessary.  To see if there's been any conversation about that.

THE COURT:  Okay.  I have his -- I have his notebooks.  He has seven notebooks that he relied on to type up his notes.

Let's bring Juror Number 29 in, please.

(Whereupon, at 9:08 a.m., Juror Number 29 entered the courtroom.)

THE COURT:  Okay.  We have Juror Number 29 present in the court with counsel, the defense, and the interpreters present.  None of the other jurors are present.

First, I've been informed that you took your notebooks home last night and that you, I guess, used your word processor to type up the notes and place them into a binder.

JUROR NUMBER 29:  Yes, sir.  It was over the last weekend.

THE COURT:  Pardon?

JUROR NUMBER 29:  It was over the last weekend.  It wasn't just last night.

THE COURT:  Okay.  How many days or --

JUROR NUMBER 29:  I had them over the weekend, sir.

THE COURT:  This last weekend?

JUROR NUMBER 29:  Yes, sir.

THE COURT:  And could you explain the process of what you did.

JUROR NUMBER 29:  Yes, sir.  When I took them home, I did not know that you said that not taking the notebooks home --

THE COURT:  The jury was advised at the beginning --

JUROR NUMBER 29:  My apologies.

THE COURT:  -- to leave the notebooks in court each and every day when they left the Court.

JUROR NUMBER 29:  And I missed that, sir.  My apologies.  I have -- I have terrible handwriting, and I wanted to make sure that anything I did in this Court on behalf of the defendant and on behalf of the Government was the absolute right thing to do according to me and what I felt and what I saw.

I could not read my notes all the time because I was writing so fast and I do have a terrible handwriting.  I heard yesterday one of the people in the court or in the jury room said something that we weren't supposed to take them home, and that's why I brought it to your attention.

Whatever decision is made in that room by me, your Honor, one side or the other will not like it.  And I want to be absolutely sure that everything I've heard, done, seen, I make the best decision.  I've never taken this lightly.  I've never tried to shirk my duty in this Court or to the defendant.

If I have done something wrong by disobeying this order, I extremely apologize, but I'm giving you 100 percent the truth of what I have done and the way I feel according to this Court and what I've heard in this Court.

THE COURT:  When you typed up your notes, did you -- did you rely solely on the notebooks and the notes that you took in court?

JUROR NUMBER 29:  Correct, sir.  Yes.

THE COURT:  Did you do any type of independent research regarding any of the notes that you placed in the notebook that you used to take notes in the courtroom?

JUROR NUMBER 29:  No, sir.

THE COURT:  Did you discuss your notes with any other person?

JUROR NUMBER 29:  Only God, sir.

THE COURT:  Did you show your notes --

JUROR NUMBER 29:  No, sir.

THE COURT:  -- to anyone?

JUROR NUMBER 29:  No, sir.

THE COURT:  Did anyone have access to your notes?

JUROR NUMBER 29:  No, sir.  I left them in my safe when I did not have them.  I am the only one in my family that has the combination to that safe.

THE COURT:  Are the notes in -- in the note -- in the typed-up version verbatim from the notes in the notebook?

JUROR NUMBER 29:  99.9 percent, sir.

THE COURT:  Okay.  Let me just ask counsel if anyone has any additional inquiry.

MR. DUGDALE:  Nothing from the Government, your Honor.  Thank you.

THE COURT:  Mr. Buehler?  Mr. Evans?

MR. BUEHLER:  No, your Honor.  Thank you.

THE COURT:  Mr. Evans, do you have anything?

MR. EVANS:  Nothing, your Honor.

THE COURT:  Okay.  The Court is satisfied that the integrity of the process has been maintained.  And what we'll do is to make sure -- make sure --

Well, let me have some additional discussions with counsel, but I want to make sure that we all -- that as part

of the record we have the typed-up version in conjunction with the notes that you've taken.

JUROR NUMBER 29:  Yes, sir.  Again my apologies, sir, for any impropriety.

MR. DUGDALE:  Your Honor, I'm sorry.  Well, we can discuss this --

THE COURT:  Go ahead.

(Whereupon, at 9:13 a.m., Juror Number 29 exited the courtroom.)

MR. DUGDALE:  I think the only thing we should ask the juror perhaps is to delete whatever information -- whatever information is on his computer now that he put on there and took outside the Court.  So something that he has -- his private thoughts about this are not roaming around somewhere else.

Government's completely satisfied with the inquiry.  I guess the only other thing that wasn't asked but is sort of implicit is -- in what he said is that he didn't discuss this with anybody around the house when he was working in the house on this case -- his wife or kids or anybody else like that.

THE COURT:  I think we should -- yeah, we should make sure that the notes are -- are erased -- the ones on his computer.

MR. DUGDALE:  Right.  And then whatever he has here

should obviously be put under seal.  Neither party should have access to that information.

THE COURT:  So the question I have is is there anyone objects -- he spent a lot of time typing up his notes.  Is there anyone that objects to having him utilize his typed notes?

MR. EVANS:  Could I confer with counsel, your Honor?

THE COURT:  Yes.

(An off-the-record discussion was held.)

THE COURT:  Have you -- Mr. Evans, Mr. Buehler, have you -- let's go -- we're back on the record on Krylov United States versus Krylov.  The -- the counsel for both sides have had further opportunities to consult and discuss the matter.  What do you wish the Court to do?

MR. DUGDALE:  Well, I haven't talked to defense counsel about this, but Miss DeWitt brought up an interesting point.  And that is the other jurors who didn't take their notes home and type them up and everything else in this process of deliberations may place more weight on what this jury says about what occurred because he's sitting there with a notebook of typed notes that he shouldn't have created in the first place.

So the solution may be not to allow him to bring back his typed notes that he shouldn't have crease created in

the first place because they could potentially give some undue influence because they don't have typed notes because they weren't ever supposed to create them.

MR. EVANS:  Or alternatively allow the others to type up their notes if they wish to do so.

THE COURT:  No.  We're not going to -- we're not going to do that.

MR. DUGDALE:  I can give them my notes.

THE COURT:  So the -- there are a couple of options here.  We can -- we can allow the juror to use his the notes taken in court and his typed notes and take them into the jury room and rely on those notes in the process of deliberations.

We can exclude the notebook, the typed notes, allow the juror to take his personal notes taken in the courtroom only, and he can use that to refresh his memory if needed.

There's an instruction that advises the jury they're not to be unduly influenced by their notes, and I could reemphasize or make reference to that -- to that instruction.

The other alternative is to excuse the juror and have an alternate substitute in.

MR. EVANS:  Well, your Honor --

THE COURT:  I think this juror is attempting to do the right thing.  That's -- I don't think he did anything

improper.  He was trying to do the right thing.  He's taken the case very seriously, and that's what he was attempting to do -- simply do the right thing.

MR. EVANS:  Your Honor, I don't think either party is suggesting that this juror be excused.  I think the Court is correct in its assessment.  I think if the -- let me confer with counsel one more time.

MR. BUEHLER:  This will just be briefly.

MR. EVANS:  I apologize to the Court.

(An off-the-record discussion was held.)

MR. EVANS:  Your Honor, I think I can probably concur with Miss DeWitt that the -- her consideration is probably correct that if somebody walks in -- one person with typed notes -- that's going to be the frame of reference for everybody.  But I think if -- he's not given his notes back, having spent this much time, I think the Court should again instruct on, as the Court considered, or suggested with the role of notes.

THE COURT:  Yes.  It's Instruction Number 59: "Some of you have taken notes during trial.  Whether or not took notes, you should rely on your own memory of what was said.  Notes are only to assist your memory.  You should not be overly influenced by the notes."

I can reread that instruction to everyone in the courtroom -- all the jurors in the court when we place them

in the jury box.

I think I agree that his typed notes should not be placed in the jury room to -- for -- so that he cannot rely on those types notes to assist him, his memory.  Agreed?  Everyone agrees?

MR. DUGDALE:  That's fine.  With the instruction that's fine.  Thank you.

MR. BUEHLER:  Your Honor, I think the Court should -- so that he doesn't feel punished or, you know, like -- like the Court's disapproving or the parties are disapproving of the careful attention he's paid, that the Court should simply, you know, say it -- that it's okay that he's given that level of attention, but it simply does not comport with the rules that he has done this, and we need to exclude the typed notes.

THE COURT:  And do that in open court with everyone present?  All other jurors present?

MR. DUGDALE:  I would just do it with him coming back out here.  I think what both parties are concerned about too is neither party wants to have it put on them that we have somehow punished this guy for spending all this time doing this and are trying to deprive him some sort of information for some benefit that either side may have.

So I think Mr. Buehler's idea is correct.  If the Court will shoulder the blame for this decision -- it is your

decision; so it is appropriate -- just to say that you appreciate and the parties appreciate the attention he's paid here and the time he's put into this, but "This doesn't comport with the rules; so I can't let you take that back." I think that's all that needs to be said.

MR. BUEHLER:  I don't want him to go back thinking, "Well, I'm not supposed to try that hard; so I'm not going to put the energy into the deliberations that I was planning to."

THE COURT:  Well, there's an additional question that I will ask him, and that is whether his typed notes reflect any -- any impressions or conclusions regarding the evidence and witnesses.  I think that may be an important inquiry.  So let's bring him back.

(Whereupon, at 9:25 a.m., Juror Number 29 entered the courtroom.)

THE COURT:  Okay.  We're back on the record with Juror Number 29.

And, sir, I think everyone appreciates that you've taken this -- your role as a juror very seriously, as you should, and that you were attempting to do the right thing in taking your notes home and typing up your notes to assist you in the deliberation process.

I have another question:  Do the typed notes reflect any impressions or conclusions that you have arrived

at, initial impressions and conclusions that you have arrived at, in assessing any of the evidence or physical evidence or the witnesses?

JUROR NUMBER 29:  The only impressions that are in there, sir, are the ones I took --

THE COURT:  Don't -- don't discuss what those impressions are.  I just want to know if the notes reflect that you have arrived at impressions or conclusions.

JUROR NUMBER 29:  No, no impressions positive and no conclusion positive, sir.  Just things that I've made notes of here in court.

THE COURT:  I understand that you didn't arrive at a positive or a final conclusion or impression.  Did you arrive at an initial impression or conclusion, and is that reflected in the notes?

JUROR NUMBER 29:  There is -- no.

THE COURT:  You have no impressions or conclusions --

JUROR NUMBER 29:  There are some my own self thoughts, self-impression thoughts of different things that I've seen in the Court, yes, that I have put in my regular notebook.

THE COURT:  So they -- you took those impressions from your notebook, and you also placed them into the binder?

JUROR NUMBER 29:  Yes, sir, word for word.

THE COURT:  Word for word.

Did you reach any -- come to any impressions regarding ing the credibility of any witnesses?  Is that reflected in your notes?

JUROR NUMBER 29:  Going both ways, your Honor, yes.  Yes.

THE COURT:  Okay.  Yes.

JUROR NUMBER 29:  "Credibilities" of different people yes in both -- in either direction, yes.

THE COURT:  Okay.  Thank you.  Let me have you go back into the jury room and then we'll -- please have no discussions with anyone else regarding this.

JUROR NUMBER 29:  Yes, sir.

THE COURT:  What do you wish to do?

MR. EVANS:  Your Honor, our position would be the same.  We -- I think that he appears to be conscientious.  The notes he's reflected would be those that he's taken.  I don't think either party, if I'm correct, wish to have him taken off.  We simply suggested the Court hold on to the typed notes.  They presumably refresh his recollection in terms of the preparation anyway.  And it's -- that process would have served him.

And just instruct him that because of the standard instructions regarding notes, that he not be permitted to take those back with him, but he, of course, can rely on

those other notes and impressions and memories.

THE COURT:  Mr. Dugdale?

MR. DUGDALE:  I have nothing to add to that, your Honor.

THE COURT:  Mr. Krylov, do you wish to be heard at all after consulting with your counsel?  You don't -- you don't have to address the Court.  I'm not asking you to address the Court, but it's important that you consult with your lawyers regarding this issue and express to them any concern that you may have.

MR. EVANS:  He concurs with that, your Honor.

MS. MEYER:  Your Honor, may we have one moment?

THE COURT:  I guess my concern is this.  And that is at the conclusion of any trial the jurors take their notes home.  They destroy their notes.  They keep their notes.  It's their own personal possession.  The Court never reviews them.  Counsel never reviews them.

And in this particular case because of what has occurred here, we're going to have the original notes of this witness -- of this juror along with the typed version and if the juror has come -- reached any conclusions regarding credibility of witnesses as he was instructed not to until the deliberation process takes place, that may be a problem later on.

MR. EVANS:  Your Honor, we -- my understanding is

what was proposed was that he would take his original notes back with him, only the typed notes would not be permitted to go in.  That --

THE COURT:  The -- the proposal was to secure his --

MR. EVANS:  -- typed --

THE COURT:  -- his original, typed -- his original as well as the typed notes and make them part of the record.

MR. EVANS:  My -- I'm sorry.  I misunderstood.  The proposed I was take making was to allowing him to take his original notes in with him anyway as he would be permitted anyway, but just not the typed notes.

THE COURT:  Yes, but at the conclusion of the case, the notes would be part of the record.  And no one's looked at his notes.  And if his notes reflect that he's arrived at credibility determinations without -- without the benefit of the views of his fellow jurors, that may be an issue that will cause a problem later on.  So now is the opportunity to excuse this juror if you so request.

I think at the very least I need to inform the juror that he's to disregard or set aside any -- any conclusions.  As a practical matter, I think jurors in any case start formulating some -- certain impressions as the case unfolds.  They're not to make any final determinations, final conclusions, until they deliberate in the jury room.

I'll emphasize that to Juror Number 29.

MR. BUEHLER:  And I think it's, of course, inevitable that as the trial goes on, jurors are --

THE COURT:  Influenced.

MR. BUEHLER:  -- in forming impressions.  And I can imagine that if I were -- I've never had the opportunity -- but if I were a juror in a case, particularly one that's long, I would want to make a few notes about my initial impressions just to be able to take myself back to remembering that juror's testimony when I'm later looking at my notes and deliberating.

So I don't think it would -- it would -- if he's got impressions in there that he formed at the time that he was listening to a witness about what he thought of that witness, I don't think that's indicative of him violating the basic rule that he not form final conclusions until he goes and deliberates.

In fact, I would be worried about a juror that just doesn't form impressions as they go along or doesn't have a desire to make notes about that.

THE COURT:  Let's bring Juror Number 29 back.

(Whereupon, at 9:32 a.m., Juror Number 29 entered the courtroom.)

THE COURT:  Sir, no one is going to review your notes.  The Court -- the lawyers are not going to review your

notes.  But the because you have taken the notes home and have typed up your notes, they're going to be part of the record once the case is concluded.

I want to make sure that you assure the Court that you have made no final determinations regarding the weight of any of the evidence, the credibility of any of the witnesses that are reflected in your notes.

JUROR NUMBER 29:  I promise to the Court that.

THE COURT:  Okay.  And again as the trial unfolds, it's natural for people to start forming -- to have certain impressions of evidence and certain impressions of witnesses. What's important is that final determinations are not made until you go back into that jury room and you have the ability to discuss the case with your fellow jurors, hear from them, they hear from you, and then only during that process can you arrive at a final determinations.

Can you assure everyone here that you haven't reached final determinations on any issue, you can keep an open mind throughout all the proceedings, keep an open mind in the deliberation process.

JUROR NUMBER 29:  I'm absolutely sure, your Honor. I can promise the Court that.

THE COURT:  Okay.  The -- what we'll do is you can have your -- the notes that you've taken in the courtroom. We're not going to give you the folder, the binder.  There's

a jury instruction that I'll reread to you that was read I believe yesterday when I instructed -- the day before when I instructed regarding notes.

And it reads as follows:  "Some of you have taken notes during the trial.  Whether or not you took notes, you should rely on your own memory of what was said.  Notes are only to assist your memory.  You should not be overly influenced by the notes."

The concern, I think, that has been expressed is that if you take your typed notes back into the jury deliberation with you to assist you, you -- your recollection of what occurred may overly influence the other jurors who have not done that.  They may place greater weight on your notes than their notes because you've taken the time to type them up.

JUROR NUMBER 29:  I can understand that.  And again my apologies for this whole impropriety.

THE COURT:  And again we all understand that you're trying to do the right thing.  I think that's what impressed everybody here.

JUROR NUMBER 29:  Okay.  Thank you.

THE COURT:  Are we ready to proceed?

(Whereupon, at 9:35 a.m., Juror Number 29 exited the courtroom.)

THE CLERK:  Do you want the jury?

THE COURT:  Do you want me to reference this issue with the other jurors who already know about it?

MR. EVANS:  No, your Honor.

THE CLERK:  Ready, Judge?

Yes.

(Whereupon, at 9:37 a.m., the jury entered the courtroom.)

THE COURT:  Okay.  We have the jury reassembled with the alternates.  Counsel are present with the defendant and the Russian interpreters.  Just some final matters, final housekeeping matters:

First of all, you're going to have several items given to you to assist you in your deliberations.  You're going to have the jury instructions that the Court has read the day before yesterday -- or what was it Wednesday?  Each juror will have a set of jury instructions to guide you in your deliberations.  You must follow the law as the Court instructs whether you agree with the law or not, and the law is placed in the charges, and you'll have a copy of that.

The jurors are going to also have a copy -- each juror will have a copy of the second superseding indictment that's been redacted.  Keep in mind what was said already.  Many times the indictment is evidence of nothing.  It's simply a statement of the charges, and that hopefully will assist you.

The jury is going to be given a special verdict form.  These are questions that the jury is going to be asked to answer.  Do we have a copy -- there's only been -- only going to be one verdict form --

THE CLERK:  Yes, your Honor.

THE COURT:  -- provided to you, and it will guide you in terms of the questions you're going to be asked to answer in this case.

The parties have provided an exhibit list to assist you.  The binder is the exhibit list or exhibits offered by the Government, and then the defendants or defense has also offered their exhibit list that consists of two pages.

The exhibit lists also contain the exhibit list offered by the Government also contains a list of what has been identified as exhibits that are biohazardous.  In other words, they may pose some risk to the -- to persons because of contamination.  They've been identified in this exhibit list identified as "Biohazard Exhibits."

If you wish to review any of those exhibits -- they're not going to be placed in the jury room.  If you wish to review any of those exhibits, they'll be here in open court.  And at any time would you like to see any of those exhibits, we could do that here in open court.

There is also a list of exhibits that have been received.  The weapons will not be placed in the jury room

for obvious reasons:  The firearms, the dagger -- for safety. And if you wish to review those exhibits, please just alert us so that we can do it here in open court with everybody being present.

The audiotapes that have been received -- if you wish to hear any of those tapes, we need you to do that here in open court.  Just alert the bailiff, and we can accomplish that.

The first part of your deliberation process is to select your foreperson.  That's the person that's going to guide you in the deliberations.  I would -- I would suggest that you take a little bit of time selecting that person.  It should be a person that's going to keep focus on -- on the -- on the duty of the juror -- of the jury, and that's to reach a verdict if you can; someone who is going to keep the process going in the deliberation room -- the jury room; somebody who is going to make sure that everybody has their opinion heard; somebody who is going to keep order there and keep the process moving.  So it takes some time thinking about who the right person should be, and it's up to you to make that determination.

It's very important that you understand that you must keep an open mind throughout the process.  You can only start forming your determinations -- credibility determinations your, final determinations, once you get into

that jury room and you start deliberating among yourselves.

So at this point in time you've heard a lot of the evidence. It's very important to keep an open mind throughout this whole process. Is there anyone here who has any concerns about their abilities at this stage to have an open mind regarding what has been presented so far.

Okay. There's no hands.

The alternates are not placed in the jury room. We have a separate location for the alternates.

A couple of housekeeping matters: Let's see. We have -- we have some forms provided to you for notes that you want to give the Court. Keep in mind that if you give us a note, it may take some time to answer a question that you have, and I'll consult with counsel before I bring the jury out to answer the question. The question will be answered here in open court or in general form generally here in open court.

It may take some time to do that. I'm informed -- on Monday I will not be available after 2:00 o'clock. On Monday I will not be available after 2:00 o'clock. I also want to inform the jury that if for any reason we're still involved in this case, I will -- on Monday you'll -- if you haven't reached a verdict, you'll continue to deliberate even though I'm not available.

If we're still involved with this case, I'm not

going to be available during the week of May 7th, that's 7, 8, 9, 10, and 11.  I will not be available.  It doesn't mean that you will not be here, but I will not be available.

And then I'm informed that May 1st is -- we have notice that there's going to be demonstrations because it's May Day.  There's going to be antiwar and other types of demonstrations that will take place.

There is some information that some anarchists may appear, but California anarchists generally like to visit Starbucks on the way in; so I don't think it will be too much of a concern.  And there's going to be certain streets that are blocked off, and we'll make sure that you have notice of this.  We'll start earlier on May 1st to avoid any issues that would be presented.

We received the same notice last year, and I can't recall any -- any major incident that occurred or any traffic condition that occurred.

The traffic conditions will be caused by the City because the City is going to -- starting at 5:00 a.m., will close off Temple Street.  Temple Street will be closed between Alameda and Los Angeles and then at 10:00 a.m. Temple Street will be closed between Alameda and Hill.  The streets around Parker Center and City Hall will be closed.  All freeway ramps into civic center will be closed by 10:00 a.m.

So we'll start earlier on Monday.

THE CLERK:  Tuesday.

THE COURT:  Is that Tuesday?

THE CLERK:  Yes, your Honor.

THE COURT:  Tuesday.  May 1st is Tuesday.  Is there -- are there any questions?

We have one juror.

JUROR NUMBER 32:  32.

THE COURT:  Yes.

JUROR NUMBER 32:  Do you have a policy regarding cell phones in the jury room?

THE COURT:  No cell phones.

JUROR NUMBER 32:  No cell phones?

THE COURT:  No cell phones.

JUROR NUMBER 32:  What are our hours?

THE COURT:  The jury will start -- we'll keep the same hours, 8:30 to 11:30 and then from 1:00 to 4:00 o'clock.  If the jury wants to stay later, feel free to make the request, and we can keep you here later.  If you want to work through lunch hour, we can make arrangements for lunch to be brought to you into the jury room.

Anything else?

Yeah, the alternates are going to be excused.

Did you swear the bailiff for --

THE CLERK:  Well I swore --

THE COURT:  Yesterday?

THE CLERK:  Yes.

THE COURT:  Anything else?  Any other questions?  Okay.  Start the deliberation process.

THE CLERK:  Please go back with the marshals, and I'll come back with all the exhibits.

(Whereupon, at 9:47 a.m., the jury exited the courtroom.)

THE COURT:  You -- you can feel free to keep your materials on counsel table if you so chose to.  I have a 10:00 o'clock matter that I'm handling, otherwise the courtroom is devoted to this case.

Let me have counsel remain here through the day.  If there's any questions, it will -- from the jury, it will probably occur today.

MR. EVANS:  Your Honor, would it be possible -- it's agreeable to Mr. Krylov and -- and to cocounsel.  I need to return to my office in order to start preparing for further preparation on the mitigation.  If there are questions, I would defer to Mr. Buehler, and then of course we could consult.

But it -- as the Court is aware, the traffic has been an issue for me coming from Pasadena.  Normally it's a 20-hour trip, but it's sometimes has taken up to an hour.  So I don't want to misrepresent my situation to the Court.

But if I'm not going to be in -- if I'm not going

to have to ask for a continuance for to -- to present the mitigation because of situations that exist for us, I'm going to have to be back there organizing now.

THE COURT:  Okay.  You're -- you're capital counsel and the mitigation expert, and Mr. Buehler will be here to handle all other matters.

Mr. Krylov, do you have any objection to that?

THE DEFENDANT:  No.

THE COURT:  No objection?

THE DEFENDANT:  (No audible response.)

THE COURT:  Okay.  Thank you.

MR. BUEHLER:  Your Honor --

THE COURT:  I assume that you want to be present when a verdict is reached?

MR. EVANS:  Absolutely.

THE COURT:  Okay.  So we'll -- just make sure that you stay in contact with the clerk of the Court so we don't have any significant delays.

MR. BUEHLER:  My office is 15 minutes away.  Can I be 15 minutes away?

THE COURT:  Does that -- let's keep you here through the morning, through noontime.

MR. BUEHLER:  Okay.

THE COURT:  And let's see if there's any questions from the jury.

MR. BUEHLER:  Thank you.

THE COURT:  Okay.

THE CLERK:  Court's in recess.

(Whereupon, at 9:47 a.m., a break was taken.)

(Out of the presence of the jury.)

THE COURT:  Okay.  We're -- we don't have the defendant.

Okay.  We're back on the record.  The record should reflect --

Do we have the interpreters?

THE CLERK:  That's one thing I forgot.  I'm sorry.

THE COURT:  Okay.  We're back on the record United States versus Krylov.  Counsel are present.  The defendant is present with the interpreters.

The jury has sent a note.  The -- the note asks for a dictionary.  I've shared the note with counsel.  Any comments?

MR. DUGDALE:  Well, obviously, your Honor, the jury's deliberations have to be guided by what they heard in court and the jury's instructions.  And I think giving them a dictionary would be improper.

THE COURT:  Agreed?

MR. BUEHLER:  No.  I -- I think that if they're -- I mean, my guess is that they're -- they may be looking at parts of the instructions and so forth, and we would not

oppose letting them have a dictionary.

THE COURT:  The Court is going to sustain the Government's objection.

MR. DUGDALE:  I think they can be informed that if they have a particular question about a word, they can ask the Court.

THE COURT:  Ask the Court, yes.

THE CLERK:  Are we ready for the jury?

THE COURT:  Yes.

(An off-the-record discussion was held.)

THE COURT:  On the Krylov case -- we need to call it to order.

In reference to Juror Number 29, I think we have agreed that the notes, his personal notes he took in court, will be incorporated with the typed notes and placed under seal.  That will be under seal only to be opened by order of the circuit court.

This Court is not going to review those notes.  The lawyers will not review the notes, but if -- if the circuit court determines that someone should review it, it will be up to a circuit court order.

(Whereupon at 11:25 a.m. the jury entered the courtroom. )

THE COURT:  Okay.  We have the jury reassembled with the alternates.  Counsel are present with the defendant

and the interpreters.

I have a note from Juror Number 32, foreperson, who's made the following request:

"The jury requests the following a dictionary."

I think I mentioned at the beginning that the jury cannot do any independent research.  Dictionaries are not provided to jurors or juries.  If you have a question regarding the meaning of a particular word, you can ask -- you can advise us of that and identify the word.

UNIDENTIFIED JUROR:  Can we do that now?

THE COURT:  It needs to be done in written form.  So if -- if the foreperson is ready to place that in a written note, you can do that.

JUROR NUMBER 32:  I do not have the --

THE COURT:  We can -- Victor --

I'm sorry they need a note --

JUROR NUMBER 32:  -- paper.

THE COURT:  -- and paper.

THE CLERK:  Would you provide -- the notes are in their --

Have you a pen, sir?

JUROR NUMBER 32:  Yes.

THE COURT:  The -- I've been provided the note.  We're going to make copies for counsel.  I'll consult with counsel.  The jury will continue with your deliberations.  I

believe you're going to be taken down to the fourth floor for lunch and then return at 1:00 o'clock.

Can you bring -- I'm informed that the jury would like to bring their lunch back into the jury room to continue your deliberations.

No?  That's not the request?

Then again during the lunch time, do not discuss the case among yourself or with any other person.  You can only discuss the case when you're in the jury deliberation room for the purposes of deliberating.

Okay.  Let's excuse the jury for lunch.

THE CLERK:  Okay.  Marshal, please take them.

(Whereupon, at 11:30 a.m., the jury exited the courtroom.)

(A break was taken at this time.)

THE COURT:  Okay.  Let's go back -- Mr. Buehler's here.  We're back on the record on U.S. versus Krylov.  The jury is excused.  Alternates are not present.  Everyone else is including the defendant and the interpreters.

The jury has asked for a definition of the word "overt."  I have a Black's Law Dictionary.  The -- the dictionary defines "overt" as "open and observable, not concealed or secret."

Do you want time to think about the response?

MR. DUGDALE:  Yes, a little bit.  I think that may

be a little -- I know that's what "overt" means, but I think that may be a little deceptive in the content that we're thinking about here because what they're asking about is overt acts and what an overt act is.

And the fact that it's done in secret within a criminal conspiracy -- they're always done in secret within a criminal conspiracy.  So I think the thing to do is to define "overt act," which I think may have already been defined in the instructions.

THE COURT:  Black's Law defines "overt act" as "an act that indicates an intent" -- well, it says, "an intent to kill or seriously harm another person and thus gives that person a justification to use self-defense."

That doesn't --

MR. DUGDALE:  Yeah, that doesn't --

THE COURT:  That doesn't work.

MR. DUGDALE:  Can we just have a little time to look into this?  They're -- Devitt and Blackmar may have a definition of it.  I'm not sure.  Or somebody may.  I'm not sure.  I think the idea is "overt" is just something that's done -- it's done where somebody else could observe it basically.  That's the idea.

THE COURT:  Yeah, "open and observable."

MR. DUGDALE:  Yes.

THE COURT:  Mr. Buehler, do you have any comments?

MR. DUGDALE:  Open and observable by anybody, I guess, even co-conspirators.

MR. BUEHLER:  I think that's the gist of the meaning as it's used in the law of conspiracy.  It might be useful to see if Devitt and Blackmar has a --

THE COURT:  Okay.

MR. BUEHLER:  -- definition.

THE COURT:  Then we'll -- we'll resume at 1:00 o'clock.

MR. DUGDALE:  Thank you, your Honor.

THE COURT:  I may be late coming back.  We have a going-away luncheon.  So...

MR. DUGDALE:  Is that for Judge Tevrizian?  We were going to run over and see him.

THE COURT:  No.  This is for my law clerk.

MR. DUGDALE:  Thank you.

(A break was taken at this time.)

(Out of the presence of the jury.)

THE COURT:  Okay.  We have the lawyers present with the defendant.  Interpreters are present.  The jury is not.

I have a proposed instruction on the definition of the term "overt" offered by counsel for Government.

Mr. Buehler, do you have any objections?

MR. BUEHLER:  No, your Honor.

THE COURT:  Do you have a clean --

UNITED STATES DISTRICT COURT

MR. DUGDALE:  I don't, your Honor.  It would take me two minutes to make one, and I will when we're done here so I can provide it to the jury.

MR. BUEHLER:  Can I get a copy again of the note?

MR. DUGDALE:  Sure.

THE COURT:  Let me just read it into the record.  The proposed definition of "overt" means "some type of outward objective action performed by one of the members of the conspiracy which evidences that agreement.

New paragraph.

"An overt act may but for the alleged illegal agreement appear totally innocent and legal."

I can bring the jury out and instruct them, and then we can provide the written instruction later on.

MR. DUGDALE:  Okay.

THE COURT:  Is that agreeable?

MR. BUEHLER:  Your Honor, Mr. Krylov would like it translated for him.

THE COURT:  Certainly.

(Whereupon the defendant consulted interpreter.)

THE COURT:  The jury, I'm informed, is preparing a third question -- offering a third note.

MS. DeWITT:  So we should just stay here.

THE COURT:  I think you should probably remain.

Okay.  The record should reflect that the

interpreter has interpreted the proposed instructions for Mr. Krylov.

Can we bring the jury out so that I can instruct -- Victor?

THE CLERK:  Yes, your Honor.

THE COURT:  The proposal, Mr. Buehler, is to bring the jury out.  The Court will read the instruction, and then it will provide it and -- counsel for the Government will provide it in written form for the jury.  Is that agreeable?

MR. BUEHLER:  Yes, your Honor.

THE CLERK:  Your Honor, are we ready?

THE COURT:  Yes.

THE CLERK:  Yes.  Bring them in.

(Whereupon, at 1:37 p.m., the jury entered the courtroom.)

THE COURT:  Okay.  We have the jurors in court with alternates.  Counsel are present, the defendant, and the interpreters, and then Mr. Buehler is present also on behalf of his client.

The -- recall that the jury requested the definition of the word "overt."  I've shared that note with counsel.  The lawyers have interpreted the note as requests for the definition of the term "overt act."  There's an agreement between counsel as to the definition of the term.

The term "overt act" means some type of outward

objective action performed by one of the members of the conspiracy which evidences that agreement.  An overt act may but for the alleged illegal agreement appear totally innocent and legal.

That will be provided to you in written form to assist you.  I have been given a note.

THE CLERK:  I have copies.  Should I give them to counsel?

THE COURT:  Yes, let's provide a copy.

Note Number 3 from Juror Number 32 -- and we need to discuss this note also.  So let me send the jury back to continue your deliberations.

JUROR NUMBER 32:  Do you understand it, your Honor?

THE COURT:  Yes.

(Whereupon, at 1:39 p.m., the jury exited the courtroom.)

THE COURT:  Okay.  The jury has been excused.  We have counsel and the defendant remaining.

Note Number 3 -- I think copies have been provided to counsel.  Just for the record, Note Number 3 in the section that calls for Jury Note Number, the juror wrote 32.  It should be 3 actually.  His number is 32.

And then in reference to the note, it reads as follows:  "Regarding Count One, does the jury need to find that the requirements for committing a conspiracy pertaining

to all four victims addressed in the indictment, or can the conspiracy factor be considered for a lesser number of victims individually?"

Mr. Dugdale?

MR. DUGDALE:  Well, the answer is no.  I mean, they would only have to find conspiracy as to one thing in order to find the existence of the conspiracy and find the defendant guilty of the conspiracy count because they only need to find one overt act.  That obviously means they wouldn't have to find every single overt act as related to every single victim in the case.

THE COURT:  Okay.  I agree.

Mr. Buehler?

MR. BUEHLER:  I think what Mr. Dugdale means is no as to the first part of the question --

MR. DUGDALE:  Right.

MR. BUEHLER -- as to the second.

MR. DUGDALE:  Yes.

MR. BUEHLER:  It gets us into the question of multiple conspiracies.  Your Honor, can I have a moment to --

THE COURT:  Well, yes.  And what's important is that the -- that the jury has identified this as referring only to Count One.

MR. BUEHLER:  Yes.

THE COURT:  And I agree that there's two parts to

the questions that call for different responses.

MR. DUGDALE:  Right.

MR. BUEHLER:  Could I have a moment to confer with my cocounsel by telephone and just step outside.

THE COURT:  Certainly.

(A break was taken at this time.)

THE COURT:  Okay.  We continue with the United States versus Krylov.

Mr. Buehler, do you have a comment?

MR. BUEHLER:  Yes.  First, may I inquire, am I correct that the indictment and the summary that's gone back to the jury includes evidence of Meyer Muscatel?

MS. DeWITT:  Yes.

MR. DUGDALE:  It does, yes.

MR. BUEHLER:  I think the Government's position is correct.

THE COURT:  Okay.  Let's make sure we have agreement.

The question again reads, "Does the jury need to find that the requirements for committing a conspiracy pertain to all four victims addressed in the indictment?"

The answer to that would be yes; agreed?

MR. DUGDALE:  No.  The answer is no.

THE COURT:  I mean -- sorry.  The answer to that would be no.  And then the second question, "Can the

conspiracy factor be considered for a lesser number of victims?"

The answer is yes.

MR. DUGDALE:  Correct.

THE COURT:  Agreed?

MR. BUEHLER:  Yes, your Honor.

THE COURT:  Agreed as to both?

MR. BUEHLER:  Yes, your Honor.

THE COURT:  Okay.  Let's bring the jury out.

(Whereupon, at 1:47 p.m., the jury entered the courtroom.)

THE COURT:  Okay.  We have the jury reassembled with the alternates.

I'll read the question again.  The question that was asked is the following:

"Does the jury need to find that the requirements for committing a conspiracy pertain to all four victims addressed in the indictment or can the conspiracy factor be considered for a lesser number of victims, in parens, individually?"

There's two questions that have been supposed and two different answers that I believe are consistent.

The first question is does the jury need -- does the jury need to find that the requirements for committing a conspiracy pertain to all four victims addressed in the

52

indictment.  The answer to that is no.

The second question, "Can the conspiracy factor be considered for a lesser number of victims?"

The answer to that is yes.

Okay.  With that I'll have the jury go back to the jury room and continue your deliberating.

JUROR NUMBER 32:  Thank you, your Honor.

(A break was taken at this time.)

(Out of the presence of the jury.)

THE COURT:  The record should reflect that everybody's present with the defendant and counsel, and the jury is not.

It was reported to me a minute before the jury came into the courtroom by Victor that a juror had reported to the bailiff who reported to Victor that my secretary used the jury bathroom which should not have occurred.  I bring that to your attention so that you would know that.

I discussed the matter with her, and if anyone wishes to have further inquiry, we can do that here.  Nothing was discussed.  Nothing was said.  She simply used the bathroom.

Do you want -- any comments?  Any -- any matters that you want to bring to the attention of the Court?

MR. DUGDALE:  I don't want --

THE COURT:  I've admonished her and told she cannot

UNITED STATES DISTRICT COURT

53

do that.

MR. DUGDALE:  I have to go to the bathroom right now actually; so I have nothing to say.

THE COURT:  Okay.

(A break was taken at this time.)

THE CLERK:  Please come to order.  This Court is now in session.

(Out of the presence of the jury.)

THE COURT:  Okay.  We'll bring the jury out.  I'll admonish the jury and then order them back on Monday. Anything further?

MR. DUGDALE:  No, your Honor.  Thank you.

MS. DeWITT:  Your Honor, do you want us to collect these binders?

THE CLERK:  You know, I was going to start, but then I noticed they had -- they might have notes.

THE COURT:  I'll let the clerk take charge just in case they have notes in them.

(Whereupon, at 4:03 p.m., the jury entered the courtroom.)

THE COURT:  Okay.  We have the jury reassembled with the alternates.  Counsel are present with the defendant and the Russian interpreters.  The jury will adjourn for the evening.  The jury is ordered to return on Monday at 8:30.

Again, during your absence you're not to discuss

54

the case among yourselves or with any other person.

Okay.  Have a good weekend, and we'll see you on Monday.

(Whereupon, at 4:04 p.m., the jury exited the courtroom.)

THE COURT:  Mr. Buehler, do you need your client here earlier than 8:30?

MR. BUEHLER:  No, your Honor.

THE COURT:  Okay.  We're adjourned.

MR. DUGDALE:  Have a good weekend, your Honor.

THE CLERK:  Court's in recess.

(Whereupon, at 4:04 p.m., the proceeding concluded.)

UNITED STATES DISTRICT COURT