UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

HONORABLE S. JAMES OTERO, JUDGE PRESIDING

UNITED STATES OF AMERICA,      )
                             )
                             )
                             )
             Plaintiff,   )
                             )
                             )
                             )
       Vs.                 )  No. CR 02-220 (B) SJO
                             )
                             )
PETRO KRYLOV,                 )
                             )
                             )
             Defendant.   )
                             )
_____  )

REPORTER'S TRANSCRIPT OF TRIAL PROCEEDINGS

LOS ANGELES, CALIFORNIA

MONDAY, MAY 21, 2007

LEANDRA AMBER, CSR 12070, RPR
OFFICIAL U.S. DISTRICT COURT REPORTER
312 NORTH SPRING STREET, # 442
LOS ANGELES, CALIFORNIA 90012
(213) 613-0179

**A P P E A R A N C E S**

**IN BEHALF OF THE PLAINTIFF,
UNITED STATES OF AMERICA:**          U.S. DEPARTMENT OF JUSTICE
                                     U.S. ATTORNEY'S OFFICE
                                     BY:  SUSAN J. DeWITT, AUSA
                                          MR. DUGDALE, AUSA
                                          MS. MEYER, AUSA
                                     312 NORTH SPRING STREET
                                     12TH FLOOR
                                     LOS ANGELES, CALIFORNIA 90012
                                     (213) 894-4496
                                     susan.dewitt@usdoj.gov
                                     robert.dugdale@usdoj.gov
                                     kim.meyer@usdoj.gov


**IN BEHALF OF THE DEFENDANT,
PETRO KRYLOV:**                      LAW OFFICES OF GEORGE W.
                                     BUEHLER
                                     BY:  GEORGE W. BUEHLER, ESQ.
                                     350 SOUTH GRAND AVENUE
                                     SUITE 3900
                                     LOS ANGELES, CALIFORNIA 90071
                                     (213) 625-1600
                                     buehler@geragos.com


                                     LAW OFFICES OF DAVID R. EVANS
                                     BY:  DAVID R. EVANS, ESQ.
                                     600 SOUTH LAKE AVENUE
                                     SUITE 506
                                     PASADENA, CALIFORNIA 91106
                                     (626) 432-5100
                                     dre@drelaw.org


**ALSO APPEARING:**
        ALEX LEVOFF, COURT-CERTIFIED RUSSIAN INTERPRETER
        VARVARA OLSON, COURT-CERTIFIED RUSSIAN INTERPRETER
        JAMES S. DAVIDSON, FBI SPECIAL AGENT
        LOUIS PEREZ, FBI SPECIAL AGENT
        SCARLET NERAD, MITIGATION SPECIALIST

**I N D E X**

                                                              **PAGE**

JURY INSTRUCTIONS READ BY THE COURT                            15

GOVERNMENT'S CLOSING ARGUMENT BY MS. DeWITT                    63

DEFENSE'S CLOSING ARGUMENT BY MR. BUEHLER                     118

LOS ANGELES, CALIFORNIA; MONDAY, MAY 21, 2007; 8:05 A.M.

-oOo-


(Out of the presence of the jury.)

THE COURT:  Okay.  We're back on the record on United States versus Krylov.

The defendant is present with counsel.  Russian interpreters are present.  Final hearing regarding jury instructions.

The Court has reviewed, this morning, the final set of proposed instructions.  There are -- I'd -- I want to -- I would like to cover the instructions this morning just to make sure that I'm clear as to all of the proposed instructions.

May I have counsel refer to the instructions?  Do you have them in front of you?

MR. DUGDALE:  Yes, your Honor.

THE COURT:  Page 1 refers to counts 1, 2, 3, and 4 on line 9.  I just want to make sure that that's correct.

MR. DUGDALE:  It is, your Honor.

THE COURT:  On page 7, Line 3, I struck the word "now" in the first paragraph.  It will read "although congress."

Page 11, Instruction Number 6, is an instruction that I'm not sure is appropriate for this portion of the

trial.  If there's a stipulation, I can -- I will withdraw it.  If counsel requests I read it, I'll read it.

MR. EVANS:  No objection, your Honor.  We suggest --

MR. DUGDALE:  No objection, your Honor.

THE COURT:  Instruction Number 6 is removed.

MR. DUGDALE:  That's fine.

Can I -- can I -- well --

THE COURT:  Well, let -- let me --

MR. DUGDALE:  Do you want me to put "deleted" here when I give it to -- make the copies for the jury or do you want me to renumber all the rest of the instructions?

THE COURT:  Pardon?

You can just put "delete."

MR. DUGDALE:  Excellent.  Thank you.

THE COURT:  And let's continue.

In -- in -- on Page 17, Instruction number 12, on line 8, I've struck a fact the parties have stipulated to because that is -- is clearly covered in instruction Number 14 and elsewhere.

MR. DUGDALE:  That's fine, your Honor.

THE COURT:  On Page 20, Instruction Number 14, Line 8, I changed the word "and the time" to "at the time" -- so "and" becomes "at."

On page 20, Line 8, "was 18 years of age at the

time."

MR. EVANS:  Okay.  Thank you.

THE COURT:  On page 23, Line 22 -- I'm sorry.

Line 1, the words "sure and inference" has been take -- has been changed to "such an inference."

On page 24, line 14, makes reference to Section 3. I just want to make sure that's the correct reference to the special verdict form.

MR. DUGDALE:  Yes, your Honor.

THE COURT:  On Page 25, the -- the word "pecuniary" is used.  I would suggest that we change it to "financial gain."  I'm not -- I think it's -- it's an easier word for the jury -- the jury to understand.  But I'll -- I'll just submit that.  It's not important, other than trying to make it easier for the jury.  If you want to remain -- keep it the same, we can.

MR. EVANS:  I believe that's the language of the --

THE COURT:  Statute?

MR. EVANS:  -- statute.

THE COURT:  Okay.  We'll keep it.

On Page 29, Line 20, the sentence, "However, as I told you before with regard to intent with certain things, circumstantial evidence, as well as the direct evidence in deciding motive," does not make sense.

MR. DUGDALE:  I can blame the *Samson* court for that

one, but --

THE COURT:  Pardon?

MR. DUGDALE:  I took it out of the *Sampson* decision.

THE COURT:  Yes.

And -- and I appreciate -- I don't know if the Judge -- the Judge may have been commenting in open court and -- and not reading from an instruction -- an instruction.

MR. EVANS:  I didn't bring the decision with me, your Honor.

MR. DUGDALE:  How about we just -- if we can make it a real sentence.

However, as I told you with regard to intent with certain things, circumstantial evidence as well as the -- as well as direct evidence may be used to -- in deciding motives.

THE COURT:  May be considered?

MR. DUGDALE:  May be considered.  Even better.

THE COURT:  I think that's -- that's the intent of the --

MR. DUGDALE:  Okay.  No problem.

THE COURT:  Is that agreeable?  "May be considered."

MR. EVANS:  Could the Court read it again?

THE COURT:  Sure.

"However, as I told you before with regard to intent with certain things, certain circumstantial evidence, as well as the direct evidence may be considered in deciding motive."

MR. EVANS:  I would delete the preceding "direct evidence."  Circumstantial, that's -- as well as direct evidence may be considered.  That's just a grammatical suggestion.  I don't care.

THE COURT:  Well, we could remove the words "with certain things."

MR. EVANS:  I think that's fine too.

THE COURT:  Does that help?

MR. DUGDALE:  Yes.

THE COURT:  Okay.  Let's --

MR. DUGDALE:  So I have:  "However, as I told you before with regard to intent, circumstantial evidence as well as direct evidence may be considered in deciding motive."

Is that okay?

THE COURT:  Agreed?

MR. EVANS:  Agreed.

THE COURT:  Okay.

On Page 33, Line 8 -- 7 and 8, it reads, "In the special verdict form relating to mitigating factors, you are asked but are not required to report the total number of jurors that find that particular mitigating factor

established by a preponderance of the evidence."

I guess the question I have is, if they're not required to report the number, why ask them to do it?

MR. DUGDALE:  I would -- the Government wouldn't object to striking this paragraph.

THE COURT:  If we're going to require them to do it, then we should require them to do it.

MR. EVANS:  Well, it's a way of focusing the discussion.  And there are further instructions talking about even though -- the fact that you all agree that it's present, that doesn't go to the weight that you give to it.  I'm --

THE COURT:  Okay.  You -- you would like it kept?

MR. EVANS:  Yes, your Honor.

THE COURT:  Okay.  We'll keep it.

In reference to Page 38 -- Paragraph 38 how -- what's the request of counsel as to how you want the Court to -- to handle that?

MR. EVANS:  Your Honor, the Court left open the possibility of our reopening or agreeing to the stipulation to render it fit.  We're unwilling to agree with the stipulation proposed by the Government and do not wish to reopen it.

THE COURT:  So the --

MR. EVANS:  So the prosecutor's is moving -- it should be -- the Government is moving it to be stricken.  We

would object, but I understand the Court's probable ruling on this.

THE COURT: The Government's objection to 38 as it now reads is -- is --

Would you restate your objection?

MR. DUGDALE: Well, the objection at this point in time is there's no evidence to support any of this and would just cause the jury to speculate about this; so I don't think the defense can make an argument to the contrary.

THE COURT: Is there any evidence to support the giving of the instructions, Mr. Evans?

MR. EVANS: None that I can think of at this moment, your Honor.

THE COURT: Okay. 38 will be eliminated.

Okay. That concludes the final review of the -- the instructions. I would like -- I want to make sure that -- that counsel have -- has had an opportunity to make a final review this morning.

Are there any additional modifications that are requested, Mr. Dugdale?

MR. DUGDALE: No, your Honor.

The only additional thing that's unrelated to the jury instructions, there are two stipulations that we reached over the weekend, one pertaining to the result in the trial, which counsel had -- defense counsel had recommended; and

also one that we reached on Friday concerning the depositions to make clear to the -- to the jury that the family member witnesses who testified via deposition were prepared to appear as live witnesses in court.  And I left those both with Mr. Cruz.  And we would just request that the Court read those to the jury prior to the instructions.

THE COURT:  So stipulated, Mr. Evans?

MR. EVANS:  Yes, your Honor.

THE COURT:  Mr. Krylov, the -- I just want to make sure that you agree that the -- that the jury should be informed that the verdicts against Mr. Mikhel and Mr. Kadamovas resulted in guilt -- in verdicts of guilty on the guilt phase, and the same jury determined that both should receive the sentence of death.

Do you agree that that should be read to the jury?

MR. EVANS:  Yes.

THE DEFENDANT:  Yes.

THE COURT:  Okay.  Thank you.

And, Mr. Evans, do you have any final request for modifications on jury instructions?

MR. EVANS:  No, thank you.

THE COURT:  I want -- I'd like to make sure that the record is clear.

On Friday we discussed, I believe, two instructions that the -- that the defendant had requested to be included.

I want to make sure that the clerk of the court has those instructions and that they're made part of the record.

Do we have them?

THE CLERK: Yes, your Honor.

THE COURT: And how many instructions? Two?

Okay. Would you -- would you show Mr. Evans to make -- just to make sure that all of the instructions that the defense has requested that were not being given by the Court are included in the set that the clerk has.

Mr. Buehler, you'll -- you'll be making argument today?

MR. BUEHLER: Yes, sir.

MR. EVANS: Thank you.

Your Honor, that was a modified version. Mr. Cruz had shown me Defendant's Proposed Instruction Number 9, which was simply a modified version of Number 9 in a set which we had originally submitted to the Court as part of our group.

When we discussed it on Friday, what I was talking about was not giving that in addition to everything else that was given. I was talking about giving -- giving that portion of the instruction listing the mitigating factors because it added, in addition, to the list of nonstatutory mitigating factors certain statutory or mitigating factors approved by Congress which were parallel -- paralleled the statutory and nonstatutory language for the Government. The Court ruled

that that was duplicative or redundant and chose not to give it. I was not suggesting that we give the whole instruction by itself.

THE COURT: Okay.

Just for clarity, are there any other instructions that -- that the defendants have requested that are not included in some -- in some format in the instructions that the Court is giving this morning?

MR. EVANS: I don't believe so, your Honor. The Court said there was a second instruction, and I'm trying to recall what that was.

THE COURT: Yes. And I may have been mistaken. It may have been Instruction Number 9.

MR. EVANS: We -- we've discussed at length and incorporated the victim elimination instruction that may have been with the Court -- that's included now.

THE COURT: Okay.

Are we ready to proceed?

MR. EVANS: I believe so, your Honor.

THE COURT: I'm going to request that the door be locked during the reading of the jury instructions.

Any objection to that?

That's to make sure -- anyone who wants to remain, please remain. Once we start the reading of the instructions, you're going to -- you're going to have to

14

remain in the courtroom.  It's -- it's -- it'll take about 45 minutes to an hour to read the instructions.  So if you would like to leave now, you can, and then return during the argument portion of the case.  I simply do not want to have people entering and exiting the courtroom and disturbing the Court reading the instructions to the jury.

Is there any objection to that?

MR. EVANS:  No.

THE COURT:  Mr. Evans -- Mr. Krylov, do you have any objection to that?

THE DEFENDANT:  No.

THE COURT:  No?

Government have any objection?

MR. DUGDALE:  No, your Honor.

THE COURT:  Okay.  Let's lock the door, please.

And then once the Court reads the instructions, we will unlock the doors.

Let's get the jury in please.

At the conclusion of the Court's reading of the instructions, I'll ask counsel if there's any record you would like to make regarding the Court's reading of the instructions.

(Whereupon, at 8:33 a.m. the jury entered the courtroom.)

THE COURT:  Okay.  We have the jury reassembled

with the alternates.  Counsel are present with the defendant. The Russian interpreters are present.

The Court is now going to read the law that you must apply to the case.  Again, you're not required to take notes regarding the Court's reading of the instructions.  The instructions are going to be provided to you in written form to guide you in your deliberations.  You will also have a special verdict form to assist you in terms of the questions to be answered.

Before I start with the reading of the instructions -- and the instructions are quite lengthy; so please bear with me this morning.  Again, you'll have them in written form.

I have two stipulations to read to the jury. Hopefully this answers the question of the juror in Seat Number 6 posed on Thursday.

And the stipulation reads as follows:

Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Defendant Petro Krylov, by and through his counsel of record, Mr. Buehler and Mr. Evans, hereby stipulate as follows:

On January 17th, 2007, a jury -- a jury found Iouri Mikhel and Mr. Kadamovas guilty of each of the crimes alleged in the second superseding indictment.  On

February 13th, 2007, the same jury determined that both Mr. Mikhel and Mr. Kadamovas should receive a sentence of death.

This is a second stipulation regarding certain deposition testimony:  Plaintiff, the United States of America, by and through its counsel of record, the United States Attorney for the Central District of California, and Defendant Mr. Krylov, by and through his counsel of record, Mr. Buehler and Mr. Evans, hereby stipulate as follows:

Relatives of the defendant, Mr. Krylov, traveled from Odessa, Ukraine, to Los Angeles to testify during the penalty phase of the trial.  Pursuant -- pursuant to restrictions on their visas, Andrei Krylov, defendant's father, Alexandra Krylov, defendant's mother, were required to return to the Ukraine before the commencement of the testimony in the penalty phase.

Defendant's aunt, Olga Brawnanova; and his cousin, Traguba, Natalya Traguba, were required to return before commencement of the penalty phase because of employment obligations.

Members of the jury, you have unanimously found the defendant, Mr. Petro Krylov, guilty of the hostage-taking offenses alleged in Counts 1, 2, 3, and 4 of the second superseding indictment and unanimously concluded that the deaths of the victims -- Alexander Umansky, George Safiev,

and Nick Kharabadze -- resulted from the defendant's criminal activity alleged in Counts 1, 2, 3, and 4.

You must now consider whether imposition of a sentence of death is -- death is justified or whether the defendant should be sentenced to life imprisonment without the possibility of release for the commission of these crimes.

The decision is left exclusively to you, the jury. If you determine that the defendant should be sentenced to death or to life imprisonment without the possibility of release, the Court is required to impose that sentence.

As to Defendant Krylov, before you consider whether to impose a sentence of death, you must make each of the following three findings -- three findings unanimously and beyond a reasonable doubt.

First, you must find unanimously and beyond a reasonable doubt that the defendant was at least 18 years of age at the time of the offenses.  Here by stipulation all counsel have agreed that the defendant was over 18 at the time of the offenses.

Second, you must find unanimously and beyond a reasonable doubt that the defendant either intentionally killed Alexander Umansky, Nick Kharabadze, and/or George Safiev; intentionally participated in an act contemplating that the life of a person would be taken or intending that

lethal -- lethal force should be used in connection with a person, other than one of the participants in the offense; and Alexander Umansky, Nick Kharabadze, and George Safiev died as a result of the act or intentionally and specifically engaged in an act of violence knowing that the act created a grave risk of death to a person, other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life; and Mr. Umansky, Nick Kharabadze, and/or George Safiev died as a result of the act.

Third, you must find unanimously and beyond a reasonable doubt that the Government has proved the existence of at least one statutory aggravating factor.  I will define the term "aggravating factor" for you shortly.

If after fair and impartial consideration of all the evidence in this case any one of you does not make the three required findings beyond a reasonable doubt, your deliberations will be over.  If you do unanimously make these three findings beyond a reasonable doubt, you will then proceed to determine whether you unanimously find the Government has proved the existence of any nonstatutory aggravating factors beyond a reasonable doubt and whether you find that the defendant has proved any mitigating factors by a preponderance of the evidence.

You must then engage in a weighing process.  If you

unanimously find that the aggravating factor or factors which you all found to exist sufficiently outweigh -- outweigh any mitigating factors which any of you found to exist to justify the imposition of a sentence of death, or if in the absence of any mitigating factors you find that the aggravating factor or factors alone are sufficient to justify the imposition of a sentence of death and, therefore, that death is the appropriate sentence in this case, the law provides that the defendant may be sentenced to death.

You are never required to impose a sentence of death.

Again, whether or not the circumstances in this case justify a sentence of death is a decision that is entirely yours.

You must not take anything I have said or did during this phase of the trial as indicating what I think of the evidence or what I think your verdict should be.

Two terms that you have already heard and will hear throughout these instructions are aggravating factors and mitigating factors. These factors concern the circumstances of the crimes or the personal traits, character, or background of the defendant, Mr. Krylov.

The word -- the word "aggravate" means to make worse or more offensive or to intensify. The word "mitigate" means to make less severe or to moderate.

An aggravating factor then is a fact or circumstance which would tend to support the imposition of the death penalty.

A mitigating factor is any aspect of a defendant's character or background, any circumstance of the offense -- of the offenses or any other relevant fact or circumstance which might indicate that the defendant should not be sentenced to death.

In the death penalty statute, a number of aggravating factors are listed. These are called statutory aggravating factors. As I instructed you earlier, before you can consider imposition of the death penalty you must find that the Government proved at least one of these aggravating factors specifically listed in the death penalty statute, and your finding must be unanimous and beyond a reasonable doubt.

In addition, there are also -- there also may be aggravating factors not specifically set out in the death penalty statute. Again, your finding that any nonstatutory aggravating factor exists must be unanimous and beyond a reasonable doubt.

The defendant, Mr. Krylov, has the burden of proving any mitigating factors. However, there's a different standard of proof as to mitigating factors. You need not be convinced beyond a reasonable doubt about the existence of a mitigating factor. You need only be convinced that it is

more likely true than not true in order to find that it exists.

A unanimous finding is not required.  Any one of you may find the existence of a mitigating factor, regardless of the number of other jurors who may agree.

If you have unanimously found that at least one statutory aggravating factor exists, then you must weigh the aggravating factors you have found to exist against any mitigating factors that a particular juror has found to exist to determine the appropriate sentence.  Any jury may also weigh a mitigating factor found by another juror, even if he or she did not find also that factor to be mitigating.

I will give you detailed instructions regarding the weighing of aggravating and mitigating factors before you begin your deliberations.  However, I instruct you now that you must not simply count the number of aggravating and mitigating factors and reach a decision based on which number is greater.  You must consider the weight and value of each factor.

Members of the jury, it is again my duty to instruct you as to the law applicable to the sentencing phase of this case.  The sole question before you is whether the defendant, Mr. Krylov, should be sentenced for his capital offense to either the death penalty or life imprisonment without the possibility of release.

22

The selection between these two -- between these very serious choices is yours and yours alone to make.  If you determine that the defendant should be sentenced to death or instead to life imprisonment without the possibility of release, the Court is required to impose whichever sentence you choose, and the Court has no discretion to set that sentence aside.

There is no parole in the federal system.

Remember that you have previously found the defendant guilty of Capital Counts 1 through 4 in the indictment.  You must still approach the sentencing decision before you with an open mind.

I cannot stress to you enough the importance of your giving careful and thorough consideration to all of the evidence.  And regardless of any opinion you may have as to what the law may be or should be, it would be a violation of your oaths as jurors to base your -- your sentencing decision upon any view of the law other than which is given to you in these instructions.  The instructions I am giving to you now are complete -- are a complete set of instructions on the law applicable to the sentencing decision for the defendant.

During your deliberations you should thus -- thus rely on these instructions.  I have also prepared a special verdict form that you must complete.  The form details the special findings you must make and will -- must make and will

aid you in properly performing your deliberative duties.

Although Congress has left it wholly to you, the jury, to decide the defendant's proper punishment, it has narrowed and channelled your discretion in specific ways, particularly by making you consider and weigh any aggravating and mitigating factors present in this case.

As I explained previously, these factors have to do with the circumstances of the crime or the personal traits, character, or background of the defendant or anything else relevant to the sentencing decision.

Aggravating factors are those that would tend to support imposition of the death penalty.  By contrast, mitigating factors are those that suggest that life in prison without the possibility of release is an appropriate sentence in this case.

Of course, your task is not simply to decide what aggravating and mitigating -- and mitigating factors exist here, if any.  Rather, you are called upon to evaluate any such factors and to make a unique, individualized choice between the death penalty and life in prison without the possibility of release.

In short, the law does not assume that every defendant found guilty of comitting the capital crimes for which defendant had been convicted should be sentenced to death, nor does the law presume that this defendant, in

particular, should be sentenced to death.  Rather, your decision on the question of punishment is a uniquely personal judgment which the law in the final analysis leaves up -- leaves up to each of you.

The instructions which I am now giving you will be made available in written form for your deliberations.  If any rule, direction, or idea in these instructions is repeated or stated in vary -- in varying ways, no emphasis is intended, and you must not draw any inference because of its repetition.

You are not to single out any -- out any certain sentence or any individual point or instruction and ignore the others.  You are to consider all the instructions as a whole and are to regard each in the light of all of the others.  The order in which the instructions are given has no significance as to their relative importance.

It is proper to add the caution that nothing said in these instructions and nothing in any verdict form prepared for your convenience is meant to suggest or convey in any way or manner any intimation as to what your -- verdict I think you should find.  What the verdict shall be is yours -- is your sole and exclusive duty and responsibility.

If any reference by the Court or by counsel to matters of testimony or exhibits does not coincide with your

25

own recollection of that evidence, it is your recollection which should control during your deliberations and not the statements of the Court or counsel. You are the sole judges of the evidence received in this case.

It is the duty of the Court to admonish an attorney, witnesses, or parties who, out of zeal for his or her cause, does something which is not in keeping with the Rules of Evidence or procedure. You are to draw no inference against the side to whom an ad -- an admonition of the Court may have been addressed during the trial of this case.

Nothing that the Court may have said or done during the course of the trial was intend -- was intended to indicate nor should be taken by you as indicating what your verdict or verdicts should be. No statement, ruling, remark, or comment which I may have made during the course of the trial was intended -- intended to indicate my opinion as to how you should decide the case or to influence you in any way in your determination of the facts and the credibility of the witnesses.

If I had -- if I have said or done anything during the course of this trial to -- to so indicate, you are expressly instructed that you must disregard and reject my comments and form your own opinion.

Remember, at all times you, the jury, are the sole judges of the facts, evidence, and credibility of the

26

witnesses.

Defendant, Mr. Petro Krylov, played segments of a videotaped interview conducted by his investigators of an individual, Adelia Dekhterenka, who resides overseas and was unavailable for trial. As a result of the manner this evidence was presented by the defendant, Krylov, the Government did not have an opportunity to cross-examine this witness in this videotaped interview to test the truthfulness of her statements. You may consider this factor when deciding whether or not to believe this witness who was interviewed and when deciding what weight, if any, to give to this videotaped interview.

When a person is unavailable to testify at trial, the deposition of that person may be used at the trial. A deposition is the sworn testimony of a witness taken before trial. The witness is placed under oath to tell the truth, and the lawyers for each side may ask questions. The questions and answers are recorded.

The depositions of Tamara Alimundova, Irina Prishedko, Andrei Krylov, Alexandra Krylov, Olga Baranova -- Baraova and Natasha Treguba were presented to you in the penalty phase of the case. Deposition testimony is entitled to the same consideration and is -- and is to be judged, insofar as possible, in the same way as if the witness had been present to testify.

Regardless of any opinion you may have as to what the law may be or should be, it would be a violation of your oaths as jurors to base your verdict upon any view of the law other than that given to you in these instructions.

Some of the legal principles that you must apply to this sentencing decision duplicate those you followed in reaching your verdict as to guilt or innocence. Others are different. The instructions I am giving you now are a complete set of instructions on the law applicable to the sentencing decision. I have prepared them to ensure that you are clear in your duties at this extremely serious stage of the case. I have also prepared a special verdict form that you must complete. The form details special findings you must make in this case and will help you perform your duties properly.

Earlier, during the trial of the defendant's guilt, I instructed you on the definition of the phrase -- phrase "proof beyond a reasonable doubt." That same definition applies to this penalty phase of the case. Let me repeat the definition as it applies to the Government's burden of proving the existence of any aggravating factors beyond a reasonable doubt.

Proof beyond a reasonable doubt is proof that leaves you firmly convinced that an aggravating factor exists. It is not required that the Government prove the

existence of an aggravating factor beyond all possible doubt. A reasonable doubt is doubt based upon reason and common sense and is not based purely on speculation. It may arise from a careful and impartial consideration of all the evidence or from a lack of the evidence.

The Government, at all times, has the burden of proving beyond a reasonable doubt that the appropriate sentence for the defendant is, in fact, the death penalty. Specifically, that means that the Government must prove beyond a reasonable doubt:

One, that the defendant was at least 18 years of age at the time of the offense and the existence of at least one gateway factor.

Two, the existence of at least one statutory aggravating factor.

Three, the existence, if any, of nonstatutory aggravating factors.

And four, that all the aggravating factors found to exist sufficiently outweigh all the mitigating factors found to exist so as to make a sentence of death appropriate or, in the absence of any mitigating factor, that the aggravating -- aggravating factors found to exist alone make the sentence of death appropriate.

A defendant never has the burden of disproving the existence of anything which the Government -- which the

Government must prove beyond a reasonable doubt.  The burden is wholly upon the Government.  The law does not at all require a defendant to produce evidence that a particular aggravating factor does not exist or that the -- or that death -- death is not an appropriate sentence.

As such, a defendant is not required to assert or establish any mitigating factors.  However, if one or more mitigating factors are asserted, it is the defendant's burden to establish any mitigating factors by a preponderance of the evidence.  To prove something by a preponderance of the evidence is a lesser standard of proof than proof beyond a reasonable doubt.  To prove something by a preponderance of the evidence is to prove that it is more likely true than not true.  To prove something by a preponderance of the evidence involves a lesser standard of proof than proving something beyond a reasonable doubt.

It is determined by considering all of the evidence and deciding what evidence is more believable.  If, however, the evidence is equally balanced, you cannot find that the mitigating factor has been proved.  The preponderance of the evidence is not determined by the greater number of witnesses or exhibits presented by the Government or a defendant.  Rather, it is the quality and persuasiveness of the information -- information which controls.

In making all the determinations you are required

to make in this phase of the trial, you may consider any information presented during this penalty phase and the guilt phase but excluding any evidence that was introduced solely against another defendant.  Also recall that for our purposes here the terms "evidence" and "information" have the same meaning.

In deciding what the facts are, you have to decide what -- you may have to decide what testimony you believe and what testimony you do not believe.  You may believe all of what a witness said or only part of it or none of it.

In deciding what testimony of any witness to believe, consider the witness's intelligence; the opportunity of the witness -- the opportunity the witness had to see or hear the things testified about; the witness's memory and any motives that the witness may have for testifying; whether that witness said something different at an earlier time; the general reasonableness of the testimony; and the existence -- and the extent to which the testimony is consistent with other evidence that you believe.

Additionally, because the law does not permit any witness to state whether he or she personally favors or opposes the death penalty in this case, you should draw no inference either way from the fact that no witnesses have testified as to their views on this subject.

Before you may consider the imposition of the death

penalty, you must first unanimously agree beyond a reasonable doubt that the defendant was 18 years of age or older at the time of the offenses charged in Counts 1, 2, 3, and 4 of the second superseding indictment.

By stipulation, all counsel have agreed that the defendant was over 18 of age -- 18 years of age at the time of the offenses charged in Counts 1, 2, 3, and 4 of the second superseding indictment.  If you unanimously make that finding, you should so indicate on the appropriate page of Section 1 of the special verdict form and continue your deliberations.

If you do not unanimously make that finding, you should so indicate on the appropriate page of a special verdict form and follow the instructions on the remainder of the form.  No further deliberations will be necessary.

Before you can -- you may consider the imposition of the death penalty, you must also unanimously find beyond a reasonable doubt that the defendant intentionally killed or committed acts resulting in the deaths of Mr. Umansky, Mr. Karabadze, and/or Mr. George Safiev in one of the manners described below.  If you unanimously make that finding as to the murder of a particular victim, you should so indicate on the appropriate page of Section 2 of the special verdict form and continue your deliberations.

If you do not unanimously make that finding as to

the murder of a particular victim, you should so indicate on the appropriate page of the special verdict form and follow the directions that follow.

No further deliberations will be necessary as to that murder.

As to the defendant, Mr. Krylov, the Government alleges that the murders of Mr. Umansky, Mr. Karabadze, and Mr. Safiev were committed in the following manner:

One, the defendant intentionally killed victims Mr. Safiev and -- and Nick Kharabadze, in this case by assisting in their suffocation and strangulation.  To establish that the defendant intentionally killed a victim, the Government -- the Government must prove that the defendant killed a victim with a conscious desire to cause the victim's death.

Two, the defendant intentionally participated in an act contemplating that the life of a person would be taken and intending that lethal force would be used in connection with a person other than the participants in the offenses and the victims died as a result -- as a direct result of the act, in this case by assisting in the abductions of Mr. Umansky, Mr. Karabadze, and Mr. Safiev, knowing that they would be murdered as a result of being abducted and assisting in the actual murders of Mr. Karabadze and Mr. Safiev.

The Government must prove that the defendant

33

deliberately committed the foregoing acts with a conscious desire that a person be killed or that lethal -- lethal force be employed against a person which then resulted in that person's death. The phrase "lethal force" means an act or acts of violence capable of causing death.

Three, the defendant intentionally and specifically engaged in an act of violence knowing that the act created a grave risk of death to a person other than one of the participants in the offense such that participation in the act constituted a reckless disregard for human life; and Mr. Umansky, Mr. Karabadze, and Mr. Safiev died as a direct result of the act.

Intent or knowledge may be proved like anything else. You may consider any statements made and acts done by the defendant, and all the facts and circumstance -- circumstances in evidence which may aid in a determination of defendant's knowledge or intent.

You may infer from the defendant's conduct that he intended to engage in conduct intending that a person be killed or that lethal force be employed by a person if you find:

One, that the defendant was a person of sound mind and discretion.

Two, that creating a grave risk of death to a person other than one of the participants -- participants in

the case was an ordinary, natural, and probable consequence of the defendant's acts.

And three, the defendant committed these acts knowingly and voluntarily.  But, once again, you are never required to make such an inference.

As to the defendant, if you unanimously find beyond a reasonable doubt that the defendant intentionally killed -- I'm sorry.  Intentionally committed the murder of Alexander Umansky, Nick Kharabadze, and/or George Safiev, or committed acts resulting in the deaths of Alexander Umansky, Nick Kharabadze, and/or George Safiev in the manner described, you must then proceed to determine whether the Government has proved beyond a reasonable doubt the existence of any of the following alleged statutory aggravating factors with -- with respect to these same murders.

If you unanimously find -- make that finding in the affirmative as to the murder of a particular victim, you should so indicate on the appropriate page of Section 3 of the special verdict form and continue your deliberations.

If you do not unanimously make that finding in the affirmative as to the murder of a particular victim, you should so indicate on the appropriate page of the special verdict form and follow the directions that will follow.  No further deliberations -- deliberations will be necessary as to that murder.

As to Defendant Krylov, the Government has alleged the following statutory aggravating factors.  The aggravating factors are as follows:

One, the title "Death during the commission of another," the death -- the deaths of Mr. Umansky, Mr. Karabadze, and George Safiev occurred during the commission of another crime, in this case violations of Title 18 United States Code Section 1203, conspiracy to commit hostage takings resulting in death and hostage takings resulting in death, as you have previously determined in finding the Defendant Krylov guilty of Counts 1, 2, 3, and 4 of the second superseding indictment.

Two, titled, "Commission of the offense for pecuniary gain," the Government -- I'm sorry.  The defendant committed the offenses charged in Counts 1, 2, 3, and 4 in the expectation of receipt of something of pecuniary value, namely ransom proceeds and the use of items purchased with ransom proceeds.  To establish that a defendant committed an offense in the expectation of the receipt of something of pecuniary value, the Government must prove that the defendant committed the offense in the expectation of anything in the form of money, property, or anything else of economic value, benefit, or advantage.

There is no requirement that the Government prove that something of pecuniary value actually changed hands.

The words "receipt or expectation of receipt" should be given their ordinary, everyday meaning, which includes obtaining or expecting to obtain something.

Three, titled "Substantial planning and premedication," the defendant committed the offenses charged in Counts 1, 2, 3, and 4 of the second superseding indictment for which you have found him guilty, after substantial planning and premeditation to cause the deaths of Mr. Umansky, Mr. Safiev, and Mr. Karabadze.  Planning means mentally formulating a method for doing something or achieving some end.  Premeditation means thinking or deliberating about something and deciding to do it beforehand.

Substantial planning and premeditation means to -- means a considerable or significant amount of planning and premeditation.

Four, titled "Multiple killings," the defendant intentionally killed one -- killed more than one person in a single criminal episode.  More than one person means one or more other people, in addition to killing any single victim named in Count 1 of the second superseding indictment.

In this case the Government alleges -- alleges that the defendant intentionally killed three individuals: Mr. Umansky, Mr. Safiev, and Mr. Karabadze.  Intentionally killing a person means killing a person on purpose, that is,

willfully, deliberately, or with a conscious desire to cause a person's death and not just accidentally or involuntarily.

A single criminal episode is an act or series of related criminal acts which occur within a relatively limited time and place or directed at the same persons or are part of a continuous course of conduct related in time, place, or purpose.

A person of sound mind and discretion may be presumed to have intended that ordinary, natural, and probable consequences -- consequences of his knowing and voluntary acts. However, this presumption is not required. Thus, you may infer from the defendant's conduct that the defendant intended to kill a person if you find:

One, that the defendant was a person of sound mind and discretion.

Two, that the person's death was an ordinary, natural, and probable consequence of the defendant's acts.

And three, that the defendant committed these acts knowingly and voluntarily, but once again you are not required to make such an inference.

If you have found the existence of one or more statutory aggravating factors unanimously and beyond a reasonable doubt, you must then consider whether the Government has proved any nonstatutory aggravating factors. And in the case of statutory aggravating factors you must

38

unanimously agree the -- that the Government has proved beyond a reasonable doubt the existence of any nonstatutory aggravating factors before you consider such factors in your deliberations on the appropriate punishment for the defendant in this case.

In addition to any statutory aggravating factors you -- you have found, you are permitted to consider and discuss only the nonstatutory aggravating factors specifically claimed by the Government and listed below.

You must not consider any other facts in aggravation -- aggravation which you think of on your own. The following are the nonstatutory aggravating factors alleged by the Government as to the Defendant Krylov.

Title "future danger -- dangerousness of the defendant if confined to a federal prison for life without the possibility of -- of release," Defendant Krylov is likely to commit criminal acts of violence in the future that would constitute a continuing and serious threat to the lives and safety of others as evidenced -- as evidenced by at least one or more of the following:

A, continuing pattern of violence: Defendant Krylov has engaged in a continuing pattern of violence, attempted violence, and threatened violence, including at least the crimes alleged against him in the second superseding indictment for which he has been

convicted.

B, lack of remorse:

Defendant Krylov has demonstrated a lack of remorse for the capital offenses committed in this case, as indicated by his statements and actions during the course of and following the offenses alleged in the second superseding indictment.

Two, defendant's participation in other uncharged serious acts of violence.

Apart from the offenses charged in the second superseding indictment, Defendant Krylov participated in the hostage taking of Armen Gyurdzhiyants between, on, or about November 14th, '01 -- that's 2001 -- on November 17, 2001, Los Angeles County Central District of California.

In order to find the -- the defendant responsible for a hostage taking -- for a hostage taking as alleged herein, the Government must prove each of the following elements beyond a reasonable doubt:

First, the defendant intentionally seized or detained a person.

Second, the defendant threatened to kill, injure, or continue to detain that person.

And third, the defendant did so with the purpose and intention of compelling a third party to act or refrain from acting in some way as an explicit or implicit condition

for the release of this -- of the seized or detained person.

Three, contemporaneous convictions:

The Defendant Krylov faces contemporaneous convictions for multiple murders and other serious acts of violence.

Four, witness elimination:

Defendant Krylov participated in crimes leading to the murders of the victims of his crimes -- including Mr. Umansky, Mr. Karabadze, Mr. Safiev -- for the sole or primary purpose of eliminating these victims as possible witnesses to his crimes.

In virtually every homicide there is a witness who will be -- who will be silenced and therefore an arrest that is potentially prevented. Thus, if this was one of the defendant's motives but not his sole or primary motive for participating in the killings here, it is not enough to constitute an aggravating factor.

However, killing a person for the sole or dominant purpose of preventing him from reporting another crime to the authorities does make a defendant more blameworthy in a way that is relevant to deciding whether the death penalty is justified. This alleged aggravating factor focuses on the motivation for the murder. Mere speculation that a witness elimination was the primary purpose of a killing is not sufficient to prove it. Moreover, standing alone the fact

that the victim could identify his murderer or murderers does not prove beyond a reasonable doubt that the elimination of a witness was the sole or dominant motive for the killing.

However, as I told you before, with regard to intent, circumstantial evidence as well as direct evidence may be considered in deciding motive. In addressing this, you may consider both any relevant direct and -- direct and any circumstantial evidence from which the motive for the murder may be inferred.

Ultimately, you must decide whether the direct and circumstantial evidence proves to each and every one of you beyond a reasonable doubt that the defendant participated in the killing of the victims for the sole or primary purpose of preventing them from reporting his criminal activities to authorities.

Five, emotional suffering of the victims:

Defendant Krylov displayed an indifference to the emotional suffering of the victims of his crimes -- including Mr. Umansky, Mr. Karabadze, Mr. Safiev -- as demonstrated by the extended period of time between the time the victims were initially seized and the time they were ultimately killed.

Six, victim impact evidence:

Defendant Krylov caused injury, harm, and loss to the family, friends, and coworkers of Mr. Umansky, as evidenced by his personal characteristics as a human being

and the impact of his death on his family, his friends, and coworkers.

Defendant Krylov caused injury, harm, and loss to the family, friends, and coworkers of Mr. Karabadze, as evidenced by his personal characteristics as a human being and the impact of his death on his family his friends and his coworkers.

Defendant Krylov caused injury, harm, and loss to the family, friends, and coworkers of Mr. Safiev, as evidenced by his personal characteristics as a human being and the impact of his death on his family, his friends, and his coworkers.

The aggravating -- aggravating factors I have just listed for you may be considered by you if they are applicable and if you unanimously find that they have been established beyond a reasonable doubt.  In determining the penalty you will impose in this case, these aggravating factors that I have listed are the only ones that you may consider to be aggravating factors.  You cannot take into account any other facts or circumstances except the circumstances of the capital offenses as a basis for imposing the penalty of death.

At this point you must record your findings regarding whether you unanimously find that the Government has proven beyond a reasonable doubt the existence of any of

these nonstatutory aggravating factors. Please enter your findings on the appropriate page of Section 3 of the special verdict form and continue your deliberations.

Before you may consider the appropriate punishment, you must consider whether the defendant has -- whether the defendant has established the existence of any mitigating factors. Again, a mitigating factor is a fact about the defendant's background, record, or character, or about the circumstances surrounding the commission of the offenses described in Counts 1, 2, 3, and 4 that would tend to mitigate -- mitigate against the imposition of a sentence of death.

A mitigating factor need not constitute a justification or excuse for the crimes charged in Counts 1, 2, 3, and 4 of which the defendant has been convicted. A mitigating factor is a fact about the crimes or the defendant which, in fairness or sympathy, may be considered or which in your opinion justifies a sentence other than death, although it does not justify or excuse the crimes of which the defendant has been convicted.

Unlike every -- aggravating factors, which you must unanimously find beyond a reasonable doubt in order to consider them in your deliberations, the law does not require unanimous agreement with regard to mitigating factors. Any juror persuaded of the existence of a mitigating factor must

44

consider it -- must -- must consider it in this case.

Further, any juror may consider a mitigating factor found by another juror, even if he or she did not find the factor to be mitigating.

It is the defendant's burden to establish any mitigating factors but only by a preponderance of the evidence.  This is a lesser standard of proof under the law than proof beyond a reasonable doubt.

A factor is established by a preponderance of the evidence if its existence is shown to be more likely so than not so.  In other words, a preponderance of the evidence means such evidence as when considered and compared with what -- with -- with what is opposed it produces in your mind the belief that what is sought to be established is more likely than not -- than not true.

In a special verdict form relating to mitigating factors you are asked but are not required to report the total number of jurors that find a particular mitigating factor established by a preponderance of the evidence.

The mitigating factors which the defendant, Mr. Krylov, asserts has proved by a preponderance of the evidence are as follows:

One, if not sentenced to death, Defendant Krylov will be sentenced to life in prison without the possibility of release.

45

Two, a sentence of life imprisonment without the possibility of release is severe and exact, significant and physical restraints and hardships, as well as great psychological pain, particularly because the defendant, Mr. Krylov, will be left for years to contemplate his wrongdoing and to feel the loss of his child, wife, friends, and family.

Three, imposing a sentence of life imprisonment without the possibility of release yet preserving defendant's -- Krylov's life protects society.

Four, others who are of equal or greater culpability than the defendant, Krylov, whether or not indicted, will not be punished by death and/or have not been the subject of capital prosecution.

Five, Defendant Krylov is less culpable than Iouri Mikhel and Mr. Kadamovas, who orchestrated the kidnappings and murders of Mr. Muscatel, Rita Pekler, Mr. Umansky, Mr. Karabadze, Mr. Safiev, and who have been separately tried, convicted, and sentenced to death.

Six, the planning and methodology of taking hostages, demanding ransoms, and then killing the victims orchestrated by Iouri Mikhel and Mr. Kadamovas began before Kadamovas and Mikhel ever met Defendant Krylov with the adduction and murder of Mr. Meyer Muscatel, if not sooner.

Seven, Defendant Krylov is less culpable than

UNITED STATES DISTRICT COURT

Mr. Altmanis, who actively participated in the kidnappings of -- and murders of Meyer Muscatel, Rita Pekler, Alexander Umansky, Nick Kharabadze, and George Safiev, and has made deals with both the state and federal authorities -- authorities to avoid capital punishment.

Eight, Mr. Altmanis was an active and willing participant -- participant in the abduction and murder of Rita Pekler, Mr. Umansky, Mr. Kharabadze, Mr. Safiev, and participated in the kidnappings and murder of Mr. Muscatel before he, Kadamovas, or Mikhel ever met Mr. Krylov.

Nine, the only direct evidence of Defendant Krylov's participation in the actual killings of Rita Pekler comes from the testimony of Mr. Altmanis, who is more culpable than Defendant Krylov, has his own motive to fabricate evidence, and in -- and in order to help his own case has cooperated with the Government.

Defendant Krylov did not -- that's ten. Defendant Krylov did not personally participate in the actual killing of Rita Pekler.

Eleven, Defendant Krylov did not personally participate in the actual killing of Mr. Umansky.

Twelve, the only direct evidence of -- of Defendant Krylov's participation in the actual killing of Nick Kharabadze comes from the testimony of Mr. Altmanis, who is more culpable than Defendant Krylov, has his own motive to

fabricate evidence, and in order to help his own case has cooperated with the Government.

Thirteen, Defendant Krylov did not personally participate in the actual killing of Nick Kharabadze.

Fourteen, the only direct evidence of Defendant Krylov's participation in the actual killing of George Safiev comes from the testimony of Mr. Altmanis, who is more culpable than the Defendant Krylov, has his own motives to fabricate evidence, and -- and in order to help his own case has cooperated with the Government.

Fifteen, Defendant Krylov did not personally participate in the actual killing of Mr. Safiev.

Sixteen, Defendant Krylov was under unusual and substantial duress, regardless of whether the duress was of such a degree as to constitute a defense to -- to the charges.

Seventeen, organized crime in the republics of the former Soviet Union or the Russian Mafia is organized internationally and has contacts throughout the world.

Eighteen, organized crime in the republics of the former Soviet Union or the Russian Mafia is ruthless in its actions, not hesitating to kill women and children to establish a point.

Nineteen, Mr. Mikhel and Mr. Kadamovas were actively involved with the Russian Mafia.

48

Twenty, Defendant Krylov believed, whether or not you agree that his belief was reasonable, that Mr. Mikhel and Mr. Kadamovas were actively involved with the Russian Mafia.

Twenty-one, Defendant Krylov believed, whether or not you agree that his belief was reasonable, that if he did not follow the orders of Mr. Mikhel, his wife, daughter, as well as his family members, his mother, father, sister, grandmother, in Odessa, Ukraine, would be killed.

Twenty-two, Defendant Krylov believed, whether or not you agree that his belief was reasonable, that by following the orders of Mr. Mikhel he would save the lives of his wife and daughter and of his family members, his mother, father, sister, and grandmother in Odessa, Ukraine.

Twenty-three, Defendant Krylov did everything in his power to create the impression with Mr. Mikhel and Mr. Kadamovas that he was a loyal member of the team out of fear that if they felt differently his family members -- his mother, father, sister, and grandmother in Odessa, Ukraine -- would be killed.

Twenty-four, Defendant Krylov was 29 years at the time of his arrest.

Twenty-five, Defendant Krylov graduated from the Marine Academy in Odessa with distinction.

Twenty-six, Defendant Krylov is a university graduate.

UNITED STATES DISTRICT COURT

49

Twenty-seven, at the time of his arrest, Defendant Krylov had no prior criminal record.

Twenty-eight, at the time of his arrest Defendant Krylov had no record of prior acts of violence.

Twenty-nine, at the time of his arrest, Defendant Krylov had no criminal convictions related to drug abuse.

Thirty, Defendant Krylov does not present a risk to prison officials or other inmates if he is sentenced to life in prison without the possibility of release.

Thirty-one, Defendant Krylov was a devoted husband to his wife, Natalya, and his infant daughter, Milana, prior to his arrest.

Thirty-two, Defendant Krylov has a close, loving relationship with his mother, Alexandra; his father, Andrei; and his sister, Anna.

Thirty-three, Defendant Krylov will have an opportunity to continue to be a loving father, husband, and son if he is spared execution.

Thirty-four, Defendant Krylov has a close, loving relation with his family and extended family.

Thirty-five, executing Defendant Krylov will cause great grief and suffering to those who love him.

Thirty-six, Defendant Krylov has accepted responsibility for the crimes he has committed.

And, thirty-seven, Defendant Krylov has shown remorse for the crimes he has committed.

You are permitted to consider anything else about the commission of the crimes charged in Counts 1, 2, and 3 and 4, or about the defendant's background, record, or character that would mitigate against imposition of the death penalty.

If there are any such mitigating factors, whether or not specifically alleged or charged by defense counsel which are established by a preponderance of the evidence, you are free to consider them in your deliberations.

If you find unanimous -- unanimously and beyond a reasonable doubt that Defendant Krylov was 18 years of age or older when he committed the offenses charged in Counts 1, 2, 3, and 4; that he acted with the requisite intent; and that the Government proved the existence of at least one statutory aggravating factor, and after you then determine whether the Government proved the existence of the nonstatutory aggravating factors submitted to you and whether the defendant proved the existence of any mitigating factors, you will then engage in a weighing process.

In determining the appropriate sentence, all of you must weigh the aggravating factor or factors that you unanimously found to exist, whether statutory or nonstatutory, and each of you must weigh any mitigating

factors that you individually found to exist and may weigh any mitigating factors that another of your fellow jurors found to exist.  Your deliberations must be based upon the evidence you have seen and heard and the law on which I have instructed you.

Passion and prejudice have no role to play in your efforts to reach a just result in this case.

Although you were instructed during the guilt phase of this trial that you must set aside any sympathy for the defendant in determining his guilt or innocence, this rule does not apply in this penalty phase of the trial.

You may consider any sympathetic aspect of the defendant's character or record that the defendant offers as a basis for a sentence of life imprisonment without the possibility of release.

If any of the evidence presented in this case arouses sympathy in you to such an extent as to persuade you that death is not the appropriate punishment, you may impose a sentence of life imprisonment without the possibility of release.  Again, whether or not the circumstances in this case justifies a sentence of death is a decision that the law leaves entirely to you.

The process of weighing aggravating and mitigating -- and mitigation factors against each other in order to determine the proper punishment is not a mechanical

process.  In other words, you must not simply count the number of aggravating and mitigating factors and reach a decision based on which number is greater.  You must consider the weight and value of each factor.

The law contemplates that different factors may be given different values and different weights by different jurors.  Thus, you may find that one mitigating factor outweighs all aggravating factors combined or that the aggravating factors proved do not, standing alone, justify the imposition of a -- of a sentence of death.

If one or more of you so find, you must return a sentence of life in prison without the possibility of release.

Similarly, if you find that a particular aggravating factor sufficiently outweighs all mitigating factors combined to justify a death sentence, you are to decide what weight or value is to be given to a particular aggravating or mitigating factor in your decision-making process.

If you unanimously conclude that the aggravating factor or factors found to exist sufficiently outweigh any mitigating factors which any of you found to exist to justify a sentence of death; or in the absence of any mit -- mitigating factors that the aggravating factors or factors alone are sufficient to justify a sentence of death and that

53

therefore death is the appropriate sentence in this case, you may record on Section 6 of the special verdict form your determination that a sentence of death shall be imposed.

If you determine that a -- that death is not justified, you must record on Section 6 of the special verdict form your determination that the defendant be sentenced to life imprisonment without the possibility of release.

After consideration of the aggravating and mitigating factors, you must unanimously determine whether the defendant should be sentenced to life -- to death or to life imprisonment without the possibility of release.  If you cannot unanimously determine that a sentence of death is justified, then the Court will impose a sentence of life without the possibility of release for the defendant.  There is no parole in the federal system.  You are never required to impose a sentence of death.  You should indicate your determinations regarding the sentence in Section 6 of your special verdict form.

You are instructed as a matter of law that you must never decide to impose a sentence of death for the purpose of vengeance or to seek revenge.  This should never be discussed or considered by you in arriving at your verdict.

You are instructed as a matter of law that you are never to discuss or consider the economic cost of imposing a

sentence of life without the possibility of release in arriving at your verdicts.

As in the guilt phase of the trial, you, the jury, are the sole judges of the facts in this case -- in this part of the case. You may decide issues of credibility of the witness -- witnesses and whether or not to accept any piece of evidence as true or what amount of weight to give it, if any.

At this phase of the trial, the evidence consists of all of the evidence received in the guilt phase of the trial to the extent it is relevant to your inquiry regarding the existence of any threshold eligibility factors, aggravating factors, or mitigating factors.

You may also consider any information received at the penalty phase of the trial, including testimony, documents, and stipulations between the parties. You may only consider evidence received in this courtroom in making your determinations.

As in the guilt phase, the arguments of the attorneys and comments and rulings of the Court are not evidence. You may consider both direct and circumstantial evidence at this phase of the trial in determining whether aggravating or mitigating factors are established. The weighing process you are called upon to undertake in this portion of the trial is different from the fact-finding

process.

Once you have found the threshold eligibility factors, aggravating factors, and mitigating factors, if any, you must use your own experience, judgment, and sense of justice in weighing the aggravating and mitigating factors to arrive at your ultimate decision in this case.

In your deliberations, you are instructed that a sentence of death means that the defendant will be executed. A sentence of life imprisonment without the possibility of release means that the defendant will spend the remainder of his life in prison.

In making all the determinations you are required to make in this phase of the trial, you may consider any evidence that was presented during the guilt phase of the trial, as well as evidence that is presented in the sentencing phase of the trial.

In deciding the facts in this case, you may have to decide which testimony to believe and which testimony not to believe. You may believe everything a witness has said or part of it or none of it.

In considering the testimony of any witness, you may take into account the same factors I instructed you about at the guilt phase including, but not limited to, such matters as to whether the witness received benefits from the Government, had prior felony convictions, was an accomplice,

had pled guilty, or had lied about any material facts.

The weight of the evidence as to a fact does not necessarily depend on the number of witnesses who testified.

Your verdict must be based solely on the evidence presented in this courtroom in accordance with my instructions.  You must completely disregard any report which you may have read in the press, seen on television, or heard on the radio.  Indeed, it would be unfair to consider such reports since they are not evidence, and the parties have had no opportunity of contradicting their accuracy or otherwise explaining them away.

In short, it would be a violation of your oath as jurors to allow yourselves to be influenced in any manner by such publicity.  You must also continue to be mindful of my earlier admonitions to avoid reading about the case in newspapers, watching any news concerning the case on television, or listening to any radio accounts of the case. As stated above, you must limit the information you get about the case to what came to you in this courtroom through the rules of evidence.

When you are in the jury room, please discuss all aspects of these -- aspects of the sentencing issues amongst your -- among yourselves with candor and frankness, but also with a due regard and respect for the opinions of one another.  Each of you must decide this question for

yourself and not merely go along with the conclusion of your fellow jurors.  In the course of your deliberations, no juror should surrender his or her conscientious beliefs of what is the truth of what is the weight and effect of the evidence and what should be the outcome as determined by that juror's individual conscience and evaluation of the case.

Remember that the parties and the Court are relying upon you to give full, considered, and mature consideration to this sentencing.

By doing so, you carry out the fullest oaths of -- oaths as jurors.  You will well and truly try the issues in this case and a just result render.

In your consideration of whether the death penalty is justified you must not consider the race, color, religious beliefs, national origin, except as it may bear on mitigation or sex of either the defendants or the victims.  You are not to return a sentence of death unless you would return a sentence of death for the crimes in question without regard to race, color, religious beliefs, national origin, or sex of either the defendants or the victims.

To emphasize the importance of this consideration, the special verdict form contains a certify -- certification statement.  Each juror should carefully read the statement and sign in the appropriate place if the statement accurately reflects the manner in which you reach your decision.

I have prepared a special verdict form to assist you in your deliberations.  You are required to record your decisions in this form.

Section 1 of the special verdict form contains a space to record your findings on the defendant's age.

Section 2 contains space to record your findings on the requisite mental state.

Section 3 contains a space to record your findings of statutory aggravating factors.

Section 4 contains a space to record your findings on nonstatutory aggravating factors.

Section 5 contains space to record your findings on mitigating factors.

Section 6 contains space to record your -- your determination of each defendant's sentence.

Section 7 is the juror's certification of the manner in which they reach their decision.  You are each required to sign the special verdict form.

Again, if you would want to communicate with me at any time during your deliberations, please write down your message or question and pass the note to the Marshal, who will bring it to the Court's attention.  Again, you are reminded to use your -- your jury numbers.  I will respond as promptly as possible either in writing or by having you return to the courtroom so that I can address you orally.

UNITED STATES DISTRICT COURT

I caution you, however -- however, with any message or question you might send that you should not tell me the details of your deliberations or how many of you are voting in a particular -- in a particular way on any issue.

Let me -- let me remind you again that nothing I have said in these instructions, nothing I have said or done during the course of the trial at any time has been said or done to suggest to you what I think your decision should be. That decision is exclusively your responsibility.

That concludes the reading of the instructions. All jurors and alternates present, everyone else in the courtroom present.

Does either counsel or any side wish to make a -- any record regarding the Court's reading of instructions?

Mr. Dugdale?

MR. DUGDALE:  There is a brief matter we probably could raise outside the presence of the jury, but not in relationship to anything the Judge read there.

THE COURT:  Mr. Evans?

MR. EVANS:  No, your Honor.

THE COURT:  Okay.

We're going to take a short recess.  That will give counsel the opportunity to set up.

Please return back to the courtroom at 10:00 o'clock, and we will continue with the trial.

PROSPECTIVE JUROR NUMBER:  I've got a question.

THE COURT:  Yes.

PROSPECTIVE JUROR NUMBER:  Juror 29.

One question:  You said we would be signing it at the end?

MR. DUGDALE:  That's my issue, too, your Honor.

THE COURT:  Pardon?

PROSPECTIVE JUROR NUMBER:  Our names or our juror numbers?

THE COURT:  I'm sorry.  You -- you put -- well, we'll have to discuss that.  Let me discuss it with counsel.

PROSPECTIVE JUROR NUMBER:  Okay.  Thank you.

(Whereupon, the jury exited the courtroom at 9:45 a.m.)

THE COURT:  Okay.  The jury -- can you shut the door?

THE CLERK:  Yeah.  He's shutting it.

THE COURT:  Okay.  Jury's been excused.  Counsel remain.

A couple of housekeeping matters.  On Wednesday I start another trial.  Wednesday afternoon between, I would say, 12:30 and 3:00 o'clock, I will not be available.  On Thursday at -- from 3:00 o'clock on I will not be available.

Mr. Dugdale, you had an issue to raise?

MR. DUGDALE:  Yes.  The issue was -- actually, the

61

issue was raised by the juror as far as whether they should sign their names and numbers at the end of it. In the Mikhel case we had them sign their numbers. I'm not sure what the defense position is on this.

MR. EVANS: Your Honor, I -- this seems to be a radically different case. We would suggest they sign their names.

THE COURT: Well, I think we have to -- we have to -- we have to follow the law in this area. So what -- what is the law in the area?

MR. DUGDALE: Well, just that they have to sign it. Now, I mean whether they sign their names or numbers doesn't really make a difference because there is a record of who these people are. It's under seal, and the Court has it in camera with the jury -- with the jury information, but in this case I don't care if they sign their names. As long as it's maintained under seal that -- that should be fine.

THE COURT: Okay. Then we'll have them sign their names, and the names will be maintained under seal.

MR. DUGDALE: I would just advise, of course, the jury, the fact that no one is going to see this.

THE COURT: Yes.

MR. DUGDALE: Thank you.

(Whereupon a break was taken.)

(Out of the presence of the jury.)

62

THE COURT:  Okay.

Okay.  Let's go on the record -- we're on the record in United States versus Krylov.  The defendant is present with counsel.  All counsel are present.

I want to make sure that the members in the -- in the -- in the audience portion have headsets.

Is there anyone who needs a headset?  Do we have an extra headset?  Anyone else need a headset?

For interpretation.  Why don't you inquire?

THE INTERPRETER:  Just to include the audio, not the interpretation.

THE COURT:  Okay.  Are we ready to proceed?

MR. DUGDALE:  Yes, your Honor.

THE COURT:  The Government -- each side has two and a half hours, as previously agreed to.

Let's bring the jury in.

(Whereupon, the jury entered the courtroom at 10:04 a.m.)

THE COURT:  Okay.  We have the jury reassembled with the alternates.  Counsel are present with the defendant.

It's the Government's opportunity now to make opening argument.

You may proceed.

MS. DeWITT:  Thank you, your Honor.

UNITED STATES DISTRICT COURT

**GOVERNMENT'S CLOSING ARGUMENT**

BY MS. DeWITT:

How do you measure loss?  How do you measure the pain and suffering of the victims in this case?  The pain and suffering of their family and friends?  How do you measure the damage and depravity of the defendant's actions?

Loss cannot be measured solely by the number of lives extinguished by the defendant and his coconspirators, nor by the number of family members and friends who have been so profoundly affected by these crimes.

You all know the ripple effect that every death has on a family, friends, and colleagues, additional people that you will never know or hear from who were affected by these deaths.  And every one of you has had an experience of the death of a loved one, sometime in your life, and you all know the resulting pain and sorrow.

But could any of you have ever imagined the horror of having a loved one first abducted at gunpoint; then having that loved one held hostage for days; bound, tied, forced to sleep in a small closet; having to negotiate for your loved one's release, for their very lives, then left wondering for years afterwards whether you could have, whether you should have done something different to secure that person's release, to save that person's life?

What about the suffering, the unbearable pain of

64

not knowing for months what had happened to your loved one? Assuming that they were dead, but hoping against hope that they might not be.  Hoping that the knock on the door, the call on the phone, that face in the crowd might be them.

Can any of you actually imagine the horror of finally getting that dreadful call from the FBI telling you that the dead body of your son, your father, your brother, your fiancé, your dear friend had been found, ending the misery of not knowing, but dashing that last bit of hope that you might have held out, and starting a new misery -- the misery of having to accept that your loved one never really would come home.

But the misery does not stop there.  Then you find out how your loved one was killed.  Not a quick and easy death, but instead with a false promise that they would be released, and then with a mouth stuffed with plastic, a plastic -- a plastic bag put over their head, a zip tie tied tight around their neck, clinging to life, only to have weights tied to their lifeless bodies, and then to be tossed off a bridge like so many pieces of trash.

Killing wasn't enough, however; extorting ransom money wasn't enough, however, for the gang of four.  No.  The family and friends of these victims didn't even get their loved ones back in recognizable form.  Even though they had paid more than $1,000,000 in ransom money, they didn't get

one last look at their loved one before they were buried.
Instead, they got decomposing bodies that even they couldn't
recognize.

Alex Umansky, this is what he looked like before;
this is what he looked like after.

Nick Kharabadze, what he looked like before, what
he looked like after.

And George Safiev.  Bodies left to rot at the
bottom of the New Melones Reservoir, left by the gang of four
with the hopes that they would never be found; the gang of
four that believed they would never get caught and held
accountable for these crimes because they had killed the very
witnesses to these crimes and had left their bodies where no
one should have ever been able to find them and probably
never would have but for the help of Ainar Altmanis.

Probably never in your wildest imagination would
you -- when you answered that jury summons that day in the
mail did you expect to be hearing about Russian criminals,
international money laundering, kidnappings, murders, and
decomposing bodies.

And you probably never expected to be asked to
weigh the value of life, to decide the price to be paid for
helping to kidnap and hold people hostage, the price to be
paid for getting and laundering ransom money, blood money
paid for by the family and friends of these victims, the

price to be paid for the lives of these three people who the defendant helped to cause, the price to be paid for devastating the lives of their families and friends.

But, ladies and gentlemen, some crimes are so bad, the facts and the circumstances are so heinous that death is an appropriate penalty under the law.

And death can and should be imposed as the appropriate sentence. And you are charged with and, in fact, when you got on this jury you swore and promised that you would follow that law.

Members of the jury, no mere words that I speak today are going to ever adequately sum up the lives of these victims, the loss and the suffering family members and friends have experienced, nor can any words that I speak today capture the full depth and depravity of the defendant's actions.

Now, I suspect that you're going to hear from defense counsel today that Defendant Krylov's co-conspirators were much worse than him; that they were the true villains.

But members of the jury, they had their day in court. Today, today is Defendant Krylov's day of reckoning. Today is the day that you, the jury, you, members of the public, the voice of our community get to decide. You get to decide that enough is enough. These kidnappings, these victims, and the way that they were killed is enough.

So consider the devastation left in the wake of the defendant's actions and let your verdicts speak to the reality that Alexander Umansky, Nick Kharabadze, and George Safiev are no more.  They'll never have another day to laugh, they'll never have another day to love, they'll never have another day to cry.

Let your verdicts speak to what justice requires when three lives are so viciously taken before their time.

This is a photograph of Alexander Umansky.  Like Defendant Krylov, Alexander Umansky's family also grew up in the Ukraine before immigrating to the United -- United States in 1994.  Unlike the defendant, however, Alexander Umansky didn't choose kidnapping, ransom, and murder as his way of life.

Alex Umansky chose instead to start his own business, to have a son, to get engaged, to work hard for his and his family's future security.  And his business was very successful, as you heard, until he was killed.

As you heard, Alexander Umansky also came from an exceptionally close-knit family.  He worked with his mother every day.  His father also worked at the business, and he talked to his brother, if not every day, once or twice almost every day of his life.  And he was close to his extended family as well, his aunts, his uncles, his cousins.

Unfortunately, what you're going to also remember

and what his family will never ever be able to force from their minds is how Alexander Umansky was forced to call them for four days to negotiate a ransom payment.  Four days that Michael Umansky described as a living nightmare.  The heartbreaking call where Ruven Umansky offered to trade places with his son.  Where Michael Umansky was told that Alex Umansky's liver and body parts would be sold and that he and his family would be next if they didn't cough up even more ransom money.

Irena Prishedko literally begging the defendants to be human beings.

Now Petro Krylov didn't personally kill Alexander Umansky, but Petro Krylov is personally responsible for his death and what happened to his family after he was abducted.

Petro Krylov is the only reason that Alexander Umansky was killed, the only reason that we're even talking about him here today.  What Petro Krylov did was the same as loading a gun and handing it to Iouri Mikhel and Jurijus Kadamovas.  Petro Krylov not only gave up Alexander Umansky as a target, but he also told Mikhel and Kadamovas that he would be a good target.  He told them that he had rich clients and that he made between 30- and $50,000 a month.

Defendant Krylov also helped to educate them so that they would be more successful in using that ruse to abduct him.  Remember that he took them to a similar auto

accessories store to show them the equipment there so they could be more educated when they executed the ruse.

He did something else. He got on the computer at Designed Water World and he logged onto the Website and he admitted that, although he didn't admit to the timing of it. He admitted that he got on that Website at Designed Water World, the Website for Hard Wired Electronics, and he did it for the purpose of educating his co-conspirators so that there would be a better chance that the ruse to abduct Alexander Umansky would be more successful.

And shortly after they logged onto that computer what happened? That first call was made to get the abduction plans rolling, to get the plan going. That first call was made to Alexander Umansky, and the phone records confirm that.

Why were Petro Krylov's fingerprints on that envelope, the envelope found at the Weslin House, the envelope with the phone number on it, the phone that was used to make these ransom calls? Defendant Krylov's fingerprints were on that envelope because he was involved in this abduction. He set up Alexander Umansky, and he helped carry out his abduction and his resulting death. That's why his fingerprints were on that envelope with that very important phone number.

He wants you to believe that his involvement was

minimal.  It wasn't.  After he targeted Alexander Umansky, he continued to help with his abduction.  He went to Hard Wired, and he found out how much money the gang of four could expect to get in ransom money.

He used his connections, his former employment, his former friendship with Alexander Umansky to gain access to the Hard Wired computers and financial information.  And he admitted as much when he testified.

This information was the information that formed the basis for the very ransom demand that the Umansky family later got and later had to pay, to no avail.  And he knew that Alexander Umansky was going to be killed.

How did he know that?  First, Alexander Umansky could recognize Mikhel Kadamovas and Altmanis.  He was a witness that could put them away for their crimes.

Second, Alexander Umansky had driven to the Weslin house.  Remember the ruse they used?  Alexander Umansky picked up Mikhel, and they drove to the Weslin House on the pretext of meeting that fake friend with the Hummer that wanted to have similar auto accessories installed in his car. He drove to that house.  He knew where that house was, that house that belonged to Kadamovas, that house that would and could and actually did tie the defendants to these crimes. He knew about that.  So he had to be killed because he could finger these defendants for these crimes.

And third, just in case there's any doubt in your mind, Rita Pekler had already been killed, and Krylov, himself, admitted not only that she had but that he knew that she had.  Rita Pekler also knew where the Weslin House was, and she could identify the defendants.  And once she could no longer be of use to the defendants, once she could not get Mr. Safiev to come meet that day, she was no longer of use to them, and she had to be killed as well because she was a witness who could finger them as well.

Now, the defense is going to argue, I believe, that hey, what about Armen Gyurdzhiyants, that crazy Armenian guy?  He was not killed.  So maybe Krylov didn't think that Mr. Umansky was going to be killed.  Well, ladies and gentlemen, that's pure nonsense.  I'd like you to remember three important things when that argument is made.

First, Armen Gyurdzhiyants, unlike the other victims, was a criminal, a criminal that had asked the defendants to kill a DEA officer for him.  They had made a tape.  Defendants had made a tape of him asking them to kill this DEA officer, and they even mentioned the name of the DEA officer on that tape.  Now, I know it was a long time ago in this trial, but remember when we played that tape during the testimony of Natalya Solovyeva and she had explained to you that she had seen that tape on a video camera that belonged to her boyfriend, Jurijus Kadamovas, shortly after this

incident with Armen, the Armenian?

The defendants now had the ultimate way to keep Armen quiet, to blackmail him into silence. They weren't worried about him talking. They didn't need to kill him. He was more valuable to them alive.

But remember also a second point. Remember what Petro Krylov said when he was on the stand: That Armen Gyurdzhiyants had been blindfolded when they took him back to the house. He couldn't identify where the defendants lived. He couldn't take the authorities back to that location.

And finally, and this is the most important point, remember the one thing that I don't think anybody in this trial is disputing, and that is that these defendants are dangerous and deadly people. They had no qualms about killing when it benefitted them, like silencing a witness. And, again, Petro Krylov himself admitted this fact, of course they were going to kill Alexander Umansky.

During this trial -- trial, Defendant Krylov has asked you to believe that he thought his family and himself would be killed if they didn't go along with the other defendants. But at the same time, he's asking you to believe that he didn't know that these victims, victims who were -- who were real victims who were likely to go to the police, that these witnesses to these serious crimes would not be killed? Simply the story -- position is simply not credible.

UNITED STATES DISTRICT COURT

Petro Krylov knew better than anyone else that the minute that Alexander Umansky was abducted, he was a dead man.  He was going to be killed.  And more than anyone else, Petro Krylov was responsible for Alexander Umansky's death.  And for that reason and for that reason alone, you should impose the death penalty in this case.

And if that isn't enough for you, ladies and gentlemen, remember this.  Defendant Krylov had a chance to save Alexander Umansky's life with one word to the FBI.  The FBI that he didn't have to go to; no, they came to him.  They were in his apartment, sitting across from him.  All he had to do was with one word tell them what was happening to Alexander Umansky.  The FBI that could have offered him and his family protection if only he had wanted it, if only he had he asked for it, which he did not.

Instead, what choice did Petro Krylov make?  What was his choice of action?  Not just silence.  Not just saying, "I don't know anything."  No, he misdirected the FBI.  And after that, as is shown by the phone records, he called Iouri Mikhel.  After he met with the FBI, he called Iouri Mikhel.  And you know what happened after those calls were made.

Later that night, Alexander Umansky was killed.  Petro Krylov was scared that day.  But he wasn't scared of his co-conspirators.  He was -- he was afraid that he was

going to get caught.

Now, let's talk for a minute about the evening that Alexander Umansky was kidnapped and his car was stripped and taken to the airport. You heard testimony during this trial about a fingerprint party. Maybe it happened. Maybe it didn't happen. Maybe his relatives are just mistaken about the time that they left the party that night or maybe they're mistaken about the date that that party happened. Or maybe they lied to protect their friend, their relative, Petro Krylov. You may never know the truth of the answer to this question.

But if there was a fingerprint party that night, Petro Krylov left it in time to help Ainar Altmanis strip that car and move it to LAX and dispose of it. And you know that's true because what isn't mistaken and what doesn't lie are the phone records. What also doesn't lie and what also isn't mistaken is your common sense. The phone records and the LAX videos show that Petro Krylov and Ainar Altmanis talked on the telephone while Altmanis was driving Alex Umansky's car to the LAX parking lot that night. They talked again minutes before that car was dropped off and then again minutes after it was dropped off. And that's what these exhibits and these records show.

Ainar Altmanis wasn't calling Petro Krylov that night to say, "Hey, just arrived at LAX, thought you'd like

to know.  Hey, just dropped off the car.  Just leaving, thought you'd like to know.  Hey, by the way, how's that fingerprint party that you're at?"

Altmanis was coordinating his ride home, his ride with Petro Krylov.  Petro Krylov might have been at a party that night and earlier that evening, but he wasn't there when these calls were made.  And Petro Krylov wasn't calling his own wife that very same night and checking his own voicemail from his very same apartment that very same night during that very same party.  He wasn't out at the pool.  He wasn't off at the patio.  He was calling his wife from the road because he was returning from dropping off that car and picking up Altmanis.

You may be asking yourself, why does this matter?  Why is she taking all the time to talk about this?

It matters because of what it shows.  It shows that Krylov hasn't been truthful with you.  It shows that he was more involved than he has admitted, more involved that he wants you to know or believe.  This is just one of the many examples of how Petro Krylov has not been truthful to you during the course of this trial.

Nick Kharabadze.  As you learned during the trial, Nick was the youngest of the victims.  He was only 29 years old when he was killed.  And he was quite literally in the prime of his life.  He was single.  He was happy.  He had

friends.  And he was just at the start of a promising career in the movie business.  And we'll never know if he could have lived up to the potential that Ron Shelton and Eric Batisha saw in him.  We'll never see that first movie that he might have made because Defendant Krylov didn't care about his potential.  Defendant Krylov did nothing to stop his abduction or his ultimate murder.  Nick Kharabadze left behind a mother, a father, and friends all devastated by his loss.

George Safiev.  The final victim, as you know, is a recent transplant from Russia.  George Safiev had a new home in Beverly Hills.  He had just started a movie production business with his good friend Nick Kharabadze.  He had a beautiful daughter that he adored and who adored him. He had a wife that he adored and a son that he loved and spoiled.  He also had a sister.  He had a sister.  And I'll use her words to describe how she felt when he died:  Her whole world collapsed.

He had a mother as well who loved him and depended upon him and who, ironically, even though she had cancer, outlived him.  Mr. and Mrs. Umansky said it best when they said a parent should never have to bury their child.

George Safiev had moved his family to Los Angeles and to the United States to live the American dream, a dream that was cut short by the defendants, even though he had paid

close to $1 million in ransom money and even though he had done everything that had been asked of him.

Did Petro Krylov know that these two individuals were going to be killed?  Absolutely.  He admitted it himself on the stand.

But he did more than just know that they were going to be killed.  He helped plan it.  As you will recall, he bought the weights to use on their bodies when they were thrown off those bridges.  And this is the receipt that was found at his house that showed that he bought those weights the very same day that they were killed.  Those weights were loaded into that van that drove up to the New Melones Reservoir the night that Nick and George were killed.  And they weren't loaded into that van so that they could do exercises on the way up.  Petro Krylov knew what those weights were for, and they weren't for exercise.

And as with Alexander Umansky, there was a reason that he had to be killed.  Like Alexander Umansky, Nick Kharabadze, and George Safiev, he could identify the defendants including, specifically, Petro Krylov.

Not only could they identify the defendants, but they knew the Weslin House.  And even more important, both of them could identify the location of Designed Water World, where they had gone to be abducted, another location that would inextricably tie the defendants to these crimes and

another reason why they had to die.

Aleksejus Markovskis, when he testified, told you that he figured out that he was being lied to as soon as he realized after looking at those driver's license that both Nick Kharabadze and George Safiev were local.  They were from the LA area.  They weren't from someplace else.  He knew that they were going to die because they were local, because they had seen the defendants, and because they knew where Designed Water World was and he could implicate them.

He confronted Kadamovas about this fact, and Kadamovas confirmed that night -- that late night that they stayed up talking that they did, in fact, have to kill Nick Kharabadze and George Safiev.  And he told Aleksejus Markovskis why.  As he put it, they had to die so that they would sleep better.

The defendants had to kill Nick Kharabadze and George Safiev so they wouldn't have to worry about two more witnesses against them.  And Defendant Krylov knew, even before the kidnapping of Nick Kharabadze and George Safiev, that they were locals.  He knew because he had a map showing where Nick Kharabadze lived.  A local address complete with information about the cars parked at that house.  Krylov knew where Nick Kharabadze lived.  He knew that he was local.

And did he ever explain to you, the jury, why he had that map in his house?  Did you ever hear him say

anything on the stand when he testified about that map?

No.  Why not?  Because there's no good explanation for why he would have this map with Nick Kharabadze's address and the description of his cars in his house. Defendant Krylov knew when they drove up to the lake that night that they weren't driving up to the lake to leave Nick and George in a hotel to wake up later.  You don't need weights for that.  He knew that they were going to die.  He knew that they were going to die before.  He knew why they had to die too:  So that they could all sleep better.  And he helped.  He helped to kill them.  First George and then Nick. And then he helped to clean up the Weslin place afterwards to try to hide the evidence, to try to hide these horrible crimes.

Ladies and gentlemen, I would like you to think about something.  In a little over two months, Petro Krylov was involved in, first, an abduction of a guy named Armen Gyurdzhiyants; then in the kidnapping of Rita Pekler; then in the kidnapping and resulting killing of Alexander Umansky; and finally, in the kidnapping and killing of Nick Kharabadze and George Safiev.  Four kidnappings and four deaths in a little over -- a little over two-month period of time.

This is truly astonishing, truly exceptionable -- exceptional and truly horrific.  And you know that the

defendants were planning even future crimes, and the only reason they stopped is because they got arrested. The sheer number, the speed, and the nature of these crimes speaks to the defendant's utter indifference to life and speaks to why the death penalty is an appropriate punishment in this case.

Now, Petro Krylov has maintained that his role in these crimes was minor. Petro Krylov has also maintained that he was acting under duress. Well, let's examine those two claims just a little bit closer.

First, what was his role? Although he was reluctant to admit it on cross-examination, Petro Krylov finally admitted in that first crime, the abduction of Armen Gyurdzhiyants, that he acted as a guard. And by the end of this killing spree, at the end of this crime spree, he was actually targeting future victims. Remember that phone call that he made to New York. And after the Armen Gyurdzhiyants' abduction, Defendant Krylov's role in these crimes increased dramatically.

By the end, Krylov was participating in every step of the crimes, from targeting victims to helping to perfect the ruses and educate his co-defendants, guarding additional victims, buying the tools necessary to kill and abduct these people, like prepaid cell phones, zip ties, and weights. He was moving cars so the defendants would not be found or

caught.  He was cleaning up afterwards to destroy evidence. He even tried to get a working silencer.  He admitted that. He laundered money.  And most important, he helped transport and kill Nick Kharabadze and George Safiev.

The amount of money that he got paid also gradually increased in time to reflect his increasing role and his increasing trust within the group, from the $5,000 that he got paid for the Armen Gyurdzhiyants kidnapping to $10,000 for Alexander Umansky to $70,000 for Safiev and Karabadze.

Now, Petro Krylov was not the mastermind or the leader of this group, but he was stepping up the ladder, not down.

He was an integral part of the success of this crew.  He was an important participant in each of these crimes.  His role simply cannot be described as minimal, nor his culpability for these crimes.

Defendant Krylov also wasn't doing what you would expect or what would be logical from a person who was acting under duress.  Krylov was given greater responsibility, greater access to information over time.  His involvement was growing.  Defendant Krylov wasn't distancing himself from this group that he claims to have feared; he was doing the exact opposite.  He was socializing with them.

Petro Krylov didn't do what you would expect someone to do who was threatened.  He didn't run.  He didn't

move.  He didn't hide his family.  He didn't even warn his family.  He didn't minimize contact with these terrible people.  No, the opposite happened.  And even up to the day that he testified in trial he had never warned his parents that they might be in danger.  His wife and child had never moved out of danger's way.  Does that make any sense if you really love your family and think that they might be in danger?  Wouldn't you warn your parents if you thought that they might be killed because of your actions?  Wouldn't you make your wife and baby move if you thought they might get killed?  Would you instead call the very person that you were afraid of who had supposedly threatened to slice and dice your family and ask him if you wanted -- if they wanted you to buy this, a Nazi dagger?  No way.

Petro Krylov's claim of duress, as made throughout this trial, defies logic, reason, and common sense.  But more to the point and more importantly, it's not substantiated by a shred of evidence.  Nothing except his own self-serving claims, claims that he made only for the first time when he was facing capital charges, when he was facing this trial.  This claim of duress should be seen by you for what it is:  An after-the-fact justification; an after-the-fact excuse for his horrible actions.

And let's consider another lie that Defendant Krylov told which shows what a sham this duress

defense is.  He claims that when he was interviewed by the FBI, after his arrest that he asked for protection.  That makes sense because that's what you would expect a person to do who had been threatened and whose family's lives had been threatened.  Except that it never happened.  He never did it. And you know that it never happened because Special Agent Davidson testified that it didn't happen, and he was there that day.  He interviewed Krylov that day that he was arrested.

He would have acted on that information if Krylov had said that because he was looking for a break, he was looking for information.  Krylov told you on the stand under oath that he was told by the FBI that they couldn't protect family members with different last names.  That was a lie. You know that is was a lie.  You know that the FBI never told him that, and they never would have.

Shortly after this interview, in fact, after this interview with Defendant Krylov, Ainar Altmanis asked for protection for his family because he was accepting responsibility, and he did want to cooperate with the FBI. And the results were dramatically and empirically different.

His wife, Elayna Kwiva Prishedko, with a different last name, and her children were immediately given protection by the FBI as were every other witness in this case who asked for it and needed it, including Mr. Markovskis and his

84

family.  Defendant Krylov lied about this fact, and he lied about it because he knew that his actions didn't make sense. And because of this you know that this whole duress offense is a sham.  It's a lie.  His actions simply make no sense.

Let's look at the real reason that Defendant Krylov joined in with this group, the gang of four.  Why did he first agree to help with what, by his own admission, is a scam involving a person who wanted to kill a DEA officer? Why did the other defendants trust him enough to bring him into their group?  They invited him to join this group, not under duress but for two reasons.

First, they wanted to expand their group, their activities.  They wanted and they needed more manpower, more bodies.  They were willing to share the money that they made with Krylov, and he was willing to work in exchange for money.

And second, they believed that he was someone that they could trust.  You don't invite somebody to your house just to work on illegal satellite TV cards at the exact same time that you're abducting somebody.  He didn't hang around that house the next two or three days just to fix that illegal satellite card that he wanted you to believe.

That's the story that he told you, that's the story that he wants you to believe, and it simply isn't credible. You don't let people see you commit serious crimes unless

you trust that person, unless you need that person and you want that person's help.  Krylov was there that day not to fix those satellite TV cards; he was there to work.  He was there to help.  He was there to help with the kidnapping of Armen Gyurdzhiyants.  He was there to earn his pay.  He was there because he was trusted; otherwise, he would have never been invited into the group.

Petro Krylov also wasn't invited to the Weslin house the day that Rita Pekler was kidnapped and killed just so that he could stand around in the back and smoke cigarettes.  He was there that day to do work.  And the work that he was doing that day was kidnapping, killing, and transporting her body.

Why were his fingerprints on that box of Dimedrol, the drug that later found -- was found in Rita Pekler's body? Did you ever hear any explanation from Petro Krylov as to why his fingerprints were on that box when he was on the stand testifying?  Did you ever hear Petro Krylov, when he was on the stand, explain that blood that was on his pants after that overnight trip that he took with Defendant Kadamovas up to the lake?  The trip that happened just before Natalya Solovyeva found that passport which Rita Pek- -- of Rita Pekler's in the van used to transport her up to the lake?

And his attorneys, during closing arguments, spent

a lot of time on the possible explanations for why there was blood on his pants, different theories, none of which were supported by the evidence. But again, what did Petro Krylov say when he was on the stand about that blood on his pants, about that trip up to the lake that night? What he said was nothing.

Krylov's role in the Karabadze and Safiev kidnapping also wasn't minor. He helped to guard Nick Kharabadze and George Safiev, and he even bought flex ties and weights. He helped transport them up to the lake, and he helped kill them.

Petro Krylov didn't drive up to the lake with Nick Kharabadze and George Safiev to do as he would have you believe, what he would like you to believe, to just fiddle with the fuses in the front of the van to try to fix the lights. He didn't travel up there that night to just stand around as an observer. No. He was there to work. He was there to help. He was there to earn his pay. And he did.

And that map in his house, that receipt for those weights in his house, that zip tie around Nick Kharabadze 's neck and the weight that he bought that was found tied to his body are just some of the pieces of evidence that prove this point.

During their closing arguments, I expect that the defense is going to ask you to show mercy towards their

client.

You're all good people, and everybody is capable of mercy.  But every time you hear that word, "mercy" -- and it may not be used in just that way but that call for leniency -- ask yourself this:  Did the defendant show mercy to any of the victims when they were kidnapped, held, and then killed in cold blood?  Did the defendant show any mercy to the families when he helped -- when he helped dump the bodies in the lake, leaving the family members, for months, not knowing what had happened to them?  Did he show any mercy or remorse when he met with the FBI that day, knowing that Alexander Umansky was being held captive, only hours before Alexander Umansky was killed?  Did he even bother to tell the FBI even after he was arrested where they could find the bodies?  Did he say I'm sorry?  Did he accept responsibility for his actions?  No.  He denied any knowledge of these crimes, and he tried to shift the blame.

He showed no mercy when he committed these crimes. He showed no mercy since he committed those crimes.  So when they ask for mercy, reject that cry.  Because this defendant deserves no mercy.

And more importantly, ladies and gentlemen, this trial is not about mercy.  That's not what your decision is about.  This trial is not about revenge either.  It's not about easing the pain of the family members because nothing

will ever do that.

This part of the trial is about one thing, and one thing only, and that's justice. When you're thinking about justice back in the jury room, I would like to you keep one very important concept always in the back of your mind and that concept is choice. Think about the many choices that the defendant made. Choices, decisions that he could have made differently; choices that led to these horrible crimes. Defendant made -- Krylov made choices that had terrible, terrible consequences.

And that's what justice is about. Justice is what our society says should be the consequences for those choices. Now, there's a legal framework for deciding justice in this matter, and the Judge has already read you the jury instructions about that framework, and you should be guided solely by what the Judge read to you.

You're also going to get a jury verdict form, a special verdict form, that details this legal framework. And my advice to you is that when you go back into that jury room to deliberate that the first thing that you do is get out that special verdict form because it details each of the steps that you have to make -- you have to reach in making this important decision. It details it. And that special verdict form will guide you in the process that you're about to begin.

I'm going to walk you through that process myself. There are six steps in the process that you are about to make.  The first step involves the age of the defendant.  He has to be 18 years of age or older at the time of these offenses.  The parties have stipulated to this fact; so it's not in dispute.  When you reach that part of the special verdict form, check the box and move on to Part 2.

Part 2 involves what are called intent factors or -- or gateway factors.  And specifically what you must find beyond a reasonable doubt is that the defendant intentionally killed or that the defendant intentionally participated in an act contemplating that it would result in death or that Defendant Krylov intentionally engaged in an act of violence knowing that the act created a grave risk of death.

Let me go over these factors in a little more detail.  You must find at least one, but only one, of the following to be true:

That Defendant Krylov intentionally killed Nick Kharabadze or George Safiev or that Defendant Krylov intentionally participated in an act contemplating that the life of a person would be taken or that lethal force would be used and that Nick Kharabadze, Alexander Umansky, and/or George Safiev died as a direct result; or that Defendant Krylov intentionally and specifically engaged in an

act of violence, knowing that the act created a grave risk of death to a person such that participation in the act constituted a reckless disregard for human life and that Alexander Umansky, Nick Kharabadze, and/or George Safiev died as a direct result of that act.

Based upon your verdicts in this case so far, you have already found that the defendant meets one or more of these gateway factors, specifically that the defendant -- that Defendant Krylov intentionally killed Nick Kharabadze and George Safiev; intentionally participated in acts contemplating that a life would be taken, specifically and directly leading to Alexander Umansky, Nick Kharabadze, and George Safiev's death; and that Defendant Krylov engaged in acts of violence, here hostage takings, knowing that those acts created a grave risk that Alexander Umansky, Nick Kharabadze, and George Safiev would be killed.

You must unanimously find one or more of these three factors to be true beyond a reasonable doubt. But you need only agree on one. Check the boxes and move on to the third step.

The third step, you must determine if the Government has proven the existence of any of the following statutory, aggravating factors beyond a reasonable doubt. Now, the Government has alleged four statutory, aggravating factors, and they're all pretty straightforward.

The first statutory, aggravating factor is that death during the -- the death during the commission of another crime. Here, the death of Alexander Umansky, Nick Kharabadze, and George Safiev occurred during the commission of another crime. And then in this case, that other crime was conspiracy to commit hostage taking, resulting in death and/or during the actual hostage taking, the substantive charges resulting in death.

Again, based upon your verdicts in the guilt phase, I submit that you have already found that each of these victims was killed during a hostage-taking offense or during the conspiracy to take them hostage. This is one of those factors that should receive great weight in your deliberation process.

The death of each of these victims was heinous enough. These were -- but these murders were much worse than just a murder because each of these victims were killed first and held for days. Each of the victims was lied to and told that they would be released. Each of these victims was restrained during this time period. And during this period they were forced to make calls to negotiate their own ransom. The defendants had the choice to let these victims go after they were kidnapped, after they got the ransom money, but they chose instead to kill them. And it is this unique combination of factors -- the kidnapping, the restraint, and

the murders -- that make these crimes so unique and so terrible.

And it is for that reason that this factor should be given great weight.  And this is just another of the reasons that you should impose the death penalty in this case.

The second aggravating factor involved the commission of the offense for pecuniary gain.  As you heard, Defendant Krylov committed the offenses that you have already found him guilty of -- in expectation of the receipt of something of pecuniary value.  What does pecuniary value mean?  In this case it's very simple.  Money.

Krylov was paid, and he admitted that he was paid.  He even arranged to launder that money.  Again, this is a factor that should be given great weight.  These weren't crimes of passion.  These weren't random acts of violence.  These crimes were motivated by the basest of motives:  Money.  Killing for money shows an utter -- utter indifference for the value of life.  And it is for that reason that this factor should be given great weight in your deliberation product -- process.  And this is another reason why it is appropriate and why you should impose the death penalty in this case.

The third statutory aggravating factor involves substantial planning and premeditation.  The evidence of

this case shows that each of the defendants put considerable time and energy into planning these kidnappings:  From buying prepaid cell phones, zip ties, weights to researching and planning the ruses.  Every kidnapping and murder was thought out well in advance and done deliberately.

And Defendant Krylov himself helped with every step of planning and preparation of these crimes, and he also helped afterwards, cleaning up the evidence and carefully disposing of the bodies.  This is another factor that should be given great weight because it shows how much time and effort went into these crimes.  It also shows how much time that Defendant Krylov had to reconsider his actions and make different decisions rather than the decisions that he made, which was to try to help these crimes be successful.

Consider how many things that Petro Krylov did to successfully execute and to help successfully execute these crimes.  Each of these steps that he took required him to make a conscious decision, a choice -- a choice with devastating impacts.  These were cold, calculated decisions on his part.  And it is this cold calculation and thought and planning that deserves so much weight in your deliberation process.  And this is another reason why the death penalty should be imposed in this case.

The four statutory aggravating factor involves multiple killings.  The defendant potentially killed more

than one person in a single criminal episode.  Here the Government alleges that the defendant intentionally killed or had a conscious desire to cause the death of Alexander Umansky, Nick Kharabadze, and George Safiev.

As the evidence in the guilt phase showed, this was a crime spree that was part of an overarching conspiracy. And these three deaths occurred in less than a two-month period of time.

These killings were part of the continuous course of -- continuous course of conduct by the defendants that were closely related in time, place, and purpose.

All in Los Angeles, all of the victims were held at the Weslin House, and they were all held for a similar purpose.  They were all killed for a similar purpose -- for money and to eliminate them as witnesses.  And keep in mind also that the law does not require that these events occur on the same day, week, or even month.

This factor also should be given great weight. Again, each murder is horrific in and of itself.  Each kidnapping is horrific in and of itself.  But here we have murders and kidnappings which occurred in a very short period of time without stop.  This factor is your way to make sure that each of the crimes and each of the victims is given independent weight, to make sure that each of the victims count.  And again, this is a factor that weighs in favor of

imposition of the death penalty in this case.

The fourth step in the legal framework is as follows:

If you found that the Government has proven the existence of one or more statutory aggravating factors unanimously and beyond a reasonable doubt, then the next step is to consider whether the Government has proven any nonstatutory aggravating factors beyond a reasonable doubt. The Government has alleged six.

First, future dangerousness if the defendant is confined to a federal prison without the possibility of release, as shown by his continuing pattern of violence, including those crimes that you've already found him guilty of as well as his lack of remorse, his utter and complete lack of remorse for these crimes.

And, again, this is a factor that should be given significant weight in your deliberation process. Why do you know that Defendant Krylov poses a future danger if released?

First, because of what he did before. As you all know from your own life experiences, the best predictor of future behavior is past behavior.

Second, because if Petro Krylov is given life, he'll have nothing to lose in prison.

And third, because he hasn't changed. He's the

same person with that same -- that committed those same violent acts. He hasn't shown remorse. His only remorse is that he was caught. And even when he was caught, he didn't show remorse or accept responsibility for his actions. Instead, as you heard, he denied all knowledge of those acts and tried to shift the blame.

And this is another reason you should impose a death sentence.

The second nonstatutory aggravating factor is defendant's participation in other uncharged, serious acts of violence. And here what we're talking about is the kidnapping, the hostage taking of Armen Gyurdzhiyants, the Armenian. Again, he admitted his involvement in this kidnapping. He admitted, reluctantly, on cross-examination that he acted as a guard. Now, Armen Gyurdzhiyants isn't a person who engenders a lot of sympathy from anyone. But the crime that was committed here was a very serious crime, and it should have very serious repercussions.

This is a factor that should weigh in favor of the death penalty, probably not as much as the other factors that we're asking you to consider. But kidnapping, regardless of the victim, is a very serious, violent crime. And this crime shows it right from the start. Krylov was willing to engage in this type of violent activity. And this factor should also be given very serious weight because of

what Defendant Krylov did afterwards.

Not just the other crimes that he did but what he did afterwards with respect to this crime. Did he warn anybody that Armen Gyurdzhiyants wanted to kill a DEA officer and was looking for hit men to do that job? Did he warn the victim that he might be killed? No.

This is another reason to impose a sentence of death.

The third nonstatutory aggravating factor involved contemporaneous convictions. Again, your verdicts establish this factor. There are four counts for which you found the defendant guilty. This is one of those factors that speaks for itself and doesn't require much explanation. The past behavior of the defendant shows his propensity for violence and his willingness to engage in that violence. It shows the depth and the breadth of that criminal conduct. This is not one single crime that he committed. And that depth and breadth should be given great weight by you in your deliberation process.

The fourth nonstatutory aggravating factor is witness elimination. I've already discussed this factor at great -- at some length. But in summary, the defendant never intended -- the defendants never intended to let their victims go despite the fact that they told them that they would if they cooperated. And except for Armen

Gyurdzhiyants, they left no witnesses alive.

They wanted to sleep better, and they knew they would without witnesses to their crime.  Petro Krylov knew this as well.  The defendants could have let the victims go, but they didn't.  They didn't need to kill these victims. They had already gotten the ransom money.  They killed these victims for one simple reason:  Not to have witnesses to their crime.

And the Court has instructed you in Jury Instruction Number 17 -- and I'm going to refer that to you because it's important, that killing a person for the sole or dominant purpose of preventing him from reporting another crime to authorities does make a defendant more blameworthy in a way that is relevant to deciding whether the death penalty is justified.  This factor should be given great weight in your deliberation and is another reason that you should impose a death sentence here.

The fifth nonstatutory aggravating factor involves the emotional suffering of the victims.  This is demonstrated by the extended period of time that they were held captive after they were initially seized.  We know that each of the -- of the victims was restrained during this time as well and forced to sleep in small closets or stay restrained in small bedrooms.  And during this time that they had no idea what was actually going to happen to them.  We could

only imagine, since they're dead, how they must have felt.

But you can't doubt that they suffered during this period of confinement.  This factor shows how these are -- these crimes -- this crime -- these crimes are worse than other murders.  These weren't quick, easy deaths where the victims were quickly put out of their misery.  No, these victims were forced to suffer.  They were forced to endure the stress and the anxiety of not knowing what was going to happen to them for four days.  And for -- for those reasons this factor should also be given great weight in your deliberation process.

The sixth and final nonstatutory aggravating factor involved victim impact evidence.  Specifically, that the defendant caused injury, harm, and loss to the family, friends, and coworkers of the victims.  One of the factors that you are allowed to consider in this case, as a matter of law, is the effect that these murders had had on other victims.  You've already heard a lot about this.

Each and every one of the family members and friends that testified during this trial was a good person -- a good person whose life has been inexorably changed for the worst because of these crimes; people who were scarred for life, who had holes ripped into their very souls, to their very lives.  You saw the testimony of these victims.  You saw for yourself the pain and the vulnerability and the lasting

effects that these murders have had on them and their families, even five years after the fact. They told you when they testified how impossible it was to put into words what they were feeling, but they tried anyhow. You saw that testimony, and you can judge it for yourself.

And don't forget the many, many friends and family members that you didn't get to hear testify that have also been affected by these terrible crimes. And think again about the choices the defendant made, the choices that left these many, many victims, these family members and friends in his wake, the scars that will never heal and holes that can never be filled.

The fifth step in the legal framework requires you to consider whether the defendant has established the existence of any mitigation factors. A mitigation factor is a fact about the defendant's life or character or about the circumstances surrounding the offense that would suggest in fairness that a sentence of death is not the most appropriate punishment or that a lesser sentence is the most appropriate punishment.

Now, as I go through these mitigation factors that have been raised by the defense, I'm going to ask you to keep this definition in mind because it's very important. And I think you will see and I think you will agree that many of the mitigation factors that have been identified by

the defense do not suggest that a lesser life sentence is appropriate.  Many of these factors don't even have anything to do with the defendant at all.

Please note as well when you're considering these that the law does not require unanimous agreement on mitigation factors.  And the burden to establishing mitigation factors is only by a preponderance of the evidence.  When you consider each of these mitigation factors, please keep in mind three things:

First, does the factor -- does the fact underlying that factor actually exist at all?  Is it true?  has the defendant proven it by a preponderance of the evidence?

Second, if he has proved that it exists, is it, in fact, really a mitigation factor?  Just because it's on your special verdict form doesn't make it a mitigation factor.  It's only a mitigation factor if it would justify a lesser sentence.  And that decision is left to you.  And ask yourself of this mitigation factor, is it anything that has to do even with the life and character of the defendant?

And finally, if you -- if you get past those first two questions, then ask yourself what, if any, weight you should give to that particular factor.

As the Judge has instructed you, this is not a counting game, and the importance of this point is made clearer by the fact that you now have 37 mitigation factors

to consider.  You, the jury, get to decide what, if any, weight to give any of those mitigation factors.  You can give those factors a lot of weight, or you can give them little or no weight.  That decision is left to you.

The defendant has, as I mentioned, identified 37 mitigation factors.  Okay?  And because my time is limited and because so many of these factors are really just duplications of each other and say the same thing in different variations, I'm going to group a lot of them together.

The first three mitigation factors deal with the fact that a life sentence is an option and that the defendant will suffer if he's sentenced to life.  The defendant is saying here, I think, you should impose life because you can impose life.  Now, that's really kind of circular logic, and I would respectfully submit that it is not a mitigation factor; it doesn't justify life over death.

In fact, what it does is begs the question -- it begs the question of what is the appropriate penalty?  Does Petro Krylov deserve the ultimate punishment?  Would life in prison be an adequate punishment for the crimes that he has committed?  Would life in -- in prison punish him fully for the crimes that have been committed?  And the aggravating factors in this case show you that it would not be.  If Petro Krylov is sentenced to life, he is going to have a

harder life, no doubt.  He'll have bad days, but he'll also have good days.  He'll have days.  Does he deserve a single day to measure against the three lifetimes of the days that he's ripped away?  The lifetimes of memories, but now only memories that the family and friends have?

These factors deserve little, if any, weight. He'll have the rest of his life to contemplate his actions, but the family and friends will also have to spend the rest of their life contemplating the lives that they miss of their loved ones and coming to terms with the pain and suffering as a result of their deaths.

Factor Number 4 alleges that Krylov is less culpable than others who are not facing the death penalty.

Who are these others?  They're not facing the death penalty.  You've heard about Mikhel and Kadamovas and what sentence they got.  Is he talking about Ainar Altmanis here? Ainar Altmanis is a bad person.  Make no mistake about that. But he did a very significant and important thing that is highly relevant to his culpability.

First of all, he confessed.  He told the FBI what they had not been able to learn up to that point, the fate of these victims.  He even told them about a victim they didn't know about:  Meyer Muscatel.  He also took the FBI to the bodies; the bodies that most likely would never been found without his help.  Without him we wouldn't have any DNA

evidence.  Without him we would have no bodies to return to the family members and no DNA to take from those bodies.  Without him we might not even know for sure, even now, what had happened to these people.

Ainar Altmanis should be punished.  Make no mistake about that.  And this Court will be responsible for deciding what the fair and appropriate punishment is for him.  But unlike Defendant Krylov, Ainar Altmanis accepted responsibility for his actions.  And unlike the defendant, and maybe for the first time in his life, Ainar Altmanis did something good, something very important.  He helped bring these defendants to justice.  He helped return these victims to their family.  Compare his actions to those of Defendant Krylov.

Mitigation Factors Number 5 and 6 address Krylov's culpability versus Mikhel and Kadamovas.  Petro Krylov joined these defendants willingly.  He joined in their crimes and he can join in their punishments.  He was also an integral part of the success of these crimes.  He got paid for that participation.

He's also the person who is most responsible for Alexander Umansky's death.  As to Alexander Umansky, he is the sole difference between an extraordinary life and an extraordinary death.  Is he really less culpable for that death, the death of the person that he socialized with?  The

man who put bread on his table and a roof over his house and gave him a job?  Is he really less culpable?  Let's assume for a moment that Iouri Mikhel and Kadamovas are more culpable for these crimes than Petro Krylov.

Again, remember the definition of mitigation. Mitigation is something about the defendant that would suggest that life is more appropriate.  These factors aren't about the defendant.  They're about Mikhel and Kadamovas. And Mikhel and Kadamovas are not on trial here today. They've already had a jury decide their case.  These aren't reasons to be lenient towards Defendant Krylov.  His crimes are heinous regardless of whether or not Mikhel and Kadamovas are worse.  These factors should be given little or no weight by you.

Factors Number 7 through 15 address what Krylov did and what he didn't do and his allegations about the fact that he believes that Altmanis fabricated evidence.

Ladies and gentlemen, you've already made your decision about Petro Krylov's responsibility and guilt with participation in these crimes, and apparently the defense is hoping to have a chance to convince you that you were wrong or create doubt in your mind.  You should put trust in the decisions that you have already made -- that you have painstakingly made about what Krylov did and didn't do.

The defense wants you to believe that Ainar

Altmanis fabricated evidence against the defendant.  Did Altmanis confess to five capital murders to get back at Petro Krylov?  Does that make any sense?  What motive did he have to fabricate evidence against Petro Krylov?  What would he gain by that?  And more importantly, what would he lose, what could he lose if he lied?  What he could lose is the benefit of that plea bargain that he made with the Government, the State Government and the Federal Government.  What he would be facing, potentially, is five life terms if he were found to have fabricated.  Quite a price to pay just to get back at Krylov.  And if he was going to lie about Defendant Krylov, don't you think he would have come up with a little bit better story, a little bit more damning evidence?

Remember that Ainar Altmanis's testimony was corroborated -- was corroborated by Natalya Solovyeva.  It was corroborated by Aleksejus Markovskis.  But even if you don't believe the other cooperators, it was also corroborated by phone records and forensics like DNA and fingerprints and fibers by dozens of other witnesses that were not participants in these crimes.

I'm going to give you just one example.  Remember the police officer who came in here and told you about pulling the car over when they were driving up to the lake that night to kill Nick and George?  He corroborated

Ainar Altmanis's testimony.  And when Ainar Altmanis confessed to the police, when he confessed to the FBI, he had no idea that all this corroborating evidence was going to be found.  He had no idea what evidence did and didn't exist.  And a lot of this evidence hadn't even been collected at that time.

But Mr. Krylov, whose testimony is not corroborated by anyone, would ask you to believe that Altmanis is lying, not him.  It's simply not credible.  And this factor should be given no weight.

Factor Number 16 is about duress.  This factor, again, should be given no weight.  It should be given no weight because it is simply not true.  As I said before, Krylov's actions were not consistent with duress.  His actions make no sense if he was under duress and there's nothing but his self-serving testimony to support this claim.

He never made this claim until he was facing this capital trial, this after-the-fact justification for these criminal actions.  If he was truly afraid for his family, he would have done something differently.  Why is his wife still living in the same place?  Why didn't he warn his family?  Why didn't he really ask the FBI for protection for his family if he felt that they were being threatened?  Protection that they would willingly and quickly have given to him.

Factors Number 17 through 20 deal with Mikhel and Kadamovas's involvement in the Russian Mafia. The Government submits that these factors are, frankly, irrelevant and should be given no weight.

First of all, these factors have nothing to do with Krylov's character, and as such aren't true mitigators to begin with. And if anything, these factors weigh in favor of the death penalty. If you believe these factors, they show that this criminal group is really dangerous.

And the Government agrees with that conclusion. But keep in mind, ladies and gentlemen, this group included Petro Krylov. He was a willing participant in this dangerous group, and as such he, himself, was a dangerous person, a really dangerous person. Now the defense wants you to believe that this is a case involving, quote, unquote, the Russian Mafia because it makes Mikhel and Kadamovas seem more scary. It makes this duress defense somehow seem more believable.

Well, ladies and gentlemen, Mikhel and Kadamovas are plenty scary without having to believe they're part of the Russian Mafia. But more importantly, there is simply no evidence that they were a part of the Russian Mafia. Did they have accomplices in Russia? Absolutely. Several of them. Were they organize? Absolutely. Were they sophisticated? Absolutely. But there's not one piece of

evidence showing that they answered to or were connected to what they would call, the defense would call, the true, quote, unquote, Russian Mafia back in Moscow. Instead, what the evidence in this case shows is exactly the opposite. That Iouri Mikhel and Jurijus Kadamovas and this group answered to no one but themselves. Give these factors no weight.

Factors Number 21 through 23 again attempt to address the duress defense. And the only point I want to make here is not to repeat what I've said before, but to remember that you're going to have a lot of mitigation factors here that say exactly the same thing. Different variations in the language, but basically that's what these are about. Don't give them weight more than once, if you think that they even deserve any weight to begin with, because all they are is repetition of the same thing in slightly different forms.

Factor Number 24, Defendant Krylov is 29 years of age at the time of his arrest. Nick Kharabadze was 29, too, at the time that he was killed. He was old enough and bright enough to be starting a significant movie company. What does it matter how old Krylov was when he committed these crimes? I'm not even sure what the defense is trying to say here or why his age would be any excuse whatsoever for any justification that would weigh in favor of leniency. What's

important here is that he was old enough to know better. He was old enough to know right from wrong. And his age is simply no excuse for actions. This factor should be given no weight.

Factor 25 through 29 are factors that describe Krylov's personal history, his education, his university, his prior criminal record. The question that you should be asking yourself with respect to these traits is, do they matter? Do they weigh in favor of leniency? Do any of these facts or traits, these so-called traits that -- that Krylov claims that he has keep him from engaging in acts of violence or from killing? And the answer to that is no. And as such, they should be given little weight by you in your deliberations. None of these traits are reasons to impose a lesser sentence. And again, if anything, they weigh the other way.

If, in fact, the fact -- because of the fact that Petro Krylov had an education; because he had the ability to get a job, he'd had good jobs in the past; and he'd had training. He had a loving and supportive family. He'd received authorization here in the United States to work legally before these crimes were committed.

He was on his way, according to him, to becoming a legal resident. He was raised with good values by good people, by a good family in Odessa. He knew right from

wrong.  So this wasn't a person -- he wasn't raised under dire circumstances or had a rotten childhood or who was beaten as he was growing up.  He had a good upbringing.  He has no excuse for actions here.  These factors, if anything, weigh against him because he has no excuse for what choices he made here.

Factor 30 addresses what gains would be proposed in prison if serving a life sentence.  Defendant Krylov has proven his willingness and his propensity for violence.  Can you be sure that he won't do this again if he's in prison, especially if he has nothing to lose?  And what -- ask yourself this:  What, if any, evidence that was presented during the course of this trial supports this claim that he poses no future danger?  There simply is none.  And you should reject this mitigating factor.

31 through 35 addresses Krylov's relationship with his family here in Los Angeles and from Odessa and the loss that they will suffer.

A true family man thinks about his family first before he decides to get involved in criminal activity.  Did Defendant Krylov think about his family when he decided to help scam Armen the Armenian?  Did Defendant Krylov think about his family when he offered up Alexander Umansky as a target?  Did Defendant Krylov thing about his family when he committed any of theses crimes that you have found him guilty

of?  Did he think about the shame or the pain that he would bring to his family?  Did he think about the consequences, if he got caught and arrested, to his family, to his daughter, to his wife?

He didn't think about his family when he committed these crimes.  But now -- now he wants to use his family as a shield, a shield to get you to not impose the death penalty.  He put himself in this position.  He put his family in this position.  Don't let him now use that very same family as a shield.  He didn't think about his family when he committed these crimes.  Don't let him use his family now.

And let me just add so it's very clear, it's clear from the testimony that his mom and his dad and his family were good people.  They didn't deserve what the defendant brought upon them, what -- what he brought into their life, the pain and suffering that he caused them.  So when you're considering the family members, tally them up in the victim column as a reason weighing against life -- a life sentence and in favor of the death penalty, not against it.  This factor should be given, at best, no weight.

Think also about this.  The defendant lived in the United States, in Los Angeles for years before he committed these crimes.  When you heard testimony from his family, they were testifying about the boy that they knew from the Ukraine.  But people change.  Clearly Petro Krylov changed,

and dramatically so from the boy that he was like in the Ukraine.

Have you heard any evidence from his current -- about his current relationship with his wife or children? And where are his friends and family in Los Angeles? They didn't testify. Now, I want you to -- I want to say this up front. The defendant isn't required to call any witnesses to testify. He doesn't have the burden of proof, except as to his mitigating factors by a preponderance of the evidence. He doesn't have to prove anything in this case. But he has a right to call witnesses, including his wife, who still lives in the same place she did five years ago. And what about any friends who would know him now? People who would know what he's like, and what he was like at the time that he committed these crimes, not people that knew him 10 years ago or 15 years ago or 20 years ago.

This is why those people don't call. These are his friends. These are the photos from that party. Marina Caracadena christening the car that they had bought with ransom money. Mikhel Kadamovas and the wives partying together. These are his friends.

That's why you didn't hear from the people who know him and know what he was like at the time these crimes were committed. This is the remorse that he showed for his action, a party to celebrate spending ransom money on new

114

cars, the car that he hoped he, himself, would get for his efforts.

Factors 36 through 37 deal with acceptance of responsibility and remorse.  And, again, I've been over this several times.  Did he accept responsibility when the FBI arrested him?  No.  He denied responsibility.

Did he show remorse when the FBI came to his house and asked him about Alexander Umansky shortly before he died?  No.

The sixth and final step in the legal framework, after you've gone through these first five steps, requires that you shall engage in a weighing process.  You weigh the aggravating factor or factors that you unanimously found to exist and you weigh them against any mitigating factors that you individually found to exist or that any other member of the jury found to exist.

You should consider the weight and the value of each factor.  And different factors may be given different weights and values.  They may be even given different weights and values by different jurors.  They can be given no weight at all.  That decision is up to you.

But the important thing -- and the important point that I want to make again is that this weighing process is not a numbers game.  It is not simply a counting decision.  You have to give the value that you think is appropriate to

UNITED STATES DISTRICT COURT

each and every one of these factors.

And if you look at the rare and unique combination of the aggravating factors that are present in this case and you compare them to the mitigation factors presented by the defense, there's simply no way that the horrific manner in which these crimes were committed, the sheer number of crimes, the sheer number of victims and the ripple effect that those crimes have had on other family members and friends can be outweighed by the mitigation that's been presented here.

There's nothing that the defense has pointed out that in any way lessens Defendant Krylov's culpability for these crimes, these devastating crimes that he committed, or that would justify or warrant leniency.

I'd like to leave you with some final thoughts and some final photographs because pictures do sometimes speak louder than words.  This is Alexander Umansky getting in one last pinch.  This is the Umansky family:  Ruven and Elizabeth with the boys that she described as her two diamonds.  This is the future wife who got a casket instead of a wedding. This is the son who doesn't understand what happened to his father.

This is Nick and his mother, who is now utterly devastated by the loss of her son.  This is Nick and his friends, who have lost a true friend, one of the good guys.

This is George and his family, including the mother that he loved so much and the sister whose whole world has now collapsed around her. This is the daughter dancing with her father, who will never get another dance with him, including at the wedding that he couldn't attend, who didn't get to see her graduate from college. And this is the son who will never have his father's guidance growing up.

When you go back into that jury room, remember these photographs, and please, please take some time to look at them again and the other photographs that I haven't shown you today and try to remember these faces and get a sense of these lives that have been lost, these lives that have been so profoundly affected by these crimes, lives that cannot be fully conveyed to you with a few pictures or a few hours of testimony.

Remember the victims who can't be here to tell you about their last moments alive and how they felt. Remember the victims' families. It's very easy in the course of deliberating to have the family members and the victims pushed to the side and to have you focus your attention on the defendant.

Your consideration of him will push these matters aside. It's natural. Don't let it happen. Take the time to look at these pictures, to consider these families, and to consider the impact that this defendant's actions have had.

117

Ladies and gentlemen, justice requires that you hold Defendant Krylov accountable for his actions.  Justice requires that you hold him accountable for the terrible consequences of his actions.  And we ask you to return the only verdict that justice requires, and that is a verdict of death.

Thank you.

THE COURT:  That concludes Government's opening argument.  We will take a ten-minute recess and then start with the defense argument.  We will stop at 12:00 o'clock; resume again at 1:00 o'clock.

Each side has been given two and a half hours to present arguments; so I want to make sure that everything is accomplished today.  Ten-minute recess.

During your absence do not discuss the case among yourself or with any other person.

(A break was taken from 11:29 a.m. to 11:43 a.m.)

THE COURT:  Let's bring the jury in.

(Whereupon, the jury entered the courtroom at 11:43 a.m.)

THE COURT:  Okay.  We have our jury reassembled with the alternates.  Counsel are present with the defendant, and we continue with the argument of counsel.  This is the defense portion of the case.

Mr. Buehler, this is your opportunity to present

argument.

MR. BUEHLER:  Thank you, your Honor.

### DEFENSE'S CLOSING ARGUMENT

BY MR. BUEHLER:

Good morning.  It's still slightly morning, your Honor -- not your Honor, but ladies and gentlemen.

This, of course, is not a time I was looking forward to.  It was not a discussion with you that I wanted to have.  I was hoping we wouldn't reach this point. I'm sure that's obvious to you.

We were hoping that the testimony of Mr. Krylov, the evidence we presented, including the supporting evidence corroborating his testimony about the circumstances under which he became involved with these two men, Mikhel and Kadamovas, and the duress and fear under which he acted that we were hoping that you might find that he was not criminally responsible.

But as I said before, the last time I argued in front of you, that's a question that the law submits to you to decide because where there's duress, there's also the question of reasonableness of conduct under duress; there's the question of whether there was awareness that killings were going to result.

And those were in the instructions that you obviously went over very carefully.  And you've reached the

verdict that Mr. Krylov is criminally responsible.  And I accept that verdict.

And now we're facing the question of what the punishment is.  Now, let's make it quite clear in all of our minds that you have already determined punishment for Mr. Krylov.  You have already, in a sense, taken his life.  Because by your verdict, it is clear that at a minimum he will spend his life in prison, his entire life in prison.

So you have taken away from him what we think of as life.  You have taken away from him all the many things that you and I are used to enjoying in life.  Little things and big things in terms of how we conduct our lives, the choices we can make about where we go and when we do, the relationships that we can have with family and friends rather than with other people who have been sentenced to prison for long periods and in other cases for life.

So you have already decided by your verdict that a very severe punishment will be imposed upon Mr. Krylov.

And the question now is whether he should receive the death penalty.  But we're not talking about Mr. Krylov somehow getting off.  We're not talking about justice not being done.  Because he necessarily faces the loss of his life to life in prison.  You've determined that.

Now, you've been told that the law never requires a death penalty.  So it's not as if justice somehow cries out

for something more severe.  These are both very severe punishments.  And the law never requires the death penalty.

And, in fact, even when we reach this point, even when we reach a category of the most severe crimes so that the death penalty comes into question -- and that's not many crimes, of course, but by your verdict, Mr. Krylov is now in that category of crimes that are considered the worst crimes.  But even there, the presumption is not in favor of the death penalty but is against it.

Because if it were a simple life for life going back to early Old Testament times, then we wouldn't need this penalty trial.  We wouldn't need 30 to 40 pages of jury instructions for you to go back and look at.  We wouldn't have multiple layers of findings to be made.

The fact of the matter is that even when we have reached this category of crimes -- and once we're at this point all the crimes are horrible; all the crimes have caused severe impact on victims and their families -- tremendous suffering.  They all have.

And yet the law of the United States of America is -- out of those, only the very worst ones will we mete out the death penalty to.  Only the worst of the worst.  So as you come to this question, the presumption of the law is against death, in favor of that very severe punishment of life in prison.

Now, the Government has just argued that the defense is going to ask you to reconsider or relitigate what was involved in the guilt phase.  I -- I'm not going to do that.  I have no intention of doing that because all the things the Government has just presented to you as reasons why they believe Mr. Krylov should receive the death penalty are things that we argued about at great length at the guilt phase of this trial.

We went through all the questions, all the evidence about whether or not Altmanis is a witness that you can believe or whether he had motives of self protection, getting a lower sentence and so forth that would lead him in some instances to minimize his involvement and cast responsibility on others.

We went through the testimony about what happened on the night of the fingerprint party.  I went to great detail to show you all the reasons, multiple reasons why one would not believe Altmanis's story about that and that it made much more sense from many standpoint that Krylov was, in fact, told to stay away from the Umansky kidnapping that night, and how Altmanis could be protecting his brother who, interestingly enough, had phone calls right around the critical time when that car was be take -- being taken to the airport.

But it seems to me that the Government, in order to

122

try to get a death penalty -- to persuade you to give the death penalty, has to pound on the idea that Mr. Krylov was a ruthless, cold blooded, more than willing participant in the evil of Mikhel and Kadamovas.

And so the Government is really asking now that we reargue and we retry all the evidence relating to Mr. Krylov's explanation of the duress that he was under when he got involved in these events.

I accept your verdict that Mr. Krylov is criminally responsible. I trust your judgment based upon what we argued before and the days that you spent sifting through the evidence. I trust your judgment about whether or not you believe Mr. Krylov. I think you did.

I think you believed that this man, who had never done a violent thing in his life, didn't just suddenly turn into this monster and become a willing participant in kidnapping and murder any more than Mr. Markovskis just suddenly turned from a person who had not been involved in violence, another young man seeking a future in the United States.

He explained to you how he, out of fear, got just as involved in going along with and aiding the activities of Mikhel and Kadamovas out of fear. And we talked before about how Markovskis went to the parties, how Markovskis accepted money acting as if yes, I want money, lest Mikhel and

Kadamovas decided they couldn't sleep at night because Markovskis wasn't really on board.

So in order for them to sleep at night, they would get rid of Markovskis and his family.  That's why Markovskis participated in these things.  That's the Government's witness.

So when the Government now gets up here and says there was absolutely nothing to corroborate Mr. Krylov's duress defense, how about Markovskis?  Another man who didn't just turn into a murderer and kidnapper when he met Mikhel but who did it because he was scared out of his wits.  That corroborates what happens with Mr. Krylov.

And there are many things that corroborate Mr. Krylov's testimony from the witness stand here.  And we went through them before.  And before I'm finished, I may go back and revisit some of the contentions that were made here in the last hour or so by Government counsel, in effect, relitigating the questions we looked at before.

But right now I want to go where I was intending to go in terms of what I want to talk about.  And, again, I'll go back to the point that under our law -- and I do agree with Government counsel that you have taken an oath to follow the law in this phase of the case as in the previous phase.

And the law is -- the way the law of the death

penalty is now structured, as is set forth in great detail in the instructions that you'll be looking at -- you've heard and you'll be looking at, is that even when we get to this category of offender where we have horrible crimes, we have terrible injury done to the victims and their families, we only give the death penalty to the worst of the worst.

We only give the death penalty to the monsters, to the people that have no redeeming value.  To the people who have shown themselves to be such that there really is no reason to not remove them from the face of the earth; that we can't even let them spend out -- spend the rest of their days basically caged in a five-by-eight-foot cell where they get out occasionally only under guard or when someone is going to let them do a little recreation or something like that.  Only for the worst of the worst.

And so you will have to go through these levels of findings.  The first one is whether or not the Government has satisfied you beyond a reasonable doubt that a certain level of intent has been proved, then whether or not the Government has satisfied you beyond a reasonable doubt that there's at least one aggravating factor that has been proven, and then whether you are all satisfied beyond a reasonable doubt that the aggravating factors outweigh the mitigating factors in the case.

And in that process, each one of you individually

can decide whether you think a mitigating factor counts.  You don't have to have the concurrence of the rest of the jury.  And in that process, each one of you can make that decision, give value to a mitigating factor or to a set of mitigating factors as warranting life for Mr. Krylov rather than death simply because in the deepest part of you, that seems to be the right thing.

You don't have to justify it to the rest of the jurors.  It's not like when you're finding facts and it has to be something that you can logically defend.  We're talking now about moral judgments that are being made -- value judgments that are being made.  And so each one of you has the responsibility to make that ultimate decision for yourself.

Now, I say, ladies and gentlemen, that this is not a case for the death penalty.  You've seen Mr. Krylov here in this courtroom for almost three months now with me sitting next to him, Mr. Evans on the other side.  You've had a chance to hear him on the witness stand testify.  You've had a chance to see his facial expressions.  You've had a chance to see him hang his head.  You've had a chance to see tears well up in his eyes.  Mr. Krylov is a feeling individual with a conscience.  Mr. Krylov is a man that has a lot of good in him.  Mr. Krylov is not a man beyond redemption.

UNITED STATES DISTRICT COURT

I think you know that from what you've seen in this courtroom.  I think you know that from what you've heard on the witness stand.  And I think you know that there are some very significant mitigating factors in this case.  And I'll go through them.

THE COURT:  Mr. Buehler?

MR. BUEHLER:  Yes.

THE COURT:  We're going to stop now.  You can start with the mitigating factors this afternoon.

Please return at 1:00 o'clock.  During your absence do not discuss the case among yourselves or with any other person.

THE CLERK:  Court's in recess.

(Whereupon, at 11:59 a.m., a break was taken.)

(The following proceedings were reported by

Victoria Valine.)