UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

HONORABLE S. JAMES OTERO, JUDGE PRESIDING

UNITED STATES OF AMERICA,          )
                                   )
                                   )
                                   )
                 Plaintiff,        )
                                   )
                                   )
                                   )
         Vs.                       )   No. CR 02-220 (B) SJO
                                   )
                                   )
                                   )
PETRO KRYLOV,                      )
                                   )
                                   )
                                   )
                 Defendant.        )
                                   )
_____   )

REPORTER'S TRANSCRIPT OF TRIAL PROCEEDINGS

LOS ANGELES, CALIFORNIA

MONDAY, MAY 14, 2007

LEANDRA AMBER, CSR 12070, RPR
OFFICIAL U.S. DISTRICT COURT REPORTER
312 NORTH SPRING STREET, # 442
LOS ANGELES, CALIFORNIA 90012
(213) 613-0179

**A P P E A R A N C E S**

**IN BEHALF OF THE PLAINTIFF,**
**UNITED STATES OF AMERICA:**        U.S. DEPARTMENT OF JUSTICE
                                     U.S. ATTORNEY'S OFFICE
                                     BY:  SUSAN J. DeWITT, AUSA
                                          ROBERT DUGDALE, AUSA
                                          KIM MEYER, AUSA
                                     312 NORTH SPRING STREET
                                     12TH FLOOR
                                     LOS ANGELES, CALIFORNIA 90012
                                     (213) 894-4496
                                     susan.dewitt@usdoj.gov
                                     robert.dugdale@usdoj.gov
                                     kim.meyer@usdoj.gov


**IN BEHALF OF THE DEFENDANT,**        LAW OFFICES OF GEORGE W.
**PETRO KRYLOV:**                       BUEHLER
                                       BY:  GEORGE W. BUEHLER, ESQ.
                                       350 SOUTH GRAND AVENUE
                                       SUITE 3900
                                       LOS ANGELES, CALIFORNIA 90071
                                       (213) 625-1600
                                       buehler@geragos.com


                                       LAW OFFICES OF DAVID R. EVANS
                                       BY:  DAVID R. EVANS, ESQ.
                                       600 SOUTH LAKE AVENUE
                                       SUITE 506
                                       PASADENA, CALIFORNIA 91106
                                       (626) 432-5100
                                       dre@drelaw.org


**ALSO APPEARING:**
        ALEX LEVOFF, COURT-CERTIFIED RUSSIAN INTERPRETER
        VARVARA OLSON, COURT-CERTIFIED RUSSIAN INTERPRETER
        JAMES S. DAVIDSON, FBI SPECIAL AGENT
        LOUIS PEREZ, FBI SPECIAL AGENT
        SCARLET NERAD, MITIGATION SPECIALIST

UNITED STATES DISTRICT COURT

3

**I N D E X**

PAGE

HEARING:                                                    4

LOS ANGELES, CALIFORNIA; MONDAY, MAY 14, 2007; 1:36 P.M.

-oOo-

(Out of the presence of the jury.)

THE CLERK:  Please remain seated and come to order. This Court is now again in session.

THE COURT:  Okay.  We're back on the record on United States of America versus Krylov.  The record should reflect that Counsel are present with the defendant.  The Russian interpreters are present.

It's been at least a week since we last had a session in court on the Krylov matter.

I'll hear I guess from Mr. Evans first.  There's several issues to discuss including whether your client was going to pursue a defense of his case in the penalty phase.

MR. EVANS:  The answer to that is yes, your Honor.

THE COURT:  Good.

MR. EVANS:  We're at that point.  I am also informed by Mr. Dugdale that the request directed to the Attorney General at the Court's direction has been rejected. And they -- Mr. Gonzalez wishes us to proceed.

THE COURT:  Yes.  And I guess I did read a report in the Daily Journal before I left regarding a hearing that took place here in the -- the reporter who wrote the article, I don't think correctly articulated the Court's concern.

The Court's concern was flexibility in -- in the

UNITED STATES DISTRICT COURT

decision-making process as the trial proceeds.  And it appears that that flexibility has been met.  The decision has been made for -- by the Attorney General to go forward.

Any -- any other issues?

MR. EVANS:  Well, your Honor, the Government has moved in limine to strike various -- or to preclude, I guess is the language they use, various of our mitigating factors that we've identified.  Mr. Buehler on our behalf has filed a motion to file limit the victim-impact evidence.

THE COURT:  Who has filed the motion?

MR. EVANS:  Mr. Buehler filed on our behalf a motion to limit the victim-impact evidence that the Government seeks to introduce.  And I have submitted to the Court a proposed instruction.

This is an outgrowth of the motion for mistrial that we brought a long time ago and filed memorandum on it. I filed memorandum and, I believe, Miss Meyer filed an opposition to it.

And I -- my recollection is the Court has never ruled on that.  I may be mistaken on that, but I think that's correct.  So I submitted the proposed instruction and met as a curative means of addressing that issue.

THE COURT:  There is one motion, as I recall, that remains outstanding.  It was a motion for a mistrial based on an alleged inconsistency between the prosecution of

Mr. Mikhel, Mr. Kadamovas, and the -- and the prosecution of Mr. Krylov.

MR. EVANS:  Specifically my concern that I was attempting to address, your Honor, was that during the cross-examination of Mr. Handelman, our Russian organized crime expert, the Government asked -- specifically asked Mr. Handelman if he had seen any Government -- the Government had never filed any briefs addressing -- claiming or arguing that this crew or group was involved in -- with Russian Mafia, Russian organized crime.  And he said, "not to my knowledge."

We subsequently discovered that, in fact, a motion had been filed by the Government.  A motion for anonymous jury.  At a time when Mr. Krylov was still joined with Mr. Mikhel and Kadamovas for trial in which they argued that as the grounds for an anonymous jury that this group was a part of a ruthless organized Russian crime group.

We believe that the question that was put to Mr. Handleman was misleading and brought in bad faith.  So we moved alternately for a mistrial.  Or the alternative is an instruction advising the jury precisely of that.

THE COURT:  And the Court will be prepared to rule on that shortly.

MR. EVANS:  Okay.

THE COURT:  In reference or in regards to the

UNITED STATES DISTRICT COURT

Government's motions to preclude certain mitigating evidence offered by Mr. Krylov -- Mr. Dugdale, do you wish to outline the areas that you wish to foreclose?

MR. DUGDALE:  I wish to pass the torch to Miss DeWitt, who filed the motion.

THE COURT:  Okay.

MR. DUGDALE:  Thank you.

MS. DeWITT:  Your Honor, the specific mitigating factors that the Government --

I'm sorry.  Are you ready --

THE COURT:  Go ahead.

MS. DeWITT:  -- you were just looking someplace else.  I wasn't sure --

THE COURT:  I was just taking an overview of the courtroom.

MS. DeWITT:  The specific mitigation factors that the Government has objected to are outlined in its motion of limine.  There were two motions in limine that were filed with the Court.

The second one -- I'll address that one first because I think it's the simpler one -- addresses two mitigation factors that relate to the Bureau of Prisons' ability to maintain somebody safely and -- under the Bureau and in the Bureau of Prisons.  The relevant case law with respect to that particular issue is very clear that that's

not appropriate mitigation.

And the case law that's referenced in the Government's brief on this is, specifically, United States versus Johnson and United States versus Adelin.  In those two opinions, the Court specifically addressed the Bureau of Prisons' ability to keep a defendant from committing further criminal acts, as an appropriate mitigation factor.  And both of those cases concluded that that was not an appropriate mitigation factor and not appropriate mitigation evidence.

As a caveat to that, your Honor, I would note that there's a difference in terms of whether or not this might be appropriate evidence as a rebuttal or response to the Government's aggravating factor of future dangerousness.  And we're not contesting that because we think within certain limitations that is an appropriate response to the Government's aggravating factor.

The issue we have -- and I believe this is clearly supported by both Johnson and Adelin -- is that it's not an appropriate mitigation factor.  And evidence in support of it is a mitigation factor, per se, should not be permitted.

And that is outlined in the briefs that were filed by the Court.  I would be happy to further address it, if the Court has any further questions on that issue.

With respect to the mitigation factors that the Government objected to in the first motion, there's a number

of them that the Government has objected to.  And I can just go through them one-by-one.  If the Court would prefer or just sort of generally outline the issues.

THE COURT:  Please cover them one-by-one.

MS. DeWITT:  Okay.

The first one is -- and I apologize, your Honor, we had numbered them based upon, in my motion, based upon the only -- what I thought was the only list we had at that time. So I'm going to try to refer to them.  I'll give you both numbers, the list that's attached to Exhibit A to the Government's motion as well as, what I think is the current order that was set forth in the jury instructions or proposed jury instruction that were filed by the defense.

The first objection that the Government has is to what is in my list Exhibit A as Number 5 and is in the current jury instructions as Number 3 where the defense asked for a mitigation factor that, essentially, says that a life sentence shows the proper respect for life itself.

And it's the Government's position that this is not an appropriate mitigation factor.  It's essentially a commentary on the appropriateness of the death penalty.  It is not something that is specific to the defendant or unique to this defendant and therefore is not an appropriate mitigation factor.

The second one that the Government objects to is --

is what was previously identified as Number 6. And it's now Government's Exhibit -- or their -- their Number 4, which the Government had not previously objected to this because it wasn't aware of the fact that in the changed jury instruction they now refer to "unindicted co-conspirators."

It's the Government's position that references to "unindicted co-conspirators" is inappropriate because not -- that evidence is not properly before the jury and therefore, that reference to "unindicted co-conspirators" is misleading, is prejudicial, and would cause confusion for the jury.

The next one that the Government objects to, is Number 9 in Government's Exhibit A, which is the original list we got, again, from the defense and is now, I think, renumbered as Government -- as Defense Mitigating Factor Number 7.

This is a particular mitigation factor that discusses the relative culpability of the defendant vis-a-vis other defendants. The Government's objection to this particular mitigation factor is two-fold.

One, that it references -- one is that that in conjunction with several of the other mitigation factors is cumulative. There's about five mitigation factors that basically address the issue of culpability.

The second objection that Government has to this particular mitigation factor is it refers to a 20-year

sentence that the defendant will be facing.

It is the Government's position that as currently worded this particular mitigation factor is misleading because it suggests to the jury that the only sentence that the defendant is going to be facing because of that -- excuse me -- that Mr. Altmanis would be facing as a result of the plea agreements that he's reached with the State and the Federal government -- the State and the Federal government is a 20-year term period of incarceration.

Now that may just be, your Honor, because of the way it is worded, but I would submit that the way it is presently worded it suggests that he will face a maximum of 20-years in custody for a State conviction which does not, because it's in the -- it's worded in the same sentence, is a deal that he's made with the State and the Federal government, that it suggests that that's all he's looking at. It's misleading and inaccurate on several grounds:

One, this Court, obviously has not sentenced Mr. Altmanis.  So we don't know what maximum term Mr. Altmanis is going to be looking at;

Second of all, the State hasn't -- hasn't sentenced Mr. Altmanis.  So we don't even know what sentence the State will give Mr. Altmanis.  And the ultimate decision about that is going to be predicated at least in part upon whether they have made a determination that he has cooperated fully and

testified truthfully.

But -- the issue that I have with this is the way that it is worded.  It suggests because it's worded together with the reference to the Federal plea agreement, that there's only a 20-year maximum, and that's my objection to it.  I don't have an objection to them saying that he's entered into a State plea agreement, under which he may receive a maximum of 20-years because I think that that would be accurate.

The next mitigation factor that the Government objects to is Number 9, which is Number 11 in the Exhibit A.  In this particular mitigation factor, there's a couple -- Government has a couple of objections.

The first is that this is a reference to -- this is a reference to Rita Pekler, the killing of Rita Pekler.  And I guess in the original objection that the Government had to this is that because the jury has not found the defendant to be responsible for the Rita Pekler, reasonably foreseeable responsible, for the resulting death of Rita Pekler, you're basically comparing apples and oranges here with Mr. Altmanis.  But to the extent that they want to discuss those two individuals' relative culpability, with respect to the Pekler abduction and the resulting death, the Government will withdraw the motion if that's what they're going to argue.  And the Government itself will argue that the

relative culpability of these two individuals with respect to Rita Pekler is something different because that's the Government's position is that their relative culpability is different with respect to that.

With respect to the way that -- the way that the second objection that the Government has to mitigation factor Number 9, is the way that it is worded.  Basically, what it says is the only direct evidence of Petro Krylov's participation in actual killing of Rita Peckler comes from the testimony of Ainar Altmanis, who is more culpable than Petro Krylov; had his own motive to fabricate evidence; and in order to help his own case, has cooperated with the Government.

I would respectfully submit, your Honor, that this is not a mitigation factor.  This is not something that is -- that is as required under the law is specific to the character or the circumstances of Petro Krylov's involvement in these crimes or his character as it relates to the case before this jury, but it instead is an attempt to put into -- before the jury an argument.

They're basically arguing that Ainar Altmanis has a motive to fabricate.  That's not a mitigation factor, that's an argument.  They can make that argument, but it isn't an appropriate mitigation factor whether or not Ainar Altmanis did or did not fabricate evidence, whether he did or did not

have a motive has nothing to do with the character or circumstances of Mr. Krylov's involvement in the crimes at issue.

It's also argumentative in that it suggests that the only evidence, the only direct evidence is -- comes from -- from Ainar Altmanis.

Now, we would respectfully submit again it's misleading and confusing in that respect as well because there's a lot of evidence that was submitted in this case that related to both the killings of Rita Pekler, the killings of Umansky, the killings of Mr. Karabadze, and the killings of Mr Safiev that was direct evidence that linked Mr. Krylov into those crimes.

Now, whether or not the jury agrees with the Government's assessment of that or whether or not they ultimately made whatever conclusions they may make about this particular crime, it is false and misleading to suggest that the only direct evidence of those crimes comes from that testimony because that's just simply not true.

The next -- the next mitigating factor that the Government objects to is Defense Number 12, which was previously identified as Number 14.  That's an identical -- identical to the mitigation factor that I just discussed. Only this one particularly addresses the participation of Petro Krylov in the killing of Nick Kharabadze.

And the same objections apply to this, that it's not a mitigation factor.  It's worded basically as an argument.  It is misleading and confusing to the jury because it suggests that there is no other direct evidence when that is in fact not the case.  And again it deals with -- it deals with something that is not an appropriate mitigation factor because it discusses motives to fabricate and what Mr. Altmanis did which has nothing to do with Mr. Krylov.

And again I'm not saying that these are not appropriate arguments that the Defense might -- might want to make.  We obviously don't -- we don't agree with them, but they're not appropriate mitigation factors because appropriate mitigation factors are factors that deal with the character of the defendant or the circumstances of the crime.

The next one that the Government objects to, is mitigation factor Number 14, which was identified as Number 16 in the Exhibit A to the Government's motion.  Again, the same -- this is exactly the same mitigation factor as the one I just discussed about Nick Kharabadze, the one I just discussed about Rita Pekler.  In addition to the reasons I've previously stated, again, this is cumulative.  Basically, what they've taken is the same basic concept and repeated it five different times in order to get five different mitigation factors in front of the jury.  And that's not appropriate either.

So it's an independent basis for not allowing basically to repeat the same mitigation factor five different times which they've done here.

The next one that we would object to, your Honor, is mitigation factor Number 16 in the Defense proposed jury instruction, which is 18 in the Exhibit A.  This is a particular mitigation factor that I will read just because I think it would be easier to follow.  It says that others involved in the hostage, taking resulting in the deaths of Rita Pekler, Alex Umansky, Nick Kharabadze, and George Safiev -- for example, Vladimir Sobolov, Vladimir Paniouchkine, Alex Afonin -- will go unpunished.

And the Government objects to this on several grounds.

First of all, it's prejudicial and misleading and confusing to the jury.  This jury wasn't in the position to hear or learn all of the information in the Government's possession with respect to these individuals what their actual involvement was, what their actual involvement was not, what proof the Government did or did not have against them.

I'll just give you a couple of examples.  And clearly the Court would not have wanted us to go into these collateral matters -- involving these collateral possible participants in the crimes alleged, because we would have had

a whole another trial, a whole another month, to try to go through all of the evidence that related to these particular individuals.  But there's a significant amount of information that's not in front of the jury.

And as such, they will not be in a position to make a reasoned decision about these things or come to a fair or proper conclusion about the accuracy of this particular information.

And I'll give you just a couple of examples.  There was an arrest warrant for Alexander Afonin.  There is still an arrest warrant outstanding for Alexander Afonin.  The Government has not been able to execute that warrant because of the extradition treaties between the United States and Russia.

The jury is not aware of that fact, and they're not aware that the United States has tried to -- has tried to go after Mr. Afonin.  That's just one example of information that is not in front of the jury.

This also suggests that Mr. Paniouchkine was somehow aware of the killings of Alexander Umansky and Rita Pekler.  There is absolutely no in evidence in this record to suggest that he knew about either of those murders or abductions.  There's no evidence that he was necessarily even aware of the abductions and killings of Nick Kharabadze or George Safiev either.  So in that respect it's also

misleading.

I mean, we didn't get into Mr. Paniouchkine and what his involvement was or what his involvement wasn't.  It just wasn't in front of the jury.  And as a result, any kind of decision they would be making on this would be an unfair and prejudicial decision that they would be making without complete information.

The next one -- the next -- and the same is true for Mr. Sobolov, for example.  That is another example.  There's no evidence that he was involved in any of these killings which this -- this particular mitigation factor suggests.  In fact, the only evidence that we have against Mr. Sobolov is voice identification and possible e-mails.  Again, there is also extradition issues involved in Mr. Sobolov.  That is information that's not before the jury.

The fact that -- for example, just to go back for a minute with Mr. Paniouchkine, the fact that the only evidence that we have against Mr. Paniouchkine is in fact evidence that he provided to us himself, immunized evidence, but information that he provided to us himself about having the credit cards.  I mean, that's the sole basis of the information that the United States Government has against Mr. Paniouchkine.

That -- that was information that he brought forward that the Government can't use against him.  They

would have never known about that had Mr. Paniouchkine not come forward.  Again, stuff that is not in front of the jury has not been fully developed by the jury, and as such they would be asking -- being asked, to make a decision in a vacuum without complete information, which is misleading and confusing and would be highly prejudicial to the Government.

The next set of issues that the Government objects to is Defense Mitigation Factor Number 18, 19, and 20.  These are three mitigation factors that address Russian Mafia, Russian organized crime, and the former Soviet Union and how ruthless the Russian Mafia is and Mikhel and Kadamovas's involvement in the Russian Mafia.

The Government's objection to these three particular mitigation factors are, again, first of all, they're not proper mitigation factors because they don't address Mr. Krylov.  We're not saying that -- that mitigation factors that involve or deal with Russian Mafia or organized crime are not themselves appropriate.

And there are other -- there's another mitigation factor that's been presented by the Defense that specifically or purportedly attempts to address that issue.  The problem with these three particular mitigation factors is that they don't address or even attempt to address or tie themselves or relate themselves to Mr. Krylov.

I mean, the mitigation factor again, has to have

something to do with the character of the defendant or the circumstances of the crime.  And these three particular ones, mitigation factors as worded, do none of these things.  They don't relate to the defendant.  They don't relate to the crime, and they don't even purport to relate to the evidence before the jury in the way that they are currently worded.

Finally, your Honor, is the Government's exhibit -- the Government's 40 on it's Exhibit A, the list that was provided by the Defense, which is still their mitigation factor Number 40.

And that is a mitigation factor that basically attempts to put before the jury the fact that Petro Krylov offered to plead guilty to the charges in this case prior to the commencement of trial, knowing that the law would require a sentence of life in prison without the possibility of release.

First of all, your Honor -- first question the Government would ask with respect to this particular mitigation factor is what evidence would ever be presented on this issue?  Because Mr. -- unless Mr. Krylov is going to get up and say something about this, I'm not sure how they would ever get this into evidence to begin with.  But even if they were somehow able to get this into evidence, it's not an appropriate mitigation factor, and it's not -- it's not accurate.

First of all, Mr. Krylov could have at any time including up -- up until today, even continuing up until today, can plead guilty and could plead guilty if he wanted to.  He chose not to.  Suggesting that somehow he had this opportunity and was denied it is misleading.

Second of all, it says that he would have gotten a life sentence if he had pled guilty.  This is also inaccurate and misleading.  If he had pled guilty, what he would have then been facing, your Honor, is a penalty phase where this jury would have been hearing exactly the same thing that they're about to hear now, which is whether or not the death penalty would be appropriate.

So this particular mitigation factor is misleading in that it suggests that that's what he would have gotten -- is a life sentence, and that's not accurate.

Third of all, there's -- what's also misleading about this is that the way that this particular offer came to the Government.  It was an attempt to get us to drop the death penalty in exchange for a plea of guilty.  And that's -- that information is not in front of the jury, and in that respect they're being given incomplete information.

Finally, there's no reason to believe -- it would be highly speculative to even wonder whether or not Mr. Krylov would have actually been able to enter into a plea agreement, even if he said he was so interested.  And the

reason why that's very important is because what happened during this trial.  He would have had to plead guilty to Miss Pekler's killing.  He would have had to pled guilty to escape charges.

So at this point it's only speculative whether or not he would have even been able to lay a factual basis for a plea agreement in this case Because certainly the Government to this day and certainly even more so at that the time was in the belief -- of the belief that he was responsible for Miss Pekler's murder.  And that he was guilty of conspiracy to escape.

And there would have been very significant differences between the Government's position and his position in terms of an attempt to lay any kind of factual basis for that.

So in summary, this is not a relevant mitigation factor because it again does not deal with the character of the defendant.  It's misleading, and it inaccurately states -- inaccurately states both the law and the facts that relate to what might have happened had any guilty plea gone forward.  And since it never did, anything that anybody would be -- any decision that anybody would be making about that would be completely speculative.

The basic bottom line of the Government's position with respect to these mitigation factors is, the Court has

the authority to limit mitigation factors to things that are relevant.  And the case law is very clear that what is relevant is something that has to do with the defendant's character and something that has to do the circumstances, not the fact of whether or not the crime exists, but the circumstances of the crime.

And the Government would respectfully submit that these -- these particular mitigation factors, as have been identified, do not do that.  In addition, the Government -- the Defense has made the objection that the Government is just, you know, without case law doing this -- that's making these objections.  That's not true.  The motion is clearly based upon Supreme Court decision, as well as the statute which outlines what is appropriate mitigation.

And I would also submit, your Honor, that the Government has been fairly conservative in terms of the objections that it has made.  And I'll give as an example of that Number 22 through 24 of Defense mitigation are all cumulative of each other.  They're all different ways that the Defense -- if you look at those, they have to do with him being a loving father and loving -- you know, they're all cumulative of each other.

It's basically taking one mitigation factor and restating it with slight variations three different times. And the same is true of Government -- of mitigation factors

Number 33 through 37, which is again an attempt to make one mitigation factor, and with slight variations in the wording, repeated several times.

And we haven't objected to those because when we get in front of the jury, we'll have a chance to explain to them that that's exactly what they're doing.  But I point that out only so the Court knows we're trying to be judicious here.  We are not trying to prevent him from getting relevant information before the jury.  But we do have a right, and I think the Court should -- to avoid confusion and to avoid unnecessary delay with this jury, having to consider 15 different mitigation factors that are not relevant and will be confusing to them -- should limit it and keep the scope of the penalty phase within the proper bounds - --

THE COURT:  Thank you.

MR. EVANS:  Your Honor, I'll address these in the sequence in which the Government argued them.

I just received it this morning.  Apparently they filed it on Friday.

What this -- designated as a supplemental motion in limine, regarding limitations on presentation mitigation factors.  And that addresses the factors concerning the Bureau of Prisons.  The Federal Bureau of Prisons has the authority and the ability to maintain Petro Krylov under highly secure conditions.  And Petro Krylov does not present

a risk to prison officials or other inmates if he is sentenced to life in prison without the possibility of release.

They cite the United States versus Johnson, which is a decision by Judge Posner of the Seventh circuit, which is as with most of Judge Posner's opinions interesting and insightful.  It seems to be addressed to something in the abstract.  We're tying this presentation directly to Petro Krylov.

The Government has informed us that it, notwithstanding various prison records indicating his successful adjustment to prison, that they seek to introduce evidence of future dangerousness.  We believe that we're entitled to rebut that, And that's what this is about.  We're not talking about something in the abstract.  We're not saying he's going to be sentenced to a maximum security prison which is exactly what Judge Posner was writing about.

THE COURT:  Judge Posner is schooled as an economist and very often engages in a cost-benefit analysis in whatever subject matter that's before him.

MR. EVANS:  Yeah, I agree with the Court.  And it's often pretty -- it's a different prospective that offers a different insight into -- but in this instance I think, we're tying something very specifically to pursuant to United States versus -- pursuant to Skipper.  We're going for a very

proper rebuttal of the Government's claim of future dangerousness.

Moving to the initial motion filed by the Government, they talk in broad term of the scope of mitigating factors.  And they seem to be implying and I would call the Court's attention to recent Ninth Circuit decision that just came down on Friday, Lambright versus Schriro.

Implicit in the Government's argument, as least as I'm hearing it, is a suggestion this there has to be some nexus to the crime charged in the various mitigating factors presented.  Lambright specifically rejects that and quite emphatically.

I don't -- I have a Westlaw cite to that if the Court desires.  It's not yet been published in the form -- in the Ninth Circuit form yet.

THE COURT:  What is the cite?

MR. EVANS:  It's 2007 Westlaw 1377612.  It's Lambright versus Schriro, S-c-h-r-i-r-o, and it was filed on May 11th.

THE COURT:  Thank you.

MR. EVANS:  In the opening statement by Miss Meyer, she argued, among other things, that is what is profoundly clear by just these limiting examples is that the victims' lives meant nothing to Defendant Krylov, nothing just a way to profit from the abduction and murder.  From the way the

blatant conspirators carried out these grizzly crimes and for that reason alone, Defendant Krylov's life should be forfeited is grounds for returning a verdict of death.

We're arguing and this mitigating factor says imposing a sentence of life imprisonment without the possibility of release yet preserving Petro Krylov's life, protects society, and at the same time shows a proper respect for life itself.

As we note, it would seem anomalous to permit the Government to argue that his lack of respect for life is a proper grounds for executing him.  Yet we're precluded from arguing that respect for life is a proper grounds for life imprisonment without the possibility of release.

The mitigating factors 9, 12, and 14 -- I'm not quite sure that -- well, each of those addresses the credibility and go directly to the credibility and weight of the evidence of Ainar Altmanis.  They are not about relative culpability.  They are about the credibility of the evidence which the jury heard in determining Mr. Krylov's guilt.  It deals specifically with the circumstances of the crime. The -- at least one interpretation of that jury's verdict is that Ainar Altmanis's testimony is profoundly suspect in the eyes of this jury.

And we should be allowed to address that and argue it and ask that it consider these as mitigating factors.  And

that evidence is of course -- is the fact that the jury came back not finding Mr. Krylov responsible for the death leading -- the abduction leading to the death of Rita Pekler.

That direct -- the testimony of Mr. Altmanis and Mr. Krylov were in direct contradiction on that factor and it -- the jury either had a reasonable doubt about agreeing with Mr. Altmanis or disregarded it.

We believe that we're entitled to talk about all of those factors with regard to all of the crimes in this case. They are part of the circumstances of the crimes as the jury -- as it has been presented to the jury by the Government in this case.

Finally, the mitigating factor 7, does address the relative culpability.  It is difficult for me to see how that is in anyway improper.  The Government's concern with the language "20-years in custody," directly mirrors the instructions given by Judge Tevrizian in the Mikhel and Kadamovas case which the Judge instructed:

"Ainar Altmanis was intimately involved in each of the murders for which Iouri Mikhel faces the death penalty. Altmanis has made deals with both the State and Federal authorities to avoid capital punishment.  He faces a maximum of 20-years in custody for his State conviction."

For the admitted architects of this scheme, the leaders, ring leaders, to be provided that instruction and

have it stripped from us I think would be profoundly unfair.

Mitigating factor 16 concerns the uncharged co-conspirators, and I don't understand the Government's position on this.  If they prefer that we say that "others involved in the hostage taking resulting in the deaths of Rita Peckler, Alexander Umansky, Nick Kharabadze and George Safiev -- for example, Vladimir Sobolov, Vladimir Paniouchkine, and Alexander Afonin -- have not been charged with these crimes," that's okay.  We now have "will go unpunished."

But -- I mean, this is a silly conversation, I think, your Honor.

Vladimir Sobolov was a colleague of Iouri Mikhel, whose voice was identified as extorting money from the Umansky family after the death of Alexander Umansky.  He was interviewed by Government agencies and has not been prosecuted.

Alexander Afonin has been identified as the architect of the money-laundering scheme employed by Mikhel.  He has been interviewed, but not charged.

Vladimir Panouchkine fingered -- fingered by his own testimony, Armand Gyurdzhiyants', and traveled to Europe to drain the credit cards of Nick Kharabadze and George Safiev.

Mr. Davidson said that they did not investigate

that because he came to them.  That seems to be the criteria of this case and we're -- that if they come to them, they don't get investigated.

In Miss Meyer's opening statement, she refers repeatedly to Petro Krylov and his co-conspirators as if Mr. Krylov were somehow the architect, the planner, the leader of this crew.  In fact he was not by any criteria looking at the verdict that's been returned.  The jury views him as obviously a participant, but not the leader or architect.  And we would be seriously prejudiced were we not allowed to argue relative culpability.

Again, the Government objects to mitigating factors 18, 19, and 20 which address organized crime in the Republic of the former Soviet Union.

They are really concerned about this.  They went at Mr. Handelman I think in a misleading way.  In earlier pleadings they've acknowledged this group was involved and tied to Russian organized crime.  These are predicate statements.

A mitigating factor is not a reason for not returning death.  It's a factor, a circumstance, which the jury can consider in determining whether life without possibility of release is appropriate.  That's all it is.

Each of these is a first step in leading toward either conclusions.  They're not the whole statements.  It's

not a complete statement.  Obviously, these are not put to the jury in a vacuum.  They're not -- we're not running a quiz after viewing the discovery video or History Channel video.

We're talking about evidence that's been presented in this trial which they are entitled to consider, which they're entitled to consider in reaching a decision whether death is the appropriate punishment for Mr. Krylov.

The Government objects to Defendant Krylov's offer to plead guilty.  Petro Krylov offered to plead guilty to the charges in this case prior to the commencement of trial knowing that the law would require a sentence of life imprisonment without the possibility of release.

Miss DeWitt argues that that's a misstatement of the law.  That's exactly what he offered to do.  There was serious and ongoing discussions about this.  It was presented to General Gonzalez.  It was rejected, but that was the offer that was presented.  He made that offer.  That was a fact.  It's a legally correct fact.  That was what the basis of the negotiations were.  We spent a lot of time trying to work that out.  That was the offer he made.  It is a mitigating factor.

Miss Meyer repeatedly argues that he did not accept responsibility for what he did, that he did not accept -- he does not express remorse for what he did.  In fact, he did

repeatedly and this is evidence of it.  And we should be permitted to argue it and present it to the jury.

That's it.

THE COURT:  Do you wish to be heard on the motion to preclude certain victim impact --

MR. EVANS:  Mr. Buehler will argue that, your Honor.

THE COURT:  -- evidence?

MS. DeWITT:  Your Honor, can I just raise one quick issue that I forgot?

The second area -- and I don't know that there is a dispute on this, but I just want to make sure it is clear on the record that the Government objected to use of the words "murder" and "kill" in referring to the decision that the jury would be making if they voted in favor of the death penalty.

This is a matter that we litigated before Judge Tevrizian, I think, that the Defense is in agreement with our position that you -- this is not something that you can accuse the jury of, of killing or murdering.

But I'm not -- I really don't understand their position in response to this.  So I'm not sure there's a disagreement, but I just want to make sure it's clear on the record what the Court thinks is permissible in terms of references to that so that we all stay within bounds in terms

of our argument.

I apologize for this --

THE COURT:  This is not before the Court at this time.  So let's move on to the --

MS. DeWITT:  It is, your Honor.  It was filed as part of the Government's motion in limine, asking for the -- and I apologize for that.  That's one of the things I should have raised when I was outlining the areas of mitigation argument specifically raised in the Government's motion in limine to preclude arguments and specifically references to the jury's decision to kill or murder in -- in -- if they were to make a decision to impose the death sentence.

THE COURT:  At the argument portion of the case?

MS. DeWITT:  Yes.

THE COURT:  Okay.  Well, it's not necessary for the Court to address that issue at this time.

MS. DeWITT:  That's fine, your Honor.

THE COURT:  Mr. Buehler?

MR. BUEHLER:  Yes, your Honor.

Your Honor, our motion basically raises three objections to -- well, three reasons to limit the Government's victim-impact testimony.

The first -- I mean, first of all, we rely upon the general proposition that even though victim-impact testimony by family members is permitted by the Supreme Court since the

UNITED STATES DISTRICT COURT

decision in Pain versus Tennessee, which I believe was around 1990.

In Pain the Court overruled a couple of prior decisions in which it had held that victim-impact testimony violated the Eighth Amendment.  In Pain, the Court backtracked on that and said that victim-impact testimony is admissible if it's -- if the particular State in question or here the Federal government chooses to -- to legislate that that kind of testimony should be admitted.  But in all events, the Court in Pain does notice -- take note of the fact that there are potential problems with victim-impact testimony.

In terms of its potential for appealing primarily to the emotions of the jurors, inflaming the emotions of the jurors, such that their decision -- their ability to make a reasoned decision becomes overwhelmed by the emotions stirred up by the victim-impact testimony.

So that is the basic proposition and the basic concern we have as we look at what the Government's going to present.

First of all, we think that what the Government proposes to present is -- is cumulative and excessive.  And we rely in part on the fact that the Government is presenting here as to the three victims at issue here:  Mr. Umansky, Mr. Karabadze, and Mr. Safiev.

The Government is presenting five -- I'm sorry -- nine witnesses consisting of family members and friends whereas as to those three victims they presented only five in the Mikhel trial.

So our question is if five were sufficient in that trial, why do we need nine in this trial?

And I might note also -- what I didn't note in our papers, but I think it's also relevant -- is that this case is -- is a little bit unlike many murder cases or capital cases in that we have already in the guilt phase had extensive testimony from these family members, concerning the circumstances under which they found out that their loved ones were missing and their interactions by telephone and in the case of Umansky, with the kidnappers, their efforts to find out where -- where their loved ones were and so forth.

And all of that, of course, was presented to the jury. It was emotional testimony, and it gave the jury a very graphic view of the -- of how loved these persons were and of how emotionally difficult and wrenching it was for them dealing with the disappearance. So we have already had substantial victim-impact testimony in the guilt phase.

And then, your Honor, we note that two witnesses that are being offered here that were not offered in the Mikhel Kadamovas trial are Mr. Umansky's mother and his fiance. And with respect to those two witnesses in

particular I -- the Government has advised that Mrs. Umansky did not testify in the penalty phase of the Mikhel Kadamovas trial because she was not emotionally able or strong enough to do it at that point.

And I mean frankly, that just plays into -- I mean with all due respect to Mrs. Umansky and all of these family members, we're not in any way questioning that they feel the way they do, and obviously they do.  But we are concerned about highly emotional testimony being presented which again runs the risk -- I think it runs a very substantial risk of the emotion overwhelming the jury's ability to reach a reasoned decision on penalty.

And finally, your Honor, it's our position that only family members are authorized by the statute to give family -- to give victim-impact testimony.  Two of the witnesses -- actually three of the witnesses the Government proposes to call -- Ronald Shelton, who was a friend and mentor of Mr. Karabadze; Erik Poticha, who was a friend of Mr. Karabadze; and then Irina Prishedko, who was the fiance of Mr. Umansky -- none of those people are family members.

And 18 U.S.C. Section 3593A provides -- and I'll quote -- that the aggravating factors the Government did give notice of, quote, "May include factors concerning the effect of the offense on the victim and the victim's family and may include oral testimony of a victim-impact statement that

identifies the victim of the offense and the extent and scope of the injury and loss suffered by the victim and the victim's family and in the -- excuse me -- and in any other relevant information."

Now, the Government seizes on any other relevant information as if that's meant to simply open the whole thing up to any relevant information in which case one might wonder why there's any specification in the statute of particular items that are proper aggravating factors.

It seems it to me that a proper reading of the statute is that Congress decided and what the Court's have recognized is a rather sensitive question given the fact that the Supreme Court has gone two ways on the question.

That Congress decided to limit aggravating -- the victim-impact testimony to the victim on -- to impact on family members and not impact on somebody like Mr. Shelton, or Mr. Poticha, or Miss Prishedko.

And the Government does cite in its opposition, several cases in which testimony by friends, non-family members was allowed.  I do not think, however, in any of those cases, the question was raised and discussed as to whether or not that was consistent with the statute.  In other words, I think the only issue raised in those cases had to do with the question of the testimony being cumulative or excessive and inflammatory.  And it's -- the point we're

raising is that we do not believe that testimony by non-family members is authorized by Congress.

I think that adequately summarizes our position, your Honor.

THE COURT:  Thank you.

Just two questions for Counsel for Government:

One is why does the Government need nine witnesses regarding impact testimony in this case and only utilized five witnesses in the Mikhel case?

And the other issue is how do we ensure that the jury's verdict, whatever it is, regarding the penalty phase is based on a proper weighing of the aggravating and mitigating factors and not -- and does not overwhelm -- the jury is not overwhelmed by the emotional impact of the various victim deaths on the family members?

MS. MEYER:  Your Honor, first of all, there were developments over the weekend in the -- in Nick Kharabadze's family.  Nick Kharabadze's mother had a stroke on Friday; so Nick Kharabadze's stepfather will not be testifying.  So in this case the Government intends on introducing the testimony of eight victim family members.

However, with respect to Nick Kharabadze, that would be two non-family members because his mother and father are no longer in a position to testify.

With respect to the fact that the Government is

intending on calling eight victim family members or eight family members and friends, your Honor, the case law makes very clear that this is not an excessive number, and the Government cited those cases --

THE COURT:  Well, it's up to the Court to exercise its discretion.  The question is with Mr. Kadamovas and Mr. Mikhel there's a representation that five victim impact witnesses were called, and in the case before this Court eight witnesses will be called.

MS. MEYER:  Your Honor, in -- for example, with respect to George Safiev we had his daughter testify in the Mikhel-Kadamovas matter.  We were unable to arrange the deposition of his sister in time for that particular testimony.

THE COURT:  You had five years -- from the date of arrest until the date the trial commenced, was five years.

MS. MEYER:  Your Honor, in order to take that or to get that deposition of his sister in this case, we had a courtroom full of people here at 10:45 P.M.  That was something that logistically was not -- we were not able to organize in the last trial.  And having two victim family members for a particular victim seems appropriate.

We would have liked to have had -- to have had Elizabeth Umansky testify regarding the death of her son in the last trial, but the fact is she just couldn't do it.

THE COURT:  I understand that.  There's no -- there's no need to discuss Mrs. Umansky's right to offer impact testimony --

MS. MEYER:  Your Honor, in the --

THE COURT:  -- the mother.

MS. MEYER:  Thank you, your Honor.

In the decision of United States versus Sampson, I believe it is, the district case out of Massachusetts of 2004, there is a sample instruction, if you say, that the Court could give to the jury prior to the introduction of victim-impact evidence that talks about the fact or the reasons behind introduction of that testimony and how it is not to play on the juror's emotions in a way that will take them away from their oath.

And if the Court would like me to, I could put together something along the lines of the Sampson case.

THE COURT:  Prepare proposed instruction and then consult with Counsel for Mr. Krylov.

MS. MEYER:  Thank you, your Honor.

THE COURT:  Before the Court addresses the -- the issues presented in the motions, we left off last approximately 10 days ago, regarding certain issues that were impacting Mr. Krylov.  And I -- the concern that Court has is whether Counsel for Mr. Krylov wishes to further address the Court in an in camera proceeding regarding any of the issues

that were discussed before the recess.

MR. EVANS:  May I have a moment, your Honor?

(An off-the-record discussion was held.)

MS. MEYER:  Your Honor, may I just raise one further point before we proceed with the next issue?

THE COURT:  Let counsel confer, and then we can get to the next.

(An off-the-record discussion was held.)

MR. EVANS:  I don't believe it's necessary, your Honor.

THE COURT:  Okay.

MR. EVANS:  Thank you.

THE COURT:  I just want to make sure that Mr. Krylov is well -- well enough and prepared to proceed with the next phase of the trial.  And if counsel assures the Court that in your opinion and in your view, that that's the case, then we can proceed without further inquiry by the Court.

MR. EVANS:  Yes, your Honor.  Thank you.

THE COURT:  Mr. Krylov, do you agree?  Yes?

THE DEFENDANT:  Yes.

THE COURT:  Yes?

MS. MEYER:  I'm sorry, your Honor.  I just also wanted to mention the fact that it appears that the defendant is going to call about 22 victim impact witnesses for

himself.  And the Government believes that eight with respect to three victims is not excessive and will at this point take at most a day and probably less than a day.

THE COURT:  Are there any other issues for the Court to address?

What -- let me just confer with the clerk.

(An off-the-record discussion was held.)

THE COURT:  Yes.  Any other issues?

The proposal would be as follows:

I've -- I have the argument -- oral argument of Counsel.  I still need to review the pleadings that have been filed.  The Court would be prepared to -- to rule on the motions that need to be addressed at least when the jury returns tomorrow at 7:45.

Does that work?

MR. DUGDALE:  That's fine, your Honor.

THE COURT:  Okay.  Anything further?  Mr. Dugdale?

MR. DUGDALE:  Just a couple of quick issues, your Honor.

On Thursday the Defense filed a notice of expert evidence of mental health condition.  This was something that Judge Manella had ordered to be filed 100 days prior to trial, which has certain implications if they intend on raising an issue concerning the defendant's mental health. The Government then has the right to have the defendant

examined by its own mental health expert.

I got a copy of the witness list again from them today.  There is no mental health professional that's on there as far as I can tell.  And I'm wondering if this is just some sort of -- I don't know.  I hate the use the vernacular, but a "CYA" thing.  I don't know what this is.

THE COURT:  What is your request of the Court?

MR. DUGDALE:  To determine whether, in fact, they intend on raising a mental health defense in the penalty phase as indicated in this notice, which again was filed about 160 days after Judge Manella ordered it be filed in this case.

THE COURT:  Mr. Buehler, do you have any -- on your witness list or witnesses to be called on the penalty phase, any mental health experts?

MR. BUEHLER:  We filed a notice, your Honor, that tells the Government and the Court -- that's been filed with the Court -- that based upon the recent examinations of Mr. Krylov, subsequent to when we were last in court.  There were two mental health professionals that had examined Mr. Krylov.  And that based on that depending on -- well, we have not made a decision to call the mental health expert.  But depending upon our assessment of where we think things may be after we've heard the Government's mitigation, the Government's case in the penalty phase, that we might seek to

44

call to a mental health expert to testify that Mr. Krylov was suffering from post-traumatic stress disorder during the offenses in this case.

That is -- it's not "CYA."  It's simply a notice. At a point in which we saw that as a potential issue, given the Government notice that -- that's the only consideration. We've not made the decision that we need to do that.  We don't want to prolong this proceeding any further, but we do need to do what we may need to do depending upon where we think things are at.

THE COURT:  Mr. Dugdale, do you have any further requests of the Court?

MR. DUGDALE:  Well, if they are going to raise the mental health issue in the penalty phase of the trial, the Government is entitled to examine him.

THE COURT:  What's your request?

MR. DUGDALE:  My request then would be to give us access to the defendant, to allow us to examine him over this up coming weekend if they raise such an issue.

MR. BUEHLER:  It would be --

THE COURT:  How long will it take the Government to present its case in chief?

MR. DUGDALE:  A day.

THE COURT:  So --

MR. DUGDALE:  -- I mean --

THE COURT:  -- by the end of the week, we will know -- we should know if the defense is going to call a mental health expert.

MR. DUGDALE:  Very well.  The rule's not structured for this to happen this way.  It's structured for this notice to be given well before the trial even starts.

THE COURT:  I understand your frustration.

MR. DUGDALE:  Okay, well, let me share some additional frustration with my last two points.

We've been asking for, ever since the break and beforehand, for a list that gives us the order of their witnesses.  Since they will be starting their case maybe tomorrow or maybe on Wednesday at the very latest, you would think after two weeks of preparation that they've had, on top of the five years the Court noted earlier, they would have some idea who they might be calling in two days.  But apparently they don't.

So, I would just like the list to allow us to prepare.  It seems only fair since we give them our list and we tell them the order we're going to call our witnesses.  That's my frustration on that issue.

It would also be nice to get discovery timely basis too.  Today we received their expert witness discovery for half of the expert witnesses they intend on calling.  Today, two days before the start of when these people are going to

testify.

And, for instance, their expert witness on -- apparently he is going to talk about Russian history. The notice I received today indicates that the first topic of discussion is going to be the presence of Jews in Russian -- in the Russian Empire since the Middle Ages. Number two, the Russian Tsar's attitude towards Jewish people, including Ivan the Terrible, Peter the Great, Catherine the First and Elizabeth the First -- none of whom were at the New Melones Reservoir in 2001.

THE COURT: Mr. Dugdale, you could properly object. If -- if the questioning of those particular witnesses is expansive and not particularly relevant to the issues before this jury and in this Court, you can object at trial, and the Court would -- would properly rule.

MR. DUGDALE: I appreciate it. The problem we have is, we don't even know what to expect because we get these things -- if at all, we get them at the last minute. So, we could have a launching into a discussion about Ivan the Terrible without any kind of notice about this happening, and it's unfair for expert opinion. We're supposed to have this stuff beforehand.

Judge Manella said 60 days before the commencement of the guilt phase of the trial, and we're getting it two days prior to the commencement of the capital phase.

It's just my frustration, your Honor, and I appreciate the Court hearing me out on that.

THE COURT:  And let me just suggest if -- if the Defense calls certain witnesses or certain experts and you haven't been given proper discovery, there's -- there are motions that can be made, and the Court certainly can issue sanctions.

MR. DUGDALE:  Thank you.

THE COURT:  In reference to the witness list, Mr. Evans, I believe the Government should be given notice of the witnesses who will be called at the commencement of your defense case in chief.

MR. EVANS:  Your Honor, we provided the Government with our witness list on April 28th.  We -- the scheduling.

THE COURT:  The order of the witnesses.

MR. EVANS:  I understand that, your Honor.  There's been a very genuine problem.  We had people from the Ukraine -- five witnesses who were scheduled to arrive over the weekend we intended to put on Tuesday or Wednesday, whatever day we began -- who for whatever reason -- I'm not sure whether it's the Ukrainian Government -- they have their visas from the United States Embassy.  They were precluded from going because the flight stopped in Western Europe.  I have no idea.  They're now arriving Tuesday night at midnight.

We're trying to reschedule the other people, and I'll notify the Government as soon as I know.

THE COURT:  Mr. Dugdale will conclude with his case probably sometime on Wednesday and counsel for the Government.  So be prepared this evening to share with Counsel for the Government the order of the witnesses to be called on -- commencing Wednesday afternoon --

MR. EVANS:  Thank you.

MR. DUGDALE:  Thank you, your Honor.

THE COURT:  -- Wednesday and Thursday.  Anything further?

MR. BUEHLER:  Well, if I may apologize to Mr. Dugdale.  The one witness he's talking about who would testify, if I really wanted to ask the questions about Ivan the Terrible, I don't expect to go there.  But I did have the information I sent to him today about two weeks ago.  And frankly I hadn't looked at it over the two weeks.  I didn't realize that we hadn't given it to him when he raised the issue today.  I sent it to him, and I do apologize for that.

But, frankly I haven't even interviewed the witness to narrow down the scope of what we intend to ask, and I don't think Mr. Dugdale will find it objectionable or particularly troubling or long when we get there.  And I will share with him once I have a more substantive sense of what we are going to ask.  I will share that with him immediately.

One other issue I wanted to raise, your Honor, is one of the Government's exhibits.  They gave us an exhibit book today, Exhibit 1864.  It refers to a "shank" found in Defendant Krylov's cell on April 2nd, 2007.

Now, I object, first of all, to the term "shank" because from the description that's been given to me I don't think this item even comes close to being a "shank."

I understand that there was seized from his cell on April 2nd, 2007, an implement that is more in the nature of a needle.  That was being used by the defendant to sew things.

We have a problem with the Government with what we think is, basically, the Government trying to manufacture a case of future dangerousness based on taking an implement like that.  It may be contrary to the regulations, but it certainly does not -- is not the type of thing that could be called a "shank," or that could properly be the basis for an argument to the jury, given the fact that otherwise Mr. Krylov's record at M.D.C. is entirely unblemished in terms of any sort of violence or attacks on anybody or keeping weapons or anything like that.

To pull this one item out now and try to say that he should get the death penalty because this shows that he's a dangerous person I think it's entirely inappropriate.

THE COURT:  I note -- I'll note that there's a particular objection to 1864.  I don't have the exhibit in

the exhibit book, but we can discuss that at the appropriate time.  If the Government intends to offer that into evidence, then we can just alert the Court, and we can address it when the jury is in the jury room.

MR. DUGDALE:  Yes, your Honor.

MR. BUEHLER:  One other item just to follow up on that, that I need to mention, your Honor, is that we do have a witness by the name of Mr Aitken, who is a witness who would testify on this issue of future dangerousness if we need to have him testify.  And we have not yet made a decision as to whether we think that's necessary.  But if we do need to have him testify, we would particularly want him to be able to testify about this so-called "shank."  And in order for him to be able to testify effectively, we would need him to interview Mr. Krylov.

We have submitted to M.D.C. the paperwork for him to be authorized to enter M.D.C., but I don't think if that's left up to the usual amount of time that M.D.C. takes to evaluate potential visitors, that it will be done before two weeks from now.

So could we have a minute order from the Court that would direct M.D.C. to expedite its determination of whether or not Mr. Aitken, who has testified as an expert in many cases on precisely these issues around the country so there shouldn't be any real question about whether or not he's

the -- of sufficient moral character to be able to go into M.D.C.?  If we could have a minute order, that would direct M.D.C. to make that determination immediately.

THE COURT:  Well, if the Government intends to offer 1864, I would think that we would -- we could allow Mr. -- is it Mr. "Aitken"?

MR. BUEHLER:  Yes.

THE COURT:  -- Mr. Aitken, a brief opportunity to interview Mr. Krylov here in court at an appropriate time.

MR. BUEHLER:  May I have just a moment, your Honor?

(An off-the-record discussion was held.)

MR. BUEHLER:  Part of our concern, is that he be able to see the area in which Mr. Krylov has been housed that would be relevant to his testimony.

THE COURT:  -- if the Government intends to offer the exhibit, we can discuss that later in the week.

MR. BUEHLER:  Very well, your Honor.  Thank you.

THE COURT:  Thank you.  Anything further?

MR. BUEHLER:  No, your Honor.

MR. DUGDALE:  No, your Honor.

THE COURT:  We'll see you tomorrow at 7:45. Mr. Evans, 7:45?

MR. EVANS:  Thank you, your Honor.

THE CLERK:  Court's in recess.

(Whereupon, at 2:45 p.m., the proceeding concluded.)

UNITED STATES DISTRICT COURT