UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

HONORABLE S. JAMES OTERO, JUDGE PRESIDING

UNITED STATES OF AMERICA,      )
                               )
                               )
                               )
                  Plaintiff,   )
                               )
                               )
                               )
            Vs.                )   No. CR 02-220 (B) SJO
                               )
                               )
                               )
PETRO KRYLOV,                  )
                               )
                               )
                               )
                  Defendant.   )
                               )
_____)


REPORTER'S TRANSCRIPT OF TRIAL PROCEEDINGS

LOS ANGELES, CALIFORNIA

TUESDAY, MAY 22, 2007; 8:30 A.M.




LEANDRA AMBER, CSR 12070, RPR
OFFICIAL U.S. DISTRICT COURT REPORTER
312 NORTH SPRING STREET, # 442
LOS ANGELES, CALIFORNIA 90012
(213) 613-0179

**A P P E A R A N C E S**

**IN BEHALF OF THE PLAINTIFF, UNITED STATES OF AMERICA:**

U.S. DEPARTMENT OF JUSTICE
U.S. ATTORNEY'S OFFICE
BY:   SUSAN J. DeWITT, AUSA
        MR. DUGDALE, AUSA
        MS. MEYER, AUSA
312 NORTH SPRING STREET
12TH FLOOR
LOS ANGELES, CALIFORNIA 90012
(213) 894-4496
susan.dewitt@usdoj.gov
robert.dugdale@usdoj.gov
kim.meyer@usdoj.gov

**IN BEHALF OF THE DEFENDANT, PETRO KRYLOV:**

LAW OFFICES OF GEORGE W. BUEHLER
BY:   GEORGE W. BUEHLER, ESQ.
350 SOUTH GRAND AVENUE
SUITE 3900
LOS ANGELES, CALIFORNIA 90071
(213) 625-1600
buehler@geragos.com

LAW OFFICES OF DAVID R. EVANS
BY:   DAVID R. EVANS, ESQ.
600 SOUTH LAKE AVENUE
SUITE 506
PASADENA, CALIFORNIA 91106
(626) 432-5100
dre@drelaw.org

**ALSO APPEARING:**
ALEX LEVOFF, COURT-CERTIFIED RUSSIAN INTERPRETER
VARVARA OLSON, COURT-CERTIFIED RUSSIAN INTERPRETER
JAMES S. DAVIDSON, FBI SPECIAL AGENT
LOUIS PEREZ, FBI SPECIAL AGENT
SCARLET NERAD, MITIGATION SPECIALIST

**I N D E X**

| | PAGE |
|---|---|
| JURY NOTE NUMBER ONE | 11 |
| VERDICT READ | 16 |
| JURY NOTE NUMBER TWO | 52 |
| JURY NOTE NUMBER THREE | 53 |
| JURY POLLED | 56 |
| JURY EXCUSED | 59 |

UNITED STATES DISTRICT COURT

4

LOS ANGELES, CALIFORNIA; TUESDAY, MAY 22, 2007; 8:30 A.M.

-o0o-

THE CLERK:  This is item number, excuse me, item number five, case number CR 02-220 SJO, United States of America versus Petro Krylov.

Counsel, please state your appearances.

MR. DUGDALE:  Good morning, your Honor.

Robert Dugdale, Susan DeWitt, and Kim Meyer on behalf of the United States of America.

MR. EVANS:  Good morning, your Honor.

David Evans and George Buehler on behalf of Petro Krylov, who is present.

THE COURT:  I understand that counsel has had an opportunity to review all of the exhibits admitted into the penalty phase and that the exhibits are ready to be given to the jury for their review.

MR. EVANS:  That's correct, your Honor.

THE COURT:  Also, you have reviewed all of the copies of the instructions, the jury instructions to be given to each of the jurors to assist in their deliberations.

You have agreed on the special verdict form.  There has been one minor change regarding the notes to be sent to the Court by the jury, the -- the form to be used references the -- that this is phase two, and we will start with Note Number One.

UNITED STATES DISTRICT COURT

One other issue, and that is the issue of foreperson.  One question that we may get from the jury is whether the foreperson that was elected in the guilt phase should be the foreperson for the penalty phase.

Does either counsel wish to be heard on that issue? Did that issue come up in Judge Tevrizian's court?

MR. DUGDALE:  It did not.  We had the same foreperson for the penalty phase as for the guilt phase, and there was no -- there is no instruction, as far as I'm aware, in the model instructions that call for the -- for having a new foreperson.  And that -- there was none given by the Court, but I'm open to whatever the Defense wants.  It doesn't matter.

THE COURT:  I -- maybe consistency is best, but I'll leave it up to counsel.

MR. EVANS:  Your Honor, I think it -- that the proper procedure would be -- because there are no instructions -- I mean, there have been, for example -- I'm aware of penalty phases where they have gone through anonymous voting procedures selected by the jury as opposed to the open that normally happens in a guilt phase.

We would suggest that they may proceed in any manner which they deem appropriate, including selection of a foreman.  Whatever procedures that they determine are best and most effective for their purpose.

UNITED STATES DISTRICT COURT

6

THE COURT:  Well, let's see if the issue is raised. If it's not raised, then the Court will not raise the issue on its own.  I'm going to remind the jury that I'm not going to be available tomorrow from 12:30 to approximately 3:00 o'clock.  I'll remind counsel of that also.

MR. DUGDALE:  Your Honor, I can't recall if this issue was addressed to the jury -- I know we addressed it to the Court -- and that is the signing of the special verdict form.  As required under the Federal Death Penalty Act, they must sign it to indicate that the defendant's race, ethnic origin, and everything else didn't come into play in their decision.  I don't think we addressed that with the jury.  I know we addressed it amongst ourselves.

THE COURT:  Yes.

MR. DUGDALE:  And we resolved the fact that they could use their names, but they should be informed that the verdict form will be under seal and not available --

THE COURT:  The Court is going to order that the jury sign the verdict form, but the -- the signed verdict form will be placed under seal.

Anything further?

Do we have the jury?

THE CLERK:  We're missing two of them.

THE COURT:  We're missing two jurors.

MR. EVANS:  Your Honor, there is one issue if we

UNITED STATES DISTRICT COURT

could have a moment.

THE COURT:  Yes.

MR. EVANS:  Could I request a minute order from the Court permitting Mr. Krylov's sister to visit with him in the lock-up?  It's -- the marshals inform me that they have no objection to it individually but -- personally, but they need a minute order allowing it.  It be the same procedure as was followed last week, and it's all right -- Mr. Perez has indicated that that's what's necessary, as well.

THE COURT:  Yes.  I'm willing to provide that as long as the order is consistent with the -- with the SAM's protocol, that she has passed FBI scrutiny and review, the Marshal's Office has no concern about any issues of security.  And if that's the case, I'll sign the order.

MR. EVANS:  My understanding is that is the case, your Honor.  Mr. Perez has indicated that they cleared the FBI.  The marshals had no problem last week.  The question -- they just need an order to facilitate the process downstairs.

THE COURT:  I'm more than willing to do that.

MR. EVANS:  Thank you.

THE COURT:  Okay.  We'll have a minute order issued by the clerk today.

MR. EVANS:  Thank you very much.  I was thinking they might be able to do it while the jury is deliberating.

THE COURT:  Yes.  We'll expedite it.  It will be

8

forthwith so that they can -- they can talk.  How long is Mr. Krylov's sister going to remain in -- here?

MR. EVANS:  I believe she's leaving tomorrow --

THE COURT:  Tomorrow?

MR. EVANS:  -- to return to the Ukraine.

THE COURT:  Then it's important that we expedite that.

MR. EVANS:  Thank you.

(Whereupon, from 8:38 to 9:49 a.m., a break was taken.)

(In the presence of the jury.)

THE COURT:  We have the jury reassembled, with the alternates.  Counsel are present.

Just to alert the jury, besides this case I have several other matters to handle, and we've been involved in other matters this morning.

You're going to start the jury deliberation process.  We're going to give you the verdict form, all of the instructions.  Each of you will have a copy of the instructions to guide you.  You'll have one verdict form.

You're to answer the questions on the verdict form. You'll have all of the evidence that has been received in the case.  Counsel have reviewed all of the evidence, all of the instructions or copies of the instructions that were read to you yesterday, and the verdict form.

UNITED STATES DISTRICT COURT

9

You're also going to be given a form for notes to be given to us.  We're going to start with Note Number One.  We'll start the process over again.

The jury foreperson should be the foreperson originally elected.  Unless the jury would like to change that system, then alert the Court.  With that being said, you'll start your deliberations.  You'll be kept together during the -- the lunch time for -- and taken to lunch, and that includes the alternates.

Any questions before you start the process?  Any questions?

A couple of matters:  The same protocol applies.  If you have a question, it is -- I share it with counsel first.  I have to -- in order to accomplish this, we have to have all counsel here.  It takes some time to do that.

I am not going to be available tomorrow between 12:30 and, I would say, about 3:00 o'clock -- 12:30 to 3:00 o'clock.  Just to alert you in case you have any questions, bring them to our attention well before 12:30.

MR. DUGDALE:  Your Honor, I'm sorry.  There was the issue with signing the verdict form.

THE COURT:  Oh, on signing the verdict form, the Court is going to require you to sign that verdict form, but I will assure you that the verdict form will be sealed.  Your signatures will not be disclosed; so it will be sealed --

UNITED STATES DISTRICT COURT

sealed by order of the District Court.

Any other questions?

Binders -- does counsel wish to be heard on the binders?  They should be left here, Mr. Buehler?  Mr. Evans?

MR. EVANS:  They're all included in the other exhibits which will be going with the jury.  The binders were for use during the presentations from the video.

THE COURT:  So they're not -- they should not be sent back?

MR. EVANS:  No, all those exhibits are included in the exhibits.

THE COURT:  Okay.  So just leave them on your chair, please.  Thank you.

(Whereupon, at 9:52 a.m., the jury exited the courtroom.)

THE COURT:  The jury has been excused.  We'll make sure the door is shut.

The door is shut.  The jury is excused.

Mr. Krylov will be taken down to the -- to the holding cell.  He can meet with his sister.  The Court has signed the order so he can talk with his sister.  And there are other matters for the Court to handle.  I'll need counsel available --

MR. BUEHLER:  We'll be in the building.

THE COURT:  -- just in case the jury has questions.

UNITED STATES DISTRICT COURT

MR. BUEHLER:  We'll be in the building.

MR. EVANS:  Thank you, your Honor.

MR. DUGDALE:  Thank you, your Honor.

THE COURT:  We have Mr. Nieto, who was here -- who needs to be brought up today, and we're going to handle that in open court.  The -- I have a criminal duty matter which we will handle in chambers.

THE CLERK:  Court's in recess.

(Whereupon, from 9:53 a.m. to 1:51 p.m., a break was taken.)

(Out of the presence of the jury.)

THE CLERK:  Please come to order.  This court is now in session.

THE COURT:  Okay.  We're back on the record on the United States of America versus Krylov.

The defendant's present.  All counsel are present.  The families of the victims are present.  The jury has reached a verdict.

Before we bring the jury out to take the verdict, a couple of matters:

One is there's a stipulation waiving jury determination of criminal forfeiture that has been provided to the Court.  It is signed by Mr. Krylov.  It is obviously not in Russian.  Mr. Krylov has signed it without the assistance of an interpreter.

Before we get to the issue of whether it's -- it constitutes a knowing waiver and an intelligent waiver, how does the Government wish to proceed on the forfeiture?

MS. DeWITT:  Your Honor, there's a couple of ways you can proceed with forfeiture.  You can have a jury decide that -- that count; you could have the Court decide that count; and you can do it by stipulation.

And what we've done is sort of a hybrid of the two which is -- is that Mr. Krylov by this stipulation has agreed to waive his jury and allow the Court to make the ultimate determination, not as to the forfeiture count per se but to what, if any, effect to give to forfeiture in the nature of the judgment that should be entered with respect to that forfeiture count.

I think that the stipulation handles any -- anything and everything that needs to be addressed today before the jury is excused.  And any further discussion about the exact language of a judgment that relates to the forfeiture count can be worked out in connection with his sentencing.

And the only reason I raised it with -- with your clerk that this is not signed as being interpreted to him is just because he's here now and we could have him agree on the record that he doesn't need to have it interpreted for it to be -- it to have legal effect and not have to drag him back

into court for that sort of ministerial purpose.

THE COURT:  Well, I'm not sure I have a better understanding of how we're going to proceed.  Is there going to be an evidentiary hearing?

MS. DeWITT:  There doesn't need to be an evidentiary hearing, your Honor.  We can submit this on the papers and submit a proposed judgment with respect to the forfeiture count.

Really the only issue is what -- what, if any, dispute there might be about the amount that the forfeiture judgment should be in, which I would submit is -- is relatively straightforward.  But to the extent there's any dispute about that, it can be decided by the Court as well.

THE COURT:  Well, I'm hoping to avoid any disputes that have to be resolved by the Court.  Is there -- is there a way that counsel can reach a stipulations on these issues?

Mr. Buehler?

MR. BUEHLER:  Your Honor, the reason we wanted to do it this way is that I don't know that there will be any issues that would need to be litigated, whether by evidentiary hearing or by pleadings filed with the Court. And I, frankly, doubt that there are any.

But neither I nor Mr. Evans were prepared today to come to that conclusion with a degree of certainty.  We would want to come to that conclusion.

I also don't know quite -- I'm not certain how the rights of other parties might play in too.  So if there are any issues to be resolved, then we would be happy to have them resolved by the Court rather than by this jury.

MS. DeWITT:  The only issue, your Honor, that I could even in my wildest imagination anticipate is the amount of the actual judgment or maybe the language of the judgment. This wasn't even a dispute in the <u>Mikhel</u> case.  I mean, once the judgment was submitted, all parties agreed on it, and there was no objection.  So I don't really anticipate there being any disputes.

To be quite frank with the Court, I think what's happening here is Mr. Krylov -- and I understand this with respect to this -- doesn't want to be agreeing to something that might ultimately affect his wife.  So he's willing to waive jury on it, but he wants ultimately for that decision to be up to the Court.  And I understand that.

So this is avoiding the jury having to decide it. I don't think there is an issue for the Court to decide except approving the final language in the judgment.

THE COURT:  The waiver was not translated, Mr. Buehler?

MR. BUEHLER:  Yes.  I've gone over it with Mr. Krylov.  He does not -- has not asked for it to be translated.  He understood when I discussed it with him.

THE COURT:  Mr. Krylov, did you agree?

THE DEFENDANT:  Yes.

THE COURT:  Did you read it?

THE DEFENDANT:  Yes.

THE COURT:  And did you understand it?

THE DEFENDANT:  Yes.

THE COURT:  And do you -- did you discuss with your counsel your right to a jury determination of the criminal forfeiture prior to signing the document?

THE DEFENDANT:  Yes.

THE COURT:  When the jury -- when we take the verdict, I'm going to have -- I'm going to order that the defendant stand to face the verdict.  I don't think there's any issue concerning his custody status any longer.  Is there any issue there that the Court should address before I am -- I make the order?

MR. EVANS:  No.  He's just going to have to have the chain removed.  I don't think he can stand up.

THE COURT:  Can he stand?

THE MARSHAL:  He can stand, your Honor, if you order us to.  But he's -- he's -- this is the way we do our high-threat defendants.

THE COURT:  We'll keep him secured to the chair.

MS. DeWITT:  Thank you, your Honor.

And this stipulation would be formally filed, if it

has not already, sometime in the next few minutes.

THE COURT:  Okay.  Let's get the jury in.

(Whereupon, at 1:57 p.m., the jury entered the courtroom.)

THE COURT:  Okay.  We have the jury reassembled with the alternates.  I'm informed that the jury has reached a verdict in the case.

Would the foreperson again identify themselves for the record by number --

JUROR NUMBER 32:  Juror 32.

THE COURT:  Okay.  Would you make sure that the verdict is signed and dated, please?

JUROR NUMBER 32:  Signed it.

THE COURT:  Would you provide it to the bailiff?

(Juror complied.)

THE COURT:  Okay.  I've reviewed the verdict form. I'll hand it to the clerk.

THE CLERK:  United States District Court for the Central District of California.  The United States of America, plaintiff, versus Petro Krylov, defendant; case number CR 02-220 (B) SJO.  Special verdict form for Defendant Petro Krylov, penalty phase, in the courtroom of the Honorable S. James Otero.

It's dated 5-22-07 at 1:10 p.m.

Section One, Age of the Defendant.

Instructions:  Answer yes or no.

Do you, the jury, unanimously find that the jury has established beyond a reasonable doubt that the Defendant Petro Krylov, the defendant, was 18 years of age or older at the time of the offenses charged in Counts One, Two, Three, and Four of the second superseding indictment?

The jury's checked off "Yes."

Foreperson:  Instructions:  If you answered no with respect to the determination of this section, then stop your deliberations.  Cross out Sections Two, Three, Four, Five, and Six of this form and proceed to Section Seven.

Each juror should then carefully read the statement in Section Seven and sign in the appropriate place.  If the statement accurately reflects the manner in which you reached your decision, you should then advise the Court that you have reached a decision.

If you answered yes with respect to the determination in this Section One, then proceed to Section Two.

Section Two:  Requisite mental state.

Instructions:  For each of the following, answer yes or no.

A:  Do you, the jury, unanimously find that the Government has established beyond a reasonable doubt that the victims [sic] intentionally killed the following victim or victims?

George Safiev, no.

Nick Kharabadze, no.

If you answered yes to any of the above, you need not answer Part B of this section, and you should proceed to Section Three.  However, if you answered no to all of Part A, go to Part B of this section.

Part B:  Do you, the jury, unanimously find that the Government has established beyond a reasonable doubt that the defendant intentionally participated in an act contemplating that the life of a person would be taken and/or that lethal force would be used in connection with the person, other than one of the participants in the offense and that the following victim or victims died as a direct result of the act?

As to Alexander Umansky, the jury's checked off, "Yes."

As to George Safiev, the jury's checked off, "Yes."

As to Nick Kharabadze, the jury's checked off, "Yes."

If you answer yes to any of the above, you need not answer Part C of this section, and you should proceed to Section Three.

However, if you answered no to all of Part B, go to Part C of this section.

The clerk's going to skip part -- Section Three.

Part C, Section Three:  Statutory aggravating factors.  Instructions:  For each of the following answer yes or no.

Number One:  Do you, the jury, unanimously find that the Government has established beyond a reasonable doubt that the victims' deaths or injuries resulting in death occurred during the commission of an offense under 18 U.S.C. Section 1203; that is, conspiracy to engage in hostage taking resulting in death or hostage taking resulting in death?"

The jury's checked off, "Yes."

Number Two:  Do you, the jury, unanimously find that the Government has established beyond a reasonable doubt that the defendant committed the offenses charged in Counts One, Two, Three, and Four in the expectation of the receipt of something of pecuniary value?

And the jury has checked off, "Yes."

Number Three:  Do you, the jury, unanimously find that the Government has proved beyond a reasonable doubt that the defendant committed the offenses charged in Counts One, Two, Three, and Four of the second superseding indictment after substantial planning and premeditation to cause the death of a person?

The jury has checked off, "Yes."

Do you, the jury, unanimously find that the Government has proved beyond a reasonable doubt that the

defendant killed or attempted to kill more than one person in a single criminal episode?

The jury has checked off, "No."

Foreperson instructions:  If you answered no with respect to all of the statutory aggravating factors in this Section Three, then stop your deliberations.  Cross out Sections Four, Five, and Six and proceed to Section Seven of this form.

Each juror should then read the statement in Section Seven and sign in the appropriate place.  If the statement accurately reflects the manner in which you have reached a decision, you should then advise the Court that you have reached a decision.

If you found the requisite age in Section One, the requisite mental state in Section Two, and answered yes with respect to one or more of the statutory aggravating factors in this section, then proceed to Section Four.

Section Four, Statutory Non-Aggravating Factors.

Instructions:  For each of the following questions, answer yes or no to the five numbered questions below.  Parenthesis, you need not answer yes or no to the letter and statements contained in questions Number One, which merely describe the Government's allegations of how the existence of a non-statutory aggravating factor can be demonstrated, close parenthesis.

Number One:  Future dangerousness of defendant if confined to a federal prison for the rest of his life without the possibility of release.

Do you, the jury, unanimously find that the Government has proved beyond a reasonable doubt that the defendant is likely to commit criminal acts of violence in the future that would constitute a continuing and seriously -- serious threat to the lives and safety of others including one or more of the following:

A, Continuing Pattern of Violence -- the defendant has engaged in a continuing pattern of violence, attempted violence, and threatened violence including at least the crimes charged in the second superseding indictment;

B, Lack of Remorse -- the defendant has demonstrated lack of remorse for the capital offenses in this case as indicated by his statements and actions during the course and following the offenses alleged in the second superseding indictment.

Answer to Section Four Question No. 1, the jury has checked off, "No."

Number Two, Defendant's Participation in Other Uncharged Serious Acts of Violence:

Do you, the jury, unanimously find that the Government has proved beyond a reasonable doubt that, apart from the offenses charged in the second superseding

indictment, the defendant participated in the hostage taking of Armen -- I'll spell the last name -- G-y-u-r-d-z-h-i-y-a-n-t-z?

Answer to Section Four Question No. 2, the jury has checked off, "No."

Number Three, Contemporaneous Convictions:

Do you, the jury, unanimously find the Government has proved beyond a reasonable doubt that the defendant faces contemporaneous convictions for multiple murders and other serious acts of violence?"

Answer to Section Four Question No. 3, the jury has checked off, "Yes."

Witness Elimination:

Do you, the jury, unanimously find that the Government has proved beyond a reasonable doubt that the defendant participated in the killings of the victims of his crimes including Alexander Umansky, Nick Kharabadze, and/or George Safiev for the sole or primary purpose of eliminating these victims as possible witnesses to his crime?

Answer to Section Four Question No. 4, the jury has checked off, "No."

Number Five, Emotional Suffering of the Victims:

Do you, the jury, unanimously find that the Government has proved beyond a reasonable doubt that the defendant displayed an indifference to the emotional

suffering of the victims of his crime -- Alexander Umansky, Nick Kharabadze, and George Safiev?

Answer to Section Four Question No. 5 is checked -- the jury has checked off, "No."

Victim-Impact Evidence:

Do you, the jury, unanimously find that the Government has proved beyond a reasonable doubt that the defendant caused injury, harm, and loss to the families, friends, and/or coworkers of Alexander Umansky, George Safiev, and Nick Kharabadze as evidenced by their personal characteristics -- characteristics as human beings and the impact of their deaths on their families, friends, and/or coworkers?

Answer to Section Four Question No. 6, the jury has checked off, "Yes."

Foreperson instructions:  Regardless of whether you answered yes or no with respect to the non-statutory aggravating factors in this Section Four, proceed to Section Five.

Section Five, Mitigating Factors.

Instructions:  Indicate the number of jurors who find that the defense has established the existence of each listed mitigating factor by a preponderance of the evidence for each of the following mitigating factors.  Please indicate in the space provided the number of jurors who have

found the existence of the mitigating factor or factors to be proven by a preponderance of the evidence.

Number 1:  If not sentenced to death, Defendant Krylov will be sentenced to life in prison without the possibility of release.

Number of jurors who found this mitigating factor, six.

Number 2:  A sentence of life imprisonment without the possibility of release is severe and exacts a significant and physical restraints and hardship, as well as great psychological pain particularly, because the Defendant Krylov will be left for years to contemplate his wrongdoing and to feel the loss of his child, wife, friends, and family.

Number of jurors who found this mitigating factor -- eight.

Imposing a sentence of life imprisonment without the possibility of release yet preserving Defendant Krylov's life protects society.

Number of jurors who found this mitigating factor, zero.

Others who were equal or greater [sic] culpability than Defendant Krylov, whether or not indicated -- indicted will not be punished by death and/or have not been the subject of capital prosecution.

Number of jurors who found this mitigating

factor -- the number is ten.

Number 5:  Defendant Krylov is less culpable than Iouri Mikhel and Jurijus Kadamovas, who orchestrated the kidnappings and murders of Mikhel -- of Meyer Muscatel, Rita Pekler, Alexander Umansky, Nick Kharabadze, and George Safiev, who have been separately tried, convicted, and sentenced to death.

The number of jurors who found this mitigating factor is twelve.

Number 6:  The planning and methodology of taking hostages, demanding ransoms, and then killing victims orchestrated by Iouri Mikhel and Jurijus Kadamovas began before Kadamovas and Mikhel ever met Krylov with the abduction and murder of Meyer Muscatel if not sooner.

The number of jurors who found this mitigating factor, twelve.

Number 7:  Defendant Krylov is less culpable than Ainar Altmanis, who actively participated in the kidnappings and murder of Meyer Muscatel, Rita Pekler, Alexander Umansky, Nick Kharabadze, and George Safiev and has made deals with both the State and Federal authorities to avoid capital punishment.

Number of jurors who found this mitigating factor, five.

Number 8:  Ainar Altmanis was an active and willing

participant in the abduction and murder of Rita Pekler, Alexander Umansky, Nick Kharabadze, and George Safiev and participated in the kidnappings and murder of Meyer Muscatel before he and Kadamovas and Mikhel ever met Krylov.

The number of jurors who found this mitigating factor, three.

Number 9:  The only direct evidence of Defendant Krylov's participation in the actual killing of Rita Pekler comes from the testimony of Ainar Altmanis, who is more culpable than Defendant Krylov, has his own motive to fabricate evidence, and in order to help his own case has cooperated with the Government.

Number of jurors who found this mitigating factor, five.

Number 10:  Defendant Krylov did not personally participate in the actual killing of Rita Pekler.

The number of jurors who found this mitigating factor, four.

Number 11; Defendant Krylov did not personally participate in the actual killing of Alexander Umansky.

The number of jurors who found this mitigating factor is three.

Number 12:  The only direct evidence of Defendant Krylov's participation in the actual killing of Nick Kharabadze comes from the testimony of Ainar Altmanis,

who is more culpable than the Defendant Krylov, has his own motive to fabricate evidence, and in order to help his own case has cooperated with the Government.

Number of jurors who found this mitigating factor is four.

Number 13:  Defendant Krylov did not personally participate in the actual killing of Nick Kharabadze.

The number of jurors who found this mitigating factor, three.

Number 14:  The only direct evidence of Defendant Krylov's participation in the actual killing of George Safiev comes from testimony of Ainar Altmanis, who is more culpable than Defendant Krylov, has his own motive to fabricate evidence, and in order to help his own case has cooperated with the Government.

The number of jurors who found this mitigating factor, two.

Number 15:  Defendant Krylov did not personally participate in the actual killing of George Safiev.

Number of jurors who found this mitigating factor, two.

Number 16:  Defendant Krylov was under unusual and substantial duress, regardless of whether the duress was of such a degree as to constitute a defense to these charges.

The number of jurors who found this mitigating

factor, six.

Number 17:  Organized crime in the Republic of the former Soviet Union, parenthesis, or in Russian Mafia, close parenthesis, is organized internationally and has contacts throughout the world.

Number of jurors who found this mitigating factor is six.

Number 18:  Organized crime in the Republic of the former Soviet Union, parenthesis, or the Russian Mafia, close parenthesis, is ruthless in its actions, not hesitating to kill women or children to establish a point.

The number of jurors who found this mitigating factor is five.

Number 19:  Iouri Mikhel and Jurijus Kadamovas were actively involved with the Russian Mafia.

The number of jurors who found this mitigating factor is five.

Number 20:  Defendant Krylov believed, whether or not you agree that his belief was reasonable, that Iouri Mikhel and Jurijus Kadamovas were actively involved with the Russian Mafia.

The number of jurors who found this mitigating factor is eight.

Number 21:  Defendant Krylov believed, whether or not you agree that his belief was reasonable, that if he did

not follow the orders of Iouri Mikhel, his wife and daughter as well as his family members -- his mother, father, sister and grandmother -- in Odessa, Ukraine, would be killed.

The number of jurors who found this mitigating factor is six.

Number 22:  Defendant Krylov believed, whether or not you agree that his belief was reasonable, that by following the orders of Iouri Mikhel, he would save the lives of his wife and daughter and of his family members -- his mother and father, sister, and grandmother -- in Odessa, Ukraine.

The number of jurors who found this mitigating factor is five.

Number 23:  Defendant Krylov did everything in his power to create the impression with Iouri Mikhel and Jurijus Kadamovas that he was a loyal member of the team out of fear, that if they felt different, his family members -- his mother, father, sister, and grandmother -- in Odessa, Ukraine, would be killed.

The number of jurors who found this mitigating factor is three.

Defendant Krylov was 29 years old at the time of his arrest.

The number of jurors who found this mitigating factor is two.

Number 25:  Defendant Krylov graduated from the Marine Academy in Odessa with distinction.

Number of jurors who found this mitigating factor is two.

Number 26:  Defendant Krylov is a university graduate.

The number of jurors who found this mitigating factor is two.

Number 27:  At the time of his arrest Defendant Krylov had no prior criminal record.

The number of jurors who found this mitigating factor is five.

Number 28:  At the time of his arrest, Krylov had no record of prior acts of violence.

The number of jurors who found this mitigating factor is five.

Number 29:  At the time of his arrest Defendant Krylov had no criminal convictions related to drug abuse.

The number of jurors who found this mitigating factor is two.

Number 30:  Defendant Krylov does not present a risk to prison officials or other inmates if he is sentenced to life in prison without the possibility of release.

Number of jurors who found this mitigating factor is five.

Number 31:  Defendant Krylov was a devoted husband to his wife, Natalya, and his infant daughter, Milana, prior to his arrest.

Number of jurors who found this mitigating factor is three.

Number 32:  Defendant Krylov had a close, loving relationship his mother, Alexandra, and his father, Andrei, and his sister Anna.

The number of jurors who found in mitigating factor three.

Number 33:  Defendant Krylov will have an opportunity to continue to be a loving father, husband, and son if he's spared execution.

The number of jurors who found this mitigating factor is eight.

Number 34:  Defendant Krylov has a close loving relationship with his extended family.

The number of jurors who found this mitigating factor is three.

Number 35:  Executing Defendant Krylov will cause great grief and suffering to those who love him.

The number of jurors who found this mitigating factor is four.

Number 36:  Defendant Krylov has accepted responsibility for the crimes he has committed.

Number of jurors who found this mitigating factor is two.

Number 37:  Defendant Krylov has shown remorse for the crimes that he has committed.

The number of jurors who found this mitigating factor, two.

Instructions:  Regardless of whether you make written findings for the mitigating factors of Section Five above, proceed to section six and Section Seven.

Section Six:  Determination.

Based upon consideration of whether the aggravating factors found to exist sufficiently outweigh any mitigating factors found to exist or, in the absence of any mitigating factors, whether the aggravating factors are themselves sufficient to justify a sentence of death and whether death is therefore appropriate sentence in this case.

A:  Death Sentence:

We determine by unanimous vote that a sentence of death should be imposed.

And the jury's checked off, "No."

If you answer yes, the foreperson must sign here, and you must then proceed to Section Seven.

If you answered no, the foreperson must sign, and you must proceed to Section Six B.

B:  Sentence in Life in Prison Without Possibility

of Release, period.

"We determine by unanimous vote that a sentence of life of -- excuse me -- that a sentence of life imprisonment without the possibility of release shall be imposed."

"No."

If you answered yes, the foreperson must sign here, and you must then proceed to Section Seven.

Section Seven:  By signing below each juror certifies that consideration of race, color, religious beliefs, national origin, or sex of the defendant or any victims was not involved in reaching his or her individual decision, and that the individual juror would have the same recommendations regarding a sentence for the crimes in question regardless of the race, color, religious beliefs, national origin or sex of the defendant or the victims.

And it is signed by each of the 12 jurors, signed by the foreperson, dated May 22, 2007.

Your Honor, that concludes the reading of the verdict.

THE COURT:  Okay.  The verdict has been read in open court.

Are there any issues to discuss regarding the jury verdict, Mr. Dugdale?

MR. DUGDALE:  One moment, your Honor.

(An off-the-record discussion was held.)

UNITED STATES DISTRICT COURT

Could we just have a brief sidebar, your Honor.

THE COURT:  Yes.

(The following proceedings were held at sidebar.)

THE COURT:  They were not able to reach unanimous verdict on either life or death.

MR. DUGDALE:  That's fine, and I guess it just reverts to life that way.

THE COURT:  Yes.

MR. DUGDALE:  Would counsel agree?

MR. EVANS:  Oh, yes.

MR. DUGDALE:  Okay.  That's fine.  I'm just a little confused, because I thought they would be required to check one or the other, because they indicated that they reached a unanimous verdict.

MS. MEYER:  Right.

THE COURT:  I'll inquire of the jury as to whether they were able to reach a unanimous verdict on life and then whether they were able to reach a unanimous verdict on death, and the answer should be no to each.

MR. DUGDALE:  If they haven't reached a unanimous verdict as to either, they really should be given an Allen charge to try to reach an unanimous verdict because that just means they're hung at this point in time.  I mean, I didn't quite understand the verdict in that sense.

MR. EVANS:  Your Honor, I think that this is a

clear verdict. They've reached a decision that they cannot reach a unanimous verdict as it is. And therefore as a matter of law, it's a life verdict.

An Allen charge would be absolutely inappropriate in this case at this time.

MR. DUGDALE: I think the Court only needs to ask if they reached a unanimous verdict. That it hasn't, that it's not death, then it reverts to life. I think that's the only issue.

THE COURT: Pardon?

MR. DUGDALE: I think the Court only needs to inquire in the answer to this, if they reached a unanimous verdict, than death should not be imposed that -- that's the only thing that we need to resolve.

MR. EVANS: No. If they -- if it doesn't have to be unanimous, death should not be imposed if one person says death should not be imposed.

MR. DUGDALE: Well, that's true.

THE COURT: They're not able to grow. There are certain jurors who wanted -- who voted for death and some jurors who voted for life.

MR. DUGDALE: But that's not what the --that's not what the jury note says and that's -- the jury note said they reached a unanimous verdict. That's what the -- that's the confusion. Do you understand --

THE COURT:  Let me -- let me inquire.

MR. EVANS:  This is the Court's, I think.

THE COURT:  Do you have the --

MR. EVANS:  It is the original.  That's -- that's the Government's copy.

THE COURT:  I'll give it to you.  Do you have the jury note?

THE CLERK:  Yes, your Honor.

(The following was heard in open court.)

THE COURT:  There is a -- the jury note -- the jury referenced, in Note Number One, that the jury has reached a unanimous verdict.  The verdict that has been read here in open court is not a unanimous verdict.

Is it my understanding that there were certain -- and without getting into numbers, there were certain jurors who believed that a death sentence should be imposed, and there were certain jurors who believed that a life imprisonment without the possibility of release sentence should be imposed.

Is that correct?

JUROR NUMBER 32:  That's correct.

THE COURT:  So the verdict was not unanimous.

JUROR NUMBER 32:  That is correct.  That is -- the note was not correct.  The unanimous portion should have been stricken when it was submitted.

UNITED STATES DISTRICT COURT

THE COURT:  Let me have further inquiry from the foreperson.

Do you believe that additional deliberations, if there are additional deliberations, the jury would be able to reach a unanimous verdict on the sentence?

JUROR NUMBER 32:  No.

THE COURT:  Is there anyone who disagrees with the statement of the foreperson?

If you do, raise your hand.  Is there anyone who believes that additional deliberation will result in a unanimous verdict on the sentence.  If you do, raise your hand.

We have two jurors who have raised their hand.

We have three jurors who have raised their hand.

May I have the Juror Numbers, please.

JUROR NUMBER 84:  84.

JUROR NUMBER 64:  64.

JUROR NUMBER 55:  55.

THE COURT:  Let me ask Juror Number 32, why did you send a note out indicating that the jury had reached a unanimous verdict?

JUROR NUMBER 32:  It was a mistake on my part, your Honor.

THE COURT:  What did you intend to tell the Court? That the jury had reached a decision?

JUROR NUMBER 32:  Reached a decision, yes.

THE COURT:  Okay.  Let's me have the jury return to the jury deliberation room, and we'll address the matter with counsel.

(Whereupon, at 2:32 p.m., the jury exited the courtroom.)

THE COURT:  How do you want to proceed?

MR. DUGDALE:  That was kind of unusual.  I think technically what they should do is continue to deliberate, since there are at least two or three jurors who believe that that could result in a unanimous verdict.  We don't know right now, what the breakdown is as far as the numbers or anything like that that's inappropriate for us to know.

I wouldn't say that they should deliberate long, but I think that the -- the Court should give them an Allen charge and they should continue their deliberations because what we don't have right now is a unanimous verdict, which is what we thought we had.  I'm not sure if it's going to make any difference given that nine hands did not raise on that issue and three did.

But, I think they are hung right now, more than just technically hung, they are hung.  There are some that think there should be one sentence.  We don't know how many.  There are some that think there should be another sentence, and there has not been a unanimous agreement yet.

THE COURT:  Mr. Evans?

MR. EVANS:  Your Honor, I think the law is clear that a unanimous verdict is not required in the penalty phase of a capital trial.

Clearly the foreman was under the impression based on conversations with the other jurors that a decision had been reached as to all of the jurors.  I -- given the necessity of the Court repeating the question of whether further deliberation would assist, it's not clear to me that the -- that the three jurors who raised their hands clearly understood the Court's question.

And we believe in any event that the -- the jury has reached a decision, that giving an Allen charge; i.e., that the jury should continue to deliberate in an effort to seek unanimous verdict -- would be absolutely inappropriate under these circumstances.  As a matter of law, it's not required.

MR. DUGDALE:  The point is, your Honor, they haven't reached a decision yet and they should be given the opportunity to reach a decision.  I don't disagree with the idea that it's not -- it's not required that you be -- unanimity for the death verdict.  I don't disagree with that at all.  It could be 11 to 1 on death, and it's hung, and it reverts to life.  There's no question about that.

THE COURT:  So the what is the Government's

request?

MR. DUGDALE:  The Government's request is that they be given an Allen charge on further deliberations; that they be allowed to deliberate further; and if they come back and they say we can't reach a verdict and we are hung, then that's the end of the proceeding at that point in time.

THE COURT:  Do you have a proposed Allen charge?

MR. DUGDALE:  I can get one, your Honor.

THE COURT:  Well, one that is -- that has been modified for purposes of a capital case.

MR. DUGDALE:  I can get that rather quickly.

THE COURT:  Let's -- let's -- why don't you retrieve it.

MR. DUGDALE:  Can we reconvene in 15, 20 minutes? I'm sure I can have it by that time.

THE COURT:  We'll take a 20-minute recess.

MR. DUGDALE:  Thank you, your Honor.

THE CLERK:  Court's in recess.

(Whereupon, from 2:35 p.m to 3:00 p.m., a break was taken.)

(Out of the presence of the jury.)

THE CLERK:  Please come to order.  This Court is again in session.

THE COURT:  Okay.  We're back on the record on U.S. versus Krylov.  All counsel are present.  The defendant is

present and the interpreters.

Mr. Dugdale has supplied the Court with a transcript of an instruction given to the jury in the case of U.S. of A. versus Mills, CR 02-938 EDOC.

Mr. Dugdale, do you wish to be heard?

MR. DUGDALE:  Yes, your Honor.  I think it's clear there's not a unanimous verdict, and as a result the jury should at least be given one -- should be given an Allen charge at this point.

They only deliberated for two hours in the penalty phase.  Given the length of the trial and all the evidence and everything else, I think it would be premature to call a mistrial at this point when there is not unanimity on the verdict.  And this jury instruction actually does a good job of informing the jury that if they honestly can't reach a verdict, they're to inform the Court, and that would be the end of it at that point in time.

I think this is awfully, actually fast to give an Allen charge given there's only been 12 hours of deliberation, but this is the point we're at right now because we know that there is this -- that the situation of a hung jury at this point in time.

THE COURT:  Do you have this in instruction format?

MR. DUGDALE:  I do not, but I can quickly get it. I can type it up.

42

THE COURT:  Mr. Evans?

MR. EVANS:  Your Honor, this instruction given by Judge Carter in the Mills-Bingham case, was given after the jury had been unable to move closer towards a verdict after two days of deliberation.  I believe that it is inappropriate in any capital case to give this instruction notwithstanding Judge Carter's experience as a State court judge in capital cases.

In any event, in this case we do not know that we have a jury that has not reached a decision.  What we have is three jurors who have said that they believe other people may change their minds.

THE COURT:  What is your request?

MR. EVANS:  What?

THE COURT:  What is your request?

MR. EVANS:  I would ask that we poll the jury to see if the decision announced by the jury foreman reflects their understanding of their votes.  And if that's the case, then that's the end.  It's not the opinion whether they think other people would change their minds which is the inquiry that was responded to by those jurors.

This is a -- the atmospherics in this courtroom, right now, Judge -- and I don't mean anything created by the Court -- are pretty intense.

THE COURT:  The -- I'm sorry?

UNITED STATES DISTRICT COURT

MR. EVANS:  The atmospherics.  There are a number of victim's family members sitting right behind me.  There are very strong feelings going out in this courtroom right now.

THE COURT:  Mr. Evans, there's nothing that's been inappropriate by any of --

MR. EVANS:  I didn't say inappropriate.

THE COURT:  Let me finish.

MR. EVANS:  I apologize.

THE COURT:  -- nothing inappropriate by any of the family members of any of the victims in front of the jury.

Go ahead.

MR. EVANS:  I didn't mean to imply that they were. I'm just saying there's an emotionally charged atmosphere in this Court.

I would ask that the Court before giving instruction of this sort, which I think would be inappropriate under any circumstances, is to poll the jury to determine whether or not the decision announced by the jury foreman reflects their vote.

THE COURT:  The -- the -- the decision announced by the jury foreman being that the jury has reached a decision -- a decision -- the decision being that they're not able to reach a unanimous verdict.

MR. EVANS:  Yes.

THE COURT:  And you want me to poll the jury?

MR. EVANS:  Yes.

MR. DUGDALE:  Your Honor, this notion that it's inappropriate in a capital sentencing phase --

THE COURT:  Well, it may be appropriate at another point in time.  The first -- the first request has been to simply poll the jury.

MR. DUGDALE:  Okay.  I just want to be clear on what we're polling them on.

THE COURT:  I think we need to be clear.

MR. DUGDALE:  What would be absolutely inappropriate and wrong would be to poll them on what their individual decisions are --

THE COURT:  Absolutely.

MR. DUGDALE:  -- who is in favor of death, who is in favor of life.

THE COURT:  Yes.

MR. DUGDALE:  We shouldn't know that information, but I think this has already been done in the sense that some jurors have said that -- they indicated they think that they can reach some sort of decision.  I don't see what the harm is in giving an Allen charge, which then gives the jury that opportunity to come back and say, "We can't reach a decision."

MR. EVANS:  They have reached a decision, your

Honor.

MR. DUGDALE:  They haven't reached a decision.
That's the point.

MR. EVANS:  They clearly --

THE COURT:  Okay.

MR. DUGDALE:  I mean the Court --

THE COURT:  One moment.

Mr. Buehler, do you wish --

MR. BUEHLER:  Pardon me, your Honor.  May I confer?

THE COURT:  Go ahead.

(An off-the-record discussion was held.)

MR. EVANS:  Your Honor, the Government's inferring
that this was somehow be a mistrial.  This is not a mistrial.
The procedures of the Federal Death Penalty Act are very
clear that when a unanimous verdict is not reached, life
without possibility of release is imposed.

THE COURT:  Yes.

MR. EVANS:  That's what we have here.  We're not
giving instructions to avoid a mistrial.  We don't have one.

THE COURT:  I'm not sure we have that, Mr. Evans.
Three of the jurors have indicated that they believe that the
jury can reach a unanimous verdict or decision regarding
sentence.

MR. EVANS:  Your Honor, what I'm asking is that the
Court poll the jury to determine whether the jury --

jurors -- without inquiring what it is, I'm not asking to inquire and if that's what is inferred.  I am asking if the jurors are comfortable with their -- with their vote, with each of their vote, not what they think other people will do in response to further deliberation.

We already have the jury foreman saying they have a decision.

THE COURT:  Anything further?

Government's requesting that I read the instruction.

MR. DUGDALE:  And the Government allows the jury to do that in the privacy of the jury room which is what they should do.

This polling is just going to create confusion, your Honor.  And it's going to set up a situation that is really not contemplated at all, by how this system is supposed to operate here.

THE COURT:  Mr. Buehler, do you wish to be heard?

MR. BUEHLER:  Just for the record, your Honor, I think it would be unprecedented for the jury to come out and announce a decision and then for the Government -- for the Court to send them back.  And I do think we have no way of knowing how the jury would be affected psychologically by having sat here in the highly emotional, inherently emotional, atmosphere in the reading of a verdict form and

then to tell them, "No.  You haven't reached a decision go back."

So just for the record we do strongly object to the Court now giving them any sort of instruction and telling them to continue to deliberate.  They were clearly all here, sitting here expecting that this was the final moment their decision was being read.

And that decision, even though there's not a box for life because we couldn't reach unanimity on death, that clearly is the decision that they were here announcing.  And I believe the Court should and must accept that decision.

MR. DUGDALE:  Your Honor, the only thing the Court has to do is say that this was not a proper decision because you haven't reached a decision yet and that you have this obligation under this instruction to continue deliberating, following the language of the instructions.

In the case United States versus Fields, a very recent case, that says that given such -- giving an Allen charge in a capital case is proper in the penalty phase, there's nothing improper about it at all.

THE COURT:  And I -- I don't disagree with that.  I think the question is when should the Allen charge be given.

MR. DUGDALE:  Well, ideally we would have liked that none of this happened and that the jury was sent back when they didn't have the proper form there; but I think at

this point this is the point to give it now.  I mean, we only have to give it once obviously, and if they come back and say, "We can't reach a decision," something they have the option to do as a result of what will be told now they know they can't reach -- they can't return a verdict form like the one they did before.

They have to either come back and say unanimously we agree with one penalty or the other or come back and say, "We can't reach the decision," in which case we'll revert to life imprisonment.

MR. EVANS:  What they did, your Honor -- may I address the Court?

THE COURT:  One last time.

MR. EVANS:  Okay.  If the Court sends them back with this instruction, they're saying that they were wrong to come out and announce the decision that they did.  The jury foreman announced to this Court that they had reached a decision.  The -- and this verdict form reflects that.  To now send them back is to say that they are wrong.

THE COURT:  Okay.  Let's get the jury in.

(Whereupon, at 3:09 p.m., the jury entered the courtroom. )

THE COURT:  Okay.  We have the jury reassembled with the alternates.

Again, just to repeat, the jury foreperson sent the

note indicating that the jury had reached a unanimous verdict.  The note apparently was incorrect.  The jury had not reached a unanimous verdict.

It seems to the Court that the jury foreperson's position is that the jury, after having full opportunity to deliberate, is not able to agree on the appropriate sentence.

And my question is to Juror Number 32, the foreperson, is that your position, sir?

JUROR NUMBER 32:  Yes, your Honor.

THE COURT:  Before you arrived at the decision, did you -- did you poll the other jurors to make sure that they agreed with you?

JUROR NUMBER 32:  Not formally, but it was unanimously agreed that we were not going to change our positions or our final decisions.

THE COURT:  Okay.  Now, I asked other jurors previously whether they agreed with your statement or not and we had three jurors who raised their hand.  I just want to make sure that I understand.  We have three --

Is there anyone who believes that further deliberations will allow the jury to reach a unanimous verdict?

JUROR NUMBER 84:  Yes.

THE COURT:  We have Juror Number 1 -- seat Number 1, Juror Number 6, Juror Number 8, Juror Number 10, seat

Number 10, I should say, seat Number 10.

Then with that being said, I'm going to ask the jury to go back to the jury room to continue your deliberations to see if you can reach a unanimous verdict. If you cannot reach a unanimous verdict, that's fine. Just alert the Court that you're not able to reach a unanimous verdict.

Okay?

(Whereupon at 3:12 p.m. the jury exited the courtroom. )

THE COURT: The next question --

The jury has been excused.

Next question is, how does counsel wish to proceed on providing the verdict form to the jury? We have one that's filled out and signed. How do you wish to proceed?

MR. DUGDALE: I think they should just be given a new verdict form, basically. I mean they can fill everything out the same, if they choose to do so after further consideration. But --

THE COURT: Mr. Evans or Mr. Buehler, who wishes to address the Court?

MR. BUEHLER: Well, I think the question illustrates the problem in the inappropriateness.

THE COURT: Pardon?

MR. BUEHLER: I think the question that now is

presented to us illustrates the nature of the problem and the inappropriateness of it.  The jury obviously went through the procedure of answering a number of pages of questions.  They filled it out.  Everyone of them signed it, and they obviously came into the courtroom with the supposition they had done what they were required to do, and they were announcing a decision.

So to send them back now a blank jury form would in effect say we're all starting over.  So I think we should wait and see what the jury asks for.  If the jury asks for a new verdict form, then we can give it to them.  But I don't think we should give it to them as if suggesting that the Court then is unhappy with the way they proceeded so far; so they're supposed to start over.

THE COURT:  So you're asking that I place back in the jury room the jury form that has been provided to the Court by the jury?

MR. BUEHLER:  No.  I don't think -- I think we should let them ask for it if they want to make the change to it.  Because I think the jury is smart enough to know that if they make some changes, then they're going to have to change the verdict form.

THE COURT:  The bailiff has informed me that they have just asked for it.

MR. BUEHLER:  Okay.  Very good.

THE COURT:  So, we'll provide it.

We're going to get written, a written question or statement by the jury --

MR. BUEHLER:  Very well.

THE COURT:  -- as to what they want.

MR. BUEHLER:  Your Honor, if I may for a moment?

THE COURT:  Yes?

MR. BUEHLER:  I do believe that in the Mills case where this jury instruction is being taken from, that the jury in that case had not done what has happened here.  And in fact, all the jury had done is communicate to the Court that they were unable to make a decision which --

THE COURT:  I think I agree with that statement.

MR. BUEHLER:  Thank you.

THE COURT:  We're in new territory.

Okay.  We're in recess until we get a note from the jury.  Stay in the courtroom, please.

(Whereupon, from 3:16 p.m. to 3:18 p.m., a break was taken.)

THE CLERK:  Please come to order.

THE COURT:  Okay.  I have a note from -- back on the record.  Everybody is present.  The defendant is present with the interpreters.

I have a note from Juror Number 32:  "Please return the verdict form."

UNITED STATES DISTRICT COURT

The Court will provide the verdict form to the jury through the bailiff.  The verdict form being the one that was filled out and signed.

Keep the note.

THE CLERK:  I will, Judge.

Court's in recess.

(Whereupon, from 3:18 p.m. to 3:28 p.m., a break was taken)

THE CLERK:  Please come to order.

THE COURT:  Okay, we're back on the record.  I have Juror Note Number 3.

3:25, the jury has reached a unanimous verdict.

MR. EVANS:  Your Honor, Mr. Buehler apparently went downstairs.

THE COURT:  We'll wait for Mr. Buehler and Mr. Dugdale.

MR. EVANS:  May I go downstairs too?

THE COURT:  No.  We're going to need you to remain.

(Counsel entered the courtroom.)

THE COURT:  Mr. Buehler and Mr. Dugdale have arrived.  The jury has Note Number 3, they reached a unanimous verdict.

Now, just for the record the Court has made a copy of the verdict form that was provided to the Court, read in open courtroom at -- that was provided at 1:10 P.M.  So we

have a copy preserved for the record.  The jury was given the original back.

Is there anything to address, any matter to address before we bring the jury out, Mr. Dugdale?

MR. DUGDALE:  No.

THE COURT:  Mr. Evans?  Mr. Buehler?

MR. EVANS:  No, your Honor.

THE COURT:  Okay.  Let's bring the jury out.

(Whereupon, at 3:30 p.m. the jury entered the courtroom.)

THE COURT:  Okay.  We have the jury reassembled with the alternates.  Note Number 3 reflects that the jury has reached a unanimous verdict.  It's dated 5-22-07, 3:35 P.M.

Does everyone agree that the jury has reached a unanimous verdict?

Please raise your hand if you agree.

All hands are raised.

Would you make sure that it is properly signed and dated and pass it to the bailiff.

Okay.  I have reviewed the verdict form.  We have the clerk returning.  I'm going to instruct the clerk to read only Section Six and to poll the jury regarding Section Six only and not to read the entire verdict in Open Court again.

THE CLERK:  United States District Court Central

55

District for the -- United States District Court for the Central District of California, United States of America versus Petro Krylov, defendant.

Case number CR 02-220 (B) SJO, special verdict form for Defendant Petro Krylov in the penalty phase.  In the courtroom of the honorable S. James Otero, originally signed at 1:10 p.m. and then revised at 3:25 p.m. by Juror Number 32, dated 5-22-07.

And pursuant to the Court's instruction, I'll start from Section Six.

Section Six, Determination:  Based on consideration of whether the aggravating factors found to exist sufficiently outweigh any mitigating factors found to exist or in the absence of any mitigating factors whether the aggravating factors are themselves sufficient to justify a sentence of death and whether death is therefore the appropriate sentence in this case.

A, Death Sentence:  We determine by unanimous vote that a sentence of death shall be imposed.

Jurors answered, "No."

If you answered yes, the foreperson must sign here and you must then proceed to Section Seven.  If you answered no, the foreperson must proceed to Section Six B.

Section B, sentence of life in prison without the possibility of release:

56

We determine by a unanimous vote that a sentence of life imprisonment without the possibility of release shall be imposed.

It's checked off, "Yes."

Juror Number -- it's -- the check of no is crossed out no and signed by Juror Number 32. If you answer yes, the foreperson must sign here, and you must then proceed to Section Seven, signed by the jury foreperson, dated 5-22-07.

Section Seven, Certification: By signing below, each juror certifies that consideration of the race, color, religious beliefs, national origin, or sex of the defendant or any victims who was not involved in reaching his or her individual decision and that the individual juror would have the same recommendation regarding a sentence for the crimes in question regardless of the race, color, religious beliefs, national origin, or sex of the defendant or the victims.

It's signed by jurors 1 through 12 inclusive. And then again signed by the juror foreperson, dated 5-22-07.

THE COURT: Okay. The -- the jury has returned a verdict. The jury's verdict is that the sentence should be life without the possibility of release.

Let me have the clerk poll each of the jurors to make sure that that is their verdict.

THE CLERK: Juror Number 64, is this your verdict as presented and read?

JUROR NUMBER 64:  Yes.

THE CLERK:  Juror Number 35, is this your verdict as presented and read?

JUROR NUMBER 35:  Yes.

THE CLERK:  Juror Number 77, is this your verdict as presented and read?

JUROR NUMBER 77:  Yes.

THE CLERK:  Juror Number 50, is this your verdict as presented and read?

JUROR NUMBER 50:  Yes.

THE CLERK:  Juror Number 66, is this your verdict as presented and read?

JUROR NUMBER 66:  Yes.

THE CLERK:  Juror Number 84, is this your verdict as presented and read?

JUROR NUMBER 84:  Yes.

THE CLERK:  Juror Number 18, is this your verdict as presented and read?

JUROR NUMBER 18:  Yes.

THE CLERK:  Juror Number 29, is this your verdict as presented and read?

JUROR NUMBER 29:  Yes.

THE CLERK:  Juror Number 21, is this your verdict as presented and read?

JUROR NUMBER 21:  Yes.

THE CLERK:  Juror Number 55, is this your verdict as presented and read?

JUROR NUMBER 55:  Yes.

THE CLERK:  Juror Number 61, is this your verdict as presented and read?

JUROR NUMBER 61:  Yes.

THE CLERK:  And Juror Number 32, is this your verdict as presented and read?

JUROR NUMBER 32:  Yes.

THE COURT:  Before we have any additional matters to address, I'd like to see counsel at sidebar with the verdict form, please.

(The following proceedings were held at sidebar.)

THE COURT:  The foreperson has signed Section A after answering the question no, and it shouldn't have been signed.  In addition, in Section B the foreperson has placed his -- his identification number after the word "no."

I just want to make sure that the Government doesn't have any issues.  I think it's pretty clear after polling the jury that the jury has returned a verdict of life without the possibility of release.

MR. DUGDALE:  The Government doesn't disagree.  I don't think that changes anything.

THE COURT:  Thank you.

(The following was heard in open court.)

UNITED STATES DISTRICT COURT

THE COURT:  All of the issues have been resolved in reference to the special verdict form.  A couple of comments:

I would like to take the opportunity to thank each and every one of the jurors and alternates.  It's been a long trial, a very difficult case.  The most serious case you probably will ever be called upon to decide.

And counsel for the Government, counsel for the defendants or defendant, thank you for your hard service.

After the jury is excused, for those of you who would like to remain, I would like to be able to chat with you a bit in chambers.  For those of you who need to return home, feel free to return home.  Don't feel that you're compelled to meet with the judge in chambers.

A couple of other comments:  Thank God for the United States of America and for the Department of Justice, the FBI, the IRS, and all of the brave men and women of law enforcement who brought this sophisticated, dangerous gang to justice.

Justice was accomplished.  That's all I have to say.

Anything further?

THE CLERK:  That's it, your Honor.  Court's in recess.

(Whereupon, from at 3:40 p.m. to 4:02 p.m., a break was taken.)

60

THE COURT:  Okay.  Can we have everyone -- the jury has been excused.  Counsel will be ordered not to have any discussions with the jury members or panel members or alternates regarding their deliberation process.  We have the issue of sentencing.

Before I continue, I just want to comment on the professionalism of counsel in this case.  It's such an honor to preside over a case with U S Attorneys who are so dedicated and counsel for the defendant so dedicated.

Mr. Evans and Mr. Buehler, I thought that you did an exceptional job on behalf of your client.

The Marshals Office, I want to thank the Marshal's Office for -- and all the security officers for the -- just handling the courtroom so well, making sure that everything flowed properly.

The interpreters also, I want to thank for your time here.  It was almost seamless, in terms of the interpretation.

We have sentencing?

MR. DUGDALE:  Yes, your Honor.  Obviously a PSR has to be prepared because there are noncapital counts or at least one, the money laundering count, in addition to the capital count.  So whatever defense counsel would like.

And thank you, your Honor, for the kind words too.

MR. EVANS:  Thank you, your Honor.

If there is a PSR report, how long does it normally take?

THE CLERK:  It's ten weeks, counsel.

MR. BUEHLER:  Your Honor, the only other issue is that we may -- we want to look at the question of bringing any motions for new trial.  And the rule is that motions for new trial are to be brought within ten days of verdict, seven days, I'm sorry, under Rule 33, I believe it is.

And I've been advised by Government's counsel, that it's their position that any motions for new trial relating to the guilt phase of the case had to be brought within seven days of the verdict in the guilt phase.

That's not our understanding, that may be an issue that the Court will have to resolve if we do file a motion for new trial.

In any event, on the assumption that -- which may be incorrect -- that they haven't already been waived, then we would obviously want more time than just seven days in order to review the issues and prepare a motion, which seven days of course, can be extended under the rule within the seven-day period.

So we would be requesting that it be understood that the Government's position is that the time has already -- the time for bringing motions has already been lost because it's too late.  If it is not -- if it's

determined by Court that it's not too late, then we would like a date -- at some date in the future.

I would say -- I mean, obviously, Mr. Evans and I would like a little bit of time to decompress after the lengthy trial. And so I would request, first of all, that motions be heard at the time of the sentencing and that any motions be filed, I would suggest, three weeks before the sentencing date. The Government had two weeks to respond, and the defense have perhaps three days to reply.

THE COURT: Any objection?

MR. DUGDALE: Nothing other than I believe under the rule they were required to file such motions within seven days of the finding of guilt. That's what the rule says. There are Ninth Circuit cases that say that once that period has lapsed, you cannot get an extension.

But with that understanding -- and that would be one of our arguments as to why the motions with be rejected. I have no problem with the scheduling proposed by counsel.

THE COURT: Then the schedule proposed is the order of the Court. And I'm not implying or suggesting that the Court is -- if there's a statutory time period to bring the motion, then you have to -- well, I guess the requirement is then to comply with the statutory time period. I'm not extending that time period.

MR. BUEHLER: Correct. That's all of our

intention, your Honor.

THE COURT:  Anything further?

MR. BUEHLER:  I think we just have to pick the date.

THE COURT:  We have a proposed date:  August 27th, position pleadings August 13, '07.

MR. BUEHLER:  August 27th for the sentencing hearing, your Honor?

THE COURT:  Yes.  Sentencing pleadings due on or before August 13th.

MR. BUEHLER:  And then under the timetable I propose any motions other than sentencing pleadings, would be due on August 6th -- that would be three weeks in advance.

THE COURT:  That -- whatever works with counsel is agreeable to the Court, August 6th --

MR. BUEHLER:  Okay.

THE COURT:  -- would be the order.

MR. BUEHLER:  Thank you, your Honor.

MR. DUGDALE:  And, your Honor, the one on -- I don't know if there's going to be more things, but we're going to take custody of the exhibits, your Honor.

And we had an agreement with the clerk of the Court to take possession of all the exhibits from the Mikhel trial and the Mikhel and Kadamovas trial and this trial at the end of the day because they wanted them secure because of the

fact there was a death sentence in the Mikhel and Kadamovas case to make sure that nothing was lost.  They're putting them in a secure location, and we will take possession of them until we can arrange for that delivery.

THE COURT:  That would be the order of the Court.

The jury -- in the jury room the only issue that came up in reference to the trial is that the jurors -- certain of the jurors have requested that their notes be returned to them, their personal notes.

Is there any issue there?  I said I would simply raise it with counsel.

MR. DUGDALE:  No, your Honor.

THE COURT:  I think that's the protocol in most matters.  They would like a copy of the indictment also.

MR. DUGDALE:  Okay.  That's fine.

THE COURT:  The notes -- notes?

MR. BUEHLER:  We have no problem, your Honor.

THE COURT:  Okay.  Notes are to be returned to the jurors for their own personal use, their own notes, and then a copy of the indictment also given to any juror who would like a copy.

MR. DUGDALE:  If they write a screenplay, I would like to be played by somebody reasonably better looking than myself.

MR. BUEHLER:  Your Honor -- just a point of

clarification, when the Court first came out and we went back into session, I'm not sure I understood the Court's order. The Court was ordering that counsel shall not talk to the jury?

THE COURT:  Yes.  Not talk to the jurors regarding the substance of the case.

MR. BUEHLER:  Was that at the request of the jurors or --

THE COURT:  No.  That's the order of the Court.

Anything further?

MR. DUGDALE:  No, your Honor.

THE COURT:  I have one -- Mr. Umansky is -- is not here.  I had one other comment for Mr. Umansky senior, the father.  It appeared to the Court that -- that he had no choice but to immediately cooperate with the FBI.  I know he feels guilty about -- about it or second guesses his decision making.

I would think based on everything I've seen here that he had no choice but to immediately cooperate.  And his cooperation I think resulted in significant evidence being acquired that has brought the prosecution to judicial process or system.

Mr. Krylov, good luck to you.

THE DEFENDANT:  Thank you.

MR. DUGDALE:  Thank you, your Honor.

THE CLERK:  Court's in recess.

(Whereupon, at 4:10P.M., the proceeding concluded.)