UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

HONORABLE S. JAMES OTERO, JUDGE PRESIDING

UNITED STATES OF AMERICA,              )
                                       )
                                       )
                                       )
                  Plaintiff,     )
                                       )
                                       )
                                       )
        Vs.                      )   No. CR 02-220 (B) SJO
                                       )
                                       )
                                       )
PETRO KRYLOV,                          )
                                       )
                                       )
                                       )
                  Defendant.     )
                                       )
_____  )

REPORTER'S DAILY TRANSCRIPT OF TRIAL PROCEEDINGS

LOS ANGELES, CALIFORNIA

WEDNESDAY, APRIL 25, 2007

LEANDRA AMBER, CSR 12070, RPR
OFFICIAL U.S. DISTRICT COURT REPORTER
312 NORTH SPRING STREET, # 442
LOS ANGELES, CALIFORNIA 90012
(213) 613-0179

UNITED STATES DISTRICT COURT

**A P P E A R A N C E S**

**IN BEHALF OF THE PLAINTIFF,**
**UNITED STATES OF AMERICA:**          U.S. DEPARTMENT OF JUSTICE
                                       U.S. ATTORNEY'S OFFICE
                                       BY:  SUSAN J. DeWITT, AUSA
                                            ROBERT DUGDALE, AUSA
                                            KIM MEYER, AUSA
                                       312 NORTH SPRING STREET
                                       12TH FLOOR
                                       LOS ANGELES, CALIFORNIA 90012
                                       (213) 894-4496
                                       susan.dewitt@usdoj.gov
                                       robert.dugdale@usdoj.gov
                                       kim.meyer@usdoj.gov


**IN BEHALF OF THE DEFENDANT,**         LAW OFFICES OF GEORGE W. BUEHLER
**PETRO KRYLOV:**                       BY:  GEORGE W. BUEHLER, ESQ.
                                       350 SOUTH GRAND AVENUE
                                       SUITE 3900
                                       LOS ANGELES, CALIFORNIA 90071
                                       (213) 625-1600
                                       buehler@geragos.com


                                       LAW OFFICES OF DAVID R. EVANS
                                       BY:  DAVID R. EVANS, ESQ.
                                       600 SOUTH LAKE AVENUE
                                       SUITE 506
                                       PASADENA, CALIFORNIA 91106
                                       (626) 432-5100
                                       dre@drelaw.org


**ALSO APPEARING:**
        SOPHIA VELEN, COURT-CERTIFIED RUSSIAN INTERPRETER
        VARVARA OLSON, COURT-CERTIFIED RUSSIAN INTERPRETER
        JAMES S. DAVIDSON, FBI SPECIAL AGENT
        LOUIS PEREZ, FBI SPECIAL AGENT
        SCARLET NERAD, MITIGATION SPECIALIST

**I N D E X**

|                        | **PAGE** |
| --- | --- |
| JURY NOTE NUMBER 10    | 10 |
| JURY NOTE NUMBER 11    | 29 |

UNITED STATES DISTRICT COURT

4

LOS ANGELES, CALIFORNIA; WEDNESDAY, APRIL 25, 2007

8:29 A.M.

-o0o-

(Out of the presence of the jury.)

THE CLERK:  Please remain seated and come to order this court is now in session.

THE COURT:  Okay.  We have all counsel present on United States versus Krylov.  The defendant is present with the interpreters.  The Russian interpreters are here.

I'm going to bring the jury out.  I just wanted to admonish the jury so that during the lunch hour, when they go their separate ways, that they have no additional discussions, conversations regarding the case.

Is there any other issues to address?

MR. EVANS:  Yes, your Honor.  I need to address the Court, and we can do it after the Court admonishes the jury with regard to some witness issues.  It does not need to be ex parte, but it doesn't -- shouldn't delay the jury.

THE COURT:  Yes.  And I'm -- the jury will deliberate today until 5:00 o'clock.  And I think that's probably -- 5:00 o'clock is probably extending it.  If the jury suggests that they want to stay longer, then we can stay longer, but I'll leave that up to them.  Okay.

Let's bring the jury out.

MR. BUEHLER:  Your Honor, Mr. Evans is going to

UNITED STATES DISTRICT COURT

step outside for a moment.

THE COURT:  Yes.

(Whereupon, at 8:45 a.m., the jury entered the courtroom. )

THE COURT:  Okay.  We're back on the record.  We have the jury and the alternates, and everyone else is present.  I already called the case.

I just wanted to remind you today -- today you're going to have lunch on your own.  You'll be separated but I -- it's again very important for me to remind everyone at all times that you cannot discuss the case among yourselves at those times or with any other person.

So please make sure during this process that you pay special attention to all that.

The jury will stay here until 5:00 o'clock.  If you want to remain longer, notify the clerk, and we can keep you here longer.  I think probably 5:00 o'clock is extending the period sufficiently.

Does anyone have any questions?

In terms of the notes you would send us, I think we've given you copies of all the previous notes that you can keep numerical order and track of those prior notes.

Is there any -- any other questions that you would have?

The clerk reminds me that there were two notes

referenced as Number 8, and I believe we -- we have already noted that into the record.  They were incorrectly numbered by the foreperson, and that's because you simply didn't have the previous notes.  So that should be corrected.

Again, I remind you, if you want to review any of the exhibits that have not been given to you, the firearms or the other exhibits that have not been placed in that jury room, feel free to ask for that.  We can bring you out here in open court -- any of the videos, any of the tape recordings here in open court.  So just feel free to ask for that.

Okay.  Have a good day.

(Whereupon, at 8:48 a.m., the jury exited the courtroom.)

THE COURT:  Okay.  We have counsel back in court with the defendants.  The jury has been excused.

Mr. Evans, yes?

MR. EVANS:  Thank you, your Honor.  This is addressing witnesses from the Ukraine for the possible penalty phase.  I -- I don't think I know anything more than anybody else does about what the jury is doing at this point but, because the Court had made the original -- provided the original direction both to the Government and to Defense that we were going to go immediately into penalty phase, we've had a number of Ukrainian witnesses here on very limited visas.

We had them lined up last week because it appeared at least possible that it would be going into this by next week. And there are now problems with work for some of them. And all of them have to appear in the Embassy in Kiev by May 5th under the terms of their visa at the latest in order to ever return to United States to obtain a visa. There are all kinds of issues with INS that I don't understand, and I think Mr. Perez has informed me that he's had some experiences that are difficult.

But in any event, they think that if they stay longer than that, that they will be trying to illegally immigrate into the United States. And there are at least three who are -- a dentist, a doctor, and an administrator -- who are here. Family members who work for clinics and have had their jobs threatened. So it's getting very complicated.

That's a predicate to asking the Court if we could set a firm date for a mitigation hearing. If it proceeds when the Court returns from its appearance in Washington D.C., we could release these witnesses. We would save the Court a ton of money ultimately in terms of the expense of keeping them here and get them back for a specific -- specified time.

THE COURT: I hate to sound -- to have them go back to the Ukraine and other parts of the former Soviet Republic and then try to get them back into the United States.

MR. EVANS:  We believe we could do that.

THE COURT:  Let's see.  We're April -- what's the date today?

THE CLERK:  Today's the 25th, your Honor.

THE COURT:  The 25th.  Let me -- let me hear from the Government.  Now, let's assume that the jury, you know, remains in deliberation the rest of the week.  It --

MR. DUGDALE:  Your Honor, if that were the case, we would have our -- our penalty phase case is going to take no longer than two days.  If they come back this week and we started -- let's say we started on Monday, we would be done by the first of May, and these witnesses could testify on the second or third.

There are other alternatives too.  We could depose these witnesses now, do videotape depositions of them.  We could have them appear by video conference if they want to go back.  We're open to any alternatives.  We won't object to issues of not having testimony if that's what it comes to.

But I tell you our penalty phase case, as the Mikhel case, will be extremely short.  So if the jury is back this week, we shall not have an issue with this.

MR. EVANS:  Your Honor?

THE COURT:  I think it's probably premature to -- to address the issue now.  We can revisit the issue at end of the day.  And let's see what happens today.  It's not unusual

in this type of case for a jury to take three or four days to decide the issues.

MR. EVANS:  What time, your Honor?  I'm going to be going back to my office and meeting with some of these witnesses.  What time would you like?  At 5:00?

THE COURT:  I think we're going to excuse the jury at 5:00.  So if you're here at 4:00 o'clock, 4:30.

MR. EVANS:  Fine.  Thank you, very much.  I appreciate that.

THE COURT:  How long will it take the Defense to put on their case?

MR. DUGDALE:  Three days, I think, your Honor.

THE COURT:  Well, if the jury comes back -- returns a verdict tomorrow, we could have most of the Government's case placed before the jury on Friday.  The Government will finish on Monday, and we can conclude with the Defense portion of the case next week.

MR. EVANS:  Could we discuss it at the end of the day?

THE COURT:  Sure.

MR. EVANS:  Because I'm very concerned about losing a couple of witnesses.

THE COURT:  And I'm more than willing to issue an order requiring them to maintain -- to remain here which if they are under court order, they have no -- no choice.  I

can't see how that would impact their ability to -- to remain or immigrate into the United States or pursue a, you know, a visa in the United States.

MR. EVANS:  Let's discuss it at that time if we could.

THE COURT:  Okay.  That's it.  Thank you.

MR. DUGDALE:  Thank you.

MR. EVANS:  Thank you, your Honor.

THE CLERK:  Court's in recess.

(Whereupon, from 8:52 A.M. to 2:26 P.M., a break was taken.)

(Out of the presence of the jury.)

THE CLERK:  Please come to order.  This court is now in session.  The Honorable S. James Otero now presiding.

THE COURT:  Okay.  We're on the record on USA versus Krylov.  We have Juror Note Number 10.  It reads, jury requests the following; definition of word "foreseeable."

And then Number Two is, "Please read back defendant's testimony under examination by the Defense, on April 16th, when defendant's -- when defendant testified regarding fingerprint party," period.

"Terminate reading of testimony at point where Krylov meets Mikhel in parking lot."

I've discussed the matter with the reporter in chambers to see if we could locate the portion of the

testimony that the jury is referring to, and I believe we have accomplished that.

May I have the transcript from the reporter, please?  Could you mark the pages?

THE REPORTER:  It's from there to there.

THE COURT:  The -- I'm not sure what page it ended at.

THE REPORTER:  117.

THE COURT:  Let's see if we have a consensus as to the portion that the jury has requested.

I'm looking at the Monday, April 16, 2007.  Do you have a copy of the transcript?

MR. BUEHLER:  I don't, your Honor.

THE COURT:  Do I have an extra copy here?  Where is your copy?

MR. BUEHLER:  I apologize, your Honor.  I had a copy right here.

THE COURT:  Does the Government have a copy?

MR. DUGDALE:  Yes, your Honor.

THE COURT:  Then maybe you can share with Mr. Buehler for the purposes of --

MR. DUGDALE:  Sure.

THE COURT:  -- just trying to see if we can locate the portions that they've requested.

I'm looking at page 112.  This is the testimony of

April 16, 2007, which has been identified in the note.  The question is -- where we probably should begin is on -- on 112, Line 13 with the question:  "And after -- and after you did that, where did you go?"

"ANSWER:  I go home.

"QUESTION:  And what was at home that night?

"ANSWER:  They have a party.

"QUESTION.  A party?

"ANSWER:  Yeah.

"QUESTION:  Did you at any time that night go to the Weslin House?

"ANSWER:  No, because I was, I was -- I start drinking Vodka at 7:00 o'clock -- 7:00, 8:00 o'clock.  And after I started drinking, I don't drive.  And we're not having -- we're not just having party.  You sit down, eat, drink.

"QUESTION:  And Mikhel had told you to stay away; correct?

"ANSWER:  Yes."

That continues through 113, 114, 115, 116.  Wait.  I'm sorry.  It stops at 116.  It appears to stop at 116 at about Line -- Line 20.

And you're going to have to look at the Government's copy to see.  I think everything should be read in between from 112 through 116.  It's about five pages.

MS. DeWITT:  I'm sorry, your Honor.  What line did you say it started on 112?

THE COURT:  Yeah, I'm looking at the first reference to the "party", it's on Line 112 -- I mean Page 112, Line 13.  And on Line 16 is the first reference to "party."

Then they requested that that portion, that we start there, it appears, and we -- and the reporter continue reading through the portion where Krylov meets Mikhel in the parking lot.

And that appears to -- to be on Page 116 -- through 116, and it may include portions of page 117 because on Page 117, I believe, they're still in the parking lot.

MR. BUEHLER:  Are we interpreting the note when it says, "terminate reading testimony at the point where Krylov meets Mikhel in the parking lot" to include the testimony about meeting him in the parking lot or stopping at the beginning of that?

THE COURT:  I've -- I've -- I'm including it, but I think we can start -- one approach is to simply start on Page 112 with the jury and then -- and then allow the jury to indicate when they've heard enough of the testimony to be read back.

MR. DUGDALE:  That's fine.

THE COURT:  Is that appropriate?

14

MR. DUGDALE:  Yes.

THE COURT:  Mr. Buehler?

MR. BUEHLER:  Yes.

MS. DeWITT:  Just a second, I would like to read to see if -- whether or not we need to start a little bit earlier.

That's fine.

MR. DUGDALE:  I think that's fine, your Honor.  To start on Page 112, at the place your Honor indicated just to go until the jury says --

THE COURT:  We'll start on Page -- Line -- Page 112 and beginning on Line 13, and the reporter will read through Page 116 and continue thereafter until the jury foreperson requests or indicates that the requested transcript portions have been covered.

Is that agreeable?

MR. DUGDALE:  Yes, your Honor.

MR. BUEHLER:  Yes, your Honor.

THE COURT:  Okay.  Do we have a definition for the word "foreseeable"?

MR. DUGDALE:  With a bunch of lawyers, I think we can come up with this one.  Just looking in Black's Law Dictionary the definition goes on for quite a bit and is pretty confusing.  But what I would take out of this; is to define "foreseeable," as something that can reasonably be

UNITED STATES DISTRICT COURT

anticipated.

THE COURT:  Well, do you want more time to consider the definition?

Mr. Buehler, do you have any comments regarding the proposed definition offered by Mr. Dugdale?

MR. BUEHLER:  Yes.  First of all, the language in the instruction is coming out of the United States versus McVeigh, I think, which is the only case on this question that I'm aware of.  So we're really in uncharted territory as to what the factual standard is for finding the element of -- resulting in death under the -- under the hostage-taking statute.

And since that factual finding is the thing that takes the crime out of hostage taking -- ordinary hostage taking to a level where the death penalty now applies, it seems to me, that there is some element of intent that's involved in that.

I think -- I think given the lack of any legal definition or case law that the definition should be -- if we give them a definition, which we're not required to do, that the definition should be something like it's anticipated that the result or the event is likely or probably going to occur.

MR. DUGDALE:  Well, I don't think that's what foreseeability means.  I think the only thing that it means is that it's something that you can reasonably anticipate.

It has nothing to do with intent nor does -- nor does the McVeigh case talk about intent at all.

The only thing that the Government must prove is that it's reasonably foreseeable that someone would die as a result of the commission of the crime, and that's all it is. It's not an intent to kill.

In fact, McVeigh and the subsequent case to McVeigh, Nichols, makes it very clear the Government doesn't have to show any intent to kill in order to move a statute like this.  For one where it's just an ordinary violation of the law to one that makes a person eligible for the death penalty.  So intent has nothing to do with it - --

MR. BUEHLER:  My response to that would be that McVeigh is one case.  And McVeigh of course could be wrong, but the language they chose as case law develops under this statute may -- may refine that language or set up a different standard.

I think the Ninth Circuit instruction or I'm -- the instruction we've used comes from the only case law available, but we're now putting a further gloss on it, on what may ultimately be determined not even to be an appropriate standard.

So are we talking about the factual determination that elevates a crime into the Category 1, that's punishable by death?  So I think, if anything, we should -- we should

err on the side of a standard that involves a higher level of responsibility rather than a lower one.

So I would say, we either don't put a gloss on it and we just use the language -- the language that's available and the current case law, or it becomes a question.

My suggestion would be that something is foreseeable, if it is reasonably anticipated as something that is likely, or probable, to occur.

MR. DUGDALE:  I just don't know, your Honor, where counsel is coming up with likely or probable to occur.  I mean, it's just something that can be reasonably anticipated.

And in fact the situation is such that we're actually already giving the defendant the benefit of the doubt on this issue.  The statute punishes or makes this potentially a death penalty eligible case because the crime results in death.

The Ninth Circuit interpreting this "results in death" language in other cases, has said it's a but-for test. If you commit a crime and somebody happens to die, whether or not it was foreseeable, or not, doesn't make any difference. So we're actually in this case giving the defendant the benefit of the doubt by having a reasonable, foreseeable quality.

And so I don't think we should tinker with it in any other way, other than advising the jury what Black's Law

dictionary says about reasonable foreseeability. And the crux of what they say is that it's something that can reasonably be anticipated.

I think the jury will understand that, if you say foreseeability is something that can reasonably anticipated, and it's correct.

THE COURT: Okay. Let's bring the jury out, and we'll have the read-back first, and then the Court will further consider the competing definitions.

MR. DUGDALE: Maybe they'll send a note back saying they don't need it anymore.

MS. DeWITT: If we wait long enough.

(Whereupon at 2:45 P.M. the jury entered the courtroom.)

THE COURT: Okay. We have the jury reassembled with the alternates.

Jury Note Number 10, signed by Juror Number 32, dated today's date at 1:30.

The jury requested the following:

One: Definition of the word "foreseeable."

Two: Please read back -- back defendant's testimony under examination by the defense on April 16th when defendant testified regarding fingerprint party, period. Terminate reading of testimony at point where Krylov meets Mikhel in parking lot, period.

I believe we have located the portions of the transcript that the jury has requested.  There's consensus by counsel.  So I'll have the reporter read back the portion beginning with the reference to "party" and the reporter will continue reading until the jury indicates that she should stop.

And I'll just direct myself to the foreperson to -- to direct the reporter to stop when you've heard enough.

(Whereupon the record was read.)

JURY FOREPERSON:  Thank you.

THE COURT:  Juror Number 32 has indicated that the reporter should stop.

Let me have the page number and the line number that you stopped at.

THE REPORTER:  Page 13, Line 15.

THE COURT:  Page 13, line 15.

Are there any of the other jurors who are requesting additional readback?  If you are, please raise your hand.

Okay.  There's no hands that are raised.

I'll have the jury go back in the jury room to continue your deliberations.

JUROR NUMBER 32:  Explanation of the word "foreseeable"?

THE COURT:  That will be answered shortly.

20

(Whereupon, at 2:49 p.m., the jury exited the courtroom.)

THE COURT:  Let me just go back on the record in reference to -- the jury has been excused, and the alternates are gone.  We have counsel remaining.

In terms of the definition of the word "foreseeable," there are a couple of proposals.

One, as offered by Mr. Dugdale, is that the word should be defined in the context of Black's Law dictionary as something that can reasonably be anticipated.

I'm not sure that suffices in reference to the context of the matter before the jury.

One other proposed definition is reasonably foreseeable within the context of the crimes referenced in Counts 1 through 4 is -- that someone would die as a result of the commission of the crime.

The third way to -- to resolve it is to -- is to simply refer the jury to the instructions as given and not provide any additional guidance.

And then I'm not quite sure as to Mr. Buehler's proposal.

Mr. Buehler, what are you offering?

MR. BUEHLER:  My proposal was, that it's something that is reasonably anticipated and is likely or probable to occur.

THE COURT:  And the authority for that is -- is?

MR. BUEHLER:  Well, there's not a whole lot of authority for anything here.  But I'm arguing that in the context of this case and the significance of the determination to the punishment available to push the case into a death penalty case.

THE COURT:  Well, but -- but the definition of the word "foreseeable" as likely -- that's including something that is reasonably anticipated and is also likely and probable to occur is based on what authority?

MR. BUEHLER:  Well, I don't have authority, your Honor, other than -- than what I think is reasonable under a statute like this.  Where that's the severe consequence of the finding.  And I'm pointing to the real act of authority for any other definition of foreseeability here.

THE COURT:  Well, I guess let me -- my question to Mr. Dugdale is, if it's reasonably anticipated, isn't it -- doesn't it there follow that it's -- that it's likely to occur?

MR. DUGDALE:  I don't think "likely" is the right word.

THE COURT:  Well, then it's -- the other proposal that it's reasonably anticipated and probably will occur, or probable to occur.

MR. DUGDALE:  Well, "could occur," your Honor.  I

22

would just ask for --

THE COURT:  Some --

MR. DUGDALE:  -- some time to go look.  There's got to be a definition in some case about reasonableness and foreseeable.

THE COURT:  -- I think we should all --

MR. DUGDALE:  This is an important issue, obviously.

THE COURT:  And I think which should all probably spend some time doing some research on it.

MR. DUGDALE:  And in the long definition in Black's Law Dictionary, we'll say that there is a reference to probable -- something being probable, but this is a definition that goes on for a long time here.  I think a short amount of research will probably resolve this pretty quickly.

THE COURT:  Okay.

MR. DUGDALE:  Could we meet back at 3:30?

THE COURT:  Certainly.

MR. BUEHLER:  My problem is I don't have any research tools here at the courthouse.  I could go over to Roybal.  There's a law library in Roybal, but when are we coming back?

THE COURT:  We have a -- an annex in this building here, a library.

UNITED STATES DISTRICT COURT

MR. BUEHLER:  I didn't know that.

THE COURT:  But I'm not sure it would have everything you would need.

Let's --

THE CLERK:  I'll see if can I make arrangements somewhere.  I'm not sure what he needs.

THE COURT:  What do you need?  What would you be looking for?

MR. BUEHLER:  Well, I believe I would want to look at the McVeigh case.  I may want to look back at the statute.  I may want to look at Devitt and Blackmar.  Those are various sources.

THE COURT:  I'm not -- let's -- let's make the 11th floor library available to --

THE CLERK:  I'll find somewhere for him, Judge.  I don't know where but --

THE MARSHAL:  The law library is on the 10th floor.

THE COURT:  We'll make sure that you have access to the library on the 10th floor.  If -- if the material you're looking for is not there, then -- then certainly you can use the facility in Roybal.  I'll just let the clerk set that up.

MR. BUEHLER:  Very well, your Honor.

Your Honor, could I raise another issue unrelated to this?

THE COURT:  Certainly.

MR. BUEHLER:  The -- as Mr. Evans explained this morning, there are people here from the Ukraine.  There are actually six family members of Mr. Krylov who are present and in Los Angeles now, three of them are the ones who are under pressure to return.  In addition to that, there's Mr. Krylov's parents and grandmother.  We would like Mr. Krylov to have a chance to meet with them.

And I'm proposing -- I want to ask the Court to order -- and I understand that if the Court does order it, the marshal's service will comply.  We would like to have the Court order that Mr. Krylov could meet with his family members in the courtroom here.

And by "meet" I mean be able to sit next to them, let them embrace him, have some time to talk.  The only other alternative is for them to just be in the courtroom and see him from a distance.

The other alternative would be to have them visit in M.D.C., but procedures that have to be gone through at M.D.C. -- it's unpredictable how long that would take.  And I would -- I would suggest that -- that on one occasion three of the family members be able to visit him, and on another occasion the other three rather than have six -- six here at a time.

So, I would request that Court so order.

THE COURT:  Well, I guess the question is where

should that take place assuming that there's an order.  One proposal is the courtroom here.  And let me just make an inquiry of the marshals.

MR. DUGDALE:  Can I be excused, your Honor?

THE COURT:  As long as we have U.S. Attorney's present.

MR. DUGDALE:  Yes, somebody will be here.

MS. DeWITT:  Do you need any of these back?

MR. DUGDALE:  No.

THE COURT:  Do we have a facility in the building where that could occur?

THE MARSHAL:  We have an attorney visiting room downstairs.

MR. BUEHLER:  The one that I usually see Mr. Krylov in?

THE MARSHAL:  Yes.

MR. BUEHLER:  That's better than nothing certainly.  The difficulty there is that there's no ability of contact.

THE COURT:  There's what?

MR. BUEHLER:  No ability to have contact, you're looking through a wire mesh.  And I think -- this could be the last -- these people, these aren't people who have the money to travel.  So this could be their last opportunity, perhaps the last ever to see Mr. Krylov.  And they haven't seen him for 10, 11 years.

THE COURT: Well, the question really is -- I understand that issue, but the issue is really one of security. And it's a question of level of comfort for the Marshal.

I don't have enough background information on Mr. Krylov or -- or the family members. But can that -- can that be accomplished in this courtroom?

THE MARSHAL: We're not allowed to have -- to allow inmates to have any type of contact with anybody but whoever is at their table. If you -- if you want us to have him visit with somebody, maybe he can remain restrained, and we could just watch one person at a time.

That's one suggestion. I would have to okay it through my supervisor.

THE COURT: Could that be done here in open court -- in this courtroom?

THE MARSHAL: I would have to okay it through the supervisor, but I can check.

THE COURT: I'm going to leave that up to the Marshal's office on how that's accomplished.

If we can accomplish it here in the Court without the wire mesh, let's see if we can do it that way.

MR. BUEHLER: Thank you, your Honor.

THE COURT: Okay. But in terms of the number of persons that are allowed to talk to him at any one time, that

will be again discretion on the Marshal's office to make sure that security is protected -- is kept.

MR. BUEHLER:  Thank you, your Honor.

THE COURT:  We also have -- this is also a public courtroom.  So we also have those issues.

MR. BUEHLER:  I understand, your Honor.

THE COURT:  We have -- we have the room across the way.  Is it -- is it -- can we use the room -- the witness room across the way?

Is that a facility that is secure enough to allow for a meeting with --

Mr. Buehler, you intend to be present?

MR. BUEHLER:  Yes.

THE COURT:  Yes.  Would Mr. Buehler and Mr. Krylov and his family members to discuss -- there may be certain confidential issues they need to discuss.

We have to respect Mr. Umansky also and the other family members here.  It may be more appropriate to have that in a more confidential, confined setting.

THE MARSHAL:  I understand.  I just would need to -- we've never done that before.  So I would have to run it by a supervisor to see what they would say because I -- we've never done that.

THE COURT:  Well, the question I have is -- is the -- the witness room -- is anyone using that room?

MR. BUEHLER:  I don't think so, except that the interpreters have used it from time to time just to wait to see what's -- if they're going to be called on.

MS. DeWITT:  Your Honor, also, just so you know, I'm not suggesting that you do anything different than what the Marshals are suggesting, but to allow him to have contact with family members would be a violation of the Special Administrative Orders that are in place.

So if you're going to make this order, you should -- you should make an order that this is a one time order by the Court that the SAM order not be complied with.

It's a violation of the SAM order for him to have contact with any family members that haven't been cleared by the FBI who haven't agreed to comply with the SAM order.

And I advised Mr. Evans of this several weeks ago that if he wanted me to get a waiver of the SAM order for this particular purpose, that I would do that.  But that he needed to get me information about the family members that he wanted to meet with, which he has not done.

And again I'm not suggesting that Mr. Krylov be deprived of this opportunity to see his family members, but I just want the Court to know that it would be a violation of that order to do so.

THE COURT:  Okay.  I'm going to leave the securities -- security issues up to the United States

Marshals office.

MR. BUEHLER:  Thank you, your Honor.

THE COURT:  Whatever they feel comfortable with in light of the orders that are already in existence the Court would concur with.  If for any reason the Marshals' office believes that security would be compromised, then it will have to take place in the facility downstairs.

MR. BUEHLER:  Thank you.

THE COURT:  If you're requesting some type of waiver, you can propose it and certainly the Court will consider it.  I think the Government has suggested that that may be one way to handle it.

MR. BUEHLER:  Thank you.

THE COURT:  Thank you.

THE CLERK:  Court's in recess.

(Whereupon, the from 3:00 p.m. to 4:50 p.m., a break was taken.)

(Out of the presence of the jury.)

THE COURT:  Okay.  Back on United States versus Krylov.  We have the defendant present.  Counsel are present for both sides.  The jury is not.

We have Juror Note Number 11.

The jury has a sense of humor.  Juror Note Number 11 -- excuse me for laughing -- but reads as follows:

"How much longer in the 'foreseeable' future must

UNITED STATES DISTRICT COURT

the jury wait for a response to Note Number 10?"

Good question.  Mr. Dugdale has offered a proposed instruction.  It reads as follows:

"Foreseeable means that a person of ordinary intelligence should reasonably have anticipated that death could result from the criminal conduct in which that person was a participant.  The authority cited:

MR. DUGDALE:  Well, there is no authority cited.

THE COURT:  -- you've attached a couple cases.

MR. DUGDALE:  -- I've attached a couple cases, and here's the explanation, your Honor.

This is relatively uncharted territory which is a part of the reason I wasn't back here in 15 minutes.  There are a couple of cases though that the Court would -- that the Government would ask the Court to focus in on.

The first is United States versus Houston, which is the one Ninth Circuit case that, I believe, deals with this issue of what this "resulting in death" language means when it's used in a statute.  And that's what we're dealing with here.  We're dealing with hostage taking resulting in death.

In this case, in the Houston case, it was the distribution of a controlled substance resulting in death.  Basically, where a drug dealer sold some drugs and a person died as a result of the use of the drugs.

In that case the Ninth Circuit held that resulting

in death was a -- was not used in this approximate cause of foreseeability, was not even the proper way to go about this, that it was a but-for test.

Nichols, on the other hand, which is the other case that the Government has given the Court -- in that case they used a reasonable foreseeability test.  In that case the charge was the use of an explosive device, and in that case the use resulted in a person's death.

They used a foreseeability language that the Government used in the instructions here which were used in the Mikhel case.

I bring these cases to the Court's attention because I think by even putting the word "foreseeability" in there, we've gone beyond what the Ninth Circuit likely requires in light of the Houston case, given that they said that that's not really the proper test when you're dealing with this "resulting in death" language, which is why we've given the instruction that we have.  I know what the Defense will likely ask for is that there would be some sort of probability assigned to this as well, to say it's likely, foreseeable or probable or something to that effect.

But I think what the Government has submitted reflects the fact that we're going beyond what the Ninth Circuit would require in Houston here.  And just inform the Government and the jury of what foreseeable means.

32

And that's the facts.  That it's something that is reasonably anticipated here.  In doing it in the context of much a -- the resulting in death language that the -- that the jury is considering here.

So the Government would have a problem with anything imposing any stricter burden on the Government since we've already assumed a burden that seems to be more strict than the Ninth Circuit has put on the Government or the Houston case.  And we've done that willingly, recognizing the fact that this is a death penalty case, but we don't think that any additional burden should be put on Government by assigning some probability standard to this foreseeability issue that's -- that the jury has.

On top of that I think it's really not even completely correct to say that foreseeability requires some sort of probability to it.  I mean, just think of an everyday example.  I have car insurance because it's foreseeable that I might get in an accident on the way home, but it's not probable that I may get into an accident on the way home or even likely; but it is foreseeable, which is the reason that I have insurance.

I think clouding the issue even more than what the Government has raised here, brings problems and can also bring conflict with what the Houston case says.

THE COURT:  Okay.  Mr. Buehler, do you have any

UNITED STATES DISTRICT COURT

comments?

MR. EVANS:  May we briefly confer, your Honor?

THE COURT:  I thought you had been.  Do you need more time?

MR. EVANS:  Just a moment, your Honor.

(An off-the-record discussion was held.)

MR. BUEHLER:  First of all, your Honor, I've just been handed the Houston case by the Government, and I haven't had a chance to fully read it nor of course Shepardize it and see what other authority is there.  It's not a case involving the statute at issue here.

It's not a case involving the death penalty, and the Nichols and McVeigh cases of course do involve the death penalty.  And I mean essentially what the Government seems to be saying is that if we could do it over again, we would -- we would look at these other cases and say that foreseeability isn't the requirement here, and therefore we want to give the weakest possible definition of foreseeability.

I don't think we can do that.  The -- the instruction was proposed by the Government, was concurred then by the Defense, treating foreseeability as an element of the Government's proof here with respect to the resulting in death element.

And so, I think, it has to be a real definition of

foreseeability.  Not one that we water down to try to reach a -- a try to basically get rid of the requirement.

Now, I would point out that in -- one thing I found in the law library below is a nice large Webster's Third International Dictionary, which defines "foresee" as:

To see as certain, or unavoidable, look forward to with assurance.

And then underneath that is a definition of "foreseeable," being as what should reasonably be anticipated.

Now, the definition of "foresee" there is a little bit stronger than what the Government is proposing here.

And what the Government's proposing is something that a person of ordinary intelligence should reasonably have anticipated that could result from a criminal conduct in which that person was a participant.  That's an even weaker definition within the one they were proposing previously.

So there may be some additional law that could be found on this since we are pretty much at the end of the day. I would ask the Court to let us, when I'm not limited by just the hard books and can look on a computer, let us do a little more research overnight and address it first thing in the morning before the Court makes a decision.

THE COURT:  I think that's probably an appropriate request.

UNITED STATES DISTRICT COURT

MR. BUEHLER:  Thank you.

THE COURT:  We'll -- let's bring the jury out. We'll excuse them.

(Whereupon, at 5:02 p.m., the jury entered the courtroom.)

THE COURT:  The jury is reassembled with the alternates.  Our foreperson has a sense of humor.

Juror Note Number 11:  "How much longer in the foreseeable future must the jury wait for a response to Note Number 10?"

Let me just provide some explanation.  Besides this case I have several other cases to handle.  I was involved in another proceeding while you were in deliberation.

I haven't had time to hear from counsel regarding all of the issues concerning this question.  We need more time to think about this, or I need more time to think about this.  I'm not sure that counsel does.

So therefore the jury is going to be excused in order to return tomorrow to continue your deliberations.

Again, I instruct you not to discuss the case with anyone other than in the jury room when you are deliberating.

Yes, sir?  Juror 32 has their hand up.

JUROR NUMBER 32:  I have a couple of questions.  It is my understanding, your Honor, that you have not been spending all this time trying to interpret what the question

36

on Note Number 10 was?

THE COURT:  Exactly.

JUROR NUMBER 32:  Okay.  If we go back into the jury room right now, can we stay longer and -- and conduct our business beyond 5:00 o'clock?

THE COURT:  Oh, absolutely.

JUROR NUMBER 32:  Okay.

THE COURT:  Any time the jury would like to do that, feel free to extend the time.

JUROR NUMBER 32:  If we do that -- and I don't know how to put this -- can -- will you people be available beyond 5:00 o'clock?

THE COURT:  Yes.  The answer is yes.

JUROR NUMBER 32:  Okay.  Thank you.

THE COURT:  I -- I am -- I -- we'll be here.

JUROR NUMBER 32:  Okay.  Thank you.

THE COURT:  Thank you.  Please continue your deliberations.

We have other jurors with their hands up.

JUROR NUMBER 32:  What time do we come in the morning?

THE COURT:  8:30, tomorrow morning.

JUROR NUMBER 32:  And how late are we staying tomorrow?

THE COURT:  The same hours, 8:30 to 5:00.

Yes?  May have your number, please.

JUROR NUMBER 84:  I'm 84.

THE COURT:  Yes?

JUROR NUMBER 84:  Tomorrow is my birthday.  I was hoping maybe I could go home.

THE COURT:  I cannot do it.  We cannot do it.  We have too many pressing matters.  We cannot do it.

JUROR NUMBER 84:  Until 5:00?  We have to stay until 5:00, not 4:00?

THE COURT:  Until 5:00, not 4:00.

We have another juror with their hand up.

JUROR NUMBER 99:  Juror 99.  Do alternates stay after hours today?

THE COURT:  Yes.  Yes.

JUROR NUMBER 99:  Is there any consideration for people that are traveling from high traffic areas?

JUROR NUMBER 106:  106.  I live in West Hills and there's a lot of traffic for me at 5:00 o'clock.  I have to spend two hours on the freeway, and I'm just concerned about me getting home late and having to come here early in the morning.

THE COURT:  And I recognize the concern.  I think it's a legitimate concern.  I don't have the flexibility.  So I'm going to keep the jury tomorrow until 5:00 o'clock and the alternates.  That's the order of the Court.

(Whereupon at, 5:04 p.m., the jury exited the courtroom.)

THE COURT:  I just would have counsel remain. I'll -- I'm going to review the cases offered by Mr. Dugdale, and we'll see what happens to the jury.

Okay?

THE CLERK:  Court's in recess.

(Whereupon, from 5:02 p.m. to 5:05 p.m., a break was taken.)

THE CLERK:  Please come to order the Court is again in session.

THE COURT:  The jury has changed their mind.  We're back on the record on U.S. versus Krylov.  The defendant is present with counsel.  The interpreters are present.

The jury has informed the bailiff that they would like to leave, not remain, as initially stated.  Because I said I would keep them until 5:00, they are excused.  I've already admonished them.

Anything further?

MR. EVANS:  Yes, your Honor.

THE COURT:  Yes?

MR. EVANS:  I'd like to -- this is apart from that question.  I don't know if the Court wants to --

THE COURT:  Anything further before I release the jury?

MR. EVANS:  No.

THE COURT:  Okay.  The jury would be released.

MR. EVANS:  This is a follow-up concern to the issues I raised this morning with regard to the witnesses from the Ukraine.

I have three witnesses who -- a doctor, a dentist and an administer of a large pharmaceutical company, who have been gone now from their work for two weeks.  They came.  They are aunts, uncles, and cousins of Mr. Krylov; and they literally face the loss of their employment.

Two of our witnesses have been ordered to return to the embassy in Kiev on May 5th.  I have no idea why that was imposed as a condition of their visa, but that literally means that they have four days from the time.  It requires four days from the time they leave the United States to get to Kiev.  Their flights go to Odessa.  They go through several changes, and then it's a full day's journey to Kiev, and then it will be the next day that they were at the embassy.

I would like to renew my request that if there is a penalty phase, that we begin when the Court returns from Washington.  I think that would be May 14th if I'm correct.

Allow us to coordinate this so that we could attempt to get them back.  The Government has offered alternatives, and I know that Mr. Dugdale has been very

cooperative in suggesting alternatives of video conferencing. It's really not the same thing as having the presence of these people. The Court can see them in court, the back. This is the first time they've seen their son, nephew, cousin in years.

The presence of their statements that their testimony is very poignant and powerful. And in a death penalty case it's critical -- it really goes to the very fairness of the proceedings in my mind.

And I would ask the Court -- and I realize that -- I understand the Court's concern with time and procedure. But I'm -- I'm very concerned about the ability to convey to the jury the weight of the issues that we think are at the core of mitigation in this case.

THE COURT: I'm not sure what the request is.

MR. EVANS: We ask -- I apologize -- that the Court set a date for the penalty phase to be commenced when the Court returns on May 14th.

THE COURT: The -- the Court intends to start -- if we have the penalty phase, the Court intends to start it as soon as the jury reaches a verdict on the guilt phase.

I -- at the beginning back in January, I informed counsel that there was one matter I could not avoid handling, and that was the issue in May. And I have provided counsel with plenty of notice regarding that, advised counsel at

41

various times through the course of the trial.  So the request to put the matter over would be denied.

I'm not confident that we're going to be able to get the witnesses back also in the timeframe that you have suggested.  The request is denied.

MR. EVANS:  Your Honor, then could I request a conditional examination on this Friday in this Court for three of the witnesses who have to leave?

They -- they will lose their employments.  Those are Natalya Traguba, Olga Barenova and Petro --

THE COURT:  I'm not sure what your request is.

MR. EVANS:  For -- to conduct a conditional examination of the witnesses with, the presence of a judicial officer so that we can question them on videotape and the Government, if it desires to do so, can cross-examine them so that we could preserve that for presentation at the hearing whenever it commences.

THE COURT:  Mr. Dugdale?

MR. DUGDALE:  I don't have any objection to that, your Honor.

Video -- essentially a videotaped deposition of these witnesses -- I don't have any objection to that.

THE COURT:  Well, what's the authority first of all for that procedure?

MR. DUGDALE:  Well, under Rule 15 they could take a

deposition of any witness who is unavailable for trial just the same way we did for the three witnesses who were not available.

If -- I'm just guessing.  I think the jury is going to come back tomorrow with a verdict.

THE COURT:  Well, let's not guess.

MR. DUGDALE:  But in any event, if that's not the case, I think on a Rule 15 you can take their deposition -- the Defense could take their deposition and preserve it for the trial in case they're not going to be here during the penalty phase.

THE COURT:  And in reference to the procedure to follow, what is the procedure under Rule 15?  Mr. Evans has requested a judicial officer to be present at that hearing.

MR. DUGDALE:  I don't necessarily think that's required.  I think as long as the witness is under oath and he's subject to cross-examination and is videotaped, as long as there is an interpreter there who is court certified, as long as there is a videographer there who is certified and stenographer who is certified, I think it could be properly preserved for use of the trial.

The Government wouldn't object to its use at trial.

THE COURT:  Would not object?

MR. DUGDALE:  Would not object.  It would not insist that -- that the Court be present or a judicial

officer be present.

We could work out a -- we could work out a stipulation as we did with the prior depositions where all objections are preserved for possible editing of the videotape if necessary.  The Court could resolve those objections later on.

THE COURT:  Was there an officer present at the video depositions of the --

MR. DUGDALE:  No.

THE COURT:  -- of the other witnesses?

MR. DUGDALE:  No, and that's why we -- we worked out a procedure whereby counsel was able to preserve objections up to the time of the videotape would be used basically and raised those after the deposition was over.

THE COURT:  Do you have a video -- a videographer, Mr. Evans?

MR. EVANS:  We will find one.  I don't have one, but I will find one.  This -- I was hoping not -- to not be in this situation obviously.

THE COURT:  Okay.  The -- then let's -- then why don't you start the process by securing a videographer so that we can conduct the questions -- the Q and A of the witnesses.

MR. EVANS:  Very well, your Honor.

THE COURT:  We're adjourned.

UNITED STATES DISTRICT COURT

MR. DUGDALE:  Thank you.

(Whereupon, at 5:12 p.m., the proceeding

concluded.)