UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

HONORABLE S. JAMES OTERO, JUDGE PRESIDING

UNITED STATES OF AMERICA,            )
                                     )
                                     )
                                     )
                   Plaintiff,        )
                                     )
                                     )
                                     )
         Vs.                         )   No. CR 02-220(B) SJO
                                     )
                                     )
                                     )
PETRO KRYLOV,                        )
                                     )
                                     )
                                     )
                   Defendant.        )
                                     )
_____    )


REPORTER'S TRANSCRIPT OF PROCEEDINGS

LOS ANGELES, CALIFORNIA

FRIDAY, JANUARY 12, 2007


LEANDRA AMBER, CSR 12070, RPR
OFFICIAL U.S. DISTRICT COURT REPORTER
312 NORTH SPRING STREET, # 442
LOS ANGELES, CALIFORNIA 90012
(213) 613-0179

UNITED STATES DISTRICT COURT

**A P P E A R A N C E S**

**IN BEHALF OF THE PLAINTIFF,**
**UNITED STATES OF AMERICA:**         U.S. DEPARTMENT OF JUSTICE
                                     U.S. ATTORNEY'S OFFICE
                                     BY:  ROBERT DUGDALE, AUSA
                                          KIM MEYER, AUSA
                                     312 NORTH SPRING STREET
                                     12TH FLOOR
                                     LOS ANGELES, CALIFORNIA 90012
                                     (213) 894-4685


**IN BEHALF OF THE DEFENDANT,**      LAW OFFICES OF GEORGE W. BUEHLER
**PETRO KRYLOV:**                    BY:  GEORGE W. BUEHLER, ESQ.
                                     350 SOUTH GRAND AVENUE
                                     SUITE 3900
                                     LOS ANGELES, CALIFORNIA 90071
                                     (213) 625-1600
                                     buehler@geragos.com


                                     LAW OFFICES OF DAVID R. EVANS
                                     BY:  DAVID R. EVANS, ESQ.
                                     600 SOUTH LAKE AVENUE
                                     SUITE 506
                                     PASADENA, CALIFORNIA 91106
                                     (626) 432-5100
                                     dre@drelaw.org


**ALSO APPEARING:**  LOUIS PEREZ, FBI SPECIAL AGENT

UNITED STATES DISTRICT COURT

**I N D E X**

PAGE


**HEARING:**   ORDER TO SHOW CAUSE                                    4

4

LOS ANGELES, CALIFORNIA; FRIDAY, JANUARY 12, 2007; 8:32 A.M.

-oOo-

THE CLERK:  This is item number one, CR 02-220 (B) SJO, United States of America versus Petro Krylov.

MR. DUGDALE:  Good morning, your Honor.

Robert Dugdale, Kim Meyer, and Special Agent Louis Perez from the FBI, on behalf of the United States of America.

MS. MEYER:  Good morning.

MR. EVANS:  Good morning, your Honor.

David Evans, George Buehler on behalf of Petro Krylov, who is present in custody, your Honor.

MR. BUEHLER:  Good morning.

THE COURT:  The matter is here primarily on an order to show cause regarding whether Miss Sanchez should be relieved from further work on this case.  The order to show cause I believe was set by this Court on Monday, and it followed review of the clerk's transcript in an order to show cause regarding the same issue that was held before Judge Tevrizian.

The issue presented is whether Miss Sanchez should be removed because of certain security issues implicated in this case, in particular remedial measures conducted at the Metropolitan Detention Center that occurred after an

UNITED STATES DISTRICT COURT

attempted escape by the defendant or other defendants associated with the litigation here.

And I'll just make sure that it's understood that these are allegations contained in the indictment and no finding has been made by any tribunal regarding that attempted escape. But there's security issues presented in reference to information to be disclosed or that has been disclosed to the defense regarding preparation for the defense of that count in the indictment.

The other issue is that the Government has various witnesses to be called in this case, as I understand it, that are under Government protection. And the issue is whether Miss Sanchez represents or presents a risk to Government witnesses, who are currently under Government protection, because she has been convicted in an indictment -- after indictment that essentially involved her acting as a messenger for her husband, who is a member of the Mexican Mafia.

Miss Sanchez is currently married to -- is currently married to the member of the Mexican Mafia. She's under supervision from the probation department after serving time in Federal custody for the underlying conviction in case number 9983 A, a matter tried before Judge Carter.

The Court has read and considered the declaration of Mr. Evans.

Mr. Evans, you filed a declaration to first put the Court on notice regarding your background, training, and experience, your commitment to the law, your long history of integrity. You assume that the Court was not familiar with your background.

This Court, before you arrived here on Monday, was well familiar with the background of all the lawyers in this case as is probably common practice in significant litigations. Courts make efforts to find out about lawyers associated with the litigation. I certainly had a long conversation with others on this bench regarding your history of service to law, your dedication, your family history.

Apart from that I rarely Google counsel who make appearances. I was well aware of your background and storied history, not only yourself but your family members. So I was aware of that. I assume your good faith and good intent.

The concern I have remains. Miss Sanchez is currently married to a member of the Mexican Mafia. I recognize that she is under supervision from the probation department. I recognize that her communication with her husband is reviewed. And I recognize that she cannot physically visit him at any institution -- I believe he's incarcerated at Pelican Bay -- or have phone calls.

That being said, I think we all understand that the prison gangs are extremely sophisticated in communicating

with each other, amongst each other, and with persons outside of the facility.  So the fact that her communication may be reviewed -- I don't think ends the analysis or the -- resolves the issue because, for example, a communication could be made to a third party who communicates with the husband in some type of fashion directly or indirectly.

The information that has been learned from certain of the gang cases is, that the gang members, the prison gang members are extremely sophisticated.  The Government has had a difficulty preventing communications between and among the prison gang members.

And according to at least one indictment currently before Judge Klausner, those communications have resulted in several murders that have occurred over time.  And that's to be finally resolved by a jury, but those are the matters currently before Judge Klausner.

So I don't think that the fact that Miss Sanchez is -- her communications being monitored ends the analysis or resolves the issue.

I respect that Miss Sanchez is attempting to rehabilitate herself, and it looks like she's gone a long way towards that.  Her loyalty is to her husband, sir, not to you.  She's still married.  I assume that her loyalty is to her husband.  It's not unusual for one to remain loyal to family members, above and beyond loyalty to my employer or

duty to any court.  So that is a separate concern of the Court.

In reference to the attempt by the Government and Counsel for the defendant to isolate Miss Sanchez from any sensitive material that the Government deems to be sensitive, again that assumes a good faith of Miss Sanchez, assumes that she will abide by your directives and again the Court has concerns regarding her ability to do so.  Because of the nature of her relationship and prior conviction.

I do -- the concern of the Court is really in reference to the last issue that you've raised, in fairness to Miss Sanchez, is not an issue to the Court.  The Court has to balance Miss Sanchez's rehabilitation with the security issues that are presented here.

Again, if this was a garden variety criminal case, it may be very different, but it's not.  And so my concern is not so much with Miss Sanchez.  My concern is with the last issue raised in the pleading, and that is that you've indicated that she has spent enumerable hours on this litigation I assume indirectly being paid by CJA funds because it's hard for the Court to understand how someone could be so involved in the case, integrally involved in the case, as referenced in the pleading here without some funds being dedicated for those -- for that work.

But that's the concern of the Court.  She has spent

a lot of time on this case.  If I was to judge early on this case, I would not have allowed this to occur.  It just doesn't make sense under the circumstances here, under the facts presented here.

So I'll hear from you in reference to, and from the Government, in reference to whether any type of wall can be built to make sure that the security of witnesses are maintained and to make sure that sensitive information regarding the M.D.C. is not transferred to her and then thereafter that information given to members who are -- persons who are incarcerated in facilities currently.

That is valuable information.  That is significant information, and that information can compromise the entire facility and have long-term ramifications.

Apart from that, there's another -- other matter I want to cover today.  I want to use the short period of time that we have to discuss the procedural aspects of the case. I would like to alert counsel that I have met with Judge Tevrizian regarding his experience in the case that he is trying currently, the Mikhel matter, just to learn his experience regarding the procedures he's employed in that litigation.

I met with Judge Klausner regarding the procedures he's employed in the litigation that he is currently handling regarding members of the Aryan Brotherhood.

And I met with Judge Perry, who is a State Court Judge, former Assistant U.S. Attorney, who is in Los Angeles Superior Court, who has since 1992 tried approximately 21 -- 21 capital cases.

I intend to employ procedures here that have been employed by Judge Klausner and by Judge Perry in reference to qualifying the jury concerning the capital allegations, the death allegations.  And as I mentioned I think on Monday, the Court is not going to employ what was formerly known as a Hovey voir dire procedure.

The Court intends to -- we have a trial date on March 5th.  The Court would intend to bring in approximately -- 150 jurors who have been time qualified by the jury office to be able to sit on the case with the estimate that has been provided.  The Court intends to bring the jurors in -- 75 in the morning of March 1st to qualify them regarding the capital allegations.

I'll discuss at a pretrial conference approximately a week before precisely how the Court is going to qualify the jury regarding the capital allegations and the death penalty issues but the Court intends to bring them in on March 1st.  75 in the morning; 75 in the afternoon.  Qualify the jury -- prospective jury panel members regarding the capital offense issues only, the death issues only.  And then bring the jury back on March 2nd to conduct general voir dire of the jury.

Hopefully, we'll have a jury selected by March 2nd. And I'll bring the jury back on March 5th, which would be the first day of trial to commence trial on the case.

We need to -- so we need to set a pretrial date today. I would like to get a pretrial date from the clerk of the court, which would be one week prior to March 1st so that we can discuss the protocol for the jury selection process.

I'm very concerned with the estimate that has been provided by Counsel here regarding the length of this trial. This is a one defendant case. I recognize that there's allegations of multiple murders, and I recognize that because of the international facts that are part and parcel of this litigation, it's going to be a little more complex than some.

Judge Perry will be starting the case next week. He has a one-defendant capital case. He expects to try that case in three weeks.

My prior experience with capital cases -- as I mentioned, the last time I handled a capital case was in 1992, a three-defendant capital case. The jury returned a verdict of death in each of those cases on each of those defendants. In the State proceedings there's additional complexity with the number of perempts. I believe, as I recall, we had 70 perempts. The case took six weeks to try involving three defendants with the complications that occur when you have multiple defendants in a capital proceeding.

So I would -- I would suggest to counsel that we need to move this case along.  It should be tried in far less time than the two to three-month estimate that has been provided by the parties.

I've discussed the length of the trial with Judge Klausner.  And in Judge Klausner's case, I think, they spent approximately 21 days of testimony involving his matter.  So I would encourage counsel to move the case along.

It's in the best interest of the defendant.  It's in the best interest of the Government, and it's in the best interest of the judicial system to make sure -- and the jury -- to make sure that we employ measures and procedures to make sure that the case is timely tried, giving each side an opportunity to present their claims and to present their defenses.

So I see no reason why we have to have a length -- a trial that has been referenced as a two-to-three-month trial.

I'm going to look at moving the case along during the course of the trial.  I will -- I may employ procedures utilized in other litigation to encourage counsel to -- to move the case along.

This is -- it's really a legal cultural issue.  The culture in the Federal Court in this district is to have lengthy trials involving capital cases.  The culture in, at

least with certain of the judges in this district and certain of the -- a majority of the judges in the Los Angeles Superior Court is to -- and the lawyers accept the culture is to -- is to try these cases in less time than has been articulated here.

I need to set -- so we need to set a pretrial date. May I have --

THE CLERK:  Your Honor, that's Monday, February 26, 2007, at 9:00 a.m.

THE COURT:  Monday, February 26, 2007, at 9:00 o'clock for pretrial.  The -- we need a date -- counsel has referenced that they intend to file motions.

This case is as old as they get.  In my view, this case is far too old.  These cases should have been tried a long time ago.  They were not for a variety of reasons. We're beyond that now.

Counsel for the Government, Counsel for the Defendant has had an inordinate amount of time to prepare for this case in my view.  I say that because it's my prospective that every -- every issue, every motion, every claim that could have been brought has within -- should have been brought.  Counsel has had an opportunity to bring those motions.  All those issues should have already been ruled on by the judges who have handled this case previously.

That being said, I recognize that there may be

UNITED STATES DISTRICT COURT

certain motions brought by Counsel regarding the procedures and issues that may present themselves at trial. We'll set a briefing schedule today.

Motions -- we probably should have all motions filed at least two weeks prior to our pretrial date. So let me get a -- a date that's two weeks prior to pretrial.

THE CLERK: Your Honor, that's February 12, 2007.

THE COURT: February 12, 2007, is the -- all motions Government, defense motions should be filed on or before February 12, 2007.

We need a date for opposition. That should be five days later.

THE CLERK: The next date would be Tuesday, February 20th, your Honor.

THE COURT: Tuesday, February 20th, opposition due. Please, I believe I have page limitations in the Court's standing order regarding criminal matters. Please try to comply with those page limitations.

Final matters at the final pretrial conference which would be held one week before the trial date -- I expect the Counsel to have trial briefs. Trial briefs should be filed on or before that date. If defense counsel for any reason needs to file their trial brief under seal for the Court's information only because of -- strategies, issues that they believe that the Government should not be aware of,

you can file it under seal.  The Court will certainly

consider it under seal if necessary.  I would encourage

Counsel not to do -- not to employ those procedures unless

necessary.

The Court expects all jury instructions to be filed

at the pretrial conference.  There should be two sets.  One

set would be those instructions that counsel agrees should be

given to the jury.  And the second set will be instructions

that would be objected to by a -- by any party.

The instructions -- all of this work should have

probably already been done because of the proceedings before

Judge Tevrizian, which is the -- which represents the primary

portion of the indictment here.  I understand that there may

be certain instructions that would -- that Counsel in this

case would want to offer that would not be before Tevrizian.

So I would expect by the pretrial we'll have a set of

instructions that are close to final.

The Court will also need -- I would expect Counsel

to meet and confer.  In reference to the day when we call the

jury in for death qualification, the jury is going to have to

be informed of the indictment.  I would expect the indictment

is very lengthy.

I would encourage Counsel to meet and confer, to

provide a statement to the Court that is a condensed version

of the indictment.  So can I read it or have the Government

read it.  I may request that the Government read that because the Government has the -- indicted the defendant here.

Let's go back to the first issue.  The first issue is whether Miss Sanchez should be -- should be relieved.

Mr. Evans, again the Court's concern is she doesn't communicate -- she can't communicate directly with her husband.  Her mail is monitored, but that doesn't mean that information can't be given to a third party who communicates to her husband and sensitive information in this case conveyed to him and thereafter to others.  So I'll hear from you regarding that issue.

The second issue is Government witnesses are under Federal protection.  The indictment reflects the ability on the part of, and again underscore "allegations", but there's allegations in the indictment here that the defendants in this case have significant resources, access to financial resources, that could be used potentially to compromise others that would -- that presents a concern to the Court.

My point is that there's -- the indictment references an escape attempt at the M.D.C.  Someone was paid to assist the defendants.  Resources were utilized; monies were accessed; communication was made.  It is surprising that the system was compromised to the extent that tools to escape would have been -- was brought into the M.D.C. and but for the reporting by another prisoner apparently, the escape

could have gone forward.

So I'll hear from you, Mr. Evans.  I'm not questioning your good faith.  I believe you and -- and I believe you're sincere.

MR. EVANS:  Thank you, your Honor.  I appreciate that.

Before I go to that, was the date for all of that, the pretrial hearing -- you said at the end that you wanted a presentation of jury instructions, I missed the date.  Is that the --

THE COURT:  May I have the date from the clerk?

THE CLERK:  The pretrial conference date is Monday --

MR. EVANS:  2-26?

THE CLERK:  February 26, at 9:00 a.m.

MR. EVANS:  Thank you.

Let me break down the Court's questions in the three areas.  The first is information regarding the escape attempt at M.D.C.  Frankly, that's never been a major focus of our investigation.  Miss Sanchez in my office has had limited exposure to it, has had none since the hearing in October.

My understanding, based on what the Government represented to the Court on Monday, is that in open court they displayed a schematic of the prison.  I mean, to the

public.  That's not public record.  I've never seen that.  I know Miss Sanchez hasn't seen it.  And if I had it, she would have not seen it.  She's completely walled off from any part of that case.  That's separate.

THE COURT:  Well, she has access to the files, doesn't she?  She's an employee of yours.  She can go into any location in your office and have access to the files theoretically.

And it's her good faith and representation to you that she would not do that -- that you depend on in order to make sure that this wall that has been created works.  Essentially is that --

MR. EVANS:  Yes, that discovery is also in a separate area from my office.  But yes, the Court is correct.  She works from -- if that level did not exist, I wouldn't have her in the office, obviously.  But there would be no reason for her to have looked at it, because that simply is not -- apart from the order not -- the escape is not a focus of our work on this case, which is extensive.

THE COURT:  What if she's ordered by a prison gang member, directly or indirectly, to get access to that information?

That's theoretically possible.

MR. EVANS:  I suppose in the abstract it is, your Honor.  I believe that Miss Sanchez would not do that.

She -- when we first -- I first employed her, we discussed that and what communications would be with her husband.  And she informed me then and I know that it's been constant, that she would not let him screw up this opportunity for her.

THE COURT:  And I know you're very experienced, but you've heard some of the testimony that has come about in Judge Klausner's court regarding his -- his case.

MR. EVANS:  Your Honor, as I think I put in the declaration I submitted to the Court, I was counsel for several years --

THE COURT:  Yes.

MR. EVANS:  -- on the Aryan Brotherhood case, to avoid precisely this situation, which would create the appearance of impropriety and was also profoundly embarrassing to Miss Sanchez, I kept her off of that case completely.  And have no reason to believe that she ever had access to the files beyond clerical functions and mail that I would send out or filings in that case.

And part of the reason for that was, of course, those were both prison gangs.  They were both Southern California prison gangs.  There was a relationship historically of both affiliation and antagonism between the two.  And I didn't want her to have anything to do with that, and she didn't.

In this case there frankly is -- until this issue

was raised, it never occurred to me that there was any connection at all or of any concern.  And again we just haven't had any -- she's had no dealings with the escape issues in this case.

THE COURT:  The -- let's go to the issue regarding the witnesses who are under Federal protection.

MR. EVANS:  We don't know where they are, Judge.  And, frankly, I would like to know because I would like to go interview them, but that information has never been disclosed to me.  I mean, I would send an investigator out in a heartbeat to go talk with them.

THE COURT:  And if Miss Sanchez is excused or removed from the case, you believe that that would significantly impact your ability to try the case?

Now, I find that hard to accept because of the -- simply because this case is so old from the date of the initial indictment.  At least that you've -- that Counsel has had ample opportunity to prepare for this case.  You should -- you should -- four years to prepare for a case is a significant amount of time, under any measure.

MR. EVANS:  Your Honor, part of the preparation in this matter was delayed significantly because of the delay in authorization of the death penalty.  As capital counsel, I focused -- Judge Manella declined to appoint mitigation specialists or support until afterwards.  And I'm not saying

that two years isn't long time, but it was about -- over two years ago, I believe, slightly over two years, that the authorization came down and was received.  And that became the primary focus of my investigation which involved review -- not only of the discovery which has been ongoing in this case as I -- I think, it's in just under 84,000 pages of discovery have been disclosed to date, but also investigation in foreign countries.

I can only say what I put in the declaration that's not -- hypothetical.  We -- according to what pleadings that -- or orders have come from Judge Tevrizian at the time, this case was severed and continued because of my health.  I had billed significantly less than one third of what the counsel for Mr. Mikhel had billed in this case.

In part, that was in reliance on the assistance provided -- to a significant degree, the assistance provided by Miss Sanchez in reviewing the evidence.  I've reviewed it.  But finding it; locating it; coordinating with investigators, mitigation investigators, and translators -- we've had to translate every document.  Every phone call has been her bailiwick.

THE COURT:  Okay.

Because of the -- Counsel have commitments in other court, I have to just end the representation that you have so far provided.  I've carefully considered the declaration.

22

Does anyone else wish to be heard in the case on this matter?

MR. BUEHLER:  May I just make one comment, your Honor?

THE COURT:  Yes, sir.

MR. BUEHLER:  To add to what Mr. Evans said with Miss Sanchez's importance to our ability to be ready for trial, it's not simply -- the Court is correct.  Of course a significant amount of time has gone by, but we have a great amount of evidence that has been organized, both what the Government produced to us, what we have developed ourselves in terms of mitigation evidence and so forth.

And her value to us is in being a person who is very familiar with how that's organized.  We have relied upon her.  We rely upon her now to be able to locate things for us.

And it would be very difficult to replace her as we go into a trial.  And the Court wants to proceed expeditiously.  I understand that, but that makes it all the more important for us to have somebody who is part of our team, who is familiar with how the evidence is organized and can help us locate the things we need as we go along.

So that in my view is where the real significance of her continuing participation in our defense effort is.  That's where it's at.  And it's extremely important, your

Honor, as we do want to come into court and be prepared to proceed as the Court says.  But no matter how much time we've had in the past, that is a major undertaking every day as we digest what is the Government's producing and how we're going to respond to it.

Thank you.

THE COURT:  Yeah.  As I thought about this issue, the Court's concern is really this:  I almost feel that there is not an inadequate remedy to correct the situation.  If I remove Miss Sanchez from the case, she's still an employee of Mr. Evans.  She still has access to the office.  She has access theoretically to all of the information provided by the Government.

Removal of her from this case doesn't really resolve the issue of making sure that the integrity of the witnesses are protected and sensitive information is protected.  Again, I have some concerns regarding the -- protecting witnesses and protecting the integrity of the evidence.  But removing her, I'm not sure resolves the problem.

Let me hear from the Government.

MR. DUGDALE:  Yes, your Honor.  It will be brief mostly out of necessity here.  But in any event, the Court's concerns in this matter are obviously completely legitimate. Miss Sanchez was convicted in a RICO conspiracy count as

being an associate of the Mexican Mafia.  And her husband, an extremely violent man, who is serving a life sentence, not only for an underlying State life sentence at Pelican Bay, but now a Federal life sentence imposed by Judge Carter as a result of that case.

And her entire conviction rested upon evidence presenting that she passed on messages, served as an intermediary between her husband, a Mexican Mafia member, who is incarcerated during the entire period of the conspiracy and to others on the street.  And they included messages about collecting taxes for the Mexican Mafia, the extortion payments that were made by people engaged in illegal activity, including drug distribution.

There was evidence concerning even messages passed concerning a conspiracy to murder a -- somebody who had spoken badly about one of the main members of the Mexican Mafia.  And that person was murdered after he hit the streets, after walking out of the L.A. County Jail.

So these are serious things.  And just to be very clear about the Government's position on this and why we took the position that we had in front of Judge Tevrizian and earlier before this court -- the Government had no idea that Miss Sanchez was working on this case, until she showed up in court one day to watch the testimony at -- I'm sure at the behest of Counsel here, of one of our main cooperators in the

case, Arno Armanez.  And she was identified by myself and a court security person who was familiar with her as a result of the work that we had done on the Mexican Mafia cases.

So had we known Miss Sanchez was working on this case, the Government wouldn't have produced any of this discovery in the manner that it did -- any discovery in the case, frankly.

The problem that we have right now is, first of all, kind of, the cat is out of the bag already.  We produced 99 percent if not 100 percent of discovery already to defense counsel that presumably Miss Schoenberg -- I'm sorry -- Miss Sanchez had access to.  So I don't know what you can do at this point in time in light of the fact that the cat is out of the bag.

And the other issue we're concerned about is this continuance issue that's now been raised.  We've been fighting continuances in this case, your Honor, for a year and a half.  From the Government's perspective, we've been opposing every single one of them.

But I think it's particularly without merit now for these defendants because not only have they had the advantage of working on this case for almost five years now, but they've had the advantage that we've had an entire trial now that had -- and they had an opportunity to basically see what the Government's case is going to look like.

26

Our case is going to be a subset, a smaller subset, of what has just been presented, but there's going to be substantial, if not entire, overlap of the lot of the things that were presented.  So these Counsel have a great advantage that the lawyers frankly in the Mikhel and Kodamovas matter right now have not had.  So this need for continuance is really bizarre in light of that fact.

So, again, this is -- this is difficult.  I don't know what you can do in light of the fact that the information is already out there.  She's already had access to it.  That's why we came up with this proposal trying to figure out when the most sensitive parts were and take them away from her and things like that.

But I can only leave it to the Court at this point in time because I don't know what to do.  We wouldn't have done what we did had we known what the situation was.

THE COURT:  Okay.  The -- essentially the bell has been rung.  We can't un-ring it.  The Court's concerns remain, but removing her from this case is not going to resolve the concerns of the Court because she's still theoretically going to have access to the materials because they remain in Mr. Evan's office.

Mr. Evans and Miss Buehler -- Mr. Buehler, you're officers of the Court, and you're going to have to police the orders that have been imposed by Judge Tevrizian to the best

UNITED STATES DISTRICT COURT

of your ability.

Again, the concern I have is if she is an associate of the Mexican Mafia, she doesn't have a choice.  If they direct her to secure information, she doesn't have a choice in responding to that.  So that -- enough said.

The Court will not order her removed because it will not accomplish anything.

MR. EVANS:  Your Honor, may I inquire about some of the other issues the Court raised.  I don't know if Counsel has time.

MR. DUGDALE:  I have 30 seconds.

THE COURT:  You have to do it in two minutes.

MR. EVANS:  I understood what the Court -- I've had experience, obviously, with Judge Perry and his procedures. For the record, we want to make some filings with regard to that.  Should we just make that in the form of a motion or motion for reconsideration?

I understand the Court has ruled, but we want to make a record on this issue because we believe it's more than a cultural issue.  I don't want to argue with the Court about that, but we believe it's a due process issue.  And we would like to lay a record.

THE COURT:  Your objection to the Court's procedure is noted.  I don't expect you to agree that the Court should -- to -- Court should utilize a procedure it's going

to utilize in the death qualification portion of the jury selection process. I don't expect you to agree, and you don't have to make a formal motion. If you wish to do, please feel free to do it.

But it will be understood that the orders of the Court will be objected to by Counsel for the defendant. They may be even objected to by Counsel for the Government. The Court is going to employ those procedures and protocol.

MR. EVANS: Thank you, your Honor.

The second one was about a jury questionnaire which we've been discussing. What is the timeframe that the Court is looking for on that? Because we want them to have some input on that, and I don't know where the Government is on submitting that.

THE COURT: Let me make it very clear. I've -- I'm experienced with questionnaires. I've used them in the past, have denied them in the past. I've used them in complex criminal cases in the past, and I have denied the use in the past.

The questionnaires create problems in many ways. You assume the sophistication of a jury to answer certain of the questions. There is potential for inconsistent responses. Jurors do not understand precisely the questions that are being raised. Sophisticated jurors do not understand precisely the questions that are being listed.

I just -- I just spoke to Judge Klausner regarding his use of a questionnaire.  I've discussed the matter with Judge Perry.  Judge Klausner's experience with a questionnaire used in his case was not a positive experience. If he had to do it over again, he would not use a questionnaire.

The Court will consider the use of a questionnaire. It must be filed on or before the date of the pretrial conference.  It should be a joint questionnaire that Counsel meet and confer and agree.  Keep it simple; keep it short. And we may employ it.  I'll decide it on that date.

MR. DUGDALE:  Thank you, your Honor.

MR. EVANS:  Thank you.

(Whereupon, at 9:14 a.m., the proceeding
            concluded.)

UNITED STATES DISTRICT COURT