**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>*Plaintiff-Appellee*,<br><br>v.<br><br>IOURI MIKHEL,<br>*Defendant-Appellant*. | No. 07-99008<br><br>D.C. No.<br>CR-02-00220-DT-1 |
| UNITED STATES OF AMERICA,<br>*Plaintiff-Appellee*,<br><br>v.<br><br>JURIJUS KADAMOVAS,<br>*Defendant-Appellant*. | No. 07-99009<br><br>D.C. No.<br>CR-02-00220-DT-2<br><br>OPINION |

Appeal from the United States District Court
for the Central District of California
Dickran M. Tevrizian, District Judge, Presiding

Argued and Submitted January 10, 2018
Pasadena, California

Filed May 9, 2018

2       UNITED STATES V. MIKHEL

Before:  Jay S. Bybee, Milan D. Smith, Jr., and Michelle T. Friedland, Circuit Judges.

Opinion by Judge Bybee

## SUMMARY[*]

### Criminal Law / Federal Death Penalty

The panel affirmed Iouri Mikhel's and Jurijus Kadamovas's convictions and death sentences for several federal crimes, including multiple counts of hostage taking resulting in death under the Hostage Taking Act.

*Guilt Phase*

The panel reaffirmed that the Hostage Taking Act does not require proof of a nexus to international terrorism. The panel held that the Act was a valid exercise of Congress's power under the Necessary and Proper Clause together with the Treaty Power, and rejected as unavailing the defendants' independent Tenth Amendment challenge. The panel rejected as meritless the defendants' argument that even if the Act does not itself exceed Congress's power, the subsequent amendment authorizing the death penalty exceeded Congress's power.

The panel held that the defendants' motion for recusal of the district judge was untimely and fails on its merits.

---

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

Affirming the district court's rejection of the defendants'
*Batson* challenge to the government's peremptory strike of a
juror, the panel held that the defendants did not meet their
burden of demonstrating race was a substantial motivating
factor.

The panel held that the district court committed no error
in empaneling an anonymous jury.

The panel held that the district court did not violate the
defendants' Sixth Amendment right to a public trial by
excluding from the courtroom a person who was observed
behaving in an intimidating manner.

The panel held that the district court did not err in using
this circuit's model reasonable-doubt jury instruction in the
guilt phase.

The panel explained that the purpose of 18 U.S.C. § 3005,
under which a capital defendant has the right to two counsel,
is not undermined by one attorney's de minimis absence from
trial, and that any error stemming from the three-day absence
from trial of one of Mikhel's attorneys was harmless.  The
panel held that the district court's denial of Kadamovas's
motions for a continuance to allow one of his attorneys more
time to prepare did not violate § 3005, and that any technical
error would be harmless.

The panel held that the district court did not abuse its
discretion in excluding as irrelevant testimony of a person
who, without repercussion, committed perjury as a
cooperating witness in a different case.

4                      UNITED STATES V. MIKHEL

The panel held that the district court did not plainly err by failing to hold a competency hearing sua sponte at the outset of trial, at the end of the guilt phase, and during the penalty phase.

The panel rejected Kadamovas's claim that under *Bruton v. United States* Mikhel's testimony and refusal to be cross-examined violated Kadamovas's Sixth Amendment Confrontation Clause rights. The panel wrote that because Mikhel's testimony did not facially incriminate Kadamovas, the testimony did not trigger the *Bruton* rule, and it must be assumed that the jury followed the district court's instruction to disregard Mikhel's testimony. The panel concluded that any error in this regard was harmless.

The panel held that the district court did not abuse its discretion in denying Kadamovas's motions for complete severance of his case from Mikhel's or in denying his requests for sequential penalty phases.

Rejecting Kadamovas's evidentiary challenges to his conviction for conspiracy to escape, the panel held (1) that the district court did not err under Fed. R. Evid. 608(b) or the Confrontation Clause in limiting the defense's cross-examination of a cooperating witness; and (2) that the erroneous admission of a letter that was inadmissible hearsay was harmless.

The panel held that the record supports the district court's determination that there was no pattern of Kadamovas being denied computer access to review discovery materials as contemplated by a stipulation with the government.

UNITED STATES V. MIKHEL                5

*Penalty Phase*

The panel held that the district court did not plainly err by using this circuit's model reasonable-doubt jury instruction in the penalty phase.

The panel rejected the defendants' contention that the Eighth Amendment and the Federal Death Penalty Act only permit evidence of a victim's personal characteristics in penalty proceedings to the extent they influenced, and thus reveal something about, the relationship the victim had with his or her family.  The panel held that the district court did not commit plain error in failing to exclude evidence of a victim's religion in the context of his commitment to his family and celebration of life.

The panel rejected some of the defendants' contentions as to the propriety of the government's remarks in penalty-phase closing arguments, but agreed with the defendants that the government should not have compared prison life to the victims' deaths.  On plain error review, the panel held that the latter statements did not so affect the jury's ability to consider the totality of the evidence fairly that it tainted the verdict and deprived the defendants of a fair trial.

Assuming without deciding that there was error in the district court's jury instruction and verdict form on the non-statutory aggravating factor of future dangerousnes, the panel held that any error was harmless.

The panel rejected the defendants' claim that the government

6          UNITED STATES V. MIKHEL

Regarding Kadamovas's contention that the government, in questioning a witness, appealed to ethnic prejudice in violation of Kadamovas's Fifth Amendment right to a fair trial, the panel held that there was no plain error.

The panel held that the district court did not abuse its discretion in excluding an interview with Mikhel's ex-girlfriend, offered as mitigating evidence.  The panel held that the district court did not abuse its discretion in excluding a portion of an interview with Mikhel's cousin whose plea for mercy was essentially an opinion about what the jury's verdict should be.

The panel held that the jury could have reasonably relied on the government's guilt-phase evidence to conclude that Kadamovas presented a risk of future dangerousness beyond a reasonable doubt.

The panel held that the district court did not abuse its discretion in admitting an antique dagger with swastikas on the handle, and did not commit plain error by admitting testimony that Kadamovas referred to the victim as a "fat Jew."

The panel rejected Kadmovas's argument that the jury's failure to find the mitigating factor that he had no prior criminal record demonstrates that it disregarded its statutory obligation to consider mitigating factors and therefore rendered an arbitrary verdict.  The panel explained that the jury was not required to find any mitigating factor, and held that the jury's failure to find that Kadamovas had no prior criminal record was reasonable.

UNITED STATES V. MIKHEL                    7

The panel held that the district court did not abuse its
discretion in rejecting Kadamovas's proffer of Lithuania's
abolition of the death penalty as a mitigating factor.

## COUNSEL

Benjamin L. Coleman (argued), Coleman & Balogh LLP, San
Diego, California; Barbara E. O'Connor, O'Connor & Kirby
P.C., Burlington, Vermont; Margaret Hills & O'Donnell,
Frankfort, Kentucky; for Defendant-Appellant Jurijus
Kadamovas.

Michael Tanaka (argued), Deputy Federal Public Defender;
Hilary Potashner, Federal Public Defender; Office of the
Federal Public Defender, Los Angeles, California; Sean J.
Bolser, Federal Capital Appellate Resource Counsel Project,
Federal Defenders of New York, Brooklyn, New York; Statia
Peakheart, Los Angeles, California; for Defendant-Appellant
Iouri Mikhel.

Michael A. Brown (argued), Assistant United States
Attorney; Lawrence S. Middleton, Chief, Criminal Division;
Sandra R. Brown, United States Attorney; United States
Attorney's Office, Los Angeles, California; for Plaintiff-
Appellee.

Alexey V. Tarasov, Houston, Texas, for Amicus Curiae
Government of the Russian Federation.

8          UNITED STATES V. MIKHEL

## OPINION

I.  BACKGROUND............................... 11

    A.  *The Hostage-Taking Conspiracy*............... 11

        1.  Death of Meyer Muscatel................ 12

        2.  Death of Rita Pekler.................... 13

        3.  Death of Alexander Umansky............. 14

        4.  Deaths of Nick Kharabadze and George Safiev ................................... 15

        5.  The FBI's investigation. ................. 17

    B.  *The Escape Conspiracy and Mikhel's Second Escape Attempt*................................. 19

    C.  *Procedural History*. ....................... 20

II.  ANALYSIS. ............................... 22

    A.  *The Guilt Phase*........................... 23

        1.  The Hostage Taking Act. ................ 23

        2.  Defendants' recusal motion............... 31

        3.  *Batson* challenge. ...................... 37

        4.  The use of an anonymous jury............. 43

5.  Right to a public trial. . . . . . . . . . . . . . . . . . . 46

6.  "Reasonable doubt" instruction as to guilt.. . . 48

7.  Right to two counsel under 18 U.S.C. § 3005
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

8.  Excluded   testimony   regarding   cooperating
witnesses.  . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

9.  Mikhel's competency.. . . . . . . . . . . . . . . . . . . 54

10. Kadamovas's Confrontation Clause claim.. . . 68

11. Kadamovas's severance motion.. . . . . . . . . . . 75

12. Kadamovas's conviction for conspiracy to escape
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

13. Kadamovas's access to a computer. . . . . . . . . 83

B.  *The Penalty Phase*. . . . . . . . . . . . . . . . . . . . . . . . . 84

1.  "Reasonable doubt" instruction as to penalty
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

2.  Victim-impact evidence.. . . . . . . . . . . . . . . . . 87

3.  Misconduct in penalty-phase closing arguments
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

4.  Instruction   and   verdict   form   on   future
dangerousness.  . . . . . . . . . . . . . . . . . . . . . . . . 96

10                        UNITED STATES V. MIKHEL

5.  *Griffin* error. . . . . . . . . . . . . . . . . . . . . . . . 104

6.  Examination of Dr. Mark Cunningham. . . . . 106

7.  Mikhel's excluded mitigation evidence. . . . . 108

8.  Kadamovas's future dangerousness. . . . . . . . 111

9.  Nazi and anti-Semitism evidence.. . . . . . . . . 113

10. Kadamovas's mitigating factors.. . . . . . . . . . 116

11. Lithuania's abolition of the death penalty. . . 117

III.  CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . 121

BYBEE, Circuit Judge:

Between late 2001 and early 2002, defendants Iouri Mikhel and Jurijus Kadamovas abducted, held hostage, and killed five people, dumping each victim's body in the New Melones Reservoir outside Yosemite National Park. After a five-month trial, a jury convicted them of several federal crimes, including multiple counts of hostage taking resulting in death under the Hostage Taking Act, 18 U.S.C. § 1203. As summarized below, the evidence that Mikhel and Kadamovas did these things—and did them without concern for their victims' suffering—was detailed, comprehensive, and in a word, overwhelming.

In subsequent penalty-phase proceedings under the Federal Death Penalty Act ("FDPA"), 18 U.S.C. § 3591 *et seq.*, the jury unanimously recommended that both defendants be sentenced to death. Defendants now challenge their convictions and death sentences on direct appeal to this court. After extensive briefing and argument from the parties, and our own careful review, we affirm.

## I. BACKGROUND

A. *The Hostage-Taking Conspiracy*

Defendants are foreign nationals under the Hostage Taking Act: Mikhel is Russian, and Kadamovas is Lithuanian. Both lived in Los Angeles, California, during the events underlying this case. Defendants were assisted at various times by coconspirators Petro Krylov, Ainar Altmanis, Aleksejus Markovskis, and Natalya Solovyeva. Altmanis, Markovskis, and Solovyeva all pleaded guilty and

testified for the government.  Krylov was tried and convicted in a separate trial.

1.   Death of Meyer Muscatel

In October 2001, Mikhel, Kadamovas, and Altmanis discussed and rehearsed a plan to kidnap local real-estate developer Meyer Muscatel.  The plan called for Mikhel to pose as a businessman interested in purchasing real estate. To that end, Mikhel asked Muscatel to view a property with him.  Muscatel agreed and drove with Mikhel to the property in question (actually Mikhel's house), where Kadamovas and Altmanis were waiting.

When Muscatel entered the house, Altmanis and Kadamovas grabbed him.  Altmanis bound Muscatel's legs with plastic ties, and Kadamovas handcuffed his arms behind his back.  Mikhel duct-taped Muscatel's eyes and pistol-whipped him in the head, drawing blood.  Mikhel and Kadamovas then took Muscatel's wallet and credit cards and questioned him about his finances.  They attempted to withdraw money from his bank account, but the bank froze the account.

When Mikhel and Kadamovas determined they would get no money out of Muscatel, they injected him with Dimedrol (an antihistamine with sedative properties) and held him down to the ground.  Mikhel closed a plastic bag over Muscatel's head and pinched his nose shut, suffocating him to death.  Mikhel and Kadamovas then loaded Muscatel's body into Kadamovas's van and drove to the New Melones Reservoir.  They carried his body to the edge of the Parrotts Ferry Bridge and accidentally dropped it on a curb—leaving blood stains—before tossing it into the reservoir. Kadamovas

later told his friend Markovskis that he had once thrown a "fat Jew" (i.e., Muscatel) off a bridge. The incident, Markovskis said, "was very funny" to Kadamovas.

2.   Death of Rita Pekler

Following Muscatel's death, Mikhel and Kadamovas set their sights on kidnapping George Safiev, a wealthy Russian businessman. First, they decided to abduct Safiev's financial advisor, Rita Pekler, to use as bait. In December 2001, Kadamovas contacted Pekler pretending to be interested in her advice on a real estate transaction. Kadamovas had Pekler pick him up and drive him to a property he claimed he was interested in buying (actually his home). Mikhel, Altmanis, and Kadamovas's friend Krylov were already there; Mikhel was carrying a gun with a fake silencer, and Altmanis had a stun gun.

When Pekler arrived, Mikhel restrained her and told her that, if she brought Safiev to them, they would get her drunk with vodka or inject her with Dimedrol and leave her unharmed in a motel. Pekler told them she was pregnant and afraid alcohol or drugs would harm the baby. Undeterred, defendants persisted in trying to use her to lure Safiev. Pekler eventually contacted Safiev, but he told her he was too busy to meet. Shortly thereafter, Safiev left Los Angeles for Russia. Mikhel and Kadamovas decided Pekler had outlived her usefulness; they injected her with Dimedrol, strangled her, and as with Muscatel, threw her body off the Parrotts Ferry Bridge.

14          UNITED STATES V. MIKHEL

### 3. Death of Alexander Umansky

Later that same month, Krylov suggested abducting his former boss, Alexander Umansky, who owned an automobile shop. Mikhel posed as a customer who needed audio systems installed in two cars and asked Umansky for a ride to one of them. Umansky was excited about the opportunity and agreed to pick up Mikhel. Mikhel directed Umansky to Kadamovas's house, where Kadamovas, Altmanis, and Krylov already lay in wait—Kadamovas with a gun and Altmanis with a stun gun. When Umansky arrived, Kadamovas sat him on a chair, handcuffed his hands behind him, and bound his legs with plastic ties. Mikhel and Kadamovas then took Umansky's keys, telephone, and wallet and questioned him about his finances. Later, Mikhel and Altmanis used Umansky's debit card to withdraw money from an ATM and were captured doing so on a surveillance camera.

Umansky remained trapped in Kadamovas's home for three days, during which Mikhel and Kadamovas forced him to call his brother and plead for money to secure his release. Eventually, Mikhel and Kadamovas decided they no longer needed Umansky alive. They sent Altmanis to buy weight plates from a used sporting goods store. When Altmanis returned, Mikhel shoved plastic bags in Umansky's mouth, duct-taped his mouth shut, and put a bag over his head, while Kadamovas held him down and pinched his nose shut. When these efforts proved ineffective, Mikhel and Altmanis twisted a rope around Umansky's neck and strangled him from behind. Mikhel, Kadamovas, and Altmanis then tied a weight plate around Umansky's body and put it in Kadamovas's van. They drove to Mikhel's house and—with the body still in the van—had dinner with Mikhel's girlfriend. After dinner, the

three of them drove to the New Melones Reservoir, where they threw Umansky's body off the Parrotts Ferry Bridge.

Mikhel and Kadamovas had previously sent the Umansky family a ransom note demanding nearly $235,000. The Umansky family contacted the FBI, which advised them to pay just part of the ransom to give the kidnappers a reason to keep Umansky alive. The Umansky family followed the FBI's advice and paid part of the ransom. Later, after receiving a call threatening harm to other family members, they paid the rest of the ransom money. An IRS investigator traced how the ransom payments were laundered abroad before being deposited in accounts held by Mikhel, Kadamovas, and defendants' business, Designed Water World (a fish aquarium store).

4. Deaths of Nick Kharabadze and George Safiev

In January 2002, Mikhel and Kadamovas learned Safiev was back in Los Angeles and decided to trap him through his friend and business partner, Nick Kharabadze. They planned for Kadamovas's girlfriend, Solovyeva, to call Kharabadze and tell him she had gotten his phone number from a friend and wanted to meet him. Markovskis was part of the plan and later testified that Mikhel and Kadamovas were in charge and calling all the shots.

Solovyeva called Kharabadze and asked him to meet her at what she said was a private club but was in fact Designed Water World's office. When Kharabadze arrived, Altmanis and Markovskis were playing pool, Mikhel and Krylov were drinking, and Kadamovas was standing behind a bar. Kadamovas had a revolver hidden under the bar, and Mikhel and Altmanis had guns concealed under their jackets.

16          UNITED STATES V. MIKHEL

Solovyeva asked Kharabadze to order her a drink, while Krylov closed the outside door behind him.  Mikhel then handcuffed Kharabadze to a chair, took his keys, wallet, and telephone, and explained they wanted him to help them trap Safiev.  At their direction, Kharabadze called Safiev and convinced him to come to Designed Water World.

When Safiev entered Designed Water World, Mikhel, Kadamovas, Altmanis, Krylov, and Markovskis converged on him.  Mikhel handcuffed Safiev and took his keys, wallet, and telephone.  Mikhel and Kadamovas then transported Kharabadze and Safiev to Kadamovas's house, where they forced Safiev to call his business partner, Konstantinos Tezhik, and beg him to transfer $940,000 to a foreign account.  Kharabadze and Safiev remained imprisoned in Kadamovas's house for four days.  During this time, Kadamovas recorded Safiev's voice to use to extort more money after he was dead.  Kadamovas also told Markovskis that he planned to continue abducting people and throwing their bodies into the reservoir until he had $50 million, even if it meant piling bodies up to the surface of the water.

After Mikhel confirmed receipt of the $940,000, he decided Kharabadze and Safiev were no longer necessary. He and the others got Kharabadze and Safiev drunk with vodka and drove them to the New Melones Reservoir in two cars.  On the way, a policeman pulled them over for driving too closely together.  Mikhel exited his car and had a brief conversation with the policeman, who sent him on his way. Solovyeva later testified that Kadamovas said he would have killed the policeman if he had seen the hostages in the car.

At the New Melones Reservoir, Mikhel killed Kharabadze by placing a plastic bag over his head and tightening a plastic

tie around his throat.  Altmanis tied a weight around Kharabadze's body and assisted in throwing it off the Stevenot Bridge.  Safiev had already been killed and thrown into the reservoir in a similar fashion.  Mikhel told Altmanis that Safiev, like Pekler, had been difficult to kill because he was "strong as a snake."

Mikhel used Kharabadze's and Safiev's ATM cards to withdraw money and was again captured on surveillance cameras.  Kadamovas then gave the ATM cards to his associate, Vladimir Paniouchkine, who traveled to Germany to withdraw more money.  Mikhel used one of Safiev's credit cards to order about $9,000 in electronic equipment.  In addition, Mikhel called Tezhik in London and faxed him a ransom note—which Safiev had signed before he died—demanding another $4 million in ransom.  Tezhik tape-recorded his calls with Mikhel.

All in all, Mikhel and Kadamovas received over $1 million in ransom money from the hostage-taking conspiracy, which they spent on high-end cars, renovations for their homes, lavish presents for their girlfriends, and expensive vacations, among other things.

5.  The FBI's investigation

A father and son returning from a fishing trip discovered Muscatel's body near the Parrotts Ferry Bridge.  Later, Altmanis learned the FBI was investigating him, decided to confess, and helped the FBI find the last four victims' bodies. The FBI wire-tapped Mikhel's and Kadamovas's phones and recorded them discussing ransom money.  The FBI also secured data from their cellphones, which showed them driving north on Highway 99 toward the New Melones

18          UNITED STATES V. MIKHEL

Reservoir on the days Muscatel, Pekler, Umansky, Kharabadze, and Safiev died.[1]

The FBI searched Mikhel's house and found extensive physical evidence linking him and Kadamovas to the victims, including the original $4 million ransom note for Safiev, a record of Safiev's and Kharabadze's personal and financial information, four sets of handcuffs, and plastic ties like those found on the victims.    Mikhel's and Kadamovas's fingerprints were on many of these items, and Safiev's and Kharabadze's DNA was on the handcuffs.  The FBI also found fourteen handguns, handgun parts, ammunition, a silencer, an electric shock baton, a stun gun, and several stolen or fraudulent passports.

The FBI searched Kadamovas's two residences and found additional evidence connected to the victims.    At Kadamovas's house in Sherman Oaks, the FBI found several weight plates (but no weight bars or other exercise equipment) and an envelope with a phone number written on it—the same number that defendants used to call the

---

[1] After briefing in this appeal was complete, defendants filed a supplemental brief claiming that the Supreme Court's pending decision in *Carpenter v. United States*, 137 S. Ct. 2211 (2017), may impact the admissibility of their cellphone data.  In *Carpenter*, the Court will address whether the seizure of cellphone data pursuant to a court order under 18 U.S.C. § 2703, but without a warrant issued upon probable cause, violates the Fourth Amendment.   The government does not contest that the cellphone data at issue here was seized in the same manner challenged in *Carpenter*.  But no matter how the Court rules in *Carpenter*, the decision will have no impact on this case because the cellphone data only corroborated other evidence.  As discussed below, the evidence of Mikhel's and Kadamovas's guilt was so overwhelming that even if we thought it was error to admit the cellphone data, the exclusion of the evidence would not have changed the verdicts.

Umansky family for ransom.  At Kadamovas's house in Encino, the FBI found a distinctive dagger linked to defendants' money-laundering scheme, a handgun, ammunition, and shoes with blood stains.  The shoes matched the shoeprints left in Muscatel's blood on the Parrotts Ferry Bridge.  The carpet in Kadamovas's house matched carpet fibers retrieved from Kharabadze's clothing.

B. *The Escape Conspiracy and Mikhel's Second Escape Attempt*

Following their arrests, Mikhel, Kadamovas, and Krylov were detained at the Metropolitan Detention Center–Los Angeles ("MDC").  Mikhel devised a plan by which he, Kadamovas, Krylov, and others would smuggle tools into their cells and bore holes through their cell walls to reach an adjacent stairwell.  Once in the stairwell, they would use a hydraulic pump to push open the window's bars, climb through the window, and rappel down the side of the building.  A motorcycle gang would be waiting for them outside and would spin off in different directions before reuniting at a safe house.  In accordance with the plan, Mikhel successfully smuggled a veritable hardware store into his cell, including hacksaw blades, wrenches, screwdrivers, fishing line, paint, work gloves, bolt cutters, and a camcorder.  Kadamovas was originally housed elsewhere in the facility but managed to change cells to be next to the stairwell intended for the escape.

Mikhel invited fellow inmate Billy Parker to join the escape conspiracy, offering him the necessary tools (for a price) and warning him they would have to kill any guards they met on their way out.  Parker, however, informed MDC officials.  In Mikhel's cell, officials found a large hole carved

20          UNITED STATES V. MIKHEL

in the wall and his cache of tools.  In Krylov's cell, they found a smaller hole, hacksaw blades, and a screwdriver. They did not find any evidence of tunneling or contraband in Kadamovas's cell.    Nonetheless, there was extensive evidence linking Kadamovas to the escape conspiracy, as described in detail below.

After the first escape attempt, Mikhel was moved to a high security section of San Bernardino County's Central Detention Center ("SB-CDC").  There, he was placed under Special Administrative Measures and isolated from other inmates.    Despite these measures, Mikhel concocted a detailed escape plan, which he outlined in a letter promising $1 million to an alleged member of the Mexican Mafia in exchange for help.  Officials intercepted the letter, and a deputy sheriff assigned to SB-CDC later testified that Mikhel's escape plan was very feasible.[2]

C.  *Procedural History*

A grand jury indicted Mikhel and Kadamovas on one count of Conspiracy to Take Hostages Resulting in Death (18 U.S.C. § 1203), three counts of Hostage-Taking Resulting in Death (18 U.S.C. § 1203), Conspiracy to Launder Monetary Instruments (18 U.S.C. § 1956(h)), Conspiracy to Escape from Custody (18 U.S.C. § 371), and Criminal Forfeiture (18 U.S.C. § 981(a)(1)(C), 21 U.S.C. § 853, and 28 U.S.C. § 2461(c)).  The government filed a notice of intent to seek the death penalty against both defendants.

---

[2] Later, at the West Valley Detention Center, the measures taken to secure Mikhel included blindfolding him and transporting him around the facility in a wheelchair to prevent him from counting his steps to orient himself.

The guilt phase of trial began in July 2006 and spanned five months. The government's case in chief was detailed and thorough, including scores of witnesses who testified over the course of more than thirty trial days. Defendants initially rested their case after just three trial days, but the district court permitted them to reopen their case when Mikhel unexpectedly chose to testify. Mikhel testified on direct for three days, at the end of which he refused to be cross-examined. On Kadamovas's motion, the district court struck Mikhel's testimony and instructed the jury to disregard it. On January 16, 2007, the jury began its deliberations. The very next day, it returned separate verdicts in each defendant's case, finding both defendants guilty on all counts.

The penalty phase began on January 24, 2007. The FDPA requires the jury to make several findings before recommending a sentence of death. Among other things, the jury must find that at least one statutory aggravating factor exists and that all aggravating factors proven by the government "sufficiently outweigh" any mitigating factors proven by defendants. 18 U.S.C. § 3593(e). The government argued four statutory aggravating factors against both defendants: (1) death during commission of another crime, (2) procurement of offense by payment, (3) substantial planning and premeditation, and (4) multiple killings. *See* 18 U.S.C. § 3592(c). The government also argued five nonstatutory aggravating factors against both defendants: (5) future dangerousness, (6) contemporaneous convictions for multiple offenses, (7) witness elimination, (8) emotional suffering of the victims, and (9) victim impact. The government's penalty-phase case incorporated all of its guilt-phase evidence. In addition, the government presented several victim-impact witnesses and further evidence of Mikhel's escape attempts.

Mikhel proffered eighteen mitigating factors and presented penalty-phase evidence regarding his upbringing, mental health, and life in Russia, as well as several videotaped interviews of his friends and family. Kadamovas proffered nine mitigating factors and presented penalty-phase evidence regarding statistical violence rates in prisons and the former Soviet Union. The district court charged the jury on February 13, 2007. Later the same day, after a brief three-hour deliberation, the jury returned separate verdicts in each defendant's case. The jury unanimously found every aggravating factor proposed by the government as to both defendants. No juror found any mitigating factor as to either defendant. And the jury unanimously recommended that both defendants be sentenced to death. Accordingly, the district court sentenced both defendants to death on each of the four capital offenses. The court also sentenced them to twenty years' imprisonment on the remaining counts and ordered over $1 million in forfeiture.

## II. ANALYSIS

Defendants claim errors in both the guilt and penalty phases of trial. We have had the benefit of extensive briefing and oral argument in this case: the briefs totaled more than 1,700 pages, and the court heard more than three hours of oral argument. The court granted generous extensions of time and space to the parties for briefing; indeed, this direct appeal was heard over ten years after the entry of judgment and fifteen years after the crimes. We will address each claimed error in turn.

A.  *The Guilt Phase*

1.  The Hostage Taking Act

Defendants were convicted and sentenced to death on one count of conspiring to take hostages resulting in death and three counts of hostage taking resulting in death under the Hostage Taking Act, 18 U.S.C. § 1203.  They seek to overturn their convictions on grounds that the Hostage Taking Act requires a nexus to "international terrorism" and that no such nexus exists here.  In the event the Act does not require such a nexus, they claim it exceeds Congress's constitutionally enumerated powers and also violates the Tenth Amendment.  We review these questions of statutory construction and constitutional law de novo.  *See United States v. Chi Mak*, 683 F.3d 1126, 1133 (9th Cir. 2012).

The United States is a party to the International Convention Against the Taking of Hostages, Dec. 17, 1979, T.I.A.S. No. 11081, 1316 U.N.T.S. 205 ("the Treaty"), which binds its signatories to take "effective measures for the prevention, prosecution and punishment of all acts of taking of hostages as manifestations of international terrorism." Treaty, pmbl.  The Treaty defines hostage taking as follows:

> Any person who seizes or detains and threatens to kill, to injure or to continue to detain another person . . . in order to compel a third party . . . to do or abstain from doing any act as an explicit or implicit condition for the release of the hostage commits the offence of taking of hostages . . . within the meaning of this Convention.

24 UNITED STATES V. MIKHEL

*Id.* art. 1(1). The Treaty, with limited exceptions, does not apply where a hostage taking is committed within a single nation, both the offender and victim are nationals of that nation, and the offender is found within that nation. *Id.* art. 13.

Congress implemented the Treaty through the Hostage Taking Act, which tracks the Treaty's language:

> (a) . . . [W]hoever, whether inside or outside the United States, seizes or detains and threatens to kill, to injure, or to continue to detain another person in order to compel a third person or a governmental organization to do or abstain from doing any act as an explicit or implicit condition for the release of the person detained, or attempts or conspires to do so, shall be punished by imprisonment for any term of years or for life and, if the death of any person results, shall be punished by death or life imprisonment.

> . . . .

> [(b)](2) It is not an offense under this section if the conduct required for the offense occurred inside the United States, each alleged offender and each person seized or detained are nationals of the United States, and each alleged offender is found in the United States, unless the governmental organization sought to be compelled is the Government of the United States.

18 U.S.C. § 1203. There are three elements to this crime: "(1) a seizure or detention; (2) a threat to kill, injure, or continue to detain; (3) with the purpose of compelling a third person or governmental entity to act in some way or refrain from acting." *United States v. Sierra-Velasquez*, 310 F.3d 1217, 1220 (9th Cir. 2002). In addition, § 1203(b) requires some international element, i.e., that the offense occurred abroad, that the defendant is found abroad, that a defendant or victim is a foreign national, or that the defendant sought to compel something from the federal government.

Defendants' interpretation of the Hostage Taking Act as requiring proof of a nexus to international terrorism is both infirm as a matter of statutory interpretation and foreclosed by our prior decision in *United States v. Lopez-Flores*, 63 F.3d 1468 (9th Cir. 1995). The definition of a hostage-taking offense in the Treaty and the Act makes no mention of international terrorism. Defendants base their argument instead on the Treaty's preamble, which refers to "all acts of taking of hostages *as manifestations of* international terrorism." Treaty, pmbl. (emphasis added). By its own terms, the preamble's reference to "international terrorism" is illustrative only; it limits neither the Treaty nor Congress's implementing legislation.

Contrary to defendant's argument, the statute's legislative history affirms that hostage taking is *not* limited to acts with a nexus to international terrorism. *See Lopez-Flores*, 63 F.3d at 1476 (quoting Legislative Initiatives Hearings, 98th Cong., 2d Sess. 48–49 (1984) (statement of Victoria Toensing, Deputy Assistant Attorney General) ("[T]he bill is not limited to hostage-taking by terrorists, in keeping with the purpose of the international Convention . . . .")). Thus, in *Lopez-Flores*, we held that the Act applied to alien smugglers who held

26          UNITED STATES V. MIKHEL

aliens for ransom.  *Id.* at 1475–76.  And in *Sierra-Velasquez*, we rejected a narrow reading of *Lopez-Flores* and once again upheld the conviction of alien smugglers.  310 F.3d at 1220 ("*Lopez-Flores* . . . does not limit hostage taking to the facts of that case.").

Nevertheless, defendants argue that the Supreme Court's more recent decision in *Bond v. United States* requires a narrower reading of the Hostage Taking Act.  134 S. Ct. 2077 (2014) ("*Bond II*").  In *Bond II*, the Court held that Bond—a microbiologist who had poisoned her husband's lover by spraying low-dosage toxic chemicals on her doorknob, car, and mailbox—could not be convicted under the federal Chemical Weapons Act.  *Id.* at 2084–85.  The statute, which implemented the Chemical Weapons Convention, criminalized the use of "chemical weapon[s]."  *Id.* at 2085.  The Court considered the ordinary meaning of "chemical weapons" and acknowledged that "the chemicals in this case are not of the sort that an ordinary person would associate with instruments of chemical warfare [i.e., the subject of the underlying treaty]."  *Id.* at 2090.  For this reason, and given the lack of any clear indication that Congress intended the statute to reach purely local crimes, the Court refused to "adopt a reading of [the Act] that would sweep in everything from the detergent under the kitchen sink to the stain remover in the laundry room."  *Id.* at 2091.

By contrast, Mikhel and Kadamovas's conduct in abducting and holding their victims for ransom fits squarely within the Treaty and Hostage Taking Act and comports with any ordinary understanding of a "hostage taking."  Moreover, the Hostage Taking Act does not cover purely local conduct but rather expressly requires some international component.  *See* 18 U.S.C. § 1203(b).  Mikhel and Kadamovas's offenses

UNITED STATES V. MIKHEL                    27

not only met the Act's requirements but had other
international contacts as well, further demonstrating an
appropriate federal interest in this case. For instance, Mikhel
and Kadamovas sent a ransom demand abroad and laundered
ransom money through foreign countries. We therefore
reaffirm, in accordance with our prior decisions in *Lopez-
Flores* and *Sierra-Velasquez*, that the Hostage Taking Act
does not require proof of a nexus to international terrorism.

This brings us to defendants' constitutional argument. In
*Lopez-Flores*, we rejected challenges to the Hostage Taking
Act as unconstitutionally vague or as violating the Equal
Protection Clause, but we did not address the argument
defendants assert here—namely, that the Hostage Taking Act
exceeded Congress's constitutionally enumerated powers and
violated the Tenth Amendment. *Lopez-Flores*, 63 F.3d at
1473–75. In this regard, we are persuaded by the Second
Circuit's reasoning in *United States v. Lue*, which rejected a
similar argument and held that the Act was a valid exercise of
Congress's power under the Necessary and Proper Clause
together with the Treaty Power. 134 F.3d 79, 82–85 (2d Cir.
1998).

The Constitution grants the President the "Power, by and
with the Advice and Consent of the Senate, to make Treaties,
provided two thirds of the Senators present concur." U.S.
CONST. art. II, § 2, cl. 2. It also grants Congress the power
"[t]o make all Laws which shall be necessary and proper for
carrying into Execution the foregoing Powers, and all other
Powers vested by this Constitution in the Government of the
United States, or in any Department or Officer thereof." U.S.
CONST. art. I, § 8, cl. 18. In *Missouri v. Holland*, the
Supreme Court held that, if a treaty is a valid exercise of the
President's Treaty Power, then Congress's statute

implementing that treaty is valid "as a necessary and proper means to execute the powers of the Government." 252 U.S. 416, 432 (1920). We and other courts have commonly understood *Holland* to mean that the Necessary and Proper Clause grants Congress broad authority to enforce our country's treaty obligations by statute. *See, e.g.*, *United States v. Shi*, 525 F.3d 709, 721 (9th Cir. 2008); *United States v. Rodriquez-Camacho*, 468 F.2d 1220, 1222 (9th Cir. 1972). Although this broad reading of the Necessary and Proper Clause has been criticized and debated, *see, e.g.*, *Bond II*, 134 S. Ct. at 2098–102 (Scalia, J., concurring), the Supreme Court has never undertaken to clarify or correct our understanding. We are thus bound by our prior cases.

As the Second Circuit held in *Lue*, there is no question the Treaty at issue here is well within the President's Treaty Power. 134 F.3d at 83 ("Whatever the potential outer limit on the treaty power of the Executive, the Hostage Taking Convention does not transgress it."). Furthermore, there can be little question that the Hostage Taking Act fulfills our country's obligation under the Treaty. The Hostage Taking Act tracks the Treaty's language in all material respects, *compare* 18 U.S.C. § 1203(a), *with* Treaty, art. I, and clearly bears a rational relationship to the Treaty, *see United States v. Comstock*, 560 U.S. 126, 134 (2010) ("[I]n determining whether the Necessary and Proper Clause grants Congress the legislative authority to enact a particular federal statute, we look to see whether the statute constitutes a means that is rationally related to the implementation of a constitutionally enumerated power."); *United States v. Santos-Riviera*, 183 F.3d 367, 373 (5th Cir. 1999) ("Congress rationally concluded that a hostage taking within our jurisdiction involving a noncitizen is sufficiently likely to involve matters implicating foreign policy or immigration concerns as to

warrant a federal criminal proscription."); *Lue*, 134 F.3d at 84 ("The [Hostage Taking] Act here plainly bears a rational relationship to the Convention."). Accordingly, the Hostage Taking Act was a valid exercise of Congress's power under the Necessary and Proper Clause together with the Treaty Power. *See Holland*, 252 U.S. at 432.[3]

Defendants' independent Tenth Amendment challenge is unavailing. The Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. CONST. amend. X. The Tenth Amendment is not a substantive, external constraint on Congress's power. Rather, it reflects a "truism," "declaratory of the relationship between the national and state governments." *United States v. Darby*, 312 U.S. 100, 124 (1941). The Tenth Amendment summarizes and, thus, reinforces the relationship between the United States—whose powers are limited and enumerated—and the states whose powers are general, except as limited by the U.S. Constitution and their own constitutions. Defendants' argument that the states have exclusive authority to punish hostage taking depends on their ability to show one of two things: either that the Constitution has not conferred any authority to Congress to enact the Hostage Taking Act or, more improbably, that the Constitution actually confers exclusive authority over hostage taking to the states. The former they cannot show, because "if Congress acts under one of its enumerated powers"—as we have concluded it did here—then "there can be no

---

[3] In light of this conclusion, we need not consider whether there might be other sufficient constitutional bases for the Hostage Taking Act as well, such as the Define and Punish Clause, U.S. CONST. art. I, § 8, cl. 10, or the Commerce Clause, *id.* art. I, § 8, cl. 3.

violation of the Tenth Amendment." *United States v. Jones*, 231 F.3d 508, 515 (9th Cir. 2000).   As to the latter, defendants have no evidence. *See Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 550 (1985) ("With rare exceptions, . . . the Constitution does not carve out express elements of state sovereignty that Congress may not employ its delegated powers to displace.").   Although California undoubtedly has its own authority to punish defendants, that only confirms the United States and California's concurrent jurisdiction—an example of the dual sovereignty doctrine.  It does not prove the exclusive jurisdiction of California.   In short, the Hostage Taking Act is consistent with Congress's "federalism-based respect for state and local authority in this area of law enforcement." *Lopez-Flores*, 63 F.3d at 1473.

Finally, defendants argue that, even if the Hostage Taking Act does not itself exceed Congress's power, the subsequent amendment to the Act authorizing the death penalty does exceed Congress's power.  The argument is without merit.  If Congress has the power to criminalize conduct, it also has the power to prescribe a constitutionally permissible punishment for that conduct. *See Mistretta v. United States*, 488 U.S. 361, 364 (1989) ("Congress, of course, has the power to fix the sentence for a federal crime.").  Indeed, the Treaty that the Hostage Taking Act implements *requires* its signatories to make hostage taking "punishable by appropriate penalties which take into account the grave nature of those offences." Treaty, art. II.  The Treaty is not self-executing, *see Medellin v. Texas*, 552 U.S. 491, 504–05 & n.2 (2008); it neither prescribes nor forbids any particular punishment but explicitly leaves it to each signatory to do so.  Congress's amendment authorizing the death penalty for hostage takings

resulting in death was equally within its constitutional power under the Necessary and Proper Clause as the original Act.[4]

### 2. Defendants' recusal motion

Defendants claim 28 U.S.C. § 455(a) required Judge Tevrizian to recuse himself after he applied to a local screening committee for the position of United States Attorney for the Central District of California—the same office prosecuting this case. "We review the denial of a recusal motion for an abuse of discretion." *United States v. Johnson*, 610 F.3d 1138, 1147 (9th Cir. 2010).

On December 28, 2006, Judge Tevrizian held a status conference and informed the parties that a search committee had asked him to submit his name for the position of United States Attorney for the Central District of California and that he had done so:

> There's been a lot of rumors floating around here. You know, I had announced that I'm

---

[4] We acknowledge the Russian Federation's amicus brief in support of defendants but are unpersuaded by its arguments. As explained above, Mikhel's and Kadamovas's conduct fell squarely within the Hostage Taking Act, and we have previously held that the Act does not violate the Equal Protection Clause. *Lopez-Flores*, 63 F.3d at 1473; *see also Lue*, 134 F.3d at 85–87. The Federation's other argument—that the death penalty violates the Eighth Amendment—is not for us to decide. *See United States v. Mitchell*, 502 F.3d 931, 982 (9th Cir. 2007) ("Whether contemporary values dictate a different answer [to the constitutionality of the death penalty] today is for the Supreme Court to decide; the Eighth Amendment does not authorize this court to overrule Supreme Court precedent 'even where subsequent decisions or factual developments may appear to have significantly undermined the rationale for [an] earlier holding.'").

> going to retire just as soon as this case is over and join a judicial arbitration mediation service. A couple of weeks ago I received a telephone call from a search committee that's looking to replace the United States Attorney and they asked me to submit my name for that position. The search committee is not associated with the Justice Department nor is it associated with the administration. They make recommendations and they asked me to submit my name. Whether anything comes of it I don't know, but I thought I should disclose this to you. I'm not doing it for any financial gain, because I made it very clear that if I do take the position that I would do it for a dollar a year, because of the fact that I'm on a federal pension, judicial pension, and I don't believe in double dipping. So I do make this disclosure to you. Again, I don't know if anything is going to come of it. I haven't been contacted by the administration. I haven't been contacted by anybody in Washington.

Neither side made any objection.

Trial proceeded, and the jury returned guilty verdicts a few weeks later. It was not until January 29, 2007, after the government had rested its case in chief in the penalty phase, that defendants moved for recusal. Judge Tevrizian denied defendants' motion the next day, stating that he had withdrawn his name from consideration and that his application had never progressed past a preliminary stage:

I advised and disclosed to all parties on the record that I was contacted by a representative of the local screening committee to apply for the position of United States Attorney for the Central District of California. None of the parties or their counsel ever objected.

I submitted a form application and was interviewed by the screening committee only. I have never been interviewed by anyone of the Department of Justice o[r] White House counsel's office. In fact, I never directly submitted my application to the Department of Justice or White House counsel's office. It was submitted only to the local screening committee, who may have passed it on.

Again, none of the defense counsel or the defendants objected when I made the disclosure on the record weeks ago that I was planning to apply for the position.

. . . .

Yesterday I withdrew my name for consideration for the position of United States Attorney by notifying the local committee. The only personal contact I had with either the Department of Justice or the White House counsel's office was over the telephone, yesterday, to inform them that I had withdrawn my name from consideration.

34          UNITED STATES V. MIKHEL

> I was also informed that my application was never considered on the merits by the Department of Justice or White House counsel's office.

Defendants filed a petition for mandamus in our court. We denied the petition, noting that they had "arguably filed their motion to recuse the district judge too late."

"It is well established in this circuit that a recusal motion must be made in a timely fashion." *E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1295 (9th Cir. 1992). "While there is no *per se* rule that recusal motions must be made at a fixed point in order to be timely, such motions should be filed with reasonable promptness after the ground for such a motion is ascertained." *Id.* (citation omitted) (quotation marks omitted). Where "unexplained delay" in filing a recusal motion "suggests that the recusal statute is being misused for strategic purposes," the motion will be denied as untimely. *Id.* at 1296; *see also United States v. Rogers*, 119 F.3d 1377, 1380 (9th Cir. 1997); *Davies v. Comm'r*, 68 F.3d 1129, 1131 (9th Cir. 1995).

Defendants discovered the alleged grounds for recusal on December 28, 2006, but nevertheless waited until January 30, 2007, to file their motion. Although a delay of a little over a month would not always, or even ordinarily, doom a motion for recusal, defendants' delay here renders their motion untimely. Defendants were clearly notified that Judge Tevrizian had put himself in the running to be United States Attorney, yet they withheld their motion while trial was ongoing and waited to file until after the jury's verdicts against them, and after the government rested its penalty-

UNITED STATES V. MIKHEL                    35

phase case.[5]  *See Rogers*, 119 F.3d at 1380.  We see "a heightened risk" that defendants used a recusal motion "for strategic purposes." *Preston v. United States*, 923 F.2d 731, 733 (9th Cir. 1991).  Defendants' recusal motion asked Judge Tevrizian to "declare a mistrial of the penalty phase, and then recuse himself from presiding further," but did not seek a mistrial as to the guilt phase.  Defendants likely recognized that the evidence of guilt was overwhelming and, rather than delay the inevitable, may have tried to throw a wrench into the penalty phase in the hope that the government would prefer accepting life sentences to conducting a fresh penalty phase.

Defendants argue that whether they timely moved for recusal is neither here nor there because § 455(a) and Canon 3C(1) of the Code of Judicial Conduct place the duty to recuse on the judge.  We have rejected this same argument before. *E. & J. Gallo Winery*, 967 F.2d at 1295.  "In fact, 28 U.S.C. § 144 expressly requires that a motion to disqualify must be 'timely,' and we have judicially required as much under 28 U.S.C. § 455." *Rogers*, 119 F.3d at 1380.  Enforcing the timeliness of a recusal motion is necessary to prevent litigants from using § 455(a) for strategic purposes.  Defendants cannot avoid their timeliness problem by putting

---

[5] Defendants argue they did not become aware of the need for recusal until late January 2007 when they read a newspaper article suggesting that Judge Tevrizian was among the frontrunners for the position.  This argument is meritless.  Judge Tevrizian's statement in December 2006 clearly indicated he had submitted his name to the local screening committee for the position.  His disclosure was straightforward and sufficient to advise all parties of the issue.  Defendants' alleged basis for recusal did not turn on whether they thought Judge Tevrizian's application might be successful.

the onus of recusal on the district court. They filed their recusal motion too late.

In addition to its untimeliness, defendants' recusal motion fails on its merits. Under § 455(a), "[a]ny justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." 28 U.S.C. § 455(a). "The goal of section 455(a) is to avoid even the appearance of partiality." *United States v. Holland*, 519 F.3d 909, 913 (9th Cir. 2008) (quoting *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 860 (1988)). Thus, we "ask whether a reasonable person with knowledge of all the facts would conclude that the judge's impartiality might reasonably be questioned." *Id.* (quotation marks omitted). "The reasonable person is not someone who is hypersensitive or unduly suspicious, but rather is a well-informed, thoughtful observer." *Id.* (quotation marks omitted). "The standard must not be so broadly construed that it becomes, in effect, presumptive, so that recusal is mandated upon the merest unsubstantiated suggestion of personal bias or prejudice." *Id.* (quotation marks omitted).

Here, Judge Tevrizian promptly and clearly disclosed the alleged grounds for recusal to the parties; his only contact was with a local screening committee; he stated he would not seek remuneration for the position, and there was no opportunity for him to negotiate salary, bonuses, or the like; his application was never considered on its merits by the Department of Justice or White House Counsel's office; and he immediately withdrew his application when defendants filed their motion. The fact that Judge Tevrizian immediately withdrew his application is particularly significant. If defendants had made a timely motion and Judge Tevrizian had not immediately withdrawn his application, this issue

might have presented a closer question. As it is, we cannot say that a reasonable person with knowledge of all the facts would have questioned Judge Tevrizian's impartiality.[6]

### 3. *Batson* challenge

Defendants made a *Batson* challenge to the government's peremptory strike of Juror 285, a black woman. "Purposeful racial discrimination in selection of the venire violates a defendant's right to equal protection because it denies him the protection that a trial by jury is intended to secure." *Batson v. Kentucky*, 476 U.S. 79, 86 (1986). Ruling on a *Batson* challenge requires a three-step framework:

> First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race. Second, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question. Third, in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination.

*United States v. Alvarez-Ulloa*, 784 F.3d 558, 565 (9th Cir. 2015) (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 328–29 (2003)). Ordinarily, we review the district court's ruling on a *Batson* challenge for clear error. *See Snyder v. Louisiana*,

---

[6] Defendants also contend that Judge Tevrizian's failure to recuse himself violated their rights under the Due Process Clause. Because there was no abuse of discretion under § 455(a), there was no due-process error. *See Exxon Corp. v. Heinze*, 32 F.3d 1399, 1403 (9th Cir. 1994) (noting that § 455(a) is more stringent than due process).

552 U.S. 472, 478 (2008). We have applied de novo review, however, where the court improperly applied the three-step framework. *See, e.g.*, *Alvarez-Ulloa*, 784 F.3d at 565. We need not decide which standard of review applies here because defendants' challenge fails even under de novo review. We acknowledge, however, that under either standard we are at some disadvantage because we are assessing a cold record and cannot, as did the trial judge and counsel, take measure of Juror 285's visage, inflection, or body language. *See Snyder*, 552 U.S. at 483 ("We recognize that a retrospective comparison of jurors based on a cold appellate record may be very misleading when alleged similarities were not raised at trial.").

The jury pool consisted of 270 potential jurors, and each side had twenty-eight peremptory challenges. The government used its thirteenth peremptory challenge against Juror 285. Defendants made a *Batson* challenge, and the government responded that its reasons for striking Juror 285 were that (1) her father was in prison on drug charges and (2) she was lukewarm on the death penalty. Defense counsel replied that "[e]very juror that the government has kicked has been a juror of color, whether it's been black, Hispanic, or Asian." When the government correctly pointed out that the last juror it had struck was white, the district court stated there was "no *Batson* challenge" and gave no further consideration to the issue. Jury selection continued—with the government leaving ten peremptory challenges unexercised—and defendants never renewed their *Batson* challenge. The final jury consisted of five white jurors, three Hispanic jurors, two black jurors, one Asian juror, and one multi-race juror.

The parties agree that the government's proffered reasons for its peremptory challenge to Juror 285 mooted step one and

satisfied step two of the *Batson* analysis.  Only step three is at issue.  "[A]t the third step, the trial court must decide not only whether the reasons stated are race-neutral, but whether they are relevant to the case, and whether those stated reasons were the prosecutor's genuine reasons for exercising a peremptory strike, rather than pretexts invented to hide purposeful discrimination."  *Green v. LaMarque*, 532 F.3d 1028, 1030 (9th Cir. 2008).  "The defendant need not prove that all of the prosecutor's race-neutral reasons were pretextual, or even that the racial motivation was 'determinative.'"  *Currie v. McDowell*, 825 F.3d 603, 605 (9th Cir. 2016).  "Instead, to prove a *Batson* violation, the defendant must demonstrate that 'race was a substantial motivating factor' in the prosecutor's use of the peremptory strike."  *Id.* at 606.  "It is true that peremptories are often the subjects of instinct, and it can sometimes be hard to say what the reason is.  But when illegitimate grounds like race are in issue, a prosecutor simply has got to state his reasons as best he can and stand or fall on the plausibility of the reasons he gives."  *Miller-El v. Dretke*, 545 U.S. 231, 252 (2005) (citation omitted).

We consider first the government's proffered reasons for striking Juror 285 vis-à-vis its other peremptory strikes.  "Comparative juror analysis is a useful tool at *Batson* step three and failure to strike similarly situated venire members can ground a conclusion that purposeful discrimination occurred."  *Alvarez-Ulloa*, 784 F.3d at 567 (citation omitted).  Defendants highlight Juror 285's juror questionnaire, on which she wrote "I am neither for or against the death penalty."  She explained: "[T]he death penalty to me is no joke.  [L]ife to me is a gift so when it come[s] to taking someone's life a lot of things need to be tak[en] into consideration."  In response to a question asking whether she

felt the death penalty was used too often, too seldomly, or randomly, she wrote: "[I]f people had any concious [sic] as to what would happen if they did the wrong, maybe even getting the death penalty, they may think twice about what they are about to do."  When asked whether her views would cause her "substantial difficulty in voting for death as the appropriate penalty," she checked "No."

Although these written responses suggested Juror 285 would have been willing to vote for the death penalty under appropriate circumstances, her oral responses during voir dire demonstrated far greater hesitance:

> [Government]: . . . .  Ma'am, in the penalty phase, depending on the evidence as you heard it, could you consider either punishment, either life imprisonment or the death penalty?
>
> [Juror 285]:  I can't consider it right now because I don't know what it is.
>
> [Government]:  I'm not asking—
>
> [Juror 285]:  And I can't base my decision on something that I don't know, so I can't answer that question for you.
>
> [Government]:  Absolutely.  Could you just consider the evidence presented by both sides?
>
> [Juror 285]:  Yes, ma'am.

Juror 285's hesitant responses during voir dire—particularly her interruption of the prosecutor and unwillingness to give an unequivocal answer to whether she could *consider* imposing the death penalty—would understandably give pause to any prosecutor trying a death penalty case. This concern was reflected in the prosecutor's extemporaneous response to the challenge: "This has nothing to do with the color of anybody's skin. It has totally to do with their attitudes concerning the death penalty and their ability to be a fair juror and render the verdict that we think is appropriate in this case."

Defendants contend Jurors 67 and 84 (whom the government did not strike) were as hesitant or more hesitant to impose the death penalty as Juror 285. Juror 67, a Hispanic male, stated he was "fairly neutral" on the death penalty and wrote in his questionnaire that the death penalty is used "unfairly" because "a great deal depends on your ability to hire a competent lawyer." But when the government asked him during voir dire whether he could consider imposing the death penalty, Juror 67 gave an unequivocal response: "Certainly." This prevents him from being an apposite comparison to Juror 285.

Juror 84, a white male, wrote on his juror questionnaire that he was neither 100 percent for nor against the death penalty and that, "depending on the crime," "the death penalty should be a possible penalty." He indicated the death penalty is used "fairly" and is generally reserved "for the most terrible crimes." Although defendants correctly quote his statement that he "really hate[d] to see anybody put to death," they ignore the remainder of his response: "[B]ut I can see the reason for it in today's society." When asked if he could consider imposing the death penalty, Juror 84

confirmed, "I believe so, yes." Like Jurors 67 and 84, the other jurors highlighted in defendants' briefs all affirmed they could consider imposing the death penalty—which is precisely what Juror 285 did not do. In short, comparative analysis does not show that the government's concern over Juror 285's willingness to impose the death penalty was pretextual.

There is less merit to the government's other stated reason for striking Juror 285: that her father was in prison on drug charges. Juror 285 stated her "dad ha[d] gone to jail on drug related charges" but that this would not influence her decisions. Some non-stricken jurors also had family in prison or had been charged with crimes themselves. Juror 67 had pleaded guilty to a DUI, and Juror 8, an Asian male, had pleaded guilty to misdemeanor assault. It is unclear whether either juror was incarcerated, but the government apparently did not follow up with them on the issue. That said, Juror 67's father and cousin were both police officers, and Juror 8 wrote in his questionnaire that he "believe[d] in the death penalty" and that it was "used fairly."

Somewhat more troubling, Juror 39, a white male, had a son who was imprisoned after pleading guilty to second-degree murder. Juror 39 attested this would not influence his decisions, but when asked whether the incident "left a bad taste in [his] mouth regarding the criminal justice system[,]" he responded "[t]hat's a hard one for me to answer . . . ." He then provided a lengthy explanation, exhibiting frustration with his son for accepting a plea bargain without consulting him and with the district attorney for charging his son with first-degree murder rather than manslaughter. On the other hand, Juror 39 represented that he had served on several juries, *all* of which went to verdict. This provided a powerful

reason for the government not to strike Juror 39: a prosecutor might assume that, if a prospective juror has served on several juries that all reached a verdict, the juror is unlikely to be a defense-friendly holdout during deliberations.

On balance, even if the government's explanation about Juror 285's father's criminal history seems weak, the comparative analysis here provides little evidence of discriminatory intent, particularly given the government's genuine and compelling reason for striking Juror 285 for being lukewarm on the death penalty, and possible reasons for not striking Jurors 8, 39, and 67 despite their criminal-history responses.  Furthermore, although the government applied six of its eighteen exercised peremptory challenges to black jurors, there were two black jurors on the final jury and two black jurors as alternates.  The government accepted this outcome, leaving ten peremptory challenges unexercised. Moreover, the final jury's composition fairly resembled the entire jury pool, with white jurors actually making up a smaller percentage of the jury than they did of the pool.  After careful review, we cannot say defendants have met their burden of demonstrating race was a "substantial motivating factor" in the government's peremptory strike of Juror 285. *Currie*, 825 F.3d at 606.

### 4.  The use of an anonymous jury

Empaneling an anonymous jury is permissible only if "(1) there is a strong reason for concluding that it is necessary to enable the jury to perform its factfinding function, or to ensure juror protection; and (2) reasonable safeguards are adopted by the trial court to minimize any risk of infringement upon the fundamental rights of the accused." *United States v. Shryock*, 342 F.3d 948, 971 (9th Cir. 2003).

Defendants did not object to empaneling an anonymous jury, and they do not challenge the district court's determination that an anonymous jury was necessary to ensure juror protection.   Rather, they claim specific precautions—a cautionary instruction on the reasons for juror anonymity and the disclosure of potential jurors' names and addresses to defense counsel—were required to minimize the risk of prejudice to their Fifth Amendment right to a presumption of innocence and Sixth Amendment right to an impartial jury. As defendants raised neither issue below, we review for plain error.[7]  *See United States v. Mitchell*, 502 F.3d 931, 967 (9th Cir. 2007).

First, the district court took reasonable precautions to safeguard defendants' Fifth Amendment right to a presumption of innocence.  The district court did not instruct the jury on the reasons for their anonymity but simply informed them they would be referred to by number rather than name.  The questionnaire potential jurors completed stated their information would "be kept confidential" and that "[n]either your identities nor your answers will be released to the general public or the media."  In short, the court treated the jurors' anonymity as routine and suggested through the questionnaires that it was concerned about their privacy and unwanted media attention.   The court also repeatedly instructed the jury that defendants were presumed innocent, further mitigating any potential prejudice in this regard.

---

[7] Plain error requires "(1) error, (2) that is plain, and (3) that affect[s] substantial rights.  If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings."  *Johnson v. United States*, 520 U.S. 461, 466–67 (1997) (quoting *United States v. Olano*, 507 U.S. 725, 732 (1993)) (quotation marks omitted).

UNITED STATES V. MIKHEL                45

Although we upheld empaneling an anonymous jury in *Shryock*, where the jury was given a pretextual reason for anonymity, we did not say that giving a pretextual reason was a necessary precaution.  Simply treating anonymity as a routine procedure and offering neutral justifications focused on juror confidentiality also sufficiently guard against prejudice.  *United States v. Fernandez*, 388 F.3d 1199, 1245 (9th Cir. 2004) (collecting cases).  Indeed, "the generally accepted practice for minimizing prejudice . . . is to downplay (not accentuate) the significance of the juror anonymity procedure."  *United States v. Ochoa-Vasquez*, 428 F.3d 1015, 1037 (11th Cir. 2005).  Had the district court done what defendants now contend was required and given a cautionary instruction on anonymity, the instruction might have drawn more attention to anonymity and led jurors to speculate on the subject.  There was no error, let alone plain error, in failing to give a sua sponte cautionary instruction on the reasons for anonymity.

Second, the district court took reasonable precautions to safeguard defendants' Sixth Amendment right to an impartial jury.  As we recognized in *Shryock*, "the use of an anonymous jury may interfere with defendants' ability to conduct voir dire and to exercise meaningful peremptory challenges, thereby implicating defendants' Sixth Amendment right to an impartial jury."  342 F.3d at 971.  Moreover, 18 U.S.C. § 3432 requires a "list of the veniremen . . . stating the place of abode of each venireman" to be provided to a capital defendant, unless "the court finds by a preponderance of the evidence that providing the list may jeopardize the life or safety of any person."  Defendants do not dispute the district court's finding that disclosing jurors' identifying information would have jeopardized their lives or safety.  Instead, defendants argue it was plain error for the

court not to sua sponte disclose potential jurors' identities to defense counsel under a protective order.

The district court sufficiently safeguarded defense counsel's ability to conduct voir dire by providing defendants with an eleven-page questionnaire for each potential juror detailing age, marital status, city of residence, employment history, and education, among other things. None of our cases require, or even suggest, that providing potential jurors' names and addresses to defense counsel is necessary in circumstances such as these. Nor does § 3432 require disclosing jurors' identifying information to counsel when the "life or safety" exception applies, as it undisputedly did here.[8] The district court committed no error, and certainly no plain error, in empaneling the anonymous jury as it did. *See United States v. Gonzalez-Aparicio*, 663 F.3d 419, 428 (9th Cir. 2011) (an error "cannot be plain where there is no controlling authority on point").

5.  Right to a public trial

Defendants claim the district court's exclusion of Armen Harutiunian from trial violated their Sixth Amendment right to a public trial. Harutiunian attended Mikhel's last day of testimony on January 5, 2007. He had been released from federal prison earlier that same day. He had a visible Armenian gang tattoo on his neck, told courtroom staff he

---

[8] Defendants do assert that § 3432 required the district court to find by a preponderance of the evidence that disclosing jurors' identities *to counsel* would have jeopardized jurors' safety. The statute has no such requirement; it refers to defendants, and the district court properly made its finding as to defendants. Once the court made this finding, it was not required by statute to disclose jurors' identifying information to either defendants or their counsel.

was a "friend" or "fan" of Mikhel, and was observed behaving in a manner that was "intimidating in nature." The next week, the district court informed the parties that Harutiunian would be barred from reentering the courtroom going forward. Neither defendant  objected, and neither defendant gave any indication of an acquaintance with Harutiunian. There is also no evidence Harutiunian ever attempted to attend the trial again. Because defendants did not object to the exclusion below, we review for plain error. *See Mitchell*, 502 F.3d at 967.

"The right to a public trial entitles a criminal defendant at the very least . . . to have his friends, relatives and counsel present, no matter with what offense he may be charged." *United States v. Rivera*, 682 F.3d 1223, 1229 (9th Cir. 2012) (quotation marks omitted). "Nonetheless, in some circumstances, exclusion of members of the public from a judicial proceeding does not implicate the constitutional guarantee." *Id.* To determine whether a closure implicates the Sixth Amendment, we look to whether the closure affected the values undergirding the right to a public trial, including ensuring fair proceedings, reminding the prosecutor and judge of their grave responsibilities, discouraging perjury, and encouraging witnesses to come forward. *Id.* Nothing in the record here suggests Harutiunian's exclusion had any effect on these values, particularly given his lack of any apparent connection to defendants or the case and the absence of any evidence that he later sought readmittance to the courtroom. The exclusion did not implicate defendants' constitutional rights. The district court therefore did not err, let alone plainly err, by excluding Harutiunian.

48                    UNITED STATES V. MIKHEL

6.  "Reasonable doubt" instruction as to guilt

Defendants challenge the district court's use of our circuit's model "reasonable doubt" instruction in the guilt phase.[9]  The parties dispute whether defendants preserved the objection.  We need not resolve that dispute because the instruction was not erroneous even under de novo review.

Our model instruction provides that a "reasonable doubt is a doubt based upon reason and common sense and is not based purely on speculation."  Model Crim. Jury Instr. 9th Cir. 3.5.  Defendants argue this misstates the law: in their view, a jury *can* use speculation to find a "reasonable doubt" in favor of the accused.  Defendants are incorrect.  "[D]oubt that does not rise above pure speculation is not reasonable." *Ramirez v. Hatcher*, 136 F.3d 1209, 1212–13 (9th Cir. 1998) (citing *Victor v. Nebraska*, 511 U.S. 1, 17 (1994)); *cf. United States v. Ramirez*, 714 F.3d 1134, 1138 (9th Cir. 2013) ("The term 'speculate' has a vaguely pejorative cast; when judges use it, they generally refer to inferences that are irrational or impermissible.").  Moreover, we have repeatedly upheld the model instruction.  *See, e.g.*, *United States v. Alcantara-Castillo*, 788 F.3d 1186, 1198 n.4 (9th Cir. 2015); *United States v. Ruiz*, 462 F.3d 1082, 1087 (9th Cir. 2006).  There was no error in using the model instruction in the guilt phase.

7.  Right to two counsel under 18 U.S.C. § 3005

Under 18 U.S.C. § 3005, a capital defendant has a right to two counsel, at least one of whom is "learned in the law

---

[9] We address defendants' challenge to the district court's use of the same instruction in the penalty phase in our discussion of that phase below.

applicable to capital cases." Four years before trial, the district court appointed Richard Callahan and Dale Rubin to defend Mikhel and Marcia Brewer and Richard Lasting to defend Kadamovas. Rubin and Lasting both had prior experience in capital cases.

Mikhel claims the district court violated § 3005 by allowing trial to proceed for three days while one of his attorneys, Callahan, was absent. In the second week of trial, Callahan fell down the stairs in his home and suffered serious head injuries. He was unable to appear in court the next day, and Rubin asked for a continuance. The government proposed instead that the parties proceed with examining live foundational witnesses—subject to defendants being able to recall those witnesses later—and with playing videotaped deposition testimony. The court adopted the government's plan.

Three days later, Rubin determined Callahan would not be able to return for at least another week and again requested a continuance. The court granted first a one-week continuance and then an additional two weeks. Mikhel concedes that when trial resumed "Callahan had sufficiently recovered from his injuries to participate in the trial." Ultimately, Callahan only missed three trial days, during which the government presented six live foundational witnesses and the videotaped deposition testimony of three substantive witnesses. Defendants chose not to recall any of the live witnesses for further cross-examination.

Mikhel does not cite, and we have not found, any authority addressing whether counsel's brief absence from trial may violate § 3005. The statute neither states nor implies that two counsel must be present in the courtroom

50          UNITED STATES V. MIKHEL

every day of trial, and we will not read the statute "so as to put in what is not readily found there." *United States v. Hood*, 343 U.S. 148, 151 (1952). Moreover, we have previously held that "the purpose of the two-attorney right is to reduce the chance that an innocent defendant would be put to death because of inadvertence or errors in judgment of his counsel." *United States v. Dufur*, 648 F.2d 512, 515 (9th Cir. 1980) (quotation marks omitted). That purpose is not undermined by one attorney's de minimis absence from trial.[10] To the extent Mikhel wishes to argue that his counsel failed to adequately represent him, that is an ineffective assistance of counsel claim, not a violation of § 3005.

Regardless, any error was harmless.[11] Mikhel does not allege any prejudice stemming from Callahan's absence. Nor could he. Both of his counsel worked on his case for years before trial, and both were present at trial for, *inter alia*, voir dire, openings, the testimony of the three key cooperating coconspirators, Mikhel's testimony, closings, guilt-phase verdicts, the entire penalty phase, and sentencing. Callahan was absent only for the examination of six foundational witnesses (whom he could have recalled but chose not to) and the deposition designations of three substantive witnesses (the

---

[10] We need not address whether a more extended absence of second counsel might violate § 3005.

[11] Mikhel relies heavily on a pair of Fourth Circuit cases holding that a court's failure to appoint a second attorney after a capital defendant's request violates § 3005 and cannot be harmless error. *United States v. Boone*, 245 F.3d 352, 361 & n.8 (4th Cir. 2001); *United States v. Watson*, 496 F.2d 1125, 1129–30 (4th Cir. 1973). Neither case addresses a situation like that here, where a second attorney was appointed but missed a handful of trial days.

admissibility of which was litigated before trial).  Callahan's three-day absence in no way prejudiced Mikhel.

Kadamovas raises a similar but distinct argument.  He claims the district court violated § 3005 by denying his requests to continue trial to allow one of his attorneys more time to prepare.[12]  Even assuming without deciding that denying a continuance could violate § 3005 under some circumstances, there was no violation here.  Trial in this case was originally scheduled for 2002, but was continued several times until it was finally set for July 2006.  In November 2005, ten months before trial, one of Kadamovas's attorneys (Brewer) submitted a declaration stating she did not have time to prepare the case to her client's satisfaction.  As a result, the district court appointed Sonia Chahin in her stead.

In March 2006, Kadamovas unsuccessfully moved to continue the trial date to allow Chahin more time to prepare.  Less than a week before trial, Kadamovas unsuccessfully moved for a continuance again.  Trial began as scheduled on July 11, 2006, with potential jurors completing questionnaires.  There was then a month-long break to accommodate Chahin—who had another trial that July— before proceedings resumed on August 15, 2006, with voir dire.

Notably, between appointment in November 2005 and the beginning of trial in July 2006, Chahin billed almost 900 hours on this case.  And in the four years leading up to trial,

---

[12] Kadamovas also vaguely asserts that the district court's denial of his motions for a continuance violated his constitutional rights.  He offers no argument to support a constitutional violation, and we find no basis for one.

Kadamovas's other attorney, Lasting, billed over 4,000 hours. Moreover, we cannot overlook the benefit Chahin derived from Brewer's prior years of work. Chahin was not starting from a blank slate; she had ten months to get up to speed; she billed 900 hours before trial began; and Kadamovas concedes she played a substantial role at trial, taking 30 percent of the witnesses. The district court's denial of Kadamovas's motions for a continuance did not violate § 3005.

Finally, like Mikhel, Kadamovas makes little attempt to explain why he was prejudiced in this regard. At best, he states: "Chahin went from a six-week murder trial into this grueling trial without reviewing much of the discovery and never traveling to Lithuania to investigate Mr. Kadamovas's background." But he does not explain what discovery Chahin failed to review that might have changed the jury's verdict or why traveling to Lithuania was essential to effectively representing him. His contention that Chahin had inadequate time to prepare is also belied by the extensive hours she spent on the case. Thus, even if there were a technical violation of § 3005, it would be harmless.

8. Excluded testimony regarding cooperating witnesses

Altmanis, Solovyeva, and Markovskis all testified for the government as cooperating witnesses. On cross-examination, defendants attacked their credibility by questioning them about their plea agreements. On redirect, the government sought to rehabilitate Solovyeva and Markovskis's credibility by eliciting testimony to the effect that their plea agreements would be voided if they committed perjury. Defendants then sought to one-up the government once more, proffering Clifford Smith as an example of a cooperating witness who had committed perjury in a different case without

repercussion.  The district court held the proffered testimony irrelevant.  We review the district court's evidentiary rulings for abuse of discretion.  *See United States v. Orm Hieng*, 679 F.3d 1131, 1135 (9th Cir. 2012).

Smith had no connection to defendants, the crimes, or the investigation.   He had merely testified in another case pending in the same courthouse.  According to defendants, he committed perjury in that case and suffered no consequence for doing so.   Kadamovas argues that the government's efforts to rehabilitate Solovyeva and Markovskis created the misleading impression that the government always controls cooperating witnesses by prosecuting them if they lie.  He claims the government thereby opened the door to Smith's "profile" evidence regarding the United States Attorney's Office's modus operandi with respect to cooperating witnesses who commit perjury.

Contrary to Kadamovas's arguments, the proffered testimony was plainly excludable.  There is nothing in the record to indicate that any of the cooperating witnesses knew that Smith had committed perjury and not been prosecuted. *Cf. United States v. Chang Da Liu*, 538 F.3d 1078, 1088 (9th Cir. 2008).  Smith's possible history of perjuring himself with impunity was at most minimally probative of Altmanis, Solovyeva, or Markovskis's credibility and threatened to create a distracting trial-within-a-trial regarding events having nothing to do with this case.   In this regard, Kadamovas's reliance on our decision in *United States v. Beltran-Rios* is inapposite.  878 F.2d 1208 (9th Cir. 1989). There, the defendant was charged with a drug trafficking crime and argued in his defense that he lacked the typical characteristics of a drug trafficker.  *Id.* at 1210.  We held that the prosecution could rebut this argument through otherwise

inappropriate "criminal profile" testimony. *Id.* at 1212–13. Here, by contrast, defendants' proffered evidence had at most an extremely limited bearing on the witnesses testifying. There was no abuse of discretion in excluding the evidence.[13]

9.  Mikhel's competency

Mikhel argues the district court erred in failing to hold a hearing to evaluate his competency at numerous points during trial. "It is well established that a conviction obtained against an incompetent defendant is a clear violation of the constitutional guarantee of due process." *United States v. Loyola-Dominguez*, 125 F.3d 1315, 1318 (9th Cir. 1997) (quotation marks omitted). "Competency requires that the defendant have the 'capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense.'" *Id.* (quoting *Drope v. Missouri*, 420 U.S. 162, 171 (1975)); *see also* 18 U.S.C. § 4241(a) (codifying this standard). The competency right does not end at a conviction but extends to "post-conviction proceedings," including the penalty phase of a capital trial. *United States v. Duncan*, 643 F.3d 1242, 1248 (9th Cir. 2011).

The parties dispute whether the district court held a competency hearing in this case. We need not resolve that dispute and assume without deciding that no competency hearing occurred. For this reason, and because defense

---

[13] Kadamovas also argues the exclusion of this evidence rose to the level of a constitutional violation by depriving him of his right to present a complete defense. But even if the evidence was minimally relevant, it did not violate due process to exclude it. *See Wood v. Alaska*, 957 F.2d 1544, 1549 (9th Cir. 1992).

counsel never moved for a competency hearing,[14] we pass to considering whether the district court plainly erred in failing to order a competency hearing sua sponte. *See United States v. Dreyer*, 705 F.3d 951, 960 (9th Cir. 2013).

In this respect, our "inquiry is not whether the trial court could have found the defendant either competent or incompetent, nor whether the reviewing court would find the defendant incompetent." *Id.* (alterations omitted). Rather, we look to see "if the evidence of incompetence was such that a reasonable judge would be expected to experience a *genuine doubt* respecting the defendant's competence." *Id.* (emphasis added); *see also Duncan*, 643 F.3d at 1249 n.2 (discussing the various ways we have articulated this standard); *Chavez v. United States*, 656 F.2d 512, 516 n.1 (9th Cir. 1981) (same). "To raise a genuine doubt, there must be substantial evidence that, due to a mental disease or defect, the defendant is either unable to understand the nature and consequences of the proceedings against him *or* to assist properly in his defense." *United States v. Garza*, 751 F.3d 1130, 1134 (9th Cir. 2014) (quotation marks omitted). "Among the factors to consider when evaluating whether a court erred in failing to order a competency hearing *sua sponte*, are the defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence[;] however, none of these factors is determinative, and even one of these factors standing alone may, in some circumstances, be sufficient." *Dreyer*, 705 F.3d at 964 (citations omitted) (quotation marks omitted) (alterations omitted).

---

[14] Mikhel argues plain error review is improper because his counsel "expressed doubt" of his competency at three different points during trial. As we explain below, the doubts raised were highly tentative, and we are unconvinced Mikhel ever squarely moved for a competency hearing.

Mikhel identifies three different points at which he believes the court should have held a genuine doubt as to his competency and therefore held a hearing: (1) at the trial's onset; (2) at the end of the guilt phase; and (3) during the penalty phase. We begin by reviewing Mikhel's pretrial history of mental illness and then address each trial segment in turn.

After his first escape attempt, Mikhel was moved to a high security section of SB-CDC and placed under Special Administrative Measures. In January 2004, more than two years before his trial began, he attempted to commit suicide by cutting an artery in his ankle. Mikhel would later explain that this was an impulsive act that he did not plan out and that he was feeling hopeless about his case at the time.

Following the suicide attempt, Mikhel was moved to the West Valley Detention Center ("WVDC"), where he received treatment from psychiatrist Dr. Inderpal Dhillon. Dr. Dhillon originally diagnosed Mikhel with major depression and prescribed anti-depressants. Later, she concluded he suffered from bipolar disorder and revised her treatment plan accordingly. During three meetings in early 2004, Dr. Dhillon noted that Mikhel suffered from auditory hallucinations, including speaking to people who were not there and hearing electricity. Mikhel continued to be treated, and nothing indicates that he suffered from any form of hallucination at any later point.[15]

A year passed, and in April 2005, Mikhel attempted to take his life a second time by hoarding his medications and

---

[15] Indeed, Dr. Dhillon attributed these symptoms to a medication that she had prescribed.

taking them all at once.  He reported that his reason was the same as before—that he was feeling hopeless about his case. Afterward, Dr. Dhillon continued to treat Mikhel and noted he was showing signs of hypomania, including increased activity, racing thoughts, and feelings of grandiosity.

Another year passed, and in May 2006, Mikhel was transferred back to MDC, where he would be held during trial.  The medical staff there diagnosed him with depression and prescribed anti-depressants.   Prior to trial, defense counsel had psychiatrist Dr. William Vicary examine Mikhel. In a September 5, 2006, letter, Dr. Vicary opined that Mikhel's demanding and irritable behavior was "largely due to his untreated Bipolar Disorder."  He summarily concluded that Mikhel's competency would be "enhanced" with proper treatment, but gave no opinion as to Mikhel's competency to stand trial.

On the eve of opening statements, Mikhel attempted suicide a third time by trying to hang himself with a sheet. Once again, his stated reason for doing so was hopelessness about his case.  The next day he insisted on appearing in court in his jail garb, with a ligature mark visible on his neck.  The court addressed the incident with Mikhel's counsel, who stated that "with [Mikhel's] suicidal frame of mind, I don't know that he's competent."   Counsel suggested Mikhel should be medically examined but never moved for a competency hearing.  The court agreed to another medical examination and ordered an MDC staff psychiatrist to evaluate Mikhel.

The following week, MDC's chief forensic psychologist, Dr. Ralph Ihle, completed a full forensic evaluation of Mikhel and submitted a comprehensive report to the court.  Dr. Ihle

58          UNITED STATES V. MIKHEL

spoke to Mikhel's attorneys and reviewed Mikhel's personal history and prior treatment, including Mikhel's medical records, a declaration from Dr. Dhillon, Dr. Vicary's initial September 5, 2006, letter, and a follow-up letter from Dr. Vicary reiterating his bipolar diagnosis. Dr. Ihle also personally interviewed Mikhel and found that he was able to follow directions and maintain daily routines at MDC; that his demeanor was polite and cooperative; that he engaged in appropriate reciprocal communication; that there was no evidence of him experiencing hallucinations, delusions, or confusion; that he had no significant deficits in attention, concentration, or memory; and that he showed no signs of odd or bizarre behavior, though he was depressed and expressed that he felt hopeless about his case. Dr. Ihle tested Mikhel's intellectual functioning and believed he was "within the high or above average range":

> Mr. Mikhel's verbal behavior during the evaluation suggested that he was within the high or above average range of intellectual functioning. He demonstrated adequate English grammar for someone educated in a foreign country, and an above average English vocabulary. His speech was well organized and sufficiently goal directed. His logic was easy to follow, and his associations were adequately organized with a normal flow or continuity of ideas. He is also well read in the subject of philosophy. He discussed his views on existential philosophy works by Frankel and Nietzsche, regarding the meaning of life and Nihilism. He had good recall of some of the passages or concepts espoused in the books. In summary, the objective information

> suggests that Mr. Mikhel is most likely functioning in the high to above average range of intelligence. He does not exhibit any significant signs of cognitive impairment or gross brain damage. His intellectual functioning supports his having the present ability to understand the nature and consequences of the charges brought against him, or to properly assist in his defense.

With respect to Mikhel's understanding of the charges against him, Dr. Ihle noted that Mikhel could clearly articulate the charges; that he knew they were serious felonies and that he could face the death penalty; that he understood the different types of pleas and their legal consequences; and that he had an adequate understanding of courtroom participants and procedures, as well as appropriate courtroom behavior. Mikhel told him he was willing to cooperate with an attorney but lacked confidence in his present attorneys because they did not follow his suggestions.

Based on the materials he reviewed and his personal examination, Dr. Ihle concluded that Mikhel was competent to stand trial:

> Based on the information available, there is evidence to indicate that Mr. Mikhel suffers from a Major Depressive Disorder, but the symptoms do not impair his present ability to understand the nature and consequences of the court proceedings against him, or his ability to properly assist counsel in his defense.

> The presence of a Major Depressive Disorder, or any other disorder, does not, in and of itself, render an individual so compromised as to lack the ability to understand legal materials and to cooperate with defense counsel in a rational manner. Despite the presence of symptoms of a Major Depressive Disorder, the defendant was able to articulate a coherent and comprehensive history, and did not appear to have any difficulties in expressive (i.e., speaking) or receptive (i.e., understanding) language. Overall, the defendant was able to offer relevant and meaningful information to this evaluator regarding both historical data and legal matters. During the competency portion of the evaluation, he provided appropriate responses to the questions posed to him. He did not appear to experience any difficulties in communicating his thoughts to the evaluator, nor did he parrot the information. Any difficulties he exhibits with respect to legal counsel are volitional, and a reflection of his perception that his defense against the charges is hopeless at this point.

Dr. Ihle submitted his report to the court on September 14, 2006, and the court found the same day that Mikhel was "competent to stand trial." Again, we need not decide whether the court's consideration of Dr. Ihle's report amounted to a competency hearing. What matters for our purposes is whether the district court plainly erred in failing sua sponte to order any additional competency proceeding. Dr. Ihle's opinion respecting Mikhel's competency and the

absence of any clinical evidence of incompetence distinguish this case from those in which we have found reversible error. *See, e.g.*, *Duncan*, 643 F.3d at 1246–50 (reversing denial of a competency hearing where court was faced with five competing expert reports, some finding "no evidence of psychotic behavior" and others finding "severe psychosis"); *Odle v. Woodford*, 238 F.3d 1084, 1087–89 (9th Cir. 2001) (reversing for retrospective competency hearing because defendant had well-documented brain damage resulting in hallucinations, "psychotic behavior," suicide attempts, and "behavioral disturbances beyond his control").

In this regard, Mikhel's prior suicide attempts did not require the court to sua sponte order a competency hearing; not "every suicide attempt inevitably creates a doubt concerning the defendant's competency." *Loyola-Dominguez*, 125 F.3d at 1318–19. Mikhel attempts to analogize his case to *Loyola-Dominguez*, where the defendant also attempted suicide on the eve of trial. But the trial court in *Loyola-Dominguez* did not elicit adequate information to dispel serious concerns regarding competency. Rather, the trial court inquired how long it would take to get an evaluation and then conducted a brief colloquy with the defendant. *See id.* at 1319 ("Also of concern is [Loyola-Dominguez's] response to the question from the court, 'Do you know what's going on?' Loyola-Dominguez answered, 'I don't know. I've never been like this, so I don't know.'"). Here, by contrast, the district court ordered a forensic evaluation after Mikhel's third suicide attempt and the resulting report found no impairment to Mikhel's ability to understand the nature and object of trial or to aid in his defense. Every doctor to examine Mikhel after a suicide attempt reported that he tried to take his life because he regarded his future as hopeless. Based on these facts,

Mikhel's suicide attempts, although naturally concerning, did not raise a genuine doubt as to his competency.

As for Mikhel's decision to wear his jail garb in court, this is the type of "bizarre action[ ]" we have said is "not necessarily sufficient evidence to compel a [competency] hearing" but is "a factor to be considered." *Torres v. Prunty*, 223 F.3d 1103, 1109–10 (9th Cir. 2000).   Mikhel later provided a reasoned explanation for his decision, stating he felt it would have been superficial to wear civilian clothes only during the few hours a day he spent in court.  His decision to wear his jail garb did not create a genuine doubt as to his competency.  *See Davis v. Woodford*, 384 F.3d 628, 645–46 (9th Cir. 2004) (the defendant's "decision not to wear civilian clothes and to remain in the doorway of the courtroom" during a capital trial did not mandate reversing for a competency hearing given that he "was evidently aware of the risks of his behavior . . . and rationally weighed those risks").  Although we acknowledge the confluence of these circumstances is concerning and that a competency hearing might have been prudent, we cannot say the district court plainly erred by failing to sua sponte order a hearing at the outset of trial.

Next, Mikhel asserts the district court should have ordered a competency hearing near the end of the guilt phase. A few months into trial, Mikhel sent the court a handwritten request for new counsel, which complained that his attorneys were unwilling to implement his trial-strategy suggestions. The court rejected Mikhel's request, and defense counsel asked that Dr. Ihle examine Mikhel again.  The court refused, stating it was receiving oral reports from MDC keeping it "fully abreast" of Mikhel's mental condition and that "nothing . . . indicates [Mikhel is] slipping or failing in any

UNITED STATES V. MIKHEL                    63

way." Mikhel later filed a second request for new counsel based on disagreements with his attorneys over whether he should testify. The court again denied the request. At the very end of the guilt phase, Mikhel testified on direct for three days but refused to be cross-examined. The court struck this testimony, and Mikhel refused to appear in court thereafter (except to hear the guilt-phase verdict).

Mikhel's requests for new counsel did not raise any genuine doubt as to his competency; to the contrary, they evinced his intelligence, his firm grasp of the proceedings and the legal system, and his own strong views on the best strategy for his defense. For instance, in response to Mikhel's allegations that his attorneys were not adequately communicating with him or preparing him to testify, his lead counsel asserted, and the court agreed, that Mikhel was merely "attempting to put appellate issues into the record." Moreover, Mikhel's stricken testimony, though perhaps ill advised, was not irrational. The evidence against him was overwhelming, and he had nothing to lose in this "Hail Mary" attempt to exculpate himself and Kadamovas. Throughout his three days of testimony—which we describe in greater detail below—he carefully developed a theme that he was a wealthy white-collar criminal operating at the margins of the law and thus had no reason to engage in the comparatively high-risk, low-reward violent hostage takings he was charged with committing. This testimony clearly demonstrated the native intelligence identified by Dr. Ihle, as well as the ability to understand and respond to questions, convey a narrative, and recall details from events spanning decades.[16]

---

[16] Mikhel also highlights that he was unshaven and "unkempt" during this stage of trial. But when his counsel raised the issue with the district

64                    UNITED STATES V. MIKHEL

Accordingly, the final months of the guilt phase provided the district court little or no reason to question Mikhel's competency.

Finally, we consider the penalty phase. Mikhel refused to be present in court for any of the penalty proceedings. His mitigation case proceeded without him and included testimony from Drs. Vicary and Dhillon regarding his mental health. Dr. Vicary asserted that Mikhel suffered from paranoid delusion and reported that Mikhel said his attorneys, the judge, and the government were "all working against him." Dr. Vicary attributed this in part to Mikhel being kept under special administrative conditions for a long time and believed prescribing a mood-stabilizing medication would reduce these symptoms. He further testified Mikhel was "faking health" as patients who want to avoid treatment often do. He explained: "He's crazy. He's irrational. You cannot sit down with [Mikhel] and spend time with him and ask him questions before he gets into this 'everything is rosy, I have no problems, and it's all just a conspiracy against me.'"

Days later, Mikhel filed another request for new counsel. In a hearing in which Mikhel was initially absent, his counsel represented that Mikhel wanted to submit to a psychological evaluation "to show that he has no mental problems" and "is totally competent in everything he does." Counsel also asserted Mikhel was "doing everything in his power . . . to throw a monkey wrench into [the defense's] ability to put on any kind of a mitigation defense." Counsel further stated: "I have a question as to Mr. Mikhel's competency. I don't object to him being submitted to an independent,

_____

court, Mikhel explained he was unshaven because MDC limited his access to a beard trimmer while he was on suicide watch.

psychological or mental evaluation." The court responded that, "based upon all the reports that I have received, he is competent to stand trial." Although counsel's statement came close to a request for a competency hearing, counsel himself did not suggest that Mikhel might be incompetent. Rather, counsel's statement that he would not "object" to an independent evaluation was an accommodation to Mikhel, who wanted an evaluation to prove he *was* competent.

The court then heard from Mikhel, who extensively criticized his counsel. Mikhel took issue with Dr. Vicary referring to him as a "pathological liar" on cross-examination and with his counsel's failure to address this testimony on redirect. Mikhel asserted this was an intentional omission by his counsel: "In my opinion, he's not doing that because he's going to use the very, very same statement to discredit me on the further actions when his performance and his conduct will be put in review later on." Mikhel explained he had planned to testify for two weeks in order to counter all of the government's evidence against him. The reason why he refused to be cross-examined or attend the remainder of the trial was because his counsel abandoned this strategy. The court denied Mikhel's request for new counsel.

Mikhel now argues that, by the end of trial, the cumulative evidence of his purported incompetency resembled that in *Drope*. There, the state court was aware from a pretrial psychiatric report that the defendant had difficulty participating in the exam, counting, and telling time; was "markedly circumstantial and irrelevant in his speech;" was diagnosed with a borderline mental deficiency and depression; and had a history of purposefully falling down flights of stairs to get attention. *Drope*, 420 U.S. at 165 n.1, 175–76. Moreover, in the midst of trial, the defendant

66            UNITED STATES V. MIKHEL

shot himself in the stomach.  *Id*. at 166–67.  The Supreme Court held that the state trial court erred in not sua sponte holding a competency hearing.  *Id*. at 181–82.

Two key facts distinguish *Drope* from the instant case. First, there was no forensic competency evaluation performed in *Drope*, and no mental health professional had opined that the defendant in that case *was competent* to stand trial.  *Id*. at 180.  Indeed, the psychiatric report—which called into question the defendant's ability to even comprehend the proceedings and was thus far more drastic than the opinions Drs. Vicary and Dhillon rendered—was the only professional evaluation of the defendant's mental health.  *See Mendez v. Knowles*, 556 F.3d 757, 773 (9th Cir. 2009) (distinguishing *Drope* based, in part, on the "finding of the court-appointed expert that Mendez was competent to stand trial").  Secondly, the defendant in *Drope* was absent from the remainder of trial due to his suicide attempt, and as a result, "the trial judge and defense counsel were no longer able to observe him in the context of the trial and to gauge" his competence.  *Drope*, 420 U.S. at 181.  Although Mikhel voluntarily absented himself from the penalty phase, the district court held two hearings with him in lock-up and thus had the ability to observe his demeanor, comprehension of the risks, and ability to respond to questions.  *See Davis*, 384 F.3d at 646 (distinguishing *Drope* based on trial judge's ability to observe defendant on days he decided to sit at defense table rather than courtroom's doorway).  Mikhel's attempt to analogize *Drope* to his case is without merit.

Mikhel also cites *Torres*, where the defendant was convicted of shooting several doctors at a hospital due to delusional beliefs they had injected him with AIDS as part of a conspiracy against him.  223 F.3d at 1105.  A court-

appointed psychologist diagnosed the defendant with "severe delusional (paranoid) disorder," and the defendant believed his counsel and the court were part of the conspiracy against him. *Id*. at 1105, 1108. While there are some parallels, this case is not *Torres*. There, the defendant's delusions were well documented and evident throughout every facet of the case, including his commission of the crime. Though Dr. Vicary testified that Mikhel suffered from paranoid delusions, he did not expound upon any perceived conspiracy. Tellingly, Mikhel himself had many opportunities to express such views through his requests for new counsel and the resulting hearings, but he at most criticized his attorneys' unwillingness to follow his desired trial strategy and expressed his opinion that his counsel was attempting to discredit him in anticipation of a charge of ineffective assistance of counsel. Most notably, Mikhel's own counsel, who presumably had the most contact with Mikhel and had the best opportunity to observe his mental state, never moved for a competency hearing.

As we concluded for the trial's guilt phase, this evidence demonstrates Mikhel's understanding of the nature and object of the trial and his familiarity with his appellate rights. He disavowed that he was trying to undermine his own mitigation defense and blamed his absence from trial on his disagreement with his attorneys. This bolsters the district court's conclusion that Mikhel was merely attempting to manufacture issues for appeal. "Although there is little doubt that [Mikhel] was recalcitrant and acted in ways that were detrimental to his case, his interactions with the trial judge indicated that he understood what was at stake during the penalty phase and could make informed decisions." *Davis*, 384 F.3d at 645; *see also Garza*, 751 F.3d at 1136 ("A defendant who refuses to work with his lawyer out of spite

alone is not incompetent even if that defendant has a serious mental disease or defect."). Accordingly, the penalty phase yielded no genuine doubt of Mikhel's competency, and the district court did not plainly err in failing to hold a competency hearing sua sponte at any stage of trial.

10. Kadamovas's Confrontation Clause claim

Kadamovas claims Mikhel's testimony and refusal to be cross-examined violated his Sixth Amendment confrontation right and prejudiced him in both the guilt and penalty phases. We review alleged Confrontation Clause violations de novo. *See United States v. Peterson*, 140 F.3d 819, 821 (9th Cir. 1998).

Mikhel's testimony on direct spanned three days. During the first two days, Mikhel testified about his life before the offense conduct at issue here. Much of this testimony concerned his purportedly lavish lifestyle as a successful smuggler and money launderer. For instance, he testified that he purchased a $17 million yacht to smuggle "big quantities" of money between countries, that he traveled throughout the Caribbean, Europe, and Asia to advance his illicit enterprises, and that he used a vineyard outside Modesto, California, as a "safe house" for paperwork and money. According to Mikhel's counsel, the purpose of this testimony was to proactively raise Mikhel's past misconduct—which did not involve kidnapping or murder—and to "establish[ ] a foundation for what he did later."

Mikhel had relatively little to say about Kadamovas in his testimony, and what he did say offered innocent explanations for some of the government's evidence tying himself and Kadamovas to the kidnappings. Mikhel testified that

Kadamovas once helped him smuggle money out of the
United States by strapping bricks of cash to their bodies using
plastic ties (thus explaining the plastic ties later found in
Mikhel's home).    He further testified that Kadamovas
participated in smuggling schemes to Cuba and Cyrus.  And
he testified that Kadamovas assisted him in an extortion
scheme, in which they videotaped a meeting with a man who
sought their help hiring an assassin and then threatened to
publish the tape unless the man paid them $50,000.

On his third day of testimony, Mikhel turned to the events
underlying this case.  He claimed that an unnamed associate
wanted Muscatel to be "taught a lesson" and that he hired
Altmanis for the job, merely instructing Altmanis to "do
whatever you think you're supposed to do" without wanting
him to kill anyone.  Mikhel said he told Altmanis, "I don't
want to know what's going to happen after you leave here."
He also said that his conversation with Altmanis caused
him to be concerned about the money in his home, prompting
him and Kadamovas to drive to his Modesto safe house the
next day (thus explaining the cellphone data showing them
making that trip).

Mikhel also testified to some events connected to the
Umansky family's ransom payments, asserting that he
believed he was only helping Altmanis launder this money
and did not know its provenance.  With regard to being
caught on a surveillance camera using Umansky's ATM card,
Mikhel said he purchased the card from Altmanis to facilitate
creating shell corporations.  As for the Safiev-related plots,
Mikhel testified he used Pekler and Kharabadze to lure Safiev
into a meeting *in order to help* Safiev.  Mikhel claimed that
unnamed individuals were after Safiev for cheating them of
$50 million, that he sought a meeting with Safiev to assist

70                UNITED STATES V. MIKHEL

him in disappearing to safety, and that he expected several
million dollars in compensation for his services. Mikhel
wove a complicated story to this effect, which included him
and Kadamovas once again making trips to the Modesto safe
house. Mikhel ended his testimony by attesting that he did
not kill Muscatel, Pekler, Umansky, Kharabadze, or Safiev.
When he refused to be cross-examined, the district court
struck his testimony and instructed the jury not to consider it
"in any matter against Mr. Mikhel or against Mr.
Kadamovas."

Kadamovas argues that the district court's instruction
could not cure his inability to cross-examine Mikhel under
*Bruton v. United States*, 391 U.S. 123 (1968). In *Bruton*, the
Supreme Court held that a defendant is deprived of his Sixth
Amendment right of confrontation when a facially
incriminating confession of a nontestifying codefendant is
introduced at their joint trial, even if the jury is instructed to
consider the confession only against the codefendant.[17]
*Bruton*, 391 U.S. at 126. This holding "recognized a narrow
exception" to the "assumption of the law that jurors follow
their instructions." *Richardson v. Marsh*, 481 U.S. 200,
206–07 (1987) (citing *Bruton*, 391 U.S. at 135–36). The
Court reasoned:

> [T]here are some contexts in which the risk
> that the jury will not, or cannot, follow

---

[17] In the *Bruton* line of cases, "codefendant" refers to the individual
who confesses and inculpates both himself and the "defendant." For
instance, in *Bruton*, Evans (the codefendant) confessed during an
interrogation that he and Bruton (the defendant) committed armed
robbery. 391 U.S. at 124. The confession was admitted at their joint trial,
but the trial court instructed the jury to consider it only as to Evans and not
as to Bruton. *Id.* at 124–25.

instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored.  Such a context is presented . . . where the *powerfully incriminating extrajudicial statements* of a codefendant, who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial.  Not only are the incriminations devastating to the defendant but their credibility is inevitably suspect . . . .  The unreliability of such evidence is intolerably compounded when the alleged accomplice . . . does not testify and cannot be tested by cross-examination.  It was against such threats to a fair trial that the Confrontation Clause was directed.

*Bruton*, 391 U.S. at 135–36 (emphasis added) (citations omitted).

The Court narrowed *Bruton*'s scope in *Richardson*, where it held that there is no Confrontation Clause violation if the codefendant's confession must be linked to other evidence to incriminate the defendant.  *Richardson*, 481 U.S. at 208.  "Where the necessity of such linkage is involved, it is a less valid generalization that the jury will not likely obey the instruction to disregard the evidence.  Specific testimony that 'the defendant helped me commit the crime' is more vivid than inferential incrimination, and hence more difficult to thrust out of mind."  *Id*.  The Court rejected the "contextual implication" doctrine that required courts to assess whether, in light of all of the evidence, a codefendant's confession was so powerfully incriminating that a new, separate trial was

required for the defendant. *See United States v. Sherlock*, 962 F.2d 1349, 1361 (9th Cir. 1989) (citing *Richardson*, 481 U.S. at 206).

The *Bruton* rule is thus "limited to facially incriminating confessions." *Id*. We have held that "[a] statement is not facially incriminating merely because it identifies a defendant; the statement must also have a sufficiently devastating or powerful inculpatory impact to be incriminatory on its face." *United States v. Angwin*, 271 F.3d 786, 796 (9th Cir. 2001) (quotation marks omitted), *overruled on other grounds by United States v. Lopez*, 484 F.3d 1186 (9th Cir. 2007) (en banc). We have also held that the *Bruton* rule applies not only to out-of-court confessions but also to when a codefendant confesses in court. *Toolate v. Borg*, 828 F.2d 571, 572 (9th Cir. 1987). Although it is ordinarily a sufficient remedy to strike the testimony of a witness who refuses to be cross-examined, "in-court confessions are no less credible or powerful as a rule than out-of-court ones." *Id*. at 572–73. Thus, "the presumed inability of juries to disregard an incriminatory codefendant's confession" also applies to in-court confessions and may result in a Confrontation Clause violation. *Id*. at 574–75.

Kadamovas argues *Bruton* and *Toolate* mandate reversal because Mikhel's testimony "corroborated the government's case and directly implicated" him. Specifically, Kadamovas contends the testimony "plac[ed] him in the events surrounding the abductions of four of the victims and validat[ed] the evidence about the trips to the [New Melones] Reservoir." The government counters that Mikhel's testimony does not implicate *Bruton* and *Toolate* because Mikhel (1) did not confess to the crimes he was charged with and (2) did not incriminate Kadamovas.

As an initial matter, we agree that Mikhel's testimony cannot accurately be described as a confession. While he certainly corroborated portions of the government's evidence against him, he never admitted to conduct that would satisfy any element of the hostage-taking charges, such as seizing or detaining the victims, threatening to kill or injure them, or holding them for ransom. Nor did he admit to conspiring with others to commit these crimes.[18] Rather, Mikhel's testimony was clearly an attempt to exculpate himself by offering an alternate narrative for the government's overwhelming evidence against him. For instance, he attempted to provide a non-nefarious explanation for why he lured Pekler, Kharabadze, and Safiev into meeting with him; why plastic ties were found in his home; and why cellphone data placed him near the reservoir at critical times.

We need not decide, however, whether a codefendant must completely inculpate himself in order to trigger *Bruton*'s protection because Mikhel's testimony did not facially incriminate Kadamovas. *See United States v. Yarbrough*, 852 F.2d 1522, 1537 (9th Cir. 1988) ("*Bruton* does not require that *all* extrajudicial statements or confessions not be used in a joint trial. Rather, only those statements that 'clearly inculpate' the defendant or are 'powerfully incriminating' implicate the '*Bruton*' rule."). Most of Mikhel's testimony regarding the offense conduct, including the events underlying Muscatel and Umansky's disappearances, made no mention of Kadamovas. When Mikhel did insert Kadamovas into his narrative, he never claimed Kadamovas seized, detained, threatened, injured, or

---

[18] In contrast, it does appear that Mikhel incriminated himself as to the charge of conspiracy to escape from custody. But Mikhel never mentions Kadamovas in this portion of his testimony.

demanded ransom for any of the victims. Rather, Mikhel's attempt to exculpate himself also extended to Kadamovas, providing Kadamovas, for instance, an explanation for why his cellphone placed him near the reservoir around the times of the victims' deaths.

Kadamovas argues that parts of Mikhel's testimony corroborated the government's evidence against him. For example, Mikhel's testimony supported the government's evidence that Kadamovas posed as a potential client to meet with Pekler and that Solovyeva lured Kharabadze to Designed Water World. But none of this evidence, *on its own*, directly established that Kadamovas committed or conspired to commit hostage taking. Instead, by arguing that Mikhel's testimony corroborated the government's evidence, Kadamovas implicitly acknowledges that the testimony must be *linked* to other evidence in order to inculpate him. Kadamovas thus asserts the precise type of "contextual implication" argument that the Supreme Court rejected in *Richardson*. Because Mikhel's testimony did not facially incriminate Kadamovas, it did not trigger the *Bruton* rule. *See Angwin*, 271 F.3d at 797–98 (finding no *Bruton* violation where the codefendant's pretrial statements "could support" the government's narrative but were only "mildly incriminating"). We therefore assume the jury followed the district court's instruction to disregard Mikhel's testimony. *See Richardson*, 481 U.S. at 206. There was no Confrontation Clause violation.[19]

_____

[19] Kadamovas alternatively argues that, even absent a Confrontation Clause violation, Mikhel's testimony violated Federal Rules of Evidence 403 and 404(b) and that striking the testimony was an insufficient remedy. In support of this argument, however, he only cites cases involving defective curative instructions. *See, e.g.*, *United States v. Merino-*

Finally, any error in this regard was harmless.  An error is harmless if, absent the offending evidence, it remains "clear beyond a reasonable doubt that the jury would have returned a verdict of guilty."  *United States v. Velarde-Gomez*, 269 F.3d 1023, 1034 (9th Cir. 2001) (en banc).  The evidence presented at trial to prove defendants' guilt was overwhelming and included the detailed testimony of three cooperating coconspirators; the testimony of numerous other witnesses linking defendants to the victims' disappearances; physical evidence retrieved from defendants' homes and Designed Water World's office; DNA and fingerprint evidence linking many of these artifacts to defendants or their victims; cellphone data placing defendants near the reservoir at the time of the victims' deaths; and expert testimony tracing ransom payments to defendants' bank accounts, identifying defendants' voices in recorded telephone calls, and matching Kadamovas's shoes to shoeprints left in Muscatel's blood on the Parrotts Ferry Bridge.  Indeed, the district court remarked at sentencing that it had "never seen a case where the evidence of guilt was so compelling as in this particular case."  It is clear beyond a reasonable doubt that Mikhel's testimony impacted neither Kadamovas's convictions nor (for reasons explained in our discussion of the penalty-phase below) his sentence.

11. Kadamovas's severance motion

Kadamovas repeatedly moved for complete severance of his case from Mikhel's or, in the alternative, for sequential penalty-phase hearings.  The district court denied his motions.

---

*Balderrama*, 146 F.3d 758, 764 (9th Cir. 1998) (holding that "the [curative] instruction was inadequate on its face").  There is no reason to believe the district court's instructions were ineffective here.

We review denial of severance for abuse of discretion. *United States v. Jenkins*, 633 F.3d 788, 807 (9th Cir. 2011).

"Defendants jointly indicted ordinarily should be jointly tried. Serious consideration must be given to judicial economy. The burden is on the defendant to show 'clear,' 'manifest,' or 'undue' prejudice from a joint trial." *United States v. Polizzi*, 801 F.2d 1543, 1553–54 (9th Cir. 1986) (citations omitted). Severance should be granted "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States*, 506 U.S. 534, 539 (1993). "[L]ess drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice." *Id.*

"The test for abuse of discretion by the district court [in denying severance] is whether a joint trial was so manifestly prejudicial as to require the trial judge to exercise his discretion in but one way, by ordering a separate trial." *Jenkins*, 633 F.3d at 807. Our review in this area is "extremely narrow." *United States v. Mariscal*, 939 F.2d 884, 886 (9th Cir. 1991) (citing *United States v. Stirling*, 571 F.2d 708, 733 (2d Cir. 1978) (severance question is "virtually unreviewable")). "The possibility of acquittal in a separate trial is not itself sufficient to require severance." *Jenkins*, 633 F.3d at 807.

The joint guilt-phase trial was not so prejudicial as to deny Kadamovas a fair trial, and the district court did not abuse its discretion in denying Kadamovas's severance motions. Although Kadamovas cites Mikhel's testimony as evidence of guilt-phase prejudice, the district court granted

Kadamovas's motion to strike that testimony and gave a curative instruction.  For the reasons discussed above, we assume that the jury followed the court's instruction and that Mikhel's testimony therefore did not prejudice Kadamovas.  Likewise, none of Mikhel's unusual behavior during trial—such as wearing his jail garb, appearing in court with a visible ligature mark from his third suicide attempt, and refusing to attend the final days of trial—demonstrated the kind of manifest prejudice required to reverse a conviction for denial of severance.[20]  Moreover, the court repeatedly instructed the jury not to consider Mikhel's absence against Kadamovas.

Kadamovas relies on the Seventh Circuit's decision in *United States v. Mannie*, which held that a district court abused its discretion in denying motions for mistrial and severance based on the "co-defendant's severe and violent disruptions during the trial."  509 F.3d 851, 852 (7th Cir. 2007).  But Kadamovas's claim is, if anything, weakened by this comparison.  In one of many courtroom incidents in *Mannie*, the codefendant yelled at defense counsel, "then stood up, knocked one of his attorneys to the ground, grabbed the other attorney by his necktie, and threw him to the ground as well." *Id.* at 855.  *Mannie* exemplifies the "truly rare" case in which jury instructions provide insufficient protection to the right to a fair trial.  *Id.* at 857.  Here, by contrast, the district court did not abuse its discretion in denying severance at the guilt phase.

---

[20] Kadamovas also cites an incident in which Mikhel applauded a potential juror's response during voir dire.  There was no possible prejudice as a result of this incident, as it took place only in front of the potential juror, who was immediately excused and prevented from discussing the matter with any other potential jurors.

78                  UNITED STATES V. MIKHEL

Nor did the district court abuse its discretion in denying
Kadamovas's requests for sequential penalty phases. Like a
joint trial, a joint penalty phase is favored for efficiency and
fairness, even though it raises a potential risk to the
individualized consideration due each capital defendant. *See
United States v. Tipton*, 90 F.3d 861, 892–93 (4th Cir. 1996)
(finding joint penalty hearing was not an abuse of discretion).
Kadamovas argues he was prejudiced during the penalty
phase by Mikhel's continued absence from court, evidence of
Mikhel's suicide attempts, the disparity in his mitigation case
versus Mikhel's, and the government's presentation of
evidence and arguments as to both defendants.

While it would not have been an abuse of discretion for
the court to conduct sequential penalty phases before the
same jury, it also was not an abuse of discretion to order a
joint penalty phase. None of the issues raised by Kadamovas
show the type of manifest prejudice or risk to individualized
consideration that would be required to vacate his sentence on
this ground. In this regard, we note that the jury rendered
separate verdicts and made individualized findings and
recommendations as to each defendant. Moreover, the
district court's penalty-phase instructions required the jury to
give individualized consideration to each defendant, which
adequately mitigated any risk of prejudice. *See Fernandez*,
388 F.3d at 1243 ("We have repeatedly held that a district
court's careful and frequent limiting instructions to the jury
. . . can reduce or eliminate any possibility of prejudice
arising from a joint trial."); *Tipton*, 90 F.3d at 892–93
(holding that "frequent instructions on the need to give each
defendant's case individualized consideration sufficed to
reduce the risk to acceptable levels" in joint capital penalty
hearing).

12. Kadamovas's conviction for conspiracy to escape

Kadamovas was convicted of conspiring to escape from custody under 18 U.S.C. § 371. Kadamovas argues this conviction must be reversed because of two alleged evidentiary errors: (1) limiting the defense's cross-examination of cooperating witness Jose Avila in violation of the Federal Rules of Evidence and Confrontation Clause; and (2) admitting improper hearsay evidence in the form of a letter penned by Mikhel after the escape conspiracy ended. We review a Confrontation Clause challenge based on the exclusion of an area of inquiry de novo, *United States v. Larson*, 495 F.3d 1094, 1101 (9th Cir. 2007) (en banc), and we review evidentiary rulings for abuse of discretion, *Orm Hieng*, 679 F.3d at 1135.

Mikhel's counsel sought to impeach Avila's credibility by questioning him about a 2001 drug trafficking offense in Ohio and threats he purportedly made against a cooperating witness in that case named Robert Walsh. The government objected, and the district court ruled the line of cross-examination irrelevant. Mikhel then proffered a letter from the United States Attorney for the Northern District of Ohio stating that a member of Jose Avila's family had once threatened an unnamed "potential witness" by saying "We know where you are and where your family lives." Mikhel's counsel told the court he "assume[d]" the letter was about Walsh. The court again sustained the government's objection to the proffered evidence.

Federal Rule of Evidence 608(b) permits cross-examination of a witness on prior conduct bearing on his or her character for truthfulness or untruthfulness. Fed. R. Evid. 608(b). In addition, the exclusion of "otherwise appropriate

cross-examination designed to show a prototypical form of bias on the part of the witness" can rise to the level of a violation of the Confrontation Clause. *Holley v. Yarborough*, 568 F.3d 1091, 1098 (9th Cir. 2009). The Confrontation Clause inquiry is (1) whether the excluded evidence was relevant; (2) whether there were other legitimate interests outweighing the defendant's interest in presenting the evidence; and (3) whether the exclusion of evidence left the jury with sufficient information to assess the witness's credibility. *Larson*, 495 F.3d at 1103. "[T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Id.* at 1101.

Even under de novo review, there was no Rule 608(b) error or Confrontation Clause violation. Kadamovas's theory of the proposed testimony's relevance was speculative, attenuated, and convoluted. Other legitimate interests easily outweighed the testimony's minimal probative value—particularly, legitimate interests in avoiding undue delay and preventing a trial-within-a-trial on unrelated events surrounding Avila's drug trafficking offense and purported threats in connection with proceedings in Ohio. The district court did not err under either Rule 608(b) or the Confrontation Clause in excluding this line of cross-examination.

Kadamovas also challenges the district court's admittance of a letter concerning Mikhel's escape plans. The escape conspiracy was discovered on March 7, 2003, and Kadamovas withdrew from the conspiracy no later than

March 17, 2003.[21]  Over a week later, on March 26, 2003, Mikhel asked a prison guard to pass Kadamovas a magazine in which he had hidden the letter now at issue.  The guard seized the letter, and Kadamovas never saw it.  The letter outlined steps Mikhel wanted Kadamovas to take to communicate with other prisoners and stated: "[L]et's start putting into motion my big bluff.  Out of concern for security, for now I won't describe the details to you.  I'm just asking you to do everything exactly as laid out below.  We've made enough mistakes."

Generally, out-of-court statements are admissible for the truth of the matter asserted if "made by the party's coconspirator during and in furtherance of the conspiracy." Fed. R. Evid. 801(d)(2)(E).  Kadamovas argues Mikhel's letter was inadmissible because "once a party withdraws from a conspiracy subsequent statements by a coconspirator do not fall within this exemption."  *United States v. Nerlinger*, 862 F.2d 967, 974 (2d Cir. 1988).  The government responds that the conspiracy had revived by the time of Mikhel's letter. The problem with the government's argument, however, is that there is no proof of the conspiracy reviving other than the contested hearsay.  We may consider contested hearsay in determining whether the Rule 801(d)(2)(E) exemption applies, but there must also be "some evidence, aside from the proffered statements, of the existence of the conspiracy and the defendant's involvement."  *United States v. Gordon*, 844 F.2d 1397, 1402 (9th Cir. 1988).  Here, Mikhel's letter was the only evidence of an ongoing conspiracy to escape

---

[21] Kadamovas confessed to his involvement in the escape conspiracy on March 17, 2003, but the government conceded the confession was obtained in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966), and was inadmissible.

after Kadamovas's withdrawal. The letter was therefore inadmissible hearsay.

In any five-month trial involving dozens of witnesses and hundreds of exhibits, there is likely to be some evidentiary error. Our question on review is whether that evidentiary error was harmless—i.e., whether, absent the error, it remains "clear beyond a reasonable doubt that the jury would have returned a verdict of guilty." *Velarde-Gomez*, 269 F.3d at 1034. In this case, we have no doubt the admission of Mikhel's letter was harmless, as the letter was merely cumulative of other evidence linking Kadamovas to the conspiracy. Avila testified he went to Kadamovas's cell in "Nine South" to talk with Mikhel through the air vents and that Kadamovas "pretty much told me a little bit about like one of the plans and he just mentioned that—like behind his pillow that he was supposed to like make a hole and they were supposed to squeeze out of there and they were all supposed to go out into the stairwell and meet at a certain time." Parker, a fellow inmate, testified he heard Mikhel communicating through the air vents in a foreign language with someone on "Nine South." Coconspirator Sabrina Tuinan testified she obtained four cellphones, three of which were for Mikhel, her husband, and her brother-in-law. Though she was not certain, she believed the fourth phone was for "the other Juri," i.e., Jurijus Kadamovas. Prison records showed Mikhel had sent money to Krylov, Avila, Cook, and Kadamovas—all members of the conspiracy. And inmate housing records showed that Kadamovas managed to be reassigned to a cell adjacent to the stairway the conspirators intended to use for their escape. In light of this evidence, the erroneous admission of Mikhel's letter did not impact Kadamovas's conviction for conspiring to escape custody. Nor could it have impacted his death sentence for

the reasons we explain in our discussion of the penalty phase below.

13. Kadamovas's access to a computer

Kadamovas claims the government breached its stipulation with him regarding his access to discovery materials on a computer. He requests a remand "for an evidentiary hearing to determine whether the stipulation was violated and, if so, the appropriate remedy." "Stipulations freely and voluntarily entered into in criminal trials are as binding and enforceable as those entered into in civil actions." *United States v. Shapiro*, 879 F.2d 468, 470 (9th Cir. 1989). We interpret a stipulation de novo and consider whether the facts demonstrate a breach of that stipulation under the more deferential clearly erroneous standard. *See United States v. Salemo*, 81 F.3d 1453, 1460 (9th Cir. 1996).

In November 2005, Kadamovas complained he lacked sufficient access to a computer to review discovery in his case, as he only had access on weekdays between 8:00 a.m. and 2:00 p.m., and only when one of three visiting rooms was available. He moved the district court to order that he be granted access to a computer for ten hours a day. The parties entered into a stipulation by which Kadamovas withdrew his motion based on the prison warden's representation that "Mr. Kadamovas will, to the maximum practicable extent, be granted daily access to his laptop computer, Monday through Friday, excluding holidays, from approximately 7:00 a.m. to 3:15 p.m." The stipulation was expressly subject to the MDC's safety, security, management, and operational needs. Significantly, Kadamovas was a high security inmate housed in MDC's Secure Housing Unit and required three guards to be present during all of his movements.

84          UNITED STATES V. MIKHEL

In March 2006, Kadamovas filed a renewed motion with the district court claiming he was receiving insufficient computer access and requesting leave to use a computer in his cell.  The court heard argument on the motion and denied Kadamovas's request, explaining that Kadamovas "always had an opportunity to review this material, and he's chosen not to do it."  Three months into trial, after continued complaints about insufficient computer access, the court ordered that Kadamovas be permitted computer access in his cell fourteen hours a day.

The district court did not clearly err in finding that Kadamovas was receiving sufficient computer access in accordance with that contemplated by the stipulation.  A detailed declaration from Federal Bureau of Prisons Supervisory Attorney Eliezer Ben-Shmuel attested that Kadamovas had regular computer access but was often not using it.  The declaration attached prison records approving Kadamovas's various requests to use his computer.  Isolated incidents of Kadamovas being denied computer access were consistent with the stipulation's terms providing that access was "subject to the safety, security, management and operational needs" of MDC.  In short, the record supports the district court's determination that there was no pattern of Kadamovas being denied computer access in violation of the stipulation.

B.  *The Penalty Phase*

As we find no reversible error in the guilt phase, we proceed to considering the penalty phase.  Generally, the same jury that determines a defendant's guilt must also consider his or her eligibility for the death penalty under the FDPA.  18 U.S.C. § 3593(b)(1).  To impose a sentence of

death, the jury must first make the following threshold findings: (1) the defendant was 18 years of age or older at the time of the offense, *id.* § 3591(a)(2)(D); (2) the defendant had at least one of four enumerated *mentes reae*, *id.* § 3591(a)(2); and (3) at least one of sixteen statutorily defined aggravating factors applied, *id.* § 3592(c).

If the jury makes these threshold findings, it must then decide whether the aggravating factor or factors found to exist "sufficiently outweigh" any mitigating factor or factors found to exist to justify a sentence of death. *Id.* § 3593(e). Aggravating factors must be found unanimously and beyond a reasonable doubt; mitigating factors may be found by one or more jurors by a preponderance of the evidence. *Id.* § 3593(c), (d). Based on its consideration of all aggravating and mitigating factors, the jury recommends by unanimous vote whether the defendant should be sentenced to death or some lesser sentence. *Id.* § 3593(d), (e). In this case, the jury unanimously found all nine of the government's aggravating factors against both defendants, and no juror found any mitigating factor as to either defendant. The jury unanimously recommended that both defendants be sentenced to death.

1. "Reasonable doubt" instruction as to penalty

As it did in the guilt phase, the district court instructed the jury in the penalty phase using our circuit's model "reasonable doubt" instruction. Model Crim. Jury Instr. 9th Cir. 3.5. The court quoted the instruction nearly verbatim, adapting it only slightly to refer to aggravating factors rather than guilt:

86              UNITED STATES V. MIKHEL

> Proof beyond a reasonable doubt is proof that
> leaves you firmly convinced that an
> aggravating factor exists.  It is not required
> that the government prove the existence of an
> aggravating factor beyond all possible doubt.
>
> A reasonable doubt is a doubt based upon
> reason and common sense and is not based
> purely on speculation.  It may arise from a
> careful and impartial consideration of all the
> evidence, or from a lack of evidence.

Defendants did not object to the instruction in the penalty phase, so we review for plain error. *See Mitchell*, 502 F.3d at 967.

Defendants contend that using the model instruction to describe the government's burden of proof on aggravating factors—particularly, future dangerousness—was error because aggravating factors inherently contemplate "speculative inquiries and speculative evidence." The Supreme Court recently observed that the future dangerousness inquiry is not a determination of "historical fact," but "a predictive judgment inevitably entailing a degree of speculation." *Buck v. Davis*, 137 S. Ct. 759, 776 (2017). We do not understand this as requiring a different definition of "reasonable doubt." Notwithstanding the predictive nature of finding future dangerousness, or of any other aggravating factor, a reasonable doubt remains "something more than a speculative one." *Victor*, 511 U.S. at 19–20.

Defendants further contend the model instruction was unfairly lopsided because it instructed jurors not to find a reasonable doubt in their favor based purely on speculation,

without telling them not to speculate in finding the
government's burden of proof beyond a reasonable doubt.
The instruction, however, left no room for jurors to
unreasonably speculate in making any finding favoring the
government.  The instruction clearly explained that "[p]roof
beyond a reasonable doubt is proof that leaves you firmly
convinced that an aggravating factor exists."  This correctly
stated the government's burden of proof.  *See, e.g.*, *United
States v. Velasquez*, 980 F.2d 1275, 1278–79 (9th Cir. 1992)
(approving "firmly convinced" language in reasonable doubt
instruction).  It was not plain error to so instruct the jury.  *See
United States v. Soto-Zuniga*, 837 F.3d 992, 1004 (9th Cir.
2016); *Ruiz*, 462 F.3d at 1087.

2.   Victim-impact evidence

The   government   presented   twelve   penalty-phase
witnesses, eight of whom testified to the non-statutory
aggravating factor "Victim Impact."[22]  Defendants challenge
the admission of this victim-impact evidence insofar as it
(1) concerned not a victim's family but his or her professional
accomplishments   or   value   to   the   wider   community, or
(2) touched on a victim's religion.  At most, defendants only
made the first challenge below.  Thus, we review the first
challenge for abuse of discretion, and the second for plain
error.  *See Mitchell*, 502 F.3d at 967.

---

[22] The eight victim-impact witnesses were Nancy Shapiro Muscatel
(Muscatel's wife), Rachel Hoisman (Muscatel's daughter), Roman
Khayumov (Pekler's husband), Ruven Umansky (Umansky's father),
Michael Umansky (Umansky's brother), Evgenia Safieva (Safiev's
daughter), Matvy Shatz (Kharabadze's stepfather), and Ron Shelton
(Kharabadze's friend).

88          UNITED STATES V. MIKHEL

Defendants first argue that the Eighth Amendment and FDPA only permit evidence of a victim's personal characteristics in penalty proceedings to the extent those characteristics influenced, and thus reveal something about, the relationship the victim had with his or her family. Although we have not previously addressed this issue, we agree with several of our sister circuits that have held that victim-impact evidence is not so limited. *See, e.g.*, *United States v. Runyon*, 707 F.3d 475, 499–501 (4th Cir. 2013) (evidence of impact of victim's death on friends and colleagues and of victim's service in Navy was admissible).[23]

In *Payne v. Tennessee*, the Supreme Court held that the Eighth Amendment does not erect a per se bar to victim-impact evidence in capital sentencing proceedings. 501 U.S. 808, 827 (1991). Victim-impact evidence gives a "quick glimpse" of the victim's life and of his "uniqueness as an individual human being." *Id.* at 822–23. Such evidence is relevant to whether the death penalty should be imposed and is no different than any other relevant evidence. *Id.* at 827. It is generally admissible if it is not "so unduly prejudicial

---

[23] *See also United States v. Whitten*, 610 F.3d 168, 187–92 (2d Cir. 2010) (testimony from victim's colleagues on police force about professional accomplishments was admissible); *United States v. Bolden*, 545 F.3d 609, 626 (8th Cir. 2008) (testimony from victim's friends, coworkers, and pastor about his relationship with his girlfriend and career aspirations was admissible); *United States v. Battle*, 173 F.3d 1343, 1348 (11th Cir. 1999) (testimony from fellow correctional officers about impact of victim's murder on Atlanta prison was admissible). Only the Tenth Circuit has adopted an arguably more restrictive view: in *United States v. Fields*, it held that victim-impact evidence from a friend and coworker was admissible, but was unwilling to extend the victim-impact inquiry further to "community-level consequences." 516 F.3d 923, 946–48 (10th Cir. 2008).

that it renders the trial fundamentally unfair," in violation of
due process.  *Id.* at 825.

*Payne* concerned testimony from a victim's grandmother
but nowhere limited victim-impact evidence to evidence by
or about family members.  Rather, it expressly affirmed the
state's "legitimate interest in . . . reminding the sentencer that
. . . the victim is an individual whose death represents *a
unique loss to society* and in particular to his family."  *Id.*
(emphasis added).  Contrary to defendants' assertions, the
Supreme Court's recent decision in *Bosse v. Oklahoma*,
137 S. Ct. 1 (2016) (per curiam), does not require a narrower
reading of *Payne*.  *Bosse* held that *Payne* did not alter the
Court's preexisting "prohibition on characterizations and
opinions from a victim's family members *about the crime,
the defendant, and the appropriate sentence.*"  *Id.* at 2
(emphasis added).  *Bosse* did not speak to the scope of
victim-impact testimony admissible under *Payne* to show the
victim's "uniqueness as an individual human being."

Defendants alternatively argue that, even if the Eighth
Amendment does not limit victim-impact evidence in the
manner they suggest, the FDPA does.  The FDPA provides
that non-statutory aggravating factors

> may include factors concerning the effect of
> the offense on the victim and the victim's
> family, and may include oral testimony, a
> victim impact statement that identifies the
> victim of the offense and the extent and scope
> of the injury and loss suffered by the victim
> and the victim's family, and any other
> relevant information.

90              UNITED STATES V. MIKHEL

18 U.S.C. § 3593(a).   Defendants interpret § 3593(a)'s
references to "the victim's family" as limiting the scope of
admissible victim-impact evidence.   But that language is
illustrative, not exhaustive.   Section 3593(a) alludes to one
possible non-statutory aggravating factor—"the effect of the
offense on the victim and the victim's family"—and then
gives examples of how the government may prove that factor,
ending with the catchall "any other relevant information."  It
does not prohibit evidence of a victim's professional
accomplishments or value to the community.   The
government's victim-impact evidence was relevant to each
victim's "uniqueness as an individual human being" and was
not "so unduly prejudicial that it render[ed] the trial
fundamentally unfair." *Payne*, 501 U.S. at 822–23, 825. The
district court did not abuse its discretion.

Defendants also argue that the district court plainly erred
in failing to exclude evidence of Muscatel's Jewish faith—
specifically, that he was a "deeply religious man," who was
"very committed to Kabala," "observed Shabbat every
Friday, Saturday," and helped start a children's spirituality
program.   We faced a similar issue in *Mitchell*, where the
defendant challenged testimony bearing on the victim's
religion and cultural heritage as a Native American. *Mitchell*,
502 F.3d at 989.   We saw "nothing untoward in this
testimony," as "it would have been difficult if not impossible
to capture what [the victim's] loss meant to her family
without reference to the significance that traditional Navajo
religion and culture played in their lives."  *Id.* at 989–90.

Witnesses testified to Muscatel's religion in the context
of describing his commitment to his family and celebration of
life.  As in *Mitchell*, this testimony was admissible to show
Muscatel's uniqueness as a person.  *See id.*; *see also United*

*States v. Bernard*, 299 F.3d 467, 479 (5th Cir. 2002)
("Because religion played a vital role in [the victims'] lives,
it would be impossible to describe their 'uniqueness as
individual human beings' without reference to their faith.").
In any event, the testimony added little risk of prejudice
because the jury already knew of Muscatel's religion from
Markovskis's guilt-phase testimony.

To the extent defendants argue that the jury found for
death *because* Muscatel was Jewish, the argument is
unavailing.    As the FDPA requires, the district court
instructed the jury not to consider the religious beliefs of any
defendant or victim.  18 U.S.C. § 3593(f).  We assume jurors
follow instructions.     *See Mitchell*, 502 F.3d at 990.
Moreover, as the FDPA requires, each juror certified he or
she would have made the same recommendation irrespective
of the religious beliefs of any defendant or victim.  18 U.S.C.
§ 3593(f).  "Absent a substantial indication to the contrary,
we accept the jurors' assurance that no impermissible
considerations of race or religion factored into the verdict."
*Mitchell*, 502 F.3d at 990.  There was no plain error here.

3.  Misconduct in penalty-phase closing arguments

Defendants assert that several of the government's
remarks in penalty-phase closing arguments amounted to
prosecutorial misconduct requiring reversal.    Because
defendants did not object to the alleged misconduct at trial,[24]

---

[24] Mikhel objected four times in penalty-phase closing arguments;
Kadamovas objected zero times.  None of Mikhel's objections preserved
the prosecutorial-misconduct claims asserted here because none were
"specific enough to bring into focus the precise nature of the alleged

92                  UNITED STATES V. MIKHEL

we review for plain error.  *See Mitchell*, 502 F.3d at 967.
"Under the plain error standard, reversal is appropriate only
if the prosecutor's improper conduct so affected the jury's
ability to consider the totality of the evidence fairly that it
tainted the verdict and deprived [the defendant] of a fair
trial." *United States v. Sanchez*, 659 F.3d 1252, 1257 (9th
Cir. 2011) (quotation marks omitted).

First, defendants contend it was improper for the
government to argue that their mitigation evidence did not
"excuse," "explain," or "justify" their crimes.  For instance,
defendants highlight the government's rhetorical questions:
"Do any of the mitigating factors in this case justify or
explain the horrible crimes committed by the Defendants? . . .
Do any of them lessen the culpability of the Defendants?"
According to defendants, statements like this incorrectly told
the jury they could only consider mitigating evidence that had
some nexus to the crimes for which defendants were
convicted.  *See Tennard v. Dretke*, 542 U.S. 274, 284 (2004)
(rejecting the view that mitigation evidence must have a
nexus to the crime of conviction); *Smith v. Texas*, 543 U.S.
37, 45–46 (2004) (same); *Poyson v. Ryan*, 879 F.3d 875, 887
(9th Cir. 2018) (same), *cert. pet. docketed*, No. 17-1274 (Mar.
12, 2018).

Defendants mischaracterize the government's statements,
which did not suggest that the jury could not consider
defendants' proffered mitigating factors but only that the jury
should not give those factors much, if any, weight.  The
FDPA requires the jury to decide whether "all the aggravating
factor or factors found to exist sufficiently *outweigh* all the

─────────

error."  *United States v. Pineda-Doval*, 614 F.3d 1019, 1026 (9th Cir.
2010) (quotation marks omitted).

mitigating factor or factors found to exist *to justify* a sentence of death." 18 U.S.C. § 3593(e) (emphasis added). The government's remarks that any mitigating factors did not "justify"—or, for the sake of variety, did not "excuse" or "explain"—defendants' crimes were consistent with this statutory language. The remarks were not improper. *See Sims v. Brown*, 425 F.3d 560, 580 (9th Cir. 2005) (prosecutor's comments were not improper where he did "not suggest that the jury *cannot* consider Sims's background as a mitigating factor but rather that it *should not* find that [factor]").

Second, defendants contend the government misstated the law with respect to mitigating factors when it said the following:

> When you consider each of these mitigating factors, I'd like you to ask yourself as to each of them, when you go back to the Jury room to deliberate. Ask yourself, first: Does this factor actually exist? Are there facts that support it? Then ask yourself: If they do exist, is this really something that would justify a lesser sentence?

> And then, finally, if you do think that it's something that might justify a lesser sentence, ask yourself: What weight, if any, you should give it in your deliberation process?

According to defendants, this statement outlined a three-step process that conflicted with the FDPA by telling jurors to not "consider" any mitigating factors that did not justify a lesser

94                     UNITED STATES V. MIKHEL

sentence.  *Cf.* 18 U.S.C. § 3592(a) (the jury "shall consider any mitigating factor").

As a threshold matter, defendants' argument makes little sense: regardless of whether the jury found that the proffered mitigating factors were factually unsupported or that they simply did not justify a lesser sentence, the final result is the same.  To the extent defendants claim the government's statement erroneously asked jurors to *entirely ignore* the proffered mitigating factors, their claim is belied by the very statement they quote, which begins "When you consider each of these mitigating factors . . . ."  If defendants' contention is rather with the government's separation into two steps of whether a mitigating factor "justif[ies] a lesser sentence" and what "weight" to give that factor, their argument is still unavailing.  As explained above, the FDPA requires the jury to determine whether aggravating factors "sufficiently outweigh" mitigating factors "to justify a sentence of death." 18 U.S.C. § 3593(e).  The government's paraphrase of this language may have been a little clunky, but it did not misstate the law.[25]

Third, defendants claim the government improperly inflamed the passions of the jury by comparing life in prison to the victims' deaths.  For instance, the government argued that defendants' life in prison must be measured "against the five lives, the five lifetimes of days that have been ripped away;" that defendants will "get three square meals a day," while "[t]he last thing that Meyer Muscatel tasted in his life was that boot cover that was shoved in his mouth;" that

---

[25] This is particularly true in light of the government's closing argument as a whole, which repeatedly stressed jurors' responsibility to "weigh" all aggravating and mitigating factors.

defendants' "privileges" of watching cable television or reading books in prison are things the victims "only wished they could do;" and that the jury should show no mercy to defendants because defendants showed none to their victims.

These statements should never have been made. *See Mitchell*, 502 F.3d at 995 (prosecutor should not have made several comments, such as "Mitchell gets to come before the jury and say 'Spare my life.' . . . I suppose that's the beauty of the system.   Doesn't work for the victim.").**[26]**   The government responds that it was merely trying to rebut defendants' argument that prison life was already so harsh as to be a sufficient sentence.  While the government was surely permitted to argue prison life was less dire than defendants made it out to be, the government should not have done so by comparing life in prison to the victims' deaths.   The comparison was not necessary to rebut defendants' arguments and appears to have been calculated to unnecessarily inflame the passions of the jury.

That said, we cannot conclude that the government's statements so "affected the jury's ability to consider the totality of the evidence fairly that it tainted the verdict and deprived [defendants] of a fair trial." *Sanchez*, 659 F.3d at 1257.  As in *Mitchell*, the comments here "were not, in and of themselves, nearly as inflammatory as the graphic evidence of the murders, or as powerful as the extensive victim impact

---

**[26]** *See also United States v. Johnson*, 495 F.3d 951, 979 (8th Cir. 2007) (prosecutor's statement "No matter how small [the defendant's] cell may be, it's going to be larger than the coffin that [the victims] are laying [sic] in now" was questionable; but permitting it was not plain error); *Bland v. Sirmons*, 459 F.3d 999, 1027–28 (10th Cir. 2006) (it was improper but harmless for prosecutor to compare defendant's life in prison to victim's plight).

testimony, which was quite properly before the jury."
502 F.3d at 995–96 (prosecutor's comments were not plain
error). Moreover, the jury was clearly instructed that the
government's argument was neither evidence nor law; that it
must avoid the influence of passion or prejudice; and that it
must weigh all aggravating and mitigating factors. There was
no plain error.

    4.   Instruction and verdict form on future dangerousness

Defendants claim the jury instruction and verdict form on
the non-statutory aggravating factor of future dangerousness
violated due process and impermissibly intruded on the jury's
role as fact finder. We review de novo whether the jury
instruction and verdict form violated due process. *United
States v. Warren*, 25 F.3d 890, 897 (9th Cir. 1994). In
addition, we review the district court's formulation of its
instructions for abuse of discretion. *Id.* at 898.

The government's notice of intent to seek the death
penalty included the non-statutory aggravating factor of
"Future Dangerousness of the Defendant." The notice
indicated the government would prove future dangerousness
in three ways: defendants' continuing pattern of violence,
their escape risk and institutional misconduct, and their lack
of remorse. Defendants initially submitted a proposed future-
dangerousness jury instruction that closely tracked the
language in the government's notice and specifically referred
to the government's three methods of proof. The government
submitted a substantially identical proposed jury instruction.

At the jury charge conference, however, defense counsel
changed course and objected to the district court's future-
dangerousness instruction on two grounds. First, defense

counsel argued the factor should be limited to future dangerousness *in federal prison.* The court agreed and altered the factor to read "Future Dangerousness of Defendant If Confined To A Federal Prison For The Rest Of His Life Without The Possibility Of Release." Second, defense counsel argued that the government's three allegations concerning the defendants' future dangerousness—continuing pattern of violence, escape risk and institutional misconduct, and lack of remorse—should not appear anywhere in the instruction or verdict form. The court rejected this argument, and the final verdict form read:

> *Instructions*: For each of the following questions, answer "yes" or "no" to the five numbered questions below. (You need not answer "yes" or "no" to the lettered statements contained in question number 1, which merely describe the government's allegation of how the existence of a non-statutory aggravating factor would be demonstrated.)

> 1. Future Dangerousness of Defendant If Confined To A Federal Prison For The Rest Of His Life Without The Possibility Of Release. Do you, the jury, unanimously find that the government has proved beyond a reasonable doubt that the defendant is likely to commit criminal acts of violence in the future that would constitute a continuing and serious threat to the lives and safety of others, including one or more of the following:

98          UNITED STATES V. MIKHEL

a. Continuing Pattern of Violence. The defendant has engaged in a continuing pattern of violence, attempted violence, and threatened violence, including, at least, the crimes charged in the Second Superseding Indictment.

b. Escape Risk and Institutional Misconduct. The defendant poses a future danger to the lives and safety of other persons, as demonstrated by his escape risk and institutional misconduct, including, at least: defendant's participation in a conspiracy to escape from the Metropolitan Detention Center Los Angeles, California, which was detected by the government on or about March 7, 2003, and charged as Count Six in the Second Superseding Indictment.

c. Lack of Remorse. The defendant has demonstrated a lack of remorse for the capital offenses committed in this case, as indicated by his statements and actions during the course of and following the offenses alleged in the Second Superseding Indictment.

ANSWER TO SECTION IV, QUESTION NUMBER 1:

Yes      ____

No       ____

The final jury instruction on future dangerousness used substantially identical language but substituted "as evidenced by, at least, one or more of the following" for "including one or more of the following."

Defendants' challenge on appeal centers on the three lettered subheadings describing the government's future-dangerousness allegations. In the penalty phase, Kadamovas presented Dr. Mark Cunningham as an expert regarding future dangerousness in prison. Dr. Cunningham described several statistical studies of violence in prisons. Among other things, he opined that, even though a conviction for conspiring to escape is "a warning factor," "[h]istory of escape . . . does not seem to be reliably predictive of violence in prison;" that "community violence [outside of prison] is not a reliable predictor of prison violence;" and that given the prevalence of "antisocial personality disorder" and repeat offenses among prisoners, "remorse is not going to tell you anything about who's likely to be violent in prison." Dr. Cunningham concluded that Kadamovas was "quite unlikely to commit acts of serious violence [if] confined for life in federal prison," especially in light of his age, his lack of serious violence during pretrial custody, the low rate of serious violence among capital offenders, and the low rate of serious violence in U.S. penitentiaries.

Based on Dr. Cunningham's testimony, defendants argued to the jury that none of the three lettered subheadings listed in the jury instruction and verdict form could predict future dangerousness. Defendants now contend that the instruction and verdict form prevented the jury from crediting their argument and therefore amounted to a "permissive inference instruction" that violated due process or, at least, was an

100          UNITED STATES V. MIKHEL

abuse of the district court's discretion in formulating instructions.

"A permissive inference instruction allows, but does not require, a jury to infer a specified conclusion if the government proves certain predicate facts." *Warren*, 25 F.3d at 897–98 (addressing the instruction "If it is shown that the defendant used a deadly weapon . . . , then you may find, . . . the existence of the malice"). Such an instruction violates due process if it suggests a conclusion that "is not one that reason and common sense justify in light of the proven facts before the jury." *Id.* at 897; *see also United States v. Rubio-Villareal*, 967 F.2d 294, 296 (9th Cir. 1992) (en banc) ("A permissive inference is constitutional so long as it can be said 'with substantial assurance' that the inferred fact is 'more likely than not to flow from the proved fact on which it is made to depend.'" (quoting *Ulster County v. Allen*, 442 U.S. 140, 166 n.28 (1979))). In addition, a district court abuses its discretion in formulating instructions if "the instructions— taken as a whole and viewed in context of the entire trial—were misleading or confusing, inadequately guided the jury's deliberations, or improperly intruded on the fact finding process." *Warren*, 25 F.3d at 898.

We assume without deciding that the district court erred in listing the government's allegations under the heading of future dangerousness but conclude that any error in this regard was harmless. Although defendants claim the government forfeited harmlessness on this issue, the FDPA requires that a "court of appeals shall not reverse or vacate a sentence of death on account of any error which can be harmless, including any erroneous special finding of an aggravating factor, where the Government establishes beyond a reasonable doubt that the error was harmless." 18 U.S.C.

§ 3595(c)(2). We have held that even where the government does not argue harmlessness, "we are not foreclosed from considering prejudice ourselves. Indeed, under the FDPA we *must* consider whether error in a sentence of death is harmless." *Mitchell*, 502 F.3d at 977 (emphasis in original). In particular, "we may overlook the government's failure to mount a harmless error argument when . . . considerations of length and complexity of the record, certainty of how harmless the error is, and the consequences of reversal ('protracted, costly, and ultimately futile proceedings in the district court') counsel in favor of doing so." *Id.* at 977–78. These reasons strongly support a harmlessness inquiry in this case. Furthermore, it is not even clear that the government forfeited harmlessness in this case. Harmlessness was a consistent theme in the government's voluminous answering brief, and though the government did not make a full harmless-error argument with respect to the specific instruction and verdict form at issue here, it correctly noted that any error in this regard was subject "to a harmless error review." "[T]he rule of waiver is a discretionary one," *Ruiz v. Affinity Logistics Corp.*, 667 F.3d 1318, 1322 (9th Cir. 2012), and even if the FDPA did not require us to review for harmlessness, we would exercise our discretion to do so here.

Error in a jury instruction or verdict form is harmless if it is "clear beyond a reasonable doubt that a rational jury" would have reached the same decision absent the error. *United States v. Anchrum*, 590 F.3d 795, 801 (9th Cir. 2009). The evidence of defendants' future dangerousness was overwhelming and included the brutal manner in which they killed Muscatel, Pekler, Umansky, Kharabadze, and Safiev in four separate incidents over the course of four months; the cold and premeditated nature of their crimes (including stopping for dinner on the way to dispose of Umansky's

body); and their demonstrable indifference to their victims' suffering (e.g., Mikhel saying Safiev and Pekler were as difficult to kill as snakes, and Kadamovas laughing about throwing a "fat Jew" off a bridge).  The evidence showed not only defendants' violent actions but that they had announced their intention to continue taking and killing hostages for financial gain.  Once they had been arrested and jailed, Mikhel and Kadamovas carefully plotted their escape from prison—a plan that involved other prisoners and that acknowledged they might have to kill guards on the way out.[27]  Mikhel later devised a second, solo escape plan despite the Special Administrative Measures used to secure him.  That plan showed similar sophistication and a willingness to involve criminal organizations with resources outside the jail.  Although defendants only faced the possibility of the death penalty while awaiting trial, they proved resourceful, determined, and desperate to escape incarceration without regard to the attendant risk to themselves or others.

In assessing harmlessness, we must take into account that future dangerousness was only one of nine aggravating factors.  Four of those factors were statutory: death during commission of another crime, procurement of offense by payment, substantial planning and premeditation, and multiple killings.  18 U.S.C. § 3592(c).  To those the government added five more non-statutory factors: contemporaneous convictions for multiple offenses, witness elimination, emotional suffering of the victims, victim

---

[27] The erroneous admission of Mikhel's letter penned after Kadamovas withdrew from the escape conspiracy does not alter this conclusion.  *See supra* at 80–83.  Although the letter was probative of Kadamovas's future dangerousness, it was merely a drop in an ocean of more probative evidence of future dangerousness.

UNITED STATES V. MIKHEL                103

impact, and future dangerousness. Under the FDPA, the jury had to find at least one of the statutory factors to recommend the death penalty, and it had to make a specific and unanimous finding as to any statutory factor found to exist. 18 U.S.C. § 3593(d). By unanimous vote, the jury found the existence of *every* aggravating factor the government presented, both statutory and non-statutory. The jury therefore had to weigh these aggravating factors against any mitigating factor found by *one* or more jurors. *Id.* § 3593(d), (e). In fact, *no* juror found any mitigating factor. The jury's unanimous findings make clear that it had no difficulty weighing aggravating and mitigating factors: it found multiple, independent reasons to impose the death penalty, and no reason in mitigation to spare defendants. We can be confident that any alleged error in the instruction on the single non-statutory factor of future dangerousness would not have changed the verdicts; even if the jury had not concluded that defendants presented a risk of future danger, it would still have had eight independent reasons (four statutory and four non-statutory) to impose the death penalty and no reasons not to impose it. *See Mitchell*, 502 F.3d at 977 (claimed error respecting aggravating factor was harmless; "the jury found five other statutory aggravating factors; only one is required . . . [the defendant] remains death eligible even if this one statutory aggravating factor is disregarded").

In addition, we note that the district court mitigated any potential prejudice to defendants by carefully and repeatedly instructing the jury on its role as fact finder and on its ultimate responsibility to weigh all aggravating and mitigating factors in reaching a bottom-line recommendation of death or a lesser sentence. Given the circumstances of this case, we have no question the jury would have returned a finding of future dangerousness and a recommendation of

death even if the instruction and verdict had not listed the government's three future-dangerousness allegations. In sum, even if we thought there was some flaw in the instructions, the callous and heinous nature of the defendants' crimes, their disregard for life, and their utter lack of remorse, would "compel[ ] [us] to conclude . . . that it is not reasonably probable that even one juror would have held out for a life sentence over death." *Allen v. Woodford*, 395 F.3d 979, 984–85 (9th Cir. 2005).

5. *Griffin* error

Defendants claim the government commented on their failure to testify at trial in violation of their Fifth Amendment rights under *Griffin v. California*, 380 U.S. 609, 611–13 (1965). "A prosecutor's comment is impermissible if it is 'manifestly intended to call attention to the defendant's failure to testify or is of such a character that the jury would naturally and necessarily take it to be a comment on the failure to testify.'" *Beardslee v. Woodford*, 358 F.3d 560, 586 (9th Cir. 2004). This rule applies equally to trial and penalty phases. *Id.* at 587. Defendants preserved their objection, and we therefore review the alleged *Griffin* error de novo. *United States v. Inzunza*, 638 F.3d 1006, 1022 (9th Cir. 2011).

Defendants claim the government implicitly commented on their failure to testify in two ways. First, defendants point to the government's statements that they never "expressed remorse," arguing that the jury inevitably understood the government as referring to their failure to express remorse *while testifying*. Taken in context of the government's entire closing argument, these statements clearly referred not to defendants' failure to testify but to their conduct during, and

in the months after, the killings. For example, the government argued: "You heard about the *actions* that these defendants took after each of their killings, *up to and including the escape attempts*. They've never shown remorse." Statements such as this did not violate defendants' Fifth Amendment rights. *See Beardslee*, 358 F.3d at 586.

Second, defendants challenge the government's statements comparing their lack of remorse to Altmanis's decision to confess and cooperate. According to defendants, these statements suggested they lacked remorse by failing to testify. The statements, however, were made in the context of comparing the coconspirators' conduct. For example, the government argued: "[W]hat I would ask you to do, ladies and gentlemen, is to compare; compare Ainar Altmanis; compare his *conduct* with that of Jurijus Kadamovas." The government also noted that "[Altmanis] led the FBI to bodies they never would have found in this case." This was relevant not only to establishing Mikhel and Kadamovas's lack of remorse but to rebutting one of their proffered mitigating factors—i.e., that Altmanis was "equally culpable in the crime" but would not be punished by death. *See* 18 U.S.C. § 3592(a)(4). Because none of the government's statements in this regard would "naturally and necessarily" be understood as commenting on defendants' failure to testify, there was no *Griffin* error. *Beardslee*, 358 F.3d at 586–87.

Relatedly, Mikhel claims the same two categories of statements invited the jury to consider his stricken testimony, thereby violating the district court's order striking that testimony and amounting to prosecutorial misconduct. For the same reasons given above, the government's statements regarding Mikhel's lack of remorse and Altmanis's cooperation clearly referred to the coconspirators' respective

106          UNITED STATES V. MIKHEL

conduct during and following the killings. The statements did not refer to Mikhel's testimony and thus neither violated the district court's order that the testimony be stricken nor constituted prosecutorial misconduct.[28]

    6.   Examination of Dr. Mark Cunningham

Kadamovas presented expert testimony from Dr. Cunningham regarding statistical violence rates in prison. While cross-examining Dr. Cunningham, the government asked the following questions:

> Q. I'd like to ask you some questions about the features that you accounted for in your base rate studies in reaching your assessment about Defendant Kadamovas?
>
> A. Yes, ma'am.

---

[28] Defendants also argue the government's statements violated the FDPA. The FDPA directs that the jury "shall consider any mitigating factor," including whether any "defendant or defendants, equally culpable *in the crime*, will not be punished by death." 18 U.S.C. § 3592(a)(4) (emphasis added). Defendants ask us to interpret the words "in the crime" to preclude the government from offering any evidence or argument regarding a coconspirator's behavior *after the crime* (such as Altmanis cooperating with the FBI's investigation). But § 3592(a) does not purport to limit the scope of admissible evidence; rather, it lists several potentially mitigating factors and ends in a broad catchall for "[o]ther factors in the defendant's background, record, or character or any other circumstance of the offense." It is § 3593(c) that principally governs the evidence admissible in capital penalty proceedings, and that section permits the government "to rebut any information received at the hearing" and to "present argument as to the adequacy of the information to establish the existence of any . . . mitigating factor." The government's statements did not violate the FDPA.

Q. What percentage of the people in your base rate studies were Russian or Lithuanian?

A. I do not know the ethnic origins of the individuals in these studies. . . .

The government then proceeded to ask Dr. Cunningham about whether his studies accounted for inmates who committed more than one murder, committed murder with premeditation, or were in their mid-30s. The clear intent of these questions was to suggest that Dr. Cunningham's studies were not tailored to Mikhel or Kadamovas.

Kadamovas characterizes the government's question about persons of Russian or Lithuanian origin as an appeal to ethnic prejudice that violated his Fifth Amendment right to a fair trial. Although he concedes that Dr. Cunningham did not substantively answer the question, he argues that "the mere question, with its improper implication, constituted misconduct." Neither defendant objected to the question below, so we review for plain error. *See Mitchell*, 502 F.3d at 967.

Kadamovas relies principally on our decisions in *Bains v. Cambra*, 204 F.3d 964, 974 (9th Cir. 2000), and *United States v. Cabrera*, 222 F.3d 590, 594 (9th Cir. 2000). In *Bains*, we held it was error for a prosecutor to generalize that "*all* Sikh persons (and thus Bains by extension) are irresistibly predisposed to violence when a family member has been dishonored." 204 F.3d at 974–75. Likewise, in *Cabrera*, we held it was plain error to admit an investigating officer's repeated testimony about Cubans being drug dealers and flight risks. 222 F.3d at 594–96. To the extent the government's questioning in this case could be interpreted as

appealing to ethnic or national-origin stereotyping, it was at most a subtle reference and was not emphasized like the anti-Sikh references in *Bains* or the anti-Cuban references in *Cabrera*.[29]   There was no plain error in permitting the government's single question.[30]

7.   Mikhel's excluded mitigation evidence

Mikhel sought to introduce a number of videotaped interviews of his friends and family.   These were not depositions: the witnesses were not under oath, and the government was not represented.  The district court admitted several of the interviews, but excluded all of an interview with Mikhel's ex-girlfriend, Marina Karagodina, and a small part of an interview with Mikhel's cousin, Edward Mikhel. Mikhel claims the exclusion of this evidence violated his rights under the Eighth Amendment and FDPA.  We review

---

[29] Kadamovas also cites the Supreme Court's decision in *Buck*. 137 S. Ct. at 769.   In that case, defense counsel called an expert psychologist who testified the defendant was statistically more likely to be violent because he was black.  *Id.*   The Court held this testimony supported an ineffective assistance of counsel claim and noted it "would be patently unconstitutional for a state to argue that a defendant is liable to be a future danger because of his race." *Id.* at 775.  Here, by contrast, Dr. Cunningham did not even give a substantive answer to the government's question.  Regardless, the government's question did not imply defendants were liable to pose a future danger based on their race or ethnicity.

[30] To the extent defendants argue the jury found future dangerousness because of their national origin, the district court instructed the jury not to consider national origin, and the jury certified it did not do so.  We accept the jurors' assurance that no impermissible considerations factored into the verdict absent substantial indication to the contrary.  *Mitchell*, 502 F.3d at 990.

the exclusion of mitigating evidence for abuse of discretion. *See* 18 U.S.C. § 3593(c); *Mitchell*, 502 F.3d at 991.

The Eighth Amendment and FDPA protect the right to present relevant mitigating evidence in capital sentencing proceedings.  18 U.S.C. § 3593(c); *Eddings v. Oklahoma*, 455 U.S. 104, 113–15 (1982). "Relevant mitigating evidence is evidence which tends logically to prove or disprove some fact or circumstance which a fact-finder could reasonably deem to have mitigating value." *Tennard*, 542 U.S. at 284. Under the FDPA, "[i]nformation is admissible regardless of admissibility under the [Federal] Rules [of Evidence], except that in the trial judge's discretion, information 'may be excluded if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury.'" *Mitchell*, 502 F.3d at 991 (quoting 18 U.S.C. § 3593(c)).

Among other things, Karagodina stated in her interview that she had a good relationship with Mikhel, that Mikhel had been good to her son from a previous marriage, and that Mikhel deserved mercy.  The district court excluded the interview entirely, reasoning that Karagodina was being led by the investigator's questions, lacked first-hand knowledge on some issues, gave irrelevant testimony about Mikhel's arrest and her feelings toward the police, and could have traveled from England to the United States to testify in person.  To this list of reasons to exclude the interview, the government adds that much of what Karagodina said in 2002 was no longer true by the time the penalty phase began in 2007.  The government cites a 2005 interview in which Karagodina called Mikhel a "scary man" and said that he had threatened her, that she had switched phone numbers because

of him, and that she had changed her daughter's last name from "Mikhel" to "Karagodina."

Parts of the Karagodina interview spoke to Mikhel's character and background and thus were at least marginally relevant. *See* 18 U.S.C. § 3592(a)(8). Nevertheless, the district court was within its discretion in excluding the interview for its danger of creating unfair prejudice, confusing the issues, or misleading the jury. *See Mitchell*, 502 F.3d at 991. As the district court explained, many of Karagodina's statements "were, at best, gratuitous remarks or coached answers by defense investigators." Moreover, had the interview been admitted, the government would have had no opportunity to cross-examine Karagodina on her alleged involvement in Mikhel's crimes and bring to light her changed attitude toward Mikhel. Although it might not have been an abuse of discretion to admit the interview, we hold the district court did not abuse its discretion in excluding it. *Cf. United States v. Taylor*, 814 F.3d 340, 363 (6th Cir. 2016) (mitigation evidence may have been admissible, but it was not an abuse of discretion to exclude it).

The district court admitted most of Edward's interview but excluded a small portion at the end in which he stated: "The only thing I ask for to be merciful, the court to be merciful. Maximum merciful as it is possible to my cousin, to my relative. What else can I say? To be merciful, to be merciful." It seems Edward did not know Mikhel well, and defense counsel conceded Edward had not seen Mikhel for years. The district court reasoned that Edward's plea for mercy was irrelevant because it was "not a mitigating factor" but "just a personal plea on behalf of the witness who has no knowledge of what transpired here."

Mikhel argues on appeal that a bare plea for mercy is relevant mitigating evidence under our decision in *Mitchell*. But that case does not help him. In *Mitchell*, we held the district court "drew a fine, but appropriate, line" by admitting testimony regarding witnesses' "affection for [the defendant] and their wish for his life to be spared," while excluding testimony offering "an opinion about what they thought the jury's verdict should be." 502 F.3d at 991. Here, Edward's plea for mercy—particularly in light of his apparently limited relationship with Mikhel—was essentially an opinion about what the jury's verdict should be. The plea did not bear on Mikhel's character, prior record, or the circumstances of his offense. The district court did not abuse its discretion in excluding it.[31] *See id.*; *see also Lockett v. Ohio*, 438 U.S. 586, 604 n.12 (1978) (reaffirming "the traditional authority of a court to exclude, as irrelevant, evidence not bearing on the defendant's character, prior record, or the circumstances of his offense").

8. Kadamovas's future dangerousness

Kadamovas claims the evidence was insufficient for the jury to find that he presented a risk of future dangerousness if confined to prison. As described above, Kadamovas offered Dr. Cunningham as an expert witness on future dangerousness. Dr. Cunningham presented statistical studies of violence rates in prisons and opined that Kadamovas was "quite unlikely to commit acts of serious violence [if]

---

[31] Moreover, any error in this regard was harmless for the reasons explained above, particularly in light of the minimal to nonexistent probative value of Mikhel's proffered mitigation evidence. *See McKinney v. Ryan*, 813 F.3d 798, 821 (9th Cir. 2015) (en banc) (reviewing the exclusion of mitigating evidence for harmlessness).

confined for life in federal prison," given his age, his lack of serious violence during pretrial custody, the low rate of serious violence among capital offenders, and the low rate of serious violence in U.S. penitentiaries. Kadamovas now argues that, in light of Dr. Cunningham's purportedly "unrebutted" testimony, there was no basis for the jury to find against him with respect to the non-statutory aggravating factor of future dangerousness. We review for whether any rational trier of fact could have found this factor beyond a reasonable doubt. *See United States v. Nevils*, 598 F.3d 1158, 1163–64 (9th Cir. 2010) (en banc).

Kadamovas simply overlooks the fact that the government's penalty-phase case incorporated all of its guilt-phase evidence, which included the gruesome means by which Kadamovas participated in killing five people; his callous remarks about the victims; his statement that he would continue taking hostages even if it meant piling bodies up to the surface of the reservoir; and his conviction for conspiring to escape custody. There was no shortage of evidence suggesting that Kadamovas presented a risk of future dangerousness if confined to prison. Although the government did not present its own expert to contradict Dr. Cunningham, it was not required to do so. The jury did not have to find Dr. Cunningham's statistical studies or opinion testimony persuasive. Dr. Cunningham presented statistics related to the probability that persons with certain characteristics would be dangerous in the future. He did not, and could not, testify that Kadamovas would not be dangerous in the future. The jury could certainly have found that Kadamovas's own conduct was more probative of his future dangerousness than Dr. Cunningham's statistics about future dangerousness generally. Thus, the jury could have reasonably relied on the government's guilt-phase evidence

to conclude that Kadamovas presented a risk of future dangerousness beyond a reasonable doubt.

### 9.   Nazi and anti-Semitism evidence

Kadamovas claims the government improperly introduced "Nazism and anti-Semitism evidence" and prejudicially portrayed him "as an anti-Semitic Nazi sympathizer."[32] Specifically, he argues the admission of (1) an antique dagger with swastikas on the handle and (2) testimony that he described a victim as a "fat Jew," along with the government's references to that testimony during argument, violated his constitutional and statutory rights.   As Kadamovas only objected to the dagger below, we review the first challenge for abuse of discretion, and the second challenge for plain error. *See Mitchell*, 502 F.3d at 967.

Coconspirator Krylov purchased the dagger at Mikhail Gurevich's pawn shop, which defendants used to launder ransom money.   Later, the FBI found the dagger at Kadamovas's home.   Over Kadamovas's objection, the court ruled the dagger relevant and admissible to connect him to the money-laundering conspiracy.  Kadamovas requested that the government "not focus or highlight the swastika on the dagger," and the court agreed the prosecution should not do so.   As a result, the prosecution never used the words "Nazi" or "swastika" before the jury.

The dagger was admitted through the testimony of an FBI agent who referred only to its "distinct markings."   Weeks

---

[32] Kadamovas argues that these harms were exacerbated by the improper victim-impact evidence touching on Muscatel's Jewish faith. As explained above, the victim-impact evidence was properly admitted.

later, Gurevich testified and mentioned the swastikas on the handle in identifying the dagger as the one Krylov had purchased.  The court denied Kadamovas's motion for a mistrial based on this testimony, noting there was no risk of prejudice as the dagger had been introduced into evidence and the jurors would see it when given the exhibits. Kadamovas did not ask for a limiting instruction or object to the dagger's consideration during the penalty phase, during which it was never mentioned.

The dagger was relevant to prove the existence of a conspiracy to commit money laundering and admissible under both the Federal Rules of Evidence and the FDPA.  The district court did not abuse its discretion in balancing the evidence's probative value against its potential for unfair prejudice, and minimized any potential prejudice by instructing the government not to refer directly to the swastikas—which the government did not do at any time. The only mention of the swastikas to the jury came from Gurevich, who did so in the context of explaining why he was able to identify the knife from Kadamovas's house as the one he had sold years before to Krylov (a fact to which Kadamovas did not stipulate).

Kadamovas also argues that admitting the dagger implicated his First Amendment rights.  His argument is perplexing because he does not claim to hold any protected belief or association regarding Nazism, but rather denies he is a Nazi sympathizer.  Regardless, his argument is without merit.  In *Dawson v. Delaware*, the Supreme Court held that admitting evidence relating to the defendant's membership in the Aryan Brotherhood that was "totally without relevance" violated the defendant's First Amendment right to association.  503 U.S. 159, 165 (1992)*. Dawson* concluded

that "the Constitution does not erect a *per se* barrier to the admission of evidence concerning one's beliefs and associations at sentencing simply because those beliefs and associations are protected by the First Amendment," but that such evidence must be relevant. *Id.* Here, the dagger was relevant to Kadamovas's participation in the conspiracy, and Gurevich's testimony was relevant to the dagger's identification. There was no abuse of discretion in admitting this evidence.

We turn next to Kadamovas's challenge to Markovskis's testimony that he referred to a victim as a "fat Jew." In the guilt phase, Markovskis testified that Kadamovas laughingly described throwing a "fat Jew" (i.e., Muscatel) off a bridge. Markovskis said Kadamovas "didn't mention the name of the person, he described him only as a fat Jew, fat, heavy person." The government briefly referred to this testimony in its guilt and penalty-phase opening statements and closing arguments. It was not plain error to admit Markovskis's testimony, which was relevant to identifying Muscatel as Kadamovas's unnamed victim. Similarly, the government's reasonable repetition of Kadamovas's words was permissible to argue both Kadamovas's connection to Muscatel's death and his lack of remorse.

Contrary to defendants' assertions, the government did not use Markovskis's testimony to inflame the passions of the jury or as improper propensity evidence. While a prosecutor's "appeal[ ] to racial, ethnic, or religious prejudice" against a defendant violates the Fifth Amendment right to a fair trial, *Cabrera*, 222 F.3d at 594, no such appeal was made here in eliciting testimony from a coconspirator that connected Kadamovas to one of the charged acts and bore on an aggravating factor. We have also recognized that

"race or ethnicity is relevant and *not prejudicial*" when used for identification purposes. *Id.* at 597 (emphasis added). It was therefore not plain error to allow Markovskis's testimony or the government's references to it.

10. Kadamovas's mitigating factors

Kadamovas proffered nine mitigating factors, including the statutory mitigating factor that he had no prior criminal record (which he claims the government conceded below). He argues that the jury's failure to find even this one mitigating factor demonstrates that it disregarded its statutory obligation to "consider" mitigating factors and therefore rendered an "arbitrary" verdict.

"Neither the FDPA nor [the Constitution] require a capital jury to give mitigating effect or weight to any particular evidence." *United States v. Basham*, 561 F.3d 302, 337 (4th Cir. 2009); *accord United States v. Lawrence*, 735 F.3d 385, 426 (6th Cir. 2013); *United States v. Paul*, 217 F.3d 989, 999–1000 (8th Cir. 2000). "There is no constitutional requirement that the jury find a mitigating factor even when it is supported by uncontradicted evidence." *United States v. Higgs*, 353 F.3d 281, 327 (4th Cir. 2003). Nor does the FDPA's "shall consider" language impose any such requirement. *See* 18 U.S.C. § 3592(a); *see also Higgs*, 353 F.3d at 327 (noting that § 3592(a) requires the jury to consider mitigating factors but nevertheless holding the jury need not find any mitigating factor). Rather, our concern in this regard is whether "there exists a reasonable likelihood that the jurors believed themselves precluded from considering relevant mitigating evidence." *Paul*, 217 F.3d at 1000. Here, the jury was allowed to consider all of Kadamovas's relevant mitigating evidence. It was not

required to find any mitigating factor based on that evidence.[33]

Moreover, the jury's failure to find that Kadamovas had no prior criminal record was reasonable. Kadamovas's *only* evidence in this regard was a letter from the Lithuania Department of Informatics and Communications stating that it had no "records of criminal activities or law suits in the name of Mr. Jurijus Kadamovas." Kadamovas offered no testimony about the letter's reliability, who wrote it, or what it meant. The letter does not prove that Kadamovas had no prior criminal record. It only showed that one agency in his home country had no such record; it said nothing about the reliability of the evidence or its implications for records in other jurisdictions. Furthermore, the government did not concede the point: at most, the prosecutor said it was "[m]aybe" true Kadamovas had no record, "but he sure made up for lost time." Defendants bore the burden of proving mitigating factors by a preponderance of the evidence, *see* 18 U.S.C. § 3593(c), and a reasonable trier of fact could have found that Kadamovas failed to prove he had no prior criminal record, *cf. Lawrence*, 735 F.3d at 421 ("Speculation is insufficient to show arbitrary influence; there must be some basis for concluding that emotion rather than reason swayed the jury.").

---

[33] Even if the jury had found that Kadamovas lacked a prior criminal record (or that there was at least no evidence he had a prior criminal record), the jury still would have been required to weigh that mitigating factor against all the aggravating factors it found to exist. *See* 18 U.S.C. § 3593(e). Nothing in the FDPA, the jury instructions, or the verdict form required the jury to treat the lack of a prior criminal record as sufficiently mitigating to render the imposition of the death penalty unjustifiable.

118        UNITED STATES V. MIKHEL

    11. Lithuania's abolition of the death penalty

    Kadamovas proposed the following mitigating factor: "Jurijus Kadamovas is a citizen of Lithuania, a country which has abolished the death penalty." The government argued that Lithuania's abolition of the death penalty was unrelated to the offense, the circumstances of the offense, or Kadamovas, and therefore was not a relevant factor. The district court agreed and rejected the proposed factor. Kadamovas claims the exclusion of this factor and related evidence violated his statutory and constitutional rights. We review the exclusion of mitigating evidence for abuse of discretion. *See* 18 U.S.C. § 3593(c); *Mitchell*, 502 F.3d at 991.

    As previously noted, the Eighth Amendment and FDPA protect the right to present relevant mitigating evidence in capital sentencing proceedings. *Eddings*, 455 U.S. at 113–15; 18 U.S.C. § 3593(c). A capital jury cannot be precluded from considering as mitigating evidence "any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett*, 438 U.S. at 604 & n.12. But evidence that does not bear on the defendant's character, prior record, or the circumstances of the offense may be excluded as irrelevant. *Id.*; *Tennard*, 542 U.S. at 284–86; *Hamilton v. Ayers*, 583 F.3d 1100, 1132 (9th Cir. 2009) ("[V]irtually no limits are placed on the relevant mitigating evidence a capital defendant may introduce *concerning his own circumstances*." (emphasis added) (quoting *Payne*, 501 U.S. at 822)).

    Kadamovas contends Lithuania's abolition of the death penalty is relevant because it relates to (1) his background as

a Lithuanian citizen and (2) the circumstances of his offense, as his status as a foreign national was an element under 18 U.S.C. § 1203.  But the excluded mitigating factor was not evidence of Kadamovas's citizenship; it was rather evidence of Lithuania's abolition of the death penalty.  Kadamovas's citizenship may well have been relevant to his background, and indeed, one of the mitigating factors the jury considered was that he "was raised under a communist system of government that devalued the life of the individual."  In contrast, Lithuania's abolition of the death penalty has no bearing on Kadamovas's character, his prior record, or the circumstances of his offense.  Kadamovas's proposed factor was irrelevant.

In analogous cases, the Fourth and Sixth Circuits have held that a federal capital defendant's ineligibility for the death penalty under state law is not relevant mitigating evidence.  *Higgs*, 353 F.3d at 328; *United States v. Gabrion*, 719 F.3d 511, 520–23 (6th Cir. 2013) (en banc).  As the Sixth Circuit explained:

> That Michigan lacks a death penalty . . . has nothing to do with Gabrion's background or character.  It has nothing to do with the reasons why he chose to kill Rachel Timmerman.  It has nothing to do with the utter depravity of the manner in which he killed her.  And above all it has nothing to do with his culpability for that offense or with any other consideration the Supreme Court has ever flagged as mitigating.

*Gabrion*, 719 F.3d at 522.  The location of the offense on federal land may have been relevant to the circumstances of

120          UNITED STATES V. MIKHEL

the offense in those cases, but that did not make it relevant mitigating evidence that the defendant would not have been eligible for the death penalty under different law.  To hold otherwise would simply be an invitation to jury nullification. *See United States v. Gabrion*, 648 F.3d 307, 362–63 (6th Cir. 2011) (Batchelder, C.J., concurring in part and dissenting in part) ("Gabrion's counsel would urge the jurors to disregard federal law in favor of Michigan law and decline to impose the death penalty because it would be unavailable under Michigan law."), *reh'g en banc granted*, *opinion vacated* (Nov. 17, 2011), *on reh'g en banc*, 719 F.3d 511 (6th Cir. 2013).

Kadamovas cites our decision in *Mitchell*, in which a letter from the Navajo Nation opposing capital punishment both as a general matter and specifically as to the defendant was admitted as mitigating evidence.  502 F.3d at 989.  Even though the Navajo Nation's opposition to the death penalty was not proffered as a mitigating factor, seven of the jurors wrote on the verdict form that they found it to be an additional mitigating factor.  *Id.* at 974, 989.  Given that *Mitchell* involved an intra-Indian crime committed in Navajo territory, *id.* at 946–49, the fact that the Navajo Nation opposed the death penalty for Mitchell personally may have been relevant.  That does not suggest, however, that the general laws of Lithuania were relevant in this case.[34] Lithuanian law had nothing to do with Kadamovas's

---

[34] Kadamovas asserts on appeal that Lithuania does oppose the death penalty for him personally, citing a 2012 letter expressing the Lithuanian Embassy's position against the death penalty.  We need not decide whether that letter would have been relevant had it been written before trial and proffered below.  The evidence Kadamovas proffered to the district court was not Lithuania's opposition to the death penalty for him personally but its abolition of the death penalty generally.

UNITED STATES V. MIKHEL                    121

background, character, or offense.    It was not relevant mitigating evidence, and the district court did not abuse its discretion in excluding Kadamovas's proffered mitigating factor. *See Lockett*, 438 U.S. at 604 & n.12.

## III.  CONCLUSION

For the foregoing reasons, we **AFFIRM** the judgment of the district court.