NICOLA T. HANNA
United States Attorney
BRANDON D. FOX
Assistant United States Attorney
Chief, Criminal Division
JOANNA M. CURTIS (Cal. Bar No. 203151)
KAREN I. MEYER (Cal. Bar No. 220554)
Assistant United States Attorneys
Violent and Organized Crime Section
     1300 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-0298/8559
     Facsimile: (213) 894-3713
     E-mail:    joanna.curtis@usdoj.gov
            kim.meyer@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 02-220-PSG |
|---|---|
| Plaintiff, | GOVERNMENT'S OPPOSITION TO DEFENDANTS' MOTION FOR LIMITED DISCLOSURE OF JUROR NAMES |
| v. | |
| IOURI MIKHEL, et al., | Hearing Date: July 29, 2020 |
| Defendants. | Hearing Time: 10:00 a.m. |
| | Location:    Courtroom of the Hon. Philip S. Gutierrez (VTC) |

Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California, hereby files its Opposition to Defendants' Motion for Limited Disclosure of Juror Names.

This opposition is based upon the attached memorandum of points and authorities, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: July 6, 2020                    Respectfully submitted,

                                       NICOLA T. HANNA
                                       United States Attorney

                                       BRANDON D. FOX
                                       Assistant United States Attorney
                                       Chief, Criminal Division


                                       /s/Joanna M. Curtis
                                       JOANNA M. CURTIS
                                       KAREN I. MEYER
                                       Assistant United States Attorneys

                                       Attorneys for Plaintiff
                                       UNITED STATES OF AMERICA

**TABLE OF CONTENTS**

Page(s)

MEMORANDUM OF POINTS AND AUTHORITIES..................................1

I.    INTRODUCTION....................................................1

II.   RELEVANT FACTS.................................................2

III.  ARGUMENT.......................................................5

    A.    Defendants Do Not Have a Right to Conduct Juror
        Interviews................................................5

    B.    The Investigation Defendants Seek to Conduct is a
        Fishing Expedition that Does Not Warrant Disclosure of
        the Jurors' Identity.....................................10

        1.    Shackling..........................................10

        2.    Racial Bias........................................14

        3.    "Other Misconduct".................................15

    C.    Defendants Have Not Established a Basis for Stripping
        the Jurors of their Anonymity............................17

IV.   CONCLUSION....................................................18

**TABLE OF AUTHORITIES**

Page(s)

Federal Cases

Bracy v. Gramley,
  520 U.S. 899 (1997) ............................................. 9

Calderon v. U. S. Dist. Ct. for the Northern Dist. Of Cal.
  (Nicolaus),
  98 F.3d 1102 (9th Cir. 1996) ................................ 9, 17

Cox v. Ayers,
  613 F.3d 883 (9th Cir. 2010) ............................ 11, 12, 13

Deck v Missouri,
  544 U.S. 622 (2005) ....................................... 10, 12

Ghent v. Woodford,
  279 F.3d 1121 (9th Cir. 2002) ................................ 12

McDonald,
  238 U.S. .................................................. 5, 7

Mitchell v. United States,
  958 F.3d 775 (9th Cir. 2020) ................. 6, 9, 14, 15, 16, 17

Murray v. Carrier,
  477 U.S. 478 (1986) .......................................... 10

Pena-Rodriguez v. Colorado,
  137 S. Ct. 855 (2016) ............................... 7, 8, 9, 18

Penry v. Johnson,
  532 U.S. 782 (2001) .......................................... 14

Smith v. Cupp,
  457 F.2d 1098 (9th Cir. 1972) ................................. 6

Tanner v. United States,
  483 U.S. 107 (1987) ..................................... 5, 6, 17

Traver v. Meshriy,
   627 F.2d 934 (9th Cir. 1980)........................................ 6

United States v. Gutman,
   725 F.2d 417 (7th Cir. 1984)........................................ 5

United States v. Kepreos,
   759 F.2d 961 (1st Cir. 1985)........................................ 7

United States v. Mikhel,
   889 F.3d 1003 (9th Cir. 2018)............. 1, 2, 3, 4, 5, 11, 13, 17

United States v. Moten,
   582 F.2d 654 (2d Cir. 1978)........................................ 7

United States v. Riley,
   544 F.2d 237 (5th Cir. 1976)........................................ 7

United States v. Shyrock,
   342 F.3d 948 (9th Cir. 2003)........................................ 6

Walker v. Martel,
   709 F.3d 925....................................................... 13

Warger v. Shauers,
   574 U.S. 40 (2014)................................................. 5

Federal Rules

Fed. R. Evid. 606(b).................................................. 9

## MEMORANDUM OF POINTS AND AUTHORITIES

**I.    INTRODUCTION**

Defendants Iouri Mikhel and Jurijus Kadamovas ("defendants") kidnapped and murdered five people and in 2007 were sentenced to death based on "overwhelming evidence" of their guilt and future dangerousness, as well as a litany of other aggravating factors. United States v. Mikhel, 889 F.3d 1003, 1016, 1027, 1040, 1058 (9th Cir. 2018).  The trial court empaneled an anonymous jury, to which defendants did not object.  Id. at 1031.  Now, defendants seek an order from this Court revealing the names and identifying information of the trial jurors so that they can interview the jurors in an effort to identify a claim of juror misconduct.

The Supreme Court and the Ninth Circuit have long discouraged this type of post-verdict questioning of jurors, even in cases where jurors were not assured -- as they were here, without objection by defendants -- of anonymity.  Defendants' motion should be denied because it is a speculative fishing expedition, devoid of any facts.

Defendants cite no facts suggesting that any jurors observed that defendants were shackled; much less, that such an observation had any impact whatsoever on the verdicts.  Instead, the record shows that the jury was well aware of defendants' custody status from the trial evidence of their escape attempts and from Mikhel's election to wear his jail jumpsuit during trial.  The jurors were aware of defendants' violence and dangerousness from the graphic details of the five murders defendants' committed.

Defendants likewise cite no facts to suggest that any juror was acting out of racial or ethnic bias, or engaged in any other misconduct.  Each juror certified, in the special verdict forms, that

their individual verdicts were not based on the race, color, religious beliefs, national origin, or sex of the defendants and defendants have cited no grounds impeaching those certifications. Given the absence of any facts, defendants are not entitled at this late date to juror identity information they agreed to forego at the time of trial and appeal.  This Court should deny defendants' motion and continue protecting the jurors' identities.

**II.   RELEVANT FACTS**

Over the course of five months, the jury heard evidence that defendants abducted, held hostage, and murdered five human beings – four men and a pregnant woman -- and then dumped their bodies off a bridge into a reservoir outside Yosemite.  Mikhel, 889 F.3d at 1016. The details of the murders that were proved at trial included that defendants held the victims hostage for multiple days, bound the victims' hands and legs, pistol-whipped at least one victim, injected the victims with sedatives, duct-taped their eyes or mouth, placed plastic bags over their heads or ropes around their necks, and manually strangled and suffocated their victims to death.  Id. at 1016-19.  Defendants did not commit these crimes alone; they enlisted numerous other participants in the kidnapping, extortion, murders, and disposal of the bodies.  Id.

Evidence at trial also established that defendants tried to escape from pretrial custody.  "Mikhel successfully smuggled a veritable hardware store into his cell, including hacksaw blades, wrenches, screwdrivers, fishing line, paint, work gloves, bolt cutters, and a camcorder.  Kadamovas was originally housed elsewhere in the facility but managed to change cells to be next to the stairwell intended for the escape." Id. at 1019-20.  Even after

Mikhel was moved to a high security section at a different facility, placed under Special Administrative Measures, and isolated from other inmates, he managed to concoct a detailed and "very feasible" escape plan, which he outlined in a letter promising $1 million to an alleged member of the Mexican Mafia in exchange for assistance. Id. at 1020.

In the guilt phase of the trial, Mikhel chose to wear his jail uniform instead of civilian clothes while at counsel table.  Id. at 1040.  He refused to be present for any of the penalty phase proceedings.  Id. at 1041.  Mikhel chose to testify in his own defense, although he refused to be cross-examined.  Id. at 1040. During his testimony, Mikhel described himself as a "wealthy white collar criminal operating at the margins of the law" who lived a "lavish lifestyle."  Id. at 1040, 1043.  Kadamovas did not testify.

In the penalty phase, the court instructed the jury:

> In your consideration of whether the death penalty is justified, you must not consider the race, color, religious beliefs, national origin, except as it may bear on mitigation, or sex of either the defendants or the victims. You are not to return a sentence of death unless you would return a sentence of death for the crimes in question without regard to race, color, religious beliefs, national origins, or sex of either the defendants or the victims.
>
> To emphasize the importance of this consideration, the Special Verdict Form contains a certification statement. Each Juror should carefully read the statement and sign it in the appropriate place if the statement accurately reflects the manner in which you reached your decision. And when you sign it, you put your Jury Number, not your name.

(2/13/07 RT 50.) Later in the instructions, the court recited the certification in the special verdict form twice, once as to each defendant. (2/13/07 RT 64-65, 75.)

The jury unanimously found all nine of the government's aggravating factors against both defendants, statutory and non-

3

statutory, and no juror found any mitigating factor as to either defendant.  Mikhel, 889 F.3d at 1059.  For each defendant, the non-statutory factors that the jury unanimously found included "future dangerousness of defendant if confined to a federal prison for the rest of his life without the possibility of release." Id. at 1056 (initial caps eliminated.  In making this finding, the jurors found that each defendant was likely to commit criminal acts of violence in the future that would constitute a continuing and serious threat to the lives and safety of others.  Id. The jury unanimously recommended that both defendants be sentenced to death. Id. at 1051, 1059.

Each juror signed the special verdict forms certifying that:

> By signing below, each juror certifies that consideration of the race, color, religious beliefs, national origin (except as it may bear on mitigation), or sex of the defendants or any victims was not involved in reaching his or her individual decision, and that the individual juror would have made the same recommendation regarding a sentence for the crimes in question regardless of the race, color, religious beliefs, national origin, or sex of the defendants or the victims.

(2/13/07 RT 92-93, 104-05; Dkt. 1541, 1542).

When the trial was completed the following week with entry of forfeiture verdicts, the court advised the jurors that whether they "should speak with any of the attorneys about the case or their verdict" was "a personal decision left entirely up to them." (2/21/07 RT 42-43.) "However," the court cautioned, "I do remind you that this jury was anonymous and you could compromise or sacrifice your anonymity by speaking with counsel.  This is also true with regard to speaking with members of the press." (Id.)  Defendants did not object to these statements or ask the court to advise jurors that it might later disclose their names.  (Id.)

4

Defendants raised numerous issue on appeal, but did not raise any claim regarding shackling, juror bias, or juror misconduct of any type.  They raised issues relating to the use of an anonymous jury -- issues the Ninth Circuit rejected -- but they "did not object to empaneling an anonymous jury" and did "not challenge the district court's determination that an anonymous jury was necessary to ensure juror protection."  Mikhel, 889 F.3d at 1031.  The Ninth Circuit affirmed the verdicts on all counts, repeatedly stating that the evidence of defendants' guilt was "overwhelming," id. at 1019 n.1, 1027, 1040, 1045, 1046, and also finding that the evidence of their future dangerousness was overwhelming, id. at 1058.

**III.  ARGUMENT**

    **A.    Defendants Do Not Have a Right to Conduct Juror Interviews**

For over one hundred years, the Supreme Court has cautioned losing parties from challenging adverse jury verdicts through "the most pernicious arts and tampering with jurors."  Warger v. Shauers, 574 U.S. 40, 47 (2014) (quoting McDonald v. Pless, 238 U.S. 264, 267– 68 (1915).  "[L]ong-recognized and very substantial concerns support the protection of jury deliberations from intrusive inquiry."  Tanner v. United States, 483 U.S. 107, 127 (1987).  Those concerns include preventing jurors from being "harassed and beset by the defeated party in an effort to secure from them evidence of facts which might establish misconduct sufficient to set aside a verdict." Id. at 119- 20 (quoting McDonald, 238 U.S. at 267-68; see also United States v. Shryock, 342 F.3d 948, 973 (9th Cir. 2003) (district court did not abuse its discretion in not revealing identity of anonymous juror during post-trial in response to allegations of

5

misconduct); United States v. Gutman, 725 F.2d 417, 422 (7th Cir. 1984) (the practice of obtaining affidavits from jurors is "inherently intimidating").

Thus, defendants do not have a constitutional right to interview jurors post-verdict in the hope of uncovering juror misconduct. Mitchell v. United States, 958 F.3d 775, 787-91 (9th Cir. 2020); Smith v. Cupp, 457 F.2d 1098, 1100 (9th Cir. 1972); see also Tanner, 483 U.S. at 113-128.  The Ninth Circuit specifically disfavors the post-verdict questioning of jurors, even where jurors were not assured of anonymity, as they were here.  As the Circuit stated just months ago in April of this year in Mitchell: "We have long imposed restrictions on lawyers seeking access to jurors."  958 F.3d at 787. "Indeed, it is incumbent upon the courts to protect jurors from the annoyance and harassment of such conduct . . . and it is improper and unethical for lawyers to interview jurors to discover what was the course of deliberation of a trial jury." Id. (internal quotation marks and citations omitted).  "Therefore, in cases where there has been no showing of juror misconduct, we have held that a district court "d[oes] not abuse [its] discretion in refusing to allow post-verdict interrogation of jurors."  Id. (citations omitted).  See also Traver v. Meshriy, 627 F.2d 934, 941 (9th Cir. 1980) (because evidence concerning of jury deliberations is inadmissible, "the practice of counsel in propounding questions on these subjects to jurors after trial should be discouraged"); Smith v. Cupp, 457 F.3d at 1100 ("there is no federal constitutional problem involved in the

denial of a motion to interrogate jurors where . . . there has been no specific claim of jury misconduct.").[1]

Even where a defendant obtains testimony from jurors (as when jurors volunteer information), the ability to use such evidence is severely limited by the "no impeachment rule," which prohibits the use of juror testimony about deliberations to attack a verdict. Fed. R. Evid. 606(b) broadly prohibits juror testimony about juror deliberations, with limited exceptions for extraneous prejudicial information, outside influences, and transcription errors; see also Tanner at 125-27 (rejecting an exception for evidence that some jurors were under the influence of alcohol or drugs during the trial and reasoning that the long-recognized and very substantial concerns supporting protections of jury deliberations from intrusive inquiry prevented same); McDonald, 238 U.S. at 268 (affirming exclusion of juror testimony to show that jurors reached an improper compromise verdict).

In Peña-Rodriguez v. Colorado, 137 S. Ct. 855 (2016), the Supreme Court carved out a narrow exception to Rule 606(b) where a juror expressly relied on racial stereotypes or animus to convict the

---

[1] Other federal circuits similarly limit post-trial juror contact absent a showing of good cause. See United States v. Kepreos, 759 F.2d 961, 967 (1st Cir. 1985)("[T]his Circuit prohibits the post-verdict interview of jurors by counsel, litigants or their agents except under the supervision of the district court, and then only in such extraordinary situations as are deemed appropriate"); United States v. Moten, 582 F.2d 654, 667 (2d Cir. 1978) (a post-trial jury hearing will not be held to afford a convicted defendant to conduct a "fishing expedition."); United States v. Riley, 544 F.2d 237, 242 (5th Cir. 1976) ("Historically, interrogations of jurors have not been favored by federal courts except where there is some showing of illegal or prejudicial intrusion into the jury process. . . . Courts simply will not denigrate jury trials by afterwards ransacking the jurors in search of some ground, not previously supported by evidence, for a new trial.").

defendant.  In Peña-Rodriguez, two jurors came forward immediately after the verdict to report that a fellow juror had stated that he believed the Mexican defendant was guilty of assaulting two teenage girls in a bathroom because, in his experience as a former police officer, Mexican men thought they "can do whatever they want to women" and were guilty of such crimes "nine times out of ten."  Id. at 861-62.  The same juror also said that defendant's alibi witness was not credible because he was "an illegal."  Id.  Defense counsel immediately sought and obtained permission from the court to obtain affidavits from the two reporting jurors.  Id. at 862.

Acknowledging that racial bias was a familiar and recurring evil that risks systemic injury to the justice system, the Supreme Court held that where a juror makes a clear statement of reliance on racial stereotypes or animus in reaching his verdict, the Sixth Amendment overrides the no impeachment rule so that the trial court may consider the juror's statement.  Id. at 869.

The Court established a threshold for a bias inquiry to proceed:

> For the inquiry to proceed, there must be showing that one or more jurors made statements exhibiting overt racial bias that cast serious doubt on the fairness and impartiality of the jury's deliberations and resulting verdict. that cast serious doubt on the fairness and impartiality of the jury's deliberations and resulting verdict. To qualify, the statement must tend to show that racial animus was a significant motivating factor in the juror's vote to convict. Whether that threshold showing has been satisfied is a matter committed to the substantial discretion of the trial court in light of all the circumstances, including the content and timing of the alleged statements and the reliability of the proffered evidence.

Id. at 869.

The Court also recognized that "[t]he practical mechanics of acquiring and presenting such evidence will no doubt be shaped and guided by state rules of professional ethics and local court rules, both of which often limit counsel's post-trial contact with jurors." Id.  It approved such rules, stating that "[t]hese limits seek to provide jurors some protection when they return to their daily affairs after the verdict has been entered."  Id.  Far from endorsing the idea (implicit in defendant's motion) that such rules would give way to counsel seeking to uncover bias without a threshold showing casting doubt on the verdict, the Court anticipated that the principal application of its exception to the no-impeachment rule would cases where jurors come forward voluntarily to disclose bias, as they had in Peña-Rodriguez itself.  Id.

Based on the caveats in Peña-Rodriguez, the Ninth Circuit has held that "[a]lthough Peña-Rodriguez established a new exception to Rule 606(b), this change in law left untouched the law governing investigating and interviewing jurors."  Mitchell, 958 F.3d at 790. "Rather than override the limitations on lawyers' access to jurors, Peña-Rodriguez emphasizes the important purpose of such limitations in providing 'jurors some protection when they return to their daily affairs after the verdict has been entered.'" Id. (quoting Peña-Rodriguez, 137 S. Ct. at 869).

Moreover, habeas petitioners are not entitled to discovery "as a matter of ordinary course." Bracy v. Gramley, 520 U.S. 899, 904 (1997).  They are required to show "good cause."  Rule 6(b), Rules Governing Section 2255 Proceedings.  And "[c]ourts should not allow prisoners to use federal discovery for fishing expeditions to investigate mere speculation." Calderon v. U. S. Dist. Ct. for the

Northern Dist. Of Cal. (Nicolaus), 98 F.3d 1102, 1106 (9th Cir. 1996).

Thus, defendants are not "entitled . . . without more" (Mot. 8) to disclosure or juror identity information to conduct juror interviews as part of their habeas investigation.

**B.     The Investigation Defendants Seek to Conduct is a Fishing Expedition that Does Not Warrant Disclosure of the Jurors' Identity**

1.   Shackling

Defendants' contention that investigation of "the propriety of the shackling at trial necessitates interviewing jurors" (Mot.5 (initial caps removed) is wrong in both its premise and its conclusion.

First, "the propriety of the shackling at trial" is not at issue because that is a procedurally defaulted issue for which defendants have not shown cause or prejudice. See Murray v. Carrier, 477 U.S. 478, 485, 496 (1986) (where a defendant has procedurally defaulted a claim by failing to raise it on direct review, the claim may be raised in habeas only if the defendant can first demonstrate either "cause" and actual "prejudice" or that he is actually innocent).

Defendants did not raise any issue with respect to the shackling in the district court or on appeal.  There was no assertion (or even any observation) that the shackles were visible, an essential element of a constitutional claim under Deck v Missouri, 544 U.S. 622, 629-31 (2005).  There was no objection to the shackling and no contention that it was not justified by "special security needs or escape risks related to the defendants(s) on trial," justifications recognized in Deck, id. at 633, which they plainly were, given defendants' dangerousness and the resourcefulness of their escape efforts.

Mikhel, 889 F.3d at 1058 (finding that evidence of defendants' future dangerousness was "overwhelming").  Nor was there any claim that the district court needed to make an explicit finding to that effect on the record.  Hence, any claim under Deck that the district court improperly used shackles unjustified by an essential state interest was procedurally defaulted by defendants' failure to object to the shackling in the district court or on direct appeal.  Since defendants have not established either cause or prejudice for this procedural default, they have not shown any "legitimate constitutional challenge" to their convictions or sentence. (Mot. 6.)

Second, defendants have not shown that investigation of shackling at trial "necessitates interviewing jurors."  They have not identified *any* reason to think the shackles were visible to the jurors.  They describe "ankle shackles" and cite portions of the record showing that the court took steps to avoid visibility or notice, by not asking counsel or defendants to stand in the jury's presence. (Mot. 5, citing 8/1/06 RT 12-13, 9/5/06 RT 67, and 1/3/07 RT 36.)  Thus, the existing record indicates that the shackles were not visible and defendants have not provided any evidence suggesting otherwise.[2]

Third, defendants are incorrect in stating that "whether defendant's constitutional rights were violated turns upon . . . whether the jurors were aware of the physical restraints." (Mot. 5-6.) Cox v. Ayers, 613 F.3d 883, 890 (9th Cir. 2010), states, to "demonstrate that his shackling at trial amounted to a

---

[2] Kadamovas's counsel say they have had "initial discussions with witnesses," but do not provide any information from any witnesses that the shackles were visible to jurors (Mot. 5.)

11

constitutional violation," a habeas petitioner must demonstrate four elements:

(1) that he was physically restrained in the presence of the Jury;

(2) that the shackling was seen by the jury;

(3) that the physical restraint was not justified by state interests; and

4) that he suffered prejudice as a result.

(Id. (internal quotation marks omitted.)

The third element does not, as defendants make it sound, embody a procedural requirement that the trial court must expressly state a "judicial determination" setting forth the state interests on the record, even in the absence of any objection to the shackling. Rather it is a requirement that habeas petitioners demonstrate that the physical restraint was not in fact justified by state interests. Id.; accord, Ghent v. Woodford, 279 F.3d 1121, 1132 (9th Cir. 2002)(to grant habeas relief, "a court must find . . . that the physical restraint was not justified by state interests").  The absence of judicial findings may bear on that issue, particularly where (unlike here) there is nothing else in the record evidencing the state interests.  However, defendants cannot claim that he satisfies the third element simply because "the record is bereft of any determination by the trial court" on a matter to which they did not object. (Mot. 5.)  Defendants have not argued that their physical restraint was not in fact justified by "special security needs and escape risks," which are two recognized "state interests" (Deck, 544 U.S. at 633) and cannot legitimately advance such an argument given their extreme level of hands-on violence and their

extraordinary record of escape efforts. See Mikhel, 889 F.3d at 1058 (affirming finding defendants' future dangerousness).

Defendant cannot meet the fourth Cox element either. "[U]nconstitutional shackling of a defendant results in prejudice only if the evidence of guilt is not 'overwhelming.'" Cox, 613 F.3d at 891 (citation omitted). "In particular, if a case is 'close, an otherwise marginal bias created by the shackles may . . . play[ ] a significant role in the jury's decision.'" Id.; see also Walker v. Martel, 709 F.3d 925, 943-44 (9th Cir. 2013) (denying ineffective assistance claim based on trial counsel's failure to raise shackling issue because defendant could not show prejudice given the strength of the evidence). Here, the Ninth Circuit has found that the evidence of defendants' guilt was "overwhelming," 889 F.3d at 1019 n.1, 1027, 1040, 1045, 1046, and also found that the evidence of their future dangerousness was overwhelming, id. at 1058. On that basis alone, defendants cannot show prejudice from their restraints.

Moreover, the restraints they describe (Mot. 5) were "relatively unobtrusive" and "only suggested [defendants'} custody status, not a proclivity for violence, as [their] hands were unencumbered." Walker, 709 F.3d at 942. The jurors were independently (and inevitably) aware of defendants' custody status; the government put on a whole case about their elaborate efforts to escape from custody and Mikhel chose to wear jail garb at trial. Mikhel, 889 F.3d at 1019-20, 1040. And even if the restraints could have suggested proclivity for violence, the voluminous testimony about the way defendants suffocated five victims swamped any conceivable impact from the possible sighting of ankle shackles.

13

Thus, defendants' claim that investigation of a possible <u>Deck</u> violation necessitates juror interviews fails on multiple grounds.

### 2.   <u>Racial Bias</u>

Defendants offer not a shred of evidence that any juror was influenced by racial or ethnic bias.  The jurors were instructed and swore not to be influenced by such bias and are presumed to have followed their oaths, <u>Penry v. Johnson</u>, 532 U.S. 782, 799 (2001).  In this case, the jurors went beyond that and individually certified that their verdicts were not influenced by defendants' race or national origin and defendants offer no evidence those certifications were false.

All they offer is an extraordinarily attenuated bit of speculation that one jurors might have been biased against an ethnic Russian because he was a Vietnam combat veteran and two others just because they served in the military.  (Mot. 9.)  They provide no reason to think that such backgrounds generated individuals so prejudiced against Russians that they would ignore a solemn oath and lie in a certification in such a serious matter as this.

Hence, defendants have not shown a "substantial possibility that constitutional error occurred" (Mot. 1), much less a "showing of juror misconduct" <u>Mitchell</u>, 958 F.3d at 787, or a "showing" of "statements exhibiting overt racial bias," 137 <u>Peña-Rodriguez</u>, S. Ct. at 869.

The cases defendants cite (Mot.6-7) do not suggest otherwise. They discuss situations in which there is evidence of bias and do not address the question whether a defendant who agreed to an anonymous jury is entitled to disclosure of juror names years later, based on

14

mere speculation that he might be able to find a basis for claiming juror bias.

### 3.    "Other Misconduct"

Defendants' proposal that they be allowed to interrogate jurors with a "general inquiry" about other misconduct (Mot. 8) is an even broader fishing expedition without any factual basis to believe that constitutional error occurred.  Defendants cite cases cataloguing different types of jury misconduct (Mot. 6), but as with the bias conjecture, they offer only baseless speculation that any misconduct occurred. (Mot. 8-9.) There is nothing suspect in the two "specific occurrences" they cite.  (Id.)

In the first, Juror 57 was not "threatened with the loss of his job."  (Mot. 8.)  Rather, his employer stopped paying him after four weeks. (11/16/06 RT 74-75; see also 11/14/09 RT 4; 11/15/06 RT 6-7.) The employer did not want the juror working nights alone, because he operated heavy equipment.  (11/16/06 RT 75.)  The juror indicated that working on non-court days was a hardship, because he usually spent time with his family, but said, "I'll do whatever it takes." (11/16/06 RT 75.)  The employer agreed to allow the juror to work Mondays, other days when he was not court, and weekends for double-time pay. (Id.)  At the time, the court had already scheduled a break from the upcoming Friday through the entire following week.  At the end of the colloquy, the court commented that "this case should end sometime in December," (id.), which was the parties' estimate at that time. (11/15/06 RT 7.)  The parties advised the court that if the juror's employment situation became an issue in the future, they would stipulate to dismissal of the juror for cause.  (11/16/06 RT 76.) The matter did not arise again and, while the trial continued

15

beyond December, there were significant breaks (e.g., November 17-27, December 18-27, January 18-25).  These facts provide no basis for inferring that the juror was later subjected to "improper pressure" by his employer or that he was "distracted and prevented from properly focusing on the evidence." (Mot. 8.)  To suggest otherwise is speculation made up out of whole cloth, with no citation to any recorded observation of Juror 57 being distracted or inattentive during the balance of the trial.

Defendants likewise offer no factual basis supporting their claim they "should be able to explore the circumstances and behavior of the people involved" in Juror 67's passing, after-hours encounter with defense counsel "to determine whether the trial court ruling" that the encounter did not necessitate removal "was justified or erroneous."  (Mot. 8-9.) The court handled the matter impeccably and there is no basis on which to question its ruling, apart from defendants' apparent (though not clearly stated) speculation that maybe the juror lied.

Mikhel's counsel (Dale Rubin) reported that, the evening before, his defense team was conversing in the bar area of the New Otani hotel about the day's testimony when a juror -- who had been sitting at the bar 10-15 feet away with his back to them -- caught their attention, said "Just give me five minutes," and left shortly thereafter. (2/1/07 RT 8-9.)  Counsel's group "didn't say another word" after the juror caught their attention, but counsel did not know if the jury had heard their conversation before that. (Id.)

The court questioned Juror 67, who stated that he "did not hear any conversation that Mr. Rubin may have been engaged in," he "only heard his voice," and was not able "able to decipher or interpret

16

anything that was said," because he "was sitting too close to the television to hear a conversation." (2/1/07 RT 11.) The juror explained that he recognized Rubin's voice "from listing to [it] for so long" and that prompted him to signal timeout to Rubin's group. (2/1/07 RT 12.)  After giving all counsel the opportunity to ask questions, the court stated, "I feel confident that he was candid with the Court. (Id.) No one disagreed.  (2/1/07 RT 12-13.)

Defendant does not identify any error in the way the court handled this matter or any basis to second-guess the court's assessment of the juror's veracity.  That defendants would even include this occurrence in their motion suggests that they contemplate precisely the type of "intrusive inquiry," Tanner 483 U.S. at 127, the Supreme Court and Ninth Circuit have long disapproved.

### C. Defendants Have Not Established a Basis for Stripping the Jurors of their Anonymity

Defendants' argument that their "right to conduct a post-conviction investigation" outweighs any grounds for continued anonymity (Mot.9-12) ignores key features of this case.

Defendants "did not object to empaneling an anonymous jury" and on appeal they did "not challenge the district court's determination that an anonymous jury was necessary to ensure juror protection." Mikhel, 889 F.3d at 1031.  They effectively agreed to proceed through trial and appeal without juror identity information.  Therefore, their request for that information now is a request for discovery, which would require a showing of good cause that they have not made. See Habeas Rule 6; Calderon, 98 F.3d at 1106.

17

Moreover, the district court assured the jurors that it was their decision whether to "compromise or sacrifice [their] anonymity by speaking with counsel." (2/21/07 RT 42-43.) The "protection" to which the jurors were entitled "when they return[ed] to their daily affairs after the verdict[s]," Peña-Rodriguez, 137 S. Ct. at 869, was anonymity. To renege on that protection now would demonstrate that jurors cannot rely on assurances by a federal court and would undermine juror confidence in a system that depends heavily on citizen willingness to serve as jurors -- a dependence that is particularly critical in cases as long as this with defendants as dangerous as these.

These countervailing considerations are not outweighed by any facts supporting defendants' request, because there are no facts supporting defendants' request, just speculation. Disclosure is not justified by defendants' desire to conduct a fishing expedition.

**IV.   CONCLUSION**

For the foregoing reasons, the government respectfully requests that this Court deny defendants' motion to release juror information.