Timothy J. Foley
tfoley9@earthlink.net
Attorney at Law
California State Bar No. 111558
1017 L Street, #348
Sacramento, CA 95814
Tel: (916) 599-3501

Jean E. Giles
jean_giles@fd.org
Indiana State Bar No. 21643-49
F. Italia Patti
italia_patti@fd.org
Indiana State Bar No. 34725-02
Indiana Federal Community Defenders, Inc.
111 Monument Circle, Suite 3200
Indianapolis, IN 46204
Tel: (317) 383-3520

Counsel for Defendant Jurijus Kadamovas

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No.    CR 02-00220-SJO |
| Plaintiff, | |
| v. | DECLARATION OF JEAN E. GILES IN SUPPORT OF PROFFER REGARDING THE EFFECTS OF THE PANDEMIC |
| IOURI MIKHEL, and JURIJUS KADAMOVAS. | |
| Defendants. | |

## DECLARATION OF JEAN E. GILES

I, Jean E. Giles, upon information and belief, declare and state the following:

1. On July 18, 2019, Timothy Foley and the Indiana Federal Community Defenders ("IFCD") office were appointed as counsel for Mr. Kadamovas. Doc. # 2330. The IFCD is the federal defender office closest to the federal death row in Terre Haute and houses a unit focused solely on capital § 2255 representation. I am an Assistant Federal Defender assigned to the capital § 2255 unit. Due to the complexity of the case and the enormity of the record, I was assigned to work on the case along with Victoria Casanova.

2. Counsel began our work on the case by compiling the voluminous record from prior attorneys and arranging to have it shipped to Indiana. While obtaining the record and arranging to have the paper files scanned, counsel started familiarizing ourselves with the case by reviewing the trial and appellate dockets, including pleadings and court decisions.

3. The joint trial of Kadamovas and co-defendant Mikhel lasted 75 days and involved five deaths, money laundering allegations, and an escape attempt. There are more than a thousand exhibits, approximately 125 testifying witnesses, and hundreds of pleadings. The discovery in the case is over 89,000 pages, plus extensive video, audio, and photographic evidence. Many documents and transcripts are in the Russian language; some are in Latvian, Greek, or Lithuanian. A second trial, involving another co-defendant, Petro Krylov, lasted

roughly 37 days and involved most of the same witnesses. The trial and appellate teams provided current counsel with 110 bankers boxes and four computer hard drives, some of which contain copies of additional case-related hard drives from other computers.

4. Given the volume of materials, counsel were still reviewing and organizing the trial and appellate materials in February. While reviewing these materials, counsel, working with Jenna Murphy, the lead mitigation specialist on the case, and other investigators, developed an investigation plan. Because Mr. Kadamovas spent the first 31 years of his life in Lithuania and the former Soviet Union, it was apparent that international travel would be necessary, and counsel began making arrangements for such travel. Further, because Mr. Kadamovas lived in Los Angeles after coming to the United States, and because the major events underlying the criminal allegations occurred in California, counsel's investigation plan also included investigation in California, and required travel to California by personnel based in Indiana.

5. As described further in this declaration, the COVID-19 pandemic has significantly hindered our ability to investigate, including organizing and reviewing materials, collecting records, and interviewing witnesses. For example, a mitigation specialist from Indiana was in California conducting interviews and collecting documents as that state (and the country as a whole) began to shut

3

down due to the pandemic. She was forced to shorten the trip and return early. All future travel plans were immediately put on hold, as the IFCD banned travel.

**COVID-19 Pandemic**

6. On March 11, 2020, the World Health Organization declared a global pandemic based upon an outbreak of a novel coronavirus, or COVID-19. COVID-19 is a highly contagious respiratory illness that causes fever, cough and shortness of breath.[1] On January 31, 2020, the Secretary of Health and Human Services declared a public health emergency. The President of the United States declared a National Emergency on March 13, 2020.

7. The effect of the pandemic in California has been devastating. As of August 12, 2020, California had a total of 594,506 cases and 10,813 deaths. A state of emergency was declared in California on March 4, 2020, and on March 19, 2020, Governor Gavin Newsom issued a stay-at-home order mandating that citizens remain home except for obtaining necessities such as food, prescriptions, and health care.

8. In early May, California came up with a plan that allowed lower-risk businesses to reopen, although offices and shopping malls stayed closed. Retail and dine-in

---

[1] The undersigned has compiled information and statistics about COVID-19 from the following sources:
1. https://www.latimes.com/projects/california-coronavirus-cases-tracking-outbreak/;
2. https://www.cdc.gov/coronavirus/2019-ncov;
3. https://www.gov.ca.gov/;
4. https://covid19.ca.gov/;
5. https://www.cdph.ca.gov/; and
6. https://www.cacd.uscourts.gov/.

restaurants soon followed. On June 12, higher-risk businesses like movie theaters and gyms were allowed to reopen with social distancing guidelines in place. However, cases began to increase, and on July 1, 2020, the California Department of Public Health ("CDPH") ordered 19 counties, including Los Angeles County, to close the indoor operations of various sectors, including restaurants, wineries, and certain entertainment venues, as well as all indoor and outdoor bars. On July 13, 2020, the CPDH issued a statewide order closing bars, prohibiting indoor dining, and closing indoor movie theaters. Certain counties, including Los Angeles County, also had to close gyms, places of worship, protests, personal care services, indoor seating in restaurants, and malls.



Times survey of county and local health departments

5

9. Los Angeles County has been especially hard hit by COVID-19. With 214,283 positive cases as of August 12, 2020, it has by far the most positive cases of any county in the state. Unsurprisingly, it also leads the state in number of deaths, with 5,112 total deaths—this is nearly half the deaths in California.

10. Of course, this Court well knows the disruptions that COVID-19 has caused. On March 13, 2020, this Court declared a thirty-day judicial emergency and restricted access to the Courthouse and cancelled naturalization ceremonies scheduled for March 19. The Judicial Council for the Ninth Circuit approved the judicial emergency through April 13, 2021. *In re Approval of the Judicial Emergency Declared in the Eastern District of California*, 955 F.3d 1140 (9th Cir. 2020).

11. On March 19, 2020, this Court activated its Continuity of Operations Plan ("COOP") effective March 23, 2020 through May 1, 2020. Courthouses were closed except for hearings on criminal duty matters, and grand jury proceedings were suspended from March 31, 2020 until May 4, 2020. On April 13, 2020, this Court extended the COOP plan through June 1, 2020. It also indicated that it would not call jurors for civil or criminal trials until after June 1, 2020, and ordered that hearings in civil cases go forward only by video or telephonic conference. Criminal duty matters were to go forward with a preference for appearances to be made by video or telephone.

12. On May 28, 2020, the Court issued Amended General Order No. 20-08, adopting the Plan for Phased Resumption of Operations ("Reopening Plan"). Phase 1 of the

Reopening Plan allowed certain staff to return to the courthouse no earlier than June 1, 2020. Phase 2 was to begin no earlier than June 22, 2020, and allowed limited in-person hearings. Phase 3—the resumption of jury trials—has not yet been announced.

13. On August 6, 2020, this Court announced that, due to the recent surge in the number of COVID-19 cases in the Central District of California, the courthouse will be closed to the public until further notice.

14. Most witnesses that the defense team needs to interview are located in Southern California. Given that deaths and hospitalizations continue to spike, the witnesses understandably will be reluctant to welcome strangers into their homes because of legitimate fears of COVID-19 transmission.

15. Further, as discussed in the declaration of Jenna Murphy, contacting potential mitigation witnesses solely though telephone would go against professional norms. *See, e.g.*, *Eaton v. Wilson*, 09-CV-261-J, 2014 WL 6622512, at *73, *84 (D. Wyo. Nov. 20, 2014), *aff'd sub nom. Eaton v. Pacheco*, 931 F.3d 1009 (10th Cir. 2019) (describing the approach of contacting potential mitigation witnesses solely via telephone in a capital case as "a textbook for how not to do it" and concluding that the defense team "clearly did not adequately perform a thorough mitigation investigation."); *see also* Murphy Decl. at 5-9.

**Federal Bureau of Prisons**

16. On March 13, 2020, the Federal Bureau of Prisons ("BOP") suspended legal visits for thirty days.[2] Currently, the website for the United States Penitentiary Terre Haute states that "[a]ll visiting at this facility has been suspended until further notice."[3] In-person contact is critical in capital cases. Without in-person client contact, defense teams lack critical information needed to understand the client's current functioning and cannot explore sensitive topics with their clients, like trauma history.

17. As currently provided, not only do these restrictions affect counsel's ability to visit Mr. Kadamovas, they prevent Mr. Kadamovas' defense team from visiting other important witnesses. We have identified a number of witnesses we need to interview who are presently incarcerated.

18. Even if the BOP were to loosen restrictions in the near future, visiting a prison in the current environment may well be a life-endangering act. The outbreaks in San Quentin State Prison and Lompoc FCI and USP demonstrate how rapidly the virus, once introduced to a correctional setting, can run rampant through a prison, sickening and killing both inmates and guards. Recognizing this danger, the IFCD has instituted a formal policy of suspending all prison visits until visits can safely occur.

---

[2] https://www.bop.gov/resources/news/20200313_covid-19.jsp
[3] https://www.bop.gov/locations/institutions/thp/

**<u>Indianapolis</u>**

19. As of August 11, 2020, Indiana reported 76,522 positive cases and 2,878 deaths. Marion County, where Indianapolis is located, has had 16,194 positive cases and 731 deaths.[4] Dr. Deborah Birx, a leader of the White House Coronavirus Task Force, identified Indianapolis as a city that needed to take aggressive steps to limit the virus's spread.

20. On March 11, 2020, the IFCD office held an all-staff meeting, and the Executive Director announced that all staff would work from home beginning on March 16, 2020. Further, a ban on investigation travel and visits to jails and prisons was announced. Employees were informed that they would have to request special permission to go into the office and were strongly discouraged from doing so. In mid-June, employees were told that each employee could work from the office on two specific days a week, although we are required to continue to work from home if at all possible until at least the end of 2020.

21. Besides the technology problems addressed below, the biggest challenge is the inability to access the physical trial file and exhibits. While before it was possible to open a box or binder and quickly look through its contents, now I must open up the computer file and page down through hundreds or thousands of pages to determine what is in a particular box. Additional challenges include having to

---

[4] https://coronavirus.in.gov

meet via telephone or conferencing software and the inability to collaborate on projects that could be done much more efficiently in person.

22. Recognizing the necessity of hands-on review of the documents in the case and the value of working directly with the Indiana staff, lead counsel Mr. Foley traveled to Indianapolis to work on the case in late 2019 and early 2020. Due to the closure of our office, and the dangers of travel, Mr. Foley has been unable to come to Indianapolis since late January. This situation has hindered and undercut the efficiency and quality of the collaboration between counsel.

23. In addition to the challenges presented by this situation, three team members— including me—have had to cope with school and daycare closings due to the pandemic. On March 12, 2020, Marion County schools were told that they should close by March 16.  Many daycares followed suit. As of March 2020, the three affected team members had a total of seven children ranging in age from 8 months to 15 years. On April 2, 2020, Indiana's Governor cancelled in-person classes for the remainder of the school year. In addition to providing basic care for the younger children, each of us had to supervise the home learning for at least one older child and attempt to meet the emotional needs of our children who were no longer able to socialize with their peers, all the while doing our best to fulfill our work obligations from makeshift home office setups.

10

24. These pressures will not be relieved with the start of the fall semester, as two of the three school districts that our children attend will remain virtual due to concerns about the growing number of COVID-19 cases in the Indianapolis area.

**Technology problems**

25. When mandatory work from home began at the IFCD, in an effort to ensure that we can work as efficiently as possible, staff members were provided with technology to use at home, including computers, monitors, printers, and, if necessary, a mobile hotspot. Nevertheless, being forced to work from home proved less efficient than being able to go to the office, particularly at the outset, when our office and the national Federal Public Defender system were attempting to quickly adapt to an unexpected crisis. To access client files from home, staff members needed to connect to the IFCD network using a VPN. The VPN, which is provided through the Federal Public Defender system, was extremely slow. It would often freeze or disconnect, and pages would take approximately three times as long to load as they would have if I were in the office. We were told that the national technical support team was working to increase the VPN capacity. I did notice an increase in speed over the last few weeks of March and beginning of April, although the speed remains well below what it would be if we were able to work from the office.

11

26. Further, when we first started mandatory work from home, the plan was to use external hard drives and synch those overnight to our files in the office. It quickly became apparent, though, that plan was not practical due to the slow VPN speeds. On March 23, 2020, our information technology specialist set up remote computers for each employee in the 2255 Unit. This solution did somewhat increase the speed at which I could open, review, move, and save documents, but, even with the improved VPN and remote computer, it still takes noticeably longer to accomplish tasks that require accessing and manipulating large files—of which there are many in this case.

27. Moreover, CaseMap, a program we had been using, was impossible to use over the VPN, even using the remote computers. Most of the time it simply would not open, but on the rare occasions it would open, it would cause the computer to freeze and need to be rebooted. While we had thought that CaseMap would be a very valuable tool to organize the large volume of material in this case, we determined that it was not possible to use it until we were able to return to the office on a regular basis. Unfortunately, we had invested many hours into loading and tagging documents in CaseMap, but now we have to use other methods to organize them, and the work we already did in CaseMap is of limited utility.

28. Additionally, while we had been reviewing the 110 boxes in the case by physically examining them, we were forced to transition to reviewing the scanned digital files. Frequently the scanned version was difficult to read. Some of the

documents must be reviewed by accessing the physical copy, a task that is quite difficult under the current circumstances.

29. Because of the enormity of the case and volume of materials, we contracted with outside vendors for the copying and scanning of documents. The pandemic lead to frustrating and lengthy delays in the vendors returning the materials, in turn delaying our review of those documents.

**Lithuania**

30. In addition to the challenges Mr. Kadamovas' defense team faces in the United States, it also is confronted with further difficulties due to the need to collect documents and interview witnesses in Lithuania, where Mr. Kadamovas lived for much of his life.

31. On March 16, 2020, Lithuania declared the country under quarantine until March 30, closing its borders to all but Lithuanian citizens, residents, and people involved in transportation of goods.[5] It also ordered that all shops and services close except for grocery stores, pharmacies, and emergency services. The quarantine was extended several times and finally ended on June 16, 2020. However, the restriction on the entry of foreigners into Lithuania remains in effect, with certain exceptions. The United States is on a list of affected countries

---

[5] Counsel has complied information regarding coronavirus in Lithuania from the following sources:
1. https://lt.usembassy.gov/;
2. https://urm.lt/default/en/important-covid19;
3. http://koronastop.lrv.lt/en/news/

from which entry is "limited to exceptional cases" with a "14-day self-isolation" period required.

32. Further, a national state of emergency is still in place in Lithuania. As such, even if members of Mr. Kadamovas' defense team could travel to Lithuania, it is highly unlikely that anyone would want to meet with them in person. His current defense team needs to meet his family members—and other witnesses who have information relevant to his case—in person. The language barrier between Mr. Kadamovas' defense team and those living in Lithuania further complicates any attempts at communication other than in person.

**Additional problems**

33. In addition to the problems I discuss above, the pandemic has created additional obstacles, as discussed in Ms. Murphy's declaration. The mitigation specialists in Mr. Kadamovas' case have searched on-line court records and databases for available information during this shut down period. However, many relevant records are not electronically available. Court records may require travel to courthouses or public record requests of other court clerks. In those cases, when travel is not possible, and when court staff are not processing non-emergency requests, these record-collection functions have been delayed. The collection of a wide range of other categories of records is likely to be delayed by staffing shortages with the requesting agencies, including, for example, the client's medical records, employment records, school records and military records.

14

34. Further, these significant delays in investigation and preparation have a cascading impact on Mr. Kadamovas' defense team's ability to prepare witnesses. For example, a delay in access to court records and medical records hinders our ability to provide an accurate and complete medical history for any mental health experts. *See* American Bar Association, *Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases 4.1(B) and Commentary*, 31 Hofstra L. Rev. 913, 956 (2003) (describing counsel's duty to create a "competent and reliable mental health evaluation" by compiling "extensive historical data"); *see also* Murphy Decl. at 11-12. Additionally, interviews of a witness often reveal the need for additional record collection or interviews with additional witnesses. By the same token, additional records can often reveal the need for additional records and witnesses. *See* Murphy Decl. at 12.

## Conclusion

35. Currently, counsel and the investigators cannot travel and cannot conduct in person interviews. It is unknown when this situation will change.

36.  In my reasonable professional judgment, the extraordinary circumstance of the COVID-19 global pandemic will prevent us from providing Mr. Kadamovas with effective assistance of counsel unless his statute of limitations is equitably tolled to allow us to complete our investigation, review, and assessment of this case, and prepare a proper and reasonably complete § 2255 motion.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed by me this 14th day of August, 2020, in Indianapolis, Indiana.

*s/ Jean. E. Giles*
Jean E. Giles
