Timothy J. Foley
tfoley9@earthlink.net
Attorney at Law
California State Bar No. 111558
1017 L Street, #348
Sacramento, CA 95814
Tel: (916) 599-3501

Jean E. Giles
jean_giles@fd.org
Indiana State Bar No. 21643-49
F. Italia Patti
italia_patti@fd.org
Indiana State Bar No. 34725-02
Indiana Federal Community Defenders, Inc.
111 Monument Circle, Suite 3200
Indianapolis, IN 46204
Tel: (317) 383-3520

Counsel for Defendant Jurijus Kadamovas

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No.    CR 02-00220-SJO |
| | ) | |
| Plaintiff, | ) | DECLARATION OF |
| | ) | JENNA C. MURPHY IN SUPPORT OF |
| IOURI MIKHEL, and | ) | PROFFER REGARDING THE |
| JURIJUS KADAMOVAS. | ) | EFFECTS OF THE PANDEMIC |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

1

DECLARATION OF JENNA C. MURPHY

I, Jenna C. Murphy, upon information and belief, declare and state the following:

**Background and Qualifications**

1. I have worked as a mitigation specialist in capital post-conviction cases for eighteen years. I have conducted post-conviction mitigation investigations in ten capital cases and thirteen life-without-parole cases. From 2001 through 2018, I was employed full-time by the Indiana State Public Defender as a mitigation specialist. Since 2018, I have been employed full-time by the Indiana Federal Community Defender (IFCD) as a mitigation specialist in the Capital § 2255 Unit. As at the Indiana State Public Defender, my work at the IFCD focuses on mitigation investigations in capital post-conviction cases. At IFCD, my work is entirely dedicated to representing clients on federal death row.

2. I hold a Bachelor of Arts from Indiana University and Juris Doctorate from Indiana University-Indianapolis. I frequently attend training sessions in Indiana and across the country on developing mitigation evidence. I have also lead trainings on developing mitigation evidence at the Indiana Public Defender Council.

3. I have been working on the post-conviction mitigation investigation for Jurijus Kadamovas since the IFCD was appointed to represent Mr. Kadamovas in July 2019.

**Capital Defense Standards**

4. Mitigation investigation is a unique aspect of capital defense work that requires a working knowledge of mental health, human development, and trauma. It also requires a working knowledge of law and legal concepts to integrate the knowledge of mental health, human development, and trauma into a capital case presentation. It cannot be conducted effectively without the proper training. This includes a working knowledge of the professional guidance and standards set out by United States Supreme Court precedent and standards produced by reputable national organizations engaged in the work of providing training and support to practitioners throughout the country.

5. To provide guidance to capital defense teams, in 2003 the American Bar Association updated the Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, 31 Hofstra L. Rev. 914 (2003) (hereafter "ABA Guidelines"). These standards were years in the making and ultimately approved by the ABA House of Delegates – a diverse body of the ABA membership responsible for directing the policy of the nation's largest professional legal association. The membership that passed the ABA Guidelines included prosecutors, former judges, defense attorneys, civil litigators, and others who agreed that the standards set out in the ABA Guidelines were essential to protect the rights of capital defendants and describe the process by which these rights are protected.

3

6. In 2008, the ABA Death Penalty Representation Project published the Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases, 36 Hofstra L. Rev. 677 (2008) (hereafter "Supplementary Guidelines"). Again, this project was undertaken by a cross section of leadership internal and external to the ABA. It focused on providing further specific information related to the mitigation function for capital defense.

7.  "[T]hese Guidelines are not aspirational. Instead, they embody the current consensus about what is required to provide effective defense representation in capital cases." 31 Hofstra L. Rev. at 920.

8. These professional standards "apply from the moment that counsel is appointed and extend to all stages of every case in which the jurisdiction may be entitled to seek the death penalty, including initial and ongoing investigation, pretrial proceedings, trial, appeal, post-conviction review, competency-to-be-executed proceedings, clemency proceedings and any connected litigation." Supplementary Guidelines 1.1.B; *see also* ABA Guidelines 10.7.A ("Counsel at every stage have an obligation to conduct thorough and independent investigations relating to the issues of both guilt and penalty."); ABA Guidelines 10.7.B.1 ("Counsel at every stage have an obligation to conduct a full examination of the defense provided to the client at all prior phases of the case. This obligation includes at minimum interviewing prior counsel and members of the defense team and examining the files of prior counsel.").

9.  Mitigation investigation, whether at the pre-trial or post-conviction phase, proceeds on two primary tracks: (1) in-person, face-to-face visits with the client and potential witnesses, and (2) exhaustive records collection. As the collection of information by those primary means occurs, the mitigation specialist must organize and evaluate this information. *See* Supplementary Guidelines 10.4.A & 10.11. This is most often done through the creation of master case files such as a comprehensive list of potential witnesses, chronology, records logs, theory memos, and other digests or summaries.

10. Mitigation specialists also aid counsel in identifying, selecting, and providing guidance to appropriate mental health experts. A primary role of a mitigation specialist is to work with counsel and mental health experts through facilitating contact with the client and key witnesses, and records collection and review.

**In-Person Interviews Are Necessary**

11. Mitigation investigation seeks to understand the biological, psychological, and social history of the defendant. This is done, in large part, by conducting face-to-face in-person interviews with the client, his family, caretakers, friends, community members, teachers, coaches, religious community, and others who have knowledge of the defendant and his family. *See* Supplementary Guidelines 10.11.C ("Team members must conduct in-person, face-to-face, one-on-one interviews with the client, the client's family, and other witnesses who are familiar with the client's life, history, or family history or who would support a

sentence less than death. Multiple interviews will be necessary to establish trust, elicit sensitive information and conduct a thorough and reliable life-history investigation."). A client's full social history must include both the static facts of his life history, such as medical conditions, education, income, employment, and housing; and the dynamic narrative of complex human experiences of his life, such as neglect, loss, or love. *See* Supplementary Guidelines 10.11.B.

12. Maximizing the accuracy of information provided in an interview requires the mitigation specialist to build rapport with the witness. *See* Supplementary Guidelines 5.1.C & 10.11.C. While some information may be quite easy to share, many of the topics that must be explored in a mitigation investigation are highly sensitive. A competent mitigation investigation will invade dark, shameful family secrets; it "exposes raw nerves, re-traumatizes, scratches at the scars nearest the client's heart." Russell Stetler, *Mitigation Evidence in Death Penalty Cases*, Champion, Jan.-Feb. 1999, at 36; *see also* Russell Stetler, *The Mystery of Mitigation: What Jurors Need to Make A Reasoned Moral Response in Capital Sentencing*, 11 Univ. of Pa. J.L. & Soc. Change 237, 253 (2007). It is often only in the context of strong rapport, built through warm and welcoming tone, smiles, eye contact, and calming body language that witnesses have the space and support to speak truthfully and expansively about sensitive topics central to a proper mitigation investigation. The accuracy of a witness's reporting on sensitive topics depends on their being in an appropriate state of mind to disclose such

information and upon a mitigation specialist having spent the appropriate amount of time, which is often significant, to allow the witness to make such disclosures. Like mitigation specialists, individuals in other professions engaged in soliciting sensitive information from people recognize the importance of rapport building to obtaining accurate information. *See generally* Allison Abbe & Susan E. Brandon, *Building and Maintaining Rapport in Investigative Interviews*, 15 Police Prac. & Res. 207 (2014); Patrick Risan, Per-Einar Binder & Rebecca Jane Milne, *Establishing and Maintaining Rapport in Investigative Interviews of Traumatized Victims: A Qualitative Study*, 12 Policing: A J. of Pol'y and Prac. 372 (2018).

13. A mitigation specialist frequently performs interviews by going to the home of a potential witness. "By going to the home of a witness or family member, the mitigation specialist will observe things about the interview subject that would not be visible in the office, thus providing a deeper perspective." Sean D. O'Brien, *When Life Depends on It: Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases*, 36 Hofstra L. Rev. 693, 746 (2008).

14. Mitigation investigation is field-based work. More can be learned about a person and their habits, beliefs, and values by a single visit to their home than can be learned in any number of conversations over the phone or by video. The items on a person's wall, the presence or absence of furniture, whether a home is cared for and maintained or disorganized and unkempt, whether there is central air or

heating, if there is a particular smell or odor, whether there is a place to eat with others, if the walls have paint chips that have peeled away, if there are pets and how they are treated, and who stops by the home or calls are some but not an exhaustive list of examples of important data points which cannot be obtained through other means. *See* O'Brien, 36 Hofstra L. Rev. at 746 (quoting Bianca Cody Murphy & Carolyn Dillon, *Interviewing in Action: Process and Practice* 28 (1998)).

15. Being in person with a witness for an extended period of time enables the mitigation specialist to observe the witness's ability to track conversation and maintain eye contact and observe their spontaneous behaviors. In-person visiting enables a mitigation specialist to respond to subtle indicators of a witness's fatigue or emotional wellbeing in ways that preserve the rapport and accuracy of information. Finally, being in person allows a mitigation specialist to ensure that the conversation is taking place out of ear shot of anyone else. "Mental health experts recognize that '[m]ost patients do not speak freely unless they have privacy and are sure that their conversations cannot be overheard.'" O'Brien, 36 Hofstra L. Rev. at 746 (quoting Benjamin James Sadock & Virginia Alcott Sadock, *Kaplan & Sadock's Synopsis of Psychiatry* 8 (9th ed. 2003)).

16. Phone or even video interviews are not an adequate substitute for in-person interviews. Phone interviews with witnesses unavoidably introduce connection issues, lack of certainty of who one is talking to, and the inability to establish

trust. Furthermore, phone interviews inevitably rely on assumptions that may be inaccurate, like a witness's ability to hear, understand, and speak with confidence and privacy in their own physical location. *See, e.g.*, *Eaton v. Wilson,* No. 09-CV-261-J, 2014 WL 6622512, at *55 (D. Wyo. Nov. 20, 2014) (finding trial counsel's performance deficient in part because trial counsel attempted to conduct mitigation investigation over the telephone, explaining, "[a]ny attempt to interview a family member over the telephone about the subjects which must be broached in the investigation of a capital case invites failure."). The district court's opinion in *Eaton* provides several good examples of what went wrong because the defense team relied on telephone calls rather than in-person interviews. Video interviews may be marginally better than phone interviews, but involve many of the same problems. Video interviews also depend on witnesses having access to a computer in a private space, reliable access to the internet, and the technological acumen to use videoconferencing programs.

17. In-person interviews, in particular in a witness' home, are not possible during a global pandemic. One indication of the dangers of in-person interviews during a pandemic is the steps the FBI has taken to limit in-person interviews. As FBI Special Agent Brian O'Hare, president of the FBI Agents Association, told NPR, "special agents are taking steps to try to minimize their potential exposure to the virus as they conduct their investigations. Witness interviews, which agents prefer to conduct in person when possible, will often now be done by phone." *See* Ryan

9

Lucas, *FBI Adjusts To Persevere Through Pandemic As Much Of America Shuts Down*, NPR (March 20, 2020), https://www.npr.org/2020/03/20/818505883/fbi-adjusts-to-persevere-through-pandemic-as-much-of-america-shuts-down.

18. In keeping with this general policy, in a letter filed in a civil case, the United States Attorney for the Southern District of West Virginia sharply criticized an attorney because a subpoena was served on a FBI agent at his home, explaining: "DOJ has serious concerns about defendants' decision to serve the foregoing subpoenas . . . on Agent Cox at his home . . . Such actions jeopardized the health and safety of Agent Cox and his family. Initiating such unnecessary person-to-person contact with Agent Cox and his family subjected them and the community to an increased risk of COVID-19 transmission, undermining the social distancing order issues by the State of Virginia on March 23, 2020." Apr. 17, 2020 Letter from U.S. Attorney Michael B. Stuart to Laura Flahive Wu (Doc. 469-2, filed in S.D. W. Va. Case No. 3:17-cv-01362) (hereafter "U.S. Atty. Letter") at 1.

19. In addition, during a pandemic, visits to correctional facilities cannot take place safely. In mid-March, the Bureau of Prisons ("BOP") suspended legal visits due to COVID-19, stating it would reevaluate in thirty days and attempt to accommodate attorneys on a case-by-case basis. *See* BOP Implementing Modified Operations, https://www.bop.gov/coronavirus/covid19_status.jsp (last visited August 13, 2020); *see also* Federal Bureau of Prisons, USP Terre Haute, https://www.bop.gov/locations/institutions/thp/

10

(last visited August 13, 2020) ("All visiting at this facility has been suspended until further notice."). Also in mid-March, as part of the IFCD's response to COVID-19, the IFCD's Executive Director prohibited IFCD employees from visiting prisons and jails. The IFCD's ban on prison visits remains in place.

**Records Collection Also Requires Travel and Office Visits**

20. Records collection and other kinds of document collection must progress at the same time as interviews. Extensive records collection and research is required in advance of an interview to guide the mitigation specialist's approach to the visit and following an interview to triangulate the information obtained. "Triangulation of data refers to obtaining data from more than one source and, preferably from more than one type of source. For example, a head injury should be documented by several witnesses and by medical records. This insures the reliability of information, as well as providing more details for each incident." O'Brien, 36 Hofstra L. Rev. at 724 (quoting Lee Norton, *Capital Cases: Mitigation Investigations*, Champion, May 1992, at 45). This approach to developing mitigation evidence is modeled on the medical profession, which requires that "the expert corroborate this information independently before he relies on it." Richard Dudley, Jr., & Pamela Blume Leonard, *Getting it Right: Life History as the Foundation for a Reliable Mental Health Assessment,* 36 Hofstra L. Rev. 963, 981 (2008). In order to reach a conclusion about a patient's functioning, a doctor

11

cannot rely on self-reporting, but must also seek out records and other information.

21. The process of developing mitigation investigations requires that information be substantiated both in the recollections of witnesses and in coordination with contemporaneous records of the time in question. Because of the relationship between these two types of evidence, the development of one informs the development of the other. If, for example, a record names one person involved in a particular hospital stay, conversation with that person may be required to investigate the details necessary to collect the full record of that stay, which in turn may provide more indications of individuals with information about that hospital stay. In this way, neither the records nor the field interview aspect can continue to develop fully while the other is impeded. The collection of records also leads frequently to follow-up in-person interviews. Mitigation specialist Lee Norton explains:

> It is insufficient to talk to witnesses only once because each new individual recalls different facts and anecdotes; if an aunt provides an account of a head injury which the mother forgot to mention, it is necessary to go back to the mother and ask about it. Similarly, an interview may reveal records that must be obtained which in turn raise new questions, questions which necessitate interviewing several witnesses again.

O'Brien, 36 Hofstra L. Rev. at 747-48 (quoting Norton, Champion, at 45).

22. Obtaining third-party documentation related to the client, his family, and his community is essential for building a working understanding of the client. Third-

party, contemporaneous documents provide substantiation of witness information. Third-party documentation provides the perspective of professionals who observed and recorded aspects of the client, family, and community life from a different and unique perspective.

23. COVID-19 related closures, partial closures, furloughs, alternative working situations, and travel restrictions have impacted and continue to impact the ability of various institutions to locate and release records. For example, the FBI's website explains that, "Due to the COVID-19 pandemic, the FBI has adjusted its normal operations and is unable to timely process Freedom of Information/Privacy Act (FOIPA) requests received via the eFOIPA portal or by standard mail. Given limited staffing to ensure safety, you can expect delays in both the acknowledgement and substantive response to your FOIPA request. We apologize for this inconvenience and appreciate your understanding during this national emergency." FBI, Requesting FBI Records, https://www.fbi.gov/services/information-management/foipa/requesting-fbi-records (last visited August 13, 2020).

24. In keeping with this general statement, the U.S. Attorney for the Southern District of West Virginia explained, "with regard to the possible production of documents, the FBI is currently not in a position to search for documents . . . and to review and process them. . . . the FBI employees responsible for locating, reviewing, and processing responsive documents are not currently working . . . they are not

authorized to work remotely due to their need to work with discovery tools and systems that can only be accessed in FBI space." U.S. Atty. Letter at 2. Further, the DOJ pointed out that when employees return to work, "the FBI will undoubtedly also be facing a significant backlog of competing requests received before and during this time of national emergency." *Id.* at 3.

25. The FBI's situation is, of course, not unique. Many offices that house documents necessary to a mitigation investigation have faced similar disruption. And to the extent that employees have begun returning to work, this disruption inevitably caused backlog and delays.

26. In addition, in my experience, collecting records often requires going to an office in person, which is currently impossible because so many offices are closed and because of travel restrictions.

**Post-Conviction Investigation**

27. The ABA Guidelines specify that the requirements for mitigation investigations in a capital case, post-conviction, are the same as those for trial-level investigation, because post-conviction investigations review the trial team's investigation and presentation of mitigating evidence.

28. A good example of the way in which post-conviction records collection and interviews inform each other, and ultimately lead to uncovering evidence that the trial investigation did not find, is *Rompilla v. Beard*, 545 U.S. 374 (2005). After the post-conviction team found documentary evidence of Mr. Rompilla's

14

wretched childhood and mental illness, they conducted additional interviews with members of Rompilla's siblings and learned that "[a]ll of the children lived in terror" of their violent father. *Rompilla v. Horn*, 355 F.3d 233, 279 (3d Cir. 2004) (Sloviter, J., dissenting). This evidence was "presented for the first time at Rompilla's PCRA hearing." *Id.* (Sloviter, J., dissenting). The Supreme Court, agreeing with Judge Sloviter, held that the post-conviction investigation had uncovered evidence that the trial team should have found, and further held that the new evidence was sufficient to undermine confidence in the jury's death sentence. *See Rompilla*, 545 U.S. at 385-86, 393.

29. There are many examples from the Ninth Circuit, as well. *See, e.g.*, *Andrews v. Davis*, 944 F.3d 1092 (9th Cir. 2019) (en banc) (sentence of death reversed where trial team never learned of mitigating evidence of defendant's upbringing in a segregated boarding school where he was submitted to brutal abuse at the hands of the state custodians); *Washington v. Ryan*, 922 F.3d 419 (9th Cir. 2019) (death sentence reversed where trial counsel never reviewed defendant's education and incarceration records, and never discovered or presented mitigating evidence regarding defendant's mental deficiencies); *Robinson v. Schriro*, 595 F.3d 1086 (9th Cir. 2010) (sentence of death reversed where trial attorney failed to investigate and present mitigating evidence of defendant's unstable, impoverished and abusive upbringing).

30. Thus, the fact that a pre-trial mitigation investigation was required in no way relieves mitigation specialists working on post-conviction cases from the obligation to conduct a mitigation investigation that is fully compliant with the ABA Guidelines. If anything, a post-conviction mitigation investigation is more demanding, because the post-conviction investigation requires speaking with witnesses the trial team spoke to, speaking with the trial team members, and investigating sources of mitigation that the trial team overlooked or ignored.

**The Kadamovas Mitigation Investigation**

31. Since this Court appointed IFCD to represent Mr. Kadamovas in July 2019, I have been working diligently on the mitigation investigation.

32. My initial task was familiarizing myself with the case by reviewing the enormous amount of documents we received from Mr. Kadamovas' prior counsel.

33. As I was reviewing and organizing these documents, I was also composing to-do lists and witness lists, formulating a plan for our mitigation investigation. I have identified at least twenty-three witnesses in California who must be interviewed. I have also identified at least seventeen witnesses in Lithuania, where Mr. Kadamovas grew up, who must be interviewed. As discussed above, these interviews should be conducted in person.

34. In accordance with the mitigation plan, I had begun interviewing witnesses in California when any in-person investigation was shut down because of COVID-

19. Returning to California to conduct in-person interviews is currently impossible because of COVID-19.

35.  Also in accordance with the mitigation plan, my first trip to Lithuania was going to be in April 2019. Traveling to Lithuania to interview witnesses is essential because Mr. Kadamovas spent his entire childhood and early-adulthood in Lithuania, aside from the time he spent in other parts of the Soviet Union while in the Soviet military. Members of Mr. Kadamovas' immediately family live in Lithuania, and, like Mr. Kadamovas, speak Russian. I was developing a plan to travel to Lithuania to interview Mr. Kadamovas' family and other witnesses, who speak Russian and Lithuanian. This trip was shut down because of COVID-19. Traveling to Lithuania to conduct in-person interviews, especially interviews that would have to include a translator or mitigation specialist with foreign language skills, is currently impossible because of COVID-19.

36. As discussed above, some record collection can be done by mail or electronically, and I have been working to collect the records I can collect under the current circumstances. However, sometimes collecting records requires in-person visits. Travel to the places where the relevant records are located is not currently possible.

37. I have been remotely working with an individual in Vilnius, Lithuania, who has been assisting me to the best of his abilities to procure records and get contact information from witnesses. He has been able to assist me and provide support

that will be useful when travel to Lithuania can resume. However, he is also limited by Lithuania's shut down in response to the COVID-19 pandemic.

38. In addition, as discussed above, interviews and record-collection inform one other. Interviewing witnesses usually reveals additional documents that need to be collected. And collecting documents usually reveals additional witnesses who need to be interviewed.

39. In the exercise of my professional judgment, the extraordinary circumstances of the COVID-19 pandemic have prevented Mr. Kadamovas' legal team from conducting an adequate mitigation investigation. Further, an adequate mitigation investigation cannot be conducted by October 7, 2020.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed by me this 14th day of August, 2020, in Indianapolis, Indiana.

_s/ Jenna C. Murphy_
Jenna C. Murphy

18