Timothy J. Foley
tfoley9@earthlink.net
Attorney at Law
California State Bar No. 111558
1017 L Street, #348
Sacramento, CA 95814
Tel: (916) 599-3501

Jean E. Giles
jean_giles@fd.org
Indiana State Bar No. 21643-49
F. Italia Patti
italia_patti@fd.org
Indiana State Bar No. 34725-02
Indiana Federal Community Defenders, Inc.
111 Monument Circle, Suite 3200
Indianapolis, IN 46204
Tel: (317) 383-3520

Attorneys for Defendant Jurijus Kadamovas

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br><br>Plaintiff, )<br><br>v. )<br><br>IOURI MIKHEL, and )<br>JURIJUS KADAMOVAS. )<br><br>Defendants. )<br>_____ ) | Case No.    CR 02-00220-MCS<br><br>MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR DISCLOSURE OF DOCUMENTS RELATING TO THE CONSPIRACY TO ESCAPE AND VISA DENIALS<br><br>DATE:    March 1, 2021<br>TIME:    3:00 P.M.<br>COURT:   Hon. Mark C. Scarsi<br>         Courtroom 7C<br>         350 S. First Street<br>         Los Angeles, CA 90012 |

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................ii

I.    INTRODUCTION.........................................................................................1

II.   PROCEDURAL POSTURE AND FOUNDATION FOR DISCLOSURE
      REQUEST ....................................................................................................2

III.  REQUESTS FOR DISCLOSURE ...............................................................7

A.    Documents Related to the Conspiracy to Escape Charge ...................7

1)    Background: the Conspiracy to Escape Allegations and Conviction .................7

2)    J.A.'s Known Activities ...........................................................................12

3)    Redacted Documents................................................................................13

4)    Requested Disclosures.............................................................................15

B.    Documents Related to the Visa Denials................................................18

1)    Background: the Missing Witnesses ......................................................18

2)    Requested Disclosures.............................................................................19

IV.   CONCLUSION AND SUMMARY ............................................................20

## TABLE OF AUTHORITIES

**Cases**

*Bracy v. Gramley*, 520 U.S. 899 (1997) ...................................................................2, 3

*Brady v. Maryland*, 373 U.S. 83 (1963) ...................................................................6, 17

*Calderon v. U.S. Dist. Ct. for N.D. Cal. (Hill),* 120 F.3d 927 (9th Cir. 1997).............4

*Calderon v. U.S. Dist. Ct. for N.D. Cal. (Nicolaus),* 98 F.3d 1102 (9th Cir. 1996).3, 4, 6

*Coleman v. Thompson*, 501 U.S. 722 (1991)................................................................4

*Cullen v. Pinholster*, 563 U.S. 170 (2011) ..................................................................4

*Edelbacher v. Calderon*, 160 F.3d 582 (9th Cir. 1998)..................................................7

*Gaines v. Hess*, 662 F.2d 1364 (10th Cir. 1984) ..........................................................15

*Giglio v. United States*, 405 U.S. 150 (1972)...........................................................6, 17

*Jones v. Wood*, 114 F.3d 1002 (9th Cir. 1997)...............................................................3

*Kyles v. Whitley*, 514 U.S. 419 (1995)...........................................................................6

*Pham v. Terhune*, 400 F.3d 740 (9th Cir. 2005).............................................................3

*United States v. Barnes*, 486 F.2d 776 (8th Cir. 1973)................................................15

*United States v. Cuya*, 964 F.3d 969 (11th Cir. 2020) ..................................................5

*United States v. Dunham Concrete Products, Inc.*, 501 F.2d 80 (5th Cir. 1974)..........5

*United States v. Mikhel & Kadamovas*, 889 F.3d 1003 (9th Cir. 2018).......................1

*United States v. Miramon*, 443 F.2d 361 (9th Cir. 1971)............................................15

*United States v. Price*, 566 F.3d 900 (9th Cir. 2009) .................................................17

*United States v. Price*, 783 F.2d 1132 (4th Cir. 1985) ...............................................15

*Williams v. Taylor*, 529 U.S. 420 (2000)......................................................................4

*Wilson v. Butler*, 825 F.2d 879 (5th Cir. 1987) ...........................................................7

*Woodson v. North Carolina*, 428 U.S. 280 (1976) .......................................................... 7

**Statutes**

18 U.S.C. § 1203 ............................................................................................................... 1

18 U.S.C. § 3500 ............................................................................................................... 7

18 U.S.C. § 371 ............................................................................................................ 1, 10

21 U.S.C. § 846 ............................................................................................................... 13

28 U.S.C. § 2254 ............................................................................................................... 3

28 U.S.C. § 2255 ........................................................................................................... 1, 2

**Other Authorities**

Attorney General Guidelines Regarding the Use of Confidential Informants ............ 18

Department of Justice Criminal Resource Manual ....................................................... 18

**Rules**

Rule 16, Federal Rules of Criminal Procedure ......................................................... 7, 14

Rule 6, Rules Governing Section 2255 Proceedings for the United States District
    Courts ............................................................................................................. 2, 5, 6, 7

Rule 7, Rules Governing Section 2255 Proceedings for the United States District
    Courts .......................................................................................................................... 5, 6

Rule 8, Rules Governing Section 2255 Proceedings for the United States District
    Courts .............................................................................................................................. 6

Defendant Jurijus Kadamovas, through his appointed counsel, has filed a Motion for Disclosure of Documents Relating to the Conspiracy to Escape and Visa Denials.

## I.   INTRODUCTION

Defendant Jurijus Kadamovas is presently incarcerated under sentence of death at the United States Penitentiary in Terre Haute, Indiana. He was convicted in the Central District of California of three counts of hostage taking resulting in death pursuant to 18 U.S.C. § 1203, one count of conspiracy to escape from custody pursuant to 18 U.S.C. § 371, as well as other charges, after a lengthy jury trial that concluded in February of 2007, with the sentence imposed on March 12, 2007. Codefendant Iouri Mikhel was convicted of the same charges and also sentenced to death after a joint trial and shared jury. The convictions and sentences of both defendants were affirmed by the Ninth Circuit in 2018, and the United States Supreme Court denied certiorari on October 7, 2019. *United States v. Mikhel & Kadamovas*, 889 F.3d 1003 (9th Cir. 2018), *cert. denied*, 140 S. Ct. 157 (2019).

In 2019, this Court issued an order appointing current counsel, the Indiana Federal Community Defenders and attorney Timothy J. Foley, to represent defendant Kadamovas in 28 U.S.C. § 2255 and post-conviction proceedings. Doc. # 2331; *see also* Doc. # 2334.

A § 2255 motion to vacate, set aside, or correct the sentence has not yet been filed. Disclosure of the information and documents requested in this motion is

necessary for the development and presentation of claims in the § 2255 proceeding. Denial of discovery, and the consequent denial of a fair opportunity to develop and present challenges to the convictions and death sentence, would be an abuse of discretion, undermine the defendant's rights under the federal statutes, and constitute a violation of his due process and post-conviction rights under the Fifth, Sixth, and Eighth Amendments to the United States Constitution.

## II. PROCEDURAL POSTURE AND FOUNDATION FOR DISCLOSURE REQUEST

In § 2255 proceedings, "A judge may, for good cause, authorize a party to conduct discovery under the Federal Rules of Criminal Procedure or Civil Procedure, or in accordance with the practices and principles of law." Rule 6(a), Rules Governing Section 2255 Proceedings for the United States District Courts.

In cases where a petition for writ of habeas corpus has been filed, good cause is established "where specific allegations . . . show reason to believe that [the movant] may, if the facts are fully developed, be able to demonstrate" that he is entitled to relief. *Bracy v. Gramley*, 520 U.S. 899, 908-09 (1997) (§ 2254 case explaining the good-cause standard). Discovery is appropriate even if the allegations are, as they were in *Bracy*, "quite speculative." 520 U.S. at 905. A petitioner "need not demonstrate that he will ultimately prevail on his underlying . . . claim" to be entitled to discovery, only that the discovery he seeks is necessary to developing the claim. *Pham v. Terhune*, 400 F.3d 740, 743 (9th Cir. 2005) (citing *Bracy*, 520 U.S. at 909).

2

Consequently, "a district court abuse[s] its discretion in not ordering Rule 6(a) discovery when discovery is 'essential' for the habeas petitioner to 'develop fully' his underlying claim." *Pham*, 400 F.3d at 743 (quoting *Jones v. Wood*, 114 F.3d 1002, 1009 (9th Cir. 1997)). As discussed, *infra,* defendant Kadamovas demonstrates good cause that supports the narrow, specific requests for documents and information brought in this motion, and the related potential claims.

As noted, the § 2255 motion has not yet been filed. Rule 6 is silent regarding the question of whether discovery should be allowed in situations where the § 2255 motion has not yet been filed. In the context of challenges to state court convictions under 28 U.S.C. § 2254, however, defendant acknowledges that, under Ninth Circuit caselaw, petitioners are not entitled to pre-petition discovery. *Calderon v. U.S. Dist. Ct. for N.D. Cal. (Nicolaus),* 98 F.3d 1102, 1106 (9th Cir. 1996); *Calderon v. U.S. Dist. Ct. for N.D. Cal. (Hill),* 120 F.3d 927, 928 (9th Cir. 1997). In large part, this prohibition against pre-petition discovery in § 2254 cases is because "courts should not allow prisoners to use federal discovery for fishing expeditions to investigate mere speculation." *Nicolaus*, 98 F.3d at 1106.

Despite some similarities, § 2255 proceedings are, of course, different from § 2254 proceedings, and the differences are especially important when considering whether to permit discovery. In § 2254 cases, the primary post-conviction fact-finding process takes place during the collateral proceedings in state court. The development of new evidence is generally limited to situations where the state court

3

acted unreasonably, and, consequently, many cases do not involve factual development in federal court. *Cullen v. Pinholster*, 563 U.S. 170, 204 (2011) (Alito, J., concurring); *see Nicolaus*, 98 F.3d at 1106. In such cases, the key, initial evaluation of the state court proceedings, manifested in the requirement that the claim be plead and presented prior to the utilization of discovery mechanisms, governs the analysis. Further, § 2254 proceedings involve a federal court assessing the legitimacy of a state court judgment, and important considerations of comity, deference, and respect caution against federal intrusion. *See, e.g.*, *Williams v. Taylor*, 529 U.S. 420, 436 (2000); *Coleman v. Thompson*, 501 U.S. 722, 726 (1991). By contrast, § 2255 proceedings are initial-review collateral proceedings for a federal criminal case, and should involve a less rigid and more equity-based approach.

To counsel's knowledge, the Ninth Circuit has yet to rule specifically whether a district court may grant discovery in a federal criminal case after judgment but before the filing of a § 2255 motion. Elsewhere, the Eleventh Circuit, however, recently held that a prisoner is "not entitled" to discovery procedures prior to the filing of the § 2255 motion. *United States v. Cuya*, 964 F.3d 969, 972 (11th Cir. 2020).[1]

Defendant here first notes that the lack of *entitlement* to discovery does not prohibit the exercise of discretion to *allow* discovery. That is: regardless of whether

---

[1]    *Cuya* cited Fifth Circuit precedent, such as *United States v. Dunham Concrete Products, Inc.*, 501 F.2d 80, 81 (5th Cir. 1974), in support of this conclusion.

4

discovery would be mandatory, this Court has the power, and thus should use its discretion, to allow the disclosure of the information requested for the reasons discussed, *infra*.

Looking at the text of the § 2255 rules, as noted, Rule 6 is not limited to the post-motion situation. In contrast, other rules concerning fact-finding procedures in § 2255 cases are specifically so limited. Rule 7 (governing requests to expand the record) and Rule 8 (governing evidentiary hearings) contain the language "If the [initial] motion is not dismissed" (referring to the preliminary review procedures), limiting the use of these mechanisms to cases in the post-motion posture. Rule 6 contains no such limiting language. The lack of such language, when contrasted with Rule 7 and Rule 8, implies that discovery *can* be used prior to the filing of the initial motion.

Defendant here offers three specific reasons why the Court should allow this narrow, specific, and supported disclosure request, prior to the § 2255 motion.

First, this request is a limited, properly tailored request supported by specific evidence in the record. This is not the "fishing expedition" feared in the *Nicolaus* opinion.

Second, these documents should have been produced at trial. The government has a clear obligation, consistent with fundamental trial rights guaranteed by the Fifth and Sixth Amendments to the Constitution, to disclose to the defense material evidence relating to a criminal prosecution. *Brady v. Maryland*, 373 U.S. 83 (1963);

5

*Giglio v. United States*, 405 U.S. 150 (1972); *Kyles v. Whitley*, 514 U.S. 419 (1995). Rule 16 of the Federal Rules of Criminal Procedure and 18 U.S.C. § 3500 provide support for disclosure as well. These are narrowly drawn requests for documents that should have been disclosed at trial.

Third, given that Rule 6 grants the court discretion to allow pre-motion discovery, discovery here is warranted because this is a capital case. The "finality" of the death penalty and its "qualitative[] differen[ce] from a sentence of imprisonment, however long," magnifies the "need for reliability" and, accordingly, the need for reliable fact-determination procedures. *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976). "[T]he death penalty is qualitatively different from all other punishments and that the severity of the death sentence mandates heightened scrutiny in the review of any colorable claim of error." *Edelbacher v. Calderon*, 160 F.3d 582, 585 (9th Cir. 1998). "[A]s a basic principle of justice . . . if death is involved, the petitioner should be presented every opportunity possible, consistent with the interests of the state, to present facts relevant to his constitutional claims." *Wilson v. Butler*, 825 F.2d 879, 883 (5th Cir. 1987).

The heightened need for reliable fact-finding in capital cases means there is an especially strong need for timely and efficient discovery in § 2255 proceedings. Authorizing discovery prior to the § 2255 motion gives a defendant the opportunity to investigate whether or not the prosecution properly complied with its obligations in order to more accurately and precisely set out the factual basis of a potential claim.

6

## III.   REQUESTS FOR DISCLOSURE

As discussed in the following sections, defendant Kadamovas requests that the Court order the government to produce information and documents relating to two specific areas:

Information and documents related to the conspiracy to escape charge.

Information and documents related to the denial of visas for three witnesses residing in Lithuania.

### A.   Documents Related to the Conspiracy to Escape Charge

#### 1)   Background: the Conspiracy to Escape Allegations and Conviction

In March of 2003, approximately a year after the initial arrest of defendants Mikhel and Kadamovas, an inmate at the Metropolitan Detention Center (MDC) alerted the staff at the jail that a number of inmates were smuggling items into the jail and possibly planning an escape attempt. Transcript, 12/6/06, 33-35, 80-85. Authorities locked down the jail, began an investigation, and searched a number of cells. Transcript, 12/6/06, 87-93.

In cell number 518, on the fifth floor of the facility, the cell that Mikhel shared with an inmate named Kim, authorities found a cache of tools, later referred to at trial by the prosecutor as a "virtual hardware store." Transcript 1/11/07, 50; *see* Transcript 12/6/06, 87-88, 179-96. The items found in the cell included: bolt-cutters, hacksaws, hacksaw blades, wrenches, tin-snips, screwdrivers, gloves, a videocamera, cell phones, paint, brushes, and other items. Transcript 12/6/06, 179-196; Exhibits 800-

884. Authorities also noted that an area of wall behind a mirror had been dug out, forming a hole one by two feet in size. Transcript 12/6/06, 88; Transcript 12/7/06, 51-52. The prosecution's theory was that the inmates in cell 518 were attempting to dig through the wall into a neighboring stairwell. Transcript 12/6/06, 107; Transcript 12/7/06, 107-08, 189.

Kadamovas's cell on the ninth floor, number 913, which he too shared with another inmate, was also searched. Transcript 12/6/06, 102, 134; Transcript 12/7/07, 45. However, no contraband relating to any escape attempt -- no tools, no digging instruments, no cell phones -- was found. Transcript 12/6/06, 45, 93, 175; Transcript 12/7/07, 45. Although that cell, like Mikhel's, was next to the stairwell, no evidence of any digging, and no damage to the wall, was found. Transcript 12/6/06, 102-103, 113, 175.

The investigation into the matter soon led to the arrest of individuals outside the jail who had received payments for their activities, including the smuggling of items into the jail and the planning of a possible escape. Transcript 12/7/06, 23-27; Transcript 12/8/06, 72-76, 104-20.

A little over a year later, in 2004, the government filed a second superseding indictment in this case, adding a charge of conspiracy to escape under 18 U.S.C. § 371 against Mikhel, Kadamovas, as well as a third defendant, Petro Krylov. Doc. # 514.

8

At the joint trial of Mikhel and Kadamovas, the prosecution presented witnesses who testified regarding the items found in Mikhel's cell (as well as Krylov's cell), along with the testimony of inmates involved in the planning and smuggling of tools and cell phones. One former inmate testified as to the discussion he had with Mikhel and the invitation to join in the planned escape. Transcript 12/6/06, 28-31. The wife of a former cellmate of Mikhel's testified as to her involvement from outside the jail, including her purchasing of tools, recruiting of her brother-in-law to smuggle those tools into the jail, and the admissions of her husband regarding the plans. Transcript, 12/8/06, 72-94, 99-126. Trial counsel for Mikhel eventually conceded the conspiracy to escape charge, noting that the "remarkably intrica[te]" planning was "typical of Mr. Mikhel," but pointing out that the planned escape was a non-violent one and that no guns had been found. Transcript 1/11/07, 118.

As to Kadamovas, however, the evidence of his involvement in the conspiracy to escape was virtually nonexistant. No tools had been found in his cell, and the tunneling into the stairwell had not been attempted. Kadamovas was on the ninth floor of the jail, separated from the planning, tool-smuggling, and digging going on four floors below. None of the witnesses active outside the jail had any involvement with, or contact with, Kadamovas.

Nonetheless, the prosecution argued that Kadamovas was part of the conspiracy. The main evidence for this argument -- indeed the only evidence

9

meaningfully linking Kadamovas to the escape attempt -- was the testimony of J.A.,[2] an inmate who had seemingly lived all around the jail, on numerous floors, and testified as to discussions with both Mikhel and Kadamovas. As to Kadamovas, J.A. testified that Kadamovas (who spoke little English at this time) had discussed the escape plan and "told me a little bit . . . he was supposed to like make a hole and they were supposed to squeeze out of there and they were all supposed to go out into the stairwell and meet." Transcript 12/8/06, 149.

The proof of Kadamovas's involvement in the planned escape was almost totally dependent on J.A.'s testimony of his conversations with Kadamovas, and the parties knew it. In summation, the prosecutor relied heavily on J.A.'s testimony (Transcript 1/11/07, 51-52), while Kadamovas's counsel attacked this witness, pointing out the benefits he had manipulated out of the system and the implausibility of his testimony.[3] Transcript, 1/12/07, 58-60.

The jury nonetheless returned guilty verdicts for both Mikhel and Kadamovas on the conspiracy to escape charge. Transcript 1/17/07, 17, 24.

With regard to the planned escape from MDC, however, matters did not end there. The plan to escape was a cornerstone of the prosecution's penalty phase case, a

---

[2]      This witness testified under his name at trial and no attempt was made to disguise his identity.  Nonetheless, given the nature of this witness's involvement in this matter, initials will be used in this pleading.

[3]      Defense counsel asserted, regarding J.A., in argument: "He's a liar. He was a liar. . . So how can you trust him?" Transcript, 1/12/07, 58-60.

10

key component of their argument for the death penalty. The prosecution argued the the escape attempt showed future dangerousness. Transcript 2/9/07, 36-37. In making this assertion, the prosecution made little distinction between the two defendants, telling the jury that the planned escape showed that the only way to assure that the defendants would not someday walk the streets to kill again was to execute them:

> Would they be willing and able to kill to get out of prison? . . . Of course they would. . . Would they be willing and able to do that again? You saw the sheer magnitude of the sophistication of the MDC escape attempt, the tools that they brought in; the people that they drew into the plot;

Transcript 2/9/07, 36-37.

> It would only be a matter of time before the defendants exploited yet another weakness in the system. And if they're not executed, they will have nothing but time on their hands to try.

> And they will also, ladies and gentlemen, if they're not given a death sentence, they will have absolutely nothing to lose

Transcript 2/9/07, 38.

> And would you be surprised if you picked up a newspaper five years from now, ten years from now, and found out that he had escaped from custody. You wouldn't be surprised in the least, would you?

Transcript, 2/9/07, 151.

Thus, the testimony of J.A. was crucial to securing the conviction for conspiracy to escape and, as such, provided the foundation for the prosecution's strenuous argument, apparently accepted by the jury, that the death penalty was the appropriate sentence for Jurijus Kadamovas.

11

### 2)   J.A.'s Known Activities

Federal court documents reveal that, in 2001, Southern California resident J.A. was charged with distribution of cocaine, a violation of 21 U.S.C. § 846, in another state. After he agreed to cooperate, the case was transferred to the Central District of California, and J.A. was held in the MDC. On May 20, 2002, J.A. entered into a plea agreement, two pages of which are attached as Exhibit A.[4]  Included in the agreement was the following:

> Defendant further has expressed an interest in the future to cooperate fully with the USAOS, the Federal Bureau of Investigation and the Drug Enforcement Administration, and, as directed by the USAOS, with any other federal, state, or local law enforcement agency. The cooperation requires defendant to:
>
> *   *   *
>
> (d) Act, if requested to do so, in an undercover capacity, including the wearing [of] a recording device and consensual recording of telephone conversations, to the best of defendant's ability in connection with criminal investigations by federal, state, or local law enforcement authorities, in accordance with the instructions of those law enforcement authorities.

Exhibit A.

Discovery produced to the defense in this case relating to this witness prior to trial included a print out of J.A.'s criminal history, two FBI 302s related to interviews about the escape plan, court documents from the federal criminal case relating to the

---

[4]   The defendant is not mentioned by name in these two pages. Discovery Bates 76897-98. The plea agreement was originally under seal but unsealed by court order dated April 12, 2006, and produced in discovery in the Mikhel/Kadamovas case. Discovery Bates 76930-31. Portions of the plea agreement were discussed during the testimony of J.A. Transcript 1/12/08, 166-167, 187-189.

plea agreement and the prosecution's Rule 35 motion to reduce his sentence, and documents relating to his housing assignments at the jail. Discovery Bates 79261-76, 38094-97, 62006-09, 76890-926, 81636-53, 62029 (Exhibit 907). However, no documents relating to his work in other criminal investigations, his debriefing on the cocaine distribution network, his undercover actions, or his participation with law enforcement in other matters, was disclosed. Nor was a DEA or FBI file regarding J.A.'s activities as an informant produced.

### 3)    Redacted Documents

The government provided, in the trial discovery disclosures, reports concerning the escape, and 302 interview forms containing statements of many of the prisoners interviewed. However, those statements were heavily redacted and many of the 302s did not disclose the name of the actual witness. While such redactions are sometimes allowed under Federal Rule of Criminal Procedure 16(d)(1) and under situations where the identity of a confidential informant needs to be protected, such non-disclosures are subject to strict limits, and disclosure is almost always needed when the informant is an accessory to the underlying criminal events. *United States v. Miramon*, 443 F.2d 361, 363 (9th Cir. 1971); *United States v. Price*, 783 F.2d 1132, 1139 (4th Cir. 1985); *United States v. Barnes*, 486 F.2d 776, 778-79 (8th Cir. 1973). The failure to fully disclose such evidence infringes on "the defendant's constitutional right to a fair trial, which includes the right to adequately prepare and present that defense." *Gaines v. Hess*, 662 F.2d 1364, 1368 (10th Cir. 1984).

Unredacted copies of these memos and reports should have been demanded during the trial. Why the court was not asked to rule on the redactions at that time is not known.[5] Regardless, unredacted copies should be released to current counsel in order to aid counsel in investigating the escape and identifying further evidence that Mr. Kadamovas had no involvement in the planned escape.

---

[5]      The record reveals that, during pre-trial discovery production, the prosecution admitted to redacting "the names of inmates at MDC who were interviewed by both MDC officials and the FBI." The prosecution advised defense counsel that "We will provide these names to you orally upon request, but you should refrain from writing those names on the memoranda of interview and providing them to your clients." Letter, July 7, 2004, included as Exhibit C to Government's Response to Defendant Mikhel's Motion for Penalty Phase Discovery, Doc. # 955. How often the defense made such requests, and how those requests were handled, is not known. Defense counsel for Mikhel complained at least once about similar redactions in the discovery. Reply to Government's Response to Defendant's Joinder in Motion to Continue Trial, Doc. # 979, p. 2 ("the government continues to redact relevant portions of investigation report[s] and refuses to provide counsel with information allowing the location of all those interviewed"). The prosecution offered to submit disputes to the court.  Letter, January 31, 2005, included as Exhibit N to Government's Response to Defendant Mikhel's Motion for Penalty Phase Discovery, Doc. # 955. Current counsel has not uncovered any court order addressing or approving the redactions.

14

### 4)    Requested Disclosures

As noted, the government had an obligation, before trial, to disclose to the defense favorable material evidence under *Brady, Giglio*, and their progeny. Obligations under *Brady* encompass "impeachment evidence, and evidence that would impeach a central prosecution witness is indisputably favorable to the accused." *United States v. Price*, 566 F.3d 900, 907 (9th Cir. 2009). The past exploits of a criminal informant, the information he revealed and the rewards he received, and the government's evaluations of these exploits, constitute impeachment evidence within the scope of the *Brady* obligation. Here, J.A. was a crucial witness for the prosecution, and his credibility was very much in dispute.

Consequently, counsel for defendant Kadamovas requests that the government produce the following items:

1.    The Confidential Informant file relating to J.A., including the suitability reports, the suitability reviews, evaluations, interviews, reports of activities, monetary disbursements, and any other documents, held by the DEA, the FBI, and any other federal law enforcement agency.

The Attorney General Guidelines Regarding the Use of Confidential Informants (AG Guidelines) define a Confidential Informant as "any individual who provides useful and credible information" to a federal law enforcement agency "regarding felonious criminal activities, and from whom [the law enforcement agency] . . . expects or intends to obtain additional useful and credible information regarding such activities in the future." AG Guidelines I.B.7. The AG Guidelines require that a suitability determination and report be made regarding any Confidential

15

Informant, and a file be maintained by the DOJ law enforcement agency involved. That file includes information about the CI, including reports of reliability and truthfulness, criminal record, descriptions of assistance, and other matters. Defendant requests a copy of this file.

    2.     The Criminal Division's Office of Enforcement Operations file relating to J.A. and any operation or investigation involving J.A., including all requests from law enforcement agencies, reports, summaries, evaluations, and any other documents.

Section 703 of the Department of Justice Criminal Resource Manual states that all requests by investigative agencies to use persons in the custody of the Bureau of Prisons for investigative purposes, "must be submitted in, in writing," to the Chief of the Witness Security and Special Operations Unit, the Office of Enforcement Operations (OEO), Criminal Division. Prior to utilizing a BOP prisoner for any operation, the OEO must approve the use of the inmate and that documentation must be maintained in the file. AG Guidelines, II.D.3. Defendant requests a copy of this file.

In addition, as noted, much of the information regarding the escape allegations was shrouded in mystery because the discovery produced by the prosecution included redacted copies, blocking out names and crucial information, of the investigative memorandum and 302 interviews of those involved. Thus, defendant requests:

    3.     Unredacted copies of BOP memorandum produced in discovery during the trial relating to the attempted escape, including:

16

A.    Battley Memorandum to Warden Benov (redacted), 4/29/2003, 9 pages. Discovery Bates 38762-38770.

B.    Inmate Investigative Report by Harlien to Wanamaker (redacted), 4/29/2003, 15 pages. Discovery Bates 38747-38761.

C.    Memorandum to Wanamaker, from MDC staff member (redacted), 7/2/2003, 1 page. Discovery Bates 38993.

D.    Memorandum report by Battley (redacted), 3/8/2003, 3 pages. Discovery Bates 38865-38867.

E.    FD 340, Sotelo handwritten notes (redacted), 3/13/03, 7 pages, Discovery Bates 40166-40172.

4.    Unredacted versions of 302s involving interviews with witnesses to the attempted escape.

A.    Report of interview of witness (redacted), 3/13/2003, 4 pages. Discovery Bates 39111-39114.

B.    Report of interview of witness (redacted), 6/9/2004, 4 pages. Discovery Bates 62006-62009.

C.    Report of interview of witness (redacted), 4/11/2003, 3 pages. Discovery Bates 39108-39110.

D.    Report of interview of witness (redacted), 8/3/2004, 3 pages. Discovery Bates 62003-62005.

E.    Report of interview of witness (redacted), 4/3/03, 1 page. Discovery Bates 38136.

F.    Report of interview of witness (redacted), 3/08/03, 3 pages. Discovery Bates 38129-38131.

G.    Report of interview of witness (redacted), 3/12/03, 4 pages. Discovery Bates 38132-38135.

17

These documents should be produced to allow defendant Kadamovas a fair opportunity to review and investigate the circumstances of the attempted escape.

**B.      Documents Related to the Visa Denials**

**1)      Background: the Missing Witnesses**

During the trial, defendant's counsel attempted to present three members of Jurijus Kadamovas's family as mitigation witnesses during the penalty trial: his sister Svetlana Kadamovas, his wife Jurate Kadamovas, and his son Gabriel Kadamovas. These three witnesses never testified because they were denied visas to travel to the United States.

The circumstances behind the situation, in summary: on January 31, 2007, during the penalty phase trial, counsel for Kadamovas noted that there was a problem getting visas for witnesses traveling from Lithuania. Transcript, 1/3/07, 220. On February 6, 2007, defense counsel made a motion for mistrial on the grounds that the three witnesses, Svetlana Kadamovas, Jurate Kadamovas, and Gabriel Kadamovas, were denied visas by the American Embassy in Vilnuis, Lithuania. Transcript, 2/6/07, 7. The prosecution took the position that defense counsel had been informed well in advance about the requirements to secure a visa and simply neglected to timely apply, and suggested that the "lack of urgency" was actually a strategic choice. Transcript, 2/6/07, 8-11. The trial court denied the motion for mistrial. Transcript, 2/6/07, 12.

The matter was raised again in a motion for new trial after the penalty verdicts, with the defense claiming that the denial of the testimony of these witnesses resulted

18

in a violation of the Eighth Amendment. *See* Doc. # 1562, pp. 3, 6-7. In response to that motion, the prosecution filed a declaration executed by Special Agent Louis Perez that described some of the circumstances surrounding the denial of the visas. Doc. # 1578-2. Special Agent Perez stated that he had attempted to aid the defense after they requested help securing the visas for the three witnesses. His efforts involved getting "information . . . provided to me by the FBI Legal Attaché covering Lithuania." Doc. # 1578-2, p. 4. Special Agent Perez also asserted that, despite warnings, the failure to obtain visas was due to the witnesses "delay in applying for these visas" which "did not afford the Consulate with enough time to conduct the background checks that were required to issue the requested visas." Doc. # 1578-2, p. 4.

No hearing was conducted into the circumstances surrounding the visa denials. Current counsel knows of no documentation that was turned over regarding the visa denials. Without a doubt, such documentation is relevant to the question of why the witnesses did not testify and relevant to the question of whether defendant's constitutional rights were respected or violated.

### 2) Requested Disclosures

Consequently, defendant Kadamovas requests that the Court order the following documents produced:

5.  All documents related to visa applications of Lithuanian citizens Svetlana Kadamovas, Jurate Kadamovas, and Gabriel Kadamovas (possible alternative spellings: Kadamov and Kadamoviene), in January-February 2007

19

in possession of the United States Attorney, the FBI, the Department of Justice, the Department of State, the United States Embassy (or Consulate) in Vilnius, Lithuania, or any other government agency.

6.      All documents, correspondence, including e-mails, or other communications exchanged between Special Agent Louis Perez, or other members of the prosecution team, and the United States Embassy (or Consulate) in Vilnius, Lithuania, regarding the visa applications of Lithuanian citizens Svetlana Kadamovas, Jurate Kadamovas, and Gabriel Kadamovas (possible alternative spellings: Kadamov and Kadamoviene), in January-February 2007, the visa application process in general, or the visa applications of any other witnesses, potential or actual, in this case.

7.      All documents, correspondence, including e-mails, or other communications exchanged between Special Agent Louis Perez and the FBI Legal Attaché covering Lithuania, relating to the visa applications of Lithuanian citizens Svetlana Kadamovas, Jurate Kadamovas, and Gabriel Kadamovas (possible alternative spellings: Kadamov and Kadamoviene), in January-February 2007, the visa application process in general, or the visa applications of any other witnesses in this case.

## IV.    CONCLUSION AND SUMMARY

Accordingly, counsel for Kadamovas requests that this Court issue an order compelling the government to produce the items listed as quickly as possible.

1.      The Confidential Informant file relating to J.A., including the suitability reports, the suitability reviews, evaluations, interviews, reports of activities, monetary disbursements, and any other documents, held by the DEA, the FBI, and any other federal law enforcement agency.

2.      The Criminal Division's Office of Enforcement Operations file relating to J.A. and any operation or investigation involving J.A., including all requests from law enforcement agencies, reports, summaries, evaluations, and any other documents.

3.      Unredacted copies of BOP memorandum produced in discovery during the trial relating to the attempted escape, including:

20

A.     Battley Memorandum to Warden Benov (redacted), 4/29/2003, 9 pages. Discovery Bates 38762-38770.

B.     Inmate Investigative Report by Harlien to Wanamaker (redacted), 4/29/2003, 15 pages. Discovery Bates 38747-38761.

C.     Memorandum to Wanamaker, from MDC staff member (redacted), 7/2/2003, 1 page. Discovery Bates 38993.

D.     Memorandum report by Battley (redacted), 3/8/2003, 3 pages. Discovery Bates 38865-38867.

E.     FD 340, Sotelo handwritten notes (redacted), 3/13/03, 7 pages, Discovery Bates 40166-40172.

4.     Unredacted versions of 302s involving interviews with witnesses to the attempted escape.

A.     Report of interview of witness (redacted), 3/13/2003, 4 pages. Discovery Bates 39111-39114.

B.     Report of interview of witness (redacted), 6/9/2004, 4 pages. Discovery Bates 62006-62009.

C.     Report of interview of witness (redacted), 4/11/2003, 3 pages. Discovery Bates 39108-39110.

D.     Report of interview of witness (redacted), 8/3/2004, 3 pages. Discovery Bates 62003-62005.

E.     Report of interview of witness (redacted), 4/3/03, 1 page. Discovery Bates 38136.

F.     Report of interview of witness (redacted), 3/08/03, 3 pages. Discovery Bates 38129-38131.

G.     Report of interview of witness (redacted), 3/12/03, 4 pages. Discovery Bates 38132-38135.

5.     All documents related to visa applications of Lithuanian citizens Svetlana Kadamovas, Jurate Kadamovas, and Gabriel Kadamovas (possible

21

alternative spellings: Kadamov and Kadamoviene), in January-February 2007 in possession of the United States Attorney, the FBI, the Department of Justice, the Department of State, the United States Embassy (or Consulate) in Vilnius, Lithuania, or any other government agency.

6.     All documents, correspondence, including e-mails, or other communications exchanged between Special Agent Louis Perez, or other members of the prosecution team, and the United States Embassy (or Consulate) in Vilnius, Lithuania, regarding the visa applications of Lithuanian citizens Svetlana Kadamovas, Jurate Kadamovas, and Gabriel Kadamovas (possible alternative spellings: Kadamov and Kadamoviene), in January-February 2007, the visa application process in general, or the visa applications of any other witnesses, potential or actual, in this case.

7.     All documents, correspondence, including e-mails, or other communications exchanged between Special Agent Louis Perez and the FBI Legal Attaché covering Lithuania, relating to the visa applications of Lithuanian citizens Svetlana Kadamovas, Jurate Kadamovas, and Gabriel Kadamovas (possible alternative spellings: Kadamov and Kadamoviene), in January-February 2007, the visa application process in general, or the visa applications of any other witnesses in this case.

Respectfully submitted,

Dated: January 29, 2021                    /s/Timothy J. Foley
                                           TIMOTHY J. FOLEY
                                           Counsel for Defendant
                                           Jurijus Kadamovas

22