Timothy J. Foley
tfoley9@earthlink.net
Attorney at Law
California State Bar No. 111558
1017 L Street, #348
Sacramento, CA 95814
Tel: (916) 599-3501

Jean E. Giles
jean_giles@fd.org
Indiana State Bar No. 21643-49
F. Italia Patti
italia_patti@fd.org
Indiana State Bar No. 34725-02
Joshua B. Pickar
josh_pickar@fd.org
New York State Bar No. 5579768
Indiana Federal Community Defenders, Inc.
111 Monument Circle, Suite 3200
Indianapolis, IN 46204
Tel: (317) 383-3520

Attorneys for Defendant Jurijus Kadamovas

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| JURIJUS KADAMOVAS, | ) | Case No. 2:23-cv-08289 |
| | ) | |
| Movant, | ) | Related Case No. 2:02-cr-00220-MCS |
| | ) | |
| v. | ) | MEMORANDUM IN SUPPORT |
| | ) | OF MOTION TO VACATE, |
| | ) | SET ASIDE, OR CORRECT |
| UNITED STATES OF AMERICA, | ) | THE CONVICTION AND SENTENCE |
| | ) | PURSUANT TO 28 U.S.C. § 2255 |
| Respondent. | ) | |
| _____ | | |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................iv

PRELIMINARY ALLEGATIONS .....................................................................1

STATEMENT OF THE CASE AND PROCEDURAL HISTORY .......................4

TIMELINESS OF THIS MOTION ...................................................................16

INADEQUACY OF THE PROCEEDINGS .......................................................17

FACTUAL INTRODUCTION ..........................................................................27

OUTLINE OF EVIDENCE INTRODUCED AT TRIAL....................................34

SECTION 2255 PROCEDURE ........................................................................44

CLAIM 1 ANONYMOUS JURY......................................................................49

CLAIM 2 JURY MISCONDUCT AND BIAS ..................................................60

CLAIM 3 DENIAL OF FAIR CROSS-SECTION ............................................71

CLAIM 4 UNLAWFUL GENDER DISCRIMINATION IN JURY SELECTION ...................................................................................................78

CLAIM 5 IMPROPER SHACKLING ..............................................................85

CLAIM 6 IMPROPER DENIAL OF CONTINUANCES ...................................92

CLAIM 7 JUDICIAL BIAS.............................................................................110

CLAIM 8 UNFAIR PREJUDICE OF MIKHEL'S TESTIMONY .....................116

CLAIM 9 DENIAL OF SEVERANCE .............................................................139

CLAIM 10 DENIAL OF ACCESS TO CASE MATERIALS.............................147

CLAIM 11 MISLEADING AND INACCURATE TRANSLATION AT TRIAL ..................................................................................................................157

CLAIM 12 FAILURE TO INSTRUCT ON DURESS DEFENSE.......................168

CLAIM 13 IMPROPER USE OF A CONFIDENTIAL INFORMANT..............176

i

Case 2:02-cr-00220-MCS   Document 2471-1   Filed 10/03/23   Page 3 of 427   Page ID #:14758

CLAIM 14 FAILURE TO DISCLOSE NATAYLA SOLOVYEVA'S DIARY ..180

CLAIM 15 SUPPRESSION OF EVIDENCE RELATING TO CONFIDENTIAL INFORMANT ...................................................................................................195

CLAIM 16 FALSE EVIDENCE RELATING TO ESCAPE CONSPIRACY .....211

CLAIM 17 SUPPRESSION OF MATERIAL EVIDENCE AND GOVERNMENT MISCONDUCT ...................................................................................................218

CLAIM 18 INEFFECTIVE ASSISTANCE OF COUNSEL: FAILURE TO OBJECT TO SHACKLING ...................................................................................220

CLAIM 19 INEFFECTIVE ASSISTANCE OF COUNSEL: GUILT PHASE TRIAL ...................................................................................................................226

CLAIM 20 INEFFECTIVE ASSISTANCE OF COUNSEL: CONSPIRACY TO ESCAPE ................................................................................................................251

CLAIM 21 INEFFECTIVE ASSISTANCE OF COUNSEL: PENALTY PHASE TRIAL ...................................................................................................................262

CLAIM 22 DENIAL OF MITIGATION SPECIALIST AND RESOURCES FOR MITIGATION INVESTIGATION...................................................................345

CLAIM 23 GOVERNMENT MISCONDUCT REGARDING DEFENSE WITNESS VISA APPLICATIONS .........................................................................359

CLAIM 24 IMPROPERLY DOUBLE-COUNTED AGGRAVATING FACTOR ...............................................................................................................................366

CLAIM 25 THE DEATH PENALTY IS UNCONSTITUTIONAL.....................370

CLAIM 26 EXCESSIVE DELAY ........................................................................373

CLAIM 27 ARBITRARY SENTENCING ...........................................................377

CLAIM 28 DOUBLE JEOPARDY VIOLATION................................................384

CLAIM 29 VIOLATIONS OF INTERNATIONAL LAW...................................387

CLAIM 30 INEFFECTIVE ASSISTANCE OF COUNSEL: APPELLATE PROCEEDINGS ...................................................................................................399

CLAIM 31 LACK OF FEDERAL JURISDICTION ...........................................401

ONGOING INVESTIGATION UNDER FREEDOM OF INFORMATION ACT ....................................................................................................................404

INCORPORATION OF RECORD ....................................................................410

PRAYER FOR RELIEF ...................................................................................411

# TABLE OF AUTHORITIES

**Cases**

*Abuan v. Level 3 Commc'ns, Inc.*, 353 F.3d 1158 (10th Cir. 2003) ........................89

*Ake v. Oklahoma,* 490 U.S. 68 (1985) ...............................................337

*Aymo v. Sessions*, 742 F. App'x 237 (9th Cir. 2018)................................154

*Banks v. Dretke*, 540 U.S. 668 (2004) ...............................................177

*Batson v. Kentucky*, 476 U.S. 79 (1986)...............................................76

*Baumann v. United States*, 692 F.2d 565 (9th Cir. 1982).........................43

*Benn v. Lambert*, 283 F.3d 1040 (9th Cir. 2002).............................191, 207

*Bentley v. Crist*, 469 F.2d 854 (9th Cir. 1972)......................................142

*Bloomer v. United States*, 162 F.3d 187 (2d Cir. 1998) .........................248

*Brady v. Maryland*, 373 U.S. 83 (1963) .......................191, 207, 214, 351

*Brewer v. Williams*, 430 U.S. 387 (1977)..............................................173

*Brown v. Ohio*, 432 U.S. 161 (1977) ...................................................379

*Bruton v. United States*, 391 U.S. 123 (1968) .............115, 133, 134, 141

*Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868 (2009)......................109

*Castillo v. Stainer*, 983 F.2d 145 (9th Cir. 1992) ...................................88

*Ceja v. Stewart*, 134 F.3d 1368 (9th Cir. 1998)....................................376

*Coker v. Georgia*, 433 U.S. 584 (1977)...............................................357

*Correll v. Ryan*, 539 F.3d 938 (9th Cir. 2008).............................259, 343

*Courtney v. United States*, 390 F.2d 521 (9th Cir. 1968) ......................136

*Coy v. Iowa*, 487 U.S. 1012 (1988).....................................................154

*Cruz v. New York*, 481 U.S. 186 (1987) ...............................................115

*Daniels v. Woodford*, 428 F.3d 1181 (9th Cir. 2005) ........................................92, 260

*Deck v. Missouri*, 544 U.S. 622 (2005) ............................. 83, 87, 88, 217, 221, 331

*Dow v. Virga*, 729 F.3d 1041 (9th Cir. 2013) ........................................................211

*Dubin v. United States*, 599 U.S. 110 (2023) .......................................................396

*Duckett v. Godinez*, 67 F.3d 734 (9th Cir. 1995)..................................................331

*Duren v. Missouri*, 439 U.S. 357 (1979) ........................................................69, 70

*Dyer v. Calderon*, 151 F.3d 970 (9th Cir. 1998) (en banc) ....................................58

*Eddings v. Oklahoma*, 455 U.S. 104 (1982) ...................................102, 165, 351

*Felts v. Estelle*, 875 F.2d 785 (9th Cir. 1989)......................................................142

*Ford v. Wainwright*, 477 U.S. 399 (1986) ............................................................362

*Furman v. Georgia*, 408 U.S. 238 (1972)...............................................363, 370, 376

*Giglio v. United States*, 405 U.S. 150 (1972) .........................................191, 207, 214

*Glossip v. Gross*, 576 U.S. 863 (2015) ..................................................................364

*Godoy v. Spearman*, 861 F.3d 956 (9th Cir. 2017)..................................................58

*Greenburger v. Roundtree*, 17 Civ. 3295, 2020 WL 4746460 (S.D.N.Y. Aug. 16, 2020)..................................................................................................................367

*Gregg v. Georgia*, 428 U.S. 153 (1976) ................................................................363

*Hinton v. Alabama*, 571 U.S. 263 (2014) .............................................................223

*Illinois v. Allen,* 397 U.S. 337 (1970) .........................................................221, 331

*In re Al-Nashiri*, 921 F.3d 224 (D.C. Cir. 2019) .................................109, 113, 114

*In re Fed. Bureau of Prisons' Execution Protocol Cases*, 955 F.3d 106 (D.C. Cir. 2020)..................................................................................................................372

*In re Murchison*, 349 U.S. 133 (1955).................................................................109

*In re Winship*, 397 U.S. 358 (1970)......................................................................165

*Irvin v. Dowd*, 366 U.S. 717 (1961)................................................................49

*J.E.B. v. Alabama*, 511 U.S. 127 (1994)........................................................76

*Johnson v. United States*, 544 U.S. 295 (2005) .........................................15

*Jones v. Chappell,* 31 F. Supp. 3d 1050 (C.D. Cal. 2014)..........................376, 377

*Karis v. Calderon*, 283 F.3d 1117 (9th Cir. 2002) ....................................260

*Kennedy v. Louisiana*, 554 U.S. 407 (2008)..............................................362

*Kyles v. Whitley*, 514 U.S. 419 (1995).........................................177, 191, 207, 214

*Larson v. Palmateer*, 515 F.3d 1057 (9th Cir. 2008) ................................88

*Lee v. Kemna*, 534 U.S. 362 (2002)...........................................................91

*Lewis v. Casey*, 518 U.S. 343 (1996)........................................................150

*Lilly v. Virginia*, 527 U.S. 116 (1999) .....................................................254

*Lockett v. Ohio*, 438 U.S. 586 (1978) ...........................................102, 137, 317, 352

*Maine v. Moulton*, 474 U.S. 159 (1985) ..................................................172

*Marshall v. United States*, 360 U.S. 310 (1959)......................................49, 136

*Massaro v. United States*, 538 U.S. 500 (2003) .....................................45, 223

*Massiah v. United States*, 377 U.S. 201 (1964).......................................172

*Maxwell v. Roe*, 628 F.3d 486 (9th Cir. 2010)......................................177, 184, 211

*McWilliams v. Dunn,* 582 U.S. 183 (2017)...............................................337

*Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009) ..........................155

*Melnik v. Dzurenda*, 14 F.4th 981 (9th Cir. 2021) .................................155

*Mempha v. Rhay*, 389 U.S. 128 (1967)....................................................173

*Morgan v. Illinois*, 504 U.S. 719 (1992)...........................................48, 312, 317

*Napue v. Illinois*, 360 U.S. 264 (1959) ...................................................207

*North Carolina v. Pearce*, 395 U.S. 711 (1969)........................................................379

*Odom v. United States*, 377 F.2d 853 (5th Cir. 1967) ............................................136

*Payne v. Tennessee,* 501 U. S. 808 (1991) ...............................................................317

*Peña-Rodriquez v. Colorado*, 580 U.S. 206 (2017) ...........................................48, 58

*People v. Burgener*, 41 Cal. 3d 505 (1986) ...............................................................66

*Pointer v. Texas*, 380 U.S. 400 (1965)....................................................................154

*Presley v. Georgia*, 558 U.S. 209 (2010)............................................................48, 52

*Press-Enterprise Co. v. Superior Court*, 464 U.S. 501 (1984).................................52

*Remmer v. United States*, 350 U.S. 377 (1956) .........................................................58

*Sampson v. United States*, 724 F.3d 150 (1st Cir. 2013) ....................................46, 49

*Sanders v. Davis*, 23 F.4th 966 (9th Cir. 2022) .....................................................259

*Sanders v. Ratelle*, 21 F.3d 1446 (9th Cir. 1994) ..................................................224

*Simmons v. Dickhaut*, 804 F.2d 182 (1st Cir. 1986)...............................................151

*Smith v. O'Grady*, 312 U.S. 329 (1941) .................................................................145

*Sochor v. Florida*, 504 U.S. 527 (1992) .................................................................317

*Spain v. Rushen*, 883 F.2d 712 (9th Cir. 1989).................................................83, 88

*Stankewitz v. Woodford*, 365 F.3d 706 (9th Cir. 2004) .........................................260

*State v. Gregory*, 427 P.3d 621 (Wash. 2018) (en banc)........................................364

*State v. Santiago*, 122 A.3d 1 (Conn. 2015) ..........................................................364

*State v. Vasquez*, 121 P.2d 903 (Utah 1942)...........................................................145

*Stephenson v. Neal*, 865 F.3d 956 (7th Cir. 2017)...........................................87, 217

*Stephenson v. Wilson*, 619 F.3d 664 (7th Cir. 2010) ...............................................87

*Strickland v. Washington*, 466 U.S. 668 (1984) .............................46, 217, 224, 247

*Strickler v. Greene*, 527 U.S. 263 (1999) ...............................................177, 184, 211

*Stringer v. Black*, 503 U.S. 222 (1992)........................................................358, 359

*Taylor v. Louisiana*, 419 U.S. 522 (1975) ................................................................69

*Test v. United States*, 420 U.S. 28 (1975)................................................................73

*Thomas v. Chappell*, 678 F.3d 1086 (9th Cir. 2012) .............................................248

*Toolate v. Borg*, 828 F.2d 571 (9th Cir. 1987) ...............................................115, 133

*Townsend v. Sain*, 372 U.S. 293 (1963)...................................................................44

*Trobaugh v. Hall*, No. C97-0125, 1999 WL 33655718 (N. D. Iowa Dec. 6, 1999) ...............................................................................................................367

*Trop v. Dulles* 356 U.S. 86 (1958)........................................................................362

*Tuilaepa v. California*, 512 U.S. 967 (1994)........................................................357

*Turner v. Murray*, 476 U.S. 28 (1986)....................................................................48

*Ungar v. Sarafite*, 376 U.S. 575 (1964)...........................................................91, 105

*United States ex rel. Negron v. New York*, 434 F.2d 386 (2d Cir. 1970) .............145

*United States v. Alden*, 776 F.2d 771 (8th Cir. 1985)..............................................74

*United States v. Algarate-Valencia*, 550 F.3d 1238 (10th Cir. 2008) ....................89

*United States v. Bagley*, 473 U.S. 667 (1985) .......................................191, 207, 214

*United States v. Bankston*, 820 F.3d 215 (6th Cir. 2016) ....................................247

*United States v. Barrett*, 985 F.3d 1203 (10th Cir. 2021) ......................................45

*United States v. Blagojevich*, 612 F.3d 558 (7th Cir. 2010)...................................49

*United States v. Blanco*, 392 F.3d 382 (9th Cir. 2004)..................................191, 207

*United States v. Contento-Pachon*, 723 F.2d 691 (9th Cir. 1984)........................165

*United States v. Coppa*, 267 F.3d 132 (9th Cir. 2001) .........................................177

*United States v. Coward*, 630 F.2d 229 (4th Cir. 1980) .........................................143

*United States v. Cronic*, 466 U.S. 648 (1984) .......................................................153

*United States v. Davenport*, 753 F.2d 1460 (9th Cir. 1985).........................177, 185

*United States v. Edouard*, 485 F.3d 1324 (9th Cir. 2007)....................................154

*United States v. Fell,* 2014 WL 3697810 (D. Vt. July 24, 2014) ......................46, 49

*United States v. Gonzales*, 150 F.3d 1246 (10th Cir. 1998) ................................339

*United States v. Hager*, 721 F.3d 167 (4th Cir. 2013).............................................51

*United States v. Hammer*, 404 F. Supp. 2d 676 (M.D. Pa. 2005) ...........................46

*United States v. Henry*, 447 U.S. 264 (1980) ...............................................172, 174

*United States v. Hernandez-Estrada*, 749 F.3d 1154 (9th Cir. 2014) .....................70

*United States v. Higgs*, 141 S. Ct. 645 (2021) ......................................................372

*United States v. Howard*, 381 F.3d 873 (9th Cir. 2004)...........................................44

*United States v. Kloehn*, 620 F.3d 1122 (9th Cir. 2010).........................96, 100, 104

*United States v. Kreutzer,* 61 M.J. 293 (C.A.A.F. 2005)......................................337

*United States v. Kuok*, 671 F.3d 931 (9th Cir. 2012).....................165, 167, 240, 326

*United States v. Layton*, 519 F. Supp. 946 (N.D. Cal. 1981) .................................74

*United States v. Leonti*, 326 F.3d 1111 (9th Cir. 2003).............................................43

*United States v. Little*, 753 F.2d 1420 (9th Cir. 1984)..........................................351

*United States v. Lyons*, 703 F.2d 815 (5th Cir. 1983) ...........................................133

*United States v. McDuffie*, 454 F. App'x 624 (9th Cir. 2011)......................177, 185

*United States v. McVeigh*, 944 F. Supp. 1478 (D. Colo. 1996)....................357, 359

*United States v. Mejia*, 69 F.3d 309 (9th Cir. 1995)................................................96

*United States v. Miller*, 529 F.2d 1125 (9th Cir. 1976)...............................178, 185

*United States v. Moore*, 159 F.3d 1154 (9th Cir. 1998) ........................................106

*United States v. Mosquera*, 816 F. Supp. 168 (E.D.N.Y. 1993)....................145, 162

*United States v. Nguyen*, 262 F.3d 998 (9th Cir. 2001).................................92, 105

*United States v. Obagi*, 965 F.3d 993 (9th Cir. 2020) ...................................177, 185

*United States v. Parse,* 789 F.3d 83 (2d Cir. 2015)......................................................58

*United States v. Rinaldi*, 301 F.2d 576 (2d Cir. 1962) ...........................................136

*United States v. Rivera-Guerrero*, 426 F.3d 1130 (9th Cir. 2005)..........................92

*United States v. Rodriguez*, 49 F.4th 1205, 1213 (9th Cir. 2022) .........................45

*United States v. Rodriguez*, 587 F.3d 573 (2d Cir. 2009)......................................398

*United States v. Rodriguez-Lara*, 421 F.3d 932 (9th Cir. 2005) .................70, 71, 75

*United States v. Romanello*, 726 F.2d 173 (5th Cir. 1984)....................................137

*United States v. Royal*, 100 F.3d 1019 (1st Cir. 1996) ....................................74, 106

*United States v. Rudolph*, 403 F.2d 805 (6th Cir. 1968) .......................................136

*United States v. Sanchez-Lopez*, 879 F.2d 541 (9th Cir. 1989) (en banc)...............71

*United States v. Schaflander*, 743 F.2d 714 (9th Cir. 1984)...................................43

*United States v. Seifert*, 648 F.2d 557, 561 (9th Cir. 1980)...................................133

*United States v. Sellers*, 645 F.3d 830 (7th Cir. 2011) ..........................................106

*United States v. Shelton*, 588 F.2d 1242 (9th Cir. 1978)...............................178, 185

*United States v. Smith*, 403 F.2d 74 (6th Cir. 1968)..............................................136

*United States v. Studley*, 783 F.2d 934 (9th Cir. 1986) ...........................................74

*United States v. Tootick*, 952 F.2d 1078 (9th Cir. 1991)................................137, 141

*United States v. Troiana*, 426 F. Supp. 2d 1129 (D. Haw. 2006).........................137

*United States v. Villa*, 503 F. App'x 487 (9th Cir. 2012)..............................177, 185

*United States v. Wells*, 879 F.3d 900 (9th Cir. 2018) ..............................................339

*Waller v. Georgia*, 467 U.S. 39 (1984).................................................................52

*Webb v. Texas*, 409 U.S. 95 (1972) ....................................................................351

*Wiggins v. Smith*, 539 U.S. 510 (2003)................................................259, 261, 343

*Williams v. Sec'y Pa. Dep't of Corr.*, 848 F.3d 549 (3d Cir. 2017) ......................368

*Williams v. Taylor*, 529 U.S. 362 (2000) ...........................................................259

*Williams v. Woodford*, 859 F. Supp. 2d 1154 (E.D. Cal. 2012) ....................224, 248

*Williamson v. United States*, 512 U.S. 594 (1994) ..............................................255

*Wilson v. Beard*, 426 F.3d 653 (3d Cir. 2005)......................................................79

*Witherspoon v. Illinois*, 391 U.S. 510 (1968) ..................................................48, 58

*Withrow v. Larkin*, 421 U.S. 35 (1975) ...............................................................109

*Woodson v. North Carolina*, 428 U.S. 280 (1976) ........................................155, 317

**Federal Statutes**

18 U.S.C. § 1203 ...............................................................................................359

18 U.S.C. § 3005 ................................................................................................92

18 U.S.C. § 3006A ............................................................................................338

18 U.S.C. § 3592 ...............................................................................................329

18 U.S.C. § 3599 ...............................................................................................338

28 U.S.C. § 1827 ..........................................................................................162, 237, 238

28 U.S.C. § 1867 ................................................................................................73

28 U.S.C. § 2255 ..........................................................................................1, 15, 43, 44

Act for the Prevention and Punishment of the Crime of Hostage Taking, Pub. L. No. 98-473, secs. 2001-2003, 98 Stat. 2186 (1984) (codified as amended at 18 U.S.C. § 1203 (2006) ...............................................................................397

**Other Authorities**

2001 Attorney General Guidelines Regarding the Use of Confidential Informants ..................................................................................................................198, 199

A Message from the President of the United States Transmitting Four Drafts of Proposed Legislation to Attack the Pressing and Urgent Problem of International Terrorism, H.R. Doc. No. 98–211, 98th Cong., 2d Sess, at 3 (April 26, 1984) 379

Department of Justice Criminal Resource Manual ...............................................199

Federal Death Penalty Cases: Recommendations Concerning the Cost and Quality of Defense Representation (May 1998) ...........................................................254

Ga. Code Ann. § 17-8-4(a) ...............................................................................142

H.R. Rep. No. 98–1159 (1984) .........................................................................378

*Justice Manual (Department of Justice)* ...............................................................79

Miss. Code. Ann. § 99-15-47..............................................................................142

Ohio Rev. Code Ann. § 2945.20.........................................................................142

**Rules**

Local Rule 83-16.1................................................................................................1

Rules Governing Section 2255 Proceedings in the United States District Courts ....1

Rules Governing Section 2255 Proceedings, Rule 8 ..............................................42

**Regulations**

28 C.F.R. § 501.3 ...............................................................................................83

28 C.F.R. § 540.18 .............................................................................................22

**International Law**

American Declaration of the Rights and Duties of Man ......................................362

Committee Against Torture, *Conclusions and Recommendations of the Committee against Torture: United States of America*, (May 1-19, 2000).........................372

Convention on the Prevention and Punishment of the Crime of Genocide...........363

Inter-American Court of Human Rights Advisory Opinion OC-16/99: *The Right to Information on Consular Assistance in The of The Guarantees of the Due Process of Law* (Oct. 1, 1999) ..................................................................368

International Covenant on Civil and Political Rights ....................362, 365, 367, 368

*Mitchell v. United States*, Case 13.570, Inter-Am. Comm'n H.R., Report No. 193/20, OEA/Ser.L/V/II.176, doc. 206 ¶ 142 .......................................371

Organization of American States Charter ............................................................363

*Rocha v. United States*, Case 12.833, Inter-Am. Comm'n H.R., Report No. 11/15, OEA/Ser.L/V/II.154, doc. 5 ¶ 106 ..........................................371

*Rogovich v. United States*, Case. 13.394, Inter-Am, Comm'n H.R., Report No. 461/21, OEA/Ser.L/V/II, doc. 475 ¶ 55 ..........................................371

*Saldaño v. United States*, Case 12.254, Inter-Am. Comm'n H.R., Report No. 24/17, OEA/Ser.L/V/161, doc. 31 ¶ 232....................................................371

United Nations Human Rights Committee General Comment No. 36..................366

Universal Declaration of Human Rights.....................................362, 363, 369, 370

Vienna Convention on Consular Relations...........................................................368

**Articles**

Amy Fettig, 2019 Was a Watershed Year in the Movement to Stop Solitary Confinement, ACLU (Dec. 16, 2019).................................................................368

Craig Haney, *The Social Context of Capital Murder: Social Histories and the Logic of Mitigation*, 35 Santa Clara L. Rev. 547 (1995) ...................................345

Death Penalty Information Center, *Background on the Federal Death Penalty*...373

Death Penalty Information Center, *Case Summaries for Modern Federal Death Sentences* ..............................................................................................................374

Death Penalty Information Center, *Executions Under the Federal Death Penalty* ................................................................................................................374

Death Penalty Information Center, *Jurors Sentence Robert Bowers to Death for 2018 Synagogue Shooting* (Aug. 3, 2023) .......................................................373

Death Penalty Information Center, *List of Federal Death Row Prisoners*............375

Elizbeth Bruenig, *The Government Has Not Explained How These 13 People Were Selected to Die*, New York Times (Feb 18, 2021)................................................372

James S. Liebman, *The Overproduction of Death*, 100 Colum. L. Rev. 2030 (2000) ...................................................................................................................60

Katie Benner, *Merrick Garland Pauses Federal Executions a Year After His Predecessor Resumed Them*, New York Times (July 1, 2021) ........................374

Lee Kovarsky, *The Trump Executions*, 100 Tex. L. Rev. 621 (2021)...371, 372, 373

Michael Johnson, *Fifteen Years and Death: Double Jeopardy, Multiple Punishments, and Extended Stays on Death Row*, 23 B.U. Pub. Int. L.J. 85 (2014). ......................................................................................................378

Rory K. Little, *The Federal Death Penalty: History and Some Thoughts About the Department of Justice's Role*, 26 Fordham Urb. L.J. 347, 370 (1999) ............371

*The Decision Maker Matters: An Empirical Examination of the Way the Role of the Judge and the Jury Influence Death Penalty Decision-Making*, 63 Wash. & Lee L. Rev. 931 (2006) ....................................................................................59

Theodore Eisenberg, Stephen P. Garvey & Martin T. Wells, *The Deadly Paradox of Capital Jurors*, 74 S. Cal. L. Rev. 371 (2001)..................................................60

**ABA Guidelines**

1989 Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases .................................................................................................253

2003 Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases....................................................... 223, 252, 255, 305, 330

## PRELIMINARY ALLEGATIONS

Defendant Jurijus Kadamovas,[1] a federal prisoner under sentence of death, through his appointed counsel, submits this Memorandum in Support of Motion to Vacate, Set Aside, or Correct the Conviction and Sentence pursuant to 28 U.S.C. § 2255. This Memorandum accompanies the Court's form. *See* Local Rule 83-16.1. Mr. Kadamovas requests that the Court grant him a new trial, vacate the judgment entered against him, and/or vacate, set aside or correct the sentence.

A.      Statement Regarding Form

In accordance with Rule 2 of the Rules Governing Section 2255 Proceedings in the United States District Courts, the Motion and Memorandum set forth the underlying facts and plead the claims entitling Mr. Kadamovas to relief. Only minimal legal argument and citations are included. The citations are representative but not exhaustive. Mr. Kadamovas will file additional and separate pleadings

---

[1] A note about names:  Mr. Kadamovas is a Lithuanian citizen.  His father, and his last name, are Turkmen in origin. His maternal family are ethnic Russians living in Lithuania for several generations. These factors, as well as Lithuania's occupation by the Soviet Union during his childhood and early adulthood, have led to a variety of spellings and endings that can be applied to many names, in part depending on whether they are transliterated/translated from Lithuanian or the Russian language.  Mr. Kadamovas is referred to as Yuri, Yura, Juri, or Jurijus by many who knew him. Other witnesses sometimes have variations in spellings in their names as well.

1

regarding discovery, evidentiary development, and legal briefing later in the proceedings.

B.    Note on Citations to the Record

To facilitate the Court's initial review of this Motion and Memorandum, counsel notes the composition of the record and the citation form that will be used in this pleading:

The pleadings filed in the underlying criminal prosecution, 2:02-cr-00220-MCS, will be referred to as "Dkt. No. ___."

The reporter's transcripts of proceedings in the underlying prosecution will be referenced by date, *e.g.*, "Tr. 12/15/06 at 4." When applicable, "A" will indicate morning session and "B" will indicate afternoon session.

The pleadings from the Ninth Circuit proceeding will be referenced with the Ninth Circuit case number and docket number, *e.g.*, "Ninth Cir. No. 07-99009, Dkt. No. __."

The exhibits that accompany this petition will be referred to by exhibit number, *e.g.*, "Ex. __," and the trial exhibits will be referred to as "Trial Ex. __."

C.    Exhibits

This Motion and Memorandum are supported by Exhibits 1 through 135, filed contemporaneously. The exhibits are incorporated by reference. The exhibits comprise a proffer in support of the claims in this Motion and Memorandum and

are not exhaustive of the evidence to be presented after discovery, investigation, and a hearing.

For the Court's convenience, Mr. Kadamovas is also filing a separate Index to Exhibits in Support of Motion to Vacate, Set Aside, or Correct the Sentence.

**STATEMENT OF THE CASE AND PROCEDURAL HISTORY**

Defendant Jurijus Kadamovas incorporates the information provided in the form that accompanies this Memorandum, and submits this additional information.

A.    Pretrial Proceedings.

On February 15, 2002, several complaints were filed in the United States District Court for the Central District of California alleging a violation of 18 U.S.C. § 1202 (kidnapping for ransom) against Jurijus Kadamovas, Iouri Mikhel, and Petro Krylov. Dkt. No. 1. Arrest warrants were issued as to these three individuals, all of whom were foreign nationals, and they were arrested on February 19, 2002. Dkt. Nos. 4, 9, 12, 18.

Ainar Altmanis, also a foreign national, was added to the case when an additional complaint was filed on February 25, 2002, and he was arraigned on the same day. Dkt. Nos. 1, 28.

An Indictment was filed on March 5, 2002, charging two counts of hostage taking, violations of 18 U.S.C. § 1203, against Kadamovas, Mikhel, Krylov, and Altmanis. Dkt. No. 33. On March 26, 2002, the case was assigned to Judge Nora Manella. Dkt. No. 63.

Attorney William Healy was initially appointed to represent Mr. Kadamovas, but was soon replaced by attorney Jeffrey Weiss. Dkt. Nos. 5, 47, 54.

4

Attorney Marcia Brewer was then appointed to represent Mr. Kadamovas, replacing Mr. Weiss, on May 21, 2002. Dkt. No. 80.

Not long after the initial Indictment was filed, one of the four defendants, Ainar Altmanis, began to cooperate with the government. Subsequently, a First Superseding Information was filed against Altmanis alone, and he pled guilty to the charges in that Information on June 6, 2002. Dkt. Nos. 94, 95.

The First Superseding Indictment involving Mr. Kadamovas was filed on June 12, 2002. Dkt. No. 100. The cooperating defendant Altmanis was removed, while the charges and the number of defendants otherwise increased. Count 1 alleged a conspiracy to take hostages resulting in death in violation of 18 U.S.C. § 1203 against Iouri Mikhel, Jurijus Kadamovas, Petro Krylov, Natalya Solovyeva and Aleksejus Markovskis. The Indictment set forth overt acts that included the abduction and homicide of Alexander Umansky in December 2001; the abduction and homicide of Rita Pekler in December 2001; and the abductions and homicides of Nick Kharabadze and George Safiev in January 2002. Count 2 charged hostage taking resulting in death (Umansky), in violation of 18 U.S.C. § 1203, against Mikhel, Kadamovas, and Krylov. Count 3 charged hostage taking resulting in death (Kharabadze) against all five defendants. Count 4 charged hostage taking resulting in death (Safiev) against all five defendants.

5

Capital-qualified counsel Richard Lasting was appointed to represent Mr. Kadamovas on June 27, 2002, joining previously appointed attorney Marcia Brewer. Dkt. No. 132.

Subsequently, in 2004, the government formally announced the decision to pursue the death penalty against Mikhel, Kadamovas, and Krylov (*see* Dkt. Nos. 504, 505, 506), while electing not to pursue the death penalty against Solovyeva and Markovskis. The Second (and final) Superseding Indictment, filed July 29, 2004 (Dkt. No. 502), contained the special death penalty allegations pursuant to 18 U.S.C. § 3591(a) and 18 U.S.C. § 3592(c) as to the three selected defendants, and modified and clarified the charges:

- Count 1 alleged a violation of conspiracy to take hostages resulting in death, 18 U.S.C. § 1203, against Mikhel, Kadamovas, Krylov, Solovyeva, and Markovskis. The overt acts included the abduction and homicide of Meyer Muscatel in October 2001; the abduction and homicide of Alexander Umansky in December 2001; the abduction and homicide of Rita Pekler in December 2001; and the abductions and homicides of Nick Kharabadze and George Safiev in January 2002.

6

- Count 2 alleged a violation of hostage taking resulting in death, 18 U.S.C § 1203, involving Umansky, against Mikhel, Kadamovas, and Krylov.

- Count 3 alleged a violation of hostage taking resulting in death, 18 U.S.C. § 1203, involving Kharabadze, against Mikhel, Kadamovas, Krylov, Solovyeva, and Markovskis.

- Count 4 alleged a violation of hostage taking resulting in death, 18 U.S.C. § 1203, involving Safiev, against Mikhel, Kadamovas, Krylov, Solovyeva, and Markovskis.

- Count 5 alleged a violation of conspiracy to launder monetary instruments, 18 U.S.C. § 1956(h), against Mikhel, Kadamovas, and Krylov.

- Count 6 alleged a violation of conspiracy to escape, 18 U.S.C. § 371, against Mikhel, Kadamovas, and Krylov regarding events that occurred at the Metropolitan Detention Center in 2002-2003.

- Count 7 asserted criminal forfeiture allegations against all five defendants.

Pretrial litigation before Judge Manella included motions to suppress certain evidence, motions to sever the prosecution into separate cases against individual

7

defendants, discovery issues, and other disputes. *See, e.g.*, Dkt. Nos. 727, 730, 929, 931, 944.

Co-defendant Aleksejus Markovskis pled guilty to the allegations in Counts 1, 3 and 4 of the Second Superseding Indictment in December 2004. As part of a plea agreement, he agreed to testify against the other defendants.

On July 28, 2005, Judge Manella set the trial date for July 11, 2006. Dkt. No. 784.

On November 28, 2005, Marcia Brewer was allowed to withdraw as counsel for Kadamovas, and was replaced by attorney Sonia Chanin. Dkt. No. 831. Richard Lasting remained as lead counsel for Kadamovas. No adjustment regarding the trial date, still set for July 11, 2006, was made.

On April 12, 2006, the matter was transferred from Judge Manella to Judge Dickran Tevrizian. Dkt. No. 948.

A few months before the trial began, on May 17, 2006, the government filed a motion to impanel an anonymous jury, citing the statutory authorization in 18 U.S.C. § 3432, and arguing that the defense, and the defendants, should be precluded from knowing the names of the potential jurors and the eventual sitting jurors. Dkt. No. 1002. The trial court, accepting the government's vague assertions, granted the motion. Tr. 06/12/06 at 66-67.

In early 2006, and continuing up to trial, a number of motions for continuance were made by all three death-eligible defendants. *See, e.g.*, Dkt. Nos. 963, 950, 949; Tr. 05/03/06 at 9-50. Counsel for Mr. Kadamovas renewed the request for the continuance on multiple occasions as the trial date loomed closer, asserting that they were unprepared to go to trial due to the complexity of the case, the volume of discovery, and Chahin's conflicting responsibilities. *See* Dkt. No. 2266; Tr. 06/12/06 at 42-53; Tr. 06/26/06 at 3-11.

On June 16, 2006, co-defendant Petro Krylov filed a new motion to continue based upon his counsel's serious medical condition. Dkt. No. 1052. On June 26, Judge Tevrizian granted the motion and severed the case against Krylov from the prosecution of Mikhel and Kadamovas. Dkt. No. 1066.

Co-defendant Natalya Solovyeva pled guilty to the allegations in Counts 1, 3 and 4 in the Second Superseding Indictment on June 30, 2006. Dkt. No. 1081. As part of a plea agreement, she agreed to testify against the remaining defendants. Dkt. No. 1100.

B.    Trial Proceedings for Kadamovas and Mikhel.

Trial for Kadamovas and Mikhel before Judge Tevrizian began on July 11, 2006, with the gathering of several panels of jurors and the distribution of juror questionnaires. Dkt. No. 1103. Jury selection began in earnest on August 16 and

continued until the final jury was sworn on September 5. Dkt. Nos. 1160, 1195. The opening statements occurred on September 7, 2006. Dkt. No. 1190.

On the fifty-second day of trial, December 12, 2006, the government rested its guilt-phase case. Dkt. No. 1365; Tr. 12/12/06 at 67.

The defense case for Iouri Mikhel began on December 13, 2006. Dkt. No. 1376. Mikhel was writing notes to the trial judge, complaining of conditions at the jail and the behavior of his attorneys, and the conflict between Mikhel and his counsel became acute. *See, e.g.*, Tr. 12/13/06 at 7-9, 141. After five brief witnesses, the defense for Mikhel rested. *Id.* at 142.

The defense guilt-phase case for Mr. Kadamovas was presented on December 13, 14, and 15. Dkt. Nos. 1376, 1384, 1385; Tr. 12/15/06 at 82. Mr. Kadamovas did not testify. Tr. 12/15/06 at 4.

After the defense for both defendants rested, co-defendant Iouri Mikhel, circumventing his attorneys, addressed the trial judge directly and asserted that he wanted to testify. Tr. 12/15/06 at 95, 106. Thus, after a holiday break, in early January 2007, Mikhel testified on direct examination over the course of three days. Dkt. Nos. 1419, 1420, 1421. The prosecution opined that Mikhel's testimony was "very helpful for the Government because it is so patently absurd." Tr. 01/05/07 at 107.

At the conclusion of his direct examination, Mikhel refused to answer any questions and refused to be cross-examined by either counsel for Mr. Kadamovas or counsel for the government. Tr. 01/09/07 at 22-28. Counsel for Mr. Kadamovas moved to strike Mikhel's entire testimony, and the trial court granted the motion. Dkt. No. 1422; Tr. 01/09/07 at 28. The jury was instructed: "You are not to consider it [Mikhel's testimony] in any matter against Mr. Mikhel or against Mr. Kadamovas in this case. The entire testimony will be struck." Tr. 01/09/07 at 28.

Due to the prejudice to Mr. Kadamovas resulting from Mikhel's antics, attorneys for Mr. Kadamovas filed a renewed motion to sever the defendants' trial, a motion for mistrial, and a motion to continue the case, all of which were denied. Dkt. Nos. 1423, 1429, 1441; Tr. 01/09/07 at 4-11, 31-32, 141; Tr. 01/10/07 at 43.

On the following day, Mikhel refused to attend the proceedings and absented himself from the rest of the trial. Tr. 01/10/07 at 4-5.

Closing guilt-phase arguments occurred January 10, 11, and 12, 2007, and the jury began deliberations on the sixty-third day of trial, January 16, 2007. Dkt. Nos. 1423, 1424, 1426, 1431. On January 17, the jury returned guilty verdicts on the first six counts of the Second Superseding Indictment with regard to Mr. Kadamovas. Dkt. No. 1481. The jury found that the conspiracy to take hostages resulted in the death of all five alleged victims, and further found that the deaths of Alexander Umansky, Nick Kharabadze, and George Safiev were the foreseeable

11

result of defendant Jurijus Kadamovas' criminal conduct. Dkt. No. 1481. With regard to Iouri Mikhel, the jury similarly found him guilty of all six counts and found true the special findings. Dkt. No. 1480.

The penalty phase of the trial, with both defendants still joined (over objection) began on January 24, 2007. Dkt. No. 1462. Mikhel continued to refuse to attend proceedings. Tr. 01/24/07 at 4-5. The presentation of penalty-phase evidence concluded on February 7. Tr. 02/07/07 at 92. Closing arguments occurred on February 9. Dkt. No. 1502.

The jury returned penalty-phase verdicts on the seventy-fourth day of trial, February 13, 2007, issuing findings on aggravating circumstances and mitigating circumstances and concluding that the death penalty should be imposed on Jurijus Kadamovas. Dkt. Nos. 1541, 1560. The jury also returned the death penalty as to Iouri Mikhel at the same time. Dkt. No. 1542.

Forfeiture proceedings with regard to Count 7 of the Second Superseding Indictment were concluded on February 21 with the jury finding a total of $ 1,203,628 in proceeds traceable to the conspiracy. Dkt. No. 1565. Judge Tevrizian entered orders of forfeiture on March 1. Dkt. No. 1573.

On March 12, 2007, the trial court denied a motion for new trial and imposed the sentence of death on Mr. Kadamovas on Counts 1, 2, 3 and 4. Tr.

12

03/12/07 at 44; Dkt. No. 1641. On Counts 5 and 6, he was sentenced to 240 months to be served concurrently. Dkt. No. 1641.

C.    Appeal.

On April 27, 2007, Benjamin Coleman and Barbara O'Connor were appointed as appellate counsel for Mr. Kadamovas. Ninth Cir. No. 07-99009, Dkt. Nos. 7-8. The cases of Kadamovas and Mikhel remained joined on appeal. A third attorney, Margaret O'Donnell, was added to represent Mr. Kadamovas in 2010. Ninth Cir. No. 07-99009, Dkt. No. 161.

The Ninth Circuit affirmed the judgments and sentences of both defendants in a single opinion issued on May 9, 2018. *United States v. Mikhel & Kadamovas*, 889 F.3d 1003 (9th Cir. 2018). A Petition for Writ of Certiorari was denied by the United States Supreme Court on October 7, 2019. 140 S. Ct. 157 (2019).

D.    The Sentences of the Other Defendants.

Six defendants were involved in this case.

Iouri Mikhel's case was joined with Mr. Kadamovas, as noted, throughout trial and appeal. Mikhel was convicted of all seven counts and is currently under sentence of death.

Ainar Altmanis was the first defendant to agree to cooperate with the government. As part of a plea agreement, Altmanis pled guilty to Counts 1, 2, 3, and 4 of a First Superseding Indictment specific to Altmanis. Dkt. No. 95. On

13

February 20, 2008, he was sentenced to concurrent terms of 280 months with five years of supervised release. Dkt. No. 2081. In a separate, related state court proceeding, Altmanis was allowed to enter guilty pleas to five counts of voluntary manslaughter and sentenced to twenty years running concurrent to the federal sentence. *People v. Altmanis*, Los Angeles County BA235193. It appears that he is no longer in custody.

Petro Krylov was tried separately in the Central District of California, in 2007, Judge S. James Otero presiding. Dkt. No. 1625. His trial began on March 9, 2007, shortly after the conclusion of the Mikhel/Kadamovas trial. Dkt. No. 1625. Krylov was convicted of Counts 1, 2, 3, 4, and 5 of the Second Superseding Indictment, and acquitted of Count 6 (the conspiracy to escape charge). After a penalty-phase trial, the jury returned a penalty verdict of life without release. On January 18, 2008, Krylov was sentenced to life without the possibility of release on Counts 1, 2, 3, and 4 and 240 months on Count 5. Dkt. No. 2043. He is currently in the custody of the Bureau of Prisons (BOP).

Natalya Solovyeva, as part of a plea agreement, pled guilty to Counts 1, 3, and 4 of the Second Superseding Indictment. On February 20, 2008, she was sentenced to 180 months in custody and five years of supervised release. Dkt. Nos. 2086, 2087. In a separate but related state court proceeding, Solovyeva was allowed to enter a plea of guilty to two counts of voluntary manslaughter running

14

concurrent to the federal sentence. *People v. Solovyeva*, Los Angeles County, BA305050. She was released from the custody of the BOP on July 8, 2015.

Aleksejus Markovskis, as part of a plea agreement, pled guilty to Counts 1, 3, and 4 of the Second Superseding Indictment. On January 17, 2008, Markovskis was sentenced to 180 months in custody and five years of supervised release. Dkt. Nos. 2060, 2061. Subsequently, however, on April 21, 2008, Judge Otero reduced the sentence and imposed a sentence of 150 months in custody, with five years of supervised release. Dkt. Nos. 2088, 2089. In a separate but related state court proceeding, Markovskis was allowed to plead to two counts of voluntary manslaughter and sentenced to eight years, running concurrent to the federal sentence. *People v. Markovskis*, Los Angeles County BA272083. It appears that he is no longer in custody.

15

**TIMELINESS OF THIS MOTION**

The appeal of Mr. Kadamovas' judgment and sentence concluded on October 7, 2019, with the denial of his Petition for Writ of Certiorari by the United States Supreme Court. 140 S. Ct. 157. Pursuant to 28 U.S.C. § 2255(f)(1), a one-year statute of limitations applies to motions for post-conviction relief in federal criminal cases, most commonly running from the date on which the judgment of conviction becomes final. *See Johnson v. United States*, 544 U.S. 295, 300 (2005).

However, due to the extraordinary situation created by the pandemic caused by the novel coronavirus known as COVID-19, and the catastrophic effect on social, economic, governmental, and structural institutions in this country (as well as the effect on international travel), it was impossible to comply with the statute of limitations. *See, e.g.*, Dkt. Nos. 2376, 2397, 2409, 2415. The Russian invasion of Ukraine has also limited the ability to travel to Russia to complete necessary investigation. The government has agreed to affirmatively waive the statute of limitations defense as to any § 2255 motion filed on or before October 7, 2023. Dkt. No. 2445; *see* Dkt. Nos. 2427, 2417, 2381, 2381-1, 2406, 2406-1.

This § 2255 motion is being filed within the grace period designated by the government and is therefore timely.

# INADEQUACY OF THE PROCEEDINGS

The proceedings under 28 U.S.C. § 2255 cannot be full and fair or reliable under the circumstances, due to the actions of the government, the denial of fundamental rights, limited time and resources, and the inability of Jurijus Kadamovas to participate in this motion for relief.

Throughout these proceedings, Mr. Kadamovas has been denied meaningful access to legal materials, including the voluminous discovery produced to defense counsel, and denied the ability to confidentially communicate with counsel, because prison authorities have repeatedly infringed on the attorney-client relationship and improperly reviewed confidential communications. Additionally, some of Mr. Kadamovas' legal materials have been destroyed or lost. Together with Mr. Kadamovas' inability to understand the trial proceedings—at the time of trial, Mr. Kadamovas did not speak English and was denied competent interpreters—these problems have prevented Mr. Kadamovas from fully participating in legal proceedings, including the trial, the appeal, and the § 2255 proceedings currently before this Court, and thus necessarily render this motion incomplete and subvert the fairness and the reliability of the process.

From the early days of this prosecution, there has been conflict regarding Mr. Kadamovas' access to legal materials and his ability to understand and review the evidence against him, the nature of the prosecution, the procedures applicable

17

to his case, and his legal options. This lack of access and understanding has led to substantial difficulties involving his ability to communicate and cooperate with his attorneys, as well as difficulties preparing for trial and participating in the appeal and postconviction litigation. See allegations set forth in Claim 10 (Denial of Access to Case Materials).

At the time of his arrest, Mr. Kadamovas, a Lithuanian citizen born and raised in the Soviet Union and a native Russian speaker, had little command of the English language. The documents produced by the government regarding the charges were voluminous and it was simply impossible, given both his lack of English language skills and the restrictions on access, for Mr. Kadamovas to review and understand the discovery in this case and the evidence offered against him.

Prior to trial, Mr. Kadamovas and his appointed counsel asserted on several occasions that the defendant lacked sufficient access to a computer to review discovery and to aid in the preparation of his defense. *See, e.g.*, Dkt. Nos. 824, 939. At one point, the defense team purchased a computer for Mr. Kadamovas to use, but the jail refused to allow him sufficient time and a suitable confidential location for use. Dkt. No. 824 at 3-4. In addition, funding for translation of key documents into Russian was inadequate. In all, only some 200 of the 90,0000-plus pages of discovery—less than 1%—were translated into Russian. Ex. 134 (Chart of

Translations to Russian). Eventually, the parties entered into a stipulation regarding computer access, only to have the stipulation unravel as the trial approached. Dkt. Nos. 833, 939. It was not until forty-three days into the trial that the trial judge finally ordered the jail to allow Mr. Kadamovas to use a computer, supplied by the defense and equipped with translation software, in his cell. Tr. 11/16/2006 at 5-6; Ex. 120 (O'Donnell dec.); Ex. 121 (Kadamovas dec.).

Translation problems occurred throughout the trial. See the allegations set forth in Claim 11 (Misleading and Inaccurate Translation at Trial), incorporated by reference. Indeed, Mr. Kadamovas could not understand the charges against him due to the non-translation of the indictment and the delays in the translation of the superseding indictments. Then, at trial, Mr. Kadamovas was unable to hear the Russian-language testimony of the key witnesses, a problem the trial court refused to correct when counsel objected. Tr. 10/11/06A at 5-8. Court-appointed interpreters mistranslated and distorted testimony. Ex. 112 (Spivakovsky dec.). The circumstances prevented Mr. Kadamovas from exercising his right to confront his accusers and to mount a defense.

Regrettably, the lack of access to legal materials, lack of confidentiality, and translation issues continued after Mr. Kadamovas was transferred to the United States Penitentiary at Terre Haute after the trial. Mr. Kadamovas was not allowed by the prison to keep the discovery in his cell. Ex. 121 ¶ 3. Numerous DVDs were

confiscated, disks went missing, and the prison did not securely store other material. *Id.*; *see also* Ninth Cir. No. 07-99009, Dkt. Nos. 104, 113, 131, 154, 172, 438. At one point, Mr. Kadamovas shipped three bankers boxes of materials to his appellate attorney. However, she only received two, and one of them had clearly been repacked—presumably by prison officials. *See* Complaint, *Kadamovas v. Watson*, S.D. Ind. No. 19-cv-00540-JPH-MJD, Dkt. 1 at 17-18. To this day, it is unknown what happened to the third box, which contained legal materials that are irretrievably lost. Ninth Cir. No. 07-99009, Dkt. Nos. 154, 359-1 at 6-7.

During the pendency of the Ninth Circuit appeal, Mr. Kadamovas repeatedly implored prison officials, and the Ninth Circuit, to allow him meaningful access to his legal materials. Objections were raised regarding the prison's failure to secure his materials, to provide translation software, and to enable him to work on his case. *See, e.g.*, Ninth Cir. No. 07-99009, Dkt. Nos. 104, 113, 131, 154, 172, 438. In 2010, the appellate court denied a request for Mr. Kadamovas to keep a computer in his cell, but ordered prison officials to allow Mr. Kadamovas twenty hours per week usage of a dedicated computer. Ninth Cir. No. 07-99009, Dkt. No. 124. However, according to appellate counsel, these measures were unsuccessful because much of the electronic discovery and transcripts would not open on the BOP computer and the translation software was inadequate. *See* Ninth Cir. No. 07-99009, Dkt. No. 438 at 5-10. Moreover, the trial transcripts took years to perfect

and contained numerous errors that cannot be remedied, and the appellate briefing, orders, and ruling were never translated for Mr. Kadamovas.

In 2018, Mr. Kadamovas' appellate lawyers renewed the previous motion for adequate access to pleadings and case materials, including discovery. Ninth Cir. No. 07-99009, Dkt. No. 438. The materials submitted with this motion included a declaration from appellate counsel Margaret O'Donnell, documenting the disputes regarding access to legal materials (Ex. 120), as well as a declaration from Mr. Kadamovas noting that "I continue to be denied meaningful access to work on my case and challenge the government narrative. . . . All I ever wanted was a chance to have a fair trial as guaranteed by the United States Constitution . . . ." Ex. 121 (Kadamovas dec.) ¶ 5.

The actions of prison authorities have denied confidentiality in attorney-client communications. Time and again, officials have improperly opened confidential mail and interfered with Mr. Kadamovas' attempts to communicate and share legal materials with court-appointed attorneys. *See* Ex. 131.

For example, in April 2017, Mr. Kadamovas received a hard drive containing approximately 95,000 pages of discovery and Mr. Kadamovas' handwritten notes from his appellate attorneys. The hard drive included notes about discrepancies in the interviews and testimony of government witnesses, Mr. Kadamovas' notes about his memories of events, financial charts with bank

21

records, information about cooperating witnesses, mitigating details about Mr. Kadamovas' life as a musician, exculpatory evidence with details and exhibits, and hundreds of other files marked as attorney-client privileged. A BOP officer took the hard drive for inspection and scanning outside of Mr. Kadamovas' presence and did not deliver it for eight days. *See* Complaint, *Kadamovas v. Watson*, S.D. Ind. No. 19-cv-00540-JPH-MJD, Dkt. 1 at 20.

In response, the Ninth Circuit admonished government counsel on June 12, 2017, to "remind prison officials at Terre Haute to open properly designated 'special mail' sent to Kadamovas by his counsel in Kadamovas's presence." *See* Order, Ninth Cir. No. 07-99008, Dkt. 184 at 2. However, the problem persisted. In November 2017, Mr. Kadamovas received a second hard drive, which included all the attorney files from one of Mr. Kadamovas' trial attorneys, including their communications with Mr. Kadamovas, Mr. Kadamovas' investigation requests, financial charts, and Mr. Kadamovas' work on government exhibits. *See* Complaint, *Kadamovas v. Watson*, S.D. Ind. No. 19-cv-00540-JPH-MJD, Dkt. 1 at 22. Mr. Kadamovas informed the lawyer from USP Terre Haute that he wanted this hard drive to be scanned in his presence, in accordance with the Ninth Circuit's order. *Id*. In response, she told him that she had to consult with the trial prosecutors in the Central District of California. *See* Complaint, *Kadamovas v. Watson*, S.D. Ind. No. 19-cv-00540-JPH-MJD, Dkt. 1 at 22. Notwithstanding the court's ruling,

the hard drive was again scanned outside Mr. Kadamovas' presence and took 12 days to deliver to him. *Id.* at 23. Because of the government's scanning of Mr. Kadamovas' legal materials, the government gained access to his theory of the case, which undermines the adversarial process and calls into question the fairness of this and any future proceedings. In protest of these repeated violations of his rights, Mr. Kadamovas has engaged in five separate hunger strikes, totaling 116 days. *See id.* at 13.

Mr. Kadamovas has long struggled to have meaningful access to information about his case, and to have a confidential and secure manner of communicating with his appointed attorneys. In violation of 28 C.F.R. § 540.18, BOP officials have improperly handled Mr. Kadamovas' legal mail repeatedly in recent years. In many of these instances, BOP personnel admitted fault and assured that the issue would not happen again. *See* Ex. 133 (Yuri Mail Admissions_Redacted). But the problems recur. Mr. Kadamovas recently filed a complaint to the United States District Court for the Southern District of Indiana, seeking declaratory and injunctive relief to halt further intrusions on his confidential attorney-client relationship. Ex. 131 (Kadamovas Compl.).

Mr. Kadamovas is of the view that if he cannot have attorney-client privileged communications and meaningful access to his legal materials, he cannot have an attorney. Accordingly, because of these repeated infringements on Mr.

Kadamovas' attorney-client privilege and lack of meaningful access to his legal materials, Mr. Kadamovas and his attorneys have been unable to establish a strong attorney-client relationship since their appointment. Mr. Kadamovas sought to proceed *pro se*, a request the Court denied. Dkt. No. 2396. He filed a *pro se* motion for relief under 28 U.S.C. § 2241 in Indiana, which was denied in a ruling citing 28 U.S.C. § 2255(e). *Kadamovas v. Watson*, S.D. Ind. No. 2:19-cv-00540-JPH-MJD, Dkt. 9 at 9. His pro se appeal of that denial has been pending in the Seventh Circuit for over three years. *Kadamovas v. Watson*, 7th Cir. No.20-1889. He has had limited phone contact and visits with legal counsel, having only spoken by phone with learned counsel Timothy J. Foley on one instance and only accepting one visit from former counsel Victoria Cassanova.

In May 2023, Mr. Kadamovas began talking by phone and meeting with attorney Joshua Pickar from the Indiana Federal Community Defenders. Mr. Kadamovas and Mr. Pickar have been working collaboratively to challenge Mr. Kadamovas' conviction and sentence. However, the fact that Mr. Kadamovas has been unable to have meaningful access to his legal materials, as well as the limited time in their relationship, has made it difficult to fully set forth all potentially meritorious claims. Mr. Kadamovas undoubtedly has a superior knowledge of the record and relevant facts—having lived through them himself—and it takes time to build a relationship of trust wherein Mr. Kadamovas can communicate the relevant

information to Mr. Pickar. Without Mr. Kadamovas' full involvement, premised on meaningful access to his legal materials, it will be difficult for post-conviction counsel to raise issues completely, or to pursue and present evidence or witnesses in support of post-conviction claims.

As a result of Mr. Kadamovas' inability to understand much of the testimony and evidence at trial, his limited access to legal materials, and the BOP's interference in his communication with counsel, Mr. Kadamovas has not been able to fully participate in legal proceedings, including the § 2255 proceedings currently before this Court.

In addition to the problems sabotaging Mr. Kadamovas' ability to fully participate in the post-conviction process, this submission has been impaired by the medical health emergency caused by the worldwide pandemic associated with the COVID-19 virus, as well as Russia's invasion of Ukraine. Beginning in 2020 and extending to this year, the pandemic caused unprecedented distortions in social, governmental, and economic systems. Courthouses, schools, and government buildings closed, severely restricting access to normal sources of records and information. Prison visitation was curtailed. The task of interviewing witnesses became essentially impossible, and international travel became unpredictable and limited. The impact of the pandemic in this specific case has been documented in

counsel's proffers, including Dkt. Nos. 2376, 2397, 2409, and 2415, which are incorporated by reference.

The claims asserted in this motion, and the supporting exhibits, are necessarily limited by the inadequacies caused by the government's conduct, the effects of the pandemic, the restrictions on investigation (such as the refusal to give counsel the names of the jurors), and the limited time and resources allowed to the defense. The allegations set forth in this motion are brought after only limited investigation, with only limited resources, with only limited time. The assertions in this motion are not intended to be exhaustive, but present allegations demonstrating an entitlement to relief, and substantial evidence of constitutional and legal violations to be supplemented with additional evidence and assertions after full opportunity for investigation, discovery, and a hearing. Mr. Kadamovas wishes not to surrender his right to file under § 2255; however, he wishes to make clear that this petition is incomplete for the aforementioned reasons.

## FACTUAL INTRODUCTION[2]

In 1966, Jurijus Kadamovas was born in Vilnius, Lithuanian Soviet Socialist Republic into a family challenged by poverty, mental illness, alcoholism, chaos, and discrimination. From the beginning, his chance at a decent life was subverted by his family's marginal economic status, the cultural clash between his parents, the stifling nature of Soviet society, and the mental illness and alcoholism characterizing his forbearers.

Aimuchamed Kadamovas, Jurijus' father, was a non-practicing Muslim from the Turkmen Soviet Socialist Republic who married Tatiana Kanopkin, a "Old Believer" Russian Orthodox Christian, in 1965. The union was supported by neither family, but tolerated, at least in the beginning, by Tatiana's family. Aimuchamed suffered from life-long psychopathy, with obsessive-compulsive and bipolar features, and soon became violently jealous of his Christian wife and her interactions with her friends. The cultural tension was exacerbated by deplorable and impoverished living conditions as the couple and Jurijus' maternal grandparents and an uncle shared a tiny two-room apartment in a small wooden building with no running water. Jurijus, the couple's first surviving child—an

---

[2] The contents of the factual introduction are based upon the life history presented in the exhibits that accompany this Memorandum.

27

earlier child died stillborn—would eat wallboard to help satiate his hunger. The needs of a second child, daughter Svetlana, would further stretch the couple's meager financial resources.

By the time Jurijus was nine and his mother finally obtained a divorce, his father had separated from the family twice, attacked his mother with a knife, attempted suicide, and was involuntarily committed to a psychiatric hospital. The tiny wooden building where they lived was torn down, and Tatiana and her children moved to another tiny apartment in a large Soviet-style building.

Jurijus was educated in a system that did little to nurture those on the low end of the economic latter. Lack of a stable homelife and an untreated learning disability undermined his efforts at school. Despite the constraints, young Jurijus found some small joys in fishing and playing with his friends. He discovered music, and surprised his family and friends with the quality of his singing and guitar playing. He also became his little sister's protector in the chaos of their environment, shielding her from the violence and helping to ensure she had enough to eat.

After a two-year period of instability while Aimuchamed inconsistently and unsuccessfully attempted to reconstruct the family, tried to kidnap Jurijus twice, threatened his ex-wife, and generally descended into madness, Tatiana married for a second time, this time to a Belarussian jobless alcoholic named Tadeush

28

("Tadik") Aleksandrovich. Tatiana and Tadik were a toxic combination, drank alcohol on a daily basis, squandered what little money they had, and engaged in belligerent, continuing, and often violent arguments. With little supervision and no positive role models after his beloved grandfather died, serving as a protector to his sister, Jurijus came of age.

Jurijus joined the Soviet army in 1985 at age 19, a mandatory enlistment. His creative talents helped him in the service: rather than some risky or remote posting, he was placed in Moscow with the military orchestra, playing the drums. Upon the conclusion of his service, he returned to Vilnius, quickly married Jurate Čepulytė and moved in with her parents.

For the next few years, as the Soviet Union disintegrated, with repercussions on all facets of Lithuanian society, Jurijus sought to somehow provide for his small family in the economic free-for-all of the Soviet collapse, especially after his wife gave birth to a son, Gabriel, in 1989. Jurijus' education was poor, he had no business acumen, and he was a bad judge of character, but he was a hard worker, energetic, and full of ideas. In addition to working as a musician, he engaged in a series of small business ventures, including selling shoes, renting limousines, running a food kiosk, selling electronics, and importing aquariums. His efforts to succeed were undercut by his naiveté, his lack of connections, the psychological trauma of his childhood, and the discrimination of ethnic Lithuanians against

29

ethnic Russians in the newly independent Lithuania. Under pressure to provide for his wife, his child, his mother and step-father (who did not work), as well as his sister and her own new child, Jurijus worked long hours at myriad ventures.

But his dream lay in America, a place he thought of as "the promised land," where hard work presumably paid off and opportunities were limitless. By the time he was thirty, Jurijus was working toward emigrating to America, with plans to establish himself, somehow, and then bring his family there, creating a better life for his son.

In the late 1990's, that dream almost came true, only to dissolve into a bitter, less romanticized reality. Jurijus was lured to Los Angeles by a Russian friend who offered a job and place to live. Jurijus left his young family behind with the promise that they would soon be united again, only to have his money drained when he arrived in America, finding himself the victim of the cynical deceit of a man he thought was a friend.

His background had made him stubborn, however, and Jurijus Kadamovas would not give up on the dream. He refused to surrender to despair. His English was so poor that most jobs were simply unavailable, but he began doing odd tasks for fellow Russian speakers, living in small low-rent apartments. Eventually he found work doing menial labor with a Russian moving company and circumstances began to improve. He met a Russian woman named Natalya Solovyeva and let her

move in, all the while still planning to bring his wife to America when the time was right. He played music when he could. He began planning a business that would feature his artistic talents: building and installing beautiful saltwater aquariums.

In early 2000, Jurijus Kadamovas was working with a moving company and helped move Iouri Mikhel's belongings from Palm Springs to Los Angeles. Iouri Mikhel was a Russian ex-convict and lifelong criminal who had a mysterious and seemingly endless stream of disposable income. Mikhel was charismatic, flamboyant, confident, and generous. He was also manipulative and cruel. Jurijus Kadamovas, who had worked so long and so hard, who had lost his father very young to mental illness and abandonment, and who had spent decades yearning for the security that a little financial success would bring, was very impressed by Iouri Mikhel. Soon, Mikhel took over the fledgling aquarium business. Soon, Mikhel helped Jurijus move into a larger apartment and, then, purchased a house for him. Within a few months of their meeting, Jurijus Kadamovas was completely dependent on, and beholden to, Iouri Mikhel.

Jurijus Kadamovas was arrested in Los Angeles on February 19, 2002.

The government pursued the death penalty in this case. In the subsequent trial, the jurors heard nothing about his impoverished and marginalized background, family history of mental illness, or tumultuous upbringing. Trial

31

counsel did not collect Jurijus' father's psychiatric records, which reveal the father's severe mental illness, psychiatric hospitalizations, suicide attempts, plan to murder his family, violent outbursts, and self-destruction. During Jurijus' childhood, his father was institutionalized on more than one occasion, with a diagnosis of paranoid psychopathy, bi-polar disorder, and chronic alcoholism.

Trial counsel also failed to interview witnesses who could have shared this key background and life history information. Worse, even the mitigation witnesses counsel did interview were unable to testify because trial counsel failed to secure visas for them to travel to the United States. When it became clear that these witnesses—Jurijus' sister, wife, and son—would not be able to travel to the United States, trial counsel unreasonably and inexplicably failed to present their testimony by video or even submit a proffer of the testimony they could have presented.

Trial counsel also unreasonably failed to counter evidence presented in the guilt phase that later formed the backbone of the government's case in aggravation. They failed, for example, to investigate the conspiracy to escape allegations or even fully review the discovery in their possession, which revealed that Mr. Kadamovas had no involvement in planning the failed escape attempt.

Ultimately, the jury that sentenced Jurijus Kadamovas to death did not hear from a single person who knew him personally. The two experts who formed the entirety of the mitigation case did not know important features of his background

and family history. And the jurors believed, incorrectly, that Mr. Kadamovas had been a tactician of various criminal schemes, when in fact Iouri Mikhel, a charismatic and cruel hardened criminal, was the sole mastermind.

## OUTLINE OF EVIDENCE INTRODUCED AT TRIAL

This case arises from the abductions and homicides of five individuals in Los Angeles between October 2001 and January 2002. The prosecution's theory was that the six charged conspirators, with the help of others, engaged in a campaign targeting certain individuals for abduction followed by ransom demands. The six original defendants were foreign nationals, as were most of the victims.

The leader of the group, according to the prosecution, was Russian national Iouri Mikhel. The others involved included Lithuanian national Jurijus Kadamovas, Ainar Altmanis (Latvian), Petro Krylov (Ukrainian), Natalya Solovyeva (Russian), and Aleksejus Markovskis (Lithuanian). The five homicide victims were: Meyer Muscatel, Rita Pekler, Alexander Umansky, Nick Kharabadze, and George Safiev. The bodies of the victims were found in the New Melones Reservoir, near Sonora in the foothills of the Sierra Nevada Mountains, over 300 miles from Los Angeles.

The defendants were arrested in February 2002. Within a few days, Ainar Altmanis agreed to cooperate with authorities, submitted to lengthy interviews, and aided efforts to recover the bodies of the missing. Eventually, Natalya Solovyeva and Aleksejus Markovskis also cooperated and agreed to testify in exchange for leniency.

34

Despite defense requests to sever the trials, Mikhel and Kadamovas were tried together with a single jury, convicted of all the counts in the Second Superseding Indictment, and sentenced to death. Petro Krylov was tried separately, convicted of a number of counts, and sentenced to life in prison.

The Mikhel/Kadamovas trial, including a capital jury selection and a penalty phase, lasted seventy-five court days, from July of 2006 until February of 2007. The key prosecution witnesses at the guilt phase trial were, unsurprisingly, the three co-conspirators, Ainar Altmanis, Natalya Solovyeva, and Aleksejus Markovskis. In addition, over one hundred other witnesses testified, including federal agents describing the items found during various searches, individuals relating facts surrounding the disappearances of the victims, people involved in the sale of portable phones and kidnapping supplies, DNA and fingerprint experts, data specialists, financial transaction trackers, and pathologists. Hundreds of documentary, demonstrative, and photographic exhibits were presented.

The following is a brief outline of the evidence introduced at the Mikhel/Kadamovas trial, primarily through the testimony of Altmanis, Solovyeva and Markovskis.

**A.      Meyer Muscatel**

Meyer Muscatel was a Los Angeles-based real estate agent who disappeared on October 11, 2001. Ainar Altmanis testified regarding the details of his

35

abduction. Claiming that he thought he was being asked to help kidnap a person to collect on a loan, Altmanis related that he, Iouri Mikhel, and Jurijus Kadamovas went to a Home Depot and purchased flex ties, rubber gloves, duct tape, and other things. Tr. 10/10/06 at 44-50; Tr. 10/24/06 at 10-19. Altmanis claimed that evening he and Kadamovas were waiting when Mikhel and Muscatel arrived at Mikhel's house on Oakview Drive in the Encino neighborhood of Los Angeles. Tr. 10/11/06A at 12-17. Altmanis, Kadamovas and Mikhel grabbed Muscatel, restrained his legs and hands, and covered his eyes with duct tape. Tr. 10/11/06 at 16-21. During the struggle, Mikhel struck Muscatel in the head with a gun, drawing blood. Tr. 10/11/06A at 20-21.

During the next day, Mikhel unsuccessfully attempted to access Muscatel's bank accounts. Tr. 10/11/06A at 42-44; Tr. 10/24/06 at 215-17; Tr. 10/25/06 at 44-51. Altmanis testified that, the following morning, he assisted Mikhel and Kadamovas in strangling Muscatel. Tr. 10/11/06A at 53-59.

They loaded Muscatel's body in the back of Kadamovas' van. Tr. 10/11/06B at 68. Kadamovas and Mikhel left with the van while Altmanis stayed behind and disposed of some of Muscatel's possessions. Tr. 10/11/06B at 71-76.

After Muscatel's body was discovered in the New Melones Reservoir, on October 18, 2001, a pool of blood next to the railing on the Parrots Ferry Bridge was investigated. Tr. 09/07/06 at 186-91. The blood on the bridge was later

determined to be Muscatel's. Trial Ex. 1400; Tr. 11/29/06 at 128-40. Pattern prints in the blood were consistent with a pair of Adidas shoes, size 7 and a half, seized during the search of Kadamovas' Lindley apartment. Tr. 09/08/06 at 132; Trial Ex. 319; Tr. 10/24/06 at 112-29; Trial Exs. 1236, 1237, 1239, 1240, 1418.

The government also presented cell phone site data tracking Mikhel's phone and Kadamovas' phone between Los Angeles and the reservoir area on October 13, 2002. Tr. 11/16/06 at 123-28, Trial Exs. 736-39, 750, 756.

**B.     Rita Pekler**

Rita Pekler handled financial matters for George Safiev, a wealthy Russian living in Los Angeles. Along with Petro Krylov, Altmanis, Mikhel and Kadamovas discussed possible ways of abducting Safiev or Pekler. Tr. 10/11/06B at 86-95. Altmanis testified that Mikhel's plan was to use Pekler to get to Safiev and force him to return money he owed to other Russians. Tr. 10/11/06B at 85-87, 90-91. On December 3, 2001, a man using the name Volodia and speaking Russian stopped by Pekler's office and asked to see her. Tr. 10/25/06 at 159-61, 185-87. Two days later, on December 5, Pekler left the office to meet with Volodia and never returned. Tr. 10/25/06 at 168-74.

Altmanis testified that the plan was for Kadamovas, posing as a wealthy Russian wishing to buy property, to bring Pekler to a house on Weslin Avenue in the Sherman Oaks neighborhood that Kadamovas owned. Tr. 10/11/06B at 98-101.

37

Altmanis, Mikhel, and Krylov were waiting at the house and grabbed her. Tr. 10/11/06B at 102-03. Pekler was pressured into making phone calls to Safiev in an unsuccessful attempt to lure him to the house. Tr. 10/11/06B at 108-21.

Pekler's body was later also recovered from the New Melones Reservoir. Tr. 12/01/06 at 72-73. The cause of death was asphyxia by suffocation. Tr. 12/1/06 at 74. Mikhel later told Altmanis that Pekler had been difficult to kill. Tr. 10/12/06 at 12; Tr. 10/17/2006 at 27-28.

Cell phone site evidence was admitted tracking the movements of Mikhel and Kadamovas' phones on December 5 and December 6. Trial Ex. 753, 757.

**C.    Alexander Umansky**

According to Altmanis, Petro Krylov suggested Alexander Umansky as a target. Krylov had worked for Umansky's business, "Hard Wired," installing audio systems in cars, but Umansky had fired him. Tr. 10/12/2006 at 32-37.

On December 13, 2001, after a series of phone calls, Umansky picked up Mikhel, who was posing as a wealthy individual shopping for a stereo system,  and drove to the Weslin Avenue house. Tr. 10/12/06 at 39-40, 51-53. Mikhel pushed Umansky into the house, and Altmanis and Kadamovas grabbed him, threatening him with a gun. Tr. 10/12/06 at 55-58. Altmanis and Krylov moved Umansky's vehicle to a parking lot at Los Angeles International Airport where it was later recovered by the police. Tr. 10/12/2006 at 70-75.

Over the next two weeks, in response to telephoned demands, the Umansky family transferred $234,628 in four wired transactions to a bank in the United Arab Emirates. Tr. 10/31/06 at 129-33; Trial Exs. 1000-B, 1001, 1002, 1003, 1004, 1005.

Altmanis testified that, after keeping Umansky at the Weslin house for several days, he and Mikhel, assisted by Kadamovas, killed Umansky by holding him down and asphyxiating him with a plastic bag and a rope. Tr. 10/12/2006B at 100-04. Altmanis testified that he, Kadamovas, and Mikhel, then drove the body to the reservoir in Kadamovas' van, stopped on a bridge, and threw the weighted body into the water. Tr. 10/12/2006B at 114-18.

**D.    Nick Kharabadze and George Safiev**

Natalya Solovyeva testified that she learned about George Safiev in 2001, visited his mansion, and videoed the property. She also learned that Nick Kharabadze was Safiev's friend and business partner. Tr. 11/02/06 at 75-82. The plan was to abduct Kharabadze as a method of getting to Safiev. Tr. 11/02/06 at 15-17. In January 2002, Solovyeva contacted Kharabadze by phone, posing as an acquaintance from Russia, and asking to meet. Tr. 11/03/06 at 19-26.

On January 20, 2002, Kharabadze met Solovyeva and she brought him to the Designed Water World office, which had been furnished like a club, with a bar and a pool table. Altmanis, Krylov, Mikhel, and Kadamovas were present, along with

Aleksejus Markovskis, posing as patrons. Kharabadze was surrounded and threatened with a gun. Tr. 11/03/06 at 28-35; Tr. 10/13/06A at 26-35; Tr. 11/09/06 at 45-52. Kharabadze was told that he would be freed as soon as he set up a meeting with Safiev, and Kharabadze telephoned Safiev, eventually persuading him to come to Designed Water World where he was also abducted. Tr. 11/09/06 at 59-75; Tr. 10/13/2006A at 29-57; Tr. 10/13/2006B at 6-11.

Kharabadze and Safiev were held at the Weslin house for four days, restrained and guarded, forced to make phone calls and record requests for money. Tr. 10/13/06B at 18-43; Tr. 11/09/06 at 75-99. Safiev called his business partner, Konstantinos Tezhik, who arranged a transfer of $969,000 to an account in Jamaica controlled by Mikhel. Tr. 09/14/2006 at 97-101. Mikhel also made ATM withdrawals from Safiev's and Kharabadze's accounts and sought to purchase electronic equipment with Safiev's credit card. Tr. 11/08/2006 at 92-109, 162-65.

On January 25, 2002, Altmanis, Krylov, Markovskis, Mikhel, and Kadamovas took Safiev and Kharabadze in two vehicles to the New Melones Reservoir. The two were strangled and their weighted bodies were thrown into the water. Tr. 09/06/2006C at 8, 31-49, 94-98; Tr. 10/13/2006B at 50-61; Tr. 10/17/2006 at 6-27.

### E.   Escape Attempt

In addition to the conspiracy to abduct, abductions, and money laundering counts, the prosecution also alleged, in Count 6, a charge of conspiracy to escape based upon events that occurred at the Metropolitan Detention Center (MDC) in late 2002 and early 2003.

Following their arrests, Mikhel, Kadamovas and Krylov were detained in the MDC. Mikhel devised a plan by which he and others would smuggle tools into their cells and dig through the cell walls to reach an adjacent stairwell. In cell number 518, on the fifth floor of the facility, a cell that Mikhel shared with an inmate named Kim, authorities found a cache of tools, later referred to at trial by the prosecutor as a "virtual hardware store," including hacksaw blades, wrenches, screwdrivers, fishing line, paint, work gloves, bolt cutters and a camcorder. Tr. 01/11/07 at 50; Tr. 12/06/06 at 87-88, 179-96. Authorities also noted that an area of wall behind a mirror had been dug out, forming a hole one by two feet in size. Tr. 12/06/06 at 88; Tr. 12/07/06 at 51-52.

Kadamovas' cell on the ninth floor, number 913, which he also shared with another inmate, was also searched. Tr. 12/06/06 at 102, 134; Tr. 12/07/07 at 45. However, no contraband relating to any escape attempt was found. Tr. 12/06/06 at 45, 93, 175; Tr. 12/07/07 at 45. An inmate testified that he had discussed the escape plan with Kadamovas. Tr. 12/08/06 at 149. A letter in Russian, sent by

41

Mikhel but intercepted, suggested that Kadamovas was part of the escape plot, but the Ninth Circuit later ruled that the admission of the letter was error.

### F.   Penalty phase

The bulk of the government's penalty evidence was the testimony of eight victim impact witnesses who described the victims and the loss that they suffered as a result of their deaths. Tr. 01/24/2007 at 114-29; Tr. 01/25/2007 at 36-157.

The government also presented evidence regarding Mikhel's second escape plot through a series of letters and writings from the San Bernardino County Jail in early 2004. Tr. 01/24/07 at 135-46, 160-80.

The penalty-phase evidence presented on behalf of Jurijus Kadamovas consisted of: (1) the testimony of Mark Cunningham, a psychologist, regarding future dangerousness in prison (Tr. 02/06/07 at 127-207), (2) the testimony of Professor Richard Anderson, a political scientist, regarding the situation in Lithuania during the post-Soviet era (Tr. 02/07/07 at 64-88); (3) a single piece of paper, Trial Ex. 2101, from the Lithuania Department of Informatics and Communications attesting that Mr. Kadamovas had no "records of criminal activities" in Lithuania. Tr. 02/07/07 at 89.

No lay witnesses, or anyone who actually knew Mr. Kadamovas, testified on his behalf in the penalty phase. Trial counsel had attempted to secure visas to have

three family members—his wife Jurate Kadamoviene, his sister Svetlana Kadamova, and his son Gabriel Kadamovas—travel to the United States to testify on his behalf. However, trial counsel was unable to secure proper visas.

## SECTION 2255 PROCEDURE

This proceeding under 28 U.S.C. § 2255 involves a complex case with multiple defendants and multiple counts. The trial of defendant Jurijus Kadamovas and his co-defendant Iouri Mikhel lasted for eight months and seventy-five court days. There were more than a thousand exhibits, approximately 125 testifying witnesses, and hundreds of pleadings. The discovery in the case produced to defense counsel was roughly 90,000 pages, plus extensive video, audio, and photographic evidence. Many documents and transcripts in the discovery produced were in the Russian language, as well as Latvian, Greek, and Lithuanian. A second trial, involving another co-defendant, Petro Krylov, lasted roughly thirty-seven court days.

Post-conviction review of the proceedings and investigation into the matter was complicated by the arrival of the COVID-19 pandemic in 2020 and its subsequent impact. Some of the impact of the pandemic on the matter has been set forth in previous pleadings, particularly the Proffer Regarding the Effects of the Pandemic, Dkt. No. 2376, filed August 14, 2020, Supplemental Proffer, Dkt. No. 2397, filed December 16, 2020, Second Supplemental Proffer, Dkt. No. 2409, filed June 30, 2021, Third Supplemental Proffer, Dkt. No. 2415, filed November 11, 2021.

The allegations in this motion represent a concise proffer, in summary form, of the grounds for relief presently known to be available. These allegations are made after a review and investigation handicapped by limited time and limited resources, and further curtailed by the effects of the pandemic.

Citations to caselaw in this initial pleading are meant to be demonstrative but not exhaustive. Defendant anticipates the opportunity for factual development, full discovery, an evidentiary hearing, and, when the time comes, full briefing on the legal claims.

A district court may summarily deny a § 2255 motion without further factual development and an evidentiary hearing only if "the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b). An evidentiary hearing is required where "the movant has made specific factual allegations that, if true, state a claim on which relief could be granted." *United States v. Schaflander*, 743 F.2d 714, 717 (9th Cir. 1984). In other words, to justify dismissal without holding an evidentiary hearing, the district court must find that a claim is "palpably incredible or patently frivolous." *United States v. Leonti*, 326 F.3d 1111, 1116 (9th Cir. 2003) (quoting *Schaflander*, 743 F.2d at 717). "[A] hearing is mandatory whenever the record does not affirmatively manifest the factual or legal invalidity of the petitioner's claims." *Baumann v. United States*, 692 F.2d 565, 571 (9th Cir. 1982).

45

The statutory language found in § 2255(b) incorporates the standard governing evidentiary hearings in habeas corpus cases that was articulated by the Supreme Court in *Townsend v. Sain*, 372 U.S. 293 (1963). *See* Rule 8, Rules Governing Section 2255 Proceedings advisory committee's note (incorporating advisory committee notes to Rule 8, Rules Governing Section 2254 Cases). In *Townsend*, the Court explained, "Where the facts are in dispute, the federal court in habeas corpus must hold an evidentiary hearing if the habeas applicant did not receive a full and fair evidentiary hearing in a state court, either at the time of the trial or in a collateral proceeding." 372 U.S. at 312. Of course, in § 2255 cases—unlike cases involving review of state court convictions pursuant to 28 U.S.C.§ 2254 cases—there are no prior state collateral proceedings in which an evidentiary hearing could have occurred. As a result, in § 2255 proceedings, anytime there are disputed facts relevant to collateral review, the federal district court must hold a hearing, because federal court is the only venue where those disputes can be resolved. Unsurprisingly, therefore, the Ninth Circuit has recognized the critical importance of evidentiary hearings in § 2255 cases. *See, e.g., United States v. Howard*, 381 F.3d 873, 877 (9th Cir. 2004) ("once a petitioner asserts a . . . detailed claim, about which there are controverted facts, an evidentiary hearing must be granted."); *United States v. Rodriguez*, 49 F.4th 1205

(9th Cir. 2022).[3] Further, "evidentiary hearings are particularly appropriate when claims raise facts which occurred out of the courtroom and off the record." *United States v. Chacon-Palomares*, 208 F.3d 1157, 1159 (9th Cir. 2000) (quotation and citation omitted).

In *Massaro v. United States*, 538 U.S. 500 (2003), the Court explained that the process available under § 2255 is preferable to direct appeal for the bringing of ineffective assistance of counsel claims precisely because there is the opportunity for further fact-finding through an evidentiary hearing. Conversely, when the claim is brought on direct appeal it is necessarily based solely upon "a trial record not developed precisely for the object of litigating or preserving the claim and [is] thus often incomplete or inadequate for this purpose." *Id*. at 505. The direct appeal record standing alone frequently "will not disclose the facts necessary to decide either prong of the *Strickland* analysis." *Id.* The trial record "may contain no

---

[3] A recent court of appeals opinion in another federal death penalty case, *United States v. Barrett*, 985 F.3d 1203 (10th Cir. 2021), illustrates the importance of hearings in capital § 2255 proceedings. In that case, the district court denied Barrett's § 2255 motion without a hearing and denied a Certificate of Appealability, but, following a hearing, the Tenth Circuit ultimately found that counsel's deficient performance caused prejudice, explaining "at the evidentiary hearing, Mr. Barrett introduced substantial mitigating evidence that bore no resemblance to the constitutionally deficient mitigation case his counsel presented at sentencing." *Barrett*, 985 F.3d at 1233.

47

evidence of alleged errors of omission, much less the reasons underlying them." *Id*. Where the alleged error is one of commission, "the record may reflect the action taken by counsel but not the reasons for it." *Id*.

Similarly, claims relating to the government withholding of evidence, jury misconduct, judicial bias, and prosecutorial misconduct, must be addressed in a forum where factual development, discovery, and a hearing are available to uncover key evidence. *See*, *e.g., Sampson v. United States*, 724 F.3d 150, 154 (1st Cir. 2013) (following hearing, ordering new trial for federal death row inmate due to juror dishonesty during voir dire); *United States v. Fell*, No. 2:01-cr-12, 2014 WL 3697810 (D. Vt. July 24, 2014) (following hearing, ordering new trial for federal death row inmate due to juror misconduct); *United States v. Hammer*, 404 F. Supp. 2d 676, 796 (M.D. Pa. 2005) (following hearing, ordering new penalty phase for federal death row inmate due to *Brady* violations). Section 2255, being the federal proceeding linked to the ancient and revered Writ of Habeas Corpus, is the proper forum for review of these claims and the correction of injustice.

This Motion is brought pursuant to federal statutory mandate as well as the right to Petition for Writ of Habeas Corpus, guaranteed in the Constitution.

## CLAIM 1 ANONYMOUS JURY

Jurijus Kadamovas' convictions and sentence are unlawfully and unconstitutionally imposed, in violation of the Fifth, Sixth, and Eighth Amendments to the United States Constitution, because he was tried before an anonymous jury with the identities of the jurors unavailable to him and his counsel. The anonymous jury situation created a proceeding in which Mr. Kadamovas was deprived of the information necessary to protect his rights to an impartial jury, to an unbiased jury, to a public trial and selection of the jury, to the effective assistance of counsel, to due process of law, to the presumption of innocence, to a public trial, and to a reliable capital sentencing proceeding. Without even the most basic information regarding the prospective jurors, and, correspondingly, without a full and fair jury selection process, Mr. Kadamovas was deprived of the effective use of peremptory challenges, the right to bring challenges for cause, and the protection against jury misconduct and bias. *Peña-Rodriquez v. Colorado*, 580 U.S. 206 (2017); *Presley v. Georgia*, 558 U.S. 209 (2010); *Morgan v. Illinois*, 504 U.S. 719 (1992); *Turner v. Murray*, 476 U.S. 28 (1986); *Witherspoon v. Illinois*, 391 U.S. 510 (1968); *Irvin v. Dowd*, 366 U.S. 717 (1961); *Marshall v. United States*, 360 U.S. 310 (1959); *Sampson v. United States*, 724 F.3d 150 (1st Cir. 2013); *United States v. Blagojevich*, 612 F.3d 558, 564-65 (7th Cir. 2010); *United States v. Fell*, No. 2:01-cr-12, 2014 WL 3697810 (D. Vt. July 24, 2014).

The following facts and allegations, among others, support this claim:

A.    Prior to trial, in May of 2006, the government filed a motion, citing 18 U.S.C. § 3432, asking for the trial to be conducted with an anonymous jury. Dkt. No. 1002. No written response was filed by either Kadamovas' counsel or Mikhel's counsel. At the hearing on the motion, the defendants did not formally object. Tr. 06/12/06 at 66-67. The trial court granted the motion without analysis, without making any factual findings in support, and without considering lesser alternatives such as allowing the attorneys access to the juror names. Tr. 06/12/06 at 67.

B.    The purported grounds for the anonymity request were: (1) the "numerous violent crimes charged"; (2) "the defendants' participation in a group with the potential to harm jurors"; (3) "the lack of respect defendants have exhibited to the judicial process as illustrated by their participation in an elaborate attempt to escape from custody prior to trial"; (4) "the sentences defendants face"; and (5) "the extensive publicity this trial is likely to receive." Dkt. No. 1002 at 1. These factors did not support the request for anonymity.

1.    The nature of the crimes involved, and the possibility of a death sentence, are factors that support the need for a jury selection that promotes impartiality and fairness, and allows the adequate, proper use of peremptory

50

challenges and for-cause challenges. Fundamental constitutional trial rights should not be disfavored where the charges are serious and the consequences grave.

2.     There is and was no connection between Mr. Kadamovas and "a group with the potential to harm jurors," nor any connection to so-called "Russian organized crime." No links to Russian organized crime groups were shown to exist. The government would eventually retreat from any such accusation, later admitting that "the government did not take any position on whether or not Mikhel and Kadamovas were part of Russian organized crime or the Russian Mafia." *See* Government's Answering Brief, 11/22/10, *United States v. Krylov*, Ninth Circuit No. 08-50033, Dkt. No. 43 at 37. The suggestion that Mr. Kadamovas was involved with an international organized crime group was inflammatory speculation without factual support. It was also untrue.

3.     Mr. Kadamovas' involvement with the escape attempt was, at best, negligible. He possessed no tools, made no attempt to escape, and was not involved at all in the smuggling of contraband into the jail. The evidence revealed that the preparations involved in the escape plan were Mikhel's, and his main coconspirators were Thomas and Sabrina Tynan. This factor does not support the infringement on Mr. Kadamovas' rights caused by an anonymous jury.

4.     The possibility, however unsupported, that allowing the defendants to know the names of the jurors would submit the jurors to danger or harassment

could have been easily dispelled by allowing counsel to know the names under a protective order. This type of arrangement has been used in a number of federal death penalty trials, protecting the jurors while preserving the constitutional rights to a fair jury selection, due process, and effective assistance of counsel. *See United States v. Hager*, 721 F.3d 167, 186 (4th Cir. 2013) ("Hager and his counsel received a list of the jury venire, but they were referred to only by number in open court."); Ex. 108 (McNally dec.). Full blanket juror anonymity is an extraordinary step and extremely rare, especially without a foundation based upon factual determination of the specific necessity.

C.     The trial court's order granting the motion was broader than necessary to protect the interests at stake. Less extreme options were available, including allowing the defense attorneys access to some information about the jurors' identities. The trial court did not consider less extreme options at all.

D.     The anonymous jury and the failure to order limited disclosure of the jurors' names to the attorneys also violated the Supreme Court's Sixth Amendment public trial jurisprudence discussed in *Press-Enterprise Co. v. Superior Court*, 464 U.S. 501 (1984), *Waller v. Georgia*, 467 U.S. 39 (1984), and *Presley v. Georgia*, 558 U.S. 209 (2010). This constitutional doctrine holds that an anonymous jury infringes on the openness that is essential to the jury selection phase of a trial. The long historical record from England through colonial America "makes clear" that

jury selection must be conducted "openly," and public jury selection "was the common practice in America when the Constitution was adopted." *Press-Enterprise Co.*, 464 U.S. at 507-08. The jury selection process, and the trial court's failure to consider a less harmful and prejudicial option to complete blanket anonymity, thus violated the Sixth Amendment right to a public trial.

E.     The trial went forward with an anonymous jury, and Mr. Kadamovas was deprived of the most basic information about the jurors, and suffered the following prejudice:

    1.     The loss of a fair jury selection process.

    2.     Inability to effectively use peremptory challenges.

    3.     Inability to conduct a modest investigation into the jurors. The most basic information could not be verified.

    4.     Inability to gain information relevant to the use of challenges for cause.

    5.     Inability to confirm the information in the jury questionnaires.

    6.     Inability to confirm and explore the criminal records of the jurors. Two jurors admitted to having criminal records: one admitted to an assault

conviction (Tr. 08/15/06 at 123)[4] and another to an arrest for drunk driving (Tr. 08/17/06 at 100-01). The nature of those criminal proceedings, and their outcomes, could not (and cannot) be verified without knowing the name of the juror.

7.    Inability to explore and investigate the potential for bias and partiality evident during the jury selection, including:

a.    The potential bias stemming from the military experience of the three jurors who had served in the armed forces during the Cold War era, including at least one Vietnam veteran. *See* Tr. 08/16/06 at 26-27, 80; Tr. 08/29/06 at 213.

b.    The ethnic and racial bias against Russians and Soviets. Such bias was evident in the jury questionnaires. *See* Dkt. No. 2360, Declaration of Jean E. Giles in Support of Motion for Limited Disclosure of Juror Names (filed under seal on July 16, 2020).

8.    Inability to explore and investigate the problems that occurred during

---

[4] Commonly, assault can be charged as a felony or a misdemeanor, and not all potential jurors understand the difference. Juror number 8 stated that "I think" the conviction was for "misdemeanor assault." Tr. 08/15/06 at 123. Without knowing the name of the juror, the parties could not confirm this conviction or what happened in the proceeding.

the trial, including:

a. The threats on Juror 57 from his employer and the employer's improper attempt to remove Juror 57 from the jury. Tr. 11/14/06 at 33; Tr. 11/15/06 at 6-7; Tr. 11/16/06 at 74-76.

b. Juror 67's encounter with defense counsel for Mikhel and an expert witness in a hotel bar during the trial. Tr. 02/01/07 at 8-12.

c. Juror 31's "continuing family medical issues," not further specified, that led to a request for scheduling changes. Tr. 01/10/07 at 167-68.

E. Further, instructing the jurors not to use their names and that their identities would be kept secret predisposed them to convict the defendants. Upon learning that their identities were being withheld, purportedly for their protection, the jurors would have naturally concluded that the defendants were dangerous criminals. In reality, there was not a valid basis to keep the jurors' identities secret and there was no evidence that Mr. Kadamovas was involved with an international organized crime group.

F. Trial counsel failed to explicitly object to the empaneling of the anonymous jury. Trial counsel's lack of a specific objection does not prevent the consideration of this claim for the following reasons, among others:

1. The trial court had an independent duty to protect the fundamental constitutional rights involved. Especially with regard to the right to a public trial,

the trial court must act in the public interest regardless of the preference of the parties.

2.     The failure of trial counsel to make a proper objection was unreasonable and constituted ineffective assistance of counsel in violation of the Sixth Amendment. The allegations of Claim 19 (Ineffective Assistance of Counsel: Guilt Phase Trial) are incorporated by this reference.

3.     The granting of the government's motion was plain error.

4.     The granting of the government's motion without making adequate factual findings and considering less restrictive alternatives was plain error.

G.     On appeal, Mr. Kadamovas' appellate counsel raised a version of this argument. *See* Ninth Cir. No. 07-99009, Dkt. No. 255-1 at 153-63. The appellate briefing emphasized that the trial court erroneously failed to adopt two necessary safeguards to protect the defendants' rights: (1) the trial court did not give instruction to the jury to minimize the prejudicial effect of an anonymous jury, and (2) the trial court did not allow counsel to have access to the names and addresses of the venire under a nondisclosure protective order. The Ninth Circuit rejected these arguments. *United States v. Mikhel & Kadamovas*, 889 F.3d 1003, 1031-32 (9th Cir. 2018). The Ninth Circuit ruling does not prevent consideration of this

claim for the following reasons, among others:

1.       The Ninth Circuit posture of the issue was based upon the assumption that the impaneling of the anonymous jury was not erroneous. The Ninth Circuit opinion does not represent a decision on this claim. This is particularly true for the public trial aspect of the claim, which was not brought before the Ninth Circuit.

2.        The Ninth Circuit misconstrued the record and its ruling was based on that misconstruction. The Ninth Circuit referenced the "district court's determination that an anonymous jury was necessary to ensure juror protection." 889 F.3d at 1031. On the contrary, the trial court made no such "determination." The actual ruling was simply that the government's request was "appropriate." Tr. 06/12/06 at 66. No findings supporting the claimed necessity of the unusual procedure were ever made.

3.       The Ninth Circuit ruling was clearly erroneous.

4.       Exceptional circumstances, including the fact that this is a capital case, warrant reconsideration of any conclusion made by the appellate court.

5.       Changes and developments in the law favor consideration of this claim.

6.       To the extent that the actions of appellate counsel restrict consideration of this claim, appellate counsel's actions and inactions constituted ineffective assistance of counsel in violation of the Sixth Amendment, to Mr.

Kadamovas' prejudice. Ex. 16 (Coleman dec.). The allegations of Claim 30 (Ineffective Assistance of Counsel: Appellate Proceedings) are incorporated by this reference.

H.    To this day, the identities of the individuals who served as jurors and returned a death sentence for Mr. Kadamovas have been hidden. A post-conviction motion to disclose the names of the jurors was made in 2020. Dk. No. 2337. That motion was denied. Dkt. No. 2375.

1.    The continued denial of the disclosure of the identities of the jurors is improper and without factual or legal basis.

2.    The continued denial of the disclosure of the identities of the jurors prevents Mr. Kadamovas from conducting an investigation into juror misconduct, governmental misconduct, potential fair trial and due process violations. Mr. Kadamovas has been deprived of his rights to post-conviction process, and deprived of his right to petition the courts for relief.

3.    The continued denial of the disclosure of the identities of the jurors is an ongoing constitutional violation. Mr. Kadamovas' rights to due process and a fair and reliable capital sentencing procedure under the Fifth, Sixth, and Eighth Amendments have been violated.

I.    These constitutional violations constitute a structural defect and warrant the granting of this motion without any further showing of prejudice.

58

J.	The error substantially prejudiced defendant, rendered the trial fundamentally unfair, eroded the reliability of the jury's verdicts and had a substantial and injurious effect on the verdicts.

**CLAIM 2 JURY MISCONDUCT AND BIAS**

Jurijus Kadamovas' convictions and sentence are unlawfully and unconstitutionally imposed, in violation of the Fifth, Sixth, and Eighth Amendments to the United States Constitution, because he was not tried before a fair and impartial jury. The proceedings violated his right to a fair trial, a jury trial, effective assistance of counsel, due process, and reliable and non-arbitrary sentencing proceedings. *Peña-Rodriquez v. Colorado*, 580 U.S. 206 (2017); *Witherspoon v. Illinois*, 391 U.S. 510 (1968); *Remmer v. United States*, 350 U.S. 377 (1956); *Godoy v. Spearman*, 861 F.3d 956, 958 (9th Cir. 2017); *United States v. Parse,* 789 F.3d 83, 111 (2d Cir. 2015); *Dyer v. Calderon*, 151 F.3d 970 (9th Cir. 1998) (en banc).

The following facts and allegations, among others, support this claim:

A.     The allegations set forth in Claim 1 are incorporated by this reference.

B.     The allegations set forth in Claim 3 are incorporated by this reference.

C.     Jury selection in this matter began with the distribution of questionnaires on July 11, 2006. After the questionnaires were collected and read, the assessment and questioning of jurors began on August 15 and proceeded for roughly three weeks until the jury was sworn in on September 5, 2006. The selection of fair and impartial jurors was hampered in a number of ways.

1.      The jury was anonymous, preventing attorneys from conducting even the most basic investigation into the potential jurors and exploring the responses in the questionnaires. *See* Claim 1 (Anonymous Jury). Undersigned counsel requested that the Court disclose the jurors' identities in a motion filed in 2020. Dkt. No. 2337. The Court denied that motion. Dkt. No. 2375.

2.      The jury was death qualified. A death-qualified jury is one from which prospective jurors have been excluded for cause in light of their views about the death penalty. Such a process skewed the jury unfairly to the prejudice of the defendants. *See* William Bowers et. al., *The Decision Maker Matters: An Empirical Examination of the Way the Role of the Judge and the Jury Influence Death Penalty Decision-Making*, 63 Wash. & Lee L. Rev. 931 (2006); Theodore Eisenberg, Stephen P. Garvey & Martin T. Wells, *The Deadly Paradox of Capital Jurors*, 74 S. Cal. L. Rev. 371 (2001); James S. Liebman, *The Overproduction of Death*, 100 Colum. L. Rev. 2030, 2097 n.163 (2000). Death qualification increases the tendency of a jury to convict, decreases conscientiousness in the jury's role as a sentencer, increases the likelihood that the jurors will deny responsibility for the defendant's punishment, and increases the likelihood that the jurors will rush to judgment. The result of the death qualification process is a jury unfairly skewed towards conviction and capital punishment.

3.  The jury questionnaire was brief and inadequate, and failed to give counsel sufficient information to support challenges for cause or to exercise peremptory challenges in a reasonably effective way.

4.  Counsel was prevented from a full and fair voir dire examination of the potential jurors. The trial court frequently cut off counsel and prevented thorough and complete questioning. *See* Tr. 08/15/06 at 85-86 (The court interjects during Mr. Lasting's questioning with its own question, leaving Mr. Lasting's question unanswered); *id.* at 88 (The court inserting itself over questioning by Mr. Lasting in the middle of voir dire.); Tr. 08/22/06 at 170 (The court takes over questioning in the middle of defense voir dire.); *id.* at 172 (In response to a defense voir dire question the court says "I don't think she should answer."); *id.* at 193-97 (The court refuses to strike for cause a *Witherspoon* excludable juror because an "eye for an eye" is a Judeo-Christian value.).[5] The restrictions inhibited the

_____

[5] The court repeatedly refused to allow a full a fair voir dire consistent with the law, *e.g.*, Tr. 08/15/06 at 33, 40, 42-43, 46-48, 63, 67, 69-71, 78-79, 84, 87, 140, 144-45, 242-43; Tr. 08/16/06 at 17, 174, 195-97; Tr. 08/17/06 at 208, 210-12; Tr. 08/18/06 at 37, 66; Tr. 08/22/06 at 43, 134, 177-81, 193-97; Tr. 08/23/06 at 36, 42-49, 60, 124-26, 131, 135-36, 179-81, 190, 193-94, 230-31; Tr. 08/24/06 at 54; Tr. 08/25/06 at 24-25, 61-64, 70-78, 131, 138, 142-46, 165-67; Tr. 08/29/06 at 24, 31-32, 48-51, 57, 66, 100-01, 116-20; Tr. 08/30/06 at 51-52, 80, 90-94, 147-49, 187, 204, 222, 234-36; Tr. 08/31/06 at 37, 70, 82, 95-100, 109, 118, 152-54, 165-75, 182, 219, 227-32, 278; Tr. 09/01/06 at 23-34.

collection of information to support challenges for cause, prevented informed use of peremptory challenges, and prevented the selection of a fair and impartial jury. The lack of full and fair voir dire consequently does not cure the prejudice of the anonymous jury, or the inadequacy of the questionnaires.

E.    The jury was infected with bias and prejudice. Indications of bias and prejudice include, among others:

1.    The potential bias stemming from the military experience of the three jurors who had served in the armed forces during the Cold War era, including at least one Vietnam veteran. *See* Tr. 08/16/06 at 26-27, 80; Tr. 08/29/06 at 213. The trial court took no steps to address or prevent this bias.

2.    The ethnic and racial bias against Russians and Soviets. At the time of the trial, much of the community was infected by substantial hostility and general bias against recent immigrants from Russia and the Soviet Union. Such bias was evident in the jury questionnaires. *See* Dkt. No. 2360, Declaration of Jean E. Giles in Support of Motion for Limited Disclosure of Juror Names (filed under seal on July 16, 2020). The trial court took no steps to address or prevent this bias.

F.    Full presentation of the allegations of bias and prejudice set forth here and present in the record, and further development of the bias and prejudice that corrupted the jury in this case have been subverted and prevented by the withholding of the jurors' names and information. Mr. Kadamovas has been denied

63

his statutory and constitutional rights to postconviction process, as well as his constitutional rights to a fair and proper death penalty proceeding, and due process of law under the Fifth, Sixth, and Eighth Amendments because the identities of the jurors were withheld at trial and have been withheld ever since.

G.    A member of the jury, Juror 57, was threatened by his employer with the loss of his job, a threat that potentially could have distracted him, incentivized him to rush to conclusions, and resulted in his partiality. Tr. 11/14/06 at 33; Tr. 11/15/06 at 6-7; Tr. 11/16/06 at 74-76.

1.    During the trial, on November 14, 2006, the trial judge announced that he had "received a telephone call from one of the Juror's [sic] employers yesterday saying they're not going to pay the Juror anymore, so I'm discussing with the employer a solution to this issue." Tr. 11/14/06A at 33. No further information was given at that time.

2.    On the following morning, November 15, the trial court announced the following developments:

> I'm having trouble with Juror Number 57 in that his employer and union are giving me some trouble here. I advised them of 28, United States Code, Section 1875 that says, "An employer shall cooperate with the Court and not intimidate, harass, threaten, discipline, and/or interfere with the juror's service.
>
> Here's the note that I received from the juror after my discussion yesterday, which I advised you of. He says, "Well, your Honor, I thought everything was fine, but I just got" -- and I'm reading you what

64

he wrote down here -- "I just got notified that my company will not pay me. Can you please call" -- and they gave me the name -- "that's my supervisor. He said that the company lawyers advised them not to pay me or show up at work when I to [sic] jury service."

Evidently what he's doing is he's doing his jury service and going into work at night. And they said that he can't do that. And I said that that's crossing the line, and they can't interfere with him.

Then I received another note from the juror. I guess he has a cell phone, which we now allow the jurors to have. And it says, "My shop steward from my union just called me and said that he was told that no judge in the world can overrule their decision."

Well, I put in a call to that individual as well and told him that, in my opinion, that if he took this position that I would send a Marshal out with a subpoena in order to show cause why he should not be held in violation of 28, United States Code, Section 1875.

So I called the shop steward, and I also called his immediate supervisor. And they're going up the food chain now. And I will get to the bottom of this as well.

Tr. 11/15/06 at 6-7.

No further inquiry was undertaken on the record regarding the juror's reaction to this pressure, the potential distraction, or the hardship caused by the juror's work situation.

65

3.      The next day, further communications led to the following discussion, on the record, with Juror 57 and counsel, outside the presence of the jury as a whole:

THE COURT: I received your latest notes, sir.

Let me read it to the counsel so they understand what it says.

"Your Honor, yesterday you told me everything was fine. But last night I got a call from my superintendent saying they cannot pay me for jury service, that they have an agreement you", meaning myself, "to have me work on the days that I don't serve jury duty. But those days are my free days for my family. I understand that. But still it is a hardship to me if I have no other choice. I'll do whatever it takes. Is this final, or are you aware of what the company is doing or what their final decisions are? As far as I know, they are not paying me for being here."

THE COURT: All right. That is correct.

They have told me that their policy is three weeks' pay. They paid you for an extra one week, I think, up to 30 days. We pay you $50. So the difference between whatever we pay you and they pay you is what they are obligated to pay you by law.

Yesterday, when I received the notes, it was that you wanted to go to work in the evening. They also told me that you operate heavy machinery, and they felt that it was going to cause a problem with safety if you were to come here for jury duty and then go to work at night, because it could cause an accident. I agreed with them.

I did explain to them my situation of having you remain on the jury. They agreed to allow you to remain.

They will not pay you any more, except they will permit you to work on the days that you are not serving on jury, which would be Mondays, and then this week will be Friday and all of next week, and any time that we're off. But that's the best I can do.

You have to, I guess, work on weekends. They said that they would allow you to work on weekends. They indicated to me that they may give you double time or whatever arrangements that you have with them, that you are a good employee. But that's the best I can do.

We all have hardships here. I don't have a hardship. I get a Government pension. . . .

That's the best I can do.

And this case should end some time in December.

Tr. 11/16/06 at 74-76.

4.      These statements on the record indicate that there were unrecorded conversations between the trial judge and the juror, and between the trial judge and the juror's employers and supervisors. The record demonstrates the possibility of improper pressure being brought upon the juror from a number of sources, the possibility of distractions and anxiety affecting the juror, the possibility of the juror being encouraged to end his jury service quickly through a rush to judgment and quick verdict. No further hearing was held into the potential impropriety and misconduct. Counsel were never given an opportunity to question the juror. The juror was never questioned by the trial court on the record.

67

5.      By promising that the trial would end in December, the trial court exacerbated an already difficult situation. The trial in fact continued into and throughout January, with the final verdicts delivered on February 13, 2007. No follow up or inquiry into this juror's situation, the hardship and distraction, or the possible damage to his status as a "good employee" was conducted.

6.      The trial court failed in its duty to properly inquire into the possibility of juror misconduct, distraction, and impropriety. *People v. Burgener*, 41 Cal. 3d 505, 516-21 (1986).

7.      Full presentation of the allegations of misconduct regarding Juror 57—and the pressure exercised by his employer—and further development of the violation of constitutional rights have been subverted and prevented by the withholding of the jurors' names and information. Mr. Kadamovas has been denied his statutory and constitutional rights to postconviction process, as well as his constitutional rights to a fair and reliable death penalty proceeding, and due process of law under the Fifth and Eighth Amendments because the identities of the jurors were withheld at trial and have been withheld ever since.

H.      A member of the jury, Juror 67, encountered defense counsel for Mikhel and an expert witness working on the Mikhel case in a hotel bar during the trial. Such an encounter could have influenced the juror in a number of ways, and resulted in

the loss of impartiality. The trial court's inquiry into this incident was inadequate and cursory. Tr. 02/01/07 at 8-12.

1. Full presentation of the allegations of misconduct with regard to Juror 67, and further development of the violation of defendant's constitutional rights, have been subverted and prevented by the withholding of the jurors' names and information. Mr. Kadamovas has been denied his statutory and constitutional rights to postconviction process, as well as his constitutional rights to a fair and reliable death penalty proceeding, and due process of law under the Fifth and Eighth Amendments because the identities of the jurors were withheld at trial and have been withheld ever since.

I. A member of the jury, Juror 31, had "continuing family medical issues," not further specified, that led to a request for scheduling changes. Tr. 01/10/07 at 167-68. The trial court failed to conduct an inquiry into these issues and failed to assure that the issues were not interfering with the ability of Juror 31 to fulfill her duties and responsibilities as a juror.

1. Full presentation of the allegations of misconduct with regard to Juror 31, and further development of the violation of constitutional rights, have been subverted and prevented by the withholding of the jurors' names and information. Mr. Kadamovas has been denied his statutory and constitutional rights to postconviction process, as well as his constitutional rights to a fair and reliable

69

death penalty proceeding, and due process of law under the Fifth and Eighth Amendments because the identities of the jurors were withheld at trial and have been withheld ever since.

J.    These constitutional violations constitute a structural defect and warrant the granting of this motion without any further showing of prejudice.

K.    The errors substantially prejudiced Mr. Kadamovas, rendered the trial fundamentally unfair, eroded the reliability of the jury's verdicts and had a substantial and injurious effect on the verdicts.

## CLAIM 3 DENIAL OF FAIR CROSS-SECTION

Jurijus Kadamovas' convictions and sentence are unlawfully and unconstitutionally imposed, in violation of the Sixth Amendment to the United States Constitution, because he was denied his right to be tried by an impartial jury drawn from sources reflecting a fair cross section of the community. *Duren v. Missouri*, 439 U.S. 357 (1979).

The following facts and allegations, among others, support this claim:

A.      Mr. Kadamovas was tried in 2006-07 in the Western Division of the Central District of California. Four counties comprise the Western Division: Los Angeles, San Luis Obispo, Santa Barbara, and Ventura. Ex. 109 (C.D. Cal. Gen. Order 03-12) at 2.

B.      The Sixth Amendment secures to criminal defendants the right to be tried by an impartial jury drawn from sources reflecting a fair cross section of the community. *Taylor v. Louisiana*, 419 U.S. 522, 528 (1975). "A criminal defendant has standing to challenge exclusion resulting in a violation of the fair-cross-section requirement, whether or not he is a member of the excluded class." *Duren*, 439 U.S. at 359 n.1.

C.      A defendant in a criminal case demonstrates a prima facie fair cross-section violation where (1) "the group alleged to be excluded is a 'distinctive' group in the community"; (2) "the representation of this group in venires from which juries are

71

selected is not fair and reasonable in relation to the number of such persons in the community," and (3) the "underrepresentation is due to systematic exclusion of the group in the jury-selection process." *Duren*, 439 U.S. at 364. "Systematic" does not require intent, but instead means only "inherent in the particular jury-selection process utilized." *Duren*, 439 U.S. at 366.

1.    First, Hispanic citizens constituted a distinctive group for purposes of a fair cross-section analysis at the time of Mr. Kadamovas' trial. *See United States v. Rodriguez-Lara*, 421 F.3d 932, 941 (9th Cir. 2005) ("Hispanics have long been recognized as a 'distinctive' group in the community."), overruled on other grounds by *United States v. Hernandez-Estrada*, 749 F.3d 1154, 1164 (9th Cir. 2014) (overruling *Rodriguez-Lara* on the grounds that absolute disparity is not the sole appropriate means for analyzing fair cross-section violations under *Duren*).

2.    Second, Hispanic individuals were unfairly and unreasonably underrepresented in the qualified jury wheel. Interpolating data from the 2000 and 2010 Decennial Censuses, over-eighteen Hispanics in the Western Division of the Central District of California in 2006 constituted 40.1% of the population. Ex. 130 (Weeks dec.) ¶ 13. By contrast, 18.9% of the venire were Hispanics. *Id*. An absolute disparity analysis, which was the acceptable analytic method at the time of trial, yields a difference of approximately 21.2% percent between the over-eighteen Hispanic population and the proportion of the venire that was Hispanic.

*Id.* ¶ 16; s*ee United States v. Sanchez-Lopez*, 879 F.2d 541, 547 (9th Cir. 1989) (en banc) (absolute disparity analysis requires "taking the percentage of the group at issue in the total population and subtracting it from the percentage of that group that is represented on the master jury wheel"). At the time of trial, the Ninth Circuit had found an absolute disparity of 7.7% sufficient to satisfy the second prong of the *Duren* test.[6] *See Rodriguez-Lara*, 421 F.3d at 943-44 & n.10. Accordingly, an absolute disparity of 21.2% was sufficient to satisfy this prong at the time of trial.[7]

3.      Third, the underrepresentation of Hispanics on the jury wheel was systematic. It was not the result of random factors, chance, or luck, but was the result of a systematic process that under-represented Hispanic persons. At the time of trial, the Central District of California drew its jury wheel exclusively from voter registration lists. *See* Ex. 109 (C.D. Cal. Gen. Order 03-12) at 2. This method of drawing a jury wheel was certain to underrepresent Hispanics. Indeed, in 2004,

---

[6] The relative disparity of 53% is also sufficient to satisfy the second prong under *Duren*. *See* Ex. 130 (Weeks dec.) ¶ 17.

[7] The second prong of *Duren* merely requires a comparison of over-eighteen Hispanics in the jury pool to those in the community. It does *not* require comparison to the jury-eligible population in the community. *See Rodriguez-Lara*, 421 F.3d at 943 n.9 (explaining the myriad reasons why requiring comparison to the jury-eligible population "risks placing one of the elements of the prima facie case for . . . fair cross-section claims out of reach, thereby insulating jury selection systems from judicial scrutiny entirely").

the Ninth Circuit's Jury Trial Improvement Committee explicitly said that voter registration lists "under-represent Hispanic citizen populations and over-represent Caucasian populations." *See* Ex. 110 (9th Cir. Jury Trial First Report) at 4. Recommendation 3 of the Committee's report was to: "Improve Source Lists, Use Drivers License and State Identification, Voter Registration and the National Change of Address System to Expand Inclusiveness." *Id.* at 3. In 2013, the Central District followed this recommendation by expanding its draw to include "the names of registered voters, licensed drivers, and holders of California Identification Cards." Ex. 111 (C.D. Cal. Gen. Order 13-13) at 2. This underrepresentation on voter registration lists is one possible cause of the systematic exclusion of Hispanics from the venire. But whatever the cause is, the result is certain: as Dr. John Weeks, who is a professor of Geography and expert in demography, concludes, the probability of this disparity occurring by chance is 0.000%. *See* Ex. 130 (Weeks dec.) ¶ 20. This underrepresentation was thus "inherent in the particular jury-selection process utilized" by the Central District of California at the time of trial. *Duren*, 439 U.S. at 366.

C.     Trial counsel's failure to request discovery from the clerk of the method of jury selection, and failure to explicitly object to the denial of the constitutional right to a jury drawn from a fair cross-section do not prevent the consideration of

this claim for the following reasons, among others:

1.      The trial court had an independent duty to ensure that the jury was drawn from a fair cross-section of the community. The trial court failed in this duty.

2.      Trial counsel should have substantially developed this claim by seeking discovery from the clerk of court about the composition of the jury wheel. Parties have wide latitude to seek such discovery under both the Jury Selection and Service Act (JSSA), 28 U.S.C. § 1867, and the Sixth Amendment. Under the JSSA, "The parties in a case *shall* be allowed to inspect, reproduce, and copy such records or papers at all reasonable times during the preparation and pendency of such a motion." 28 U.S.C. § 1867(f) (emphasis added). In fact, "a litigant has essentially an unqualified right to inspect" jury selection records, *Test v. United States*, 420 U.S. 28, 30 (1975) (footnote omitted), and "[t]his right is virtually absolute: the only limitation on this right of access is that the inspection must be done at 'reasonable times.'" *United States v. Layton*, 519 F. Supp. 946, 958 (N.D. Cal. 1981) (quoting § 1867(f)); *see also United States v. Studley*, 783 F.2d 934, 938 (9th Cir. 1986) ("The right to inspect jury lists is essentially unqualified."). To be entitled to such discovery, a litigant need only "allege that he is preparing a motion to challenge the jury selection process," without any additional specifics, *United States v. Royal*, 100 F.3d 1019, 1025 (1st Cir. 1996), and a "court is not

75

free to establish additional requirements that defendants must meet in order to gain access to jury selection records." *United States v. Alden*, 776 F.2d 771, 775 (8th Cir. 1985).

3.     Given the large discrepancy between the percentage of Hispanics living in the Western Division of the Central District and the percentage in the jury wheel, reasonably competent trial counsel would have sought discovery to support a fair cross-section claim. The disclosure of this information would have demonstrated a basis for a valid objection to the jury selection process on fair cross-section grounds.

4.     Counsel should have challenged the jury selection process directly, and objected to the jury selected. Counsel was on notice of the problems with Hispanic underrepresentation because of the Ninth Circuit's 2004 findings. *See* Ex. 110 (9th Cir. Jury Trial First Report).

5.     The failures of trial counsel to make a proper objection, request discovery regarding the method of jury selection, and challenge the violation of the right to a fair cross-section were unreasonable and constituted ineffective assistance of counsel in violation of the Sixth Amendment. The allegations of Claim 19 (Ineffective Assistance of Counsel: Guilt Phase Trial) are incorporated by this reference.

D.     This constitutional violation represents a structural error invalidating the convictions and death sentence. *See Rodriguez-Lara*, 421 F.3d at 940 ("The selection of a grand or petit jury in violation of either the equal protection or the fair cross-section guarantee is structural error that entitle s a defendant to relief without a demonstration of prejudice.").

## CLAIM 4 UNLAWFUL GENDER DISCRIMINATION IN JURY SELECTION

Jurijus Kadamovas' convictions and sentence are unlawfully and unconstitutionally imposed, in violation of the Fifth, Sixth, and Eighth Amendments to the United States Constitution because the government impermissibly used its peremptory strikes against female jurors on the basis of their gender, in violation of the principles articulated in *Batson v. Kentucky*, 476 U.S. 79 (1986) and *J.E.B. v. Alabama*, 511 U.S. 127 (1994). The government's unlawful jury selection practices in this case resulted in part from a strategy by the Department of Justice Capital Case Section to systematically exclude women from juries in federal capital cases. As a result, Mr. Kadamovas was deprived of his rights to an impartial jury, to an unbiased jury, to the effective assistance of counsel, to due process of law, and to a reliable capital sentencing proceeding.

The following facts and allegations, among others, support this claim:

A.      At Mr. Kadamovas' trial, although women and men were equally represented in the venire after challenges for cause, including death qualification, the government used twelve of its eighteen peremptory challenges (66.6%) to

strike women. *See* Ex. 135 (Gov. chart of jury strikes) at 2.[8] This sharply contrasted with the prosecution's treatment of men.

B.     The government had no adequate gender-neutral reason for striking these prospective jurors and any supposedly gender-neutral reasons proffered for the exclusion of these jurors in this case would be pretextual.

C.     The jury selection in this case demonstrated an apparent strategy to reduce the number of female jurors in the final jury.

1.     In this case, once challenges for cause concluded, twelve jurors were seated into the jury box. Tr. 09/05/06 at 4. Peremptory strikes alternated between the government and the defense. *See, e.g.*, *id.* at 35-36. Once a juror was stricken, a new juror was slotted into the former juror's seat until both sides accepted the jury as constituted. *See, e.g.*, *id.*

2.     The initial jury box was composed of five men and seven women.[9] In its first eleven strikes, the government struck eight women and three men, *see* Ex.

_____

[8] The government struck Prospective Jurors 30, 112, 10, 115, 174, 193, 90, 241, 285, 217, 100, and 216, who the government identified as female, and Prospective Jurors 2, 164, 172, 116, 142, and 206, who the government identified as male.

[9] *See* Tr. 09/05/06 at 10 (indicating that initial composition of the jury box was Prospective Jurors 84, 3, 174, 30, 116, 239, 231, 193, 57, 112, 110, 101); *see also* Ex. 135 (Gov. chart of jury strikes) at 2 (indicating that Prospective Jurors 3, 174, 30, 193, 112, and 110 are female and Prospective Jurors 116, 231, and 101 are

135 (Gov. chart of jury strikes) at 2, until the jury box was composed of nine men and three women.[10]

3.     The government then used three of its final four strikes against women. *See* Ex. 135 (Gov. chart of jury strikes) at 2. The final gender composition of the jury was nine men and three women.[11]

4.     The government's decision to strike most, but not all, women or people of color is a tactic that prosecutors use, and teach each other to use, to evade *Batson/J.E.B.* challenges. For example, in a former Philadelphia District

_____

male); Tr. 08/18/06 at 86 (referring to Prospective Juror 84 as "sir"); Tr. 08/30/06 at 112 (referring to Prospective Juror 239 as "ma'am"); Tr. 08/18/06 (referring to Prospective Juror 57 as "sir").

[10] *See* Tr. 09/05/06 at 68 (listing the Prospective Jurors in the jury box as 84, 242, 120, 197, 116, 239, 36, 241, 57, 87, 261, 256); *id.* at 69 (government exercising peremptory against Prospective Juror 241, who is replaced with Prospective Juror 95); *see also* Ex. 135 (Gov. chart of jury strikes) at 2 (indicating that Prospective Jurors 242, 241, and 261 are female and Prospective Jurors 116 and 120 are male); Tr. 08/18/06 at 86 (referring to Prospective Juror 84 as "sir"); Tr. 08/25/06 at 123 (referring to Potential Juror 197 as "sir"); Tr. 08/16/06 at 77 (referring to Potential Juror 36 as "sir"); Tr. 08/18/06 (referring to Prospective Juror 57 as "sir"); Tr. 08/30/06 at 238 (referring to Prospective Juror 256 as "ma'am"); Tr. 09/05/06 at 101 (referring to Prospective Juror 87 as "him" and "this gentleman"); Tr. 08/18/06 at 178 (referring to Prospective Juror 95 as "sir").

[11] *See* Dkt. 1541 at 14 (juror numbers listed on Special Verdict Form); Tr. 08/29/06 at 209 (referring to Prospective Juror 227 as "sir"); Tr. 08/16/06 at 97 (referring to Prospective Juror 39 as "sir"); Tr. 08/16/06 at 23 (referring to Prospective Juror 31 as "ma'am"); Tr. 08/15/06 at 124 (referring to Prospective Juror 8 as "sir"); Tr. 08/17/06 at 102 (referring to Prospective Juror 67 as "sir").

Attorney's training video, in which he explains how to get away with using peremptory strikes in a discriminatory manner with pretextual excuses for race-based strikes, he opines, "a jury of like eight whites and four blacks is a great jury, or nine and three." *See Wilson v. Beard*, 426 F.3d 653, 657 (3d Cir. 2005).

D.      In other capital prosecutions, federal prosecutors have used peremptory challenges to strike a disproportionate number of women.

1.      At least four other individuals sentenced to death in federal court have pointed out federal prosecutors' disproportionate strikes of women in post-conviction proceedings. These cases together show that federal prosecutors frequently used at least twice as many of their peremptory strikes against women as men, often using around 80% of their strikes against women.

2.      In *United States v. Lighty*, federal prosecutors used 82% of their strikes (eighteen of twenty-two) against women, although women comprised 47% of the qualified pool (thirty of sixty-four). *See United States v. Lighty*, 8:03-cr-457, Dkt. 454 (D. Md. Dec. 20, 2012) (Mem. of Law in Support of Disc.).

3.      In *United States v. Higgs*, federal prosecutors used approximately 73.3% of their peremptory strikes (eleven of fifteen identifiable strikes) against women, although women comprised only 36.5% of the qualified pool. In that case, not a single woman was seated on the jury. *See United States v. Higgs*, 8:98-cr-520, Dkt. 491 (D. Md. Nov. 28, 2005) (§ 2255 Motion).

4.    In *United States v. Roane*, federal prosecutors used 80% of their peremptory strikes (eight of ten) against women, although women comprised less than 50% of the qualified pool (twenty of forty-one). *See United States v. Roane*, 92-cr-068 (E.D. Va. June 15, 1998) (Memo in Support of § 2255 Motion).

5.    In *United States v. Runyon*, federal prosecutors used 68% of their peremptory strikes (thirteen of nineteen) against women, although women comprised 56% of the qualified pool (twenty-nine of fifty-two). *See United States v. Runyon*, 4:08-cr-016, Dkt. 478 (E.D. Va. Oct. 5, 2015) (§ 2255 Motion).

6.    The above examples are cases in which the defendants were sentenced to death and post-conviction counsel raised discrimination against women in jury selection as an issue in § 2255 proceedings, not an exhaustive list of all cases in which federal prosecutors discriminated against women in capital jury selection.

7.    The prevalence of gender bias in jury selection by federal prosecutors across a number of capital trials in different jurisdictions provides an inference of a systemic, intentional strategy. This prevalence, in turn, suggests that the Capital Case Section trains or advises federal prosecutors to use their peremptory challenges to exclude women from federal capital juries.

E.    The Department of Justice's Capital Case Section is involved in some capacity in all federal capital prosecutions, and provides "valuable litigation advice and support, as well as trial assistance." *Justice Manual*, 9-10.040. Given that the

82

methods and strategies for selecting a jury in a capital case are fundamentally different from common federal trials, it is logical to assume that federal prosecutors are reliant on the Capital Case Section's "advice and support" about jury selection.

F.    In this case, prosecutors used their peremptory challenges in a discriminatory manner with regard to gender.

G.    Trial counsel failed to object to the prosecutor's use of peremptory strikes in a discriminatory manner with regard to gender and failed to establish the prima facie case readily available to them. Trial counsel's lack of a specific objection does not prevent the consideration of this claim for the following reasons, among others:

1.    The trial court had an independent duty to prevent an improper, discriminatory jury selection.

2.    The failure of trial counsel to object was unreasonable and constituted ineffective assistance of counsel in violation of the Sixth Amendment. The allegations set forth in Claim 19 (Ineffective Assistance of Counsel: Guilt Phase Trial) are incorporated by this reference.

3.    The discriminatory jury selection in this case was plain error.

83

H.     On appeal, Mr. Kadamovas' appellate counsel did not raise this issue. The failure to raise the issue in the appeal does not prevent consideration of this claim for the following reasons, among others:

1.     The factual record on appeal was inadequate. This claim is dependent on factual development through discovery and a hearing that was not possible during the direct appeal.

2.     Exceptional circumstances, including the fact that this is a capital case, warrant consideration of this issue regardless of any procedural irregularity.

3.     Changes and developments in the law favor consideration of this claim.

4.     To the extent that the actions of appellate counsel restrict consideration of this claim, appellate counsel's actions and inactions constituted ineffective assistance of counsel in violation of the Sixth Amendment, to Mr. Kadamovas' prejudice. The allegations of Claim 30 (Ineffective Assistance of Counsel: Appellate Proceedings) are incorporated by this reference.

I.     This error constitutes a structural defect and warrants an order vacating the convictions and the death penalty.

## CLAIM 5 IMPROPER SHACKLING

Jurijus Kadamovas' convictions and sentence are unlawfully and unconstitutionally imposed, in violation of the Fifth, Sixth, and Eighth Amendments to the United States Constitution, because he was improperly shackled during the trial. Mr. Kadamovas was restrained by a waist chain and shackled to a chair throughout the entire trial, without sufficient cause and without any judicial determination that such measures were necessary and justified. The improper shackling violated his rights to due process, to a fair trial, to the presumption of innocence, to the effective assistance of counsel, to a jury trial, and to a reliable capital sentencing proceeding. *Deck v. Missouri*, 544 U.S. 622 (2005); *Rhoden v. Rowland*, 172 F.3d 633 (9th Cir. 1999); *Spain v. Rushen*, 883 F.2d 712 (9th Cir. 1989).

The following facts and allegations, among others, support this claim:

A.     Mr. Kadamovas was subject to excessive and extreme security measures throughout his pretrial detention, and subject to shackling during judicial hearings and at trial. These measures were not supported by any factual or legal findings, were implemented without due process or fairness, and were not justified.

1.     Prior to trial, in June 2003, the Department of Justice placed Mr. Kadamovas, along with co-defendants Mikhel and Krylov, under "special administrative measures" (SAM) pursuant to 28 C.F.R. § 501.3. Tr. 07/07/03 at 33-

85

37. SAMs are supposedly applicable where there is "a substantial risk that a prisoner's communications or contacts with persons could result in death or serious bodily injury to persons, or substantial damage to property that would entail the risk of death or serious bodily injury to persons." 28 C.F.R. § 501.3(a). Under these provisions, a SAM designated prisoner is subject to extreme oversight and limitations on communications, as well as special detention and other heightened security measures. The implementation of these measures was done without notice, due process, a hearing, or the ability to object. The Department of Justice simply unilaterally designated Mr. Kadamovas as a SAM prisoner.

2.       In October 2005, a videotaped deposition of a key witness, Konstantinos Tezhik, took place in Greece.[12] The defendants were not allowed to attend the deposition, but were allowed to view a live video feed from the courtroom. The security procedures involved provided that Mr. Kadamovas be fully shackled, legs and arms, and his hands cuffed within a "black box" mechanism. *See* Dkt. Nos. 802, 805, 811. Prior to the deposition, Mr. Kadamovas' counsel filed an application asking that Mr. Kadamovas be allowed to have one hand free to write notes and better communicate with his attorney. Dkt. No. 802.

---

[12] The videotape was later introduced at the trial. Tr. 09/14/06 at 89-130; Tr. 10/10/06 at 16-20.

86

Without that accommodation, Mr. Kadamovas was denied his constitutional rights. *See id.* at 3. Without a hearing, and without any findings of fact, the trial court denied the application. Dkt. No. 804. The court simply and totally deferred to the United States Marshals Service, allowing the shackles. *See* Dkt. Nos. 804, 805.

3.    During a status conference that occurred a month before the start of trial, Judge Tevrizian advised that the defendants would be chained down in the courtroom during the trial. Tr. 05/31/06 at 5. The defendants were brought into court fully shackled with handcuffs and leg restraints. Heavy wooden chairs were provided and Mr. Kadamovas was shackled to a chair with a lap restraint. Only after he was chained down were his handcuffs removed, and he was allowed to use his hands during the trial proceedings. *Id.* at 5-6. The trial judge again deferred completely to the U.S. Marshal, endorsing "a memo from the Marshal" without investigation, review, or support. *Id.* at 5.

4.    Throughout the entire trial, Mr. Kadamovas was chained to the chair and unable to stand up. Ex. 11 (Chahin dec.) ¶ 26.

5.    The trial court made no findings and presided over no hearing regarding the necessity of the shackles. No determination was made as to the justification for the shackles.

6.    During jury selection, defense counsel pointed out that the jury would be sure to notice that the defendants were unable to stand. The failure to stand

87

could be interpreted as a demonstration of flagrant disrespect or evidence that the defendants were chained down. The failure to stand would also tip off the jury that the defendants were chained and unable to stand. Counsel pointed out that the trial would begin with the clerk announcing "all rise." Tr. 08/01/06 at 12-13. This was unfair because, simply, "Mr. Kadamovas . . . can't rise." *Id.* at 13. Later, counsel again complained about this problem because although the court had said that sessions would not generally begin with the court announcing "all rise," in fact sessions were beginning that way. Tr. 09/05/06 at 67. The trial court agreed that it was inappropriate to ask the parties to rise because defendants were chained to their chairs, but it did nothing to remedy the situation, which it said was the fault of "a new clerk . . . she's not used to it." *Id.*

7. Later, addressing the trial court directly, Mr. Kadamovas apologized to the court for not standing, noting that he was trying to be respectful but "I can't stand up." Tr. 01/12/07 at 9.

B. There is a reasonable possibility that the jurors observed the shackling.

There is a reasonable possibility that the jurors recognized, when seeing that Mr. Kadamovas was unable to stand, that he was chained to his chair.

C. The use of shackles prejudiced Mr. Kadamovas in the minds of the jurors.

Shackling suggests to the jury that the defendant is a violent, vicious, and dangerous man. Shackling sharply undermines the presumption of innocence,

implying that the authorities have determined that the defendant must be chained like an animal to prevent any danger to the people around him. This is a particularly unfair inference during the penalty phase of a capital case where the jury is subjectively weighing the moral worth of the defendant and assessing his character. As the Supreme Court noted in *Deck*: "The appearance of the offender during the penalty phase in shackles . . . almost inevitably implies to the jury, as a matter of common sense, that court authorities consider the offender a danger to the community . . . [and] almost inevitably affects adversely the jury's perception of the character of the defendant." *Deck*, 544 U.S. at 633. Here, where the prosecution argued future dangerousness as an aggravating circumstance, restraints on a defendant are particularly prejudicial. *Stephenson v. Wilson*, 619 F.3d 664, 674 (7th Cir. 2010) (noting that restraints could create prejudice at the penalty phase because "the defendant's life turns on the same jury's answer to the question of *future* dangerousness"); *see also Stephenson v. Neal*, 865 F.3d 956, 959 (7th Cir. 2017) (finding prejudice from restrains at the penalty phase).

D.      In addition to biasing the jurors, subverting the presumption of innocence, and skewing the penalty determination, the prejudicial effects of shackling include abridging the right to counsel by burdening the communication between the defendant and his attorney and undermining the dignity of the process. *See Deck*, 544 U.S. at 631. In a situation where the defendant's ability to communicate with

his attorneys is already difficult because of the lack of a shared language, the impact of restraints is exacerbated. Shackling also can impair a defendant's ability to concentrate and participate at trial and may cause pain and discomfort that can eventually rise to the level of torture. *See Castillo v. Stainer*, 983 F.2d 145, 147 (9th Cir. 1992); *Spain*, 883 F.2d at 721.

E.    Mr. Kadamovas' constitutional rights were violated because the trial court never made a finding on the record justifying the necessity of the physical restraints. *Deck*, 544 U.S. at 633-34. The absence of such a finding cannot be cured by after-the-fact justifications. *Larson v. Palmateer*, 515 F.3d 1057, 1063 (9th Cir. 2008).

F.    The lack of specific objection by defense counsel at trial does not bar the consideration of this claim for the following reasons, among others:

1.    The trial court had a sua sponte duty to assure that Mr. Kadamovas was not prejudiced by the use of physical restraints without adequate justification.

2.    In light of the denial of the previous motion to unshackle Mr. Kadamovas during the Tezhik deposition, any objection to the judge's plan would have been futile and no further objection was required. *See United States v. Algarate-Valencia*, 550 F.3d 1238, 1243 (10th Cir. 2008); *Abuan v. Level 3 Commc'ns, Inc.*, 353 F.3d 1158, 1172 (10th Cir. 2003).

90

3.    The failure to object was an instance of ineffective assistance of counsel in violation of the Sixth Amendment right to counsel. The allegations set forth in Claim 18 (Ineffective Assistance of Counsel: Failure to Object to Shackling) and Claim 19 (Ineffective Assistance of Counsel: Guilt Phase Trial) are incorporated by reference.

G.    Mr. Kadamovas has been denied the opportunity to question the jurors because the identities of the jurors have been improperly suppressed. The allegations of Claim 1 (Anonymous Jury) are incorporated by reference. To the extent that the showing and allegations set forth above are inadequate to demonstrate a colorable claim, this Court must allow investigation and questioning of the jurors as to what they observed.

H.    The improper shacking of Mr. Kadamovas constitutes a structural error and necessitates the reversal of the convictions and sentence.

I.    The error substantially prejudiced Mr. Kadamovas, rendered the trial fundamentally unfair, eroded the reliability of the jury's verdicts and had a substantial and injurious effect on the verdicts.

**CLAIM 6 IMPROPER DENIAL OF CONTINUANCES**

Jurijus Kadamovas' convictions and sentence are unlawfully and unconstitutionally imposed, in violation of the Fifth, Sixth, and Eighth Amendments to the United States Constitution, because the trial court improperly denied reasonable requests for continuances to allow trial counsel sufficient time to prepare for trial, to allow trial counsel sufficient time to review critical late-disclosed evidence, and to allow Mr. Kadamovas' family members to travel to the United States to testify on his behalf. Because of the denial of continuances, trial counsel was not prepared for trial and failed to present key evidence, notably about Mr. Kadamovas' lack of involvement in the escape attempt; trial counsel also did not have enough time to review Natalya Solovyeva's diary before she testified, and failed to elicit key evidence from her; and Mr. Kadamovas' family members were unable to present important mitigating evidence on his behalf. Throughout the proceedings, the trial judge announced his intention to finish the trial as quickly as possible so he could retire. Because of the trial court's haste and the denial of reasonable continuances, without counsel who had enough time to prepare, review evidence, and secure witnesses, Mr. Kadamovas was deprived of due process, a fair trial, the effective assistance of counsel, a reliable sentencing determination, and the right to present mitigating evidence. *See Lee v. Kemna*, 534 U.S. 362, 366 (2002); *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964); *Daniels v. Woodford*, 428

F.3d 1181, 1205 (9th Cir. 2005); *United States v. Nguyen*, 262 F.3d 998, 1002 (9th Cir. 2001); *United States v. Rivera-Guerrero*, 426 F.3d 1130, 1138 (9th Cir. 2005).

The following facts and allegations, among others, support this claim:

**Denial of Continuance to Allow Counsel to Prepare for Trial**

A.    Attorney Sonia Chahin was appointed by Judge Manella to represent Mr. Kadamovas on November 28, 2005. Dkt. No. 830; Ex. 11 (Chahin dec.) ¶ 7.

1.    Chahin replaced attorney Marcia Brewer, who withdrew from the case, and represented Mr. Kadamovas along with attorney Richard Lasting. Ex. 11 (Chahin dec.) ¶¶ 5, 7.

2.    A defendant facing a federal capital trial must be represented by two lawyers, one of whom (in this case, Lasting) must have the qualifications to handle death penalty cases. *See* 18 U.S.C. § 3005.

B.    At the time of her appointment, Chahin was also engaged in another complex federal case, a multi-defendant homicide case culminating in a twenty-five-day trial against Chahin's client Alejandro Martinez and his co-defendants. *United States v. Martinez, et. al.*, 2:04-cr-00415; Ex. 11 (Chahin dec.) ¶ 4.

C.    Chahin "was told, and believed" Mr. Kadamovas' trial would be continued to give her adequate time to prepare for his case. Ex. 11 (Chahin dec.) ¶ 6. Lasting also "felt confident" that the trial date would be continued to give Chahin time to prepare. Ex. 10 (Lasting dec.) ¶ 15.

D.      On March 15, 2006, Mr. Kadamovas' counsel filed a motion to continue the trial, asking to move the scheduled start date of July 11, 2006 to January 9, 2007. Dkt. No. 2266; Tr. 05/03/06 at 8.

E.      On April 12, 2006, Judge Tevrizian took over the case from Judge Manella.

F.      Judge Tevrizian denied the motion for a continuance, commenting:

> It's not like Mr. Lasting is an inexperienced attorney. He's a very experienced capital attorney. Look I've tried a lot of cases involving the death penalty. I don't know. I think I was going to try one in the Federal Court, but I tried lot in the State Court. It's just like any other case, to be very frank with you. And for some reason I don't even know why this case is going to take five to seven months to complete. It's not that difficult -- I don't think -- of a case. So I question, you know, the time estimate of five to seven months it's been given to the prior judge in this case.[13]

Tr. 05/03/06 at 30, 50.

G.      Throughout his time presiding over the case, Judge Tevrizian referenced his intention to retire and desire to finish the trial quickly so that he

---

[13] In fact, the case was sufficiently complex and the volume of information sufficiently large that the trial did take seven months. The trial began in July 2006, the guilt phase concluded with guilty verdicts in January 2007, and the penalty phase concluded with death verdicts in February 2007. The government called over 100 witnesses at the guilt phase and twelve witnesses at the penalty phase. The discovery included documents from foreign countries and in foreign languages and government agents travelled to multiple countries to interview witnesses. The prosecution relied on not only the FBI, but also the IRS, BOP, state and local police departments, and international law enforcement agencies to assist with its investigation. Mr. Kadamovas' mitigation investigation was also international in scope, as he was born and spent much of his life in Lithuania.

could start his retirement. *See* Tr. 09/21/06 at 44 (in response to a request to continue the trial by Mikhel's counsel, "When I agreed to take this case, you know, it was another Judge and I was trying to help the Court out, postponing my retirement to take this case"); Tr. 10/18/06 at 96 ("All right, but I'm hoping before I have to make this decision, that we will finish this case before December. Remember, I want to retire."); Tr. 10/31/06 at 14-15 ("Well I'm so happy that I'm retiring. . . . All I know is I'm not going to interrupt my trial, because I've been going on this thing and everybody else has to defer to me."); Ex. 11 (Chahin dec.) ¶ 14 ("Judge Tevrizian was retiring from the bench and he made it clear that he intended to get the Kadamovas/Mikhel trial finished before he retired."); Ex. 10 (Lasting dec.) ¶ 17 ("Judge Tevrizian was close to retirement and wanted to get the case done.").

H.    Denial of the continuance meant that Mr. Kadamovas' trial began while the trial in Chahin's other case, *Martinez*, was still going on. Ex. 11 (Chahin dec.) ¶ 16.

I.    On June 12, 2006, trial counsel asked the trial court to reconsider the motion for a continuance. In a declaration filed with the motion to reconsider, Lasting explained that "[t]he reasons set forth in Ms. Chahin's motion to continue the trial date to January 2007 still mandate that a continuance be granted in order for her to be properly prepared for trial." Dkt. No. 1046. Lasting added that he would also

not be ready for trial in July 2006. *Id.* Lasting explained that when Chahin was appointed to the case, she sought to confirm that the defense team had received all of the available discovery, but "learned that we did not have all of the bates stamped discovery. Additionally she found that we were missing nine videotapes and 69 CD ROMs the government had turned over to Copy Pro for disclosure to defense counsel." *Id.* It took "months" for trial counsel to get all of this material. "A substantial portion of the newly obtained discovery consisted of recorded phone calls in the Russian language" and as of June 2006 defense counsel still did not have all of the material translated into English. *Id.*

J.    On July 5, 2006, trial counsel filed another motion to continue the trial. Dkt. No. 1089 (under seal). The trial court denied this motion as well. Dkt. 1091.

K.    The failure to grant a continuance to allow trial counsel Chahin adequate time to prepare prejudiced defendant.

1.    Chahin was not prepared for the trial. Knowing she was not prepared, Chahin made a motion to be relieved as counsel, a request that the trial court denied. Ex. 11 (Chahin dec.) ¶ 17.

2.    Because the trial court denied the continuance, counsel for Mr. Kadamovas were unable to prepare for the trial, unable to direct an adequate investigation, unable to properly cross-examine key witnesses, unable to present

relevant evidence to confront the prosecution's case, and unable to provide a zealous defense. Ex. 11 (Chahin dec.) ¶ 21.

3.    "[T]he required showing of prejudice in cases in which a defendant alleges that the denial of a continuance affected his ability to present evidence . . . is 'less stringent' than the 'clearest showing' of 'actual and substantial prejudice' standard . . . appl[ied] in cases in which a defendant alleges that the denial of a continuance prevented him from obtaining discovery." *United States v. Kloehn*, 620 F.3d 1122, 1128 (9th Cir. 2010) (quoting *United States v. Mejia*, 69 F.3d 309, 316-19, 318 n.11 (9th Cir. 1995)); *see also Mejia*, 69 F.3d at 317. "[T]he focus of [the] prejudice inquiry is the 'extent to which the aggrieved party's right to present his defense has been affected.'" *Kloehn*, 620 F.3d at 1128 (quoting *Mejia*, 69 F.3d at 318 n.11).

**Denial of Continuance After Late, Incomplete Disclosure of Solovyeva's Diary**

L.    On October 31, 2006—two days before Natalya Solovyeva's testimony began—the government turned over to Mr. Kadamovas' trial counsel an incomplete version of Solovyeva's diary. Tr. 10/31/06 at 6; Ex. 11 (Chahin dec.) ¶ 27.

M.    Solovyeva was a key witness against Mr. Kadamovas. As a co-defendant who pled guilty and received a generously reduced sentence in exchange for her testimony against Kadamovas and Mikhel, Solovyeva testified as to crucial

evidence and provided evidence of the conspiracy, the homicides, and aggravating evidence. Her testimony provided what the government described as "an amazingly significant . . . factor in getting the ultimate sentence that we were able to get with respect to Mr. Kadamovas." Ex. 78 (Solovyeva sent.) at 36.

N.      Solovyeva's diary is handwritten in Russian. When the government disclosed her diary to the defense two days before she testified, they did not disclose the complete diary, and did not disclose a complete translation:

1.      The prosecution failed to produce the diary in a timely fashion and only produced a portion of the diary just before Solovyeva testified.

2.      The prosecution never produced the full diary.

3.      The prosecution provided English-language summaries but did not provide summaries of each entry. Ex. 79 (Solovyeva diary summaries); Ex. 81 (Solovyeva diary Russian).

4.      The prosecution provided English-language summaries of entries that do not appear in the copy of the handwritten Russian version they disclosed, indicating that there are pages of the diary that were not disclosed. Ex. 79 (Solovyeva diary summaries); Ex. 81 (Solovyeva diary Russian). Trial counsel never received copies of the undisclosed portions of the diary.

5.      The English-language summaries were misleading, incomplete, and inadequate. An actual translation was not provided at all.

98

6.      Trial counsel did not realize that there were English-language summaries of entries that did not appear in the copy of the handwritten Russian version that they received, that is, that they did not even receive the entirety of the Russian-language diary.

7.      The allegations of Claim 14 (Failure to Disclose Natalya Solovyeva's Diary) are incorporated by reference.

O.      Denying trial counsel's request to delay Solovyeva's testimony, or at least cross-examination, to allow time to translate and review the diary, the trial court emphasized its concern with a scheduling conflict: "Well the fairness has nothing to do with it right now. I've got a bigger problem, and that is there's a trial going on next door in which Mr. Crane is the attorney for Ms. Solovyeva, and as such Judge Klausner has indicated he wants to go forward with his trial." Tr. 10/31/06 at 9. The trial court added:

> See, I have been yelling and screaming at my colleagues over the last 25 years that the CJA panel is too small and because of its smallness has created too many conflicts in the judicial system and it's caused a bottleneck. And I have advocated for 22 years to increase the size of the CJA panel four times so that you have more attorneys, because to me it's an exclusive club of defense lawyers that try these cases. And I have a readout on everybody that's on the CJA panel and most CJA attorneys are making 300 to 800,000 dollars a year, which I think is obscene compared to the lawyers in the County of Los Angeles. I think that it's -- personally I think it's scandalous and that's why I've advocated that they open up the CJA panel. And this case illustrates it and this situation illustrates it.

99

> Well I'm so happy that I'm retiring. . . . All I know is I'm not going to interrupt my trial, because I've been going on this thing and everybody else has to defer to me.

Tr. 10/31/06 at 11-12, 14-15.

P.    The failure to grant a continuance to allow trial counsel time to review Solovyeva's diary prejudiced Mr. Kadamovas.

1.    Trial counsel was unable to use the diary to prepare for the cross-examination.

2.    Trial counsel failed to elicit key information from Solovyeva. The diary contains Solovyeva's observations of Mr. Kadamovas being taken in by Mikhel. Later diary entries show Mr. Kadamovas spending more time with Mikhel and becoming more subject to his influence, specifically based on Mikhel's apparent interest in the aquarium business. Indeed, Solovyeva complains about how much time Mr. Kadamovas begins to spend with Mikhel and that he is more interested in Mikhel than her. The diary also included other mitigating information about Mr. Kadamovas, such as providing a glimpse at Mr. Kadamovas' life before meeting Mikhel. The diary revealed Mr. Kadamovas to be someone who worked hard, mostly doing manual labor as a mover and carpet cleaner, and struggled to get by. There are many references to Mr. Kadamovas being busy with work and working long hours. Entries also emphasized that he was engaged in creative endeavors like making music and building aquariums and was trying to establish

an aquarium business. There are references to Solovyeva's concern that they do not have enough money, and the pressure she put on Mr. Kadamovas about money. Ex. 82 (Solovyeva diary English).

3. The focus of the prejudice inquiry in cases in which denial of a continuance affected the defendant's ability to present evidence is the extent to which his right to present his defense has been affected. *Kloehn*, 620 F.3d at 1128.

**Denial of Continuance to Allow Family Members to Travel to the U.S. to Testify**

Q.    Trial counsel requested a brief continuance of the penalty phase to allow enough time for Mr. Kadamovas' family members to travel to the United States to testify. Tr. 01/23/07 at 41.[14] In support of the request for a continuance, trial counsel explained:

> I was told by Mr. Schnack [head of the CJA office] that there would be time to get this done, and it was my impression that the Court wanted to wait until after there was a verdict before the Court was going to approve travel funds. I have made a request of Mr. Schnack; he has approved travel funds for Mr. Kadamovas's wife, his sister, and his son. . . . [W]e need a week and a half to try to get the witnesses here.

Tr. 01/23/07 at 41-43.

---

[14] Mikhel's counsel initially filed the motion for a continuance and Mr. Kadamovas' counsel joined. Dkt No. 1451; Tr. 01/23/07 at 41.

101

R.      On January 31, 2007, during the penalty phase, counsel for Mr. Kadamovas noted again that there was a problem getting the witnesses to the United States. Tr. 01/31/07 at 220.

S.      On February 5, 2007, Mr. Kadamovas' sister, wife, and son were denied visas by the American Embassy in Vilnius, Lithuania. In a declaration attached to a later filing, Agent Perez attested that the failure to obtain visas was due to the witnesses' "delay in applying for these visas" which "did not afford the Consulate with enough time to conduct the background checks that were required to issue the requested visas." Dkt. No. 1578-2 at 4.[15]

T.      Despite reasonable requests from trial counsel, the trial court denied continuances to allow Mr. Kadamovas' family members to get to the United States to testify on his behalf.

U.      Mr. Kadamovas was deprived of his Eighth Amendment right to present mitigating evidence. *Eddings v. Oklahoma*, 455 U.S. 104, 113-14 (1982); *Lockett v. Ohio*, 438 U.S. 586, 604-05 (1978).

---

[15] Contrary to Agent Perez's explanation, Mr. Kadamovas' trial counsel was told that the visas were being denied because of the family's financial situation, "that none of them had sufficient economic resources or money in the bank that would justify the issuance of a visa to come to the United States." Tr. 02/06/07 at 7-8. The court did not hold a hearing or make factual findings on this point.

V.      The failure to grant a continuance to allow Mr. Kadamovas' family members to testify prejudiced defendant.

1.      Although they wanted to testify on his behalf, Mr. Kadamovas' family members did not make it to the United States to testify at the penalty phase of his trial. Ex. 17 (Kadamova dec.) ¶¶ 86, 89; Ex. 18 (Kadamoviene dec.) ¶ 56; Ex. 10 (Lasting dec.) ¶ 25.

2.      The jury that sentenced Mr. Kadamovas to death did not hear testimony on his behalf from anyone who knew him personally.

3.      Trial counsel "thought that Juri's wife Jurate, sister Svetlana, and son Gabriel would have been strong mitigation witnesses at the penalty phase. . . . [T]hey might connect with the jury and humanize him" by testifying about his positive qualities. Ex. 10 (Lasting dec.) ¶ 24.

4.      These witnesses had important information about Mr. Kadamovas that they could have conveyed to the jury.

        a.      Mr. Kadamovas' sister Svetlana would have testified that he was a good older brother, who cared for her when they were children, and then sent money back to Lithuania for her and her son as well as for their mother and for his own wife and son. Ex. 17 (Kadamova dec.) ¶¶ 50, 76, 78. She also would have testified about the struggles he faced in Lithuania, both within their family and

103

because of the economic turmoil prompted by the collapse of the Soviet Union. *Id.* ¶¶ 57-59, 66, 67.

b. Mr. Kadamovas' then-wife Jurate characterized him as "a good father and a good family man." Ex. 18 (Kadamoviene dec.) ¶ 23. She would have testified about the love they shared, his generosity toward her, and his love for his son, Gabriel. *Id.* ¶¶ 15, 23, 28. She would have testified about Mr. Kadamovas caring for his mother and grandfather, and about his mother's heavy drinking. *Id.* ¶¶ 16, 17, 18, 19, 20. Jurate would have explained how she and Gabriel were going to join Mr. Kadamovas in the United States, but they were unable to go because she was denied a visa. *Id.* ¶ 41. Jurate also would have joined Svetlana in testifying that Mr. Kadamovas continued to support Jurate and Gabriel by sending them money from the United States, even after their physical distance caused them to drift apart, and that he sent money to his mother and Svetlana, as well. *Id.* ¶ 43, 44. Jurate was aware that Mr. Kadamovas had a girlfriend (Solovyeva), *see* ¶ id. 47, but would have testified on his behalf anyway, *see* ¶¶ 49, 56. She "was hurt by his affair but stood by him because [she] loved him. [She] will always love him." *Id.* ¶ 49.

5. The focus of the prejudice inquiry in cases in which denial of a continuance affected the defendant's ability to present evidence is the extent to which his right to present his defense has been affected. *Kloehn*, 620 F.3d at 1128.

W.    These denials of reasonable requests for continuances demonstrate a pattern of rushing to trial at the expense of the Mr. Kadamovas' rights.[16]

1.    There was no legitimate government interest in denying the continuances.

2.    At the time that the trial court denied the motion to reconsider a continuance to allow sufficient time for trial counsel to prepare, co-defendant Krylov's case had already been severed and delayed, meaning the government was going to try the case twice regardless of whether Mr. Kadamovas was tried in July 2007 or later. (Or indeed, if the court had continued all of the cases instead of severing Krylov's case, the government could have tried the case once.) Tr. 06/26/06 at 11.

---

[16] Also establishing this pattern, when one of Mikel's lawyers, Callahan, suffered a medical emergency, Mikhel's other lawyer, Rubin, suggested pausing the trial for one week. Tr. 09/12/2006 at 11. Here, even the government expressed some concern that proceeding in Callahan's absence would violate Mikhel's right to have two lawyers. Tr. 09/11/06 at 7. Yet the trial court insisted on moving the trial along, deciding that the government could call "basically those witnesses that gathered evidence," saying, "based upon what has taken place so far in the trial, there's been very little cross-examination by either defense counsel of these witnesses. So I'm prepared to go forward with the foundational witnesses, the evidence gathering witnesses, the coroners, and the deposition." Tr. 09/12/2006 at 10. Although this denial of a continuance affected Mikhel, it further demonstrates the pattern of denying reasonable requests for continuances, even when the government did not object, and this pattern significantly prejudiced Mr. Kadamovas.

3.      Trial counsel's requests for continuances to allow them time to review Solovyeva's diary and to allow Mr. Kadamovas' family members time to get to the United States to testify sought only very short continuances—or, as to Solovyeva's diary, possibly just having witnesses testify in a different order, rather than continuing the trial. Tr. 10/31/06 at 7-11; Tr. 01/23/2007 at 41.

4.      These minor adjustments to the schedule over the course of a seven-month trial would have had little to no effect on the government's ability to present its case.

5.      The trial judge made clear that he was ready to retire and wanted to finish this trial before retiring. Tr. 09/21/06 at 44; Tr. 10/18/06 at 96; Ex. 11 (Chahin dec.) ¶ 14; Ex. 10 (Lasting dec.) ¶ 17.

6.      Such a "myopic insistence upon expeditiousness in the face of a justifiable request for delay" or a trial judge who is "'above all to be determined not to disturb [the court's] trial schedule'" undermines a defendant's right to counsel and to due process. *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964); *United States v. Nguyen*, 262 F.3d 998, 1002 (9th Cir. 2001) (alteration in original) (quoting *United States v. Moore*, 159 F.3d 1154, 1160 (9th Cir. 1998)); *see also United States v. Sellers*, 645 F.3d 830, 835 (7th Cir. 2011). The trial court cannot "decide[] to deny the continuance from the outset" without "giv[ing] [a defendant's] Sixth Amendment rights additional consideration"—and this is no

106

less true when the trial court is "faced with a difficult task of managing a trial with multiple defendants." *United States v. Royal*, 43 F. App'x 42, 45 (9th Cir. 2002).

X.      In addition, trial counsel were ineffective in their handling of the timing issues by, among other errors: failing to properly advocate for more time to prepare; failing to properly advocate for more time to review Solovyeva's diary; failing to review the portions of the diary they did receive, including failing to realize that there were English summaries of entries that were not in the Russian version, indicating that they did not have the complete diary in Russian; failing to exercise reasonable diligence in securing visas for Mr. Kadamovas' family members; and failing to call Mr. Kadamovas' family members by video when they were unable to secure visas to travel to the United States. The allegations of Claims 19 (Ineffective Assistance of Counsel: Guilt Phase Trial) and 21 (Ineffective Assistance of Counsel: Penalty Phase Trial) are incorporated by reference.

Y.      Although on direct appeal, Kadamovas' counsel argued that denying Chahin sufficient time to prepare violated § 3005, there is evidence outside the trial record that is necessary to evaluate the impact of denying the continuance. Indeed, the problem with giving Chahin insufficient time to prepare is that there were facts trial counsel did not have time to investigate, did not know, and therefore did not present to the jury. New information is also necessary to evaluate the denial of the continuance to give trial counsel time to review the diary, because trial counsel

never even had a complete translation of the diary, which they did not realize, and the denial of the continuance to allow Mr. Kadamovas' family members to get to the United States to testify, in particular the information that those witnesses could have presented to the jury, *see, e.g.*, Ex. 17 (Kadamova dec.); Ex. 18 (Kadamoviene dec.). The allegations of Claim 14 (Failure to Disclose Natalya Solovyeva's Diary) are incorporated by reference.

Z.     The denial of a continuance meant that Chahin was in intense trial preparation, working simultaneously on Mr. Martinez's case and Mr. Kadamovas' case, creating an untenable situation with extraordinary demands on her time. *See* Ex. 11 (Chahin dec.) ¶¶ 15-19. Chahin "remained as sole counsel for Mr. Martinez through to his sentencing on November 20, 2006," *id.* ¶ 18, but when Chahin "explained that [she] would be in trial in the Martinez case when the Kadamovas/Mikhel trial started, Judge Tevrizian said that Mr. Lasting could handle jury selection without [her]," *id.* ¶ 16. Because she did not have sufficient time to commit to both cases she was forced to choose between two clients facing high-stakes trials. She asked to be relieved from her appointment as counsel in Mr. Kadamovas' case, but was denied. *Id.* ¶ 16. The allegations of Claim 20 (Ineffective Assistance of Counsel: Conspiracy to Escape) are incorporated by reference.

AA.   These constitutional violations constitute a structural defect and warrant the granting of this motion without any further showing of prejudice.

BB.   The error substantially prejudiced defendant, rendered the trial fundamentally unfair, eroded the reliability of the jury's verdicts and had a substantial and injurious effect on the verdicts.

## CLAIM 7 JUDICIAL BIAS

Jurijus Kadamovas' convictions and sentence are unlawfully and unconstitutionally imposed, in violation of the Fifth and Eighth Amendments to the United States Constitution, because the trial proceeding was infected by potential judicial bias and a conflict of interest. While presiding over Mr. Kadamovas' trial, the trial judge was simultaneously applying to be the new United States Attorney for the Central District of California, the head of the office that was pursuing the convictions and seeking to have Mr. Kadamovas sentenced to death. The judge operated under a conflict of interest and was influenced by bias. Alternatively, the appearance of bias undermined the integrity and legitimacy of the proceedings. Mr. Kadamovas' constitutional rights to due process, a fair trial, an unbiased tribunal, and a reliable sentencing determination were violated. *See Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 876-77 (2009); *Withrow v. Larkin*, 421 U.S. 35, 46-47 (1975); *In re Murchison*, 349 U.S. 133, 136 (1955); *In re Al-Nashiri*, 921 F.3d 224 (D.C. Cir. 2019).

The following facts and allegations, among others, support this claim:

A.    During the trial, the trial judge was approached by a search committee concerning the position of United States Attorney for the Central District of California. Judge Tevrizian submitted an application for the position.

110

1. On December 28, 2006, the fifty-sixth day of the jury trial, Judge Tevrizian addressed the parties:

> I had announced that I'm going to retire just as soon as this case is over and join a judicial arbitration mediation service. A couple of weeks ago I received a telephone call from a search committee that's looking to replace the United States Attorney and they asked me to submit my name for that position. The search committee is not associated with the Justice Department nor is it associated with the administration. They make recommendations and they asked me to submit my name. Whether anything comes of it I don't know, but I thought I should disclose this to you. . . . I haven't been contacted by the administration. I haven't been contacted by anybody in Washington.

Tr. 12/28/06 at 5.

2. On January 29, 2007, attorneys for co-defendant Mikhel filed a motion requesting the court declare a mistrial and recuse itself, citing 28 U.S.C. § 455(a). Dkt. No. 1449.

3. On January 30, 2007, Judge Tevrizian denied the motion to recuse. Tr. 01/30/07 at 5. The judge told trial counsel:

> When I took this case last year, I specifically announced my intention to retire at the end of this case. I stated this intention over and over throughout this trial on the record. . . .
>
> In early January of this year, I advised and disclosed to all parties on the record that I was contacted by a representative of the local screening committee to apply for the position of United States Attorney for the Central District of California. None of the parties or their counsel ever objected.

111

I submitted a form application and was interviewed by the screening committee only. I have never been interviewed by anyone of the Department of Justice of White House counsel's office. In fact, I never directly submitted my application to the Department of Justice or White House counsel's office. It was submitted only to the local screening committee, who may have passed it on.

Again, none of the defense counsel or the defendants objected when I made the disclosure on the record weeks ago that I was planning to apply for the position.

Tr. 01/30/07 at 5-6. The judge then explained:

Yesterday I withdrew my name for consideration for the position of United States Attorney by notifying the local committee. The only personal contact I had with either the Department of Justice or the White House counsel's office was over the telephone, yesterday, to inform them that I had withdrawn my name from consideration.

I was also informed that my application was never considered on the merits by the Department of Justice or White House counsel's office.

Tr. 01/30/07 at 8-9.

4.      No evidentiary hearing was held on this matter. No additional evidence was submitted concerning this matter, nor were any factual findings made.

B.      Contrary to the judge's characterization, a January 18, 2007 *Los Angeles Times* article had identified him as "one of the leading candidates" for the United States Attorney position. Ex. 123.

C.	On direct appeal, the Ninth Circuit rejected the argument that the trial judge was required to recuse. *United States v. Mikhel & Kadamovas*, 889 F.3d at 1025-28. The Ninth Circuit did not have the opportunity to review a developed factual record on the issue.

D.	Presiding over a trial involving a death penalty prosecution in a highly publicized case while simultaneously applying for a position with the prosecuting agency would constitute a potential conflict of interest and the appearance of impropriety. Misleading the parties with regard to the nature and status of the application for a position with the prosecuting agency would constitute the appearance of bias and a violation of due process.

E.	Counsel for Mr. Kadamovas is seeking, through the Freedom of Information Act, documents regarding the application process for the Central District United States Attorney at the time, and Judge Tevrizian's involvement in that application process.

1.	Currently, counsel has a lawsuit seeking relevant records pending in the U.S. District Court for the District of Columbia.

2.	Counsel initially submitted its FOIA request to the Department of Justice on February 24, 2020 (approximately three years ago). *See* Ex. 124 (Compilation of FOIA Materials).

3.	The DOJ has located potentially responsive records.

a. The DOJ Office of Information Policy and the DOJ Executive Office of the United States Attorneys located potentially responsive records. *See id.*

b. Both the Office of Information Policy and the Executive Office of the United States Attorneys have released some records, but both offices withheld a substantial number of records and heavily redacted the records that were released. *See id.*

c. Counsel's attempts to secure additional information through FOIA continues. Counsel is currently working (in coordination with the Assistant United States Attorney assigned to the FOIA lawsuit) to assess whether the withheld information should be disclosed. If the parties cannot reach an agreement, the litigation will proceed to summary judgment.

F. Information learned from counsel's FOIA requests may be relevant to resolving the unanswered questions relating to Judge Tevrizian's application to be the United States Attorney.

1. In a case with many similarities, the reviewing court initially rejected the claim that the presiding judge's application for a DOJ position created a disqualifying appearance of bias, but, with additional evidence gathered through a FOIA request, the D.C. Circuit found that there was at least an appearance of bias. *See In re Al-Nashiri*, 921 F.3d 224, 237 (D.C. Cir. 2019).

114

2.      As in this case, at the time of the initial denial, it had been reported in the press that the judge presiding over Al-Nashiri's prosecution had accepted a position within the DOJ, but, also as in this case, the factual record was not well-developed. *Id.* at 231-32.

3.      Records later "obtained through a Freedom of Information Act (FOIA) request . . . reveal[ed] the information" that the D.C. Circuit relied on in ruling on the judicial bias issue. *Id.* at 227.

4.      Based on the newly discovered information, the D.C. Circuit granted the mandamus petition because of the appearance of bias. *Id.* at 238, 240.

I.    The trial court's actions amounted to a due process violation and a structural defect that warrants the granting of this motion without any further showing of prejudice. The convictions and death penalty must be vacated.

**CLAIM 8 UNFAIR PREJUDICE OF MIKHEL'S TESTIMONY**

Jurijus Kadamovas' convictions and sentence are unlawfully and unconstitutionally imposed, in violation of his rights under the Fifth, Sixth, and Eighth Amendments to the United States Constitution, because the trial court refused to order a mistrial or a severance despite co-defendant Mikhel's damaging and prejudicial testimony. The Mikhel testimony prejudiced Mr. Kadamovas, implicated Mr. Kadamovas in uncharged crimes not otherwise known to the jury, and indirectly implicated Mr. Kadamovas in the charged crimes. Mr. Kadamovas had no opportunity to rebut or challenge the testimony due to Mikhel's refusal to submit to cross-examination. The failure to grant a mistrial or severance resulted in a violation of the rights to due process, to a fair trial, to confrontation, to a jury trial and to a reliable sentencing proceeding. *See Bruton v. United States*, 391 U.S. 123 (1968); *Cruz v. New York*, 481 U.S. 186 (1987); *Toolate v. Borg*, 828 F.2d 571 (9th Cir. 1987).

The following facts and allegations, among others, support this claim:

A.     Mikhel's testimony occurred after Mr. Kadamovas had presented his case in chief, so Mr. Kadamovas could not rebut any of the testimony.

1.     After the government rested its case in chief, Mikhel's defense team presented evidence, including the testimony of five witnesses. *See* Tr. 12/13/06 at 12-140.

116

2.      On December 13, 2006, just before the Mikhel defense team rested its case, counsel indicated they wanted to "check with our client and make sure he hasn't changed his mind once again" about testifying. Tr. 12/13/06 at 140.

3.      After a recess, the Mikhel defense team rested its case without Mikhel testifying. *Id.* at 142.

4.      Mr. Kadamovas' defense team presented its guilt phase case from December 13 through December 15, 2006.

5.      On December 14, 2006, counsel for Mikhel informed the Court, "[o]ur client, having lost his attempts to either get on the stand or put a monkey wrench in the works, is now talking about filing motions with the court to limit the penalty phase evidence that we intend to put on for him." Tr. 12/14/06 at 112.

6.      On December 15, 2006, the defense for Mr. Kadamovas rested its case. Tr. 12/15/06 at 82. At this point, the parties expected that the prosecution would begin its rebuttal case.

7.      However, later on December 15, 2006, Mikhel informed the court that he now wished to testify. Mikhel told the court that he had wanted to testify all along, but that he wanted the forthcoming recess to prepare his testimony. Tr. 12/15/06 at 94-95.

8.      Because the jury trial was not scheduled to resume until January 3, 2007, Mikhel had 19 days to prepare his testimony. *Id.* at 95.

117

9. The court was convinced that Mikhel was playing games: "[y]ou have been playing games. One day you don't want to testify; one day you want to testify. One day you want to testify; one day you don't want to testify." *Id.* The Court's frustration was evident: "Mr. Mikhel, I've just about had it with you. . . . You play these games back and forth." *Id.* at 97.

10. Mikhel expressed his belief that one of his attorneys, Dale Rubin, was only trying to "discredit and disparage me." *Id.*

11. Later that day, there was additional speculation by the participants that Mikhel still might not testify. The court deduced that "he just wants to piss everybody off." *Id.* at 99. Before the holiday recess, the court again asked Mikhel's intention, which he indicated was to testify. *Id.* at 106.

12. After the holiday break, Mikhel testified over the course of three days. *See* Tr. 01/03/07 at 40-202; Tr. 01/04/07 at 20-75, 84-175; Tr. 01/05/07 at 6-97.

13. Mr. Kadamovas had no opportunity to respond to that evidence, explain that evidence, or rebut that evidence. Instead, the jury heard Mikhel testify about his lawless exploits and about Mr. Kadamovas' involvement in uncharged criminal conduct. Mikhel asserted that Mr. Kadamovas was his "partner," and Mikhel expressed zero remorse. Mr. Kadamovas had no opportunity to confront or challenge this evidence.

118

B. Mikhel's testimony introduced evidence and information that otherwise would not have been before the jury. That evidence, information, and inferences prejudiced Mr. Kadamovas.

1. When the trial resumed from the holiday recess on January 3, 2007, Mikhel testified for three full days. *See* Tr. 01/03/07 at 40-202; Tr. 01/04/07 at 20-75, 84-175; Tr. 01/05/07 at 6-97. The jury sat through hours and hours of this testimony—and only this testimony—for those three solid days.

2. It was clear before, during, and after Mikhel's testimony that his choice to testify was against the advice of his counsel. In fact, Mikhel testified that he had "tremendous disagreements" with counsel, that his testimony was against the advice of his counsel, and that even his lawyers had no idea what he would say on the stand. Tr. 01/03/07 at 44.

3. Instead, he insisted that he was testifying because there was only so much humiliation he could take and because his and his friends' names were being dragged through the mud. *Id.* at 43.

4. His counsel at numerous times made additional remarks suggesting counsel did not condone this testimony, including, "I'm just trying to get through this." *Id.* at 186.

5. Mikhel initially objected to the use of the term "criminal conduct" as applied to him, indicating that in Russia that's what "everyone does." *Id.* at 59.

Later, however, he identified himself as a "professional criminal." Tr. 01/05/07 at 35.

6.      Mikhel portrayed himself as an international money laundering con man. He described a con operation in the late 1990s in Russia through which he claimed to have made 1.6 million dollars. Tr. 01/04/07 at 28-29.

7.      Mikhel corroborated the prosecution's case against him. He provided his own voice for the jury to hear, matching the recordings demanding ransom that the government had previously played for the jury, suggesting that the voice was Mikhel's.

8.      Mikhel also provided his own handwriting in prepared timeline exhibits, matching handwriting the government had used to implicate him in the ransom money.

9.      Mikhel admitted to use of various aliases, accounts, and mail service. *Id.* at 30.

10.     Mikhel admitted he had Gitte Lellan smuggle SIM cards, tools, and instruments into prison in exchange for $2,000. Tr. 01/05/07 at 94-95.

C.     Mikhel's testimony included information about Mr. Kadamovas' involvement in uncharged crimes.

1.      Mikhel testified that he met Jurijus Kadamovas when he hired a moving company he found through the Russian newspaper. Mr. Kadamovas was

120

one of the workers who moved Mikhel from Palm Springs to Los Angeles around December 1999. Tr. 01/04/07 at 32.

2.    Mikhel characterized his investment in Mr. Kadamovas' aquarium business as a money-laundering scheme. *Id.* at 43-45.

3.    Mikhel testified that Mr. Kadamovas had emeralds in Lithuania that he wanted to sell. *Id.* at 118. Mikhel testified that he facilitated the eventual sale of this emerald for 1.2 million dollars and that he and Mr. Kadamovas smuggled the money into the United States and were laundering it. Tr. 01/05/07 at 17, 20-21.

4.    Mikhel testified that through Mr. Kadamovas' contacts, he became involved in a money-laundering business deal aboard a yacht in Cyprus. He claimed to have backed out of the deal and to know nothing about the disappearance and drowning of a man named Popov. Tr. 01/04/07 at 126-28, 142-43.

5.    The jury heard no other evidence about Popov and would not have known about any missing person associated with Mikhel and Kadamovas in Cyprus but for Mikhel's testimony.

6.    Later, right after acknowledging his involvement with some of the victims of the charged murders, Mikhel claimed that he did not kill Popov. Tr. 01/05/07 at 93.

121

7.      Mikhel also said that the "person in Turkey" (referring to additional uncharged crime victim Popsuy-Shapko) was not dead. Tr. 01/05/07 at 92.

8.      The court had excluded uncharged alleged homicides, such as that of Popsuy-Shapko in Turkey and Popov in Cyprus, from the government's guilt and penalty case. Tr. 05/22/06 at 43-44. The Court's exclusion rested on the fact that they were so extremely prejudicial and because of the Court's concerns about lack of reliability and use of judicial resources. Tr. 05/22/06 at 27-28, 44-45. Nonetheless, Mikhel introduced them.

9.      Mikhel's denial of involvement in these homicides introduced to the jury the fact that Mikhel and Kadamovas were suspected of additional killings. Because his denials came on the heels of his denial of the charged killings where extensive evidence had been presented to the jury, the denials rang hollow.

9.      Mikhel also testified about the abduction of a man named Armen, more evidence of a crime of which the jury had no information but for Mikhel's testimony. He indicated that Mr. Kadamovas arranged the meeting with Armen and brought Armen to Mikhel's house. He testified that he and Mr. Kadamovas extorted $50,000 from Armen in exchange for a videotape that incriminated Armen for another crime. Tr. 01/05/07 at 49-50.

122

D.     Mikhel testified about the homicide victims. Mikhel told the jury about his interactions with each of the actual victims whose deaths were part of the charges in this case.

1.     Mikhel claimed that he knew that Muscatel was trying to cheat others in business and that Mikhel and Altmanis wanted to beat him up to teach him a lesson. Tr. 01/05/07 at 26-29.

2.     Mikhel confessed to portions of the government case against him regarding the kidnapping and killing of Muscatel, including that contact was made with a prepaid phone number, a meeting was arranged, and Mikhel provided Altmanis with a plan. Mikhel denied, however, that he was involved in the planned abduction. *Id.* at 31-32.

3.     Mikhel admitted that in October 2001, Altmanis abducted Muscatel to Mikhel's home, where Mikhel observed him to be bleeding and semiconscious and injected him with Dimedrol. *Id.* at 35.

4.     Mikhel claimed he went up to his bedroom and did not know what happened to Muscatel after that. *Id.* at 37-38.

5.     Mikhel testified—completely gratuitously—that he called Jurijus Kadamovas and told him of this incident, then he and Mr. Kadamovas drove to a safe house in Modesto to deposit some cash the next day. *Id.* at 38-40.

123

6.      Mikhel admitted that he was collecting information about Safiev to "invite him for the normal, a civilized meeting at the neutral ground" and to disclose to him that people were after him and knew where he was. *Id.* at 54.

7.      Mikhel explained that to try to get to Safiev, he approached victim Rita Pekler.

8.      He claimed that he and Mr. Kadamovas left Pekler alone with Altmanis, and only learned a few days later that she had disappeared. Mikhel suggested that he thought she skipped town and did not suspect Altmanis had killed her. *Id.* at 60-63.

9.      Mikhel told of laundering money for Altmanis, but said that he believed the money was from a check scheme rather than ransom money. *Id.* at 70. He boasted about his savvy abilities with money laundering and was incredulous at the government's financial chain being so obvious that he said, "I'd rather be accused of murder than of this insanity." *Id.* at 72.

10.      Mikhel admitted a January 2002 plan for Solovyeva to lure victim Nick Kharabadze to get to Safiev. *Id.* at 79. He denied that there was any plan to murder or kidnap Safiev. He instead claimed a plan only to sit down and "put all the cards on the table" and calmly describe to Safiev that other people were chasing him and knew his whereabouts and to help devise a plan for him to disappear. *Id.* at 80.

124

11.     Mikhel directly implicated Jurijus Kadamovas in this plan regarding Safiev. *Id.* at 83-84.

12.     Mikhel admitted that he hoped to make a million dollars off Safiev. *Id.* at 84. His plan was for Safiev to disappear and to persuade everyone in Moscow that Safiev had been kidnapped.

13.     Yet Mikhel insisted that Safiev was not in fact kidnapped. *Id.* at 88.

14.     Mikhel testified that both Safiev and Kharabadze stayed at the Weslin house while they arranged this plan. *Id.* at 90. Then, he claimed, they checked into a hotel with Altmanis. *Id.* at 90-91.

15.     Mikhel testified that he left the hotel, with Safiev, Kharabadze, Kadamovas, and Altmanis there, all alive and well. *Id.* at 91. This account directly implicated Mr. Kadamovas as one of the last people to see Safiev and Kharabadze alive.

E.     Mikhel's testimony was devastating not only to Mikhel, but also to Mr. Kadamovas. While Mikhel had the right to testify in his own defense, regardless of whether that testimony helped or hurt his case, the impact of this testimony on Mr. Kadamovas was extremely damaging, given that the two were being tried jointly.

1.     The prosecution admitted that Mikhel's testimony was damning to the defendants, stating:

> [W]e like his testimony the way it is. . . . I think that Mr. Mikhel's testimony actually is very helpful for the Government, because it is so

125

patently absurd. . . . We intend on using it extensively in our closing argument in fact.

Tr. 01/05/07 at 107

2.    Mr. Kadamovas' counsel, Richard Lasting, noted that Mikhel was on a "suicide mission," apparently insistent on bringing Mr. Kadamovas with him. *Id.* at 102. Attorney Chahin described the situation in the court room as "surreal" during Mikhel's testimony. Ex. 11 (Chahin dec.) ¶ 28.

3.    The trial court noted that Mikhel was essentially uncontrollable during his testimony, ignoring questions, embarking on rambling narrative answers, commenting on other witnesses and the evidence already presented. Tr. 01/05/07 at 102-03.

4.    Mikhel testified that Mr. Kadamovas was a partner through the money laundering and illegal activities he admitted to over the two years leading up to their arrest. Mikhel placed Mr. Kadamovas at his side, even suggesting that Mr. Kadamovas' contacts allowed them to make contact with Popov and Armen, two individuals against whom crimes were suspected but about whom the jury would never have known but for Mikhel's testimony.

5.    While Mikhel admitted that he invested in Mr. Kadamovas' aquarium business, he misrepresented the true nature of their relationship. Instead, he spoke of their relationship as one of equals rather than properly characterizing Mr.

126

Kadamovas as a hapless uneducated and unsophisticated person unable to speak English and who acted at Mikhel's behest and bidding.

F. The trial court's initial refusal to strike Mikhel's testimony, as requested by Kadamovas' counsel, allowed Mikhel to continue to provide testimony that prejudiced Mr. Kadamovas.

1. On direct examination Mikhel refused to answer two questions as to identities of additional associates. Tr. 01/05/07 at 106.

2. The trial court stated that a testifying witness cannot pick and choose and that if Mikhel did not answer all questions, then the court would have no choice but to strike his testimony. *Id.* at 107.

3. The government responded that it did not want to strike the testimony, regardless of it being incomplete: "[W]e like his testimony the way it is." The testimony was "actually . . . very helpful for the Government." *Id.* at 107.

4. When counsel for Mikhel and Mr. Kadamovas both indicated that they would move to strike, the court refused to strike the testimony upon defense motion. *Id.* at 108. No resolution was reached by the court at this time, although the trial court would later strike Mikhel's testimony. Tr. 01/09/07 at 28.

G. Pretrial, counsel for Mr. Kadamovas had foreseen the possible prejudice of testimony from a co-defendant who was on trial for the same offenses and attempted to prevent any such problem.

1. Counsel for Mr. Kadamovas filed a pretrial motion to sever his case from that of his co-defendants. Dkt. No. 727. Among the concerns raised was that a co-defendant could offer evidence without the same requirements the government had to provide notice, thereby depriving Mr. Kadamovas of the protections afforded by the federal death penalty scheme. This motion anticipated, while seriously underestimating, the risk of trying these co-defendants together.

2. The government responded to this motion:

> If new information is presented at trial by a co-defendant, defendant will have an opportunity to respond to that evidence, explain that evidence, rebut that evidence, and even, if appropriate, request additional time to investigate that evidence. Defendant's due process concerns, while well taken, do not mandate severance in this case.

Dkt. No. 741 at 24. The government's proposed remedies would remain unfulfilled.

H.    Counsel's request to respond to Mikhel's testimony was rejected by the court, prejudicing Mr. Kadamovas.

1. When Mr. Kadamovas did request additional time to respond to Mikhel's fantastical testimony during trial, as the government had anticipated pretrial might be required, that request was denied. Dkt. No. 1441, Tr. 01/09/07 at 4.

I.    The court denied Mr. Kadamovas' motion for a mistrial or continuance, prejudicing Mr. Kadamovas.

128

1.     Over the weekend between Mikhel's completion of his testimony on January 5, 2007, and his scheduled cross examination on January 9, 2007, the Kadamovas defense team filed "Defendant Jurijus Kadamovas' Motion for a Mistrial or Alternatively for a Continuance to Permit him to Investigate the Two Foreign Unadjudicated Murders." Dkt. No. 1441.

2.     The court denied the motion. Tr. 01/09/07 at 4.

3.     This motion was filed and denied under the assumption that Mr. Kadamovas' legal team would have the full opportunity to cross examine Mikhel. Moments after the court denied the motion, Mikhel—and the court—vitiated this right. *Id.* at 4-5.

J.     Mikhel's refusal to submit to cross examination denied Mr. Kadamovas his right to confront witnesses against him, and the court failed to enforce this right.

1.     At the conclusion of Mikhel's direct examination, on what would have been the fourth day of his testimony, counsel for Mr. Kadamovas and for the government each attempted to cross examine Mikhel. Tr. 01/09/07 at 22-28.

2.     The question of whether Mikhel would submit himself to a full and fair cross examination was already raised, as he had refused on direct examination to answer two questions, both as to the identity of associates.

3.     At the prospect of possible refusal to submit to cross examination, the government made clear that they would not move to strike Mikhel's testimony, as

they viewed it, even absent cross-examination, as so "patently absurd" as to be helpful to the prosecution. Tr. 01/05/07 at 107.

4.      Mr. Lasting, counsel for Mr. Kadamovas stated, "I think that one cannot understate the devastating nature of Mr. Mikhel's testimony on the defense of Mr. Kadamovas. And I think that's clear to everybody here in the courtroom." Tr. 01/09/2007 at 9.

5.      Counsel for Mr. Kadamovas began cross examination of Mikhel:

Q:      Mr. Mikhel, in your direct examination you described a safe house that was located near Modesto; is that correct?

A:      Ms. Chahin, I refuse to answer any questions, yours or the government's as I am here to - - I took the stand to state the truth not to advocate it.

Tr. 01/09/07 at 23.

6.      After several additional attempts to ask questions of Mikhel, with Mikhel continuing to refuse to answer, counsel asked:

Q:      Mr. Mikhel if I continue to ask you questions in other areas, are you going to continue to refuse to answer those questions?

A:      Yes. I'm going to refuse every single question.

*Id.* Counsel then inquired of the court, "Is there any point to my continuing, Your Honor?" The court responded, "No. You may sit down." *Id.* at 23-24.

7.      Immediately thereafter at sidebar the court indicated, "I told you this was going to happen." *Id.* at 24. Counsel for Mr. Kadamovas moved to strike Mikhel's entire testimony. *Id.*

8. The government pointed out that "Well, the damage has been done to a certain extent already, your Honor. And he has opened the door to certain things the Government should be able to present evidence about." *Id.* The court announced, "I'm going to strike his entire testimony." *Id.*

9. Nonetheless, the prosecution attempted its own cross examination of Mikhel:

Q: Mr. Mikhel, last week when you testified, you told jury [sic] that you wanted to set the story straight and tell the whole truth; is that right?
A: I refuse to even talk to you.

***

Q: You're not going to answer anybody's questions today; are you?
A: I'll answer that question if I'll not be interrupted.
Q: You're going to answer one question?
A: No. This - - this one, yes.
Q: Okay. Well, let me ask a different question. When your own attorney Mr. Callahan called you a master of deception during the opening statement, did you agree with that characterization?
A: No.
Q: So you're not a master of deception?
A: No.
Q: Is it true, Mr. Mikhel, that you've utilized a number of different ways over your life to deceive people?

A: I refuse to answer any of the questions of yours.
Q: Let me ask the other one then. Isn't it true that you can't even represent who you are to people correctly, that you use a number of different aliases?
A: (no response).
Q: Are you going to answer that question?
A: I refuse to answer any questions.

131

Tr. 01/09/07 at 25-26.

10.   The prosecution continued to ask five more questions, none of which Mikhel answered, before counsel for Mr. Kadamovas objected. *Id.* at 26-27. The court then clarified with Mikhel that he was not going to answer any questions. *Id.* at 28.

11.   In open court, counsel for Mr. Kadamovas moved to strike the entirety of Mikhel's testimony. The court responded:

> Ladies and gentlemen, I'm going to grant the motion to strike all of the testimony of Mr. Mikhel. You are not to consider it in any matter against Mr. Mikhel or against Mr. Kadamovas in this case. The entire testimony will be struck.

*Id.* at 28.

12.   Closing arguments began the very next day, immediately after 3 days of Mikhel's fantastical narrative implicating Mr. Kadamovas time and time again in crimes, both charged and uncharged.

K.   The trial court's denial of counsel's motion for severance and motion for a mistrial unfairly prejudiced Mr. Kadamovas.

1.   Before any government rebuttal or closing arguments, counsel for Mr. Kadamovas orally renewed their motion for severance and motion for mistrial.

2.   The entire motion consisted of the following statement:

132

In light of the events this morning when we come back at 1:30, I'd just like to advise the Court and counsel that we plan to renew our severance and mistrial motions.

*Id.* at 31.

3. The court responded, "You want to renew them just for the record? You can do it now, because I'm not going to grant you a severance. And I'm not going to - -." *Id.* at 31.

4. Counsel interrupted,

Well, I do want to renew them. I'm not just doing it for the record. I'm doing it because I think that they're well taken, and they should be granted.

But based on the events this morning and Mr. Mikhel's refusal to answer any questions asked on behalf of Mr. Kadamovas and his - - I think he responded to one question asked by Mr. Dugdale, that I think that it's impossible for the jury to disregard his testimony.

I think the spill over effect as to Mr. Kadamovas is devastating. And on that basis, again, I think the court should reconsider. And I think at this point in light of these latest developments, the Court should either grant us a mistrial or in the alternative a severance.

*Id.* at 31-32.

5. The court denied this motion.

L.   The court's instructions failed to provide an adequate remedy.

1.     During instructions for the guilt phase, the court instructed, "Testimony that has been excluded or stricken or that you have been instructed to disregard is not evidence and must not be considered." Tr. 01/16/07 at 15.

2.     The court further instructed,

> Due to defendant Iouri Mikhel's refusal to subject himself to cross examination, the Court struck all of the testimony of defendant Iouri Mikhel on his direct examination. You are, therefore, specifically instructed that you are not to consider or discuss any statement made by defendant Iouri Mikhel here in court for any purpose whatsoever.

> You are instructed, as a matter of law, that defendant Iouri Mikhel should be considered as not testifying in this matter.

> A defendant in a criminal case has a Constitutional right not to testify. No presumption of guilt may be raised and no inference of any kind may be drawn from the fact that defendant Iouri Mikhel did not testify.

> You are further instructed that you are not to draw any inference or inferences about the guilt or innocence of any other defendant from the testimony which was struck by the Court.

Tr. 01/16/07 at 24-25.

J.     The denial of counsel's renewed motions for severance and mistrial impermissibly prejudiced Mr. Kadamovas.

1.     After the conclusion of the presentations of evidence at the penalty phase, counsel for Mr. Kadamovas orally renewed the motion for a "severance or mistrial." Tr. 01/10/07 at 43.

2.    Mr. Kadamovas undisputedly had a right to cross examine the witnesses against him. *Bruton*, 391 U.S.123; *Toolate*, 828 F.2d 571.

3.    Ordinarily when a testifying witness cannot or will not be cross examined, the appropriate relief is to strike the testimony of the witness and to instruct the jury to disregard it. *United States v. Lyons*, 703 F.2d 815, 819 (5th Cir. 1983); *see United States v. Seifert*, 648 F.2d 557, 561 (9th Cir. 1980).

4.    However, this is not always an adequate remedy:

> If the direct testimony is especially prejudicial. . .  this remedy [is] inadequate. On the premise that the jury could not follow the instruction to disregard the witness' testimony, we have then required a mistrial.

*Lyons*, 703 F.2d at 819.

5.    *Bruton* created an exception to the general presumption that juries will follow an instruction to disregard evidence.

> There are some contexts in which the risk that the jury will not, or cannot follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored. Such a context is presented here, where the powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial.

*Bruton*, 391 U.S. at 135-36 (internal citation omitted). In *Bruton*, the Supreme Court held that a new trial must be granted if a such a confession is heard by the jury and the defendant does not have an opportunity to cross-examine. A jury

135

cannot be expected to completely shut out of its mind devastating evidence under such circumstances. *Bruton*, 391 U.S. at 135.

8.      Similar circumstances exist in Mr. Kadamovas' trial, and his jury likewise could not have shut Mikhel's devastatingly harmful testimony out of its mind.

9.      Attorney Chahin noted:

> The failure of the court to grant a severance from Mikhel was extremely damaging to Mr. Kadamovas' case. The testimony of Iouri Mikhel was one of the most surreal experiences I have had in a courtroom. His testimony was absurd, almost insulting, and certainly angered the jurors. The prosecution stopped making objections after awhile because Mikhel's statements were obviously very damaging to his interests and, by association, very damaging to Mr. Kadamovas' interests. I feel it was utterly unfair to Kadamovas not to grant a severance or a mistrial after Mikhel's testimony. There was no chance that a jury could forget Mikhel's testimony or erase it from their minds.

Ex. 11 (Chahin dec.) ¶ 28.

K.      Mr. Kadamovas was prejudiced by the Mikhel testimony and the failure of the court to grant a mistrial.

1.      Mikhel's testimony was damaging to Mr. Kadamovas in substance and contributed to the convictions and the death sentence of Mr. Kadamovas. It also likely worked to convince the jury that the co-defendants were equally culpable and thus contributed to Mr. Kadamovas' sentence of death in this way as well.

136

2.      Although the court struck the testimony, the taint it created was so damaging and prejudicial that a mistrial was the only appropriate remedy.

3.      The prejudice to Mr. Kadamovas from the false and misleading testimony by Mikhel infiltrated and tainted both the guilt and the penalty phases.

4.      It was particularly damning at the penalty phase because the government's theory was that Mikhel and Mr. Kadamovas were equals, while the remaining co-defendants had lesser culpability. Tr. 02/09/07 at 149.

5.      Mikhel provided testimony to support that incorrect theory, wrongly portraying Mr. Kadamovas as Mikhel's equal and implicating him in uncharged sophisticated criminal conduct.

6.      Mikhel testified about numerous uncharged alleged crimes by Mr. Kadamovas of which there was no other evidence or corroboration.

7.      The court could have, and should have, either granted the motion for severance of Mr. Kadamovas' trial or granted the motion for mistrial of Mr. Kadamovas' trial.

8.      Some information introduced at trial is so improper and prejudicial that the harm cannot be erased by any instruction the court might give. *United States v. Rudolph*, 403 F.2d 805, 806 (6th Cir. 1968); *United States v. Smith*, 403 F.2d 74 (6th Cir. 1968); *Courtney v. United States*, 390 F.2d 521 (9th Cir. 1968);

137

*Odom v. United States*, 377 F.2d 853 (5th Cir. 1967); *United States v. Rinaldi*, 301 F.2d 576 (2d Cir. 1962); *see also Marshall v. United States*, 360 U.S. 310 (1959).

L.    This constitutional violation constitutes a structural defect and warrants the granting of this motion without any further showing of prejudice.

M.    The error substantially prejudiced defendant, rendered the trial fundamentally unfair, eroded the reliability of the jury's verdicts and had a substantial and injurious effect on the verdicts.

**CLAIM 9 DENIAL OF SEVERANCE**

Jurijus Kadamovas' convictions and sentence are unlawfully and unconstitutionally imposed, in violation of the Fifth, Sixth, and Eighth Amendments to the United States Constitution, because he was denied severance from his co-defendant Iouri Mikhel. *See Lockett v. Ohio*, 438 U.S. 586 (1978); *United States v. Tootick*, 952 F.2d 1078 (9th Cir. 1991); *United States v. Romanello*, 726 F.2d 173 (5th Cir. 1984); *United States v. Troiana*, 426 F. Supp. 2d 1129, 1132-35 (D. Haw. 2006).

The following facts and allegations, among others, support this claim:

A.     Trial counsel made five motions to sever Mr. Kadamovas' trial from that of his co-defendants; all were denied in error. The result was a trial that violated fundamental notions of fairness, due process and in this capital case, also violated the requirement of an individualized penalty determination.

1.     Trial counsel for Mr. Kadamovas filed a first motion to sever his case from his co-defendants on May 31, 2005. Dkt. No. 727. Among concerns raised in the motion was that a co-defendant could offer evidence without the same requirements the government had to provide notice, thereby depriving Mr. Kadamovas of the protections afforded by the federal death penalty scheme and the constitution generally. This motion anticipated, while underestimating, the risk of trying these co-defendants together. At the time, there was no way to anticipate the

extent of the harm that would follow, with Mikhel testifying to uncharged, un-

introduced crimes attributed to him and Mr. Kadamovas, the government

embracing the testimony of Mikhel, and the complete inability to cross-examine

Mikhel. This was damage far more unfair than the prejudice typically alleged in

the joinder of co-defendants.

2.    The government responded to this motion:

> If new information is presented at trial by a co-defendant, defendant will have an opportunity to respond to that evidence, explain that evidence, rebut that evidence, and even, if appropriate, request additional time to investigate that evidence. Defendant's due process concerns, while well taken, do not mandate severance in this case.

Dkt. No. 741 at 24. The government's proposed remedies would remain

unfulfilled.

3.    The trial court denied Mr. Kadamovas' motion to sever. Dkt. No. 787. The court noted that it "will, however, continue to consider the possibility of holding sequential penalty hearings or other alternatives." *Id.*

4.    Defendant Iouri Mikhel filed a renewed Motion for Severance on May 17, 2006. Dkt. No. 997. Mr. Kadamovas joined Mikhel's "Renewed Motion for Severance, or in the Alternative Motion for 'Sequential' Penalty Hearings If Found Guilty of a Capital Offense" by a filing on June 8, 2006. Dkt. No. 1051.

5.    By written Order, the court specifically deferred ruling on the renewed motion for severance until after the guilt phase of the trial was completed,

thereby essentially denying the motion for severance but again leaving open the possibility of sequential or separate penalty hearings. Dkt. No. 1064.

6.    On January 3, 2007, counsel for Mr. Kadamovas filed "Defendant Jurijus Kadamovas' Renewal of His Request for Severance from Codefendant Iouri Mikhel." Dkt. No. 1429. This third motion was made during the guilt phase, after Mikhel had indicated that he intended to testify in his own defense and the court had tentatively ruled that the government would be permitted to cross-examine Mikhel on uncharged crimes Mikhel and Kadamovas were suspected of but that had been ruled inadmissible in the government's case in chief. *Id.* at 3-4.

7.    While the mid-trial motion was a renewed request for severance, it was based on new facts that counsel anticipated would arise during Mikhel's testimony. *Id.* Counsel had no notice that Mikhel, through his testimony, would introduce evidence or otherwise open the door to these unadjudicated foreign crimes and therefore had not properly prepared to challenge these allegations. *Id.* at 4-6.

8.    The trial court denied without prejudice this third motion to sever the two defendants. Tr. 01/03/07 at 25.

9.    The third motion had been filed and denied under the assumption that Mr. Kadamovas' team would have an opportunity to cross-examine Mikhel. After Mikhel refused to submit to cross-examination, counsel for Mr. Kadamovas orally

renewed their motion for severance and motion for mistrial. The entire motion consisted of the following statement:

> In light of the events this morning when we come back at 1:30, I'd just like to advise the Court and counsel that we plan to renew our severance and mistrial motions.

Tr. 01/09/2007 at 31.

10. The court responded, "you want to renew them just for the record? You can do it now, because I'm not going to grant you a severance. And I'm not going to - ." *Id.* at 31.

11. Counsel interrupted,

> Well, I do want to renew them. I'm not just doing it for the record. I'm doing it because I think that they're well taken, and they should be granted.
>
> But based on the events this morning and Mr. Mikhel's refusal to answer any questions asked on behalf of Mr. Kadamovas and his -- I think he responded to one question asked by Mr. Dugdale, that I think that it's impossible for the jury to disregard his testimony.
>
> I think the spill over effect as to Mr. Kadamovas is devastating. And on that basis, again, I think the Court should reconsider. And I think at this point in light of these latest developments, the Court should either grant us a mistrial or in the alternative a severance.

*Id.* at 31-32.

12. The court denied this motion. *Id.*; Dkt. No. 1422.

142

13.     The next day counsel made his fifth motion to sever, an oral motion "to either grant us the severance or declare a mistrial." Tr. 01/10/2007 at 43.

14.     The court denied this motion. *Id.*; Dkt. No. 1423.

B.     Mr. Kadamovas' Fifth, Sixth, and Eighth Amendment rights were violated by the denial of severance from defendant Mikhel, causing prejudice and confusion and denying an individual and reliable penalty determination.

1.     If the joinder of defendants appears to prejudice a defendant unfairly, a trial court should sever the trials, or provide other relief that justice requires. Fed. R. Crim. P. 14, *see Tootick*, 952 F.2d at 1080. Joint trials can severely prejudice defendants due to the spillover effect of evidence admitted against one defendant, even if it is not directly relevant to the other. Instructional guidance is sometimes inadequate to cure this unfair prejudice. In this case, under these circumstances, it is inconceivable that the jurors did not improperly use the evidence against Mikhel against Mr. Kadamovas. *See Bruton v. United States*, 391 U.S. 123 (1968).

2.     Mikhel added to the general unfair prejudice by his own actions. Mikhel appeared in court before the jury in his jail garb. Tr. 10/13/06A at 6; Tr. 11/30/06B (sealed) at 224 (counsel notes that Mikhel has worn his jail clothing during the majority of the trial). Wearing jail clothing creates unfair prejudice and damages the presumption of innocence in the eyes of the jury. *Bentley v. Crist*, 469 F.2d 854 (9th Cir. 1972); *Felts v. Estelle*, 875 F.2d 785 (9th Cir. 1989). Mr.

143

Kadamovas should not have been forced to face a jury prejudiced by Mikhel's actions.

3.    Mikhel also demonstrated disrespect to the jury, the victims, and the court by refusing to attend proceedings during much of the trial. Tr. 01/10/07 at 4; Tr. 01/11/07 at 4; Tr. 01/12/07 at 4; Tr. 01/16/07 at 3; Tr. 01/17/07 at 3; Tr. 01/23/07 at 3; Tr. 01/24/07 at 4-5; Tr. 01/25/07 at 4; Tr. 01/30/07 at 5; Tr. 01/31/07 at 4; Tr. 02/01/07 at 4; Tr. 02/02/07 at 4, 11; Tr. 02/06/07 at 4; Tr. 02/07/07 at 4; Tr. 02/09/07 at 4 (for penalty closing arguments); Tr. 02/13/07 at 4, 13; Tr. 02/15/07 at 3; Tr. 02/21/07 at 4. Mr. Kadamovas should not have been forced to face a jury prejudiced by Mikhel's actions.

4.    Mikhel testified to extremely prejudicial information, which Mr. Kadamovas had no ability to confront or cross-examine. Mikhel's actions in refusing to be cross-examined, and his implication of Mr. Kadamovas in uncharged, otherwise inadmissible crimes all prejudiced Mr. Kadamovas beyond repair. The allegations set forth in Claim 8 (Unfair Prejudice of Mikhel's Testimony) are incorporated by reference.

5.    Joint trials of co-defendants can also cause confusion, making it difficult for the jury to differentiate between the actions of each defendant. *United States v. Coward*, 630 F.2d 229, 231 (4th Cir. 1980). The jury was particularly

144

susceptible to such confusion in this case because the trial was so lengthy and because Mr. Kadamovas' and Mikhel's first names are pronounced the same.

C.     A guiding principle of Eighth Amendment capital sentencing is that each defendant has a constitutional right to individualized sentencing based on the character and record of the defendant, as well as the facts of the particular charged offense. *Lockett*, 438 U.S. at 605. The joint trials of Mikhel and Mr. Kadamovas permitted a jury to sentence Mr. Kadamovas without the individualized sentencing the Constitution requires.

D.     Many states recognize the unreliability, confusion, and unfairness of pairing two capital defendants in a single penalty trial and discourage this practice. *See, e.g.*, Ga. Code Ann. § 17-8-4(a), Miss. Code. Ann. § 99-15-47, Ohio Rev. Code Ann. § 2945.20.

E.     The Ninth Circuit panel rejected a similar claim on appeal. *United States v. Mikhel*, 889 F. 3d at 1046-47. The ruling of the Ninth Circuit does not prevent consideration of this claim for the following reasons, among others:

    1.     The Ninth Circuit panel used the wrong standard of review.

    2.      The Ninth Circuit ruling was clearly erroneous.

    3.     Exceptional circumstances, including the fact that this is a capital case, warrant reconsideration of any conclusion made by the appellate court.

145

4.      Changes and developments in the law favor consideration of this claim.

F.     The constitutional violation constitutes a structural defect and warrants the granting of this motion without any further showing of prejudice.

G.     The error substantially prejudiced defendant, rendered the trial fundamentally unfair, eroded the reliability of the jury's verdicts and had a substantial and injurious effect on the verdicts.

146

## CLAIM 10 DENIAL OF ACCESS TO CASE MATERIALS

Jurijus Kadamovas' convictions and sentence are unlawfully and unconstitutionally imposed, in violation of the Fifth, Sixth, and Eighth Amendments to the United States Constitution, because he was denied reasonable access to case materials, discovery materials, and pleadings prior to and during his trial. The denial of access included the denial of adequate translations into Russian. Unable to access and review the evidence against him, Mr. Kadamovas was consequently unable to confront the government's case, intelligently exercise his rights, and participate in his defense. He was denied his constitutional rights to confrontation, to present a defense, to due process, to counsel, to a fair trial, and to a reliable capital sentencing proceeding. *Smith v. O'Grady*, 312 U.S. 329 (1941); *United States ex rel. Negron v. New York*, 434 F.2d 386 (2d Cir. 1970); *United States v. Mosquera*, 816 F. Supp. 168 (E.D.N.Y. 1993); *State v. Vasquez*, 121 P.2d 903 (Utah 1942).

The following facts and allegations, among others, support this claim:

A.     The discovery materials in this case were voluminous. Documents produced in discovery numbered over 90,000 pages. These documents included witness interviews, transcripts, phone records, financial records, scientific and forensic tests, and other items. Electronic media, including CD ROMs, hundreds of audio and video tapes and other digital content were also produced.

B.    Mr. Kadamovas was born and grew up in the Soviet Union, and his native language is Russian. At the time of his arrest, and through the time of his trial, Mr. Kadamovas could not read English and could understand little spoken English. Through the pretrial and trial proceedings, he was denied sufficient translation services and was unable to understand the discovery materials in English. The allegations of Claim 11 (Misleading and Inaccurate Translation at Trial) are incorporated by this reference.

C.    Prior to trial, Mr. Kadamovas was denied reasonable access to discovery materials and case materials. Throughout the period leading up to the trial, Mr. Kadamovas and his appointed counsel objected to the restrictive conditions and asserted that Mr. Kadamovas was denied a means of reviewing discovery and preparing his defense.

1.    As early as April 2002, Mr. Kadamovas requested that he be allowed to review the discovery, alerting the judge to the fact that he had not received any discovery materials at all. Mr. Kadamovas wrote a letter to Judge Manella, dated April 30, 2002, explaining that he was very limited in his ability to understand English and needed translation services as well as access to the documents that the government controlled that purportedly supported the charges against him. Ex. 122. Mr. Kadamovas had assistance in preparing this letter.

2.      In order to effectively prepare for trial and aid his counsel, Mr. Kadamovas needed to review, know and understand the nature of the evidence, the content of the documents and media, and the discovery materials. Only then could he participate in trial preparation and give his counsel the benefit of his knowledge to investigate the allegations, refute the government's case, and discredit the prosecution witnesses. But Mr. Kadamovas was denied meaningful access and the opportunity to review the discovery and case materials.

3.      During 2004, counsel Richard Lasting attempted to work with the Metropolitan Detention Center (MDC) to find a means by which Mr. Kadamovas could access case materials. These attempts were unsuccessful. By letter dated December 28, 2004, Mr. Lasting wrote to Warden Michael Benov making the reasonable request that Mr. Kadamovas be allowed to have an electronic translating device. Ex. 117. The request was denied. By letter sent in April of 2005 (erroneously dated April 25, 2004), a follow up request to the MDC warden asked that Mr. Kadamovas be allowed to use a computer to review the case materials, noting that the  documents and electronic media in the case were so voluminous that a computer was the only viable method of allowing Mr. Kadamovas access. Ex. 118.

4.      After a year of negotiation and continuous defense requests, the MDC finally authorized Mr. Kadamovas to have a computer in 2005, over three years

149

after his arrest. Mr. Lasting supplied the computer and the translation software and managed to work through various technical issues to allow audio and DVD formats to be accessed. Dkt No. 824 at 10-11. However, the authorities would not allow Mr. Kadamovas to store the computer in his cell and instead stored the computer in a separate locked room in the visiting area. Mr. Kadamovas' ability to use the computer was so restricted as to be a denial of meaningful access. Dkt. No. 824 at 12.

5.      In November 2005, frustrated by the denial of meaningful access, defense counsel made a motion for a court order directing the MDC to allow Mr. Kadamovas meaningful access to discovery and case materials in order to prepare for trial. Dkt. No. 824. The government reacted by promising that Mr. Kadamovas "to the maximum practicable extent, be granted daily access to his laptop computer, Monday through Friday, excluding holidays, from approximately 7:00 a.m. to 3:15 p.m." and to "maximize Mr. Kadamovas' access to the computer." These provisions were set forth in a stipulation filed with, and endorsed by, the court on November 30, 2005. Dkt. No. 833.

6.      The government and the MDC did not comply with the terms of the November 2005 stipulation. On January 6, 2006, counsel for Mr. Kadamovas wrote Warden Benov advising him of the consistent failure of the institution to honor the spirit of the stipulation and of problems that continued to preclude

sufficient opportunity for Mr. Kadamovas to have access to the computer. Ex. 119. Counsel was forced to file a new motion requesting that the court intervene to allow adequate access to the computer. Dkt. No. 939. The court failed to intervene to correct the problem.

7.    Defense counsel pointed out to the court the inadequacy of access in the period leading up to the trial. The representations by the warden and the jail that Mr. Kadamovas had access to the computer—and that he simply was not using the computer—were misleading and false. Counsel pointed out that Mr. Kadamovas' requests to use the computer were simply being ignored. Tr. 06/26/06 at 8-11; *see also* Tr. 08/01/06 at 18.

8.    When co-defendant's counsel, who was experiencing similar problems with the jail's refusal to allow access to a computer, requested an evidentiary hearing on the matter, the trial court summarily denied the request. Tr. 06/26/06 at 19. Instead of holding a hearing, the trial judge informed the parties that he had discussed the issue with the warden over lunch. Tr. 06/26/06 at 8, 10-11. The judge accepted the warden's account, offered over a shared meal, rather than allowing the parties to present evidence on the record.

9.    Mr. Kadamovas was denied use of a computer in his cell at the MDC during the entire pretrial period. It was not until forty-three days into the trial that

151

the trial judge finally ordered the MDC to allow Mr. Kadamovas to use a computer in his cell. Tr. 11/16/06 at 5-6; Ex. 120 (O'Donnell dec.).

10.    The lack of access to the case materials and discovery materials, coupled with the inadequate translation services, severely handicapped Mr. Kadamovas' attempt to participate in his own defense. He could not meaningfully engage with his attorneys and could not assess the evidence the government proposed to use against him.

D.    The inadequate access and the government's breach of the pretrial stipulation were raised as issues in the appeal, but the Ninth Circuit rejected the claims, concluding that the "district court did not clearly err in finding that Kadamovas was receiving sufficient computer access." *United States v. Mikhel & Kadamovas*, 889 F.3d 1003, 1050 (9th Cir. 2018).

E.    The violation of Mr. Kadamovas' constitutional rights, the denial of access to case materials, the inadequate translation services, and the breach of confidentiality continued when Mr. Kadamovas was transferred to the United States Penitentiary at Terre Haute after the trial. Mr. Kadamovas was not allowed by the prison to keep the electronically stored discovery in his cell. *See* Ninth Cir. No. 07-99009, Dkt. No. 438-2 at 35. Numerous DVDs were confiscated, disks went missing, and the prison did not securely store other material. *Id.*; Ex. 120

(O'Donnell dec.); *see also* Ninth Cir. No. 07-99009, Dkt. Nos. 104, 113, 115, 131, 154, 172, 438.

1.      The actions of the authorities at the prison in Terre Haute constitute an ongoing violation of Mr. Kadamovas' constitutional rights of due process and access to the courts. *Lewis v. Casey*, 518 U.S. 343, 346 (1996); *Simmons v. Dickhaut*, 804 F.2d 182, 183 (1st Cir. 1986).

2.      During the pendency of the Ninth Circuit appeal, Mr. Kadamovas repeatedly implored prison officials, and the Ninth Circuit, to allow him meaningful access to his legal materials. Objections were raised regarding the prison's failure to secure his materials, to provide translation software, and to enable him to work on his case. *See, e.g.*, Ninth Cir. No. 07-99009, Dkt. Nos. 104, 113, 131, 154, 172, 438.

3.      In 2010, the appellate court denied a request for Mr. Kadamovas to keep a computer in his cell, but ordered the BOP to allow Mr. Kadamovas twenty hours per week usage of a dedicated computer. Ninth Cir. No. 07-99009, Dkt. No. 124. However, according to appellate counsel, these measures were unsuccessful because much of the electronic discovery and transcripts would not open on the BOP computer and the translation software was inadequate. Ex. 120 (O'Donnell dec.) ¶ 5.

4.      In light of this, appellate counsel for Mr. Kadamovas filed additional motions requesting access, including a renewal of the request for computer use in his cell, and Mr. Kadamovas also filed pro se pleadings accusing the prison authorities of tampering with, and destroying, his case materials. Ninth Cir. No. 07-99009, Dkt. Nos. 131, 154, 157. The BOP was accused of failing to comply with the Ninth Circuit order regarding the twenty hour per week access. Ninth Cir. No. 07-99009, Dkt. No. 172-2 at 17. In response, the government asserted that the accusations of tampering with Mr. Kadamovas' legal materials were unfounded. Ninth Cir. No. 07-99009, Dkt. No. 178. The Ninth Circuit issued additional orders denying the requests to intervene. Ninth Cir. No. 07-99009, Dkt. Nos. 189, 352.

5.      On April 10, 2018, after the oral argument in the appellate court and one month before the Ninth Circuit issued its decision on the appeal, Mr. Kadamovas' appellate lawyers renewed the motion for full access to the case materials. Ninth Cir. No. 07-99009, Dkt. No. 438. The motion included a declaration from Mr. Kadamovas noting that "I continue to be denied meaningful access to work on my case and challenge the government narrative. . . . All I ever wanted was a chance to have a fair trial as guaranteed by the United States Constitution . . . ." Ninth Cir. No 07-99009, Dkt. No. 438-2, at 38.

154

F.     By order dated August 22, 2022, this Court denied a motion requesting an order directing the prison to grant Mr. Kadamovas access to the legal materials. Dkt. No. 2430.

G.     The Ninth Circuit ruling does not prevent consideration of this claim for the following reasons, among others:

1.     The Ninth Circuit posture of the issue was the question whether the government breached the stipulation regarding access to the computer.

2.     The constitutional violations alleged here concern an ongoing infringement of Mr. Kadamovas' rights, violations that have continued since the trial and persist to this day.

3.     The Ninth Circuit ruling was clearly erroneous.

4.     Exceptional circumstances, including the fact that this is a capital case, warrant reconsideration of any conclusion made by the appellate court.

H.     These constitutional violations constitute a structural defect and warrant the granting of this motion without any further showing of prejudice. Prejudice from this error must be presumed, based on the fact that the denial of access to case materials is a structural error that constitutes a constructive denial of Mr. Kadamovas' right to be present at trial and assist and utilize counsel. *United States v. Cronic*, 466 U.S. 648 (1984).

155

I.      The error substantially prejudiced Mr. Kadamovas, rendered the trial fundamentally unfair, eroded the reliability of the jury's verdicts and had a substantial and injurious effect on the verdicts.

## CLAIM 11 MISLEADING AND INACCURATE TRANSLATION AT TRIAL

Jurijus Kadamovas' convictions and sentence are unlawfully and unconstitutionally imposed, in violation of his rights under the Fifth, Sixth, and Eighth Amendments to the United States Constitution, because of myriad problems with translation of evidence at his trial. Most significantly, the interpreters' translation made a crucial government witness, Ainar Altmanis, seem more credible than he was by doing what interpreters refer to as "interpreting in the wrong register"—that is, not accurately conveying how Altmanis spoke, and making him seem more respectable and well-spoken, and thus more trustworthy, than he actually was. The imprecise and misleading translation of evidence, inability of Mr. Kadamovas to hear a witness testifying in their shared language, and the lack of a sound recording preserving the testimony in the original language deprived Mr. Kadamovas of his rights to be present at trial, to confront the evidence against him, to a jury trial, to due process, to a fair trial, and to a reliable sentencing determination. *See Pointer v. Texas*, 380 U.S. 400, 406-07 (1965); *Coy v. Iowa*, 487 U.S. 1012, 1017 (1988); *Aymo v. Sessions*, 742 F. App'x 237, 238 (9th Cir. 2018); *United States v. Edouard*, 485 F.3d 1324, 1338 (9th Cir. 2007); *see also, e.g.*, *Woodson v. North Carolina*, 428 U.S. 280 (1976) ("Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two. Because of that qualitative difference, there is a

corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case."); *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 325 (2009) ("The Confrontation Clause may make the prosecution of criminals more burdensome, but that is equally true of the right to trial by jury and the privilege against self-incrimination. The Confrontation Clause—like those other constitutional provisions—is binding, and we may not disregard it at our convenience."); *Melnik v. Dzurenda*, 14 F.4th 981, 986 (9th Cir. 2021) (defendant's right to respond to evidence means right to examine and understand evidence against him).

The following facts and allegations, among others, support this claim:

A.     Mr. Kadamovas is a native Russian speaker, and at the time of trial, "he did not speak more than a few words in English . . . and he needed to use an interpreter to communicate with his attorneys." Ex. 112 (Spivakovsky dec.) ¶ 11; *see also* Ex. 10 (Lasting dec.) ¶ 14 ("His understanding of English was limited and I had to take a Russian-speaking interpreter in order to communicate.")

B.     Problems with the translation of key information plagued the proceedings from the beginning. Mr. Kadamovas was never provided with a written translation of the initial indictment, for example. *See* Ex. 134 (Chart of Translations to Russian). With his limited English and other difficulties, such as his learning disability, he struggled to understand the charges when they were read out and

158

orally translated in court. Problems with translation were not resolved by the time of trial.

C.     At the trial, the government's star witness, Ainar Altmanis, testified in Russian. Tr. 10/10/06 at 24. Other witnesses who testified in Russian include: cooperating accomplice and Mr. Kadamovas' girlfriend, Natalya Solovyeva, Tr. 11/02/06 at 19; Ninel Faktorovich, Tr. 10/25/06 at 155; Svitlana Korogodska, *id.* at 186; Pavel Akopnik, Tr. 11/14/06 at 106; and Elena Krivohatchenko, Tr. 12/13/06 at 12.

D.     The government's presentation of evidence at the guilt-phase of the trial was centered on Altmanis' account of how the events unfolded. As an admitted participant in all of the hostage takings, Altmanis was in a unique position to testify about what transpired, who was responsible for the planning, who directed other participants, and who simply took orders. Altmanis' testimony, which he provided in exchange for a more lenient sentence, was the only evidence of who actually committed the homicides and who orchestrated the conspiracy, making it crucial that the jury be able to assess his credibility. *See, e.g.*, Tr. 01/10/07 at 79, 116.

E.     Mr. Kadamovas was unable to hear portions of the trial proceedings, including Altmanis' testimony.

159

1.    Mr. Kadamovas' trial counsel asked the court to have Altmanis "speak up in a loud enough fashion . . . so that Mr. Kadamovas can hear his answers in Russian and understand exactly what is being said in the trial." Tr. 10/11/06 at 5.

2.    The court's response was, "Then do we need four interpreters?" *Id.* Trial counsel tried to explain, "We need the interpreter to translate things that are said in English, but things that are said in Russian Mr. Kadamovas understands. So if he could hear the witness's answer, he would know what he is saying. It seems to me sort of an odd process for the witness –" but the court interjected, "This is not the United Nations where you have the type of technical devices that are used for instantaneous translation. We are doing the best we can, and I brought in four interpreters. I mean, that's unheard of in this building." *Id.*

3.    Trial counsel clarified, "My only request, Your Honor, is the witness be requested to speak in a loud enough voice so that the defendant can hear the answers in his native language." *Id.*

4.    The court would not commit to asking Altmanis to speak loudly enough to be heard, saying only, "We will do the best we can." *Id.* The trial court also said, "I think both you [Mikhel's counsel] and Mr. Lasting are trying to get the witness upset by making all these demands upon the witness. . . . You use all these

160

buzz words. 'Right to confront.' Your client is in the courtroom at the time that this trial is going on. He is confronting the witness." Tr. 10/11/06 at 6-7.

F.      The interpreters mistranslated and distorted testimony, including Altmanis' testimony.

1.      Trial counsel informed the court, "I have heard from Mr. Kadamovas that the translation is not what the witness is saying; in essence, that the interpreter is – I don't know what the right word to use is, but the interpreters are putting it in a more proper English or that somehow the words he is using and the translation is not precise." Tr. 10/11/06 at 8.

2.      To this, the court's response was, "Mr. Kadamovas is the one that is making this determination. All four of these interpreters are certified interpreters. The one interpreter that was having difficulty, I excluded that interpreter at the beginning of this trial. Now, these other four interpreters -- because Mr. Kadamovas doesn't like the way it's going down is -- does not really sit well with me." *Id.* at 8-9.

3.      Mikhel's trial counsel then notified the court that "When we inquired of one of the interpreters yesterday about it, we were told they are, in fact, extrapolating what is being said into proper English instead of translating word for word." *Id.* at 10.

4.      The trial court failed to inquire further or hold an evidentiary hearing on these legitimate complaints about the mistranslation and distortion of testimony.

G.      Since the trial, one of the trial interpreters has confirmed that some of the interpreters did extrapolate the testimony into proper English rather than translating in a way that preserved the witnesses' speech patterns, vocabulary, or style of speech. Ex. 112 (Spivakovsky dec.) ¶¶ 15-17. Altmanis "came across as more polished on the witness stand due to the apparent credibility of the interpreters working with him and the way his speech was interpreted." *Id.* ¶ 15.

H.      Failing to accurately convey how a witness speaks is a problem that interpreters grapple with, and it is referred to in the profession as "interpreting in the wrong register." Ex. 112 (Spivakovsky dec.) ¶ 16.

I.      At least one interpreter for Altmanis' testimony did interpret in the wrong register. Ex. 112 (Spivakovsky dec.) ¶¶ 16-17. This interpretation made Altmanis "seem more respectable, well-spoken, and intelligent than he was." *Id.* ¶ 16.

J.      Additionally, one interpreter for Altmanis' testimony had "significant hearing loss" and health problems that greatly impacted her work, including "having issues with her hearing during Mr. Kadamovas' trial." Ex. 112 (Spivakovsky dec.) ¶ 16. This interpreter "kept working even when she was unable to interpret" and other interpreters would "cover for her." *Id.*

162

K.     The trial court ignored these problems with the translation of evidence, even though counsel made the court aware of them. No hearing or factual inquiry occurred.

L.     Beyond any questions about individual interpreters' style or competence, this trial presented many logistical challenges for interpreters that made it particularly burdensome and negatively impacted the translation.

1.     For example, because Mr. Kadamovas needed an interpreter to communicate with his legal team, the interpreters who were on a break from interpreting the proceedings would interpret for Mr. Kadamovas and his team. Ex. 112 (Spivakovsky dec.) ¶ 12.

2.     This meant that the interpreters did not take appropriate breaks, although breaks are necessary to ensure high quality interpretation—studies show that an "interpreter's performance deteriorates significantly after" twenty minutes without a break. Ex. 112 (Spivakovsky dec.) ¶ 12.

M.     Compounding the problems with the translations are problems with how the proceedings were memorialized.

1.     Several days of the trial were audio recorded but not transcribed by an in-court court reporter. Transcripts were then created from the audio recordings, not the proceedings themselves. On those days, if a witness or interpreter spoke quietly or incomprehensibly, there was no court reporter present to ask the speaker

163

to repeat themselves or speak more loudly or clearly. The transcripts from the audio-recorded days of trial frequently have notations like "inaudible." For example, in the transcript from January 24, 2007, a day when the proceedings were sound recorded, there are at least eight times when portions of the proceedings are classified as "inaudible" or have the notation "(***)" instead of the words that were spoken. January 24, 2007 was a particularly important day—the first day of penalty-phase proceedings. The government gave its opening statement, the court gave the jurors their preliminary instructions, and several government witnesses testified. October 18 and 19, 2006, days when Altmanis was testifying, similarly have "***" notations.

2.     On the days when a court reporter was present and transcribing the proceedings, no audio recording was made. For witnesses who testified in a foreign language, the court reporter, of course, transcribed the interpreters' English translation, not the foreign-language testimony. On those days, no record exists of what the witness actually said.

N.     Altmanis' testimony began on October 10, 2006, a day when a court reporter transcribed the proceedings. There is no record of what Altmanis actually said on October 10, 2006.

O.     In addition to problems with the translation of the trial proceedings, there were also problems with translation of crucial case information. For example, the

164

initial indictment was never translated. The First Superseding Indictment was filed on June 5, 2002, and not translated into Russian for Mr. Kadamovas until January 23, 2004, and the Second Superseding Indictment was filed on July 29, 2004, and was not translated into Russian for Mr. Kadamovas until March 4, 2005. *See* Ex. 134 (Chart of Translations to Russian). The Sixth Amendment and the Due Process Clause require that the government provide a non-English-speaking defendant with a translation of the indictment, so that he has notice of the charges against him and can consult with counsel and meaningfully participate in the proceedings. *See Mosquera*, 816 F. Supp. at 172-73 .

P.      The problems with translation violated Mr. Kadamovas' right to due process, to meaningfully participate in the proceedings, and right to confront the witnesses against him. The problems with translation also violated Mr. Kadamovas' rights under the Eighth Amendment by undermining the integrity and reliability of the proceedings in a death penalty case.

Q.      In addition, trial counsel was ineffective in its handling of translation issues, failing to take steps to ensure that their client could meaningfully participate in the trial and failing to take steps to ensure that the in-court interpretation was accurate, including in the right register. There were steps trial counsel could and should have taken but did not. For example, trial counsel should have asked for sound recording of each day when a witness testified in a foreign language. *See* 28 U.S.C.

165

§ 1827(d)(2). The allegations set forth in Claims 19 (Ineffective Assistance of Counsel: Guilt Phase Trial) and 21 (Ineffective Assistance of Counsel: Penalty Phase Trial) are incorporated by reference.

R.    Mr. Kadamovas was prejudiced by problems with the translation of testimony, including problems with the translation of Altmanis' testimony, which prevented the jury from accurately assessing Altmanis' credibility.

1.    Altmanis' credibility was a crucially important factor at trial.

2.    Altmanis was uniquely able to supply information about who was responsible for the planning, who directed other participants, and who simply took orders. Altmanis told the jury that Mr. Kadamovas was in charge, along with Mikhel, referring throughout his testimony to being directed by Mikhel and Mr. Kadamovas.

3.    Altmanis' testimony was also the only evidence of who actually committed the homicides.

4.    These considerations were especially relevant in the penalty phase, where the jury had to assess Mr. Kadamovas' moral culpability and compare his actions to the other members of the conspiracy. The jury needed to determine whether Mr. Kadamovas was among the worst of the worst and thus deserving of the death penalty or, by contrast, someone who was a follower, taking orders, and easily manipulable.

5.	The translation of Altmanis' testimony distorted the evidence by making him seem more credible than he was.

6.	Mr. Kadamovas' inability to hear Altmanis speaking in Russian exacerbated this problem, as he was unable to identify problems with Altmanis' statements and alert his counsel.

S.	These constitutional violations constitute a structural defect and warrant the granting of this motion without any further showing of prejudice. Even if the structural defect does not warrant reversal of the convictions, in light of the unique nature of the death sentence, the sentence should be reversed.

T.	The error substantially prejudiced defendant, rendered the trial fundamentally unfair, eroded the reliability of the jury's verdicts and had a substantial and injurious effect on the verdicts.

167

**CLAIM 12 FAILURE TO INSTRUCT ON DURESS DEFENSE**

Jurijus Kadamovas' conviction on Count 6 of the Second Superseding Indictment (conspiracy to escape) is unlawfully and unconstitutionally imposed, in violation of the Fifth and Sixth Amendments to the United States Constitution, because the jury was not instructed, and was prohibited from considering, the defense of duress. This error also caused the death sentence to be unlawfully and unconstitutionally imposed, in violation of the Fifth, Sixth, and Eighth Amendments to the United States Constitution, because the escape conspiracy conviction was used as aggravation at the penalty phase trial, and the jury did not consider duress as mitigation. This error violated Mr. Kadamovas' constitutional rights to due process, to a fair trial, to present a defense, to a jury determination, and to a reliable, non-arbitrary sentencing procedure. The incomplete and defective instructions had the effect of lightening the government's burden of proof at the guilt-phase trial and preventing the full consideration of mitigating inferences at the penalty-phase trial. *In re Winship*, 397 U.S. 358 (1970); *Eddings v. Oklahoma*, 455 U.S. 104 (1982); *United States v. Kuok*, 671 F.3d 931, 947-50 (9th Cir. 2012); *United States v. Contento-Pachon*, 723 F.2d 691 (9th Cir. 1984).

The following facts and allegations, among others, support this claim:

A.      Count Six of the Second Superseding Indictment charged Mr. Kadamovas, along with Mikhel and the severed co-defendant Krylov, with conspiracy to

escape, a violation of 18 U.S.C. § 371. The allegations stemmed from events that occurred at the Metropolitan Detention Center (MDC) in 2002-2003.

1.      Evidence introduced at trial demonstrated that, in early 2003, Mikhel possessed a virtual hardware store of tools in his cell on the fifth floor of the MDC and was digging through the wall of his cell towards an adjacent stairwell. Tr. 12/06/06, 87-88, 179-96; Tr. 12/07/06 at 51-52. Mikhel made statements during later interviews that he was, indeed, planning an escape. Ex. 88 (Battley memo 7/15/03).

2.      Mr. Kadamovas' cell on the ninth floor, however, held no contraband relating to any escape attempt, no tools, no digging instruments, no cell phones. Tr. 12/06/06 at 93, 175; Tr. 12/07/07 at 45. Although that cell, like Mikhel's, was next to the stairwell, no evidence of any digging into the stairwell, and no damage to the wall, was found in Mr. Kadamovas' cell. Tr. 12/06/06 at 113, 175.

3.      Further details about the conspiracy to escape evidence are set forth in the allegations relating to Claim 15 (Suppression of Evidence Relating to Confidential Informant) and Claim 16 (False Evidence Relating to Escape Conspiracy) and those allegations are incorporated by this reference.

4.      Trial counsel for Mikhel eventually conceded the conspiracy to escape charge, noting that the "remarkably intrica[te]" planning was "typical of Mr. Mikhel." Tr. 01/11/07 at 118.

5.     As to Mr. Kadamovas, however, evidence of his involvement in the conspiracy to escape was virtually nonexistent. As noted, no tools were found in his cell, no digging into the walls was discovered, no tunneling into the stairwell had been attempted. Mikhel himself said: "Kyrlov [sic] and Kadamovas . . . had nothing to do with the planning." Ex. 89 (Battley memo 07/15/03). Mr. Kadamovas was on the ninth floor of the jail, separated from the planning, tool-smuggling, and digging going on four floors below on the fifth floor. None of the witnesses active outside the jail, including Sabrina Tuinan,[17] had any involvement with, or contact with, Mr. Kadamovas.

B.     To establish the defense of duress, a defendant must show that "(1) he was under an immediate threat of death or serious bodily injury, (2) he had a well-grounded fear that the threat would be carried out, and (3) he had no reasonable opportunity to escape" the threatened harm. *Kuok*, 671 F.3d at 947.

C.     At trial, the evidence demonstrated a prima facie case of duress. Indications

---

[17] Despite the spelling of Tuinan in the transcript, the actual name of this prosecution witness, at the time, was Sabrina Tynan. Ex. 83 (Tynan dec.).

of a prima facie case include the following evidence:

1.     The evidence introduced at trial, particularly the testimony of Altmanis, established that Mikhel was a cruel and vicious individual capable of murder.

2.     Mikhel was paying off various inmates in the jail, exercising control and influence, and those payments included money to Mr. Kadamovas. Tr. 12/07/06 at 65-66. This payment to Kadamovas was intended to control him, the same means of control Mikhel used to manipulate Kadamovas on the outside. Ex. 9 (Krausz dec.); Ex. 1 (Volynsky dec.).

3.     The testimony of Billy Parker indicated that Mikhel planned to kill any guards who prevented his escape. Tr. 12/06/06 at 29-31.

4.     In order to protect Parker from Mikhel's wrath, authorities removed Parker from his cell in the jail and put him on suicide watch in order to disguise the situation. Tr. 12/06/06 at 34-35.

5.     According to Sabrina Tuinan, the escape plan was solely Mikhel's. Tr. 12/08/06 at 80-81.

6.     Other evidence demonstrated Mikhel's control over individuals and his ability to manipulate and influence by bribe or by threat. New evidence supports this trait even further. Witnesses state, "It was clear that Mikhel was the

171

leader among them. He seemed much smarter than Yuri . . . . Mikhel had language and intellectual skills that Yuri lacked." Ex. 33 (Zadorozny dec.) ¶ 17.

7. In the subsequent trial of Krylov, where the evidentiary record was substantially similar, a duress instruction was requested and given to the jury resulting in the acquittal of the conspiracy to escape charge. Ex. 100 (Krylov duress instr.); Ex. 97 (Krylov Trial Tr. 04/26/07) at 25; Ex. 101 (Krylov Trial Tr. 04/19/07).

D. By failing to instruct on duress, the trial court erred. The error prevented the jury from properly considering the defense of duress.

1. The duress instruction given to the jury in the Krylov trial on a substantially similar evidentiary record, is included as an Exhibit. Ex. 100 (Krylov duress instr.). Evidence of Krylov's direct involvement in the escape conspiracy was vast as compared to that against Mr. Kadamovas. Tr. 12/06/06, 87-88, 179-96; Tr. 12/07/06 at 51-52; Tr. 12/06/06 at 93, 175; Tr. 12/07/07 at 45.

2. A proper duress instruction would have told the jury the three elements of the duress defense and allowed the jury to decide whether the evidence supported such a theory.

E. During the penalty phase, the government took full advantage of the conviction on Count Six by using the threat of escape as aggravating evidence and evidence of future dangerousness. Tr. 02/09/07 at 36-37. In making this assertion,

the prosecution made no distinction between the two defendants, telling the jury that the planned escape showed that the only way to guarantee that the defendants would not someday walk the streets to kill again was to execute them. *Id.* at 36-38. "And would you be surprised if you picked up a newspaper five years from now, ten years from now, and found out that he had escaped from custody. You wouldn't be surprised in the least, would you?" *Id.* at 151.

F.      Co-defendant Krylov was acquitted of the conspiracy to escape charge because the court in his trial, unlike the court in Mr. Kadamovas' trial, properly gave a duress instruction. Ex. 100 (Krylov duress instr.); Ex. 97 (Krylov Trial Tr. 04/26/07) at 25.

G.      The Krylov jury concluded that the duress was a significant mitigating factor, and six of the twelve jurors in that trial found that the defendant "was under unusual and substantial duress, regardless of whether the duress was of such a degree as to constitute a defense." Ex. 102 (Tr. 05/22/07 at 27-28).

H.      Trial counsel failed to explicitly request a duress instruction. Trial counsel's lack of a specific request for a duress instruction does not prevent the consideration of this claim for the following reasons, among others:

1.      The trial court had an independent duty to instruct the jury on the principles of law that guided the jury's decisions.

173

2. The failure of trial counsel to request a duress instruction was unreasonable and constituted ineffective assistance of counsel in violation of the Sixth Amendment. The allegations set forth in Claim 20 (Ineffective Assistance of Counsel: Conspiracy to Escape) are incorporated by this reference.

3. The failure to give a duress instruction and allow the jury to consider a duress defense to the conspiracy to escape charge was plain error.

I. On appeal, Mr. Kadamovas' appellate counsel did not raise this issue. The failure to raise the issue in the appeal does not prevent consideration of this claim for the following reasons, among others:

1. Exceptional circumstances, including the fact that this is a capital case, warrant consideration of this issue regardless of any procedural irregularity.

2. Changes and developments in the law favor consideration of this claim.

3. To the extent that the actions of appellate counsel restrict consideration of this claim, appellate counsel's actions and inactions constituted ineffective assistance of counsel in violation of the Sixth Amendment, to Mr. Kadamovas' prejudice. Ex. 16 (Coleman dec.). The allegations of Claim 30 (Ineffective Assistance of Counsel: Appellate Proceedings) are incorporated by this reference.

174

J.      This error constitutes a structural defect and warrants an order vacating the conviction for conspiracy to escape, as well as the death penalty.

K.      The failure to properly instruct regarding the duress defense as to the conspiracy to escape charge substantially prejudiced Mr. Kadamovas, rendered the trial fundamentally unfair, eroded the reliability of the jury's verdicts on Count 6 and the penalty, and had a substantial and injurious effect on the verdicts.

**CLAIM 13 IMPROPER USE OF A CONFIDENTIAL INFORMANT**

Jurijus Kadamovas' conviction on Count 6 and the death sentence are unlawfully and unconstitutionally imposed, in violation of the Fifth, Sixth, and Eighth Amendments to the United States Constitution, in that the government unlawfully used a confidential informant to secure information from Mr. Kadamovas while Mr. Kadamovas was represented by counsel, and that information was used against him in the government's guilt and sentencing presentations. *Massiah v. United States*, 377 U.S. 201 (1964); *Maine v. Moulton*, 474 U.S. 159 (1985); *United States v. Henry*, 447 U.S. 264 (1980).

The following facts and allegations, among others, support this claim:

A.    Count 6 of the Second Superseding Indictment charged Mr. Kadamovas, along with Mikhel and the severed co-defendant Krylov, with conspiracy to escape, a violation of 18 U.S.C. § 371. The allegations stemmed from events that occurred at the Metropolitan Detention Center (MDC) in 2002-2003.

B.    The only evidence meaningfully linking Mr. Kadamovas to the escape attempt was the testimony of Jose A, who had already made a deal to inform and cooperate with the government and testified about discussions with both Mr. Mikhel and Mr. Kadamovas.

C.    As outlined in Claim 15 (Suppression of Evidence Relating to Confidential Informant), Jose A was, pursuant to an agreement with the authorities, operating as

a confidential informant in the MDC in 2002-2003, for which he received benefits, including undisclosed benefits. The facts and allegations set forth in Claim 15 are incorporated by this reference.

D.    In his trial testimony, Jose A claimed to have had a conversation with Mr. Kadamovas where they discussed the escape plan. According to Jose A, Mr. Kadamovas "told me a little bit . . . he was supposed to like make a hole and they were supposed to squeeze out of there and they were all supposed to go out into the stairwell and meet at a certain time." Tr. 12/08/06 at 149.

E.    When Jose A supposedly spoke with Mr. Kadamovas, Mr. Kadamovas was in jail awaiting trial in a death penalty case. He had a right to the assistance of counsel for trial and sentencing proceedings. The government was constitutionally prohibited from interfering with his right to counsel. *See generally Brewer v. Williams*, 430 U.S. 387 (1977); *Mempha v. Rhay*, 389 U.S. 128 (1967).

F.    The government interfered with Mr. Kadamovas' right to counsel by having its confidential informant, Jose A, secure information from Mr. Kadamovas while counsel was not present and then using that information against him in both the guilt phase and penalty phase of his trial. *See United States v. Henry*, 447 U.S. 264, 273-74 (1980).

G.    Trial counsel failed to explicitly object to the testimony of Jose A regarding the statements purportedly made to him by Mr. Kadamovas. Trial counsel's failure

177

to object does not prevent the consideration of this claim for the following reasons, among others:

1. The government suppressed information regarding the activities and obligations of this confidential informant, misleading the defense. The defense was not aware of the extent of Jose A's activities and did not, consequently, have the factual basis for an objection.

2. In the alternative, the failure of trial counsel to object to the testimony of Jose A was unreasonable and constituted ineffective assistance of counsel in violation of the Sixth Amendment. The allegations set forth in Claim 20 (Ineffective Assistance of Counsel: Conspiracy to Escape) are incorporated by this reference.

H. On appeal, Mr. Kadamovas' appellate counsel did not raise this issue. The failure to raise the issue in the appeal does not prevent consideration of this claim for the following reasons, among others:

1. The factual record was inadequate to raise the issue, given the suppression of evidence by the government and the inadequacy of defense trial counsel.

2. Exceptional circumstances, including the fact that this is a capital case, warrant consideration of this issue regardless of any procedural irregularity.

3. To the extent that the actions of appellate counsel restrict consideration of this claim, appellate counsel's actions and inactions constituted ineffective assistance of counsel in violation of the Sixth Amendment, to Mr. Kadamovas' prejudice. Ex. 16 (Coleman dec.). The allegations of Claim 30 (Ineffective Assistance of Counsel: Appellate Proceedings) are incorporated by this reference.

I. The use of a confidential informant to elicit incriminating and aggravating information from Mr. Kadamovas, and the introduction of that testimony at trial, substantially prejudiced defendant, rendered the trial fundamentally unfair, eroded the reliability of the jury's verdicts and had a substantial and injurious effect on the verdicts.

## CLAIM 14 FAILURE TO DISCLOSE NATALYA SOLOVYEVA'S DIARY

Jurijus Kadamovas' convictions and sentence are unlawfully and unconstitutionally imposed, in violation of the Fifth, Sixth, and Eighth Amendments to the United States Constitution because the government suppressed Natalya Solovyeva's diary, Ainar Altmanis' diary, and Aleksejus Markovskis' day planner in violation of the constitutional principles set forth in *Brady v. Maryland*, 373 U.S. 83 (1963) and its progeny. Only two days before Mr. Kadamovas' girlfriend and co-defendant Natalya Solovyeva testified, the government disclosed an incomplete version of her diary to defense counsel. The government gave defense counsel photocopies of some entries of the handwritten diary. The government also gave defense counsel English-language summaries of some entries. However, the government did not disclose a complete English translation of the diary, nor did it disclose copies of the complete handwritten, Russian-language diary. Further, the material the government did turn over came too late to be useful to defense counsel. In addition, the government never disclosed Ainar Altmanis' personal diary, which the government discovered in a search of his residence. And the version of Aleksejus Markovskis' day planner that the government disclosed is almost entirely redacted and, therefore, unusable. The government's late disclosure of an incomplete version of Solovyeva's diary, failure to ever disclose Altmanis' diary, and failure to disclose nearly all of the

information in Markovskis' planner violated its constitutional obligations under *Brady* and its progeny, denying Mr. Kadamovas due process, a fair trial, the effective assistance of counsel, the right to confront the evidence against him, and the right to a reliable sentencing proceeding. *Banks v. Dretke*, 540 U.S. 668, 703 (2004); *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999); *Kyles v. Whitley*, 514 U.S. 419, 434 (1995); *United States v. Obagi*, 965 F.3d 993, 998 (9th Cir. 2020); *United States v. Villa*, 503 F. App'x 487, 489 (9th Cir. 2012); *United States v. McDuffie*, 454 F. App'x 624, 626 (9th Cir. 2011); *Maxwell v. Roe*, 628 F.3d 486, 509 (9th Cir. 2010); *United States v. Coppa*, 267 F.3d 132, 139 (9th Cir. 2001); *United States v. Davenport*, 753 F.2d 1460, 1462 (9th Cir. 1985); *United States v. Shelton*, 588 F.2d 1242, 1247 (9th Cir. 1978); *United States v. Miller*, 529 F.2d 1125, 1128 (9th Cir. 1976).

The following facts and allegations, among others, support this claim:

A.     Natalya Solovyeva was a key witness against Mr. Kadamovas, but when Mr. Kadamovas' counsel cross-examined her, they did not have a complete version of the diary she kept because the government failed in its duty to disclose the diary.

1.     As Mr. Kadamovas' girlfriend, with whom he shared a home and was raising a daughter, and as his co-defendant, Solovyeva had an extraordinary amount of information relevant to both the guilt and penalty phases of trial.

181

2.      Solovyeva testified for the government after pleading guilty to one count of conspiracy to commit hostage taking and two counts of hostage taking resulting in death. Dkt. No. 502 (Second Superseding Indictment); Ex. 78 (Solovyeva Sent.); Tr. 11/02/06 at 18.

3.      Solovyeva's testimony provided what the government described as "an amazingly significant, I think, factor in getting the ultimate sentence that we were able to get with respect to Mr. Kadamovas" by conveying what the government argued was "his full character." Ex. 78 (Solovyeva Sent.) at 36. She received a reduced sentence, 180 months, in exchange for her cooperation, *see id.* at 49-53, even though, as the sentencing court noted, "[s]he killed two people," *id.* at 43-44.

4.      On October 31, 2006—two days before Solovyeva's testimony began—the government produced to defense counsel a document that purported to be a copy of Solovyeva's handwritten Russian diary and some English-language summaries of a portion of the contents. Tr. 10/31/06 at 6-11; *see* Ex. 81 (Solovyeva Diary Russian); Ex. 79 (Solovyeva Diary Summaries).

5.      Upon receiving the untranslated diary and summaries, defense counsel Sonia Chahin explained to the court:

> This morning we received some additional discovery from the Government, a FedEx box which contained, among other things, a Russian language diary of a witness who is expected to testify possibly

182

as soon as tomorrow. I have not had a chance to go through it yet and once we go through it -- we'll have to go through it with an interpreter. It may be necessary for us to request that the Court postpone our cross examination of this witness until we've had a chance to look at this.

Tr. 10/31/06 at 6.

6. Prosecutor DeWitt stated:

Just to let you know what the situation is, we just got these diaries ourselves on Friday. It was my understanding that they were being translated, and in fact what we got was not a translation of the documents but was a summary of them done by a translator on audiotape. We spent about, I don't know, close to 20 hours this weekend typing up those summaries and we made as quickly as we possibly could a copy of the actual diaries themselves as well as the summaries of the diaries available to them as soon as we could get them copied.

*Id.* at 8.

7. In fact, the diary had been in the government's possession much earlier.

a. Solovyeva's attorney has recently explained that a few days before Solovyeva was scheduled to testify, an Assistant United States Attorney or a federal agent called her attorney, Michael Crain, asking for the diary. *See* Ex. 80 (Crain dec.) ¶ 5. Crain located the diary and an FBI agent, James Davidson, went to Crain's house to collect it from him. *Id.* ¶¶ 5-6.

b. The government knew about the diary and knew to call Crain to take (or retake) possession of the diary, prior to the partial disclosure of the diary.

183

8.      DeWitt offered her interpretation of the diary to the trial court, saying, "I want to note for the record, because I think this is important, these are diaries that were written essentially by a woman in her twenties, her personal diaries, and they were written before any of the events that happened involving this case, and I --" Tr. 10/31/06 at 8. The trial court then posited, "Ninety-nine percent of it is totally irrelevant to this case," to which DeWitt responded, "It is, and I've tried to advise them, give them a heads up as to what I think could even be wildly in my imagination relevant because there's some negative stuff that she makes -- comments she makes. So --." *Id.* at 8-9.

9.      The parties discussed delaying Solovyeva's testimony, or at least cross-examination, to allow Mr. Kadamovas' trial counsel time to have the diaries translated and review them. *Id.* at 6-11. The trial court expressed concern about a scheduling conflict with another courtroom: "Well the fairness has nothing to do with it right now. I've got a bigger problem, and that is there's a trial going on next door in which Mr. Crane [sic] is the attorney for Ms. Solovyeva, and as such Judge Klausner has indicated he wants to go forward with his trial." *Id.* at 9. The trial court told Chahin, "You're going to have to look at those diaries tonight," to which Chahin responded, "Your Honor, the problem is that they're in Russian and there are only partial translations. I don't think it's feasible for us to be required to

184

review these in their entirety in a foreign language overnight and then be prepared to cross examine possibly tomorrow." *Id.* at 10-11.

10.    In response to Chahin's request to delay the cross-examination, the trial court said:

> Yeah, but you see you're forgetting that there's a trial going on next door that Mr. Crane is the attorney on another defendant and he's also the attorney on Ms. Solovyeva.
>
> See, I have been yelling and screaming at my colleagues over the last 25 years that the CJA panel is too small and because of its smallness has created too many conflicts in the judicial system and it's caused a bottleneck. And I have advocated for 22 years to increase the size of the CJA panel four times so that you have more attorneys, because to me it's an exclusive club of defense lawyers that try these cases. And I have a readout on everybody that's on the CJA panel and most CJA attorneys are making 300 to 800,000 dollars a year, which I think is obscene compared to the lawyers in the County of Los Angeles. I think that it's -- personally I think it's scandalous and that's why I've advocated that they open up the CJA panel. And this case illustrates it and this situation illustrates it.

*Id.* at 11-12.

11.    Chahin again explained to the trial court, "Your Honor, the problem that I find myself in as an advocate is that I've been given these documents this morning and I'm potentially going to examine her on them tomorrow." *Id.* at 12.

12.    The trial court responded, "Well then you're going to have to go next door and tell Judge Klausner that he's going to have to stop his trial. You're going to have to tell him to stop the locomotive." *Id.* at 12. Without hearing from Chahin

185

again, the trial court concluded the discussion by saying, "Well I'm so happy that I'm retiring. . . . All I know is I'm not going to interrupt my trial, because I've been going on this thing and everybody else has to defer to me." *Id.* at 14-15. This discussion, in which the trial court said that "the fairness has nothing to do with it" because the court had "a bigger problem"—scheduling—and explained that "I'm not going to interrupt my trial" because "everybody else has to defer to me" made it explicit that the trial court was more concerned with his own schedule, and even other judges' schedules, than the need for counsel to adequately prepare for a death penalty case.

13.     The next day, Chahin told the court:

Your Honor, with respect to the Natalya diary that I spoke to the Court about yesterday, I just wanted to give to the Court some more information. The diary is 437 pages written in longhand in Russian. Okay. We have summaries, but we don't have a complete review of what those 437 pages are.

I have reviewed the summaries, which the Government has transcribed after listening to cassettes prepared by a court interpreter. We don't have copies of those tapes. So I guess the first thing that we would like to do is obtain copies of those tapes from the Government and be able to listen to them.

In addition to that, I think that we need to be able to have an interpreter either read to us or translate for us pertinent portions of the diary. The Government has characterized this as a diary of the folly of a young girl outside of the time period of this case. But there are

186

numerous statements in there which go to credibility, bias, and motive.
. . . .

So there are, as I indicate, repeated statements which are relevant for our ability to be able to cross-examine her.

Tr. 11/01/06 at 4-5.

14.    Chahin viewed the "English transcription of some select parts of the journal" as "incomplete and suspect" and not "reliable or helpful." Ex. 11 (Chahin dec.) ¶ 27.

15.    In response to Chahin's concerns, the trial court said, "You will cross-examine her at the conclusion of the Government's case. But I'll permit you to recall her to complete your cross-examination once you've reviewed the diary. So you will have to be prepared to cross-examine her at the conclusion of the Government's direct examination." Tr. 11/01/06 at 5-6.

16.    Chahin responded, "Your Honor, the problem with that is that information contained in the diary may affect the manner in which we structure this cross-examination." *Id.* at 6. To this, the trial court responded, "Well, there is nothing I can do about it. That's just the way it's got to be, because of the fact that her attorney is engaged in a capital case before Judge Klausner. . . . So now you move on. You've made the record. We go." *Id.* at 6-7. Again, the trial court was explicit about its lack of concern for giving counsel time to prepare for a death penalty case. The court's instance that "there is nothing I can do about it" is

obviously false—there is no question that the trial court could have rearranged the schedule to ensure Mr. Kadamovas' rights were adequately protected.

17. As a consequence of the trial court's insistence that "[w]e go," when Solovyeva testified and was cross examined, trial counsel had only photocopies of the Russian-language diary (which was useless to trial counsel, as neither of them could read Russian) and the government's English-language summaries of some entries (which gave only a limited picture of the diary's contents, and which Chahin did not view as reliable). Trial counsel did not have a complete translation of the diary prior to Solovyeva's testimony and cross-examination. Although Mr. Kadamovas himself would have been able to understand the Russian-language diary—as he could read Russian and was familiar with his girlfriend's handwriting—he did not have an opportunity to review the portions counsel received.

B. To establish a *Brady* claim, the evidence at issue must have been suppressed, either willfully or inadvertently; the evidence must be favorable to the defendant, either because it is exculpatory, mitigating, or impeaching; and prejudice must have ensued. *Maxwell v. Roe*, 628 F.3d 486, 509 (9th Cir. 2010) (citing *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999)).

1. A late disclosure can constitute suppression. *See United States v. Obagi*, 965 F.3d 993, 998 (9th Cir. 2020); *United States v. McDuffie*, 454 F. App'x

188

624, 626 (9th Cir. 2011); *United States v. Davenport*, 753 F.2d 1460, 1462 (9th Cir. 1985).

2.    A late disclosure is more likely to constitute suppression if, as here, the trial judge did not allow a continuance after disclosure. *See United States v. Villa*, 503 F. App'x 487, 489 (9th Cir. 2012); *United States v. Shelton*, 588 F.2d 1242, 1247 (9th Cir. 1978); *United States v. Miller*, 529 F.2d 1125, 1128 (9th Cir. 1976).

C.    Solovyeva's diary was suppressed. The disclosure was late and the government did not disclose either the complete diary in Russian or a complete English translation:

1.    The government provided English-language summaries but did not provide summaries of each entry. The summaries are incomplete and misleading. Exs. 11 (Chahin dec.) ¶ 27, 82 (Solovyeva Diary English).

2.    Further, the government provided English-language summaries of entries that do not appear in the copy of the handwritten Russian version they disclosed. It appears that the government must have had these entries, because it created English-language summaries of them, but it also appears that the government did not provide them to trial counsel. Trial counsel did not recognize this omission.

189

3.      Although it is clear that some pages of the diary have never been disclosed, it is not clear precisely how many pages have never, to this day, been disclosed to defense counsel.

4.      As to the portions of the diary that the government did disclose, they did so only two days before Solovyeva testified.

D.      Solovyeva's diary provided material, favorable evidence and inferences to Mr. Kadamovas. Its suppression prejudiced him because it contained information that could have been used to impeach Solovyeva, and also contained important mitigating evidence and inferences that would have impacted the penalty phase presentation and deliberations.

1.      As to impeachment, the diary provides evidence that Solovyeva was involved in criminal activity unrelated to Mr. Kadamovas. The diary also provides evidence of her own desperate desire for money.

2.      As to mitigation, the diary provides a glimpse at Mr. Kadamovas' life before Mikhel. The diary revealed Mr. Kadamovas to be someone who worked hard, Doing menial labor as a mover and carpet cleaner, and struggled to get by. There are many references to Mr. Kadamovas' being busy with work and working long hours. Entries also emphasized that he was engaged in creative endeavors like making music and building aquariums and was trying to establish an aquarium business. There are references to Solovyeva's concern that they do not have

190

enough money, and the pressure she put on Mr. Kadamovas about money. And the diary contains Solovyeva's observations of Mr. Kadamovas being taken in by Mikhel. Later diary entries show how Mr. Kadamovas was dominated by Mikhel and becoming more and more subject to his influence, specifically based on Mikhel's apparent interest in the aquarium business. Indeed, Solovyeva complains about how much time Mr. Kadamovas begins to spend with Mikhel and that he is more interested in Mikhel than her. *See* Ex. 82 (Solovyeva Diary English).

3. The prosecution acknowledged that details about Mr. Kadamovas' life and his relationship to Mikhel were important factors in determining whether Mr. Kadamovas would be sentenced to death, and that Solovyeva provided the most important evidence as to these factors. As prosecutor DeWitt explained at Solovyeva's sentencing, when arguing for a drastically reduced sentence, Solovyeva's testimony was

> an amazingly significant, I think, factor in getting the ultimate sentence that we were able to get with respect to Mr. Kadamovas. . . . It would have been very easy for Mr. Kadamovas to say, 'I was just following along with Mr. Mikhel. I was just following his lead. He was this evil, horrible person, and I was' – And there was some evidence to suggest that might be true. We didn't believe it was true. But it was through Ms. Solovyeva's testimony about how he treated her and what kinds of decision-making that he was involved in and what she was able to observe.

Ex. 78 (Solovyeva Sent.) at 36.

191

4.      Yet when explaining the prosecution's late disclosure of the diary, prosecutor DeWitt dismissed it as unimportant, even though it touched on precisely the issues she emphasized during Solovyeva's sentencing. Tr. 10/31/06 at 8-9. Characterizing the diary as unimportant is flatly incorrect. Solovyeva was living with Mr. Kadamovas. Her observations of his behavior were important both for the development of mitigating evidence and as a defense to the prosecution's assertions regarding his character and behavior. The prosecution was able to characterize Mr. Kadamovas as they did in part because trial counsel was not able to use Solovyeva's diary to counter their characterizations.

5.      If Mr. Kadamovas' trial counsel had been able to review Solovyeva's diary before cross examining her, the cross examination would have been an ideal opportunity to begin to introduce mitigating evidence and counter the prosecution's portrayal of Mr. Kadamovas. Beginning to present this evidence in the guilt phase would have been beneficial, even if the evidence ultimately would have been most relevant to—and, indeed, crucial to—the jury's decision about whether to impose the death penalty.

E.      Ainar Altmanis was also a key witness against Mr. Kadamovas. His diary was also suppressed, and to this day has not been turned over to counsel for Mr. Kadamovas. Its suppression prejudiced Mr. Kadamovas because it contained information that could have been used to impeach Altmanis, whose credibility was

192

a major issue at the trial. The allegations set forth in Claim 11 (Misleading and Inaccurate Translation at Trial) are incorporated by reference.

F. Aleksejus Markovskis was also a key witness against Mr. Kadamovas. Although the government disclosed his date book to trial counsel, the government redacted nearly all of the information from it, making it completely unintelligible.

G. In addition, audio recordings of Solovyeva's, Altmanis', and Markovskis' calls and visits with family members were not disclosed to the defense.

H. The consideration of this claim should not be constrained or limited by the actions of trial counsel. Trial counsel should have received Solovyeva's complete diary, in addition to a complete translation of the diary, and should have received it more than two days before Solovyeva testified. Trial counsel's lack of a more aggressive and effective cross-examination of Solovyeva, and the lack of effective use of the inferences in the diary as part of the mitigation case do not prevent the consideration of this claim for the following reasons, among others:

1. The government's improperly late and incomplete disclosure of the diary excuses any attempt to argue that the performance of defense counsel was inadequate. As a matter of fairness and equity, defense counsel's response, even if imperfect, does not excuse the misconduct.

2.    The government's partial English transcription was misleading in that it misconstrued portions of the diary, emphasized selective aspects while ignoring others, did not include all the entries, and did not include an actual translation.

3.    Defense counsel were ineffective in their failure to challenge the incomplete disclosure, failure to move for full disclosure, and failure to recall Solovyeva in order to impeach her damaging testimony and illicit favorable mitigating evidence. The allegations set forth in Claim 19 (Ineffective Assistance of Counsel: Guilt Phase Trial) and Claim 21 (Ineffective Assistance of Counsel: Penalty Phase Trial) are incorporated by this reference.

I.    Trial counsel should have had the opportunity to structure the entire cross examination of Solovyeva around the diary, as Chahin argued to the trial court. Tr. 11/01/06 at 5-7. Getting the diary so late, and being denied a continuance, prevented them from doing so.

J.    Further prejudice is shown because trial counsel should have had the opportunity to cross examine Altmanis and Markovskis based on the information contained in their diary and planner.

K.    The error substantially prejudiced Mr. Kadamovas, rendered the trial fundamentally unfair, eroded the reliability of the jury's verdicts and had a substantial and injurious effect on the verdicts.

## CLAIM 15 SUPPRESSION OF EVIDENCE RELATING TO CONFIDENTIAL INFORMANT

Jurijus Kadamovas' conviction on Count 6 and the death sentence are unlawfully and unconstitutionally imposed, in violation of the Fifth, Sixth, and Eighth Amendments to the United States Constitution, in that the government suppressed, withheld, failed to disclose, or produced in a tardy, improper fashion, material evidence and information that would have led to the discovery of material evidence favorable to Mr. Kadamovas relating to the conspiracy to escape charge and the key prosecution witness, a confidential informant. The suppression, withholding, and/or late disclosure of evidence and information violated Mr. Kadamovas' constitutional and statutory rights to a fair trial, due process, confrontation, effective assistance of counsel, and a reliable penalty determination, to his prejudice. *Kyles v. Whitley*, 514 U.S. 419 (1995); *United States v. Bagley*, 473 U.S. 667 (1985); *Giglio v. United States*, 405 U.S. 150 (1972); *Brady v. Maryland*, 373 U.S. 83 (1963); *United States v. Blanco*, 392 F.3d 382 (9th Cir. 2004); *Benn v. Lambert*, 283 F.3d 1040 (9th Cir. 2002).

The following facts and allegations, among others, support this claim:

A.     Count 6 of the Second Superseding Indictment charged Mr. Kadamovas, along with Mikhel and the severed co-defendant Krylov, with conspiracy to escape, a violation of 18 U.S.C. § 371. The allegations stemmed from events that occurred at the Metropolitan Detention Center (MDC) in 2002-2003.

195

1.      In March of 2003, approximately a year after the arrest of defendants Mikhel, Kadamovas, and Krylov, an inmate at the MDC alerted the staff at the jail that a number of inmates were smuggling items into the jail and possibly planning an escape attempt.[18] Tr. 12/06/06 at 33-35, 80-85; *see* Ex. 88 (Battley memo 4/29/03). Authorities locked down the jail, began an investigation, and searched a number of cells. Tr. 12/06/06 at 87-93.

2.      In cell number 518, on the fifth floor of the facility, the cell that Mikhel shared with an inmate named Kim, authorities found a cache of tools, later referred to at trial by the prosecutor as a "virtual hardware store." Tr. 01/11/07 at 50; *see* Tr. 12/06/06 at 87-88, 179-96. The items found in the cell included: bolt-cutters, hacksaws, hacksaw blades, wrenches, tin-snips, screwdrivers, gloves, a video camera, cell phones, paint, brushes, and other items. Tr. 12/06/06 at 157, 179-96; Trial Exs. 800-84; Ex. 88 (Battley memo 04/29/03). Authorities also noted that an area of wall behind a mirror had been dug out, forming a hole one by two feet in size. Tr. 12/06/06 at 88; Tr. 12/07/06 at 51-52. The prosecution's theory was that Mikhel, the resident of cell number 518, was attempting to dig through the wall into a neighboring stairwell. Tr. 12/06/06 at 107; Tr. 12/07/06 at 107-08, 189.

_____

[18] The information from this inmate was directed at events and prisoners on the fifth floor and did not involve Mr. Kadamovas, who was housed on the ninth floor at the time.

Mikhel made statements during later interviews that he was, indeed, planning an escape. Ex. 96 (Mikhel 302); Ex. 89 (Battley memo 7/15/03).

3. Mr. Kadamovas' cell on the ninth floor, number 913, which he too shared with another inmate, was also searched. Tr. 12/06/06 at 102, 134; Tr. 12/07/07 at 45. However, no contraband relating to any escape attempt—no tools, no digging instruments, no cell phones—was found. Tr. 12/06/06 at 45, 93, 175; Tr. 12/07/06 at 45. Although that cell, like Mikhel's, was next to the stairwell, no evidence of any digging into the stairwell, and no damage to the wall, was found. Tr. 12/06/06 at 102-03, 113, 175.

4. At the trial of Mikhel and Kadamovas, in support of the allegations in Count 6, the prosecution presented testimony regarding the items found in Mikhel's cell, along with the testimony of inmates involved in the planning and smuggling of tools and cell phones. One former inmate, Billy Parker,[19] testified as to the discussions he had with Mikhel and an invitation to join in the planned escape. Tr. 12/06/06 at 28-31. The wife of a former cellmate of Mikhel's, Sabrina Tuinan, testified as to her involvement from outside the jail, including purchasing tools, recruiting her brother-in-law to smuggle those tools into the jail, and her

---

[19] This prosecution witness was also known as Harold Wilson. Tr. 12/06/06 at 23-24.

197

husband's admissions regarding the plans. Tr. 12/08/06 at 72-94, 99-126. Trial counsel for Mikhel eventually conceded the conspiracy to escape charge, noting that the "remarkably intrica[te]" planning was "typical of Mr. Mikhel," but pointing out that the planned escape was a non-violent one and that no guns had been found. Tr. 01/11/07 at 118.

5. As to Mr. Kadamovas, however, evidence of his involvement in the conspiracy to escape was virtually nonexistent. No tools were found in his cell, no digging into the walls was discovered, no tunneling into the stairwell had been attempted. Tr. 12/06/06 at 45, 93, 175; Tr. 12/07/06 at 45. Mr. Kadamovas was on the ninth floor of the jail, separated from the planning, tool-smuggling, and digging going on four floors below on the fifth floor. None of the witnesses active outside the jail, including Sabrina Tuinan, had any involvement with, or contact with, Mr. Kadamovas.

6. Nonetheless, the prosecution argued that Mr. Kadamovas was part of the conspiracy. The main evidence for this argument—indeed the only evidence meaningfully linking Mr. Kadamovas to the escape planning—was the testimony of Jose A,[20] an inmate who had moved all around the jail, on numerous floors, had

---

[20] This witness testified under his name at trial and no attempt was made to disguise his identify. Nevertheless, given the nature of the role of this witness, "Jose A" will be used instead of his name.

198

already made a deal to inform and cooperate with the government, and testified as to discussions with both Mikhel and Kadamovas. As to Mr. Kadamovas, Jose A, who spoke no Russian, claimed that Mr. Kadamovas, who spoke little English, had discussed the escape plan and "told me a little bit . . . he was supposed to like make a hole and they were supposed to squeeze out of there and they were all supposed to go out into the stairwell and meet." Tr. 12/08/06 at 149.

7.    The proof of Mr. Kadamovas' involvement in the planned escape was almost totally dependent on Jose A's testimony of his hearsay conversations with Mr. Kadamovas,[21] and the parties knew it. In summation, the prosecutor relied heavily on Jose A's testimony, *see* Tr. 01/11/07 at 51-52, while Mr. Kadamovas' counsel attacked this witness, pointing out the benefits he had manipulated out of the system and the implausibility of his testimony, Tr. 01/12/07 at 58-60.

8.    The prosecution also took the position, presumably in an attempt to divert suspicion, pile moral indignation on Mr. Mikhel and Mr. Kadamovas, and falsely inflate their purported future dangerousness, that no guards or staff

---

[21] The prosecution additionally introduced a cryptic jail letter from Mr. Mikhel to Mr. Kadamovas, sent almost three weeks *after* the attempted escape was thwarted, and containing vague references to a "big bluff." Trial Exs. 890, 891. The incriminating value of this letter is speculative at best. Aside from the vagueness of its language, the letter was never received by Mr. Kadamovas, and the Ninth Circuit ruled it was improperly admitted in evidence at the trial. *United States v. Mikhel*, 889 F.3d at 1049.

199

members at the MDC were involved in the conspiracy to escape. This position was contrary to a number of statements by inmates and inconsistent with the physical evidence. Nonetheless, the prosecution managed to introduce uncontradicted evidence before the jury that the special investigation into the incident found that no MDC personnel were involved in the planned escape attempt. Tr. 12/06/06 at 98.

9.      The jury returned guilty verdicts for both Mr. Mikhel and Mr. Kadamovas on the conspiracy to escape charge. Tr. 01/17/07 at 17, 24.

B.      With regard to the penalty phase, the prosecution used the conspiracy to escape evidence as a cornerstone of the case in aggravation, a key component of their argument for the death penalty. The prosecution asserted that the escape attempt showed future dangerousness. Tr. 02/09/07 at 36-37. In making this assertion, the prosecution made no distinction between the two defendants, telling the jury that the planned escape showed that the only way to guarantee that the defendants would not someday walk the streets to kill again was to execute them:

> Would they be willing and able to kill to get out of prison? . . . Of course they would. . .. Would they be willing and able to do that again? You saw the sheer magnitude of the sophistication of the MDC escape attempt; the tools that they brought in; the people that they drew into the plot . . ..

Tr. 02/09/07 at 36-37.

200

It would only be a matter of time before the defendants exploited yet another weakness in the system. And if they're not executed, they will have nothing but time on their hands to try.

And they will also, ladies and gentlemen, if they're not given a death sentence, they will have absolutely nothing to lose. . ..

*Id.* at 38.

And would you be surprised if you picked up a newspaper five years from now, ten years from now, and found out that he had escaped from custody? You wouldn't be surprised in the least, would you?

*Id.* at 151.

C.    Much of the information regarding the conspiracy to escape allegations was shrouded in mystery because the discovery produced by the prosecution included redacted copies, blocking out names and crucial information, of the investigative memorandum and 302 interviews of those involved. *See, e.g.*, Ex. 88 (Battley memo, 4/29/03).

D.    The government suppressed, withheld, and failed to disclose crucial material evidence or information that would have led to material evidence regarding Jose A. In particular, important impeachment evidence regarding this crucial witness was withheld and suppressed. The government produced some late information and impeachment evidence regarding Jose A (after the defense demanded it), only producing key documents just before, or, indeed, after his testimony.

1.      In 2001, California resident and Mexican national Jose A was charged with conspiracy to distribute of cocaine, a violation of 21 U.S.C. § 846, in another state. On July 12, 2001, Jose A signed a plea agreement and agreed to cooperate with the government. His case was then transferred to the Central District of California, and Jose A was held in the MDC.

2.      Jose A met with government officials on three occasions beginning in October 2001 and was debriefed on drug trafficking activities and other criminal activities. Trial Discovery Bates 76915.

3.      In March 2002, shortly after Jose A first encountered Mikhel at the MDC, his lawyer contacted authorities, requesting a meeting to expand the scope of Jose A's cooperation. Jose A and his attorney met with government authorities shortly thereafter. Trial Discovery Bates 83657-59.

4.      On May 20, 2002, Jose A entered into a new plea agreement, expanding his cooperation with the government. Two pages of the May 2002 plea agreement are submitted as Ex. 98. Included in the agreement was the following:

> Defendant further has expressed an interest in the future to cooperate fully with the USAOS, the Federal Bureau of Investigation and the Drug Enforcement Administration, and, as directed by the USAOS, with any other federal, state, or local law enforcement agency. The cooperation requires defendant to:
> *   *   *
> (d) Act, if requested to do so, in an undercover capacity, including the wearing [of] a recording device and consensual recording of telephone conversations, to the best of defendant's ability in connection with criminal

investigations by federal, state, or local law enforcement authorities, in accordance with the instructions of those law enforcement authorities.

5. Pursuant to his agreement with the authorities, Jose A was operating as a confidential informant in the MDC in 2002-2003.

6. The government produced some minimal discovery relating to Jose A prior to the Kadamovas/Mikhel trial, including two FBI 302s related to interviews about the escape plan, court documents from the federal criminal case relating to the plea agreement and the prosecution's Rule 35 motion to reduce his sentence. Trial Discovery Bates 38765, 39111-14, 62006-09, 76910-22. Documents relating to his housing assignments at the jail, Ex. 92 (Trial Ex. 907), were also disclosed.[22] However, no documents relating to his work as a confidential informant in the jail, his work in other criminal investigations, his debriefing on the cocaine distribution network, his "undercover" actions, or his participation with law enforcement in other matters, was disclosed prior to trial. No documents related to the suspension of his deportation were disclosed prior to trial. Nor was a DEA or FBI file regarding Jose A's activities as an informant produced.

7. During the trial, it became apparent to Mr. Kadamovas' counsel that Jose A had made statements during the autumn of 2002 to government authorities

_____

[22] The housing assignments of Mikhel and Kadamovas were also disclosed. Exs. 90, 91.

and law enforcement about the activities of the "Russians" in the jail and that those statements had not been produced in discovery. Ex. 93 (Chahin ltr 11/28/06). Only after defense counsel demanded disclosure did the prosecutors admit that Jose A had been interviewed on October 10, 2002, by jail and DEA authorities, an interview during which he attempted to peddle information about the "Russians" and potential escape plans in a ploy to reduce his sentence. Ex. 95 (Meyer ltr 12/12/06); *see also* Ex. 94 (Meyer ltr 12/14/06). This disclosure occurred *after* Jose A testified. Portions of the October 10, 2002, interview contradicted, or were inconsistent with, parts of Jose A's testimony. The tardy disclosure of this information prevented the defense from using it effectively in cross-examination and also prevented the defense from following up on the information and using it to further impeach Jose A. The tardy disclosure of this information was prosecutorial misconduct and a violation of defendant's constitutional rights.

8.    In addition to the improper, tardy, and incomplete mid-trial disclosure of the October 10, 2002, interview with Jose A, the government also improperly tardily disclosed select documents relating to Jose A's activities and cooperation agreement(s). On December 12, 2006, the day Jose A testified, the prosecution delivered documents relating to Jose A's interviews and proffers in March and April 2002. Ex. 95 (Meyer ltr 12/12/06). Two days later, the prosecution disclosed information regarding Jose A's statement to a DEA agent. Ex. 94 (Meyer ltr

12/14/06). The tardy disclosure of this information prevented the defense from using it effectively in cross-examination and also prevented the defense from following up on the information and using it to further impeach Jose A. The tardy disclosure of this information was prosecutorial misconduct and a violation of defendant's constitutional rights.

9.    The prosecution, in a further violation of Mr. Kadamovas' constitutional rights, failed to disclose the full extent of the rewards sought by, and given to, Jose A. Importantly, Jose A was given an undisclosed benefit with regard to his immigration status.

a.    Jose A should have been deported after his release from custody. The prosecution was unclear whether he actually asked for immigration benefits. Ex. 94 (Meyer ltr 12/14/06).

b.    Jose A was not deported after his release from custody. Ex. 86 (Mason dec.).

10.    The prosecution, in a further violation of Mr. Kadamovas' constitutional rights, never produced or disclosed:

a.    Information, notes, reports related to the United States Marshal's investigation and search of the MDC, in response to the October 10, 2002, interview, on the following day. *See* Ex. 94 (Meyer ltr 12/14/06).

b.    A report, transcript, or notes of the October 10, 2002, interview between Jose A and authorities. *See* Ex. 94 (Meyer ltr 12/14/06); Trial Discovery Bates 76916-17.

c.    A report, transcript, or notes relating to the three debriefings of Jose A that occurred after October 2001. *See* Trial Discovery Bates 76915.

d.    A report, transcript, or notes of the interview/debriefing that occurred in March-April 2002 which led to the renegotiation of Jose A's plea agreement in May 2002. Ex. 95 (Meyer ltr 12/12/06); *see also* Trial Discovery Bates 83660-62.

11.    The prosecution did not disclose and has suppressed the Confidential Informant file relating to Jose A, including the suitability reports, the suitability reviews, evaluations, interviews, reports of activities, monetary disbursements, and other documents, held by the DEA, the FBI, and possibly other federal law enforcement agencies. Jose A was a Confidential Informant pursuant to the 2001 Attorney General Guidelines Regarding the Use of Confidential Informants (AG Guidelines), which define a Confidential Informant (CI) as "any individual who provides useful and credible information" to a federal law enforcement agency "regarding felonious criminal activities, and from whom [the law enforcement agency] expects or intends to obtain additional useful and credible information regarding such activities in the future." AG Guidelines I.B.6, *quoted in* Office of

Inspector General, Special Report, *The Federal Bureau of Investigation's Compliance with the Attorney General's Investigative Guidelines (Redacted)* (Sept. 2005), https://oig.justice.gov/sites/default/files/archive/special/0509/chapter3.htm.[23] The AG Guidelines require that a suitability determination and report be made regarding any CI, and a file be maintained by the DOJ law enforcement agency involved. That file includes information about the CI, including reports of reliability and truthfulness, criminal record, descriptions of assistance, and other matters. In violation of Mr. Kadamovas' constitutional rights, the prosecution did not produce a copy of this CI file (redacted or otherwise) to the defense.

12.    The prosecution did not disclose and has suppressed the Criminal Division's Office of Enforcement Operations file relating to Jose A and any operation or investigation involving Jose A, including the communications from law enforcement agencies, reports, summaries, evaluations, and other documents. Section 703 of the Department of Justice Criminal Resource Manual states that all requests by investigative agencies to use persons in the custody of the Bureau of Prisons for investigative purposes, "must be submitted in writing," to the Chief of

---

[23] These Guidelines were reissued and amended in late 2006 while the trial was pending but, on this point, remain consistent.

207

the Witness Security and Special Operations Unit, the Office of Enforcement Operations (OEO), Criminal Division. Prior to utilizing a BOP prisoner for any operation, the OEO must approve the use of the inmate and that documentation must be maintained in the file. AG Guidelines, II.D.3. In violation of Mr. Kadamovas' constitutional rights, the prosecution did not produce a copy of the OEO file (redacted or otherwise) to the defense.

E.     The government suppressed, withheld, and failed to disclose crucial material evidence or information that would have led to material evidence regarding the involvement of MDC staff and government employees in the smuggling operations and escape plans in 2002 to 2003. The withholding of this evidence allowed the government to assert that no MDC staff members were involved in the conspiracy, improperly increasing the aggravation related to future dangerousness, and misleading the jury in a crucially important area. The allegations set forth in Claim 16 (False Evidence Relating to Escape Conspiracy) are incorporated by reference.

1.     There were clear indications that staff members of the MDC were involved in the conspiracy. Some indications of this involvement include the following:

a.     Mikhel said about staff involvement, "Follow the drugs and you'll find who was involved." Ex. 89 (Battley memo 7/15/2003) at 2.

208

b.      Thomas Tynan, a crucial participant in the conspiracy and the escape plot, told the FBI investigating agents that staff members were involved in the escape attempt. Ex. 85 (Tynan Interview Notes) at 2, 7; Ex. 84 (Tynan 302) at 2, 4. Tynan observed staff members conversing with Mikhel. Ex. 83 (Tynan dec.) ¶¶ 12, 15.

c.      Battley also noted that the FBI informed him that there were other indications that staff may be involved. Ex. 89 (Battley memo 7/15/03) at 7.

d.      A confidential informant whose name was withheld from the defense identified an Officer McKinnon as being involved in the smuggling of escape tools. Ex. 87 (CI 302).

2.      The government has suppressed and failed to disclose the report of Department of Justice Inspector General Special Agent Paul J. Leonard, who conducted an investigation in the spring of 2003 into the conspiracy and staff involvement in conspiracy. Ex. 87 (CI 302) at 1. In violation of Mr. Kadamovas' constitutional rights, the prosecution did not produce a copy of the Inspector General report.

F.      Section 2255 counsel is currently litigating two pending FOIA lawsuits seeking records and continues to receive records responsive to its FOIA requests as a result of these lawsuits. In particular, the FBI, which initially determined it could

not release any records to counsel, is now set to release approximately 500 pages of records per month. *See* Ex. 124 (FOIA Materials).

G.     The suppression and late disclosure of impeachment evidence relating to the conspiracy to escape charge and the credibility of the confidential informant has a particularly prejudicial impact on the penalty assessment. The government asserted that Mr. Kadamovas would remain a threat in the future because the escape attempt showed that he might someday escape from prison. This gave the jury a completely distorted impression of the conditions in a maximum security federal prison. The penalty assessment was based upon a misperception.

H.     The withholding, suppression, failure to produce, and/or tardy production of this information substantially prejudiced defendant, rendered the trial fundamentally unfair, eroded the reliability of the jury's verdicts and had a substantial and injurious effect on the verdicts.

**CLAIM 16 FALSE EVIDENCE RELATING TO ESCAPE CONSPIRACY**

Jurijus Kadamovas' conviction on Count 6 and the death sentence are unlawfully and unconstitutionally imposed, in violation of the Fifth, Sixth, and Eighth Amendments to the United States Constitution in that the government suppressed, withheld, or failed to disclose material evidence and information that would have led to the discovery of material evidence favorable to Mr. Kadamovas relating to the conspiracy to escape charge, and knowingly allowed false testimony about the conspiracy to escape charge, in violation of the constitutional principles articulated in *Brady v. Maryland*, 373 U.S. 83 (1963); *Napue v. Illinois*, 360 U.S. 264 (1959); and their progeny. The suppression, withholding, and/or late disclosure of evidence and information violated Mr. Kadamovas' constitutional and statutory rights to a fair trial, due process, confrontation, effective assistance of counsel, and a reliable penalty determination, to his prejudice. *Napue*, 360 U.S. 264; *Kyles v. Whitley*, 514 U.S. 419 (1995); *United States v. Bagley*, 473 U.S. 667 (1985); *Giglio v. United States*, 405 U.S. 150 (1972); *Brady*, 373 U.S. 83; *United States v. Blanco*, 392 F.3d 382 (9th Cir. 2004); *Benn v. Lambert*, 283 F.3d 1040 (9th Cir. 2002).

The following facts and allegations, among others, support this claim:

A.     On March 7, 2003, a plot to escape from the Metropolitan Detention Center (MDC) in Los Angeles was discovered. Tr. 12/06/06 at 78. Mr. Kadamovas and his co-defendants Mikhel and Krylov were pretrial detainees at the MDC and were

subsequently charged with conspiracy relating to the attempted escape. Mikhel and Kadamovas were both convicted. The allegations set forth in Claim 15 (Suppression of Evidence Relating to Confidential Informant) are incorporated by reference.

B.      Marvin Battley, a Bureau of Prisons Special Investigative Services (SIS) Agent, conducted the investigation into the escape attempt and testified for the government. At trial, Agent Battley testified that he did not "ever find any evidence that MDC personnel were complicit in this escape attempt" and that to his knowledge the FBI also did not find any evidence of MDC staff involvement. Tr. 12/06/06 at 98.

C.      Despite this testimony, there was substantial evidence suggesting MDC staff involvement in the conspiracy. Agent Battley was personally aware of much of this evidence, as were FBI agents. This evidence includes:

1.      Battley's timeline of the escape investigation notes that, "I contacted FBI Agent, Ingerd Sotelo, who states [redacted]. According to the FBI, that may be an indication that staff might be involved. [multiple lines of text redacted] According to the FBI [redacted] attorney states, [redacted] will tell all only if all charges against him are dropped and his is set free." Ex. 88 (Battley memo 4/29/03) at 7.

2.      When Battley interviewed Mikhel, Mikhel said about staff involvement, "Follow the drugs and you'll find who was involved." Ex. 89 (Battley memo 7/15/2003) at 2.

3.      A confidential informant interviewed by FBI Agent Noh with Battley present said that an MDC officer, McKinnon, told him to find out if anyone needed phones, ropes, hacksaw blades, or mini bolt cutters because he was looking for some money. According to the interview, the confidential informant told McKinnon that Russians were looking to bring items into MDC. Ex. 87 (CI 302).

4.      Thomas Tynan, who admitted to being involved in the escape plot, told FBI Agents Sotelo and Meriano that staff members were involved in the escape attempt. The handwritten notes from that interview specifically mention two officers, "C.O. 'Esqueviel?' H/M" who "would distribute tools to other floors" and "C.O. Freez W/M" who "'knows to stay away'" and would "avoid going by I's door." Ex. 85 (Tynan Interview Notes) at 7. This information does not appear in the typed memorandum of the interview (302), although the 302 does include that Tynan reported Mikhel telling him that "a black Correctional Officer, who was retiring in May, had told him about video surveillance and other security measures at MDC," Ex. 84 (Tynan 302) at 2, and that he received tools from "the maintenance man, Mr. Johnson," *id.* at 4.

D.     Tynan has recently confirmed that he is "certain that staff members were involved in the escape planning." Ex. 83 (Tynan dec.) ¶ 11.

E.     In response to FOIA requests and litigation, current counsel for Mr. Kadamovas received additional evidence pointing to staff involvement.

1.     Counsel received from the Office of Inspector General an Investigations Divisions Complaint Form, in which an individual (whose identity was withheld) stated that staff were involved in drug trafficking and "assisting in the escape of inmate members of the Russian Mafia." Ex. 125 (FOIA final resp. 09/30/2022) at 4.

2.     Counsel received from the FBI a June 2003 memo indicating that a source stated that an MDC correctional officer smuggled contraband, including drugs and at least one cell phone, into the MDC. Ex. 126 (6/25/03 FBI record).

F.     Agent Battley's testimony at trial that he never found any evidence of MDC staff involvement in the escape is false.

G.     The government suppressed material information from the investigation into the attempted escape, including information revealing that MDC staff were involved in the escape planning.

H.     The government knowingly presented false testimony about the escape attempt, including Battley's testimony that he never found any evidence of staff involvement. Tr. 12/06/06 at 98.

214

I.    The government violated Mr. Kadamovas' rights under *Brady* and *Napue*.

1.    To establish a *Brady* claim, the evidence at issue must have been suppressed, either willfully or inadvertently; the evidence must be favorable to the defendant, either because it is exculpatory or because it is impeaching; and prejudice must have ensued. *Maxwell v. Roe*, 628 F.3d 486, 509 (9th Cir. 2010) (citing *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999)).

2.    To establish a *Napue* claim, the testimony at issue must have been actually false, the prosecutor must have known it was false, and the false testimony must have been material "*i.e.*, there is a reasonable likelihood that the false testimony could have affected the judgment." *Dow v. Virga*, 729 F.3d 1041, 1048 (9th Cir. 2013).

3.    The government suppressed evidence, including evidence of staff involvement in the escape attempt that would have, at minimum, impeached Battley's testimony. The evidence also would have lessened the aggravating inferences of the conspiracy to escape, and reduced the assertion of future dangerousness used by the government to secure a death sentence.

4.    Government witnesses, including Battley, testified falsely and prosecutors knew these witnesses testified falsely.

5.    Mr. Kadamovas suffered prejudice from the suppression of evidence and false testimony, including prejudice from the suppression of evidence about

staff involvement in the escape attempt and false testimony that there was no staff involvement.

a.      In its closing argument at the penalty phase, the government heavily emphasized the escape attempt to argue for the aggravating factor of future dangerousness. Tr. 02/09/07, 36-38, 150-51.

b.      Mr. Kadamovas did not actually escape from custody. In reality, the threat of Mr. Kadamovas escaping was non-existent. Whatever took place on the fifth floor of the jail, no digging, possession of tools or weapons occurred on the ninth floor, and no contraband was found in Mr. Kadamovas' cell. To suggest a future risk despite the attempt's failure, the government argued that the threat of escape was real and almost successful. "And think for a minute, ladies and gentlemen, about what could have happened, what would have happened, with just one slip in security, with just one tired guard, with one inattentive moment; one co-opted staff member. You know it can happen." Tr. 02/09/2007 at 38. This argument gave the jury a false impression of the situation in a federal maximum security prison.

c.      Denying staff involvement mischaracterizes the risk of actually escaping. Mischaracterizing the risk of escaping, in turn, mischaracterizes whether Mr. Kadamovas really would present a danger if serving a life sentence in maximum security BOP custody.

216

J.      The government's failure to disclose evidence about staff involvement and knowingly presenting false evidence that staff was not involved calls into question the integrity of their investigation and presentation of evidence about the escape attempt. The suppressed evidence was material and favorable to Mr. Kadamovas.

K.      Section 2255 counsel is currently litigating two pending FOIA lawsuits seeking records continues to receive records responsive to its FOIA requests as a result of these lawsuits. In particular, the FBI, which initially determined it could not release any records to counsel, is now set to release approximately 500 pages of records per month. *See* Ex. 124 (FOIA Materials).

L.      These errors and constitutional violations substantially prejudiced Mr. Kadamovas, rendered the trial fundamentally unfair, eroded the reliability of the jury's verdicts and had a substantial and injurious effect on the verdicts.

**CLAIM 17 SUPPRESSION OF MATERIAL EVIDENCE AND GOVERNMENT MISCONDUCT**

Jurijus Kadamovas' convictions and the death sentence are unlawfully and unconstitutionally imposed, in violation of the Fifth, Sixth, and Eighth Amendments to the United States Constitution, in that the government suppressed, withheld, failed to disclose, or produced in a tardy, improper fashion, material evidence and information that would have led to the discovery of material evidence favorable to Mr. Kadamovas. The suppression, withholding, and/or late disclosure of evidence and information violated Mr. Kadamovas' constitutional and statutory rights to a fair trial, due process, confrontation, effective assistance of counsel, and a reliable penalty determination, to his prejudice. *Kyles v. Whitley*, 514 U.S. 419 (1995); *United States v. Bagley*, 473 U.S. 667 (1985); *Giglio v. United States*, 405 U.S. 150 (1972); *Brady v. Maryland*, 373 U.S. 83 (1963).

The following facts and allegations, among others, support this claim:

A.    The allegations set forth in Claim 14 (Failure to Disclose Natalya Solovyeva's Diary) are incorporated by this reference.

B.    The allegations set forth in Claim 15 (Suppression of Evidence Relating to Confidential Informant) are incorporated by this reference.

C.    The allegations set forth in Claim 16 (False Evidence Relating to Escape Conspiracy) are incorporated by this reference.

218

D.      The prosecution has, in this case, engaged in a pattern and practice of withholding, suppressing, and failing to disclose in a timely fashion material evidence and information likely to lead to material evidence to Mr. Kadamovas' prejudice. The prosecution has engaged in a pattern and practice of misconduct.

E.      On March 7, 2003, during a search of Mr. Kadamovas' jail cell, the government seized and reviewed Mr. Kadamovas' confidential notes prepared as part of this case and intended to aid his attorneys. These notes included information regarding the government's lead witness in the case, Ainar Altmanis. That information appears to have been the basis for further interviews of Altmanis in March of 2003 and admissions regarding his prior crimes. Ninth Cir. No. 07-99009, Dkt. No. 154 at 2. This constituted prejudicial government misconduct and interference in the defense function.

F.      Section 2255 counsel is currently litigating three pending FOIA lawsuits seeking records. In particular, the FBI, which initially determined it could not release any records to counsel, is now set to release approximately 500 pages of records per month. *See* Ex. 124 (FOIA Materials).

G.      The withholding, suppression, failure to produce, and/or tardy production of this information substantially prejudiced Mr. Kadamovas, rendered the trial fundamentally unfair, eroded the reliability of the jury's verdicts and had a substantial and injurious effect on the verdicts.

219

## CLAIM 18 INEFFECTIVE ASSISTANCE OF COUNSEL: FAILURE TO OBJECT TO SHACKLING

Jurijus Kadamovas' convictions and sentence are unlawfully and unconstitutionally imposed, in violation of the Fifth, Sixth, and Eighth Amendments to the United States Constitution, because he was denied effective assistance of counsel. The performance of Mr. Kadamovas' court-appointed counsel fell below reasonable standards of representation, to Mr. Kadamovas' prejudice, in that counsel failed to exercise the skill, judgment and diligence expected of reasonably competent criminal defense lawyers and failed to object to the shackling and security procedures imposed on Mr. Kadamovas at trial. During the trial, Mr. Kadamovas was restrained by a waist chain and shackled to a chair, without sufficient cause and without any judicial determination that such measures were necessary and justified. The improper shackling violated his rights to due process, to a fair trial, to the presumption of innocence, to the effective assistance of counsel, to a jury trial, and to a reliable capital sentencing proceeding. Had counsel objected to these procedures, it is reasonably probable that the shackling, and the resulting prejudice, would have been avoided, and a result more favorable to Mr. Kadamovas achieved. *Strickland v. Washington*, 466 U.S. 668 (1984); *Deck v. Missouri*, 544 U.S. 622 (2005); *Stephenson v. Neal*, 865 F.3d 956 (7th Cir. 2017).

The following facts and allegations, among others, support this claim:

A.     The factual background regarding Mr. Kadamovas' representation at trial are set forth in the allegations of Claim 19 (Ineffective Assistance of Counsel: Guilt Phase Trial) and those allegations are incorporated by reference.

B.     The allegations set forth in Claim 5 (Improper Shackling) are incorporated by reference.

C.     During the pretrial proceedings, starting in June 2002, Mr. Kadamovas was represented by Richard Lasting and Marcia Brewer. Dkt. No. 132. In November 2005, Sonia Chahin was appointed and Ms. Brewer was relieved. Dkt. No. 831. At trial, Richard Lasting and Sonia Chahin represented Mr. Kadamovas. Ex. 10 (Lasting dec.); Ex. 11 (Chahin dec.).

D.     Counsel failed to object to the physical restraints and shackling of Mr. Kadamovas at trial. Counsel failed to timely and adequately object to security provisions that were used to restrict Mr. Kadamovas' movements. The physical restraints and security measures hampered his ability to review and understand the evidence against him, and infringed on his right to confront the evidence against him, his right to be present at trial, and his right to effective assistance of counsel. Counsel unreasonably failed to demand that the court justify the security provisions. Counsel unreasonably failed to demand a full inquiry, including an evidentiary hearing, into the necessity for such measures. These measures were not

221

supported by any factual or legal findings, were implemented without due process or fairness, and were not justified.

1.      Prior to trial, in June of 2003, the Department of Justice placed Mr. Kadamovas under "special administrative measures" (SAM) pursuant to 28 C.F.R. § 501.3. Tr. 07/07/03 at 33-36. SAMs are supposedly applicable where there is "a substantial risk that a prisoner's communications or contacts with persons could result in death or serious bodily injury to persons, or substantial damage to property that would entail the risk of death or serious bodily injury to persons." 28 C.F.R. § 501.3(a). Under these provisions, a SAM-designated prisoner is subject to extreme oversight and limitations on communications, as well as special detention and other heightened security measures. The implementation of these measures was done without notice, due process, a hearing, or the ability to object. The Department of Justice simply unilaterally designated Mr. Kadamovas as a SAM prisoner. Counsel unreasonably failed to object to the SAM designation and unreasonably failed to call for an inquiry into the process that led to the SAM designation.

2.      In October 2005, a videotaped deposition of a key witness, Konstantinos Tezhik, took place in Greece. The defendants were not allowed to attend the deposition, but were allowed to view a live video feed from the courtroom. The security procedures provided that Mr. Kadamovas be fully

shackled, legs and arms, and his hands cuffed with a "black box" mechanism. *See* Dkt. Nos. 802, 805, 811. Prior to the deposition, Mr. Kadamovas' counsel filed an application asking that Mr. Kadamovas be allowed to have one hand free to write notes and better communicate with his attorney, as, without that accommodation, Mr. Kadamovas was being denied his constitutional rights. Dkt. No. 802. Without a hearing, and without any findings of fact, the court denied the application. Dkt. No. 804. The court simply and totally deferred to the United States Marshal's Service, allowing the shackles.

3. During a status conference that occurred a month before the start of trial, Judge Tevrizian advised that the defendants would be chained down in the courtroom during the trial. The defendants were brought into court fully shackled with handcuffs and leg restraints. Heavy wooden chairs were provided and Mr. Kadamovas was shackled to a chair with a lap restraint. Only after he was chained down were his handcuffs removed, and he was allowed to use his hands during the trial proceedings. Tr. 05/31/06 at 5-6. The trial judge again deferred completely to the U.S. Marshal, simply endorsing "a memo from the Marshal" without investigation, review, a hearing, or support. Tr. 05/31/06 at 5. Counsel failed to object to the security provisions, and failed to object to the shackling. Counsel failed to request a hearing into the alleged necessity for such measures.

223

4. The trial court made no findings and presided over no hearing regarding the necessity of the shackles. No determination was made as to the justification for the shackles. Trial counsel unreasonably failed to demand a hearing and demand justification for the shackling.

E. Counsel's failure to object to the security measures was unreasonable. Counsel's failure to object fell below an objective standard of reasonableness under prevailing professional norms.

F. Counsel's failure to object to the shackling and physical restraints in the courtroom was unreasonable. Counsel's failure to object fell below an objective standard of reasonableness under prevailing professional norms.

G. At the time of trial, in 2006-2007, the law regarding shackling was well established. *See Deck v. Missouri*, 544 U.S. 622 (2005); *Illinois v. Allen,* 397 U.S. 337, 344 (1970). Grounds existed for an objection. No strategic reason existed for the failure to object.

H. The shackling was prejudicial in numerous ways, undercutting Mr. Kadamovas' ability to communicate, and distracting him from the proceedings. *See generally Spain v. Rushen*, 883 F.2d 712, 721-27 (9th Cir. 1989). But the prejudice was particularly acute at the penalty phase. At the penalty phase in a capital trial, a jury must determine "the extent to which [defendant] continues to be dangerous." *Duckett v. Godinez*, 67 F.3d 734, 748 (9th Cir. 1995). Thus, "physical restraints

224

may create the impression in the minds of the jury that the court believes the defendant is a particularly dangerous and violent person." *Id*. The shackling sent a signal to the jury that Mr. Kadamovas was a dangerous, violent man, unfairly impacting the jury's assessment of the sentencing factors and implicitly promoting the prosecution's arguments regarding future dangerousness.

H.     But for counsel's failures, there is a reasonable probability that the result of the trial would have been different. The shackling, and the ineffective assistance of counsel, had a substantial and injurious effect or influence on the verdicts.

**CLAIM 19 INEFFECTIVE ASSISTANCE OF COUNSEL: GUILT PHASE TRIAL**

Jurijus Kadamovas' convictions and sentence are unlawfully and unconstitutionally imposed, in violation of the Fifth, Sixth, and Eighth Amendments to the United States Constitution, because he was denied effective assistance of counsel at the guilt-phase portion of his trial. The performance of court-appointed counsel fell below reasonable standards of representation, to Mr. Kadamovas' prejudice, in that counsel failed to exercise the skill, judgment, and diligence expected of a reasonably competent criminal defense lawyer in investigating the case, reviewing the discovery, preparing for trial, promoting Mr. Kadamovas' rights and interests, selecting a jury, challenging the prosecution's case, and presenting evidence and a defense at trial. Trial counsel's failures, errors and omissions denied Mr. Kadamovas the right to present a defense and to present all relevant evidence on issues of guilt; the right to cross-examine and confront witnesses; the privilege against self-incrimination; the right to a jury determination of every material fact; the right to compulsory process; the right to a reliable, rational, and accurate determination of guilt and death-eligibility; the right to due process of law; and the right to a fair trial and to a reliable and non-arbitrary sentencing determination. *See Hinton v. Alabama*, 571 U.S. 263 (2014); *Massaro v. United States*, 538 U.S. 500 (2003); *Strickland v. Washington*, 466 U.S. 668

226

(1984); *Sanders v. Ratelle*, 21 F.3d 1446, 1456-61 (9th Cir. 1994); *Williams v. Woodford*, 859 F. Supp. 2d 1154, 1171-74 (E.D. Cal. 2012).

The following facts and allegations, among others, support this claim:

A.    At trial, Mr. Kadamovas was represented by attorneys Richard Lasting and Sonia Chahin. Ex. 10 (Lasting dec.) ¶¶ 3, 15. The circumstances of this representation were as follows:

1.    After filing, the case was assigned to Judge Nora Manella. Ex. 10 (Lasting dec.) ¶ 3.

2.    After arrest, on February 20, 2002, attorney William Healy was initially appointed to represent Mr. Kadamovas, but was quickly replaced by attorney Jeffrey Weiss. Dkt. Nos. 5, 47, 54. Panel attorney Marcia Brewer was appointed by the court to represent Mr. Kadamovas, replacing Mr. Weiss, on May 21, 2002. Dkt. No. 80.

3.    Because the charges in the indictment made Mr. Kadamovas eligible for the death sentence, pursuant to 18 U.S.C. § 3599, the court appointed second, learned, counsel Richard Lasting to represent Mr. Kadamovas. Mr. Lasting was appointed on June 27, 2002. Tr. 06/27/02 at 8-9.

4.    The defense team assembled by Mr. Lasting and Ms. Brewer included: paralegal Christine Larson Gits, fact investigator Paul Ingels, and Russian-speaking fact investigator Sergei Litvinov. Ex. 10 (Lasting dec) ¶ 4. In

2003, the defense filed two motions asking for the appointment of a mitigation investigator, M.E. Hadley, but those motions were denied by Judge Manella. Ex. 10 (Lasting dec.) ¶ 6; Exs. 103, 104, 105, 106 (Dkt. Nos. 332, 333, 403, 404).

5.      In January 2004, Mr. Lasting and Ms. Brewer met with Department of Justice officials in Washington, D.C. to discuss whether the government would pursue the death penalty. Dkt. No. 550 at 2; Ex. 10 (Lasting dec.) ¶ 9. On August 3, 2004, the government provided notice that it would be seeking the death penalty against Mr. Kadamovas. Dkt. No. 506.

6.      On October 1, 2004, the trial court finally approved funding for a mitigation investigator. Dkt. No. 588. The court appointed John Brock for that role, even though Mr. Brock was not a mitigation specialist, nor a licensed investigator, but was, rather, a retired former deputy public defender. Ex. 12 (Brock dec.) ¶¶ 1, 6.

7.      On July 28, 2005, Judge Manella set a trial date for July 11, 2006. Dkt. No. 784.

8.      In later 2005, problems with Ms. Brewer necessitated a change of counsel, and panel attorney Sonia Chahin agreed to replace Ms. Brewer. On November 28, 2005, Judge Manella issued an order substituting Ms. Chahin as counsel and allowing Ms. Brewer to withdraw. Dkt. Nos. 830, 831. Ms. Chahin obtained assurances that the trial date of July 11, 2006, would be continued so that

she would have time to review the discovery and properly prepare for trial. Ex. 11 (Chahin dec.) ¶ 6. Had she known that the trial date would not be changed, Ms. Chahin would not have agreed to take the case. Ex. 11 (Chahin dec.) ¶ 6.

9.    The defense team struggled with the volume of discovery and information produced by the prosecution. Over 70,000 pages of discovery were produced by late 2005, and an additional approximately 20,000 pages were produced in 2006. The number of tapes, videos, and electronic media was also overwhelming. The defense team was unorganized and unable to review all the discovery. Ex. 11 (Chahin dec.) ¶¶ 8, 10, 11.

10.    In addition to her representation on the Kadamovas case, Ms. Chahin was also appointed counsel in a complex federal murder prosecution, *United States v. Martinez, et. al.*, 2:04-cr-00415. Ex. 77 (Martinez Dkt.). The Martinez case went to trial in June 2006, and the trial lasted 25 court days, ending on August 1, 2006. Ms. Chahin was working "ridiculous" hours preparing for the Martinez trial while also reviewing the discovery and attempting to get up to speed on Mr. Kadamovas' case. Ex. 11 (Chahin dec.) ¶¶ 10, 12, 15.

11.    During 2004, 2005, and 2006, Richard Lasting was also extremely busy working on other serious criminal cases.

12.    The Kadamovas defense team filed a motion to continue the trial date on March 15, 2006, asking Judge Manella to grant a six-month continuance from

229

the July 11, 2006, date to January 9, 2007. Defense counsel candidly admitted that they could not be prepared for trial in July 2006. Dkt. No. 2266.

13. Before the motion to continue the case was heard by Judge Manella, on April 13, 2006, the case was transferred to Judge Dickran Tevrizian. Dkt. No. 948. Judge Tevrizian refused to grant the motion to continue and forced the trial to go forward despite the fact that counsel were not prepared for the trial. The allegations set forth in Claim 6 (Improper Denial of Continuances) are incorporated by reference.

14. When it became clear that Judge Tevrizian would not grant a continuance, even after multiple requests and a showing that counsel was not prepared for trial, attorney Chahin asked to be relieved from her appointment as she could not render effective representation. The court denied her request to be relieved. Tr. 06/26/06 at 11-12; Ex. 11 (Chahin dec.) ¶ 17.

15. According to attorney Chahin: "I do not believe I was prepared for trial"; "I simply did not have the time to completely review the discovery and investigation and I felt like, had I been able to do a complete review and proper investigation, I might have found a way to provide a better defense for Mr. Kadamovas." Ex.11 (Chahin dec.) ¶¶ 19, 30.

16. According to attorney Lasting: "We were not ready to go to trial." Ex. 10 (Lasting dec.) ¶ 16.

230

B.     Defendant's counsel failed to properly investigate, prepare, and present a trial defense. Counsel failed to investigate potential defenses, interview witnesses, manage the investigation, collect available records, seek out and utilize experts, collect material evidence, and provide evidence to appropriate experts. Counsel had no legitimate tactical or strategic reason for the failure to investigate and prepare adequately for trial. The various failures, actions, and inactions included:

     1.     Failure to comprehensively and completely review the discovery and potential evidence.

     2.     Failure to make appropriate motions to ensure full production and receipt of discovery and *Brady* material. Failure to adequately object to the lack of disclosure and incomplete discovery production. The allegations of Claim 17 (Suppression of Material Evidence and Government Misconduct) are incorporated by reference. These failures included, among others:

     a.     Failure to ensure full production and receipt of the Natalya Solovyeva diary, journal, and personal documents. Failure to object to the tardy and incomplete production of these items and other items relating to Natalya Solovyeva.

     b.     Solovyeva testified for the government after pleading guilty to one count of conspiracy to commit hostage taking and two counts of hostage taking

231

resulting in death. Dkt. No. 502 (Second Superseding Indictment); Ex. 78 (Solovyeva sent.); Tr. 11/02/06 at 18.

     c.     On October 31, 2006—two days before Solovyeva's testimony began—the government produced to defense counsel a document that purported to be a copy of Solovyeva's handwritten Russian diary and some English-language summaries of a portion of the contents. Tr. 10/31/06 at 6-9; *see* Ex. 79; Ex. 81.

     d.     The next day, Chahin told the court:

> Your Honor, with respect to the Natalya diary that I spoke to the Court about yesterday, I just wanted to give to the Court some more information. The diary is 437 pages written in longhand in Russian. Okay. We have summaries, but we don't have a complete review of what those 437 pages are.
>
> I have reviewed the summaries, which the Government has transcribed after listening to cassettes prepared by a court interpreter. We don't have copies of those tapes. So I guess the first thing that we would like to do is obtain copies of those tapes from the Government and be able to listen to them.
>
> In addition to that, I think that we need to be able to have an interpreter either read to us or translate for us pertinent portions of the diary. The Government has characterized this as a diary of the folly of a young girl outside of the time period of this case. But there are numerous statements in there which go to credibility, bias, and motive. . . .
>
> So there are, as I indicate, repeated statements which are relevant for our ability to be able to cross-examine her.

Tr. 11/01/06A at 4-5.

232

e.	In response to Chahin's concerns, the trial court said:

> You will cross-examine her at the conclusion of the Government's case. But I'll permit you to recall her to complete your cross-examination once you've reviewed the diary. So you will have to be prepared to cross-examine her at the conclusion of the Government's direct examination.

Tr. 11/01/06A at 5.

f.	Despite this, trial counsel did not recall Solovyeva to testify later after reviewing the complete diary.

g.	In fact, trial counsel never reviewed the complete diary—they did not have the entire diary in Russian, and they did not get a complete translation of the Russian entries they did have. Trial counsel did not realize that there were English-language summaries of entries that did not appear in the copy of the handwritten Russian version that they received, that is, that they did not even receive the entirety of the Russian-language diary.

h.	Mr. Kadamovas was prejudiced by counsel's errors. Because trial counsel never cross-examined Solovyeva using information from her diary, trial counsel failed to elicit key information from her. *See* Ex. 82 (Solovyeva diary English).

i.	The allegations set forth in Claim 14 (Failure to Disclose Natalya Solovyeva's Diary) and Claim 6 (Improper Denial of Continuances) are incorporated by reference.

j.    Failure to ensure full production and receipt of the Altmanis diary and failure to object to the prosecution's withholding of this material evidence. Ex. 132 (Meyer ltr 10/22/02).

k.    Failure to ensure full production and receipt of an unredacted version of the Markovskis datebook. Failure to object to the excessive redactions. This item was heavily redacted to the point where it was essentially useless. Trial Discovery Bates 21763-815.

l.    Failure to object to extensive, unnecessary redactions to the government's produced discovery. Failure to request unredacted versions of reports, notes, and other materials.

m.    Failure to ensure full production of forensic materials related to DNA, fingerprints, and other scientific tests.

n.    Failure to ensure full production of telephone lists, telephone records, and cell phone data.

o.    Failure to ensure full production of items concerning the Metropolitan Detention Center and materials relating to the jail relevant to the escape conspiracy charge, jail contraband smuggling, and guard misconduct.

C.    Defendant's counsel failed to fulfill their duty to ensure that Mr. Kadamovas, who was not able to read or speak English, adequately understood the proceedings. Mr. Kadamovas' counsel failed to ensure that the contents of the

234

discovery were translated so that Mr. Kadamovas could review the evidence against him and fully participate in his defense. The allegations set forth in Claim 11 (Misleading and Inaccurate Translation at Trial) and Claim 10 (Denial of Access to Case Materials) are incorporated by reference.

D.     Mr. Kadamovas' counsel failed to properly represent Mr. Kadamovas by making appropriate pretrial motions and the objections necessary to defend his rights. The failures, actions, and inactions included:

1.     Failure to object to the admission of Jose A's testimony regarding the statements of Mr. Kadamovas on the grounds that Jose A was a confidential informant and an agent of the government who questioned Mr. Kadamovas while he was in custody. The allegations set forth in Claim 13 (Improper Use of a Confidential Informant) are incorporated by reference.

2.     Failure to object to the anonymous jury. Failure to object to the denial of the release of the jurors' identities to counsel. The allegations set forth in Claim 1 (Anonymous Jury) are incorporated by reference.

3.     Failure to investigate and challenge the jury venire pool on the grounds that Mr. Kadamovas' right to a jury drawn from a fair cross-section of the community was being violated. Failure to request discovery of the method for drawing the jury pool and the potentially biased and improper manner in which the jury pool was drawn. Failure to request a hearing and investigation into the fair

235

cross-section violation. The allegations set forth in Claim 3 (Denial of Fair Cross-Section) are incorporated by reference.

4.     Failure to object to the shackling of Mr. Kadamovas. Failure to challenge the SAMs restrictions. The allegations set forth in Claim 5 (Improper Shackling) and Claim 18 (Ineffective Assistance of Counsel: Failure to Object to Shackling) are incorporated by reference.

E.     Mr. Kadamovas' counsel failed to represent Mr. Kadamovas properly in the jury selection process. Counsel failed to make proper objections to the inadequacy and unfairness of the process, failed to prepare for and conduct reasonably competent voir dire, failed to utilize peremptory and for-cause challenges in a proper, effective manner. Counsel failed to adequately question the jurors. Counsel failed to vigilantly ensure Mr. Kadamovas' right to trial by an unbiased jury. The allegations set forth in Claim 2 (Jury Misconduct) are incorporated by reference. The commentary to the 2003 version of the Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, Guideline 10.10.2 discusses the standard of care in jury selection in a capital case:

> Jury selection is important and complex in any criminal case. In capital cases, it is all the more critical. Counsel should devote substantial time to determining the makeup of the venire, preparing a case-specific set of voir dire questions, planning a strategy for voir dire, and choosing a jury most favorable to the theories of mitigation that will be presented. . . ..

236

As a practical matter, the burden rests with defense counsel to "life qualify" a jury. Counsel should conduct a voir dire that is broad enough to expose those prospective jurors who are unable or unwilling to follow the applicable sentencing law, whether because they will automatically vote for death in certain circumstances or because they are unwilling to consider mitigating evidence. Counsel should also develop a strategy for rehabilitating those prospective jurors who have indicated opposition to the death penalty. Bearing in mind that the history of capital punishment in this country is intimately bound up with its history of race relations, counsel should determine whether discrimination is involved in the jury selection process. Counsel should investigate whether minorities or women are underrepresented on the jury lists from which grand and petit juries are drawn, or if race or gender played a role in the selection of grand jury forepersons. The defense in a capital case is entitled to voir dire to discover those potential jurors poisoned by racial bias, and should do so when appropriate.

31 Hofstra L. Rev. 913, 1051-53 (footnotes omitted). Trial counsel failed in these basic duties. The failures, actions and inactions included:

1.     Failure to prepare an adequate juror questionnaire. The questionnaire used in the trial was superficial, incomplete, and inadequate.

2.     Failure to conduct a reasonably effective voir dire during the questioning of the potential jurors. Counsel's questioning was superficial and unproductive, failing to inquire into crucial areas and explore adequately the attitudes and biases of the jurors.

3.     Failure to object to the prosecution's gender bias and constitutional violation in the use of peremptory challenges on a discriminatory basis as to

237

gender. The jury contained only three females. The allegations set forth in Claim 4 (Unlawful Gender Discrimination in Jury Selection) are incorporated by reference.

4.    Failure to protect against ethnic bias in jury selection. Mr. Kadamovas is of Russian ethnicity and was born and raised in the Soviet Union. Four members of the jury were military service veterans; one was a Vietnam veteran who had seen combat, presumably battling Viet Cong and/or North Vietnamese Army personnel who were supplied and supported by the Soviet Union. Tr. 08/29/06 at 213. In the jury questionnaires (under seal), potential jurors expressed ethnic bias and prejudice against those from communist countries. Juror 39 expressed the view that groups that have been oppressed have "pent-up anger." Juror 239 thought that certain races or ethnic groups are more violent than others. Counsel failed to inquire of the jurors regarding their ethnic bias, fear of Russians, and attitudes about the Cold War. Counsel failed to use peremptory challenges to eliminate anti-Russian bias from the jury.

4.    Failure to "life qualify" the jury, including failure to use a peremptory challenge on juror 39 who disclosed in his questionnaire that his "mind is made up" regarding the death penalty. The allegations in Claim 21 (Ineffective Assistance of Counsel: Penalty Phase Trial) are incorporated by reference. The unreasonable failure to object to jurors who could not consider a life sentence also

238

impacted the guilt phase; numerous studies have shown that jurors who will automatically impose a death sentence are also more likely to convict.

5.     Failure to object to, or demand further inquiry into, the financial pressures brought to bear on juror 57 and his employer's threats to terminate his job, or his pay. Failure to move to remove juror 57 from the jury.

a.     Juror 57 was threatened with the loss of his job midway through the trial. His employer telephoned the judge to state that the juror's pay would be withheld, and the juror's union supervisor began phoning the juror demanding that he get off the jury or at least work nights if he was serving on the jury by day. Tr. 11/14/06A at 33; Tr. 11/15/06 at 6-7; Tr. 11/16/06 at 74-76.

b.     Counsel did not demand a hearing on this situation or ensure that a proper record was made regarding the circumstances and the judge's secret communications with the juror's employer and the juror.

c.     Counsel did not object to the jury misconduct.

6.     Failure to object to, or demand further inquiry into, the contact between juror 67 and the Mikhel defense team. Failure to move to remove juror 67.

a.     Juror 67 had an encounter with defense counsel for Mikhel and an expert witness in a hotel bar. Tr. 02/01/07 at 8-12. After an inadequate and superficial discussion of this incident, the trial court elected to allow the juror to stay on the jury. Tr. 02/01/07 at 10-12.

239

b.       Counsel did not demand a hearing on this situation or ensure that a proper record was made regarding the circumstances.

c.       Counsel did not object to the jury misconduct.

F.       Mr. Kadamovas' counsel failed to represent Mr. Kadamovas properly during the trial. Mr. Kadamovas' counsel failed to present evidence to counter the prosecution's case. Mr. Kadamovas' counsel failed to present a complete and adequate defense to the charges. Mr. Kadamovas' counsel failed to object during trial to instances of constitutional violations, misconduct, error, improper or prejudicial evidence, and other instances of unfairness. Mr. Kadamovas' counsel failed to preserve the record regarding the many violations of Mr. Kadamovas' constitutional, statutory, and international rights. Mr. Kadamovas' counsel failed to request proper instructions. The failures, actions, and inactions included:

1.       Failure to ensure that a sound recording and full record of the trial was made. Pursuant to 28 U.S.C. § 1827(d)(2), the judge could have ordered an electric sound recording of all the portions of the trial where a witness was testifying through an interpreter. Based on the criteria specified in § 1827(d)(2), trial counsel could and should have ensured that the proceedings were recorded on each day when a witness testified in a foreign language.

2.       Failure to object to the inadequate and distorting translations that occurred at trial, including the improper translation of the testimony of the

240

government's star witness Altmanis. Counsel was aware that the court interpreters were making Altmanis seem more respectable and well-spoken than he was, thereby enhancing his credibility, and making the jury more likely to believe his assertions about Mr. Kadamovas. *See* Ex. 112 (Spivakovsky dec.) ¶¶ 16-17. An interpreter told trial counsel that they were indeed cleaning up Altmanis' language—known as "interpreting in the wrong register." *Id.* ¶ 16; Tr. 10/11/06A at 8. While trial counsel told the court about the problem, they failed to submit any sworn testimony or take other steps to establish how serious the problem was. Trial counsel failed to ask for a hearing or factual inquiry. Trial counsel also failed to ensure that each day of the trial was audio recorded, to at least preserve all of Altmanis' testimony as he actually spoke it, without the interpreter's distortion. *See* 28 U.S.C. § 1827(d)(2). The allegations set forth in Claim 11 (Misleading and Inaccurate Translation at Trial) are incorporated by reference.

3.     Failure to present a duress defense to the allegations of conspiracy to escape. Trial counsel failed to present evidence or otherwise develop the facts to support a duress defense, even when there was ample evidence of duress presented at trial and in the discovery received from the government.

a.     Evidence at trial showed that Mikhel and Krylov both had extensive contraband tools, a "virtual hardware store," in their cells. Mikhel was digging through the wall of his cell towards an adjacent stairwell. Tr. 12/06/06 at

87-88, 179-96; Tr. 12/07/06 at 51-52. Mikhel confessed to planning the escape. Ex. 96 (Mikhel 302).

        b.     Mr. Kadamovas, by contrast, had no tools, no digging efforts, no cell phones, no contraband. Tr. 12/06/06 at 93, 175; Tr. 12/07/07 at 45.

        c.     Further details about the conspiracy to escape evidence are set forth in the allegations relating to Claim 12 (Failure to Instruct on Duress Defense), Claim 20 (Ineffective Assistance of Counsel: Conspiracy to Escape), Claim 15 (Suppression of Evidence Relating to Confidential Informant), Claim 16 (False Evidence Relating to Escape Conspiracy), and Claim 13 (Improper Use of a Confidential Informant), which are incorporated by reference.

        d.     Trial counsel for Mikhel eventually conceded the conspiracy to escape charge, noting that the "remarkably intrica[te]" planning was "typical of Mr. Mikhel." Tr. 01/11/07 at 118. This was consistent with his role in planning the homicides, his role in coordinating and controlling the money laundering, and his leadership exercised throughout the criminal enterprise.

        e.     As to Mr. Kadamovas, however, evidence of his involvement in the conspiracy to escape was scant, limited to a jailhouse informant who implicated him. No tools were found in his cell, no digging into the walls was discovered, no tunneling into the stairwell had been attempted. Mikhel himself said: "Kyrlov [sic] and Kadamovas . . . had nothing to do with the planning." Ex. 89 (Battley memo

07/15/03). Mr. Kadamovas was on the ninth floor of the jail, separated from the planning, tool-smuggling, and digging going on four floors below on the fifth floor. None of those participating in the support of the escape from outside of the jail, including Sabrina Tuinan, had any contact with Mr. Kadamovas or evidence to support his involvement.

f.      To establish the defense of duress, a defendant must show that "(1) he was under an immediate threat of death or serious bodily injury, (2) he had a well grounded fear that the threat would be carried out, and (3) he had no reasonable opportunity to escape" the threatened harm. *United States v. Kuok*, 671 F.3d 931, 947 (9th Cir. 2012). At trial, the evidence demonstrated a prima facie case of duress. Indications of a prima facie case include the following evidence:

g.      Evidence at trial, particularly the testimony of Altmanis, established that Mikhel was a cruel and vicious individual capable of murder. Mikhel was paying off various inmates in the jail, exercising control and influence, and those payments included money to Mr. Kadamovas. Tr. 12/07/06 at 65-66. This payment to Mr. Kadamovas was intended to control him, the same means of control he used against Mr. Kadamovas on the outside. Ex. 9 (Krausz dec.).

h.      The testimony of Billy Parker indicated that Mikhel planned to kill any guards who prevented his escape. Tr. 12/06/06 at 30. Recognizing the threat that Mikhel posed, authorities removed Parker from his cell in the jail and

243

put him on suicide watch in order to disguise his cooperation. Tr. 12/06/06 at 34-35.

i.      According to Sabrina Tuinan, the escape plan was solely Mikhel's. Tr. 12/08/06 at 80-81.

j.      Other evidence demonstrated Mikhel's control over individuals and his ability to manipulate and influence either by bribe or by threat. New evidence supports this even further. Witnesses state, "It was clear that Mikhel was the leader among them. He seemed much smarter than Yuri. . . . Mikhel had language and intellectual skills that Yuri lacked." Ex. 33 (Zadorozny dec.) ¶ 17. The evidence of Mikhel's control over Mr. Kadamovas is extensive, including that he paid Mr. Kadamovas large sums of money to maintain his dependence on him, paying his rent and expenses, and even taking out a life insurance policy in Mr. Kadamovas' name with Mikhel as the beneficiary. Tr. 12/13/06 at 184-85. Mikhel handled all the financials for their "joint" business. Ex. 9 (Krausz dec.). Mikhel used his power and influence to groom Mr. Kadamovas and the other co-defendants, just as he had attempted with Mr. Rabinovich and Mr. Khachatryan. Ex. 1 (Volynsky dec.) ¶¶ 219-24, ¶¶ 232-44.

k.      In the subsequent trial of Krylov, where the evidentiary record was similar to that against Mr. Kadamovas, a duress instruction was requested and given to the jury resulting in the acquittal of the conspiracy to escape charge. Ex.

100 (Krylov duress instr.); Ex. 97 (Krylov Trial Tr. 04/26/07) at 25; Ex. 101 (Krylov Trial Tr. 04/19/07). This is despite the fact that evidence of Krylov's direct involvement in the escape conspiracy was vast as compared to evidence against Mr. Kadamovas. Tr. 12/06/06 at 179-96; Tr. 12/07/06 at 56-57; Tr. 12/06/06 at 175; Tr. 12/07/07 at 45.

4.      Failure to request a duress instruction with regard to the conspiracy to escape charge. By failing to request an instruction on duress, trial counsel was ineffective. The error prevented the jury from properly considering the defense of duress.

a.      A proper duress instruction would have told the jury the three elements of the duress defense and allowed the jury to decide whether the evidence supported such a theory. The evidence supports a jury finding of duress.

b.      The allegations set forth in Claim 12 (Failure to Instruct on Duress Defense) are incorporated by reference.

5.      Failure to present a duress defense to the charges of conspiracy to abduct and money laundering.

6.      Failure to demonstrate that Mr. Kadamovas is innocent of the allegations of money laundering.

7.      Failure to prepare and present a proper and persuasive defense to the conspiracy to escape charge. The allegations set forth in Claim 20 (Ineffective Assistance of Counsel: Conspiracy to Escape) are incorporated by reference.

8.      Failure to adequately and fully cross-examine and impeach prosecution witness Natalya Solovyeva. Failure to utilize the diary and the inconsistent and impeaching evidence contained in that diary in cross-examination. Failure to recall Natalya Solovyeva as a witness after the late disclosure of the diary for further impeachment. The allegations set forth in Claim 14 (Failure to Disclose Natalya Solovyeva's Diary) and Claim 6 (Improper Denial of Continuances) are incorporated by reference.

9.      Failure to object to the incomplete disclosure of the Solovyeva diary.

10.     Failure to adequately and fully cross-examine and impeach prosecution witness Ainar Altmanis, including failure to adequately cross-examine Altmanis on his purchase of cell phones and/or phone cards and/or SIM cards, as well as on other issues that would have undermined his credibility. Failure to cross-examine Altmanis on his possession of identifying information and personal financial account numbers relating to Jurijus Kadamovas. Trial Discovery Bates 12996-98; 13014-15.

11.     Failure to adequately and fully cross-examine and impeach prosecution witness Aleksejus Markovskis.

246

12.     Failure to present evidence that prosecution witness Ninel Faktorovich was unable to identify Mr. Kadamovas from a photographic line-up. *See* Tr. 10/25/06 at 155-85.

   a.     Ninel Faktorovich, Rita Pekler's partner, testified about a man calling himself "Volodia" came into Pekler's office on Dec. 3, 2001, spoke Russian, and made an appointment to come back and see her. Two days later, Pekler left to meet this man, using Faktorovich's car, and never returned. Tr. 10/25/06 at 159-69. The prosecution's theory was that "Volodia" was Mr. Kadamovas.

   b.     Detective Berchem of the Los Angeles Police Department presented a photo six-pack, containing a photograph of Mr. Kadamovas, to Faktorovich in March of 2002 and she failed to select his photo as "Volodia." Ex. 129 (Faktorovich 302).

   c.     Counsel did not introduce this failure to identify Mr. Kadamovas either independently or in cross-examination of Faktorovich.

13.     Failure to investigate and rebut the financial evidence. A careful review of the financial transactions shows that Iouri Mikhel, not Mr. Kadamovas, was the beneficiary of the financial transactions. Ex. 9 (Krausz dec.).

14.     Failure to challenge the identification of Mr. Kadamovas as the individual who purchased the portable phones.

247

15. Failure to investigate, challenge, and rebut the evidence concerning telephone calls, cell phone sites, cell phone tracking, and other forensic evidence.

G. Mr. Kadamovas' counsel failed to represent him properly during all phases of the case by failing to ensure that the judge who presided over the trial was not biased against him. During the pendency of these proceedings, Judge Tevrizian, who presided over the trial, was in the process of applying to be the United States Attorney for the Central District of California, that is, applying to be the head of the office that was prosecuting Mr. Kadamovas. Trial counsel initially failed to object at all to the judge's conflict of interest and then, once they did object, failed to adequately investigate and address the issue. The allegations set forth in Claim 7 (Judicial Bias) are incorporated by reference.

H. Mr. Kadamovas was substantially prejudiced by counsel's inadequate preparation, lack of investigation, and performance. Counsel's various actions and inactions deprived Mr. Kadamovas of a fair trial before an unbiased jury. Among other things, the prejudice caused by the ineffectiveness of counsel included:

1. Mr. Kadamovas was deprived of a trial before an unbiased, properly selected jury based on a fair cross-section of the community and untainted by prior knowledge, ethnic prejudice, and other biases.

2. Mr. Kadamovas was deprived of a trial before an unbiased judge.

248

3.    Inflammatory argument, improper evidence, irrelevant but prejudicial evidence, prosecutorial misconduct and other prejudicial inferences, which could and would have been prevented by timely objection and proper court ruling, were presented to the jury.

4.    Because trial counsel failed to ensure the full production of a complete copy of Solovyeva's diary and to cross-examine Solovyeva using the contents of her diary, trial counsel failed to elicit key information relevant to both the guilt phase and the penalty phase trials. *See* Ex. 82 (Solovyeva diary English).

5.    The jury was not properly instructed, to Mr. Kadamovas' prejudice.

6.    Had the jury been properly instructed on a duress defense, there is a reasonable possibility that the jury would not have convicted Mr. Kadamovas of Count 6, conspiracy to escape.

7.    The prosecution's evidence was not adequately challenged.

8.    A proper defense to the charges was not presented.

I.    The ineffectiveness of counsel at the guilt-phase trial, and during the pre-trial portions of the proceedings, also directly impacted the assessment of sentence. An aggressive, proper guilt-phase defense would have demonstrated Mr. Kadamovas' lesser and diminished culpability regarding the activities underlying the charges, and, even if the jury would have returned convictions, would have lessened the aggravating evidence and provided additional mitigating evidence at

249

the penalty trial. The allegations of Claim 21 (Ineffective Assistance of Counsel: Penalty Phase Trial) are incorporated by reference.

J.      The denial of his right to effective assistance of counsel substantially prejudiced Mr. Kadamovas, rendered the trial proceeding fundamentally unfair, eroded the reliability of the verdicts and had a substantial and injurious effect on the verdicts. But for the denial of this right, it is reasonably probable that a more favorable result would have been attained.

**CLAIM 20 INEFFECTIVE ASSISTANCE OF COUNSEL: CONSPIRACY TO ESCAPE**

Jurijus Kadamovas' conviction on Count 6 of the Second Superseding Indictment (conspiracy to escape) and death sentence are unlawfully and unconstitutionally imposed, in violation of the Fifth, Sixth, and Eighth Amendments to the United States Constitution, because he was denied effective assistance of counsel with regard to the conspiracy to escape charge at the guilt phase of his trial. This denial of effective assistance of counsel resulted in the improper use of the conspiracy to escape conviction to inflate aggravation at the penalty phase and improperly support the death sentence. The performance of court-appointed counsel fell below reasonable standards of representation, to Mr. Kadamovas' prejudice, in that counsel failed to exercise the skill, judgment, and diligence expected of a reasonably competent criminal defense lawyer in investigating the conspiracy to escape allegations, reviewing the discovery, preparing for trial, promoting Mr. Kadamovas' rights and interests, challenging the prosecution's case, and presenting a defense at trial. Trial counsel's failures, errors, and omissions denied Mr. Kadamovas the right to present a defense, the right to cross-examine and confront witnesses, the right to a jury determination of every material fact, the right to due process of law, the right to a fair trial, and the right to a reliable and non-arbitrary sentencing determination. *See Strickland v. Washington*, 466 U.S. 668 (1984); *United States v. Bankston*, 820 F.3d 215 (6th

251

Cir. 2016); *Thomas v. Chappell*, 678 F.3d 1086 (9th Cir. 2012); *Bloomer v. United States*, 162 F.3d 187 (2d Cir. 1998); *Williams v. Woodford*, 859 F. Supp. 2d 1154 (E.D. Cal. 2012).

The following facts and allegations, among others, support this claim:

A.      At trial, Mr. Kadamovas was represented by attorneys Richard Lasting and Sonia Chahin. Ex. 10 (Lasting dec.); Ex. 11 (Chahin dec.). The allegations set forth in Claim 19 (Ineffective Assistance of Counsel: Guilt Phase Trial) are incorporated by reference.

B.      The evidence presented at trial regarding the conspiracy to escape strongly implicated Mikhel in the events that occurred in the Metropolitan Detention Center (MDC) toward the end of 2002 and the beginning of 2003. To the extent that there was evidence implicating Mr. Kadamovas, it was very weak. In summary, the evidence regarding the escape consisted primarily of:

1.      The testimony of Billy Parker. Tr. 12/06/06 at 23-71. Parker testified regarding his own discovery of Mikhel's digging through the wall of his cell, Parker's potential joinder in the escape plan, and various conversations and observations involving Mikhel. Parker never interacted with Mr. Kadamovas and had no information regarding Mr. Kadamovas' involvement in the conspiracy.

2.      The testimony of Sabrina Tuinan.[24] Tr. 12/08/06 at 71-137. Sabrina Tuinan was a full participant in the conspiracy, purchasing tools and cellphones and overseeing the smuggling of those items into the jail, working with her husband, Tom Tuinan (aka Tynan). Her contact with the scheme was entirely through her husband, a cellmate of Mikhel's. She testified that she "understood" her husband to tell her that Mikhel told him that "people [she] knew only by the name, Juri and Peter, were involved." Tr. 12/08/06 at 75. She never interacted with Mr. Kadamovas, and had no direct information regarding Mr. Kadamovas' involvement in the escape plan.

3.      The testimony of a number of guards and staff members at the MDC, who supplied information about:

a.      the jail geography and cell locations, including the testimonial foundation for the documentation of cell assignments, the jail floorplan, and a video exhibit regarding the planned escape. *See, e.g.*, Tr. 12/06/06 at 93-135, 143-50; *see* Exs. 90, 91, 92.

b.      the items found in Mikhel's cell, including hacksaw blades, bolt cutters, screwdrivers, wrenches, cell phones, and a camcorder. *See, e.g.*, Tr.

---

[24] Although she testified under the surname "Tuinan," Sabrina's actual last name was Tynan. *See United States v. Tynan*, No. 03-cr-00542 (C.D. Cal.); Ex. 83 (Tynan dec.).

253

12/06/06 at 92, 118-26, 157-58, 181-85; Tr. 12/07/07 at 51-57, 106-40, 156-60. In contrast, no contraband relating to any escape attempt—no tools, no digging instruments, no cell phones—was found in Mr. Kadamovas' cell. Tr. 12/06/06 at 93, 175; Tr. 12/07/07 at 45.

      c.    digging into the wall of Mikhel's cell, including hollowing out of a space to store the tools related to the planned escape. Tr. 12/07/06 at 51-56, 150-66. As for Mr. Kadamovas' cell, no evidence of any digging into the stairwell, and no damage to the wall, was found. Tr. 12/06/06 at 175.

      d.    the transfer of money, supervised by Mikhel, from the jail accounts to outside accounts and within the jail accounts. Tr. 12/07/06 at 65-73.

    4.    Forensic testimony regarding some of the tools, which linked them to Mikhel. Tr. 12/08/06 at 10-46. This forensic testimony did not link tools or other contraband to Mr. Kadamovas (nor did any other testimony).

    5.    A cryptic letter in Russian from Mikhel to Mr. Kadamovas, intercepted a couple of weeks after the escape plan was discovered, and therefore never delivered, that was improperly admitted at the trial. Tr. 12/08/06 at 63-66; Trial Ex. 891; *see United States v. Mikhel & Kadamovas*, 889 F.3d at 1049.

    6.    The testimony of Jose A, a confidential informant placed in the jail, who testified regarding the statements of Mikhel and the statements of Mr. Kadamovas, as well as his own participation in the smuggling of contraband into

254

the jail. Tr. 12/08/06 at 139-219; Tr. 12/12/06 at 30-35. The testimony of Jose A was extremely suspect, not only because Jose A did not speak Russian but because much of his testimony was contradicted by physical evidence.

7.      Hearsay (inadmissible but wrongly admitted into evidence) regarding a supposed attempt by Mr. Kadamovas to occupy a cell (913) next to the stairwell. Tr. 12/06/06 at 135.

C.      Defense counsel were not prepared for trial at the time the trial started, and had not completely or carefully reviewed the discovery provided by the prosecution. Ex. 10 (Lasting dec.) ¶¶ 16, 20; Ex. 11 (Chahin dec.) ¶¶ 20, 21.

D.      Defense counsel were not prepared to defend the conspiracy to escape charge at the time of trial. Defense counsel failed to investigate the allegations or the evidence supporting the conspiracy to escape charge. Defense counsel did not prepare and present a defense to the conspiracy to escape allegations.

1.      Attorney Chahin described the situation:

Given that this case involved abductions that resulted in death, I paid very little attention to the escape allegations prior to the trial. Well into the prosecution presentation, John Brock, who was working with us on the case, pointed out that the evidence that Mr. Kadamovas was involved in the escape planning was very weak and possibly vulnerable to attack. When the time came to prepare to cross-examine the government witnesses regarding the escape allegations, I reviewed the discovery regarding the escape carefully for the first time, discovered facts new to me, and found that there were important statements missing.

255

Ex. 11 (Chahin dec.) ¶ 21.

2.      Counsel's lack of preparation and diligence resulted in a situation where the government's failure to produce relevant discovery was not uncovered until the conspiracy to escape evidence was presented. Counsel was left scrambling for relevant prior statements and other crucial information possessed by the government. *See, e.g.*, Ex. 93 (Chahin ltr 11/28/06), Ex. 94 (Meyer ltr 12/14/06), Ex. 95 (Meyer ltr 12/12/06).

3.      Counsel did not conduct an adequate investigation into the conspiracy to escape allegations.

4.      Counsel did not gather evidence to support a duress defense to the conspiracy to escape allegations. Counsel did not introduce evidence to support a duress defense. The allegations set forth in Claim 19 (Ineffective Assistance of Counsel: Guilt Phase Trial) are incorporated by reference.

5.      Counsel did not adequately investigate and present the evidence that staff had been involved in the smuggling of tools and contraband into the MDC. *See* Ex. 83 (Tynan dec.); Ex. 84 (Tynan 302); Ex. 85 (Tynan interview notes); Ex. 87 (CI 302); Ex. 88 (Battley Memo 4/29/03); Ex. 89 (Battley memo 7/15/03).

6.      Counsel did not object to the admission of Jose A's testimony regarding the statements of Mr. Kadamovas on the grounds that Jose A was a government agent, a confidential informant, and those statements were therefore

256

inadmissible. *See United States v. Henry*, 447 U.S. 264, 273-74 (1980). The allegations set forth in Claim 13 are incorporated by reference.

7. Counsel did not impeach Officer Battley's testimony that he "did not" "ever find any evidence that MDC personnel were complicit in this escape attempt" and that to his knowledge the FBI also did not find any evidence of MDC staff involvement, Tr. 12/06/06 at 98, even though trial counsel had received reports of interviews conducted by Officer Battley and FBI agents in which multiple interviewees indicated that staff were involved, *see* Ex. 84 (Tynan 302); Ex. 85 (Tynan interview notes); Ex. 87 (CI 302); Ex. 88 (Battley Memo 4/29/03); Ex. 89 (Battley memo 7/15/03).

8. Counsel did not adequately and completely cross-examine Sabrina Tuinan.

9. Counsel did not adequately and completely cross-examine Jose A. Counsel failed to properly impeach Jose A's testimony.

a. Jose A testified that Mikhel approached him regarding the escape plan in early 2002 and Mikhel was housed in a cell next to the stairwell. Tr. 12/08/06 at 143. Since Mikhel was not in a stairwell-adjacent cell at that time, *see* Ex. 90 (Trial Ex. 900), Jose A's testimony was inconsistent with the actual location of Mikhel's cell.

b.      The purported conversations with Mr. Kadamovas about opening the ninth-floor windows, *see* Tr. 12/08/06 at 149, were nonsensical since there were no open windows on the ninth floor and nothing was smuggled into the ninth floor. The only smuggling through windows occurred on the fifth floor: Mikhel's floor.

c.      Jose A testified that Mr. Kadamovas showed him the "mesh" within the walls, *see* Tr. 12/08/06 at 149-50, an impossibility since no digging into the wall, and no exposure of the "mesh," occurred on the ninth floor.

d.      Jose A did not speak Russian. He could not have had such conversations with Mr. Kadamovas in 2002, as Mr. Kadamovas did not speak English. See the allegations set forth in Claim 11 (Misleading and Inaccurate Translation at Trial), incorporated by reference.

10.      Counsel failed to object to the hearsay evidence regarding Mr. Kadamovas supposed "desperate" (the prosecutor's characterization, not supported by evidence) attempt to occupy a cell next to the stairwell. Officer Battley related the contents of a report that Mr. Kadamovas had been disciplined for his presence in cell 913 prior to the planning of the escape. Tr. 12/06/06 at 135-36. This was inadmissible hearsay.

11.      Counsel failed to object to the nested hearsay related by Sabrina Tuinan repeating Tom Tynan's statements repeating Iouri Mikhel's statements.

258

This introduction of nested hearsay violated the Confrontation Clause. *See generally Lilly v. Virginia*, 527 U.S. 116 (1999); *Williamson v. United States*, 512 U.S. 594 (1994).

12.   Counsel failed to request a duress instruction. *See* Ex. 100 (Krylov duress instr). The allegations set forth in Claim 12 (Failure to Instruct on Duress Defense) are incorporated by reference.

13.   Counsel failed to introduce testimony regarding Mikhel's statements that Mr. Kadamovas was not involved in the plan to escape:

a.   In a statement made on March 13, 2003 to Battley and Harlien, Mikhel stated that he was planning to take his two co-defendants, but "They had nothing to do with the planning. It was my plan." Ex. 89 (Battley memo 7/15/03).

b.   In a statement to Special Agent Sotelo made on April 11, 2003, Mikhel stated "he was going to escape alone and that Krylov and Kadamovas were not involved." Ex. 96 (Mikhel 302).

E.   Mr. Kadamovas was substantially prejudiced by counsel's inadequate preparation, lack of investigation, failures to object to inadmissible damaging evidence, and performance. Counsel's various actions and inactions deprived Mr. Kadamovas of a fair trial on the conspiracy to escape charge. Among other things, the prejudice caused by the ineffectiveness of counsel included:

1.   Mr. Kadamovas was deprived of the presentation of a duress defense.

259

2.      Inflammatory argument, inadmissible but prejudicial evidence, and other prejudicial inferences, which would have been prevented by timely objection and proper court ruling, were presented to the jury.

3.      The jury was not properly instructed.

4.      The prosecution's evidence was not adequately challenged.

5.      A proper defense to the charges was not presented.

F.      In the Krylov trial, defense counsel put forth a duress defense that led to a not guilty verdict on the conspiracy to escape charge. Ex. 97 (Krylov Trial Tr. 04/26/07).

1.      The circumstances of the Krylov trial demonstrate the prejudice of the ineffective assistance of counsel and show what could and should have been achieved had a proper defense to Count 6 been undertaken. *See* Ex. 97 (Krylov Trial Tr. 04/26/07); Ex. 99 (Krylov Trial Tr. 04/16/07); Ex. 100 (Krylov duress instr.); Ex. 101 (Krylov Trial Tr. 04/19/07); Ex. 102 (Krylov Trial Tr. 05/22/07).

2.      Krylov's defense counsel delivered a summation to the jury that demonstrates what could have been done in the Kadamovas trial, had counsel properly performed. *See* Ex. 101 (Krylov Trial Tr. 04/19/07).

G.      The failure to confront and provide a defense to the conspiracy to escape allegations had a separate and acute prejudicial impact on the penalty phase of the trial. The prosecution used the conspiracy to escape evidence as significant

260

aggravation, arguing that the world could only be safe from the two defendants if they were executed. Tr. 02/09/07 at 36-38, 151. The failure to confront the escape evidence and the failure to present a duress defense (even if not a complete defense to the charges) resulted in a lost opportunity to undercut the aggravating evidence, as well as the loss of significant mitigation, that would have altered the result of the sentencing phase trial.

H.      The denial of his right to effective assistance of counsel substantially prejudiced Mr. Kadamovas, rendered the trial proceeding fundamentally unfair, eroded the reliability of the verdicts and had a substantial and injurious effect on the verdicts. But for the denial of this right, it is reasonably probable that a more favorable result would have been attained.

## CLAIM 21 INEFFECTIVE ASSISTANCE OF COUNSEL: PENALTY PHASE TRIAL

Mr. Kadamovas' death sentence is unlawfully and unconstitutionally imposed, in violation of the Fifth, Sixth, and Eighth Amendments to the United States Constitution, because he was denied effective assistance of counsel at the penalty-phase portion of his trial. The performance of Mr. Kadamovas' court-appointed counsel fell below reasonable standards of representation, to Mr. Kadamovas' prejudice, in that counsel failed to exercise the skill, judgment, and diligence expected of a reasonably competent criminal defense lawyer in investigating the case, preparing for trial, challenging the prosecution's evidence, investigating mitigating evidence, and presenting evidence and a defense at trial.

Most notably, trial counsel failed to uncover important mitigating evidence, such as Mr. Kadamovas' father's psychiatric hospitalizations, suicide attempts, plan to murder his family, violent outbursts, and self-destruction. During Jurijus' childhood, his father was institutionalized on more than one occasion, with a diagnosis of paranoid psychopathy, bi-polar disorder, and chronic alcoholism. The jury knew none of this.

Trial counsel also failed to present a single mitigation witness who knew Mr. Kadamovas personally, because they failed to make the proper arrangements for his family members to travel from Lithuania to testify on his behalf. In addition, errors that occurred during the guilt phase impacted the jury's sentencing decision

262

at the penalty phase. Trial counsel failed to investigate the escape and to use evidence that was in their possession to establish that Mr. Kadamovas was not involved in the escape planning. They also failed to establish that Mikhel, not Mr. Kadamovas, received and controlled the ransom proceeds. They failed to use Solovyeva's diary to show the jury how Mr. Kadamovas changed as he came under Mikhel's influence, and why he was vulnerable to that influence in the first place. Witnesses that trial counsel should have, but did not, interview could have also helped explain why Mr. Kadamovas was vulnerable to Mikhel's influence and how he changed under it.

And trial counsel failed to ensure that witness testimony was translated correctly, undermining Mr. Kadamovas' ability to participate in the trial and allowing the jury to believe that the prosecution's star witness, Altmanis, was more credible that he was. Trial counsel's failures, errors and omissions denied Mr. Kadamovas the right to present a defense and to present all relevant mitigating evidence and resulted in the loss of the right to a fair trial and to a reliable and non-arbitrary sentencing determination. *See Wiggins v. Smith*, 539 U.S. 510 (2003); *Williams v. Taylor*, 529 U.S. 362 (2000); *Sanders v. Davis*, 23 F.4th 966 (9th Cir. 2022); *Correll v. Ryan*, 539 F.3d 938 (9th Cir. 2008); *Daniels v. Woodford*, 428 F.3d 1181, 1201-06 (9th Cir. 2005); *Stankewitz v. Woodford*, 365 F.3d 706, 708 (9th Cir. 2004); *Karis v. Calderon*, 283 F.3d 1117, 1134-35 (9th Cir. 2002).

The following facts and allegations, among others, support this claim:

A.    At trial, Mr. Kadamovas was represented by court-appointed attorneys Richard Lasting and Sonia Chahin. Ex. 10 (Lasting dec.). As discussed more fully below, *see* paragraph L, and in the allegations set forth in Claim 6 (Improper Denial of Continuances) and Claim 19 (Ineffective Assistance of Counsel: Guilt Phase Trial), which are incorporated by reference, Chahin did not have sufficient time to prepare. When she accepted appointment to represent Mr. Kadamovas, she was told, and believed, that the trial date would be continued. She would not have accepted the appointment if she had known the trial would not be continued, because at that time she was sole counsel for a client, Mr. Martinez, facing a life sentence in a highly complex case also headed to trial. Ex. 11 (Chahin dec.) ¶¶ 6, 10, 12, 15. When Mr. Kadamovas' trial was not continued, Chahin tried to withdraw, but her motion was denied. Tr. 06/26/06 at 11-12.

**Failure to Hire a Mitigation Specialist with Necessary Experience and Training**

B.    Mr. Kadamovas' penalty phase presentation consisted of two witnesses, neither of whom had met him prior to his incarceration on the crimes at issue. These two witnesses—both retained experts—did not have crucial social history records that would have informed their testimony. No lay witness testimony was offered to support and enrich the expert testimony. And there was no discussion of

264

Mr. Kadamovas' positive features and artistic contributions to give the jury a fuller picture of who he was, and is. Counsel unreasonably failed to prepare, investigate, and present a case in mitigation, unreasonably and ineffectively "acquir[ing] only rudimentary knowledge of [the defendant's] history from a narrow set of sources." *Wiggins*, 539 U.S. at 524. Trial counsel's failures were caused by a series of omissions, actions, and inactions that undercut the reliability of the verdict and fell below a reasonable level of effective representation. These errors began with counsel's failure to hire a qualified mitigation specialist.

1.    Counsel unreasonably failed to hire a mitigation specialist with appropriate experience and training. No person with experience or training as a mitigation specialist was ever made part of the defense team, a failure to ensure that the team was properly composed, in contradiction of recognized contemporaneous standards of capital case representation.

a.    Initially the trial court refused timely appointment of a mitigation specialist and did not appoint a mitigation investigator until October 1, 2004, thirty-one months after the arrest of Mr. Kadamovas. Ex. 104 (Dkt. No. 333); Ex. 106 (Dkt. No. 404); Dkt. No. 588 (under seal). The allegations set forth in Claim 22 (Denial of Mitigation Specialist and Resources for Mitigation Investigation) are incorporated by reference.

b.    Two motions requesting appointment of a mitigation specialist filed in 2003 were brief, unpersuasive, and failed to cite obvious applicable controlling authority. As expert mitigation specialist and the former National Mitigation Coordinator for the federal death penalty projects Russell Stetler explains:

> Counsel could have cited all the contemporaneous authorities and cases . . . in support of a motion for immediate appointment and funding of a mitigation specialist. If funding was refused, counsel needed to renew the motion and make a record as to why there was an urgent need to fund a mitigation specialist *before* the Government had decided whether to authorize the filing of a Notice of Intent to Seek the Death Penalty, and counsel had an obligation to conduct that investigation to the best of their ability regardless of any funding limitations. The mitigation investigation was critical to multiple aspects of trial counsel's representation . . . .

Ex. 4 (Stetler dec.) ¶ 44 (footnote omitted). Yet counsel did none of that.

c.    Counsel eventually requested that John Brock be appointed as mitigation investigator, and Mr. Brock was appointed on October 1, 2004. Dkt. No. 540 (under seal); Dkt. No. 588 (under seal). Mr. Brock was not a qualified, experienced mitigation specialist. Rather, he was a retired Deputy Public Defender. Ex. 12 (Brock dec.) ¶¶ 1, 6. According to Mr. Brock: "I had no training as a mitigation specialist. I now believe that I was totally unqualified to be a mitigation specialist. I have come to realize that the psychological concerns that mitigation specialists deal with are not things that I am adequately familiar with or

266

understand." *Id.* ¶ 6. In addition, he had no special knowledge of Russian or Lithuanian culture or language. *Id.* ¶ 5. Although he was an experienced defense attorney, he "had never been counsel in a death penalty trial where [he] had to put on a mitigation case at penalty phase." *Id.* ¶ 3.

         d.     Mitigation specialists were part of the standard of care for capital trial representation long before the trial in this case. In 1998 after a decade of experience with the federal death penalty, the Committee on Defender Services of the Judicial Conference of the United States appointed a subcommittee under the Hon. James R. Spencer of the Eastern District of Virginia to study the cost and quality of defense representation. The subcommittee report, commonly referred to as the Spencer Report, found that, as of 1998, the work of mitigation specialists was "part of the existing 'standard of care' in a federal death penalty case." Federal Death Penalty Cases: Recommendations Concerning the Cost and Quality of Defense Representation (May 1998), https://www.uscourts.gov/sites/default/files/original_spencer_report.pdf (last visited Oct. 1, 2023). The report noted that mitigation specialists "have extensive training and experience in the defense of capital cases. They are generally hired to coordinate an investigation of the defendant's life history, identify issues requiring evaluation by psychologists, psychiatrists or other medical professionals, and assist

attorneys in locating experts and providing documentary material for them to review." Ex. 4 (Stetler dec.) ¶ 20.

        e.     As revised in 2003, the ABA Death Penalty Guidelines state unequivocally that lead counsel at any stage of capital representation should assemble a defense team as soon as possible after designation with at least one mitigation specialist and at least one member qualified by training and experience to screen individuals for the presence of mental or psychological disorders or impairments (Guideline 10.4), in order to conduct a thorough and independent investigation relating to penalty (Guideline 10.7 and Guideline 10.11). 31 Hofstra L. Rev. 913, 999, 1015, 1055 (2003). The original edition of the ABA Guidelines, adopted in 1989, similarly required counsel to begin investigation immediately upon counsel's entry into the case and to "discover all reasonably available mitigating evidence." 1989 Guideline 11.4.1(C)[25] The 1989 Guidelines also required counsel to retain experts for investigation and "preparation of mitigation." 1989 Guideline 11.4.1(D)(7). Notably, the 1989 Guidelines specifically stated that "the investigation for preparation of the sentencing phase should be conducted

---

[25] The original edition of the ABA Guidelines is available at ambar.org/1989guidelines.

regardless of any initial assertion by the client that mitigation is not to be offered." 1989 Guideline 11.4.1(C) Ex. 4 (Stetler dec.) ¶ 21.

f.      Mr. Stetler reaffirms the importance of a qualified mitigation specialist, explaining that at the time of this case the use of a qualified mitigation specialist was indispensable because counsel could not fulfill their duties to their client without one:

In a capital case, competent defense counsel have a duty to conduct a thorough life-history investigation, but generally lack the skill to conduct the investigation themselves. Moreover, even if lawyers had the training, skills, and patience, they do not have the time to conduct thorough mitigation investigation because of all the other work that is demanded of them in representing a capital client. Besides, it is more cost-effective to employ those with recognized expertise in developing mitigation evidence. Capital defense counsel have long retained a mitigation specialist to complete a detailed, multigenerational social history to highlight the complexity of the client's life and identify multiple risk factors and mitigation themes.

Ex. 4 (Stetler dec.) ¶ 20 (footnotes omitted).

g.      Of particular note, Mr. Stetler explains that attorneys "generally lack the skill to conduct the investigation themselves." *Id.* ¶ 20.

h.      Attorney John Brock, who was appointed as the mitigation specialist was *not* a mitigation specialist. Ex. 12 (Brock dec.). He "had no training as a mitigation specialist" and "was totally unqualified to be a mitigation specialist." *Id.* ¶ 6.

269

2.     Trial counsel failed in their obligation to ensure that a proper mitigation investigation was undertaken.

**Failure to Collect Necessary and Available Social History Records**

C.     Having failed to hire a qualified mitigation specialist, trial counsel for Mr. Kadamovas and the team they formed failed to collect necessary and available social history records relating to Mr. Kadamovas and his family.

1.     Mr. Stetler explains the requirements for conducting an adequate social history investigation, which must include extensive record collection:

> The social history investigation should include a thorough collection of objective, reliable documentation about the client and his family, typically including medical, educational, employment, social service, and court records. Such contemporaneous records are intrinsically credible and may document events which the client and other family members were too young to remember, too impaired to understand and record in memory, or too traumatized, ashamed, or biased to articulate. The collection of records and analysis of this documentation involve a slow and time-intensive process. . . . Great diligence is required to ensure compliance with appropriate requests. Careful review of records often discloses the existence of collateral documentation which, in turn, needs to be pursued.

Ex. 4 (Stetler dec.) ¶ 26.

2.     The Commentary to ABA Guideline 10.7 (Investigation) notes:

> Records should be requested concerning not only the client, but also his parents, grandparents, siblings, cousins, and children. . . . The collection

270

of corroborating information from multiple sources – a time-consuming task – is important wherever possible to ensure the reliability and thus the persuasiveness of the evidence.

Counsel should use all appropriate avenues including signed releases, subpoenas, court orders, and requests or litigation pursuant to applicable open records statutes.

31 Hofstra L. Rev. at 1024-25.

3. Counsel for Mr. Kadamovas, and the defense investigators, failed to conduct a competent, diligent search for records and, accordingly, failed to collect available records, including school records, medical records, military records, and other crucial life history documents.

a. Among the important records that trial counsel did not collect and did not have are the psychiatric records of Jurijus Kadamovas' father, Aimuchamed Kadamovas. Ex. 34. These records catalogue the severe mental illness of defendant's father, his psychiatric hospitalizations, suicide attempts, plan to murder his family, violent outbursts, and self-destruction, and anticipate the devastating impact of these events on the family. During Jurijus' childhood, his father was institutionalized on more than one occasion, with a diagnosis of paranoid psychopathy, bi-polar disorder, and chronic alcoholism. Ex. 34 (A. Kadamovas psych. records) at 82, 107, 112.

b. The psychiatric records include Aimuchamed Kadamovas' suicide note written to his young son, his daughter and his ex-wife, and note his

repeated suicide attempts, including at least one attempt that occurred in the view of his young children. *Id.* at 87, 144. During one of Aimuchamed Kadamovas' internments in a psychiatric hospital, he shared his plans to kill both himself and Jurijus' mother, even drawing the electrical device he planned to use to electrocute them both:



*Id.* at 7.

      c.     The turmoil that Jurijus Kadamovas experienced as a child, the conflict in his parents' relationship, and the dysfunctional, chaotic household is evident in these records. The records recount that Aimuchamed Kadamovas was

272

obsessively jealous of his wife's routine interactions with other men from the day of their marriage. *Id.* at 103. He believed she was immodest and was unfaithful. *Id.* at 99, 103. He heard voices, *id.* at 125, experienced drastic mood swings, *id.* at 133, experienced paranoia, *id.* at 104, 133, and a variety of other debilitating and serious psychological problems.

d. Trial counsel also failed to obtain Jurijus Kadamovas' school records from the Builder's Training College (Ex. 37), and School 46 (Ex. 38). These school records show a student struggling with math and science, suffering from a learning disorder, adversely affected by the chaos and dysfunction in his family, who was channeled into trade school because of his academic difficulties and limitations.

e. Trial counsel failed to obtain Jurijus Kadamovas' Komsomol Characteristics letter. Ex. 48. This letter reveals a delayed acceptance into the Komsomol, most likely due to his extremely poor grades and learning disability. Ex. 1 (Volynsky dec.) ¶¶ 110-13; Ex. 2 (Klumbyte dec.) at 12, 16.

f. Trial counsel failed to obtain Jurijus Kadamovas' Military records. Ex. 39. These records demonstrate Jurijus Kadamovas was approved for combatant status but assigned instead to the military orchestra. *Id.* There is no indication of disciplinary problems in the military. *Id.*

g.    Trial counsel failed to obtain additional life history records that confirm events and give context to his life in Lithuania, including marriage certificates, birth certificates, death certificates, and other official documents. Ex. 7 (Ravluševičius 2022 dec.) ¶ 6. These records demonstrate the family history of Mr. Kadamovas and would have allowed experts to place his life in his own specific context of religion, politics, culture, and unique family background.[26]

4.    These records could easily have been attained by trial counsel. Any attorney licensed in Lithuania could have obtained such records in 2005. Ex. 7 (Ravluševičius 2022 dec.) ¶ 7. Failing to collect these records constitutes deficient performance that prejudiced Mr. Kadamovas.

**Failure to Interview Crucial Mitigation Witnesses**

D.    Trial counsel failed to interview necessary mitigation witnesses.

1.    There were many witnesses willing to provide crucial information about Jurijus Kadamovas' life.

a.    Witnesses would have testified, for example, that Jurijus Kadamovas is a talented artist, a creative person seeking to make his deprived world one of beauty. Ex. 27 (Chernykh dec.) ¶ 8; Ex. 28 (Nagrockis dec.) ¶¶ 35-38;

---

[26] *See* Exs. 6, 8, 35, 36, 40, 41, 45, 49-75.

274

Ex. 33 (Zadorozney dec.) ¶¶ 13-15. He is a talented musician who, with no formal instruction he became accomplished enough in his music to be recruited as a member of the military orchestra, a coveted position in his mandatory Soviet military service often reserved for those with unique talents or special social connections. Ex. 24 (V. Aleksandrovich dec.) ¶ 21; Ex. 22 (Gorshanenko dec.) ¶ 11; Ex. 20 (Kanopkin dec.) ¶ 65; Ex. 30 (Vatkin dec.) ¶ 5; Ex. 31 (Daletsky dec.) ¶ 10; Ex. 23 (J. Aleksandrovich dec.) ¶ 8; Ex. 32 (Rabkin dec.) ¶ 16; Ex. 31 (Daletsky dec.) ¶ 13.

      b.     Witnesses could have testified that Jurijus Kadamovas' life in the United States got off to a difficult start. Ex. 26 (Baranchik dec.) ¶¶ 7, 8; Ex. 28 (Nagrockis dec.) ¶ 30. This testimony could have complemented testimony from his closest family members explaining that his early life in Lithuania was characterized by poverty, deprivation, chaos, lack of stability, lack of positive role models, and domestic violence.

      c.     These witnesses would have been able to offer context that explained why Jurijus Kadamovas was so vulnerable to Mikhel's influence. Ex. 27 (Chernykh dec.) ¶¶ 5, 8, 9. And they would have explained that, outside of Mikhel's influence, Jurijus Kadamovas is not a violent person. Ex. 22 (Gorshanenko dec.) ¶ 12; Ex. 25 (Jakovleva dec.) ¶ 34; Ex. 28 (Nagrockis dec.) ¶ 10.

2. Trial counsel's deficient mitigation investigation—which had the trial team conducting their life history investigation in Lithuania after jury selection had already started—meant that they did not interview many crucial witnesses, so they did not know what information they could offer. *See, e.g.*, Ex. 25 (Jakoleva dec.) ¶ 38 (stepsister willingly would have met with trial team); Ex. 22 (Gorshanenko dec.) ¶ 18 (cousin willingly would have met with trial team). For the few witnesses they did interview, they conducted these interviews without the benefit of crucial life history records, and failed to elicit crucial information. *See, e.g.*, Ex. 17 (Kadamova dec.); Ex. 18 (Kadamoviene dec.).

3. Failing to meet with witnesses who would have been easy to locate and would have spoken to the trial team and testified on Mr. Kadamovas' behalf constitutes deficient performance that prejudiced Mr. Kadamovas.

**Failure to Make Proper Arrangements for Family Members to Travel to the United States to Testify**

E. Having conducted a wholly inadequate mitigation investigation, defense counsel then failed to secure attendance of the only three family witnesses they intended to call, who would have travelled from Lithuania to testify on Mr. Kadamovas' behalf. Those three witnesses were prohibited from leaving Lithuania to travel to the United States for the trial. Defense counsel negligently failed to timely secure visas and provide travel arrangements for these three witnesses.

276

1.    Defense counsel for Mr. Kadamovas planned to present three family witnesses: Jurate Kadamoviene (defendant's wife), Gabriel Kadamovas (defendant's son) and Svetlana Kadamova (defendant's sister). Ex. 10 (Lasting dec.) ¶ 24.

2.    On January 17, 2007, counsel for co-defendant Mikhel alerted the trial court that, because of the lack of funding for a travel authorization, and the time delay to get a visa, some penalty phase witnesses for Mikhel might not be available when the penalty phase trial began. The trial court responded: "That's your problem. . . . You had over a month now," and indicated he would not give any continuance. Tr. 01/17/07 at 13. Counsel for Mr. Kadamovas was alerted that securing visas could be a problem. *See* Dkt. No. 1578.

3.    Guilt phase verdicts were returned on January 17, 2007, and the trial court excused the jurors, indicating that the penalty phase portion of the trial would begin on January 24, 2007. Tr. 01/17/07 at 26-27.

4.    On January 19 or January 20, 2007, counsel for Mr. Kadamovas forwarded the three names of the family mitigation witnesses to FBI Special Agent Perez who was offering to help secure the visas and he in turn forwarded the names to the "FBI Legal Attaché" in Lithuania. Ex. 107 (Perez dec., Dkt. No. 1578-2) ¶ 2; *see also* Dkt. No. 1578.

5.    During the week of Monday, January 22, 2007, none of the three

Lithuanian family witnesses had any assistance with travel arrangements from the trial team, and they did not apply for visas. Ex. 17 (Kadamova dec.) ¶ 86; Ex. 19 (Kadamoviene dec.) ¶ 51; Ex. 107 (Perez dec., Dkt. No. 1578-2) Ex. D. The penalty phase trial began with the prosecution case in aggravation on Wednesday, January 24. With regard to the Kadamovas witnesses, Agent Perez followed up with an e-mail to attorney Lasting on Saturday, January 27, inquiring about the status of the witnesses. Ex. 107 (Perez dec., Dkt. No. 1578-2) ¶ 4. Attorney Lasting responded that he anticipated that the witnesses would go to the embassy on Monday, January 29. Ex. 107 (Perez dec., Dkt. No. 1578-2) Ex. D.

6.      On Tuesday, January 30, co-defendant Mikhel's attorneys began to present his penalty phase case. Tr. 01/30/07.

7.      On Wednesday, January 31, as Mikhel's penalty phase case was proceeding, at the end of the court day, attorney Lasting informed the court, with regard to the Kadamovas family witnesses:

> [T]hey've run into some problems in applying for the visa. When they went to the Embassy they were told that they had to pay $100 apiece with the application. I discussed that with Special Agent Perez. It was unclear to me whether they had to pay the $100 when they made the application or when the visa was issued. But in an effort to resolve it, we wired them . . . $300 so they could each apply and have the money in case it was required at the time.
>
> I'm led to believe that they were applying for the visa today. But the economics there, their financial situation prohibited them from being able to seek the visa until they got the money from us. And I've been trying to stay

278

in touch with Special Agent Perez. I think he's doing what he can to try to help us, but again, I think the problem is that this all may have started too late and that's why I indicated to the Court we might need a continuance to get them over here. But we're doing the best we can; we're trying.

Tr. 01/31/07 at 220.

8. On Tuesday, February 6, Mikhel's penalty phase case was scheduled to conclude. Attorney Lasting announced to the court:

Your Honor, I learned this morning that our efforts to have visas issued for Mr. Kadamovas' family, specifically his wife [Jurate], his son Gabriel, and his sister Svetlana, were denied at the American Embassy or Consulate in Vilnius, Lithuania.

I'm told that when they went yesterday for their interview with regard to the visa, someone in the position that was described to me as a screener informed them that visas would not be issued to any of them because of their financial situation, that none of them had sufficient economic resources or money in the bank that would justify the issuance of a visa to come to the United States.

Tr. 02/06/07 at 7-8. Counsel made a motion for a mistrial. Tr. 02/06/07 at 8.

9. The prosecutor's response to the news of the denial of the visa applications was:

It shouldn't be a shock to anybody right now that we're sitting in the penalty phase of the trial. It shouldn't be a shock to anybody that it's happening right now.

I mean we had a whole break before we came back over the New Year's. And we knew that this case was going to end soon after that break and that the penalty phase was likely going to start soon afterwards.

279

The first time that Mr. Lasting raised this issue about getting these visas was on the day of the verdicts, which was January 17th, 2007. I communicated with Mr. Lasting by email within 24 hours of that asking him to provide me information concerning the three people that he wanted to bring over here. I got a response on January 19th of 2007 concerning who these people were and some information about them.

They were informed that they had to make an appointment with the consulate in Lithuania. And they had to do so to fill out their visas applications and to get that process rolling.

They didn't start -- we started the penalty phase on January 24th. They didn't even make an appointment to go to the consulate until sometime mid to late last week is my understanding. And they didn't show up at the consulate's doorstep until yesterday.

So there had to be more urgency to this if this was really something that these people wanted to do and be a part of. I mean we can't help the fact that they showed up at the consulate doorstep yesterday wanting a visa to immediately come here. That's not how the process works.

The consulate has to do some sort of at least minimal investigation to find out why these people are coming here and whether they should issue the visas. And a 24-hour-turnaround time or 48-hour-turnaround time is just not practical.

It's not the way that it works. And there's nothing that we can do to assist the defense in this regard at this point in time. It's simply too late.

Tr. 02/06/07 at 8-9. The prosecutor went on to suggest that the visa problem might be a ruse, a "strategic" decision not to put on the family witnesses because of potential "dirty laundry." *Id.* at 10-11. The prosecutor offered to file a proffer

280

regarding the nature of this so-called dirty laundry. *Id.* at 11. No such proffer was filed.

10. The three family witnesses, Mr. Kadamovas' sister, wife, and son, never were presented to the jury and never testified. No effort was made to introduce their testimony via an alternative such as videoconference or videotaped interviews. *See* Dkt. No. 1578 at 11.

11. The defense included the visa debacle episode in a Motion for New Trial, Dkt. No. 1562, asserting that Mr. Kadamovas' constitutional rights had been violated. The prosecution response included the following:

> [T]here was little, if any diligence accompanying the efforts to secure the presence of these purported witnesses at trial. . . . Kadamovas' family members, who were well aware of the procedures involved in obtaining visas to travel to the United States, did not even start the process of apply [sic] for visas until February 5, 2007, weeks after the penalty phase of the trial began.

Dkt. No. 1578 at 13. The motion was denied. Tr. 03/12/07B at 29.

12. The available testimony of Jurate Kadamoviene and Svetlana Kadamova is set forth in their declarations, Ex. 18 (Kadamoviene dec.) and Ex. 17 (Kadamova dec.); *see also* Ex. 1 (Volynsky dec.). In addition, Gabriel Kadamovas could have testified regarding his love for his father.

a. Svetlana Kadamova is Mr. Kadamovas' only sister. Not only would she have expressed her love and affection for her brother, but she would

281

have told the harrowing tales of their childhood, their father's attempts to kidnap her and her brother, and the eventual destruction of the family unit and abandonment by their father. Ex. 17 (Kadamova dec.) ¶¶ 27, 34, 83. Svetlana would have also explained her family's history with alcoholism, poverty, and economic uncertainty. *Id.* ¶¶ 19, 46-48.

   b.  While the jury heard suggestions from the prosecution that Mr. Kadamovas had abandoned his wife Jurate in Lithuania, Svetlana could have countered that narrative by sharing the facts about Jurate's behavior and the bond between husband and wife that persisted. *Id.* ¶¶ 63, 73. The jury never heard Svetlana convey Jurijus' loving and protective role as her older brother, as well as his musical, artistic, and caring nature. *Id.* ¶¶ 52, 57, 68.

   c.  Jurate could have shared with the jury the story of her relationship with Jurijus, the destructive force that alcohol played in the extended family, Jurijus' attempts to help his family members financially, and his joy at the birth of his son Gabriel. Ex. 18 (Kadamoviene dec.) ¶¶ 4-21. This testimony would have refuted the negative and aggravating inferences of the prosecution case, and served to humanize Mr. Kadamovas in the eyes of the sentencer.

   d.  Contrary to the government's portrayal of their relationship, Jurate would have explained that Jurijus was not difficult or argumentative. *Id.* ¶ 30. Jurijus moved to the United States, initially alone but with the intention of

bringing Jurate and Gabriel to join him once settled. *Id.* ¶ 41. In fact, "Yuri was very happy that we were coming. He told me that he filled the fridge with so much food that Gabriel would be spoilt for choice." *Id.* However, Jurate's visa was denied and she was unable to emigrate. *Id.* Jurijus continued to support her financially. Jurate loved Jurijus and wanted to share these and other details about Jurijus, his artistic talent, and his gentle nature with the jury. *Id.* ¶ 51.

13.   The allegations in Claim 6 (Improper Denial of Continuances) and Claim 23 (Government Misconduct Regarding Defense Witness Visa Applications) are incorporated by reference.

14.   Counsel's lack of diligence in securing visas and making proper travel arrangements for Mr. Kadamovas' immediate family members resulted in the jury being deprived of this important mitigating evidence and constitutes deficient performance that prejudiced Mr. Kadamovas.

**Presenting a Minimal and Incomplete Mitigation Case**

F.   Having failed to hire a qualified mitigation specialist, collect necessary and available social history records, interview necessary witnesses, and secure visas for the family members they did interview and intend to call, Mr. Kadamovas' trial counsel put on a minimal and incomplete mitigation case. They presented only two witnesses, neither of whom had met Mr. Kadamovas before the charged offenses.

283

Counsel's performance fell short of minimum constitutional standards and deprived the jury of a true, reliable, accurate, portrait of Mr. Kadamovas.

1.    On the afternoon of February 6, 2007, after an exceptionally brief opening statement, the defense called Dr. Mark Cunningham, a psychologist, who testified for two hours. Tr. 02/06/07 at 127-207. On the morning of February 7, 2007, the government cross-examined Dr. Cunningham, Tr. 02/07/07 at 10-60, and after a brief re-direct and re-cross, the defense called Professor Richard Anderson, a political scientist. Professor Anderson was finished with his testimony by about 11:30. Tr. 02/07/07 at 64-88. All in all, the mitigation case for Mr. Kadamovas, in a seven-month-long capital trial, lasted roughly four hours and constituted approximately (including the government's cross-examination of the two witnesses) 160 pages of transcript. The entire mitigation case presented on behalf of Jurijus Kadamovas consisted of:

a.    The testimony of Dr. Mark Cunningham, who testified that Mr. Kadamovas would make a positive adjustment to prison and, based on his jail history and personal characteristics (limited to age and lack of violence in jail) would not likely commit violent acts in prison. Tr. 02/06/07 at 136-60. Dr. Cunningham also explained the nature and design features of maximum-security prisons, particularly focusing on the prison in Florence, Colorado where Mr. Kadamovas would likely be housed if he were sentenced to life. *Id.* at 167-202. Dr.

284

Cunningham now notes that his testimony was grossly incomplete, and had he received readily available life history records—such as the psychiatric records of Mr. Kadamovas' father, the medical records of his mother, military records and school records—and mitigation information from the family, he could have expanded on Mr. Kadamovas' likely nonviolent adjustment to prison and would have recommended development of a number of important mitigating themes. Ex. 15 (Cunningham dec.).

         b.     The testimony of Professor Richard Anderson of UCLA who generally discussed life in Lithuania during the dissolution of the Soviet Union. Tr. 02/07/07 at 67-83. Professor Anderson testified that he never interviewed Jurijus Kadamovas and knew very little about him or his unique experience in Lithuania. *Id.* at 84-86.

         c.     A single piece of paper, Trial Ex. 2101, from the Lithuania Department of Informatics and Communications attested that Mr. Kadamovas had no "records of criminal activities" in Lithuania. Tr. 02/07/07 at 89. On appeal, the Ninth Circuit panel ridiculed this evidence:

> Kadamovas's *only* evidence in this regard was a letter from the Lithuania Department of Informatics and Communications stating that it had no "records of criminal activities or lawsuits in the name of Mr. Jurijus Kadamovas." Kadamovas offered no testimony about the letter's reliability, who wrote it, or what it meant. The letter does not prove that Kadamovas had no prior criminal record. It only showed that one agency in his home

country had no such record; it said nothing about the reliability of the evidence or its implications for records in other jurisdictions.

*United States v. Mikhel & Kadamovas*, 889 F.3d at 1066.

          d.     A two-page document from the Soviet army, Trial Ex. 2102, that summarized Mr. Kadamovas' time in the military, noting that "During his service in the Military Unit 11282, Kadamovas . . . proved himself to be a disciplined and industrious soldier. He never shrunk from responsibilities and filled them completely and with zeal and diligence." Tr. 02/07/07 at 90-91. Mr. Kadamovas, according to this report, was "a caring friend and reliable comrade. Has earned well-deserved respect and enjoyed authority among his comrades. Morally stable and of good physical development." *Id.* at 91. No context or depth was given to this stilted information, and no witness testified regarding Mr. Kadamovas' activities while in the Soviet armed forces.

          2.     At the penalty phase trial, Mr. Kadamovas' counsel did not present any testimony of any family members, friends, or colleagues regarding Jurijus Kadamovas' life, childhood, background, struggles, or talents. The jury was left unaware that Jurijus Kadamovas was an artist, a musician, and a creator. No attempt was made to explain the circumstances that led him to be captured in the web of Iouri Mikhel. No life history evidence whatsoever was presented to the jury evaluating his moral worth and assessing the appropriate sentence.

286

3.      Defense counsel proffered verdict forms for nine mitigating factors. At the conclusion of the mitigation presentation, in evaluating the mitigating evidence, the jury unanimously rejected every single one of the mitigating factors, including those that were undisputed and obviously true. Tr. 02/13/07 at 102-03. That is: the mitigation presentation was so lacking in value that not only did the jury return a death sentence, but every single one of the jurors rejected the presence of every single one of the mitigating factors proffered. When weighing the aggravation against the mitigation, the jury confronted a situation where defense counsel for Mr. Kadamovas put nothing on the mitigation side of the scale.

**Prejudice Flowing from Trial Counsel's Deficient Penalty Phase Investigation**

G.      The failures, actions, inactions, and mistakes of trial counsel resulted in substantial prejudice. There is a reasonable probability that, but for counsel's inadequacies, the result of the proceeding would have been different. The jury's understanding of Mr. Kadamovas was incomplete and inaccurate. Vital, compelling, and persuasive mitigating evidence was not presented to the sentencer. The penalty phase verdict rendered at the end of this trial was unreliable and defective.

1.      In addition to the two unprepared expert witnesses, trial counsel only sought to have the jury hear from three family witnesses, a plan that was sabotaged by counsel's own negligence and inattentiveness. However, even those three

witnesses would have related an incomplete and inadequate picture of Mr. Kadamovas' life history.

2.       Available mitigating evidence regarding Mr. Kadamovas' childhood, background, lack of opportunity, deprivation and poverty, character, good deeds, personality features, potential for rehabilitation, and other attributes was not presented to the sentencer. Some of the important and impactful mitigation evidence that witnesses could have provided is set forth in the Exhibits that accompany this Motion, including Ex. 19 (Z. Kovalchuck dec.), Ex. 20 (Kanopkin dec.), Ex. 21 (A. Kovalchuk dec.), Ex. 22 (Gorshaenko dec.), Ex. 23 (J. Aleksandrovich dec.), Ex. 24 (V. Aleksandrovich dec.), Ex. 25 (Jakovleva dec.), Ex. 26 (Baranchik dec.), Ex. 27 (Chernykh dec.), Ex. 28 (Nagrockis dec.), Ex. 29 (Pinkovski dec.), Ex. 30 (Vatkin dec.), Ex. 31 (Daletsky dec.), Ex. 32 (Rabkin dec), Ex. 33 (Zadorozney dec.), and Ex. 127 (Bedirian dec.). Contemporaneous social history records would have corroborated the testimony of these witnesses. *See, e.g.*, Ex. 7 (Ravluševičius 2022 dec.). In addition, properly prepared expert witnesses could have explained how Mr. Kadamovas' background and social history affected his behavior, personality, and development and how he was predisposed to the negative influence and manipulation of Iouri Mikel. *See* Ex. 2 (Klumbyte dec.); Ex. 9 (Krausz dec.); Ex. 1 (Volynsky dec.). The following is a brief summary of the types of mitigating evidence that should have been presented

and would have made a difference in the jury's assessment of the balance of aggravation and mitigation and, ultimately, the choice of penalty:

3.      Jurijus Kadamovas is a talented artist. His best grades in school, the only good grades he received, were in art and music. Ex. 17 (Kadamova dec.) ¶ 82. He is an accomplished visual artist. He began drawing as a teenager, creating unique visual displays for his aquarium fish. Ex. 17 (Kadamova dec.) ¶ 52; Ex. 19 (Z. Kovalchuk dec.) ¶ 40. He was a creative person seeking to make his deprived world one of beauty. Ex. 27 (Chernykh dec.) ¶ 8. He sought to make his creative process one of financial success by building unique aquariums for installation in restaurants and homes in Los Angeles. *Id.*; Ex. 28 (Nagrockis dec.) ¶¶ 35-38; Ex. 33 (Zadorozney dec.) ¶¶ 13-15.

4.      Jurijus Kadamovas is a talented musician. Ex. 24 (V. Aleksandrovich dec.) ¶ 21; Ex. 22 (Gorshanenko dec.) ¶ 11; Ex. 20 (Kanopkin dec.) ¶ 65; Ex. 30 (Vatkin dec.) ¶ 5; Ex. 31 (Daletsky dec.) ¶ 10. He taught himself to play guitar and drums as a teenager. Ex. 23 (J. Aleksandrovich dec.) ¶ 8; Ex. 32 (Rabkin dec.) ¶ 16. With no formal instruction, he became accomplished enough in his music to be recruited as a member of the military orchestra, a coveted position in his mandatory Soviet military service often reserved for those with unique talents or special social connections that Mr. Kadamovas' family did not have. Ex. 31 (Daletsky dec.) ¶ 13; Ex. 39 (Military records). After his military service, he

continued making music personally and professionally. Ex. 17 (Kadamova dec.) ¶¶ 57, 58, 68; Ex. 30 (Vatkin dec.) ¶¶ 5-9; Ex. 31 (Daletsky dec.) ¶ 14. Despite his struggles and deprived background, Jurijus Kadamovas' demonstrated artistic and musical talents make him a candidate to become a positive and nonviolent influence in prison. He recorded music throughout his adult life, including one notable song memorialized in Los Angeles prior to his arrest with his original lyrics and score. He wrote the song in the Russian language. The translation:

**My Soul**

One day I will tell my soul
To go deep into hiding
I will never let anyone pry into it
And no one will harm it again
It will never again know anguish
It will never suffer again
No one will ever torment it
Maybe it's time for my soul to be free.
I wish I could buy a new one
But there aren't any for sale
I tried to sell it to Devil
But he wanted it almost for free.
Will my soul endure lonely
All the pain, sorrow and agony
I wish I could give it a new life
But I don't have one for myself.
One day I will go out
Into the glamour of a beautiful morning
I will remove all the ties from my soul
And let it fly free with the wind.
If my soul never comes back to me

That will mean it enjoys its freedom
It will mean that it is much happier
In its new life without me.

Ex. 76 (lyrics translated).

5.      Jurijus Kadamovas adored his children, Gabriel and Anastasia, and was a gentle and loving caretaker. Ex. 19 (Z. Kovalchuck dec.) ¶ 28; Ex. 1 (Volynsky dec.) ¶¶ 147, 261. He also was the caretaker of his beloved grandfather as he aged and needed assistance. Ex. 19 (Z. Kovalchuk dec.) ¶ 19.

6.      Jurijus Kadamovas was kind, and he loved animals. During his childhood he had a beloved cat that slept with him every night. He treated it gently and lovingly. Ex. 17 (Kadamova Dec.) ¶ 53; Ex. 24 (V. Aleksandrovich dec.) ¶ 20. He learned to care for fish, which he maintained as an interest throughout his life. Ex. 23 (J. Aleksandrovich dec.) ¶ 8; Ex. 24 (V. Aleksandrovich) ¶ 20; Ex. 17 (Kadamova dec.) ¶ 52; Ex. 19 (Z. Kovalchuk dec.) ¶ 40. He knew details about how to care for fish, both common and exotic. Ex. 23 (J. Aleksandrovich dec.) ¶ 18; Ex. 27 (Chernyk dec.) ¶ 6; Ex. 28 (Nagrockis dec.) ¶ 35; Ex. 17 (Kadamova dec.) ¶ 52; Ex. 19 (Z. Kovalchuck dec.) ¶ 40; Ex. 20 (Kanopkin dec.) ¶ 68. As a young adult he had many pets, including fish, a dog, a cat, and a turtle. Ex. 18 (Kadamoviene dec.) ¶ 39.

7.      Jurijus Kadamovas' early life in Lithuania was characterized by poverty, deprivation, chaos, lack of stability, lack of positive role models, and domestic violence. The jury heard nothing of this.

a.      Mr. Kadamovas' father, Aimuchamed, was a Muslim from the Turkman Soviet Socialist Republic (now Turkmenistan). Ex. 46 (J. Kadamovas birth certificate); Ex. 17 (Kadamova dec.) ¶ 25; Ex. 34 (A. Kadamovas psych. records).

b.      Mr. Kadamovas' mother, Tatiana Kanopkin, was from a Russian immigrant family that had come to Lithuania several generations before and practiced a hyper-traditional "Old Believers" form of the Russian Orthodox religion. Ex. 46 (J. Kadamovas birth certificate); Ex. 17 (Kadamova dec.) ¶¶ 5, 15. Her father was a decorated veteran of World War II, having valiantly fought against Nazis. Ex. 17 (Kadamova dec.) ¶ 40; Ex. 20 (Kanopkin dec.) ¶ 19; Ex. 19 (Z. Kovalchuk dec.) ¶ 10.

c.      Mr. Kadamovas' parents met while Aimuchamed was stationed in Vilnius, Lithuania during his mandatory Soviet army service, and Aimuchamed broke off an arranged engagement in Turkmenistan to marry the Russian Tatiana in Lithuania. Ex. 20 (Kanopkin dec.) ¶ 51. Both families were opposed to the marriage and, from the beginning, this union of a Muslim Turkman and a traditional Christian Russian was tumultuous and unstable. Ex. 17 (Svetlana dec.)

292

¶¶ 8, 14, 25. They married anyway. Ex. 42 (Marriage Cert. Tatiana Kanopkina and Aimuchamed Kadamovas).

d.      The strains on the family unit were increased when the first child of Aimuchamed and Tatiana was stillborn. Ex. 19 (Z. Kovalchuck dec.) ¶ 25.

e.      Jurijus Kadamovas was born in 1966. Ex. 46 (Jurijus Kadamovas Birth Certificate). Until 1975, he lived in a two-room apartment in a wooden structure at Trimitu 40 in the Kalvariju region of Vilnius. Ex. 31(Daletsky dec.) ¶ 5; Ex. 17 (Kadamova dec.) ¶¶ 19, 20. The entire apartment was about five meters wide and five meters long. *Id.* There was no plumbing or running water, and the family had to use public baths and toilets. *Id.* After Svetlana (Jurijus' sister) was born in 1971, six people lived in this tiny apartment: Aimuchamed and Tatiana, the two children, and the maternal grandparents Aleksandra and Varfolomey Kanopkin. No one had any privacy. Sometimes an uncle, Venarii, would live there as well. *Id.*; Ex. 20 (Kanopkin dec.) ¶¶ 50, 57.

f.      The marriage of Aimuchamed and Tatiana, who were fundamentally incompatible even before Aimuchamed began to deteriorate psychologically, collapsed after a few years, in an acrimonious and tumultuous separation. Ex. 17 (Kadamova dec.) ¶ 25; Ex. 19 (Z. Kovalchuck dec.); Ex. 43 (divorce certificate).

g.    Jurijus Kadamovas' father Aimuchamed was severely mentally ill, and his behavior terrorized his family and adversely affected his children.

h.    Aimuchamed was born in 1941 in the Turkmen SSR. Despite being raised in a strict Muslim culture, he began smoking at age eight and drinking alcohol at age nineteen. Ex. 34 (A. Kadamovas psych. records). From childhood, he was "abrupt, intemperate, with fast changing mood." *Id.* at 133. One of the medical reports states succinctly: "his personality is clearly psychopathic since childhood." *Id.* at 148. Aimuchamed first landed in a sober house in 1966, the year of Mr. Kadamovas' birth. *Id.* at 19.

i.    From the beginning of his marriage with Tatiana, Aimuchamed was obsessively jealous, leading to his abandonment of the family in 1971 (when Jurijus was four), to return in 1972. From that point, his behavior was intensely destructive; he was drinking alcohol every day, beating his wife, and generally uncontrollable. *Id.* at 103. In 1973, Aimuchamed was hospitalized in a psychiatric facility, diagnosed with psychopathy. *Id.*

j.    Mr. Kadamovas' uncle could hear the arguments between Aimuchamed and Tatiana through the thin walls, with disputes becoming louder and more frequent as time went by. Ex. 20 (Kanopkin dec.) ¶ 56. Tatiana began to fear her husband and worried that he would kill her with an axe. Ex. 19 (V. Kovalchuck dec.) ¶ 30. Their fighting was terrifying for young Jurijus and his little

sister Svetlana, and they ran to their grandparents in fear. Ex. 20 (Kanopkin dec.) ¶ 56.

k.      In 1975, matters became acute. Aimuchamed attacked Tatiana with a knife. She decided, with the support of her parents, that she could not live with him anymore and started divorce proceedings. Ex. 34 (A. Kadamovas psych. records) at 103-04. Jurijus' aunt explains: "Tatiana became afraid of [Aimuchamed] at some point, and she feared he would kill her . . . ." Ex. 19 (Z. Kovalchuk dec.) ¶ 30.

l.      After the divorce, Aimuchamed became obsessed with the thought of killing his wife and then committing suicide. Ex. 34 (A. Kadamovas psych. records) at 92, 102, 148. The aunt relates: "The situation became so serious that Tatiana contacted the police . . . saying that she wanted [Aimuchamed] to be committed. The police came and took [Aimuchamed] to a psychiatric hospital to calm down." Ex. 19 (Z. Kovalchuk dec.) ¶ 30. Aimuchamed was committed to a psychiatric hospital, diagnosed with psychopathy and obsessive compulsive disorder. Ex. 34 (A. Kadamovas psych. records) at 82, 90, 92, 102, 148.

m.      In October 1975, while a patient in the Vilnius Republican Psychiatric Hospital, Aimuchamed wrote his (now former) wife a note. Part of the note read:

295

Today, on the 18th of October, I will become 34 years old and if today together we do not decide how to live and how to behave in terms of our children then either I will kill you or both of us.

Ex. 34 (A. Kadamovas psych. records) at 86.

n. Aimuchamed was released into his brother's care in late October 1975, and returned to Turkmenistan, where he was accepted into the Ashgabat Psychoneurological Hospital. Ex. 34 (A. Kadamovas psych. records) at 105, 107, 116, 133. Aimuchamed would return to Vilnius in 1977-1978, where he would continue to have homicidal and suicidal ideation, and was hospitalized again, with a diagnosis of "psychopathic suicidal tandem," and "psychopathy affective type, decompensation." Ex. 34 (A. Kadamovas psych. records) at 141.

o. Aimuchamed attempted to kidnap Jurijus on at least two occasions. Tatiana attempted to stop the kidnapping and tried to cut off all communication between the children and Aimuchamed. Ex. 17 (Kadamova dec.) ¶¶ 27, 28. He attempted to take the children back to Turkmenistan but was stopped by the police once at a train station and once at an airport. *Id.* ¶ 27. After this, Tatiana's mother would secretly allow visits but would force Aimuchamed to take another child with him on visits with his own children as an effort to prevent him from kidnapping them. *Id.* ¶ 29. Svetlana has a photo of herself, her father, Jurijus and the little neighbor child:

296

*Id.* at 31. Text, handwritten by their father on the back of the photograph, reads:

> In memory of my dear children Yuri and Svetlana. Be attentive in everything and take care of the memory of me, do not forget that your last name is Kadamov. I was happy with you even in these days when we photographed and met in secret. Ashgabat. 1976. Kadamov.

Id. ¶ 83 (Image 6).

p.    Eventually, Aimuchamed would leave Lithuania for good and live in Turkmenistan. Svetlana spoke to her father over the telephone twice in the early 1990s but has not spoken to him since. *Id.* ¶ 34. Jurijus would likewise never see his father again.

q.    In 1975, when Jurijus was nine years old, the little apartment on Trimitu was demolished and the family moved to the Viršuliškės area into a five-story building. *Id.* ¶ 49. The new apartment also only had two rooms, but the grandparents were

297

able to get a separate apartment. *Id.* Soon, a man named Tadeush ("Tadik") Aleksandrovich married Tatiana and moved in. Svetlana relates: "it felt like a stranger moved into our house." *Id.* ¶¶ 42, 43; Ex. 44 (Marriage Certificate of Tatiana Kadamova and Tadeush Aleksandrovich).

r.      Tadik and Tatiana consumed alcohol to an extreme degree, on a daily basis, and were drunk at almost every family celebration. Ex. 17 (Kadamova dec.) ¶¶ 47, 48, 59; Ex. 18 (Kadamoviene dec.) ¶ 17. Jurijus' wife Jurate states:

> As long as I knew Tatiana, she was a heavy drinker. I have not seen her sober. Nobody talked about the drinking, but it was clear to everyone who came over to her apartment. They would mainly drink home made vodka as they could not afford it from the shops. They would make alcohol from anything that was at home including tomato sauce. She and Tadik were usually drunk when we came over. They were very argumentative when they drank and sometimes violent.

*Id.* ¶17.

s.      A cousin, Ina Gorshanenko, describes the situation at this point: "Yuri's [Jurijus] family was worse off than most. They were very poor. His parents were drunks and squandered the money they had on alcohol." Ex. 22 (Gorshanenko dec.) ¶ 7. Tadik was disabled and could not work. Ex. 23 (J. Aleksandrovich dec.) ¶ 7.

t.      After Jurijus' maternal grandmother died, grandfather Varfolomey moved back in with the family, and the Soviet authorities allowed them to have a three-room apartment. Ex. 17 (Kadamova dec.) ¶ 49.

u.      Both Svetlana and Jurijus married young, in part to get out of the house due to the unstable and destructive behavior of Tatiana and Tadik, who were always drunk. *Id.* ¶ 59. Jurijus married Jurate in 1988 and moved in with her family. *Id.* ¶¶ 59, 61; Ex. 21 (A. Kovalchuk dec.) ¶ 14.

v.      Jurijus was never a good student and received barely passing grades. Ex. 18 (Kadamoviene dec.) ¶ 8. Expert psychologist Irina Volynsky explains that Jurijus was "an extremely poor student due to a learning disability combined with parental neglect." Ex. 1 (Volynsky dec.) ¶ 90. Dr. Volynsky explains that his grades were barely passing, especially those relying on literacy and math skills. *Id.* ¶ 163. His being a gifted artist and musician is entirely consistent with this, as she explains that visual giftedness is not uncommon in students with learning disabilities. *Id.* ¶ 81.

w.      Due to his status as a Russian in Lithuania, and as the son of a Muslim, Jurijus Kadamovas experienced discrimination as a child and young adult, undermining his attempts to succeed and subverting his education. Ex. 24 (V. Aleksandrovich dec.) ¶ 23 ("People used to call Yuri 'Mustafa'" to ridicule him.). Due to the occupation of Lithuania by Russia (and, later, the Soviet Union), ethnic Lithuanians held an underlying anger and resentment toward Russians and Russian speakers. After the dissolution of the Soviet Union and the independence of

Lithuania, this discrimination flourished, and it was very hard for Russians to find jobs and succeed economically. Ex. 17 (Kadamova dec.) ¶ 7.

        x.     As a child, Jurijus enjoyed music. His father gave him his first guitar at a very young age. He was a naturally talented musician. *Id.* ¶¶ 18, 57. Jurijus began performing at an early age, and surprised the family with his talent. Ex. 20 (Kanopkin dec.) ¶ 65; Ex. 31 (Daletsky dec.) ¶ 10. Jurijus made people happy when he played for them. Ex. 22 (Gorshanenko dec.) ¶ 11; Ex. 23 (J. Aleksandrovich dec.) ¶ 8; Ex. 24 (V. Aleksandrovich dec.) ¶ 21.

        y.     In the late 1980s and early 1990s, Jurijus worked as a drummer, playing with groups around Vilnius. Despite his talents, it was impossible to earn a living through music alone in Lithuania at the time, so he had to seek out business ventures. Ex. 30 (Vatkin dec.) ¶¶ 5, 9.

    8.     As the Soviet Union collapsed and Lithuanian society struggled to reinvent itself, Jurijus Kadamovas attempted to succeed through hard work and diligence. Despite his efforts, his attempts to establish a viable business in Lithuania were undermined by the difficulties of the emerging post-communist economy, and also by his lack of business acumen, his lack of education, his naivete and his gullibility.

        a.     When he returned from the military, Jurijus attempted to get different businesses off the ground, including selling shoes, renting limousines,

running a food kiosk, and selling electronics. He worked very hard, but could not succeed in post-Soviet Lithuania. Ex. 17 (Kadamova dec.) ¶¶ 64, 68, 69, 70.

b.      Jurijus tried to start various businesses to better his family's circumstances. Ex. 24 (V. Aleksandrovich dec.) ¶ 31; Ex. 28 (Nagrockis dec.) ¶ 11. At one point, Jurijus began buying aquariums in Poland, transporting them in a van, and selling them in Lithuania. Ex. 20 (Kanopkin dec.) ¶ 68.

c.      Romulada Pinkovski was one of Jurijus' business partners. Jurijus tried hard in business but "he was not very well educated and many of his business ideas had no perspective." Further: "He was bad at keeping and handling business records. His written Russian was not very good." He was naïve and a bad judge of character and would get involved with people who were not good business partners. Ex. 29 (Pinkovski dec.) ¶¶ 6, 7.

d.      His good friend Ilja Vatkin states: "[It] was a time of profound transition in Lithuania. . . [C]reative types like Yuri had it especially hard. . . . Yuri was not smart enough or savvy enough to be successful in Vilnius's business environment. He was not good in business situations, and he was unable to easily navigate the social world of Vilnius at the time." Ex. 30 (Vatkin dec.) ¶¶ 8, 13.

9.      Jurijus Kadamovas dreamed of emigrating to America. After his attempts to support his family in Lithuania failed, he turned to the opportunities in the United States, a place he considered the promised land, filled with opportunity.

301

He began to plan a move to America, where he would establish himself and then bring Jurate and Gabriel to join him. Ex. 17 (Kadamova dec.) ¶¶ 73, 74; Ex. 28 (Nagrockis dec.) ¶¶ 21-22. To Jurijus, America was the land of possibilities, a place where a person could become successful, starkly different than post-Soviet Lithuania. Ex. 29 (Pinkovski dec.) ¶ 10.

a.     A Russian named Boris Shiglik promised Jurijus a place to live in Los Angeles, and good opportunities, if he could get to America. When Jurijus arrived, Shiglik took his money, but did not have a place for him, nor a job. Soon, Jurijus was living in a dangerous part of Los Angeles with no resources and little hope. His desperation was so great his friend Robertas Nagrockis states: "I was afraid Yuri was going to commit suicide." Ex. 28 (Nagrockis dec.) ¶¶ 23, 25, 26. As an immigrant who spoke little English, Jurijus Kadamovas could not succeed in Los Angeles, despite his hard work.

b.     In the late 1990's Jurijus was hired by Andrey Baranchik, a Russian living in Los Angeles, to work for his moving company. At the time, Jurijus lived in a small studio apartment with two other men. Jurijus did not speak more than a few words of English. Baranchik describes Jurijus:

> I knew him to be a good person. He was a responsible and good worker. . . . He was trustworthy. He showed up to work on time and never missed his shifts. He worked well with other people and was dependable. He was not argumentative and was easy to work with. . . . He was a reliable and hard-working employee overall.

302

Jurijus eventually left this job to open the aquarium business. Ex. 26 (Baranchik dec.) ¶¶ 7, 8; Ex. 28 (Nagrockis dec.) ¶ 30.

 c. Jurijus teamed up with a Russian-born naturalized citizen, Michael Chernykh, to open an aquarium business. Chernykh noted that Jurijus was a hard worker but "Language was a barrier for Yuri. He usually did not deal with English-only speaking clients." The business struggled, and was not very profitable. Ex. 27 (Chernykh dec.) ¶¶ 5, 8, 9.

 d. The aquariums were unique and beautiful, enabling Jurijus to be creative with lighting and design. They were works of art. Ex. 28 (Nagrockis dec.) ¶ 36.

 e. The aquarium business needed financing, however. The plan was to build a showroom that would attract new business. Jurijus needed investors to make the business viable. *Id.* ¶ 41.

 f. Sometime in 2000, Iouri Mikhel entered the scene. Soon, Mikhel took over and Chernykh was pushed out of the aquarium business. Mikhel did not want Chernykh involved in the business; he "wanted to be a partner with Yuri alone." Ex. 27 (Chernykh dec.) ¶¶ 10, 11; Ex. 28 (Nagrockis dec.) ¶ 43.

10. His lack of education, naivete, trusting nature, and desperation made Jurijus Kadamovas an easy target for Iouri Mikhel. Mikhel took over Kadamovas' life and business. Mikhel made Kadamovas dependent upon him, and fearful of

303

offending him. Having grown up in an impoverished, unstable environment, without a father, Jurijus was vulnerable to the manipulation of powerful, wealthy, and charismatic individuals like Iouri Mikhel.

   a.    Lithuanian business associate Romualdas Pinkovski observed that Jurijus Kadamovas was easily "affected by people who had a lot of money." Jurijus was a bad judge of business partners. Ex. 29 (Pinkovski dec.) ¶ 9.

   b.    Andrey Baranchik, who was Jurijus' employer in the late 1990s before Mikhel lured him away, held the same view: "I believed then, as I believe now, that there is no way Yuri [Jurijus] could have done anything like that on his own. Yuri was a good person who was not greedy or selfish when I knew him. He wasn't an awful person or a criminal mastermind. He wouldn't be capable of planning of carrying out a big scheme like that." Ex. 26 (Baranchik dec.) ¶ 16. After Mikhel came into his life, Jurijus changed. He was no longer happy but was always worried, easily irritated, and morose. Ex. 28 (Nagrockis dec.) ¶ 45.

   c.    Robertas Negrockis states: "Yuri [Jurijus] was a good person, and it was shocking that he was accused of hurting people. I could not believe what happened when I heard what Yuri was accused and convicted of. I think he met the wrong people in the U.S. and they had some kind of power or influence over him." *Id.* ¶ 51. Romualdas Pinkovski states: "I could see Jurijus participating in such

304

crimes only if he was affected by somebody else, where lots of money was involved." Ex. 29 (Pinkovski dec.) ¶ 11.

11.    Jurijus Kadamovas is a caring person, and a friend to those in need. As a child, Quirinus nurtured and protected his little sister, cooked for her and took care of her. Ex. 17 (Kadamova dec.) ¶ 50. Despite his own challenging circumstances, Jurijus was generous with his sister and her son, aiding them financially when they were in need. Even after he went to America, Jurijus would send money to his sister. *Id.* ¶ 76. During his time in America, Jurijus sent money home to his wife and his mother. *Id.*; Ex. 18 (Kadamoviene dec.) ¶ 43. His cousin describes him, simply, as "a caring person." Ex. 22 (Gorshanenko dec.) ¶ 9. Jurijus protected and nurtured his younger step-brother, Vadim (Tadik's son from a prior marriage) who states: "He was a good older brother and would look after me. I tagged along with him and his friends, and he would make sure I did not get into trouble. . . Yuri [Jurijus] didn't get into fights, but he did protect me once or twice when I was being bullied. He took me camping and fishing." Ex. 24 (Vadim dec.) ¶ 19. Jurijus' step-sister notes: "Yuri [Jurijus] was generous and giving. It was easier for him to give than to receive. He had a kind heart." Ex. 25 (Jakovleva dec.) ¶ 34.

12.    Jurijus Kadamovas did not abandon his family. Rather, he behaved as a caring father and husband who intended to bring his wife and son to America once he established himself and could provide a home for them. Jurijus married

305

Jurate in 1988. Ex. 17 (Kadamova dec.) ¶ 74; Ex. 18 (Kadamoviene dec.) ¶ 15; Ex. 47 (Marriage Certificate of Jurijus Kadamovas and Jurate Kadamoviene). A son was born, Gabriel, in 1989. Ex. 17 (Kadamova dec.) ¶ 64. Jurijus was proud to be a father. *Id.* He wanted a better life for Gabriel and he knew that such a life might not be possible in Lithuania.

13.     Jurijus was a good father and a good family man. Ex. 28 (Nagrockis dec.) ¶ 7. Jurijus had a special relationship with his nephew (Svetlana's son) Maxim. Despite his own limited funds, he helped Svetlana and Maxim financially. Ex. 17 (Kadamova dec.) ¶ 65. During his time in America, Jurijus regularly sent money back to his wife Jurate and his son Gabriel. *Id.* ¶ 76. He also supported his mother and sister. *Id.* ¶ 76. Jurijus always planned that his son would join him in America. Ex. 28 (Nagrockis dec.) ¶ 21.

14.     Jurijus Kadamovas is not a violent person. Ex. 22 (Gorshanenko dec.) ¶ 12; Ex. 25 (Jakovleva dec.) ¶ 34; Ex. 28 (Nagrockis dec.) ¶ 10. The government's own evidence could have been harnessed to demonstrate Mr. Kadamovas' lesser role, as compared to Mikhel, in the criminal conspiracy. Mr. Kadamovas "did not have access to or means to receive ransom proceeds, to direct their use, or to initiate wire transfers from foreign accounts connected to the ransom." Ex. 9 (Krausz dec.) ¶ 5. While the prosecution pointed to evidence that he benefitted from the alleged criminal conspiracy financially, any benefit was entirely

controlled and doled out by the more culpable co-defendant Iouri Mikhel. *Id.* ¶¶ 6, 10.

15.    A properly investigated, prepared, and presented case in mitigation would have presented the jury with these and other significant mitigating themes.

16.    A properly investigated, prepared, and presented case in mitigation would have included qualified expert witness testimony. The expert witnesses would have added significant and substantial mitigating weight into the sentencing calculus. Properly prepared expert witnesses would have contextualized and explained the social history evidence and elaborated on the psychological, emotional, and economic factors that shaped Jurijus Kadamovas.

a.    At trial, Dr. Cunningham's testimony gave demographic information about Mr. Kadamovas in an effort to support his low risk of violent behavior in the future. Dr. Cunningham has now reviewed portions of the records and declarations collected by undersigned counsel and declares that he could have made a more compelling and comprehensive case for Mr. Kadamovas' low likelihood for future violence based on this information. Ex. 15 (Cunningham dec.). Dr. Cunningham declares:

> Had the….declarations and records been provided for my review pretrial, I would have had corroboration for and testified regarding additional factors associated with his low likelihood of future serious violence while serving life without possibility of release sentence in the federal Bureau of Prisons.

307

*Education*: The records and declarations reflected that Mr. Kadamovas had graduated from a vocational secondary school (i.e., high school). Inmates who have a high school diploma or its equivalent (i.e., GED) demonstrate lower rates of assaultive misconduct in federal prison. Similarly, in a large-scale study of correlates of prison violence among inmates in a high security state prison, inmates holding a high school diploma or its equivalent were half as likely to be involved in assaultive misconduct, controlling for other factors.

*Military service:* the records and declarations reflected that Mr. Kadamovas has served two years in the Soviet military. No misconduct/discipline was noted, and he advanced to the rank of sergeant in a military orchestra unit. His compliant response to military structure points to a similarly compliant response to prison authority and regulations.

*Employment*: The records and declarations reflect that Mr. Kadamovas took initiative in entrepreneurial work roles, even in the face of economic upheaval and hardship accompanying the break-up of the Soviet Union. Inmates with histories of community employment tended to become "industrious" inmates in prison, occupying themselves in constructive ways and being less likely to be involved in prison misconduct and violence.

*Id.* ¶¶ 9-12 (internal citations omitted). Counsel's failure to provide these records and facts to Dr. Cunningham was unreasonable and prejudice to Mr. Kadamovas ensued.

b.      The testimony by Dr. Anderson at trial was even more limited by his lack of access to information. Dr. Anderson was an expert in Russia during the post-Soviet era, but was not an expert in the unique experience of Lithuanians during that time. His testimony was superficial at best, misleading at worst.

308

c.       A properly selected and prepared expert witness like Dr. Neringa Klumbyte would have provided the jury with the understanding and knowledge they needed to evaluate the mitigating impact of the social history evidence. Ex. 2 (Klymbyte dec.)

d.       Dr. Klumbyte explains the history of the repression and persecution of the "Old Believers," Mr. Kadamovas' maternal family. Ex. 2 (Klymbyte dec.) at 15. Dr. Klumbyte explains that many Old Believers moved to Lithuania in the 17th century because of relative religious freedoms there. Old Believers were often banished to Siberia in the 1940s and were executed or deported to Germany during Nazi occupation. *Id.* at 15. During the Soviet era, and Mr. Kadamovas' childhood and adolescence, Old Believers tended to associate in groups and remained outsiders to Lithuanian and Russian society, leading to increased isolation or secularization. *Id.* at 16. This is consistent with Svetlana's recollection that her grandmother covered her face, to hide her identity, when attending any religious services. Ex. 17 (Kadamova dec.) ¶ 15.

e.       Dr. Klumbyte is further able to shed light on the significance of Mr. Kadamovas' mother, from an Old Believer family, marrying a Muslim man from Turkmenistan. While Lithuania and Turkmenistan were supposedly part of the same country under the Soviet era (the USSR), there were significant cultural differences. Lithuanians and Russians alike, she explains, tended to look down

309

upon Central Asians and the term "Asiatic" was used with negative connotations. Ex. 2 (Klumbyte dec.) at 17.

f.      Dr. Klumbyte is additionally able to tell the story of Lithuanian history with specific reference and context to Mr. Kadamovas and his unique experience. *Id.* The generational trauma that was experienced by nearly every Lithuanian under an oppressive Russian regime was made that much worse in the Kadamovas family due to their unique position. *Id.* at 2-3.

g.      Dr. Klumbyte is able to explain how Mr. Kadamovas' family lived in extreme poverty compared to other Lithuanians, which stands in opposition to the idealized communist regime with equitable distribution of resources. She is able to corroborate the testimony about meager living conditions: growing up with no running water, no central heating, no indoor toilet, and relying on public bath houses as common in the small neighborhood of his rearing. *Id.* at 8.

h.      Dr. Klumbyte also explains the food insecurity suffered by Mr. Kadamovas and his family, the prevalence of alcoholism suffered by Mr. Kadamovas' family, limited career opportunities suffered by Mr. Kadamovas and his peers, ethnic discrimination suffered by Mr. Kadamovas and his family, and crime and criminality in Lithuania. All of these discussions can be placed into the specific context of Mr. Kadamovas' life and family.

i.      Dr. Klumbyte is also able to explain Mr. Kadamovas' misguided loyalty to Mr. Mikhel as a Soviet experience not at all uncommon. She explains that during Soviet and post-soviet culture one had to be loyal to an in-group for security and protection. Mr. Kadamovas was predisposed to rely on Mr. Mikhel as his benefactor, protector, and security. *Id.* at 22.

j.      A properly selected and prepared expert witness like Dr. Bradley Woodworth would also have provided jurors with the understanding and knowledge they needed to evaluate the mitigating impact of the events the Kadamovas family experienced. Ex. 3 (Woodworth dec.). Dr. Woodworth focuses specifically on the terrors experienced in Lithuania as a result of Soviet occupation. Ex. 3 (Woodworth dec.).

k.      Dr. Woodworth explains that the Soviet blockades led to financial hardships and shortages of goods. Ex. 3 (Woodworth dec.) at 26. Soviet troops invaded Lithuania in 1991 (when Mr. Kadamovas was 25 years old) and not only occupied the region but committed violence against resisters: firing upon the public, killing 14 and wounding over 140. *Id.* at 27.

l.      Dr. Woodworth, by reviewing the social history records and testimony, is able to put into historical and social context the financial desperation experienced by so many in Lithuania in the period of Mr. Kadamovas' coming of age. Jurijus Kadamovas was part of a generation trained for one type of life in

311

school but then came of age—and allowed to sink or swim—in an entirely different economy. *Id.* at 41. As Dr. Woodworth explains, ethnic Russians, like Mr. Kadamovas, were in even worse positions to thrive in this environment as compared to the ethnically Lithuanian citizens in Lithuania. *Id.* at 46.

17.    Trial counsel failed to call any social historian or mental health expert to testify and help the jury place Mr. Kadamovas and his life history in appropriate context. The declaration of Dr. Irina Volynsky demonstrates how this should have been done. Dr. Volynsky weaves together the information from records and from declarations to tell a compelling narrative of Mr. Kadamovas' life. Ex. 1 (Volynsky dec.).

a.    Due to the dysfunction and problems in his family, their lack of resources, and his own limitations, Jurijus Kadamovas experienced serious difficulties in school as a child and lacked the opportunities to rise out of the chaos and deprivation of his situation. Dr. Volynsky adds further flavor to the persecution Mr. Kadamovas' maternal family would have experienced as Old Believers, being labeled by the KGB as belonging to an "anti-Soviet organization." Ex. 1 (Volynsky dec.) ¶ 18. Old Believers would have been considered backwards and uncultured for their stand against the use of modern medical procedures and refusal to integrate into modern life. *Id.* ¶ 17.

312

b.      Dr. Volynsky is able to describe the experience of a family in Mr. Kadamovas' family's social class. Because of significant poverty and ostracization, his childhood was unusual for a Lithuanian child, given Lithuania's comparative westernization. *Id.* ¶¶ 30-31.

c.      Dr. Volynsky explains that the psychiatric hospitalization of Mr. Kadamovas' father would have been extremely rare and demonstrates the severity of his illness. At the time, such hospitalizations were reserved for political oppression or for the most severe acute cases of mental illness. *Id.* ¶ 61. The diagnoses that Aimuchamed received in these records are now outdated. Dr. Volynsky explains that today he would likely be diagnosed with severe bipolar disorder with psychotic features, with substance abuse. The prognosis for which is very poor if untreated. *Id.* ¶ 62.

d.      Aimuchamed' s illness was traumatic for young Jurijus, resulting in chaos, neglect, abandonment. The loss of his father, who was the more nurturing of Mr. Kadamovas' two parents, was a significant loss in "Yuri's otherwise barren emotional landscape of childhood." *Id.* ¶ 70. This loss of his father was detrimental to his "ability to feel cared for and protected by anyone." *Id.* ¶ 71.

313

e.      Dr. Volynsky states that Mr. Kadamovas' behavior presents symptoms of a mood disorder, which would be unsurprising in light of the strong hereditary link with such an illness. *Id.* ¶ 192.

f.      Dr. Volynsky diagnoses Mr. Kadamovas with a learning disability. She is able to interpret the grading system in Lithuania at the time of his schooling. *Id.* ¶ 101. She explains that the marks Mr. Kadamovas received, mostly "3s" are just above a failing grade and routinely given to pass along students that were not succeeding academically but were expected to move on to trade schools. *Id.* ¶¶ 101-03.

g.      Mr. Kadamovas' written work as an adult confirms that he still suffers from this learning disability. His primary language is Russian, which was the language of his instruction in school, yet one letter demonstrates thirty-two grammar mistakes in a single paragraph of 105 words. The mistakes are the sort expected of early elementary students in Russian. *Id.* ¶¶ 178-79.

h.      Mr. Kadamovas' early life was characterized by hunger and physical deprivation, but also by loneliness and emotional deprivation. *Id.* ¶¶ 34, 74. Dr. Volynsky describes him as "a dreamer-boy living in an extremely harsh, cold, and unhealthy home." *Id.* ¶ 85. He rarely measured up and lacked praise and acknowledgment from his mother. *Id.* ¶ 95.

314

i.      "Every single meaningful event in Yuri's life during his early adult years was peppered with distress and shame." *Id.* ¶ 130. His mother and his step-father were severe alcoholics leading to his shame and embarrassment. *Id.* ¶¶ 148, 159. This pushed Mr. Kadamovas into an early marriage. *Id.* ¶ 121.

j.      Yet, as a young adult with limited academic skills, he engaged in various creative entrepreneurial endeavors. He supported his own small family, in addition to his mother, step-father, sister and nephew. Many of his business endeavors were met with limited success. When they did meet some initial success, Mr. Kadamovas was unable to respond to changes in the regulatory landscape in a rapidly changing environment. *Id.* ¶ 190. The pressures to support so many with his meager skills were mounting and he had grandiose and unrealistic plans for what success he must achieve. *Id.* ¶¶ 199-201.

k.      After moving to the United States as his dream, his life did not become easier. At times he was working multiple menial jobs to support himself as well as three households in Lithuania. He sought to bring his wife and son to the United States, but failed in that effort. Once he was living with his girlfriend Natalya in the United States, it is clear that they had times of not having enough food to eat. *Id.* ¶ 252.

l.      It is in this context of a young man with a predisposition to look for validation and protection from strong figures in his life and his own deep sense

315

of inadequacy, cultivated from his culture and from his own childhood experiences, that Jurijus Kadamovas met Iouri Mikhel. *Id.* ¶ 32.

m.    Mikhel demonstrated a pattern of sophisticated grooming of others by showering them with gifts and suggesting he could fulfill dreams. With Ruben Khachatryan, Mikhel showered him with extravagant gifts and proposed a plan by which he could fulfill his wish of a private jet to pilot. *Id.* ¶¶ 233, 234. The grooming process also often requires breaking one of relationships that interfere with the groomer's plans, which Mikhel did as he very intentionally sought to get Ruben to break his relationship with his skeptical fiancé. *Id.* ¶¶ 239-40. Mikhel also engaged in grooming behavior with attorney Mark Rabinovich, *Id.* ¶¶ 219, 222, Petro Krylov, *Id.* ¶¶ 300-01, and Ainar Altmanis, *Id.* ¶ 304.

n.    Mikhel met Mr. Kadamovas in the context of a distinct power imbalance between them, with Mr. Kadamovas initially being a hired as a mover to move Mikhel from his luxurious Palm Springs golf resort condominium. *Id.* ¶ 274. Immediately, Mikhel began his efforts at grooming through dream fulfillment: "Yuri spent all of his adult life trying to build a business, unsuccessfully, and Mikhel made this dream come true by investing money and attention into Designed Water World, which was an ultimate dream fulfillment for Yuri." *Id.* ¶ 234. Mikhel invested large sums of money into Mr. Kadamovas' fledgling business designing and servicing artistic aquariums, which he had been trying to run out of his

316

apartment. *Id.* ¶¶ 275-77. He prepaid Mr. Kadamovas rent for a full year in a new apartment and acquired business rental space for the business, which Mr. Kadamovas began renovating. *Id.* ¶¶ 283.

o.    Mr. Kadamovas became dependent on Mikhel, as a dream father figure he had always yearned for, as a financial benefactor, and for the very practical language skills he brought to the relationship. Mr. Kadamovas' limited English skills meant he was limited in jobs he could seek, but Mikhel began translating for him. *Id.* ¶ 290. Mikhel continued to buy Mr. Kadamovas' dependence on him, but even more importantly, "for the first time in his life Yuri had a male who was by his side, who took interest in him and took care of him." *Id.* ¶ 288.

17.    Trial counsel additionally failed to use any maps, pictures, research, or visual aids to assist the jury in understanding the social context and challenges Mr. Kadamovas faced. Amy Nguyen is a mapping expert who demonstrates for this Court the sort of materials that trial counsel could have, but failed to, present to the jurors in the penalty phase of Mr. Kadamovas' trial. *See* Ex. 5 (Nguyen dec.). These visual aids demonstrate and place into context the historical oppression of Lithuania's near continual occupation by foreign powers from 1563 through 1991. *Id.* at 5-6. In this context during the first period of independence, the early 1990s, the male suicide rate skyrocketed. *Id.* at 4. These visual charts could

have placed compelling images before the jury that demonstrate the desperation common among Lithuanians during Mr. Kadamovas' childhood and launch into early adulthood. This would have brought to life the social context that Dr. Woodworth and Dr. Klumbyte could have compellingly spoken of, which exacerbated the extreme deprivation, violence and alcoholic neglect in Mr. Kadamovas' own unique family that lay witnesses and an expert like Dr. Volynsky could have explicated.

18. The mitigation evidence that counsel failed to present would have demonstrated Mr. Kadamovas' susceptibility to the overpowering influence of his co-defendant and his lesser culpability for the charged crimes.

19. The potential evidence in mitigation, never presented to the jury, should have included an explanation, put into context with expert testimony, of the circumstances of Jurijus Kadamovas' life and the factors that led him to become easy prey for the manipulation and dominance of Iouri Mikhel. The evidence should have explained his debilitating and desperate need for community, his unhealthy and obsessive desire for wealth, his psychological impairments, and his patterns of behavior. The testimony of family, friends, and others should have illuminated instances of positive conduct, positive character traits, and his gifted artistic talents. Counsel should have conducted a comprehensive investigation into Mr. Kadamovas' life, so that the mitigation presented to the jury would have been

compelling and persuasive, rather than the empty and disturbingly brief mitigation case that counsel actually presented. It was also incumbent upon counsel to present mitigation information and inferences to the jury in a way that put the information into a useful context, so that it explained behavior and generated understanding and empathy, and led to a life sentence.

**Failure to Life Qualify the Jury**

H.      In addition to unreasonably failing to present a complete mitigation case, counsel also presented their mitigation case to jurors who were unable to fairly consider a life sentence because they did not properly life qualify the jury pursuant to *Morgan v. Illinois*, 504 U.S. 719 (1992). Trial counsel's actions during jury selection failed to ensure a process that safeguarded Mr. Kadamovas' rights to a fair and impartial jury and a reliable determination of penalty, in violation of the Fifth, Sixth, and Eighth Amendments.

1.      The jury selection process employed by the defense failed to identify jurors whose views about the death penalty, mitigation, or mitigating factors would have resulted in their exclusion through challenges for cause. Further, the selection process failed to elicit the basic information about prospective jurors' views on these and other topics necessary for counsel to make effective decisions about who to strike with peremptory challenges. As a result, trial counsel's approach to jury selection fell short of constitutional requirements.

319

2.    Counsel's questioning of prospective jurors fell below reasonably professional standards, as jury selection is a critical component of capital trial defense.

3.    Trial counsel Lasting, for the most part, conducted voir dire alone. Jury selection began while Ms. Chahin was engaged in another trial. Ex. 11 (Chahin dec.) ¶ 16. Once that trial concluded, "while the jury was being selected in the Kadamovas trial, Richard Lasting would be conducting voir dire in court while [Chahin] was sitting at counsel table reviewing discovery and researching motions." *Id*. ¶ 19. "Although [she] did review the questionnaires, [she] had little to no involvement in the in-court jury selection because [she] was desperately trying to review the case materials." *Id.*

4.    This new information reveals important context about trial counsel's questioning of prospective jurors; namely, that any failures in jury selection were not strategic, but were the result of counsel being unable to devote sufficient attention to jury selection. Counsel's inattention to jury selection also resulted in a record that was not adequately developed for direct appeal.

5.    Among counsel's errors were that prospective jurors who would have been excludable under *Morgan*, were not questioned to adequately elicit their views. *See id.* at 739. Trial counsel repeatedly failed to question jurors about their views on mitigation. None of the nineteen jurors for whom the defense exercised

320

peremptory strikes were questioned about their ability to consider mitigation. *See* Tr. 08/30/06 at 45-59; Tr. 08/18/2006 at 200-07; Tr. 08/22/2006 at 66-76; 08/15/06 at 27-35; 08/15/06 at 177-85; 08/16/06 at 213-19; 08/15/06 at 35-59; 08/16/06 at 165-84; 08/31/06 at 74-100; 08/30/06 at 195-200; Tr. 08/30/06 at 134-38; 08/17/06 at 153-60; 08/20/06 at 256-67; 08/30/06 at 181-90; 08/30/06 at 54-78; 08/16/06 at 55-70; 08/22/06 at 122-36; 08/25/06 at 150-67; 08/31/06 at 266-73. Had Lasting properly questioned these jurors, he could have established that at least some of them were excludable for cause, and not used peremptory strikes on them.

6.    Prospective jurors who stated on questionnaires or in open court that they would vote for death for any intentional murder were not subjected to in-depth questioning under *Morgan*. Counsel's inadequate questioning failed to fully establish the grounds necessary to exclude these jurors, leading the trial court to deny challenges for cause, and creating an insufficient record for direct appeal. Indeed, there were some prospective jurors that Lasting did not question at all.

a.    Of the jurors he did question, one member of the venire (Prospective Juror 4) opined that anyone who had committed multiple murders should automatically, without consideration of any other circumstances, be sentenced to death. Tr. 08/15/06 at 45. When questioned that venireperson initially seemingly backed off these *Morgan* excludable views and said they would modify

that view now. Upon further questioning, they explained that the "other circumstances" they would need to consider would be evidence of guilt. *Id.* at 48.

   b.  This potential juror was substantially impaired in their ability to consider mitigation and excludable under *Morgan*. Yet the inadequate questioning meant that the juror was not struck for cause and the defense used a peremptory strike on this juror.

   c.  Another member of the venire (Prospective Juror 34) was asked if a person convicted of murder should always receive the death penalty and responded "the circumstance wherein the person knows what he or she was doing at the time." Counsel asked, "In other words, where the person is in fact sane?" The juror responded, "Exactly." Tr. 08/16/06 at 63. The court attempted to rehabilitate this juror with a question, "Would your answer be the same if you were instructed by the Court to follow the law and weigh aggravating factors against mitigating factors? And if the mitigating factors outweigh the aggravating factors, then you need not impose the death penalty?" To this the juror simply answered, "Yes," the answer would be the same. *Id*. at 63-64.

   d.  This potential juror was substantially impaired in their ability to consider mitigation and excludable under *Morgan*. Yet the inadequate questioning meant that the juror was not struck for cause and the defense used a peremptory strike on this juror.

322

e.    Yet another member of the venire (Prospective Juror 48) said in their questionnaire, and reiterated in voir dire, that "anyone who has committed multiple murders should automatically, without consideration of any other circumstances, be sentenced to death." Tr. 08/16/06 at 169-70. The prosecution rehabilitates the prospective juror by simply asking if they could "listen" to evidence and would "follow the law." *Id.* at 170. No questioning about their ability to consider mitigation occurred. This prospective juror was substantially impaired in their ability to consider, not just "listen to," mitigation.

f.    The court relied on its own unhelpful questions to deny a motion for cause. The court asks repeatedly, "Is there any view that you have on capital punishment that would prevent or substantially impair the performance of your duty as a juror in accordance with the Court's instructions and your oath?" Tr. 08/15/06 at 37. But rare is the juror that believes they are "substantially impaired" even if they are an automatic death juror. Nonetheless, that prospective juror may be *Morgan/Witherspoon* excludable.

g.    This juror was substantially impaired in their ability to consider mitigation and excludable under *Morgan*. Yet the inadequate questioning meant that the juror was not struck for cause and the defense used a peremptory strike on this juror.

323

7. Capital defendants are constitutionally required to be sentenced by an impartially chosen panel of jurors who are not "mitigation-impaired." Jurors necessarily must give appropriate weight to mitigation. *Morgan*, 504 U.S. at 738-39; *see also generally Woodson v. North Carolina*, 428 U. S. 280 (1976); *Lockett v. Ohio*, 438 U.S. 586 (1978); *Payne v. Tennessee*, 501 U. S. 808, 833 (1991) (Scalia, J., concurring); *Sochor v. Florida*, 504 U.S. 527, 554 (1992) (Scalia, J., concurring in part and dissenting in part); *see also American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases,* 31 Hofstra Law Rev. 913, 926 (2003), Guideline 10.10.2.

8. The failure to ensure that the jury was not mitigation impaired deprived Mr. Kadamovas of rights secured him by the Fifth, Sixth, and Eighth Amendments in this federal death penalty case.

**Guilt Phase Errors that Prejudicially Impacted the Penalty Phase**

I. In addition to trial counsel's deficient penalty phase investigation and presentation, trial counsel made many errors during the guilt phase that had a prejudicial impact during the penalty phase. These errors include:

**Failure to Procure Solovyeva's Complete Diary**

1. Counsel unreasonably failed to ensure that they received a complete version of Solovyeva's diary.

a. During the guilt phase of the trial, Solovyeva testified for the

government after pleading guilty to one count of conspiracy to commit hostage taking and two counts of hostage taking resulting in death. Dkt. No. 502 (Second Superseding Indictment); Ex. 78 (Solovyeva sent.); Tr. 11/02/06 at 18.

b.      Two days before Solovyeva's testimony began, the government produced to defense counsel a document that purported to be a copy of Solovyeva's handwritten Russian diary and some English-language summaries of a portion of the contents. Tr. 10/31/06 at 6-9; *see* Ex. 79, Ex. 81.

c.      The next day, Chahin told the court:

Your Honor, with respect to the Natalya diary that I spoke to the Court about yesterday, I just wanted to give to the Court some more information. The diary is 437 pages written in longhand in Russian. Okay. We have summaries, but we don't have a complete review of what those 437 pages are.

I have reviewed the summaries, which the Government has transcribed after listening to cassettes prepared by a court interpreter. We don't have copies of those tapes. So I guess the first thing that we would like to do is obtain copies of those tapes from the Government and be able to listen to them.

In addition to that, I think that we need to be able to have an interpreter either read to us or translate for us pertinent portions of the diary. The Government has characterized this as a diary of the folly of a young girl outside of the time period of this case. But there are numerous statements in there which go to credibility, bias, and motive. . . .

325

So there are, as I indicate, repeated statements which are relevant for our ability to be able to cross-examine her.

Tr. 11/01/06A at 4-5.

d.    In response to Chahin's concerns, the trial court said,

You will cross-examine her at the conclusion of the Government's case. But I'll permit you to recall her to complete your cross-examination once you've reviewed the diary. So you will have to be prepared to cross-examine her at the conclusion of the Government's direct examination.

*Id.* at 5.

e.    Despite this, trial counsel did not recall Solovyeva to testify later after reviewing the complete diary, either later in the guilt phase or in the penalty phase.

f.    In fact, trial counsel never reviewed the complete diary—they did not have the entire diary in Russian and they did not get a complete translation of the Russian entries they did have. Trial counsel did not realize that there were English-language summaries of entries that did not appear in the copy of the handwritten Russian version that they received, that is, that they did not even receive the entirety of the Russian-language diary.

g.    Mr. Kadamovas was prejudiced by this error. Because trial counsel never cross-examined Solovyeva using information from her diary, trial counsel failed to elicit key information from her that would have contributed to the

326

mitigation case that they should have presented. *See* Ex. 82 (Solovyeva diary English).

h.    Solovyeva's diary contains important mitigating evidence. The diary contains Solovyeva's observations of Mr. Kadamovas being taken in by Mikhel, which would have helped show that Mikhel had a powerful influence over Mr. Kadamovas. *See id.*

i.    Later diary entries show how Mr. Kadamovas was dominated by Mikhel and becoming more and more subject to his influence, specifically based on Mikhel's apparent interest in the aquarium business. Indeed, Solovyeva complains about how much time Mr. Kadamovas begins to spend with Mikhel and that he is more interested in Mikhel than her. *See id.*

j.    The diary also provides a glimpse at Mr. Kadamovas' life before meeting Mikhel. It revealed Mr. Kadamovas to be someone who worked hard, mostly doing menial labor as a mover and carpet cleaner, and struggled to get by. There are many references to Mr. Kadamovas being busy with work and working long hours. Entries also emphasized that he was engaged in creative endeavors like making music and building aquariums and was trying to establish an aquarium business. These observations also would have helped show the powerful influence Mikhel had over Mr. Kadamovas. *See id.*

k.    The diary also contains references to Solovyeva's concern that

327

they do not have enough money, and the pressure she put on Mr. Kadamovas about money, which could have helped establish not just that Mr. Kadamovas came under Mikhel's influence, but why. *See id.*

l.      The allegations set forth in Claim 14 (Failure to Disclose Natalya Solovyeva's Diary), Claim 6 (Improper Denial of Continuances), and Claim 19 (Ineffective Assistance of Counsel: Guilt Phase Proceedings) are incorporated by reference.

**Improper Handling of Translation Issues**

2.      Counsel also unreasonably failed to ensure that the translation of key witness testimony, in particular the testimony of Ainar Altmanis, was translated correctly.

a.      Counsel were aware that the court interpreters were making Altmanis seem more respectable and well-spoken than he was, thereby enhancing his credibility, and making the jury more likely to believe his assertions about Mr. Kadamovas. *See* Ex. 112 (Spivakovsky dec.) ¶¶ 16-17. An interpreter told trial counsel that they were indeed cleaning up Altmanis' language—known as "interpreting in the wrong register." *Id.* ¶ 16; Tr. 10/11/06A at 8. While trial counsel told the court about the problem, they failed to submit any sworn testimony or take other steps to establish how serious the problem was. Trial counsel failed to ask for a hearing or factual inquiry. Trial counsel also failed to

328

ensure that each day of the trial was audio recorded, to at least preserve all of Altmanis' testimony as he actually spoke it, without the interpreter's distortion. *See* 28 U.S.C. § 1827(d)(2).

b.     Mr. Kadamovas' inability to hear Altmanis speaking in Russian exacerbated this problem, as he was unable to identify problems with Altmanis' statements and alert his counsel.

c.     This error happened during the guilt phase but its prejudicial impact was most acute at the penalty phase. Mr. Kadamovas was prejudiced by problems with the translation of testimony, including problems with the translation of Altmanis' testimony, which prevented the jury from accurately assessing Altmanis' credibility.

d.     Altmanis' credibility was a crucially important factor at trial.

e.     Altmanis was uniquely able to supply information about who was responsible for the planning, who directed other participants, and who simply took orders. Altmanis told the jury that Mr. Kadamovas was in charge, along with Mikhel, referring throughout his testimony to being directed by Mikhel and Mr. Kadamovas.

f.     Altmanis' testimony was also the only evidence of who actually committed the homicides.

g.     These considerations were especially relevant in the

penalty phase, where the jury had to assess Mr. Kadamovas' moral culpability and compare his actions to the other members of the conspiracy. The jury needed to determine whether Mr. Kadamovas was among the worst of the worst and thus deserving of the death penalty or, by contrast, someone who was a follower, taking orders, and easily manipulable.

h.      The translation of Altmanis' testimony distorted the evidence by making him seem more credible than he was, thus making the jury more likely to credit his description of Mr. Kadamovas, and thus more likely to think that Mr. Kadamovas was a mastermind of the kidnapping conspiracy.

i.      The allegations of Claim 11 (Misleading and Inaccurate Translation at Trial) are incorporated by reference.

**Failure to Establish Mr. Kadamovas' Lack of Involvement in Escape Planning**

3.      Trial counsel unreasonably failed to counter the narrative that Mr. Kadamovas was involved in planning the attempted escape from MDC Los Angeles.

a.      The evidence presented at trial regarding the conspiracy to escape strongly implicated Mikhel in the events that occurred in the Metropolitan Detention Center (MDC) toward the end of 2002 and the beginning of 2003. To the extent that there was evidence implicating Mr. Kadamovas, it was very weak. Evidence at trial showed that Mikhel and Krylov both had extensive contraband

330

tools, a "virtual hardware store," in their cells. Mikhel was digging through the wall of his cell towards an adjacent stairwell. Tr. 12/06/06, 87-88, 179-96; Tr. 12/07/06 at 51-52. Mikhel confessed to planning an escape, Ex. 96 (Mikhel 302), and said, "Kyrlov [sic] and Kadamovas . . . had nothing to do with the planning," Ex. 89 (Battley memo 7/15/03). This was consistent with Mikhel's primary role in planning the homicides, his role in coordinating and controlling the money laundering, and his leadership exercised throughout his criminal enterprise. Trial counsel for Mikhel eventually conceded the conspiracy to escape charge, noting that the "remarkably intrica[te]" planning was "typical of Mr. Mikhel." Tr. 01/11/07 at 118. As to Mr. Kadamovas, however, evidence of his involvement in the conspiracy to escape was limited to a jailhouse informant who implicated him. Mr. Kadamovas had no tools in his cell, no digging efforts, no cell phones, no evidence of escape in his cell. Tr. 12/06/06 at 93, 175; Tr. 12/07/07 at 45. Mr. Kadamovas was on the ninth floor of the jail, separated from the planning, tool-smuggling, and digging going on four floors below on the fifth floor. None of those participating in the support of the escape from outside of the jail, including Sabrina Tuinan, had any contact with Mr. Kadamovas or evidence to support his involvement.

331

b.      Yet defense counsel were not prepared to defend the conspiracy to escape charge at the time of trial. Defense counsel failed to investigate the allegations or the evidence supporting the conspiracy to escape charge. Counsel's lack of preparation and diligence resulted in a situation where the government's failure to produce relevant discovery was not uncovered until the conspiracy to escape evidence was presented and where counsel failed to object to the improper use of a confidential informant.

c.      Attorney Chahin described the situation:

> Given that this case involved abductions that resulted in death, I paid very little attention to the escape allegations prior to the trial. Well into the prosecution presentation, John Brock, who was working with us on the case, pointed out that the evidence that Mr. Kadamovas was involved in the escape planning was very weak and possibly vulnerable to attack. When the time came to prepare to cross-examine the government witnesses regarding the escape allegations, I reviewed the discovery regarding the escape carefully for the first time, discovered facts new to me, and found that there were important statements missing.

Ex. 11 (Chahin dec.) ¶ 21.

d.      The failure to confront and provide a defense to the conspiracy to escape allegations had a separate and acute prejudicial impact on the penalty phase of the trial. The prosecution used the conspiracy to escape evidence as significant aggravation, arguing that the world could only be safe from the two defendants if they were executed. Tr. 02/09/07 at 36-38, 151. The failure to

332

confront the escape evidence and the failure to present a duress defense (even if not a complete defense to the charges) resulted in a lost opportunity to undercut the aggravating evidence, as well as the loss of significant mitigation, that would have altered the result of the sentencing phase trial.

e.  The allegations set forth in Claim 20 (Ineffective Assistance of Counsel: Conspiracy to Escape), Claim 15 (Suppression of Material Exculpatory and Impeachment Evidence Relating to the Escape Charges), Claim 16 (Withheld and False Information About the Escape Attempt), and Claim 13 (Improper Use of a Confidential Informant) are incorporated herein.

**Failure to Request a Duress Instruction**

4.  Counsel also unreasonably failed to request an instruction on a duress defense to the escape charge at the guilt phase and then compounded this error by failing to request a mitigation instruction on duress.

a.  Trial counsel ineffectively failed to request an instruction on a duress defense to the charge of escape. Trial counsel additionally failed to present evidence or otherwise develop the facts to support duress, even when there was ample evidence of duress presented at trial and in the discovery received from the government.

b.  To establish the defense of duress, a defendant must show that "(1) he was under an immediate threat of death or serious bodily injury, (2) he had

a well- grounded fear that the threat would be carried out, and (3) he had no reasonable opportunity to escape" the threatened harm. *United States v. Kuok*, 671 F.3d 931, 947 (9th Cir. 2012).

       c.     At trial, the evidence demonstrated a prima facie case of duress. Indications of a prima facie case include the following evidence:

       d.     Evidence at trial, particularly the testimony of Altmanis, established that Mikhel was a cruel and vicious individual capable of murder.

       e.     Mikhel was paying off various inmates in the jail, exercising control and influence, and those payments included money to Mr. Kadamovas. Tr. 12/07/06 at 65-66. This payment to Kadamovas was intended to control him, the same means of control he had weaponized against Kadamovas on the outside. Ex. 9 (Krausz dec.); Ex. 1 (Volynsky dec.) ¶¶ 234, 283.

       f.     The testimony of Billy Parker indicated that Mikhel planned to kill any guards who prevented his escape. Tr. 12/06/06 at 29-31. Recognizing the threat that Mikhel posed, authorities removed Parker from his cell in the jail and put him on suicide watch in order to disguise his cooperation. Tr. 12/06/06 at 34-35.

       g.     According to Sabrina Tuinan, the escape plan was solely Mikhel's. Tr. 12/08/06 at 80-81.

h.      Other evidence demonstrated Mikhel's control over individuals and his ability to manipulate and influence either by bribe or by threat. New evidence supports this even further. Witnesses state, "It was clear that Mikhel was the leader among them. He seemed much smarter than Yuri . . . . Mikhel had language and intellectual skills that Yuri lacked." Ex. 33 (Zadorozny dec.) ¶ 17. The evidence of Mikhel's control over Mr. Kadamovas is extensive, including that he paid Kadamovas large sums of money to maintain his dependence on him, paying his rent and expenses, and even taking out a life insurance policy in Mr. Kadamovas' name with Mikhel as the beneficiary. Tr. 12/13/06 at 184-85. Mikhel handled all the financials for their "joint" business. Ex. 9 (Krausz dec.). Mikhel used his power and influence to groom Mr. Kadamovas and the other co-defendants, just as he had attempted with Mr. Rabinovich and Mr. Kachatryan. Ex. 1 (Volynsky dec.) ¶¶ 219-224, ¶¶ 232-244.

i.      In the subsequent trial of Krylov, where the evidentiary record was similar to that against Mr. Kadamovas, a duress instruction was requested and given to the jury resulting in the acquittal of the conspiracy to escape charge. Ex. 100 (Krylov duress instr.); Ex. 97 (Krylov Trial Tr. 04/26/07); Ex. 101 (Krylov Trial Tr. 04/19/07). This is despite the fact that evidence of Krylov's direct involvement in the escape conspiracy was vast as compared to evidence against

Mr. Kadamovas. Tr. 12/06/06, 87-88, 179-96; Tr. 12/07/06 at 51-52; Tr. 12/06/06 at 93, 175; Tr. 12/07/07 at 45.

j.     By failing to request an instruction on duress, trial counsel was ineffective. Had the jury been properly instructed and properly found Mr. Kadamovas not guilty of escape due to duress, the penalty phase would have been substantially different. This would have removed the government's thumb from the weighing of aggravating factors and there is a reasonable probability the sentencing outcome would be different.

k.     During the penalty phase, the government took full advantage of the conviction on Count Six by using the threat of escape as aggravating evidence and evidence of future dangerousness. Tr. 02/09/07 at 36-37. In making this assertion, the prosecution made no distinction between the two defendants, telling the jury that the planned escape showed that the only way to guarantee that the defendants would not someday walk the streets to kill again was to execute them. Tr. 02/09/07 at 36-38. "And would you be surprised if you picked up a newspaper five years from now, ten years from now, and found out that he had escaped from custody. You wouldn't be surprised in the least, would you?" Tr. 02/09/07 at 151.

l.     Co-defendant Krylov was acquitted of the conspiracy to escape charge because the court in his trial, unlike the court in Mr. Kadamovas' trial,

336

properly gave a duress instruction. Ex. 100 (Krylov duress instr.); Ex. 97 (Krylov Trial Tr. 04/26/07).

m.    The Krylov jury concluded that the duress was a significant mitigating factor, and six of the twelve jurors in that trial found that the defendant "was under unusual and substantial duress, regardless of whether the duress was of such a degree as to constitute a defense." Ex. 102 (Krylov Tr. 05/22/07) at 27-28.

n.    Trial counsel additionally unreasonably failed to request a mitigation duress instruction. Based on the evidence, Mr. Kadamovas was entitled to an instruction and verdict option under 18 U.S.C. § 3592(a)(2) in which the jury could have found that, even if the duress did not rise to the level of a legal defense to the crime, duress constituted a mitigating factor. The failure to seek this mitigation instruct and verdict, resulted in Mr. Kadamovas receiving ineffective assistance of counsel in violation of the Sixth Amendment. This rendered Mr. Kadamovas' trial fundamentally unfair and eroded the reliability of the jury's verdicts on Count 6 and the penalty, and had a substantial and injurious effect on the verdicts.

o.    The allegations of Claim 12 (Failure to Instruct on Duress Defense) are incorporated herein.

337

**Failure to Object to Improper Shackling**

5.      Trial counsel unreasonably failed to object to the improper shackling of Mr. Kadamovas during the trial.

a.      During a status conference that occurred a month before the start of trial, Judge Tevrizian advised that the defendants would be chained down in the courtroom during the trial. The defendants were brought into court fully shackled with handcuffs and leg restraints. Heavy wooden chairs were provided, and Mr. Kadamovas was shackled to a chair with a lap restraint. Only after he was chained down were his handcuffs removed, and he was allowed to use his hands during the trial proceedings. Tr. 05/31/06 at 5-6. The trial judge again deferred completely to the U.S. Marshal, simply endorsing "a memo from the Marshal" without investigation, review, a hearing, or support. Tr. 05/31/06 at 5. Counsel failed to object to the security provisions, and failed to object to the shackling. Counsel failed to request a hearing into the alleged necessity for such measures.

b.      The trial court made no findings and presided over no hearing regarding the necessity of the shackles. No determination was made as to the justification for the shackles. Trial counsel unreasonably failed to demand a hearing and demand justification for the shackling.

c.      At the time of trial, in 2006-2007, the law regarding shackling

338

was well established. *See Deck v. Missouri*, 544 U.S. 622 (2005); *Illinois v. Allen*, 397 U.S. 337, 344 (1970). Grounds existed for an objection. No strategic reason existed for the failure to object.

d. The shackling was prejudicial in numerous ways. The prejudice was particularly acute at the penalty phase. At the penalty phase in a capital trial, a jury must determine "the extent to which [defendant] continues to be dangerous." *Duckett v. Godinez*, 67 F.3d 734, 748 (9th Cir. 1995). Thus, "physical restraints may create the impression in the minds of the jury that the court believes the defendant is a particularly dangerous and violent person." *Id*. The shackling sent a signal to the jury that Mr. Kadamovas was a dangerous, violent man, unfairly impacting the jury's assessment of the sentencing factors and implicitly promoting the prosecution's arguments regarding future dangerousness.

e. The allegations of Claim 18 (Ineffective Assistance of Counsel: Failure to Object to Shackling) are incorporated by reference.

H. Those guilt phase errors, separately and cumulatively, rendered the penalty phase unreliable.

**Failure to Object to Improper Aggravating Factor**

J. Counsel unreasonably failed to object to the use, as an aggravating factor, of "Death During the Commission of Another Crime." Dkt. No. 506, Gov's Notice of Intent to Seek the Death Penalty Against Def. Jurijus Kadamovas at 4.

1.      Contrary to the title of the aggravating factor, hostage taking is not "another" crime, separate from the death-eligible crime, during which the victims' deaths occurred but is, rather, the only crime Mr. Kadamovas was charged with that carries a potential death sentence.

2.      The aggravating factor alleging that death occurred during hostage taking simply reiterates the capital charge of hostage taking resulting in death. *See* 18 U.S.C. § 1203. This is the crime that made Mr. Kadamovas eligible under the law for the death sentence and should not be considered as an aggravating factor. It should not be used as aggravating the criminal acts and calling for an increased sentence.

3.      The double-counting of an aggravating factor in this manner resulted in the illusory and false inflation of aggravation and skewed the proceeding toward a death sentence, prejudicing Mr. Kadamovas.

4.      The allegations set forth in Claim 24 (Improperly Double-Counted Aggravating Factor) are incorporated by reference.

**Other Failures to Object**

K.      Trial counsel also unreasonably failed to raise other objections.

1.      Trial counsel unreasonably failed to object to the use of an anonymous jury. The allegations of Claim 1 are incorporated by reference.

2.      Trial counsel unreasonably failed to object to the jury selection procedures that resulted in a jury pool that was not a fair cross section of the community. The allegations of Claim 3 are incorporated by reference.

3.      Trial counsel failed to raise an objection under *J.E.B. v. Alabama* in response to the government's improper gender-based strikes. The allegations of Claim 4 are incorporated by reference.

4.      Trial counsel failed to object when the trial judge initially announced that he was applying to be the United States Attorney for the Central District of California, an obvious conflict of interest. The allegations of Claim 7 are incorporated by reference.

5.      Trial counsel failed to raise challenges to the federal death penalty, which is applied arbitrarily in violation of the Eighth Amendment and violates international law. The allegations of Claims 25, 26, 27, 28, and 29 are incorporated by reference.

6.      Trial counsel failed to ensure that their client had access to case materials, depriving him of the sacred protections enshrined in our Constitution. The allegations of Claim 10 are incorporated by reference.

**Failure to Secure Necessary Continuances to Ensure Adequate Time to Prepare**

L.      Counsel unreasonably failed to secure the continuances necessary to adequately prepare for trial. Although inadequate time to prepare is not the only reason for trial counsel's failures—it does not explain, for example, the decision to hire as a mitigation specialist someone without the relevant training, qualifications, or cultural competence—inadequate time to prepare contributed to counsel's errors. Chahin, in particular, was unable to prepare for Mr. Kadamovas' trial. She was, in fact, operating under a conflict of interest, representing two clients in high-stakes trials leaving her insufficient time to work on both cases.

1.      At the outset, trial counsel unreasonably failed to secure a continuance to allow attorney Chahin enough time to prepare.

a.      Attorney Sonia Chahin was appointed by Judge Manella to represent Mr. Kadamovas on November 28, 2005. Dkt. No. 830; Ex. 11 (Chahin dec.) ¶ 7.

b.      Chahin replaced attorney Marcia Brewer, who withdrew from the case, and represented Mr. Kadamovas along with attorney Richard Lasting. Ex. 11 (Chahin dec.) ¶¶ 5, 7.

c.      At the time of her appointment, Chahin was also engaged in another complex federal case, a multi-defendant homicide case culminating in a twenty-five-day trial against Chahin's client Alejandro Martinez and his co-

342

defendants. *United States v. Martinez, et. al.*, 2:04-cr-00415; Ex. 11 (Chahin dec.) ¶ 4.

        d.     Chahin "was told, and believed" Mr. Kadamovas' trial would be continued to give her adequate time to prepare for his case. Ex. 11 (Chahin dec.) ¶ 6. Lasting also "felt confident" that the trial date would be continued to give Chahin time to prepare. Ex. 10 (Lasting dec.) ¶ 15.

        e.     Denial of the continuance meant that Mr. Kadamovas' trial began while the trial in Chahin's other case, Martinez, was still going on. Ex. 11 (Chahin dec.) ¶ 16.

        f.     Chahin was not prepared for the trial. Knowing she was not prepared, Chahin made a motion to be relieved as counsel, a request that the trial court denied. Ex. 11 (Chahin dec.) ¶ 17.

    2.     Later, trial counsel unreasonably failed to secure a continuance to give themselves enough time to review Solovyeva's diary and they also failed to use the time they did have to get a complete translation of the diary to at least recall Solovyeva in the penalty phase and elicit mitigating evidence from her.

    3.     Finally, counsel unreasonably failed to make the necessary arrangements to get Mr. Kadamovas' family members to the United States to testify and failed to secure a continuance when they were unable to get their witnesses to the United States.

343

4.      The inadequate amount of time that counsel had to prepare contributed to their errors and omissions at the penalty phase. The Kadamovas trial lawyers unreasonably put on a minimal and incomplete mitigation case, presenting only two brief witnesses, neither of whom had met Mr. Kadamovas before the charged offenses. Given what trial counsel could have presented, as outlined above, Mr. Kadamovas was prejudiced by trial counsel's unreasonable errors.

M.      The denial of his right to effective assistance of counsel substantially prejudiced Mr. Kadamovas, rendered the penalty phase trial fundamentally unfair, eroded the reliability of the verdict and had a substantial and injurious effect on the verdict. But for the denial of this right, it is reasonably probable that a more favorable result would have been attained. The errors, omissions, and inactions of trial counsel were significant individually, and their cumulative prejudicial impact manifestly requires the reversal of the death sentence.

## CLAIM 22 DENIAL OF MITIGATION SPECIALIST AND RESOURCES FOR MITIGATION INVESTIGATION

Jurijus Kadamovas' sentence is unlawfully and unconstitutionally imposed, in violation of federal statutes and the Fifth, Sixth, and Eighth Amendments to the United States Constitution, because he was denied timely expert assistance in preparing his defense and investigating mitigating evidence. Mr. Kadamovas was denied the appointment of a mitigation specialist, and denied the resources necessary to conduct a mitigation investigation and have a fair capital trial. The trial court's rulings violated his due process right to adequate resources, his right to present a defense, his right to a fair trial, his right to effective assistance of counsel, and his right to a reliable and non-arbitrary sentencing proceeding. The trial court's rulings also undermined the presentation to the Capital Case Committee, prevented his counsel from convincing the authorities not to pursue a death sentence, and subverted pretrial plea negotiations. *McWilliams v. Dunn,* 582 U.S. 183 (2017); *Ake v. Oklahoma,* 490 U.S. 68 (1985); *United States v. Kreutzer,* 61 M.J. 293, 298-305 (C.A.A.F. 2005).

The following facts and allegations, among others, support this claim:

A. During the pretrial period, Mr. Kadamovas was denied the services of a qualified mitigation specialist and, consequently, the mitigation investigation was delayed, undercut, and inadequate, leading to an unfair trial and an unreliable sentencing verdict.

345

1.      Mr. Kadamovas was arrested on February 19, 2002. On March 5, 2002, the government filed an indictment charging him, along with a number of co-defendants, with two counts of hostage taking, violations of 18 U.S.C. § 1203. Dkt. No. 33. A First Superseding Indictment was filed on June 12, 2002, charging Mr. Kadamovas, and others, with conspiracy to take hostages resulting in death and three counts of hostage taking resulting in death, also violations of 18 U.S.C. § 1203. Dkt. No. 100. The charges in the superseding indictment made the defendants potentially subject to the death penalty.

2.      Mr. Kadamovas was found to be indigent and entitled to court appointed counsel and funding. Dkt. No. 5.

3.      Pursuant to 18 U.S.C. § 3599, because of the death penalty allegations, Mr. Kadamovas qualified for, and received an appointment of a second, learned, counsel. Second counsel was appointed for Mr. Kadamovas on June 27, 2002. Tr. 06/27/02 at 8-9.

4.      Pursuant to 18 U.S.C. § 3006A(e)(1) and 18 U.S.C. § 3599(f), Mr. Kadamovas was also entitled to "investigative, expert, or other services necessary for adequate representation."

5.      On June 4, 2003, counsel for Mr. Kadamovas filed an Ex Parte Application for Appointment of Mitigation Investigator at Government Expense Pursuant to 18 U.S.C. § 3006(e)(1) and Authorization for Investigator to Travel

Outside the Central District of California. Ex. 103 (Dkt. No. 332). That document, originally filed ex parte and under seal,[27] set out the need for the appointment of a mitigation specialist, M.E. "Max" Hadley, and asked for the sum of $15,000 as "the first stage of the mitigation investigation services necessary in this matter." *Id.* at 2.

        a.     The application noted that the services of the mitigation specialist were "necessary to the competent representation of the defendant at penalty phase of the trial." The application pointed out the potentially capital nature of the case and how it was "necessary for the defense team to have the services of a mitigation specialist to assist in the investigation and preparation of the mitigation case." The application noted that Mr. Kadamovas was from Lithuania, and it would be necessary to gather information and interview witnesses in that country, his "country of birth." *Id.* at 2, 3-4.

        b.     The expert investigator requested, Ms. Hadley, was a qualified

---

[27] Applications under § 3006A are filed ex parte and under seal in order to assure the confidentiality of the defense and protect the defense function. *See generally United States v. Wells*, 879 F.3d 900, 913 (9th Cir. 2018); *United States v. Gonzales*, 150 F.3d 1246, 1258-66 (10th Cir. 1998). Upon motion of the defendant, this Court issued an order unsealing this application, Dkt. No. 332, as well as Dkt. No. 403 and the two orders, Dkt. No. 333 and 404, on January 30, 2023. Dkt. No. 2439.

mitigation specialist. The application included a declaration executed by Ms. Hadley attesting to her qualifications and experience. *Id.* at 6.

6. The June 2003 application for a mitigation specialist was denied by Judge Manella. She wrote on the order: "Denied as premature." No factual findings or determinations were made to support this order. Ex. 104 (Dkt. No. 333) at 2.

7. On September 8, 2003, counsel for Mr. Kadamovas filed a Second Ex Parte Application for Appointment of Mitigation Investigator at Government Expense Pursuant to 18 U.S.C. § 3006(e)(1) and Authorization for Investigator to Travel Outside the Central District of California. Ex. 105 (Dkt. No. 403). The second application closely tracked the first application, requesting funds for Ms. Hadley to do a mitigation investigation. *Id.*

   a. Counsel's declaration, attached to the second application, noted that the case "to a high degree of certainty" would be a capital case. The government had already informed two of the defendants that the death penalty would not be sought against them, thus "it can safely be assumed at this point that the Government will most probably seek the death penalty against [Kadamovas]." Counsel noted that it was crucial to begin the mitigation investigation promptly: "it is necessary for the defense team to have the services of a mitigation specialist to assist in the investigation and preparation of the mitigation case which needs to commence immediately due to the extent of the necessary investigation." *Id.* at 4.

b.    Consistent with the first application, the second application noted the need to conduct a social history investigation including traveling to Lithuania and interviewing witnesses and gathering information on Mr. Kadamovas' background and family. Ms. Hadley's declaration regarding her expertise and experience was also attached. *Id.* at 6.

8.    Judge Manella denied the second application, writing on the denial order: "Denied w/o prejudice as premature. Counsel may reapply if + when Govt gives notice of intent to seek death penalty." Ex. 106 (Dkt. No. 404) at 3. No factual determinations were made in support of this order. The order denying the mitigation specialist and mitigation investigation was based solely on the timing of the request, labeling it as "premature." *Id.*

9.    The trial court's denial of the application and the second application on the grounds that the government had not filed a notice of intent to seek the death penalty was an abuse of discretion and deprived Mr. Kadamovas of his constitutional rights to a fair trial, due process, the effective assistance of counsel, and a reliable and non-arbitrary sentencing proceeding.

10.    On January 5, 2004, Mr. Kadamovas' counsel met with the Capital Case Committee of the Department of Justice and made a presentation asking the government to forego seeking the death penalty. Ex. 10 (Lasting dec.) ¶ 3; *see* Dkt.

349

No. 550 at 2. The presentation was not supported by a mitigation investigation. The lack of a mitigation investigation—caused by the denial of a mitigation specialist and the denial of funding—resulted in an inadequate, incomplete, and misdirected presentation. The presentation was not successful.

11.     On August 3, 2004, seven months after the presentation in Washington to the Capital Case Committee, the government provided notice that it would be seeking the death penalty against Mr. Kadamovas. Dkt. No. 506.

12.     The government's notice was filed two years and six months after Mr. Kadamovas' arrest, and two years and two months after the first superseding indictment that contained allegations potentially subjecting him to the death penalty.

13.     On September 1, 2004, counsel filed a third application for a mitigation specialist. By this time, Ms. Hadley was no longer available. Counsel now asked for the appointment of John Brock as a mitigation investigator. Mr. Brock was a former Los Angeles County Deputy Public Defender and not an investigator. Dkt. No. 540 (under seal); Ex. 12 (Brock dec.) ¶ 6. The third application for a mitigation investigator was also denied, this time on the basis that the court wanted more specific cost information. Dkt. No. 538 (under seal).

14.     On October 1, 2004, two years and eight months after Mr. Kadamovas' arrest, and one year and four months after counsel first asked for

funding for the mitigation investigation, the court finally approved funding for a mitigation specialist and investigation. Ex. 12 (Brock dec.) ¶ 2.

15. John Brock was an attorney, not an investigator, and he was not qualified to serve the role as a mitigation specialist. Ex. 11 (Brock dec.) ¶ 6. Due in part to the delay in approving funding for a mitigation investigation, the defense lost a qualified and skilled mitigation specialist, Max Hadley.

B. The need for a qualified mitigation specialist was clearly established as an indispensable part of a robust defense in a capital defense more than twenty years ago. Because a penalty phase defense must include the presentation of all mitigating evidence, including all information and characteristics of the accused that suggest a sentence less than death, a thorough investigation into the defendant's psycho-social history, background, and family is necessary. *See Wiggins v. Smith*, 539 U.S. 510, 521-25 (2003); *Williams v. Taylor*, 529 U.S. 362, 395-96 (2001); *Correll v. Ryan*, 539 F.3d 938, 942-46 (9th Cir. 2008).

1. Mitigation investigation is an inter-disciplinary, scientific analysis of the psycho-social history of an individual accused in a capital case. Specialists collect and analyze social history records, conduct extensive interviews with family members and other witnesses, and uncover the significant contributing events and factors that affected the defendant's character, behavior, mental health, and personality.

351

2.      The Commentary of the 2003 version of the ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases is instructive:

A mitigation specialist is . . . an indispensable member of the defense team throughout all capital proceedings. Mitigation specialists possess clinical and information-gathering skills and training that most lawyers simply do not have. They have the time and the ability to elicit sensitive, embarrassing and often humiliating evidence (e.g., family sexual abuse) that the defendant may have never disclosed. They have the clinical skills to recognize such things as congenital, mental or neurological conditions, to understand how these conditions may have affected the defendant's development and behavior, and to identify the most appropriate experts to examine the defendant or testify on his behalf. Moreover, they may be critical to assuring that the client obtains therapeutic services that render him cognitively and emotionally competent to make sound decisions concerning his case.

Perhaps most critically, having a qualified mitigation specialist assigned to every capital case as an integral part of the defense team insures that the presentation to be made at the penalty phase is integrated into the overall preparation of the case rather than being hurriedly thrown together by defense counsel still in shock at the guilty verdict. The mitigation specialist compiles a comprehensive and well-documented psycho-social history of the client based on an exhaustive investigation; analyzes the significance of the information in terms of impact on development, including effect on personality and behavior; finds mitigating themes in the client's life history; identifies the need for expert assistance; assists in locating appropriate experts; provides social history information to experts to enable

them to conduct competent and reliable evaluations; and works with the defense team and experts to develop a comprehensive and cohesive case in mitigation.

31 Hofstra L. Rev. 913, 959 (footnotes omitted). *See* Guidelines 4.1(A)(1); 10.4(C)(2); 10.9.1; 10.9.2; Craig Haney, *The Social Context of Capital Murder: Social Histories and the Logic of Mitigation*, 35 Santa Clara L. Rev. 547 (1995).

2.     A thorough and complete mitigation investigation must begin quickly, both because records disappear and memories fade and because the undertaking is extensive and the evidence must be ready when the trial comes, and integrated into the overall defense case. Further, the mitigation evidence is important before trial as well. An understanding of the mitigation case, prepared by a mitigation specialist, is crucial in a number of areas, including defense counsel's input into the government's decision whether to pursue the death penalty (particularly crucial in a federal capital case, where the decision making process is formalized), plea negotiations, client relations, assessment of the need and type of psychiatric or other experts and other situations addressed long before the actual trial begins. Commentaries have emphasized that the mitigation specialist must begin work on the case as soon as possible after the defendant is charged. The Commentary to Guideline 10.4(C)(2)(a) provides:

Investigation and planning for both phases must begin immediately upon counsel's entry into the case, even before the prosecution has affirmatively indicated that it will seek the death penalty. Counsel must

promptly obtain the investigative resources necessary to prepare for both phases, including at minimum the assistance of a professional investigator and a mitigation specialist, as well as all professional expertise appropriate to the case. Comprehensive pretrial investigation is a necessary prerequisite to enable counsel to negotiate a plea that will allow the defendant to serve a lesser sentence, to persuade the prosecution to forego seeking a death sentence at trial, or to uncover facts that will make the client legally ineligible for the death penalty.

ABA Guidelines, 31 Hofstra L. Rev. at 925 (footnotes omitted).

3.      As Russell Stetler, former National Mitigation Coordinator for the federal death penalty projects, notes: a mitigation specialist must begin the investigation as soon a possible, both because of the difficult, time-consuming tasks involved, and also because a mitigation presentation is crucial as part of the attempt to convince the Government not to seek a death sentence. Ex. 4 (Stetler dec.) ¶ 3. "It is therefore imperative to commence the mitigation investigation as early as possible in order to uncover information that may cast the defendant in a more sympathetic light or a least persuade the Government that a death sentence will not be as easily obtained as initially thought . . . ." Ex. 4 (Stetler dec.) ¶ 37.

4.      The denial of the use of a mitigation specialist in the early stages of this case crippled the defense team and undermined their entire penalty-phase case. Counsel were forced to engage in the authorization process without proper tools of persuasion. The entire point of inviting the defense to participate in the authorization process presupposes that the defense has conducted an investigation

354

sufficient to understand and discuss the mitigating evidence and inferences involved in the case. Without a mitigation specialist and funds to investigate the defendant's record, character, and social history, any presentation is sabotaged from the beginning. The trial court's decision to deny the defense funding until after the authorization process was erroneous, unfair, and an abuse of discretion.

C.    The eventual appointment of a mitigation specialist does not eliminate the taint, or dissipate the prejudice, of this error.

1.    The denial of the mitigation specialist in 2003 resulted in the absence of a proper mitigation presentation during the authorization process, and severely prejudiced Mr. Kadamovas' interests.

2.    The delay before the final appointment of a mitigation specialist in October of 2004 was prejudicial, resulting in the loss of documents, witnesses, and information.

3.    The delay before the final appointment of a mitigation specialist in October of 2004 resulted in a situation where the mitigation investigation was rushed, harried, and incomplete. The allegations in Claim 6 (Improper Denial of Continuance) are incorporated by this reference.

4.    John Brock, the individual appointed after Max Hadley became unavailable, was not qualified to be a mitigation specialist. His efforts were inadequate and his investigation was incomplete. Ex. 12 (Brock dec.) ¶ 8.

355

5.      The mitigation investigation was superficial, inadequate, and defective. The presentation of the mitigating evidence in Mr. Kadamovas' defense was inadequate, minimal, and unpersuasive.

D.      The motions submitted by trial counsel in 2003 were minimalistic and lacked persuasive authority. The failure of trial counsel to prepare and file a more persuasive motion for a mitigation investigator does not prevent full consideration of this claim because:

1.      While not a model of persuasiveness, and lacking key citations to controlling cases and opinions that described the need for a mitigation investigation early in the process, the content of the motions presented the issue adequately.

2.      Any failure on the part of trial counsel to more adequately argue for a mitigation investigator was ineffective assistance of counsel in violation of the Sixth Amendment. The allegations set forth in Claim 21 (Ineffective Assistance of Counsel: Penalty Phase Trial) are incorporated by reference. Mr. Stetler explains: "If funding was refused, counsel needed to renew the motion and make a record as to why there was an urgent need to fund a mitigation specialist *before* the Government had decided whether to authorize the filing of a Notice of Intent to Seek the Death Penalty, and counsel had an obligation to conduct that investigation to the best of their ability regardless of any funding limitations. The mitigation

356

investigation was critical to multiple aspects of trial counsel's representation . . . ." Ex. 4 (Stetler dec.) ¶ 44.

E.      Mr. Kadamovas was substantially prejudiced by the denial of the applications for a mitigation specialist.

1.      Had a proper mitigation investigation been done prior to the Capital Case Committee review, counsel could have presented a compelling case to the Committee and it is reasonably probable that the government would not have authorized this case for the death penalty.

2.      Had a proper mitigation investigation been done prior to trial, an extensive and persuasive mitigation case would have been presented to the jury. Available mitigating evidence regarding Mr. Kadamovas' childhood, background, lack of opportunity, deprivation and poverty, character, good deeds, personality features, potential for rehabilitation, and other attributes would have been gathered through investigation, collection of documents, and interviews. Major mitigating themes, supported by witnesses and corroborated by documents, could have been presented.

3.      A summary of the mitigation evidence that should have been presented to the jury is set forth in Claim 21 (Ineffective Assistance of Counsel: Penalty Phase Trial). Those allegations are incorporated by this reference. *See also* Ex. 2 (Klumbyte dec.); Ex. 1 (Volynsky dec.). Had the defense team been given

adequate resources, and used them in a reasonably competent way, a persuasive mitigation case would have been presented and the jury would not have sentenced Mr. Kadamovas to death.

K.    The error substantially prejudiced Mr. Kadamovas, rendered the trial fundamentally unfair, eroded the reliability of the jury's verdicts and had a substantial and injurious effect on the verdicts.

## CLAIM 23 GOVERNMENT MISCONDUCT REGARDING DEFENSE WITNESS VISA APPLICATIONS

Jurijus Kadamovas' death sentence is unlawfully and unconstitutionally imposed, in violation of the Fifth, Sixth, and Eighth Amendments to the United States Constitution, because the government interfered with Mr. Kadamovas' family members' ability to secure visas to come to the United States to testify on his behalf in the penalty phase and suppressed evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). The family members' inability to secure visas was a result, at least in part, of misconduct by the United States government, which is both the entity that would have issued visas for Mr. Kadamovas' family members to travel to the United States and the entity seeking the death penalty against Mr. Kadamovas. Because the government engaged in misconduct and withheld information, Mr. Kadamovas was unable to present his family as mitigation witnesses and was deprived of due process, a fair trial, a reliable sentencing proceeding, and the right to present mitigating evidence. *Webb v. Texas*, 409 U.S. 95, 98 (1972); *United States v. Little*, 753 F.2d 1420,, 1439 (9th Cir. 1984); *Eddings v. Oklahoma*, 455 U.S. 104, 113-14 (1982); *Lockett v. Ohio*, 438 U.S. 586, 604-05 (1978).[28]

---

[28] Mr. Kadamovas also alleges that trial counsel were ineffective for their lack of diligence in ensuring that his family members would be able to attend the

The following facts and allegations, among others, support this claim:

A.      Mr. Kadamovas' family members, Svetlana, Jurate, and Gabriel, sought to travel to the United States to testify on his behalf. Ex. 17 (Kadamova dec.) ¶ 86; Ex. 18 (Kadamoviene dec.) ¶ 51. They applied for visas. Ex. 17 (Kadamova dec.) ¶ 86; Ex. 18 (Kadamoviene dec.) ¶ 51.

B.      On February 5, 2007, their applications for visas were denied by the American Embassy in Vilnius, Lithuania. Tr. 02/06/07 at 7-8; Ex. 17 (Kadamova dec.) ¶ 86; Ex. 18 (Kadamoviene dec.) ¶ 51. They were told that the U.S. government was worried they would not return to Lithuania and they did not have sufficient assets and property in Lithuania. Ex. 17 (Kadamova dec.) ¶ 86.

C.      Trial counsel moved for a mistrial, arguing that denying the visas "impact[s] our ability to fully and completely present Mr. Kadamovas' mitigation." Tr. 02/06/07 at 8. The trial court denied the motion. Tr. 02/6/07 at 12.

D.      Earlier, counsel for Mikhel had moved for a brief continuance, and Mr. Kadamovas' counsel joined the motion. The trial court denied this motion as well.

---

trial and testify on his behalf, and that the trial court violated his constitutional rights by denying a continuance to allow enough time for his family members to travel to the United States. The allegations set forth in Claim 6 (Improper Denial of Continuance) and Claim 21 (Ineffective Assistance of Counsel: Penalty Phase Trial) are incorporated by reference.

360

Tr. 01/23/07 at 41. The allegations set forth in Claim 6 (Improper Denial of Continuance) are incorporated by reference.

E.      The trial court did not hold an evidentiary hearing, nor did it sufficiently inquire into the factual basis and details underlying the denial of the visas and the absence of these three witnesses.

F.      After the penalty phase verdicts, trial counsel raised the issue again in a motion for new trial. Dkt. No. 1562 at 3, 6-7.

G.      In response to the motion for a new trial, the prosecution filed a declaration executed by FBI Special Agent Perez stating that he had attempted to aid the defense after they requested help securing the visas. His efforts involved getting "information . . . provided to me by the FBI Legal Attaché covering Lithuania." Ex. 107 (Perez dec., Dkt. No. 1578-2) ¶ 5. Perez also asserted that the failure to obtain visas was due to the witnesses' "delay in applying for these visas" which "did not afford the Consulate with enough time to conduct the background checks that were required to issue the requested visas." *Id.*

H.      Perez's explanation for why the visas were denied contradicts the explanation given to Mr. Kadamovas' family members, that visas were being denied because of their financial situation and the concern that they would not return to Lithuania. Ex. 107 (Perez dec.). Other than Agent Perez's post-trial declaration, the government did not produce any documentation of the

361

communications between the prosecution, the FBI agents, the FBI Legal Attaché, and the individuals who denied the visas to these witnesses. Documents and information relating to those communications, and the visa denials, were withheld from the defense.

I.      The United States government was both the entity seeking the death penalty against Mr. Kadamovas and the entity that decided whether his family members would be able to travel to the United States to testify on his behalf. Despite Svetlana, Jurate, and Gabriel seeking to travel to the United States specifically to testify at a trial in federal court in which the United States was a party, the United States government prevented them from traveling.

J.      AUSA Dugdale, seeking to place blame on the defense, argued that "The consulate has to do some sort of at least minimal investigation to find out why these people are coming here and whether they should issue the visas." Tr. 02/06/07 at 9. In fact, the United States government knew, and the consulate specifically could have easily discovered, that they were seeking to travel to the United States to testify as mitigation witnesses in a case where the United States government was seeking the death penalty against their brother, husband, and father.

K.      The United States government should not have prevented Svetlana, Jurate, and Gabriel from traveling to the United States. The United States government

knew that they were traveling to testify at a trial and, as such, should not have denied their visas because they had insufficient funds. If the applications were in fact late, the government should have expedited the applications, given their reason for traveling. The contradictory explanations for the denial given to the court by Perez and given to Mr. Kadamovas' family members reveal that the government did not act in good faith. The United States government committed misconduct in handling the visa applications and in failing to secure the attendance of these crucial witnesses at the trial and withheld evidence in violation of *Brady*.

L.    Trial counsel's failure to ensure that the three crucial family member mitigation witnesses appeared to testify does not prevent the consideration of this claim for the following reasons, among others:

1.    The government misconduct was responsible for the denial of the visas and the failure of these witnesses to testify. Trial counsel's actions or inactions do not excuse the misconduct.

2.    The trial court had an independent duty to protect the fundamental constitutional rights involved and ensure that a reliable sentencing determination occurred. The trial court refused to grant a continuance and refused to grant a mistrial.

3.    The failure of trial counsel to secure the attendance of these three crucial witnesses constituted ineffective assistance of counsel in violation of the

363

Sixth Amendment, prejudicial to Mr. Kadamovas. The allegations of Claim 21 (Ineffective Assistance of Counsel: Penalty Phase Trial) are incorporated by this reference.

M.    Section 2255 counsel filed a discovery motion seeking documents related to the visa applications, including communications between members of the prosecution team and the United States Embassy (or Consulate) in Vilnius, Lithuania and the FBI Legal Attaché covering Lithuania. *See* Dkt. No. 2399. This Court denied the motion as premature, holding that "in order for this Court to consider any request for discovery under Habeas Rule 6, Kadamovas must first file a motion pursuant to section 2255." Dkt. 2405 at 3.

N.    Section 2255 counsel has also sought information relevant to this claim through the Freedom of Information Act. *See* Ex. 124 (FOIA Materials).

O.    Defense counsel viewed these three witnesses as crucial to the mitigation. Richard Lasting states in his declaration: "I thought that Juri's wife Jurate, sister Svetlana, and son Gabriel would have been strong mitigation witnesses at the penalty phase. They would have testified about the nature of Juri's service in the Soviet Army, his attempts to found legitimate businesses and his good qualities. I thought they might connect with the jury and humanize him." Ex. 10 (Lasting dec.) ¶ 24.

P.     These three individuals were crucial witnesses and would have submitted important mitigating evidence to the jury. *See* Ex. 17 (Kadamova dec.); Ex. 18 (Kadamoviene dec.). Without these family members' testimony, the jury was deprived of authentic, reliable evidence regarding Mr. Kadamovas' family life, childhood, character, background, and the struggles he endured growing up in the Soviet Union. Without this evidence, the presentation before the jury constituted a fundamentally inaccurate portrait of Jurijus Kadamovas and deprived the jury of important evidence in mitigation.

Q.     These constitutional violations substantially prejudiced defendant, rendered the trial fundamentally unfair, eroded the reliability of the jury's sentencing verdict, and had a substantial and injurious effect on the verdict.

**CLAIM 24 IMPROPERLY DOUBLE-COUNTED AGGRAVATING FACTOR**

Jurijus Kadamovas' death sentence is unlawfully and unconstitutionally imposed, in violation of the Fifth, Sixth, and Eighth Amendments to the United States Constitution, because he was charged with an inappropriate and unconstitutional aggravating factor. One of the aggravating factors alleged against Mr. Kadamovas repeated the definition of the only crime that carried a potential death sentence, skewing the weighing process required by the Federal Death Penalty Act (FDPA) in favor of death. Double counting the only death-eligible crime as an aggravating factor rendered the sentencing procedure unreliable and arbitrary, depriving Mr. Kadamovas of a fair sentencing procedure in violation of due process and the Eighth Amendment. *Tuilaepa v. California*, 512 U.S. 967, 971-72 (1994) (citing *Coker v. Georgia*, 433 U.S. 584, 597 (1977)); *United States v. McVeigh*, 944 F. Supp. 1478, 1489 (D. Colo. 1996) (citing *Stringer v. Black*, 503 U.S. 222, 231-32 (1992)).

The following facts and allegations, among others, support this claim:

A.    As an aggravating factor against Mr. Kadamovas, the government alleged "Death During the Commission of Another Crime." In support of this aggravator, the government stated, "The deaths of Meyer Muscatel [Count l], Rita Pekler [Count l], Alexander Umansky [Counts 1 and 2], Nick Kharabadze [Counts 1 and 3], and George Safiev [Counts 1 and 4] occurred during the commission and

366

attempted commission of an offense under 18 U.S.C. § 1203 (conspiracy to commit hostage taking and hostage taking)." Dkt. No. 506 (Gov's Notice of Intent to Seek the Death Penalty Against Def. Jurijus Kadamovas) at 4.

B.     Contrary to the title of the aggravating factor, hostage taking was not "another" crime, separate from the death-eligible crime, during which victims' deaths occurred.

1.     Hostage taking resulting in death was the only crime Mr. Kadamovas was charged with that carries a potential death sentence. *See* Dkt. No. 502, Second Superseding Indictment (alleging violations of § 1203; § 1956(h), money laundering, which carries a maximum sentence of twenty years imprisonment; and § 371, conspiracy to escape in violation of § 751(a), which carries a maximum sentence of five years imprisonment; plus seeking forfeiture).

2.     The aggravating factor alleging that death occurred during hostage taking simply reiterates what was already necessary for Mr. Kadamovas to be convicted of hostage taking resulting in death. *See* 18 U.S.C. § 1203.

C.     The FDPA requires a jury deciding whether to sentence someone to death to weigh the aggravating factors against the mitigating factors. 18 U.S.C. § 3591(a); § 3593(e). "To allow the jury to weigh as an aggravating factor a crime already proved in a guilty verdict would unfairly skew the weighing process in favor of death"; consequently, "the government may not introduce those offenses as

367

aggravating factors that duplicate the crimes charged in the indictment." *McVeigh*, 944 F. Supp. at 1489-90; *see also Stringer*, 503 U.S. at 232.

D.      Trial counsel failed to object to the inappropriate aggravating factor. Trial counsel's lack of a specific objection does not prevent the consideration of this claim for the following reasons, among others:

1.      The trial court had an independent duty to protect the fundamental constitutional rights involved.

2.      Allowing the jury to double count the aggravating factor to Mr. Kadamovas' prejudice was plain error.

3.      The failure of trial counsel to make a proper objection was unreasonable and constituted ineffective assistance of counsel in violation of the Sixth Amendment. The allegations of Claim 21 are incorporated by this reference.

E.      To the extent that the actions of appellate counsel restrict consideration of this claim, appellate counsel's actions and inactions constituted ineffective assistance of counsel in violation of the Sixth Amendment, to Mr. Kadamovas' prejudice. Ex. 16 (Coleman dec.). The allegations of Claim 30 are incorporated by this reference.

F.      Inclusion of the inappropriate aggravating factor deprived Mr. Kadamovas of his rights under the Eighth Amendment and due process. Inclusion of the

inappropriate aggravating factor deprived Mr. Kadamovas of his rights to a reliable, fair, and non-arbitrary sentencing procedure.

G.     The double counting of the aggravator constitutes a structural defect that invalidates the death sentence.

H.     Mr. Kadamovas was prejudiced by the government's reliance on this inappropriate aggravating factor and counsel's failure to challenge it.

1.     The jury found as an aggravating factor that the victims' deaths occurred during the commission of hostage taking resulting in death. *See* Dkt. No. 1541, Special Verdict Form at 5. This finding was inevitable because the case could not have proceeded to the penalty phase if the jury did not agree that the crime of hostage taking resulting in death had been committed.

2.     The government went into the penalty phase with one aggravating factor already weighing in favor of death. Allowing the government to go into the penalty phase with an extra aggravator skewed the weighing process toward death and rendered the process fundamentally unfair.

I.     The error substantially prejudiced Mr. Kadamovas, rendered the trial fundamentally unfair, eroded the reliability of the jury's sentencing verdict, and had a substantial and injurious effect on the verdict.

**CLAIM 25 THE DEATH PENALTY IS UNCONSTITUTIONAL**

Jurijus Kadamovas' sentence is unlawfully and unconstitutionally imposed because the death penalty violates the Eighth Amendment to the United States Constitution.

The following facts and allegations, among others, support this claim:

A. After a jury trial on the allegations against him, Mr. Kadamovas was sentenced to death in the United States District Court for the Central District of California on March 12, 2007. Dkt. No. 1641 (Judgment and Commitment Order).

B. The Eighth Amendment prohibits "cruel and unusual punishments." The Eighth Amendment serves "to protect the dignity of society itself from the barbarity of exacting mindless vengeance." *Ford v. Wainwright*, 477 U.S. 399, 410 (1986). The terms "cruel and unusual" draw their "meaning from the evolving standards of decency that mark the progress of a maturing society." *Trop v. Dulles* 356 U.S. 86, 101 (1958) (plurality opinion). And these evolving standards "counsel us" to recognize that "decency, in its essence, presumes respect for the individual and thus moderation or restraint in the application of capital punishment." *Kennedy v. Louisiana*, 554 U.S. 407, 435 (2008).

C. In *Furman v. Georgia*, 408 U.S. 238 (1972), the United States Supreme Court confronted the question of whether evolving standards of decency prohibited the use of the death penalty. Although it rejected that broad claim, the Court went

370

on to hold that the death penalty "could not be imposed under sentencing procedures that created a substantial risk that it would be inflicted in an arbitrary and capricious manner." *Gregg v. Georgia*, 428 U.S. 153, 188 (1976) (plurality opinion) (explaining *Furman*'s holding. *Gregg* and subsequent United States Supreme Court opinions sought to salvage the death penalty in America by preventing arbitrary, unreliable, racist, and capricious imposition of death sentences through the use of guided discretion: "[C]apital punishment must be limited to those offenders who commit a narrow category of the most serious crimes and whose extreme culpability makes them the most deserving of execution." *Kennedy v. Louisiana,* 554 U.S. at 420 (internal quotation marks omitted).

D.    The guided discretion experiment has failed. As Justice Breyer has explained:

> In 1976, the Court thought that the constitutional infirmities in the death penalty could be healed; the Court in effect delegated significant responsibility to the States to develop procedures that would protect against those constitutional problems. Almost 40 years of studies, surveys, and experience strongly indicate, however, that this effort has failed. Today's administration of the death penalty involves three fundamental constitutional defects: (1) serious unreliability, (2) arbitrariness in application, and (3) unconscionably long delays that undermine the death penalty's penological purpose. Perhaps as a result, (4) most places within the United States have abandoned its use. . . .

371

> [These defects] lead me to believe that the death penalty, in and of itself, now likely constitutes a legally prohibited "cruel and unusual punishmen[t]."

*Glossip v. Gross*, 576 U.S. 863, 909 (2015) (Breyer, J., dissenting) (second alteration in original).

E.     The system of capital punishment under which Jurijus Kadamovas was sentenced is arbitrary, capricious, and racially and ethnically biased. In its arbitrariness, caprice, and bias, it offends the evolving standards of decency that mark the progress of a maturing society. Capital punishment violates the Eighth Amendment's cruel and unusual punishment clause.

F.     If capital punishment is to be morally and legally justified, it must be based on the deterrent or retributive value of executions. A death penalty system that is arbitrary and capricious, dysfunctional, and undermined by excessive delays has no deterrent value. Nor does it have any meaningful retributive value. *See State v. Santiago*, 122 A.3d 1, 98 (Conn. 2015); *see also State v. Gregory*, 427 P.3d 621, 636-37 (Wash. 2018) (en banc). It is simply mindless vengeance.

G.     Because Mr. Kadamovas was sentenced to death under such a system, and because executing him would be arbitrary, cruel, and unconstitutional, his execution is prohibited and his death sentence must be vacated.

## CLAIM 26 EXCESSIVE DELAY

Jurijus Kadamovas' sentence is unlawfully and unconstitutionally imposed, in violation of the Eighth Amendment to the United States Constitution, because the excessive delay since the sentencing, and the particular circumstances in this case, have inflicted an unreasonably cruel and unusual punishment on the defendant.

The following facts and allegations, among others, support this claim:

A.    Mr. Kadamovas was arrested on February 19, 2002, and charged with death-eligible federal crimes on March 5, 2002. The government took more than two years to evaluate the case and announce to Mr. Kadamovas that the prosecution would pursue the death penalty. The notice regarding the death sentence was filed on August 3, 2004. Dkt. No. 506. The death sentence was imposed on Mr. Kadamovas on March 12, 2007, and Mr. Kadamovas was transported to the United States Penitentiary at Terre Haute, Indiana, to be confined in the maximum-security prison, within days.

B.    Since early 2007—a period of over sixteen years—Mr. Kadamovas has been incarcerated in a maximum-security federal penitentiary in solitary confinement awaiting the execution of his death sentence. He is imprisoned in the Special Confinement Unit (SCU) in Terre Haute, and held in severely isolating and solitary conditions. He is restricted to his single cell except for a few hours each week. This

373

treatment is fundamentally inhumane, degrading, and intolerable. *See* Ex. 114 (Haney test.); Ex. 115 (ACLU letter); Ex. 116 (Kupers article).

C.    During this sixteen-year period of incarceration in the USP, Mr. Kadamovas has been subjected to psychological and emotional deprivation, and suffered from serious and debilitating health issues, including Crohn's disease, sleep apnea, hypertension, breathing problems, and arthritis. He also has severe asthma that is exacerbated by the common use of tear gas in the prison. These medical problems, the lack of proper medical care, and the conditions in the prison have caused him severe physical and "psychological harm" and "heightened anxiety." Petition for Writ of Habeas Corpus, *Kadamovas v. Watson*, S.D. Ind. No. 2:19-cv-00540-JPH-MJD, Dkt. No. 1 at 29, 31 (filed Nov. 8, 2019); Ex. 128 (Kadamovas SCU issues 12/1/17).

D.    During his sixteen-year period of incarceration, Mr. Kadamovas has been subjected to conditions that amount to torture. This torture constitutes cruel and unusual punishment. The solitary confinement and emotional and psychological pressure have caused him, and is causing him, severe emotional and psychological problems including depression, anxiety, difficulty in concentration, suicidal ideation, and memory problems. Ex. 113 (Kadamovas compl.); Ex. 131 (Kadamovas compl.); Ex. 128 (Kadamovas SCU issues 12/1/17); *see also Greenburger v. Roundtree*, 17 Civ. 3295, 2020 WL 4746460, at *4 (S.D.N.Y. Aug.

374

16, 2020); *Trobaugh v. Hall*, No. C97-0125, 1999 WL 33655718, at *3 (N. D. Iowa Dec. 6, 1999).

E.      The suffering of Mr. Kadamovas is unsurprising, as the prolonged use of solitary confinement is known to have harmful effects. As the Third Circuit has explained:

> [A]ll [individuals subjected to solitary confinement] will . . . experience a degree of stupor, difficulties with thinking and concentration, obsessional thinking, agitation, irritability, and difficulty tolerating external stimuli. Anxiety and panic are common side effects. Depression, post-traumatic stress disorder, psychosis, hallucinations, paranoia, claustrophobia, and suicidal ideation are also frequent results.

*Williams v. Sec'y Pa. Dep't of Corr.*, 848 F.3d 549, 566 (3d Cir. 2017) (second and third alterations in original) (footnotes omitted). In light of increasing concerns about the dangerous effects of solitary confinement, many states have passed legislation that modifies their use of solitary confinement. *See* Amy Fettig, *2019 Was a Watershed Year in the Movement to Stop Solitary Confinement*, ACLU (Dec. 16, 2019), https://www.aclu.org/news/prisoners-rights/2019-was-a-watershed-year-in-the-movement-to-stop-solitary-confinement. Evolving standards of decency are offended by Mr. Kadamovas' continued torturous confinement.

E.      Because the death penalty serves no legitimate penological purpose in light of the extraordinary delay between sentence and execution, and because of the resulting extensive suffering of Mr. Kadamovas, the excessive delay in this case

between sentencing and execution violates the norms of a civilized society, constitutes cruel and unusual punishment, and violates the Eighth Amendment.

F.     In light of the excessive delay, the carrying out of Mr. Kadamovas' execution would be arbitrary, cruel, and unconstitutional. The death sentence is therefore invalid and must be vacated.

**CLAIM 27 ARBITRARY SENTENCING**

Jurijus Kadamovas' sentence is unlawfully and unconstitutionally imposed, in violation of the Eighth Amendment to the United States Constitution, because the excessive delay and procedural irregularities in the federal post-conviction process in capital cases have resulted in a system that arbitrarily selects a small few of the capitally sentenced prisoners to be executed, and a system that serves no legitimate penological purpose. Such a system is unconstitutional and requires that Mr. Kadamovas' death sentence be vacated. *See Furman v. Georgia*, 408 U.S. 238 (1972).

The following facts and allegations, among others, support this claim:

A.     Mr. Kadamovas was arrested on February 19, 2002, and charged with death-eligible federal crimes on March 5, 2002. The government took more than two years to evaluate the case and announce to Mr. Kadamovas that the prosecution would pursue the death penalty. The notice regarding the death sentence was filed on August 3, 2004. Dkt. No. 506. The death sentence was imposed on Mr. Kadamovas on March 12, 2007, and Mr. Kadamovas was transported to the United States Penitentiary at Terre Haute, Indiana, to be confined in the maximum-security prison, in solitary confinement in the Special Confinement Unit, within days.

377

B.      On April 24, 2007, appellate counsel Benjamin Coleman and Barbara O'Connor were appointed to represent Mr. Kadamovas on his capital appeal in the Ninth Circuit. Almost eleven years later, on January 10, 2018, the Ninth Circuit held argument. The opinion affirming the convictions and sentences of Mr. Kadamovas and his co-defendant Iouri Mikhel was issued on May 9, 2018. A petition for writ of certiorari was denied on October 7, 2019.

C.      At the conclusion of his direct appeal, Mr. Kadamovas had been on death row in SCU solitary confinement at the Terre Haute facility for over twelve years and incarcerated on these charges for seventeen years. Since then, four more years have gone by. The allegations set forth in Claim 26 (Excessive Delay) are incorporated by reference.

D.      Prior to *Furman v. Georgia*, 408 U.S. 238 (1972), the federal government last executed an individual in 1963. Lee Kovarsky, *The Trump Executions*, 100 Tex. L. Rev. 621, 630 n.69 (2021); *see also, e.g.*, Rory K. Little, *The Federal Death Penalty: History and Some Thoughts About the Department of Justice's Role*, 26 Fordham Urb. L.J. 347, 370 (1999). After *Furman*, the Federal Death Penalty Act, which was passed in 1994, "sought to ensure a workable and expanded system of capital punishment . . . [creating] more than two dozen new capital offenses." *In re Fed. Bureau of Prisons' Execution Protocol Cases*, 955 F.3d 106, 120 (D.C. Cir. 2020) (Katsas, J., concurring).

E.    The first execution of an inmate sentenced under the FDPA occurred on June 11, 2001, when the government executed Timothy McVeigh, a domestic terrorist who was responsible for the bombing of a federal building that killed 168 people in Oklahoma City. One further execution occurred in 2001 and another in 2003. Kovarsky, 100 Tex. L. Rev. at 630.

F.    From 2003 until 2020, there were no federal executions. *United States v. Higgs*, 141 S. Ct. 645, 647 (2021) (Sotomayor, J., dissenting). Then, during a seven-month period between July 2020 and January 2021, the federal government executed thirteen prisoners. Elizbeth Bruenig, *The Government Has Not Explained How These 13 People Were Selected to Die*, New York Times (Feb 18, 2021), https://www.nytimes.com/2021/02/18/opinion/federal-death-penalty.html. The government's selection process for which prisoners were executed, and which were not, was secret and never revealed. *Id.*; Kovarsky, 100 Tex. L. Rev. at 636 (the first five people executed by the Trump administration were individually selected based on criteria that Attorney General William Barr set and there was no discernable pattern in who was subsequently chosen for execution). After the spree of executions in 2020 and 2021, forty-nine federal prisoners remained under sentence of death. Bruenig, *The Government Has Not Explained How These 13 People Were Selected to Die*, https://www.nytimes.com/2021/02/18/opinion/federal-death-penalty.html.

379

G.     Eighty federal defendants have been sentenced to death in the modern era. *See* Death Penalty Information Center, *Background on the Federal Death Penalty*, https://deathpenaltyinfo.org/state-and-federal-info/federal-death-penalty/background-on-the-federal-death-penalty (last visited Sept. 24, 2023) (seventy-nine defendants were sentenced to death between 1988 and 2021); Death Penalty Information Center, *Jurors Sentence Robert Bowers to Death for 2018 Synagogue Shooting* (Aug. 3, 2023), https://deathpenaltyinfo.org/news/jurors-sentence-robert-bowers-to-death-for-2018-synagogue-shooting (additional federal death sentence imposed in August 2023). Of those individuals, sixteen have been executed. Death Penalty Information Center, *Executions Under the Federal Death Penalty* (last visited Sept. 24, 2023), https://deathpenaltyinfo.org/state-and-federal-info/federal-death-penalty/executions-under-the-federal-death-penalty. Approximately sixteen individuals have had their death sentences vacated either by the courts or by the executive. Death Penalty Information Center, *Case Summaries for Modern Federal Death Sentences* (last visited Sept. 24, 2023), https://deathpenaltyinfo.org/state-and-federal-info/federal-death-penalty/case-summaries-for-modern-federal-death-sentences. Four death-sentenced individuals have died in prison prior to execution. *Id.* After the cruel and vicious flurry resulting in thirteen executions in 2020-21, the Department of Justice announced a moratorium on executions. Katie Benner, *Merrick Garland Pauses Federal*

380

*Executions a Year After His Predecessor Resumed Them*, New York Times (July 1, 2021), https://www.nytimes.com/2021/07/01/us/politics/executions-pause-merrick-garland.html. When that moratorium will end is unknown, but the Department of Justice continues to defend sentences of death in the federal courts.

H.    At the time of the filing of this Motion and Memorandum, ten individuals on federal death row have been incarcerated under sentence of death for over twenty years. Death Penalty Information Center, *List of Federal Death Row Prisoners* (last visited Sept. 24, 2023), https://deathpenaltyinfo.org/state-and-federal-info/federal-death-penalty/list-of-federal-death-row-prisoners. Mr. Kadamovas has been on death row for over sixteen years, and incarcerated for over twenty-one years.

I.    The federal death penalty is arbitrarily imposed. Beyond the arbitrariness of who is sentenced to death, the post-conviction system, including the manner in which death-sentenced prisoners are selected for execution, is arbitrary, irrational, and nonsensical. Such a process, and the 2020-21 flurry of executions comprising some, but not all, of the eligible inmates, also constitutes psychological and emotional torture on both those who were ultimately executed as well as those who survived.

J.    Writing in 2014, District Judge Cormac Carney expressed a characterization regarding the California death penalty system that is equally applicable to the

381

federal system: "[T]he death sentence is actually carried out against only a trivial few of those sentenced to death. . . . For all practical purposes then, a sentence of death in California is a sentence of life imprisonment with the remote possibility of death—a sentence no rational legislature or jury could ever impose." *Jones v. Chappell,* 31 F. Supp. 3d 1050, 1062 (C.D. Cal. 2014), *rev'd sub nom. Jones v. Davis,* 806 F.3d 538 (9th Cir. 2015). While the *Jones* order issued by Judge Carney was reversed by the Ninth Circuit, his comments regarding the California system remain accurate, and remain equally applicable to the federal system.

K.     The federal death penalty system fails in the constitutional requirement that the punishment serve some rational penological purpose.

     1.     Such a system fails to provide any rational deterrent.

     2.     Such a system fails to make any meaningful contribution to retribution. *See Ceja v. Stewart*, 134 F.3d 1368, 1374 (9th Cir. 1998) (Fletcher, J., dissenting).

     3.     If the death penalty does not serve a penological purpose, does not contribute to any retributive concept, or have any deterrent value, then it is simply mindlessly cruel and therefore unconstitutional. *Furman v. Georgia*, 408 U.S. 238, 304-05 (1972) (Brennan, J., concurring); *id.* at 311 (White, J., concurring).

L.     In the words of Judge Carney:

> Inordinate and unpredictable delay has resulted in a death penalty system in which very few of the hundreds of individuals sentenced to

death have been, or even will be, executed by the State. It has resulted in a system in which arbitrary factors, rather than legitimate ones like the nature of the crime or the date of the death sentence, determine whether an individual will actually be executed. And it has resulted in a system that serves no penological purpose. Such a system is unconstitutional.

*Jones*, 31 F. Supp. 3d at 1069.

M.    Because Mr. Kadamovas was sentenced to death under such a system, and because executing him would be arbitrary, cruel, and unconstitutional, his execution is prohibited and his death sentence must be vacated.

383

## CLAIM 28 DOUBLE JEOPARDY VIOLATION

Jurijus Kadamovas' death sentence is unlawfully and unconstitutionally imposed in violation of the Fifth Amendment to the United States Constitution, because it violates the prohibition against double jeopardy. *Ex Parte Lange*, 85 U.S. 163 (1873); Michael Johnson, *Fifteen Years and Death: Double Jeopardy, Multiple Punishments, and Extended Stays on Death Row*, 23 B.U. Pub. Int. L.J. 85 (2014).

The following facts and allegations, among others, support this claim:

A.      Mr. Kadamovas was arrested on February 19, 2002, and charged with death-eligible federal crimes on March 5, 2002. The Government filed the notice of intention to seek the death penalty on August 3, 2004. The death sentence was imposed on Mr. Kadamovas on March 12, 2007. Mr. Kadamovas was transported to the United States Penitentiary at Terre Haute, Indiana, to be held in solitary confinement in the maximum-security prison, a few days later.

 B.      Since early 2007—a period of over sixteen years—Mr. Kadamovas has been incarcerated in a maximum-security federal penitentiary in solitary confinement awaiting the execution of his death sentence. He is imprisoned in the Special Confinement Unit (SCU) in Terre Haute, in severe isolation. He is restricted to his single cell except for a few hours each week, and held in degrading, inhumane, and torturous conditions. *See* Ex. 114 (Haney test.); Ex. 115 (ACLU letter); Ex. 116

384

(Kupers article); Petition for Writ of Habeas Corpus, *Kadamovas v. Watson*, S.D. Ind. No. 2:19-cv-00540-JPH-MJD, Dkt. No. 1 at 29, 31 (filed Nov. 8, 2019); Ex. 128 (Kadamovas SCU issues 12/1/17); Ex. 131 (Kadamovas compl.). The allegations set forth in Claim 26 (Excessive Delay) and Claim 27 (The Death Penalty is Arbitrarily Imposed in Light of the Dysfunctional Post-Conviction System) are incorporated by reference.

C.    The Supreme Court has recognized that the Double Jeopardy Clause contains three prohibitions: against (1) "a second prosecution for the same offense after acquittal," (2) "a second prosecution for the same offense after conviction," and (3) "multiple punishments for the same offense." *North Carolina v. Pearce*, 395 U.S. 711, 717 (1969); *see also Brown v. Ohio*, 432 U.S. 161, 165 (1977). This last prohibition—against multiple punishments for the same offense—is applicable to death row prisoners, including Mr. Kadamovas, who have been sentenced to death but also undergo years of imprisonment in deplorable death-row conditions.

D.    Mr. Kadamovas has endured over sixteen years of torturous confinement apart from and in addition to his death sentence. This additional punishment, not imposed by any court nor approved by any statute, is a violation of the Double Jeopardy Clause.

E.    One commentator notes as follows:

>       The Double Jeopardy Clause of the Constitution calls for a justice system in which sentences, once given, cannot be augmented in any way.

The current practice of keeping inmates within the punitive confines of death row for a period of time currently averaging fifteen years violates this clause by punishing those convicted of capital crimes with additional criminal sanctions not expressly permitted by an underlying capital statute. In addition to violating the Double Jeopardy Clause, these capital statutes drastically misrepresent to the public the punishments given to those sentenced to death. The conditions . . . have never been seen before in the history of American capital punishment . . . ."

Johnson, 23 B.U. Pub. Int. L.J. at 115.

F.      In light of the constitutional violation, the carrying out of Mr. Kadamovas' execution would be arbitrary, cruel, and unconstitutional. The death sentence is therefore invalid and must be vacated.

# CLAIM 29 VIOLATIONS OF INTERNATIONAL LAW

Jurijus Kadamovas' convictions and death sentence are unlawfully and unconstitutionally imposed in violation of international law, the provisions of international treaties, and the fundamental precepts of international human rights as well as the Fifth, Sixth, and Eighth Amendments to the United States Constitution. Mr. Kadamovas was denied his rights to a fair trial by an independent tribunal, to a reliable sentencing determination, to equal protection and due process, to freedom from torture or cruel, inhuman or degrading treatment and punishment, to liberty and security of person, and to the minimum guarantees for an accused under customary international law as informed by the Universal Declaration of Human Rights (UDHR), the International Covenant on Civil and Political Rights (ICCPR), and the American Declaration of the Rights and Duties of Man (American Declaration). Mr. Kadamovas' ongoing imprisonment in a maximum security prison and in solitary confinement, awaiting execution, constitutes a violation of international law, the provisions of international treaties, and the fundamental precepts of international human rights under the UDHR, and ICCPR, the American Declaration, and the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT).

The following facts and allegations, among others, support this claim:

387

A.     The two principal sources of international human rights law are treaties and customary international law. The United States Constitution, in Article VI, section 1, clause 2, accords treaties equal rank with federal statutes. To the extent possible, courts must construe American law so as to avoid violating principles of international law. The United States Constitution also authorizes Congress to "define and punish . . . offenses against the law of nations," thus recognizing the existence and force of international law. U.S. Const. article I, § 8. Sources of international human rights law, applicable to the Kadamovas case, include:

1.     In 1948, the United Nations drafted and adopted both the Universal Declaration of Human Rights (the Universal Declaration) and the Convention on the Prevention and Punishment of the Crime of Genocide (Genocide Convention). The Universal Declaration is part of the International Bill of Human Rights, which also includes the ICCPR, the Optional Protocol to the ICCPR, the International Covenant on Economic, Social and Cultural Rights, and the human rights provisions of the U.N. Charter. These instruments enumerate specific human rights and duties of state parties and illustrate the multilateral commitment to enforcing human rights through international obligations.

2.     The Organization of American States was established to promote and protect human rights. The OAS Charter, a multilateral treaty which serves as the Constitution of the OAS, entered into force in 1951 and was has been amended

388

several times, most recently in 1997. The OAS Charter provides: "The American States proclaim the fundamental rights of the individual without distinction as to race, nationality, creed or sex." In 1948, the Ninth International Conference of American States proclaimed the American Declaration of the Rights and Duties of Man, a resolution adopted by the OAS, and thus, its member states. The American Declaration is today the normative instrument that embodies the authoritative interpretation of the fundamental rights of individuals in this hemisphere.

3.    The OAS also established the Inter-American Commission on Human Rights, a formal organ of the OAS which is charged with observing and protecting human rights in its member states.

B.    The United States has acknowledged international human rights law and has committed itself to pursuing international human rights protections by becoming a member state of the United Nations and of the Organization of American States. The United States ratified multilateral human rights treaties, including the ICCPR and the CAT. A country, through commitment to a treaty, becomes bound by international law.

C.    Customary international law arises out of a general and consistent practice of nations acting in a particular manner out of a sense of legal obligation. The United States, through signing and ratifying the ICCPR, the CAT, as well as being a member state of the OAS and thus being bound by the OAS Charter and the

389

American Declaration, is bound by the force of customary international human rights law.

D.      The provisions of the Universal Declaration are customary international law. The right to be free from torture is a substantive aspect of customary international law as evidenced and defined by the Universal Declaration of Human Rights. The ICCPR incorporates the protections of the Universal Declaration. The ICCPR imposes an immediate obligation "to respect and to ensure" the rights it proclaims and to take whatever other measures are necessary to give effect to those rights.

E.      Under the Constitution, a treaty stands on equal footing as the law of the land as the Constitution itself and the laws of the United States. A treaty operates without the assistance of any legislation, state or national. Moreover, treaties designed to protect individual rights must be construed as self-executing.

F.      The factual circumstances and legal issues presented in this motion under 28 U.S.C. § 2255 and this case demonstrate that Mr. Kadamovas was denied his rights in violation of international law as evidenced by the ICCPR.

1.      Article 6 of the ICCPR guarantees the right to life and prohibits arbitrary deprivation of life. Because of the improprieties of the capital sentencing process, the errors and claims raised elsewhere in this memorandum and motion, the conditions under which the condemned are incarcerated, the excessive delays in the post-conviction process, and the excessive delays between sentencing and

390

execution under the federal death penalty system, the implementation of the death penalty in the United States constitutes "cruel, inhuman or degrading treatment or punishment" in violation of Article 7 of the ICCPR. The death sentence as imposed in this case, under the circumstances pled throughout this memorandum and motion, constitutes the arbitrary deprivation of life in violation of Article 6.

a.      In 2019, the Human Rights Committee (HRC), a United Nations Treaty body tasked with ensuring the implementation of the ICCPR, released General Comment No. 36, which concluded, among other things:

States parties that have not abolished the death penalty must respect article 7 of the [ICCPR]. . . Extreme delays in the implementation of a death penalty sentence, which exceed any reasonable period of time necessary to exhaust all legal remedies may also entail the violation of article 7 of the Covenant, especially when the long time on death row exposes sentenced persons to harsh or stressful conditions, including, solitary confinement, and when sentenced persons are particularly vulnerable due to factors such as age, health, or mental state.

HRC General Comment No. 36, art. 6, ¶ 40 (Sept. 3, 2019) (footnotes omitted), https://documents-dds-ny.un.org/doc/UNDOC/GEN/G19/261/15/PDF/G1926115.pdf?OpenElement.

b.      General Comment No. 36 of the HRC further explains:

Violation of the fair trial guarantees . . . resulting in the imposition of the death penalty would render the [death] sentence arbitrary in nature, and in violation of article 6 . . . Such violations might involve . . . . lack of effective representation involving confidential attorney-client meetings during all stages of the criminal proceedings, including criminal interrogation, preliminary hearings, trial and appeal; failure to respect the

presumption of innocence, which may manifest itself in the accused being placed in a cage or handcuffed during the trial; lack of an effective right of appeal; lack of adequate time and facilities for the preparation of the defense, including the inability to access legal documents essential for conducting the legal defense or appeal, such as access to official prosecutorial applications to the court, the court's judgment or the trial transcript; lack of suitable interpretation;. . . excessive and unjustified delays in the trial or the appeal process; and general lack of fairness of the criminal process, or lack of independence or impartiality of the trial or appeal court.

*Id.* ¶ 41 (footnotes omitted).

2.     Article 7 of the ICCPR prohibits cruel, inhumane or degrading treatment or punishment. The death sentence as imposed in this case, under the circumstances pled throughout this memorandum and motion, constitutes a violation of Article 7.

3.     Article 9 of the ICCPR guarantees that no one shall be deprived of liberty except in accordance with procedures established by law. The death sentence as imposed in this case, under the circumstances pled throughout this memorandum and motion, constitutes a violation of Article 9.

4.     Article 14 of the ICCPR is a guarantee to a fair trial, including the right to a public trial, a fair and unbiased tribunal, the presumption of innocence, notice of the charges, adequate time and facilities for preparation of the defense, the right to communicate with counsel of the defendant's choosing, speedy trial, the right to be present for all stages of trial, the right to counsel, the right to

392

confront witnesses, the privilege against self-incrimination, and the right to have one's conviction and sentence reviewed by a higher tribunal. The death sentence as imposed in this case, under the circumstances pled throughout this memorandum and motion, constitutes a violation of Article 14.

        a.      General Comment No. 36 of the HRC notes:

> Other serious procedural flaws, not explicitly covered by article 14 of the Covenant, may nonetheless render the imposition of the death penalty contrary to article 6. For example, a failure to promptly inform detained foreign nationals of their right to consular notification pursuant to the Vienna Convention on Consular Relations resulting in the imposition of the death penalty . . .

HRC General Comment No. 36, art. 6, ¶ 42.

    6.     Article 26 of the ICCPR guarantees equal protection of the law regardless of religion, race, or political opinion. Mr. Kadamovas is an ethnic Russian, a Lithuanian citizen, who was sentenced to death by a jury that did not contain a single member of his own ethnicity or nationality. The death sentence as imposed in this case, under the circumstances pled throughout this memorandum and motion, constitutes a violation of Article 26.

G.    Mr. Kadamovas' initial detention in this case violated the Vienna Convention on Consular Relations, Apr. 24, 1963, 21 U.S.T. 77. A citizen of Lithuania, Mr. Kadamovas was not advised of his right to contact the embassy of his country in a timely fashion. Nor was the Lithuanian Embassy notified of his

arrest and detention in a timely and proper fashion. His treatment constituted a violation of his right to consular notification. *See generally* Inter-American Court of Human Rights Advisory Opinion OC-16/99: *The Right to Information on Consular Assistance in The of The Guarantees of the Due Process of Law* (Oct. 1, 1999) ¶ 137, https://www.unhcr.org/sites/default/files/legacy-pdf/4bfb8da09.pdf.

H.    Exacerbating the initial Vienna Convention violation and further violating international law, Mr. Kadamovas' ability to communicate with the Lithuanian embassy was unreasonably restricted.

1.    On January 23, 2007, Mr. Kadamovas asked the trial court (through an interpreter), "Please, help me to arrange a telephone call to Lithuanian Embassy. I haven't been able to contact them during the last four years." Tr. 01/23/07 at 77.

2.    The following day, January 24, 2007, trial counsel informed the court that Mr. Kadamovas was unable to call the embassy. Trial counsel explained:

> I believe the special administrative measures that have been imposed upon Mr. Kadamovas preclude him from making a telephone call unless it's monitored by, I think, someone from the FBI or someone that speaks the language that he's going to be speaking into the telephone. The other problem with it is he was hoping to call the Lithuanian Embassy in Washington D.C. And the time difference I guess presents a problem . . . .

Tr. 01/24/07 at 14. Trial counsel later clarified,

> I think the problem is because somebody has to monitor it, there have to be arrangements made. They have to schedule it in advance and then

394

> trying to work that out around the time when the embassy's open. It was my perception of what the problem is.
>
> I found out this morning that he didn't get the call.

Tr. 01/24/07 at 15-16. While the court assured trial counsel that the court or the government would assist if necessary, there is no indication in the record that any call took place.

I.    The factual circumstances and legal issues presented in this motion under 28 U.S.C. § 2255 and this case demonstrate that Mr. Kadamovas was denied his rights in violation of international law as evidenced by the Universal Declaration of Human Rights.

1.    The United Nations General Assembly adopted the UDHR on December 10, 1948.

2.    While the UDHR does not prohibit the death penalty, it does list life as a human right, making the death penalty a violation of one of the most fundamental principles under widely accepted human rights law. Article 3 of the UDHR states: "Everyone has the right to life, liberty, and the security of person." Article 5 provides: "No one shall be subjected to torture or to cruel, inhuman or degrading treatment or punishment." Article 2 states: "Everyone is entitled to all the rights and freedoms set forth in this Declaration, without distinction of any kind, such as race, color, sex, language, religion, political or other opinion, national

395

or social original, property, birth or other status." Article 7 states: "All are equal before the law and are entitled without any discrimination to equal protection of the law."

3.     The death penalty is used and applied in an unfair manner, largely dependent on factors such as socioeconomic status of the defendant, the race of the victim, and even where the crime took place. Since the death penalty is often used disproportionately against members of disadvantaged social groups, it is applied in a discriminatory fashion, contrary to Articles 2 and 7 of the UDHR. It is the ultimate denial of the dignity and worth of the human person, affirmed in the preamble to the UDHR.

J.     The factual circumstances and legal issues presented in this motion under 28 U.S.C. § 2255 and this case demonstrate that Mr. Kadamovas was denied his rights in violation of international law as evidenced by Articles 1, 18, 25, and 26 of the American Declaration.

1.     The American Declaration was adopted on May 1, 1948, by the Ninth Pan-American Conference.

2.     Under a series of cases, the Inter-American Commission on Human Rights has ruled the death penalty as imposed in circumstances like this, combined with the inhumane and torturous conditions of confinement, violate the American Declaration. *See, e.g.*, *Rogovich v. United States*, Case. 13.394, Inter-Am, Comm'n

H.R., Report No. 461/21, OEA/Ser.L/V/II, doc. 475 ¶ 55; *Mitchell v. United States*, Case 13.570, Inter-Am. Comm'n H.R., Report No. 193/20, OEA/Ser.L/V/II.176, doc. 206 ¶ 142; *Saldaño v. United States*, Case 12.254, Inter-Am. Comm'n H.R., Report No. 24/17, OEA/Ser.L/V/161, doc. 31 ¶ 232; *Rocha v. United States*, Case 12.833, Inter-Am. Comm'n H.R., Report No. 11/15, OEA/Ser.L/V/II.154, doc. 5 ¶ 106.

K.     The conditions in the SCU at the United States Penitentiary at Terre Haute, where Mr. Kadamovas has been confined for more than sixteen years, violate international law and international principles of fundamental human rights. Ex. 113 (ACLU Compl.); Ex. 114 (Haney test.); Ex. 115 (ACLU letter); Ex. 116 (Kupers article); Ex. 131 (Kadamovas compl.). Numerous international treaties and other instruments outlaw the use of prolonged solitary confinement or otherwise recognize its severe harm, including the ICCPR and the CAT.

1.     The United States ratified the CAT on October 21, 1994. Consequently, the CAT is binding on the United States, both as a matter of international law and federal law.

2.     The imprisonment of Mr. Kadamovas under the conditions he has suffered (and continues to suffer) constitutes prohibited torture under the CAT and customary international law. See Committee Against Torture, *Conclusions and Recommendations of the Committee against Torture: United States of America*,

397

(May 1-19, 2000), A/55/44, ¶¶ 175-180,

http://hrlibrary.umn.edu/cat/observations/usa2006.html.

L.     Mr. Kadamovas' death sentence was obtained and affirmed in violation of international law. His treatment and incarceration are violations of international law.

M.     The violations of these rights have substantially prejudiced defendant, rendered the trial fundamentally unfair, eroded the reliability of the jury's verdict and had a substantial and injurious effect on the verdict. Mr. Kadamovas' sentence of death should be vacated.

**CLAIM 30 INEFFECTIVE ASSISTANCE OF COUNSEL: APPELLATE PROCEEDINGS**

Jurijus Kadamovas' convictions and sentence are unlawfully and unconstitutionally imposed, in violation of the Fifth, Sixth, and Eighth Amendments to the United States Constitution, because defendant was denied effective assistance of counsel on his appeal.

The following facts and allegations, among others, support this claim:

A.    Mr. Kadamovas' counsel on appeal in the Ninth Circuit Court of Appeals were Benjamin Coleman, Barbara O'Connor, and Margaret O'Donnell. Ex. 16 (Coleman dec.) ¶ 1. Mr. Coleman and Ms. O'Connor were appointed in 2007. Ninth Cir. No. 07-99009, Dkt. Nos. 7, 8. Later, in 2010, Ms. O'Donnell was appointed. Ninth Cir. No. 07-99009, Dkt. No. 161.

B.    The Ninth Circuit decided the appeal in an opinion issued in 2018. *United States v. Mikhel & Kadamovas*, 889 F.3d 1003 (9th Cir. 2018), *cert denied*, 140 S. Ct. 157 (2019).

C.    Mr. Kadamovas' appellate counsel were ineffective in that they failed to raise issues apparent on the record, failed to raise issues completely, failed to adequately support and argue the issues raised, failed to adequately review, perfect and correct the record, failed to adequately pursue and present evidence in support of the issues on appeal, failed to adequately pursue, present, and preserve evidence in support of post-conviction claims. *See* Ex. 16 (Coleman dec.).

D.    The performance of Mr. Kadamovas' court-appointed appellate counsel fell below reasonable standards of representation, to Mr. Kadamovas' prejudice, in that counsel failed to exercise the skill, judgment, and diligence expected of a reasonably competent attorney in reviewing the record, investigating issues, researching issues, and presenting issues to the appellate court. Appellate counsel's errors and omissions denied Mr. Kadamovas his right to appellate counsel and his right to proper appellate review.

E.    Counsel's performance was below reasonable standards of representation.

F.    But for counsel's inadequate performance, it is reasonably probable that a more favorable result would have been obtained for Mr. Kadamovas. Mr. Kadamovas has been substantially prejudiced, the reliability of the judgment and jury verdicts have been eroded, and the constitutional violation has had a substantial and injurious effect on the judgment and verdicts.

400

## CLAIM 31 LACK OF FEDERAL JURISDICTION

Jurijus Kadamovas' convictions and sentence are unlawfully and unconstitutionally imposed, in violation of federal constitutional jurisdiction and in violation of the Fifth, Eighth, and Tenth Amendments to the United States Constitution, because Congress, and the federal courts, have exceeded their proper power, authority, and jurisdiction in expanding the Hostage Taking Act of 1984 to include kidnappings that do not involve international terrorism or have any nexus with legitimate national concerns. The application of the Hostage Taking Act, 18 U.S.C. § 1203, to this case and these factual circumstances exceeds its proper scope. *See Dubin v. United States*, 599 U.S. 110 (2023).

The following facts and allegations, among others, support this claim:

A.     Mr. Kadamovas was prosecuted under the Hostage Taking Act, 18 U.S.C. § 1203. Counts 2, 3, and 4 were charges of hostage taking resulting in death under § 1203 and Count 1 was conspiracy to commit hostage taking resulting in death. Dkt. No. 502. These charges purportedly made Mr. Kadamovas eligible for the death penalty and provided the foundation for the death sentence imposed in this case.

B.     The Hostage Taking Act was addressed to, and intended to protect against, international terrorism. The basis for the legislation was an attempt to implement the International Convention Against the Taking of Hostages. *See* H.R. Rep. No.

98–1159, at 418 (1984), *as reprinted in* 1984 U.S.C.C.A.N. 3710, 3714; *see also* Act for the Prevention and Punishment of the Crime of Hostage Taking, Pub. L. No. 98-473, secs. 2001-2003, 98 Stat. 2186 (1984) (codified as amended at 18 U.S.C. § 1203 (2006)). The preamble to this treaty states that its purpose is to have its signatories adopt "effective measures for the prevention, prosecution and punishment of all acts of taking of hostages as manifestations of international terrorism." International Convention Against the Taking of Hostages, preamble, T.I.A.S. No. 11,081, https://treaties.un.org/doc/db/terrorism/english-18-5.pdf; *see* A Message from the President of the United States Transmitting Four Drafts of Proposed Legislation to Attack the Pressing and Urgent Problem of International Terrorism, H.R. Doc. No. 98–211, 98th Cong., 2d Sess, at 3 (April 26, 1984) (The president's initial draft of the legislation notes it was necessary "[t]o demonstrate to other governments and international forums that the United States is serious about its efforts to deal with international terrorism.") "Indeed, the Hostage Act did not become effective until the Convention came into force and the United States became a party to it." *United States v. Rodriguez*, 587 F.3d 573, 579 (2d Cir. 2009).

C.      The criminal acts involved in this case have no connection to international terrorism.

D.    In the appeal in this case, the Ninth Circuit rejected an attack on the application of the Hostage Taking Act and the jurisdiction of the federal courts. *United States v. Mikhel & Kadamovas*, 889 F.3d 1003, 1021-25 (9th Cir. 2018). The decision of the Ninth Circuit in the appeal does not bar reconsideration of this claim because it was incorrectly decided. *See Dubin*, 599 at 127-30 (emphasizing the importance of "exercis[ing] restraint in assessing the reach of a federal criminal statute" and "avoid[ing] reading incongruous breadth into opaque language in criminal statutes," with an emphasis on the importance of the titles of statutes and the broader context, including whether broadly construing the statute would lead to severe consequences).

E.    The convictions and death sentence are invalid because Congress exceeded its authority in enacting § 1203 without assuring that it only applied to criminal acts involving international terrorism. If § 1203 is not limited to the international terrorism context, it is unconstitutional.

F.    Because the statutory basis for the convictions on Counts 1, 2, 3, and 4 is invalid, those convictions and the sentence of death must be vacated.

403

**ONGOING INVESTIGATION UNDER FREEDOM OF INFORMATION ACT**

Section 2255 counsel Indiana Federal Community Defenders (IFCD) has submitted several Freedom of Information Act (FOIA) requests and filed three FOIA lawsuits seeking disclosure of public documents relevant to Mr. Kadamovas' claims. IFCD has requested, among other records: (1) records related to attempted or completed escapes from the Metropolitan Detention Center Los Angeles (MDC); (2) records related to investigations of MDC employees for smuggling contraband and trafficking drugs into the MDC; (3) records related to the search for a new United States Attorney to replace Debra Wong Yang upon her resignation; and (4) records related to the visa applications for mitigation witnesses Svetlana Kadamova and Jurate Kadamoviene. *See* Ex. 124 (FOIA Materials). IFCD has filed lawsuits seeking to compel disclosure of records related to escapes from MDC, drug trafficking at MDC, and the U.S. Attorney search. *See id.* As detailed below, IFCD's pursuit of records is ongoing.

A.      Requests for records related to escapes from MDC

On February 24, 2020, IFCD submitted FOIA requests to the Department of Justice (DOJ), the Bureau of Prisons (BOP), and the Federal Bureau of Investigation (FBI), seeking records related to attempted or completed escapes from the MDC. On April 28, 2020, IFCD submitted FOIA requests the United

404

States Marshals Service (USMS), also seeking records related to escapes from the MDC.

On March 4, 2020, the BOP indicated that it located no responsive records and denied IFCD's FOIA requests.

On March 17, 2020, the DOJ's Mail Referral Unit (MRU), which refers FOIA requests to the DOJ component it deems most likely to have the requested records, informed IFCD that it forwarded IFCD's request to the BOP. (As noted above, IFCD also submitted a request directly to the BOP and the BOP indicated that it located no responsive records.)

On March 2 and March 27, 2020, the FBI indicated that it located no responsive records and denied IFCD's FOIA requests. On June 25, 2020, after IFCD followed up with the FBI, the FBI indicated that it did locate responsive records but that the records were exempt from disclosure.

The USMS acknowledged IFCD's requests but, prior to IFCD's lawsuit, did not provide a final response.

On April 11, 2022, IFCD filed a lawsuit in the United States District Court for the District of Columbia naming DOJ, BOP, FBI, and USMS as defendants, seeking to compel disclosure (case number 1:22-cv-994). In response to litigation, the BOP, FBI, and USMS all located responsive records. The BOP and USMS have released records to IFCD but withheld some information. The FBI initially

asserted that all of its records were exempt from disclosure but has recently determined that it can release some records and anticipates releasing approximately 500 pages per month. The parties have been submitting Joint Status Reports (JSRs) with the court and are scheduled to submit another JSR by November 29, 2023.

B.      Requests for records related to staff smuggling in MDC

On April 30, 2020, IFCD submitted FOIA requests to the BOP and FBI seeking records related to investigations of MDC employees for trafficking drugs into the MDC. On July 2, 2020, IFCD submitted a FOIA request to the USMS seeking records related to investigations of MDC employees for trafficking drugs into the MDC. On October 21, 2020, and September 24, 2021, IFCD submitted FOIA requests to the OIG seeking records related to investigations of MDC employees from trafficking contraband, including drugs, into the MDC.

The FBI acknowledged IFCD's request but, prior to IFCD's lawsuit, did not provide a final response.

The OIG acknowledged IFCD's request but, prior to IFCD's lawsuit, did not provide a final response.

On August 27, 2020, the USMS indicated that it located no responsive records and denied IFCD's request.

On July 8, 2021, and June 8, 2022, the BOP released records, with redactions, to IFCD.

On April 11, 2021, IFCD filed a lawsuit in the United States District Court for the District of Columbia naming DOJ, FBI, USMS, and OIG as defendants, seeking to compel disclosure (case number 1:22-cv-997). The USMS conducted an additional search for records and located no responsive records. IFCD voluntarily dismissed USMS from the lawsuit. The FBI and OIG have released some records to IFCD but withheld some information and are continuing to consult with other agencies about additional records. The parties have been submitting JSRs to the court and are scheduled to submit another JSR by October 5, 2023.

C.      Requests for records related to the search for a new U.S. Attorney

On February 24, 2020, IFCD submitted a FOIA requests to the DOJ, through the MRU, seeking records related to the search for a new United States Attorney to replace Debra Wong Yang upon her resignation.

MRU forwarded the request to the Executive Office of the United States Attorneys (EOUSA). EOUSA then forwarded the request to the Office of Information Policy (OIP). On February 18, 2021, OIP indicated that it located no responsive records and denied IFCD's FOIA request.

On April 11, 2022, IFCD filed a lawsuit in the United States District Court for the District of Columbia naming DOJ, EOUSA, and OIP as defendants, seeking to compel disclosure (case number 1:22-cv-1000). In response to litigation, EOUSA and OIP located responsive records and have released some records to

IFCD but withheld some information. The parties are working to determine whether the withheld information is in fact exempt from disclosure or should be released to IFCD. The parties have been submitting JSRs to the court and are scheduled to submit another JSR by November 6, 2023.

D.      Requests for records related to the denied visa applications

On August 12, 2022, IFCD submitted a FOIA request to the FBI seeking records related to the visa applications for the defense witnesses Svetlana and Jurate Kadamoviene. On August 15, 2022, IFCD submitted a FOIA request to the U.S. Embassy in Lithuania seeking information about the visa applications for Svetlana Kadamova and Jurate Kadamoviene. On August 17, 2022, IFCD submitted a FOIA request to the Department of State (DOS) seeking information about the visa applications for Svetlana Kadamova and Jurate Kadamoviene. On August 18, 2022, IFCD submitted a FOIA request to the USMS seeking information about the visa applications for Svetlana Kadamova and Jurate Kadamoviene. Along with all of these requests, IFCD submitted authorizations from Svetlana and Jurate to release this information.

On August 17 and 18, 2022, the FBI indicated that it located no responsive records and denied the request.

On January 18, 2023, the DOS informed IFCD that it could not provide any information in response to IFCD's request but explaining that it could release

certain limited information with a signed authorization. (The response did not explain why it determined that the authorizations IFCD submitted were insufficient).

The U.S. Embassy and USMS have not yet responded to IFCD's requests.

## INCORPORATION OF RECORD

Jurijus Kadamovas incorporates the full and complete court record from his trial and appeal. Mr. Kadamovas incorporates the record before the Central District of California in this matter, including all documents, transcripts, exhibits, orders, and filings relating to the co-defendants. *United States v. Mikhel, Kadamovas, et al.*, Central District No. 02-cr-00220. Mr. Kadamovas incorporates the record before the Ninth Circuit Court of Appeals, including the briefing, pleadings, motions, exhibits, transcripts, orders, and other documents on file or lodged with the court. *United States v. Mikhel & Kadamovas*, Ninth Circuit Nos. 07-99008, 07-99009.

Mr. Kadamovas also incorporates the exhibits that accompany this Memorandum.

**PRAYER FOR RELIEF**

WHEREFORE, Jurijus Kadamovas prays that this Court:

1.    Authorize discovery under Rule 6 of the Rules Governing Section 2255 Proceedings, the Federal Rules of Civil Procedure, the Federal Rules of Criminal Procedure, and the practice and principles of law, including, but not limited to: depositions, requests for production, requests to admit, interrogatories, and subpoenas;

2.    Require the Government to file an Answer to the Motion in the form prescribed by Rule 5 of the Rules Governing Section 2255 Proceedings;

3.    Permit Mr. Kadamovas to file a Reply to the Government's Answer, responding to any affirmative defenses raised by the Answer;

4.    Permit Mr. Kadamovas to amend this Motion to include any additional claims or allegations not presently known to him or his counsel, which are identified or uncovered in the course of discovery, investigation, and litigation of this Motion;

5.    Conduct an evidentiary hearing to resolve any factual disputes raised by the Government's Answer to this Motion, or by Mr. Kadamovas' Reply to any affirmative defenses raised by the Government;

6.    Permit Mr. Kadamovas to file a Memorandum of Law in Support of this Motion in accordance with a briefing schedule established by this Court;

411

7.      Permit oral argument as appropriate and required;

8.      Stay Mr. Kadamovas' execution pending final disposition of this Motion;

9.      Grant the Motion and vacate Mr. Kadamovas' convictions and/or sentences and order that appropriate retrial and/or sentencing hearings be conducted; and

10.      Grant such further and additional relief as may be just and proper.

Dated this 3rd day of October, 2023.

Respectfully submitted,

/s/ Jean E. Giles
Jean E. Giles
Assistant Federal Defender
Indiana Federal Community Defenders
111 Monument Circle, Suite 3200
Indianapolis, IN 46204
Phone: 317-383-3520
E-Mail: jean_giles@fd.org

Certificate of Service

I certify that on October 3, 2023 a copy of the foregoing Memo in Support of Motion to Vacate, Set Aside, or Correct the Conviction and Sentence pursuant to 28 U.S.C. § 2255, the Motion pursuant to 28 U.S.C. § 2255 and supporting Exhibits were filed electronically.  Notice of this filing will be sent to the parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

/s/ Jean E. Giles
Jean E. Giles

412