## DECLARATION OF RUSSELL STETLER

I, RUSSELL STETLER, declare as follows:

*Summary of Opinions*

1. I was asked by federal habeas corpus counsel for Jurijus Kadamovas to address three questions in this declaration:

(a) What were the prevailing professional norms in the investigation of mitigation evidence in federal death penalty cases at the time of Mr. Kadamovas's prosecution, trial, and sentencing (2002 to 2007)?

(b) Why was it important to commence the mitigation investigation as early as possible after counsel was appointed in a federal death penalty case at the time of Mr. Kadamovas's representation?

(c) At that same time, how did the development of social history evidence through a mitigation investigation affect defense counsel's representation of a client facing the death penalty in a federal prosecution, in addition to necessary preparation for a sentencing proceeding?

2. The prevailing norms in mitigation investigation in 2002 to 2007 are addressed in detail in this declaration, but the critical points can be summarized succinctly. Counsel's duty to conduct a thorough mitigation investigation was well established during the time of Mr. Kadamovas's prosecution. By the time of his trial, three decisions of the Supreme Court of the United States had established trial counsel's duty to conduct thorough mitigation investigation in a death penalty case: *Williams v. Taylor*, 529 U.S. 362 (2000); *Wiggins v. Smith*, 539 U.S. 510 (2003); and *Rompilla v. Beard*, 545 U.S. 374 (2005). In the same year as the *Wiggins* decision, the American Bar Association revised its Guidelines for the Appointment and Performance of

1

IFCD002888

Defense Counsel in Death Penalty Cases.[1] These Guidelines summarizing the prevailing professional norms at that time were widely circulated and discussed at capital training seminars at the time of Mr. Kadamovas's prosecution, when I was on the faculty of over a hundred death penalty CLE programs.

3. These Guidelines highlighted what capital defenders had long recognized: a team should be assembled to begin the mitigation investigation at the earliest opportunity.[2] The need to establish the team as early as possible stems from the complexity of capital defense representation. Commencing the mitigation investigation as early as possible derives in part from the nature of mitigation investigation itself: it is a slow, time-intensive process involving the interaction between documentary records and witness interviews. Even mitigation interviewing is a cyclical process that requires building trust and rapport with client and witnesses.[3] In addition, in federal death penalty cases it has always been important to begin the investigation as soon as possible in order to develop evidence that might persuade the Department of Justice not to authorize the filing of a Notice of Intent to Seek the Death Penalty and/or to accept a

---

[1] Published in 31 HOFSTRA L. REV. 913 (2003). The symposium issue of that law review included articles on teamwork (*see* Jill Miller, *The Defense Team in Capital Cases*, 31 HOFSTRA L. REV. 1117 (2003)) and the critical role of a mitigation specialist in conducting the required investigation (*see* Pamela Blume Leonard, *A New Profession for an Old Need: Why a Mitigation Specialist Must Be Included on the Capital Defense Team*, 31 HOFSTRA L. REV. 1143 (2003)). The *Wiggins* Court favorably cited the original 1989 edition of the ABA Guidelines as "well defined norms." *Wiggins, supra* ¶ 2, at 524. The *Rompilla* Court extensively discussed both editions of these Guidelines in finding trial counsel's performance deficient despite consulting three mental health experts. *Rompilla, supra* ¶ 2, at 359, 382 (three experts), 387 n.7 (discussing 1989 and 2003 editions of Guidelines).

[2] *See* ABA Guideline 10.4.C (The Defense Team) ("As soon as possible after designation, lead counsel should assemble a defense team . . ."). 31 HOFSTRA L. REV. at 999; Commentary to Guideline 10.7 (Investigation): "The mitigation investigation should begin as quickly as possible, because it may affect the investigation of first phase defenses (e.g., by suggesting additional areas for questioning police officers or other witnesses), decisions about the need for expert evaluations (including competency, mental retardation, or insanity), motion practice, and plea negotiations." *Id.* at 1023 (citation omitted).

[3] *See* Lee Norton, *Mitigation Investigation*, THE CHAMPION, May 1992, at 43, 45 (discussing cyclical interplay of records and interview); Russell Stetler, *Mitigation Evidence in Death Penalty Cases*, THE CHAMPION, Jan./Feb. 1999, at 35, 39 (citing need for hundreds of hours to collect, decipher, and decode old records, as well as patience in eliciting disclosures from both witnesses and clients).

IFCD002889

Ex. 4 pg.2 of 30

negotiated disposition.[4] Early investigation may also uncover evidence of intellectual disability establishing that the client is not even eligible for capital prosecution.[5]

4. The purpose of a thorough mitigation investigation is to develop social history evidence that will humanize the defendant, help jurors to understand why he may have committed the capital offense, and evoke compassion and empathy by identifying the client's individual frailties that at once establish human kinship and expose vulnerabilities and disadvantage. When fully developed, it may be the basis for persuading the Government to reconsider an earlier decision to authorize seeking the death penalty, and either deauthorize the case or accept an agreed-upon disposition. Moreover, a thorough social history investigation also provides the foundation for reliable mental health evidence and enables counsel to make informed decisions about what kind of mental health experts to consult and what questions they should address. Mental health experts, in turn, require social history information to conduct a complete and reliable evaluation in the wide spectrum of areas that they may address, which range from the statutorily defined issues of competency and criminal responsibility to the broadest varieties of statutory and non-statutory mitigation that have mental health aspects. The fruits of a thorough mitigation investigation not only provide capital defendants with the

---

[4] *See* United States Attorneys' Manual § 9-10.030 (2001) (providing defense counsel reasonable opportunity to present information, including mitigation, for consideration before Notice of Intent to Seek the Death Penalty is filed). *See also* Russell Stetler, *Commentary on Counsel's Duty to See and Negotiate a Disposition in Capital Cases (ABA Guideline 10.9.1)*, 31 HOFSTRA L. REV.1157.

[5] *See Atkins v. Virginia*, 536 U.S. 304 (2002). Fourteen years earlier, Congress had exempted individuals with what was then known as "mental retardation" from execution. Anti-Drug Abuse Act of 1988, Pub. L. 100-690, § 7001(*l*), 102 Stat. 4390, 21 U. S. C. § 848(*l*). When Congress expanded the federal death penalty law in 1994, it again included a provision that prohibited any individual with "mental retardation" from being sentenced to death or executed. The Federal Death Penalty Act of 1994 was enacted as Title VI of the Violent Crime Control and Law Enforcement Act of 1994 and became effective on September 13, 1994. *See* Pub. L. 103-322, Title VI, Sections 60001-26, Sept. 13, 1994, 108 Stat. 1959 (codified at 18 U.S.C. 3591-3598). In October 2010, Congress passed Rosa's Law, which changed references in specified federal laws from "mental retardation" to "intellectual disability." *See* Fed. Register (Aug. 1, 2013), *available at:* https://www.federalregister.gov/documents/2013/08/01/2013-18552/change-in-terminology-mental-retardation-to-intellectual-disability (last visited Feb. 27, 2023).

IFCD002890

effective representation to which they are entitled under the Sixth Amendment, but assure jurors of the opportunity to consider all the evidence relevant to the reasoned moral judgment they are asked to render, thereby also assuring the courts of an outcome that is reliable and just.

*Background and Qualifications*

5. I served as the first National Mitigation Coordinator for the federal death penalty projects (described more fully at their web site, www.capdefnet.org) from 2005 until my retirement from full-time work in the spring of 2020. I continue to write, train, and consult on mitigation evidence in death penalty cases throughout the United States. The National Mitigation Coordinator position was created in 2005 in response to the increased demand for effective mitigation preparation in death penalty cases following the U.S. Supreme Court's decision in *Wiggins v. Smith, supra* ¶ 2, and the revision of the ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases the same year (2003).[6] Thus, during much of the time of Mr. Kadamovas's prosecution, my job was to consult with lawyers, investigators, mitigation specialists, and experts in connection with death penalty cases that were pending in the federal courts at trial or on habeas corpus (under 28 U.S.C. §§ 2254, 2255, and 2241). I was also heavily involved in training and case brainstorming with defense teams in federal capital prosecutions in this time frame. During my service as the National Mitigation Coordinator, I presented ten times at the Federal Death Penalty Resource Counsel's annual Strategy Session (between 2005 and 2017). In addition, defense teams regularly brought their federal death penalty cases to the weeklong Bryan R. Shechmeister Death Penalty College at

---

[6] *See* JON B. GOULD & LISA GREENMAN, UPDATE ON THE COST QUALITY OF DEFENSE REPRESENTATION IN FEDERAL DEATH PENALTY CASES (2010) at 111-112 (Commentary describes authorization of the position "to assist in expanding the availability and quality of mitigation work in death penalty cases in the federal courts" and my role as the National Mitigation Coordinator in case consultations and training). Gould and Greenman updated the 1998 Spencer Report discussed *infra* § 20, note 29.

IFCD002891

Santa Clara University Law School, where I served on the faculty for twenty-five years between 1996 and 2021 (when the program was held virtually).

6. From 1995 to 2005, I served as the Director of Investigation and Mitigation at the New York Capital Defender Office, which was established under New York State's death penalty statute with a mandate to ensure that indigent defendants in capital cases received effective assistance of counsel. The Capital Defender Office was charged with creating an effective system of capital defense throughout New York State by providing direct representation and offering assistance to private counsel assigned by the courts to represent indigent capital defendants. I supervised a statewide staff of investigators and mitigation specialists, and I consulted with lawyers, investigators, mitigation specialists, and experts who were retained or employed by the Capital Defender Office or the private bar in connection with death penalty cases in New York.

7. From 1990 to 1995, I served as Chief Investigator at the California Appellate Project, a nonprofit law office in San Francisco that coordinated the appellate and post-conviction representation of all the prisoners under sentence of death in California. In that capacity, I also supervised an in-house staff and consulted with staff attorneys and court-appointed counsel, as well as investigators, mitigation specialists, and experts outside the office who were retained to assist counsel representing death-sentenced prisoners.

8. I have investigated all aspects of death-penalty cases since 1980, first working in a private office in California and later in institutional offices. All my work on death penalty cases has been on behalf of indigent clients, either through funding authorized by courts or public defender offices, or as an employee of indigent defense agencies. Since 1980, I have regularly attended seminars and conferences relating to the defense of capital cases at trial, on appeal, and

5

IFCD002892

Ex. 4 pg.5 of 30

in post-conviction proceedings. Most of these conferences were organized and attended by attorneys specializing in capital work. I investigated mitigation evidence in over two dozen death penalty cases in California in the 1980s.

9. Since 1990, I have lectured extensively on capital case investigation, particularly the investigation of mitigation evidence. I have lectured on these subjects not only in New York and California, but in most of the other death-penalty jurisdictions, including Alabama, Arizona, Arkansas, Colorado, Connecticut, Delaware, Florida, Georgia, Idaho, Illinois, Indiana, Kansas, Kentucky, Louisiana, Maryland, Mississippi, Missouri, Nevada, New Jersey, New Mexico, North Carolina, Ohio, Oklahoma, Oregon, Pennsylvania, South Carolina, Tennessee, Texas, Utah, Virginia, Washington, and Wyoming, as well as in Puerto Rico, a jurisdiction where only federal death penalty cases are prosecuted.[7] I have also lectured on numerous occasions under the auspices of the Administrative Office of the United States Courts (in connection with federal death-penalty cases and habeas corpus litigation) and at the Fourth Capital Litigation Workshop of the U.S. Army Trial Defense Service. Over the past three decades, I have lectured at roughly four hundred continuing legal education programs around the country (including over 125 capital defense and mitigation trainings in California, more than a dozen of them in Los Angeles), as well as dozens of additional programs at law schools and related professional conferences in the United States, Europe, and Asia.

10. Since the 1990s, I have lectured on mitigation investigation in death penalty cases at multiple national training conferences sponsored by the following organizations: the NAACP

---

[7] At the time I lectured on these subjects in Colorado, Connecticut, Delaware, Illinois, Maryland, New Jersey, New Mexico, New York, Virginia, and Washington, capital punishment was permitted in those jurisdictions. The four death penalty jurisdictions where I have not been invited for CLEs – Montana, Nebraska, New Hampshire, and South Dakota – have had very few capital prosecutions. They account for only a dozen out of more than 1,500 executions in the modern era according to the Death Penalty Information Center Execution Database, *available at:* https://deathpenaltyinfo.org/executions/execution-database (last visited Feb. 27, 2023): Montana 3; Nebraska 5; New Hampshire 0; South Dakota 4. They currently have fifteen people on death row.

IFCD002893

Legal Defense Fund (annual Airlie conference), the National Legal Aid and Defender Association ("Life in the Balance"), and the National Association of Criminal Defense Lawyers ("Making the Case for Life"). At various times over more than three decades, I have served on the planning committees for these national conferences, as well as the annual Capital Case Defense Seminar sponsored by California Attorneys for Criminal Justice (CACJ) and the California Public Defenders Association (CPDA), which is attended by over a thousand practitioners. I was a co-chair of the planning committee for this seminar in 2009 and from 2011 to 2015. I delivered the virtual keynote address of this seminar in 2021 (attended by fifteen hundred participants and later published by *Santa Clara Law Review*). I have continued to teach at that seminar in 2022 and 2023. I have also taught at the death penalty colleges at the Santa Clara University School of Law in California and the DePaul University College of Law in Illinois. I have taught at more than a dozen capital defense seminars throughout the country under the auspices of the National Institute of Trial Advocacy and over a dozen "bring-your-own-case" capital brainstorming seminars under the auspices of the National Consortium for Capital Defense Training and its regional counterparts. I also designed and organized the annual Capital Mitigation Skills Workshop, held annually under the auspices of the national Habeas Assistance and Training Counsel Project since 2012 until it was interrupted by the Covid pandemic in 2020. It was resumed in January 2023 at the law school of the University of Texas in Austin.

11. In the 1990s, I contributed extensively to the California Death Penalty Defense Manual published by the California defense bar (CACJ and CPDA). This multi-volume reference includes a volume devoted to the investigation and presentation of mitigation evidence which I helped to shape in the 1990s. In 1999, I published articles on *Mitigation Evidence in Death*

7

IFCD002894

Ex. 4 pg.7 of 30

*Penalty Cases* and *Mental Disabilities and Mitigation* in *The Champion*, the monthly magazine of the National Association of Criminal Defense Lawyers, as well as an article entitled *Why Capital Cases Require Mitigation Specialists* in *Indigent Defense*, published by the National Legal Aid and Defender Association. These and other articles of mine were cited in the Commentary to the 2003 revision of the ABA Death Penalty Guidelines, *supra* note 1.[8]

12. I am the author or co-author of over a dozen law review articles,[9] several book chapters,[10] and a practice guide on mental health issues in capital cases.[11] My published work on mitigation has been cited by post-conviction courts in overturning death sentences because of trial lawyers' failure to provide effective representation, as demonstrated by their failure to conduct thorough mitigation investigations. *See State v. Revis*, 49-CC-2005-000142.60, Circuit

---

[8] Citations in the Commentary to Guideline 4.1, The Defense Team and Supporting Services, 31 HOFSTRA L. REV. at 959-60 n.105; Guideline 10.7, Investigation, *id.* at 1022 n.210, 1027 n.226; Guideline 10.9.1, The Duty to Seek an Agreed-Upon Disposition, *id.* at 1042 n.249; Guideline 10.15.1, Duties of Post-Conviction Counsel, *id.* at 1085 n.348

[9] *Commentary on Counsel's Duty to Seek and Negotiate a Disposition in Capital* Cases (ABA Guideline 10.9.1), 31 HOFSTRA L. REV. 1157 (2003); *Dying Twice: Incarceration on Death Row*, 31 CAPITAL U. L. REV. 853 (2003), with Norman L. Greene, William D. Buckley, Craig Haney, Joseph Ingle, & Michael B. Mushlin; *Using the Supplementary Guidelines on the Mitigation Function to Change the Picture in Post-Conviction*, 36 HOFSTRA L. REV. 1067 (2008) with Mark E. Olive; *The Mystery of Mitigation: What Jurors Need to Make a Reasoned Moral Response in Capital Sentencing*, 11 U. PA. J. L. & SOC. CHANGE, (2008); *The Unknown Story of a Motherless Child*, 77 UMKC L. REV. 947 (2009); *The ABA Guidelines and the Norms of Capital Defense Representation*, 41 HOFSTRA L. REV. 635 (2013) with W. Bradley Wendel; *Mental Health Evidence and the Capital Defense Function: Prevailing Norms*, 82 UMKC LAW REVIEW 407 (2014); *The ABA Guidelines: A Historical Perspective*, 43 HOFSTRA L. REV. 731 (2015) with Aurélie Tabuteau; *The Past, Present, and Future of the Mitigation Profession: Fulfilling the Constitutional Requirement of Individualized Sentencing in Capital Cases*, 46 HOFSTRA L. REV. 1161 (2018); Lockett v. Ohio *and the Rise of Mitigation Specialists*, 10 CONLAWNOW 51 (2018); *Death Penalty Keynote: Why Mitigation Matters, Now and for the Future*, 61 SANTA CLARA L. REV. 699 (2021); *Mitigation Works: Empirical Evidence of Highly Aggravated Cases Where Juries Rejected the Death Penalty*, 51 HOFSTRA L. REV. 89, with Maria McLaughlin & Dana Cook; and *Mitigation Reports in Capital Cases: Legal and Ethical Issues*, 13 ST. MARY'S J. OF LEGAL MALPRACTICE & ETHICS ___ (forthcoming 2023), with W. Bradley Wendel.

[10] *Dead Men Talking: Mental Illness and Capital Punishment, in* FORENSIC MENTAL HEALTH: WORKING WITH OFFENDERS WITH MENTAL ILLNESS (Gerald Landsberg, D.S.W., & Amy Smiley, Ph.D., eds., 2001) with Leah George; *Punishment, in* PRINCIPLES AND PRACTICE OF FORENSIC PSYCHIATRY, 2d ed. (Richard Rosner, M.D., ed., 2003) with Robert Lloyd Goldstein; *Mitigation Works, in* TELL THE CLIENT'S STORY: MITIGATION IN CRIMINAL AND DEATH PENALTY CASES (Edward Monahan & James Clark, eds., 2017) with John Blume; *The History of Mitigation in Death Penalty Cases in* SOCIAL WORK, CRIMINAL JUSTICE, AND THE DEATH PENALTY (Lauren A. Ricciardelli, ed., 2020); *Mitigation and the Death Penalty: Successes, Obstacles, and Forced Constraints in* THE DEATH PENALTY: A POST-MORTEM (Todd C. Peppers et al. eds., New York University Press, *forthcoming*).

[11] A PRACTITIONER'S GUIDE TO REPRESENTING CAPITAL CLIENTS WITH MENTAL DISORDERS AND IMPAIRMENTS (2008), with Dick Burr, Matthew Cross, David Freedman, Anne James, & Kathy Wayland.

IFCD002895

Criminal Court, Marion County Alabama (Presiding Judge John H. Bentley) (Feb. 13, 2015) slip. op. at 27, and *Stokes v. Stirling*, 10 F.4th 236, 252 (4th Cir. 2021).

13. Courts have qualified me as an expert witness in multiple state and federal jurisdictions, and I have provided opinion evidence on standard of care issues in capital cases (especially in the investigation and presentation of mitigation evidence) by live testimony or affidavit over two hundred fifty times in numerous jurisdictions, including Alabama, Arizona, Arkansas, California, Colorado, Florida, Georgia, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Mississippi, Missouri, Nevada, New York, North Carolina, Ohio, Oklahoma, Oregon, Pennsylvania, South Dakota, Tennessee, Texas, Utah, Virginia, Washington, and Wyoming. I have testified as an expert witness thirty-three times, including testimony in capital habeas corpus cases in the Districts of Arizona, Arkansas (Northern), California (Eastern), Iowa (Northern), Louisiana (Middle), Missouri (Western) (three times), Texas (Northern), and Wyoming, as well as in state capital post-conviction proceedings in Alabama, Arkansas, California, Colorado, Louisiana, Nevada, South Carolina, and Wyoming. I have also testified as a pretrial expert witness on mitigation standards in the state and federal trial courts of various states. The United States District Court for the Middle District of Louisiana in *Wessinger v. Cain*, Case No. 3:04-637-JJB-SCR (July 27, 2013),[12] and the United States District Court for the District of Wyoming in *Eaton v. Wilson*, Case No. 09-CV-261-J (November 20, 2014), issued orders in which the courts qualified me as an expert in the investigation and presentation of mitigating evidence, competent to testify about the quality of the petitioner's trial counsel's

---

[12] *Rev'd Wessinger v. Vannoy*, 864 F.3d 387, 392-93 (5th Cir. 2017) (finding state *post-conviction* counsel's failure to investigate was caused by state post-conviction court's decisions to deny a hearing, discovery, and funds, not counsel's inexperience or error), *cert. denied*, 583 U.S. ___, 138 S. Ct. 952 (2018). Habeas corpus penalty phase relief subsequently granted by district court on Amended (Re-Urged) Motion for Summary Judgment, or, in the Alternative, for Habeas Relief, *Wessinger v. Vannoy*, United States District Court for the Middle District of Louisiana, Case No. 3:04-637-JWD-EWD, Doc. No. 298 (Dec. 20, 2022).

IFCD002896

performance, and found counsel deficient in each case. My testimony was also cited in a state post-conviction grant of relief for failure to investigate and present mitigation evidence in *Gutierrez v. State*, Case No. CR94-1795B, Second Judicial District Court, Washoe County, Nevada (Judge Jerome M. Polaha) (Aug. 21, 2017), slip op. at 30-32.[13] The Ninth Circuit Court of Appeals also cited my testimony in granting sentencing relief for ineffective assistance of counsel in *Sanders v. Davis*, 23 F.4th 966, 979 (9th Cir. 2022), a case from Bakersfield (Kern County), California.

14. Over the years, I have been directly involved in hundreds of capital cases, including scores of trials and post-conviction hearings. I have also been consulted in various capacities on capital cases in numerous jurisdictions around the country, including California, and on numerous federal death penalty cases.

### *Prevailing Norms in the Development of Mitigating Evidence in Capital Cases, 2002 to 2007*

15. Investigation of a client's background, character, life experiences, and mental health is axiomatic in the defense of a capital case and has been for as long as I have done this work. In every seminar in which I have participated since 1980, instructors have emphasized the importance of conducting a "mitigation investigation" in preparation for the penalty phase of a capital trial and developing a unified strategy for the guilt-innocence and sentencing phases. When I began working on capital cases in 1980, investigation was already firmly established as an integral part of the criminal defense function generally. When the American Bar Association published the second edition of its Standards for Criminal Justice (1980), Standard 4.4-1 of the Defense Function described the duty to investigate as follows: "It is the duty of the lawyer to

---

[13] *Aff'd State v. Gutierrez*, Supreme Court of Nevada, Case No. 74236 (unpublished opinion, Dec. 6, 2020).

IFCD002897

conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case *and the penalty in the event of conviction.*" *Id.* at 4:53 (emphasis added). The Commentary to this Standard noted concisely, "Facts form the basis of effective representation." *Id.* at 4:54. In discussing mitigation, the Commentary continued, "Information concerning the defendant's background, education, employment record, mental and emotional stability, family relationships, and the like, will be relevant, as will mitigating circumstances surrounding the commission of the offense itself." *Id.* at 4:55.[14] These ABA Standards were cited by Justice Stevens in reference to counsel's obligation to conduct a thorough investigation of a capital defendant's background. *Williams v. Taylor*, 529 U.S. 362, 396 (2000).

16. These standards covered criminal defense generally. Discussions of *capital* defense provided more specific detail about counsel's duties in investigating mitigating evidence. As early as 1979, Dennis Balske (an effective capital litigator then practicing in the South) emphasized, "Importantly, the life story must be complete." [15] In 1983, Professor Gary Goodpaster discussed trial counsel's "duty to investigate the client's life history, and emotional and psychological make-up" in capital cases in a widely read law review article.[16] He wrote, "There must be inquiry into the client's childhood, upbringing, education, relationships, friendships, formative and traumatic experiences, personal psychology and present feelings. The affirmative case for sparing the defendant's life will be composed in part of information uncovered in the course of this investigation. The importance of this investigation, and the care

---

[14] *See also* Joseph B. Cheshire V, *Ethics and the Criminal Lawyer: The Perils of Obstruction of Justice*, CHAMPION (Jan./Feb. 1989) at 12 ("Defense counsel have a right and a duty to approach and interview every witness that might have any information regarding the particular issue involved in their client's case.").

[15] Dennis N. Balske, *New Strategies for the Defense of Capital Cases*, 13 AKRON L. REV. 331, 358 (1979).

[16] Gary Goodpaster, The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases, 58 N.Y.U. L. REV. 299 (1983).

IFCD002898

with which it is conducted, cannot be overemphasized."[17] Writing again in 1984, Mr. Balske

advised capital defense counsel that they "must conduct the most extensive background

investigation imaginable. You should look at every aspect of your client's life from birth to

present. Talk to everyone that you can find who has ever had any contact with the defendant."[18]

17. At the beginning of the 1980s, a capital defense lawyer in California hired a former

*New York Times* reporter to investigate the life history of his client. The reporter, the late Lacey

Fosburgh, had previously written a best-selling book about a murder case she had covered for the

newspaper.[19] After her successful work in developing the capital client's mitigation evidence,

Ms. Fosburgh wrote about the critical role she had played:

> A significant legal blind spot existed between the roles played by the private
> investigator and the psychiatrist, the two standard information-getters in the trial
> process. Neither one was suited to the task at hand here -- namely discovering and
> then communicating the complex human reality of the defendant's personality in
> a sympathetic way.
>     Significantly, the defendant's personal history and family life, his
> obsessions, aspirations, hopes, and flaws, are rarely a matter of physical evidence.
> Instead they are both discovered and portrayed through narrative, incident, scene,
> memory, language, style, and even a whole array of intangibles like eye contact,
> body movement, patterns of speech -- things that to a jury convey as much
> information, if not more, as any set of facts. But all of this is hard to recognize or
> develop, understand or systematize without someone on the defense team having
> it as his specific function. *This person should have nothing else to do* but work
> with the defendant, his family, friends, enemies, business associates and casual
> acquaintances, perhaps even duplicating some of what the private detective does,
> but going beyond that and looking for more. This takes a lot of time and
> patience.[20]

---

[17] *Id.* at 323-324.

[18] Dennis Balske, *The Penalty Phase Trial: A Practical Guide*, THE CHAMPION, Mar. 1984, at 40, 42. See also David C. Stebbins & Scott P. Kenney, *Zen and the Art of Mitigation Presentation, or, the Use of Psycho-Social Experts in the Penalty Phase of a Capital Trial*, THE CHAMPION, Aug.1986, at 14, 18 ("capital defense attorneys must recognize that the profession demands a higher standard of practice in capital cases"); Robert R. Bryan, Death Penalty Trials: Lawyers Need Help, THE CHAMPION, Aug. 1988, at 32 ("There is a requirement in every case for a comprehensive investigation not only of the facts but also the entire life history of the client.")

[19] LACEY FOSBURGH, CLOSING TIME: THE TRUE STORY OF THE "GOODBAR" MURDER (1977).

[20] Lacey Fosburgh, *The Nelson Case: A Model for a New Approach to Capital Trials*, in CALIFORNIA STATE PUBLIC DEFENDER, CALIFORNIA DEATH PENALTY MANUAL, 1982 supplement, N6-N10, N7 (July 1982) (emphasis added). This article also appeared in the magazine of the California defense bar, FORUM, Sept.-Oct. 1982. *See also* Report by the Team Defense Project, *Team Defense in Capital Cases*, FORUM, May-June 1978, and

IFCD002899

Capital defense lawyers across the country soon recognized the value of nonlawyers with expertise in the development of sentencing evidence -- ultimately referred to as "mitigation specialists." The California defense bar prominently featured one such nonlawyer on the cover of its monthly magazine FORUM in 1987.[21] Another defense bar magazine, *The Champion* (published by the National Association of Criminal Defense Lawyers), discussed the use of social workers in developing mitigating evidence in 1986.[22] The following year, another article in the same magazine commented tersely, "The mitigation specialist is a professional who, as attorneys across the nation are now recognizing, should be included and will be primary to the defense team."[23]

18. Since the early 1980s, it has also been standard practice for competent defense counsel to determine whether their capital client suffers from organic brain injury, psychiatric disorders, or trauma outside the realm of ordinary human experience. Whenever brain-behavior relationships are at issue, a thorough investigation of the etiology of brain damage is needed to determine the interplay of genetics, intra-uterine exposure to trauma and toxins, environmental exposures, head injuries, etc. In a capital case, such investigation is particularly important because of the additional mitigating factors that may be disclosed beyond the fact of psychiatric disorder or organicity.[24]

---

Michael G. Millman, *Interview: Millard Farmer*, FORUM, Nov.-Dec. 1984, at 31-33.

[21] Anne E. Fragasso, *Interview: Casey Cohen*, FORUM, Jan.-Feb. 1987, at 22, 26.

[22] Cessie Alfonso & Katharine Bauer, *Enhancing Capital Defense: The Role of the Forensic Social Worker*, CHAMPION, June 1986, at 26, 26-29.

[23] James Hudson et al., *Using the Mitigation Specialist and the Team Approach*, THE CHAMPION, June 1987, at 33, 36. Hudson and one of his co-authors had worked in the *Mitigation Specialists Department* of the Ohio State Public Defender's Office. *Id.* at 33.

[24] *See, e.g.*, John Hill & Mike Healy, *The Death Penalty and the Handicapped*, FORUM, May-June 1986, at 18-20 (discussing implications of childhood disorders affecting the brain and other disabilities for penalty phases in capital cases); David C. Stebbins, *Psychologists and Mitigation: Diagnosis to Explanation*, THE CHAMPION, April 1988, at 34, 36 (discussing need for adequate time to overcome clients' distrust and the value of a neuropsychologist or neurologist in cases with head trauma).

13

IFCD002900

19. As noted *supra* ¶ 2, since 2000, the Supreme Court of the United States has found trial counsel ineffective in five cases for failing to investigate mitigation evidence thoroughly: *Williams v. Taylor*, 529 U.S. 362 (2000; *Wiggins v. Smith*, 539 U.S. 510 (2003); *Rompilla v. Beard*, 545 U.S. 374 (2005); *Porter v. McCollum*, 558 U.S. 30 (2009) (per curiam); and *Sears v. Upton*, 561 U.S. 945 (2010) (per curiam). Every case but *Sears* was tried in the 1980s, and *Sears* was tried in 1993, more than a decade before Mr. Kadamovas's trial. In *Williams,* the Court reaffirmed an all-encompassing view of mitigation and found trial counsel ineffective for failing to prepare the mitigation case until a week before trial in 1986 and failing to conduct an investigation of the readily available mitigating evidence (nightmarish childhood, borderline retardation, model prisoner status, etc.). In *Wiggins*, a case tried in 1989, trial counsel were found deficient in their performance, even though they had had their client examined by one mental health expert, because they failed to conduct a complete social history investigation in accordance with the ABA Guidelines. "Despite these well-defined norms, however, counsel abandoned their investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources." 539 U.S. at 524. In *Rompilla*, tried in 1988, trial counsel were found deficient "even when a capital defendant's family members and the defendant himself have suggested that no mitigating evidence is available" and despite consulting three mental health experts. 545 U.S. at 377, 382, 379. Similarly, in *Porter*, also tried in 1988, trial counsel were found deficient despite a "fatalistic and uncooperative" client because "that does not obviate the need for defense counsel" to conduct mitigation investigation. 558 U.S. at 40. Quoting *Williams*, the Court in *Porter* reaffirmed this duty: "It is unquestioned that under the prevailing professional norms" at the time of Porter's trial, counsel had an "obligation to conduct a thorough investigation of the defendant's background." *Id.* at 39 (citation omitted).

14

IFCD002901

Among the mitigation that Porter's counsel failed to present was "brain damage that could manifest in impulsive, violent behavior." *Id.* at 36. In *Sears*, the Court found trial counsel ineffective in a 1993 trial even though they had presented seven witnesses in the penalty proceedings. The Court noted, "We have never limited the prejudice inquiry under *Strickland* to cases in which there was only 'little or no mitigation evidence' presented . . ." 561 U.S. at 954. Post-conviction evidence emphasized significant frontal lobe brain damage causing deficiencies in cognitive functioning and reasoning. *Id.* at 946. Four of these five individuals have subsequently received sentences of less than death, and the fifth case remains in litigation as of this writing. Terry Williams received a life sentence by negotiated disposition in Danville, Virginia, in 2000.[25] On October 15, 2004, the State of Maryland agreed to a disposition sending Kevin Wiggins to a state facility for mental health treatment and rehabilitation services, but making him eligible for parole immediately based on time already served.[26] On August 13, 2007, the Lehigh County (Pennsylvania) District Attorney's Office stipulated to a life sentence for Ronald Rompilla.[27] On July 21, 2010, the Brevard-Seminole (Florida) State Attorney's Office announced that it would allow George Porter, Jr., to be resentenced to life.[28] All five cases involved mental health evidence, including brain damage or cognitive impairment, that was not discovered and presented at trial.

***The Need for a Qualified Mitigation Specialist***

---

[25]*See* Frank Green, *Death Penalty Cases Scrutinized: More Hearings Are Being Ordered in Virginia*, RICHMOND TIMES-DISPATCH (Apr. 9, 2001) at A1, *available at* truthinjustice.org/va-dpreview.htm.
[26] *See* Jenner & Block, *12 Year Battle for Kevin Wiggins Comes to an End* (Oct. 15, 2004), jenner.com/news/news_item.asp?id=12759624.
[27] *See* Associated Press, *Death Row Inmate Gets New Life Term*, USA TODAY, usatoday.com/news/topstories/2007-08-13-477084247_x.htm.
[28] Kaustuv Basu, *Aging Killer May Get Reprieve from Death Row*, FLA. TODAY (July 21, 2010).

IFCD002902

20. After a decade of experience with the federal death penalty, the Committee on Defender Services of the Judicial Conference of the United States appointed a subcommittee under the Hon. James R. Spencer of the Eastern District of Virginia to study the cost and quality of defense representation. The subcommittee report, commonly referred to as the Spencer Report,[29] found that, as of 1998, the work of mitigation specialists was "part of the existing 'standard of care' in a federal death penalty case."[30] The report noted that mitigation specialists "have extensive training and experience in the defense of capital cases. They are generally hired to coordinate an investigation of the defendant's life history, identify issues requiring evaluation by psychologists, psychiatrists or other medical professionals, and assist attorneys in locating experts and providing documentary material for them to review."[31] In a capital case, competent defense counsel have a duty to conduct a thorough life-history investigation, but generally lack the skill to conduct the investigation themselves.[32] Moreover, even if lawyers had the training, skills, and patience, they do not have the time to conduct thorough mitigation investigation because of all the other work that is demanded of them in representing a capital client. Besides, it is more cost-effective to employ those with recognized expertise in developing mitigation evidence. Capital defense counsel have long retained a mitigation specialist to complete a detailed, multigenerational social history to highlight the complexity of the client's life and identify multiple risk factors and mitigation themes. As noted *supra* ¶ 17, even before the term "mitigation specialist" had been coined, penalty phase biographical investigation was widely accepted in the 1980s as a critical part of the capital defense function.

---

[29] FEDERAL DEATH PENALTY CASES: RECOMMENDATIONS CONCERNING THE COST AND QUALITY OF DEFENSE REPRESENTATION (May 1998), *available at:* https://www.uscourts.gov/sites/default/files/original_spencer_report.pdf (last visited Feb. 24, 2023).

[30] *Id.*, Commentary to 7. Experts, Sec. II, Recommendations and Commentary.

[31] *Id.*

[32] *See,* generally, Russell Stetler, *Mitigation Investigation: A Duty That Demands Expert Help but Can't Be Delegated,* THE CHAMPION, Mar. 2007, at 61.

IFCD002903

21. As revised in 2003, the ABA Death Penalty Guidelines state unequivocally that lead counsel at any stage of capital representation should assemble a defense team as soon as possible after designation with at least one mitigation specialist and at least one member qualified by training and experience to screen individuals for the presence of mental or psychological disorders or impairments (Guideline 10.4), in order to conduct a thorough and independent investigation relating to penalty (Guideline 10.7 and Guideline 10.11). The original edition of the ABA Guidelines, adopted in 1989 (*available at* ambar.org/1989guidelines (last visited Feb. 26, 2023), similarly required counsel to begin investigation immediately upon counsel's entry into the case and to "discover all reasonably available mitigating evidence." 1989 Guideline 11.4.1.C. The 1989 Guidelines also required counsel to retain experts for investigation and "preparation of mitigation." 1989 Guideline 11.4.1.D(7). Notably, the 1989 Guidelines specifically stated that "the investigation for preparation of the sentencing phase should be conducted regardless of any initial assertion by the client that mitigation is not to be offered." 1989 Guideline 11.4.1.C.

*Evolution of Prevailing Norms*

22. The 1989 edition of the ABA Guidelines reflected a national consensus among capital defense practitioners based on their practices in the 1980s. These Guidelines were the result of years of work by the National Legal Aid and Defender Association (NLADA) to develop standards to reflect the prevailing norms in indigent capital defense. NLADA published its Standards for the Appointment of Defense Counsel in Death Penalty Cases in 1985 and updated in 1988, *available at:* https://www.nlada.org/defender-standards/death-penalty (last visited Feb. 24, 2023). With initial support from the ABA's Standing Committee on Legal Aid and Indigent

17

IFCD002904

Ex. 4 pg.17 of 30

Defendants (SCLAID), NLADA developed its expanded Standards for the Appointment *and Performance* of Defense Counsel in Death Penalty Cases (emphasis added) over the course of several years. In February 1988, NLADA referred the Standards to SCLAID, which reviewed them and circulated them to appropriate ABA sections and committees. SCLAID incorporated the only substantive concerns expressed (by the Criminal Justice Section) and changed the nomenclature to "Guidelines" as more appropriate than "Standards." Each black-letter guideline is explained by a commentary, with references to supporting authorities. *See* Introduction to original ABA Death Penalty Guidelines (1989).

23. Courts have found the various editions of the ABA Criminal Justice Standards and Death Penalty Guidelines useful in assessing the reasonableness of counsel performance. As Justice Stevens noted in writing for the Court's majority in *Padilla v. Kentucky*, 559 U.S. 356, 366 (2010): "We long have recognized that 'prevailing norms of practice as reflected in American Bar Association standards and the like . . . are guides to determining what is reasonable . . .'" Justice Stevens cited *Strickland*, 466 U.S. 668, 688 (1984); *Bobby v. Van Hook*, 558 U.S. 4 (2009) (per curiam); *Florida v. Nixon*, 543 U.S. 175, 191, and n.6 (2004); *Wiggins v. Smith*, 539 U.S. 510, 524 (2003); and *Williams v. Taylor*, 529 U.S. 362, 396 (2000). Justice Stevens concluded: "Although they are 'only guides,' *Strickland*, 466 U.S. at 688, and not 'inexorable commands,' *Bobby*, 558 U.S. at 8, these standards may be valuable measures of the prevailing norms of effective representation . . ." Justice Stevens also cited law review articles and the publications of criminal defense and public defender organizations (such as the National Association of Criminal Defense Lawyers and the National Legal Aid and Defender Association) as guides to prevailing professional norms. *Id.* at 367. *Accord Hinton v. Alabama*, 571 U.S. 263, 273 (2014) (per curiam) (capital reversal finding trial counsel ineffective and citing *Padilla's*

18

IFCD002905

Ex. 4 pg.18 of 30

analysis of "prevailing professional norms," 559 U.S. at 366, and quoting verbatim the first two sentences of Justice Stevens's analysis of prevailing norms).

24. The Commentary to the 2003 edition of the ABA Guidelines explained in detail why mitigation specialists are vital members of the capital defense team:

> Mitigation specialists possess clinical and information-gathering skills and training that most lawyers simply do not have. They have the time and the ability to elicit sensitive, embarrassing and often humiliating evidence (e.g., family sexual abuse) that the defendant may have never disclosed. They have the clinical skills to recognize such things as congenital, mental or neurological conditions, to understand how these conditions may have affected the defendant's development and behavior, and to identify the most appropriate experts to examine the defendant or testify on his behalf. . . .
> . . . The mitigation specialist compiles a comprehensive and well-documented psycho-social history of the client based on an exhaustive investigation; analyzes the significance of the information in terms of impact on development, including effect on personality and behavior; finds mitigating themes in the client's life history; identifies the need for expert assistance; assists in locating appropriate experts; provides social history information to experts to enable them to conduct competent and reliable evaluations; and works with the defense team and experts to develop a comprehensive and cohesive case in mitigation.[33]

25. Without a thorough social history investigation, it is impossible to ascertain the existence of previous head injuries, childhood trauma, and a host of other life experiences that may provide a compelling reason for a juror to vote for a life sentence. Moreover, without a social history, counsel cannot make an informed and thoughtful decision about which experts to retain, in order to gauge the nature and extent of a client's possible mental disorders and impairments. Mental health experts, in turn, require social history information to conduct a complete and reliable evaluation.[34]

---

[33] 31 HOFSTRA L. REV. at 959 (citations omitted).

[34] *See* Richard G. Dudley, Jr., & Pamela Blume Leonard, *Getting It Right: Life History Investigation as the Foundation for a Reliable Mental Health Assessment*, 36 HOFSTRA L. REV. 963 (2008); Douglas Liebert & David Foster, *The Mental Health Evaluation in Capital Cases: Standards of Practice*, 15:4 AM. J. FORENSIC PSYCHIATRY 43 (1994). *See also* George W. Woods et al., *Neurobehavioral Assessment in Forensic Practice*, 35 INT'L J. OF L. & PSYCHIATRY 432 (2012).

19

IFCD002906

26. The social history investigation should include a thorough collection of objective, reliable documentation about the client and his family, typically including medical, educational, employment, social service, and court records. Such contemporaneous records are intrinsically credible and may document events which the client and other family members were too young to remember, too impaired to understand and record in memory, or too traumatized, ashamed, or biased to articulate. The collection of records and analysis of this documentation involve a slow and time-intensive process. Many government record repositories routinely take months to comply with appropriately authorized requests. Records are sometimes mistakenly presumed destroyed when they are in fact simply stored offsite in dusty warehouses that no one is eager to visit. Great diligence is required to ensure compliance with appropriate requests. Careful review of records often discloses the existence of collateral documentation which, in turn, needs to be pursued.

27. The Commentary to ABA Guideline 10.7 (Investigation) notes, "Records should be requested concerning not only the client, but also his parents, grandparents, siblings, cousins, and children. . . . The collection of corroborating information from multiple sources – a time-consuming task – is important wherever possible to ensure the reliability and thus the persuasiveness of the evidence. Counsel should use all appropriate avenues including signed releases, subpoenas, court orders, and requests or litigation pursuant to applicable open records statutes . . ." [35]

28. Records invariably provide valuable background information on clients and their families. In *Rompilla v. Beard* (2005), a court file from a prior offense that the prosecution intended to use as aggravating evidence – a readily available public document – contained "a

---

[35] 31 HOFSTRA L. REV. at 1024-25.

IFCD002907

range of mitigation leads that no other source had opened up."[36] In an earlier ineffectiveness case, *Williams v. Taylor* (2000), the Supreme Court found the life-history records such powerful mitigating evidence that the High Court added a footnote to quote a caseworker report verbatim:

> The home was a complete wreck. . . . There were several places on the floor where someone had had a bowel movement. Urine was standing in several places in the bedrooms. There were dirty dishes scattered over the kitchen, and it was impossible to step any place on the kitchen floor where there was no trash. . . . The children were all dirty and none of them had on under-pants. Noah and Lula were so intoxicated, they could not find any clothes for the children, nor were they able to put the clothes on them. . . . The children had to be put in Winslow Hospital, as four of them, by that time, were definitely under the influence of whiskey.[37]

This excerpt provides a lucid example of a vivid illustration of family dysfunction – and a story that even the most skilled interviewer could never have elicited simply by talking with family members. The records documented an event that Terry Williams and his siblings were too young to remember, and his parents were too intoxicated to register in memory. Records have no inherent bias, and contemporaneous records are in any event more credible than witnesses who share previously undisclosed memories.

29. Life-history records enable capital defense teams to interview all witnesses more effectively – not only the witnesses who created the records in the first place (like the teachers who produced report cards) but also family members and friends who can organize their memories more accurately if there is hard documentation of dates and places. The frailty of human memory obliges us all to rely on records, and they provide the essential skeletal framework for social history investigation. They are helpful in preparing witnesses to testify.

30. A social history cannot be completed in a matter of hours or days. In addition to the bureaucratic obstacles to the acquisition of essential documentation, it takes time to establish

---

[36] Rompilla, 545 U.S. at 390.
[37] Williams, 529 U.S. at 395, n.19.

IFCD002908

rapport with the client, his family, and others who may have important information to share about the client's history. It is quite typical, in the first interview with clients or their family members, to obtain incomplete, superficial, and defensive responses to questions about family dynamics, socioeconomic status, religious and cultural practices, the existence of intra-familial abuse, and mentally ill family members. These inquiries invade the darkest, and most shameful secrets of the client's family, expose raw nerves, and often re-traumatize those being interviewed. Barriers to disclosure of sensitive information may include race, nationality, ethnicity, culture, language, accent, class, education, age, religion, politics, social values, gender, and sexual orientation/LGBTQ+ status, ability/disability, body type, and physical appearance.[38]

31. Only with time can an experienced mitigation specialist break down these barriers, and obtain accurate and meaningful responses to these sorts of questions. One nationally recognized authority in mitigation investigation, Lee Norton, writing in 1992, stressed the cyclical nature of the work and estimated that hundreds of hours would typically be required.[39]

32. Mitigation investigation is particularly complex when the client does not share the attorney's cultural background.[40] Attorneys may too readily overlook symptoms of impairment, attributing them to language difficulties or cultural differences. Cultural issues may involve not only race and ethnicity, but sexual orientation, gender, language, nationality, socioeconomic status, or any other characteristics that define social identity. Diversity in capital defense team is

---

[38] While these social differences have long been recognized as practical barriers in mitigation investigation (*see* Russell Stetler, *Mitigation Evidence in Death Penalty Cases, supra* note __ at 36), they are also seen as inequalities in the literature of social psychology analyzing intersectionality in the dynamics of power. In many ways, the unequal power relationship between imprisoned clients facing capital charges and defense teams in the free world (whom they did not choose) is the most fundamental obstacle to trust.

[39] *See* Norton, *supra* note 3, at 43-45. *See also* Leonard, *supra* note 1, at 1154. (reiterating a decade later that "it takes hundreds of hours to conduct a thorough social history investigation"); DAVID DEMATTEO ET AL., FORENSIC MENTAL HEALTH ASSESSMENTS IN DEATH PENALTY CASES 244 (2011) ("Typically, mitigation specialists invest hundreds of hours in a detailed mitigation investigation.").

[40] *See* Scharlette Holdman & Christopher Seeds, *Cultural Competency in Capital Mitigation*, 36 HOFSTRA L. REV. 883 (2008).

IFCD002909

Ex. 4 pg.22 of 30

of practical importance. Just as an all-white defense team representing a capital defendant of color will face enhanced barriers to disclosure of sensitive life-history information, so will a monolingual team face enhanced barriers with a foreign national who is not a native speaker of English.

33. Mitigation evidence is not developed to provide a defense to the crime. Instead, it provides evidence of a disability, condition, or set of life experiences that can inspire compassion, empathy, mercy and understanding. Unlike insanity and competency, both of which are strictly defined by statute and temporal limitations, mitigation need not involve a mental disease or defect, and it may encompass the entire trajectory of the client's life. In many cases, defendants suffer mental impairments that do not meet the legal definition of insanity or incompetency, but are powerfully mitigating disabilities that are given great weight when juries are charged with assessing individualized culpability.

34. Over the years, I have been involved in hundreds of capital cases, including scores of trials and post-conviction hearings, throughout the country. I have provided evidence as an expert on the standard of care in investigating capital cases and mitigation by live testimony or affidavit in over one hundred fifty cases around the country. *See supra* ¶ 13. My personal experience of the effectiveness of mitigation evidence accords with the empirical research of social scientists who have studied the decision-making processes of actual jurors in death-penalty cases.[41]

---

[41] *See*, for example, Stephen P. Garvey, *Aggravation and Mitigation in Capital Cases: What Do Jurors Think?* 98 COLUM. L. REV. 1538 (1998) and *The Emotional Economy of Capital Sentencing*, 75 N.Y.U. L. REV. 26 (2000) (concluding that mitigation does matter, especially mental impairment and mental illness). *See also* John H. Blume et al., *Competent Capital Representation: The Necessity of Knowing and Heeding What Jurors Tell Us About Mitigation*, 36 HOFSTRA L. REV. 1035 (2008) "The [Capital Jury Project] studies reveal that many different types of mitigation resonate with jurors. Low intelligence, mental illness, child abuse, extreme poverty, remorse, lack of a significant prior record, and lesser culpability are just some of the categories of mitigation that, in a particular case, can lead jurors to choose life over death." *Id.* at 1038. "[E]vidence that the defendant was under the influence of

IFCD002910

35. My own research has also documented over six hundred highly aggravated cases (involving multiple victims, or victims who were children or law enforcement officers) in which juries (or, in a small number of cases, judges) declined to impose death sentences after a sentencing proceeding.[42] Over eighty of these highly aggravated cases were tried to a penalty-phase jury in federal court.

*How Early Mitigation Investigation Helps to Avoid Authorization and Promote Settlement*

36. Only a fraction of the cases that are eligible for federal death penalty prosecution go to trial with execution as a punishment option. Many cases are simply prosecuted in state court, where 98 percent of the death row population is found.[43] As noted *supra* ¶ 3, when death-eligible charges are filed in federal court, the Government provides defense counsel a reasonable opportunity to present information before a final decision is made about whether to file a Notice of Intent to Seek the Death Penalty. The process usually involves presenting information to the local U.S. Attorney's Office and then a presentation in writing and/or in person or by video to the Capital Case Committee at Main Justice in Washington. The ultimate decision rests with the Attorney General, so a written submission ensures that defense counsel can make their most persuasive presentation directly to the ultimate decision-maker. Even after a Notice has been

---

extreme emotional disturbance or mentally ill at the time of the crime is also mitigating to almost half of all jurors. Almost a third of jurors found exposure to serious child abuse mitigating, and a like number found childhood poverty mitigating." *Id.* at 1051.

[42] Russell Stetler et al., *Mitigation Works: Empirical Evidence of Highly Aggravated Cases Where the Death Penalty Was Rejected at Sentencing*, 51 HOFSTRA L. REV. 89 (2022).

[43] *See* DEBORAH FINS, DEATH ROW USA (April 2022) (finding 44 of 2,414 people on death row were federal prisoners as of April 1, 2022), *available at:* DRUSA SPRING 2010 Tabled version (00021413-2).DOC (naacpldf.org) (last visited Feb. 25, 2023).

IFCD002911

filed, there have often been successful motions for deauthorization based on changed circumstances.[44]

37. As a practical matter, it is critical for the defense to provide information that the Government does not already know. The Government already knows, for example, its charging decisions and case outcomes in similarly situated cases (such as Bureau of Prison murders), so proportionality data are unlikely to add anything to the decision-making process in comparable individual cases, whereas previously confidential information about an individual defendant has the potential to offer new information to the capital calculus. It is therefore imperative to commence the mitigation investigation as early as possible in order to uncover information that may cast the defendant in a more sympathetic light or at least persuade the Government that a death sentence will not be as easily obtained as initially thought based on the crime.

38. I had related experience in this area when I served as Director of Investigation and Mitigation at the New York Capital Defender Office (1995 to 2005). New York had a statutory framework where prosecutors had 120 days from arraignment in the trial court in which to decide whether to seek the death penalty in an eligible case.[45] I know from personal experience how important it was to begin the mitigation investigation as soon as counsel was appointed, so that the defense would have information to share within that 120-day period that might persuade prosecutors not to elect to pursue execution in an individual case. While the New York death penalty statute was operative, there were over eight hundred cases eligible for capital

---

[44] The Federal Death Penalty Resource Counsel Project has tracked the outcomes of federal capital prosecutions. Three years after Mr. Kadamovas's case, there had been a total of 465 defendants authorized for a capital prosecution (1988 to 2010), and 34 cases were pending. Of the remaining 431 closed cases, 100 had been resolved by plea agreement prior to trial; 25 had been resolved by plea during trial; 53 Notices of Intent to Seek the Death Penalty had been withdrawn prior to trial; and 12 Notices were withdrawn at trial. Thus, 185 of the authorized cases (43%) had avoided death sentences by means of a plea agreement or withdrawal of a Notice of Intent, according to a declaration by Kevin McNally, director of the project, on Feb. 24, 2010.

[45] *See* N.Y. Crim. Proc. Law § 250.40(2) (McKinney 2002). The notice could also be withdrawn at any time. *Id.* § 250.40(4).

IFCD002912

Ex. 4 pg.25 of 30

prosecution, but only fifteen cases that ultimately went to trial with death as a punishment option. In most cases, prosecutors elected not to pursue the death penalty or to accept an agreed-upon disposition.[46]

*Social History Investigation as the Key to Reliable Capital Mental Health Evaluations*

39. For clients who are psychiatrically disordered or brain damaged, mitigation evidence may explain the succession of facts and circumstances that led to the crime, and how that client's disabilities distorted his judgment and reactions. Of all the diverse frailties of humankind, brain damage is singularly powerful in its ability to explain why individuals from the same family growing up in the same environment turn out differently. It is an objective scientific fact. Psychiatric evidence can provide a context to explain the capital crime and past behaviors as more than simply bad choices made by the client.

40. Both anecdotal reports from capital defense practitioners and social science research[47] indicate that defense experts are viewed with great skepticism and often regarded as "hired guns" unless their conclusions are supported by abundant, credible evidence from lay witnesses and historical experts (i.e., the professionals who encountered the capital client long before the alleged offense).[48] Thus, if only for pragmatic reasons, capital defense counsel are well advised

---

[46] When the ABA Death Penalty Guidelines were revised in 2003, New York prosecutors had filed 780 death-eligible cases (1995 to 2003) but elected to file Notices of Intent to Seek the Death Penalty in only 48, largely owing to the pre-authorization presentations by the defense. 31 HOFSTRA L. REV. at 1040-41, n.244. Pleas were negotiated in the majority of cases, including two that occurred after conviction before the sentencing proceeding commenced. Stetler, *Commentary, supra* note 9, at 1158 n.3.

[47] *See, e.g.*, Scott Sundby, *The Jury as Critic: An Empirical Look at How Capital Juries Perceive Expert and Lay Testimony*, 83 VA. L. REV. 1109 (1997) (finding that two-thirds of the witnesses jurors thought "backfired" were defense experts).

[48] During the operative years of the New York death penalty statute (1995 to 2004), for example, the Capital Defender Office offered the testimony of historical experts in several cases. A school psychologist who had tested a client routinely as part of mandated triennial review for Special Education explained the significance of his borderline intellectual functioning (FS IQ 76-81). People v. George Davis Bell (Ind. 128-97, Judge Cooperman, Queens County, N.Y., 1999). In another case, a different school psychologist explained the impact of learning

IFCD002913

not to rely on expert testimony without the corroborative lay witnesses whose identity and potential evidence can only be discovered through life-history investigation. However, it is equally important to offer well-prepared expert testimony to explain the effects of life experiences on an individual's functioning and behavior. Lay witnesses on their own are unlikely to understand the significance of the symptoms and behaviors they describe, and only an expert is likely to be able to provide an overview of the factors that shaped the client over the course of her life and to be able to offer an empathic framework for understanding the resultant disorders and disabilities.[49] Expert testimony is essential for placing the factual details elicited from lay witnesses into an interpretive context that explains how various life events shaped the capital client's brain and behavior.

41. The proper standard of care for a competent mental health evaluation also requires an accurate medical and social history as its foundation. Because psychiatrically disordered or cognitively impaired individuals are by definition likely to be poor historians, a reliable evaluation requires historical data from sources independent of the client (for clinical, not simply

---

disabilities (at age eleven, reading just above a second grade level; at fourteen, just above fourth grade; and at seventeen, just above fifth grade). People v. José J. Santiago (Ind. 1210/99, Judge Bristol, Monroe County, N.Y., 2000). In a third case, a psychiatrist had treated the client's mother after her suicide attempt when the client was nine B thirty years before the capital trial. From the records, the psychiatrist testified to the history of mood disorders and suicidality in the maternal lineage, as well as family dysfunction, including fights over promiscuity, gambling, and drinking. From her current perspective, the psychiatrist opined about the devastating impact on the children of the mother's mood disorder, suicidality, and psychiatric removal from the family. People v. John F. Owen (Ind. 547-99 cons. with 414-99, Judge Egan, Monroe County, N.Y., 2001). *See* Russell Stetler, *The Mystery of Mitigation: What Jurors Need to Make a Reasoned Moral Response in Capital Sentencing*, 11 U. PA. J. L. & SOC. CHANGE 237, 258 (n.92) (2007-08).

[49] It has long been recognized that lay and expert testimony must be harmonized to be credible to the trier of fact. As one capital defense lawyer pointed out in 1988, "[T]estimony about the psycho-social development of the defendant explains the psychological diagnosis in human terms that the jury can understand." He continued, "Typical psychological testimony on sanity, competency, or diminished capacity sounds like it comes out of a textbook. Despite the best efforts of the mental health professional and the attorneys, most of this type of testimony is incomprehensible to a lay juror. There is also an unfortunate tendency to get caught up in technical terms that bore the jurors and do nothing to humanize the client. It makes little sense to spend several days putting on the testimony of relatives and friends of the defendant about the human characteristics of the defendant, and then put on a psychologist or psychiatrist who immediately turns this around by making the person sound like a casebook study out of some obscure and arcane psychology textbook." David C. Stebbins, *Psychologists and Mitigation, supra* note 24 at 38.

IFCD002914

forensic, reasons). Additional components of a reliable evaluation will include a thorough physical examination (including neurological examination) and appropriate diagnostic testing. The standard mental status examination cannot be relied upon in isolation for reliable clinical assessments any more than the expert can be relied upon in isolation in the courtroom context.

42. Except when clients exhibit such florid symptomatology that immediate clinical intervention is patently warranted, capital defense counsel are well advised to conduct a thorough social history investigation before retaining mental health experts. At the same time, it is important that counsel not prematurely rule out disorders and impairments simply because they have not observed florid symptoms. The signs of mental disorders typically wax and wane, and many clients are skilled at masking stigmatized impairments and conditions. It is not at all uncommon for capital defendants to present well, striving to avoid the potential shame and embarrassment of being labeled "crazy" or "retarded." Only after the social history data have been meticulously digested and the multiple risk factors in the client's biography have been identified will counsel be in a position to determine what kind of culturally competent expert is appropriate to the needs of the case, what role that expert will play, and what referral questions will be asked of the expert. Psychiatrists and psychologists have different training and expertise, and within each profession are numerous subspecialties including the disciplines that study the effects of trauma on human development. The potential roles of experts include consultants; fact gatherers needed to measure cognitive capacities or to elicit client disclosures (and/or to assess their credibility); and testifying witnesses, to name but a few. To make informed decisions about the kinds of experts that may be needed and the referral questions they will address, counsel first needs a reliable social history investigation.

IFCD002915

Ex. 4 pg.28 of 30

43. The importance of independently corroborated social history data was also well recognized among mental health practitioners as early as the 1980s. A leading psychiatric text in that period described an accurate and complete medical and social history as the "single most valuable element to help the clinician reach an accurate diagnosis."[50] The same text noted that the individuals being evaluated are often poor historians: "The past personal history is somewhat distorted by the patient's memory of events and by knowledge that the patient obtained from family members."[51] Thus, "retrospective falsification, in which the patient changes the reporting of past events or is selective in what is able to be remembered, is a constant hazard of which the psychiatrist must be aware."[52] This problem is particularly acute in the forensic context, as two other leading authorities pointed out in 1980:

> The thorough forensic clinician seeks out additional information on the alleged offense and data on the subject's previous antisocial behavior, together with general "historical" information on the defendant, relevant medical and psychiatric history, and pertinent information in the clinical and criminological literature. To verify what the defendant tells him about these subjects and to obtain information unknown to the defendant, the clinician must consult, and rely upon, sources other than the defendant.[53]

Capital defense lawyers also appreciated this need: "A psychologist armed with all of the records of the client's history is much better equipped to present a sympathetic and truthful explanation of the client's psychological make-up and of how the crime occurred."[54]

*Conclusion*

44. At the time of Mr. Kadamovas's prosecution, trial, and sentencing, defense counsel

---

[50] H. KAPLAN & B. SADOCK, COMPREHENSIVE TEXTBOOK OF PSYCHIATRY 837 (4th ed. 1985).
[51] *Id.* at 488.
[52] *Id.*
[53] Richard J. Bonnie & Christopher Slobogin, *The Role of Mental Health Professionals in the Criminal Process: The Case for Informed Speculation*, 66 VA. L. REV. 427, 508-509 (1980).
[54] David C. Stebbins, *Psychologists and Mitigation, supra* note 24, at 37.

29

IFCD002916

Ex. 4 pg.29 of 30

had a well-established obligation to conduct a thorough mitigation investigation, beginning at the earliest opportunity. Counsel could have cited all the contemporaneous authorities and cases that I have discussed in this declaration in support of a motion for immediate appointment and funding of a mitigation specialist.[55] If funding was refused, counsel needed to renew the motion and make a record as to why there was an urgent need to fund a mitigation specialist *before* the Government had decided whether to authorize the filing of a Notice of Intent to Seek the Death Penalty, and counsel had an obligation to conduct that investigation to the best of their ability regardless of any funding limitations. The mitigation investigation was critical to multiple aspects of trial counsel's representation, including efforts to prevent authorization of a death penalty case (or to deauthorize the case at a later point), to resolve the case through an agreed-upon disposition, or ultimately to persuade at least one juror that the punishment of last resort was not necessary or justified. The thoroughness of this investigation also implicated the reliability and credibility of any mental health assessments in the case.

I declare under penalty of perjury under the laws of the United States and the State of California, that the foregoing is true and correct and was executed this 4th day of March 2023 at Berkeley, California.

RUSSELL STETLER

---

[55] In fact, I could have assisted in supporting funding motions if asked. As noted *supra* ¶ 5, it was my job to provide mitigation-related assistance in federal death penalty cases after 2005. However, even before my federal employment, I provided *pro bono* assistance of mitigation funding issues with testimony in the fall of 2001 in a hearing before the Hon. John T. Nixon in the United States District Court for the Middle District of Tennessee in *United States v. Jamal Shakir*, Case No. 3:98-cr-00038, at the request of a California attorney who had been appointed as learned counsel for co-defendant, Eben Payne. I also testified *pro bono* at a hearing on mitigation funding before the Hon. Benjamin Lerner, calendar judge for the Philadelphia County Court of Common Pleas, in the spring of 2003, at the request of attorney Steven G. Laver for a group of court-appointed attorneys who were challenging the adequacy of the funding system at that time. I could have provided similar assistance to counsel for Mr. Kadamovas even before my federal employment if it had been requested.

IFCD002917