DECLARATION OF RICHARD P. LASTING

I, Richard P. Lasting, declare:

1.    I am an attorney licensed to practice law in the State of California and admitted to practice in the United States District Court for the Central District of California.

2.    Prior to 2002 I had been trial counsel in several death penalty cases in Los Angeles Superior Court.

3.    In 2002, pursuant to 18 U.S.C. § 3006A, I was appointed by the United States District Court for the Central District of California as Learned Counsel to represent Jurijus Kadamovas in case 02-cr-00220. Mr. Kadamovas was charged with offenses which potentially qualified him for a death sentence. Marcia Brewer was counsel for Kadamovas at the time. I received a telephone call from Maria Stratton, the federal defender who was overseeing panel appointments, asking me to come on the case with Ms. Brewer. I agreed. The case was assigned to the Honorable Nora Manella.

4.    Christina Larson Gits was the paralegal on the case. We retained a fact investigator named Paul Ingels who Ms. Brewer had brought into the case. I thought a Russian speaking investigator was necessary, so I retained Sergei Litvinov to also work as a fact investigator on the case and to help us with translation.

5.    Ms. Brewer was in charge of organizing the discovery. The discovery in the case was extensive. Paginated discovery consisted of tens of thousands of pages and there were videos, audiotapes and other digital media. Some of the discovery

Initial: RPL

1

IFCD002942

was in Russian and other foreign languages. As we described the situation in our motion to continue six months before trial (Dkt. No. 2266):

> To say that the discovery materials provided by the Government in this matter are voluminous seems quite insufficient to describe the magnitude of the materials which defense counsel must review to prepare this case for trial. The documentary materials exceed 75,000 (seventy-five thousand) pages. These 75,000 pages, however, are simply a fraction of the total materials which defense counsel must review. Defense counsel has attached a 51 (fifty-one) page master index of the non-documentary discovery material provided by the Government. These other non-documentary discovery materials include CD ROMs, electronic media, floppy disks, information from numerous computer hard drives, as well as audiotapes, videotapes and DVDs. . .
>
> Further, there are also additional materials which must be reviewed which are not contained in the 51 page Master Discovery index. These materials include the transcripts and DVD's of the depositions of Government witnesses Andrei Liapine, Andrei Agueev, and Konstantinos Tezhik. . . .
>
> An additional complication related to the review of the discovery materials is that there are a substantial number of documents and audio conversations in several foreign languages. Defense counsel's review to date has identified conversations in Russian, as well as Latvian.

6.     We filed two motions in 2003 asking for a mitigation investigator, but the motions were denied. Judge Manella declined to give us a mitigation investigator until the Department of Justice had officially authorized the case as a capital case. Consequently, we had not done a mitigation investigation prior to our presentation to the DOJ in the authorization process.

7.     Setting forth the potential mitigation case is a crucial part of the presentation to the Department of Justice during the authorization process. The DOJ manual specifically directs that potential mitigation be considered in the decision-making

Initial: _ℛℕℒ_

2

IFCD002943

process regarding whether to pursue a death penalty. Because we had no mitigation investigation, we were unable to present an effective, organized, factually-supported, and convincing argument to the DOJ. Although we met with the local prosecutors and then, in January of 2004, with the capital case committee in Washington D.C., we had very little support for our arguments that they should not pursue the death penalty.

8.    Such a delay in the appointment of a mitigation investigator would not happen today. A mitigation specialist is consistently appointed very soon after the death-eligible charges are filed.

9.    In January of 2004, Marcia Brewer and I went to Washington D.C. to meet with DOJ officials to make our presentation to the capital case committee and participate in the authorization process. The DOJ authorized the death penalty in the case in August of 2004.

10.    Judge Manella's denial of our previous motions for mitigation investigation seemed premised on the idea that she would give us time to investigate the case after the authorization. As a result of the delay, however, M.E. "Max" Hadley, who was a talented investigator, was no longer available to us.

11.    John Brock was a friend of mine who had recently retired from the Los Angeles Public Defender in 2004. After authorization, he was appointed as the mitigation specialist.

12.    Mr. Kadamovas was a Lithuanian national. I sought assistance from Lithuanian government officials to assist in the preparation of his defense and to raise objections to a capital prosecution. During the same trip in January of 2004,

Initial: _R P L_

3

IFCD002944

Ms. Brewer and I went to the Lithuanian embassy in Washington to request assistance. We were given no assistance from any official at the embassy.

13.    My contacts and communications at the Lithuanian embassy left a clear impression that the officials I met with were more concerned with not offending the government of the United States than in the welfare of Mr. Kadamovas. I also had contact with the Lithuanian Honorary Consul in Los Angeles. He was always very pleasant. On at least one occasion he met with Mr. Kadamovas in custody. He arranged for me to receive a document stating that Mr. Kadamovas had no criminal record in Lithuania.

14.    Jurijus Kadamovas met with me and other members of the defense team at the Metropolitan Detention Center (MDC). He was pleasant and cooperative. His understanding of English was limited and I had to take a Russian-speaking interpreter in order to communicate. He was very interested in reviewing the materials in the case, including the discovery. Because his English was extremely limited, review of the discovery was very difficult and time-consuming. Because the discovery was so voluminous, using a computer was the only realistic way to review the documents. In April of 2005 we were able to supply Juri with a computer, but his access was limited by the jail authorities.

15.    In late 2005, attorney Sonia Chahin was appointed as co-counsel with me, replacing Marcia Brewer. Ms. Chahin determined that the discovery in our possession was incomplete and also recognized how voluminous the discovery was. At the time, there was a July 2006 trial date set. I realized that Ms. Chahin could not possibly come up to speed in time for that trial date, particularly since I knew she was working on another federal murder case at the time. I felt confident,

Initial: RPL

4

IFCD002945

Ex. 10 pg.4 of 8

however, that Judge Manella would give her time to prepare and that the judge would continue our trial date.

16.     In February 2006 we filed a motion to continue the trial. Capital defendants are entitled to two counsel at trial in federal court. Unless the trial date was changed, I felt that Ms. Chahin would be unable to fully assist me, so Mr. Kadamovas would actually only have one attorney. The motion stated that we needed more time due to the "complexity of the case, the voluminous amount of discovery materials, . . . and the substantial investigation and preparation which must be done . . . prior to the Capital trial." Dkt. No. 2266, at 5. We were not ready to go to trial.

17.     I believe that Judge Manella would have given us time to prepare for trial, but Judge Tevrizian replaced her just after we filed the motion to continue. Judge Tevrizian was close to retirement and wanted to get the case done. He denied our motion to continue the case, and denied all our subsequent further requests for a continuance.

18.     Another reason why we needed a continuance in 2006 was because I needed additional time to meet with Mr. Kadamovas to discuss the evidence and the witnesses and Mr. Kadamovas needed time to review and understand the discovery. The MDC would not let him have sufficient time with the case materials. His lack of access to the materials, and the need to translate key portions of the discovery into Russian so that he could understand them, as well as my own inability to read Russian, made the process of conferring much slower than in a typical case.

Initial: P.N.C

5

IFCD002946

19. After our 2006 motion to continue was denied, I asked for reconsideration. The prosecution added to our predicament by delivering 4500 pages of new discovery. I argued to the court:

> . . . I haven't had the opportunity, nor has Ms. Chahin, to fully read, digest, absorb, and compare this material, which impinges upon my ability to have the factual background and knowledge of the case that the Government has. And I think it puts Mr. Kadamovas at a distinct disadvantage if both of his counsel have not had sufficient opportunity to review the materials. There're experts that we're still attempting to retain.
>
> I received from the Government -- I think on Thursday -- documentation about telephone calls and cell sites that they connected with. . . it's a large volume of material that needs to be read and understood and then discussed with various experts . . .

Tr. 6/26/06 at 5.

> [I]t's not just Ms. Chahin who hasn't had a chance to look at the materials. . . there are things that I have not sufficiently had the opportunity to review. And it put[s] Mr. Kadamovas at a tremendous disadvantage in terms of the Government.

Tr. 6/26/06 at 7.

At this time, the Krylov prosecution had been severed and a second trial was going to be necessary. The solution to the problem seemed obvious and I asked that Kadamovas be paired with Krylov to give us the time we needed to prepare. Judge Tevrizian denied that request. Ms. Chahin requested that she be relieved because she was unprepared for trial. Judge Trevizian denied that request as well.

20. Our continuance motion requested an additional 6 months. Had the continuance been granted I would have been more fully and properly prepared for trial. It also would have given Juri more time to review the discovery and the case

Initial: _ƒ𝑅𝑀_

6

IFCD002947

materials and contribute to the preparation of his defense. Ms. Chahin would have been more familiar with the discovery and the evidence against Mr. Kadamovas. The additional time might also have made a difference in our ability to bring the three mitigation witnesses from Lithuania who were prevented from testifying because they were denied visas.

21.    The codefendant Mikhel testified at trial and then refused to be cross-examined. Although the judge struck his testimony and instructed the jury to not consider it, no juror could have followed that instruction. The testimony severely damaged Juri Kadamovas in the eyes of the jury. The court refused to sever the case or grant a mistrial for Kadamovas after Mikhel's testimony.

22.    The other codefendant, Petro Krylov, was able to get his case severed and he was tried separately. He was able to get a life sentence.

23.    The conspiracy to escape charge was based on things that Mikhel did. Juri Kadamovas had nothing to do with the planned escape. Mikhel planned a second escape after he was transferred from the MDC.

24.    Based on the investigation we did, I thought that Juri's wife Jurate, sister Svetlana, and son Gabriel would have been strong mitigation witnesses at the penalty phase. They would have testified about the nature of Juri's service in the Soviet Army, his attempts to found legitimate businesses and his good qualities. I thought they might connect with the jury and humanize him. We planned for them to testify at the penalty phase.

25.    These three family witnesses did not testify because the government denied them visas to come to the trial.

Initial: _R̄ Ⱥ L_

7

IFCD002948

Ex. 10 pg.7 of 8

26.    I mistakenly thought that getting the three family witnesses to the United States would not be a significant problem. My belief was that we would get the funding for the witnesses to come, but only after the guilt phase verdicts. I assumed that getting visas would not be difficult and the government would help us. When Mikhel's team brought up their problems getting visas for their witnesses, I realized that getting the visas was a potential problem.

27.    Had we been able to present the testimony of the three family witnesses, in my opinion it would have influenced the jury's sentencing decision.

28.    It has been my experience, in other federal capital trial proceedings, that resource counsel, supplied by the federal death penalty project, are very helpful. In the Kadamovas case, resource counsel were not assigned to the Kadamovas defense team. As I recall, we had no project assistance during the trial or with the presentation to the DOJ. In my opinion Juri was at a significant disadvantage compared to other capital defendants. Because Ms. Chahin did not have sufficient time to review the discovery, and because resource counsel were not involved, we did not have the proper resources to defend the case. Rather than two prepared attorneys and an engaged resource counsel, we had no participating resource counsel and an attorney who was not ready when the trial started.

29.    I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this __*3*__ day of March, 2023, in Los Angeles, Calfornia.

_Richard Lasting_ (signature)

Richard P. Lasting

Initial: _R.AL_

8

IFCD002949

Ex. 10 pg.8 of 8