DECLARATION OF SONIA E. CHAHIN

I, Sonia E. Chahin, declare:

1.    I was admitted into the California State Bar in 1988. I served as a Deputy Federal Defender for the Central District of California from 1989 to 1991. In 1991, I went into private practice as an attorney, and qualified as a member of the CJA panel for court appointments in the Central District of California. Most of my cases at that time were court appointments in the Central District.

2.    In preparing this declaration, I have been supplied with some materials, including dockets, motions, and transcripts, so that I could be accurate with regard to dates, details, and quotations.

3.    Prior to my appointment as second counsel for Jurijus Kadamovas in 2005, I had not served as defense counsel in a trial where the government was pursuing the death sentence against my client. I had served as counsel in a handful of cases where the allegations made my client death-eligible, but the government had not authorized pursuit of a death sentence against my client.

4.    In 2004, I was appointed to represent Alejandro Martinez in a multi-defendant murder prosecution before Judge Anderson, *United States v. Martinez, et. al.*, 2:04-cr-00415. The docket entries for that case show that I was appointed to represent Mr. Martinez on August 20, 2004. Because the allegations made Mr.

Initial: _RC_

1

IFCD002797

Ex. 11 pg.1 of 11

Martinez death-eligible, Judge Anderson appointed attorney Amy Jacks as learned capital counsel for Mr. Martinez on September 27, 2004. A mitigation specialist, Angela Mason, was appointed on December 2, 2004, and began to work up the mitigation case. In September of 2005, the government opted not to pursue the death sentence against Mr. Martinez. Despite our arguments that the complexity and seriousness of the case warranted two attorneys, the court removed Ms. Jacks as my co-counsel on October 11, 2005, and I was left as sole counsel for Mr. Martinez. The indictment was superseded and the court set a trial date for May 30, 2006.

5.    In late 2005, I received a call either from Amy Jacks or from attorney Richard Lasting inquiring whether I would be interested in coming on to the Kadamovas case as second counsel. I was told that there were serious problems with Mr. Lasting's co-counsel Marcia Brewer and she needed to be replaced. Although I had never done a trial with Mr. Lasting, I knew him, knew his reputation, and considered him a capable trial attorney.

6.    At the time I was approached and asked to consider the Kadamovas case, the matter was before Judge Manella and a tentative trial date was set for July 11, 2006. I was concerned about the trial date because I learned that the Kadamovas case involved a huge amount of discovery. I was also concerned because of the

Initial: _RLC_

2

IFCD002798

upcoming trial date in the Martinez matter. Informally, I made some phone calls and tried to learn how firm the July, 2006 trial date was. I was told, and believed, that Judge Manella would give me enough time to come up to speed on the case and that the trial date would be continued. Had I known that the trial date was not going to be continued, I would not have taken the appointment on the case.

7.    On November 28, 2005, Judge Manella issued an order substituting me in place of Marcia Brewer as counsel for Jurijus Kadamovas. On December 7, 2005, I met with Mr. Kadamovas.

8.    After the meeting with Mr. Kadamovas, on December 7, 2005, I visited the Copy Pro location that was serving as the distributor of discovery on the case. I found the situation disturbing and Copy Pro unorganized. There was no inventory or reliable index. The Kadamovas defense team had no accurate list of the discovery produced by the government. I learned from the paralegal Chrissie Gits that the situation was very unorganized and we did not even know what portions of the discovery we had and what portions we didn't. Ms. Gits characterized the situation as a "nightmare." I brought the matter to Richard Lasting's attention and I was told that Marcia Brewer had been in charge of the discovery. I later learned that there were significant amounts of documentary and non-documentary discovery that the Kadamovas team did not have and had not reviewed.

Initial: _QEC_

3

IFCD002799

Ex. 11 pg.3 of 11

9. As I later noted in the motion to continue the trial date, upon appointment, I spent numerous hours organizing the discovery materials to ascertain whether all necessary discovery materials were included in the materials given to me by prior counsel. There was a substantial amount of material missing.

10. The amount of material in the case was enormous. In addition to the approximately 70,000 pages of documents that had been produced by late 2005 (later to be added to as the trial date approached), there were approximately 139 CD ROMS, 29 DVD's, 126 videotapes and 128 audiotapes. In early January, 2006, I learned that many of the CD ROMs and videos had not been ordered from Copy Pro. Review of the materials was also complicated by the amount of discovery in several foreign languages, primarily Russian. On January 10, 2006, we filed a motion to modify the pretrial motions schedule in which I pointed out that I had no real working knowledge of the materials in the case and was unable at that point to provide assistance to Mr. Lasting.

11. On February 14, 2006, we filed a motion to continue the trial date, asking Judge Manella to give us a continuance of six months from the July 11 date, and asking for a new trial date of January 9, 2007. At that time, I had only begun to review the discovery materials. We advised the court that defense counsel could

Initial: _____

4

IFCD002800

not be prepared by the trial date due to the sheer quantity of materials to be reviewed. In the motion to continue that I drafted, I explained:

> . . . even if defense counsel could somehow complete review of all of these materials prior to the July 11, 2006, trial date, there would be insufficient time for analysis of the materials, investigation and formulation of a theory of defense. A complete review of the discovery materials does not mark the completion of defense counsel's work, but rather the beginning. . . . Defense counsel's preparation cannot simply be limited to sitting in a room and reviewing the discovery materials. Adequate preparation requires that time be devoted to numerous tasks simultaneously. These other tasks including meeting with Capital Counsel, meeting with paralegals and investigators, meeting with potential experts, meeting with the client to review discovery materials and discuss case status, conducting investigation, preparing motions and other filings, as well as traveling to view crime scenes and other remote locations.

At the time we filed the motion to continue, Copy Pro had still not produced roughly 505 pages of discovery, 9 videotapes and 70 CD ROMs which had been requested in January. Thus, not only had we not reviewed the discovery, we did not even have the produced discovery in our possession.

12. In addition to grappling with the voluminous, missing, and unorganized discovery materials in the Kadamovas case, I was also spending many hours preparing for trial in the Martinez case.

13. On March 24, 2006, Judge Manella set a hearing date of May 1, 2006, for the motion to continue the trial. Codefendants Mikhel and Krylov joined in the

Initial: _SEC_

5

IFCD002801

Ex. 11 pg.5 of 11

motion to continue, the government opposed. On April 12, 2006, the case was transferred from Judge Manella to Judge Dickran Tevrizian.

14.     The motion to continue the trial was heard by Judge Tevrizian on May 3, 2006. I argued that I could not be prepared for trial and noted that had I known the extent of the discovery materials I would not have agreed to take the case. Judge Tevrizian denied our motion to continue. Subsequently, he denied our renewed requests to continue the trial and stuck to the July 2006 trial date. Judge Tevrizian was retiring from the bench and he made it clear that he intended to get the Kadamovas/Mikhel trial finished before he retired.

15.     During the summer of 2006, I was working a ridiculous amount of hours on the Kadamovas and the Martinez cases. I was under a great deal of pressure. Although I was diligent and working very hard, the amount of material that needed to be reviewed in the Kadamovas/Mikhel matter was far more than I could reasonably review, especially given my responsibilities in the Martinez case.

16.     Judge Tevrizian refused to continue the matter and was dismissive of our need for more time. When I explained that I would be in trial in the Martinez case when the Kadamovas/Mikhel trial started, Judge Tevrizian said that Mr. Lasting could handle the jury selection without me.

Initial:

IFCD002802

17. After a short continuance from the May 30 date, trial in the Martinez case began on June 21, 2006. On June 26, 2006, Judge Tevrizian again refused to continue the Kadamovas case, even though, at that point, codefendant Krylov had been severed and it was clear that there would be two trials. Knowing that I would not be prepared when the Kadamovas trial started, I asked to be relieved from my appointment as counsel. Judge Tevrizian denied my request to be relieved.

18. The Martinez trial took 25 court days and lasted through July. Verdicts were returned on August 1, 2006. I remained as sole counsel for Mr. Martinez through to his sentencing on November 20, 2006.

19. During August, while the jury was being selected in the Kadamovas trial, Richard Lasting would be conducting the voir dire in court while I was sitting at counsel table reviewing discovery and researching motions. Although I did review the questionnaires, I had little to no involvement in the in-court jury selection because I was desperately trying to review the case materials. I was simply unable to review the discovery in the case. I do not believe I was prepared for trial.

20. By nature, I was a very methodical attorney and would normally review the discovery carefully, then make my plan for investigation and assess the potential motions available, then make decisions regarding trial strategy. I never had the chance to do these things in the Kadamovas case. I felt like I was always behind,

Initial:

7

IFCD002803

and I was performing a type of triage, managing the immediate problem or issue without true insight or effective strategy. I never felt like I had a complete grasp of the evidence in the case, and felt like I was simply moving from one crisis to the next. I remember sitting there during the trial knowing that there was a ton of material I had never seen. It was a terrible experience.

21.     My work on the escape allegations provides an example. Given that this case involved abductions that resulted in death, I paid very little attention to the escape allegations prior to the trial. Well into the prosecution presentation, John Brock, who was working with us on the case, pointed out that the evidence that Mr. Kadamovas was involved in the escape planning was very weak and possibly vulnerable to attack. When the time came to prepare to cross-examine the government witnesses regarding the escape allegations, I reviewed the discovery regarding the escape carefully SeC for the first time, discovered facts new to me, and found that there were important statements missing.

22.     During the Kadamovas case, Richard Lasting was capital counsel, and he made all the important decisions in the case. He was lead counsel. I did the tasks that he assigned me. I respected him as an attorney, valued his experience, and recognized my role as being whatever he needed me to do.

Initial: SeC

8

IFCD002804

23.    Mr. Kadamovas was cordial and cooperative with me and the defense team. He seemed genuinely appreciative of my efforts.

24.    Mr. Kadamovas struck me generally as a follower, not the type of person who would have initiated the events that occurred. Based upon my observation of the dynamic between Mikhel and my client, but for his friendship with Mikhel, Kadamovas would never have been involved with this type of criminal activity.

25.    Mr. Kadamovas was very concerned about his ability to review the evidence. He was only allowed a limited amount of time to review the discovery due in part to the SAMs restrictions. He also struggled because he was a Russian speaker and had trouble reading English, and it was impossible to translate all of the many documents in the case. Mr. Kadamovas had a tendency to obsessively focus on a single small thing and it was sometimes difficult to move on and get him to focus on something else. He had fixations on things that I did not think were important.

26.    In the courtroom during the proceedings, Mr. Kadamovas was chained to his chair with a waist restraint. He could not physically stand. I think his ankles were shackled as well. He was able to use his hands and arms.

27.    Just prior to the testimony of Natalya Solovyeva, the government produced a copy of her journal in the original Russian. I remember Mr. Kadamovas had asked

Initial:

9

IFCD002805

me previously what had happened to Ms. Solovyeva's journal and I could not answer. The copy produced at trial was untranslated. I could not use it as a tool in cross-examination for the simple reason that the contents were a mystery. The government did disclose an English transcription of some select parts of the journal but I did not view this incomplete and suspect partial transcription as reliable or helpful.

28.    The failure of the court to grant a severance from Mikhel was extremely damaging to Mr. Kadamovas' case. The testimony of Iouri Mikhel was one of the most surreal experiences I have had in a courtroom. His testimony was absurd, almost insulting, and certainly angered the jurors. The prosecution stopped making objections after awhile because Mikhel's statements were obviously very damaging to his interests and, by association, very damaging to Mr. Kadamovas' interests. I feel it was utterly unfair to Kadamovas not to grant a severance or a mistrial after Mikhel's testimony. There was no chance that a jury could forget Mikhel's testimony or erase it from their minds.

29.    With regard to the penalty phase portion of the case, Mr. Lasting was in charge. My involvement in the penalty phase investigation and strategy was limited. Mr. Lasting took at least one trip to Lithuania. I did not go on that trip. I had no contact with my client's family members. The decisions regarding the

Initial: _____

IFCD002806

mitigation case, including which witnesses to call to testify and which witnesses not to call were entirely Richard's.

30.    After the trial, I took an extended period to recover, about seven months, from the stress of the trial. One of the reasons the trial was so stressful is that I simply did not have the time to completely review the discovery and investigation and I felt like, had I been able to do a complete review and proper investigation, I might have found a way to provide a better defense for Mr. Kadamovas.

31.    I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 23rd day of February, 2023, in Kaneohe, Hawai'i.

Sonia E. Chahin

Initial:

11

IFCD002807

Ex. 11 pg.11 of 11