# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CRIMINAL MINUTES - GENERAL

| | | | |
|---|---|---|---|
| Case No. | CR-02-00220(B)-SJO | Date | February 20, 2008 |

| | |
|---|---|
| Present: The Honorable | S. JAMES OTERO |
| Interpreter | Russian Interpreters: Alex Lebov and Ludmilla Genn |

| Victor Paul Cruz | Margarita Lopez | Susan J. De Witt<br>Robert E. Dugdale<br>Karen I. Meyer |
|---|---|---|
| *Deputy Clerk* | *Court Reporter/Recorder, Tape No.* | *Assistant U.S. Attorney* |

| U.S.A. v. Defendant(s): | Present | Cust. | Bond | Attorneys for Defendants: | Present | App. | Ret. |
|---|---|---|---|---|---|---|---|
| | | | | 5) Michael M. Crain and Terry J. Amdur | | X | X |
| 5) Natalya Solovyeva | X | X | | | | | |

**Proceedings:   SENTENCING**

In preparation for today's sentencing proceeding the Court has reviewed the following documents: The Court has reviewed the plea agreement, in particular the stipulated factual basis, which is exhibit A attached to the plea agreement.  The Court has read and considered the Presentence Investigation Report (PSR) with a notification date of 9/10/07.  The Court has reviewed several letters contained in the PSR submitted on behalf of the defendant.  The Court summarizes the letters as follows: The defendant submitted a letter on her own behalf.  There are also letters from the Russian Government.  The Russian Foreign Minister sent a letter to the Attorney General asking that the United States not seek the death penalty.  A second letter from the Russian Consulate requesting that the defendant not be given a life sentence.  The Court indicates that this letter is not particularly relevant because the defendant will not be sentenced to life.  The remaining letters attached to the PSR include letters from spiritual advisors and instructors attesting to the defendant's work, cooperation, and involvement while in custody.  The Court has also read and considered the confidential letter recommendation from the Probation Officer to the Court dated 10/09/2007.  The recommendation is without the benefit of the government's 5K1 motion, and the recommendation is life without the possibility of release.  The Court has read and considered the defendant's sentencing pleading, filed 11/10/2007 and  objections to the PSR.  The Court has read the government's position filed on 1/10/08.  The government concurs with the findings and conclusions in the PSR, and pursuant to the 5K1.1 motion, because of the defendant's substantial cooperation and assistance, the government requests that the Court depart from a level 43, to a level 32, and sentence the defendant to a term of 132 months, five years supervised release, and then restitution as mandated by statute.  The Court has reviewed the addendum to the PSR and the revision to the PSR which was disclosed 1/14/08.  The addendum addresses each of the objections raised by the defendant.  The Court has also considered  the government's supplemental submission regarding sentencing.  Attached to the government's submission, filed 2/12/08, the government has offered a letter from supervising F.B.I. Special Agent

TFSB20- 0004- 007127

Ex. 78 pg.1 of 71

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CRIMINAL MINUTES - GENERAL

Perez as Exhibit A.  The Court has carefully considered all of the issues addressed in said letter.

The Court reviews the PSR.  Defendant acknowledges that the PSR translated from English into Russian, and that she read it and understood it.  Defendant acknowledges that she also received the addendum to the PSR dated 1/14/08, and that is was also translated from Russian into English.  Defendant acknowledges that she had the opportunity to discuss the contents of the PSR with her counsel.  Counsel concurs.

The Court indicates that the record should reflect that the defendant  entered a plea of guilty to Counts One, Three, and Four of the Superseding Indictment.  Count One charged the following: Beginning on a date unknown and continuing until on or about February 19th, 2002, the defendant, along with the other named co-conspirators, conspired to seize and detain other persons, including Mr. Muscatel, Ms. Rita Pekler, Alexander Umansky, Mr. Kharabadze, and Mr. Safiev, and threatened to kill, injure and continue to detain the victims to compel third persons to pay money as a condition for the  release of the victims with the death of the victims resulting.  Count Three charged on or about January 20th, 2002,  the defendant, along with the other named defendants,  threatened to kill, injure and continue to detain and to compel Mr. Safiev to meet Mr. Kharabadze at a particular location where Mr. Safiev could be abducted so that Mr. Safiev's business associate would be compelled to pay ransom money as a condition for the release of Mr. Kharabadze.  The conspirators' act of seizing and detaining Mr. Kharabadze resulted in his death.  Count Four charged that on or about January 20th,  2002, the defendant, along with the other named defendants, threatened to kill, injure, and continue to detain him to compel Mr. Safiev's business associate to pay ransom money as a condition for the release of Mr.Safiev. Again, the conspirators' act of seizing and detaining Mr. Safiev resulted in Mr. Safiev's death.  The Court has considered the offense conduct detailed in the PSR.  The defendant has objected to various portions of the PSR which have been addressed in the addendum.  On page six of the PSR, the defendant has objected to paragraphs nine, ten, 11, and 12.  In reference to paragraph nine, the defendant objected to the extent it suggested that the defendant participated in the abduction of Ms. Pekler, and that has been corrected in the revised PSR.  The Court notes that in the stipulated factual basis attached to the plea agreement, the defendant admitted that she was aware of the abduction of Ms. Pekler and that she assisted in the detention of Ms. Pekler by dropping off the Nissan Quest to the location where Ms. Pekler was being held.  And also, she participated in that by washing the jeans of Mr.  Krylov.  Those jeans, according to the admissions in the plea  agreement and the evidence elicited at trial, Mr. Krylov had  blood on his jeans and she helped him remove that blood.  She also participated in that detention and abduction by locating Ms. Pekler's passport.  The defendant also objected to paragraph ten to the extent it suggests that the defendant had a role in the abduction of Mr. Umansky and also Ms. Pekler.  She also objected to paragraph 11 because it failed to specify which defendants were responsible for the acts enumerated in that paragraph.  Finally, defendant objected to paragraph 12 because references that she was enamored with Mr. Safiev's home, and defendant claims that she was not so enamored.  The Court indicates that the revised PSR has corrected the concerns regarding  the characterization of facts or alleged facts stated in the  PSR.  In reference to all of the other objections, that the facts that the Court relied on in determining the appropriate sentence for the defendant are the facts stipulated to in the plea agreement and also the evidence elicited at trial.

TFSB20- 0004- 007128

Ex. 78 pg.2 of 71

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES - GENERAL**

Accordingly, the Court declines to rule on any remaining objections that would remain after the revised PSR pursuant to 32(i)(3)(B) of the Federal Rules of Criminal Procedure. The defendant also objected to paragraph 19 because portions of it describe her providing food. Defendant denies delivering food or anything else to the Weslin house involving Mr. Kharabadze. The Court notes that on page 21of the stipulated facts the defendant admits that she actually delivered food to Mr. Mikhel's home. On page 22 of the stipulated facts she also admitted that she delivered food in reference to the person who was described as the Armenian who was kept at the location also. So she did participate at times in reference to delivery of food and drugs, and vehicles. The Court has reviewed all of the remaining paragraphs. Defendant objects to paragraph 25 because the defendant claims that she was only involved in the plan to abduct, not in physically killing or murdering the victims. The Court indicates she played an important role in their abductions. The Court finds that the defendant has accepted responsibility. The Court adopts the finding and conclusion in paragraph 21 that the November 1, 2006, guideline manual is the guideline manual that is to be used. The Court has reviewed the offense level calculations offered by the Probation Officer. The Probation Officer has determined that the combined adjusted offense level is 45. The defendant has accepted responsibility, so the total offense level is 42. As to Counts One, Three, and Four, the defendant has objected to the calculation in paragraph 39. The defendant argues that she qualifies for a minor role adjustment because she did not physically restrain, kill, or dispose of any of the bodies. The Court concludes that she is not a minor participant but not an organizer or leader, and therefore there would be no level increase for that role. The Court has considered the defendant's criminal history. The defendant has no criminal history other than the conviction in state court for the murders involved here, and those are not counted in her criminal history. The Court has reviewed the defendant's personal data. The Court has reviewed her financial condition. The Court has reviewed the mental and emotional health of the defendant. The Court finds that the defendant will not have the ability to pay any fines. The Court has reviewed the sentencing options. Restitution is mandated. The Court declines to rule on defendant's objection to paragraph 122 pursuant to 32(i)(3)(B).

In re defendant's sentencing position, defendant agrees with the ten-level departure pursuant to the government's 5k1.1 motion. The defendant requests, that there should be an additional two-level reduction for minor role. In the government's pleading it has requested that the Court depart ten levels from a level of 42 to a level 32 with a criminal history category I. The guideline range would be 121 to 151 months, and the government has requested 132 months. The F.B.I. Special Agent has attached a letter in support of the government's request.

The Court indicates that in sentencing the defendant that it is compelled to factor in considerations in the sentencing process, including all of the factors enumerated in Title 18 USC § 3235. The Court has the role of making sure that not only is the integrity of the 5(k) process maintained and the ability of the government to pursue these types of matters facilitated, but the Court has the duty to make sure that justice is accomplished, that the public sees or views the judicial system as one that will impose a just sentence, considering all the circumstances. The Court has the duty to make sure that the victims, the persons who are not here today because of the conduct of the defendants, have their say through the Court. These considerations are sometimes conflicting.

TFSB20- 0004- 007129

Ex. 78 pg.3 of 71

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES - GENERAL**

Government and defendant's counsel argue.

The defendant exercises her right of allocution.

The victims father, Reuven Umansky, addresses the court.

The Court indicates that it is not going to follow the government's recommendation. However, the Court is going to come off the sentence that it intended to impose at the urging of the government. The Court grants the government's 5K1.1 motion and will grant an eight-level reduction, placing the defendant in Criminal History Category I, with an Offense Level of 34, resulting in a guideline range of 151 to 188 months. The Court intends to sentence the defendant to 180 months.

The Court sentences the defendant as follows:

It is ordered that the defendant shall pay to the United States a special assessment of $300, which is due immediately.

It is ordered that the defendant shall pay restitution in the total amount of $725,245 pursuant to 18 U.S.C. § 3663A.

The amount of restitution ordered shall be paid as follows:

| Victim | Amount |
|---|---|
| George Safiev c/o Konstantinos Tezhik | $ 725,245 |

Restitution shall be due during the period of imprisonment, at the rate of not less than $25 per quarter, and pursuant to the Bureau of Prisons' Inmate Financial Responsibility Program. If any amount of the restitution remains unpaid after release from custody, nominal monthly payments of at least $50 shall be made during the period of supervised release. These payments shall begin 30 days after the commencement of supervision. Nominal restitution payments are ordered as the court finds that the defendant's economic circumstances do not allow for either immediate or future payment of the amount ordered.

The defendant shall be held jointly and severally liable with co-participants Iouri Mikhel, Jurijus Kadamovas, Petro Krylov, Ainar Altmanis, and Aleksejus Markovskis (Docket No. CR02-00220) for the amount of restitution ordered in this judgment.

Pursuant to 18 U.S.C. § 3612(f)(3)(A), interest on the restitution ordered is waived because the defendant does not have the ability to pay interest. Payments may be subject to penalties for default and delinquency pursuant to 18 U.S.C. § 3612(g).

TFSB20- 0004- 007130

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CRIMINAL MINUTES - GENERAL

The defendant shall comply with General Order No. 01-05.

All fines are waived as it is found that the defendant does not have the ability to pay.

Pursuant to the Sentencing Reform Act of 1984, it is the judgment of the Court that the defendant, Natalya Solovyeva, is hereby committed on counts one, three, and four of the second superseding indictment to the custody of the Bureau of Prisons to be imprisoned for a term of 180 months. This term consists of 180 months imprisonment on each of counts one, three and four of the second superseding indictment, to be served concurrently.

If released from imprisonment, the defendant shall be placed on supervised release for a term of five years. This terms consists of five year on each of counts one, three and four of the second superseding indictment, to be served concurrently under the following terms and conditions:

1.   The defendant shall not commit any violation of local, state or federal law or ordinance.

2.   The defendant shall comply with the rules and regulations of the U. S. Probation Office and General Order 318;

3.   During the period of community supervision the defendant shall pay the special assessment and restitution in accordance with this judgment's orders pertaining to such payment;

4.   The defendant shall comply with the immigration rules and regulations of the United States, and if deported from this country, either voluntarily or involuntarily, not reenter the United States illegally. The defendant is not required to report to the Probation Office while residing outside of the United States; however, within 72 hours of release from any custody or any reentry to the United States during the period of Court-ordered supervision, the defendant shall report for instructions to the United States Probation Office, located at the United States Court House, 312 North Spring Street, Room 600, Los Angeles, California  90012;

5.   The defendant shall not obtain or possess any driver's license, Social Security number, birth certificate, passport or any other form of identification in any name, other than the defendant's true legal name, without the prior written approval of the Probation Officer; nor shall the defendant use, for any purpose or in any manner, any name other than her true legal name;

6.   The defendant shall cooperate in the collection of a DNA sample from the defendant; and

7.   As directed by the Probation Officer, the defendant shall apply monies received

TFSB20- 0004- 007131

Ex. 78 pg.5 of 71

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES - GENERAL**

      from income tax refunds, lottery winnings, inheritance, judgements and any
anticipated or unexpected financial gains to the outstanding court-ordered financial
obligation.

The drug testing condition mandated by statute will be imposed because there is evidence in this case
that the defendant supplied controlled substances.

The Court advises the defendant of his right to appeal.

The Court recommends that the defendant be incarcerated in Southern California.

In the interest of justice the Court dismisses any underlying indictment(s).

|  | : | 1/39 |
|---|---|---|
| Initials of Deputy Clerk | vpc | |

TFSB20- 0004- 007132

Ex. 78 pg.6 of 71

## United States District Court
## Central District of California

| UNITED STATES OF AMERICA vs. | Docket No. | CR02-00220-(B)-SJO |
|---|---|---|

Defendant    SOLOVYEVA, Natalya

akas:    Natalia V. Adamova; Natalia Solovieva; Natalia Solovyeva; Natalja Solovyeva

Social Security No. 9  1  9  0

(Last 4 digits)

**JUDGMENT AND PROBATION/COMMITMENT ORDER**

| | MONTH | DAY | YEAR |
|---|---|---|---|
| In the presence of the attorney for the government, the defendant appeared in person on this date. | Feb. | 20, | 2008 |

**COUNSEL**    [x] WITH COUNSEL    Michael M. Crain and Terry J. Amdur, appointed

(Name of Counsel)

**PLEA**    [x] GUILTY, and the court being satisfied that there is a factual basis for the plea.    [ ] NOLO CONTENDERE    [ ] NOT GUILTY

**FINDING**    There being a finding/verdict of [x] GUILTY, defendant has been convicted as charged of the offense(s) of:

18 USC § 1203: Conspiracy to take hostages resulting in death as charged in count one of the second superseding indictment; 18 USC § 1203: Hostage-Taking resulting in death as charged in counts three and four of the second superseding indictment.

**JUDGMENT AND PROB/ COMM ORDER**    The Court asked whether defendant had anything to say why judgment should not be pronounced. Because no sufficient cause to the contrary was shown, or appeared to the Court, the Court adjudged the defendant guilty as charged and convicted and ordered that: Pursuant to the Sentencing Reform Act of 1984, it is the judgment of the Court that the defendant is hereby committed to the custody of the Bureau of Prisons to be imprisoned for a term of:

It is ordered that the defendant shall pay to the United States a special assessment of $300, which is due immediately.

It is ordered that the defendant shall pay restitution in the total amount of $725,245 pursuant to 18 U.S.C. § 3663A.

The amount of restitution ordered shall be paid as follows:

| Victim | Amount |
|---|---|
| George Safiev c/o Konstantinos Tezhik | $ 725,245 |

Restitution shall be due during the period of imprisonment, at the rate of not less than $25 per quarter, and pursuant to the Bureau of Prisons' Inmate Financial Responsibility Program. If any amount of the restitution remains unpaid after release from custody, nominal monthly payments of at least $50 shall be made during the period of supervised release. These payments shall begin 30 days after the commencement of supervision. Nominal restitution payments are ordered as the court finds that the defendant's economic circumstances do not allow for either immediate or future payment of the amount ordered.

The defendant shall be held jointly and severally liable with co-participants Iouri Mikhel, Jurijus Kadamovas, Petro Krylov, Ainar Altmanis, and Aleksejus Markovskis (Docket No. CR02-00220) for the amount of

CR-104 (11/04)    JUDGMENT & PROBATION/COMMITMENT ORDER    Page 1 of 4

TFSB20- 0004- 007133

Ex. 78 pg.7 of 71

USA vs.   **SOLOVYEVA, Natalya**                     Docket No.:   **CR02-00220-(B)-SJO**

restitution ordered in this judgment.

Pursuant to 18 U.S.C. § 3612(f)(3)(A), interest on the restitution ordered is waived because the defendant does not have the ability to pay interest. Payments may be subject to penalties for default and delinquency pursuant to 18 U.S.C. § 3612(g).

The defendant shall comply with General Order No. 01-05.

All fines are waived as it is found that the defendant does not have the ability to pay.

Pursuant to the Sentencing Reform Act of 1984, it is the judgment of the Court that the defendant, Natalya Solovyeva, is hereby committed on counts one, three, and four of the second superseding indictment to the custody of the Bureau of Prisons to be imprisoned for a term of 180 months. This term consists of 180 months imprisonment on each of counts one, three and four of the second superseding indictment, to be served concurrently.

If released from imprisonment, the defendant shall be placed on supervised release for a term of five years. This terms consists of five year on each of counts one, three and four of the second superseding indictment, to be served concurrently under the following terms and conditions:

1.  The defendant shall not commit any violation of local, state or federal law or ordinance.

2.  The defendant shall comply with the rules and regulations of the U. S. Probation Office and General Order 318;

3.  During the period of community supervision the defendant shall pay the special assessment and restitution in accordance with this judgment's orders pertaining to such payment;

4.  The defendant shall comply with the immigration rules and regulations of the United States, and if deported from this country, either voluntarily or involuntarily, not reenter the United States illegally. The defendant is not required to report to the Probation Office while residing outside of the United States; however, within 72 hours of release from any custody or any reentry to the United States during the period of Court-ordered supervision, the defendant shall report for instructions to the United States Probation Office, located at the United States Court House, 312 North Spring Street, Room 600, Los Angeles, California 90012;

5.  The defendant shall not obtain or possess any driver's license, Social Security number, birth certificate, passport or any other form of identification in any name, other than the defendant's true legal name, without the prior written approval of the Probation Officer; nor shall the defendant use, for any purpose or in any manner, any name other than her true legal name;

CR-104 (11/04)                     **JUDGMENT & PROBATION/COMMITMENT ORDER**                     Page 2 of 4

TFSB20- 0004- 007134

USA vs.   **SOLOVYEVA, Natalya**                                                    Docket No.:   **CR02-00220-(B)-SJO**

6.   The defendant shall cooperate in the collection of a DNA sample from the defendant; and

7.   As directed by the Probation Officer, the defendant shall apply monies received from income tax refunds, lottery winnings, inheritance, judgements and any anticipated or unexpected financial gains to the outstanding court-ordered financial obligation.

The drug testing condition mandated by statute will be imposed because there is evidence in this case that the defendant supplied controlled substances.

The Court advises the defendant of his right to appeal.

The Court recommends that the defendant be incarcerated in Southern California.

In the interest of justice the Court dismisses any underlying indictment(s).

The Court orders that a copy of the transcript shall be attached to this judgment.

In addition to the special conditions of supervision imposed above, it is hereby ordered that the Standard Conditions of Probation and Supervised Release within this judgment be imposed. The Court may change the conditions of supervision, reduce or extend the period of supervision, and at any time during the supervision period or within the maximum period permitted by law, may issue a warrant and revoke supervision for a violation occurring during the supervision period.

February 20, 2008                                          S. James Otero
_____                      _____
Date                                                            U. S. District Judge/Magistrate Judge

It is ordered that the Clerk deliver a copy of this Judgment and Probation/Commitment Order to the U.S. Marshal or other qualified officer.

Sherri R. Carter, Clerk

February 20, 2008                              By    Victor Paul Cruz
_____                      _____
Filed Date                                                    Deputy Clerk

CR-104 (11/04)                        **JUDGMENT & PROBATION/COMMITMENT ORDER**                        Page 3 of 4

TFSB20- 0004- 007135

Ex. 78 pg.9 of 71

USA vs.  **SOLOVYEVA, Natalya**                                  Docket No.:  **CR02-00220-(B)-SJO**

The defendant shall comply with the standard conditions that have been adopted by this court (set forth below).

### STANDARD CONDITIONS OF PROBATION AND SUPERVISED RELEASE

While the defendant is on probation or supervised release pursuant to this judgment:

1. The defendant shall not commit another Federal, state or local crime;
2. the defendant shall not leave the judicial district without the written permission of the court or probation officer;
3. the defendant shall report to the probation officer as directed by the court or probation officer and shall submit a truthful and complete written report within the first five days of each month;
4. the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;
5. the defendant shall support his or her dependents and meet other family responsibilities;
6. the defendant shall work regularly at a lawful occupation unless excused by the probation officer for schooling, training, or other acceptable reasons;
7. the defendant shall notify the probation officer at least 10 days prior to any change in residence or employment;
8. the defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any narcotic or other controlled substance, or any paraphernalia related to such substances, except as prescribed by a physician;
9. the defendant shall not frequent places where controlled substances are illegally sold, used, distributed or administered;
10. the defendant shall not associate with any persons engaged in criminal activity, and shall not associate with any person convicted of a felony unless granted permission to do so by the probation officer;
11. the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view by the probation officer;
12. the defendant shall notify the probation officer within 72 hours of being arrested or questioned by a law enforcement officer;
13. the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court;
14. as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics, and shall permit the probation officer to make such notifications and to conform the defendant's compliance with such notification requirement;
15. the defendant shall, upon release from any period of custody, report to the probation officer within 72 hours;
16. and, for felony cases only: not possess a firearm, destructive device, or any other dangerous weapon.

[x]  The defendant will also comply with the following special conditions pursuant to General Order 01-05 (set forth below).

### STATUTORY PROVISIONS PERTAINING TO PAYMENT AND COLLECTION OF FINANCIAL SANCTIONS

The defendant shall pay interest on a fine or restitution of more than $2,500, unless the court waives interest or unless the fine or restitution is paid in full before the fifteenth (15th) day after the date of the judgment pursuant to 18 U.S.C. §3612(f)(1). Payments may be subject to penalties for default and delinquency pursuant to 18 U.S.C. §3612(g). Interest and penalties pertaining to restitution , however, are not applicable for offenses completed prior to April 24, 1996.

If all or any portion of a fine or restitution ordered remains unpaid after the termination of supervision, the defendant shall pay the balance as directed by the United States Attorney's Office. 18 U.S.C. §3613.

The defendant shall notify the United States Attorney within thirty (30) days of any change in the defendant's mailing address or residence until all fines, restitution, costs, and special assessments are paid in full. 18 U.S.C. §3612(b)(1)(F).

The defendant shall notify the Court through the Probation Office, and notify the United States Attorney of any material change in the defendant's economic circumstances that might affect the defendant's ability to pay a fine or restitution, as required by 18 U.S.C. §3664(k). The Court may also accept such notification from the government or the victim, and may, on its own motion or that of a party or the victim, adjust the manner of payment of a fine or restitution-pursuant to 18 U.S.C. §3664(k). See also 18 U.S.C. §3572(d)(3) and for probation 18 U.S.C. §3563(a)(7).

Payments shall be applied in the following order:

1. Special assessments pursuant to 18 U.S.C. §3013;
2. Restitution, in this sequence:
      Private victims (individual and corporate),
      Providers of compensation to private victims,
      The United States as victim;
3. Fine;
4. Community restitution, pursuant to 18 U.S.C. §3663(c); and
5. Other penalties and costs.

---

CR-104 (11/04)                    **JUDGMENT & PROBATION/COMMITMENT ORDER**                    Page 4 of

TFSB20- 0004- 007136

USA vs.  **SOLOVYEVA, Natalya**                                      Docket No.:  **CR02-00220-(B)-SJO**

### SPECIAL CONDITIONS FOR PROBATION AND SUPERVISED RELEASE

As directed by the Probation Officer, the defendant shall provide to the Probation Officer: (1) a signed release authorizing credit report inquiries; (2) federal and state income tax returns or a signed release authorizing their disclosure and (3) an accurate financial statement, with supporting documentation as to all assets, income and expenses of the defendant. In addition, the defendant shall not apply for any loan or open any line of credit without prior approval of the Probation Officer.

The defendant shall maintain one personal checking account. All of defendant's income, "monetary gains," or other pecuniary proceeds shall be deposited into this account, which shall be used for payment of all personal expenses. Records of all other bank accounts, including any business accounts, shall be disclosed to the Probation Officer upon request.

The defendant shall not transfer, sell, give away, or otherwise convey any asset with a fair market value in excess of $500 without approval of the Probation Officer until all financial obligations imposed by the Court have been satisfied in full.

These conditions are in addition to any other conditions imposed by this judgment.

### RETURN

I have executed the within Judgment and Commitment as follows:

Defendant delivered on _____ to _____

Defendant noted on appeal on _____

Defendant released on _____

Mandate issued on _____

Defendant's appeal determined on _____

Defendant delivered on _____ to _____

at _____

the institution designated by the Bureau of Prisons, with a certified copy of the within Judgment and Commitment.

United States Marshal

_____          By _____

Date                                           Deputy Marshal

### CERTIFICATE

I hereby attest and certify this date that the foregoing document is a full, true and correct copy of the original on file in my office, and in my legal custody.

Clerk, U.S. District Court

By _____

CR-104 (11/04)                **JUDGMENT & PROBATION/COMMITMENT ORDER**                Page 5 of

TFSB20- 0004- 007137

USA vs.   **SOLOVYEVA, Natalya**                                    Docket No.:   **CR02-00220-(B)-SJO**

_____                              _____
Filed Date                                                Deputy Clerk

---

### FOR U.S. PROBATION OFFICE USE ONLY

Upon a finding of violation of probation or supervised release, I understand that the court may (1) revoke supervision, (2) extend the term of supervision, and/or (3) modify the conditions of supervision.

These conditions have been read to me. I fully understand the conditions and have been provided a copy of them.

(Signed) _____              _____
         Defendant                                Date


_____              _____
U. S. Probation Officer/Designated Witness        Date

TFSB20- 0004- 007138

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO: CR-02-220-(B)-SJO |
| | ) | |
| Plaintiff, | ) | CRIMINAL |
| | ) | |
| vs. | ) | Los Angeles, California |
| | ) | |
| NATALYA SOLOVYEVA, | ) | |
| | ) | Wednesday, February 20, 2008 |
| Defendant. | ) | (9:08 a.m. to 10:46 a.m.) |

SENTENCING RE GUILTY PLEA COUNTS ONE, THREE AND FOUR
OF THE SECOND SUPERSEDING INDICTMENT

BEFORE THE HONORABLE S. JAMES OTERO,
UNITED STATES DISTRICT JUDGE

Appearances:   (See next page)

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

EXCEPTIONAL REPORTING SERVICES, INC

TFSB20- 0004- 007139

Ex. 78 pg.13 of 71

2

APPEARANCES FOR:


The Government:               GEORGE S. CARDONA, ESQ.
                             Acting United States Attorney
                             THOMAS P. O'BRIEN, ESQ.
                             Assistant United States Attorney
                             Chief, Criminal Division
                             SUSAN J. DEWITT, ESQ.
                             ROBERT E. DUGDALE, ESQ.
                             KIM MEYER, ESQ.
                             Assistant United States Attorney
                             312 North Spring Street
                             Los Angeles, CA 90012

Also present:                Special Agent Louis Perez

The Defendant:               MICHAEL M. CRAIN, ESQ.
                             Michael M. Crain Law Offices
                             P.O. Box 3730
                             Santa Monica, CA 90408

                             TERRY J. AMDUR, ESQ.
                             Terry J. Amdur Law Offices
                             1939 Rose Villa Street
                             Pasadena, CA 91107

Court Recorder:              Margarita Lopez

Deputy Clerk:                Victor P. Cruz

Interpreter:                 Ludmilla Genn

Law Clerks:                  Tony Lopez
                             Andrew Gloger

Transcribed by:              Exceptional Reporting Services, Inc.
                             14493 S. Padre Island Drive
                             Suite A-400
                             Corpus Christi, TX 78418-5940
                             361 949-2988

TFSB20- 0004- 007140

3

Los Angeles, CA; Wednesday, February 20, 2008; 9:08 a.m.

(Interpreter utilized for translation)

(Call to Order)

THE CLERK:  All rise.

This is Item Number one, Case Number CR-02-00220(B)-SJO; *United States of America versus Natalya Solovyeva.*

Counsel, would you please state your appearances?

MR. DUGDALE:  Good morning, your Honor; Robert Dugdale, Susan DeWitt, and Kim Meyer on behalf of the United States of America.  And we're joined at counsel table by Special Agent Louis Perez of the FBI.

MR. CRAIN:  Good morning, your Honor; Michael M. Crain and Terry Amdur for Ms. Solovyeva.

THE COURT:  Good morning.

Okay, the matter is here for the purposes of sentencing.  Because of the nature of the matter, the Court will conduct sentencing with the defendant seated at counsel table, and counsel can remain at counsel table also.

THE INTERPRETER:  Excuse me, your Honor.  Interpreter cannot hear at microphone.

THE COURT:  Your microphone is on.  Are you able to hear now?

THE INTERPRETER:  No.

THE COURT:  No?

(The Court confers with the Clerk)

EXCEPTIONAL REPORTING SERVICES, INC

4

THE COURT:  The equipment should be tested before the Court takes the bench.

THE INTERPRETER:  Excuse me?

THE COURT:  The equipment should be tested before the Court takes the bench.

(Pause - Equipment is tested)

THE COURT:  Victor, can you assist, please?

THE CLERK:  Sir?

THE COURT:  Can you assist?

THE CLERK:  Yeah, I'm going to --

THE COURT:  Because Mr. Umansky is there, and he shouldn't be doing this.

THE INTERPRETER:  Will you try again, please?

THE COURT:  Yes.  Is it working?

(No audible response)

THE COURT:  Okay.

THE INTERPRETER:  Sorry.

THE COURT:  And we thank you, Mr. Umansky, for assisting in the operation of the equipment.

MS. DEWITT:  Multi-talented man.

THE COURT:  Again, the matter is here for purposes of sentencing.  The Court will conduct sentencing with the defendant seated at counsel table along with her attorneys.

In preparation for today's sentencing proceeding, the Court has reviewed various documents and pleadings.  I want to

EXCEPTIONAL REPORTING SERVICES, INC

5

make sure that I have covered everything.

The Court has again reviewed the Plea Agreement; in particular the factual basis, which is Exhibit A attached to the Plea Agreement; the stipulated factual basis.

The Court has read and considered the Presentence Investigation Report with a notification date of September 10th of 2007.

In the PSR, there were certain letters submitted on behalf of the defendant. The Court has reviewed each of those letters. The letters can be summarized as follows. The defendant submitted a letter on her own behalf. There are also letters from the Russian Government. The Russian Foreign Minister sent a letter to the Attorney General asking that the United States not seek the death penalty.

The Court has reviewed that letter; it's not relevant really to the proceedings today.

The second letter was from the Russian Consulate requesting that the defendant not be given a life sentence; again, not particularly relevant because the defendant will not be sentenced to life.

The remaining letters attached to the PSR include letters from spiritual advisors and instructors attesting to the defendant's work, cooperation, and involvement in custody.

The Court has also read and considered the confidential letter recommendation from the Probation Officer

EXCEPTIONAL REPORTING SERVICES, INC

TFSB20- 0004- 007143

6

to the Court dated 10/09/2007.  The recommendation is without the benefit of the Government's 5(k) motion, and the recommendation is life without the possibility of release.

The Court has read and considered the defendant's pleading, sentencing pleading, filed and dated 11/10/2007 and objections to the Presentence Investigation Report.

The Court has read the Government's position pleading dated January 10th, 2008.

The Government concurs with the findings and conclusions in the PSR, and pursuant to a motion that the Government has filed, 5(k)1.1, because of the defendant's substantial cooperation and assistance, the Government requests that the Court depart from a level 43 ten levels, to a level 32, and sentence the defendant to a term of 132 months, five years supervised release, and then restitution as mandated by statute.

The Court has reviewed the addendum to the Presentence Report and the revision to the Presentence Report which was disclosed January 14th, 2008.  The addendum in particular addresses each of the objections raised by counsel for the defendant.

The Court has also received and read and considered the Government's supplemental submission regarding sentencing of the defendant.  And attached to that Governmental submission which was filed February 12th, the Government has offered a

TFSB20- 0004- 007144

7

letter as Exhibit A, which is a letter from supervising Special Agent Perez, who's here in the courtroom.  And the Court has carefully considered all of the matters and issues addressed in that letter in the Government's supplemental pleading.

We start with the Presentence Investigation Report. I want to make sure that the defendant has an opportunity to review it.

Ms. Solovyeva, did you have an opportunity to have that report translated for you from English into Russian?

THE DEFENDANT:  I have read it and understood it.

THE COURT:  Would you speak into the microphone, please, as opposed to turning around and speaking to the interpreter?

(Ms. Solovyeva complies)

THE COURT:  And did you also receive the addendum to the report and the revision dated January 14th, 2008?

THE DEFENDANT:  Yes.

THE COURT:  And was that document also translated for you from Russian into English (sic)?

THE DEFENDANT:  Yes.

THE COURT:  And did you have the opportunity to discuss the contents of that document with your counsel?

THE DEFENDANT:  Yes.

THE COURT:  And do you feel that you've had enough time to discuss the addendum, the revised PSR, and the initial

EXCEPTIONAL REPORTING SERVICES, INC

TFSB20- 0004- 007145

8

PSR with your attorney?

THE DEFENDANT:  Yes.

THE COURT:  And does counsel believe that you've had enough time to consider the PSR and discuss it with your client?

MR. AMDUR:  Yes, your Honor.

MR. CRAIN:  Yes.

THE COURT:  Okay.  We'll start with the Presentence Investigation Report.  The record should reflect that the defendant, Ms. Solovyeva, entered a plea of guilty to Counts One, Three, and Four of the Superseding Indictment.

Count One charged the following:

Beginning on a date unknown and continuing until on or about February 19th, 2002, the defendant, along with the other named co-conspirators, conspired to seize and detain other persons, including Mr. Muscatel, Ms. Rita Pekler, Alexander Umansky, Mr. Kharabadze, and Mr. Safiev and threatened to kill, injure and continue to detain the victims to compel third persons to pay money as a condition for the release of the victims with the death of the victims resulting.

Count Three charged on or about January 20th, 2002, the defendant, along with the other named defendants, threatened to kill, injure and continue to detain and to compel Mr. Safiev to meet Mr. Kharabadze at a particular location where Mr. Safiev could be abducted so that Mr. Safiev's

EXCEPTIONAL REPORTING SERVICES, INC

9

business associate would be compelled to pay ransom money as a condition for the release of Mr. Kharabadze.

The conspirators' act of seizing and detaining Mr. Kharabadze resulted in his death.

Count Four charged that on or about January 20th, 2002, the defendant, along with the other named defendants, threatened to kill, injure, and continue to detain him to compel Mr. Safiev's business associate to pay ransom money as a condition for the release of Mr. Safiev.

Again, the conspirators' act of seizing and detaining Mr. Safiev resulted in Mr. Safiev's death.

The Court has considered the offense conduct detailed in the Presentence Investigation Report. The defendant, through counsel, has objected to various portions of the PSR which have been addressed in the addendum. On page six of the PSR, the defendant has objected to paragraphs nine, ten, 11, and 12.

In reference to paragraph nine, the defendant objected to the extent it suggested that the defendant participated in the abduction of Ms. Pekler, and that has been corrected in the revised PSR.

I would point out that in the stipulated factual basis attached to the Plea Agreement, the defendant admitted that she was aware of the abduction of Ms. Pekler; that she assisted in the detention of Ms. Pekler by dropping off the

TFSB20- 0004- 007147

10

Nissan Quest to the location where Ms. Pekler was being held. And also, she participated in that by washing the jeans of Mr. Krylov.

Those jeans, according to the admissions in the Plea Agreement and the evidence elicited at trial, Mr. Krylov had blood on his jeans and she helped him remove that blood. And she also participated in that detention and abduction by locating Ms. Pekler's passport. So, I think that probably better reflects her involvement in reference to Ms. Pekler.

The defendant also objected to paragraph ten to the extent it suggests that the defendant had a role in the abduction of Mr. Umansky and also Ms. Pekler.

And then she objected to paragraph 11 because paragraph 11 failed to specify which defendants were responsible for the acts enumerated in that paragraph.

And then finally, she objected to paragraph 12. In particular, paragraph 12 references that she was enamored with Mr. Safiev's home, and she claims that she was not so enamored.

I believe, and counsel could address this later, I believe the revised PSR has corrected the concerns regarding the characterization of facts or alleged facts stated in the PSR.

In reference to all of the other objections, the Court will make it clear that the facts that the Court relied on in determining the appropriate sentence for the defendant

EXCEPTIONAL REPORTING SERVICES, INC

TFSB20- 0004- 007148

Ex. 78 pg.22 of 71

11

are the facts stipulated to in the Plea Agreement and also the evidence elicited at trial, and so the Court would, for purposes of the record, decline to rule on any remaining objections that would remain after the revised PSR pursuant to 32(i)(3)(B) of the Federal Rules of Criminal Procedure.

The Court has continued with its review of the alleged facts in the PSR. Paragraph 19 the defendant objected to because portions of paragraph 19 describe her providing food. She denies delivering food or anything else to the Weslin house involving Mr. Kharabadze.

I would point out I think that's probably a fair concern on the part of the defendant, brought to the attention of the Court through counsel. I would, however, place on the record that on page 21 of the stipulated facts she admits that she actually delivered food to that location, the Weslin house location, in reference to Mr. Muscatel, who was also -- Well --

MS. DEWITT: I think, your Honor --

THE COURT: It was the other location.

MS. DEWITT: It's the other location, yes, your Honor.

THE COURT: She admitted that she delivered food and Demerol, which was a drug used to sedate certain of the victims, to -- not to the Weslin house location but to Mr. Mikhel's home. And then she admitted also on page 22 that she delivered food in reference to the person who was described as

EXCEPTIONAL REPORTING SERVICES, INC

TFSB20- 0004- 007149

12

the Armenian who was kept at the location also.  So she did participate at times in reference to delivery of food and drugs and vehicles.

The Court has reviewed all of the remaining paragraphs.

In reference to paragraph 25, the defendant has objected to paragraph 25.  Twenty-five reads:

Solovyeva was involved in the murders of at least two individuals.  The relatives of these individuals are also victims.  The defendant claims that she was only involved in the plan to abduct, not in physically killing or murdering Mr. Safiev or Mr. Kharabadze.  And I think that's probably a fair statement.  She did not pull the trigger, metaphorically speaking, but she was an important -- she played an important role in their abductions.

And the Court has reviewed the paragraphs on page nine regarding acceptance of responsibility.  The defendant has accepted responsibility, clearly.

We start with the sentencing process by the Court first considering the sentencing guidelines so the calculation should be done, especially in this proceeding.

The Court would adopt the finding and conclusion in paragraph 21 that the November 1st, 2006, guideline manual is the guideline manual that is to be used.

The Court has reviewed the offense level calculations

EXCEPTIONAL REPORTING SERVICES, INC

TFSB20- 0004- 007150

13

offered by the Probation Officer. The Probation Officer has determined that the combined adjusted offense level is 45. The defendant has accepted responsibility, so the total offense level would become 42.

As to Counts One, Three, and Four, the defendant has objected to the calculation in paragraph 39. The defendant believes, or counsel for the defendant believes, that she qualifies for a minor role adjustment because she did not physically restrain, kill, or dispose of any of the bodies, and she did not participate -- she claims that she did not participate; they would have been abducted in any event; the reference to Mr. Kharabadze and Mr. Safiev, I believe.

So again, metaphorically speaking, she did not pull the trigger in reference to any of the victims, but she did play a significant role in the abductions of Mr. Kharabadze and Mr. Safiev.

She helped plan the kidnapping of Mr. Safiev as early as July, 2002. When she participated in the planning of the kidnapping of Mr. Safiev, she knew, in the Court's view, that they would be killed because of all of the other information she had regarding prior murders, including statements made by her husband regarding murders that had taken place in other parts of the world, and then the clear evidence she saw in reference to the murder of Ms. Pekler.

Mr. Umansky, her knowledge of the abduction of the

EXCEPTIONAL REPORTING SERVICES, INC

TFSB20- 0004- 007151

Ex. 78 pg.25 of 71

14

person that has been described by the Government as being their minion.

And if we look also, in terms of her role in the abduction and planning of the murders of Mr. Safiev and Mr. Kharabadze, if we look at the Government's pleading in reference to Mr. Markovskis, and I'm referring to the Government's pleading of January 10th, 2008, entitled 'Government's Amended Position Regarding the Sentencing of Defendant Markovskis'.

On page 15 of that pleading, in reference to the conversation that Mr. Markovskis had with Mr. Kadamovas when they were at the Weslin house location where Mr. Safiev and Mr. Kharabadze were being held, Mr. Kadamovas told Mr. Markovskis that Ms. Solovyeva had found George Safiev.  In other words, the plan to abduct Mr. Safiev apparently was -- that issue was raised by her.  And Mr. Kadamovas tells Mr. Markovskis that she set the whole thing up, referencing his wife, and in return she was going to get a new car.

So, I think it's pretty clear from all of the testimony, including the admissions in the Plea Agreement and the Government's position regarding Mr. Markovskis, but for her involvement, Mr. Safiev and Mr. Kharabadze would probably be alive today.

So, in reference to paragraph 39, the defendant claims that she is entitled to a minor role adjustment because

EXCEPTIONAL REPORTING SERVICES, INC

TFSB20- 0004- 007152

Ex. 78 pg.26 of 71

15

she did not physically kill and the persons would have been killed in any event. And the Court disagrees. It's clear that she helped plan the kidnapping of Mr. Safiev as already mentioned. She was the lure who brought in Mr. Kharabadze. And when she lured in Mr. Kharabadze in order to secure Mr. Safiev, she knew both of them would be killed because of the prior history here.

So, the Court would just conclude that she is not a minor participant at all. She's at least an average participant and certainly not an organizer or leader, and therefore there would be no level increase for that role. But certainly she is not entitled to mitigating role adjustment.

So, the Court would conclude that the calculations in the PSR of 42, with the acceptance of responsibility, is the correct calculation.

The Court has also considered all of the other relevant conduct, offense behavior not part of the relevant conduct, I'm sorry, that's referenced in the PSR.

And the Court has considered the defendant's criminal history. She has no criminal history other than the conviction in state court for the murders involved here, and those are not counted in her criminal history.

The Court has reviewed the defendant's personal data. She was born October 7th, 1975, in Russia. She came to the United States in 1998 on a six-month tourist visa and

TFSB20- 0004- 007153

16

overstayed her tourist stay and remained in the country illegally.

The Court has reviewed her financial -- her alleged financial dependence on her husband. The Government has claimed -- I believe the Government claimed, but certainly the defendant claims, that she was financially dependent on her husband, Mr. Kadamovas, and somewhat vulnerable and emotionally dependent on him also.

I think there's probably some truth to that claim, but at the same time, I think it's clear from the evidence that the Court has that Ms. Solovyeva was motivated also by greed. She benefitted by the Weslin home that Mr. Kadamovas had purchased. She saw herself moving up in the world. According to the statement provided by Mr. Kadamovas to Mr. Markovskis, she was going to get a vehicle for the abduction of Mr. Safiev.

She helped assist in that abduction, beginning in July of 2001. I believe he was actually abducted in January of 2002, so there was a planning process that was involved there.

The evidence reflects that she benefitted also because there were certain monies that were transferred into joint accounts. In the trip that Mr. Kadamovas took with Mr. Mikhel I believe to Aspen, Colorado, he returned with a fur coat or a mink stole of some sort that she gladly took.

So, it's not simply that she's vulnerable financially; she was also enamored with the lifestyle that they

TFSB20- 0004- 007154

17

were living. I think that's a fair conclusion.

The Court has reviewed the mental and emotional health of the defendant referenced here. No obvious signs of physical dysfunction, which could be a mitigating circumstance, but nothing there.

In reference to substance abuse, she claims that she drank infrequently.

In reference to the supervised release, the Court is going to impose drug conditions because the evidence that was elicited at trial, and more importantly in the admissions in the Plea Agreement, is that she supplied Demerol, which is a controlled substance, to sedate the victim.

The Court has reviewed the employment history. The defendant would not have the ability to pay any fines.

The Court has reviewed the sentencing options. Probation is not in order; it's precluded. It wouldn't be in order in any event.

Restitution is mandated even though the plaintiff (sic) will not have the ability to pay the restitution that's mandated by law. Paragraph 121 references that the amount of restitution is $969,000. Because of the monies that have been recouped by the Government, that has to be reduced to $710,245; as was done with Mr. Markovskis.

Paragraph 122; the defendant has objected to paragraph 122. The defendant objects claiming that the offense

EXCEPTIONAL REPORTING SERVICES, INC

TFSB20- 0004- 007155

18

of conviction, which is Title 18, U.S. Code 1203, contemplates that death may result of the hostage and therefore a departure is not in order. That, the Court is going to decline to address that. It's just not important to the sentence today, and the Court would decline to rule on that pursuant to 32(i)(3)(B).

I think that covers in detail the Presentence Investigation Report. As referenced, the defendant has objected in the January 16th, 2008, filing.

I believe I've covered all the objections.

In the defendant's position pleading, the defendant agrees with the ten-level departure pursuant to 5(k) urged by the Government. The defendant requests, however, that there should be an additional two-level reduction for minor role. And, assuming that the Court granted the ten-level reduction, with the additional two-level, that would place the defendant in a sentencing guideline range of 97 months to 120, and the defendant urges the Court to impose a 97-month sentence.

I think the important issue that we need to address is the Government's supplemental pleading. In its supplemental pleading, the Government has again requested that the Court depart pursuant to 5(k) and urges the Court to depart ten levels from a level of 42. That would place her into a level 32 with a criminal history category of one. The guideline range would be 121 to 151 months, and the Government has

EXCEPTIONAL REPORTING SERVICES, INC

TFSB20- 0004- 007156

Ex. 78 pg.30 of 71

19

requested 132 months.  And the Special Agent has attached a letter in support of the Government's request.

And let me just make it clear that this Court has, in reference to Mr. Markovskis, has placed great weight on the fact of cooperation and great weight in terms of encouraging that behavior in the future.  At the same time, the Court is compelled to factor in other considerations in the sentencing process, including all of the factors enumerated in Title 18, 3235.

The Court has the role of making sure that not only is the integrity of the 5(k) process maintained and the ability of the Government to pursue these types of matters facilitated, but the Court has the duty to make sure that justice is accomplished; that the public sees or views the judicial system as one that will impose a just sentence, considering all the circumstances.

The Court has the duty to make sure that the victims, the persons who are not here today because of the conduct of the defendants, have their say through the Court.  And, as referenced by counsel for the Government, these considerations are sometimes conflicting.

And I understand the Government's position placing great weight on matters that will make prosecutions in the future easier for them, but at the same time, there are other considerations that the Court has to address.

EXCEPTIONAL REPORTING SERVICES, INC

TFSB20- 0004- 007157

20

Now, that being said, I will hear further from counsel for the Government regarding this issue.

I also want to stress, the Court has spent a lot of time considering the appropriate sentence in light of the Government's position pleading here, and I place great weight on the opinion of counsel for the Government.  They represented the Government extremely well during the course of the trial; and also great weight in the position of the FBI in terms of facilitating their work in the future; and in reference not only to the future but this case also.

So, I'll hear from counsel for the Government if that's not objected to by counsel for the defendant.

I also want to say a couple -- make a couple other points here.  I've discussed -- I've counseled with other Judges in this case, some very, very experienced Judges -- one colleague just down the hall -- and the opinions range, but nothing close to what is recommended by the Government.

And so we start.  But, the question I have is this: The Court has already sentenced Mr. Markovskis, and the sentence that the Court imposed was 180 months.  And I started that process by intending to -- early on intending to impose a sentence more severe than 180 months.

And in reference to the brief filed by the Government regarding Mr. Markovskis and the brief filed by the Government involving this defendant, I think it is clear that Mr.

EXCEPTIONAL REPORTING SERVICES, INC

TFSB20- 0004- 007158

21

Markovskis is less culpable than Ms. Solovyeva.

Is the Government -- Let me just find out what the Government's position is. Is the Government requesting that this defendant be sentenced to a period of time less than the time imposed involving Mr. Markovskis?

MS. DEWITT: Your Honor, we stand by the recommendations that we made with respect to both of the defendants. With all due respect to the Court, we don't agree with the sentence that was imposed for Mr. Markovskis. And I'm placed in the awkward position to say something different here because I don't believe that that sentence was appropriate, with all due respect to the Court, and I stand by the recommendation that we've made here with respect to Ms. Solovyeva.

I think that Mr. Markovskis and Ms. Solovyeva are, of all the participants that have been charged and convicted in this case, clearly the least culpable people involved. They had different involvement --

THE COURT: Well, let me --

MS. DEWITT: -- that can be measured in different ways and different mitigating factors.

THE COURT: I'm sorry. Let me just ask you this: Are you asking the Court to, through a procedure that may be utilized in the Federal Rules of Criminal Procedure, to correct the sentence or to modify the sentence of Mr. Markovskis?

EXCEPTIONAL REPORTING SERVICES, INC

22

MS. DEWITT: I believe that the recommendation that we made was -- I stand by the recommendation, and yes, I would encourage the Court to reconsider the sentence imposed for Mr. Markovskis. If it's the Court's position that he should be sentenced to something less than Ms. Solovyeva, yes, I would request it.

THE COURT: Well, one of the factors under 3553 is disparity in sentencing. And I think that you recognize and I recognize and probably everyone recognizes that Mr. Markovskis is less culpable. So, just in terms of disparity in sentencing, I don't think we should have a situation where Mr. Markovskis is sentenced to a term higher than Ms. Solovyeva.

MS. DEWITT: I very much appreciate that, your Honor, and I can't disagree with that, but I do also think that there are some different mitigating factors that might factor into that as well that relate to Ms. Solovyeva that may or may not relate to Mr. Markovskis.

Let me just say, your Honor, six years ago yesterday Mr. Mikhel and Mr. Kadamovas were arrested. It's taken us six years to get to this date, and, as the Court is well aware, we were successful not only in prosecuting those two very ruthless and cruel people, but in ultimately getting the death penalty against them, which is, frankly and unfortunately, very difficult to do in this jurisdiction.

One of the reasons that we were able to do that is

EXCEPTIONAL REPORTING SERVICES, INC

23

because of the cooperation not only of Ms. Solovyeva but of Mr. Markovskis, of Mr. Altmanis. The cooperation in this case is extraordinary by any measure, and the results were extraordinary, as is shown just historically by what has happened in this District.

I recognize, we recognize, the Government recognizes, the FBI recognizes that setting a sentence for these cooperators is extremely, extremely difficult. It's extremely difficult for us to do. It's not easy for us to get up here and ask for leniency for someone who has helped to commit these kinds of crimes. It just isn't. But we very, very carefully factored in, frankly, a combination of over a hundred years of experience on this case.

You know, each of us has spent more than five or six years going through this evidence. And it's not without incredible soul searching and painstaking deliberation that we came up with the recommendations. And I'm not saying that we know the exact number, because this is not an exact science. It's a very difficult process. But, those recommendations were made through a painstaking process, and that's all we wanted to bring to the Court's attention. It's not to suggest that we have any kind of greater ability to say the exact right number that the Court should impose.

There are a couple of things also that the Court said leading up to this that I just want to address very briefly,

EXCEPTIONAL REPORTING SERVICES, INC

TFSB20- 0004- 007161

24

because I think that they're not completely -- maybe not completely accurate in the sense of the full picture of Ms. Solovyeva.

One of the things is that in order to get the death penalty against Mr. Kadamovas, one of the things that was really important to be able to bring to the Jury's attention was his full character, his full participation, his full nature. And one of the important people that could do that was Ms. Solovyeva.

It would have been very easy for Mr. Kadamovas to say, 'I was just following along with Mr. Mikhel. I was just following his lead. He was this evil, horrible person, and I was' -- And there was some evidence to suggest that might be true. We didn't believe it was true. But it was through Ms. Solovyeva's testimony about how he treated her and what kinds of decision-making that he was involved in and what she was able to observe. And that, coupled frankly with what Mr. Markovskis was able to bring to the table in terms of the things that Mr. Kadamovas said, that we were able to paint for the Jury a much more honest and full picture of Mr. Kadamovas' role as being a co-equal participant with Mr. Mikhel. And that was an amazingly significant, I think, factor in getting the ultimate sentence that we were able to get with respect to Mr. Kadamovas.

With respect to Mr. Mikhel, you had to look at the

EXCEPTIONAL REPORTING SERVICES, INC

25

whole panoply from all of the testimony from all three of the cooperators, and probably in his respect, much more significant was Mr. Altmanis.

The second thing that the Court noted here that I think is really not a fair characterization of Ms. Solovyeva, and that is that she was motivated by greed. There's no argument that she benefitted in some way from each of these crimes. There's no question about that, and I don't think she would deny that. She did get gifts. She did get a house. She did get, you know, those benefits. But there is absolutely no evidence that she had any control over any of those things.

THE COURT: How about the statement I mentioned from Mr. Kadamovas when he had the conversation at the Weslin house talking to Mr. Markovskis, and he said that she had found Mr. Safiev and helped set -- And this is your -- I'm just quoting the Government --

MS. DEWITT: Sure.

THE COURT: -- helped set up the whole thing. In return, she was going to get a new car, and she knew that they were going to be dead.

MS. DEWITT: There are a couple of important, I think, distinctions that need to be -- finer points that need to be made about that statement.

First of all, there's no question that Ms. Solovyeva is the person who brought Mr. Safiev to their attention.

EXCEPTIONAL REPORTING SERVICES, INC

TFSB20- 0004- 007163

26

There's no denying that, and I don't think she'll deny that. The question is: When did she know that they were targeting him? And it's clear by all the evidence that we had that she did not know that they were targeting him in July.

She did not --

THE COURT: Her husband said she planned the whole thing; set the whole thing up.

MS. DEWITT: Her husband said that she was the one that brought Mr. Safiev to their attention. Don't deny it; I don't think she'll deny it. At some point, she began to gather information for them. Later on -- And she doesn't deny that and we don't deny that. And that information was important. It's also clear that they got additional information from other sources.

Now, his characterization of her involvement in this is frankly ridiculous. Yeah, she brought him to their attention, but who planned this? Mr. Kadamovas and Mr. Mikhel planned this. Who brought her into this? Mr. Kadamovas and Mr. Mikhel brought her into it. Who brought Mr. Markovskis into this? Mr. Mikhel and Mr. Kadamovas did.

Yes, her role was important. There's no question about that, and I'm not suggesting otherwise. But to suggest that she somehow was the mastermind of it I think is unfair, because I think the reality is she brought the name to their attention and then they took it from there.

EXCEPTIONAL REPORTING SERVICES, INC

TFSB20- 0004- 007164

27

THE COURT: Let's have an exchange, please.

She -- They targeted Mr. Safiev in July of 2001. He was actually abducted in January of 2002, is that correct?

MS. DEWITT: That's right, but I don't believe that there's evidence that they began targeting him at that point. What we have is evidence that she actually went to the house and took a videotape of his house. There's no evidence that Mr. Kadamovas even saw that.

THE COURT: I'm sorry, she went to the house on seven occasions, according to the pleadings.

MS. DEWITT: Absolutely. Don't deny that.

THE COURT: She -- He wanted her to provide information on Mr. Safiev. She took a camera to that location. At trial, she testified that she took the camera to simply film her children.

MS. DEWITT: That's all correct.

THE COURT: I frankly found that difficult to accept considering the sophistication of this group. She was using that camera, from the Court's point of view, to surveil the location and provide further information to Mr. Kadamovas regarding Mr. Safiev's home. But apart from that, she was going to get a BMW.

When she agreed to lure Mr. Kharabadze, she knew that Mr. Muscatel had been murdered. Her husband had told her that he had committed a murder in Cyprus. She knew Ms. Pekler had

TFSB20- 0004- 007165

28

been murdered. She knew Mr. Umansky had been murdered. She knew this person was going to be killed.

MS. DEWITT: And she admitted that, your Honor. She knew that -- not for certain -- but she admitted that she knew that there was a very good chance that both of these individuals were going to end up dead. And I don't -- I'm not standing here trying to excuse that behavior or to explain that behavior, but I do think it's important to set it into context.

What we have here is a person -- And I respectfully disagree that she knew when she went to film that house that that's why. But that's, you know, there's no evidence to support that. There is no testimony from Mr. Altmanis or Mr. Markovskis that that was what they were planning on doing at that date.

There's no question in my mind -- Well, I would like to think that nobody would be stupid enough to film themselves and their child in a place if they knew at the time that that's the reason for it.

THE COURT: Counsel --

MS. DEWITT: She would have made sure she wasn't in the film and that her kids weren't in the film.

THE COURT: Counsel, Mr. --

MS. DEWITT: But putting that aside --

THE COURT: Counsel, look, Mr. Mikhel -- This was a very sophisticated group, but they made some horrendous errors,

TFSB20- 0004- 007166

29

including Mr. Mikhel using the credit cards to go to the ATMs and having his picture taken.  Not a very sophisticated thing to do.  So, they planned well but they also made some incredible mistakes is my point here.

MS. DEWITT:  No question.  That's how criminals get caught.

THE COURT:  Including the filming.

MS. DEWITT:  And there's no question that the film was a mistake.  But my only point is, your Honor, is I don't believe that's why that film was taken at that time.

I don't deny that at some point Ms. Solovyeva knowingly helped gather information that was an important part of the later abduction and the resulting murders of Mr. Kharabadze and Mr. Safiev.  On that point you and I are in complete agreement.

The only issue that I take is that I think her knowledge of what she thought was going on, what she suspected was going on and whether she was intentionally helping, that evolved over time, and it got to a point where it was inexcusable.  But that's not where it started, and that's the only point that I'm making.

And I'm not trying to excuse her behavior.  I'm just trying to put it in context of the evolution that I think she underwent.

THE COURT:  Okay.  Let me just see if I can

EXCEPTIONAL REPORTING SERVICES, INC

TFSB20- 0004- 007167

30

understand the Government's position here.  The Government --

And I respect the issue regarding substantial assistance and

need for it.  I'm one hundred percent in agreement.

The Government -- The defendant has pled to certain

Counts that require her to spend the rest of her life in prison

without the possibility of release.  She wasn't a volunteer in

terms of providing the information to the Government.  She made

a decision in her best interest.  She understood through

counsel that if she cooperated with the Government, there was a

substantial chance that she was going to be able to see the

light of day.  Without that cooperation, she was going to

remain in custody the rest of her life.

So this is not a person who says, 'You know, I need

to come forward.'  She did it in her own interest.

Now, the Government has recommended 132 months.  If I

do the math here, she serves 85 percent of her time.  She will,

assuming that she serves only 85 percent of her time, that

comes out to 112 months.  That means she does 9.3 years.  She

has already served six years in prison.  She gets out in

another three for being responsible for the murder of two

persons?  Explain that.

MS. DEWITT:  First of all, your Honor --

THE COURT:  How is that justified under the law?

MS. DEWITT:  Because of the substantial assistance

that she provided.

EXCEPTIONAL REPORTING SERVICES, INC

TFSB20- 0004- 007168

Ex. 78 pg.42 of 71

31

THE COURT: And if she didn't provide that assistance, she would be in there the rest of her life.

MS. DEWITT: There's no question about that.

THE COURT: Okay.

MS. DEWITT: I can't argue with that.

THE COURT: So that substantial assistance --

MS. DEWITT: That's assuming that we would have been able to convict her, first of all; assuming that we would have been able to prove, which I think is in question, her knowledge, because all the information that we have about her knowledge and her state of mind came from her own statements, your Honor. And there's a certain level of inherent unfairness to hold somebody accountable for something greater than what you would have been able to prove had you just gone straight to trial with them.

And I'm not saying that she shouldn't accept responsibility for that, but she has. But I think that the Court should take that into consideration.

Anything we know about her state of mind, and most of the things we know about what she suspected over time, is based upon her own statements. And if you penalize defendants who come forward and cooperate by telling you stuff that you might not have otherwise known, it creates a problem.

THE COURT: Counsel, we're not here to penalize her. I think we're on the same side there. She is going to be

EXCEPTIONAL REPORTING SERVICES, INC

TFSB20- 0004- 007169

32

rewarded.  The question is: What reward does she receive?  You want her to walk in three years for being responsible for the murder of two individuals and --

MS. DEWITT:  I want her --

THE COURT:  -- assisting in the detention of the rest.

MS. DEWITT:  Let me just say I think it's a little unfair to talk about three years.  She was arrested in 2002.

THE COURT:  I understand.

MS. DEWITT:  So the fact that it took us six years to get this case to this point should not be something that's held against Ms. Solovyeva or Mr. Markovskis.

THE COURT:  Counsel, I'm not holding it against her.

You want a sentence of 9.3 years for the murder of two people.

MS. DEWITT:  I want a sentence of 132 months, and I want her, like any other defendant, to earn or not earn her good time credits.  I don't calculate my sentence recommendations based upon good time credits, but if that's the way the Court sees it, then yes, that's what I'm recommending, because I'm actually fairly optimistic that Ms. Solovyeva will behave herself in custody and will continue to try to reform herself, so she probably will get those credits.

THE COURT:  Okay.  Anything further?

MS. DEWITT:  I want to make one other point, your

EXCEPTIONAL REPORTING SERVICES, INC

TFSB20- 0004- 007170

33

Honor, and that is that -- Because I don't think that this is something that was fully developed in the record of this Court before you because Mr. Kadamovas was not a part of the trial before you. And that is I don't know that I captured this adequately in my papers, so this is my fault.

It is an appreciation for just how incredibly cruel and controlling Mr. Kadamovas was. For example, we have a wiretap conversation in which there are discussions between Ms. Solovyeva and Ms. Karogodina talking about how Mr. Kadamovas at a party had gotten drunk and basically threatened her and almost broke her hand. There's evidence like that. And there's other evidence to suggest how manipulative and how controlling he is, and that's something that I think perhaps I should have done a better job of explaining to the Court, because that's not evidence that came in during our trial because Mr. Kadamovas was not a part of that trial directly.

I think you have to take that relationship into consideration as well. Not an excuse, not a justification; but just one of the additional factors in mitigation that doesn't necessarily apply to the other cooperators in this case.

THE COURT: Just a couple more comments.

Look, I understand that on the federal side, because of the nature of the prosecutions, it's often very difficult to secure a death verdict. On the state side, it's not. It really comes down to the horror involved in the criminal acts.

EXCEPTIONAL REPORTING SERVICES, INC

34

And if you have horrific conduct, such as in this case, the Jury most often, with the people who metaphorically pulled the trigger, will return a verdict of death. We have 600 on death row in California. It's done all the time.

MS. DEWITT: I understand that, your Honor, and just to --

THE COURT: So, in reference to the two main defendants here, those are clearly death penalty cases; clearly death penalty cases.

MS. DEWITT: And let me just emphasize, your Honor, one last point. I don't mean to interrupt you, but I understand, and I don't mean any disrespect in taking the position that we're taking here. I understand this is a very, very difficult decision for anybody to make as well as your Honor, and we respect the decision that you're going to make. I just want to make sure that you are fully apprised of the facts to the best of my ability.

So, thank you, your Honor, for taking the time.

THE COURT: I think you've done that to the best of your ability. Thanks.

May I hear from defense counsel?

MR. CRAIN: Yes, your Honor. Thank you.

Your Honor, I'm sure it's no surprise to the Court that, except for the exact amount of time which we're asking the Court to impose which has been set forth in Mr. Amdur's

EXCEPTIONAL REPORTING SERVICES, INC

TFSB20- 0004- 007172

35

pleadings, we're in complete agreement with the Government as to their view of Ms. Solovyeva, her role in the case, and what the fair and appropriate sentence should be.

I'd like to say to the Court, we don't know each other. I've been in this business, your Honor, for 38 years, both in the state and federal court. I've tried death penalty cases in both courts. I've handled thousands and thousands of defendants, and I think I have a pretty good handle on how to size up a defendant. And I've seen a lot of really bad people who deserve very severe punishments, and I've seen others who have found themselves in predicaments where, yes, they committed an offense, they were involved in some sort of criminal activity, but they are different than the other type of defendant that I see.

And this is not a case where anyone here is seeking to offer legal excuses. What we're talking about is mitigation. And I think as a member of the defense Bar since 1970, your Honor, that I'm sure the Court -- I'm not telling the Court anything you don't know, but let me just say it anyway. The Government, in its determination that it needs people to cooperate, that's also a factor that enters into the decision-making process of any defense attorney, and it certainly entered into our evaluation and recommendations and advice to Ms. Solovyeva as to how we should deal with this case.

TFSB20- 0004- 007173

36

This was a tryable case as to Ms. Solovyeva. As Ms. DeWitt has pointed out, Ms. Solovyeva, in her complete candor with the Government and with the Jury, admitted to things that she didn't have to, and without those admissions, the Government's case, had it gone to trial, would have been in a much different posture than if the evidence that was heard from her lips on the witness stand and during the proffer sessions had been available to be offered against her, which it was not.

But nonetheless, after great consideration about what we should recommend to Ms. Solovyeva that she do, we reached a decision. And the Court can scoff at this; that it was in her best interest and so forth. Well, that's always the case, your Honor.

In any case where a defendant elects to cooperate with the Government, certainly there's going to be a consideration of self-interest. No cooperator does not think of that. It would be contrary to human nature to simply say that all cooperators are simply doing it because they want to receive a good citizenship award.

But, be that as it may, the defense Bar also, in advising defendants whether or not to become a cooperator with the Government, has to take into consideration what is going to happen to that person. And so all we can do is make a decision, give them advice -- It's ultimately their decision, not ours -- and to be truthful and to assure them that if you

EXCEPTIONAL REPORTING SERVICES, INC

TFSB20- 0004- 007174

37

cooperate and if you are truthful on the witness stand, you will receive a fair and just sentence.

And although the two sides are somewhat apart on what we think a fair and just sentence is, we're not that far apart. And I think any sentence in excess of the Government's recommendation, your Honor, with all respect to the Court, based on Ms. Solovyeva, who she is as a person and what she actually did in this case --

THE COURT: She killed two people.

MR. CRAIN: Well, she -- Your Honor, as the Court pointed out repeatedly, and I was here for Mr. Markovskis's sentencing. And let me just say parenthetically, I think people can differ about this. I personally think that Mr. Markovskis is more culpable than Ms. Solovyeva.

Ms. Solovyeva did not, nor did he, physically kill anyone, but she did not engage in any physical conduct. She did not restrain people, as did Mr. Markovskis. She did not keep watch over them so they couldn't escape prior to being transported to the lake. She didn't do those kinds of things.

So, from a personal point of view, and from my analysis of this case, and I've been on this case since 2002, as has Mr. Amdur, we don't think that Mr. Markovskis is less culpable, and we don't think that Mr. Markovskis -- that Ms. Solovyeva should receive a greater sentence than Mr. Markovskis.

EXCEPTIONAL REPORTING SERVICES, INC

TFSB20- 0004- 007175

38

And for what it's --

THE COURT: That Ms. Solovyeva should not receive a greater sentence than Mr. Markovskis?

MR. CRAIN: She should receive a lesser sentence --

THE COURT: Okay.

MR. CRAIN: -- is what I mean to say.

THE COURT: We just disagree.

MR. CRAIN: Well, we do, and you're the Judge, obviously, but I do want to tell the Court that.

And for what it's worth, the Court mentioned that there is a parallel case that was settled with the District Attorney's Office arising out of this, and the Court has stated that the District Attorney agreed that both defendants, Mr. Markovskis and Ms. Solovyeva, receive an eight-year sentence. And it was evaluated by very experienced, high-level District Attorneys, and I know the Court has a great deal of state court experience. So, that's how others have seen the case.

But whatever Mr. Markovskis' position may be, I'd like to say one thing, because his name also came up in the context of purported conversations between Mr. Kadamovas and Mr. Markovskis.

And I completely disagree with any credence being given to any statement that Mr. Kadamovas purportedly made. I mean, Mr. Kadamovas is not only everything that Ms. DeWitt said that he is; he's a completely evil, despicable person. And to

EXCEPTIONAL REPORTING SERVICES, INC

TFSB20- 0004- 007176

39

use some out-of-court conversation that supposedly transpired between Mr. Kadamovas and Mr. Markovskis, where the source of information about Ms. Solovyeva's apparent role is coming from, that I don't think is appropriate and fair.

And as a matter of fact, your Honor --

THE COURT: It was in the Government's brief.

MR. CRAIN: I'm saying that Mr. Kadamovas could say that Ms. Solovyeva was Charles Manson's right-hand person, and they would have about as much credibility as any statement that he might have made about her role in the case.

This Court heard one trial, and she testified at two trials, and the facts are as Ms. DeWitt says.

With regard to her involvement in the abduction of Mr. Kharabadze, I have talked to the lady who was not called as a witness in the case, but Larissa, who was the woman who Ms. Solovyeva went to Mr. Safiev's house so that their children could play together; they were friends. I don't believe there was ever any evidence that Mr. Kadamovas ever saw this video, your Honor, that the Court has placed emphasis on.

But in any event, her reasons for going there during the summer were exactly as has been represented by the Government. They were wholly innocent and they had nothing to do with her masterminding some plot or having any part in some plot to target Mr. Safiev on behalf of Mikhel and Kadamovas.

And in addition, the Court made a comment, and with

TFSB20- 0004- 007177

40

all respect to the Court please, but that without Ms. Solovyeva, that the defendant, the lead defendants Mikhel and Kadamovas, would not have succeeded with Kharabadze and Safiev. And I respectfully disagree with that. There's no reason to believe that. Mikhel was a highly skilled, one of the most amazingly astute -- even though he got caught, as criminals generally do -- but one of the most skilled and sophisticated defendants I've ever seen. There's no reason to believe that had Ms. Solovyeva not made that phone call that, as the Court said, Mr. Kharabadze and Mr. Safiev would be alive today. I just disagree with that.

THE COURT: Well, they had made several attempts to try to capture Mr. Safiev, including kidnapping Ms. Pekler and murdering her, and that didn't work.

MR. CRAIN: That's true, your Honor, they did.

THE COURT: And they had talked about staging a traffic accident to secure him. They had talked about using Mr. Krylov to sell various equipment to him. They considered a home invasion. The FBI was on the case at this time because of the Umansky murder.

MR. CRAIN: I agree.

THE COURT: And but for the fact that she lured these two individuals to that location, they would probably be alive today.

MR. CRAIN: Well, I respectfully disagree because

EXCEPTIONAL REPORTING SERVICES, INC

41

although it's true, your Honor, I --

THE COURT: Well, Counsel, I expect you to disagree. You're Counsel for your client. I expect it.

MR. CRAIN: Well, I'm not only -- I'm her Counsel but I'm stating what I believe from the heart, too, your Honor, which I generally try to avoid doing in my representation of someone but nevertheless, these two men, Mikhel and Kadamovas, although, yes, they had other ideas and other schemes that they had concocted to try to get a hold of Kharabadze and Safiev. Safiev had an office in Santa Monica. Kharabadze was a man about town frequently seen in restaurants all over the place. It does not strain the imagination at all to think that had this phone call not been made that they would have found some other means of hooking up with these guys even though their previous few plans had not come to fruition.

THE COURT: They didn't want Kharabadze. They wanted him only to secure Mr. Safiev. Kharabadze, yes, could easily have been abducted. Mr. Safiev was far more difficult and --

MR. CRAIN: Well, he did have an office in Santa Monica where he frequently was at work and so he was not all -- he was not hiding in a cave somewhere where he couldn't be reached. He was a public man.

THE COURT: Any other comments or any other matters regarding the PSR that you would like to address?

MR. CRAIN: The Government's 5K1 Motion, your Honor,

TFSB20- 0004- 007179

42

I think accurately sets forth Ms. Solovyeva's role in this case. The Court mentioned the Pekler incident and as the Government has stated in the 5K1 Pleading, she was not aware prior to the abduction of Ms. Pekler that this had taken place. So I did want to say some things about --

THE COURT: She was not aware of the abduction of Ms. Pekler? Was that your point?

MR. CRAIN: Can I step over here for just a moment?

THE COURT: Yeah, please.

MR. CRAIN: It says on Page 17 of the 5K1 Motion that she was not aware that Ms. Pekler had been abducted and murdered until after the fact.

THE COURT: Well, until after the fact. Yeah, but she was aware that --

MR. CRAIN: Yes. That's what I meant. I thought that's what I said. I'm sorry.

THE COURT: She -- and when -- from Mr. Muscatel and the other occurrences, she was aware that if somebody was kidnapped, they were likely to be murdered is the point. And after Ms. Pekler was murdered, she assisted in washing the blood off of the jeans of Mr. Krylov, as I recall.

MR. CRAIN: As I stated, we agree with the Government's factual assertions with regard to Ms. Solovyeva's role as they're set forth in the 5K1 Motion that the Government filed in relation to her.

EXCEPTIONAL REPORTING SERVICES, INC

TFSB20- 0004- 007180

43

THE COURT:  Thank you.

MR. CRAIN:  I did want to -- your Honor, if the Court will bear with me for a few moments, I wanted to make a few comments about Ms. Solovyeva, about her person, about her as an individual and the Court has heard this, you know.  As I said, you know, I've seen a lot of Defendants, your Honor.  I've seen a lot of sophisticated people.  I've seen a lot of bad crooks. I've seen all kinds of people.  Ms. Solovyeva is not that kind of person.  She came to this country.  She didn't speak a word of English.  She came here in the hopes of working.  She comes from a place out in eastern Siberia about eight hours from Vladivostok where people have very little opportunity and she came to the United States as many other immigrants do and, unfortunately -- and she's sitting here today paying the price for the most unfortunate events that have ever happened to her in that she came in contact with Jurijus Kadamovas.  And before long, he had impregnated her.  She had a small child.  That child now resides in --

THE COURT:  Counsel, look --

MR. CRAIN:  Yes, your Honor.

THE COURT:  -- it's -- you want to portray her as a victim in terms of being impregnated?  She had a choice in the matter.  She got pregnant.

MR. CRAIN:  Your Honor, I'm not a believer in what's commonly called victimology and I'm not trying to portray her

EXCEPTIONAL REPORTING SERVICES, INC

TFSB20- 0004- 007181

Ex. 78 pg.55 of 71

44

as a victim but I'm saying she did become pregnant.

THE COURT: Yes.

MR. CRAIN: And was --

THE COURT: She chose to become pregnant.

MR. CRAIN: Well, I'm not certain but she became --

THE COURT: There's eleven forms of contraception.

MR. CRAIN: Well, she became pregnant.

THE COURT: Okay.

MR. CRAIN: All right.

THE COURT: And she had a small child and she lived with a person that the Government has very aptly described as a cruel, controlling and manipulative person. Ms. DeWitt mentioned a wire tap. There's also a statement from Mr. Altmanis in his debriefing where he described an incident at a party where Mr. Kadamovas nearly broke her hand in a fit of anger in front of all the other people at the party and bent her fingers back in a very severe manner where it looked to Mr. Altmanis like they were going to break. So she did not -- her life with Mr. Kadamovas was not some bed of roses and, in fact, it was -- she was in a -- in one of those situations that some young women get into, unfortunately, where they're in the company of and under the control of a controlling and manipulative person.

And I agree with Ms. DeWitt in her comments or response to the Court's take on the greed issue. I agree with

EXCEPTIONAL REPORTING SERVICES, INC

45

the Government wholeheartedly on that, your Honor.  And also not only was Mr. Kadamovas on the scene but he was bringing Mr. Mikhel around.  So she was -- and Altmanis.  So here was a young woman, a naïve young woman and basically a sweet young woman who -- well, your Honor, you've never met Ms. Solovyeva. I've spent six years.  So I'm telling the Court candidly.  I'm not here to dress up the facts.  I'm here to tell the Court exactly what the facts are.  The Court may have its own view of Ms. Solovyeva and see her as some sort of a different kind of person.  Yeah, she's involved in this case and, yes, she's accepted responsibility for it.

THE COURT:  Okay.  Do you have any concluding remarks, please?

MR. CRAIN:  Yes, I do, your Honor.  You know, early in the case when she was represented by other Counsel and not charged with anything, the Court talks -- had talked about attorneys advising the Defendant that it's in their self-interest and so forth.  Well, for whatever reason, without having criminal charges pending against her, Ms. Solovyeva met with the Government, with the Agents and the U.S. Attorneys and gave very detailed statements.

THE COURT:  She was already detained at that time; is that correct?

MR. CRAIN:  She was detained on immigration charges --

EXCEPTIONAL REPORTING SERVICES, INC

TFSB20- 0004- 007183

46

THE COURT:  Yes, I understand.

MR. CRAIN:  -- ready to be deported with her daughter, her young daughter who she hasn't seen for years who's growing up without her mother.  She was ready to be deported to Russia.  Instead of being deported, she went of her own accord with her attorney to the courthouse to meet with the U.S. Attorneys and gave them very detailed statements and subsequently gave them more and more sessions and testified at two trials.

THE COURT:  I agree she should be rewarded for her substantial cooperation.  The question is what should the end result be and we just see it a little bit differently.

MR. CRAIN:  And let me just -- I know the Court wants me to conclude and I don't want to go on and on and on but I do want to say, your Honor, also -- and I think another factor the Court has to consider is not -- are not only the factors that the Court has described but also do we have a potential recidivist sitting in front of us?  Absolutely not.  This is not a professional criminal.  This is somebody who made mistakes and if the Government's position is accepted by the Court will serve -- and I would agree, she probably will get the credits because she's had an excellent record while in custody -- but would receive a sentence of 132 months.  And as Ms. DeWitt says, it's not that she's walking into court through the front door and we're talking about getting out in 3.3 years

EXCEPTIONAL REPORTING SERVICES, INC

TFSB20- 0004- 007184

Ex. 78 pg.58 of 71

47

or something like that.  She's been in custody since the -- early in 2002.

So this is not someone who's going to re-offend, your Honor.  This is not somebody who poses a danger to society. This is somebody who wanted to help the Government, did help the Government, did great things for the Government, as Ms. DeWitt just pointed out, in ensuring that Ms. Kadamovas would receive a death sentence, the first one in this District since 1946, and is to pay a price.  The price should be no more, your Honor, than the Government has recommended, 132 months.  Thank you for the time, your Honor.  I'll be glad to answer any questions if you have them.  I don't know if I did mention -- I think I did -- about that video.  I think -- there's no evidence that Mr. Kadamovas ever saw that.  I think I did say that.  So if the Court has any questions, I'll be happy to answer.

THE COURT:  I have no questions.  Thank you.

MR. CRAIN:  Thank you, your Honor.

THE COURT:  Does your client wish to make a statement?

MR. CRAIN:  I believe so.

THE COURT:  Yeah, from the -- she would approach the lectern, please.

MR. CRAIN:  Your Honor, I think she wishes to address the Court in English.

EXCEPTIONAL REPORTING SERVICES, INC

TFSB20- 0004- 007185

48

THE COURT:  Please.

THE DEFENDANT:  Thank you, your Honor.  I would like to say a few words --

THE COURT:  Would you speak into --

THE DEFENDANT:  Closer?

THE COURT:  -- louder and into the microphone?

THE DEFENDANT:  Your Honor, I would like to say a few words and say that over and over again how sorry I am for what I did.  I'm sorry for all the victims.  I know I have made a terrible choice that I will be regretful of all my life.  I am truly sorry for the part of being -- of -- for being -- I'm sorry -- for being a part of causing such a pain and sorrow to others.  I told so many times myself if I would have a chance, I would do differently if I only could change, undo these terrible things.  Unfortunately, I cannot.  And I'm terribly sorry for that.  I'm sorry for all family victims.  I really -- I just want to ask for your forgiveness and, your Honor, for your mercy.  I'm sorry.  Thank you for your time and if it would be safe to say regarding video tape, Kadamovas never seen video tapes and I honestly, sincerely telling you I videotape my child with friends regardless show that -- I mean, Kadamovas never saw that.

THE COURT:  Yeah, I accept that as a true statement.

THE DEFENDANT:  Thank you, your Honor.

THE COURT:  Under the Federal Rules of Procedure, if

TFSB20- 0004- 007186

49

there's any families of the victims, they could address the --
make a statement.

MR. UMANSKY:  I want to.

THE COURT:  Mr. Umansky.

(Interpreter whispered to Mr. Umansky)

MR. UMANSKY:  English.  Your Honor, I will talk on behalf of my family and me and I believe that as to the victims will agree with me.  I disagree with Ms. DeWitt, the Government in the assessment of her.  Honesty and truthful, she knew from the beginning about everything was done by that herd of animals.  She would save lives.  Instead, she didn't.  She, to the end, held them, abduct and kill people.  Thank you.

THE COURT:  Thank you.  Are there any other matters to address before the Court sentences the Defendant?

MR. CRAIN:  I'm not aware of any, your Honor.

THE COURT:  Government?

MR. CRAIN:  No, your Honor.  Thank you very much.

THE COURT:  Okay.  A very difficult sentencing decision only because of the Government's position and the Government's need to be able to -- in these types of very serious criminal acts, be able to secure valuable information by having coconspirators cooperate against the main perpetrators.  And in this case it was obviously a significant accomplishment to -- and I recognize that because I've presided in other death penalty cases where the Government was able to

EXCEPTIONAL REPORTING SERVICES, INC

TFSB20- 0004- 007187

50

secure the testimony of a spouse.  Very powerful testimony if you can secure that and I recognize that Ms. Solovyeva was a significant witness here and added to the Government's prosecution and the merits of its claims before juries because of that testimony.

And the Government's position has made it very difficult on the Court because I want to make sure that I do everything I can in the future to assist law enforcement in terms of allowing them to secure these types of witnesses and pursue these types of prosecution.  So that's a significant factor but let me just make a couple of comments.

Again, this Defendant is looking at life without the possibility of release.  She's 32 years old.  According to the Government's calculation, if I sentenced her to 132 months with time off for good behavior, she would serve actually 9.35 years and she has served approximately six years.  She will be out at approximately 39 years old.  If you look at the actuarial tables, she probably has another 42 years after that remaining in her life.  So that is a long period of time.

The Court is not going to follow the Government's recommendation.  However, the Court is going to -- and based on the Supplemental Pleading and the Declaration offered by the Declarant, is going to come off the sentence that I intended to impose in this case at the urging of the Government.  And I guess the Court has to balance the 5K considerations with 3553

EXCEPTIONAL REPORTING SERVICES, INC

TFSB20- 0004- 007188

51

considerations and, again, it's not simply the ability of the Government to go forward with prosecutions in the future but also making sure that serious offenders are treated justly, that the public maintains its respect for the judicial process system, that the victims who cannot be here are represented by a sentence that reflects the seriousness of the offenses done to them and the Court has to balance that process.

Before I sentence the Defendant, though, I need to -- I'm in agreement with the Government that Mr. Markovskis is less culpable than this Defendant here and that was reflected in their sentencing position.  Is there any legal impediment to modifying the sentence of Mr. Markovskis?

MS. DEWITT:  I don't believe so, your Honor.

THE COURT:  If I sentence -- the Court is -- will grant the 5K Motion.  The Government has the -- the Adjusted Offense Level is 42.  The Government has urged a ten-level reduction and that would place the Defendant at a Level 32, which would be 121 to 151 months.  The Court will grant the 5K Motion and I find this very difficult to do because I see this case very differently than Counsel.  But the Court will grant the 5K Motion and grant an eight-level reduction, placing the Defendant in Criminal History Category I with an Offense Level of 34.  That will place her in the Guideline range of 151 to 188 months.  The Court would intend to sentence the Defendant to 180 months.

EXCEPTIONAL REPORTING SERVICES, INC

TFSB20- 0004- 007189

52

Now, that means that this Defendant will have approximately 40 years of life left after she is released from prison, time to spend with her family, her daughter, time to enjoy her life and the other two victims that she's responsible for helping to abduct and murder will not have that enjoyment. And I want to make it very clear, Ms. Solovyeva, that but for the vigorous urging of Counsel for the Government, this would never occur. This would absolutely never occur.

And so I guess the sentence that should be imposed here is the sentence that accomplishes the Government's goal of cooperation in the future, the Court's goal of making sure that the 3553 factors are considered. And so the end result should be that whatever sentence the Court imposes, it would -- if Counsel for the Defendant knew that that would be the ultimate sentence, you would nevertheless encourage your client to move forward and cooperate with the Government and I believe a sentence of 180 months is extremely generous and is a sentence that clearly accomplishes what the Government is trying to achieve, at the same time is a sentence that's more reflective of her involvement.

The Court will sentence the Defendant as follows. I believe I've ruled on all of the objections. That being the case, since I'm sentencing this Defendant to 180 months, the 3553 factors and Mr. Markovskis' involvement will require the Court to make an adjustment to his sentence and I agree that

EXCEPTIONAL REPORTING SERVICES, INC

TFSB20- 0004- 007190

53

there should be at least a 30-month reduction and his sentence should be 150 and not 180.

The Court, having considered the sentencing factors enumerated in Title 18, 3553, the Court, considering that the statutory mandatory minimum penalty in this case is life imprisonment without the possibility of release, the following sentence is imposed. The Court has determined that the Adjusted Offense Level is 42, Criminal History Category I. The Government has moved pursuant to 5K for a reduction below the statutory minimum. The Court grants that motion. It is ordered that the Defendant shall pay the United States a Special Assessment of $300 which is due immediately.

It is ordered that the Defendant shall pay restitution in the amount of $725,245 pursuant to Title 18, U.S.C.3663(a). The restitution and order shall be paid to George Safiev in care of Mr. Teshec (phonetic). Restitution shall be due during the period of imprisonment at the rate of not less than 25 per quarter and pursuant to the Bureau of Prisons Inmate Financial Responsibility Program. If any amount of restitution remains unpaid after release from custody, nominal monthly payments of at least $50 shall be made during the period of Supervised Release. These payments shall begin 30 days after the commencement of supervision. Nominal restitution payments are ordered as the Court finds that the Defendant's economic circumstances will not allow her to make

EXCEPTIONAL REPORTING SERVICES, INC

TFSB20- 0004- 007191

Ex. 78 pg.65 of 71

54

either immediate payment or future or other amounts that would be ordered.

The Defendant shall be held jointly and severally liable with co-participants Mr. Mikhel, Mr. Kadamovas, Mr. Krylov, Mr. Altmanis and Mr. Markovskis for the amount of restitution ordered in this judgment. Pursuant to Title 18, U.S.C. 3612(f)(3)(a), interest on the restitution is waived. The Defendant does not have the ability to pay interest. Payments are subject to penalties and default and delinquency pursuant to Title 18, U.S.C. 3612(g). The Defendant shall comply with the following General Order 01-05. All fines are waived. The Defendant does not have the ability to pay a fine.

Pursuant to The Sentencing Reform Act of 1984, it is the judgment of the Court the Defendant Ms. Natalya Solovyeva is hereby committed on Counts One, Three and Four of the Second Superseding Indictment to the custody of the Bureau of Prisons to be imprisoned for a term of 180 months. And I find it very difficult to make that pronouncement. This term consists of 180 months imprisonment on each of the Counts One, Three and Four of the Second Superseding Indictment to be served concurrently.

When released from imprisonment, the Defendant shall be placed on Supervised Release for a term of five years. I need the phone. The term consists of five years on each of Counts One, Three and Four of the Second Superseding Indictment

TFSB20- 0004- 007192

55

to be served concurrently under the following terms and conditions.  The Defendant shall not commit any violation of local, State or Federal law.  The Defendant shall comply with the rules and regulations of the U.S. Probation Office.  During the period of supervision, the Defendant shall pay the Special Assessment and restitution in accordance with the Judgment Orders of the Court.

The Defendant shall comply with the Immigration rules and regulations of the United States.  If deported from this country, either voluntarily or involuntarily, you may not reenter the United States illegally.  The Defendant is not required to report to the Probation Office while residing outside the United States.  However, within 72 hours of release from any custody or any reentry to the United States during the period of Court ordered supervision, the Defendant shall report for instructions to the U.S. Probation Office located at 312 North Spring Street, Room 600.

The Defendant shall not obtain or possess any driver's license, social security number, birth certificate, passport or any other form of identification in any name other than her true legal name without prior written approval of the Probation Officer nor shall the Defendant use for any purpose or in any manner any name other than her true legal name.  The Defendant shall cooperate in the collection of a DNA sample. As directed by the Probation Officer, the Defendant shall apply

EXCEPTIONAL REPORTING SERVICES, INC

TFSB20- 0004- 007193

56

all monies received from tax refunds, lottery winnings, inheritances, judgments and any anticipated or unexpected financial gains to the outstanding quarter's financial obligation.  The drug testing condition will be imposed because there is evidence in this case that the Defendant supplied controlled substances and, therefore, those conditions will be imposed.

In sentencing the Defendant, the Court has considered the goals that the Government is trying to achieve under 5K and attempted to balance those interests and goals with the factors enumerated in 3553.  The Court agrees that the Defendant provided significant cooperation to the Government and assisted the Government in the prosecution of Mr. Mikhel, Mr. Kadamovas and Mr. Krylov who are serious -- very serious, horrific offenders.  In mitigation, the Court has also considered the Defendant's age and her dysfunctional relationship with Mr. Kadamovas.  In aggravation, the Court believes that this Defendant is not the victim that she has portrayed herself to be and has participated in the offenses because of financial consideration and the Court, also in aggravation, understands that but for the acts of the Defendant, there are two individuals who probably would be alive today.

I must advise you of your right to appeal.  You have a right to appeal your sentence if you believe, Ms. Solovyeva, that your sentence is contrary to law, contrary to a Plea

EXCEPTIONAL REPORTING SERVICES, INC

TFSB20- 0004- 007194

Ex. 78 pg.68 of 71

57

Agreement. I would have the Government, if the Government requests, to read that portion of the Plea if you so choose to into the record. It is in the Court's opinion the sentence today is consistent with the goals in the Plea Agreement and the Defendant has waived her rights but she has to decide that between and amongst her lawyers.

MS. DEWITT: I think you've accurately set forth what the Plea Agreement says, your Honor.

THE COURT: If you intend to appeal your sentence, with few exceptions, any Notice of Appeal must be filed within ten days from today's date. That being said, I want to take just a moment to compliment Counsel for the Defendant and Counsel for the Government again. We just see it differently. I respect your views and the advocacy that you have brought to court today on behalf of your client. I think you represented your client and the Bar as expected of lawyers of high standing in the legal community and the Government has done likewise and has convinced the Court to make some adjustment here for the reasons articulated in the brief. So thank you very much.

MR. SPEAKER: Your Honor, are there remaining counts?

THE COURT: Remaining counts?

MS. DEWITT: No. There are no remaining counts that need to be dismissed as to this particular Defendant, your Honor, but the underlying Indictments do need to be.

THE COURT: Okay. Motion will be granted. Thank

TFSB20- 0004- 007195



you.

THE CLERK:   Court's in recess.

(This proceeding ended at 10:46 a.m.)

EXCEPTIONAL REPORTING SERVICES, INC

TFSB20- 0004- 007196

Ex. 78 pg.70 of 71

59

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____                    February 21, 2008


TONI HUDSON, TRANSCRIBER

TFSB20- 0004- 007197