# Ninth Circuit Jury Trial Improvement Committee

## First Report on Goals and Recommendations

**Adopted by the**
**Judicial Council of the Ninth Circuit**
**May 2004**

1

Ex. 110 pg.1 of 15

**A Message from the Chair**

---

August 10, 2004

The Jury Trial Improvement Committee's first series of recommendations addresses ways to reduce the hardship jury service imposes on prospective jurors and to increase citizen participation in the jury process.  The Committee hopes that the District Courts will look favorably on these recommendations.  The Committee also believes that the implementation of the recommendations are interdependent. Expansion of the pool of prospective jurors, restrictions on excuse categories and liberal deferral policies must be coupled with the use of updated technology to improve juror qualification and scheduling for these recommendations to be cost effective for the districts.



In the coming months, the Committee will be focusing on suggestions for improving the voir dire process and juror comprehension.  We will be drawing on the experience of the district and magistrate judges from our 2003 survey as well as asking both prospective and trial jurors about their experiences to frame the recommendations of our second report.

In the near future we also hope to provide information about implementation of the recommendations in this first report that will be affordable for the districts and that will decrease the burden of jury administration on our already overextended Clerk's office personnel.

The Committee encourages comments and suggestions from the judges of the Ninth Circuit about the work of the Committee and any ideas the judges have about improving jurors' experiences serving in the District Courts.

i

**Ninth Circuit Jury Trial Improvement Committee Members**

---

**Hon. Richard C. Tallman**
*U.S. Circuit Judge*
**U.S. Ninth Circuit Court of Appeals**

**Hon. Virginia Phillips**
*U.S. District Judge*
**Central District of California**

**Hon. Anthony Ishii**
*U.S. District Judge*
**Eastern District of California**

**Hon. William Alsup**
*U.S. District Judge*
**Northern District of California**

**Hon. Elizabeth Laporte**
*U.S. Magistrate Judge*
**Northern District of California**

**Hon. Debra Yang**
*U.S. Attorney*
**Central District of California**

**Dr. Gregory B. Walters**
*Circuit Executive*
**Office of the Circuit Executive**

**Committee Staff:**

**Dr. Robert E. Rucker**
*Assistant Circuit Executive*
**Office of the Circuit Executive**

**Ms. Franny Forsman**
*Federal Public Defender*
**District of Nevada**

**Hon. Judith McConnell**
*Presiding Justice*
**California Court of Appeal**

**Hon. Michael Brown**
*Retired Presiding Judge*
**Pima County, Arizona Superior Court**

**Ms. Cynthia Jensen**
*Deputy Clerk of Court*
**District of Nevada**

**Mr. Brian Rekofke**
*Lawyer Representative*
**Eastern District of Washington**

**Mr. John Hannah**
*Lawyer Representative*
**District of Arizona**

**Ms. Joanne Cook**
*Jury Administrator*
**District of Idaho**

**Ms. Kathleen Mantila**
*Policy and Research Analyst*
**Office of the Circuit Executive**

ii

## Contents

**Goal I:  Reduce the Hardships of Jury Service**

   **Recommendation 1.**  Term of Jury Service Should Be One Appearance or One Trial............................1

   **Recommendation 2.**  Use Technology to Improve Juror Qualification and Scheduling.........................2


**Goal II:  Broaden Citizen Participation in the Jury System**

   **Recommendation 3**.  Improve Source Lists, Use Drivers License & State Identification, Voter Registration & the National Change of Address System to Expand Inclusiveness..................................3

   **Recommendation 4**.  Abolish Most Excuse Categories & Develop Objective Criteria for Hardships....5

   **Recommendation 5.**  Grant Deferrals to Jurors Upon Request................................................ 6

   **Recommendation 6.**  Consider Ways to Address Non-Responders........................................ 7

   **Recommendation 7.**  Increase Awareness about Jury Service through Public Outreach....................... 7

**Conclusions**…………………………………………..………………………………........8

Ex. 110 pg.4 of 15

**Goal I:  Reduce the Hardships of Jury Service**

**Recommendation 1:  Term of Jury Service Should be One Appearance or One Trial**

There is no standard term for jury service in the Ninth Circuit's district courts.  The typical term is one month, though some courts have three-month terms and two have terms of up to one year.  Thus, prospective jurors may be "on call" anywhere from one month to an entire year in order to fulfill their jury duty.  This can be a significant disruption to the potential jurors' lives.  As evidenced by the high number of requests to be excused, such disruptions can lead to negative attitudes about the courts and jury service, and adverse affect on their performance as jurors.

Even for those people who are willing to serve, the extended "on call" status may complicate their schedules for work, family, schools, vacations, etc.  Potential jurors may find it difficult to take time off from work at the time of the summons.  Some cannot afford the loss of income; some cannot afford the costs associated with childcare, and there are other legitimate reasons for finding it difficult to serve at a particular time.  As a result there are large numbers of failures to appear that place hardships on the court as well, forcing the courts' jury administration staff to process thousands of requests to be excused.[1]

The Jury Trial Improvement Committee believes that the current terms of service place undue hardship on both jurors and courts.  Therefore, the Committee recommends that district courts implement a five-day or one week "on call" term for jury service.  Jurors should normally have to make only one appearance in court for jury selection or serve for one trial.

> **One Appearance / One Trial**
>
> In 1984 the District of Nevada transitioned from a six-month term of jury service to the first one appearance / one trial term of jury service in the federal court system. The shorter term of service resulted in the jurors feeling more positive about their service, more willing to serve again and a feeling that the length of jury service was either "about right" or "too short."  While there was a substantial increase in the number of jurors qualified, it was offset by a 10% to15% decrease in the number of requests for excuse and a savings of four hours a week in processing excuses.  There was also a sense that as more people were able to serve, the jury panels would be more representative of the population.

State courts that have implemented a jury plan that called for one appearance or serving as a juror on one trial have reported positive results.  The Committee found that one

---

[1] Jensen, Cynthia, "One Appearance / One Trial Term of Jury: U.S. District Court, District of Nevada." Presentation to the Jury Trial Improvement Committee, Pasadena, CA June 5, 2003.

appearance/one trial policies produced increased participation by members of the public in the jury systems.  Additional benefits include fewer requests to be excused, reduced financial losses for prospective jurors, and reduced waiting times for jurors.  Revised policies can help assure administrators of increased juror availability and allow the courts to reduce the resources allocated for monitoring that availability.

In 1984, the District of Nevada led the federal courts by being the first to reduce its term for jury service from six months to one appearance or one trial.  Jurors are dismissed from jury duty after making one appearance for jury duty or after completing the trial for which they are impaneled.  Two other Ninth Circuit districts operate "in practice" on a one appearance or one trial policy.

Prior to implementation of the one appearance/one trial policy, some judges in Nevada expressed concern about the potential negative impacts such as increased deliberation times and the possibility of more hung juries.  These concerns were unrealized.  The court found no discernable change in deliberation time or in the number of hung juries.  In fact, following implementation of one appearance/one trial, the court found that the jurors' attitudes about their service, and about the courts in general, improved and requests for excuses dropped significantly.

The change to one appearance/one trial will likely necessitate an increase in the number of persons summoned for jury duty, which in turn, can result in some additional work for the jury administration division of the clerks' offices.  Some mitigation strategies that have been successfully used by the courts when they have implemented this procedure include pooling jurors, further automating the jury management process (see recommendation 2), streamlining the summonsing process, and improving juror utilization to minimize the number of jurors that go unused.

**Recommendation 2:  Use Technology to Improve Juror Qualification and Scheduling**

The committee found that interactive voice response systems (IVR) and other automated systems will improve the scheduling and qualifying process.  Potential jurors can use IVRs from their telephones (or even their computers via the Internet).  They can confirm citizenship, age, residence, and other qualifying information using IVRs and they can easily request a limited number of postponements to available alternate dates when the court will need jurors.

2

All of this can be accomplished without using the time of court staff.  The courts benefit by saving printing and postage costs and reducing the staff time previously devoted to reviewing thousands of deferral requests or responding to telephone calls.

IVR systems have additional benefits.  Rather than having one general message for all prospective jurors, IVRs allow for messages tailored to individual jurors.  These messages not only provide general information, such as directions to the courts, they can tell prospective jurors when to appear.  The messages can also be in multiple languages.

**A personal example from the committee chair:**  After receiving a jury summons to Maricopa County Superior Court for an inconvenient date, I accessed the court's website and took advantage of the one-postponement policy.  I chose my own new summons date.  That date, May 27, 2004, conflicted with the Judicial Council meeting and the court website would not permit a second postponement.  Undeterred, I called the IVR system which allowed me a second postponement but gave me a six week window within which I could choose my new summons date.  After completing the call I looked at the court's website which I had not closed before making my call.  It had updated my file with the new summons date.  A confirming postcard was later received.  All of this occurred without any contact with court staff.

The Committee visited two state trial courts with IVRs in operation.  The Los Angeles County Superior Court and Clark County District Court in Nevada have operations that federal district courts may choose to emulate.  Clark County, in particular, has software supporting their IVR-telephone system that is nearly identical to the Jury Management System (JMS) currently used by the federal courts.  The same company makes both software packages.

A sophisticated interactive voice response system can alleviate many of the administrative burdens associated with qualifying questionnaires, excuse requests, and deferrals.  Courts that are using IVRs have shown that they can actually reduce staff time even when they are using a one appearance/one trial procedure and calling in more potential jurors.

**Goal II:  Increase Citizen Participation in the Jury System**

**Recommendation 3:  Improve Source Lists, Use Drivers License and State Identification, Voter Registration, and the National Change of Address System to Expand Inclusiveness**

Nearly all state courts now use more than one source list (the most commonly used supplemental sources are department of motor vehicle drivers licenses and state identification card lists) when creating master jury wheels.  Most of the district courts in the Ninth Circuit still

3

use only voter registration lists.  The Committee believes that voter registration lists should be supplemented in order to increase inclusiveness and to provide better representation of the adult citizen population who are qualified to serve as jurors.

According to the 2000 national census statistics, voter registration lists tend to disproportionately represent persons when compared to the total U.S. citizen population in certain age, income, employment classification, and education categories.[2]  In addition, in California and Arizona, voter registration lists under-represent Hispanic citizen populations and over-represent Caucasian populations. [3]

Moreover, according to census statistics, a substantial portion of the population is not registered to vote -- voter registration lists contain only about 66 percent of the adult citizen population in the states of the Ninth Circuit.  This percentage falls far below the American Bar Association's standard of at least 80 percent[4] for source list coverage and even further below the National Center for State Courts' standard of at least 85 percent coverage.[5]  Drivers license lists include more than 90 percent of the adult citizen population in the Ninth Circuit states.[6]

Combining department of motor vehicles drivers license/identification lists and voter lists would provide superior coverage.  Duplication of names can be addressed with computer software that is currently utilized by some courts.

One state achieved an increase in coverage of more than 75% after it combined voter and driver lists and purged the duplicates.[7]  The Committee anticipates the district courts that combine voter registration along with the department of motor vehicle drivers license/ identification data will be able to achieve levels that meet or exceed the 80 percent ABA standard.  The Committee believes the adoption and implementation of this recommendation will lead to more representative and inclusive master wheels and pools of prospective jurors.

Two other related factors have a negative impact on the extent to which the juror source lists accurately represent populations in the districts.  The first factor is transitory populations

---

[2] U.S. Census Bureau; "Voting and Registration in the Election of November 2000**:** Detailed Tables for Current Population Report, P20-542," Published 27 February 2002; http://www.census.gov/population/www/socdemo/voting/p20-542.html

[3] U.S. Census Bureau; "Reported Voting and Registration of the Total Voting-Age Population, by Sex, Race, and Hispanic Origin, for States: November 2000;" Table 4a.

[4] American Bar Association. *Standards Relating to Juror Use and Management*. National Center for State Courts, 1993.

[5] Munsterman, G. Thomas. *Jury System Management*. National Center for State Courts, 1996.

[6] Federal Highway Administration, "Highway Statistics 2001, Section III: Driver Licensing," Published October 2002; <http://www.fhwa.dot.gov/ohim/hs01/dl.htm>

[7] Munsterman, G. Thomas and Paula L. Hannaford-Agor. *The Promise and Challenges of Jury System Technology*. National Center for State Courts, 2003.  Calculations conducted using source list data for Connecticut divided by 18 years and older population estimates.

4

due to migration.  Between 1995 and 2000, 120 million people (46%) of the U.S. population changed addresses.  According to the 2000 Census data, people in the western states move even more frequently than people living elsewhere.[8]

A second factor, which is related to the first one, is the high number of undeliverable questionnaires sent out by the district courts.  In a survey conducted by the Committee, the jury administrators in ten districts reported that about 33,000 recently mailed potential juror questionnaires were returned as undeliverable.

In light of these findings, the Committee recommends that courts have the people constructing the master jury wheel run the names through the National Change of Address System (NCOA), a program that private companies use to identify changes of address.  These companies are licensed by the U.S. Postal Service to use the NCOA program.

For example, the District of Idaho's vendor builds a master wheel and then runs the names and addresses through the NCOA.  They follow this process every two years at a cost of approximately $2,000 for the entire process.  There are several vendors that can provide just the NCOA services for those courts that build their own master wheels or whose vendors currently do not combine these services.  The cost of using NCOA is usually only a few hundred dollars, a cost that can quickly be recouped by reducing the number of undeliverable questionnaires.

**Recommendation 4:  Abolish Most Excuse Categories and Develop Objective Criteria for Hardships**

The larger the jury pool the more likely it is to be representative of the population.  However, very lenient excuse policies create a danger that the jury pools will be smaller, and therefore, less representative.  The Committee believes that some excuse categories are valid, but most are unnecessary.

Some district courts routinely excuse entire categories of occupations, including attorneys, physicians, pharmacists, dentists, registered nurses, teachers, and members of the clergy.  In addition, some district courts routinely excuse students, persons more than 70 years of age, caretakers of children or aged persons, individuals who must travel long distances to court, individuals with previous jury service in the past two years, and essential business personnel.

Lenient excuse policies mean that thousands of prospective jurors are routinely excused each year, causing others to carry the burden of service.  Based on a survey of jury administrators, the Committee found that district courts recently excused almost forty thousand

---

[8]U.S. Census Bureau; "Migration and Geographic Mobility in Metropolitan and Nonmetropolitan America:  1995 to 2000." Published August 2003, <http://www.census.gov/prod/2003pubs/censr-9.pdf>

5

prospective jurors.[9]  Since lenient excuse policies result in less representative jury pools --
especially with regard to occupations and social class -- the Committee believes that most of the
excuse categories should be eliminated.  As a result, jury service would then be spread more
evenly across occupations, allowing for a more equitable distribution of the benefits and burdens
of jury service.

The Committee also discovered that limited, but fair excuse policies result in more first
time jurors.  Bringing more new potential jurors into the courts is an important additional benefit
of eliminating excuses.  When combined with shorter terms of service, more people can serve
and many hardships associated with jury service are eliminated or significantly reduced because
service is spread across a larger population.

In addition to broad excuse categories, some district courts have a general hardship
excuse category that permits some flexibility in granting excuses that do not fall into the specific
categories addressed in their jury plans.  The Committee found problems can arise when court
staff lack clear guidelines on which prospective jurors should be granted excuses under this
general hardship category.  When more than one person is authorized to grant excuses different
standards may be employed by different people.

The Committee therefore recommends that if district courts have a general hardship
category, clear written standards for granting hardship excuses should be developed.  Such
uniform standards will help the courts enforce a fair and equitable application of the excuse
policy.

**Recommendation 5:  Grant Deferrals to Jurors Upon Request**

To help citizens meet their duty to serve as jurors, the Committee recommends that in
place of lenient excuse policies, the district courts should accommodate requests for
postponements of jury service to dates more convenient for prospective jurors.

Although strict excuse policies spread the burdens and benefits of jury service more
evenly and lead to a more representative jury pool, the district courts may find a significant
number of citizens dissatisfied with the court's refusal to dismiss them solely for reasons of
inconvenience.  The Committee believes that deferrals for unexcused persons will alleviate much
of this dissatisfaction while still allowing jurors to fulfill their duties to serve as jurors.

Courts that implement the IVR system suggested in Recommendation 2 will find that
granting deferrals can be done with almost no burden to the court staff.  IVR software permits

---

[9] Jury Trial Improvement Committee; "Survey Results: Jury Systems Management in the Ninth Circuit."
San Francisco. February 27, 2003.

6

Ex. 110 pg.10 of 15

potential jurors to select future jury service dates that are convenient for them while still ensuring that the courts have sufficient jurors for the upcoming trials.

The Los Angeles County Superior Court has implemented a system with features similar to the one the committee is recommending with highly satisfactory results.  Potential jurors can use their telephones to call the IVR and defer jury service up to three times, without directly contacting court staff.  This computer-based system permits the potential juror to choose from a range of dates when the court needs jurors.

The Los Angeles County Superior Court's IVR system has improved juror satisfaction by accommodating jurors' personal schedules while still fulfilling the jury needs of the court.  This has been accomplished with reduced staffing levels because of the system's automated capabilities.

**Recommendation 6:  Consider Ways to Address Non-Responders**

The Committee's survey of Ninth Circuit jury administrators found that of 27,676 persons recently summoned, 13 percent did not respond.  In addition, only a few of the courts routinely send a follow-up summons to non-respondents.  Research has found that the most effective way to increase response rates is to send a follow up mailing to non-respondents.[10]  The Ninth Circuit's jury administrators agreed that following up on non-respondents is one of the most important things a court can do to increase response rates.  The Committee therefore recommends that district courts issue a second summons to non-responding citizens.

Currently, the district courts in the Ninth Circuit rarely or never require the person to appear in court to show cause for not responding to the summons, impose fines on persons, or imprison persons for not responding.  The Committee recommends that district courts consider enforcing summons by holding show cause hearings on a limited basis.  Such hearings can be made known to media outlets for coverage in newspapers and on television.  This technique is reported to have been very effective in improving response rates in the California state courts.  It was anecdotally reported that the federal district courts also noted improved response rates as a result of the state courts' use of show cause hearings.

**Recommendation 7:  Increase Awareness about Jury Service through Public Outreach**

The courts have previously focused public outreach efforts on jury service as an important civic duty.  The Committee found that most citizens agreed that jury service is an important civic duty and they are willing to serve, but they frequently fail to respond to

---

[10]Boatright, Robert G. *Improving Citizen Response to Jury Summonses: A Report with Recommendations.*  American Judicature Society, 1998.

summons because they believe jury service means long waits, dull trials, too much time away from work, or very low probability of being selected to actually serve on a jury.[11]

Public outreach efforts, therefore, should strive to dispel these concerns.  In order to assist the districts with outreach to citizens and to employers, the Committee will be working with the Ninth Circuit's existing committees, such as the Public Information and Community Outreach (PICO) Committee, LRCC, and the Advisory Board, to develop materials and dissemination plans.  The Committee recommends that the district courts distribute the materials that will be developed from the joint efforts of the Jury Trial Improvement and Public Information and Community Outreach committees.

Additionally, the Committee believes that efforts should be made to contact employers and educate them about jury duty and the normal terms of jury service in the Ninth Circuit's courts.  Research has demonstrated that some employers have informal, and sometimes, formal policies that discourage people from participating on juries.  Policies that limit or eliminate salaries discourage the public from willingly participating when they are summoned for jury duty.

Research has shown that contacting and educating the largest employers in a community may significantly improve response rates to juror summons.  The PICO Committee and others can provide substantial assistance to the Jury Trial Improvement Committee in this area.

**Conclusion**

The Jury Trial Improvement Committee is keenly aware that the courts are experiencing a period of unprecedented budget constraints.  The Committee recognizes that implementing an IVR system or some of the recommendations made above will necessitate both a significant financial commitment and a commitment to training staff.  However, the Committee is convinced that the financial costs can be quickly recouped by the courts and the courts will ultimately need to allocate fewer staff hours to jury-related activities such as answering phone calls for deferrals and excuses.

The Committee also believes that if the recommendations are implemented a number of other positive benefits will be achieved, including broader citizen participation in our jury process and increased juror satisfaction.

---

[11] Ibid, p. 71.

**References**

American Bar Association, Standards Relating to Juror Use and Management (1993).

Anderson, David, Let Jurors Talk: Authorizing Pre-Deliberation Discussion of the Evidence During Trial, 174 Mil. L. Rev. 92 (2002).

Bradley Saxton, How Well Do Jurors Understand Jury Instructions? A Field Test Using Real Juries and Real Trials in Wyoming, 33 Land & Water L. Rev. 59 (1998).

Colorado Supreme Court Committee on the Effective and Efficient Use of Juries, *With Respect to the Jury: A Proposal for Jury Reform* (1997).

David Bordy and John Neiswender, *Judicial Attitudes Toward Jury Reform*, 83 Judicature 298 (2000).

Frank A. Maiocco and Jr., Lore A. Joplin and Peter C. Kiefer, *An Evaluation of the Marion County Court One-Day/One-Trial Jury Term,* Trial Court Programs Division, Office of the State Court Administrator, Oregon Judicial Department (February 27, 1997).

G. Thomas Munsterman and Linda Walker, Study and Implementation Plan: One-Day/One-Trial Term of Jury Service, King County Superior Court, Seattle, Washington, National Center for State Courts (August 24, 1993).

G. Thomas Munsterman, *Jury System Management,* National Center for State Courts (2001-2002).

G. Thomas Munsterman, *Jury Trial Innovations*, prepared for the Jury Trial Improvement Committee, San Francisco, CA, February 27-28, 2003.

G. Thomas Munsterman, research on second mailing effects in Eau Claire County, Wisconsin (1997).

G. Thomas Musterman, *A Brief History of State Jury Reform Efforts*, 79 Judicature 216 (1996).

G.P. Kramer and D. Koening, *Do Jurors Understand Criminal Jury Instructions? Analyzing the Results of the Michigan Juror Comprehension Project*, 23 U. Mich.J.L.Reform 401 (1990).

Hope Viner Samborn, *The Vanishing Trial*, 88-OCT A.B.A. J. 25 (2002).

James Carroll, *The Many Roads to One-Day/One-Trial*, Judicial Council of California Court News (March-April 1999).

Joanne Cook, *Report on Operation of the Jury Selection Plan*, Idaho statistics on jury demographics (2002).Stephanie Domitrovich, Jury Source Lists and the Community's Need to Achieve Racial Balance on the Jury, 33 Duq. L. Rev. 39 (1994).

Joel D. Lieberman, *What Social Science Teaches Us about the Jury Instruction Process*, 3 Psychol. Pub. Pol'y & Law. 589 (1997).

9

John Fallahay, *A Survey of Jury Reforms: Initiatives, Innovations Abound*, 36 NO. 4 Judges' J. 34 (1997).

John P. Cronan, *Is Any of This Making Sense? Reflecting on Guilty Pleas to Aid Criminal Juror Comprehension*, 39 Am. Crim. L. Rev. 1187 (2002).

John Shapard and Molly Johnson, *Federal Judicial Center Survey Concerning Voir Dire*, October 4, 1994.

Judge Jacqueline A .Connor, *Jury Reform: Notes on the Arizona Seminar*, 1 J. Legal Advoc. & Prac. 25 (1999).

Judicial Counsel of California, *Final Report of the Task Force on Jury System Improvements* (2003).

K.B. Battaglini and Mark A. Behrens, Cary Silverman, *Jury Patriotism: The Jury System Should Be Improved for Texans Called to Serve*, 35 St. Mary's L. J. 117 (2003).

Leslie Miller-Stover, *Employing Common Sense in West Virginia Trial Courts: Encouraging Juror Note-Taking and the Questioning of Witnesses by Jurors*, 102 W. Va. L. Rev. 869 (2000).

Lore A. Joplin and Frank A. Maiocco and Peter C. Kiefer, An Evaluation of the Marion County Court One-Trial/One-Day Jury Term, Oregon Judicial Department (1997).

Mark A. Behrens and Edward O. Gramling, *Improving the Jury System in Kansas: A Call for Jury Patriotism Legislation,* 13 Kan. J. L. & Pub. Pol'y 1 (2003/2004).

Nancy S. Marder, *Juries, Justice and Multiculturalism,* 75 S. Cal. L. Rev. 659 (2002).

New York State Unified Court System, *Continuing Jury Reform in New York State* (2001) <<http://nysl.nysed.gov>>.

Ninth Circuit Jury Trial Improvement Committee, Results of Judges' Survey (2003).

Ninth Circuit Office of the Circuit Executive, *A Surprising Look at Jury Trials in the Ninth Circuit*, presentation prepared for the Conference of Chief District Judges, Sacramento, CA, February 18, 2003.

Ninth Circuit Office of the Circuit Executive, *Jury Systems Management in the Ninth Circuit*, prepared for the Jury Trial Improvement Committee, San Francisco, CA, February 27, 2003.

Paula L. Hannaford and G. Thomas Munsterman, *Beyond Note-Taking: Innovations in Jury Reform*, 1997 WL 9957730 (1997).

Paula L. Hannaford-Agor and Valerie P Hans and G. Thomas Munsterman, *"Speaking Rights": Evaluating Juror Discussions During Civil Trials*, 85 Judicature 237 (2002).

Robert G. Boatright, *Improving Citizen Response to Jury Summonses*, American Judicature Society (1998).

Shari Diamond et al, *Juror Discussions During Civil Trials: Studying An Arizona Innovation*, 45 Ariz. L. Rev. 1(2003).

10

Shari Seidman Diamond and Neil Vidmar and Mary Rose and Leslie Ellis and Beth Murphy, *Juror Discussions During Civil Trials: Studying an Arizona Innovation*, 45 Ariz. L. Rev. 1 (2003).

State of Massachusetts Office of Jury Commissioner, *Failure to Appear for Juror Service*, <<http://www.state.ma.us/courts/jury/public.htm>>

State of Massachusetts Office of Jury Commissioner, *The Public Outreach Program* <<http://www.state.ma.us/courts/jury/public.htm>>

Supreme Court of Florida Jury Innovations Committee, Final Report (2001).

Supreme Court of Nevada, Report of the Supreme Court of Nevada Jury Improvement Committee (2002).

Susan Jennen and Lois McBride and Wayne Minske, *Defending Your Jury Source List*, prepared at the Direction of the Minnesota Jury Rule 803 Committee (1997).

Susan L. Coleman and Peter C. Kiefer, *Marion County Juror Satisfaction Analysis*, Oregon Judicial Department (1999).

The Administrative Office of the Courts of Maryland, Council of Jury Use and Management Report and Recommendations (2000).

The Arizona Supreme Court Committee on More Effective Use of Juries, *Jurors: The Power of 12* (1994).

*Through the Eyes of the Juror: A Manual for Addressing Juror Stress*, National Center for State Courts (1998).

U.S. v. Faron Wade Jones 353 F.3d 816 (2003).

USPS, Description of the National Change of Address System (NCOA) <<http://wwwusps.com/ncsc/products/ncoa.htm>>.

Valerie Hans and Paula Hannaford and G. Thomas Munsterman, *The Arizona Jury Reform Permitting Civil Jury Trial Discussions: The Views of Trial Participants*, Judges and Jurors, 32 U. Mich.J.L.Reform 349 (1999).

Washington State Jury Commission, Report to the Board for Judicial Administration (2000).

11