```
                    UNITED STATES DISTRICT COURT
                        DISTRICT OF VERMONT


    _____

    UNITED STATES OF AMERICA        )

             VS                     )   CASE NO:  5:01-cr-12

    DONALD FELL                     )

    _____)    MOTIONS HEARING



    BEFORE:    HONORABLE GEOFFREY W. CRAWFORD
               DISTRICT JUDGE



    APPEARANCES:   SONIA V. JIMENEZ, ESQUIRE
                   RICHARD E. BURNS, ESQUIRE
                       U.S. Department of Justice
                       Capital Case Section
                       1331 F Street, N.W., 6th Floor
                       Washington, DC   20530
                       Representing The Government



                   WILLIAM B. DARROW, ESQUIRE
                       Assistant U.S. Attorney
                       P.O. Box 570
                       Burlington, Vermont   05402
                       Representing The Government



                       (Appearances Continued:)



    DATE:          July 11, 2016

               TRANSCRIBED BY:  Anne Marie Henry, RPR
                        Official Court Reporter
                            P.O. Box 1932
                        Brattleboro, Vermont   05302
```

Ex. 114 pg.1 of 251

APPEARANCES CONTINUED:


MICHAEL N. BURT, ESQUIRE
     Law Offices of Michael N. Burt
     1000 Brannan Street, Suite 400
     San Francisco, California    94103
     Representing the Defendant


KERRY B. DeWOLFE, ESQUIRE
     38 Calberg Drive
     Corinth, Vermont    05039
     Representing the Defendant


LAURA ROGERS, ESQUIRE
     Law Offices of Laura Rogers
     115 1/2 Bartlett Street
     San Francisco, California    94110
     Representing the Defendant

I N D E X

WITNESS:                                                    PAGE:

CRAIG HANEY

Direct Examination by Mr. Burt                               13

Cross Examination by Ms. Jimenez                             89

Further Examination by Mr. Burt                             167

Further Examination by Ms. Jimenez                          221


GOVERNMENT EXHIBITS:                                      SHOWN:

10 - Longitudinal Study 2010                               118

11 - Context & Clarification of Single Study               121

12 - Commentary Toward an Improved Understanding 121, 135


DEFENDANT EXHIBITS:                                       SHOWN:

A1-18 - Volume 1 - Haney                                    19

A19-28 - Volume 2 - Haney                                   19

A29-31 - Volume 3 - Haney                                   19

A2 - Haney Report                                          166

A3 - 1981 Publication Juries & Death Penalty               193

A4 - 1981 Publication Death Qualification                  193

A8 - 1984 Publication Death Qualification                  233

A13 - 1996 Publication Wainright v Witt                    232

A19 - 2005 Publication Death by Design                     205

INDEX CONTINUED:

DEFENDANT EXHIBITS:                                          SHOWN:

A28 - 9-18-12 Letter to BOP                                    159

A32 - 1/16 US DOJ Report Restrictive Housing        168

A33 - US DOJ Final Report                                       168

A 34 - 2/24/14 DOJ Letter                                        175

later than 3 o'clock today and then we would start right away with Dr. Reidy.

THE COURT:  Sure.  Okay.  I think we're ready to begin.

MR. BURT:  Thank you.  We would call Dr. Craig Haney.

C R A I G   H A N E Y,   The Witness, after being duly sworn, was examined and testified as follows:

THE COURT:  Good morning.  Thank you for making the trip.

THE WITNESS:  Good morning, Your Honor.

THE COURT:  It wasn't a great weekend for travel. Did you come in okay?

THE WITNESS:  I came in fine.  Thank you.

THE COURT:  Good.  Good.  Glad to have you here.

MR. BURT:  And Your Honor should have before you certain volumes.  There are exhibit volumes for each individual witness.  And those have been pre-marked.  The exhibit volumes relating to Dr. Haney are in three volumes. The first volume is marked A1 through 18.  The second is marked A19 through 28.  And the third is marked A29 through 31.

THE COURT:  Thank you.  I have all three.

MR. BURT:  Thank you.

DIRECT EXAMINATION BY MR. BURT:

Q.    Sir, could you state your name, for the record, and tell the Court who you are?

A.    Yes.  My name is Craig Haney.  I'm a Professor of Psychology at the University of California at Santa Cruz.

Q.    And, doctor, in accordance with the Court's instruction about keeping the qualifications fairly brief here, give the Court just a little thumbnail sketch on what you do for a living and what your expertise is in the area of the death penalty?

A.    My general area of expertise in psychology is what's generally called psychology and law.  I became interested as a graduate student in this application of psychological principles and theories and data to various legal questions.

So got a Ph.D. in psychology at Stanford.  Went to law school at Stanford.  And have been doing research on primarily two very general topics.  One, the topic on which I began work in psychology and law while still a fairly young graduate student is the psychology of imprisonment.

And somewhere along the line, after getting into graduate school and starting to connect to the issues in the law school, I became interested in another very general topic, capital punishment, the system of death sentencing in the United States.

So over really a 40 year period I've done research almost equally much in both general areas.  The research has

taken different forms.  I worked on different topics.  But largely under the rubric of either the psychology of imprisonment or some aspect of the system of death sentencing in the United States; either the manner in which the system of death sentencing unfolds or proceeds in the United States and it's also involved becoming very interested in doing research on the backgrounds and social and institutional histories of people who are charged with or convicted of capital crimes.

Q.    And can you tell the Court, just generally, the two topics you're going to discuss today in your testimony?

A.    Yes.  You asked me to prepare testimony for the Court on the issue of solitary confinement, the effects of solitary confinement.  And, in particular, the conditions of confinement that exist in the special confinement unit, the federal death row facility at the United States Penitentiary at Terra Haute.

And then you also asked me to prepare testimony on a separate issue.  The state of knowledge on the issue of death qualification.  The procedure that is used in capital cases to identify persons who are eligible to serve on a jury, in part, on the basis of their attitudes towards the death penalty.

Q.    Now, are those the only two topics that your research and writing has focused on in relation to the death penalty?

A.    No.    No.    I've done research on a variety of different aspects having to do with capital punishment.    I wrote a book about the entire system of death sentencing in the United States.

Q.    And besides writing a book about the death system in the United States, have you also published a number of articles that are listed in your C.V. about various aspects of capital punishment, as well as various aspects about the effects, psychological effects of long-term incarceration?

A.    Yes, I have.

Q.    Okay.    You are a social psychologist; correct?

A.    I am.

Q.    You are not a clinical psychologist; right?

A.    Correct.

Q.    And how is that field different than say what a clinical psychologist does?

A.    Clinical psychologists are trained in the diagnosis and treatment of various forms of mental disorders, mental illness, mental health problems and so on.

Social psychologists are trained in how people, in general, react to various conditions, experiences, circumstances.    So social psychologists don't focus exclusively on people who have different forms of mental disorder or emotional distress.

Q.    In terms of your experience in assessing the

psychological effects of incarceration, give the Court a sense of your experience in that particular field. Who have you worked for doing that kind of work and how long has that work been going on in your experience?

A. I, it's a topic that I became interested in as a young graduate student. Phillip Zimbardo and Curtis Banks and I did an experiment when I was a second year graduate student at Stanford that became a very famous experiment. It's called the Stanford Prison Experiment in which we put college student volunteers in a prison-like environment, randomly assigning half of them to be prisoners and the other half to be guards.

We expected that there would be some differences between both groups. That's why we did the study. But the results were very dramatic. The young students were changed and transformed by the experiment almost immediately.

As a graduate student I was there for most of it. And I watched these transformations take place. And it underscored for me the power of institutional environments, particularly prison environments. And I began, even as a graduate student, to study how people were changed and affected in real prisons, not simulated prisons.

Correctional officers, to a certain extent, but I focused my attention primarily on prisoners, mostly in maximum security prisons. And then over the years, the

focus of today's testimony, I began to concentrate on the issue of solitary confinement, an increasingly widespread practice in the United States in the late 1970's and throughout the '80's, and really up to the present time.

And I devised a technique for interviewing and understanding the ways in which prisoners were affected by their conditions of confinement.

As His Honor said earlier, very -- everybody learns from other people who have gone before them.  So there were already well identified standard ways of assessing people's emotional distress.  And I simply applied those techniques in institutional settings.

I've probably been in and accessed the effects of conditions of confinement in dozens of state prison systems and the federal prison system as well.  Scores of prisons around the country.  Many, many solitary confinement units.  Over a four year or so year period I've probably interviewed thousands of prisoners, including over a thousand who were confined in solitary confinement type units.

Q.    Have you done any work for governmental agencies related to assessing the effects of prison conditions?

A.    Yes.  Quite a bit.  I've been a consultant to various Legislative bodies in California and elsewhere.  I was a member of the National Academy of Sciences Committee to which I was appointed in 2012.  It was a committee that was

charged with the responsibility of assessing the causes and the consequences of high rates of incarceration in the United States.

And my job, on the committee, was to bring to bear the most up-to-date scientific knowledge about the effects of imprisonment, what prison conditions did to or how they changed the people who were exposed to them.

We published the results of that, the committee's deliberations, which went on for two years in a book that was published in 2014 on which I and the rest of the committee members were a co-author.

I testified in front of the United States Senate in 2012. Senator Durbin had a hearing, really a historic hearing. There had never been a Senate hearing on the issue of solitary confinement. There were four or five witnesses, expert witnesses who were called to testify. And my job at the hearing was to talk about the psychological effects of solitary confinement.

In conjunction with the National Academy of Sciences Report I've been a consultant to the White House on several occasions to various Congressional Committees. Basically briefing those bodies on the, the analysis and the conclusions which the National Academy of Sciences Committee reached. Consulted with Bureau of Justice Statistics, National Institute of Justice, the Justice Department,

Homeland Security, all around issues of various aspects of the psychology of prison confinement.

Q.    And have you also, on the second topic you're going to talk about here, the effects of death qualification, are you also published fairly extensively in that area?

A.    Yes.  It's a topic which I became interested in the 1970's.  And I, at the time many of these, the issues I'm going to talk about were being litigated widely in the United States.  And I did, not only some, a number of studies myself, but also testified about these issues in various state and federal courts.

Q.    You have a copy of the three binders of exhibits that I referred to earlier?

A.    I do.  They are right here.

Q.    Okay.  And if you could take a look at the first volume, which is volume one of three, A1 through 18?

A.    Yes.

Q.    Does tab one contain a current C.V. listing your various qualifications and publications in the areas that you're going to testify about, as well as other areas?

A.    It does.

Q.    And does tab two contain your expert witness report in this case dated June 1st, 2016?

A.    Yes.

Q.    And do the remainder of the items in volume one and

also volume two and volume three contain copies of the literature that you either wrote or are going to discuss during the course of your testimony?

A.   Yes.

MR. BURT:  Judge, I would move into evidence, at this point, Exhibits A1 through 31.

MS. JIMENEZ:  Your Honor, the government does not object, given the Court's comments earlier.  I do just want to note for the record that we received this exhibit list Saturday night.  And that some of the studies listed on this exhibit list are not referenced in Dr. Haney's report.  And so we just learned about them Saturday night.

THE COURT:  All right.  I'll admit 1 through 31.

MR. BURT:  Thank you, Your Honor.  And, Your Honor, at this point I would offer Dr. Haney as an expert in social psychology and the effects, psychological effects of long-term incarceration and in the death qualification process.

MS. JIMENEZ:  No objection.

THE COURT:  Noted.  And I welcome his testimony.

Q.   Now, doctor, in terms of the substance of your testimony, have you prepared a power point which hopefully will get us through the material in fairly efficient fashion here?

A.   Yes, I have.

Q.    And is a copy of that power point in volume number three of that set of exhibits under tab 31?

A.    Yes.

Q.    And could we bring that up at this point?  Doctor, does this first slide, which corresponds with tab 31, set forth the two topics you're going to talk about?

A.    Yes, exactly.

Q.    And in terms of the first topic, let's start there, with the Conditions of Isolated SCU Confinement, tell us what SCU refers to?

A.    It's an acronym for this special confinement unit, which is essentially the federal death row facility.  It's an area within the prison at the United States Penitentiary at Terre Haute.

Q.    And in terms of framing that particular issue, if I could have the next slide, do you have a portion of Justice Breyer's opinion in Glossip excerpted here?

A.    Yes.  It was my understanding that the, at least part of the Court's focus in this proceeding was at least related to some of the issues which Justice Breyer had surfaced in his in Glossip.  And as you all know, one of the issues that he addressed or raised as a constitutional difficulty with the death penalty is the fact that death rows are kept in isolation, death row inmates are kept in isolation in most parts of the country, and certainly, as you'll see in a

moment, in the federal system.

And so this is one portion or the first portion in the Glossip opinion in which he raises that. There's a following paragraph I think I've also quoted that --

Q. Okay. And in this excerpt we have here, Justice Breyer says, it is well documented that such prolonged solitary confinement produces numerous deleterious harms. And then he cites, see, for example, Haney, Mental Health Issues in Long-term Solitary and Supermax Confinement. Are you familiar with that cite?

A. Yes.

Q. Did you write that article?

A. I did.

Q. Is that one of the articles you're going to talk about today?

A. It is.

Q. And could I have the next slide, please? Is this also from the Glossip dissent?

A. It is. Yes. It is, I mean, it elaborates a little bit on the issue of the dehumanizing effect of solitary confinement. But it's an interesting reference because it's one of the few times that the United States Supreme Court has talked directly about the dehumanizing effect of solitary confinement. It's a 1890 case. And In re: Medley actually is a death penalty case.

So many people like myself, who are scholars on the issue of solitary confinement, cite this case because it's the Court talking about the harms of solitary confinement.  But, in fact, it's solitary confinement that was imposed as the aftermath of a death sentence, not unlike the issue we're talking about now and that Justice Breyer has raised in Glossip.

Q.   So looking on the next slide, if we could, you're going to talk, first of all, about the Conditions of Isolated, SCU Confinement, correct?

A.   Yes.

Q.   And the next slide, could you define for us what you mean by solitary confinement?

A.   Yes.  So there are a variety of ways to define it. Most people who study it have settled upon a particular definition.  And that definition I've quoted here.  And it's actually from the United States Department of Justice. They've used the definition that most people who study solitary confinement use.

It basically means being confined to one's cell for approximately 22 hours a day or more, alone or with other prisoners, because solitary confinement can apply when prisoners are actually double celled as long as they are confined to their cell in the overwhelming majority of hours in a day.  And it limits their contact with others.

And they go on to say that an isolation unit means a unit where all or most of those housed in the unit are subjected to isolation as defined in the preceding paragraph.

And this is a kind of operating definition that most of us who study solitary confinement would endorse. I've defined it in essentially the same way in scholarly writing.

Q.    And I think you allude in your report to the fact that, or I'll ask you, is there any solitary confinement unit in the country that imposes total solitary confinement in the sense that there is absolutely no contact with any human beings at any point in time?

A.    No.    There isn't and there can't be if you reflect on a moment on that notion.  You can't, you can't keep a human being alive without having some contact with other persons. They have to be fed.  They have to get medical attention. They have to be checked in on and so on.

So solitary confinement has never meant total and complete isolation from another human being.  It's physically impossible to do that.  It was impossible in the 19th century when solitary confinement was in widespread use in the Eastern State Penitentiary in Philadelphia.  It's different now in the sense that we have more modern ways of controlling and monitoring solitary confinement, but it's

essentially the same kind of experience that it's always been.  And, as I say, the Justice Department defines it just fine in this quote.

Q.    So tell us what the effects are.  Just summarize that for us in terms of the effects of solitary confinement as you've defined it?

A.    So there are, there are several kinds of, distinct kinds of effects.  And the first set of effects are what I would call here, immediate symptoms or indices of stress and trauma.  And immediate doesn't mean that they happen in the beginning and then go away.

One of the things that I've learned, as a result of studying this widely, is that people are oftentimes traumatized by the experience of being placed in solitary confinement at the outset of their placement.  And that trauma continues.  It does not necessarily, for most people, subside.  It happens early on.  They have to figure out ways to cope with and survive it.  But, as you'll see when we talk a little bit later about long-term confinement, many people who have been in solitary confinement for a long period of time are still suffering as a result of the immediate shock that they felt when they first went into solitary confinement.

There are many symptoms and indices of stress and trauma.  And they have been studied by lots of different

people.  And I think the next slide actually to, not to dwell on all of them, but just to underscore for the Court how extensively these things have been studied, how many people have looked at these issues, how many different symptoms and indices of stress and trauma have been identified in studies of solitary confinement.

So this long string cite, which I will mercifully not go into in detail, basically just summarizes those symptoms, the symptoms that have been documented in empirical studies, the various studies that have documented them.  This is from an article of mine, the article that you cited earlier that Justice Breyer also cited in 2003.  There are more studies that have been done since 2003 that aren't listed here.  But this just gives you a feel for how many of these symptoms there are and how many people have studied them.

Q.   And that set of cites comes directly from your paper that is cited in the Glossip dissent?

A.   Yes.

Q.   Which that full article is tab 16?

A.   It is.

Q.   Of the volume there?

A.   I think this is Page 130 or 131 of that article, but it's just a section of the article where there are citations listed.

Q.    In addition to your own writing on that topic, is there support outside yourself for these effects?

A.    Yes.  In the next slide cites a couple of comprehensive literature.  Two of them are mine, but they don't cite only my research.  And, in fact, they purposely focus on the research that has been done widely by other researchers. Researchers, it's research really that spans decades, that people have been interested in solitary confinement for a long time.

I mentioned a moment ago the in re:  Medley opinion that Justice Breyer cited is from the 19th century. Solitary confinement has been around for a long time.  And people have studied it for a long time.  So there's a vast literature on solitary confinement and related psychological situations or contexts.

That second article that's listed here on this slide is the article that we've been talking about that that string cite came from, the 2013 article.  Stewart Grassian, a psychiatry professor at Harvard, has done research on it and written about and has a very good literature view that he's published in the Washington University Journal of Law and Policy.  That's the third listed.

And then Peter Shaw Smith, who is a Scandinavian researcher, summarized the research that's been done not only in the United States but also Europe and in Scandinavia

where they also have had solitary confinement and studied solitary confinement carefully.  So his literature review, both those last two are 2006 literature reviews.  Again, there's been research even done since 2006 on this topic.

Q.   And are the empirical findings, that are set forth in these studies, in terms of the effects of solitary confinement, are they theoretically coherent?

A.   Yes.  It's one of the things that has emerged over the last decade and a half.  The notion that there are sound theoretical reasons that explain the harmful or deleterious effects of solitary confinement.

A kind of deeper theoretical understanding of what may be obvious, but it's also always nice to have theoretical support for a proposition that seems otherwise obvious or common sense.  And I've listed the two, the two interrelated notions here.

In the last 10 or 15 years there has been a tremendous amount of research, broad research in social psychology underscoring the importance of social contact and social connectedness to human health and well-being.  You may, you may be familiar with the phrase, we're social animals.

Well, in the last 10 or 15 years social psychologists have actually documented how extensively and intensively we are social animals.  How fundamentally our

contact is with other people, not just to derive joy and happiness from contact with other people, but really our sense of self depends on our interactions with other people. Some social psychologists have argued, as a result of this research, that there's a fundamental human need to be able to connect to others.

One of my colleagues has written a book called Wired to Connect, by which he means to suggest that human beings are, in fact, innately structured, neurologically wired to connect to other people.

And one of the things that underscores the importance of this is what happens when you look at circumstances or situations with where people are denied the opportunity to do that or, for whatever reason, aren't able to connect to other people.

So there's been a lot of research on social isolation and social exclusion and loneliness in settings outside of prison.

So you're looking now at particularly aging populations where people have lost their connections to other people. They don't, it's not, they are not as comfortable interacting with other people. Or people who are placed in settings maybe even or homes or other institutions, but penal institutions, but places where it's difficult for them to have normal social interaction with

others.

And what researchers find is there is a tremendous negative cost, both psychologically and physically.  So that people who are isolated and lonely actually get sick more often.  And they also have higher mortality rates that researchers have been able to connect to their social isolation.

Now, these are studies that are done outside of the prison setting.  But it provides a kind of theoretical framework for what solitary confinement researchers have uncovered over the decades, which is that because solitary confinement imposes social exclusion and loneliness in, as comprehensive and pejorative a way as possible, it's not surprising that it has the kind of negative effects that we've been able to identify given what we know about isolation and loneliness in the world at large under conditions much less onerous, much less comprehensively isolating than exists in solitary confinement.

Q.    So that's the way it operates outside of prison.  Have you tested that theory in the context of the prison environment, and specifically the environment of prisoners who have been isolated?

A.    Yes.  I've done really research over -- I started doing the work in late 1970's.  And I've continued do it up, you know, up until the present time.

I've done it in a variety of different ways, but one of the main ways I've done it is to conduct long, systematic interviews, structured interviews with prisoners who are in isolation units in different parts of the country.

Oftentimes, I'm able to select these, the prisoners that I interview randomly so that I can be assured that it's a random or representative sample of the prisoners who are in these units. And then I'm able to interview them for an hour or so about -- with a specific list of questions designed to understand the nature of the experience, what they are going through, what's happening to them, how they've changed as a result of being in isolated confinement.

Not everybody reacts in exactly the same way, but as I've said here, virtually all of the people suffer from some form of distress and psychic pain. Very, very rarely does someone tell you that they are not bothered by this experience, that it does not hurt them, that they are not feeling distressed or pain of some sort.

There are -- the high prevalence of symptoms of severe stress and isolation related trauma, I'll show you some numbers on that in a moment. So that high prevalence addresses the issue of how many people feel this way.

So it's not just, as you'll see in a minute, it's

not just a few people, it's the overwhelming majority of people who are suffering from a whole range of these stress related and trauma related symptoms.

And then, because solitary confinement has been used in the United States with increasing frequency, really up until relatively recently, at which time, beginning a few years ago, I think there's been a, a reflection on whether or not we've overused this.  But it was unreflectively used for a couple of decades in the United States.

And what I began to encounter were people who were in solitary confinement for relatively long periods of time. So we're not talking about people who now are, maybe have spent a month or even a few months or a year in solitary confinement.  But I've encountered populations, or at least individuals within populations in solitary confinement, who have been in there for years, several years.  Sometimes a decade.  Sometimes two decades.

And what I have seen in those people is something a little bit different than simply the prevalence of symptoms of stress and trauma.  But, rather, it is the consequence of people trying to adapt to or adjust to living in a world without people.

It's the long-term consequence of what happens when we have to -- that wiring to connect that we have, begins to atrophy.  So you have to structure your life, your

world without human beings in it.

And, again, apropos what you asked me earlier, do I mean literally no one.  I mean no meaningful social contact with people.  And that's an abnormal situation to place people in.

You can argue about whether or not it's justified in some circumstances or not, but it's abnormal.  No one would dispute it's abnormal for people to live without the presence, the normal meaningful contact with others.

So how do we adjust to or adapt to living for a long period of time in an abnormal situation?  We began to make abnormal adaptations to that abnormal situation so that the abnormal becomes normal.

People get used to not being around other people. And after getting used to it it doesn't, it doesn't mean they are not in pain about it, but they just assume that there won't be other people in their life.

And then, after that happens, people begin paradoxically, to become aversive.  They don't want to be around people.  They, even though they are isolated from people they isolate themselves even further.  And that's what I've described a form of social pathology, that is, it is a pathological human adaptation to an abnormal pathological situation.

Q.   You said you had discussed the numbers in terms of the

prevalence.  And I think your slide that we have here does that.

A.   Yes.  So this is a, this is a summary of some of the, some of the data that's reported in the 2003 article that we've talked about a couple times already.  These are data that I collected in a study that I did some years ago in an isolation unit in California.  I've done this kind of study elsewhere in the United States.  And these numbers are roughly comparable in each one of those institutions.

In fact, I had an opportunity to go back to that particular facility and basically redo this study and came up with many of the same exact results even though it was 20 or so years later.

And what you can see is that the symptoms of stress related trauma are experienced by very high numbers of people.  Now, this was a sample of people who were randomly selected.  These were not prisoners who were complaining or they were not prisoners whose lawyers brought to me because they had issues.  This is a representative sample of prisoners who were in that unit at that time.

And you can see over 50 percent of them were experiencing one or another of these forms of trauma.  And some of the stress related symptoms were being experienced by nearly everybody, including anxiety, troubled sleep and feelings of an impending breakdown.

Q.    And the next slide, please?

A.    And then there were, again, in the same study, same group of people, a hundred randomly selected, so they were representative of the general population of people in that isolation unit.  And these are what I've characterized and they are characterized in the literature as the psychopathological effects of isolation.

These are a bit more extreme, but these are the kinds of thing that happen to people, not just under stress, but when they are under the kind of stress that people are in when they are in isolation units.

And so you can see, again, very high prevalence rates.  Most, in some instances nearly all of the prisoners are experiencing these things, sometimes experiencing them in very deep and profound ways.  You know, including things like chronic depression, three out of four people talking about just feeling hopeless and helpless.  More than three out of four of them withdrawing that paradoxical effect of being isolated, wanting to be around people, but then not being comfortable around people and so pushing people even further away withdrawing further into yourself.

The only, the only symptom of psychopathology reported by less than half of the people in this study were hallucinations and suicidality or thoughts of self harm. But even those things were experienced in this study by a

relatively high number of people.  A quarter of the prisoners I interviewed said that they had thought about, thought seriously about taking their own lives.

THE COURT:  How do you correct for the psychological impact of incarceration on all prisons? Right, because the general population probably has some of these troubles too.

THE WITNESS:  They do.  And so we have -- I didn't show you -- we have data that show for the general population much, much, as you would expect, much, much lower.  And then for prisoners in general, again, higher than the general population, but much lower than the prevalence rates for people who are in solitary confinement.

So other people, I've done some of that research myself, but there are other people who have studied what happens to people in mainline prison populations.  And those prevalences are nowhere near as high.

Q.   Now, doctor, you talked about your experience with people who have been in these isolation conditions for long periods of time.  And I want to focus just for a couple minutes on definitions of longer term isolation.

So if we could have the next slide and then the next slide as well?

A.   So longer-term isolation, when I use this term, you said what do you mean by longer-term isolation.  So I

thought I would try to define it in, with reference to how other people, other organizations have defined it.

Obviously longer-term or long-term is a relative comparative term.  So what do people who have opined about solitary confinement think is long-term.

So I've given you several examples here of people who have issued opinions and standards or mandates about the use of long-term solitary confinement.

The first one comes from the American Psychiatric Association and separately the Society of Correctional Physicians.  So the American Psychiatric Association, I'm sure you know, is the professional organization for the nation's psychiatrists.  The Society of Correctional Physicians is a group of physicians who work in prison settings.  So these are people who are not only physicians, but whose primary occupation is to work in correctional settings, oftentimes working for correctional institutions. They define solitary confinement that lasts for longer than four weeks as prolonged solitary confinement.

The second citation I've given you here is just from something that was issued last year by the United Nations.  The United Nations, as you may know, devises and then promulgates what they call standard minimum rules for the treatment of prisoners.  These have come to be known as the Mandela Rules, after Nelson Mandela.

But just last year they issued the latest version of these.  And they prohibit the use of solitary confinement that is indefinite.  So any solitary confinement that has no ending point to it is prohibited under the Mandela Rules. And it will also, what they call prolonged solitary confinement lasting more than 15 days, they, the Mandela Rules also prohibit.

The American Bar Association has standards on the treatment of prisoners.  They mandate, not an absolute ending point, but they do identify as 90 days the interval at which, each 90 days there needs to be a full classification review.  But not only that, an individualized treatment plan each 90 days devised in segregation with, as they say quote, a presumption in favor of removing the prisoner from segregated housing.  So a treatment plan each 90 days, with the expectation that that prisoner will be moved from solitary confinement.

And, finally, just a few months ago, the National Commission on Correctional Healthcare issued a position statement concluding that what they called, prolonged solitary confinement, i.e., greater than 15 consecutive days, constituted cruel, inhumane and degrading treatment and is harmful to an individual's health.

So these obviously are examples of what certain bodies or organizations that have considered this issue have

considered either long-term or prolonged.

In the United States we deal typically with longer periods than that.  But just so you can get a framework for what some of the evolving standards look like in terms of the length of time people regard as problematic, harmful or in the case of the NCCHC cruel, inhuman and degrading.

Q.   Who is on this National Commission on Correctional Healthcare and what role do they play in the correctional system?

A.   It's actually a prestigious body of correctional healthcare administrators and physicians, and including mental health professionals, who actually certify correctional healthcare in systems all around the country.

So you may know that the American Correctional Association does this as well.  And, but the NCCHC also is a body that evaluates the quality of correctional healthcare and mental healthcare around the country.

And correctional institutions apply for certification either from the American Correctional Association or from this organization or both.

Q.   Before we turn to your analysis of the federal death row, could you just elaborate a little on this idea of social pathologies of long-term isolation, which I think on the next slide you have summarized?

A.   Sure.  Again, this is based on the notion that somebody

is in an environment for a long period of time.  An environment in which they begin to operate on a day-to-day basis in the absence of meaningful human social contact.

They try to adjust and survive to this environment as best they can.  And the adaptation that they make is to try to accommodate to the fact that there is no interaction in their life, there are no meaningful social contacts.  But that adaptation oftentimes leads people to atrophy in their ability to interact with other people.  So much so that they actually become anxious around other people, find themselves, because they are hardly around anybody else, in those rare instances in which they are given an opportunity to interact with someone, find that this is anxiety arousing and they begin to develop what I call here a social phobia or an asociality.

I recognized this when I would do interviews with people who have been in solitary confinement for a relatively long period of time.  And when I was given, I was -- I don't always have the opportunity to have contact visits with them, but sometimes I would.  So that, you know, that would be a situation in which I would be able to actually sit in the same room with them rather than talking to them over the, over a telephone and through glass in a non-contact visit, but actually to interact with them the way you ordinarily would interact with somebody who you were

visiting or somebody who you were having a normal social interaction with.

And I realized this was, for many of them, the first time that they had had this kind of an interaction with anybody for months or years. And they were extraordinarily uncomfortable. Not having anything to do necessarily with me, but just because -- and some of them actually verbalized it, that it made them very uncomfortable, that they had to get used to it.

Now, sometimes they began to perspire. Some of them hyperventilated. I, you know, had the sort of natural human tendency when you meet somebody to extend your hand to shake their hand. And I had long-term isolated prisoners recoil from an extended hand because it was, it was so foreign an experience to them.

So it led me to begin to sort of dig deeper with this issue and understand that this is one of the things that happens to people who have been in this environment for a long, a long period of time.

The other thing I've listed here is what I've called, pardon this sort of academic jargon, but derealization or ontological insecurity. People really questioning whether or not they exist.

And this sounded farfetched to me when I first heard it, but the more I talked to prisoners, again

long-term, isolated prisoners, the more I realized that it was actually a very frequent phenomenon that occurs in these institutions.

So much of what we do and who we are depends on our interactions with other people.  It's such a part of who we are.  It's almost like the air we breathe.  We take it for granted.  And it's only when people, for long periods of time, are taken out of those opportunities to interact with other people, they, they really lose a sense of themselves.

And I've had many prisoners say to me, I don't know if I exist any more.  I don't have any -- I don't have any way of affecting the world around me.  The only interactions I have with people are these sort of proforma superficial interactions that I have with correctional staff.  And I, either there are times when I'm not sure whether I'm still here.  Or they talk about an unreality to their existence, not necessarily that they literally don't think they are there, but that there's something unreal about their, about their existence.

And it leads to, not surprisingly, this third phenomenon that I've described here as meloncholia.  A deep joylessness, a kind of a grief that's deeper than depression, where people just feel like they've lost who they are, who they were.  And they've lost the capacity to regain.

Again, this typically happens only after long-term solitary confinement, but it is a deep and a widespread phenomenon.

And then the final stage I've described here is social death. People being in an environment where as all of these things have added up over time for them they are no longer comfortable with people, they no longer feel connected to other people. Oftentimes relationships have withered because they've been in solitary confinement for a long period of time and they haven't, you know, for various reasons, haven't been able to maintain contacts with the outside world.

Many of these units are located in remote locations. So it's difficult for families to visit. Oftentimes you have only non-contact visits so even when the visits take place they are over a telephone, you're talking to somebody through glass. You can't touch them.

One of the components of this experience is that in the overwhelming majority of these places there are non-contact visits. So people have not touched another human being with affection for years or decades, however long they've been in solitary confinement.

The only physical contact they'll have with another human being is the incidental contact they have with a correctional officer whose putting them in restraints.

Otherwise, there's no opportunity to shake hands, hug, to do the things we ordinarily would do, not just signs or demonstrations of affection, but it's a way of reinforcing our humanness.

Well, you live for a long period of time where you can't do even those basic things and your self begins to recede.  And you experience, what I've called here, a form of social death.  You really don't have any meaningful contacts with people, both in the immediate environment where you're denied to have those kind of contacts, but even in the larger world around you.

And then in the case of people who are in these environments for very long periods of time, they age in these environments.  And, indeed, many family members also age, but without them and people pass away and they literally have nobody in the outside world with whom they can be connected.  And they are for all intents and purposes socially dead.

Q.   Now, did I ask you to assess whether the conditions under which federal death row inmates are housed constitute the kind of the solitary confinement that you've been speaking of?

A.   Yes.

Q.   And before I asked you to do that in this case, had you in fact toured any isolation units within the federal system

or interviewed any federal prisoners about the kinds of issues you've been discussing here?

A.    Yes.  I've toured the federal administrative maximum security, which is commonly referred to as ADX, in Florence, Colorado several times.  Interviewed many prisoners there.

Q.    And the ADX Unit is for non-death row prisoners who, for whatever reason, are confined in solitary confinement?

A.    Yes.  There are, in fact, several death row prisoners who have been sent to ADX who are currently confined in ADX, but it's primarily, overwhelmingly not a death row unit, but a long-term maximum, super maximum security prison.  Perhaps the, you know, the most modern and among the most isolating in the United States.

Q.    And how about your experience with death, federal death row before your involvement in this case?

A.    I, yes, I have, I had been to the special confinement unit, but did not tour it.  I conducted interviews with four or five prisoners in 2012 at the request of some federal attorneys who were concerned that clients on the federal death row were becoming so despondent over their conditions of confinement that they may be volunteering to be executed, to waive their appeals because the conditions were so severe.

And so they asked me to begin the process of trying to evaluate that issue, in a general way, to

understand what conditions were like and how -- if they were having an effect on people and, if so, how.

Q.    And did that process involve actually interviewing federal death row inmates in 2012, I think you said?

A.    Yes.  November of 2012 I was there.  And in a room that, a picture of which is coming up, but there's an attorney visiting room in the federal death row at Terre Haute.  And that's where I conducted those interviews.

Q.    Did you draw any conclusions as a result of those interviews in terms of conditions at that point?

A.    The conditions that were described to me by the prisoners I interviewed were severe, but I hadn't seen them myself.  But they certainly gave me reason for concern that that, that what the routines that the prisoners described in 2012, and their reactions to those conditions, were -- underscored concerns about the negative long-term effects of living in that environment, yes.

Q.    Now, and just recently, were you permitted to actually tour the facility?

A.    I was.

Q.    When did that happen?

A.    It happened just last week, on last Thursday, July 7, 2016.

Q.    Now, as a result of that visit, and also as a result of looking at some photographs that were in discovery, do you

have some photographs that you could use to sort of walk the Court through what the conditions are like there?

A.   I do.  I thought it would be better to try to explain this with photographs.  And I'll sort of narrate them as we go through.

And I'll do this quickly and please stop me if I skip over something, but I'll try to recreate what it was like as you walk into the, into the institution and then eventually get into the -- the special confinement unit is generally referred to both by the staff and by the prisoners as the SCU.  SCU.  So if I lapse into that you'll know that's what I'm talking about.

This is just the entrance, the outside entrance to the main prison.  The Terre Haute complex is a large prison. It's got a general population unit.  It's also got an infirmary and a special housing unit that you'll see in a minute.  And then in that unit that houses the special housing unit also houses the special confinement unit or the SCU.

Q.   And just so we're clear, in terms of the special housing unit, is that an isolation unit for non-death row inmates?

A.   It is.  It's special housing unit or security housing unit, or SHU, is a term which is used widely in the United States to describe isolation, solitary confinement, supermax

type prison units.

Q.    So are these units basically prisons within prisons?

A.    That's exactly what they are, yes.

Q.    All right.  Next slide, please.  What do we see here?

A.    So this is just the entrance area.  Everybody going into the prison.  Visitors and staff enters in this way.  This is where the security is done and so on.

And then you move through this area to the next area.  And this is the entrance to the actual prison itself.  So the visiting entrance is a slight distance away from the entrance of the prison, but, you know, you can see here the large walls that surround the entire prison as you go in.

And then when you get through that first gate or door you enter then a series of gates and walk down a hallway, a long hallway towards the area where the special housing unit or the SHU is located.  So you can see it's a fairly long hallway.  And the special housing unit and the special confinement unit, the federal death row, is down this hallway.  You have to go through a door.

The special confinement unit is on the second floor.  So there's an elevator.  You go through the next door.  Take the elevator up.

THE COURT:  I've been on a couple prison tours, not to this one, they didn't encourage photography.

THE WITNESS:  No, they didn't.  And it was -- so

some of these photographs, as Mr. Burt described, these were not taken by me. I'm not sure whether I would have done a better or worse job, but I can't take credit or blame for the photography.

So some of these photographs came from a file that involved an incident in which I believe Mr. Fell was involved in and you had photographs that had been taken of the facility.

And then other photographs were taken -- I requested, the legal affairs coordinator accompanied me, at the prison accompanied me on the tour. And I requested of him certain photographs to be taken of places that I wanted to be able to illustrate to the Court.

We got those, those photographs last night at about 9:30. So I've integrated some of those photographs in here. You'll see, they are distinctively marked. And it will be clear when those photographs come up. But most of the photographs, and all of them up to this point, are ones that were in the file that you gave me Mr. Burt.

Q. All right. Next slide?

A. So this -- so that this is the entrance to the unit, which you go inside the unit. Let me, let's back up and let me just talk for a second. Can we go back to the slide before that?

MS. DeWOLFE: I'm very sorry, I don't think I can

without jeopardizing everything.

THE WITNESS:  You can't.  Okay.  All right.  So that's okay.  There's, that, a slide like that comes up I think again.  So you enter into the unit, and let me put on my glasses and see, the corner where these three housing units come together is the, there's an area that, sort of in the very middle of the page it says, officer's station.  Exactly.  That's, that's called -- referred to by the staff and the inmates as the bubble.  That's the control room where the officers both have the security and restraint equipment and also control movement in and out of the unit, including being able to open the doors.

So this is a relatively modern facility in which the inmate movement is controlled in large part centrally with mechanically controlled locking devices.

Right where that arrow is, is the entrance to the unit.  So that was the earlier photograph that we went by quickly was taken right where that arrow is sort of looking out on the floor of the unit, which is generally referred to as the rotunda.

If you look, if you look at the arrow and then to the left you'll see below a series of rooms.  There's a room that's labeled law library.  I'll show you a photograph of that in a moment.  That's an area where prisoners are able to access the law library.  They have to make an appointment

to do it.  They get scheduled to do it.

They are taken out of their cells and they are placed in that room.  Only one at a time.  And they have access to a computer terminal on which they can do legal research.

The next room over is listed as an inmate workroom.  This room is depicted on this graphic as an empty room, but it isn't empty.  It's actually filled with eight cages.  I don't know how else really to describe them.  They are telephone booth size, type size cages, not unlike the cages that we'll see in a minute that are used for exercise, but they are smaller.

And in this inmate workroom these, the cages are there because, it was described to me, the unit manager Mr. Sample, Mike Sample, explained to me that this was an area which was used primarily for religious services.

So when prisoners are given an opportunity to come out for appropriate religious services once a week they are placed in these cages because they are not allowed to have contact with one another.  So they are placed in the cages and then the minister, or which ever denomination it is, comes in and administers the religious service.

There's also another, another workstation.  I believe there's two workstations in separate cages.  So two of the cages have a computer terminal in it.  And, again,

prisoners who have made appointments can do legal research in that room in one of the, in one or another of those two cages that are wired with a computer terminal.

Just to give a sense of, so we won't look, I'll show you these places, but just to get a sense of the configuration, if you go further down that bottom row there are some sort of empty areas that are, that are described as outdoor recreation.  These are also cage-like units, but they are outside.  Remind you, that this is, that this is the second floor.  This is actually on the roof of the building.

So these are, these are, when the prisoners go outside they go outside and they are on the roof of the building.  There are walls on the side so you can't see past, past the walls.  You can't see anything from that vantage point except above you.  You can see above, the sky above obviously.  I have a photograph of the cages, which I'll show you in a moment.

The three spokes that are coming out of the rotunda area or the open area are the housing units.  And if you proceed from left to right, or in a clockwise direction, the housing unit on the -- the first housing unit on the far left, the one that only has one row of cells, is the housing unit that is reserved -- it's unit or Range A.  It's used for prisoners who are in what is described in the SCU

protocols, it was reserved for prisoners who have received a notice of impending execution.  So it's set aside as the place where prisoners who have been notified that there is an imminent execution will be, will be housed.  And there are a certain set of protocols that apply to them.

The day that I was there I was informed that there were several other prisoners who were housed in that unit for different reasons, not because they had an impending execution, but some of them were on special administrative measures or SAMs.  There were two of them on the second floor.  And then there were two other men on the first floor who were there for various reasons.

This configuration is different.  You can see it from the diagram.  There's only one row of cells on -- to a unit.  I should point out that these are, all of these housing units are two stories high.  So you can -- obviously this is a two dimensional diagram, but the third dimension is that there are two floors or stories to each one of these units, including that first one or A Range.

The other thing that's different about A Range, and I'll show you this in a minute, is that the configuration of the cells is slightly different.  There's an interior, corrections people refer to it as a sallyport door.  There's the outer door and then there's an interior door.  And I have a picture of that I'll show you in a

minute.

Just, I think may be the only schematic that I have so I'll just quickly go through it and then I'll show you the actual facility.

B Range, in the middle, is for prisoners who are on phase two. This is the phase where prisoners have the possibility to have very limited interaction, face to face contact with other, with other prisoners. And I'll describe what that consists of in a moment. But those prisoners who are on phase two are housed in that middle, in that middle unit.

And then to the right, or as you go clockwise to the end, that's C Range. And the prisoners who are in that range are on phase one. And this is complete non-contact. There's never -- they never have the possibility of being in the presence of another prisoner. And that, that includes when they are exercising or any of the other activities that take place. They are always separated from another one, either in the cell that they are in or in a cage or in some other way.

Q.    Where does somebody start out when they first come to death row? Are they assigned to a particular phase, and, if so, how long do they stay in that phase before they move to another?

A.    So there are actually more people in phase one in the

institution.  There are about, 52 I think was the count the day that I was there.

Q.    Fifty-two total in the entire unit?

A.    Total in this unit, yes.  There are 120 cells.  And there are 52 prisoners, according to Mr. Sample.  I didn't see any documentation of that, but that's what he represented to me.

There are more than that, there are more than 52 death sentenced federal prisoners in the United States.  There are, there are a couple of them, who I mentioned a moment ago, at ADX.  There is one prisoner, who is a female.  And she wouldn't be housed there.  And there is another prisoner who was at the hospital the day that I was there.  So the count, I think, was about 52.  And 29 of whom were on phase one.  So you can see the majority of prisoners are on phase one.

You stay on phase one a minimum of one year when you go into the facility, but most people have been there much longer.  Any prisoner who is, has been convicted of attempted murder or murder in a correctional institution stays permanently on phase one.  Other, other prisoners are considered for movement to phase two after a year, but for various reasons many of them don't get moved, so have, basically have stayed on phase one.

Phase two is different in, I suppose a significant

respect, but not dramatically so.  Phase two prisoners are allowed to apply to have a partner who serves as an exercise partner or a recreation partner.  And also prisoners who are on phase two get two hours a week of what's described as leisure time.  There's a room on B Range where it's at the very beginning of the entrance to B Range.  It's to the left.  It's a room with a table in it, there's a television, and there's some board games and prisoner -- and a microwave.  Prisoners who have a partner, who have been approved to have a partner.  The partner, incidentally, is assigned by the institution.  So you don't get to just pick your own partner.  The institution has to approve the person who will be your recreation partner.  You can go into that area for two hours a week.  And you can also go out to outdoor exercise with that person.

Prisoners, whether you're on phase one or phase two or phase three, are permitted out of their cells to go to outdoor or indoor exercise one hour a day, five days a week.

So the total amount of time that a prisoner is in phase one would be regularly out of his cell would be five hours a week.  The rest of the time they would be isolated in their cell by themselves.

And those who are on phase two, and assuming they have been approved for the leisure time, not everybody on

phase two has been approved for this, you would have five hours of out of cell time for exercise or recreation and then an extra two hours of leisure time in that leisure room, for a total of seven hours a week.  Otherwise, they too are confined in their cell and confined in their cell by themselves.  So the fact that you have an exercise or a leisure time partner doesn't mean that you have any other contact with that person other than the time that you are in recreation or the two hours a week you would be in the leisure room.

Q.    In terms of the number of hours, maximum number of hours they can be out of their cells, how does that compare to other solitary confinement situations you're familiar with?

A.    It's on the -- it's on the restrictive side.  Not, not, not the opportunity to have an exercise partner or a leisure partner, but if you look overall just at the amount of time they are out of their cell, this is severe.  Most prison systems with which I'm familiar provide a bit more out of cell time, even severe units.

        Realize when we were talking earlier about the definition of solitary confinement, 22 or more hours confined to yourself.  The best of circumstances in this unit you are in your cell 23 hours a day.  If you take into account the five hours of outdoor recreation, and the two

hours of leisure time, that's seven hours a week.  That's one hour, average one hour a day that you are out of your cell.  So, you know, it, as these things, in my experience, this is a restrictive environment in terms of the amount of out of cell time.

Q.    Did you have an occasion, in the course of your preparation of this case, to talk with a former warden of death row, Mark Bezy?

A.    I did.

Q.    And were you able to determine, through your conversations with him, or otherwise, whether the federal system has yet had experience with inmates who have been moved into phase three, in other words, that informed that there is going to be an execution and then moved off that phase and told your execution has been postponed?

A.    Yes.

Q.    Has that happened in the federal system yet?

A.    It has happened.  It has happened in the federal system.  He had personal experience with this.  He knew a number of cases, I believe some of which he was actually the warden at the facility when it happened, where he had to counsel the men who had pending execution dates.

There's a certain protocol, he described it to me, as involving the details about who, who, to whom they wanted their property sent, how they wanted their body to be

disposed of. They had to identify people who they wanted to be witnesses to their execution. And then they were moved to this special unit, this A Range, where they were, where they were isolated even further.

You know, I should point out, I'll give, I was going to get to this when we looked at the A Range photograph, but A Range is, I mentioned that there are 52 people in the unit and there are 120 cells. So there are a lot of empty cells in this unit.

A Range is almost completely empty. So there are a total of two people on the second floor. And I think there are 16 cells. And those people are at opposite ends of the hallway.

So they're, they are not only isolated in their own cell, but they are isolated in the sense that there's no one around them. I mean, the man who is at the end of the second floor of A Wing is literally 14 cells away from any other human being on a day-to-day basis. He is a death sentenced prison who is on special administrative measures.

Q. You mentioned in your report that, and you allude to a letter, I think, by some of the prisoner representatives, that recently there's been issues about people being too easily moved from phase two back to phase one because of rules violations?

A. Yeah.

Q.    Would you explain that a little bit?

A.    Well, there's a lot of discretion, and as there is in many correctional settings, about whether or not somebody is going to be punished for a rule violation.  And there was general unrest among the death sentenced prisons about what they regarded as an arbitrariness to decisions that were being made about relatively minor rule violations resulting in them being moved from phase two back to phase one.

And, you know, it's, it is -- I mentioned that there are -- that the difference between the two phases are not dramatic but, but they are substantial when those are the only privileges that you have.

The unit manager, Mr. Sample, made it clear to me that the privileges that prisoners have on phase two are just that, they are privileges.  And that he made it very clear that they could be withheld or denied based on the, on the decision of the administration, primarily him, but other people as well.

THE COURT:  Mr. Burt, why don't we take a break.

MR. BURT:  Certainly.

THE COURT:  It's 10:30.  I would leave you with a question, if I could, because you are also an attorney, right, that's what we started out?

THE WITNESS:  More or less, Your Honor.

THE COURT:  More or less.  So here's my question

really, the additions and concerns about isolation which you've studied, certainly aren't unique to death penalty cases.  They don't strike me as sort of necessary or essential to the operation of a death penalty system.  And they are separate in many ways from the process of adjudicating a death penalty case.  So my question, and I'll leave you to think about it over the break, why aren't these issues subject to review and correction through something like a civil case challenging conditions of confinement rather than this case which looks more at the constitutionality of the penalty and the process itself.

THE WITNESS:  I'd be happy to answer that.

THE COURT:  Okay.  Catch you in 15 minute.

MR. BURT:  Thank you.

(The Court recessed at 10:30 a.m. and resumed 10:45 a.m.)

THE CLERK:  Your Honor, we are back on the record in criminal number 01-12, United States of America versus Donald Fell.  And we have Craig Haney as a witness.

THE COURT:  So what do you think, why are we here with these issues as opposed to in something like a Bivens case?

THE WITNESS:  Well, first of all, there have been, there has been civil litigation having constitutional challenges to this.  And I participated in some of them.

And they have been overwhelmingly successful in the sense the Courts have agreed with the literature that I presented about the negative effects on someone.

The issue then becomes, what is the remedy, what do you do to address these concerns.  And I think where most Courts have come out is to, is to reduce the amount of time that people can spend.  We just finished a case in California in which, although the Court didn't reach this decision, the parties did, ending long-term solitary confinement.

So the idea is not that you can, that you can or will end the practice per se, but that you will address the issue of duration, sort of the worse effects that I was talking about earlier.

The other resolution the Courts have reached is that there are certain kinds of people who should never be in these places, particularly the mentally ill.  So mentally ill prisoners have a higher likelihood of getting in a segregation unit, their mental illness tends to precipitate disciplinary infractions, they get written up for it, they get put in isolation.  They shouldn't be there.  Oftentimes their mental illness worsens in the face of these conditions and so Courts have recognized that and said those folks need to come out.

The problem is, Your Honor, that it is difficult

to reform these places.  Correctional reform is difficult in its own terms.  This is a -- so with respect to death row, it's a much, in a certain sense a more complicated issue because you really can't shorten the time.

So if you make a correctional commitment to putting death sentenced prisoners in conditions of isolation the remedy that many, not just Courts, but correctional systems have moved to of shortening the amount of time, sort of avoiding the worse case scenarios of long duration, all those changes I talked about, with a population of death sentenced prisoners they are, you know, the normative times now are measured in many years or even decades.  So you really can't, you really can't circumvent the problem by shortening the length of time in an effective way.

And, you know, it's my understanding that what, that Justice Breyer's point is, that this is an additional punishment over -- it has become a -- long-term solitary confinement has become an inevitable component of a death sentence in the United States simply by practice, simply by virtue of the fact that this now is part and parcel of the sentence by virtue of the lengths of time and by virtue of the correctional decision to keep and overwhelming number of death sentenced prisoners in isolation conditions.

THE COURT:  All right.  Thank you.  I appreciate you thinking about it.

MR. BURT:  Thank you, Your Honor.

DIRECT EXAMINATION CONTINUED BY MR. BURT:

Q.   So, doctor, I think we're ready to sort of move through the rest of these photos fairly quickly in terms of educating the Court here on what this place is about.  So if you could maybe narrate?

A.   Yes, I will.  And I will do it expeditiously.  This is one of the photographs that was provided to us.  This is one of the photographs that I asked to be taken and that we got last night.

This is a photograph of the law library. Prisoners are allowed in here one at a time.  Your clerk was nice enough to show me the technology whereby I can circle things.  So I'm going to try this.  So this is the computer terminal to which a prisoner has access when they are doing legal research.

This is a small room that's off of the main rotunda area that I was describing earlier.  When you first come into the unit it would be to the left as you are walking into the rotunda..

Q.   Next photo?

A.   Good.  Thank you.  This is a, just a perspective photograph.  This is on the bottom of the B Tier, the middle housing unit.  And it shows you up here where the location of the bubble or the control room where the officers are.

This is obviously the entrance to the housing unit.

The next photograph shows you, as you're going into the unit, walking from the rotunda.  Again, this is the B or the middle housing unit.

You walk through a gate to get in.  You can see the cells are arranged, this, the housing units B and C have cells on both sides of the hallway or the tier.  You can see that the -- they all have, and I'll show you a close-up of a door in a second, but they all have these solid metal doors.

The next photograph is the opposite perspective.  So that's looking down from the end of the hallway.  The cells at the very end looking down to where the entrance is.

I'm just going to guess here there's about 15, 16 cells on each side.  And then, again, remember these are two story housing units or walks.  So each one, A, B and C, both have two stories to them.

Let's to go the next one.  This is the, this is the housing unit that I described as having only one, one row of cells.  Both the bottom and the top floor are configured in this way.  This is the unit where I was describing earlier, prisoners who have pending execution dates are placed.  This is the A Block or A Unit.

This is what one of the cell doors looks like.  There's solid steel, small thin window.  Notable because obviously prisoners can't see into each other's cells.  You

know, if you're looking out of your cell you would only really be able to see another prisoner if that other prisoner happened to be looking out of his cell at the same time.

So these are obviously designed to allow the staff to look in, monitor or check on prisoners.  But they don't provide prisoners with very much visual access to anything outside of their cell.

Q.   Is this a standard in isolation units, these solid doors or does it vary?

A.   It varies actually.  I mean, this is -- again, this is on the more sort of severe and secure range of solitary confinement units.  There are some solitary confinement units in the United States that have open cells.  You know, they sort of have classic bars, open barred cells so that you have visual access to the hallway, visual access to prisoners who are housed in other, in other cells if you have cells across from you.

In other units there's a kind of a metal mesh on the cell.  Pelican Bay, for example, where some of the data that I cited and showed the Court earlier was collected, has a, kind of a tight metal mesh or grate on the door, but it does allow much greater visual access.  Here the, your visual access to the outside is, as I said, quite restricted.

Q.    All right.  Next photo?

A.    So this is a look inside one of the cells.  This is an empty cell.  I'll show you a cell in a minute, a couple of cells that are occupied.  But unique configuration in a sense because, well, two reasons.  Here is this sallyport grate that I talked about earlier.

Now these are only the cells that are in the one unit that, the A Run, the first unit that I described, where prisoners who are on, what's described as phase three, are housed and a couple of guys who I described earlier who were there for other reasons.

So what this means is when you open that metal door, it's the same outside metal door, but when the correction officer in the bubble opens that door, instead of walking into the cell there is this additional grate or sallyport configuration.  And that then has to be opened -- a second, a second gate then has to be opened for -- in order for the prisoner to come out.

Q.    All right.  The next photo?

A.    So this is a photograph of only a few of the doors. Each one of the housing units have these, they go by various, various terms.  They are basically what they, they call them at the SCU, food tray extenders.

So this is a procedure which is used if correctional officers who have to, of course, feed

prisoners.  They come around several times a day with food. Prisoners eat in their cells.  And if a correctional officer is having a difficult time with a prisoner who may be jostling the food tray or refusing to give it back, or whatever, they get, those prisoners get placed in this cell. And this is a mechanical way which allows the correctional officer to control the delivery of the food tray.

So the officer would put the food tray in this device.  And he would pull the lever allowing the prisoner to have access to the food tray.  So there's no -- rather than the normal exchange through the tray slot.  Which I'll show you in a second, the exchange of the food tray happens through this food tray extender.

There are only a few of these on the doors of the cells in the various units, but they are there.  And that's a configuration that they do use.

Q.    Next photo?

A.    Again, this is inside a more typical cell, either in housing Unit B or C.  Unusual configuration I started to say a moment ago.  These don't have that interior sallyport, but they do have something which very few other solitary confinement units in the country have, which are interior cell showers.

So this is a configuration, I first saw it at ADX in Florence.  This is one of the only other few units in the

country that have it.  It's important because what it means is that prisoners stay in their cell to shower.

So in other solitary confinement units you typically get out of your cell several times a week in order to be escorted to a shower somewhere in the unit.

And so prisoners have an opportunity for incidental social contact with others as they are walking to the shower and at least it's an opportunity to get out of your cell.

In these units prisoners don't have to do that. And so they -- and, in fact, aren't allowed to do that.  So they stay in their cell and shower.  You can see there's a little metal cabinet where prisoners keep their property. There's a bunk.  Basically the cells are all the same.  Very few variations.  I looked in every cell when I was there. And there was virtually no difference in the configuration of the cells.

There's a little desk over here and a plastic chair the prisoners can sit at.  There is a window on the back.  The windows are all the same.  They are covered with opaque covering.  So that, although light can come into the cell through the window, and you can see it here, you cannot see out of the window.  You can't see anything through the white.  It looks like kind of a plastic, either a pane or a chemical which the window has been covered with so that it's

impossible to see anything outside of the window.

Unless they are on punishment status prisoners have small televisions in their cells.  And, of course, there will be a sink and a toilet over here.  Prisoners sleep and eat and defecate and shower and do whatever they do on a daily basis in, in these cells with the exception of, as I said, the hour a day that they go out to exercise. Or if they are on phase two and they are approved for a leisure period they get two additional hours in that leisure room.

Q.    Next photo, please?

A.    This is inside of a cell that Mr. Fell actually, it turns out, occupied, at least in 2012.

Q.    Next one?

A.    Next slide, so you can get a feel for what a cell looks like when, again, this is Mr. Fell's cell, not necessarily his current cell, but a cell that he was in in 2012.

This is a relatively neatly kept cell, I must say. It varies.  You're going to see a cell in a minute that's not kept quite this way.

I make a point when I go to these units to look inside cells and see what people are doing, what their cells look like, and so on.

The day that I was there I noted that many of the men, it was about 10:30, 11 o'clock in the morning, many of

the men were asleep with the covers pulled up over their heads.  And you see this phenomenon in these kinds of units often.  It's a sign or a symptom that prisoners have relatively few activities in which to engage.  There's nothing for them to do.  There's no reason to get up.  There's no reason to do much of anything.  And so, you know, it's, it, if you see it in a widespread basis it's a sign for concern because it suggests that people have become increasingly disconnected from the world in which they are living.

I didn't do a systematic study of the prisoners in this institution, so I don't want to imply that I know that that's what's happening to them.  But I did note there were a lot of people at that hour of the morning who were just inert, not doing anything all.

When you counsel people about how to survive this kind of environment you counsel them against that.  You counsel them to get up at the same time every morning early, engage in activities, even if it's the same thing every day, to impose on yourself a structure because if you don't do that you are unlikely to be able to survive it.

Q.   Next photo, please?  This is just another shot of that same cell?

A.   This is the same, this is the same cell.  It's not uncommon for prisoners to sometimes cover.  So it looks like

this is a person who maybe is drying something.  Prisoners will sometimes put a towel or covering over the commode to, you know, for obvious sanitary reasons.  Um, and this is the environment in which prisoners in this unit will be living, as you'll see, on a very long-term basis.

Q.   Next photo, please?

A.   This is another cell.  Obviously much less well kept. I don't know exactly why the cell looks like this, but, you know, it would be a cause for concern if somebody was living like this for a long period of time.

It's not uncommon to see cells that look like this.  And I saw a few when I was in the unit, not necessarily quite as disheveled as this, but where people had obviously just kind of lost contact with the rhythm of life, with the rhythm of their day.

And you can imagine how difficult it would be for somebody to survive in an environment where you don't get out of your cell, where you do basically all of the things that you're going to do in a day in this same 60 or so square foot environment.  You accumulate property, you accumulate food.  It becomes difficult for you to take care of all that.  And eventually, for many people, not necessarily everybody, it becomes difficult for you to take care of yourself.  And that's sometimes manifested in the way in which you live in these environments.

Q.   If you could move ahead, I want to skip ahead to a couple of slides here, until we get to the page.  Is there something you wanted to say?

A.   Well, I just wanted to -- I'll just give you a configuration.  Maybe -- we can't back up.  Great, great, we can now.

Q.   We figured that out.

A.   All right.  So this is where you enter.  And this is a slide that we started with and I quickly skipped by it, but this is the entrance.  So the elevator is over here.  And you come off of the elevator and into the unit this way.  This obviously is the bubble.

Back here is where we're about to go.  It's the visiting area.  It's, this is the internal area.  This is where the prisoners are taken for their visits by correctional officers.

I should point out that there are on the doors of the prisoners indications of how many correctional officers are needed for an escort.  So there is a -- no prisoner gets out of their cell without being placed in restraints before they even get out of their cell.  That's the procedure.

Some of the prisoners have a one person escort, but many of the prisoners have additional escorts assigned to them.  And that's designated on a card on the door outside their cell.  And I saw as many as three correctional

officers indicated as needed for an escort.  But the point is, nobody leaves their cell without being under at least one, and sometimes as many as three correctional officers, and sometimes as many as three and a lieutenant escorting them.

In any event, under whatever circumstances they are moved through the unit, and if they have a visit, a social visit or a legal visit, they are going to go back through that door.  And the visitors will be coming through another hallway that's over here.  They never, of course, enter the area itself.

Q.    Next photo, please?

A.    This is the visiting area.  This is the back end of the visiting area.  So these are the doors through which the prisoner will go.  This is a seat where if a prisoner is having a legal visit, which will be a contact visit, these are the only kind of contact visits prisoners are allowed to have, there's always a correctional officer stationed on a chair sitting behind the room in which the contact visit is taking place.

Q.    Next?

A.    This is the attorney visiting room.  There were three of them.  There are a total of six visiting rooms in the facility.  Three are attorney visits.  Visiting rooms, they are identical, they all look like this.

The attorney or the prisoner sits on one side or the other. I can't tell which side the picture was taken. But they are identical basically on both sides.

And the, the contact visits are done in these three rooms. The day that I was there there was a contact visit with an inmate and an attorney taking place there.

Q.   Next?

A.   This is the social visiting area. There are, again, there are three of these rooms. So a prisoner sits on one side of the window and the, he and the visitor communicate over a telephone.

If a prisoner is getting a religious visit or visit from an outside organization that will take place in that room, in this non-contact visiting basis as well. So the only time a prisoner in this unit would have a contact visit would be on a legal, on a legal basis.

Q.   And then the last photo I think is the, is this the exercise area?

A.   Yes. So this, these, this is a photograph that the former warden of the facility, Mark Bezy, provided me with. I'd asked for photographs to be taken of this and also the cages that are in that inmate workroom, but for some reason or another I didn't receive them. But Mr. Bezy had a photograph of the outdoor exercise cage.

So you can see, a couple of things are notable.

One is that they are, they are clearly cages.  They are larger than the cells obviously.  And phase two prisoners who are approved to have an exercise partner can have, there can be two people in these cages.

The only equipment which is allowed out there is a basketball.  There's a basketball hoop in each one of them.  You can vaguely make it out up there.

The day I was there there were four men who were out.  They were each individually exercising.  They didn't have exercise partners.  They were really just walking around the perimeter of the unit getting their exercise that way.  They weren't, no one was playing basketball.

There are eight of these.  It looks much longer -- it looks like a very long hallway, but it actually isn't.  If you count them it actually adds up to eight.  So this last one here is the eighth one.

And Mr. Sample told me that they rarely have -- almost never have that many people out there.  And they oftentimes will separate them so they are not in adjoining, in adjoining cages.  So there may be four people out there but they might be separated by a cage.

You can't, you can see, you can see it overhead here, but you can't see anything else.  So there's no, there's no view here that you can actually, where you can actually see the outside world or nature or see a horizon or

anything like that.  You are on the roof of this facility.

The security housing unit inmates, the security housing unit is exactly the same configuration.  At least I was told that.  I didn't see it.  And it's underneath this.

So the security housing unit inmates exercise in cages like this, but instead of this sort of sky-like area, they have a ceiling or a roof over their head.  Otherwise the units are identical.

Q.   So going back to the definition of solitary confinement that you --

THE COURT:  Are we done with the photos?

MR. BURT:  I'm sorry?

THE COURT:  Are we done with the photos?  I just have one question.

MR. BURT:  Yes, Your Honor.

THE COURT:  Are you under any obligation, confidentiality obligation to the Bureau of Prisons with respect to these photos that I should also respect?

THE WITNESS:  I should defer that question to Mr. Burt.  I think there is an order which has been signed.  And I think it does probably --

MR. BURT:  I think the Court signed an order regarding the photos that were taken at, during the tour, the ones that are marked confidential in the program.  And the agreement was that those photos would be used only in

this case and then destroyed after they are used.  I believe I'm stating that correctly.

THE COURT:  Okay.

MR. BURT:  The photos that are not marked confidential were provided in discovery.  I did not think we have a confidentiality agreement as to those photos.  I certainly have no objection to it though if that's what the government wishes to do.

THE COURT:  All right.  Do you have a view about that?  I just want to be sensitive to the BOP security issues.

MR. BURNS:  That's very much appreciated, Your Honor.  We did discuss with BOP counsel regarding the photographs that were taken at Terre Haute last week.  And those were subject to a protective order.  We're not aware that there would be additional photographs described or used in this hearing.  We would similarly request that they be considered under the same protective order that exists.

THE COURT:  All right.  And then I haven't got it in the forefront of my mind, that provides for a sealing?  I just don't want them disseminated if the understanding is they wouldn't be.

MR. BURNS:  That's correct, Your Honor.  They can be used in this hearing and admitted as exhibits, but not disseminated beyond that.

THE COURT:  So I'll seal them in the Court's record.

MR. BURNS:  Thank you, Your Honor.

THE COURT:  Thank you.

MR. BURT:  Thank you.

Q.    So, going back to your definition of solitary confinement, did you form an opinion as to whether the conditions you've just described constituted solitary confinement within the meaning of your definition here?

A.    Yes.  So I've asked to put the definition up again so we can be reminded of it.

And, again, this is a definition, I've quoted the Justice Department, but it's a commonly accepted definition of what constitutes isolation or solitary confinement.

Clearly, even under the best of circumstances, the prisoners who were in even phase two and who have been authorized to have a workout partner and have access to the leisure room, would qualify as being prisoners held in isolation or under solitary confinement.

The best case scenario in the SCU is 23 hours a day alone or with other prisoners that limits their contact with others.  Most of the prisoners in that unit are experiencing solitary confinement for even more than 23 hours a day.  If you have only an hour a day, five days a week, out of your cell, that averages out to more than 23

hours a day in your cell.

Q.    And are there certain ways in which the conditions here actually constitute a harsher version of solitary than what you've been describing?

A.    I think so.  And I've listed them on the next slide.

Q.    Would you elaborate on that?

A.    Yes.  It, the core of solitary confinement and the core pain and suffering that people experience is from social depravation.  But there are aspects of it that, I think, makes some units a little bit different than others.

And on most dimensions that I can think of this unit, and certainly for prisoners on phase two, but even those on phase three, really falls into the harsher version of or instance of solitary confinement.  It's not a particularly benign unit in terms of the way it's architecturally structured in terms of the procedures which people are subjected to.

So I've listed here, I've talked as we were going through it, that these are solid doors with small windows on the outside.  So you have very limited opportunity to even look out at what's going on inside, inside the housing unit.

A number of prison solitary confinement units, and I alluded to this earlier, actually have open bars.  And you have the experience oftentimes when you go into one of those units prisoners who hear the gate opening in the unit will

put a mirror out of their cell to see whose coming in, coming into the unit.  So you have this, you have this experience where when you walk in there are people trying to figure out whose coming onto the unit.  And they have their, a mirror in their hand looking out their cell to see whose coming down the walkway.

That's a, you know, a way of, you know, very minimal way of participating in what's taking place in the environment.

Prisoners in these units, needless to say, don't have that opportunity.  And they -- what happens is you basically withdraw further into yourself when you have no, you have no connection whatsoever to what's going on in the hallway even.  Even at the level of looking at what's going on in the hallway, when somebody walks by, I mean, when I walked by, for example, there was not even any -- nobody even acknowledged the fact that anybody was in the hallway, let alone come up to the glass of their window and look out to see who was there.  I mean, these are prisoners who have learned simply to withdraw further into their cell.

The, you know, I've said here on the second item that these are prisoners who rarely leave their cells.  I talked a moment ago about the feature of showering in your cells, which, again, in a modest way, but nonetheless, limits even incidental social contact that you might have or

opportunities to get out of your cell on a regular basis.

These are underpopulated units.  You know, in, from a prison management perspective that's a good thing. Prisons that are overcrowded are hard to manage.  But from a perspective of isolation it's a bad thing because it means that you can be separated by several cells even from anybody who is similarly isolated.  So the opportunity to talk to somebody through a wall, as limited and difficult as that may be, is impossible in an environment where there are two or three cells that, in between you.  And that's the norm in this unit.  It's about half full or somewhat less than that.

And, you know, the one unit that I talked to you about already, at A Run, the first housing unit, has almost no one in it.  And those prisoners are about as isolated from human beings as anybody could be.

The fourth thing I've listed here is there's no view of the outside world, horizon, or nature of any kind. This may sound like a little thing, but prisoners will tell you that being deprived the opportunity to actually see or experience nature in any way, even to see it or touch it, is not necessarily quite as painful as the inability to touch other human beings or to connect to them.  But prisoners do experience this as a, as a painful form of deprivation.

This unit doesn't even allow prisoners to see outside.  And that's unusual.  Usually there's a little,

there's a little sliver of window in the back of a cell that people can look out of if they want to.  And, you know, it doesn't necessarily look out into a pleasant vista, but they can at least see the outside world.  Or not necessarily the outside world, but a world outside of their cell.

The prisoners in this unit really don't get an opportunity to see anything on a regular basis except what exists inside that unit.  And even when they go to the yard they can't see anything other than walls and a sky overhead, certainly, but no other, but no other view of anything else beyond that, beyond that unit.

And then I put down here the no contact visiting, which is not unusual.  This is the norm in many solitary confinement units.  But there is an additional issue here, which is that as the federal facility, this is a facility that houses people from around the country.

So prison, many prisons are located in remote areas of different, of whatever state they are located in. And the distances that visitors have to travel are sometimes daunting within a state.  But if you take into consideration the fact that this, this is, the federal prison, this is a prison that serves the entire United States.

I looked on the Death Penalty Information Center, which identifies the, the place from which the prisoners on death row in the federal system were sentenced.

The death row is located in Indiana.  There's only one prisoner from Indiana on death row.  All of the other prisoners are from other states.

So you take into account the fact that these are non-contact visits and, and the, the limitation, the limited nature of the visiting itself, the kind of experience that a visitor would have visiting somebody on a non-contact basis. And then the geographical distances that many, if not most of the families, would have to travel in order to, in order to reach this place, it, it, it's a severe environment in the sense that the, that the visiting is going to be very challenging in an environment like this.

The day I was there, for example, there was nobody visiting.  I can't, I mean I don't have any sense of how often visits occur, but I, I would expect to see that these, that the combination of the non-contact visits and the long distances involved would make it unlikely that people would be getting very many visits.

Q.   On top of those factors that you just discussed, are there unique aspects of the fact that this is a federal death row that add to the traumatic effects that you are talking about?

A.   Yeah, there are several additional issues.  I also tried to, tried to calculate from the Death Penalty Information Center the period of time, the length of time

that people are spending, have spent in this unit. So there, at the time that they calculated this figure, and I think it was in 2015 was the latest data they had, there were 62 death sentenced prisoners in the United States.

Now, the reason -- the reason for the difference between 62 and 52 the day I was there, some of it has to do with people like Mr. Fell who are elsewhere. So even though they are still on a sentence of death they are not housed at that unit. But just from their, from the calculation of the date that they entered I was able to determine that 39 of the 62 death sentenced prisoners have been housed in the SCU for 10 years or longer. Ten of them have been there for 18 years or longer, they are approaching their 20th or second decade at this facility.

Two things about that. One is that those are long, those are long terms. We're not talking -- remember I started earlier by saying prolonged has been defined by some groups as four weeks or longer. We're talking about people who, most, the great majority of whom have been there 10 years and some, you know, significant number of them have been there 18. But even perhaps more importantly, or equally important, it's intended to be a permanent isolated confinement. So these are not people who have any expectation of coming to the end of their time in solitary confinement because they are going to, because they've moved

through a step process or they've behaved well, or they've -- this is intended to be a -- the permanent conditions of their confinement until and unless the time of their execution.

And that's, that's the kind of indefinite duration of solitary confinement that, along with the actual amount of time someone is spending there, is recognized by, by most of us who study these issues as an added stressor, an added part of the trauma that people experience.  That you, you have really no expectation that if you just do -- if you move through the right steps or you behave yourself or you engage, you do this program that you can control your own fate.

These are people who, who realize that absent the intervention of the courts on some other dimension of their life over which they have no control they are going to be there permanently.

And then, you know, I've put what is perhaps obvious, but I think important to emphasize, these are not people who are just or only in solitary confinement, as onerous and psychologically damaging as that can be, but they are all living under the additional stress of a pending, if not impending, death sentence and the associated stress and terror and uncertainty that comes with that.

Q.   Justice Breyer, in his Glossip dissent, in that portion

you had quoted there, refers to the element of uncertainty. And we talked a little bit earlier about inmates who are given a sentence of death, an execution date and then moved off that phase three.

What role does uncertainty play in the process you are describing here?  And is there a literature that speaks to that issue?

A.    Yes.    There is broad literature that speaks to the issue of uncertainty and how uncertainty adds to the stress and pain of aversive experiences or aversive events in people's lives.

Basically it intensifies the painfulness of the experience because it makes it difficult for people to adjust to whatever reality they are going to be forced to adjust to.  They don't know their status.  They don't know their state.  They don't know what's going to happen to them or when it's going to happen to them.

And, you know, there's a literature well beyond the death penalty and the issues, the specific issues we're talking about.  But showing when people are in situations where punishment is going to be applied, for example, not knowing when the punishment is going to occur is much more psychologically aversive or painful than if you actually have predictability.

In fact, some of the studies have involved

something, where you have this experience repeatedly, it's called, a phenomenon that's called learned helplessness, where people are, they -- the bad things that happened to them are so unpredictable that they give up really trying to adjust to them or control them.

So broad literature shows that uncertainty, uncertainty about a negative event or painful event, a punishment or punishment event adds to the painfulness of it.

Q.   Did some of that literature come out of tortured situations?

A.   It does.  It absolutely does.  I mean, you, one of the things that -- torture protocols involved is imposing a unpredictable routine.  So somebody never knows when it's going to happen and they never know exactly what's going to happen.  And the idea is that that makes it all the more difficult -- all the more painful and also all the more difficult to resist.

Q.   So has that been studied in relation to the victims of that kind of trauma and what happens to them?

A.   Yes.  And the notion is this is part of the learned helplessness phenomenon that I talked about a moment ago. That what -- basically, it certainly doesn't happen to everybody, but it is designed to produce learned helplessness and undermine a person's ability to resist or

withstand what they are being subjected to.

Q.   All right.

MR. BURT:  Unless the Court had questions, I wanted to turn to the second area of your testimony which is the death qualification process.

THE COURT:  For the jurors?  The death qualification with respect to the jurors?

MR. BURT:  Correct.

THE COURT:  I was thinking maybe we should hear from the government at this point on this issue so we get people close in time.

MR. BURT:  Sure.

THE COURT:  You guys prepared for that?  Is that a good idea?

MS. JIMENEZ:  That's fine.  Can I just take a moment to organize?

THE COURT:  Take your time.  I know I sprung it on you.

CROSS EXAMINATION BY MS. JIMENEZ:

Q.   Good morning, Dr. Haney.

A.   Good morning.

Q.   So you talked a little bit about your background and your education.  I just want to clarify a couple of things. You do hold a JD but you are not a practicing attorney, correct?

A.   Correct.

Q.   And is it fair to say that you've never been a practicing attorney?  Is that accurate?

A.   That's fair to say.

Q.   So you have not done a trial yourself, correct?

A.   Correct.

Q.   Nor have you picked a jury yourself or been involved in the trial phase, other than testifying, correct?

A.   That's correct.  I studied those things, but I haven't actually -- I haven't actually appeared as the attorney of record in any case, no.

Q.   And you said you are not a clinical psychologist, you are a social psychologist, which means you don't do diagnosis or treatment, correct?

A.   Correct.

Q.   You have, however, testified at criminal trials, correct?

A.   I have.

Q.   In the penalty phase of death cases; is that correct?

A.   Yes.

Q.   And all of that testimony has been for the defense; is that correct?

A.   Yes.  All of that -- all of the testimony about a defendant's background or social history would have been on behalf of the defense.

Q.   And in some instances, in that testimony, you also talk about the nature of confinement or prison conditions, correct?

A.   Yes.  If a person has lived part of their life in an institutional setting I oftentimes try to analyze that institutional setting and testify about their institutional history as well as their social or family history.

Q.   You also testify in civil cases as well, correct?

A.   Yes.  I, I mentioned to His Honor that I had been involved in some litigation around prison conditions type issues.

Q.   And that's been on behalf of the plaintiffs or the prisoners, correct?

A.   Um, some, you know, yeah, certainly mostly.  You know, in the beginning when I was doing this I worked for the Justice Department actually.  And I was a witness for the United States in prison conditions cases.

Q.   Your more recent work has been on behalf of plaintiffs?

A.   It's generally the plaintiff's attorneys who retain me. And I evaluate conditions at their, at their request.

Q.   So yes?

A.   Yeah.  I mean, it depends on what you mean by, on behalf of the prisoners.  I mean, I do the evaluation the way I do the evaluation.  And if it's helpful to them they will put on the testimony and if it's not they don't.

Q.    Let's talk a little bit about the terminology that you've used.  And you addressed this a little bit on direct examination.  You have been using the term solitary confinement, correct?

A.    Yes.

Q.    And you would agree with me that, not in the context of experts in your field, but in the context of the lay person, the lay person's vision, when they think of solitary confinement, probably is that circumstance where somebody is put into a cell, nobody contacts them except maybe some food is shoved through the slot three times a day, and that's about it, that's probably the lay person's impression of solitary confinement, correct?

A.    I don't, I don't know.  I don't know what the lay person's impression of that is.  I think there's been a lot of public education about this issue in the last 10 or so years.  And I think a lot of people, a lot of members of the public understand that it constitutes pretty much what I showed you today.

Q.    You referenced in one of your reports another definition of solitary confinement which is Amnesty International's definition that solitary confinement covers all forms of incarceration that totally remove a prisoner from inmate society, it often means that the prisoner is visually and acoustically isolated from all other prisoners,

as well as having no personal contact with them.  You're familiar with that definition, it's from your Regulating Prisons Report, correct?

A.    Yes.  But that's not the definition that is typically used.  That kind, that version of solitary confinement doesn't exist.

Q.    But my question was, you're familiar with that definition?

A.    Yes.

Q.    And you even talk about in your Regulating Prisons Report, you talk about the fact that because of their, some ambiguity in the use of the terminology surrounding this type of housing, that it can sometimes be difficult to ascertain the exact conditions that are applicable in each study or each publication related to this issue?

A.    Well, I think I said in that, in that report, as I recall, that that's why it's important to try to specify what the conditions were.  That's why, for example, when I was talking about the SCU I had pictures, I talked about how it was different from other solitary confinement units I had seen.  It's important to do that, yes.

Q.    And each facility, each jurisdiction has slightly different policies in place as it relates to this type of restrictive confinement?

A.    I think that's fair.  Within limits.  I mean, solitary

confinement is as I've described it.  And then, you know, there are variations in terms of how much out of cell time, whether you have a window that looks anywhere, whether you have people housed along side of you and it's possible to talk to through the wall.  You know, so there are, there are variations on the theme and they vary in accordance.

Q.   So, yes, it does vary, correct?

A.   Within limits, yes.

Q.   You also -- in fact it's often discussed or called administrative segregation or restrictive housing, as opposed to solitary confinement, correct?

A.   Can you --

Q.   This type of housing is often referred to as either administrative segregation or restrictive housing as opposed to solitary confinement?

A.   Yes.  Different states have different terms; intensive management unit, high security units, variations on the terminology.

Q.   I want to clarify something.  In your report that you provided for this case you used, at times, the terms solitary confinement and you would say or supermax.  And you used those almost interchangeably, but those are not interchangeable terms are they?

A.   Um, it depends.  It depends on whether -- the term solitary confinement is the broader term.  Supermax tends to

refer to a dedicated facility where there is typically longer-term solitary confinement taking place.

Q.    For example, in the federal system, the only supermax prison is the ADX Facility that you referred to, correct?

A.    Well, it depends.  Again, this is a definitional issue. To a certain extent you could describe the SCU as a supermax facility.

It's, it's a separate dedicated facility.  It's dedicated to nothing else.  There's nothing else that happens there except isolation and people are there for a long time.

Q.    So you would describe the SCU as a supermax facility, but the Bureau of Prisons does not describe it that way, they only describe ADX as their only supermax facility, correct?

A.    I don't know.  I don't know whether they, in fact, I don't even know whether they describe it as a supermax. They call it administrative maximum.

Q.    All right.  Well, we'll come back with that because we're going to discuss ADX a little bit later on.

So I want to ask you some questions about some of the studies that you've published.  You referenced, during your direct examination, that one of the things that you had done is in 1993 you conducted some interviews at Pelican Bay's special housing unit, correct?

A.    Yes.

Q.    Now, at that time, my understanding is, that was a group of 100 inmates that you ultimately spoke to; is that correct?

A.    I actually spoke to more than that.  There were a hundred of them who were randomly selected.  So they were selected from the inmate roster of all of the -- taken from all of the prisoners who were in that facility.  At the time there were about a thousand prisoners who were housed there. I randomly selected a hundred names off of that list.  But I interviewed a number of other people in addition to those folks.

Q.    And what was the purpose of conducting those interviews?  Was it for litigation or was it related to your own study that you wished to conduct?

A.    It was both.  At that time nobody really knew, at least in the United States, or at least not that I knew of, what the effects of that kind of complete isolation were. Pelican Bay was a recently opened facility in California. And it imposed isolation to a degree that very few of us who studied prisons had ever seen before.  It was a supermax facility.  It was one of the first supermaxes in the United States.  I didn't know what effects of it would be.  I was relatively new to studying those kind of facilities.

            There was also a federal lawsuit which was pending

over those conditions.  So that was how I was able to get access to prisoners and able to conduct the interviews.  But it was for the joint purpose of genuinely finding out what the effects were.

THE COURT:  You must have said that's a state, California state facility?

THE WITNESS:  Yes, sir.  It was.

Q.   And ultimately the publication that discusses those interviews is the Mental Health Issues in Long-term Solitary and Supermax Publication in Crime and Delinquency from 2003; is that correct?

A.   Yes.

Q.   And that's, there wasn't anything published in 1993 or close in time to when you conducted those studies, it was the 2003 publication where it's discussed; is that correct?

A.   Yes.

Q.   Okay.  When you conducted those interviews, did you do them yourself or did you have somebody working with you who conducted them?

A.   I had a team of people for that study.

Q.   And so you didn't speak to every single one of those 100 people, correct?

A.   No.  I, I probably interviewed a third to close, you know, maybe a little more than that, but there were three other researchers who were with me.

Q.   And did everybody who was involved in interviewing the inmates have a set of questions that they were supposed to ask the inmates?

A.   Yes.

Q.   And do you have those with you?

A.   No.

Q.   Do you -- what were the questions?  What did they involve?  How many questions were there?

A.   There were a series of questions.  We did the interviews the way I've done them many times since then.  That was the first such study that we did.

We did an institutional history.  We asked the prisoners to tell us a little bit about their background, their experience in the prison system, how old they were when they came into the prison system, what other institutions they had been to.

We asked them some demographic information; their age, their marital status.  We made a notation of their race or ethnicity, where they lived.  They were California prisoners.  Where they lived in California.  Asked them a little bit about how many visits they had had in the last year.

And then we asked them a series of questions about things that we told them prisoners who were in isolation sometimes experience and sometimes don't.  And we were

interested in finding out from them whether or not they had experienced these things. And if they said that they had experienced these things we asked them how often they experienced them.

And then there were a list of 27 items, 25 of which were items that were taken from literature about stress and trauma and some of the literature that addressed issues of psychopathology or psychopathological consequences of isolation, things like ruminations, depression and so on.

Q. So when they were asked about these series of symptoms or psychological effects, they essentially were providing a yes or no answer followed up by, if they said yes, how often that occurred; is that understanding correct?

A. It was a little bit more elaborate than that. We asked them yes or no. And then we asked them how often. And then we asked them to describe a little more, tell us a little bit more. How long has this been going on, how has it affected you, elaborate. And we took notes on what they said.

Q. And so the percentages that you published in that 2003 paper, that we were discussing, are those percentages based on their yes or no answers to whether or not they had experienced that particular symptom?

A. Yes. We asked them have you experienced these, been bothered by these things in the last three months.

Q.    And that would reflect the percentage -- if they said yes they were included in having experienced that symptom?

A.    Yes.

Q.    These were not symptoms that were intended to diagnose them with any particular mental illness, correct?

A.    No.    These were signs and symptoms of trauma and stress or the psychopathology of isolation, but not diagnostic and statistical manual symptoms that would lead to a diagnosis of a mental disorder.

Q.    And that's not what you do, that's not the type of work you do, correct?

A.    Correct.

Q.    And when these inmates were asked these questions they were already housed in the special housing unit at Pelican Bay, correct?

A.    Yes.

Q.    And this is some now over 20 years ago when this happened.    The conditions at Pelican Bay are different or were different at that time than the conditions you described at the special confinement unit at USP Terre Haute?

A.    In some respects they were different, yes.    They are different facilities.

Q.    And then ultimately your publication that you, that you published about this study, you ultimately compared the

results how often these inmates or what percentage of these inmates indicated they had experienced one of these trauma symptoms, and you compared them to some surveys that had been done of the general population, meaning the general population outside of prison, correct?

A.    We compared them to a couple different populations.  So there were, there were some studies that had been done of people in general.  There were some studies -- in which some of the same kind of items were used.  There were some studies that had been done on people in prison.  There were studies that had been done of people who were in prison and in isolation units, but protective custody units, where they essentially asked to be placed for their own protection in these units.

And then we also had some -- I did some comparisons with -- I looked to find a group of comparably traumatized people in, in the psychiatric or mental health literature.  And we were able to find one group of people who approximated the Pelican Bay prisoners.  They were a group of people who were former political prisoners in East Germany who had come to West Germany for psychiatric care.

Q.    And the different surveys that you were comparing your group to, those surveys were done in different years.  For example, the Dupuy Engel, that sample was done in 1970, correct?

A.    Yes.    General, general survey of the U.S. population.

Q.    And the survey done by Broadski and Scoggins, that was done in 1988, correct?

A.    Yes.

Q.    And your questioning was done in 1993, correct?

A.    Correct.

Q.    You did not use a control group in this study; is that correct?

A.    No, we didn't have a control group.

Q.    You also, you mentioned that you had a chance to go back and interview inmates at Pelican Bay.  That happened in 2003, correct?

A.    No.  That, that happened, that happened just two years ago.

Q.    Well, I'm referring to when you went back and you, this was part of the Ashaer litigation?

A.    Yes.

Q.    And you discussed that in your 2003 publication, correct?

A.    No.  The Ashaer litigation was not even filed until 2013.

Q.    You, in that you were working for the plaintiff's attorney, correct?

A.    Yes.

Q.    And you went back and you again interviewed some

individuals in the SHU at Pelican Bay?

A.   I did.

Q.   Twenty-five of the people -- it's my understanding that 25 of the people, I could have that number wrong, but a portion of the people were specifically selected by the plaintiff's attorney, correct?  It wasn't random, they said I want you to go talk to these people?

A.   No, that's not correct.  They were randomly selected. If you are talking about the -- so there were several groups of people I interviewed.  If you're talking about the comparisons that I made at Pelican Bay, I made a point of randomly selecting people.

         And there, there there was a comparison group because I also randomly selected people who were in the mainline housing unit also at Pelican Bay, but not in isolation.  And they were also randomly selected.

Q.   I'm talking about as part of your Ashaer litigation, correct?

A.   Umhum.

Q.   And you did a report related to that, correct?

A.   Yes.

Q.   Okay.  It was a declaration.  And you referenced in that report that some of the inmates that were interviewed were selected by plaintiff's counsel?

A.   But that was not -- as I said, there were several

groups of inmates.  The group of 25 inmates, that you're referring to, were randomly selected.

Q.  I apologize.  I may have mis-spoke with the number of 25.  I don't want to mislead you with that number.

My question is, in general, in the course of the work that you did related to this litigation, some of the inmates that you spoke to were identified to you by plaintiff's counsel?

A.  Yes.  The named plaintiffs in the litigation were among the people who I interviewed.  Not as part of the study of Pelican Bay, but, rather, as part of just talking to them and understanding what the issues were that they, that they were concerned with.  But the study that I did at Pelican Bay was of 25 randomly selected prisoners from the population of isolated prisoners.  And then I compared that to a group of people who had been in the mainline housing unit.  Both groups that had been at least 10 years or more.

Q.  You handled that similarly to how you handled it back in 1993, correct?  It was a series of questions through an interview process?

A.  Correct.

Q.  Identifying symptoms that they had?

A.  Yes.  It's the only way anybody can identify symptoms whether you are a clinical psychologist or a social psychologist is by asking people whether they are

experiencing certain things.

Q.    You referenced, during your direct testimony as well, a study done by Grassian, and that was Psychiatric Effects of Solitary Confinement.  You mentioned that study in your direct examination?

A.    It's actually a literature review.  He does a long literature review.  If you'll remember, that is the slide where I said there are some extensive literature reviews that have been done of the literature on solitary confinement.

That was a literature review in which Stuart Grassian wrote about, not only his own research, but the research that a number of other people had done as well.

Q.    He didn't do any original study for that publication, correct?

A.    I don't know, I don't think he did for that publication.  He has done original research on this issue. He did one of the early studies done in the recent history of this in the United States done in Massachusetts, but I don't, I don't remember whether, how much he references his own work in that literature review and how much he concentrates on the work of others.

Q.    Well, would it sound familiar if I said he does discuss some basically anecdotal reports of prisoners that he's spoken with, but doesn't do any original work specifically

for that publication, would that sound accurate to you?

A.    It could very well be.

Q.    He also, when he goes through this literature review he includes things outside of the prison context that he discusses, correct?

A.    Yes.

Q.    He talks about prisoner of war experiences, correct?

A.    Yes.

Q.    He talks about experimental research on sensory deprivation?

A.    Yes.

Q.    He talks about soundproof rooms, cardboard tubes surrounding the arms, things like that, that are done, that were done by other people in specific testing circumstances, correct?

A.    Yes.    Long tradition of sensory deprivation research, a lot of it done in Canada in the '60's or so.    And he references some of that.

Q.    And the conditions that inmates housed at, whether it's the SCU or a special housing unit in prison, they are not subjected to the sensory deprivation that is discussed in part of in his study, correct?

A.    Not in the same way.    I mean, I think what Stuart is saying, and what I've said when I write about these things, is not that these are exactly the same kinds of experiences,

but that we know from those studies that a lack of sensory stimulation causes psychological and even psychiatric problems.  That's what that research shows.

And there is some limitation of stimulation in these environments, even in an environment like the SCU. Not like the sensory deprivation studies certainly, but it, certainly in a way that also suggests that people can deteriorate and your mental faculties can atrophy from a lack of activity or what might be described as sensory stimulation.

Q.   Would it be accurate if I stated that my understanding is the only publication that you've published that specifically discusses your own work or a study that you've done in a scientific journal or legal journal has been not mental health issues in long-term solitary?  And I'm not talking about literature reviews.  I'm talking about something where you discuss your own work or your results from interviews or surveys or what have you.

A.   No.  I think I've -- I think I discuss my work periodically from time to time.  I'm involved in writing a book about solitary confinement now, in which the more recent Pelican Bay study is, is featured in that.

You know, I've been doing this for a lot of years and have done a lot of interviews as I've described.  And I refer to them from time to time in written work.

Q.    And I'm talking about not just referring to them, but a process where you're publishing information about a particular study you did, describing the methodology and describing the results of that study?

A.    No.  I think -- no, I don't -- I wouldn't --

Q.    As contrasted to anecdotal references, maybe in some of your other publications, where you're talking about your experience?

A.    No.  I think I often, I often refer to that work in various, in various publications.  I often refer to the work that I do not -- in more than an anecdotal basis.

Q.    And what -- so then what other publications have you discussed the exact methodology that you've gone through, what your results were?  What other publications?

A.    Well, I'm not sure I've discussed exactly what the methodology was, but I've certainly made reference to those results in a variety of different publications talking about the impact, the prevalence of solitary -- the prevalence of these symptoms in solitary confinement units in a variety -- I think I may have even referred to it in my book on prisons, Reforming Punishment.

I mean, it's not something that I don't talk about or don't make reference to in articles.  The findings, not necessarily the methodology, but the findings.

Q.    Let's talk about the Colorado study.  You're familiar

with the Colorado study, correct?

A.    I am.

Q.    That's a study that was done in 2010, correct?

A.    Yes.

Q.    At the Colorado Department of Corrections?

A.    Yes.

Q.    And it was done about what they referred to as their, I believe they use administrative segregation to describe that population, correct?

A.    Correct.

Q.    And you referenced that in your Pre-Sentence Report as something you're very familiar with?

A.    I am very familiar with.

Q.    And you are aware that one of the goals of that study was to address criticisms that there wasn't enough empirical research in the area of restrictive housing, correct?

A.    Well, that was, that was the perception -- that's the stated goal of the people who did the study, yes.

Q.    Yes.  That's my question.  I'm talking about what their stated goal was.  And there was, they wanted to respond to that by putting together this study on administrative segregation in Colorado, correct?

A.    They wanted to get to the bottom of what the effects of administrative segregation were in the Colorado system.

Q.    They followed in that study inmates who had been housed

in administrative segregation for a period of a year,
correct?

A.    A period of as much as a year, yes.

Q.    And they also started out prior to these inmates being assigned to administrative segregation, correct?

A.    I'm not sure what you mean by that.

Q.    Well, in your study in Pelican Bay, when you went to interview the inmates, they had already been, for some period of time, in the special housing unit there, correct?

A.    Yes.

Q.    In the Colorado study, they attempted to identify individuals who were just at the point where they were being assigned to either administrative segregation or not administrative segregation, correct?

A.    Yes.  That's correct.  But it's, it's an important issue because it's one of the fatal flaws in the study.  All of those people were already in a form of solitary confinement.  That's how they were identified.

So they were originally being considered for, they were originally being considered for placement in one year of administrative segregation and housed in a special form of solitary confinement in the Colorado system, all of them.

Q.    Well, one of the ways, and we're going to talk about in a little while why people get placed into restrictive housing, but one of the ways that people end up in

administrative segregation, at least in Colorado, is that there's some investigation into some conduct in prison, or perhaps they are new coming into the prison, so they are housed there temporarily until a decision is made, either yes, we're going to send you to administrative segregation or no, your punishment, or what have you, is not going to be administrative segregation, you're going back to general population?

A.    Right.  And that, and that temporary housing is, was a very severe form of solitary confinement.

Q.    And in the Colorado study they did several different, I guess I'll use the word interview, although we're going to talk about what they did, but they talked to these inmates and gathered data at several different points in time, correct?

A.    They did no interviews.  Another flaw in the study. They administered questionnaires.  So they had a graduate student who came and handed out questionnaires to the prisoners.  The prisoners filled out the questionnaires.

She looked at the questionnaires.  If there were answers on the questionnaires that she didn't -- that concerned her she gave them the questionnaires back to correct.  So it was a terrible methodology.

Q.    I understand that you have criticisms of the study, and we're going to talk about those criticisms, but right now my

question was, whether or not they spoke or performed these questionnaires at various different points of time with the inmates.  That's how they did it, correct?

A.    Yes.  I thought you asked me whether or not she did interviews with them or they interviewed the prisoners. They did not ever interview the prisoners.

Q.    Well, my question was about the timing of it, that they did it at several different points in time, correct?

A.    Yes.  They did it over, for most of them, over a year period.  Not all of them, but for most of them.

Q.    And, in fact, I believe there was four different time periods where they would go back and administer these questionaries?

A.    Yes.  Assuming the prisoners were still there.

Q.    And, correct.  And obviously some of them left before the end.

At some point, the initial questionnaire that was administered though, was generally administered as soon as they could after they were identified as going into this special area where the decision was going to be made about administrative segregation, correct?

A.    Yes.  They would be in another form of administrative segregation.  And that was when the initial contact was made.

Q.    They also used actual assessment tools with these

questionnaires, correct?

A.    They used a variety of questionnaires.

Q.    And these were assessments that were looking at --
well, I'm just going to go through I guess what the
instruments were.

There's one called the Beck Hopelessness Scale,
correct?

A.    They used items from that.  They didn't use the actual
entire scale.

Q.    Well, they indicated the 12 self-report instruments
used in the study were the Beck Hopelessness Scale, the
Brief Symptom Inventory, correct?

A.    Um, hum.  Yes.

Q.    The Coolidge Correctional Inventory, correct?

A.    Correct.

Q.    The Deliberate Self-Armed Inventory, correct?

A.    It's been a while since I looked at this study, but if
you're reading it I assume it's correct.  They used a
variety of scales, not necessarily the whole form of all of
the scales, but they used a variety of scales.

Q.    Would it be helpful if I gave you a copy of the study
to look at as we're discussing it?

A.    No.  And I understand it well enough to talk to you
about it.

Q.    Okay.  They used the Prison Symptom Inventory, correct?

A.    It sounds correct.

Q.    Profiled Mood States?

A.    Fair enough.

Q.    Sounds correct?  St. Louis University Mental Status, State Trait Anxiety Inventory, Structured Inventory of Malingered, Symptomatology, Trail Making Test and Trauma Symptom Inventory, if all of those are listed, and I'm reading directly from the report, you are not disputing that those were the tools that were used?

A.    If you're reading them I'm sure they are there.

Q.    All right.  And so they conducted this study.  And they, it had this questionnaire administered at four different times where that was possible, correct?

A.    Yes.

Q.    And they approached this study with the hypothesis that administrative segregation is extremely detrimental to inmates both with and without mental illness, correct?

A.    I'm, I'm not sure, when you say they, I'm not sure that um, I can verify what everybody working on this study had as their hypothesis.

        I know, for example, that one of the consultants on the study, Jeff Metzner, has had ambivalent feelings about whether or not solitary confinement had a negative effect on people.  So I'm not sure what everybody's hypothesis was.

Q.    Well, I'm talking about the actual published study in which the section labeled findings are quoted as saying, the results of this study were largely inconsistent with our hypothesis and the bulk of literature that indicates AS, standing for administrative segregation, is extremely detrimental to inmates with and without mental illness.

So regardless of what you're saying you think the personal opinions of the individuals are, this publication, that's what they state as their findings, correct?

A.    That's what they state, yes.

THE COURT:  Did you say consistent or inconsistent?  I just couldn't hear.

MS. JIMENEZ:  Inconsistent.

Q.    So, and I guess let me back up a little bit, because in addition to following and administering these questions to both inmates who were placed in administrative segregation and sent back to general population, they also divided those groups into inmates who had been previously diagnosed as either mentally ill or not mentally ill, correct?

A.    Yes.

Q.    And they also followed a separate group that were sent into special housing at a special psychiatric unit?

A.    Correct.

Q.    And so they were following all of these different groups to compare them?

A.    Yes.

Q.    And, in fact, they went into this with the hypothesis or the opinion that the results were going to be that administrative segregation caused harm to these inmates?

A.    No.    That's, it may be as a minor disagreement between us, but I don't think that's entirely accurate.    I know, in fact, that Jeffrey Metzner, who is colleague of mine, did not hold that hypothesis.

So I can't speak for the others who I don't know terribly well.    But I do know him.    And I know he had expressed, even in print, skepticism about whether or not solitary confinement was harmful.    He has since changed his opinion, but his opinion at the time of this study was done was quite different.

Q.    You are not actually listed as an author on this study?

A.    Correct.

Q.    And the study that's published, and I'm quoting again, states, we hypothesized that inmates in segregation would experience greater psychological deterioration over time than comparison inmates who were comprised of similar offenders confined in non-segregation prison.    So they state what their hypothesis is right there, correct?

A.    Well, that's a hypothesis, but not necessarily an expectation.    That's different.    I mean, you say it's your expectation, that suggests that you are implying that you

expect that to happen.  Hypothesis is something you're testing.

Q.   And their hypothesis was that there wouldn't be any harm, correct?

A.   There -- no, I think their hypothesis was --

Q.   Or, I'm sorry, that there would be harm?  I apologize.

A.   Yes.

Q.   That was my fault.  And the results of the study were actually contrary to their hypothesis, correct?

A.   The results of the study, as I pointed out in my report, are uninterpretable.

THE COURT:  Are what?

THE WITNESS:  Uninterpretable, Your Honor.

Q.   You've given your opinion, right now I'm asking what the results in the published study are.  We're going to talk about your opinion.

The findings, as reported in the study, were that more inmates in segregation improved than declined with their mental health, correct?

A.   Yes.  That segregation was good for people.

Q.   The findings in the -- well, that's not what they say actually.  We're just talking about percentages now.  So they found that percentage-wise more inmates in segregation improved than declined, correct?

A.   More improved than declined.

Q.   They also found that adverse psychological symptoms in segregation could not be attributed to the segregation, correct?

A.   Correct.

Q.   They also reported that the greatest degree of psychological disturbances and the greatest degree of negative change were actually found in the group of offenders in the psychiatric care facility, correct?

A.   If you're reading the results I'm sure that's right.

Q.   You don't have a specific memory of that as you sit here?

A.   I remember them concluding a whole lot of things on the basis of data that was, as I said a moment ago, uninterpretable.

THE COURT:   Why don't we take an hour for lunch, okay?  We'll get back together a few minutes after 1.

(The Court recessed at 12:02 p.m. and resumed at 1:03 p.m.)

THE CLERK:   Your Honor, we are back on the record in criminal number 01-12, United States of America versus Donald Fell.  And we have Craig Haney still on the stand.

THE COURT:   All yours.

MS. JIMENEZ:   Thank you, Your Honor.

EXAMINATION CONTINUED BY MS. JIMINEZ:

Q.   And Dr. Haney, I went ahead and asked Madame Clerk if

she would mark for identification the Colorado study. It's been marked as Government's Exhibit 10. I'm directly quoting from it. I'd be more comfortable if you had it in front of you.

MS. JIMENEZ: And may I have the Court's permission to approach and provide that to the witness?

THE COURT: Of course.

MS. JIMENEZ: Thank you.

May I have the Court's indulgence for a moment? I thought ahead and printed two. I didn't think I had to print three for defense counsel. And I think I can give it to him digitally and he can put it on his computer?

THE COURT: Yeah, sure.

MS. JIMENEZ: My apologies. Thank you, Your Honor.

THE COURT: Sure.

Q. So, Dr. Haney, what I would like to do is talk about, just briefly, we ended, and I believe I was asking you about the conclusions or the findings of the study. And if you'll refer to the study, starting at Page 31, you agree with me that's the section that starts with the results, correct?

A. Yes, correct.

Q. And I'm going to ask you to just sort of briefly flip through to page 77. And you can maybe flip over and look at 78. And just ask you if you would agree with me that

generally speaking the results are quite lengthy and are

described in detail on pages 31 through 77 of the report,

correct?

A.    Yes.

Q.    The good news is, I'm not going to go through every

single page in detail of that, but I wanted to have some

sense that there's quite a bit of analysis, there's charts,

graphs, statistical analysis present in those pages, would

you agree with that?

A.    I would.

Q.    And if you'll go specifically to page 78, to the bottom

paragraph, I'm going to ask you to go ahead and take a look

at that paragraph and ask if you would agree that that

appears to be basically a summary of one of their main

findings in the study?

A.    Yes.

Q.    And part of their conclusion was that, and I'm going to

about four lines from the bottom, this study cannot

attribute the presence of SHU symptoms to confinement in AS

or administrative segregation, correct?

A.    Yes.

Q.    And they even showed that there was a -- that the last

line states that, in fact, the group of offenders who were

placed in a psychiatric care facility had the greatest

degree of psychological disturbances and the greatest amount

of negative change, correct?

A.    Yes.  That's correct.

Q.    And you mentioned in some of the your answers that there were some concerns to the study.  And, in fact, if you look at Page 79 there's a section where they discuss some of the limitations of the study, correct?

A.    Yes.

Q.    And they discuss, starting at the bottom of that page, they indicate that this study can only be generalized to other prison systems to the extent that their conditions of administrative segregation confinement are similar to Colorado, correct?

A.    Yes.

Q.    And so they take a section, and I've just read one statement, but there's several paragraphs long where they go through and they talk about the limitations of the study and they're forthright in discussing those in that section, is that correct?

A.    No, that's not correct.

Q.    You disagree with that statement.  As you indicated, you believe that there were serious flaws in the study, correct?

A.    I believe the flaws were fatal.

Q.    Now, in this study, they did do statistical analysis by having control groups and by dividing the groups into

mentally ill and non-mentally ill individuals, correct?

A.    They did, yes.

Q.    And they used those psychological assessments we discussed in making determinations about the mental health of the inmates, correct?

A.    Yes.  The questionaries we talked about.

Q.    And they also did, in their statistical analysis, they did various checks or robustness checks on their data as well, correct?

A.    They elaborately statistically analyzed the data in a number of ways.

Q.    Now, you've mentioned that your opinion is that the data is fatally flawed.  And, in fact, there have been several articles that have been published criticizing the Colorado study, correct?

A.    Numerous articles, yes.

Q.    And several of them were published in an issue of the Corrections and Mental Health, an Update of the National Institute of Corrections.  Are you familiar with that?

A.    Yes.

Q.    And I have, I did have that marked as Government's Exhibit 12.  And I don't know what I did with it.  Did I not take them all yet?  May I approach the clerk, Your Honor?

A.    Counsel, I think you may have handed that to me by mistake.

Q.   Oh, do you have that in front of you?

A.   I'm not sure I have -- something at the bottom of this that you handed to me.

Q.   That's correct.  So I'll leave that up there with you. That was going to be my next question.

     And I wanted to ask you, are you familiar with what's been marked for identification as Government's Exhibit 11?

A.   Yes.

Q.   And that is a reply by the authors of the Colorado study to some of the criticisms that were published in that same publication, the Corrections and Mental Health, an Update of the National Institute of Corrections, correct?

A.   Yes.

Q.   And we're going, I'm not going to go through all of their arguments or their rebuttals, but I do want to talk about a few that you mentioned in answering questions during cross examination.

     You mentioned, for example, the fact that these inmates had already spent some time in administrative segregation, correct?

A.   Yes.

Q.   And I would ask you to turn to, to turn to Page 7 of that, of Government's Exhibit 11 marked for identification. And there's a section that is entitled, in the middle of

that page, Study Groups, correct?

A.   Yes.

Q.   And they make the comment that it would, about three lines down, that it would be ideal, from a research standpoint, to randomly assign first-time inmates to administrative segregation or general prison confinement and then observe change in psychological well-being over time.

And that's essentially your criticism, correct, that they have inmates who have already spent time in administrative segregation?

A.   Well, you just -- those are two separate things.  They don't address that issue.  What you just -- what you just described is a lack of random assignment.  And, of course, that would be impossible.  And that's what they talk about.

What I addressed was the fact that they were supposed to have a control group, the design of the study was to have a control group where people experience solitary confinement and then they would be compared to people who did not.

You can't begin a study like that by having everybody having started out in solitary confinement.  By definition then that's not a non-solitary confinement control group.

As I do a random assignment it has to do with whether or not the people who are supposedly in your control

group have experienced, recently experienced precisely what it is you are studying.

Q.    And then if you'll turn to Page 8, the second paragraph, or the first full paragraph, they also acknowledge your point that some of these individuals may have been in administrative segregation prior to this study, correct?  At the beginning, first few lines?

A.    Well, that's different.  I mean, that's -- I'm not sure -- I'm not sure, give me the lines.  They're talking about a couple things here.  Which lines are you referring to?

Q.    Okay.  I'll quote.  I'm starting at the beginning.  As may be expected from a behaviorally disruptive group, our participants had a history of AS and likely punitive segregation with a group being placed in AS during the study period having a higher incidence of past AS experiences than comparison subjects.

A.    Yes.

Q.    Then they make the statement, we do not know if these earlier segregation experiences contributed to elevated measures of psychological distress at the start of the study.  However, they do not explain the lack of change or improvement over time?

A.    Yes, they say that.

Q.    And as you mentioned, there are limitations, and not

only are they mentioned in this rebuttal from the Colorado study authors, but you've commented on them in papers that there are some ethical limitations to how you can conduct a study of people in prison, correct?

A.   Yes, there are.

Q.   I mean, you can't take people who are entering the prison system and randomly assign some to general population and some to administrative segregation because that wouldn't be fair to the inmates?

A.   No question about that.

Q.   And that's something that applies not just to their study, but to any study that you could come up with?

A.   That you could not randomly assign people to administrative segregation or not?

Q.   In the prison system, correct?

A.   Yes, of course.

Q.   However, your opinion is that completely discredits the work as opposed to being an issue of concern or an issue to take into account when analyzing the results of the study, correct?

A.   Well, there are so many criticisms in this study that I would try the Court's patience by going through all of them. This is just one of them.  There are multiple criticisms. The authors of the study don't deal with even half of them. And I think the consensus in the field is that this study is

not something that anybody can make any sense of.

Q.   Okay.  We're going to come back to the consensus in the field.  So I'm glad you said that.  But let me ask you this, one of the, and like you said, we're not going to go through all of them, but one of the other criticisms you mentioned is you had an objection to them using a written questionnaire instead of an interview process, correct?

A.   Well, it was a little more complicated than that.  It was that there were a lot of questionnaires and the questionnaires were administered without there being any relationship of trust between the person administering the questionaries and the inmate who was being asked to fill them out.

Q.   The researcher who issued the questionnaire, she was a professional research assistant, correct?

A.   She was a graduate student.

Q.   She had a Bachelor's Degree in Psychology and previous corrections research experience, correct?

A.   I'm not sure about the correctional research experience, but she was a graduate student with a Bachelor's Degree in Psychology.

Q.   My question was, she was a professional research assistant who, according to this report, had a degree in psychology and previous corrections research experience.  You don't have reason to dispute that she had previous

corrections research experience?

A.    I don't know, but I don't know what that was.

Q.    She also was criticized for her ability to determine if test scores were accurate and truthful.  That was one of the criticisms of her, correct?

A.    Yes.

Q.    And the response, and I'm looking at the very bottom of Page 6, if you'd like to follow along.  And I'm starting, it's about five lines up, the line starts, her assessment of responses.  Do you see that?

A.    Yes.

Q.    And the authors of the Colorado study indicated her assessment of responses were related to response style.  For example, did the participant circle the same response for all questions, not respond substance.  This was not a judgment about psychological response, but rather, a check of how the participant filled out the scoresheet. Assessments were marked questionable so we could consider those responses overall when analyzing an individual's consistency across measures or to check that there was at least feasibility of taking the task seriously, correct?

A.    Yes, that's what it says.

Q.    And so that's how they explained, the accusation was, well, she's making them redo the test.  The explanation was they were testing the -- they were examining the

questionnaires to make sure that the inmate was appropriately responding taking the test seriously or the questionnaire seriously?  I shouldn't call it a test.

A.    Well, she was making a judgment about the responses and whether, in her opinion, the responses were accurate or correct.

It wasn't a judgment about them psychologically, it was a judgment about what she deemed to be the accuracy of the responses.  And when she felt the responses were problematic she returned the questionnaire to have them refilled out.

Q.    Okay.  And you don't think there's any, I mean, you're aware that sometimes, whether it's an innate, whether it's maybe a student who doesn't care about a test result, there are times that if somebody doesn't want to participate they may not answer the questions being asked truthfully, correct?

A.    Yes.

Q.    And that's something that you would want a researcher to be aware of, correct?

A.    Well, we want them to be aware of it, but this concern in the larger context of how these questionnaires were administered.

I said earlier that there wasn't an interview. There was not a relationship between the person who was

administering the questionnaires.  And that was complicated by the fact that she would review the answers to the questionnaires and when she decided that there was some reason why the questionnaire answers were problematic would return them to the inmate.  That's a problematic practice.

Q.   One of the other criticisms that you mentioned was the fact that these inmates were in punitive segregation before being assigned to administrative segregation, correct?

A.   Yes.

Q.   And the response to that from the authors of the study was that that was why they obtained the measures as quickly as possible once the person was placed in punitive segregation, correct?

A.   Yes.  I'm sure they did it as quickly as possible, but in a number of instances it was weeks in punitive segregation.

Q.   On Page 7, the last full paragraph, they indicated that the participants were confined in segregation for an average of 30 days prior to the first assessment?

A.   Yes.

Q.   And so when you say weeks, you believe it was a time period longer than 30 days?

A.   An average of 30 days means that some are shorter and some are longer.

Q.   When you conducted your survey or your interviews in

Pelican Bay, some of those individuals had been in the special housing unit for upwards of 10 years I believe you testified, or perhaps it's in your paper, correct?

A.   Yes.  Absolutely.  But a different kind of study.  I never represented them as members of a control group.  The issue here is not whether people going into administrative segregation have been in punitive segregation first.  It is whether or not you say that people who have been in punitive segregation, and then leave it, have not been exposed to solitary confinement.  That's not a control group.

Q.   There's a difference between the control group they went to general population, the group being studied went to administrative segregation, correct?

A.   Both groups, both groups were studied.

Q.   Both groups were studied.  They started in punitive segregation.  One group went to general population, one group went to administrative segregation, correct?

A.   Except that if you read the study carefully you learn that both groups were cross-contaminated.  So some of the people who went to general population ended up in administrative segregation and some of the people who were in administrative segregation ended up back in general population.  And that's the end of the study.  Then it's no longer a study of people who are in general population versus people who are in administrative segregation.

And I will say, you know, commendably to them, they acknowledged the fact that it was cross-contamination between the groups, but acknowledging the problem is not solving it.

Q.   Let me go back, just for a second, to follow up on the paper and pencil, the questionnaires, instead of the interview format.

The authors of the study indicated that they did the paper and pencil questionnaire because part of the goal of their study was to address the criticism that most studies had not used standardized data with known psychometric properties.

A.   Yes.

Q.   Would you agree that that's true, that the prior literature did not address or use standardized data with known psychometric properties?

A.   Yes.  But, again, if you read further in the study you will find that they didn't really do that either.  They combined those scales in ways that don't have psychometric properties.

Q.   There was also a criticism about the paper and pencil assessments about whether or not the results, the self-reported results from the inmates were accurate; is that correct?

A.   I, I'm not sure.  I'm not, I don't, I don't recall

exactly whether that was one of the criticisms that was levied.  There's a concern about just handing inmates questionnaires to fill out, especially when there's no relationship between the person whose asking and the person whose filling out the questionnaire.  That was my point about the lack of an interview.

I don't, I don't know whether or not there were specific criticisms or reasons for concern about whether or not the questionnaires were being answered honestly.

Also, if you hand out a questionnaire you are excluding people from the study who are not literate.

Q.   Well, and they addressed that.  Well, you've made sort of two points in your answer that went beyond what we were talking about.  But let me address, I guess, both of those.

One of their responses to the criticism of the paper and pencil test is that, they make the comment that, look, if you take the results of the paper and pencil test, those results do indicate that there is high elevations on measures of psychological distress and that that would be the same result that they, that you would have had if you had just done an interview technique which is the same strategy that you and Grassian used.  And they even reference you specifically.  I'm on Page 7, the first paragraph.

And so they say the difference -- they ended that

paragraph by saying, within the context of measuring early and multiple times, as well as including comparison groups, our study just differs in how we attribute the cause of the elevated scores.

So they make the point that the results from the paper and pencil test, in terms of just the answers and showing that there was some psychological stress, were the same as if you had done your interview.

A.    Not so.

Q.    You disagree with that statement?

A.    Of course.  An interview is a relationship.  It's a conversation.  You have an opportunity to ask people what they mean, explain further.  You develop a level of trust with them.  It's one of the reasons you begin an interview by asking background questions, social history questions. You can't, really not just with prisoners, but especially with prisoners, show up and hand out questionnaires and necessarily expect a level of engagement and a level of honesty that you would get when you were talking to someone face to face.

THE COURT:  So is the problem a little like when I go to one of these conferences and they ask that every single speaker be evaluated.  And the first day you do your best and by the third day you are just done with it?

THE WITNESS:  Exactly.

THE COURT:  Like that?  Okay.

THE WITNESS:  That's exactly my, one of the criticisms of the study is exactly that.

Q.   And isn't it also possible that when you develop this rapport with the inmates, that they either learn more about what you are doing and perhaps have a motivation to exaggerate their symptoms or perhaps they develop a relationship with you and want to please you by giving you the answers they think you're looking for?

A.   Well, there's always the possibility of that.  So you have to be careful that that's not what's taking place. When I do my interviews I build in a control question.  I ask them a question about something that's not a sign or a symptom of being in isolation.  So it allows me to compare whether or not I'm getting everybody simply answering yes to these things.

And when you actually see the column of responses you see prisoners telling you, no, that happens to me, but that doesn't.  And you get a very complicated pattern of responses from people.

Prisoners don't answer yes to every question. They don't say yes, that's a terrible problem for me.  And it turns out, and I've done this now well over a thousand times, that the control question ends up being answered affirmatively the least of all the questions that I ask.

Q.    In your interviewing questions, you said you ask a control question, but do you do any kind of scientific testing for malingering in the inmates?

A.    I don't do malingering testing, no.

Q.    They did do malingering testing in the Colorado study, correct?

A.    They did just about every test known to mankind in the Colorado study.

Q.    Because that was their whole goal was to do a scientific, empirical examination, to the extent possible, under the circumstances?

A.    Except that was the goal.  And it was a noble goal. And sadly it fell apart almost at the very beginning of the study.  And that's ashame.

Q.    You indicated that the consensus in the community was that the study was flawed, correct?

A.    Yes.

Q.    I would like to have you take a look at what I've marked for identification as Government Exhibit 12 and ask if you recognize that article or publication by Robert Berger, MD, Paul Chaplin PhD. and Robert Trestman PhD.  Have you read that before?

A.    I've seen this, yes.

Q.    So you are familiar with it or have read it at least, in the past?

A.    Yes.

Q.    And would you agree with me that they had favorable things to say about the methodology of the Colorado study?

A.    Yes.  Yes, they do.  But these are not experts on these, on these issues.  These are, these are folks who are entitled to their opinion, but they are not experts on the psychological or psychiatric effects of solitary confinement.

Q.    Well, they are individuals who have, who are medical doctors and in one case a PhD., correct?

A.    Yes, fair enough.  But that's, that's different than being an expert either on research methodology or on solitary confinement.

Q.    Well, I didn't suggest that it was.  My question was simply if they had an MD or PhD., correct?

A.    Yes.

Q.    And people with an MD or PhD. are generally considered to be scientists, correct?

A.    Well, I don't know what their, the kind of MD work that they do or the kind of PhD. that they have.  Not always.  Some of them are clinical practitioners who don't necessarily have any training in research methodology whatsoever.

Q.    The footnote, I guess you could call it in this article, is that Dr. Berger is Director of Mental Health and

Psychiatric Facilities.  Dr. Chapman is director of Psychological Services and Dr. Trestman is Executive Director of the Correctional Managed Healthcare, it looks like at the University, and a Professor of Medicine at the University of Connecticut?

A.   Yes, my point exactly.  They appear to be clinicians, not researchers.

Q.   They comment on page, what's page 261 of their study, that given the intrinsic limitations of the study environment, the study design nonetheless created a reasonable real world test of the hypothesis.

You believe that opinion is invalid because they aren't -- you don't believe them to be research experts, correct?

A.   Well, I don't know whether they are or not.  They are obviously from your occupational descriptions they are clinicians.  I don't know how you much research training they have.

That's an incorrect conclusion.  This is not a study, as we've been saying for a while now, I'm disagreeing about.  This is not a study that tells you anything about the effects of even one year of administrative segregation.

Q.   And they disagree with your opinion and they state that the full year of assessments more realistically reflects the timeframe of greatest concern regarding potential

1139

psychological impact?

A.    And that seems to me, on its face, to be a kind of a non-sequitur.  Why would one year be of greatest concern, especially, when in this case, we're talking about people who, the bulk of whom have been in for 10 years.

Q.    Well, prior to this study the only arguably empirical work that had been done had been done for much shorter periods of time.  And I may get the name wrong, I think it's Springer maybe who had done that study, and it followed individuals for maybe a period of 30 days in Canada, correct?

A.    Zinger.

Q.    Zinger.  Thank you.  I apologize.  I didn't have it in front of me.

And so to the extent that they followed people for a year that was an improvement over the 30 day prior study, correct?

A.    Well, yes.  It was an improvement.  Zinger actually didn't follow people for 60 days either.  So, I mean, here you have to be, you have to look at them carefully, not just what the title says, but what actually happened.

So in the Zinger study there were only a very small number of people even stayed for 60 days in solitary confinement.  But many other studies have looked at longer term solitary confinement.

My own work, I mean, we're talking about people who look at whether or not people have been in for a long period of time or people who have been in for a long period of time.

Q.   Well, I'm talking about specifically empirical work where we're talking about a control group and another group, not the, I think they are referred to, and again I'm certainly, I'm not a research expert, I believe they are referred to as longitudinal studies, what you have done.  Am I using that term correctly, doctor?

A.   Yes.  So the Colorado study was a longitudinal or attempted to be a longitudinal study.  Zinger studies it too, but it didn't have a control group.  Zinger didn't have a control group.

Q.   The Berger article that we're looking at, also commented on the fact that they used five repeated measurements to provide improved power and the ability to determine trends.  As you stated, they used a lot of different statistical analysis in their study, correct?

A.   I definitely concede that, yes.

Q.   And they also noted that the simple -- as we talked about the fact that they actually used psychological assessments here, and in Berger article they talked about the similarity in statistical results between the BSI, that's one of the psychological assessments, and other

Ex. 114 pg.133 of 251

instruments used, supports the stability of the assessments?

A.   Yes, they say that.  I'm not sure what you want me to comment to.

Q.   Well, they are commenting on -- your criticism I guess has been the invalidity of the work, but they have a different opinion and are commenting on the different statistical measures they use to help ensure the accuracy of the work?

A.   Well, let me -- with respect to Berger, et al, let me point out something quite important.  They have cited here the brief version of this report, the brief published version of this hundred and 60 or so page report, 150 page report, which contains all of the details of what exactly was done in the study with all of the statistical analyses that we've been talking about.  And where, again, commendably the authors of this study laid bare all of the mythological flaws in the study.

Berger, et al don't cite this.  They cite the short version of the study, the 11 page version of the study.  Not the 150 page.  The 11 page abbreviated short form that doesn't contain all of those details.

So with deference to them, I'm not sure they knew all of the problems with the study that are contained in the long 150 page report because they appear only to have read the 11 page version of it.

Q.    All right.  You mentioned also that one of the concerns that you had in looking at this Berger article was that they weren't research methodology experts.  You said they looked like, they appeared to be clinicians to you.  And clinicians would be more familiar with the psychological assessment tools that were discussed in this study than perhaps the social psychologists, would you agree to that?

A.    There might be.  It would depend on which particular, which particular assessment tools you're talking about.  Some of them are clinical assessment tools.

Q.    And there's no chance that the various criticisms of the Colorado study would be due to the fact that it came up with results that were contrary to the preexisting literature and the hypothesis of probably most of the people who have studied solitary confinement?

A.    Well, if you, if you mean is it an outlier study, yes, it's an outlier study.  It's not consistent with the results that anybody else who studied this has come up with.

I knew the study was taking place.  I was eager to read the results.  Jamie Fellner is somebody I know well.  Jeff Metzner also collaborated on this study.  And was disappointed when I, when I realized what they had done and what kind of mythological flaws compromised anybody's interpretation of the results.  And that's an opinion, which is shared widely, by researchers in this area.

Q.    So I take it your opinion of the study would have been the same if they had found that there was, in fact, a negative psychological impact from being housed in administrative segregation?

A.    Yes.  Yes, it would have.  Realize also that when a study comes up with a finding that says, that suggests that solitary confinement is actually good for people, that they improve in solitary confinement, and that flies in the face of not only all of the other research which has been done for decades by researchers, not just in this country but also around the world, different methodological sophistication and background, different kind of methods and so on used, not just flies in the face of that, but flies in the face of the basic theoretical coherence about what we know about the harmfulness of isolation, not just in prison, but elsewhere.

So, of course, when a study says solitary confinement is actually good for you, people improved in this environment, of course you are, you look at it carefully because it defies, not just common sense, but it defies theoretical coherence.

Now if the study had been done correctly, if it had been done the way the researchers started out to do the study, then the study would have said what the study said. And those of as who work in this area would have had to have

analyzed the significance and meaning of it and modified our understanding of the phenomena. But, sadly, it is not a -- it is not a study whose results can be interpreted to mean anything.

Q. We're going to move on now from discussing the Colorado study, although I am going to move to admit Government Exhibits 10, 11 and 12.

MS. JIMENEZ: May I approach the witness to retrieve them for from clerk?

THE COURT: Any objection, 10, 11 and 12?

MR. BURT: I think I do, Your Honor. I just, if I could have one minute to confer with counsel to make sure because I just printed these out?

THE COURT: Sure.

(Attorneys conferring off the record)

MR. BURT: Thank you, Your Honor.

THE COURT: Ten, 11 and 12 are admitted.

Q. I want to turn to talking about the conditions of confinement that you've testified to.

Are you familiar with the report that was published by the Department of Justice in January of 2016 entitled, Report and Recommendation Concerning the Use of Restrictive Housing?

A. Yes, I'm very familiar with it.

Q. And that's a relatively new report, correct?

A.   Yes.

Q.   One of the things that the report does is it goes through some background and history on the use of restrictive housing or administrative segregation, whichever term we want to use, correct?

A.   Yes.

Q.   And one of the things that they discuss are the reasons that people get placed into administrative segregation, correct?

A.   Correct.

Q.   And you're familiar with those reasons?

A.   Yes.

Q.   They include when a person is put there for investigative segregation, as they entitled it, and that's similar to what we were talking about in the Colorado study, they called it punitive segregation, but when you're placed pending an investigation, and a determination will eventually be made if you're going to stay or if you're going to go back to general population?

A.   Yes.

        THE COURT:  You mean pending an investigation of some incident or something?

        MS. JIMENEZ:  Some disciplinary violation, correct.

Q.   Another reason that people get placed in segregated

housing is, or restricted housing is for discipline reasons, they committed a violation and they now have to do time in restrictive housing as punishment for that, correct?

A.    Correct.

Q.    The third reason is for what they term protective segregation.  And that's individuals who would be in danger if they were themselves in general population, correct?

A.    Correct.

Q.    The fourth reason they list is preventative segregation.  And they define that as segregation designed to prevent an inmate from threatening the safety and order of the institution.  You're familiar with that?

A.    I am.

THE COURT:  I'm not.  Is that like a gang problem or something?

THE WITNESS:  It could be.  Sort of a status, you're, yeah, the judgment gets made that you need to be separated from other people.

THE COURT:  Right.

Q.    And so it could be a gang circumstance, it could be, would it be fair to say that it could include someone who has a history of violence, whether it's against other inmates or staff, and while they are not being put in restrictive housing as punishment, they are being placed there because it's deemed that they can't be safely housed

in general population without risking the lives of other inmates or of the staff?

A.    Yes.    Some determination is made, on the basis of security interests, they need to be confined separately or in segregated housing.

Q.    And then the last category that they describe is transitional segregation which is generally while they are waiting to be transferred to a new location, correct?

A.    Yes.

Q.    For example, perhaps somebody, there's been found that there's some problem with housing an inmate in general population at the same prison as another inmate?  The inmate hasn't done anything wrong, they want to send him to a different prison, and in the meantime they put him in segregated housing, both for his safety, to keep him away from the other inmate and because it takes paperwork and time to get them to the other prison?

A.    Yes.  Correct.

Q.    So that would be the fifth example?

        THE COURT:  You mean like a cooperator or something?

        THE WITNESS:  Yes.  Yes.  Or for whatever reason somebody has an enemy on the yard, they need to be moved somewhere else, there's not a space in another institution right away.  But to keep them safe at that institution they

put him in a security housing unit or administrative segregation restrictive housing.

Q.   And so whether you agree with the reasons or not, inmates, and I'm going to at this point talk specifically about the Bureau of Prisons, inmates are generally not willy-nilly thrown into restrictive housing, there's a particular purpose that BOP places them there?  And, again, I'm not asking you to agree with the reasons, but the fact that there are reasons.

A.   Yeah.  I certainly never suggested there weren't reasons.  There has to be a reason, of course.

Q.   And there is, within the Bureau of Prisons you talked about the special confinement unit.  There are also special housing units found at pretty much every single prison, correct?

A.   Yes.  Well, I don't know about every prison, but they are not uncommon.

Q.   And that is to house inmates who may fit into any one of these categories?

A.   Yes.  Yes.  Although, I mean, it depends.  The, the longer term confinement requires a certain kind of a unit. So you can't -- but generally, yes, there are these units in most places.

Q.   And in the SHUs, as they are called for short, SHU, inmates are double celled in SHUs in BOP, correct?

A.    In a lot of them they are, yes.

Q.    I guess we could say most.  Would that be fair to say most are?

A.    Yes.

Q.    And are you also familiar with the special management unit?

A.    Yes.

Q.    And that's a program that is meant for high risk inmates to process through to hopefully get them to not be high risk inmates any more?

A.    Yes.  It's a program that they are put through.  And there's a, you know, it's kind of a, I don't want to call it a therapy program, but it's kind of a training program that they go through.

THE COURT:  What's it called?  I didn't write it down.

MS. JIMENEZ:  It's called the special management unit.  And sometimes you'll hear it referred to as the SMU.  But the SHU, the SCU and the SMU.

THE COURT:  So this is like a behavioral change unit?

MS. JIMENEZ:  Correct.  Well, I mean, I guess Dr. Haney should answer that, but that's my understanding, correct.

THE COURT:  All right.

Q.   And, in fact, ADX is the only facility where all inmates are single celled?

A.   I, I can't say for sure.  But I think double selling is fairly common in these units.  I can't say, you know, there are inmates that can't be housed with other inmates.  So it would be incorrect to say that every single person in the security housing unit is double celled, even though the crowding related issues might mandate that.  But certainly by design ADX is a single cell institution.

Q.   And that is the location when you talked about some inmates, who are going to be held for long periods of time, they don't get housed at a SHU, at a special housing unit, they would go, for example, to ADX depending on the circumstances?

A.   Well, there are people who have been in SHUs for long periods of time.  I, I'm not sure what you mean.  But they, they can spend a fair amount of time in the SHU.

Q.   I guess I was going off the answer that you just gave a few moments ago when you said that -- I asked about inmates being housed in the SHU, who are a danger to others, and you talked about, well, sometimes they are going to be housed somewhere else if it's going to be long-term.

     So I was responding to something that you had commented on.  But, in any event, in this report it talks about the number of people that are housed at ADX.  And they

provide the statistic that less than a quarter percent of all BOP inmates at any given time are in ADX. Does that sound correct to you or do you recall that from the study?

A. I don't recall the number specifically. It's a small number of people who are there compared to the vast number of people who are in the BOP. So I don't -- I haven't done the calculation on the percentages, but it's a comparatively small number of people.

Q. And so if the report says a quarter of a percent, you wouldn't have a reason to disagree with that?

A. I wouldn't.

Q. And I think you mentioned on direct examination that while there are a few people at ADX who are under sentence of death, the vast majority of inmates housed at ADX are not under sentence of death, correct?

A. That's correct.

Q. They have other sentences. And you would consider ADX to fit in your definition of solitary confinement, correct?

A. Well, yes, along with all those other places we're talking about.

Q. And, if anything, it's more restrictive than phase one or phase two of the special confinement unit?

A. I don't, I don't know that. I, that's an interesting question. I'm not sure. I'd have to look at the ADX rules and regulation. It's not, it's not dramatically different

certainly from phase one and not too much different from phase two except for this opportunity to have contact with another, with another prisoner for a brief period of time.

But I'd have to look at the actual out of cell time that ADX prisoners get, and which I have not done. I didn't know I was going to be asked about ADX. So I'm -- it's not dramatically different from phase one, in my opinion.

Q. But you would consider the special confinement unit, the special housing unit and ADX all to fit within your definition of solitary confinement, correct?

A. And within your definition, and the Justice Department, that's the definition I used. And that would certainly, that certainly fits well within the parameters of that definition.

Q. So yes?

A. Yes.

Q. I know you got a plane to catch or you gotta head out of here, so I'm just trying to move along when we have yes or no questions. It will, I think, be more efficient.

And so you don't have to be under sentence of death to be placed into solitary confinement, correct?

A. No, of course that's correct.

Q. And when we're talking about solitary confinement, in terms of the special confinement unit, while inmates even in

phase one are not allowed physical contact with each other, they can and do communicate with each other by yelling when they are in their cells, correct?

A.    Yes, if they are in a cell where yelling is possible to communicate with somebody.  You know, the guys in the A Range probably would have a hard time communicating with each other because they are separated by many cells.

Q.    And I would suggest that, for purposes of our conversation, you said there's very few inmates housed on the A Range, correct?

A.    Yes.

Q.    Some of them aren't even death sentenced inmates, they are inmates with SAMs in place?

A.    One of them, yes.

Q.    And SAMs is S-A-M-S, abbreviation.

And so I'm going to suggest for purposes of this set of questions, I'm going to ask that we focus on B and C Ranges where most of the population of the SCU is.  Would that be all right with you?

A.    Sure.

Q.    Okay.  And so those inmates, if they go out to have rec time, and there's another inmate also out for rec time, they can communicate with them through the cages that you referenced, correct?

A.    Yes.  Yes.

Q.    They get daily rounds in the special confinement unit for medical services, psychological services, unit staff, counselors, they have contact with all those people on a close to daily basis, correct?

A.    Yes.

Q.    You mentioned the religious services that they can have.  They are placed in separate cages, but they can have a group conversation, they can respond to the religious services person if it's an interactive type of session and communicate in that form, correct?

A.    Yes.  They can from that room I described earlier with the cages.

Q.    They can, in addition to the visits that you've already talked about, they can write letters and receive letters to friends, loved ones, strangers, anyone that they can get to write to them or that they care to write to?

A.    Sure.  They are permitted to correspond.

Q.    They have a window in their cell, correct?

A.    Yes.  I described and I think showed several photographs of the window, both the window in the back and the window in the cell in the front.

Q.    And the window in the back goes to the outside, correct?

A.    Well, it doesn't look to the outside.  You can't see through it.  But it's a window that, where light from the

outside comes in.

Q.   What do you mean, you can't look through it?  I'm sorry, I'm not understanding that.

A.   It's a glazed window.  You can't see through it.

Q.   Oh, because of the nature of the glass, okay.

When, you mentioned that if an inmate is standing at their door, and another inmate across the hall is standing at their door, they can see each other, correct?

A.   They could, yes, if they were standing at the same time looking out the window of the door.

Q.   And they could yell to each other to make that happen if they wanted to?

A.   Presumably that might be possible.

Q.   Call the other person to the door and have a conversation, at least looking at each other through the glass of the doors?

A.   It might very well be possible.

THE COURT:  Do these cells have a little anti-chamber or not?

THE WITNESS:  No.  No.  Only the ones in the first, in the first unit or run.  The A, the A Housing Units have a, have a little sallyport in them.

THE COURT:  Right.

Q.   They also can have TVs in their cells, correct?

A.   Yes, they do.

Q.   And, in fact, even with the phase one inmates, there are some additional privileges that they can have on occasion even if they haven't moved to phase two?

A.   I'm not sure what you're referring to.

Q.   I'm talking about in the institutional supplement, it's one of the exhibits that you have.  You've reviewed that, correct?

A.   I have.

Q.   And there's a portion in there that discusses that if an inmate isn't eligible to proceed to phase two, with permission from BOP staff, they can have some additional privileges normally aren't allowed to phase one?  Does that ring a bell?

A.   You mean the use of the microwave?  Is that what you're talking about?  I'm not sure what else there is.

Q.   Well, it includes having a work assignment?

A.   Yes.  There's one, one phase one prisoner is given the opportunity to be a tier porter.  That means they clean the floor in the unit.

Q.   It includes access to microwave and color television?

A.   Yes.  The microwave room is, has a, it's my understanding, has a colored television in it.

Q.   If they are denied progression to phase two they have the right to appeal that, correct?

A.   Yes.

Q.    And when we're talking about inmates at the special confinement unit, there's a reason that this has been put into place at BOP to house inmates under sentence of death, correct?

A.    I assume there's a rationale for it, of course.

Q.    And, again, whether you agree with the rationale or not, it would make sense, from a logical point of view, that inmates under sentence of death, there's no harsher punishment that they can face, correct?

A.    In a certain sense, of course, that's true, yes.

Q.    If they commit a crime while in, while being housed at the Bureau of Prisons they can't get any sentence worth, any sentence worse than death?

A.    There is no sentence worse than death.

Q.    All that can be done is either their privileges can be taken away or their housing circumstance can change in response to that, correct?

A.    Yes.

Q.    And, in particular, with death row inmates, because they are risking a harsher sentence by criminal behavior, from BOP's point of view it would make sense that there needs to be some additional restrictions on them because they have less to risk than your average inmate?

A.    Well, I'm not sure what you are asking me.  If you're asking me to endorse or analyze that rationale, I'm happy to

do that.  There are other ways of controlling inmates, even death sentenced inmates, than to keep them under the extraordinarily harsh conditions that they are kept under in this unit.

Q.    I'm just asking you to acknowledge that that's a rationale for having the special confinement unit operate how it does?

A.    I assume that's their rationale.

Q.    In fact, even being housed on the special confinement unit doesn't guarantee that those inmates can be kept from harming other inmates and staff, correct?

A.    It's not an absolute guarantee, no.

Q.    In fact, Donald Fell, the defendant in this case, attempted to kill Mr. Roan while Mr. Fell was housed in the special confinement unit?

A.    Yes.  I'm aware that there was an incident in which he attacked another inmate named Roan, yes.

Q.    And if solitary confinement is unconstitutional, there wouldn't be anyplace to house someone like Donald Fell because you couldn't have the SCU and you couldn't have the ADX, so Mr. Fell would have to be housed in general population, correct?

A.    No.  No.  Not at all.  I mean, there are, there are, there are variations on the theme.  There are controlled housing units in which people are, first of all, given

opportunities to demonstrate whether or not they are capable of interacting with other people.  There are also temporary suspensions of the opportunity to interact with other people.

One of the problems with solitary confinement units like the one we're talking about is that it is so profoundly harsh that in addition to the security related issues, you're talking about deprivations at another level. You're talking about people who have one hour a day, five days a week out in the yard.  That's not a security issue. That's administrative convenience.

You're talking about nobody in that unit being permitted an opportunity to sit in a classroom with other people or to engage in group therapy in a meaningful way, no matter what their record is, whether they've attacked anybody or not.  So there are plenty of things in between the really truly harsh confinement that they are subjected to in that environment and a general population situation. Many variations in between.

Q.   Well, you'd agree that other inmates and staff at the Bureau of Prisons also have the right to be kept safe from attacks by other inmates?

A.   Of course, yes.

Q.   In fact, you referenced the 2012 letter that was sent by various counsel on behalf of inmates in the SCU.  It's

Exhibit 28 or A28 I believe is the exhibit number.  You recall that letter, correct?

A.    Yes.

Q.    Part of the motivation for that letter, in fact, the very first section of that letter, discusses concerns about the safety of inmates at the SCU?

A.    Yes.

Q.    And, in fact, that was motivated by the fact that Mr. Roan had been stabbed by defendant Fell?

A.    Yes.  But there's much more to that letter than that issue.  I mean, you'll recall that one of the things that's being complained about is what at least was alleged on the part of the inmates that the staff was actually participating in or precipitating that kind of activity.

So it's -- the issue of safety obviously is a very important one, but it's not an either or.  And units like the SCU operate as if it is.

Q.    My question though was whether or not that one of the concerns that precipitated the letter was the fact that Mr. Roan was stabbed by Mr. Fell?

A.    Yes.  There were safety concerns expressed in that letter.  Absolutely.

Q.    Okay.  And that reminds me, one of the pictures from your power point, and if I, is this turned on?  I apologize. I only have a black and white copy of this binder here, but

you recognize this picture from your presentation, correct?

A.    I do.

Q.    And it's one of the pictures where you discussed the condition of the cell, correct?

A.    Yes.

Q.    And you also indicated that this is one of the pictures that were taken after Fell's stabbing of Roan, correct?

A.    I assume that's the case.  It was Mr., it was identified as Mr. Roan's cell.  So I assume that that was taken after the fact, of course.

Q.    Okay.  And so it wouldn't surprise you if this was taken after the stabbing occurred, correct?

A.    It wouldn't surprise me, no.

Q.    And are you aware that the initial altercation started with Mr. Fell?

        THE COURT:  Can I interrupt you?  I'm sorry.  We were preparing for this before you came into the case. There's a limit to the findings I can make in this case regarding these sorts of issues.  In other words, I can't, in fairness to both sides, enter findings about these specific defendant related events.  So to the extent we can proceed at a high level of generality, I can follow you and join you or not.  But I kind of have to put blinders on here because of the presumption of innocence and a bunch of other issues.

MS. JIMENEZ:  Well, let me rephrase the question. I think the issue that I'm ultimately getting at I don't think will implicate those concerns of the Court.  And if I can have a little leeway I'll maybe jump to that final issue with respect to the cell.

Q.   Doctor, what I'm getting at is you testified that you've seen many cells that are messy because the inmates don't care about the cell.  And ultimately the point that I was getting at is it's -- you don't know whether or not this cell is messy because there was an altercation inside it that resulted in a stabbing?

A.   Yeah, I think I said that.  I think I said I didn't know why it was disheveled, but that I've seen other ones like it that are disheveled as a result of an inmate deteriorating in the cell.

Q.   You can't say that's the case with this particular photograph?

A.   I don't know whether or not Mr. Roan was or not.  No.

Q.   That's all I had on that.

THE COURT:  Appreciate it.  Thank you.

MR. BURT:  Your Honor, I wonder if we take a break so I can discuss arrangements with Dr. Haney.  I want to make sure --

THE COURT:  Absolutely.  All right.  It's time for -- anybody that needs to sort of run out of the room there's

plenty of time for that too.

MR. BURT:  Thank you, Your Honor.

(The Court recessed at 2:11 p.m. and resumed at 2:13 p.m.)

THE CLERK:  Your Honor, we are back on the record in criminal number 1-12, United States of America versus Donald Fell.

THE COURT:  We going to do all right with your schedule?

THE WITNESS:  Yes.  We worked it out, Your Honor.

THE COURT:  You worked it out.  Great.

MS. JIMENEZ:  Thank you.  I just had a few more questions.  I was done with the questions with the photo.  I think Mr. Burt misunderstood.  But I only have a couple more anyway.

THE COURT:  Okay.

EXAMINATION CONTINUED BY MS. JIMINEZ:

Q.   And, Dr. Haney, you've been, I shouldn't say you, but inmates or prisoners and their attorneys have been relatively successful in getting change to happen at prison institutions by way of lawsuits, correct?

A.   Um, no.  I mean, I don't, we've been relatively successful in the cases that I've been involved in, in getting court order, courts to order changes.  We've been less successful in having those changes actually come about.

Q.    In that restrictive housing report that we were talking about, there's a table that shows that there has been a significant decrease in the numbers of inmates who are housed in restrictive housing, do you recall that?

A.    Yes.  The federal government is under some pressure to reduce that number significantly, yes.

Q.    And, in fact, in the Bureau of Prisons between January 28th of 2012, and December 5th of 2015, that chart shows a reduction by 24.87 percent, so almost 25 percent of all of the inmates in restrictive housing, correct?

A.    Yes.  As I said, there's pressure to reduce the number and they are doing it.

Q.    And another success was the, I believe fairly recent litigation, whereby inmates who have been diagnosed with mental illness can no longer be housed at ADX, correct?

A.    Well, they were never supposed to be housed at ADX. That was really what precipitated the litigation.  The Bureau of Prisons had a policy saying there was never ever to be anybody with a serious mental illness at ADX.

And the lawsuit uncovered a sizeable number of people who were there with mental illness.  And the ADX is in the process of, well along in the process of removing those prisoners and placing them elsewhere.

Q.    So changes were made as a result of that litigation, correct?

A.   Yes.

Q.   And there's nothing to stop litigation from being housed about the conditions of confinement at the, at the SCU, at the special confinement unit, correct?

A.   I can't imagine any, no.

Q.   And there are documents, such as this recent report on restrictive housing, that show that the agency, at least the Department of Justice or Bureau of Prisons, however you want to describe it, are doing their own investigations and presumably making policy changes based on those investigations, correct?

A.   Well, they've acknowledged the very harms that I've been talking about and, as a result of that, are in the process of making some changes.  The magnitude or extent of the changes remains to be seen, but, yes.

Q.   And those changes in solitary confinement would apply to inmates who have death sentences and inmates who don't have death sentences, correct?

A.   Well, no.  Actually, the report doesn't really address the SCU.  And that's a problem.  Because I don't really believe the Bureau of Prisons has fully acknowledged the fact that that's a solitary confinement unit.

Q.   The litigation that relates to ADX, in terms of not having mentally ill persons housed at ADX any more, they are now -- they don't go to other restrictive housing units

either, correct?  Or does that just apply to ADX?

A.    No.  It just applies to ADX.  There are other policy related changes that I think are, the bureau is being pressured to implement those things.  But I think in terms of the immediate response to the ADX litigation, it's ADX only.

And, frankly, some of those prisoners have been removed from ADX, but they've been placed in fairly significantly restrictive housing units.  They are not going to general population.

Q.    And BOP policies do change, whether it's due to court order, external pressure or internal decisions, it's a constantly evolving and changeable process, the policies by BOP, correct?

A.    It's changing.  I wouldn't say constantly.  And it's not always evolving.  But it's changeable.  And it's certainly subject to some of the kinds of pressures that we've been talking about.  The overall reduction in people in restrictive housing I think is a result of external pressures.

I mentioned that hearing in 2012.  I think that was the beginning of the Senate Hearing, that I think was the beginning of BOP's reflection on these issues.

MS. JIMENEZ:  I have nothing further.

THE COURT:  When was the Sunday Times Article?

That was for outsiders.  That was sort of our first look, right?

THE WITNESS:  Yes.  Yes.

THE COURT:  When was that, two years ago?

THE WITNESS:  Two years ago, Your Honor.  Yes.

MR. BURT:  With the Court's permission, I'm going to follow-up on re-direct and then I'm going to move into the other topic, if the Court, please?

THE COURT:  Sure.  Sure.

MR. BURT:  Thank you.  I'll try and be brief.

FURTHER EXAMINATION BY MR. BURT:

Q.   Doctor, a lot of the cross examination was focused on this Colorado study, which you described at one point in your testimony as an outlier?

A.   Yes.

Q.   And in your report, which is Exhibit A2, if you have that in front of you?

A.   I do.

Q.   If you can turn to page 20 of your report?

A.   Yes.

Q.   And is it true that page, page 20 of your report, all the way through page 23, you discuss and document the criticisms concerning this specific report that's the Colorado study?

A.   Yes.  Correct.

Q.    Do you feel that you've comprehensively addressed that study in your report?

A.    I do.

Q.    You think there is anything to be gained at this point or anything to add to what you've done in this four or five pages in your report which addresses this, the study and flaws, various flaws in the methodology which you discuss here?

A.    No.  I think, there's more to be said, I certainly cite to the other criticisms that other people have made about it, but I think this is a good summary, along with my testimony in answer to counsel's questions about it.  I think we surfaced the methodological limitations, and frankly, the fatal flaws in the study.

        THE COURT:  What's the exhibit number?

        MR. BURT:  Your Honor, that is A2.

        THE COURT:  Got it.

        MR. BURT:  And it's pages 20 through 23, which would contain the discussion that I just referenced.

        THE COURT:  Oh, you mean, his report, his Rule 16 report for this case?

        MR. BURT:  That's correct.

        THE COURT:  I'm with you.  All right.

Q.    Now, doctor, you were also questioned about a department, U.S. Department of Justice study.  And you said

you were very familiar with it, correct?

A.   Yes.   The report, the report and recommendations, is that what you're referring to?

Q.   Yes.   And I've marked two parts of this report.   A32 I've marked it.   It's entitled, U.S. Department of Justice Report and Recommendations Concerning the Use of Restrictive Housing, Executive Summary, January, 2016?

A.   Yes.

Q.   You're familiar with that summary report?

A.   I am.

Q.   Nine pages in length, correct?

A.   Yes.

Q.   And then A33 that I've had marked, is a much longer document.   And it is 123 pages.   That's the full report by this same Department of Justice report here, correct?

A.   Correct.

Q.   All right.   How are you familiar with this particular report?   Did you have some involvement with this group that wrote this report?

A.   Yes.   Yes, I did.

Q.   Could you tell me what that was?

A.   This report was written in response to a request, a direct request to the Justice Department by President Obama to conduct a review and develop a set of recommendations about limiting or reducing the Bureau of Prisons' use of

solitary confinement.

As part of, as part of that analysis, and the report and recommendations, a working group was convened that met in Washington, DC, convened by the National Institute of Justice, discussing the various state of research, various prison policies, not just in the Bureau of Prisons, but alternatives that other states have been using.

And it was a two-day working group at which members of the Department of Justice, including the core group of people who were charged with the responsibility of actually writing the report and recommendations to President Obama were present at the meeting.

I, I was also a participant at the meeting and was one of the people who participated in -- I gave a presentation at the meeting.  I was present for the discussions.  And subsequent to the meeting was in contact with the working group of people who were actually drafting the report to the president, and providing them with the studies and documentation for the various issues that they were considering in order to report to the president.

Q.   I want to direct your attention, if I could, to the executive summary on the first page of the summary report. And it says --

MR. BURT:  And by the way, Your Honor, I'm moving into evidence A32 and A33, which is the summary and the

report itself.

THE COURT:  Are they part of the three binder series?

MR. BURT:  No, this is in addition in response to the cross.  I provided copies to the --

THE COURT:  Any objection?

MS. JIMENEZ:  No objection.

THE COURT:  32 and 33 are in.

MR. BURT:  Thank you.

Q.   The first sentence of that report says, in a July 14, 2015 speech President Obama announced that he had asked the Attorney General Loretta Lynch to conduct a review of the quote overuse of solitary confinement across American prisons.  The president directed that the purpose of the review be not simply to understand how, when and why correctional facilities isolate certain prisoners from the general inmate population, but also to develop strategies for reducing the use of this practice throughout our nation's criminal justice system.

The last paragraph there is a highlighted sentence in the report which says, as a matter of policy, we, and I assume we're talking here about the Department of Justice, believe strongly this practice should be used rarely, applied fairly, and subjected to reasonable constraints.

And then in the last paragraph it says, the stakes

are high.  Life in restrictive housing has been well developed, well documented by inmates, advocates and correctional officials.  In some systems the conditions can be severe, the social isolation, extreme.  At its worst, and when applied without regard to basic standards of decency, restrictive housing can cause serious, long-lasting harm.

Do you see that in the summary?

A.   I do, yes.

Q.   Can you explain to me why the president would be recommending against the use of solitary confinement if this Colorado study had any validity?  In other words, if, in fact, it was true empirically that solitary confinement was not only not harmful, but helpful, would you expect that the executive branch would actually be advocating wider use of this practice?

A.   Well, of course not.  I mean, there has been in, in the country, over the last 10 years, a developing consensus, not just among human rights groups, and even experts like myself who study this issue, but also professional organizations, like the American Bar Association, American Psychiatric Association, and increasingly correctional administrators, secretaries of corrections, and so on, including in the state of Colorado one of the leaders for reducing administrative segregation and isolation in the country is located in Colorado.

The Colorado Department of Corrections has led the way for the rest of the country, in the aftermath of the Colorado study, which they obviously, obviously attribute little or no significance to.

And I think the president and the Justice Department, at least certain members of the Justice Department, have recognized the implications of the literature that I've been talking about.

And this is a practice that's been in widespread use in the United States for, at least for 30 or 40 years, much wider-spread than it had been for the preceding almost hundred years.

And I think there is recognition, not only about criminal justice reform generally, prison reform, even somewhat more specifically, but very specifically the need to reduce the use of long-term solitary confinement.  I think the president is reflecting that consensus.

Q.   When you say certain members of the Department of Justice, this document, this executive summary and the report itself, are not being presented as the policy of only certain members of the department, correct?

In other words, this, these documents are stating policy of the Department of Justice, are they not?

A.   Yes.  Fair enough.  Yes.

Q.   Now, on the report itself, this is A33, I want to ask

you about, there's a section in the report where they, at Page 65, where they talk about an earlier study. This is a GAO report in December. And it was entitled Improvements Needed in Bureau of Prisons' Monitoring and Evaluation of Impact of Segregated Housing.

Are you familiar with that report?

A. Yes, I am.

Q. And the department summarizes that earlier report. And it says, towards the bottom of the page there, in sum, the GAO found the following. And the last thing that the GAO study found was, the bureau's own policies recognized that long-term segregation may have a detrimental effect on inmates. While the bureau regularly checked the mental health of inmates in segregated housing, BOP had not conducted an assessment of the long-term impact of segregation on inmates.

Were you aware of that GOP report and that finding of what the Bureau of Prisons policy was?

A. Yes. It's one of the things I think that contributed to the president's request for a more in-depth analysis, not about whether or not solitary confinement was harmful, that was already a consensus, I think even among high level BOP administrators, but rather, what could be done to reduce it, given what we know about its harmfulness what can be done to reduce it.

And I think that paragraph points to an important issue, which is, that simply checking on the mental health of prisoners is not the same thing as identifying whether they are being adversely affected by the conditions of their confinement.  It's an important distinction.

You can be severely adversely affected without actually becoming mentally ill.  And I think that's part of what they are getting at at that paragraph that you read.

Q.   All right.  And elsewhere in that report, this is at page 83, the report describes the activities of the Department of Justice Civil Division as it relates to trying to restrict or end segregated or isolated confinement, correct?

A.   Yes.

Q.   And it talks, 83 and 84, about the success or the involvement of the Department of Justice in restricting solitary confinement.  And it mentions as its first example, the involvement of the department in litigation with the state of Pennsylvania?

A.   Yes.

Q.   Are you familiar with that litigation?

A.   I'm very familiar with the litigation, yes.

Q.   And is this the Department of Justice, at least the civil division, becoming actively involved in trying to end segregation in state systems?  Is that what this is

describing?

A.    Yes, that's what it's describing.  That, the quote that I had in the power point defining solitary confinement using the Justice Department's definition comes out of the Department of Justice's letters in that litigation to the governor of the state of Pennsylvania.

Q.    Okay.  And Exhibit A34 that I've had marked, is your letter in your power point, was a letter I believe to the governor of the state of Pennsylvania from someone in the civil division?

A.    Yes.

Q.    Defining what solitary confinement is, correct?

A.    Yes.

Q.    Are you familiar with this letter A34, which is a letter, also to the governor of the state of Pennsylvania from the U.S. Department of Justice Civil Division?

A.    Yes.

Q.    February 24, 2014?

A.    I am.

Q.    And, by the way, these letters are up on the DOJ's civil division website, correct?

A.    Yes, they are.

Q.    They publicize their efforts to try and restrict around segregation?

A.    Yes.

Q.    The last page of this letter, after detailing the department's efforts, actually Page 24 of the letter, in the conclusion section, it says, now is the time to put a stop to these harmful solitary confinement practices and to meaningfully improve the mental services PDOC provides, correct?

A.    Yes, it does.

Q.    Now, is there a certain inconsistency between the position adopted here in this Colorado study?  If that study had any validity would you expect that the civil division of the Department of Justice would be writing a letter like this to the governor of the state of Pennsylvania describing the harmful effects of solitary confinement?

A.    No.  As I've been saying, I don't think anybody who is a credible researcher and expert in this area, and certainly not correctional policymakers and lawyers who litigate these issues on behalf of the Department of Justice, question the fact that solitary confinement can be and is often extraordinarily harmful and, and attribute really no significance to the Colorado study, including ironically in Colorado where the study was done.

Q.    The Court asked you a question about why can't these kinds of issues be addressed in litigation like as is described in this letter.  Do you recall that question?

A.    I do, yes.

Q.   And in this letter, this is A34, the footnote in this letter says, in making these findings, in reference to their findings about the Pennsylvania system, the Department of Justice does not intend to suggest that every use of solitary confinement on persons with SMI, I assume that means, mental illness prisoners?

A.   Yes.  SMI.  Serious mental illness.

Q.   And ID is intellectual disability?

A.   Yes.

Q.   In making these findings the department does not intend to suggest that every use of solitary confinement on persons with SMI ID is a per se violation of the Eighth Amendment or the ADA?

A.   Correct.

Q.   Now, is that position, that is, the position stated here, that we're not saying that there's a Fourth Amendment violation, and the kinds of questions which you heard on cross examination, the thrust of which was, well, aren't their justifications for locking certain populations down, such as death row prisons.  Is that an impediment in any way to successful litigation of trying to end or restrict restrictive housing for death row inmates?

A.   Yes, it is.  I mean, certainly as long as the Bureau of Prisons, or in the state system the State Department of Corrections, maintains the position that I inferred counsel

was maintaining in cross examination, that there is a necessary to isolate or keep in solitary configuration death sentenced prisoners then that stands as an impediment to my rating or ameliorating those conditions.

Q.    And is the way that the system presently operates, if they have an incident in, on death row, assault, stabbing, misconduct, or whatever, is it just that person that is continued to be kept in isolation?  In other words, does the policy affect everybody regardless of what everybody else is doing?

A.    Yes, it does.  And it also oftentimes motivates changes in the practices within the unit itself that makes the unit even harsher, and thereby affects everybody, even though only a person or a few people may have been involved in the, in the conflict or infraction.

Q.    You have reviewed the expert witness reports of the two BOP experts for the government who are going to testify next week I believe, correct?

A.    Yes.

Q.    And did you see, in particular, the report of John Oliver, who is a former warden, may still be a warden?

A.    Yes.

Q.    And, in particular, his report where he says, although ADX is the most restrictive institution in the Bureau of Prisons, it is expected that the inmates continue to program

and alternately progress, step down to a less restrictive environment either within ADX or to a less restrictive general population facility?

A.   Yes.

Q.   And you've heard that statement in other contexts where they are describing ADX as sort of a temporary housing unit and not a permanent --

A.   Correct.

Q.   -- assignment?

Does that sort of reason apply to the SCU?

A.   Well, no, it doesn't.  And I, I tried to make that clear in passing.  Maybe it bears a little bit more emphasis.  The solitary confinement conditions that inmates are subjected in the SCU are a permanent state of affairs. There is, aside from the relatively modest, not insignificant, but relatively modest change from phase one to phase two, that's the end of the line.

So the best you are ever going to do in this unit is seven hours out of your cell a week on a regular basis; five hours for exercise and two hours in the so-called leisure room.  Otherwise, you are confined in your cell for what averages out to 23 hours a day under the conditions that we saw.  And that's a permanent state of affairs.

That's not, you are not working your way to some other better place.  That is, that is where death row

inmates are confined in the federal system except for the two who are at ADX.

Q.   This lengthy report from the Department of Justice concerning the use of restrictive housing talks about all forms of restrictive housing within the Bureau of Prisons, except death row; isn't that true?

A.   Yes.  It was, I read it carefully.  Even when it first came out, quite apart from this litigation, wondering where and why the death row unit wasn't acknowledged as a solitary confinement unit and issues with respect to that unit addressed.

Q.   Is that in recognition of the fact that there are special concerns regarding that population and that whatever progress is being made in this area isn't going to apply to that population or is there some other reason that that group would be sort of not discussed within the context of this policy statement trying to restrict solitary confinement?

A.   I think that's the most reasonable inference to make, is that they have somehow separated this group out.  And this group is not being subjected, either to the scrutiny over their conditions of confinement, they appear no where in that that long report, nor are they acknowledged in the recommendations that they made about the importance of and the policies by which they would reduce the use of

restricted housing.

Q.    You talked about changes at places like ADX.  To your knowledge, and based on your study, have there been changes in the way people are housed on death row, the federal death row, during this period of time when people seemed to be, and agencies seemed to be more concerned about solitary confinement?  Has there been progress one way or the other, more restrictive, less restrictive?

A.    Well, there, you know, there has been some actually reduction in -- I mean, the unit, the SCU has gotten more rather than less restrictive.

There was a time when this unit operated in a somewhat more benign way.  There was group exercise where prisoner, more than one prisoner could be together in the same, in the same exercise area, where they could be in the so-called leisure room together in groups of more than two. That all has been -- that unit has been going in the other direction as the larger BOP restrictive housing policy has been liberalized.

Q.    Do you know anyplace in the country where there has been successful litigation on behalf of death row inmates, moving them from a restrictive housing situation to a better housing situation?

A.    Not anything recently.  In the very early years there was litigation in California and in Texas that I actually

participated in.  And those two states liberalized their death row, both the conditions of confinement and the procedures by which they operated.

Texas has gone back to its earlier, the earlier pre-litigation model.  California has a somewhat more, more benign set of conditions for at least some inmates.  They operate with a grading system.  So you are an A or a B inmate.  If you're an A inmate you have more privileges, more freedom of movement.

In you're a B inmate, and that's ordinarily a judgment which is made because you've engaged in a disciplinary infraction, then you're on a much more restricted housing status.

Q.    Other than those two examples, any development?

A.    I don't know of any.  I can't say there aren't any, but I have no personal knowledge of any.

MR. BURT:  Your Honor, with the Court's permission, I would like to move into the next area, but I would move in A34, which is the DOJ letter that I referenced.

MS. JIMENEZ:  No objection.

THE COURT:  And you are prepared to move on as well, Miss Jimenez?

MS. JIMENEZ:  Yes.

THE COURT:  Me too.  Okay.

Q.    Doctor, I think the second topic, and we can go back in the power point, that would be good.  The second topic you were going to discuss was the issue of death qualification, correct?

A.    Yes.

Q.    And let me get this out.  As you did with the first topic, do you sort of frame your discussion here by reference to the discussion in the Glossip dissent?

A.    Yes.

Q.    And tell us what this is?

A.    This is quite a, quite a transition here to a totally different topic.  But this, again, is with reference to the framing of these issues for the Court.

        This is the section of the Glossip opinion in which the other issue you've asked me to prepare testimony on is addressed.

        So this, again, is, is the part of that opinion which focuses on death qualification.  And here Justice Breyer says one other factor that raises questions about the constitutionality of the death penalty is the practice of death qualification and the fact that no one can serve on a capital jury who is not willing to impose the death penalty.

        Later he goes, near the bottom of that paragraph, he concludes from an article of Roger Williams that over, for over 50 years empirical investigation has documented, or

demonstrated rather, that death qualifications skews juries toward guilt and death.

Q.   And are you familiar with that article?

A.   Yes, I am.  And I've, except I've misstated the name of the author.  This is actually a law note that was in the Roger Williams University Law Review.  But, so this is a -- I'm familiar with the article.  It's an interesting article which discusses, not only the problems, but potential solutions to the problems that are created by death qualification.

Q.   And that statement, for over 50 years empirical investigation has demonstrated that death qualification skews juries toward guilt and death.  Based on your knowledge and your contribution to the literature on this issue, do you agree or disagree with that statement?

A.   Well, it's a completely accurate statement.  It's very consistent literature.  Again, lots and lots of studies all pointing in the same direction elaborately documenting the various ways in which death qualification skews juries toward guilt and death certainly, but skews juries in other ways as well.

Q.   So next slide, please.  Could you, are you going to summarize for us the current status of what this research is?

A.   Yes.  You've asked me to kind of give the Court a sense

of where we've been on this issue and then quickly to where it is we are now given the research that's been done over the last 15 or 20 years.

Q.   And before you do that, if you would, just sort of briefly define for us the, your understanding of the term death qualification within the context of the case law?

A.   Okay.  So it really is a practice that has been around and used, in use in the United States for really the beginning of the use of the death penalty.  So there's some very, very early Supreme Court opinions that talk about it in the 19th Century.  But the first focused opinion on the issue came in 1968 when the Supreme Court in a case called Witherspoon versus Illinois, focused on the breadth of the practice that was then underway in the courts.

        In pre-Witherspoon days it was not uncommon for a court to death qualify the veneer, the potential jurors, by asking whether there was anybody who had scruples against the death penalty.  And that, in fact, was the term that was used.

        And oftentimes the reports at the time of Witherspoon were large numbers of people would raise their hand expressing scruples against the death penalty.  This was a time in the United States, incidentally, when there was a divided opinion about the death penalty or roughly same number of people in favor as who were opposed.

And the Court tried to regularize that process in Witherspoon by saying that unless a prospective juror made it unmistakenly clear that they were irrevocably opposed to the death penalty then they could not be excluded. But it left open the issue of what the effects were of even those exclusions.

So there is a phrase, a memorable phrase in Witherspoon social scientists picked up, that the state of the social science at that time was too tentative and fragmentary for the Court to rest a constitutional decision outlawing the process across the board.

So it said based on the evidence before it, based on what its understanding was of the practice, restricting it just to excluding those people who made it unmistakably clear that they could never impose the death penalty no matter the facts and circumstances that they would allow the practice to proceed.

There was a revisiting of this issue in a case called Wainwright versus Witt in 1985 in which the court modified the standard of exclusion from making it unmistakably clear that a person was irrevocably opposed, could never impose it, to whether or not their feeling or attitude about the death penalty interfered with their ability to be a fair juror. So it was a broadening basically of the standard of exclusion.

And in 1992, the evolution of the doctrine, recognized the fact that there were some people, typically a much smaller group of people, but nonetheless a non-existent group of people, who also were problematic because they were so strongly in favor of the death penalty that it would impair their ability to function fairly as a juror.

So in Morgan versus Illinois the court said that you not only have to death qualify a jury, but life qualify a jury as well, so ask the people who are very strongly in favor of the death penalty, whether their attitude about the death penalty would impair their ability to function fairly as a juror, but also to ask the people who are strongly in favor of the death penalty a comparable or parallel kind of question.

And so that's sort of the evolution of the doctrine. And it's remained more or less the same to until the present. At the present, there was a case in 1986 that I know you want me to talk about, that addressed this issue of whether the effects of death qualification in a more direct way.

Q.    All right. Next slide, please? So you said 1986. Is it actually 1985?

A.    No, it's actually, I said 1985, because it's the year before the opinion was rendered by the court.

Q.    And the opinion you're talking about is not one of the

three listed, but another one?

A.    No, it's another one.  Lockhart versus McCree, which we'll talk about in a minute.

Q.    So we'll talk about that in a minute, but capture for me what the social science literature was prior to the Lockhart decision in 1996?

A.    Yes.  So Witherspoon a '68 case, and Witt, the later case, really spawned a fair amount of social science research on the issue of what are the effects of death qualification on the jury pool that results after death qualification has taken place.

And there are -- we knew in 1985, when the record that went to the Court for the decision that they rendered in '86, four things that had been fairly well established.  The first three in a little bit more detail than the fourth.

One is that, I should say all of these first three things are based on the notion that people's attitudes towards the death penalty, which is the basis upon which death qualification operates, are correlated with other characteristics of people.  So attitudes tend to be correlated with other attitudes.  And attitudes also, certain kinds of attitudes are correlated with other demographic characteristics, like a person's race, their gender, could be their age, various other things about them.  Maybe earn socioeconomic class, etcetera.

So attitudes are not randomly distributed, but they are connected to other attitudes and beliefs and other characteristics that people have.  So when you focus a process of exclusion on a particular attitude, because you're intending to cull the group of prospective jurors of people who hold what you regard as disqualifying attitudes, you are also necessarily indirectly, but perhaps inexorably, culling that group of other characteristics that it otherwise would have had.

And so there's the concern over unrepresentativeness that because, particularly African Americans, but other racial minorities also tend to oppose the death penalty in greater numbers than others.

A process that excludes people on the basis of their attitude toward the death penalty and the way the process works is primarily opposition to the death penalty, disproportionate numbers of African Americans are excluded from participating on capital juries.

Women tend to oppose the death penalty.  It's not quite as great a disparity as it is with racial minorities, but the disparity is there, it's consistent, it's longstanding.

So that means also that all of the things being equal, a death qualified group of potential jurors will contain fewer woman, as well as fewer minorities than a

group that is not death qualified.

Q.   Does that same principle to say, let's say, religious groups who might have a, you know, cognizable religious group that has a particular stance on the death penalty?

A.   Yes.  Absolutely.  And later on I'll cite a study which shows that it differentially affects, for example, Catholics, who because of the church's position on capital punishment, are more likely to oppose the death penalty and who, therefore, would be more likely to be excluded from participation in a capital case as a potential juror.

So those are, those are concerns over representativeness because some of those characteristics are, of course, protected classes.  Race and gender the most obvious.

Then, because attitudes towards the death penalty are also correlated with other attitudes that people have, research has shown that there, that a death qualified group tends to be what is generally described in the literature as prosecution prone.  That's a sort of shorthand way of saying that they tend to emphasize or value crime control and tend to de-emphasize what might be called due process values.

That doesn't mean they only believe in one and not believe in the other.  So it's a matter of relative emphasis.  And these are probabilities, so you are really talking about a process that eliminates percentages of

people not literally everybody.  But when you death qualify a jury, the research shows, and research showed up to 1985 as well, that you tend to get, have a group of people left who are more likely to favor the prosecution's perspective or position in a criminal case.

Not surprisingly, a lot of the research has shown what might be argued as the logical consequence of that.  If you eliminate people who are opposed to the death penalty, particularly racial groups and women who are opposed, and then you have a group of people who are more prosecution prone, not because you are selecting for prosecution prone, it's because when you are de-selecting for death penalty opposition that means that you are automatically culling people out of that group of people because their attitudes towards the death penalty are correlated with others, you end up with a group who are guilt prone.

All, all of the other things being equal, based on the same set of facts and circumstances, a death qualified group is more likely to convict than a non-death qualified group or the kind of jury that you would have in any other kind of case that is not a death penalty case.

The final fourth issue is really my own research, my own direct research done in the early 1980's.  Very difficult research to do so it hasn't really been followed up on, but it's a relatively common sense proposition, but

we were able to, actually able to document it in the research that I did.

It's called the process effect.  And it basically, basically acknowledges that in order to -- in order to death qualify a jury you necessarily have to ask questions about the death penalty.  And you do that at the very outset of the trial before any evidence has been presented in the trial, before anything really about the defendant has entered into the courtroom you're asking people, essentially asking people whether or not they could, if they were called upon to do so, impose the death penalty on the defendant.

And what we found is that that has a biasing effect on people.  It tends to imply that, that there's a greater likelihood of guilt because if there wasn't a likelihood of guilt why would we be talking about penalty.

It tends to imply to some jurors, not literally everyone, but to some jurors, that the major trial participants think the defendant is likely guilty because they are the people who engage in the process of questioning about the death penalty.

It, we found also, or at least I tried to explain finding by suggesting, that it also may desensitize people to the prospect of actually imposing the death penalty because it's an issue that they deal with at the very outset of the case before they've heard any evidence in the case.

It also, if it's done in open court, as it typically is, not always, but it typically is, it also implies that the correct position, the legally correct position, is the position which says that, yes, you can impose the death penalty because prospective jurors will see other prospective jurors be dismissed on the basis of their opposition to the death penalty.

Q. Did you start writing about this topic and about doing studies in this topic in 1980?

A. Yes.

Q. And the exhibit index indicates that A3 is an article written in October of 1980 in the Journal of Crime and Delinquency called Juries and the Death Penalty: Readdressing the Witherspoon Question by you. And then the item number four, A4 is an article published in June of 1981 by yourself entitled Death Qualification as a Biasing Legal Process. Were those the first studies that you wrote on this topic?

A. Yes.

Q. Were you actually the one writing about this or were other people studying this same phenomenon?

A. A lot of other people were studying these issues. I was writing about what I've called here the process effect.

THE COURT: The process effect is a little like an anchoring effect in negotiation analysis where I start to

say the hotel is worth a million dollars and everybody believes it after a while?

THE WITNESS:  Exactly.  Very well put.  So you start talking about the death penalty, can you impose the death penalty, would you be willing to vote for the death penalty.  It starts to move people very implicitly in the direction of thinking, well, I guess this is an issue we're going to address in this case because otherwise why would the Court and counsel be asking questions about it.

And sometimes this questioning, as you probably all know, can go on for a considerable period of time.  So it's not necessarily just a quick part of the voir dire process.  It actually can be quite protracted.

And jurors, not surprisingly, or prospective jurors infer from that that this is an issue in this case. And they, of course, infer that before they have heard any evidence about guilt or innocence.

THE COURT:  Thank you.

Q.   Now, were you involved in some litigation that was directed toward trying to modify this issue in the state systems early on?

A.   Yes.  Yes.

Q.   What, and just give me a little summary of that, if you would?

A.   Well, the two cases of significance were a case in

California, which ended up, it was decided by the California Supreme Court in a case called Hovey versus Superior Court, in which the California Supreme Court modified the jury selection process in California to be done on an individual sequestered basis and cited the research that we had done on the process effect as the basis for that.  But there was litigation in which all of this research, again this litigation took place in the late 1970's.  I think the case was decided in 1980.

There were other people who testified in that case as well about the unrepresentativeness issue, about prosecution proneness, about guilt proneness.

Q.   And following that decision did, and in response to the kind of criticisms or concerns you raised in your study, did the practice begin to change in terms of how the questioning was conducted vis-a-vis group questioning or individual questioning?

A.   Yes, it did.  It, certainly in California Hovey directed the questioning to be done on an individual sequestered basis, in part, to avoid the biasing effects of the process effect that we've been talking about.

Q.   Is it your understanding that in most of the federal capital cases the questioning is conducted individually sequestered on death qualification issues?

A.   I don't believe it is.  I think there's variation on

that.

THE COURT:  That's an easy reform?

THE WITNESS:  Yes.

THE COURT:  Yes.

Q.  And have you written about whether that reform addresses all aspects of this process effect you've been talking about?

A.  I have.  So as His Honor just pointed out, the process effect is relatively straightforward to cure, at least, at least the audience effect of it.  So you still, even in an individual sequestered voir dire, you're engaged in a protracted discussion of the death penalty with a prospective jury who may infer from this protracted discussion that the death penalty is very likely a possibility here.

Some jurors, and I know this from post-trial interviews, some jurors actually mistakenly believe that they've made a commitment to impose the death penalty because they've agreed they could.  Now, that's obviously a mis-interpretation of the law, but that gives you a sense of how the process can go awry and how people don't understand the legal distinctions that are being made in the questioning.  And the implication of the questioning being that this is very likely something, I'm being asked can I do this, this implies perhaps that not only will I be asked to

do it, i.e., there will be a guilty verdict, but if I said I can does that mean I've said I will.

So even if you reform the audience effect of having a group voir dire there's still some residual concern.

The other problems, however, are much more difficult to resolve.  The first four that I've listed here. Because they really are what might be called composition effects.  This is the composition of the group that results after you've done this process.  And if you are going to do the process those things are invariably going to happen.

Q.   You talk here about prosecution proneness.  And as I understood the next point, guilt proneness.  Does that extend to the penalty aspects of the case?  In other words, is there some impact of this process on how jurors enter the sentencing phase?

A.   Yes.  So this was not as widely studied in 1985 as its been since then.  And, actually, some of the research I have done, but other people have done this research as well, show that really as a combination of the, the change in the composition of juries that death, prospective jurors that death qualification brings about the prosecution proneness and the guilt proneness also combine to create death proneness.  That you have a group of people who are, who are more likely to impose the death penalty, but not just

because they favor the death penalty, also because they have a differential understanding and a differential valuing of mitigating and aggravating circumstances.

Q.   Is it true that that understanding came later, that that literature gets developed later?

A.   It did.  It did.  Up until 1985, and up to Lockhart versus McCree, these were the issues that were mainly at the forefront of both the social science research and the litigation.

Q.   So did Lockhart versus McCree address certain aspects of these issues you've been discussing?

A.   Certain aspects, yes.  So the evidentiary record that went up in the Court in Lockhart was comprised of 15 social science studies.

Q.   By the way, were you involved in this litigation, Lockhart versus McCree?

A.   Yes.  I was the expert who presented this evidence in the Federal District Court hearing in Little Rock, Arkansas.

Q.   When did that hearing take place?  I'm trying to get a sense of what the state of the literature was.  Was that 1983?

A.   1983 or '84.  So the case, of course, went from the Federal District Court to the Eighth Circuit, who affirmed. And then it went from the Eighth Circuit to the U.S. Supreme Court.

THE COURT:  All right.  This was a federal post-conviction review of a state prosecution?

THE WITNESS:  I believe it was actually a, it must have been.  You know, the procedural posture.

THE COURT:  Some warden's name has got to be in there.

THE WITNESS:  Yeah, Lockhart was the warden. Lockhart is the warden's name.  McCree was the petitioner. But there were a couple of petitioners.  And the evidentiary record was actually established in a, in a related, Grigsby versus Mayberry.  That was the District Court case.  But that was the evidentiary record that was incorporated into McCree's appeal.  And Lockhart appealed from the Eighth Circuit, on the Eighth Circuit's affirmance.

And I want to say, this was done in the early 1980's.  And I, I wish I could remember exactly which year the litigation took place.  It took a few years for it to work its way through the appellate process.

Q.  So you presented these studies, that record went up onto the, to the Supreme Court in Lockhart versus McCree?

A.  Yes.  Not just my own study, but the entire group of studies that had been done on these composition effects that we were looking at earlier.

Q.  What got addressed there and what was the ruling?

A.  Well, the Supreme Court in Lockhart had this, the

evidentiary record of these 15 studies.  Justice Rehnquist found that the studies were not sufficient to establish the unconstitutionality of the, of the procedure of death qualification.  But he also ruled that even if the studies were valid, and he had some questions about the methodology of the studies, that death qualification was not unconstitutional because the group of people excluded under death qualification did not, as he said, constitute a distinctive group under the fair cross section requirement.

Q.    That's a group defined by their attitudes concerning the death penalty as opposed to the issue you talked about before, which is the impact on groups that are cognizable?

A.    Yes.  Yes.  So he said that, as he understood it the, the, the respondent's claim, McCree's claim was that, that excludables were a distinctive group and, therefore, elimination of them created an unrepresentative group of prospective jurors.  And that that, that they were not a distinctive group under the fair cross section requirement. And so the claim failed on that, on that basis.

He went on to say that because a similarly biased jury could result from mere chance, that is to say, you could, even if you didn't death qualify a jury you could get a jury that was composed of the same group of people, in theory you could by chance, that a process, an outcome that could arise by mere chance did not become unconstitutional

if it was mandated by a legal process.

Q.   When, the quote you had from Justice Breyer, is that in a section of the dissent dealing with the issue of reliability?

A.   Yes.

Q.   In other words, he's not discussing it -- is it your understanding that he's not discussing it as a distinct constitutional claim, similar to what is being presented or was presented in Lockhart, but an issue of reliability in terms of its impact on the jury, the conviction proneness aspect of it?

A.   Right.  I mean, the quote, his words, and the section of the law note that he quoted from, really raise questions, not about the fair cross section requirement, but much more directly about what does this process do to the reliability of the decision making given the fact that the composition of the people who are making the decisions has been affected in all of these adverse ways that we're about to talk about.

Q.   So after that decision, Lockhart, did research into this area stop from a social science standpoint?

A.   No.  It's actually very interesting, because oftentimes when the Supreme Court speaks about something definitively or seemingly definitively the research, the research sort of comes to an end.  I mean, the researchers move onto something else.

In this area I can't speculate about exactly why. I know in my own case I continued to do research on the issue because I thought there were a number of unanswered questions, not only in the opinion, but also a number of research questions that hadn't been adequately answered. And so people continued to do research and continued to do writing about exactly this issue.

Q.   So besides the research aspect of it, which we'll get to in a moment, what else changed, if anything?

A.   Well, one of the things that's changed is attitudes towards the death penalty.  So since this case was decided, if you look, this is a graphic that I, that I pulled from the Pew Research Center, a good demonstration on the way death penalty attitudes have changed in the United States when they first started to be measured in the 1930's.

You can see in the mid sort of 1960's, a period of time I was talking about a little earlier, when there was, at the time of Witherspoon there was almost an even divide in the country in terms of in favor or opposed.

After that period, in the '70's and '80's, and up to the '90's, many more people were in favor of the death penalty than were opposed.  And probably the widest separation took place, you know, I want to say mid, mid-19, early to mid-1990's when there was about a 60 percentage point difference between people who were opposed to the

death and those who were in favor.

That has changed slowly, but very consistently. Since that time, in the mid-1990's, you see those two lines coming closer and closer together.

I showed you this slide because it shows how the Pew Research Center conducts their surveys.  So they do a national survey on death penalty attitudes.  The numbers in the beginning from 36 to 95 come from Gallup.  Pew wasn't around then.  And they didn't do this kind of survey work. But their numbers now cover '93 though 2013.

The next slide carries it two more years out. Just so, I wanted to show you the first slide so you could see the methodology.  This is the same methodology, but now this is the current data we have on trend lines up to 2015.

And you can see, again, that basically these numbers are, have come close together.  There is about a, you know, an 18 point difference between the groups who are -- the group that is opposed versus the group that is in favor.  A very large difference between the earlier time when it was about a 60 point difference.

Q.   So at least in this, from '95 to 2016, the, those in favor, as defined by that question in your slide, is shrinking and the number opposing is increasing, right?

A.   Yes.  And important, because obviously the process of death qualification tends to differentially affect the

people who are opposed to the death penalty.  And as the group of people who are opposed to the death penalty gets larger, there is the reasonable expectation that the group of people who will be excluded on the basis of their death penalty opposition also has grown correspondingly.

So at the time Lockhart was decided, for example, the number of people who were opposed to the death penalty and who therefore were being affected by death qualification, were being excluded on the basis of their opposition to the death penalty, was quite small.

You know, you see here down around 18 or so percent, never really more than 20 percent who were opposed. Whereas the people who were in favor very, very high.

As those numbers get closer and closer together the differential impact, the death qualification on people who are opposed to the death penalty also, it's reasonable to assume has grown.

You are now looking at more than a third of the population who expresses opposition to the death penalty. And some percentage of which will express opposition, which is significant enough to be excluded from participating as a juror in a capital case based on that opposition.

Q.    And these graphs are, both of them, charts or whatever, are all premised on the way this question is phrased.  In other words, are these poling results ones in which the

poller is asking, do you favor or oppose the death penalty for persons convicted of murder?

A.   Yes.   Which is an important distinction to make because that's a broader and less probing question than one might ask if you were trying to reflect the current realities in, in capital trials.

Q.   Would you turn, if you would, to page, exhibit in volume two of three, Exhibit A19?   Let me know when you are there.

A.   Yes, I'm here.

Q.   Is that a -- is this a copy, or at least a portion of chapters from your book, Death by Design, which you wrote in 2005 which I'm holding up?

A.   Yes.

Q.   It is?

A.   It is.

Q.   Okay.  And do you discuss the issue of death qualification in your, in your book?

A.   I do.

Q.   At Page 88 you have a summary of public opinion polls which ask the question somewhat differently than what we have in the polls on your power point, correct?

A.   Yes.

Q.   Explain to the Court what the difference is and what impact asking the question in a different way has on

opinions?

A.   The, the data that were collected by Gallup on the graph that we're looking at now, in the very beginning in the 1930's, and the question that the data that the Pew folks based their results on, is this general question about favor or opposed.  That's the way the question is oftentimes asked by public opinion surveys, particularly when they are national surveys.  You have a large, it's a large sample of people and you really don't have -- it's difficult to get people to answer questions in depth.  So you ask this general question, this is the way it's been asked for years and year and years.

But beginning in the 1980's many states, and eventually most states, and now virtually every state, has as an alternative to the death penalty, a punishment that both was not widely used and the public was not widely aware of until relatively recently, namely, life without parole.

So researchers in the 1980's and '90's began to ask a different kind of question.  Do you favor the death penalty or life without parole for people who are convicted of murder.

And acknowledging what was, in fact, increasingly becoming the reality all across the United States, that the alternative was not the death penalty or life with parole, but rather, death penalty versus life without parole.

When you ask the question that way, there is a dramatic shift in favor of life without parole.  And so these, I've summarized here on Page 88 of my book the various different polls that show those differences.

The very first one is my own poll done in 1989 in California showing that when you offer as the alternative life without parole an overwhelming majority of people preferred life rather than death.

So if you just ask the question the way Pew asks it, and most polling organizations do it that way, are you in favor of the death penalty, you get these numbers.  And even they are declining.  But if you ask the question in a way that, that suggests what the real reality is as an alternative, then you find that there's a very substantial number of people, in most of the states, where this was asked, in fact, a majority of people or nearly a majority of people, who were in favor of life over death, suggesting that these numbers actually underestimate the actual magnitude of opposition.

Q.    Okay.  And your book is written in 2005.  Has that finding been replicated in other or recent public opinion polls?  In other words, when the question is asked to include the alternative of life without parole, do you see a wider margin in favor of life than death?

A.    Yes.  And, and I want to say every, in every study that

I've ever seen the question asked that way there is a reversal of support.

So if you ask it this way, the way that Pew asks it, there is still a majority of people who support the death penalty.  That's typically the way it's asked.  That's the representation of death penalty opinion is often made politically.  But if you ask it this other way with life without parole as the alternative then favoring becomes the majority and not the minority position.

Q.   In terms of -- so the research in after '85 is the context of this sort of change in public opinion where the death penalty opponent group is getting larger, the favorable group is getting smaller?

A.   Yes.  I think it's raised, it's raised the profile of this question among social scientists because of this fairly, a gradual, but nonetheless, a dramatic shift away from, a 60 point difference between those opposed and those who are in favor to now what we have is a, you know, essentially a 17, 18 percentage point difference.

Q.   And in terms of the flow of the research on this issue, if we could have the next slide, what did you find?

A.   Well, I actually was interested in seeing whether or not my intuition that, in fact, there's been more research done in recent years, recent decades was correct.  So I used a psychology database, a PsycINFO/ProqQuest, to actually

trace the number of, in this instance, this particular graph shows the number of publications, book chapters and journal articles that use the term death qualification by decade since 1970.

And you can see that, you know, rather than the Supreme Court's decision in 1985 settling the matter, at least among social scientists and people who write about this issue, has been much more written since 1986 than there was written before that. And the next slide I think, you know, introduces the slide before. All right. That's okay.

So, and then this is, this is the same database all scholarly writing, including book chapters, journal articles, reports and dissertations. You can see it's a much larger number. I think the last one had about 180 or so articles. Yeah, there we go.

Q. So what, if we could have the next slide, what is the state of knowledge in 2016 on these issues?

A. It is that the previous biasing effects continue to be corroborated by subsequent research. The process of death qualification still results in unrepresentative jurors, ones that underrepresent racial minorities and to a lesser, but still significant degree, underrepresent women.

The prosecution proneness attitudes are still being reflected, as is guilt proneness. The process effect bias is having, having continued to be studied, but there's

no reason to believe that they've changed.  It's the same process which is being used.

So there are no counter-studies that raise significant questions about what we knew even in the pre-1986 days.  But in addition to that, there's been research beyond what was known at the time of Lockhart, a significant amount of research actually, that establishes what I've called here, continuing or increasing attitudinal divisions.  Really attitudinal divisions mostly around race.  The divide between, especially African American support for the death penalty, and everyone else, is greater even nowadays than it once was.

And there are additional dimensions to the bias.  People have studied different aspects of what death qualification does.  I talked earlier about basically there being an unrepresentative concern, a prosecution proneness concern and a guilt proneness concern.

We now know that there's actually a number of other concerns that the jury that results, once you cull a strong opponent to the death penalty, is different in a number of significant respects that raise questions about the fairness and the reliability of their decision making.

Q.   So can you give me some examples about what you're talking about in terms of what the studies have shown?

A.   Yes.  So there's a lot of information on this slide.

And I apologize for it.  It's really just for illustrative purposes.  This is a handful of studies that represent a number of studies that have been done on this issue showing basically that there are continuing divisions between African Americans, primarily African Americans, but other racial minorities as well, and whites, and also between women and men on the issue of the death penalty.

So, again, we're not -- when you eliminate people on the basis of their opposition to the death penalty you are invariably also eliminating a higher percentage or number of especially African Americans, but also other racial minorities, and to a lesser, but still significant extent, you are eliminating more women than otherwise would be represented in the jury pool.

These are just a series of studies which basically make that point, studies which connect people's attitudes towards the death penalty to the racial characteristics or their gender.

Q.   The next to the last slide are these additional dimensions of bias that have been studies?

A.   Exactly.  So here are some examples of the other things which have been studied.  There's a researcher in Florida named Brooke Butler who has studied, done five or six of these studies, I've only listed a couple of them here, but she shows, for example, that death qualified jurors are more

likely to be susceptible to pre-trial publicity.  They are more likely to be influenced by victim impact statements.

I did a survey in, a state-wide survey in California and found that persons who were death qualified were more sensitive to, were more sensitive to aggravation. That is to say, they were more willing to recognize it and respond to it than persons who were excluded, who were more sensitive to mitigation.

So you begin to see some sense of what the death proneness of the jury would look like if you have a group of people who are being dismissed, who otherwise would be willing to identify and take into account mitigation, and you have left behind a group of people who are more willing to recognize and take into account aggravation.  That helps to explain why you would expect to get more death verdicts from a jury that's been death qualified than one that hasn't.

You know, there's a, Summers did a study, this is the fourth one on the list, showing that there -- that actually there's is a religious impact to the process.  That we use systematic, you end up systematically excluding people who have certain religious characteristics or beliefs.

Catholics and persons who, he describes it as persons to whom religion is especially important.  These are

people who end up being excluded from participating in capital cases disproportionately.  A couple of other studies on related issues.

My own study at the bottom here that a former graduate student of mine, who is now a professor at UC Irvine, Mona Lynch and I did, we did a study about the, how capital, a simulated capital jury, but one that had been death qualified, that basically had death qualifying attitudes and beliefs, how those juries operated in the context in which they were shown a case that had different, different racial characteristics.

And we actually did a study in which they not only saw a simulated penalty trial, but they actually had an opportunity to deliberate.  And they were able to document the tendency of a jury like that to render death verdicts more often, in the case of African American defendants, especially African American defendants who were judging the case in which the victim, excuse me, jurors judging a case in which there was an African American defendant and the victim was white.

And also that there was a tendency on these juries to become more death prone as they deliberated.  So they took a vote at the outset before they had deliberated and then they deliberated and they became more inclined to vote for the death penalty after the deliberation.  And that

appeared to have been driven by what we called the, a white, a white male juror or dominance effect of the white males on the jury.

Q.    Two last things.  Are you familiar with the study which is in evidence, 8026, by Ken Shirley called Hierarchal Models for Estimating State and Demographic Trends in U.S. Death Penalty Public Opinion, and specifically, the discussion in there about public opinion in Vermont about the death penalty?

A.    Yes.  Yes.

Q.    And what is your understanding of --

A.    It's a study that documents the overall shift in attitudes away from the death penalty nationally.  And some of that was in that slide I showed you with the graphs.  But he was actually able to identify several states where the overall shift was even more pronounced than it was nationally.  And Vermont was one of the three states that he cites as essentially ahead of the curve or with decreasing support more rapidly than in other states.

Q.    Did I also ask you to review a document, which is document 784-5, which is an attachment to a letter from the Clerk of the Court containing some demographic information about the jury pool in the District of Vermont?

A.    Yes, you did.

Q.    And did you, as part of your review, learn that in

Q.   terms of the demographic breakdown of the district, the Vermont District, that according to the 2010 census, there is 96.9 percent white?

A.   Yes.

Q.   .6 percent black or African American, and these are 18 or older citizens?

A.   Yes.

Q.   .3 percent Asian?

A.   Yes.

Q.   .3 percent multi-racial and 1.1 percent Hispanic?

A.   Yes.

Q.   Given the trends in Vermont public opinion, as documented in that first study, and the overall racial composition of the population, the juror eligible population in Vermont, what would you expect the impact of death qualifications would be in a state like this?

A.   Well, realize, of course, we're talking about probabilities here.  So the concern would be that there are so few racial minorities to begin with that if you, at the outset of jury selection, use a process which is known to exclude a disproportionate number of minorities, that you run the risk, and it's a risk, it's a probability, not a certainty, but you run the risk that the very few minorities who might be in that jury pool might, might well be excluded completely from participating so that there would be none of

them left or an insignificant number of them left from a group that was already insignificant in terms of the numbers of people who would be represented.

This is something that, you know, I guess another way to think about it is even though it would be a concern in a community where there were a very sizeable number of minorities, that you would be under, you would be underrepresenting them. That would always be a concern. That is a concern. But it would be unlikely that you would, you would end up excluding all of them because if there were a large number of them they wouldn't all be excluded.

But here, again, this is a probabilistic statement, so one can't say for sure, but if you have very, very few to begin with then there's a real possibility that few, if any of them, would be left at the end of this process if it, if it has the effects that we've documented in the studies that I've been talking about.

Q.    And according to the, this document that I reference, 48.7 percent males, 51.3 percent females, you talked about the differential attitudes between male and female on the death penalty, as the number of people opposed to the death penalty grows, so you approach 50-50 in a population, what is the impact going on be on excluding large groups like women who are differentially opposed to the death penalty?

A.    Well, again, I mean, you are, in an environment like

this one, which is, which really does speak to the unreliability issue, because you're talking about now a process, the overall capital punishment process, which is subject to the vagaries of changing public attitudes.

And so it would, it would affect the, the kind of trial someone got because it would affect the composition of the people who were eligible to serve as jurors in that trial.

And paradoxically, in the state where there is widespread opposition to the death penalty, more people would be excluded as a result of death qualification. So a defendant would be judged by an even less representative, less representative jury or a jury less representative of a larger community.

You know, is that, is that, as that disparity grows then the likelihood that the group of people who is making the decision about whether or not someone lives and dies is very different from the community in which they live. Hardly the conscience of that community in the sense in which that term is used with respect to what capital juries are supposed to function as.

Q.   Thank you, doctor.

         MR. BURT:  I believe that's all I have, Your Honor.

         THE COURT:  Before we start, just help me out a

little bit.  I'm thinking about the two prongs of, as you described, Chief Justice Rehnquist's analysis in Lockhart. And one is that he was not persuaded that there was a purposeful or systemic exclusion of minority or specific groups.  Different from say a Batson problem, which is aimed at purposeful conduct.

The other one is the other, the other point was that he says, which any trial judge or lawyer would say, is that all kinds of things happen on juries.  And once, in any jury selection once you finish excluding people who have some personal connection to the case, right, all you are really talking about is excluding groups, right?  Like, plaintiffs in a civil case don't particularly want wealthy people or bankers and people that say no for a living on the jury.  They'd rather have working folks.

In a criminal, a burglary case the state doesn't particularly want young men who have a history of problems with police on a jury, like that.  Everybody's got their own.  And we accept that, except for the special problem of Batson.  So how is this different?

THE WITNESS:  So it seems to me, Your Honor, that it's different in the sense that in every other case that you cite the preferences of the prosecution or the defense are limited and come at a price.  So in order to exercise one of those preferences they have to exercise a peremptory

challenge.  There are a limited number of them.  And if they are exercising a peremptory challenge on this person they can't do it on that person.

This is, this comes at the outset of, before any, before this costs anybody anything.

THE COURT:  Right.

THE WITNESS:  And it culls the jury pool of people who, and leaving behind people who we know from the research end up having these characteristics and also correspondingly end up having fewer of the other characteristics in terms of the ratio and gender makeup.

THE COURT:  And it's sort of court sponsored in a way that the other is party driven.

THE WITNESS:  Exactly.  And, as I said, it's limited.  It's always limited, right?  There's a certain number of these challenges and you have to make a decision. Whereas here, it could go seemingly, I mean, it can go on as long as there is opposition being expressed towards the death penalty in the pool of prospective jurors.

THE COURT:  Right.  All right.  That's helpful. Thank you.  Let me turn it over to you.  I apologize.  We should give everybody 10 minutes off.

(The Court recessed at 3:40 p.m. and resumed at 3:50 p.m.)

MR. BURT:  Your Honor, I'm wondering if we might

go a little beyond 4:30 in an attempt to finish up with him in case we need to. I don't know what the Court's schedule is.

THE COURT: I think we can work through till 5.

MR. BURT: Thank you.

THE COURT: All yours.

MS. JIMENEZ: Thank you, Your Honor.

CROSS EXAMINATION BY MS. JIMENEZ:

Q. So, Dr. Haney, you acknowledged that the current state of the law, under Lockhart v. McCree, is that the death qualification process is not unconstitutional, correct?

A. Yes. That was a ruling in Lockhart.

Q. And one of your studies was part of and considered and referred to in Lockhart, correct?

A. It was referred to in passing, not seriously considered at the time.

Q. That was the 1984 report you did on the Biasing Effects of Death Qualification?

A. Yes.

Q. And, in fact, part of the reason it was only mentioned in passing is because McCree's defense counsel admitted that your report standing alone would not give rise to a constitutional violation, correct?

A. Yes. It was the only study that had been done on the issue.

Q.    He then went on and, the Court then went on to consider basically six other studies, three had occurred pre-Witherspoon and three additional studies that occurred after Witherspoon, correct?

A.    Well, no.  There were more studies presented in -- I think I said in my testimony there were 15 studies that were, that were presented as part of and considered in the record.  Justice Rehnquist focused on a smaller number of them, but there were more of them that were originally presented.

Q.    And my question was about the six studies that were specifically discussed and referenced in Lockhart, three occurred before Witherspoon and three occurred after Witherspoon, correct?

A.    Well, again, I'm not sure what you mean by, specifically discussed, but the other studies were talked about, they just weren't focused on.

Q.    And my question is about the six studies that were referenced.  Would it be helpful to look at the case of Lockhart v McCree to see what I'm referring to?

A.    Sure.  Maybe you could let me know what part of the opinion you're focusing on.

        MS. JIMENEZ:  May I approach?

        THE COURT:  Of course.

Q.    I'm going to start at the bottom of what's listed as

Page 4.  And I'm also going to refer to Page 5, okay?

A.    Okay.  Sure.

Q.    And on Page 4 there's a highlighted paragraph that references, of the six studies, if you'll just take a look at that, refresh your memory about the six studies that I'm talking about?

THE COURT:  You have a copy there?  You can throw it on the Elmo and we can all look.

MS. JIMENEZ:  Sure.  I don't, but if I can go and get that copy I can do that.

THE COURT:  Sure.  I hate to interrupt him.  We'll throw it up on the screen then everybody can see.

Q.    It's actually just above my highlight so -- and so this is the bottom of Page 4 of my printout.  It's Page 170 in the actual opinion itself.  And this is just for your reference, there's six studies that are talked about in this paragraph.  Of the six studies introduced by McCree that at least purported to deal with the central issue in this case, three were also before this Court when it decided Witherspoon.

So now do you know what I'm talking about when I say there were three studies that the Court looked at that were decided before Witherspoon, correct?

A.    Yes.  This is the part of the opinion where the Court discusses the six studies that deal with guilt premise.

Q.   And if we go to the following page, which is Page 5 on the printout, it's 171 in the opinion, does it then go on to discuss the three studies, of those six the three studies were conducted after Witherspoon, correct?

A.   Yes.   Those are post-Witherspoon studies.

Q.   And in making its decision the Court indicated at the end of that highlighted portion that, we have serious doubts about the value of these studies in predicting the behavior of actual jurors, correct?

A.   Yes.

Q.   So the Court had doubts about the studies in and of themselves, but as you mentioned, if you continue on down that same page, this is going to be on 173, the internal cite, and you mentioned this, the Court said, we will assume for purposes of this opinion that the studies are both methodologically valid and adequate to establish that death qualification, in fact, produces juries somewhat more conviction prone than non-death qualified juries, correct?

A.   Yes, that's what it says.

Q.   So it basically assumes what you've been testifying about which is that the death qualification process makes jurors more conviction prone?

A.   Yes, that's what that paragraph addresses.

Q.   And then they go on to find that these, the Constitution does not prohibit the state from death

qualifying juries in capital cases as you testified, correct?

A.   Yes.  Based upon his reading of those studies that's exactly what he concludes.  Even if you assume, as he says there, methodologically valid and establish what the petitioner says they establish.

Q.   And as you said, he goes on further and discusses the fact that groups of people who have a particular opinion aren't the same types of groups of people that are, for example, blacks, women or Mexican Americans are the three specific examples that Justice Rehnquist uses, correct?

A.   Yes.  Those are not -- he says excludables are not a cognizable or distinct class in the same way that, for example, and those are the three that he cites as clearly cognizable classes.

Q.   And in your 1984 study that is referenced in Lockhart, you had individuals watch video of a fake voir dire process, correct?

A.   I prefer to call it simulated, but, yes.

Q.   Sorry.  We'll go with simulated.

A.   It was not an actual voir dire.

Q.   It wasn't -- you didn't go to a courtroom and videotape an actual voir dire process?

A.   We did go to a courtroom.  And we had an actual judge and actual attorneys, but it was not an actual trial.

Q.    And within the context of that voir dire process you had a portion where the jury was asked the usual questions about death qualification, correct?

A.    Yes.

Q.    Did you do a full and complete voir dire process or did you only ask the questions that related to death qualification?

A.    We did both.  That was the, that was the, that was the format of the study.

So we went through a full voir dire of the 12 or 14 people who were questioned.  And then in order to create the conditions in the study we either showed a group of participants in the research, not the people who were in the videotaped voir dire, either the full version of the jury selection that included death qualification or the version of the, of the voir dire from which death qualification had been excluded, which is what allowed us to have a comparison group.

Q.    And in the portion that involved the death qualification, that portion of the video that was shown to the group that watched that, you had two people be kicked from the jury for being opposed to the death penalty, correct?

A.    Yes.  Two people were excluded on the basis of their death penalty attitudes.

Q.   You did not have any of these jurors excluded because they were, what we refer to commonly, as reversed Witherspoon or auto death people; is that correct?

A.   That's correct.  Frankly, it wasn't being done very much in those days.  So it wasn't something that we included.

Q.   So that's not something that your survey participants or your study participants observed during the course of the voir dire process that they watched?

A.   No.  Not in that study, no.

THE COURT:  Interrupt you just for a second.  Do these auto death people, you mean people that will always vote for death, they say they will?

MS. JIMENEZ:  Correct.

THE COURT:  I know they are an academic idea, but do they actually exist in the population?

MS. JIMENEZ:  Oh, yes.

THE WITNESS:  They are a very small group of people, Your Honor.  They are a small group of people when you try to measure them.  And they are even a smaller group of people when you try to identify them in court.

THE COURT:  And what are they like?  I mean, are they --

THE WITNESS:  You know, they run the gambit.  I mean, there are some people who are quite, you know,

legitimately but rabidly in favor of the death penalty.  And they will tell you in any case in which there's a conviction I'm for the death penalty.  There are a very, very small number of people who will do that in a courtroom.

You get a somewhat larger number of people when you ask the question in a survey who are willing to say I'm so in support of the death penalty that I would do it whenever I could or it would affect me in ways that would lead me to render a death verdict pretty much all the time.  Some, still a small percentage, but they are much more frequent than they are in a courtroom.

THE COURT:  I appreciate it.  Sorry for the interruption.

MS. JIMINEZ:  No, no problem.

Q.   What are you basing your opinion on that they are a small number of people who, what we'll call auto death people?

A.   I um, sitting on jury selections, it's just something I've been studying for a long time.  I spent a lot of time talking to attorneys about, about these issues.  I look at voir dire transcripts, analyze voir dire transcripts.  There's an analysis of a voir dire transcript in my book.  It's an issue and a topic of study.

Q.   In your, I want to come back to the 1984 study, because I'm not done with questions about that, but in your 1994

publication, The Modern Death Penalty, Death Qualification Process, you actually had excluded -- in that particular study you did have individuals excluded who would either be Witherspoon and Witt or reverse Witherspoon and Witt, and you came out with an equal percentage of people excluded from both sides, maybe not exactly, but close enough?

A.   It wasn't quite equal, yeah.  It was a time when it was the heighth of support for the death penalty.  If you recall that was a study -- we didn't -- the study was published in 1994, but we did the research in 1989.  And that was the year of the very highest support for the death penalty in California.

And there were people who were willing to say on a survey that they were so in favor of the death penalty that they would vote to impose it any time they could.  Even though there were a percentage of people who were willing to say that in, in a survey, there was not a comparable percentage of people who were saying that in courtrooms where voir dire was being conducted, even in California where there was such high support for the death penalty.

Q.   Well, in fact --

THE COURT:  This is what I call pre-meditated murder, right, not for vehicular manslaughter?

THE WITNESS:  No.  No.  So you'd say first, the way you usually ask the questions on a survey is you say,

well, there are -- somebody's been convicted of first degree murder in which in California you have special circumstances.  So if you're doing this study in California it's like, where special circumstances have been found, and then you ask the questions about what they would be willing to do.

Q.   And you've phrased it as, well, these are people who are so in favor of the death penalty, but you just mentioned, at least in a courtroom setting, typically the question they are being asked is or what they are responding to is, do you -- that they believe that death, the death penalty is the appropriate verdict for first degree murder convictions, which is different than saying they are just so in favor of the death penalty?

A.   No.   That's not what they are asked in death qualification.  That's not the question they get asked. That's not, that's, I mean, that may be the beginning of the questioning, but that's certainly not the question that is asked in order to death qualify the jury.

Q.   It is a question that's discussed with the jurors.  You just talked with the judge about what it is that these jurors are saying that are getting them disqualified from being able to serve on the jury.  And you made the statement that these are individuals who are so in favor of the death penalty that they are kicked off the jury.

The point that I'm making to you is that what these jurors are typically saying, and I'm not addressing any one particular question, but in the course of voir dire process, is that they could not return any verdict other than the death penalty for first degree murder.

And I'm suggesting to you that is different than saying somebody has such a strong feeling in favor of the death penalty that they wouldn't consider any other verdict.

A.   I may have mis-heard you.  But those things sound like the same thing to me.  That, and they there, in any event, there are very few people who answer yes to that.  And there are many more people who say, I am morally opposed to the death penalty and I couldn't do it.  And it doesn't matter what the circumstances are, I just can't do it.  That's why it's a problem for people who are opposed to the death penalty in much greater numbers than it is for people who are actually in favor of the death penalty.

Q.   Except back when you did the study about the modern death penalty publication, correct?

A.   Yes.  But recall, I said, at the height of death penalty support, and not in a courtroom, on an anonymous telephone survey.

Q.   So let's go back to your 1984 study.  I got a little sidetracked there.

THE COURT:  No, my fault.  It's on me.

MS. JIMENEZ:  I wanted to ask those questions Your Honor so it was perfect.

Q.   Going back to the 1984 study, so at the end of this -- how did you end this, this videotaped process that they are watching?  So they are watching voir dire, at what point do you end this video that they are showing?  What's happening in the courtroom?  What does the judge say?  Have they gotten all the way through the cause challenges and they now have a group or what's the ending of the video that they watch?

A.   So the, the ending of the video is that the, basically the judge impanels the jury and tells them that they, they have been selected to participate in the case.  And then we -- so that's the videotape.  And then there's a group of participants who watch the videotaped.  One of the tapes or the other.

Q.   And I'm sorry to interrupt, but I was just talking about the videotape right now.  And I know we're getting late on time, so I'm going to try and keep us on track here and ask you to try and be responsive just to my questions instead of adding on.

So they end with the judge you said impaneling the jury.  Does that mean that the attorneys on the video exercised peremptory challenges?

A.   Um, I don't believe they were peremptory challenges.

You know, to be honest with you, I don't recall.  I don't think we used peremptory challenges.

Q.   Nonetheless, this video doesn't include a trial, a simulated trial, if I used the right word this time?

A.   No, it was a focus on the jury selection process, not on the trial process.

Q.   So when you start asking them questions, the second part of the study that you alluded to, this is based only on the information that they received through this simulated voir dire process that they watched, correct?

A.   Yes, exactly.  That we focused on just that.

Q.   And one of the questions that you asked them was if they learned that the defendant in your voir dire had been previously convicted of murder they were asked if they would vote for the death penalty, correct?  That was one of the questions?

A.   There were a whole series of questions.  That may very well have been one of them.  I'm not sure.  It wasn't the focus of the study, however.

Q.   If I got that from your study would you dispute that that was one of the questions that was asked?

A.   Could I look at it?  I'm not sure what you're looking at.

Q.   Absolutely.

MR. BURT:  If I could, I might be able to help.

It's A12.

MS. JIMENEZ:  A12?

MR. BURT:  A12.

THE COURT:  Thanks.

MR. BURT:  Sure.

Q.   I'm sorry, they were talking about --

MR. BURT:  Okay.  That's A8.

MS. JIMENEZ:  Not on my list.  Okay.

Q.   It's actually A9, just for the record.

A.   Okay.

MS. JIMENEZ:  And I apologize, Your Honor, it's going to take me a moment to find the correct page.

Q.   You have a binder up there with you, Dr. Haney?

A.   I have a binder with that study in it, yes.

Q.   You do?

A.   Yes.

Q.   If you go to Page 128 of that study?

A.   Yes.

Q.   The paragraph below table 2 is where it mentions and references that question.

A.   Yes.

Q.   And so you would agree that's one of the questions that was asked, correct?

A.   Yes.

Q.   And your conclusion was, that subject opposed, or

excuse me, subjects exposed to death qualification were significantly more likely to select the death penalty than were subjects who had not been exposed to death qualification, correct?

A.    Yes.

Q.    This process, however, that's different than what happens in a real trial, correct?

A.    Yes.  Of course.  It was a simulated study, and they didn't, they didn't hear evidence and consider evidence and so on.  Of course.

Q.    In fact, a real jury is specifically told not to arrive at any conclusion until after the presentation of evidence, correct?

A.    Yes.  Which is why it was so important to develop the biases that they had already established merely based on the jury selection process that they had been through.

Q.    Well, your conclusion is that there is a bias simply based on the death qualification process, but you can't really say that without following through and finding out what their verdict would have been at a real trial, correct?

A.    No.  You can say that.  You can say they are biased in all the ways that I measured.  And the page before that you see there were a whole series of questions that were asked that show the dimensions of the bias based merely on an exposure to a brief version of death qualification.  That's

the mindset with which any group of jurors would begin the process.

Now, would it absolutely positively determine the outcome in any given case? I don't know. But obviously it's a mindset which is different and, therefore, speaks to the whole issue of unreliability. That a group of people whose been biased in this way is not hearing the same case. They've already made assumptions. They've already decided things about the defense attorney, about the judge, about the defendant based on nothing more than being exposed to the process of death qualification.

Q.    Except in a real trial they wouldn't have formed those opinions because they are assumed to have followed the instructions from the judge and so they wouldn't form an opinion until the end of the presentation of the evidence?

A.    This is not, this is not asking them to render a verdict. It's asking them what, what is their mindset, what are there biases, what has this process done to them in the brief period of time during which they've been exposed to it.

To change their expectations about the case, change their expectations about the likelihood of the defendant's guilt, even before they've heard anything.

Now, I certainly can't say, and I didn't say in this article, that in every single case that would result in

a guilty verdict.  But certainly as a prosecutor, you'd rather begin a case with a jury that is thinking the client is probably guilty than a case where they are thinking there's a presumption of innocence and I don't know anything about this defendant.

What we were able to show this brief exposure to death qualification actually put them in the first category.

Q.   Would you agree though that in any case, not just death penalty cases, there is a learning process for the jurors as they go through the voir dire process?

A.   Yes.

Q.   And that may very well effect what their opinions are going into the trial itself?

A.   Yes.  That's exactly what the study's intended to show.

Q.   But my question is that that's not something that happens just in death qualification cases, that's something that happens in all jury trials?

A.   But a death qualification portion of it is something that happens only in death penalty cases and that's the problem.

Q.   I guess the point that I'm making is that this is a problem that occurs, it isn't unique to the death penalty system, it's a general problem that is inherent in the nature of our criminal justice system?

A.   No, this is totally and completely unique to the death

penalty.  This is not done in any other kind of case.  You can't ask questions in any other kind of case about somebody's attitude towards the death penalty and have the court exclude them from participating because they are opposed to the death penalty.

There's one kind of case and one kind of case only in which that is possible and in which all those biases comes into play.

Q.   But I suggested to you, and you agreed, that in any trial, whether it's a death penalty case or not, that the jury goes through a learning process and has, probably their opinions are affected before they start actually hearing the trial, correct?

A.   In a variety of random unpredictable possible ways. It's somewhat similar to His Honor's question earlier about the use of peremptory challenges.  This is a systematic skewing of the jury's perspective and attitudes, not random, not depending on the facts of the case, etcetera, etcetera. Unique only to death penalty cases.  And it has that kind of an affect as a result of the process and it has all these other kinds of affects as a result of the people who are systematically excluded and not allowed to participate.

Q.   Well, there are lots of different types of cases, not just death cases, where certain types of jurors end up being excused, not by peremptory challenges, but by cause,

correct?

A.    Correct.

Q.    Let's take, for example, in a sexual assault case. There is highly likely to be individuals in the prospective jury panel who perhaps have been the victim of some sort of sexual assault in their past, who, who is so affected by that that they cannot consider the evidence, who is going to be excused for cause from the jury, correct?

A.    Yes.

Q.    And, in fact, that group of people is more likely than not to be a higher percentage of women than it is men?

A.    Very possible.  I, I wouldn't, I haven't seen the studies on it, but it seems very commonsensically likely.

Q.    So that's another type of trial with another group of people who are being systematically excluded that relates potentially to their gender?

A.    Yes.

Q.    And there may be jurors going through that process, who watch that process, it may have affected how they are going to view the trial going forward, correct?

A.    Yes.

Q.    How about in the circumstance of the jurors who come in, non-capital case again, who say, look, I have a moral or religious objection to sitting in judgment on someone, I don't think it's my place to decide if they are guilty or

not guilty, they are going to be excused from the jury, correct?

A.   Yes.   Keep in mind it's a tiny percentage of people. We're talking here now about a third or more of the population who comes with potentially disqualifying attitudes.   Very, very few people express the kind of attitude you're talking about.   And so excluding them has a very insignificant affect on the jury panel that results.

THE COURT:   It's my experience it's usually people that want to do something else.

MS. JIMENEZ:   What's that?

THE COURT:   They are usually people that have another commitment outside of the court.

MS. JIMENEZ:   Well, sure.   If we go down that rabbit hole of jurors who are making things up or have picked up on what they need to say to get excused.

THE COURT:   Right.

Q.   What are you basing this idea that there is a very small percentage of people who do that?   Do you have some study that has talked about the numbers of people who do that?

A.   Just my own personal experience as somebody who has studied this for a long time.   I'm not sure I've heard somebody say it exactly the way you put it.   Maybe a handful of people over years and years and years of sitting in on

voir dire.  But, in any event, it's certainly not a third or more of the group of people who show up in the jury veneer.

Q.   Well, and you're suggesting the number of a third or more based on the Gallup or the Gallup or the Pew Research Center polling, correct?

A.   Yes.

Q.   But there is not necessarily a correlation between someone who answered a survey question saying they are opposed to the death penalty, that doesn't necessarily mean that when they go through the voir dire process they are going to end up being one of the people excused from the jury does it?

A.   No, it doesn't necessarily mean that.  I'm just talking about the number of people who now oppose the death penalty, probably higher than that in Vermont, but nationally it's now upwards to a third to 40 percent.

Q.   In fact, since you've said you've sat in on some death penalty juries, it probably isn't a surprise to you that oftentimes jurors will come in having filled out a questionnaire perhaps and answered some questions about the death penalty, and they may come into the voir dire process and they may express a different opinion from what they wrote in their questionnaire, correct?

A.   Yes.  It certainly happens, yes.

Q.   And they often say, you know, I hadn't really thought

Ex. 114 pg.234 of 251

about it before I filled out my questionnaire, but now that I've sat and thought about it this is why I changed my answer on the death penalty question?

A.    Yes.  Sometimes they say that.  Sure.

Q.    And that very well may be a person who answered when they are taking a poll, a phone poll, they are not somebody who sat there and thought about the death penalty for the past week before they get the call asking them to answer their questions about the opinion of the death penalty, correct?

A.    Typically they wouldn't be.  Sure.

Q.    And someone who is opposed to the death penalty can also come into court and they can say, well, I am generally opposed to the death penalty, but I do feel that I could consider all four possible punishments, correct?

A.    Yes.  Mere opposition is not enough to have someone excluded.

Q.    So you can't necessarily correlate that a third of the people who have responded that they are opposed to the death penalty are going to be excluded from the jury and we're talking about a third of the population?

A.    No.  And I didn't mean to suggest that.  I just meant that it was a large and growing group of people who are potentially disqualified as a result of their death penalty opposition.  And that's different from the mid-1980's when

Lockhart was decided.

Q.    And we don't know where the opinions of the public are going to go in the future do we?

A.    No.  Part of the unreliability of the process isn't it, that it's, it's tethered to changing attitudes in the population.  And even changing attitudes between states where a state like Vermont, where lots of people oppose the death penalty might have a much more unrepresentative jury than another state where death penalty support basically speaks for the representative group in the community who could sit on a case.

Q.    But the change of opinion that people have, that's not unique to the death penalty either is it?

A.    No.  But it's, but the death penalty is the only time in a criminal proceeding where an opinion, which is subject to change, is used to determine fitness for service in the systematic way in a capital case.

Q.    Well, how about a person who has an opinion, and I think given current and recent happenings, we can probably assume this is a number that has recently grown, who have a negative opinion of law enforcement, and, therefore, because of that opinion, are not eligible to sit on the jury because they can't be fair to law enforcement witnesses who are testifying?

A.    Yes.  I mean, there are, there are individual, there

are individual values or individual attitudes and beliefs randomly distributed among the population.  And they might impact a person's fitness for service in a particular kind of case, given the specifics of that particular kind of case.

Here we're talking about a kind of unfairness that is unique, not to the specific facts of the case, but to the particular legal status of the case.  Only in capital cases do we engage in this inquiry and do we cull from the group of prospective jurors those people who have strong attitudes about the punishment to be inflicted.  And that produces all of these negative consequences I've been describing.

THE COURT:  It's kind of odd because in all, I was thinking in all other criminal cases we hide any sentencing issues from the jury.

THE WITNESS:  You can't talk about it.

THE COURT:  It's a mistrial if somebody says --

THE WITNESS:  If somebody blurts out --

THE COURT:  -- this is going to be 10 years or something like that.

THE WITNESS:  Exactly.  Exactly.  That's an irony, yes.

Q.   Well, actually, that's not entirely true because are you aware that there are jurisdictions who do do penalty hearings in first degree murder cases that are non-capital?

A.   Very rare.  It's very rare.

THE COURT:  Some states.  I don't know quite what we're talking about.  Some state systems are set up that way?

Q.   Yes.  Some state systems are set up such that there are penalty hearings in non-capital cases.  And usually the jury decides between life without, life with possibility of parole and perhaps a term of years, correct?

A.   Yes.  But those, as you know, are extreme minority states.  There are a handful of them, no more.

Q.   And in those cases though, in those states that have them, the jury does get asked and questioned about the possible penalties and ask if they can consider all of them, correct?

A.   I don't know how they do that.  I don't -- it's such an unusual -- I don't know what that process looks like.

Q.   If I suggest to you, having done such a hearing before, being from one of those states where that's the type of hearing, we do that type of hearing, if I suggest to you that that's the process, that your jury still has to be penalty qualified, would you have any reason to disagree with me?

A.   No.  But what I would say is that, that the opposition to the death penalty is in many ways a unique attitude in American history.  Very different from people's attitudes

about other things, even their attitudes about things like imprisonment.

So there is a well established religious and moral opposition to the death penalty which doesn't extend to most other aspects of the criminal justice system.  So even in states where you are doing what, I suppose you might call it prison qualifying, or life without parole qualifying, you are not, you are very likely not to engage that same set of deep attitudes where people have a formulated view or opinion which they frankly have thought about and they've come to a conclusion about.  And it's not really a modifiable conclusion for many people.

That's, I can't imagine that that would be the same kind of issue that you would confront in a case even where you're asking people about penalty in those very few states in which you are doing that.

THE COURT:  The Gallup organization didn't find it a fruitful line of inquiry, the penalty qualifications.

THE WITNESS:  Whether people, how they feel about penalties and certain kind of penalties?

THE COURT:  Right.  Right.

Q.   Well, and the polling suggests I think, I didn't quite hear what the Court asked, but I think you were asking about the question that involves comparing possibility of death to life without?

THE COURT:  Well, I shouldn't have said anything, but it's the end of the day.  The witness had said that the death penalty question was a special one that people often have a pre-disposition towards.  But the question of whether you would favor or vote in favor of life without parole or would you prefer a fixed term for a pre-meditated murder, something, unless you're an attorney or a judge, you don't really think about from one day to the next.

MS. JIMENEZ:  Okay.

THE COURT:  And that was what I was, what I was responding to.

MS. JIMENEZ:  Okay.  Thank you.

THE COURT:  Did the Gallup organization, which has been assiduously asking about people's attitude towards the death penalty since 1930, or something or other, hasn't really found it very interesting to ask about people's attitude towards life without parole.

THE WITNESS:  And I think rarely do.  If they do I haven't seen the results.

Q.   And, but I guess the point that I'm getting at is you keep saying well, this is unique to death cases because death is a fact of the case.  The fact that there is the death penalty being sought, you want to turn that as a legal, as a legal issue, but really the question, the reason juries are getting excluded is because they are saying, I

can't follow the instructions and consider all four punishments, correct?

A.    Yes.   I mean, that's the core of the death qualification process.

Q.    And a person who is saying that I have a religious ethical moral objection to sitting in judgment of somebody, just in a non-capital case, they are also saying, they are also disqualified because they are saying I can't follow the law and make, consider all of my options, which in that case happened to be guilty or not guilty, but there's still two options that the jury member has to be able to consider?

A.    But there are two important differences.  First of all, we've already talked about the size of the group involved. We're now talking about an issue around which there is sizeable and growing opposition to the death penalty. Potentially excluding large numbers of people from participating in a death penalty case as a juror in your communities where that's the prevailing sentiment.

And that, and that by definition, unrepresentative group of people, is going to act, in theory, as the conscience of a community whose attitudes they don't share. That's the first problem.

The second problem is unlike the hypothetical group of people you're talking about who say I couldn't sit in judgment of anybody, we know what the consequences are

when you exclude people who are opposed to the death penalty under death qualification.  It's all those biasing effects that I've been taking about which skews the composition of the jury and undermines the reliability of the process.

Q.    Actually, we don't know the results of that process because at the point that you're asking those questions that's before the jurors have sat through the trial.  And even if their initial response to your question after voir dire is, hey, if I found out the defendant had another murder, I would be inclined to sentence him to the death penalty, we don't know if that's really what the results of the case is going to be because he hasn't sat through it.

A.    But, again, we're talking about bias.  We're talking about somebody's pre-disposition at the very outset of the trial.

And, you know, you've focused on my research. There are other studies that, in fact, have focused on studies where people do deliberate, where there are other simulation studies, for example, where people do deliberate. And they are asked to render verdicts based on the evidence that's been presented.  So, you know, studies other than the one that I did.

But whether we're talking about my study or whether we're talking about the study that I did in 1994, or

we're talking about the research that other people have done, the outcomes of, the outcome of any trial is obviously affected by the mindset and the pre-disposition and the biases of the jury that decides that case.

That's why you engage in voir dire in the first place.  If those things didn't matter you wouldn't be asking questions about your attitude towards the death penalty.

What all of this death penalty and death qualification research shows is that mindset, either the mindset of individual jurors is skewed by the process or the mindset of the group of jurors is skewed by virtue of the fact that a larger number of people are systematically excluded from being in that group.  There's every reason to expect those things matter.

Q.   This research has only been done with respect, this type of research has only been done with respect to the death penalty, correct?

A.   No.  There's been research on whether people's attitudes and beliefs affect other, other outcomes in cases. It's been done most systematically around the issue of death qualification because it's a legally mandated process that's unique to capital cases.

Q.   Let's talk about another subject matter that there is probably a large population who has an opinion on it, which is the criminalization or legalization of marijuana.  You

would agree that there's a large amount of people who believe that marijuana should be legalized and, in fact, many states have headed in that direction, correct?

A.    Yes.

Q.    However, there are still some states who criminalize drug related crimes related to marijuana, and the federal government also criminalizes those marijuana related crimes, correct?

A.    Correct.

Q.    And if you're picking a jury related to a marijuana case, one of the areas of voir dire is going to be whether or not a particular juror can set aside a belief that they may have that marijuana should not be illegal and whether or not they can consider and follow the law and come, return with a verdict finding a person guilty even though they don't think the law should say that?

A.    Yes.  I wouldn't be surprised to find that that's an inquiry in a marijuana related case.

Q.    And you said that, well, death cases are different because it's legally mandated that the jury has to be death qualified.  But death qualification is really just one portion of assuring a fair and impartial jury who can do what their duty is, and that's the same thing that you are doing in a marijuana case when you're inquiring of particular jurors whether or not they can follow the law and

consider whether or not this person violated a statute that they don't believe in, when you are asking those questions of them.  They are both part of the process of a fair and impartial jury.

Now, because death cases are so high profile, there's lots of cases about them and, or opinions that relate to death cases, and so maybe there aren't opinions related to marijuana cases specifically, but that doesn't change the fact that that is part of the qualification process for that particular jury, wouldn't you agree?

A.   I would, except, first of all, there are multiple differences.  That we don't, we don't know what the, what the impact of that is.  We do know what the impact of it is in the case of death qualification.  We've been studying it for 50 years as Justice Breyer said.

In addition to that, the attitudes and beliefs that many people, not everybody, but that many people have formulated around the death penalty are deep-seated.  Some of them are religious beliefs, some of them are moral beliefs.  I'm not sure that your marijuana example reflects the same kind of deep-seated belief.

Q.   I don't know about that.

A.   Well, moral or religious belief, I'm not sure.  And then the other issue is the sheer numbers of people.  Again, you know, we are speculating about how many people would

come in with qualms about sitting on a marijuana case.  I don't know how many of those people there are.  Except we do know how many of those people that are in a capital case. They are sizeable and they affect in a significant way the composition of the jury pool eligible to serve.

Q.    So what's the cutoff number for a group to be a large enough group holding a particular opinion that it affects the constitutionality of the process?

A.    I don't, I don't know, I don't know what the cutoff point is except that I believe, based on the research that I've presented, and the other research that's in the materials that I submitted, that, that in this case it's clearly beyond that cutoff point.

Q.    And then are we going to need to do studies in all the different areas that could affect the composition of the jury based on challenges for cause to determine whether or not it reaches the, a same threshold or a threshold that they are a large enough group that makes it unconstitutional?

A.    Well, I mean, I can't answer that question.  I think it depends on the particular issue.  It depends on the size of the group.  But more importantly, it depends on what we know about the outcome of the exclusions.

I mean here, these things are joined, these things are joined together.  It's the combination of the nature of

the case, the seriousness of the case.  It doesn't matter what the issue is in the death penalty case.  It is a capital case.  Then this process, this biasing process is put in operation.

We also know that there, it affects a sizeable number of people.  And it has profound impact on the, on the group of people who remain after the process has been finished in ways that raise questions about the, fundamental questions about the reliability of the decision making process that that group is capable of once they've been selected.

Q.   Each jury pool that comes in, whether it's for a capital case or a non-capital case, you would agree with me they are not going to be composed or comprised of the same percentages of the people who have the same types of views, correct?

A.   Sure.  Every panel is different in certain ways.  Of course.

Q.   You may have a panel that comes in and the attorney's opinion is generally that, hey, this is a really pro-prosecution panel and the prosecution is really happy because the defense is going to have to use up all their pre-empts and probably still want to use a few more, correct?

A.    Yes.   That happens.   And it happens the other way.

Q.    Exactly.  It happens the other way too, where the panel is just really pro-defense and the prosecution isn't so happy?

A.    Yes.

Q.    And it also happens that whatever the composition or whatever your jury's original makeup whether they are, and I'm just using the most general terms, pro-prosecution or pro-defense, by the time you get through the hardship questions, the, the vacation or other issues, medical reasons maybe that they can't be on a jury, when you get through the particular facts, specific cause issues, the composition of the jury at the end of that process is always going to be different than the composition of the jury in terms of their views at the beginning of the process, correct?

A.    Yes.  But that's not what we're talking about.  We're talking about a legal process that is applied to whatever panel, whatever the idiosyncrasies or the characteristics of that group is.  This is a legal process that sits on top of it and culls out a certain group of people.

        I mean, it's, it's, it's as if you're going to argue that, and I know you are not doing this, but it's as if this would be kind of a defense against excluding African Americans from the list of people who will get called for jury service and saying, well, what's the big deal, you

know, you might have a jury panel where there aren't any African Americans anyway, so, you know, sometimes there's some and sometimes there's not.  So what does it matter that we don't?  But we systematically exclude people.

Here, in addition to all the vagaries that you described, and all the unpredictability aspects, the unpredictable aspects of jury selection, this is a legally mandated process that operates across the board to change the group of people who can sit in a capital case and have all of the kind of effects that I've described.

Q.   You would agree with me that it's always legally mandated to make sure that there's a fair and impartial jury for both sides, correct?

A.   Yes.

MS. JIMENEZ:  Can I have the Court's indulgence for a moment?

THE COURT:  Of course.  Take your time.

MS. JIMENEZ:  Thank you.  I have no further questions.

THE COURT:  Okay.

MR. BURT:  I have no further questions, Your Honor.  And thank you for going a little bit over time.  We appreciate that.

THE COURT:  I think we have to thank our court reporter.  All right.  I'll let you get on the road.  It was

very nice to meet you.  I appreciate you coming up.

THE WITNESS:  Nice to meet you as well, Your Honor.

THE COURT:  Look for everybody at 9 tomorrow.

MS. JIMENEZ:  Nine o'clock.  Thank you.

MR. BURT:  Yes.

THE COURT:  Who do we have tomorrow?

MR. BURT:  Your Honor, our next two witnesses in line would be Dr. Thomas Reidy, will be the first witness. And then Dr. Michael Radelet.  And I think that will take us through the end of the day.  I'll have a third witness lined up just in case.  And that would be Lisa Greenman.

THE COURT:  Okay.

MR. BURT:  Unless Carol Steiker gets here, but I'm not sure she's going to get here in time.  So we may have to put Lisa Greenman toward the end of the day.

THE COURT:  All right.  It sounds like you got plenty to do and you guys know what's coming.  So I'll let you get to it.  Thanks.

MR. BURT:  Thank you, Your Honor.

MS. JIMENEZ:  Thank you, Your Honor.

(The Court recessed at 4:38 p.m.)

                   C E R T I F I C A T E


          I, Anne Marie Henry, Official Court Reporter for

the United States District Court, for the District of

Vermont, do hereby certify that the foregoing pages are a

true and accurate transcription of my shorthand notes taken

in the aforementioned matter to the best of my skill and

ability.


                         _____

                         Anne Marie Henry, RPR
                         Official Court Reporter

Ex. 114 pg.251 of 251