in *Living on Death Row*, Eds. Hans Toch, James Acker & V. M. Bonventre, American Psychological Association Press, 2018, pp. 47-69.

# Waiting Alone to Die

Terry A. Kupers

The turning point in the argument on the death penalty is whether we believe there are crimes of such horror that their perpetrators deserve incredibly cruel punishment at the hands of the state.  Execution is the ultimate cruel punishment.  But then there is solitary confinement.  Adding a long stint in solitary confinement prior to the execution certainly makes life significantly more miserable for the condemned.  There are levels of the logic of death penalty abolition: A significant number of those on death row will eventually be proven innocent, as then-Governor Ryan pointed out in commuting death sentences in Illinois; there is blatant racial discrimination at all steps along the way in meting out the death penalty, as Justice Blackmun argued repeatedly; and ultimately, execution is simply wrong on religious and moral grounds.  The same arguments apply to the solitary confinement of those awaiting their execution on death row.

I believe, and it is my purpose in writing this piece to prove to readers, that no matter how awful a person's crimes, he or she deserves to be treated as a human being and accorded all the rights and privileges spelled out in our Constitution as well as in human rights accords.  It is not acceptable to torture people just because they committed awful deeds.  The multiple murderer, even if he evidences no remorse and threatens to kill again, has the right to be confined in decent surroundings and be permitted meaningful social contacts and activities.  In fact, solitary confinement is not a sentence meted out by any court. It is a management strategy mandated by

prison policies, not judges.  The death-sentenced prisoner does not even have a prison sentence, he is merely consigned to prison awaiting the enactment of his sentence, execution.[1]


## THE ARCHITECTURE OF DEATH ROW

## INSIDE THE SUPERMAX

The architecture of the supermaximum security unit, Special Management Unit II (SMU II, subsequently re-named the Browning Unit), in Florence, Arizona (Arizona Department of Corrections), was quite familiar to me, because it is strikingly similar to the Security Housing Unit (SHU) at Pelican Bay State Prison in California, a facility I toured in preparation for expert psychiatric testimony in *Coleman v. Wilson* (1993) and later in *Ashker v. Brown* (2014).[2]  Death Row occupied two clusters of cells within SMU II/ The Browning Unit.  Death-sentenced prisoners were confined alone in a cell nearly 24 hours per day, exceptions being (relatively rare) for visits, showers, medical appointments and time alone in the small recreation area down the tier from their cells.  Cells measured approximately 11 1/2 feet deep by less than 7 feet across the front.  There were no windows in the cells, no view of the sky or outdoors. There were lexan (indestructible plexiglass) covered skylights high up on the wall opposite the two stacks of cells on each pod, but since there was a second lexan cover external to the first on that wall, there was still no clear view of the sky.  All cells faced in the same direction, so inhabitants of cells could not see another human being except when an officer came to deliver a food tray or another prisoner from the pod passed by on the way to recreation.  There were three blank walls within the cell, plus a metal grid over the door that permitted a somewhat distorted view of the blank outer wall.  Then,

---

[1] Many thanks to Hank Skinner for this insight.  See Skinner (2007).

[2] For a more detailed description of the Pelican Bay SHU, see my redacted report in *Ashker v. Brown*, available at https://ccrjustice.org/sites/default/files/attach/2015/07/Redacted_Kupers%20Expert%20Report.pdf.

in quite a few cells, an additional thick lexan plate had been affixed on the hallway side of the metal grid cell covering, enhancing the stark isolation.

As I toured Arizona's Death Row in 2002 in preparation for testimony in federal court about Mr. Robert Comer's competency to waive his appeals and be executed, I asked to be locked into an empty, lexan-covered cell.  I was taken aback by how quickly the temperature and humidity rose in the cell, which gave me some sense of Mr. Comer's complaint that he often felt like he could not breathe in his cell.  He told me he tried to work out all day to stay sane and fit – mostly he walked or ran in his cell – but difficulty catching his breath inside his cell hampered that project.  Mr. Comer had not shaken a hand for many years. He was permitted one book from the library every two weeks and, when the book arrived, he would read it while pacing in his cell.

The quality of my writing is not adequate to fully describe the severity of the isolation and starkness of the cells and pod where Mr. Comer was confined.  Many death-sentenced prisoners spend ten or even twenty years in approximately these circumstances, even though up to 40 percent of them will eventually either be determined innocent, exonerated of their capital crime, or have their death sentence commuted to a prison term or be pardoned.  Thirty-eight states and the U. S. Government have death rows in their prisons, and the majority of Death Rows involve solitary confinement within supermax prison facilities.

Death Row in Texas has been located in the Polunsky Unit of the Texas Department of Criminal Justice since 1999 (for a description of conditions on Texas's death row, see Kupers, 2007).  The 246 prisoners on Death Row (as of June, 2016) are strip-searched, cuffed with their hands behind their backs and accompanied by two (or more) officers any time they leave their area.  There are narrow horizontal windows high on the outside wall of the cells that cannot be opened. The windows are smaller than the width of a fist, and inmates must stand atop their bunks

just to see through them. Unless the prisoner is fortunate enough to have a view of the parking lot, his view will be limited to an adjoining section of building. Often, prisoners' sole connection with the outside world is through personal radios that are only obtained if they are fortunate enough to be able to afford one.  Sleep cycles are interrupted at 3:30 every morning, when officers turn on all lights to serve breakfast. The architecture of the units has been described to me by prisoners as "cavernous"; every noise or scream reverberates throughout the unit. When officers conduct count during the night hours, they bang loudly on metal cell doors demanding the prisoner call out his number. The noise is piercing, causing most prisoners to wake instantly.  A recent Declaration (part of a legal appeal) written by Juan (not his real name), a prisoner on Texas' Death Row, illustrates many of the phenomena that are almost universally reported by individuals in isolative confinement.  It is my understanding he does not have a history of serious mental illness and he certainly is a coherent narrator.  He declares:

> The isolation is really hard for me. Sometimes I feel desperate just to see or talk to another person…. Although I can talk through the cell walls to other inmates on death row, I might go weeks without seeing another person's face or eyes, except for the guards who walk by my cell and slide a tray of food through my door….  At times, I feel trapped in a state of hyper-awareness. During these times, I feel incredibly sensitive to the slightest sounds…. I find it impossible to relax—I feel tense and anxious from being in my tiny cell all the time, with no one to keep me company and nothing to distract me from my own thoughts. When I have gone a long period of time without a visit, I notice that I start ruminating. I spend a lot of time thinking about the violent or cruel things I've seen guards do to other inmates, and fearing that they will do the same things to me…. sometimes my mind races so

much that I can't focus on what I'm reading or writing and need to stop…. I also get extremely depressed; when this happens I spend all my time sleeping and don't want to read, write or take recreation. I just stare at the walls. I'm usually social and outgoing, but then I become withdrawn and detached. Years ago, I wanted to commit suicide by waiving my appeals. I felt it wasn't worth living any more…. In the past few years, something strange has started to happen to me: I sometimes see or hear things that aren't there….I no longer know what is real, or if I'm real. I try my best to shake these episodes and feelings off, because I know too well from watching other inmates that once a person loses his sense of reality entirely, it's a slippery slope to hitting a breaking point, medication and sedation. Men who go that route become living zombies….  I also have noticed that my memory seems to be slipping…. I used to be a big reader…. Reading helped keep me sane by helping me focus on the outside world and on positive things. But lately I can't concentrate on reading anymore…. I can almost never sleep at night and can't seem to keep a normal sleep cycle. The light fixture in my cell gives off a really bright, jarring light. They first turn the light on extremely early, around 3 or 4 A.M…. The sound of inmates who have lost their minds from the isolation also fills the air with screaming or incoherent yelling.

In other words, this man remains sane, but is plagued by a large number of serious symptoms and disabilities, and they are strikingly similar to the symptoms and disabilities that are reported by a large number of prisoners in solitary confinement throughout the country.

Robert Charles Comer had been living on Arizona's Death Row for sixteen years when I met him.  He had killed a man he encountered at a campsite, and he had kidnapped and raped a

woman from the same campground.  He was convicted in 1988 and given a death sentence.  In prison, he exhibited a penchant for manufacturing shanks (prison-manufactured knives), and he had a knack for defeating the lock on his cell door.  He would make a shank by grinding a piece of metal from the ventilation outlet in his cell against the concrete floor or cell wall. Next, he would secrete the blade by chipping away at the concrete to form a cubby hole. Then he would mix the concrete powder he'd chipped away with water to create a sufficiently realistic cover for the hiding place so that officers conducting cell searches would not find the shanks.

Mr. Comer's shank-manufacturing activities were not the reason he spent sixteen years in solitary confinement.  Arizona's entire Death Row was contained within SMU II (now the Browning Unit).  And that brings us to the first question I want to address here.  What is the rationale, and the morality, of situating entire Death Rows inside supermax isolation units?  I do not believe there is solid evidence that placing Death Row inside a supermax unit makes the prisons safer and easier to manage.  Actually, on average, death-sentenced prisoners are not difficult to manage, and are not especially prone to violence.  Sure, there are a number of outliers, murderers who would murder again in the prison if left to their own devices.  These dangerous men are a very small proportion of the denizens of death rows.

Most prisoners on death row are older than the average prisoner; they are more interested in finding time to work on their appeals and stay in touch with loved ones than they are in getting into fights; and they long ago stopped seeking vengeance against other groups who they once felt were out to get them.  In the early 1990s, in preparation for expert testimony in a previously filed class action lawsuit about the harm of double-celling prisoners in solitary confinement units in the California prisons (*Toussaint v. Enomoto/McCarthy,* 1976), I visited California's Death Row.  It wasn't a solitary confinement unit, and it still is not today (see Hunter, 2007).  There I found

prisoners of all races sitting around in a common area, sharing cigarettes and chatting across racial lines.  This contrasted with all of the other maximum security units in California, where there was strict segregation of prisoners by race, presumably to minimize the risk of interracial violence.

## SOLITARY CAUSES GREAT HARM

The warehousing of death-sentenced prisoners in solitary confinement causes great harm, the same harm that isolation causes in other prisoners forced to endure long-term solitary (Grassian, 1983; Haney, 2003; Kupers, 2013; Scharff-Smith, 2006).  It has been known, for as long as solitary confinement has been practiced, that human beings suffer a great deal of pain and mental deterioration when they remain in solitary confinement for a significant length of time. Human beings require at least some social interaction and productive activities to establish and sustain a sense of identity and to maintain a grasp on reality.  In the absence of social interactions, unrealistic ruminations and beliefs cannot be tested in conversation with others, so they build up inside and are transformed into unfocused and irrational thoughts, including paranoia. Disorganized behaviors emerge.  Internal impulses linked with anger, fear, despair and other strong emotions grow to overwhelming proportions.

Prisoners do what they can to cope.  Many pace relentlessly or clean their cells repetitively, as if this non-productive action will relieve the emotional tension.  Those who can, read books and write letters.  We know from much research that the social isolation and idleness, as well as the near absolute lack of control over almost all aspects of daily life, very often lead to serious psychiatric symptoms and breakdown.  Isolated prisoners develop massive free-floating anxiety that can trigger panic. Their thinking becomes increasingly disorganized, including paranoid ideas.

They become angry and then they are very fearful that their anger will lead to more disciplinary problems and worse punishments.

Another symptom I hear from prisoners in isolation units around the country is that they cannot concentrate and they experience memory problems.  If one is in an isolation cell, the most important activity that supports sanity is reading.  But many prisoners in isolation who can read tell me they quit reading.  I ask why, and they explain they can't remember what they read three pages back.  (Just imagine how difficult this symptom alone makes life for a condemned man or woman who would like to work on legal appeals.)

There are other symptoms very widely reported by the denizens of solitary confinement units, including hypersensitivity to external stimuli, perceptual distortions and hallucinations, fears of persecution, lack of impulse control, severe and chronic depression, appetite loss and weight loss, heart palpitations, social withdrawal, blunting of affect and apathy, talking to oneself, headaches, severe problems sleeping, confused thought processes, nightmares, dizziness, self-mutilation, and lower levels of brain function, including a decline in EEG activity (Grassian, 1983; Haney, 2003; Kupers, 2013; Scharff-Smith, 2006).  All of these symptoms and disabilities occur in prisoners who have been in solitary confinement for weeks or months.  When they are consigned to solitary confinement for longer periods, decades even, as are many inhabitants of Death Row, even more chronic and lasting damage is likely.  Prisoners who have been in solitary confinement for more than a decade report that they have become severely cut off from their own feelings and have turned inward. They hardly engage in any social activity at all, even considering their very limited options within the isolation unit.  The damage is cumulative and often severe, and in many

cases can bode poorly for adjustment after release from solitary in a general population prison setting or in the community.[3]

A significant proportion of prisoners on Death Row will never be executed, and quite a few will eventually be exonerated and released to the community.  In the U.S.A. in recent decades, there have been 156 prisoners exonerated and released from Death Row, including 13 in Texas (Death Penalty Information Center, 2016). There can be other reasons why individuals exit Death Row.  Their sentence can be commuted, they can be granted compassionate release, etc.  But because of the years in solitary confinement, they usually have psychological damage that causes dysfunction and requires mental health treatment.  There is a great risk that they will not be able to function without counseling or other therapeutic help, either in a general population prison setting or in the community if they are released.  I have reported on a "SHU Post-Release Syndrome," including a need to retreat into a cell or a room or stay in a home without going out, an inability to relate to others, massive fear of being in places where there are strangers, and a number of other disabling symptoms (Kupers, 2016; see also Kupers, 2017).

MENTALLY ILL PRISONERS IN SOLITARY CONFINEMENT

So far, I have been talking about the effects of solitary confinement on prisoners who are relatively stable from a psychiatric perspective.  But when there is serious mental illness, the isolation and idleness exacerbate the psychiatric disorder, for example causing a psychotic episode or suicide attempt.  In long-term isolation (or segregation) units, especially on Death Row inside a supermax prison, there are a disproportionate number of prisoners suffering from very severe

---

[3] See my Report in *Ashker v. Governor of California*, retrieved from https://ccrjustice.org/sites/default/files/attach/2015/07/Redacted_Kupers%20Expert%20Report.pdf.

mental illness (Hudgins & Cole, 1991; Human Rights Watch, 2003).  I have toured supermax isolative confinement units in over two dozen states, including many Death Rows within supermax facilities. In the process, I have encountered the most severely decompensated and disabled individuals suffering from serious mental illness that I have encountered anywhere else in my 40-year career as a clinical psychiatrist (including state, county and private psychiatric hospitals).

There are quite a few very disturbed prisoners on Death Row. Other prisoners tell me that their incessant screaming and noise-making, especially at night, make life on "The Row" that much more awful.  There have been class action lawsuits challenging unconstitutional prison conditions and, in many corrections departments, there is a serious effort to remove prisoners with mental illness from solitary confinement (Raemisch, 2014; Raemisch & Wasko, 2016).  But that is often not possible with death-sentenced prisoners. They usually are mandated to stay on Death Row until they are executed.  And that means that prisoners with serious mental illness are being forced to endure conditions well known to exacerbate mental illness and suicidal inclinations, and makes miserable the lives of others on Death Row.

Prisoners in long-term isolation experience despair about their plight and some resort to suicide, or non-suicidal self-harm.  Suicide is approximately twice as prevalent in prison as it is in the community.  Of all successful suicides that occur in a correctional system, approximately fifty percent involve the 5 to 10 percent of prisoners who are in some form of isolated confinement at any given time (Kaba, 2014).  This is a stunning statistic, meaning that isolative confinement is one big cause of prison suicide.  By non-suicidal self-harm I mean, for example, "cutting," where the prisoner cuts himself.  Typically, I know that the cutting is not suicidal. Someone who is suicidal and cuts himself will blame himself afterwards, if he survives, that he has failed even in the act of self-destruction. By contrast, someone who cuts himself for other reasons will say

something like, "I felt better after I saw the blood (or felt the pain); it reassured me that I am still alive." There is an epidemic of non-suicidal self-harm in prison isolation units, including Death Rows situated inside isolation units. Staff tend to think the prisoners committing non-suicidal self-harm are manipulating to get out of isolation. But the tragic truth is that the acts are compelled to a great extent, and not voluntary, and they are a symptomatic response to the very high anxiety that is induced by the harsh conditions of solitary confinement.

A disproportionate number of prisoners on Death Row suffer from serious mental illness. There is a consensus in corrections today that prisoners with serious mental illness must not be consigned to solitary confinement. Litigation abounds on this issue (see, e.g., *Jones 'El v. Berge*, 2001; *Madrid v. Gomez*, 1995; *Presley v. Epps,* 2005). But on Death Row, prisoners with serious mental illness must remain right where they are. This creates the untenable situation where federal courts keep ruling that prisoners with serious mental illness are not to be consigned to solitary confinement but, because death sentenced prisoners are required to be housed on Death Row, there are many prisoners with serious mental illness in isolative confinement on Death Row. Their psychiatric disorders as well as their prognoses and disabilities are very much worsened by the stint in solitary confinement. In other words, prisoners with serious mental illness are excluded from supermax isolative confinement in many jurisdictions, but death-sentenced prisoners with serious mental illness are not granted that exclusion. They remain on death row, and that usually means isolative confinement in a supermax unit or facility.

The presence of a large number of prisoners with serious mental illness on death row creates hardships for the other prisoners. They are forced to endure a neighbor who hallucinates, is very paranoid and screams loudly that he is being persecuted – at all hours of day and night. That is one more reason so many prisoners complain about not being able to sleep. An exoneree, who

had spent years on Texas Death Row, testified in a declaration that he provided for another prisoner's legal appeal:

> I watched a lot of other men in solitary confinement develop serious mental illness and become suicidal. They would come in at the age of nineteen and by twenty-one they would appear to have completely lost touch with reality. I think this is because the isolation may have broken their will to live. The monotony can be so loud. Silence can be really loud. Men would drop appeals; men would commit suicide. Juan and I witnessed people slit their throats, overdose on their medication and hang themselves with their sheets. We experienced men being gassed and beaten up by guards. I remember one man screaming inside his cell. Others were replying, encouraging him and telling him to stay strong. Suddenly he went silent. We knew something bad had happened. We were banging on the side of our cells trying to get the guards' attention. They did not come. We could hear them laughing. They were eating a meal and didn't want to be disturbed. Then they were annoyed and threatened to write us up for bad behavior. Finally they came, to find that the man in question had slit his throat. This kind of thing happened frequently. The mental anguish was so intense. We were desperate just to be able to shake someone's hand, or to hug our mothers when they came to visit.

## REPREHENSIBLE CONDITIONS OF CONFINEMENT

I testified as an expert in a class action lawsuit about horrid and unconstitutional conditions on Death Row in Mississippi, in *Russell v. Epps* (2003) and *Russell v. Johnson* (2003).  Death Row contained between 90 and 100 cells inside the 1,000 cell supermaximum Unit 32 of the Mississippi

State Penitentiary at Parchman.  Beginning in the early 1990s, prisoners in Unit 32 complained of a harsh environment: severe isolation, unrelieved idleness and monotony, little access to exercise, stench, and filth. The toilet in each cell had a "ping-pong" mechanism. Whenever the toilet was flushed, it pushed the waste in the bowl into the bowl in the adjoining cell. Infestations of mosquitoes and other stinging insects forced prisoners to keep their windows closed and their bodies completely covered, even in the hottest weather—and the temperatures in the cells during the long Delta summers were extreme. The light was too dim for reading and writing.  Medical, dental, and mental health care was inadequate, especially on Death Row.  Psychotic prisoners started fires, flooded the tiers, smeared feces, and screamed, often all night. Prisoners were moved into cells that had been smeared from floor to ceiling with excrement from previous, psychotic tenants. Takedown teams extracted prisoners from their cells and subdued them with pepper spray, adding to the toxic environment caused by fire and flooding.  In January 2002, the prisoners on Mississippi's death row had gone on a hunger strike to protest the conditions of their confinement. The plaintiffs on Death Row, represented by Margaret Winter and the National Prison Project of the ACLU, were successful in court. The resulting order requiring that the unit be brought up to constitutional muster was upheld by the Fifth Circuit Court of Appeals (see Kupers, et al., 2009).

In this type of very high security unit, there evolves a vicious cycle of worsening hostility and misunderstanding between staff and prisoners.  This is not to downplay the reality that rule violations do occur in such units, and an appropriate and fair disciplinary system must be maintained.  But when human beings are subjected to extremes of isolation and idleness, and deprived of every vestige of control over their environment, in addition to being denied social contact and all means to express themselves in a constructive manner, the consequence is entirely predictable. They (or almost any human being) will resort to increasingly desperate acts to achieve

some degree of control of their situation, and to restore some modicum of self-respect.  The prisoners are driven to small acts of resistance, which in turn are likely to be perceived by officers as disrespectful or rule-breaking. The officers, in turn, become increasingly insensitive, punitive or even abusive toward the identified troublemakers.

### THE HARM MULTIPLIES IN THE DEATH-SENTENCED PRISONER

It is entirely disingenuous to theoretically grant the death-sentenced individual due process in the form of automatic as well as elective legal appeals, and then to confine him or her in harsh isolative conditions that greatly diminish his or her capacity to participate in legal proceedings.  At core, competency in court requires an understanding of the legal process and an ability to collaborate with counsel in fighting for one's rights.  But solitary confinement disables these capacities.  I am not arguing that the death-sentenced prisoner in solitary confinement is necessarily incompetent to proceed.  To their credit, many inhabitants of Death Row inside solitary confinement units sustain their sanity and do manage to advance their legal appeals.  But that is an extraordinary accomplishment.  Too many other inhabitants of Death Row are driven to mental illness, despair and incompetence.  How is the death-sentenced prisoner to participate in appeals if he is so anxious he feels a need to pace in his cell relentlessly?  How can he read legal documents and think through the appeals process when his concentration and memory are impaired from the isolation?  How can he collaborate with his appeals attorney when the enforced isolation has caused him to forget how to relate to another human being?  I do not apply the word disingenuous lightly.

Then there is "the Death Row Phenomenon" (Harrison & Tamony, 2010).  The term emerged in the legal discussion of the death penalty, not the psychiatric literature.  It refers, for

example, to the psychological experience of condemned prisoners who repeatedly get their hopes up that an appeal will be granted, and then have the rug pulled out from under them when their appeal is denied and their hopes are dashed.  Or, on most Death Rows, prisoners who are within 24 hours of being executed are moved to a special cell where they will have no contact with other prisoners — an especially isolating experience (and therefore more cruel), just as the prisoner is closest to death. But if he then wins a last minute reprieve, he is moved back to a regular cell on Death Row.  Prisoners tell me it's like a roller coaster. First they prepare for imminent death, then they put their hopes in an appeal, then their hopes are dashed.  The Death Row phenomenon also includes the reality that the only human beings in their lives, besides correction officers and an attorney who visits infrequently, are their neighbors on Death Row, and often their neighbors precede them to execution.  So they repeatedly lose the only people with whom they have a relationship.

The Death Row Phenomenon includes living for years with the knowledge that one is going to be executed, living among prisoners who will likewise by executed, and watching one after another of one's neighbors on Death Row undergo execution.  Mr. Comer was given a date of execution in November, 1991, and that date was postponed at the last minute.  By 2002, Mr. Comer had been on Death Row for 13 years. There had been quite a few executions during that time, and he experienced a great deal of emotional pain with each one.  This was especially true with regard to the execution of his best friend, Bonzai (Robert Vickers), on May 5, 1999, a loss from which Mr. Comer told me he never recovered.

The Death Row Phenomenon is real, and much discussed in the literature on Capital Punishment.  But how much worse does the Death Row Phenomenon become when the person facing the death penalty is forced to live in harsh circumstances replete with near total isolation

and idleness?  An individual with schizophrenia is very likely to have a psychotic episode triggered by the conditions of supermax isolation, and a person prone to despair and depression will likely be driven to suicide or self-harm.  Similarly, the person on Death Row who is vulnerable to thought impairment and despair is almost certain to have that condition exacerbated by stark isolation and idleness.  This is one additional reason we find so much mental illness and hear of so many suicides on Death Row.

Prisoners on Death Row are exquisitely vulnerable to the harm of solitary confinement. They are vulnerable because they are automatically prisoners in solitary confinement and there is nothing they can do to improve their situation. They experience a significant number of the symptoms and disabilities typical of prisoners in long-term solitary confinement.  Beyond that, they have some additional vulnerabilities common to death-sentenced individuals.  On average, Death Row prisoners have suffered numerous severe traumas.  These may begin with physical and sexual abuse during childhood, and then include witnessing "drive-by" murders on their street or being victimized by domestic violence (Hannaford, 2015).  Typically, the traumas have multiplied over a lifetime prior to their capital sentence.  The harshness and callousness of life in solitary confinement tends to trigger old traumatic memories—e.g., the officer who beats the prisoner in the next cell reminding a man of the father who beat the son mercilessly.  The extremities of life in prison, the violent fights and rapes on the yard, the endless hours of solitude in the segregation unit, serve as re-enactments of prior traumas. In other words, the prisoner is re-traumatized (Kupers, 2005).

Touring prisons and Death Rows in many states in preparation for testimony in class action litigation, I have witnessed a great deal of very serious psychopathology, including prisoners smearing feces on walls, setting fires to their cells and cutting themselves mercilessly. I believe

that many of the most severe pathological behaviors – cutting oneself for other than suicidal purposes, for example – in fact involve re-enactments of prior trauma.  Since prisoners on Death Row, on average, have suffered more traumas in their lives than almost any other subgroup of citizens, we need to make every effort to make certain that their experiences in prison do not mirror their traumatic past.

This list of symptoms and disabilities would almost certainly obstruct a death-sentenced prisoner from participating in the legal process, especially his appeals.  Juan's experience also illustrates the ups and downs of hope on Death Row:

> I experienced a tremendous sense of relief and gratitude to God when my execution was stayed, which I didn't learn until the night of my scheduled execution. But the experience caused so much turmoil for me—not only because I had to personally come to terms with what I thought would be my death, but also because I watched what my family and friends went through. It was difficult to work through my own fear and feelings about dying, and it took a lot of time and prayer. But it was even more devastating to watch how painful my execution date was for all of the people I love. I felt so overwhelmed as I watched my mother going through the pain of losing her one and only child. Now that I have a new execution date, we're having to go through it all over again.

Prisoners on Death Row are simply less able to participate in the legal process.  Research findings on the human costs of solitary confinement include cognitive and memory problems.  We know there are changes in the EEG when human beings are consigned to solitary.  Prisoners almost universally complain they cannot concentrate and their memory is impaired by the experience of isolation.  They also report that they are anxious, angry, paranoid or despairing.

They have great difficulty sleeping.  Their emotional problems, including any mental illness or suicidal inclination, are exacerbated. All of this makes it much more difficult for them to participate in the legal process, to do the research on their case or the law that is needed if they are to be successful, and to collaborate peacefully and effectively with counsel.

## AND THEN MANY VOLUNTEER TO DIE

Prisoners in unprecedented number are driven by the harsh conditions to "volunteer" or waive their appeals.  According to the ACLU, "To date, more than 10 percent of the 1,323 executions since 1976 were of those who dropped their appeals and sought execution. Death-row suicides are also common.  Texas has seen 10, including six since 2004" (American Civil Liberties Union, 2013; see also Rountree, this volume).

"Volunteering" is the informal term for prisoners who waive their automatic appeals and all rights to appeal, which means they will be promptly executed (Blume, 2004).  As I mentioned, since the 1980s, Death Rows in many states, including Arizona and Texas, have been moved inside Supermax Isolation Units.  In the same time period, the number of condemned prisoners seeking to waive their appeals has risen (Blume, 2004).  In other words, they are consigned to supermax isolation, where they are condemned to live for the rest of their lives or until their death sentence is commuted, and then they volunteer in unprecedented numbers to be executed.  One would hope that if such a trend were identified by experts in corrections — for example, a growing proportion of condemned prisoners being subjected to long-term solitary confinement on Death Row, and at the same time more condemned men choosing to waive their appeals — that should be sufficient reason to remove Death Row from supermax isolation.

According to Dr. Robert Johnson (2016), Professor of Justice, Law and Criminality at

American University, who has considerable experience investigating conditions on Death Rows,

> Human beings cannot be stored like so many commodities without violating their huan dignity…. We as a society are left with a punishment that, in its present and likely future form, is an instance of torture that is cruel as that term is understood in an Eighth Amendment context. (p. 1242)

John Blume provides a rigorous review of legal precedents and a well-reasoned approach to distinguishing between prisoners who waive their appeals "knowingly and intelligently," on one hand, and "state assisted suicide" on the other.  According to Blume (2004):

> Conditions of confinement are frequently referred to as contributing to volunteerism…. There is some force to this contention.  Most death row prisoners are housed under conditions designed for inmates who are disciplinary problems, and not intended to be used for long term incarceration.  For example, most death row inmates are typically confined to their cells for 23 hours a day in very small cells. Sanitation and eating conditions can be very poor…. Death sentenced inmates are, with few exceptions, ineligible for prison jobs or correctional programs or even the usual forms of prison recreation, such as sports and movies.   Generally death row inmates are not permitted "contact" visits with their family members, or if they are, the visits must occur under the close observation of numerous correctional officers. (p. 950)

Thus, there is an additional symptom of solitary confinement on Death Row, and that symptom is "volunteering."  As death rows are moved into supermax prisons, more prisoners are volunteering to die at the state's hands.  Although volunteers must be deemed mentally competent

in order to abandon their appeals (*Godinez v. Moran*, 1993), it is "not a high bar to cross… permit[ing] even severely mentally ill defendants to be found competent to waive trial rights" (Rountree, 2014, pp. 299-300). Hopelessness plays a significant role in one's willingness to volunteer, and hopelessness is created by a lack of belief that one can create a meaningful life in prison (Rountree, 2014, pp. 304-305). According to the Texas exoneree I quoted earlier:

> I saw guys who dropped their appeals because of the intolerable conditions. Before his execution, one inmate told me he would rather die than continue existing under these inhumane conditions. I saw guys come to prison sane, and leave this world insane, talking nonsense on the execution gurney. One guy suffered some of his last days smearing feces, lying naked in the recreation yard, and urinating on himself. (American Civil Liberties Union, 2013)

### THE PENOLOGICAL OBJECTIVE?  THE MORALITY?

What exactly is the penological objective for placing Death Row inside a supermax? Research on supermaximum security prisons shows that the isolation of a significant proportion of prisoners does not decrease violence in the prisons, nor does it make a dent in gang activity (Briggs, Sundt & Castellano, 2003).  It does cause immense and unnecessary suffering, as well as severe mental illness, psychological dysfunction, and suicide.  In Mississippi, as the result of the *Presley v. Epps* (2005) class action lawsuit brought by the National Prison Project of the ACLU on behalf of prisoners, supermax Unit 32 at the Mississippi State Penitentiary at Parchman was downsized and then dismantled. Death Row was moved to a much less restrictive facility, and the result was actually a *decrease* in the violence rate as well as in the number of disciplinary infractions throughout the Mississippi Department of Corrections (Kupers & Dronet et al., 2009).

There really is no sound penological objective for placing Death Row within a supermaximum security prison.

Then why should death-sentenced prisoners be subjected to very long-term isolation while waiting to die? The public seems obsessed with the image of the heinous murderer very set on murdering again, the murderer himself demonstrating the potential for future violence in the way he grits his teeth as the television camera passes through his pod on Death Row. The image of the killer in an isolation cell on Death Row serves to rationalize the massive expansion of prison budgets. Those guys on Death Row are so mean they need to be isolated for everyone's safety. With more cells to isolate "the worst of the worst," the prisons and the streets would be safer! The imprisonment binge of recent decades proves very profitable for some – the politicians who win votes by showing how tough they are on crime, the construction companies that build the new prisons, and the contractors who supply the rapidly growing prison population with food, medical supplies, telephone access, and even gifts from home. President Eisenhower warned of an expanding Military-Industrial Complex. The Prison-Industrial Complex is a contemporary reincarnation of Eisenhower's worst fears.

Public relations plays a big part in the expansion of the Prison-Industrial Complex as well as in the placement of Death Rows inside supermaximum isolation prisons. Think of the news coverage when someone goes to Death Row, and then when he is executed. There is a strong message in the public spectacle of an execution. Part of it is a stern warning to all others who might even contemplate committing a capital crime. "If you commit that crime, if you kill someone, you will be put to death." French historian Michel Foucault (1977) and sociologists of deviance in the U.S.A. (Goffman, 1962) arrived at that interpretation.

But there is another side to this development.  The powers that be, including the Commissioners and Wardens, want to give the message that they are responsible for guarding the most dangerous of human beings, heinous murderers who truly deserve to be consigned to solitary for the rest of their lives.  The execution of monsters props up the whole image of our police and correction officers as heroes.  They guard the most dangerous, so they need to be paid more, and given more political influence in state governance.  Pursuing this logic, there is the myth that the murderers on Death Row cannot be safely incarcerated anywhere but in solitary confinement for the remainder of their lives.  Knowing this to be untrue gives us reason to explore further possible reasons for the foolhardy placement of Death Row within supermax security.

There is a deeper level to the morality of it all.  What if, hypothetically, in a state with the death penalty, we knew for a fact that every single one of the death-sentenced prisoners would be dangerous were he or she to be mixed with other prisoners.  And what if, again hypothetically, we believed that solitary confinement was a viable and ethical consignment for very dangerous criminals?  (This is a huge hypothetical because, like the majority of readers, I strongly disbelieve that solitary is effective or constitutionally acceptable.)  But assuming, hypothetically, that we knew a group of prisoners created a high risk of violence if mixed with other prisoners, and assuming that we believed that solitary confinement is an appropriate choice for the management of very dangerous prisoners, then we would still be confronted by this important question:  Is it acceptable, in our democratic and humane society, to impose on a subgroup of prisoners that we deem to be mean and incorrigible, punishment so harsh that it is regularly deemed unconstitutional by federal courts—punishment that violates just about all standards of decency and, according to the Special Rapporteur on Torture of the United Nations, constitutes torture?

I was assigned to perform a psychiatric examination of Robert Comer to help the court determine whether or not he was competent to waive his appeals.  The Federal Court of Appeals for the Ninth Circuit had already remanded his case to a federal trial judge for determination of Mr. Comer's competence to waive his appeals.  The court noted that he had been in an isolation cell with metal and lexsan covers over the doors for many years, and that the conditions were very harsh and known to cause human damage. The court wanted to be certain Mr. Comer was not simply in the dilemma imposed by Hobson, the 16th Century British stable owner who offered customers the choice of riding a certain less-than-healthy and less-than-appealing horse, or riding no horse at all.  The other horses in the stable were not available to the customer, so he would have to choose to take the one horse offered or choose to have no horse at all. Like Mr. Hobson's customer, Mr. Comer had two choices, to fight his appeals while living under horrid conditions of isolation and suffocation, or he could halt the appeals process and have his life ended.  Was this simply a case of Hobson's Choice?  Was Mr. Comer capable of giving "knowing, intelligent and voluntary" consent for the discontinuation of all appeals on his behalf?

I offered my opinion that, while Mr. Comer did not suffer from a serious mental illness other than depression with some signs of posttraumatic stress disorder, the fact that he was forced to endure 16 years in an isolation cell — and for many of those years with an additional lexsan cover across the front of his cell — made his "knowing, intelligent and voluntary" consent to waive very problematic.  The court found that he was competent to make a knowing, intelligent and voluntary decision to waive all further appeals, and he was executed in 2007.

Why do we accord the death-sentenced prisoner a series of appeals and then place him in conditions that preclude his participating competently in his own defense?   And why do we then accept his decision, presumably "knowing, intelligent and voluntary," when he is in no condition

24

to really know what his legal chances are and has no capacity to make a voluntary choice?  What is

the difference between placing a death-sentenced prisoner in solitary confinement, where his

concentration and memory are so impaired that he cannot effectively assist his attorney in the

pursuit of an appeal, and simply torturing that individual until he "hollers uncle" and begs to be

killed?

References


American Civil Liberties Union (2013). *A death before dying*. Retrieved from

https://www.aclu.org/files/assets/deathbeforedying-report.pdf.

*Ashker v. Brown* (2014). 4:09-cv-05796-CW (N.D. Cal.).

Blume, J. H. (2005). Killing the willing: "Volunteers," suicide and competency. *Michigan Law Review*, vol. 103, no. 5, 939 - 1009 (March).

Retrieved from http://scholarship.law.cornell.edu/lsrp_papers/16.

Briggs, C., Sundt, J., & Castellano, T. (2003). The effect of supermaximum security prisons on aggregate levels of institutional violence. *Criminology*, *41*, 1341-1376.

*Coleman v. Wilson* (1993). 912 F.Supp. 1282 (E. D. Cal.)

Death Penalty Information Center (2016). Retrieved from

http://www.deathpenaltyinfo.org/innocence-and-death-penalty?did=412&scid=6#inn-st.

Foucault, M. (1977) *Discipline and punish: The birth of the prison* (2nd. ed., A. Sheridan, Trans.). New York: Vintage Books.

*Godinez v. Moran* (1993). 509 U.S. 389.

Goffman E. (1962) *Asylums: Essays on the social situation of mental patients and other inmates*. Chicago: Aldine.

Grassian, S. (1983). Psychopathological effects of solitary confinement. *American Journal of Psychiatry*, *140*, 1450 – 1452.

Haney, C. (2003). Mental health issues in long-term solitary and "Supermax" confinement. *Crime & Delinquency, 49*, 124 – 156.

Hannaford, A. (2015). Letters from death row: The biology of trauma, new studies show that trauma biologically alters the brains of young boys in ways that affect their adult behavior.

*Texas Observer* (June 22).

Harrison, K. & Tamony, A. (2010). Death row phenomenon, death row syndrome and their effect on capital cases in the U.S. *Internet Journal of Criminology.* Retrieved from https://docs.wixstatic.com/ugd/b93dd4_0af562fdf3e44a87896b5e6366c484e9.pdf.

Hodgins, S. & Cote, G. (1991). The Mental health of penitentiary inmates in isolation. *Canadian Journal of Criminology, 33,* 177-182.

Human Rights Watch (2003).  *Ill-equipped: U.S. prisons and offenders with mental illness.*  New York: Human Rights Watch, 149 n. 513.

Hunter, M. W. (2007). California's death row. In *Writing for their lives: Death Row USA*. M. Mulvey-Roberts (Ed.), Urbana, IL: University of Illinois Press, pp. 78-90.

Johnson, R.  (1989)  *Condemned to die: Life under sentence of death*.  Long Grove, IL: Waveland Press.

*Jones 'El v. Berge* (2001). 164 F. Supp. 2d 1096 (W.D. Wis.).

Kaba, F., A. Lewis, S. Glowa-Kollisch, J. Hadler, D. Lee, H. Alber, D. Selling, R. MacDonald, A. Solimo, A. Parsons & H. Venters.  (2014). Solitary confinement and risk of self-harm among jail inmates. *American Journal of Public Health, 104*, 442-447). Retrieved from http://ajph.aphapublications.org/doi/pdf/10.2105/AJPH.2013.301742.

Kupers, T. (2017). *Solitary: The inside story of supermax isolation and how we can abolish it.* Berkeley: University of California Press.

Kupers, T. (2016). The SHU post-release syndrome. *Correctional Mental Health Report*, 17, 6, pp. 81-95.

Kupers, T. (2013). Isolated confinement: Effective method for behavior change or punishment for punishment's sake? *The Routledge handbook of international crime and justice studies.*

B.Arrigo & H. Bersot, Eds. Oxford: Routledge, pp. 213-232.

Kupers, T. (2007). Conditions on Terrell Unit, Texas. In *Writing for their lives: Death Row USA*. M. Mulvey-Roberts, Ed. Urbana, IL: University of Illinois Press. pp. 69-77.

Kupers, T. (2005). Posttraumatic stress disorder (PTSD) in prisoners. In *Managing special populations in jails and prisons.* S. Stojkovic, Ed. Kingston, NJ: Civic Research Institute.

Kupers, T., T. Dronet, T., M. Winter, J. Austin, L. Kelly, W. Cartier, T. Morris, S. Hanlon, E. Sparkman, P. Kumar, L. Vincent, J. Norris, K. Nagel & J. McBride. (2009). Beyond supermax administrative segregation: Mississippi's experience rethinking prison classification and creating alternative mental health programs, *Criminal Justice and Behavior*, *36,* 1037-1050.

*Madrid v. Gomez* (1995). 889 F Supp. 1146 (N.D. Cal.).

*Presley v. Epps* (2005, 2007). No. 4:05CV148-JAD (N.D. Miss.).

Raemisch, R. & K. Wasko. (2016) Open the door: Segregation reforms in Colorado. *Corrections.com.* Retrieved from http://www.corrections.com/news/article/42045.

Raemisch, R. (2014). My night in solitary. *New York Times* (Feb. 20).

Rountree, M. (2014). Volunteers for execution: Directions for further research into grief, culpability, and legal structures. *University at Missouri Kansas City Law Review*, 82, 295-333.

Rountree, M. (this volume). Executing "volunteers": Psychological and legal issues.

*Russell v. Epps* (2003). Civ. No. 1:02CV261-D-D (N.D. Miss.).

*Russell v. Johnson* (2003). Civil No. 1:02CV261-D-D (N.D. Miss.), consolidated with *Gates v. Cook* (2003) Civil No. 4:71CV6-JAD (N.D. Miss.).

Scharff-Smith, P. (2006). The effects of solitary confinement on prison inmates: A brief history

and review of the literature, In M. Tonry (Ed.), *Crime and Justice*, *34*, 441-528, Chicago: University of Chicago Press.

Skinner, H. (2007). Running in: Cell extraction. In *Writing for their Lives: Death Row USA*. M. Mulvey-Roberts, Ed. Urbana, IL: University of Illinois Press. pp. 65-68.

*Toussaint v. Enomoto (*1976*)*, 462 F. Supp. 397 (N.D. Cal.).