BILAL A. ESSAYLI
United States Attorney
CHRISTINA T. SHAY
Assistant United States Attorney
Chief, Criminal Division
KAREN I. MEYER (Cal. Bar No. 220554)
Violent and Organized Crime Section
Assistant United States Attorney
    1300 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-8559
    Facsimile: (213) 894-3713
    E-mail:   kim.meyer@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>      Plaintiff,<br><br>         v.<br><br>PETRO KRYLOV,<br><br>      Defendant. | No. CR 02-220-MCS<br><br>GOVERNMENT'S OPPOSITION TO DEFENDANT PETRO KRYLOV'S MOTION FOR COMPASSIONATE RELEASE; EXHIBITS A THROUGH E |

Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorney Karen I. Meyer, hereby files this Opposition to defendant's Motion for Compassionate Release.  ("Motion" (CR 2509).)

This opposition is based upon the attached memorandum of points and authorities, the attached declaration of Karen I. Meyer, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: June 2, 2025                    Respectfully submitted,

                                       BILAL A. ESSAYLI
                                       United States Attorney

                                       CHRISTINA T. SHAY
                                       Assistant United States Attorney
                                       Chief, Criminal Division

                                       KAREN I. MEYER
                                       Assistant United States Attorney

                                       Attorneys for Plaintiff
                                       UNITED STATES OF AMERICA

**TABLE OF CONTENTS**

I.    INTRODUCTION....................................................1

II.   BACKGROUND.....................................................2

      A.    Defendant's Offense Conduct..............................2

            1.    The abduction and murder of Alexander Umansky........2

            2.    The abduction and murder of Nick Kharabadze and
                  George Safiev.......................................3

      B.    Trial and Sentence.......................................5

      C.    Appeal...................................................7

      D.    Defendant's Incarceration and Disciplinary Record........7

III. LEGAL FRAMEWORK FOR COMPASSIONATE RELEASE.......................8

IV.   ARGUMENT......................................................11

      A.    Defendant Is Not Entitled To Compassionate Release.......11

      B.    Defendant Has Not Fully Exhausted His Administrative
            Remedies.................................................11

      C.    Defendant Remains a Danger to the Community, Defeating
            His Eligibility for Relief...............................12

      D.    Defendant Has Failed to Establish "an Extraordinary
            and Compelling Reason" for Release.......................13

            1.    Defendant Has Not Identified Any Changes in
                  Sentencing Laws That Would Change the Life
                  Sentence He Is Now Serving.........................14

2.    COVID and Prison Conditions Do Not Qualify as "Other Reasons" Under U.S.S.G. § 1B1.13(b)(5).......16

3.    Defendant's Alleged Rehabilitation Cannot Qualify Defendant for Release...............................18

C.    The Section 3553(a) Factors Do Not Support Defendant's Request for Release....................................19

1.    Defendant Remains a Danger to the Community, and Public Safety Counsels Against Early Release........19

2.    Defendant Committed the Most Serious of Offenses that Justify the Life Sentence He Received..........19

3.    Defendant's Alleged Rehabilitation in Custody Does Not Support Release............................20

IV.   CONCLUSION...................................................21

ii

**TABLE OF AUTHORITIES**

Page(s)

**CASES**

Dillon v. United States,
    560 U.S. 817 (2010)..........................................9, 10

Freeman v. United States,
    564 U.S. 522 (2011)............................................9

Gall v. United States,
    552 U.S. 38 (2007)...........................................20

Jones v. Hendrix,
    599 U.S. 465 (2023)..........................................15

Roberts v. Dist. Ct.,
    339 U.S. 844 (1950)..........................................14

United States v. Applewhite,
    No. 08-CR-60037, 2020 WL 137452 (D. Or. Jan. 13, 2020)........13

United States v. Arcila,
    2024 WL 578688 (D. Org. Feb. 12, 2024)...................10, 11

United States v. Aruda,
    993 F.3d 797 (9th Cir. 2021)..........................9, 10, 11

United States v. Bautista,
    2024 WL 3014637 (S.D. Cal. June 14, 2024)....................10

United States v. Chen,
    48 F.4th 1092 (9th Cir. 2022).............................9, 16

United States v. Gotti,
    No. 02-CR-743, 2020 WL 497987 (S.D.N.Y. 2020)................13

United States v. Green,
    592 F.3d 1057 (9th Cir. 2010)................................20

United States v. Greenhut,
    No. 18-CR-48-CAS, 2020 WL 509385 (C.D. Cal. Jan. 31, 2020).....9

United States v. Hamilton,
    715 F.3d 328 (11th Cir. 2013)................................10

United States v. Horvath,
    2024 WL 3276338 (D. Nev. July 2, 2024).........................10

United States v. Kanohokula,
    572 F. Supp. 3d 895 (D. Hawaii 2021)..........................12

United States v. Keller,
    2 F.4th 1278 (9th Cir. 2021)...................................9

United States v. Krylov,
    431 Fed. App'x. 566 (9th Cir. 2011)............................8

United States v. Mercado-Moreno,
    869 F.3d 942 (9th Cir. 2017)..................................14

United States v. Mikhel, et al.,
    889 F.3d 1003 (9th Cir. 2018)..................................3

United States v. Osinger,
    753 F.3d 939 (9th Cir. 2014)..................................20

United States v. Sprague,
    135 F.3d 1301 (9th Cir. 1998)..................................9

United States v. Urso,
    No. 03-CR-1382, 2019 WL 5423431 (E.D.N.Y. Oct. 23, 2019)......13

**STATUTES**

18 U.S.C. § 1203..........................................6, 16

18 U.S.C. § 3142(g)..........................................13

18 U.S.C. § 3553(a)..........................1, 9, 12, 19, 21

18 U.S.C. § 3553(a)(6).......................................20

18 U.S.C. § 3582(c)......................................9, 10, 15

28 U.S.C. § 994(t)......................................10, 15, 18

28 U.S.C. § 2255.............................................15

**RULES**

U.S.S.G. § 1B1.13.......................................passim

U.S.S.G. § 1B1.13(2).........................................19

iv

U.S.S.G. § 1B1.13(a)(2)..........................................11, 13

U.S.S.G. § 1B1.13(b)...........................................11, 13, 18

U.S.S.G. § 1B1.13(b)(5).............................................17, 18

U.S.S.G. § 1B1.13(b)(6).............................................14, 15

U.S.S.G. § 1B1.13(d)...................................................18

U.S.S.G. § 2A1.1.........................................................6

## MEMORANDUM OF POINTS AND AUTHORITIES

**I.   INTRODUCTION**

Serving a life sentence for both conspiring to engage in hostage-taking resulting in death and substantive hostage-taking with death resulting of three victims, defendant Petro Krylov ("defendant") has filed a motion for compassionate release based on three grounds:  (1) his purported rehabilitation; (2) defendant's alleged unusually long sentence where his co-defendants' death sentences were commuted to life imprisonment, even though there is no change in the law, including no change that would result in a gross disparity between defendant's sentence and any sentence likely to be imposed were defendant sentenced today, at the time of the filing of his motion; and (3) COVID-19 and supposed resulting harsh prison conditions even though the national COVID-19 emergency is long over. (CR 2509 ("Motion").)[1]  Defendant's motion should be denied because (1) defendant cannot demonstrate that he is no longer a danger to the community given the brazen violence of the charged conduct and continued incidents while in custody, (2) defendant has failed to establish extraordinary and compelling reasons for relief as set forth in U.S.S.G. § 1B.13, the applicable policy statement for the compassionate release statute, and (3) defendant has not established that the relevant 18 U.S.C. § 3553(a) factors weigh in favor of release.[2]

---

[1] The government sets forth defendant's arguments in the order in which defendant presents them in his Motion, but responds to them in the argument section in the order set forth in the policy statement of U.S.S.G. § 1B1.13.

[2] As discussed in more detail below, defendant also failed to exhaust all his administrative remedies by not raising them all with the Warden at USP Canaan.

## II.   BACKGROUND

### A.   Defendant's Offense Conduct

In November 2001, defendant joined a conspiracy initiated by co-defendants Iouri Mikhel and Jurijus Kadamovas to target wealthy Los Angeles residents whom they could abduct and hold hostage for ransom, including defendant's former boss, Alexander Umansky. (PSR ¶¶ 10, 18.)

Defendants abducted Umansky, the owner of a high-end auto accessories shop, and two partners in a fledgling film production company, George Safiev and Nick Kharabadze, by luring these victims to various locations using different ruses, holding them hostage, and then collecting money from the victims' family members or business associates with the promise that the payment of this money would secure the victims' release.  (PSR ¶¶ 11, 13, 18, 23.)  Between December 2001 and January 2002, defendants collected approximately $234,628 in ransom money from the family of victim Umansky and $960,000 from a business partner of victims Safiev and Kharabadze.  (PSR ¶¶ 20, 21, 26.)  Defendants killed each victim by asphyxiation or strangulation and then threw each body, with weights attached, from one of the bridges spanning the New Melones Reservoir, a body of water located just north of Yosemite National Park, near Sonora, California. (PSR ¶ 11.) Defendant was paid for his involvement in the abduction and murders of the victims. (PSR ¶¶ 22, 32.)

#### 1.   The abduction and murder of Alexander Umansky

After a failed plan to abduct Safiev, defendants attempted to locate new victims whom they could kidnap for money. (PSR ¶ 18.)

2

Defendant informed Mikhel, Kadamovas, and co-defendant Ainar Altmanis that his former boss (Umansky) owned a business specializing in car accessories and made between $35,000 and $50,000 each month. (PSR ¶ 18); United States v. Mikhel, et al., 889 F.3d 1003, 1017 (9th Cir. 2018) ("Krylov suggested abducting his former boss, Alexander Umansky, who owned an automobile shop.").  As a result of defendant's actions, Umansky became the next person whom defendants targeted for kidnapping. (PSR ¶¶ 19-21.)

In December 2001, Mikhel called Umansky using contact information provided by defendant. (PSR ¶ 19.)  Mikhel told Umansky that he was a wealthy businessman who was interested in having Umansky install electronic equipment in a car that he was planning to buy and in a car that belonged to a friend. (PSR ¶ 19.)  Mikhel convinced Umansky to pick him up and drive him to a house where his friend's vehicle was supposedly located, that was in actuality a house owned by Kadamovas. (PSR ¶ 19.)  When Umansky arrived with Mikhel, Umansky was abducted. (PSR ¶ 19.)

The morning following Umansky's abduction, defendants caused ransom notes seeking the payment of $234,628 to be sent to Umansky's business and to Umansky's brother. (PSR ¶ 20.)  Mikhel, Kadamovas, and Altmanis murdered Umansky and drove his body to the New Melones Reservoir. (PSR ¶ 21.)  For his involvement in arranging for the abduction and murder of Alexander Umansky, Mikhel and Kadamovas paid defendant approximately $10,000 of the ransom proceeds they collected.  (PSR ¶ 22.)

        2.    The abduction and murder of Nick Kharabadze and George Safiev

In January 2002, defendants focused again on kidnapping

3

Safiev, this time by abducting Nick Kharabadze, Safiev's business partner and close friend, with the hope that they would be able to force Kharabadze to lure Safiev to them.  (PSR ¶ 23.)  With the help of Kadamovas' girlfriend and co-defendant, Natalya Solovyeva, Kharabadze agreed to meet Solovyeva at Mikhel's and Kadamovas' aquarium business that Solovyeva described as a private club.  (PSR ¶ 23.)  When Solovyeva led Kharabadze into the business, Mikhel, Kadamovas, defendant, Altmanis, and co-defendant Aleksejus Markovskis, armed with weapons, were waiting to abduct him.  (PSR ¶ 23.)

After defendants abducted Kharabadze, they forced him to call Safiev, who also came to the business and was abducted.  (PSR ¶ 24.)  Defendants forced Safiev to call his business associate and have him transfer almost $1M to an overseas bank account.  (PSR ¶ 25.)  Defendants then decided that Kharabadze and Safiev should be taken to the New Melones Reservoir and killed.  (PSR ¶ 26.)  Before that, Mikhel and Kadamovas sent defendant to buy weights that were later used to weigh down Kharabadze's and Safiev's bodies, as well as vodka to be used to intoxicate Kharabadze and Safiev prior to killing them.  (PSR ¶ 27.)

After plying Kharabadze and Safiev with vodka, defendants loaded Kharabadze into a car driven by Altmanis, in which defendant was a passenger. (PSR ¶ 28.) Defendants then loaded Safiev into a van driven by Kadamovas, in which Mikhel was a passenger.  (PSR ¶ 28.)  The car and the van then drove, in tandem, toward the New Melones Reservoir.  (PSR ¶ 28.)

Near the New Melones Reservoir, the car and the van stopped

at a parking lot near an inn in Sonora, California.  (PSR ¶ 29.) Mikhel, Kadamovas, and defendant then left with Safiev in the van, leaving Altmanis alone to guard Kharabadze.  (PSR ¶ 29.)  Mikhel, Kadamovas, and defendant murdered Safiev, throwing his weighted body from a bridge into the New Melones Reservoir.  (PSR ¶ 29.)  They then returned and picked up Altmanis and Kharabadze. (PSR ¶ 29.)

Kadamovas drove to a small clearing near a bridge, where Mikhel and defendant murdered Kharabadze by strangling him with a plastic flex-tie and placing a plastic bag over his head.  (PSR ¶ 30.)  After Kharabadze had been murdered, defendants attached the 45-pound weight that defendant had purchased to Kharabadze's body and threw his body from the bridge into the New Melones Reservoir.  (PSR ¶ 30.)  For his participation in the abductions and murders of Kharabadze and Safiev, Mikhel and Kadamovas paid defendant approximately $70,000 of the ransom money. (PSR ¶ 32.)

**B.    Trial and Sentence**

Defendant went to trial separate from co-defendants Mikhel and Kadamovas.  After a 31-day trial, a jury convicted defendant of conspiracy to take hostages resulting in death (count one of the second superseding indictment), three counts of hostage-taking resulting in death (counts two through four), and conspiracy to launder monetary instruments (count five).  (PSR ¶¶ 3-5).[3]

---

[3] As noted in the PSR, the jury found that defendant was not involved in the abduction and murder of Rita Pekler.  (PSR ¶ 3.)  The jury acquitted defendant of count six, conspiracy to escape from custody, (PSR ¶ 7), despite defendant arranging to move to a cell on his floor (along with Mikhel and Kadamovas on their respective floors) abutting a stairwell that led to an area that might lead to escape.  (PSR ¶ 40.)  A search of defendant's cell at MDC also resulted in the discovery of hacksaw blades and other escape tools, as well as a small hole that defendant had begun to carve into the wall abutting the stairwell.  (PSR ¶ 44.)

Defendant's convictions as to counts one through four made defendant eligible for the death penalty.  See 18 U.S.C. § 1203(a) ("whoever, whether inside or outside the United States, seizes or detains and threatens to kill, to injure, or to continue to detain another person in order to compel a third person...to do or abstain from doing any act as an explicit or implicit condition for the release of the person detained...shall be punished by imprisonment for any term of years or for life and, if the death of any person results, shall be punished by death or life imprisonment.") (emphasis added).  After a penalty hearing with the same jury, the jury unanimously determined that a sentence of life imprisonment without the possibility of release should be imposed on defendant instead of the death penalty. (PSR ¶ 2; CR 2055, at 12.).

The PSR calculated defendant's offense level at 50, seven levels above the highest level of 43 in the Guidelines Sentencing Table, denominating a sentencing range of life for each of counts one through four, and 240 months for count five (the money laundering count).  (PSR ¶¶ 102, 103.)  The PSR further noted that, based on application note 2(A) to U.S.S.G. § 2A1.1, "in the case of premeditated killing, life imprisonment is the appropriate sentence if a sentence of death is not imposed.  A downward departure would not be appropriate in such a case."  (PSR ¶ 119.)

On January 11, 2008, the district court sentenced defendant to imprisonment for life without the possibility of release on each of counts one through four, to be served consecutively, and a term of imprisonment of 240 months on count five, to be served concurrently with the life sentence previously imposed.  (CR 2055, Judgment and Commitment Order and at 34) ("The Court believes that the jury

6

sentence in this case, life without the possibility of release, is the appropriate sentence to be imposed, either under a 3553 analysis or a guideline analysis").[4]  The district court determined that defendant's offense level should be 48 instead of 50, reducing the offense level by the two points that probation applied for obstruction based on defendant's escape attempt.  (CR 2055, at 29.)[5] The district court also imposed a five-year period of supervised release on counts one through four and a three-year period of supervised release on count five, and ordered defendant to pay $500 in special assessments and a criminal forfeiture in the amount of $1,203,628.  (CR 2055, Judgment and Commitment Order).

**C.    Appeal**

Defendant appealed his conviction and sentence, challenging the district court's failure to grant his motion for a mistrial.  The Ninth Circuit upheld defendant's conviction and sentence, finding that the district court did not abuse its discretion by failing to

---

[4] Defendant asserts that the district court noted that defendant acted under duress in committing these offenses.  (Motion at 2.) This is incorrect.  According to the transcript of the sentencing proceeding, the district court said the exact opposite.  See CR 2055, at 29 ("In reference to the Defendant's other claims that the Defendant acted under duress, there was no evidence offered at trial that convinces this Court that the Defendant so acted.").

[5] In the transcript of the sentencing proceeding, the district court initially (and mistakenly) referred to the two level adjustment as pertaining to role as oppose to obstruction.  (CR 2055, at 29) ("In reference to the objections to Paragraphs 58, 64 and 70 where the probation officer has recommended a two level adjustment for role in the offense [sic], the Court will not apply the two level adjustment for obstruction of justice.  Because whether or not the Government has proved by clear and convincing evidence that the Defendant attempted to escape, it would not affect the sentence imposed by the Court.  Whether it's an offense level of 50 or 48 is immaterial to the sentence to be imposed by the Court."); (CR 2055, at 31) ("The two level adjustment not being applied for obstruction and a Criminal History Category I, the offense level, again, is 48.").

grant defendant's motion for a mistrial.  See United States v. Krylov, 431 Fed. App'x. 566 (9th Cir. 2011).

### D.    Defendant's Incarceration and Disciplinary Record

Defendant is currently serving his life sentence at the high security United States Penitentiary Canaan in Waymart, Pennsylvania. https://www.bop.gov/inmateloc/.  Defendant's disciplinary record reflects sanctions for conduct that ranges in severity.

While incarcerated, defendant has incurred nine disciplinary incidents, ranging from interfering with count, possessing unauthorized items and intoxicants, attempting escape, and possessing dangerous weapons.  (See Inmate Discipline Data, Chronological Disciplinary Record, attached as Exhibit ("Ex.") A.)  Specifically, defendant was found to have attempted to escape from MDC in 2003 before trial in this case (conduct for which he was charged and acquitted at trial); to have possessed a sharpened instrument attached to an ink pen (2007); to have possessed intoxicants in his cell (2007); to have broken a window in his cell with a battery in a sock or with a sink pipe for removal of intoxicants from his cell (2007); to have possessed part of a paper clip (2008); to have possessed 5½ inch sharp metal hidden in a cookie box (2014); and to have possessed an unauthorized item (2017).  (Id.)  The Bureau of Prisons ("BOP") has assessed him as a minimum risk recidivism level, (see Inmate History First Step, attached as Ex. B), with a security classification of high.  (See Inmate History Level, attached as Ex. C).

## III. LEGAL FRAMEWORK FOR COMPASSIONATE RELEASE

A compassionate release motion is a request for a permanent

8

reduction in a defendant's federal sentence. A district court generally may not modify a term of imprisonment once it has been imposed. 18 U.S.C. § 3582(c); Freeman v. United States, 564 U.S. 522, 526 (2011) (plurality opinion); Dillon v. United States, 560 U.S. 817, 824-25 (2010); United States v. Aruda, 993 F.3d 797, 799 (9th Cir. 2021). Compassionate release is one of the "few narrow exceptions," Freeman, 564 U.S. at 526, allowing a court to "reduce the term of imprisonment" and "impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment." 18 U.S.C. § 3582(c)(1)(A); Aruda, 993 F.3d at 799-800.

Because this relief is drastic and permanent, it is subject to strict statutory conditions, each of which must be met for relief: (1) defendant must exhaust administrative remedies; (2) defendant must establish "extraordinary and compelling reasons" warranting a sentencing reduction; (3) any sentence reduction must be consistent with applicable policy statements issued by the U.S. Sentencing Commission; and (4) the district court considers the factors set forth in 18 U.S.C. § 3553(a). 18 U.S.C. § 3582(c)(1)(A); see United States v. Chen, 48 F.4th 1092, 1094-95 (9th Cir. 2022).

"[A]lthough a district court must perform this sequential inquiry before it grants compassionate release, a district court that properly denies compassionate release need not evaluate each step." United States v. Keller, 2 F.4th 1278, 1284 (9th Cir. 2021) (emphasis in original). Defendant bears the burden of establishing each element of relief. See United States v. Greenhut, No. 18-CR-48-CAS, 2020 WL 509385, at *1 (C.D. Cal. Jan. 31, 2020) (citing United States v. Sprague, 135 F.3d 1301, 1306-07 (9th Cir. 1998)); United States v.

9

Hamilton, 715 F.3d 328, 337 (11th Cir. 2013) ("defendant, as the § 3582(c)(2) movant, bears the burden of establishing" eligibility).

In evaluating compassionate release, courts must follow both this statute and relevant, binding policy statements.  28 U.S.C. § 994(t); U.S.S.G. § 1B1.13.  As noted, the statute requires that any reduction be "consistent with applicable policy statements issued by the Sentencing Commission" -- in this case, U.S.S.G. § 1B1.13.  As the Supreme Court recognized in Dillon, 560 U.S. at 821, 827, because § 3582(c) permits a sentencing reduction only where it is "consistent with applicable policy statements issued by the Sentencing Commission," such policy statements are binding on a court determining eligibility.

In 2021, in Aruda, the Ninth Circuit held that the then-existing version of U.S.S.G. § 1B1.13 was not an applicable policy statement for evaluating motions under 18 U.S.C. § 3582(c)(1)(A) because § 1B1.13 had not been updated since passage of the 2018 First Step Act to allow defendants, rather than just BOP officials, to bring motions under the statute.  Aruda, 993 F.3d at 800-02.  However, that decision was abrogated in November 2023, when the Sentencing Commission set forth new U.S.S.G. § 1B1.13 policy statements for evaluating compassionate release, including a defendant's motion, so any sentencing reduction must now be consistent with the current version of § 1B1.13.  E.g., United States v. Horvath, 2024 WL 3276338, at *1 (D. Nev. July 2, 2024) ("Based on this recent amendment to the sentencing guidelines the Ninth Circuit's decision in Aruda no longer applies"); United States v. Bautista, 2024 WL 3014637, at *3 (S.D. Cal. June 14, 2024) (same); United States v. Arcila, 2024 WL 578688, at *2 (D. Org. Feb. 12, 2024) (in light of

10

2023 amendments "Aruda is no longer good law to the extent it held that the policy statement is not binding on motions filed by defendants.").

In its 2023 policy statements, the Sentencing Commission made clear that, notwithstanding defendant's satisfaction of any other elements, to find a defendant eligible for relief, a court must find that defendant "is not a danger to the safety of any other person or to the community."  U.S.S.G. § 1B1.13(a)(2).  U.S.S.G. § 1B1.13(b) also explicitly defines the "extraordinary and compelling reasons" that may make a defendant eligible for compassionate release.

**IV.   ARGUMENT**

   **A.   Defendant Is Not Entitled To Compassionate Release**

Defendant's motion fails on multiple, independent grounds. First, defendant cannot show that he is not a danger to a person or the community under U.S.S.G. § 1B1.13(a)(2) given defendant's conduct in the charged offense in helping murder two victims and setting up his own boss for abduction and murder by his co-defendants, all for money, coupled with defendant's attempt to escape from custody and possession of dangerous weapons while in custody.  Second, defendant cannot establish an "extraordinary and compelling" reason (either alone or in combination) for his release under U.S.S.G. § 1B1.13(b). Defendant's life sentence does not qualify as an "unusually long sentence" where defendant has failed to identify any change in the sentencing laws that would have affected his sentence were he sentenced today.  And defendant's efforts to establish an "extraordinary and compelling" reason for relief based on alleged sentencing disparity between him and Mikhel and Kadamovas whose death sentences were commuted to life imprisonment, as well as based on

11

COVID conditions and defendant's purported rehabilitation, also fail. Third, the 18 U.S.C. § 3553(a) factors do not weight in favor of his permanent release.

**B.    Defendant Has Not Fully Exhausted His Administrative Remedies**

On March 29, 2024, defendant submitted an administrative request for compassionate release to the Warden at USP Canaan claiming exceptional conduct and rehabilitation, his mother's medical conditions, and his desire to return to Ukraine to fight against Russia's invasion.[6]  This request was denied based on defendant's failure to meet the criteria for extraordinary or compelling circumstances.  See Request and Warden Denial, attached as Ex. D.) Defendant did not claim an "unusually long sentence" whereby a change in the law would produce a gross disparity between his current sentence and the sentence likely to be imposed when his motion was filed.  Neither did defendant raise allegations of harsher prison conditions as a result of COVID.  And finally, defendant did not claim entitlement to compassionate release for his alleged minor role.  While the exhaustion requirement should not be applied in an "overly technical manner," defendant's request must provide the basis for the requested relief.  See United States v. Kanohokula, 572 F. Supp. 3d 895, 900 (D. Hawaii 2021).

**C.    Defendant Remains a Danger to the Community, Defeating His Eligibility for Relief**

Defendant's motion should be denied because he remains a danger to the community.  Umansky's brother has written a letter to this Court expressing concern about defendant's release in opposing

---

[6] Defendant did not raise his mother's care (or his desire to return to Ukraine) in his Motion.

defendant's request.  (Letter from Michael Umansky, dated June 2, 2025, attached as Ex. E).  This Court may not reduce a defendant's sentence unless it finds that "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)."  U.S.S.G. § 1B1.13(a)(2); see United States v. Gotti, No. 02-CR-743, 2020 WL 497987, at *6 (S.D.N.Y. 2020) (release is inappropriate regardless of extraordinary and compelling circumstances; defendant posed a continuing danger to the public); accord United States v. Urso, No. 03-CR-1382, 2019 WL 5423431, at *3 (E.D.N.Y. Oct. 23, 2019); United States v. Applewhite, No. 08-CR-60037, 2020 WL 137452, at *2 (D. Or. Jan. 13, 2020) (denying compassionate release for seriously ill 80-year-old inmate based on danger).  Based on defendant's callousness in setting up his own boss for abduction, ransom, and murder and assisting in the brutal murder of two additional victims and disposal of the bodies, coupled with defendant's possession of homemade weapons in custody, breaking his cell window with a homemade implement (apparently out of anger), possession of intoxicants, and attempted escape, defendant would be a danger if released.

> **D.   Defendant Has Failed to Establish "an Extraordinary and Compelling Reason" for Release**

Defendant's motion should be denied for the additional, stand-alone reason that defendant has not met his burden of establishing an "extraordinary and compelling" reason (either alone or in combination) for release from his life sentence, as defined in U.S.S.G. § 1B1.13(b).  Pursuant to § 1B1.13, extraordinary and compelling circumstances include: (1) medical circumstances of the defendant, (2) age of the defendant, (3) family circumstances of the

defendant, (4) whether defendant has been a victim of abuse while in custody, (5) other reasons similar in gravity to (1)-(4), and (6) an unusually long sentence where a change in the law would produce a gross disparity between the sentence defendant is currently serving and a likely sentence were defendant sentenced at the time his motion was filed.  U.S.S.G. § 1B1.13.  The plain meaning of the term "extraordinary and compelling" reflects Congress's intent that only rare circumstances should qualify for release.  See Roberts v. Dist. Ct., 339 U.S. 844, 845 (1950) (per curiam) ("extraordinary" remedies are reserved for "rare" cases).  Further, Section 3582 does not authorize a "plenary resentencing proceeding," let alone a re-litigation of facts.  See United States v. Mercado-Moreno, 869 F.3d 942, 956 (9th Cir. 2017) (Section 3582(c)(2) "does not authorize a sentencing or resentencing proceeding. Instead, it provides for the modification of a term of imprisonment by giving courts the power to reduce an otherwise final sentence in circumstances specified by the Commission.") (citing Dillon).

Defendant's bases for purported relief – (1) his alleged exceptional rehabilitation, (2) the length of his sentence, and relatedly, purported sentencing disparities between him and Mikhel and Kadamovas in light of his asserted minor role, and (3) harsher prison conditions as a result of COVID – do not provide sufficient bases for relief.

   1.   Defendant Has Not Identified Any Changes in Sentencing Laws That Would Change the Life Sentence He Is Now Serving

Defendant asserts that he is entitled to compassionate release based on U.S.S.G. § 1B1.13(b)(6), Unusually Long Sentence.  (Motion at 20-30.)  However, as set forth below, there are no changes to the

14

law that create any disparity, much less a gross disparity, between the life sentence he is currently serving and a sentence "likely to be imposed" if he were sentenced now.  Thus, there is no "extraordinary or compelling" basis for relief.

U.S.S.G. § 1B1.13(b)(6) provides:

> If a defendant received an unusually long sentence and has served at least 10 years of the term of imprisonment, a change in the law (other than an amendment to the Guidelines Manual that has not been made retroactive) may be considered in determining whether the defendant presents an extraordinary and compelling reason, but only where such change would produce a gross disparity between the sentence being served and the sentence likely to be imposed at the time the motion is filed, and after full consideration of the defendant's individualized circumstances.[7]

---

[7] To preserve the issue for further review, the government respectfully maintains that the Sentencing Commission exceeded its statutory authority by adopting U.S.S.G. § 1B1.13(b)(6).

The Sentencing Commission's authority to "describe what should be considered extraordinary and compelling reasons," 28 U.S.C. § 994(t), necessarily is limited by Congress's clear directive that any such reasons be both "extraordinary and compelling," 18 U.S.C. § 3582(c)(1)(A).  No reasonable interpretation of that phrase can encompass a nonretroactive or intervening change in the law.  Every lawfully imposed sentence reflects the law at the time of sentencing, and any disparity caused by a change in sentencing law—whether by statutory or an intervening judicial decision—merely reflects the operation of ordinary nonretroactivity principles and the ordinary process of the legal system.  Statutory context confirms this interpretation, because in the very next paragraph of Section 3582(c), Congress expressly addressed the retroactive application of some changes in law.  See 18 U.S.C. § 3582(c)(2).  That Congress did not similarly provide the Commission or district courts with authority to revisit sentences in light of statutory amendments or changes in decisional law suggests that Congress did not intend for Section 3582(c)(1)(A) to reach such changes.  By reducing sentences based on intervening changes in the law, moreover, subsection (b)(6) undermines congressional design by supplanting the "remedial vehicle" Congress "specifically designed for federal prisoners' collateral attacks on their sentences" in 28 U.S.C. § 2255.  Jones v. Hendrix, 599 U.S. 465, 473 (2023).  Purporting to empower courts to ignore Congress's retroactivity determinations in individual cases is also in tension with basic separation-of-powers principles.  Finally, allowing individual district courts to recognize intervening changes in the law as extraordinary and compelling circumstances will produce the unwarranted sentencing disparities that the Sentencing Reform Act of 1984 was designed to eliminate.

*(footnote cont'd on next page)*

15

Here, defendant has not identified any such changes in the law. Instead, defendant points to national averages for murder as somehow supportive of compassionate release (Motion at 24), but that is not a change in the law.

Defendant also points to former President Joseph Biden Jr.'s commutation of the death sentences of Mikhel and Kadamovas as support for his release. This argument fails for several reasons. First, any alleged disparities in sentencing, which do not exist here, are not a result of a change in the law. Commutation is a political decision, not a legal one. Second, as noted above, separate and apart from defendant's mandatory life sentence pursuant to 18 U.S.C. § 1203 when death results, defendant's guideline range as found by the Court was five levels above the highest level in the Guidelines Sentencing Table. There has been no change in the law that has altered defendant's Guideline range. Third, defendant was not a minor player in this kidnapping and murder scheme (and did not receive a minor role adjustment).[8] Defendant targeted Umansky for abduction, ransom, and murder, helped murder (in the most brutal of ways) and dump the bodies of Kharabadze and Safiev in the New Melones Reservoir, and received a portion of the ransom proceeds for his efforts. Nothing about Mikhel's and Kadamovas' death sentence commutations changes these facts. A life sentence itself provides no special justification for extraordinary relief, especially where

---

Although the government acknowledges that the Ninth Circuit's decision in United States v. Chen, 48 F.4th at 1098, will influence this Court's interpretation and application of subsection (b)(6) to this case, in order to preserve the issue for further review the government respectfully maintains the position that this decision is incorrect.

[8] The probation officer determined defendant to be an "average participant" in the scheme. (PSR ¶ 56.)

defendant received a statutory life sentence that was also a within-Guidelines sentence.

2.    COVID and Prison Conditions Do Not Qualify as "Other Reasons" Under U.S.S.G. § 1B1.13(b)(5)

Defendant makes reference to the harsh prison conditions that accompanied the COVID pandemic, while recognizing that "COVID is now in our rearview mirror." (Motion at 31.) Defendant is correct that COVID is no longer a health crisis, and COVID conditions are over. Yet defendant makes historical reference to the lockdown conditions at USP Allenwood during the crisis (a facility where defendant no longer is housed), contending that the prison system still runs its facilities on lockdown status, creating a harsher prison environment than what the Court contemplated when defendant was sentenced.[9] (Motion at 34.)

Prison conditions do not form a basis for compassionate release, either by themselves or in combination with other factors. Under U.S.S.G. § 1B1.13(b)(5), a defendant can present as extraordinary and compelling reasons "any other circumstance or combination of circumstances that...are similar in gravity to those described in paragraphs (1) through (4)." Paragraphs (1) through (4) of this Guideline include:  (1) medical circumstances of the defendant, (2) a defendant's minimum age of 65, deterioration in health, and service of significant portion of sentence, (3) defendant's family circumstances, such as incapacitation of caregivers of defendant's family members, and (4) victim of sexual or physical abuse by or at the direction of a correctional officer or

_____

[9] Defendant also asserts a five-year period when he was placed in solitary confinement as making incarceration extremely difficult. (Motion at 35.)

17

BOP employee.  U.S.S.G. § 1B1.13(b)(1)-(4).  Because prison conditions do not fall within the circumstances enumerated in paragraphs (1) through (4) of § 1B1.13(b), the purported harshness of prison conditions could only be considered under the "other reasons" provision of § 1B1.13(b)(5), but it still does not qualify under paragraph (b)(5) because it is not similar in gravity to the four circumstances set forth in paragraphs (1) through (4).

> 3.    Defendant's Alleged Rehabilitation Cannot Qualify Defendant for Release

Defendant relies most heavily on his alleged rehabilitation, pointing to his steady employment within his various custodial institutions.  (Motion at 8-16.)  As defendant admits (Motion at 13), this ground alone cannot qualify as an extraordinary and compelling reason for release.  The § 1B1.13 policy statement for the compassionate release statute makes clear that, "[p]ursuant to 28 U.S.C. § 994(t), rehabilitation of a defendant is not, by itself, an extraordinary and compelling reason for purposes of this policy statement.  However, rehabilitation of the defendant while serving the sentence may be considered in combination with other circumstances in determining whether and to what extent a reduction in the defendant's term of imprisonment is warranted."  U.S.S.G. § 1B1.13(d).

Here, defendant's claims of rehabilitation are significantly undermined by his disciplinary history over the span of years, including sanctions for possessing dangerous weapons, attempting to escape, and fashioning an implement to break his cell window when his unauthorized intoxicants were confiscated.  Defendant's letters in

18

support of his work while in custody,[10] while commendable, cannot qualify as extraordinary in light of these disciplinary incidents. Thus, neither alone nor in combination with the other reasons defendant articulates, does rehabilitation constitute a basis for relief.

**C.    The Section 3553(a) Factors Do Not Support Defendant's Request for Release**

Any compassionate release decision must also consider the factors under 18 U.S.C. § 3553(a).  See 18 U.S.C. § 3582(c)(1)(A)(i). Here, the § 3553(a) factors provide a separate and independent reason to deny defendant's premature, permanent release.

### 1.    Defendant Remains a Danger to the Community, and Public Safety Counsels Against Early Release

The weightiest factor in the § 3553(a) analysis is defendant's serious danger to the community, reflected here in defendant's most callous and brutal criminal conduct in the instant offense, as well as his sanctions in federal prison, see 18 U.S.C. §§ 3553(a)(2)(A), (B), (C).  Defendant cannot demonstrate that he is "not a danger to the safety of any other person or to the community."  U.S.S.G. § 1B1.13(2).  And this Court may not reduce a defendant's sentence absent such a finding.  See U.S.S.G. § 1B1.13 ("the court may reduce a term of imprisonment if...the court determines that...the defendant is not a danger....").  Defendant's record of violent acts, including the crime of hostage-taking and murder, gives no reason to believe that defendant's behavior will change if released.

---

[10] The government did not receive copies of these letters and none were filed on the docket.

19

2. <u>Defendant Committed the Most Serious of Offenses
that Justify the Life Sentence He Received</u>

Defendant committed the most serious offenses recognized in society when he and his conspirators murdered for money.  The nature and circumstances of these offenses fully justify the statutory and Guidelines life sentence that defendant is serving.  Requiring defendant to complete this sentence furthers "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a)(6).  Indeed, that is the very purpose of the Sentencing Guidelines; they exist to ensure national uniformity in sentencing, and "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges."  <u>Gall v. United States</u>, 552 U.S. 38, 54 (2007); <u>see</u> <u>also</u> <u>United States v. Osinger</u>, 753 F.3d 939, 949 (9th Cir. 2014) ("We have trouble imagining why a sentence within the Guidelines range would create a disparity, since it represents the sentence that most similarly situated defendants are likely to receive.") (quoting <u>United States v. Green</u>, 592 F.3d 1057, 1072 (9th Cir. 2010)).  Releasing defendant after serving 23 years of his life sentence will create rather than avoid unwarranted disparities between similarly situated defendants, including between defendant and his co-defendants Mikhel and Kadamovas.

3. <u>Defendant's Alleged Rehabilitation in Custody
Does Not Support Release</u>

Defendant's life sentence is not something that happened to defendant, but a sentence he earned from his own actions in taking lives for money.  And while defendant has worked while in custody,

20

this fails to diminish his involvement in significant and unparalleled violence.  Granting compassionate release under these circumstances would undermine the 3553(a) factors, resulting in an effective term of custody far below the defendant's current Guideline and statutory life sentence.  The law and the specific facts of defendant's case do not support this result.

**IV.    CONCLUSION**

Defendant has failed to demonstrate that he is no longer a danger, or that extraordinary and compelling circumstances and § 3553(a) factors justify release or a reduction in sentence. Defendant's Motion should be denied.

Dated: June 2, 2025                    Respectfully submitted,

                                       BILAL A. ESSAYLI
                                       United States Attorney

                                       CHRISTINA T. SHAY
                                       Assistant United States Attorney
                                       Chief, Criminal Division

                                       _____
                                       KAREN I. MEYER
                                       Assistant United States Attorney

                                       Attorneys for Plaintiff
                                       UNITED STATES OF AMERICA

21