BILAL A. ESSAYLI
Acting United States Attorney
JOSEPH T. MCNALLY
Assistant United States Attorney
Acting Chief, Criminal Division
KAREN I. MEYER (Cal. Bar No. 220554)
Assistant United States Attorney
Major Crimes Section
     1300 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-8559
     Facsimile: (213) 894-3713
     E-mail:    kim.meyer@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | Case No. 2:23-cv-08289-MCS |
|---|---|
| Plaintiff, | (Related Case No. 02-220-MCS) |
| v. | GOVERNMENT OPPOSITION AND MOTION TO DISMISS DEFENDANT JURIJUS KADAMOVAS'S MOTION TO VACATE, SET ASIDE, OR CORRECT SENTENCE PURSUANT TO 28 U.S.C. § 2255 |
| JURIJUS KADAMOVAS, | |
| Defendant. | |

Plaintiff United States of America, by and through its counsel of record, the Acting United States Attorney for the Central District of California and Assistant United States Attorney Karen I. Meyer, hereby files the government's opposition and motion to dismiss the motion to vacate, set aside, or correct sentence pursuant to 28 U.S.C. § 2255 filed by defendant Jurijus Kadamovas ("defendant Kadamovas"). (Dkt. 1; CV 23-08289 (Kadamovas).)

This opposition and motion to dismiss is based upon the attached memorandum of points and authorities, the files and records in these cases, the files and records of the underlying criminal case (United

States v. Mikhel, et al., CR No. 02-220), the appeal of the underlying criminal cases, CA Nos. 07-99008 and 07-99009, and any other materials submitted to the Court.

Dated: October 7, 2025                    Respectfully submitted,

                                          BILAL A. ESSAYLI
                                          Acting United States Attorney

                                          JOSEPH T. MCNALLY
                                          Assistant United States Attorney
                                          Acting Chief, Criminal Division

                                          _____
                                          KAREN I. MEYER
                                          Assistant United States Attorneys

                                          Attorneys for Plaintiff
                                          UNITED STATES OF AMERICA

**TABLE OF CONTENTS**

DESCRIPTION                                                          PAGE

TABLE OF AUTHORITIES...............................................xii

I.    INTRODUCTION..................................................1

II.   PROCEDURAL HISTORY............................................2

      A.    Defendant's Convictions and Sentence....................2

      B.    Defendant's Motions Following Conclusion of His Appeal
            in Connection with His Section 2255 Petition.............4

III.  STATEMENT OF FACTS............................................6

      A.    The Kidnappings and Murders.............................6

            1.    Meyer Muscatel....................................6

            2.    Rita Pekler.......................................8

            3.    Alexander Umansky.................................9

            4.    Nick Kharabadze and George Safiev................11

      B.    The FBI's investigation uncovers "overwhelming"
            physical and digital evidence..........................14

            1.    New Melones Reservoir............................14

            2.    Mikhel's residence..............................15

            3.    Kadamovas's two residences......................16

            4.    Designed Water World............................17

            5.    Krylov's residence..............................17

      C.    Co-defendants' testimony...............................17

      D.    Conspiracy to Escape...................................19

IV.   LEGAL STANDARD...............................................21

      A.    DEFENDANT'S SECTION 2255 CLAIMS SHOULD BE EITHER
            DISMISSED OR DENIED WITHOUT AN EVIDENTIARY HEARING......21

            1.    Where Defendant Has Not Established Cause and
                  Prejudice for Failing to Raise a Claim and Where
                  a Claim Has Been Previously Raised and Denied,
                  Such Claims Cannot Be Raised in Habeas.............21

            2.    Procedurally Defaulted and Meritless Claims Do

i

**TABLE OF CONTENTS (CONTINUED)**

DESCRIPTION                                                          PAGE

Not Receive an Evidentiary Hearing or Discovery.....22

3.   Ineffective Assistance of Counsel Claims Should
     Be Dismissed Where Unsupported and Conclusory.......23

V.   ARGUMENT.................................................24

A.   Defendant's Claim that Use of An Anonymous Jury Was
     Unconstitutional Is Both Procedurally Defaulted and
     Facially Meritless (Defendant's Claim 1).................26

     1.   Defendant Procedurally Defaulted This Claim By
          Not Raising It on Direct Appeal.....................26

     2.   Defendant Cannot Establish "Cause" to Excuse His
          Failure to Raise This Claim Because Counsel Were
          Not Ineffective.....................................27

          a.   The use of an anonymous jury is
               constitutionally permissible...................27

          b.   Defense counsel were not ineffective for
               failing to object to an anonymous jury.........30

               (A)  Counsel's performance was not deficient...31

               (B)  Defendant has suffered no prejudice.......34

     3.   The Use of An Anonymous Jury Did Not Violate
          Defendant Kadamovas's Sixth Amendment Right to a
          Public Trial........................................37

          a.   Defendant's public trial claim is
               procedurally defaulted.........................37

          b.   Selection of an anonymous jury bears no
               relationship to the "public trial"
               guaranteed by the Sixth Amendment..............39

B.   Defendant's Claim that the District Court Failed to
     Implement Sufficient Safeguards for Use of the
     Anonymous Jury is Both Procedurally Barred and
     Facially Meritless (Defendant's Claim 1).................41

     1.   Defendant Cannot Assert the Same Claims in the
          2255 Petition As He Did on Appeal...................41

     2.   Even Were These Claims Not Procedurally Barred,
          They Are Facially Meritless.........................42

C.   Because There Was No Jury Misconduct or Bias,

**TABLE OF CONTENTS (CONTINUED)**

DESCRIPTION                                                                    PAGE

Defendant Was Not Deprived of His Right to a Fair and Impartial Jury (Defendant's Claims 1 and 2)..............44

1.   Defendant Procedurally Defaulted This Claim By Not Raising It on Direct Appeal.....................44

2.   There Was No Misconduct or Bias Associated with the Military Service of Jurors 31, 36, or 227 (Defendant's Claim 1)..............................45

3.   Defendant's Claims of Bias and Prejudice Based on Individual Jurors' Employment, Brief Encounter with Defense Counsel, and Scheduling Request for Family Medical Issues Are Meritless (Defendant's Claim 2)..........................................50

     a.   Juror 57's resolved issues with payment for jury service did not prejudice defendant.......51

     b.   Juror 67's brief encounter with defense counsel where Juror 67 did not overhear counsel's conversation does not reflect either bias or prejudice.......................52

     c.   Juror Number 31's simple request for Mondays Off to handle family issues fails to raise the specter of either bias or prejudice........54

D.   The Jury Selection Process Did Not Violate Defendant's Right to a Fair and Impartial Jury By Denying Defendant's Right to a Jury Reflecting a Fair Cross Section of the Community (Defendant's Claim 3)...........55

     1.   Defendant Procedurally Defaulted This Claim By Not Raising It on Direct Appeal.....................55

     2.   Defense Counsel Were Not Ineffective Where Defendant Cannot Make Out a *Prima Facie* Case of a Fair Cross Section Sixth Amendment Violation........56

          a.   Hispanics are a distinct group in the community.......................................58

          b.   Defendant has provided no data to support his claim that he has met the second element of the Duren test.............................58

          c.   Defendant has failed to establish any systematic exclusion of Hispanics in the jury selection process........................62

**TABLE OF CONTENTS (CONTINUED)**

DESCRIPTION                                                                PAGE

    E.   Defendant's Claim of Gender Discrimination In Jury Selection Was Procedurally Defaulted and Meritless (Defendant's Claim 4).....................................67

        1.   Defendant Procedurally Defaulted This Claim By Not Raising It on Direct Appeal.....................67

        2.   There Was No Gender Discrimination In Jury Selection.........................................69

           a.   The process of the parties' exercise of peremptory challenges...........................69

               (A)   Composition of the prospective jury at the government's first pass and acceptance of the jury....................70

               (B)   Composition of the prospective jury at the government's second pass and acceptance of the jury....................70

               (C)   Composition of the prospective jury at the government's third pass and acceptance of the jury....................71

               (D)   Composition of the prospective jury when both parties' pass and accept the jury the first time.......................71

           b.   Defendant's claims are facially specious and unsupported by the record......................72

    F.   Defendant's Claim of Improper Shackling Is Procedurally Defaulted and Without Merit (Defendant's Claims 5 and 18).........................................78

        1.   Defendant Failed to Object to Defendant's Shackling Both at the District Court and on Direct Appeal........................................78

        2.   Defendant's Shackling Claim is Facially Specious Where Defendant Was Charged with Conspiracy to Escape from Custody and Defendant's Hands Were Free During Trial....................................79

        3.   The Use of Restraints Did Not Interfere with Defendant's Ability to Communicate with Counsel.....83

        4.   Defendant Has Failed to Show Counsel to Be Ineffective Where Shackles Were Not Visible and Defendant Was Able to Communicate with Counsel,

**TABLE OF CONTENTS (CONTINUED)**

DESCRIPTION                                                                PAGE

        so Claim Was Meritless, and Defendant Has Also Failed to Show Prejudice (Defendant's Claim 18).....85

G.    Defendant's Claim that the District Court Improperly Denied His Request for Further Continuances Is Both Procedurally Barred and Meritless (Defendant's Claim 6)..........................................................86

    1.    Defendant Cannot Assert This Claim in His Habeas Petition Where It Was Raised (and Denied) on Direct Appeal........................................86

    2.    Even Were This Claim Not Procedurally Barred, It Was Not Clearly Erroneous and Manifestly Unjust for the Ninth Circuit to Deny the Claim Given the Thousands of Hours the Defense Team Worked on the Case.............................................87

        a.    Defense counsel cross-examined cooperators and law enforcement officials regarding evidence of defendant's role in the escape.....93

            (A)  Government cooperators....................93

            (B)  MDC Official Marvin Battley...............95

            (C)  FBI SA Ingerd Sotelo......................97

            (D)  Defendant's challenge to Mikhel's intercepted letter.........................97

        b.    Defense counsel received the time they requested to review Solovyeva's diary..........98

        c.    Defense counsel were not ineffective..........101

H.    Defendant's Claim that the District Court Judge Should Have Been Recused Upon Submitting an Application to the Search Committee for the Position of United States Attorney Is Both Procedurally Barred and Meritless (Defendant's Claim 7) ..................................102

    1.    Defendant Cannot Assert This Claim in His Habeas Petition Where It Was Raised (and Denied) on Direct Appeal........................................102

    2.    Even Were This Claim Not Procedurally Barred, It Was Not Clearly Erroneous and Manifestly Unjust for the Ninth Circuit to Uphold Denial of Defendant's Recusal Motion in Light of Defendants' Month-Long Delay in Filing the Motion

**TABLE OF CONTENTS (CONTINUED)**

DESCRIPTION                                                                     PAGE

            and the Lack of the Appearance of Impropriety......103

I.   Defendant's Claim Alleging Unfair Prejudice of Mikhel's Testimony is Procedurally Barred and the Ninth Circuit's Ruling was Neither Clearly Erroneous Nor Manifestly Unjust (Defendant's Claims 8 and 9)......108

     1.   Defendant Cannot Assert This Claim in His Habeas Petition Where It Was Raised (and Denied) on Direct Appeal......................................108

     2.   Even Were This Claim Not Procedurally Barred, It Was Not Clearly Erroneous and Manifestly Unjust for the Ninth Circuit to Deny the Claim Given That Mikhel's Testimony Did Not Facially Incriminate Kadamovas and the Court Instructed the Jury to Disregard It When Mikhel Refused to be Cross-Examined..................................108

J.   Defendant's Claim of Denial of Access to Legal Materials Is Procedurally Barred, and Because Defendant Has At All Times Been Represented by Counsel and Has Had Access to Legal Materials, His Claim Is Also Meritless (Defendant's Claim 10)..................114

     1.   Defendant Cannot Assert This Claim in His Habeas Petition Where It Was Raised (and Denied) on Direct Appeal......................................114

     2.   Because Kadamovas Has At All Times Been Represented by Counsel and Has Had Meaningful Access to His Case Materials, the Ninth Circuit's Ruling that Kadamovas Had Adequate Access to the Courts Is Not Clearly Erroneous or Manifestly Unjust..............................................114

VI.  Defendant's Claim that the Translation at Trial Was Misleading and Inaccurate is Procedurally Defaulted and Without Merit (Defendant's Claim 11).........................121

     1.   Defendant Procedurally Defaulted This Claim by Not Raising It on Direct Appeal...................121

     2.   Any Deviation by the Interpreters from the Standard of Word-for-Word Translation of Altmanis's Testimony Was Corrected by the Court Almost at the Outset of His Testimony With Instructions to the Four Court-Certified Interpreters......................................121

     3.   Defendant Had No Constitutional Right to Hear

**TABLE OF CONTENTS (CONTINUED)**

DESCRIPTION                                                                PAGE

Altmanis's Testimony in Russian Where the
Evidence Was the Translated Testimony in English...128

4.   Defendant Was Not Entitled to a Sound Recording
of Altmanis's Testimony, Nor Was He Prejudiced by
Its Absence........................................128

B.   Defendant's Claim Alleging Failure to Instruct on
Duress Defense is Procedurally Defaulted and Meritless
(Defendant's Claim 12).................................131

1.   Defendant Procedurally Defaulted This Claim By
Not Raising It on Direct Appeal....................131

2.   Defense Counsel Was Not Ineffective Where
Defendant Cannot Make Out a Prima Facie Case of
Duress............................................132

C.   Defendant's Claim that the Government Failed to
Produce Natalya Solovyeva's Diary is Both Procedurally
Defaulted and Meritless (Defendant's Claim 14)..........134

1.   Defendant Procedurally Defaulted This Claim By
Not Raising It on Direct Appeal....................134

2.   A Complete Account of the Production of the Diary
to the Defense Reveals No Misconduct...............135

a.   A complete account of how the court resolved
issues involving Solovyeva's diary reveal
that defense counsel had ample time to
review – and did review – the diary...........137

b.   Defendant's cross examination of Solovyeva
occurred on the date counsel requested after
having had the opportunity to review the
diary.........................................141

3.   Even Had the Government Withheld Portions of the
Diary, Such Withholding Would Not Have Been
Material under *Brady*..............................144

D.   Defendant's Claim of a Sixth Amendment Violation under
Massiah Is Procedurally Defaulted and Without Merit
(Defendant's Claim 13).................................146

1.   Defendant Procedurally Defaulted This Claim by
Not Raising It on Direct Appeal....................146

2.   Because Defendant's *Massiah* Claim Is Meritless,
Defense Counsel Was Not Ineffective for Failing

**TABLE OF CONTENTS (CONTINUED)**

DESCRIPTION                                                           PAGE

          to Raise It at Trial or On Appeal...................147

        a.   Avila was not a "government agent" for the purpose of Massiah claims in the Ninth Circuit........................................147

        b.   Avila did not "deliberately elicit incriminating statements" from defendant......153

  E.    Defendant's Claim that the Government Failed to Produce Impeachment Evidence for Witness Jose Avila Concerning the Conspiracy to Escape is Procedurally Defaulted and Without Merit (Defendant's Claim 15)......156

     1.   Defendant Procedurally Defaulted This Claim by Not Raising It on Direct Appeal...................156

     2.   The Government Did Not Fail to Disclose Impeachment Information and Even If It Had, Such Information Was Immaterial Because It Would Not Have Resulted In a Reasonable Probability of a Different Outcome at Trial........................157

        a.   The government did not withhold proffer information from the defense..................157

        b.   The Government had no information from a confidential informant file to disclose because Avila was not signed up as an informant.......................................160

        c.   The government did not withhold information about an undisclosed immigration benefit because the government did not promise Avila any immigration benefits......................162

     3.   Even If Such Information Was Withheld, It Was Immaterial.........................................163

  F.    Defendant's Claim Alleging False Evidence Relating to the Escape Conspiracy is Procedurally Defaulted and Meritless (Defendant's Claim 16)........................164

     1.   Defendant Procedurally Defaulted This Claim By Not Raising It on Direct Appeal...................164

     2.   Defendant Fails to Demonstrate There Was False Testimony Under Napue..............................165

        a.   Investigation into the discovery of the escape attempt demonstrates no MDC staff

**TABLE OF CONTENTS (CONTINUED)**

DESCRIPTION                                                                    PAGE

involvement...................................166

    (A)  Mikhel made inconsistent statements in his interviews...........................167

    (B)  Proffer report shows Correctional Officer McKinnon was not involved in the escape...............................169

  b.  Defendant's documents from FOIA requests do not relate to Mikhel, Kadamovas, and Krylov's escape conspiracy...................169

  c.  Defendant Fails to Show that The Prosecution Could Have Known Any Testimony it Presented was False...................................171

3.  Any Testimony or Evidence that Defendant Alleges to be False was Immaterial Under Napue.............171

G.  Defendant's Claim that Defense Counsel Were Ineffective Throughout the Guilt Phase Portion of the Trial Simply Rehashes Deficient and Conclusory Arguments Already Addressed Elsewhere in this Opposition (Defendant's.................................172

H.  Defendant's Claim that Counsel Were Ineffective Regarding Conspiracy to Escape Evidence Introduced at Trial Is Meritless (Defendant's Claim 20)...............178

1.  Procedural Default................................178

2.  There Were No Evidentiary Errors Based on Counsel's Failure to Object, and Even If There Were, Counsel's Performance Did Not Fall Below Reasonable Standards of...........................179

  a.  Battley Did Not Testify to Inadmissible Hearsay.......................................180

  b.  Avila's Testimony Regarding Defendant's Statements Were Admissible Because Avila Was Not a Government Informant....................182

  c.  Sabrina Tynan's testimony satisfied the co-conspirator exception to the hearsay rule at every level of hearsay........................182

  d.  Counsel's failure to impeach Avila's misrecollections do not reflect deficient performance and defendant did not suffer

**TABLE OF CONTENTS (CONTINUED)**

DESCRIPTION                                                              PAGE

actual prejudice...............................183

    (A)   Mikhel's housing on Five South...........184

    (B)   Avila's testimony that Kadamovas Showed Avila mesh in the wall was an obvious mistake for which Kadamovas suffered no prejudice................................185

    (C)   Defense counsel challenged Avila's testimony about his conversations with Kadamovas when counsel questioned Avila on his ability to speak Russian and argued this point in closing............186

I.   Defendant's Claim Alleging Suppression of Material Evidence Is Both Duplicative of Other Claims and Procedurally Defaulted, and Allegation of Government Misconduct Is Based on Speculation and Is Therefore Not Cognizable in Habeas (Defendant's Claim 17)........188

J.   Defendant's Claimed Violations of International Law Are Procedurally Defaulted and Have No Merit (Defendant's Claim 29)................................190

    1.   Procedural Default................................190

    2.   Alleged Violations of International Treaties Are Not Cognizable in Habeas...........................192

    3.   The International Treaties Defendant Cites Provide No Relief Because They Are Not Self-Executing and Do Not Confer Individual Rights......193

        a.   Solitary confinement and international law....194

        b.   Torture and international law.................195

    4.   Defendant's Conditions Do Not Constitute Either Prolonged Solitary Confinement or Torture.........196

    5.   Defendant's Consular Notification Rights Were Satisfied Where the Government Notified the Lithuanian Embassy In Two Separate Instances and Kadamovas Had Ample Access to the Lithuanian Embassy.........................................198

K.   Petitioner Fails to Establish Ineffective Assistance of Appellate Counsel (Defendant's Claim 30).............202

L.   Defendant's Claim That Congress Invalidly Gave Courts

**TABLE OF CONTENTS (CONTINUED)**

DESCRIPTION                                                                    PAGE

       Federal Jurisdiction Over Defendant's Hostage Taking Crimes Under the Hostage Taking Act is Meritless (Defendant's Claim 31)...................................204

VII. NO HEARING IS NECESSARY AND THIS COURT SHOULD NOT ISSUE A CERTIFICATE OF APPEALABILITY................................205

VIII.    CONCLUSION.........................................207

**TABLE OF AUTHORITIES**

DESCRIPTION                                                            PAGE

**Cases**

Ayers v. Hudson,
    623 F.3d 301 (6th Cir. 2010) .................................. 146

Aymo v. Sessions,
    742 F. App'x 237 (9th Cir. 2018) ............................. 121

Badea v. Cox,
    931 F.2d 573 (9th Cir. 1991) ................................. 189

Barker v. Fleming,
    423 F.3d 1085 (9th Cir. 2005) ................................ 142

Batson v. Kentucky,
    476 U.S. 79 (1986) ........................ 67, 68, 71-72, 76, 77

Baumann v. United States,
    692 F.2d 565 (9th Cir. 1982) .................................. 22

Bell v. Bell,
    512 F.3d 223 (6th Cir. 2008) (en banc) ....................... 160

Bentley v. Crist,
    469 F.2d 854 (9th Cir. 1972) ................................. 111

Bounds v. Smith,
    430 U.S. 817 (1977) ............................... 114, 119, 174

Bousley v. United States,
    523 U.S. 614 (1998) ............................... 21, 24, 26, 38

Bracy v. Gramley,
    520 U.S. 899 (1997) ............................................ 6

Brady v. Maryland,
    373 U.S. 83 (1963) ........................................ passim

Breard v. Greene,
    523 U.S. 371 (1998) (per curiam) ................... 197, 199-200

Brooks v. Kincheloe,
    848 F.2d 940 (9th Cir. 1988) .................. 145, 146, 149, 153

Bruton v. United States,
    391 U.S. 123 (1968) ............................... 109, 110, 112

Burriola v. Nevada,
    2021 WL 4941992 at *4 (D. Nev. Oct. 21, 2021) ................ 192

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                          PAGE

Carpenter v. Martel,
    2011 WL 5444165, *15 (N.D. Cal. Nov. 9, 2011) ............... 191

Castillo v. Stainer,
    983 F.2d 145 (9th Cir. 1992) ......................... 80, 82, 84

Castillo v. Stainer,
    997 F.2d 669 (9th Cir. 1993) ................................. 82

Catlin v. Broomfield,
    124 F.4th 702 (9th Cir. 2024) ............ 163, 169, 169-170, 170

Clements v. Madden,
    112 F.4th 792 (9th Cir. 2024) ............................... 170

Cockett v. Ray,
    333 F.3d 938 (9th Cir. 2003) ................................ 200

Cone v. Bell,
    556 U.S. 449 (2009) .................................... 143, 162

Copperwood v. Cambra,
    245 F.3d 1042 (9th Cir. 2001) ................................ 72

Cornejo v. County of San Diego,
    504 F.3d 853 (9th Cir. 2007) ....................... 191, 196, 197

Cornett v. Donovan,
    51 F.3d 894 (9th Cir. 1995) ................................. 119

Courtney v. United States,
    390 F.2d 521 (9th Cir. 1968) ................................ 112

Crater v. Galaza,
    491 F.3d 1119 (9th Cir. 2007) ............................... 106

United States v. Croft,
    124 F.3d 1109 (9th Cir. 1997) ............................... 143

Davis v. Woodford,
    384 F.3d 628 (9th Cir. 2004) ................ 76, 48, 73, 74, 204

Deck v. Missouri,
    544 U.S. 622 (2005) ................................... 79, 81, 83

Dickey v. Davis,
    69 F.4th 624 (9th Cir. 2023) ................................ 170

Dretke v. Haley,
    541 U.S. 386 (2004) ......................................... 21

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                    PAGE

Dubin v. United States,
    599 U.S. 110 (2023) ........................................ 203

Earp v. Davis,
    881 F.3d 1135 (9th Cir. 2018) ............................... 23

Fairbank v. Ayers,
    650 F.3d 1243 (9th Cir. 2011) ......................... 145, 153

Felts v. Estelle,
    875 F.2d 785 (9th Cir. 1989) ............................... 111

Fernandez v. Roe,
    286 F.3d 1073 (9th Cir. 2002) ..................... 75-76, 76-77

Fields v. Brown,
    503 F.3d 755 (9th Cir. 2007) ................................ 36

Flores-Nova v. Att'y Gen. of United States,
    652 F.3d 488 (3d Cir. 2011) ................................ 192

Trinidad y Garcia v. Thomas,
    683 F.3d 952 (9th Cir. 2012) ............................... 194

Garza v. Lappin,
    253 F.3d 918 (7th Cir. 2001) ............................... 192

Glossip v. Oklahoma,
    604 U.S. 226 (2025) .................................... 163, 170

Hampton v. Shinn,
    143 F.4th 1047 (9th Cir. 2025) ........................ 143, 163

Harrington v. Richter,
    562 U.S. 86 (2011) ......................................... 101

Harris v. Pulley,
    885 F.2d 1354 (9th Cir. 1988) ............................... 45

Heishman v. Ayers,
    621 F.3d 1030 (9th Cir. 2010) .............................. 161

Hurles v. Ryan,
    752 F.3d 768 (9th Cir. 2014) ............................... 106

Duren v. Missouri
    439 U.S. 357 (1979) ..................................... 56, 64

In re Al-Nashiri,
    921 F.3d 224 (D.C. Cir. 2019) ............................. 105

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                                     PAGE

J.E.B. v. Alabama,
   511 U.S. 127 (1994) ........................................... 72

James v. Borg,
   24 F.3d 20 (9th Cir. 1994) ............................. 176, 181

Jenkins v. Bloomfield,
   2023 WL 8441491 *40 (C.D. Cal. Oct. 17, 2023) ............... 192

Jones v. Gomez,
   66 F.3d 199 (9th Cir. 1995) .............. 30, 76, 173, 187, 157

Jones v. Meyer,
   899 F.2d 883 (9th Cir. 1990) .................................. 81

Kuhlmann v. Wilson,
   477 U.S. 436 (1986) .......................................... 151

Kyles v. Whitley,
   514 U.S. 419 (1995) ..................................... 143, 162

Larson v. Palmateer,
   515 F.3d 1057 (9th Cir. 2008) ................................ 81

Lewis v. Casey,
   518 U.S. 343 (1996) ..................................... 118, 119

Lockhart v. McCree,
   476 U.S. 162 (1986) .......................................... 45

Maine v. Moulton,
   474 U.S. 159 (1985) ..................................... 153, 154

Marshall v. United States,
   360 U.S. 310 (1959) .......................................... 112

Massiah v. United States,
   377 U.S. 201 (1964) .......................................... 144

Matylinsky v. Budge,
   577 F.3d 1083 (9th Cir. 2009) ............................... 177

Maxwell v. Roe,
   628 F.3d 486 (9th Cir. 2010) ................................ 143

McDermott v. Johnson,
   85 F.4th 898 (9th Cir. 2023) ................................ 75

Medellin v. Texas,
   552 U.S. 491 (2008) .......................................... 197

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                                    PAGE

Mikhel v. United States,
    140 S. Ct. 157 (October 7, 2019) ............................... 1

Miles v. Ryan,
    713 F.3d 477 (9th Cir. 2013) .................................. 66

Miller-El v. Cochrell,
    537 U.S. 322 (2003) .......................................... 204

Mooreman v. Ryan,
    628 F.3d 1102 (9th Cir. 2010) ........................... 200, 201

Morgan v. Illinois,
    504 U.S. 719 (1992) .......................................... 45

Murray v. Carrier,
    477 U.S. 478 (1986) .............................. 26, 55, 67, 130

Murtishaw v. Woodford,
    255 F.3d 926 (9th Cir. 2001) .................................. 31

Mu'Min v. Virginia,
    500 U.S. 415 (1991) ....................................... 46, 36

Napue v. Illinois,
    360 U.S. 264 (1959) .......................................... 162

Nettles v. Grounds,
    830 F.3d 922 (9th Cir. 2016) ................................. 189

Nevius v. McDaniel,
    218 F.3d 940 (9th Cir. 2000) ................................. 204

Nguyen v. Frauenheim,
    45 F.4th 1094 (9th Cir. 2022) ........................ 72, 76, 77

Odom v. United States,
    377 F.2d 853 (5th Cir. 1967) ................................. 112

Odom v. United States,
    455 F.2d 159 (9th Cir. 1972) .................................. 22

Paige v. United States,
    493 F.2d 22 (9th Cir. 1974) ................................ 55-56

Paine v. City of Lompoc,
    160 F.3d 562 (9th Cir. 1998) .................................. 36

Paulino v. Castro,
    371 F.3d 1083 (9th Cir. 2004) ................................. 75

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                          PAGE

Pena v. United States,
   2009 WL 2912653 *2 (C.D. Cal. Sept. 9, 2009) ................. 190

Pollard v. White,
   119 F.3d 1430 (9th Cir. 1997) ............................... 201

Preiser v. Rodriguez,
   411 U.S. 475 (1973) ......................................... 189

Presley v. Georgia,
   558 U.S. 209 (2010) .......................................... 40

Press-Enterprise Company v. Superior Court,
   464 U.S. 501 (1984) .......................................... 39

Ramirez-Burgos v. United States,
   313 F.3d 23, n.12 (1st Cir. 2002) ............................ 43

Randolph v. People of the State of California,
   380 F.3d 1133 (9th Cir. 2004) ................................ 65

Rhoden v. Rowland,
   172 F.3d 633 (9th Cir. 1999) ..................... 79-80, 80, 81

Rich v. Calderon,
   187 F.3d 1064 (9th Cir. 1999) ................................ 50

Richardson v. Marsh,
   481 U.S. 200, 208 (1987) ......................... 107, 709, 110

Rivas v. Hatton,
   2016 WL 7674792 at *13 (C.D. Cal. Nov. 18, 2016) ............ 200

Rowland v. Chappell,
   902 F.Supp.2d 1296 (N.D. Ca. 2012) .......................... 191

Sanchez-Llamas v. Oregon,
   548 U.S. 331 (2006) .............................. 197, 190, 196

Sechrest v. Baker,
   816 F. Supp. 23d 1017 (D. Nevada 2011) ....................... 37

Serna v. Holbrook,
   2023 WL 163253 *24 (N.D. Cal. Jan. 11, 2023) ................. 23

Serra v. Lappin,
   600 F.3d 1191 (9th Cir. 2010) ............................... 191

Shabazz v. Artuz,
   336 F.3d 154 (2d Cir. 2003) ................................. 160

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                                 PAGE

Shah v. United States,
  878 F.2d 1156 (9th Cir. 1989) ................................. 22

Shook v. Apker,
  472 F. App'x 702 (9th Cir. 2012) ............................ 189

Shotwell Mfg. Co. v. United States,
  371 U.S. 341 (1963) .......................................... 55

Slack v. McDaniel,
  529 U.S. 473 (2000) ......................................... 204

Sosa v. Alvarez-Machain,
  542 U.S. 692 (2004) .................................... 192, 193

Soto-Portillo v. Ryan,
  2018 WL 2075328 *14 (D. Ariz. 2018 Feb. 23, 2018) ........... 197

Spain v. Rushen,
  883 F.2d 712 (9th Cir. 1989) .............................. 84, 80

Sridej v. Blinken,
  108 F.4th 1088 (9th Cir 2024) ............................... 194

Strickland v. Washington,
  466 U.S. 668 (1984) ...................................... passim

Todd v. Schomig,
  283 F.3d 842 (7th Cir. 2002) ................................ 160

Toolate v. Borg,
  828 F.2d 571 (9th Cir. 1987) ........................... 109, 112

Torres Valenzuela v. Ryan,
  2018 WL 6606252 *8 (D. Ariz. 2018) .......................... 121

Turner v. Marshall,
  63 F.3d 807 (9th Cir. 1995) .................................. 75

Turner v. United States,
  582 U.S. 313 (2017) .............................. 133, 142, 143

United States v. Artero,
  121 F.3d 1256 (9th Cir. 1997) ................................ 59

United States v. Bailey,
  286 F.3d 1219 (10th Cir. 2002) ............................ 43, 44

United States v. Barragan,
  871 F.3d 689 (9th Cir. 2017) ................................. 29

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                                  PAGE

United States v. Benboe,
   157 F.3d 1181 (9th Cir. 1998) ............................. passim

United States v. Birtle,
   792 F.2d 846 (9th Cir. 1986) ........................... 144-145

United States v. Blaylock,
   20 F.3d 1458 (9th Cir. 1994) ........................... 25, 203

United States v. Bowman,
   302 F.3d 1228 (11th Cir. 2002) ................................ 35

United States v. Branch,
   91 F.3d 699 (5th Cir. 1996) .................................. 35

United States v. Braswell,
   501 F.3d 1147 (9th Cir. 2007) ................... 56, 26, 34, 100

United States v. Brown,
   303 F.3d 582 (5th Cir. 2002) ................................. 35

United States v. Caputo,
   2023 WL 5207318 *12 (E.D. Cal. Aug. 14, 2023) ................ 36

United States v. Celis,
   608 F.3d 818 (D.C. Cir. 2010) ............................... 129

United States v. Changco,
   1 F.3d 837 (9th Cir. 1993) ............................... 68, 69

United States v. Childress,
   58 F.3d 693 (D.C. Cir. 1995) ................................. 35

United States v. Chinchilla,
   874 F.2d 695 (9th Cir. 1989) ................................. 73

United States v. Contreras-Contreras,
   83 F.3d 1103 (9th Cir. 1996) ................................. 68

United States v. Darden,
   70 F.3d 1507 (8th Cir. 1995) ............................. 31, 33

United States v. Dunkel,
   927 F.2d 955 (7th Cir. 1991) ................................ 201

United States v. Edmond,
   52 F.3d 1080 (D.C. Cir. 1995) ................................ 35

United States v. Edouard,
   485 F.3d 1324 (9th Cir. 2007) ............................... 121

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                                 PAGE

United States v. Esquivel,
  88 F.3d 722 (9th Cir. 1996) ...................... 59, 57, 59, 61

United States v. Fernandez,
  388 F.3d 1199 (9th Cir. 2004) ....................... 27, 29, 31

United States v. Frady,
  456 U.S. 152 (1982) ..................................... passim

United States v. Gilbert,
  807 F.3d 1197 (9th Cir. 2015) ................................ 1

United States v. Gudino,
  671 F. App'x 513 (9th Cir. 2016) ........................... 132

United States v. Hafoka,
  312 F. App'x 77 (9th Cir. 2009) ......................... 22, 24

United States v. Henry,
  447 U.S. 264 (1980) .............................. 152, 153, 180

United States v. Hernandez-Estrada,
  749 F.3d 1154 (2014) .................................... 58, 64

United States v. Howard,
  381 F.3d 873 (9th Cir. 2004) ................................ 22

United States v. Jingles,
  702 F.3d 494 (9th Cir. 2012) ........................... passim

United States v. Johnson,
  988 F.2d 941 (9th Cir. 1993) ........................... passim

United States v. Kimball,
  884 F.2d 1274 (9th Cir. 1989) ............................. 152

United States v. Kuok,
  671 F.3d 931 (9th Cir. 2012) ......................... 131, 132

United States v. Long,
  301 F.3d 1095 (9th Cir. 2002) ............................. 120

United States v. Lyons,
  703 F.2d 815 (5th Cir. 1983) ............................. 111

United States v. Marashi,
  913 F.2d 724 (9th Cir. 1990) ............................. 159

United States v. Mejia-Mesa,
  153 F.3d 925 (9th Cir. 1998) ......................... 203-204

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                                PAGE

United States v. Mikhel, et al.,
    889 F.3d 1003 (2018)  ...................................... passim

United States v. Montejano,
    2025 WL 1563959 (9th Cir. June 3, 2025)  ...................... 55

United States v. Mosquera,
    816 F. Supp. 168 (E.D.N.Y. 1993)  ............................ 129

United States v. Olsen,
    704 F.3d 1172 (9th Cir. 2013)  ............................... 143

United States v. Polizzi,
    801 F.2d 1543, 1551 (9th Cir. 1986)  ......................... 161

United States v. Pulgarin,
    955 F.2d 1 (1st Cir. 1992)  ................................... 68

United States v. Ratigan,
    351 F.3d 957 (9th Cir. 2003)  ............................. passim

United States v. Rinaldi,
    301 F.2d 576 (2d Cir. 1962)  ................................. 112

United States v. Robinson,
    913 F.2d 712 (9th Cir. 1990)  ........................... 114, 118

United States v. Rodriguez,
    49 F.4th 1205 (9th Cir. 2022)  ..................... 23, 24, 142

United States v. Rodriguez,
    924 F.Supp.2d 1108 (C.D. Ca. 2013)  .......................... 56

United States v. Rodriguez-Lara,
    421 F.3d 932 (9th Cir. 2005)  ................... 57, 59-60, 65

United States v. Ross,
    468 F.2d 1213 (9th Cir. 1972)  ........................... 63, 64

United States v. Rudolph,
    403 F.2d 805 (6th Cir. 1968)  ................................ 112

United States v. Sarno,
    73 F.3d 1470 (9th Cir. 1995)  ............... 116, 114, 116, 143

United States v. Scarfo,
    850 F.2d 1015 (3d Cir. 1988)  ................................. 35

United States v. Schaflander,
    743 F.2d 714 (9th Cir. 1984)  ................................. 22

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                           PAGE

United States v. Scrivener,
   189 F.3d 825 (9th Cir. 1999) ...................... 41-42, 87, 102

United States v. Seifert,
   648 F.2d 557 (9th Cir. 1980) ........................... 111-112

United States v. Shepard,
   2018 WL 2387946 *2 (D. Ariz. May 25, 2018) .................... 47

United States v. Shyrock,
   342 F.3d 948 (9th Cir. 2003) .................................. 27

United States v. Smith,
   241 F.3d 546 (7th Cir. 2001) .................................. 43

United States v. Smith,
   403 F.2d 74 (6th Cir. 1968) .................................. 112

United States v. Soto-Barraza,
   799 F. App'x 456 (9th Cir. 2020) ............................. 110

United States v. Span,
   75 F.3d 1383 (9th Cir. 1996) .................................. 24

United States v. Thai,
   29 F.3d 785 (2d Cir. 1994) .................................... 35

United States v. Thompson,
   2022 WL 824022 *2 (9th Cir. Mar. 18, 2022) ................. 90-91

United States v. Torres-Hernandez,
   447 F.3d 699 (9th Cir. 2006) ......................... 59, 60, 61

United States v. Wilkes,
   662 F.3d 524, 536-37 (9th Cir. 2011) ........................ 161

United States v. Williams,
   791 F.2d 1383 (9th Cir. 1986) ............................... 131

United States v. Zuno-Arce,
   339 F.3d 886 (9th Cir. 2003) ........................... 161, 163

Vasquez v. Kirkland,
   572 F.3d 1029 (9th Cir. 2009) ............................... 124

Vasquez-Landaver,
   527 F.3d 798 (9th Cir. 2008) ................................ 131

Waller v. Georgia,
   467 U.S. 39 (1984) ....................................... 39, 40

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                          PAGE

Wildman v. Johnson,
  261 F.3d 832 (9th Cir. 2001) ................................. 202

Williams v. Barnhart,
  289 F.3d 556 (8th Cir. 2002) ................................. 127

Williams v. Woodford,
  384 F.3d 567, 584 (9th Cir. 2004) ............. 73, 74, 75-76, 203

Wilson v. McCarthy,
  770 F.2d 1482 (9th Cir. 1985) ............................. 81-82

Withrow v. Williams,
  507 U.S. 680 (1993) ..................... 41, 86, 102, 107, 113

Ybarra v. McDaniel,
  656 F.3d 984 (9th Cir. 2011) .................................. 48

Yee v. Duncan,
  463 F.3d 893 (9th Cir. 2006) .................................. 72

Zafiro v. United States,
  506 U.S. 534 (1993) ......................................... 111

**Statutes**

18 U.S.C. § 371 ................................................. 2

18 U.S.C. § 981 ................................................. 3

18 U.S.C. § 1203 ...................................... 2, 202, 203

18 U.S.C. § 1956 ................................................. 2

18 U.S.C. § 2255 ................................................. 4

18 U.S.C. § 3005 ................................................ 85

18 U.S.C. § 3231 ................................................. 4

18 U.S.C. § 3432 ............................................ 28, 43

21 U.S.C. § 846 ............................................... 159

21 U.S.C. § 853 ................................................. 3

28 C.F.R. § 501.3 .............................................. 83

28 U.S.C. § 455(a) ............................................ 101

28 U.S.C. § 1827 .............................................. 127

28 U.S.C. § 1863 ........................................... 28, 63

28 U.S.C. § 1865 ............................................... 60

28 U.S.C. § 1867 .......................................... 55, 128

28 U.S.C. § 2253 .............................................. 204

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                                    PAGE

28 U.S.C. § 2254 ............................................... 190

28 U.S.C. § 2255 ............................................ passim

28 U.S.C. § 2461 ................................................ 3

42 U.S.C. § 1983 .......................................... 189, 197

**Rules**

Fed. R. App. P. 4 ............................................... 3

Fed. R. Crim. P. 10 ........................................... 128

Federal Rule of Criminal Procedure 12(b) ........................ 55

Fed. R. Crim. P. 24 ............................................ 46

Fed. R. Evid. 801(c) .......................................... 177

Fed. R. Evid. 801(d)(2)(A) .................................... 180

Fed. R. Evid. 801(d)(2)(E) .................................... 180

Fed. R. Evid. 805 ........................................ 181, 187

Rule 6, Rules Governing Section 2255 Proceedings for the United
States District Courts ...................................... 5-6, 23

Rule 15 ................................................. 82, 83, 84

Rule 20 ................................................. 146, 156

**I.   INTRODUCTION**

On October 3, 2023, defendant/petitioner Jurijus Kadamovas ("Kadamovas" or "defendant") filed a Motion to Vacate, Set Aside, or Correct Sentence, Pursuant to 28 U.S.C. § 2255 ("2255 petition"). (CV 23-08289, Dkt. 1.)  Kadamovas and co-defendant Iouri Mikhel ("Mikhel") were convicted at a five-month trial (exclusive of jury selection).  In a bifurcated proceeding, Mikhel and Kadamovas were sentenced to death for claims involving hostage-taking resulting in death.  Based on separate penalty-phase verdicts, the district court sentenced both Mikhel and Kadamovas to death on counts one through four; concurrent 240-month terms of imprisonment on counts five and six; and criminal forfeiture in the amount of $1,203,628.  The convictions and death sentences were upheld by a unanimous panel on appeal.  United States v. Mikhel, et al., 889 F.3d 1003 (2018).  The Supreme Court denied certiorari.  See Mikhel v. United States, 140 S. Ct. 157 (October 7, 2019); Kadamovas v. United States, 140 S. Ct. 157 (October 7, 2019).

Despite strict construction of the one-year filing deadline for defendant to file a motion to vacate, set aside or correct sentence pursuant to 28 U.S.C. § 2255 pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), (see 28 U.S.C. § 2255(f)(1), United States v. Gilbert, 807 F.3d 1197, 1199 (9th Cir. 2015)), the government granted multiple multi-year timeliness waivers based on the exceptional complexity of the capital case, resulting from a seven-month-long trial that generated thousands of pages of briefing and motions on direct appeal, and defense counsel's representations regarding the effect of COVID-19 restrictions on their ability to file the motion.  (CR 2406, 2414, 2417, 2427, 2445.)

On December 23, 2024, Joseph R. Biden Jr., then-President of the United States of America, issued an executive grant of clemency to both defendants.  As a result, defendants are no longer facing death.[1]

Defendant makes numerous challenges to the conduct of the trial, the trial court's rulings, government conduct, and to appellate proceedings.  Woven throughout are numerous claims of ineffective assistance of counsel.  Many of the claims are either procedurally defaulted or procedurally barred.  Further, ineffective assistance of counsel claims should be denied because defendants have not shown that defense counsel have been ineffective or that defendant suffered any actual prejudice from counsel's conduct.  The government respectfully urges this Court to dismiss or deny the Motion without an evidentiary hearing.

## II.   PROCEDURAL HISTORY

### A.    Defendant's Convictions and Sentence

On July 29, 2004, a federal grand jury in the Central District of California returned a seven-count Second Superseding Indictment charging Mikhel and Kadamovas with one count of Conspiracy to Take Hostages Resulting in Death (18 U.S.C. § 1203) (Count One), three counts of Hostage-Taking Resulting in Death (18 U.S.C. § 1203) (Counts Two, Three and Four), Conspiracy to Launder Monetary Instruments (18 U.S.C. § 1956(h)) (Count Five), Conspiracy to Escape from Custody (18 U.S.C. § 371) (Count Six), and Criminal Forfeiture

---

[1] As a consequence, the government will not address Claims 21 through 28 in defendant's petition because they challenge error in the penalty phase or the death sentence itself.  Within the remaining claims, defendant sometimes asserts that the claim also affects the penalty phase, which has also been mooted by the commutation of the death sentence to life imprisonment.

(18 U.S.C. § 981(a)(1)(C), 21 U.S.C. § 853, and 28 U.S.C. § 2461(c)). (CR Dkt.[2] No. 502.)

After hearing from scores of witnesses over the course of several months, the jury began deliberations regarding defendant and Mikhel's guilt on January 16, 2007. The jury returned guilty verdicts the next day. United States v. Mikhel, 889 F.3d 1003, 1020 (9th Cir. 2018). Deliberations for the penalty phase were even shorter, where the jury returned death verdicts against both Mikhel and Kadamovas on February 13, 2007, after only three hours of deliberation. (Id. at 1021.)

On March 12, 2007, the district court sentenced both defendants to death on counts one through four; concurrent 240-month terms of imprisonment on counts five and six; and to criminal forfeiture in the amount of $1,203,628. (CR Dkt. Nos. 1602, 1639.) The district court entered judgment as to both defendants the next day. (CR Dkt. No. 1604.) Kadamovas filed a timely notice of appeal. See Fed. R. App. P. 4(b)(1)(A)(i).

The Ninth Circuit affirmed the judgments and sentences of both defendants, finding that the district court did not abuse its discretion and that the district court's proceedings had no plain error (or any error was otherwise harmless). Mikhel, 889 F.3d at 1003. On October 7, 2019, the Supreme Court denied defendant's petition for writ of certiorari. Kadamovas, 140 S. Ct. at 157. The

---

[2] "CR Dkt." Refers to the underlying criminal case, CR No. 02-220-MCS.

3

district court had federal jurisdiction under 18 U.S.C. § 3231, which the Ninth Circuit affirmed.[3]

Pursuant to 28 U.S.C. § 2255(a), the defendants filed their habeas petitions.  In light of external factors such as the COVID-19 pandemic and the complexity of the case, the government agreed to waive the one-year statute of limitations set forth in 18 U.S.C. § 2255(f)(1).  (See CR Dkt. Nos. 2381, 2406, 2417, 2427, 2445.) Defendant filed his 2255 petition on October 3, 2023.  (CR Dkt. No. 2471; CV Dkt. No. 1.)[4]  On December 23, 2024, former President Joseph R. Biden Jr. issued an Executive Grant of Clemency, commuting the death sentences for both defendants.  (CR Dkt. Nos. 2502-5.)[5]

**B.    Defendant's Motions Following Conclusion of His Appeal in Connection with His Section 2255 Petition**

After the Supreme Court denied defendant's request for certiorari, defendant filed several motions in this court prior to raising some of these same claims in his petition.  First, on June 15, 2020, defendant filed a motion (joined by Mikhel the next day) for a limited disclosure of Juror Names (CR Dkt. No. 2337), which was denied by the Honorable Philip S. Gutierrez, United States District Judge.  (CR Dkt. No. 2375.)  Second, on January 29, 2021, Kadamovas filed a Motion for Discovery (CR Dkt. No. 2399), which this Court denied as premature.  (CR Dkt. No. 2405.)  Third, on June 29, 2022,

---

[3]  Defendant claims that his convictions and sentence are unconstitutional because the Hostage Taking Act requires a nexus involving international terrorism.  (Mot. at 401-03.)  Defendant raised this claim on direct appeal, which the Ninth Circuit rejected. Mikhel, 889 F.3d at 1021-25; see infra, response to Claim 31.

[4] "CV Dkt." Refers to the underlying civil case for the defendant's habeas petition, No. 23-CV-08289.

[5] Following this grant of clemency on April 30, 2025, Mikhel gave Notice of Dismissal with Prejudice to his § 2255 petition, which this Court granted. (CV Dkt. 14, 23-CV-08403); (CR Dkt. No. 2515.)

Kadamovas filed a Motion for Order Directing Bureau of Prisons to Permit Access to Legal Materials, requesting that defendant be given access to his own computer in a separate cell dedicated exclusively to defendant's own use (CR Dkt. No. 2420), which this Court denied over a month later.  (CR Dkt. No. 2429).

Over a year after filing his habeas petition, after the government's timeliness waiver expired on October 7, 2023, on October 31, 2024, defendant filed three additional motions:  (1) Motion for Discovery (CV Dkt. No. 7), (2) Motion for Limited Release of Juror Names (CV Dkt. No. 8), and (3) Motion for Order Directing the Bureau of Prisons to Allow Petitioner to Have a Computer in His Cell (CV Dkt. No. 9), all of which this Court denied on April 23, 2025.  This Court denied Kadamovas's Motion for Limited Release of Juror Names and Motion for Order Directing the Bureau of Prisons to Allow Petitioner to Have a Computer in His Cell for the same reasons they were previously denied.[6]  (CV Dkt. Nos. 24, 25.) This Court also rejected Kadamovas's argument in support of his Motion for Discovery that by articulating claims in his § 2255 petition, defendant established the predicate good cause to conduct discovery pursuant to Rule 6(a).  (CV Dkt. No. 23.)  In doing so, this Court further explained what constitutes "good cause" under Rule 6(a), Rules Governing Section 2255 Proceedings for the United States District Courts, specifying that "Rule 6 permits discovery only if the Petitioner offers 'specific allegations' that give the court 'reason to believe' the Petitioner could show he would be 'entitled

---

[6] This Court found that Kadamovas had no right to disturb the anonymity of the jurors by interviewing them and that he had adequate access to legal materials and representation without further access to a computer in his cell.

5

to relief' if the record were 'fully developed.'" (CV Dkt. No. 23 (quoting <u>Bracy v. Gramley</u>, 520 U.S. 899, 908-9 (1997).)  In denying the motion, this Court found that each of Kadamovas's requests for different documents failed to demonstrate good cause.  (CV Dkt. No. 23.)

**III. STATEMENT OF FACTS**

Between October 2001 until his arrest in February 2002, defendant and Mikhel abducted and viciously murdered five people from the Los Angeles area:  Meyer Muscatel, Rita Pekler, Alexander Umansky, George Safiev, and Nick Kharabadze.  The defendants had help, at various times, from other co-defendants, including Petro Krylov, Ainar Altmanis, Aleksejus Markovskis, and Kadamovas's girlfriend Natalya Solovyeva.  In each case, the defendants lured their victims to one of the defendants' residences or business, restrained them, attempted to extract ransom money from them or their families, killed them, and threw their bodies into the New Melones Reservoir outside Yosemite National Park.

**A.    The Kidnappings and Murders**

1.    <u>Meyer Muscatel</u>

In October 2001, Kadamovas and Mikhel abducted and murdered their first victim, a local real estate broker named Meyer Muscatel. The defendants tricked Muscatel, with Mikhel calling Muscatel from a pre-paid cell phone and posing as a wealthy Russian businessman. <u>Mikhel</u>, 889 F.3d at 1016.  Mikhel said he was interested in buying a home in Encino, California, and invited Muscatel to view the property with him.  <u>Id.</u>  The latter agreed and they drove together.  <u>Id.</u>  In reality, they were driving to Mikhel's own million-dollar house, where Kadamovas and co-defendant Altmanis lay in wait.  <u>Id.</u>

6

When Mikhel and Muscatel entered the house, Kadamovas and Altmanis grabbed Muscatel, forcing him to the ground.  Id.  Kadamovas handcuffed him.  Then the defendants restrained him with the plastic ties they had bought at Home Depot.  (Exhibit ("Ex.") 1, RT 10/10/06 at 44-48; Ex. 2, RT 10/24/06 at 7-26.)  Altmanis ziptied his ankles.  Mikhel, 889 F.3d at 1016.  Mikhel duct-taped his eyes and pistol-whipped him in the head, drawing blood.  Id.  They took Muscatel's wallet, cell phone, and keys (id.), leaving him lying on the floor, mumbling and crying.  (Ex. 1, RT 10/10/06 at 40, 56; Ex. 3, RT 10/11/06AM at 11-23.)  They then attempted to withdraw money from his bank account, but the bank froze the account.  Mikhel, 889 F.3d at 1016.

When Kadamovas and Mikhel realized they would not be able to collect any money from Muscatel, they killed him.  They first injected him with Dimedrol (an antihistamine with sedative properties), but when that did not work, they shoved a boot cover into his mouth, wrapped his head in duct tape, and held him face down on a tarpauline in Mikhel's garage.  Kadamovas then held Muscatel's body down while Mikhel asphyxiated him by placing a plastic bag over his head and pinching his nose.  (Ex. 3, RT 10/11/06AM at 53-59, 71.)  Kadamovas and Mikhel then loaded Muscatel's body into Kadamovas's van and drove to the New Melones Reservoir.  They carried his body to the edge of the Parrotts Ferry Bridge, accidentally dropping it on the curb along the way —- leaving blood stains and losing one of the weights they had tied to it (Ex. 4, RT 10/11/06PM at 77-78) — before throwing the body into the reservoir below.  (Ex. 4, RT 10/11/06PM at 79.)

Kadamovas later talked about the murder.  He told co-defendant Markovskis that they had once thrown "a fat Jew" with weights attached to his body (Ex. 5, RT 11/09/06 at 109-10) from a bridge. Mikhel, 889 F.3d at 1016-17.  Muscatel was a heavyset, Jewish man. (Ex. 3, RT 10/11/06AM at 77; Ex. 6, RT 10/12/06PM at 106; Ex. 7, RT 10/25/06 at 31.)  Markovskis testified that Kadamovas found the incident "very funny."  Mikhel, 889 F.3d at 1017.  Kadamovas also told his girlfriend Solovyeva that he and Mikhel "threw out the body of the American."  (Ex. 8, RT 11/02/06 at 107-08.)

### 2.   Rita Pekler

Kadamovas and Mikhel murdered their second victim Rita Pekler as part of a scheme to kidnap a wealthy Russian businessman, George Safiev.  Solovyeva had visited Safiev's home several times.  (RT Ex. 4, 10/11/06PM at 86-87; Ex. 8, RT 11/02/06 at 74-84.)  After she told Kadamovas of Safiev's wealth, Kadamovas pressed her for more information, which he went on to share with Mikhel.  (Ex. 8, RT 11/02/06 at 84-90.)  In 2001, the defendants explored a number of plans to lure Safiev (Ex. 4, RT 10/11/06PM at 89-90), ultimately settling on kidnapping Pekler, Safiev's financial advisor, to use as bait.  Mikhel, 889 F.3d at 1017.

This time, it was Kadamovas who posed as a wealthy Russian businessman and feigned interest in hiring Pekler to advise him on a real estate transaction.  Id.  Defendant first visited her business, introducing himself as "Volodia" to one of Pekler's colleagues, but Pekler was not in the office.  (Ex. 7, RT 10/25/06 at 186-194; RT Ex. 9, 10/26/06 at 27-28.)  He then called Pekler, again from a pre-paid cell phone, and convinced her to drive with him to a house he was interested in buying.  The house was Kadamovas's own home in Sherman

Oaks, California, where his armed accomplices lay in wait. Mikhel, 889 F.3d at 1017.

When Pekler walked into the house, Mikhel restrained her. He told her that if she brought Safiev to them, they would either get her drunk with vodka or put her to sleep with Dimedrol and leave her unharmed in a motel. Mikhel, 889 F.3d at 1017. Pekler told them she was pregnant and afraid that alcohol or drugs would harm the baby. Id. The defendants, however, convinced her it would be safe. (Ex. 4, RT 10/11/06PM at 112-14, 121; Ex. 10, RT 10/12/06AM at 9-10.) Pekler contacted Safiev, but Safiev told her he was too busy to meet because he was on his way to catch a flight to Russia. (Ex. 4, RT 10/11/06PM at 119-20; Ex. 11, RT 11/08/06 at 61-62, 126-29.)

When Kadamovas and Mikhel realized that the ploy had failed and Pekler had outlived her usefulness, they killed her. Mikhel, 889 F.3d at 1017. They injected her with Dimedrol, strangled her, and threw her body off the Parrotts Ferry Bridge. Id. A toxicology examination of blood and tissue samples from Pekler's body detected the presence of alcohol and Dimedrol. (Ex. 12, RT 12/01/06 at 34-35.) Months later, Mikhel told Altmanis that Pekler had been difficult to kill, "like a snake." (Ex. 10, RT 10/12/06AM at 12.)

### 3. Alexander Umansky

After failing to lure Safiev, Kadamovas and Mikhel looked for new victims. Krylov brought his former employer, Alexander Umansky, to the group's attention. Umansky owned an automobile shop that installed high-end car audio systems. (Ex. 10, RT 10/12/06AM at 34-35.) He became Kadamovas and Mikhel's third victim.

The group used the same method to lure Umansky. Mikhel called Umansky from a pre-paid cell phone, posing as a wealthy businessman

9

who was interested in installing audio equipment in two cars. Mikhel, 889 F.3d at 1017.  He asked Umansky for a ride to one of the cars.  (Ex. 10, RT 10/12/06AM at 44-52; Ex. 13, RT 10/27/06 at 72-73, 127-29; Ex. 12, RT 12/1/06 at 126-27.)  Umansky, excited about the opportunity, readily agreed.  Mikhel, 889 F.3d at 1017.  Mikhel directed Umansky to Kadamovas's house in Sherman Oaks, where Kadamovas, Altmanis, and Krylov were waiting.  Kadamovas was armed with a gun and Altmanis with a stun gun.  Id.

When Umansky arrived, Kadamovas handcuffed him and bound his legs with plastic ties.  Id.  They took his keys, phone and wallet, questioning him in detail about his finances.  Id.  Later, a surveillance camera captured Mikhel and Altmanis using Umansky's debit card to withdraw cash from an ATM.  Id.

Over the next several days, defendant and Mikhel trapped Umansky in the house and sought money for his release.  Mikhel, 889 F.3d at 1017.  They arranged for a $250,000 ransom note to be sent to Umansky's business and to his brother.  (Ex. 13, RT 10/27/06 at 12-15, 31, 113-17, 173-79.)  They also forced Umansky to call his parents and brother to plead for the ransom money.  Mikhel, 889 F.3d at 1017.  On December 17, 2001, Umansky's family paid half the ransom via wire transfer to a bank in the United Arab Emirates designated by defendants.  (Ex. 6, RT 10/12/06PM at 88-94; Ex. 13, RT 10/27/06 at 32-41, 75-79, 80-100, 147; Ex. 14, RT 10/31/06 at 16-46.)

After learning the ransom had been partially paid, Kadamovas and Mikhel decided they no longer needed Umansky alive.  Mikhel, 889 F.3d at 1017.  They sent Altmanis to buy weight plates from a sporting goods store.  Id.  When Altmanis returned, Mikhel stuffed plastic bags into Umansky's mouth, duct-taped his lips shut, and then slipped

10

a plastic bag over his head.  Kadamovas then sat on Umansky's lap and pinched his nose shut as Mikhel and Altmanis strangled him from behind with a rope.  (Ex. 6, RT 10/12/06PM at 94-95.)  They tied the weight plate around Umansky's body and loaded it into Kadamovas's van. Mikhel, 889 F.3d at 1017.

Mikhel, Kadamovas, and Altmanis then drove to Mikhel's house and had dinner with Mikhel's girlfriend, while the body lay in the van. Id.  After dinner, the three men drove to the New Melones Reservoir, where they threw Umansky's body off the Parrotts Ferry Bridge.  Id.

Even after killing Umansky, defendant and Mikhel continued pressuring his family for ransom money.  Co-conspirators from Russia called Umansky's family to say that Umansky was still alive but, if the money was not paid, they would cut out his liver and kidneys and sell them on the black market.  (Ex. 15, RT 10/13/06AM at 21-22; Ex. 13, RT 10/27/06 at 147-49; Ex. 14, RT 10/31/06 at 54-62, 64-66; Ex. 16, RT 12/05/06 at 74-82.)  The family paid the rest of the ransom money.  Mikhel, 889 F.3d at 1018.  Later, an IRS investigator traced the laundering of the ransom payments abroad before they landed in accounts held by Mikhel, Kadamovas, and defendants' aquarium business, Designed Water World.  Id.

### 4.   Nick Kharabadze and George Safiev

In January 2002, Kadamovas and Mikhel turned their attention back to Safiev.  The previous attempt to lure him ended in the Pekler murder.  This time, they decided to reach Safiev through his friend, Nick Kharabadze.

Kadamovas convinced Solovyeva to contact Kharabadze to meet him. She called Kharabadze using a pre-paid cell phone and invited him to

meet her at a small "private club."  In fact, the "club" was the office of Designed Water World.  Mikhel, 889 F.3d at 1018.

When Kharabadze arrived, Kadamovas was behind the bar with a hidden revolver.  Id.  Mikhel was drinking with Krylov, and had concealed a gun in his jacket.  Altmanis was playing pool with Markovskis and was also concealing a gun.  Id.  Mikhel, Kadamovas, Altmanis, Krylov, and Markovskis surrounded Kharabadze, who was handcuffed to a chair and Mikhel took his keys, wallet, and cell phone.  (Ex. 15, RT 10/13/06AM at 42-51.)  Then they forced Kharabadze to call Safiev and convince him to come to Designed Water World.  Mikhel, 889 F.3d at 1018.

This time, the plan worked.  When Safiev entered, Mikhel, Kadamovas, Altmanis, Krylov, and Markovskis grabbed him, handcuffed him, and took his personal effects.  Id.  They then took both Kharabadze and Safiev to Kadamovas's Sherman Oaks house, where they forced both men to place calls to people close to them and explain their disappearance.  Defendants then forced Safiev to call his business partner, Konstantinos Tezhik, and beg him to transfer $940,000 to a foreign account.  Mikhel, 889 F.3d at 1018.  Tezhik made the transfer.  Id.

Kharabadze and Safiev remained imprisoned in Kadamovas's house for four days.  During this time, Kadamovas recorded Safiev's voice (id.), recordings he used after killing Safiev to try to extort more money from Tezhik.  (Ex. 17, RT 09/14/06 at 125-30; Ex. 18, RT 11/15/06 at 77-84.) Defendants also forced Safiev to draft and sign a $4 million ransom note, which they also faxed to Tezhik in London after killing Safiev. (Ex. 17, RT 09/14/06 at 109-20; Ex. 19, RT 11/14/06 at 79-81.)  Kadamovas told Markovskis that he planned to

continue abducting people and throwing their bodies into the reservoir until he had $50 million, even if it meant piling bodies up to the surface of the water.  Mikhel, 889 F.3d at 1018.

Upon receiving the $940,000, Mikhel determined that they no longer needed Kharabadze and Safiev alive.  They plied Safiev and Kharabadze with vodka, telling both men that they did not intend to harm them.  (Ex. 20, RT 10/13/06PM at 45.)  Then the defendants loaded the two men into Kadamovas's van and another car (Ex. 20, RT 10/13/06PM at 47-50), and began driving to the New Melones Reservoir.  Mikhel, 889 F.3d at 1018.

On their way, a policeman stopped them for driving too closely together.  Mikhel exited his car and had a brief conversation with the policeman, who sent them on their way.  Solovyeva later testified that Kadamovas said he would have killed the policeman if the officer had seen the hostages.  Mikhel, 889 F.3d at 1018.

Near the New Melones Reservoir, Mikhel and Kadamovas, along with the others, killed both Kharabadze and Safiev, this time throwing their bodies from another bridge spanning the reservoir, the Stevenot Bridge.  They first killed Safiev, tied weights to his body, and threw the corpse into the reservoir.  Then they killed Kharabadze by covering his head with a plastic bag and tightening a plastic tie around his throat.  Mikhel, 889 F.3d at 1018.  Altmanis tied weight around Kharabadze's body and they threw the corpse off the bridge.  Id.  Mikhel told Altmanis that Safiev, like Pekler, was "strong as a snake" and had been difficult to kill.  Id.

In addition to the recordings and the $4 million ransom note faxed to Tezhik, Kadamovas recruited an associate who flew to Europe with Kharabadze and Safiev's ATM cards to withdraw cash from their

13

accounts in Europe.  The associate flew to Germany, believing the ATM withdrawal limits in that country were higher.  Finding this was not the case, he contacted a friend who agreed to drain the cards in Ukraine.  The associate later turned over to the FBI Kharabadze's driver's license and a wallet containing Safiev's driver's license, subsequently testifying at trial.  (Ex. 18, RT 11/15/06 at 13-43.)

In total Mikhel and Kadamovas received more than $1 million in ransom money from their hostage-taking and murder scheme, which they spent on high-end cars, home renovations, lavish presents for their girlfriends, and expensive vacations, among other things.  Mikhel, 889 F.3d at 1019.

**B.    The FBI's investigation uncovers "overwhelming" physical and digital evidence**

In court, the government presented testimony of scores of witnesses and hundreds of exhibits (Mikhel, 889 F.3d at 1020, 1049), including extensive physical evidence and cell phone data collected at locations including the New Melones Reservoir, Mikhel's residence, Kadamovas's two residences, Designed Water World, and Krylov's residence.  Three co-defendants — Altmanis, Solovyeva, and Markovskis — also testified against Kadamovas and Mikhel.

1.    New Melones Reservoir

Federal investigators found each of the bodies and other physical evidence at the New Melones Reservoir.  A father and son returning from a fishing trip discovered Muscatel's body near the Parrotts Ferry Bridge (Mikhel, 889 F.3d at 1019), where it had floated to the surface.  (Ex. 21, RT 09/06/06PM at 69-73.)  The colored duct tape wrapped around Muscatel's head and the boot cover found inside his mouth matched the rolls of colored duct tape and

14

boot covers that Kadamovas, Mikhel, and Altmanis bought at Home Depot the morning they abducted Muscatel.  (Ex. 22, RT 09/07/06 at 184-85; Ex. 23, RT 10/20/06 at 145-47; Ex. 24, RT 01/10/07 at 81, 88.) Investigators also found shoeprints left in Muscatel's blood on the Parrotts Ferry Bridge, which they matched to shoes found at Kadamovas's apartment.  Mikhel, 889 F.3d at 1019. Later, when Altmanis learned the FBI was investigating him, he directed the FBI to the other four victims.  Mikhel, 889 F.3d at 1019.  An underwater search of the New Melones Reservoir returned the four remaining bodies, two under the Stevenot Bridge and two under the Parrotts Ferry Bridge.  (Ex. 21, RT 09/06/06PM at 5-11, 16.)  Dental records identified the bodies as Pekler, Umansky, Kharabadze, and Safiev. (Ex. 21, RT 09/06/06PM at 84-103.)

Data from Kadamovas and Mikhel's cell phones also showed them driving to the New Melones Reservoir on the days each victim was killed, and also near the reservoir at the time of the victims' deaths.  Mikhel, 889 F.3d at 1019, 1046.

### 2.   Mikhel's residence

The FBI searched Mikhel's residence.  As the Ninth Circuit recognized, agents found "extensive physical evidence linking [Mikhel] and Kadamovas to the victims."  Mikhel, 889 F.3d at 1019. This includes, but is not limited to, the following:

- Four sets of handcuffs, plastic ties identical to those found on the victims when their bodies were recovered from the reservoir, duct tape, rope, and Dimedrol.  (Ex. 22, RT 09/07/06 at 29-68, 111-29.)  Agents found Kadamovas's fingerprint on one pair of handcuffs, in addition to the DNA of Kharabadze on one and Safiev's DNA on another.  (Ex.

15

25, RT 11/29/06 at 143-44, 185; Ex. 26, RT 11/30/06 at 100.)  They also found fourteen handguns, a stun gun, a silencer, and numerous stolen and fraudulent passports. Mikhel, 889 F.3d at 1019.

- The original $4 million ransom note for Safiev (id.), which contained Mikhel's fingerprints.  (Ex. 19, RT 11/14/06 at 79-81; Ex. 26, RT 11/30/06 at 97-98, 190-92.)

- A note with Safiev's and Kharabadze's personal and financial information, including bank account numbers, balances, and PIN numbers.  (Ex. 22, RT 09/07/06 84-85, 87; Ex. 11, RT 11/08/06 at 73-74; Ex. 19, RT 11/14/06 at 87-90.)  Kadamovas's fingerprints and palm prints were found on this document. (Ex. 26, RT 11/30/06 at 99.)  The handwriting on this document matched Kadamovas's handwriting.  (Ex. 26, RT 11/30/06 at 162-164, 185-191.)

- Safiev's and Kharabadze's cell phones, and the pre-paid cell phone that Kadamovas bought and Solovyeva used to lure Kharabadze to Designed Water World.  (Ex. 22, RT 09/07/06 at 71-72; Ex. 18, RT 11/15/06 at 166-71; Ex. 12, RT 12/01/06 at 134-44; Ex. 16, RT 12/05/06 at 61, 65.)

3.   Kadamovas's two residences

The FBI searched two of Kadamovas's residences:  his Sherman Oaks house and an apartment in Encino, California.  At the Sherman Oaks house, agents found "several weight plates (but no weight bars or other exercise equipment) and an envelope with a phone number written on it — the same number that [Mikhel and Kadamovas] used to call the Umansky family for ransom."  Mikhel, 889 F.3d at 1019.  At Kadamovas's house in Encino, the FBI found a handgun, ammunition, and

sneakers with blood stains matching the bloody footprint on the Parrotts Ferry Bridge. Id.  They also found recordings of Safiev talking to Kadamovas, and the mini-disk player that Kadamovas used to make the recordings.  (Ex. 27, RT 09/08/06 at 108-13 (mini-disk recorder and mini-disks).)  The carpet in Kadamovas's house matched carpet fibers retrieved from Kharabadze's clothing.  Mikhel, 889 F.3d at 1019.

### 4.  Designed Water World

At Designed Water World, where Solovyeva first lured Kharabadze, who then lured Safiev, agents found a piece of paper with Tezhik's phone number and a script of the telephone call that Mikhel placed to him.  (Ex. 28, RT 09/15/06 at 60-62; Ex. 18, RT 11/15/06 at 96-101.) The writing on this script was consistent with Mikhel's handwriting. (Ex. 26, RT 11/30/06 at 160-61.)

### 5.  Krylov's residence

At Krylov's residence, agents found a receipt for the purchase of the 45-pound weight that was strapped to Kharabadze's body and a map with Kharabadze's home address marked and written on it.  (Ex. 27, RT 09/08/06 at 158-64, 173-74; Ex. 11, RT 11/08/06 at 63-65.) Kadamovas's fingerprint was on the map.  (Ex. 11, RT 11/08/06 at 63-65, 71-73; Ex. 12, RT 12/01/06 at 106-07.)

**C.  Co-defendants' testimony**

Three co-defendants testified against Kadamovas and Mikhel. Altmanis described the defendants' plans to murder all five victims, and described the three murders for which he was present:  Muscatel, Umansky, and Kharabadze.  He also detailed how they collected and spent the ransom money, and the group's plans to take hostage and kill other victims in the future.  (RT Ex. 1, 10/10/06; Ex. 3, RT

10/11/06AM; Ex. 6, RT 10/12/06PM; Ex. 29, RT 10/17/06; Ex. 30, RT 10/18/06; Ex. 31, RT 10/19/06 (portions of Altmanis's testimony)). Markovskis testified about how he helped defendants abduct Kharabaze and Safiev at Designed Water World.  He also testified to Kadamovas's various incriminating statements, including that he and Mikhel intended to kill Kharabadze and Safiev and dump their bodies where they had disposed of other victims; that he had killed a "fat Jew" (Muscatel) and thrown the body off a bridge after strapping weights to it; and that he intended to continue killing people until they amassed a fortune of tens of millions of dollars.  (Ex. 5, RT 11/09/06 at 104-10.)

Solovyeva, Kadamovas's girlfriend, who lived with him during the period of the murders, testified to salient details, including her direct involvement in the abduction of Kharabadze and Safiev and her delivery to Mikhel, Kadamovas, and Altmanis at Mikhel's Encino residence of food, Dimedrol, and the van used to transport Muscatel's body.  (Ex. 8, RT 11/02/06 at 90-98.)  She also testified to details about Kadamovas's actions and admissions, namely, that he disappeared on overnight trips and returned with blood on his clothes (Ex. 8, RT 11/02/06 at 99-115); that he confided to her that he and Mikhel "threw out the body of the American" (Muscatel) (Ex. 8, RT 11/02/06 at 107-08); and that if the policeman who stopped them had figured out Kharabadze and Safiev were hostages, "we would have killed the policeman, and we would have continued our business."  (Ex. 32, RT 11/03/06 at 51-55, 97.)

In its opinion on direct appeal, the Ninth Circuit described the government's case against the defendants as "detailed, comprehensive, and in a word, overwhelming."  Mikhel, 889 F.3d at 1016.

**D.    Conspiracy to Escape**

After their arrests, authorities detained Kadamovas, Mikhel, and Krylov at the Metropolitan Detention Center-Los Angeles ("MDC-LA"), where Mikhel devised and tried to execute an escape plan.  Mikhel, 889 F.3d at 1019.  To escape, the defendants planned to smuggle tools into their cells and dig through their cell walls to reach a stairwell.  After reaching the stairwell, they would use a hydraulic pump to push open the window's bars, climb through the window, and rappel down the side of the building.  Id. at 1020.  A waiting motorcycle gang would help them escape and reunite at a safe house. Id.

To execute the plan, Mikhel paid accomplices on the outside approximately $25,000, with a promise of an additional $1 million upon escape, to provide him within MDC-LA several cell phones, an array of tools and a hydraulic pump.  (Ex. 33, RT 12/08/06 at 71-81.) One of the accomplices brought the cell phones and tools to an area outside the facility, and Mikhel, using a length of string, pulled them into MDC-LA through cell windows that Mikhel managed to open with an Allen wrench.  (Ex. 34, RT 12/06/06 at 94-97; Ex. 33, RT 12/08/06 at 37-46, 50-56, 82-101, 104-110, 151-57.)  Using this method, Mikhel "successfully smuggled a veritable hardware store into his cell, including hacksaw blades, wrenches, screwdrivers, fishing line, paint, work gloves, bolt cutters, and a camcorder" (Mikhel, 889 F.3d at 1020) to film his escape.  (Ex. 35, RT 12/07/06 at 108, 148.) Kadamovas, who was originally housed elsewhere in the facility, managed to get himself moved to a cell next to the stairwell intended for the escape.  Mikhel, 889 F.3d at 1020.

19

In March 2003, Mikhel's digging after lockdown at night alerted Billy Parker, a fellow inmate.  (Ex. 34, RT 12/06/06 at 25-29.) Mikhel told Parker that he and his co-defendants were planning to escape, and asked if Parker wanted to join.  (Ex. 34, RT 12/06/06 at 28-30.)  Mikhel warned Parker that they would have to kill any guards they encountered on the way out.  (Ex. 34, RT 12/06/06 at 30.) Parker informed MDC-LA officials.  (Ex. 34, RT 12/06/06 at 32-35.) In Mikhel's cell, MDC-LA officials found a large hole in the wall next to the stairwell and his cache of tools.  (Ex. 35, RT 12/07/06 at 104-38, 146-87.)  In Krylov's cell, they found a smaller hole, hacksaw blades, and a screwdriver. They did not find any evidence of tunneling or contraband in Kadamovas's cell.  The Ninth Circuit found that a letter from Mikhel to Kadamovas instructing Kadamovas to take specific actions was inadmissible hearsay, but that its admission constituted harmless error because it was cumulative of the other evidence linking Kadamovas to the escape.  Mikhel, 889 F.3d at 1049. This other evidence included testimony from cooperating witnesses Jose Avila, Billy Parker, and Sabrina Tynan[7] about the escape and Kadamovas's role.  Avila testified that he visited Kadamovas's cell in "Nine South," where he spoke with Mikhel through the air vents and Kadamovas told him about their plan to escape by digging through the walls of their cells into the adjacent stairwell.  Id. at 1049. Parker testified that he heard Mikhel using the air vents to communicate in a foreign language with someone on "Nine South."  Id.

---

[7] In the transcripts and the Ninth Circuit's decision in Mikhel, Sabrina Tynan was mistakenly referred to as Sabrina "Tuinan." Because Michael, Sabrina, and Thomas Tynan are all referred to in this opposition and share the same last name, they will each be referred to by their first names.

Sabrina testified that she obtained four cell phones for the conspirators, one of which she believed was for Kadamovas. Id. The evidence also included prison records showing Mikhel sending money to other members of the conspiracy, and inmate housing records showing that Kadamovas had managed to be reassigned to a cell on "Ninth South" adjacent to the stairway the conspirators planned to use for their escape. Id. at 1050.

## IV.   LEGAL STANDARD

### A.   DEFENDANT'S SECTION 2255 CLAIMS SHOULD BE EITHER DISMISSED OR DENIED WITHOUT AN EVIDENTIARY HEARING

#### 1.   Where Defendant Has Not Established Cause and Prejudice for Failing to Raise a Claim and Where a Claim Has Been Previously Raised and Denied, Such Claims Cannot Be Raised in Habeas

In order for relief to be granted under § 2255, a petitioner must establish that "the sentence was imposed in violation of the Constitution or law of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." 28 U.S.C. § 2255. The claims a defendant may raise in a Section 2255 petition must have been previously addressed (such as in the direct appeal) or else risk procedural default. Dretke v. Haley, 541 U.S. 386, 387 (2004) ("a federal court will not entertain a procedurally defaulted constitutional claim in a habeas petition absent a showing of cause and prejudice to excuse the default"); see also United States v. Frady, 456 U.S. 152, 167 (1982) (to obtain relief from a § 2255 petition on issues that were not previously raised, both "cause" excusing procedural default and "prejudice" resulting from such errors must be shown); Bousley v. United States, 523 U.S. 614, 622

21

(1998) (claims procedurally defaulted not raised on direct appeal can only be raised in habeas if cause and prejudice are shown).

Further, claims previously raised and denied cannot be litigated in habeas.  United States v. Jingles, 702 F.3d 494, 499-500 (9th Cir. 2012) (the "law of the case" doctrine ordinarily precludes a court from reexamining an issue previously decided by the same or higher court unless prior decision was clearly erroneous and its enforcement unjust); Odom v. United States, 455 F.2d 159, 160 (9th Cir. 1972) (a matter adversely decided on appeal from a conviction cannot be re-litigated in a 2255 petition).

Additionally, claims must not be "vague and conclusory" (Shah v. United States, 878 F.2d 1156, 1161 (9th Cir. 1989)), and can "warrant summary dismissal" if they are found to be "palpably incredible or so patently frivolous or false."  United States v. Schaflander, 743 F.2d 714, 717 (9th Cir. 1984).

2.    Procedurally Defaulted and Meritless Claims Do Not Receive an Evidentiary Hearing or Discovery

The Ninth Circuit has stated that "[w]hen considering a § 2255 petition, the district court shall hold an evidentiary hearing '[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief.'"  United States v. Hafoka, 312 F. App'x 77 (9th Cir. 2009) (citing 28 U.S.C. § 2255(b)).  Additionally, "[a] district court has the discretion to forego an evidentiary hearing and instead rely on the record."  Id.  On multiple occasions the Ninth Circuit "has specified that '[m]erely conclusory statements in a § 2255 motion are not enough to require a hearing.'"  Id. (quoting United States v. Johnson, 988 F.2d 941, 945 (9th Cir.1993); United States v. Howard,

381 F.3d 873 (9th Cir. 2004) ("... bald, conclusory or inherently incredible assertions ... do not require an evidentiary hearing"); Baumann v. United States, 692 F.2d 565 (9th Cir. 1982) ("mere conclusory statements by the petitioner do not justify a hearing").

When determining whether an evidentiary hearing is necessary, a judge has the authority to grant a party to conduct discovery "for good cause."  Rule 6, Rules Governing Section 2255 Proceedings for the United States District Courts.  This Court made clear that "[a] party requesting discovery must provide reasons for the request." (CV Dkt. No. 23.)  As the Ninth Circuit explained, "[j]ust as bald assertions and conclusory allegations do not afford a sufficient ground for an evidentiary hearing, neither do they provide a basis for imposing upon the state the burden of responding in discovery to every habeas petitioner who wishes to seek such discovery."  Earp v. Davis, 881 F.3d 1135, 1142-43 (9th Cir. 2018) (internal citations omitted).  See also Serna v. Holbrook, 2023 WL 163253 *24 (N.D. Cal. Jan. 11, 2023) (denying defendant's request for an evidentiary hearing and discovery where defendant has not shown that either would entitle defendant to habeas relief).  Thus, a habeas petitioner cannot justify his request for discovery by simply pointing to and demanding an evidentiary hearing with the hope that something might possibly turn up.

　　　　3.　Ineffective Assistance of Counsel Claims Should Be Dismissed Where Unsupported and Conclusory

A defendant's claim of ineffective assistance of counsel can and ought to be dismissed if the claim is "palpably incredible or patently frivolous."  United States v. Rodriguez, 49 F.4th 1205, 1213 (9th Cir. 2022) (quoting Schaflander, 743 F.2d at 717).  A defendant

must demonstrate a rational possibility that defense counsel's performance was deficient and thereby prejudiced the outcome of the proceeding. See id.; see also Strickland v. Washington, 466 U.S. 668, 687-88, 694 (1984). Here, defendant's ineffective assistance claims do not demonstrate any such possibility because counsel's performance fell well within the "wide range of reasonable professional assistance which, under the circumstances, might be considered sound trial strategy." United States v. Span, 75 F.3d 1383, 1387 (9th Cir. 1996) (citation omitted).) See also Hafoka, 312 F. App'x at 78 (defendant's ineffective assistance claim was dismissed without an evidentiary hearing as "bald, conclusory assertions unsupported by credible facts"); Rodriguez, 49 F.4th at 1206 (an attorney's reasonable advice or actions cannot be regarded as deficient). Under such circumstances, no evidentiary hearing is required and the claim should be dismissed.

## V. ARGUMENT

Each of the claims set out in defendant's § 2255 petition are either procedurally defaulted or so "palpably incredible" as to merit no further attention. For the claims subject to procedural default, the defendant fails to demonstrate cause excusing the failure to raise them and prejudice to the outcome (Bousley, 523 U.S. at 622), nor could he, given the Ninth Circuit's view of the evidence against the defendant as "detailed, comprehensive, and in a word, overwhelming." Mikhel, 889 F.3d at 1016.

Defendant raises a litany of complaints regarding the conduct of the trial, including use of an anonymous jury, insufficient guardrails by the district court for an anonymous jury, denial of a fair cross section of the community in constituting the jury pool,

juror misconduct and other issues related to jury selection, judicial bias, government misconduct in the use of confidential informants, discovery violations, and shackling.  Certain of these claims are procedurally defaulted.  Others are procedurally barred.

In an attempt to circumvent procedural default, defendant claims that trial counsel and appellate counsel were ineffective.  The record makes clear that trial counsel were anything but ineffective and, regardless, defendant did not suffer actual prejudice.  The same holds true for appellate counsel.  In sum, defendant does not demonstrate that counsel were responsible for any errors, or that a reasonable probability that any mistakes counsel may have made had any impact on the outcome of the trial.

Finally, defendant's notion that a hearing is required anytime there are allegations of disputed fact relevant to collateral review – of which there are none - is inconsistent with Ninth Circuit law. A § 2255 motion may be resolved without an evidentiary hearing if "the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief."  28 U.S.C. § 2255(b); United States v. Blaylock, 20 F.3d 1458, 1465 (9th Cir. 1994) (no evidentiary hearing necessary if, assuming truth of petitioner's allegations, he could not have prevailed on ineffective assistance claim).  As shown below, this is true of each claim in defendant's motion.

**A.   Defendant's Claim that Use of An Anonymous Jury Was Unconstitutional Is Both Procedurally Defaulted and Facially Meritless (Defendant's Claim 1)**

      1.   Defendant Procedurally Defaulted This Claim By Not Raising It on Direct Appeal

Defendant did not object to empaneling an anonymous jury either at the district court or on appeal.  Nor did he challenge the district court's determination that an anonymous jury was necessary for juror protection.  Mikhel, 889 F.3d at 1031.  A defendant's failure to raise an issue on direct review amounts to a procedural default of that claim.  See, e.g., United States v. Frady, 456 U.S. 154, 162, 164 (1982); United States v. Johnson, 988 F.2d 941, 945 (9th Cir. 1993).  Specifically, under governing Supreme Court law, a defendant's failure to raise an issue on direct appeal alone constitutes a procedural default.  Bousley v. United States, 523 U.S. 614, 622 (1998).

Once a claim is procedurally defaulted, a court may entertain that claim in a § 2255 proceeding only if defendant establishes both cause for failing to raise the issue and resulting prejudice.  Frady, 456 U.S. at 162, 164; United States v. Benboe, 157 F.3d 1181, 1183 (9th Cir. 1998); United States v. Ratigan, 351 F.3d 957, 964 (9th Cir. 2003).  A court need not determine whether a defendant has established cause if defendant has suffered no actual prejudice "of a degree sufficient to justify collateral relief."  Frady, 456 U.S. at 168.

A defendant may establish cause where he demonstrates that his counsel was constitutionally ineffective within the meaning of Strickland v. Washington, 466 U.S. 668 (1984).  However, "[a]ttorney error short of ineffective assistance of counsel does not constitute

cause for a procedural default." See Murray v. Carrier, 477 U.S. 478, 492 (1986). Here, where an anonymous jury is constitutionally permissible, trial counsel could not have been ineffective by failing to challenge its use.

Habeas review "is not to substitute for an appeal." United States v. Braswell, 501 F.3d 1147, 1150 (9th Cir. 2007) (citing Bousley, 523 U.S. at 621). As the Supreme Court explained in Frady, a collateral challenge "may not do service for an appeal" because once a defendant's appeal has been exhausted, there is a presumption that the defendant "stands fairly and finally convicted." Frady, 456 U.S. at 164-65. The elements constituting "cause" have been narrowly construed by the Supreme Court.

    2.    Defendant Cannot Establish "Cause" to Excuse His Failure to Raise This Claim Because Counsel Were Not Ineffective

        *a.*    *The use of an anonymous jury is constitutionally permissible*

The Ninth Circuit has made clear that the use of an anonymous jury in appropriate circumstances is not constitutionally infirm. In United States v. Shyrock, 342 F.3d 948 (9th Cir. 2003), the Ninth Circuit joined other circuits in concluding that a district court's decision "to empanel an anonymous jury is entitled to deference and is subject to abuse of discretion review." Shyrock, 342 F.3d at 970 (citing cases). While recognizing that the use of an anonymous jury may cause jurors to infer a defendant's dangerousness, possibly implicating a defendant's Fifth Amendment right to the presumption of innocence, or may impinge on defense counsel's conduct of voir dire and exercise of peremptory challenges in violation of the Sixth Amendment right to an impartial jury, the Ninth Circuit nonetheless

27

held that use of an anonymous jury is permissible in limited circumstances.  Id. at 971.  A trial court may empanel an anonymous jury if the following two conditions are met:  (1) where there is a strong reason to conclude that it is necessary for the jury to perform its factfinding function; and (2) where the trial court adopts reasonable safeguards to minimize the risk of infringement of the fundamental rights of the defendant.  Id. at 971; United States v. Fernandez, 388 F.3d 1199, 1244 (9th Cir. 2004).  Both conditions were met here where the district court found the use of an anonymous jury appropriate but to the jurors treated anonymity as routine, and the completed 11-page questionnaires provided to the parties in advance of jury selection revealed more information about the jurors' backgrounds and attitudes than disclosure of their names and addresses ever could.

Before trial, the government moved to empanel an anonymous jury. (CR Dkt. No. 1002, Govt. Mot. to Empanel An Anonymous Jury ("Govt. Mot. for Anonymous Jury").)  The government did so based on statutes providing for the confidentiality of potential jurors, 28 U.S.C. § 1863(b)(7) (in the interests of justice) and 18 U.S.C. § 3432 (in capital cases where providing the list may jeopardize the safety of any person), and factors including anticipated extensive media publicity the trial might garner; evidence that defendants were associated with a violent Russian criminal organization, some of whom were still at large; Mikhel and Kadamovas's disregard for the judicial process as reflected in their conspiracy to escape from MDC-LA; and Mikhel and Kadamovas's ability to eliminate and threaten witnesses, including killing their victims regardless of whether a ransom was paid, and threatening Altmanis and Markovskis.  (CR Dkt.

28

No. 1002, at 4-6.)  Defendant did not object.  In finding an anonymous jury "appropriate," the district court granted the government's motion.  (Ex. 36, RT 06/12/06, at 66-67.)

To the jury, the district court limited its explanations as to why the jury was being empaneled anonymously, effectively downplaying its significance.  The district court simply told the jurors that it would be referring to them throughout the trial by number rather than by name.  (Ex. 37, RT 07/11/06 at 67-69 (The court: "I will not be using your name.  You'll be known by a number and not a name throughout this entire trial.  We'll only refer to you by number that you were given when you were in the jury room.").  The juror questionnaire explained that their identities would not be released to the public or media.  (Juror Questionnaire for Juror Number 67, attached as Ex. 38 under seal ("All information contained in this questionnaire will be kept confidential.  It will be reviewed only by the court and by the attorneys on each side.  Neither your identities nor your answers will be released to the general public or the media without authority or expressed order of the Court.").)  The court did not mention to the jury the reasons given by the government in its motion.  By treating juror anonymity in a nonchalant manner, the court gave the jurors no reason to believe that this practice was in any way unusual or a comment on defendant's dangerousness.

This approach is similar to one taken by the district court in United States v. Barragan, 871 F.3d 689, 713 (9th Cir. 2017).  In Barragan, the Ninth Circuit noted with approval the district court's precautions in not telling the jury that their identities were being withheld from the defendants or that juror anonymity was unique to

the case.[8]  Id.; Fernandez, 388 F.3d at 1245 (noting with approval the district court's care in offering neutral justifications for the jury's anonymity, focusing on juror confidentiality and suggesting such procedures are routine).  As here, the juror questionnaire in Barragan explained that the jurors' identities would not be released to the public or media.  Barragan, 871 F.3d at 713 ("The questionnaire stated that jurors' information would be reviewed 'by the court and by the attorneys' but not 'released to the general public or the media,' suggesting that the reason for anonymity was publicity-related.").  There was no constitutional infirmity in the district court's approach.

> b.  *Defense counsel were not ineffective for failing to object to an anonymous jury*

Despite case law approving the use of an anonymous jury, defendant contends that counsel were ineffective for failing to object to its use.  (Mot. at 49-59 (Claim 1)).  Defendant makes additional unfounded constitutional claims based on the Sixth Amendment's right to a public trial.  (Mot. at 52-53.)[9]  Because this

---

[8] In contrast to this case, in Barragan the jurors' names were provided to the attorneys, an approach used by the district court in that case.  Barragan, 871 F.3d at 712.  However, the Ninth Circuit did not find that providing the juror names to defense counsel was required.

[9] Without specificity, defendant also asserts the use of an anonymous jury as a violation of the Eighth Amendment.  (Mot. at 49.)  Assuming this refers to the death sentence the jury imposed and the argument that such a sentence violates the Eighth Amendment's prohibition on cruel and unusual punishment, that issue has been rendered moot by former President Biden's commutation of the death sentences.  To the extent it refers to other claims, it should be deemed non-cognizable in a § 2255 petition as unduly vague.  "Mere conclusory statements in a § 2255 motion are not enough to require a hearing."  United States v. Johnson, 988 F.2d 941, 945 (9th Cir. 1993) (internal citation omitted).  See also Jones v. Gomez, 66 F.3d 199, 204-05 (9th Cir. 1995) (conclusory allegations without specific facts do not justify habeas relief).

claim is substantively meritless, defendant cannot demonstrate that his counsel's performance was constitutionally deficient and that he suffered actual prejudice. Strickland v. Washington, 466 U.S. 668, 687 (1984).

(A)    Counsel's performance was not deficient

Defense counsel's performance is to be measured by "an objective standard of reasonableness." Strickland, 466 U.S. at 688 (petitioner must show counsel's representation was unreasonable "under prevailing professional norms...considering all the circumstances"). A strong presumption exists that counsel's performance was reasonable and made all significant decisions in the exercise of reasonable professional judgment. Id. at 688-89. Courts must avoid second-guessing counsel's performance. Id. A defendant's burden is a heavy one. Murtishaw v. Woodford, 255 F.3d 926, 940 (9th Cir. 2001 ("The defendant bears the heavy burden of proving that counsel's assistance was neither reasonable nor the result of sound trial strategy.") (citing Strickland)).

The Ninth Circuit identified a non-exclusive, non-dispositive list of five factors that courts can consider to support use of an anonymous jury, including (1) defendant's involvement with organized crime; (2) defendant's participation in a group with the capacity to harm jurors; (3) defendant's past attempts to interfere with either the judicial process or with witnesses; (4) the potential for a lengthy custodial sentence; and (5) the possibility of extensive publicity. Fernandez, 388 F.3d at 1244 (citing Shyrock, 342 F.3d at 971). Not all five factors need be present. United States v. Darden, 70 F.3d 1507, 1532 (8th Cir. 1995). Here, there was evidence of all five factors in varying degree. Defendant was looking at a

31

custodial sentence at the low end of life imprisonment without the possibility of release, with the government seeking the higher penalty of death.  As noted in the government's motion, defendant and Mikhel sought to interfere with the judicial process by killing their victims, threatening Altmanis and Markovskis, and by concocting an elaborate escape attempt from MDC that resulted in additional charges for that attempt.  Defendants also had accomplices that had not been apprehended.  Finally, given the number of murders and the gruesome way in which those murders were carried out, coupled with the fact that this was a death penalty case, it was reasonable to conclude that the trial might generate extensive media coverage.  (CR Dkt. No. 1002, Govt. Mot. for Anonymous Jury.)  Under these circumstances, the court was well within its discretion to find an anonymous jury "appropriate."

Defendant takes issue with some of these factors, asserting that he had no connection to "Russian organized crime" or to "a group with the potential to harm jurors," and that his involvement with the escape attempt was "negligible."  (Mot. at 66.)  The government and the district court disagreed.

In its motion, the government linked defendants' activities to "organized crime," including individuals who had not yet been apprehended "who helped communicate the ransom demands made in connection with defendants' hostage-taking activities."  (CR Dkt. No. 1002, Govt. Mot. for Anonymous Jury, at 3-4.)[10]  The government

---

[10]  Defendant asserts that he had no connection to a group "with the potential to harm jurors" or to "so-called 'Russian organized crime," and that the government retreated from any accusation that there was any link to Russian organized crime groups.  (Mot. at 51.) There is no dispute that defendants had accomplices who remained at

*(footnote cont'd on next page)*

proffered evidence from a transcript of a recorded conversation between Kadamovas and victim George Safiev that the hostage-taking and murders were committed "within the structure of a violent Russian criminal organization."  See CR Dkt. No. 1002, Govt. Mot. for Anonymous Jury, Exhibit A ("JK [Kadamovas]: ...worry.  Although, we have already decided here that we are fucking getting rid of our bosses, in any event.  GS [victim Safiev]: What?  JK: That is, we're getting rid of our bosses...Shit, it will be better for us this way. GS:  But this one...will you still give me who is behind the order or not?  JK: We'll try to find out.  I'm not promising, but we'll try.") There is no question that defendants had contacts who assisted with the ransom demands and the laundering of the ransom money.  But even assuming that there was no evidence of this factor, it was not required to be present for an anonymous jury to be empaneled. Darden, 70 F.3d at 1532.  The other non-exhaustive identified factors supported empaneling an anonymous jury.  For example, Mikhel and Kadamovas's attempts to interfere with the judicial process by trying to escape from custody (conduct for which they were charged and convicted) and murdering victims who paid ransom to eliminate them as witnesses, plus threats to cooperating defendants, justify the use of an anonymous jury.  Kadamovas's claim that his involvement in the escape conspiracy was "negligible" is belied both by the evidence and defendant's conviction of the charge.  Further, defendants' conduct in murdering victims to silence them as witnesses and threatening cooperators could give rise to a reasonable inference that defendants

---

large and assisted with the ransom demands, that Mikhel was from Russia and Kadamovas was from Lithuania, and that the group that engaged in this conduct was violent, regardless of the label given to the group.

could be considered to have the potential to harm jurors.  The fact that defendants were facing a life sentence and possibly death is yet another factor supporting an anonymous jury.

Considering that there is Ninth Circuit case law directly on point authorizing use of an anonymous jury under certain circumstances, and those circumstances were met here, counsel's strategic decision not to challenge the use of an anonymous jury cannot be considered deficient, much less constitutionally deficient. Strickland, 466 U.S. at 691 (strategic choices of counsel in particular deserve "a heavy measure of deference").

(B)    Defendant has suffered no prejudice

Even assuming counsel erred by not challenging the use of an anonymous jury, defendant has not suffered any actual prejudice. "[T]he prejudice prong of the test requires demonstrating 'not merely that the errors at . . . trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." Braswell, 501 F.3d at 1150 (citing United States v. Frady, 456 U.S. 152, 170 (1982) (emphasis in original).

Defendant claims prejudice here, contending that not being able to know the jurors' names and addresses deprived him of the ability to conduct meaningful voir dire.  (Mot. at 53-55.)  But the parties received considerable information about the jurors when each juror completed a detailed, 11-page questionnaire asking for the following information:  age; marital status; city of residence; length of time at current residence; whether the juror was a homeowner or renter; the juror's ability to speak and read English; employment history of the juror, any spouse or significant other, children and

34

grandchildren, and others living with the juror; military service; education of juror and spouse or significant other; previous jury experience; associations with law enforcement, attorneys, and judges; criminal history of the juror and of any spouse, family members, or close friends; experience with and attitudes toward law enforcement; prior knowledge of the case; and attitudes about the death penalty. (Ex. 38 under seal, Juror Questionnaire for Juror Number 67.) Defendant was given the opportunity to conduct voir dire based on jurors' answers in their questionnaires.  (Ex. 37, RT 07/11/06 at 4-5.)  Knowing the names and addresses would have added little to this wealth of information because the questionnaire was "far more extensive and detailed than the generalizations [defendant] might have drawn from jurors' mere names and addresses." United States v. Edmond, 52 F.3d 1080, 1092 (D.C. Cir. 1995).  Other courts have held that such comprehensive questionnaires like the one used here effectively safeguard a defendant's ability to conduct an effective voir dire.  E.g., United States v. Brown, 303 F.3d 582, 602-03 (5th Cir. 2002); United States v. Branch, 91 F.3d 699, 724 (5th Cir. 1996); United States v. Childress, 58 F.3d 693, 704 (D.C. Cir. 1995); United States v. Thai, 29 F.3d 785, 801 (2d Cir. 1994); United States v. Scarfo, 850 F.2d 1015, 1022 (3d Cir. 1988).  Under such circumstances, the district court "sufficiently safeguarded" defense counsel's ability to conduct voir dire.  Mikhel, 889 F.3d at 1032. Because "the parties knew everything about the jurors except their names," United States v. Bowman, 302 F.3d 1228, 1236 n.1 (11th Cir. 2002), defendant suffered no prejudice.

Defendant tries to manufacture prejudice by claiming an inability to "confirm and explore" criminal records of jurors 8 and

67[11] based on their anonymity.[12]  (Mot. at 53-54.)  This is incorrect. No party is entitled as a matter of constitutional right to "confirm" a potential juror's criminal record,[13] and is only entitled to "explore" a potential juror's criminal record to the extent that record may demonstrate a juror's bias either for or against a party. The point of voir dire is to ensure the selection of an impartial jury, consistent with the dictates of the Sixth Amendment.  See Mu'Min v. Virginia, 500 U.S. 415, 431 (1991) ("Voir dire examination serves the dual purposes of enabling the court to select an impartial jury and assisting counsel in exercising peremptory challenges."); Fields v. Brown, 503 F.3d 755, 772 (9th Cir. 2007) ("The whole point of the voir dire process is to elicit information from the venire that may shed light on bias, prejudice, interest in the outcome, competence, and the like so that counsel and the parties may exercise their judgment about whom to seat and whom to challenge."); Paine v. City of Lompoc, 160 F.3d 562, 564-65 (9th Cir. 1998) ("A district judge has broad discretion in how to conduct the voir dire," which should be "reasonably sufficient to test the jury for bias or impartiality.").

---

[11] Defendant did not identify juror number 67 in his petition, but government counsel determined it based on defendant's citation to the referenced trial transcript.

[12] Defendant makes no claim of bias for these two jurors. Defendant raises purported bias and prejudice with respect to certain other jurors in both Claims 1 and 2, an argument that is addressed infra.

[13] To the extent defendant, by asserting this claim, is raising the specter of these jurors lying about their criminal records, it is not only highly unlikely given that each admitted to the conduct, but also pure speculation, which is not cognizable in a 2255 petition. "The probability of prejudice [under Strickland] may not be based merely upon conjecture or speculation."  United States v. Caputo, 2023 WL 5207318 *12 (E.D. Cal. Aug. 14, 2023) (citations omitted).

Here, defendant received that opportunity.  Further, the jurors' criminal record was explored by the district court.  (Ex. 39, RT 08/15/06 at 122-23 (juror 8); Ex. 40, RT 8/17/06 at 100-02 (juror 67)).  Those inquiries were apparently sufficient for defense counsel, who instead of probing the jurors' brush with the criminal justice system, probed these jurors' views on the death penalty (Ex. 39, RT 08/15/06 at 124-26 (juror 8)), and their employment and law enforcement employment by family members as well as exposure to press about the case (Ex. 40, RT 08/17/06, at 104-06 (juror 67)).  At the conclusion of voir dire, defense counsel passed for cause for both of these jurors.  (Ex. 39, RT 08/15/06 at 127 (juror 8); Ex. 40, RT 8/17/06 at 106 (juror 67)).[14]  Defendant suffered no prejudice.  Sechrest v. Baker, 816 F. Supp. 23d 1017, 1039 (D. Nevada 2011) ("Sechrest does not make any allegation ... that any individual who was actually seated on the jury was biased.  Therefore, Sechrest cannot show that any conceivable shortcoming of his counsel's performance with respect to juror voir dire caused him prejudice.").

            3.    The Use of An Anonymous Jury Did Not Violate Defendant Kadamovas's Sixth Amendment Right to a Public Trial

                  a.    Defendant's public trial claim is procedurally defaulted

On direct appeal, defendant claimed that the district court violated his right to a public trial by excluding from the courtroom an individual bearing an Armenian gang tattoo on his neck who attended the last day of Mikhel's testimony after being released from prison earlier that same day.  Mikhel, 889 F.3d at 1032.  The

_____

[14] Defense counsel also did not exercise peremptory challenges against these jurors, as reflected in both being seated on the jury. (Ex. 41, RT 09/05/06 at 110-11.)

individual told court staff that he was either a friend or fan of Mikhel's, and in court was observed conducting himself in an intimidating manner. Id. The district court advised the parties that the individual would be barred from the courtroom going forward. Id. at 1033. In determining that the Sixth Amendment's right to a public trial had not been violated, the Ninth Circuit made clear that the crux of the right is whether a judicial proceeding is closed (id.), not whether it involves an anonymous jury.

Defendant here asserts that his public trial right is implicated by the selection of an anonymous jury. (Mot. at 52.) Defendant makes no reference to the exclusion of the Armenian-gang-tattooed individual from the courtroom. By failing to raise this claim on direct appeal, defendant has procedurally defaulted this claim. See, e.g., Frady, 456 U.S. at 162, 164 (1982); Johnson, 988 F.2d at 945. As noted above, under governing Supreme Court law, a defendant's failure to raise an issue on direct appeal alone constitutes a procedural default. Bousley, 523 U.S. at 622. This court may not entertain this claim in habeas because defendant has established neither cause for failing to raise the issue nor resulting actual prejudice. Frady, 456 U.S. at 162, 164; Benboe, 157 F.3d at 1183; Ratigan, 351 F.3d at 964.

Here, there can be no cause for defendant's failure to raise the claim, considering that defendant knew of and raised a different public trial claim on direct appeal. There also can be no actual prejudice based on defense counsel's alleged ineffectiveness, because the present "public trial" claim involves no public trial issue at all. Because this claim is substantively meritless, as described in more detail below, there can be no prejudice flowing from appellate

counsel's failure to raise it.  See Strickland, 466 U.S. at 687 (only if counsel's performance was constitutionally deficient can defendant have suffered actual prejudice).

        *b. Selection of an anonymous jury bears no relationship to the "public trial" guaranteed by the Sixth Amendment*

Defendant wrongly asserts that the public trial doctrine "holds that an anonymous jury infringes on the openness that is essential to the jury selection phase of a trial."  (Mot. at 52.)  Defendant continues, alleging that an anonymous jury and failure to order limited disclosure of the jurors' names to the attorneys violated the Sixth Amendment's "public trial" jurisprudence.  (Mot. at 52.) Neither is correct.  Rather, the issue in the cases defendant cites references closure of the courtroom during judicial proceedings (in two cases those proceedings involved the voir dire process), not the use of numbers as opposed to the jurors' names in referring to them.[15] For example, in Press-Enterprise Company v. Superior Court, 464 U.S. 501 (1984), the district court closed the voir dire proceedings to the public for six weeks (the proceedings were open to the public for three days), and media requests for transcripts were denied.  Press-Enterprise, 464 U.S. at 509.  The Supreme Court found that such prolonged closure was not justified.  Id.  The same holds true in the remaining two cases defendant cites.  In Waller v. Georgia, 467 U.S. 39 (1984), the public trial issue was whether the state courts in the two combined cases were justified in closing the entire motion to

---

[15] Here, the district court closed the courtroom for limited purposes.  For example, the court held a closed hearing regarding the government's taint team request for a mental health examination, information to which government trial counsel was not entitled.  (Ex. 19, RT 11/14/06 at 4-5.)  The district court's actions were both limited and justified.

suppress hearing to the public over defendant's objection based on the state of Georgia's claim that a public hearing concerning the propriety of the wiretaps might require the introduction of evidence involving a reasonable expectation of privacy of persons other than defendants, leading to the possible inadmissibility of those taps under Georgia statute. Waller, 467 U.S. at 41-42. In finding the state courts' rulings overbroad, the Supreme Court ruled that there was no justification to close the entire suppression motion hearing, which lasted seven days, when the portion of the hearing referencing the tapes lasted only 2½ days. Id. at 48-49. The Supreme Court reversed and remanded to the state courts to determine what portions of the hearing – if any – should be closed. Id. at 50. Defendant's citation to Presley v. Georgia, 558 U.S. 209 (2010), suffers from the same analytical flaw. There, in reversing and remanding for further proceedings, the Supreme Court held that in evaluating whether to close voir dire proceedings, trial courts must consider all reasonable alternatives to closure. Presley, 558 U.S. at 216.

By conflating closure of judicial proceedings to the public – something that rarely happened here – with substituting a juror number for a juror's name throughout the proceedings, defendant erroneously concludes that the latter is a violation of defendant's public trial right. No public trial right was either implicated or violated by the process employed here.

**B.    Defendant's Claim that the District Court Failed to Implement Sufficient Safeguards for Use of the Anonymous Jury is Both Procedurally Barred and Facially Meritless (Defendant's Claim 1)**

　　　　**1.    Defendant Cannot Assert the Same Claims in the 2255 Petition As He Did on Appeal**

Instead of challenging the use of an anonymous jury, defendants only claimed on direct appeal that specific precautions were required to minimize the risk of prejudice to defendants' Fifth Amendment right to a presumption of innocence and Sixth Amendment right to an impartial jury. Mikhel, 889 F.3d at 1031. Defendants asserted that a cautionary instruction on the reason for juror anonymity and disclosure of juror names and addresses to defense counsel were necessary to satisfy the presumption of innocence of the Fifth Amendment and the right to an impartial jury guaranteed by the Sixth Amendment. Id. Defendants raised these claims on direct appeal and lost. Mikhel, 889 F.3d at 1032 ("The district court committed no error, and certainly no plain error, in empaneling the anonymous jury as it did."). Consequently, the same claims in these 2255 petitions are procedurally barred. Withrow v. Williams, 507 U.S. 680, 720-21 (1993) (Scalia, J., concurring) (collecting cases); Jingles, 702 F.3d at 499-500 (referring to this doctrine as "law of the case," where a court is ordinarily precluded from reexamining an issue previously decided by the same court, or a higher court, in the same case and a collateral attack is considered the "same case" as proceedings on direct appeal) (citations and quotations omitted); Odom, 455 F.2d at 160 ("The law in this circuit is clear that when a matter has been decided adversely on appeal from a conviction, it cannot be litigated again on a 2255 motion...The decision in United States v. Odom, supra, is the law of the case.").

41

2.    <u>Even Were These Claims Not Procedurally Barred, They Are Facially Meritless</u>

A court may decline to apply the doctrine of "law of the case" where (1) the prior decision was clearly erroneous and its enforcement would be manifestly unjust; (2) an intervening change in the law has occurred that makes reconsideration appropriate; or (3) substantially different evidence was adduced at a later trial. See <u>Jingles</u>, 702 F.3d at 502-03.  A court abuses its discretion if it fails to apply the law of the case in the absence of one of these circumstances.  <u>United States v. Scrivener</u>, 189 F.3d 825, 827 (9th Cir. 1999) (citations omitted) (citing the exceptions as five instead of three).  In cursory fashion and without support, defendant only asserts that the Ninth Circuit ruling was clearly erroneous (Mot. at 57), without addressing whether enforcement of the decision would be manifestly unjust.[16]

Here, defendant has failed to establish as clearly erroneous the Ninth Circuit's decision finding a lack of error in how the district court empaneled the anonymous jury where the district court's treatment of jury anonymity as routine drew less attention to its use and the 11-page questionnaire provided more information about the jurors than their names and addresses ever could.  The Ninth Circuit's discussion of the trial court's approach makes clear that defendant suffered no prejudice and thus, the decision was not manifestly unjust.

Specifically, the Ninth Circuit determined that the district court was not required to give a cautionary instruction regarding the

---

[16] Defendant does not raise either of the remaining two exceptions.  Nor could he.

42

use of an anonymous jury, finding instead that the district court acted reasonably when it treated juror anonymity as routine, suggesting through the questionnaires that the court was concerned about the jurors' "privacy and unwanted media attention." Mikhel, 889 F.3d at 1031.  The Ninth Circuit cited with approval the district court's repeated instruction to the jury that defendants were presumed innocent, mitigating any potential prejudice. Id.  Also, the Ninth Circuit dispatched defendant's assertion that the district court should have disclosed the juror names and addresses to defense counsel under protective order (Mot. at 51-52), concluding that "[n]one of our cases require, or even suggest, that providing potential jurors' names and addresses to defense counsel is necessary in circumstances such as these," especially where jurors' identifying information was not required to be produced pursuant to 18 U.S.C. § 3432, exempting the provision of jury and witness lists to the defense in capital cases where the "life or safety" exception applies.  Id. at 1032 ("Nor does § 3432 require disclosing jurors' identifying information to counsel when the 'life or safety' exception applied, as it undisputedly did here.").

Because the Ninth Circuit's preclusive ruling was based on plain error review, defendants cannot establish prejudice in the collateral attack context, which imposes a heavier burden for collateral attack challenges than does the plain-error standard applicable on direct review.  See Frady, 456 U.S. 152, 166 (1982) ("We reaffirm the well-settled principle that to obtain collateral relief a prisoner must clear a significantly higher hurdle than would exist on direct appeal."); United States v. Smith, 241 F.3d 546, 548 (7th Cir. 2001) (an issue raised on direct appeal is subject to the "plain error"

standard, but when the issue is raised on collateral attack, "the standard is even higher"); Ramirez-Burgos v. United States, 313 F.3d 23, n.12 (1st Cir. 2002) (because the actual prejudice standard "is more demanding than that for plain error and that [defendant] is unable to satisfy the plain error standard, he fails, *a fortiori*, to satisfy the actual prejudice standard to excuse his default") (emphasis in original); United States v. Bailey, 286 F.3d 1219, 1223 (10th Cir. 2002).  As the Supreme Court explained in Frady, "the 'plain error' standard is out of place when a prisoner launches a collateral attack against a criminal conviction after society's legitimate interest in the finality of the judgment has been perfected ... by the affirmance of the conviction on appeal."  Id. at 164.  Nothing about the Ninth Circuit's ruling is either error or manifestly unjust.

**C.   Because There Was No Jury Misconduct or Bias, Defendant Was Not Deprived of His Right to a Fair and Impartial Jury (Defendant's Claims 1 and 2)**

**1.   Defendant Procedurally Defaulted This Claim By Not Raising It on Direct Appeal**

Defendant argues that the jury was infected with bias and prejudice of certain jurors, allegedly depriving defendant of his right to a fair and impartial jury.  (Mot. at 54, 63-70.)  Because defendant did not raise this issue either at the district court or on appeal, it is procedurally defaulted.  See, e.g., Frady, 456 U.S. at 162, 164; Johnson, 988 F.2d at 945.

Further, because defense counsel was not ineffective where no bias has been established, as shown below, defendant has failed to establish both cause for failing to raise the claim and actual

44

prejudice.  Frady, 456 U.S. at 162, 164; Benboe, 157 F.3d at 1183; Ratigan, 351 F.3d at 964.

> 2.    There Was No Misconduct or Bias Associated with the Military Service of Jurors 31, 36, or 227 (Defendant's Claim 1)

Defendant asserts potential bias of jurors 31, 36, and 227[17] stemming from their military experience, claiming bias based on their time in service "during the Cold War era," including one Vietnam veteran.  (Mot. at 54.)  First, there is no link – and defendant posits none – between serving in the military during the "Cold War era"[18] and bias against a defendant from Lithuania, even if that country was part of Russia's sphere of influence during the Cold War. Second, there is no record evidence in the voir dire of these jurors of a discussion of the "Cold War" at all, much less in relation to their military service and the impact of that service on their role as a juror.

Defendant is guaranteed a right to an impartial jury pursuant to the Sixth Amendment.[19]  As the Ninth Circuit made clear in Fields, as

---

[17] Again, defendant did not identify these jurors by number in his petition, but government counsel determined their numbers from the transcript citations and review of the voir dire.

[18] A claim that any individual who served in the military any time after the end of World War II to the collapse of the Soviet Union in the early 1990s (the acknowledged "Cold War era") would in every instance be biased when serving on a jury where the defendant comes from Russia or a former Soviet-bloc country is so broad as to be meritless, because it fails to identify whether a potential juror suffers from particular bias or prejudice.

[19] A death-qualified jury does not violate this right, as defendant suggests.  (Mot. at 61.)  See Lockhart v. McCree, 476 U.S. 162, 173 (1986) (holding that the death-qualification of a jury does not violate the defendant's constitutional right to an impartial jury, no matter the validity of the research provided); Harris v. Pulley, 885 F.2d 1354, 1371 (9th Cir. 1988) (finding that a death qualified jury did not violate defendant's right to an impartial jury).

noted above, voir dire plays a role in guaranteeing that right by ferreting out bias, prejudice, and competence.  See also Morgan v. Illinois, 504 U.S. 719 (1992) ("Part of the guarantee of a defendant's right to an impartial jury is an adequate voir dire to identify unqualified jurors.").  Defendant was afforded ample voir dire:  each juror completed an 11-page questionnaire that sought a broad range of information, including a juror's views on the death penalty (Ex. 38 under seal, Juror Questionnaire for Juror Number 67); defense counsel had time to review the completed questionnaires in advance of questioning each juror; the district court examined each juror separately, asking the Witherspoon questions as well as additional questions requested by the parties; each party was then given an opportunity to ask additional questions; and finally, after certain jurors were challenged and removed for cause, the remaining jurors answered the standard questions asked in every trial concerning residence, employment, contacts with law enforcement, marital status, and prior jury experience.  (Ex. 41, RT 09/05/06 at 17, 18, 21-23, by way of example.)  Further, as part of its standard voir dire, the Court addressed potential jurors seated in the jury box with the following question:

> THE COURT: It may appear that one or more of the parties or their witnesses comes from a particular national, racial, or religious group.  Would this fact alone prejudice any of you or affect your judgment?
>
> (All seated jurors answered negatively)

(Ex. 41, RT 09/05/06 at 22, 35, 36-37, 38-39, 40-41, 42, 43-44, 46, 47-49, 50-51, 52, 53-54, 55, 57-58, 59, 60, 62, 64, 65-66, 69, 74,

46

75, 77, 78-79, 81-82, 86-87, 89, 91, 94, 95, 103-04, 105, 106, 107, 109.)  It is hard to imagine a more robust exercise of voir dire.[20]

In spite of this extensive process, defendant doubles down on his claim, arguing that evidence of ethnic and racial bias against Russians and Soviets was evident in the questionnaires.  (Mot. at 54.)  The only evidence defendant cites in support of this claim is an under seal declaration of Jean E. Giles ("Giles Decl.", Ex. 43 under seal),[21] defendant's co-counsel from the Indiana Community Defender's Office, filed in support of defendant's Motion for Limited Disclosure of Juror Names, filed July 16, 2020 (CR Dkt. No. 2360) without any discussion of the contents of that declaration.[22]  (Mot. at 54.)  Giles' declaration simply refers to question 40 of the questionnaire and answers given in response.  Question 40 asked:  "Do you believe that certain nationalities or races or ethnic groups tend

---

[20] Defendant contends that the court's alleged interruption of voir dire prevented a "full and fair" examination of the potential jurors.  (Mot. at 62.)  This is incorrect.  The transcript citations to which defendant refers show limited interruption where the court simply sought answers to its own questions and clarified counsel's questions (Ex. 39, RT 08/15/06 at 33, 85-86, 88), while other citations refer to the colloquy with the court over whether various prospective jurors should be excused for cause.  (See Mot. at 62.) (citing RT 08/22/06 (Exhibit 42) at 193-97), and n.5.)  Given the ample discretion courts have over voir dire and whether to allow attorneys to examine prospective jurors, as well as the court's obligation to ensure a fair and impartial jury, the court's questioning was proper.  (See Mu'Min v. Virginia, 500 U.S. 415, 423 (1991) (citation omitted); Fed. R. Crim. P. 24(a)(1).)

[21] Defendant did not provide the under seal declaration as an exhibit to his 2255 petition.  The government has attached it to its opposition, also under seal, Ex. 43.

[22] It is problematic that defendant cites as evidence documents associated with other pleadings.  One district court has identified the hazards of such a piecemeal and incomplete approach to a habeas petition.  See United States v. Shepard, 2018 WL 2387946 *2 (D. Ariz. May 25, 2018) ("The Court does not find it appropriate to place itself or government counsel in the position of attempting to decipher which facts, claims, and arguments from each documents support the facts, claims, and arguments in other documents.").

to be more violent than others?" (Ex. 43 under seal, Giles Decl., CR Dkt. No. 2360.) Defendant apparently asserts that the answers from 19 prospective jurors to Question Number 40 support his claim of ethnic bias against Russians and Soviets when only one of those jurors (number 39) was actually seated on the jury. (Ex. 43 under seal, Giles Decl. at 6-8, CR Dkt. No. 2360) (setting forth the responses of the following potential jurors: 1, 15, 22, 27, 39, 42, 47, 61, 75, 82, 87, 119, 133, 160, 175, 183, 187, 220, and 260.) Because only juror number 39 was actually seated as a trial juror (Ex. 41, RT 09/05/06 at 110-11), any suggested or actual bias by any of the other 18 rejected jurors mentioned in Giles' declaration is irrelevant to a finding of prejudice. See Ybarra v. McDaniel, 656 F.3d 984, 1001 (9th Cir. 2011) ("Ybarra has not made the required showing of prejudice under Strickland, because he has not shown that any juror who harbored an actual bias was seated on the jury as a result of counsel's failure to voir dire on the insanity defense"); Davis v. Woodford, 384 F.3d 628, 643 (9th Cir. 2004) ("Establishing Strickland prejudice in the context of jury selection requires a showing that, as a result of trial counsel's failure to exercise peremptory challenges, the jury panel contained at least one juror who was biased.").

Further, juror number 39's answer to question number 40 reveals no suggested or actual bias against Russians or Soviets:

> Yes. I believe strongly in the individual but our history is such that groups have been oppressed which leads to pent-up anger by members of these groups although genetically we might be similar.

(Ex. 43, under seal, Giles Decl., at 6-7, CR Dkt. No. 2360.) Had defense counsel believed this answer to be cause for

48

concern, he would have questioned juror number 39 about it during voir dire, but did not.  Rather, voir dire of juror 39 focused instead, by both the government and defense, on his 19-year-old son's plea to second degree murder and seven-year sentence and the juror's views on the death penalty.  (Ex. 44, RT 08/16/06 at 95-100.)  Any purported bias by juror 39 could not have infected any other members of the jury panel because the district court admonished all jurors, including juror 39, not to discuss with anyone the questions or answers from the questionnaire after individual voir dire was complete.  (Ex. 44, RT 08/16/06 at 100.)  Defense counsel passed for cause on juror number 39.  (Ex. 44, RT 08/16/06 at 100-01.)

Finally, after the penalty phase evidence had concluded, the district court admonished the jury, in their deliberations over whether the death penalty was justified, "not [to] consider the race, color, religious beliefs, national origin, except as it may bear on mitigation, or sex of either the defendants or the victims."  (Ex. 45, RT 02/13/07 at 50.)  To emphasize this consideration, the special verdict form contained a certification statement that each juror was required to sign after reaching their decision:

> By signing below, each Juror certifies that consideration of the race, color, religious beliefs, national origin, or sex of the defendants or any victims was not involved in reaching his or her individual decision, and that the individual Juror would have made the same recommendation regarding a sentence for the crimes in question regardless of the race, color, religious beliefs, national origin, or sex of the defendants or the victims.

(Ex. 45, RT 02/13/07 at 64-65 (Mikhel), at 75 (Kadamovas).)  At various points in going over the Special Verdict Form with the jurors, the district court advised the jurors to individually sign

49

the certification statement.  (Ex. 45, RT 02/13/07 at 50 (The court: "To emphasize the importance of this consideration, the Special Verdict Form contains a certification statement.  Each Juror should carefully read the statement and sign it in the appropriate place if the statement accurately reflects the manner in which you reached your decision."), 52, 55, 57, 66, 67, 69.)  Each juror signed this certification statement for both defendants upon returning their verdicts of death, as they were also polled on those verdicts.  (Ex. 45, RT 02/13/07 at 92-93, 94-95 (Mikhel), at 104-05, 105-07 (Kadamovas)).

Thus, the jurors were instructed not to return any sentence based on the national origin of the defendants, and they were required – and did – attest to that fact.  There was no potential or actual bias.  Defendant's bias claim is nothing more than a fishing expedition, which is not cognizable in habeas.  See Rich v. Calderon, 187 F.3d 1064, 1069 (9th Cir. 1999) ("Habeas is an important safeguard whose goal is to correct real and obvious wrongs.  It was never meant to be a fishing expedition for habeas petitioners to 'explore their case in search of its existence.'") (citations omitted).

        3.    Defendant's Claims of Bias and Prejudice Based on Individual Jurors' Employment, Brief Encounter with Defense Counsel, and Scheduling Request for Family Medical Issues Are Meritless (Defendant's Claim 2)

Defendant asserts in cursory fashion that purported "threats" from Juror 57's employer concerning whether Juror 57[23] would continue to be paid for jury duty, Juror 67's brief encounter with Mikhel's

---

[23] Juror 57 was juror number 9 in the jury box.  (Ex. 46, RT 11/15/06 at 7.)

50

defense counsel at a hotel lobby restaurant, and Juror 31's request for the court to be dark on Mondays to accommodate family medical issues demonstrates both bias and prejudice.  (Mot. at 63-70.)  These instances demonstrate neither.

          *a.    Juror 57's resolved issues with payment for jury service did not prejudice defendant*

After paying Juror 57 for four weeks of jury duty, in November 2006, Juror 57's employer called the Court to advise that the employer was not going to continue to pay Juror 57 for jury service. (Ex. 19, RT 11/14/06 at 4; Ex. 18, RT 11/15/06 at 11.)  The Court indicated that it was in discussions with the employer to avoid having to excuse the juror for hardship.  (Ex. 19, RT 11/14/06 at 4.) The next day, the Court advised the parties that the Court had received a note from Juror 57 asking the Court to call his supervisor, and the Court advised the parties that the Court would "get to the bottom of this."  (Ex. 18, RT 11/15/06 at 6-7.)  The next day, in the presence of the parties, the Court advised Juror 57 (after bringing Juror 57 into the courtroom), that the Court had been in discussions with Juror 57's employer and the employer had agreed to allow Juror 57 to remain on the jury and the juror would be allowed to work whenever trial was not in session and on the weekends, perhaps at double time pay.  (Ex. 46, RT 11/16/06 at 74-75.)  The district court resolved the issue and Juror 57 did not raise it again.  Defendant's unsupported claims of employer "threats" are speculative, and therefore not cognizable in habeas.  See Johnson, 988 F.2d at 945.

51

>    b.    *Juror 67's brief encounter with defense counsel where Juror 67 did not overhear counsel's conversation does not reflect either bias or prejudice*

Also speculative is defendant's claim that Juror 67's[24] encounter with Mikhel's counsel and expert witness at a hotel bar resulted in Juror 67's bias.  (Mot. at 68-69.)  Defendant admits as much when he states that the encounter "<u>could</u> have influenced the juror in a number of ways."  (Emphasis added.)  This is not enough for defendant to have a hearing, much less prevail in habeas.

The record supports the conclusion that defendant's assertion is entirely speculative.  Specifically, the next morning after the encounter, Mikhel's counsel advised the district court that members of the defense team went after court to meet the defense expert at the hotel where the expert was staying.  (Ex 47, RT 02/01/07 at 8.)  They sat at a table in the bar and spoke of the day's court testimony.  (Ex. 47, RT 02/01/07 at 8.)  They heard a whistle, and 10 to 15 feet away was Juror 67, who asked if he could have five minutes, finished what he was doing, then left.  (Ex. 47, RT 02/01/07 at 8.)  Defense counsel did not know whether Juror 67 overheard their conversation, which was confirmed when the district court then made inquiry of Juror 67 in the presence of the parties:

THE COURT:            Yesterday afternoon were you at the New Otani Hotel?

JUROR NUMBER 11:     Yes, I was.

THE COURT:            Did you see Mr. Rubin, Mr. Callahan, and another person?

JUROR NUMBER 11:     I saw Mr. Rubin.

---

[24] Juror 67 was seated in seat 11 in the jury box, (Ex. 45, RT 02/13/07 at 93), so is referred to in the relevant portions of the transcript as Juror Number 11.

52

THE COURT:            Did you hear any conversation that Mr. Rubin may have engaged in?

JUROR NUMBER 11:     No.  I only heard his voice.

THE COURT:            Were you able to decipher or interpret anything that was said?

JUROR NUMBER 11:     No.  I was sitting too close to the television to hear a conversation.  It's just that I recognized his voice.

THE COURT:            All right.  Mr. Rubin, do you have any questions?

MR. RUBIN:            No, sir.

THE COURT:            Mr. Callahan? [Mikhel's co-counsel]

MR. CALLAHAN:         No.

THE COURT:            Mr. Lasting?  [Kadamovas's co-counsel]

MR. LASTING:          No, I don't have any questions.

THE COURT:            Ms. Chahin? [Kadamovas's co-counsel]

MS. CHAHIN:           No, thank you.

MR. RUBIN:            Okay.  All right.  Just if I may, your Honor.  Other than my voice, did you hear anybody else's voice?

JUROR NUMBER 11:     No, not really.  I just – it's just something that kind of – from listening to your voice for so long, I could hear – I recognized your voice.  And I thought, "Well, I need to stand up and say I'm here—

MR. RUBIN:            Sure.

JUROR NUMBER 11:     -- and leave.

MR. RUBIN:            And as soon as you heard that, that's when you whistled and called our attention –

JUROR NUMBER 11:     That's when I went over and gave you the timeout signal.

MR. RUBIN:            Right.  All right.  Thank you.

THE COURT:            I appreciate it.  You did the correct thing. Anything the government wishes to ask?

53

MR. DUGDALE:          Not at all.  Thank you, your Honor. (Ex. 47, RT 02/01/07 at 11-12.)  Despite questions regarding what Juror 67 may or may not have overheard, what may have prevented Juror 67 from overhearing any conversation, and the opportunity the court gave for the parties themselves to inquire, defendant summarily asserts that this inquiry was both "inadequate and cursory."  (Mot. at 69.)  There is no evidence to support defendant's claim.

> c.    *Juror Number 31's simple request for Mondays Off to handle family issues fails to raise the specter of either bias or prejudice*

Shortly before conclusion of the guilt-phase portion of the case, the district court reported to the parties that Juror Number 31[25] sent a note to the court requesting every Monday off even during jury deliberations "[d]ue to continuing family medical issues."  (Ex. 24, RT 01/10/07 at 168.)  The note said nothing more.  (Ex. 24, RT 01/10/07 at 168.)  The district court found the request not to be a problem "because I [the court] wasn't planning on having them come in on Mondays anyway because I [the court] have other matters to take care of."  (Ex. 24, RT 01/10/07 at 168.)  The district court then informed the jury that they would report for deliberations on Tuesday, and that the upcoming Monday was a holiday.  (Ex. 24, RT 01/10/07 at 168.)  There is no specter of bias or prejudice in the juror's request, only defendant's repeated speculation.

---

[25] Juror 31 is identified in the transcript as Juror Number 5 because that is the seat in the jury box that she occupied. (Ex. 45, RT 02/13/07 at 93.)

**D.    The Jury Selection Process Did Not Violate Defendant's Right to a Fair and Impartial Jury By Denying Defendant's Right to a Jury Reflecting a Fair Cross Section of the Community (Defendant's Claim 3)**

      1.    <u>Defendant Procedurally Defaulted This Claim By Not Raising It on Direct Appeal</u>

Defendant argues that, based on census data (not provided) and the jury composition evaluated by his expert, John Weeks, Hispanics were allegedly unreasonably underrepresented in the jury pool, and this underrepresentation was systematic, violating the fair cross section of the constitutional right to a fair and impartial jury. (Mot. at 71-77.)  Because defendant did not raise this issue either at the district court or on appeal, it is procedurally defaulted. See, e.g., Frady, 456 U.S. at 162, 164; Johnson, 988 F.2d at 945.

As noted above, a court may entertain a procedurally defaulted claim in habeas only if defendant establishes both cause for failing to raise the claim and prejudice.  Frady, 456 U.S. at 162, 164; Benboe, 157 F.3d at 1183; Ratigan, 351 F.3d at 964.  If defendant has not suffered actual prejudice, a court need not address whether defendant has established cause.  Frady, 456 U.S. at 168.  Cause may be satisfied if defendant establishes that his counsel was constitutionally ineffective pursuant to Strickland.  See Murray, 477 U.S. at 479.  Not all attorney error constitutes ineffective assistance of counsel.  Id.  Here, where defendant cannot make out a prima facie case of a violation of a fair cross section Sixth Amendment violation, no attorney error occurred, much less error of constitutional dimension.

There is a question as to waiver based on the untimeliness of defendant's claim as well.  Under the Jury Selection and Service Act, defendant must move to dismiss the indictment or stay the proceedings

55

against him for failure to comply with the Act "within seven days after the defendant discovered or could have discovered, by the exercise of diligence, the grounds therefor, whichever is earlier[.]" 28 U.S.C. § 1867(a); see also United States v. Montejano, 2025 WL 1563959, *1 (9th Cir. June 3, 2025) (finding that a challenge under § 1867 could not provide relief because it was not brought before the start of voir dire).  The Federal Rule of Criminal Procedure 12(b) also does not allow for untimely objections against jury composition. Shotwell Mfg. Co. v. United States, 371 U.S. 341, 362-63 (1963) (relying on Rule 12(b) to find that petitioners lost the ability to object to the composition of a petit jury "by years of inaction"); Paige v. United States, 493 F.2d 22, 23 (9th Cir. 1974) (Rule 12(b)(2) provides an unsurmountable barrier to a claim that a petit jury was selected in an unconstitutional manner if first raised after verdict).  Under either scenario, defendant's claim is 17 years too late and the claim is waived.

> ### 2. Defense Counsel Were Not Ineffective Where Defendant Cannot Make Out a *Prima Facie* Case of a Fair Cross Section Sixth Amendment Violation

In challenging the composition of the jury pool, which defendant did not do at trial or on direct appeal, but for the first time in habeas,[26] defendant does not meet all the elements set forth by the Supreme Court in Duren v. Missouri, 439 U.S. 357 (1979) for a prima

---

[26] By attempting to litigate for the first time in habeas a complicated, statistically-driven claim, defendant violates the principle that habeas may not serve as an appeal.  See Frady, 456 U.S. at 164-65; Braswell, 501 F.3d at 1150.  It also preempts a fulsome record of the issue had a motion been timely filed in the district court, to which not only the government but also the clerk's office would have replied.  See United States v. Rodriguez, 924 F.Supp.2d 1108, 1115 (C.D. Ca. 2013).

facie case.  Consequently, defense counsel could not have been constitutionally ineffective.

In Duren, the Supreme Court set forth the following three elements that a defendant must satisfy to establish a prima facie violation of the fair-cross-section requirement:

(1)    that the group alleged to be excluded is a "distinctive" group in the community;

(2)    that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and

(3)    that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

Duren, 439 U.S. at 364.  Even if these elements are met, the analysis is not complete.  If a defendant satisfies this prima facie test, the burden then shifts to the government to justify the infringement by a "significant state interest."  Id. at 368.  The district court must then weigh the proffered state interest against the infringement and determine whether the government has carried its burden.  See United States v. Rodriguez-Lara, 421 F.3d 932, 941 (9th Cir. 2005) ("If [defendant] establishes the prima facie case, the burden will shift to the government in accordance with Duren.  If, at that point, the government cannot carry its burden, then the district court must grant [defendant's] motion to dismiss the indictment and set aside the conviction."), overruled on other grounds by United States v. Hernandez-Estrada, 749 F.3d 1154 (9th Cir. 2014).

Here, as shown below, defendant meets the first element, provides no data and makes the wrong statistical comparisons to support the second, and admits that he has not met the third.

*a.    Hispanics are a distinct group in the community*

Defendant has met the first element because Hispanics are a distinctive group in the community.  Rodriguez-Lara, 421 F.3d at 941 ("Hispanics have long been recognized as a 'distinctive' group in the community.").

*b.    Defendant has provided no data to support his claim that he has met the second element of the Duren test*

With regard to the second element, defendant gives no support for his percentages concerning the population of Hispanics (and other ethnicities) in the community.  United States v. Esquivel, 88 F.3d 722, 726 (9th Cir. 1996) ("The second prong of the Duren test requires proof, typically statistical data, that the jury pool does not adequately represent the distinctive group in relation to the number of such persons in the community.").  Defendant relies solely on his expert John Weeks' statement that Weeks used data "interpolated between the 2000 and 2010 decennial censuses of population."  (Mot. at 72, Ex. 1-128 (Ex. 130),[27] Declaration of John R. Weeks ("Weeks Decl."), ¶ 12.)  Weeks provides no census documents to support the percentages, but instead simply populates his chart with his calculation of the percentage of adults from different ethnic groups contained in the general population (Mot., Ex. 1-128 (Ex. 130), Weeks Decl., at ¶¶ 12-13), before then discussing the various methodologies used to evaluate the significance of this

---

[27] In his motion, defendant refers to Weeks' declaration as Exhibit 130.  Weeks' declaration is file-stamped on the docket as Exhibit 128 (Document number 1-128), so the government has used the file-stamped Exhibit reference in its opposition, followed by defendant's exhibit number reference from his motion in parentheses in those cases where the numbers differ.  Government counsel has followed the same practice for all defendant's exhibits.

representation.[28]  (Mot., Ex. 1-128 (Ex. 130), Weeks Decl., at ¶¶ 14-23.)  Ninth Circuit law makes clear that this is not sufficient to satisfy the second element.

For example, in Weeks' chart, he references the percent of "18+ population in the Western District of the Central Division of California[29] of this Group [ethnicity] in 2006," citing – but without supporting -- his interpolation between 2000 and 2010 decennial censuses.  (Mot., Ex. 1-128 (Ex. 130), Weeks Decl., Table 1.)  In other words, Weeks references the adults in the populations referenced in his chart, without further refinement.  The Ninth Circuit has made clear that the relevant population comparison should be to "jury-eligible Hispanics," not just all Hispanic adults.  "Our precedents agree that to prove Hispanics are underrepresented in a given district's jury pools, the ultimate basis for comparison is the district's actual percentage of jury eligible Hispanics."  United States v. Torres-Hernandez, 447 F.3d 699, 703 (9th Cir. 2006) (emphasis added).[30]  See also Esquivel, 88 F.3d at 727 (in the

---

[28] That data is important, because application of different methodologies can result in different outcomes.  For example, in Hernandez-Estrada, 749 F.3d 1154 (2014), application of one methodology (the Fisher Exact test) showed Hispanics to be underrepresented in the Southern District jury pool, while application of the absolute disparity test revealed Hispanics to be overrepresented.  Hernandez-Estrada, 749 F.3d at 1159.

[29] It should be the "Western Division" of the "Central District" of California.

[30] In Torres-Hernandez, Weeks, as the defense expert in that case as well, prepared evidence of population percentages for three different categories for comparison:  the overall population of Hispanics in San Diego and Imperial counties at 28.9 percent, the "age eligible" for jury service of Hispanics at 24.8 percent, and "jury eligible" Hispanic individuals at 16.1 percent.  Torres-Hernandez, 447 F.3d at 703.  Query why defendant failed to provide such a breakdown from Weeks in this case.  Regardless, as noted above, "age eligible," which is the category that Weeks set forth in
*(footnote cont'd on next page)*

Southern District of California, the "census data offered by the Government shows that the absolute disparity between Hispanics in the population and the jury wheel is only 4.9 percent <u>when readily available data relating to jury eligibility</u> is taken into account.") (emphasis added)[31]; <u>but</u> <u>see</u> <u>Rodriguez-Lara</u>, 421 F.3d at 943 ("defendant's prima facie case for a fair-cross section claim may rely on a comparison to total population data or, where available in the record, age-eligible population data") (<u>overruled on other grounds by</u> <u>United States v. Hernandez-Estrada</u>, 749 F.3d 1154 (9th Cir. 2014);[32] <u>Torres-Hernandez</u>, 447 F.3d at 704 ("When presented with various types of data to determine whether Hispanics are underrepresented on grand jury venires, a court must rely on the statistical data that best approximates the percentage of jury-eligible Hispanics in the district.").

The biggest difference between a group comprised of all Hispanic adults and a group comprised of jury-eligible Hispanic adults is whether those adults are United States citizens:

> (b)...the chief judge of the district court, or such other district court judge as the plan may provide, or the clerk if the court's jury selection plan so provides, shall deem any person qualified to serve on grand and petit juries in the district court unless he –

---

Table 1 of his declaration, is a larger percentage than the "jury eligible" category, thus artificially inflating the disparity number.

[31] In <u>Esquivel</u>, the Ninth Circuit rejected defendant's expert's calculations (John Weeks, also Kadamovas's expert) using census data establishing the general population of Hispanics in San Diego and Imperial counties in favor of the government's more refined data taking jury eligibility into account.  <u>Esquivel</u>, 88 F.3d at 726-27.

[32] The Ninth Circuit found in <u>Torres-Hernandez</u> that it need not resolve this intra-circuit conflict because the jury-eligible statistical data satisfied the higher evidentiary burden set forth in <u>United States v. Artero</u>, 121 F.3d 1256 (9th Cir. 1997), and the lesser burden of <u>Rodriguez-Lara</u>.  <u>See</u> <u>Torres-Hernandez</u>, 447 F.3d at 704.

> > (1) is not a citizen of the United States eighteen years old who has resided for a period of one year within the judicial district;
> >
> > (2) is unable to read, write, and understand the English language with a degree of proficiency sufficient to fill out satisfactorily the juror qualification form;
> >
> > (3) is unable to speak the English language;
> >
> > (4) is incapable, by reason of mental or physical infirmity, to render satisfactory jury service; or
> >
> > (5) has a charge pending against him for the commission of, or has been convicted in a State or Federal court of record of, a crime punishable by imprisonment for more than one year and his civil rights have not been restored.

Jury Selection and Service Act ("JSSA"), 28 U.S.C. § 1865(a), (b). It is axiomatic that a group of jury-eligible Hispanic adults would be smaller than a group of all Hispanic adults (see Torres-Hernandez, 447 F.3d at 703), which would necessarily result in a lower disparity number than that posited by Weeks in Table 1. Thus, defendant has not satisfied, much less satisfied with any reliability, the second element of the Duren test.

Citing to Rodriguez-Lara in a footnote, defendant claims that this second prong of the Duren test only requires a comparison of adult Hispanics in the jury pool to those in the community, not a comparison to the jury-eligible population. (Mot. at 73, n.7.) Defendant ignores the Ninth Circuit's comparison to jury-eligible Hispanics as cited in Torres-Hernandez, issued a year after Rodriguez-Lara. As noted above, the Ninth Circuit in Torres-Hernandez stated that it need not resolve this intra-circuit conflict because the jury-eligible statistical data satisfied both the higher and lower burden. Torres-Hernandez, 447 F.3d at 704. In light of

this intra-circuit conflict, defendant is not allowed to cherry pick evidence by failing to provide readily available evidence to the Court, in this case, by the same expert, (see supra n.23 above), and ignore controlling authority against him, to support his claim.  See Torres-Hernandez, 447 F.3d at 705, n.8 ("We are mindful that future defendants may decide to withhold unfavorable jury-eligible data so as to not trump their own general population or age-eligible data. As mentioned above, it is not clear at this time whether less refined data can satisfy a prima facie case when more refined data is available, but not proffered...Thus, it would be objectionable for a defendant to submit age-eligible data if the data source also included other jury-eligible factors such as citizenship or English proficiency."); Esquivel, 88 F.3d at 727, n.2 ("In presenting census data, the defendant should not selectively include data which supports [the defendant's] position, while ignoring census data which...also bears on the issue of disparity.").

> c.    Defendant has failed to establish any systematic exclusion of Hispanics in the jury selection process

With respect to the third element and defendant's obligation to establish that the underrepresentation stems from systematic exclusion of the particular group in the jury-selection process, Weeks himself states in his declaration that without more information, he is unable to determine the reason for any underrepresentation.  (Mot., Ex. 1-128 (Ex. 130), Weeks Decl., ¶ 24 ("Given the very limited data provided to me, it is not easy to hypothesize why these disparities exist"), ¶ 25 ("Until I am provided with the additional data requested by [sic] habeas counsel I will be unable to answer the question of why the disparities exist.").

Ignoring Weeks' statements in this regard, defendant instead only references Weeks' statement that the disparity (as calculated by the decennial censuses figures Weeks and defendant failed to provide) between the number of Hispanics in the jury venire compared to adult Hispanics in the community is not random and "almost certainly" could not have occurred by chance.  (Mot. at 74 (citing Ex. 1-128 (Ex. 130), Weeks Decl., ¶¶ 20, 22.)  But Weeks' belief that the disparity is "highly statistically significant" (Mot., Ex. 1-128 (Ex. 130), Weeks Decl., ¶ 21) does not satisfy the systematic exclusion requirement of the third element, as Weeks himself admits.  (Mot., Ex. 1-128 (Ex. 130), Weeks Decl., ¶¶ 24, 25) ("Until I am provided with the additional data requested by habeas counsel I will be unable to answer the question of why the disparities exist.").  In his petition, defendant skirts the issue by asserting that because the Central District of California drew its jury wheel at the time of this trial exclusively from voter registration lists, that this method "was certain to underrepresent Hispanics."  (Mot. at 73.) This assertion does not satisfy the third element of Duren.

According to the JSSA, a district court's written plan for random selection of grand and petit jurors shall specify whether the names of prospective jurors shall be selected from voter registration lists or lists of actual voters of the political subdivision within the district or division.  JSSA, 28 U.S.C. § 1863(b)(2).  "The plan shall prescribe some other source or sources of names in addition to voter lists where necessary to foster the policy and protect the rights secured by section 1861 and 1862 of this title."  Id.  The JSSA and its legislative history "clearly contemplate that the use of sources other than voter lists will be the exception rather than the

rule." United States v. Ross, 468 F.2d 1213, 1216 (9th Cir. 1972). Here, the Jury Plan in place at the time of defendant's trial was governed by General Order No. 03-12. (Mot. at 88, Ex. 1-107 (Ex. 109), C.D. Ca. Gen. Order No. 03-12 ("Order 03-12").) Consistent with the mandate of the JSSA, Order 03-12 specified that prospective jurors would be randomly selected from voter lists. (Mot., Ex. 1-107 (Ex. 109), Order 03-12, point 4) ("A random selection of a fair cross section of the citizens residing in the counties of the Divisions of the District can be made from the lists of registered voters in the various counties of the Divisions which comprise the District."). Also consistent with the JSSA, Order 03-12 further found it unnecessary to resort to sources other than the voter registration lists to foster the policy and protect the rights established by sections 1861 and 1862 of the JSSA. (Id.); 28 U.S.C. § 1863(b)(2).

In Ross, defendant asserted that the jury plan in the Northern District of California excluded persons 21 to 24 years old, and like the defendant here, asserted that the use of voter registration lists as the exclusive source of potential jurors to be in violation of the JSSA. Ross, 468 F.2d at 1216. The Ninth Circuit disagreed, finding no such violation where the right of young persons to register to vote had not been inhibited in any way. Id. at 1216-17 ("A bald comparison of percentages will therefore not support an inference of systematic exclusion."); Hernandez-Estrada, 749 F.3d at 1158, 1166 (despite flaws in jury selection procedures that did not rise to constitutional dimension, defendant did not provide sufficient evidence linking sole reliance on voter registration lists for jury selection to systematic exclusion of distinctive groups in the Southern District) (citation and quotation omitted). See also Duren,

64

439 U.S. at 366-67 (finding systematic exclusion where a large discrepancy occurred in every weekly venire for nearly a year coupled with Missouri's automatic exemption for women); Hernandez-Estrada, 749 F.3d at 1165 (recognizing that in Duren, the underrepresentation was systematic because women – but not men – could opt out of jury service by so indicating on the questionnaire, and if a prospective female juror failed to return the questionnaire, assuming it was because the woman had opted out).  As these cases make clear, absent something more than a jury venire being selected from voter registration or voter lists, there is no Sixth Amendment violation.

Defendant cites to the May 2004 Ninth Circuit Jury Trial Improvement Committee Report ("Committee Report") to support his claim that the voter lists cause underrepresentation of Hispanics.  In the Report, the Committee recommended supplementing voter registration lists to increase inclusiveness, stating that "in California and Arizona, voter registration lists under-represent Hispanic citizen populations and over-represent Caucasian populations."  (Mot. at 74, Ex. 1-108 (Ex. 110), Committee Report, at 4).  This is not evidence of a direct link between a particular jury selection process and underrepresentation in a particular district, a problem identified by the Ninth Circuit in Rodriguez-Lara.  In that case, the Ninth Circuit found inadequate to prove systematic exclusion an old declaration from another case by a sociology professor who opined generally that using voter registration lists as the source of jurors underrepresents racial and ethnic minorities. Rodriguez-Lara, 421 F.3d at 945.  The Ninth Circuit found that defendant had not established his prima facie case because there was no evidentiary link between reliance on voter registration lists and

65

"current systematic exclusion of Hispanics in the Fresno Division." Id.  The same is true here.  See also Randolph v. People of the State of California, 380 F.3d 1133, 1141 (9th Cir. 2004) (unsupported hypotheses for the underrepresentation are insufficient to satisfy Duren's third prong).  Simply because the Central District adopted the Report's recommendation years later in its 2013 General Order to expand the draw for prospective jurors to include licensed drivers and holders of California identification cards in addition to registered voters (Mot. at 74, Ex. 1-109 (Ex. 111), General Order No. 13-13, point 4), does not change the absence of evidence to support the necessary link required for defendant to prove this element.[33] Defendant admits as much when he speculates that voter registration lists might be "one possible cause" of the systematic exclusion of Hispanics from the venire, but dismissing as irrelevant any causal connection[34] when that linkage is the crux of any prima facie case.

Defendant contends that trial counsel were ineffective for not seeking discovery regarding the method of jury selection and for failing to object to the jury selection process.  (Mot. at 76.) Evaluating defense counsel's conduct from counsel's perspective at the time, (Strickland, 466 U.S. at 689), defense counsel were not ineffective.  The protocols for selection of jury veniremen pursuant to Order 03-12 was in compliance with the dictates of the JSSA, including a finding made by the Central District that it was "not

---

[33] It should be noted that defendant is not differentially situated compared to any other defendant tried in the Central District prior to implementation of General Order No. 13-13.  The government is not aware of any case declaring unconstitutional based on fair cross section grounds the selection of jury venires prior to 2013.

[34] See Mot. at 74 ("But whatever the cause is...").

66

necessary to resort to sources other than the voter registration lists" to further rights guaranteed by certain provisions of the JSSA.  (Order 03-12, pt.4.)  Given that the jury selection process was in compliance with the statute, it certainly could be regarded as a strategic choice for defense counsel to focus its efforts elsewhere rather than on a procedure that conformed to applicable law, based only on the specter of hope that that procedure would be found unconstitutional.  Strickland, 466 U.S. at 691; Miles v. Ryan, 713 F.3d 477, 486 (9th Cir. 2013) (an analysis of deficient performance begins with the premise that the challenged action might be considered sound trial strategy, and under this objective approach, the appellate court must affirmatively entertain the range of possible reasons why counsel may have done what they did) (citations and quotations omitted).[35]

### E.    Defendant's Claim of Gender Discrimination In Jury Selection Was Procedurally Defaulted and Meritless (Defendant's Claim 4)

#### 1.    Defendant Procedurally Defaulted This Claim By Not Raising It on Direct Appeal

Defendant asserts for the first time in his petition that the government used its peremptory challenges to impermissibly remove jurors during jury selection based on gender, in violation of the Supreme Court's decision in Batson v. Kentucky.  (Mot. at 78-84).  As set forth above, because defendant did not raise this issue either at

---

[35] Defendant disclaims any requirement to prove actual prejudice since selection of a petit jury in violation of the fair cross-section guarantee is structural error.  (Mot. at 77.)  However, defendant's failure to make out even a prima facie case makes any claimed violation purely speculative, therefore, any claim of structural error is specious.

the district court or on appeal, it is procedurally defaulted.  See, e.g., Frady, 456 U.S. at 162, 164; Johnson, 988 F.2d at 945.

As noted above, a court may entertain a procedurally defaulted claim in habeas only if defendant establishes both cause for failing to raise the claim and prejudice.  Frady, 456 U.S. at 162, 164.  A court need not address cause if defendant has not suffered actual prejudice.  Id., 456 U.S. at 168.  Cause may be satisfied if defendant establishes that his counsel was constitutionally ineffective pursuant to Strickland.  See Murray, 477 U.S. at 479.  Here, where defendant's claim of gender discrimination is meritless, defense counsel were not ineffective.

Further, because defendant declined at the time of jury selection to challenge the government's use of any peremptory challenge to strike a female juror, defendant deprived the trial court of any opportunity to address such objections contemporaneously and deprived this court of a complete record from which to evaluate defendant's claim.  As the Ninth Circuit has recognized, "contemporaneous objection is especially pertinent as to Batson claims, where innocent oversight can so readily be remedied[.]" United States v. Pulgarin, 955 F.2d 1, 2 (1st Cir. 1992) (quoted in United States v. Contreras-Contreras, 83 F.3d 1103, 1105 (9th Cir. 1996)).  The Ninth Circuit found in United States v. Changco, 1 F.3d 837 (9th Cir. 1993), that it was "unable to consider" newly raised Batson arguments on appeal because the defendant's failure to object left the record undeveloped with no facts to support them.  Changco, 1 F.3d at 841.  That is the case here.

          2.    <u>There Was No Gender Discrimination In Jury Selection</u>

          *a.    The process of the parties' exercise of
peremptory challenges*

The final composition of the jury was nine men and three women. (RT 09/05/06 at 110).  In total, the government used twelve of its eighteen peremptory strikes against women.  (Mot., Ex. 1-133 (Ex. 135), peremptory strikes chart[36]).  Similarly, defendant used eleven of its nineteen peremptory strikes against women.  <u>Id.</u>  Each side had 28 peremptories total, (RT 08/31/06 at 286), which means at the conclusion of voir dire, the government had 10 peremptories remaining.  (<u>See</u> Mot., Ex. 1-133 (Ex. 135) (peremptory strikes chart.)

The government accepted a duly constituted jury four different times before the final jury was accepted and seated.  (Mot., Ex. 1-133 (Ex. 135), peremptory strikes chart).  At the government's first pass, the jury consisted of eight men and four women, but at the next peremptory, the defense struck one of the women.  (Mot., Ex. 1-133 (Ex. 135), peremptory strikes chart, line 13.)  While the continued exercise of peremptories on both sides resulted in certain male prospective jurors being replaced with different male jurors, as well as the selection and dismissal of additional female jurors, the three female jurors present at the government's first pass were actually seated on the jury and sworn.  At one point, both parties accepted a duly constituted jury, but before being sworn, one juror expressed undue hardship, and the parties stipulated to his dismissal and recommenced with jury selection.  (<u>Id.</u> at line 19; Ex. 41, RT

---

[36] This chart was included in the government's answering brief on direct appeal, and defendant has attached this chart as an exhibit to his petition.  (Mot., Ex. 1-133 (Ex. 135), peremptory strikes chart).

09/05/06 at 103).[37]  At no point did defendant challenge the government's exercise of its peremptories based on gender.

> (A)  Composition of the prospective jury at the government's first pass and acceptance of the jury

The government's acceptance of a duly constituted jury for the first time included eight male jurors and four female jurors.[38] (Mot., Ex. 1-133 (Ex. 135), peremptory strikes chart, line 13; Ex. 41, RT 09/05/06 at 35-78 (detailing exercise of peremptories and resulting prospective jurors)).  In exercising his next peremptory, defendant removed one of the female jurors (juror 261).  (Mot., Ex. 1-133 (Ex. 135), line 13, peremptory strikes chart).  The remaining three female jurors – 31, 239, and 256 – all became seated as actual trial jurors.  (Ex. 41, RT 09/05/06 at 110).

> (B)  Composition of the prospective jury at the government's second pass and acceptance of the jury

The government's acceptance of a duly constituted jury for the second time included nine male jurors and three female jurors.[39] (Mot., Ex. 1-133 (Ex. 135), peremptory strikes chart, line 15; Ex.

---

[37] Right before the district court swore in the jury, Juror 87 objected that his participation in the jury would reflect extreme hardship, so the parties stipulated to his excusal and jury selection recommenced.  (Ex. 41, RT 09/05/06 at 103).

[38] The following transcript references identify the gender of the prospective jurors at this stage:  Ex. 48, RT 08/18/06 at 86 (male juror 84); Ex. 49, RT 08/31/06 at 270 (male juror 205); Ex. 42, RT 08/22/06 at 124 (male juror 120); Ex. 50, RT 08/25/06 at 121 (male juror 197); Ex. 44, RT 08/16/06 at 23 (female juror 31); Ex. 51, RT 08/30/06 at 112 (female juror 239); Ex. 44, RT 08/16/06 at 75 (male juror 36); Ex. 48, RT 08/18/06 at 178 (male juror 95); Ex. 46, RT 11/16/06 at 74 (male juror 57); Ex. 48, RT 08/18/06 at 99 (male juror 87); Ex. 51, RT 08/30/06 at 262 (female juror 261); and Ex. 51, RT 08/30/06 at 238 (female juror 256).

[39] All the jurors were the same as at the government's first pass except for the replacement of a male juror with a different male juror. (Ex. 50, RT 08/25/06 at 54, 57).

41, RT 09/05/06 at 78-84 (detailing exercise of peremptories and resulting prospective jurors at this stage).  Prior to this pass by the government, each side had exercised a peremptory against a prospective female juror.  (Mot., Ex. 1-133 (Ex. 135), peremptory strikes chart, line 14).

           (C)   Composition of the prospective jury at the government's third pass and acceptance of the jury

The government's acceptance of a duly constituted jury for the third time again included nine male jurors and three female jurors.[40] (Mot., Ex. 1-133 (Ex. 135), peremptory strikes chart, line 16; Ex. 41, RT 09/05/06 at 84-86.)

           (D)   Composition of the prospective jury when both parties' pass and accept the jury the first time

The parties reached agreement on a duly constituted jury, (Mot., Ex. 1-133 (Ex. 135), peremptory strikes chart, line 19), which again consisted of nine men and three women.[41]  When the parties reached agreement on a duly constituted jury this first time, both the government and defendant had each struck 10 women.  (Mot., Ex. 1-133 (Ex. 135), peremptory strikes chart, lines 1-18).  Jury recommenced, however, when Juror 87 was stipulated by the parties for excusal for hardship.  (Ex. 41, RT 09/05/06 at 103).

---

[40] At this stage, two male jurors were replaced with two different male jurors.  (Ex. 41, RT 09/05/06 at 84-86.)

[41] Also at this juncture two male jurors were replaced with two different male jurors, through multiple rounds of peremptories.  (Ex. 41, RT 09/05/06 at 86-97.)

71

(E)    *Composition of the final jury*

After Juror 87 was excused, both the government and defense each excused a female juror.  (Mot., Ex. 1-133 (1-135), peremptory strikes chart, line 20.)  Before coming to the final jury composition, the government exercised two more peremptories, one against a man and the other against a woman.  (Mot., Ex. 1-133 (1-135), peremptory strikes chart, lines 21, 22.)  The final jury of nine men and three women was then accepted by both sides.  (Mot., Ex. 1-133 (1-135), peremptory strikes chart, lines 21, 22.)

> b.    *Defendant's claims are facially specious and unsupported by the record*

Defendant's claim that the government improperly used its peremptory challenges based on gender discrimination is unsupported by the record set forth above.  Simple percentages do not establish defendant's prima facie case.

"[A] prosecutor ordinarily is entitled to exercise permitted peremptory challenges for any reason at all, as long as that reason is related to his view concerning the outcome of the case[.]"  Batson v. Kentucky, 476 U.S. 79, 89 (1986) (punctuation and citation omitted).  However, there is an important limitation on peremptory challenges:  they cannot be used to remove jurors on the basis of their race, sex, sexual orientation, or Latino national origin.  The Supreme Court in J.E.B. v. Alabama, 511 U.S. 127 (1994), extended Batson's principles to the use of peremptory challenges based on gender.  J.E.B., 511 U.S. at 146.  A defendant opposing a preemptory challenge "bears the ultimate burden of proving [that] the challenge was improper and [] this burden never shifts."  Yee v. Duncan, 463 F.3d 893, 895, 901 (9th Cir. 2006) (citation omitted) (finding that

defendant did not meet his burden of proving purposeful gender discrimination under the final step in the analysis even though the prosecutor could not remember why she struck a particular juror, which evidenced discrimination under the test).

A three-step inquiry exists to determine whether a party has impermissibly exercised a peremptory challenge.  First, the defendant "must make a prima facie showing "that the totality of the circumstances give rise to an inference of discrimination." Nguyen v. Frauenheim, 45 F.4th 1094, 1099 (9th Cir. 2022) (citations omitted).  Second, the burden then shifts to the state to offer race [or gender] neutral reasons for the strikes.  Id.  Third, the court then determines whether the defendant established "purposeful discrimination."  Id.

In order to make a prima facie case, defendant must establish that (1) the potential juror who was removed is a member of the cognizable group, (2) the prosecution used a peremptory challenge to remove the juror, and (3) the facts and circumstances "raise an inference that the challenge was motivated by race or gender." Copperwood v. Cambra, 245 F.3d 1042, 1045-46 (9th Cir. 2001).  "There is no magic number of challenged jurors which shifts the burden to the government to provide a neutral explanation for its actions. Rather, the combination of circumstances taken as a whole must be considered."  United States v. Chinchilla, 874 F.2d 695, 698 (9th Cir. 1989).  See also Williams v. Woodford, 384 F.3d 567, 584 (9th Cir. 2004) (defendant "must point to more facts than the number of African-Americans struck" to establish a pattern of strikes that would support an inference of discrimination).

73

Here, defendant has not made a prima facie case that the peremptories the government used against prospective female jurors reflected a discriminatory purpose because the totality of the circumstances does not support it.  When the government first accepted a jury, there were four female jurors.  Defendant struck one of them and brought that number down to three, all three of whom sat on the final jury.  Up to the point where the parties first accepted a duly constituted jury, both sides had struck the same number of female jurors – ten.  That number only increased to 12 for the government upon the seating of the final jury.  The government used only 18 of its 28 total peremptory challenges.  Under the totality of these circumstances, there is no evidence of discriminatory purpose.

Defendant claims without support that the government "had no adequate gender-neutral reason" for striking these prospective jurors.  (Mot. at 79.)  But no reasons are provided on the record when a party exercises a peremptory challenge, unless a defendant challenges that exercise, which defendant chose not to do here.  In other words, the government was not required to offer a non-discriminatory reason because there was no challenge.  There were no gender-neutral reasons given because there were no reasons given at all.

Defendant further claims without support that the government's alleged unlawful jury selection practices is a strategy employed by the Department of Justice Capital Case Section.[42]  (Mot. at 78, 82-83.)  Even more attenuated is defendant's claim that this is a tactic

---

[42] Defendant admits as much when he states that "it is logical to assume that federal prosecutors are reliant on the Capital Case Section's 'advice and support' about jury selection."  (Mot. at 83) (emphasis added).

taught to prosecutors at the state level, referencing a Philadelphia District Attorney's training video that apparently instructs state prosecutors in Philadelphia on how to use peremptory strikes in a racially discriminatory manner with pretextual excuses.  (Mot. at 80-81.)  These arguments are frivolous.  There is no evidence that the Department's Capital Case Section employs an impermissible strategy to exclude women from juries, including in the federal cases defendant cites from other districts.  (Mot. at 81-82.)  Nor is there any evidence that any impermissible practices at the state level are at play here.  Further, defendant's citation to federal cases in other districts is not relevant to this case.  See Williams, 384 F.3d at 584 (two unrelated California Supreme Court decisions involving the same prosecutor where prosecutor in those cases was found to have used peremptory challenges in a race-based manner irrelevant because they did not involve the prosecutor's use of peremptory challenges in the instant case, and even assuming "some relevance," they were not sufficient to raise an inference of deliberate discrimination).  Defendant's claim of gender bias must be premised upon relevant facts, not speculation, and no such facts exist here.

Even defendant's reference to the government's use of 66.6 percent of its peremptories against women is not particularly meaningful by itself, (Mot. at 78-79), although statistical disparities alone can be proof of a prima facie case.  Paulino v. Castro, 371 F.3d 1083, 1091 (9th Cir. 2004). See McDermott v. Johnson, 85 F.4th 898, 910 (9th Cir. 2023) ("Courts frequently look to numeric evidence to detect impermissible discrimination, including the percentage of a particular group removed from the venire by the challenged strikes and the percentage of strikes directed against

members of a particular group.").  However, the percentage of peremptory strikes used against a protected class (such as women), i.e., the rate of strikes, has more meaning when that rate is high compared to a lower percentage of that class in the jury pool, resulting in a disproportionate rate of strikes against the protected class.  See Fernandez v. Roe, 286 F.3d 1073, 1078 (9th Cir. 2002) ("Although only about 30% of those called for voir dire had been African-American [in Turner v. Marshall], the prosecution had used 56% of its peremptory challenges against African-Americans") (citing Turner v. Marshall, 63 F.3d 807, 812 (9th Cir. 1995), overruled on other grounds by Tolbert v. Page, 182 F.3d 677 (9th Cir. 1999); Paulino, 371 F.3d at 1091 (the prosecutor's use of five of six peremptory challenges against black persons resulting in the exclusion of over 83 percent of possible black jurors (also five out of six) raised an inference of discrimination).  Absent such evidence, it is "impossible to say whether any statistical disparity existed that might support an inference of discrimination." Williams, 384 F.3d at 584 (while "[s]tatistical facts like a high proportion of African-Americans struck and a disproportionate rate of strikes against African-Americans can establish a pattern of exclusion" that supports a prima facie Batson violation, because the record did not disclose how many African-Americans sat on the jury or were in the venire, or how large the venire was, there was no inference of discrimination).  Here, defendant asserts without evidence that "women and men were equally represented in the venire

76

after challenges for cause."[43]  (Mot. at 78.).  But assuming that defendant is correct that the venire was split equally between men and women, then any asserted disparity in the exercise of the government's peremptory strikes against women, standing by itself, has no constitutional significance.  Cf. McDermott, 85 F.4th at 910 (finding that the prosecutor challenged Black jurors "at a rate of more than twice the percentage of the Black prospective jurors in the jury pool").

While courts "look to statistics and patterns of strikes to determine if a defendant has shown an inference that motivated the prosecutor to exercise a strike,...[i]n addition to statistics, the court considers any other relevant circumstances brought to its attention that may support or refute an inference of discriminatory purpose."  Nguyen, 45 F.4th at 1101 (cleaned up, citations and quotations omitted).  So even assuming the rate of the government's strikes is significant, which it is not, the additional circumstances under which those strikes were made make clear that there can be no prima facie case of discriminatory intent.  Fernandez, 286 F.3d at 1079 ("Under Batson, we must consider 'all relevant circumstances' surrounding the challenges.") (citing Batson, 476 U.S. at 96-97).  In Nguyen, defense raised a Batson challenge when the prosecutor had used three of his first five peremptory strikes against Hispanics and struck three out of four Hispanic potential jurors.  Nguyen, 45 F.4th at 1102.  In finding no inference of discrimination, the Ninth

---

[43] Defendant's assertions and assumptions without evidence are fatal to his claims.  McDermott, 384 F.3d at 588 ("conclusory allegations by counsel that are unsworn and unsupported by any proof or offer of proof do not provide an adequate basis to obtain a federal evidentiary hearing"); Jones, 66 F.3d at 204-05.

Circuit in Nguyen found the numbers to be "somewhat small" to rely on, and identified as notable the fact that the prosecutor had passed and accepted the jury "multiple times" while another Hispanic individual sat in the jury box, who was there at the time of defendant's Batson motion.  Id. ("without statistics, comparison, or anything else suggesting an inference of discrimination, we can find none.").  Here, the government's acceptance of the jury in five separate instances, where in four of those instances three women were on the jury and in one there were four women, the government's use of only one more peremptory challenge against females than the defense, and the fact that there is no evidence that the government's strikes against females significantly depleted the number of female jurors in the venire, defeats any claim that defendant has established a prima facie case of purposeful discrimination.

### F.    Defendant's Claim of Improper Shackling Is Procedurally Defaulted and Without Merit (Defendant's Claims 5 and 18[44])

#### 1.    Defendant Failed to Object to Defendant's Shackling Both at the District Court and on Direct Appeal

Defendant initially asserts that he was "restrained by a waist chain and shackled to a chair throughout the entire trial," (Mot. at 85), mentioning only later that defendant's hands were free during trial.  (Mot. at 87.)  By not objecting either at trial or on appeal, defendant procedurally defaulted this claim.[45]  See, e.g., Frady, 456

---

[44] Defendant sets forth in a separate claim (Claim 18) his contention that trial counsel were ineffective in failing to object to shackling.  (Mot. at 220-25.)  Because a comparison of Claims 5 and 18 show them to be largely redundant of each other, if not verbatim for significant passages, defendant's ineffective assistance claim will be addressed as part of this section.

[45] Defendant also claims that the shackling of defendant prejudiced the penalty phase proceedings.  (Mot. at 89.)  Because defendant's death sentence has been commuted to life imprisonment, the government will not address this argument.

U.S. at 162, 164; Johnson, 988 F.2d at 945.  Further, defendant's shackling claim is meritless (and counsel were therefore not ineffective) where defendant had been charged with conspiracy to escape from custody.  The district court was well within its rights to have defendant shackled.  Further, because defendant's hands were free during trial, defendant's ability to communicate with his counsel was not compromised so defendant suffered no actual prejudice, especially where there is no evidence his shackles were visible to the jury.

> 2. Defendant's Shackling Claim is Facially Specious Where Defendant Was Charged with Conspiracy to Escape from Custody and Defendant's Hands Were Free During Trial

At trial, defendant was shackled in accordance with procedures set forth in a memorandum authored by the United States Marshal to the district court.  The court confirmed that it was going to follow the procedures for shackling defendant set forth in that memorandum, which read as follows:

> The following is a brief description of the Defendants' appearance for the upcoming trial scheduled for July 11th. All Defendants will be dressed and ready for trial upon entering the courtroom.  Defendants will be brought into court handcuffed behind the back with leg restraints on. Defendants will then be seated one at a time in the wooden chairs provided by the Court.  A lap restraint will be placed over the defendants' legs and then the handcuffs will be removed to allow Defendants movement of upper body. Any restraints worn during court proceedings will be covered in a thick plastic to prevent any metallic noise.

(Ex. 52, RT 05/31/06 at 5) (emphasis added).  After finishing reading the memorandum into the record, the court stated, "That's the way it's going to be, except if a Defendant is to testify in the trial." (Id.)  The court noted that all defendants would be brought into the courtroom "outside the presence of the jury."  (Id. at 5-6.) Counsel did not object.  There is no evidence these shackles were

visible.  Misapprehending Ninth Circuit law, defendant asserts that this procedure was a violation of defendant's constitutional rights.

The courts are primarily concerned with restraints that are visible to the jury because of their negative effect on a defendant's presumption of innocence and right to counsel, as well as judicial decorum.  Deck v. Missouri, 544 U.S. 622, 630 (2005).  The cases defendant cites that conclude that shackling violates a defendant's constitutional rights are premised upon visible shackles, a circumstance that did not exist here.  For example, the Supreme Court in Deck pronounced that "[t]he law has long forbidden routine use of visible shackles during the guilt phase."  Deck, 544 U.S. at 626 (emphasis added).[46]  See also Rhoden v. Rowland, 172 F.3d 633 (9th Cir. 1999) ("The issue before the court is whether a prisoner is entitled to habeas corpus relief when he has demonstrated that he was shackled during the entire course of his trial, in violation of his constitutional rights, and the shackles were visible from the jury box"); Spain v. Rushen, 883 F.2d 712, 722-23 (9th Cir. 1989) (over the course of a 17-month trial, defendant was subject to maximum restraints amounting to 25 pounds of total weight that were "conspicuous" to the jury, including "leg irons, a waist chain to which each hand was bound by individual chains about eight inches long, and chains that apparently held him to his chair").  Inadvertent and limited view of a defendant in shackles outside the courtroom does not warrant habeas relief.  Rhoden, 172 F.3d at 636;

[46] It is notable that the Supreme Court stated that visible shackles were permissible "in the presence of a special need."  Deck, 544 U.S. at 626 629 ("[T]he Fifth and Fourteenth Amendments prohibit the use of physical restraints visible to the jury absent a trial court determination, in the exercise of discretion, that they are justified by a state interest specific to a particular trial.").

Castillo v. Stainer, 983 F.2d 145, 148-49 (9th Cir. 1992) ("Chaining of a prisoner in transport to the courtroom is a different matter...No harm that rises to a constitutional level is done by such an unintended, out-of-court occurrence.").

Nowhere does defendant offer any evidence that his shackles were visible to the jury, or that any juror saw him in shackles at any point.  Defendant merely speculates that "[t]here is a reasonable possibility that the jurors observed the shackling," (Mot. at 88) (emphasis added), also suggesting that defendant's inability to stand would "tip off" the jury that defendants were shackled.[47]  (Mot. at 88.)  Speculation is not evidence.  And by having his handcuffs removed during trial, the district court complied with defendant's entitlement in the presence of the jury "to be relieved of handcuffs, or other unusual restraints, so as not to mark him as an obviously bad man or to suggest that the fact of his guilt is a foregone conclusion."  Rhoden, 172 F.3d at 636-37 (finding that visible, unconstitutional shackling influenced the jury's verdict where the

---

[47] Defendant incorrectly asserts that when defense counsel identified the problem for the court, the court did nothing.  (Mot. at 88.)  On the final day of jury selection when the court recessed for lunch, the clerk said, "All rise."  (Ex. 41, RT 09/05/06 at 67.)  Defense counsel raised the issue, and the court agreed, stating that he does not do it except in the mornings, and once the trial starts, he does not do it.  (Id.)  The court then indicated, "I've got a new clerk and she's not used to it."  (Id.)  After this one instance, the clerk did not announce "All rise" in the presence of the jury.  (See e.g., Ex. 41, RT 09/05/06 at 68 (prospective jurors enter courtroom); Ex. 41, RT 09/05/06 at 130 (break); Ex. 41, RT 09/05/06 at 131 (jurors enter courtroom); Ex. 41, RT 09/05/06 at 161 (jurors exit courtroom at the end of the day); Ex. 53, RT 09/06/06AM at 4 (jurors enter courtroom in the morning); Ex. 53, RT 09/06/06AM at 85 (jurors exit courtroom for lunch recess); Ex. 53, RT 09/06/06AM at 87-88 (jurors enter courtroom after lunch recess); Ex. 53, RT 09/06/06AM at 101-102 (jurors exit for short recess).

jury saw the shackles, and the case involved violent crime where evidence was disputed).

Defendant complains that the district court simply endorsed the United States Marshal's memorandum "without investigation, review, or support." (Mot. at 87.) Yet a trial court need not conduct a hearing or make findings before ordering that a defendant be shackled, Jones v. Meyer, 899 F.2d 883, 886 (9th Cir. 1990), notwithstanding defendant's claims to the contrary. (Mot. at 90.) The Supreme Court case in Deck and the Ninth Circuit decision in Larson v. Palmateer, 515 F.3d 1057 (9th Cir. 2008), both cited by defendant (Mot. at 90), are inapposite, because those cases required findings where defendant's restraints were visible. Deck, 544 U.S. at 624, 626; Larson, 515 F.3d at 1062. Nonetheless, the district court was not without information about security concerns raised by defendant's conduct, namely, that he had been charged with viciously murdering for money multiple individuals and after being detained, conspired to escape from federal custody with Mikhel and Krylov, conduct for which he was charged. Under these circumstances, the district court was well within its discretion to agree to the shackling protocol proposed by the United States Marshal. Wilson v. McCarthy, 770 F.2d 1482, 1484 (9th Cir. 1985) ("The trial court has discretion to use shackles or other security measures when circumstances dictate.").

To the extent that the district court did not find non-visible shackling of defendant to be the least restrictive alternative, in the absence of proof that this error "had substantial and injurious effect or influence in determining the jury's verdict," it was

harmless.[48]  See Castillo v. Stainer, 997 F.2d 669 (9th Cir. 1993), modifying the opinion in Castillo v. Stainer, 983 F.2d 145, 148-49 (9th Cir. 1992).  Defendant has made no such showing.

### 3. The Use of Restraints Did Not Interfere with Defendant's Ability to Communicate with Counsel

Defendant broadly asserts without evidence that the use of "black box" restraints[49] interfered with his ability to communicate with counsel during the Rule 15 deposition of a witness that took place in Greece in October 2005.  (Mot. at 86-87.)  Defense counsel requested in an ex parte application prior to the deposition that defendant be allowed one free hand, suggesting that use of "black box" restraints during the deposition would interfere with defendant's Sixth Amendment and Confrontation Clause rights.  (CR Dkt. No. 802, Ex Parte Motion Re: Conditions During Rule 15 Proceedings ("Motion Re: Rule 15 Proceedings"), Declaration of Richard Lasting ("Lasting Decl."), ¶ 9) ("I also believe that the restrictive measures, if implemented, will interfere with Mr. Kadamovas's Sixth Amendment rights to counsel and to confront the witnesses against him.").  The government opposed counsel's request, citing the Marshals' ordinary practice to have prisoners fully restrained while in the courtroom to ensure safety and order, with the removal of handcuffs when prisoners actually appear before the court; defendant's status as a high security inmate under Special

---

[48] It is not structural error, as defendant asserts without authority.  (Mot. at 91.)

[49] "Black box" restraints restrain both hands.  (CR Dkt. No. 805, Government Opposition, Declaration of Karen I. Meyer ("Meyer Decl."), ¶ 4.)

Administrative Measures (SAMs);[50] the assault of Marshal and government staff by inmates in this district even while restrained; the need for full shackling given the pending charges; after-hours scheduling of the video-conference deposition when security staff availability was limited; and the presence of three defendants for the deposition.  (CR Dkt. No. 805, Government's Opposition, Meyer Decl., ¶ 3.)  The government further stated that the use of "black box" restraints only occurred while defendant was in the secure courtroom, after defendant had received a meal at 10:15 p.m., until defendant was returned to the Metropolitan Detention Center at 5:00 a.m.  (Id. at ¶ 4.)  The court denied defendant's request.  (CR Dkt. No. 804.)

While restraints diminish a right to counsel and shackles can interfere with a defendant's ability to communicate with his lawyer, (Deck, 544 U.S. at 630) (citation omitted), there is no evidence of that here.  In his ex parte application, defense counsel only asserts his belief that the use of "restrictive measures, if implemented, will interfere with [defendant's] Sixth Amendment rights to counsel and to confront the witnesses against him."  (CR Dkt. No. 802, Motion Re: Rule 15 Proceedings, Lasting Decl., ¶ 9.)  In fact, there was no interference with communications, where defendant was present with co-counsel in Los Angeles and where court personnel at Roybal

---

[50] As defendant references, the use of Special Administrative Measures is governed by 28 C.F.R. § 501.3, and are imposed when there is a substantial risk that the defendant's communications or contacts with persons could result in death or serious bodily injury to persons.  The SAMs can restrict a defendant's access to mail, media, the telephone, and visitors.  28 C.F.R. § 501.3(a).  In both Claim 5 and Claim 18, defendant cites to defendant's SAMs (Mot. at 85-86, 222), but makes no claim that the SAMs interfered with defendant's ability to converse with counsel either during the Rule 15 deposition or at trial.

arranged to provide a telephone line for defense counsel in Athens, Greece, to use to confer with their clients and co-counsel in Los Angeles.  (September 22, 2005 Letter from then AUSA Robert Dugdale to counsel for defendants Mikhel, Kadamovas, Krylov, and Natalya Solovyeva, attached hereto as Ex. 54.)  Had there been actual interference, counsel certainly would have raised that claim with the district court, having been concerned in advance about possible interference.  Yet at no point did defendant assert that shackling interfered with his ability to communicate with his attorney during the deposition (or at trial), including when the deposition was read into evidence at trial.  (Ex. 17, RT 09/14/06 at 89-130; Ex. 28, RT 09/15/06 at 13-45, 49-64; Ex. 1, RT 10/10/06 at 16-20.)  Without more, defendant cannot make out a cognizable claim in habeas. Castillo, 983 F.2d at 149 (defendant "made no showing that the shackling impaired his mental ability, inflicted pain or impeded communication with his counsel").[51]

> 4. Defendant Has Failed to Show Counsel to Be Ineffective Where Shackles Were Not Visible and Defendant Was Able to Communicate with Counsel, so Claim Was Meritless, and Defendant Has Also Failed to Show Prejudice (Defendant's Claim 18)

Where defendant's shackles did not violate defendant's presumption of innocence because they were not visible to the jury, and where there is no evidence that the shackles interfered with defendant's ability to communicate with counsel where defendant's

---

[51] The facts of Spain, a case cited by defendant (Mot. at 90) where defendant wore 25 pounds of weights, including chains that bound his hands and held him to his chair, that were visible to the jury during the course of a 17-month trial that caused defendant debilitating pain (Spain, 883 F.2d at 722-23), contrast so starkly with the waist chains and leg irons that defendant wore here - with both hands and his upper body free - as not to be probative of defendant's claim.

hands were free during trial, defendant has not met his heavy burden of showing that defense counsel were ineffective for not raising the issue at trial or on appeal. Neither can defendant show prejudice where there was no reasonable probability that the result of the trial would have been different but for counsel's failure to object to defendant's shackles where the evidence of guilt was, in the words of the Ninth Circuit, "overwhelming."

### G. Defendant's Claim that the District Court Improperly Denied His Request for Further Continuances Is Both Procedurally Barred and Meritless (Defendant's Claim 6)

#### 1. Defendant Cannot Assert This Claim in His Habeas Petition Where It Was Raised (and Denied) on Direct Appeal

Defendant claimed on direct appeal that the district court violated the two-counsel rule articulated in the Federal Death Penalty Act, codified at 18 U.S.C. § 3005, when it denied defendant's request for a six-month continuance where defense counsel Sonia Chahin was appointed as counsel eight months before jury selection began and ten months before opening statements, had billed approximately 900 hours of work on the case up to the point of jury selection, had played a substantial role at trial by taking 30 percent of the witnesses, and lead capital counsel had billed over 4,000 hours in the four years up to trial. Mikhel, 889 F.3d at 1035 (also noting that Chahin benefited from prior counsel's years of work prior to being replaced by Chahin). Defendant raised this claim on direct appeal and lost. Id. In rejecting defendant's claim, the Ninth Circuit noted that defendant failed to establish any prejudice, other than making generalized claims that Chahin had not reviewed "much of the discovery" and did not travel to Lithuania to investigate defendant's background, without identifying what

86

discovery she failed to review that might have changed the jury verdict or why travel to Lithuania was necessary for her representation.  Id.  As noted above, because this claim was raised on direct appeal, it is procedurally barred.  Withrow, 507 U.S. at 720-21 (Scalia, J., concurring) (collecting cases); Jingles, 702 F.3d at 499-500 (referring to this doctrine as "law of the case").[52]

        2.    Even Were This Claim Not Procedurally Barred, It Was Not Clearly Erroneous and Manifestly Unjust for the Ninth Circuit to Deny the Claim Given the Thousands of Hours the Defense Team Worked on the Case

As noted above, the "law of the case" will not apply where (1) the previous decision was clearly erroneous and its enforcement would be manifestly unjust.[53]  See Jingles, 702 F.3d at 502.  A court must apply the law of the case in the absence of one of these circumstances.  Scrivener, 189 F.3d at 827.  Here, in light of the repeated continuances that defendant received since the inception of the case, the 60-day continuance of the pretrial motions schedule after Chahin's appointment, and the equivalent of additional several-month continuances stemming from significant breaks throughout the trial, the Ninth Circuit's affirmance of the trial court's decision denying defendant's request for further continuances was not clearly

[52] On direct appeal, defendant chose not to raise this claim as a constitutional claim but instead as a violation of the Federal Death Penalty Act.  Mikhel, 889 F.3d at 1034.  To the extent defendant's same claim raised here, but allegedly in violation of the Fifth, Sixth, and Eight Amendments of the United States Constitution, is considered a different claim than defendant raised on direct appeal, it is then procedurally defaulted, and defense counsel were not ineffective for failing to raise a meritless claim that the Ninth Circuit denied on direct appeal.

[53] The other two exceptions noted above do not apply here. Additionally, a court need only find that the prior decision was either clearly erroneous or manifestly unjust.  In Jingles, the court did not need to decide whether the previous decision was clearly erroneous "because, even if it were, its enforcement does not work any manifest injustice."  Jingles, 702 F.3d at 503.

erroneous.  Further, defendant's claims of prejudice are both conclusory and refuted by the record.[54]

Defendant made his initial appearance in this case on February 20, 2002.  (CR Dkt. 5.)  In May 2002, the district court appointed a CJA panel attorney to represent him.  (CR Dkt. 80.)  In June 2002, a second CJA attorney with significant death penalty experience, Richard Lasting, was also appointed to represent him.  (CR Dkt. No. 132.)  On November 28, 2005, at defendant's request, CJA panel attorney Chahin substituted in for the original panel attorney (CR 830), joining Lasting as counsel.

Over the next eight months, Chahin billed CJA Services $142,553.21 in defendant's case (Ex. 55, RT 01/24/07 at 10), with an hourly rate of $160 to $163.  (CR Dkt. No. 864.)  Thus, from the end of November 2005 through July 2006, Chahin worked almost 900 hours preparing defendant's case for trial.  Lasting billed $677,392.35 for work up until the eve of trial, which equaled almost five times as many hours as Chahin.  (Ex. 55, RT 01/24/07 at 10.)

The court appointed several more persons to assist in defendant's defense, including:

- a paralegal who performed at least 2,250 hours of work on the case (CR Dkt. Nos. 174, 271, 291, 284, 317, 355, 385, 390, 398, 428, 433, 443, 445, 472, 477, 515, 613);

- a defense investigator (CR Dkt. Nos. 155, 285, 638-40);

---

[54] Defendant does not articulate the standard set forth in Jingles, but instead refers to prejudice as opposed to whether enforcement of the trial court's decision to deny further continuances is manifestly unjust.  Because proof of prejudice – which does not exist here – would be an example of where enforcement would be manifestly unjust, the government addresses this prong as prejudice.

- a Russian-language interpreter to translate documents and other evidence (CR Dkt. Nos. 234, 301, 322, 366, 393, 434, 435, 452, 703); and

- a mitigation specialist to focus on preparing defendant's penalty-phase case (Ex. 37, RT 07/11/06 at 9; Ex. 56, RT 01/31/07 at 205).

Defendant also had a joint defense agreement with Mikhel, under which Mikhel's attorneys worked closely with defendant's attorneys to strategize and prepare the case for trial.  (CR Dkt. No. 652, Notice of Motion and Motion to Preclude Disclosure of Writings Found in Defendant Mikhel's Cell, Or in the Alternative, Motion to Suppress Such Evidence, Declaration of Richard M. Callahan, Jr. ("Callahan Decl.") at ¶ 5, filed under seal.)

While trial was initially set to begin in April 2002, it was repeatedly continued until July 11, 2006 (CR Dkt. Nos. 66, 75, 152, 191, 264, 362, 382, 668, 784), at the request of defense counsel for time to review discovery, conduct investigation, research and file suppression motions, and to investigate and prepare mitigation evidence for the Department of Justice to dissuade the government from pursuing the death penalty.  In early January 2006, two months after Chahin substituted in as counsel, defendant requested and was granted a 60-day extension of time to file pretrial motions.  (CR Dkt. No. 855.)  In March 2006, defendant moved for a six-month continuance from July 2006 to January 2007.  (CR Dkt. No. 926), which the district court denied.  (CR Dkt. No. 990.)  Defendant based his request on Chahin's need to review discovery and to be prepared to examine expert witnesses; the fact the government charged seven

murders, two of which occurred outside the United States;[55] and Chahin's involvement in another trial.  (CR Dkt. No. 2266.)

In late June 2006, defendant's co-defendant and former girlfriend, Solovyeva, decided to plead guilty and testify in the case.  Solovyeva had given two statements to the FBI during proffers that lasted a few hours.  The government planned on calling Solovyeva near the end of its case-in-chief.  (Ex. 57, RT 07/05/06 at 10 (under seal).)  A week before jury selection was set to begin, on July 5, 2006, during a pretrial conference, defendant renewed his request for a continuance, arguing that he needed six more months to review the reports of Solovyeva's two prior proffer statements to prepare for cross examination.  (CR Dkt. No. 1089, filed under seal.)  The district court denied the motion.  (Ex. 57, RT 07/05/06 at 13 (under seal).)

Even though the district court denied defendant's request for a continuance of six months, defendant ended up getting three months of shorter continuances combined during the trial.  The first occurred during jury selection, which began on July 11, 2006, when the prospective jurors filled out their questionnaires.  (Ex. 57, RT 07/05/06 at 16 (under seal).)  However, jury selection did not resume until over a month later on August 15, 2006, when voir dire on those questionnaires began.  (Ex. 57, RT 07/05/06 at 16 (under seal).)[56]  As

---

[55] The district court granted defendant's motion in limine to exclude evidence in the government's case-in-chief of the two murders that occurred outside the United States.  (CR Dkt. No. 1025, Court Order dated June 5, 2006.)

[56] This month-long break accommodated Chahin's participation in trial in another court.  Mikhel, 889 F.3d at 1035.  Defendant complains that the trial court was dismissive of Chahin's concerns when the court stated that Lasting could conduct jury selection without her participation.  (Mot. at 108.)  First, Chahin did

(footnote cont'd on next page)

the district court noted, defendant received a month continuance "by default." (Ex. 57, RT 07/05/06 at 16 (under seal).) There was another three-week continuance just one week into trial when one of Mikhel's attorneys was hospitalized. (Ex. 28, RT 09/15/06 at 10-11, Ex. 59, RT 09/21/06 at 47.) The district court also gave the jury breaks over the holidays, including a two-week break for Thanksgiving.[57] (Ex. 46, RT 11/16/06 at 208.) In light of all this evidence, the Ninth Circuit's finding that Chahin was not deprived of adequate time to prepare was not clearly erroneous. United States v. Thompson, 2022 WL 824022 *2 (9th Cir. Mar. 18, 2022) ("The previous panel's finding is not clearly erroneous [where] there is strong evidence supporting it.") (citing Anderson v. Bessemer City, 470 U.S. 564, 53-74 (1985) (explaining that a factual determination is not clearly erroneous if it 'is plausible in light of the record viewed

participate in jury selection, both at the stage of examining jurors about the answers to their questionnaires and when the parties exercised their peremptory challenges. (Ex. 44, RT 08/16/06 at 27, 52-54, 148-49, 196-98; Ex. 48, RT 08/18/06 at 54-57, 90-91, 199; Ex. 42, RT 08/22/06 at 23-27, 44-48, 85-87, 135-36, 172-77; Ex. 58, RT 08/24/06 at 57-60, 87-90, 104-05; Ex. 50, RT 08/25/06 at 45-46, 161-65; Ex. 41, RT 09/05/06 at 32, 106, 111) (refuting Chahin's claim in her declaration that she "had little to no involvement in jury selection." (Mot., Chahin Decl., Ex. 1-11, ¶ 19.) Second, capital counsel for both defendants (Dale Rubin and Richard Lasting for Mikhel and Kadamovas respectively), took the lead in examining jurors during the juror questionnaire phase when jurors were primarily examined on their views of the death penalty. (See transcripts of initial phase of jury selection, Ex. 39, RT 08/15/06 (sample); Ex. 44, RT 08/16/06 (sample); Ex. 40, RT 08/17/06 (sample); Ex. 48, RT 08/18/06 (sample); Ex. 42, RT 08/22/06 (sample); Ex. 58, RT 08/24/06 (sample); Ex. 50, RT 08/25/06 (sample); Ex. 51, RT 08/30/06 (sample); and Ex. 49, RT 08/31/06 (sample).) Third, counsel for Mikhel and Kadamovas had to work together on jury selection where the two defendants were assigned 28 peremptory challenges combined. (Ex. 49, RT 08/31/06 at 286).

[57] The district court also gave a break around Christmas of two and a half weeks (Ex. 60, RT 12/15/06 at 105), but the government rested its case before that, on December 12, 2006 (Ex. 61, RT 12/12/06 at 67), with Kadamovas resting three days later on December 15, 2006. (Ex. 60, RT 12/15/06 at 82.)

in its entirety'")).

Without addressing why the Ninth Circuit's decision was allegedly clearly erroneous,[58] defendant contends that denial of these continuance requests prejudiced defendant because counsel allegedly was not prepared for trial in the following ways:

- by failing to present key evidence, including the lack of evidence of defendant's involvement in the escape attempt;

- by not having enough time to review Solovyeva's diary before Solovyeva testified and allegedly failing to elicit key evidence from her; and

- by failing to secure Kadamovas's family members to be able to present mitigating evidence on his behalf.[59]

(Mot. at 92.)  The record in this case belies any claim that counsel did not have sufficient time to address what it perceived as the lack of evidence of defendant's involvement in the escape conspiracy as well as any contention that counsel did not have sufficient opportunity to review and use Solovyeva's diary in cross-examining her.

---

[58] Perhaps in an attempt to show the Ninth Circuit's ruling to be clearly erroneous, defendant asserts that the district court had an easy alternative – simply join Kadamovas's trial with that of Krylov, whose trial had already been severed.  (Mot. at 105.)  This is a red herring, especially where defendant had previously tried to avoid a trial with Krylov, moving to sever his case out of fear that Krylov would claim he was less culpable than Kadamovas, prejudicing the jury against Kadamovas.  (CR Dkt. No. 727.)  Further, Krylov was not charged with participating in Muscatel's abduction and murder, so joinder would have significantly lengthened Krylov's trial and would have forced numerous witnesses to travel to Los Angeles to testify twice.  (Ex. 59, RT 09/21/06 at 42-43.)  Finally, Krylov gave notice of a duress defense, which both Kadamovas's counsel and the district court recognized would inevitably draw the two co-defendants into prejudicial opposition to each other at a joint trial.  (Ex. 62, RT 01/09/07 at 16.)

[59] The government will not address this claim because it pertains to the penalty phase of the trial, which is no longer at issue.

*a.   Defense counsel cross-examined cooperators and law enforcement officials regarding evidence of defendant's role in the escape*

With respect to defendant's involvement in the escape, both Chahin and Lasting cross-examined MDC officials, law enforcement, and government cooperators about the evidence against Kadamovas (or lack thereof) in the escape.  Defense counsel also repeatedly challenged the admissibility of Mikhel's intercepted letter to Kadamovas.

(A)   Government cooperators

(1)   Billy Parker

Billy Parker (aka Harold Wilson), Jose Avila, and Sabrina Tynan all testified regarding defendant's involvement in the escape plan. Parker testified on direct that he heard Mikhel communicate through the vents with someone on "nine south" (the floor and range of MDC where Kadamovas was housed) in a foreign language and that Mikhel told Parker that they were going out through the stairwell and Mikhel had already been digging in his cell.[60]  (Ex. 34, RT 12/06/06 at 30-31; Mikhel, 889 F.3d at 1049.)  Mikhel's counsel cross-examined Parker, as did Chahin on behalf of defendant (Ex. 34, RT 12/06/06 at 58-69), with Chahin referencing defendant's numerous felony convictions and the reduction in sentence (by half) that he had already received from the government.  (Ex. 34, RT 12/06/06 at 58-60.)  Chahin also impeached Parker with his failure to tell agents at certain meetings that he overheard Mikhel conversations or that Mikhel was on the vents shouting "nine south," (Ex. 34, RT 12/06/06 at 61, 63-64, 67-68), suggesting that Parker made up those

---

[60] That same day of trial, Marvin Battley, Special Investigative Agent at MDC, further explained how inmates communicate through MDC's ventilation system and transfer contraband through the plumbing system.  (Ex. 34, RT 12/06/06 at 115-16, 119.)

facts to obtain a further reduction in his sentence.

(2)   Jose Avila

Avila testified that he went to defendant's cell in "Nine South" to talk with Mikhel through the air vents and that defendant "pretty much told me a little bit about like one of the plans and he just mentioned that – like behind his pillow that he was supposed to like make a hole and they were supposed to squeeze out of there and they were all supposed to go out into the stairwell and meet at a certain time."  Mikhel, 889 F.3d at 1049.

After defense counsel for Mikhel cross-examined Avila, Chahin did the same, not only challenging his facts regarding the escape but attacking Avila's credibility.  (See Ex. 33, RT 12/08/06 at 176-77 (highlighting Avila's challenge to his deportation even though Avila agreed under penalty of perjury not to challenge his deportation); Ex. 33, RT 12/08/06 at 177-87, 210; Ex. 61, RT 12/12/06 at 30-32 (addressing his underlying drug offense and the reduction in sentence he received for cooperating); Ex. 33, RT 12/08/06 at 204 (probing his attempt to extract promises from the government to keep him from being deported in exchange for his testimony); Ex. 61, RT 12/12/06 at 32, 34 (highlighting Avila's hope to receive government assistance from being deported)).

With respect to the escape in particular, Chahin cross-examined Avila on where he was housed at the time he obtained information about the escape, including his time on the same floor with defendant (Nine South) and his time on the fifth floor with Mikhel, in relation to meetings he had with law enforcement, and challenged his testimony that Mikhel and Kadamovas communicated through the vents. (Ex. 33, RT 12/08/06 at 188-200, 215-16.)  Chahin also

94

challenged Avila's veracity concerning what he told law enforcement about the escape plan and alleged he withheld information absent a promise not to be deported. (Ex. 33, RT 12/08/06 at 200-06.) Chahin further brought out on cross-examination that Avila had not been charged with assisting with the escape. (Ex. 33, RT 12/08/06 at 208.)

(3) Sabrina Tynan

Sabrina Tynan testified that her husband at the time was helping with an escape attempt for Mikhel and "another gentleman also named Juri." (Ex. 33, RT 12/08/06 at 74.) To aid in that effort, she obtained four cell phones – one for Mikhel, one for her husband, and one for her brother-in-law. Mikhel, 889 F.3d at 1049. She believed the fourth cell phone was for "the other Juri," (Kadamovas), although she was not certain. Id.

After Mikhel's counsel's cross examination, defendant's counsel Lasting cross-examined Sabrina regarding her false statements to law enforcement (Ex. 33, RT 12/08/06 at 125), the complaint filed against her regarding the escape (Ex. 33, RT 12/08/06 at 126-28), and who the four phones were for that she bought as part of her involvement in helping plan the escape, and whether the fourth phone was for Peter (co-defendant Krylov) or "Juri" (Kadamovas). Although she was not certain, Sabrina testified that she believed the fourth cell phone was for "the other Juri" (Kadamovas).[61] (Ex. 33, RT 12/08/06 at 135, 136) (redirect and recross).

(B) MDC Official Marvin Battley

Chahin also cross-examined Marvin Battley (as did Mikhel's

_____

[61] In his case-in-chief, defendant called IRS SA Jose Gonzalez to impeach Sabrina on this point. (Ex. 60, RT 12/15/06 at 78-80.)

95

counsel), a Special Investigative Agent at MDC during March 2003 when the escape attempt was discovered (Ex. 34, RT 12/06/06 at 74, 165-75). Battley testified on direct that he had an opportunity to interview Parker about Parker's knowledge of the escape attempt, where Parker said that if the "Russians" found out that Parker was talking to MDC officials, they would kill him. (Ex. 34, RT 12/06/06 at 84.) Battley also testified on direct that no contraband was found in Kadamovas's cell (913 south) on March 7, 2003 (the day the escape was discovered), but that the cells for Kadamovas, Mikhel, and Krylov (cell 616) were in alignment next to a stairwell where they were to escape. (Ex. 34, RT 12/06/06 at 82-83, 92, 102, 113-14.) Battley further testified that Kadamovas and other inmates involved in the escape plan had received money on their prison books. (Ex. 34, RT 12/06/06 at 93-94.)[62] Finally, Battley testified how inmates could get themselves moved from one cell to another, and that Kadamovas had been sanctioned for initially being in cell 913 without authorization. (Ex. 34, RT 12/06/06 at 132-33, 135-37.)

Chahin cross-examined Battley on the housing overlap between Kadamovas and cooperator Jose Avila, the number of cells between Mikhel's cell (518) and Kadamovas's cell (913), the ability of inmates to move themselves to another cell, including Kadamovas's proper assignment to cell 913 subsequent to being sanctioned for being in that cell, and the absence of contraband or evidence of digging in his cell. (Ex. 34, RT 12/06/06 at 165-66, 171, 172-73,

---

[62] Lieutenant Mark Harlien, special investigative supervisor at MDC in March 2003 (RT 12/07/06 at 48), testified that FBI SA Ingerd Sotelo told him that Mikhel had placed this money on the inmates' books, including for Kadamovas, on March 6, 2003 (RT 12/07/06 at 65-67), the day before the escape attempt was discovered.

175.)

(C)   FBI SA Ingerd Sotelo

FBI SA Ingerd Sotelo who investigated the escape also testified about the contraband seized from the searches of Mikhel's and Krylov's cells, and on cross examination the absence of similar seizures from Kadamovas's cell aside from a few papers.  (Ex. 34, RT 12/06/06 at 179-96 (direct), Ex, 35, RT 12/07/06 at 10-28 (continued direct), 29-44 (cross by Mikhel counsel), 45-46 (cross by defendant's counsel, Lasting.)

(D)   Defendant's challenge to Mikhel's intercepted letter

Aside from cross examining these witnesses about defendant's role in the escape, defendant also objected repeatedly to the introduction of a note written in Russian by Mikhel addressed to Kadamovas, alerting the trial court to the issue when an MDC correctional officer was called to the stand to testify about intercepting the note from a magazine that Mikhel gave him while in the special housing unit.[63]  (Ex. 33, RT 12/08/06 at 58-59, 62-66; Ex. 61, RT 12/12/06 at 21-24; 64 (the court's acknowledgement of Kadamovas's objection)).  While the district court admitted the note (and its translation) over defendant's objection on the grounds that it demonstrated that the conspiracy had revived (Ex. 33, RT 12/08/06

---

[63] After the escape attempt was discovered on March 7, 2003, both Mikhel and Kadamovas were placed in the special housing unit, which is where inmates are temporarily housed for rule infractions at the institution.  (Ex. 33, RT 12/08/06 at 61.)  Mikhel asked the corrections officer to give a magazine to another inmate in the special housing unit.  (Ex. 33, RT 12/08/06 at 62-65.)  After accepting the magazine, the corrections officer discovered an envelope inside the magazine.  (Ex. 33, RT 12/08/06 at 65-66.)  The envelope contained a note written in Russian addressed to Kadamovas. Mikhel, 889 F.3d at 1049; Ex. 33, RT 12/08/06 at 58.

at 58-59; Ex. 61, RT 12/12/06 at 21-24, 64), the Ninth Circuit found this to be error, but ultimately harmless in light of the other evidence of Kadamovas's ties to the escape.  Mikhel, 889 F.3d at 1049 ("we have no doubt that the admission of Mikhel's letter was harmless, as the letter was merely cumulative of other evidence linking Kadamovas to the conspiracy.")[64]

In light of all this evidence, it is indisputable that defendant's counsel were prepared to challenge - and did challenge - the government's escape evidence.  They focused not only on the alleged absence of evidence of defendant's participation in the escape attempt, but also repeatedly challenged the admission of certain escape evidence.

                *b.    Defense counsel received the time they requested to review Solovyeva's diary*

Defendant's claim with respect to defendant's purported lack of time to review Solovyeva's diary is both specious and not germane to the issue of a continuance of the trial itself.[65]  (Mot. at 92, 97-101).  Even if it were germane, however, the government turned over

---

[64] This additional evidence included Avila's testimony that he went to Kadamovas's cell on "Nine South" to talk to Mikhel through the vents and that Kadamovas told Avila about the escape plan, Parker's testimony that he heard Mikhel communicating through the air vents in a foreign language with someone on "Nine South," Tynan's testimony that she obtained four cell phones, one of which she believed, although she was not certain, was for "the other Juri" (Kadamovas), prison financial records showing Mikhel had placed money on the books of those involved in the escape plan, including Kadamovas, and inmate housing records showing that Kadamovas managed to be reassigned to a cell adjacent to the stairwell the conspirators intended to use for their escape.  Mikhel, 889 F.3d at 1049-50.  See also Mikhel, 889 F.3d at 1020 ("Kadamovas was originally housed elsewhere in the facility but managed to change cells to be next to the stairwell intended for the escape").

[65] In fact, defendant raises this claim concerning Solovyeva's diary as a discovery violation in Claim 14, which the government responds to more fulsomely below.  See infra.

the Russian diary expeditiously after receiving it from Solovyeva's counsel and preparing both audio recorded English translations of significant portions of it and transcriptions of those audio recordings.  Defense counsel received a week to review the Russian diary with the help of both a Russian translator and defendant, as well as the English transcriptions, to prepare for cross examination, using the diary's contents during that examination.  There is no manifest injustice with respect to defendant's opportunity to review to prepare to use the diary in cross examination.

Specifically, the government received the diary (in Russian) from Solovyeva's counsel the Friday (October 27, 2006) before Solovyeva was to testify the following week.  (Ex. 14, RT 10/31/06 at 6-8.)   The diary was a voluminous 437 pages.  (Ex. 63, RT 11/01/06 at 4.)  Over the weekend, the government (through the FBI) had audiotaped summaries in English prepared of significant portions of the diary along with transcriptions of those audiotaped summaries, producing the entire Russian diary and the English transcribed summaries to defense counsel the following Tuesday morning, October 31, 2006.  (Ex. 14, RT 10/31/06 at 6.)  Government counsel also gave defense counsel "a heads up" as to what from the diary might possibly be relevant, noting that the diary entries all pre-dated the charged conduct in the case (Ex. 14, RT 10/31/06 at 8-9), which Solovyeva confirmed in her testimony.  (Ex. 32, RT 11/03/06 at 71.)  After raising concerns with the court over their opportunity to review the diary in advance of cross examination, defendant's counsel requested that his cross examination of Solovyeva not begin until Tuesday (November 7, 2006).  (Ex. 63, RT

11/01/06 at 71-72.)  While denying the request but offering defendant the opportunity to recall Solovyeva for further cross if necessary (Ex. 63, RT 11/01/06 at 72-73), ultimately defendant received the time he requested as a result of witness scheduling and other matters before the court.  (Ex. 63, RT 11/01/06 at 72; Ex. 64, RT 11/07/06 at 5.) Thus, defendant cross-examined Solovyeva the very day counsel asked for, Tuesday, November 7, 2006.  (Ex. 64, RT 11/07/06 at 5.)  During that cross examination, defense counsel used the diary (Ex. 14, RT 10/31/06 at 49)[66], and despite being given the opportunity (Ex. 63, RT 11/01/06 at 72-74), never recalled Solovyeva to the witness stand.  (See Ex. 65, RT 12/13/06 at 143 through 12/15/06 at 82) (reflecting witnesses called in defendant's case-in-chief.)

In light of the above, any claims that defense counsel's ability to question witnesses regarding defendant's purported lack of involvement in the escape attempt and insufficient time to review Solovyeva's diary in preparation for cross examination are fully refuted by the record in this case.  Given that the trial court gave reasons justifying its denial of defendant's request for a trial continuance that showed that decision not to be clearly erroneous, and that defendant received the time he requested for counsel to review Solovyeva's diary, the Ninth Circuit's decision upholding the trial court's denial of defendant's later requests for a further continuance works no manifest injustice on defendant in the utter

---

[66] Mikhel's counsel also declined to further cross-examine Solovyeva after having the weekend to review the diary.  (Ex. 64, RT 11/07/06 at 5.)

absence of any prejudice.[67]

               *c.   Defense counsel were not ineffective*

Defendant claims that trial counsel were ineffective in handling these "timing issues." (Mot. at 107.) This is incorrect. As noted above, in order to establish Strickland error, defendant must establish both deficient performance and actual prejudice, which is prejudice infecting his entire trial with error of constitutional dimensions." Braswell, 501 F.3d at 1150 (citing United States v. Frady, 456 U.S. 152, 170 (1982)) (emphasis in original). That did not exist here, and defendant has not established either prong, much less both. Defendant also could not, where the Ninth Circuit acknowledged "the extensive hours" Chahin spent on the case. Mikhel, 889 F.3d at 1035. In light of Chahin's extensive and active role throughout the course of the trial, including questioning jurors during voir dire (Ex. 44, RT 08/16/06 at 27, 52-54, 148-49, 196-98; Ex. 48, RT 08/18/06 at 54-57, 90-91, 199; Ex. 42, RT 08/22/06 at 23-27, 44-48, 85-87, 135-36, 172-77; Ex. 58, RT 08/24/06 at 57-60, 87-90, 104-05; Ex. 50, RT 08/25/06 at 45-46, 161-165[68]), giving the opening statement at the guilt phase (Ex. 53, RT

---

[67] Because defendant has failed to establish that the Ninth Circuit's decision upholding the district court's denials of a further continuance was clearly erroneous and did not work any manifest injustice, defendant's unfounded claim that such denials constituted constitutional violations amounting to a "structural defect" also fails.

[68] In addition to assisting with examining prospective jurors concerning answers in their jury questionnaires, Chahin also participated in the final selection of the jury that took place on September 5, 2006, wherein the parties exercised their peremptory challenges. (Ex. 41, RT 09/05/06 at 32, 106, 111.) Chahin's active involvement in jury selection refutes her statement in her declaration in which she erroneously states that, "Although I did review the questionnaires, I had little to no involvement in the in-court jury selection because I was desperately trying to review the case materials." (Mot., Chahin Decl., Ex. 1-11, ¶ 19.)

101

09/06/06AM at 95-101), cross examining Solovyeva (Ex. 64, RT 11/07/06 at 5-63, 65-124; Ex. 11, RT 11/08/06 at 5-39, 49) and other government witnesses, including its language analyst; DNA, trace evidence, and fingerprint experts; the principal escape count witnesses (Ex. 18, RT 11/15/06 at 89-94; Ex. 66, RT 11/28/06 at 61-65; Ex. 25, RT 11/29/06 at 178-91; Ex. 26, RT 11/30/06 at 7-18, 32-35, 53-56, 119-128; Ex. 33, RT 12/08/06 at 175-218; Ex. 61, RT 12/12/06 at 30-34); and the direct examinations of about half of defendant's witnesses during his guilt-phase case-in-chief (Ex. 65, RT 12/13/06 at 171-88; Ex. 67, RT 12/14/06 at 41-44, 45-62, 70-74, 85-87, 92-102, 124-30, 166-71),[69] defendant could not establish any deficient performance.  See Harrington v. Richter, 562 U.S. 86, 111 (2011) ("it is difficult to establish ineffective assistance when counsel's overall performance indicates active and capable advocacy").

**H. Defendant's Claim that the District Court Judge Should Have Been Recused Upon Submitting an Application to the Search Committee for the Position of United States Attorney Is Both Procedurally Barred and Meritless (Defendant's Claim 7)**

**1. Defendant Cannot Assert This Claim in His Habeas Petition Where It Was Raised (and Denied) on Direct Appeal**

Defendant claimed on direct appeal that the district court judge should have recused himself from presiding over the trial pursuant to 28 U.S.C. § 455(a) (Disqualification of Justice, Judge, or Magistrate Judge) after applying to a local screening committee for the position of United States Attorney for the Central District of California.

_____

[69] Chahin also took responsibility for Mikhel's cross-examination, had his direct testimony not been stricken (Ex. 62, Ex. 62, RT 01/09/07 at 21-24), a task she could not have undertaken without a firm grip on all the material evidence in the case.

Mikhel, 889 F.3d at 1025.  The Ninth Circuit denied this claim both on statutory and due process grounds, finding that no "reasonable person" with knowledge of all the facts would have questioned Judge Tevrizian's impartiality.[70]  (Id. at 1028 and n.6.)  As noted above, because this claim was raised on direct appeal, it is procedurally barred.[71]  Withrow, 507 U.S. at 720-21 (Scalia, J., concurring) (collecting cases); Jingles, 702 F.3d at 499-500 (referring to this doctrine as "law of the case").

        2.   Even Were This Claim Not Procedurally Barred, It Was Not Clearly Erroneous and Manifestly Unjust for the Ninth Circuit to Uphold Denial of Defendant's Recusal Motion in Light of Defendants' Month-Long Delay in Filing the Motion and the Lack of the Appearance of Impropriety

As noted above, the "law of the case" will not apply where (1) the previous decision was clearly erroneous and its enforcement would be manifestly unjust.  See Jingles, 702 F.3d at 502.  Defendant must prove both.  Id. at 503.  A court must apply the law of the case in the absence of one of these circumstances.  Scrivener, 189 F.3d at 827.  Here, the Ninth Circuit's decision in affirming the district court's denial of defendant's and Mikhel's motion for recusal was not clearly erroneous where Judge Tevrizian disclosed that he had been contacted by a search committee to submit an application for the position of United States Attorney,

---

[70] In addressing the due process claim, the Ninth Circuit noted that because there was no abuse of discretion under § 455(a), there was no violation under the less stringent due process standard. Mikhel, 889 F.3d at 1028, n.6 (citing Exxon Corp. v. Heinze, 32 F.3d 1399, 1403 (9th Cir. 1994)).  Based on the Ninth Circuit's finding, there is no reason to believe that a challenge solely on due process grounds would have succeeded.

[71] The Ninth Circuit considered and decided the issue twice because defendants filed a petition for mandamus in the Ninth Circuit, which the Circuit denied.  Mikhel, 889 F.3d at 1026.

defendants did not object until over a month later after the government had rested its case-in-chief in the penalty phase, and in response Judge Tevrizian immediately withdrew his application.  The Ninth Circuit concluded there was no appearance of impropriety. Mikhel, 889 F.3d at 1028.

On December 28, 2006, at a status conference approximately two weeks after the government and defendant had rested their respective cases (Ex. 61, RT 12/12/06 at 67 (government rests its case); Ex. 60, RT 12/15/06 at 82 (defendant rests his case)), Judge Tevrizian advised the parties that a couple of weeks prior he had been contacted by a search committee and asked to submit an application for position of United States Attorney in this district:

> There's been a lot of rumors floating around here.  You know, I had announced that I'm going to retire just as soon as this case is over and join a judicial arbitration mediation service.  A couple of weeks ago I received a telephone call from a search committee that's looking to replace the United States Attorney and they asked me to submit my name for that position.  The search committee is not associated with the Justice Department nor is it associated with the administration.  They make recommendations and they asked me to submit my name. Whether anything comes of it I don't know, but I thought I should disclose this to you.  I'm not doing it for any financial gain, because I made it very clear that if I do take the position that I would do it for a dollar a year, because of the fact that I'm on a federal pension, judicial pension, and I don't believe in double dipping.  So I do make this disclosure to you.  Again, I don't know if anything is going to come of it.  I haven't been contacted by the administration.  I haven't been contacted by anybody in Washington.

Mikhel, 889 F.3d at 1025-26.  Neither side objected.  Mikhel, 889 F.3d at 1026.  Trial continued, and a few weeks later the jury returned guilty verdicts.  Mikhel, 889 F.3d at 1026.

On January 29, 2007, defendant and Mikhel moved for recusal after the government rested its case in chief in the penalty phase.

Mikhel, 889 F.3d at 1026. Noteworthy was defendants' request for Judge Tevrizian to declare a mistrial of the penalty phase and recusal from further presiding over the penalty phase, but did not seek a mistrial of the guilt phase. Mikhel, 889 F.3d at 1027. Judge Tevrizian denied the motion the next day, telling the parties that he had withdrawn his name from consideration and that his application had not progressed beyond a preliminary stage:

> I advised and disclosed to all parties on the record that I was contacted by a representative of the local screening committee to apply for the position of United States Attorney for the Central District of California. None of the parties or their counsel ever objected.

> I submitted a form application and was interviewed by the screening committee only. I have never been interviewed by anyone of the Department of Justice o[r] White House counsel's office. In fact, I never directly submitted my application to the Department of Justice or White House counsel's office. It was submitted only to the local screening committee, who may have passed it on.

> Again, none of the defense counsel or the defendants objected when I made the disclosure on the record weeks ago that I was planning to apply for the position.

> ***

> Yesterday I withdrew my name for consideration for the position of United States Attorney by notifying the local committee. The only personal contact I had with either the Department of Justice or the White House counsel's office was over the telephone, yesterday, to inform them that I had withdrawn my name from consideration.

> I was also informed that my application was never considered on the merits by the Department of Justice or White House counsel's office.

Mikhel, 889 F.3d at 1026. Defendant filed a petition for mandamus in the Ninth Circuit, which was denied where the Circuit concluded that defendants had "arguably filed their motion to recuse the district judge too late." Mikhel, 889 F.3d at 1026. On direct appeal, the Ninth Circuit ruled the motion both untimely and meritless. Mikhel,

889 F.3d at 1027.  The Circuit noted that the timing of the filing of the motion suggested that defendants used the recusal motion for strategic purposes, trying "to throw a wrench into the penalty phase in the hope that the government would prefer accepting life sentences to conducting a fresh penalty phase."  Mikhel, 889 F.3d at 1027. Regarding the merits, the Circuit found that there was no reason a reasonable person would have questioned Judge Tevrizian's impartiality where Tevrizian had "promptly and clearly" disclosed the alleged grounds for recusal, his only contact was with a local screening committee, he would not be paid so there would be no negotiation over salary, his application was never considered either by the Department of Justice or the White House Counsel's office, and he immediately withdrew his application upon the filing of defendants' motion, finding Tevrizian's immediate withdrawal from consideration particularly significant.  Mikhel, 889 F.3d at 1028. Under these circumstances, the Ninth Circuit's ruling was not clearly erroneous and certainly did not work manifest injustice where defendant's choice to file the motion a month after Tevrizian's disclosure appears to have had less to do with prejudice to defendant and more to do with attempting to "throw a wrench into the penalty phase."  Mikhel, 889 F.3d at 1027.

Defendant's citation to the District of Columbia Circuit's decision In re Al-Nashiri, 921 F.3d 224 (D.C. Cir. 2019) does not alter this conclusion.  In Al-Nashiri, the military judge presiding over Al-Nashiri's death penalty case before a military commission never disclosed for "two-plus years" his application for employment as an immigration judge with the Department of Justice.  Al-Nashiri, 921 F.3d at 237 (highlighting in his application his role as presider

106

over the Al-Nashiri prosecution).  As defendant pointed out, records of the judge's job search were obtained through a Freedom of Information Act request.[72]  (Id. at 228.)  The important distinction between Al-Nashiri and this case – and fatal to defendant's claim – is the military judge's lack of candor compared to Judge Trevizian's immediate and full disclosure of the alleged grounds for recusal, which the Ninth Circuit found did not present even the appearance of impropriety.  Mikhel, 889 F.3d at 1028.  See also Crater v. Galaza, 491 F.3d 1119, 1131 (9th Cir. 2007) (the Supreme Court has recognized only three circumstances in which the appearance of bias (as opposed to actual bias) necessitates recusal:  (1) when a judge has a financial interest in the outcome of the case; (2) when the judge becomes embroiled in a bitter controversy with one of the litigants; and (3) when the judge has acted as part of the accusatory process); Hurles v. Ryan, 752 F.3d 768, 789-90 (9th Cir. 2014).  Under these circumstances, there is no question defendant's claim is meritless and should be denied.

---

[72] From this, defendant seems to suggest that his pending FOIA requests will reveal the same lack of candor that the military judge exhibited in Al-Nashiri. (Mot. at 113-15.)  In an attempt to bolster this claim, defendant impugns Tevrizian's integrity when he states Judge Tevrizian misled the parties "with regard to the nature and status of the application for a position with the prosecuting agency" based on a January 18, 2007 Los Angeles Times article identifying Tevrizian as "one of the leading candidates" for United States Attorney.  (Mot. at 112, 113.)  The Ninth Circuit also found this argument meritless.  Mikhel, 889 F.3d at 1027, n.5.  Further, defendant has had years beyond the one-year time period in which to file his petition.  There is no reason to believe that additional time will turn up the type of evidence defendant seeks.

**I.    Defendant's Claim Alleging Unfair Prejudice of Mikhel's Testimony is Procedurally Barred and the Ninth Circuit's Ruling was Neither Clearly Erroneous Nor Manifestly Unjust (Defendant's Claims 8 and 9)**

      **1.    <u>Defendant Cannot Assert This Claim in His Habeas Petition Where It Was Raised (and Denied) on Direct Appeal</u>**

Defendant claimed on direct appeal that the district court erred and violated Kadamovas's Sixth Amendment right of confrontation when it refused to order a mistrial or a severance after co-defendant Mikhel testified, neither confessing to the charged crimes nor incriminating Kadamovas, but refusing to be cross-examined.  <u>Mikhel</u>, 889 F.3d at 1043.  In rejecting defendant's claim, the Ninth Circuit noted that Mikhel's testimony "did not facially incriminate Kadamovas" and any "contextual implication" of guilt does not justify a mistrial or severance for the defendant.  <u>Id.</u> at 1045 (citing <u>Richardson v. Marsh</u>, 481 U.S. 200, 208 (1987)).  As noted above, because this claim was raised on direct appeal, it is procedurally barred.  <u>Withrow</u>, 507 U.S. at 720-21 (Scalia, J., concurring) (collecting cases); <u>Jingles</u>, 702 F.3d at 499-500 (referring to this doctrine as "law of the case").

      **2.    <u>Even Were This Claim Not Procedurally Barred, It Was Not Clearly Erroneous and Manifestly Unjust for the Ninth Circuit to Deny the Claim Given That Mikhel's Testimony Did Not Facially Incriminate Kadamovas and the Court Instructed the Jury to Disregard It When Mikhel Refused to be Cross-Examined</u>**

As noted above, the "law of the case" will not apply if the previous decision was clearly erroneous, or its enforcement would be manifestly unjust.  <u>See Jingles</u>, 702 F.3d at 502.  With little to add to his arguments on direct appeal, defendant ignores the Ninth Circuit ruling (as well as the applicable standard) and simply asserts that he was prejudiced by Mikhel's testimony and as a result,

108

the court should have granted either severance or a mistrial (Mot. at 119, 137), rather than striking Mikhel's direct testimony and instructing the jury to disregard it.  (Mot. at 132.)  Because Mikhel's stricken testimony did not facially incriminate Kadamovas in the charged crimes, the Ninth Circuit's affirmance of the district court's denial of severance or a mistrial was not clearly erroneous or manifestly unjust.

Mikhel's testimony lasted three days, during which he said little about Kadamovas.  Mikhel, 889 F.3d at 1043.  Instead, Mikhel offered various innocent explanations for the government's evidence tying them both to the kidnappings, including why cell phone data placed defendant near the reservoir at salient times.  (Id. at 1043, 1045.)  Mikhel further testified to smuggling schemes with Kadamovas to explain other government evidence such as the flex-ties found in Mikhel's home.  (Id.)  Mikhel also testified to an extortion scheme he and Kadamovas carried out where they recorded a meeting with a man looking to hire an assassin and then threatened to publish the tape unless the man paid $50,000.  (Id.)  Mikhel denied killing any of the victims, often implying Altmanis had something to do with several of their disappearances and deaths.  (Id.; Ex. 68, RT 01/05/07 at 31-39, 61, 63, 83-84, 91.)  Far from admitting his involvement in the charged hostage takings and murders, Mikhel denied playing any part in these crimes and attempts to exculpate both himself and Kadamovas.  Mikhel, 889 F.3d at 1045.  Mikhel testified that Kadamovas was absent for Muscatel and Pekler's murders (Ex. 68, RT 01/05/07 at 38, 61) and that he, Kadamovas, and Altmanis left Safiev and Kharabadze behind in

a hotel with someone named Aleve (Ex. 68, RT 01/05/07 at 91).[73]  With regard to Umansky, Mikhel only mentioned Umansky once to claim he did not kill him, with no reference to Kadamovas at all.  (Ex. 68, RT 01/05/07 at 92.)

When it came time for Mikhel to be cross-examined by defendant's counsel and government counsel, Mikhel refused to answer questions. (Ex. 62, RT 01/09/07 at 23-28.)  Thus, the court struck his direct testimony and instructed the jury not to consider it "in any matter against Mr. Mikhel or against Mr. Kadamovas," (Mikhel, 889 F.3d at 1043), an approach endorsed by the Ninth Circuit except where the testimony is especially prejudicial.  See Toolate v. Borg, 828 F.2d 571, 572-73 (9th Cir. 1987) ("Ordinarily when a testifying witness cannot or will not be cross-examined, the appropriate relief is to strike the direct testimony of the witness and to instruct the jury to disregard it ... except where the direct testimony is especially prejudicial," in which case a mistrial is required) (cleaned up) (citations and quotations omitted).  Defendant asserts that Mikhel's testimony so qualifies, despite Mikhel denying any involvement by either him or Kadamovas in the kidnappings and murders.  Defendant is incorrect.

As the Ninth Circuit recognized on direct appeal, defendant's reliance on the Supreme Court's decision in Bruton v. United States, 391 U.S. 123 (1968) is misplaced.  (Mot. at 135; Mikhel, 889 F.3d at 1045-46.)  In Bruton, the Supreme Court held that a defendant's confrontation clause rights are violated when a "facially

---

[73] Misciting the record, defendant claims that Mikhel testified that only Mikhel left the hotel, leaving both Kadamovas and Altmanis behind with Safiev and Kharabadze.  (Mot. at 125.)  This does not accurately recount Mikhel's testimony.  (Ex. 68, RT 01/05/07 at 91.)

incriminating confession" of a nontestifying codefendant is introduced at a joint trial even if the trial court instructs the jury to consider the confession only against the codefendant. Bruton, 391 U.S. at 126, 135-36 (when a codefendant offers "powerfully incriminating extrajudicial statements" at trial, a defendant is deprived of his right to a fair trial).  This holding was considered a "narrow exception" to the assumption that jurors follow a court's instructions.  Mikhel, 889 F.3d at 1044 (citing Richardson v. Marsh, 481 U.S. 200, 206-07 (1987)) (citing Bruton, 391 U.S. at 135-36.)).  The Ninth Circuit extended Bruton's reasoning in Toolate to codefendants' confessions at trial.  What the Supreme Court made clear in Richardson, however, and what the Ninth Circuit recognized, is that there is "no Confrontation Clause violation if a codefendant's confession must be linked to other evidence to incriminate the defendant."  Mikhel, 889 F.3d at 1044 (citing Richardson, 481 U.S. at 208).  See United States v. Soto-Barraza, 799 F. App'x 456, 458 (9th Cir. 2020) (finding that Bruton was not violated because confessions did not facially incriminate a co-defendant and limiting instructions were provided in accordance with Richardson).  In other words, if a codefendant's testimony does not facially incriminate a defendant, there is no violation under Bruton or Toolate.

Here, Mikhel's testimony did not qualify as a confession. Mikhel, 889 F.3d at 1045 ("As an initial matter, we agree that Mikhel's testimony cannot accurately be described as a confession. While he certainly corroborated portions of the government's evidence against him, he never admitted to conduct that would satisfy any elements of the hostage-taking charges, such as seizing or detaining

111

the victims, threatening to kill or injure them, or holding them for ransom."). Even if it did, since the testimony on its own did not directly inculpate Kadamovas in the crimes, Bruton is not implicated. Mikhel, 889 F.3d at 1045-46. Because Mikhel's testimony did not facially incriminate Kadamovas, the assumption is the jury followed the district court's instruction to disregard it (Mikhel, 889 F.3d at 1044), and it was neither clearly erroneous nor manifestly unjust for the court to deny mistrial or severance under Bruton or Toolate.

For the same reasons that Mikhel's testimony did not justify a mistrial, Mikhel's testimony did not justify severance.[74] For a court to grant a severance motion, the standard of prejudice is similarly high. Severance is granted "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants or prevent the jury from making a reliable judgment about guilt or innocence." Zafiro v. United States, 506 U.S. 534, 539 (1993). Otherwise, "less drastic measures, such as limiting instructions, often will suffice." Id. at 537.

Defendant's citations to cases both (both in- and out-of-circuit) for the proposition that Mikhel's testimony could not be disregarded and therefore the court's instruction was inadequate

---

[74] In arguing for severance, defendant also contends that Mikhel's absence from portions of the proceedings and appearance in court for the majority of the trial in jail clothing constituted sufficient prejudice as to require severance. (Mot. at 143-44.) As to the first point, "the court repeatedly instructed the jury not to consider Mikhel's absence against Kadamovas," limiting any concerns as to prejudice. Mikhel, 889 F.3d at 1047. Second, the cases defendant cites regarding defendant's courtroom attire are inapposite because they refer to the state compelling a defendant to wear jail attire where defendant cannot afford civilian clothing. See Bentley v. Crist, 469 F.2d 854 (9th Cir. 1972) and Felts v. Estelle, 875 F.2d 785 (9th Cir. 1989). Neither case refers to any alleged spillover effect on a defendant choosing to wear street clothes from a co-defendant choosing to wear prison attire during a joint trial.

(Mot. at 135-36, 143) are not well-taken.  For example, the Fifth Circuit's decision in United States v. Lyons, 703 F.2d 815 (5th Cir. 1983) actually supports the Ninth Circuit's approach set forth above by finding a mistrial unnecessary and the court's instruction sufficient where testimony of the witness who asserted her rights under the Fifth Amendment was short and cumulative of other admissible incriminating evidence.  Lyons, 703 F.2d at 818-19.  See also United States v. Seifert, 648 F.2d 557, 564 (9th Cir. 1980) (finding that a court's instruction to the jury to disregard testimony "cured any possible prejudice caused to [defendant]").  Even in Toolate, where a co-defendant's confession inculpating defendant's involvement in a robbery and murder was considered to violate Bruton when the co-defendant refused to be cross-examined, the Ninth Circuit found the Bruton error to be harmless where evidence of the non-testifying defendant's participation "was overwhelming."  Toolate, 828 F.2d at 576.[75]  Under these circumstances, the Ninth Circuit's decision was neither erroneous nor

---

[75] Defendant's remaining cases either describe circumstances far more extreme than the non-inculpating testimony Mikhel gave here or are inapposite.  See United States v. Rudolph, 403 F.2d 805, 806 (6th Cir. 1968) (finding instruction insufficient where prosecutor's first question was whether the testifying co-defendant, the defendant and others ordered a hit on an individual); United States v. Smith, 403 F.2d 74, 75 (6th Cir. 1968) (instruction insufficient where witness referenced defendant's release from the penitentiary); United States v. Rinaldi, 301 F.2d 576, 578 (2d Cir. 1962) (cautionary instructions cannot cure error involving improper introduction of evidence of a defendant's past criminal record); Odom v. United States, 377 F.2d 853, 859 (5th Cir. 1967) (where arresting officer testified that he knew that defendant had been in and out of jail for a year and a half in describing how long he had known the defendant); Marshall v. United States, 360 U.S. 310 (1959) (inapposite where it refers only to defendant's right to a new trial based on some jurors' exposure to newspaper articles describing defendant's prior convictions); and Courtney v. United States, 390 F.2d 521, 529 (9th Cir. 1968) (where defendant's own cross-examination was belatedly struck for being irrelevant).

113

manifestly unjust.

**J. Defendant's Claim of Denial of Access to Legal Materials Is Procedurally Barred, and Because Defendant Has At All Times Been Represented by Counsel and Has Had Access to Legal Materials, His Claim Is Also Meritless (Defendant's Claim 10)**

1. Defendant Cannot Assert This Claim in His Habeas Petition Where It Was Raised (and Denied) on Direct Appeal

Defendant claimed on direct appeal that the district court erred when it found that Kadamovas was granted sufficient computer access as part of a stipulation regarding access to discovery materials. Mikhel, 889 F.3d at 1050. The Ninth Circuit rejected this claim, concluding that Kadamovas had regular computer access that he often was not using. Id. As noted above, because this claim was raised on direct appeal, it is procedurally barred. Withrow, 507 U.S. at 720-21 (Scalia, J., concurring) (collecting cases); Jingles, 702 F.3d at 499-500 (referring to this doctrine as "law of the case").[76]

2. Because Kadamovas Has At All Times Been Represented by Counsel and Has Had Meaningful Access to His Case Materials, the Ninth Circuit's Ruling that Kadamovas Had Adequate Access to the Courts Is Not Clearly Erroneous or Manifestly Unjust

The "law of the case" will not apply where the previous decision was clearly erroneous and its enforcement would be manifestly unjust. See Jingles, 702 F.3d at 502. That cannot be the case here where

---

[76] On direct appeal, defendant chose not to raise this claim as a constitutional claim but instead as a violation of a stipulation with the government regarding his access to a computer. Mikhel, 889 F.3d at 1050. To the extent defendant's same claim raised here, but allegedly in violation of the Fifth, Sixth, and Eight Amendments of the United States Constitution, is considered a different claim than defendant raised on direct appeal, it is then procedurally defaulted, and defense counsel were not ineffective for failing to raise a meritless claim that the Ninth Circuit denied on direct appeal.

114

defendant has always been represented by counsel and has been given access to his case materials.

Defendant asserts that he was denied reasonable access to case materials as well as adequate tools to review these materials.  (Mot. at 147.)  Defendant has made this claim pre-trial, trial, on appeal, during appellate proceedings, prior to the filing of his habeas petition, and now in habeas.  (Mot. at 148-55.)  Defendant frames these complaints as a violation of defendant's access to the courts (Mot. at 153), despite defendant being represented by counsel at all times.

This Court, the Ninth Circuit, and the Supreme Court have all made clear that a defendant who is represented by counsel has no constitutional right of access to legal materials.[77]  (CR Dkt. No. 2513 (CV Dkt. No. 25) at 5); Bounds v. Smith, 430 U.S. 817, 821 (1977) (finding that prisoners have the right to prepare meaningful legal papers through either "adequate law libraries or adequate assistance from persons trained in the law"); United States v. Robinson, 913 F.2d 712, 717 (9th Cir. 1990).  The only exception is for incarcerated pro se defendants – which Kadamovas is not and never has been – for whom the courts have granted a Sixth Amendment right to reasonable access to legal materials.  United States v. Sarno, 73 F.3d 1470, 1491 (9th Cir. 1995).  Even then, "[t]he right of access is not unlimited, but must be balanced against the legitimate security needs or resource constraints of the prison."  Id.  Because defendant is and always has been represented by counsel, defendant's

_____

[77] These rulings refute defendant's claim that his alleged lack of access to case materials constituted a structural defect.  (Mot. at 155.)

claim that the Ninth Circuit's decision that Kadamovas had sufficient computer access was clearly erroneous (Mot. at 155) is wrong.

Despite being afforded two counsel (three on appeal) throughout every stage of his case, defendant contends that at the pre-trial stage, "a computer was the only viable method of allowing [him] access" to his case materials (Mot. at 149)[78] and because he was not allowed a computer <u>in his cell</u>, this restriction denied him meaningful access to those materials.  (Mot. at 150.)  The record demonstrates otherwise.  In November 2005, defendant filed a motion for daily use of a computer.  (CR Dkt. No. 824.)  Later that same month, the parties entered into a stipulation setting forth the parameters for defendant's pre-trial computer access, including daily access from Monday through Friday (excluding holidays), from approximately 7:00 a.m. to 3:15 p.m., "subject to the safety, security, management and operational needs of the Metropolitan Detention Center."  (Stipulation and Order, CR Dkt. No. 833.)  A few months later in March 2006, defendant renewed his motion for daily use of a computer, claiming that MDC-LA violated the terms of the stipulation and seeking a greater number of hours than what the stipulation established for daily access to his laptop computer.  (CR Dkt. No. 939, Renewed Motion for Court Order for Daily Use of Computer at Metropolitan Detention Center, at 3.)  In opposition, the government provided the declaration of MDC Supervisory Attorney

---

[78] Kadamovas did not need access to a computer to access much of the case materials, including bank documents and phone records not requiring translation; discovery in Russian, including most of the audiotapes of wiretap calls, ransom calls, and recordings of victims; or discovery that was visual in nature, such as photographs.  In addition, several thousand pages of discovery came from Kadamovas's own residence and presumably did not need be to be translated for him.

116

Eliezer Ben-Shmuel setting forth in detail defendant's computer usage, or lack thereof.  (CR Dkt. No. 969, Government's Opposition to Renewed Motion for Court Order for Daily Use of Computer at Metropolitan Detention Center; and Attached Declaration of Eliezer Ben-Schmuel ("Ben-Shmuel Decl.")).  Mr. Ben-Shmuel made clear that Kadamovas had consistent access to a computer but failed to take advantage of that access.  From January through March of 2006, Kadamovas only requested use of his laptop computer three times. (Id. at ¶ 10.)  "[O]n most days, inmate Kadamovas [would] not ask to use his computer and actively refuse[d] staff offers to allow him to do so."[79]  (Id. at ¶ 12.)  In light of this evidence, the court noted that Kadamovas's request was "really not a good faith request" (Ex. 69, RT 05/03/06 at 73) and that his computer usage was "negligible." (Ex. 36, RT 06/12/06 at 96.)  Even so, three months into trial, the district court "ordered that Kadamovas be permitted computer access in his cell fourteen hours a day" (Mikhel, 889 F.3d at 1050) for periods when trial was not in session.  E.g., CR Dkt. No. 1443 (Abstract of Court Proceedings).

Defendant subsequently asserted on appeal that the government and MDC-LA did not comply with the stipulation.  (Mot. at 150.)  The Ninth Circuit rejected this claim, finding that "Kadamovas had regular computer access but was often not using it," "[i]solated incidents" of defendant being denied computer access were consistent

---

[79] Staff in the SHU would ask Kadamovas "every weekday whether he wishe[d] to use his laptop computer."  (CR Dkt. No. 969, Government's Opposition to Renewed Motion for Court Order for Daily Use of Computer at Metropolitan Detention Center, Ben-Shmuel Decl., ¶ 5.) If so, defendant would be taken to an available visiting room or to the law library after filling out a written request.  (Id.)  Staff would "feed lunch to [him] in the law library or visiting room." (Id. at ¶ 6.)

with the security and operational needs of MDC-LA, and "there was no pattern of Kadamovas being denied computer access in violation of the [parties'] stipulation." Mikhel, 889 F.3d at 1050.  The Ninth Circuit held that the district court did not clearly err in finding that defendant was receiving sufficient computer access consistent with the terms of the stipulation, noting that defendant was a high security inmate requiring three guards to be present for all of his movements.  Id.  On this record, the Ninth Circuit's ruling was not clearly erroneous or manifestly unjust where, despite having legal counsel, defendant had significant access to his case materials.

Defendant's complaints concerning access to case materials persisted after conviction and sentence when defendant was transferred to the United States Penitentiary in Terre Haute, Indiana, resulting in defendant filing several motions with the Ninth Circuit seeking to have a computer in his cell, all of which were denied.  (CA 07-99009 Dkt. 124, Order dated February 24, 2010;[80] CA 07-99009 Dkt. 189, Order dated April 29, 2011;[81] CA 07-99009 Dkt. 338, Order dated April 18, 2017;[82] and CA 07-99009 Dkt. 352, Order dated June 12, 2017.[83]  Despite the security reasons why some of defendant's

---

[80] This order denied defendant's request for a laptop computer in cell and his request that the out-of-cell computer have word processing capability but required the prison to provide defendant with 20 hours per week access to the out-of-cell computer.

[81] This order denied defendant's renewed motion to keep a computer, translation device, and digital files in his cell and denied his request for software to open digital files not in pdf or Windows Media formats.  The Ninth Circuit noted that there was no dispute that defendant had used his out-of-cell computer only once in the previous six months.

[82] This order denied defendant's motion to allow counsel to bring a laptop computer to prison to confer with defendant.

[83] This order denied another request by defendant for a laptop computer.

requests could not be met (CA 07-99009, Dkt. No. 115, Declaration of Trey Adams ("Adams Decl."), ¶ 8); CA 07-99009, Dkt. No. 178, Adams Decl., ¶ 4), defendant was provided substantial computer resources at Terre Haute, including a translation device, yet defendant failed to avail himself of these resources.  (See CA 07-99009 Dkt. No. 115, Adams Decl., ¶¶ 5, 7) (noting that "Kadamovas did not make regular use of [a computer and translating software] when it was offered to him" and "Kadamovas requested that [a translating] device be sent back to his attorneys because...he did not want to use it"); CA 07-99009 Dkt. No. 178, Declaration of Todd Royer ("Royer Decl."), ¶¶ 5, 9) (declaring that "inmate Kadamovas has adamantly refused to use the computer that was purchased for his use unless it is put in his cell and left there so he may use it at his leisure" and "has adamantly refused to utilize the electronic translation device that was purchased for him because he cannot keep it in his cell"); CA 07-99009 Dkt. No. 178, Adams Decl., ¶ 9) ("[Kadamovas] is the only inmate at FCC Terre Haute with a computer set aside solely for his personal use, as well as an electronic translating device").

After defendant's appeal was fully briefed, argued, and submitted, in April 2018 defendant filed yet another renewed motion regarding computer resources (CA 07-99009 Dkt. No. 438), which the Ninth Circuit denied without prejudice to defendant raising the issues before this Court.  (CA 07-99009 Dkt. No. 465.)  This Court has denied defendant's requests for a computer in his cell twice since then, in 2022 and 2024, on the same grounds.  See court order dated August 22, 2022 (CR Dkt. No. 2430) and court order dated April 23, 2025 (CR Dkt. No. 2513; CV Dkt. No. 25).  As this Court stated in both of those orders, while the law only requires a defendant to be

granted either meaningful access to legal materials or to counsel, here defendant has received both.  (CR Dkt. No. 2430 at 5-6; CR Dkt. No. 2513 (CV Dkt. No. 25) at 5.)  This holding is consistent with Supreme Court and Ninth Circuit authority (Lewis, 518 U.S. at 351; Robinson, 913 F.2d at 717) and is "law of the case" on this issue. Jingles, 702 F.3d at 499-500.

Because defendant raises no new claims in this Court that were not previously considered and rejected, there is "no reason to revisit or upset [this Court's] prior rationale and order denying Petitioner's Motion for Order Directing the Bureau of Prisons to Permit Access to Legal Materials."  (CR Dkt. No. 2513 (CV Dkt. No. 25) at 4.)  "[T]he denial of [Kadamovas's] request for access to a computer in his cell under prison's security policies neither violates his constitutional right to access the courts nor denies him his right to participate in § 2255 proceedings."  (CR Dkt. No. 2513 (CV Dkt. No. 25) at 8.)  By virtue of filing this petition, defendant has demonstrated his access to the courts, which is all the law requires.  Lewis v. Casey, 518 U.S. 343, 356 (1996) (Bounds confers the "capability of bringing contemplated challenges to sentences...before the courts."); Cornett v. Donovan, 51 F.3d 894, 899 (9th Cir. 1995) ("The right of access is designed to ensure that a habeas petition...of a person in state custody will reach a court for consideration.").  As this Court recognized, "[t]he fact that Kadamovas is represented by counsel in his habeas corpus proceedings satisfies the right of access to the courts as guaranteed by the Constitution and interpreted by the Supreme Court."  (CR Dkt. No. 2430 at 5.)  Thus, any claim that defendant has suffered manifest

120

injustice by being denied sufficient access to a computer, let alone the courts, should be denied.

**VI.  Defendant's Claim that the Translation at Trial Was Misleading and Inaccurate is Procedurally Defaulted and Without Merit (Defendant's Claim 11)**

> 1.  <u>Defendant Procedurally Defaulted This Claim by Not Raising It on Direct Appeal</u>

Defendant alleges that the translation of Altmanis's testimony was misleading and imprecise because the interpreters translated "in the wrong register," allegedly making Altmanis seem more credible as a witness.  (Mot. at 157.)  At trial, defense counsel raised this issue with the court at the beginning of Altmanis's two-week testimony, which the court addressed.  Because defendant did not raise the issue on appeal, it is procedurally defaulted.[84]  <u>See</u>, <u>e.g.</u>, <u>Frady</u>, 456 U.S. at 162, 164; <u>Johnson</u>, 988 F.2d at 945.  Defendant cannot overcome procedural default here where counsel had significant opportunity to cross examine Altmanis and thus was not ineffective, and where defendant has failed to establish actual prejudice where the district court addressed the interpreter issue early on and there is no evidence that any translation was inaccurate.

> 2.  <u>Any Deviation by the Interpreters from the Standard of Word-for-Word Translation of Altmanis's Testimony Was Corrected by the Court Almost at the Outset of His Testimony With Instructions to the Four Court-Certified Interpreters</u>

The standard for the interpretation of witnesses at trial is

---

[84] Defendant makes additional related arguments, including that defendant could not hear Altmanis testify in Russian, counsel was ineffective in not requesting a sound recording of Altmanis's testimony, that portions of the proceedings were not sufficiently audible to be transcribed, and that defendant should have been provided with a written translation of the second superseding indictment by the government.  All these arguments were also procedurally defaulted, and meritless, as discussed below.

"continuous word for word translation," but occasional lapses in the standard "will not necessarily contravene a defendant's constitutional rights." United States v. Long, 301 F.3d 1095, 1105 (9th Cir. 2002).  In addition, issues with the interpretation of a witness's testimony are generally viewed "within the context of an entire trial."  Id. (where other evidence and witnesses besides testimony of witness at issue supported case against defendant).

Altmanis testified in Russian.  The district court retained four court-certified interpreters throughout Altmanis's testimony (Ex. 1, RT 10/10/06 at 3; RT 10/11/06AM at 3; Ex. 4, RT 10/11/06PM at 64; Ex. 10, RT 10/12/06AM at 3; Ex. 6, RT 10/12/06PM at 68; Ex. 15, RT 10/13/06AM at 3; Ex. 20, RT 10/13/06PM at 3; Ex. 29, RT 10/17/06 at 2; Ex. 30, RT 10/18/06 at 2; Ex. 31, RT 10/19/06 at 2; Ex. 23, RT 10/20/06 at 2), two who would trade off interpreting for Altmanis (as the witness) from Russian into English, and two who would trade off interpreting Altmanis's testimony from English into Russian for Mikhel and defendant, who would listen through headphones.

Defendant asserts that the interpreters used during Altmanis's testimony made Altmanis seem more polished, well-spoken, and intelligent than he was, appearing to contend that this violated defendant's right of confrontation.[85]  (Mot. at 157, 162).  Because defendant fails to identify any inaccuracies in the translation (much

---

[85] Most of the cases defendant cites pertain to the right of confrontation (Mot. at 157-58), although defendant cites to Aymo v. Sessions, 742 F. App'x 237 (9th Cir. 2018), which is inapposite because it involves demonstrably inaccurate translation in the context of a removal hearing where due process applies, and United States v. Edouard, 485 F.3d 1324 (9th Cir. 2007), which involved the need for an interpreter where one was not provided.  Both are inapposite here where there is no proof of inaccurate translation, only rank speculation, and where Kadamovas had an interpreter during trial at all times.

less any actual prejudice), this claim fails. See Torres Valenzuela v. Ryan, 2018 WL 6606252 *8 (D. Ariz. 2018) (speculation that improper translation could violate the confrontation clause did not support habeas relief where defendant did not allege testimony was inaccurately translated and did not identify any allegedly inaccurate translations).[86]

---

[86] Kadamovas cites Zoya Spivakovsky's declaration, one of the interpreters from the trial, in which she claims that Altmanis "came across as more polished on the witness stand" due to the tendencies of two of the interpreters at the trial, Ludmilla Glen and Alex Levoff, to interpret "in the wrong register." (Mot., Ex. 112, Declaration of Zoya Spivakovsky ("Spivakovsky decl.") ¶¶ 15-17.) However, Spivakovsky concedes that even so, "the meaning conveyed is the same." (Id. at ¶ 16.) She also claims that "[a] well dressed and neatly groomed interpreter is going to lend credibility, legitimacy, and status to a testifying witness." (Id. at ¶ 18.) Assuming this is true, it is not unique to this trial or this witness. Interpreters only convey what a witness says. It is not the interpreter's role to adopt the persona or demeanor of the witness. The interpreter comports both in demeanor and dress with the decorum of the judicial proceeding. Where there was no allegation that the interpreters interpreted Altmanis's testimony incorrectly and where the court admonished the interpreters almost at the outset of Altmanis's testimony to interpret word-for-word, these allegations have no merit.

Spivakovsky also asserts that the interpreters did not receive sufficient breaks and that one of the interpreters did not have enough energy to work because of illness and suffered from hearing loss, so other interpreters covered for her. (Mot., Ex. 1-110 (Ex. 112), Spivakovsky Decl., ¶¶ 12, 16-17.) Notably, Spivakovsky never raised any of her concerns with the parties or the court throughout the months' long trial but instead only raised them 16 years later. Regardless, Spivakovsky does not identify any inaccurate translation. Further, Spivakovsky's contention that while on break from interpreting for the witness they were required to interpret for defendant and his counsel, Spivakovsky fails to identify how frequent such demands were, especially where defense counsel would be focused on the witness testimony as opposed to having a lengthy exchange with defendant.

Finally, in an apparent attempt to discredit the government, Spivakovsky makes a puzzling claim about the conduct of an FBI agent while she was interpreting for the FBI for an unspecified "case in California." (Id. at ¶ 6). The lack of specifics and the interpreter's failure to identify the co-defendants in this paragraph in contrast to naming the co-defendants in this case suggests that this reference has nothing to do with this case or, even if it does, how it affected the accuracy of any interpretation.

The morning of the first full day of Altmanis's testimony before the jury was brought out, both counsel for Mikhel and Kadamovas reported to the court from their respective clients that the interpreters were putting Altmanis's words into "proper English" as opposed to translating the words Altmanis was actually using. (Ex. 3, RT 10/11/06AM at 9).[87] Mikhel's counsel advised that they spoke to one of the interpreters the day before and confirmed that the interpreters were extrapolating what Altmanis was saying into proper English as opposed to translating word for word. (Ex. 3, RT 10/11/06AM at 10.) The court noted that the court had brought in four interpreters for the trial, something "unheard of in this building [courthouse]" (Ex. 3, RT 10/11/06AM at 5), and that all four were court-certified after taking comprehensive tests. (Ex. 3, RT 10/11/06AM at 8, 10.) The court further noted that it had excluded at the beginning of trial one interpreter who was having difficulty. (Ex. 3, RT 10/11/06AM at 8.) Kadamovas's counsel responded that he was "not complaining about [the interpreters] or their qualifications or ability," that he thought they were "terrific interpreters," but that there needed to be a discussion with them about how to interpret. (Ex. 3, RT 10/11/06AM at 9.) In other words, defendant's counsel did not allege that the interpretation of Altmanis's testimony was inaccurate, only that it was not word-for-word. In fact, the record reflects that the interpreters at trial were quite diligent, asking clarifying questions of the attorneys and the witnesses and correcting themselves on the record if they realized they had made a mistake. (See Ex. 1, RT 10/10/06 at 54; Ex. 3, RT

---

[87] This confirmed that defendant, despite his complaint, was able to hear Altmanis testify in Russian.

124

10/11/06AM at 26; Ex. 6, RT 10/12/06PM at 112, as examples.)

At defense counsel's request, the court agreed to and did admonish the interpreters the morning of Altmanis's first full day of testimony before bringing the jury out:

> THE COURT: This is to the interpreters outside the presence of the jury. Counsel for the defendants have indicated that they are not happy with the way the interpretation is being done. They feel that the interpreters are editorializing or cleaning up the translation from Russian into English. So I have got to admonish the interpreters just to utilize the words that are spoken in Russian and translate, to the best of your ability and competency, the English translation as accurately as possible. With that, I will bring the jury in at this time.

(Ex. 3, RT 10/11/06AM at 10.)  Thus, the court took steps early on to resolve the issue and admonished the interpreters to interpret verbatim.  During the remainder of Altmanis's two-week period on the witness stand, no further objections to the interpretation (or to not being able to hear Altmanis's Russian testimony) were raised by either counsel.  Any limited instances where the interpreters put Altmanis's answers into proper English before being corrected by the court had no meaningful bearing on the jurors' evaluation of Altmanis's credibility (as defendant contends) where the issue was resolved.

Further, the jurors had the opportunity to observe Altmanis and his demeanor, who testified under oath, and defense counsel had the opportunity to cross examine him, all traditional protections of the right of confrontation.  Vasquez v. Kirkland, 572 F.3d 1029, 1038 (9th Cir. 2009) (citation and quotations omitted).  The opportunity for cross examination was ample here, where both Mikhel's and defendant's counsel cross-examined Altmanis for over a day each (Ex. 29, RT 10/17/06, Ex. 30, RT 10/18/06 (Mikhel's counsel); Ex. 31, RT

125

10/19/06, Ex. 23, RT 10/20/06 (Kadamovas' counsel)), and after redirect, engaged in recross examination.  (Ex. 23, RT 10/20/06.) Thus, where defense counsel had the opportunity to cross-examine Altmanis, "the main and essential purpose of confrontation [] to secure...the opportunity of cross-examination" had been met. Vasquez, 572 F.3d at 1035.

It is even less likely that any purported polish imparted to Altmanis's answers prejudiced defendant in the context of his entire trial, as Long instructs, where defendant was tied to the abductions and murders through other evidence, including the testimony of Markovskis and Solovyeva, physical evidence obtained at the crime scene and from the searches, and a six-pack identification from one of Pekler's colleagues when defendant visited Pekler's office. Markovskis testified about the abduction of Kharabadze and Safiev at Designed Water World where Markovskis was present, that defendant told him that defendant and Mikhel intended to kill Kharabadze and Safiev and dump their bodies where they had dumped other victims, and that defendant had killed a "fat Jew" (Muscatel) and thrown the body off a bridge after strapping weights to it.  Solovyeva also testified concerning the abduction of Kharabadze and Safiev since she was the lure that brought Kharabadze to Designed Water World, and to Kadamovas's disappearance on overnight trips, returning with blood on his clothes, as well as to his statement that he and Mikhel had thrown out the body of the American.

The physical evidence also was both damning and abundant, including defendant's shoeprint in Muscatel's blood found on a bridge at the New Melones Reservoir and the corresponding sneakers found at his residence, cell phone data showing defendant and Mikhel driving

to the reservoir on the days each victim was killed and near the reservoir at the time of their deaths, defendant's print on a pair of handcuffs found in Mikhel's house in addition to another pair with Kharabadze's DNA and a third with the DNA of Safiev, and a document containing Safiev's and Kharabadze's personal and financial information found at Mikhel's house that was in Kadamovas's handwriting and contained Kadamovas's fingerprints and palm prints. At Kadamovas's house, additional evidence was recovered, including weight plates with no weight bars or other exercise equipment, an envelope with the phone number used to call the Umansky family for ransom, and the recordings of Safiev talking to defendant and the mini-disk player used to make the recordings.  Further, carpet fibers taken from the carpet in defendant's house matched the carpet fibers retrieved from Kharabadze's clothing.  At Krylov's residence, a map of Kharabadze's home address was found that contained defendant's fingerprint.  Finally, one of Pekler's colleagues Svitlana Koragodska[88] identified defendant as "Volodia," the gentleman who came into Pekler's business two days before Pekler's disappearance and who Pekler went to visit the day she disappeared.  (Ex. 7, RT 10/25/06 at 186-194; Ex. 9, RT 10/26/06 at 27-28).  Against this backdrop of "detailed [and] comprehensive" evidence, with or without Altmanis's testimony, the evidence against defendant was "overwhelming." Mikhel, 889 F.3d at 1016.  Defendant's claim should be denied.

---

[88] Svitlana Korogodska's last name was misspelled as "Koragotska" in the 10/26/06 transcript.  (See Ex. 7, RT 10/25/06 at 186.)

3.   <u>Defendant Had No Constitutional Right to Hear Altmanis's Testimony in Russian Where the Evidence Was the Translated Testimony in English</u>

Defendant also complains about his inability to hear Altmanis testify in their shared Russian language (Mot. at 157), alleging a general constitutional violation without citing any authority.  (Mot. at 157, 167.)  The first day of Altmanis's testimony defense counsel requested that Altmanis speak up when testifying so that defendant could hear his testimony in Russian.  (Ex. 1, RT 10/10/06 at 25, 41.)  The court responded, "I can't really do that.  You got your own interpreter sitting next to you."  (Ex. 1, RT 10/10/06 at 41-42.)  The next morning defense counsel repeated this request, to which the court responded, "We will do the best we can."  (Ex. 3, RT 10/11/06AM at 5.)  Counsel did not raise the issue again.  There is no constitutional violation where Altmanis's testimony in Russian was not evidence, only the English translation was, and the jury was so instructed.  (CR Dkt. No. 1464 (jury instructions (given)), instruction number 31.)

4.   <u>Defendant Was Not Entitled to a Sound Recording of Altmanis's Testimony, Nor Was He Prejudiced by Its Absence</u>

Defendant also claims that trial counsel was ineffective for not asking for, in addition to a court reporter, "a sound recording of each day when a witness testified in a foreign language[,]" citing the Court Interpreters' Act, 28 U.S.C. § 1827(d)(2), (Mot. at 165-66).[89]  Counsel could not have been ineffective for raising it where

---

[89] Defendant also complains when a sound recording was used where in very limited instances the transcripts of the audio recordings contained portions classified as "inaudible" or with a *** notation (Mot. at 164), pointing to the transcript of January 24, 2007, the first day of the penalty-phase proceedings, as problematic, a claim that is now moot.  With respect to defendant's claims of inaudibility
*(footnote cont'd on next page)*

128

the Court Interpreters' Act does not entitle defendant to both a recording of every witness who testifies in a foreign language as well as court interpretation of that foreign language testimony.  The Act makes clear that it is up to the court whether to use a sound recording and in making such a determination, should consider (1) the qualifications and experience of the interpreters, (2) whether the language to be interpreted is not one where certified interpreters are available from the Director of the Administrative Office of the United States Courts, and (3) the complexity or length of the proceeding.  28 U.S.C. § 1867(d)(2).  Here, counsel could not have been ineffective for failing to make such a request when all four interpreters used throughout Altmanis's testimony were court-certified and subject to extensive testing for certification.  (Ex. 3, RT 10/11/06AM at 8, 10.)

_____

(***) during Altmanis's testimony on October 18 and 19, 2006 (Mot. at 164), defendant not only provides no specifics concerning the extent of inaudible portions, but also fails to identify what constitutional principle has allegedly been violated.  Certainly any limited inaudible portions did not affect appellate review.  Cf. Williams v. Barnhart, 289 F.3d 556, 558 (8th Cir. 2002) (where defendant gave "no indication what material facts were supposedly omitted or how any missing portion of the transcript could bolster her case" and the "remaining omissions [were] small gaps in the transcript that [did] not interfere with comprehension of the testimony to an extent that would hinder fair review" of an administrative claim) (citation and quotation omitted).  Under such circumstances, these limited gaps could not give rise to a constitutional violation.  Nor does defendant so assert.

5.  Defendant Was Not Entitled to a Written Translation of the Indictment

Defendant complains that he was not provided written translations of the various indictments, alleging without specifics a violation of the Sixth Amendment and the due process clause.  (Mot. at 165.)  Defendant had a written translation of the second superseding indictment (the operative charging instrument for trial) well over a year before trial began in July 2006.  Thus, defendant's claim is meritless and he suffered no prejudice.

Rule 10 of the Federal Rules of Criminal Procedure governs arraignments, and only requires that defendant have a copy of the indictment, that it be read to him or the substance of the charge told to him, with defendant then entering his plea.  (Fed. R. Crim. P. 10.)  Defendant was arraigned on the original indictment on March 11, 2002, with a Russian interpreter present, and pled not guilty. (CR Dkt. No. 50.)  Defendant was arraigned on the second superseding indictment on August 10, 2004, and again pled not guilty.  (CR Dkt. No. 514.)  Defendant admits that he had a written translation of the second superseding indictment through a hired translator on March 3, 2005 (Mot., Ex. 1-132 (Ex. 134), Chart of Translated Documents), over a year before jury selection began in July 2006.

Despite having a written translation, defendant elevates form over function asserting that the government was required to provide him one, citing a district court case out of the Eastern District of New York, United States v. Mosquera, 816 F. Supp. 168, (E.D.N.Y. 1993).  This district court case is neither binding nor controlling, and is not persuasive in light of the District of Columbia Circuit's

130

decision in United States v. Celis, 608 F.3d 818 (D.C. Cir. 2010), in which that Circuit noted that even the court in Mosquera explained "that the scope of translation in a given case is committed to the district court's discretion. Celis, 608 F.3d at 841 (citing Mosquera, 816 F. Supp. at 174.) "A court may decide to provide written translations in difficult and complicated cases, but that decision, like the management of discovery in general, is committed to the district court's discretion." (Id.) (citation and quotation omitted) (emphasis in original). Defendant's own chart of translations shows that defendant submitted the first superseding indictment and second superseding indictment for translation, the cost of which appears to be paid out of Court Justice Act ("CJA") funds (Mot., Ex. 1-132 (Ex. 134), Chart of Translated Documents, at 1), thus comporting to the practice condoned in Mosquera. Mosquera, 816 F. Supp at 174 (an attorney under the CJA may move for the translation of documents where necessary for adequate representation). Given that defendant was arraigned on the second superseding indictment and it was translated in writing for him through CJA funds over a year before trial started, there is no constitutional violation or actual prejudice.

All the permutations posited above are meritless. Defendant's claim should be either dismissed or denied.

**B. Defendant's Claim Alleging Failure to Instruct on Duress Defense is Procedurally Defaulted and Meritless (Defendant's Claim 12)**

**1.   Defendant Procedurally Defaulted This Claim By Not Raising It on Direct Appeal**

Defendant claims that his conviction on the conspiracy to escape is unlawful and unconstitutional because the jury was not instructed

to consider the defense of duress.  Because defendant did not raise this issue either at the district court or on appeal, it is procedurally defaulted.  See, e.g., Frady, 456 U.S. at 162, 164; Johnson, 988 F.2d at 945.

As noted above, a court may entertain a procedurally defaulted claim in habeas only if defendant establishes both cause for failing to raise the claim and prejudice.  Frady, 456 U.S. at 162, 164; Benboe, 157 F.3d at 1183; Ratigan, 351 F.3d at 964.  If defendant has not suffered actual prejudice, a court need not address whether defendant has established cause.  Frady, 456 U.S. at 168.  Cause may be satisfied if defendant establishes that his counsel was constitutionally ineffective pursuant to Strickland.  Murray, 477 U.S. at 479.  Here, defendant cannot make out a prima facie case of duress, so no attorney error occurred.

        2.    Defense Counsel Was Not Ineffective Where Defendant Cannot Make Out a Prima Facie Case of Duress

Defendant contends that defense counsel erred by failing to request a jury instruction (Mot. at 173), despite defendant's failure to establish a prima facie case of duress.  To establish a duress defense, a defendant must show that "(1) he was under an immediate threat of death or serious bodily injury, (2) he had a well-grounded fear that the threat would be carried out, and (3) he had no reasonable opportunity to escape" the threatened harm.  United States v. Kuok, 671 F.3d 931, 947 (9th Cir. 2012).[90]  Defendant presents no

[90] In the escape from prison context, a fourth element must be satisfied where the escape was completed or inmates are caught in the act of escaping:  that the defendant submitted to proper authorities after attaining a position or safety (escape completed), or defendant intended to surrender to authorities had the escape succeeded (caught while escaping).  United States v. Williams, 791 F.2d 1383, 1388 (9th

*(footnote cont'd on next page)*

proof of any of the elements. First, defendant articulates no immediate threat of death or serious bodily injury from Mikhel, nor could he, considering that he and Mikhel were housed four floors apart at MDC, Mikhel on Five South and Kadamovas on Nine South. Kadamovas only offers evidence of control through Mikhel's payment of money on Kadamovas's account in prison, Mikhel's plan to kill any guards who got in the way of the escape, and cooperator Parker's placement on suicide watch to disguise Parker's disclosure about the escape. (Mot. at 171.) None of this constitutes a threat, and certainly not the kind of immediate, specific and directed threat to Kadamovas required by law. The Ninth Circuit has explained that "the threat to the defendant or the defendant's family must be 'present, immediate, or impending,' such that the defendant's persecutors 'figuratively held a gun to his head' (or to his family's heads) compelling the defendant to commit the illegal action." Vasquez-Landaver, 527 F.3d 798, 802 (9th Cir. 2008) (citations omitted). See also Kuok, 671 F.3d at 948 ("Put simply, vague and undetailed threats will not suffice."); United States v. Gudino, 671 F. App'x 513, 514-15 (9th Cir. 2016) (threat suggesting that defendant's brother would be killed if defendant did not sell the drugs was neither specific nor direct to demonstrate an immediate threat).[91] Because there was

---

Cir. 1986). While not directly on point here, certainly by analogy defendant has offered no evidence that in the months the escape plan was put into effect did Kadamovas at any point try to alert prison officials like other inmates did, disproving his claim of being under duress.

[91] The three declarations defendant provided in support of this claim fall short. Defendant provided the declaration of Gary Krausz (Mot., Ex. 9) and Irina Volynsky (Ex. 1-3 (Ex. 1)) as evidence of Mikhel's control of Kadamovas, where Krausz is a certified public accountant who simply analyzed the ransom money trail to determine that Kadamovas received only 5.49 percent of the proceeds. (Mot.,

*(footnote cont'd on next page)*

133

no threat, defendant has articulated no "well-grounded fear" that any "threat" would be carried out, or no reasonable opportunity to escape any threatened harm.  Because defendant offers no proof of any of the elements required for a duress instruction, defense counsel was not ineffective for not requesting one.[92]

## C.   Defendant's Claim that the Government Failed to Produce Natalya Solovyeva's Diary is Both Procedurally Defaulted and Meritless (Defendant's Claim 14)

### 1.   Defendant Procedurally Defaulted This Claim By Not Raising It on Direct Appeal

Defendant argues that the government "suppressed" Natalya Solovyeva's diary in violation of the constitutional obligations under Brady v. Maryland, 373 U.S. 83 (1963), denying defendant the ability to confront evidence against him.  (Mot. at 181, 188-89.) Because defendant did not raise this issue either at the district court or on appeal, it is procedurally defaulted.[93]  See, e.g., Frady, 456 U.S. at 162, 164; Johnson, 988 F.2d at 945.

---

Ex. 1-9, (Krausz Decl., ¶ 4.))  Volynsky is a psychologist whose declaration is largely devoted to a social history of defendant's life, in addition to opining on the relationship between Mikhel and defendant based on her review of materials provided to her by the defense.  Stanislav Zadorozny met defendant in the Russian community in Los Angeles where Zadorozny was working as an electrician.  (Mot., Ex. 1-31 (Ex. 33), declaration of Stanislav Zadorozny ("Zadorozny Decl."), ¶ 7.)  Zadorozny stated that Mikhel seemed smarter than defendant and was the leader.  (Mot., Ex. 1-31 (Ex. 33), Zadorozny Decl., ¶ 17.) None of these declarations mention threats, much less the imminent threat required to support a duress defense.  They are not probative of this claim.

[92] Defendant points to co-defendant Krylov's trial as somehow supportive of his claim.  (Mot. at 172-73.)  However, simply because a duress instruction was given in one case does not absolve defendant of establishing a prima facie case of duress in his own.

[93] In passing, defendant also raises conclusory claims regarding the government's failure to produce Altmanis's diary, and redactions of Markovskis's day planner that allegedly made it "unusable."  (Mot. at 180, 192-93; 234 (Claim 19).)  Having not been raised on appeal, these claims are also procedurally defaulted, and counsel was not ineffective for raising these claims where defendant has pointed to
*(footnote cont'd on next page)*

Further, defense counsel was not ineffective where counsel reviewed the diary, as reflected in her use of it on cross examination.[94]  Thus, defendant fails to establish both cause for failing to raise the claim and actual prejudice.  <u>Frady</u>, 456 U.S. at 162, 164; <u>Benboe</u>, 157 F.3d at 1183; <u>Ratigan</u>, 351 F.3d at 964.  Even if there were portions of the diary that were suppressed, such suppression was immaterial.

2.    <u>A Complete Account of the Production of the Diary to the Defense Reveals No Misconduct</u>

Defendant alleges that the government withheld Solovyeva's diary by producing it late.  (Mot. at 189.)  This is incorrect both factually and legally.  First, the government did not produce the diary late.  The government produced the diary together with transcribed English summaries of significant portions of it a few days after receiving it from Solovyeva's counsel, Michael Crain.  Specifically, the government produced the diary and the transcribed summaries at the beginning of the week after having received the diary from Solovyeva's counsel the Friday before.  (Ex. 14, RT 10/31/06 at 6-8.)  Second, Kadamovas's trial counsel had ample time to review the diary and make use of its contents in cross-examination, which occurred on the date defendant requested.

Contrary to defendant's allegations that Kadamovas's trial counsel had only a "limited picture" of the diary's contents (Mot. at

---

no information either in Altmanis's diary or in Markovskis's day planner that was material and would have changed the outcome of the trial.  <u>Turner v. United States</u>, 582 U.S. 313, 323-24 (2017) (evidence must be "material" to constitute a <u>Brady</u> violation).

[94] Defendant asserts that the diary's contents would have been relevant to the penalty phase and the decision whether to impose the death penalty (Mot. at 190), an assertion that has been mooted by the commutation of Kadamovas's death sentence.

188), trial counsel not only had photocopies of all 437 pages of the diary in Russian (Ex. 63, RT 11/01/06 at 4) and transcribed English-language summaries of substantial portions of it (Ex. 14, RT 10/31/06 at 49)[95] a full week before cross-examining Solovyeva (Ex. 64, RT 11/07/06 at 5), they also were given the option to recall Solovyeva after analyzing her diary further.  (Ex. 63, RT 11/01/06 at 5; Ex. 11, RT 11/08/06 at 50.)  Trial counsel also had access to a Russian translator to translate the diary as well as the assistance of defendant, who was provided a full copy upon order of the court (Ex. 14, RT 10/31/06 at 67), a week before the cross examination took place.  (Cf. Ex. 14, RT 10/31/06 at 67 with Ex., 64,RT 11/07/06 at 5-6.)

Chahin used the diary during cross examination (Ex. 64, RT 11/07/06 at 75) and as noted above, defense chose not to recall Solovyeva after analyzing her diary further.  (Ex. 63, RT 11/01/06 at 5; Ex. 11, RT 11/08/06 at 50.)  Any notion that Solovyeva's diary was "suppressed" or that trial's counsel access to it was limited is mistaken.[96]

---

[95] At defendant's request, the government also provided the audiotaped translation summaries that the government prepared (Ex. 63, RT 11/01/06 at 8; Mot., Ex. 1-77 (Ex. 79), at 25 (referencing FBI SA Louis Perez), at 30, 55 (referencing FBI SA James Davidson.)

[96] Defendant states that the government produced an incomplete copy of the Russian diary based on entries in the English summaries that the government created and produced that do not correspond to the handwritten Russian version.  (Mot. at 189.)  In the government's review, it appears that there were fewer than 10 English summaries of entries with no counterpart in the Russian version of the diary.  Out of 437 pages of entries, this is negligible, especially where defendant received those entries in English, the diary in Russian, and the audiotaped translation summaries and transcriptions, and all entries predate – sometimes by almost two years and sometimes by several months – the charged offense conduct.  Absent identifying any withheld information as material in those less than 10 entries (i.e., a reasonable probability that disclosure of the withheld information

*(footnote cont'd on next page)*

136

> *a.    A complete account of how the court resolved issues involving Solovyeva's diary reveal that defense counsel had ample time to review – and did review – the diary*

Defendant's account of what transpired regarding Solovyeva's diary is misleading in its selectivity.  A more complete account from the record shows that the government turned over the diary within days of receiving it from Solovyeva's counsel, receiving it on a Friday and sending it to counsel on Monday.  Over the weekend in between, the government (through the FBI) had audiorecorded summaries in English made by interpreters of much of the diary[97] and then transcribed those summaries (also over the weekend), providing those to defense as well, which counsel received on Tuesday the following week.  Finally, the government also advised counsel of what it believed to conceivably be the most relevant information from the diary, while also advising counsel that the diary's entries pre-dated the charged conduct in this case.[98]  (Ex. 14, RT 10/31/06 at 8-9; Ex. 63, RT 11/01/06 at 6-7.)

---

would have changed the outcome of the trial), defendant's claim is purely speculative and should be denied.

[97] At one point government counsel (DeWitt) told the court that the summaries were not made by the government, but this is in apparent reference to herself in terms of who decided which parts of the diary to translate into English.  (RT 10/31/06 at 49) (**Ms. DeWitt:...** And, for the record, your Honor, those summaries that were made were not made by the Government, so it wasn't me decided what to select or not.  It was somebody who was trying to do a quick job to get this turned around so that they could have an idea of what was in the entries.").  The references in the English summaries to FBI Special Agents Louis Perez and James Davidson (along with names of interpreters) appear to demonstrate that the audiotaped English summaries were made by interpreters working with the FBI. (Ex. 63, RT 11/01/06 at 8; Mot., Ex. 1-77 (Ex. 79), at 25 (referencing FBI SA Louis Perez), at 30, 55 (referencing FBI SA James Davidson.)

[98] During the government's direct of Solovyeva, she confirmed that the entries in the diary predated the events of the case:

**BY MS. DeWITT:**

...

*(footnote cont'd on next page)*

Specifically, the morning of October 31, 2006, when defense counsel received Solovyeva's diary, Chahin told the court:

> ...This morning we received some additional discovery from the Government, a FedEx box which contained, among other things, a Russian language diary of a witness [Solovyeva] who is expected to testify possibly as soon as tomorrow.  I have not had a chance to go through it yet and once we go through it -- we'll have to go through it with an interpreter. It may be necessary for us to request that the Court postpone our cross examination of this witness until we've had a chance to look at this.

(Ex. 14, RT 10/31/06 at 6.)

The court responded:

> That's no problem. You can do the direct examination and then see what happens and go through the diary. If there's anything in there, you can call her back in a couple of days or next week....

(Ex. 14, RT 10/31/06 at 7.) Chahin requested to defer her entire cross examination until completing her review of the diary:

> Your Honor, I don't know how long the diary is; like I said we just got the document. I don't know what's in there. We have summary translations, but I would like to defer my entire cross examination, because I don't know if there's things in here that are going to affect the questions that I need to ask her.

(Ex. 14, RT 10/31/06 at 7.)

---

> Q And Ms. Solovyeva, approximately when did you stop keeping a diary?
>
> A In 2001.
>
> Q When in 2001?
>
> A At the end of April of 2001.
>
> Q So Ms. Solovyeva, is it accurate to say that you stopped keeping a diary approximately five to six months before any of the events that you've testified about here today?
>
> A Yes.  (Ex. 32, RT 11/03/06 at 71.)

138

Government counsel (DeWitt) explained the government's effort in obtaining and producing the diary, explaining they had received it only a few days before (counting the weekend):

> Just to let you know what the situation is, we just got these diaries ourselves on Friday. It was my understanding that they were being translated, and in fact what we got was not a translation of the documents but was a summary of them done by a translator on audiotape. We spent about, I don't know, close to 20 hours this weekend typing up those summaries and we made as quickly as we possibly could a copy of the actual diaries themselves as well as the summaries of the diaries available to them as soon as we could get them copied.
>
> I want to note for the record, because I think this is important, these are diaries that were written essentially by a woman in her twenties, her personal diaries, and they were written before any of the events that happened involving this case ... I've tried to advise [defense counsel], give them a heads up as to what I think could even be wildly in my imagination relevant, because there's some negative stuff that she makes -- comments she makes.

(Ex. 14, RT 10/31/06 at 8-9.)

Despite this well-documented chronology, defendant attempts to cast unfounded aspersions on the government, claiming "the diary had been in the government's possession much earlier."  (Mot. at 183.) This claim is incorrect, with defendant admitting as much through the declaration of Solovyeva's counsel Michael Crain, which defendant submitted in support of his petition.  Crain declared:

> A few days before [Solovyeva] was scheduled to testify in the Mikhel/Kadamovas trial, I received a call from either an Assistant US attorney or a federal agent asking about the box of her property. The caller told me that they were looking for something handwritten in Russian. I went to the box and looked through it and found what he described, and called him back.
>
> Special Agent James Davidson came to my house. I handed him the handwritten journal in the driveway and he left with the journal.

139

(Mot. at 80, Ex. 1-78 (Ex. 80), Declaration of Michael Crain ("Crain Decl.") ¶¶5-6; see also Ex. 63, RT 11/01/06 at 7.)

Not fully understanding the timeline concerning when the government received the diary from Solovyeva's counsel and its subsequent production to the defense, the court expressed concern over the timing of the diary's production, at which point government counsel repeated how and when the government came to possess the diary:

> **THE COURT:** ... You know I'm not a happy camper when the Government at the last minute all of a sudden turns over documentation. ...
>
> ...
>
> **MS. DeWITT:** Your Honor, I got these documents on Friday. And I got the tapes on Saturday. And I had -- I brought people in over the weekend and spent 20 hours typing up these tapes.
>
> **THE COURT:** Where did --
>
> **MS. DeWITT:** That's the first time I got them.
>
> **THE COURT:** Where did these documents come from?
>
> **MS. DeWITT:** From her client. From [Solovyeva's] attorney. I didn't get them until then, and I turned them over as quickly as I can. And this is the first time that they've asked me for the actual tapes. I'm not really sure why they want the tapes, but I'm going to do everything I can to expedite getting them a copy of the tapes.
>
> But they have a transcription of them, which is, you know, a verbatim, to the best of the ability of the people that do it, copy of the tapes.
>
> **THE COURT:** I understand. But see what you have to realize is in these kind of cases, the trial is a very small portion of what takes place. Because the defense is geared up for whether it's their agenda or for their defense of the defendant to take this case you know step by step through the process, which may take anywhere from eight to ten years. That's just the way it is.
>
> **MS. DeWITT:** I understand, your Honor. And for what it's worth, just two points. One, I'm as unhappy about getting these at the last minute as the defense is. ...

140

(Ex. 63, RT 11/01/06 at 7-8.)  There was no misconduct in the timing of the disclosure of Solovyeva's diary.

>              *b.    Defendant's cross examination of Solovyeva occurred on the date counsel requested after having had the opportunity to review the diary*

The timing of Solovyeva's examination was complicated by her counsel being in trial in another case.  Thus, notwithstanding the timing of the government's receipt and production of the diary and English summaries, the court expressed a separate concern about Solovyeva needing the presence of her counsel Crain in court during her testimony, while Crain was simultaneously occupied in another trial "next door."  (Ex. 14, RT 10/31/06 at 7, 9.)  While acknowledging the court's concern, government counsel expressed reservations about the fairness of letting defense counsel postpone their cross examination well after the government conducted its direct:

> I don't disagree with that at all, your Honor. But I do have a problem with the idea of her [Solovyeva] being put on direct examination and then them having a week or more to sit back and think about their cross examination. I don't think that's fair.

(Ex. 14, RT 10/31/06 at 9.)

The court dismissed the government's concern about fairness in light of the "bigger problem" of Solovyeva's counsel being required to be in two courtrooms simultaneously.  (Ex. 14, RT 10/31/06 at 9-10.)  Government counsel repeated her concern, stating, "I do think that this concept of splitting the direct from the cross is not fair to Ms. Solovyeva or to the Government and I don't think that's appropriate."  (Ex. 14, RT 10/31/06 at 10.)  The court then told Chahin she would "have to look at those diaries tonight" (Ex. 14, RT 10/31/06 at 11), given the possibility of Solovyeva testifying the

next day.  (Ex. 14, RT 10/31/06 at 15.)  Chahin suggested that the "fairer thing to do would be to put the entire examination over if the Government doesn't want to split up the direct and the cross." (Ex. 14, RT 10/31/06 at 11.)  To this the court expressed frustration over scheduling issues involving Solovyeva's counsel.  (Ex. 14, RT 10/31/06 at 11-12.)

The next day, Chahin gave a more complete assessment to the court regarding Solovyeva's diary, explaining:

> Your Honor, with respect to the Natalya diary that I spoke to the Court about yesterday, I just wanted to give to the Court some more information. The diary is 437 pages written in longhand in Russian. Okay. We have summaries, but we don't have a complete review of what those 437 pages are.
>
> I have reviewed the summaries, which the Government has transcribed after listening to cassettes prepared by a court interpreter. We don't have copies of those tapes. So I guess the first thing that we would like to do is obtain copies of those tapes from the Government and be able to listen to them.
>
> In addition to that, I think that we need to be able to have an interpreter either read to us or translate for us pertinent portions of the diary. The Government has characterized this as a diary of the folly of a young girl outside of the time period of this case. But there are numerous statements in there which go to credibility, bias, and motive.
>
> There are repeated statements of her being involved in frauds, including immigration fraud, including thefts, including attempts to have someone erase information from a computer regarding her participation in government programs. There are repeated statements regarding her hatred of Mr. Kadamovas, and there's even one reference where she says something to the effect of "I'm not going to do him any harm especially. But if the opportunity arises, I will."
>
> So there are, as I indicate, repeated statements which are relevant for our ability to be able to cross-examine her.

(Ex. 63, RT 11/01/06 at 4-5.)  On this record, the court reiterated its position that counsel would be permitted to recall Solovyeva to

142

the witness stand to "cross-examine her about the material that's contained in the diaries should [counsel] believe it's necessary." (Ex. 63, RT 11/01/06 at 9.)

Later that same day, defendant's capital counsel Lasting requested that the court recess the trial upon completion of the government's direct "and resume on Tuesday, [November 7, 2006]." (Ex. 63, RT 11/01/06 at 72.) The court denied the request but acknowledged that many other delays could occur (see Ex. 63, RT 11/01/06 at 72), again reiterating that Solovyeva could be recalled once counsel had an opportunity to review the entire diary. (Ex. 63, RT 11/01/06 at 72.) Ultimately, Kadamovas's counsel was not forced to cross-examine Solovyeva until the day they requested, Tuesday, November 7, 2006. Despite being subject to recall at defense counsel's request (Ex. 11, RT 11/08/06 at 50), counsel opted not to do so.[99]

The record demonstrates that defendant received Solovyeva's diary, that counsel had ample time to review the diary to contemplate using it, and in fact, did use it for its cross examination of Solovyeva. Under such circumstances, counsel was not ineffective. Defendant fails to point to a single instance of material information from its fully translated diary[100] that defense counsel overlooked.[101]

---

[99] Mikhel's counsel also did not further cross examine Solovyeva when given the opportunity by the court after having the weekend to review the diary. (Ex. 64, RT 11/07/06 at 5.) This appears to be sound trial strategy where, as Solovyeva testified, she stopped keeping a diary approximately five to six months before the conduct at issue here. (Ex. 32, RT 11/03/06 at 71.)

[100] It appears that defendant's Exhibit 1-80 (Ex. 82) is a full translation of Solovyeva's diary in Russian (Ex. 1-79 (Ex. 81)) that defendant had prepared for purposes of this motion.

[101] Defendant also complains that the government failed to provide him a complete translation of the diary (Mot. at 178, 188-

*(footnote cont'd on next page)*

Such conclusory allegations are not cognizable in habeas.  See Rodriguez, 49 F.4th at 1217 (explaining such claims are "so palpably incredible or patently frivolous as to warrant summary dismissal") (quoting United States v. Schaflander, 743 F.2d 714, 717 (9th Cir. 1984)).

### 3.   Even Had the Government Withheld Portions of the Diary, Such Withholding Would Not Have Been Material under *Brady*

Even had the government withheld portions of Solovyeva's diary, it would not be sufficient to constitute a Brady violation.  As the Supreme Court made clear in Turner v. United States, Brady is not violated even if evidence favorable to the defendant is withheld. Turner v. United States, 582 U.S. 313, 323-24 (2017).  "The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense."  Barker v. Fleming, 423 F.3d 1085, 1099 (9th Cir. 2005) (quoting United States v. Croft, 124 F.3d 1109, 1124 (9th Cir. 1997)).  Materiality is defined as "...when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different."  Turner, 582 U.S. at 323-24 (citing Cone v. Bell, 556 U.S. 449, 469-470 (2009)); Maxwell v. Roe, 628 F.3d 486, 509 (9th Cir. 2010).  "In other words, favorable evidence is subject to constitutionally mandated disclosure when it 'could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'"  Cone, 556 U.S. at 469-70 (citing Kyles

89), but points to no authority requiring the government to do so, especially where defendant had access to a Russian translator to translate the diary, had English summaries of much of it, and defendant himself was given a full copy of the diary in Russian to aid his counsel in their review.  (Ex. 14, RT 10/31/06 at 67.)

v. Whitley, 514 U.S. 419 (1995)).  Materiality is a "formidable barrier to relief" on a Brady claim.  Hampton v. Shinn, 143 F.4th 1047, 1063 (9th Cir. 2025).

Defendant fails to assert that anything allegedly withheld was material to the defense because there was no reasonable probability that the outcome of the trial would have been different, or even that it could have been helpful where Solovyeva stopped keeping the diary months before the offense conduct in this case occurred.  See Sarno, 73 F.3d at 1506 (evidence did not satisfy Brady standard when Court was "unable to discern how disclosure could have aided the Defendant's cause.").  Even assuming that undisclosed portions of the diary provided some new ground for impeachment, it still was not material because much of Solovyeva's testimony "was merely cumulative to the testimony of a number of the government's other witnesses," here, Altmanis and Markovskis.  Croft, 124 F.3d at 1124.

Further, defendant must also establish prejudice to succeed on a Brady claim.  "For purposes of determining prejudice, [] the withheld evidence must be analyzed in the context of the entire record."  United States v. Olsen, 704 F.3d 1172, 1184 (9th Cir. 2013) (cleaned up).  Where the Ninth Circuit found the evidence against Kadamovas to be "detailed, comprehensive, and in a word, overwhelming" (Mikhel, 889 F.3d at 1016), any alleged failure to disclose would have been immaterial to the trial's outcome.

145

**D.   Defendant's Claim of a Sixth Amendment Violation under Massiah Is Procedurally Defaulted and Without Merit (Defendant's Claim 13)**

1.   Defendant Procedurally Defaulted This Claim by Not Raising It on Direct Appeal

Defendant asserts that the government improperly used a confidential informant, Jose Avila, to gather information from defendant in violation of Massiah v. United States, 377 U.S. 201 (1964).[102]  Because defendant did not raise this issue at the district court or on appeal, it is procedurally defaulted.  See, e.g., Frady, 456 U.S. at 162, 164; Johnson, 988 F.2d at 945.

A court may entertain a procedurally defaulted claim in habeas only if defendant establishes both actual prejudice and cause for failing to raise the claim.  Frady, 456 U.S. at 162, 164; Benboe, 157 F.3d at 1183; Ratigan, 351 F.3d at 964.  A defendant may establish cause if he demonstrates that (either trial or appellate) counsel were constitutionally ineffective within the meaning of Strickland.  See United States v. Birtle, 792 F.2d 846, 847 (9th Cir. 1986) (Strickland is the proper standard by which to evaluate the effectiveness of counsel on appeal).

---

[102] Defendant states that Avila's testimony was the only evidence "meaningfully linking" defendant to the escape attempt.  (Mot. at 176.)  This is incorrect.  As the Ninth Circuit noted, there was also the testimony of Billy Parker, who testified that he heard Mikhel talking through the vents in a foreign language to someone on Nine South (Kadamovas's cellblock); the testimony of Sabrina Tynan that the fourth cell phone she bought to smuggle into MDC-LA she believed, although she was not certain, was for defendant; prison records showing that Mikhel had deposited money onto the accounts of co-conspirators, including defendant; and most tellingly, inmate housing records showing that Kadamovas managed to be assigned to a cell adjacent to a stairway that they intended to use for their escape, Mikhel, 889 F.3d at 1049-50, a placement that Kadamovas was sanctioned for as an unauthorized placement.  (Ex. 34, RT 12/06/06 at 132-33, 135-37.)

146

Defendant does not establish cause under <u>Strickland</u> because there is no evidence that Avila was ever activated as a government informant who engaged in conduct triggering a <u>Massiah</u> violation.

>       2.    <u>Because Defendant's *Massiah* Claim Is Meritless, Defense Counsel Was Not Ineffective for Failing to Raise It at Trial or On Appeal</u>

To establish a <u>Massiah</u> violation in the Ninth Circuit, "a defendant must demonstrate both that the informant was acting as a government agent and that the informant deliberately elicited incriminating statements." <u>Fairbank v. Ayers</u>, 650 F.3d 1243, 1255 (9th Cir. 2011). The rule applies "even when the defendant initiates the contact with the informant, if the state knowingly circumvents the accused's right to have counsel present." <u>Id.</u> (citation and quotations omitted.) Defendant fails to establish either prong of this test.

>             a.    *Avila was not a "government agent" for the purpose of Massiah claims in the Ninth Circuit*

For an informant to be a "government agent" for purposes of <u>Massiah</u>, the Ninth Circuit requires the informant to have been instructed by the police to gather information about a particular defendant. See <u>Brooks v. Kincheloe</u>, 848 F.2d 940, 945 (9th Cir. 1988) (rejecting a defendant's <u>Massiah</u> challenge because the informant to whom defendant spoke about his crime "was not instructed to ask [the defendant] any questions, and was not promised any 'deals' or rewards for any information he might provide."). See also <u>Fairbank</u>, 650 F.3d at 1256 (holding that the informant did "not act[] as a state agent because law enforcement officers had never asked him

147

to solicit information from [the defendant].").[103]  Defense does not point to any evidence indicating that the government instructed Avila to elicit information from defendant.  Nor could Avila have elicited such information, based on the sequence of events described below.

Avila was charged in February 2001 out of the Northern District of Ohio for drug trafficking.  Avila signed a cooperation plea agreement in July 2001 on this drug case.  (Ex. 33, RT 12/08/06 at 179.)  Pursuant to Rule 20 proceedings, Avila was transferred to California for sentencing.  (Ex. 33, RT 12/08/06 at 180-83.)  Avila met with government officials for the first time on October 26, 2001, to provide them with information on drug trafficking.  (Ex. 1-93 (Ex. 95); Ex. 33, RT 12/08/06 at 182-83.[104])  He again met with DEA agents in March 2002. (Mot., Ex. 1-93 (Ex. 95).)  A couple of months later, in May 2002, he signed another cooperation plea agreement with the Central District of California pleading to the same drug charges that were the basis for the indictment out of Ohio.  (See CR Dkt. No. 52, Avila cooperation plea agreement, filed under seal, May 23, 2002, attached hereto as Exhibit 70.)  Avila testified that he was seeking to cooperate to avoid deportation.  (Ex. 33, RT 12/08/06 at 183-85, 187.)

---

[103] The Ninth Circuit's approach along with several other circuits has been deemed a "bright line rule," where "an informant becomes a government agent...only when the informant has been instructed by the police to get information about the particular defendant."  (Ayers v. Hudson, 623 F.3d 301, 310-11 (6th Cir. 2010) (citing, among others, the Ninth Circuit opinion in Brooks v. Kincheloe, 848 F.2d 940, 945 (9th Cir. 1988)) (quotation omitted). The purpose of the Ninth Circuit's test is precisely to distinguish between those informants who are acting as government agents from others who are not.

[104] In trying to recall the date, Avila mistakenly remembered that he met with the government only once in February 2002.

From December 13, 2001, to September 10, 2002, Avila was housed in the same MDC-LA cellblock as Mikhel on Five South.  (Ex. 33, RT 12/08/06 at 196-97.)  Defendant was housed on Nine South.  (Ex. 33, RT 12/08/06 at 190-91.)  After learning details of the escape plan from Mikhel and other inmates while housed on Five South, Avila called his lawyer to set up a meeting with the government.  (Ex. 33, RT 12/08/06 at 142, 189.)  At this meeting in March 2002, Avila told the prosecutor and two DEA agents about the escape plan, but refused to divulge the names of the participants unless the government guaranteed his safety and helped him avoid deportation.  (Ex. 33, RT 12/08/06 at 143, 200-05.)  The government made clear that it would not promise Avila any benefits or make any deal for the information he had obtained.  (Ex. 33, RT 12/08/06 at 205.)  After the meeting, DEA agents conducted their own investigation and concluded Avila was lying.  (Ex. 33, RT 12/08/06 at 143.)  The prosecutor advised Avila's lawyer that if Avila could obtain information that was credible and believable, then the government might be willing to meet Avila again. (Ex. 33, RT 12/08/06 at 143-44.)

The timing of these meetings in October 2001 and March 2002 is fatal to defendant's claimed Massiah violation because it demonstrates that the information came from Mikhel (and other inmates) on Five South, not Kadamovas, with whom Avila had not yet been housed on cellblock Nine South.  (Ex. 33, RT 12/08/06 at 191, 195-96, 197.)  Given the skepticism that the government expressed about Avila's information and given where Avila had been housed at the time of these meetings, defendant's argument that Avila was a government agent and was directed to collect information from defendant is not credible.

149

Months later, between late September and early October 2002 after serving time in disciplinary segregation, Avila was transferred to the cellblock where defendant was housed, Nine South. (Ex. 33, RT 12/08/06 at 144, 200 (Avila was housed on the ninth floor from September 13, 2002, to October 4, 2002).) Defendant approached Avila at Mikhel's direction to discuss the escape. (Ex. 33, RT 12/08/06 at 144 (Avila: "I guess that Iouri in Five South [Mikhel] had told him [defendant] that I was going to be getting out of the hole [disciplinary segregation] and for him to find me.") During Avila's limited time on Nine South, defendant approached Avila in the common area and waived for him to follow defendant to his cell. (Ex. 33, RT 12/08/06 at 146.) Defendant then waived at the vent inside his cell, through which Avila heard Mikhel's voice from Five South, telling Avila it was all right for Avila to speak to defendant. (Ex. 33, RT 12/08/06 at 147.) After this introduction by Mikhel, Avila and defendant spoke about the escape attempt. Defendant told Avila that defendant was supposed to make a hole behind his pillow that he could squeeze through into the stairwell at a prearranged time. (Ex. 33, RT 12/08/06 at 147.) In front of Avila, defendant took a piece of paper and sketched the type of tools they were going to need. (Ex. 33, RT 12/08/06 at 147.) Avila met again with law enforcement in October 2002 after transferring from Nine South to the sixth floor (Ex. 33; RT 12/08/06 at 200), but was met with the same response. (Ex. 33, RT 12/08/06 at 158.) At trial, Avila testified that he ultimately gave up on providing the government with information about the escape. "I just kind of left it at that," he said. (Ex. 33, RT 12/08/06 at 156.)

Avila was transferred off Nine South and eventually was returned to Five South in February 2003 where Mikhel was housed.  (Mot., Ex. 1-90 (Ex. 92) (Avila housing record); Ex. 34, RT 12/06/06 at 148-49 (Battley testimony)).  Mikhel had Avila help with bringing tools into MDC-LA, relocating an inmate to use his cell to bring in tools, serving as a lookout, and stuffing tools into his clothing to bring to Mikhel's cell.  (Ex. 33, RT 12/08/06 at 148-49, 152-53, 154-56, 157.)  Shortly after, when the attempted escape was discovered and the entire institution was placed on lockdown, Avila slid a note underneath the door to MDC-LA officials saying that he could provide information about the escape.  At that point he gave full information about the escape to MDC investigators and the FBI.  (Ex. 33, RT 12/08/06 at 158, 207-08.)

Defendant's claim fails because he points to no evidence that Avila was ever activated as a confidential informant, despite having signed a cooperation plea agreement.[105]  Defendant's claimed Massiah violation rests entirely on the fact that Avila was under a cooperation plea agreement with the government at the time he spoke with defendant.  (Mot. at 202-03 (Claim 15).)  But the mere act of signing a cooperation plea agreement or meeting with government representatives does not render Avila a "government agent" under the Ninth Circuit Massiah test.  See e.g., Brooks, 848 F.2d at 942, 945

---

[105] Although uncharged in the escape attempt, Avila functioned as a cooperating defendant.  (RT 12/08/06 at 141 ("Q: Now, you said that he [Mikhel] approached you and asked you if you were interested in helping with the escape.  What did you say? A [Avila]: Initially I said no, and then when he asked me again I said yes."); at 208 (Q: So you met with the FBI agents in March 2003, correct? A: Yes, ma'am. Q: And at that point you had already been a participant in this escape plan, correct? A: Correct. Q: And were you ever charged with the federal offense of assisting in an escape? A: No.")).

(informant was not a government agent for <u>Massiah</u> purposes even where informant had cooperated with the government on multiple occasions). Defendant also attempts to use standard, conditional language from Avila's second plea agreement with the United States Attorney's Office in Los Angeles as proof that Avila was an informant:

> Defendant [Avila] further has expressed an interest in the future to cooperate fully with the USAOS, the Federal Bureau of Investigation and the Drug Enforcement Administration, and, as directed by the USAOS, with any other federal, state, or local law enforcement agency.  The cooperation requires defendant to:
>
> ***
>
> (d) Act, <u>if requested to do so</u>, in an undercover capacity, including the wearing [of] a recording device and consensual recording of telephone conversations, to the best of defendant's ability in connection with criminal investigations by federal, state or local law enforcement authorities, in accordance with the instructions of those law enforcement authorities.

(Mot. at 202-03) (emphasis added).  However, defendant points to no evidence that the government actually requested Avila to operate in an undercover capacity through these provisions of the agreement.

Nor does defendant point to other evidence that the government instructed Avila to elicit information from defendant.  In fact, the evidence shows the opposite.  Far from instructing Avila to obtain information from defendant, the government disbelieved him (Ex. 33, RT 12/08/06 at 156 ("[n]obody wanted to believe my story"), did not promise him any benefits (Ex. 61, RT 12/12/06 at 35[106]), and returned

---

[106] Q:  Mr. Avila, did you receive any further reduction in your sentence besides the three and a half years you originally received?

A: No, ma'am.

Q: And by the time you're testifying here today, you've already been released from custody?

A: Correct.

*(footnote cont'd on next page)*

152

Avila to his cell, which was never on Kadamovas's cellblock at the time of these meetings.[107]  It was not until the escape attempt was discovered in March 2003 that Avila provided full information and the government believed him.

The law is clear that an informant who voluntarily provides the government with information, without being instructed to do so, is not a "government agent."  The mere fact an informant is under a plea agreement cannot render him a "government agent" if he has not been instructed by the government to collect information on a particular defendant.  Under these circumstances, Avila was not a government agent.  Therefore, defense counsel were not ineffective for failing to raise a Massiah claim on direct appeal.

> b. *Avila did not "deliberately elicit incriminating statements" from defendant*

Defendant's Massiah challenge also fails at step two of the Ninth Circuit's test because Avila did not "deliberately elicit" incriminating statements from defendant.  "[T]he primary concern of the Massiah line of decisions is secret interrogation by

---

Q: Has the Government promised you anything for testifying here today?
A: Nothing.
Q: Any promise of lawful, permanent resident status?
A: No.
Q: Any promise of citizenship?
A: No.
Q: Any promise of assistance with your immigration?
A: No.
(Ex. 61, RT 12/12/06 at 35.)

[107] Defendant did receive a reduction in sentence of 3½ years for cooperation credit, which included information he obtained regarding the escape attempt.  (Ex. 33, RT 12/08/06 at 181.)

153

investigatory techniques that are the equivalent of direct police interrogation." Kuhlmann v. Wilson, 477 U.S. 436, 459 (1986) (overruled by statute on other grounds).  To make out a Massiah violation, "the defendant must demonstrate that the police and their informant took some action, beyond merely listening, that was designed to elicit incriminating remarks." Kuhlmann, 477 U.S. at 458-59.  The government or an informant can also "deliberately elicit" information from a defendant when the government "intentionally creates a situation likely to induce an indicted defendant to make incriminating statements without counsel's assistance." United States v. Kimball, 884 F.2d 1274, 1278 (9th Cir. 1989).

There is no evidence that Avila took active steps to elicit information from defendant and his co-conspirators.  In fact, the trial record shows that defendant and his co-conspirators approached Avila and drew him into their plans.  Avila testified that he heard about the escape plan from an unrelated third party:  his cellmate in MDC-LA who was not involved in the escape.  (Ex. 33, RT 12/08/06 at 138-39.)  In March 2002, Avila was approached by Mikhel, who told Avila that he wanted to escape and wanted to know if Avila was interested.  (Ex. 33, RT 12/08/06 at 139.)  At first, Avila declined to participate, but later agreed to join.  (Ex. 33, RT 12/08/06 at 141.)  Later, when Avila was transferred to defendant's cellblock on Nine South, defendant approached Avila, gestured that Avila should follow him to his cell to talk to Mikhel through the vents, then discussed with Avila the escape plan itself.  (Ex. 33, RT 12/08/06 at 146-47.)  After that, Avila was approached repeatedly by the co-conspirators to plan the escape.  (Ex. 33, RT 12/08/06 at 148-49,

154

151.)  Defendant points to no instance where Avila himself took steps to deliberately elicit information from defendant.

Nor do these facts suggest that the government engineered circumstances likely to induce defendant to make incriminating statements to Avila.  Defendant's citation to the Supreme Court's decision in United States v. Henry, 447 U.S. 264, 274 (1980), is inapposite.  (Mot. at 176-77.)  In Henry, the government intentionally placed a paid government informant in the same cellblock with defendant, instructing the informant to obtain information about the charged crime from the defendant but expressly admonishing him not to ask defendant any questions.  Henry, 447 U.S. at 268.  The inmate collected information and was later paid for it. Id. at 266, 270.  In finding a Sixth Amendment violation, the Supreme Court found that the government "deliberately elicited" incriminating statements from the defendant (id. at 270), and that "under the circumstances, the agent 'must have known' that [the inmate] would take affirmative steps to secure incriminating information."  Maine v. Moulton, 474 U.S. 159, 175 (1985) (quoting Henry, 447 U.S. at 271).  No similar facts exist here.

Even if Avila had elicited information from defendant, which he did not, that is not necessarily enough to establish a Massiah violation.  See Brooks, 848 F.2d at 942 (where the informant "did take action beyond mere listening" by asking questions about the murder but there was no Massiah violation because the informant did so before contacting law enforcement); Fairbank, 650 F.3d at 1256 (where the informant asked the defendant about the murder weapon to obtain information that he could give to law enforcement but was not

directed to do so by law enforcement).  As the above makes clear, Avila was not operating under instructions from law enforcement.

In short, Avila was recruited by defendant and Mikhel to be a participant in the conspiracy, and during that participation, obtained incriminating statements from defendant.  Defendant points to no evidence that the government engineered circumstances likely to induce defendant to make incriminating statements.  "[T]he Sixth Amendment is not violated whenever—by luck or happenstance—the State obtains incriminating statements from the accused after the right to counsel has attached."  Maine, 474 U.S. at 176.

Defendant's Massiah challenge should be denied.

**E.    Defendant's Claim that the Government Failed to Produce Impeachment Evidence for Witness Jose Avila Concerning the Conspiracy to Escape is Procedurally Defaulted and Without Merit (Defendant's Claim 15)**

    1.    Defendant Procedurally Defaulted This Claim by Not Raising It on Direct Appeal

Defendant alleges that the government suppressed impeachment evidence related to Jose Avila (Mot. at 195-208)[108], a former MDC-LA inmate who testified for the government regarding Mikhel and Kadamovas' involvement in the planned escape from the institution. (Ex. 33, RT 12/08/06 at 137-217; Ex. 61, RT 12/12/06 at 30-35.) Because defendant did not raise this issue on appeal, it is procedurally defaulted.  See, e.g., Frady, 456 U.S. at 162, 164;

---

[108] Defendant also asserts that the government failed to disclose "material evidence or information that would have led to material evidence" regarding involvement of MDC staff in the escape plan (Mot. at 199-200, 208-10), a claim he also makes in Claim 16.  (Mot. at 211.)  Because the details of defendant's argument here (Mot. at 208-10) are repeated in Claim 16, the government's response is set forth only once in response to defendant's Claim 16.  Further, as noted elsewhere, to the extent defendant's assertions in this claim are used to challenge the penalty phase, such a claim is now moot.

156

Johnson, 988 F.2d at 945.  Further, because the government did not withhold impeachment information and because Avila was not a confidential informant, as defendant mistakenly claims, defense counsel was not ineffective for failing to raise the claim either at trial or on direct appeal.

### 2. The Government Did Not Fail to Disclose Impeachment Information and Even If It Had, Such Information Was Immaterial Because It Would Not Have Resulted In a Reasonable Probability of a Different Outcome at Trial

Defendant claims that the government produced impeachment information for Avila too late, after he testified (Mot. at 204, 206), withheld Avila's purported confidential informant file (Mot. 206-08), and failed to disclose an unspecified immigration benefit. (Mot. at 205.)[109]  Defendant's assertions are unfounded because such information did not exist or, where it did, was consistent with Avila's testimony at trial.  Even if such information was inconsistent, it was immaterial because there was not a reasonable probability of a different outcome on the conspiracy to escape count.

#### a. The government did not withhold proffer information from the defense

Defendant alleges that the government failed to disclose Avila's statements from his October 2002 interview with the government until after Avila testified (Mot. at 204), even though no report had been

_____

[109] Defendant makes an additional spurious claim of non-disclosure that the government suppressed a report by Department of Justice Inspector General Special Agent Paul J. Leonard (Mot. at 209) without any proof that such a report exists.  Defendant apparently assumes that because Agent Leonard was present at an April 11, 2003 interview of an undisclosed witness (Mot., Ex. 1-85 (Ex. 87)), that Agent Leonard generated a report.  (Mot. at 209.)  There is no evidence that such a report was prepared.

written of that interview until government counsel memorialized the agent's recollection of the interview in a December 14, 2006 letter to the defense in which no new material information was disclosed.

In late November 2006, defense counsel requested "a copy of the report related to Jose Avila's meeting with the government in October 2002, during which he was not completely forthcoming and wherein he refused to give information unless he was promised he would not be deported upon his release." (Mot., Ex. 1-91 (Ex. 93), Chahin November 28, 2006 Letter.) A week later but three days prior to Avila taking the stand, the government responded that a review of Avila's Rule 20 file included no such report. (Meyer December 5, 2006 Letter, attached hereto as Ex. 71.)[110] On December 14, 2006, two days after Avila had concluded his testimony, government counsel sent a letter to defense counsel memorializing the DEA agent's recollection of his interview of Avila in October 2002, which the agent had not documented.[111] (Mot., Ex. 1-92 (Ex. 94), Meyer December

---

[110] On December 12, 2006, the day of Avila's testimony, government counsel produced the three proffer letters sent to Avila's counsel from October 26, 2001, March 7, 2002, and October 9, 2002 (confirming permission to meet with Avila) (Mot., Ex. 1-93 (Ex. 95)), indicating that the government had met (or planned to meet) with Avila on these occasions. Defendant asserts without specifics or proof of materiality that the government failed to produce reports, transcripts, or notes pertaining to the three debriefings of Avila that occurred after October 2021. (Mot. at 206.) It is unclear to what defendant is referring when defendant confirmed receipt of "two FBI 302s related to interviews about the escape plan." (Mot. at 203.) To the extent defendant refers to debriefing on defendant's involvement in the cocaine trafficking conspiracy, as noted in infra, Avila's cooperation plea agreement contained a factual basis regarding that conduct.

[111] DEA Agent Polski recalled interviewing Avila "three to six months prior to the discovery of the escape attempt" (Mot., Ex. 1-92 (Ex. 94), Meyer December 14, 2006 letter), which would have placed the interview sometime between September and December 2002.

14, 2006 Letter).  That letter set forth the agent's recollection of the interview over four years later:

- The agent recalled Avila telling him that "Russians" on Avila's floor (the agent did not recall which floor) were involved in an escape attempt and they had dental floss and cell phones;

- The agent did not recall whether Avila requested to be moved out of the institution during the interview;

- The agent assumed that Avila asked for assistance with his immigration status because that was a common request from deportable aliens, but did not recall specifically whether Avila made such a request;

- The agent did not recall one way or another whether Avila mentioned tools or bars on the windows;

- The agent did not believe that Avila told him about the Russians' plans to blow up the visitors' room wall.

(Mot., Ex. 1-92 (Ex. 94), Meyer December 14, 2006 Letter.)  The agent reported the information to the United States Marshal, who searched the unit where Avila and the Russians were housed and reported to the agent the next day that no evidence of a possible escape had been discovered.[112]  (Id.)

Defendant contends that portions of this October 2002 interview

---

[112] Defendant asserts without evidence that the government failed to produce any information, notes, or reports related to the United States Marshal's investigation and search of MDC-LA in response to Agent Polski reaching out after interviewing Avila on October 10, 2002.  (Mot. at 205.)  Defendant points to nothing indicating that any notes or report were generated, and further, even if they were, how such documentation would not have been cumulative where the information was provided in the government's December 14, 2006 letter.  (Mot., Ex. 1-92 (Ex. 94), Meyer December 14, 2006 Letter.)

159

contradicted Avila's testimony at trial, without specifying which portions were contradictory or whether such portions were material. (Mot. at 204.)   This is fatal to defendant's claim.  See Jones, 66 F.3d at 204-05 (conclusory allegations without specific facts do not justify habeas relief).   Further, there were no material contradictions where the agent recalled few, if any specifics, of what Avila had said, except that he "believed" that Avila did not tell him about the Russians' plan to blow up the visitors' room wall. Defendant's claim that alleged "tardy disclosure" of this information prevented his counsel from using the information effectively on cross examination (Mot. at 204) is belied by the actual cross examinations themselves where counsel for Mikhel and Kadamovas both questioned Avila on this topic.   (See Ex. 33, RT 12/08/06 at 165 (cross by Mikhel's counsel)[113]; at 203 (cross by defendant's counsel)[114]).   Thus, contrary to defendant's assertion (Mot. at 204), there was no information in the government's December 14, 2006 letter to add to defense counsel's cross examination of Avila.

> b.    *The Government had no information from a confidential informant file to disclose because Avila was not signed up as an informant*

Defendant devotes considerable discussion in Claim 15 to his assertion that the government suppressed Avila's alleged confidential

---

[113] "[Rubin]: Now, when you originally – the first time that you spoke to the authorities about this situation did you inform them that... Mr. Mikhel had a crazy plan to escape from MDC using C4 explosives to blast a hole in the library visiting room wall? [Avila]: Yes."   (Ex. 33, RT 12/08/06 at 165.)

[114] "[Chahin]: Didn't you tell them that – you didn't tell them anything about anyone was going to blow up the visiting room. [Avila]: Yes, I did tell them."   (Ex. 33, RT 12/08/06 at 203).)

informant file.[115]   (Mot. at 206-08.)   There is no such file.
Defendant mistakenly assumes that because defendant entered into a
(second) cooperation plea agreement with the government that included
the option of acting in an undercover capacity "if requested to do
so" by the government (Mot., Ex. 1-96 (Ex. 98), Avila's CDCA plea
agreement, select pages), that the government activated that
option.[116]   That is not the case, and defendant points to no evidence
demonstrating that the government signed up Avila as an informant.
Consequently, defendant's claim that the government suppressed any
confidential informant file or Office of Enforcement Operations file
is false, because no such files exist.

---

[115] Defendant also contends without support that the government
failed to turn over defendant's work "in other criminal
investigations."  (Mot. at 203.)  It is unclear to what defendant
refers, because the government did not sign up Avila as an informant
and thus did not actively work him in other investigations.

[116] Defendant also erroneously claims the government did not turn
over a report or notes of a purported interview that led to the
"renegotiation" of Jose A's plea agreement in May 2002.  (Mot. at
206.)  There is no evidence that there was a "renegotiation" of
Avila's plea agreement, where Avila's plea agreement from this
district is to the same drug charge that defendant sustained in the
Northern District of Ohio.  Relatedly, defendant also contends that
the government failed to turn over Avila's "debriefing on the cocaine
distribution network."  (Mot. at 203.)  To the extent defendant is
referring to Avila's participation in the cocaine trafficking for
which he was charged, defendant received Avila's cooperation plea
agreement setting forth his conduct in that conspiracy, which both
defense counsel referred to during their respective cross
examinations.  (RT 12/08/06 at 159-60, 164 (cross by Mikhel's
counsel), at 181, 185-87 (cross by defendant's counsel.)  That
information in another form would simply have been cumulative, and
thus does not violate Brady.  (See United States v. Marashi, 913 F.2d
724, 732 (9th Cir. 1990) (where transcript of witness statement
referencing patient ledger cards the government produced before trial
was "virtually identical" to information contained in agent notes
produced after trial, the notes "contained merely cumulative
impeachment evidence and thus [were] not Brady material.").

        *c.      The government did not withhold information about an undisclosed immigration benefit because the government did not promise Avila any immigration benefits*

Defendant alleges that Avila received an undisclosed immigration benefit.[117]   (Mot. at 205.)   This is incorrect.   In its letter dated December 5, 2006, government counsel responded to Chahin's November 2006 letter (Mot., Ex. 1-91 (Ex. 93)) advising that the government made no promises of immigration benefits to Avila:

> Mr. Avila finished his custodial term for his underlying offense on November 25, 2006.  The government designated him as a material witness, and on November 29, 2006, he was released on bond pursuant to an order for designating and detaining a material witness with $10,000 appearance bond. Mr. Avila has not been granted any type of immigration status in this country, and no representations have been made to him concerning whether he will be permitted to stay in the United States after his testimony in this case.  Mr. Avila has been expressly advised that once the material witness designation is lifted, he will be subject to deportation.  In the December 4, 2006 meeting, Mr. Avila advised that he plans on contesting his deportation hearing, currently scheduled for sometime in January 2007.

(Meyer December 5, 2006 Letter, Ex. 71).

Avila himself testified at trial on both direct, cross-examination, and redirect that while he asked for such benefits, the government refused to provide them.   (Ex. 33, RT 12/08/06 at 143-44 (direct); 12/08/06 at 187-88, 204-05, Ex. 61, RT 12/12/06 at 34 (cross examination); Ex. 61, 12/12/06 at 35 (redirect)).   As several circuits have held, Brady is not violated when a government witness merely desires favorable treatment in return for his assistance,

---

[117] Defendant also asserts without specifics that the government failed to disclose documents related to "the suspension of his deportation."  (Mot. at 203.)  As set forth in this section, the government did not offer Avila any immigration benefits, including any alleged suspension of his deportation, and defendant points to no evidence to the contrary.

162

without any sort of agreement.  See Shabazz v. Artuz, 336 F.3d 154, 165 (2d Cir. 2003); Todd v. Schomig, 283 F.3d 842, 849 (7th Cir. 2002); see also Bell v. Bell, 512 F.3d 223, 234 (6th Cir. 2008) (en banc).  The fact that defendant hired a private investigator in 2021 to locate Avila in the United States (Mot. at 205, Ex. 1-84 (Ex. 86), Declaration of Eric Mason) is not proof that the government promised that he could remain in the United States.

### 3. Even If Such Information Was Withheld, It Was Immaterial

Where evidence never existed, such as the informant file or an undisclosed immigration benefit, defendant cannot satisfy the materiality element.  Moreover, it is unclear whether the agent's belief that Avila did not tell him of the Russians' plan to blow up the visitors' room wall (even if arguably withheld), would be information favorable to the defense or impeachment evidence as defendant claims.  The Ninth Circuit has long recognized that "[a] witness may be 'so thoroughly impeached' that even evidence of perjury at trial is 'merely cumulative.'"  Heishman v. Ayers, 621 F.3d 1030, 1035 (9th Cir. 2010) (quoting United States v. Polizzi, 801 F.2d 1543, 1551 (9th Cir. 1986).  When an informant is subject to "extremely thorough impeachment," additional impeachment is unlikely to "have changed the jury's verdict."  United States v. Wilkes, 662 F.3d 524, 536-37 (9th Cir. 2011) (quotation marks omitted); see also United States v. Zuno-Arce, 339 F.3d 886, 991 (9th Cir. 2003) (concluding that undisclosed evidence was not material because "the defense presented hefty and devastating impeachment evidence at trial, concerning past crimes, government favors, and inconsistencies in testimony").

Here, Avila was crossed at length, including on this very topic. On this record, this alleged "material" information, at best, could be construed to offer simply another means of escape, and could not have been material where both defense counsel cross-examined Avila with this very evidence. See supra. Because the evidence only reflects a different means of escape, there is no reasonable probability that, had the allegedly withheld evidence been disclosed, the result of the escape conviction would have been different. Consequently, it was immaterial. Cone, 556 U.S. at 469-70 (where disclosure of such evidence would not have cast such a different light on this aspect of the case "'as to undermine confidence in the [escape] verdict.'") (citing Kyles, 514 U.S. at 435). Defendant's claim fails.

**F.    Defendant's Claim Alleging False Evidence Relating to the Escape Conspiracy is Procedurally Defaulted and Meritless (Defendant's Claim 16)**

　　　1.    Defendant Procedurally Defaulted This Claim By Not Raising It on Direct Appeal

Defendant argues that the government allowed false testimony about the conspiracy to escape charge in violation of the constitutional obligations under Brady v. Maryland, 373 U.S. 83 (1963) and Napue v. Illinois, 360 U.S. 264 (1959).  (Mot. at 211.) Because defendant did not raise this issue either at the district court or on appeal, it is procedurally defaulted.  See, e.g., Frady, 456 U.S. at 162, 164; Johnson, 988 F.2d at 945.[118]

---

[118] Defendant asserts that correction of the alleged false testimony was relevant to the penalty phase and the decision to impose the death penalty.  (Mot. at 216-17.)  Because the death penalty has been commuted for Kadamovas, this claim is moot.

164

As shown below, no false evidence was admitted at trial. Because there is no Napue violation, there cannot have been ineffective assistance of counsel.  Thus, defendant fails to establish both cause for failing to raise the claim and actual prejudice.  Frady, 456 U.S. at 162, 164; Benboe, 157 F.3d at 1183; Ratigan, 351 F.3d at 964.

###### 2. Defendant Fails to Demonstrate There Was False Testimony Under Napue

Defendant asserts that the government knowingly presented false testimony about the escape conspiracy by not introducing alleged evidence of MDC staff involvement, supposedly violating the standard set in Napue.[119]  (Mot. at 211-12.)  As shown below, the evidence defendant asserts should have been introduced is both unreliable and uncorroborated.

To establish a Napue violation, defendant must show that "(1)[the] testimony (or evidence) was actually false, (2) the prosecution knew or should have known that the testimony [was] false, and (3)...the false testimony was material."  Catlin v. Broomfield, 124 F.4th 702, 741 (9th Cir. 2024) (quoting Dickey v. Davis, 69 F.4th 624, 636 (9th Cir. 2023) (emphasis added)); see also Glossip v. Oklahoma, 604 U.S. 226, 246 (2025) ("To establish a Napue violation, a defendant must show that the prosecution knowingly solicited or allowed false testimony to go uncorrected.").  A Napue claim can

---

[119] Defendant also asserts without specifics both here and in Claim 15 (Mot. at 195) that the government failed to "disclose material evidence and information that would have led to the discovery of material evidence relating to the conspiracy to escape charge." (Mot. at 211.)  Defendant further mentions in passing that the alleged "suppression, withholding, and/or late disclosure of evidence and information violated" defendant's rights.  (Mot. at 211.)  Without more, such ill-defined and unsupported claims cannot provide relief.  Johnson, 988 F.2d at 945.

never succeed if the defendant cannot prove actual falsity. Hampton, 143 F.4th at 1068. Thus, for defendant's Napue claim to survive, evidence that is deemed reliable must show that Battley's testimony was false. Zuno-Arce, 339 F.3d at 889-90 (finding that a witness's recantation was unreliable due to, among other things, a "history of self-interested recantations" that were not reliable to demonstrate other testimony was false). Here, defendant cites to interviews of Mikhel, Thomas Tynan (a former cellmate of Mikhel's), and an unnamed confidential informant, along with government documents reporting smuggling of contraband and possible escapes at MDC-LA, to suggest that Battley's testimony was false (Mot. at 212-14), all of which are either inconsistent, unreliable, or irrelevant to this escape conspiracy. As such, defendant fails to establish any of the elements necessary for a Napue violation.

> a. *Investigation into the discovery of the escape attempt demonstrates no MDC staff involvement*

Defendant alleges Agent Battley (and the prosecution) knowingly provided false testimony that there was no evidence of MDC-LA staff involvement. (Mot. at 212, 214.) However, the evidence from the FBI and MDC's investigation into the escape confirms that MDC-LA staff were not involved, and that no false testimony or evidence was presented.

The chronology set forth in Battley's April 29, 2003 memorandum to Warden Benov shows that on March 7, 2003 (the day the escape was discovered), an informant told the FBI that "some guys are planning an escape" and that they had "FBI uniforms, possible guns, and BOP staff are involved." (Mot., Ex. 1-86 (Ex. 88), Battley April 29, 2003 memorandum ("Battley April 29, 2003 Memo") at 1.) The inmate

166

the informant referred to was interviewed by MDC personnel, and based on the information the inmate provided, MDC initiated a prison-wide lockdown, began their investigation, and discovered evidence of possible escape.  (Mot., Ex. 1-86 (Ex. 88), Battley April 29, 2003 Memo at 2-3.)  Mikhel, Kadamovas, Krylov and other inmates were placed in administrative detention.  (Mot., Ex. 1-86 (Ex. 88), Battley April 29, 2003 Memo at 2-3.)  MDC personnel found a security Allen wrench among Mikhel's belongings (id. at 7) that was used to open cell windows.  (Ex. 34, RT 12/06/06 at 97, 153, 155.)  The FBI considered the possibility of MDC staff involvement.  (Mot., Ex. 1-86 (Ex. 88), Battley April 29, 2003 Memo at 7.)[120]

Further investigation did not corroborate staff involvement. Mikhel was inconsistent in his various interviews, calling into question his claim of staff involvement, and the unnamed confidential informant referenced a correctional officer the informant said never dealt with the Russians directly.  Finally, the references to possible escape in defendant's FOIA documents do not pertain to Mikhel and Kadamovas's escape plan.

(A)  Mikhel made inconsistent statements in his interviews

On March 13, 2003, a week after the escape attempt was discovered, Battley interviewed Mikhel about the escape attempt, and when asked about staff involvement, Mikhel said staff may have been involved but he did not know their identities.  Mikhel then stated,

---

[120] Law enforcement (here, the Federal Protective Service in conjunction with the FBI) considered all possibilities, including the possibility that a Russian male and Russian female taking photographs outside of MDC-LA were involved, which later turned out not to be the case.  (Mot., Ex. 1-86 (Ex. 88), Battley April 29, 2003 Memo at 5, 9.)

"Follow the drugs and you'll find who was involved."  (Mot., Ex. 1-87 (Ex. 89), Battley July 15, 2003 Memorandum to Warden Benov ("Battley July 15, 2003 Memo") at 2.).  A month later, in an April 2003 interview with FBI agents, Mikhel expressly stated that there were no staff members involved in his escape plan.[121]  (Mot., Ex. 1-94 (Ex. 96), April 11, 2003 Mikhel interview.)

Defendant also cites Thomas Tynan's interview with FBI agents in July 2003 (Mot. at 213-14, Exs. 1-82 and 1-83 (Exs. 84-85), July 11, 2003 FBI Report of Interview and agent notes), identifying from agent notes that two correctional officers were supposedly participants – "C.O. Esqueviel? H/M" who "would distribute tools to other floors" and "C.O. Freez W/M would avoid going by I's [Iouri's] door.  'He knows to stay away.'"  (Mot. at 213.)  But these references are Thomas relaying what Mikhel told Thomas:

[121] In this same FBI interview, Mikhel also claimed that the people on the outside who sent the tools up to him at MDC-LA were friends from Russia who flew in to help him (Mot., Ex. 1-94 (Ex. 96), April 11, 2003 Mikhel interview at 1), a claim that is demonstrably false where inmate (and former Mikhel cellmate) Thomas Tynan, his brother Michael Tynan, and Tom's wife Sabrina Tynan were all charged with their involvement in the escape attempt (see CR Dkt. No. 03-542; Ex. 33, RT 12/08/06 at 75; Mot. at 51, Ex. 1-81 (Ex. 83), Declaration of Thomas Tynan dated July 20, 2022 ("Thomas Tynan Decl.") ¶ 17), and Sabrina Tynan testified at trial about her, her husband's, and her brother-in-law's roles in buying the tools and phones and helping to get those tools and cell phones into the prison to Mikhel.  (Ex. 33, RT 12/08/06 at 71-79, 81, 82-84, 89-91, 93-101, 105-06, 108-13, 115.) These false statements also cast doubt on any of Mikhel's statements, including whether MDC-LA staff were involved in the escape plan.

168

(Mot., Ex. 1-83 (Ex. 85) at 7) (where "I said" is shorthand for "Iouri said" where "I" stands for "Iouri")[122] (highlighted). Statements by Mikhel, whether to MDC-LA personnel, the FBI, or co-conspirator Thomas Tynan, are inherently unreliable because Mikhel was not consistent about whether MDC staff were involved, and his statements of MDC involvement were not corroborated.[123] These inconsistencies show that the government did not present false testimony or evidence.

(B)   Proffer report shows Correctional Officer McKinnon was not involved in the escape

Defendant cites to an interview referencing MDC Correctional Officer McKinnon also as support for a Napue violation. (Mot. at 213, Ex. 1-85 (Ex. 87).). This report does not show that McKinnon was involved in the escape. Rather, it shows that, at least according to the inmate, MacKinnon sought to profit from the sale of tools similar to what Mikhel smuggled into MDC-LA but that "[McKinnon] never dealt with the Russians directly." (Mot., Ex. 1-85 (Ex. 87), at 3.) This falls far short of proof that McKinnon was part of the escape conspiracy and the "actual falsity" requirement of Napue.

b.   *Defendant's documents from FOIA requests do not relate to Mikhel, Kadamovas, and Krylov's escape conspiracy*

Defendant claims that evidence he received from his FOIA requests point to staff involvement in this escape attempt. (Mot. at

---

[122] Throughout the notes, the agent used "I" as shorthand for "Iouri." (Mot., Ex. 1-83 (Ex. 85).)

[123] Thomas Tynan's statements and declaration regarding MDC staff involvement also are not sufficiently credible to prove falsity where nothing in the record from law enforcement's investigation supports this assertion.

214.)  This is incorrect because none of the entries from those records pertain to this escape conspiracy.

The complaint from the Department of Justice's Office of Inspector General ("DOJ-OIG") shows three complaints concerning trafficking contraband into MDC-LA from 1994, 2009, and 2018.  (Mot., Ex. 1-123 (Ex. 125), DOJ-OIG September 30, 2022 Letter.)  The 1994 complaint is well before the abductions and murders in this case and is therefore irrelevant.  The 2018 complaint is over a decade after conviction in this case.  The 2009 complaint references the statement of an inmate who was incarcerated at MDC-LA in 2003 and claims staff were involved in drug trafficking and "assisting in the escape of inmate members of the Russian Mafia."  (Mot., Ex. 1-123 (Ex. 125), DOJ-OIG September 30, 2022 Letter, at 4.)  There is no evidence of the basis for the inmate's claim to establish the reliability of such a statement to satisfy the first element of Napue, and even if true, as noted below, would not be material.  Further, the date of the inmate's letter (2009) is over two years after trial concluded, so neither Battley nor the prosecution would have known of this information, even if true, at the time of trial.

Defendant also cites a June 25, 2003 FBI record noting that MDC-LA initiated an investigation of a correctional officer suspected of smuggling contraband into MDC-LA.  (Mot. at 214; Ex. 1-124 (Ex. 126), June 25, 2003 FBI record).)  Smuggling contraband, however, is not the same as assisting with an escape attempt, and in any case, the contraband identified in the record is not the contraband that Mikhel had smuggled into MDC-LA.  For example, the FBI record mentions tools such as two knives, while Battley testified that nothing like what would be considered an "official knife" was found in Mikhel's cell,

as opposed to a number of blades such as box cutter blades. (Ex. 34, RT 12/06/06 at 162.) The report at issue also identifies contraband such as food, cigarettes, and shampoo; again, these are not items associated with the tools Mikhel had smuggled into MDC-LA. The conduct identified in the report at issue is, therefore, unrelated to Mikhel and Kadamovas's escape conspiracy, and could not have been material.

None of the evidence in these documents that defendant points to as proof of MDC staff involvement in the escape is corroborated or reliable.[124] Defendant thus fails the "actual falsity" standard set forth in Catlin.

                *c.*    *Defendant Fails to Show that The Prosecution Could Have Known Any Testimony it Presented was False*

Because defendant cannot demonstrate that any of the testimony or evidence that the government presented was actually false, there is no way the prosecution could have known any testimony or evidence it presented was false. Thus, defendant fails to establish the second element of a Napue violation.

        3.   <u>Any Testimony or Evidence that Defendant Alleges to be False was Immaterial Under Napue</u>

In addition to having to prove actual falsehood and prosecutorial knowledge of such falsehood, defendant must show that any testimony he alleges to be false is material. Catlin, 124 F.4th

---

[124] Defendant's apparent suggestion that he is expecting additional relevant materials from his pending FOIA lawsuits to support this claim (Mot. at 217) is sheer speculation. There is no reason to believe that additional time beyond the years defendant has already had will turn up any support for this claim.

at 741.[125]  The "materiality standard requires the beneficiary of the constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." Glossip, 604 U.S. at 246 (cleaned up, citations and quotations omitted).  See also Catlin, 124 F.4th at 741 ("the materiality analysis for a Napue violation requires that a conviction 'must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury'") (cleaned up, citations, quotations and emphasis omitted); Clements v. Madden, 112 F.4th 792, 802 (9th Cir. 2024) ("On a Napue claim, the existence of constitutional error does not alone justify relief; the error must be material") (citation omitted).

Any alleged involvement of MDC staff in the escape conspiracy – a claim that is uncorroborated – would not have affected the judgment of the jury in its conviction against Kadamovas on the escape charge. See Mikhel, 889 F.3d at 1049-50 (citing to the testimony of Avila, Parker, and Sabrina Tynan, inmate housing records, and prison records reflecting Mikhel placing money on co-conspirators' books).  Under these circumstances, alleged MDC staff involvement would not have been material against Kadamovas on this count.  Defendant has failed to satisfy this materiality element as well.

**G.    Defendant's Claim that Defense Counsel Were Ineffective Throughout the Guilt Phase Portion of the Trial Simply Rehashes Deficient and Conclusory Arguments Already Addressed Elsewhere in this Opposition (Defendant's Claim 19)**

---

[125] Napue's materiality standard is "considerably less demanding" than materiality for Brady claims (Dickey, 69 F.4th at 637), a standard that defendant nonetheless fails to meet where alleged involvement of MDC staff in the escape plan would not have had any effect on the jury's evaluation of the conspiracy to escape evidence against defendant.

172

Defendant repeats many of the arguments in Claim 19 that he already raised in other claims complaining about counsel's conduct, all of which in addition to being meritless are either procedurally defaulted or procedurally barred.[126]

Separate and apart from the repeated claims, identified below, defendant raises a new claim regarding trial counsel's alleged failure to present evidence that Rita Pekler's business partner Ninel ("Nellie") Faktorovich failed to identify Kadamovas from a photographic line-up.  (Mot. at 247.)  This is incorrect.  Defense counsel cross-examined Los Angeles Police Department ("LAPD") Detective Michael Berchem on that very point, since he was the detective who prepared the six-pack containing defendant's photograph:

> Q [Lasting]:  Did -- these six-packs, the two six-packs [of Kadamovas and Altmanis], the 12 photographs:  Did you show them to anybody else on the same date, that is, March the 6th, 2002?
>
> A [Berchem]:  Yes.
>
> Q:  Who else did you show them to?

---

[126] Defendant also makes vague reference to many claims that cannot support habeas relief, including defendant's conclusory reference to counsel's purported failure to "adequately and fully cross-examine and impeach" Altmanis and Markovskis (Mot. at 246), non-specific claims to "unnecessary redactions" to "reports, notes, and other materials," "failure to ensure full production of forensic materials related to DNA, fingerprints, and other scientific tests," failure "to ensure full production of telephone lists, telephone records, and cell phone data." (Mot. at 234), failure to demonstrate that defendant "is innocent of the allegations of money laundering (Mot. at 245), and failure to "investigate, challenge, and rebut" the cell phone evidence and generally "other forensic evidence."  (Mot. at 248.)  The lack of specificity dooms these claims to fail. Johnson, 988 F.2d at 945 (conclusory statements in a habeas motion do not justify a hearing.)

173

A:   Nellie.   The lady I referred to as Nellie.[127]

Q:   And did she make any identification when she looked at these pictures?

A:   No.   She wasn't going to make an identification.

(Ex. 9, RT 10/26/06 at 40).   Defense counsel went further and moved to strike everything after the word, "no," which the court granted. (Ex. 9, RT 10/26/06 at 40.)   This is not ineffective where counsel did exactly what defendant claims counsel did not – namely, introduced into evidence Faktorovich's failure to identify defendant as "Volodia," the person who came to visit Pekler at her office two days before she disappeared, and actually went further by moving to strike that portion of Berchem's answer that was non-responsive.[128] Under these circumstances, there is no deficient performance or actual prejudice under Strickland.[129]

With respect to claims defendant previously raised, defendant

---

[127] Earlier in the transcript Nellie is identified as Nellie (or Ninel) "Fractovovich," a misspelling of her last name of Faktorovich, as set forth in the transcript from the day before when she testified.   (RT 10/25/06 at 155.)

[128] Defendant's claim that defense counsel failed to cross-examine Faktorovich on her failure to identify Kadamovas as "Volodia" (Mot. at 247) misapprehends how identifications work at trial. Because Faktorovich failed to identify Kadamovas, she did not have the requisite knowledge to testify that she failed to identify Kadamovas from a photographic lineup. LAPD Detective Berchem was the only witness who could testify to Faktorovich's failure to identify Kadamovas.

[129] Defendant also asserts in cursory fashion counsel's failure to "challenge the identification of Mr. Kadamovas as the individual who purchased the portable phones."   (Mot. at 247.)   Because defendant says nothing more, the claim fails.   But defendant's contention is incorrect.   Defense counsel did challenge the identification by FBI SA Davidson that defendant (and Krylov) bought a SIM card at Affordable Portables for a phone used in the Kharabadze and Safiev abductions, using the time stamps on the video clip.   (RT 12/05/06 at 53-55 (Davidson direct), 130-33, 135-37 (Davidson cross)).   Defense counsel then used this point in closing.   (RT 01/12/07 at 31-40.)   Thus, defendant's claim that counsel did nothing on this issue is inaccurate, and thus, the claim is meritless.

174

re-alleges the following:

- that defense counsel were ineffective in not being ready for trial (Mot. at 228-230), a claim fully addressed in the government's response to Claim 6 (Improper Denial of Continuances), supra, which also addressed how prepared Chahin was for trial, despite her protestations to the contrary;[130]

- that defense counsel were ineffective in allegedly failing to ensure "full production" of Solovyeva's diary,[131] in failing to cross examine Solovyeva using information from her diary and to "fully cross-examine and impeach" Solovyeva, and for failing to recall Solovyeva to testify after reviewing the full diary (Claim 14) (Mot. at 231-33, 246), claims fully addressed in the government's response to Claim 14 (Failure to Disclose Natayla Solovyeva's Diary), supra;[132]

- that defense counsel failed to object to Avila's testimony as an alleged confidential informant (Claim 13) (Mot. at 235), a claim

---

[130] Defendant obtained from capital counsel Lasting a declaration asserting that "[w]e were not ready to go to trial."  (Mot., Ex. 1-10 (Lasting Decl.) ¶ 16.)  The bulk of Lasting's declaration addresses the purported delays in obtaining the appointment of a mitigation investigator (¶¶ 6-13, 24-28), contentions mooted by the commutation of defendant's death sentence.  Claims that Lasting himself was not prepared for trial ring hollow where Lasting was appointed in June 2002 (Mot. at 227), four years before the case went to trial, and actively and capably represented defendant throughout all aspects of the case.  See Harrington, 562 U.S. at 11 (no ineffective assistance when counsel engaged in "active and capable advocacy").    .

[131] Defendant re-alleges claims concerning the purported failure of the government to produce (and counsel's failure to demand production) of Altmanis's diary and an unredacted version of Markovskis's datebook (previously referred to as his day planner). (Mot. at 234.)  These claims have already been fully addressed in the government's response to Claim 14, supra.

[132] Without more, this claim about failure to fully cross-examine Solovyeva fails for lack of specificity.  Johnson, 988 F.2d at 945; Jones, 66 F.3d at 204-05.

175

fully addressed in the government's response to Claim 13, <u>supra</u>;

- that defense counsel failed to ensure "full production" of "items" and "materials" relevant to the escape conspiracy charge and failed to present a "proper and persuasive defense" to this charge (Claim 16) (Mot. at 231, 234, 242-44, 246), a claim too cursory to warrant relief, but which has nonetheless been fully addressed in the government's response to that claim, <u>supra</u>, including where counsel were not ineffective because there was no <u>Napue</u> violation;

- that defense counsel failed in their duty to ensure that defendant could review the evidence against him through access to case materials (demanding a computer in his cell) (Claim 10) (Mot. at 234-35), which was the subject of multiple motions and colloquies in the district court, as well as multiple motions in the Ninth Circuit during pendency of the appeal, which has been set forth in full in the government's response to Claim 10,[133] <u>supra</u>;

- despite raising the issue with the court, that defense counsel failed to "fulfill their duty" to ensure that defendant understood the proceedings (Claim 11) (Mot. at 234-35), where the court instructed the interpreters based on counsel's complaint.  This issue was fully addressed in the government's response to Claim 11 (Misleading and Inaccurate Translation at

---

[133] As noted in the government's response to Claim 10, defendant has improperly framed the issue where he is represented by counsel and thus has no right of access to legal materials.  <u>See</u> <u>Bounds v. Smith</u>, 430 U.S. at 821.  Instead, the issue is a right of access to the courts.  Given the plethora of filings counsel filed on this issue and numerous exchanges with the court, there is no basis to find ineffective assistance of counsel.

176

Trial)[134];

- that defense counsel failed to object or otherwise challenge various aspects of the jury selection process, including the use of an anonymous jury; challenges to the venire pool based on defendant's right to a jury drawn from a fair cross-section of the community; purported jury misconduct; that counsel failed (a) to prepare an adequate juror questionnaire, (b) to conduct reasonably effective voir dire, (c) to object to purported gender bias in the government's use of peremptory challenges, (d) to object to purported ethnic bias in jury selection, and (e) to remove jurors 57 and 67. (Mot. at 235-40, 248.) Each of these claims has been fully addressed in the government's responses to the individual claims where defendant raised these issues, including Claim 1 (Anonymous Jury), Claim 2 (Jury Misconduct and Bias), Claim 3 (Denial of Fair Cross-Section), and Claim 4 (Unlawful Gender Discrimination in Jury Selection), supra;

- that defense counsel failed to object to defendant's shackling and challenge defendant's SAMs conditions (Claims 5 and 18) (Mot. at 236), claims fully addressed in the government's response to both claims, supra;

- that defense counsel failed to present a duress defense for the conspiracy to escape charge (Mot. at 241-44, 249), which was thoroughly addressed in response to Claim 12 (Failure to Instruct on Duress Defense), supra; and

---

[134] The government's response to Claim 11 also addresses defendant's complaint that a sound recording should have been used in addition to a court reporter for Altmanis's testimony. (Mot. at 240-41.)

177

- that counsel did little to protect defendant from Judge Tevrizian's alleged bias, contending that counsel "failed to adequately investigate and address the issue" (Mot. at 248), without specifying what else counsel should have done where counsel both moved for recusal and upon denial, filed a petition for mandamus in the Ninth Circuit.  This claim has been fully addressed in the government's response to defendant's Claim 7 (Judicial Bias), supra.

Defendant's Claim 20 should be denied.

**H.   Defendant's Claim that Counsel Were Ineffective Regarding Conspiracy to Escape Evidence Introduced at Trial Is Meritless (Defendant's Claim 20)**

**1.   Procedural Default**

Defendant asserts numerous performance errors by trial counsel regarding their failure to object to the admissibility of certain escape evidence and failure to properly cross examine certain witnesses at trial,[135] arguing that counsel "fell below reasonable

---

[135] Defendant repeats his claim that counsel were not prepared for trial (Mot. at 255, 259), a claim fully addressed in the government's response to defendant's Claim 6, Improper Denial of Continuances.  Relatedly, defendant again alleges that the government failed to timely produce escape evidence (Mot. at 256), a reference to Avila and Claim 15, Suppression of Evidence Relating to Confidential Informant, allegations to which the government has also fully responded.  Further, defendant claims counsel were ineffective where counsel did not impeach Battley's testimony for lack of MDC staff involvement (Mot. at 257), a claim fully addressed in response to Claim 16, False Evidence Relating to Escape Conspiracy.  In addition, defendant repeats his claims that defense counsel failed to present a duress defense at trial (Mot. at 251, 256, 259, 260), also fully addressed in the government's response to defendant's Claim 12, Failure to Instruct on Duress Defense.

Defendant further makes general non-specific claims concerning defendant's failure to investigate the conspiracy to escape charge (Mot. at 255, 256) and to review discovery (Mot. at 255).  Such conclusory allegations without a statement of specific facts cannot meet the deficient performance standard of Strickland or warrant relief.  James v. Borg, 24 F.3d 20, 26 (9th Cir. 1994) (where

*(footnote cont'd on next page)*

178

standards of representation" set forth in Strickland.[136]  (Mot. at 251-61.)  Because any alleged evidentiary errors were not raised at the district court or on appeal, they are procedurally defaulted. See, e.g., Frady, 456 U.S. at 162, 164; Johnson, 988 F.2d at 945. Further, counsel was not ineffective for not raising such issues at trial where defendant misapprehends the evidentiary rules and there were no evidentiary errors.[137]

        2.    <u>There Were No Evidentiary Errors Based on Counsel's Failure to Object, and Even If There Were, Counsel's Performance Did Not Fall Below Reasonable Standards of Representation, Nor Did Defendant Suffer Actual Prejudice</u>

As noted elsewhere, in order for defendant to succeed on this claim he must establish both deficient performance that falls below an objectively reasonable standard and actual prejudice.  See Strickland, 466 U.S. at 687 (counsel's errors must be so serious as to deprive defendant of a fair trial).  Further, defendant must overcome "the presumption that...the challenged action 'might be considered sound trial strategy.'"  Matylinsky v. Budge, 577 F.3d 1083, 1091 (9th Cir. 2009) (citing Strickland).  Aside from cursory

---

petitioner failed to identify what evidence counsel should have presented that would have shown that petitioner was not the shooter, such a conclusory allegation without facts could not support relief).

[136] Defendant devotes the first several pages of this claim to a general discussion of the allegedly weak evidence of the escape conspiracy against him.  (Mot. at 251-55.)  A detailed review of this evidence has already been set forth in the government's responses to Claims 6 (Improper Denial of Continuances) and 16 (False Evidence Relating to Escape Conspiracy), above.

[137] For example, defendant asserts that defense counsel failed to introduce Mikhel's statements that defendant was not involved in the escape plan.  (Mot. at 259.)  This is classic hearsay because it is an out-of-court statement sought to be introduced for the truth of the matter asserted.  Fed. R. Evid. 801(c).  Because no exception applies, defense counsel could not introduce them at trial.

allegations that are not supported by facts, defendant has not established either prong.

              *a.    Battley Did Not Testify to Inadmissible Hearsay*

Defendant asserts that during Battley's testimony, inadmissible hearsay was introduced concerning defendant's sanction for occupying cell 913 next to the stairwell without authorization.  (Mot. at 255, 258.)  This is incorrect.

Specifically, defendant claims that "Officer Battley related the contents of a report that Mr. Kadamovas had been disciplined for his presence in cell 913 prior to the planning of the escape" (Mot. at 258), apparently referencing the following exchange between government counsel and Battley:

**BY MS. DeWITT:**

Q:  And if you know or if you remember Mr. Battley, was it some time in this period that he [Kadamovas] was found to be in an unauthorized cell?

A:  I'm not sure.  I would have to reflect on the records.

Q:  Would it help to refresh – is there something that would help you refresh your recollection, Special Agent Battley?

A:  Yes.

Q:  Would the –

**MS. DeWITT:**  May I approach your Honor?

**THE WITNESS:**  Okay.

**BY MS. DeWITT:**

Q:  Does that record help to refresh your recollection as to the approximate date?

A:  Yes it does.

Q:  When Defendant Kadamovas was in an unauthorized cell?

A:  Yes, it does.

Q:  When was that?

A:  He received an incident report on May 3rd, 2002.

Q:  And, again, does that report that I just showed you help refresh your recollection as to which cell he was in that he wasn't supposed to be in?

A:  Yes, he was in 955, cell 955, on May 3rd, 2002, when he received the incident report.

Q:  Does the report show that he was supposed to be in 955 or that he was in 955?

A:  The report shows that he was supposed to be in 913, but he was found in 955.  No, I stand corrected.  He was in 913, he should have been in 955.

Q:  Okay.  And that was on May 3rd, 2002?

A:  That's right.

(Ex. 34, RT 12/06/06 at 136-37.)  Government counsel refreshed Battley's recollection with a report about Kadamovas being sanctioned for moving to cell 913 (next to the stairwell) without approval.  To the extent Battley testified from the report as opposed to his memory regarding the cell Kadamovas was in before moving to cell 913, such a limited error fails to rise to a constitutional violation where there is no evidentiary significance to which cell Kadamovas occupied before moving to cell 913, such evidence was already admitted through Kadamovas's housing quarters record that was properly admitted into evidence as an exhibit (Mot., Ex. 1-89 (Ex. 91) (trial exhibit 901)), and where immediately prior to this exchange Battley had already testified that defendant was subjected to discipline for not being authorized to be in cell 913:

Q [AUSA DeWitt]:  And, Mr. Battley, are you aware of whether or not Defendant Kadamovas was sanctioned at some point for being in an unauthorized cell?

181

A [Battley]:  Yes, he did receive an incident report for being in an unauthorized cell.

Q:  What cell was Defendant Kadamovas in without authorization?

A:  He was in cell – actually he was in cell 913.

(Ex. 34, RT 12/06/06 at 135.)  Such a limited error on such an inconsequential point where the evidence was already admitted at trial shows both that there was no constitutional violation and that defendant suffered no prejudice.

> b.  *Avila's Testimony Regarding Defendant's Statements Were Admissible Because Avila Was Not a Government Informant*

Defendant next asserts that Avila's testimony concerning Kadamovas's statements were inadmissible pursuant to United States v. Henry, 447 U.S. 264 (1980), where Avila was allegedly a government informant.  (Mot. at 256-57.)  As fully briefed in response to defendant's Claim 13 (Improper Use of a Confidential Informant), Avila was never a confidential informant.  Rather, he participated in the escape conspiracy at various points.  Thus, defendant's statements came in through Avila's testimony as both co-conspirator statements and party admissions under Rules 801(d)(2)(E) and 801(d)(2)(A), respectively, of the Federal Rules of Evidence.

> c.  *Sabrina Tynan's testimony satisfied the co-conspirator exception to the hearsay rule at every level of hearsay*

Defendant claims that Sabrina Tynan testified to inadmissible "nested" hearsay in violation of the confrontation clause where Sabrina testified to conversations she had with her husband Thomas

182

relating statements that Mikhel made to Thomas.[138]  (Mot. at 258-59.)
Double hearsay is "not excluded by the rule against hearsay if each part of the combined statements conforms with an exception to the rule."  Fed. R. Evid. 805 (Hearsay Within Hearsay).  Because Thomas and Sabrina, along with Thomas's brother Michael Tynan, conspired to aid and assist the escape (and were indicted for such conduct),[139] each level of hearsay properly satisfied the co-conspirator statement exception to the hearsay rule.  These statements were properly admitted.

> d.   *Counsel's failure to impeach Avila's misrecollections do not reflect deficient performance and defendant did not suffer actual prejudice*

Defendant claims that his counsel failed to "adequately and completely" cross-examine Avila and failed to impeach his testimony, apparently based on mistakes Avila made in his testimony over four years after the events took place, concerning (1) when Mikhel was located in the cell next to the stairwell on Five South, (2) whether defendant showed Avila mesh within the walls of his cell when the concrete in defendant's cell wall had not been broken, and (3) whether Avila's conversations with Kadamovas about bringing tools into the ninth-floor windows actually occurred where Avila did not speak Russian.  (Mot. at 257-58.)  None of these reflect deficient performance where (1) Mikhel and Avila were both on Five South in March 2002 when they spoke about the escape even though Mikhel had

---

[138] Defendant also alleges without any fact in support that his counsel failed to "adequately and completely" cross-examine Sabrina Tynan.  (Mot. at 257.)  As noted above, without a statement of facts to support the allegation, no habeas relief is justified.  James, 24 F.3d at 26.

[139] CR 03-542(A)-GHK.

not yet moved to cell 518, the stairwell-adjacent cell, and the details of Mikhel's various housing locations on Five South did not involve Kadamovas except for Mikhel's final move to cell 518, (2) Avila's statement that Kadamovas showed him mesh in the walls was an obvious mistake that counsel established through the cross examination of another witness, and (3) defense counsel did cross-examine Avila on his inability to speak Russian.  Nor did defendant suffer actual prejudice where Mikhel's housing on Five South (other than in cell 518) had no impact on the escape evidence against Kadamovas, where the government did not argue in closing Avila's mistaken testimony regarding the mesh, and where defense counsel argued in closing that Avila's testimony regarding his conversations with defendant were not to be trusted because Avila did not speak Russian.

(A)  Mikhel's housing on Five South

Avila testified that Mikhel approached Avila in March 2002 to discuss the escape and Mikhel was housed next to the stairwell on Five South (cell 518).  (Ex. 33, RT 12/08/06 at 141.[140])  Because Mikhel did not move to cell 518 until November 2002 (according to his housing records, Mot., Ex. 1-88 (Ex. 90)), defendant claims that defense counsel's failure to cross-examine Avila on this

---

[140] Avila testified as follows:
    Q:  Do you remember about when he [Mikhel] approached you
    to see if you were interested [in the escape]?
    A:   It was about March of 2000 and – wait a minute, 2002.
    Q:   Now, do you know where Iouri's cell was located on
    Five South?
    A:   It was on the second tier on the floor of Five South,
    on the second level on the far corner on the right-hand
    side by the stairwell.
(Ex. 33, RT 12/08/06 at 141.)  There is no timeframe specified in either the government's question or Avila's answer as to when Mikhel was in the cell "by the stairwell."

184

inconsistency constituted deficient performance.  (Mot. at 257.) This omission was not a failure as opposed to presumed sound trial strategy because Avila's mistake was of no consequence to defendant for two reasons – first, it did not apply to defendant, and second, Avila and Mikhel were both housed on Five South in March 2002 when Avila testified that Mikhel first spoke to Avila about the escape. (Mot., Ex. 1-90 (Ex. 92) (Avila housing records); Ex. 1-88 (Ex. 90) (Mikhel housing records); Ex. 34, RT 12/06/06 at 148-49 (Battley testimony).)  Defense counsel's presumed decision not to cross-examine Avila on such an inconsequential point was sound strategy where it would not have proven Avila a liar, as defendant seems to suggest, since both Avila and Mikhel still had the opportunity to talk to each other in March 2002 while housed together on Five South, and Mikhel was in the stairwell-adjacent cell (518) when Avila was moved back to Five South on February 11, 2003, before the escape attempt was discovered a little under a month later.  (Mot., Ex. 1-90 (Ex. 92) (Avila housing records); Ex. 1-88 (Ex. 90) (Mikhel housing records).)  The absence of cross examination on this point could not have prejudiced defendant where it would have proven nothing other than Avila misremembered a minor fact relating to events that happened over four years before.

> (B)   Avila's testimony that Kadamovas Showed Avila mesh in the wall was an obvious mistake for which Kadamovas suffered no prejudice

Avila also testified that defendant showed him mesh inside the drywall:

> Q [AUSA Meyer]:  Did the Juri on Nine South [Kadamovas] say what they were going to do with the tools that they were going to bring in?

        A [Avila]:  He just said that they needed like wire cutters.  I think it was because of the – he showed me there was like a mesh inside that drywall and they were going to need it to cut that.  And just wrenches and all different kinds of tools just in case they needed whatever.

(Ex. 33, RT 12/08/06 at 148.)  Avila was mistaken about being shown

mesh inside drywall because there was no evidence of any digging

inside defendant's cell.  (Ex. 34, RT 12/06/06 at 175.)  Counsel's

choice not to cross-examine Avila on this point was sound trial

strategy where defense counsel chose instead to cross-examine Battley

on the absence of evidence of digging in defendant's cell,[141] making

Avila's mistake self-evident.  Defendant was not prejudiced where

Avila's mistake was obvious and the government did not argue the

mistake in closing.  (Ex. 72, RT 01/11/07 at 44, 48, 51, 54 (portions

of government closing addressing Avila.)

                    (C)   Defense counsel challenged Avila's testimony about his conversations with Kadamovas when counsel questioned Avila on his ability to speak Russian and argued this point in closing

     Defendant also contends that Avila's conversation with defendant

about "opening the ninth-floor windows" after Avila moved to Ninth

South where defendant was housed was nonsensical because the Ninth

floor windows were not used for smuggling.  (Mot. at 258.)  Coupled

with defendant's contention that defendant "did not speak English"

---

[141] "Q [Chahin]:  And one of the cells that you [Battley] had searched was Mr. Kadamovas' Cell Number 913, correct?
A [Battley]: Correct.
Q:  Okay.  In his cell you didn't find any tools, did you?
A:  No, I did not.
Q:  You didn't find any contraband?
A:  On March 7th, no, we did not.
Q:  And you didn't find any evidence of digging, did you?
A:  No, I did not.
(Ex. 34, RT 12/06/06 at 175.)

and "Jose A did not speak Russian" (Mot. at 258), defendant claims that this conversation never took place.  (Mot. at 258.)  This makes no sense.  Kadamovas spoke "broken" English with a heavy Russian accent, and even though Avila could not understand defendant "that well," they still talked about the escape after Mikhel brokered an introduction.  (Ex. 33, RT 12/08/06 at 146-48.)

Specifically, after Avila arrived on Nine South in the fall of 2002 (where he stayed for only three weeks) (Mot., Ex. 1-90 (Ex. 92) (Avila housing records)), Kadamovas introduced himself at the prompting of Mikhel.  (Ex. 33, RT 12/08/06 at 144 (Avila testimony) ("...I guess that Iouri in Five South [Mikhel] had told [defendant] that I was going to be getting out of the hole [administrative segregation] and for [defendant] to find me.)  The day after Kadamovas introduced himself, Kadamovas told Avila that someone wanted to speak to Avila, and Kadamovas motioned for Avila to follow him to his cell, where Avila spoke to Mikhel through the vents.  (Ex. 33, RT 12/08/06 at 146-47.)  Mikhel confirmed that defendant was one of Mikhel's "people" and it was okay for Avila to speak with defendant:

> Q [AUSA Meyer]:  So after the Iouri on Five South [Mikhel] sort of made this introduction did you and Juri on Nine South [Kadamovas] talk about the escape attempt?
>
> A [Avila]:  Yes.
>
> Q:  What did he say?
>
> A:  Like I said, I don't remember like exactly word for word, but he just pretty much told me a little bit about like one of the plans and he just mentioned that – like behind his pillow that he was supposed to like make a hole and they were supposed to squeeze out of there and they were all supposed to go out into the stairwell at a certain time.  And he also like grabbed a piece of paper and put it up on the window, on the frame of the window, and he sketched out the type of tools they were going to need,

because they were going to remove that window and bring certain things like tools and whatever needed into the building.

(Ex. 33, RT 12/08/06 at 147-48.)  Defendant's contention that this conversation was "nonsensical" because Ninth floor windows were not used for smuggling construes the conversation too narrowly. Kadamovas's description of how tools were going to be brought into MDC-LA - namely, through windows (regardless of what floor) – is exactly how tools were brought into the institution six months after the conversation occurred, proof that the conversation took place.

Further, contrary to defendant's assertion, defense counsel cross-examined Avila on his inability to speak Russian (Ex. 33, RT 12/08/06 at 213), and then used that evidence to argue in closing that Avila was a liar.  (Ex. 73, RT 01/12/07 at 60 (defense closing) ("So how can you trust him [Avila] given what you know about this guy and the period of time that he was even up there where Mr. Kadamovas is where he doesn't even speak Russian? ...He's a liar.").

None of defendant's evidentiary claims establish deficient performance and even if they did, defendant has asserted only conclusory prejudice, not actual prejudice.  On both grounds defendant's evidentiary claims fail.

### I.   Defendant's Claim Alleging Suppression of Material Evidence Is Both Duplicative of Other Claims and Procedurally Defaulted, and Allegation of Government Misconduct Is Based on Speculation and Is Therefore Not Cognizable in Habeas (Defendant's Claim 17)

Defendant repeats in this claim his assertions that the government "suppressed, withheld, failed to disclose, or produced in a tardy, improper fashion" material pertaining to Solovyeva's diary (Claim 14), evidence relating to Avila (Claim 15), and evidence

188

pertaining to the escape conspiracy (Claim 16).  (Mot. at 218.)  The government has fully addressed each of these claims both in terms of procedural default and on the merits, set forth above.

The only new claim defendant raises pertains to a government misconduct allegation where defendant contends that as part of the search of his jail cell during investigation of the escape attempt in March 2003, the government allegedly seized confidential notes that defendant prepared as part of his case to aid his attorneys.  (Mot. at 219; CA No. 07-99009, Dkt. No. 154 at 2 ("Motion to Nefarious Acts by the Government and Prison Officials In Relation J. Kadamovas Legal, Discovery Materials and Trial Transcripts" (filed pro se).)  Defendant alleges that the prosecution obtained these notes, interfering with the "defense function," using them in further interviews of Altmanis.  (Id.)  This is incorrect.[142]  The government did not interfere with defendant's right to counsel by seizing documents from his cell intended for his attorneys.  Any such documents were filtered through the case's taint Assistant United States Attorney, Alka Sagar.  On October 18, 2005, the district court held a hearing in which documents seized from both Mikhel's and Kadamovas's cells at the time of the escape investigation were addressed, with the contents of those documents only known to AUSA Sagar, not AUSA Robert Dugdale (or any other AUSA) as part of the prosecution team.  (See Ex. 74, RT 10/18/05 at 6-67.)  While almost the entire colloquy with the court discussed a document obtained from

---

[142] It is also speculative because defendant alleges that this supposed information "appears to have been the basis for further interviews of Altmanis."  (Mot. at 219.)  There is no evidence of that.  Speculation is not cognizable in habeas.  See Jones, 66 F.3d at 204-05 (conclusory allegations without specific facts do not justify habeas relief).

Mikhel's cell, near the end of the hearing AUSA Sagar put the following on the record with respect to a document seized from Kadamovas's cell:

> MS. SAGAR:  Your Honor, may I just bring up one additional factor with respect to taint issues?  There was a document that was seized from defendant Kadamovas' cell and it was also forwarded to me, and that document was also in Russian and it was translated and Mr. Lasting and I have agreed that that is a – a document that's covered by the attorney-client privilege and that it will not be disclosed to the prosecution.  And I think Mr. Lasting would like some sort of record of that agreement to be made.
>
> And would the Court – does the Court have any ideas as to how we should do that?  Should we submit –
>
> THE COURT:  You might want to submit something under seal just identifying the document in a way that is satisfactory to you since I haven't seen it and won't see it.  I think that should do it, maybe stipulation filed under seal.
>
> MR. LASTING:  That's fine, Your Honor.

(Ex. 74, RT 10/18/05 at 67.)  Thus, the record makes clear that there are no facts to support defendant's contention that the prosecution team improperly received documents from a search of his cell.  His claim should be either dismissed or denied.[143]

### J. Defendant's Claimed Violations of International Law Are Procedurally Defaulted and Have No Merit (Defendant's Claim 29)

#### 1. Procedural Default

Defendant argues that his conditions of confinement violate international treaties and international law, and the government violated his consular rights pursuant to the Vienna Convention on

---

[143] Defendant also implies that he anticipates receiving additional documents pursuant to his FOIA lawsuits that will substantiate this claim.  (Mot. at 219.)  There is no reason to believe that additional time beyond the years defendant has already had will turn up any support for this claim.

190

Consular Relations ("Vienna Convention").[144]  (Mot. at 387.) Specifically, defendant contends that his conditions of confinement at the United States Penitentiary at Terre Haute constitute prohibited torture under the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT") (Mot. at 397-98), the Universal Declaration of Human Rights ("UDHR") (Mot. at 390), the International Covenant on Civil and Political Rights ("ICCPR" or "Covenant") (Mot. at 390), and customary international law (Mot. at 397); that he has been subject to solitary confinement in violation of the CAT (Mot. at 387, 397), UDHR (Mot. at 387), ICCPR (Mot. at 387, 397), and the American Declaration of the Rights and Duties of Man ("American Declaration") (Mot. at 387); and that he was allegedly unable to contact the embassy of Lithuania, his home country, in violation of the Vienna Convention and (unspecified) international law (Mot. at 393-95).[145]  Because defendant did not

---

[144] To the extent defendant's complaint about his conditions of confinement relies on treaties that are not self-executing or where the implementing regulations do not confer a right on defendant, there is a question whether defendant's claim is nothing more than a conditions of confinement claim not cognizable in habeas.  Such a claim must be brought in a separate civil rights action.  See Preiser v. Rodriguez, 411 U.S. 475, 498-99 (1973); Nettles v. Grounds, 830 F.3d 922, 933-34 (9th Cir. 2016).  See, e.g., Shook v. Apker, 472 F. App'x 702, 702-03 (9th Cir. 2012); Badea v. Cox, 931 F.2d 573, 574 (9th Cir. 1991) (challenges to the conditions of a prisoner's confinement are cognizable pursuant to 42 U.S.C. § 1983 and may only be brought in the district where a prisoner is confined).  In 2023, defendant brought such a civil rights complaint in the Southern District of Indiana, (Mot., Ex. 1-111 (Ex. 113), which defendant amended on December 13, 2023.  (Kadamovas v. Director, Federal Bureau of Prisons, et al., No. 2:23-cv-22-MPB-MKK, Dkt. No. 67.)

[145] Defendant also claims his death sentence violated international law (Mot. at 387, 390-93, 396), a claim mooted by the commutation of his death sentence.

191

raise these claims in the district court or on appeal, they are procedurally defaulted.  See, e.g., Frady, 456 U.S. at 162, 164; Johnson, 988 F.2d at 945; Sanchez-Llamas, 548 U.S. at 331, 360 ("[C]laims under Article 36 of the Vienna Convention may be subjected to the same procedural default rules that apply generally to other federal-law claims"); Pena v. United States, 2009 WL 2912653 *2 (C.D. Cal. Sept. 9, 2009) (denying certificate of appealability on consular notification claim that was first raised on habeas where defendant failed to establish cause and prejudice to overcome procedural default).

Defendant alleges no ineffective assistance of counsel to establish cause to overcome default, nor could he, where defendant was either not afforded any individual rights pursuant to the international treaties or his consular notification rights were satisfied.

Defendant also attempts to bootstrap these claims into alleging violations of the "Fifth, Sixth, and Eighth Amendments," but without more, these claims are not cognizable in habeas.  Johnson, 988 F.2d at 945 (conclusory statements in a habeas petition do not warrant a hearing).

    2.    <u>Alleged Violations of International Treaties Are Not Cognizable in Habeas</u>

The habeas statutes only provide a cause of action for defendants who assert that their sentence was imposed "in violation of the Constitution or laws of the United States" (28 U.S.C. § 2255(a)) or where they are in custody "in violation of the Constitution or laws or treaties of the United States."  (28 U.S.C. § 2254(a)).  Consequently, a claim that defendant's sentence violates

192

international treaties or laws without those laws having the force of United States law fails.  See Rowland v. Chappell, 902 F.Supp.2d 1296, 1339 (N.D. Ca. 2012) (defendant's claim that the means of carrying out the death sentence was cruel and unusual punishment under the ICCPR "is meritless and borders on frivolous" because such a claim is not cognizable on federal habeas review pursuant to 28 U.S.C. § 2254(a) where such review is for claims that a petitioner "is in custody in violation of the Constitution or laws or treaties of the United States"), aff'd on other grounds, 876 F.3d 1174 (9th Cir. 2017); Carpenter v. Martel, 2011 WL 5444165, *15 (N.D. Cal. Nov. 9, 2011) (denying petitioner's habeas claim pursuant to 18 U.S.C. § 2254(a) as meritless and non-cognizable where petitioner asserted violations of customary international law, the UDHR, the ICCPR, and the American Declaration).  As shown below, none of the treaties defendant cites are self-executing or confer an individual right to support defendant's alleged torture or solitary confinement claims.

3. The International Treaties Defendant Cites Provide No Relief Because They Are Not Self-Executing and Do Not Confer Individual Rights

None of the treaties defendant cites support defendant's claims either because they are not self-executing or because they do not confer individual rights.  Both are required for "any treaty to be susceptible to judicial enforcement."  Cornejo v. County of San Diego, 504 F.3d 853, 856 (9th Cir. 2007).  "A treaty is self-executing when it is automatically enforceable in domestic courts without implementing legislation."  Serra v. Lappin, 600 F.3d 1191 (9th Cir. 2010).  Here, defendant cites several treaties for his claims that he has been illegally held in solitary confinement and

that his conditions constitute torture, however, none of these treaties are self-executing or confer an individual right.

          *a.    Solitary confinement and international law*

Defendant argues that he has allegedly been held in solitary confinement (discussed further below) in violation of the UDHR, the American Declaration, ICCPR, and CAT.  (Mot. at 387, 397.)  However, the UDHR is only a statement of principles, and "does not of its own force impose obligations as a matter of international law."  Sosa v. Alvarez-Machain, 542 U.S. 692, 734 (2004).  The same is true for the American Declaration of the Rights and Duties of Man ("American Declaration"), which is not a treaty.  It represents instead "a noble statement of the human rights aspirations of the American States, but creates no binding set of obligations."  Flores-Nova v. Att'y Gen. of United States, 652 F.3d 488, 494-95 (3d Cir. 2011); see also Garza v. Lappin, 253 F.3d 918, 923 (7th Cir. 2001) (holding execution would not violate the American Declaration because it "is merely an aspirational document that, in itself, creates no directly enforceable rights"); Jenkins v. Bloomfield, 2023 WL 8441491 *40 (C.D. Cal. Oct. 17, 2023).  Thus, it is not enforceable domestically. Burriola v. Nevada, 2021 WL 4941992 at *4 (D. Nev. Oct. 21, 2021) (the American Declaration "is not a treaty and is not enforceable domestically").  While ICCPR binds the United States as a matter of international law, "the United States ratified the Covenant on the express understanding that it was not self-executing and so did not itself create obligations enforceable in the federal courts."  Sosa, 542 U.S. at 735.  Finally, as discussed in more detail below, the CAT only confers an individual right to an extraditee to have the Department of State conduct a torture assessment of the extraditee's

194

home country before extradition occurs, a situation not applicable here.

b.    Torture and international law

Defendant asserts without specifics that his imprisonment "constitutes prohibited torture under the CAT and customary international law." (Mot. at 397.) On this same basis defendant also asserts violations of the UDHR and the ICCPR. (Mot. at 390.) Even if Kadamovas' conditions somehow violated international treaties (which they do not), these treaties do not provide Kadamovas relief. First, as noted above, the UDHR is only a statement of principles and does not impose obligations under international law. Sosa, 542 U.S. 692, 734 (2004). Second, also as noted above, ICCPR does not establish obligations enforceable in federal court. Sosa, 542 U.S. at 735. Third, with respect to an alleged violation of customary international law (Mot. at 397), defendant fails to articulate some normative standard for torture that would qualify as binding customary international law. See, e.g., Sosa, 542 U.S. at 738 ("Whatever may be said for the broad principle [defendant] advances [regarding arbitrary detention]...it expresses an aspiration that exceeds any binding customary rule having the specificity we require. Creating a private cause of action to further that aspiration would go beyond any residual common law discretion we think it appropriate to exercise.").

Fourth and finally, the CAT does not grant defendant any relief because defendant is not an extraditee. As ratified, CAT provides a mechanism for foreign nationals to avoid being extradited back to their home country if "there are substantial grounds for believing the person would be in danger of being subjected to torture."

195

Trinidad y Garcia v. Thomas, 683 F.3d 952, 955-56 (9th Cir. 2012) (citing the Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"), 8 U.S.C. § 1231).  Pursuant to this ratification, the Department of State adopted regulations requiring policy and legal review before any recommendation to the Secretary whether to sign a surrender warrant.  Id. at 956 ("An extraditee may be surrendered only after the Secretary makes a determination regarding possible torture," and because the "CAT and its implementing regulations are binding domestic law...the Secretary of State must make a torture determination before surrendering an extraditee who makes a CAT claim") (emphasis in original); see also Sridej v. Blinken, 108 F.4th 1088, 1093 (9th Cir 2024) (finding that petitioner Sridej's "narrow liberty interest ha[d] been vindicated" where the United States submitted a declaration stating that the Acting Deputy Secretary of State had authorized Sridej's extradition after reviewing "all pertinent information").  These circumstances do not apply here and thus the CAT also does not afford Kadamovas habeas relief.  Thus, international law in any form does not provide Kadamovas relief.

### 4.   Defendant's Conditions Do Not Constitute Either Prolonged Solitary Confinement or Torture

Even assuming these treaties grant defendant an individual right, which they do not, defendant is neither in prolonged solitary confinement nor do his prison conditions constitute torture. According to his civil rights complaint, since 2014 when Kadamovas became a "Phase II" prisoner, Kadamovas receives recreation time out of his cell five days a week for an hour each day with another designated prisoner, with expanded recreation time of two hours on one of those days.  He is also allowed to meet with that prisoner in

196

the "leisure room" that contains books, hot water to make drinks, and a television, for 90 minutes twice a week,[146] and is permitted out of his cell for an hour a day to use the law library.[147]  There is also an area with cells for religious services.  (Mot., Ex. 1-111 (Ex. 113), Class Action Complaint No. 2:23-cv-22, at 6-8.)  Finally, defendant's clemency video reveals that he is permitted to participate in artistic endeavors such as drawing and painting, has taught an art class to other inmates (clemency video[148]; First Amended Class Action Complaint, Kadamovas v. Director, Federal Bureau of Prisons, et al., 2:23-cv-22-MPB-MKK (S.D. Ind.), Dkt. No. 67, at 10-11), and a google search reveals that he maintains a website of his art.



15 October 2020

---

[146] In his amended complaint, defendant changed 90 minutes to 60 minutes.  (First Amended Class Action Complaint, No. 23-cv-22-MPB-MKK, Southern District of Indiana, at 7, CV Dkt. No. 67.)

[147] Previously the Ninth Circuit granted Kadamovas law library access in the amount of 20 hours per week.  (CA 07-99009 Dkt. No. 124, Order dated February 24, 2010.)

[148] The video also shows him playing the guitar and singing (in English).

See https://sites.google.com/site/yurikadamov/home (refuting his claim that his conditions qualify as prolonged solitary confinement or torture).  Defendant's claims fail where defendant's conditions of confinement do not qualify as prolonged solitary confinement or torture under any definition of the term.

     5.    Defendant's Consular Notification Rights Were Satisfied Where the Government Notified the Lithuanian Embassy In Two Separate Instances and Kadamovas Had Ample Access to the Lithuanian Embassy

Defendant alleges without support that the Lithuanian Embassy was not notified of his arrest and detention in a timely and proper manner and Kadamovas was not timely advised of his right to contact the embassy in violation of the Vienna Convention.  (Mot. at 393-94.) There is no evidence of this, and defendant cites to none. Defendant's mere conclusory assertion to the contrary does not make it true.

Article 36 of the Vienna Convention provides that if a foreign national is detained by authorities, those authorities must notify consular officers of the detainee's home country if the detainee so requests.  Sanchez-Llamas v. Oregon, 548 U.S. 331, 338 (2006) (citing Article 36(1)(b) of the Vienna Convention).  Article 36 also provides that the authorities shall inform the detainee without delay of his rights under this sub-paragraph.  (Id.)

Ninth Circuit law makes clear that the "rights" referred to in the Vienna Convention must be construed in light of their intended purpose, which is to "facilitat[e] the exercise of consular functions."  Cornejo, 504 F.3d at 860.  For the United States to inform a foreign national that it will advise his consulate of an

arrest and facilitate communications is to exercise "a means of implementing the treaty obligations as between States." Cornejo, 504 F.3d at 860 (citation omitted) (emphasis in original).  Article 36 of the Vienna Convention does not confer a private, judicially enforceable right upon individuals.[149]  Id.  Even if there were an initial failure to inform Kadamovas of the treaty obligation to place him in contact with the Lithuanian Embassy, which there was not, he was not denied any individual right under the Vienna Convention.

Further, here those rights were satisfied, as demonstrated by the exchange between the parties and the court in January 2007 after conclusion of the guilt-phase portion of the case:

> **THE COURT:**  ...Now, anything you want to bring up, Mr. Lasting?  The clerk tells me there was a problem with a telephone order that I signed.
>
> **MR. LASTING:**  There was, your Honor.  I believe that the special administrative – **(Pause)**
>
> I believe the special administrative measures that have been imposed upon Mr. Kadamovas preclude him from making a telephone call unless it's monitored by, I think, someone from the FBI or someone that speaks the language that he's going to be speaking into the telephone.  The other problem with it is he was hoping to call the Lithuanian Embassy in

---

[149] The Ninth Circuit goes further in Cornejo than the Supreme Court in stating that the Vienna Convention does not confer an individual right (there in the context of a § 1983 civil rights complaint) (Soto-Portillo v. Ryan, 2018 WL 2075328 *14 (D. Ariz. 2018 Feb. 23, 2018)), where the Supreme Court has declined to decide whether Article 36 creates a right enforceable by individuals in judicial proceedings.  See Sanchez-Llamas, 548 U.S. at 343 ("[W]e find it unnecessary to resolve the question whether the Vienna Convention grants individuals enforceable rights....[W]e assume, without deciding, that Article 36 does grant...such rights."); Medellin v. Texas, 552 U.S. 491, 506 n.4 (2008) ("[W]e thus assume, without deciding, that Article 36 grants foreign nationals an individually enforceable right to request that their consular officers be notified of their detention, and an accompanying right to be informed by authorities of the availability of consular notification.") (internal quotation marks and citation omitted); Breard v. Greene, 523 U.S. 371, 376 (1998) (per curiam) (stating that the Vienna Convention "arguably confers on an individual the right to consular assistance following arrest").

Washington D.C.  And the time difference I guess presents a problem, because that embassy shuts down Eastern Standard Time, which is two o'clock in the afternoon here.

**THE COURT:**  Well, the consular notification and access is provided by treaty I believe.  And I don't know if Lithuania is a signatory to the treaty.[150]  But in this case, I believe when I first got it I had the Government re-verify that the consular notification was in fact made.

But the telephone call -- I permitted two telephone calls to be made to the Lithuanian Consulate.  Now, there is no attorney-client privilege.  So the telephone calls under the special administrative order can be monitored by the FBI.

So I do think that Mr. Dugdale or Ms. DeWitt can assist you to get those telephone calls completed.

**MS. DEWITT:**  Just two things, your Honor.  One is in addition to not only giving consular notification, we did it twice just to sort of belt and suspender the issue.  We also made special arrangements for somebody from the consulate to actually come in and visit Mr. Kadamovas at an earlier date.  So he's had full access to consulate members and anything relating to consular notification and contact.

With respect to this telephone call, I think what Mr. Lasting is saying is not that he has been in any way inhibited from having this or making this phone call, but that he doesn't want the FBI to monitor it.  There's nothing I can do about that.  We have a right to monitor these calls.  And unless he's telling me that there's some other problem other than that, I would be happy to help him work out any problems.  But I think that's what the problem is not that anybody's stopping him from doing the call.

**MR. LASTING:** That's not what I was saying, your Honor.  I wasn't saying that he objects to having somebody monitor.  That's provided under the SAMS.  I think the problem is because somebody has to monitor it, there have to be arrangements made.  They have to schedule it in advance and then trying to work that out around the time when the embassy's open.  It was my perception of what the problem is.

I found out this morning that he didn't get the call.  Perhaps the thing to do is to let me confer further with Mr. Kadamovas about it.  I'll talk to Ms. DeWitt.

---

[150] Later in this exchange the district court noted that Lithuania is a signatory to the Vienna Convention, but is a non-mandatory notification country.  (RT 01/24/07 at 16-17.)

It appears to me it's something that can be worked out and that the Court's order will be honored.  And if we can't work it out in a reasonable fashion, I'll bring it back to the Court's attention.

(Ex. 55, RT 01/24/07 at 14-16) (emphasis added).

The transcript makes clear that the government gave consular notification (twice), arranged for Kadamovas to have an in-person visit from a consular officer, and Kadamovas had at least two calls with the Lithuanian Consulate.[151]  The requirements of the Vienna Convention were satisfied.

Defendant only points to the above exchange as supposed evidence of a Vienna Convention and international law violation, nothing else. (Mot. at 394-95.)  However, the transcript makes clear that if any logistical difficulties associated with the placement of this particular call were not resolved, defense counsel was going to raise them with the court again.  That did not occur.  The notion that Mr. Kadamovas' ability to communicate with the Lithuanian embassy was unreasonably restricted is baseless.

Even assuming there was a violation of the Vienna Convention, which there was not, and assuming that the Vienna Convention confers an individual right on defendant, which it does not, defendant would still be required to show prejudice for the failure to obtain consular assistance, a showing that could not "arguably be made." Breard v. Greene, 523 U.S. 371, 377 (1998) (per curiam) ("[I]t is extremely doubtful that the violation should result in the overturning of a final judgment of conviction without some showing

---

[151] It is unclear from the transcript whether the court's telephone order discussed above was one of the two authorized telephone calls to which the district court made reference.

201

that the violation had an effect on the trial.  In this action, no such showing could even arguably be made.") (citation omitted).  <u>See also</u> <u>Rivas v. Hatton</u>, 2016 WL 7674792 at *13 (C.D. Cal. Nov. 18, 2016) (the need to show prejudice from a violation of the Vienna Convention is a "high burden" and "difficult to even argue") (citing <u>Breard</u>, 523 U.S. at 377)).  Defendant sets forth no prejudice.  He simply asserts his oft-repeated catchphrase, "The violations of these rights have substantially prejudiced defendant."  (Mot. at 398.) This is not a showing of prejudice.

### K.   Petitioner Fails to Establish Ineffective Assistance of Appellate Counsel (Defendant's Claim 30)

Defendant claims ineffective assistance of counsel on appeal without any support or evidence.  Defendant argues in generalities, without specifying what issues appellate counsel failed to raise or investigate or what evidence counsel failed to "present[] and preserve."  (Mot. at 399-400.)  Defendant offers nothing other than unsubstantiated assertions of "inadequate performance" and "substantial prejudice."  (Mot. at 400.)  This is not enough to meet the two-pronged <u>Strickland</u> test.

Claims of ineffective assistance of appellate counsel are reviewed under the familiar standard set forth in <u>Strickland</u>.  <u>See</u> <u>Mooreman v. Ryan</u>, 628 F.3d 1102, 1106 (9th Cir. 2010); <u>Cockett v. Ray</u>, 333 F.3d 938, 944 (9th Cir. 2003).  To establish a valid claim for ineffective assistance of appellate counsel, defendant must demonstrate (1) "that counsel acted unreasonably in failing to discover and brief a merit-worthy issue," and (2) there was "a reasonable probability that, but for appellant counsel's failure to

raise the issue, the petitioner would have prevailed in his appeal." Mooreman, 628 F.3d at 1106.

Because defendant identifies no issues, much less any "merit-worthy" ones, that appellate counsel failed to raise on appeal and fails to analyze why those issues would have prevailed on appeal, defendant fails both prongs of the Strickland test. Mooreman, 628 F.3d at 1107. Defendant only cites to a declaration from one of defendant's appellant counsel, Benjamin Coleman, Esq., without identifying anything in the declaration that would support defendant's claim. This is not enough. "Judges are not like pigs, hunting for truffles buried in briefs." United States v. Dunkel, 927 F.2d 955, 956 (7th Cir. 1991) (a skeletal argument, "really nothing more than an assertion, does not preserve a claim" for direct appeal...[e]specially not when the brief presents a passel of other arguments") (citation omitted). Further, it is clear from Coleman's declaration that the decision whether to raise certain issues on appeal was the product of reasonable professional judgment.[152] See

---

[152] For example, appellate counsel "elected to focus on the trial court's failure to give a cautionary instruction" for the use of an anonymous jury and the failure to provide juror information to defense counsel rather than challenging the use of the anonymous jury itself, and did not consider the "public trial" aspect of the challenge. (Mot., Coleman Decl., Ex. 1-14 (Ex. 16), ¶ 3.) This reflects counsel's reasoned judgment where Ninth Circuit law has approved the use of an anonymous jury in circumstances met here and, as noted above, there is no "public trial" component to the use of an anonymous jury. With respect to duress, where defendant has failed to make a prima facie case, as noted above, appellate counsel were not ineffective for not considering it. (Id. at ¶ 4.) And finally, Mr. Coleman concluded that claims involving shackling and Solovyeva's diary were not appropriate for direct appeal since they required further factual development. (Id. at ¶¶ 5, 6.) These examples all show appellate counsel to have acted objectively reasonably in deciding which claims to - and which claims not to - raise on appeal. See Pollard, 119 F.3d at 1435 ("A hallmark of effective appellate counsel is the ability to weed out claims that have no likelihood of

*(footnote cont'd on next page)*

Pollard v. White, 119 F.3d 1430, 1435 (9th Cir. 1997) (to establish ineffectiveness, defendant must show attorney performance that fell below an objective standard of reasonableness and that the attorney's acts or omissions "were not the result of reasonable professional judgment") (citation and quotations omitted).  Where defendant makes nothing more than unsubstantiated allegations, defendant cannot sustain a claim of ineffective assistance against appellate counsel where his issues are meritless and would not have resulted in reversal.  Wildman v. Johnson, 261 F.3d 832, 840 (9th Cir. 2001).  Because defendant has failed to show that appellate counsel's performance fell below an objective standard of reasonableness and that he was prejudiced, defendant has not established a claim of ineffective assistance of appellate counsel.

### L.    Defendant's Claim That Congress Invalidly Gave Courts Federal Jurisdiction Over Defendant's Hostage Taking Crimes Under the Hostage Taking Act is Meritless (Defendant's Claim 31)

In the defendant's § 2255 petition, Claim 31 erroneously suggests that Kadamovas's convictions and sentence were unlawful due to lack of federal jurisdiction based on the scope and application of the Hostage Taking Act of 1984, despite the Ninth Circuit's contrary holding.  See Mikhel, 889 F.3d at 1003.  As the Ninth Circuit made clear, defendant incorrectly interprets the Hostage Taking Act, as codified in 18 U.S.C. § 1203, to require a nexus to international terrorism in order to apply.  Id. at 1023.  "Mikhel and Kadamovas's conduct in abducting and holding their victims for ransom fits squarely within the ... Hostage Taking Act."  Id.  This alone

---

success, instead of throwing in a kitchen sink full of arguments with the hope that some argument will persuade the court.") (citation omitted).

provided federal jurisdiction.  Additionally, the Ninth Circuit explained that the United States and California share "concurrent jurisdiction" to punish violators of federal crimes like hostage-taking in violation of 18 U.S.C. § 1203.

Nevertheless, defendant suggests that the Supreme Court's reasoning in Dubin v. United States, 599 U.S. 110 (2023), implies that Section 1203's scope should be limited in a manner that excludes federal jurisdiction (Mot. at 401).  Defendant is incorrect.  Dubin involves an allegation of healthcare billing fraud where the Supreme Court rejected an expansive reading of a congressional statute that would render criminal "everyday" healthcare billing acts.  Id.  There is no such concern (by analogy) here.  Section 1203 of Title 18, United States Code penalizes "whoever ... seizes or detains and threatens to kill, to injure, or to continue to detain another person in order to compel a third person ... to do or abstain from doing any act as a[] ... condition for the release of the person detained."  18 U.S.C. § 1203(a).  Criminalizing hostage taking for ransom payments is hardly an expansive reading of the Hostage Taking Act that would incriminate "everyday" people, as was the Supreme Court's concern in Dubin.  Dubin does not support a finding of no jurisdiction, as defendant asserts.

**VII.     NO HEARING IS NECESSARY AND THIS COURT SHOULD NOT ISSUE A CERTIFICATE OF APPEALABILITY**

A § 2255 motion may be resolved without an evidentiary hearing if "the motions and the files and records of the case conclusively show that the prisoner is entitled to no relief."  Blaylock, 20 F.3d at 1465 (emphasis in original); see also United States v. Mejia-Mesa, 153 F.3d 925, 929 (9th Cir. 1998) ("The district court has discretion

to deny an evidentiary hearing on a § 2255 claim where the files and records conclusively show that the movant is not entitled to relief."). That is the case here where defendant's claims have been denied in prior rulings by this Court or the Ninth Circuit, or are vague and conclusory, with no supporting facts. Woodford, 384 F.3d at 591 (holding that a district court may make a factual finding based solely upon "the declarations and exhibits already present in the record" when an evidentiary hearing "would not alter [its] view of the record"). Lacking in merit, defendant has made no substantial showing of the denial of a constitutional right as to any of the issues, and thus a hearing is not warranted.

Similarly, defendant has failed to make the necessary showing for issuance of a certificate of appealability. 28 U.S.C. § 2253(c)(2) (certificate may issue "only if the applicant has made a substantial showing of the denial of a constitutional right.") (emphasis added). This standard requires a petitioner to demonstrate that reasonable jurists could debate whether resolution of the petition by the district court should have been resolved differently or that the issues presented deserve encouragement to proceed. Miller-El v. Cochrell, 537 U.S. 322, 336 (2003); Slack v. McDaniel, 529 U.S. 473, 484 (2000) (this showing required to satisfy 2253(c) is straightforward where the district court has rejected the constitutional claims on the merits); Nevius v. McDaniel, 218 F.3d 940, 948 (9th Cir. 2000) (denying issuance of a certificate of appealability where "[r]easonable jurists would not find the district court's rulings on the merits to be debatable or wrong") (citing Slack, 529 U.S. 473 (2000)). That is not the case here where

defendant's claims are not debatable on their face.  No certificate of appealability should issue.

**VIII.    CONCLUSION**

For the foregoing reasons, the Court should either dismiss or deny defendant's § 2255 Motion without an evidentiary hearing and decline to issue a certificate of appealability.