# GOVERNMENT EXHIBIT 1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

- - -

THE HONORABLE DICKRAN TEVRIZIAN, JUDGE PRESIDING

- - -

U.S.A.,                          )
                                 )
                  Plaintiff(s), )
                                 )
       vs.                       ) CR02-220(B)-DT
                                 )
IOURI MIKHEL; JURIJUS KADAMOVAS,)
                                 )
                  Defendant(s). )
_____)

REPORTER'S TRANSCRIPT OF PROCEEDINGS

JURY TRIAL - DAY 22

LOS ANGELES, CALIFORNIA

TUESDAY, OCTOBER 10, 2006

GAIL PEEPLES,CSR
Contract Court Reporter
100 United States Courthouse
312 North Spring Street
Los Angeles, California 90012
(213) 894-3013

VARVARA OLSON, Russian Interpreter

LUDMILLA GENN, Russian Interpreter

ZOYA SPIVAKOVSKY, Russian Interpreter

ALEX J. LEVOFF, Russian interpreter

CHRISTINA LARSON GITS, paralegal

the jury.

The record should indicate that all jurors are present and all parties and counsel are present.

I apologize for the delay during this trial, but there were some unforeseen circumstances that we had to address.  And I think now we're in the position to move forward.

All right.  I believe when we were last here we were playing the video deposition of the witness.  And there's about another 2 1/2 or 3 hours left to go.

So, Mr. Dugdale, if you will continue.

MR. DUGDALE:  Yes, Your Honor.  Specifically, there's about 25 minutes of the government's direct that needs to be played as well as the cross-examination.  So I will begin by playing the last part of the direct examination.

(Whereupon, at 9:44 a.m. the videotaped deposition of Konstantinos Tezhik resumed playing until 10:17 a.m.)

MR. DUGDALE:  Your Honor, with the playing of that segment, that concludes the direct examination by the government.  And I will now play the cross-examination conducted by the defense.

THE COURT:  Again of Mr. Tezhik?

MR. DUGDALE:  Correct.

(The videotape resumed playing.)

THE COURT:  Let's take our morning recess --

(The recording continued playing.)

THE COURT:  Let's stop there.  Let's take ten minutes.

(At 10:54 a.m. the jury left the courtroom.)

THE COURT:  All right.  Outside the presence of the jury.

You indicated in morning that you're going call Mr. Altmanis.

MR. DUGDALE:  Yes.  Mr. Altmanis, Your Honor.  Yes.

THE COURT:  Now, if you're going to call him, I believe I have to give jury instruction number 4.9, which is the model jury instructions dealing with an accomplice and an individual who has pled guilty to a crime and the admonition that in evaluating the witness' testimony they have to consider the extent to which the witness' testimony had been influenced by certain factors and the fact that the witness' testimony should be examined with greater caution than that of the other witnesses.  Look at that --

MR. DUGDALE:  I'm familiar with the instruction, Your Honor.

We -- certainly we would propose that instruction be given at the end of the trial.  If the Court must give it now, that's fine.

THE COURT:  Well, my policy is to give it during the trial.

MR. DUGDALE:  That's fine, Your Honor.

THE COURT:  All right.  Let's take our morning recess.

(Morning recess taken from 10:56 a.m. 11:11 a.m.)

THE COURT:  All right.  Outside the presence of the jury.  The record will indicate all parties and counsel are present.

Anything the government wishes to bring up?

MR. DUGDALE:  No, thank you, Your Honor.

THE COURT:  Anything the defendants with to bring up?

Nothing, Your Honor.

THE COURT:  All right.  We'll bring the jury back in.

(At 11:11 a.m. the jury entered the jury room and the videotaped deposition of Konstantinos Tezhik resumed playing.)

THE COURT:  All right. Let's stop.

All right.  We'll take our lunch break. We're only going to take an hour today.  So I want you back here in the jury room at five minutes to 1:00.  We'll take our lunch break at this time.

(A lunch recess was taken at 12:00 p.m. with proceedings resuming at 12:59 p.m.)

THE COURT:  Back on the record.  Outside the presence of the jury.  The record will indicate all parties and counsel are present.

Anything the government wishes to bring up?

MR. DUGDALE:  No, Your Honor.  Thank you.

THE COURT:  Anything the defendants wish to bring up?

MR. CALLAHAN:  No.  Thank you.

THE COURT:  All right.  Bring the jury in.

(At 12:59 the jury entered the court room and proceedings resumed as follows.)

THE COURT:  The record will indicate all parties, counsel, and jurors are present.

We will continue with the playing of the video deposition of Mr. Konstantinos Tezhik.

MR. DUGDALE:  Yes, Your Honor.

(The videotaped deposition resumed playing at 1:01 p.m.)

MR. DUGDALE:  Just so you know, there's about 13 minutes, 15 minutes left.

THE COURT:  Let's take the 13 minutes then we'll break.

(The video resumed playing at 2:31 p.m.)

THE COURT:  All right.  We're going take our break.
But before we go, a couple of things.

1.  All of the exhibits referred to in the
video deposition were admitted into evidence.

For the record, the following objections
were overruled and motions to strike testimony are denied.

Mr. Callahan objected on the basis of not
not responsive.  Mr. Dugdale objected on the basis of
asked and answered.

Also, on the video deposition it indicated
that the deposition was taken on October 4, 2002.

Is that correct?  Or is it October 4, 2005?

MR. DUGDALE:  It was 2005, Your Honor.  That is
correct.

THE COURT:  All right.  So I wanted to make that
clear.

Also, on the cross-examination that took
place, first Mr. Callahan cross-examined on behalf of
defendant Mikhel.  Next, Mr. Lasting cross-examined on behalf
of Mr. Kadamovas.  Next, Mr. Buehler cross-examined on behalf
of defendant Krylov.  And Mr. Crain, during his cross
examination, asked no questions on behalf of Ms. Solovyeva.
And then Mr. Dugdale did the redirect examination.

Let's take a ten minute recess.  Remember

the admonition.

(A break was taken at 2:47 p.m. with proceedings resuming at 2:59 p.m.)

THE COURT:  Back on the record in the Mikhel, Kadamovas matter.

The record will indicate all parties, all counsel are present outside the presence of the jury.

What I'm going to do is I'm going to have the clerk swear Mr. Altmanis outside the presence of the jury.  And I will advise the jury that he has in fact been previously sworn.

All right.  Mr. Altmanis, please raise your right hand.

THE CLERK:  Do you solemnly swear that the testimony you're about to give to the court in this case shall be the truth, the whole truth, and nothing but the truth so help you God?

THE WITNESS:  Yes.

THE CLERK:  Thank you, sir.

Would you state your name for the transcript please.

THE WITNESS:  Ainar Altmanis.

THE CLERK:  Would you please spell your first and last name.

THE WITNESS:  A-i-n-a-r --

THE COURT:  All those people circling around please take your seats.

MR. RUBIN:  Your Honor, just as I technical matter, with the monitor, the way it's placed, I can't see --

THE WITNESS:  A-l-t-m-a-n-i-s --

THE COURT:  Well, then, we got a problem.

MR. RUBIN:  I don't know what we can do.  I mean, it doesn't matter where I sit.

THE COURT:  You're going to have to move back more, Mr. Rubin.

MR. RUBIN:  Okay.

MS. DE WITT:  It's just loading, Your Honor.  If you can wait just one second.  I'm sorry.

THE INTERPRETER:  Is that better?

MR. RUBIN:  No.  Thank you though.

THE COURT:  How long is it going to take to load up?

MS. DE WITT:  Normally it only takes a minute or two, Your Honor.  So I'm not sure.

MR. DUGDALE:  It's fine, Your Honor.

THE COURT:  All right.  Let's take it off the screen then.

THE COURT:  All right.  Outside the presence of the jury.

Anything the Government wishes to bring up?

MR. DUGDALE:  No, Your Honor.  Thank you.

THE COURT:  Anything the defense wishes to bring up?

(No audible response.)

THE COURT:  All right.  I'll bring the jury out.

MR. RUBIN:  Your Honor, may I just have one minute to move this stuff?

THE COURT:  All right.

The record will indicate all the jurors, all counsel, all parties are present.  The witness has been previously sworn.

Please state your name for the record.

THE WITNESS:  Ainar Altmanis.  A-i-n-a-r A-l-t-m-a-n-i-s.

THE COURT:  All right.  Ladies and gentlemen of the jury, you're about to hear testimony from Mr. Ainar Altmanis, who admitted to being an accomplice to various of the crimes charged in the indictment.

An accomplice is one who voluntarily and intentionally joins with another person in committing a crime.

Mr. Altmanis has pleaded guilty to a crime or crimes arising out of the same events for which the defendants Mikhel and Kadamovas are on trial.

Mr. Altmanis' guilty plea is not evidence

against either defendant Mikhel or Kadamovas; and you may consider the plea of guilty of Mr. Altmanis only in determining Mr. Altmanis' believability.

For these reasons, in evaluating Mr. Altmanis' testimony you should consider the extent to which or whether Mr. Altmanis' testimony may have been influenced by any of these factors.  In addition, you should examine Mr. Altmanis' testimony with greater caution than that of other witnesses.

Mr. Dugdale.

MR. DUGDALE:  Thank you very much, Your Honor.

AINAR ALTMANIS,

a witness, having been duly sworn, testified as follows with the assistance of a Russian interpreter:

EXAMINATION

BY MR. DUGDALE:

Q.   Good afternoon, Mr. Altmanis.

A.   Good afternoon.

Q.   Mr. Altmanis, how old are you?

A.   47.

Q.   And where were you born?

A.   In the Soviet Union in Latvia.

Q.   And how long did you live in Latvia?

A.   All my life 'til 1992.

Q.   And where did you move when you moved from Latvia in

1992?

A.   To the United States of America.

Q.   And how --

MR. LASTING:  I'm sorry.  Could we ask the witness to speak up so that Mr. Kadamovas can hear his answer.

THE COURT:  Well, I can't do both.  Remember, it's through the interpreter.

MR. LASTING:  The interpreter's translating into English.

THE COURT:  I understand.

Proceed.

BY MR. DUGDALE:  Yes.

Q.   How old were you when you moved to the United States?

A.   34.

Q.   And were you at one time, as indicated by the judge today, formerly a defendant in this case?

A.   Yes.

Q.   And did you plead guilty in this case?

A.   Yes.

Q.   And are you now cooperating with the government?

A.   Yes.

Q.   And what offenses did you admit to committing?

A.   The conspiracy to commit kidnapping which led to the -- to their death.

Q.   And who did you -- who did you conspire to kidnap which

led to the persons death?

A.   Rita Pekler, Alex Umansky, Georgy Safiev, Nick Kharabadze, and Muscatel.

Q.   And who did you conspire with to commit these crimes?

A.   With Jurijus Kadamovas and Iouri Mikhel, Peter Krylov, Natalya Solovyeva and Alex Markovskis.

Q.   One of people you identified in your answer as one of your coconspirators was a man by the name of Jurijus Kadamovas.

Do you know a man by the name of Jurijus Kadamovas?

A.   Yes, I know.

Q.   And when did you first meet Mr. Kadamovas?

A.   He shared an apartment with my brother.

Q.   What year was it that you first met him?

A.   In 1997.

Q.   And do you see Mr. Kadamovas in the courtroom today?

A.   Yes.

Q.   And can you identify where he is sitting and what he is wearing.

A.   On the right.  In glasses.

MR. DUGDALE:  Your Honor, may the record reflect that the witness has identified the defendant Mr. Kadamovas?

THE COURT:  The record will so reflect that the witness has identified defendant Kadamovas.

BY MR. DUGDALE:

Q.    And can you explain to the jury how you first met Mr. Kadamovas.

A.    When I visited my brother, I saw him there.  I got acquainted with him.

Q.    What relationship did Mr. Kadamovas have with your brother at the time?

A.    They shared an apartment.

Q.    And when Mr. Kadamovas was sharing an apartment with your brother back in 1997, how frequently did you see Mr. Kadamovas?

A.    Depending on how often I visited my brother.  About two, three times a month.

Q.    And was there a point in time when you started to see Mr. Kadamovas more frequently than once or twice per month?

A.    Yes.  Several years later when we had families.

Q.    And when approximately was this when you and he started families respectively?

A.    About the year of 2000.

Q.    And back in the year of 2000 did you start a business?

A.    Yes.

Q.    And what kind of business did you start?

A.    I opened the store from A to (foreign word.)

        THE INTERPRETER:  Interpreter comment.

                It's the last letter of Russian alphabet.

Corresponds to A to Z.

BY MR. DUGDALE:

Q.   What was the name of the store?

A.   A to (foreign word.)

MR. DUGDALE:  You have to interpret that.

THE INTERPRETER:  It means from A to Z.

BY MR. DUGDALE:

Q.   And what kind of store was it?

A.   We're selling different things from a needle to a TV set.

Q.   And where was this store located?

A.   In North Hollywood.  On the plaza at Coldwater Canyon and Ventura Boulevard.

Q.   And when did you open this store?

A.   Excuse me?

Q.   When did you open this store?

A.   In the fall of 2000.

Q.   And in the fall of 2000 at approximately that time did defendant Kadamovas open an office for business as well?

A.   Yes.  He opened a business nearby on Ventura Boulevard.

Q.   And what was the name of that business?

A.   The business for building aquarium systems called Water World.

Q.   Now, you testified earlier that you knew defendant Kadamovas back in 1997.  As a result of knowing him and the

fact he lived with your brother, were you generally aware of Mr. Kadamovas' financial condition at that time?

MR. RUBIN:  Objection.  Speculation.  No foundation.

THE COURT:  No.  Overruled.  You can -- allow the answer in subject to motion to strike.

Go ahead.

BY MR. DUGDALE:

Q.   You can answer the question.

A.   Yes, I knew.

Q.   And can you describe for the jury what his financial condition was when you knew him at the time that he lived with your brother.

A.   His financial situation wasn't very good.  He was sharing apartment with my brother and he was also working as a furniture mover.  And I was giving him things to sell.

Q.   Was there a point in time when you became aware of a change in Mr. Kadamovas' financial condition?

A.   Yes, I knew it.

Q.   And when did that occur?

A.   In the fall of 2000 I visited them and he explained to me that he acquired a partner who was helping financial to promote his business Water World.

Q.   And did you eventually meet this man who defendant Kadamovas described as his business partner?

A.    Yes.  After a while.

Q.    And who was defendant Kadamovas' new business partner?

A.    Iouri Mikhel.

Q.    And when did you first meet Mr. Mikhel?

A.    He visited my store in 2001 together with Kadamovas.
And Kadamovas introduced us.

Q.    Is Mr. Mikhel in the courtroom today?

A.    Yes.

Q.    Could you identify where Mr. Mikhel is by where he is
sitting and what he is wearing?

A.    Yes.

He's sitting across from me on the right in
the green jacket.

MR. DUGDALE:  Your Honor, may the record reflect
the defendant has identified the defendant Mr. Mikhel?

THE COURT:  The record will so reflect the witness
has identified defendant Mikhel.

BY MR. DUGDALE:

Q.    And Mr. Altmanis, can you explain to the jury how you
first met Mr. Mikhel.

A.    Yes, I can.

Q.    And how did you first meet Mr. Mikhel?

A.    He visited my store together with Kadamovas.

Q.    And on this first occasion when Mr. Mikhel visited your
store with defendant Kadamovas, did he make any unusual

requests of you?

A.   Yes, he did, during our conversation.

Q.   What did he ask you?

A.   He asked me whether having a store like that I had any contacts around the hotel and whether I know people, among my people that I know that could give me the opportunity to purchase weapons.

Q.   Did Mr. Mikhel ask you if you could get any particular types of weapons?

A.   He said any type, any number.

Q.   And what was your response when defendant Mikhel asked you if you could get weapons any type, any number?

A.   I was stunned.  I asked him whether he was going to arm the whole army or a group.

And he said, "I can if necessary."

Q.   Now, is this store where this conversation took place -- was that the A to Z store that you testified about earlier?

A.   Yes.  But the conversation was outside of the store.

Q.   That store that you opened, what period of time did that store remain in business?

A.   Less than a year.

Q.   And why did that store that you owned close?

A.   Because financially it was insolvent and it would lead me to bankruptcy.

Q.   And what happened to the A to Z store the location after

you closed it?

A.   I rebuild the location to house a sewing business.

Q.   And did your efforts to open a sewing business at that location -- did those fail as well?

A.   Yes.  After a while it failed completely.

Q.   During this time period when you were attempting to open these various businesses, did you have any discussions with defendant Kadamovas about your own financial condition?

A.   Yes.

Q.   And did Mr. Kadamovas make any offers to you at that point in time?

A.   Yes.  He did.  And even before that.

Q.   And what did he offer to you?

A.   In one of the parties in the restaurant he told me that whenever I had a financial problem in my life I could come to him for help and he would loan me money without interest for indefinite period of time.  He gave me names of people who he loaned money before.

Q.   And did you ultimately ask Mr. Kadamovas for such a loan?

A.   Yes.  When I opened the business I felt that I don't have enough capital, and I came to him for loans several times.

Q.   And did Mr. Kadamovas ever end up loaning you any money?

A.   No.  He kept putting it off and off.  He used to say

Page: 33 of 57

"call me in a week or two."

Q.   And as a result of the financial problems that you were having with your store, did you eventually have to move your apartment that you were in?

A.   Yes.

Q.   And where was the new apartment that you moved to in relationship to where the defendant's business Designed Water World was located?

A.   In the block from that location.

Q.   And after you moved to an apartment approximately a block away from Designed Water World or so, did you start hanging around Designed Water World more frequently than you had in the past?

A.   Yes.

Q.   And how frequently would you come by Designed Water World?

A.   Every time I would drive by and saw that there was somebody there I would stop by.

Q.   Now, ultimately when the businesses that you tried to start failed, did Mr. Kadamovas offer -- ask you to help around Designed Water?

A.   Yes.  Once he asked me what I can do.

          And I said nothing except -- except selling things.

Q.   And what was the first thing -- did he ultimately have

you do anything around Designed Water World in relation to the business?

A.   Yes.  He decided to show me how to clean aquariums and asked me to help them.

Q.   And what happened after he asked you to clean aquariums at the place and showed you how to do so?

A.   I started doing what he showed me.  But I screwed up two aquariums.

THE COURT:  Give us a year that that took place.  A time frame.

THE WITNESS:  That was 2001.  The beginning of summer.

BY MR. DUGDALE:

Q.   Just to clarify things for everyone, so this is the beginning of the summer of 2001.  By that point in time had your businesses failed?

A.   Yes, they failed.

Q.   And after the situation where you, as you put it, screwed up the fish tanks while you were trying to clean them, was there any other offer for you to do anything else around Designed Water World?

A.   After they returned from a trip, Kadamovas said that he couldn't loan me money because they had difficult financial situation themselves and he said that I could earn some money.

Q.   And how did defendant Kadamovas propose that you earn some money?

A.   That -- he said that there is a job enforcing loans, that Mikhel's acquaintances asked him for help.

Q.   Did he explain to you what this job enforcing loans would involve?

A.   He said that if I managed to get the money from a person who borrowed money and wouldn't return, then the customer would pay half of that money to me.

Q.   And how was it proposed that money could be gotten from a person who owed money?

A.   He said it would be no problem, we can easily get money. Hit somebody with a baseball bat.  Break something.  Scare somebody.  We'll get the money.

Q.   And at some point in time did Mr. Kadamovas propose a specific person who you could help get money back from?

A.   First he didn't identify the person.  He explained that this is a person who is a businessman who borrowed some money and wouldn't return it.

Q.   And approximately when did this conversation take place?

A.   That was later.  Close to the fall of 2001.

Q.   And this conversation closer to October of 2001 --

        MR. RUBIN:  Objection, Your Honor.  That misstates the answer.

        THE COURT:  Sustain the objection.

He said near the close of 2001.

MR. DUGDALE:  Oh.  Close of 2001.  I apologize, Your Honor.

Q.   So this was after the summer period that you described earlier in testimony.

Is that right?

A.   Yes.

Q.   And what did Mr. Kadamovas tell you -- did he tell you anything specific about the person who he wanted you to help get the money back from?

A.   I asked him why wouldn't he go to the police and ask the police to interfere and help him to get the money back because the person borrowed the money wouldn't pay it back.

And he said that it was a large sum of money in cash and people who are involved don't want to make it known because they would have to pay taxes on that amount.

Q.   Did he tell you what this person did for a living who they wanted to get this money from?

A.   Yes.  He said that person was in real estate.

Q.   And did they explain who this person who was in real estate owed money to?

MR. RUBIN:  Objection, Your Honor, to the word "they."

THE COURT:  Sustain the objection as to the form of the question.

BY MR. DUGDALE:

Q.   Did Mr. Kadamovas explain who this person owed this money to?

A.   He said a businessman.

Q.   And did he explain who this business -- who this businessman knew that was connected to Mr. Kadamovas?

THE INTERPRETER:  Excuse me?

MR. RUBIN:  Objection.  Assumes facts --

THE COURT:  Wait.

No.  No.  No.  There's no question because the interpreter didn't understand the question.

MR. DUGDALE:  That's fine, Your Honor.

Q.   Did Mr. Kadamovas explain who this businessman knew that Mr. Kadamovas knew --

MR. RUBIN:  Objection.  That assumes facts not in evidence.

THE COURT:  I'll sustain the objection as to the form of the question because it is unclear as to who's on first, who's on second, and what's happening.

MR. DUGDALE:  Let me go to third base then.

Q.   And did Mr. Kadamovas explain who this person was who owed the money -- who this intended target owed the money to?

A.   He said that it was -- that that person was a businessman and the case was got to Mikhel through his acquaintances.

Q.   Was Mr. Mikhel aware of this plan to try and get this money back from this businessman engaged in real estate?

MR. RUBIN:  Objection.  Speculation.

THE COURT:  Sustained.

BY MR. DUGDALE:

Q.   Well, are you aware if Mr. Mikhel knew about this plan?

MR. RUBIN:  Objection.  There's -- there's no foundation.

THE COURT:  That's what he's trying to find out.

Overrule the objection subject to motion to strike.

THE WITNESS:  Yes.  Mikhel told Kadamovas --

MR. RUBIN:  Objection, Your Honor.  It's double hearsay.

THE COURT:  Sustain.  Motion to strike will be granted.

The fault of your questions, you're going into someone's mind through this witness.  And that's the problem.

MR. DUGDALE:  Okay.

Q.   Did you ultimately participate in a plan to try and get the money from this person?

A.   Yes.

Q.   And who participated in that?

A.   Myself, Jurijus Kadamovas, and Iouri Mikhel.

Q.   And did defendant Kadamovas explain to you before this happened what benefits to the three of you would occur in the

event you were able to retrieve the money from this person?

A.   Yes.  I wouldn't have to borrow money from Kadamovas.  I would have earned that money.  He said $25-, $30,000.

So you would make $25- to $30,000 if you participated in this plan and you were able to get money from this person.

Is that right?

A.   Yes.

Q.   And would the defendants, Mr. Mikhel and Mr. Kadamovas, would they earn any money if they were able to get some of the money back from this businessman who they were targeting?

MR. RUBIN:  Again, speculation.

THE COURT:  Well, I'll have to sustain the objection to the form of the question.

MR. DUGDALE:  Yes, Your Honor.

Q.   Did defendant Kadamovas discuss money that he and Mikhel would make as a result of participating in this plan?

A.   No.  They didn't involve me in their financial problems.

Q.   Of the money that was going to be potentially obtained from this person or re-acquired from this person, what percentage of that money, if any, was your group going to be able to keep?

A.   As far as I understood from what Kadamovas had said, it was half of the amount.

Q.   So, in other words, you -- the three of you would be

able to keep half of the amount that was recovered from this person engaged in real estate if you were able to recover money from him.

Is that correct?

A.    Yes.

Q.    Now, Mr. Altmanis, did someone come up with a plan of how to get this money back from this person engaged in real estate?

A.    Yes.

Q.    And who came up with the plan?

A.    Kadamovas and Mikhel briefed me on this plan.

Q.    And what did Mr. Kadamovas and Mr. Mikhel tell you about the plan?

A.    They told me how they were going to kidnap him.

Q.    And what did they tell you about how they were going to kidnap him?

A.    They said that Mikhel would act as if he were interested in buying real property, a house, and that's how they were going to lure him in.

Q.    And who would Mr. Mikhel contact under this plan to express an interest in real estate?

A.    With this man, with the businessman, for the -- with the real estate person.

Q.    And according to the plan, what would happen after Mr. Mikhel contacted this person and told him that he was

interested in a real estate deal?

A.   That Mikhel would bring him to the house which they were going to show and that we would be waiting for them there and there we would kidnap him.

Q.   And this house -- according to the plan, the house that this real estate person was going to be brought to, whose house was it?

A.   Realistically, this house belonged to Mikhel himself.

Q.   And who would be waiting at Mikhel's house to kidnap this businessman?

A.   Personally I and Kadamovas.

Q.   And did you ultimately participate in a plan to kidnap this person?

A.   Yes.

Q.   And was he kidnapped?

A.   Yes.

Q.   Mr. Altmanis, at this point I'm going to have Special Agent Perez hand you what has been marked for identification as Government's Exhibit number 72.

          THE COURT:  72 for identification.

          MR. LASTING:  Your Honor, could I request the Court ask the witness to speak up.  He's apparently speaking so the interpreter can hear him but Mr. Kadamovas can't.

          THE COURT:  I can't really do that.

               You got your own interpreter sitting next to

you.

MR. DUGDALE:  May I continue, Your Honor?

THE COURT:  You may.

BY MR. DUGDALE:

Q.   Mr. Altmanis, do you recognize the person who is pictured in Government's Exhibit number 72?

A.   Yes.

Q.   And who is that person?

A.   This is businessman Muscatel.

Q.   And is that the person who you kidnapped, the businessman who was part of this plan?

THE INTERPRETER:  Could you please repeat your question.

MR. DUGDALE:  Sure.

Q.   This person you identified as Mr. Muscatel, is that the businessman who your group was planning to go kidnap?

A.   Yes.

MR. DUGDALE:  Your Honor, the government would offer into evidence Government's Exhibit number 72.

THE COURT:  All right.  Same stipulation as before. Unless there's an objection, I will admit the evidence.

All right.  Exhibit 72 received as stated.

BY MR. DUGDALE:

Q.   Mr. Altmanis, prior to the abduction of this man did the defendants ask you to do anything?

MR. RUBIN:  Objection, Your Honor.  It's ambiguous.

THE COURT:  I'll sustain the objection.

BY MR. DUGDALE:

Q.   Did the defendants ask you to do anything specifically to plan for this kidnapping?

A.   Will you please repeat your question.

Q.   Sure.

Did the defendants -- prior to the time that this man was abducted, did the defendants ask you to go somewhere and do something specifically related to this kidnapping?

MR. RUBIN:  Well, objection.  Leading.  And I'm also going to object to the use of "defendants" --

THE COURT:  All right.  I'll sustain the objection as to the form of the question, not the area of inquiry.  Specifically, the use of the term "defendants."

MR. DUGDALE:  That's fine, Your Honor.

Q.   Mr. Altmanis, just so we can be clear to everybody here, were both of the defendants involved in the plan to kidnap this man, Mr. Muscatel?

A.   Yes.

Q.   And when the plan was explained to you about how to kidnap this man, were both the defendants present when this happened?

A.   Yes.  We were in Mikhel's kitchen at the table and we discussed it.  We discussed the plan.

Q.   Okay.  And when the plan was discussed, who was speaking and describing what had to be done under the plan?

A.   They both were explaining to me how it will be fulfilled.  And we rehearsed who was going to do what.

Q.   Okay.  When you say both, you refer to both Mr. Kadamovas and Mr. Mikhel?

A.   Yes.  Mr. Kadamovas and Mr. Mikhel, they had already had this plan and they just informed me about the details of the plan.

Q.   Okay.  And under the plan were there supplies that were needed in order to carry out the kidnapping of this person?

A.   Yes.

Q.   And were you instructed to do anything as it related to assembling these supplies?

A.   Yes.  The day before they told me to go do that -- to hardware store and to buy plastic ties with snaps.

MR. RUBIN:  Your Honor, can I object to the answer because of the word "they."

And I don't know who he's talking about told him --

THE COURT:  Overrule the objection.  But I think another follow-up question will be asked.

MR. DUGDALE:  Absolutely, Your Honor.

Q.   When you say they told you to go to a hardware store and buy plastic ties, who is the "they" referring to?

A.    Kadamovas and Mikhel.

Q.    And where did they, Kadamovas and Mikhel, instruct you to go to buy these plastic ties?

A.    To any hardware store.  Because I was driving around the town in connection with my own errands.  And they told me just stop by somewhere and to buy them.

Q.    And what was your understanding as to why these items were needed?  These plastic ties.

A.    In order to tie up the victim.

Q.    And did you go somewhere to look for these plastic ties?

A.    Yes.  I was passing by one store and I stopped and I went in.  But I didn't find what I needed there.

Q.    And despite the fact that you couldn't find these plastic ties as instructed by the defendants, do you know if these materials were purchased prior to the abduction of this man Mr. Muscatel?

A.    Yes.  They had been bought.  We were in the store. Mikhel, myself, and Kadamovas.

Q.    Okay.  And what store did you go to with Mr. Kadamovas and Mr. Mikhel?

A.    They knew of a store somewhere on Topanga.  And we went to that store.

Q.    And what did they buy, if anything, at this store located near Topanga?

A.    They bought these plastic ties, rubber gloves, duct

tape, and small things for the house.

Q.   Mr. Altmanis, at this point I'm going to have Special Agent Perez hand you what has been previously admitted as Government's Exhibit No. 108.

MR. DUGDALE:   And Special Agent Perez, could you please take those out of the folder.

Q.   Mr. Altmanis, do you recognize those items?

A.   Yes.

Q.   And what are they?

A.   These are the ties.

Q.   So are those plastic ties like the plastic ties the defendant purchased with you at the store on Topanga?

A.   Yes.  Quite right.

Q.   And how are those plastic ties used to abduct somebody?  What role do they play?

A.   They were used to tie up the legs.  And later on they were used to tie up the weights to the body.

Q.   And if you could take one out of -- out, Mr. Altmanis.  Just take one out of the package.  Can you demonstrate for the jury basically how they're used to secure the items that you talked about, either a person's body, their legs, or a weight.

A.   Should I show it?

Q.   Yes.  And please describe what you're doing.

A.   That goes inside.  And it fixes here.

Q.   And once that is secured like that, it goes through the
loop, could a person break out of it?

A.   No.  It has to be like that.

Q.   Now, you testified about this occasion where you went
with the defendants and they purchased those items and
others.  Do you recall, by the way, the name of the store
where they purchased these items?

          THE INTERPRETER:  Can you please repeat.

          MR. DUGDALE:  Yes.

Q.   Do you recall the name of the store where they purchased
these items?

A.   Either Home Base or Home Depot.  I don't remember
concretely.

Q.   Now, you testified earlier that you had been sent out
the day before the kidnapping to look for these items.  Do
you recall when the defendants went with you and purchased
these items in relationship to when the kidnapping occurred?

A.   The same day.

Q.   The same day as what?

A.   The same day when they kidnapped.  The same day just
before the kidnapping of this businessman.

Q.   And after you went to the store to purchase the plastic
ties --

          THE INTERPRETER:  Excuse me.  When you walk --

          MR. DUGDALE:  I'm sorry.

THE INTERPRETER:  -- I lose the sound.

BY MR. DUGDALE:

Q.   After you went to the store to purchase these plastic ties and the duct tape and the gloves and the other items you described, where did you and the defendants go then?

A.   After they have purchased all these things, we went back to Mikhel's home.

Q.   And why did you go to Mikhel's home?

A.   Because according -- because according to the plan, that was the place where the victim was supposed to be brought. And we worked out the details and the possibilities of what could happen.

MR. DUGDALE:  Now, at this time I'll ask Ms. De Witt to please publish Exhibit 100A on the screen, which has been previously admitted.  100A, Ms. De Witt.

THE COURT:  108A or 100A?

MR. DUGDALE:  100A, Your Honor.

Q.   And Mr. Altmanis, do you recognize the residence that's in that picture?  Government's Exhibit number 100A.

A.   Yes.  This is Mikhel's home.

Q.   And is this the place where you went to rehearse the kidnapping of this businessman Mr. Muscatel?

A.   Yes.  The same home.

MR. DUGDALE:  At this point in time I'd like Ms. De Witt to please publish Government's Exhibit number

101A, which has previously been admitted.

Q.   Mr. Altmanis, can you look behind you right there.

101.  It's fine.

And this exhibit is both behind you, Mr. Altmanis, and also on the screen here.

Do you recognize that diagram, Mr. Altmanis?

A.   Yes.  This is the floor plan of Mikhel's house.

Q.   And using this floor plan, can you please point out to the jury where it was where you practiced what would happen to accomplish the abduction of Mr. Muscatel.

A.   Here in this -- what do you call it?

The hall.

Q.   And Mr. Altmanis, you can actually use your finger and touch the screen to signify the location.  Can you please touch the screen.

Okay.  So, are you -- are you pointing to this area here that has the red dots on it here?

A.   Yes.

MR. DUGDALE:  And now I'd ask Ms. De Witt to please publish for the jury Exhibit No. 102A.

Q.   Do you recognize what's in that photo, Mr. Altmanis?

A.   Yes.  This is the hall in Mikhel's house.

Q.   And is this the area that you -- where you practiced the abduction of Mr. Muscatel and how it would take place?

A.   Yes.

Q.   And can you please describe for the jury what happened during this rehearsal of the plan to abduct Mr. Muscatel.

A.   We rehearsed who would be doing what at the moment when he enters.

Q.   And where were you supposed to be at the moment that Mr. Muscatel entered this area?

A.   According to the plan, they told me that I was supposed to be here in the closet.

Q.   And you mentioned that Mr. Kadamovas was also supposed to be there waiting to abduct Mr. Muscatel.  What role was he playing in this plan to abduct this man?

A.   He acted as -- he acted as the owner of this house.  And he was supposed to be here in the middle.

Q.   And what was supposed to happen after Mr. Muscatel walked in the door?

A.   After Mikhel brought him to the house and let him walk into the house, of course they were supposed to meet here in the middle -- in the middle and they were supposed to greet each other.  And at that moment -- at that moment I was supposed to come out of the closet and to grab Muscatel from behind.

Q.   And what were the -- what were the defendants supposed to do after you grabbed Mr. Muscatel?

        MR. RUBIN:  Again, I'm going to object, Your Honor.  It assumes they're doing the same thing.  I don't know.

MR. DUGDALE:  That's why I'm asking.  I'm asking --

THE COURT:  I'll allow it subject to motion to strike.

Who was supposed to do what, when, and where?

MR. RUBIN:  Isn't it compound?

BY MR. DUGDALE:

Q.   You mentioned that you were supposed to come out of the area near the closet and grab Mr. Muscatel from behind.

What was Mr. Mikhel, defendant Mikhel, supposed to do at this point in time under this plan?

A.   Mikhel was supposed to help us.  Because Kadamovas was supposed to grab him by the legs, I was supposed to grab him by the shoulders, and Mikhel was supposed to help us.

Q.   How was Mikhel supposed to help you?

A.   In case of -- in case of resistance on the part of Muscatel, he was supposed to help and to hold him down.

Q.   Now, Mr. Altmanis, after you practiced at the defendant's house what would happen when Mr. Muscatel was abducted, what did you do next that day?

A.   The next day or the same day?

Q.   The same day.

A.   We started fulfilling our plan of kidnapping.

Q.   And what was the next step in that plan after practicing at defendant Mikhel's house?

Page: 52 of 57

A.    Kadamovas and myself, we went to the place where the office of this gentleman -- of Muscatel was located.  And we placed ourselves opposite to the office.  And we were watching when he was going to show up.

And according to the plan, Mikhel was somewhere not far away.  And he was waiting for a call from Kadamovas telling him that Muscatel showed up.

Q.    Okay.  And you mentioned you went to this man's office.  Where was this man's office located in relationship to Designed Water World?

A.    Literally a block and a half away from Designed Water World.

Q.    And what street was it on?

A.    On Ventura.

Q.    And who went with you to this area near Mr. Muscatel's business?

A.    Kadamovas and myself, we came there in his SUV.  And we placed ourselves opposite to his office and we began waiting for him to show up.

Q.    And approximately what time did you show up at this location?

THE INTERPRETER:  Could you please repeat your question.

MR. DUGDALE:  Sure.

Q.    Approximately what time did you show up in this location

near Mr. Muscatel's office to stake it out?

A.   After 6:00 o'clock.

Q.   And how do you know it was after 6:00 o'clock?

A.   Because he parked his car at the meter and after 6:00 o'clock we did not have to pay for the meter.

THE COURT:   Now, when you say 6:00 o'clock, 6:00 o'clock in the morning?  6:00 o'clock in the evening?

THE WITNESS:   6:00 o'clock in the evening.

BY MR. DUGDALE:

Q.   And how did you know how to get to this place where Mr. Muscatel's business was located?

A.   I came together with Kadamovas.  And Kadamovas brought me in his car to the place.

Q.   And where did you position yourself after you arrived at this location?

A.   We got out of the car and was standing near the car.  And he was smoking.  And I sat down at a table at a cafeteria.

THE COURT:   When you say car, what kind of a car was it?

THE WITNESS:   It was a green SUV.  Cherokee.

BY MR. DUGDALE:

Q.   And you mentioned that you sat down near some sort of eating establishment.  Where was that located in relationship to the business that you were scouting out?

A.    Just across the street from that side to -- on the other side of the street.

Q.    And what were you supposed to be doing at that location?

A.    We were supposed to stand there and to wait until that businessman Muscatel showed up in his office.

And I asked Kadamovas how we would learn about it.

And he told me that we would learn about it when the light would go on.

Q.    And did the target that night, Mr. Muscatel, eventually show up at his business that evening?

A.    Yes.

Q.    How did you know when he showed up?

A.    Kadamovas told me that he had already arrived.

THE COURT:  Do you recall the date that this took place?

THE WITNESS:  No, I don't.

THE COURT:  We'll go to 4:15 today.

MR. DUGDALE:  That's fine, Your Honor.

Q.    Just a follow-up on the question asked by the Judge.

Mr. Altmanis, do you know the approximate time of year when this happened?

THE INTERPRETER:  Excuse me.  What time of the year or --

BY MR. DUGDALE:

Q.   The approximate time of year when this happened.

A.   Was close to the fall.

Q.   And you mentioned that Mr. Kadamovas indicated to you that this person had showed up at the office.

What did Mr. Kadamovas do when this man showed up at his business?

A.   I asked him where, but he wouldn't answer.  He started calling Mikhel.

Q.   And --

THE COURT:  I have to interrupt again.

When you say close to fall, what year are we talking about?

THE WITNESS:  The year of 2000 -- no.  2001.

BY MR. DUGDALE:

Q.   And you mentioned that Kadamovas had called Mikhel. Could you overhear what defendant Kadamovas told defendant Mikhel during this phone call?

A.   Yes, I heard.

Q.   And what did he tell him?

A.   He said that that businessman Muscatel arrived alone and he's in the office.

Q.   And what was the significance of reporting to defendant Mikhel that this person showed up at his office alone?

A.   It would be -- he would be easier to kidnap because there would be no witnesses.

Q.    And after defendant Kadamovas phoned defendant Mikhel
and told him that the target had shown up alone, where did
you go then?

A.    We got into Kadamovas' car and went back to his home.
To Mikhel's home.

Q.    And under the plan, what was defendant Mikhel supposed
to do after being informed that the target showed up alone?

A.    He was supposed to come to the -- he was supposed to
come to the office of that businessman and bring him to the
place.

Q.    Bring him to what place?

A.    To Mikhel's home.  The trap was there set.

Q.    And you mentioned that before this happened that you and
defendant Kadamovas went to Mikhel's house.

      Is that correct?

A.    Yes.  We came to Mikhel's house and were waiting for
them.

Q.    What did you do when you arrived at Mr. Mikhel's house?

A.    We stayed in the kitchen and were waiting for Mikhel's
call.

      THE COURT:  This looks like a good time to break.
We'll break for the evening, returning tomorrow at 9:15 in
the jury room, 9:30 in the courtroom.

      Remember the admonition.

      (Proceedings recessed at 4:14 p.m.)