# GOVERNMENT EXHIBIT 3

1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

---

THE HONORABLE DICKRAN TEVRIZIAN, JUDGE PRESIDING

United States of America,          )

                    Plaintiff,      )

                                    )

vs.                                 )    Case No.

                                    )    CR 02-220(B)-DT

Iouri Mikhel and Jurlius            )

Kadamovas,                          )

                    Defendants.     )

_____     )


REPORTER'S TRANSCRIPT OF TRIAL PROCEEDINGS

Day 23

(Morning Session)

Los Angeles, California

Wednesday, October 11, 2006

Pamela A. Seijas, CSR, FCRR
Official Reporter
Roybal Federal Building
255 East Temple Street
Room 181-I
Los Angeles, California  90012
(213) 687-0446

3

APPEARANCES CONTINUED:

FOR DEFENDANT                  RICHARD P. LASTING

JURLIUS KADAMOVAS:             1717 FOURTH STREET

                               THIRD FLOOR

                               SANTA MONICA, CA   90401

                                   - AND -

                               SONIA E. CHAHIN

                               2222 FOOTHILL BOULEVARD

                               SUITE e-278

                               LA CANADA, CA   91011


THE RUSSIAN                    ALEX J. LEVOFF

INTERPRETERS:                  LUDMILLA GENN

                               ZOYA SPIVAKOVSKY

                               VARVARA OLSON

4

Los Angeles, California, Wednesday, October 11, 2006

9:26 a.m.

-oOo-

(Jury Out)

THE CLERK:  Please remain seated and come to order.  This United States District Court is again in session.  The Honorable Dickran Tevrizian presiding.

THE COURT:  Good morning.  Outside the presence of the jury, the record will indicate the defendants and all counsel are present.

Mr. Lasting, the clerk informs me that you want to speak to the Court outside the presence of the jury.

MR. LASTING:  I did, Your Honor.  I want to ask if there is some way that the microphone can be set up so that Mr. Kadamovas can hear the witness's answers in Russian.

THE COURT:  The problem that you have is I have four interpreters in this trial, all speaking Russian.  Two of them rotate for the witness and two of them rotate for Mr. Kadamovas.  And it's very difficult for the interpreters that are with the witness to basically gear the translation to your client.

MR. LASTING:  If the witness could -- it appears to me -- I could be wrong, but it appears the witness is speaking to the interpreter rather than speaking to the courtroom and the jury.

THE COURT:  That's what he is supposed to do.

MR. LASTING:  If he could speak up in a loud enough

5

fashion -- I mean, I have heard the witness on tapes, and he can be quite loud -- so that Mr. Kadamovas can hear his answers in Russian and understand exactly what is being said in the trial.

THE COURT:  Then do we need four interpreters?

MR. LASTING:  We need the interpreter to translate things that are said in English, but things that are said in Mr. Russian Mr. Kadamovas understands.  So if he could hear the witness's answer, he would know what he is saying.  It seems to me sort of an odd process for the witness --

THE COURT:  This is not the United Nations where you have the type of technical devices that are used for instantaneous translation.  We are doing the best we can, and I brought in four interpreters.  I mean, that's unheard of in this building.

MR. LASTING:  My only request, Your Honor, is the witness be requested to speak in a loud enough voice so that the defendant can hear the answers in his native language.

THE COURT:  We will do the best we can.

MR. DUGDALE:  Your Honor, I don't know if there is a point raising this now.  This probably should have been brought up before the testimony.

I don't know if there is point in doing this, but there is an instruction 2.9 of the Ninth Circuit Jury Instructions that discusses foreign language testimony.

THE COURT:  I already gave 2.9.  That was one of the initial instructions I gave.

6

MR. DUGDALE:  That's fine, Your Honor.

THE COURT:  When I pre-instructed the jury.

MR. DUGDALE:  That's fine.

MR. RUBIN:  There is one other matter I would like to request of the Court.

THE COURT:  Mr. Rubin.

MR. RUBIN:  Yes, sir.  Again it's the issue of the monitor in front of the witness.  I am in a position now that I can see the witness, and what the witness is doing when he is answering the questions, he is kind of bending forward and bending over, and my client cannot see him at all.

THE COURT:  I think both you and Mr. Lasting are trying to get the witness upset by making all these demands upon the witness.  That monitor has been there since this building has been built.  We have never had a problem with that monitor before.  I told you that you can move around the courtroom anywhere you want.

MR. RUBIN:  And I have.

THE COURT:  That's fine.  I have no problem with that.

MR. RUBIN:  I am just trying to work out this right to face and confront witnesses, and it almost looks to me as if -- from the jury's point of view, as if something was put up there to block his view of the defendant.

THE COURT:  You use all these buzz words.  "Right to confront."  Your client is in the courtroom at the time that

7

this trial is going on.  He is confronting the witness.  The monitor is located in that position.  There is nothing I can do about it.

Anything from the government?

MR. DUGDALE:  No, Your Honor.  Thank you.

THE COURT:  Let's bring the jury out, if they are all here. Ellen Barry, Mr. Altmanis' attorney, was here yesterday.  I don't see her.  Is she planning to come today?

MR. DUGDALE:  Your Honor, I think she was planning on being here throughout the course of the testimony but indicated she might not be able to make it every time because of some other work.  I'm not sure about today specifically.  She did not tell me.

THE COURT:  It's still a little early.  It's not 9:30 yet. We are missing two jurors.

MR. DUGDALE:  I could call Ms. Barry.

THE COURT:  I would call Ms. Barry.  I feel more comfortable having her here during the testimony of her client. Her client is an unsentenced defendant.  The plea was taken before another judge.

MR. DUGDALE:  I will contact Ms. Barry right now.

THE CLERK:  I will check on the jurors, Your Honor.

THE COURT:  Are we checking on Ms. Barry?

MR. DUGDALE:  The agents are checking on it right now.

MR. LASTING:  Your Honor, could we have a moment?

8

(Defense counsel confer off the record.)

MR. LASTING:  May we have a sidebar?

(Sidebar conference commenced.)

MS. DeWITT:  Mr. Dugdale stepped outside to check on the call.

THE COURT:  We will go ahead without Mr. Dugdale.

MR. LASTING:  I asked to come to sidebar because I didn't want to have the discussion where the witness could overhear.  I have heard from Mr. Kadamovas that the translation is not what the witness is saying; in essence, that the interpreter is -- I don't know what the right word to use is, but the interpreters are putting it in a more proper English or that somehow the words he is using and the translation is not precise.  And I would ask if -- I guess my first question is are the interpreters supposed to interpret what the witness says, or are they supposed to --

THE COURT:  Verbatim.

MR. LASTING:  Then I think we need to have a discussion with the interpreters and tell them that because in the discussion that we had --

THE COURT:  Wait a minute.  Wait a minute.  Mr. Kadamovas is the one that is making this determination.  All four of these interpreters are certified interpreters.  The one interpreter that was having difficulty, I excluded that interpreter at the beginning of this trial.  Now, these other four interpreters --

9

because Mr. Kadamovas doesn't like the way it's going down is -- does not really sit well with me.

MR. LASTING:  Your Honor, I think that the interpreters may have a misunderstanding because -- I think the interpreters are terrific interpreters.  I'm not complaining about them or their qualifications or ability.  I have the highest respect for each and every interpreter in the courtroom.  I think the interpreters have a view that they are supposed to put the witness's statements in a different format --

MR. RUBIN:  In proper English.

MR. LASTING:  -- than what the witness actually says.  I think there needs to be a discussion with the interpreters in --

THE COURT:  I'll admonish the interpreters to interpret exactly what he is saying.  That's all I am going to do. Mr. Kadamovas does not set the standard.

MR. LASTING:  I'm not saying he does.  I am saying he has indicated to me that he believes that what the witness is saying and what the --

THE COURT:  Okay.  His objection is noted.

MR. CALLAHAN:  Mr. Mikhel said the same thing to me --

THE COURT:  His objection is noted as well.

MR. CALLAHAN:  -- from his standpoint, and it mirrors what Mr. Kadamovas said, a couple of situations, because in the Russian language a number of words are spoken by the witness yet only one more cogent word is used to clarify the matter to the

jury, and the flavor is not coming through.

THE COURT:  I cannot run this trial according to the whims and likes and dislikes of your clients.

MR. LASTING:  We are not asking you to.

THE COURT:  We have official interpreters.  These are not people off the street.  These people take comprehensive tests in order to become court certified interpreters.

MR. RUBIN:  When we inquired of one of the interpreters yesterday about it, we were told they are, in fact, extrapolating what is being said into proper English instead of translating word for word.

THE COURT:  All right.  I will admonish them.

MR. DUGDALE:  Ms. Barry is here.

(Sidebar conference ended.)

(Jury Out)

THE COURT:  This is to the interpreters outside the presence of the jury.  Counsel for the defendants have indicated that they are not happy with the way the interpretation is being done.  They feel that the interpreters are editorializing or cleaning up the translation from Russian into English.  So I have got to admonish the interpreters just to utilize the words that are spoken in Russian and translate, to the best of your ability and competency, the English translation as accurately as possible.  With that, I will bring the jury in at this time.

(Jury In)

11

THE COURT: Good morning, ladies and gentlemen.  The record will indicate all jurors are present.  All counsel, all parties are present.

You are still under oath, Mr. Altmanis.  Please state your name for the record

THE WITNESS:  Ainar Altmanis.

DIRECT EXAMINATION RESUMED

BY MR. DUGDALE:

Q.   Good morning, Mr. Altmanis.

A.   Good morning.

Q.   Mr. Altmanis, when we left off yesterday, you had returned from across the street from Mr. Muscatel's office and had gone with defendant Kadamovas to Mr. Mikhel's home.

According to the plan, what were you supposed to be doing at Mr. Mikhel's home at this time?

A.   We were supposed to wait for Mikhel until he comes back to his house with Muscatel.  Then, according to the plan, we were supposed to grab him.

Q.   And where was Mr. Muscatel supposed -- I am sorry.  Where was the defendant, Mr. Mikhel, supposed to pick up Mr. Muscatel?

A.   He was going to his office.  That's why Kadamovas called him and told him that he was in the office.  So Mikhel was going to pick him up in the office.

Q.   And how did you and defendant Kadamovas know when defendant Mikhel and Mr. Muscatel were going to arrive at Mr. Mikhel's

12

home?

A.    According to the plan, when Mikhel and Muscatel were on the way back to Mikhel's house, Mikhel was supposed to call on the cell phone to Mr. Kadamovas and tell him that they were arriving.

Q.    And did such a call, in fact, occur?

A.    Yes.

Q.    Did you witness this phone call?

A.    Yes.  I was in the kitchen next to Mr. Kadamovas when he received the call from Mikhel.

Q.    And what occurred during this telephone call that you witnessed?

A.    The -- Mikhel called him, and Kadamovas answered "okay."

Q.    After this happened, did Mr. Kadamovas tell you what defendant Mikhel had told him on the phone?

A.    He said that they were coming.

        MR. RUBIN:  Objection, Your Honor.  Multiple hearsay.

        MR. DUGDALE:  Your Honor, they are both admissions by defendants.

        THE COURT:  Overrule the objection.

        THE WITNESS:  Kadamovas told me that they are coming, Mikhel and Muscatel are coming.

BY MR. DUGDALE:

Q.    And after you were told that the defendant Mikhel was on the way there with the target, what did you do?

13

A.   We took our places the way it was rehearsed.  I took my place in the closet and Kadamovas took his place in the middle of the entrance hall.

Q.   And at this point in time, I am going to have Ms. DeWitt put up on the screen what has previously been admitted as government's Exhibit 102-A.

Mr. Altmanis, can you point to the screen and indicate where you took your position to await the target's arrival.

A.   Yes.  I took my position in the closet and closed the door, make sure that I'm not visible.  Kadamovas positioned himself in the middle and began waiting for their arrival.

Q.   Can you indicate on this photograph where the front door to defendant Kadamovas's house is?

MR. LASTING:  Your Honor, I would object.  It's a misstatement.  He referred to it as Mr. Kadamovas's house.

MR. DUGDALE:  I am sorry.  Strike that.

Q.   Can you indicate on this picture here where defendant Mikhel's front door is?

A.   Right here (indicating).

THE COURT:  Indicating the left side of the photograph as you are looking at it, just behind the stairwell.

BY MR. DUGDALE:

Q.   Can you please erase that, Mr. Altmanis.

After you took these positions, yourself and defendant Kadamovas, how long was it before Mr. Mikhel arrived with the

14

target?

A.   Mikhel and the target appeared in about ten minutes.  Less than ten minutes.

MR. DUGDALE:  At this time, I am going to ask Ms. DeWitt to please put on the screen government's Exhibit 72.

THE COURT:  That's only been marked for identification.

MR. DUGDALE:  I believe it was admitted yesterday.

THE COURT:  It was.  72 admitted into evidence before the witness.

BY MR. DUGDALE:

Q.   Mr. Altmanis, who is this person here?

MR. RUBIN:  This was all asked and answered yesterday, Your Honor.

MR. DUGDALE:  I am going to ask about two questions, Your Honor.

THE COURT:  All right.

BY MR. DUGDALE:

Q.   Mr. Altmanis, do you recognize this person?

A.   Yes.  This is a businessman, Meyer Muscatel, who came with Mikhel.

Q.   Is this the person who entered the house with defendant Mikhel?

A.   Yes.  He went into the house.

Q.   By the way, prior to your arrest in this case, did you know this man's name?

15

A.    No, I didn't.  I didn't even know his last name.

Q.    When you were questioned by the police and began cooperating with the government and talked about what happened to this man, how did you refer to him?

A.    I didn't.  I didn't know how to call him.  I called him just an American because he was an American.

Q.    Can you please describe for the jury what happened to this man when he walked into defendant Mikhel's house.

A.    When he walked in, according to the plan, Kadamovas was standing in the middle of the hall, pretending to be the house owner.  When -- and when Mikhel let the businessman, Mr. Muscatel, in, Kadamovas was supposed to greet him, and while they were greeting each other and introduced each other, I was supposed to jump out of the closet and grab him from behind.

         MR. RUBIN:  Your Honor, I am going to object to the narrative form of the answer.

         THE COURT:  Sustain the objection.  It is narrative at this point.  Do you need -- when you don't need the exhibit anymore, it should be taken off.

         MR. DUGDALE:  It will, Your Honor.

Q.    Let's put Exhibit 102-A on the screen.  In response to your last answer, you indicated that when Mr. Muscatel walked in the house, he greeted defendant Kadamovas; is that right?

A.    Yes.  That's the way it happened.

Q.    And can you indicate on this photograph where they met

16

inside this foyer area of defendant Mikhel's house?

MR. RUBIN:  Objection.  There is no foundation.  At this point the witness's statement is he is in the closet.

THE COURT:  I will sustain an objection to the form of the question.

BY MR. DUGDALE:

Q.  Did you see what happened after Mr. Muscatel walked in the house?

A.  Yes.  The door had a crack so I could see what was going on.

Q.  What is the first thing you saw when Mr. Muscatel walked into the -- into this foyer?

A.  I -- I didn't see him walking into the house, but I saw him greeting Mr. Kadamovas.  I saw it very well because the door was slightly ajar, and I saw him standing there, and according to the plan, I jumped out and grabbed him behind around his shoulders.

Q.  After you grabbed Mr. Muscatel from around his shoulders, was this from the back or from the front?

A.  From the back.  In front of him -- Mr. Kadamovas was in front of him, and they were greeting each other, and Kadamovas was holding his hand.

Q.  And after you grabbed Mr. Muscatel from the back of his shoulders, did anyone else grab him as well?

A.  According to the plan, Kadamovas was supposed to grab him

17

by the legs, and we were supposed to put him down on the floor.

Q.   Did defendant Kadamovas, in fact, do that?  Did he grab Mr. Muscatel by the legs?

A.   Yes, he did, but the plan failed a little bit at this point because when I grabbed him by the shoulder, his shoulder happened to be wider than they described him to me.  I have never seen him before.  So I didn't have enough strength to hold him.

Q.   And what did Mr. Mikhel do at this point in time when defendant Kadamovas is grabbing his feet and you are trying to bring him to the ground by his shoulders?

A.   According to the plan, he was supposed to help us in case we wouldn't be able to -- to bring him down on the floor, and that's exactly what had happened.  He helped us to bring him down.

Q.   And what did you do after the three of you -- yourself, defendant Mikhel and defendant Kadamovas -- brought Mr. Muscatel down to the floor?

A.   According to the plan, I was supposed to -- to tie his legs with plastic ties, and Kadamovas was supposed to put handcuffs on his arms on the back.  And Mikhel put duct tape over his eyes.

Q.   Did these three things happen?  Did you put the plastic ties around his legs, Mr. Altmanis?

A.   Everything happened -- everything happened almost hundred

18

percent according to the plan, except one little thing.
Muscatel was scared, and he made a lot of noise.  He was yelling loudly.

And because there was a lot of noise, that noise brought Mikhel into the state of rage.  So he went to the closet, took a gun, and hit Muscatel on the head.

Q.   Let's go back just a little ways before defendant Mikhel hit Mr. Muscatel.  You mentioned that you had tied up the defendant -- I am sorry -- Mr. Muscatel's leg with some plastic ties.  Where did you get those plastic ties from?

A.   They were prepared in advance, according to plan.  They were sitting on the shelf -- the plastics ties, handcuffs and the handgun.

Q.   Did you recognize where these plastic ties came from?

A.   I didn't understand the question.

Q.   Sure.  You mentioned in your testimony yesterday that you witnessed the defendants -- you and the defendants went to what you believe was a Home Depot to buy some items.

A.   Yes.  That was the same plastic ties that we purchased from this Home Depot.

MR. RUBIN:  Objection, Your Honor.  Non-responsive, anything after "yes."

THE COURT:  I am going to overrule the objection.  He has answered the question directly, and he is entitled to explain his answer.

19

MR. DUGDALE:  I am sorry.

Q.    Can you repeat the answer, please.

A.    Yes.  They were the same plastic ties that we bought in Home Base or Home Depot.

Q.    And you also mentioned in your testimony that defendant Kadamovas put handcuffs on Mr. Muscatel at this point in time. Do you know where those handcuffs came from?

A.    I am not sure I understand the question.

Q.    Okay.

A.    They were on the shelf.

Q.    The shelf of defendant Mikhel's house; is that right?

MR. RUBIN:  Objection.  Leading.

THE COURT:  No.  I am going to overrule the objection.

BY MR. DUGDALE:

Q.    Now, how did Mr. Muscatel react when these things were happening to him?

A.    When we -- when I grabbed him and we started bringing him down, he first didn't understand what was going on, and he started yelling, "What is that?  It's a mistake.  What are you doing?"

Q.    And in addition to -- in addition to yelling, did he -- did he struggle when the three of you were trying to bring him down to the ground?

MR. RUBIN:  Objection.  Leading and suggestive.

THE COURT:  No.  It can be answered yes or no.

20

THE WITNESS:  Yes.  He struggled.

BY MR. DUGDALE:

Q.   How did defendant Mikhel react when Mr. Muscatel was screening and struggling when the three of you were bringing him down to the ground?

MR. RUBIN:  Objection.  Asked and answered.

THE COURT:  It was asked and answered, but I will permit the answer again.

THE WITNESS:  He started yelling something about the police, and that brought him into rage.

BY MR. DUGDALE:

Q.   What did he do?

A.   It wasn't according to the plan.

Q.   What did defendant Mikhel do at that point in time?

A.   He let Muscatel go, went to the shelf where the gun was, got the gun and hit Muscatel somewhere around the head.

Q.   Can you describe the gun that he picked up to hit him in the head.

A.   It was a black automatic pistol.

Q.   Can you describe how he hit Mr. Muscatel in the head.

A.   He was -- he was -- strike him with the low part of the handle where the clip is, and he hit him in the -- hit him in the temple.

Q.   And how did Mr. Muscatel react when he was hit with the gun by defendant Mikhel?

21

A.   He -- he yelled from pain, and then quieted down, and he made -- I could hear him panting.

Q.   Can you point on this photograph here, government's Exhibit 102-A, where this occurred.

THE COURT:   Indicating in the center of the entry hallway.

BY MR. DUGDALE:

Q.   And what did the defendants, Mr. Mikhel and Mr. Kadamovas, do after defendant Mikhel hit Mr. Muscatel in the head with the gun?

A.   After he quieted down and he was lying face down with his hands in handcuffs at the back, they took his wallet, his cell phone, and his key.

Q.   And what did the defendants do with those items?

A.   After they took those items, they went to the kitchen to look at those items.

Q.   I will ask at this point in time that Ms. DeWitt put up government's Exhibit 101, which has previously been admitted into evidence.

Mr. Altmanis, could you please touch the screen to make the red circle disappear.

Using this diagram here, Mr. Altmanis, can you point out to the jury where the defendants took these items from Mr. Muscatel -- the cell phone, the keys, and the wallet?

A.   Yes.   They went to the kitchen here (indicating).   We were standing around the table -- Kadamovas, Mikhel and myself.

22

Q.   Mr. Altmanis, where was Mr. Muscatel while the three of you were in the kitchen?

A.   He remained lying in the same spot.

Q.   Now, at this point in time, did you voice an opinion over what should happen to Mr. Muscatel?

A.   Yes.  I suggested that he should be moved away from the entrance because who knows who could pass by.

Q.   And did either of the defendants respond to your suggestion of moving Mr. Muscatel at that time?

A.   Yes.  Mikhel answered.  He said, "No.  Let him lie there and let him rest, and then later we will move him."  I said that he was mumbling something and that he was speaking out loud.

MR. RUBIN:  Objection, Your Honor.  Is there a question pending?

BY MR. DUGDALE:

Q.   What did you say in response to defendant Mikhel's statement about --

MR. RUBIN:  I would ask that the last part of the answer be stricken as there was no question pending.

THE COURT:  There was no last part of the answer.  There was an interpreter speaking in Russian.

BY MR. DUGDALE:

Q.   How did you respond to defendant Mikhel's statement that Mr. Muscatel should be left in the foyer?

A.   That he was making there -- how do I put it?  He was

23

mumbling and crying.

Q.   After you informed defendant Mikhel that Mr. Muscatel was making these noises, what did Mr. Muscatel -- I am sorry -- what did defendant Mikhel say?

A.   Mikhel said that at first everyone usually -- they produce noise, and that later they calm down.

Q.   Was Mr. Muscatel injured as a result of the way he was abducted in the foyer area of defendant Mikhel's house?

THE INTERPRETER:  Could you please repeat the question.

BY MR. DUGDALE:

Q.   Sure.  Was Mr. Muscatel injured as a result of the way that he was abducted?

A.   Yes.

MR. RUBIN:  Objection.  Your Honor.  The question was answered with "yes."

THE COURT:  And the witness can always explain his answer.

MR. DUGDALE:  Can we get the answer to the question.

THE COURT:  The interpreter will interpret the rest of the answer.

THE WITNESS:  And he had the wound in the head, and it was bleeding.

BY MR. DUGDALE:

Q.   Did you do anything in response to Mr. Muscatel's injuries?

A.   Well, yes.  I again asked Mikhel.  I said the guy is bleeding.  We need to do something about it.

24

Q.   Did you do something about it?

A.   Yes.  I asked him whether he had alcohol or something of the kind, and he told me that in the closet under the sink there is some alcohol.

I took a towel and used this alcohol, and I approached Muscatel.

Q.   And what happened when you approached Mr. Muscatel with these items?

A.   I poured alcohol over his wound.  And I put the towel under his head.

Q.   How did Mr. Muscatel respond to you when you approached him with the towel and the alcohol?

A.   He screamed because he could not see what I was -- what I had in my hands because his eyes were -- his eyes were covered with the duct tape, and he began asking me, "What is it?  What is it?"

Q.   Did you end up treating Mr. Muscatel's wound?

A.   Yes.  He -- yes.  He just didn't understand that it was alcohol, and he was in pain because the alcohol was burning his wound.

Q.   And did either of the defendants say anything to you about what you were doing as far as nursing Mr. Muscatel's wound?

A.   Yes.  They said that I was playing kindergarten and that he would have -- he would heal well without it.

Q.   And while you were putting the towel and alcohol on

25

Mr. Muscatel's wound, what were the defendants doing?

A.   They were there in the kitchen.  They were looking at the things that they pulled out of Muscatel's pockets and everything that they took out of the wallet, credit cards and everything.

Q.   Do you know why the defendants were looking through these items?

A.   Yes.  They were looking for some information about his accounts and about his financial situation.

Q.   Did you see Mr. Muscatel's wallet?

A.   Yes, I did.  Particularly after they called -- especially after they called me particularly to look at his wallet.

Q.   And was there anything distinctive about the way that Mr. Muscatel's wallet looked?

A.   Yes.  They ridiculed Mr. Muscatel's wallet because it looked very worn out, and Mikhel said that even homeless people don't have such wallets.

Q.   Now, where was Mr. Muscatel the entire time this was happening?

THE INTERPRETER:  Mr. Muscatel or --

MR. DUGDALE:  Yes.  Mr. Muscatel.

THE WITNESS:  In the same spot.

BY MR. DUGDALE:

Q.   And what happened after the defendants finished looking through Mr. Muscatel's wallet for the financial information that you mentioned?

26

A.    After that, they decided to move him to another spot, to another room.

Q.    And where did they move Mr. Muscatel?

A.    They moved him into one of the small rooms in the same floor behind the kitchen.

Q.    Okay.  And looking at Exhibit 101, can you identify the room where they moved Mr. Muscatel?

A.    Yes, I can.  We each took him -- I took him by the legs, and Kadamovas took him by the middle of the body, and Mikhel took him around the chest, and we moved him completely here into the small room.

Q.    And on this diagram here -- just for the record, you have drawn a line stretching from room A to room H; is that correct?

A.    Yes.

Q.    And is room H the room where you and the defendants carried Mr. Muscatel at this point in time?

A.    Yes.  We brought him there and put him there on the floor.

Q.    And can you describe for the jury what that room looked like?

A.    It is a small room.  Here was a window (indicating).  There was no furniture there except for the --

THE INTERPRETER:  The interpreter needs to clarify something.  May she, Your Honor?

THE COURT:  Yes.

THE WITNESS:  And the wardrobe.  And a wardrobe, a simple

27

wardrobe, like a cupboard.

BY MR. DUGDALE:

Q.   Was there anything else in the room besides this cupboard that you described?

A.   Yes.  Also there was a big metal safe box.

Q.   And at this point in time, I would like you -- I would like to have Ms. DeWitt put what has previously been admitted as government's Exhibit 102-E.  Mr. Altmanis, can you hit the corner of the screen to erase the red lines, please.

     Mr. Altmanis, do you recognize what is photographed in Exhibit 102-E?

A.   Yes.  This is the safe.

Q.   And is this room where the safe was -- this is the room where Mr. Muscatel was moved after he was taken from the foyer?

A.   Yes.  Quite right.

Q.   Mr. Altmanis, did the defendant speak with Mr. Muscatel after he was moved into this room?

     THE COURT:  Which defendant?

     MR. DUGDALE:  Either of the defendants, Your Honor.

     THE WITNESS:  Yes.  They were taking turns.  Mikhel talked to him and Kadamovas talked to him.

BY MR. DUGDALE:

Q.   Who spoke to him first?

A.   Mikhel did.

Q.   And what did Mr. Mikhel say to Mr. Muscatel?

28

A.   He was -- he said that it was his own fault that he got into such unpleasant situation, and Muscatel asked him questions why.  And Mikhel explained to him, "How come you borrowed money from other people?  You invested it in the real estate, you made profit, and you are not returning money."

And that those people had been waiting for a long time, and they had not received any money, and then they approached him to help them to get money from him.

Q.   Did Mr. Mikhel ask any additional questions of Mr. Muscatel at this time?

A.   Yes.  He asked him about his finance.  He asked him where and how he invested the money so that the money could be returned.

Q.   And what was Mr. Muscatel's response to these questions?

A.   That it was totally a mistake.  That he had not borrowed money from anyone and that that information was wrong. Especially -- especially when he was contracted -- when he was confronted with amount of three hundred thousand or five hundred thousand, and he said that he never had so much money.

And he said that he personally had only $50,000 on his account and that it was his personal money, and that if Mikhel did get that information, that was wrong, and someone wanted to frame him.

Q.   After Mr. Mikhel did this initial questioning of Mr. Muscatel, who spoke to him next?  Who spoke to Mr. Muscatel

next?

A.    When he got out in the kitchen, I and Kadamovas, we were in the kitchen, and Mikhel came into the kitchen, and he said, "Huh, he doesn't want to admit it.  He pretends that he is stupid."

Q.    And what did defendant Kadamovas do in response to Mr. Muscatel -- I am sorry -- Mr. Mikhel informing him that Mr. Muscatel didn't want to admit to being involved in this?

A.    Kadamovas got angry, and he went into the room, and he began yelling at him using obscene words.

Q.    Could you hear what he was yelling?

A.    Yes, I did.

Q.    And what was he yelling at Mr. Muscatel?

A.    He was yelling obscene words using "FF, mother, mother, FF where is money?"

Q.    How long did this go on where defendant Kadamovas yelled at Mr. Muscatel in this manner?

A.    A couple of minutes.  Not long.  And he returned to the kitchen.  And he -- and he said, "All right.  Let him sit there and think about his situation and then he will cooperate."

Q.    Who said that?

A.    Kadamovas.

Q.    What happened after Mr. Kadamovas said -- by the way, who did he say this to, Mr. Kadamovas?

A.    He just said it.  He entered the kitchen, and he simply

30

said it because I was there and Mikhel was there.

Q.   And what happened after Mr. Kadamovas said this?

A.   Nothing.  We still remained in the kitchen, and they continued talking to each other, looking at his credit cards.

And Mikhel came in, and he asked some information about some numbers and some cards.

Q.   Who did he ask this information to?

A.   Muscatel.

Q.   Now, did Mr. Muscatel ultimately agree to the payment of any money to secure his release?

A.   Yes.  He said that he would pay, and that he had 50,000 on his account.  And the rest that -- the amount that he was confronted with, saying that he had taken it from somewhere, that was the wrong information.

Q.   And how did you find out that Mr. Muscatel had agreed to pay this money?

A.   After the conversation between Muscatel and Mikhel, Mikhel came out and he said, "It doesn't look like he had money.  He denies it.  And he says that he has -- he says that he has only fifty thousand on his account."

Q.   And did Mr. Mikhel make any statements regarding this $50,000 and Mr. Muscatel's willingness to pay that amount?

A.   Yes.  He said that he was ready to pay that money for his skin.

Q.   Now, what did the defendants do after this initial round of

questioning of Mr. Muscatel?

A.    They went to the office of Meyer Muscatel.

Q.    And how do you know that?

A.    They left me to guard him.  They told me, "You stay here and guard him, and we are going to his office.  We need to look for some documents."

Q.    So did they tell you why they were going to his office?

MR. RUBIN:  Objection.  Asked and answered.

THE COURT:  No.  I will overrule the objection.

THE WITNESS:  Yes.  They were interested in some kind of information.  They wanted to find his accounts or something else, and they said that they would go to his office and look for it.  Because they knew that they needed something.

BY MR. DUGDALE:

Q.    And did they -- you mentioned that you were then left to guard Mr. Muscatel.  Did they give you any instructions about guarding Mr. Muscatel before you left -- before they left?

A.    Yes.  So that I wouldn't let myself drag in the conversation with him and that I would have as less contacts with him as possible.

Q.    Now, after the defendants left to go to Mr. Muscatel's office and left you alone with him, did Mr. Muscatel attempt to talk to you?

A.    Yes.  He did try to talk to me.

Q.    And what sorts of things was he trying to talk to you

32

about?

A.   He began talking, and it was very difficult for me to understand him because at that time I didn't speak English well enough to be able to understand him, and he was asking me where he was and what it all was about.

Q.   And did you talk back to him?

A.   No.  I didn't answer him.  I just told him, and I gave him some water to drink.

Q.   And why didn't you talk to Mr. Muscatel when he was asking you these questions?

A.   I didn't -- I didn't want him to hear my voice, and there was nothing for me to talk to him about.

Q.   And why didn't you want him to hear your voice?

A.   Because he was promised that as soon as he paid all the amount of money or some amount of that money, he would be set free.

Q.   And who promised him this?

A.   Mikhel did.

Q.   Now, how long did the defendants leave you alone with Mr. Muscatel after they left to go to his office?

A.   Approximately two hours.

Q.   And did you get worried as a result of being left alone with Mr. Muscatel for that length of time?

MR. RUBIN:  Objection, Your Honor.  That's leading and suggestive.

33

THE COURT:  No.

THE INTERPRETER:  Can you repeat the question.

BY MR. DUGDALE:

Q.   Did you get worried as a result of being left alone with Mr. Muscatel for that length of time?

A.   Yes.  Because he began making more and more noise and talk. And I called Kadamovas' telephone.  And I asked them where -- where they had been for so long because he began -- he began to be nervous, and he began yelling.

Q.   And what did defendant Kadamovas tell you when you called him on the phone at this time?

A.   They told me that they were in the office, and they were looking for the documents that they needed, and they can't find them, and they told -- he told me not to panic.  They will be back soon.

Q.   And did the defendants return to defendant Mikhel's house later that evening?

A.   Yes.  They came back.

Q.   And what were you doing when they came back?

A.   I was in the kitchen at that time.

Q.   And when the defendants returned, did you ask them why they had been gone for so long?

A.   Yes.  I told them -- I said, "Where you been?  The guy started making a lot of noise, started talking," and they said they were looking for the documents, and they spent a lot of

34

time looking for them but couldn't find them.

And some -- they took some time to move the -- the -- Muscatel's car, to move -- to park it in another place.

Q.   And did they tell you where they moved Mr. Muscatel's car from?

A.   Yes.  It was parked in the parking lot next to his office.

Q.   Did they tell you who moved Mr. Muscatel's car?

A.   Yes.  Kadamovas.  Kadamovas himself moved the car.  Mikhel was following him in his car to bring him home.

Q.   What is your understanding as to why they moved the car?

A.   The way I understood them, it's because to -- somebody might get suspicious that the car is parked at the office and there is no owner around.

Q.   And did they say anything to you about the condition of Mr. Muscatel's car?

A.   That was -- that was their biggest surprise when they saw the car.  It was very old, it was broken, nothing worked there. The car smelled gas and you can't drive the car like that too far.

They -- they also compared the condition of the car with the condition of his wallet.

Q.   And did they give you any opinions at that time as to this man's ability to pay money to them to secure his release?

A.   No.  They were talking among themselves.  They said that it doesn't look like a person who drives a car like this or has a

35

wallet like this has money, and there is something wrong.

They thought maybe he had another car somewhere because he had two key rings.  One was matching his office and the car, and they didn't know what was the key to -- the other key ring to.

But he denied everything.  He denied that he had another car.

Q.   Did the defendants tell you what they ultimately did with Mr. Muscatel's car?

A.   Yeah.  They parked -- parked it in another spot but not very far because the car was in the condition that they were afraid to drive it.  They were afraid it might stall on the way.

Q.   Did they describe the area where Mr. Kadamovas parked the car?

A.   I don't know whose decision it was, Mikhel's or Kadamovas', but Kadamovas parked the car in the parking lot at the Gelson's store on Van Nuys.

Q.   Did defendant Kadamovas express any concerns about having to park the defendant's car?

A.   Yes.  He was worrying -- he was worried because he had to leave the car at that parking lot.  That parking lot was under surveillance of the security cameras.  They knew it well because it looked that they attended the place very often.

Q.   And what happened after the defendants returned to Mr. Mikhel's house that evening after parking Mr. Muscatel's car

36

at the Gelson's parking lot?

A.    When they came back, they had two plastic bags with some documents, checkbooks.  They spread it all over the kitchen table and started looking at it.

Q.    How long did you stay at defendant Mikhel's house that evening?

A.    Somewhere until about 11:00.  I left after 11:00.

Q.    Did the defendants tell you what they planned to do that evening before you left?

A.    Yes.

Q.    What did they tell you that they planned to do that evening?

A.    That they going to stay, two of them, with Muscatel.  And the way they said it, they were going to work with him.  They said, "We're going to have a long time with him."

They said, "You can come back tomorrow and relieve us. Meanwhile, we're going to work with him."

Q.    What was your understanding of what the defendants meant when they told you that they were going to work with him that night?

A.    They were going to find the possibility to get more financial values out of him.  They didn't believe that he had only $50,000.

Q.    You testified that you were told to come back the next day to relieve them.  Did you, in fact, come back to defendant

Mikhel's house the next day?

A.    Yes.  I came back to relieve them.

Q.    Approximately what time did you come back the next day?

A.    Somewhere around 10:00 in the morning.

Q.    Was the American still there when you returned?

A.    Yes.  He was still in the same room, but he was sitting on a chair.  And his hands were still in the handcuffs but at the front, not at the back.  And his legs were -- were tied with the plastic ties.

Q.    Now, you mentioned that he was in the same room.  Had anything been done since you left the prior evening to change the appearance of that room?

A.    Yes.  The -- something was hanging over the windows -- over the window.  They were afraid that he might look at the window and figure out where he was.  Kadamovas said that he pretends that he can't see because of the -- of the tape around his eyes.  He might see something if he lift his head and see out of the corner of his eye.

Q.    And when you came back that next day, you mentioned that he was in handcuffs, but they were in the front, and he had the ties around his feet.

      Did he still have the duct tape around his eyes?

A.    Yes.  He had the tape.

      THE COURT:  Let's take our morning recess, approximately 10 minutes.  Remember the admonition.

38

(Recess taken)

(Jury Out)

THE COURT:  Outside the presence of the jury, the record will indicate all parties and counsel are present.  Anything the government wishes to bring up?

MR. DUGDALE:  No, Your Honor.

THE COURT:  Anything defendants wish to bring up?

MR. LASTING:  Yes, Your Honor.  Your Honor, I wasn't objecting during the examination of the answers of the witness, but repeatedly there are questions asked of this witness "did they do this, did they do that," and the witness responds "they."  I think that it's inappropriate and improper to ascribe collective action like that, and I would ask for the Court to direct the witness to specify who he is referring to when he is --

THE COURT:  Well, I think we should admonish Mr. Dugdale to ask the question to specifically describe what defendant did what rather than collectively, unless they were all present.

I understand this is a conspiracy theory, and -- but still, you know, each actor should be identified as to his or her specific actions.

MR. DUGDALE:  I understand that, Your Honor.  And the case is that in just about every instance we have discussed, they did things collectively.  They moved the car collectively.  They looked at the wallet collectively.

39

THE COURT:  I understand.  I think the objection is well taken.  Whenever they answer "they," which defendant or he -- you know, "who are you referring to when you use the word 'he'?"

MR. DUGDALE:  Thank you, Your Honor.

THE COURT:  Let's bring the jury back in.

THE COURT:  I try not to interject myself in the trial unless there is an objection.  If you feel your objection is well taken, Mr. Lasting, I advise you to make it.

MR. LASTING:  Thank you, Your Honor.

(Jury In)

THE COURT:  The record will indicate all jurors are present.  All parties and counsel are present.  You are still under oath, Mr. Altmanis.  Please state your name for the record.

THE WITNESS:  Ainar Altmanis.

BY MR. DUGDALE:

Q.   Mr. Altmanis, when you returned to defendant Mikhel's house a day after Mr. Muscatel was abducted by the defendants, did you learn what would happen when Mr. Muscatel would have to go to the bathroom?

A.   When I came there the next morning, Mikhel said, "You know the news?  You don't have to do hard work now to take him to the bathroom.  Kadamovas taught him how to use the bathroom."

Q.   And were you able to see how Kadamovas taught Mr. Muscatel to go to the bathroom?

40

A.    Yes.  After a while, I saw myself how Muscatel would go to the bathroom holding the wall.

Q.    Can you describe for the jury how he would do this?

A.    Yes.  He would get off the chair and move along the wall, touching the wall with his hands because his eyes had tape around them and the legs were tied, but in such a way that he could still make small steps.

And -- and he already learned the distance, how far he had to move to get to the sink or to the toilet, and he used it himself, and he would come back the same way to his chair and get into the chair.

Q.    And at this point in time, I am going to ask Ms. DeWitt to again put up Exhibit 101.  Can you describe to the jury how the defendant -- I am sorry.  How Mr. Muscatel -- where he would go to go to the bathroom from where he was being kept captive.

A.    He was right here (indicating), and he was moving to the bathroom along the wall, and then he would come back the same way.

Q.    When you returned to defendant Mikhel's house the day after Mr. Muscatel was kidnapped, what kind of physical condition were the defendants in that day?

MR. RUBIN:  Objection, Your Honor.  Ambiguous, vague and speculation.

BY MR. DUGDALE:

Q.    You saw the defendants when you came back to the house; is

41

that right?

A.    Yes, I saw them.  Because Kadamovas opened the door for me.

Q.    Okay.  And what kind of shape was Mr. Kadamovas in at that point in time?

MR. RUBIN:  Objection, Your Honor.  I think it's ambiguous, what he is asking.

THE COURT:  Do you understand the questions -- the question, what kind of shape was he in, the victim?  Does he understand the question?

THE INTERPRETER:  Did you say "the victim"?

THE COURT:  The victim.

BY MR. DUGDALE:

Q.    What kind of condition was defendant Kadamovas in?

THE COURT:  What do you mean by "condition"?  I agree that that is ambiguous.

BY MR. DUGDALE:

Q.    How did he appear to you, Mr. Kadamovas?

A.    Kadamovas looked very tired, and Mikhel looked the same way.

MR. RUBIN:  Objection.  Non-responsive.

THE COURT:  Everything after Kadamovas looked very tired will be struck, jury admonished.  Disregard everything after that.

BY MR. DUGDALE:

Q.    Mr. Altmanis, did you also see Mr. Mikhel when you returned

42

to his house that day?

A.   Yes.  I saw both of them, Mikhel and Kadamovas.

Q.   And how did Mr. Mikhel appear to you?

A.   It was visible that they didn't sleep all night, and they were very tired.  And they admitted themselves, they told me.

MR. RUBIN:  Objection, Your Honor.  It's non-responsive.

THE COURT:  I will sustain an objection.  Motion to strike will be granted as to the last question and answer.

MR. DUGDALE:  Okay.  I will ask it one more time.

Q.   What physical condition did Mr. -- just answer the particular question, Mr. Altmanis.

What physical condition did Mr. Mikhel appear to be in?

A.   Tired.

Q.   And did you learn why both of the defendants looked the way they did to you?

A.   Yes.  Because they didn't sleep all night.

Q.   And did either of the defendants discuss with you what they did that night?

A.   Yes.  They explained to me that they worked with Muscatel.

MR. RUBIN:  I am going to object to the response.

THE COURT:  Everything after "yes" will be struck as non-responsive.  We are getting into a situation --

MR. DUGDALE:  I am going to ask a follow-up question, Your Honor.

43

Q.    Which defendant spoke to you about what happened that evening?

A.    Kadamovas.

Q.    And what did he tell you?

A.    He said that they were working -- they were trying to find out from Muscatel his financial situation.

Q.    And when you say "they were trying to find out," who was trying to find out this information from Mr. Muscatel?

A.    Mikhel.

Q.    And did defendant Kadamovas tell you what -- what they did to try and find out this financial information?

MR. RUBIN:  Again, Your Honor, the question contains the word "they."

THE COURT:  I have to sustain the objection on the form of the question.  You can ask him "did any of the defendants tell you," and then if he answers it "yes," "which one?"

MR. DUGDALE:  Yes, Your Honor.  We have already established that he is being told by Mr. Kadamovas --

THE COURT:  I understand.  But the problem you have is the defendants are objecting to the form of the question, and I have to rule on a specific objection and the form the question is asked in.

MR. DUGDALE:  No problem, Your Honor.

Q.    Mr. Kadamovas was the person telling you this information; correct?

44

A.   Yes.  Kadamovas gave me part of the information.  Another part was given to me by Mikhel.

Q.   And what did Mr. Kadamovas tell you?

A.   That they were trying to find out about his bank accounts.

Q.   And what did Mr. Mikhel tell you about this?

A.   He said that when they tried to contact the bank, there was some kind of mistake, and the bank frozen all the information.

Q.   Whose bank did they try and contact?

A.   Meyer Muscatel.

Q.   And what happened when the bank was contacted by the defendants?

A.   The bank froze everything, and Mikhel told me that probably Muscatel had had some kind of a pass code with the bank because they couldn't get anywhere.  The bank immediately froze the information.

Q.   And did defendant Mikhel tell you why they were trying to contact the bank, Mr. Muscatel's bank?

A.   Yes.  In order to withdraw the money.

Q.   And did they tell you who -- did defendant Mikhel tell you who was the person who actually contacted the bank?

A.   No.

Q.   And did you learn what happened when the bank was contacted in an effort to get this money?

     MR. RUBIN:  Objection, Your Honor.  Asked and answered.

     THE COURT:  Overruled.

45

THE WITNESS:  Yes.  I was explained that they couldn't do anything.

BY MR. DUGDALE:

Q.   Did you find out why they couldn't do anything?

A.   Yes.  Mikhel explained to me that either he had a pass code or he had a partner, and something had happened that stopped the -- their attempt.

They didn't -- they didn't get me the details of that information.

Q.   Now, after you came back to defendant Mikhel's house that day, how long did defendant Kadamovas stay around the house?

A.   Not more than an hour, and then he went home to -- to have a rest.

Q.   And after defendant Kadamovas left, who was left over to guard Mr. Muscatel?

A.   I stayed to guard him.

Q.   What happened to Mr. Mikhel after defendant Kadamovas left the house?

THE INTERPRETER:  Could you repeat the question?

BY MR. DUGDALE:

Q.   What happened to defendant Mikhel after defendant Kadamovas left defendant Mikhel's house that day?

A.   Mikhel went to his bedroom also to have a rest.

Q.   And what did you do at this point after defendant Kadamovas left the house and defendant Mikhel went up to his bedroom?

46

A.    I remained next to Meyer Muscatel in the kitchen to guard him.

Q.    In addition to guarding Mr. Muscatel, did you do anything else in relation to him?

A.    Yes.  Because the time was dragging very slow and I was walking around the kitchen to see what there was -- what was there in the kitchen.

And when I opened one of the drawers, I saw that there were different things, and also that there was a duct tape.

Q.    Can you describe for the jury specifically what you saw in the drawer of defendant Mikhel's kitchen.

A.    Besides all kinds of hammers and --

THE INTERPRETER:  Interpreter need help from someone knowledgeable in the tools.  "Ploskogubtsy."

THE INTERPRETER:  Pliers.

THE INTERPRETER:  Pliers, hammers, and the tongs and the different colors of electrical tape.  Different colors electrical tape.

THE WITNESS:  Okay.  Besides hammers, pliers and tongs, there were different colors of duct tape.

BY MR. DUGDALE:

Q.    When you were left alone with Mr. Muscatel that afternoon, did you feed him?

A.    Yes, I did feed him because I prepared for myself a sandwich with ham.  And I offered him the sandwich and some

47

water, and he drank water, and he didn't eat the sandwich.  When he smelled it, he asked me according to the smell what it was, and I told him that it was ham.

And he said that he didn't eat it because he ate only kosher.

Q.   Now, Mr. Altmanis, how long did defendant Mikhel stay asleep or stay up in his bedroom and leave you alone to guard the American?

A.   About an hour.  An hour later, he went down from the second floor.

Q.   And what did defendant Mikhel do after he came down from the second floor?

A.   He immediately went in his home office when he came down, and he found me there because I was watching television.

Q.   And did defendant Kadamovas return to defendant Mikhel's house later that day?

A.   Yes.  Sometime later he did.

Q.   Can you recall approximately how long he was gone?

A.   About three and a half hours.

Q.   Now, turning to this second day that Mr. Muscatel was held at defendant Kadamovas' house, did anyone else come over to defendant Kadamovas' -- I'm sorry -- defendant Mikhel's house that second day?

A.   Yes.

Q.   And who else came over to defendant Mikhel's house that

48

day?

A.   In the evening, Kadamovas' girlfriend came, and she brought food.

Q.   What was the defendant Kadamovas' girlfriend's name?

A.   Natalya Solovyeva.

Q.   At this time, I would ask Special Agent Perez to hand the witness what has been marked for identification and not previously admitted as government's Exhibit Number 7.

THE COURT:  7 for identification.

BY MR. DUGDALE:

Q.   Do you recognize the person in that photograph?

A.   Yes.  This is Natalya Solovyeva.

MR. DUGDALE:  Your Honor, at this time the government would move for the admission of government's Exhibit 7.

THE COURT:  7 admitted this date.

(Government's Exhibit 7 was received.)

MR. DUGDALE:  I would request permission for Ms. DeWitt to publish it.

THE COURT:  You may.

BY MR. DUGDALE:

Q.   Mr. Altmanis, is this the person who came over to defendant Mikhel's house on the evening of the second day?

A.   Yes.  This is she, Kadamovas's girlfriend, Natalya Solovyeva.

Q.   And when she came over to that -- to the house that day,

49

did you see her bring anything with her?

A.    Yes.  She brought some food with her.

Q.    Who did she bring the food for?

A.    For us.

Q.    And who is "us"?  Who was there at the house at that point in time?

A.    For myself, Kadamovas, and Mikhel.

Q.    Staying on that second day, was there a point in time that day when the defendant sent you -- strike that.

Was there a point in time that day where you were sent on an errand to go do something?

A.    Yes.  They sent me so that I would bring syringes for them that they told me.

MR. LASTING:  I would object.

THE COURT:  Sustain the objection.  Define who "they" is.

BY MR. DUGDALE:

Q.    Who sent you to do this?

A.    Kadamovas and Mikhel were in the kitchen, and all three of us were discussing that they would be injecting Demedrol into Muscatel.

Q.    And so they are in the kitchen of defendant Mikhel's house, "they" meaning both of the defendants; is that right?

A.    Yes.  There was Mikhel, Kadamovas, and myself.

Q.    And did both participate in this discussion concerning getting a syringe?

50

A.    Yes.  Because they had Demedrol, but they didn't have syringes.  And Kadamovas and Mikhel asked me saying that because I knew people in town, maybe I knew where to get the syringes.

Q.    And was it explained to you why they wanted the syringe?

MR. RUBIN:  I would object, Your Honor.  It's been asked and answered.

THE COURT:  No.  Overruled.

THE WITNESS:  They explained to Muscatel that they were going to give him water to drink before they were going to release him, and because he said that he was not consuming alcohol, they would be injecting Demedrol into him.

This is how Mikhel and Kadamovas explained to me why they needed a syringe.  And whether there was a possibility for me to find the syringe.

BY MR. DUGDALE:

Q.    Did you, in fact, have access to a syringe that could be used to inject Mr. Muscatel with Demedrol?

A.    Yes.  I had it at home.  That's why I jumped at the idea, and I said that I agreed and that I would find one.  So that I would be able to leave the house for a while.

Q.    And did the -- did either of the defendants explain to you why they wanted to inject Mr. Muscatel with Demedrol?

A.    So that they would --

MR. RUBIN:  Objection to the form of the answer, Your Honor.  Non-responsive.

51

THE WITNESS:  So that when they would be taking him to set him free, he would be sleeping.

THE COURT:  Overrule the objection.

THE WITNESS:  That's how they explained it to him.

BY MR. DUGDALE:

Q.  And when you were sent to go get the syringe by the defendants, were you sent to do anything else as well?

A.  They told me that once I was going to look for the syringe, they also gave me the number and the address, and they told me you -- "once you will be driving in the same direction, why don't you go and see what kind of address it is."

MR. RUBIN:  Again, Your Honor, I am going to object as --

THE COURT:  Sustain the objection.  Let me admonish the witness, sir, Mr. Altmanis, try not to use the word "they."  Be as specific as you can to who did what and said what.

THE WITNESS:  I apologize.  Okay.  I will.

MR. RUBIN:  Motion to strike the last answer.

THE COURT:  Motion to strike the last question and answer will be granted.  You can reask the question now.

BY MR. DUGDALE:

Q.  Did this conversation about going to look for the address, did that take place at the same time as the conversation about going to get the syringe?

A.  Yes.

Q.  And who was present during this conversation?

52

A.   I personally, Kadamovas, and Mikhel.

Q.   And who provided you with the information concerning the address?

A.   Kadamovas gave me this piece of paper, and he told me to go and see what is there at that address.

Q.   Now, after Kadamovas gave you the piece of paper and told you to look for this address and the defendants told you to go get a syringe, what did you do?

A.   I went.  I left the house, Mikhel's house.

Q.   And where did you go first?

A.   First I went to the address that was on this piece of paper to see what was there.

Q.   And what was there?

A.   There was some kind of official institution.

Q.   And did you also go look for the syringe that you had at your house?

A.   Yes.  I went home, and I had it in my medical kit.

Q.   And what did you do after you found the syringe?

A.   I spent about two hours at home.

Q.   And what did you do after you spent the two hours at home?

A.   I decided that it was time for me to go to them, to Mikhel's home.

Q.   Did you, in fact, do that?

A.   Yes, I did.  I came to Mikhel's home.  They were in the kitchen, Mikhel and Kadamovas.

53

Q.   And what did you do with the syringe at that point in time?

A.   I gave it to them.  They were both in the kitchen, Mikhel and Kadamovas.  They just -- they just asked me why it took me so long, and I told them it took me awhile to find it driving around the town.

Q.   How long did you stay at defendant Mikhel's house after you came back with the syringe?

A.   Until late at night.  Approximately until 11:00.

Q.   And what did you do at 11:00?

A.   I -- I went home.  They told me that I could go and that I could go home and have a rest.

Q.   Were you told what time to come back the next day?

A.   Yes.  In the morning.

Q.   Who told you when to come back?

A.   At 6:00.  By 7:00.

Q.   Who told you to come back the next morning by that time?

A.   Kadamovas did.

Q.   Now, did you return to defendant Mikhel's house the next morning?

A.   Yes, I did.  I returned to Mikhel's home, but I was late. I was not there at that point in time.

Q.   Approximately when did you show up at defendant Mikhel's house that morning?

A.   After 7:00 in the morning.

Q.   Now, when you got back to defendant Mikhel's house, did

54

someone meet you at the door?

A.    Yes.  When I knocked at the door, Kadamovas opened the door for me.

Q.    And did Mr. Kadamovas say anything to you at that point in time?

A.    Yes.  He was unhappy because of the fact that I was late, and they were doing everything without me.

Q.    Did you understand what he was talking about when he told you that they were doing everything without you?

A.    I thought that -- I thought that, yes, they had already injected or that they were injecting the Demedrol without me.

Q.    Where did you -- where did you go after you met Mr. Kadamovas at the front door of defendant Mikhel's house?

A.    When he opened the door, he turned and he went in the direction of the kitchen, and I followed him.

       And while we were walking, he expressed his dissatisfaction by the fact that I was late, and that they did everything without me.

Q.    Now, at this point in time, I am going to have Ms. DeWitt publish government's Exhibit 101 again.

       And using this diagram on the screen here, Mr. Altmanis, can you point to where you followed defendant Mikhel when you walked in the house?

       MR. RUBIN:  Objection.  Misstates the testimony.

       THE COURT:  Sustain the objection.  I think it was

55

Mr. Kadamovas he testified to.

MR. DUGDALE:  I am sorry.  Yes.  That is correct, Your Honor.

Q.  Can you explain to the jury where you followed defendant Kadamovas after you walked in the house?

A.  When he opened the entrance door for me, I followed him through the whole foyer and the kitchen, and he was walking on without stopping.  And he went directly into the garage.

Q.  Just to stop you for a second, Mr. Altmanis, what did you see when you walked in that area near the hallway and kitchen?

A.  When I was at the corner of the kitchen table that was located right here, I saw through the open doors of the garage -- I saw Kadamovas step over the legs of Muscatel, who was lying on the floor.

Q.  So just so we have this clear, you went to the area of the kitchen there, and Mr. Kadamovas continued to walk into the garage; is that correct?

A.  Yes.  He didn't stop.  He went straight, and I followed him.

Q.  And where did you go when you saw the legs of Mr. Muscatel lying on the floor in the garage from the angle that you were at?

A.  I stopped at the doorway, and Kadamovas -- he stepped over the legs of Muscatel.

Q.  And what did you see when you got to the doorway of the

56

garage?

A.   I saw that when Kadamovas was stepping over him, he bend down, and he pressed his knee over Muscatel's back.  At the same moment, Mikhel was pressing with his knees Muscatel's shoulders to the floor.  And I saw that he was closing plastic bag that was on Muscatel's head.  He was spinning it.

Q.   Can you describe what you mean by "spinning it," the plastic bag?  What was defendant Mikhel doing with the plastic bag?

A.   The bag was on Muscatel's head, and he was closing the ends of the bag so that the air wouldn't get inside.

Q.   Was defendant Mikhel doing anything in addition to closing this plastic bag over Mr. Muscatel's head?

A.   Yes.  He was also holding onto the nose so that he wouldn't be able to breathe.

Q.   So he was -- was he using both hands at this point in time to try and shut off the air from Mr. Muscatel?

A.   No.  In his right hand, he was holding the ends of the plastic bag so that the air wouldn't get inside, and with his hand -- with his left hand, he was pinching on his nose through the bag.

         And Kadamovas was holding his body so that he wouldn't be kicking.  And Kadamovas said, "Hold onto his legs."

Q.   Let's stop for one second.

         You mentioned that Mr. Kadamovas is on top of the

57

American, is holding him down, and you testified that Mr. Mikhel was holding his nose and tightening a bag around his head.

How was Mr. Mikhel -- I am sorry.  What was Mr. Muscatel's reaction to what was going on?

A.   I saw that the body was moving in an impulse and that he was producing a sound.  That's why -- when he said hold to his legs.

Q.   Okay.  Just so we can get to that point, who told you to hold Mr. Muscatel's legs at this point in time?

A.   Kadamovas did.

Q.   And what did you do when defendant Kadamovas told you to help by holding down Mr. Muscatel's legs?

A.   I don't know, but I didn't move from the spot.

Q.   And when you didn't move from the spot that you were in -- and, again, where is that spot on this diagram?  Where were you standing?

A.   Right here (indicating).  May I have your pen?

Q.   When you didn't move from that spot, Mr. Altmanis, did either of the defendants say something to you then?

A.   Yes.  Kadamovas ordered me.  He said, "Go outside, start the car, and have it run for a while."

Q.   And why did he tell you to go do this?

A.   Because -- because Muscatel was making noise.  He was making noise.

Q.   What did you do after defendant Kadamovas ordered you to go

58

outside?

A.    I hurried outside.  I got into my car.  I started the car, and I had it running for a while.  Because I parked right at the gates of the garage.

Q.    And did the noise that you were making by revving the car engine in front of the garage, did that cause a problem?

A.    Yes.  I probably was overdoing it because sometime later, Kadamovas showed up, and he said, "Why are you pressing the pedal?  You're making too much noise.  You will wake up all the neighbors."

Q.    Where did the defendant Kadamovas come from when he told you this?

A.    He went out through the door, the entrance door to the house.

Q.    Did Mr. Kadamovas tell you anything in addition to the fact that you were making too much noise?

A.    Yes.  When he opened the door and I followed him into the house, he said, "Yes.  Everything is ready now."

Q.    And after defendant Kadamovas told you that everything was ready and you followed him into the house, where did you go?

A.    Right into the garage from where I left.

Q.    What did you see when you got back to the garage?

A.    That Muscatel was lying on the floor dead.

Q.    What did he look like?

A.    He was lying on his stomach, and he had black plastic bag

Case 2:02-cr-00220-MCS    Document 2530-3    Filed 10/17/25    Page 59 of 59    Page ID #:23134

59

on his head.

Q.   At this point in time, was there a car inside the garage when all this was going on?

A.   Yes.  There was van, Kadamovas'.

Q.   At this point in time, I would like you to take -- Special Agent Perez to hand you what has been marked for identification as government's Exhibit Numbers 79, 80 and 81.

THE COURT:  79, 80 and 81 for identification.

BY MR. DUGDALE:

Q.   Mr. Altmanis, can you please take a look at those three exhibits.

A.   Yes.  This is Kadamovas' car.

MR. DUGDALE:  Your Honor, at this time the government would move to admit government's Exhibits 79, 80 and 81.

THE COURT:  79 through 81 are admitted this day.

   (Government's Exhibits 79, 80, and 81 were received.)

THE COURT:  Let's take our lunch recess at this time because it's 12:00.  Remember the admonition.  We will be back at 1:25 in the jury room; 1:30 in the courtroom.

                  (Lunch Recess Taken.)

     (Morning session recessed at 12:02 p.m.)