# GOVERNMENT EXHIBIT 4

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

- - -

THE HONORABLE DICKRAN TEVRIZIAN, JUDGE PRESIDING

- - -

U.S.A.,                            )
                                   )
                    Plaintiff(s), )
                                   )
        vs.                        ) CR02-220(B)-DT
                                   )
IOURI MIKHEL; JURIJUS KADAMOVAS,)
                                   )
                    Defendant(s). )
_____)


REPORTER'S TRANSCRIPT OF PROCEEDINGS

JURY TRIAL - DAY 23

1:30 P.M. TO 4:16 P.M.

LOS ANGELES, CALIFORNIA

WEDNESDAY, OCTOBER 11, 2006


                        GAIL PEEPLES,CSR
                        Contract Court Reporter
                        100 United States Courthouse
                        312 North Spring Street
                        Los Angeles, California 90012
                        (213) 894-3013

JAMES S. DAVIDSON, FBI Special Agent

VARVARA OLSON, Russian Interpreter

LUDMILLA GENN, Russian Interpreter

ZOYA SPIVAKOVSKY, Russian Interpreter

ALEX J. LEVOFF, Russian interpreter

CHRISTINA LARSON GITS, paralegal

LOS ANGELES, CALIFORNIA; WEDNESDAY, OCTOBER 11, 2006;

1:30 P.M.

- - -

THE CLERK:  Please remain seated and come to order. This United States District Court is now in session.

THE COURT:  Outside the presence of the jury, the record will indicate all parties and counsel are present.

Anything the government wishes to bring up?

MR. DUGDALE:  No, Your Honor.  Thank you.

THE COURT:  Anything defendants wish to bring up?

MR. LASTING:  No, Your Honor.

Yes, Your Honor.  Could you get us some assistance with the monitor?

THE COURT:  What happened to the monitor?

MR. LASTING:  I don't know.

MS. DE WITT:  Is it on?

MR. LASTING:  I don't know.

(Pause in the proceedings.)

THE COURT:  Anything yet?

THE INTERPRETER:  There should be a light coming on.

THE COURT:  We'll start going without it and then we'll have the man come over and check it out.

MR. LASTING:  Thank you, Your Honor.

THE COURT:  All right.  Let's bring the jury in.

(The jury entered the courtroom at 01:34 p.m.)

THE COURT:  All right.  The record will indicates all jurors are present, all parties and counsel are present.

And you're still under oath, Mr. Altmanis.

Please state your name for the record.

THE WITNESS:  Ainar Altmanis.

THE COURT:  Mr. Dugdale.

MR. DUGDALE:  Thank you, Your Honor.

DIRECT EXAMINATION(resumed)

BY MR. DUGDALE:

Q.   Good afternoon, Mr. Altmanis.

Right before the break you identified a car that's pictured on the screen here -- and that's Government's Exhibit No. 79 -- as defendant Kadamovas' van.

Where was this van parked when the defendants were murdering Mr. Muscatel?

A.   The Kadamovas' car was parked in the Mikhel's house's garage.

Q.   And after the defendants murdered Mr. Muscatel, what happened to Mr. Muscatel's body?

A.   The back door of the van was open.  And we three of us loaded the body of Mr. Muscatel into the van.

MR. DUGDALE:  At this time I'm going to have Ms. De Witt publish Government's Exhibit No. 81, which was admitted just prior to the break.

Q.   And Mr. Altmanis, you recognize what Government's Exhibit No. 81 is a picture of?

A.   Yes.  It was Kadamovas' car with the back door open. That's the way it was parked in the garage.

Q.   And can you demonstrate to the jury by touching the screen there where Mr. Muscatel's body was loaded into this van.

THE INTERPRETER:  Excuse me, counselor.  I have a problem with your microphone.

BY MR. DUGDALE:

Q.   Mr. Altmanis, can you demonstrate for the jury by touching the screen where Mr. Muscatel's body was loaded into the van.

A.   Myself, Kadamovas, and Mikhel lifted the body and put it horizontally like this.

Q.   And is that indicated, where the body was, indicated by that red line at the bottom of Government's Exhibit No. 81 in the trunk area of that van?

A.   Yes.  Right.  Right.

Q.   Was anything else put in the van apart from or in addition to Mr. Muscatel's body?

A.   After that, we collected different things from the garage.  Boxes.  Baskets.  Other things.  And we loaded it into the van to make -- to make it look like somebody was moving.

Q. And who loaded these items into the van to make it appear that somebody was using the van to move?

A. Myself, Kadamovas, and Mikhel.

Q. Now, after the defendants and you loaded Mr. Muscatel's body into the van and put these other items in the van as well -- strike that.

Where were these items loaded into the van? What part of the van were they put in?

A. The whole back part was loaded the way that it would close the body. And on top of it there were stored some boxes.

Q. After these items were loaded in the van, could you see Mr. Muscatel's body?

A. No. It was impossible. It was impossible to see the body of Mr. Muscatel. There were so many things that it was impossible to see. In order to see it, we needed to unload everything.

Q. And what did you do after Mr. Muscatel's body was put into defendant Kadamovas' van and covered with these items?

A. Myself, Kadamovas, and Mikhel went to the kitchen. And I started making coffee, and Kadamovas and Mikhel started looking at the map which was prepared there.

Q. You say that defendants Mikhel and Kadamovas were looking at some maps. Why were they looking at the maps?

A. They were looking at the roads where to take the body

and dump there.  They were looking at the reservoirs.

Q.   And was there a discussion at that point in defendant
Mikhel's kitchen about where to dump Mr. Muscatel's body?

A.   Mikhel and Kadamovas were deciding where to take the
body.  And I got in with my suggestion about that too.

Q.   And where did you suggest that they take the body?

A.   Couple of years ago I had a trip to San Francisco.  And
go to San Francisco, I was passing a lot of bridges.  And I
told them that there are bridges there.

Q.   And what did -- did one of the defendants respond to
your suggestion about dumping the body somewhere on the way
up to San Francisco?

A.   Mikhel said there are bridges there but the rivers are
dry.  He said, "thank you, but we have our opinion."

Q.   And did Mr. Mikhel tell you what his opinion was as far
as what they should do with the body and where they should
take it?

A.   Yes.  He said that they already found a place on the map
together with Kadamovas suitable for the purpose.

Q.   And did they describe for you where this place was on
the map?

A.   Yes.  They showed me.  They didn't know exactly
themselves.  But they showed me a national forest somewhere.
And there were a lot of reservoirs shown on the map.

Q.   Now, you testified this morning about bringing a syringe

to the defendants the night before.

First of all, why did you have a syringe at your house?

A.   It was sitting in the medicine cabinet because there was a lot of medicine that I brought from Russia.

Q.   And when you were with the defendants in the kitchen right after Mr. Muscatel was murdered, did you have a discussion about what had happened -- how they had used that syringe?

A.   Yes.  We had a conversation between myself, Kadamovas, and Mikhel.  And they explained to me that they tried to inject Muscatel with that Dimedrol but it didn't work because Dimedrol had expired.

And another possibility that because of the nervous condition he had a lot of adrenalin in his body and the Dimedrol didn't work.

Q.   And who told you that Muscatel had been injected -- that this person had been injected with the Dimedrol but that the Dimedrol didn't have its desired effect?

A.   It's difficult to say at this moment who in particular told me that because it was a common conversation between three of us.  Myself, Kadamovas, and Mikhel.

Q.   Now, did the defendants leave with Mr. Muscatel's body that morning?

A.   Yes, they left.

Q.   And approximately what time did they leave?

A.   Somewhere around 8:30.  By 9:00 o'clock they left the house.  Kadamovas and Mikhel.

Q.   And before -- did they ask you to come with them when they were going to dump the body?

A.   Yes.  They told me that I should have gone with them. But I refused.  I said I had a doctor's appointment for my children.

Q.   And did you really have a doctor's appointment with your children that day?

A.   No.  It was an excuse not to go.

Q.   And before they left did the defendants take anything with them?

A.   Yes.  They picked up maps, coffee, and some bag with something.  I don't know what was in there.

Q.   Now, after you refused to go with them up to the -- to dump Mr. Muscatel's body, did they instruct you to do anything?

A.   Yes.

Q.   And what did they instruct you to do?

A.   Since I wasn't going with them, I was supposed to clean up the room where they kept Meyer Muscatel.  I was supposed -- I was supposed to wash the floors, walls, to wash the toilet, bathroom.  Everywhere where he could touch.

Q.   And did you in fact do that?  Did you clean those areas?

A.   Yes, I cleaned it.

Q.   And you testified earlier this morning about an incident where Mr. Muscatel was struck in the entranceway near near Mr. Mikhel's front door.

Do you recall that?

A.   Yes.  I remember it.

Q.   And when Mr. Muscatel was struck in that area, did he bleed?

A.   Yes.  It was a lot of bleeding.  That's why I decided to pour alcohol on the wound.  Because he lost a lot of blood.

Q.   And did you clean up the area around where Mr. Muscatel had bled?

A.   Yes.  I cleaned it right after they moved him to the small room with a chemical that I found under the sink in the cabinet.  But after the cleaning there still was a stain on the hardwood.

Q.   Now, in addition to having you clean up the areas where Mr. Muscatel had been inside the house, did they also ask you to get rid of any property that belonged to Mr. Muscatel?

A.   Yes.  They asked me to get rid of those things.

Q.   What did they ask you to get rid of?

A.   To get rid of his cell phone.

Q.   And did you get rid of his cell phone?

A.   Yes.  After I left after I had cleaned the house, I threw it out of the window of my car on the freeway.

Q.   Now, after the defendants left that morning to get rid of Mr. Muscatel's body, did you keep in contact with either one of them that day?

A.   Yes, I kept in touch with them.

Q.   And who did you keep in contact with?

A.   With Kadamovas.  I called him twice on his cell phone.

Q.   And how many times did you speak with him that day?

A.   Two times.

Q.   And when was the first time that you spoke with Mr. Kadamovas in relationship to when he left with defendant Mikhel and Mr. Muscatel's body?

A.   After lunch.  Somewhere after lunch.

     Well, it was kind of -- it was not exactly lunch. It was about 3:00 o'clock.

Q.   And what did Mr. Kadamovas tell you when you spoke to him on the phone on this first occasion?

A.   First time he picked up the phone and said that they were looking for a place, they still haven't found it, and told me to call later if something -- if I needed to.

Q.   And did you call him back later?

A.   Yes.  Closer to the evening.

Q.   And what happened when you called him back the second time?

A.   He said that he woke him up because they were sleeping in the car, they were having a rest.  He said that they had

already found a place and were waiting for the complete dark.

Q.   Did he explain to you why they were waiting for it to be dark?

A.   Yes.  In order to get rid of the body without any obstacles.

Q.   Now, Mr. Altmanis, did you ultimately find out what the defendants did with Mr. Muscatel's body?

A.   Yes.  A couple of days when I met them they told me what they had done with the body and what had happened.

MR. RUBIN:  Your Honor, I'm going to object again --

MR. DUGDALE:  I'll ask a follow-up question.

THE COURT:  Ask a follow-up question.  I'll reserve the ruling on the objection.

BY MR. DUGDALE:

Q.   So, there was an occasion where you met with the defendants after Mr. Muscatel's body was disposed of.

Is that correct?

THE INTERPRETER:  Could you repeat it please.

MR. DUGDALE:  Sure.

Q.   Did you meet with the defendants after Mr. -- after they drove away with Mr. Muscatel's body?

A.   Yes, I met them.  But I don't remember exactly where that conversation had happened.  It could possibly be in the office of the Water World.

MR. RUBIN:  I'll object to that as speculation.

THE COURT:  No.  I think that's a valid answer. He's not pining it down.  He's just giving his best testimony.  That's permissible.

Overrule the objection.

BY MR. DUGDALE:

Q.   Who was present at this meeting?

A.   I spoke with Kadamovas in particular.

Q.   And was Mr. Mikhel present as well?

A.   Yes, he was present.  But during the conversation when Kadamovas told me what had happened, he wasn't standing next to us.

Q.   Okay.  And what did -- did defendant Kadamovas tell you anything about the location where they dumped Mr. Muscatel's body?

A.   Would you repeat the question please.

Q.   I'm sorry.

Did Mr. Kadamovas describe the place where they dumped the American body?

A.   Yes.  He described it well.

Q.   And how did he describe the place?

A.   He said that they found a -- either a reservoir or a lake and there was a large bridge crossing it.

Q.   And did Mr. Kadamovas tell you how they disposed of Mr. Muscatel's body?

A.   Yes, they told me.  They were also offended that I didn't participate in it because it was very difficult for them to do it just for two of them and they some obstacles. And they described -- and they made some mistakes and they described how it has been done.

MR. RUBIN:  Objection, Your Honor.  He's taking as "they" although I assume he's only talking as to Mr. Kadamovas.

THE COURT:  And that's what you got to pin down here.

MR. RUBIN:  I'll make a motion to strike that answer --

THE WITNESS:  Kadamovas.

THE COURT:  I overrule the objection now because he has pinned it down.

MR. DUGDALE:  Okay.

Q.   And you mentioned that you were told about some difficulties in getting rid of the body.  Precisely what did defendant Kadamovas tell you in this regard?  What were the difficulties of getting rid of the body?

A.   First of all, there was difficulties to leave the body because he was heavy.  And then he told me that when they were taking the body over the curb, they dropped it and the body hit the curb with the head and started bleeding.  And in addition to that, they lost a weight that was attached to the

body.

Q.    And did defendant Kadamovas explain to you why they had these problems?

A.    Yes.    Because there were only two of them, Kadamovas and Mikhel, and that I -- they needed me there, a third person, for sure.

Q.    Did defendant Kadamovas also tell you how defendants Mikhel and Kadamovas were able to throw the body from the bridge without being seen?

A.    They -- yes.    They worked it out in the daytime and also in the evening.    They told me that they worked out and calculated the time --

        MR. RUBIN:    Your Honor, I'm going to object at this point because again we got a conversation with Mr. Kadamovas and he's saying "they told me".

        MR. DUGDALE:    Your Honor, I will ask follow-up questions --

        THE COURT:    Now, this is the problem.    He's going to object every time unless you specifically frame your question so that you have the speaking party or parties specifically identified.

        MR. DUGDALE:    Your Honor, I asked that question.    I asked about defendant Kadamovas.    I did.    But I will ask the question again.

Q.    Did defendant Kadamovas explain to you, Mr. Altmanis,

how he and defendant Mikhel were able to throw the body from
the bridge without being seen?

A.   Yes.   Kadamovas explained to me completely.

Q.   And what did he tell you?

A.   Kadamovas told me that when it became dark they
calculated the time of the approaching traffic from both
sides, from the right and from the left.   Because the bridge
was situated in the area that was hilly and foresty and the
road -- and the road was going up and down and it was waving,
and that's why it could be seen when the lights of the car
were approaching it.

Q.   Mr. Altmanis, were you paid any money as a result of
assisting the defendants with the abduction of Mr. Muscatel?

A.   No.   They didn't pay me any money because Mikhel
explained to me that since they didn't get any money from him
and that they were unable to withdraw anything from the
accounts.   And Mikhel also told me that he knew those people
and that he was going to clear up and find out why they had
such a failure with Muscatel.

Q.   What people was Mr. Muscatel referring to when he told
you this?

A.   Those people who ordered this kidnapping from what he
said.

Q.   Now, you testified earlier that the defendants, when
they left to dispose of Mr. Muscatel's body, that they left

you alone at defendant Mikhel's house to clean.  Where did you go after you finished cleaning up the areas of defendant Mikhel's house that you discussed in your earlier testimony?

A.   After I cleaned the house, I left it.  I got rid of the telephone, and I went home.

Q.   And did you return to defendant Mikhel's house later that day?

A.   Yes, I did.

Q.   And why did you go back to defendant Mikhel's house?

A.   I wanted to tape this house on the videotape and to show my wife at home.

Q.   And why did you want to show your wife a videotape of the house?

A.   I wanted to show her the house, not the tape, because she was suspicious of me being absent for three days and she thought that we were just carousing all those three days. And I wanted to show her that that was the house and that we were busy cleaning the house.

For three days I have been explaining to her what kind of house it was.  And then I asked her whether she wanted to see it, and she said yes.  And then when the chance came up, I did it.

Q.   And, so, when you went back to defendant Mikhel's house later that day, did you go alone?

A.   No.  We were just passing by and we went to Mikhel's

house all together with my family.

Q.   And how did you get inside defendant Mikhel's house when you came back?

A.   One door was not locked.  I locked one door, and another door I left it unlocked so that it would be possible to get back.

Q.   Did you have the key to get inside defendant Mikhel's house?

A.   No.  That's why I left one door unlocked.

Q.   Did you ever have a key to get inside defendant Mikhel's house?

A.   No.  No one trusted me with the keys.

Q.   What did you do when you got back to defendant Mikhel's house?

A.   I entered through the unlocked door, then I opened the other door for my wife.  And she came in and I showed her the whole house.

Q.   And what did you do when you were showing her the house?

A.   I videotaped it just to have -- just to remember about it.  That it was a nice and pretty house.  And I liked it.

Q.   And did the defendant know that you were videotaping his house like this?  Defendant Mikhel?

A.   Oh, no.

Q.   And why did you choose that time to go to defendant Mikhel's house with your wife and videotape?

A.   Because they were absent and they were going to be absent for a while and that was a very good opportunity because he wouldn't have allowed me to do it.

Q.   And what were they -- what was the reason why they were absent at this time that you went to his house?

A.   They left with the body, Kadamovas and Mikhel.  They drove away with the body.  Although I didn't know when they were going to come back because I didn't know how long it would take them.  That's why my family and I entered the house.  And we spent very little time there and then we left quickly.

Q.   And which body were the defendants with at this point in time?

MR. RUBIN:  Objection, Your Honor.  Assumes facts not in evidence at this time.

THE COURT:  Sustained.

BY MR. DUGDALE:

Q.   Whose body were they with at that time?

A.   Meyer Muscatel.

Q.   Now, Mr. Altmanis, after the abduction and murder of Mr. Muscatel took place, did you continue to engage in criminal activity with the defendants?

A.   Yes.

Q.   And were you involved in other abductions and murders with the defendants?

Page: 83 of 63

A.   Yes.

Q.   And who was the next victim that the defendants abducted and murdered?

A.   Rita Pekler.

Q.   And when did the defendants abduct and murder Ms. Pekler in relationship to the abduction and murder of Mr. Muscatel?

A.   Closer to the end of the year in December.

Q.   Of what year?

A.   2001.

Q.   And were you present when Ms. Muscatel -- I'm sorry -- when Ms. Pekler was abducted?

A.   Yes, I was present.

MR. DUGDALE:  At this time I'd like the Special Agent to hand you what's been marked for identification as Government's Exhibit No. 73.

THE COURT:  73 for identification.

BY MR. DUGDALE:

Q.   Mr. Altmanis, you recognize the person in that photograph?

A.   Yes.

Q.   And who is the person in that photograph?

A.   This is Rita Pekler.

MR. DUGDALE:  Your Honor, at this time the government would move to admit and publish Government's Exhibit No. 73.

THE COURT:  73 is admitted this date and may be published.

BY MR. DUGDALE:

Q.  Now, Mr. Altmanis, in between the murder -- the abduction and murder plaintiff Muscatel and the abduction and murder of Ms. Pekler, was there a new member who joined your group?

A.  Yes.

Q.  And who was that person?

A.  Petre Krylov.

MR. DUGDALE:  I'm now going to ask Ms. De Witt to publish what has previously been admitted as Government's Exhibit No. 94.

Q.  Mr. Altmanis, you recognize the four people in that photograph?

A.  Yes.

Q.  And who are they?

THE COURT:  Starting with the left.

BY MR. DUGDALE:

Q.  Starting to the left.

THE COURT:  As you look at the picture.

THE WITNESS:  Petre Krylov.  Jurijus Kadamovas, Iouri Mikhel.  And myself.

BY MR. DUGDALE:

Q.  And do you know how Mr. Krylov began to associate with

your group?

A.   Yes.

Q.   And how do you know that?

A.   I met through Kadamovas.  Kadamovas introduced us to each other in his office at Water World.

Q.   And what did Mr. Kadamovas tell you about Mr. Krylov, the person who's over to the far left in this picture?

A.   Kadamovas told me that Petre was his friend and that he was a very good specialist in electronics and computers and that he was going to be in charge of computers and electronics in their business.

Q.   Now, turning back to Ms. Pekler, did you learn why the defendants wanted to abduct Ms. Pekler?

A.   Yes, I did.

Q.   And who told you why the defendants wanted to abduct Ms. Pekler?

A.   Kadamovas.  Jurijus Kadamovas explained to me that they had a new project, that someone from Russia approached Mikhel saying that there was a person who had stolen a lot of money. That man's name was Georgy Safiev.

Q.   And how did Ms. Pekler relate to Mr. -- did defendant Kadamovas explain how Ms. Pekler -- Ms. Pekler's relationship to Mr. Safiev?

A.   Yes.  Both Kadamovas and Mikhel explained to me that all that -- all of that all together and that Ms. Pekler was in

charge of his finance and his real estate.

Q.   She was in charge of whose finances and real estate?

A.   Safiev.

Q.   Now, you explained that both of the defendants told you this.  Did either of the defendants explain how how they learned this information about Ms. Pekler and her relationship with Mr. Safiev?

A.   Yes, they did.

Q.   Who told about how they learned this information about the relationship between Ms. Pekler and Mr. Safiev?

A.   Kadamovas told me that they had their own person in Safiev's house and through this person they learned this information about Safiev.

Q.   Okay.  When you say this person in Safiev's house, did he explain what the relationship was between that person and Safiev's house?  What he did there?

A.   Probably he was working for Safiev in some capacity.  I don't know.

Q.   And did Mr. Kadamovas explain to you how he was able to get information about Mr. Safiev from this person at Safiev's house?

A.   Yes, he did.

Q.   And what did he tell you?

A.   He told me that his girlfriend, Natalya Solovyeva, was getting him the information because she had an access to

Safiev's house.  She knew someone in this house who was working there.

Q.   Now, you mentioned Mr. -- Mr. Safiev earlier in your testimony.

What were the defendants' plans as they related to Mr. Safiev?

A.   They wanted to lure him into a trap and to abduct him and get money from him.

Q.   And were there discussions about different ways in order to do this?  In order to lure Mr. Safiev into a trap where he could be abducted?

A.   Yes.  A lot of possibilities were discussed on how to abduct him.

Q.   And who participated in these discussions about different plans to abduct Mr. Safiev?

A.   Myself, Mikhel, Kadamovas, and Krylov.

Q.   And what were the different plans that were discussed?

A.   One of the plans was to abduct Safiev with the help of a rental truck, U-Haul, staging a car accident with his car and then during the conversation concerning this abduct him and put him in the U-Haul truck and abduct him.

Q.   And whose idea was that?

A.   I don't know whose idea it was.  It was discussed among all of us.

Q.   And was that plan ever followed through on?

A.   No.   They abandoned this plan because they recognized themselves that that was a crazy plan and that it wouldn't have been realistic for them to do it in the middle of the day.

Q.   Were there other plans about -- discussed about how your group could abduct Mr. Safiev?

A.   Yes.   Another possibility was discussed in connection with this.

THE INTERPRETER:   Interpreter needs to ask the witness to repeat.

THE COURT:   Go ahead.

THE WITNESS:   The next plan was to place a car not far from Safiev's house with a flat tire and with several girls or one girl in the car and when he was going out of his house he would see it and definitely he would come up and start helping her and at that moment he could be abducted.

But they dropped this idea as not realistic.

BY MR. DUGDALE:

Q.   And was there yet another plan that was formulated to abduct Mr. Safiev?

A.   Yes.   Another plan was to use the possibilities of Petre Krylov.

Q.   And how was Mr. Krylov going to be used in a potential plan to abduct Mr. Safiev?

A.   Because he had -- he was related professionally to the

installation of electronic equipment and also he was involved in to installing illegal television boxes.

Q.   And how was Mr. Krylov's involvement in these activities going to be used in a potential plan to abduct Mr. Safiev?

A.   That he would go to that area of Safiev, to the kind of closed homes, and that he would knock on Safiev's house at the door and that he would offer Safiev to install electronics into his car.

So acting as if he were an agent, he would be walking around the area offering other people the -- to install the equipment and to offer also Safiev to install the equipment.

And during the conversation they were supposed to find out that they both were Russians and that they would find something else in common -- something else to do in common.

Q.   Was this plan to create this relationship between Mr. Krylov and Mr. Safiev successful?

A.   No, because they received information from the Safiev's house that he wasn't interested in all that equipment, the electronics and TV and other stuff.

Q.   And when these plans that you discussed did not result in any kind of successful move to abduct Mr. Safiev, what was the plan that was turned to next?

A.   Then they told me that they were going to abduct Rita

Pekler because she was related to Safiev in terms that she was working for him as a real estate agent.

Q.    And how would the abduction of Ms. Pekler have led to a chance to abduct Mr. Safiev?

A.    Could you repeat the question.

Q.    Sure.

How would the abduction of Ms. Pekler, as it was explained to you, how could that lead to the abduction of Mr. Safiev?

A.    Because she was managing his affairs financial and in real estate.  And if she called him and told him that she had some problems, he would -- he would get in touch with her.

Q.    Now, before -- strike that.

Did either of the defendants explain to you why they wanted to abduct Mr. Safiev to begin with?

A.    According to the legend that I've heard from Mikhel and Kadamovas, Safiev was the person who stole a large sum of money or extorted a large sum of money from somebody in Russia and then fled with the money.

Q.    So why did they want to abduct Mr. Safiev?

A.    To get that money from him.

Q.    Now, before the abduction of Ms. Pekler took place, were you asked to do anything in connection with tracking down Ms. Pekler's whereabouts?

A.    Yes.  They wanted me to find out where her office was.

And Kadamovas left me a piece of paper with her address.

Q.   And what were you told to do in relationship to finding out her office?

A.   I was supposed to drive by and look where that office was located.

Q.   And who told you to do this?

A.   Kadamovas in particular.

Q.   And did you go to look for Ms. Pekler's office?

A.   Yes, I went to this address.  But I couldn't find the place.  There was a -- some storage instead of an office.

Q.   And what did you do when you couldn't find Ms. Pekler's office with the information provided to you by defendant Kadamovas?

A.   When I came back home, I called Kadamovas in London.  At that time he and Mikhel were in London.

Q.   And what happened when you called Mr. Kadamovas?

A.   I told him that I drove to that address and I didn't find the office.  I told them that there was some storage there.

Q.   And when you told Mr. Kadamovas this, what did he tell you to do?

A.   Kadamovas said okay, there was possibly an error, something happened with the address, we messed it up.  And he told me to call their real estate agent named Jeff.

Q.   And did you know this person named Jeff who

Mr. Kadamovas told you to call?

A.   Yes, I knew him.

Q.   And had you met him before?

A.   Twice -- I met him twice at the -- Kadamovas' parties. He introduced me.

MR. DUGDALE:  At this point in time I'd like to ask Special Agent Perez to please hand you what's been marked for identification as Government's Exhibit No. 76.

Q.   And Mr. Altmanis, do you recognize the person in that photograph?

A.   Yes, I recognize.

Q.   And who is he?

A.   This is Jeff.  I don't know his last name.

Q.   Is that the person who defendant Kadamovas told you to call to get Ms. Pekler's address?

A.   Yes.

MR. DUGDALE:  Your Honor, at this time the government would move to admit and publish Government's Exhibit No. 76.

THE COURT:  Exhibit 76 admitted this date and may be published.

BY MR. DUGDALE:

Q.   After defendant Kadamovas told you to contact this man, did you contact him?

A.   Yes, I called him on the phone right away.  The only

thing, I don't know whether it was his cell phone or his home phone or maybe his office phone.

Q.   And what -- what happened when you called this man?

A.   Yes.  I told him that Kadamovas had told me to find this number, this address, but I couldn't find it.  And Kadamovas told me to call him, Jeff, and find out whether that was correct address or maybe it was mistake.

And I read Jeff the whole address with the number and street and everything.

Jeff said, "yes, that's correct address. Everything's correct."

Q.   And what did you do with the address that you were provided by this man?

A.   I called Kadamovas in London again.  Told me that Jeff had given me the same address, the same number.

And Kadamovas said, "okay, forget it.  When we come back we'll figure it out ourselves."

Q.   Now, do you know if the defendants were able to figure out where Ms. Pekler's office was?

A.   Yes.  They found her.  But in a different place, at a different address.

Q.   And how do you know that the defendants were able to locate where Ms. Pekler's office was?

A.   During one of our meetings between myself, Krylov, Kadamovas and Mikhel, they -- they said that they found it.

And Kadamovas said that this all fucks, move to -- into another place.

Q.   Now, eventually did someone in the group formulate a plan to kidnap Ms. Pekler for the purpose of luring Mr. Safiev to your group?

A.   Yes.

Q.   And how were you informed about this plan?

A.   I was informed the same day that the kidnapping had happened.  We were in -- in the house.  Myself, Krylov, Kadamovas, and Mikhel.

Q.   And what house were you at?

A.   In the Kadamovas' house.  The one that he purchased recently.

          MR. DUGDALE:  I would now like to have Ms. De Witt publish what has previously been admitted as Government's Exhibit No. 250.

Q.   Do you recognize what this is a photograph of, Mr. Altmanis?

A.   Yes.  This is a photograph of the Kadamovas' house made from the street.

Q.   And you testified that you met at this house on the date that Ms. Pekler was ultimately kidnapped and there was a discussion about the plan to kidnap her.

          First of all, who was present at the house when this was discussed?

A.   When I arrived to Kadamovas' house in the morning, they were Kadamovas, Mikhel, and Krylov in the house.

Q.   And who told you what the plan was as it related to abducting Ms. Pekler?

A.   Kadamovas and Mikhel informed myself and Krylov about the plan that they formulated earlier and explained to us what was going to happen.  Krylov mainly was already in the midst of that because he came earlier and he already knew some of the plan.  And so when I came, they explained to me the rest of it and told me what was supposed to happen.

Q.   Okay.  And were you aware of efforts to contact Ms. Pekler before this meeting that day?

A.   Yes, I knew.

Q.   And what had happened prior to this day of the abduction as it related to setting this trap for Ms. Pekler?

A.   The first thing that I found out from Kadamovas -- Mikhel that Kadamovas had already been in Ms. Pekler's office but he didn't find her there.

Q.   Okay.  And did you find out what -- why did Mr. Kadamovas go to Ms. Pekler's office?

A.   According to the plan, the plan formulated by Kadamovas and Mikhel, Kadamovas was supposed to portray a rich Russian who came to this country and wanted to buy real estate.  It was supposed to look like somebody in Russia told him that that person was a former client of Ms. Pekler and advised him

to get in touch with her.

Q.   And did you learn what happened when Mr. Kadamovas went to Ms. Pekler's office under this guise that he was a rich Russian interested in real estate?

A.   Yes.  I was told that Kadamovas had been there but he didn't find Pekler, she had been busy and he talked to her secretary.

But they didn't give me the small details of what the conversation was about.  They didn't explain that to me.

Q.   Now, moving to the day of the abduction itself while you, defendant Mikhel and defendant Kadamovas and Mr. Krylov were at this house, what -- was there something that happened that accelerated the plan to abduct Ms. Pekler to make it happen that day?

A.   Yes.

Q.   And what happened?

A.   Yes.  The information came from the Safiev's house that he had to leave Los Angeles and go back in Russia in a hurry.

Q.   And why did that accelerate the plan to abduct Ms. Pekler?

A.   Kadamovas and Mikhel didn't want to let him go to Russia because nobody was sure that he would come back.  And there was only two days before his flight.

Q.   Okay.  So the four of you were at this house, Mr. Kadamovas' house.  Was it decided at that point how

Ms. Pekler could be lured to a place where she could be abducted?

A.   Yes.   The plan was formulated that I already said. Kadamovas was supposed to portray a rich Russian who wanted to purchase real estate in Los Angeles and he would do everything he could to try to get to meet her and lure her into a meeting where she could be abducted.

And mainly he wanted to show that house where we were to Ms. Pekler and pretend that he wants to know her opinion whether it's worth buying or not.

THE COURT:  All right.  Let's take our afternoon recess.  Approximately ten minutes.  Remember the admonition.

(A break was taken at 2:50 p.m. with proceedings resuming at 3:05 p.m.)

THE COURT:  Let's go on the record outside the presence of the jury.

All defendants and counsel are present.

Anything the government wish to bring up?

MR. DUGDALE:  No, Your Honor.  Thank you.

THE COURT:  Anything the defendant wishes to bring up?

MR. CALLAHAN:  No, Your Honor.

MR. LASTING:  Only a question that I have the monitor --

THE COURT:  I'm working on it, Mr. Lasting.  I have

at least six calls in.  They said someone is on the way.
David.

All right.  Let's bring the jury out.

(At 3:06 p.m. the jurors entered the courtroom.)

THE COURT:  All right.  The record will indicate
all jurors are present, all defendants are present, all
counsel are present.

You're still under oath.

Please state your name for the record.

THE WITNESS:  Ainar Altmanis.

BY MR. DUGDALE:

Q.    When we broke, Mr. Altmanis, you were explaining that
the plan involved luring Ms. Pekler to a house.  What house
did the defendants try to lure Ms. Pekler to?

A.    According to the plan, she was to be lured in the house
of Kadamovas that belonged to him.  But he acted as if he
were going to buy this house.

Q.    And the house that you're describing the one that
Mr. Kadamovas was going to act like he was going to buy but
in fact was his house, is that the house that's on the screen
right there and that's in the picture marked as Government's
Exhibit No. 250?

MR. RUBIN:  I'm going to object as leading --

THE COURT:  Overruled.

THE WITNESS:  Yes.  It's the same house belonging

to Kadamovas.

BY MR. DUGDALE:

Q.    And according to the plan that was discussed amongst you and the defendants that day, how was Ms. Pekler going to be lured to this house?

A.    The plan was worked out in such a way that as if Kadamovas were in North Hollywood in the place that he was going to indicate for her saying that because he came to the United States and he doesn't have the driver's license and he doesn't have a car and he has no one to accompany him he was -- he was going to wait her in such a place where she should come.

And Pekler was supposed to pick up Kadamovas in the place that Kadamovas told her he was waiting for her.  And Kadamovas will take her to this house and he would show her that house which he liked very much and which he was going to buy.

Q.    And did defendant Kadamovas call Ms. Pekler -- contact Ms. Pekler to arrange for her to pick him up in the location you described in your testimony?

A.    Yes.  Kadamovas placed a call to her phone personally and explained the situation.

Q.    And did Ms. Pekler ultimately pick up Mr. Kadamovas and come to this house?

A.    Yes.  Yes.  She came to pick him up.  And from

Kadamovas' words, from what he said later on, she tried to persuade him not to conclude any deal regarding this house so that he wouldn't be buying this house without her.  Because Pekler had her own plans to offer Kadamovas other real estate locations.

But Kadamovas insisted that he wanted to buy this very house because he liked it very much and that he wanted to buy it urgently.  That's why Pekler decided to come to this house so quickly.

Q.   Okay.  And did you see Mr. Kadamovas before he went off to go to the location where Ms. Pekler was to pick him up?

A.   Yes.  I saw him leave.

Q.   And how was Mr. Kadamovas dressed that day?

A.   He was dressed in such -- in the way so that he would look very representative.  Like a businessman.  Like a businessman who had a lot of money.

Q.   And did Mr. Kadamovas normally dress that way?

A.   No.

Q.   And why was he dressed that way?

A.   In order -- in order to mislead Pekler so that she would think that he was a nice and cultured rich man.

Q.   Now, when Mr. Kadamovas went off to this location where Ms. Pekler was going to pick him up, who was left behind at this house?

A.   I, Petre Krylov, and Mikhel remained in the house.

Q.   And what was the reason why you stayed behind at the house?

A.   So that when -- when she picked up Kadamovas and they came here we would be waiting for them in this trap.

Q.   And what would happen, what was the plan, what were you going to do with Ms. Pekler after she was abducted?

A.   So that Pekler would call George Safiev to meet with us.

Q.   Now, did Ms. Pekler ultimately arrive at this house? Mr. Kadamovas' house?

A.   Yes.  She came together with Kadamovas in her car.

Q.   And what car was Ms. Pekler driving when she came to this house?

A.   Ms. Pekler came in the silver SUV Mercedes.

Q.   And how did the people inside the house know when Ms. Pekler was about ready to arrive at the house?

A.   It was agreed between -- it had been agreed between Kadamovas and Mikhel before that Kadamovas would call Mikhel pretending that Mikhel was the owner of the house and he would ask him, "well, can we come and see the house?"

And it would be clear that Kadamovas was arriving, but not by himself, but together with Pekler.

And second, from one of the windows of this house, the parking of this house could be seen and it would have been seen when they arrived.  When Pekler and Kadamovas arrived.

MR. DUGDALE:  At this point in time I'm going asking Ms. De Witt to please publish what has previously been entered into evidence as Government's Exhibit No. 251.

Q.   Mr. Altmanis, do you recognize what Government's Exhibit No. 251 is?

A.   Yes.  This is Kadamovas' house floor plan.

Q.   And by touching the screen can you indicate for the jury where you were positioned when Ms. Pekler and defendant Kadamovas arrived at the house that day.

A.   I, Krylov, and Mikhel, we were not far from the entrance door.

Q.   Okay.  So all three of you were in the area that you signified with the yellow dots there.

Is that correct?

A.   Yes.

THE COURT:  Let me change the color.

(Pause in the proceedings.)

THE COURT:  Well, we have to get him back again.

MR. DUGDALE:  Your Honor, that's fine.  I'm not going to have him touch anything in the near future.

THE COURT:  We can always use the laser pointer.

MR. DUGDALE:  That's fine, Your Honor.

Q.   Okay.  Mr. Altmanis, can you explain to the jury what happened when Ms. Pekler entered this house.

A.   She was arrested.  She was grabbed.

Q.   And who grabbed her?

A.   Kadamovas brought her and he opened the door to her, letting her in first.  And we were meeting her.  Mikhel was meeting her, I was meeting her, and Krylov was meeting her.

Q.   And what was Ms. Pekler's reaction when she walked into the house and saw the three of you standing there?  Yourself, Mr. Krylov, and defendant Mikhel.

A.   It was a surprise for her.  It was unexpected for her that when she entered the door and she was facing three bulky guys.

Q.   And did any of you have any weapons on you?

A.   Yes.  And even more so that Mikhel had an automatic pistol with a silencer in his hands.

         And this is something that surprised her tremendously.

Q.   So Mr. Mikhel had an automatic pistol with a silencer.

         Is that correct?

A.   Yes.  And I had a stun gun in my pocket.

Q.   Going back for a second to discuss the silencer that was attached to the gun that defendant Mikhel had, was that a real silencer?

A.   I'm not a specialist in guns and it's difficult for me to say whether it was a real or not real silencer --

         MR. RUBIN:  Objection, Your Honor.  Foundation --

         THE COURT:  No.  He's explaining it.  I think it

goes to the weight, not admissibility, at this point.

Go ahead.

THE WITNESS:  But Kadamovas and Mikhel told me that they had purchased it through some kind of store and that was not a real silencer.

BY MR. DUGDALE:

Q.   And did either of defendants ever explain -- well, strike that.

Do you know why they would attach a silencer that didn't work to a gun to use in these kidnappings?

MR. RUBIN:  Well, objection.  Speculation.

THE COURT:  Sustained.

BY MR. DUGDALE:

Q.   Was it ever explained to you why they would attach a silencer that didn't work properly to the guns that they used during the course of these kidnappings?

A.   To create a less serious atmosphere.  Because seeing the silencer, the victim would treat the situation differently and would react differently.

Q.   And why would the victim react differently if he or she saw the silencer?

A.   Because the presence of the silencer meant the possibility of a shot without producing any noise.  Because without the silencer the shot would produce such noise that it could attract someone's attention.  And she could also

raise noise.

And because it wasn't a -- a real silencer and it couldn't have been used for shooting, for that purpose I had a stun gun in case we would need to silence her or stop her using the stun gun if she raises noise.

Q.   And where did you get the stun gun from that you had?

A.   Mikhel brought it with him.

MR. DUGDALE:  And at this point I'm -- I'd like Ms. De Witt to publish what has been previously identified and admitted as Government's Exhibit No. 120a.

Q.   And Mr. Altmanis, do you recognize that item in that picture?

A.   Yes, I do.

Q.   And what is it?

A.   This is the electron gun.

Q.   And who did you get this from?

A.   From the bag that Mikhel had brought with him.  There was also another electro gun.

Q.   And why did you have this stun gun with you?

A.   In case Pekler could raise alarm and could start making noise and yelling and shouting.  Because they were unable to use real guns, I would have to use the stun gun.

MR. DUGDALE:  I'd ask Ms. De Witt at this time to re-publish Government's Exhibit No. 251.

Q.   Mr. Altmanis, where was Ms. Pekler taken after she

confronted you, the defendants, and Mr. Krylov near the front door area of defendant Kadamovas' house?

THE INTERPRETER:  Excuse me, Your Honor.  I hear an interpreter who is interpreting for Mr. Kadamovas through this microphone.  So it's interfering with --

THE COURT:  You'll have to move that microphone.

THE INTERPRETER:  Sorry.  Thank you.

THE COURT:  All right.  Let's try again.

BY MR. DUGDALE:

Q.   Mr. Altmanis, what happened to Ms. Pekler after she entered this house and was confronted by yourself, the defendants, and Mr. Krylov?

A.   She found herself in an absolutely strange situation and she was shocked.  And that's why she --

MR. RUBIN:  Objection, Your Honor.  It's nonresponsive.

THE COURT:  Sustained.  Motion to strike will be granted.

Re-ask the question.

BY MR. DUGDALE:

Q.   Mr. Altmanis, where did they put Ms. Pekler after she walked in the house?

A.   After she walked into the house and she faced the unexplained situation, Mikhel explained to her that she will be explained everything --

MR. RUBIN:  Objection, Your Honor.  It's nonresponsive.

THE COURT:  Sustained.

Mr. Altmanis, listen very carefully to the question that's asked and specifically answer that question.

The question that was asked of you is where was Ms. Pekler taken next after she was confronted at or near the front door to Mr. Kadamovas' house?

THE WITNESS:  We took her to the room D in the small bedroom.

MR. RUBIN:  Your Honor, the previous nonresponsive answer, can that be stricken as well?

THE COURT:  It was stricken.

MR. RUBIN:  Thank you, Your Honor.

BY MR. DUGDALE:

Q.   And is that room D you're referring to that, is that bedroom D on the diagram that's been admitted as Government's Exhibit No. 251 that the judge highlighted with the laser pointer?

A.   Yes.

Q.   And what happened to Ms. Pekler after she was led into room D?

A.   She was placed in a chair.  They offered her tea, coffee, and cigarettes.  She took cigarettes and coffee.

Q.   And did someone then start to speak with Ms. Pekler

after she was offered the cigarettes and the coffee?

A.    After a certain period of time she started asking question.  She asked what had happened, whether it was some kind of mistake.

And Mikhel explained to her.

Q.    And what did defendant Mikhel say to her when she asked what happened, if this was some sort of mistake?

A.    He said -- he told her that they personally didn't have anything against her but she made a mistake having a person named Safiev in the list of her clients and Safiev was a person who stole a large sum of money from Russia.

Q.    Did they tell her what -- I'm sorry.

Did defendant Mikhel tell her what they wanted her to do as it related to Mr. Safiev?

A.    Yes.  Mikhel explained to her that they personally didn't have anything against her but she would have to do everything in her power to get in touch with Safiev and invite him for a meeting with them.

Q.    And did they explain to her how this could take place?  How they wanted her to invite Mr. Safiev to a meeting?

A.    They told her several different possibilities what she could said -- could have said to Safiev in order to bring him for a meeting.

Q.    And did they explain to Ms. Pekler -- I'm sorry.

Did defendant Mikhel explain to Ms. Pekler what

would happen to her if she was successful in bringing Mr. Safiev to a meeting?

A.   Yes.  Mikhel told her that she shouldn't worry and her only -- her only responsibility is to bring Mikhel -- bring Safiev to a meeting and after that she would be freed.

Q.   And did they explain -- you've talked about the fact that there were several different plans as far as getting Mr. Safiev to come or things she could say to Mr. Safiev to get him to come to such a meeting.  What plan did the defendants propose that she tell Mr. Safiev to get him to come to a meeting?

MR. RUBIN:  Your Honor, I'm going to object again --

THE COURT:  Sustain the objection.

BY MR. DUGDALE:

Q.   Did the --

THE COURT:  Did one or more of the defendants --

MR. DUGDALE:  Yes --

THE COURT:  Ask which one, then you can get the content.

MR. DUGDALE:  Yes, Your Honor.

Q.   Now, this entire time is anyone talking to Ms. Pekler apart from defendant Mikhel?

A.   Yes.  Kadamovas talked to her.

Q.   Okay.  And who discussed with Ms. Pekler what she could

say to Mr. Safiev in order to get him to come to a location?

A.   At that moment where the thing was discussed, there were myself, Krylov, Kadamovas, and Mikhel there.  And we all discussed it, bringing up different possibilities of what she could say to bring Georgy Safiev to a meeting.

Q.   And what -- what was the proposal that was made to Ms. Pekler as far as how to get Mr. Safiev to a meeting?

A.   Since she worked with his finances and his real estate, that the question of finance or real estate were the surest way to bring him to a meeting.

THE INTERPRETER:  Excuse me, Your Honor.  Can I try to figure out something?

THE COURT:  You may.

THE WITNESS:  The question was discussed that she would try to call Safiev and tell him that she had real estate that he might be interested in and suggested that he would come and look at that real estate.

BY MR. DUGDALE:

Q.   And what was the piece of real estate that Ms. Pekler was going to propose to Mr. Safiev that he come and look at?

A.   The same house where we all inside.  Kadamovas, Krylov, myself, and Pekler.  And Mikhel.

Q.   And under that plan what would happen to Mr. Safiev if he came to that house?

A.   If he came to that house, he would get himself into a

trap and we would have grabbed him.

Q.   And what was Ms. Pekler's response when she heard about this particular plan to lure Mr. Safiev to this house?

A.   Pekler was against that plan because she said at this moment Safiev wasn't interested in purchasing any real estate.

Q.   And did Ms. Pekler propose a different plan?

A.   Yes.  But then Mikhel and Kadamovas asked her to suggest something that could be used as a bait to lure Safiev into a meeting.

Q.   And after the defendants Mr. Mikhel and Mr. Kadamovas suggested what she could tell Mr. Safiev to lure him to this location, what did Mr. -- what did Ms. Pekler tell your group?

A.   She said that since she was working with his financial affairs, at least some of them -- I'm sorry I don't know exactly what she was involved in -- she said that that was the best bait for Safiev.  She could have said to him that a tax agency was interested in his affairs and would invite him to come and discuss the situation.

Q.   And under this plan where would she invite Mr. Safiev to come to discuss this tax situation?

A.   This problem was resolved this way.  She would tell him that she was on her personal business as a real estate agent at some location and she was looking at -- she was looking at

the real estate for sale for another client of hers, she would give him an address and he would come to that address and get himself into a trap.

Q.    And where was the address that she was going to lead him to?

A.    The Kadamovas' house.

Q.    And is that the house where you and the defendants and Mr. Krylov were stationed at that time?

A.    Yes.  I was there myself, Kadamovas, Mikhel, and Pekler herself.

Q.    Now, you testified earlier that defendant Mikhel told Ms. Pekler that she would be freed if she agreed to go along with this plan to lure Mr. Safiev to the house.  How did Mr. Mikhel explain to Ms. Pekler how she would be released if she helped lure Mr. Safiev to the house?

A.    She was explained that after she helped to lure Safiev into a trap she would be freed.

And in the conversation she asked, "what's going to happen to me?"

And Mikhel explained her there was nothing personal against her and she would be released.

And she asked, "how?"

Mikhel explained to her that she was -- she would be given Vodka to get her drunk and then she would be taken to a hotel and left there.  And we told her, like it was

developed during our planning, that we were Russians and we came from Russia for Safiev.

Q.   And did -- what did Ms. Pekler say in response to the defendant's propose -- defendant Mikhel's proposal that she would be -- that they would get her drunk and leave her at a motel if she agreed to this plan to lure in Safiev?

A.   She became worried because she said she didn't use alcohol.

Q.   And when she told your group that she did not use alcohol, did any of the defendants come up with another way to free her?

A.   Yes.  That she would be injected Dimedrol and she would be sleeping.

Q.   And who told her this?  That they would use Dimedrol as a substitute to alcohol to put her to sleep?

A.   It's difficult to say who in particular.

Q.   Who was present when this conversation occurred?

A.   Mikhel, Kadamovas, Krylov, and myself.

     And there was different suggestions.  Everybody would put different words into the conversation.  And I didn't recall -- I didn't remember the exact moment.

Q.   And when this proposal was made to Ms. Pekler about injecting her with Dimedrol so she could fall asleep, what did Ms. Pekler say in response to that plan?

A.   She became worried again and she said it wasn't possible

because she was pregnant at that time.

Q.   Now, did Ms. Pekler eventually try to contact Mr. Safiev and lure him to this house?

A.   Yes.  Ms. Pekler called Safiev.

Q.   And before that happened did she place any other calls?

A.   Yes.  Mikhel and Kadamovas asked her where she would be calling normally to make sure that nobody will be looking for her.  To her office, to her home, or somewhere else.

Q.   And as a result of the defendants Mikhel and Kadamovas asking her who she needed to call, did she make calls?

A.   Yes.  I was present when she made a call to her office.

Q.   And before Ms. Pekler made this call to her office, was she told what to say?

THE INTERPRETER:  The interpreter didn't understand that.

Your Honor, can I --

THE COURT:  Go ahead.

THE WITNESS:  Mikhel and Kadamovas found out from her that she had to return the car, the same car she drove to that location.

BY MR. DUGDALE:

Q.   And as a result of finding out this information, did the defendants have her call her office?

A.   Yes.  They made her to call the office and to talk to the person who was supposed to pick up the car.

Q.   And before she called her office and talked to the person who was supposed to pick up the car, did either of the defendants tell her what to say to this person?

A.   Kadamovas and Mikhel told her what she should say to make sure that there are no suspicions and the car would be successfully picked up.

Q.   And when she placed this call to her office, was she allowed to do so alone, or did the defendants monitor what she said?

A.   No, she wasn't allowed to talk alone.  Kadamovas, Mikhel, and myself were next to her.  And Pekler was explained what she was supposed to say.

Q.   And what happened during this phone call to her office that you witnessed?

A.   She said that she allegedly met a client and then the client picked her up and took her to another location and she left her car at the address.  And she gave an address.

Q.   And after Ms. Pekler called her office and left an address where her car was, what were you instructed to do?

A.   Mikhel ordered me and Krylov to move the car to the location that is pointing to the address given to that person and leave the car there.

Q.   And where was this car at this point in time when this call was made to Ms. Pekler's office?

A.   All the time since -- since she and Kadamovas came to

the house, the car was sitting in the parking place next to the house.

Q.   And after defendant Mikhel instructed you and defendant -- I'm sorry -- and Mr. Krylov to move the car, what did you and Mr. Krylov do?

A.   We moved the car.  But before that Mikhel told Krylov to search the car and make -- and find either any personal things or any information that could have been gotten from that car.  Most of all, they worried about Krylov carefully wiping the side of the car where Kadamovas was sitting.

Q.   Wiping it for what?

A.   To make sure that there are no fingerprints left after Kadamovas was sitting on the passenger side.  Because he could have touched the dashboard, the seat, or other parts of the car.

Q.   And who ended up moving the car that Ms. Pekler drove to this location in that day?

A.   Krylov got behind the wheel of Pekler's car and I was following him in my car to pick him up and bring him back to Kadamovas' house.

Q.   And where did Mr. Krylov end up parking the car that day?

A.   Mikhel gave an address where they decided to park the car.

Q.   And did Mr. Krylov park the car at the address that

Mr. Mikhel provided to him?

A.    Yes.  We came to Ventura.  And Krylov found a large two-story building with a real estate office.  And we parked the car on the parking lot behind that office.  He put the car keys under the mat, closed the door, got into my car, and we left.

Q.    And what happened after Mr. Krylov got into your car?

I'll repeat the question.

What happened after Mr. Krylov got in your car after he dropped off Ms. Pekler -- or the car driven by Ms. Pekler at the location specified by the defendant Mr. Mikhel?

A.    We came back to Kadamovas' home where there was Kadamovas, Mikhel, and Pekler.

Q.    And what happened when you got back to Mr. Kadamovas' home with Mr. Krylov?

A.    Krylov found out that he left his cell phone in Pekler's car.

Q.    And did the defendants learn about this problem?

A.    Yes.  They did.  And this made Mikhel angry.  And he said that we -- that -- and Mikhel told Krylov to go back quickly and take back the telephone.

Q.    And did Mr. Krylov in fact go back to Ms. Pekler -- or the car driven by Ms. Pekler to retrieve the telephone?  Cell phone?

A.   Yes.  At first Krylov asked me to take him back.  And I told him, "you were the one who forgot it and you will be the one who would go there."

I don't know what car he drove.  But he did go back to pick up the phone.

Q.   And did Mr. Krylov return back to the house later that day?

A.   Yes.  About 15 minutes later he was back with the phone.

Q.   Now, in addition to the phone call that you heard Ms. Pekler make to her office about the car, did you witness Ms. Pekler make any other phone calls that day?

A.   Yes.  She called Safiev.

Q.   And prior to when Ms. Pekler called Mr. Safiev, were there discussions concerning what she was supposed to tell him?

A.   That question had been discussed before.  And she knew what she should talk about.

Q.   Okay.  And is this the plan that you discussed earlier in your testimony about trouble with the tax authorities that he needed to meet with her and talk about?

A.   That -- yes.  That was the only version in the result of which Safiev could come to her.

Q.   And was Ms. Pekler able to get ahold of Mr. Safiev that day?

A.   Yes.  She did get in touch with him over the phone.

Q.   And what happened when she got in touch with him over the phone?

A.   She probably got him in the wrong -- not in the very best moment because Safiev was very busy.  And Pekler explained to Safiev that she wanted to meet with him to discuss the financial business urgently.

Safiev asked her what kind of problem so that she needed to see him so urgently.

And Pekler explained Safiev that she received some kind of subpoenas and that she was having problems with the taxes.

Q.   And what was the result of this phone call to Mr. Safiev?

A.   The result was a zero because Safiev told her that although he understood all the importance of the situation, nevertheless he was too busy.  And he asked her to call him back an hour later.

Q.   And did Ms. Pekler in fact call him back?

A.   Yes, she did.  She called him back.  Not exactly in one hour, but a little bit more time had passed.

Q.   And what happened when Ms. Pekler attempted to reach Mr. Safiev on this occasion?

A.   She called the same number.  And I don't know whether it was the home number, the business number, or the cell number. But she called the same number but it was not Safiev who

answered the telephone but another man.

Q.   And what happened as a result of this call?

A.   The man said that unfortunately Safiev was not available because at that moment Safiev was either in the airport or had already left Los Angeles on his way to Moscow.

Q.   And did Ms. Pekler inform the defendants and yourself, Mr. Krylov, what happened as a result of this call?

A.   Yes.  Everybody was stunned that Safiev was not there anymore because he was supposed to leave the following day. And he left a day before.

Q.   Now, after Ms. Pekler made this telephone call to try and reach Mr. Safiev and lure him to the location where you were and realized that he was either at the airport or on his way out of the country, did Ms. Pekler ask the defendants any questions?

THE INTERPRETER:  Could you repeat the last part of your sentence.

MR. DUGDALE:  Sure.

Q.   Did Ms. Pekler ask the defendants anything when she realized that Mr. Safiev was either at the airport or on his way out of the country?

A.   Yes.  When Ms. Pekler and everyone else heard that Safiev had already left, she changed -- her face changed and she drooped and she said, "what should we do now?  What can I do now?  What will happen to me?"

Q.   And did someone respond to Ms. Pekler when she said, "what's going to happen to me?"

A.   Yes.  Mikhel told her don't worry, you have done what you were supposed to do and we do not have any more issues with you and we will do as we had planned -- as we had planned before.  We'll just take you -- we will take you where we promised to take you according to the plan.  To the motel.

And in order to calm her down and to stop her worries, they began asking her different questions about her clients.  And she made -- picked up the conversation and she either said that she had more than 30 clients from Russia.

And Mikhel asked her how it happened that she was -- she was not careful to the extent that she allowed Safiev to become her client and Safiev, who stole so much money in Russia and he came to Los Angeles to use the money in Los Angeles.

And Pekler said that her clients do not have on their foreheads written what they are and who they are.

Q.   Now, Mr. Altmanis, when defendant Mikhel told Ms. Pekler that they were going to let her go even though she didn't get in contact with Mr. Safiev and lure him to that location, did you believe that that was going to happen to Ms. Pekler that day?  That she was going to be let go?

A.   No.

Q.   And why not?

A.   After what happened to American Muscatel, I realized that she had the same fate in store for her and they will kill her.  Because they were not going to leave any witnesses alive.

Q.   Now, after the defendant told Ms. Pekler that they were going to let her go --

THE COURT:  Which defendant?

MR. DUGDALE:  I'm sorry.

Q.   After defendant Mikhel told Ms. Pekler that they were going to let her go, did you have a discussion with either of the defendants concerning what was specifically going to be done with her?

A.   Yes.  When Krylov took my place, I heard the conversation between Kadamovas and Mikhel.  And Kadamovas told Mikhel that it didn't --

THE INTERPRETER:  Interpreter just misstated.

THE WITNESS:  Mikhel told Kadamovas that it didn't make sense to keep her there any longer until the return of Safiev and that no one was going to guard her there.

BY MR. DUGDALE:

Q.   And where -- where were the defendants Mr. Mikhel and Mr. Kadamovas when they were having this discussion?

A.   In the kitchen in Kadamovas' house.

Q.   And where were you when you heard this discussion?

A.   Krylov had just taken my place and I walked into the kitchen.

Q.   You said that Mr. Krylov took your place.  What did he take your place doing?

A.   To guard and to be next to Pekler.

Q.   And what did you understand the defendants' intention to be when you heard this discussion about how Ms. Pekler wasn't needed anymore at that place?

MR. RUBIN:  Objection.  Speculation.

THE COURT:  No.  Overruled.

THE WITNESS:  That she would be killed.

THE COURT:  All right.  Let's break for the evening, returning again tomorrow at 9:15 in the jury room, 9:30 in the courtroom.  Remember the admonition.

(Proceedings recessed at 4:16 p.m.)