# GOVERNMENT EXHIBIT 6

66

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

---

THE HONORABLE DICKRAN TEVRIZIAN, JUDGE PRESIDING

United States of America,          )

                    Plaintiff,     )

                                   )

vs.                                )   Case No.

                                   )   CR 02-220(B)-DT

Iouri Mikhel and Jurlius           )

Kadamovas,                         )

                    Defendants.    )

_____    )


REPORTER'S TRANSCRIPT OF TRIAL PROCEEDINGS

Day 24

(Afternoon Session)

Los Angeles, California

Thursday, October 12, 2006

Pamela A. Seijas, CSR, FCRR
Official Reporter
Roybal Federal Building
255 East Temple Street
Room 181-I
Los Angeles, California  90012
(213) 687-0446

68

APPEARANCES CONTINUED:

FOR DEFENDANT              RICHARD P. LASTING

JURLIUS KADAMOVAS:         1717 FOURTH STREET

                          THIRD FLOOR

                          SANTA MONICA, CA   90401

                               - AND -

                          SONIA E. CHAHIN

                          2222 FOOTHILL BOULEVARD

                          SUITE e-278

                          LA CANADA, CA   91011


THE RUSSIAN

INTERPRETERS:             ALEX J. LEVOFF

                          LUDMILLA GENN

                          ZOYA SPIVAKOVSKY

                          VARVARA OLSON

69

Los Angeles, California, Thursday, October 12, 2006

1:44 p.m.

-oOo-

(Jury Out)

THE CLERK:  Please remain seated and come to order.

THE COURT:  Outside the presence of the jury, I would like to indicate all parties and counsel are present.

Anything the Government wishes to bring up?

MR. DUGDALE:  No, Your Honor.  Thank you.

THE COURT:  Anything the defendant wishes to bring up?

MR. CALLAHAN:  No, Your Honor.

THE COURT:  All right.  Let's bring the jury in.

(Jury In)

THE COURT:  Let the record indicate all jurors are present, all counsel and parties are present.

Mr. Altmanis, you are still under oath.  Please state your name for the record.

THE WITNESS:  Ainar Altmanis.

DIRECT EXAMINATION RESUMED

BY MR. DUGDALE:

Q.   Mr. Altmanis, before the lunch break you testified that defendant Mikhel instructed you and Mr. Krylov to move Mr. Umansky's car.  Did Mr. Mikhel tell you where to move the car?

A.   To move the car to the parking of LAX airport.

70

Q.    And did defendant Mikhel tell you why he wanted you to move the car to that particular location?

A.    He didn't explain it to me in particular.  He explained it to me and Krylov.  We had to move there so that it wouldn't be found right away.

Q.    And how would moving the car to parking near LAX make sure that it wouldn't be found right away?

A.    Because not far from LAX there is long-term parking.  And when you drive in, you get a receipt.  And you can keep the car there a month or two, and just when you want to take the car, you go and pay for it.

      And no one would be interested why this car is there for such a long -- for such a long time because sometimes the cars stay there for half a year.

Q.    Now, eventually did you and Mr. Krylov move the car to this spot where you were ordered to move it by defendant Mikhel?

A.    Yes.  We did move it to where we told to move it.  But before that, we had to work with the car a little bit.

Q.    Okay.  What do you mean that you had to -- by that you had to work with the car a little bit?

A.    As Krylov explained to me, we had to rid this car, to take out -- a lot of stuff out of it so that it would create an impression that the car had been rid of that -- that the car was stolen.  And I don't know where he got this idea from.

Q.    After Mr. Krylov told you that he wanted to create the

71

impression that the car had been stolen, did he do anything to the car?

A.    Yes.  I saw him do it.  He didn't tell me.  He just did it. I saw him taking the systems out of the car and breaking them. Especially he was looking for the camera that was inside the car that was recording those who were inside the car.

Q.    And why was he looking for such a camera?

A.    Because he knew this car very well, and as he said himself, he had invested a lot of labor into this car.  And from the information that he had -- had before, he knew that Umansky was going to install this kind of camera into the car.

Q.    And do you know, in fact, if there was a camera inside the car that videotaped what was happening inside the car?

A.    No, I don't know.  But as he said, he had found some recording device that was there, and from that -- and that there was no tape, and from that I understood that the camera was not there.

Q.    And did Mr. Krylov take anything out of Mr. Umansky's car before it was moved to LAX long-term parking?

A.    Yes.  He removed amplifiers from the car and the monitors.

Q.    What did these monitors look like that Mr. Krylov removed from the car?

A.    Small screens.

Q.    Where were they located inside the car?

A.    In the headrests.

72

Q.   And how many monitors were there?

A.   Six.

Q.   And what did Mr. Krylov do with these monitors after he removed them from the car?

A.   He put everything into Kadamovas' garage on the table.

Q.   In addition to removing these items from Mr. Umansky's car, did Mr. Krylov do anything else to the car?

A.   Yes.  He broke all the cameras that were inside the car, that were installed in the mirrors.

Q.   What did these cameras look like?

A.   I don't know.  I haven't seen them.  He said that he did it.  But I . . .

Q.   Do you know how he did it?

A.   I did not see him doing it, but I think that he broke them with a hammer.

Q.   Did Mr. Mikhel participate in any way in breaking up items that were located in Mr. Umansky's car?

A.   Yes.  After he had finished and he cleaned the right side of the car to make sure that there were no fingerprints left as Mikhel had instructed him before because -- because Umansky was driving Mikhel to Kadamovas' house.  And of course Mikhel must have left his fingerprints on the doors or on the seats.  That's why Krylov cleaned everything very carefully.  And at that moment, Mikhel got out of Kadamovas' house.

Q.   And what happened -- can you describe for the jury what

73

happened after defendant Mikhel walked out of defendant Kadamovas' house?

A.   Mikhel asked Krylov whether everything had been done, and he said, "Yeah.  It's time to move the car."  And just out of interest, he asked Krylov, "Where is this camera that takes everything that happens behind the car?"  And Krylov showed him.

And he took a hammer, and he broke this camera just for fun.

Q.   Who took the hammer and broke the camera?

A.   Mikhel did.  And after that, he asked whether Krylov --

MR. RUBIN:  Objection, Your Honor.  There is no question pending.

THE COURT:  I will sustain the objection.  You will have to ask another question.

MR. DUGDALE:  No problem, Your Honor.

Q.   After defendant Mikhel smashed the camera in Mr. Umansky's car with a hammer, did he ask Mr. Krylov to do something?

THE INTERPRETER:  What was the end of your question?

BY MR. DUGDALE:

Q.   Yes.  Did defendant Mikhel ask defendant Krylov to do something?

A.   He said that it was time to move the car.

Q.   And what did you do after defendant Mikhel told Mr. Krylov that it was time to move the car?

A.   Because I was there without the car and Krylov was there

74

with his car, I had to drive Umansky's car to the airport, and Krylov was following me so that he would bring me back from the airport.

Q.   Okay.  Who drove Mr. Umansky's car to the airport?

A.   I was driving Umansky's car, and Krylov was following me in his car.

Q.   Before you left defendant Kadamovas' house that day, did something occur in connection with Mr. Umansky's car that angered Mr. Mikhel?

A.   Yes.  When I got -- yes.  There was a small incident.

When I got into the car, I couldn't put the key into the ignition in order to start the car, and also I was unable to find the button for the -- for the lights because everything had been changed, and it was different from the standard cars that were produced -- manufactured in the factories.

And I wanted to get out of the car.  Somehow the door was blocked.  I don't know how.  And I began talking loudly and accidentally I pushed the alarm, the sound alarm.  And it -- and at that moment, Mikhel got angry, and he said, "What are you doing?  You will wake up all the neighbors," because it was very quiet all over.

Q.   How did you get the alarm to stop after you accidentally triggered it with the car?

A.   Krylov opened the door, and he showed me which button was where.  I -- I started the car, and this is how we left for the

75

airport, myself and Krylov.

Q.   And you have testified that you drove Alexander Umansky's car towards the airport.  What car did Mr. Krylov drive?

A.   He was driving his car, Infiniti.

Q.   Why was Mr. Krylov accompanying you to the airport?

A.   To bring me back to Kadamovas' house.

Q.   And where did you go with Mr. Umansky's car that evening?

A.   We went to 101 freeway and then moved to 405 freeway, and we went to LAX to the parking lot.

Q.   And was this parking lot located exactly where the airport was located, or was it located somewhere near the airport?

A.   It was before the airport.

Q.   And what did you do when you arrived at this parking lot near LAX?

A.   I drove inside.  I parked the car at the available space. I left it there.  I went back to Krylov's car, and we drove back on the 405 freeway.

Q.   Where did Mr. Krylov drive you after you left the area where you left Mr. Umansky's car?

THE INTERPRETER:  Can you repeat the question.

MR. DUGDALE:  I will.

Q.   Where did Mr. Krylov take you then?

A.   We were supposed to go back to Kadamovas' house, but Krylov passed the exit to 101, and as he explained, he drove on to do his own errands.

76

Q.   Where did he stop before -- or did he stop somewhere before he went to defendant Kadamovas' house?

A.   Yes.  He exited at one of the exits on 405, and then he went to the gas station, and he had a meeting.  He met one of his -- some people.

Q.   Did Mr. Krylov explain who these people were who he met with?

A.   He didn't go into the details, but he said that these were important people, that they were working in the Bank of America, and that they were very helpful for the business.

Q.   And did Mr. Krylov take you -- where did he take you after he met with these people who he described as people from Bank of America?

A.   We came back to Kadamovas' house.

Q.   Who was at defendant Kadamovas' house when you returned there that evening?

A.   When we got into the house, there was Kadamovas himself, Mikhel, and Umansky in the room.

Q.   Was Mr. Umansky still in the same room where you had moved him when he was initially abducted that night?

A.   Yes.  He was still in the same room, but his legs were untied and only one arm was in handcuff, cuffed to a chair, and he was drinking coffee and smoking cigarettes.

Q.   You mentioned he had been seated in a chair.  Can you describe the chair, what it looked like, that Mr. Umansky was

77

sitting in?

A.   Yes.  It has metal legs and plastic seat and the back support.

Q.   At this time I am going to ask Ms. DeWitt to publish what has previously been entered into evidence as Government's Exhibit No. 252-E.

And, Mr. Altmanis, do you recognize what this is a photograph of?

A.   Those are the chairs that were in the room.

Q.   And do you recognize what this room is?

A.   Yes.  This is a living room.

Q.   A living room of what location?

A.   Kadamovas' house.

Q.   If you will look at this picture here, just to the right of the fireplace there is a black item in the background.  Do you recognize what that is?

A.   Yes.  It's a leather sofa.

Q.   And do you know where that leather sofa -- strike that.

Did I just circle with this -- the yellow circle here, is that the leather sofa that you are talking about?

A.   Yes.  That's the one.  It was in that living room.

Q.   And had you seen this leather sofa at a different location than at defendant Kadamovas' house?

A.   Yes.  It was previously in Mikhel's house.  They brought from Mikhel's house.

78

Q.   And do you know why it was brought from Mikhel's house to this location?

A.   Yes.  It was in that little room, and they were sitting on it when they were talking to Pekler and Umansky, and then later they had a rest on it.  They were sleeping on it.

Q.   Now, you have testified that this is one room in defendant Kadamovas' house.  Did defendant Kadamovas, in fact, live in this house at the time that these abductions were going on?

A.   No.  He didn't live there before.  He lived during the -- those events, and he didn't live after that because he was going to rebuild the house completely.

Q.   Where was defendant Kadamovas living at the time that these abductions were taking place at this location?

A.   He -- he had a private apartment somewhere.  I don't remember the street name.

        THE COURT:  Let me interrupt.  You said he was going to "reveal" --

        THE INTERPRETER:  Rebuild.

        THE COURT:  Rebuild.  Okay.

BY MR. DUGDALE:

Q.   I am sorry.  Just to be clear about this, he was going to rebuild this location here?  Is that what you are referring to?

A.   Yes.  He had plans.  He had an architect working on the project, and he already started purchasing materials for the construction project.

79

Q. Now, at the moment where we left off, you had returned to this house after dropping off Mr. Umansky's car at -- near LAX. What were -- what was defendant Mikhel doing when you came back to the house that evening?

THE INTERPRETER: You said defendant Kadamovas?

MR. DUGDALE: Defendant Mikhel.

THE WITNESS: They were in the house, yes, but I can't say what they were doing. One of them, I think Kadamovas, was in Umansky's room. I didn't walk into the house alone. Krylov was following me. We went in through the garage door and went to the kitchen.

Mikhel was there. I don't know what he was doing there, but he asked whether we dropped off the car, and we said yes.

BY MR. DUGDALE:

Q. Now, do you know if Mr. Umansky was allowed to make any phone calls that evening when he was abducted?

A. Yes. Mikhel and Kadamovas told me that he had made some calls. He called to his relatives, he called to his girlfriend, but they didn't give me the details.

Q. Now, this morning you testified that the defendants had asked various questions of Alexander Umansky, including some questions about his finances. Do you recall that testimony?

A. Yes. Before he sent us to the airport. Yes. I remember.

Q. And one of the items that you testified about was PIN

80

numbers that Mr. Umansky provided to the defendants for his bank
card.  Do you recall that?

A.   I wouldn't say all credit cards.  I -- I have heard about
one particular card.  They showed him this card and asked him
about this card.  And Umansky wrote for them PIN number on a
piece of paper.

Q.   And do you know if defendant Mikhel used any of this
information provided by Umansky concerning his bank account?

A.   Yes.  He used them.

Q.   How do you know that?

A.   Because I took him personally to the -- to the bank machine
to check it out.

Q.   Okay.  Who did you take to the -- to the -- what you
described as the bank machine?

A.   Mikhel.

Q.   And why did you take Mikhel to one of these bank machines?

A.   He asked me -- he said, "I need to go to the bank.  Take
me."

Q.   And can you describe what these -- the bank machines that
you are referring to, what did those machines do?

A.   People used them to withdraw some amount of cash from their
accounts.  They are located next to the -- to every bank branch,
and they are outside on the street.

Q.   Did defendant Mikhel explain to you why he wanted to go to
one of these machines?

81

A.    Because they suspected that Umansky was lying to them regarding that credit card.  They asked him how much money is there, and he said $5,000.  But they didn't believe him and decided to check it out.

Q.    Okay.  So how would going to one of these bank machines that you have described allow the defendants to verify the amount of money that Mr. Umansky had in his bank account?

A.    Mikhel took that particular card and the number that Umansky had written for him on the piece of paper and asked him -- and told me where to take him.  He knew the place.

Q.    And did you, in fact, take defendant Mikhel to a bank that evening?

A.    Yes.  He was showing me the way.  We took 101, and we got off either at Topanga or Canoga.  I don't remember.  I always mix up those two exits.

Q.    Who told you what particular bank to go to?

A.    Mikhel told me, and he showed me where to go and how to get to the bank and where to stop and let him off.

Q.    And what car did you use to drive defendant Mikhel to this bank that he instructed you to go to?

A.    I used my car, the Navigator, because when we returned to Kadamovas' house, Krylov, who went home, picked me up and dropped me off at my house.  So I took the car and returned back to Kadamovas' house.

Q.    What color is your Navigator?  What does it look like?

82

A.   White one.

Q.   At this point in time, I am going to ask Special Agent Perez to please hand you what has been marked for identification as Government's Exhibits No. 86 and 87.

Mr. Altmanis, do you recognize what is pictured in Government's Exhibits No. 86 and 87?

A.   Yes.  This is my car.

Q.   Okay.  And what car is that?

A.   This is a white Navigator.

Q.   Is this the car that you drove defendant Mikhel to the bank in on that evening?

A.   Yes.  He was sitting next to me on the right.

MR. DUGDALE:  Your Honor, at this time the Government would move for admission of Government's Exhibits No. 86 and 87 and request permission to publish them.

THE COURT:  Admitted.

(Government's Exhibits 86 and 87 were received.)

BY MR. DUGDALE:

Q.   Just for the jury's edification, this is Government's Exhibit No. 86 and this is Government's Exhibit No. 87, and just to be clear, Mr. Altmanis, are both of those photographs a photograph of your vehicle, your white Lincoln Navigator?

A.   Yes.

Q.   And can you explain to the jury, Mr. Altmanis, what happened when you arrived at the bank that defendant Mikhel

83

instructed you to go to?

A.   He showed me the place where I was supposed to drop him off and wait for him until he comes back.

Q.   And did you see defendant -- what did the defendant do before he got out of your car, defendant Mikhel?

A.   He put on the jacket -- put on a jacket and put a knitted cap on his head, a black one.

Q.   And where did he go after he got out of your car?

A.   Towards the bank.  I couldn't see him where I was parked -- from where I was parked.

Q.   Did you see where he walked to?

A.   He was -- he was -- he was walking towards the building, but I couldn't see what he was doing there.

Q.   At this point in time I would like you to have -- strike that.

        Did defendant Mikhel return to your car after walking away towards the bank?

A.   Yes.  After some time, about ten minutes or so.  He got into my car, took off the cap, and said, "It's true.  He really doesn't have any money on his account."  He said he withdrew 2, $300 for his expenses, but he didn't say how much money was there.

Q.   At this point, I would like you to please take a look at what has been marked for identification as Government Exhibit No. 187-A, which consists of six photographs.

84

Special Agent Perez --

AGENT PEREZ:  What is the exhibit number?  1287?

THE COURT:  You said 187.

MR. DUGDALE:  1287.  I am sorry.  It's 1287-A, Your Honor.

Q.   That exhibit, just for the record, consists of six photographs.  Mr. Altmanis, do you recognize the person who is pictured in the first five photographs that consist of Government's Exhibit No. 1287-A?

A.   Yes.  This is Mikhel in a jacket and a cap that he put on.

Q.   And is this what defendant Mikhel looked like on the night that you dropped him off at the bank to check on Mr. Umansky's bank account?

A.   Yes.  Yes.  That's him.

Q.   Could you look specifically then at the sixth photograph that is a part of Exhibit 1287-A.  What is in that photograph?

A.   This is my car, the Navigator, but we were driving off.  We just moved off the place, which wasn't visible from the bank.

Q.   Is that a picture of the car that you dropped off Mr. Mikhel at the bank with and then used to pick him up after he went to the ATM machine?

A.   Yes.

MR. DUGDALE:  Your Honor, at this time the government would move to admit Government's Exhibit No. 1287-A?

THE COURT:  All right.  Exhibit 1287-A, the six

85

photographs, admitted this date.

(Government's Exhibit 1287-A was received.)

MR. DUGDALE:  Your Honor, I would ask Special Agent Perez to approach.  The photographs are such that they won't appear on the computer.  I would ask the Court to switch to the ELMO mode for the presentation.  One moment, Your Honor.  I'm sorry.

Q.   All right, Mr. Altmanis, what I have published to the jury here is the second photograph of the six photographs that consist of Government's Exhibit No. 1287-A.

I am sorry.  There is no question, Mr. Altmanis.

Do you recognize the person who is in this photograph?

A.   Yes.  This is Mikhel.

Q.   And you testified that he put on a black cap before he went to the ATM machine here.  Do you know where he got that black cap from?

A.   It was in Kadamovas' house.  I don't know how it got there or who brought it there.

Q.   But it came from defendant Kadamovas' house?

A.   Yes.  It was there.

Q.   And you testified about a jacket that he put on before he walked over to the bank machine.  Had you seen defendant Kadamovas wearing -- I am sorry.  Defendant Mikhel wearing that jacket before?

A.   Many times.

86

Q.   I am now going to show the jury what has previously been admitted as Government's Exhibit No. 92.  Mr. Altmanis, who is the person in this photograph?

A.   Mikhel.

Q.   And do you recognize the jacket that he is wearing in this photograph?

A.   Yes.  I recognize it.

Q.   Is this the same jacket he wore on the night that you dropped him off at the ATM machine to check on Mr. Umansky's bank account?

A.   Yes.  This is the same jacket.  Yes.  It just -- it's visible better on the photograph than on the screen.

Q.   I am now going to publish for the jury what is the sixth photograph from Government's Exhibit No. 1287-A.  And do you recognize that car, Mr. Altmanis?

A.   Yes.

Q.   And what is that car?

A.   This is my car shown where -- when I was leaving.  Once more I can say that it's visible much better on the photograph than on the screen.

THE COURT:  You say you were leaving.  Leaving from what location?

THE WITNESS:  When Mikhel got into my car, we were leaving the bank.

MR. DUGDALE:  Your Honor, at this time the Government

87

would ask permission to -- if it could be possible to circulate these particular exhibits to the jury?

THE COURT:  No.  I don't like to do that.

MR. DUGDALE:  That's fine, Your Honor.

THE COURT:  They will have all the exhibits when they eventually go in to deliberate.

MR. DUGDALE:  The only reason I requested it is because the following is different --

THE COURT:  I understand.

BY MR. DUGDALE:

Q.   Now, Mr. Altmanis, where did you go after you took Mr. Mikhel to the bank that night?

A.   You mean after the bank?

Q.   Correct.

A.   Home, to Kadamovas's home.

Q.   Did you take defendant Mikhel with you back to Kadamovas' home?

A.   Yes.  I brought him there.

Q.   How long did you stay around defendant Kadamovas' home that evening?

A.   Not more than an hour.  Then I could go home.  Because -- because they left there for the night with Umansky.  They told me to come back next morning to relieve one of them.

Q.   Did you, in fact, go back to defendant Kadamovas' house the next morning to relieve one of them?

88

A.   Yes.  I came back at 10:00 in the morning.  They were still -- they were both still there.

Q.   Was Mr. Umansky still there as well?

A.   Yes.  Umansky was there.

Q.   And who did you relieve?

A.   It's hard to say.  I don't remember.

Q.   When you came back to the house that next day, did you have an opportunity to hear Mr. Umansky make any phone calls?

A.   Yes.  During the whole day I was a witness of couple of calls.

Q.   And over the course of time that Mr. Umansky was held at the defendant Kadamovas' house, who was he allowed to call?

A.   They spent whole night with him, and they got -- they got definite information, and they knew where to call, and he called his parents, and then he called his brother in New York.

Q.   Who spent the whole night with Mr. Umansky?

A.   Both of them.  Mikhel and Kadamovas.

Q.   How do you know that?

A.   Because when I came, they were both there.

Q.   You mentioned --

        MR. RUBIN:  I am going to object, Your Honor.  It's speculation.

        THE COURT:  Sustain the objection.

        MR. RUBIN:  Prior answer stricken, please.

        THE COURT:  Motion to strike is granted.  The jury is

89

admonished to disregard the last question and answer.

You may reask the question in a different form.

MR. DUGDALE:  I will, Your Honor.  Thank you.

Q.   Did either of the defendants tell you what they had done with Mr. Umansky that first night that they held him?

A.   Yes.  They had conversations with him.  But how long it lasted and what period of time it took, I don't know.

Q.   Did either defendant talk to you about any particular type of information they were able to get from Mr. Umansky that night?

A.   They didn't go into -- into the details with me, but they told me that they made -- they had made Umansky call home and to his girlfriend and tell them that he was in Las Vegas on business, so they wouldn't worry about him.

Q.   Now, the next day, you had testified that Mr. Umansky called some relatives.  Do you know who he called?

A.   Yes.

Q.   Who did he call?

A.   I heard him call with his brother -- I heard him call and talk with his brother, and they talked about money.

Q.   And do you know before these -- this phone call happened to the brother, was Umansky told what to say?

A.   Yes.  They had already wrote down for him, and they gave him a plan of what he was supposed to say to his family and explain the reason why he needed money.

90

Q.   Who wrote this information down?

A.   I did not -- I did not see who completely was writing it,
either Kadamovas or Mikhel, because they were discussing it
together.  And they decided what to tell Umansky to say.

Q.   And when Umansky would make phone calls to his relatives,
was he alone in a room when he made such phone calls, or were
the phone calls monitored in some sort of way?

A.   They -- they never allowed him to use the telephone in
their absence.  Usually either Kadamovas or Mikhel were present.
But usually they both were present.  In some instances, I had to
step out, and they would stay there, just the two of them.

Q.   And do you know why Mr. Umansky was placing these phone
calls to his relatives?

A.   Yes.  From what they told him, Umansky was supposed to say
that he was in Las Vegas, and he was drunk, and that he ran over
a child, and the child was injured, and he had to pay.

Q.   And was there -- were there discussions -- were the calls
placed from Mr. Umansky concerning a certain sum that had to be
paid in order to secure his release?

A.   The amount of money were different, and it's hard for me to
say because on several occasions, I had to step out of the room,
and Mikhel and Kadamovas remained there with Mr. Umansky, and I
was not there.

Q.   Okay.  Now, during this time period when Mr. Umansky was
held, did you hear specific calls that he placed, any specific

91

calls?

A.   His -- he called his brother, and I heard the brother's voice, and I heard the conversation because they were using the telephone with a speaker.

Q.   During that telephone call, did Mr. Umansky, Alexander Umansky, tell his brother that money needed to be paid to secure his release?

A.   Yes.  He said he explained the reason why the money had to be paid, and he was very nervous, and the brother said that he will do everything possible to help him.

Q.   And do you know where this brother was located at the time that this phone call that you heard took place?

A.   Yes.  He was in New York.  Or he was living in New York. I'm not sure.

Q.   Now, how many days was Mr. Umansky held at defendant Kadamovas' house?

A.   Three days.

Q.   And was -- did it appear to you that -- was Mr. Umansky frightened by the situation that he was in?  Did he appear scared?

A.   Yes.  He was scared, and at some point he was depressed.

Q.   Did you ever see him cry?

A.   Yes.  At one point he cried when Kadamovas told him that he would chop off a finger and -- his finger, and he would send it to his parents.

92

Q.   And did Mr. Umansky appear to take that threat seriously, that his finger would be chopped off and sent to his parents?

A.   The guy took everything very seriously from the very beginning when he saw the guns and everything.  But when -- when Kadamovas threatened him that he would chop off his finger, of course he got more scared because you could expect -- he could expect everything from them.

Q.   Now, during the time period that Mr. Umansky was held for the money that he was waiting for his brother to pay, what was your role around the house?

A.   I replaced them when one of them had to step away, either Mikhel or Kadamovas.  Or when they would send me to purchase something for them.  Or to buy food.

Q.   Okay.  You mentioned in your answer that one of the things they had you do was to purchase items for them.

What did you purchase at the defendant's -- strike that.

Did either of the defendants make a particular request of you during this time period to purchase a particular item?

A.   Yes.  One of the days they ran out of the minutes on the prepaid telephone cards, and they sent me to buy telephone cards.

MR. RUBIN:  I am going to object, Your Honor, regarding the answer "they."  The question was did one of them.

THE COURT:  You can ask a follow-up question.  I will

93

reserve ruling until he asks the follow-up question.

When you say the word "they," who are you referring to?

MR. DUGDALE:  I am sorry.  Can you state the answer, please.

THE WITNESS:  One day, one of them -- I don't remember, Mikhel or Kadamovas -- sent me to a certain address on Ventura where they sell -- where they sell cards, prepaid cards for phone conversations.

BY MR. DUGDALE:

Q.   And was it explained to you why these cards were needed?

A.   Yes.  They were using them for the telephones because this kind of telephones couldn't be wired and listened to.

Q.   And where did you go to get the prepaid cards that you were sent to go get?

A.   I was given an address that was written on a piece of paper on Ventura.  Probably it had been purchased there before.

Q.   And did you buy a card or cards to bring back to the defendants after being sent there to get this item?

A.   Yes.  I bought cards for $300 for the time.  For $300.

Q.   What did you do with these cards after you purchased them at this store?

A.   I gave them to Kadamovas or Mikhel, to one of them.

Q.   Now, you testified earlier that Mr. Umansky had made calls to some relatives about getting some money for his release.

94

Do you know if any money was paid by the family members of Mr. Umansky to secure defendant -- to secure Mr. Umansky's release?

A.    Yes.   Sometime later I heard that the amount of $150,000 was transferred to Arab Emirates on Mikhel's request to Mikhel's people who were working for Mikhel there, and these people were laundering the money there.

Q.    And who did you hear this from?

A.    From Mikhel.  He said that his people there would launder the money there and then they would transfer this money to Russia.

Q.    Now, after you were told that this ransom money had been paid, did you have any discussion with either of the defendants about what was going to be done with Mr. Umansky?

A.    Yes.  Mikhel said in the kitchen that that was all the money that Umansky's relatives could get, and that it didn't make any sense to keep Umansky any longer.

Q.    And after defendant -- was defendant Kadamovas also present during this conversation, or was this just you and defendant Mikhel?

A.    At that time, Kadamovas was in the room talking to Umansky, and that conversation took place between me and Mikhel.

Q.    And after defendant Mikhel gave you this information, that this was the amount of money they were able to get, what was your response to that?

95

THE INTERPRETER:  Could you repeat the end of the question.

BY MR. DUGDALE:

Q.   What was your response to defendant Mikhel's telling you that this was the amount of money that they were able to get?

A.   I asked him whether that amount of money that was received was worthy of all of the troubles and all the problems that were caused, and he said, "No.  This is not the end of it yet."

And that someone would be working with the Umansky's relatives to get more money.  And he said that he had a man in Russia, and that this man would continue working with the -- using the information that had been collected, and he would be working with Umansky's relatives.

Q.   Now, after you were told this information about the payment of the ransom money, did either of the defendants send you to go do something?

A.   Yes.  They asked me a question.  They asked me whether I knew a place where weight could be purchased.

Q.   Who asked you this?

A.   Mikhel did.

Q.   Did you know a place where some weights could be purchased?

A.   Yes.  Because I knew a lot of stores where I brought the goods -- the stores to which I brought the goods.  One of such stores was situated at Ventura and Laurel Canyon.  It was a secondhand shop of athletic equipment, and I knew it because

96

I -- I returned there my skis and my skiing equipment.

Q.    What was the name of that store?

A.    Play It Again.  I'm not sure I know exactly.

THE COURT:  Let's take our afternoon recess, approximately 10 minutes.  Remember the admonition.

(Recess taken.)

(Jury Out)

THE COURT:  Outside the presence of the jury, the record will indicate that all defendants, all counsel are present.

Anything the Government wishes to bring up?

MR. DUGDALE:  No, Your Honor.  Thank you.

THE COURT:  Anything defendants wish to bring up?

MR. CALLAHAN:  No, Your Honor.

THE COURT:  All right.  I will bring the jury in.

(Jury In)

THE COURT:  The record will indicate all jurors are present, all defendants are present, all counsel are present.

Mr. Altmanis, you are still under oath.  Please state your name for the record.

THE WITNESS:  Ainar Altmanis.

BY MR. DUGDALE:

Q.   Mr. Altmanis, when we left off, you were describing a discussion that you were having with defendant Mikhel concerning purchasing some weights.

97

A.   Yes.  I had a conversation.

Q.   Did you know why defendant Mikhel was asking you where you could buy some weights?

A.   Yes.  They needed weights to tie up to Umansky's body.

Q.   And after you told Mr. Mikhel where such weights could be purchased, did Mr. Mikhel ask you to do something?

A.   Yes.  They asked me to -- to go there and buy it.

Q.   And did you go to the store and buy the weights?

A.   Yes.  I bought two disks for the weight lifting device, 35 pounds each.

Q.   And can you describe what they looked like to the jury, please.

A.   The -- round disk with the empty hole in the middle for the handlebar.

Q.   Where did you buy these items?

A.   In this store, Play It Again.

Q.   What did you do with these weights after you purchased them?

A.   I brought them to Kadamovas' home and put them in the garage.

Q.   Now, after you returned to defendant Kadamovas' home with the weights that you had purchased, did you have a discussion with one of the defendants?

A.   Yes.  We had a conversation with Kadamovas heart to heart.

Q.   Was this just you and Mr. Kadamovas?

98

A.   Yes.  Because Mikhel was in Umansky's room.

Q.   And where did this discussion take place?

A.   My conversation with Kadamovas took place in the kitchen when I gave him the receipt for purchasing the disk -- the weights.  I said that I paid my own money, and I asked him whether they going to reimburse me, and he said, "Yes.  Later."

Q.   What else did you talk about with defendant Kadamovas at this time?

A.   I asked him, "What is going on?  We are working with the people, and you received that much money, and Mikhel told me that you were going to send them to Dubai and launder there, and after laundering, we would get back about $80,000."

I was surprised that they -- the half of the money would be laundered.  What would come out of it?

Q.   When you were informed that that was the limit on the amount of money that was going to be obtained as a result of kidnapping Umansky, what was your response?

A.   I -- I said that I spent a lot of time here.  I said that I -- I went -- I left my own business -- I had people, I had contacts, I had agreements to fulfill, and I was losing more money than I was making.

And, you know, one thing after another.  Had heart to heart conversation.

Q.   And how loudly was this conversation that you were having with Mr. Kadamovas?

99

THE INTERPRETER:  Excuse me?

BY MR. DUGDALE:

Q.   How loud was this conversation?

A.   It was quite loudly because after that, Mikhel came out and asked us what was that -- all that yelling was about.

Q.   And what did defendant Mikhel do after he came out and asked you what all the yelling was about?

A.   Mikhel -- Kadamovas went to Umansky's room, and Mikhel came to me and started explaining the situation.  He knew what he was talking about.

Q.   What did defendant Mikhel explain to you?

A.   Yes.  He said I shouldn't get upset.  I shouldn't panic.  Yes, it was true, that $150,000 was -- were transferred to Dubai, and, yes, that money would have been -- would be transferred to Russia and then back to the United States, and, yes, part of that money was -- were going to be paid to people involved in laundering, but that was not all the money, and they would continue working, and they would get more money.

Yes, it would -- it was supposed to come out 84, maybe $85,000 for everybody.  And -- but he said it wasn't the end of it because he had a man who would continue working in that direction, even after Umansky wouldn't be alive anymore.

Q.   After defendant Mikhel told you these things, where did he go?

A.   He turned around and went to the room where there were

100

Umansky and Kadamovas.

Q.   And did you follow him into the room?

A.   Yes.

Q.   And can you explain to the jury what happened when you followed Mikhel into the room where Mr. Kadamovas and Mr. Umansky were.

A.   When I walked into the room, Mikhel went into the room, and I stayed in the door opening, and -- and Kadamovas was sitting on the sofa, and Umansky was sitting on the chair, and they were talking about something and smoking.

When Mikhel went into the room and opened -- and opened a pass for me, I went into the room and placed myself by the window on their other side.  At that moment, there was like -- there was a voice of Mikhel so fast and so sharp like a thunderclap telling Umansky to open his mouth.

MR. RUBIN:  Your Honor, I am going to object to --

MR. DUGDALE:  Your Honor, I will follow it up with some questions.

MR. RUBIN:  Thank you.

BY MR. DUGDALE:

Q.   What happened after defendant Mikhel ordered Mr. Umansky to open his mouth?

A.   Mikhel pushed crumbled bags -- I don't know how many, two or three -- into his mouth.  And put some tape -- tape on his mouth.  At that moment, Kadamovas got off of the sofa quickly

101

and set himself on Umansky's knees -- lap.  I'm sorry.  He pushed Umansky to the chair, wouldn't let him -- wouldn't let him get up.

Q.   Just for one second, at this point in time when this is happening to Mr. Umansky, is Mr. Umansky handcuffed?

A.   Yes.  He -- his hands were cuffed behind the back of the chair.

Q.   And where was Mr. Mikhel positioned at this point in time when he is doing these things to Mr. Umansky?

A.   First he was on the left side where -- when he was pushing the bag, and then he was behind Umansky when he put a bag over his head.

Q.   And why did defendant Kadamovas then approach Mr. Umansky and lean against him in the manner you described?

A.   You mean why he sat on Umansky's lap?

Q.   Correct.

A.   So Umansky wouldn't be able to resist, to move.  And second, he pinched his nose, wouldn't let him breathe, even after Mikhel put a bag over -- over his head and -- and rolled it.

Q.   Okay.  Now, in this -- during this entire time, was Mr. Umansky still in the chair where he had been left all those days inside the house?

A.   Yes.  He was constantly on that chair.  Except times when he was sleeping or going to the bathroom.

102

Q.   And what did you do when defendant Mikhel was putting the bag over Mr. Umansky's head and defendant Kadamovas was pressing against him so he couldn't struggle?

A.   I was on the right side watching because I had nothing to do at that moment.  But when Mikhel released the bag and Kadamovas got up, they noticed that Umansky was still breathing.

Q.   So at that point after the period of time where Mikhel had put the bag over his head and Kadamovas had pressed against him, he was still alive?

A.   I don't know whether he was alive or not, but when they let him go, I could see the bag going into his nostrils.  It was obvious that his body was still wresting for air.

        The -- Kadamovas said, "Looks like he's still breathing," and at that moment, Mikhel pulled a rope out of his pocket and put around his neck and started pushing -- pulling.  I'm sorry.

        And he yelled at me, "Take -- take the end of the rope and hold it."  I took one end of the rope, and he held another end of the rope.

Q.   Let me stop you for one second.  So defendant Kadamovas took a rope out.  Where did he take the rope from?

        THE INTERPRETER:  You said Kadamovas?

BY MR. DUGDALE:

Q.   I am sorry.  Defendant Mikhel took a rope.  Where did he take the rope from?

103

A.    Out of the pocket of his pants.

Q.    And what did defendant Mikhel do with this rope after he took it out of the pocket of his pants?

A.    He put it around his neck and told me to hold one end, and he held another end.

Q.    After defendant Mikhel told you to grab one end of the rope, what did you do?

A.    Yes.  I took the end of the rope, which he told me to take, and he took another end of the rope.

Q.    And what happened after you grabbed your end of the rope?

A.    He pulled it so hard that he -- he actually pushed his leg against the chair, and he rolled his end of the rope around his -- his hand.

        THE COURT:  Now, when you say "he," who is "he"?

        THE WITNESS:  Mikhel.  This -- it was so hard that my end of the rope went out of my hand, and the rope unrolled and came off Umansky's neck.

BY MR. DUGDALE:

Q.    What was defendant Kadamovas doing at this point in time when defendant Mikhel was pulling against this -- pulling one end of the rope and you had the other end of the rope in your hand?

A.    He was sitting on Umansky's lap, pressing his body against the chair and holding his nose.

Q.    And after the rope slipped out of your hand, what kind of

104

condition was Mr. Umansky in?

A.    I think -- I think he was dead, even before that.

Q.    And did you see anything at that moment that made you question whether he was alive or dead?

A.    Yes.  There was a moment when Kadamovas got off his lap and stepped aside, and I noticed a motion around Umansky's solar plexus.

Q.    Can you describe for the jury what this looked like, this motion that you saw?

A.    It looked unusual, so I expressed my opinion.  I said, "The guy is breathing.  It looks like he's still alive."

Q.    And what happened after you told the defendants, "It looks like he's breathing; it looks like he's still alive"?

A.    Mikhel said, "No.  It happens sometimes.  He still has air in his body."  So he kicked him into that area, and the air went out, and the motion stopped.

Q.    Now, where did -- where did defendant Mikhel kick Mr. Umansky?

A.    The area of the solar plexus.

Q.    And was Mr. Umansky still sitting in the chair when this happened?

A.    Yes.  He was still in the chair.

Q.    And was he, in fact, dead at that point in time?

A.    Yes.  He was dead.

Q.    Now, what happened to Mr. Umansky's body after Mikhel

105

pushed his foot into his chest and pushed out that last breath of air out of the body?

A.   He -- he stayed in the chair.  Just his head went to the side.  I walked out, and Mikhel walked out.  Kadamovas stayed there.

Q.   Where did you walk to?

A.   I went to the kitchen, and I think Mikhel went to the garage.  While I had a drink of water, Mikhel came back and said, "That's it.  We got to take him out."

Q.   After Mikhel told you that you had to take him out, what did you do next?

A.   I -- he went into the room where Kadamovas was with Umansky, and I followed him, and when I walked in, I saw that Umansky -- Umansky was lying on the floor without handcuffs. And his legs were tied together with a plastic tie.

Q.   So just to be clear, when you left the room earlier to go to the kitchen and when Mr. Mikhel left, Mr. Umansky was still handcuffed; is that right?

A.   Yes.  He was kind of half sitting, and his hands were behind in handcuffs.  But when I came back, he was lying on the floor on his side -- on his side, and the handcuffs were off. It looks like Kadamovas took them off.

Q.   And what did you do --

MR. RUBIN:  I am going to object to the last part as non-responsive and speculation.

106

THE COURT: No. Overruled.

BY MR. DUGDALE:

Q. And what did you do with Mr. Umansky's body after you walked back in the room and you saw it on the floor?

A. Myself, Mikhel, and Kadamovas took the body. I got the legs. I don't remember who took the middle part, and another one took the shoulder -- the shoulders, and we took him into the garage.

Q. Why did you take him into the garage?

A. Because there was a van there with the back door open and everything was prepared to take him away.

Q. And whose van was that in the garage?

A. Kadamovas' van. It was parked with the back door open.

Q. And what did you -- what did you do after you got to the garage into Kadamovas' van?

A. The body was heavy. We put him on the cement floor of the garage, and at that time, there was either a blanket or a comforter put on the floor of the van.

Q. What did you do with the body after that?

A. We lifted -- lifted it. The body was heavy, and we put it in the van in the back.

Q. Did you do anything else to the body after you put it into the van?

A. Yes. We tied the weight to the middle part of his body.

Q. And where did that -- where did that come from, the weight?

107

A.   That was the disks that I purchased in the store, Play It Again.

Q.   Now, after Mr. Umansky's body was loaded into defendant Kadamovas' van, where did you go next?

A.   After we loaded it, we went to Mikhel's home.  Kadamovas got behind the wheel, Mikhel was next to him, and I was in the back.

Q.   And where was Mr. Umansky's body in the van?

A.   In the back of the van inside.

Q.   You testified that you went to defendant Mikhel's house at that point.  Why did you go to defendant Mikhel's house?

A.   They went to Mikhel's garage to cover the back of the van with boxes.

Q.   And when you got to defendant Mikhel's house, did you, in fact, you and the defendants, cover the body with boxes that were found at defendant Mikhel's house?

A.   Yes.  Myself and Kadamovas were gathering boxes and placing them there.

Q.   And was someone at defendant Mikhel's house when the three of you arrived there with Mr. Umansky's body?

A.   You said in front of the house?

Q.   No.  Was somebody at the house?

A.   At that time, there was his girlfriend, Marina, who came from London.  That's why we used Kadamovas' house.

Q.   Who is Marina?

108

A.    Mikhel's girlfriend.

Q.    Did anything happen as a result of the fact that Mikhel's girlfriend Marina was at the house when you arrived?

A.    When we pulled into the garage and were loading boxes on the back of the van, Mikhel went to the house to talk to Marina to make sure that she wouldn't walk out into the garage while we were doing that.

Q.    And did the three of you do anything else at defendant Mikhel's house that evening, apart from just loading these boxes into the van to cover Mr. Umansky's body?

A.    When we were finishing loading the boxes, Mikhel walked in, and he asked, "Did you do everything?"  And we said, "Yes."  And he said, "Okay.  Well, we have nothing else to do.  Marina prepared the dinner, and we have to stay here and -- and have dinner because otherwise she would be offended."

Q.    At this point in time, I am going to have Ms. DeWitt publish Government's No. Exhibit 101, which has previously been admitted.

        You have previously identified in your testimony -- Your Honor, I believe that the door is -- I am sorry.  The door may be on or this may be in blackout mode.

        THE COURT:  All right.  We are now back to the lectern PC mode.

        MR. DUGDALE:  Thank you, Your Honor.

Q.    You previously have identified this as a floor plan for

109

defendant Mikhel's house.

A.   Yes.

Q.   Where did defendant Kadamovas park his van in order for the boxes to be loaded on Mr. Umansky's body?

A.   In Mikhel's garage right here.

Q.   And you mentioned that you -- did you end up having this meal that defendant Kadamovas -- I am sorry -- defendant Mikhel told you about that evening?

A.   Yes.  We had.

Q.   Where did you have this meal at?

A.   They usually ate right here.  It was a round table right there.

THE COURT:  When you say, "Eat right there; there was a round table there," is that where you put the circle in room D like "David"?

THE WITNESS:  Yes.  Right here (indicating).

BY MR. DUGDALE:

Q.   Just so we are clear, the van and the body are in room E; is that right?

A.   Yes.

Q.   And you and the defendants ate the meal in room D; is that correct?

A.   Yes.

Q.   Now, approximately how long did you spend at defendant Mikhel's house that evening?

110

A.   Not more than an hour.

Q.   And where did you go after you left defendant Mikhel's house?

A.   They directed their car towards those lakes, reservoirs. Kadamovas was behind the wheel, Mikhel was next to him, and I was again at the back.

Q.   And do you remember approximately what time you left defendant Mikhel's house that evening?

A.   Yes.  After 9:00 in the evening.

Q.   I would now like Ms. DeWitt to please publish -- I am going to have her publish what has previously been admitted as Government's Exhibit No. 80.

THE COURT:  80?

MR. DUGDALE:  80, Your Honor, yes.

Q.   Actually, I'm sorry.  Can you go to 82, please -- 81.  I'm sorry.  Switching to 81, Your Honor.

THE COURT:  All right.  Exhibit 81 is in evidence.

BY MR. DUGDALE:

Q.   You previously identified this, Mr. Altmanis, as a picture from the rear of defendant Kadamovas' van; is that correct?

A.   Yes.  That's his van.

Q.   And can you identify, using this picture, where everybody was positioned inside of this van on the trip up to the lake?

A.   Yes, I can.  Alex was here covered by a multitude of boxes. Kadamovas was in front, behind the wheel.  Mikhel was next to

111

him.  And I was behind them.

THE COURT:  There are basically two rows of seats before the rear compartment; is that correct?

THE WITNESS:  There is a driver's seat and a passenger's seat up front, and then another long seat in the middle because they removed the third row seat.

BY MR. DUGDALE:

Q.  Which row of seats were you sitting in on this trip up to the lake?

A.  In the second row right behind the driver and the passenger.

Q.  And did either of the defendants explain to you why you had to make this trip up to the lake with them?

A.  That was said in Kadamovas' house when Umansky was still alive.  Because Krylov couldn't go.  He was busy with something very important.

Q.  And what were you told as far as why you had to go up to the lake?

A.  First of all, because I already did -- missed two times. They gave me kind of relief from my duties.  And second, because the last time they did it, the body was heavy, and they had problem -- problems because of it.

Q.  Now, you testified that you left with the defendants that evening to go up to the lake.  Do you know what route they took to get up to the lake that evening?

112

A.  Yes, I know.

Q.  How did they get up to the lake?

A.  After we left Kadamovas' house -- I'm sorry.

THE INTERPRETER:  The interpreter stands corrected.

THE WITNESS:  (Continuing) -- Mikhel's house, we took the streets, and we got ourselves on the 405 freeway.  From 405, we took I-5.

BY MR. DUGDALE:

Q.  Mr. Altmanis, after you took the I-5 --

THE INTERPRETER:  Just one second.  One second.

BY MR. DUGDALE:

Q.  After you took the I-5, did you go to another freeway before you were able to get up to the lake?

A.  Yes.  A few hours later, we switched to 99.

Q.  And eventually -- by the way, who was driving this entire time on the way up to the lake?  Was it the same person all the way up?

A.  Yes.  Kadamovas was driving for a long time.  Mikhel was sitting next to him.  I was sitting behind.  And we were driving along the 5 freeway until we reached 99.  Closer to 99 it became foggy.

99 freeway had almost been covered with a fog.  And then Mikhel took over the driving instead of Kadamovas for a certain length of the road.  And then they switched again.

Q.  Okay.  Now, after you -- after the car got off the 99

113

freeway, where did the car go after that to get to the bridge?

A.   I don't know the roads that they were taking.  It was very foggy.  I don't know.  I don't know.

Q.   Were these -- can you describe what these roads were like? Were they major roads like an interstate, or were they smaller roads, smaller amounts of traffic?

A.   No.  They were smaller roads.  They were weaving and there were intersections.

Q.   You testified at some point along the drive there was a lot of fog.  Despite this fog, did either of the defendants have any -- any problem finding their way to the lake?

A.   No.  They didn't have any problems.  It's just that sometimes they would speed up and sometimes they would slow down.

Q.   And did either --

          THE INTERPRETER:  There was no end of the sentence.

          THE WITNESS:  Because from time to time, the fog disappeared because the area was hilly.  And it was possible to see the corners of some buildings and some constructions there.

BY MR. DUGDALE:

Q.   Now, at some point on the trip on the way to the lake, did the defendants need to consult a map in order to find the lake?

A.   No.  From the very beginning when they left Mikhel's home, they were driving in the area that was familiar to them, and they were not using the maps.

114

Q.  Did they ever get lost on the way up to the lake?

A.  No.

Q.  And approximately how long did it take to get from defendant Mikhel's house up to the lake?

A.  Quite certain long period of time because since it was foggy, they had to slow down.

Q.  And what happened when you arrived at the lake?

A.  When we arrived to the very lake, to the bridge, Kadamovas crossed the bridge, and he stopped at the small construction parking site.

Q.  What happened when Kadamovas stopped the van at this kind of small construction parking place?

A.  All of us got out of the car -- Mikhel, Kadamovas, and myself -- and we began unloading the boxes of the body.  We threw some boxes in the park -- not far from the parking in the bushes.  And some -- and boxes remained in the car, just next to the body.

Q.  And just for clarification, were the boxes that were taken out of the van at the time, were those the boxes that were used to cover Mr. Umansky's body?

A.  Yes.

Q.  And what did you do next after these boxes were discarded, some of these boxes were discarded from the van?

A.  Kadamovas sat behind the steering wheel.  Mikhel sat next to him, and I took my place, and we drove back to the bridge.

115

Q.   And what happened when you got to the bridge?

A.   When we were approaching the bridge, I don't remember who in particular, either Kadamovas or Mikhel, noticed that not far from the bridge there was another parking.  It was the construction parking, and there was a car with the lights off.  And that alarmed them.

Q.   And what did the defendants do as a result of noticing this car that was in the parking lot?

A.   Kadamovas said, "Someone is stopped there.  Probably there is someone in the car.  What do we do?"

     Mikhel said, "Go to that parking and stop not far from them, and do not turn off the lights."

     I said, "What if it is security -- some kind of security or police?"

     And Mikhel said, "No.  It's very unlikely.  Probably someone is just sitting and smoking there."

Q.   Okay.  Now --

A.   "We'll come and find out."

Q.   Did that car eventually move away from the area near the bridge?

A.   Yes.  This is how it happened.  People probably didn't know what kind of car it was.  Because the lights were not turned off and we had long distance beams and they were directed towards that car.

     And very shortly the car started and left quickly.

116

Q.   Just so we are clear about this, did defendant Kadamovas shine the lights on that car that you spoke of in your testimony there?

A.   Yes.

Q.   And what was the effect of defendant Kadamovas doing that?

A.   That car left the parking.

Q.   Did there come a point in time after that where it was safe to throw the body from the bridge without being detected?

A.   Yes.  After that, Kadamovas drove the car back to the bridge.  And we crossed the bridge to the other side of the bridge.  And we -- we made a U-turn, and, again, we stopped for a couple of minutes in front of the bridge.

Q.   What was the reason why you stopped for a couple of minutes in front of the bridge?

A.   To make sure that there was no approaching transport from either side.

Q.   And how could you tell whether there were approaching cars from either side of the bridge from where you stopped on the bridge?

A.   We would have seen it because it was a hilly and foresty area.

Q.   How would the fact that it was a hilly and foresty area have allowed you to see oncoming cars?

A.   If they were approaching, we would have seen the light of the cars.

117

Q.   And did what you saw -- did that correspond with anything
the defendants had told you earlier about this area?

A.   It coincided with these -- with their words, and also I saw
myself that they were familiar with that area.

Q.   And when did they previously tell you about what this area
looked like?

A.   It was after they took their -- that American businessman,
Muscatel.

Q.   Now, eventually was there a determination that there was no
oncoming traffic, and it was safe to discard the body?

A.   Yes.  Kadamovas pushed the gas pedal, and we drove into the
middle of the bridge.

Q.   Can you describe for the jury what happened when Kadamovas
drove the van to the middle of the bridge.

A.   I'm not sure whether he drove to the very middle of the
bridge because the bridge was very long, but he stopped in a
particular spot.  We got out of the car.  Kadamovas left the
car, Mikhel left the car, and I left the car.  And we opened the
back door where Umansky's body was.  Everyone took a certain
part of the body, and we carried him to the end, to that -- to
the railing of the bridge.

Q.   What happened when you got to the railing of the bridge
with the body?

A.   We threw the body over the railing, and the body fell down.

Q.   After you threw the body over the railing with the

118

defendants, did you look to see where the body landed?

A.   It was extremely quiet.  And when the body fell down, I did not hear either the sound of a splash or any other sound.  And I asked them, "What happened to the body?  Did it remain in the air because we didn't hear any splash or any sound?"  I did not hear.

Q.   And what were you told after you commented to the defendants that you didn't hear a splash?

A.   They said that the bridge was so high that it would be impossible to hear the sound.

Q.   Now, what time of day was it when you and the defendants threw Mr. Umansky's body off of the bridge and into the water?

A.   It was approximately 1:00 to maybe 3:00 a.m.  I cannot tell you exact time because I didn't have a watch.

Q.   And what time -- what did you and the defendants do after throwing Mr. Umansky's body from the bridge?

A.   We got back into the car.  Mikhel sat next to Kadamovas, who was driving, and I sat in the back.  And we went to pick up the boxes that we had left at the parking in the bushes.

We loaded the boxes, and Kadamovas turned the car in the direction of his home, to Los Angeles.

Q.   Okay.  And did defendant Kadamovas drive the van back to Los Angeles after this?

A.   Yes.

Q.   And did defendant Kadamovas take the same route back to

119

Los Angeles as he and defendant Mikhel took up to the bridge?

A.   No.  When we drove to one of the intersections that was not far from the bridge, to my surprise, Kadamovas turned right and not left, and he took a different route.

Q.   Where did he go to?

A.   They drove to quite a different -- quite a different spot, a bridge.  When they stopped there, they began looking around so that they could see what was there around the bridge.

Q.   And after the defendants scoped out this other bridge --

     MR. RUBIN:  Objection, Your Honor, to the form of the question.

     THE COURT:  Sustain the objection.

BY MR. DUGDALE:

Q.   What did the defendants do around that second bridge that they stopped at?

A.   They spent -- they spent a short period of time there. They looked around the bridge, and they said that that bridge wouldn't do because very close to the bridge were located some kind of houses.

Q.   And after this comment was made to you that that bridge wouldn't do, where did the defendants go then?

A.   That was it.  Then they drove directly to Los Angeles.

Q.   And did they get back on the freeway in order to get back to Los Angeles?

A.   Yes.  I don't know what roads they took, but Kadamovas

120

ended up, and I saw that we were driving onto the 5 freeway.

Q.    Approximately what time of day was it when you got to the freeway with the defendants on the way back to Los Angeles?

A.    It was early morning.  It was getting light, and the people were going to work.  They were driving to work.

Q.    Approximately what time was it when you arrived back in Los Angeles?

A.    Could you please make -- could you please verify whether you mean Los Angeles or back to Kadamovas' home?

Q.    Sure.  Where did you drive to after you got on the freeway?

A.    In the direction -- to Los Angeles, to Kadamovas' home.

Q.    Approximately what time was it when you got to Kadamovas' home?

A.    10:00 in the morning.  10:00 or 11:00.

THE COURT:  I think we will break at this time. Remember the admonition.  We will return tomorrow in the jury room, 9:15; 9:30 in the courtroom.

(Jury Out)

(Proceedings adjourned at 4:18 p.m.)