UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA


# DRAFT COPY


| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO:  CR-02-220(B)-DT |
| | ) | |
| Plaintiff, | ) | CRIMINAL |
| | ) | |
| vs. | ) | Los Angeles, California |
| | ) | |
| IOURI MIKHEL, | ) | Thursday, November 2, 2006 |
| JURIJUS KADAMOVAS, | ) | (9:33 a.m. to 11:58 a.m.) |
| | ) | (1:33 p.m. to  3:55 p.m.) |
| Defendants. | ) | |


JURY TRIAL (36th DAY)
(VOLUME XXXVI)


BEFORE THE HONORABLE DICKRAN TEVRIZIAN,
UNITED STATES DISTRICT JUDGE


EXCEPTIONAL REPORTING SERVICES, INC
14493 SOUTH PADRE ISLAND DRIVE
SUITE A-400
CORPUS CHRISTI, TX 78418-5940
361 949-2988

Solovyeva - Direct / By Ms. DeWitt          74

A     Eight years.

Q     Does your state Plea Agreement have any impact on your federal Plea Agreement, Ms. Solovyeva?

A     From what I know, no.

Q     So the sentence that you get in state court and the Plea Agreement that you entered in state court doesn't have any effect whatsoever on your plea in federal court and what sentence you may get in federal court.

      Is that your understanding?

A     That's correct.

Q     Now, Ms. Solovyeva, you've testified that you pleaded guilty to your involvement in the abductions and resulting deaths of George Safiev and Nick Kharabadze.

      When did you first learn who George Safiev was?

      THE INTERPRETER:  Would you repeat the second part of the question, please?

      MS. DeWITT:  Do you need the whole thing?

      THE INTERPRETER:  Sure.

BY MS. DeWITT:

Q     Ms. Solovyeva, you've testified that you've pleaded guilty to your involvement in the abductions and resulting deaths of George Safiev and Nick Kharabadze.

      When did you first learn who George Safiev was?

A     The first time I found out about Safiev was in August 2002 -- or rather, 2001; I'm correcting myself; 2001 -- through

**DRAFT COPY**

Solovyeva - Direct / By Ms. DeWitt          75

an acquaintance of mine, through a girlfriend of mine whose name is Larisa (phonetic).

Q    Okay.  Let me ask the next question.

        MS. DeWITT:  And, ma'am, I'm sorry but could you just move the microphone a little bit closer to you, because you're very hard to hear.

        THE INTERPRETER:  Sure.

        MS. DeWITT:  And if I'm having trouble, I'm sure other people are, as well.

BY MS. DeWITT:

Q    How did you first learn who George Safiev was, Ms. Solovyeva?

A    You mean when or how?

Q    How?

A    Through an acquaintance of mine, through my girlfriend.

Q    What was your girlfriend's name?

A    Larisa.

Q    And what was Larisa's relationship to George Safiev?

A    Larisa's husband, Vitaly (phonetic), worked at Safiev's house as a caretaker.

Q    And, Ms. Solovyeva, do you know what either Larisa or her husband, Vitaly's last name was?

A    No, I do not recall.

Q    Did Larisa tell you about George Safiev, her husband's boss?

**DRAFT COPY**

Solovyeva - Direct / By Ms. DeWitt                76

A    Yes --

Q    What did --

A    -- she did.

Q    I'm sorry, go ahead.

What did you learn about George Safiev through your friend, Larisa?

A    That he came to the U.S. from England recently, that he was from Moscow, that he either had or he has a bank in Moscow, that he's a rich man, that he's a nice person, that he has a family.

Q    Did you learn through your friend Larisa anything about the house that he lived in?

A    Yes.

Q    What did you learn?

A    That they had purchased a house, Safiev and his family had purchased the house recently, and that they paid $5 million in cash for it; and that it is located in Beverly Hills in the hills.

Q    Okay.  Let me just back up for one second. I think you said -- and maybe I just misunderstood the interpreter -- that Mr. Safiev and Vitaly bought the house; is that --

**THE COURT:**  His family.

**THE WITNESS:**  Safiev and his family.

**MS. DeWITT:**  Family.  Thank you, your Honor.

//

**DRAFT COPY**

Solovyeva - Direct / By Ms. DeWitt          77

**BY MS. DeWITT:**

Q    Okay.  So they bought a house, and you were told that it was for $5 million.

A    Yes.  That's what I was told by Larisa.

Q    And you mentioned that this house was in the hills.  Can I digress for just one moment?

In Russia, do Russian speakers sometimes refer to hills as mountains and mountains as hills?  Are those words used interchangeably?

A    Usually when we speak to each other in Russian we may refer to "the mountain," but what we mean to say is "the hills."  So in Russian we say the word "mountains," but in English it means "in the hills."  But it's translated that way.

Q    Ms. Solovyeva, did you learn from Larisa what type of business Mr. Safiev was engaged in in the United States?

A    Yes.  She had also mentioned that he was involved in the film industry.

Q    Now, Ms. Solovyeva, after you learned from your friend Larisa that George Safiev was from England, that he might have a bank -- that he was from Moscow, that he had a bank, that he had a $5 million home and he was involved in a movie company, did you tell anyone else about that information that you had learned about Mr. Safiev?

A    I shared this information with Kadamovas.

Q    Ms. Solovyeva, when did you first learn who Nick

**DRAFT COPY**

Solovyeva - Direct / By Ms. DeWitt          78

Kharabadze was?

A    I have a question.  When or --

Q    When.

A    Or how?

Q    Yes, when.  I'm sorry.

A    I would say approximately at the end of 2001, in November
or December.  I do not recall exactly.

Q    Who first told you about Nick Kharabadze?

A    Larisa, my girlfriend.

Q    And what did Larisa tell you about Nick Kharabadze?

A    That he is a business partner of Safiev, that he was
helping him with translations and that he is like an assistant
or a helper or aid.  Larisa also said that she didn't like Nick
Kharabadze because he was, based on her words, using Safiev to
his advantage.

Q    Ms. Solovyeva, did you ever go to George Safiev's house?

A    Yes.

Q    When was the first time you went to George Safiev's house?

A    Approximately in August, mid August 2001.

Q    And where was George Safiev's house located?

A    The house was located at the gate community in the hills
of the Beverly Hills.  I remember how to get there, the streets
how to get there, but -- now if I'm pronouncing it correctly,
Coldwater Canyon and Mulholland Drive.  That's what I can
recall.

**DRAFT COPY**

Solovyeva - Direct / By Ms. DeWitt          79

Q    Okay.  So you don't remember the exact address of
Mr. Safiev's house but these two -- Mulholland and Coldwater
were nearby cross streets?

A    Yes.  I remember that one can get there using those
streets, get to the gate community.

          MS. DeWITT:  Are you guys switching?

          MR. SPEAKER:  Yes.

     (Pause)

BY MS. DeWITT:

Q    Ms. Solovyeva, you mentioned that the Safiev house was in
a gated community.

          How were you able to get into this gated community
when you went to the Safiev house?

A    When I arrived to the gate there was security guards.  And
I was supposed to tell them who I was visiting with.  And they
would call this person in his home and would ask this person
whether he or she was expecting this person to come.

Q    So, essentially, it had to go through a security guard at
the front gate.

A    Yes.

Q    Why did you go to George Safiev's house?

A    Larisa invited me to spend time with her baby and with my
baby together.

Q    So Larisa had a young child, as well?

A    The same age with mine.  The difference was a couple of

**DRAFT COPY**

Solovyeva - Direct / By Ms. DeWitt                80

days.

Q    Did you go to the Safiev house on more than one occasion?

A    Yes.  It was more than one time, approximately five or
seven times.

Q    When was the last time that you went to the Safiev house?

A    I don't remember exactly.  I can tell you approximately.
It was either the end of December or the beginning of January.
Maybe even at the end of November.  It's hard for me to say.

Q    And when you say "the end," you mean the end of 2001 and
the beginning of 2002?

A    Correct.

Q    Did you ever take a video of the Safiev house?

A    Yes.

Q    And before you testified today did you have an opportunity
to review an excerpt of the video that you took of the Safiev
house?

A    Yes, I did have a chance.

Q    And, Ms. Solovyeva, I'm showing you what has been marked
for identification as Government's Exhibit 1353.

      Is this the video clip that you reviewed prior to
testifying today?

A    Yes.

Q    And how do you recognize that this is the same video clip
that you previously reviewed?

A    Because after I had seen it I put my initials.

**DRAFT COPY**

Solovyeva - Direct / By Ms. DeWitt          81

Q    And are your initials on Government's Exhibit 1353?

A    Yes.

MS. DeWITT:  At this time, your Honor, I'd move to admit Government's Exhibit 1353.

THE COURT:  1353 admitted this date.

**(Government's Exhibit Number 1353 was received in evidence)**

MS. DeWITT:  And at this time, your Honor, I'm going to play Government's Exhibit 1353.

THE COURT:  All right.

MS. DeWITT:  And for the record, your Honor, these are four short clips from this.

**(Begin playing of video clip, Government's Exhibit 1353, at 2:05 p.m.)**

**BY MS. DeWITT:**

Q    And, Ms. Solovyeva, there's a time stamp on this video.

Is that approximately the date that this was taken or the exact date this was taken?

A    Yes, it was the same date.

Q    It still did not work right.

**(Pause)**

MS. DeWITT:  Your Honor, I apologize.  There's a section on this thing that for some reason it just keeps skipping.  And if it doesn't work this time, I'll...

//

**DRAFT COPY**

Solovyeva - Direct / By Ms. DeWitt        82

**BY MS. DeWITT:**

Q    And, Ms. Solovyeva, who is that that's in the screen in the last -- in this video clip?  Who's depicted in that last screen?

A    This is I and my child, Anastasia.

Q    And, Ms. Solovyeva, what is depicted in these video clips?

A    It's the back yard of Safiev's house.  There's the swings, the playground.  Basically, it's the back yard.

Q    Ms. Solovyeva, can you take a look at Government's Exhibit 1353-A through E, which have been marked for identification?

A    Yes.  I have it in front of me.

Q    Are these still --

A    1353-A.

Q    I'm sorry?

A    1353-A.

Q    Do you have 1353-A through E?

A    Yes.

Q    And are these still photographs from the video clip just shown to the jury?

A    Yes.

        **MS. DeWITT:**  At this time, your Honor, I'd move to admit Government's Exhibits 1353-A through E.

        **THE COURT:**  Admitted this date.

        **(Government's Exhibits Numbers 1353-A through 1353-E were received in evidence)**

DRAFT COPY

Solovyeva - Direct / By Ms. DeWitt          83

MS. DeWITT:  And if Ms. Meyer could please show these to the jury, 1353-A through E.

(Pause / Exhibits shown to jury)

Do I need to blow them up again?  Just go to the next one.

BY MS. DeWITT:

Q    Ms. Solovyeva, I'd like to ask you to now please take a look at what's been marked for identification as Government's Exhibit 1515.

A    Yes.  I have it in front of me.

Q    Who is depicted in that photograph?

A    I, my girlfriend Larisa, her child and my child.

Q    And where was this photograph taken?

A    In the back yard of Safiev's house.

MS. DeWITT:  And at this time, your Honor, I'd move to admit Government's Exhibit 1515.  And if Ms. Meyer could publish it.

THE COURT:  Admitted this date.

(Government's Exhibit Number 1515 was received in evidence)

BY MS. DeWITT:

Q    Ms. Solovyeva, why did you take the video that you took at Mr. Safiev's house?

A    To have a video of our children playing in the back yard together.  And also, I wanted to look at this huge and

DRAFT COPY

Solovyeva - Direct / By Ms. DeWitt          84

beautiful house, because for me it was -- I have never seen

such houses.  I mean very rarely.  And most of the films that I

made -- most of the videos that I made of the child and of the

surrounding places were made for the purpose of sending them to

my mother to show it to her.  Because my parents had never been

to America, and it was very interesting for them to see the

country; and, what is most important thing, to see their

granddaughter.

Q    Ms. Solovyeva, did you take this video for the purpose of

gathering information about the Safiev house?

A    No.

Q    Was this video taken during the first visit that you ever

made to the Safiev house?

A    Yes.  It was the first and the last time that I made the

video of Safiev's house when my child was there and we were

playing.

Q    And this was also the first time that you had ever been to

the house; is that right?

A    It was my first visit.

Q    After this first visit to George Safiev's house, did you

tell Defendant Kadamovas about his house?

A    Yes.  I shared the information with him.

Q    What exactly did you share with him?  What did you tell

Defendant Kadamovas about the house?

A    That, let's say, on that day Larisa and I were in Safiev's

**DRAFT COPY**

Solovyeva - Direct / By Ms. DeWitt                85

house where her husband was working; that it was the first time that they had invited me to see the house where Vitaly was working and to see a beautiful house.  I told Kadamovas that it was a very big and beautiful house in the hills with a beautiful view and how much it cost.

Q    Ms. Solovyeva, did you ever meet George Safiev?

A    No, not even once.

Q    Were you ever at Mr. Safiev's house at the same time that Mr. Safiev was at his house?

A    No.

Q    Was there a reason why Mr. Safiev was never at the house when you were there?

A    Yes.  And the reason was that Larisa invited me to spend some time with her and with the babies only when Safiev and his family were out of town.

Q    And how did you know when George Safiev and his family were going to be out of town?

A    She would let me know about it.  Larisa would tell me.

Q    Now, Ms. Solovyeva, after you told Defendant Kadamovas about George Safiev, the information about him being a banker and being from Russia and about the house, did Mr. Kadamovas ask you to get additional information about Mr. Safiev?

A    Yes.  He began asking me more and more information as time went.

Q    And can you give some specific examples of information

**DRAFT COPY**

Solovyeva - Direct / By Ms. DeWitt          86

that Defendant Kadamovas asked you to follow up on?

A    I remember that the first time he asked me to --

interpreter's correction -- I remember the first time Kadamovas

asked me to ask Vitaly to talk to Safiev whether he would want

to install an aquarium in his house.  Another time he asked me

to find out whether Safiev was interested in installing an

antenna and satellite dish.

Q    Did you tell Defendant Kadamovas when you would be going

over to Mr. Safiev's house?

A    Yes.  He knew that I was going to Safiev's house.

Q    Was he aware of the fact that you would only go over there

when Mr. Safiev was out of town?

A    I believe, yes.

Q    In addition to Mr. Kadamovas, Defendant Kadamovas, knowing

when you were going to be going over there to Mr. Safiev's

house and knowing that you only went over there when Mr. Safiev

was out of town, were there ever any times when Defendant

Kadamovas specifically asked you whether or not Mr. Safiev was

in town or was going out of town?

A    I don't remember exactly but I believe, yes.

Q    So there were times when Defendant Kadamovas specifically

asked you if George Safiev was going to be out of town?

        **MS. CHAHIN:**  Objection.  Misstates the evidence, the

testimony.

        **THE COURT:**  I'll sustain the objection.

Solovyeva - Direct / By Ms. DeWitt            87

MS. DeWITT:  I'm sorry, I couldn't hear what the objection was.

THE COURT:  I sustained the objection.

MS. DeWITT:  I didn't hear what it was.  I want to be able to --

MR. SPEAKER:  Misstates the record.

MS. CHAHIN:  Misstates the testimony.

THE COURT:  Misstates the evidence, misstates the testimony.

BY MS. DeWITT:

Q    Ms. Solovyeva, was there ever a time when Defendant Kadamovas specifically asked you whether or not you knew Mr. Safiev was going to be out of town?

A    It's hard for me to say.  I don't remember exactly, but it seems to me that he did.

MS. CHAHIN:  Objection, your Honor, as non-responsive.  Move to strike.

THE COURT:  Go ahead and answer.  I'll make the ruling.

THE WITNESS:  I don't remember exactly.

THE COURT:  Overrule the objection.

BY MS. DeWITT:

Q    Now, you mentioned these two instances about where Defendant Kadamovas asked you to get some additional information regarding an aquarium and a satellite installation.

**DRAFT COPY**

Solovyeva - Direct / By Ms. DeWitt          88

Was Mr. Safiev interested in either of those items?

THE INTERPRETER:  Could you repeat the end of the question?

BY MS. DeWITT:

Q    Did you get any additional information about whether George Safiev was interested in the satellite installation that Defendant Kadamovas asked you to get more information about?

A    I found out through Vitaly that Safiev was not interested in either of them.

Q    And did you pass this information along to Defendant Kadamovas?

A    Yes.

Q    Did you learn any additional information about George Safiev that you passed along to Defendant Kadamovas regarding George Safiev?

MS. CHAHIN:  Objection, your Honor.  Hearsay.

THE COURT:  No.  It can be answered either "yes" or "no."

THE WITNESS:  I would like to ask you to repeat your question.

BY MS. DeWITT:

Q    Did you learn any additional information about George Safiev that you passed along to Defendant Kadamovas regarding George Safiev?

A    What I have already said.  I don't quite understand the

**DRAFT COPY**

Solovyeva - Direct / By Ms. DeWitt          89

question.

Q     Did you ever learn about a party that was being planned?

A     Larisa mentioned to me that Safiev was planning to have a
party in Jamaica.

          MS. CHAHIN:  Objection.  Non-responsive.  Motion to
strike.  Can become hearsay.

          THE COURT:  Well, it is and it isn't.  The
information -- I mean the question is asking for information
that this witness passed on to one of the coconspirators.  And
so that is admissible during the course of the conspiracy.

          The problem that you have, though, when you frame the
question is, it's coming from someone else.  So --

          MS. DeWITT:  It's not offered for hearsay purpose,
your Honor.

          THE COURT:  I understand that.  So just ask her:
What other information did you pass on to Defendant Kadamovas?

**BY MS. DeWITT:**

Q     What other information, Ms. Solovyeva, did you pass on to
Defendant Kadamovas?

A     That I learned from my girlfriend Larisa that Safiev was
planning to have a party in Jamaica and that he was making
arrangements for it.  I shared this information with Kadamovas.

Q     Ms. Solovyeva, when you were relaying this information
about Mr. Safiev to Defendant Kadamovas, did you know why he
was interested in Mr. Safiev?

**DRAFT COPY**

Solovyeva - Direct / By Ms. DeWitt                    90

A    To have business together with him and to get money from him.   This is what he said.

Q    Prior to your involvement in the abductions of Nick --

        THE COURT:   Who said?

        THE WITNESS:   Kadamovas.

        MS. DeWITT:   Thank you, your Honor.   Sorry.

BY MS. DeWITT:

Q    Prior to your involvement in the abductions of Nick Kharabadze and George Safiev, did you become aware of Defendant Mikhel's involvement in any other abductions?

A    Yes, I did know.

Q    And prior to your involvement in the abductions of Nick Kharabadze and George Safiev did you become aware of Defendant Kadamovas' involvement in any other abductions?

        THE INTERPRETER:   It was interpreter's mistake the first time.   The interpreter asked about Kadamovas.   So the second question will be about Mikhel, right?

        MS. DeWITT:   Yes.

        THE WITNESS:   Yes.

BY MS. DeWITT:

Q    Okay.   Just so the record's clear, you were aware of both Defendants' involvements in other abductions.

A    That's correct.

Q    Ms. Solovyeva, I'd like to direct your attention to the timeframe of October 2001.

**DRAFT COPY**

Solovyeva - Direct / By Ms. DeWitt          91

Do you have that timeframe in mind?

A    Yes.

Q    Did you notice anything about Defendant Kadamovas' activities during the month of October 2001 that you thought were unusual?

A    Yes, I did.

Q    What did you notice?

A    First of all, that Kadamovas spent huge amounts of time with Mikhel.  He was always absent.  He was not at home at all and he would come back home just for a few minutes to change. It was unusual for me.  And also, sometime later he asked me to bring some food to Mikhel's home, to bring Demetrol (phonetic) and to leave the car.  And he was not at home at night.

Q    The first thing that you mentioned was in addition to him being gone for even greater periods of time than normal that he asked you to bring food to the house.

A    Yes.

Q    What house were you referring to?

A    Mikhel's on Oak View Drive.

Q    And had you been to that house before?

A    Yes, I had.

Q    And, Ms. Solovyeva, could you take a look at what's been previously admitted as Government's Exhibit 100-A?

**(Pause / Witness complies)**

Ms. Solovyeva, do you recognize what's depicted in

**DRAFT COPY**

Solovyeva - Direct / By Ms. DeWitt          92

this photograph?

A     Yes, I do.  This is Mikhel's house.

Q     Is that the house that you brought the food to at Mikhel's request?

A     Yes.

Q     Now, you mentioned that he asked you to drop off food.
      Specifically, what did he ask you to do?  And by "he" I mean Defendant Kadamovas.

A     Kadamovas asked me to bring some food and also he asked me to bring an extra portion.

Q     And, Ms. Solovyeva, did you bring the food over to Defendant Mikhel's house at Oak View?

A     Yes, I did.

Q     Did you go inside the house when you dropped off the food?

A     Yes, I did enter.

Q     Where did you go inside the house?

A     As soon as I entered the house I immediately went to the kitchen and I put the food on the counter.  And, basically, I left immediately because Kadamovas told me to leave.  They didn't want me to remain there.

Q     Who was in the kitchen when you arrived to drop off the food?

A     Kadamovas, Mikhel and Ainar.

Q     Now, you mentioned that Defendant Kadamovas rushed you out.

**DRAFT COPY**

Solovyeva - Direct / By Ms. DeWitt          93

How were they acting when you came into the kitchen?

A   They were acting strangely.  They were very quiet, not really talking.  They didn't even let me stay there and help them to prepare the food.  Usually this is what I would have done if they were hungry.  I would have stayed to help them to prepare food.  But this time they told me, "Leave the food and go."

Q   So it was unusual for you to be rushed out of the house.

A   Yes, it was unusual.

Q   And I take it that you didn't go anywhere other than to the kitchen and then back out of the house.

A   That's correct.  They didn't let me walk around the house.

Q   Ms. Solovyeva, you also mentioned that Defendant Kadamovas asked you to drop off Demetrol.

Did you, in fact, take Demetrol to the Oak View house at Defendant Kadamovas' request?

A   Yes.

Q   And what is "Demetrol"?

A   Medication.

Q   Where did you get the Demetrol that you took over to the Oak View house at Defendant Kadamovas' request?

A   From our apartment.

Q   Whose Demetrol was it?

A   Kadamovas'.

Q   Can you describe for the jury what this Demetrol that you

**DRAFT COPY**

Solovyeva - Direct / By Ms. DeWitt                94

dropped off at the Oak View house at Mr. Mikhel -- excuse me -- Kadamovas' request looked like, how it was packaged?

A    It was a paper square box, the Russian word of "Demetrol." And there were ampules inside.

Q    And when you say "ampules," do you mean glass?

A    Yes.  Those were these kind of long, glass ampules, narrowed at the top.

Q    And were they, basically, clear glass?

A    Yes.

Q    Ms. Solovyeva, is Demetrol the kind of drug that you take with a syringe?

        MR. CALLAHAN:  Objection.  Foundation.

BY MS. DeWITT:

Q    If you know.

        THE COURT:  All right.  Overrule the objection.  The defect has been cured.  If you know.

        THE WITNESS:  From what I know, the medication that is in the ampules is injected with the syringe.

BY MS. DeWITT:

Q    When you brought the Demetrol over to Oak View at Defendant Kadamovas' request, did you bring syringes?

A    No.

Q    Why is that?

A    We didn't have any in our home.

Q    Ms. Solovyeva, you also mentioned that you were asked to

**DRAFT COPY**

Solovyeva - Direct / By Ms. DeWitt                95

drop off the car.

What car was that?

A    That was Nissan Quest mini van, black.

Q    At this time, Ms. Solovyeva, I'd ask you to take a look at Government's Exhibit 79 through 81, which were previously admitted.

MS. DeWITT:  And for the record, your Honor, I also have Government's Exhibit 79 on the screen for the jury to see.

BY MS. DeWITT:

Q    Ms. Solovyeva, do you recognize what's depicted in Government's Exhibit 79?

A    Yes, I do.

Q    And Government's Exhibit 80?

A    Yes.  It's the same car but viewed from the rear side.

Q    And Government's Exhibit 81?

A    Yes, I do recognize it.

Q    And is this the van that you dropped off at the Oak View house at Defendant Kadamovas' request?

A    Yes.

Q    And, Ms. Solovyeva, can you please take a look at what's been marked for identification as Government's Exhibit 1518?

Do you recognize what's depicted in that photograph?

A    Yes, I do.  This is our car and Kadamovas'.

Q    And by your car do you mean the Nissan Quest van?

A    Correct.

**DRAFT COPY**

Solovyeva - Direct / By Ms. DeWitt                96

MS. DeWITT:  And at this time, your Honor, the Government would move to admit Government's 1518.

THE COURT:  Admitted this date.

(Government's Exhibit Number 1518 was received in evidence)

BY MS. DeWITT:

Q    Ms. Solovyeva, who normally drove the Nissan Quest van?

A    Usually I was driving this car.

Q    And what car did Defendant Kadamovas usually drive?

A    Kadamovas drove Mikhel's car, Jeep Cherokee.

Q    Kadamovas normally drove a Jeep Cherokee?

A    Mostly, yes.

Q    And if I understood you, that car actually belonged to Defendant Mikhel?

A    From what I knew, yes.

Q    Okay.  And at this time, Ms. Solovyeva, I'd ask you to look at Government's Exhibit 1519, 1520 and 1521 that have been marked for identification.

A    1519, 1520 and 1521.

Q    What's depicted in those photographs, Ms. Solovyeva?

A    In 1519, Kadamovas is in Jeep Cherokee.  In 1520, the same car but I am behind the wheel.  And 1521 is the same car where I'm depicted together with a child.

MS. DeWITT:  And at this time, your Honor, the Government would move to admit Government's Exhibits 1519, 1520

**DRAFT COPY**

Solovyeva - Direct / By Ms. DeWitt           97

and 1521.

THE COURT:  Admitted in evidence this date.

(Government's Exhibits Numbers 1519, 1520, 1521 were
received in evidence)

MS. DeWITT:  And if Ms. Meyer would publish to the
jury just Government's Exhibit 1519.

BY MS. DeWITT:

Q    Now, Ms. Solovyeva, we were talking about the items that
you took over to the Oak View house in October 2001 at
Defendant Kadamovas' request.

Did you take all these items over to the Oak View
house at one time in one trip?

A    I believe so, but I am not sure.  Maybe it happened the
following day.

Q    Okay.  So they were dropped off on either one or two
occasions?

A    I think so, yes.  No.  I would like to correct myself and
say that I remember that I brought everything on one occasion.
No.  Yes, on one occasion.

Q    You said that one of the unusual things that you noticed
during this time period was the Defendant Kadamovas was gone
over night.

A    Yes.

Q    And was he gone over night after you dropped off the van,
the Nissan Quest van?

**DRAFT COPY**

Solovyeva - Direct / By Ms. DeWitt                98

A    Yes.  He was absent the following day for a short period of time, yes.  And he was absent through the whole night.

Q    So after you dropped off the Nissan Quest van, Defendant Kadamovas was gone for an even longer period of time over night.

A    Yes.

Q    Was this something that he had done before, to go away over night without telling you?

A    No.  That was the first time.

Q    At some point did Defendant Kadamovas return home?

A    Yes.

Q    When did he do that?

A    He came home early in the morning, and it's hard for me to say what day it was.

Q    When he returned home from being gone this extended period of time after you had dropped off the van, did you ask him where he had gone?

A    Yes, I did.

Q    What did he say?

A    He told me that they -- that he and Mikhel went up north and that they found a very beautiful park with a lake and that there are big trees in this park.

Q    When Defendant Kadamovas returned from this trip up to the lake and the park, did you notice anything unusual about Defendant Kadamovas?

**DRAFT COPY**

Solovyeva - Direct / By Ms. DeWitt                99

A     Yes, I did.

Q     What did you notice?

A     First of all, he was very tired, covered with dust and very irritable.  His shoes were dirty, his sneakers, with blood and dirt.

Q     What did Defendant Kadamovas do about the blood and dirt on his shoes?

A     He asked me to clean his shoes and to wash his clothes.

Q     Did you clean Defendant Kadamovas' shoes for him?

A     Yes, I did.  I washed it with a brush and with the soap.

Q     And he also asked you to clean his clothes?

A     Yes, to wash it.

Q     Did Defendant Kadamovas explain to you how he got the blood and the dirt on his shoes?

A     No.

Q     Can you describe for the jury the shoes that you saw that Defendant Kadamovas was wearing when he returned from this overnight trip that had blood and dirt on them?

A     These are sneakers, Adidas, size 7 ½, white and blue.

        THE COURT:  Let's take our afternoon recess, approximately ten minutes.

        MS. DeWITT:  Thank you, your Honor.

        (Recess taken from 2:49 p.m. to 2:59; parties present)

        (Outside the presence of the jury)

        THE COURT:  All right.  Mr. Rubin has come in.  The

DRAFT COPY

Solovyeva - Direct / By Ms. DeWitt          100

record will indicate all parties and counsel are present.

Outside the presence of the jury.  Anything the government

wishes to bring up?

        **MS. DeWITT:**  No, your Honor.

        **THE COURT:**  Any defense wish to speak to the court?

        **DEFENSE ATTORNEYS:**  No, sir.

        **THE COURT:**  All right.  Let's bring the jury back in.
We'll break at 4:00.

        **MS. DeWITT:**  I'm sorry?

        **THE COURT:**  We'll break at 4:00.

        **MS. DeWITT:**  Okay.

        **THE CLERK:**  All rise.

        **THE COURT:**  All right.  The record will indicate all
parties and counsel are present; all jurors are in the jury
box.

        You're still under oath, Ms. Solovyeva.  Please state
your name for the record.

        **THE WITNESS:**  Natalia Solovyeva.

        **DIRECT EXAMINATION (CONTINUED)**

**BY MS. DeWITT:**

Q    Ms. Solovyeva, at this time, I'd ask you to look at
Government's Exhibit 319, which was previously admitted into
evidence.

A    Yes.  I can see that these are sneakers, Iouri's sneakers.

Q    And Ms. Solovyeva, do you recognize these as being a

**DRAFT COPY**

Solovyeva - Direct / By Ms. DeWitt          101

particular pair of sneakers that Defendant Kadamovas wore?

A     Yes.  These are the sneakers that he would wear.

Q     Do you recognize those as being the sneakers that he wore that night when he came -- that morning when he came back from the trip to the lake?

A     Yes.

Q     So these are the same sneakers that you washed the blood and mud off of for Defendant Kadamovas?

A     Yes.

Q     And do you recognize these sneakers because you used to live with Mr. Kadamovas and you saw him wearing them?

          MR. SPEAKER:  Objection --

          THE COURT:  Sustained.  It is a leading question: "How do you recognize these sneakers?"

          MS. DeWITT:  Withdraw the question.

BY MS. DeWITT:

Q     Ms. Solovyeva, how is it that you recognize these blue and white, size seven and a half Adidas?

A     I recognize these.  I recognize these sneakers because Kadamovas was wearing them and we always had them at home.  And these were the sneakers he would usually wear.

Q     Ms. Solovyeva, can you now, please, take a look at what was previously admitted as Government's Exhibit 319-A and 319-B.

          MS. DeWITT:  And for the record, I'm also going to be

**DRAFT COPY**

Solovyeva - Direct / By Ms. DeWitt          102

showing the first 319-A on the screen for the jury.

**BY MS. DeWITT:**

Q    Ms. Solovyeva, do you recognize what's depicted in

Government's Exhibit 319-A?

A    Yes, I do.  It's a storage -- a shoe storage in our home.

My sneakers and his sneakers, his shoes.

Q    And Ms. Solovyeva, when you say that it's a shoe storage

in your home, do you mean your home on Linley Avenue?

A    Yes.

Q    And you indicated -- you described two different pairs of

shoes and can you circle the pair of shoes that you recognize

as being Defendant Kadamovas' on Government's Exhibit 319-A?

You could circle it directly on the screen, Ms. Solovyeva.  And

which pair of shoes, Ms. Solovyeva, are the pair that you

described as being your sneakers?

A    On the -- on the left side.  Would you like me to circle

that?

Q    On the left side of the white pair of sneakers?

A    Yes.

          MS. DeWITT:  And your Honor, for the record,

Ms. Solovyeva has circled the blue and white pair of sneakers

that are indicated at the center of Government's Exhibit 319-A.

          THE COURT:  All right.  Of the two pair of sneakers

on the bottom shelf is the pair on the right.

          MS. DeWITT:  Thank you, your Honor.

**DRAFT COPY**

Solovyeva - Direct / By Ms. DeWitt            103

**BY MS. DeWITT:**

Q    Ms. Solovyeva, can you now please take a look at Government's Exhibit 319-B; when did Defendant -- I'm sorry -- do you recognize what's depicted in this photograph?

A    I recognize his sport shoes, sneakers.

Q    That's the item on the right-hand side of the photograph, Ms. Solovyeva?

A    Yes.  Would you like me to circle it?

Q    Sure.  Now, Ms. Solovyeva, I'd ask you to look at what's been marked for identification as Government's Exhibit 516.

        **THE COURT:**  516 or 1516?

        **MS. DeWITT:**  1516.  Thank you, your Honor.

**BY MS. DeWITT:**

Q    Ms. Solovyeva, do you recognize what's depicted in Government' Exhibit 1516?

A    Yes, I do, Kadamovas and Mikhel.

        **MS. DeWITT:**  And at this time, your Honor, I'd move to admit Government's Exhibit 1516 into evidence.

        **THE COURT:**  1516 admitted this date.

        **(Government's Exhibit Number 1516 was received in evidence)**

        **MS. DeWITT:**  And if Ms. Meyer could please publish that for the jury.

//

//

**DRAFT COPY**

Solovyeva - Direct / By Ms. DeWitt          104

**BY MS. DeWITT:**

Q     Ms. Solovyeva, do you recognize the tennis shoes that Defendant Kadamovas is wearing in this photograph?

A     Yes, I do.  These are the same tennis shoes, Adidas.

Q     The same tennis shoes that had the blood and the dirt on them?

A     Yes.

Q     Now, Ms. Solovyeva, where is -- where is this picture taken?

A     This photograph was taken at the back of the house, the back view of the -- Mikhel's house, like, in the patio.

Q     And is that Defendant Mikhel's house at Oakview?

A     It's Mikhel's house.

Q     The house that was on Oakview Drive?

A     Yes.

Q     And at this time, Ms. Solovyeva, I'd ask you to look at what's been marked for identification as Government's Exhibit 1517; do you recognize what's depicted in that photograph?

A     Yes, I do.  This is Kadamovas.

Q     It's Defendant Kadamovas?

A     Correct.

        **MS. DeWITT:**  And at this time, your Honor, the Government would move to admit Government's Exhibit 1517 into evidence.

//

**DRAFT COPY**

Solovyeva - Direct / By Ms. DeWitt          105

**THE COURT:** Admitted this date.

**(Government's Exhibit Number 1517 was received in evidence)**

**MS. DeWITT:** And if Ms. Meyer could please publish that to the jury?

**BY MS. DeWITT:**

Q    And again, Ms. Solovyeva, do you recognize what Mr. -- Defendant Kadamovas is wearing in this photograph?

A    Yes.

Q    What is he wearing in this photograph?

A    The same sneakers.

Q    The same sneakers that had the blood and the mud on them?

A    Yes.

Q    Now, Ms. Solovyeva, this series of events that you've just been describing, the extended period of time that Mr. Kadamovas was away from the house and when you dropped off these items; can you tell the jury approximately when those events occurred?

A    This was approximately in the beginning of October 2001. I would say it was after we had celebrated my birthday.

Q    And when is your birthday, Ms. Solovyeva; what date?

A    October 7th.

Q    And just approximately how much time passed after your birthday to the best of your recollection to the time these events took place?

A    I would say a few days.  I don't remember exactly but a

**DRAFT COPY**

Solovyeva - Direct / By Ms. DeWitt                106

very short period of time.

Q    Ms. Solovyeva, did you find out what Defendant Kadamovas

and Defendant Mikhel were doing on this trip that they took up

north?

A    Yes, after some time I had found out.

Q    And what did you find out that Defendant Mikhel and

Defendant Kadamovas were doing on this trip up north in

October --

         MR. CALLAHAN:  Objection, foundation.

         MS. DeWITT:  -- in October of 2001.

         THE COURT:  Sustain the objection.  You may re-ask

but you've got to lay the foundation.

BY MS. DeWITT:

Q    And so Ms. Solovyeva, you did find out what they were

doing on this trip?

         THE COURT:  You can answer it yes or no, only.  Yes

or no only.

         THE WITNESS:  Yes.

BY MS. DeWITT:

Q    And how did you find out what they were doing on this

trip?

A    After some time Kadamovas had told me.

Q    And what did Defendant Kadamovas tell you that he and

Mikhel had been doing on this trip up north?

         MS. CHAHIN:  Objection, foundation as to the time of

**DRAFT COPY**

Solovyeva - Direct / By Ms. DeWitt          107

the conversation.

THE COURT:  All right.  Time?  Place?  Date?

MS. DeWITT:  As to when she found out, your Honor?

THE COURT:  Yes, the best you can.

BY MS. DeWITT:

Q    Ms. Solovyeva, to the best of your recollection when did you find out -- without going into what you found out -- when did you find out what Defendant Kadamovas and Defendant Mikhel were doing on this trip up north?

A    I don't remember exactly but soon after maybe a week or several weeks after or a month.  I do not know exactly.

Q    And Ms. Solovyeva, you found out what they were doing on this trip because Defendant Kadamovas told you?

A    Exactly.

Q    And what did Defendant Kadamovas tell you that they had been doing on this trip?

A    That they threw out the body of the American.

Q    And Ms. Solovyeva, to the extent that you can remember, what was the context in which he was telling you that information, Defendant Kadamovas?

A    From what I recall or from what I can remember that this was a negative expression about Ainar, something to the effect that he was not helpful, that he did not join, that it was very difficult to throw out the body.

Q    So basically, Ms. Solovyeva, the way you learned about

**DRAFT COPY**

Solovyeva - Direct / By Ms. DeWitt        108

this is because Defendant Kadamovas was complaining about Ainar

Altmanis?

A    From what I recall, yes.

Q    Ms. Solovyeva, was there another time after this incident

that you became aware of Defendant Kadamovas going on an

overnight car trip?

A    Yes.

Q    And when was that second overnight car trip that you

became aware of?

A    Approximately at the beginning of December 2001.

Q    What car did Defendant Kadamovas drive on that trip?

A    He took the same car, Nissan Quest.

Q    How do you know that Defendant Kadamovas drove the Nissan

Quest van on this overnight trip?

A    Because he asked me to bring that -- this car to the

Weslin house.

Q    And did you do that, Ms. Solovyeva?

A    Yes.

Q    Where was Defendant Kadamovas when he asked you to bring

him the Nissan Quest van?

A    He was at the Weslin house and he was standing outside the

house.

Q    So he met you outside when you dropped off the van?

A    Yes.

Q    Was anyone with Defendant Kadamovas when you dropped off

**DRAFT COPY**

Solovyeva - Direct / By Ms. DeWitt          109

the van to the Weslin house?

THE INTERPRETER:  I'm sorry; could you repeat the question, please?

THE COURT:  Was anybody with Mr. Kadamovas when you dropped off the van at the Weslin house?

THE INTERPRETER:  Thank you.

THE WITNESS:  There was Ainar standing outside the house because Ainar was the one who had took me home after I dropped off the car.

BY MS. DeWITT:

Q    So Ms. Solovyeva, after you dropped the van Mr. Altmanis is the one who gave you a ride home?

A    Yes.

Q    Did Ainar Altmanis say anything to you when he gave you a ride home that day?

A    Yes.

Q    What did he say?

A    He was very upset and irritated.  And he said that the business is not going well, that everything is not the way it should be with these Jews, that it's impossible to obtain the information.  That's what I recall.

Q    Now, you said that Defendant Kadamovas was gone overnight after you dropped off the Nissan Quest van that day; did he go alone on this trip, to your knowledge?

A    Based on my knowledge --

**DRAFT COPY**

Solovyeva - Direct / By Ms. DeWitt          110

**MR. CALLAHAN:** Objection, your Honor, lay a better foundation.

**THE COURT:** All right. I'll sustain an objection.

**BY MS. DeWITT:**

Q   Ms. Solovyeva, do you know whether or not he went with anybody on that trip?

A   Yes.

Q   And how do you know whether or not he went with somebody on that trip?

A   Because after this trip he came back to our house -- to our apartment with Krylov.

Q   When Defendant Kadamovas came home after this trip he had Petro Krylov with him; is that what you're saying?

A   Correct. Yes.

Q   And when did Defendant Kadamovas and Petro Krylov arrive at your house, approximately?

A   Early in the morning.

Q   Did you notice anything unusual when Defendant Kadamovas came home with Petro Krylov after this overnight trip?

A   Yes.

Q   What did you notice?

A   Krylov had asked me to wash his jeans because there was a spot of blood on his jeans.

Q   Did Petro Krylov tell you how he had gotten blood on his jeans?

**DRAFT COPY**

Solovyeva - Direct / By Ms. DeWitt          111

A     No.  No.

Q     Did the blood that was on his jeans appear to be a recent blood stain?

MR. CALLAHAN:  Objection -- objection, foundation.

THE COURT:  No.  I'm going to overrule the objection.

THE WITNESS:  Yes.  Yes, to some extent, yes.

THE COURT:  How did you make that determination?

THE WITNESS:  It wasn't dry; it was fresh not very dark.

BY MS. DeWITT:

Q     Was it a lot of blood?

A     No, it was a small spot.

Q     Did Petro Krylov do anything about the blood spot on his jeans?

A     Yes.  He asked me to wash his jeans.

Q     And did you wash his jeans out for him?

A     Yes, I did.

Q     And did the blood come out when you washed the jeans?

A     No, not fully.

Q     What was Petro Krylov's reaction when the blood didn't come out of his jeans after you washed them?

A     He was upset and he scolded me that I had washed his jeans in the warm water instead of the cold water.  That's why the blood spot was still there and one can still see it if you can really look for it and if you know that it's there.

**DRAFT COPY**

Solovyeva - Direct / By Ms. DeWitt          112

Q    Ms. Solovyeva, did you find anything else unusual or did you find anything unusual in the van after this overnight trip?

A    Kadamovas usually cleans the car.  I don't remember.

Q    Did you find anything in the Nissan Quest van after this particular overnight trip?

A    This was the next day when I found the passport.  And I am sure that it was the next day.  This passport belonged to a woman about 30 or 35 years old, white female.

Q    So Ms. Solovyeva, you recall finding the passport for a white female in the Nissan Quest van after this trip was taken by Defendant Kadamovas and Petro Krylov?

A    Yes, I do remember.

Q    And I take it from your answer that you don't recall the name on the passport; is that right?

A    I do not remember.  I remember looking at it but I did not remember it.

Q    When you first found this passport in the Nissan Quest van did you ask Defendant Kadamovas about it?

A    Yes, I did.

Q    And what did you --

A    I asked Kadamovas.

Q    What did you say to Mr. Kadamovas about the passport that you had found in the Nissan Quest van?

A    I asked Kadamovas who this passport belongs to, who she is and what relation -- what relation she is to him.  In my view,

**DRAFT COPY**

Solovyeva - Direct / By Ms. DeWitt          113

she was someone he could have an affair with or an acquaintance, that's why I had asked.

Q    What did Defendant Kadamovas say to you when you asked him about the passport that you'd found in the Nissan Quest van after this overnight trip?

A    He said that this passport belongs to one of Mikhel's acquaintances.

Q    After you found the passport in the Nissan Quest van did you learn about a Russian business woman who had reportedly gone missing in the area, in specifically the Los Angeles area?

A    Yes, after some time I found out.

Q    How did you learn about this Russian business woman who had reportedly gone missing?

A    I found out through the hairdresser who's name is "Luba."

Q    Ms. Solovyeva, what did Luba, your hairdresser, tell you about this woman?

        MR. CALLAHAN:  Objection, hearsay, your Honor.

        MS. DeWITT:  It's not offered for hearsay purpose, your Honor.

        THE COURT:  It's being offered for state of mind. Overruled the objection not for the truth.

BY MS. DeWITT:

Q    You can answer, Ms. Solovyeva.

A    When I came to my hairdresser she asked me whether I had heard that a very famous accountant in -- that a very famous

**DRAFT COPY**

Solovyeva - Direct / By Ms. DeWitt          114

accountant was missing, Rita Pekler.

Q    After you learned about this from Luba, your hairdresser, did you ever find out anything more about the passport that you'd found in your van?

A    Yes, I did.

Q    Can you explain how that happened?  How did you find out more about the passport that you found in your Nissan Quest van?

A    When I heard Luba saying to me that a woman had been missing and had been kidnapped I immediately thought about Kadamovas and about the passport that I found in our car, the passport that belonged to a woman.  And when I asked Kadamovas whether the passport that I had found in the car belonged to the missing woman, Rita Pekler, he told me, "Yes."

Q    So Ms. Solovyeva, after you learned about -- or after Luba, your hairdresser, told you about this woman you went back to Mr. Kadamovas and asked him again about the passport; is that how it happened?

A    Yes.

Q    Now, when you asked him again this time, did Defendant Kadamovas told you who the passport belonged to?

A    Yes.

Q    And specifically, who did he tell you the passport belonged to?

A    To Rita Pekler.

**DRAFT COPY**

Solovyeva - Direct / By Ms. DeWitt          115

Q    Ms. Solovyeva, after the incident with the passport and that second overnight trip, did you become aware of another time when Defendant Kadamovas' activities were unusual?

A    Yes.

Q    And when was that?

A    In a very short period of time after the second overnight trip.

Q    Now, Ms. Solovyeva, what activities was Defendant Kadamovas engaging in at that time that you thought were unusual?

A    I didn't understand the question.

Q    What activities was Defendant Kadamovas engaging in at that time that you thought were unusual?

A    Again, he was absent a huge amount of time; spent time in Weslin house, then sometime later, again, he was away for the night and --

Q    Did Defendant Kadamovas tell you what he was doing during this period of time when he was again absent from the house for extended periods of time?

A    He said that they were keeping in Weslin house Krylov's former boss.

Q    Did he tell you who "They" were?

A    No.  No, he didn't specify it, but I know.

Q    Ms. Solovyeva, how many days was this period of time that Defendant Kadamovas was absent for an extended period of time?

**DRAFT COPY**