# GOVERNMENT EXHIBIT 10

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

- - -

THE HONORABLE DICKRAN TEVRIZIAN, JUDGE PRESIDING

- - -

U.S.A.,                              )
                                     )
                    Plaintiff(s), )
                                     )
        vs.                          ) CR02-220(B)-DT
                                     )
IOURI MIKHEL; JURIJUS KADAMOVAS,)
                                     )
                    Defendant(s). )
_____)

REPORTER'S TRANSCRIPT OF PROCEEDINGS

JURY TRIAL - DAY 24

9:30 A.M. TO 11:58 A.M.

LOS ANGELES, CALIFORNIA

THURSDAY, OCTOBER 12, 2006

GAIL PEEPLES,CSR
Contract Court Reporter
100 United States Courthouse
312 North Spring Street
Los Angeles, California 90012
(213) 894-3013

JAMES S. DAVIDSON, FBI Special Agent

VARVARA OLSON, Russian Interpreter

LUDMILLA GENN, Russian Interpreter

ZOYA SPIVAKOVSKY, Russian Interpreter

ALEX J. LEVOFF, Russian interpreter

CHRISTINA LARSON GITS, paralegal

A.   More than half an hour.  About 40 minutes.

Q.   And during that time period when you stayed around the house, did you hear any additional discussions with Ms. Pekler?

A.   Yes.  After that conversation that took place part -- that happened in the kitchen, Mikhel and Kadamovas went to the room where Ms. Pekler was together with Krylov.  And I followed them and I stayed in the door opening and I heard the conversation.

Q.   And what did you hear?

A.   Ms. Pekler was trying to find out which way they going to let her go and which way they going to release her because the alcohol wasn't part of it now.

Q.   Okay.  You discussed yesterday that there was some discussion with Ms. Pekler about releasing her after she did her part to try to lure Mr. Safiev to the defendants.

Was this discussion along the same lines as that discussion?

A.   Yes.  It followed the same scenario.  And they were joking now.  And Ms. Pekler even told them which part of the leg she wanted to get the shot in.

Q.   And what was the purpose or -- at least what were the defendants -- strike that.

Did you know why -- why was there -- why was she being told that she would be injected with Dimedrol?

A.    She already told them that she didn't use alcohol.  And at that time she mentioned that she was pregnant and she asked -- she was worrying that Dimedrol might bring her harm. And she was explained that it wouldn't.

Q.    And did you believe that she was pregnant?

A.    I can't say.  She said that.

But I heard Mikhel and Kadamovas discussing it between themselves that she might pretend, lying to make her safer.

Q.    Now, after this discussion that you heard about Ms. Pekler commenting where she wanted to be -- where the injection would take place on her body with the drug, did you hear anything to indicate who the person was who was going to be injecting Ms. Pekler?

A.    Yes.  They discussed between themselves.  Mikhel, Krylov, and Kadamovas.  And I was there.  And it was decided that Krylov would be the one who would make an injection.

Q.    Now, can you estimate approximately what time it was when you left Mr. Kadamovas' house.

A.    After 8:00 o'clock.  8:30 or something around -- something close to it.

Q.    Okay.  Was this 8:30 in the evening or in the morning?

A.    It was in the evening.

Q.    And when you left Mr. Kadamovas' house that evening, was Ms. Pekler still alive?

Q.   So subsequent to Ms. Pekler's murder, Mr. Safiev and Mr. Kharabadze were killed.

Is that correct?

A.   Yes.

Q.   And what did -- what did defendant Mikhel tell you about Ms. Pekler and what happened?

A.   He said that Safiev had the same capacity not to die as the Pekler.  He said he was -- he said she was -- she was like a snake can kill her.

Q.   Okay.  What does that mean?  What did that mean to you? What do you understand that to mean about how she was like a snake to kill?

A.   That it was difficult to kill her, that she was -- she was holding for her life.

Q.   And when defendant Mikhel told you that it was difficult to kill her and that she was holding on for her life, who was he comparing her murder with?

MR. RUBIN:  Objection.  Asked and answered.

THE COURT:  Overruled.

THE WITNESS:  With Safiev's.

BY MR. DUGDALE:

Q.   Now, Mr. Altmanis, did you receive any money from either of the defendants as a result of assisting them with the abduction of Ms. Pekler?

A.   No, I didn't.  Neither I nor they got anything.  The

what sort of boss he thought that Mr. Umansky was?

A.   He gave a lot of information about Umansky's business. And he added that Umansky was cruel and unfair person.

Q.   Did he explain how his relationship with Mr. Umansky ended?  How his employment ended?

A.   Yes.  He explained that Umansky was very particular to him, didn't pay him several times, and treated his employees poorly.

And he meant that at the end Umansky fired him with a scandal.

Q.   Now, what was defendant Mikhel's reaction when Mr. Krylov said this information in this discussion?  The information about the $50,000 per month, for instance, that Mr. Umansky made with his business.

A.   They liked the idea.  They grabbed it.

Q.   What do you mean by that?

A.   Mikhel says "okay.  Okay.  Go ahead.  Tell us more. What else is in there?"

Q.   And what was defendant Kadamovas' reaction to hearing all this information about Mr. Umansky?

A.   He supported their idea.

Q.   And what idea was that?

A.   They liked the idea that Krylov led them to Umansky and they asked him to find an opportunity to figure out more about -- find out more about his finances and his business at

that time.

Q.   Who instructed Mr. Krylov to try and find out more information about Mr. Umansky's business and finances?

A.   Mikhel and Kadamovas.  And Krylov himself was taking active part in it.

Q.   Okay.  Was Mr. Krylov instructed to do something particular to find out more information about Mr. Umansky's finances?

A.   They asked whether Krylov had an opportunity to go back to the business and be there -- when he had a legitimate purpose to go back there and find out more information.

Krylov said, "yes.  I still have some equipment that belongs to the business" --

Q.   Okay.  And what business -- what business supposed --

THE COURT:  There was --

MR. DUGDALE:  I'm sorry.

THE WITNESS:  It was his personal equipment.

BY MR. DUGDALE:

Q.   What business was he supposed to go back to?

A.   To the Umansky's company.

Q.   And was there a discussion about how Mr. Krylov could explain going back to this business where he had been terminated?

A.   Oh.  That the excuse was that he was supposed to pick up his personal items from the business.  And that would give

Q.    And Mr. Altmanis, when did the abduction of Mr. Umansky take place in relationship to the abduction and murder of Ms. Pekler?

A.    It wasn't long after Pekler.  A couple of weeks.

Q.    Now, you testified that one aspect of the plan was to have Mr. Mikhel contact Mr. Umansky to interest him in coming to see these cars.

Do you know how defendant Mikhel was able to get contact information to contact Mr. Umansky?

A.    Yes, I do.

Q.    And how was defendant Mikhel able to get the contact information necessary to -- necessary to talk to Mr. Umansky?

A.    Petre Krylov gave him complete information.

Q.    And did Mr. Mikhel end up calling Umansky on the day that he was abducted?

A.    Yes, he did, several times.

Q.    And did you witness any of these phone calls?

A.    Yes.  In everyone's presence.

Q.    And when did the first of these phone calls occur on the day that Mr. Umansky was abducted?

THE INTERPRETER:  Interpreter needs to verify something.

THE COURT:  You may.

THE WITNESS:  The first call was made from my car after the lunch time.  After 12:00.

BY MR. DUGDALE:

Q.    Okay.  And where was your car at the time that Mr. Mikhel made this phone call?

A.    Not far from Range Rover dealership in North Hollywood.

Q.    And why was the call placed from that location?

A.    From the conversation between Mikhel and Umansky, Mikhel told Umansky that that was the spot or the place where he was buying a new car.

      And according to what Mikhel said to Umansky, he was leaving his own car as a trade-in at the same place and that in the result of this he was -- he didn't have a car. And he asked Umansky whether Umansky could pick him up from the dealership and then they would go together to the mountains to look at the Hummer.

Q.    Okay.  And was this -- what you've just related to us, was this the substance of the first call that you witnessed Mr. Mikhel make to Mr. Umansky that day?

A.    Yes.  That telephone call was placed from my car and that was conversation that Mr. Mikhel had with Mr. Umansky.

Q.    And after this conversation occurred, did Mr. Mikhel tell you what Mr. Umansky's response was to this request to pick him up at the Range Rover dealership?

A.    Umansky was very busy and he apologized and he asked Mikhel to call him back an hour later.

Q.    And after Mr. Umansky asked Mr. Mikhel to call him back

an hour later, what did you and defendant Mikhel do?

A.   In order not to sit in the car while we were waiting, we stepped out of the car and -- to wait.  And we went to a pancake place to eat.

Q.   And what did you do after you were finished eating?

A.   Mikhel called Umansky again.

Q.   And did you witness this second phone call?

A.   Yes, I witnessed it.

Q.   And what did defendant Mikhel tell Mr. Umansky during this second phone call?

A.   He asked him whether he was available and whether he could come and pick him up.  And Umansky apologized and said that he was in the middle of very important business -- a very important meeting and then he asked Mikhel to call him closer to the evening.

Q.   And Mr. Altmanis, when did this second phone call that you witnessed occur in relationship to when the first phone call occurred?

A.   An hour later.

Q.   Now, when Mr. Umansky told defendant Mikhel that he was busy until the evening and that he should call back then, what did you and defendant Mikhel do?

A.   We went to Kadamovas' house where there were Krylov and Kadamovas.

Q.   Okay.  Now, you've described this house earlier as a

house in the mountains.

Why do you describe it that way?

A.    Because it is on a mountain.

Q.    Okay.  And where is this house located, for instance, in relationship to where Designed Water World is?

A.    If one goes down from the house, one would immediately get to Ventura Boulevard.

Q.    And -- so approximately how far away is it driving distance from this house that defendant Kadamovas had to Designed Water World?

A.    It depends.  If one drove observing all the rules, it would take 7 or 8 minutes.  If not, then in 5 minutes you could get there.

Q.    Okay.  And who was at defendant Kadamovas' house when you came back -- came there that day with defendant Mikhel?

A.    Kadamovas himself and Krylov.

Q.    And what happened after you arrived at defendant Kadamovas' house with defendant Mikhel after these phone calls to Mr. Umansky that you observed took place?

A.    Mikhel told Kadamovas and Krylov that he had placed several calls to Umansky and that Umansky was very busy, very busy, until the very evening and if in evening Mikhel called him again and Umansky was busy again then they will give up the idea of kidnapping at all.

Q.    Now, after defendant Mikhel told this to defendant

Kadamovas himself and Mr. Krylov, did defendant Kadamovas and defendant Mikhel and Mr. Krylov go somewhere?

A.    Yes.  All of us went to a similar store, a store similar to that one of the installation of the electronic equipment on Ventura.

Q.    A similar store to what?

A.    Similar to Umansky's business.  So that Mikhel could --

MR. RUBIN:  Objection, Your Honor.  Nonresponsive.

THE COURT:  I haven't heard the answer, so I can't -- unless you speak Russian, you're ahead of the game.

MR. RUBIN:  The question was similar to what business?

He said --

MR. DUGDALE:  I'll ask a follow-up question.

MR. RUBIN:  -- the next part of the answer was so that --

THE COURT:  He's going to withdraw the question, ask another question.

BY MR. DUGDALE:

Q.    What was this business that the defendants went to?  What kind of business was it similar to?

A.    Umansky's business.

Q.    And why did the defendants go to that business?

A.    In order to see with their own eyes what kind of equipment they were going to ask Umansky to install.

Q.    And did you go to the store directly with the defendants and Mr. Krylov?

A.    No.  We separated.  Krylov went there in his own car with Kadamovas and Mikhel.  And I drove in my Navigator home.

Q.    After you went home in your Navigator, did you meet up with the defendants at that store?

A.    Yes, I did.  Sometime later.  I walked to the store.  It was not very far away.

Q.    And what did you observe at the store when you arrived there?

A.    There were Kadamovas, Mikhel, and Krylov.  They were walking around the store and looked at the things that they might want and need.  And Krylov was explaining Mikhel what was what and how it could be used.

Q.    And how long did the four of you -- the two defendants, yourself, and Mr. Krylov -- stay at that store?

A.    Approximately half an hour.  Because the time was close to 7:00 p.m. and that was the time when Umansky asked Mikhel to call him.  That's why Mikhel said that's it time to go.

Q.    Okay.  And after defendant Mikhel said that it's time to go, where did the four of you go?

        MR. RUBIN: I'm going to object that the question. Assumes facts not in evidence.

        THE COURT:  Sustained.

BY MR. DUGDALE:

Q.   After defendant Mikhel said, "okay, it's time to go," did the four of you leave the store?

A.   Yes.  We went out.  We went in Krylov's car, Infinity. And Krylov was driving.  And Mikhel was on the front seat together with him.  And I and Kadamovas were in the back seat.

Q.   And where did the four of you go in Mr. Krylov's Infinity?

A.   In the direction that Mikhel told us to go.  It was in the direction of Coldwater Canyon and Ventura next to the store Ralph's.

Q.   And what happened when the four of you arrived near Coldwater Canyon and Ventura Boulevard?

A.   We parked in one of the nearby street.  And only ten minutes was left until 7:00 o'clock, until the time of the telephone call.  We were sitting there and waiting.

Q.   Okay.  And what were you waiting for?

A.   Mikhel was waiting for 7:00 o'clock so that he would be very accurate and make a call at 7:00 o'clock.

Q.   And did Mikhel call somebody at 7:00 o'clock?

A.   Yes.  At 7:00 o'clock he told us to shut up and he placed a call to Umansky.

Q.   And were you able to hear what Mikhel said during this telephone call?

A.   Yes.  It could be heard what Mikhel was saying.  But it

Page: 51 of 65

could not be heard what Umansky was answering.

Q.   And who was present when this telephone call was made?

A.   In the presence of Kadamovas, Krylov, and myself.  We were all in the same car.

Q.   And what did defendant Mikhel tell Umansky during this telephone call?

A.   He asked whether Umansky was available after all his business meetings.  And then he said all right.  And Umansky said that yes he was available.  And probably he asked Mikhel where he was located because Mikhel told him that he was at the corner of Coldwater Canyon and Ventura at one of the gas stations.

But I don't remember which gas station he mentioned because there were two gas stations there.

Q.   After this phone call took place where defendant Mikhel told Umansky to meet him near Coldwater and Ventura, did defendant Mikhel give you any instructions?

A.   Yes.  After he told Umansky what he looked like and where he would be standing -- because Umansky had never seen him before and Umansky was supposed to come sometime to pick him up -- he told us to go to Kadamovas' house.

Q.   And did defendant Mikhel, before he instructed you to go to Kadamovas' house did he tell you what Mr. Umansky said to him during this phone call that you heard?

THE INTERPRETER:  I lost the end of the sentence.

I'm sorry. Can you please repeat.

BY MR. DUGDALE:

Q. Did defendant Mikhel tell you and the other people present during this telephone call what Mr. Umansky had told him when he called him?

A. Yes. He said that they're meeting with him at that gas station and told us to go to the house and wait for them there.

Q. What did defendant Mikhel do after he told you to go to the house and wait for them there?

A. He left the car. He went to the appointment place. And Krylov took myself and Kadamovas to Kadamovas' house.

Q. And why did you go to defendant Kadamovas' house?

A. To wait until Mikhel bring Umansky to the trap and myself and Kadamovas would be waiting for him there.

Q. Okay. And did Mr. Krylov stay at Kadamovas' house to wait for Alexander Umansky to arrive with defendant Mikhel?

THE INTERPRETER: Could you repeat please.

MR. DUGDALE: Sure.

Q. Did Mr. Krylov stay at defendant Kadamovas' house to wait for Alexander Umansky to arrive with defendant Mikhel?

A. No. He brought us and left. He couldn't stay there because Umansky knew him because he had worked there.

Q. Okay. And why would that have created a problem if Krylov would have been around when Umansky showed up?