# GOVERNMENT EXHIBIT 11

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

# DRAFT COPY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO:  CR-02-220(B)-DT |
| | ) | |
| Plaintiff, | ) | CRIMINAL |
| | ) | |
| vs. | ) | Los Angeles, California |
| | ) | |
| IOURI MIKHEL, | ) | Wednesday, November 8, 2006 |
| JURIJUS KADAMOVAS, | ) | (9:38 a.m. to 11:57 a.m.) |
| | ) | (1:44 p.m. to  4:49 p.m.) |
| Defendants. | ) | |

JURY TRIAL (39th DAY)
(VOLUME XXXIX)

BEFORE THE HONORABLE DICKRAN TEVRIZIAN,
UNITED STATES DISTRICT JUDGE

EXCEPTIONAL REPORTING SERVICES, INC
14493 SOUTH PADRE ISLAND DRIVE
SUITE A-400
CORPUS CHRISTI, TX 78418-5940
361 949-2988

Solovyeva - Cross / By Ms. Chahin                    5

THE COURT:  It should be 2040.

MR. LASTING: 2040?

THE COURT:  2040.

(Off the record discussion)

(Jury enters at 9:39 a.m.)

Good morning, ladies and gentlemen.

The record will indicate that all jurors are present. All counsel and parties are present.

Ms. Solovyeva, you're still under oath.

State your name for the record.

THE WITNESS:  Natalya Solovyeva.

THE COURT:  You may continue.

MS. CHAHIN:  Thank you, your Honor.

CROSS EXAMINATION (CONTINUED)

BY MS. CHAHIN:

Q   Ms. Solovyeva, at some point after Mr. Kadamovas was arrested, did you learn that $25,000 had been transferred into the Designed Water World business account?

THE INTERPRETER:  The account of Designed Water World?

MS. CHAHIN:  The Designed Water World business checking account.

THE WITNESS:  I don't remember exactly.  But most likely Kadamovas mentioned it when he was in custody.

//

DRAFT COPY

Solovyeva - Cross / By Ms. Chahin                    6

**BY MS. CHAHIN:**

Q    Do you recall whether or not you had any discussions with Marina Karogodina in order to devise a plan to get that money out of the account?

A    I don't remember.  Maybe.  I don't remember exactly.

Q    If I were to show you a document, do you think that might refresh your recollection?

A    Please.

         **MS. CHAHIN:**  And if I could have one moment, your Honor.

         If I could have document 83 please.

    **(Pause)**

         Your Honor, if I could approach?

         **THE COURT:**  You may.

         **MS. CHAHIN:**  Your Honor, I'm placing before the witness a document dated February 24th of 2002.

**BY MS. CHAHIN:**

Q    Ms. Solovyeva, could you please review this document and see if it refreshes your recollection as to whether or not you had a conversation with Marina Karogodina regarding getting money out of the Designed Water World checking business account?

A    Okay.  I'm looking.

    **(Pause)**

         Do you want me to read it completely or only the

**DRAFT COPY**

Solovyeva - Cross / By Ms. Chahin                    7

first paragraph?

Q    I want you to read whatever portion you need to determine if it refreshes your recollection about whether or not you had a conversation with Marina Karogodina devising a plan to get money out of the Designed Water World checking account?

**(Pause)**

A    Yes.

Q    Now, having reviewed that document, do you now have a recollection of whether or not you had any such conversation with Marina Karogodina?

A    Yes.

Q    Okay.  And what was the plan?  How were you going to get the money out of the account?

A    Marina wanted me to sign the check for Kadamovas and transfer money.  And I don't remember how it was going to happen, either to transfer money or to withdraw money.  I remember that the conversation was about me signing the check. And I remember telling her that I had to talk to Kadamovas about it first.

Q    Did you discuss with her how the -- that the money would be divided equally between the two of you?

A    It says here that the money would be divided half and half.

Q    And is that what you discussed with her?

A    Yes.  This is what she told me.

**DRAFT COPY**

Solovyeva - Cross / By Ms. Chahin          8

**MS. CHAHIN:**  Your Honor, at this time I would ask that Defense Exhibits 2040 and 2041 be placed before the witness for identification.

**THE COURT:**  2040 and 2041.

**MS. CHAHIN:**  Yes.  Thank you.

**BY MS. CHAHIN:**

Q    Ms. Karogodina, could you please take a look at these documents and tell me if you recognize them?

I'm sorry.

Ms. Solovyeva, could you please take a look at these documents and tell me if you recognize them?

A    It's hard for me to say.  One check looks like my handwriting, and the other check doesn't.

Q    Which check looks like your handwriting?

A    I would say Exhibit 2041, the check written to Marina Mikhel.

**MS. CHAHIN:**  Your Honor, at this time --

**THE WITNESS:**  I'm sorry.

**MS. CHAHIN:**  Go ahead.

**THE WITNESS:**  I wrote the date, the amount, the name, the amount, and the amount in writing.  This is not my signature.  I doubt.  I didn't sign it like that.  Because "M" is written in Russian, and I don't think that I would write "M" in Russian.

**MS. CHAHIN:**  Your Honor, I would ask that Exhibits

**DRAFT COPY**

Solovyeva - Cross / By Ms. Chahin                9

2040 and 2041 be received in evidence.

THE COURT:  Any objection?

MS. DeWITT:  Object to foundation, your Honor.  She said she doesn't recognize it.

THE COURT:  All right.  Sustain the objection as to foundation at this time.

MS. CHAHIN:  Your Honor, I would ask that they be submitted as self authenticating.

THE COURT:  Let me see.

How can they be self authenticating?

There's no evidence as to the manner in which they were kept.  So I sustain the objection at this time.

BY MS. CHAHIN:

Q    Ms. Solovyeva, aren't these in fact -- isn't that in fact your signature on both of these checks?

A    I doubt it.  No.

Q    Isn't it true that you forged Mr. Kadamovas' signature and wrote these checks in accordance with the plan that you discussed with Marina Karogodina in a conversation on February 24th of 2002?

A    I didn't understand the question.

Did you say I was forced?

Q    No.  I said you forged the signature.  You forged Mr. Kadamovas' signature and wrote these two checks in accordance with the plan that you discussed with Marina Karogodina on

**DRAFT COPY**

Solovyeva - Cross / By Ms. Chahin                10

February 24th of 2002?

MS. DeWITT:  Your Honor, I'm going to object to the question as being compound, because it's asking her both whether she signed the check and whether it was in accordance with some so-called plan.

THE COURT:  Sustain the objection to the form of the question --

MS. CHAHIN:  Thank you, your Honor.

THE COURT:  -- but not the area of inquiry.

BY MS. CHAHIN:

Q    Did you sign the check?

A    I don't think so.  I don't know.

Q    Did you and Marina Karogodina -- were you ever successful in getting those $25,000 out of the design Water World business checking account?

A    I don't think so.  I don't remember.  No.  No.  I don't remember to have withdrawn that money.  I personally didn't withdraw it.  I don't remember.

THE COURT:  All right.  Let me interrupt.

We have the technician here.  I've switched to the computer mode, but it doesn't seem to be working.  Maybe the computer's not on.

MS. DeWITT:  The computer's not on, your Honor.

THE COURT:  The computer is not on?

MS. DeWITT:  It's not set up yet.

**DRAFT COPY**

Solovyeva - Cross / By Ms. Chahin          11

**THE COURT:**  Okay.  That's -- I wanted to know that.

(Indiscernible)

It's working?  Good.  All right.

Let's continue.

**MS. CHAHIN:**  Thank you.

**BY MS. CHAHIN:**

Q    I believe you indicated that you did not obtain any money

from the Designed Water World business checking account after

Mr. Kadamovas' arrest.

Is that your recollection as you sit here today?

A    From what I remember, I didn't go to the bank where the

business account of Designed Water World was.  Again, this is

what I remember.

Q    Aside from going to the bank, did you obtain the money --

excuse me.

Did you obtain the money through any other method?

A    I withdrew money from our account.

Q    I'm referring specifically to the Designed Water World

account.

A    Frankly, I don't remember.  I don't think so.

Q    You indicated that you recognized your handwriting on a

check written to Marina Mikhel; is that correct?

A    Yes.

Q    What other information did you write on that check?

A    The date, the amount, and the amount in writing.

**DRAFT COPY**

Solovyeva - Cross / By Ms. Chahin          12

**THE COURT:**  Now, do you want to make a point of reference for the record?  What exhibit are you specifically talking about?

**MS. CHAHIN:**  Your Honor, thank you.

I'm talking about Defense Exhibit 2041.

**THE WITNESS:**  And as I have already said, I don't remember about the signature.

**BY MS. CHAHIN:**

Q    Are you not certain if you signed it, or you don't remember?

A    I don't remember.  I don't know.  I don't remember, but I have the feeling that I did not.  But I don't remember.

Q    I believe you said in your testimony yesterday that on previous occasions you had signed Mr. Kadamovas' name when he was not around; is that correct?

A    Yes.  When he asked me.

Q    But specifically with reference to this check in Exhibit 2041, you do not recall; is that correct?

A    I don't remember.

Q    What was the purpose of this check?  Why were you writing this check to Marina Karogodina?

A    The reason was to withdraw as much money as possible and to raise as much money as possible to pay for the attorneys. That's why Marina said that there was money on the business account of Designed Water World and that we would withdraw

**DRAFT COPY**

Solovyeva - Cross / By Ms. Chahin                13

money and that we would split this money.

And she would take half and pay for the attorneys for Mikhel.  And I would take half, and I would pay for the attorneys for Kadamovas.  In other words, basically, this money was taken to pay for their attorneys.

Q   So the purpose of giving her that amount of money was going to pay attorneys' fees, correct?

A   It was, yes.

Q   So the check was written after Mr. Kadamovas was arrested, correct?

A   According to the date, the check was written before the arrest.

Q   But you told us that the reason for giving her that money was to pay for attorneys' fees, right?

A   Yes.

Q   On February the 18th of 2002, did you know that Mr. Kadamovas would be arrested the following day?

A   I know that Kadamovas was addressed on the 19th.

Q   Okay.  My question to you is whether or not on February 18th, 2002, you knew that he was going to be arrested the following day?

A   I know that this check was written after Kadamovas was arrested.  That's why I don't remember whether I discussed it with Marina or it was Marina's idea to put down this date.  I don't remember.

**DRAFT COPY**

Solovyeva - Cross / By Ms. Chahin              14

Q     What date did you put on the check?

A     18th.

Q     Why did you back date the check?

A     Because this is how we discussed with Marina.  I don't know.  Maybe this is what Kadamovas asked me to do.  I don't remember.

Q     Between the date of his arrest -- excuse me -- and the date that you wrote this check, had you spoken with Mr. Kadamovas?

A     Yes.  We spoke several times.  Yes.  Almost every day.

Q     What date do you recall writing this check?

A     I don't remember.

Q     In relation to the date of his arrest, do you recall how soon you started trying to gather money for the attorneys?

A     I don't remember exactly.  Maybe the following day or maybe two days later.  Maybe even on the day of the arrest.  I don't remember exactly.

Q     Okay.  And when you were gathering money for the attorneys those were attorneys other than Mr. Lasting and myself; is that correct?

A     Yes.

Q     Now, with regard to this check that was written to Marina Mikhel, was there another check that was written on the same date in the same amount?

A     Yes.

**DRAFT COPY**

Solovyeva - Cross / By Ms. Chahin                15

Q    And looking at -- if I could refer you to Defense Exhibit 2040, can you tell me if any of the writing on this check is your writing?

A    The name and the amount.  No.  This is not my handwriting.

Q    What about the date?

A    No.

Q    And does this date have the same date as the previous check we discussed that you did write?

A    Yes.

Q    And written for the same amount?

A    Yes.

Q    And what is that amount?

A    $11,000.

Q    Now, I believe you told us that at some point after Mr. Kadamovas was arrested, initially the accounts were not frozen. But at some point later they were; is that correct?

A    Yes.

Q    And did you continue to withdraw money from credit cards or other bank accounts until they were frozen?

A    Yes.

Q    Do you know how long after your arrest -- excuse me -- after his arrest they were frozen?

A    From what I remember on the day of my arrest, on the 4th of March, I went to the bank.  And they told me there that the account had been frozen, if I remember exactly.  Or before.  I

**DRAFT COPY**

Solovyeva - Cross / By Ms. Chahin                16

don't remember.

Q    Did they tell you why the accounts were frozen?

A    No.  I don't remember.

Q    Did they tell you whether or not it had to do with the FBI?

A    That it was frozen by FBI.  I don't remember exactly.  But yes, they did tell me something of the kind.

Q    Just so we're clear.  You do remember or you don't remember them telling you it was frozen by the FBI?

A    Most likely it was.  I was told that yes.  That the accounts were frozen by FBI.  But again, I cannot be a hundred percent sure.  I don't remember.

Q    Do you recall having a telephone conversation with Marina Karogodina on March the 4th of 2002 wherein you told her that you found out from the bank people that the accounts were frozen and they were talking about the FBI?

A    Yes.  I remember that I told her that the accounts were frozen.

Q    Now, yesterday I asked you some questions in regard to any certain telephone conversations you had discussing whether or not you had been threatened by the FBI.  I want to ask you a few other questions in that area.  During --

          THE INTERPRETER:  Just one second.

          MS. CHAHIN:  I'm sorry.

//

**DRAFT COPY**

Solovyeva - Cross / By Ms. Chahin                17

**BY MS. CHAHIN:**

Q    During the period of time between the time -- let me

withdraw that.

Do you know on what date Mr. Mikhel was arrested?

A    The same day as Kadamovas, February 19th.

Q    Okay.  And how did you learn that?

A    I went to Marina's home, and I learned about it.  But most

likely -- I don't remember.  But most likely, I saw it in the

documents.  I don't remember whether FBI told me or I learned

it from Marina.  Right now I don't remember.

Q    Okay.  And when you're referring to that you might have

seen it in the documents, what documents are you referring to?

A    Again, I doubt it.  But I might not remember.  But if I do

remember, it might be in the search warrant.

Q    Do you recall having any telephone conversations with Mr.

Mikhel between the period of the date of his arrest and the

date you were arrested?

A    Yes.

Q    And did you discuss with him whether or not the FBI had

talked to you?

A    I remember that at the moment when I was being arrested,

Mikhel called my home.  And I told him that at that moment I

was being arrested.  This is what I remember.

Q    Okay.  Prior to the time that you were arrested, did you

have any discussions with him regarding whether you were going

**DRAFT COPY**

to be deported?

A    I don't remember exactly.  I might have mentioned to him because the deportation issue was always a concern.  Because Kadamovas and Mikhel, they both told me to leave the country.  I remember exactly that Kadamovas told me about it.

Q    Do you recall having a conversation with Mr. Mikhel on February the 27th of 2002 wherein he asked you if you were going to be deported right away, and you responded that "No, they told you to think about it"?

        MS. DeWITT:  Your Honor, I'm going to object to the extent that these questions attempt to interject hearsay statements from the defendants.

        THE COURT:  I'll sustain an objection as to the form of the question but not the area of inquiry.

BY MS. CHAHIN:

Q    Ms. Solovyeva, did you have any discussions with Mr. Mikhel regarding the fact that you were told by the agents that they were not going to deport you right away but they wanted you to think about it?

A    I don't remember exactly.  I do remember that we discussed the issue of me leaving the country and about deportation.  But I don't remember in what context.  I simply don't remember.

Q    Do you recall discussing with him the fact that you were not going to be -- that you were told that you were not going to be deported right away, but that you should -- that you were

Solovyeva - Cross / By Ms. Chahin          19

going to think -- that they wanted you to think about it?

A    I don't remember.

        MS. CHAHIN:  If I could have a moment, your Honor.

     (Pause)

BY MS. CHAHIN:

Q    Ms. Solovyeva, if I were to show you a document, do you think that might refresh your recollection?

A    Please show it to me.

        MS. CHAHIN:  Your Honor, may I approach?

        THE COURT:  You may.

BY MS. CHAHIN:

Q    Ms. Solovyeva, if I could ask you to review the second paragraph of this document please.  And tell me if that refreshes your recollection.

A    Yes.

Q    Do you recall having that conversation with Mr. Mikhel?

A    Yes.

Q    Prior to the time of your arrest, did you have any conversations with a woman by the name of Marianna Baranchik?

A    Yes.

Q    And was Marianna Baranchik a friend of yours?

A    Yes.

Q    Did you ever tell Marianna Baranchik that you were threatened with deportation because you were here illegally?

A    Again, I could have discussed with her the issue of my

**DRAFT COPY**

Solovyeva - Cross / By Ms. Chahin                    20

departure from the country.  And she knew that I was here illegally.  But I don't remember.

Q    Okay.  The question I'm asking you is not whether you talked to her about being deported but whether you told her that you were being threatened with being deported?

A    I don't remember.

Q    If I were to show you a document, do you think it might refresh your recollection?

A    Yes, please.

Q    If you would look at the same document that I've already provided you and if you could look at the first entry on that document.  And please let me know when you're done.

     **(Pause)**

A    Okay.

Q    Do you recall having this telephone conversation with Marianna Baranchik prior to your arrest?

A    I did talk to her.  Yes.

Q    Did you talk to her about the fact that they were talking about deportation, and they said they wanted some kind of help from you?

A    I might have told her something of the kind.  I don't remember exactly.

Q    You indicated you were arrested on March the 4th of 2002; is that correct?

A    On the 4th of March, yes.

**DRAFT COPY**

Solovyeva - Cross / By Ms. Chahin            21

Q    After your arrest, did you continue to have telephone conversations with Marina Karogodina?

A    Yes.

Q    Did you have any discussions with Marina Karogodina whether or not the FBI agents were speaking poorly of you?

A    I don't think so.  I know that I was so frightened when I was arrested.  No.  I don't remember exactly.  I didn't know where my child was and maybe because FBI took away my child.  I don't remember exactly.

Q    Do you recall having any discussions with Marina Karogodina regard -- excuse me.

        **MS. CHAHIN:**  let me withdraw that, your Honor.

**BY MS. CHAHIN:**

Q    If I could -- would it refresh your recollection if I were to show you a document?

A    Please.

        **MS. CHAHIN:**  If I could have one moment, your Honor.

        **(Pause)**

        If I could have document 74.

        Your Honor, may I approach?

        **THE COURT:**  You may.

**BY MS. CHAHIN:**

Q    Ms. Solovyeva, if you could please review this document to determine whether or not it refreshes your recollection.

        **(Pause)**

**DRAFT COPY**

Solovyeva - Cross / By Ms. Chahin                22

A    You would like me to read everything or some portion of it?

Q    Whatever portion you need in order to refresh your recollection in this regard.

        **(Pause)**

A    Okay.

Q    Having read this document, does it refresh your recollection whether or not you had a conversation with Marina Karogodina after your arrest regarding that the agent was speaking poorly of you?

A    Yes.  Yes, I have read it.

Q    Okay.  The question is now having read it, do you remember having this discussion with Marina Karogodina?

A    Most likely yes.  I kind of remember something that she was telling me.  But I don't remember for sure.  This one just reminded me, this what I have just read.

Q    And what do you recall her having told you about what the female FBI agent was saying about you?

        **THE INTERPRETER:**  Could you please repeat your question?

        **MS. CHAHIN:**  I'm sorry?

        **THE INTERPRETER:**  Could you please repeat your question?

        **THE COURT:**  What do you recall of her saying that the female FBI agent said about you?

**DRAFT COPY**

Solovyeva - Cross / By Ms. Chahin                    23

**BY MS. CHAHIN:**

A    Frankly, I don't remember it word for word.  I don't remember.

Q    I'm sorry.  Can you tell us what you do remember, if anything?

A    No, I can't remember.  I remember that they were saying bad things about me, but I don't remember completely what or what in particular they meant by that.  I don't remember.

Q    Subsequent to this conversation with Marina Karogodina, did you have any further discussions with her about the fact that you didn't understand the politics of the FBI?

A    Yes, I remember that I did tell her something of the kind.

Q    Do you recall telling her that at first you didn't understand it because at first the agent told you that you were a victim, and now she's saying bad things about you?

A    Yes, I do remember that.

Q    What did the FBI agent tell you about being a victim?

A    I remember that they told me to be careful or cautious and not to trust anyone, and Marina was not my friend, she was only pretending to be one.  That they wanted kind of help me and protect me.  At that time, I didn't believe them.  I said it couldn't be true.

Q    When did that discussion take place?

A    You mean conversation with Marina?

Q    No, I'm referring to the conversation with the FBI agent.

**DRAFT COPY**

Solovyeva - Cross / By Ms. Chahin          24

A    This is when they came the second time to talk to me.

Q    When you're referring to the second time, are you
referring to the second time after the arrest?

A    No.  It was on the 23rd of February.  It was after
Kadamovas's arrest a week later.  Or the 26th.  I don't
remember exactly.

Q    And what agent did you have that discussion with?

A    At that moment there was a woman agent, Jannette, and I do
not recall who else.

Q    Were there other agents present, if you recall?

A    There was an interpreter there, and some other agents.  I
do not recall who else.

Q    Between the date of Mr. Kadamovas's arrest and your
arrest, did you ever speak with him on the telephone?  I'm
sorry, I believe you said that you did speak with him on the
telephone, is that correct?

A    Yes.

Q    Do you recall having any discussions with him regarding
the topic of whether the FBI had scared you?

A    I remember telling him that they were pressuring me.

Q    Do you recall telling him that they told you that they
would take the child away and deport you?

        THE COURT:  Wasn't this asked and answered yesterday?

        MS. CHAHIN:  Your Honor, I did not ask about this
specific conversation.

**DRAFT COPY**

Solovyeva - Cross / By Ms. Chahin          25

THE COURT:  All right.

BY MS. CHAHIN:

A    I do not recall.  Perhaps I said something about the child or them pressuring me.  I don't remember.

Q    Very well.  I would like to move forward in time to the interview that you had on April the 11th of 2002.  Do you have that in mind?

THE COURT:  I thought we covered that yesterday, the 11th and the 22nd of April of 2002.

MS. CHAHIN:  That's true, your Honor.  I'm just trying to establish foundationally to move on to another area.

THE COURT:  Don't repeat.  Because I've been listening to all her testimony here, and I think you asked her on what date she got arrested five times.

MS. CHAHIN:  Very well, your Honor.  I'm almost done.

BY MS. CHAHIN:

Q    After your interview on April the 11th, were you successful in being able to work out a deal with the Government?

A    After my arrest, after some time, yes.  There was a meeting scheduled.

Q    The question I have to you is:

A    And it took place.

Q    I'm sorry.  After your interview, which spanned the two days, April 11th of 2002, and April the 23rd of 2002, how long

**DRAFT COPY**

Solovyeva - Cross / By Ms. Chahin                    26

after that did you work out a deal?

A    I'm sorry, could you repeat the question, please, for me.

Q    Yes.  After your interview in April of 2002, how long after that did you work out a deal with the Government?

A    We have not discussed any business matters, deals.  I don't recall.

Q    Okay, what I'm referring - I'm sorry, go ahead.

A    I do not recall.

Q    Okay.  My question to you is: Signing an agreement with the Government where they would agree to make a recommendation for you if you helped them, how long after the April, 2002 interview did that take place?

A    I do not understand the question.

Q    Okay.  Did you sign a plea agreement with the Government?

A    Yes.

Q    When did you sign that?

A    On June 13th, 2006.

Q    Okay.  And so between the time of your April 11th interview in 2002, and - I'm sorry, what day did you say, May the 6th?

A    June 13th, 2006, is when I signed plea agreement.

Q    During that period of time, were you facing a mandatory minimum sentence in this case?

A    Yes.

Q    And during that period of time, what was that mandatory

**DRAFT COPY**

Solovyeva - Cross / By Ms. Chahin                27

minimum sentence?

A    Lifetime in prison.

Q    Did you have an understanding of whether or not you had
the opportunity to be released on that kind of a sentence?

A    My understanding was that no, that no release.

Q    After you were arrested on the charges in this case, did
you have access to the discovery materials related to this
case?

A    Pardon me.  Could you tell me the second part of the
question?

Q    Yes.  I'm inquiring whether she had access to the
discovery materials related to the case.

A    Yes, after some time.  Yes.

Q    And in addition to that, were you also sometimes housed in
facilities with other defendants in this case?

A    Yes.

Q    What other defendants were you housed with?

A    Aleksejus Markovskis.  We were in the same jail.  But,
again, I was in a woman's and he was in a man's part.  And
also, from what I know that he was in Santa Ana.

Q    Were you ever housed in the same facility with Ainar
Altmanis?

A    Yes, for one night, when I was in Alhambra.  I saw him
once.

Q    When you were housed in the same facility with Aleksejus

**DRAFT COPY**

Solovyeva - Cross / By Ms. Chahin                28

Markovskis, would you sometimes be transported to and from court together?

A    Yes.

Q    And when you were transported together, did you have the ability to talk to him?

A    Yes.

Q    Prior to entering your agreement with the Government, would you sometimes come to court appearances?

A    Yes.

Q    And when you came to court, did you have the opportunity to talk to other co-defendants in this case?

A    Yes.

Q    While you were in INS custody, did you receive visits from any people?

A    Yes.

Q    Who visited you while you were in INS custody?

A    My friend Larissa with her husband; an acquaintance of mine; a hairdresser, Lyuba; the foster mom; my attorney, from what I remember.

Q    Okay.  While you were in custody, did you have the ability to correspond with other defendants?

A    Like I said before, when I was in the custody of INS.  A few days later, perhaps a couple of days later, I had written a letter to Kadamovas, and that was the first and last letter. And after that I had not communicated with anyone.

**DRAFT COPY**

Solovyeva - Cross / By Ms. Chahin          29

Q    So it's your testimony that after that first letter, you never sent any other letters to Mr. Kadamovas?

A    Yes, that's from what I recall.

          MS. CHAHIN:  Your Honor, if I could have a moment, please.

          Your Honor, I have a document which I'd like to have identified as Defense Exhibit 2043.

          THE COURT:  2042 is next.

          MS. CHAHIN:  I'm sorry, your Honor, 2042.  And I would ask that it be placed before the witness.

          THE COURT:  All right.  2042 for identification.

**BY MS. CHAHIN:**

Q    Ms. Solovyeva, if you could please take a look at this document which is marked as Defense Exhibit 2042.

A    (Witness looking at document)  Yes, I looked at it.

Q    Do you recognize the handwriting?

A    Yes.

Q    Is this your handwriting?

A    Yes.

Q    Are these notes that you said to Mr. Kadamovas while you were arrested?

A    This was in the letter.

Q    In what letter are you referring to?

A    The letter that I had written to him.

Q    In the letter that you wrote from INS custody?

**DRAFT COPY**

Solovyeva - Cross / By Ms. Chahin                30

A    Yes.

Q    How long was that letter?

A    Several pages.  I do not remember any more.

Q    Okay.  And can you look at these documents and tell me if they span more than date?

A    I can see on one of them the date is March 15th.  And on the other pieces, there is no date shown because they seem to be a part of the whole page.

Q    Would it be fair to characterize these letters as love letters?

A    Yes.

Q    Do you express to him that you love him and that you're waiting to see him, hoping to see him soon?

A    Yes.

Q    During the period of time between the date he was arrested and you were arrested, did you visit Mr. Kadamovas?

A    Yes.

Q    Where did you visit him?

A    The Kern County jail.

Q    How many times did you visit him there?

A    I do not remember exactly.  I would say four.  I would say approximately four to five times; three to five times.  I do not recall exactly.

Q    Did you take Anastasia with you to see him?

A    Yes.  Several times.

**DRAFT COPY**

Solovyeva - Cross / By Ms. Chahin                 31

Q     On the date that you were arrested, did you tell the
agents who interviewed you that he was a good father?

A     I remember when they asked me during the second time when
we met.  I mentioned that, but I knew that I was covering him
because they were asking me about him.

Q     Did you tell them that you only fought over trivial
matters when he would drink?

A     We argued over everything lately.  But when he drank, he
was violent.

Q     Do you recall telling them, on the date of your interview,
that you had only one violent episode with him?

A     Yes, I said that the physical violence was expressed once.
But there were occasions of other violent episodes.  In other
words, his violence was expressed in verbal manner.

Q     Were the love letters that we talked about earlier, were
those written after the date of your interview with the FBI?

A     Yes.

Q     Now, you understand that your ability to reduce your
sentence is going to be based on a recommendation made by the
U.S. Attorneys, is that correct?

A     Yes.

Q     And do you hope they're going to make a favorable
recommendation for you?

A     I hope that there will be a recommendation.

Q     Prior to testifying in this case, have you ever in any of

**DRAFT COPY**

Solovyeva - Cross / By Ms. Chahin          32

your interviews told the FBI agents that Mr. Kadamovas wanted

you to work as a prostitute?

A    I don't remember talking about it at first, but later,

when we would meet again, we had discussed this, when there

were more questions and more discussions.

Q    When do you recall making that statement to them?  Which

interview?

A    I do not remember.

Q    Do you recall if it was before or after you signed your

plea agreement?

A    I do not remember exactly whether it was on May 30th or

some other date, or it was before that date.  I do not

remember.

Q    You've talked about some tennis shoes, and you've

identified those as Adidas tennis shoes, is that correct?

A    Yes.

Q    Where were those tennis shoes purchased?

A    I do not remember anymore whether this pair was purchased

at the store or through a magazine.  I do not remember.

Q    Isn't it true that the first time that you were asked

about those shoes, you described them as Reebok tennis shoes?

A    I remember that I was saying that they were Adidas, but

Reebok or Adidas, I was confused.

Q    Isn't it true that the only time you identified them as

Adidas was after you were shown a picture of them by the FBI

**DRAFT COPY**

Solovyeva - Cross / By Ms. Chahin          33

agents?

A    I know that Kadamovas was wearing Adidas tennis shoes. And when I saw them on a photograph, I had identified them as such.

Q    The question I asked you was: Prior to seeing them in the photograph, did you refer to them as a different brand?

A    No.  I was also saying that they were white with blue stripes shoes.  And those were his Adidas shoes that he would wear.

Q    Ma'am, if you could please listen to my question carefully.  The question I'm asking you is whether, prior to seeing the photograph, you identified them as a different brand?

A    When I saw the shoes, I had recognized them or identified them as the shoes that had been worn by Kadamovas.

          MS. CHAHIN:  Your Honor, I would object.

          THE COURT:  You're not listening to the question that's asked.  You're not answering to that question.

          The attorney has asked you whether or not, before you saw pictures of the shoe, did you identify them as a Reebok shoe rather than as an Adidas shoe, yes or no.

BY MS. CHAHIN:

A    I know that I was mentioning Adidas.

Q    Is the answer to your question 'no'?

A    I know that I had been saying Adidas.  Perhaps it was a

**DRAFT COPY**

Solovyeva - Cross / By Ms. Chahin          34

misunderstanding or a misinterpretation, whether I was misunderstood or the question was misunderstood.

Q    So you never said they were Reeboks?

A    I don't remember.  Perhaps I mentioned that Kadamovas had been wearing Adidas and Reebok.  But I know that Kadamovas had owned a pair of Adidas that he had wear.

THE COURT:  Let me ask a question.

When you were interviewed by the FBI on various occasions, did you always go through an interpreter?

THE WITNESS:  Yes.

THE COURT:  Were you ever questioned in English, and did you ever respond in English when you were interviewed by the FBI?

THE WITNESS:  During the first meetings, no.

THE COURT:  When did you speak with the FBI agents in English, if at all?

THE WITNESS:  On May 30th.

THE COURT:  Of which year?

THE WITNESS:  2006.

THE COURT:  Is that the first time you spoke with the FBI agents in English?

THE WITNESS:  Yes.  And my testimony was in English for the first time.  And I also used an interpreter during those times when I had difficulty expressing myself.  But the interview was mainly in the English language.

**DRAFT COPY**

Solovyeva - Cross / By Ms. Chahin          35

THE COURT:  But was an interpreter also present?  Is that what you're telling us?

THE WITNESS:  Yes.

THE COURT:  All right.  Let's break at this time, 10 minutes.

Remember the admonition.

**(Recess from 10:52 a.m. to 11:05 a.m.; parties present)**

**(Outside the presence of the jury)**

THE COURT:  All right, outside the presence of the jury.  The record will indicate all parties and counsel are present.

How long are you going to be, Ms. Chahin?

MS. CHAHIN:  I'd say no more than 10 minutes, your Honor.

THE COURT:  All right.

Now, one thing I want to admonish the witness about.  Listen carefully to the question.  Before you answer the question ask yourself what did they ask me and then answer that question directly.  Because what's happening is you're wandering and then when you wander the attorneys just ask 10 more questions based on the answer that you gave.  It's called your feeding the attorneys.

MR. RUBIN:  We're very hungry.

THE COURT:  All right, let's bring the jury out.

You have insatiable appetites.

**DRAFT COPY**

Solovyeva - Cross / By Ms. Chahin                36

MR. RUBIN:  More than you know.

(Jurors enter courtroom at 11:07 a.m.)

THE COURT:  All right, the record will indicate all jurors are present and all counsel and parties are present.

You're still under oath.  Please state your name for the record.

THE WITNESS:  Natalya Solovyeva.

(Witness previously sworn)

CROSS EXAMINATION (CONTINUED)

BY MS. CHAHIN:

Q    Ms. Solovyeva, prior to your interview in May of 2006, during any of your prior interviews before that, did you ever identify Mr. Kadamovas as being the person depicted in a cell phone store?

A    I don't remember.  No.

Q    Prior to your interview -- prior to your testimony in this case have you ever said on any other occasion that Mr. Kadamovas told you that they threw out the body of the American?

A    Yes, something of the kind did happen.  Yes.

Q    Please listen to the question carefully.  I'm not asking you if it happened.  I'm asking you if you ever made that statement prior to your testimony in this case.

A    Okay.

Q    Do you understand the question?

**DRAFT COPY**

Solovyeva - Cross / By Ms. Chahin          37

A     Yes.

Q     Okay.  So the question I asked you was prior to your testimony in this case did you ever tell anyone that Mr. Kadamovas told you they threw out the body of the American?

A     Yes.

Q     When did you say that?

A     During my meeting.  I remember exactly.  It was August 30th.  I don't remember whether I had -- whether I had said that before, because it took place long ago.

Q     So is it your testimony that you're not certain if you said that at any point prior to your May 30th, 2006 meeting?

A     From what I remember yes.

Q     When is the first time that you told the Government that Mr. Kadamovas had described some adventures to you that he had when he drove up north?

A     I didn't quite understand the question.  You said when?

Q     When was the first time you told the Government about that?

A     I don't remember.  It's hard for me to say.

Q     Do you know what year it was in?

A     I don't remember whether it was at the beginning of 2001 --

          THE INTERPRETER:  Interpreter's correction.

A     I don't remember whether it was at the beginning of 2002 when I began talking to them or it was already on the 30th of

**DRAFT COPY**

Solovyeva - Cross / By Ms. Chahin              38

May.  I don't remember when I said about it the first time.

Q    When was the first time that you told the Government that Mr. Kadamovas told you that he'd been stopped by the police when Mr. Safiev was alive in the vehicle?

A    Again, I don't remember.  Either it was on the 30th of May or it was before.  It's hard for me to say.  I don't remember. Most likely it was on the 30th.

Q    When you say the 30th, what date are you referring to?

A    30th of May 2006, when I was asked a lot of questions when there were many more questions.

Q    And that was about two months before the trial started, correct?

A    Yes.

Q    When was the first time that you told the Government that Mr. Kadamovas told you that if the policeman had detected him that they would have killed him and moved on about their business?

A    Again I cannot say.  It's difficult for me.

Q    Isn't it true that you never said any of those things until 2006, shortly before this trial started?

A    Most likely yes.  I don't remember.

Q    In addition to entering into agreement with the Federal Government you also have a State agreement, is that correct?

A    Yes.

Q    And is it your understanding -- what is your understanding

**DRAFT COPY**

as to what the maximum amount of time you can face on those

State charges is?

A     Lifetime without possibility of release.

Q     On the State charges or on the Federal charges?

A     On the State charges from what I know.

Q     Isn't it true that you face a maximum term of

incarceration of eight years on the State charges?

A     Only under the condition that the Government files the

motion in case of my credibility, if I give credible testimony.

Q     And you're hoping that they'll do that, correct?

A     Yes, I do.

Q     And what sentence do you hope to receive on the Federal

case?

A     It depends on the Judge.  I don't know.

Q     Have you been sentenced yet on this case?

          THE INTERPRETER:  Excuse me?

BY MS. CHAHIN:

Q     Have you been sentenced yet on this case?

A     No.

          MS. CHAHIN:  I have nothing further, your Honor.

     (Pause)

                    REDIRECT EXAMINATION

BY MS. DeWITT:

Q     Just a few questions, Ms. Solovyeva.

          THE COURT:  Can I write that down, just a few

Solovyeva - Recross / By Ms. Chahin / Redirect      49

**MR. CALLAHAN:**  Thank you.  Nothing further, your Honor.

**MS. CHAHIN:**  One question, your Honor.

**RECROSS EXAMINATION**

**BY MS. CHAHIN:**

Q    Ms. DeWitt asked you some questions about a statement you made on April 11th of 2002, correct?

A    Yes.

Q    After you made the statements on that date the Government did not make a deal with you at that time but they charged you as a Defendant in this case, is that correct?

A    Yes.

Q    And they charged you with a crime requiring a mandatory life sentence, correct?

A    At that moment, yes.

**MS. CHAHIN:**  Nothing further, your Honor.

**FURTHER REDIRECT EXAMINATION**

**BY MS. DeWITT:**

Q    Ms. Solovyeva, who do you understand will be the person responsible for ultimately deciding your sentence in this case?

A    The Judge has the last word; it's his decision.

**MS. DeWITT:**  Nothing further, your Honor.

//

//

//

**DRAFT COPY**

Solovyeva - Recross / By Mr. Callahan          50

**FURTHER RECROSS EXAMINATION**

**BY MR. CALLAHAN:**

Q    Ma'am, although the Judge has the final decision, he cannot go below the statutory mandatory minimum sentence unless this Prosecution team asks him to, isn't that correct?

A    That's correct, but only under stipulation that I -- only with the stipulation that I will be telling truth and only the truth.

         **MR. CALLAHAN:**  Nothing further, your Honor.  Thank you.

         **MS. CHAHIN:**  Nothing.  Thank you, your Honor.

         **MS. DeWITT:**  Nothing further, your Honor.

         **THE COURT:**  All right, let's take a short recess.  Remember the admonition.

      **(Jurors exit courtroom at 11:35 a.m.)**

         **THE CLERK:**  Okay, so we're through with Ms. Solovyeva?

         **MR. LASTING:**  Subject to recall.

         **THE CLERK:**  Okay.

      **(A recess was taken from 11:35 a.m. to 11:37 a.m.; parties present)**

      **(Outside the presence of the jury)**

         **THE CLERK:**  Please remain seated and come to order.

         **THE COURT:**  All right, outside the presence of the jury.  The record will indicate all parties and counsel are

**DRAFT COPY**

Shatz - Direct / By Ms. Meyer                    61

2001?

A    Yes.  They traveled December 2001 to Moscow and London and some other countries.

Q    Mr. Shatz, did Nick Kharabadze know someone by the name of Rita Peckler?

A    Yes.

Q    How?

A    When they established company Nick found a newspaper advertisement about Rita Peckler accounting firm and they hired her to be accountant for Matador Media.

Q    Mr. Shatz, did the two of you, you and Nick, ever speak about Ms. Peckler's disappearance?

A    Yes.

Q    When?

A    It was the last day, on January 20th, on Saturday, and Nick said that --

            **MR. RUBIN:**  Objection.  Hearsay, your Honor.

            **MS. MEYER:**  Your Honor --

            **THE COURT:**  It's not being offered for the truth of the matter asserted.

            Go ahead.

**BY MS. MEYER:**

Q    Just to clarify the date, you said January 20th, was that the year 2002?

A    Yes.

**DRAFT COPY**

Shatz - Direct / By Ms. Meyer                          62

Q    And what did Nick say?

A    Nick said, you know, last call that Peckler did before

disappeared, it was to George Safiev when we go to Moscow in

airport.

Q    Mr. Shatz, back in January of 2002 where did

Mr. Kharabadze live?

A    He lived at 22559 Margarita Drive, Woodland Hills,

California 91364.

Q    Is that with you and your wife?

A    Yes.

Q    Back in January of 2002 what cars did the family have?

A    Oh, have few.  I have Audi 100.  My wife, Mitsubishi

Diamante.  Nick has Trooper Isuzu and BMW new, just bought

couple months before.  And we have a sport utility truck,

Nissan Extra -- Xterra I should say, Nissan Xterra.

Q    So what car did Mr. Kharabadze drive?

A    He drove BMW 740.

Q    And at this time if I could have Agent Davidson show you

what's been marked for identification as Government's

Exhibit 1380.

        THE COURT:  1380 for identification.

BY MS. MEYER:

Q    Mr. Shatz, if you could just take a look at the photograph

contained in that exhibit and let me know when you're finished.

A    Yes, it's Nick's car.

**DRAFT COPY**

Shatz - Direct / By Ms. Meyer                63

**MS. MEYER:**  Your Honor, at this time the Government moves Government's Exhibit 1380 into evidence.

**THE COURT:**  Any objection?

**MR. CALLAHAN:**  No objection.

**THE COURT:**  1380 received this date.

**(Government's Exhibit Number 1380 was received in evidence)**

**MS. MEYER:**  At this time, your Honor, I'm going to publish it to the jury.

**THE COURT:**  All right.

**BY MS. MEYER:**

Q   Now, Mr. Shatz, if you could take a look at Government's Exhibit 406-B as in Boy, if Agent Davidson could place that before you.

**MS. MEYER:**  Your Honor, I believe this has already been admitted into evidence.

**THE COURT:**  It has.  The rest of the exhibits on the list that you gave me have all been received.

**MS. MEYER:**  For the record, your Honor, this is a photograph of the back of a page of a Thomas Guide map found at Mr. Krylov's apartment.  And at this time I'm going to publish it for the jury.

**THE WITNESS:**  Yes.

//

//

**DRAFT COPY**

Shatz - Direct / By Ms. Meyer                64

**BY MS. MEYER:**

Q    Mr. Shatz, looking at that exhibit, there's an address written on the back of that map.  Is that your address?

A    Almost.  It's one extra 2.  It's 22559 Margarita Drive, Woodland Hills, California 91364.  Over here it's 222559.

Q    And, Mr. Shatz -- I'm going to see if I can -- to the left of that address, I'm going to enlarge it, there are some words written in Russian and English.  Obviously you read Russian, Mr. Shatz?

A    Yes.

Q    Let's start with the English word "Trooper."

A    Yes.

Q    Is Trooper a description of one of your cars?

A    Yes.  It says Russian "cherme" (phonetic), black. Trooper, color black.

Q    So the Russian word to the right of Trooper is the word "black"?

A    Yes.

Q    And was your Trooper black?

A    Yes.

Q    Then there's the English word "Audi 100."  You testified that that's one of your cars.

A    Yes.

Q    What's to the right of Audi 100?

A    "Vele" (phonetic), white.

**DRAFT COPY**

Shatz - Direct / By Ms. Meyer                      65

Q     Was that the color of your Audi 100?

A     Yes.

Q     Then there's the English word "Mitsubishi Gallant," or phrase.  Is that another type of car your family owned?

A     I have a Mitsubishi, but it's a Diamante.  But it's not big difference.  Diamante.

Q     Now, next to the words "Mitsubishi Gallant" is a word or words in Russian.  Can you tell the jury what that says?

A     It says "sierra siene" (phonetic).  It's a gray/blue I would say.

Q     Is that --

A     Gray/blue.

Q     I'm sorry.

A     My car is a dark silver, but it's a metallic color.  It changes color, depends what light or sun is going to that.  That's -- officially it's dark silver.  This is sierra siene, a gray/blue.

          THE COURT:  Let's take our lunch break at this time.  Returning 1:25 in the jury room, 1:30 in the courtroom.

     (Jurors exit courtroom at 11:57 a.m.)

     (Lunch recess from 11:57 a.m. to 1:44 p.m.; parties present)

     (Outside the Presence of the Jury)

          THE COURT:  All right.  Outside the presence of the jury the record will indicate that all parties and counsel are

**DRAFT COPY**

Shatz - Direct                                  71

MS. MEYER:  And, your Honor, if I could have the projector on PC mode.

THE COURT:  Okay.

MS. MEYER:  Thank you.

THE COURT:  The reason I turn it off is it's aggravating when you're sitting behind with the light shining up.  So either you turn it off or I turn it off so that it doesn't bother anybody.

MS. MEYER:  Thank you, your Honor.

**(Pause / Jurors enter courtroom at 1:51 p.m.)**

THE COURT:  The record will indicate that all jurors are present, all parties and counsel are present.

You're still under oath.  Please state your name for the record, Mr. Shatz.

THE WITNESS:  **(No response)**

THE COURT:  State your name for the record.

THE WITNESS:  Matve Shatz.

THE COURT:  All right.  You may continue.

MS. MEYER:  Thank you, your Honor.

DIRECT EXAMINATION (Continued)

BY MS. MEYER:

Q    Mr. Shatz, when we broke for lunch we were looking at what's still on screen as Government's Exhibit 406-B.  And I believe you testified in the morning that the address at the top is one digit off from your home address and

DRAFT COPY

Shatz - Direct                                72

Mr. Kharabadze's home address; is that right?

A     That's correct.

      **(Pause)**

Q     Mr. Shatz, could you now take a look at Government's Exhibit 599, which already been admitted into evidence.

      **MS. MEYER:**  For the record, your Honor, this is a document imaged from the computer at Designed Water World showing internet history.

**BY MS. MEYER:**

Q     Mr. Shatz, focusing your attention to the portion at the top with the designation "URL," do you see in that first line the misnumbering of your street address on Margarita Drive?

A     Yes.  On the first line it's, again, one 2 is extra.  It's "222559 Margarita Drive; city, Woodland Hills; state, California SLT."  And that's it.  Yeah, that's my address and I guess where Nick lives.  And only one extra 2.

Q     And down on the -- in fact, your address goes all the way on the second line and ends on the third line, is that right, with 91364 as your zip code?

A     Yes, that's correct.

Q     Mr. Shatz, could you please now take a look at Exhibit 406, if Agent Davidson could place that before you.  It's a map.  And if you could look at the front of that map, the same map that we previously reviewed.

      Do you have that in front of you?

**DRAFT COPY**

Shatz - Direct                         73

A    Yes.

Q    Mr. Shatz, it's a little bit hard to see on this map, but in front of you I want to direct your attention to an "X."

Do you see an "X" on that map?

A    Yes, I do.

Q    And what word do you see next to that "X"?

A    Margarita Drive -- Margarita.

Q    And is that, again, near where you live?

A    Yeah, it exactly maps where my house is and Nick's house.

Q    And, Mr. Shatz, could you now take a look at Government's Exhibit 406-A, which is simply a photograph of the front page of that map.

A    Yes.

**(Pause)**

Q    Now, looking at this on the screen, Mr. Shatz, can you see the "X"?  Can you point out the "X" to the jury?

A    Yes.

Q    Actually, if you'd touch the screen or circle it, you can actually with your finger put a circle around that.

A    Yeah.  I put something -- yeah, okay.

**(Witness complies)**

Q    And is that your address?

A    Yes.  It maps the house where we live.  It's Margarita and the corner -- and cross street Mulholland.

Q    Mr. Shatz, could you please take a look at Government's

**DRAFT COPY**

Shatz - Direct                                          74

Exhibit 61, which has already been admitted into evidence.

MS. MEYER: Your Honor, for the record I'm publishing this exhibit for the jury.

**BY MS. MEYER:**

Q   Mr. Shatz, looking down at what I'll call the fourth entry across from Line Number 4, did Mr. Kharabadze have an account at Washington Mutual?

A   Yes, it's Nick's account.

Q   And did he also have an account at Bank of America?

A   Yes.  And he also has Wells Fargo, but I didn't see it.

Q   He also had an account at Wells Fargo?

A   Yes.

Q   I want to focus your attention to the address underneath entry five on this document.

A   It's address where we live, 22559 Margarita Drive, Woodland Hills, California 91364.

Q   And underneath that street address, Mr. Shatz, are a couple of words in Russian.

    What do those say?

A   Date of birth.

Q   And to the right of "date of birth" it says "09.12.72."

    Do you recognize that?

A   It's Nick's birthday, yeah.

Q   9.12.72 is Nick's birthday?

A   Yes.  September 12th, '72.

**DRAFT COPY**

Paronyan - Direct / By Mr. Dugdale            126

as Government's Exhibit Number 1352; and Mr. Paronyan, do you

recognize the people in that photograph?

A     Yes.

Q     And who are the people in that photograph?

A     It's George Safiev and Nick Kharabadze.

Q     Okay.  And who is the person on the left in the

photograph?

A     It's George Safiev.

Q     And then who is the person on the right?

A     Nick Kharabadze.

Q     Now as a friend of these two men back in the year 2001,

2002, were you aware if they had any sort of business

relationship with each other?

A     Yes.

Q     What business relationship did they have with each other?

A     They had production company, Matador Media.

Q     And what kind of business was Matador Media, to your

knowledge?

A     It's producing movies and entertainment.

Q     And did you become aware of a trip that these two

gentlemen made in association with their movie company?

A     Yes.

Q     And did you take this trip with them?

A     Yes.

Q     And where was this trip?  Where did you travel to with

**DRAFT COPY**

Paronyan - Direct / By Mr. Dugdale          127

these two gentlemen?

A    We traveled on December 5th from Los Angeles to Moscow, then from Moscow to Hong Kong, from Hong Kong to Singapore, from Singapore to Greece then to London and then back to Los Angeles.

Q    And you mentioned that you traveled with them on this trip on December 5th, what year was that?

A    It's in 2001.

Q    And did you leave together with Mr. Safiev and Mr. Kharabadze on this trip on December 5th of 2001?

A    Yes, I did.

Q    And where did your plane depart from?

A    Plane from LAX, Los Angeles.

Q    "LAX" do you mean Los Angeles International Airport?

A    International, yes.

Q    And what airline did you fly?

A    Air Float.

Q    And do you remember how you got to the airport that day?

A    Yes.  I picked up George Safiev and we drove back to airport.

Q    And you mentioned that you went to the airport with George Safiev; did you meet Mr. Kharabadze at the airport as well?

A    Yes, we did.

Q    And do you recall approximately what time it was in the day when you met at the airport with Mr. Kharabadze and

**DRAFT COPY**

Paronyan - Direct / By Mr. Dugdale          128

Mr. Safiev to take this overseas flight to Moscow in December 5th of 2001?

A    It's approximately about maybe 4:00 o'clock or 5:00 o'clock.

Q    And do you recall approximately how long you were in the airport before you left on that flight to Moscow?

A    Maybe four or five hours.

Q    Now when you were at the airport with Mr. Kharabadze and Mr. Safiev, did you witness Mr. Safiev receive any telephone calls?

A    Yes.

Q    And is that something you personally saw; you saw him receive a phone call?

A    Yes.

Q    And when this occurred did Mr. Safiev tell you who this phone call was from?

A    Yes, he did.

Q    And who was the phone call from?

A    Rita Pekler.

Q    And what Mr. Safiev tell you, if anything, about this phone call that he received at the airport when you were with him?

A    Yeah.  He been kind of wondered that Rita Pekler called -- called him on the cell phone and asked him to meet her right away.  And he said, you know, "I'm traveling.  I'm

**DRAFT COPY**

Paronyan - Direct / By Mr. Dugdale          129

going to Moscow.  I can't."  That -- that was it.

Q    Okay.  So just so this is clear for everybody, Rita Pekler called Mr. Safiev and said that she wanted to meet with him right away; is that correct?

A    Yes.

Q    And Mr. Safiev responded to her that he couldn't because he was going to get on a flight and go out of the country; is that right?

A    That's correct.

Q    When this occurred did Mr. Kharabadze tell you anything about any phone calls that he had received that day?

A    Yes.  Nick Kharabadze he told that he received calls from Rita Pekler the same day, but he didn't answer it; he just got voice mails but Rita Pekler she been asking also to meet with Nick Kharabadze.

Q    Now you've testified that you went on this trip overseas with these two gentlemen leaving on December 5th of 2001, when did you return to the United States from this trip?

A    Before Christmas, like I think it's maybe on 20, December 20.

Q    Okay.  And when you travel back to the United States did you travel back alone or did you travel back with --

A    No.  We --

Q    -- with them?

A    We traveled back with Nick and George.

**DRAFT COPY**