# GOVERNMENT EXHIBIT 13

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO:  CR-02-220(B)-DT |
| | ) | |
| Plaintiff, | ) | CRIMINAL |
| | ) | |
| vs. | ) | Los Angeles, California |
| | ) | |
| IOURI MIKHEL, | ) | Friday, October 27, 2006 |
| JURIJUS KADAMOVAS, | ) | (9:48 a.m. to 11:59 a.m.) |
| | ) | (1:15 p.m. to  3:58 p.m.) |
| Defendants. | ) | |

JURY TRIAL (33rd DAY)
(VOLUME XXXIII)

BEFORE THE HONORABLE DICKRAN TEVRIZIAN,
UNITED STATES DISTRICT JUDGE

EXCEPTIONAL REPORTING SERVICES, INC
14493 SOUTH PADRE ISLAND DRIVE
SUITE A-400
CORPUS CHRISTI, TX 78418-5940
361 949-2988

Davidson - Direct / By Ms. DeWitt                    12

Jurijus Kadamovas?

A       I was.

Q       What was your role in connection with that investigation,
Special Agent Davidson?

A       In general, myself, along with my partner, Special Agent
Perez, were assigned to investigate the hostage taking and
murder of the five victims in this case:  Rita Pekler -- or
Meyer Muscatel, Rita Pekler, Alex Umansky, Nick Kharabadze, and
George Safiev.

        To accomplish that we did a variety of things, and my
role included a variety of responsibilities, including
interviewing victim family members, interviewing witnesses,
interviewing defendants, writing and conducting search
warrants, writing what we call a Title 3 Affidavit, which is
actually an affidavit to intercept telephone communications.
We collected and analyzed a variety of evidence in this case,
some telephone toll analysis, and recording incoming and
outgoing ransom telephone calls from one of the victims.

Q       And I take it that investigation continued over some time.

A       It did.

Q       How did the FBI first become involved in that
investigation?

A       We received a call from Ruven Umansky, Alex Umansky's
father, asking us -- or reporting the disappearance of his son
and asking us to get involved.

Davidson - Direct / By Ms. DeWitt                13

Q    When did the FBI first become involved in that investigation?

A    On December 14th, 2001.

Q    And when did you, yourself, first become involved in that investigation, Special Agent Davidson?

A    The same day.

Q    What did you do when you first became involved in the investigation?

A    Well, my first responsibility was to write what we call a pen register and trap-and-trace order, which is an order to intercept in real time telephone call information from a few of the phones that we thought were directly related to Alex's disappearance, including his personal cell phone and another cell phone that we thought was relevant in this case to his disappearance.

Q    At some point did you meet with the Umansky family?

A    I did.

Q    Who did you meet with from the Umansky family?

A    I met with Ruven Umansky, Alex's father; Michael Umansky, his brother; and his fiancée, Irina Prishedko.

Q    Over the course of the next few days, did you meet with additional family members?

A    Yeah, I did.  I met briefly with Alex's mother, Elizabeth Umansky, and his aunt and uncle, the Tillises, Boris and Ella Tillis.

Davidson - Direct / By Ms. DeWitt                    14

Q    And did you also meet with Michael Umansky's wife?

A    I did; Stella Zibler (phonetic) -- Stella Umansky.

Q    When did you first meet with the Umansky family and Irina Prishedko?

A    On December 15th, Saturday.

Q    So this was the day following the initial reporting of this particular kidnapping?

A    Yes.

Q    Where did you meet them?

A    In the FBI office.

Q    And that's in Westwood?

A    It is.  Yes.

Q    What did you do when you first met with the family and Ms. Prishedko?

A    We discussed briefly the process by which we were going to record telephone calls with Alex, who had previously been calling them to ask them about gathering together a ransom to pay for his release and the process of doing that.

Q    Did you also come up with a general plan for how to proceed?

A    We did.

Q    And just generally could you explain to the jury, give them a brief overview, of what that general plan was in terms of how you were going to proceed at that point?

A    I can.  In general, we had a strategy, and our strategy

EXCEPTIONAL REPORTING SERVICES, INC

Davidson - Direct / By Ms. DeWitt                15

was to increase the frequency or the number of calls that were

coming in and also to increase the length of each call.  And

the reason we wanted to do that was to give us the time and

ability to use some other investigative means to physically

locate Alex before it was time to pay the ransom.

Q    Were you the agent who was primarily responsible for the

recorded calls?

A    Yes.

Q    And at the same time that that was going on, was there

other activity and other investigation going on by the FBI in

connection with this kidnapping?

A    There was.

Q    And can you just in a very general way give the jury an

idea of what that was?

A    Yeah.  In general, we had other agents out in the field

that were doing different things, just tracking down different

leads, people of interest.  We had agents that were

interviewing the family members to determine, you know, who may

possibly have done this, and we were also using other methods

to try to physically locate Alex.

Q    Now, you mentioned that one of your primary

responsibilities at that time was to record these calls.

        Who were the calls from and to that you were

recording in connection with that investigation at that time?

A    Yeah, the calls to and from were -- or the parties

Davidson - Direct / By Ms. DeWitt                    31

A     It was.

Q     At some time, Special Agent Davidson, did you learn about a ransom demand being made to the Umansky family?

A     I did.

Q     What did you learn regarding the ransom demand for Alexander Umansky?

A     I learned that it arrived by facsimile to the Hard Wired business on the 14th of December in the form of an invoice and that the amount of the ransom was $234,628, and that the request was for this money to be wired to a bank, or to an account in the name of Al Shaza Building Materials in Dubai, United Arab Emirates.

Q     And did you actually see the ransom demand, this fax?

A     I did.

Q     And did you see this ransom demand before you started making the recorded calls?

A     Yes.

Q     So it had been received prior to the time that you started recording the calls.

A     It had been.

Q     Did the Umansky family, after you met with them, collect money to pay the ransom?

A     They did.

Q     Did the FBI give the Umansky family any advice with respect to paying the ransom demand?

Davidson - Direct / By Ms. DeWitt          32

A    We did.  When it came time to paying the ransom, we advised them to withhold part of the ransom.

Q    Can you explain why the FBI advised the family to only pay part of the ransom and to withhold part of it?

A    Yeah, we felt that this could potentially be the best way to keep Alex alive.  We felt that if we paid the whole ransom that we might never hear from him again, so we wanted to withhold part of it to create more phone calls and to hopefully keep him alive longer and get a proof of life.

Q    Was the FBI, in fact, able to locate Alexander Umansky while he was still alive?

A    No, we weren't.

Q    Now, you mentioned that you arranged to tape calls between the Umansky family and Irina Prishedko and Alexander Umansky, and specifically, those calls were between Ruven Umansky, Michael Umansky, Irina Prishedko, and Alexander Umansky; is that correct?

A    Yes, and then later on --

Q    As well as later some calls between the unidentified males and Michael Umansky; is that correct?

A    That's correct.

Q    And did you preserve those recordings?

A    I did.

Q    And were those calls in Russian or in English?

A    Those calls were primarily in Russian.  There was some

English at various times, but a very large percentage of the calls were in Russian.

Q    Were those calls later translated and were transcripts prepared of those calls?

A    Yes.

Q    And, Special Agent Davidson, did you also prepare a summary chart showing the pertinent calls that you recorded in connection with the Umansky abduction?

A    I did.

Q    At this time I'd like you to take a look at what's been marked for identification as Government's Exhibit 1294.

A    Okay.

Q    Do you have that in front of you?

A    I do.

Q    What is that?

A    I'm sorry?

Q    What is it?

A    This is the summary chart of pertinent Alex Umansky ransom calls.  And --

Q    Were you involved in the preparation of this chart?

A    I was.

Q    And is this chart based upon information that you're personally familiar with as a result of your participation in this investigation?

A    It is.

Davidson - Direct / By Ms. DeWitt                34

Q    Does this chart accurately reflect information from the phone records that you previously identified?

A    It does.

Q    As well as information that you obtained through your personal observations?

A    Yes.

MS. DeWITT:  At this time, your Honor, I'd move to admit Government's Exhibit 1294.

THE COURT:  1294 admitted this date.

**(Government's Exhibit Number 1294 was received in evidence)**

BY MS. DeWITT:

Q    Special Agent Davidson, this chart lists Exhibits 1995-A through 1931-A, correct?

THE COURT:  I'm sorry; you misspoke yourself.

THE WITNESS:  Yeah.

MS. DeWITT:  I'm sorry?

THE COURT:  You misspoke yourself.  List the exhibits again; 1295-A through 1331-A, I think you wanted to say.

MS. DeWITT:  Thank you.  Yes, I did; 1295-A through 1331-A.  Thank you, your Honor.

BY MS. DeWITT:

Q    Is that correct?

A    That's correct.

Q    And those particular exhibits:  Do they represent the

Davidson - Direct / By Ms. DeWitt                    35

recorded calls that you made during this period?

A     They do.

Q     And prior to testifying today, did you have an opportunity to review Government's Exhibit 1295-A through 1331-B?

        THE COURT:  B or A?

        MS. DeWITT:  B.

        THE WITNESS:  I did.

        MS. DeWITT:  Okay.  And, for the record, your Honor, the A's in this set of exhibits are the actual audiotapes, and then the corresponding transcripts is the B number.

        THE COURT:  Right.

BY MS. DeWITT:

Q     So did you have an opportunity to review all of the audio transcripts as well as all of the written transcripts -- audiotapes, as well as the written transcripts?

A     I did.

Q     And do these exhibits consist of -- do each of the exhibits in this set of documents consist of the audio recordings that were made of the Umansky calls?

A     Yes.

Q     And did you have an opportunity to confirm that the exhibits, these exhibits, were true and correct copies of the original calls that you recorded during this period?

A     Yes.

Q     Did you also have an opportunity to review the transcripts

Davidson - Direct / By Ms. DeWitt                36

that were prepared of those calls?

A    Yes.

Q    Okay.  And did you have an opportunity to confirm that the
call time and date and the reference to the tape was accurate
on those transcripts?

A    I did.

MS. DeWITT:  At this time, your Honor, the Government
would move to admit Government's Exhibit 1295-A through 1331-A.
And, for the record, your Honor, I'm only going to be admitting
the tapes through him, not the transcripts, at this time.  If
you'd like --

THE COURT:  All right.  You're only -- when you say
1295-A through 1331-A, you're going to be eliminating the "B"
portion of that.

MS. DeWITT:  At this time, your Honor, yes.

THE COURT:  All right.

MS. DeWITT:  He's going to be -- just for the record,
he's confirming one portion of the information that's on the
transcripts, which is the date and time, but the actual
witnesses who are going to be introducing them, they're going
to confirm that they're accurate translations, because they're
in Russian, and he can't do that.

THE COURT:  You're going to eventually introduce the
"B" section as well?

MS. DeWITT:  Yes, I am, your Honor.

Davidson - Direct / By Ms. DeWitt          37

THE COURT:  Okay.

Well, why don't I admit the "B" section at this time subject to a motion to strike.

MS. DeWITT:  That's fine, your Honor.

THE COURT:  All right.

MS. DeWITT:  Thank you.

THE COURT:  Then 1295-A through 1331-B admitted at this time.

**(Government's Exhibits Numbers 1295-A through 1331-B were received in evidence)**

**BY MS. DeWITT:**

Q   Special Agent Davidson, now referring back to Government's Exhibit 1294, would you please explain to the jury what information is set forth on this summary chart?

A   I can.  Starting from the left-hand column.  Starting from the left-most column, we have the Government exhibit number, and then for the next column, if you look at this tape number and call number, right here, that refers to -- that's actually -- actually the calls are now contained on CD, but originally they were on cassette tape.  That would be the cassette number, and then the call number on that cassette, because there'd be multiple calls on each cassette.

Q   But, just for the record, when you reviewed the disks that are being moved into evidence, you confirmed that they are true and correct copies off of these original tapes.

Davidson - Direct / By Ms. DeWitt          38

A    Yeah, they're identical to the recordings on the original tapes.  And then you have the date, and then we have an approximate time, which I obtained from the telephone records themselves or from my log.

Q    And the date is the date that the call was made?

A    Yes.  I'm sorry.  That is the date that the call was made --

Q    Now go ahead.

A    -- which is right here, and then the approximate time of the call, and then who the call is from and who the call is to, in these two columns here.  This one, the second column from the right, and then the last column right there.

          THE COURT:  When you say approximate time per telephone records or log, that's when the call was placed?

          THE WITNESS:  That's when the call was placed or received.  And then --

          THE COURT:  But it's not the length of the call.

          THE WITNESS:  It's not the length of the call, no.

          THE COURT:  Okay.

BY MS. DeWITT:

Q    And just to clarify, Special Agent Davidson, for the calls that you actually had specific phone records, you put the exact time, and for calls that were like, for example, the voice mails, you'd put approximately when they came in, to your knowledge?

Davidson - Direct / By Ms. DeWitt          39

A    Yeah; the voice mails it was a little hard to determine exactly when the call came in, so I usually got that time off my log, sometimes off the phone records.

Q    And just to make this clearer for the jury, if they were to look at this chart later, there is an indication about -- on 1299-A it says:  two V-M messages?

A    Yes.  I'm sorry.  V/M stands for voice mail.

Q    So that particular call was two voice mail messages that you recorded.

A    Exactly.

Q    Okay.  And if it doesn't indicate -- if it indicates a voice mail it also gives a time if there's more than one on that particular call, that there's two on that call, right?

A    If there's two on that call, yes.

Q    Okay.  And if you look at the "from" column, and, specifically, if you could look at Exhibit 1297-A, it says it's from Alex Umansky and then in brackets it says Ian Pollack, and it gives a phone number.  Can you explain why there's two names listed there?

A    I can.  I think you're referring to this call right here.

Q    1297-A, yes.

A    Exactly.  And you'll notice that I have Alex Umansky's name, and then in brackets I have the name Ian Pollack and the telephone number 818-259-1740, and that's because Alex called his brother, Michael, as you'll see in the next column, and

**EXCEPTIONAL REPORTING SERVICES, INC**

Davidson - Direct / By Ms. DeWitt          40

when he called, he was using that prepaid phone that I had

earlier discussed.

Q    Can you look at the first exhibit that's indicated in

yellow?

A    Yeah.  I think you're referring to 1306-A right here where

I circled?

Q    Yes.  And can you explain why that says Ruven Umansky with

Michael Umansky in brackets?

A    That's very much the same reason.  Again, Ruven Umansky is

Alex Umansky's father, Michael Umansky's father as well, and

Ruven placed a call to Alex in that call, but he was using

Michael's cell phone.

Q    And the Ruven Umansky call that you've just indicated was

on the Michael Umansky cell phone are the records that you just

talked about previously.

A    Exactly; the records that correspond to 214-673-1297.

Q    And the Alex Umansky call, Exhibit 1297, the one above it,

the Ian Pollack phone, those are the records -- that relates to

the records that you previously testified to as well; is that

correct?

A    That's correct.

Q    During the time that you were recording these calls, was

there any time when a call was initiated by either Ruven,

Michael, or Irina that Alexander Umansky answered the phone?

A    In this time period, from the time that we started

EXCEPTIONAL REPORTING SERVICES, INC

Davidson - Cross / By Mr. Callahan        41

recording the calls, no.  To my knowledge, Alex never picked up.  The actual calls in which we have an interaction between Alex and his family members are when Alex called us.  So the outgoing calls usually result in a voice mail message left for Alex.

Q    So the calls that are live conversations between these individuals is when Alex Umansky is initiating the call.

A    Yeah.

Q    When he's the one being the caller and making the call, that's when you have a live conversation?

A    Exactly.

        MS. DeWITT:  I have no further questions at this time.

        THE COURT:  Mr. Callahan?

        MR. CALLAHAN:  Thank you, your Honor.

    (Pause)

                    CROSS EXAMINATION

BY MR. CALLAHAN:

Q    Mr. Davidson, good morning.

A    Good morning, Counselor.

Q    I understand that you are going to be testifying on other occasions in this case, so for this particular session I'll be very brief.

        If you can look at the first page of Exhibit 1294, which you were just discussing -- and I know it's difficult for

Qureshi - Direct / By Ms. DeWitt                    72

A    He was excited because money wasn't an object, so it's good for the business.

Q    Okay.  And now, ma'am, I'd like to direct your attention to the next day, December 13th, 2001, the day that you testified that Alex Umansky went missing.

Did you see Alexander that day?

A    Yes.

Q    When was the last time you saw Alexander Umansky that day?

A    In the morning when we woke up.

Q    So right before he left for work?

A    Yes, before he left for work.

Q    Were you at the Hard Wired business at any time during the day on December 13th, 2001?

A    Excuse me?

Q    Did you go to the business at any time that day?

A    No.

Q    Did you --

A    Well, very late at night on December 13th --

Q    Okay.  And --

A    -- yeah, but not during the day time.

Q    Right.  Okay.

So during the work day you weren't there.

A    No.

Q    Okay.  Did you talk to Alexander Umansky during the course of the work day that day, so 8:00 to 6:00-ish time period?

A    Yes.

Q    And when did you talk to him?

A    I talked a couple of times during the day and in the evening before he went for his meeting with the potential client.

Q    And approximately what time was that?

A    It was probably 6:00, 7:00.  It was still daylight.

Q    And you said he had a meeting that night.

Did he talk to you about the fact that he had a meeting that night?

A    Yes.  And he went to meet the same client that he talked the night before.

Q    Okay.  What did he tell you about the meeting that he had scheduled for that night?

A    Nothing that -- just that he has to go because it's important for the business, and --

Q    Did you have some plans that evening yourself?

A    Yes.

Q    What were your plans for that evening?

A    I was supposed to go to a party and I invited him also. We were supposed to go together, my school party.

Q    And was this for the end of the semester party?

A    Yes.

Q    And originally Mr. Umansky was supposed to go with you to that party.

Qureshi - Direct / By Ms. DeWitt                    75

Q    Okay.  And you said at some point you went to the business.

A    Yes.

Q    And so you went to Hard Wired.

A    Yes.

Q    Okay.  And what did you do when you got to Hard Wired that night?

A    Well, I met there with Todd.  It was me and him, and we were going through the paperwork on Alex's table trying to find where he went.  And I was calling him also, but he wouldn't pick up.

Q    At some point did you hear from Alexander Umansky?

A    Yes.

Q    And how did you hear from him, in person or by telephone?

A    By telephone.

Q    And approximately what time was that?

A    Around 2:00 o'clock at night.

Q    So this was then December 14th, 2001?

A    Yes.

Q    And at that point, at 2:00 o'clock in the morning, what was your general state of mind, ma'am?

A    Excuse me?

Q    What was your general state of mind at that time?

A    I was very scared because I knew -- I loved Alex to death, so I knew him very well.  I knew that if he is not there, he --

EXCEPTIONAL REPORTING SERVICES, INC

Qureshi - Direct / By Ms. DeWitt                76

something happened to him.  So I was really worried and just waiting and -- I knew something bad happened.

Q    This behavior was out of the normal for him?

A    Yes.

Q    What did Alexander Umansky say when he called you at approximately 2:00 p.m. on the morning of December 14th, 2001?

A    He sounded very serious and he said that just:

            This is very serious, this is very important.  You should go home, let the dog in, close the door, don't call anybody, don't call the parents, don't be stupid, and I'm trying to get -- I'm trying to reach Michael" -- his brother -- and someone will call you in the morning."

Q    How did Alex Umansky sound when he was talking to you on the phone?

A    Very serious, to the point that I believed and I did everything exactly like I had to, like he asked.

Q    Was he speaking to you in English or in Russian?

A    Russian.

Q    Is that how he would normally speak to you or would he speak to you --

A    He would speak both.  While we were together more Russian he would speak, so --

Q    Did you notice anything unusual about that call other than what he said?

Qureshi - Direct / By Ms. DeWitt                77

A      It sounded maybe like he was on a speakerphone.  It sounded a little different like he was on a speakerphone.

Q      After this call from Alex Umansky, did you try to get a hold of his brother, Michael Umansky?

A      Yes.

Q      And were you able to get a hold of Michael Umansky?

A      No.

Q      Were you eventually able at some point to get a hold of Michael Umansky?

A      Excuse me?

Q      Were you eventually able to get a hold of Michael Umansky?

A      Next morning.

        THE COURT:  You say next morning, the 14th?

        THE WITNESS:  Fourteenth.  I'm sorry.

BY MS. DeWITT:

Q      So, I'm sorry, later -- later in the morning on the 14th.

A      Later in the morning.  Correct.

Q      Do you know why you were having trouble getting a hold of Michael Umansky?

A      He was in New York, and either he didn't have his cell phone -- he just wouldn't answer his cell phone.

Q      Did you finally get a hold of Michael Umansky?

A      Yes.

Q      And did he give you a cell phone number that he could be reached at?

A      Yes.

Q      Did you hear from Alex Umansky again that morning?

A      Yes.

Q      How many times did Alexander Umansky call you that morning?

A      He called me about four to five times.

Q      And where were you when you were getting these later calls, the ones after 2:00 p.m.?

A      I had final exams on that morning, so I was taking my finals and receiving calls, so I had to step out, and -- in school.

Q      What time was that?

A      Around 9:00 a.m.

Q      And you remember the time because you were in an exam?

A      Because I had just started my exam, yeah.

Q      And how long were these four or five calls that you were getting at around 9:00 o'clock on that morning of December 14th?

A      How long were the calls?

Q      Yes.

A      They were very brief, very brief, all of them.

Q      What did Alexander say when he made these short calls to you that morning?

A      All he wanted is to get a hold of Michael, and that was it.

Qureshi - Direct / By Ms. DeWitt          79

Q    So during one of these calls did you give him Michael's phone number, the phone number that he had given you?

A    Yes.  Eventually when Michael called me I got his number and I gave it to Alex.

Q    After these four or five short calls, did you talk to Alexander Umansky again that day?

A    I don't think so.

Q    Did your cell phone have a caller I.D. function at that time?

A    Yes.

Q    During the calls that you had gotten from Alexander Umansky that morning, did you notice what number he was calling from?

A    Yes.

Q    Did you notice whether or not he was using a telephone number that was his usual cell phone, or was it some other number?

A    It was the other number.

Q    Did your cell phone capture what number -- that number on your caller I.D.?

A    Yes.

Q    Did you talk to Michael Umansky later that day?

A    Yes.

Q    And what did Michael Umansky say to you when you talked to him later that day?

Qureshi - Direct / By Ms. DeWitt          80

A    He told me that Alex was kidnapped and the people who kidnapped are asking for ransom.

Q    Did you and Michael Umansky discuss whether or not you should go to the police or the FBI?

A    Yes.

Q    And what was said in that conversation about going to the police or the FBI?

A    That we shouldn't go if we want Alex to be safe.

Q    Did he tell you why he didn't think you should go to the police?

A    You mean Michael?

Q    Yes.

A    Yeah, because they threatened to kill him.  They said, "Don't go anywhere if you want him to be safe," or something like that.

Q    Despite that fact, did you eventually talk with the FBI about the fact that Alexander had gone missing?

A    Yes.

Q    And where were you when you talked to the FBI?

A    At the Hard Wired business.

Q    When you met with the FBI for the first time, when was that?

A    It was on the 14th in the evening.

Q    And, in addition to yourself, who else talked to the FBI at that time?

Qureshi - Direct / By Ms. DeWitt                81

A    It was Ruven; it was Todd Provencio; it was everybody who were in the business, I guess, at that time.

Q    And where did you meet them; you met them at the business?

A    Yes.

Q    Okay.  Did the FBI at that time take a statement from you?

A    Yes.

Q    Did you meet with the FBI again after that evening?

A    Yes.

Q    When was that?

A    Did you ask that evening or --

Q    Yeah; when was the next time that you met with the FBI after you gave them the statement that evening?

A    Probably next morning or the evening.

Q    And where --

A    We spent a lot of time with the FBI after that, so --

Q    Okay.  And you mentioned that you thought the next time was the next day; where did you meet that next day?

A    At the FBI, at the federal building.

Q    And in addition to yourself, who else went with you to the FBI or met with you in the FBI that day?

A    Ruven, Alex's father.

Q    What did you do when you went to the FBI the next day?

A    We were waiting for the calls and trying to trace the calls and trying to record whatever was said and trying to come up with the money to give for ransom.

Qureshi - Direct / By Ms. DeWitt                    82

Q    So at that time you started to record calls or planned to record calls that were coming in from Alex Umansky?

A    Yes.

Q    You mentioned that Alexander Umansky had called you from a number that was not his normal phone number.

     Did you provide that number to the FBI --

A    Yes.

Q    -- at that time?

     And did you take that number off of your caller I.D. on your phone?

A    Yes.

Q    Now, you said that at that time you made plans to record calls.

     Did you, in fact, get additional calls from Alexander Umansky after that time?

A    Yes.

Q    And did you also try to call him and leave messages for him after that time?

A    Yes.

Q    And those calls:  Were those all recorded at the FBI office?

A    Yes.

Q    Approximately how long did you continue to stay at the FBI office in an effort to record these calls and to continue trying to find Alex Umansky?

Qureshi - Direct / By Ms. DeWitt                83

A     About four or five days.

Q     And who was responsible for actually taping the calls?

A     The FBI agent, Jim Davidson.

Q     Okay.  And would it be fair to say that over the next few days you were pretty much camped out at the FBI offices?

A     Excuse me?

Q     You were pretty much staying there all the time for the next few days?

A     Yes.

Q     I'm going to ask you a couple of questions about those recorded calls.

      Before you came in to court today to testify, did you have a chance to review the tape recording of the calls and the messages between yourself and Alexander Umansky that were made in December of 2001?

A     Yes.

Q     And at this time I'd ask you to take a look at what's been marked and previously moved into evidence as Government's Exhibit 1294.

      Do you have that in front of you?

A     Uh-huh.

Q     Did you have a chance --

      **THE COURT:**  That's "yes"?

      **THE WITNESS:**  Yes.

      **MS. DeWITT:**  You have to say "yes" or "no," or it

comes out as a grunt when they're transcribing it.

            THE WITNESS:  Oh.

BY MS. DeWITT:

Q    Did you have a chance to look at this chart prior to testifying today?

A    Yes.

Q    And I want to ask you a couple of questions about the information on this chart.  First of all, in the upper right-hand corner, you see the two column and it says Irina Prishedko?  Right here, on that --

A    Yes.

Q    Okay.  Do you recognize the number that's listed under -- and that's your maiden name, right?

A    Yes.

Q    Okay.  Do you recognize the number that's listed under that, 818-262-3235?

A    Yes.

Q    What number is that?

A    That used to be my cell phone number.

Q    Who was that phone actually subscribed to?  Who was actually --

A    To Hard Wired business.

Q    And can you look at the phone number that's right below that?

            THE COURT:  You can also look at the monitor to your

Qureshi - Direct / By Ms. DeWitt                85

side.

THE WITNESS:  Uh-huh.

BY MS. DeWITT:

Q    Where it says "Alex Umansky," do you recognize the number that's listed under Alex Umansky's name?

A    Yes.

Q    818-266-2281?

A    Yes.  That's Alex's number --

Q    That was his --

A    -- cell phone number.

Q    -- his cell phone number?

And, ma'am, can you look at the number that's listed right there, where it says "Alex Umansky" and then in brackets it says "Ian Pollack" --

A    Uh-huh.

Q    -- "818-259-1740"?

A    Yes.

Q    Do you recognize that number?

A    Yes.

Q    How do you recognize that number?

A    That was the number where Alex called from, and I saw it on my caller I.D.

Q    So this is the other number that you received a call from before you went to the FBI that you got on your caller I.D. on your phone.

Qureshi - Direct / By Ms. DeWitt                86

A    Yes.

Q    The number that you didn't recognize as being his normal number.

A    Yes.

Q    Were some of the calls that were made after that time to and from Alexander Umansky voice mail messages?

A    Yes.

Q    And some of the calls that you had were actually where you talked to him live?

A    Yes.

Q    So you were talking to him and he was responding; it wasn't just a message being left.

A    Uh-huh.  Yes.

Q    Okay.  Can you please look again at this chart, and marked in blue on this chart -- and there's a couple of pages -- are calls that are identified as being made or received by you.

Do you see those calls?

A    Yes.

Q    And prior to testifying today, did you have an opportunity to review the underlying audiotapes that are indicated on this summary chart as being made or received by you?

A    Yes.

Q    And did those tapes accurately reflect the calls to and from yourself --

A    Yes.

Qureshi - Direct / By Ms. DeWitt                 87

Q      -- and Alex Umansky?

A      Yes.

Q      Did you also have an opportunity to review prior to coming in to court today to testify the translations that related to those particular tapes?

A      Yes.

Q      And the translations were basically -- if the number was 1295-A, the translation was at 1295-B?

A      Yes.

Q      And did those transcripts accurately -- were they accurate translations of the calls that you were listening to?

A      Yes.

Q      And for the record, the calls that you reviewed and the calls that you confirmed were accurate audio recordings and the transcripts that were accurate translations were Government's Exhibit 1295-A, 1296-A, 1300, 1311-A, 1313-A, 1325-A, and 1326-B, and the related B exhibits; is that right?

A      Yes.

Q      At this time I want to direct your attention to Government's Exhibit 1295-A, which was previously identified as a call made on December 15th, 2001, at 12:36 p.m. from Alexander Umansky to Irina Prishedko and the related transcript.

       At this time, your Honor, I'm going to play the call and the subtitles.

Qureshi - Direct / By Ms. DeWitt                    88

And, Ms. Prishedko, I'm going to ask, if he hasn't done it already, Special Agent Davidson to set the transcripts next to you so that you can have them to refer to if you need to.  I don't think you'll need them, but just in case you do -- or Special Agent Perez.  Thank you.

1295-A.  You can start with that one.

**(Pause)**

**MS. DeWITT:**  And, again, just to be clear for the jury, what we're going to be doing, your Honor, is playing the audio, and then there will be subtitles that are played along with it, and there is a box at the top that indicates who -- by picture who is speaking, if it's Mr. Umansky, and there is no picture for any other individuals.

**(Audio recording was played from 11:49 a.m. to 11:50 a.m.)**

BY MS. DeWITT:

Q    And, ma'am, can you -- excuse me.

Ma'am, can you explain to the jury what this call is?

A    This is a message from Alex to me, and he says that, "Irina, everything is all right, and we're in the car," and he's asking where is his brother, Michael.

Q    Okay.  And the person's voice that is identified with the initials "A.U." on this transcript:  Is that Alexander Umansky?

A    Yes.

Q    And is this the first call from Alexander Umansky that you were able to record after he was kidnapped?

EXCEPTIONAL REPORTING SERVICES, INC

Qureshi - Direct / By Ms. DeWitt                    89

A     Yes.

Q     Okay.  And in the call he refers to a person by the name of -- that he calls "Era" (phonetic).  Who is that?

A     That's Irina.  That's my name.

Q     That's you.

A     Uh-huh.

Q     And he also refers to someone and he says, "This is Sasha."

      Who is that?

A     That's Alex in Russian.

Q     Is that short for Alexander?

A     It's the same as Alexander in Russian.

Q     And who is "Misha" that he's referring to in this call?

A     That's the same as Michael, his brother.

      **MS. DeWITT:**  Okay.  And at this time I'd like to play Government's Exhibit 1296-A, and I'd ask Special Agent Davidson if you could just, for the convenience of the witness, place 1296-B before her.

      And, for the record, this is a call that was previously identified in the chart as a call being made on December 15th, 2001, at 4:05 p.m.

      **(Audio recording was played from 11:52 a.m. until 11:53 a.m.)**

//

//

Qureshi - Direct / By Ms. DeWitt                    90

**BY MS. DeWITT:**

Q    And, ma'am, can you explain to the jury what this call is?

A    That's -- I'm leaving a message on Alex's phone letting him know that we can't reach him and please call us back, and that I spoke to Misha -- to Michael -- and that we're all worried and just begging him to call back.

Q    The person that is identified with the initials "I.P." on this transcript:  Is that you?

A    I.P.?

Q    I.P.

A    Correct.  That's me.

Q    Okay.  And that's true of all of the transcripts that you reviewed; when you're speaking, you've identified that voice as yourself by I.P., as identified by I.P.?

A    Yes.

Q    And A.U. is Alex Umansky?

A    Alex Umansky.

Q    During this call there is a voice mail message at the very beginning that says, "Hi, you've reached Alex."

        Is that the message that Alex had on his personal cell phone for his voice mails?

A    Yes.

Q    Do you recognize that?

A    Yes.

Q    And in this call you say that you've called several times

EXCEPTIONAL REPORTING SERVICES, INC

Qureshi - Direct / By Ms. DeWitt                91

and hadn't been able to reach him.

Had you, in fact, tried to call him several times at that point?

A    Probably not, because we were trying to promote them to call us back, promote the --

Q    At the time of this call did you have any idea at all where Alex Umansky was?

A    No.  I just knew that he was kidnapped, and that's it.

Q    Did you attempt to call the other number that Alex had used to call you from earlier?  This is a call to his personal cell; did you try to call the other number?

A    Yes.

Q    Were you able to reach him at that number?  Did he ever answer that other number?

A    No.

**MS. DeWITT:**  At this time I would like to play Government's Exhibit 1300, which has been previously identified as a call made on December 16th at 12:20 p.m.

And if Special Agent Perez could place the transcript in front of you just for reference purposes.

**THE COURT:**  All right.  1300-A and B.

**(Audio recording was played from 11:55 a.m. until 11:57 a.m.)**

//

//

Qureshi - Direct / By Ms. DeWitt                    92

**BY MS. DeWITT:**

Q    And, ma'am, just for the record, who are the people that are talking on this call?

A    It was a conversation between Alex Umansky and me.

Q    And this was, at the time it was recorded, was a live conversation between the two of you.

A    Correct.

Q    In this call Alexander refers to a person by the name of Sasha.  Who was that?

A    Sasha was our friend who owned a body shop, and I guess he was asking so we can have money from him also, because we were looking for money.

Q    This is another person whose name was Alex and who went by Sasha?

A    Yes.

Q    In this call Alexander says:

        "You should also talk to Sasha so that there won't be, you know, any sort of delays."

        What did you understand he meant by "delays"?  What was he concerned about?

A    About money.  He was concerned about so we get money on time.

Q    Okay.  Can you move the mike just a little bit closer?

A    He was concerned so we get the money on time.

Q    In this call you asked Alex Umansky:

"Will they let you go?"

And he responded:

"If the money is there, they'll let me go.  That's all.  All that's of concern is that the money be there."

What did you understand him to be saying when he said that?

A    That if we give the money they're going to let him go.

Q    What money?

A    The ransom money.

MS. DeWITT:  At this time, your Honor, I'm going to play Government's Exhibit 1311-A.

THE COURT:  We'll do that after lunch.  We'll take our lunch break at this time, returning at 1:15 in the jury room, 1:20 in the courtroom; 1:15.

**(Court in recess from 11:59 a.m. to 1:15 p.m.; parties present)**

**(Outside the presence of the jury)**

THE CLERK:  Please remain seated and come to order.

And would the witness please resume the stand.

THE COURT:  All right.  Outside the presence of the jury, the record will indicate all parties and counsel present.

Anything the Government wishes to bring up?

MS. DeWITT:  No, your Honor.

THE COURT:  Anything any defendant wishes to bring up?

Qureshi - Direct / By Ms. DeWitt          94

MR. CALLAHAN:  No, sir

MR. LASTING:  No, your Honor.

THE COURT:  All right.  We'll bring the jury out.

The last exhibit you used was 1300-A.  And I think you were just marking 1311-A.

(Pause)

We're missing one juror.

(Pause)

(Off the record discussion)

(Jury enters at 1:21 p.m.)

THE COURT:  The record will indicate all jurors are present.  All parties and counsel are present.

You're still under oath.  Please state your name for the record.

THE WITNESS:  Irina Qureshi.

DIRECT EXAMINATION (CONTINUED)

BY MS. DeWITT:

Q    Ms. Qureshi, before the lunch break I think we were talking about Government's Exhibit 1311 or just started to talk about that, which is a call that was previously identified as being made on December 16th at 11:35 p.m.  And it's a call that's identified as being made from you to Alexander Umansky.

And I believe if you need to refer to it that you have the transcript, which was 311-B, next to you.  And if you need it just let me --

Qureshi - Direct / By Ms. DeWitt                    95

Do you have it there?

A    Yes.

Q    Okay.

**(Audio tape playing from 1:22 p.m. to 1:23 p.m.)**

Ma'am, can you tell the jury what this call is?

A    That was -- I left a message on Alex's cell phone.

Q    In this call you say, "We're meeting your demands, finding the money we don't have."

What did you mean by we're meeting your demands?

A    I meant that we're going to send them the money.  We were trying to do everything we could to send them the money.

Q    And by the money, what money did you mean?

A    The ransom money.

Q    You also said in this call, "I have one favor to ask you. You're also human beings.  You probably have those who you also worry about at least a little."

Who was this statement directed at?

A    Towards the people that kidnapped Alex.  I was asking them --

Q    So even though you were talking to Alex, you were directing this statement to the people that you assumed were with him?

A    Yes.

Q    Did you assume somebody was listening in on these calls when you made that statement?

Qureshi - Direct / By Ms. DeWitt                96

A      Yes.

Q      You also said, "Please take what you need and let him go."

What did you mean by that?

A      I meant that please take that money that you want and just let Alex go.

Q      And you also said during this call, "We won't report it anywhere."

What did you mean when you said that?

A      I meant we will not report it to police or FBI or any government.

Q      Finally, in this message to Alex Umansky you say, "Leave. Please just leave him alive.  Be human beings."

Again, who was this statement directed at?

A      Towards the people who kidnapped him.

Q      Were you afraid at that time that Alexander Umansky was going to be killed?

A      Yes.

MS. DeWITT:  At this time I'd like to play, your Honor, Government's Exhibit 1313.  And this is previously identified as a call that was made on December 17th at 8 --

THE COURT:  It's 1313-A?

MS. DeWITT:  1313-A.  Yes, your Honor.  I'm sorry.

1313-A with the related transcript 1313-B.

THE COURT:  All right.

MS. DeWITT:  As a call that was previously identified

Qureshi - Direct / By Ms. DeWitt          97

as being made on December 17th, 2001, at 8:58 p.m.

**(Audio tape playing from 1:26 p.m. to 1:29 p.m.)**

And I'm sorry, your Honor.  For the record I indicated that this was made at 8:58 p.m., and in fact this is a call on December 17th, 2001, at 8:58 a.m.

**BY MS. DeWITT:**

Q    Ma'am, what is this call?

A    This is a conversation between me and Alex.

Q    And, again, on this call AU on the subtitles is Alex Umansky, and IP is yourself?

A    Yes.

Q    And who is the Sasha that's referred to in this call?

A    Our friend Sasha that we were --

Q    The same Sasha that was referred to before?

A    The same Sasha.  Hoping he'll give us money.

Q    In this call Alex Umansky says, "I know he's running to my bank."

Who did you understand him to be referring to when he said that?

A    Michael, his brother.

Q    And why would Michael have been going to the bank at that time?

A    To get the money for ransom.

Q    To get the ransom money.

In this call you ask Alex, "When will they let you

**EXCEPTIONAL REPORTING SERVICES, INC**

Qureshi - Direct / By Ms. DeWitt                    98

go?"  And he responds, "As everything goes well, then they will let me go."

        Again, what did you understand Alexander to be saying when he said that?

A    That if we'll give them money, they'll let him go.

Q    Alex also says, "So don't involve anyone, anyone. Everything will be fine."

        What did you understand he meant when he said that?

A    That we shouldn't go to police or FBI and everything will be fine, meaning he'll stay alive and they'll let him go.

Q    So at this time you were being told that as long as the ransom money was paid, he would be released?

A    Yes.

Q    Is that what you understood?

A    Yes.

Q    You also tell Alex, "We're trying to find the stupid money."  And he responded, "Okay.  Look.  Today, we have today. That's it.  Let it all be today."

        What did you understand he was saying there?

A    That he wanted everything to happen that day.

Q    Did you understand that that was -- that day, December 17th, 2001, was some sort of a deadline?

A    Yes.

Q    And, again, when he says, "It has to be today," what had to be that day?

Qureshi - Direct / By Ms. DeWitt                    99

A    The money should be given.

Q    And that was the money that was being demanded for his release?

A    Yes.

Q    You said that, "I think Misha is resolving everything with the bank now."

      And what was Misha resolving at the bank?

A    Trying to get the money out of the bank or send or do the transaction, like send the money.

Q    He was trying to make the arrangements to actually send the money?

A    I think so.

Q    Were you present when other calls were received from. Alexander Umansky in addition to the calls that you were directly involved in?

A    Yes.

Q    At some point did you stop getting calls from Alexander Umansky?

A    Yes.

Q    And when was that, relative to when you first went in, when you first heard from him -- had gone missing?

A    Four or five days after 17th, I don't think we spoke to him anymore.

Q    Okay.  So from that early morning hour or the evening of the 13th it was three or four days later?

EXCEPTIONAL REPORTING SERVICES, INC

Qureshi - Direct / By Ms. DeWitt          100

A     Excuse me?

Q     I'm just trying to make it clearer.  From the day that you first found out that he'd gone missing, it was three or four days after that that you stopped getting calls from him?

A     Yes.

Q     Do you know whether or not the Umansky family paid the ransom demand?

A     They did pay.

Q     And after they paid -- did they pay all of it originally? Do you know?

A     I know that they paid it.  They paid half, and then they paid another half.

Q     And after they paid part of the ransom demand, was Mr. Umansky released?

A     No.

Q     And you said that they paid some at one time and some later.

      After they paid the later amount was Mr. Umansky released?

A     No.

      MS. DeWITT:  At this time I'm going to play Government's Exhibit 1325, which is a call that was previously identified as being made on December 19th, 2001, at 12:22 p.m.

      THE COURT:  P.m. or a.m.?

      MS. DeWITT:  1225-A, and 1225-B is the transcript.

EXCEPTIONAL REPORTING SERVICES, INC

Ruven Umansky - Direct / By Ms. DeWitt          113

arrange --

A     Yeah.

Q     -- to open the business?

A     Yeah.

Q     When you got to the business that morning at around ten o'clock, did you notice anything unusual?

A     Yeah.  I went to the business.  And on my way to Alex's office, I saw some papers on the fax machine.  So I went to pick up.  There were some flyers.  And then I saw three pages of the same -- it appears the same.  And I started looking through them.  And at the beginning, I couldn't understand what is it.

      And it says that it is an invoice, but it doesn't look an invoice.  We never had invoices like that from anybody.

Q     Okay.  Let me ask you a couple of question about that. You said there was for this document that was three pages.

      Were they three identical pages?

A     Three identical.

Q     And can you describe -- you said it was unusual it was an invoice.

      Can you describe to the jury what that document -- more about that document?

A     Yeah.  The document started like "Dear, sir," I think "Dear, sir, this is an invoice for an amount $234,628.  And you have to send it through New York Bank."  And this money was for

Ruven Umansky - Direct / By Ms. DeWitt        114

kind of a -- I don't know for what -- to Al Shaza Sanitary

Company -- I would never heard what is it -- in Dubai.

MS. DeWITT:  I'd ask Special Agent Davidson to place

in front of you what's been marked for identification as

Government's Exhibit 1281.

Oh, I'm sorry.  That apparently was previously

admitted, your Honor.

THE COURT:  I know.  The reason I black it out is you

keep the exhibits on the screen when they're not in use.  And

that --

MS. DeWITT:  I'm sorry, your Honor.  It's just

normally we would have this over there, and they could turn it

off.  It's just a little bit hard doing both.

THE COURT:  I understand.  That's why I'm turning it

off.

MS. DeWITT:  We appreciate the assistance.  And

normally I would do that myself.  And I think your tech person

is going to get us a longer thing for the audio; so we can make

sure that that's taken care of in the future.

BY MS. DeWITT:

Q    Can you take -- would you take a look at this document.

Do you recognize this document?

A    I don't have it.

Q    1281.

MS. DeWITT:  Let me put it up on the screen, your

Ruven Umansky - Direct / By Ms. DeWitt          115

Honor.

**BY MS. DeWITT:**

Q    Do you recognize this document, Mr. Umansky?

A    Yes.

Q    What is it?

A    That's the invoice.  It's called the invoice when I received them.

Q    Okay.  And when you originally received this, there was identical pages of the same?

A    Identical three pages.

Q    Does this fax that you found that morning, does it have a fax time stamp on it?

A    Yeah.  That's what puzzles me from the beginning.  It has a time different from United States time.  It says 14/12.  So it's European time.

Q    Okay.  And just so the jury can see a little better --

A    Yeah.  It's European time.  And the time is 2206.  So I figured out the closest start right away so that it have to do something from Russia in that part.  And the time was delayed. It came in maybe nine o'clock in the morning whatever is.  If it left 2206 so the shortest distance is like nine hours.

Q    Okay.  And just so that it's clear for the jury and the Judge.

        In the top left-hand corner of this document was a fax line that said, "14/12 2001"?

Ruven Umansky - Direct / By Ms. DeWitt        116

A    Yeah.  The 14th of December.

Q    And you understood that to be European time?

A    Yes.

Q    Because it's obviously there's no -- there's not 14 months in a year?

A    No.

Q    And the time that you picked this up was approximately ten o'clock in the morning --

A    Ten o'clock.

Q    -- on the 14th?

A    Yeah.

Q    And this indicates that it's at 2206 that day?

A    Yeah.  That's like 10 hours before that and --

Q    Ten hours ahead?

A    I mean -- yeah.  But the distance is --

Q    Okay.  So --

A    From here to Europe or to Russia is like nine, ten hours.

Q    Okay.  So this fax had a fax line that showed it was sent at approximately 10:06?

A    Yeah.

Q    Which was 12 hours ahead of you?

A    Yeah.

Q    And am I correct that your assumption that it had been sent from somewhere overseas because it was ahead of you?

A    No.  And I ask Todd and I ask the accountant, Zoya, if

Ruven Umansky - Direct / By Ms. DeWitt          117

they know anything about this.  And my son, I asked, "Where is Alex?"  They said, "He didn't show up yet."

And I tried to call him on the phone, but he didn't answer.

Q    Let me ask you a couple of questions about Government's Exhibit number 1281, Mr. Umansky.

Does this invoice request payment of certain moneys? Does it request that you --

A    Yeah.  It request for $234,628.

Q    And that's indicated right here --

A    Right.

Q    -- where I'm circling?

A    Yes.

Q    And does it lists a bank that it should be sent to?

A    Yeah.  It says to send to Standard Chartered Bank in New York and they give account number and a swift number (1:57:56 p.m.) and the beneficiary of the Standard Chartered Bank Dubai. So that means, like, from New York it had to go to Dubai.

Q    Okay.  So it was asking for money to be sent to Dubai and it was asking for money to be sent to some company called Al Shaza Sanitary and Building?

A    Yeah.  Al Shaza Sanitary and Building Materials.  I have no idea who this is.  Whenever -- first thing we never deal with companies like that.  The second, we never even buy from them amount half of that.

Ruven Umansky - Direct / By Ms. DeWitt          127

Q    Okay.  What did you do when you met with the FBI that evening?

A    I told them everything I know about it.

Q    Did you make arrangements to meet with them again after that?

A    Yes.

Q    And when did you next meet with the FBI?

A    I think next day, because Michael flew in from New York next day.

Q    Okay.  And that would be Saturday the 15th?

A    Saturday the 15th.

Q    2001?

A    Yeah.  In the morning I believe.

Q    Okay.  And, Mr. Umansky, before we go to that Saturday, did you provide the FBI with a phone message that you thought might be relevant to Alexander's kidnapping?

A    Yes.  I believe Todd or somebody else -- first I was going to desk through all the papers see if somebody's -- any mentioning where he go.  Because usually he had in the planner in the computer where he go and when he go.  And this case there was nothing.  So I was looking on his desk.

          And Todd showed me a message that he was supposed to meet somebody six o'clock or something.  And then underneath I saw that Alex's handwriting "Cold Water and Ventura."

Q    Okay.  And you referenced a Todd.  That you were looking

Ruven Umansky - Direct / By Ms. DeWitt          128

for this with Todd or Todd brought it to you.  Which one of the
Todds?  Do you remember?

A     To me I think Todd Owen.

Q     And at this time, Mr. Umansky, I'd like you to look at
what's been marked as Government's Exhibit 1280 and previously
admitted into evidence.

A     Yes.  This is the message phone call.

Q     And I believe Special Agent Davidson is handing you the
original exhibit.

A     Yes.

Q     Do you recognize that?

A     Yes.

Q     And what is it?

A     This is the message that was taken from the customer.  And
he's supposed to meet Alex.  I thought Alex went over there,
because underneath I saw with his handwriting "Cold Water and
Ventura."

Q     Okay.  Just a couple of questions about this exhibit, Mr.
Umansky.

      The date indicated on it is 12/13/01?

A     Yeah.  That was the day -- the message was taken a day
before 14th.  I saw it on the 14th.

Q     And this is written in American format, right?

A     Right.

Q     And the time is 6:55?

Ruven Umansky - Direct / By Ms. DeWitt          129

A     Yeah.  It was in the evening, 6:55 p.m.

Q     And you understood this was a message that was taken right before he left that evening?

A     Yeah.  I thought that that where he went for the appointment.  That's what I --

Q     On the top portion of this message up here, do you recognize the handwriting?

A     That's not Alex's handwriting.

Q     Okay.  And the bottom portion of this message --

A     That's Alex's handwriting.

Q     And that says, "Cold Water/Ventura."

      Did that have any significance to you at the time?

A     Yeah.  Because on the corner, that corner, there is a gas station.  And a lot of times appointments with people would be made, like, in a business somewhere or a gas station or something.

Q     Now, you mentioned that your other son Michael was flying out to me you.

      Did he meet you on that Saturday, the 15th of December?

A     Yeah.  He came from New York.  He flew in from New York that day.

Q     And when your son Michael arrived in Los Angeles, did you then go to the FBI to meet with them?

A     Yeah.  We went to the FBI.

Ruven Umansky - Direct / By Ms. DeWitt          147

A    That was the last call that was recorded.  We were sitting that day very late, and no calls came in.

Q    At some point, did you and the rest of your family decide to send that remaining $145,000 in ransom money that you decided to hold previously?

A    Yeah.  That was later.  We received a call.  Michael received a call from another person where he start to tell a lot of things that "we'll cut pieces, and we'll sell parts and anything (indiscernible)."  So --

Q    Who was actually involved in the decision to send that final $145,000?

A    Then I told Michael, "The hell with it.  And we'll not wait.  And let's send all the money.  And we'll see what happens."

Q    Okay.  And so that it's clear for the jury.

     The reason that you decided at that point to send the final 145 is because you'd gotten an additional call?

A    Yes.  It was a horrible call.

Q    And this is a horrible call where they were talking about body parts?

A    Yes.

Q    And why did you decide, aside from the fact that it was this horrible call, why did you decide to send the money then?

A    Money is nothing, but that was our hope.

Q    Did you send the money because you were afraid for your

Ruven Umansky - Direct / By Ms. DeWitt          148

son?

A     Yes.

Q     In this call did they -- in addition to talking about your son, did they talk about other members of your family?

A     Yeah.  They tried to threaten Michael, Michael's family --

          MR. CALLAHAN:  Your Honor, objection.  I'll object to this as hearsay.  Also, lack of foundation.

          THE COURT:  No.

          MR. RUBIN:  There's no foundation.

          THE COURT:  Overruled.  It goes to his state of mind.

          Go ahead.

          THE WITNESS:  That call, I heard that call.  That was Alex's voice.  And it was threatened not only hold the family but Michael specifically and his family, my grandchildren.

BY MS. DeWITT:

Q     And I'm sorry, Mr. Umansky.  Just to clarify, this call at this time was this from a voice that you didn't recognize?

A     Yes.

Q     Okay.  Not from Alex?

A     No.

Q     Okay.  And so because they were threatening your family, you basically said, "To hell with it --

A     I said that --

Q     -- I'm going to pay"?

A     That's my words, "The hell with everything.  Send the

EXCEPTIONAL REPORTING SERVICES, INC

Ruven Umansky - Direct / By Ms. DeWitt        149

money."

Q    Mr. Umansky, when was the last time that you saw your son

alive?

A    On December 11th.

Q    At this time, Mr. Umansky, I'd like you to take a look at

a photograph that was previously marked for identification as

Government's Exhibit 1279-A.

        MS. DeWITT:  If you could put that in front of him

please.

        THE WITNESS:  Yes.

BY MS. DeWITT:

Q    Do you recognize the person that's depicted in that

photograph?

A    This is my son Alexander.

        MS. DeWITT:  At this time, your Honor, I would move

to admit Government's Exhibit 1279-A.

        THE COURT:  Admitted this date.

    **(Government's Exhibit Number 1279-A was received in**

**evidence)**

BY MS. DeWITT:

Q    This is your son Alex on the beach?

A    Yes.

Q    Did Alex -- Alex had a tattoo on his arm?

A    Yes.

Q    Did he have that tattoo in December of 2001?

Michael Umansky - Direct / By Ms. DeWitt          173

A    The number in San Francisco, yes.

Q    Aside from what Alexander said, did you notice anything unusual about this call?

A    It was very unusual for my brother to speak only Russian. He never spoke Russian to me.  We always conversed in English. So right just that fact and the way he was speaking was enough to suspect there was something wrong.  And I heard noises in the background like somebody talking telling him what to say. Because my brother wasn't that good in Russian, and he had to be sometimes told what various words -- what to say in Russian.

Q    Okay.  So you heard in the background somebody --

A    Giving him instructions what to say.

Q    Okay.  Could you tell exactly what they were saying or could you just hear the --

A    I couldn't tell exactly.  I just recognized it as the language.

Q    Did you get another call from Alexander that morning, December 14th, 2001?

A    Yes, later on.

Q    Approximately when was this next call from Alexander on December 14th, 2001?

A    I think it was about an hour later after that, so perhaps about 1:00 o'clock my time, right after 10:00 o'clock California time.

Q    What did Alexander say during this phone call?

EXCEPTIONAL REPORTING SERVICES, INC

Michael Umansky - Direct / By Ms. DeWitt        174

A     He asked the status of collecting the money.  I told him that we were still working on it.  I asked if we can send the money from multiple places.  I told him it's impossible to get so much money from one place.  The answer was immediate no, there was no negotiation and it had to be done exactly like they said and that he would call me back.

Q     Did he mention anything about the fax in this call?

A     He asked me if I received the fax with instructions how to send it.  I think by that time I already had it.  I think it was already received at my fax machine at the house.

Q     Did you at some point get the fax that had been sent to your house?

A     I asked my wife's brother, my brother-in-law, to go over to my house in San Francisco and check if the fax has been received.  He told me that it was.  And I asked him to fax it to me in the hotel where I was staying in New York.

Q     And did you get it there?

A     Yes, I did.

Q     Okay.  And just for the record, who was the person who sent the fax and forwarded the fax to you in New York?

A     He is Alex's -- his name is Alexander -- Alex Trepetin. He is my wife's brother.

        MS. DeWITT:  At this time I'd ask Special Agent Davidson to set before the witness Government's Exhibit 1282 for identification.

Michael Umansky - Direct / By Ms. DeWitt          175

THE COURT:  1282?

MS. DeWITT:  1282, your Honor.

THE COURT:  Okay.  On your list you gave me 1382 and I had a question mark about it.

(Pause / Special Agent Davidson complies)

Well, at least I got it right in one place.

BY MS. DeWITT:

Q    Do you recognize this exhibit, sir?

A    1382?

Q    1282.

THE COURT:  1282.

THE WITNESS:  This is 1382.  That's why I didn't recognize it.

THE COURT:  You gave him the wrong list, too.

MS. DeWITT:  I apologize.

THE WITNESS:  Sorry.

MS. DeWITT:  Your Honor, if you could black out the rest of the screen, I'll put it on the screen for him.  That might expedite things.

THE COURT:  You want to go on the document cam?

MS. DeWITT:  Yes.

THE WITNESS:  1282.

BY MS. DeWITT:

Q    Can you see it on your screen, Mr. Umansky?

A    My screen?

Michael Umansky - Direct / By Ms. DeWitt        176

**MS. DeWITT:**  I have it on my computer.  I just don't want to have to show it to everybody before he's identified it, your Honor.

**THE COURT:**  All right.  Well, let me just do it here.

**THE WITNESS:**  Okay.  I can --

**MS. DeWITT:**  I'm sorry.  You can show it to him. I'll --

**THE COURT:**  No, I can't.  That's all right.  It's going to come in anyway.

**THE WITNESS:**  Okay.  I can see it.

**BY MS. DeWITT:**

Q    Okay.  What is this?

A    This is a copy of a fax that was received at my house that was forwarded to me in New York.  There were three pages of the exact same thing.  It looks like an invoice, supposedly paid out to some Al Shaza Sanitary Building Materials.  It gives instructions how to wire the money from the United States to end up in a bank in Dubai, United Arab Emirates.  And it gives the amount that I was supposed to wire.  It was $234,628.

**MS. DeWITT:**  And at this time, your Honor, I would move to admit Government's Exhibit 1282.

**THE COURT:**  1282 admitted this date.

**(Government's Exhibit Number 1282 was received in evidence)**

//

EXCEPTIONAL REPORTING SERVICES, INC

Michael Umansky - Direct / By Ms. DeWitt        177

**BY MS. DeWITT:**

Q    And, Mr. Umansky, also as part of that exhibit is there a page that shows that it was faxed to you?

A    If you look on the bottom of the screen here that shows information from the sending fax and --

Q    Let me just see if I can make that a little bit easier for the jury to see.

A    Yes.  It's a page number and a date stamp, time stamp of the sending fax.

Q    When does it show that this fax was sent to your house in San Francisco?

A    It shows a time as December 14th, 2001, at 22:00 minutes at 10:00 p.m.

Q    And again, is this in European time?

A    This is European time.  You can tell because the day of the week is before the month in the 24-hour format.

Q    And approximately what time were you told that this fax was going to be sent to you that day?

A    I think it arrived between 2:00 and 4:00 in the afternoon.

Q    And that's New York time?

A    I'm sorry.  Yes, that's New York time.  So it would have been like 10:00 or 11:00 in the morning California time.

Q    And does this fax show that it was faxed at sometime, basically, ahead of time -- ahead of that time?

A    Yes.  It looks like a whole bunch of hours ahead of the

Michael Umansky - Direct / By Ms. DeWitt       178

time it was received.

Q    And, Mr. Umansky, was there more than one page that was faxed to you?

A    Yes.  There was three pages of exactly the same thing.

Q    All three were exactly identical.

A    All three were identical.

     **(Pause)**

Q    Going back to Government's Exhibit 1282, Mr. Umansky, what did you understand this fax to be?

A    I understood it to be as a ransom demand that, supposedly, shows an invoice from a non-existent company because it --

Q    And that conclusion was based on your conversation with your brother, Alexander Umansky?

A    Yes.

Q    And did this fax purport to demand payment of a certain amount of money?

A    Yes, it did.

Q    How much?

A    $234,628.

Q    And where did this fax demand that you send the money to?

A    This money was supposed to sent [sic] to Al Shaza Sanitary and Building Materials in a bank in Dubai.

Q    Had you ever heard of a company called Al Shaza Sanitary and Building Materials?

A    I have never heard of it.

Michael Umansky - Direct / By Ms. DeWitt          179

Q    Had Hard Wired ever had any business dealings in Dubai, to your knowledge?

A    Not to my knowledge, no.

Q    Did you get any more calls that day from Alexander Umansky, your brother?

A    Yes, I did.

Q    Approximately when was the next call?

A    Either an hour or two later after that.

Q    And what did --

A    The previous one.

Q    I'm sorry.

A    After the previous one.

Q    So approximately one hour after the last call?

A    Yes.

Q    What did Alexander say during that call?

A    Again, he was asking about the status of gathering the money.  I told him it's very hard to gather the money that much in one day and it's getting late and there was no physical way to wire the money out over the weekend and that we need more time.  We were told there's, again, no negotiation.  And again, he was speaking only Russian.

Q    Did you get any additional calls from Alexander that day?

A    Yes.  There was a call later on, again, I think two hours later; and, again, asking about the money that -- trying to suggest how to gather the money to use credit cards.  And I

EXCEPTIONAL REPORTING SERVICES, INC