Case 2:02-cr-00220-MCS    Document 2530-14    Filed 10/17/25    Page 1 of 55   Page ID
#:23472

# GOVERNMENT EXHIBIT 14

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

# DRAFT COPY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO:  CR-02-220(B)-DT |
| | ) | |
| Plaintiff, | ) | CRIMINAL |
| | ) | |
| vs. | ) | Los Angeles, California |
| | ) | |
| IOURI MIKHEL, | ) | Tuesday, October 31, 2006 |
| JURIJUS KADAMOVAS, | ) | (9:26 a.m. to 12:01 p.m.) |
| | ) | (1:34 p.m. to  4:00 p.m.) |
| Defendants. | ) | |

JURY TRIAL (34th DAY)
(VOLUME XXXIV)

BEFORE THE HONORABLE DICKRAN TEVRIZIAN,
UNITED STATES DISTRICT JUDGE

EXCEPTIONAL REPORTING SERVICES, INC
14493 SOUTH PADRE ISLAND DRIVE
SUITE A-400
CORPUS CHRISTI, TX 78418-5940
361 949-2988

6

children at home with regard to I guess Halloween.  So I have no problem letting them go at 4:00.

MS. DeWITT:  I have no problem with that, your Honor. If you could just let me -- once we get to Special Agent Gogley, in an effort to do what the Court has encouraged us to do, which is to speed things up a little bit, I've tried to narrow down his testimony a little bit to expedite it.  I'm not exactly sure how long he's going to go because of that, but if you'd just give me an idea in the afternoon when you want to stop I'll make sure that I stop at a good point.

THE COURT:  About 4:00.

MS. DeWITT:  Okay.

THE COURT:  Ms. Chahin, you wanted to speak to the Court also.

MS. CHAHIN:  Yes, your Honor.  This morning we received some additional discovery from the Government, a FedEx box which contained, among other things, a Russian language diary of a witness who is expected to testify possibly as soon as tomorrow.  I have not had a chance to go through it yet and once we go through it -- we'll have to go through it with an interpreter.  It may be necessary for us to request that the Court postpone our cross examination of this witness until we've had a chance to look at this.

THE COURT:  Who is the witness?

MS. CHAHIN:  Natalya Solovyeva.  My client's wife.

**DRAFT COPY**

THE COURT:  That's no problem.  You can do the direct examination and then see what happens and go through the diary. If there's anything in there, you can call her back in a couple of days or next week.  The only problem is the attorney that's on that case is next door.

MS. CHAHIN:  Yes.

THE COURT:  And we have to finish with that witness this week.

MS. CHAHIN:  Your Honor, I don't know how long the diary is; like I said we just got the document.  I don't know what's in there.  We have summary translations, but I would like to defer my entire cross examination, because I don't know if there's things in here that are going to affect the questions that I need to ask her.

THE COURT:  Well, what's going to happen is, you know, this trial has to shut down or that trial has to shut down until that attorney is available to sit, and since I started first they're going to have to shut down.  So you're going to have a very unhappy Judge next door.  In addition, there's only one attorney I believe for Ms. Solovyeva.

MS. CHAHIN:  Your Honor, I believe she has two attorneys, Mr. Amdor and Mr. Crane (phonetic).

THE COURT:  Both of them?

MS. DeWITT:  Both of them are in trial, your Honor.

THE COURT:  Well Mr. Amdor's going to start one trial

DRAFT COPY

I believe before Judge Hatter, and he hasn't that trial.

**MS. DeWITT:**  Maybe I'm mistaken, your Honor, but I thought actually that was starting today.  But maybe I'm wrong.

**THE COURT:**  I don't know.

**MS. DeWITT:**  Your Honor, just to give you --

**(Telephone rings and conversation temporarily interrupts)**

I don't know why it did that, your Honor.  I'm sorry.

Just to let you know what the situation is, we just got these diaries ourselves on Friday.  It was my understanding that they were being translated, and in fact what we got was not a translation of the documents but was a summary of them done by a translator on audiotape.  We spent about, I don't know, close to 20 hours this weekend typing up those summaries and we made as quickly as we possibly could a copy of the actual diaries themselves as well as the summaries of the diaries available to them as soon as we could get them copied.

I want to note for the record, because I think this is important, these are diaries that were written essentially by a woman in her twenties, her personal diaries, and they were written before any of the events that happened involving this case, and I --

**THE COURT:**  Pardon me.  Ninety-nine percent of it is totally irrelevant to this case.

**MS. DeWITT:**  It is, and I've tried to advise them, give them a heads up as to what I think could even be wildly in

**DRAFT COPY**

9

my imagination relevant, because there's some negative stuff that she makes -- comments she makes.  So --

THE COURT:  Here's the problem though, because I require the attorney that represents the Defendant to be present in court, because that Defendant is on sentence and she's pled to a mandatory life without possibility of release and the Government -- she's hoping the Government will make a 5K1.1 at the time of sentencing, it's imperative that she be adequately represented here.

MS. DeWITT:  I don't disagree with that at all, your Honor.  But I do have a problem with the idea of her being put on direct examination and then them having a week or more to sit back and think about their cross examination.  I don't think that's fair.

THE COURT:  Well the fairness has nothing to do with it right now.  I've got a bigger problem, and that is there's a trial going on next door in which Mr. Crane is the attorney for Ms. Solovyeva, and as such Judge Klausner has indicated he wants to go forward with his trial.

MS. DeWITT:  I understand the problem.  I don't know what the answer to it is, but I understand the problem and I completely agree with you, your Honor, that she should be represented --

THE COURT:  Well one of us is going to have to declare a mistrial if this happens, either myself or Klausner.

**DRAFT COPY**

10

All right, that's one of the possibilities in this particular case.  Or we go to night, which means one of us, either Klausner or myself, is going to have to go to trial at night.

**MS. DeWITT:**  Well, your Honor, I wouldn't presume to tell you or Judge Klausner how to handle this conflict.  It's not a conflict that I can avoid.  I've done -- I don't know what to do about it.  But I will do whatever you want in terms of accommodating --

**THE COURT:**  Well it's very simple for me, because I'm the senior judge and I have priority and I will continue my case.  But it's going to cause a major impact on Judge Klausner and he's not going to be happy with any of the attorneys that ever appear before him again.

**MS. DeWITT:**  Again, I wish that there were something I could do to avoid that, but it's not within my control.  But for the Government's sake I will say that if we need to go mornings and he needs to go afternoons for a couple of days to accommodate this, or whatever you tell us to do, we will do it.  And I mean I just -- there's nothing -- it's not within my control.  But I do think that this concept of splitting the direct from the cross is not fair to Ms. Solovyeva or to the Government and I don't think that's appropriate.  So if they're going to want more time and you think that's appropriate --

**THE COURT:**  You're going to have to look at those diaries tonight.

**DRAFT COPY**

11

**MS. CHAHIN:**  Your Honor, the problem is that they're in Russian and there are only partial translations.  I don't think it's feasible for us to be required to review these in their entirety in a foreign language overnight and then be prepared to cross examine possibly tomorrow.  It seems like the fairer thing to do would be to put the entire examination over if the Government doesn't want to split up the direct and the cross.

**THE COURT:**  Yeah, but you see you're forgetting that there's a trial going on next door that Mr. Crane is the attorney on another defendant and he's also the attorney on Ms. Solovyeva.

See, I have been yelling and screaming at my colleagues over the last 25 years that the CJA panel is too small and because of its smallness has created too many conflicts in the judicial system and it's caused a bottleneck. And I have advocated for 22 years to increase the size of the CJA panel four times so that you have more attorneys, because to me it's an exclusive club of defense lawyers that try these cases.  And I have a readout on everybody that's on the CJA panel and most CJA attorneys are making 300 to 800,000 dollars a year, which I think is obscene compared to the lawyers in the County of Los Angeles.  I think that it's -- personally I think it's scandalous and that's why I've advocated that they open up the CJA panel.  And this case illustrates it and this situation

**DRAFT COPY**

12

illustrates it.

MS. CHAHIN:  Your Honor, the problem that I find myself in as an advocate is that I've been given these documents this morning and I'm potentially going to examine her on them tomorrow.

THE COURT:  Well then you're going to have to go next door and tell Judge Klausner that he's going to have to stop his trial.  You're going to have to tell him to stop the locomotive.

MR. RUBIN:  Your Honor, Judge Klausner probably knew about this situation before he started his trial.  I mean it's not a surprise.

THE COURT:  I knew about -- well I have the same problem with Judge Percy Anderson with Ms. Chahin.

MR. RUBIN:  Well, and to respond to the Court's discussions about the CJA panel, Mr. Crane is the capital counsel in this case, he's the capital counsel in that case. And the death penalty statute requires the appointment of a learned counsel.  To tell you the truth, there aren't that many of us in the County of LA.

THE COURT:  Well I think there are.

MR. RUBIN:  Well I'm telling you that there aren't that many --

THE COURT:  No, it's --

MR. RUBIN:  -- between the State panel --

**DRAFT COPY**

15

else has to defer to me.

All right, any other bad news?

**MR. RUBIN:**  Do you want me to go talk to him now?

**THE COURT:**  All right, let's bring the jury out.

**(Pause)**

How long do you think Ms. Solovyeva will be on direct examination?

**MS. DeWITT:**  I anticipate, your Honor, that it will be a little bit more than a day, because she's going to be using an interpreter, so a day and a half.  And I wouldn't even begin to guess what they're going to do on cross examination, but I mean if I'm guessing --

**THE COURT:**  Markovskis, how long is he going to be?

**MS. DeWITT:**  He will be a little bit more than a day as well.  I anticipate he will speak in English, your Honor, so that should actually expedite it, so I figure two days to two and a half days including cross.

**(Jurors enter courtroom at 9:41 a.m.)**

**THE COURT:**  Good morning, ladies and gentlemen of the jury.

The record will indicate all jurors are present and all counsel and all parties are present.

Mr. Umansky, please come forward.  You're still under oath.  And state your name for the record.

**THE WITNESS:**  Michael Umansky.

**DRAFT COPY**

Michael Umansky - Direct / By Ms. DeWitt          16

**(Witness previously sworn)**

**DIRECT EXAMINATION (CONTINUED)**

**BY MS. DeWITT:**

Q    Good morning, Mr. Umansky.  On Friday when we broke I believe that we were just about to start going through some of the recorded calls between yourself and your brother, Alex Umansky.

          **MS. DeWITT:**  At this time, your Honor, I'm going to play Government's Exhibit 1297-A with subtitles from 1297-B. And for the record this call was previously identified as a call made on 12/15/01 at 4:23 p.m. from Alexander Umansky to Michael Umansky on a phone subscribed to Ian Polack.

          And also for the record, your Honor, I placed next to Mr. Umansky, although I do not think he'll need it, a copy of the transcripts in case he needs to refer to them.

     **(Pause)**

     **(Government's Exhibit 1297-A played from 9:43 a.m. to 9:47 a.m.)**

**BY MS. DeWITT:**

Q    Mr. Umansky, is this one of the calls that you received from Alexander Umansky on December 15th, 2001 after he was kidnapped?

A    Yes.

Q    And can you explain to the jury what this call is?

A    My brother was asking the status of me collecting the

**DRAFT COPY**

Michael Umansky - Direct / By Ms. DeWitt          17

money for the ransom.  He was asking how much money I got.

Q    Is the voice that's identified on the transcript as AU Alex Umansky's voice?

A    Yes, the voice is my brother's.

Q    And is the voice that's identified on the transcript as MU, is that your voice?

A    Yes, it is.

Q    And is that true on all the transcripts that you reviewed, that the corresponding MU is for your voice and AU is for Alex Umansky's voice?

A    Yes, it is.

Q    In this call Alexander says "Hello, Misha."  Who's Misha?

A    Misha is my Russian name, for Michael.

Q    In this call you tell Alexander Umansky that you have collected a little bit of the money.  What money were you talking about?

A    The money to be used for ransom for his release that was demanded.

Q    At that time were you still collecting the ransom money, or had you found all the money that you needed to pay the ransom at that time?

A    I think at that time I was still collecting it.

Q    In this call you tell Alexander that you have 165.  What did you mean by 165?

A    I meant $165,000.

**DRAFT COPY**

Michael Umansky - Direct / By Ms. DeWitt          18

Q     In response to that Alexander says, "There's no negotiating."  What did you understand he meant when he said that there was no negotiating?

A     It was a threat saying that the ransom was set at the previous amount that was 234,628 and there was no negotiating and I had to come up with the full amount.

Q     After you tell him that you only have $165,000 Alexander says, "It's serious.  Serious.  It's serious.  By Monday.  By Monday it needs to be found."  What did you understand he was saying here?

A     I took it as a threat that something will happen if we don't get all the money by Monday.

Q     So you took Monday as being a deadline?

A     Yes.

Q     In this call you ask Alex "What will happen to you?" and he responds "If there's money, if the money is there, everything will be fine."  What did you understand him to be saying there?

A     This was a promise that if we paid the ransom that he would be released unhurt.

        **MS. DeWITT:**  At this time, your Honor, I'm going to play Government's Exhibit 1298-A with subtitles from 1298-B.  And for the record this is a call that was previously identified as a call made on 12/15/01 at 4:30 p.m. from Alexander Umansky to Michael Umansky from a cell phone

**DRAFT COPY**

Michael Umansky - Direct / By Ms. DeWitt          19

subscribed to Ian Polack.

THE COURT:  All right, 1298-A.

(Government's Exhibit 1298-A played from 9:49 a.m. to 9:52 a.m.)

BY MS. DeWITT:

Q    Mr. Umansky, is this another call between yourself and your brother, Alex Umansky?

A    Yes.

Q    In this call there's some references to a person named Ira (phonetic).  Who's that?

A    Ira was my brother's ex-fiancée.

Q    In this call you tell Alexander that you're working to find more people to borrow the money from.  Again, at that time did you have all the money to pay the ransom demand or were you still looking for it?

A    I think by that time we knew where the money would be coming from.

Q    Did Alexander tell you what would happen to him if all the money was paid?

A    He said if I paid all the money everything would be fine. And I took it that he would probably be released.

Q    And again in this call did he tell you again that there was some deadline for paying the ransom?

A    Yes.

Q    And what was that deadline?

DRAFT COPY

Michael Umansky - Direct / By Ms. DeWitt          20

A    Monday.

Q    In this call did you hear somebody whispering in the background?

A    Yes.

Q    What did you hear that person say?

A    It was very faint.  I just heard conversation.

Q    Did you hear the person say "tomorrow"?

A    I think so.

Q    And after that did Alexander tell you that he would call tomorrow?

A    Yeah, he repeated the words.

Q    Okay.  And did this confirm your suspicion that Alex's calls were somehow being monitored?

A    Yes.

Q    And that he was somehow being told what to say on the phone?

A    Yes.

        MS. DeWITT:  At this time, your Honor, I'm going to play Government's Exhibit 1299-A with subtitles from 1299-B.

        THE COURT:  You played 1298-A.  This is 1299 I believe now.

        MS. DeWITT:  That's what I said.  I'm sorry, your Honor.

        THE COURT:  I'm sorry.

        MS. DeWITT:  1299.

**DRAFT COPY**

THE COURT:  1299-A.

(Government's Exhibit 1299-A played from 9:53 a.m. to 9:56 a.m.)

BY MS. DeWITT:

Q   Mr. Umansky, were these voicemail messages that were left by your brother, Alex Umansky, on your voicemail?

A   Yes.

Q   And in the first message Alexander says to call Sasha about getting some money.  Who was the Sasha that he was referring to?

A   It was his friend who owns a body shop.

Q   And he also refers to himself as Sasha.  Is that how he --

A   Yes.

Q   -- referred to himself with you?

A   Alex is in English; Sasha is in Russian.

Q   In his call Alexander says, "This is very serious, Misha. If there won't be exactly 234 there will be big problems.  My fingers will be cut off."  What was your reaction when you got this message about cutting off Alexander Umansky's fingers?

A   It was a threat that if I didn't pay the money, if we didn't come up with the money exactly what they were asking for, they would do bodily harm to him, namely cutting off his fingers.

Q   At this time the ransom demand is now escalating to threats, is that you took it?

DRAFT COPY

Michael Umansky - Direct / By Ms. DeWitt        22

A    Yes, it is.

Q    In this call Alexander also says, "When they're talking to you, don't even say less.  Not enough.  Exactly 234, not less, not later than Monday morning."  Again, did you understand that this was a deadline for paying the ransom demand?

A    Yes.

Q    And what did you understand at this point, based on these calls, would be the consequences if the money was not paid in full?

A    The threat was explicit that if I didn't pay the full ransom that something very bad would happen to him.

Q    Specifically they were threatening to cut off the fingers.

A    Yes.

Q    In his second call Alexander mentions that the cars and his house can be done through the pawn shop.  Was Alexander suggesting ways to get additional or raise additional ransom money?

A    Yes.

Q    And his suggestion basically was to start pawning his personal property?

A    Yes.

Q    Other than what was being said, the words themselves, did you notice anything unusual about these calls?

A    The way he was speaking, it's not a normal speech pattern. He was either reading or he was being told what to say right

**DRAFT COPY**

Michael Umansky - Direct / By Ms. DeWitt          23

away.

Q    So it sounded like it was scripted?

A    It was scripted, yes.

          MS. DeWITT:   At this time, your Honor, I'm going to

play Government's Exhibit 1301 with subtitles from 1301.

Thirteen hundred and one.

          THE COURT:   1301?

          MS. DeWITT:   Yes, your Honor.

          THE COURT:   It will be A, right?

          MS. DeWITT:   A and B with the subtitles, yes,

your Honor.   Thank you.

          THE COURT:   All right.

          MS. DeWITT:   And for the record this call was

previously identified as a call made on December 16th, 2001 at

12:25 p.m. from Alexander Umansky to Michael Umansky.

     **(Government's Exhibit 1301-A played from 9:59 a.m. to**

**10:02 a.m.)**

**BY MS. DeWITT:**

Q    Mr. Umansky, is this another call between yourself and

your brother, Alexander Umansky?

A    Yes.

Q    And this is on Sunday, now three days after he's gone

missing, is that right?

A    Yes.

Q    And the day before you understood the deadline to be --

**DRAFT COPY**

Michael Umansky - Direct / By Ms. DeWitt            24

A     Yes.

Q     -- to pay the ransom.

A     Yes.

Q     What are you telling -- what are you trying to communicate to Alexander in this call?

A     This conversation was about where to find the money and how to send the money on Monday morning.

Q     Are you also trying to tell him that you're going to have all the money together?

A     I'm telling him by Monday I will try to come up with all the money that's been asked to pay for the ransom.

Q     And again does he tell you that there's a deadline?

A     He keeps repeating that it cannot be any later than Monday morning.

        MS. DeWITT:  At this time, your Honor, I'm going to play Government's Exhibit 1302-A with subtitles from 1302-B. And for the record this call was previously identified as a call made on December 16th, 2001 at 12:30 p.m. from Alexander Umansky to Michael Umansky.

        THE COURT:  All right, this is 1302-A?

        MS. CHAHIN:  1302-A --

        THE COURT:  On the list that you gave me you had 1310-A before 1302-A.  Is that a mistake?

        MS. DeWITT:  It must be, your Honor.

        THE COURT:  Okay.

**DRAFT COPY**

Michael Umansky - Direct / By Ms. DeWitt          25

MS. DeWITT:  They should go in order.

THE COURT:  All right, 1302-A in evidence.

(Government's Exhibit 1302-A played from 10:03 a.m. to 10:05 a.m.)

BY MS. DeWITT:

Q    And can you explain to the jury what this call is about?

A    Alex is again asking if the money is together.  He's trying to tell me how to send the money, the ransom money, to wherever they wanted it to be sent.

Q    Alexander says in this call "You need to remember to put the reference number."  What was he talking about when he was referring to a reference number?

A    He means the reference number that is given by the bank when the wire transfer is made to track the wire transfer.

Q    And at that time had you and Alexander been talking about the fact that the money might be coming from different accounts?

A    Yes.

Q    Alexander also says that "No trace should be on the account."  What did you understand him to be talking about when he said that?

A    He meant not to put a trace on the wire transfer so that nobody can track where the wire transfer is going to.

Q    And what did Alexander tell you that he wanted you to do with the reference numbers that he had asked you about?

**DRAFT COPY**

Michael Umansky - Direct / By Ms. DeWitt          26

A    He told me to call him back on a number and leave it on the voicemail.

Q    And was it your understanding that by use of the reference numbers you could actually check on whether the wires had gone through or see where they came from?

A    Yes.

MS. DeWITT:  At this time, your Honor, I'm going to play Government's Exhibit 1303-A with subtitles from 1303-B. And for the record this call was previously identified as a call made on December 16th, 2001 at 12:43 p.m. from Alexander Umansky to Michael Umansky from a cell phone subscribed to Ian Polack.

THE COURT:  1303-A in evidence.

(Government's Exhibit 1303-A played from 10:07: a.m. to 10:08 a.m.)

BY MS. DeWITT:

Q    Mr. Umansky, is this another call between yourself and Alexander Umansky?

A    Yes.

Q    And in this call once again you're talking about the ransom money that needs to be paid?

A    Yes.

Q    And the reference numbers that would relate to the wire transfers of that ransom money?

A    Yes.

Q    In this call you asked Alexander if he was okay and his response to that question is "If the money is there everything will be fine."  What did you understand he was saying?

A    I understood it as a promise that if we paid the full amount of the ransom that he would be released.

Q    So at this time you understood or you thought or hoped that if you paid the ransom money he would be released?

A    That was the hope.

Q    At that point what did you understand or what did you believe would happen if the ransom money was not paid?

A    I understood that something bad would happen to him.

Q    In this call you tell Alexander to quote/unquote "Make them understand that we're doing everything to get you back." Whose benefit were you making that comment for?

A    I was addressing the statement to the kidnappers who were holding him.

Q    You also say in this call "We are getting everything you want, please return him to us."  Who was the who that you were directing that comment to?

A    I was talking about my brother, I was telling them really to return my brother to us, we're paying you, we're going to do everything you want.  I'm addressing the kidnappers, telling them.

Q    And just to be clear, even though you're speaking to Alexander Umansky, is your assumption that somebody's listening

Michael Umansky - Direct / By Ms. DeWitt          28

and monitoring the calls?

A     Yes.

Q     So those comments were directed at that person.

A     Yes.

Q     Or those persons.

A     Yes.

        MS. DeWITT:  At this time, your Honor, I'm going to play Government's Exhibit 1304-A with subtitles from 1304-B. And for the record this call was previously identified as two voicemail messages left on 12/16/01 at 12:38 p.m. and 12:40 p.m. by Alexander Umansky for Michael Umansky.

        THE COURT:  All right, 1304-A in evidence.

    **(Government's Exhibit 1304-A played from 10:10 a.m. to 10:12 a.m.)**

**BY MS. DeWITT:**

Q     Mr. Umansky, are those voicemail messages left by your brother, Alexander Umansky?

A     Yes.

Q     It mentions having you leave messages on this phone.  Was he referring to his personal cell phone?

A     No, the phone that I'd been calling to leave him messages, the other number.

Q     And he wanted you to leave certain information on that phone.

A     yes.

**DRAFT COPY**

Michael Umansky - Direct / By Ms. DeWitt          29

Q    And again is he asking you for the wire transfer information relating to the payment of the ransom money in these calls?

A    Yes.

Q    And specifically asking you to leave the details of that on his voicemail?

A    Yes.

        MS. DeWITT:  At this time, your Honor, I'm going to play Government's Exhibit 1305-A with subtitles from 1305-B. And for the record this call was previously identified as a voicemail left on December 16th, 2001 at 1:46 p.m. by Michael Umansky for Alexander Umansky.

        THE COURT:  1305-A in evidence.

    **(Government's Exhibit 1305-A played from 10:13 a.m. to 10:14 a.m.)**

**BY MS. DeWITT:**

Q    Is this a voicemail message you left for Alexander Umansky?

A    Yes.

Q    And in this call you talked to him about using his car for collateral.  Why did you tell him that you needed to use his car for collateral?

A    Just to say that.  It was --

Q    Did you need to use his car for collateral?

A    No.

**DRAFT COPY**

Michael Umansky - Direct / By Ms. DeWitt          30

Q    So what was the point of telling him that?

A    It was just a delaying tactic.

        MS. DeWITT:  At this time, your Honor, I'm going to play Government's Exhibit 1307 with subtitles from 1307 -- 1307-A, excuse me, with subtitles from 1307-B.  And for the record this call was previously identified as a call made on December 16th, 2001 at 8:23 p.m. from Alexander Umansky to Michael Umansky from a cell phone subscribed to Ian Polack.

        THE COURT:  1307-A in evidence.

        **(Government's Exhibit 1307-A played from 10:15 a.m. to 10:18 a.m.)**

**BY MS. DeWITT:**

Q    Mr. Umansky, again is this another call between yourself and your brother, Alex Umansky?

A    Yes.

Q    And in this call Alexander is talking about borrowing money from his friends and he says, "There is no -- there's no tomorrow or the next day."  What did you understand he meant by that comment?

A    Another threat that if the full ransom is not paid when they asked for it, there will be problems.

Q    At this time, and this is an 8:30 call on that Sunday, had you collected all the ransom money by that time?

A    Yes.

Q    You and the family?

Michael Umansky - Direct / By Ms. DeWitt        31

A    Yes.

Q    And you're telling Alex in this call that you're still looking for money.  Why did you do that?

A    There was a strategy in place to put as much delay to the whole proceeding to give FBI time to try to locate him.

Q    And is that partly why you sort of keep talking about these matters, is to try to extend the call and drag it out?

A    Yes, as much as possible.

        **MS. DeWITT:**  At this time, your Honor, I'm going to play Government's Exhibit 1308-A with subtitles from 1308-B. And for the record this call was previously identified as a call made on December 16th, 2001 at 8:43 p.m. from Alexander Umansky to Michael Umansky from a cell phone subscribed to Ian Polack.

        **THE COURT:**  1308-A in evidence.

    **(Government's Exhibit 1308-A played from 10:20 a.m. to 10:22 a.m.)**

**BY MS. DeWITT:**

Q    And for the record, Mr. Umansky, this is another call between you and your brother, Alex Umansky?

A    Yes.

Q    And again you talked to him about the fact that you're looking and you're not going to look all around the world for this money and you talk about still gathering money.  You'd collected all the ransom money at this time, right?

**DRAFT COPY**

Michael Umansky - Direct / By Ms. DeWitt        32

A    Yes.

Q    And was this again just another attempt to sort of drag out the call and increase the number of calls as part of your tactic?

A    Yes.  We needed more calls and as long as possible keep him on the line.

Q    What did you understand was going on in this call from his perspective?

A    He was getting frustrated and desperate to make sure that -- he couldn't understand why I couldn't get all the money and I was trying to tell whoever was listening that I'm working my best to get the money.

Q    When you mentioned to him that you can't read the numbers, is that also just a delaying tactic?

A    Yes, it was.

Q    Can you describe for the jury what Alexander's tone was like in this call?

A    Compared to the previous one, it was more depressed.

Q    And how does that compare -- I'm sorry, go ahead.

A    Just in the previous one he was more agitated, in this one he is still frustrated but he's now getting kind of depressed about what was going on.

        **MS. DeWITT:**  At this time, your Honor, I'm going to play Government's Exhibit 1309-A with subtitles from 1309-B. And for the record this call was previously identified as a

**DRAFT COPY**

Michael Umansky - Direct / By Ms. DeWitt          33

call made on December 16th, 2001 at 9:37 p.m. from Alexander Umansky to Michael Umansky from a cell phone subscribed to Ian Polack.

          THE COURT:  1309-A in evidence.

     **(Government's Exhibit 1309-A played from 10:24 a.m. to 10:27 a.m.)**

**BY MS. DeWITT:**

Q    Mr. Umansky, again is this a call from your brother, Alexander Umansky?

A    Yes.

Q    And in this call you say to Alexander, "Alex, what are you afraid of?  Alex?  Hello?"  Can you explain to the jury why you made that comment to Alex during this call?

A    It was based on the -- I know his voice and from the previous couple of calls his tone of voice changed.  It went from more agitated to more depressed, resigned, and that he's worried about everything.  He's just getting worse.  And so I'm asking him how he feels, maybe hoping something he'll say.

Q    In response to that statement by you he says, "What?  What I'm afraid of?  This is serious business.  Don't you understand?  Don't you understand?"  Did you understand what his situation was at that time, Mr. Umansky?

A    He was very afraid of something.  He was very afraid of whatever he was told.

Q    After that he says to you that "Everything will be fine if

**DRAFT COPY**

Michael Umansky - Direct / By Ms. DeWitt         34

we give the money.  This is for all of us, not just for me.

Okay?"  What did you understand he was saying when he said

"This is for all of us"?

A    I understood it as an escalation of a threat from just him

to the whole family.

Q    And you proceed in this call to talk about protection for

everyone.  Again, what did you understand this was about, this

protection that you were talking about?

A    The protection is sort of if you're dealing with a mafia

ring that you pay for protection from being attacked,

threatened, or whatever bad thing happens to you.

Q    And again you took this call as a further escalation of

the threats, now not just against Alexander Umansky but against

the family?

A    Yes.

        **MS. DeWITT:**  At this time, your Honor, I'm going to

play Government's Exhibit 1312-A with subtitles from 1312-B.

And for the record this call was previously identified as a

voicemail left on 12/16/01, December 16th, 2001 --

        **THE COURT:**  1312-A is in evidence.

        **MS. DeWITT:**  -- at 11:39 p.m. by Michael Umansky for

Alexander Umansky.

   **(Government's Exhibit 1312-A played from 10:29 a.m. to**

**10:30 a.m.)**

//

**DRAFT COPY**

Michael Umansky - Direct / By Ms. DeWitt          35

**BY MS. DeWITT:**

Q    Mr. Umansky, is this a voicemail message you left for your brother, Alexander Umansky, that evening?

A    Yes.

Q    What were you trying to communicate to Alex in this call?

A    (No response)

Q    Is there a reason why you left this message after you just talked to him before?

A    I'm just talking more about getting the money together and just needed information and to get him to call me more.

Q    Were you --

A    And I'm asking about -- more about the protection stuff.

Q    I'm sorry.  Were you concerned based on the call that you'd just gotten before this?

A    Yes.

Q    So was part of the reason for this call to reassure him that you were going to pay the money?

A    Yes, I was getting worried.

        MS. DeWITT:  At this time, your Honor, I'm going to play Government's Exhibit 1316-A with subtitles from 1316-B. And for the record this call was previously identified as six voicemail messages left on December 17th at or prior to 8:55 a.m. from Alexander Umansky to Michael Umansky from a cell phone subscribed to Ian Polack.

        THE COURT:  1316-A is in evidence.

**DRAFT COPY**

Michael Umansky - Direct / By Ms. DeWitt          36

(Government's Exhibit 1316-A played from 10:32 a.m. to 10:35 a.m.)

BY MS. DeWITT:

Q    Mr. Umansky, were these also calls from your brother, Alex Umansky?

A    Yes.

Q    These were on the day that the ransom demand was supposed to be paid, is that right?

A    Yes.

Q    And in one of the calls there's references to some numbers and in one of the other calls there's references to some other number.  Are those numbers that are being referred to in the first instance where the money was supposed to be sent to?

A    Yes, they're the account numbers.

Q    And that was the -- did that match the account number on that ransom demand that you had received earlier?

A    Yes.

Q    And there were references also to the wire transfers that you were going to be sending?

A    Yes.

Q    Okay.  And in the last message there Alex says, "Patience. No one here has it."  What did you understand that he was trying to communicate with you when he made this comment?

A    That he was being threatened that they were running out of patience why the money hasn't been paid yet.

**DRAFT COPY**

Q    And what was the tone of his voice during this last message?

A    It was more depressed and afraid.

MS. DeWITT:  At this time, your Honor, I'm going to play Government's Exhibit 1317-A with subtitles from 1317-B. And for the record this call was previously identified as a voicemail message left on December 17th, 2001 at 2:47 p.m. by Michael Umansky for Alexander Umansky.

THE COURT:  All right, 1317-A is in evidence.

(Government's Exhibit 1317-A played from 10:36 a.m. to 10:37 a.m.)

BY MS. DeWITT:

Q    Mr. Umansky, this is a voicemail message that you left for Alex that day?

A    Yes.

Q    And again this is the day that the ransom demand was -- the deadline for the ransom demand.

A    Yes.

Q    And you tell him in this message that "I have done everything that was asked" and you ask him to call you back. What did you mean when you said that you had done everything that was asked?

A    I meant that I wired all the money that was being asked for ransom.

Q    And had you in fact paid all the ransom money at that

Michael Umansky - Direct / By Ms. DeWitt          38

point?

A     No.

Q     But you wanted to communicate that to him nevertheless.

A     Yes.

Q     You testified that your family gathered the full amount of the ransom demand and you also testified that you sent some of it that day, December 17th, 2001.  How much money did you actually send that day, December 17th, 2001?

A     I think it was about $90,000, maybe a little bit less.

Q     Who was involved in actually going to the bank and sending the money?

A     Myself, my mother, and my uncle.

          **MS. DeWITT:**  At this time I'd ask Special Agent Davidson to place in front of the witness Government's Exhibits 1001, 1002, and 1003.

          **THE COURT:**  1001 through 1003 for identification before the witness.

**BY MS. DeWITT:**

Q     Mr. Umansky, take just a second to look at each of those. I'll ask you some questions about each one in a second.

     **(Witness complies)**

A     Okay.

Q     Do you recognize Government's Exhibits 1001, 1002, and 1003?

A     Yes.  These are copies of the wire transfers.

**DRAFT COPY**

Michael Umansky - Direct / By Ms. DeWitt          39

Q    For the ransom money that you paid on behalf of Alexander?

A    Yes.

MS. DeWITT:  At this time, your Honor, I'd move to admit Government's Exhibit 1001, 1002, and 1003.

THE COURT:  All right, Exhibits 1001, 1002, 1003 admitted this date.

(Government's Exhibits Numbers 1001, 1002, and 1003 were received in evidence)

MS. DeWITT:  And for the record I'm publishing this to the jury.

BY MS. DeWITT:

Q    Mr. Umansky, how much is this wire transfer for, Government's Exhibit 1001?

A    $29,000.

Q    And thank you, you've indicated it and circled it in red.

Where was this money being sent?

A    It was being sent to Al Shaza Sanitary Building in Dubai.

Q    And just so it's a little easier for the jury to see, can you go ahead and circle that on the --

A    Yes.

Q    -- exhibit?

A    This is the name of the company (circling).  The name of the country (circling).

Q    And what was the account number where this money was being sent?

DRAFT COPY

Michael Umansky - Direct / By Ms. DeWitt        40

A    It's the same account number that was in the ransom demand.

Q    Okay.  And that's the fax that you testified about earlier that you received?

A    Yes.

Q    Did you personally go to the bank to arrange for this wire transfer?

A    Yes, I did.

Q    And whose money or whose account was this money coming from?

A    This is my personal account.

Q    At this time, Mr. Umansky, can you look at Government's Exhibit 1002?

        And again how much is --

        **MS. DeWITT:**  And for the record this is now being displayed to the jury on the overhead.

**BY MS. DeWITT:**

Q    How much is this wire transfer for?

A    20,620.

Q    And was this -- where was this wire transfer sent?

A    It was again sent to this Al Shaza Sanitary Building in Dubai.

Q    And again was it sent to the same account that was listed on the ransom demand that you testified about earlier?

A    Yes.

**DRAFT COPY**

Michael Umansky - Direct / By Ms. DeWitt          41

Q    And did you personally go to the bank to arrange for this particular transfer as well?

A    Yes.

Q    And what account did this money come out of?

A    It's another one of my accounts.

Q    And at this time, Mr. Umansky, I'd ask you to look at Government's Exhibit 1003.

          **MS. DeWITT:**  And for the record it's being shown on the overhead to the jury.

**BY MS. DeWITT:**

Q    How much is this wire transfer for?

A    This is for $40,008.

Q    Was this wire transfer actually sent?

A    Yes.

Q    And where was this money sent?

A    It was sent to the same Al Shaza Sanitary Building in Dubai.

Q    And again to the same account number that was listed on the ransom fax that you'd earlier received?

A    Yes.

Q    And did you personally go to the bank to arrange for this particular wire transfer?

A    Yes.

Q    Did you go with somebody?

A    My uncle, it's his account.

**DRAFT COPY**

Michael Umansky - Direct / By Ms. DeWitt          42

Q    And is that because the money was actually coming out of his account?

A    Yes.

Q    And again, just for the record, who is your uncle?  What's his name?

A    Boris Tillis (phonetic).

Q    At this time I'd like you to look at Government's Exhibit 1004.

          MS. DeWITT:  And for the record, your Honor, this has been previously admitted and I'm not sure of the date.

          THE COURT:  It was admitted on the 27th of October.

BY MS. DeWITT:

Q    Mr. Umansky, how much is this wire transfer for?

A    It's for $145,000.

Q    Was this wire transfer actually sent?

A    No, it was not.

Q    Where was this wire transfer going to be sent?  Who does it indicate as a recipient?

A    The same Al Shaza Sanitary Building in Dubai.

Q    And again this is the same number that was listed on the ransom fax that you'd received earlier?

A    Yes.

Q    And did you personally go to the bank to make the initial arrangements in connection with this particular wire transfer request?

DRAFT COPY

Michael Umansky - Direct / By Ms. DeWitt          43

A     Yes, I did.

Q     Why wasn't this wire transfer sent?

A     It was a part of the delaying tactic to make sure that we had some time to negotiate and track down Alex.

Q     Okay.  So you'd actually arranged for the $145,000 but you decided to hold it --

A     Yes.

Q     -- and not send it that day.

A     Yes.

          MS. DeWITT:  At this time, your Honor, I'm going to play -- go back to playing recorded calls.  I'm going to be playing specifically Government's Exhibit 1320-A with subtitles from 1320-B.  And for the record this call was previously identified as a call made on December 17th, 2001 at 8:40 p.m. from Alexander Umansky to Michael Umansky on a cell phone subscribed in the name of Ian Polack.

          THE COURT:  1320-A in evidence.

     (Government's Exhibit 1320-A played from 10:45:03 a.m. to 10:45:15 a.m.)

BY MS. DeWITT:

Q     Mr. Umansky, although this call indicates that it was coming from the same cell phone that Alex had been using, you didn't actually hear his voice on this call, is that right?

A     Right, I didn't hear it.

Q     You didn't hear his voice.

**DRAFT COPY**

Michael Umansky - Direct / By Ms. DeWitt          44

A     No.

Q     And is this a call that came in almost immediately after a call where Alex had talked to your father?

A     Yes.

Q     And he said in that prior call that he'd call you right back?

A     Yes.

Q     And in fact had you listened to that call, the call that was right before that, yourself?

A     Yes.

Q     And at the very end you walked in and picked up the phone and said hello?

A     Yes.

Q     Was that call, the call that came in just before that, the last call that was ever recorded with Alexander Umansky's voice?

A     Yes.

        MS. DeWITT:  At this time, your Honor, I'm going to play Government's Exhibit 1321-A with subtitles from 1321-B. And for the record this call was previously identified as a voicemail left on 12/17/01 at 8:48 p.m. by Michael Umansky for Alexander Umansky.

        THE COURT:  1321-A is in evidence.

        (Government's Exhibit 1321-A played from 10:46 a.m. to 10:47 a.m.)

**DRAFT COPY**

Michael Umansky - Direct / By Ms. DeWitt          45

**BY MS. DeWITT:**

Q    Mr. Umansky, this is a voicemail that you left for Alex shortly after that last call?

A    Yes.

Q    You called him back to try to get a hold of him?

A    Yes.

Q    In this call you tell him "I have the numbers.  I have all the information."  What numbers and information were you referring to?

A    The wire transfer reference numbers.

Q    You also say "I need to hear your voice."  Why did you say that?

A    I wanted to make sure that he was still okay.

Q    Why didn't you just leave the numbers on the voicemail during this call?

A    Because I wanted him to call me back.

Q    You were trying to generate a call back?

A    Yes.

        MS. DeWITT:  At this time, your Honor, I'm going to play Government's Exhibit 1322-A with subtitles from 1322-B. And for the record this call was previously identified as a voicemail left on December 18th, 2001 at 9:25 a.m. by Michael Umansky for Alexander Umansky.

        THE COURT:  All right, 1322-A in evidence.

//

**DRAFT COPY**

Michael Umansky - Direct / By Ms. DeWitt          46

(Government's Exhibit 1322-A played from 10:48 a.m. to 10:49 a.m.)

BY MS. DeWITT:

Q    Mr. Umansky, is this a voicemail message that you left the day after the ransom -- the first portion of the ransom was paid?

A    Yes.

Q    And at this time you still hadn't heard from Alexander Umansky again, is that correct?

A    Yes.

MS. DeWITT:  At this time, your Honor, I'm going to play Government's Exhibit 1323-A with subtitles from 1323-B. And for the record this call was previously identified as a voicemail left on December 18th, 2001 at 11:47 a.m. by Michael Umansky for Alexander Umansky.

THE COURT:  All right, 1323-A in evidence.  It may be played after we take our morning recess.

Approximately 10 minutes.  Remember the admonitions.

(Jurors exit courtroom at 10:50 a.m.)

(A recess was taken from 10:50 a.m. to 11:04 a.m.; parties present)

(Outside the presence of the Jury)

THE COURT:  All right.  Outside the presence of the Jury, record will indicate all counsel and parties are present.

Before I call the Jury in, I guess, Mr. Rubin, you

**DRAFT COPY**

will.  But, frankly, from my perspective, it's irrelevant.  I'm not going to tell them how to do their job, but that's --

THE COURT:  Well, you know, I haven't seen it.  I don't know anything about it, but

MS. DeWITT:  The other thing is --

THE COURT:  -- I'm surprised that you turned it over so late.

MS. DeWITT:  Your Honor, I didn't -- I turned it over as soon as I got it and I was under the -- I was under the belief that it was being translated and that I was going to be able to hand them translations.  What I got instead was a summary of all of the entries that was done on audio tapes.  And I got those transcribed absolutely as quickly as I could.  And, for the record, your Honor, those summaries that were made were not made by the Government, so it wasn't me decided what to select or not.  It was somebody who was trying to do a quick job to get this turned around so that they could have an idea of what was in the entries.

THE COURT:  All right.

MS. CHAHIN:  Your Honor, for the record, I've been dealing with it.  The diary is several hundred pages.  The problem is it's in the record.

THE COURT:  Well start reading it.  Get yourself an interpreter and start reading it.

MS. CHAHIN:  Your Honor, the additional problem is

Michael Umansky - Direct / By Ms. DeWitt          54

A     Yes.

Q     But you limited yourself to the more business part of it.
Is that because that was your role?

A     Yes.

Q     And you kept yourself from having personal conversations
with him for the most part?

A     I had to do that, yes.

          MS. DeWITT:  At this time, your Honor, I'm going to
play Government's Exhibit 1324-A, with subtitles from 1324-B.
And for the record, this call was previously identified as a
voice-mail message left on 12/19/01 at 12:25 p.m. by an
unidentified male for Michael Umansky.

          THE COURT:  1324-A is in evidence.

     (Government's Exhibit Number 1324-A, phone call, played at
11:14 a.m.)

BY MS. DeWITT:

Q     Mr. Umansky, those two calls were essentially a message
that was recorded twice.  Is that right?  The same message?

A     Yes.

Q     Okay.  Can you tell the Jury what this call is?

A     It's a message from unidentified somebody saying they've
been trying to reach me about Alexander, my brother, and that
he would be calling me back.

Q     Did you recognize the voice on this call?

A     No.

DRAFT COPY

Q    Did you understand that this call was related to Alexander's abduction?

A    Yes, I did.

        MS. DeWITT:  At this time, your Honor, I'm going to play Government's Exhibit 1327-A, with subtitles from 1327-B. And for the record, this call was previously identified as a call on December 21st at 2:00 p.m. from an unidentified male to Michael Umansky.

        THE COURT:  1327-A is in evidence.

        **(Government's Exhibit Number 1327-A, phone call, played at 11:15 a.m.)**

**BY MS. DeWITT:**

Q    Mr. Umansky, can you tell the Jury what this call is?

A    It's a call from somebody I never heard of before asking where is the money.

Q    In this call, the unidentified male voice asks about the numbers for the transactions and the dates and the amounts of the transactions.  What did you understand he was referring to?

A    He was asking about the reference numbers about the wire transfers I made for ransom.

Q    And those are the ones that you paid on December 17th?

A    Yes.

Q    You asked to speak to Alexander.  Why did you do that?

A    I did not understand why he wasn't calling me.  I wanted to hear his voice.

Michael Umansky - Direct / By Ms. DeWitt          56

Q    And at that time, you still hadn't heard from him since the 17th, is that right?

A    Yes.

Q    And you weren't allowed to speak to Alexander, is that right?

A    I wasn't allowed.

Q    And are those numbers that you provided in this call, the actual transaction numbers for the transactions that you sent on the 17th?

A    Yes.

Q    And the amounts of the transfers?

A    Yes.

          MS. DeWITT:  At this time, your Honor, I'm going to play Government's Exhibit 1328-A, with subtitles from 1328-B. And for the record, this call was previously identified as a call on December 21st at 2:15 p.m. from an unidentified male to Michael Umansky.

          THE COURT:  1328-A is in evidence.

     (Government's Exhibit Number 1328-A, phone call, played at 11:20 a.m.)

BY MS. DeWITT:

Q    Mr. Umansky, what is this call?

A    It's another conversation between me and somebody I don't know about the ransom money.

Q    And, again, he's asking about the transactions that you

**DRAFT COPY**

Michael Umansky - Direct / By Ms. DeWitt          57

sent as ransom money on behalf of Alexander Umansky, your

brother?

A     Yes.

Q     And you asked to speak to Alexander, but you weren't

allowed to speak to Alexander.  Is that right?

A     Several times, yes.

Q     In fact, as of the 21st of December, you still hadn't

heard from Alex.  Is that right?

A     Yes.

Q     And as this time, did you have any idea what

Alexander Umansky's status was?

A     No.

          **MS. DeWITT:**  At this time, your Honor, I'm going to

play Government's Exhibit 1329-A, with subtitles from 1329-B.

And for the record, this call was previously identified as a

call on December 27th at 8:55 a.m. from an unidentified male to

Michael Umansky.

          **THE COURT:**  1329-A is in evidence.

     **(Government's Exhibit Number 1329-A, phone call, played at**

**11:24 a.m.)**

**BY MS. DeWITT:**

Q     Mr. Umansky, call you tell this Jury what this call is

about?

A     It's another conversation with somebody I don't know about

Alex ransom and where the money is.

**DRAFT COPY**

Michael Umansky - Direct / By Ms. DeWitt          58

Q    And this person -- this is the first time that somebody's
actually asking you directly about that last transfer that you
decided to hold back, is that right?

A    Yes.

Q    The $145,000 transfer?

A    Yes.

Q    And in this call, you again asked to speak to
Alexander Umansky, your brother.  But you weren't allowed to
speak to him, is that right?

A    Yes.

Q    And this is now December 27th, so 14 -- approximately 14
days after he first went missing?

A    Yes.

Q    At this time, did you have any idea what -- where
Alex Umansky was?

A    No.

Q    In this call, the person, the unidentified male, asked you
did you go to someone for help.  What did you understand he was
saying?

A    I was asking if we went to authorities, police or FBI.

Q    You told him no?

A    I told him no.

Q    Why'd you say that?

A    I didn't want him to convey something to the kidnappers
and maybe they will do something to Alex if we did.

**DRAFT COPY**

Michael Umansky - Direct / By Ms. DeWitt          59

Q    You mention in this call that you need to Alexander's voice and you explain "especially since we heard that some woman disappeared completely."  What woman were you talking about?

A    We read that a Rita Peckler (ph.s.) disappeared and was being searched for by her family.

Q    And so, at the time of this call, you'd actually heard about that other person going missing, Ms. Peckler?

A    Yes.

MS. DeWITT:  At this time, your Honor, I'm going to play Government's Exhibit 1330, with subtitles from Government's Exhibit 1330-B -- I'm sorry, 1330-A, with 1330-B subtitles.  And for the record, this call was previously identified as a call on December 27th at 11:18 a.m. from an unidentified male to Michael Umansky.

THE COURT:  1330-A is in evidence.

(Government's Exhibit Number 1330-A, phone call, played at 11:33 a.m.)

BY MS. DeWITT:

Q    Mr. Umansky, tell the Jury what this call is.

A    It's another conversation with unidentified person about where the money is and the ransom and my brother.

Q    In this call, the unidentified male tells you about some accident with Alexander.  What did you understand that to be able?

**DRAFT COPY**

Michael Umansky - Direct / By Ms. DeWitt          60

A      It was some kind of a fake story they came up with to try to convince us as to why we're supposed to send the money.

Q      And, to your knowledge, was there any truth to the story?

A      None whatsoever.

Q      In his call, the person says that they aren't going to harm him if you transfer the money.  And then this person says if this doesn't occur, then he'll work off the remaining amount by himself or if he can't work it off by himself, then the whole family will have to work it off.  What did you understand he was referring to that would have to work it off?

A      It was escalating the threat that if they could not get the money out of Alex, they would come after the whole family in some fashion.

Q      And he says -- in his call, he says you will be next in line so his kidneys will be sold, the liver.  If his won't be bought, then yours will be bought or everyone else's.  What did you understand this person to be saying here?

A      It's a direct deadly threat against my brother and then myself, my family.  They would cut out body parts and sell them on the market.

Q      Did you understand, essentially, at this point that the threat was escalating not only now was it against Alex himself and you but also your family?

A      Yes.

Q      And this person says this can happen in a month, in three

**DRAFT COPY**

Michael Umansky - Direct / By Ms. DeWitt          61

months, in a year, it doesn't matter how long.  What did you
understand he was saying there?

A    He was saying that the threat would always be there until
the money's paid off.

Q    And did he give you a deadline to make this payment?

A    No, he said it doesn't matter when just as long as it's
paid.

Q    And then at the end --

A    Well that there was two days to pay but initially he says
it's up to me.

Q    So it went from it doesn't matter, we just want the money,
to two days?

A    Yes.

Q    In this call, the unidentified male also says to you the
price will be going up and will grow.  What did you understand
he was saying there?

A    It says that it always, like an interest rate.  If we
don't pay now then we have to pay more later.  And it's now the
longer we take, the more we have to pay.

Q    And finally, Mr. Umansky, he says for you to live in
constant fear, I personally just don't recommend it.  Again,
what did you take this to be?

A    It's again a threat against myself, my family, that I
should pay or live in fear of reprisal or whatever it is for
the rest of my life.

**DRAFT COPY**

Michael Umansky - Direct / By Ms. DeWitt          62

Q    Did this person make some kind of promise about Alexander
being released?

A    He promised to return him alive and well if we paid the
ransom.

Q    At some point, did your family decide to send the
remaining amount of the ransom money?

A    Yes, we did.

Q    Who made that decision?

A    Myself and my father.

Q    And was that amount finally -- was it actually sent?

A    Yes, it was.

Q    When was that final payment sent?

A    I think on the same day.

Q    It was sometime after this call?

A    Yeah, right after.

Q    Why did you decide after this call to send the final
ransom payment?

A    I was getting worried that something really happened to
him and if we just paid the money off, we delayed long enough
and give them all the money and then my brother would be
returned.

Q    Was it essentially this call that caused you to make the
decision to make the final ransom payment?

A    Yes, it was.

Q    Can you please look at what's been marked for

**DRAFT COPY**

Michael Umansky - Direct / By Ms. DeWitt          64

A     Yes.

Q     And who actually arranged to send this wire transfer?

A     I did with my mother.

Q     Whose account did it come out of?

A     It's a joint account between me and my mother.

Q     Did you receive any additional calls after this particular call?

A     Yes.

Q     That was just listened to?

A     Yes.

            **MS. DeWITT:**  At this time, your Honor, I'm going to play Government's Exhibit 1331, with subtitles from -- 1331-A, excuse me, with subtitles from 1331-B.  And, your Honor, for the record, this is the last call that I'll be playing.  This call --

            **THE COURT:**  13 --

            **MS. DeWITT:**  I'm sorry.

            **THE COURT:**  1331-A is in evidence.

            **MS. DeWITT:**  And for the record, this call was previously identified as a call on January 16th, 2002, at 9:30 a.m. from an unidentified male to Michael Umansky.

            **(Government's Exhibit Number 1331-A, phone call, played at 11:48 a.m.)**

//

//

**DRAFT COPY**

Michael Umansky - Direct / By Ms. DeWitt          65

**BY MS. DeWITT:**

Q    Mr. Umansky, can you tell the Jury what this call is?

A    It's my conversation with unidentified person about Alex's ransom.

Q    Was this the last call you got in connection with Alexander's abduction?

A    Yes.

Q    And this was now more than a month after Alex had gone missing?

A    Yes.

Q    During this call, you're asked for money over and above the amount of the original ransom demand, is that right?

A    Yes.

Q    And during this call, you're confronted basically about the fact that you've gone to the FBI.  Is that right?

A    Yes.

Q    And at that time, do you know why this person thought you were talking to the FBI?

A    Because I think they knew.

Q    There's a couple of questions in there where you ask for information, personal information, about Alexander Umansky. Was the purpose of that to see if you could find out whether he was still alive?

A    I was asking for proof of life, personal information only he and I knew.

**DRAFT COPY**

Michael Umansky - Direct / By Ms. DeWitt          66

Q    So you asked that question because you figured if he was alive they would ask that question only Alex could answer those questions?

A    Yes.

Q    And at this time, did you have any idea where Alex was or what his status was?

A    I had no idea.

        THE COURT:  Let's break for lunch.

        MS. DeWITT:  I have like two more questions, your Honor, then I'll be done.

        THE COURT:  Go ahead.

BY MS. DeWITT:

Q    Mr. Umansky, at some time later did you view a body that you had been told was found at the New Melones Reservoir?

A    Yes.

Q    Were you able to identify that body?

A    Yes.

Q    How were you able to identify that body and who was that?

A    It was my brother's body.  And I identified him by a tattoo on his shoulder.

        MS. DeWITT:  No further questions at this time, your Honor.

        THE COURT:  Let's take our lunch break, returning at 1:25 in the jury room, 1:30 in the courtroom.

        (Jurors exit courtroom at 11:59 a.m.)

**DRAFT COPY**

67

**THE COURT:** Outside the presence of the Jury, I'm about to make a ruling so make sure you get it correctly.

Regardless of the protective order in place in order to expedite the issues raised by Ms. Chahin, each individual Defendant, that's Mr. Mikhel and Mr. Kadamovas, will each be given a copy of the diary of Ms. Solovyeva to review and assist their respective counsel. As soon as the direct and cross examination of Ms. Solovyeva is completed, the Defendants' copy of the said diary will be returned to Defense counsel to be returned to the Government. At the conclusion of the examination, each Defense counsel will retain one copy of the said diary pursuant to the terms and conditions of the protective order in place.

Now, the Government will make copies at their expense of the diary as ordered by the Court.

We'll stand in recess.

**(Court in recess from 12:01 p.m. to 1:34 p.m.; parties present)**

**(Outside the Presence of the Jury)**

**THE COURT:** All right. Outside the presence of the jury the record will indicate all parties and counsel are present.

A couple of things I want to briefly bring up with you. I received in response to a subpoena that was served by Mr. Rubin on eBay a disk. I think they complied with what you

**DRAFT COPY**