# GOVERNMENT EXHIBIT 16

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA


# DRAFT COPY


| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO:  CR-02-220(B)-DT |
| | ) | |
| Plaintiff, | ) | CRIMINAL |
| | ) | |
| vs. | ) | Los Angeles, California |
| | ) | |
| IOURI MIKHEL, | ) | Tuesday, December 5, 2006 |
| JURIJUS KADAMOVAS, | ) | ( 9:16 a.m. to  9:33 a.m.) |
| | ) | ( 9:39 a.m. to 12:00 p.m.) |
| Defendants. | ) | ( 1:33 p.m. to  3:15 p.m.) |


JURY TRIAL (48th DAY)


BEFORE THE HONORABLE DICKRAN TEVRIZIAN,
UNITED STATES DISTRICT JUDGE


EXCEPTIONAL REPORTING SERVICES, INC
14493 SOUTH PADRE ISLAND DRIVE
SUITE A-400
CORPUS CHRISTI, TX 78418-5940
361 949-2988

Davidson - Direct / By Mr. Dugdale          53

A     That's the telephone number to the what we call the Portables phone.  That's the prepaid phone that was connected to the abduction of Nick Kharabadze and George Safiev.

Q     Okay.  And what was purchased at Affordable Portables?  Was it actually a phone, or was it something else?

A     It was actually a -- it's called a sim card.  And it's essentially the brains of the chip that you put inside the phone.

Q     And does the phone -- does that sim card -- when it's plugged into a phone, does it always carry the same phone number with it, that sim card?

A     It does.

Q     Okay.  And in this case, did the sim card always carry with it the phone number 818-268-9422?

A     There was -- yes.

Q     Okay.  And was there anything left by the person who purchased that sim card?

A     No.

Q     Did you review a videotape of the purchase of the -- a purchase that day at Affordable Portables?

A     I did.

Q     And did you see anybody you recognized when you reviewed videotape?

A     I did.

Q     Who'd you see?

**DRAFT COPY**

Davidson - Direct / By Mr. Dugdale          54

A    I saw Defendant Kadamovas and Petro Krylov on that
videotape in the store at a time that is close to the time of
the purchase of that sim card as connected to the records of
the purchase.

Q    I'm now going to have Special Agent Perez, hand you what's
been previously admitted as Government's Exhibit Number 1358-A.

A    Got it.

Q    And, Special Agent Davidson, do you recognize Government's
Exhibit Number 1358-A?

A    I do.

Q    And what is contained in Government's Exhibit Number
1358-A?

A    These are still photographs from the videotape of the
Affordable Portables store on January 12th, 2002, six
photographs -- six stills made from the video.

          **MR. DUGDALE:**  And, your Honor, I'm now going to
publish a page from this on the Elmo, if you can switch over
again.

**BY MR. DUGDALE:**

Q     Special Agent Davidson, do you recognize anybody who is -
- is this one of the stills that's in front of you as part of
Government's Exhibit Number 1358-A?

A    Yes.

Q    And do you recognize anybody in this photograph and still?

A    I do.

**DRAFT COPY**

Davidson - Direct / By Mr. Dugdale                55

Q    Who do you recognize?

A    Jurijus Kadamovas and Petro Krylov.

Q    Can you circle where they are in this photograph?

A    Defendant Kadamovas is in the forefront on the right wearing a blue jean -- what appears to be a light blue shirt and light blue pants, possibly jeans.  And then also in the foreground all the way to the left is Petro Krylov in a dark shirt and jeans.

        **MR. DUGDALE:**  Your Honor, could we switch back to computer mode please.

**BY MR. DUGDALE:**

Q     in addition to the video taken at the Affordable Portables phone, which you personally reviewed, did you find any other evidence that connected either of the Defendants to this particular phone number that was used in connection with the abduction of Mr. Kharabadze?

A    Yes.

Q    And can you explain to the jury what that was?

A    The phone itself was found in Mikhel's residence.  And inside the phone was the sim card.

Q    And was that the sim card that carried that number, 818-268-9422?

A    It was.

Q    Special Agent Davidson, in addition to the analysis that you talked about already, did you also analyze some of the

**DRAFT COPY**

Davidson - Direct / By Mr. Dugdale                61

Q    Did you also find instances where he called people who worked at Matador Media?

A    Yes.

Q    Turning to the second page of this exhibit, when was the last phone call that Mr. Kharabadze placed over this phone?

A    It was January 24th at 3:56 p.m. in the afternoon.

Q    And he was it to?

A    Olga Preiss.

Q    And were there any other phone calls that were placed over Nick Kharabadze's phone after that phone call on January 24th of 2002?

A    There were not.

Q    And, Special Agent Davidson, was Nick Kharabadze's cell phone recovered in this case?

A    It was.

Q    And where was it recovered at?

A    At Iouri Mikhel's residence.

Q    I'm now going to have Special Agent Perez hand you what's been previously admitted as Government's Exhibit Number 137.

     **(Pause)**

         Special Agent Perez, it's actually in a folder with another exhibit, Exhibit 136, as well.  There are two in there.

         **MR. DUGDALE:**  Your Honor, that's fine.

         We'll come back to this, Jim.

//

**DRAFT COPY**

Davidson - Direct / By Mr. Dugdale          65

Mr. Safiev in any way after January 20th of 2002 to these phone numbers that were written on this piece of paper seized at Defendant Mikhel's house?

A     Yes.

Q     How so?

A     The phone numbers on the chart, Exhibit 731, as I just showed you where we don't have an associated with name or actually all of those numbers are on this sheet of paper.

Q     So all these additional foreign numbers that were called from Mr. Safiev's cell phone were found written down on a piece of paper at Defendant Mikhel's house, is that right?

A     Yes.

Q     Now, was Mr. Safiev's cell phone recovered in this case?

A     It was.

Q     And where was it recovered from?

A     Mikhel's residence.

Q     I'm now going to have Special Agent Perez hand you what's been previously admitted as Government's Exhibit Number 136.

A     I have it.

Q     Special Agent Davidson, what is Government's Exhibit Number 136?

A     It's George Safiev's cell phone that was recovered at Iouri Mikhel's residence on the day he was arrest, February 19th, 2002.

Q     And earlier we discussed the fact that Mr. Kharabadze's

**DRAFT COPY**

Davidson - Direct / By Mr. Dugdale          74

**BY MR. DUGDALE:**

Q    During the wire-tap phase of the case, Special Agent Davidson, you mentioned earlier that there were intercepted calls involving this person named Bova (phonetic), is that right?

A    Yes.

Q    And as a result of the pin register on the phone, were you able to get a telephone number associated with this Bova?

A    Yes.

Q    And what were the last four digits for that phone number?

A    8789.

Q    And did you conduct a review of both of the Defendants phone records to see if they had previously called that phone number that ended with 8789 that was associated with Bova?

A    Yes.

Q    And were there any contacts between either of the Defendants and that number associated with Bova prior to the wire-tap phase of the case?

A    There were.

       **MR. LASTING:**  Excuse me, your Honor.  I'd object. That calls for conclusions as to whether the Defendant made the call.

       **MR. DUGDALE:**  Well, the Defendant --

       **THE COURT:**  Wait.  Wait.  Wait.  I'm going to sustain the objection as to the form of the question, but not his --

**DRAFT COPY**

Davidson - Direct / By Mr. Dugdale          75

not the area of inquiry.

      **MR. DUGDALE:**  That's fine.  I will re-ask the question.

**BY MR. DUGDALE:**

Q    Were there any -- did you find in the phone records for either Defendant contacts between their phones and this phone number ending in 8789 that belonged to Bova?

A    I did.

Q    And prior to today, did you have an opportunity to create summary chart for demonstrative purposes which show those connections, those phone connections, as they related to other aspects of the case?

A    I did.

Q    At this point in time, I'm going to ask you to please take a look at what's been marked for identification of Government's Exhibit Number 770.  I'm sorry, 770-A.

A    There's nothing in it.  We don't have the Exhibit over here, Counselor.

      **MR. DUGDALE:**  Can I approach, Your Honor?

      **THE COURT:**  You may.  Now these are not on your list that you gave me, neither is 768 or 769, but I have room to write them.

      **MR. DUGDALE:**  Not on the master exhibit list, it's on the sublist that we gave you.  That's correct, your Honor.  We will have fill ins for this.

**DRAFT COPY**

Davidson - Direct / By Mr. Dugdale                76

Can I approach, your Honor?

**THE COURT:**  You may.

**BY MR. DUGDALE:**

Q    Special Agent Davidson, what I handed you there is Government's Exhibit Numbers 770-A, 770-B and 770-C.  So, let's just get through all of these at the same time then.

What is Government's Exhibit Number 770-A?

A    It's a chart depicting calls from Mikhel's residential telephone to a number associated with Bova in conjunction with some other events surrounding Alexander Umansky's disappearance.

Q    And does that chart, for demonstrative purposes, does that demonstrate those phone contacts between the Defendants' phones and this phone associated with Bova during the events that you describe?

A    Yes.

Q    Would you turn to Government's Exhibit Number 770-B?

A    Got it.

Q    What is Government's Exhibit Number 770-B?

A    It shows calls related to Bova contacts with Michael Umansky and also with Mikhel and Kadamovas' residential telephones.

Q    And what is Government's Exhibit Number 770-C?

A    It's contacts between Raul and Tezhik and an email address called Raul0135 and Tezhik and also Mikhel's residential

**DRAFT COPY**

Davidson - Direct / By Mr. Dugdale          77

telephone and the phone that we've connected to Bova as well as

the payphone in Colorado and its connection to Bova.

Q    And do you believe that the summary exhibits would they

assist the Jury and the Court in following along the contacts

between the Defendants' phones and this Bova phone and show how

they interrelated to other aspects of the case?

A    Yes.

          **MR. DUGDALE:**  Your Honor, at this point in time, the

Government's not going to move for the admission of these

Exhibits but would request permission to publish them to the

Jury as demonstrative summary charts.

          **THE COURT:**  All right.  You may.  Now I'm going to

give the Jury two instructions dealing with the use of summary

charts.

          The first is a summary chart not received into

evidence, such as Exhibit 770-A through 770-C.  The instruction

is as follows:  Certain charts and summaries have been shown to

you in order to help explain the facts disclosed by the books,

records and other document which are in evidence in the case.

They are not, themselves, evidence or proof of any facts.  If

they do not correctly reflect the facts or figures shown by the

evidence in the case, you should disregard these charts and

summaries and determine the facts from the underlying evidence.

          Now there's another instruction that deals with

charts and summaries which have been received into evidence.

Davidson - Direct / By Mr. Dugdale          78

Certain charts and summaries have been received into evidence.

Charts and summaries are only as good as the underlying

supporting material.  You should therefore give them only such

weight as you think the underlying material deserves.

With regard to 770-A through C, they may be used for

demonstrative purposes only.

**MR. DUGDALE:**  Thank you.  May I retrieve the exhibits

from the witness, please, your Honor?

**THE COURT:**  You may.

**(Pause)**

**MR. DUGDALE:**  And could we please turn on the Elmo

mode, your Honor?

**BY MR. DUGDALE:**

Q    First, Special Agent Davidson, can you explain to the Jury

was this chart shows, this summary chart, Government's Exhibit

Number 770-A?

A    Again, it's some telephone contacts between Mikhel's

residential telephone and Bova's phone in conjunction or --

yeah, in conjunction with events surrounding

Alexander Umansky's disappearance -- actually, beginning with

his disappearance.

Q    And starting off at the top here, and I'll highlight this

because no human could ever see this, what does the first entry

pertain to?

**DRAFT COPY**

Davidson - Direct / By Mr. Dugdale                79

A     It just -- it notes that Alexander Umansky left Hard Wired, his business in Sherman Oaks, California -- actually, not Sherman Oaks but I believe it's North Hollywood, between 7:00 and 7:30 p.m. on the evening of December 13th.  And he left to meet a potential client and he was never seen -- he was heard from after that but he was never seen by family and friends after that.

Q     So Mr. Umansky leaves on the evening of December 13th of 2001, is that right?

A     That's right.

Q     And the following day, was there contact between Mr. Mikhel's residential telephone and the number associated with Bova?

A     There was.

Q     And what time did that call occur?

A     8:01 a.m.

Q     And was there a subsequent call later that day between Defendant Kadamovas' residential phone and Bova?

A     There were actually two.  There was one at 9:28 a.m. and then again at 10:05 a.m.  And I should note that Bova's telephone number is in St. Petersburg, Russia.  Both Mikhel and Kadamovas' residential lines are in Los Angeles, California.

Q     And what events happened in the case after these phone calls were made from the Defendants' phones to this individual named Bova?

**DRAFT COPY**

Davidson - Direct / By Mr. Dugdale                80

A      Somewhere in mid-morning on December 14th, a fax was received, it's Exhibit 1281, it was the ransom demand in the form of a promissory note that was received at the Hard Wired Business in the Valley, in North Hollywood.

Q    So that's the last entry we have here.  And what time did that fax have written on it?

A      There was a date and time stamped at the top, the date is listed as 14/12/2001.  That's in European format, that's day, month and then year.  Then it lists a military time of 2206, which is 10:06 in the evening.  It was received mid-morning, and I should note that the time difference between St. Petersburg and L.A. is 11 hours.  L.A. is 11 hours earlier than St. Petersburg.  We don't know exactly what time the fax came in, however, if you subtract 11 from 2206, you get 11:06 a.m. in the morning.

Q     Turning to the next summary exhibit, Government's Exhibit Number 770-B, can you explain to the Jury what this chart illustrates?

A     I can.  These are -- it's a pattern of calls in conjunction with each other from Mikhel's residential line to Bova.  And then it also displays or denotes calls that Michael Umansky received from -- first from an unidentified male and then later from someone whom the FBI has identified as Bova.  The same Bova that is associated with the 8789 telephone number.

**DRAFT COPY**

Davidson - Direct / By Mr. Dugdale          81

Q    But let's start at the top, was there a contact between Mikhel's residential phone and this phone number for Bova starting on December 19th, 2001?

A    There was.  On the 19th of December, 2001, at 3:08 p.m. Mikhel's residential telephone calls Bova in St. Petersburg, the 8789 number.  And then it calls it again on December 20th, 2001, at 9:14 a.m.  And that's the first part of the chart there.

Q    And after those phone contacts from Defendant Mikhel's phone to this Bova number, what then occurred in the case after that -- those contacts were made?

A    On the 21st of December, 2001, at approximately 2:00 p.m., a Russian-speaking male called Michael Umansky to demand additional ransom for the release of his brother, Alex.

Q    And was there another call to Michael Umansky that was placed after that date?

A    There was.

Q    And when did that occur?

A    On December 27th, 2001, at 8:55 a.m., Vladimir Sobolev, aka Bova, calls Michael Umansky at approximately 8:55 a.m. and again demands additional ransom for the release of his brother, Alex.

Q    And after that phone call between Vladimir Sobolev and Mr. Umansky, was there a contact between Mr. Mikhel's phone and this Bova number again?

**DRAFT COPY**

Davidson - Direct / By Mr. Dugdale                    82

A    There was.

Q    And when did that occur?

A    On the 27th of December at 11:45 a.m., Mikhel's residential phone contacts Bova in St. Petersburg, Vladimir Sobolev.

Q    And after that contact occurred on December 27th, 2001, were there additional contacts between Defendant Mikhel's residential phone and this number associated with Bova, ending of 8789?

A    There were.  On January 15th and 16th, 12:02 p.m. -- I'm sorry, on the 15th at 12:02 p.m.; on the 16th, at 9:58 a.m., both 2002, Mikhel's residential phone calls the telephone number associated with Bova.

Q    And was there a contact or significant event that happened in the case in the aftermath of or in between these contacts between Mikhel's residential telephone and the person identified as Bova's number?

A    There was.

Q    And what happened?

A    On the 16th of January, 2002, at 9:30 a.m., Michael Umansky received what was actually the final call from Bova demanding additional ransom.

Q    Finally, turning to Government's Exhibit Number 770-C, can you explain to the Jury what Government's Exhibit Number 770-C shows?

**DRAFT COPY**

Davidson - Cross / By Mr. Lasting          130

based on hearsay.

        **THE COURT:**  Sustained.

**BY MR. LASTING:**

Q    Was it brought to your attention as the investigator on the case as to whether or not the analyst who conducted the handwriting was able to make any determination as to who wrote the phone number there?

        **MR. DUGDALE:**  Same objection, your Honor.

        **THE COURT:**  Sustained.

**BY MR. LASTING:**

Q    Is the connection -- I'll withdraw that.

        Do you have any information as part of your investigation as to when this envelope first arrived at the Weslin house?

A    None.

Q    When you located it or when it was located in the search, either February the 19th, 2002 or subsequent search, where was it located?

A    Again, I would be speculating.  I don't remember which part of the house.  It may have been located in the garbage can in the garage.

Q    It was located in the trash, right?

A    I believe so, yes.

Q    In your direct testimony you talked about the phone purchase at -- I'm sorry -- the SIM card purchase at Affordable

**DRAFT COPY**

Davidson - Cross / By Mr. Lasting                131

Portables, that the date of that purchase was January the 12th,

2002; is that correct?

A     That's correct.

Q     Where was the Affordable -- did you ever go out to that store yourself?

A     I did.

Q     Where is it located?

A     It's located on Ventura Boulevard on the corner of Ventura and Van Nuys Boulevard.  I believe it's the northwest corner.

Q     The northwest corner of -- is it actually right on the corner of Van Nuys and Ventura?

A     I don't think it's exactly -- I don't think it's right on the corner.  I think it's the corner business -- there may be a lot just to the east, but I'm not positive about that.

Q     But it's in close proximity to the corner.

A     Close proximity, yes.

Q     As part of your investigation did you make any determination as to what time of day on Saturday the Affordable Portables store opens for business?

A     In the discussions that we had with the manager over time I think we learned what time the store opened.  It was -- if I recall, it was normal business hours.

Q     Do you know if the store opens for business at 10:00 o'clock in the morning?

A     I don't know exactly when.

**DRAFT COPY**

Davidson - Cross / By Mr. Lasting          132

Q      You reviewed -- in fact, up on the board is -- up on the Elmo is one of the still photographs from the videotape of the surveillance cameras at the Affordable Portables; is that correct?

A      That's correct.

Q      It's a part of Exhibit 1358-A, correct?

A      I believe it is, yes.

Q      In the still photograph and on the video there is a date and time stamp; is that correct?

A      Yes.

Q      Did you make any effort to determine the accuracy of the date/time stamp?

A      We had -- certainly we had a discussion about it.  I think the answer is yes.

Q      Did you reach any conclusion as to the accuracy of the date/time stamp?

A      Yes.

Q      What was your conclusion?

A      That it was off by the clock that was probably more accurate, which was the time stamp on the receipt tied to their internal accounting system.

Q      And the receipt for the purchase of the SIM card, was it at 4:38 p.m.?

A      Yes.

Q      I'm showing you another of the still photographs.  This

**DRAFT COPY**

Davidson - Cross / By Mr. Lasting                 133

one's a little harder to see; it's darker.  But does this show the person that you identified as Mr. Kadamovas and Mr. Krylov leaving the store at 4:30 and 18 seconds?

A     It does.

Q     And the receipt was at 16:38 or 4:38?

A     Approximately eight minutes after that, yes.

Q     So based on that you drew the conclusion that the video date/time stamp may be eight minutes off?

A     Exactly, yes.  Because the way in which the store clock -- the cash register clock is calibrated, according to the general manager, is that it's done every morning, and he does it -- connects an atomic clock -- a clock that's connected to an atomic clock.  This is set periodically by the guy that changes the videotape.  And there's no guarantee that he actually even does check the clock according to the manager.  He's supposed to.

Q     As part of your investigation did you consider the possibility that the clerk may have waited eight minutes before inputting the purchase into their computer system?

A     We did.  That's also a possibility.

Q     As part of your investigative efforts to determine the accuracy of the date/time stamp, did you go back to the beginning of this date, January 12th, 2002, and look on the video to see if you had a video depiction of an employee actually opening the store?

**DRAFT COPY**

Davidson - Cross / By Mr. Lasting                135

A     That's correct.

Q     I'm putting up another portion of that still -- of the still photographs from that video that shows 1552.

Does this photograph appear to show the person you identify as Mr. Kadamovas entering the store?

A     It does.

Q     So if you look at the video and go by the time stamp on the video, if it's accurate, it would show that the person you identify as Mr. Kadamovas arrives approximately 3:52 and leaves about 4:30, right?

A     That's right.

Q     Did you make any effort in going through the cell phone records that you obtained by subpoena to determine if Mr. Kadamovas received or made any cell phone calls between those two times, between 3:52 and 4:30 on January the 12th, 2002?

A     I did not.  I don't believe I did an analysis like that, no.  And I can give a further explanation for my answer.

Q     Okay, sure.

A     These are stills and there are times when he's not completely visible on this video; he's in the back.  So an analysis of his phone records versus seeing him here would, you know, probably have limited value.

Q     So you never undertook it.

A     No.

**DRAFT COPY**

Davidson - Cross / By Mr. Lasting          136

(Pause)

Q    I'd like to show you a portion of what I believe has been received into evidence as Exhibit 702-A.

MR. LASTING:  Am I correct that that's been received, your Honor?

THE COURT:  I'm going to tell you in a minute.  702-A has been received on November the 16th.  That's 702-A.

BY MR. LASTING:

Q    Agent Davidson, this is one page that bears a Bates stamp of 17854 down here at the bottom.

(Pause)

I blew it up to try to make it visible because it's small print and it's kind of hard to read there.

But these records, 702-A, relate to Mr. Kadamovas' cell phone records; is that correct?

A    That's correct.

Q    Okay.  And can you see a entry on his records that show cell phone usage on January the 12th at 3:59 p.m.?

A    I believe where I marked an "X" shows a call -- these records are a little hard to read -- 3:59, maybe 3:58.  It looks like a "9."

Q    Okay.  And then within the timeframe of at least the date/time stamp on the video there is another telephone call there within that timeframe, right?  Do you see one at 4:06 p.m.?

DRAFT COPY

Davidson - Cross / By Mr. Lasting          137

A     Yeah, right below it.

Q     And then there's another one at -- is it 4:38 p.m.?

A     It looks like 4:38, yes.

Q     That's the time that according to the store's -- that the store receipt was entered into the computer that somebody was purchasing the SIM card; is that right?

A     According to the store computer, yes.

Q     And then at -- I'm not going to be able to successfully slide this over, but if you look at the document and somebody wanted to compare it, they could look and see whether those calls were calls that were incoming or calls that were placed by Mr. Kadamovas' cell phone, right?

A     That's right.  It would say "incoming" if it was incoming. And if it was outgoing it has a area designation probably related to some other aspect of the call record.  And here's, (indicating), an incoming call.  That, (indicating), would be an outgoing call.

Q     Okay.  And if it's an outgoing call, it means that the person's actually using the phone, that they're using it to make a call, right?

A     Yes.

        **(Pause)**

        **MR. LASTING:**  Your Honor, I have a document that appears to be a page from Ainar Altmanis' Sprint cellular telephone.  Could it be marked as Exhibit 2047?

**DRAFT COPY**