# GOVERNMENT EXHIBIT 18

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

# DRAFT COPY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO:  CR-02-220(B)-DT |
| | ) | |
| Plaintiff, | ) | CRIMINAL |
| | ) | |
| vs. | ) | Los Angeles, California |
| | ) | |
| IOURI MIKHEL, | ) | Wednesday, November 15, 2006 |
| JURIJUS KADAMOVAS, | ) | (9:51 a.m. to 11:57 a.m.) |
| | ) | (1:33 p.m. to  4:06 p.m.) |
| Defendants. | ) | |

JURY TRIAL (42nd DAY)
(VOLUME XLII)

BEFORE THE HONORABLE DICKRAN TEVRIZIAN,
UNITED STATES DISTRICT JUDGE

EXCEPTIONAL REPORTING SERVICES, INC
14493 SOUTH PADRE ISLAND DRIVE
SUITE A-400
CORPUS CHRISTI, TX 78418-5940
361 949-2988

it in the microwave and heat it up.

**THE COURT:** All right. Now, that's issue number one.

Issue number two, I'm having trouble with Juror Number 57 in that his employer and union are giving me some trouble here. I advised them of 28, United States Code, Section 1875 that says, "An employer shall cooperate with the Court and not intimidate, harass, threaten, discipline, and/or interfere with the juror's service.

Here's the note that I received from the juror after my discussion yesterday, which I advised you of. He says, "Well, your Honor, I thought everything was fine, but I just got" -- and I'm reading you what he wrote down here -- "I just got notified that my company will not pay me. Can you please call" -- and they gave me the name -- "that's my supervisor. He said that the company lawyers advised them not to pay me or show up at work when I to jury service."

Evidently what he's doing is he's doing his jury service and going into work at night. And they said that he can't do that. And I said that that's crossing the line, and they can't interfere with him.

Then I received another note from the juror. I guess he has a cell phone, which we now allow the jurors to have. And it says, "My shop steward from my union just called me and said that he was told that no judge in the world can overrule their decision."

Well, I put in a call to that individual as well and told him that, in my opinion, that if he took this position that I would send a Marshal out with a subpoena in order to show cause why he should not be held in violation of 28, United States Code, Section 1875.

So I called the shop steward, and I also called his immediate supervisor.  And they're going up the food chain now. And I will get to the bottom of this as well.

**MR. RUBIN:**  Your Honor, can we inquire as to what number?

**THE COURT:**  I think I told you.  He's 57.

**MR. RUBIN:**  Yeah.  But what number is that on the jury?

**THE COURT:**  I think it's Number Nine.

**MR. RUBIN:**  So it's a sitting juror.

**THE COURT:**  Yes, it --

**MR. RUBIN:**  It's not an alternate.

**THE COURT:**  -- is a sitting juror.

**MR. RUBIN:**  All right.

**THE COURT:**  All right.  That's issue number -- I'll put this notes in the -- Well, I've read them into the record; so I don't have to put them in the file.

Now, the next issue is another juror note.  And they had asked to have December 22nd through January the 2nd off. And I postponed giving them that decision because I didn't know

**DRAFT COPY**

the jury.

His problem is they don't pay him after 30 days.  And I'm trying to have the employer waive that rule with regard to that employee through friendly persuasion.

**MR. DUGDALE:**  Did you tell him the story about the pen stopping the train?

**THE COURT:**  Pardon me?

**MR. DUGDALE:**  Are you going to tell him the story about the pen stopping the train?

That might work.

**THE COURT:**  Maybe I'll send them Judge Real (phonetic).

**MR. RUBIN:**  It worked with me.

**THE COURT:**  All right.  Let's bring the jury out.

**(Pause)**

**(Jury enters at 9:59 a.m.)**

**THE COURT:**  All right.  Good morning, ladies and gentlemen.

The record will indicate that all the jurors are present.  All parties and counsel are present.

A couple of housekeeping matters.  Again, we're not going to meet this Friday or next week.  Now, one of the jurors asked about December, specifically December 27th through January the 2nd.  We will -- our last day of service will be the 21st.  When I say the last day of service before the break

**DRAFT COPY**

Thorn - Direct / By Mr. Dugdale                    13

**THE WITNESS:**  My name is William Thorn.

**THE CLERK:**  And would you spell your last name please?

**THE WITNESS:**  T-h-o-r-n.

**DIRECT EXAMINATION**

**BY MR. DUGDALE:**

Q    Good morning, Mr. Thorn?

A    Hi.

Q    Mr. Thorn, are you familiar with a business called Play it Again Sports?

A    Yes.

Q    And how are you familiar with that business?

A    I was an owner of a Play it Again Sports store.

Q    And is Play it Again Sports is that basically a business that has different franchises?

A    Yes, it is.

Q    And did you own one of those franchises?

A    I was a franchise owner, yes.

Q    And where was the Play it Again Sports store that you owned located?

A    Mine was at 12038 Ventura Boulevard in Studio City, California.

Q    And when did you own that Play it Again Sports store in Studio City?

A    From '95 through -- till 2003.

**DRAFT COPY**

Thorn - Direct / By Mr. Dugdale                14

Q    Now, at the time that you were the owner of the store, did you also work inside the store?

A    Yes.

Q    And what kind of work did you do inside the store?

A    I did sales, as well as managing the store.

Q    And can you explain to the jury what kind of store Play it Again Sports is?

A    It's a sporting goods store that buys and sells and consigns used as well as new sports equipment.

Q    And at the time that you owned the Play it Again Sports store in Studio City, did the sporting goods that you sold include weight plates?

A    Yes.

Q    And did you sell used weight plates as well as new weight plates?

A    Yes, we did.

Q    Now, as the former owner of Play it Again Sports, are you familiar with the documents that your business maintained to memorialize the sales that were made by your store?

A    Yes.

Q    And on every occasion that your store would sell an item would the store generate some sort of sales receipt to memorialize that sale?

A    Yes, it did.

Q    At this point in time, I'm going to ask Special Agent

**DRAFT COPY**

Thorn - Direct / By Mr. Dugdale                    15

Perez to hand you what's been previously admitted as

Government's Exhibit Number 407.  And for the record, Exhibit

407 was a document that was seized during the search of

Defendant -- I'm sorry -- of Mr. Krylov's apartment.  It was

admitted through the testimony of Special Agent Sean Sterle.

Mr. Thorn, do you recognize that document?

A    Yes, I do.

Q    And what is that document?

A    It's a sales receipt from our store.

Q    And is that a receipt that would have been generated to

memorialize a particular sale at your store at the time that

the sale was made?

A    Yes, it is.

Q    And is that the type of document that's generated in the

normal course of business, in the regular course of business by

your store?

A    Yes.

Q    And is it the type of document and that your business

relied upon in order to conduct its business?

A    Sorry?

Q    Is it the type of document that your store relied upon to

conduct its business?

A    Yes.

Q    Generating sales receipts?

A    Yes, it is.

**DRAFT COPY**

Thorn - Direct / By Mr. Dugdale                16

**MR. DUGDALE:**  I'm going to publish that exhibit.

Again, your Honor, it has been previously admitted.

**THE COURT:**  All right.  Let me --

**BY MR. DUGDALE:**

Q    Mr. Thorn, how do you recognize this sales receipt as a receipt that came from the particular store that you worked at?

A    It has our address printed on it.

Q    And if the computer screen in front of you, sort of like when John Manning on Monday Night Football circles something, you can circle things on the screen.

Can you indicate where on this receipt your store address is located?

A    Yeah.  It's right here.  As well as the phone number.

Q    And is there something on this receipt to indicate who the sales clerk was who sold these particular items?

A    Yes.  It's right here.  And that sales clerk and sales person 001, that was me.

Q    And what items does this receipt show were sold by your store?

A    It's showing that we sold fifty pounds of new Olympic plates, as well as forty-five pounds of used Olympic plates.

Q    And now you mention that they're Olympic plates.  Can you describe for the jury what an Olympic plate is?

A    Basically, there's two types of plates.  Olympic plates are the weight plates that have two-inch diameter in the middle

**DRAFT COPY**

Thorn - Direct / By Mr. Dugdale            17

of them so it has a bigger bar as opposed to a standard type of

plate, which has the one-inch hole for smaller bars.

Q    And what kind of -- just to put it in exercise terms,

something unfortunately I'm not very familiar with.

What kind of exercises do you do with an Olympic

plate?

A    Well, they're used for weight lifting.  And Olympic plates

are generally heavier, bigger.  Olympians use them.

Q    So exercises like a bench press for instance or a squat --

A    I'm sorry.

Q    -- is that the type --

A    Absolutely.

Q    -- of exercises that you would do with an Olympic weight?

A    Yes, it is.  Yes.

Q    And does Olympic plate, does that refer to a type of

weight as opposed to a brand name?

A    Yes.  They're Olympic plates are a type.  It's like I said

the two-inch diameter.  There are Olympic plates that have a

brand name that's a standard, which is the brand.  But they are

still an Olympic plate type.

THE COURT:  And you say they're heavier.

THE WITNESS:  Well, they go up --

THE COURT:  Fifty pounds is fifty pounds.

THE WITNESS:  That's true.

THE COURT:  But if the increments, they're heavier in

**DRAFT COPY**

Thorn - Direct / By Mr. Dugdale            18

increments than weight.  Because it's misleading when you say it's heavier.

THE WITNESS:  Yeah.  You're right.  You can -- the Olympic bars is -- the main thing here is that the Olympic bar will hold a greater amount of weight as opposed to a standard one-inch bar.  It won't hold as much weight on it.

BY MR. DUGDALE:

Q    And is that because of the size of the hole accommodating a bigger bar?

A    Yes.

Q    And turning back to this exhibit, Government's Exhibit Number 407, can you tell by looking at this receipt what the date was when you sold these items?

A    It was dated January 24th, 2002.

Q    And can you tell what the time was when you sold these items?

A    It was at 1:50 p.m.

Q    And how much did the customer spent who purchased these items?

A    The total sale was $45.52.

Q    And can you tell by this receipt how the customer paid for these Olympic weights?

A    They paid a hundred dollars cash.  Right there.

Q    Now, Mr. Thorn, going back to the year of 2002.  On April 10th of 2002, did two members of the Los Angeles Police

**DRAFT COPY**

Thorn - Direct / By Mr. Dugdale                19

Department interview you about this particular receipt?

A    Yes, they did.

Q    And at the time of that interview, did they show you a
photo spread of pictures of various people?

A    Yes.

Q    At this point in time, I'd like Special Agent Perez to
hand you what's been marked for identification as Government's
Exhibit Number 1361.

         And, Mr. Thorn, do you recognize Government's Exhibit
Number 1361?

A    Yes, I do.

Q    And how do you recognize that?

A    I remember circling it, and I've initialed it.  The circle
that I made, I've initialed.

Q    And is that -- is that document in front of you, Exhibit
1361, is that a photo spread that was shown to you by the Los
Angeles Police Department?

A    Yes, it is.

Q    And I believe you testified you recognize it because you
circled one of the photos and initialed it; is that right?

A    I seem to recognize that person, yes, when I --

Q    And attached to that photo spread is -- the second
document is a photo identification report.

         Can you turn to the second page of that document?

A    Yes.

**DRAFT COPY**

Thorn - Direct / By Mr. Dugdale                    20

Q    And do you recognize any of the handwriting on that document?

A    Yes, I wrote it.

Q    Okay.  And what specifically did you write down there? A    It says, "Number three photos seems to be familiar to me as one of our store customers."

         **MR. DUGDALE:**  At this point in time, the Government's going to move to admit Government's Exhibit Number 1361.

         **THE COURT:**  1361 admitted this date.

     **(Government's Exhibit Number 1361 was received in evidence)**

**BY MR. DUGDALE:**

Q    What I -- and, Mr. Thorn, before you circled this and initialed the person in position number three, did the police tell you anything?  Did they ask you anything?

A    They had -- they just told me to look at these photos and see if I recognized anybody.

Q    And after listening to that, that admonishment to see if you recognized anybody in the photographs, did recognize any of the people that were pictured in any of these six photographs here?

A    I thought that number three may have looked familiar.

Q    Okay.  And how did number three look familiar to you?

A    He could have been a store customer.

Q    Okay.

**DRAFT COPY**

Thorn - Direct / By Mr. Dugdale                21

A    he just seemed familiar looking to me.

Q    Is this the only one of the six people that you had any familiarity with?

A    Yes.

Q    And --

          **THE COURT:**  Number four looks like the governor, Arnold Schwarzenegger.

          **(Laughter)**

          **MR. DUGDALE:**  He might have been buying weight plates too.

**BY MR. DUGDALE:**

Q    Okay.  After ignoring Governor Schwarzenegger and picking out number three -- you see there's a circle around number three.

          Who made that Circle?

A    I did.

Q    And at the top, it's difficult to see here.

          Did you initial this as well?

A    Yeah.  It's a BT.

Q    And after you circled this and initialed it, did you write out what you believed about this person in what is the second page of this exhibit?

A    Yes, I did.

Q    And turning to the second page of the exhibit, what did you indicate about the person who was in position number three?

**DRAFT COPY**

Thorn - Direct / By Mr. Dugdale                    22

A    I wrote, "Number three photo seems to be familiar to me as one of our store customers."

Q    And at the bottom of this page from the exhibit, there is an area that indicates signature of witness; is that your signature?

A    Yes, it is.

Q    And are those your initials next to it as well?

A    Yes.

Q    As the time and the date?

A    Yeah.  I did all that.  Yes.

Q    At this point in time, I'd like Special Agent Perez to hand you what's been marked for identification as Government's Exhibit Number 1362.

And, Mr. Thorn, do you recognize Government's Exhibit Number 1362?

A    Yes, I do.

Q    And how do you recognize that?

A    It was a photo given to me another time afterwards when some officers came in and asked me if I recognized anybody in them.

Q    Okay.  And how do you recognize that photo spread?

A    Same thing.  I circled it and initialed it.

Q    And attached to that photo spread again on page two is another one of these photo identification reports.

Can you turn to page two of that document?

**DRAFT COPY**

Thorn - Direct / By Mr. Dugdale          23

A     Yes.

Q     And do you recognize any of the handwriting on that document?

A     Yes, I wrote it.

        MR. DUGDALE:  Your Honor, at this time the Government would move for the admission of Government's Exhibit Number 1362.

        THE COURT:  1362 admitted this date.

        **(Government's Exhibit Number 1362 was received in evidence)**

**BY MR. DUGDALE:**

Q     And, Mr. Thorn, at the time that you -- before you looked at this or while you were looking at this, did the police give you the same admonishment that they gave you in the prior occasion?

A     Yes, they did.

Q     And after they asked you if you recognized any of the people in that photo spread, did you recognize or potentially recognize any of the people in that photo spread?

A     I thought I may have recognized somebody, which I circled.

Q     Can you indicate which person that you thought you recognized?

A     It's number three.

Q     Okay.  And, again, photo number three, which you just circled, there's another circle in pen.

**DRAFT COPY**

Thorn - Direct / By Mr. Dugdale                24

Did you make that circle?

A    Yes, I did.

Q    And are those your initials above the circle?

A    Yes.

Q    And, again, just like you did with the previous photo spread, did you write down on that second page of this exhibit what you thought about this person?

A    Yes, I did.

Q    And I'm now publishing the second page of this exhibit.

Can you indicate to the jury what you indicated about this person who was in position number three of the photograph?

A    I wrote, "Number three looks familiar, maybe or maybe not, from being in store."

Q    And again at the bottom of this, is that your signature?

A    Yes.

Q    And also the date and time in which you made this comment?

A    Yes, it is.

        MR. DUGDALE:   Thank you, your Honor.   I have no further questions.

        THE COURT:   Mr. Callahan?

        MR. CALLAHAN:   Thank you, your Honor.

    (Pause)

//

//

//

**DRAFT COPY**

Thorn - Cross / By Mr. Callahan                    25

**CROSS-EXAMINATION**

**BY MR. CALLAHAN:**

Q    Mr. Thorn, good morning.

A    Hi.

        **MR. CALLAHAN:**  If I can ask the Government's assistance in putting the Play it Again receipt on the screen.

**BY MR. CALLAHAN:**

Q    Mr. Thorn, I've put on the overhead screen for you Exhibit 407, which has been admitted, which is the receipt you've been discussing this morning.

        Do you see that up there?

A    Yes.

Q    All right.  And you see it also on the screen in front of you?

A    Yes, I have it here.

Q    It's difficult to read a bit.  But if you can look at the items that were purchased, I just want to ask you a few questions about those.

A    Okay.

Q    The first item transaction is UB13 new Olympic plates. And it says, "Fifty pounds."  And just clarify.  You may have said it; so forgive me.

        Can you tell from looking at this, how many plates were actually purchased with that entry?

A    No.

**DRAFT COPY**

Thorn - Cross / By Mr. Callahan                    26

Q    All right.  So it could be any combination of weights up to fifty pounds?

A    Yes.

Q    All right.  And for the second entry, which is UB5, it says, "Used Olympic plates."  And below it, it has the number 45.0, which is, I believe, 45 pounds?

A    Correct.

Q    And as with that entry, you cannot tell simply by looking at it how much or how many plates were purchased; is that correct?

A    That's correct.

Q    All right.  Now, you indicated you left Play it Again Sports in 2003.  I want to ask you a couple of questions just about it.

Can you describe the location in a little more detail for me?

A    It's in a Studio City Plaza.  This was a strip mall. Typical, parking lot in front, kind of an L-shaped mall, close to the corner of Laurel Canyon and Ventura Boulevard.

Q    So it's a busy area?

A    Yes.

Q    All right.  And in addition to selling weights, you had other merchandise there too; did you not?

A    Yes.

Q    You sold golf equipment?

**DRAFT COPY**

Thorn - Cross / By Mr. Callahan                    27

A      Yes.

Q      Let's see.  Fitness equipment?

A      Yes.

Q      Treadmills?

A      Yes.

Q      Snow equipment, ski equipment?

A      Yes.

Q      Okay.  And during the time you were there, if you can generalize, approximately how many customers do you think you'd see on an average day?

A      On an average day?

Q      Uh-huh?

A      I'd say between 30 and 35.

        MR. CALLAHAN:  And forgive me.  If I could ask the Government to assist in putting up on the overhead Exhibit 1362, which has been admitted.

BY MR. CALLAHAN:

Q    Mr. Thorn, directing your attention to Exhibit 1362, which is in evidence, this was presented to you on a second interview by the police; is that right?

A      That's right.

Q      And you indicated that the person in the number -- I guess it's the sixth spot, the upper right spot, looked familiar to you?

A      Upper right spot, yeah.  It seemed like he looked familiar

**DRAFT COPY**

Thorn - Cross / By Mr. Callahan                28

to me.

Q    You weren't sure, but he did look familiar?

A    That's correct.

Q    And you weren't sure if he looked familiar to you from being in the store or something out of the store such as a restaurant or something; is that right?

A    You're right.

Q    Okay.  And you have no specific recollection of him ever being in your store?

A    I couldn't tell you If I did or not.

        MR. CALLAHAN:  If I may ask the Court to put it in Elmo mode for a moment.  I'm placing on the overhead which has been introduced as Exhibit 69.

**BY MR. CALLAHAN:**

Q    Can you see that picture, sir?

A    Yes.

Q    Could you recognize that person as a customer of your store?

A    I couldn't tell you if he was or was not, no.

        THE COURT:  All right.  For the record when you say introduced, it was admitted.

        MR. CALLAHAN:  Forgive me.  Thank you.

        Your Honor, thank you.  I have nothing further of Mr. Thorn.

        THE COURT:  Mr. Lasting?

**DRAFT COPY**

Thorn - Redirect / By Mr. Dugdale                29

MR. LASTING:  Thank you, your Honor.  No questions.

THE COURT:  All right.

Any redirect.

MR. DUGDALE:  Just very, very briefly.

**REDIRECT EXAMINATION**

BY MR. DUGDALE:

Q    Mr. Thorn, going back to what was purchased on this particular purchase, there's 50 pounds of weights and then 45 pounds of weights.

Is there anything unusual about a person buying these types of weights in an odd increment like that adding up to 95 pounds?

MR. CALLAHAN:  Objection.  Speculation.

THE COURT:  Sustained.

BY MR. DUGDALE:

Q    Well, you mentioned that these types of weights are used for squats and for bench presses; is that right?

A    Usually, yes.

Q    Okay.  So if you have 45 pounds of weight on one end or a 45-pound weight on one end and 50 pounds of weight on the other end, that doesn't allow you to properly do a squat or a bench press; is that right.

MR. CALLAHAN:  Objection.  Assumes facts not in evidence and argumentative.

THE COURT:  Sustained.

Mosher - Direct / By Ms. Meyer                30

MR. DUGDALE:  I have no further questions.  Thank you.

THE COURT:  Anything further?

MR. CALLAHAN:  Nothing further.  Thank you, your Honor.

THE COURT:  You may stand down.

THE WITNESS:  Thank you.

THE COURT:  All right.  The Government's next witness will be?

MS. MEYER:  Your Honor, at this time the Government calls Detective Eric Mosher to the stand.

THE CLERK:  Please step up to the witness stand.

Raise your right hand.

**(Witness sworn)**

Please have a seat.  And would you please state your name for the record.

THE WITNESS:  Eric Mosher, E-r-i-c M-o-s-h-e-r.

MS. MEYER:  Thank you, your Honor.

**DIRECT EXAMINATION**

BY MS. MEYER:

Q    Good morning, sir.

What do you do for a living?

A    I'm a detective for the Los Angeles Police Department assigned to Robbery Homicide Division.

Q    And how long have you worked for the Los Angeles Police

**DRAFT COPY**

Mosher - Direct / By Ms. Meyer                    31

Department?

A     As of December 3rd of this year, it will be 16 years.

Q     As a member of the Robbery Homicide Division, have you participated in the investigation of this case?

A     Yes.

Q     Did you have an opportunity to interview someone by the name of William or Bill Thorn?

A     Yes, I did.

Q     When did that interview take place?

A     That interview took place on April 10th of 2002.

Q     And why did you interview Mr. Thorn?

A     Information that we received during the case let us know that there was a receipt from Play it Again Sports on Ventura Boulevard that was located inside one of the suspects' vehicles.  And that suspect was Petro Krylov.

      So we went to the store to see whether or not that receipt came from the store.  And additionally, information was also received that the victims in this case were weighted down before they were thrown into the water.  And the receipt had weights on the receipt.

Q     Detective Mosher, during the course of your interview of Mr. Thorn, did you show him any photographs?

A     Yes.

Q     Could you please take a look at Government's Exhibit 1361 -- I'd ask Agent Perez to place that before you -- which has

**DRAFT COPY**

Mosher - Direct / By Ms. Meyer                    32

previously been admitted into evidence.  I will also display

it.

          MS. MEYER:  Well, your Honor, may I have the PC mode?

          Thank you, your Honor.

BY MS. MEYER:

Q    Do you recognize that exhibit?

A    Yes.

Q    And what is it?

A    It is a six picture photographic spread including the

photograph of Mr. Petro Krylov.

Q    Who prepared it?

A    It was prepared by our department.  I believe our Records

and Identification Division.

Q    And did you show this set of photographs to Mr. Thorn?

A    Yes.

Q    Before you showed him this photo spread, did you tell him

anything?

A    Yes.  I read him the photographic admonition.

Q    Could you just give a general or brief summary of what

that admonition contains for the jury?

A    Sure.  Essentially we say that in a moment we're going to

show you a group of photographs.  In the group of photographs,

a picture of a person may or may not be in this set of

photographs in regards to the crime being investigated.

          We ask them to keep in mind that hair styles, beards,

**DRAFT COPY**

Mosher - Direct / By Ms. Meyer                 33

moustaches, may be different.  We ask them to also keep in mind

that the pictures may look lighter or darker, as some pictures

might.  We also ask them to keep in mind or not to pay any

attention to any markings that might be on or near the photos.

We also explain to them that they're not to discuss with any

other witnesses or potential witnesses that they have or have

not identified anybody from any photo spread that they're

shown.

Q    And, Detective Mosher, after you're giving this admonition

to Mr. Thorn, did he identify anyone in this photo spread?

A    He did.

Q    Who?

A    He identified Mr. Petro Krylov -- excuse me.  Petro

Krylov.

Q    In what position?

A    It's in the upper right-hand corner.  And it's number

three.

Q    Could you please circle it on the screen with your finger?

A    Okay.

Q    Detective Mosher, are you aware of whether other photo

spreads were shown to Mr. Thorn?

A    I am.

Q    Can you please take a look at Government's Exhibit 1362,

which has already been admitted into evidence.

          **MS. MEYER:**  And, your Honor, at this time I'm

**DRAFT COPY**

publishing this for the jury.

**BY MS. MEYER:**

Q    Do you recognize that exhibit?

A    I do.

Q    What is it?

A    It's a six-photo photographic spread, including the photo of Iouri Mikhel.

Q    And who prepared that six pack?

A    That was prepared by our department also.

Q    And do you see that someone ID'd a photo on that six pack?

A    Yes.

        **MR. RUBIN:**  Objection, your Honor.  No foundation.

        **THE COURT:**  No.  Overruled.

**BY MS. MEYER:**

Q    And can you please tell the jury who's identified in that six pack?

        **MR. RUBIN:**  Objection, your Honor.  No foundation.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  The person --

        **MS. MEYER:**  You may answer the question.

        **THE WITNESS:**  The person identified is number three in the upper right-hand corner, Iouri Mikhel.

        **MS. MEYER:**  And could you please circle that for the jury on screen.

        No further questions, your Honor.

**DRAFT COPY**

Mosher - Cross / By Mr. Rubin                     35

THE COURT:  Mr. Rubin?

MR. RUBIN:  Thank you, sir.

**CROSS EXAMINATION**

BY MR. RUBIN:

Q    Good morning, Detective.

A    Good morning, sir.

Q    The first time that you showed a photo spread was April 10th of '02?

A    That is correct?

Q    The second photo spread was shown when?

A    On April 16th of '02?

Q    Were you present at that time?

A    No, I was not.

Q    So you were not there when the photo spread was shown to Mr. Thorn on April 16th?

A    No, I was not.

Q    And you don't know what happened at that time?

A    Other than going by the reports.

Q    So you've read a report by some other officer who said what happened on April 16th?

A    That is correct.

Q    And that's the only way that you know about what happened on April 16th?

A    Other than having a conversation with that officer and the reports, no.

**DRAFT COPY**

Mosher - Cross / By Mr. Rubin                36

Q    You have no first-hand knowledge of anything that happened on April 16th of 2002 regarding the showing of 1362 to Mr. Thorn?

          **MS. MEYER:**  Objection, your Honor.  Asked and answered.

          **THE COURT:**  No.  Overruled.

          **THE WITNESS:**  I'm sorry.  Repeat the question.

**BY MR. RUBIN:**

Q    You don't have any personal knowledge of what happened on April 16th of 2002 when this Exhibit 1362 was shown to Mr. Thorn?

A    I was not present when it was shown, no.

Q    So you have no personal knowledge?

A    Other than talking with the detective and seeing the reports, no.

Q    Okay.  Well, that's not personal knowledge; is it?

          That's reading someone else's report?

          Isn't that right?

A    I would say that's -- other than that knowledge, no.  I was not present when it was shown.

Q    Okay.  Now, you indicated that both 1362 and 1361 were prepared by R&I?

A    Yes.  I believe they were prepared by R&I.

          **THE COURT:**  R&I?

          **MR. RUBIN:**  Records --

**DRAFT COPY**

Mosher - Cross / By Mr. Rubin                    37

THE WITNESS:  I apologize.  Records and Identification Division.

MR. RUBIN:  Thank you.

BY MR. RUBIN:

Q    And is that normal for R&I Division to prepare six packs for you?

A    At that time, it was the new system coming on line.  We were able to pull the photos down, and it was computerized.  So yes.

Q    And if you asked R&I to prepare a six pack, did you have input into the preparation of that six pack?

A    I did not have personal input into the preparation of these six packs.

Q    Did you have any personal input into the preparation of 1362?

A    No.

MR. RUBIN:  And I'm sorry.  How do I get this to the other, 1361?

BY MR. RUBIN:

Q    I'm going to show you Exhibit 1362.

Did you have any input into the preparation of Exhibit 1361?

A    No.

Q    And you did show this six pack to Mr. Thorn?

A    That is correct.

**DRAFT COPY**

Mosher - Cross / By Mr. Rubin                    38

Q     Was it in color?

A     My recollection -- you know, I can't recall.

Q     Okay.  It could have been black and white.  It could have been color.

A     That's correct.

Q     All right.  Now, before this new policy started at the LAPD where R&I did computerized six packs, the detectives investigating a case actually took part in putting the six back together; isn't that true?

A     That is correct.  Perhaps I should rephrase the -- when these paragraphs are put together, there is a detective present.  But I did not.  I was not the person who was present during this.

Q     Okay.  Do you know who was present?

A     I do not.

Q     Do you know if it was anyone that was investigating this case?

A     Yes.  I'm certain it would be, because those are the paragraphs being put together on this case.

Q     All right.  Now, let's take 1361 for example.  What would happen is you would have a photo of a suspect; is that correct?

A     Yes.

Q     And you would start with that photo; is that right?

A     Yes.

Q     Then you want to test a witnesses ability to identify a

**DRAFT COPY**

Mosher - Cross / By Mr. Rubin                    39

suspect; is that correct?

A       I don't know that I understand the question, sir.

Q       Okay.   The purpose of the six pack is what?

A       To see whether or not a person recognizes a person in a
particular crime.

Q       Okay.   And isn't the reason that you use a six pack as
opposed to just showing the witness one photo is to test that
individual's ability to recognize the suspect?

A       Yes.

Q       Okay.   So the test is to find five other photos that look
similar to your suspect; is that correct?

A       Yes.

Q       Okay.   If you have -- in this case with Mr. Krylov in the
number three position, you would not have not selected a
picture of an African American to also go into this photo
spread; would you?

A       That is correct.

Q       Because you're trying to see if the person can identify
Mr. Krylov, who in the photo spread looks to be Caucasian; is
that right?

A       Yes.

Q       Okay.   So you're trying to find photos of five other
individuals that have a similar look to the person that you're
interested in?

A       Yes.

**DRAFT COPY**

Mosher - Cross / By Mr. Rubin                    40

Q    And you think that this 1361 does that?

A    I do.

Q    You think that Arnold Schwarzenegger looks like Mr. Krylov?

        THE COURT:  That's argumentative now.

BY MR. RUBIN:

Q    Do you think that the photo in the number four position looks similar to Mr. Krylov?

        MS. MEYER:  Same objection, your Honor.

        THE COURT:  No.  Overruled.

        THE WITNESS:  The photos that are in this six pack all show male whites, similar facial features, similar hair, similar age range.  So yes.  I think that these photographs are a good representation.  They can't be exact, obviously.

BY MR. RUBIN:

Q    No.  But you can find photos of people that look similar to other people; can't you?

        THE COURT:  Now you're arguing with him.

BY MR. RUBIN:

Q    Can you go through a data base and try to find photos that look similar to the person that you're interested in?

A    Yes.

Q    Okay.  And the person in the number two position, does that person look Asian to you?

A    No.

**DRAFT COPY**

Mosher - Cross / By Mr. Rubin                    41

Q    How about Pacific Islander?

A    No.

Q    He looks like Mr. Krylov?  The number two and the number three, they look similar?

A    He can't look exactly like Mr. Krylov.

Q    Well, no.  But they -- don't you think they should be a little more related other than two eyes, a nose, and a mouth?

          MS. MEYER:  Objection.

          THE COURT:  That's argumentative.

BY MR. RUBIN:

Q    Now, I notice in both this exhibit, 1361, and the Exhibit 1362, the individuals that you were -- that were a subject of your investigation were both in the number three position; is that right?

A    They were both in number three, correct.

Q    Is it when R&I puts these together for you, do they normally put the suspect in the number three position?

A    No.  They can be in any position.

Q    So it just was a coincidence in this case?

A    Yes, it was.

          MR. RUBIN:  All right.  Thanks a lot, Detective.

          THE COURT:  Mr. Lasting?  Ms. Chahin?

          MR. LASTING:  Thank you, your Honor.  No questions.

          THE COURT:  Ms. Meyer?

          MS. MEYER:  Just a few.

**DRAFT COPY**

Mosher - Redirect / By Ms. Meyer                    42

**REDIRECT EXAMINATION**

**BY MS. MEYER:**

Q    Detective Mosher, before Mr. Thorn was shown this particular six pack, was race, ethnicity, or anything pertaining to the suspects conveyed to Mr. Thorn?

A    No.

Q    And one final question, Detective Mosher.  In this six pack in the course of your investigation you learned that the person in position number three is Iouri Mikhel?

A    That is correct.

          **MS. MEYER:**  No further questions, your honor.

          **THE COURT:**  Mr. Rubin?

          **MR. RUBIN:**  No, sir.

          **MR. LASTING:**  No questions.

          **THE COURT:**  All right.

          You may stand down.  You're excused.

          **THE WITNESS:**  Thank you.

          **THE COURT:**  All right.  The Government's next witness will be?

          **MR. DUGDALE:**  Yes, your Honor.  The United States of America would call Anna Mahli.

          And at this point in time, I'm going to ask Special Agent Davidson and Special Agent Perez to distribute the binders that were previously handed out during the Tezhik deposition, your Honor.

**DRAFT COPY**

Mosher - Redirect / By Ms. Meyer                43

THE COURT:  All right.

MR. DUGDALE:  And they are all over here, all 28 of them.

THE COURT:  All right.  Pass them out at this time.

MR. RUBIN:  Your Honor, while that witness is coming in, can we approach the sidebar?

THE COURT:  Certainly.

**(Begin sidebar discussion on the record at 10:37 a.m.)**

MR. RUBIN:  Your Honor, I'm going to move to strike all of Detective Mosher's testimony regarding the photo spread of Mr. Mikhel that was shown on April 16th of 2002.

THE COURT:  Why --

MR. RUBIN:  Because he has no foundation.  Everything that he knows about it was based on hearsay.

THE COURT:  Well, your objection was no foundation. The objection was not hearsay.  But the prior witness, Mr. Mosher, identified that that was the person that he picked out. So therefore, the lack of foundation is not a well taken objection.  And there was no hearsay objection.

MR. DUGDALE:  And your Honor, just to be clear what the purpose of that was, it was just to communicate to the jury who was in that position that was picked out.  He's not saying that, you know, that he was present during the ID.  He never said that.

MR. RUBIN:  But he did.  He indicated that Mr. Thorn

**DRAFT COPY**

Mahli - Direct / By Mr. Dugdale                77

**THE WITNESS:**  Anna Mahli.

**THE COURT:**  Mr. Dugdale?

**MR. DUGDALE:**  Thank you, your Honor.

**DIRECT EXAMINATION (CONTINUED)**

**BY MR. DUGDALE:**

Q    Good afternoon, Ms. Mahli.

A    Good afternoon.

Q    Ms. Mahli, during selected testimony in the case there's been some discussion about the use of playing tracks from the mini disk to Mr. Tezhik and an attempt to get ransom money. Prior to today did you listen to the tracks on the mini disk and attempt to match any of the words that were on the mini disk to the recordings that Mr. Tezhik made?

A    Many, many times.

Q    And did you find any identical portions of any recordings that were in common between the recordings on the mini disk and the recordings that Mr. Tezhik made?

A    I did.

Q    And how did you conduct this search to see if there were identical portions on both of those types of recordings?

A    I initially looked at my transcripts to see if there was an exact verbiage, and then I started listening.  And when I thought I heard the same verbiage on one, I would play it again on the other.  When I had identified what I thought were matching, I went to one of our tech rooms and so I wouldn't

**DRAFT COPY**

Mahli - Direct / By Mr. Dugdale                78

have to insert a disk and take it out and then listen and

insert another one and have lapse time.  I went up to one of

our tech rooms and I was able to play them immediately side by

side, almost one on top of the other, or one right after the

other.

Q    And when you're talking about playing something side by

side, what were you playing side by side?

A    I played the two recordings, the two separate recordings.

I played on one machine and then I played it on another -- on

one computer and then another.

Q    So just so we're clear about this, you would play

something from the mini disk on one machine and then something

from the Tezhik recordings on another; is that correct?

A    Correct.

Q    And can you please take a look now at what's been marked

for identification as Government's Exhibit Number 1355.

A    Thank you.

Q    And, Ms. Mahli, do you recognize the computer disk that's

been marked as Government's Exhibit Number 1355?

A    I do.

Q    And what is -- is there a recording on that computer disk

that you listened to prior to today?

A    What is it?

Q    Yeah; is there a recording on that disk that you listened

to prior to today?

**DRAFT COPY**

Mahli - Direct / By Mr. Dugdale                    79

A     Yes, there is.

Q     And what is that a recording of?

A     It's Track 12 on the mini disk.

Q     Okay.  And is that just a segment from that track, Track 12 on the mini disk?

A     It is.

Q     And I'm now going to have Special Agent Davidson hand you what has been marked for identification as Government's Exhibit Number 1355-A.

A     Thank you.

Q     And, Ms. Mahli, prior to today did you have an opportunity to review the recording that's on Exhibit 1355-A?

A     I did.

Q     And where did that recording come from?

A     This was from Mr. Tezhik's recordings.

Q     And which track and exhibit number was it from?

A     This is Track 5.

Q     From which exhibit?

A     Oh, Exhibit 41.

Q     Okay.  So do both Exhibits Number 1355 and 1355-A, are they accurate recordings of segments that you found respectively from the mini disk and from the Tezhik recordings?

A     That is correct.

          **MR. DUGDALE:**  Your Honor, at this point in time the Government would move for the admission of Government's Exhibit

Mahli - Direct / By Mr. Dugdale                80

Number 1355 and 1355-A and request permission to play them.

THE COURT:  1355 and 1355-A received this date.

(Government's Exhibits Numbers 1355 and 1355-A were received in evidence)

BY MR. DUGDALE:

Q    And first, for the record, I'm going to play the segment from 1355, which you identified as a segment from Track 12 of the mini disk recovered from Defendant Kadamovas's apartment.

(Audio playing)

BY MR. DUGDALE:

Q    And, Ms. Mahli, what did the voice that you just heard -- what did it say?

A    "Hello.  Are you alone now?  Is it convenient to talk?"

Q    I am now going to play what has been admitted as Government's Exhibit Number 1355-A, a recording from what you have identified as a recording from Track 5 of Exhibit 41 from the Tezhik recordings.

(Audio playing)

BY MR. DUGDALE:

Q    And, Ms. Mahli, what did the voice -- there were two voices on that; is that correct?

A    That is correct.

Q    And did you hear one voice that sounded similar to the voice that you heard in the prior recording?

A    I did.

DRAFT COPY

Mahli - Direct / By Mr. Dugdale                    81

Q    And what did that voice say?

A    "Hello.  Are you alone now?  Is it convenient to talk?"

Q    In both of those recordings that we just listened to, Exhibit 1355 and Exhibit 1355-A, did the speaker say exactly the same words?

A    Indeed.  Exactly the same words.

Q    And was the same intonation and tone used by the speaker in both recordings?

A    Exactly the same intonation and tone.

Q    And as a result of that did you draw any conclusions about these two respective recordings?

A    In my opinion and my conclusion it was the same speaker and exactly the same words and that they were duplicate recordings.

Q    Now, did you find a second duplicate recording when you compared the mini disk recording seized from the Defendant Kadamovas's apartment and the recordings that were made by Mr. Tezhik?

A    I did.

Q    And did you use the same methodology that you used to find the two recordings that we just listened to?

A    Exactly.

Q    At this point in time I'm going to have Special Agent Davidson hand you what has been marked for identification as Government's Exhibit Number 1356.

**DRAFT COPY**

Mahli - Direct / By Mr. Dugdale                    82

A     Okay.

Q     And, Ms. Mahli, prior to today did you have an opportunity to review the recording that is on Government's Exhibit Number 1356?

A     I did.

Q     And where did that recording come from?

A     It came from a mini disk.

Q     And which track on the mini disk did that come from?

A     Track 4.

Q     I'm now going to have -- and, I'm sorry -- is that an exact duplication of a segment from Track 4 on the mini disk?

A     Yes, it is.

Q     I'm now going to have Special Agent Davidson hand you what has been marked for identification as Government's Exhibit Number 1356-A.

        And, Ms. Mahli, prior to today did you have an opportunity to review Government's Exhibit Number 1356-A?

A     I did.

Q     And where did that recording on that mini disk come from?

A     It was from Mr. Tezhik's recordings, and it was Track 13.

Q     From what exhibit?

A     Exhibit 42.

Q     And did you extract the two segments from, first one from the mini disk, 1356, and the second from the Tezhik recordings, 1356-A, using the same methodology that you testified in

**DRAFT COPY**

relationship to Exhibit 1355?

A    I did.

MR. DUGDALE:  Your Honor, at this time the Government would move for the admission of Government's Exhibit Number 1356 and 1356-A and request permission to play them.

THE COURT:  1356 and 1356-A admitted this date.

**(Government's Exhibits Numbers 1356 and 1356-A were received in evidence)**

**BY MR. DUGDALE:**

Q    And first, for the record, Ms. Mahli, I am going to play Government's Exhibit Number 1356.

**(Audio playing)**

**BY MR. DUGDALE:**

Q    And, Ms. Mahli, did you recognize the words that were spoken by that voice that appeared on that track for the mini disk?

A    I did.

Q    And what did that person say?

A    My memory is not as good as it should be, but I believe he said, "I'm not quite reachable right now.  I'm in the mountains."

Q    I am now going to play what's been admitted as Government's Exhibit Number 1356-A from a track of one of the Tezhik recordings.

**(Audio playing)**

Mahli - Cross / By Mr. Callahan                              84

BY MR. DUGDALE:

Q    And, Ms. Mahli, what did the person say in that particular recording there?

A    "I can't quite be reached right now.  I'm in the mountains."

Q    And were the same exact words used by the speaker in both of those tracks?

A    The exact same words.

Q    And was the same tone and intonation used by the speaker?

A    Absolutely.

Q    And did you draw any conclusions when you compared Government's Exhibit Number 1356-A with Government's Exhibit Number 1356?

A    In my opinion it appears to be a recording one of the other.

        MR. DUGDALE:  Your Honor, I have no further questions.

        THE COURT:  Mr. Callahan?

        MR. CALLAHAN:  Thank you, your Honor.

                    CROSS EXAMINATION

BY MR. CALLAHAN:

Q    Ms. Mahli, good afternoon.

A    Good afternoon.

Q    You talked earlier this morning about a tape that contained recordings between Mr. Tezhik and someone identifying

**DRAFT COPY**

Mahli - Cross / By Ms. Chahin                    89

understand -- I could identify the person whether he was

speaking in English or Russian because his tone of voice is the

same.  It doesn't change.  Whether I started speaking Russian

to you now, my voice would still sound the same to you.

MR. CALLAHAN:  Ms. Mahli, thank you.

THE WITNESS:  You're welcome.

THE COURT:  Ms. Chahin?

MS. CHAHIN:  Thank you, your Honor.

**CROSS EXAMINATION**

BY MS. CHAHIN:

Q    Ms. Mahli, you've indicated that you've been employed as a

language specialist for the last ten years; is that correct?

A    For the FBI, ten as a full-time linguist, close to ten;

and two as a contract linguist before I was hired full time.

Q    So for the two years prior to the ten years you worked as

a contract linguist for the FBI as well?

A    I worked my regular clients, meaning I was a federal court

interpreter, superior, and everything else that I had listed.

And, in addition, whenever I had days where the FBI needed me,

they would call me and I would assist them.

THE COURT:  Let me interrupt a minute.

Are you going to request any of the tapes be played

or disks be played?

MS. CHAHIN:  I am not, your Honor.

THE COURT:  Then I'm going to ask the Government to

**DRAFT COPY**

Mahli - Cross / By Ms. Chahin                    90

put the microphone back in front of --

        **MR. DUGDALE:**  Sure.

        **THE COURT:**  -- Ms. Chahin.  There's no need for it down there.

        **THE WITNESS:**  Thank you, your Honor.

        **THE COURT:**  It's very difficult to hear.

        **MS. CHAHIN:**  Thank you.

        **THE WITNESS:**  I thought it was just me.

        **MS. CHAHIN:**  Ms. Mahli, if you can't hear me, please let me know, and I'll speak up.

        **THE WITNESS:**  That's much better.  Thank you.

        **MS. CHAHIN:**  Thank you.

**BY MS. CHAHIN:**

Q    So you have been working in some capacity with the FBI for approximately 12 years; is that correct?

A    That is correct.

Q    Okay.  And for the past 10 years you have been a full-time employee of the FBI?

A    Approximately 10, that's correct, full time.

Q    Okay.  So that means that you no longer handle other clients, correct?

A    I have a little bit.  We have the permission to do outside employment with, of course, the sanction of the Bureau to make sure it's not a conflict of interest or anything.  But primarily, yes, I work solely for the FBI.

**DRAFT COPY**

Mahli - Cross / By Ms. Chahin                91

Q    Are you a salaried employee?

A    I am indeed.

Q    Okay.  So your primary source of income over the last ten years has been from your job with the FBI, correct?

A    That is correct.

Q    Now, in your capacity as a language -- your title is language specialist, correct?

A    We fluctuate between language specialist and language analyst.  Nobody has quite told us what we are yet.

Q    Okay.  And in that capacity would it be fair to say that your primary job is doing translation and interpretation?

A    That is correct.

Q    Okay.  And prior to the time that you began your work with the FBI, I believe you indicated that you were a certified court interpreter.

A    In those days they were not called "certified."  We were court approved.

Q    So you were a court-approved interpreter?

A    I was.

Q    Okay.  And in your job when you worked as a court-approved interpreter, were you ever asked to perform the function of voice analysis?

A    No.

Q    Okay.  Were you ever asked to perform the function of document identification?

**DRAFT COPY**

Mahli - Cross / By Ms. Chahin                 92

A     In which capacity document identification?  I would have to identify documents that I had translated.  I had testified before the grand jury about documents that I had translated.

Q     I'm referring to the fact that you have identified documents in this case.  I believe you compared a document found in one location to a document found in another location and determined them to be similar or identical.

A     I don't believe so.  It's been a while, because -- I don't believe I did that.

Q     Okay.  Prior to your employment with the FBI, have you ever been asked to perform the function of determining whether certain recordings are duplicative?

A     No, I had not.

Q     Now, you've described that you would sometimes participate in monitoring calls in a wire room; is that correct?

A     That is correct.

Q     Now, as you would participate in the monitoring of those calls, were those calls that were live calls?

A     That is correct.

Q     And so at that time you would hear the voice of the speaker as the call was taking place; is that correct?

A     That is correct.

Q     In other instances you've identified that you have listened to recorded calls; is that correct?

A     Many.

**DRAFT COPY**

Mahli - Cross / By Ms. Chahin                93

Q    Okay.  And with respect to recorded calls, there are sometimes different variables that can affect the quality of the recording; isn't that right?

A    Depending how it's recorded.  If it's a body wire, sometimes people wear microphones, and depending on the ambiance or their circumstances, that recording is more difficult to hear than a recording done by a wiretap.

Q    Okay.  Just as the recordings that we've heard today here in court, correct?

A    That's correct.

Q    Some of them had static.

A    That's correct.

Q    Distortion.

A    Absolutely.

Q    Yes, and isn't it also correct that the speed at which a recording is played can affect the intonation -- or not the intonation, but the pitch of the voice?

A    I have never modified the speeds, because otherwise you get chipmunk or slow.  There was no need for me to speed it up or slow it down.

Q    Okay.  I'm not asking you if you've modified the speed; I'm asking you if the speed is modified whether it's your understanding of whether or not that can affect the pitch of the voice.

A    Yes.  Absolutely.

**DRAFT COPY**

Mahli - Redirect / By Mr. Dugdale          94

Q    And with respect to the identifications that you've testified here in court about, have you performed any tests or any scientific analysis other than what you've described listening to the calls?

A    No, because I'm not a scientist; I'm a linguist.

Q    And have you performed any -- have you or has anyone, to your knowledge, performed any blind test to determine your level of accuracy in being able to recognize voices?

A    That's beyond my expertise.  I do not know if anybody has ever analyzed that.  I do not know that.

Q    Have you ever participated in any experiments, for example, where you had a known sample of, let's say Mr. Kadamovas's voice, together with the four other individuals, and someone has tested your ability to recognize his voice, under blind circumstances?

A    No.

Q    So, in essence, what you're testifying here today is simply your opinion; is that correct?

A    That is absolutely correct.

        **MS. CHAHIN:**  Thank you, your Honor.

        **MR. DUGDALE:**  Just very briefly, your Honor.

                    **REDIRECT EXAMINATION**

**BY MR. DUGDALE:**

Q    Ms. Mahli, after reviewing the hundreds of hours of the recordings of Defendant Mikhel's voice, do you have any doubt

Black - Direct / By Ms. DeWitt                96

(Witness sworn)

THE CLERK:  Please have a seat.

Would you state your name for the record, please.

THE WITNESS:  Dina Black.

THE CLERK:  Would you spell your first and last name.

THE WITNESS:  D-I-N-A; and B-L-A-C-K.

THE CLERK:  Thank you.

**DIRECT EXAMINATION**

**BY MS. DeWITT:**

Q    Detective Black, what do you do for a living?

A    I am a detective with the L.A. County Sheriff's Department.

Q    How long have you been a detective for the L.A. County Sheriff's Department?

A    Seven years.

Q    In February of 2002, did you have a particular responsibility with the Los Angeles Sheriff's Department?

A    Yes, I did.

Q    And what was that?

A    I was working in our organized crime area of the criminal offenders unit.

Q    Detective Black, were you involved in the execution of a federal search warrant on February 19th, 2002?

A    Yes, I was.

Q    And where was that federal search warrant executed?

**DRAFT COPY**

Black - Direct / By Ms. DeWitt                97

A    It was executed at Designed Water World.

Q    And, specifically, do you know the address of where that particular search warrant was executed that day?

A    Yes.  It was 13605 Ventura Boulevard in Sherman Oaks.

Q    And I take it that this location was a business, not a home.

A    Yes.  That's correct.

Q    Detective Black, at this time I'd like to show you a photograph which has been marked and previously admitted as Government's Exhibit 351.

**(Pause)**

     **MS. DeWITT:**  And, for the record, your Honor, I am also showing this on the overhead for the jury to see.

**BY MS. DeWITT:**

Q    Detective Black, do you recognize the location that's depicted in this photograph?

A    Yes, I do.

Q    And what is this a photograph of?

A    This is a photograph of the front of the business that we served the search warrant at.

Q    Okay.  And that was the search warrant that you searched on February 19th, 2002.

A    Yes.

Q    What were you looking for when you conducted the search of that business on February 2nd, 2002, at Designed Water World?

**DRAFT COPY**

Black - Direct / By Ms. DeWitt                98

A    Any evidence which might help us with the investigation involving a kidnap, a murder.

Q    And how did you know what to look for that day?

A    We had had a briefing prior to serving the search warrant.

Q    And did you seize specific items of evidence during the search of Designed Water World on February 19th, 2002?

A    Yes, I did.

Q    Can you please now take a look at what's been marked and previously admitted as Government's Exhibit 354.

     **(Pause)**

          **MS. DeWITT:**  And, for the record, I am now showing this on the overhead for the jury to see.

**BY MS. DeWITT:**

Q    Do you have that in front of you?

A    Yes, I do.

Q    Do you recognize what's depicted in that photograph?

A    Yes, I do.

Q    What is it?

A    It was items of torn pieces of paper that I had pulled out of the trash can during the search warrant.

Q    And this was one of the items that you seized that day at Designed Water World?

A    Yes, it was.

Q    Can you please now take a look at what's been marked and previously admitted into evidence as Government's Exhibit 58.

**DRAFT COPY**

Black - Direct / By Ms. DeWitt          99

(Pause)

BY MS. DeWITT:

Q    Do you recognize that document?

A    Yes, I do.

Q    And what is it?

A    It's one of the pieces of paper when I sorted all of the papers I had put back together that was in the trash can.

Q    And was this one of the pieces of paper that you reassembled from Government's Exhibit 354?

A    Yes, it was.

Q    Okay.  And can you just show that to the jury so they can see what it looks like in its current form?

(Witness Complies)

        MS. DeWITT:  Thank you, Detective Black.

BY MS. DeWITT:

Q    Now, if you could please take a look at what's been previously admitted as Government's Exhibit 59.

(Pause)

BY MS. DeWITT:

Q    Do you have that in front of you?

A    Yes, I do.

Q    Okay.  And what is that?

A    It's also another one of the pieces of paper that was retrieved from the trash can.

Q    And, again, was that reassembled from the pieces of papers

**DRAFT COPY**

Black - Direct / By Ms. DeWitt          100

that are depicted in Government's Exhibit 354?

A    Yes.

Q    And can you just show that to the jury so they can see what it looks like in its present form?

    **(Witness Complies)**

**BY MS. DeWITT:**

Q    And, Detective Black, can you now please take a look at what's been marked and previously admitted as Government's Exhibit 60.

    **(Pause)**

**BY MS. DeWITT:**

Q    Do you recognize that exhibit?

A    Yes, I do.

Q    And what is that exhibit?

A    It was also some of the torn papers that were retrieved on the day of the search warrant.

Q    And, again, that was also reassembled from the pieces of paper depicted in Government's Exhibit 354?

A    Yes.

Q    Can you now please take a look at photographs that have been marked for identification as Government's Exhibit 355, 356, and 357?

    **(Pause)**

//

//

**DRAFT COPY**

Black - Direct / By Ms. DeWitt          101

**BY MS. DeWITT:**

Q    Do you recognize what is depicted in those photographs,

Detective Black?

A    Yes, I do.

Q    And what is depicted in those three photographs?

A    They are photographs of the pieces of paper that were put

back together, the three items that we just looked at, that

prior to them being sent off for analysis.

         **MS. DeWITT:**  Okay.  At this time, your Honor, the

Government would move to admit Government's Exhibit 355, 356,

and 357, and request permission to publish.

         **THE COURT:**  Exhibits 355, 356, and 357 admitted this

date.

     **(Government's Exhibits Numbers 355, 356, and 357 were**

**received in evidence)**

         **MS. DeWITT:**  For the record, that's 355.

     **(Pause)**

         **MS. DeWITT:**  And, for the record, I am now showing

356 on the overhead.

     **(Pause)**

         **MS. DeWITT:**  And, for the record, I am now showing

Government's Exhibit 357.

**BY MS. DeWITT:**

Q    At this time, Detective Black, can you please take a look

at what's been marked for identification as Government's

**DRAFT COPY**

**(Witnesses steps down)**

The Government's next witness?

**MS. MEYER:**  Your Honor, at this time the Government calls FBI Special Agent Bryan Tepper.

**(Pause)**

**THE CLERK:**  Would you come up to the witness stand, please?  Please raise your right hand.

**(Witness Sworn)**

Would you please have a seat.  Would you state your name for the transcript, please?

**THE WITNESS:**  My name is Bryan Tepper.

**THE CLERK:**  Would you spell your first and last name?

**THE WITNESS:**  B-r-y-a-n, last name Tepper, T-e-p-p-e-r.

**THE CLERK:**  Thank you.

**MS. MEYER:**  Thank you, your Honor.

**DIRECT EXAMINATION**

BY MS. MEYER:

Q    Good afternoon, sir.

Where do you work?

A    I work for the Federal Bureau of Investigation.

Q    And how long have you worked for the FBI?

A    Approximately 18 years.

Q    Doing what kind of work?

A    I was a supervisor here in the Los Angeles office for the

**DRAFT COPY**

Tepper - Direct / By Ms. Meyer                167

FBI, and currently I am assigned to the U.S. Embassy in Ottawa

as an Assistant Legal Attache.

Q    So back in 2002, Agent Tepper, where were you assigned?

A    I was assigned to the main office here in Los Angeles and

I was a supervisor for the Computer Analysis Response Team know

as CART and the computer specialist.

Q    Did your responsibilities include any other types of

technical assistance?

A    We were -- the squads I supervised were in charge of,

basically, all computer operations of the office.  And at that

point in time we were installing a lot of different computer

systems, and we were in charge of -- as a Computer Analysis

Response Team we were in charge of the examination of digital

evidence of computers and things.

Q    Does this include examinations of phones?

A    Yes, it can.

Q    Agent Tepper, did you participate in a search of 17055 Oak

View on February 19th, 2002?

A    Yes, I did.

Q    Could you please take a look at Government's Exhibit 185,

which has already been admitted into evidence, if Agent Perez

would please place that exhibit before you.

        **MS. MEYER:**  And for the record, your Honor, this is a

cell phone that was recovered from Mr. Mikhel's residence on

February 19th, 2002.

**DRAFT COPY**

Tepper - Direct / By Ms. Meyer                    168

BY MS. MEYER:

Q    Agent Tepper, do you recognize that exhibit?

A    Yes, I do.

Q    What is it?

A    It's a Nokia cellular telephone.

Q    And how do you recognize it?

A    It's one of the phones that I was given to extract data off of.

Q    Agent Tepper, were you able to determine what telephone number was associated with that phone?

A    Yes.  The phone number associated with this telephone number was 310-993-6748.

Q    And, Agent Tepper, how were you able to determine that that's the phone number for that phone?

A    By powering the phone on I was able to go into some of the menu options, and it displayed the telephone number.

Q    Now if you could take a look, Agent Tepper, at Government's Exhibit 137.

        MS. MEYER:  Agent Perez, Government's Exhibits 136 and 137 are together, if you could place both of those exhibits before the witness.

BY MS. MEYER:

Q    And, Agent Tepper, if you could first look at Government's Exhibit 137, which has already been admitted into evidence.

        MS. MEYER:  And, your Honor, for the record, again,

**DRAFT COPY**

Tepper - Direct / By Ms. Meyer                    169

this is another cell phone that was seized from Mr. Mikhel's

residence on February 19th, 2002.

**BY MS. MEYER:**

Q    Agent Tepper, do you recognize that exhibit?

A    Yes, I do.

Q    What is it?

A    It's an Ericsson cellular telephone.  It's a Model CE0682.

Q    And how do you recognize it?

A    It's one of two I processed, and I actually placed a

rubber band around it to make sure we would not confuse it with

the other model, which is identical to it.

Q    And, Agent Tepper, were you able to determine what

telephone number is associated with that phone?

A    Yes.  This cellular telephone number was 818-731-4324.

Q    Agent Tepper, how were you able to determine the telephone

number for that phone?

A    This one we could not go into the menu.  I actually had to

make a call from this phone to another telephone that could

identify the Caller I.D., that displayed the Caller I.D., as we

called it.

Q    And where did you do t?

A    I was at the Verizon telephone company's headquarters when

we did that.

Q    Now, if you could please take a look at Government's

Exhibit 136, which I believe is contained in the same file,

**DRAFT COPY**

Tepper - Direct / By Ms. Meyer               170

which has also previously been admitted into evidence.

MS. MEYER:  And, your Honor, again, for the record, this phone was also seized at Mr. Mikhel's house on Oak View on February 19th, 2002.

BY MS. MEYER:

Q    Agent Tepper, do you recognize that exhibit?

A    Yes, I do.

Q    How do you recognize it?

A    It's one of the phones I processed, and it's got -- once again, you look at the phone and it's got specific serial numbers in the phone.

Q    And were you able to determine the phone number associated with that phone?

A    Yes.  This cellular telephone number was 310-908-9993.

Q    And how were you able to determine that phone number in this particular case?

A    This one we were able to bring the subject telephone number -- or this target telephone number actually up on the menu.

Q    Agent Tepper, is that phone, Exhibit 136, the same as Exhibit 137, same model, same type of phone?

A    It's the same.  Yes, it's the same model.

Q    Agent Tepper, with respect to this exhibit, what language was this phone operating in when you initially searched it?

A    The phone appeared to be in Cyrillic characters, and I

**DRAFT COPY**

Tepper - Direct / By Ms. Meyer                 171

assumed it was Russian.  So we couldn't -- I couldn't tell exactly what that was.

Q    Agent Tepper, could you now take a look at Government's Exhibit 138, which has previously been admitted into evidence.

MS. MEYER:  For the record, your Honor, this cell phone was also seized from Mr. Mikhel's Oak View residence on February 19th, 2002.

BY MS. MEYER:

Q    Agent Tepper, do you recognize that phone?

A    Yes, I do.

Q    How do you recognize it?

A    It's one of the phones also that I wound up processing.

Q    What kind of phone is that?

A    This is a Nokia.  It says it's a Pac Bell phone.

Q    Were you able to determine what phone number was associated with that phone?

A    The telephone number associated with this telephone was 818-268-9422.

Q    And again, in this case, how did you determine that phone number?

A    On this phone I also made an outgoing call to another telephone where we could see what the incoming number was, the Caller I.D. number.

Q    Agent Tepper, were you able to extract any call data from this phone?

**DRAFT COPY**