# GOVERNMENT EXHIBIT 21

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO:  CR-02-220(B)-DT |
| | ) | |
| Plaintiff, | ) | CRIMINAL |
| | ) | |
| vs. | ) | Los Angeles, California |
| | ) | |
| IOURI MIKHEL, | ) | Wednesday, September 6, 2006 |
| JURIJUS KADAMOVAS, | ) | (8:59 a.m. to 11:59 a.m.) |
| | ) | (1:31 p.m. to  4:38 p.m.) |
| Defendants. | ) | |

JURY TRIAL (15th DAY)
(Volume XV)

** PARTIAL TRANSCRIPT OF PROCEEDING **
(PORTION FROM 8:59 a.m. through 2:05 p.m. WAS OMITTED)

BEFORE THE HONORABLE DICKRAN TEVRIZIAN,
UNITED STATES DISTRICT JUDGE

EXCEPTIONAL REPORTING SERVICES, INC
14493 SOUTH PADRE ISLAND DRIVE
SUITE A-400
CORPUS CHRISTI, TX 78418-5940
361 949-2988

Tindall - Direct / By Mr. Dugdale                                    5

squad?

A     Approximately a year and a half.

Q     And prior to being a member of the counter terrorism squad, were you in a different squad?

A     Yes.  I was on the Eurasian squad, Eurasian organized crime.

Q     And how long were you on the Eurasian organized crime squad?

A     Approximately four years.

Q     And what did you do as a member of that squad?

A     I worked in investigations that involved kidnappings, extortions, money laundering, and such.

Q     In your capacity of the Eurasian organized crime squad, did you participate in an underwater search and recovery mission in March of 2002?

A     Yes, I did.

Q     And where did this recovery operation take place?

A     The New Melones Reservoir in Northern California which bordered the Tuolumne County and Calaveras counties.

Q     And what was the purpose of this recovery operation?

A     The purpose of that operation was to recover four bodies.

Q     And who were the four individuals that you were looking for?

A     Nick Kharabadze, George Safiev, Alex Umansky, and Rita Pekler.

Tindall - Direct / By Mr. Dugdale                          6

Q    And can you explain to the jury what role you played in this recovery operation?

A    I coordinated the diving efforts for the dive teams up there, for the local dive teams, and also for the FBI dive team, which came in from New York.

Q    And what period of time did this recovery operation span?

A    Approximately three weeks in March of '02.

Q    And can you give the jury a sense of the important events that occurred over this three week time period?

A    Yes.  Initially what we did is we identified the location in the reservoirs in which to conduct the operations, which was the area of New Melones Reservoir and then we dove under -- we dove at Lake Don Pedro.

There were two reservoirs there.  We dove first at Lake Don Pedro, and then at New Melones Reservoir.  And there were two bridges there that we dove underneath.

Q    Okay.  And did you ultimately locate any bodies as a result of this recovery effort?

A    Yes.  We located four bodies and assisted in identifying a fifth.

Q    And you testified that the first portion of this recovery operation was identifying the location to be searched.

Can you explain to the jury why you searched the location that you searched?

A    Yes.  Through the assistance of a cooperating witness,

Tindall - Direct / By Mr. Dugdale                    7

Ainar Altmanis, and through many debriefings, through drawings that we used with him, through maps, landmarks and discussions; we came to the conclusion that the area that he was describing and discussing was in that area which is around Yosemite. There were highways described and such.  And that's how we were able to determine that that was the area to look.

Q    And once you determined a general area that could have been the location where the bodies were located, what did you do then?

A    We then obtained temporary release of Ainar Altmanis, and we went to the area up there.  And we drove around with other special agents from that area and also Mr. Altmanis' attorney. We drove around different roads where we looked at landmarks, motels, businesses, highways, and also reservoirs that he had described in that area.

Q    And were there any bodies of water in the area that he described that you should be looking at?

A    Yes.  There were two bodies of water.  One was Lake Don Pedro, and the other was New Melones Reservoir.

Q    And were there any bridges from which bodies could be thrown that spanned either one of these reservoirs?

A    Yes.  We looked at three bridges.

Q    And what were the three bridges that you looked at?

A    The first bridge that we looked at was over Lake Don Pedro.  And it was the called the Jackson Stent (phonetic)

Tindall - Direct / By Mr. Dugdale                    8

Bridge.  The second bridge was the Stevenot Bridge.  And that was over New Melones.  And the third bridge was over New Melones Reservoir.  And that was called Parrot's Ferry.

Q    And which of the reservoirs did you search first?

A    The Jackson Stent Bridge over Lake Don Pedro.

Q    And did you find any bodies when you searched that area?

A    No.  We did not find any bodies underneath that bridge.

Q    And after you didn't find any bodies at that location, did you move on to another location?

A    Yes.  We moved over to the other reservoir, New Melones Reservoir.  And we began diving operations underneath the Stevenot Bridge.

Q    And was that one of the locations Mr. Altmanis identified as the location that you should search for the bodies?

A    Yes.  He had identified that bridge.

Q    And when did the search underneath the Stevenot Bridge take place?

A    The Stevenot Bridge started March 16th.

Q    And how many days did you search underneath that bridge?

A    Two days.

Q    And did you find any bodies underneath that bridge?

A    Yes.  We located two bodies under that bridge.

Q    Now prior to today, Special Agent Tindall, did you have an opportunity to review a digital video disc which is marked as Government's Exhibit Number 500?

Tindall - Direct / By Mr. Dugdale                     9

A      Yes, I did.

Q      And can you reach into the redwell folder there and pull out the folder that says Government's Exhibit Number 500 on it.

A      This one here, sir?

Q      Correct.

          **THE COURT:**  All right.   Exhibit 500 for identification before the witness.

          **THE WITNESS:**  Yes, sir.

**BY MR. DUGDALE:**

Q      Special Agent Tindall, do you recognize Exhibit Number 500

A      Yes, I do.

Q      And what is it?

A      This is a disc or a DVD that I have reviewed.

Q      And what is on that disc?

A      There are pictures and videos and video clips of the operation, a summary of basically the operation that we conducted in that area.

Q      And does that video disc accurately reflect both in video form and photograph form the search operation that you coordinated at the New Melones Reservoir?

A      Yes, it does.

Q      And prior to your appearance on the stand today, did you witness me put an identical disc as the one in your hand into the computer right here?

A      Yes.  I did witness that.

Tindall - Direct / By Mr. Dugdale                    10

Q    And does the disc in the computer here contain the same images on what you have in your hand?

A    Yes, it does.

        MR. DUGDALE:  Your Honor, at this time the Government would request permission to admit Government's Exhibit Number 500 and began playing it for the jury.

        THE COURT:  Any objection to Exhibit 500 being admitted?

        MR. CALLAHAN:  No.

        MR. DUGDALE:  Special Agent --

        THE COURT:  Iouri --

        MR. LASTING:  No objection, your Honor.

        THE COURT:  All right.  Exhibit 500 admitted this day.

    **(Government's Exhibit Number 500 was received in evidence)**

**BY MR. DUGDALE:**

Q    As we see here on the title here, it says recovery of four bodies from the New Melones Reservoir, March 17th through 19th. And you mentioned that you started on the 16th.

        Was there an effort to recover a body on that day?

A    Yes.  We conducted the operations, and we attempted to recover a body on the 16th.  But the device which we use to attach the body failed and broke.  So the body cast back down to the floor of the reservoir.  So we were unable to recover it, the body.

Tindall - Direct / By Mr. Dugdale                    11

Q    Okay.  So the actual bodies were recovered then on the 17th and the 19th; is that right?

A    Yes, sir.

Q    And before we discuss the search and recovery of these bodies, I want you to discuss a little bit about where the New Melones Reservoir is located.

THE COURT:  Wait, Mr. Dugdale.

MR. LASTING:  I hesitate to interrupt, but our monitor is not working.  I see other people have got things up on the screen.

THE COURT:  Did you turn it on?

MR. LASTING:  Maybe that's the problem.  It's on.

THE COURT:  It's on now?

MR. LASTING:  No.

THE COURT:  It's still not working?

Well, there's nothing I can do right now.  I have to call for our person.  Let me just check it one second.

(Pause)

THE COURT:  I'll have to call the technical staff.

MR. LASTING:  Thank you.

THE COURT:  You may proceed.

MR. DUGDALE:  Thank you, your Honor.

BY MR. DUGDALE:

Q    As we were discussing, Special Agent Tindall, the first thing we would like to discuss is the location of the New

Tindall - Direct / By Mr. Dugdale                    16

Q    And can you please take a look at Government's Exhibit Number 503A and 503B, which have been marked for identification?

A    Yes.

Q    Do you recognize those photographs?

A    Yes, I do.

Q    And what is depicted in those photographs?

A    This is aerial photos of the Parrot's Ferry Bridge.

         **MR. DUGDALE:**  Your Honor, the Government would move for the admission of Government's Exhibits Number 503A and 503B and request permission to publish them to the jury.

         **THE COURT:**  503A and B admitted this date.

         **(Government's Exhibits Numbers 503-A and 503-B were received in evidence)**

**BY MR. DUGDALE:**

Q    Special Agent Tindall, what is Exhibit 503A?

A    503A is an aerial photograph of Parrot's Ferry Bridge which spans the New Melones Reservoir.

Q    And is 503B a similar shot from a different angle?

A    Yes, it is.

Q    And how many bodies were located at this bridge?

A    There were two bodies located.

Q    And prior to today, did you have an opportunity to review a short video segment of this bridge as well that is contained on the Government's Exhibit Number 500?

Degen - Direct / By Ms. DeWitt                    69

MR. CALLAHAN:  About Mr. Tindall's testimony.

THE COURT:  Please raise your right hand.

(Witness sworn)

THE CLERK:  Please state your name for the record.

THE WITNESS:  Dominick Degen.

THE CLERK:   Would you spell your last name please.

THE WITNESS:  Degen, D-e-g-e-n.

THE COURT:  One more time.

THE WITNESS:  Degen, D-e-g-e-n.

THE COURT:  Okay.  You're going to have to speak up loud.

THE WITNESS:  Okay.

THE COURT:  Move the microphone towards you so that we can hear you.

THE WITNESS:  Okay.

THE COURT:  All right.  You may examine Mr. Degen.

DIRECT EXAMINATION

BY MS. DeWITT:

Q    Where do you live Mr. Degen?

A    Angels Camp, California.

Q    Where is Angels Camp, California, relative to Los Angeles?

A    It would be north.

Q    And just to use a landmark that might be more familiar to people, is that in the general vicinity of Yosemite?

A    Yes, it is.

EXCEPTIONAL REPORTING SERVICES, INC

Degen - Direct / By Ms. DeWitt                                    70

Q    How long have you lived in the Angels Camp area?

A    Twenty-three years.

Q    Would do you do for a living?

A    I'm a mechanic.

Q    Are you familiar with the New Melones Reservoir?

A    Yes, I am.

Q    Do you live near the New Melones Reservoir?

A    Yes, I do.

Q    Approximately how far away?

A    Two to three miles.

Q    Do you spend time at the New Melones Reservoir?

A    Yes, I do.

Q    What kind of things do you do at the reservoir, Mr. Degen?

A    Oh, we boat, fish, ski.

Q    How long have you been doing these types of activities at the New Melones Reservoir?

A    Almost all my life.

Q    So would you consider yourself to be pretty familiar with the reservoir?

A    Yes, I am.

Q    In particular you're familiar with the layout of the lake and the wind patterns on the lake?

A    Yes.

Q    Are you also familiar with the bridges that span the New Melones Reservoir?

Degen - Direct / By Ms. DeWitt                              71

A      Yes, I am.

Q     In particular are you familiar with the Parrot's Ferry Bridge?

A      Yes, I am.

Q     How is it that you first became familiar with the Parrot's Ferry Bridge, Mr. Degen?

A      I watched them build it from the ground up.  I drove over it hundreds of times, been underneath it with my boat several times.

Q     Okay.  And Mr. Degen, can you move the microphone just a little bit closer to you so that the jurors can all hear what you're saying.  Thank you very much.

A      Okay.

Q     Sir, I'd like to direct your attention to the time of mid October of 2001.  Did something unusual happen to you at that time when you were out on the reservoir?

A      Yes, it did.

Q     What happened to you at that time?

A      I found a dead body.

Q     Where did you find a dead body?

A      About a quarter mile up the lake from the bridge.

Q     What time of day was this when you found the body?

A      It was in the afternoon, probably 5:00 to 5:30.

Q     What were you doing when you found this body in the New Melones Reservoir?

Degen - Direct / By Ms. DeWitt                                    72

A     We were returning from a fishing trip.

Q     Okay.  When you say we, who do you mean?

A     Me, my father, and my son.

Q     How old was your son at the time?

A     Five years old.

Q     Can you describe in more detail for the jury where you found this body in the reservoir?

A     Oh, he was real close to the shore.  Actually, he was lodged onto the shore just about a quarter mile up from the bridge.

Q     And when you say a quarter mile up from the bridge, do you mean the Parrot's Ferry Bridge?

A     Yes.

Q     Where was the body relative to the Parrot's Ferry Bridge?

A     It'd be east.

Q     Now you described the body as being close to shore.  Can you describe exactly how far away from the shore it was?

A     He was on the shore.  I mean his shoulder was touching the shore.

Q     And how deep was the water there?

A     Well, right where he was at, it wasn't but -- the water is maybe three to four feet deep.

Q     and I think you mentioned that the body was lodged on something?

A     Yes, it was.  On the shore.

Degen - Direct / By Ms. DeWitt                                73

Q    okay.  Can you explain what it was lodged on?

A    Just on the bank.  It had blown up and his shoulder was lodged onto the shore.

Q    Like on a rock?

A    Well, it'd be on the ground.  Yeah.

Q    On the ground.  Now, can you describe exactly for the jury what you saw when you found this body floating in the New Melones Reservoir?

A    I saw what appeared to be a man with a bag taped up over his head and his hands were zip tied.

Q    What did you do when you saw this body floating in the New Melones Reservoir?

A    Well, I backed away from there with the boat real quick because I didn't want to traumatize my son anymore than what I had to.  And I didn't know what to do; so we backed out.  And I discussed it with my father.  And we said it didn't look like he was going to go anywhere; so we didn't want to go in and tie it up or anything so it wouldn't float away with my son in the boat.  So from there we left and went back to my pickup where my cell phone was to call 911.

Q    Did you in fact call 911 when you got back?

A    Yes, I did.

Q    And what did you tell 911 when you called them?

A    I told 911 exactly what I had found and where it was at. And they asked me which side of the lake it was on and.  I said

EXCEPTIONAL REPORTING SERVICES, INC

Emery - Direct / By Ms. Meyer                          84

A     Yes, I have.

Q     About how many?

A     Seventy-four.

Q     Would that be since 1986?

A     Yes.

Q     For what agencies?

A     Both Tuolumne County and Calaveras County.

Q     Have you testified in court before on forensic odontology?

A     Yes, I have.

Q     Have you been designated as an expert before?

A     Yes.

Q     Dr. Emery, turning to this case, did you perform identifications for the Tuolumne County Coroner's Office as well as the Calaveras County DA's Office?

A     Yes, I did.

Q     How many identifications did you perform in relation to this case?

A     Five.

Q     How were those bodies labeled or those jaws labeled when you made those identifications?

A     They were labeled with John Doe 1, 2, and 3, Jane Doe 1, and John Doe.

Q     So there's both a John Doe and a John Doe 1?

A     That's correct.

Q     Let's take John Doe Number 1 first.  What items did you

Emery - Direct / By Ms. Meyer                    85

receive for purposes of making a comparison or identification for John Doe 1?

A    I received the upper and the lower jaws.

Q    From?

A    I went to Terzich & Wilson Funeral Home at the direction of the Tuolumne County Sheriff Coroner and I picked up the jaws from the funeral home.

Q    When did you do that?

A    March 20 --

Q    What year?

A    -- 2002.

Q    My apologies for interrupting.

         Could you please tell the jury where the Terzich & Wilson Funeral Home is located?

A    In Sonora, California.

Q    And when you got to the funeral home, how were the jaws of John Doe Number 1 marked?

A    They were in a bag and they were labeled with John Doe 1 on the bag and it was on or in the body bag of John Doe 1.

Q    How did you end up getting called to the funeral home?

A    The Tuolumne County Coroner's Office called me.

Q    What did you do after you received the jaws of John Doe 1?

A    I took them to my office, my dental office, and I did an exam, a visual exam, and I also took X-rays.

Q    Take a look at what's been marked for identification as

Emery - Direct / By Ms. Meyer                    86

Government's Exhibit 1441.  Dr. Emery, to your left are a series of redweld file folders in numerical order.  You will just have to go through them until you find Exhibit 1441.  I do not believe it's in that first redweld.

THE COURT:  You should have these all laid out for him.

What is it?

MS. MEYER:  Government's Exhibit 1441, your Honor.

(Pause, Court assists witness)

THE COURT:  What other ones are you going to use?

MS. MEYER:  1441, 1377.

THE COURT:  Go ahead, I'll look for them.

MS. MEYER:  I'm sorry, your Honor.

BY MS. MEYER:

Q    Dr. Emery, taking a look at what's been marked for identification as Government's Exhibit 1441, do you have that exhibit in front of you?

A    1441, yes.

Q    Do you recognize that exhibit?

A    Yes, I do.

Q    What is it?

A    This is a copy of the postmortem X-rays that I took --

Q    For?

A    -- of John Doe 1.

Q    How do you recognize it?

EXCEPTIONAL REPORTING SERVICES, INC

Emery - Direct / By Ms. Meyer                    87

A    I recognize it by my handwriting on the label.  I recognize it by the teeth that are present here and that, you know, that I made the copies.  I routinely do that for the postmortem X-rays.

MS. MEYER:  Your Honor, at this time the Government would move Government's Exhibit 1441 into evidence.

THE COURT:  Any objection?

MR. CALLAHAN:  No, sir.

THE COURT:  All right.  Received, 1441.

**(Government's Exhibit Number 1441 was received in evidence)**

**BY MS. MEYER:**

Q    Dr. Emery, when you looked at those X-rays, you said you conducted a visual examination.  Did you chart or make notes as you're doing your examination?

A    Yes, I do.  I --

Q    Can you --

A    I'm sorry.

Q    Go ahead.

A    I visually look at the jaws and I chart on a dental chart, similar that I would on a patient, the existing dental work and the missing teeth, and any, you know, unusual characteristics.

Q    Dr. Emery, what does postmortem mean?

A    Postmortem is after death.

Q    Did you receive any antemortem dental records in relation

Emery - Direct / By Ms. Meyer                    88

to this case?

A     Yes, I did.

Q     From whom?

A     From the Tuolumne County Coroner's Office, I believe.

Q     Could you take a look at what's been admitted as Government's Exhibit 1377?

        **(Pause, Court assists witness)**

            **MS. MEYER:**  Thank you, your Honor.

**BY MS. MEYER:**

Q     Dr. Emery, do you recognize that exhibit, 1377?

A     Yes, I do.

Q     What is it?

A     These are the antemortem X-rays -- the copy of the antemortem X-rays of Nick Karabadze.

Q     Dr. Emery, what does antemortem mean?

A     Antemortem means before death.

Q     So once you have the postmortem X-rays and a set of antemortem X-rays, what do you do?

A     Oh, I compare the dental work between the two.  I compare whether they have missing teeth.  I just make a comparison between the two sets of X-rays.

Q     And when you're doing a comparison of the dental work, do you identify what type of dental work you're looking at?

A     I'm sorry, can you repeat the question?

Q     When you look at -- when you're doing your comparison of

Emery - Direct / By Ms. Meyer                    89

the dental work, do you identify what type of dental work you're looking at?

A     Yes, I do.

Q     Can you explain that to the jury?

A     Well I will just go through and if the fillings are the same size and shape, then I will mark that as consistent.  And I just look at, you know, the similarities and possible dissimilarities between the two.

Q     Is there anything about the nature of dental work that makes it -- or that aids you in making your comparison?

A     I'm sorry, I didn't hear the question.

Q     Is there anything about the nature of dental work that aids you in making your comparison?

A     Yeah, it's very unique.  Each piece of dental work, the filling for example, is unique in it's own size and shape.

Q     So in this case did you make a comparison of the postmortem X-rays for John Doe 1 and the antemortem X-rays for Nick Karabadze?

A     Yes, I did.

Q     At this time I'd like to show you what's been marked for identification as Government's Exhibit 1433.  Could you please pull that folder out?

        **(Pause, witness complies)**

            **THE COURT:**  You should put all those exhibits back in the proper folder.

Emery - Direct / By Ms. Meyer                              90

THE WITNESS:  1433.

BY MS. MEYER:

Q    Do you recognize that exhibit?

A    Yes, I do.

Q    What is it?  All five pages, I believe.

A    All five pages are copies of my summary of dental findings on my report.

Q    For what victims?

A    The first page is Nick Karabadze.

Q    Can you please identify what all five pages refer to? Just John Doe --

A    I'm sorry.

Q    -- usable for their references.

A    Each page -- do you want me to give the names?

Q    Just John Doe 1.

A    Yeah, there's John Doe 1, John Doe 2, John Doe 3, Jane Doe 1, and John Doe.

Q    Dr. Emery, would this exhibit aid the jury in understanding your testimony?

A    Yes, it would.

MS. MEYER:  Your Honor, may I publish this demonstrative exhibit for the jury?

THE COURT:  1433?

MS. MEYER:  Yes.

THE COURT:  Any objection?

EXCEPTIONAL REPORTING SERVICES, INC

MR. CALLAHAN:  No, sir.

THE COURT:  Okay, you can publish it.  Are you offering it in evidence or not?

MS. MEYER:  No, your Honor.

THE COURT:  All right.  Summary evidence only?

MS. MEYER:  Yes, your Honor.

THE COURT:  All right.  1433 not admitted but may be used for illustrative purposes.

**(Government's Exhibit Number 1433 published for demonstrative purposes only)**

BY MS. MEYER:

Q    Take a look at the first page of Exhibit 1433, Dr. Emery.

MS. MEYER:  Your Honor, we believe you may have to push a button on your panel at your --

THE COURT:  Is this on your computer?

MS. MEYER:  Yes, your Honor.

Thank you, your Honor.

BY MS. MEYER:

Q    Dr. Emery, looking at the first page of Exhibit 1433, could you tell the jury about the process of comparing X-rays -- or comparing teeth?

A    I just go through and I mark down the unique fillings or dental work on the antemortem and then I compare it with the postmortem X-rays.  And then I label them either identical, consistent, or inconsistent.

Emery - Direct / By Ms. Meyer                    92

Q    Let's go --

A    Um --

Q    I'm sorry, go ahead.

A    So for example a unique piece of dental work in John Doe 1 would be Tooth Number 9, it has an implant with a crown on it.

Q    And, Dr. Emery, looking at this summary, you have a column for antemortem to the left, correct?

A    Yes.

Q    And then you have a column for postmortem findings to the right, correct?

A    Correct.

Q    So taking a look at Tooth Number 9, could you describe that in a little more detail regarding your comparison of John Doe 1 and Nick Karabadze?

A    Well Tooth Number 9, the implant obviously was placed there to replace a missing tooth.  And I found the same implant on the postmortem X-rays of John Doe 1.

Q    So you labeled that as consistent?

A    Yes, I did.

Q    And with respect to the other dental work identified on the teeth on the summary chart, those were -- also found those to be consistent?

A    Yes.

Q    Take a look at what's been marked for identification Government's Exhibit 1445.

Emery - Direct / By Ms. Meyer                    93

     (Pause, Court assists witness)

          MS. DeWITT:  Excuse me, your Honor.  May I approach?

Maybe I can assist.

BY MS. MEYER:

Q    Do you have Exhibit --

A    1445?

Q    Yes.  That's right.  Do you recognize that exhibit?

A    Yes, I do.

Q    What is it?

A    This is a copy of -- on the upper portion it's a copy of

the antemortem X-rays of Nick Karabadze.  On the bottom half

it's a copy of the postmortem X-rays for John Doe 1.

Q    Would this chart aid the jury in understanding your

testimony?

A    Yes.

          MS. MEYER:  Your Honor, may I publish that

demonstrative exhibit for the jury?

          THE COURT:  All right.  This is 1445?

          MS. MEYER:  Yes, your Honor.

          THE COURT:  Any objection?

          MR. CALLAHAN:  No, sir.

          THE COURT:  All right, for demonstrative purposes

only.

          MS. MEYER:  Thank you, your Honor.

     (Government's Exhibit Number 1445 published for

Emery - Direct / By Ms. Meyer                          94

**demonstrative purposes only)**

**BY MS. MEYER:**

Q    Dr. Emery, could you please describe what is depicted on this in terms of the close-up?

A    Okay, on the close-up the X-ray at the top, that would be the antemortem X-rays -- or X-ray.  Below that is the postmortem X-ray that I took.  So you can pretty much clearly see that, you know, it's the same.

Q    So based on that comparison you made of Nick Karabadze's antemortem X-rays and John Doe 1's postmortem X-rays what did you conclude?

A    Well I concluded that John Doe 1 was Nick Karabadze.

Q    Looking back at the first page of Exhibit 1433.  Keep that one handy.

A    Yes.

Q    In the far right column it lists all your conclusions as consistent.  Can you please tell the jury what various classifications are used in forensic odontology?

A    We use consistent, identical, and inconsistent.

Q    And looking back to Exhibit 1445 and that implant, you labeled that as consistent rather than identical.  Could you describe your reasoning for when each classification is used?

A    When I reach a conclusion of identical it's -- I'm very conservative, but it's based on if I have two X-rays and that I can overlay them and look at it and the outline is exact.  In

Emery - Direct / By Ms. Meyer                              95

this case it was -- they were digital X-rays, which means they were placed on a computer, and the only way to obtain a copy of that is through the -- you know, through paper, and so I'm not able to overlay the X-rays.  So they were all labeled -- you know, I concluded they were all consistent, but not necessarily identical.

Q    Dr. Emery, you said they were all digital.  Are you talking about Nick Karabadze's antemortem X-rays?

A    Yes.

Q    Dr. Emery, if you find an inconsistency, what does that mean?

A    That means that the body doesn't belong to the person who, you know, has the antemortem X-rays.

Q    So just one inconsistency and there's no positive ID?

A    That's correct.

Q    Dr. Emery, did you go through the same process of comparison with John Doe 2?

A    Yes, I did.

Q    Could you describe that process for the jury?

A    Again, I went to Terzich & Wilson Funeral Home, picked up the upper and lower jaws and took them to my office, did a visual exam, and did X-rays, took X-rays.

Q    Did you pick up these jaws again on the same day, March 20 of 2002?

A    Yes, I did.

Emery - Direct / By Ms. Meyer                                96

Q    And who called you to come pick up those jaws?

A    The Tuolumne County Sheriff Coroner.

Q    And after you received those jaws, what did you with them?

A    Well I took them to my office and I did a visual exam and took some X-rays on them.

Q    Take a look at what's been marked for identification as Government's Exhibit 1442.

        THE COURT:  All right, for identification, 1442.

    (Pause, Court assists witness)

        THE WITNESS:  Yes.

BY MS. MEYER:

Q    Do you recognize that exhibit?

A    Yes, I do.

Q    What is it?

A    These are the postmortem X-rays on John Doe 2.

Q    How do you recognize them?

A    My handwriting is on the label and also I recognize the teeth when I've done -- I routinely do copies of the postmortem X-rays in my office.

        MS. MEYER:  Your Honor, the Government moves Government's Exhibit 1442 into evidence.

        THE COURT:  Any objection.

        MR. CALLAHAN:  No, sir.

        THE COURT:  1442 received this date.

    (Government's Exhibit Number 1442 was received in

EXCEPTIONAL REPORTING SERVICES, INC

Emery - Direct / By Ms. Meyer                                97

evidence)

BY MS. MEYER:

Q    Dr. Emery, could you also look at Government's Exhibit 1378, which has been previously admitted into evidence?

      **(Pause, witness complies)**

A    1378.

Q    Do you recognize that exhibit, Dr. Emery?

A    Yes, I do.

Q    What is it?

A    These are X-rays of George Safiev dated 09/01, so they would be antemortem.

Q    Did you compare the postmortem X-rays of John Doe 2 with the antemortem X-rays of Georgios Safiev?

A    Yes, I did.

Q    Again, Dr. Emery, could you take a look now at the second page of Government's Exhibit 1433.

      **(Pause, witness complies)**

A    Okay.

Q    Do you have the second page in front of you?

A    I do.

Q    Using that summary of dental findings, could you please tell the jury about the process of comparing the X-rays for John Doe 2 and Georgios Safiev?

A    Again I compared the antemortem with the postmortem dental work.  And for example on Tooth Number 12 to 13, Tooth Number

13 is missing and it's replaced with a ponic which is attached to a bridge, which is part of the process of restoration to replace a tooth.  However, in this case it's -- we call it a cantilever, it's only two pieces, which is a fairly unique bridge.  Normally there's three pieces.  And I found that consistent between the antemortem and the postmortem X-rays.

Q    Dr. Emery, based on your summary or your analysis of this comparison, did you find any comparisons that were inconsistent?

A    No, I did not.

Q    So based on your evaluation and examination what did you conclude?

A    I concluded that John Doe 2 was Georgios Safiev.

Q    Dr. Emery, did you go through the same process with John Doe 3?

A    Yes, I did.

Q    Could you describe that process for the jury?

A    I went to Terzich & Wilson Funeral Home on March 20 and --

Q    2002?

A    -- 2002 and I removed the upper and lower jaws from John Doe 3, the body of John Doe 3.

Q    What did you do with them after you removed them?

A    I took them to my office and I did a visual exam and took X-rays of the jaws.

Q    Dr. Emery, please take a look at what's been marked for

identification as Government's Exhibit 1443.

**(Pause, witness complies)**

Do you recognize that exhibit, Dr. Emery?

A     Yes, I do.

Q     What is it?

A     These are the postmortem X-rays of John Doe 3.

Q     How do you recognize them?

A     I recognize them by my label, my handwriting, and also the fact that I made copies of these X-rays.

**MS. MEYER:**  Your Honor, the Government moves Government's Exhibit 1443 into evidence.

**THE COURT:**  Any objection?

**MR. CALLAHAN:**  No, sir.

**THE COURT:**  1443 received this date.

**(Government's Exhibit Number 1443 was received in evidence)**

**BY MS. MEYER:**

Q     Dr. Emery, could you please take a look at Government's Exhibit 1291, which has already been admitted into evidence.

**(Pause, witness complies)**

Do you recognize that exhibit?

A     Yes, I do.

Q     Can you please tell the jury what that is?

A     This is an X-ray, and antemortem X-ray, of Alex Umansky dated 12/20/99.

Emery - Direct / By Ms. Meyer                    100

Q    Did you compare the postmortem X-rays of John Doe 3 with the antemortem X-ray for Alexander Umansky?

A    Yes, I did.

Q    Dr. Emery, again going back to Government's Exhibit 1433, and this time the third page.

       **(Pause, witness complies)**

       Using that chart, could you please describe the process of comparing the antemortem X-ray with your postmortem X-rays?

A    I just again went through the dental work involved with the antemortem and the postmortem X-rays.  And in this case I did find Tooth Number 18 to be identical, the filling in that tooth to be identical.  And occlusal amalgam means a filling, a silver filling, on the surface of the tooth, on the top part of the tooth.

Q    So that means you overlaid the X-rays of the antemortem with the postmortem X-rays and they were identical in outline?

A    Yes, they were.

Q    Did you find any comparisons that were inconsistent?

A    No.

Q    So based on the comparison and the similarities you've noted in your summary what did you conclude?

A    I concluded that John Doe 3 was Alex Umansky.

Q    Dr. Emery, did you go through the same process with Jane Doe 1?

Emery - Direct / By Ms. Meyer                                101

A      Yes, I did.

Q      Again just briefly describe that process for the jury?

A      Again I went to Terzich & Wilson Funeral Home and I removed the upper and the lower jaws and then I took them to my office and performed a visual exam, charting as I did that, and also took X-rays.

Q      And again this was on March 20 of 2002?

A      Yes.

Q      Take a look, Dr. Emery, at what's been marked for identification as Government's Exhibit 1444.

       THE COURT:  1444 for identification.

       **(Pause, witness complies)**

**BY MS. MEYER:**

Q      Do you recognize that exhibit, Dr. Emery?

A      Yes, I do.

Q      What is it?

A      These are a copy of the postmortem X-rays that I took on 3/20/02 of Rita Peckler -- Jane Doe 1, sorry.  Excuse me.

Q      How do you recognize them?

A      I recognize them because of my handwriting on the label and also I recognize the films and I made a copy of them.

       **MS. MEYER:**  Your Honor, the Government moves Government's Exhibit 1444 into evidence.

       **THE COURT:**  Any objection?

       **MR. CALLAHAN:**  No, sir.

Emery - Direct / By Ms. Meyer                              102

THE COURT:  Received, 1444.

(Government's Exhibit Number 1444 was received in evidence)

BY MS. MEYER:

Q    Dr. Emery, could you please take a look at Government's Exhibit 1275, which has already been admitted into evidence?

(Pause, witness complies)

A    Okay.

Q    Dr. Emery, do you recognize that exhibit?

A    Yes, I do.

Q    What is it?

A    These are the antemortem X-rays of Rita Peckler.

Q    Did you compare the postmortem X-rays of Jane Doe 1 with the antemortem X-rays for Rita Peckler?

A    Yes, I did.

Q    Going back again to Government's Exhibit 1433, this time the fourth page of that exhibit, Dr. Emery.

(Pause, witness complies)

A    Yes.

Q    Using that summary could you describe your process of comparison for the jury?

A    I did the same thing.  I compared the antemortem X-rays with the postmortem X-rays and I noted the consistencies between the dental work.  And in her case there were actually three fillings that I was able to overlap the antemortem and

Emery - Direct / By Ms. Meyer                                   103

the postmortem X-rays and the outline was identical, of the filling.

Q   Dr. Emery, did you find any comparisons that were inconsistent?

A   No.

Q   So based on the comparisons you made and the similarities you noted, what did you conclude?

A   I concluded that Jane Doe 1 was that of Rita Peckler.

Q   Dr. Emery, did you go through the same process with John Doe?

A   Yes, I did.

Q   How did you obtain the jaws for John Doe?

A   For John Doe I went to San Andreas, California and I removed the upper and lower jaws.

Q   Do you recall when this was?

A   That was November 17, 2001.

Q   So several months before these other identifications?

A   Yes.

Q   Who called you to make that -- to come and take those jaws, do you recall?

A   I believe it was the Calaveras County DA's Office.

Q   Dr. Emery, take a look at what's been marked for identification as Government's Exhibit 1440.

        THE COURT:  1440, identification.

        **(Pause, witness complies)**

**EXCEPTIONAL REPORTING SERVICES, INC**