# GOVERNMENT EXHIBIT 25

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

# DRAFT COPY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO:  CR-02-220(B)-DT |
| | ) | |
| Plaintiff, | ) | CRIMINAL |
| | ) | |
| vs. | ) | Los Angeles, California |
| | ) | |
| IOURI MIKHEL, | ) | Wednesday, November 29, 2006 |
| JURIJUS KADAMOVAS, | ) | (9:48 a.m. to 11:54 a.m.) |
| | ) | (1:33 p.m. to  4:12 p.m.) |
| Defendants. | ) | |

JURY TRIAL (45th DAY)
(VOLUME XLV)

BEFORE THE HONORABLE DICKRAN TEVRIZIAN,
UNITED STATES DISTRICT JUDGE

EXCEPTIONAL REPORTING SERVICES, INC
14493 SOUTH PADRE ISLAND DRIVE
SUITE A-400
CORPUS CHRISTI, TX 78418-5940
361 949-2988

Craig - Direct / By Ms. DeWitt                143

Iouri Mikhel's residence.

A    Yes, I do recognize Government's Exhibit 104.  Again, I recognize it as an item that we tested, a pair of handcuffs.  I recognize it because it has a unique laboratory identifier relevant to this submission of evidence.  It has my examiner symbols present on it.  It also has the unique item identifier given by the FBI, the Q52.  And, again, it does have my biologist initials present on the item.

Q    So, again, this is one of the items that you tested for DNA?

A    Yes.

Q    And is the results of that particular item what's showing up on the screen here, Government's Exhibit -- which indicates it's Exhibit 104?

A    Yes, it is.

Q    And that's a part of -- I've now blown up a part, for the record, of Government's Exhibit 1400-A for the Jury to see more clearly.

        Was the DNA sample taken off of these handcuffs in the similar manner as you described for the previous pair of handcuffs?

A    Yes, they were.

Q    And the next item listed here is blood from George Safiev, and it's indicated as being Government's Exhibit 1505 in paragraph eight.  Is that also an item that was admitted

**DRAFT COPY**

Craig - Direct / By Ms. DeWitt                144

pursuant to the stipulation?

A    Yes, it was.

Q    And after you -- did you obtain typing results from both of these items?

A    Yes, I did.

Q    And is that what's reflected on the screen?

A    Yes.

Q    And after you tested these items, did you compare the results of the DNA testing?

A    Yes, I did.

Q    And what conclusion did you reach?

A    I determined that there was a match between the DNA typing results obtained from the Q52 handcuff sample.  Again, it was a mixture of DNA present, more than one person's DNA was present. But there was a major contributor.  One person's DNA profile stood out above the others.  And the DNA typing results from the major contributor off of those handcuffs, Q52, did match the DNA typing result obtained from the blood sample K12 from George Safiev.

Q    George Safiev?

A    Yes.

Q    Ms. Craig, now you testified that there was a match of the DNA from the blood from George Safiev and the DNA taken from the handcuffs seized at Iouri Mikhel's residence.  What was the statistical significance of that match?

**DRAFT COPY**

Craig - Cross / By Ms. Chahin          178

THE COURT:  Ms. Chahin.

MS. CHAHIN:  Yes, your Honor.

THE COURT:  Will you be using any of the -- the ELMO or the computer?

MS. CHAHIN:  Your Honor, I may be asking the government to assist you with one of the charts.

THE COURT:  Well I'll keep the light off then.

MS. CHAHIN:  Thank you.

**CROSS EXAMINATION**

**BY MS. CHAHIN:**

Q    Ms. Craig, you've described the presumptive phenophelen test and Mr. Callahan asked you a few questions about it as well.  I had a couple of more questions.  In regard to the phenophelen test, you described that perhaps rust could give you a positive result; is that correct?

A    There has been some documentation in the literature that suggest that rust could give a false-positive result.

Q    And I think you've also described horseradish?

A    Yes.

Q    Now, specifically, with regard to the phenophalen test are you aware of any chemicals that can give a positive result with regards to the phenophalen test?

A    As far as chemicals I've heard that perhaps some oxidizing agents could perhaps give a result.  However, in my experience with that I've not seen a -- a pink color develop from that

**DRAFT COPY**

Craig - Cross / By Ms. Chahin                179

type of reaction.

Q    And when you're referring to oxidizing agents what types of chemicals are you referring to?

A    Bleach or some other type of Oxi-Clean or something like that, some of the oxidizing agents that are present in some of the cleaners.

Q    Now you've said that in your experience you have seen a result other than a pink result; is that right?

A    That's right.  It is possible that when you do that test if some sort of oxidizing agent is present you would possible see a different, a slightly different color change.  It wouldn't be pink.  I've seen orangish-type colors.  And if that happens then that's given an inconclusive result.

Q    And have you read any of the literature as to whether or not those types of chemicals could give a pink result?

A    I haven't seen that that could -- anywhere in the literature that says it could give a pink result.

Q    Now when you describe that you may get a result that's slightly different what do you mean by that?

A    Again, I could detect a color change from something that's colorless to a color.  But again, I've seen orangish or even greenish tints to the swab and not a pink.

Q    Okay.  And that would depend upon the subjective observations of the person conducting the test as to what color the results were; is that correct?

**DRAFT COPY**

Craig - Cross / By Ms. Chahin                    180

A     I'm not sure.  I mean, pink is pink, but maybe some people see more pink or less pink.

Q     Now you've described this test, the phenol test although it's presumptive for blood -- let me withdraw the question --

          The test you've described as very sensitive, correct?

A     It is a very sensitive test, yes.

Q     So if you were to use the test and if blood were present it would be detected?

A     Yes, within a certain limit.  I mean it a very sensitive test, at least in our laboratory.  We have done studies that have shown that blood diluted one to 100,000-fold would still give a positive result.  If blood is possibly more diluted than that then that would be below our detection limit and we wouldn't be able to detect it.

Q     So but you said that it could be diluted to the one to 100,000 and it would still be detected?

A     That's what we have seen in our validation studies of that, that blood that was diluted one to one in 100,000-fold was detectable.

Q     Okay.  You've also described another test called I believe the Takayama Test?

A     That's correct.

Q     And that is not a presumptive test?

A     That's right.  That's a confirmatory test.

Q     So when you get a positive result on a Takayama Test that

**DRAFT COPY**

Craig - Cross / By Ms. Chahin                    181

means that there is, in fact, blood present?

A    That's right.  That's when I can say absolutely that that stain is blood.

Q    And is that test conclusive for human blood as opposed to some sort of other type of blood?

A    No.  The Takayama Test is not conclusive for human blood; it's conclusive for blood.  The DNA testing that we do, looking at those STR locations, that is specific for humans or higher primates, so that's how we know that we have human DNA not from our presumptive or our confirmatory test for blood.

Q    Now in your direct examination you've described some of the quality assurance checks that you have with the FBI; could you explain to us one more time what those quality control checks are that you have in place?

A    Certainly.  We -- well for one thing we have to follow the quality assurance standards which were issued by the FBI laboratory director.  And in fact, all forensic DNA testing laboratories that receive federal funding or participate in the national DNA indexing system must be in compliance with those standards.  And when I was speaking earlier to being audited that's what we're audited to are those standards.

Those standards speak to having a documented step-by-step procedure that's followed for all of our testing procedures, you know, documentation for how evidence is stored, for how reports -- the content of reports for the

**DRAFT COPY**

Craig - Cross / By Ms. Chahin                182

qualifications of biologists and examiners and a number of

other things that are included as part of those standards.

Q    So would it be fair to say that great steps are taken to

ensure the accuracy of the results that are obtained?

A    Yes.

Q    And that in fact I think you said the auditors who come

into perform are not connected with the FBI?

A    That's right.  They are not hired -- they're not employees

of the FBI; they are experts in other laboratories that do DNA

testing.

Q    So in fact there are scientific controls to make sure that

the tests performed are accurate, correct?

A    Yes.  There are controls that are run with all the

procedures that we use.

Q    And those are similar to the controls that you described

when you were talking about the Profiler and the Cofiler Test;

is that correct?

A    Well those aren't actually controls.  That's an internal

control, perhaps, that the manufacturer has where they have a

repetition of two STR loci between the two different kits and

that's to make sure that of course that they -- the typing

result on one kit on that one sample if you use the other kit

you should certainly get the same typing results using the

other kit at those two STR locations.

Q    Okay.  And one of the reasons that you used both of those

**DRAFT COPY**

Craig - Cross / By Ms. Chahin                183

kits is as an internal check for yourselves so that you can make sure that both tests show the same result and the same location; is that correct?

A    I wouldn't agree that that's why we use the second kit. We use the second kit because it's going to get us answers to different test areas than what we've already tested so that we have additional locations.  It's coincidence for us anyway that there's two loci that are -- that are overlapping between the two kits.

Q    But is -- when you use the second kit do you use that as an internal check-yourself to see if there is a match in the same location?

A    We certainly make sure that there's -- that there is the same result at those locations between the two kits that are the same.  Yes, we do make sure that is -- is the case.

Q    And what would you do if you were to find that the results at that same location, for example, didn't match?

A    If they didn't match it would mean that there was possibly a sample switch.  And if we could we'd want to try to go back and to repeat the test with different sample.

Q    Now you've described that it's possible that you can let's say -- let me rephrase the question --

You've described that cleaning may get rid of DNA in a location; is that correct?

A    Yes.  It's possible that if you clean or wipe an area

**DRAFT COPY**

Craig - Cross / By Ms. Chahin                184

thoroughly enough you may remove enough of that cellular material or even all of it so that we can't detect either blood or DNA.

Q    Okay.  How large is DNA?

A    How large is it?

Q    Yeah.  How big is it?  Is it visible to the eye?

A    It's not visible to the naked eye.  It is -- DNA is actually composed of chemical basis that you may have heard of and we call those bases "A, T, G, and C" that's sort of the DNA alphabet.  Well that string of bases is about six-billion base pairs long in one strand of DNA.

Q    So for example, would it be possible for someone that was cleaning a location to verify that all DNA had been removed?

A    Is it possible for a person to have clean DNA and verify that they've removed it all?

Q    Yeah.  For example, would -- if I were to -- would it be possible for me to confirm that I've removed all existing DNA from a location by wiping it off?

A    No.  I wouldn't expect that by wiping it off you can -- you can verify that you have removed everything.

        MS. CHAHIN:  If I could have one moment?

BY MS. CHAHIN:

Q    Now you were asked some questions in regard to some exhibits that you analyzed and they were handcuffs, Q-51 and Q-52 --

**DRAFT COPY**

Craig - Cross / By Ms. Chahin                185

**MS. CHAHIN:**  And if I could ask the government's assistance in putting a chart on the screen, I would appreciate it.

**MS. DeWITT:**  Which one?

**MS. CHAHIN:**  1400-A.

**MS. DeWITT:**  It's on here but I think you're --

**THE COURT:**  Oh, I'm sorry.  Let me adjust it.

**MS. CHAHIN:**  Thank you.

**BY MS. CHAHIN:**

Q    If I could ask you please to take a look at first of all the handcuffs which are identified as Q-51, Government Exhibit 103 on the chart -- not look at them physically but here look at the information on the chart -- under Q-51 it says "Major" can you explain to us what that means?

A    Yes.  Again, a "Major" means that there's a mixture of DNA.  There's more than one person's DNA present in that sample.  There was a major contributor, though.  One person left more DNA than the other individuals and so the major contributor results are listed in the table and they match that of K-75, Mr. Kadamovas -- excuse me -- Mr. Kharabadze.

Q    And did you make any -- undertake any analysis to see if you could determine who the minor contributor was?

A    Yes.  The minor contributor results were largely inconclusive meaning they didn't mean that height requirement for us so they were pretty much inconclusive and we couldn't

**DRAFT COPY**

Craig - Cross / By Ms. Chahin                    186

make much determination on that.

Q    Okay.  So the fact that you have a major contributor and a minor contributor does that mean that you have the DNA of more than one person on those handcuffs?

A    Yes.

Q    Based on the amount of DNA that you were able to find for the minor contributor were you able to perform tests to see if you could exclude people as the minor contributor?

A    Yes, I think I was.  And I'd have to refer to my report for that.

Q    If you would, please.

A    On my report which is dated April 13, 2004 on page 22 of 25 I discuss the typing results from Q-51.  And I discuss that there was DNA for more than one individual but that the DNA from the major contributor matched that of the K-75 sample and then at the end of that paragraph I say that the typing results from the minor contributor are not suitable for matching purposes meaning they are below that level of height requirement that we have.  However, the sources of Q-11, which is Mr. Muscatel, Q-18, which was Rita Pekler, the K-12 sample from Mr. Safiev, K-22, K-23, K-24, K-30, K36, K-42, and K-79 and Q-81 are excluded as minor contributors.

Q    Was K -- excuse me -- as a minor contributor?

A    Yes.

Q    And that is Mr. Kadamovas, correct?

**DRAFT COPY**

Craig - Cross / By Ms. Chahin                    187

A      That's right.

Q      So that means that the DNA from the minor contributor was not Mr. Kadamovas; is that correct?

A      That's correct.

Q      Now with respect -- and I believe I misspoke I believe I may have referred to Q-51 as Exhibit 104 but, in fact, 103 -- if I could direct your attention now to Q-52, Government's Exhibit 104 the information on the summary chart.  With respect to these -- this exhibit as well did you find the DNA of more than one person?

A      Yes.  Again, there was more than one person.  There was a major contributor, one person's DNA typing results stood out. And the major contributor's results matched that of the K-12 sample from George Safiev.

Q      And with respect to Q-52 were you able to determine whether or not there was sufficient DNA in order to match another person?

A      No.  The minor contributor results, again, were inconclusive.  They were not suitable for matching purposes. However, I could exclude a number of individuals.

Q      And among the persons that you were able to exclude from that as being the minor contributor were you able to exclude Mr. Kadamovas?

A      Yes, I was.  The K-30 sample.

Q      Now you identified a number of items upon which you were

**DRAFT COPY**

Craig - Cross / By Ms. Chahin                188

able to -- you were able to identify DNA that belonged to

Mr. Kadamovas; is that correct?

A    Yes.

         MS. CHAHIN:  And if I could ask your assistance one

more time, please?

The second page, please.

         MS. DeWITT:  Of this one or --

         MS. CHAHIN:  Let me see.  Yes, it's 1400.  This one.

         MS. DeWITT:  That's 1400-B.

         MS. CHAHIN:  Yes.

         MS. DeWITT:  Do you want the second page or do you

want the first page?

         MS. CHAHIN:  I'm sorry, I want the first page of

1400-B.

BY MS. CHAHIN:

Q    And in your direct examination you talked about a number

of cigarette butts that you were able to identify as having

Mr. Kadamovas' DNA on it; is that correct?

A    That's correct.

Q    Okay.  Can you tell me how do you collect DNA from a

cigarette butt?

A    Well, actually, the cigarette butt is going to be

something where we cut the filter tip.  Obviously we expect

that someone is smoking the cigarette, they're going to put it

in their mouth, so there's going to be skin cells transferred

**DRAFT COPY**

Craig - Cross / By Ms. Chahin                    189

from their mouth or their lips onto that filter, so we would cut a portion of that filter off and do our test on that.

Q    And with respect to the cigarette butts that you tested how many cigarette butts did you find that had Mr. Kadamovas' DNA on them?

A    Q-107, Q-108, Q-119, K-123, Q-125.1, Q-126, Q-129, and Q-165, so that would be one, two, three, four, five, six, seven, eight.

Q    And those were from what location?

A    Those were all identified as being taken from the Weslin location.

Q    Were you also asked or related to this investigation were you asked to conduct DNA testing on any other cigarette butts?

A    Yes.

Q    And specifically, do you recall if you were asked to conduct any DNA testing on any cigarette butts that were from the New Melones Lake area?

A    Yes.

Q    And can you tell us how many cigarette butts from the New Melones Lake area you tested?

A    I believe we got DNA typing results from three cigarette butts that were taken from that location.

Q    And can you tell what -- you said you got DNA typing results from three cigarette butts; is that correct?

A    Yes.

**DRAFT COPY**

Craig - Cross / By Ms. Chahin                    190

Q    Were there additional cigarette butts from which you which

you were not able to obtain DNA typing from the New Melones

area?

A    I would have to look through my report to see how -- I

mean a lot of cigarette butts were tested.  We obtained DNA

results from three from that location.  And I would have to

look through my notes to see how many others might have been

tested.

Q    Can you please tell us whether or not Mr. Kadamovas' DNA

was found on any cigarette butts from the New Melones Lake

area?

A    No.  Those -- those were compared to all of the reference

sample and they didn't match any of the reference samples that

were submitted for comparisons.

Q    Aside from cigarette butts were you asked to test other

items that were gathered in the New Melones area?

A    I don't recall that.  If you can name some other items, I

can possibly tell you if we tested them.

Q    If you could refer to your report and look at Q-346, 347,

and 348, please?

A    346, is that what you said?

Q    Yes.

A    A bottle-cap.  347, a bottle.  And 348?

Q    Yes.

A    A can.  Yes, in the last paragraph of my report on page 24

**DRAFT COPY**

Craig - Cross / By Ms. Chahin                    191

of 25, there's a paragraph that says, "No detectable DNA was recovered from specimens."

And there's a very large listing and those particular items, 346, 347 and 348 are listed as no detectable DNA was recovered from those items.

Q    So would it be fair to say that based on the DNA testing that you conducted Mr. Kadamovas' DNA was not found on any items in the New Melones area?

A    That's correct.

THE COURT:  How long will you be, Ms. Chahin?

MS. CHAHIN:  I'm sorry, your Honor?

THE COURT:  How long do you think you'll be?

MS. CHAHIN:  Probably another 15 minutes.

THE COURT:  All right.  We'll break at this time; returning tomorrow at 9:15 in the jury room; 9:30 in the courtroom.  Remember the admonition.

(This proceeding was adjourned at 4:12 p.m.)

DRAFT COPY