# GOVERNMENT EXHIBIT 26

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

# DRAFT COPY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO:  CR-02-220(B)-DT |
| | ) | |
| Plaintiff, | ) | CRIMINAL |
| | ) | |
| vs. | ) | Los Angeles, California |
| | ) | |
| IOURI MIKHEL, | ) | Thursday, November 30, 2006 |
| JURIJUS KADAMOVAS, | ) | (9:36 a.m. to 11:53 a.m.) |
| | ) | (1:36 p.m. to  4:45 p.m.) |
| Defendants. | ) | |

JURY TRIAL (46th DAY)
(VOLUME XLVI, PART 1 OF 2; PAGES 1 THROUGH 217)

SEALED PORTION FROM 4:16 P.M. TO 4:27 P.M. WAS OMITTED)

BEFORE THE HONORABLE DICKRAN TEVRIZIAN,
UNITED STATES DISTRICT JUDGE

EXCEPTIONAL REPORTING SERVICES, INC
14493 SOUTH PADRE ISLAND DRIVE
SUITE A-400
CORPUS CHRISTI, TX 78418-5940
361 949-2988

7

And we'll get the witness back on the stand.

And you'll finish up with her in about 10 or 15 minutes?

**MS. CHAHIN:**  Yes, your Honor.

**MR. DUGDALE:**  Yes.  And the next two witnesses are Ms. Korsberg and then Ms. Rees, your Honor.

**THE CLERK:**  Okay.  We're ready to start.

**THE COURT:**  Ms. Craig, you can come up.

**(Pause)**

Good morning, ladies and gentlemen of the jury.

The record will indicate all jurors are present.  All counsel and parties are present.

Ms. Craig, you're still under oath.  Please state your name for the record.

**THE WITNESS:**  Rhonda Craig.

**THE COURT:**  All right.  Before we begin, I'm going to have the investigating officers here pick up those notebooks that you have.  So if you'll pass them up.

Also, the Government has indicated that, hopefully, they intend to rest their case sometime near the close of next week.  All right.

You're still under oath.  Again state your name for the record.

**THE WITNESS:**  Rhonda Craig.

**THE COURT:**  Ms. Chahin, you may continue with your

**DRAFT COPY**

Craig - Cross / By Ms. Chahin                    8

cross-examination.

          **MS. CHAHIN:**  Thank you, your Honor.

                    **CROSS-EXAMINATION CONTINUED**

**BY MS. CHAHIN:**

Q    Ms. Craig, yesterday Mr. Callahan was asking you some question about some DNA testing that you did of fingernails.

          Do you have that in mind?

A    Yes.

Q    And, specifically, you were asked to test fingernails associated with Alexander Umansky; is that correct?

A    Yes.

Q    And it's sometimes significant to test DNA material associated with fingernails of a homicide victim; is that correct?

A    That's true.

Q    And a reason for that is because it might assist in identifying the perpetrator of the crime; is that correct?

A    That's possible.  If they had perhaps scratched or something like that, they might have gotten some DNA from another individual under their fingernails.

Q    And that's something that you did in this case was do such testing, correct?

A    Yes.

Q    And with respect to the testing that you performed of the fingernails associated with Mr. Umansky, Mr. Kadamovas was

**DRAFT COPY**

Craig - Cross / By Ms. Chahin                        9

excluded from the DNA you found associated with those

materials, correct?

A    That's correct.

Q    And you also did similar testing with the fingernails

associated with Mr. Safiev; is that correct?

A    Yes.

Q    And similarly, Mr. Kadamovas was also excluded from the

DNA that you found associated with that fingernail, right; is

that correct?

A    Yes.

Q    And the same is true of Mr. Kharabadze; is that correct?

A    Yes.

Q    So that there was DNA material located but Mr. Kadamovas

was excluded from the persons that you found associated with

that DNA, correct?

A    Yes.

Q    And for that matter so was Mr. Mikhel, correct?

A    Yes.

Q    Now, the items that we have discussed here in court, and

they're referenced on your summary chart, those are not all of

the items that you tested for DNA; is that correct?

A    That's correct.

Q    And you tested numerous items from numerous locations?

A    Yes.

Q    Some of those locations were associated with Mr.

**DRAFT COPY**

Craig - Cross / By Ms. Chahin                    10

Kadamovas?

A    I'm sorry?

Q    Some of the locations that the items came up from were identified as having come from locations associated with Mr. Kadamovas; is that correct?

A    That's correct.

Q    And do you have any idea of approximately how many items you tested?

A    My recollection is over 50 items, not including the reference samples were tested.

Q    Did you test any items coming from various vehicles?

A    I would have to refer to my notes.  If you have something in particular you could perhaps jog my memory by stating?

Q    Yes.  Well, let me ask you a more general question first.

If you have a vehicle that you believe may be associated with the crime, what's the best way to preserve evidence that may be later used for DNA testing?

A    For a vehicle?

Q    Yes.

A    It would be simply to look at that vehicle as soon as you could and try to -- as the agents who are doing the collection try to visualize any material and take swabbings from those areas.

Q    Okay.  Are you able to test hairs for DNA?

A    Not with nuclear DNA.  You can do a different type of DNA

**DRAFT COPY**

Craig - Cross / By Ms. Chahin                11

analysis on hairs that's called mitochondrial DNA analysis.

But that's not my specialty.

Q    So mitochondrial DNA analysis can be done on hairs, but not nuclear DNA analysis?

A    Generally.  If you had a pulled hair where you would have a cell root at the bottom of that hair, you could possibly do nuclear DNA analysis on that.  But generally hairs are much better suited for doing a mitochondrial DNA analysis.

Q    So returning to the example of a vehicle, I believe you indicated that the best way would be to swab the vehicle; is that correct?

A    It would be to visually observe that vehicle and try to identify any areas of possible stains that would contain biological material for DNA testing and then to take swabbings from those areas.

Q    And could you -- for purposes of nuclear DNA testing, can you review and analyze, let's say, material that comes from a vacuum filter that has been vacuumed out of a vehicle?

A    Again, that wouldn't be something that the nuclear DNA person would do.  That would be more likely something that would be done by a mitochondrial DNA person.

Q    Okay.  But can it be done is my question.

A    I have never done it.  And I know it's not done in our laboratory in our nuclear unit.

Q    Okay.  If there were -- let me withdraw that question.

**DRAFT COPY**

Craig - Cross / By Ms. Chahin                12

Now referring -- were you asked to review any or analyze any materials that came from a location associated with Mr. Kadamovas' Nissan Quest van?

And if I could direct you specifically to some item numbers that may help you locate that in that report I can do that.

A    Okay.

Q    The item numbers would be Q325, 326, 327, and 328.

THE COURT:  Now, these are not exhibits.  These are Q's.

MS. CHAHIN:  These are Q numbers, your Honor.

THE WITNESS:  325, 326, 327, and 328?

MS. CHAHIN:  Yes.

THE WITNESS:  Yes.  They were items that were sent into FBI laboratory.  But they are vacuum filterings that were collected.  So, again, that's not something that the nuclear DNA unit would test.

BY MS. CHAHIN:

Q    So you did not test those items?

A    No.

Q    Okay.  Can you review your report and tell me if you were asked to test any swabbings that came from the Nissan Quest van?

A    Do you have item numbers?

Q    I don't have specific item numbers.  I'm sorry.  No.

**DRAFT COPY**

Craig - Cross / By Ms. Chahin                    13

A     Well, the only things that I have listed from Mr. Kadamovas' Quest van are those vacuumings.  So since those are the only things that are listed as submitted there were no swabbings.  So that was not done.

Q    Can you tell me if any of your DNA results, any of the analysis that you did, showed a match between any DNA found and identified as coming from a Nissan Quest van and, let's say, Alexander Umansky?

A     Well, actually, I didn't have a reference sample that worked for Mr. Umansky.  So I couldn't do any comparisons to his sample.

Q    I apologize.

Nick Kharabadze.

A     Nick Kharabadze I did have a sample for.  But, again, coming from that Quest van I only have these vacuum filterings listed as what was received.

Q    So you did not find any DNA matches from Mr. Kadamovas to any evidence that might have been in the Nissan Quest van; is that correct?

A     That's correct.  I didn't test anything from that van.

Q    And the same can be said of Mr. Safiev; is that correct?

A     Yes.

Q    Ms. Pekler?

A     No.  Didn't find anything.  Again, I didn't test anything from that van.  So I didn't find anything.

**DRAFT COPY**

Craig - Cross / By Ms. Chahin                14

Q    And Mr. Muscatel?

A    This is true.

Q    Okay.  Were you asked to test any -- well, let me ask you another question.  Can you obtain -- do you only conduct -- or let me withdraw that.

When you receive items into the FBI lab, once you receive the items, is it you who determines what items will be tested?

A    Yes.  I play, certainly, a large role in deciding what's going to be tested.  And that's in conjunction with talking with any detectives or agents involved in the case, as well as reading the incoming letter that sort of describes a little bit of the details so that we can assess what needs to be worked and in what priority should we work those items.

Q    Okay.  And did you make those determinations in this case?

A    Yes.  I made many of them.  Yes.

Q    Okay.  And did you receive any items that were identified as coming from a Lincoln Town Car belonging to Ainar Altmanis?

And if I could refer you to Q numbers 243 through 250, approximately.

A    To specimens Q243 through Q250?

Q    Yes.

A    Yes.  Those were items that were received into the FBI laboratory.  But, again, DNA analysis was not conducted on those items.

**DRAFT COPY**

Craig - Cross / By Ms. Chahin                    15

Q     Okay.  So you did not conduct any analysis on Q243, which are identified as nunchucks, correct?

A     That's correct.

Q     No DNA analysis on Q244, a screwdriver?

A     That's right.

Q     No DNA analysis on Q245, a screwdriver tip?

A     That's correct.

Q     No analysis on Q246 and 247, two pairs of pliers?

A     That's right.

Q     And no analysis on Q249 identified as a pocket knife?

A     That's correct.

Q     Did you also receive items associated with a Lincoln Navigator belonging to Ainar Altmanis?

A     Yes.

Q     And can the same be said with respect to those items that you did not conduct any DNA analysis on those items?

A     Yes.  Again, we received vacuum filters, which, again, we don't do DNA testing on.  And there were some other items that were sent as well as part of that Lincoln Navigator that were not tested.

Q     And those items included Q265 and 266, which were rolls of duct tape, correct?

A     That's correct.

Q     Q267, which is twine, correct?

A     Yes.

**DRAFT COPY**

Craig - Cross / By Ms. Chahin                16

Q    Q268 through 269.6, which were 13 plastic gloves?

A    Excuse me.  Tell me those items again.

Q    Q268 through 269.6.

A    That's correct.

Q    Q272, which is a tie?

A    Yes.

Q    And Q275, a tool set?

A    Yes.

Q    So no DNA analysis was conducted on any of those items, correct?

A    That is correct.

Q    Now, the summary chart that we reviewed yesterday, does that -- do the identifications that are listed on that chart is that the extent of the entire matches that you were able to make between any of the known DNA of the victims and the items which were sent to you?

A    I'm sorry.  Would you repeat that?

Q    Yes.  I'm sorry.  That was a little confusing.

        We reviewed yesterday your summary of nuclear DNA results, correct?

A    Yes.

Q    And is that the extent of all of the matches that you were able to make between the items that were submitted to you and the known samples of the DNA submitted from the defendants and the victims?

**DRAFT COPY**

Craig - Cross / By Ms. Chahin                    17

A    There was actually a couple of other items that were tested that we did receive or we did get DNA results for that was a match.  However, it wasn't -- it was a situation where we had a mixture.  And there was not a major contributor; so we had to do a different type of calculation that I spoke of, a mixture calculation.  And I could not exclude certain individuals from those DNA results.  And those were not listed on the chart yesterday.

Q    Okay.  Aside from those that you've now listed, this includes the summary of the total matches that you were able to make, correct?

A    Yes.

Q    So, in sum, of all of the items that you tested, the only items on which you found Mr. Kadamovas' DNA were eight cigarette butts and a cup located from the Weslin house, correct?

A    That's correct.

          **MS. CHAHIN:**  Now, I'd liked to ask if I could please have Exhibit 319 placed before the witness.

          Your Honor, this is in evidence.  And it is a pair of tennis shoes which was seized from the Lindley residence.

**BY MS. CHAHIN:**

Q    Ms. Craig, can you please take a look at this item and tell me if you recognize it?

A    Yes, I do recognize these items.  I recognize them because

Craig - Cross / By Ms. Chahin                    18

of the unique laboratory number assigned to this submission of evidence.  And I also recognize it because the unique item identifier.  It's Q515 and Q516.  And, also, it has my examiner's symbols present, as well as my biologist initials present on the shoes as well as the packaging.

Q    Ms. Craig, were you asked to perform some testing on these shoes?

A    Yes, we were.

Q    What type of testing did you conduct?

A    We did a phenolphthalein test to try to identify whether or not blood was present on these shoes.

Q    And that phenolphthalein test is a test that you described yesterday as being extremely sensitive, correct?

A    Yes.

Q    And you described it as being a test that could detect blood that was diluted to one one-hundredth thousandth; is that correct?

A    That's correct.

Q    What were the results of your examination?

A    Those results were negative.

        MS. CHAHIN:  I have nothing further, your Honor.

        THE COURT:  Ms. DeWitt?  Redirect examination.

//

//

//

**DRAFT COPY**

Craig - Recross / By Ms. Chahin                32

fingernails was Mr. Iouri Mikhel; isn't that correct?

A     Yes.

Q     And Mr. Kadamovas as well?

A     Yes.

          MR. CALLAHAN:  Thank you.

          THE COURT:  Ms. Chahin?

          MS. CHAHIN:  Just briefly, your Honor.

                    **RECROSS EXAMINATION**

**BY MS. CHAHIN:**

Q     Ms. Craig, regarding Exhibit 319, can you indicate when
you were asked to test those shoes?

A     Excuse me.  Those were the Adidas shoes?

Q     Yes.

A     Again, I was asked to test those in September or early
October.  No.  It had to be September, because we received it
in September.

          THE COURT:  What year?

          THE WITNESS:  Of this year.

          THE COURT:  Of this year?

          THE WITNESS:  Of this year.

**BY MS. CHAHIN:**

Q     So that would be approximately two to three months ago,
correct?

A     Yes.

Q     Prior to that time, had you conducted any testing of those

Craig - Recross / By Ms. Chahin                33

shoes?

A      No.  Not on those shoes.

Q      Okay.  And pursuant to procedure, you indicated that you returned those shoes to the people who sent them to you, correct?

A      That's right.

Q      And do you know if those shoes remained in evidence or if they had been -- how long they had been in evidence prior to the time you'd received them?

A      I had been told that they had been collected earlier, several years earlier.  But I don't know anything about how they were collected or where they were stored at that time until they got to me.

Q      Okay.  So, nevertheless, the first time you were asked to test them was approximately two to three months ago?

A      That's correct.

Q      Now, you described that when a body is in water that it can have some affect on the decomposition or dilution of the DNA?

A      That's correct.

Q      Okay.  And particularly with regard to that associated with fingernails, correct?

A      Yes.

Q      Okay.  But, nevertheless, when you tested the fingernails, you found DNA?

**DRAFT COPY**

Craig - Recross / By Ms. Chahin                    34

A      I found some DNA that -- my DNA results weren't of a very
high level, as we talked about yesterday.  But I was able to
get some DNA on some of those fingernails and was able to
exclude individuals.

Q      And so with the DNA, despite the decomposition, you were
able to find some DNA which excluded Mr. Kadamovas?

A      Yes.

Q      And Mr. Mikhel?

A      Yes.

Q      Now, in regards to the -- you described the manner in
which you believed that DNA can most likely be transferred to
handcuffs; is that correct?

A      Yes.

Q      Okay.  Well, despite the manner in which you believe it's
most likely to result in a transfer, isn't it true that any
contact with those could result in a transfer of DNA?

A      It's possible that some contact could result in DNA being
transferred.  However, the most likely reason for DNA being
found on the inside of those handcuffs is prolonged skin
contact with that area.

Q      The question I'm asking you is, is it possible whether any
contact, not prolonged -- not simply just prolonged contact on
the inside of the handcuffs -- can result in the transfer of
DNA?

              **MS. DEWITT:**  Asked and answered, your Honor.

**DRAFT COPY**

Craig - Recross / By Ms. Chahin          35

THE COURT:  That's all right.  Technically, you're correct.

But go ahead.  Re-ask the question.

BY MS. CHAHIN:

Q     The question I'm asking you is whether, despite your belief that most likely -- the manner that you described as the most likely to result in the transfer, that any contact with the handcuffs by an individual could result in a transfer of DNA?

A     Any contact could result in the transfer of some DNA.

MS. CHAHIN:  Thank you, your Honor.

MS. DEWITT:  Nothing further, your Honor.

THE COURT:  You may stand down.  Thank you.

THE WITNESS:  Thank you.

THE COURT:  All right.

Government's next witness will be?

MS. MEYER: Your Honor, at this time the United States calls Karen Korsberg to the stand.

THE COURT:  Karen Korsberg?

MS. MEYER: Yes, your Honor.

(Pause)

THE CLERK:  Please raise your right hand.

(Witness sworn)

Would you your name for the transcript please.

THE WITNESS:  Karen Korsberg.  Korsberg is

**DRAFT COPY**

**CROSS EXAMINATION**

**BY MS. CHAHIN:**

Q    You talked about some cordage that you analyzed; is that correct?

A    That's correct.

Q    And I believe that was Q391 and 397; is that correct? A    That's correct.

Q    Based on the analysis that you did, is part of the analysis -- or as part of your analysis, are you able to determine if those ropes had been cut in any manner?

A    The ends were not really subject to that.  They were pretty frayed.  And it would be difficult to tell with that type of material to determine if they were cut or torn or what have you.

Q    So basic --

        **THE COURT:**  You used the term Q.  But I believe they're Exhibits 520 and 529.

        **MS. CHAHIN:**  Thank you, your Honor.

**BY MS. CHAHIN:**

Q     So that is not a determination you were able to make?

A     Correct.  I mean what I referred to as cut were the end were tied together.  It looked like they may have been cut. But as far as absolutely being able to tell, the material just didn't lend itself to that type of exam.

Q    So you're not able to tell, for example, if it was cut

**DRAFT COPY**

Korsberg - Cross / By Ms. Chahin                54

with a knife?

A     No.

Q     I believe that you described that once you make a determination that something is consistent that another person verifies your results; is that correct?

A     That's correct.

Q     Okay.  But, nevertheless, this science is not a means of positive identification; is that correct?

A     That's correct.

Q     You've testified about a few items here.  Is it -- would it be fair to say that you received additional items for your review and evaluation?

A     Yes.

Q     Okay.  And with regard to other items that you received, did you receive any items that were identified as having been associated with a Nissan Quest van?

A     Yes, I believe so.

Q     And I don't know if you have it before you, but if you need to refer to your report please feel free to.

A     Okay.

Q     And, specifically, if I could direct you to Q325, 326, 327, and 328.

A     325 through 328; is that correct?

Q     Yes.

A     Okay.

Korsberg - Cross / By Ms. Chahin          55

THE COURT:  Those are the Q numbers?

THE WITNESS:  Correct.

MS. CHAHIN:  Those are Q numbers, your Honor.  Yes.

BY MS. CHAHIN:

Q    Did you analyze those Q items?

A    Yes.  They're all vacuumings that were identified as coming from a Quest van.

Q    And there were four vacuumings, correct?

A    That's correct.

Q    And did you also receive, for purposes of your analysis, known samples of both hair and clothing from various individuals?

A    Yes.

Q    And you received hair and clothing from Rita Pekler, correct?

A    That's correct.

Q    Hair and clothing from Alexander Umansky?

A    Correct.

Q    Hair and clothing from George Safiev?

A    Yes.

Q    Hair and clothing from Nick Kharabadze?

A    Yes.

Q    And hair and clothing from Meyer Muscatel?

A    Correct.

Q    And is it fair to say that you did not find any hair or

**DRAFT COPY**

Korsberg - Redirect / By Ms. Meyer                56

clothing associated from any of those people in the vacuumings

of the Nissan Quest van?

A    That's correct.

            **MS. CHAHIN:**  I have nothing further, your Honor.

            **THE COURT:**  Ms. Meyer?

            **MS. MEYER:** Briefly, your Honor.

                    **REDIRECT EXAMINATION**

**BY MS. MEYER:**

Q    Ms. Korsberg, Ms. Chahin asked you some question about

samples of hairs that you received from different individuals;

is that right?

A    That's correct.

Q    And you received hair samples for Meyer Muscatel; is that

correct?

A    Yes.

Q    Did you also receive samples of debris taken from the

Parrot's Ferry Bridge, which would be identified as Q448 and

Q450?

A    Yes, I did.

Q    Did you draw any conclusions regarding a comparison of

Meyer Muscatel's hair with the debris taken from that bridge?

A    Can I refer -- I know that there were two different

conclusions.  Let me refer.

        There were Caucasian head hairs found in the debris

that was identified as coming from Parrot's Ferry Bridge.  Some

**DRAFT COPY**

Rees - Direct / By Mr. Dugdale          97

in addition to the four fingerprints of Mr. Mikhel on this particular exhibit, you found a palm print belonging to Mr. Mikhel as well.

Is there any difference between the way that you compare a known palm print and a latent palm print found on an item of evidence from how you compare a known fingerprint and a latent fingerprint found on an item of evidence?

A    No.  With the latent palm prints you're usually working with a larger area.  And, again, instead of maybe a pattern type that's visible, because there aren't many patterns in a palm, you look at the flow of the ridges.

And then from the ridges you also look at the characteristics.

So, again, it's matching up the same ridge flow and the same characteristics.

Q    I'm now going to have Special Agent Davidson hand you what's been previously admitted as Government's Exhibit Number 56, the next item on the chart.

And, Ms. Rees, do you recognize Government's Exhibit Number 56?

A    Yes, I do.

Q    And how do you recognize it?

A    My initials do appear on this item.

Q    And is that true of all the items that you're going to talk about today; that you initialed them at some point in time

**DRAFT COPY**

Rees - Direct / By Mr. Dugdale                98

during the process of your examination?

A    Yes.  When I receive an item of evidence, I'll initial the

packaging as well as the item itself.

Q    And what is Government's Exhibit Number 56?

A    Exhibit Number 56 is a handwritten note.

Q    And did you examine this exhibit for latent fingerprints?

A    Yes, I did.

Q    And did you find any latent fingerprints or palm prints on

this exhibit?

A    Yes.  I identified five fingerprints belonging to Mr.

Mikhel.

Q    I'm now going to have Special Agent Davidson hand you

what's been previously admitted as Government's Exhibit Number

57.

        And, Ms. Rees, do you recognize Government's Exhibit

Number 57?

A    Yes, I do.

Q    And what is it?

A    This is a handwritten note that contains names and phone

numbers.

Q    And did you analyze this for fingerprints and palm prints

as well?

A    Yes, I did.

Q    And did you find fingerprints or palm prints on this item

of evidence?

**DRAFT COPY**

Rees - Direct / By Mr. Dugdale          99

A    Yes.  I identified three fingerprints that belong to Mr. Mikhel.

Q    And is that correctly noted on this, what is published on the board, which is the second page in the summary chart that you're testifying about?

A    Yes, it is.

Q    I'm now going to have Special Agent Perez hand you what's been previously admitted as Government's Exhibit Number 61.

And, Ms. Rees, do you recognize Government's Exhibit Number 61?

A    Yes, I do.

Q    And what is it?

A    It is a listing with banks and numbers on it.

Q    And is this another item of evidence that you examined for latent fingerprints?

A    Yes, it is.

Q    And did you find any latent fingerprints or palm prints on that item of evidence?

A    On this item of evidence I identified two fingerprints and three palm prints belonging to Mr. Kadamovas.

Q    I'm now going to have Special Agent Perez hand you what's been previously admitted as Government's Exhibit Number 62.

And, Ms. Rees, do you recognize Government's Exhibit Number 62?

A    Yes, I do.

**DRAFT COPY**

Rees - Direct / By Mr. Dugdale              100

Q    And what is it?

A    This is a note that has, again, names and phone numbers on it.

Q    And did you examine Government's Exhibit Number 62, that handwritten note, for fingerprints and palm prints?

A    Yes, I did.

Q    And did you find any latent fingerprints or palm prints on that note?

A    Yes.  I identified three fingerprints as belonging to Mr. Kadamovas, and two fingerprints belonging to Mr. Mikhel.

Q    I'm now going to have Special Agent Perez hand you what's been previously admitted as Government's Exhibit Number 105.

        And, Ms. Rees, do you recognize Government's Exhibit Number 105?

A    Yes, I do.

Q    And what is Government's Exhibit Number 105?

A    105 is a pair of handcuffs.

Q    And can you please take a second to remove that from the bag and show it to the jury.

A    (Witness complying)

Q    And, Ms. Rees, did you analyze those handcuffs for the presence of latent fingerprints?

A    Yes, I did.

Q    And did you find any fingerprints on those handcuffs?

A    Yes.  I identified one fingerprint as belonging to Mr.

**DRAFT COPY**

Rees - Cross / By Ms. Chahin                    119

Q    And in your evaluation of -- in your investigation of this case and your analysis of fingerprints, were you given as a known exemplar the fingerprints of a gentleman named Raymond Eidaks?

A    I would have to refer to my notes for that.

Q    If you can do that, that will be fine, if it's --

A    Could you give me the spelling of the name, please?

Q    E-I-D-A-K-S.

        **(Pause)**

            **THE WITNESS:**  No.  My notes show no indication of that.

            **MR. CALLAHAN:**  Thank you, Ms. Rees.

            Thank you, your Honor.  Nothing further.

            **THE COURT:**  Ms. Chahin?

            **MS. CHAHIN:**  Thank you, your Honor.

                            **CROSS EXAMINATION**

**BY MS. CHAHIN:**

Q    In your direct examination you described the manner in which fingerprints can -- a residue can be left on porous and nonporous materials; is that correct?

A    Yes.

Q    I'd like to talk to you first about porous materials.  I believe you said that documents are one example of porous materials; is that right?

A    Yes.

**DRAFT COPY**

Rees - Cross / By Ms. Chahin                    120

Q    And I believe you described that even if a paper is crumpled that the residue can still remain on that porous material; is that correct?

A    The residue has absorbed into the paper over time and so, yes, it is still within that paper.

Q    And once that residue has absorbed onto a porous piece of paper, for example, how long will that impression remain on that porous surface?

A    It can remain for a great many of years, actually, if it's preserved properly.

Q    How many years?

A    In my personal experience I have received evidence that is over five years, and I've still developed latent prints.

Q    Off of a porous surface.

A    Yes.

Q    Okay.  And with respect to a nonporous surface, I believe you described that that would be like a harder surface, like a steel or other examples that you gave?

A    Correct.

Q    I'm sorry?

A    Yes, like glass, metal, that type of item.

Q    And I believe that you described as well that the prints could be affected by environmental factors or other factors could deteriorate the quality of a print on a nonporous surface; is that correct?

**DRAFT COPY**

Rees - Cross / By Ms. Chahin                    121

A     Correct.

Q     Okay.  And, now, let's say, for example, if you didn't have those environmental or other factors degrading the print; how long could a print last on a nonporous surface?

A     Again, it could last indefinitely if the item is handled properly.  If a print is left and that surface isn't touched in any way and it's left in a regular room environment, it could remain.  I couldn't say specifically; I haven't done any investigation into that.

Q     But you believe it could remain indefinitely.

A     Yes.

Q     Now, are there certain means that someone could use, for example, if they didn't want to leave any residue or any impression on a piece of either porous or nonporous materials?

A     Yes.

Q     And how would someone go about doing that?

A     If a person was wearing gloves of any type, rubber gardening gloves, that type of thing.  If they, you know, pulled their hand through their sleeve and handled an item, they could wrap, you know, a tissue around their hand to handle, you know, another item.  They wouldn't leave any residue if that were the case.

Q     So if a person, for example, were wearing, let's say, surgical gloves, that would not leave an impression on a porous or nonporous material that you could later evaluate; is that

**DRAFT COPY**

Rees - Cross / By Ms. Chahin                    122

correct?

A    That's correct.

Q    I'd like to ask you specifically about a particular exhibit that you tested, and that would be Q-375 -- I'm sorry; Q-216, Government Exhibit Number 375.  And if I could have the ELMO, please, your Honor.

        **(Pause)**

        **THE COURT:**  Can you move it just a little bit more to the right, because we have the Q number but not the exhibit number.

        **MS. CHAHIN:**  Oh, I'm sorry, your Honor.

**BY MS. CHAHIN:**

Q    Did you examine these monitors for fingerprints?

A    Yes, I did.

Q    And this monitor is identified as Government's Exhibit 375, a monitor which was recovered from Mr. Altmanis's apartment?  Is that correct?

A    Correct.

Q    And the monitor:  would that be a porous or a nonporous surface?

A    That was a nonporous surface.

Q    And on this monitor did you examine it to see if it had any fingerprints of Mr. Altmanis?

A    Yes.  The two fingerprints that I developed would have been compared to him, because I had his known fingerprints.

**DRAFT COPY**

Rees - Cross / By Ms. Chahin                    123

Q    And were you able to identify any fingerprints of Mr. Altmanis on this item?

A    No.  I was not.

Q    Now, with respect to -- if I can remove that, your Honor.

With respect to other examinations that you conducted, are you able to perform any analysis on a document to determine what came first, if the writing on the document came first or if the fingerprint came first?

A    I don't do any microscopic examination that would be required to determine which was laid down first.

Q    And to your knowledge was any such analysis performed on any of the documents that you have testified about?

A    No.  No such analysis was done.

Q    And if I could ask you specifically about Government's Exhibit 253, which is Q-92.

I will put that on the ELMO, your Honor.

(Pause)

BY MS. CHAHIN:

Q    This was, again, an item that you've analyzed, correct?

A    Yes.

Q    And with respect to this item, is it fair to say that you're not able to tell us which came first, the fingerprint or the writing; is that correct?

A    That would be correct.

(Pause)

**DRAFT COPY**

Rees - Cross / By Ms. Chahin                   124

**BY MS. CHAHIN:**

Q    I'm now placing on ELMO Government's Exhibit 1400, I believe, which describes Exhibit Number 62, Q-67, which you also analyzed; is that correct?

A    Yes.

Q    And with respect to this document as well, would it be fair to say --

THE COURT:  I believe that's 1409.

MS. CHAHIN:  I'm sorry, your Honor; 1409.  Exhibit Number 62, Q-67.

**BY MS. CHAHIN:**

Q    You analyzed this as well, correct?

A    Yes.

Q    And would it also be fair to say that you are unable to tell us which came first, the writing or the fingerprint?

A    That's correct.

Q    You also performed some analysis on Exhibit Number 105, which is Q-53; is that correct?

A    Yes.

Q    And were you also asked to analyze any other sets of handcuffs?

A    I would have to refer to my notes for that.

Q    If you could, please.

A    Yes, I did examine other handcuffs.

Q    And how many other sets of handcuffs did you analyze?

**DRAFT COPY**

Rees - Cross / By Ms. Chahin                125

(Pause)

THE WITNESS:  I believe three other sets of handcuffs, for a total of four.

BY MS. CHAHIN:

Q    And are you aware whether this set of handcuffs had any DNA results present on it?

A    I don't know the results of the DNA analysis as compared to my fingerprint analysis.

Q    But this is one of four sets of handcuffs that you analyzed, correct?

A    Correct.

Q    Finally, I would like to ask you a question if I could, and let me retrieve the exhibit number.

(Pause)

MS. CHAHIN:  If I could please ask the Government's assistance in placing before the witness Government's Exhibit 288.

(Pause)

BY MS. CHAHIN:

Q    Ms. Rees, could you please take a look at that and tell us if that is an item that you analyzed?

A    Yes.  My initials appear as having seen this evidence.

Q    And can you describe for the jury what that item is?

A    This is a blue tarp that was about 6½ by 9½ feet and inches long and wide.

**DRAFT COPY**

Rees - Cross / By Ms. Chahin                    126

Q    When you received that tarp for examination, was it in a closed container; was it unopened?

A    I don't recall how I received it.

Q    Did you examine the tarp itself or did you examine the outer packaging of the tarp?

A    I examined the tarp itself.

Q    And is the tarp -- what wrapping did you put on this tarp after -- or let me withdraw that.

Did you wrap the tarp in plastic after you examined it?

A    Yes.  I placed it in these two bags and sealed it, and my initials appear as having sealed it and these items in this plastic.

MS. CHAHIN:  Your Honor, could I have a moment with the Government, please?

THE COURT:  Certainly.

(Pause)

BY MS. CHAHIN:

Q    Ms. Rees, could you please take Exhibit Number 288 and remove it from whatever wrapping you put it in?

A    I might need some assistance with scissors, too.  It's taped fairly well; if there are scissors available.

MS. CHAHIN:  I'm sorry, your Honor.  Are there any scissors available to assist the witness?

THE COURT:  We don't have scissors at the bench.

**DRAFT COPY**

Rees - Cross / By Ms. Chahin                127

**MS. CHAHIN:**  I'm sorry.

**THE CLERK:**  The clerk has one, though.

**(Pause)**

**BY MS. CHAHIN:**

Q    Ms. Rees, now having looked at that exhibit, is that the tarp that you examined?

A    Yes, it is.

Q    Okay.  And is that tarp in an unopened condition?

A    Yes, it is.

Q    Okay.  So, in fact, did you examine the blue tarp?

A    If it's still in the original packaging.  I misspoke earlier.  I examined the tarp as I received it in its packaging.

Q    So you examined the outside packaging of the blue tarp, correct?

A    Yes.  It doesn't appear that this exhibit had ever been opened.

Q    So that was in a brand new condition.

A    It would appear to be so, yes.

Q    And when you found Mr. Kadamovas's fingerprint on that item, it would have been on the exterior packaging of the blue tarp; is that correct?

A    Yes.

Q    Yes?

A    Yes, that would be correct.

**DRAFT COPY**

Rees - Redirect / By Mr. Dugdale          128

MS. CHAHIN:   Thank you.

Nothing further, your Honor.

MR. DUGDALE:   Thank you, your Honor.

THE COURT:   Mr. Dugdale?

MR. DUGDALE:   Thank you.

REDIRECT EXAMINATION

BY MR. DUGDALE:

Q    Ms. Rees, you were asked some questions by both defense counsel concerning some impressions that were found on some of the items of evidence you talked about this morning.

Can you describe for the jury what those impressions were?

A    The impressions either came from a fingerprint or a palm print.  Due to the area that I had available, there would have been no pattern type or no indication as to whether it came from a finger or some area of the palm.  So it's called a latent impression, but it could be identified if I had the correct known exemplars to compare it to.

Q    And is it the case that you didn't have a way to compare it because of the nature of the impression at issue there?

A    That's correct.  It's difficult to record all of the known friction skin on an individual, so at times you are unable to make a complete determination.

Q    And quickly looking at some of the items you testified about this morning, Exhibit 55, this note with the fax number

**DRAFT COPY**

Anderson - Direct / By Ms. Meyer          160

**BY MS. MEYER:**

Q    Mr. Anderson, is this one of the documents that you received as part of your examination in this case?

A    Yes.

Q    Did you reach any opinion regarding the writing on this document?

A    Yes.

Q    What was your opinion?

A    That a portion of that hand printing may have been prepared by Mr. Mikhel.

Q    Can you please identify for the jury those portions that may have been prepared by Mikhel?

A    Yes.  "Costan Tezhik" (phonetic) and numerical sequence 0953648370.

Q    Did you say "3648370"?

A    Yes.

Q    So the portions that are not highlighted were excluded or you reached no conclusion on?

A    Yes.

Q    But the portions that are highlighted you found may have been prepared by Mr. Mikhel?

A    Yes.

Q    Now, if Agent Davidson could place before you Government's Exhibit 59.

        And again, your Honor, this was partially assembled

**DRAFT COPY**

Anderson - Direct / By Ms. Meyer          161

pieces of paper seized from Designed Water World.  At this time I'm going to publish that exhibit.

(Pause)

BY MS. MEYER:

Q    Did you receive Government's Exhibit 59 as part of your examination in this case, Mr. Anderson?

A    Yes.

Q    Did you reach any conclusions or opinions regarding the writing on this document?

A    Yes.

Q    And what were your conclusions?

A    That a portion of the hand printing on Government's Exhibit 59 may have been prepared by Mr. Mikhel.

Q    Can you please identify by name or the words that you consider to have -- may have been prepared by Mr. Mikhel?

A    Yes.  Starting with "deal, Mexico" and starting with "bail, home, Nick."

Q    What about the numerical sequences underneath "Nick"?  Did you reach any opinions regarding those numbers?

A    The opinion of no conclusion, meaning I can't tell who prepared it.  But there were some characteristics in common with --

Q    With what?

A    Mr. Mikhel's writing.

Q    Now if Agent Davidson will place before you Government's

**DRAFT COPY**

Anderson - Direct / By Ms. Meyer          162

Exhibit 61.

MS. MEYER:  Your Honor, this is a piece of paper seized at Mr. Mikhel's Oak View residence.  And right now I'm going to publish that for the jury.

(Pause)

BY MS. MEYER:

Q    Mr. Anderson, is this one of the exhibits that you received as part of your examination in this case?

A    Yes, it is.

Q    Did you draw any conclusions or render any opinions regarding the writing on Government Exhibit 61?

A    Yes.

Q    Could you please describe what those opinions are?

A    That the English writing, with the exception of the numerals 1 through 5 down the left side of the document, the dollar signs and the overwriting may have been prepared by Mr. Kadamovas.

Q    So other than those limited exceptions that you've identified, the rest of the document was prepared or may have been prepared by Mr. Kadamovas; is that right?

A    Yes.

Q    Now, could you take a look at Government's Exhibit 406?

MS. MEYER:  And, your Honor, this is a Thomas Guide Map page found at Mr. Krylov's residence.

//

**DRAFT COPY**

Anderson - Direct / By Ms. Meyer          163

**BY MS. MEYER:**

Q    Mr. Anderson, if you could please look at the back of that map.

        **MS. MEYER:**  And, your Honor, at this time I'm going to publish the back page or the back side of that Thomas Guide page.

**BY MS. MEYER:**

Q    Mr. Anderson, is this one of the items that you received for examination in your office?

A    Yes, it is.

Q    Did you render an opinion regarding the writing on this document?

A    Yes.

Q    And what was your opinion?

A    The opinion of no conclusion, meaning I can't tell who wrote it but some characteristics in common with portions of that writing with Mr. Kadamovas' known writing.

Q    Can you identify the words where you found characteristics in common with Mr. Kadamovas' writing?

A    Yes.  The word "truper," t-r-u-p-e-r, "audi," a-u-d-i, "g-o-l-a-n-t," g-o-l-a-n-t.

Q    Now, to the right of "truper" appears to be foreign writing; is that right?

A    Yes.

Q    You did not analyze that?

**DRAFT COPY**

Anderson - Direct / By Ms. Meyer                164

A     No.

Q     And there appears to be foreign writing to the right of "audi"; is that right?

A     Yes.

Q     And you did not analyze that?

A     No.

Q     And underneath the phrase "Mitsubishi Golant," again, appears to be foreign writing?

A     Underneath?

Q     Yeah.

A     Yes, yes.  None of those entries were compared.

Q     Because you only did the English portion?

A     Yes.

Q     In each of these instances, Mr. Anderson, were your conclusions verified?

A     Yes.

Q     All right.

        **MS. MEYER:**  Your Honor, I have no further questions for this witness.

        **THE COURT:**  All right.  We're going to break for lunch.  But before we break, I want to --

        **MS. SPEAKER:**  For lunch?

        **THE COURT:**  Not lunch.  We're going to break for our afternoon recess.  But before we break I want to go over the schedules.

**DRAFT COPY**

A    Yes.   These were identified as having been prepared by Iouri Mikhel.

Q    Now down at the bottom did you mean to circle just the last what looks like a P?

A    It's actually the -- since the last letter was Cyrillic I identified the entire letters in the Peter --

Q    As belonging to Mr. Mikhel?

A    That's correct.

Q    Could you please take a look at Government's Exhibit 61?

         **MS. MEYER:**  And your Honor, this was a document seized at Oakview which I am now publishing for the jury.

**BY MS. MEYER:**

Q    Mr. Sexton, I also have that on the screen to your right. Did you receive this document for comparison?

A    Yes, I did.

Q    Could you please describe for the jury -- well did you reach any opinions regarding the writing on this document?

A    Yes.   There were a number of Cyrillic letter formations but I actually concentrated on the lower portion that has the most so in this particular area there also appeared to be a -- a letter P-formation in "America."  The Russian R appears to be a P and that was also identified.

Q    As being compared by Mr. Kadamovas -- or Kadamovas?

A    That was identified as being compared by Mr. Kadamovas.

Q    Mr. Sexton, did you prepare a demonstrative exhibit using

**DRAFT COPY**

Sexton - Direct / By Ms. Meyer                186

Exhibit 61?

A     Yes, I did.

Q     Would that aid the jury in their understanding of your testimony?

A     I believe so.

        MS. MEYER:  And if you, Mr. Gogley or Agent Gogley, if you could just pull up the next foam board?  It should be Government Exhibit 1416.

BY MS. MEYER:

Q     Mr. Sexton, using Government's Exhibit 1416, could you describe your process of comparison for the jury?

A     Yes.  Again, this is a side-by-side comparison of question and known.

Q     Where did the known start?

A     The known are actually just below the question.  This is question material and these are known extracts used to reasonably demonstrate the reasons for the finding.

        As indicated you do a side-by-side comparison at cursory glance you're looking for writings that look similar and in this particular case they were similar.  Then you look for specific letter formations that are considered significant identifiable formations in that they have specific shape, form, approximate layout in terms of the ability of the individual where the spacing is, height proportional ratios and those type things.  During the side-by-side comparison I did find that

**DRAFT COPY**

Sexton - Direct / By Ms. Meyer                187

there were significant corresponding characteristics between the question and known writings.

Q    Thank you.  Mr. Sexton, if you could have placed before you -- if Agent Davidson could place before you Government's Exhibit 406?  Oh, I'm sorry, Mr. Sexton, were you done with that exhibit?

A    Would you like me to demonstrate the reasons for findings?

Q    Oh, I'm sorry, I thought you were done.

A    That's okay.

          MS. MEYER:  Hang on, Agent Davidson.

          THE WITNESS:  That's okay.  I thought that was the next question.

BY MS. MEYER:

Q    Go ahead.

A    And again, this comparison you're looking at certain letter formations not only the -- in the English written but the ones that stand out as obviously Russian Cyrillic.  In this case that's a D-formation.  In the known writings we -- I actually depicted or found a number of the D-formations that were in exact -- not exact -- but highly significant to the preparation of this particular letter formation in that it's almost a table-bottom, has a slight angle to it and then another table with a U in the middle, slightly narrower than the lower portion.  And you'll also find that that's the case in this particular D-formation.

**DRAFT COPY**

Sexton - Direct / By Ms. Meyer          188

As I indicated before there are certain letter formations that are -- appear in our English written language but it has a different meaning in this particular case.  That's an R-formation in Russia Cyrillic but it certainly is a P that we can recognize.  That's one of the reasons that Russian Cyrillic since it's base or foundation was in -- based on the Greek alphabet and ours the English language is based on the Greek alphabet.  There is a certain number of letters and configurations that would be in agreement.

That D-formation, of course -- the O-formation as you can see is elliptical versus a circular-type formation.  It starts at the top and actually concludes at the -- also at the top and that was also true in the preparation of this.  It's elliptical shape not circular and it starts at the top and actually has an overhand terminal stroke at the top of the letter formation.

The W and the R -- every letter that you see here you can actually pick out in the upper portion of the question writing in that the W looks like to V's together with an overhand-type stroke.  Here the W is two V's together and then there's a slight overhand terminal stroke at the terminal part of the W.

The R-formation has a slight hook at the -- the base and then an overhand elliptical.  And you'll find that it has a slight hook at the base.  It has an overhand elliptical shape

**DRAFT COPY**

Sexton - Direct / By Ms. Meyer                    189

for the -- the bowl of the R in the upper portion and then the terminal stroke is basically towards the baseline on an angle. That it was in fine agreement.  The I-formation has no dot, I-dot.  You'll find that also true in the known writings.

The T-formation, again, is a -- basically a straight T.  It has the T-crossings at the top of the T instead of in the middle or two-thirds of the way down or a third of the way down, so the handprinting is pretty consistent throughout the question and known writings.

This little U-formation that you see here it almost looks like a V-formation.  It has an open area, starts from the left and goes to the right.  There's an overhand loop that's a terminal loop at the -- the terminal stroke of the U.  You'll also see that and the known writings.  If you don't see it, you should.  That's one of the reasons I brought that out.

**THE COURT:**  Look under "Kharabadze."  The E you're looking for?

**THE WITNESS:**  That was the U-formation.

**THE COURT:**  U, I'm sorry.

**THE WITNESS:**  And that apparently was in -- again we had a number of charts prepared to be able to demonstrate each and every letter formation, but you'll see that the significance of all the other letter formations this particular U-formation is a body of writing that I observed.  And it's pretty consistent with the W as well with the format, the way

**DRAFT COPY**

Sexton - Direct / By Ms. Meyer            190

it's set up.

The N-formation is a -- it's a straight stroke and then it's also a little looped from the left to the right lower portion with a terminal relatively straight staff, so you've got actually three motions that make that N-formation.  And you also see that with a downward stroke.  It's the middle center stroke is actually on an angle from the left to the right and then the final stroke is a straight downstroke that would be terminal or terminating at the baseline and that also was present in all the N-formations that were extracted.

And again, these were just extractions taken from the question and known writings to be able to demonstrate the reasons for the findings.

So the M-formation, again, has a -- basically a straight approach.  The letter formation it has a bold center and then a terminal stroke.  In this case it has a couple of hooks on the end of it because it was prepared a little more rapidly than this particular, but the significant part of it with the bold formation, the fact it doesn't go to the baseline and it terminates near the baseline with that final stroke is the significant characteristic are involved in that case.

Even referring to the numerals 2 you'll see the 2 has a slight hooked approach and then an elliptical shape in the middle with an underhand garland-type stroke at the terminal stroke and that was also true with the two-formations.  The

**DRAFT COPY**

Sexton - Direct / By Ms. Meyer                191

two-formation starts at the top, an elliptical shape in the

middle and then it has that little garland terminal stroke.

And again, this is only one of many that were observed and it

certainly was significant to the preparation or formation of

the -- that particular numeral formation.

          The nine, this is a -- it could be considered a

classic nine formation, but the thing that makes it significant

is that the nine has an overhand stroke and instead of having a

real narrow and arced terminal stroke as you see in a lot of

Cyrillic handwriting in this particular case it's a downward

stroke with a slight hook on the end of it.  And I found that

to be true in all the known writings that were observed in the

known submission of handwriting in the side-by-side comparison.

And it's for all those reasons and others that I've explained

to you, I did arrive at a conclusion in that particular case.

Q    Mr. Sexton, if you could now --

          **MS. MEYER:**  Now if Agent Davidson could place before

you Government's Exhibit 406.  Your Honor, again, this is the

Thomas Guide Map page found at Mr. Krylov's residence.  And I'm

going to publish the backside of that exhibit for the jury.

**BY MS. MEYER:**

Q    Mr. Sexton, did you receive that map page as part of your

request examination?

A    Yes, I did.

Q    Now looking at the portions that I have highlighted on the

**DRAFT COPY**

Sexton - Direct / By Ms. Meyer                    192

screen to your right, did you draw any conclusions or reach any

determinations regarding that writing?

A    Yes, I did.

Q    Could you please describe for the jury what your

determinations were?

A    They were sufficient similarities and also significant

corresponding characteristics between the question writing and

the known writing of Mr. Kadamovas.

Q    Could you please identify where you found those

similarities?

A    Actually, it would be the entire text really even though

some are English.

Q    Mr. Sexton, the U-formation that you were just discussing

with respect to your demonstrative exhibit is that -- do you

see a similar formation in this question writing?

A    Yes.  Actually, the T, the R, the U, the P, the E-

formation, the R pretty significantly conforms to what I've

already explained.

You see the "U" again in the "Audi?"  That five

formation is a Cyrillic letter formation.  That also appears in

the known writing.  The -- actually all the handwriting that

appears in that particular area has been identified as being

prepared by Mr. Kadamovas.

Q    Mr. Sexton, could you now take a look --

MS. MEYER:  And if Agent Davidson could place before

DRAFT COPY