# GOVERNMENT EXHIBIT 29

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO:  CR-02-220(B)-DT |
| | ) | |
| Plaintiff, | ) | CRIMINAL |
| | ) | |
| vs. | ) | Los Angeles, California |
| | ) | |
| IOURI MIKHEL, | ) | Tuesday, October 17, 2006 |
| JURIJUS KADAMOVAS, | ) | (9:26 a.m. to 11:57 a.m.) |
| | ) | (1:30 p.m. to  4:21 p.m.) |
| Defendants. | ) | |

JURY TRIAL (26th DAY)
(VOLUME XXVI)

BEFORE THE HONORABLE DICKRAN TEVRIZIAN,
UNITED STATES DISTRICT JUDGE

EXCEPTIONAL REPORTING SERVICES, INC
14493 SOUTH PADRE ISLAND DRIVE
SUITE A-400
CORPUS CHRISTI, TX 78418-5940
361 949-2988

2

APPEARANCES FOR:


The United States:        DEBRA W. YANG, ESQ
                          United States Attorney
                          JACKIE CHOOLJIAN, ESQ
                          Assistant United States Attorney
                          Chief, Criminal Division
                          SUSAN DeWITT, ESQ
                          KIM MEYER, ESQ
                          ROBERT DUGDALE, ESQ
                          Assistant United States Attorney
                          312 North Spring Street
                          Los Angeles, CA 90012


Iouri Mikhel:             DALE MICHAEL RUBIN, ESQ
                          2275 Huntington Dr., Suite 902
                          San Marino, CA 91108

                          RICHARD M. CALLAHAN, JR, ESQ
                          230 E. Colorado Blvd., Suite 1200
                          Pasadena, CA 91101


Jurijus Kadamovas:        SONIA E. CHAHIN, ESQ
                          2222 Foothill Blvd., Suite E-278
                          La Canada, CA 91011

                          RICHARD P. LASTING, ESQ
                          1717 Fourth Street, Third Floor
                          Santa Monica, CA 90401


Russian Interpreters:     Ludmilla Genn
                          Alex J. Levoff
                          Zoya Spivakovsky
                          Varvara Olson


Courtroom Deputy:         Debra L. O'Neill

Court Recorder:           Rose Yapundgian

Transcribed by:           Exceptional Reporting Services, Inc.
                          14493 S. Padre Island Drive
                          Suite A-400
                          Corpus Christi, TX 78418-5940
                          361 949-2988

3

**INDEX**

| WITNESS FOR THE GOVERNMENT | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Ainar Altmanis | 5/41/68 | | -- | |
| By Mr. Rubin | | 71/105 | | -- |


| GOVERNMENT'S EXHIBITS | RECEIVED |
|---|---|
| Numbers 82, 83, 84 | 38 |
| Number  85 | 39 |
| Numbers 535-C through E | 10 |
| Numbers 535-F, 535-G | 13 |
| Numbers 570-A, B, C, D | 61 |
| Number  570-E | 25 |
| Number  570-F | 61 |
| Number  570-G | 7 |
| Number  570-H | 59 |

4

**Los Angeles, California; Tuesday, October 17, 2006; 9:26 a.m.**

**(Certified Interpreter utilized for translation)**

**(Call to Order)**

**(Outside the presence of the jury)**

THE CLERK:  Please remain seated and come to order. This United States District Court is back in session, the Honorable Dickran Tevrizian presiding.

THE COURT:  All right.  Outside the presence of the jury, the record will indicate all counsel and parties are present.  Anything Government which to bring up?

MR. DUGDALE:  No, your Honor.  Thank you.

THE COURT:  Anything defense wish to bring up?

MR. ALTMANIS:  No, your Honor.

MR. SPEAKER:  No, your Honor.

THE COURT:  All right.  We'll bring the jury out.

THE CLERK:  Okay.  We're ready to start.

THE COURT:  Incidentally, before the jury comes out, I saw Mr. Buehler here.  Judge Carter has a call in to me regarding Ms. Shounberg (phonetic), as well.  And so, he is as concerned about this as I am.  I don't think this matter is going to go away.  All right.  Let's bring the jury out.

**(Jurors enter courtroom)**

THE CLERK:  Okay.  Sorry about that.

THE COURT:  Good morning, ladies and gentlemen of the jury.  The record will indicate that all parties and counsel

Altmanis - Direct                    5

are present.

Mr. Altmanis, you're still under oath.  State your name, for the record.

**THE WITNESS:**  Ainar Altmanis.

**THE COURT:**  Mr. Dugdale.

**MR. DUGDALE:**  Thank you, your Honor.

**(Witness previously sworn)**

**DIRECT EXAMINATION (RESUMED)**

**(TESTIMONY TRANSLATED THROUGH INTERPRETER)**

**BY MR. DUGDALE:**

Q    Good morning, Mr. Altmanis.

A    Good morning.

Q    Mr. Altmanis, we had adjourned on Friday, for the weekend, you were testifying that you located a gravel parking lot and that Mr. Krylov had just gotten into defendant Mr. Kadamovas' van and left with the defendant's and Mr. Safiev, do you recall how you ended your testimony on Friday?

A    Yes.

Q    And did Mr. Kadamovas' van pull away from that area after Mr. Krylov got into the van?

A    Yes.  Kadamovas, Mikhel, Krylov, with Safiev left.

Q    And, at that point in time, was there somebody left behind with you?

A    Yes.  Kharabadze was left with me.

Q    And were you all alone with Mr. Kharabadze, at this time?

**EXCEPTIONAL REPORTING SERVICES, INC**

Altmanis - Direct                              17

question again, please.

          MR. DUGDALE:  Sure.

BY MR. DUGDALE:

Q    After Mr. Kharabadze was done smoking, where was Mr. Kharabadze taken at that point?

A    Everyone got in the car.  Kadamovas got behind the wheel of the van, Mikhel sat next to him, the three of us sat in the back, Krylov, Kharabadze in the middle, and then I was next to him, kind of closing him in.

Q    And where did defendant Kadamovas drive to, after everybody got into the van?

A    That was it.  We went to the bridge, to the lake.

Q    Okay.  Now, you testified last week about traveling to a bridge to dispose of the body of Mr. Umanksy?

A    Yes.

Q    Did you notice any difference in the route that defendant Kadamovas took to get to the bridge that he drove on this occasion, with Mr. Kharabadze?

A    Yes.  There were two things, one was that we didn't pass the -- there was a spot that I remembered before, yes.  And the other thing was that it took longer.

Q    Now, did Mr. Kadamovas eventually stop at an area near the bridge?

A    Yes.  He parked beyond the bridge.

Q    And could you describe the area where Mr. Kadamovas

**EXCEPTIONAL REPORTING SERVICES, INC**

Altmanis - Direct                    18

stopped?

A     Yes, I can.

Q     And what did it look like?

A     It was this small -- well, I guess, they used it when they were building the road or the bridge, maybe as a place for construction.

        MR. DUGDALE:  At this point I'm going to have Special Agent Perez hand you what's been marked for identification as Government's Exhibit Number 530D.

        THE COURT:  530D?

        MR. DUGDALE:  Correct, your Honor.  And actually, these have been previously admitted so we can demonstrate on the screen, your Honor.  I apologize.

        Ms. DeWitt, can you please publish Exhibit 530D?

        THE COURT:  It was admitted on September the 8th.

BY MR. DUGDALE:

Q     And, Mr. Altmanis, do you recognize the area that's pictured on the screen here, Exhibit 530D?

A     Yes.  This is the same parking.

Q     The same parking as what?

A     Where we drove to.  Where Kadamovas always drove with his van.

Q     Okay.  And can you indicate, on this picture, approximately where Mr. Kadamovas parked his van, in this area?

A     Yes, I can.  He drove right here, and then he backed off

Altmanis - Direct                    19

to this opening and he parked there.

Q    Okay.  So, indicating, for the record, in this photograph, pulling up to the area near where the tire mark is, just above the exhibit tag, and then backing into the area toward the woods, just to the right of what appears to be a fence or small chain-link fence type area; is that right?

A    Yes.

MR. DUGDALE:  At this time, I'm going to ask Ms. DeWitt to please publish what has previously been admitted as Government's Exhibit Number 81.

BY MR. DUGDALE:

Q    And, Mr. Altmanis, you've previously identified this as a view of the back interior of defendant Kadamovas' van.  Could you identify for the jury where everybody was positioned in the car at the time that defendant Kadamovas pulled into that area, you just identified?

A    Yes, I can.

Q    And where was everybody positioned inside the van?

A    Kadamovas was behind the wheel, Mikhel was sitting next to him, Petro was on this side, Kharabadze was in the middle, and I was here on this side.

Q    Okay.  And when you're making the notations about where Mr. Krylov, Mr. Kharabadze and where you were located, what area of the van was that, just so we're clear?

A    It was the second row, right behind the driver and the

Altmanis - Direct                          20

passenger seat.

Q    And, Mr. Altmanis, can you describe for the jury what

happened after Mr. Kadamovas pulled his van over at the area

that you identified, in the previous exhibit?

A    The car was parked and the lights were turned off, someone

went past and Kadamovas with Mikhel and Krylov got out of the

car.

Q    Mr. Altmanis, what did they do when they got out of the

car?

A    They stood there, and Krylov and Kadamovas lit cigarettes.

They smoked for a very short period of time and then they

waited to see whether everything was quiet around there.

Q    And what were you doing at this point in time?

A    I was sitting next to Kharabadze.  Kharabadze was sitting

in the middle.  He was asleep.

Q    Okay.  Now, did someone hand you something at some point

in time?

A    Yes.  When they decided that everything was quiet,

Kadamovas with Mikhel and Krylov approached the van from the

back, here, and the back door opened.  And Kadamovas was --

handed me plastic ties and he told me to tie up Kadamovas'

legs.

Q    And what --

          THE INTERPRETER:  Interpreter's correction,

Kharabadze's leg.

EXCEPTIONAL REPORTING SERVICES, INC

Altmanis - Direct                                        21

BY MR. DUGDALE:

Q    And what did you do after Mr. Kadamovas handed you these plastic ties?

A    I began tying up Kharabadze's legs.

Q    And did you hear anything when you were tying up Mr. Kharabadze's legs?

A    Yes.  While they tightened up his legs, I heard behind me the sound of a tightened up plastic ties like zip.  And at that moment Kharabadze's body went up.  And I looked back and I saw that on his neck there was that gray plastic tie which Mikhel tightened up.

Q    Okay.  After you looked up and saw Mikhel having tightened this plastic tie, what did you do after that?

A    I began tying up the second plastic tie on his legs.

Q    And when you looked up and you saw this gray plastic tie, did you see where the tie was being put by Mr. Mikhel?

A    On his neck, Kharabadze's.

Q    Okay.  After Mr. Mikhel put the gray -- or put the plastic tie around Mr. Kharabadze's neck, did you hear him say anything to anybody else in the area?

A    Yes.  He said to Krylov, "Hold on to the end of this tie." And Krylov took the end of it and Mikhel put a bag on Kharabadze's head.  And he tightened up the end so that the air wouldn't come in.

Q    Now, after Defendant Mikhel put this bag over

EXCEPTIONAL REPORTING SERVICES, INC

Altmanis - Direct                          22

Mr. Kharabadze's head, did he ask you to do something?

A    Yes.   When Kharabadze's head fell on the side when he was already dead, Mikhel told me, "Well, hold on to the bag so that the air wouldn't get in."

Q    Okay.  And did Mr. Kharabadze -- how did his body react to what was happening to him at this point in time?

A    When the loop was put on his neck and the belt was tightened up, his body tightened up and he moved back.

Q    Okay.

A    And then he relaxed.

Q    And how did his body react when Mr. Mikhel put the plastic bag over his head and start to tighten it?

A    It was tight but it was kind of relaxing at that time.  I think that the plastic tie put him to death.

Q    And so did Mr. Kharabadze die right there in Defendant Kadamovas' van?

A    Yes.

Q    Do you know where Defendant Kadamovas was located when Defendant Mikhel put the plastic tie around Mr. Kharabadze's neck?

A    He was next to them.  Because Mikhel was in the middle, Petro was here, (indicating), and Kadamovas was on this, (indicating), side.

Q    And how do you know he was located there?

A    Because I heard his voice from behind.  It was difficult

EXCEPTIONAL REPORTING SERVICES, INC

Altmanis - Direct                        27

night before you were able to dispose of the body?

A     Yes.

Q     Okay.  Can you explain to the jury what happened?

A     We went back to the bridge.  Kadamovas, Mikhel, Krylov and myself, we got out.  We opened the back door and the four of us each was carrying certain part of the body.  And we dropped the body over the --

    THE INTERPRETER:  The Interpreter needs to clarify something.

    THE COURT:  You may.

    THE WITNESS:  And we threw the body over the railing.

BY MR. DUGDALE:

Q     Okay.  And after the four of you threw the body over the railing, where did you guys go then?

A     We got into the car.  Kadamovas was behind the wheel and Mikhel next to him, and Krylov and me we were behind.

Q     And where did you go?

A     We returned to the spot where my car had been parked.

Q     Now, on the trip back from the bridge to the spot where your car had been left, did either of the Defendants tell you what had happened to Mr. Safiev that night?

A     Yes.  From Mikhel's words I learned that Safiev had been killed and that it was as difficult to kill him as it was to kill Pekler.  They compared her -- Mikhel did -- compared her to a snake.  She was as strong as a snake, strongly fighting

Altmanis - Direct                          34

numbers.

        MR. DUGDALE:  Room Number D and Room Number N, your

Honor.

BY MR. DUGDALE:

Q    Now, Mr. Altmanis, did either of the Defendants tell you

how much money was collected as a result of abducting

Mr. Safiev and Mr. Kharabadze?

        MR. RUBIN:  Objection, your Honor.  It assumes facts

not in evidence.

        THE COURT:  No, overruled.

        MR. RUBIN:  It's also compound.

        THE COURT:  No, overruled.

        THE WITNESS:  My name is Altmanis.

BY MR. DUGDALE:

Q    Yes.  I don't know what I called you by.  I apologize.

A    Yes.  I learned, based on what Mikhel said, that they were

able to get $940,000 from Safiev.

Q    And were you told how much of this money that you would be

paid for assisting them?

A    Yes.  48,000.

Q    And who told you that that was the amount of money that

you were going to be paid for assisting in the abduction of

Mr. Kharabadze and Mr. Safiev?

A    I can't say specifically who it was, whether it was

Kadamovas or Mikhel, because I spoke to both of them about

Altmanis - Direct                              35

this.

Q    And did either of the Defendants explain to you how you were going to be paid?

A    He said this time it won't be cash.  We're going to have to put it in the account.

Q    And what account was -- who told you this?

A    Mikhel.

Q    And what account was Mr. Mikhel referring to?

A    The account that I gave him in Latvia.

Q    In whose name was that in, that account?

A    It was in my mother's name, Anna Aitika (phonetic).

Q    And did either of the Defendants ever talk to you about any money that had been paid to the other people who had helped out in the abduction of Mr. Safiev and Mr. Kharabadze?

A    Yes.

Q    What were you told about money that other people had been paid as a result of helping them?

          THE INTERPRETER:  As a result of?

BY MR. DUGDALE:

Q    Of helping them in the abduction of Mr. Kharabadze and Mr. Safiev.

A    That happened at the same time they were addressing Alek Markovskis, and they said -- they told him no cleaner has ever gotten this much money for one time, for cleaning once.

Q    Okay.  And who was present during this conversation when

Altmanis - Direct                              36

you heard the remark that no cleaner had ever been paid this

much money before?

A    Markovskis himself, Mikhel, Kadamovas and myself.

Q    And can you remember specifically who made that remark?

A    No, I can't remember specifically.  It was somebody --

Kadamovas or Mikhel.

Q    And did you get paid the money that you were promised

right away?

A    No.

Q    And did this cause a problem for you?

A    Yes, because they kept promising day after day, week after

week.  But the money never appeared in the account.  I kept

inquiring.

Q    And was there anything specifically that happened that

upset you concerning how slowly you were getting paid?

A    Yes.

Q    And what happened?

A    They started acquiring expensive vehicles, one after

another.

Q    Who acquired expensive vehicles?

A    First, Kadamovas.  He purchased a Mercedes ML55.

Q    And how did you learn that Defendant Kadamovas had

purchased a new Mercedes?

A    We were invited to a supper, to a dinner.

Q    And what happened at that dinner?

Altmanis - Direct                    37

A    At the dinner Kadamovas showed the car he had bought.

Q    And did he do anything particular -- strike that.

What was the purpose of the dinner?

A    Like he was celebrating in the purchase of a car.

Q    Okay.  Is there a Russian tradition that occurs when a person buys a new expensive item?

MR. RUBIN:  Objection.  Leading.

THE COURT:  No, overruled.  He can answer "yes" or "no."  He didn't ask him what the tradition was at this time and --

THE WITNESS:  Yes.

BY MR. DUGDALE:

Q    And can you explain to the jury what that tradition is?

A    The tradition is when you buy something important like a house, an apartment or a car or when a child is born.

Q    What happens when these events take place?

A    That's when they drink to it and you make a party.

Q    And was the party that you attended related to the purchase of this new car?

A    Yes.  Kadamovas -- I mean his wife, invited us.

Q    At this point in time I'm going to have Special Agent Perez hand you what's been marked for identification as Government's Exhibits 82, 83 and 84.

(Pause / Special Agent Perez hands witness exhibits)

And, Mr. Altmanis, do you recognize Government's

Altmanis - Direct                    38

Exhibits Number 82, 83 and 84?

A     Yes.

Q     And what is pictured in Government's Exhibits Number 82,
83 and 84?

A     This is Kadamovas' new car.

        MR. DUGDALE:  All right.  Your Honor, the Government
would move for the admission of Government's Exhibits Number
82, 83 and 84.

        THE COURT:  Received in evidence this date.

    **(Government's Exhibits Numbers 82, 83, 84 were received in
evidence)**

        MR. DUGDALE:  And, Ms. DeWitt, can you please publish
Government's Exhibit Number 82?

    **(Pause)**

**BY MR. DUGDALE:**

Q     And, Mr. Altmanis, is the car that we have pictured on the
screen here in Government's Exhibit Number 82 the Mercedes that
Defendant Kadamovas purchased and celebrated with this party?

A     Yes, that the exact same Mercedes ML55.

Q     Now, did Defendant Mikhel also acquire a new car in the
aftermath of the abduction and murder of Mr. Kharabadze and
Mr. Safiev?

A     Yes, he did buy one, too.  He purchased one, too.

Q     And what kind of car was it?

A     A Range Rover.

Altmanis - Direct                    39

Q    At this point in time I'd like you to please take a look at what's been marked for identification --

MR. DUGDALE:  Special Agent Perez, if you'd give him Government's Exhibit Number 85.

(Pause / Special Agent Perez hands witness exhibit)

Your Honor, may I approach?

THE COURT:  You may.

BY MR. DUGDALE:

Q    Mr. Altmanis, I'm handing you what's been marked for identification as Government's Exhibit Number 85.

Do you recognize what's in that photograph?

A    Yes.  That's the Range Rover that is parking [sic] next to his house.

Q    And is that the car that Mr. Mikhel acquired after the abduction of Mr. Safiev and abduction of Mr. Kharabadze?

A    Yes.

MR. DUGDALE:  Your Honor, at this time the Government would move for the admission of Government's Number 85.

THE COURT:  Received this date.

(Government's Exhibit Number 85 was received in evidence)

BY MR. DUGDALE:

Q    And, Mr. Altmanis, did Defendant Mikhel do anything to celebrate the acquisition of this new car?

A    Yes.  He had a party to drink to his car, too.  And he invited us.

Altmanis - Direct                    40

Q    Were you present at that party?

A    Yes, I was there.

MR. DUGDALE:  At this point in time I'd like Ms. DeWitt to please publish what has previously been admitted as Government's Exhibit Number 202.

BY MR. DUGDALE:

Q    And, Mr. Altmanis, were you present when this photograph was taken?

A    Yes, I was present when it was made.  Mikhel was taking a picture of his girlfriend.

Q    And can you explain what's happening in this picture here?

A    She's pouring champagne on the wheels.

Q    And what's the significance of pouring champagne on the wheel in the manner that Mr. Mikhel's girlfriend is doing here?

A    Well, it signifies an easy, easy driving, easy path.

Q    Now, Mr. Altmanis, how did you feel upon learning that the Defendants were acquiring these new things, the new Land Rover that Defendant Mikhel acquired and the new Mercedes that Defendant Kadamovas acquired?

A    I expressed this to them that everybody is buying things except me.

Q    And --

THE COURT:  Let's take our morning recess at this time.  Remember the admonition.

(Recess taken from 10:50 a.m. to 11:02 a.m.; parties

EXCEPTIONAL REPORTING SERVICES, INC

Altmanis - Direct                              41

present)

        (Outside the presence of the jury)

                THE CLERK:  Please remain seated and come to order.
This United States District Court is now in session.   The
Honorable Dickran Tevrizian presiding.

                THE COURT:  All right.  Outside the presence of the
jury.  The record will indicate all parties and counsel are
present.

                How long are you going to be?

                MR. DUGDALE:  I think it will either be at the break
or shortly after the break.  It's not going to be much more
than an hour though, your Honor.

                THE COURT:  All right.  Bring the jury back in.

                THE CLERK:  Okay.  We're ready to start.

        (Pause)

        (Jury enters at 11:03 a.m.)

                THE COURT:  All right.  The record will indicate all
jurors are present.  All counsel and parties are present.

                Mr. Altmanis, you're still under oath.  Please state
your name for the record.

                THE WITNESS:  Ainar Altmanis.

                      DIRECT EXAMINATION (CONTINUED)

BY MR. DUGDALE:

Q    Mr. Altmanis, at the break you were discussing complaints
that you were making to the defendants as a result of the fact

Altmanis - Direct                              42

that they were acquiring new cars and you had not yet been paid.

What was the result of the complaints that you made to the defendants?

A    I just told them my opinion that I didn't get any money --

Q    And did they agree --

A    -- until then.

Q    Did they agree to do anything as a result of your complaint?

A    Yes.  They told me that they will raise the amount up to 100,000.  And that would be -- that amount would be sent to Latvia to my mother to the bank in the nearest time.

Q    And did you ever learn whether any of this money was sent to your mother's bank?

A    Yes.  They did mail the money.

Q    Okay.

MR. LASTING:  Excuse me, your Honor.  I'm going to object to the use of the word "they."

THE COURT:  All right.  Sustain an objection as to "they" unless you ask a follow-up question.

MR. DUGDALE:  That's fine, your Honor.

BY MR. DUGDALE:

Q    How did you learn -- well, did you learn that money was sent to your mother's account in Latvia?

A    Yes, it was.  When I had been arrested for three or four

Altmanis - Direct                      43

weeks.

Q    And as a result, did you ever touch a dime of that money

that was sent to your mother's account?

A    No.  I was here.

THE COURT:  All right.  For the record, I have to

sustain the objection.  Motion to strike the answer "they" will

be granted.  All the record should indicate is that he

discovered, after making a request, that the money was

eventually sent to the account in Latvia.

MR. DUGDALE:  That's fine, your Honor.  And then

there were subsequent questions about it being after his

arrest.  I take it those are also --

THE COURT:  Those are all valid questions.

MR. DUGDALE:  Thank you, your Honor.

THE COURT:  "They" was struck.

MR. DUGDALE:  Okay.

BY MR. DUGDALE:

Q    So you never touched any of that money; is that right, Mr.

Altmanis?

A    No.

Q    Do you know what happened to that money?

A    Yes.  My parents withdrew the money from the account for

their needs and for themselves.

Q    Okay.  Did you ever have a discussion with anybody about

your parents withdrawing that money?

EXCEPTIONAL REPORTING SERVICES, INC

A      Yes, I did.

Q      Who did you talk to about this?

          THE INTERPRETER:  Interpreter needs to clarify something?

          THE COURT:  You may.

          THE WITNESS:  Yes.  I spoke about it to my brother.

BY MR. DUGDALE:

Q      And what did you tell your brother about -- what's your brother's name?

A      Raymond Eidaks.

Q      And what did you tell your brother about that money?

A      So that they would withdraw money and use the money to secure the safety for themselves and for my children, who are there.

Q      And why did you want your parents to do that?

A      Because at that time I was already cooperating with federal authorities.  And here my family was protected, but over the ocean they couldn't.

Q      Now, turning back to the money that was paid in connection with the abductions of Mr. Safiev and Mr. Kharabadze, did either of the defendants ever mention any plans to try to collect more money after Mr. Safiev and Mr. Kharabadze were killed?

A      Yes.

Q      And who told you about such plans?

Altmanis - Direct                                45

A     Yes.  Mikhel himself.  He said that in the presence of everyone; Mikhel, Kadamovas, myself, and Krylov.

Q     And what did Defendant Mikhel tell you about plans to collect more money following the murders of Mr. Safiev and Mr. Kharabadze?

A     He said that they -- I mean Kadamovas and Mikhel had a recording of the voice and the conversation of Safiev and that they were going to use this recording and his voice in order to get more money from his partner in London.

Q     Now, Mr. Altmanis, after the defendants abducted and murdered Mr. Safiev and Mr. Kharabadze, did either of them ever discuss with you any future plans to abduct people for money?

A     Yes, they did.  Mikhel discussed his plans about the future.

Q     And what ideas did Defendant Mikhel discuss with you about abducting people for money?

        MR. RUBIN:  Objection your Honor.  That misstates the evidence or assumes facts not in evidence.

        THE COURT:  I'll sustain an objection to the form of the question.

        MR. DUGDALE:  That's fine, your Honor.

BY MR. DUGDALE:

Q     What did Defendant Mikhel discuss with you about future plans after the murders of Mr. Kharabadze and Mr. Safiev?

A     Mikhel explained that he had been in Miami on the yacht

Altmanis - Direct                                    46

show and that there are a lot of rich Russians.  And they show up there, and they buy yachts.

Q    And did he explain to you how this place in Miami where rich Russians would show up could be used in the future to make money?

A    Yes.  It was possible to find good, rich man for kidnapping and receiving money.

Q    And besides yourself, do you know if Mr. Mikhel shared this idea with anybody else?

A    I don't know whether he discussed it with anyone else in any concrete details or what.  In general, he explained all this in front of all of us; myself, Kadamovas.

Q    Did Defendant Mikhel discuss any other ideas like this in front of yourself and Mr. Kadamovas?

A    Yes.  There were more ideas.

Q    And what additional ideas did Mr. Mikhel discuss in front of you relating to a possibility to look for rich people who could be kidnapped?

A    One idea was to send Krylov to New York, because he had good connections there.

Q    And what would be the point of sending Mr. Krylov to New York?

A    So that he would go there for two weeks, not longer, as Mikhel explained so that Krylov would look at the situation there and try to find a target for kidnapping.

Altmanis - Direct                          47

Q    Had Mr. Krylov ever been used before by the defendants to try and find a target for kidnapping in New York?

A    Yes.  There was an instance from Mikhel's home.  He called New York.

Q    Who called New York?

A    Krylov did some time before.

Q    And what was the reason why Mr. Krylov was calling New York from Defendant Mikhel's home?

A    He called to the telephone one of his former clients that Krylov had when he was working in New York.

Q    And what was the reason why Mr. Krylov was contacting this former client?

A    So that he would get him interested in purchasing a truck company.

Q    And who purportedly was he going to purchase this trucking company from?

A    That Krylov had information that there was a trucking company for sale and that that man was interested.  And he was in business with the trucks.

Q    Okay.  And what was the reason why Mr. Krylov was trying to interest this man in a deal involving a trucking company?

A    To lead him on, to make him interested in this fraudulent affair, and then later on kidnap him for the purpose of getting money.

Q    And who was involved in this plan to kidnap this man?

Altmanis - Direct                        48

A    Myself, Kadamovas, Mikhel, and Krylov.  Everyone was there.

Q    And did this plan ultimately succeed?

A    No.

Q    And why not?

A    This person didn't get interested.  And he told Krylov never call him again and forget his telephone number.

Q    Now, in addition to the idea that was presented about using Mr. Krylov to find targets in New York and to look for targets in Miami associated with this boat show, were there any other ideas that were proposed by Mr. Mikhel concerning future kidnappings that the group could conduct?

A    Yes.

Q    And what were the other ideas that Mr. Mikhel proposed?

A    One was that they were -- that he and Kadamovas were going to ski to Aspen.  And they invited me with the purpose of looking for rich people there.

Q    And what was the purpose -- what would be the purpose of looking for rich people in Aspen?

A    In order to kidnap them and get money.

Q    And did you end up going on such a trip with the defendants?

A    No, I did not.  I refused.

Q    Do you know if they went on a trip to Aspen?

A    Yes, they did go to Aspen.  But I don't know the details.

EXCEPTIONAL REPORTING SERVICES, INC

Altmanis - Direct                                49

Mikhel and Kadamovas didn't tell me about them.

Q    And was there a last idea that Defendant Mikhel proposed as far as acquiring new targets for kidnapping?

A    He did not offer it.  He simply gave me the information. He told me that he knew a woman in France -- in French Riviera that they are paying for her lodging and paying for her expenses and that she was working for them.

Q    And did Defendant Mikhel explain what this woman was doing for him up in France?

A    Yes.  That she was gathering information about rich people, Russians.

Q    For what purpose?

A    For kidnapping and for getting profit, money.

Q    Now, Mr. Altmanis, what day were you arrested on?

A    February 19th, 2002.

Q    And were you initially arrested by the State or the federal authorities?

A    Police.

Q    What crime were you initially charged with committing when you were arrested on February 19th of 2002?

A    Theft from a store.

Q    And where were you being -- were you being held by the police at that point in time following your arrest?

A    Yes.  In one of the police stations in Hollywood.  I don't know where.