# GOVERNMENT EXHIBIT 30

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO:  CR-02-220(B)-DT |
| | ) | |
| Plaintiff, | ) | CRIMINAL |
| | ) | |
| vs. | ) | Los Angeles, California |
| | ) | |
| IOURI MIKHEL, | ) | Wednesday, October 18, 2006 |
| JURIJUS KADAMOVAS, | ) | (9:37 a.m. to 11:49 a.m.) |
| | ) | (1:26 p.m. to  4:11 p.m.) |
| Defendants. | ) | |

JURY TRIAL (27th DAY)
(VOLUME XXVII)

BEFORE THE HONORABLE DICKRAN TEVRIZIAN,
UNITED STATES DISTRICT JUDGE

EXCEPTIONAL REPORTING SERVICES, INC
14493 SOUTH PADRE ISLAND DRIVE
SUITE A-400
CORPUS CHRISTI, TX 78418-5940
361 949-2988

2

**APPEARANCES FOR:**


| | |
|---|---|
| The United States: | DEBRA W. YANG, ESQ |
| | United States Attorney |
| | JACKIE CHOOLJIAN, ESQ |
| | Assistant United States Attorney |
| | Chief, Criminal Division |
| | SUSAN DeWITT, ESQ |
| | KIM MEYER, ESQ |
| | ROBERT DUGDALE, ESQ |
| | Assistant United States Attorney |
| | 312 North Spring Street |
| | Los Angeles, CA 90012 |
| | |
| Iouri Mikhel: | DALE MICHAEL RUBIN, ESQ |
| | 2275 Huntington Dr., Suite 902 |
| | San Marino, CA 91108 |
| | |
| | RICHARD M. CALLAHAN, JR, ESQ |
| | 230 E. Colorado Blvd., Suite 1200 |
| | Pasadena, CA 91101 |
| | |
| Jurijus Kadamovas: | SONIA E. CHAHIN, ESQ |
| | 2222 Foothill Blvd., Suite E-278 |
| | La Canada, CA 91011 |
| | |
| | RICHARD P. LASTING, ESQ |
| | 1717 Fourth Street, Third Floor |
| | Santa Monica, CA 90401 |
| | |
| Russian Interpreters: | Ludmilla Genn |
| | Alex J. Levoff |
| | Zoya Spivakovsky |
| | Varvara Olson |
| | |
| Courtroom Deputy: | Debra L. O'Neill |
| | |
| Court Recorder: | Rose Yapundgian |
| | |
| Transcribed by: | Exceptional Reporting Services, Inc. |
| | 14493 S. Padre Island Drive |
| | Suite A-400 |
| | Corpus Christi, TX 78418-5940 |
| | 361 949-2988 |

3

**INDEX**

| WITNESS FOR THE GOVERNMENT | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Ainar Altmanis | | | | |
| By Mr. Ruben | | 9/43/61/98 | | |

| DEFENSE EXHIBITS | MARKED | RECEIVED | RE-NUMBERED |
|---|---|---|---|
| Number 2003 | 73/121 | 75 | 76 |
| Number 2004 | 121 | | |
| Number 3000 | 76 | | |
| Number 3001 | 94 | | |

EXCEPTIONAL REPORTING SERVICES, INC

8

little sparse now for Mr. Mikhel.  It's also because Mr. Callahan is here assisting me, it looks like no one wants to sit next to Mr. -- and the Marshals won't let us move that chair.

THE COURT:  I understand.

MR. RUBIN:  So I was wondering if it was possible that our investigator could actually sit there and then he could transfer notes from Mr. Mikhel to Mr. Callahan.

THE COURT:  No, I can't do that.

All right.  Let's bring the jury in unless Mr. Lasting or Ms. Chahin have anything.

MR. LASTING:  I'm sorry, your Honor?

THE COURT:  Do you have anything at this time?

MR. LASTING:  No, your Honor.  My thanks to the Court...

THE COURT:  Bring the jury out.

**(Pause / Jurors enter courtroom at 9:43 a.m.)**

Good morning, ladies and gentlemen of the jury.  The record will indicate all Defendants and counsel are present and the witness, Mr. Altmanis, is still under oath.

**(Witness Previously Sworn)**

State your name for the record.

THE WITNESS:  Ainar Altmanis.

THE COURT:  And all jurors are present.

You may continue with your cross examination at this

Altmanis - Cross                          9

time, Mr. Rubin, of the witness, Mr. Altmanis.

                MR. RUBIN:   Thank you, your Honor.

                CROSS EXAMINATION (CONTINUED)

           (Testimony Translated Through Interpreter)

BY MR. RUBIN:

Q    When you were working at Russian Roulette Restaurant, did you have an opportunity to meet Rita Pekler?

A    I saw her there.  I wasn't personally -- I never personally met her.  I saw a lot of people there.

Q    Well, did you wait on her at the restaurant?

A    No.  No, I did not.  There's 500 seats in the restaurant.

Q    Didn't you tell the FBI at some point in time during your debriefings that you believed that Rita Pekler recognized you from Russian Roulette Restaurant?

A    No.  I said the opposite.  I said that I doubt that she recognized me because it was a few years ago, that it was quite a few years ago.

Q    Okay.  Specifically, you didn't tell the FBI that you felt that Rita Pekler was -- remained calm because she recognized you from the Russian Roulette Restaurant?

A    No.

Q    Well, in fact, didn't Ms. Pekler do work, immigration work for your wife to try to get her legal status in the country?

A    No.  I don't know about that.  I know that there's some kind of -- one of the Armenian offices was helping my wife.  I

Altmanis - Cross                                    10

went there myself personally.  But Pekler, no.

Q    Well, and again, my question is:  Are you saying you don't know if she did, or are you saying no, she didn't?

A    No.  I don't know what happened before we started living together.  I don't know what she was doing before.  I know I have a rough idea where she went when we lived together.  But before me, I don't know.

Q    Well, did your wife, Elena (phonetic), tell you that she had used Rita Pekler to try to assist her in her immigration status?

A    I don't know about the immigration issues.  Specifically, she might have said something that she did go to her for some other stuff.  I'm not sure.

Q    All right.  So other than your recognition of Ms. Pekler from Russian Roulette Restaurant, you had heard her name before.

A    Yes.  I've heard of a lot of names before that.

Q    And you knew -- when I say "before" I'm talking about before the incident you testified to regarding Ms. Pekler.

A    Yes.

Q    You knew who she was.

A    I knew that she's a member of the community, but specifically who or what she was, no.

Q    Well, do you remember what your wife told you that she went to Ms. Pekler's office for?

Altmanis - Cross                          11

A       No, I don't remember.

Q       Didn't your wife Elena tell you that the work that
Ms. Pekler did for her was bad, it was shoddy?

          MR. DUGDALE:   I'm going to object.  This is all
hearsay, all the statements made to this witness, your Honor.

          THE COURT:   Sustained.

          MR. RUBIN:   Can we approach, your Honor?

          THE COURT:   At the sidebar.

      **(Sidebar on the record begins at 9:50 a.m.)**

          THE COURT:   All right.  It's definitely hearsay the
conversation between his wife and himself, because it has
nothing to do with this case.  The fact that Ms. Pekler was
working for the witness's wife, if at all, that is a legitimate
area of inquiry.  But the way you have to do it is you're going
into the specific content of the conversation and the
characterizations of the work that has been performed.  And
that's hearsay.

          MR. RUBIN:   Well, first of all, at this point it is
not necessarily offered for the truth of the matter.  It's
offered for his state of mind and it's offered to develop
motive.

          THE COURT:   No, it's still hearsay.  I mean you can
ask him, "Did you have any conversations with your wife about
Ms. Pekler?"  And he can answer that "yes" or "no."  But the
specific content of the conversation is out of bounds because

EXCEPTIONAL REPORTING SERVICES, INC

Altmanis - Cross                       12

it's hearsay and it wouldn't go to state of mind.

**MR. RUBIN:**  But again, at this point the purpose of the conversation is to supply motive for the subsequent crime other than as has been stated.  And the question is whether or not at this point the witness is credible.

**THE COURT:**  Well, he doesn't know.  He said:  I don't know what my wife did before we lived together and afterwards I have no specific recollection of Ms. Pekler doing any work for him.  So, you know, you can't, you know, develop motive that way.

**MR. RUBIN:**  Well, he does say that he believes that she did go to her office and did some work for her.

**THE COURT:**  Well, I don't think he really said that.  He doesn't know.  I mean, you know, you're sort of putting words in his mouth that he went there.  So I think without more of a showing it's off bounds.

**MR. RUBIN:**  All right.  Thanks, your Honor.

**(Sidebar ends at 9:51 a.m.)**

Thank you, your Honor.

**BY MR. RUBIN:**

Q    Sir, did you have a conversation with your wife Elena concerning her use of Ms. Pekler's services?

A    Possibly there was but I don't remember when this conversation happened.  We had a lot of conversations during our life together.  If I knew that this was going to be useful

Altmanis - Cross                          13

at some point, I would have remembered or taken notes, but...

Q    Well, I'm not asking when at this point.  I just want to know if you remember a conversation with your wife regarding her using the services of Ms. Pekler.

A    Yes, she did say something but I can't remember what it was.  She told me a lot of stuff about her life and what she was doing.

THE COURT:  That's not the question.

Do you recall a specific conversation with your wife regarding utilizing the services of Rita Pekler to help your wife gain immigration status?  "Yes" or "no."

THE WITNESS:  No.  Not for immigration status, no.

THE COURT:  Did you have a discussion with your wife regarding Ms. Pekler?

THE WITNESS:  Yes.  She told me that she had some kind of dealings, but I don't remember what.

MR. RUBIN:  Okay.  Thank you, your Honor.

BY MR. RUBIN:

Q    In that discussion with your wife regarding Ms. Pekler, did your wife express dissatisfaction for the quality of the services?

MR. DUGDALE:  Objection.  Hearsay, your Honor.

THE COURT:  No, overruled.  He's not asking for the specific content of the conversation but what the general conversation was all about.

EXCEPTIONAL REPORTING SERVICES, INC

Altmanis - Cross                    14

THE WITNESS:  Yes, she did express it.

BY MR. RUBIN:

Q    She expressed the fact that she was not happy with the quality of the services she received.

A    Yes.  She told me about that.  But it was brief.  She said that she changed the person and went to some other people.

Q    Did you personally have any contact with Ms. Pekler regarding the services that were provided for your wife?

A    No.

Q    You didn't go and ask if you could have her money back.

A    Money?  Can you come again?

Q    Well, I'm assuming that Ms. Pekler charged your wife Elena for the services provided.

        MR. DUGDALE:  Objection.  Would assume facts not in evidence.

        THE COURT:  Sustain the objection.  Don't assume anything.

        THE WITNESS:  Well --

        THE COURT:  There's no question pending.

BY MR. RUBIN:

Q    Did your wife pay Ms. Pekler for the services she received?

        THE COURT:  If you know.

        THE WITNESS:  Yes.  She had some problems with the money possibly.  Possibly, maybe.  It was maybe before there

Altmanis - Cross                          15

was some money dealings.

**BY MR. RUBIN:**

Q    Did you contact Ms. Pekler or her office in attempts to get a refund for your wife?

A    Yes, we went to the office and my wife talked to her.

Q    When you say "we," are you included along with your wife?

A    Yes, yes.

Q    And you both went to Ms. Pekler's office.

A    Yes, on -- yes.

Q    Do you remember when this occurred?

A    Oh, God.  That was a long time ago.

Q    Well, how about a year?

        **THE COURT:**  A year from today or a year from --

        **MR. RUBIN:**  No.  A year that this happened.  Thank you, your Honor.

        **THE WITNESS:**  '98.  Well, as soon as I met her I brought her there.

        **THE COURT:**  As soon as you met who?

        **THE WITNESS:**  My wife.

**BY MR. RUBIN:**

Q    And --

A    Maybe.  I don't know.  It's hard for me to say.

Q    Okay.  To the best of your recollection, somewhere around 1998?

A    Possibly, if not before.

Altmanis - Cross                           16

Q    All right.  Would I be correct, then -- are you comfortable with 1998 or maybe a little earlier?

A    '98.

Q    All right.  And you and your wife, I assume that you weren't married when you went to Ms. Pekler's office.

A    No.

Q    And so you took your girlfriend, soon to be wife, to Ms. Pekler's office, correct?

A    Yes, she -- yeah, I took her there because she didn't have a car.

Q    And the purpose for your taking Elena to Ms. Pekler's office was to attempt to recover some of the money that she had already paid Ms. Pekler.

A    Yes.  She had some kind of dealings with her in that office.  She went in the office.

Q    Well, again, was the purpose of your taking Elena to the office to try to get repayment of money that she had paid?

A    Yes.  She wanted to get some part of the money back and to pick up her documents.

Q    Do you know if Elena was successful in getting a refund?

A    I really don't remember what happened there.

        THE COURT:  Did you go into the office with your -- with Elena at that time?

        THE WITNESS:  Yes, I did.

BY MR. RUBIN:

EXCEPTIONAL REPORTING SERVICES, INC

Altmanis - Cross                          17

Q    Do you remember where that office was located?

A    Somewhere in Santa Monica.  I don't remember the address.

Q    Santa Monica Boulevard?

A    Yes.

Q    Well, didn't you tell us about a time when Mr. Mikhel and Mr. Kadamovas were in London and you were given an address for Ms. Pekler to verify her office?

A    Yes.

Q    And you went to the address and you couldn't find the office.

A    Yes, because it wasn't there.

Q    And you called Jeff Dabbs to verify the address that you had received as Ms. Pekler's office.

A    Yes.

Q    You knew where her office was at that time, you had already been there.

A    No.  That office, she wasn't there.

Q    She wasn't where?

A    I don't think she was at that office because they gave me a different address and --

Q    When you say --

A    -- I was there in '98.  And I still don't remember where that office was.  So by the time they'd asked me to confirm where the office was I wasn't there.  I didn't even remember where it was.  I was checking on the office that they gave me,

EXCEPTIONAL REPORTING SERVICES, INC

Altmanis - Cross                              18

the address that they gave me.  Because I knew that they had the information.

Q     When you say you --

A     Kadamovas and Mikhel.

Q     When you say that you don't think Ms. Pekler was there, what are you talking about?  Where?

A     Well, when -- you know, after I was there in '98, I didn't even think it was important because I just -- they gave me an address and I went to that address.

Q     They gave you an address.  You went there looking for Ms. Pekler's office.  The office wasn't there and you didn't say, "Wait, I've been there before.  It's not at this address."

        MR. DUGDALE:  Objection to the compound nature of that question.

        THE COURT:  Sustained.  An objection to the question. No question pending.

        MR. RUBIN:  Thank you, your Honor.

BY MR. RUBIN:

Q     So you were looking -- and again, this happened regarding the address that you got that you could not find.

        When was that, 2001?

A     Yes.

Q     And you were given an address, correct?

A     Yes, I was given an address.

Q     You went to the address and the office wasn't there.

Altmanis - Cross                    19

A    No.  I called London again.  I called Kadamovas.  I said, "That office isn't there."  I was told to call Jeff, and I called Jeff.

Q    All right.  Did you -- when you called Mr. Kadamovas in London to say the address is not -- the office isn't there, did you tell him, "I've been to her office before and it's on Santa Monica Boulevard"?

A    They knew that before.  They knew that before.  When they were looking for that address, I told them already that they knew I'd been there, and I told them that my wife had been there and it was on Santa Monica Boulevard.  And they already knew.  And I'd explained to them when they were looking for the office.  But they told me that's not where the office was, and they gave me the new address.  And that's where I went.  And that's why I went there.  And I'm 100 percent sure that they told me that the office was in the new place.

Q    When you say "they," who are you referring to?

A    Kadamovas.

Q    So before you even went to look at their address you had had a discussion with Mr. Kadamovas about locating Ms. Pekler's office and you had told him that you had previously been to her office.

A    Yes.  I told them and, you know, I said that that's not -- I was told that that's not where it was.  And I was given a different address.

EXCEPTIONAL REPORTING SERVICES, INC

Altmanis - Cross                    20

Q    And you didn't go by -- as long as you were on La Cienega you didn't go by the Santa Monica address to see if she was still there.

          MR. DUGDALE:  I'm going to object as to the question. There's no evidence about being on La Cienega, your Honor.

          THE COURT:  Sustained.

          MR. DUGDALE:  It assumes facts not in evidence.

          MR. RUBIN:  I'm sorry.

BY MR. RUBIN:

Q    Was the address that you were given and verified by Jeff Dabbs on La Cienega?

A    Yes, on La Cienega.

Q    Okay.  So you had gone by the La Cienega address.  You didn't think maybe to go -- as long as you were there, drive by Santa Monica and see if the office was still there?

A    No, because he told me that she's not there any more. This is her new address.  Why should I waste my time?  I had already wasted a whole day on this.  I told them and I said, "It's not there."  He said, "Fine.  Call Jeff."

          I called Jeff.  He gave me the street number.  I told him, "No, it's not there."  Then, I called London again.  Then, Kadamovas told me, "Forget about it.  We'll figure it out when we get back."  And that was that.

Q    By the way, does Jeff Dabbs speak Russian?

A    No, he speaks English.

Altmanis - Cross                              21

Q    Did you speak to Jeff Dabbs in English?

A    I just did my best to explain the street -- the address to him and the street and the street number.

Q    So the --

A    I remember that well.

Q    The answer is "yes," you do speak some English.

A    Yes.  The elementary stuff.

Q    And after doing all of this work and spending a day driving around trying to locate the address, did you think of looking in a phone book?

A    No.  What would I need to -- I didn't need it.  They were the ones who needed it.  I had my own stuff to take care of.

Q    Did you know how to dial 411 and ask for someone's phone number?

A    I knew.  I've never used it, but I don't need it.

Q    Well, so you really weren't looking for Ms. Pekler's correct address.

A    No.  I didn't need it.

        THE COURT:  Can I ask it again?

        THE COURT:  You may.

BY MR. RUBIN:

Q    Were you looking actually to find Ms. Pekler's correct address or not?

A    No.  I didn't find what I was given.  I called them back. I got rid of that errand and that's it.  That's all I needed to

Altmanis - Cross                          22

do.  I wasn't interested, you know, about the details.

Q    So what you did was stupid busywork that you didn't get paid for.

MR. DUGDALE:  Objection.  Argumentative, your Honor.

THE COURT:  Sustained.  No question pending.  No question pending.  No question pending.

BY MR. RUBIN:

Q    Now --

A    I did as little as possible.

THE COURT:  There's no question pending.

BY MR. RUBIN:

Q    Now, all of this information that you've just told us about your wife having used the services of Ms. Pekler and previously being at her office, did you give that information to the FBI?

A    I just remembered it just now.  It's such a trifle.

Q    So --

A    If I would have remembered it, I would have told them.

Q    So the answer is you did not tell.

A    If I remembered, I said.  No.

Q    Let me ask a complete --

A    Because I just found that out right now.  I just remembered right now.

Q    So the answer to the question is yes, you never told the FBI this information about your wife with Ms. Pekler.

Altmanis - Cross                           23

MR. DUGDALE:  Your Honor, asked and answered.

MR. RUBIN:  This is cross.

THE COURT:  No, I'm going to overrule.  I don't want the two of you slugging it out here.

MR. RUBIN:  Yes, sir.

BY MR. RUBIN:

Q    I'm sorry, what was your answer?

A    No, I did not because I didn't remember at the time.

Q    Well, let's talk a little bit about your debriefings with the Government if we can.

Your first meeting with the FBI was approximately four days after your arrest on February 19th, 2002, correct?

A    Yes.  That's about right.

Q    And...

(Pause)

MR. RUBIN:  I'll wait for you --

THE INTERPRETER:  Thank you.

BY MR. RUBIN:

Q    And it was as of that day, four days after your arrest, it was in your mind that you were going to cooperate with the FBI in some way.

A    Yes.

Q    All right.  And since that time you --

THE INTERPRETER:  Just one second.

MR. RUBIN:  Sure.

Altmanis - Cross                            24

THE INTERPRETER:  Something is wrong.

MR. RUBIN:  No problem.

THE INTERPRETER:  I apologize.

(Pause)

Yes?

BY MR. RUBIN:

Q    Since that time you've had numerous debriefings and conversations with police authorities.

A    Yes, I did meet with them.

Q    And we're including in that the FBI; is that correct?

A    Yes.

Q    Members --

A    Fabar (phonetic) and police.

Q    Okay.

A    FBI and police.

Q    Members of the local police, LAPD?

A    Yes.

Q    Sheriff's Department?

A    I don't know what they were.  There were a lot of people there.

Q    Agents of the Internal Revenue Service?

A    I don't know.

Q    Members of the Los Angeles District Attorney's Office?

A    Yes.

Q    I'm sorry.  The answer was?

Altmanis - Cross                                    25

A     Yes.

Q     And members of the U.S. Attorney's Office?

A     Yes, I think so.

Q     And -- well, you think so?  Didn't you meet with
Mr. Dugdale?

A     Yes.  But I am not knowledgeable about positions and the
terms.

Q     I'm sorry.  But you did meet with -- or you have met with
all of the prosecutors that are here in court.

A     Yes.

Q     And other prosecutors, as well.

A     What you're asking me and I don't know.

Q     District Attorneys?

A     Yes, there were people.

Q     All right.  In fact, there was a member of the Los Angeles
District Attorney's Office in court during your direct
examination, wasn't there?

A     Yes.

Q     Now, roughly, how many times have you had interviews,
debriefings, conversations with members of law enforcement?

A     It's hard for me to say.

Q     A hundred times?

A     At first I met twice with the federals and then with the
state authorities.

Q     Well, it's been -- you've been -- it's been four years,

EXCEPTIONAL REPORTING SERVICES, INC

Altmanis - Cross                                26

hasn't it?

A       Yes.

Q       Have you met 100 times for debriefings?

A       A hundred?  No.

Q       Less?

A       Much less.

Q       Well, was it once a month?

A       While I was here in MDC I met with them.  I answered their questions and I took them to show them the places.  And then I met with them -- they brought the agreement.  Maybe in these four years I have had altogether about 20 meetings with them.

Q       Okay.  And that includes the years 2002, 2003, 2004, 2005 and 2006.

A       Yes.

Q       All right.  And since you have actually been here testifying, have you had conversations or meetings with law enforcement or the prosecutors?

A       Yes.  I did have conversations with my attorney.

Q       Well, I just asked about law enforcement and the prosecutors.

A       Yes, with law enforcement, too.

Q       Okay.  And when did those conversations occur?

A       I don't know what you mean.  I don't know how I would answer -- I should answer that question.  They came to see me. We just saw each other.

Altmanis - Cross                        27

Q    All right.  Well, you took the stand on October 10th; is that right?  October 10th.  I think you took the stand October 10th.

Did you talk to law enforcement or prosecutors before you started your testimony?

A    Yes, I did.

Q    Was that in the morning before your testimony or the day before?

A    Probably the day before when I was brought here.

Q    And how long was that interview?

A    An hour.  They explained to me that I was brought --

MR. RUBIN:  Objection, your Honor.  It's non-responsive and he's giving hearsay.

THE COURT:  All right.  I'll sustain the objection.  Re-ask the question again.

MR. RUBIN:  Okay.  Sir --

THE COURT:  Wait a minute.  Mr. Altmanis, listen very carefully to the question.  Before you answer the question, ask yourself:  What did he ask?  And then answer that specific question.

BY MR. RUBIN:

Q    So the day before you took the stand you met with the prosecutors for about an hour; is that correct?

A    Yes.

Q    And how about --

Altmanis - Cross                            28

A    About an hour.  I was not watching the time.

Q    Thank you.  How about the day that you testified, the first day?  Did you talk to the prosecutors on that day?

A    Yes, I did.

Q    And was that before your testimony or over the lunch hour or after we ended for the day?

A    After the day was over.

Q    All right.  How long was that interview?

A    Half an hour.

Q    How about -- I'm sorry.  How about the next day after you testified or the next day that you testified?  Did you have an interview with law enforcement?

A    Yes, I did meet with them.

Q    Well, in fact, since you've been on the stand you've met with the Prosecution or law enforcement every day.

A    No, not every day.

Q    Well, what days did we miss?

A    I don't remember.  Some day I did not see them.

Q    How about over the weekend?  Did you have an interview with the prosecutors or law enforcement over the weekend?

A    On Saturday I did.  On Sunday I don't believe I saw them.

Q    All right.  And how long was the interview that you had on Saturday?

A    About 40 minutes.

Q    Now in -- and, again, now I'm talking about all of your

Altmanis - Cross                         29

interviews or debriefings with law enforcement or the

Government.

At any of those did someone play defense attorney and

ask you questions that they thought the defense would ask?

A    No.  No, we discussed my situation.

Q    In any of those meetings did you go over or did someone

ask you questions that you would be asked on the stand in front

of the jury at trial?

A    No.  I knew myself what I would be asked and what I would

not be asked because I -- whatever I know I say it and whatever

I saw I say, and what I didn't see I don't say.

Q    But again, during that -- actually four-and-a-half year

period of time you never told any mention, you never -- strike

that.

During that four-and-a-half period of time, you never

mentioned to law enforcement or the Prosecution that you had

previously met Ms. Pekler or had been to her office.

A    Yes, I did tell them.  Yes, I did tell them that I had --

yes, I did tell them that I had seen her before in the

restaurant where she would come and have a good time.  And I

didn't hide it.  And that I just -- I simply forgot and that I

just didn't think that it was important, it was such a trifle.

Had they told me that it was important, I would have

remembered.

Q    So you didn't think that your wife's and your prior

Altmanis - Cross                           30

relationship with Ms. Pekler was something that you should tell

the Government about.

A    I have already just said that I entirely forgot about it.

Had I remembered it, I would have told them.  Had I remembered

I would have told them that I had seen her and had some kind of

business with her.  I wouldn't be hiding it.

Q    All right.  So I don't understand.  Was it a trifle or was

it --

        **THE COURT:**  "I don't understand" is struck as an

editorial comment.  You can only ask questions.

**BY MR. RUBIN:**

Q    Was it a trifle or was it that you forgot?

        **MR. DUGDALE:**  Objection, your Honor.  Argumentative.

        **THE COURT:**  Sustained.

**BY MR. RUBIN:**

Q    Well, you just said that it was a trifle; is that correct?

A    Yes.  I simply didn't remember it.

Q    All right.  So you didn't have a recollection of it.  It's

not that you didn't give them the information because you

didn't think it was important.

A    Yes.  Had I -- I would have told them, of course.  If I

had told that I had met her before, sure.  And even more so, I

know almost everyone in this community.  During all these years

that I have spent working in the restaurant I have met so many

people I simply couldn't remember all the people that I met and

Altmanis - Cross                                31

all the people with whom I talked.

Q    And you didn't remember that your wife had had a bitter business relationship with Ms. Pekler.

A    That's right.  It was a trifle that I had been a lot of such things during the life in the course of their relationship with different people.  And to keep in the head all these trifles and all these smallest details, it would be just...

Q    Well, did anyone in four-and-a-half years ask you if you knew Ms. Pekler before the incident that you told them about?

A    Yes.  They did ask me and I told them that I had known her from the restaurant and from the community.  I had known her and I was not hiding it.  I said right away that I had met her.

Q    And did anyone ask you if you had prior business dealings with Ms. Pekler?

A    No.

Q    Did anyone ask you if your wife had had prior business dealings with Ms. Pekler?

A    No.  I don't remember.  No, they didn't ask me.

Q    Was Ms. Pekler involved in the staged auto accident ring that you told us about yesterday?

A    No.

Q    Do you know that five days before her abduction Ms. Pekler was subpoenaed to testify before a federal grand jury on the subject?

             MR. DUGDALE:  Objection.  That assumes facts not in

Altmanis - Cross                                    32

evidence.

            THE COURT:   Sustained.   There's no question pending.
No question pending.

BY MR. RUBIN:

Q    By the way, I want to go back a minute.

            In all of the time in four-and-a-half years that
you've been in custody, in all of whatever, 20 times or more or
less, that you've spoken to police authorities or the
Government, have you ever spoken to me?

A    No.

Q    Did you ever speak to Mr. Callahan?

A    No.

Q    Did you ever speak to Ms. Chahin?

A    No, I haven't.

Q    Did you ever speak to Mr. Lasting?

A    No.  I haven't talked to anyone.

Q    Were you told that we were requesting interviews with you?

A    No.  I don't remember any of such conversations.

Q    The Government didn't tell you that we were asking to talk
to you?

A    No.  Nothing that I remember of.

Q    And you didn't tell the Government, "No, I don't want to
talk to them"?

A    No.

Q    Did you --

Altmanis - Cross                                              33

A      I don't recall any of it.

Q      Did your attorney mention to you that the defense attorneys wanted to talk to you?

A      No, I don't recall any of it.

Q      And you don't recall telling her, no, you don't want to talk to the defense attorneys?

A      Why wouldn't I?  I would have talked to you.  If it were necessary, I would have talked to you.  Why not?

Q      When you say "if it was necessary," what would have made it necessary?

A      If they -- if you would have come, I don't know.  You should decide it at the Government level.  You know better about it.  I don't make decisions about who to talk and whom not to talk [sic].

Q      Well, are you saying that if the Government would have told you to talk to us you would have talked to us?

A      I don't know how about -- again, I'm telling you, I don't know who are the prosecutors and who are defense attorneys, and I don't know about your relationship and who should talk to who.

Q      Do you see these three individuals at the end of the table here, (indicating)?

A      Yes.  This is my prosecutor and the agents.

Q      Did either or any of these prosecutors -- strike that.

        If any of these prosecutors would have told you to

Altmanis - Cross                              34

talk to us, would you have talked to us?

A    If it had been necessary and if it had been required from me, yes, of course, I would have talked to you.  Do I have a choice?

Q    And if they -- if either of these prosecutors would have told you not to talk to the defense, then you wouldn't have, correct?

A    This is all decided at the Government level.  Whatever the Government says I will do it.  I am a little man.

Q    Well, do you recall anyone from the Prosecution's office telling you the defense attorneys want to talk to you, you can talk to them if you want to but you don't have to?

A    Could you please repeat your question?  I was unable to comprehend it.

Q    Yes.  Did any one of these three prosecutors right here, (indicating), did any of them tell you that the defense attorneys want to talk to you and that if you want to talk to them you can, but you don't have to?

A    Is this a question?

Q    Yes.  Did they tell you that or not?

A    No.  I don't know.

Q    How about the FBI agents?  Did any of them tell you that?

A    Not to talk to the opposite -- to him?

Q    Do you want me to repeat the question again?

A    Uh-huh.

Altmanis - Cross                                    35

THE COURT:  Is that "yes"?

BY MR. RUBIN:

Q    Is that "yes"?

A    Yes.

Q    Did anyone from law enforcement tell you the defense attorneys want to talk to you, that if you want to talk to them you can, but you don't have to?

A    Yes.

Q    Someone told you that.

A    Probably.  It slipped somewhere during the conversation. I don't know.

Q    Well --

A    I cannot say "yes" or "no."  I can't.  I simply don't remember.

Q    Okay.  Did someone -- do you remember hearing that from someone or not?

A    No, I don't remember.

Q    Okay.

A    I don't remember.  There were a lot of conversations, and I don't remember.

Q    The bottom line is, is you haven't spoken to the Defense.

A    That's correct.  I have not talked to them.  If they had told me, I would have spoken to them, again.

Q    All right.  So your best recollection is that no one told you the Defense wanted to interview you.

Altmanis - Cross                                        36

A     I don't remember.  I don't think so.

Q     Now --

A     Had I remembered, I would have told you.

Q     Going back to Russian Roulette Restaurant for a moment, did you meet Mr. Umansky at the Russian Roulette Restaurant?

A     No.  I saw him for the first time -- no, I have not seen him, no.

Q     So you did not see him at Russian Roulette Restaurant.

A     No.  The first time that I saw him it was when he was brought to Kadamovas' home.

Q     You did not know him prior to the incident you testified to earlier.

A     No, I didn't know him.

Q     You had not heard of him prior to the incident that you testified to earlier.

A     No, I have not -- I had not.  The first time I learned about him was from Kadamovas, Mikhel and Krylov.

Q     Didn't you just testify not about five minutes ago that you knew everyone in the Russian community?

A     Yes, but it doesn't mean that I knew everyone I knew [sic].

Q     Okay.  You did say you knew everyone in the Russian community.  You did testify to that.

A     That was in the general meaning, but it doesn't mean that I know everyone, in particular.

Altmanis - Cross                    37

Q    Okay.  So when you testify that, "I know everyone in the Russian community," you don't mean everyone.

A    Of course.  Whoever I have seen, I have seen.  But whoever I have not seen, I have not seen.  Three days a week 500 persons, even more so if the guests comes there often, there are more chances to remember.  But it doesn't mean -- yes, it means that I know very many people.  But it doesn't mean that I know each and every one out of the million that live here.

Q    I'm sorry.  Did you testify that you first heard about Mr. Umansky from Mr. Kadamovas or from Mr. Krylov?

     **MR. DUGDALE:**  Your Honor, that question misstates his testimony.

     **THE COURT:**  Sustained.  It misstates the testimony.

     **MR. RUBIN:**  Well, I'm trying to clear something up that may be a problem with the --

     **THE COURT:**  I understand, but you're misstating the testimony to clear it up.

     **MR. RUBIN:**  Okay.

**BY MR. RUBIN:**

Q    Who did you first hear about Mr. Umansky from?

A    Krylov.

Q    Now, was Mr. Umansky involved in the staging auto accident ring that you were involved in?

A    No, no.

Q    Mr. Umansky's business, was that involved in filing false

**EXCEPTIONAL REPORTING SERVICES, INC**

Altmanis - Cross                                      38

insurance claims that you --

          MR. DUGDALE:  Your Honor, I'm going to object.
There's actually a motion that --

          THE COURT:  Sustained.  And the jury's not to infer
anything from a question.  The question is not evidence.

          MR. RUBIN:  Your Honor, can we approach?

          THE COURT:  There's no need to.  There's no question
pending.

BY MR. RUBIN:

Q    Did you also work at a restaurant called Premier?

A    No.  I knew people from there.  I would spend some time
there.  But, no.

Q    How about Mr. -- strike that.

          So as far as I understand your testimony, you had
never seen Mr. Umansky in the Russian Roulette Restaurant; is
that correct?

A    That's correct.  Had I seen him I would have remembered
him and for sure I would have told Kadamovas and Mikhel that I
had seen him there.

Q    Now, how about Mr. Safiev?  Had you seen him at the
Russian Roulette Restaurant?

A    No.  I haven't seen him.  Besides Pekler, I don't
remember.  I don't remember to have seen them anywhere.

Q    Now, I wanted to go back yesterday.  When we were
finishing up we were talking about your inability to open any

EXCEPTIONAL REPORTING SERVICES, INC

Altmanis - Cross                                    39

kind of bank accounts.  Remember?

A    Yes.

          THE COURT:  All right.  Let's take a break at this time.

          MR. RUBIN:  Yes, your Honor.

          THE COURT:  It is 10:50.  Remember the admonition.

     **(Recess taken from 10:50 a.m. to 11:09 a.m. / Parties present)**

     **(Outside the presence of the jury)**

          THE CLERK:  Please remain seated and come to order.

          THE COURT:  All right.  Outside the presence of the jury.  The record will indicate all parties and counsel are present.

          Anything the Government wish to bring up?

          MR. DUGDALE:  Only this thing, your Honor.  There have been a couple of questions about the alleged -- or the victim's alleged criminal conduct in the matter.  I don't know if Mr. Rubin remembers this, but there was a motion that specifically covered that.

          THE COURT:  I've already ruled that it's irrelevant whether they're money launderers, whether they're guilty of other criminal activity.  There was a Motion in Limine.  That is all irrelevant to the fact they were killed in this case.

          MR. RUBIN:  Except, your Honor, as I remember the Court's order, it was unless we could show a connection to this

40

case.  With Ms. Pekler we have -- well, we've got the witnesses --

Can the interpreter be told --

THE COURT:  I understand, but it's still relevant.

MR. RUBIN:  Can the interpreter be told not to interpret for the witness at this point?

THE COURT:  All right.

Don't interpret that.

MR. RUBIN:  We have information that we have gotten both in discovery and recently in discovery that we have the testimony from Mr. Altmanis regarding his connection to both auto insurance, staged accidents, and fraudulent insurance claims.

THE COURT:  So what?

MR. RUBIN:  And we have information that immediately prior to her abduction Ms. Pekler was being investigated and was actually subpoenaed to testify regarding an auto insurance -- fraudulent auto insurance claims, staged accidents.  And we believe that Mr. Umansky was involved in that case as well.

Now, this then connects it to this witness and the case.

THE COURT:  It's all speculation.

MR. RUBIN:  Well, except that we now know that the witness knew Ms. Pekler before the incident.

THE COURT:  He knew her as a result of the restaurant

41

and the fact that his wife consulted with Ms. Pekler on an immigration issue and that there was a request to have the documents returned and a dispute over the fee.  And that's all you know.

MR. RUBIN:  Well --

THE COURT:  But he specifically said that Ms. Pekler was not involved in the auto fraud.  He specifically stated that Mr. Umansky was not involved in the auto fraud.  And the inference there is all speculation.

MR. RUBIN:  And, again, the point is, is that it's the jury's job to determine his credibility.

THE COURT:  But credibility is irrelevant at this juncture, because you're inferring that these people were all involved.  You know, and I said that the criminal activities of the victims in this case are totally irrelevant.  They were killed.

MR. RUBIN:  Unless it was somehow connected to this case, I thought that's what the court's order was.  I won't go over it again.

THE COURT:  Okay.

Now, we're going to have to break a little early today, because --

MR. RUBIN:  Yes, sir.

THE COURT:  -- I have an appointment at 12:05.

MR. RUBIN:  Just tell me when, your Honor.  And

42

that's fine.

THE COURT:  Stop about 10 minutes to 12:00.

MR. RUBIN:  Yes, sir.

THE COURT:  And look at the clock behind you so that we look at that time.

MR. RUBIN:  Yes.

THE COURT:  Okay.  Let's bring the jury out, unless Mr. Lasting has an issue and Ms. Chahin has an issue.

MR. LASTING:  I not have any issues, your Honor.

THE COURT:  All right.  How long --

MR. RUBIN:  I would point out to the Court that yesterday when I said I thought I would be done this morning, that was realistic.  The process involving the interpretation is actually taking a lot longer than I thought.

THE COURT:  I understand.  I'm not going anyplace.

MR. RUBIN:  Thank you.

THE COURT:  Let's bring out the jury.

THE CLERK:  Okay.  We're ready.

   (Jury enters at 11:13 a.m.)

THE COURT:  All right.  The record will indicate all jurors are present.  All counsel and parties are present.

Mr. Altmanis, you're still under oath.  Please state your name for the record.

THE WITNESS:  Ainar Altmanis.

THE COURT:  All right.  Before Mr. Rubin continues

Altmanis - Cross                                43

with his cross-examination, one of the jurors sent me a note

asking whether it's possible to have off November 21st and

November 22nd, which is the Tuesday and the Wednesday preceding

Thanksgiving.

We are off November 17th.  So, basically, what the

juror is requesting is that we take off the entire week of the

20th, because generally we do not meet on Mondays.  I talked

with counsel.  They have no problem with that.

So unless I hear to the contrary via a note from any

other juror members then the week of the 20th we will be off as

well as November the 17th.  All right.

Mr. Rubin?

**MR. RUBIN:**  Thank you, your Honor.

**CROSS EXAMINATION (CONTINUED)**

**BY MR. RUBIN:**

Q    Prior to your arrest in February of 2002, did you have

monthly bills that needed to be paid?

A    Yes.

Q    How did you pay those bills?

A    I would sign checks.

Q    So you had a checking account?

A    No, I used my brother's.

Q    Well, you said you signed checks.  You used your brother's

checking account, and you signed his checks?

A    No, he signed them.  I would just write whatever I need.

Altmanis - Cross                              44

He'd pay for it.  I would just put money in.

Q    So was this a checking account that you shared with your brother, or was it a checking account that your brother opened for you to use?

A    No.  It was his account.  He wouldn't open one for me.  He was afraid after all my mistakes.  He'd only let me use it if there was bills that needed to be -- I paid for my apartment in cash.  Other than that, there were very few bills.

Q    When you say that he was afraid of your prior mistakes, are you talking about that you wrote more checks than you had money in your account?

A    No.  He was worried that I would do what I did with my account and with my wife's account, where they would freeze my -- freeze the account.

Q    This is -- by the way, this is Raymond, the brother that was stealing checks from MGM, correct?

A    Yes.

Q    And Raymond also was arrested in December of 2001 for stealing from stores as well?

A    Yes, he was arrested for stealing.

Q    In fact he was stealing cell phones; wasn't he?

A    I don't know what it was that they caught him with in the store.  He was arrested.  I do know that.  And that's why he lost his job here.

Q    And this is Raymond your brother that was storing your

Altmanis - Cross                               45

excess stolen property in his apartment?

A    He wasn't storing them.  I gave it to him to sell.  I said

the price, and he sold it through EBay.  And he had a

percentage.

Q    Okay.  Was the -- the stolen property that was in his

apartment, was it yours or his?

A    Mine.

Q    Okay.  Anyway, this is the -- we're talking about the

right brother when you say that he was afraid you'd do

something to ruin his checking account?

A    Yes.

Q    So sometime around November of 2001, you contacted your

mother in Latvia about opening a foreign account that you could

transfer money into?

A    Yes.

Q    Did you tell your father to open an account as well?

A    I don't remember.  I told my mother, yes.  But my father,

I don't recall.  Our relationship is -- you know, he's a step

father.  I trusted my mother more.

Q    Well, you're aware that your mother opened an account at

the Hansa Bank in Latvia on November 12th, 2001?

A    I know that she opened an account.  But I don't know at

which bank and on what date.

Q    Am I correct that at any time before your arrest, you

weren't given any information about the bank and the account?

Altmanis - Cross                                    46

A     No.  I would just call to find out did the money come. And she would just tell me, "No.  The money's not there."

Q     In order to wire money into another bank, don't you need to know the name of the bank?

A     Yes.

Q     Don't you need to know the address of the bank?

A     Yes.

Q     Don't you need to know the account number that you're using?

A     Yes.

Q     There is an international bank code.  Isn't that required on wire transfers?

A     I don't know.  I didn't transfer any money in euros; so I don't know.

Q     Well, but the information that was -- that you said was given to Mr. Mikhel was given to him so that money could be wired into that account; isn't that right?

A     Yeah.  I gave him the address that my mother gave me.  I gave him the account number.

Q     So you did know the information.  You did have it, and you passed it on for purposes of collecting funds through wire transfer?

A     Yes.

Q     Now, is there any way that Mr. Mikhel could have wired money into your stepfather's Latvia account if you did not give

Altmanis - Cross                              47

him that information?

       **MR. DUGDALE:**  Objection.  Calls for speculation, your Honor.

       **THE COURT:**  Sustained.

**BY MR. RUBIN:**

Q     Did you provide Mr. Mikhel with information regarding an account that your stepfather opened at the Hansa Bank in Lithuania?

A     I don't know.  It's a joint account, my mom and my dad. And they send me the information.  They have it together.  They send me the address.  I gave it to him.  I had the address, and I had the number.  But as to who opened the account, my mother or my father, I don't know.

Q     Did you get two different account numbers?

A     I don't remember.  One or two.

Q     Was it, like, not important to you?

A     Not that important.  Important, but I just don't remember. Because it didn't matter to me if the account was in my mother's name or my father's name.

Q     Or if it was two accounts?

A     Or two accounts.

Q     Now, when your mother opened the account, did you tell her something about the money that you expected to be wired into that account?

A     Yes.  I did tell her that something would be transferred.

Altmanis - Cross                          48

I couldn't know the amount.  I told her that some amount was going to be transferred from a business partner.

Q    Did you tell your mother that whatever monies were transferred into those accounts she could have?

A    Yes.  I told her that they could use the money that they could pay for their own expenses.  And they could also pay for the 15 years back child support that I owed and my debts.

Q    So now you're talking to your mother in November of 2001 about opening the accounts and telling her whatever money comes in the account she can use; is that correct?

        THE INTERPRETER:  I'm sorry.  Could I hear the question again please?

        MR. RUBIN:  You bet.

        This is in November of 2001.  When you ask your mother to open the account, you told her, gave her instructions, that whatever money comes in the account she can take and use.

        THE COURT:  "Is that correct?"

        MR. RUBIN:  Is that correct?

        Thank you.

        THE WITNESS:  Yes, I did.  Yes.  I told her to pay alimony.  And I said that they could use it, because I didn't have access to the money.

//

//

Altmanis - Cross                                49

BY MR. RUBIN:

Q    So you told your mother to use it to support your teenage children?

A    Yes.  To pay my debts, because my ex-wife had gone to court, I think.

Q    So you had 15 years of child-support payments that you owed your ex-wife?

A    I don't remember if it was 15 or maybe less.  It was more than 10.  I left when they were five and six.

Q    And you left them with your ex-wife?

A    Yes.

Q    So they weren't being supported or cared for by your mother and stepfather?

        MR. DUGDALE:  Your Honor, objection.  Irrelevant.

        THE COURT:  No.  Overruled.

        But he's going to have to tie it up here.

        THE WITNESS:  No.  They did take care of them. Because my ex-wife is an alcoholic and so is her husband.  So they lived with my parents all the time.

        THE COURT:  Who lived with your parents all the time?

        THE WITNESS:  My children.

        MR. RUBIN:  So was the money for your --

        THE WITNESS:  That's why I wanted to have them come here when they'd grow up, you know, after they'd grow up. That's why their passports ended up with Mikhel and Kadamovas.

Altmanis - Cross                    50

**MR. RUBIN:**  Your Honor, I'm going to ask that the last part be stricken as non-responsive.

**THE COURT:**  No.  I think it is responsive.

Overrule the objection.

**BY MR. RUBIN:**

Q    Then the money that you were wiring or that you thought would be wired into the Latvia account was for your mother to take to support your children?

A    Yes.  To support my children and also to use for themselves.

Q    And you were telling your mother to take that money for her own?

A    Yes.  To use the money in their life.

Q    And, again, this is -- you told these instructions to your mother at the time that the account was opened?

A    No.  It was before that.  I explained to her why she needs to open the account.  That the money was going to come from the business and for them to use it.  And that's why they opened it.

Q    So even before the accounts were opened, you told your mother to use the money?

A    Yes.  We had a conversation.  And she knew that I had child-support or alimony debt.

Q    So up until February 19th of 2002, your testimony is you did not know of any funds transferred to your parent's Latvian

Altmanis - Cross                                  51

account?

A    Yes.  I didn't know.

Q    And you were talking to your mother on a regular basis
about the account?

        **THE INTERPRETER:**  Account?

        **MR. RUBIN:**  Account.

        **THE WITNESS:**  About the account or about the funds
that came in there?

        I would call to find out if any money has come in.

**BY MR. RUBIN:**

Q    And how often would you call?

A    Once a week, possibly every two weeks.

Q    So between mid November of 2001 till February 19th of
2002, you called your mother once a week to see if money had
been transferred into the accounts?

A    I couldn't tell you.  It could have been once a week.  It
could have been twice.  I didn't really focus on when it is
that I made the calls.  Whenever I needed to find out, I would
make the call.

Q    So at least once a week then?

A    Yes, possibly.

Q    And it could have been more often?

A    Possibly.

Q    All right.  Now -- I'm sorry.

A    Possibly a couple of times a week.

**EXCEPTIONAL REPORTING SERVICES, INC**

Altmanis - Cross                              52

Q    All right.

A    I think once I called twice a week.  Because I found out from Mikhel and Kadamovas -- I said to them, "What's going on? I called, and the money isn't there."  And they said --

MR. RUBIN:  Your Honor, is any of this responsive?

THE COURT:  All right.  This will all be struck. It's not responsive now to the question.

Sir, listen very carefully to the specific question that's asked of you.  Answer the question directly.  If you need to explain your answer, you may explain your answer.

If a question calls for a yes or no answer, answer yes or no.  If you need to explain the yes or no answer, you may do so.  But listen to the question, and specifically answer the question that's asked.  Don't go wandering off.

BY MR. RUBIN:

Q    Now, were these accounts -- did you have these accounts opened anticipating that money would be coming from the MGM checks?

A    No.  No.  I opened the accounts when it was already necessary -- when Mikhel and Kadamovas said.

Q    Now, in discussions with your mother, were you told about a wire transfer that entered her account on January 15th, 2002, in the amount of $14,965?

A    No, I did not discuss that.

Q    You didn't know about that?

Altmanis - Cross                                    53

A     I didn't know, no.

Q     Okay.

A     I wasn't told.

Q     Were you informed by your mother of a wire transfer that was received into her account on February 13th, 2002, in the amount of $48,730?

A     No.

Q     All right.  So in around February 13th of 2002, is the incident that you mentioned at the party when you complained that money wasn't being transferred into your account; is that correct?

A     Yes.  Because the money was not there.  I was sure.  I knew that the money had not come in.

Q     Okay.  You had not been told that the money had arrived?

A     No.  No one did.

Q     Now, again, you were arrested on February 19th, 2002, correct?

A     Yes.

Q     Subsequent to your arrest, you at least had conversations with your brother Raymond who had spoken to your mother?

A     Yes.

Q     And did he inform you that he was told that on February 20th, 2002, a wire transfer in the amount of $51,270 was received into your father's account?

A     How could he have told me that when we were both in jail?

Altmanis - Cross                                    54

Q    Oh, I'm sorry.  I thought you said you had conversations between yourself and your brother?

A    About money, yes.  But this was after a month and a half or -- well, he was freed six months later.

THE WITNESS:  No.  Six weeks.

THE INTERPRETER:  I'm sorry.  Six weeks later.

THE WITNESS:  And that's how I found out.  My mother said that there was an amount of 113,000.  That's how I knew -- that's when I knew that that amount was there.

BY MR. RUBIN:

Q    But you were not -- oh, I'm sorry.  I'll wait.

(Pause)

And what you -- I'm sorry.

What you were not aware of was the dates that those funds were wired into the account?

THE INTERPRETER:  You were not aware?

MR. RUBIN:  You were not aware of the dates that those funds were wired into the account.

THE WITNESS:  Yes.  I learned about the total amount, 113,000, only when my brother told me about it.  And before that they called, and they didn't tell me.

BY MR. RUBIN:

Q    And you had before -- you gave Raymond instructions to tell your mother to take the money out of the account; isn't that right?

Altmanis - Cross                                55

A    Yes.  So that she would withdraw the money and use it for her needs.

Q    Right.  You had already told her to do that when she opened the account?

A    Yes.

Q    Now, in fact your parents took the $113,000?

A    Yes.  Because the first time I explained it -- they were explained in a different way.  And this time they were explained in a different way.  This time I told them that they need to use these $113,000 in order to protect the children and themselves.  This is what I told my brother.

Q    Well, do you know what -- Well, when you say they were told.  You told your brother to tell this to your parents?

A    Yes, that's right.

Q    Do you have any idea of what your parents used the $113,000 for?

A    No.  Not the slightest idea.

Q    And they're --

A    After they learned what had happened to me, they relinquished me.

Q    They relinquished you?

A    Yes.  They said that their life was very difficult, and they stopped writing to me.  And they were in touch with only a brother.

Q    All right.  Would you say they denounced you?

Altmanis - Cross                                56

A    I don't know.  My father, yes.  But my mother, maybe she still have some feelings for me.

Q    So they're not having anything to do with you?

A    No.  I haven't heard for a month, for a year, anything from them.

Q    So you don't know that they're still in the same residence that they were in when you were arrested?

        MR. DUGDALE:  Objection.  Lack of foundation.  It also assumes facts not in evidence.

        THE COURT:  No.  I'll overrule the objection.

        He's trying to find out.

        THE INTERPRETER:  Could you please repeat your question?

        MR. RUBIN:  You don't know that they are in the same location that they lived at the time of your arrest.

        THE WITNESS:  Why, I do know.  My brother tells me on the telephone when I talk to him.  They tell that they are all right, that they are sick, that they have heart condition, where the children are, that the children are somewhere in Europe.

BY MR. RUBIN:

Q    Okay.  They didn't move, did they, when they took the 113,000?

A    No, they didn't move.  I don't know for what reason they didn't move.  The father took to drinking.  And as my mother

EXCEPTIONAL REPORTING SERVICES, INC

Altmanis - Cross                               57

explained to my brother, he's somewhere -- he kind of gambled

somewhere.  I don't know.  It's hard for me to understand

what's going on there.

Q    So the money was spent on gambling; wasn't it?

A    I don't know.

Q    The money was spent --

A    Probably.

Q    Probably.  The money was spent on alcohol?

        MR. DUGDALE:  Objection.  Lack of foundation.  It

would all call for hearsay as well, your Honor.

        THE COURT:  Sustained.

        I mean he doesn't -- unless he knows, he can't answer

those questions.

BY MR. RUBIN:

Q    Do you know what the money was spent for by your parents?

        MR. DUGDALE:  And I'll add --

        THE WITNESS:  I know one thing.

        MR. DUGDALE:  I'll object.  I'll add to his saying he

knows anything.  It has to be based on hearsay and hearsay

alone, your Honor.

        THE COURT:  I'll overrule your objection here.

        Go ahead.

        THE WITNESS:  I know one thing.  I know that they

spent a certain amount on the children.  And the son went to

Europe somewhere to hide and the daughter also.

Altmanis - Cross                          58

**BY MR. RUBIN:**

Q    Where did you hear that from, Raymond?

A    Yes, he told me that.  Especially even more so, because the bank kind of cheated them of 15 or $20,000 when they were withdrawing money from the bank.

Q    Where did you hear that from?

A    Also my brother told me that when the parents were withdrawing the money, the bank charged them about 15 or 20,000 for something.

Q    Now, any of that money, were you asked to return it?

A    (No response).

Q    Were you asked to return any of that money?

A    No.  Who asked me?  My brother?

Q    Did anyone at this table over here or any other member of law enforcement ask you to return that money?

A    Yes.  They told me -- I told them that when the money arrived but -- and they asked, but I don't know how -- they told me that they couldn't return the money.  That it was impossible.

Q    Who's they?

A    My agents and the prosecutors.

Q    Did anyone ask your parents?

A    Two voices.  Two voices simultaneously.

Q    He doesn't stop.

     Did anyone go to your parents and ask them to return

**EXCEPTIONAL REPORTING SERVICES, INC**

Altmanis - Cross                                    59

the money?

          MR. DUGDALE:  Objection to lack of foundation, your Honor.

          THE COURT:  Only if he knows.

          THE WITNESS:  Yes.  Yes.  From what I know from the conversation between the agents, they turned to the authorities there.  And the authorities went to my parents.  But I don't know whether they received the money or not.

BY MR. RUBIN:

Q    Was -- your Lincoln Navigator was seized at the time of your arrest; wasn't it?

A    Yes.  I said where it was.  It was just being repaired. And I said where it was.

Q    Was that car returned to you or your wife?

A    No.

Q    How about the Lincoln Town Car, was that seized?

A    Yes.  But it was registered to my wife's name I believe.

Q    Was that car returned to your wife?

A    Yes.

Q    That's the car that you drove up and down the coast when you were hitting the Robinson's May (phonetic)?

A    Yes.

          MR. RUBIN:  This would be a good time --

          THE COURT:  Now, one thing comes across.  A lot of questions have, you know, colloquialisms in it, "hitting the

60

Robinson May."

MR. RUBIN:  I'm sorry, your Honor.

THE COURT:  You know when it's translated those don't translate correctly.  And it may translate that you're hitting Robinson May.

MR. RUBIN:  Yes, sir.

THE COURT:  So you have to really try to avoid colloquialisms.

MR. RUBIN:  Oh, point taken.  I'll do that.

THE COURT:  We're going to break for lunch at this time a little early.  I have an appointment out of the building.

We'll return at 1:25 in the jury room, 1:30 in the courtroom.  Remember the admonition.

**(Jury exits at 11:49 a.m.)**

**(Court in recess from 11:49 a.m. to 1:26 p.m.; parties present)**

**(Outside the presence of the jury)**

THE CLERK:  Please remain seated and come to order. This United States District Court is again in session, the Honorable Dickran Tevrizian presiding.

THE COURT:  All right, outside the presence of the jury.  The record will indicate that all counsel and parties are present.

Anything the Government wishes to bring up?

Altmanis - Cross                                    61

MR. DUGDALE:  No, your Honor.  Thank you.

THE COURT:  Anything Defense wishes to bring up?

MR. LASTING:  No, your Honor.

THE COURT:  All right, we'll bring the jury back out.

(Pause)

THE COURT:  Roughly how long do you think you'll be, Mr. Rubin?  Give me just a rough estimate.

MR. RUBIN:  I am hoping to finish before the end of the day.  It won't be before the next break, your Honor.

(Jurors enter courtroom at 1:27 p.m.)

THE COURT:  All right, the record will indicate all jurors are present and all counsel and parties are present.

You're still under oath Mr. Altmanis.  Please state your name for the record.

THE WITNESS:  Ainar Altmanis.

THE COURT:  Mr. Rubin?

MR. RUBIN:  Thank you, your Honor.

(Witness previously sworn)

CROSS EXAMINATION (CONTINUED)

BY MR. RUBIN:

Q    Sir, at some time in the year 2001 you started spending more time at the business Designed Water World, is that correct?

A    Yes.

Q    And do you have an idea, can you give us a timeframe, when

Altmanis - Cross                                   62

it was --

                THE INTERPRETER:  Excuse me.  Interpreter can't hear

with that interpreter.

        (Pause)

                Okay.  Thank you.

BY MR. RUBIN:

Q     Do you have a timeframe of when it was when you started

frequenting the business Designed Water World more?

A     Yes.

Q     When was that?

A     May.  Starting from May and June.

Q     May in 2001?

A     Yes.

Q     And you told us about going in and asking Mr. Kadamovas if

there was anything that you could do, is that correct?

A     No, I was not asking for work from him.

Q     All right.  Did you ever ask Mr. Kadamovas for work?

A     No, I didn't ask him about work, I just hinted him that

maybe there was something that I could be helpful with.

Q     And at the time it was your belief that the business

Designed Water World was doing rather well.

A     Yes.

Q     And is this the time period when you were asked if you

wanted to clean aquariums?

A     No, not at that time.  That was somewhere in the middle of

Altmanis - Cross                          63

the summer.

Q    All right.  Between May and middle of the summer were there any jobs that you were given around Designed Water World to try to earn some money?

A    Nothing that I can recall.

Q    All right.

A    Construction, no I couldn't be doing construction because of what Kadamovas was involved in.

Q    All right.  They were designing the office and completing the way that it looked.

A    Yes, he was designing everything and he also laid the floors by himself and the pool or fountain, whatever he did there.

Q    Now, in the summer of 2001 you did try out cleaning aquariums, is that correct?

A    Yes.

Q    And did this job require that you clean the aquariums that were on display in Designed Water World?

A    Yes, with the ones that he was working he showed me, Kadamovas.

Q    Did cleaning aquariums also involve going out to other businesses that had aquariums or had purchased aquariums and maintaining them and cleaning them?

A    No, that was not discussed.  I don't know.  I was not even sure whether I will be able to handle this business.

Altmanis - Cross                              64

Q     This business being cleaning aquariums?

A     Yes.

Q     Am I correct that it wasn't a job or a function that you really wanted?

A     No.

Q     And --

THE COURT:  No what?  No, you didn't want that or no, you didn't mind it.

THE WITNESS:  I didn't want to do this work, but I had to because I needed money.

BY MR. RUBIN:

Q     Were you shown how to clean the aquariums?

A     Yes, Kadamovas showed me how to clean aquariums.

Q     And is it your testimony that you -- in cleaning three aquariums you ruined them because you scratched them?

A     Two.  Two aquariums.

Q     All right.  So you ruined two aquariums cleaning them.

A     Yes, I scratched the glass from the inside.

Q     And them Mr. Kadamovas told you that he wasn't going to let you clean any more aquariums, is that correct?  Is that true?  Thank you.

A     Yes.

Q     Now, at around this time, summer of 2001, is this the first time that you heard about the possibility of making money by intimidating people to pay back their debts?

Altmanis - Cross                                65

A     I can't say it was in the summer.  It was closer to autumn.

Q     All right.  So would that be September?

A     Probably in September.

Q     All right.  September of 2001 then.

A     (No response)

          THE COURT:  Is that correct?

          THE WITNESS:  Yes.  Yes, at the end of September.

BY MR. RUBIN:

Q     All right.

          THE COURT:  Your questions have to be questions and not statements.

          MR. RUBIN:  They -- no.

          THE COURT:  You haven't been sworn as a witness.

          MR. RUBIN:  Thank you, your Honor.

BY MR. RUBIN:

Q     During this period of time, mid-summer to end of September 2001, were you working still at the stolen property and the eBay and selling the stolen property out of your apartment?

A     Yes, I was involved in it, but not on eBay, eBay happened later.

Q     All right.  And it was again at this time, the end of September of 2001, that you bought your Lincoln Navigator for $25,000 cash, is that correct?

A     Yes, 23.

Altmanis - Cross                              66

Q    Okay.  I'm sorry.  $23,000, is that right?

A    Yes.

Q    And at this time, end of September 2001, you were living at the Mammoth Avenue address?

A    Yes.

Q    And how long had you been at that address?

A    From spring, somewhere approximately from April.  I don't remember.  It was when my wife entered into a lease.

Q    So about April of 2001?

A    Yes.

Q    Approximately.

A    Yes, approximately.

Q    And your wife signed that lease, is that correct?

A    Yes.

Q    Now, the offer of making money by intimidating people who did not pay back their debt, was that something that you were interested in?

A    Yes, I was interested when Kadamovas told me about it.

Q    That was better than cleaning fish aquariums, wasn't it?

A    Not better, but I was not knowledgeable about cleaning aquariums.

Q    And as part of the job description that you were given you were told -- or you were asked if you could hit someone with a baseball bat as part of the job, is that correct?

A    Yes, Kadamovas offered me, he suggested that.

Altmanis - Cross                                        67

Q    And you had no problem with hitting someone with a

baseball bat in order to get them to pay back money that they

owed?

A    No.

Q    No, you didn't have a problem with it, right?

A    Well, I might have some problems deep inside me, but once

I did it I did it.  I ***.

Q    Well, when Mr. Kadamovas told you that there was a -- this

was all about a third party, you were actually going to be

working for someone else who was owed the money, is that

correct?

A    Yes.

Q    And you knew the job involved collecting money unlawfully,

isn't that right?

A    Yes, I did.  That was how Kadamovas explained it to me.  I

knew.

Q    And at that point when that was explained to you by

Mr. Kadamovas, did you say, "Oh, no, I can't do that.  I can't

be involved in that activity"?

A    No, I didn't say that.

Q    And you didn't leave Designed Water World at that time and

go to the Los Angeles Police Department and say, "I know some

people that are planning on using intimidation and violence to

collect debts."

A    That's right.

Altmanis - Cross                                     68

Q     And you had no problem with using force and violence in order to commit a crime of collecting a debt.

A     No.

Q     And where were you going to hit someone with a baseball bat?

        MR. RUBIN:  Do you want me to rephrase it?

        THE INTERPRETER:  I need clarification to the word "where."

        MR. RUBIN:  Okay.  Let me --

        THE COURT:  Location on the body, location --

        MR. RUBIN:  Yeah.  Let me re-ask the question.

BY MR. RUBIN:

Q     What part of the person's body were you planning on hitting them with the baseball bat?

A     I was not going to hit on any part of the body; that was that Kadamovas explained to me that if need be.  But he explained to me it's very unlikely that it would be necessary.

Q     So if need be where you planning on -- on what part of the body were you planning on hitting someone?

A     If need be?

Q     Yes.

A     Wherever they told me.

Q     Well --

        THE INTERPRETER:  Interpreter's correction. "Wherever they would have told me."

Altmanis - Cross                                    69

**BY MR. RUBIN:**

Q     Was there a reason why Mr. Kadamovas couldn't do all of this himself?

          **MR. DUGDALE:**  Objection.  Calls for speculation, your Honor.

          **THE COURT:**  Sustained.

**BY MR. RUBIN:**

Q     Did Mr. Kadamovas tell you why he needed you to wield the baseball bat instead of himself?

A     No, it's not particularly that he needed me to do it.  We didn't agree that I would be the one who would be beating.  And it's not that I in particular was given this assignment, he just explained that in case, in case there was a need to do that whether I would be able to do it, whether I wouldn't faint.  It was not discussed in particular where to hit, it was just discussed that there were two of them and that they needed a third person.

Q     Well, in fact wasn't this job offer for you because you were the one that was in need of money?

A     Yes, this offer was made to me and the way it was presented to me, they told me that in this case I wouldn't have to borrow money from them but I would be able to earn the money myself and that I wouldn't have to return this money, either with interest or without interest, ever.

Q     The money that you're talking about is you were told that

Altmanis - Cross                          70

whatever debt you collected, half of what you collected you could keep?

A    No.

Q    What were you told?

A    No.  I was told that the customer who ordered Mikhel to get the money and the amount of the money that Mikhel would get for him, Mikhel would get half of it.  And as for me, we were talking about the money that I asked Kadamovas to lend me in the amount of 25 or 30,000 dollars.

Q    You asked Mr. Kadamovas to lend you 25 to 30,000 dollars?

A    Yes.  I had been asking him for months when I was still closing the sales business and I was opening the sewing business and I miscalculated, I needed more money.

Q    That was earlier in the year when that happened, wasn't it?

A    Yes.

Q    That wasn't in September of 2001 when that occurred?

A    No, it was in the spring or the summer.

Q    So you were asking in September of 2001 for a loan of 25 to 30,000 dollars?

A    Yes, because I wanted to open a barbershop.  By that time I had closed the sewing business and I had debts.

Q    Now, did Mr. Kadamovas lend you the money?

A    No, he didn't.  He had promised me that he would, but he didn't actually.

**EXCEPTIONAL REPORTING SERVICES, INC**

Altmanis - Cross                                        71

Q    So -- I'm sorry.  So this idea of using force and intimidation to collect bad debts was so that you could have a job that you could perform where you could make money, isn't that right?

A    Yes.  When I asked them to lend me the money they told me that -- Kadamovas told me that instead of borrowing money from them there was a chance to earn this money, because at that time they didn't have money because they had just returned from Jamaica and that some kind of business went wrong.

Q    Well, you told us about this going to Jamaica before.  You told us that Designed Water World at the time, as far as you were told, was doing very well, correct?

A    I am not an accountant and I was not auditing their accounts.  But from the way it looked, it looked like they did have money.

Q    Were you aware that Mr. Mikhel had just purchased a home up in the hills?

A    No, at that time I didn't know about it.

Q    Were you aware that Mr. Kadamovas had moved into a nice big apartment?

A    Yes, I did.  I visited him in this apartment and he showed it to me.

Q    And you were told that Mr. Kadamovas and Mr. Mikhel went to Jamaica because a hotel had purchased a large aquarium, isn't that correct?

Altmanis - Cross                         72

MR. DUGDALE:  Objection.  Hearsay, your Honor.

THE COURT:  Sustained.

BY MR. RUBIN:

Q    Were you told why they went to Jamaica?

A    They had a business there.  They purchased with someone else a restaurant there and they were going there to bring aquariums.

Q    To the restaurant?

A    I don't know.

Q    And when they came back didn't you hear from Mr. Kadamovas and Mr. Mikhel that they were thinking of buying a hotel there?

MR. DUGDALE:  Objection.  It's hearsay, your Honor.

THE COURT:  Sustained.

BY MR. RUBIN:

Q    So there's no information that you had that the business had any problems at all, isn't that right?

A    Yes, there was.  They complained that they didn't have money.

Q    Really?  Did you tell the FBI on February 25th, 2002 --

THE COURT:  "Really" will be struck as a comment.

BY MR. RUBIN:

Q    Did you tell the FB --

MR. RUBIN:  I'm sorry, your Honor.

THE COURT:  You can't editorialize.  You know that.

//

Altmanis - Cross                        73

BY MR. RUBIN:

Q    Did you tell the FBI on February 25th, 2002 that whenever you visited Kadamovas at Designed Water World he said that he and Mikhel were doing great?  Did you say that?

          MR. DUGDALE:  Your Honor, all that's hearsay.  That's all hearsay, your Honor.

          THE COURT:  Sustained.

          You've got to see which party is offering it.  The Government is not offering it.  The Government can offer it as admission.  If the Defense offers it, it's hearsay.  And there's no exception to the hearsay rule.

          MR. RUBIN:  It's his state of mind.

          THE COURT:  I understand, but it's still hearsay.

          MR. RUBIN:  Your Honor, I have an aerial photograph I would like to have marked as Defense next in order, whatever that is.

          THE COURT:  Well, I don't have a --

          MR. RUBIN:  I think we're -- I don't know if we're in the 2000 -- 2000 --

          THE CLERK:  2003.

          MR. RUBIN:  Thank you.

     (Defense Exhibit Number 2003 marked for identification)

          THE COURT:  All these exhibits should be pre-marked so we don't have any down time.

          MR. RUBIN:  There won't be any down time, your Honor.

Altmanis - Cross                                              74

Thank you.

May I approach the witness?

THE COURT:  You may.

BY MR. RUBIN:

Q    Mr. Altmanis, showing you what has been marked as 2003 for identification.  Do you recognize what's depicted in that photograph?

A    No.

Q    That's not the Mammoth Avenue apartment building where you live?

A    It doesn't say anything.  I can't figure it out.

Q    You don't recognize this photo?

A    Well it's from the air, so it's hard to say.

Q    Do you see the street across the top?

A    The long street, yes.

Q    Yes.  Does that look like Mammoth Avenue to you?

A    I don't remember.  It's hard for me to say looking from the top.  I've never seen it from above.

Q    And wasn't there an alley going along the parking structure along the side of the apartment building?

A    Yes, I see it.  I see it.  Yes.

Q    And wasn't there a tree growing in the center court of the apartment?

A    Yes, I remember the flowerbed.  The flowerbed.

Q    Now, does this look like your Mammoth Avenue apartment

Altmanis - Cross                                    75

building taken from the air?

A      Yes.

Q      All right.

          MR. RUBIN:  Can I publish the photo, your Honor?

          THE COURT:  Any objection?

          MR. DUGDALE:  No, your Honor.

          THE COURT:  All right, 2003 admitted.  It may be published at this time.

     **(Defense Exhibit Number 2003 was received in evidence)**

          MR. LASTING:  Your Honor, may we approach the bench for a second?

          THE COURT:  Pardon me?

          MR. LASTING:  May we approach the bench regarding numbering of the exhibits?

          THE COURT:  I can't hear you.

          MR. LASTING:  Could we approach the bench regarding numbering of the exhibits?

          THE COURT:  All right.  Let me see you at sidebar.

          You can use 3000, if that's what you're coming up here for.

     **(Begin bench conference)**

          MR. LASTING:  We'd already started at 2000.

          MS. CHAHIN:  We started at 2000, your Honor.

          THE COURT:  Which ones are yours?

          MS. CHAHIN:  We started with 2000.  If they could

Altmanis - Cross                              76

start with 3000?

THE COURT:  3000.  And we'll mark that as --

THE CLERK:  3000.

THE COURT:  -- 3000.

MR. LASTING:  Okay.  Thanks.

MS. CHAHIN:  Thank you, your Honor.

**(End bench conference)**

MR. RUBIN:  Should I renumber this, your Honor?

THE COURT:  Yes.  3000.

The Kadamovas exhibits will be in the 2000s; the Mikhel exhibits will be in the 3000s.

MR. RUBIN:  So this would be 3000?

THE COURT:  3000.

MR. RUBIN:  Thank you.

**(Defense Exhibit Number 2003 renumbered as Defense Exhibit Number 3000)**

BY MR. RUBIN:

Q    Okay, Mr. Altmanis, where my pen is right here, this is the Mammoth Avenue apartment that you lived in -- apartment building?

A    Yes.

THE COURT:  You also can use the screen.

MR. RUBIN:  Oh, I can?

THE COURT:  Yes.

MR. RUBIN:  Okay.

Altmanis - Cross                        77

**BY MR. RUBIN:**

Q    Can you identify where your apartment was in that building?

A    Yes.  Here (indicating).

Q    Okay.  And I see a green dot has appeared on the -- that's where your apartment was?

A    Yes.

Q    Now --

        **THE COURT:**  For the record, it's to the rear of the building to the right side, in the cutout area.

**BY MR. RUBIN:**

Q    The office of Mr. Muscatel that you told us earlier you and Mr. Kadamovas went and watched to make sure that he came back, is that shown on the diagram?

A    Yes, you can see it more or less.  The house.  The building.

Q    Can you show me where it is?

A    But where the office is, I don't know.

Q    Okay.  Do you see the building?

A    Yes, I see the building.

Q    Can you show me where the building is?

A    (Indicating)

Q    All right.  Can you put a green mark in the lower left-hand corner where Mr. Muscatel's office was located -- in the building that his office was located, correct?

Altmanis - Cross                              78

A     Yes.  That's the building (indicating).  I don't know where the office is.

Q     Understood.

          THE COURT:  All right.  Let me stop now.

          Which street is this (indicating), sir, that runs along --

          MR. RUBIN:  That's Mammoth Street.

          THE COURT:  You're testifying now.

          MR. RUBIN:  Oh.  I thought you were asking me.

          THE COURT:  No, I'm asking the witness.

          MR. RUBIN:  I'm sorry.

          THE COURT:  Which street is this (indicating), sir, that is running to the top left of the photograph?

          THE WITNESS:  Mammoth.

          THE COURT:  And which street is this (indicating) that runs from the top to the bottom of the photograph on which you have marked Mr. Muscatel's building?

          THE WITNESS:  I don't know what it's called.  Ventura is right there (indicating).  I know that.

          THE COURT:  Mark Ventura.

          THE WITNESS:  It's not marking.

          THE COURT:  It's not shown on the photograph?

          THE WITNESS:  No.

          THE COURT:  But it would be at the bottom of the photograph as you're looking at it?

Altmanis - Cross                                79

THE WITNESS:  Yes.

BY MR. RUBIN:

Q    So where you put a purple line, it would be Ventura Boulevard?

A    Yes.

Q    Now, the -- if you go to the right on the aerial photo, the next what looks like a roadway is actually a -- what is that?

A    I don't know.

Q    Isn't that an alley that allowed you to get into the parking area of your building?

A    Yeah, it is an alley but I don't think it has a name.

Q    The alley also gives access to the office buildings that are there lining Ventura Boulevard?

THE INTERPRETER:  Say the question again, please.

BY MR. RUBIN:

Q    The alley also gives access to the parking areas of the buildings that are lining Ventura Boulevard, is that correct?

A    Yes, that's where all the parking spots for all the cars are.

THE COURT:  This is the alley (indicating) that you're speaking of?

MR. RUBIN:  Yes, sir.

THE COURT:  Mr. Altmanis?

THE WITNESS:  Yes, that's it.

Altmanis - Cross                          80

MR. RUBIN:  Sorry.

THE COURT:  I'm going to have the clerk swear you in, I guess, Mr. Rubin.

MR. RUBIN:  Just shoot me.

Thank you, your Honor.

BY MR. RUBIN:

Q    During the time that you lived in the Mammoth Avenue apartment building did you have an occasion to meet Mr. Muscatel?

A    No, I didn't know him and I didn't see him.

Q    You didn't have an auto accident or some kind of auto altercation with Mr. Muscatel in the alley between your building and his building?

A    No, no, never.

Q    You told us that you and Mr. Kadamovas positioned yourself in a location so that you could observe Mr. Muscatel's office, is that correct?

A    Yes.  Kadamovas was the one doing the watching.  Yes, we did watch it.  He was the one who knew where the office was.

Q    All right.  Do you see the location where you placed yourselves on the aerial photo, Exhibit 3000?

A    No.

Q    And when you went with Mr. Kadamovas to observe the office, did you realize that you were near your home?

A    Yes, of course.  Ventura and Mammoth.  Yes.

EXCEPTIONAL REPORTING SERVICES, INC

Altmanis - Cross                                            81

Q    So you were familiar with this area?

A    Yes, I was.  I lived there and so I was familiar with it.
Maybe not the whole thing, but the rear part of the building
where the garage was, because I parked the car in all kinds of
different spots at night.  Sometimes in the morning I wouldn't
have time to pick it up and I'd see that I already had a
ticket.

Q    You parked in areas that were parking for something other
than your apartment building?

A    We all had one -- there was only -- we only had one
parking.  We only had one parking spot and we had two cars, so
it was hard.

Q    I assume that's yes, I parked in other spaces other than
provided for in my apartment building, correct?

A    Yes.

Q    Did you ever park in the parking area behind the building
where Mr. Muscatel's office was?

A    I parked my car everywhere.

Q    So is that yes, I parked the car --

A    Yes.

Q    -- behind the building --

A    Wherever there was a place to park.

Q    -- where Mr. Muscatel's office was?

A    Yes.

Q    Did you have a confrontation with Mr. Muscatel when you

Altmanis - Cross                    82

parked your car behind the building in the building's parking lot?

A    No, never.  Never had one.  I'd never seen him.

Q    Now, you told us regarding Mr. Muscatel that you were given an assignment of going out and buying plastic ties and plastic gloves, is that right?

A    Just the ties, not the gloves.

Q    All right.  You were just told to go buy the plastic ties?

A    Yes.

Q    And you couldn't find them.

A    No, I didn't find them there --

Q    Were you also --

A    -- in the store.

Q    Were you given the assignment to get weights?

A    Yes.

Q    And you knew a location where weights were sold.

A    Yes, because I'd used that store before.  I had brought some old items in there of mine.

Q    Is that the Play it Again Sam store?

A    Yes.  It's on Ventura and Laurel Canyon.

Q    And they sell weight equipment, is that right?

A    Yeah, they sell all kinds of weight equipment, hockey equipment, and tennis equipment.

Q    And you had made purchases in that store before, because you actually had weights in your apartment where you worked

Altmanis - Cross                    83

out?

A    Yes.  I did have it at home.

Q    Did someone tell you that you needed weights for Mr. Muscatel?

A    No.

Q    When did you go buy --

A    I don't remember --

Q    I'm sorry?

A    -- about Muscatel, no.  I bought them for Umansky, not Muscatel.

Q    Well weren't weights used for Mr. Muscatel?

        MR. DUGDALE:  Objection.  Lacks foundation, your Honor.

        THE WITNESS:  No.

        THE COURT:  Only if he knows.

        THE WITNESS:  I didn't bring them.

BY MR. RUBIN:

Q    Weren't you told that it was difficult to get Mr. Muscatel over the side of the bridge because of his size and then he had weights on him?

A    Yes.  These were the words of either Kadamovas or Mikhel, but what the nature of the problem was, as far as the weight or which weight it was -- because I took part when he was loaded in the car, I was there when he was loaded in the car, but there was no -- he didn't a weight then.

Altmanis - Cross                                    84

Q    You didn't supply weights then?

A    No.

Q    Now, did Mr. Muscatel speak Russian?

A    No, he spoke English.

Q    Mr. Muscatel, you heard him speaking in English only?

A    In my presence, when I was there, I only heard him speak English.

Q    And when you would hear anyone else speak to Mr. Muscatel, it was in English?

A    Yes.

Q    After the Muscatel incident occurred you were asked to remain behind and clean, is that correct?

A    Yes.

Q    And you cleaned what you called -- or what you termed the safe room, the room in the back of the safe, is that right?

A    Yes.  And the bathroom.

Q    You cleaned the bathroom?

A    Yes, the one that the American went to.

Q    And did you clean the wood in the foyer area by the front door?

        THE INTERPRETER:  I'm sorry.  Interpreter --

        THE COURT:  The foyer area near the front door.

        THE INTERPRETER:  No.  Interpreter needs clarification of wood.  Is Counsel referring to parquet?

        THE COURT:  Wood, W-O-O-D.

**EXCEPTIONAL REPORTING SERVICES, INC**

Altmanis - Cross                              85

**THE INTERPRETER:** Parquet?

**THE COURT:** Wood floor, yes.

**THE INTERPRETER:** Okay. Is it a correct --

**MR. DUGDALE:** I don't know if it's parquet. I know it's wood.

**THE INTERPRETER:** Okay.

**THE WITNESS:** Yes. Immediately after Mikhel and I carried the American into the room I used some chemical that I found underneath his sink to clean that spot.

**BY MR. RUBIN:**

Q    This was the first day?

A    Yes, the first day I cleaned it.

Q    Did you use some kind of a machine for washing that wood floor?

A    No. No, just a towel and I poured this chemical and then I wiped it up.

Q    And was there a lot of blood there?

A    There was blood. I don't remember if there was a lot of blood or not.

Q    Was it drops of blood or a pool of blood or a large pool of blood?

A    No, not a large pool. Not a large -- it wasn't a pool. The way -- he was just lying there and basically I just poured off of his…

Q    So there was not much blood?

Altmanis - Cross                    86

A     Well, the spot was larger than that (indicating).

         MR. RUBIN:  The top of the cup, your Honor, that he's pointing to, an inch and a half --

         THE WITNESS:  Larger.

         MR. RUBIN:  -- in diameter?

         THE COURT:  Or both hands, if you'd show us.

    (Witness complies)

         THE COURT:  Approximately six inches.

         MR. RUBIN:  Thank you, your Honor.  In diameter.

         THE COURT:  In diameter.

         MR. RUBIN:  Thank you.

BY MR. RUBIN:

Q     So you cleaned that up the first day of the incident?

A     Yes, I wiped off the blood.  And later when I was cleaning that room I think I cleaned up that spot again.

Q     So --

A     Twice.

Q     -- on the third day when you were doing the cleaning you cleaned that spot as well as the safe room and the bathroom?

A     Yes, because I was told to clean the bathroom, to definitely clean the toilet bowl really well, and to also clean that spot one more time.

Q     All right.  And you did that?

A     Yes, I did.

Q     And then you left?

Altmanis - Cross                              87

A    Yes, I left.

Q    And were you given instructions upon leaving and locking the house up?

A    I was told to shut the door and there was just a slide that was going to be locked.

Q    But you actually made an effort to leave a door unlocked, is that correct?

A    Yes, that's what I did.

Q    Now, Mr. Mikhel was not moved into this house yet, is that right?

A    He had already moved in.  The beds were there.  The TV. He had moved in completely.

Q    Completely?

A    I thought so.  That's what I thought.

Q    Had you ever been to this house before this incident?

A    Yes, I had.

Q    How many times?

A    Many times.  When the Armenian was there, Armen.

Q    How many times had you been there before?

A    Three days with that guy, Armen.  We'd meet them --

          MR. RUBIN:  Your Honor, can we approach?

          THE COURT:  No, there's no need to.

          MR. RUBIN:  Motion to strike as nonresponsive.

          THE COURT:  Motion to strike is granted.  The jury is admonished to disregard the last two questions and answers.

Altmanis - Cross                               88

MR. RUBIN:  Thank you.

BY MR. RUBIN:

Q    Can you give me a number of how many times you'd been at the house before the incident with Mr. Muscatel?

A    Three times.  Three days.  I went there three times when Armen was there.

MR. RUBIN:  Motion to strike.  Nonresponsive.

THE COURT:  Not the whole thing.  "When Armen was there" will be struck.

MR. RUBIN:  Thank you.

THE COURT:  The jury is admonished to disregard that comment.

BY MR. RUBIN:

Q    Now, had your wife ever been invited to that house before?

A    No.

Q    And when you went home -- you told us something that your wife was upset because she didn't know what you'd been doing, is that right?

A    Yes, she didn't know.

Q    Now, when you left the house you didn't go from the Oak View house to the police department and report a crime, did you?

A    No.  How could I have?

Q    Well, had you observed the crime to be committed?

A    Yes, I had.

Altmanis - Cross                                    89

Q    So why is there a question as to how could you?  Couldn't you go to the police and report a crime?

A    I should've have, but I was afraid.  I didn't know how to do it.

Q    You were afraid because you didn't want to get in trouble, is that right?

A    Yes.  I didn't want to.

Q    You didn't know --

A    After all that.

Q    -- how to do it without getting yourself out of it, as far as your liability was concerned?

        **THE COURT:**  Is that correct?

**BY MR. RUBIN:**

Q    Is that correct?

        **MR. RUBIN:**  Thank you.

A    Yes.  I didn't know.

Q    So instead you went home, right?

A    Yes.

Q    You got your wife and your children and put them in the car, correct?

A    Yes, about four hours later.

Q    And you drove back to the Oak View house, is that right?

A    Yes.

Q    And this was to show your wife, Elena, the Oak View house?

A    Yes.  Yes, because I told her a lot about the house, that

Altmanis - Cross                                    90

Mikhel bought a house, and I was telling her a lot about it and that we were working there.  But she was suspecting that we were partying somewhere, because I'd never left home for such a long period of time, for these long stretches before.

Q    Three days?

A    So that's why I decided to show her that, yeah, that we definitely -- that we were cleaning this house and this really happened.

Q    You were gone for three days, is that correct?

A    Yes, for three days I'd stay late every evening and in the morning and during the day.

Q    But you went home in the evening?

A    Yes, late, after 10:00 or 11:00, which caused her to be suspicious because I'd never come home late before, because it was late.

Q    Before October of 2001 you had never come home late from a job?

A    Except for the period of time where I worked at the Roulette, at the bar.  Then she knew that I would work late. Plus she could go over there at night, late at night, and she'd sit at the bar.  But otherwise -- after I'd left the bar I didn't really have any business that would make me come home late.  My whole business took place during the day.

Q    Now, you previously told us that you brought your wife and your children over to the Oak View house because you happened

EXCEPTIONAL REPORTING SERVICES, INC

Altmanis - Cross                                    91

to be in the neighborhood, is that right?

A    Yes, we were going to go somewhere.  We had to take care of some documents for the children.  And it just so happened that we were driving along 101 Freeway.

THE COURT:  I've got to interrupt a minute.

MR. RUBIN:  Yes.

THE COURT:  When you say, sir, "children," are you referring to the children that you have with Elena or are you referring to the children that we talked about earlier this morning that were in Latvia?

THE WITNESS:  With Elena.  Three.

BY MR. RUBIN:

Q    You were on the 101 Freeway, which requires you to get off the 101 Freeway and drive up into the hills for about 15, 20 minutes in order to get to the Oak View house, isn't that right?

A    I don't remember.  I was not watching the time.

Q    So you don't know how long it took to get to the Oak View house from the off ramp from the freeway?

A    No, I don't remember.

Q    All right.

A    We got there fast.

Q    It certainly wasn't on the way to wherever you were going, was it?

A    No, I took a turn.  Because we talked and I asked her

Altmanis - Cross                              92

would they like to see, let's go and see.

Q    Well you'd already left the back door of the house unlocked four hours ago when you left.  You knew you were coming back, weren't you?

A    Yes, I did.  But if she had told me no, then it's very unlikely that I would have.  I would have gone with them.  But I was sure that she would agree to go in to see it.

Q    Now -- and by the way, you just -- were you going to take videos of the children wherever, whatever, you were taking them?

A    No, I was going to take the video of the house, but it so happened that I took the video of the children in the house.

Q    But you just happened to have the video camera with you?

A    Yes.  I took it with me because I wanted to have the video of the house because I liked that house very much and I didn't keep it a secret.  I told everyone, Mikhel and Kadamovas and my wife, that I liked the house very much and it was not a secret.

Q    Well, but you kept your visit with your family and the fact that you were videotaping the house a secret from Mr. Mikhel?

A    Yes.

Q    You didn't tell him that you were bringing your family over that day, did you?

A    No, he would have -- get very angry.

Q    He would have told you no.

Altmanis - Cross                                    93

A    I don't know.  Probably not.

Q    He certainly didn't tell you to leave the back door open so you could get in again, did he?

A    Of course not.  It was completely my idea.

Q    And it didn't bother you to bring your wife and children to a location that you had just cleaned up because a murder had been committed there?

A    Yes.  This is how it turned out.  I am not denying it. This is how it turned out.

Q    Well, it didn't turn out that way.  The murder was committed.  You were there.  Isn't that right?

A    Yes, I was there.

Q    Four hours later you brought your family there.

A    Yes, I did, because it was a good chance because Kadamovas and Mikhel were not there and I very unlikely would have another chance to show the house and to get there.

Q    So this was your chance to show your wife this house?

A    Yes, and also a chance to videotape it.  When I talked at home with my wife I used to tell her, "Well, this is the kind of a house that one day we will build for us."

       **MR. RUBIN:**  All right.  Your Honor, I have marked as Defense 3001 a CD, which is a video that was taken by Mr. Kadamovas at the house and I --

       **MR. LASTING:**  Excuse me, your Honor.  I believe he's misspeaking.

94

THE COURT:  You misspoke it.

MR. RUBIN:  3001?

THE COURT:  No.  Who was it?

MR. RUBIN:  I'm sorry.  Mr. Altmanis at the house. And at this time I would like to play it for the jury.

THE COURT:  Any objection?

MR. DUGDALE:  No, your Honor.  Thank you.

THE COURT:  All right, 3001 marked for identification and may be played.

(Defense Exhibit Number 3001 marked for identification)

MR. RUBIN:  Thank you, your Honor.

THE COURT:  What format is it in?

MR. RUBIN:  It's in this computer, which is I hope set up correctly --

THE COURT:  In the computer --

MR. RUBIN:  -- and ready to go.

THE COURT:  It's in the computer and not in the --

MR. RUBIN:  I have this marked as evidence, but the same thing's in the computer.

THE COURT:  All right.  Let me switch to the computer mode, then.

Don't start it until we set up.  Okay, now you can start it.

(Begin playing video, Defense Exhibit Number 3001, at 2:36 p.m.)

**(Begin sidebar)**

**THE COURT:** Why are we watching the whole thing?

**(Sidebar indiscernible, video noise)**

**(End playing video, Defense Exhibit Number 3001, at 2:54 p.m.)**

**THE COURT:** All right, let's take our afternoon recess. Approximately 10 minutes.

**(A recess was taken from 2:54 p.m. to 3:09 p.m.; parties present)**

**(Outside the presence of the jury)**

**THE COURT:** All right. Outside the presence of the jury, anything the government wish to bring up?

**MR. DUGDALE:** No, your Honor.

**THE COURT:** Anything defense wishes to bring up?

**MR. CALLAHAN:** Yes, your Honor.

**THE COURT:** Yes.

**MR. CALLAHAN:** Your Honor, if Mr. Rubin finishes his examination today -- I don't know if he will or he won't, and I'm not trying to rush him but if he does, we then use that time to discuss the issue with regard to the video clips that are in contention (***)

**THE COURT:** How long are your video clips?

**MR. CALLAHAN:** Mine are short. I think the longest one is a minute and 30 seconds and they're generally under a minute each.

THE COURT:  Well, it depends on when he finishes.  If he finishes close to 4:00 or after 4:00, we'll obviously do it, we'll let the jury go.  But if he finishes at, let's say 3:30, I'm not going to let the jury go.

I've got a note here now from one of the jurors indicating, "Can we have December 27, 28, 29 --

(Laughter heard)

-- January 2nd off.  Now, I hope to finish --

MR. RUBIN:  I join with that request.

THE COURT:  Yeah, I hope to finish before Christmas in this case.

MR. RUBIN:  Well, I'm sure we will.

MS. MEYER:  Didn't your Honor already tell the jury we were going to be dark that week?

THE COURT:  Umm, I don't know if I went to Christmas; I didn't think I got that far.  Did I?

MS. MEYER:  Yes, you did.  You said that we had the 25th and the 26th off.

THE COURT:  All right, but I'm hoping before I have to make this decision, that we will finish this case before December.  Remember, I want to retire.

MR. DUGDALE:  What were those dates again, your Honor?

THE COURT:  It's December 27th through January 2nd. And I also told them they were going to be off on December the

23rd or -- you know, before Christmas; now they want the week after Christmas.  I mean, you know, they've got better hours than a union ...

MR. LASTING:  Your Honor, just to get back to the video clip for a second?

THE COURT:  Yeah.

MR. LASTING:  If we don't do it today could we do it in the morning?  I mean, what's the time --

THE COURT:  I'd like to do it tonight before we go home if --

MR. LASTING:  Oh, we will do it today?

THE COURT:  Yes.

How long do you think you'll be, Mr. Rubin?

MR. RUBIN:  I'm still hopeful of finishing this afternoon.

THE COURT:  Okay.  Let's bring the jury in then.

**(Pause; off record)**

Remember these exhibits that have been received are now property of the clerk.

MR. RUBIN:  I put them on the clerk's desk.

THE COURT:  Okay.

**(Jurors enter courtroom at 3:11 p.m.)**

All right, the record will indicate all jurors are present, all counsel, parties are present; you're still under oath, Mr. Altmanis.  Please state your name for the record.

Altmanis - Cross                         98

THE WITNESS:  My name's Ainar.

THE COURT:  Mr. Rubin?

MR. RUBIN:  Thank you, your Honor.

CROSS EXAMINATION (CONTINUED)

BY MR. RUBIN:

Q    Sir, the video that we just saw, that's the video you took?

A    Yes.

Q    Was there any -- was there part of it that wasn't there or was that the entire video as far as you know?

A    I didn't quite understand the question.

Q    I'm sorry.  Did it look complete?  You took it.  Did it look complete to you?

A    Yes.

Q    All right.  It looked like it was a very festive occasion?

MR. DUGDALE:  Objection.  That's not a question, your Honor.

THE COURT:  Sustained.

THE WITNESS:  No.

BY MR. RUBIN:

Q    It looked like everyone was happy, were they?

A    Yes, I invited them; they didn't know anything.

Q    And a number of times during the video, it was you that we heard speaking in Russian?

A    I always spoke in Russian.

Altmanis - Cross                                      99

Q    I just want to make sure, sir, that that was your voice
that we heard on the video.

A    Yes, it was mine.

Q    And on a number of occasions during the video did you say
in Russian that, "Take your time there's no hurry?"

A    Yes, they were rushing, the children were.

Q    All right.  And you just said a number of times to "take
your time there's no rush."

A    Yes.

Q    Now, after the incident with Ms. Pekler (phonetic), that
you previously testified about, did you go over to the Weslin
address with your wife and children and show them that house?

A    No.

Q    You didn't take a video of the interior of Weslin?

A    No.

Q    And did you ever take your wife and children over to the
inside of Design Water World?

A    Yes.

Q    When did you do that?

A    We came there.  I don't remember.  There were Kadamovas
and Mikhel.  I don't remember.  There were other people and it
was some kind of holiday, and then we all went to the house of
-- to the office of the Water World.

Q    All right.  But Mr. Kadamovas and Mr. Mikhel were with you
at that time with your family at Design Water World, correct?

**EXCEPTIONAL REPORTING SERVICES, INC**

Altmanis - Cross                              100

A    No, there was Mikhel, myself, my wife and my wife's girlfriend.

Q    All right.

A    We wanted to introduce Mikhel to her.

Q    The bottom line is you didn't go into the store without telling anyone that you were going, correct?

A    That's right.

Q    Now, in your preparations for Ms. Pekler's kidnapping, were you the one that brought the syringe?

A    Yes, I did bring the syringe but not for Pekler but for the American.

Q    Did you also bring a syringe regarding Ms. Pekler?

A    No.

Q    On --

        THE COURT:  Excuse me; let me interrupt.  When you say "the American" are you referring to Mr. Muscatel?

        THE WITNESS:  Yes, Muscatel.  Sorry.

BY MR. RUBIN:

Q    On February 25th, 2002, did you tell the FBI that you brought a syringe for Ms. Pekler?

A    No, no I don't remember to have said that.  I know that I brought, I went and I got for this -- what's his name? Muscatel.

Q    All right.  And for Ms. Pekler you brought weights from Play it Again Sam; is that right?

Altmanis - Cross                            101

A     No, for Umansky.

Q     Again, on February 25th, 2002, did you tell the FBI that in order to weigh her body down, Altmanis purchased weights at Play it Again Sam?

A     I brought, I brought for Umansky.

Q     I'm not talking about Mr. Umansky right now I'm talking about Ms. Pekler.

A     No.

Q     You claim that you did not know what was going to happen to Ms. Pekler; is that correct?

A     No, I said that I didn't -- that I did know.  I knew that the same thing was in store for her.

Q     When did you know that?

A     When Mikhel said that they would take her away, that it was time to take her away.

Q     All right but if you brought weights for Ms. Pekler and you bought -- brought a syringe for Ms. Pekler, then you would have known what was going to happen to her much earlier; is that right?

          MR. DUGDALE:  Objection, your Honor.  It all assumes facts not in evidence.

          THE COURT:  Sustained.

BY MR. RUBIN:

Q     So you didn't tell the FBI that you brought the syringe and the weights in order to weigh down Ms. Pekler.

EXCEPTIONAL REPORTING SERVICES, INC

Altmanis - Cross                                102

A     No, I didn't bring either the syringe or the weights.

Q     And then you informed us that you asked to be excused as far as Ms. Pekler was concerned; is that right?

A     Yes, I said that I was not going to participate in Pekler's murder.

Q     Right.  You said that was too low for you.

A     A woman is a woman; she is the mother and she is a sister. No matter what happens in one's life, it shouldn't be a woman.

Q     So in order to follow through with your belief that you've just told us, you immediately went to the police in order to save Ms. Pekler; is that right?

A     No.  It was not a question of a police; it was impossible.

Q     All you had to do was go from Weslin to the Van Nuys Police Station of the Los Angeles Police Department and tell them a crime was being committed; isn't that right?

A     Yes, I should have done it but I didn't.  I was a coward.

Q     Well, it wouldn't have made you any money, would it?

        **MR. DUGDALE:**  Objection, argumentative, your Honor.

        **THE COURT:**  Sustained.  Wait, wait, there's no question pending; it's argumentative.

**BY MR. RUBIN:**

Q     Now, for Mr. Umansky you did buy the weights?

A     Yes, I did.

Q     And so you knew what was going to happen to Mr. Umansky.

A     Yes, I did.

Altmanis - Cross                                        103

Q    Once again, you didn't go to the police, did you?

A    No, I didn't.

Q    And as far as Mr. Safiev and Mr. Karabadze, you -- you say that Mr. Krylof bought the weights, is that correct?

A    Yes, Krylof did.

Q    Krylof didn't know where to buy them; you had to tell him where the Play it Again Sam's store was.

        THE COURT:  Wait, is that correct?

BY MR. RUBIN:

Q    Is that correct?

A    Yes.

Q    And again, regarding Mr. Safiev and Mr. Karabadze, you didn't go to the police and tell them a crime was being committed, did you?

A    No, I didn't.

Q    Even when the police were right there in front of you, you were worried about how you were going to get away with the crime; isn't that right?

A    First of all, in this situation I found myself between the hard rock and the --

        THE INTERPRETER:  What's the expression?  Between the hard rock and ...

        THE COURT:  Rock and a hard spot.

A    -- and I didn't what to do in this situation.

        And also, I depended on them because they had all my

EXCEPTIONAL REPORTING SERVICES, INC

Altmanis - Cross                               104

information.  They had the passports for the children and everything, all the documents.  I got screwed up, what can I say?  Yes, I -- it was my fault.  Had I acted the way I should have and hadn't I been a coward, maybe there wouldn't have been so many victims.

BY MR. RUBIN:

Q    Well, you were in the, was it the Columbia Inn hotel parking lot?

A    Yes.

Q    Isn't that where you were facing a police officer?

A    Yes, I was.

Q    All you had to say was, "There's a victim in that car and there's a victim in that car," isn't that right?

A    Yes, I could have said but I didn't do it.

Q    And you didn't because you were in the *I don't want to get caught for this crime* mode; isn't that right?

        MR. DUGDALE:  Objection, argumentative, your Honor.

        THE COURT:  No, overruled.

        THE WITNESS:  Yes.  This and --

        MR. RUBIN:  Your Honor, the question was a yes or no answer.  All of this is non-responsive.

        THE COURT:  Well, he answered it.

        MR. RUBIN:  I understand.  He's still talking.

        THE COURT:  Well, I don't know what he's saying.

        MR. RUBIN:  I don't either but it can only be non-

Altmanis - Cross                           105

responsive.

       **THE COURT:** Okay then we have to wait till the interpreter starts translating it. You know, I'm not clairvoyant here or ...

       **THE INTERPRETER:** The short answer was "yes."

       **MR. RUBIN:** Thank you.

**BY MR. RUBIN:**

Q   Now, as a result of being arrested on February 19th, 2002, you had discussions with the government and then entered into a plea agreement; is that correct?

A   What does he mean, specifically?

Q   Did you enter into a plea agreement with the government?

A   Yes, but that happened three months later. Before that, we didn't have any agreements for anything.

Q   No, you were just being debriefed.

A   Yes, I was telling them everything.

Q   So on June 5th of 2002, you entered into a plea agreement.

       **THE INTERPRETER:** Two thousand and --?

       **THE COURT:** -- two.

       **MR. RUBIN:** -- two.

    **(Interpreter continues translating)**

A   Yes.

**BY MR. RUBIN:**

Q   And you agreed to plead guilty to one count of conspiring to commit hostage-taking that resulted in death. That's one

Altmanis - Cross                                    106

count, correct?

A    No -- no all five.

Q    Well, sir, let's go through it one at a time.  Okay?

You pled to one count of conspiring to commit hostage-taking that resulted in death; is that correct?

A    Yes.

Q    And you pled to three counts of hostage-taking resulting in death; is that correct?

A    Yes.

Q    And you admitted statutory factors that enhanced the penalty on those four counts regarding the deaths, causing the actual deaths of Rita Pekler, Alexander Umansky, Nick Karabadze and George Safiev; isn't that correct?

A    Yes.

Q    As a result of pleading to those charges, you were looking at a sentence of either the death penalty or life imprisonment without the possibility of release; is that correct?

A    Yes.

Q    Now, the government has agreed not to seek the death penalty against you; is that right?

A    Yes.

Q    So the mandatory statutory minimum that you can get under the law for those charges is life without possibility of release; is that correct?

A    Yes.

Altmanis - Cross                              107

Q    But the government has also promised you that -- strike that.

You haven't been sentenced in this case yet, have you?

A    No.

Q    And your sentencing is not going to occur until all of these cases are over and you're done testifying; isn't that right?

A    I don't know these kind of details.

Q    Well, you know you haven't been sentenced yet, don't you?

A    Yes but --

Q    Okay, do you have a sentencing date?

A    No.

Q    The government has also promised that in exchange for your cooperation they will make a motion to the sentencing judge to reduce your sentence below the statutory, mandatory minimum; is that right?

A    Yes.

Q    So at the time of your sentencing, based on a filing that the government makes, you can actually get less than life without possibility of release.

A    I can't assert that.  It's -- everything is in the hands of the government, I don't know.

Q    But that's what they've promised to do as long as you cooperate.

Altmanis - Cross                                108

A    Yes, to the end of my life, yes.

Q    So at some point in time you're anticipating that at your sentencing, you can actually get a sentence where you can do a number of years and be released.

A    Possibly.  I can't estimate anything right now.

Q    No, but you can hope, can't you?

A    Yes, I can hope.

Q    And it's your hope that you will actually end up getting a sentence that will allow you to be released back into society.

A    Yes --

Q    Now --

A    -- if that's -- if that's going to be possible.

Q    Well, and the only ones that can make it possible is a motion from the government; isn't that right?

A    Yes.

Q    Now, you also entered into a plea agreement with the Los Angeles Deputy District Attorney's Office.

A    Yes.

Q    And in that case which is filed in the Superior Court of the State of California, Number B-A-235-193, you're charged with five counts of first degree murder; is that correct?

A    Yes.

Q    And you have entered guilty pleas in Los Angeles Superior Court in that case to five counts of first degree murder.

A    Yes.

Altmanis - Cross                                         109

Q    And in the state of California the statutory minimum that you could be sentenced to in that case would be life without the possibility of release; isn't that right?

A    Yes.

Q    But in that plea agreement you are -- as long as you cooperate with the government and the State, you will be allowed to withdraw your guilty pleas to five first degree murders; isn't that right?

A    Yes.

Q    And at that time you will plead to five counts of voluntary manslaughter; is that right?

A    Yes, that's right, five.

Q    And it's agreed that at the time of your sentencing in State Court for five counts of voluntary manslaughter, the sentence that you will receive will be up to 20 years, subject to the discretion of the court.

A    Yes.

Q    So the sentence could be less than 20 years but it can't be more than 20 years in State Court.

A    Yes, that's possible.

Q    Also the sentence that you receive in State Court is agreed would run concurrently with any sentence that you are serving in Federal Court.

A    Yes.

Q    So as far as your State Court plea is concerned, you won't

Altmanis - Cross                                   110

do any more time than you're serving in your federal sentence because the time runs concurrently or together at the same time.

          MR. DUGDALE:  Objection, your Honor.  That calls for speculation.

          THE COURT:  His understanding only.

          MR. RUBIN:  Thank you.

          THE WITNESS:  Possibly, I don't know.  I don't really know about these things.

BY MR. RUBIN:

Q    Well, what do you think that it means if it's going to run concurrently with your federal case number?

A    That they happen at the same -- that it happens at the same time.

Q    Right.  You don't serve one sentence and then when that sentence is over you serve the other sentence.  That's not the way it's going to work.

A    That will never happen.

Q    And you have been promised by the District Attorney that you cannot, first of all, be prosecuted for any of these crimes that you've pled to in any other jurisdiction in California; is that true?

          MR. DUGDALE:  Objection, ambiguous, your Honor.

          THE COURT:  Sustain the objection.  I don't even understand it.

Altmanis - Cross                                  111

**MR. RUBIN:**  All right.

Q    Did they promise you that you -- I'll withdraw the question.

Were you also promised that no criminal charges will be filed against you regarding the recovery of stolen property from 4320 Mammoth Avenue in Sherman Oaks on February 19th, 2002?

A    Yes.

Q    That's all the stolen merchandise that was recovered from your residence; is that right?

A    Yes, they confiscated it.

Q    Right, but you're not going to be charged for those crimes.

A    Yes, there's just -- there was just one episode of shoplifting and the store gave it up.  The store dropped it.

Q    Excuse me.  Does the plea agreement provide that you will not be charged with receiving stolen property regarding the property that is recovered at 4320 Mammoth Avenue in Sherman Oaks on February 19th, 2002?

A    No.

Q    That's not in the agreement?

A    No, it's there I think.

Q    So again, what that means is, is you are not going to be charged with any crimes regarding the stolen property that was recovered in your apartment when you were arrested.

Altmanis - Cross                                    112

A     No.

Q     And you're not going to be charged with any --

            THE COURT:  Wait.  "No, I'm not going to be charged with those crimes."  Is that your answer?

            THE INTERPRETER:  I'm sorry there was no answer rendered, your Honor.

            THE COURT:  Is that correct?

            THE WITNESS:  Yes, I will not be charged.

BY MR. RUBIN:

Q     And you're not going to be charged with any charges relating to the firearms that were found in your apartment at the same time.

A     Yes.

Q     Now, have you been paid any monies by the government over the last four years?

A     No.

Q     Has your wife been paid any money by the government over the last four years?

            MR. DUGDALE:  Objection.  Lack of foundation, your Honor.

            THE COURT:  Only if he knows.

            THE WITNESS:  No, I don't know of that.

BY MR. RUBIN:

Q     You've had a number of discussions with your wife over the last four years, haven't you?

Altmanis - Cross                                              113

A     Yes, I have --

Q     And over --

A     -- before the divorce.

Q     You haven't spoken to your wife since the divorce?

A     I have spoken to her but very briefly.  Everyone's alive, everyone's healthy and that's it.

Q     And she didn't tell you that the government had provided her with almost $200,000?

        MR. DUGDALE:  Objection.  That assumes facts not in evidence.

        THE COURT:  Sustained an objection.  The jury is admonished to disregard any inference from that.

BY MR. RUBIN:

Q     Did the govern -- did she tell you the government was giving her money?

A     Yes, that she's in some kind of government program but what it is, I don't know what it is.

Q     So you didn't bother to ask her if she was being taken care of and if money was being paid to her?

        MR. DUGDALE:  Objection.  Argumentative as phrased, your Honor.

        THE COURT:  No, it's not argumentative.

        THE WITNESS:  No, I asked her but she never told me, she always lied to me.

//

Altmanis - Cross                                          114

BY MR. RUBIN:

Q    So your wife didn't tell you how much money she was getting from the government?

A    No, I know she got some kind of car, some old car.  She was complaining.  But other than that, she never told me.  It was a big mystery.

Q    Wasn't part of your plea agreement with the government that they would take care of your wife and children?

A    Yes, that it was.

Q    The government wasn't supposed to take care of your wife and children out of the goodness of their heart; they were doing it because you were cooperating; isn't that right?

        MR. DUGDALE:  Objection, your Honor, that's argumentative.

        THE COURT:  Sustained, that's clearly argumentative.

BY MR. RUBIN:

Q    The government was paying money to your wife because you were cooperating with the government's case; isn't that correct?

A    I don't know if they paid her money or if they helped her financially.  I know that she was in a program, a protection program, but how that worked in terms of money, I don't know.

Q    The bottom line is, is your wife never spoke to you and told you how much money the government was giving her --

        THE COURT:  Again you're using this colloquialism --

Altmanis - Cross                                    115

Q     -- is that true?

c-- and bottom line means -- to us it means a sum and --

          MR. RUBIN:  I'll rephrase it.

**BY MR. RUBIN:**

Q     In the last four years your wife has never spoken to you
and told you how much money the government is giving her; is
that true?

A     No, she did not.  I wanted to find it out but she kept it
a secret.  She said that -- she said she had a roof over her
head and that they were paying for her shelter and that's it.

Q     You wanted to find out how much she was getting; is that
what you said?

A     Yes, I asked her but she never said it.

Q     Did you ever think of asking the FBI agents?

          **MR. DUGDALE:**  Objection.  Relevancy and
argumentative.

          **THE COURT:**  Sustained on both grounds.

Q     Did you ever think of asking the government?

          **MR. DUGDALE:**  Same objection, your Honor; it's not
relevant.

          **THE COURT:**  Sustained.

Q     Did you ever think of asking your lawyer?

          **MR. DUGDALE:**  Same --

          **THE COURT:**  This is argumentative.  You're arguing
with the witness.

Altmanis - Cross                              116

BY MR. RUBIN:

Q    Did you ask the FBI agents how much money your wife was getting?

A    No, I didn't ask them if she received something or not received something.  They said that she was in some kind of program but that it's a secret and they said, "We're helping her."

          MR. RUBIN:  What they said is non-responsive to the question.  Move to strike.

          THE COURT:  All right.  Motion to strike is granted.

          The question, sir, is, did you ask the FBI agents whether your wife was getting any money?  Yes or no?

          THE WITNESS:  Yes, I did.

BY MR. RUBIN:

Q    Did they tell you?

A    They told me she's in the program.

Q    Did you ask Mr. Dugdale how much money your wife was getting?

A    No, I didn't ask him?  I asked --

Q    You ask Ms. Meyer --

A    No, I asked Louie.  He said that she's in a program --

          MR. RUBIN:  Objection, your Honor.  There's no question pending and it's hearsay.

          THE COURT:  Motion to strike is granted.  Objection is sustained.

Altmanis - Cross                              117

Listen very carefully to the question.  He's asking whether or not you asked Ms. Meyers [sic] how much money, if any, your wife was receiving.  Yes or no.

THE WITNESS:  No.

BY MR. RUBIN:

Q    Did you ask Ms. DeWitt ...

A    No, I did not.

Q    ... how much money your wife was getting?

A    No, I did not.

Q    Did you ask your attorney to find out for you how much money your wife was getting?

A    No, I didn't ask her.  We talked -- we talked but I didn't ask her specifically.  I didn't ask anyone specifically to look into it.

MR. RUBIN:  Thank you very much, sir.

THE COURT:  What I'm going to do rather than have Mr. Lasting start is let the jury go home for the evening, returning tomorrow 9:15 in the jury room, 9:30 in the courtroom.  Remember the admonition.

Oh, before the jury goes, one of the jurors asked the question:  "Can we have December 27[th], 28[th], 29[th] and January 2[nd] off as well."  I hope to finish this case to be very honest with you prior to the holiday season so I will hold this and not answer this question till we get closer to that time.

(Jurors exit courtroom at 3:52 p.m.)