# GOVERNMENT EXHIBIT 31

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO:  CR-02-220(B)-DT |
| | ) | |
| Plaintiff, | ) | CRIMINAL |
| | ) | |
| vs. | ) | Los Angeles, California |
| | ) | |
| IOURI MIKHEL, | ) | Thursday, October 19, 2006 |
| JURIJUS KADAMOVAS, | ) | (9:24 a.m. to 11:59 a.m.) |
| | ) | (1:24 p.m. to  4:27 p.m.) |
| Defendants. | ) | |

JURY TRIAL (28th DAY)
(VOLUME XXVIII)

BEFORE THE HONORABLE DICKRAN TEVRIZIAN,
UNITED STATES DISTRICT JUDGE

EXCEPTIONAL REPORTING SERVICES, INC
14493 SOUTH PADRE ISLAND DRIVE
SUITE A-400
CORPUS CHRISTI, TX 78418-5940
361 949-2988

Altmanis - Cross / By Mr. Lasting          10

THE CLERK:  Please remain seated and come to order. This United States District Court is again in session, the Honorable Dickran Tevrizian presiding.

THE COURT:  All right, outside the presence of the jury.  The record will indicate all parties and counsel are present.

We'll bring the jury out at this time.

(Jurors enter courtroom at 9:41 a.m.)

THE COURT:  All right, the record will indicate all jurors are present, all counsel are present, and all parties are present.

You're still under oath, Mr. Altmanis.  Please state your name for the record.

THE WITNESS:  Ainar Altmanis.

THE COURT:  All right.  You may cross examine the witness at this time, Mr. Lasting.

MR. LASTING:  Thank you, your Honor.

(Witness previously sworn)

CROSS EXAMINATION

(Testimony translated through interpreter)

BY MR. LASTING:

Q    Mr. Altmanis, in your insurance fraud schemes did you lie to people?

A    Yes.

Q    And when did you start this practice of trying to deceive

EXCEPTIONAL REPORTING SERVICES, INC

Altmanis - Cross / By Mr. Lasting                11

people with things that you would say to them?

        MR. DUGDALE:  Objection.  Vague, your Honor.

        THE COURT:  Sustain the objection.

BY MR. LASTING:

Q    Do you consider yourself a good liar?

A    No.

Q    Are you an actor?

A    No.

Q    Did you ever claim to be an actor?

A    No, I never said I was an actor.

Q    Did you ever have a brochure or some type of flyer made up with your picture on it advertising yourself as an actor?

A    Yes, that happened.

Q    When did that happen?

A    In '96 or '96 in New York.

        MR. LASTING:  Your Honor, I have a document I'd like to show the witness.  If it could be marked as Defense --

        (To Ms. Chahin):  What's next in line?

        THE COURT:  All right, Defendant --

        MS. CHAHIN:  2005.

        THE COURT:  2005?

        MS. CHAHIN:  Yes, your Honor, 2005.

        (Defense Exhibit Number 2005 marked for identification)

        MR. LASTING:  Could I show this to the witness, your Honor?

Altmanis - Cross / By Mr. Lasting            12

THE COURT:  Show it to Government first.

MR. LASTING:  Okay.

THE INTERPRETER:  I'm sorry, your Honor.  We need a pen up here for the witness.

THE COURT:  All right.  I'll get you a pen, but at the -- you're not to leave the pen up there.

THE WITNESS:  Yes.

BY MR. LASTING:

Q    Did you have a chance to look at that, Mr. Altmanis?

A    Yes, it's mine.

Q    Is this something that you caused to be prepared?

A    What specifically?  I don't understand.

Q    Was it your idea to have this made up?

A    No, I went to a school.  I mean classes.

Q    You went to an acting school?

A    No, it was a place that would make up headshots or photographs if you wanted to send them somewhere.  Any person could be admitted.  I tried but I failed.

Q    Did you take classes?

A    Well, yes.  I came in, they took pictures of me, they created a portfolio, and that was it.

Q    And then did you send it out to people?

A    I gave it to one of the agents that was there and I guess they sent it out.  I don't know.  Because I paid for the photographs and all that.

Altmanis - Cross / By Mr. Lasting            13

MR. LASTING:  Your Honor, could I publish this to the jury?

THE COURT:  Are you offering it for admission?

MR. LASTING:  Yes.

THE COURT:  Any objections?

MR. DUGDALE:  No, your Honor.  Thank you.

THE COURT:  All right, received this date 2005, Exhibit 2005.

**(Defense Exhibit Number 2005 was received in evidence)**

BY MR. LASTING:

Q    Can you see that, Mr. Altmanis?

A    Yes.

Q    Who's that in the picture?

A    It's me.

Q    And does it list your desire to perform in movies and perform as an actor?

A    Yes.

Q    Do you think you're somebody that's capable of playing different roles?

MR. DUGDALE:  Objection.  Vague, your Honor.

THE COURT:  Sustain the objection.  It's also argumentative.

BY MR. LASTING:

Q    Do you have a good memory for details?

A    Yes, I do.  Very, very -- well, to the extent that my

Altmanis - Cross / By Mr. Lasting                14

brain is able to keep it.

Q    And when you were doing these fraud schemes to defraud insurance companies did you have a good memory for the details of what you were doing there?

A    Well as far as details there, there weren't many.  They just explained who was in the accident and that kind of stuff.

Q    So you were able to keep all the lies straight?

        MR. DUGDALE:  Objection, your Honor.  It's argumentative.

        THE COURT:  Sustained.  It's argumentative.

BY MR. LASTING:

Q    Did you ever forget the details of any of the lies that you told?

A    I don't know.  I never checked.  I don't know.

Q    You don't know if you ever forgot any of the details or not?

A    Of course, you don't tend to remember everything in your life.

Q    And when you were doing these insurance frauds and you were telling these lies, what was your purpose in doing that?

A    That whole campaign was to receive money from the insurance companies.

Q    So money was something that you wanted?

A    Yes.

Q    So you were involved in making up these lies and telling

Altmanis - Cross / By Mr. Lasting                15

lies to get money, is that right?

A       Yes.

Q       Did you ever, as part of your efforts to cheat the insurance companies with these fake accidents, did you ever actually fake injuries on your body?

A       Yes.  It was based on the request of the person who was telling me to -- he said that it has to look a hundred percent real, so yes.  He hired a, what do you call it, I guess a -- the person in Hollywood who does the -- who works on your face.

Q       Like a makeup artist?

A       Yes, a makeup artist.  A person who -- and the makeup artist worked on me for two hours.

Q       So this was somebody that you and your coconsipirator in these fraudulent schemes hired and spent two hours putting makeup on you, is that what happened?

A       Yes.

Q       What kind of makeup did you have put on you?

A       Something to do with the body -- it had to do with the belts, when the accident happened with the belts.

Q       And then did you take pictures -- did you have somebody take pictures of these fake injuries?

A       Yes, the organizers did.

Q       The people you were conspiring with?

A       Yes.

Q       And then what did you do with the fake pictures -- or the

Altmanis - Cross / By Mr. Lasting                16

pictures of your fake injuries?

A    I guess they sent them to the insurance company.  I don't know.

Q    And you also sent the insurance company fake -- or false doctor's reports?

A    Yes.  They sent them in.  I didn't send anything.  Like I said, they were the ones who handled all those things.  What I was supposed to do was to come in and sign that I'd been to the doctor and that was it.

Q    And all of this was to get money, is that right?

A    Yes, to deceive the insurance company.

Q    And you've engaged in a number of other activities which were -- or have you engaged in a number of other activities which were designed to deceive people?

A    Yes, I've already said I have.

Q    What day did you get arrested in connection with your current confinement and custody?

A    February 19th, 2002.

Q    And when you got arrested on February the 19th, 2002 did you want to get your freedom back as quickly as you could?

A    Yes, I processed bail.  I filed for bail.  Because I was arrested for theft.

Q    So the first thing you tried to do to get out of jail was to spend money to get out by posting bail, is that right?

A    Yes, because it was explained to me, they handed me a

Altmanis - Cross / By Mr. Lasting                17

piece of paper and it said that I had to apply for bail.

Q    How quickly did you start trying to get out on bail after you got arrested?

A    I called my wife the next day to have her call the attorney or whatever was needed to get it done.

Q    So the first thing you did was call your wife and ask her to get an attorney and arrange bail for you, and he did that on what, February the 20th, is that what you're saying?

A    I think so, yes.

Q    Did that work?

A    No, because we --

Q    So you didn't get out on bail?

A    First -- they made a mistake.  First they set it up as $10,000 and then in San Bernardino they -- not in San Bernardino, in Santa Barbara then they asked for 50,000.

Q    Well you had $50,000, didn't you?

A    No, not by then.  Everything was confiscated.

Q    The $110,000 that was under your sink had been confiscated?

A    That too.  All the money that was found in my home was confiscated.

Q    So when you couldn't get out on bail you still wanted to get out, didn't you?

A    Yes, I was working towards that.  They were looking for money to pay the 50,000.

Altmanis - Cross / By Mr. Lasting                18

Q    When did you first talk to the FBI?

A    Four days later.

Q    By that time you knew that your efforts to spend money to get out weren't going to work, is that right?

A    Yes.

Q    You still wanted to get out, didn't you?

A    Yes, if it was possible.  Yes.

Q    And if you couldn't get out you wanted to spend as little time as possible in prison, is that true?

A    I wasn't thinking about that.

Q    You weren't thinking about that?  The thought never crossed your mind that you'd want to get out of prison as quickly as you could?

A    It's possible that I had that thought, but by then I was completely lost in all my thoughts.  I was very confused.  I didn't know what the outcome of this whole thing would be.

Q    Wasn't your goal from the start to get out as quickly as you could?

A    I think that any person who would get in such situation would have similar desire.

Q    Well we're not talking any person right now; we're talking about you.  Is that what you wanted?

A    Yes.

Q    So did you think maybe you could accomplish this by making a deal with somebody?

Altmanis - Cross / By Mr. Lasting                    19

A    No.

Q    You didn't think that maybe you could make a deal that would be a sweet deal for you and benefit yourself?

A    I was not thinking about the sweetness of the deal, I was thinking about how to put an end to all that and to start talking.  And in that case I was thinking about how to help my wife and my children.

Q    You weren't thinking about yourself at all, is that what you're telling us?

A    About myself, what could I think about myself?  I was a lost person already.

Q    Weren't you thinking about yourself "I want to get out of this mess"?

A    Yes, I did.  I was thinking about it.  And that's why I did it.  The only right step in my life.

Q    So you'd been committing the crime of defrauding insurance companies, been committing insurance fraud, is that right?

        **MR. DUGDALE:**  Objection.  Asked and answered.

        **THE COURT:**  Sustained.

**BY MR. LASTING:**

Q    Had you been committing the crime of receiving stolen property?

A    Yes.

Q    Did you want to work out a deal so you wouldn't be prosecuted for those crimes?

Altmanis - Cross / By Mr. Lasting                    20

A    Yes.

Q    Did you want to work out a deal so you wouldn't be prosecuted for the insurance frauds you'd been involved in?

A    Yes.

Q    You'd been committing the crimes of commercial burglary; you'd been going into stores intending to steal things, hadn't you?

A    Yes.  That too.

Q    Did you want to work out a deal so you wouldn't be prosecuted for those crimes?

A    Yes.  These issues came up in the course of the deal.

Q    You'd been committing the crime of forgery, hadn't you?

A    Yes.

Q    Did you want to work out a deal so you wouldn't be prosecuted for that?

A    Yes.

Q    You'd been involved in embezzling money from MGM, is that true?

A    We didn't receive the money.  We stole the checks, but we didn't get the money.

Q    You and your brother conspired to steal checks and try to cash them, is that what you did?

A    Yes.

Q    And over what period of time were you and your brother involved in this criminal enterprise?

EXCEPTIONAL REPORTING SERVICES, INC

Altmanis - Cross / By Mr. Lasting                    21

A    Somewhere in the summer of 2001.  In the summer.

Q    Continuing until when?

A    It happened a couple of times or maybe one time, I don't remember.

Q    Was it your testimony that your brother would steal the checks, give them to you, and you would give them to Mr. Mikhel?

A    Yes, to Mikhel and Kadamovas.

Q    What, did you hand some to Mr. Mikhel and some to Mr. Kadamovas, is that what you're saying?

A    I gave everything to them.  I didn't give them to them separately.

Q    Did you pass these checks to them, as you put it, so that the checks could be cashed and you could get back money?

A    Yes.

Q    And that's why you were doing it, weren't you, to get money?

A    Yes.

Q    And so how much -- what was the value of the checks that you passed on so that you could get money for it?

A    I don't remember.

Q    You don't have any idea at all?

A    It was much, but I don't remember the exact amount.

Q    You say it was "much," you mean it was a lot of money?

A    Yes, the sum was quite considerable.  I don't remember

EXCEPTIONAL REPORTING SERVICES, INC

Altmanis - Cross / By Mr. Lasting                22

what exactly.

Q    So it was a crime that you and your brother were involved in and it was designed to get money for you and you have no recollection of how much money was involved in these checks?

A    Back then probably I remembered, but now I don't.  Since nothing came out of it I just didn't keep all those trifle details in my head.

Q    Was it over $2 million?

A    Probably, yes.

Q    Was it somewhere between $2 million and $5 million?

A    I don't remember.  I don't remember.  It's hard for me to tell.

Q    You didn't want to be prosecuted and have to serve time for that, did you?

A    I didn't understand the question.

Q    Did you want to work out a deal so you wouldn't be prosecuted for the check scam or the embezzlement of the checks from MGM that you now recall was perhaps over $2 million?

A    MGM didn't prosecute anyone, either me or my brother, because they didn't lose a single cent.

Q    What I'm asking, sir, is did you want to work out a deal so you wouldn't be prosecuted for this crime that you and your brother committed against MGM?

A    No, I didn't.

Q    You weren't worried about that?

Altmanis - Cross / By Mr. Lasting                23

A       Because there was no charge concerning this.  I just said openly that such instance happened in my life.

Q       Had you committed the crime of perjury?

A       Perjury?

Q       Do you know what perjury is?

A       No.

Q       You don't know, you've never heard that term?

A       Perjury with documents?

Q       Okay, perjury with documents.  Have you committed that crime?

A       Yes, I had Florida driver license and that passport.

Q       So in order to get that you committed the crime of perjury, is that what you're telling us?

A       Yes.

Q       And did you want to work out your deal so you wouldn't be punished for that?

A       Yes.

Q       And you were illegally in the United States, were you not?

A       Yes, illegally.

Q       Did you want to work out your deal so you wouldn't be punished for that?

A       No, concerning this I kind of don't remember any conversation about immigration.

Q       You weren't concerned about your status about illegally being in this country?

Altmanis - Cross / By Mr. Lasting                    24

A      Me personally?

Q      Yeah, you personally.

A      No.  Besides me there is 1 million of illegals.  And even more so, that I became illegal not through my own fault but through the fault of immigration attorneys.

Q      So the fact that you were here illegally, that's somebody else's fault, that's not your fault, is that what you're saying?

A      No, I'm not putting the blame on anyone.  That's my fault.

Q      And you illegally possessed firearms, did you not?

A      Yes.

Q      Did you want to work out your deal so you wouldn't be prosecuted for that?

A      Yes.

Q      Were you involved in criminal activity in Latvia before you came to the United States?

A      No.

Q      So you started committing these various crimes that you've detailed once you got to the United States?

A      Yes, when I came to New York.

Q      What year was it that you started committing crimes here? Here meaning the United States.

A      In California, when I met people regarding the insurance.

Q      When was that?

A      Around '97.

EXCEPTIONAL REPORTING SERVICES, INC

Altmanis - Cross / By Mr. Lasting                25

Q    You mentioned that you know Alexander -- or Aleksejus Markovskis, is that right?

A    Yes.  I met him at Kadamovas's party.

Q    Did you ever talk to him about yourself and your past?

A    I don't remember.  Probably.

Q    Did you tell him that you had some serious problems in Latvia prior to coming to the United States?

A    No.  I didn't have any problems there.

Q    So then you didn't tell him that, is that right?

A    Probably I said, but very unlikely that I had problems.

Q    Well did you tell him that you were involved in criminal activity in Latvia?

A    Very unlikely.  I worked in that nightclub.  I was involved in speculation of merchandises, reselling merchandises, but criminal activity, no.

Q    So then, if you could just answer this question with a yes or a no, did you tell Aleksejus Markovskis that you were involved in criminal activity in Latvia?

A    Yes.  I told him that I was reselling merchandise for profit.

Q    So --

A    Yes.

Q    -- did you tell Mr. Markovskis that you had to flee from Latvia?

A    To flee?

Altmanis - Cross / By Mr. Lasting                    26

Q     Flee.

A     No.

Q     Were you involved, in addition to yourself being here illegally here in the United States, were you involved in arranging for other people to enter the United States illegally?

A     If consider the children, yes.

        THE INTERPRETER:  Interpreter would like to correct herself on the record.  The right word would be profiteering. I was involved in profiteering, reselling goods for profit. Profiteering, not speculation.  That would be the correction.

        THE COURT:  Is that in Latvia -- you're referring to in Latvia?

        THE INTERPRETER:  Yes, your Honor.

BY MR. LASTING:

Q     I'm not talking about family members, I'm talking about people unrelated to you.  Were you involved in assisting people to illegally enter the United States?

A     No.  Never.

Q     Did you tell Mr. Markovskis that you were involved in illegally sneaking people into the United States from Canada?

A     No.  I was brought in here illegally.  But I myself, I didn't bring anyone.

Q     You were brought in here illegally from where?

A     From Canada.  When I was sent back to Canada when my

Altmanis - Cross / By Mr. Lasting                27

documents into the United States expired.  I was returned to Canada.  And after that a man, together with him we drove in a car to New York through one of small border patrol points.

Q    Were you able, Mr. Altmanis, to work out a deal where you wouldn't be prosecuted for any of these crimes we've just discussed?

A    Yes.

Q    And in addition to working out deals for yourself, did you want to work out a deal for your brother, Raymond?

A    No.

Q    To your knowledge has Raymond ever been prosecuted for any of the crimes he participated in or conspired to commit with you?

            MR. DUGDALE:  Objection.  Relevance, your Honor.

            THE COURT:  No, overruled.

            THE WITNESS:  Could you please verify what agencies, when, and where?

BY MR. LASTING:

Q    I'm sorry?

A    Could you please verify with what agencies, when, and where?

Q    Has he ever been prosecuted, charged with a crime which went to court, by any agency?

            THE COURT:  For ever and ever?

            MR. LASTING:  I'm sorry, your Honor.

Altmanis - Cross / By Mr. Lasting                    28

**BY MR. LASTING:**

Q    Any of the crimes you conspired to commit or that he committed with you.

A    No, he was prosecuted through his own fault for a theft from a store.

Q    The things he did with you, there was no prosecution of him.  Is that correct or incorrect?

A    We only had checks with MGM and MGM didn't file anything.

Q    Didn't you tell us that he was assisting you in the sale of stolen property?

        **THE INTERPRETER:**  Interpreter's correction.  (Re-translates)

A    Yes.  With the resale, yes.

Q    Was he prosecuted for that?

A    No.

Q    And when you met the FBI for the first time, what day did you say that was?

A    I don't remember the date, but it was four days after my arrest.

Q    So that would make it February the 23rd, 2002?

A    Yes.

Q    And did you tell -- do you recognize FBI Agents Davidson and Perez seated here in the courtroom?

A    Yes.

Q    Did you speak with them around the 23rd of February 2002?

Altmanis - Cross / By Mr. Lasting          29

A     Yes, we had a conversation.

Q     Did you tell them you wanted a deal?

A     No.

Q     Didn't you tell them you wanted a deal and you wanted it in writing?

A     I said that I wanted to talk and that I needed an attorney.

Q     Did you tell them that you wanted a deal and that you wanted it in writing?

          THE COURT:  At what point, Mr. Lasting?

BY MR. LASTING:

Q     On the 23rd of February 2002.

A     Yes, that everything had to be put in writing in the presence of my attorney.

Q     And one of the things you wanted in writing was a deal, is that right?

A     The only request that I made was that when I started speaking that my wife and my children would be provided protection.

Q     Did you eventually sign a deal?

A     Yes, somewhere three months later.

Q     Did you sign a plea deal with the Government in June of 2002?

A     Yes, I did.

Q     And then did you make a deal with the Los Angeles County

Altmanis - Cross / By Mr. Lasting          30

District Attorney's Office in October of 2003?

A    Yes.

Q    And are these deals designed to get you as little time as you can possibly get for the crimes you've committed?

          MR. DUGDALE:  Objection, your Honor.  This document speaks for itself.

          THE COURT:  I'll sustain an objection the form of the question.  You can ask him his understand, because now you're asking him the document and the document speaks for itself.

**BY MR. LASTING:**

Q    Is it your understanding, Mr. Altmanis, that these deals are designed to get you as little time as possible for the crimes you've committed?

A    Yes.

Q    And just briefly, without going into every detail, your State deal is that for the murders of five people you'll get 20 years or less, is that right?

A    Yes.

Q    And your State deal is you won't be prosecuted for any other crimes that you've committed in the state of California, is that right?

          MR. DUGDALE:  Objection, your Honor.  That misstates the document and it speaks for itself.

          THE COURT:  He's only asking for his understanding.

          MR. DUGDALE:  That wasn't the question.

Altmanis - Cross / By Mr. Lasting                31

**BY MR. LASTING:**

Q    Mr. Altmanis, is it your understanding that your State deal is you won't be prosecuted for any of the other crimes you've committed in the state of California?

A    Yes.

Q    And that's what you wanted?

A    If it works out.

Q    And your deal with the Government in this case, is it your understanding that that deal is that you won't be subjected to a possible death sentence?

        **THE INTERPRETER:**  I'm sorry, Counsel.  Would you mind repeating your question?

        **THE COURT:**  Is it your understanding that your deal in this case, the Federal case, is that you will not be subjected to a possible death sentence?

        **THE WITNESS:**  Yes.

**BY MR. LASTING:**

Q    Did your attorney explain to you what the possible punishment was?

        **THE INTERPRETER:**  I'm sorry --

Q    -- for the crimes charged in this case?

        **THE INTERPRETER:**  -- I didn't hear.

        **THE COURT:**  Did your attorney explain to you what the possible punishments were for the crimes in this case?

        **THE WITNESS:**  Yes.  It was a life sentence.

EXCEPTIONAL REPORTING SERVICES, INC

Altmanis - Cross / By Mr. Lasting                32

**BY MR. LASTING:**

Q    Did your attorney explain to you that the crimes charged in this case carry a punishment of either death or life in prison without any possibility of release?

A    Yes.

Q    Did your attorney explain to you that those punishments are mandatory, that the Court has -- if somebody's convicted of the crimes that were originally charged against you, that the Court, if you're convicted, has to impose one or the other punishment?

A    Yes.

Q    Did your attorney explain to you that there may be a way around that?

A    What do you mean "around that"?

Q    Did your attorney explain to you that there may be a way that the Court would not be required to give you life without release, but that you could receive a sentence which could be served and you'd then be released from prison?

A    Yes, she said that that was possible should the Government decide that that was possible.

Q    Did she tell you that in order for that to happen the Government has to make a motion to the Court?

A    Possibly, yes.

Q    She did tell you that, didn't she?

A    Yes, she did.

EXCEPTIONAL REPORTING SERVICES, INC

Altmanis - Cross / By Mr. Lasting                33

Q    You know that, don't you?

A    Yes, but not in the same words.  It was explained differently.

Q    Well how was it explained to you?

A    Just, you know, in regular terms, the way I understand it.

Q    Tell us.

A    Just simply that there's a way.

Q    There's a way what?

A    A way for me to receive a long prison term, but not a life sentence and not a death penalty.

Q    And in fact your State plea deal is structured so that the maximum term that you could receive is up to 20 years, is that correct?

A    Yes.  With the State, yes.

Q    And was it explained to you that your State deal is whatever time you get from the State of California won't be in addition to any time you get from the Federal Court?

A    I don't understand.  Can you repeat the question one more time?

Q    Is it your understanding that your State plea deal is that whatever time, the 20 years or less that you get from the State, will be served simultaneously with whatever time you get from the Federal -- in your Federal sentence?

A    Are you talking about them being together?

Q    Yes, that's what I'm talking about.

Altmanis - Cross / By Mr. Lasting                34

A     Yes.  Yeah, they go together.

Q     So you understand that?

A     Yes.

Q     And did you enter your plea in this case back in June of 2002?

A     No.

Q     When did you plead guilty in this case?

A     You mean this case?  The Federal case?

Q     Yes.

A     Yes.  Yes.  June.

Q     June 2002?

A     Yes.  Yes.

Q     Have you been sentenced yet?

A     No.

Q     When are you going to be sentenced?

A     Probably when the trial is over.

Q     And did you plead guilty in the State Court in December of 2003?

A     Yes.

Q     Have you been sentence there yet?

A     No.

Q     When are you going to be sentenced there?

A     Probably when the trial is over.

Q     Does your plea deal call for you to be sentenced there not until you've been sentenced in the Federal Court?

Altmanis - Cross / By Mr. Lasting          35

A     I don't know.

          MR. DUGDALE:  I'll object again.  The Plea Agreement speaks for itself, your Honor.

          THE COURT:  He doesn't know.

BY MR. LASTING:

Q    You don't have any understanding of when you're going to be sentenced by the State of California for the crimes you pled guilty to -- or the crimes that you'll be allowed to withdraw your guilty plea to and enter a plea to different crimes?

A     No, I don't know.  I don't understand this issue at all.

Q    You don't have any understanding of it?

A     No idea.  I have no idea what you're talking about.  I really don't know these kind of details.

Q    Mr. Altmanis, did you look the same back in the summer, say August of 2001 as you look today?

A     No.  I was fat, bald.

Q    You were fat and bald?

A     Yes.

Q    You were muscular, weren't you?

A     Like any normal person.  No more than anyone else.

Q    Did you take videos of yourself back then?

A     Yes, I did.  I videotaped myself and my family.

          MR. LASTING:  Your Honor, previously we've marked as an exhibit --

          THE COURT:  2004 I believe it is.

Altmanis - Cross / By Mr. Lasting                36

MR. LASTING:  -- 2004.  Could I --

THE COURT:  Are you moving for its admission?

MR. LASTING:  Yes, your Honor.

THE COURT:  All right, 2004 is admitted over objection.

(Defense Exhibit Number 2004 was received in evidence)

MR. LASTING:  And could I publish that to the jury and show it to the witness at the same time?

THE COURT:  You can.  Let me get the thing set up here on the right mode.

(Defense Exhibit 2004, video, played from 10:38 a.m. to 10:39 a.m.)

BY MR. LASTING:

Q    Mr. Altmanis, who's that?

A    It's me.

Q    And what were you doing in that video?

A    I'm posing.

Q    What was the purpose of taking that video of yourself?

A    I don't know, you know, you don't usually videotape for any particular purpose.  Maybe I wanted to be Spielberg.

Q    And that's the way you looked back in August of 2001?

A    Yes.  I was about 230 pounds.  I was fat.  And I shaved my head.

Q    So at different times you affect different appearances?

MR. DUGDALE:  Objection, your Honor.  Argumentative

Altmanis - Cross / By Mr. Lasting                37

and irrelevant.

THE COURT:  Sustained.

BY MR. LASTING:

Q    Do you at different times affect different appearances?

MR. DUGDALE:  Objection.  It's also ambiguous.

THE COURT:  I'll also sustain that objection.

BY MR. LASTING:

Q    Mr. Altmanis, at some point did you arrange for your mother and stepfather in Latvia to open a bank account?

A    Yes, I did ask them.

Q    When did you do that?

A    In 2001.

Q    When in 2001?

A    In the fall.

Q    What month?

A    I don't remember.

Q    Do you remember if it was November of 2001?

A    I don't remember now.  I know it was in the fall, but what month.

Q    And was there something special about the bank account that you wanted them to open?

MR. DUGDALE:  Objection, your Honor.  Ambiguous.

THE COURT:  Do you understand the question?

THE WITNESS:  Yes, because it was impossible -- I didn't have any accounts here.

Altmanis - Cross / By Mr. Lasting                38

THE COURT:  It's clear that he understood the question, because he answered it.  So objection overruled.

MR. DUGDALE:  I understand.

BY MR. LASTING:

Q    Did your brother have an account here?

A    Yes.

Q    Is there some reason that you asked your parents to open this account rather than utilizing your brother's account?

A    Yes.

Q    What's the reason?

A    Because I wasn't able to deposit amounts into my brother's account that exceeded $10,000 and to involve him in any -- I didn't want to involve him into my activities or any of my activities.

Q    Wasn't he already involved in your activities?

A    No, that was a complete different thing.

Q    Was he involved in your criminal activities?

A    Yes, just that one thing with the checks.

Q    Did you want your family members in Latvia to open an account to which U.S. dollars could be transferred into it?

A    Well, I wanted -- yes, I wanted them to open an account, but as far as which hard currency, whether it was dollars or euros, I don't know.

Q    You wanted it a currency other than the local Latvian currency though, is that correct?

Altmanis - Cross / By Mr. Lasting                  39

A     Well, I don't know, I didn't send the money.  Did I send the money?  I don't know if the money arrived in dollars, euros, or latos.

Q     Did you want the account to be an account that could receive currency other than the Latvian currency?

A     Yes, because a lata is like paper.  It's local money, has zero value.  It's nothing.

Q     And did you actually do some computer research to find banks that might be available for your family in Latvia to open these accounts?

A     No.  I don't know how to turn on a computer.  We didn't have a computer in our family.

Q     Did you make some notes from looking at a computer about these banks or bank accounts?

A     I don't remember.

Q     What's your mother's name?

A     Anita Eidaka.

Q     And she opened an account at your direction?

A     Yes.  I asked her and she opened an account.

Q     And your stepfather, what's his name?

A     Anton Eidaks.

Q     And did he open an account in Latvia at your request?

A     I didn't ask him to open an account, I asked my mother to open an account.  They did that on their own, to open two.

Q     Well did you get the information with regard to the

Altmanis - Cross / By Mr. Lasting                 40

account number for your mother's account?

A    Yes, she sent it to me.

Q    Did you get the information regarding an account that your stepfather had opened?

A    Yes.

Q    Did you write stuff down -- did you write this information down?

A    Naturally.  How could I keep it in my head?

Q    And what was the purpose of having these accounts?

A    So that Kadamovas and Mikhel could transfer money into the account, because they were not able to pay with cash.

Q    And when you arranged for these accounts to be opened what money were you contemplating receiving?

A    The money that Kadamovas and Mikhel were supposed to send, that they promised to send.

Q    So at the time this account was opened Mr. Mikhel and Mr. Kadamovas had promised to send some money to you?

A    Yes.

Q    What was that money for?

A    The money for, what do you call it -- what the people paid that they laundered in the what do you call it.

Q    I'm sorry, I didn't hear the answer.  Could you repeat it?

        **THE INTERPRETER:**  I probably couldn't.

        **THE COURT:**  The money that these people paid that was laundered.

Altmanis - Cross / By Mr. Lasting          41

**BY MR. LASTING:**

Q    The money that what people paid?

A    The money that was -- to Dubai that would come in to their accounts.

Q    This was money that you had earned as of that time?

        **THE INTERPRETER:**  I'm sorry.  This was the money that was --

**BY MR. LASTING:**

Q    Was this money that you had earned?

A    Yes.  This is the money that they were supposed to pay. They said that they couldn't pay cash, or there was a check.

Q    What were you supposed -- what had you done that you were supposed to be paid for at the time you opened these accounts?

        **MR. DUGDALE:**  Objection.  There's been no testimony that he opened anything.

        **THE COURT:**  Sustained as to the form of the question.

        **MR. LASTING:**  Thanks, your Honor.

        **THE COURT:**  All right, let's take our morning recess. Remember the admonition.  Ten minutes.

    **(Jurors exit courtroom at 10:50 a.m.)**

    **(A recess was taken from 10:50 a.m. to 11:01 a.m.; parties present)**

    **(Outside the presence of the jury)**

        **THE CLERK:**  Please remain seated and come to order. This United States District Court is again session.

EXCEPTIONAL REPORTING SERVICES, INC

42

THE COURT:  All right.  Outside the presence of the jury the record will indicate all parties and counsel are present.

Anything the Government wishes to bring up?

MR. DUGDALE:  No, your Honor, thank you.

THE COURT:  Anything any defendants wish to bring up?

MR. LASTING:  (***)

THE COURT:  All right.  We'll bring the jury back in.

Mr. Lasting, how long do you think you'll be?

MR. LASTING:  I'll be the rest of the day, your Honor.  And it may go into tomorrow.  My hope is that it won't, but I can't tell.

**(Jury enters courtroom)**

THE COURT:  Okay.  The record will indicate all jurors are present.  All counsel of parties are present.

You're still under oath, Mr. Altmanis.  Please state your name for the record.

THE WITNESS:  Ainar Altmanis.

THE COURT:  Mr. Lasting, you may continue.

MR. LASTING:  Thank you, your Honor.  Your Honor, I have two pages of documents.  Could these be marked at this point as Exhibit 2006 and I then show them to the witness?

THE COURT:  2006, what --

MR. LASTING:  I think that's the next in order.

//

43

THE COURT:  It is next in order.  Show them to the Government.

**(Defense Exhibit Number 2006 was marked for identification)**

MR. LASTING:  I did.  Oh --

MR. DUGDALE:  Oh, thank you.  Thank you.

MR. LASTING:  All right.

THE COURT:  Approach.  Okay.  You haven't stapled them.

MR. LASTING:  I had the paper clipped, your Honor, I can --

THE COURT:  All right.  Let me staple them.  It says page one of one and then it says page one of two.  They're different documents?

MR. LASTING:  They are.  Rita Markhum (phonetic) --

THE COURT:  206A and 206B; how's that?

MR. LASTING:  Thank you very much, your Honor.  I appreciate it.

THE COURT:  206A will be the one that says HansaBanka at the top, and 206B, looks like 2006B, has Parex Banka the top.  All right.  Before the witness for -- no, in evidence at this time.  No, I'm sorry, for identification, only, at this time.

**(Defense Exhibit Numbers 206-A and 206-B were marked for identification)**

Altmanis - Cross / By Mr. Lasting                    44

THE COURT:   Your question.

CROSS EXAMINATION (CONTINUED)

BY MR. LASTING:

Q    Yes, Mr. Altmanis, did you have a chance to look at the documents that are now marked as Exhibits for Identification, 2006 and 2006A or 2006A and B?

A    Yes.

Q    You recognize them?

A    Yes, I do.

Q    Looking at the 2006A, it's a document that's got HansaBanka, at the top.

A    Yes.

Q    Is this something that was at your house?

A    Yes, it was in my house.

Q    And what language is this document in?

A    In Latvian.

Q    And does this document appear to be a printout from a computer?

A    I don't know whether it's a computer or a fax.  I don't know.

Q    And what does this document represent?

A    This is the bank's address.

Q    The HansaBanka?

A    Yes.

Q    Is that a bank in Latvia?

Altmanis - Cross / By Mr. Lasting          45

A     Yes.

          MR. LASTING:  Your Honor, could I publish this document for the jurors --

          THE COURT:  Are you offering it in evidence?

          MR. LASTING:  I am.

          THE COURT:  Any objection?

          MR. DUGDALE:  No, your Honor, thank you.

          THE COURT:  All right.  2006A received this day.

     **(Defense Exhibit Number 2006-A was received in evidence)**

          THE COURT:  Are you going to go on the document cam?

          MR. LASTING:  Please.

**BY MR. LASTING:**

Q    Mr. Altmanis, how did you get this, referring to the exhibit that's on the screen?

A     It's hard to say whether it was mailed or I don't remember how I got it, but it came from Latvia.  This is bank.  But, how it got to me, either it was sent --

Q    Does it have any indication that it was ever transmitted via facsimile machine?

A     I don't know.

Q    Is it something that you went on a computer and researched and printed out?

A     Probably yes, but I didn't do it.

Q    You didn't do what?

A     I didn't work on the compute.  I didn't have a computer.

Altmanis - Cross / By Mr. Lasting                46

Probably my brother gave it to me, or even Mikhel and Kadamovas gave it to me.

Q    Does Mr. Kadamovas speak Latvian?

A    No, he doesn't.

Q    Does Mr. Mikhel speak Latvian?

A    No, he doesn't.

Q    Do you speak Latvian?

A    Yes, I do.

Q    And was this document acquired by you in connection with your desire to have these Latvian bank accounts opened by your family?

A    Yes.

Q    What money were you entitled to when these accounts -- when you got this document that you needed this bank account for?

A    I didn't understand the question.

Q    You wanted your family in Latvia to open a bank account so that you could get money; is that right?

A    Yes.  I asked them to open an account.  I remember that.

Q    And this was some money that you were entitled to receive because of something you've done; isn't that what you told us?

A    Yes.  Yes.  It was Mikhel and -- it was because Mikhel and Kadamovas explained to me that they couldn't pay me with cash, and they could give me only a check, and that's why I had to open an account.

Altmanis - Cross / By Mr. Lasting          47

Q    Well, what were you going to get this cash for?  What had you done to get this cash you were going to receive?

A    For the part of the people that were kidnapped.  And Mikhel said that as soon as the money was laundered, it would be sent.

Q    So who had been kidnapped that you were going to be paid for in this account, when you opened it, or when you asked your family to open it?

        MR. LASTING:  Let me rephrase.  Let me withdraw that question; if I might, your Honor.

BY MR. LASTING:

Q    What kidnapping had you participated in, that you were going to be paid money that caused you to have your parents open this account?

A    I participated in the kidnapping of Muscatel, Pekler, Umanksy, Safiev and Kharabadze.

Q    And had you participated in those at the time you asked your parents to open this account?

A    Yes.  During those events, I asked my family to open the account because I was told that I would be paid not in cash, but by check.

Q    And the document entitled, that's got Parex Banka, at the top?

        THE COURT:  2006B for identification.

//

Altmanis - Cross / By Mr. Lasting          48

**BY MR. LASTING:**

Q    When did you get that?

A    I think it was together.  There were two banks, but which of them they opened, that I don't remember.

        **MR. LASTING:**  Your Honor, I'd offer into evidence 2006B.

        **THE COURT:**  Any objection?

        **MR. DUGDALE:**  No objection, your Honor.

        **THE COURT:**  2006B received this day.

    **(Defense Exhibit Number 2006-B was received in evidence)**

        **MR. LASTING:**  May I show this --

        **THE COURT:**  You may publish it now.  Once it's been admitted you may publish it.

        **MR. LASTING:**  Thank you.

**BY MR. LASTING:**

Q    This document is in Latvian, also, Mr. Altmanis?

A    Yes, in Latvian and in Russian, both.

Q    And is this something that you went on the Internet to get?

A    Yes.

Q    When did you do that?

A    I, personally, didn't do it.  I don't remember who did it for me.  Probably my brother got from the Internet, the information about what kind of banks existed.

Q    Is there something in handwriting at the bottom of this

EXCEPTIONAL REPORTING SERVICES, INC

Altmanis - Cross / By Mr. Lasting            49

document?

A     Yes.

Q     Whose handwriting is that?

            THE COURT:  Do you want to scroll down to it or raise --

            MR. LASTING:  I was going to ask him what it was first, your Honor, but I will.

            THE WITNESS:  Probably mine, probably not.  I don't know.

**BY MR. LASTING:**

Q     It probably is and it probably isn't?  Can you explain that?

A     I don't remember.  It's hard for me to say now whether I wrote or anything on the paper or not.

Q     What are the numbers written there beginning at 10 10 629; what do they represent?

A     10 10 629 -- it's probably bank's number because 32 578 -- 579 is the telephone of my parents.  I remembered, I gave this page to Kadamovas and Mikhel.

Q     Was this document found at your house when the FBI or the San Bernardino sheriff's searched your apartment on Mammoth?

            MR. DUGDALE:  Objection.  Calls for speculation, your Honor.

            THE COURT:  Only if he knows.

            THE WITNESS:  No.  I don't know.  I'm not sure.  Had

Altmanis - Cross / By Mr. Lasting            50

I wanted to keep it at home, I wouldn't have put this telephone in writing because I know it by heart from my childhood. Especially -- no.  It's not my handwriting.

**BY MR. LASTING:**

Q    It's not your handwriting?

A    No.

Q    Was the document -- do you know -- wasn't this a document that was at your house, at your apartment on Mammoth?

A    I don't deny it.  They might've found it there.  If I was interested in the information about banks, probably I had it in my home.  But, this is not my handwriting.

Q    You were interested, Mr. Altmanis, in this information because you wanted to keep track of the money that was going to go into these bank accounts that you requested your family to open in Latvia; isn't that the truth?

A    Yes.  I had to call home to my mother and ask her whether she had received any money or not.  And she answered me yes and no, but it was very difficult for her to do it.  To be able to find out whether she had any money in her account, she had to go personally to the bank.

Q    Well, she had a car didn't she?

A    No.  She didn't drive.

Q    Did she have a car?  Did your family have a car?

A    Yes, my father did.

Q    And did your father and mother live together?

Altmanis - Cross / By Mr. Lasting                    51

A     Yes.   They live together.

Q     And your father had a bank account, too?

A     Yes.

Q     Opened at your -- opened after you made the request to your mother, to receive these foreign currencies; is that right?

A     Yes.

Q     And you kept these documents so you would have information about the banks; didn't you?

A     Yes, naturally.  This is the information to know which bank it was.

Q     And you wanted to keep track of the money that was going to go into your bank account, or the bank accounts that you had opened; is that right?

A     Yes.  I called my mother and asked her whether the money came or not.

Q     And in order to find out if there was money, you're telling us she had to go to the bank, she couldn't call; is that right?

          **THE INTERPRETER:**  Interpreter didn't have to time to interpret, your Honor.

          **THE COURT:**  All right.  Re-ask the question.

          **MR. LASTING:**  I'll withdraw the question.

//

//

Altmanis - Cross / By Mr. Lasting          52

BY MR. LASTING:

Q    You knew that your step-father had an account also; is that correct?

A    Yes.  I learned it now.  I didn't know before that they had separate accounts.  They were not supposed to do it.

Q    You learned it now, what do you mean now?

A    The other day when I was told that some amount of money went to my mother's account and the other amount of money went to my father's account.  I thought that they had one account.

Q    So, when you say --

A    Maybe I was simply confused.

Q    When you say you learned this the other day, what other day are you talking about.  You mean like yesterday or last week or something like that?

        MR. DUGDALE:  Objection, your Honor.  Argumentative.

        THE COURT:  Sustained.

BY MR. LASTING:

Q    What day did you learn that your step-father had an account?  When did you learn that, for the first time?

        THE COURT:  That's three questions.

        MR. LASTING:  I'll try to ask it as one, your Honor. Thank you.

BY MR. LASTING:

Q    What day did you first learn that your step-father had an individual account that was opened after you made this request?

Altmanis - Cross / By Mr. Lasting                53

A     I thought that they had one account.  And it was here that I learned that they had two accounts, that my father had one account and that my mother had another account.  That's why.  I know that I asked to open one account.  I asked her to open the account.  I never knew whether they had one account or two accounts.  I knew that they were one family, one last name and one account.  Especially, that I didn't have any money, and I didn't send them any money, that's why for me it was.

Q     When you say, you learned it here, do you mean here in Court?

A     Yes.

Q     So, you learned for the first time here, during the trial, that your step-father had an account in Latvia that had been opened sometime in 2001.  Is that what you're telling the jury?

A     Yes.  I heard it because from the very beginning I thought that they had one mutual account, and I didn't go in any details.

        MR. LASTING:  Your Honor, I have six pages of documents.

        THE COURT:  Are they different documents, or are they same document with six pages?

        MR. LASTING:  It's six pages.  I think it all relates to these banking --

        THE COURT:  All right.

        MR. LASTING:  -- events, so if I could mark them

EXCEPTIONAL REPORTING SERVICES, INC

Altmanis - Cross / By Mr. Lasting                     54

collectively?

THE COURT:  2007-A, B, C, D, E, and F.

(Defense Exhibits Numbers 2007-A, B, C, D, E and F were marked for identification)

MR. LASTING:  Thank you very much.  Could I have just a second, your Honor?

THE COURT:  What I suggest that you do is, over the lunch hour pre-mark all your exhibits that you intend to use.

MR. LASTING:  I had tried to, your Honor, I didn't do it well.  My apologies, sir.  And I made another mistake, too. It's only five pages.

THE COURT:  All right.

MR. DUGDALE:  Now, I'm confused, actually.

THE COURT:  A, B, C, D and E.

MR. LASTING:  (***)

THE COURT:  Yes.  Let me see them first, to make sure that they're marked correctly.

MR. LASTING:  I have them here, your Honor, so I'll bring them up to you.

THE COURT:  There are six pages.

(Pause)

MR. LASTING:  Your Honor, I've confused myself here. Can I -- trying to keep these things properly lettered and numbered.  Can I come up to the bench?

THE COURT:  All right.

Altmanis - Cross / By Mr. Lasting                55

MR. LASTING:  Compare notes with the Court here.

(Pause)

(Begin bench conference at 11:30 a.m.)

MR. LASTING:  Okay.  I'm sorry.  Those are Bates numbers.  These were produced in discovery.  I don't know why the originals aren't here.  We would've brought them in unrequested.  There's three that appear to be in order and then two other ones, one page missing.

MR. SPEAKER:  I just want them around with the same letters that the Court's got so that we're all talking about the same thing.

THE COURT:  I don't know what these documents -- how you going to introduce them?

MR. LASTING:  It's stuff that he knows about.

THE COURT:  All right. Let's do it this way.  I will mark each one differently.  One (***) 970 will be A,  971 will be B, 972 is C, 573 is D, 575 is E --

MR. LASTING:  Wait, wait a minute.  573 is D?

THE COURT:  573 is D, 575 is E and 576 is F.  It's 207-A through F.  That's six pages.

MR. LASTING:  Thank you.  I appreciate it.  Thanks.

(End Bench conference at 11:33 a.m.)

MR. LASTING:  All right.  I appreciate the Court's indulgence, and I apologize to the Court, counsel, and the jury for my inability to sort this out.

Altmanis - Cross / By Mr. Lasting          56

**BY MR. LASTING:**

Q    Mr. Altmanis, do you have these documents in front of you?

THE COURT:  (***) points of reference here.  The exhibits 207A through F for identification before the witness.

**BY MR. LASTING:**

Q    Mr. Altmanis, we could start with 207A.  Do you have that there in front of you?

A    Yes.

Q    Do you recognize that?

A    Yes.

Q    What is it?

A    This is -- they're accounts opened in HansaBanka to the name of my mother, my father and a friend.

Q    Were just talking about 2007A.  Is this something that you wrote?

A    Yes.

Q    And when did you write it?

A    Hmmm.  I don't remember when I wrote it, but I did.

Q    Your Honor, could I publish this document to the jury?

THE COURT:  You offering into evidence?

MR. LASTING:  I am.

THE COURT:  Any objection?

MR. DUGDALE:  No, your Honor.

//

//

**EXCEPTIONAL REPORTING SERVICES, INC**

THE COURT:  All right.  2007A received, may be published.

   **(Defense Exhibit Number 2007-A was received into evidence)**

Q    Mr. Altmanis, looking at the top of the page there, where it says, HansaBanka, and then it's got -- you see where I'm pointing here?

A    Yes.

Q    Who wrote that?

A    This one?

Q    Yes.

A    Yes.  I wrote it.  It means account number.

Q    So, is the words there, with the blue line through it, is that written in Latvian?

A    No, in Russian.

Q    Okay.

A    I wrote it for Mikhel and Kadamovas so that they would know that this is their account number.

Q    Okay.  So, you wrote the word account number, and then you put a number that begins 55200 and it goes on, and you recognize that to be an account number that you wrote down; is that correct?

A    Yes.

Q    And then, it's got a name underneath there?

A    Yes, the last name and first name.

Q    Is that your mother's name?

Altmanis - Cross / By Mr. Lasting            58

A    Yes.  The first name and the last name of my mother.

Q    And was this to provide information about an account, a specified account number, that you're mother had opened in the Hansa Bank?

A    Yes.

Q    And this is something that you wrote long before you came to Court here; isn't that true?

A    Yes.

Q    And then -- what does it say underneath there?

A    This is my father, my father's.

Q    And so when you say, this is my father, circle where your father is?  And you drew a circle around the second entry, separated by an underline after your mother's account; is that right?

A    Yes.

Q    You this line, right here, that I'm pointing at, Mr. Altmanis?

A    Yes.

Q    Who drew that line on there?

        THE INTERPRETER:  Excuse me.

BY MR. LASTING:

Q    Who drew that line?

A    I did.

Q    And did you draw that line to separate out information pertaining to your mother from information pertaining to your

EXCEPTIONAL REPORTING SERVICES, INC

Altmanis - Cross / By Mr. Lasting                59

father, the step-father, that's underneath it?

A    Yes.

Q    And then, what's the information about your father?  Is there another account number there?

A    Yes, a different account number.

Q    A different account number.  Is it still in the Hansa Bank?

A    No.  This is in Parex.

Q    Right up above the number 55200, that you've got circled there, what does it say?

A    The first name and the last name of my father, of my step-father.

Q    Do you see what I'm pointing at?

A    Yes, I can see; HansaBanka.

Q    Does this document, at least these first two entries that we're talking about here, represent two different accounts in the HansaBanka?

A    Yes.

Q    And one account is an account in your mother's name; is that right?

A    Yes.  One is my mother's and one is my father's.

Q    And then there's an entry about -- can you erase?  Do you see the entry there about the Parex Bank?

A    Yes, I can see it.

Q    And what is that about?

Altmanis - Cross / By Mr. Lasting                    60

A    This is the father's bank in Parex, his account number.

Q    And is this information, that you gave to Mr. Mikhel, to provide him separate bank accounts for your mother and your step-father?

A    Yes.

Q    So, isn't the truth that you did know that there was separate bank accounts opened by your mother and your step-father long before this trial commenced?

A    Yes, but I thought that they had one.

Q    Well, if you thought they had one --

A    That's why I got into this kind of confusion.

Q    If you thought they had one, why did you write down two different bank account numbers?

A    I wrote down two bank accounts for them, so that they would send it there in case one of them fails.  And when Mikhel told me that it was send, that we send to your mother, and that would be calling my mother -- and I would be calling my mother and ask her, "Do you have money on this account?" and she would answer me, and that's why the information about the other account erased from my mind.  And I always thought that they both had one account.

Q    What kind of car did your family have, there in Latvia?

A    Some kind old Audi or something.

Q    And you knew that they had that car; didn't you?

A    Yes.

Altmanis - Cross / By Mr. Lasting                61

Q    In fact, you have videos that were taken of the car; isn't that correct?

A    Yes.

Q    And after you got arrested, did you have conversations, I think you've testified, you had numerous conversations with the FBI; is that correct?

A    Yes.

Q    Did the FBI ever tape record any of those conversations?

A    Yes.

Q    Did you have conversations with officers from the Los Angeles Police Department?

          THE INTERPRETER:  Did you have what?

          MR. LASTING:  Conversations.

          THE INTERPRETER:  Where?

          MR. LASTING:  With officers from the Los Angeles Police Department?

          THE WITNESS:  Yes, I did.

BY MR. LASTING:

Q    And where those conversations tape recorded?

A    Yes.  Would you please clarify the question?

          THE INTERPRETER:  No.  I want to clarify.  In the police station of (***) or when I was arrested, or after that?

BY MR. LASTING:

Q    Do you remember having some conversations over a period of days, with a number of people including Los Angeles police

Altmanis - Cross / By Mr. Lasting                    62

officers, that they tape recorded?

A     Yes.

Q     And among the things that were discussed with you, in these conversations that were tape recorded, was it discussed with you money being transferred into these accounts, that your family had opened in Latvia?

A     Yes.

Q     And did you tell the police officers, that were talking to you, Los Angeles Police Officers, among other, that no money was ever transferred into these accounts?

A     Yes, I did.

Q     Do you remember speaking to the police officers on the date of March the 14th, 2002?

            THE INTERPRETER:  What year?

            MR. LASTING:  March 14th, 20023

            THE COURT:  March 14th, 2002.

            THE WITNESS:  Yes, I do.

BY MR. LASTING:

Q     And, at that time, did you tell the police there is no money in these accounts, to this day, there has been no money transferred into these accounts.

A     Yes, I did because I knew one hundred percent that there that there was no money at that account.  When the money came I told them right away, that the money had come in the amount of $113,000.

Altmanis - Cross / By Mr. Lasting                63

Q    Mr. Altmanis, when you talked to telling them, on March the 14th, in addition to telling them that to this day there is no money in the account, did you go on to couldn't check the account because she had to ride the bus?

A    Yes, I did say that because this is what she told me, and she had approached me on numerous occasions, telling me that she was unable to go back and forth to the bank to check whether the money had come.

Q    And you knew, when you told the police, that your mother had to rely on the bus for transportation, that your step-father had a car.  You knew that didn't you?

A    Yes, I did.

Q    And do you know what day your mother closed this account and withdrew the money that had been transferred into it?

A    No, I don't know the day.

Q    Did you ever learn that your mother closed that account on March the 14th, 2002?

        THE INTERPRETER:  On what day?

        MR. LASTING:  March the 14th, 2002.

        THE WITNESS:  No, I didn't know.

BY MR. LASTING:

Q    You never knew that on the day you were telling the police, to this day there is no money in the account, that she was withdrawing the money out of that account?

A    Once more.

EXCEPTIONAL REPORTING SERVICES, INC

Altmanis - Cross / By Mr. Lasting                64

Q    Did you ever find out, that on the day you were telling the police, that there was no money in this account, that that was the day that your mother was withdrawing the account, withdrawing all of the money out of the account?

A    Yes.  I told that -- I said, that I didn't know, both to the policeman and to my attorney because I was in the jail, and I was unable to know about it.  And when I learned, when I talked to my brother and I learned that the money had arrived then I explained that the money had arrived.

Q    But, my question to you is, are you saying, are you telling the jury that you were unaware, that on the day that you were telling the police there is no money there, that the money was being withdraw?

A    That's right, I didn't know.  When I knew, I told them. When I didn't know, I didn't tell them.

Q    To your knowledge, was this money ever recovered by the FBI?

A    No.

Q    And how much money are we talking about that went into these two accounts?

A    One hundred thirteen thousand, this is what my brother told me, 113,000 came to their account.

Q    And how much was withdrawn from those two accounts?

A    Once more, I thought there was one account.  I said, to withdraw the money, all of it.

Altmanis - Cross / By Mr. Lasting                65

Q    You said to withdraw all the money?  How much was all of the money that s=you said to withdraw?

A    One hundred thirteen thousand, this is what I told to my attorney and to FBI, that my parents received the money, 113,000.

Q    And it's that it's that same amount of money that was withdraw by your parents; isn't that true?

A    Yes.

Q    And that's the money that they kept and spent however they wanted to; is that correct?

A    Yes.  The way I told them to do.  I told them to use this money to hide the children and do go into hiding themselves. When I began cooperating -- because I knew that Mikhel and Kadamovas had their people, both, in Latvia, in (***) and in Russia.

Q    So, your parents remained living in the same place that they lived at the time that you left Latvia; is that correct?

A    Yes and what -- they're old people, they said they were not going people to move anywhere.  They help children, and that was it.

Q    So, rather than spend the money to go into hiding, they spent the money to improve their residence?

        MR. DUGDALE:  Objection, your Honor.  This all lacks foundation.  It can only be based on hearsay.

        THE COURT:  Sustained, unless he's there, unless he

EXCEPTIONAL REPORTING SERVICES, INC

Altmanis - Cross / By Mr. Lasting                66

knows.

**BY MR. LASTING:**

Q    Did you learn, Mr. Altmanis, that rather than to go into hiding, they spent the money to improve their residence?

A    They didn't improve the conditions of their living.  They spend the money helping my son.  My son went to Europe to hid, and my daughter, too.  I don't know where the daughter is.

Q    So you didn't -- you're telling us that you never learned that they spent the money, some of the money to improve the residence?

A    I don't have any information about how they're living.

Q    Did you ever learn that they spent some of the money gambling and playing the slot machines?

A    Yes.  It was in Latvian newspapers, that when my father was so upset, that he had a nervous --

        MR. DUGDALE:  I'm going to ask that this entire answer be stricken.  It's all based on --

        THE COURT:  Hearsay.

        MR. DUGDALE:  -- on hearsay.

        THE COURT:  Sustained.  I can't do anything until there's an objection so.  It is hearsay.  You're asking him for things that are just speculation and hearsay.

        MR. LASTING:  I was asking if he heard it, your Honor.

        THE COURT:  Well --

MR. DUGDALE:  It can only be from a hearsay source, your Honor.

THE COURT:  Yeah.  Let's break for lunch, at this time.  Returning at 1:15 in the jury room, 1:20 in the courtroom.

**(Court in recess from 11:59 a.m. to 1:24 p.m.; parties present)**

**(Outside the Presence of the Jury)**

THE COURT:  All right.  Outside the presence of the jury the record will indicate all parties and counsel are present.

Anything the Government wishes to bring up?

MR. DUGDALE:  No, your Honor.  Thank you.

THE COURT:  Anything any Defense wishes to bring up?

MR. SPEAKER:  No, sir.

MR. CALLAHAN:  No thanks, your Honor.

THE COURT:  All right.  We'll bring the jury out.

THE CLERK:  Okay.  We're ready to start.

THE COURT:  Now, you've marked for identification 2007-A and introduced it, but you haven't done anything with B, C, D, E or F.

Are you going to use those?

MR. LASTING:  I might use them later, your Honor, but --

THE COURT:  All right.  I just want to make sure with

Altmanis - Cross / By Mr. Lasting          68

regard to the state of the record.

MR. LASTING:  I don't think there's a need to at the present moment.

(Pause / Jurors enter courtroom at 1:26 p.m.)

THE COURT:  All right.  The record will indicate all jurors are present, all counsel, all parties are present.

Mr. Altmanis, you're still under oath.  Please state your name for the record.

THE WITNESS:  Ainar Altmanis.

THE COURT:  Mr. Lasting?

MR. LASTING:  Thank you very much, your Honor.

CROSS EXAMINATION (RESUMED)

BY MR. LASTING:

Q    Mr. Altmanis, when did you move to California?

A    In '96.

Q    And where in California did you move in 1996?

A    Los Angeles.

Q    And at some point did you acquire a fraudulent identification?

A    Yes, Florida -- from Florida.

MR. LASTING:  Your Honor, could I mark as for identification as -- Exhibit 2008 I believe is the next number.

THE COURT:  2008 is next in order.

(Defense Exhibit Number 2008 was marked for identification)

Altmanis - Cross / By Mr. Lasting                69

          **MR. LASTING:**  State of Florida, Department of Highway Safety and Motor Vehicles' document.  And I've given a copy to the Government and to the witness.

          **THE COURT:**  All right.

**BY MR. LASTING:**

Q    Mr. Altmanis, will you take a look at what's been marked for identification as Exhibit 2008 and tell me if you recognize it?

A    Yes.  It's me.

Q    Is that your picture?

A    Yes, it's my photograph.

Q    Is this something that you obtained?

A    Yes.  It's the driver license that I obtained in the name of Richard Tercjak (phonetic).

          **MR. LASTING:**  Your Honor, I'd offer it into evidence as an exhibit.

          **THE COURT:**  Any objection?

          **MR. DUGDALE:**  No, your Honor.  Thank you.

          **THE COURT:**  Received, 2008.

       **(Defense Exhibit Number 2008 was received in evidence)**

          **MR. LASTING:**  May I present it to the jury?

          **THE COURT:**  On the document camera?

          **MR. LASTING:**  Please, your Honor.

          **THE COURT:**  All right.

//

Altmanis - Cross / By Mr. Lasting                70

**BY MR. LASTING:**

Q    Is this your phony identification from Florida, Mr. Altmanis?

A    Yes.

Q    And in order to get this document did you acquire -- I think you testified you did -- a Polish passport?

A    Yes.

Q    Where did you go to get the passport?

A    I was given it.

Q    Where?

A    The --

Q    Where physically were you?  Where were you located?  What state were you in?

A    In Los Angeles.

Q    And you then left Los Angeles, or did you then leave Los Angeles and go to Florida to get this identification card that's Exhibit 2008?

A    Yes.  To Tampa.

Q    And the signature that's there, do you see the signature there underneath the photograph?

A    Yes.

Q    Who signed that?

A    I did.

Q    And where did you get the picture taken?  Was that taken by the Department of Motor Vehicles there in Florida?

EXCEPTIONAL REPORTING SERVICES, INC

Altmanis - Cross / By Mr. Lasting                71

A    Yeah.  They did it over there.

Q    And the birth date that's shown on this document, is that your birth date?

A    No.

Q    What's your birth date?

A    July 23rd, '59.

Q    I'm sorry, what year?

A    '59.

Q    And how much time did you spend in traveling to Florida to get this identification card?

A    Two days.

Q    And how did you get to Florida?

A    By airplane.  I got an airplane ticket and I flew there. And somebody was waiting for me there.  A person was waiting for me at the airport.

Q    So something that you had planned out in advance?

A    Yes.  They planned it.  I bought a ticket.  I told them when I would be arriving, and Edwin called Tampa for me for somebody to meet me there.

Q    And where did you stay in Florida?

A    They put me in some Polish motel in Clearwater after we had done everything that had to be done at the DMV and the social security office.

Q    And after you got this what you refer to as this Florida driver's license in a false name, did you then obtain a social

EXCEPTIONAL REPORTING SERVICES, INC

Altmanis - Cross / By Mr. Lasting          72

security card?

A     Yes, social security number.  And they also issued a --

what do you call it -- Florida I.D.

Q     So you had a Florida driver's license, a Florida

identification card and a social security card so that you

could represent that you were Richard Tercjak; is that correct?

A     Yes.

Q     And was this part of a plan that you were involved in to

deceive people in order to get rich?

A     This was thought through or devised in order to sell cars.

Q     Was it part of a plan to deceive people so that you could

make money?

A     Yes.  Yes, if you put it that way, yes.

Q     And what's the expiration date on your Florida driver's

license?

A     Where?  Show me.

Q     Do you see it there?  Do you see on there where it says,

"issue date" and then it says "expiration date"?

A     This, (indicating), one?

Q     Yes.

A     Yes.

        THE COURT:  All right.  I'm going to ask you to touch

the lower left part of the screen and change the color.  Use

that color so it contrasts.  Because you had black up there and

the black has no contrasting ability.

Altmanis - Cross / By Mr. Lasting          73

(Pause / Witness complies)

BY MR. LASTING:

Q    You've marked it.  What is it?

A    Expiration date, right?

Q    Yes.

(Pause)

          THE COURT:  Is there a question pending?

          MR. LASTING:  Yes.

BY MR. LASTING:

Q    What's the expiration date?

A    02-06-02.

Q    February 6th, 2002?

A    Yes.

Q    Is there -- and you had this at the time of your arrest, this Florida I.D.; is that right?

A    Yes.  They were somewhere in the cabinet, somewhere where I kept my documents.

Q    There were some more what?  You said there were some more?

A    Where all the -- they were in my desk.

Q    And did you ever open a bank account using this identification, this Tercjak identification?

A    Yes.  There was a bank account that was opened in that name.

Q    Where did you open that bank account?

A    In North Hollywood somewhere on Laurel Canyon.

Altmanis - Cross / By Mr. Lasting                74

Q    And was that bank account available to you to acquire money that you were going to earn for participating in kidnaps and murders?

A    No.

Q    What happened to it?

A    It was -- there was an amount that was transferred into that bank account from the first car that was sold.

Q    And then you withdrew it and closed the account?

A    No.  I didn't close the account right away.  No, I was told -- they told me not to close the account.  It didn't make sense because there would be more cars and more money.

Q    Is there a reason that you didn't use your false identification to open an account to receive money for being involved in kidnapping and murdering people as opposed to having the accounts opened in Latvia?

A    Yes.  Because it was closed.  Because when that $15,000 was there for that car that was sold for some amount of time and when I withdrew the money and paid it for the car, there was some interest that stayed there.  And it just -- it was growing.  And I withdrew that money.

Q    I'm asking you is there a reason that you didn't use this I.D. and your social security identification in this name to open an account to receive money that you say you were going to receive for participating in kidnaps and murders?

A    The bank closed my account.  I withdrew $400 and I never

Altmanis - Cross / By Mr. Lasting                75

paid it back, their money.  And that's why they closed the account.

Q    Okay.  And is there a reason you didn't open a new account?

A    No, no.  No difference.  I didn't even think about it.

Q    Well, you knew you had this identification in this Tercjak name, didn't you?

A    Yes, I did.

Q    But rather than use that, you elected to go through the process of having your mother and stepfather open the accounts in Latvia?

A    Yes, because I can't leave more than $10,000 in an account here because of the IRS.  Because they can look into it.

Q    If there's more than -- you can't have a bank account with more than $10,000 in the United States.

          Is that what you're saying?

A    No.  After it reaches 9,000 you have to account for how you made the money.  I wasn't working.  That's why I didn't have bank accounts here.  And when I had a Bank of America account I never had more than $10,000 there.  Because I hadn't worked one single day for a check, so I couldn't prove the source of the...

Q    You never worked one single day for a check?

A    No.

Q    So from the time that you came to the United States, all

Altmanis - Cross / By Mr. Lasting                76

the money that you earned was illegally earned?

A     Yes.

Q     What was your financial situation in September of 2001?

          THE INTERPRETER:  I'm sorry.  What was the date, Counsel?

BY MR. LASTING:

Q     September, 2001.

A     Regular, as it was the rest of the summer.  Everything was going to bills, and there was some left.

Q     This was when you didn't have much money.

          Is that your testimony?

A     Not much.

Q     In September of 2001, is that when you purchased this Lincoln Navigator?

A     Yes.

Q     What was the date you purchased that?

A     I don't recall the date.

Q     Do you recall paying $23,000 cash for a Lincoln Navigator on September the 29th, 2001?

A     Yes, I do.

Q     And did you make a video of your Lincoln Navigator after you bought it?

A     Possibly.  I don't remember if I did or not.  I made a lot of videotapes.

Q     Just a second.

Altmanis - Cross / By Mr. Lasting                77

        **(Pause)**

            I'll come back to that.

            This Lincoln Navigator, after you were arrested was it searched by the police?

A    Yes.

Q    Did you have a flex tie in your Lincoln Navigator?

A    Yes, there is one.

            **MR. LASTING:**  Your Honor, I have a photograph.  Could I mark this as the next exhibit in order?

            **THE COURT:**  2009 is next in order.

    **(Defense Exhibit Number 2009 was marked for identification)**

            **MR. LASTING:**  Your Honor, may I --

            **THE COURT:**  Show it to Government first.

    **(Pause / Counsel complies)**

**BY MR. LASTING:**

Q    Mr. Altmanis, you were just handed a photograph.

            Do you recognize what's depicted in that photograph?

A    Yes.  The plastic belt.  It's white.

            **MR. LASTING:**  Your Honor, I'd offer the photograph into evidence as --

            **THE COURT:**  Any objection?

            **MR. DUGDALE:**  No, your Honor.  Thank you.

            **MR. LASTING:**  -- Defense Exhibit --

            **THE COURT:**  2009 received this date.

Altmanis - Cross / By Mr. Lasting          78

(Defense Exhibit Number 2009 was received in evidence)

MR. LASTING:  May I present --

THE COURT:  You may.  Any time it's admitted you can publish it.

MR. LASTING:  Thank you.

BY MR. LASTING:

Q    Mr. Altmanis, is that something that was recovered from your Lincoln Navigator in February of 2002?

A    Yes.  That's what the police officers explained to me, that this was taken from my car -- found in my car.

Q    Where was it in your car?

A    In the back.  In the glove compartment there were gloves and different things for the car -- not the glove compartment. In the back where there is -- there is a special section there. I used it as a -- that's where I stored things.

Q    So this was something that you stored in your Navigator?

A    Yes.  There were gloves there, regular gloves and linen gloves or cotton gloves.  And these --

Q    Well, I'm only asking you about the flex tie.

What was your purpose in having a flex tie in your Navigator?

A    It was one small one.  It was about this, (indicating), yea big.  There were also these kind of rubber springs to tie things and rope.  Because I moved a lot of merchandise, so I had to tie it together.

Altmanis - Cross / By Mr. Lasting                79

THE COURT:  When you say "yea big," I can't see. Okay.  Approximately 18 inches, for the record.

THE WITNESS:  Eighteen, twenty.

THE COURT:  Eighteen, twenty inches.

BY MR. LASTING:

Q    Did you have surgical gloves in your Navigator, as well?

A    Yes, I did.

MR. LASTING:  Your Honor, I have a photograph.  Could it be marked as Defense Exhibit 2010, please?

THE COURT:  2010.

(Defense Exhibit Number 2010 was marked for identification)

MR. LASTING:  I'm showing a copy to the Government.

(Pause)

BY MR. LASTING:

Q    Mr. Altmanis, did you have a chance to look at this exhibit?

A    Yes.

Q    So is this something that you carried in your Lincoln Navigator?

A    Yes.

Q    What is it?

A    Rubber gloves.

MR. LASTING:  Your Honor, I'd offer this as an exhibit.

THE COURT:  Any objection?

MR. DUGDALE:  No, your Honor.  Thank you.

THE COURT:  Received, 2010.

**(Defense Exhibit Number 2010 was received in evidence)**

BY MR. LASTING:

Q    And are these the type of gloves, Mr. Altmanis, that somebody could wear to handle objects or to touch things and not leave fingerprints?

MR. DUGDALE:  Objection.  Calls for speculation.

THE COURT:  Sustained.

THE WITNESS:  There's --

THE COURT:  Wait.  No, no.  There's no question pending.  No question pending.

BY MR. LASTING:

Q    Mr. Altmanis, do you believe that this is the type of thing that somebody could wear to avoid leaving fingerprints?

A    Yes.

**(Pause)**

MR. LASTING:  Your Honor, I have a computer disk.

Could this be marked as --

THE COURT:  2011.

MR. LASTING:  -- Defense 2011.

**(Defense Exhibit Number 2011 was marked for identification)**

And is it -- the Government has a copy, and I don't

Altmanis - Cross / By Mr. Lasting          81

believe there's an objection.  May I offer it into evidence at this point or do you want me to show it to the witness first?

THE COURT:  Well, let me find out from Mr. Dugdale.

Are you going to object to this?

MR. DUGDALE:  I have no idea what it is.

MR. LASTING:  Oh, I'm sorry.

MR. DUGDALE:  I had a series of disks that were given to me yesterday, but I don't know which one this is.

(Pause / Counsel examines disk)

Oh, okay.

THE COURT:  Any objection?

MR. DUGDALE:  No, your Honor.

THE COURT:  All right.  2011 received this date.

(Defense Exhibit Number 2011 was received in evidence)

MR. LASTING:  And could I --

THE COURT:  Do you want me to switch the mode to computer?

MR. LASTING:  Yes, your Honor, please.

(Pause)

BY MR. LASTING:

Q    Mr. Altmanis, do you recognize what's depicted there?

A    Yes.  It's my car.

Q    And is that a video that you made?

A    Yes.

Q    And did you notice a red vehicle parked back behind the

Altmanis - Cross / By Mr. Lasting              82

Lincoln Navigator?

A     I don't know.  No.

Q     Let me show it to you again.

A     That, (indicating), one?

Q     Yes.

A     Yes, that's mine.  That's my Town Car -- I mean my wife's.

Q     So you had the Lincoln Navigator and you had a Lincoln Town Car; is that correct?

A     Yes.  The Town Car was '90 -- actually, it was a '94, I think.  It was old.  And this one was '99.

Q     And is the date that's on there, is that the date that you purchased this car, September 29th, 2001?

A     Possibly.  I don't remember the date.  I got the car from a person who I paid the money to and during the day, and this is probably in the evening.  I don't remember.

Q     But you're the person that made the video; is that correct?

A     Yes.

Q     Did your video camera accurately record the dates on it, or was the date off, or do you know?

A     No.  The camera had the right date.

Q     And --

A     But if -- I don't remember if I bought it on this date or a different date but taped it on a different day.  I don't remember.  The way to find this out is by looking at the --

**EXCEPTIONAL REPORTING SERVICES, INC**

Altmanis - Cross / By Mr. Lasting                83

what do you call it -- the document for the car, the title.

Q    Did you ever let anybody drive your car?  Speaking of your Lincoln Navigator.

A    No.  Who else was there to drive?  My wife is very short and even the Town Car was too big for her.  My brother had his own car, his own Jeep.  And I really just -- I drove this car just whenever I had to take a long trip, because I would be afraid to take the Town Car for a long trip.

Q    Excuse me --

A    I took --

Q    -- all I'm asking --

A    -- this car to San Diego.

Q    -- is, did you let other people drive the vehicle or not?

A    No.  There was no one to drive it.

Q    Did you let people that you knew, friends or acquaintances, drive your vehicle, your Navigator?

A    Yes.  Yeah, that happened.

Q    So who would you let drive it?

A    Krylov once drove this car.

Q    Anybody else?

A    No, I don't remember anybody else.  Krylov, yes, I let him drive once.

          THE INTERPRETER:  I'm sorry, interpreter correction. I let him drive.

//

Altmanis - Cross / By Mr. Lasting                84

**BY MR. LASTING:**

Q    In this video, Mr. Altmanis, is this vehicle parked at your residence?

A    Yes, it's in my parking spot.

Q    And how many parking spaces did you have?

A    One.  And the second one was I constantly parked the car over there where the Town Car is.

            **THE INTERPRETER:**  I'm sorry.  The interpreter needs to inquire.  I didn't quite understand.

        **(Interpreter confers with witness)**

            **THE WITNESS:**  After being billed many times for parking around, I finally found one place -- because I was towed all the time by the police.  And I finally found one spot that didn't seem to belong to anybody, so I parked there.  But still one time I got a fine from the police, that one time.

**BY MR. LASTING:**

Q    You also parked back there behind Mr. Muscatel's office, didn't you?

A    Yes.  But at that time I didn't know Mr. Muscatel or his office or his parking.  I parked everywhere.

Q    The Navigator is parked in a carport.

            Is that correct, Mr. Altmanis?

            **THE INTERPRETER:**  Excuse me.  Could you repeat the question, please?

            **MR. LASTING:**  Sure.

Altmanis - Cross / By Mr. Lasting                85

THE COURT:  The Navigator is parked in the carport.

Is that correct, Mr. Altmanis?

THE WITNESS:  At my parking spot, yes.

BY MR. LASTING:

Q    Well, your parking spot, is it a carport or is it a garage?

A    It's under a building.

Q    Did it have a garage door?

A    And there were no bars.  It was open.

Q    So you did not have a garage door; is that correct?

A    That's correct.

Q    Did you have a garage door opener in your vehicle, in your Navigator?

A    Yes.  Probably from my old house on Magnolia where we used to live.  There, there were doors.  I didn't need it here.

Q    So you kept the garage door opener to your former residence.

Is that what you're saying?

A    Yes, I think so.  I think I didn't return it after we moved.

Q    How many garage door openers did you have to that property?

A    You mean here?  None for here because there were no doors here.

Q    You told us that you may have kept the garage door opener

Altmanis - Cross / By Mr. Lasting                86

for your former residence.  I'm asking you how many garage door openers did you have for your former residence.

A    Two.  There were two.  I had two.  They gave two.

Q    Is there some reason why not living at that address any more you would take one of the garage door openers to a place you didn't live and keep it in your Navigator?

A    There was no reason for that.  Also, at home I had another five or six garage openers that remained from the former work of my wife.

Q    Did you --

A    They were just lying around there.

Q    Did you have a garage opener for a house that was on Weslin?

A    No, I didn't.  I didn't need it.

Q    Did the house on Weslin have a garage that opened with a garage opener?

A    You mean Kadamovas' house?

Q    The house that you referred to as Mr. Kadamovas' house. That's the one I'm talking about.

A    Yes -- no, it didn't -- yes.  That house -- yes, that house did have a garage.

Q    And was that garage capable of being opened with a garage door opener?

A    Yes.  Kadamovas opened it --

          **MR. LASTING:**  Can we change this?

EXCEPTIONAL REPORTING SERVICES, INC

Altmanis - Cross / By Mr. Lasting          87

THE WITNESS:  -- with a garage opener.

THE COURT:  Do you want to go to the document cam?

MR. LASTING:  I think so just so my computer...

(Pause)

BY MR. LASTING:

Q    And at Mr. Mikhel's house did he have a garage that opened with a garage door opener?

A    Yes.

Q    Did he have a -- was that a gated property that you had to enter through some type of a remote-controlled gate to get to the garage or to the house?

A    No.

Q    You didn't have to get through a gate to get to Mr. Mikhel's house?  Just drive straight up the driveway and get to the garage?

A    Yes.  There were gates but they were not working.  They didn't close or he didn't close them.  I don't know.

Q    Did you have a garage opener to access Mr. Mikhel's property?

A    No.

(Pause)

Q    At the time of your arrest did you have credit cards?

A    Yes.

Q    And how many credit cards did you have?

A    I don't remember.  Not many.  About five, maybe.

Altmanis - Cross / By Mr. Lasting                88

Q    You had about five?  Were they in your name?

A    Yes.

Q    Did you charge things on these credit cards?

A    Yes, I did.

Q    And did you pay your bills?  Did you pay your credit card
bills?

A    Yes, minimum.

Q    How did you make the payments?

A    As long as I had a bank I wrote checks.  And when they
closed the account I turned to my brother.  I gave him money,
cash, and he would write a check.

        MR. LASTING:  Your Honor, I have a document that has
a list of various (***) on it.

        THE COURT:  All right, 2012 is next in order.

        (Defense Exhibit Number 2012 was marked for
identification)

BY MR. LASTING:

Q    Mr. Altmanis, do you recognize the information that's on
that document?

A    Yes.

Q    What is it?

A    These are my stores and visas, and these -- what do you
call them -- my cars -- my cards.

Q    These are your credit cards?

A    Yes.

EXCEPTIONAL REPORTING SERVICES, INC

Altmanis - Cross / By Mr. Lasting                89

MR. LASTING:  Your Honor, I'd offer this into evidence as an exhibit.

THE COURT:  Any objection?

MR. DUGDALE:  Yes, your Honor.  This is a list created by an agent during the search.  It's --

THE COURT:  All right.  Sustain the --

MR. DUGDALE:  This is all hearsay.

THE COURT:  Sustain the objection.

MR. LASTING:  Could I be heard on that, your Honor?

THE COURT:  We'll save it for a later time.

MR. LASTING:  Okay.

BY MR. LASTING:

Q    You did say, Mr. Altmanis, that you recognize this as your credit cards; is that right?

A    I don't remember the numbers.  I remember Robinson, Macy's, Discovery [sic], Target.  But I don't remember the numbers.

Q    Did you lift weights?

A    Yes.  In back yard I had the athletic bar, weight bar.

Q    Did you have weights that you kept at your home?

A    Yes, I did have weights.  Yes, I think they are weights.

Q    Did you buy these weights?

A    Yes, I did.  I bought it there on a swap meet.

Q    Did you also buy weights at a place called Play it Again or Play it Again Sam?

Altmanis - Cross / By Mr. Lasting          90

A    Yes.  I also bought it there.

Q    When did you start business with Play it Again?

A    We were not in business.  I was the customer.

Q    That's what I'm asking you.  When did you become a customer?

A    It was long ago.  It was when I brought there my hockey equipment.  I think it was in '89.  Then I brought there my ski suit.

Q    And I'd like to show you a photograph.

        MR. LASTING:  Your Honor, I have a photograph that appears to depict some weights.  Could it be marked as the next --

        THE COURT:  Next in order is 2013.

    **(Defense Exhibit Number 2013 was marked for identification)**

**BY MR. LASTING:**

Q    Mr. Altmanis, do you recognize what's depicted in that photograph in terms of the weights?

A    Yes.  These are weights.

Q    And were these weights that you had at your house?

A    Yes.  These weights were in my home.

Q    Was this photograph taken at your home?

A    Yes.  This is a picture of my daughter.

Q    Standing next to the weights?

        THE INTERPRETER:  And what?

Altmanis - Cross / By Mr. Lasting                91

**BY MR. LASTING:**

Q    Standing next to the weights.

A    Yes.

        **MR. LASTING:**  Your Honor, I'd offer this as Exhibit 2013.

        **THE COURT:**  Any objection?

        **MR. DUGDALE:**  No, your Honor.

        **THE COURT:**  2013 received this date.

        **(Defense Exhibit Number 2013 was received in evidence)**

**BY MR. LASTING:**

Q    Mr. Altmanis, was this all of the weights that were at your house, or did you have additional weights other than the ones depicted in this photograph?

A    Yes.  I had a bar, a bended bar.

Q    So in addition to the weights that are shown here on the floor, you had other weights.

        Is that correct or incorrect?

A    That's right.

Q    Did you also have a weight bench?

A    Yes.

Q    And did you use that for lifting weights, as well?

A    Yes, I did.  I did use it.

        **MR. LASTING:**  Your Honor, I have a photograph of a weight bench.

        Could this be marked as --

**EXCEPTIONAL REPORTING SERVICES, INC**

Altmanis - Cross / By Mr. Lasting                92

THE COURT:  Next in order is 2014.

(Defense Exhibit Number 2014 was marked for identification)

BY MR. LASTING:

Q    Mr. Altmanis, do you recognize what's depicted in this photograph?

A    Yes.  This is a bench or a chair, whatever you call it.

Q    Is that used for lifting weights?

A    Yes.

Q    Is that what you used it for?

A    Yes.  I used it to lift weights and also for children. They played with it.

            MR. LASTING:  Your Honor, I'd offer this --

            THE COURT:  Any objection to 2014?

            MR. DUGDALE:  No, your Honor.

            THE COURT:  Received this date.

(Defense Exhibit Number 2014 was received in evidence)

BY MR. LASTING:

Q    Is this a picture of the weight bench taken at your apartment on Mammoth?

A    No.  This picture was taken on Magnolia.

Q    Was taken where?

            THE COURT:  Magnolia.

            THE WITNESS:  I had it when we were on Magnolia.

//

EXCEPTIONAL REPORTING SERVICES, INC

Altmanis - Cross / By Mr. Lasting            93

BY MR. LASTING:

Q    And did you continue to have a weight bench when you lived on Mammoth?

A    Yes, I moved it.

Q    And did you also take this weight bench to the house on Weslin at some point?

A    Yes, I did.

Q    When did you do that?

A    When I was left to guard Safiev and Kharabadze and there was only Mikhel.  And I put it in the living room.  And, also, I brought a bar, weight bar, with me.  And I exercised there.

Q    Did you bring weights, as well?

A    Yes.  I said that I brought the bar.

Q    Well, when you say "the bar," did you bring the weight plates, as well?

A    Yes.  There were just these weights from this picture.

Q    Those were the only weights that you took, the ones that are in the previous exhibit?

A    No.  There were also additional.  There were also smaller weight plates:  10 kilogram, 7 ½ kilogram, 5 kilogram.  I knew that when I had to add some weight I had to take these weights off.

Q    Did you have heavier weights, as well?

A    Yes, I told you.  I had 10 and 12 ½.  It's hard for me to say.  There were a lot of smaller weights.

Altmanis - Cross / By Mr. Lasting                94

Q    And did you have heavier weights, as well?

THE INTERPRETER:  Did you have what?

MR. LASTING:  Heavier.

MR. DUGDALE:  Objection, your Honor.  Asked and answered.

THE COURT:  Not really.  Overruled.

THE WITNESS:  I said I had 10, maximum 15-pound weights.

BY MR. LASTING:

Q    You didn't have any weights heavier than 15 pounds?

A    No, I didn't.  I don't remember.  I remember that I had a lot of small weights.

Q    When did you decide that you would participate in the abduction of Meyer Muscatel?

A    When Kadamovas offered me in the office of Designed Water World.

Q    When was that?

A    In autumn.

Q    What month was it?

A    Somewhere around October.

Q    And this is still a time when you didn't have any money?  Is that correct or incorrect?

A    Yes, I did have money.  I didn't have a lot of money.  I did have money for living expenses, because I was in the selling business and also I stole, myself, in the stores.  So I

Altmanis - Cross / By Mr. Lasting                    95

was able to pay for everyday needs of myself and my family, but not more than this.

Q    What store are you talking about?

A    I'm not talking about the store.  The store had been closed for a long time.

Q    So how were you making money?

A    I stole, myself, and then I would buy and sell.

Q    How were you selling the things that you stole?

A    There were people who bought from me.

Q    So you were known as somebody that sold stolen property?

A    Yes.  And also they knew that I was purchasing.

Q    So did you have a supply of cash at your house?  Did you have a large sum of cash at your house at this time?

A    No.

Q    At some point I think you told the jury that you were asked to go out and buy flex ties; is that correct?

A    Yes.

Q    And did you tell the jury you didn't know where to buy them?  Is that what you told the jury?

A    I was told where to buy them.  In Home Base and Home Depot.

Q    Didn't you tell the jury that you couldn't find the flex ties, that you didn't know where to go to get them?

A    Kadamovas told me where I had to go, as I have already mentioned.  To Home Depot or Home Base.

EXCEPTIONAL REPORTING SERVICES, INC

Altmanis - Cross / By Mr. Lasting                    96

Q    Did you tell the jury that you couldn't buy the flex ties because you couldn't find them?

A    Yes, I did.  It's not that I couldn't find them.  I just went there.  I didn't see them, and I went onto my own errands. That's how I explained it.

Q    Where did you buy the flex tie that's depicted in the exhibit that's up on the screen?

THE COURT:  For the record you'll have to identify it.

MR. LASTING:  It should be 2009, your Honor.

THE COURT:  2009.  All right.

THE WITNESS:  I didn't buy it.

BY MR. LASTING:

Q    Didn't you tell the jury just a short while ago that you had this flex tie because you needed it for personal business?

A    I didn't say that I purchased it, that I bought it if I had it.  But I don't know how it got there, as well as the other ties, which I had at home.  I had them in different sizes from two inches up to -- I wrapped them around telephone wires and those -- I had carpets at home.

Q    Well, then you knew where to buy flex ties, didn't you?

THE INTERPRETER:  You knew what?

BY MR. LASTING:

Q    You knew -- did you not know where to buy flex ties?

MR. DUGDALE:  Objection.  Vague and ambiguous as to

Altmanis - Cross / By Mr. Lasting                97

the way the question --

THE COURT:  Sustained, sustained.  There's no question pending.  No question pending.  It's also argumentative.

BY MR. LASTING:

Q    Mr. Altmanis, at your home did you have a California license plate that you kept under the sink?

THE INTERPRETER:  Could you please repeat your question?

THE COURT:  Did you have a California license plate that you kept under the sink?

THE WITNESS:  Yes.  Yes.  This was the license plate for my old Ford Escort that I was going to take to the metal scrap.

BY MR. LASTING:

Q    Was that license plate, to your knowledge, seized during the search of your home?

A    I don't know.  I haven't heard.

Q    Did you have a roll of partially used duct tape at your home?

A    Probably I had one.  I don't remember.  Probably among the tools I had one.

Q    Did you have the monitors to Mr. Umansky's car at your home?

A    Yes.

Altmanis - Cross / By Mr. Lasting                    98

Q    You mentioned a trip to the Home Depot to purchase tape and other items.

     Do you recall that trip?

A    Yes, I do.

Q    And what was the date of that trip?

A    I can't remember.  I couldn't tell you.

Q    Was it the date that Mr. Muscatel was kidnapped?

A    Yes.

Q    Was it earlier in the day?

A    Yes.

Q    Who went on that trip to Home Depot?

          THE INTERPRETER:  I'm sorry.  Can I hear the question again?

          THE COURT:  Who went on that trip to Home Depot?

          THE WITNESS:  Myself, Mikhel and Kadamovas.

BY MR. LASTING:

Q    And who drove?

A    I can't remember.  I can't remember.

Q    Did the three of you go together?

A    Yes, the three of us.

Q    And did the three of you go into the store together?

A    Yes.

Q    Did the three of you leave together?

A    Yes.

Q    Who actually made the purchase?

Altmanis - Cross / By Mr. Lasting                99

A    You mean who went and paid at the cash register or who walked around the store?

Q    Who paid at the cash register?

A    Kadamovas.

Q    And I'd like to show you what's been marked -- but I don't think --

THE COURT:  2014 is next.

MR. LASTING:  This is actually a Government exhibit, your Honor.  Do you want me to mark it as mine or use their numbering?

THE COURT:  No.  Let's refer to the Government's exhibit.

MR. LASTING:  It's Exhibits 1201 and 1202.

THE COURT:  1201 and 1202, for identification.

MR. LASTING:  Your Honor, I assume that the Government's going to introduce these exhibits at some later time, but can I --

THE COURT:  It really makes no difference who introduces the exhibits.  They're just used as point of references here.

(Pause)

BY MR. LASTING:

Q    Mr. Altmanis, do you see Exhibit 1201 there in front of you?

A    Yes.

Altmanis - Cross / By Mr. Lasting          100

Q    And what is that?

A    All I see is the name of the store, Home Depot.  But I don't know what this means.

Q    Can you look at Exhibit 1202 behind it?  Do you recognize that?

A    No.  It's the first time I've seen this.

Q    On Exhibit 1201, do you recognize the signature there?

    **(Pause / Witness examines exhibit)**

A    No.

Q    Do you know whether or not this document relates to items that were purchased at the Home Depot trip that you're telling the jury that you, Mr. Kadamovas and Mr. Mikhel went on the day of Mr. Muscatel's kidnapping?

    **MR. DUGDALE:**  I object.  Lack of foundation.  The witness already said he didn't recognize this document.

    **THE COURT:**  He said he doesn't know anything about those.

**BY MR. LASTING:**

Q    Well, what was the purpose of the trip to Home Depot?

A    We went to buy those plastic belts.  They bought them for the house.  Kadamovas had a whole basket full from what I recall.

Q    So on this trip to the Home Depot Mr. Kadamovas was making the purchases.

    Is that your testimony?

Altmanis - Cross / By Mr. Lasting          101

**MR. DUGDALE:**  Objection.  Asked and answered, your Honor.

**THE COURT:**  Well, it hasn't really been asked and answered.  But it's an ambiguous question because when you -- "purchase" can have several meanings.  One, somebody puts it in the basket.  That doesn't necessarily mean that they went to the cash register and paid for it.  Someone could have paid for it and yet not put it in the basket.  So you've got to be more specific in asking the question.

**BY MR. LASTING:**

Q    Mr. Altmanis, on this trip to Home Depot did Mr. Kadamovas pay for the items at the cash register?  Is that what you're telling the jury?

A    Yes.

Q    And how do you know that?

A    I was at the store.  We were standing nearby, not far, with what's his name, with Mikhel.

Q    So you saw him?

A    I saw him going to the cash register with the baskets.  We exited across from the cash register.  He was in the line, and we were over here, (indicating).

Q    And then you walked out together and got back in the car?

A    Yes.  The three of us left the store and we got in the car.

Q    Where did you go?

**EXCEPTIONAL REPORTING SERVICES, INC**

Altmanis - Cross / By Mr. Lasting          102

A     Back to Mikhel's house.

          THE COURT:  Whose car did you get into?

          THE WITNESS:  A Jeep Cherokee.

          THE COURT:  Whose Jeep Cherokee was that?

          THE WITNESS:  Kadamovas'.

BY MR. LASTING:

Q     So Mr. Kadamovas drove the Jeep Cherokee?

A     Yes.

Q     Did Mr. Kadamovas own a Jeep Cherokee?

A     Yes.

Q     What kind of car did Mr. Mikhel own?

A     A sports car, a BMW.

Q     Did you tell the jury that Mr. Kadamovas owned a Nissan Quest van?

A     Yes.  He had the Nissan Quest, also.  He changed them.

Q     He changed back and forth between his Jeep Cherokee and his Nissan Quest.

          Is that what you're saying?

A     Yes.  Because he told me later -- no, because he would say, not just to me but to everybody, he would say, "Oh, I left the Nissan, again."  He would leave it for his wife, Natalya Solovyeva, to take the kid if she needed it.  And that's why he'd drive the Jeep Cherokee.  And that's why he constantly switched cars.

Q     Where was your car at this time?  Let me rephrase that.

Altmanis - Cross / By Mr. Lasting          103

Where was your Navigator at this time?

A     At home.

Q     Where was your Town Car?

A     The Town Car was back at Mikhel's house.

Q     And after you left the Home Depot, is it your testimony that you went to Mikhel's house?

A     As far as I remember, yes.

Q     And is that where you say you planned out the kidnapping of Mr. Muscatel?

A     Yes.

Q     You participated in those plans?

A     Yes.

Q     Was the plan for you to threaten him?

A     No.  The plan we were working on had to do specifically with the kidnapping, his kidnapping.

Q     So the plan you were working on didn't have anything to do with what was going to happen to him after he was kidnapped?

A     No.

Q     There was never a plan as to what to do after he was kidnapped?

A     No.  I wasn't initiated into that.  We worked out a plan of how he was going to get detained, how he was going to get brought there and how Kadamovas and I were going to tackle him to the ground, to the floor.

Q     And that's as far as the plan went, Mr. Altmanis?

Altmanis - Cross / By Mr. Lasting            104

A     Yes.  The main thing was to grab him, was to detain him.

Q     So at what point -- did you stay at Mikhel's house all day after you got back from the Home Depot?

A     Yes, I was there and Mikhel was there.

Q     Was Mr. Kadamovas there?

A     Yes.  He was there because we spoke in the kitchen, then we rehearsed the whole thing.

Q     So the three of you were together all day.

       Is that what you're saying?

A     As far as I remember.

Q     And at some point did you go to watch for Mr. Muscatel to arrive at his office?

A     Yes, I did.  Kadamovas and I left.

Q     Did you recognize that his office was right there by your apartment?

A     Yes.  When Kadamovas pointed out the building to me, I realized that it was right next door.

Q     And did either you or your brother have a window that looked out over that apartment building?  I'm sorry, over that office building.

A     I didn't.  I don't know about my brother.

Q     Well, you know where your brother lived, don't you?

A     Yes.  I know that he lived on the second floor.  But as far as where his windows faced, I don't remember.  They were facing that street but -- where our cars were parked.  But

EXCEPTIONAL REPORTING SERVICES, INC

whether or not you could see it from his house, I really never paid attention to that.

Q    Didn't your brother Raymond's window overlook the alley behind the carports?

A    Yes.  I just said that you could see the driveway and the garage.  But whether or not you could see from his window, from his windows, whether or not you could see the office, I don't know.  I never really -- I've never had the need to look through his windows, period.

Q    You've been in his apartment but you've never looked out of that window.

Is that what you're saying?

A    This is in his bedroom.  How can I go to his bedroom? What am I going to be doing there?

Q    So is your answer you've never looked out the window so you don't know what you see out?

A    I'm not stating that I didn't look out of the window. Maybe when I visited him I might have looked through the window.  I'm not stating that.

Q    Mr. Altmanis, can you say whether or not looking out that window you could see Muscatel's office or not?

A    I'd have to look through that window and then I'll tell you, because I don't know.

Q    Was part of the reason that you were there to collect a debt that Mr. Muscatel owed?

Altmanis - Cross / By Mr. Lasting                106

A    Yes.  The story that Kadamovas told me that Mikhel told him.

Q    What were you going to do to collect the debt?

A    Since they told me that they need a third person, that they can't -- the two of them can't do it by themselves, and I could earn some money and I wouldn't have to borrow money from him.  That's what Kadamovas explained to me.

Q    Were you there to threaten Mr. Muscatel?

A    Yes.  That's what they explained to me, that we have to kidnap him and get the money from him that he owed.

THE INTERPRETER:  Excuse me.  Extract the money from him that he owed.

THE WITNESS:  I said why didn't they go to the police if it's such a big amount of -- if it's so much money.  He said that they gave him cash.  I might be wrong about the amount. It was either $300,000 or $500,000.  That's the amount, more or less, that Kadamovas told me.

THE COURT:  All right.  Let's take our afternoon recess, approximately ten minutes.

MR. LASTING:  Thank you.

(Recess taken from 2:47 p.m. to 3:00 p.m. / Parties present)

(Outside the presence of the jury)

THE COURT:  Do you think you're going to finish today, Mr. Lasting?

107

MR. LASTING:  Regrettably, your Honor, I don't believe I'm going to finish today as much as I'd like to.

THE COURT:  You know you're losing some of those jurors.

MR. LASTING:  I know that.

THE COURT:  All right.  Outside the presence of the jury.  The record will indicate that all parties and counsel are present.  Anything the government wishes to bring up?

MR. DUGDALE:  No, your Honor.

THE COURT:  Anything any defense wishes to bring up?

MR. CALLAHAN:  Nothing, your Honor.

MR. LASTING:  Your Honor, I have -- I want to bring up the issue about the credit cards at some point.  We can do it at the end of the day.  And I also wanted to bring up an issue about Mr. Kadamovas, but we can do that at the end of the day as well.

THE COURT:  All right.  Let's bring the jury out.

**(Jurors enter the courtroom at 3:02 p.m.)**

THE COURT:  All right.  The record will indicate all jurors are present, all counsel and parties and counsel are present.

Mr. Altmanis, you're still under oath.  Please state your name for the record.

THE WITNESS:  Ainar Altmanis.

THE COURT:  Mr. Lasting.

Altmanis - Cross / By Mr. Lasting        108

MR. LASTING:  Yes.  Thank you, your Honor.  Your Honor, I have a photograph that appears to be a garage door opener; could this be marked as Defense Exhibit 2015.

THE COURT:  2015 is next in order.

**(Defense Exhibit Number 2015 was marked for identification)**

MR. LASTING:  And the witness has a copy as does counsel.

THE COURT:  All right.

**CROSS EXAMINATION (CONTINUED)**

**BY MR. LASTING:**

Q    Mr. Altmanis, do you recognize what's depicted in this photograph, Exhibit 2015?

A    Yes.  It's a remote control to open the garage doors.

Q    And was this item in your Lincoln Navigator at the time of your arrest?

A    If it was found there then it was there.

Q    Is this your remote control?  Is this something you had possession of at the time of your arrest?

A    Yes.

MR. LASTING:  Your Honor, I'd offer this as Exhibit 2015.

THE COURT:  Any objection?

MR. DUGDALE:  No, your Honor.

//

THE COURT:  Received 2015.

**(Defense Exhibit Number 2015 was received in evidence)**

**BY MR. LASTING:**

Q    Mr. Altmanis, what does that garage door open?  What does that remote control open?

A    I don't know.  It seems to me that it didn't open anything.

Q    This is something that you kept?

A    Yes.

Q    Did it open the garage at Weslin?

A    I have not tried; I don't know.

Q    Did it open anything at the Mikhel house?

A    No.  I don't -- no, I don't know.  I didn't try.

Q    Would there be any reason for you to have this in your Lincoln Navigator?

         **THE INTERPRETER:**  Two voices speaking simultaneously please.

         **THE COURT:**  Yeah, he was still speaking.

         **MR. LASTING:**  I'm sorry, your Honor.

         **THE WITNESS:**  I think it was not in a working condition at all.

         **THE COURT:**  Would there be any reason for you to have it in Lincoln Navigator as of February 19th, 2006?

         **THE COURT:**  2006?

         **MR. LASTING:**  I'm sorry; 2002.  Thank you, your

Altmanis - Cross / By Mr. Lasting          110

Honor.

THE WITNESS:  I did have a remote control but I don't remember whether it was this one.  There are two of them and I don't remember which one of them.

BY MR. LASTING:

Q    Well you had one in your Lincoln Navigator and you had one in your Lincoln Town Car, didn't you?

A    I know -- I know that I had one which remained from the old residence and this one -- this one -- this one I do remember.

Q    Let's just talk about the one that we're looking at here right now; is there any reason for you to have it in your Lincoln Navigator as of February 19th, 2002?

A    I don't remember because I remember this one and that one probably -- it's hard for me to say.  I remember this one very well.  I had this one but with the screen I didn't have it.

Q    I'm sorry; the one on the screen, you didn't have it; is that what you just said?

A    No.  I don't remember to have this one.

Q    Well let me ask you this if this -- if you had a remote control to the garage that you lived at before you moved to Mammoth, would there be any reason for you to move that garage door opener into your Lincoln Navigator that you acquired after you were living at Mammoth?

A    I don't think so.  Had I put there anything I would have

Altmanis - Cross / By Mr. Lasting          111

put this one with it too because this one was from the old house.

Q     You're holding up another photograph that we haven't talked about yet.  Let's just talk about this one now.

          THE COURT:  You say this one, that one -- Exhibit 2015.

          MR. LASTING:  Exhibit 2015.

          THE COURT:  2015.

BY MR. LASTING:

Q     Would there be any reason for you to have that in your Lincoln Navigator as of February 19th, 2002?

          THE COURT:  Yes or no?

          THE WITNESS:  No.

          MR. LASTING:  Your Honor, I have another photograph that appears to be a remote control device; could this be marked as --

          THE COURT:  2016 is next in order.

     **(Defense Exhibit Number 2016 was marked for identification)**

          MR. LASTING:  The witness already has a copy of it.

BY MR. LASTING:

Q     Mr. Altmanis, do you recognize what's depicted here in this photograph, Exhibit 2016?

          THE COURT:  Just yes or no.

          THE WITNESS:  Yes.

Altmanis - Cross / By Mr. Lasting          112

**BY MR. LASTING:**

Q    What is it?

A    This is a remote control.  I know this is my remote control.

          **MR. LASTING:**  Your Honor, I'd offer into evidence as Exhibit 2016.

          **THE COURT:**  Any objection?

          **MR. DUGDALE:**  No, your Honor.

          **THE COURT:**  When you say this is your remote control what is the remote control to?  What does it operate?

          **THE WITNESS:**  It operated -- it operated the garage doors in our old place of residence.  May I add something?

          **THE COURT:**  No, there's no question pending.  When you say your old place of residence is that the Magnolia Street address?

          **THE WITNESS:**  Yes, Magnolia.

          **THE COURT:**  All right.

**BY MR. LASTING:**

Q    And was this device that's depicted on the screen, 2016, was this in your Lincoln Town Car as of February 19th, 2006?

          **THE COURT:**  Yes or no?

          **MR. LASTING:**  I'm sorry; 2002.

          **THE INTERPRETER:**  The answer was "Yes" before the interpreter had time to interpret.

//

Altmanis - Cross / By Mr. Lasting          113

**BY MR. LASTING:**

Q    And is this a device that can be reprogrammed; this referring to Exhibit 2016.

A    Yes, it is possible.

Q    And as of 2002, February the 19th, what was this device programmed to open, Exhibit 2016?

A    To open the doors where I used to live before.

Q    What was the reason for keeping it in your Lincoln Town Car?

A    It just stayed there.  It just remained there after we left the building because I was moving furniture and it remained there.

Q    When were you moved out of that building?

A    In the spring.

Q    The spring of 2001?

A    Yes, in the spring 2001.

Q    And I just want to go back a moment to a question I asked you earlier about flex-ties that you had.  How many flex-ties did you have in your possession at your home or in your vehicles as of February 19th, 2002?

A    Whatever you found.  One in the Navigator and then at home I had short ones, two inches and four inches.  And besides in the glove compartment also there was such rubber band --

Q    Mr. Altmanis, I don't mean to interrupt you.  I'm only asking you about flex-ties; how many did you have in your home?

EXCEPTIONAL REPORTING SERVICES, INC

Altmanis - Cross / By Mr. Lasting                114

A     One, this one.  And at home, I had short ones specially for this one.

Q     How many did you have?

A     For electronics to tie the wires.

Q     How many did you have?

A     I don't remember.  As many as were used to tie up the videotape recorder -- tape recorder, television set.

Q     How many did you have that were unused?

A     I don't remember.  They were different colors: green, black, red, white, blue.

Q     I was asking you before about the kidnapping of Mever Muscatel and just before the break did you tell us that Mr. Muscatel was reported to you owed somebody between 300 and $500,000?

A     Yes, I did say that.

Q     And how much of this money were you supposed to collect?

A     From what Kadamovas explained to me it was 25 or $30,000 the same amount that I had already borrowed from him.

Q     Is that the amount that you were to paid for your participation in this; is that your testimony?

A     Yes.

Q     And what were you supposed to do?

A     To help them.

Q     Were you supposed to frighten Mr. Muscatel?

A     Yes.

Altmanis - Cross / By Mr. Lasting                115

Q    Were you supposed to threaten to beat him?

A    No.  Because when he said that it wouldn't come up to this because he would agree before this.

Q    So you were supposed to threaten him; how were you supposed to threaten him?  What were you going to do?

A    Mentally.

Q    What were you going to do?

A    Yell at him.

Q    Were you going to do anything else?

A    Yes.  If he wouldn't do this one then I was supposed to somehow hit him or beat him up.

Q    Were you supposed to use something to do that?

A    No.  At first we were planning to use the baseball bats but because we didn't have the bats at the time when we kidnapped him.  We had a black automatic gun and he was supposed to cooperating just at the sight of this black gun.

Q    Did you tell the jury that at some point Mr. Kadamovas and Mikhel left the house after Muscatel had been kidnapped and went to Muscatel's office?

A    Yes.  Kadamovas and Mikhel went to Muscatel's office.

Q    And did you do anything while you were there to contact them?

A    Yes.  I called to Kadamovas' telephone.

Q    And how did you make that call?

A    From Mikhel's home.

Altmanis - Cross / By Mr. Lasting          116

Q    So you used Mikhel's home telephone; is that what you're saying?

A    No.  I used my cell phone from Mikhel's home.

Q    And did you call Mr. Kadamovas on his cell phone?

A    Yes.

Q    Did you talk to him?

A    Yes.  I made --

Q    And at some point is it your testimony that they returned carrying some items from Mr. Muscatel's office?

A    Yes.  Two plastic bags from grocery stores.

Q    And what was in these plastic bags?

A    Documents, checkbooks and something else.

Q    Did you see this?

A    Yes.  They spread it on the table.

Q    What happened to these documents and checkbooks?

A    They were looking at them.

Q    And what happened after they looked at them?  What did they do with them?

A    I don't know.  They placed them somewhere.

Q    Did Mr. Kadamovas speak English at this time?

A    The same way I did.

Q    Did Mr. Kadamovas read English at this time?

A    I don't know.  I didn't see him read and I was not present and he didn't -- when he would be reading something -- and he didn't tell me.

Altmanis - Cross / By Mr. Lasting                117

Q    What time did -- did you leave Mr. Mikhel's house that night?

THE INTERPRETER:  Mikhel's house you said, counsel?  Mikhel's house?

THE COURT:  Yes.  What time did you leave Mikhel's house that night?

THE WITNESS:  At night around midnight.

BY MR. LASTING:

Q    And did you see Mr. Mikhel -- I'm sorry -- Mr. Muscatel when he arrived at his officer earlier that night prior to being kidnapped?

A    No, I didn't but Kadamovas did.  And he told me that he had arrived.  I was sitting at the table in the coffee shop and Kadamovas was standing next to his Jeep Cherokee and he was watching.

Q    And did Mr. Kadamovas mention anything about the vehicle that Muscatel arrived in?

A    No.  He called Mikhel and he said that he had arrived by himself.  He didn't mention the car.

Q    To your knowledge, did Mr. Kadamovas know what Mever Muscatel looked like?

A    Yes, he did.

Q    How did he know -- what do you base that upon?

A    Because I asked him where is the office and he told me that this is the office that he entered.

EXCEPTIONAL REPORTING SERVICES, INC

Altmanis - Cross / By Mr. Lasting          118

Q    Were you supposed to be looking for Mr. Muscatel as well?

A    No.  I was not supposed to.  I was just accompanying him, Kadamovas.

Q    So your purpose was just to be there for companionship?

A    They didn't leave me in Mikhel's home.  They told me, "Let's go."  And Kadamovas said, "That's it.  Let's go."  And I went with Kadamovas.

Q    But you weren't supposed to be looking as well for Mr. Muscatel's arrival?

A    No.  No one told me that I, personally, was supposed to watch for it.

Q    Did you know what Mr. Muscatel looked like?

A    No.  I saw him only when he tackled him to the floor.  But before that when we were rehearsing Kadamovas, Mikhel and myself, they explained to me that he would be scout.  And they explained to me approximately his height.

Q    Did you know what kind of vehicle Mr. Muscatel drove?

A    No, I didn't.

Q    After you left that night when did you come back to Mr. Mikhel's house?

A    I returned the following day.

Q    Approximately what time?

A    10:00 or 11:00.

Q    And who was there?

A    Kadamovas and Mikhel.

Altmanis - Cross / By Mr. Lasting            119

Q     And on this second day, the day after Mr. Muscatel has been kidnapped, how long did you stay at Mikhel's house?

A     I spend the day there then I was there in the evening.

Q     And during the day and the evening were you there continuously?

A     No.  I left for a period of time -- in the evening I had to.

Q     Well what time did you leave?

A     When I had to go and get the syringe.

Q     What time was that?

A     In the evening.

Q     Other than the evening can you give us an approximate time?

A     After 9:00 -- 9:00, 10:00.

Q     9:00 p.m. or 10:00 p.m.?

A     Yes, 9:00.  Around 9:00 because I was gone for two hours.

Q     So you were gone from approximately 9:00 p.m. to 11:00 p.m. and then you returned; is that what you're saying?

A     Yes, that's about right.

Q     And between the time you got there and 9:00 p.m. when you left to go get the syringe was Mr. Kadamovas there?

A     No.  He was gone during the day.  When I arrived in the morning -- after I arrived in the morning he left about half an hour later.  He went home to get some sleep.  And Mikhel went upstairs to his bedroom --

EXCEPTIONAL REPORTING SERVICES, INC

Altmanis - Cross / By Mr. Lasting          120

Q    So --

A    -- to sleep.

Q    Did Mr. Kadamovas ever return to Mikhel's house on this first day after Mr. Muscatel had been kidnapped?

A    Yes, he did.  He returned sometime later.

Q    What time?

A    Boy, that's hard to say.

Q    Approximately?

A    He was gone for about three or four hours.

Q    So he came back what time would that be roughly?

A    During the day.

Q    The afternoon?

A    Yes, sometime in the afternoon.

Q    And did he remain there from sometime in the afternoon that he came back until you left to go get the syringe?

A    He was there but I didn't really pay total attention whether or not he was there or not because they'd go out on their own business.  They'd go to the office.

Q    When you say, "They" --

A    Kadamovas and Mikhel.

Q    So they would leave and you were left alone with Mr. Muscatel; is that what you're saying?

A    Yes.  That's why I replaced them.  That's why I came in order to replace them, let them rest and then -- then the -- they'd leave me there when they'd have to go on their own

EXCEPTIONAL REPORTING SERVICES, INC

Altmanis - Cross / By Mr. Lasting          121

business and possibly they'd left -- even left the house.

Q    And did you remain there all night or did you leave at some point?

A    No.  I brought them the syringe.  I stayed for about 30 or 40 minutes and then I was told to come back the next morning around 6:00, after 6:00.

Q    So approximately what time did you leave?

A    Also sometime around 12:00 I was already -- I was -- when I was on the freeway it was already half-empty.

        THE COURT:  Now when you say, "12:00" 12:00 in the afternoon or 12:00 in the morning?

        THE WITNESS:  12:00 a.m.

BY MR. LASTING:

Q    And during the period of time when you got back with the syringe until you left at midnight were both Mr. Mikhel and Mr. Kadamovas there at the house?

A    Yes.

Q    So it was three of you that were there; is that correct?

A    Yes, when I arrived they were there.

Q    You mentioned that there was a discussion after Mr. Muscatel had been killed about what to do with his body; do you recall that?  Do you recall that testimony?

A    Could you repeat the question?

Q    Do you recall telling the jury about discussions about what to do with the body after Mr. Muscatel had been killed?

Altmanis - Cross / By Mr. Lasting                122

A    Yes.   That he had to be loaded in the car.   The three of us loaded him.   He was loaded into the trunk.

Q    Was there a discussion about where to take the body?

A    Yes, there was.   There was a conversation in the kitchen after he'd been loaded in the car.

Q    Did you participate in that conversation?

A    Yes.

Q    And you said that -- I believe your testimony, if I'm correct, was that you suggested taking the body to San Francisco; is that what you said?

A    No, not San Francisco.

Q    What did you suggest?

A    I said that we were returning -- that I was driving from San Francisco and we saw these bridges.   There were rivers and numerous bridges from what I remember.   I was driving during the day and I remember this.

Q    And where would these bridges and rivers be that you are describing?

A    The ones that I drove by when I was on this freeway that is -- that goes along the ocean.   What's it called?   The first freeway?   I don't know.

          THE COURT:   Highway One?

          MR. LASTING:   Are you talking about --

          THE COURT:   Highway One?

          THE WITNESS:   Yeah.

EXCEPTIONAL REPORTING SERVICES, INC

Altmanis - Cross / By Mr. Lasting        123

**BY MR. LASTING:**

Q    And was there some discussion about maps?

A    Yes.  The map was already opened by the time I gave my two cents with my suggestion.

Q    And you saw this map?

A    Yes, with my own eyes.

Q    And you looked at the map and participated in the discussion as to where to take the body; is that what you're saying?

A    Yes.

Q    Did you tell this to the FBI?

A    Yes.

Q    Did you tell it to the Los Angeles Police?

A    Yes.

Q    Did you say the same thing to them you're saying to the jury?

A    Yes, that I made the suggestion.

Q    Where did this map come from?

A    I didn't see where they brought it from, but I did see that it was open, lying open on the table.

Q    Did the first discussion about where to take the body take place after Mr. Muscatel had been killed?

A    As far as I recall, yes, in the kitchen when the maps were there and everyone was looking for the road where to go.

Q    And what time was it that you were left alone at

Altmanis - Cross / By Mr. Lasting            124

Mr. Mikhel's house?

THE COURT:  Before or after Mr. Mikhel was killed?

MR. LASTING:  I'm sorry, your Honor?

THE COURT:  At what point in time?

BY MR. LASTING:

Q    After -- Mr. Altmanis, after -- your testimony is that Mr. Kadamovas and Mr. Mikhel spread these maps out; you looked at it.  You participated in the discussion and then they left with the body in the van; is that correct?

A    Yes.

Q    What time was that?

A    After 8:00.

THE COURT:  8:00 in the morning; 8:00 in the evening?

THE WITNESS:  In the morning.  Sorry.  In the morning.

BY MR. LASTING:

Q    During any of the times that you were at Mr. Mikhel's house did you ever use Mr. Mikhel's phone to call anybody?

A    I don't remember.  I had my own cell phone.

Q    So calls that you made would've been made on your cell phone during this period of time; is that what you're saying?

A    Yes.  If I had my phone why would I need to use?

Q    Did you call to Mr. Kadamovas or to Mr. Mikhel after they left the house?

A    Yes, I called Kadamovas.

Altmanis - Cross / By Mr. Lasting                125

Q    And how many times did you call him?

A    Many times but I spoke to him -- I spoke to him twice.

Q    And are you saying that you called Mr. Kadamovas and spoke to him twice on the day that according to you he and Mr. Mikhel left Mikhel's house to go and take Mr. Muscatel's body somewhere?

A    Yes.

Q    Is that what you told the FBI?

A    Yes.

Q    Did you tell the FBI that after they left Mr. Kadamovas called you on a number of occasions?

A    I don't remember him calling me.

Q    Well I'm asking you did you tell the FBI that Mikhel and Kadamovas called you often while they were gone?

A    No, because I don't remember that.  If I had remembered that I would've definitely said that.

Q    So you didn't say that?

A    No.  I called, yes.

Q    And the first time that you talked to Mr. Kadamovas what happened?

A    There still looking for the spot.  I asked them where they are and they said that they were still looking for the spot.

Q    What time was that?

A    It was during the day, after -- sometime in the afternoon.  It was during the day.  I don't know when.

Altmanis - Cross / By Mr. Lasting          126

Q    And did you have a second conversation with Mr. Kadamovas?

A    Yes, in the evening.

Q    And how long was that conversation?

A    I don't recall.  I wasn't looking at my watch.  I was at home I think it was already dark outside.

Q    Did you make that telephone call on your cell phone?

A    No, from my home phone, I think, because I was at home why would I need to use my cell phone?

Q    And is it your testimony that you never got paid any money for the actions that you took with regard to Mr. Muscatel?

A    Not just me.  They didn't receive anything.  That's what they explained to me, Mikhel, that no one received any money.

Q    Did the FBI ask you about money that you'd receive for your participation in the abduction and murder of people?

A    Yes.

Q    Did you tell somebody in the FBI that you received $4,500 for the actions you took with regard to Mr. Muscatel?

A    4,000?

Q    4,500.

A    No.  5,000 and 9,500.

Q    Did you tell somebody from the FBI that you were paid $4,500 for the kidnap and murder of Mever Muscatel?

A    No.

Q    When do you say there was -- what is your testimony as to the first time you were ever involved in a discussion with

**EXCEPTIONAL REPORTING SERVICES, INC**

Altmanis - Cross / By Mr. Lasting                127

regard to the abduction of Rita Pekler?

          THE INTERPRETER:  In the discussion?

          MR. LASTING:  Yes.

          THE COURT:  Yes.

          THE WITNESS:  Could you be more specific?

BY MR. LASTING:

Q    When was the first time there was ever a discussion that involved -- that you were involved in that related to Rita Pekler?

A    When they had already said that they want to kidnap her. They were looking for information and that's when I learned that they're planning to kidnap Rita Pekler.

Q    Did you tell anybody that you knew Rita Pekler?

A    Yes, I did.

Q    And did you explain what your knowledge of her was?

A    That I saw her at the Russian Roulette, that she'd been a frequent customer there and that she'd partied there.

Q    Did you discuss the fact that you had had a dispute with her regarding problems she had with Elena?

A    Yes, I told them that.  I told them that there was that personal conversation.

Q    When did you meet Rita Pekler in regard to the dispute that Elena had with her?

A    I never met her.  I'd seen her but there was no introduction.

Altmanis - Cross / By Mr. Lasting                128

Q    Didn't you speak with her with regard to getting money
back that Elena had paid her?

A    Yes, but that was after I'd already seen her and knew of
her at Russian Roulette.

Q    When did you meet with Rita Pekler and discuss the
situation that involved Elena and Elena's dissatisfaction with
Ms. Pekler's services?

A    When I took Elena there to her office.

Q    When was that?  What year?

A    80 -- well no, '98.

Q    And what service had Ms. Pekler failed to properly perform
for Elena?

A    Something -- something having to do with her older
daughter, some kind of money, some kind of immigration papers.

Q    Did it -- was there a dispute that Elena had with Rita
Pekler regarding Elena's immigration status?

A    I didn't hear their entire dispute because I wasn't
present during the whole thing, but as far as Elena's
immigration stuff, she had her own attorney and we'd been to
that office many times.  Her lawyer was Nona.  It's an Armenian
name; I can't remember it.  It's hard for me to remember it.
I'd been there many times.  We'd probably been there five times
at the immigration.

Q    How much money was involved in this dispute between Elena
and Rita Pekler?

A     Gosh, I don't know.

Q     Well how much money were you trying to get back?

A     I can't remember at all.  I have no idea.  It was $100 or $200; I don't remember what they were talking about.

Q     How much money did you get back?

A     I don't know if my wife got the money back or not.  I think she didn't get anything back.

Q     Was your wife trying to get false immigration documents?

A     No.  I don't know.  I don't know her status.  I know that she had gone through the process and gotten her green card but I don't know how she did that.  I didn't know her before that. She has numerous secrets that she keeps from me just like I kept numerous secrets from her.  Like any person here, everyone has their own life.

Q     Wasn't she trying -- wasn't your wife trying to get false immigration documents as late as February -- I'm sorry -- as late as January of 2002?

        MR. DUGDALE:  At this point, I'm going to object on relevancy grounds.

        THE COURT:  What's the relevancy of this?

        MR. LASTING:  Do you want me to approach the bench?

        THE COURT:  No.  I'm going to sustain an objection unless it has to do with Ms. Pekler.

//

//

Altmanis - Cross / By Mr. Lasting          130

**BY MR. LASTING:**

Q    Did you tell Aleksejus Marcowskis that your wife was going to San Francisco to get false immigration documents?

        **MR. DUGDALE:**  Objection, your Honor, relevance.

        **THE COURT:**  Sustained.

**BY MR. LASTING:**

Q    Were you upset that Rita Pekler had failed to get immigration documents for your wife?

        **MR. DUGDALE:**  Objection, assumes facts not in evidence.

        **THE COURT:**  Sustained.

**BY MR. LASTING:**

Q    Did you ever tell anybody that you were upset that Rita Pekler had failed to get immigration documents for your wife?

A    I'm going to say it again.  First of all, I didn't know these were not immigration papers.  It had to do with her older daughter.  That's what I know.  That's what my wife explained to me.  But as far as me expressing that to somebody else, yes, I did say that to Mikhel and Kadamovas when that happened.  I said that they had friction.  That's it.

Q    You've testified regarding a call that you made to Mr. Kadamovas when he was in London with regard to the location of Rita Pekler's office; when did you make that call?

        **THE INTERPRETER:**  When?

        **MR. LASTING:**  When?

Altmanis - Cross / By Mr. Lasting          131

**THE WITNESS:** When they -- when they were in London when they left that address for me to check out.

**BY MR. LASTING:**

Q    When was that?

A    I don't remember.  I don't remember the day.  One of the days when they left they'd left this for me to do.  I think I even took them to the airport.

Q    Where did you make the call from?

A    One time I called from a pay phone.  He asked me how I was making the phone call and I said I'm calling from home.  That's why explained to me how I could make a call from a pay phone. So that means I could go to any 7-11 Store and get those cards, you know, those cards and make calls from -- what do you call it?  From the public phone not to call from home.  One call was made from home for sure.  The second call was from a pay phone.

Q    The call that you made from your home phone did you -- how did -- did you call Mr. Kadamovas' cell phone or did you call him at a number in London?

A    Yes.  It was a number that I was given.

Q    So you called a number in London; is that correct?

A    Yeah, London.  Yes, London.

**THE COURT:** Was it a London telephone number or was it a local number that was picked up in London?

**THE WITNESS:** I don't remember.  I couldn't tell you specifically.  I made the phone call using the number I was

Altmanis - Cross / By Mr. Lasting          132

given but whether or not it was a local number or a London number I can't remember.

**BY MR. LASTING:**

Q    Mr. Altmanis, on the day that Rita Pekler was abducted did you attend a meeting to discuss and to plan what was going to happen in terms of kidnapping her?

A    Yes.

Q    And did you tell the jury that meeting took place at the house on Weslin?

A    Yes, in the house on Weslin.

Q    And what time did you go there?

A    In the morning I was supposed to come there in the morning.

Q    And in the morning did you go?

A    Yes, as they told me.  In the morning of that day I did come.  Kadamovas knew that sometimes I could go shopping or go and do some errands in the morning so he told me ahead of time so that I wouldn't be busy doing anything else in the morning.

Q    What time did you go?

A    Around 10:00, probably after 10:00 but not earlier.

        THE COURT:  This is in the morning?

        THE WITNESS:  Yes.

**BY MR. LASTING:**

Q    And who else was there?

A    Mikhel, Kadamovas and Krylov.

**EXCEPTIONAL REPORTING SERVICES, INC**

Altmanis - Cross / By Mr. Lasting          133

Q     And how long did the four of you remain at the Weslin house before somebody left?

A     It's hard to say for how long but Kadamovas left and went to meet Pekler.

Q     Well was this the day that you met to discuss the plan for the kidnapping and what was going to happen?

A     Yes.  About the kidnapping, how Rita was going to be kidnapped.

Q     How long did that discussion take?

A     It's hard to say.  It was long enough.  We were talking just among ourselves.

Q     Well did you discuss it for a couple of hours?

A     No.

Q     Did you discuss it for more than that or less than that?

A     Less.  Less.

Q     Approximately how long?

A     Half an hour.

Q     And is it your testimony that Mr. Kadamovas then left from the Weslin house to go meet with Rita Pekler?

A     Yes.

Q     Did somebody call Ms. Pekler that morning?

A     Yes.

Q     Were you present when that call was made?

A     No, I was not present.

Q     How do you know that somebody called her?

Altmanis - Cross / By Mr. Lasting          134

**THE INTERPRETER:**  No, interpreter didn't --

**THE WITNESS:**  They had already known that someone called.

**BY MR. LASTING:**

Q    Did you personally hear somebody call Rita Pekler on the day of her kidnapping?

A    No, I did not hear.

Q    Do you know where the call was made from?

A    One call as it was found out after I came that they had called her before and the second call it was decided that Kadamovas was going to call her from outside on the way there telling her where he was.

Q    Approximately what time was it that you say Mr. Kadamovas left the Weslin house to go meet with Rita Pekler?

A    Around 12:00 o'clock, around that time, in the middle of the day.

Q    And when Ms. Pekler arrived at Weslin did anybody point guns at her?  Were guns pointed at her?

A    No.  No one pointed the guns at her in her face, but the guns were in the hands.

Q    Who had guns?

A    Mikhel.

Q    Anybody else?

A    I had electro-gun.

Q    You had a stun gun?

Altmanis - Cross / By Mr. Lasting          135

THE INTERPRETER:  A stun gun.  Interpreter's correction, a stun gun.

BY MR. LASTING:

Q    Did you point a stun gun at Ms. Pekler?

A    No.  There was no need to do it.  And Mikhel didn't have to show her gun -- well to point at her face -- as soon as she saw it in their hands she realized.

Q    Ms. Pekler knew you from these prior encounters with her; is that correct?

MR. DUGDALE:  Objection, calls for speculation, your Honor.

THE COURT:  Sustained.

BY MR. LASTING:

Q    Did you think Ms. Pekler would know you from your prior encounters with her?

MR. DUGDALE:  Same objection, your Honor.

THE COURT:  Sustained.

BY MR. LASTING:

Q    Were you concerned that Ms. Pekler might be able to identify you as somebody that was involved in kidnapping her?

A    No.  I don't think so because at that time I was twice as thin.  I was drinking a lot at that time.  And I was smoking and I was partying a lot.  And I don't think that.

Q    You didn't have any concern about being identified by her; is that what you're saying?

Altmanis - Cross / By Mr. Lasting          136

THE INTERPRETER:  Two voices.

MR. LASTING:  I didn't realize he hadn't finished.

THE WITNESS:  Even more so at that time I did have more hair.  And when I -- when we arrested her I was bald and I had beard.  I had facial hair.  It's very unlikely that she would have.  Had she recognized me it would have been seen from her appearance.

BY MR. LASTING:

Q    Did you tell the FBI that you thought that Ms. Pekler would see you and recognize you and it would put her at ease?

A    No, very unlikely.  There were chances that she wouldn't recognize me.  Had she recognized me she would have immediately shown.

Q    Did you tell the FBI anything with regard to your feelings about Ms. Pekler recognizing you after she was kidnapped?

A    Very unlikely, no.

Q    Did you bring a syringe to be used to inject Ms. Pekler?

A    No.

Q    Did you tell the FBI or the Los Angeles Police that you brought a syringe to inject Ms. Pekler?

A    No.  I brought the syringe only on one occasion with Muscatel.

Q    So the answer is no, you did not tell that to the FBI?

A    No.

Q    Did you bring a weight?  Did you purchase a weight to be

Altmanis - Cross / By Mr. Lasting          137

used to weigh Ms. Pekler's body down after she was killed?

A    No.  I didn't buy and I didn't bring it.

Q    Did you tell the FBI that in order to weigh her down, her body down, you purchased weights at Play It Again Sam?

A    No.  I bought in Play It Again only for Umansky.

Q    Was Ms. Pekler ever tied up when she was abducted?

A    No.  I left the house when Pekler was alive.

Q    When you became involved in the plan to kidnap Ms. Pekler, did you know she was going to be killed?

A    Yes, I knew about it.

Q    And what was the reason that you participated?

A    Because they needed -- because they needed Safiev and she was the closest person who could lure him into this trap.

Q    Did you do it so you could get money?

A    Yes.

Q    And did you agree to participate in the abduction of Alex Umansky?

A    Yes, I did.

Q    How long was Ms. Pekler held at the Weslin house?

A    I don't know how long they kept her there; I left in the evening.  And I never got interested in it.

Q    How long were you there?

A    From the moment I came there at around 10:00 in the morning and then I stepped out just to re-park the car with Krylov and then I stayed there 'til 8:00 o'clock, 'til 8:00

Altmanis - Cross / By Mr. Lasting          138

p.m. and after 8:00 I left.

Q    So you were gone for a short period of time to re-park the car that Ms. Pekler had come in; is that what you're saying?

A    Yes, Krylov and myself.

Q    What time was that?

        **THE INTERPRETER:**  Interpreter needs to clarify something, your Honor.

        **THE WITNESS:**  After lunch, approximately after 1:00 or 2:00.

**BY MR. LASTING:**

Q    And how long were you gone?

A    About 40 minutes.

Q    During the time that Ms. Pekler was at the Weslin house who was there?

A    I was there, Kadamovas, Mikhel and Krylov.

Q    Other than you and Mr. Krylov leaving to re-park the car that Ms. Pekler had arrived in, were all of you there together throughout that period of time?

A    Yes.  But just that Kadamovas before Pekler was brought there, he was absent and then after he came he stayed there together with Mikhel and Pekler and Krylov.  And I went to move the car.

        **THE COURT:**  How long will you be on the Pekler issue because once you're finished with Pekler then we're going to break.

Altmanis - Cross / By Mr. Lasting          139

MR. LASTING:  Thank you, your Honor.

THE COURT:  How long will you be on the Pekler issue?

MR. LASTING:  I'm just about done with the questions about Ms. Pekler.

THE COURT:  When you're finished with Ms. Pekler, we'll break for the evening.

MR. LASTING:  Fine.  Thank you.

BY MR. LASTING:

Q    So over that day, Mr. Altmanis, the day that Ms. Pekler was kidnapped you were at the Weslin house continuously with the exception of moving the car that Ms. Pekler arrived in; is that correct?

A    Yes.

Q    And that was from about 10:00 o'clock in the morning until when?

A    Until the time we stepped out to move the car and then after we had moved the car 'til 8:00 o'clock p.m.

Q    And at the time that you arrived in the morning who was there?

A    Mikhel, Kadamovas, Krylov.

Q    When you got there about 10:00 in the morning Mr. Mikhel and Mr. Kadamovas were already there?

A    Yes, they were there.  Kadamovas was preparing to leave to meet Pekler.

MR. LASTING:  Your Honor, that's I believe the end of

140

the questions I have about Ms. Pekler.  There may be one or two more but that's the bulk of it.

THE COURT:  All right.  Then we'll break for the evening; returning tomorrow 9:15 in the jury room; 9:30 in the courtroom.  Remember the admonition.

**(Jurors exit courtroom at 4:19 p.m.)**

**(Outside the presence of the jury)**

THE COURT:  All right.  Outside the presence of the jury.  You wanted to talk, Mr. Lasting, about Exhibit 2012.

MR. LASTING:  I did, your Honor.

THE COURT:  You may take Mr. Altmanis out at this time.  All right.  2012 as I understand it is a list of bank accounts.

MR. LASTING:  I believe it's a list of credit cards and the number associated with them.

THE COURT:  And that list, as I understand it, was prepared by the agents?

MR. DUGDALE:  Your Honor, that's right.  Apparently this was prepared by the agents.  On the bottom of this thing you see a name.  I'm not sure where he's stationed -- "Douglas Cornesky (phonetic)" and above that is "6:30 p.m. start" that probably refers to a start time for a warrant.

THE COURT:  May I look at it?

MR. DUGDALE:  Sure.  It's the government's position that it's no more admissible than a 302 written by an agent.