# GOVERNMENT EXHIBIT 32

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

# DRAFT COPY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO:  CR-02-220(B)-DT |
| | ) | |
| Plaintiff, | ) | CRIMINAL |
| | ) | |
| vs. | ) | Los Angeles, California |
| | ) | |
| IOURI MIKHEL, | ) | Friday, November 3, 2006 |
| JURIJUS KADAMOVAS, | ) | (9:41 a.m. to 12:02 p.m.) |
| | ) | (1:51 p.m. to  3:33 p.m.) |
| Defendants. | ) | |

JURY TRIAL (37th DAY)
(VOLUME XXXVII)


** Bench conferences were omitted **
(From 2:14 to 2:19 p.m. and 2:35 to 2:37 p.m.



BEFORE THE HONORABLE DICKRAN TEVRIZIAN,
UNITED STATES DISTRICT JUDGE

EXCEPTIONAL REPORTING SERVICES, INC
14493 SOUTH PADRE ISLAND DRIVE
SUITE A-400
CORPUS CHRISTI, TX 78418-5940
361 949-2988

Solovyeva - Direct / By Ms. DeWitt          51

it all."

Who said that?

A     Kadamovas.

Q     Ms. Solovyeva, did Defendant Kadamovas go on any additional overnight trips after Nick Kharabadze and George Safiev were abducted?

A     Yes.

Q     When did he go on this overnight trip?  And by "he" I mean when did Defendant Kadamovas go on this overnight trip.

A     A few days after they kidnapped Safiev and Kharabadze.

Q     And, Ms. Solovyeva, how did you know that he was going on an overnight trip?

How did you know that Defendant Kadamovas was going on an overnight trip at that time?

A     He, again, took our car, a Nissan Quest.  And he said that he was not going to come back for the night.

Q     Do you know who went with Defendant Kadamovas on this overnight trip?

A     Yes.

Q     Who went with Defendant Kadamovas on this overnight trip?

A     Ainar, Krylov, Mikhel, and Kadamovas.

Q     What did Defendant Kadamovas do when he returned from this overnight trip?

A     He immediately went to the house on Weslin.

Q     And I'm sorry, Ms. Solovyeva.  Let me back up.

**DRAFT COPY**

Solovyeva - Direct / By Ms. DeWitt                52

Do you know where he went on this trip?

MS. CHAHIN:  Your Honor, I'm going to object to foundation, please.

THE COURT:  Well, ask the question.  Then lay the foundation.

BY MS. DeWITT:

Q    Okay.  Just yes or no.

Do you know where he went on this overnight trip?

A    Yes.

Q    How do you know where he went on this overnight trip?

A    He told me about it later.

Q    Okay.  And what did he tell you when he told you about it later?

A    That they had a trip with adventures that they were stopped by policeman.  And the reason that the policeman stopped them was that either one of them speeded up or the lights were not on.  I don't know.  But for some reason the policeman stopped them.

Q    Okay.  Let me just back up and clarify.

When he told you that they had gotten stopped by the police, who did you understand they were that got stopped by the police?

MS. CHAHIN:  Your Honor, I'm going to object and request further foundation for this conversation; time, place, date.

Solovyeva - Direct / By Ms. DeWitt                53

THE COURT:  All right.

Why don't you asked a foundational question.

MS. DeWITT:  Sure.

BY MS. DeWITT:

Q    Did Defendant Kadamovas tell you who the they were that got stopped by the police?

A    Kadamovas told me that he was driving when his car was stopped and that Ainar was driving the second car when the second car was stopped.  This is what he told me.

Q    Did he tell you who was in the car --

THE COURT:  Okay.  Let's stop now.

There was an objection as to foundation.

When did this conversation take place?

THE WITNESS:  After the trip had been completed.

THE COURT:  Approximately when was that?

THE WITNESS:  A few days. I would say 10 days or a week.  I don't remember exactly.

THE COURT:  Ten days or a week from when?

THE WITNESS:  Maybe even less after the last overnight trip.

THE COURT:  And who was present during the conversation?

THE WITNESS:  Kadamovas and I.

THE COURT:  And where did the conversation take place?

**DRAFT COPY**

Solovyeva - Direct / By Ms. DeWitt          54

THE WITNESS:  In our apartment only in the living room.

MS. DeWITT:  Thank you very much, your Honor.

BY MS. DeWITT:

Q    Who did Defendant Kadamovas say was in the car with him when he got pulled over by the police?

A    He told me that at that moment Safiev was in his car, alive Safiev.  Safiev was alive.  And I don't remember who else he mentioned to be in his car.

Q    Okay.  And did he tell you who was in the other car that you said was being driven by Mr. Altmanis?

A    Yes.

Q    Who did he tell you was in the other car that was being driven by Mr. Altmanis?

A    Nick Kharabadze, who was alive.

Q    Now, you mentioned that he told you about getting stopped by the police.

Can you tell the jury, to the best of your recollection, what you remember him saying about this incident with the police?

THE COURT:  Who are you referring to as to he?

MS. DeWITT:  He, Mr. Kadamovas.

THE WITNESS:  The conversation began by him saying that he was unhappy about Ainar, because Ainar did something wrong.  And he said that that trip was with -- it was an

**DRAFT COPY**

Solovyeva - Direct / By Ms. DeWitt                55

adventurous trip and that they had been stopped by police.

And they asked him, "What would you have done if he had learned who you have in your car?"  He said, "We would have killed the policeman, and we would have continued our business."

**BY MS. DeWITT:**

Q    Now, Ms. Solovyeva, to get back to where I was before I went back.

What did Mr. Kadamovas do when he returned from this overnight trip?

A    He went back to Weslin house, and he cleaned up there.

Q    And how do you know that he did that?

A    He told me that after the trip all of them came back to the house, and they were cleaning there.

Q    Okay.  And when you say "All of them," who is all of them?

A    I remember him to mention that there were Ainar and Mikhel.  And also there was Aleksejus Markovskis, who was cleaning the carpet with a professional vacuum, professional equipment.

Q    Was anyone else there?

Did he tell you whether or not anyone else was there?

A    I don't remember.

Q    When did he get home to the Lindley -- I'm sorry.  Let me back up.  You said he was at a house.

What house was this at that they were cleaning?

**DRAFT COPY**

A     Yes.

          THE COURT:  Let me interrupt.  Shouldn't you establish how old she is at the present time so that we can see whether or not the diary entries are, in fact, relevant?

BY MS. DeWITT:

Q     Ms. Solovyeva, how old are you now?

A     Thirty-one years old.

Q     And Ms. Solovyeva, approximately when did you stop keeping a diary?

A     In 2001.

Q     When in 2001?

A     At the end of April of 2001.

Q     So Ms. Solovyeva, is it accurate to say that you stopped keeping a diary approximately five to six months before any of the events that you've testified about here today?

A     Yes.

          MS. DeWITT:  Your Honor, could we approach the side bar for just a second?

          THE COURT:  All right.  I'll see you at side bar.

     (Bench conference from 2:14 to 2:19 p.m. was omitted)

BY MS. DeWITT:

Q     Ms. Solovyeva, after the overnight trip that you testified that Defendant Kadamovas took following the Kharabadze and Safiev kidnapping, did Defendant Kadamovas tell you about any additional efforts that he undertook to collect more money in

**DRAFT COPY**

Solovyeva - Cross / By Mr. Callahan          97

Agreement, the first step that has to take place is for someone
from this table to request of the judge to lower that sentence.

A    I do understand that I have to fully cooperate with the
prosecution.

Q    Now, in addition to the federal Plea Agreement that you
signed, you've also signed a state Plea Agreement; is that
right?

A    Correct.

Q    All right.  And you pleaded guilty -- and we talked about
it a little bit -- but as to two counts of first-degree murder
in state court; is that right?

A    I'm sorry; could you repeat the question, please?

Q    Of course.

        You pleaded guilty to two counts of first-degree
murder in that case.

A    Yes.

Q    And in that agreement you've also agreed to cooperate with
the state authorities, correct?

A    Correct.

Q    And if all goes well for you, the state will allow you to
withdraw your plea of guilty and instead enter a plea of guilty
to two counts of voluntary manslaughter?

A    Yes, with full cooperation and through full testimony.

Q    All right.  And the agreed-upon --

A    These were the stipulations.

**DRAFT COPY**