# GOVERNMENT EXHIBIT 33

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

# DRAFT COPY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO:  CR-02-220(B)-DT |
| | ) | |
| Plaintiff, | ) | CRIMINAL |
| | ) | |
| vs. | ) | Los Angeles, California |
| | ) | |
| IOURI MIKHEL, | ) | Friday, December 8, 2006 |
| JURIJUS KADAMOVAS, | ) | ( 9:28 a.m. to 11:43 a.m.) |
| | ) | ( 1:15 a.m. to  3:55 p.m.) |
| Defendants. | ) | |

JURY TRIAL (51st DAY)
(VOLUME LI)

BEFORE THE HONORABLE DICKRAN TEVRIZIAN,
UNITED STATES DISTRICT JUDGE

EXCEPTIONAL REPORTING SERVICES, INC
14493 SOUTH PADRE ISLAND DRIVE
SUITE A-400
CORPUS CHRISTI, TX 78418-5940
361 949-2988

Hollett - Direct / By Ms. Meyer                    37

**DIRECT EXAMINATION**

**BY MS. MEYER:**

Q    Good morning, sir.

Where do you work?

A    I work at the Federal Correctional Institute in Edgefield, South Carolina.

Q    What is your title?

A    I am a lieutenant.

Q    In charge of what?

A    I make shift supervisor.

Q    Lieutenant Hollett, in March of 2003, where did you work?

A    I worked at the Metropolitan Detention Center in Los Angeles, California.

Q    And what did you do there?

A    Again, I was a shift supervisor, lieutenant.

Q    How long have you worked in total for the Bureau of Prisons?

A    In January, it will be 18 years.

Q    When you were working at the Metropolitan Detention Center, the MDC here in Los Angeles, do you recall an incident that occurred in March of 2003?

A    Yes.

Q    What happened?

A    We had an escape attempt.

Q    Were you working the day that the escape attempt was

**DRAFT COPY**

discovered?

A    I was not.

Q    When you next came on shift, did you play a role in the investigation and collection of evidence related to the escape attempt?

A    Yes, I did.

Q    What did you do?

A    I searched -- I was ordered to search cell 533 on Five South.

Q    When did you conduct that search?

A    On March 10th, 2003.

Q    Did you know who occupied that cell?

A    Not till later.

Q    And who did you find out occupied that cell later on?

A    Inmates Shultz and Cook.

Q    And how did you determine that?

A    Through our institutional rosters.

Q    Did anyone else conduct the search of cell 533 with you?

A    Officer Medina did.

Q    Now, when you searched cell 533, did you notice anything unusual?

A    Yeah.  While conducting the search, I noticed that the window was loose in its frame.

Q    Did you notice anything about the screws around the window?

**DRAFT COPY**

Hollett - Direct / By Ms. Meyer                39

A    There was one missing on the -- one of the sides.  And some of the other ones had some fresh paint on them.

Q    And what about the screws that were remaining; did you notice whether or not they were loose?

A    Some of them were loose.  I removed some of them, and I retrieved a tool from our tool room to remove the others.

Q    Now, when you said you removed some of them; did you mean with your fingers?

A    Yes.

Q    Is that normal?

A    No.

Q    Could you describe that for the jury?

A    The window is part of our security features of our building.  Without the one, it would allow access to the outside.  And that's not allowed.

        THE COURT:  What was the size of this window?

        THE WITNESS:  It's approximately five and a half inches wide.  I don't know how tall.

        THE COURT:  Approximately how tall; do you remember?

        THE WITNESS:  It's two and a half feet, maybe three.

BY MS. MEYER:

Q    Lieutenant Hollett, could you please take a look at what's been marked for identification as Government's Exhibit 895.

        MS. MEYER:  And, your Honor, could I please have the computer mode.

**DRAFT COPY**

Hollett - Direct / By Ms. Meyer                40

BY MS. MEYER:

Q    Lieutenant Hollett, do you recognize that exhibit?

A    Yes.

Q    What is it?

A    These are pictures taken of the cell that Mr. Medina and I searched?

Q    Cell 533?

A    Correct.

        MS. MEYER:  Your Honor, at this time the Government admits Government's Exhibit 895 into evidence.

        THE COURT:  895 received this date.

        **(Government's Exhibit Number 895 was received in evidence)**

        MS. MEYER:  And, your Honor, I'd like to now publish that to the jury.

        THE COURT:  Anything that's admitted, you may publish.

        MS. MEYER:  Thank you, your Honor.

        I'm going to enlarge the second and third picture on this piece of paper, Lieutenant Hollett.

BY MS. MEYER:

Q    Could you describe for the jury what is shown in the picture on the top?

A    This first picture is a picture of the cell from the doorway showing the window that I removed from the cell.

Q    And that appears to be the bed frame in front of the

**DRAFT COPY**

Hollett - Direct / By Ms. Meyer                    41

window; is that right?

A     Correct.

Q     And is that bolted to the cell?

A     It's bolted both to the walls and to the floor.  And it stretches from wall to wall.

Q     About how much space was between the bed frame and the --

A     There's none.

Q     I'd now like to focus on the bottom picture in that exhibit.

          What's depicted there?

A     This is a picture of the 13 screws that were removed from the window, minus the one that wasn't there, and the bottom piece of the frame that would fit right in this bottom section of the window.

Q     Going through the pictures on the second page of that picture, Lieutenant Hollett, could you describe what the jury sees from top to bottom?

A     The first picture is the picture of the window with the glass removed showing that you can have access to the outside. The second --

Q     The -- go ahead.

          The second picture?

A     The second picture shows the window still in place and just its relationship to the bed and the cell.  The third picture is the one screw that was missing from the window

**DRAFT COPY**

Hollett - Direct / By Ms. Meyer                42

before we removed it.

Q    And it's a little bit dark on there.

Could you circle where --

A    Yeah.

Q    -- the screw is missing?

A    Right there.

Q    And is that where you saw some fresh paint?

A    Yeah.  There was fresh paint inside of the indentation of the bracket that holds that in.

Q    Lieutenant Hollett, could you please now take a look at what's been marked for identification as Government's Exhibits 888 and 888-A.

A    Okay.

Q    Lieutenant Hollett, do you recognize Government's Exhibit 888?

A    Yes.  These are the 13 screws that I removed from the window.

Q    In cell 533?

A    Yes.

Q    And what about Government's Exhibit 888-A?

A    This is a close-up of the previous bottom picture of the 13 screws.

MS. MEYER:  And, your Honor, at this time the Government moves Government's Exhibits 888 and 888-A into evidence.

**DRAFT COPY**

Hollett - Direct / By Ms. Meyer                    43

THE COURT:  Received.

(Government's Exhibits Numbers 888 and 888-A were received in evidence)

MS. MEYER: Lieutenant Hollett, could you please publish Government's Exhibit 888 to the jury while I publish Government's Exhibit 888-A.

BY MS. MEYER:

Q    Now, Lieutenant Hollett, could you describe what you mean by the security screw.  What is it about it that makes it a security screw?

A    These security screws are called torques-head security screws.  They have a small pin on the inside of it.  And the tool used to remove them has a small hole on the inside of it. So when you match the two together, they create a tight fit. And you're allowed to remove the screw or tighten the screw. If you use a regular torques-head bit, it would not allow you entry into it.  It wouldn't allow you entry with a regular Philips head either.

Q    Lieutenant Hollett, in the prior exhibit we saw that you had removed the window.

Did you notice anything outside of the window?

A    When I looked out onto the flower bed on the outside of the building, I noticed an item on the flower bed.  I was sure what it was at the time.

Q    Did you go outside and investigate?

**DRAFT COPY**

Hollett – Direct / By Ms. Meyer                    44

A    I did.

Q    What'd you find?

A    Some string hanging off the flower bed right below cell 533.

Q    Could you please take a look at what's been marked for identification as Government's Exhibit 877.

Do you recognize that exhibit, Lieutenant Hollett?

A    Yes.  These are the pictures that were taken outside of the institution in the courtyard between the Roybal Building and the MDC.

**MS. MEYER:**  Your Honor, at this time the Government moves Government's Exhibit 887 into evidence.

**THE COURT:**  Received.

**(Government's Exhibit Number 887 was received in evidence)**

**MS. MEYER:**  And now I'm going to publish those photographs for the jury.

Lieutenant Hollett, I'm going to see if I can make these a little bit more viewable for the jury.

**BY MS. MEYER:**

Q    What's this first picture depict?

A    This is a picture of me standing on top of the flower bed pointing to the area where I found the string below cell 533 on Five South.

Q    And which cell is 533?

A    533 is this one right here with the light on that you can

**DRAFT COPY**

Hollett - Direct / By Ms. Meyer                    45

barely see.

Q    What about this second picture?

A    This is a picture of the string that was found in the flower bed as it sat.

Q    And is the bottom picture just a picture of it later? A    This is a picture of it in the lieutenant's office when we recovered it.

Q    About how long was that string?

A    It was later measured to be about 59 feet.

Q    Looking at the second page of that exhibit, what does that depict?

A    This is a picture of the flower bed looking towards Alameda Street with the MDC on the left side and the Roybal Building on the right side.

Q    And what about the third picture in that exhibit?

A    This is a picture of the small courtyard that's below the steps of the Roybal Building between the MDC and the flower bed.

Q    And can you see the flower bed in this photograph?

A    The flower bed is this brick wall that runs the length over in here.

Q    Lieutenant Hollett, could you now take a look at what's been marked for identification as Government's Exhibit 886.

     Do you recognize that exhibit?

A    Yes.

**DRAFT COPY**

Hollett - Direct / By Ms. Meyer                46

Q    What is it?

A    This is the actual string that I found on top of the flower bed.

        MS. MEYER:  Your Honor, at this time the Government moves Government's Exhibit 886 into evidence.

        THE COURT:  Received.

    **(Government's Exhibit Number 886 was received in evidence)**

        Lieutenant Hollett, could you please publish that string for the jury.

**BY MS. MEYER:**

Q    Lieutenant Hollett, did you have an opportunity prior to testifying here today to compare this string to string taken from cell 518?

A    Yes, I did.

Q    Could you please take a look at Government's Exhibit 846, which has already been admitted into evidence, keeping Government's Exhibit 886 in front of you.

        Lieutenant Hollett, did you draw any conclusions when you compared the string that you found outside cell 533, Government's Exhibit 886, to the string found in cell 518, Exhibit 846?

A    Yes.  They appear to be the same.

        MS. MEYER:  Could you please hold that up for the jury.  Thank you.

        No further questions for this witness, your Honor.

**DRAFT COPY**

States calls Officer Lorenzo Cervantez to the stand.

**(Pause)**

THE COURT:  Please come forward.

The Clerk has stepped out.  Sir, I'm going to swear you as a witness.  If you'll raise your right hand.

**(Witness sworn)**

Please have a seat on the witness stand.

State your first and last name, spelling both names.

THE WITNESS:  My name is Lorenzo Cervantez.  First name is spelled L-o-r-e-n-z-o.  Last name is spelled C-e-r-v-a-n-t-e-z.

MS. MEYER:  Thank you, your Honor.

**DIRECT EXAMINATION**

**BY MS. MEYER:**

Q    Good morning, sir.

Where do you work?

A    Good morning.

I work at the Metropolitan Detention Center here in downtown Los Angeles.

Q    And what do you do at the Metropolitan Detention Center?

A    I worked in a Special Investigation Section.

Q    What's your title?

A    I'm a senior officer specialist.

Q    And how long have you worked at the BOP?

A    Twelve years and two months.

**DRAFT COPY**

Cervantez - Direct / By Ms. Meyer          51

Q    Were you working on March 7th, 2003?

A    Yes, I was.

Q    Are you aware of an incident that occurred that day at the MDC?

A    Yes, I am.

Q    Can you tell the jury about that?

A    Yes.  I was in the telephone room monitoring live inmate telephone conversations.  And I received a telephone call from Officer Truijillo at which time he informed me of a possible escape attempt that was to take place sometime that evening.

Q    What did you do when you received this information?

A    He also informed me to report to the third floor lieutenant's office to be briefed as to the situation at hand.

Q    And after you were debriefed, what did you do?

A    We went up to the fifth floor housing unit Five South, to be specific, cell number 518.

Q    What did you do at cell 518?

A    Officers De La Mora and Officer Truijillo entered the cell and began a cell search while I stood outside the cell.

Q    After you watched the search for a little bit, what did you then do?

A    I was then ordered by S.I.A. Martin Battley to return to the telephone room and to begin pre-recorded monitoring calls from four inmates.

Q    And who were those inmates?

**DRAFT COPY**

Cervantez - Direct / By Ms. Meyer                52

A    The inmates were inmates Krylov, inmates Kadamovas, inmate Mikhel, and inmate Tuinan.

Q    And would that be Tom Tuinan?

A    Yes, it would.

Q    Subsequent to this, did you have an opportunity to search Mr. Mikhel's personal property?

A    Yes, I did.

Q    Who instructed you to search his property?

A    Special Investigative Agent Marvin Battley.

Q    When did this occur?

A    This occurred on March the 3rd, 2003.  I received a telephone call from Special Agent Battley that the FBI had previously searched inmate Mikhel's property, which was located on the second floor in the associate warden's complex.

Q    Officer Cervantez, you said that you learned of the escape attempt on March 7th.

       Did you search his property not on March 3rd, but on --

A    Oh, yes.  I stand corrected.  It was March 7th.

Q    Sometime after the escape attempt was discovered?

A    Yes.

Q    Tell the jury where this evidence was kept again?

A    In the second floor the associate warden's complex in the evidence locker.

Q    Can you please take a look at what's been marked for

**DRAFT COPY**

Cervantez - Direct / By Ms. Meyer          53

identification as Government's Exhibit 880.

A     This is a photograph of Mikhel's property.  Specifically the box on the table contains the shoe box where I found an Allen wrench.  The shoe box was initially in a plastic bag with other articles.  And the plastic bag also contained an inventory form containing Inmate Mikhel's name.

          **MS. MEYER:**  Your Honor, at this time the Government moves Government's Exhibit 880 into evidence.

          **THE COURT:**  Received, 880.

      **(Government's Exhibit Number 880 was received in evidence)**

          **MS. MEYER:**  And I'm now publishing Government's Exhibit 880 for the jury.

**BY MS. MEYER:**

Q     So, Officer Cervantez, is this the property that you searched?

A     Yes, it is.

Q     Now, you said that you found an Allen wrench.  Can you circle where you found that Allen wrench.

A     Yes.  The Allen wrench was located inside the shoe box right here.

Q     Now, take a look at what's been marked for identification as Government's Exhibit 881.

          **THE COURT:**  What about 881-A?

          **MS. MEYER:**  And 881-A.

          Thank you, your Honor.

**DRAFT COPY**

Cervantez - Direct / By Ms. Meyer                54

THE WITNESS:  This is the --

BY MS. MEYER:

Q    Oh.  Officer Cervantez, could you tell the jury -- or do you recognize Government's Exhibit 881?

A    Yes, this is the Allen wrench that I found located in the shoe box.

Q    And what is Government's Exhibit 881-A?

A    881-A is a photograph that I took of the Allen wrench located in the shoe box.

        MS. MEYER:  Your Honor, at this time the Government moves Government's Exhibits 881 and 881-A into evidence.

        THE COURT:  Received.

    **(Government's Exhibits Numbers 881 and 881-A were received in evidence)**

        MS. MEYER:  Officer Cervantez, could you publish Government's Exhibit 881 for the jury, the Allen wrench.

BY MS. MEYER:

Q    So it's an L-shaped tool?

A    Yes, it is.

Q    Now, on one of the ends, does it have like a dimple or a hole in it?

A    Yes, it is indented in one of the ends, right here.

        MS. MEYER:  Your Honor, I'm now going to publish Government's Exhibit 881-A for the jury.

//

**DRAFT COPY**

Cervantez - Direct / By Ms. Meyer                    55

**BY MS. MEYER:**

Q     Officer Cervantes, starting at the top picture, could you describe what is shown there?

A     Yes.  The top photograph shows the location of the Allen wrench as I found it.

Q     What about the middle and bottom picture?

A     The middle one shows the indention of the Allen wrench on one end.  And the lower photograph shows the length of the Allen wrench.

Q     Now, Officer Cervantez, were you able to determine what this tool could be used for?

A     Yes.  Having prior knowledge --

            **MR. RUBIN:**  Objection.  Speculation.

            **THE COURT:**  No.  Overruled.

            Go ahead.

            **THE WITNESS:**  Yes.  Having prior knowledge of other cells having the security screws removed to remove the windows from them, I basically knew this tool could have been used for that purpose.

**BY MS. MEYER:**

Q     Prior to testifying here today, have you had an opportunity to insert that Allen wrench, Government's Exhibit 881, into security screws taken from cell 533 to see if they fit?

A     Yes, I have.  Uh-huh.

**DRAFT COPY**

Cervantez - Cross / By Mr. Rubin          56

Q    Could you please take a look at Government's Exhibit 888, keeping Government's Exhibit 881 in front of you.

THE COURT:  All right.  888 is previously received.

(Pause)

BY MS. MEYER:

Q     Officer Cervantez, could you remove one of the Security screws from that packet?

A    Yes.

Q    And at this time could you take that L-shaped tool and see if it fits into that security screw?

A    Yes, it fits.

Q    And does it turn it?

A    And yes, it turns.

MS. MEYER:  Thank you, Officer Cervantez.

Your Honor, I have no further questions for this witness.

THE COURT:  Mr. Rubin?

CROSS EXAMINATION

BY MR. RUBIN:

Q    Good morning, sir.

A    Good morning.

Q    Are you familiar with a security torque's tip screwdriver?

A    Yes, I am.

Q    Do you maintain those in the institution?

A    In the tool room.

DRAFT COPY

Cervantez - Cross / By Mr. Rubin          57

Q    Is what you have there a security torque's tip screwdriver?

A    No, it's not.

Q    So that, the tool that you have in front of you, is just a normal tool that anyone can buy in any hardware store?

A    This tool is considered a security tool here.  The ones you can buy in a hardware store -- I've never seen these in a hardware store.

Q    All right.

A    But the regular ones are solid.  As far as the indention makes it a security tool.

Q    Okay.  And so what you're holding there is manufactured as some sort of a security tool?

A    Yes.  I would imagine, yes.

Q    Okay.  But it's not like the security tools that are maintained in the institution, the MDC?

A    No, it is not.

Q    Okay.  And you had never seen a wrench like that before in the institution?

A    No, I have not.

        **MR. RUBIN:**  All right.  Thank you, sir.

        **MR. LASTING:**  No questions.

        **MS. MEYER:**  No questions, your Honor.

        **THE COURT:**  You may stand down.

        Your next witness?

**DRAFT COPY**

58

MR. DUGDALE:  Yes, your Honor.

The United States calls Robert Schneider.

MR. LASTING:  Your Honor, could we approach the bench on sidebar?

THE COURT:  Yes.

(Begin bench conference at 10:35 a.m.)

MR. LASTING:  Your Honor, this is the correctional officer who was given the magazine by Mr. Mikhel at some time after the escape attempt had been foiled.  And it had a note in it, which is written in Russian.  I don't have any objection to this evidence, but I think that at some point the Government's going to try to introduce the contents of that note.  I don't think this witness will be able to it, because I don't think he speaks Russian.

THE COURT:  I agree with you.

MR. DUGDALE:  No.  He's not going to.

THE COURT:  On the witness list it says that the -- what's her name?

MR. DUGDALE:  Anna Mahli is the one that --

THE COURT:  Mahli.

MR. DUGDALE:  She will translate this thing.

MR. LASTING:  I just wanted to alert the Court that before that happens, we have an objection that it would be denial of right to confront and cross-examine the witness, because it's Mr. Mikhel's writing on there.  And absent his

59

taking the stand to testify before the jury on his version of events, I would object to that --

THE COURT:  It's a voluntary statement.  It's a written, voluntary statement that's made that was intercepted.  I don't see that there's any --

MR. LASTING:  But it indicates Mr. Kadamovas by inference.  And I think it would be a denial of our right to cross-examine, if we get to that.  I guess it's not going to happen with this witness.  I just wanted to raise the issue.

THE COURT:  I understand.  Well, we'll talk about it later.  But it really it's a statement that's made in furtherance of a conspiracy.

MR. DUGDALE:  The letter actually makes that fact very clear, your Honor.

THE COURT:  I understand.

We'll talk about it later.

MR. LASTING:  Okay.  That's fine.

**(End of sidebar discussion at 10:37 a.m.)**

THE COURT:  The Clerk has stepped out.  I'm going to swear you as a witness, sir.  Please raise your right hand.

**(Witness sworn)**

Please have a seat on the witness stand.

State your first and last name, spelling both names.

THE WITNESS:  Okay.  First name Ronald, last name Schneider; R-o-n-a-l-d, S-c-h-n-e-i-d-e-r.

**DRAFT COPY**

Schneider - Direct / By Mr. Dugdale                    60

**DIRECT EXAMINATION**

**BY MR. DUGDALE:**

Q    Good morning, Mr. Schneider.

A    How are you?

Q    Great.  Thank you.

What do you do for a living?

A    I'm a federal correctional officer.

Q    And how long have you been a correctional officer?

A    Eighteen years.

Q    And what are your duties as a correctional officer currently at the MDC?

A    Just to make sure that we -- to protect and make sure that the inmates are held safely at the institution.

Q    And where did you start your career as a correctional officer?

A    FCI Terminal Island.

Q    And how long were you at Terminal Island?

A    One year.

Q    And that's a federal prison as opposed to a detention facility like MDC, correct?

A    Yes, sir.

Q    And after you were at that prison for one year, where did you go after that?

A    MDC LA.

Q    So you've been there for the past 16 years or so; is that

**DRAFT COPY**

Schneider - Direct / By Mr. Dugdale          61

right?

A     That's correct.

Q     I'm going to take you now to the afternoon of March 26th, 2003.  I know that's a long time ago.

          But what was your assignment that day?

A     On that particular day, I was working on the special housing unit at MDC LA.

Q     And can you explain to the jury what the special housing unit is?

A     The special housing unit is called -- it's a place where we keep the inmates that are brought up that may have had fights.  We keep high custody inmates and if certain things are found in inmate cells that shouldn't be there -- it's basically a place for disciplinary people and such.

Q     Okay.  And does the special housing unit have different sections to it?

A     Yes, sir.

Q     And how are those different sections identified?

A     Well, we call the section ranges.  Basically, it's just four hallways with maybe 10 cells per hall -- I mean on each hallway.  And it's in four sections, basically, two on each side.

          When you walk into the shoe unit, you have a place where the officers sit and two hallways on each side.

Q     So you basically have four different hallways branching

**DRAFT COPY**

Schneider - Direct / By Mr. Dugdale                62

off from a central location?

A    That's correct.

Q    Is that right?

A    Right.

Q    And are these four hallways, are they given different names?

A    Yes.  You have -- when you first walk in, it's A range, B range, C and D changes.

Q    And on March 26th of 2003, was an inmate named Iouri Mikhel housed in the shoe unit?

A    Yes, sir.

Q    Do you remember which range he was in?

A    He was on D range.

Q    And were you -- you were working the shoe unit that day?

A    Yes, I was.

Q    And when you were conducting your rounds that day in the shoe, did Defendant Mikhel speak to you from his cell?

A    Briefly that morning, yes.  He asked -- he spoke to me briefly about just giving an inmate a magazine.

Q    Okay.  And so he was inside his cell, and you were walking out in the hall?

A    Right.

Q    Is that right?

A    Right.

Q    And he asked you to deliver a magazine to another

**DRAFT COPY**

Schneider - Direct / By Mr. Dugdale                63

person --

A     That's correct.

Q     -- basically?

What did you tell him when he first asked you to deliver that magazine?

A     Well, being that the shoe was kind of busy, I just told him, you know, I was kind of busy and I'd try to get back with him, you know, a little later or whatever.

Q     Okay.  And did you in fact go back to him later?

A     Well, I didn't -- when I went back passing through the range, I passed by his cell.  And, you know, that's when I encountered him again.

Q     Okay.  So you didn't go back specifically to talk to him or anything?

A     No.

Q     You just happened to be walking back later; is that right?

A     Exactly, right.

Q     And when you came back the second time, did he ask you to do something again?

A     Well, the same thing that he asked prior, to just, you know, if I could give the magazine to an inmate on another range.

Q     Okay.  What was the other range that he wanted you to deliver the magazine to?

A     If I recall correctly, I think it was B range.

**DRAFT COPY**

Schneider - Direct / By Mr. Dugdale                64

Q    Did you create a report of this incident after it happened?

A    Yes, I did.

Q    And if you reviewed your report, do think you could properly recollect where he asked you to send that magazine?

A    Yes, sir.

        **MR. DUGDALE:**  Your Honor, may I approach?

        **THE COURT:**  You may.

**BY MR. DUGDALE:**

Q    And, Mr. Schneider, just for the record, what did I just hand you there -- or Special Agent Davidson just hand you?

A    This is a memorandum that I wrote regarding the incident.

Q    Okay.  And was this memorandum written within a week of when the incident happened?

A    Yes, it was.

Q    Okay.  And by reviewing that, can you tell what range the inmate was in that Mr. Mikhel asked you to deliver the magazine to?

A    Yeah.  Inmate Mikhel was on D range.

Q    And where did he ask you to deliver the magazine?

A    B range.

Q    He asked if you could give somebody -- I'm sorry.
        B range or C range?

A    I'm sorry.  It was C range.  I'm sorry.

Q    Okay.  And when Mr. Mikhel asked you to deliver this

**DRAFT COPY**

Schneider - Direct / By Mr. Dugdale                65

magazine to the C range of the unit -- and, again, the C range is another unit within the special housing unit; is that right?

A    That's correct?

Q    It's one of those four hallways that comes off the center?

A    Correct.

Q    Okay.  What did you do when he asked you the second time to deliver that magazine?

A    Well, I took the magazine.  He slid the magazine under the door.  And, you know, I just took the magazine from him.

Q    Okay.  And did you take that magazine with the intention of delivering it to this person?

A    No.  I took it -- no, not with the intention of delivering the magazine, no.

Q    Okay.  Why did you take the magazine from him?

A    Well, being that he asked earlier to give the magazine to someone else, I just, you know, suspected with working in the shoe that's one way that inmates usually pass contraband.  And I just had a hunch that, you know, it was probably something in there that he wanted an inmate to have.

Q    Okay.  And after he slid the magazine, was there, in fact, something in there?  Were your suspicions correct?

A    They were correct, right.

Q    And what was inside the magazine that he passed?

A    It was an envelope inside the magazine.

Q    Okay.  What did you do with that envelope and magazine

**DRAFT COPY**

Schneider - Cross / By Mr. Rubin                66

after you got it from Defendant Mikhel to pass to that other inmate?

A    When I got the magazine, I just -- I felt the -- what obviously was something in there, and I just -- I took it out and gave it to the supervisor in charge in the housing unit, which was a Lieutenant Bell.

Q    Okay.  And do you know was that envelope then passed on to Lieutenant Harlien, who was the special investigative --

A    That's correct --

Q    -- person at MDC?

A    Yes.

Q    So it went from you to Bell to Harlien; is that correct?

A    That's correct, right.

Q    And after it was passed to Lieutenant Harlien, did he have you write that memo that you've looked at?

A    That's correct.

        MR. DUGDALE:  Thank you, your Honor.  I have no further questions.

        THE COURT:  Mr. Rubin?

        MR. RUBIN:  Yes.  Thank you, your Honor.

                    CROSS EXAMINATION

BY MR. RUBIN:

Q    Good morning, sir.

A    How are you.

Q    I'm okay.

DRAFT COPY

Tuinan - Direct / By Ms. DeWitt                71

THE WITNESS:  Sabrina Tuinan.  My first name is spelled 'S-a-b-r-i-n-a'.  Last name 'T-u-i-n-a-n'.

THE CLERK:  Thank you.

**DIRECT EXAMINATION**

**BY MS. DEWITT:**

Q    Ms. Tuinan, what do you do for a living?

A    I'm an executive assistant at a mortgage company.

Q    And what did you do for a living in late 2002 and early 2003, that time period?

A    I was a stay-at-home mom.

Q    You weren't working at that time?

A    No, I was not.

Q    What was your financial situation at that time?

A    I was very strapped.  I was being evicted out of my apartment with my son.

Q    Do you know a person by the name of 'Thomas Tuinan'?

A    Yes, I do.

Q    How do you know him?

A    He's my ex-husband.

Q    Was he your husband in 2002/2003?

A    Yes, he was.

Q    Do you know a person by the name of Michael Tuinan?

A    Yes, I do.

Q    How do you know him?

A    He's my ex-husband's brother.

**DRAFT COPY**

Tuinan - Direct / By Ms. DeWitt                72

Q    In late 2002 and early 2003, was Tom Tuinan incarcerated?

A    Yes, he was.

Q    Where was he incarcerated?

A    MDC Los Angeles.

Q    And is that the facility that's right next to the courthouse?

A    Yes, it is.

Q    And when you refer to the MDC, you mean the Metropolitan Detention Center?  That's what you're referring to?

A    Yes.

Q    What was Tom Tuinan incarcerated for at that time, in late 2002 and early 2003?

A    Counterfeiting money.

Q    Did Tom Tuinan approach you at some time to help with an escape attempt from the Metropolitan Detention Center?

A    Yes, he did.

Q    When was this?

A    Late November, early December, of 2003.

Q    I'm sorry, 2000?

A    Sorry.  2002.

Q    So, late 2002?

A    Yes.

Q    When Tom Tuinan first approached you about helping with an escape attempt, what did he tell you he wanted you to do?

A    He was very vague.  He started to describe a money-making

**DRAFT COPY**

Tuinan - Direct / By Ms. DeWitt                73

opportunity, and then I cut him off.

Q    Just to be clear.  At the time that he approached you,
with respect to your situation, he was in jail, is that right?

A    Yes, he was.

Q    You weren't working?

A    Right.

Q    And you had a newborn baby?

A    Yes, I did.

Q    At the time what did he tell you he wanted you to do with
respect to the escape plan?

A    When he first brought it up, he was very vague.  He just
started to mention something about a money-making opportunity
with regards to somebody that he was in jail with at the time.
But I cut him off, because I didn't want to hear about it, and
he didn't bring it up again for several weeks.

Q    When he brought it up again, was he less vague about what
he wanted you to do?

A    Yes, he was.

Q    What did he tell you at that time?

A    He mentioned at that time that he was looking to get
involved in an escape attempt involving his current cell mate.

        He wanted me to purchase some cell phones and use
some money that was going to be sent to me to bring out his
brother, Michael, so that Michael could purchase and deliver
some tools to MDC.

**DRAFT COPY**

Tuinan - Direct / By Ms. DeWitt          74

Q    Did Tom Tuinan tell you specifically who you were supposed to be helping to escape?

A    Yes, he did.

Q    Who were you supposed to be helping to escape?

A    His cell mate, Iouri Mikhel.

Q    Did you learn at some point that there were other people in addition to Mr. Mikhel that were part of the escape plan?

A    Yes.  He mentioned that there were two other co-defendants on Mr. Mikhel's case, a gentleman named Peter, and another gentleman also named Juri.

Q    Now, you mentioned that - The initial person you mentioned was Iouri Mikhel, and he was his cell mate.

A    Yes.

Q    Was he always Tom Tuinan's cell mate?

A    No.  At one point he was transferred to another floor.

Q    Okay.  But at the time that he initially approached you, that Tom Tuinan initially approached you, they were cell mates?

A    Yes.

Q    And what did Tom Tuinan tell you about his former cell mate, Iouri Mikhel?

A    He told me that he was a computer hacker.

Q    That's what you understood he was in custody for?

A    Yes.

Q    Did he tell you anything else about his cell mate?

A    That he had a lot of money, yachts in Europe, that he

**DRAFT COPY**

Tuinan - Direct / By Ms. DeWitt                    75

owned a business in LA or Long Beach, and that his wife lived

in London.

Q    Now, you mentioned that you understood from Tom Tuinan

that Iouri Mikhel and his two co-defendants, people that you

knew only by the name, Juri and Peter, were involved.

Did you understand that there were other individuals

who might be involved in this escape plan?

A    Yes.  He mentioned a gentleman named Harold Wilson, and

someone else, another gentleman by the last name of 'Silva'.

Q    Ms. Tuinan, when you were approached with this more

detailed information about the escape plan, did you agree to

help?

A    Yes, I did.

Q    In fact, Ms. Tuinan, at some point you were arrested for

your involvement in connection with this escape attempt, right?

A    Yes, I was.

Q    When were you arrested in connection with this escape

attempt?

A    May 9th, 2003.

Q    And what were you actually charged with?

A    Conspiracy to assist in a prison escape attempt.

Q    Was Tom Tuinan, your ex-husband, and Michael Tuinan, his

brother, also charged in connection with that escape attempt at

that time?

A    Yes, they were.

**DRAFT COPY**

Tuinan - Direct / By Ms. DeWitt                    76

Q    And Ms. Tuinan, did you plead guilty to conspiracy to
assist in an escape attempt?

A    Yes, I did.

Q    And that was an escape attempt involving the people that
you've identified?

A    Yes, it was.

Q    When were you sentenced in that case, Ms. Tuinan?

A    February of 2004.

Q    So, your case, as far as you're concerned, is resolved in
terms of sentencing, pleading guilty, and that process?

A    Yes, it is.

Q    And, Ms. Tuinan, are you testifying here today pursuant to
a subpoena?

A    Yes, I am.

Q    Did the Government promise you anything in exchange for
your testimony today?

A    No.

Q    Why did you agree to testify, Ms. Tuinan?

A    It gave me the opportunity to make this right.

Q    Now, Ms. Tuinan, you testified that you were initially
told when you were approached about helping with this escape
attempt, that Mr. Mikhel was a computer hacker.

        At some point did you find out why Iouri Mikhel was
really in jail?

A    Yes, I did.

**DRAFT COPY**

Tuinan - Direct / By Ms. DeWitt                    77

Q    When was that?

A    After I was arrested.

Q    So, after you were arrested, after you're charged and actually involved in your own case?

A    Yes.  I had been arrested and then extradited back down to Los Angeles.  And when I met with my attorney, he finally told me then.

Q    Now, let's go back to the escape attempt.

     You said that you agreed to help with the plan.

     Did you expect to get paid for helping with this escape attempt?

A    Yes, I did.

Q    How much did you expect to get paid?

A    One million dollars.

Q    Did you, in fact, Ms. Tuinan, during the course of assisting in this escape attempt, actually receive any money?

A    Yes, I did.

Q    How much money did you receive?

A    A total of approximately $25,000.

Q    And you say 'a total'.  Was there more than one payment made to you?

A    Yes, there was.  There was two.

Q    And we'll go back over this in a little bit more detail later.

     But can you just generally tell the Jury how many

**DRAFT COPY**

Tuinan - Direct / By Ms. DeWitt                78

payments you got and approximately how much each of those

payments were?

A    I received one payment by check for $6,500, and another

payment by wire transfer for 19,000 and some change.

Q    And approximately when were those two payments made?

A    The first payment was in late January.  The second payment

was in mid-February.

Q    Ms. Tuinan, at some point did you get additional detailed

information about the escape plan?

A    Yes, I did.

Q    Can you tell the Jury what the escape plan was, as far as

you understood, after you got this detailed information?

A    It was a three-stage plan.  The first were some cellular

phones to be purchased and delivered to MDC by Mike Tuinan

through a window.

        The second stage would be the delivery of some

assorted requested tools.

        And then the third stage was a delivery of a

hydraulic pump, then to be followed by the actual escape that

evening.

        And then the individuals escaping were going to go

stay at a safe house.

Q    Okay.  And when you mentioned the third delivery involving

the hydraulic pump, was anything supposed to be delivered,

according to the plan, together with the hydraulic pump?

**DRAFT COPY**

Tuinan - Direct / By Ms. DeWitt                79

A     Yes.  Some uniforms and some rappelling gear.

Q     Okay.  And going back to the tools.  You mentioned that there were supposed to be different deliveries of tools.

What were the tools going to be used for, as you understood?

A     To cut through a wall that led to a stairwell.  And then the hydraulic pump was to be used once the individuals got down through the stairwell.

There was a floor of the building that had horizontal bars, and the hydraulic pump was to be used to push open the hydraulic (sic) bars so that people could climb through.

Q     Okay.  So just to be clear.  You understood that the tools were supposed to be used to break through the wall into the stairwell?

A     Yes.

Q     And then they were going to go down the stairwell to another floor?

A     Yes.

Q     And at that floor they were going to use a hydraulic pump to get through some windows on that other floor?

A     Yes.

Q     And what did you understand the plan was for when Mr. Mikhel and his co-defendants, Juri and Peter, got out of the Metropolitan Detention Center?

A     Michael was supposed to have hired a motorcycle gang to be

**DRAFT COPY**

waiting outside.

Q    Let me just interrupt you.  When you say 'Michael', do you mean Michael Tuinan?

A    Yes.

Q    Okay.  Go ahead.

A    Once the individuals rappelled down the side of the building, they were to meet up with the biker gang and jump on the backs of motorcycles and go in different directions.  And then to meet up at a later time at the safe house.

Q    You mentioned that at some point there were supposed to be uniforms delivered.

     Can you explain what the uniforms were for?

A    Yes.  Gray polyester pants, navy blue windbreakers, navy blue ball caps.

     It was intended that should anyone from the street see anyone climbing out the window, those outfits were similar to what's worn by MDC personnel, so that anybody on the street witnessing this would think that it was MDC personnel having a drill, a training exercise.

Q    And why did you understand they needed the rappelling ropes?

A    They realized how far off the ground they were.  It was so that they could safely come down the wall without hurting themselves when they got to the bottom.

Q    Ms. Tuinan, whose escape plan was this?

**DRAFT COPY**

Tuinan - Direct / By Ms. DeWitt                    81

A    Iouri Mikhel's.

Q    And how do you know that it was Iouri Mikhel's plan?

A    Tom told me.

Q    Ms. Tuinan, what were you, yourself, specifically asked to do to assist with this escape plan?

A    I was asked to purchase some cellular phones, to receive money, and then bring Mike Tuinan out from Chicago to Los Angeles, give him the money to purchase the necessary tools, and set him up with a hotel room so he had a place to stay.

Q    Were you supposed to handle the money in connection with all of this on the outside?

A    Yes.  Mike didn't have a bank account, so the money would be sent to me, and then I would give it to him.

Q    And were you also the person who was responsible for sort of coordinating or keeping an eye on Michael Tuinan?

A    I had to pass messages from the jail to Mike and make sure that any questions he had were clarified.

Q    In addition to buying cell phones and tools and coordinating with Michael Tuinan, you mentioned a couple of other items that were part of the plan, or parts or steps in the plan.

        First of all, who was supposed to get the uniforms?

A    I was supposed to get the uniforms.

Q    And who was supposed - You mentioned that after everyone got out they were supposed to be met by a motorcycle gang.

**DRAFT COPY**

Tuinan - Direct / By Ms. DeWitt                82

Who was supposed to make the arrangements for the motorcycle gang to take them away from the institution?

A    Mike was.

Q    Who was supposed to find the safe house?

A    I was supposed to look for a location.

Q    And was somebody supposed to purchase the items, certain items for use in the safe house?

A    Yes.  Mike was.

Q    What did you understand was supposed to be purchased for the safe house?  What items?

A    A tanning bed, a Universal gym, some TVs, just general supplies, furniture, things to make the house livable.

Q    And you mentioned that you were one of the people that was tasked - You were the person who was tasked with looking for a safe house.

Were you given some specific instructions about what to look for or where to look?

A    Yes.  It had to be a house in Orange County on a cul-de-sac.

Q    Now, going back to some of the other things that you said you were tasked with.  You mentioned that you were tasked with buying cell phones.

Did you in fact buy cell phones for use in connection with this escape attempt?

A    Yes, I did.

**DRAFT COPY**

Tuinan - Direct / By Ms. DeWitt                          83

Q    How many cell phones did you buy for use in the escape attempt?

A    Four.

Q    Did you buy all of the phones at the same time?

A    No, I didn't.

Q    How many different times did you go out to buy cell phones?

A    Twice.

Q    Who did you understand those four phones were intended to be used by?

A    The first phone was for Iouri Mikhel.  The second phone was for one of his other co-defendants.  The third cell phone was for Michael Tuinan to be able to communicate with the people on the inside.  And the fourth cell phone was to be kept at home until Tom was released from jail.  And that way, once he was out, he could also have a phone to communicate with everybody.

Q    Okay.  When you mentioned his other cell mate, are you again referring to the person you knew only as 'Peter' and 'Juri'?

A    Yes.  I never knew their last names.

Q    Did you also need to buy air time for use with these phones?

A    Yes, I did.

Q    Can you explain what you mean by that?

**DRAFT COPY**

Tuinan - Direct / By Ms. DeWitt                84

A    It's like a pre-paid calling card, but it's for a cell phone.

And it's really not a card; it's a receipt that you get that has a phone number for you to call in, and it has a PIN number.  And you enter the PIN number, and that credits however many dollars you've purchased to the phone.

I was told to buy it in $100 increments.

Q    And did you in fact do that?

A    Yes, I did.

Q    Did you do that on more than one occasion?

A    Yes, I did.

Q    Ms. Tuinan, can I ask you to now please take a look at what was previously admitted as Government's Exhibit 808.

**MS. DEWITT:**  And if Special Agent Davidson could set that in front of you.

And for the record, your Honor, I'm also publishing this for the Jury to see.

**BY MS. DEWITT:**

Q    Ms. Tuinan, do you recognize this exhibit, what's depicted in this exhibit?

A    Yes, I do.

Q    Can you explain to the Jury what that is as far as you're aware?

A    These are the pre-paid phone minutes.  You can see that it'll say 'product amount' on the far right one.  It says

**DRAFT COPY**

Tuinan - Direct / By Ms. DeWitt          85

'product amount: $100'.

There's a PIN number towards the middle of the receipt, and then directly under the PIN number is the phone number that you would call that in with.

Q    Okay.  And just so that, it's a little hard to see.

And you could actually mark this on the screen if you wanted as well, but let me just see if I can.

Is that the hundred dollar amount that you're referring to?

A    Right.

Q    And is this the PIN number that you're referring to?

A    Yes.

Q    Okay.  And then there's a separate one listed on this one as well, another hundred dollars, and then a PIN number?

A    Right.

Q    Okay.  So, just so that I'm clear and it's clear for the Jury and for the Court.

With this particular type of phone, you don't get a card, you just get a receipt?

A    Correct.

Q    And you use the information off the receipt to make the phone work?

A    Right.

Q    So, instead of paying like a monthly bill, you just get this pre-paid amount of minutes?

Tuinan - Direct / By Ms. DeWitt          86

A     Yes.

Q     Ms. Tuinan, what was your understanding as to why Iouri Mikhel wanted a cell phone, in addition to what you previously testified to, his need to coordinate with Michael Tuinan on the outside?

A     It was so he could arrange for wire transfers so he could call his wife back in London.

Q     You also mentioned that Tom Tuinan was supposed to get a phone for use while he was incar - I'm sorry.  Tom Tuinan was supposed to get a phone.

         When was he supposed to get that phone?

A     He was going to use it after his release.

Q     Okay.  It wasn't for his intended use while he was in custody?

A     No.

Q     When did you actually expect Tom Tuinan at that time to get out of custody?

A     I was being told by his attorney every month that he was coming home, whether it be by a bail hearing.

         And then at one point, he said he had done enough time so that he would be getting time served and coming home.

         Every month I was told he was coming home that month.

Q     So, at least as of that time, when you first became involved in this escape attempt, your understanding or your belief was that Tom Tuinan was going to get out of jail

**DRAFT COPY**

Tuinan - Direct / By Ms. DeWitt                    87

imminently?

A     Yes.

Q     Ms. Tuinan, you mentioned that you bought, I believe you said four cell phones?

A     Yes.

Q     Where did you buy these cell phones?

A     Affordable Portables in Long Beach.

Q     Did you buy all four of the phones there?

A     No.  I know that I bought the first two there.  I don't recall where I bought the other two.

Q     You mentioned that with respect to at least two, and possibly four, you're not sure where you bought the other two, you bought them at Affordable Portables.

      Why did you go to that particular - First of all, what city was Affordable Portables in?

A     Long Beach.

Q     Why did you go to that particular location to buy the phones?

A     Tom told me to go there.  He said it was a place where you could pay cash for these phones and that they wouldn't ask questions.

Q     And I asked you some questions previously about this air time.

      Where did you go to buy the air time and get the receipts for that?

**DRAFT COPY**

Tuinan - Direct / By Ms. DeWitt                    88

A    Initially when I bought the phones, I bought $100 worth of air time for each phone.  Tom had asked me to do that.

And then after those first two, I would go, you know, as needed, to random cell phone places and mailboxes-type places to buy the pre-paid minutes.

Q    And these two receipts that are in Government's Exhibit 808 indicate they're from a mailboxes and shipping place in Costa Mesa.

Did you go to that place?

A    Yes, I did.  It's on Harbor Boulevard over by Triangle Square.

Q    Now, before you went out, in addition to buying the air time for the phones and buying the phones, did you have any other specific instructions as to what type of phone to get?

A    Yes.  I was told that they had to have international capabilities.

Q    Were you given any other instructions about how to buy the cell phones?

A    Yes.  I was told to pay cash for them and to put them into fake names.

Q    You were told to pay cash?

A    Yes, I was.

Q    Did you follow those instructions with respect to your purchase of these cell phones?

A    Yes, I did.

**DRAFT COPY**

Tuinan - Direct / By Ms. DeWitt                    89

Q     And what fictitious names did you use to purchase the phones under?

A     Kyle Cannon (phonetic); Kenneth Cannon (phonetic); Emily Castagneto (phonetic), and Burt Madera (phonetic).

Q     And again, these were basically fictitious names that you made up?

A     Yes.

Q     Who did you give the cell phones to that you purchased?

A     I gave three of them to Michael Tuinan, and I kept one at the house for Tom when he'd be coming home.

Q     And the three that you gave to Michael Tuinan, were those intended to be delivered to the Metropolitan Detention Center?

A     Two of them were intended to be delivered, and then one he was supposed to keep so that he could talk to the people on the inside of the jail.

Q     And you said one of them you kept for Tom Tuinan?

A     Yes.

Q     For use for when he got out of custody?

A     Yes.

Q     Ms. Tuinan, did you also buy tools as part of the escape plan?

A     Yes, I did.

Q     What tools did you buy?

A     Glass cutters, 24-inch bolt cutter, a double-ended screw driver, a couple of metal clips, and some fishing wire.

**DRAFT COPY**

Tuinan - Direct / By Ms. DeWitt                    90

Q     Do you know whether or not you bought any hacksaw blades?

A     Yes.  I bought some hacksaw blades as well.

Q     Did you buy any other additional tools that you don't remember specifically, or is that pretty much what you bought?

A     That's all I recall at this time.

Q     Where did you go to buy these items?

A     A place called 'Tool Time' in Eliso Viejo (phonetic), an 'Ace' or 'True Value' hardware store, also in Eliso Viejo, a 'Pep Boys', and an outdoor-type store for the fishing line.

Q     At this time, Ms. Tuinan, I'd like you to look at just a couple of items.

        MS. DEWITT:  First of all, if Special Agent Davidson could place in front of you Government's Exhibit 823, which has already been admitted into evidence, your Honor.

        THE COURT:  All of the exhibits on the list that you've provided to me for use with the witness Sabrina Tuinan have previously been received in evidence.  I've checked them out.

        MS. DEWITT:  Thank you, Your Honor.

BY MS. DEWITT:

Q     Ms. Tuinan, you now have Government's Exhibit 823 in front of you.

        Do you recognize that?

A     Yes, I do.

Q     What is it, and how do you recognize it?

**DRAFT COPY**

A    It's a 24-inch set of bolt cutters.

     I recognize it because it was red, and it looks to be about 24 inches.

Q    Okay.  Can you hold that up for the Jury to see?

A    (witness complying)

Q    That exhibit appears to be identical to the bolt cutters that you purchased?

A    Yes, it does.

Q    And if you could now please take a look at Government's Exhibit 842.

A    (witness complying)

Q    Do you recognize that exhibit?

A    Yes, I do.

Q    And how do you recognize that?

A    This is the glass cutter that I bought at 'Tool Time'.

Q    And if you could now please take a look at Government's Exhibit 830.

A    (witness complying)

Q    Do you recognize that?

A    Yes, I do.  This is a -

Q    How do you recognize that?  I'm sorry.

A    It's a double-ended screw driver that I bought at 'Tool Time'.

     When I say 'double-ended', it's because the bit here pulls out, and it can be Phillips or flathead.

**DRAFT COPY**

Tuinan - Direct / By Ms. DeWitt                    92

Q    And Ms. Tuinan, looking at that exhibit, it appears to be the same or similar to the one that you purchased?

A    Yes.

Q    And what is written on that particular screw driver?

A    It says the name of the company, 'Tool Time', and then the phone number.

Q    And is that the 'Tool Time' that you went to to buy some of the items that you previously testified about?

A    Yes.

Q    And finally, Ms. Tuinan, can you take a look at Government's Exhibit 859?

A    (witness complying)

Q    Do you recognize that?

A    Yes.

Q    How do you recognize that particular exhibit?

A    It's a metal clip that I bought at 'Pep Boys'.

Q    And what color is it?

A    Purple.

Q    Do you recall buying one that was purple?

A    Yeah.  I recall specifically buying a purple one.

Q    So that's either the same or similar to the one that you purchased?

A    Yes.

Q    Ms. Tuinan, where did the money come from for purchase of these tools and cell phones and the air time that you talked

**DRAFT COPY**

Tuinan - Direct / By Ms. DeWitt                93

about buying?

A    It was sent to me.

Q    So it didn't come out of your own money that you had, your own resources?

A    No.  I didn't have any money left at the time.

Q    Now, you testified that part of the plan was to have Michael Tuinan come out and assist in the escape attempt.

        Did you help to arrange for Michael Tuinan to come to Los Angeles to assist in the escape attempt?

A    Yes, I did.

Q    What did you do to help Michael Tuinan get to Los Angeles?

A    I sent him money for bail, money for his bus tickets, and money for food along the way.

        When he arrived, I picked him up at the bus station, and I took him to a hotel, and I got him a hotel to stay at.

Q    When he came out, where was he coming from, and what bus station did you pick him up from?

A    He was coming from Chicago, and I picked him up at the Greyhound Station in Santa Ana.

Q    And in connection with this escape attempt, did Michael Tuinan come out to Los Angeles more than once?

A    Yes, he did.

Q    The first time that he came out, you picked him up at the bus station in Santa Ana?

A    Yes.

**DRAFT COPY**

Tuinan - Direct / By Ms. DeWitt                94

Q    And just now focusing, for purposes of these questions, on the first trip that he made out.

When did he first come to Los Angeles to assist in the escape attempt?

A    The first week of February.

Q    When Michael Tuinan first got to Los Angeles from Chicago, did you explain to him what he was supposed to do to assist with the escape attempt?

A    When he arrived I gave him a packet of paperwork that had been sent to me, given to me by Tom for him to read that was supposed to be a detailed explanation of what he was going to do.

After he read it, I clarified any questions that he had.

Q    Okay.  And you mentioned that you gave him these detailed instructions.

A    Yes.

Q    How did you get those instructions?  Can you explain that?

A    Tom gave them to his attorney on an attorney visit that he had coordinated the same time that I had a personal visit up there.  And he gave the packet to the attorney; the attorney gave it to me.

Q    Okay.  So these instructions, written instructions, never went through the mail?

A    No.

**DRAFT COPY**

Tuinan - Direct / By Ms. DeWitt                95

Q    And they didn't go directly from Tom to you?

A    Right.

Q    Whose instructions were they?

A    They were Iouri Mikhel's.

Q    How do you know that they were Iouri Mikhel's instructions with respect to the escape plan?

A    Tom told me that Iouri had dictated the plans to him.

Q    And was it your understanding that this was the dictation of those plans?

A    Yes.

Q    What was Michael Tuinan supposed to do, specifically, to help with the escape attempt?

        MR. RUBIN:  Your Honor, I'm going to make an objection.

        Can we approach?

        THE COURT:  Let me see you at sidebar.

        (Sidebar from 11:32 to 11:35 a.m. omitted from draft copy)

        THE COURT:  We're going to go until 11:45, and then we'll break until 1:15.

BY MS. DEWITT:

Q    Ms. Tuinan, in connection with your involvement in this escape attempt, was there some discussion about what Michael Tuinan's role was supposed to be in connection with that escape attempt?

A    Yes.  He was supposed to make the deliveries to MDC,

**DRAFT COPY**

Tuinan - Direct / By Ms. DeWitt                96

purchase some of the tools, purchase the hydraulic pump, hire the biker gang.

And the after the escape, he was to live in the safe house with the people that had escaped, and run their errands for them, buy their supplies for them, such like that, so they wouldn't have to leave the house.

Q   And I think you said this, but just to be clear.

He was the person who was also supposed to deliver these items?

A   Yes, he was.

Q   Did the instructions that you testified that you gave to Michael Tuinan when he first got to Los Angeles include a list of the tools that he was supposed to purchase?

A   Yes, it did.

Q   How do you know that?

A   At some point, I believe that Mike showed me the list.  I recall seeing pictures, drawn pictures of some tools, and Tom's handwriting.

Q   And again, I think you testified it was your understanding that Tom wrote at least portions of this, because it was dictated to him by Mr. Mikhel?

        **MR. RUBIN:**  Objection.  Asked and answered.

        **THE COURT:**  Overruled.

//

//

**DRAFT COPY**

Tuinan - Direct / By Ms. DeWitt                97

**BY MS. DEWITT:**

A     Yes.  He explained that to me.  And he also had mentioned

some of the things that were in the instructions.

Q    Ms. Tuinan, did you yourself help Michael Tuinan, your

brother-in-law, purchase the tools that he was supposed to

deliver to the Metropolitan Detention Center on behalf of

defendant Mikhel and his two co-defendants, Juri and Peter?

A     Yes, I did.

Q    Where did you go with him to purchase these items?

A     We went to Sears together, and I gave him some money and

he walked around buying some assorted tools there.

        We also went to Best Buy together, and I gave him the

money for him to buy a video camera.

Q    Okay.  Let's start with Sears.  You mentioned some

assorted tools.

        Can you describe in more detail what you assisted

with, or when you went with Michael to Sears, what kind of

tools he bought?

A     He bought some screw drivers, some dry-wall knives, a

bottle of Gorilla Glue.  I'm' not sure of the rest.  Those were

just the ones that stick out.  But I know he bought several

items.

Q    Was there a particular brand that he was supposed to be

buying?

A     Craftsman.

**DRAFT COPY**

Tuinan - Direct / By Ms. DeWitt                    98

Q    And you mentioned that a lot of these tools were bought at Sears.  And you also mentioned that you went to Best Buy.

What did you buy at Best Buy?

A    A video camera.

Q    And who actually picked out the video camera?

A    He picked it out.

Q    Do you know why, based on the discussions that you had in connection with this escape attempt, Iouri Mikhel wanted you to purchase a video camera?

A    He wanted to videotape the escape, and then send a copy of the videotape to 'Hard Copy', or that type of program, and another copy of the videotape to his prosecutor on his case.

Q    Ms. Tuinan, when you went with Michael Tuinan, your brother-in-law, to purchase the tools and the video camera, what money was used to purchase those items?

A    The money that had been sent to me.

Q    So you provided Michael with that money?

A    Yes, I did.

Q    Did Michael Tuinan in fact deliver the phones and the tools and other items that you've discussed to the Metropolitan Detention Center to Iouri Mikhel?

A    Yes, he did.

Q    Did he deliver the tools on more than one occasion, to your knowledge?

A    Yes, he did.

**DRAFT COPY**

Tuinan - Direct / By Ms. DeWitt                99

Q    How many times did he actually successfully deliver tools to the Metropolitan Detention Center, to your knowledge?

A    Two successful deliveries.

Q    And were there - We'll go into more detail about the other attempts, but were there other attempts that were unsuccessful, to your knowledge?

A    Yes, there were.

Q    How many?

A    Multiple.  Four, maybe.

Q    Okay.  Let's start first with the first delivery of tools.

In connection with that first delivery of tools, first of all, how did Michael Tuinan know where to go to deliver those tools?

A    He had come up with me on a visit to see my husband at the time, so he knew where MDC was located.

When I went in on the visit, he walked around MDC.

But the exact location, as far as what window and what floor, came to him in that packet of paperwork.

Q    Okay.  So the first time that, to your knowledge, that Michael Tuinan came to the Metropolitan Detention Center was with you when you came to visit your ex-husband?

A    Yes.

Q    How did Michael Tuinan know where to deliver the tools once he got to the Metropolitan Detention Center?

A    In the packet of paperwork that he had, he had a brochure

**DRAFT COPY**

Tuinan - Direct / By Ms. DeWitt          100

of MDC.  And he explained to me that somebody had written down like what window, what floor, and such like that, to go to.

Q    Was there a particular time that was discussed that Michael Tuinan was supposed to deliver the tools to Mr. Mikhel at MDC?

A    Yes.  It was to be approximately 9:30 in the evening.

Q    Do you know why that particular time was the time that the tools were supposed to be delivered?

A    Yes.  He was told that the outside cameras shut off after 8:00 o'clock at night, and that 9:45 was lockdown.  So that 9:30 would be a time when people would be running around. There would be a little bit of confusion, people getting last minute drinks and such before lockdown.  And that the guard on the floor would be doing paperwork and such.

Q    Okay.  So when you said 'people would be running around and be doing things', you mean the correctional officers?

A    No.  The inmates on the floor, before they'd be locked into their cells, would be going to get a last minute drink, putting away their magazines, such like that.  So there'd be a lot of activity.

        And then the correctional officers would be doing paperwork in preparation for lockdown, so it would be kind of a confusing time.

Q    You mentioned that there was a specific sort of window of time that he was supposed to at least target for delivery.

**DRAFT COPY**

Tuinan - Direct / By Ms. DeWitt          101

How did he know what day to try the delivery on?

A    He had spoken to Tom when he first got into town and received the packet of paperwork.  And they had worked out the details on the phone, as far as exactly, you know, what day to go on.

Q    And do you know whether or not they had some type of signal worked out ahead of time?

A    Yes.  Mike was supposed to stand outside smoking a cigarette at that time.

Q    Okay.  And can you explain to the Jury how Michael Tuinan actually delivered the tools to the Metropolitan Detention Center this first time?

          **MR. RUBIN:**  Objection.  No foundation.

          **THE COURT:**  If you know.

          **THE WITNESS:**  Yes.

          **THE COURT:**  Do you know?

          **THE WITNESS:**  Yes, I do.

          **THE COURT:**  Overrule the objection.

          **MR. RUBIN:**  Your Honor, may we approach?

          **THE COURT:**  No.  No need to.

          We're going to take our recess at this time for lunch, returning at 1:10 in the Jury room, 1:15 in the Courtroom.

          Remember the admonition.

          **(Recess for lunch from 11:43 a.m. to 1:15 p.m.; parties**

**DRAFT COPY**

102

**present)**

　　　　(Outside the presence of the jurors)

　　　　　　THE CLERK:  Please remain seated and come to order.

　　　　　　THE COURT:  All right.  Outside the presence of the jury.

　　　　　　Anybody wish to speak to the Court?

　　　　　　MR. RUBIN:  Yes, your Honor.  I just wanted the Court to understand what the nature of the objection was right before we left.

　　　　　　The witness was asked about her understanding of how the first delivery occurred.  And the foundation was -- I don't know if she was there, if she heard it from one of the other people, or if she read it in their discovery.

　　　　　　THE COURT:  I believe she testified that this is what she was told.

　　　　　　MR. RUBIN:  Well, specifically regarding that, it was just:  Do you know what happened?  And she says -- and she's going to start -- I don't know how she knows it.  And that's the purpose of the foundation objection.  If she knows this because she did say she had discovery materials in which she later found things out --

　　　　　　THE COURT:  All right.

　　　　　　MR. RUBIN:  -- that she should not be --

　　　　　　THE COURT:  I think that that's a valid objection, and I think the Government will ask a preliminary question as

103

to --

MR. RUBIN: Thank you.

THE COURT: -- the basis for her information.

MR. DUGDALE: I'll relay that information to Ms. DeWitt, who doesn't appear to be presently here. She was here a second ago. I think she just stepped out.

THE COURT: Yeah. Let me -- the witness is present in the Court. I'm going to ask her to step into the hallway just one second.

THE WITNESS: Sure. Excuse me.

(Pause)

THE COURT: Ms. DeWitt, in your absence, Mr. Rubin has objected on the basis of foundation as to the testimony of this witness. My understanding is that this witness testified that this is what she was told as to what happened in regard to how the items were delivered to the facility and then taken up.

MS. DEWITT: She had various discussions, your Honor, and I'm happy to go back and lay more of a foundation.

THE COURT: All right.

MR. RUBIN: Thank you.

MS. DEWITT: I apologize for stepping out, your Honor.

THE COURT: No problem.

All right. Let's bring the witness in and I'll bring the jury in.

Tuinan - Direct / By Ms. DeWitt          104

(Pause)

THE COURT:  Ms. Tuinan, please come forward and resume your seat.

(Pause)

THE COURT:  How long will you be with this witness on direct?

MS. DEWITT:  Not much longer, your Honor.  I'm about -- more than halfway done, so -- I'm a little leery about giving you a time estimate, because I have been told I'm not very good at them, but I can tell you that that is -- that I'm more than half way;  I'm more than halfway done.

(Pause)

(Jurors enter the courtroom at 1:19 p.m.)

THE COURT:  All right.  The record will indicate all jurors are present, counsel are present, all parties are present.

Ms. DeWitt, you may continue.

Ms. Tuinan, you're still under oath.

DIRECT EXAMINATION (CONTINUED)

BY MS. DEWITT:

Q   Ms. Tuinan, when we took the break at lunch, you were about to answer some questions about Michael Tuinan's delivery of tools to the Metropolitan Detention Center.

First let me ask you a question:  Without going into any details, are you aware of what happened during that first

DRAFT COPY

Tuinan - Direct / By Ms. DeWitt                    105

delivery of tools?

A      Yes.

Q      And can you describe how it is that you became aware of what happened during that delivery?  How did you learn what happened?

A      Tom had told me ahead of time of what was going to happen, and then Mike called me directly afterwards to tell me what had actually transpired.

Q      And then did you also talk to Tom, in addition to Michael, again after the delivery?

A      Yes, I did, and he confirmed.

Q      Okay.  And can you tell the jury, based upon those discussions that you had with Tom Tuinan and Michael Tuinan, how the delivery of tools to Mr. Mikhel and his co-defendants at the Metropolitan Detention Center occurred that first time?

A      Mike had driven up there and stood outside in the courtyard and smoked a cigarette, and a window had opened from MDC and a line was tossed down.  Mike wasn't paying attention at the time, and he told me that Iouri had to call down to him to pick up the line because he wasn't looking, and that he attached the line to the pillowcase, and he said the pillowcase was yanked right up into the window.

Q      And, Ms. Tuinan, what was delivered, to your knowledge, in that first delivery in the pillowcase to the Metropolitan Detention Center?

**DRAFT COPY**

Tuinan - Direct / By Ms. DeWitt                106

A      To my knowledge, it was two cell phones, a couple of hacksaw blades, and a screwdriver maybe, too.

Q      And you mentioned that you talked to Michael after this happened?

A      Yes.

Q      And he confirmed to you what had happened and how it had happened?

A      Yes, he did.

Q      And did you also confirm through Tom whether or not those tools had been successfully delivered to Mr. Mikhel?

A      Yes, I did.

Q      And you mentioned that there was a problem with the line getting thrown out.  Did you hear anything about that when you talked to Tom to confirm the delivery of the tools?

A      Yes.  He had said that Iouri was very unhappy about how that delivery had gone because Mike was being inattentive and that he had had to actually yell down from the window; he yelled down, "Pick up the line," and then Mike turned around and saw the line laying on the ground.

Q      Now, Ms. Tuinan, after this first delivery, did Michael Tuinan return to Chicago?

A      Yes, he did.

Q      At some point after he returned to Chicago, did he come back to Los Angeles again?

A      Yes, he did.

**DRAFT COPY**

Tuinan - Direct / By Ms. DeWitt                107

Q    When did he come back to Los Angeles the second time?

A    Towards the end of February.

Q    And did you help Michael Tuinan return to Los Angeles the second time?

A    Yes, I did.

Q    How did you help him return to Los Angeles the second time?

A    I sent him money for bail again, sent him money for his bus tickets and money for food for the trip, and then when he arrived at a bus station I picked him up and then got him a hotel room.

Q    Was Michael Tuinan delayed in getting back to Los Angeles the second time?

A    Yes, he was.

Q    Can you explain to the jury why it was that he was delayed?

A    He had gotten arrested in Chicago and had to be bailed out, and then when he finally did get on a bus, there was some type of bus trouble, so I had to go pick him up at the Riverside bus station instead of the Santa Ana one.

Q    Now, Ms. Tuinan, did you ever during the course of these events speak to somebody who you believed to be Iouri Mikhel?

A    Yes, I did.

Q    Can you explain to the jury how that happened?

A    The phone that I had kept at the house for Tom was ringing

**DRAFT COPY**

Tuinan - Direct / By Ms. DeWitt          108

one day, and I was afraid to pick it up, and when I finally did, there was an accented voice on the other line that used words to the effect asking where the traveler was, where the whereabouts of the traveler or the status of the traveler.

Q    And what did you understand that person to be referring to when they asked about the "traveler"?

A    Mike; because he was traveling from Chicago that day to Los Angeles.

Q    So this was the same day that Michael came out on the second trip.

A    Yes.  I picked him up a couple hours later from the bus station.

Q    Okay.  And did the person on the other end of the line that you described as having a heavily accented voice say anything else?

A    Just that he was not going to tolerate any delays, any games that were going on, and that this needed to be taken care of.

Q    Now, you mentioned that Michael made two deliveries of tools to the Metropolitan Detention Center.

        Was the second delivery made after he came out the second time to Los Angeles?

A    Yes, it was.

Q    And were you aware of that second delivery of tools in the same way that you were aware of the first delivery, which is

**DRAFT COPY**

Tuinan - Direct / By Ms. DeWitt                   109

based on conversations with Michael and Tom?

A    Yes.

Q    What tools were delivered the second time?

A    A 24-inch set of bolt cutters, video camera, drywall knives, screwdrivers; just the balance of the tools that had been purchased, that Mike had purchased.

Q    Okay.  You mentioned in your previous testimony that you'd purchased glass cutters?

A    Yes; glass cutters, glue.

Q    You mentioned that Tom Tuinan -- you'd gone with Tom to buy a variety of Craftsman tools as well.

A    With Mike, yes.

Q    And were those also delivered in this second delivery?

A    Yes, it was.

Q    You also mentioned that you at some point went to a sporting goods store and bought some fishing line.  What was the purpose for that?

A    The line that was initially thrown out on the first delivery was made of dental floss and Mike didn't feel that it would hold, that it'd be strong enough to hold a bag full of, you know, heavy metal tools, so he wanted something that would be strong enough to withstand being pulled up like that.  So I purchased like a fishing line that's designed for saltwater fish, for -- the really heavy gauge.  It's almost like a cable.

Q    Now, were there any problems in connection with this

**DRAFT COPY**

Tuinan - Direct / By Ms. DeWitt                110

second delivery?

A    Yeah.  Mike had become very unreliable.  He arrived late
at one point; he fell asleep for another delivery.  He just
plain didn't show up for another one and turned off his cell
phone so he couldn't be reached.  At one point the line -- a
line -- the line broke, I think.  But it was finally
successful.

Q    Okay.  So is it fair to say that these things that you
were describing happened on different nights?

A    Yes.

Q    And there were a variety of different nights where the
efforts by Michael Tuinan to deliver the tools were not
successful.

A    Correct.

Q    Okay.  Was Michael Tuinan ultimately successful in making
a second delivery of tools to Iouri Mikhel and his co-
defendants at the Metropolitan Detention Center?

A    Yes, he was.

Q    And how do you know that he was successful the second
time?

A    Mike called me after the delivery was made to let me know
that it had been successful, and then Tom called me the next
day to confirm that as well.

Q    Now, was Michael Tuinan supposed to make a third delivery
of tools?

**DRAFT COPY**

Tuinan - Direct / By Ms. DeWitt                111

A    Yes, he was.

Q    What was he supposed to deliver, as far as you understood it based upon your discussions in connection with these events? What was he supposed to deliver that third time?

A    The third time he was supposed to deliver a hydraulic pump, the uniforms that I described earlier, and rappelling gear.

Q    What was the hydraulic jack for?

A    When the individuals had cut through the wall and gone down the stairwell to the lower floor, the hydraulic pump would have been placed in between the bars and used to push them apart.  It was specific that it had to be able to push 10,000 pounds.

Q    So you were given specific instructions for the type of hydraulic pump that was supposed to be purchased?

A    Yes.

Q    And do you know if a hydraulic jack was ever delivered to the Metropolitan Detention Center?

A    Not to my knowledge.

Q    Do you know if one was ever purchased?

A    No, not to my knowledge.

Q    Do you know if any efforts were made to either find or to at least start the process of purchasing or locating a hydraulic pump?

A    Yes.  I know Mike had gone out shopping for it.  He had

**DRAFT COPY**

Tuinan - Direct / By Ms. DeWitt                112

shown me a catalog at one point where it had a picture in it, but he never purchased it.

Q    Okay.  And you talked a little bit earlier about some additional tasks that you were responsible for.  I think one of them you said was buying rappelling gear?

A    Yes.

Q    And one of them was buying uniforms?

A    Yes.

Q    And the third was looking for a safe house.

A    Yes.

Q    Can you again describe for the jury just generally what type of uniforms you were asked to get?

A    Grey polyester pants, blue windbreakers -- navy blue windbreakers, and navy blue ball caps.

Q    And what was the reason for buying uniforms that looked like that?

A    So that when the individuals came out of the window, if anybody was on the street witnessing them climb out, they would think it was a training exercise by MDC personnel, because those outfits are similar to what's worn by the personnel on the inside.

Q    Did you, in fact, ever purchase uniforms?

A    No, I did not.

Q    Did you, in fact, ever purchase rappelling gear?

A    No.

**DRAFT COPY**

Tuinan - Direct / By Ms. DeWitt          113

Q    Did you, in fact, ever get to the point of making an effort to locate a safe house?

A    No.

Q    And, to your knowledge, were items for the safe house ever -- did the plan ever get to that stage; were those things ever done?

A    No.

Q    Now, Ms. Tuinan, you testified earlier about some money that you received in connection with this escape attempt. Let's go back to that.

How did you get the money?

A    I received two payments.  The first was a check that came from the law offices of Sherman and Sherman.  It came by FedEx, UPS, some kind of overnight carrier.  The second amount of money came by a wire transfer.  It was directly deposited in my account at Navy Federal for nineteen thousand and some change.

Q    Okay.  Let's start first with the check.

And at this time if Special Agent Davidson can show you Government's Exhibit 1039.

I'm sorry; 1039-D, your Honor.

**(Pause)**

**BY MS. DEWITT:**

Q    Do you have that in front of you, Ms. Tuinan?

A    Yes, I do.

Q    Do you recognize that?

**DRAFT COPY**

Tuinan - Direct / By Ms. DeWitt                    114

A    Yes, I do.

Q    Is this the check that you described getting?

A    Yes, it is.

Q    Okay.  And let me just ask you a couple of questions about this.

First of all, it says it's payable to the order of S. Cannon.  Who is "S. Cannon"?

A    Cannon is my maiden name.

Q    Okay.  Why was the check made out to S. Cannon?

A    Tom was concerned that it would raise eyebrows that money was being sent.  He didn't want me to get in any trouble, so he suggested that I have the check be written under my maiden name.

Q    Okay.  And, Ms. Tuinan, did you actually receive this check?

A    Yes, I did.

Q    Where was it sent?

A    It was sent to my P.O. Box; it was a Mailboxes, Etc. place.

Q    And you mentioned that it was sent to you by Federal Express?

A    Yes.

Q    When, or approximately when, did you actually pick up this check?

A    I picked it up late January, and then the day I picked it

**DRAFT COPY**

Tuinan - Direct / By Ms. DeWitt                115

up I took it to the bank.

Q    Now, the check is dated January 21st, 2003.  Do you see
that in the upper right-hand corner?

A    Yes, I do.

Q    Is that on or about the date that you received it?

A    About the date, yeah.

Q    Okay.  And the second item that's listed, that's shown on
this exhibit, is the back of a check; is that right?

A    Yes.

Q    This bottom half here is the back of the check; is that
correct?

A    Yes.

Q    And it shows a deposit date, for deposit only, on 1/22 --
actually sort of written over it -- 2003.

        Is that on or about the date that you deposited the
check?

A    Yes, it is.

Q    And, again, were these the funds that you were talking
about that you used to buy the cell phones and the tools and
the various other items?

A    Yes, it is.

Q    And did you also use these funds to pay for Michael
Tuinan's expenses that you discussed earlier?

A    Yes, I did.

Q    This check appears to be written from Sherman and Sherman.

**DRAFT COPY**

Tuinan - Cross / By Mr. Lasting                 125

**CROSS EXAMINATION**

**BY MR. LASTING:**

Q    Ms. Tuinan, good afternoon.

What date did you get arrested?

A    May 9th, 2003.

Q    And before you got arrested had either the FBI or some law enforcement officials met with you to discuss the escape attempt from MDC.

A    Yes.

Q    Did you agree to talk to the police or did you decline to talk to them?

A    I talked to them.

Q    And when you talked to them before you got arrested were you honest with them or were you dishonest?

A    No, I didn't tell them the truth.

Q    You didn't tell them the truth?

A    No.  I was really scared.

Q    Okay.  And then you got arrested and where were you when you got arrested?

A    I had been evicted out of my apartment, so I went to go live with my sister with my son.

Q    You were living up in Idaho?

A    I had just moved with my baby up to Idaho to go live with my sister.

Q    And you got arrested in Idaho and then what did they do,

**DRAFT COPY**

Tuinan - Cross / By Mr. Lasting          126

bring you back down to Los Angeles?

A    Yes.

Q    And when they brought you back down to Los Angeles did you go into court for an arraignment on a Complaint, that is the first time you go to court to find out what you're accused of?

A    Yes, I went to court.

Q    And did you get a copy of the Complaint at that time?

A    I don't recall.  I was still in custody at that time.

Q    Right, you were in custody and you had a lawyer appointed for you, right?

A    Correct.

     **MR. LASTING:**  Your Honor, I have a one-page document entitled "Criminal Complaint, United States of America versus Sabrina Cher (phonetic) Tuinan and others."  Could this be marked?  I think it's Defense Exhibit 2048 would be the next.

     **THE COURT:**  2048 would be the next.

     **MR. LASTING:**  And can I show it to the witness, please?

     **THE COURT:**  Yes.

     **(Defense Exhibit Number 2048 marked for identification)**

**BY MR. LASTING:**

Q    Ms. Tuinan, would you take a look at that and see if you recognize that to be the charge that was -- you were notified you were being accused of after you were taken into custody and brought down here to Los Angeles?

**DRAFT COPY**

Tuinan - Cross / By Mr. Lasting                127

A     I don't -- I'm sorry, I don't see the charge.

Q     Here.

A     Um --

Q     Do you see the part at the top that says "United States of America" and then a "V" which means versus?

A     Yes.  I've got that, right.

Q     And it's got the name of the Defendants and you are one of them, right?

A     Right.

Q     And then do you see like in the middle of page there's a box that starts out "On or about February 7th"?

A     Yes.

Q     Do you recognize what's contained in that box to be the charge that was --

        MS. DeWITT:  Your Honor, I'm going to object on relevancy grounds.  Also that she doesn't appear to recognize this document, so there's a foundational issue.

        THE COURT:  Well he's trying to lay the foundation, so I'll reserve ruling on an objection until he continues.

        Go ahead.

        MR. LASTING:  Thank you, your Honor.

        THE WITNESS:  It says "Date of Offense," but I don't see an actual charge.  I don't -- I mean it might be in, you know, codes, title codes, but I don't know what those mean.

//

**DRAFT COPY**

Tuinan - Cross / By Mr. Lasting                128

**BY MR. LASTING:**

Q    Do you see the words there about assisting an escape?

A    Yeah.  Yes.

Q    Having looked at it, does it refresh -- do you now recognize this to be the Complaint that you were arraigned on, that is that you were notified this was the charged that was being placed against you?

A    Yes.

MR. LASTING:  Your Honor, I would offer this into evidence as Defense Exhibit 2048.

THE COURT:  Any objection?

MS. DeWITT:  Same objection, your Honor.  Relevance.

THE COURT:  No.  Overruled.  Received.

**(Defense Exhibit Number 2048 was received in evidence)**

**BY MR. LASTING:**

Q    After you were charged with the Complaint, Ms. Tuinan, with your lawyer did you work out an agreement to plead guilty to a charge?

A    Yes.

Q    And you followed through on that and you pled guilty, right?

A    Yes.

Q    And after you pled guilty you sent to court for a sentencing hearing?

A    Yes.

**DRAFT COPY**

Tuinan - Redirect / By Mr. Lasting          135

phones.  In the second interview that you had a couple of days later on July 22nd, at that time did you tell law enforcement that you believed -- who you believed one of the phones was for other than Mr. Mikhel, your husband, Mr. Tuinan, and your brother-in-law, Michael Tuinan?

A    I'm sorry, one more time.

Q    There's four phones, right?

A    Right.

Q    Okay.  Did you at some point tell law enforcement before today in court who you thought that fourth phone was intended for?

A    I believe so.

Q    Okay.  And what did you tell law enforcement you believed that -- who you believe that fourth phone was intended for?

A    I knew it was for another Codefendant, but I -- I'm doing my best to recall that conversation, but I believe I told them it was for the other Juri.

          MS. DeWITT:  No further questions, your Honor.

          THE COURT:  Mr. Rubin?

          MR. RUBIN:  No, thank you, your Honor.

          THE COURT:  Mr. Lasting?

                    RECROSS EXAMINATION

BY MR. LASTING:

Q    Mr. Tuinan, do you remember what you said in either the first conversation or your subsequent conversation about who

**DRAFT COPY**

Tuinan - Redirect / By Mr. Lasting          136

the other phone was for?

A    Not a hundred percent, no.  I can tell you that I remember I said it was for another Codefendant.  I believe it was Juri, the other Juri, but I can't say for a hundred percent sure.  No, I'm sorry.

Q    Isn't the truth about it that the first time you were asked you said one phone was for Mikhel and the other phone was for Peter and then two days later you changed it and you said one phone was for Mikhel and the other one was for either Peter or Juri?

A    I don't recall ever saying specifically Peter, no.  I'm sorry.

          **MR. LASTING:**  Okay.

          **MS. DeWITT:**  Nothing further, your Honor.

          **THE COURT:**  You may stand down.  Thank you.

     **(Witness excused)**

          **THE COURT:**  Government's next witness will be?

          **MS. MEYER:**  Your Honor, at this time the Government calls Jose Avila to the stand.

     **(Pause)**

          **MS. DeWITT:**  Your Honor, may I have a minute just to talk to Defense counsel?

     **(Counsel confer)**

          **MS. DeWITT:**  Thank you, your Honor.

     **(Witness sworn)**

**DRAFT COPY**

Avila - Direct / By Ms. Meyer          137

THE CLERK:  Please be seated.

Please state your full name and spell your last name for the record.

THE WITNESS:  Jose Avila.  Avila, A-V-I-L-A.

THE CLERK:  Thank you.

MS. MEYER:  Thank you, your Honor.

**DIRECT EXAMINATION**

BY MS. MEYER:

Q    Good afternoon, Mr. Avila.

Are you currently in federal custody?

A    No, I'm not.

Q    When were you released?

A    On the 20th of November, this year.

Q    Was it after Thanksgiving, shortly after Thanksgiving?

A    Right after Thanksgiving.

Q    What were you in federal custody for?

A    I was in federal custody for conspiracy to distribute cocaine.

Q    And when were you sentenced for that offense?

A    I was sentenced on I believe it was February of 2004.

Q    Mr. Avila, did you receive time off your sentence for information you provided related to an escape attempt that was discovered at MDC in 2003?

A    Yes, I did.

Q    How much time off your sentence did you receive?

**DRAFT COPY**

Avila - Direct / By Ms. Meyer                     138

A      About three and a half years.

Q      Now, you've testified that you're no longer in custody. Are you here pursuant to a subpoena?

A      Yes.

Q      And, Mr. Avila, has the Government made you any promises in exchange for you testifying here today?

A      No.

Q      So why are you testifying here today?

        **MR. RUBIN:**  Objection, your Honor.  It's asked and answered.  He was subpoenaed.

        **THE COURT:**  No.  Overruled.

**BY MS. MEYER:**

Q      You may answer, Mr. Avila.

A      First I believe that I'm doing the right thing, but I am being subpoenaed also.

Q      Mr. Avila, in 2002 were you in custody?

A      Yes, I was.

Q      Where were you housed?

A      In MDC, that's the Metropolitan Detention Center in downtown L.A.

Q      Were you aware of an escape attempt at MDC that was discovered in March of 2003?

A      Yes.

Q      How did you learn about that escape attempt?

A      I originally found out about it from a cellmate, he was

**DRAFT COPY**

Avila - Direct / By Ms. Meyer               139

celled in the same room that I was housed in in downtown L.A.

Q   Do you know whether that person was involved in the escape attempt?

A   No, I believe he wasn't, he just knew about it.

Q   Mr. Avila, did someone actually involved in the escape attempt come up and talk to you about it?

A   Yes.

Q   Who was that?

A   Iouri.

Q   And where were you housed at MDC?  What floor?

A   I was on the --

THE COURT:  When you use the word "Iouri," what Iouri are you talking about?

THE WITNESS:  The one on Five South, your Honor.

THE COURT:  Do you see that person here in the courtroom?

THE WITNESS:  Yes.  He's the one in the green shirt.

THE COURT:  All right.  For the record the witness has referred to and identified Iouri Mikhel.

BY MS. MEYER:

Q   Mr. Avila, could you please take a look at what's been marked for identification as Government's Exhibit 918.  I believe it's sitting in our folder before you.

MS. MEYER:  Thank you, Agent Perez.

THE WITNESS:  Yes.

**DRAFT COPY**

Avila - Direct / By Ms. Meyer                    140

**BY MS. MEYER:**

Q    Do you recognize that exhibit?

A    Yes.

Q    What is it?

A    It's a lineup of people and it's a picture of Iouri.

Q    Iouri from Five South?

A    Yes.

Q    Did you initial and date it?

A    Yes.

Q    When?

A    6/9/04.

        **MS. MEYER:**  Your Honor, at this time the Government moves Government Exhibit 918 into evidence.

        **THE COURT:**  Received, 918.

    **(Government's Exhibit Number 918 was received in evidence)**

        **MS. MEYER:**  Your Honor, at this I'm publishing Government's Exhibit 918 to the jury.

**BY MS. MEYER:**

Q    Mr. Avila, there's a circle around the third picture in that lineup.  You said that's the Iouri from Five South who talked to you about the escape attempt?

A    Yes.

Q    What did he say?

A    Oh, I don't remember like word for word, it's been such a long time, but he just told me that, and on our first meeting,

**DRAFT COPY**

Avila - Direct / By Ms. Meyer                141

like that he was interested in -- that he wanted to escape and that they were in the process of -- like having different plans.  That was pretty much -- he was just wanting to know if I was interested.

Q    Do you remember about when he approached you to see if you were interested?

A    It was about March of 2000 and -- wait a minute, 2002.

Q    Now, do you know where Iouri's cell was located on Five South?

A    It was on the second tier on the floor of Five South, on the second level on the far corner on the right-hand side by the stairwell.

Q    Now, you said that he approached you and asked you if you were interested in helping with the escape.  What did you say?

A    Initially I said no, and then when he asked me again I said yes.

Q    After you said yes did he describe -- the Iouri on Five South describe what he had in mind?

A    Right.  Yes.

Q    What did he tell you?

A    He told me that one of the plans that he had at that time was that there was -- what he wanted to do is that he wanted to get some C4 and some machine guns and some FBI jackets and that they wanted to blow out the side of a visiting room in the visiting area.

**DRAFT COPY**

Avila - Direct / By Ms. Meyer                    142

Q    What's your understanding of what C4 is?

          MR. RUBIN:  Objection.  Relevance.

          THE COURT:  Overruled.

BY MS. MEYER:

Q    You may answer.  I'm sorry.

A    Oh.  A plastic explosive.

Q    Did Iouri from Five South say what he would like you to do?

A    He just asked me if I could get any of those things.

Q    What did you say?

A    I told him that I'd see -- I told him that I would see what I could do.

Q    About how many times in total do you recall meeting with Iouri from Five South about the escape attempt this first time that you were on Five South?

A    Four or five times.

Q    Mr. Avila, while you were housed on Five South at this point did you tell anyone from law enforcement about the escape plan?

A    Yes, I did.  Initially I called my lawyer and I let him know that something bad was going to happen and then he set up a meeting with the Prosecutor in which two DEA agents were present.

Q    And you went to that meeting?

A    Yes, I did.

**DRAFT COPY**

Avila - Direct / By Ms. Meyer                    143

Q    What did you tell them?

A    I told them that I had seen some pictures of the MDC building and different angles and that these people were planning to blow up the visiting room and that I was concerned that, you know, people are going to get hurt.

Q    Did you tell them everything you knew about the escape attempt at that point?

A    No.

Q    Why not?

A    Because -- they wanted me to tell them everything, but initially I said that I didn't -- that I wanted a guarantee for my safety that I was going to be protected and they couldn't guarantee me that.  So I was put in a position where I was like I wasn't secure for my safety, I didn't feel right.

Q    Did they ask you if you wanted anything else?

A    Yes.  And I told them if there was a possible way that they could me without -- for me not to get deported and they said, you know, they were going to -- they were going to speak to the supervisors and they would get back to me.  And after that, like maybe about a couple of days after that, I called my lawyer and he said that the DEA agents had conducted an investigation and they thought that I was lying and that I was making this big story up and they didn't believe me.  In which case that the Prosecuting attorney, Ms. Fishman I believe was her name, said something like if he can get more information,

**DRAFT COPY**

Avila - Direct / By Ms. Meyer                144

something that's credible and believable, then they might be willing to see me, or whatever.

Q    Mr. Avila, after being on Five South did you then subsequently get transferred to Nine South?

A    Yes.

Q    Do you remember about when?

A    (No response)

Q    Just about when.

A    Like in the fall, the fall of --

Q    Of 2002?

A    Right, in the fall of 2002.

Q    Once you were transferred to Nine South did anyone approach you about the escape attempt?

A    Yes.  There was another gentleman by the name of Juri too, he said his name was Juri, and he just told me that somebody had -- I guess that Iouri in Five South had told him that I was going to be getting out of the hole and for him to find me.

Q    Now, Mr. Avila, you mentioned the hole.  Can you -- what's that?

A    The hole is -- it's a place where they keep you for disciplinary.  I had got into a fight on Five South, so I was put on disciplinary.

Q    So after you got out of the hole you were moved to Nine South?

A    Correct.

**DRAFT COPY**

Avila - Direct / By Ms. Meyer                145

Q    Now could you take a look at what's been marked for identification as Government's Exhibit 917?

        Do you recognize that exhibit?

A    Yes.

Q    What is it?

A    It is another lineup.  It has a picture of Juri, the person I met on the ninth floor.

Q    And did you circle, date, and initial that photograph?

A    Yes, I did.

        **MS. MEYER:**  Your Honor, at this time the Government moves Government Exhibit 917 into evidence.

        **THE COURT:**  Received, 917.

        **(Government's Exhibit Number 917 was received in evidence)**

        **MS. MEYER:**  And, your Honor, at this time the Government is publishing Government's Exhibit 917 to the jury.

**BY MS. MEYER:**

Q    So it's the -- you identified Juri from Nine South in position Number Five on this, is that correct?

A    Yes.

Q    Mr. Avila, do you see the Juri from Nine South in the courtroom here today?

A    He's in the far corner.

        **THE COURT:**  Would you point to him?

        **THE WITNESS:**  There (indicating).

        **THE COURT:**  Where is he seated at the --

**DRAFT COPY**

Avila - Direct / By Ms. Meyer                146

          THE WITNESS:  He's wearing a -- I believe it's a sweater.

          THE COURT:  All right.  For the record the witness has referred to and identified Defendant Juri Kadamovas.

BY MS. MEYER:

Q    Mr. Avila, you said that the Juri on Nine South came up and talked to you.  Did he have an accent?

A    Yes, he did.

Q    Did he speak English?

A    Yes, but it was very broken, like a heavy Russian.

Q    So what did he say to you when he came up to talk to you?

A    Initially he just, you know, wanted to -- he just wanted to introduce himself.  And then like maybe like a day later I was playing a game of chess in the common area and he told me that somebody wanted to talk to me and I couldn't understand him that well but he just like waived at me for me to follow him and I proceeded to follow him towards his -- to his cell.

Q    And where was his cell located, Mr. Avila?

A    It was also located at the far end of the hallway on the right-hand side --

Q    Now, when --

A    -- next to the stairwell.

Q    Thank you.  Sorry for interrupting.

     When you got to his cell what happened?

A    He waived at the vent and then I heard Iouri on Five

**DRAFT COPY**

Avila - Direct / By Ms. Meyer                    147

South -- I recognized Iouri on Five South's voice and I climbed up on the plumbing for the toilet and we started talking.

Q    And what did the Iouri on Five South say to you through the vent?

A    He was asking me if I was all right, if I needed anything. He knew that I had just gotten out of the hole.

Q    Did he say anything about the Juri on Nine South whose cell you were in?

A    He just said that it was his people and that it was all right for me to talk to him.

Q    So after the Iouri on Five South sort of made this introduction did you and Juri on Nine South talk about the escape attempt?

A    Yes.

Q    What did he say?

A    Like I said, I don't remember like exactly word for word, but he just pretty much told me a little bit about like one of the plans and he just mentioned that -- like behind his pillow that he was supposed to like make a hole and they were supposed to squeeze out of there and they were all supposed to go out into the stairwell and meet at a certain time.  And he also like grabbed a piece of paper and put it up on the window, on the frame of the window, and he sketched out the type of tools they were going to need, because they were going to remove that window and bring certain things like tools and whatever needed

**DRAFT COPY**

Avila - Direct / By Ms. Meyer                148

into the building.

Q    Did the Juri on Nine South say what they were going to do
with the tools that they were going to bring in?

A    He just said that they needed like wire cutters.  I think
it was because of the -- he showed me there was like a mesh
inside that drywall and they were going to need it to cut that.
And just wrenches and all different kinds of tools just in case
they needed whatever.

Q    Now, Mr. Avila, about how long were you on Nine South?

A    About two weeks.

Q    After you were transferred off Nine South did you ever
return to Five South?

A    Yes.  I went to different floors and then after that I was
on Five South maybe -- probably like in February of 2003.

Q    Now, when you returned to Five South did anyone approach
you about the escape attempt at that point?

A    Yes.

Q    Who?

A    There was another inmate, they called him Bandit, and
Iouri.

Q    Did you know Bandit's real name?

A    I believe it's Michael Cook.

Q    And when you say Bandit and Iouri, do you mean the Iouri
from Five South that you previously identified?

A    Yes.

**DRAFT COPY**

Avila - Direct / By Ms. Meyer                     149

Q    When they came up to you what did they talk to you about?

A    Well when I originally initially arrived there they just came up, you know, we shook hands and, you know, they asked me if I needed anything and then Iouri just told me go ahead and get situated, we'll talk about it later and, you know, he just said that everything was all right, whatever.  And then like later on that evening, like after dinner I believe, Iouri -- we went into Iouri -- he called me over, we went into his cell, and we spoke a little more.

Q    I'm sorry.  When you say "he called me over and we went into his cell" --

A    Iouri.  Iouri on Five South.

Q    Now, when you got to Iouri's cell on Five South who was there?

A    Well Bandit and Iouri and I walked into Iouri's cell.

Q    Did Iouri talk to you about the escape attempt at that point?

A    Yes.  He just continued by telling me that everything was still -- he had like a different kind of a plan and we spoke a little bit and, you know, he just told me about that he had to let other people know about it because he didn't know if I was going to be coming back to the fifth floor.

Q    Did he show you any tools while you were in that cell with him -- in his cell?

A    No, he didn't.

**DRAFT COPY**

Avila - Direct / By Ms. Meyer                    150

Q    Did he show you an L-shaped tool?

A    Oh, he did.  He showed me, yes, an L-shaped tool that he had -- that's the only thing he did show me, was like a L-shaped tool that was going to be used to remove the frame around the window.

Q    At this time did the Iouri on Five South mention anything about his Codefendants?

A    Excuse me?

Q    At this time did the Iouri on Five South mention anything about his Codefendants?

A    Well he just told me that he was having a little bit of a problem with one of the Defendants that was located on the sixth floor, that he was on the north side of the building, and he was having trouble moving him to the south side of the building so that everybody, when the day the escape was supposed to take place that he was supposed to -- they were all supposed to come down into the stairwell and meet at a certain time.

Q    Now, you said that the Iouri on Five South showed you a tool that could be used to open the window.  Did he tell -- or take off the window.  Did he tell you why he wanted to remove the window?

A    Yes.  He said that they were in the process of bringing -- he was supposed to get another shipment in and that he had already had one shipment in, I think he told me that he had a

**DRAFT COPY**

Avila - Direct / By Ms. Meyer                    151

cell phone brought in, and that he was in the process of

getting another shipment in.  I believe it was a week after I

arrived.

Q    So at some point later were you asked to help out with

bringing tools into the prison?

A    Yes.  About a week after that I was -- again I was playing

a game of chess and Bandit came and tapped me on the shoulder

and told me that Iouri wanted to talk to me, so I followed him

into a different cell located in the center of the dorm room.

Q    Whose cell was that?

A    His name was Preceado (phonetic).

Q    So who went to Preceado's cell?

A    Bandit and I.

Q    And do you recall where that cell was located?

A    It was in the center of the dorm.  I think it was 541.

Q    When you arrived at Preceado's cell who was there?

A    Iouri.

Q    So it was just you, Bandit, and Iouri?

A    Yes.

Q    So what happened?  What did you do?

A    Well when I walked in there Iouri asked -- told Bandit to

step outside and to keep a lookout, and when he walked out he

placed a jacket over the door, that covered the door so that

people couldn't see -- the guards couldn't see in, you know,

anybody couldn't see inside the door into the cell.

**DRAFT COPY**

Avila - Direct / By Ms. Meyer          152

Q    And after he put the jacket over the window --

A    To the door.

Q    To the door.  What did Iouri do?

A    He closed the door and then I noticed that there was two paper bags on the floor and he pulled out the contents in there and there were like -- there was bread and there was like tooth floss made into a little rope, and that L-shaped tool.

Q    What did you do?

A    He asked me to -- like to crush the bread and to sort of make it into a little ball while he removed the frame on the window.

Q    Did he use that L-shaped tool to remove the frame on the window?

A    Yes.

Q    And did he tell you why he wanted you to crush the bread into little balls?

A    He said it was going to be for weight, but he ended up tying the little rope -- it was tooth floss made into a little rope and he tied it on that ball.

Q    Then what?  After the window was removed --

A    Then he finished removing the frame on the window and, because the lights were off, he flashed the lights on and off I believe it was twice and whistled and we just waited, and then when he -- I heard a response, somebody whistled back, and I looked over and I seen somebody, it was like -- I believe he

**DRAFT COPY**

Avila - Direct / By Ms. Meyer                153

was wearing a baseball cap.  And which at that time he threw the ball that I had originally -- the bread that I had originally crushed up into a ball with the rope and he threw it over and the guy on the outside caught it.  And we waited for a little while, maybe about 10 minutes, and when he felt a yank on the rope he started pulling the rope back up.  And --

Q    When the rope was pulled back up what was at the end of that rope?

A    There was a bag, like a black gym bag.

Q    Could that gym bag fit through the window?

A    Well, yeah, he removed a couple of tools from there, like a wrench I remember, and he twisted it around and finally brought it through.

Q    Now, when you say "he," you're talking about Iouri?

A    Yes.

Q    On Five South?

A    Yes.

Q    So after the tools and the gym bag were brought in then what happened?

A    He replaced -- he put the glass back up, put the frame back up that held the glass -- holds the glass in place, and we removed the jacket, we put everything inside the paper bag, and we walked out.

Q    Where did you go when you walked out?

A    We went into Iouri's cell.

**DRAFT COPY**

Avila - Direct / By Ms. Meyer                    154

Q    And what did you do when you got to Iouri's cell?

A    Nothing.  He just told me that he would talk to be about it later and I went back to playing games -- chess.

Q    Was Preceado's cell ever used again to bring tools into the prison?

A    No.

Q    Do you know why not?

A    I think Preceado was -- he got a little nervous and -- because I guess it was taking so long and he didn't want anything to do with it anymore, there was too many rumors going around, too many people already knew of the attempt to escape.

Q    So once Preceado's cell was no longer an option did Iouri talk to you about using another cell to bring tools into the prison?

A    Yes.  Iouri asked me that if we could get the cell located on the right-hand side of the showers on the bottom tier, but when we tried to get that cell the guy didn't want -- he didn't want to move out of that cell.  So he asked me if I could get Bandit and his friend, Bobby Shultz (phonetic), moved into -- on the left-hand side of the showers.

Q    Now --

A    So --

Q    Mr. Avila, what was your understanding of why Iouri would ask you about moving Bandit and Bobby Shultz to a cell near the showers?

**DRAFT COPY**

Avila - Direct / By Ms. Meyer                155

A     Because I was an orderly there and I had more access to talk to the lead orderly, so it was -- I could talk to the lead orderly and he's the only one that can actually go to the counselor and have anybody moved to a different cell.

Q     So did it happen?

A     Yes.  Not on the right-hand side, but the movement was done on the left-hand side of the showers.

Q     Did Iouri tell you why he wanted a cell next to the showers?

A     He showed me like a little sketch plan of why, there was some kind of a landing, and I didn't understand exactly but from that landing I think it went to -- I don't know if there was a garbage can, and it was better access to walking out of that back -- it was dark in the back of that building, so the showers were located on the back side of that building where it was dark, and that's the way that -- you know, just in case that the other way of escape that they were planning out wouldn't happen, and also so they can bring the tools from Bandit's cell.

Q     So was this cell used to bring in more tools?

A     Yes.

Q     Can you tell the jury about that?

A     There was -- about a week after that again I was like in the common area and Bandit comes and tells me that Iouri wants to talk to me, so when I followed him he tells me if I could

**DRAFT COPY**

Avila - Direct / By Ms. Meyer                156

just keep a lookout.  I was kind of like getting already frustrated from it, you know, from the whole situation already as it was.  Nobody wanted to believe my story and at the same time I didn't believe that my family or anybody else would have been in danger when they come to the visiting room.  I already knew what their plans were, so I was like already -- nobody believes me, everything was all right, so I just kind of left it at that.  So I just went over there and I was getting a little frustrated because when I was keeping a lookout this took forever, it must have taken maybe about an hour, and when it was finally over with, when they finally opened the door -- it was Bobby Shultz and I that were actually keeping a lookout.

Q    So, Mr. Avila, just to clarify, this is the time that Bandit's cell was used to bring up tools?

A    Yes.

Q    And during this time you served as a lookout?

A    Yes.

Q    You and Bobby Shultz?

A    Yes.

Q    Who was inside Bandit's cell bringing up the tools?

A    Iouri and Bandit.

Q    I'm sorry?

A    Iouri and Bandit.

Q    And you said it took a while, about an hour.  Did you learn why it took so long?

**DRAFT COPY**

Avila - Direct / By Ms. Meyer                    157

A    Yes.  When they finally opened the door I asked them why are you guys taking so long and Bandit told me that it was -- that there was a problem, the rope broke first, and then the guy that was bringing the tools in left the keys in the car so they had to call like Triple A.

Q    Mr. Avila, after the tools were brought up did you go inside Bandit's cell?

A    Yes.

Q    What did you see?

A    I seen -- there was the same thing, kind of a paper bag, and there was tools in there.  And there was a black -- there was another gym bag.

Q    And what was Bandit doing?

A    He was stuffing tools in his pockets in his pants and in his shirt.

Q    What was Iouri doing?

A    The same thing.

Q    Did you grab some tools?

A    Yes.

Q    And what did you guys do with all these tools that you were stuffing into your clothing?

A    Took them to Iouri's cell.

Q    Did you have to make more than one trip?

A    Yes.

Q    Now, you testified that you attempted to tell authorities

**DRAFT COPY**

Avila - Cross / By Mr. Rubin                158

about the escape attempt while you were originally located on Five South.  Did you try to notify the authorities another time?

A     Yes.

Q     Can you describe that for the jury?

A     After the -- well I still attempted to call my lawyer after that and it was still the same thing, you know.  And then shortly after that, I believe it was like in March, when the attempted escape was discovered, I slid a note -- they locked the whole facility down and I slid a note underneath the door and told them that if they wanted to know about it that I would have to be pulled out in handcuffs.

Q     And were you brought out and did you meet with the FBI?

A     Yes.

Q     And at that point did you provide complete information about the escape attempt?

A     Yes.

        MS. MEYER:  No further questions for this witness, your Honor.

        THE COURT:  Mr. Rubin?

        MR. RUBIN:  Yes, thank you, your Honor.

                    CROSS EXAMINATION

BY MR. RUBIN:

Q     Good afternoon, sir.

A     Good afternoon.

Avila - Cross / By Mr. Rubin                159

Q     You were originally arrested on your Federal Indictment in what year?

A     2001.  I believe it was February 22nd.

Q     And you were indicted for what charge?

A     Conspiracy to distribute cocaine.

Q     What was the quantity of the cocaine that you were alleged to have conspired to distribute?

A     I believe it was 50 kilos.

Q     Do you know what you were looking at as far as the sentencing guidelines for that charge were concerned?

A     Ten years.

Q     When were you sentenced?

A     I was sentenced in I believe it was February of 2004.

Q     And what was your sentence in February of 2004?

A     Seventy-eight months.

Q     And it's your testimony that you received three years less or three years --

A     Three and a half.

Q     -- off of your sentence because of your cooperation with the Government?

A     Not necessarily all of it because of the attempted escape. I had -- one of the conditions that I told them that I would sign -- that I would plead guilty was if I was allowed to speak the truth for my conspiracy charge.

            **THE COURT:**  Which conspiracy charge?

**DRAFT COPY**

Avila - Cross / By Mr. Rubin          160

THE WITNESS:  My original charge, your Honor.

THE COURT:  The drug charge?

THE WITNESS:  Yes, sir.

BY MR. RUBIN:

Q    So you got three years off your sentence for --

A    Three and a half years, sir.

Q    You got three and a half years off your sentence for telling the truth about your crime?

A    Yes.

Q    That's what you're saying you got time off for?

A    Yes.

Q    Is that right?

A    Yes.

Q    You didn't get any time off for your cooperation with the Government in the investigation of the attempted escape?

A    Yes.  It's all together.

Q    Now, this Indictment that you had in 2001, was that your first contact with the law?

A    No.

Q    You had prior criminal convictions?

MS. MEYER:  Objection, your Honor.  We're going to have to approach on this, your Honor.

THE COURT:  Let me see counsel at sidebar.

(Begin sidebar)

THE COURT:  Are these felony convictions, sir?

**DRAFT COPY**

Avila - Cross / By Mr. Rubin               161

MR. RUBIN:  I don't have a rap sheet for this individual.

THE COURT:  Then you can't --

MR. RUBIN:  I was not given one.

THE COURT:  Then you can't ask questions about --

MR. RUBIN:  I was not given one.

MS. CHAHIN:  I have a rap sheet and I thought he had a 1994 drug charge.

THE COURT:  But that's not -- doesn't go to truth, honesty, and veracity.

MS. CHAHIN:  It's a felony.

THE COURT:  I understand that.

MS. MEYER:  The two priors are he has two misdemeanor domestic violence convictions and a misdemeanor domestic violence conviction.  He has no prior felonies prior to this one.

MS. CHAHIN:  Can I check my notebook, please?

MR. DUGDALE:  Your Honor --

MS. CHAHIN:  Can I check my notebook?

MR. DUGDALE:  -- he got a safety valve reduction for his drug charge, which means he didn't have any prior felonies.

THE COURT:  I understand that.  I understand that.

You shouldn't ask a question like that unless you have a basis for asking the question.

MR. RUBIN:  Well, we have asked for rap sheets for

**DRAFT COPY**

Avila - Cross / By Mr. Rubin               162

all the witnesses.

MS. MEYER:  Your Honor, it's Bates stamped.

MR. RUBIN:  I don't have it.

MS. MEYER:  It's Bates stamped.

MR. RUBIN:  Well I don't have it.

MS. DeWITT:  The Defense has it even if you don't.

MS. MEYER:  I sent it to all eight counsel.

MR. RUBIN:  You also sent --

THE COURT:  What's the --

MR. RUBIN:  -- us a letter --

THE COURT:  What's the Bates --

MR. RUBIN:  You also sent us a letter the other day, but I didn't get that letter.

THE COURT:  What's the Bates stamp number that has the rap sheet on it?

MS. MEYER:  Actually, your Honor, there are two, because we had a wrong rap sheet originally and I corrected it and sent a new one out to all of them saying this is the correct rap sheet for this witness.

MR. RUBIN:  I didn't get another rap sheet for this witness.

THE COURT:  But you're still not supposed to ask questions like that without proper foundation or proper basis for asking the question.

MR. RUBIN:  Well the basis for asking the question

Avila - Cross / By Mr. Rubin                         163

was he admitted he's had prior contacts.

MS. MEYER:  He has.

THE COURT:  But the prior contacts is not relevant. It's felony convictions and it's felony convictions of a certain type.

MS. MEYER:  Right.  And his priors were misdemeanors for domestic violence.

THE COURT:  Ms. Chahin is looking.

MS. MEYER:  I have it right here.

MR. SPEAKER:  Do you want to take a break now?

THE COURT:  No.

MR. SPEAKER:  No.

MS. MEYER:  I have it right here.  Would you like to examine it?

MS. CHAHIN:  I'm sorry.  Can you check this? According to my notes he has a 1998 felony drug conviction for the sale of marijuana and hashish.

MS. MEYER:  That's the wrong rap sheet *** and we had the wrong *** but this is the corrected one.

THE COURT:  All right.  I'll sustain an objection to this line of questioning.

MS. MEYER:  Thank you, your Honor.

(End sidebar)

THE COURT:  Mr. Rubin?

MR. RUBIN:  Yes, sir.  Thank you.

**DRAFT COPY**

Avila - Cross / By Mr. Rubin                    164

**BY MR. RUBIN:**

Q    In addition to the plea agreement that you had with the Government on your Federal Indictment, did the Government also file a Rule 35 Motion after you were sentenced?

A    Yes.

Q    And what is -- do you know a Rule 35 Motion is

A    No, not really.

Q    So you don't know what effect that Motion would have?

A    From my understanding it's just for cooperating some kind of like downward departure for my sentencing.

Q    It would give you a reduction of your sentence after you were sentenced, is that correct?

A    During my sentence.

Q    While you were serving it.

A    During my sentence.  Right.

Q    Now, are you a citizen by the way?

A    No, I'm a resident alien.

Q    And you're not being subject to deportation right now?

A    I am -- I still have to -- I'm going to fight for my deportation.

Q    You were being held as a material witness in this case in custody because of the fact that you were -- you had the possibility of immediately being deported, is that right?

A    Right now, yes.

Q    Okay.  And at this point you're out of custody, correct?

**DRAFT COPY**

Avila - Cross / By Mr. Rubin                165

A     Correct.

Q     And at this point you are working on fighting your

deportation?

A     Yes.

Q     To stay in the country.

A     Yes.

Q     Even though you have a felony drug conviction now.

A     Yes.

Q     All right.  Now, when you originally -- the first time

that you spoke to the authorities about this situation did you

inform them that you had heard from another Southsider

(phonetic) named Solo (phonetic) and Mr. Mikhel had a crazy

plan to escape from MDC using C4 explosives to blast a hole in

the library visiting room wall?

A     Yes.

Q     Who was Solo?

A     Solo was another inmate that was housed in that same

housing area in Five South.

Q     And what does it mean when you said that he was a

Southsider?

A     A Southsider is a -- it's just a -- in jail, when you're

in jail, there is like certain groups that you I would say

classify as being part of.  If you're from Mexico, it's Spica

(phonetic), and if you're from out here you'd be classified as

Southsider.  If you're white, then you go White.  It's just a

**DRAFT COPY**

Avila - Cross / By Mr. Rubin                    166

racial thing that's run in jail.

Q    All right.  And was Solo a gang member?

A    Yes.

Q    By the way do you have a street name also?

A    A street name -- a nickname?

Q    Yes.

A    Yes.

Q    What is it?

A    Chuco (phonetic).

Q    Now, can you tell me who Robert Walsh Jr. (phonetic) is?

        **MS. MEYER:**  Objection, your Honor.  Ask for another sidebar.

        **THE COURT:**  Well, let's get the question answered first.

        Go ahead.  I'll overrule the objection.  Do you know Robert Walsh?

        **THE WITNESS:**  Yes, your Honor.

        **THE COURT:**  Who is Robert Walsh?

        **THE WITNESS:**  Robert Walsh is someone who I know from the streets that I believe was in that same Indictment that I was in on my prior case.

        **THE COURT:**  All right, let's take our recess at this time.

        **(Jurors exit courtroom at 2:40 p.m.)**

        **(Discussions off the record)**

**DRAFT COPY**

167

**(Outside the presence of the jury)**

THE COURT:  All right, outside the presence of the jury.

What's the relevancy of Mr. Walsh?

MS. MEYER:  Your Honor, I had a conversation with Ms. Chahin about this.  Bobby Walsh is a Codefendant --

MR. SPEAKER:  Do you want him in?

THE COURT:  No, I don't want him in.  He's outside. Mr. --

MS. MEYER:  Bobby Walsh is somebody who was also implicated in this drug trafficking offense and he was picked up and he and Mr. Avila were incarcerated together out in Ohio. Mr. Avila was originally indicted out of Ohio.  Mr. Avila signed a plea agreement with the Northern District of Ohio in July of 2001 and in that plea agreement the Government said that it would not charge Mr. Avila for threatening a Government witness.  Ms. Chahin asked the Government for further disclosures on that.  I went through Mr. Avila's entire Rule 20 file and I determined the following:  there was nothing related to that.

I asked Mr. Avila about that and he told me that he knew Mr. Walsh from the streets and they had a dispute out on the streets.  When they saw each other in prison they fought. He did not know whether Mr. -- he did not know that Mr. Walsh was going to be a witness against him one way or the other.

168

I conveyed all this information to Ms. Chahin. Mr. Rubin never approached me about this. And I said that the Government believes that it's irrelevant under Rule 608. That plea agreement that was signed in 2001 is two years before he learned -- or a year and a half before he learned anything about the escape attempt and two years before he provided any information to the Government, so the Government does not consider the fact that he would not be charged for assaulting a Government witness as a fact that he received for information he related to the escape. And I asked Ms. Chahin if she was going to raise it, because if she was I wanted an opportunity to raise it with the Court. I hadn't heard from Mr. Rubin, I didn't know he was going to do this, so that's why the Government objects.

MR. RUBIN: Didn't talk to everybody.

THE COURT: It's not relevant.

MR. RUBIN: Excuse me, your Honor, I have a letter from the U.S. Attorney in the Northern District of Ohio that says -- I assume it's regarding Mr. Walsh -- a member of Jose Avila's family came into contact with a potential witness in the prosecution and said something to the effect, "We know where you are and where your family lives."

MS. MEYER: Your Honor --

THE COURT: That's all speculation and I'm not going to allow it in.

**DRAFT COPY**

169

In addition, I was just handed a document that was filed on December the 8th, 2006 regarding an Ex Parte Application for a Writ of Habeas Corpus Ad Testificandum and a Declaration of Counsel by, on behalf of Mikhel, Mr. Rubin and Mr. Callahan asking that a Clifford Smith (phonetic) be brought out here.  And I read the reason for this request and it's totally irrelevant.

MR. RUBIN:  You're not asking me about that, are you?  I didn't --

THE COURT:  Well your name's on here.

MR. RUBIN:  I'm cocounsel, that's why I guess my name appeared on this document, even though I never received it.  But I've been here all day.

THE COURT:  All right.  We're going to take our recess.  We'll talk about this on Tuesday, but I have no intention of signing the Application for Writ of Habeas Corpus Ad Testificandum for Clifford Smith, who is a witness in the Aryan Brotherhood case that has nothing to do with this case.

MR. SPEAKER:  Oh, well, okay.

(A recess was taken from 2:45 p.m. to 2:53 p.m.; parties present)

(Outside the Presence of the Jury)

THE COURT:  All right.  Outside the presence of the jury the record will indicate all counsel and all parties are present.

**DRAFT COPY**

170

Anybody want to speak to the Court?

MR. LASTING:  I do, your Honor.

MR. DUGDALE:  Just very briefly for the Government, your Honor.

This is our last witness that we have here today.  We have three additional short witnesses.  We may eliminate one of them.  All three of the remaining witnesses we have, their direct should be less than 10 or 15 minutes long.  So we'll call them first thing on Tuesday morning.  Then, we will rest.

THE COURT:  Mr. Lasting?

MR. LASTING:  Yes, your Honor.  Thank you.

THE COURT:  Do you think we'll finish with this witness today, Mr. Rubin?

MR. RUBIN:  I'm done now.

THE COURT:  Oh.

MR. RUBIN:  I have nothing else to ask him, your Honor.

THE COURT:  Mr. Lasting?

MR. RUBIN:  It was all taken away.

MR. LASTING:  Your Honor, Ms. Chahin is going to cross examine the witness.

But I just wanted to raise the issue with the Court.  Mr. Callahan filed the Ex Parte Application for the Writ of Habeas Corpus Ad Testificandum for Clifford Smith.  And this motion is really filed on behalf -- although it bears the

**DRAFT COPY**

171

heading of Mr. Callahan and Mr. Rubin, it's filed on behalf of Ms. Chahin and myself, as well, for Mr. Kadamovas.

I know the Court's indicated what I would refer to as a tentative ruling on this. But I would like to be heard on it before the Court finalizes it.

THE COURT: I said we'll hear about it on Tuesday.

MR. LASTING: That's fine.

THE COURT: But my inclination is not to -- I mean this is so farfetched. Because a witness allegedly lied, a Government witness allegedly lied in another case, that means that all Government witnesses lie.

MR. RUBIN: No, it's not --

THE COURT: I mean that's absolutely --

MR. RUBIN: That's not the issue.

THE COURT: -- preposterous.

MR. RUBIN: That's not the issue.

MR. LASTING: I would totally agree with the Court if that was what this issue was about. But that's not what the issue is about. And I don't want to take up the time right now, but I hope that the Court's remarks are really nothing more than a tentative and that the Court will hear what we've got to say.

THE COURT: That's why I prefaced everything by saying we will take it up on Tuesday. But my present frame of mind and present intention is not to allow -- not to execute

**DRAFT COPY**

172

this Habeas Corpus Ad Testificandum.

MR. LASTING:  I'd just like to --

THE COURT:  I took Latin and I can't even spit it out any more.

(Laughter)

MR. LASTING:  Believe me, I have trouble with the English.  But just two quick points, if I might, your Honor.

One is, the Court said, "allegedly lied."  It's no alleged about it.  He admitted that he lied.  It's in the transcript that he admitted that he lied.

MR. RUBIN:  The witness admitted it.

MR. LASTING:  And secondly --

MR. RUBIN:  That was used to give him --

MR. LASTING:  And secondly --

MR. RUBIN:  He was benefited --

MR. LASTING:  I'm sorry.  Secondly, after he lied he was called again by the Government.  And after he lied he was paid money.  So I don't think it is as simple an issue.  And it goes directly to the issue raised in the Government's examination of four witnesses in this case that they have -- they face serious punishment if they lie under oath.  And I think that to give that impression to the jury when it's clear that the same office has done exactly the opposite with another government witness is extremely relevant.

But we can -- if the Court's got an open mind, we can

**DRAFT COPY**

Avila - Cross / By Ms. Chahin                173

discuss it --

THE COURT:  We'll discuss it on Tuesday.

MR. LASTING:  Thank you, your Honor.

THE COURT:  After the Government's has had an opportunity to look at the document and respond, as well.

MR. DUGDALE:  Thank you, your Honor.

THE COURT:  All right.  Let's bring the jury out.

(Pause / Counsel conferring off the record)

(Jurors enter courtroom at 2:57 p.m.)

All right.  The record will indicate all jurors are present, all counsel and all parties are present.

Mr. Rubin, any additional questions you wish to ask of Mr. Avila?

MR. RUBIN:  No, sir.

THE COURT:  Ms. Chahin?

MS. CHAHIN:  Thank you, your Honor.

CROSS EXAMINATION

BY MS. CHAHIN:

Q    Where were you born, Mr. Avila?

A    Guadalajara, Mexico.

Q    And you're a citizen of Mexico?

A    Yes, ma'am.

Q    Okay.  You indicated that you're a resident alien.

When did you become a resident alien?

A    A long time ago.  I was probably, maybe three years old.

DRAFT COPY

Avila - Cross / By Ms. Chahin                 174

Q    So would it be fair to say that you've lived most of your life in this country?

A    Yes, ma'am.

Q    And you currently in deportation proceedings?

A    No.  Currently I still have to go in front of a judge and present my case, which I may be deported because of my prior felony.

Q    Sir, isn't it true that right now you're out of status and you're here in this country illegally?

A    No.

Q    You're not here illegally?

A    No.

Q    It's your belief that you are a resident alien in status and in this country legally?  Is that what you're saying?

A    Correct.

Q    Have you been before an immigration judge yet?

A    No.

Q    After your release from custody were you taken before an immigration judge?

A    No.

Q    Were you released from the federal institution directly to the streets?

A    From INS.

Q    I'm sorry?

A    From INS.

**DRAFT COPY**

Avila - Cross / By Ms. Chahin                    175

Q    From INS.  Why were you in INS custody?

A    Because I had to see a judge.  I have to see a judge. It's the law I have to see the judge before I get deported.

Q    Okay.  When you were released from the federal institution, were you transferred into immigration custody?

A    Yes.

Q    For purposes of deportation proceedings.

A    For purposes of seeing the judge.

Q    Because you are subject to deportation from this country based on your --

A    Well, the judge --

Q    -- drug felony conviction.

A    -- hasn't determined that, ma'am.

Q    I'm sorry?

A    The judge has determined that.

Q    Okay.

A    Whether he does a deportment or not it will be solely up to him.  I have to present my case in front of an immigration judge.

Q    Sir, isn't it true that in connection with your sentencing you filed an Affidavit in regards to your immigration status in this country?

A    Yes.

Q    Okay.  And in that Affidavit you recognized that you were subject to deportation; isn't that true?

**DRAFT COPY**

Avila - Cross / By Ms. Chahin                    176

A    No.  It wasn't that I was subject to deportation.  I signed that Affidavit saying that I wouldn't contest it.

Q    Sir, isn't it true and you signed a document under penalty of perjury which states that you have been advised of your opportunity to contest that deportation and knowing that you forego your ability and your right to do that, that you would not contest it?

A    Correct.

Q    You would not contest it and you would agree to deportation.

A    Correct.

Q    Isn't that true?

A    Correct.

Q    Okay.  So why did you file that Affidavit under penalty of perjury with the Court saying that you would agree to deportation if it's now your intention to contest it?

A    The reason that I did that was because my lawyer advised me saying that if I did sign that, that I would get a downward departure in my sentence, which I did not.  So when I asked him, he told me that since the judge says that I would mostly likely get deported after I see an immigration judge, that she wouldn't give me a downward departure; which, in that case, I said that in that case I might as well fight for my resident alien.

Q    So at the time that you believed that you could get time

**DRAFT COPY**

Avila - Cross / By Ms. Chahin                177

off for saying you'd agree to be deported, you signed a

document under penalty of perjury saying you agreed to it

because you thought it would help you get time off.

A    Yes.

Q    Okay.  And now that it's not going to help you get time

off any more, now you're saying you want to fight it; is that

right?

A    Yes.

Q    Now, do you have a court hearing scheduled before INS?

A    I have to meet with an INS officer in January.

Q    And is that for purposes of going before a judge?

A    Yes.

Q    And contrary to the document that you signed under penalty

of perjury saying that you would agree to it, you're now going

to contest it, correct?

A    Correct.

Q    I'd like to ask you some questions about the case on which

you were being held in federal custody.

          This was a drug offense, correct?

A    Yes.

Q    Drug trafficking offense.

          And was it originally out of this district?

A    It was out of Ohio.

Q    And did you live in Ohio?

A    No.

**DRAFT COPY**

Avila - Cross / By Ms. Chahin                    178

Q    So your participation in this case was here in California;
is that correct?

A    In that case?

Q    Yes.

A    The one that was in Ohio?

Q    Yes.

A    I got sentenced here in California, right.

Q    Okay.  And the question was:  Where did you commit the
crime?

A    It was allegedly done in Ohio.

Q    Allegedly done or did you commit the crime?

A    It's a conspiracy.

Q    I understand that.  Were you involved in that conspiracy?

A    Yes.

Q    You pled guilty to it.

A    Yes.

Q    To trafficking in 50 kilograms of cocaine, correct?

A    Yes.

Q    Now, at the time that you were involved in that case did
you reside here in California?

A    Yes.

Q    Okay.  The indictment was out of the other district,
correct?

A    Yes.

Q    Where were you arrested?

**DRAFT COPY**

Avila - Cross / By Ms. Chahin                179

A     Here in California.

Q     And did you go before a judge here in California?

A     Yes.

Q     Okay.  Did you end up back in that district --

A     Yes.

Q     -- where you were charged?  Yes?

A     Yes.

Q     Okay.  And was your case set for trial in that district?

A     Yes.

Q     Shortly before your case was set for trial did you enter into an agreement with the Government and agree to plead guilty?

A     Yes.

Q     Okay.  And was that a cooperation agreement?

A     Yes.

Q     In conjunction with that cooperation agreement did you request to be transferred back here to California?

A     Yes.

Q     Why?

A     My lawyer believed that I could get a better sentence out here.

Q     Okay.  And you had lived here in California, right?

A     Correct.

Q     You wanted to cooperate; you wanted to provide information to the Government so you could get time off of your sentence,

**DRAFT COPY**

Avila - Cross / By Ms. Chahin          180

correct?

A     One of the reasons that I decided to plead guilty was if I was allowed for the Prosecutor -- if the Prosecutor would listen to what I had to say.  That was the only way that I would agree to me signing -- for me to plead guilty.

          THE COURT:  Now, which Prosecutor are you talking about?  The Prosecutor --

          THE WITNESS:  Ronald Bakeman (phonetic), your Honor.

          THE COURT:  The one in Ohio or the Prosecutor here in California?

          THE WITNESS:  The one in Ohio, your Honor.

          THE COURT:  Now, was your case eventually transferred from Ohio to the Central District of California, which is this district, on the basis of a Rule 20 transfer?

          THE WITNESS:  Yes, sir.

          THE COURT:  Your plea negotiations, did they take place in this district or did they take place in Ohio?

          THE WITNESS:  The Plea Agreement took placed in Ohio.

          THE COURT:  But the plea was entered where, in California or in Ohio?

          THE WITNESS:  In Ohio.

          THE COURT:  And the sentencing took place in which district, Ohio or California?

          THE WITNESS:  California.

          THE COURT:  And that was the Rule 20 transfer that

**DRAFT COPY**

Avila - Cross / By Ms. Chahin                    181

you entered into with your attorney and yourself, the

Prosecutor in Ohio and the Prosecutor here in California?

          THE WITNESS:  Correct.

          MS. CHAHIN:  Thank you, your Honor.

BY MS. CHAHIN:

Q     Sir, as part of the Rule 20 transfer, would it be fair to say that you wanted to be transferred here to California because this is where you'd be able to provide information about drug cases?

A     No.  I was just sent here just for sentencing.

Q     Sir, it was a cooperation agreement, correct?

A     Right.

Q     Okay.  You wanted to provide the Government information to help you get time off of your sentence, correct?

A     That was part of the Plea Agreement.

Q     I'm sorry?

A     That was part of the Plea Agreement.

          THE COURT:  Let me interrupt again.

          The cooperation that was talked about, is that cooperation that you are going to give as a result of the drug charge that was pending against you in Ohio or was it the result of information that you had obtained while you were incarcerated in California at the Metropolitan Detention Center, or was it both?

          THE WITNESS:  It was both, your Honor.

**DRAFT COPY**

Avila - Cross / By Ms. Chahin                    182

**BY MS. CHAHIN:**

Q    Okay.  Now, I'm asking you specifically about the agreement that you entered into when you were in Ohio.

Do you have that in mind?

A    Uh-huh.

Q    Do you know --

**THE COURT:**  Is that "yes"?

**THE WITNESS:**  Yes.

**THE COURT:**  You can't say "uh-huh."

**THE WITNESS:**  Yes.

**BY MS. CHAHIN:**

Q    Do you know approximately when you entered into that agreement?

A    In Ohio?

Q    Yes.

A    I think it was in -- I believe it was in July.

Q    Of what year?

A    2001.

Q    At the time you had entered into that agreement it was your hope to cooperate, correct?

A    Correct.

Q    At that time did you have any information to provide the Government in Ohio?

A    Yes.

Q    Did you have meetings with them in Ohio and provide them

**DRAFT COPY**

Avila - Cross / By Ms. Chahin                    183

information?

A    No.

Q    At some point was your case transferred to California?

A    I was transferred to California, and I believe it was
somewhere around August of 2001.

Q    And once you arrived here in California did you have --
was it still your intention to cooperate?

A    Yes.

Q    Okay.  You wanted to provide information to get time off
of your sentence, correct?

A    Correct.

Q    And did you have meetings with the Government in regards
to drug charges to see if you could provide them some
information that would be useful to them?

A    Yes.

Q    Okay.  How many times did you meet with them?

A    I believe it was once.

Q    When did you meet with them?

A    The date I don't remember, ma'am.

Q    Do you remember approximately when?

A    About February of 2002.

Q    At some point when you were transferred here to California
did you enter into a second Plea Agreement?

A    Yes.

Q    Do you recall when that was?

**DRAFT COPY**

Avila - Cross / By Ms. Chahin                184

A    I believe it may be somewhere around May 2002.

Q    Now, as part of the cooperation agreements that you entered, did you have an understanding of whether or not you had some obligations?  What were your responsibilities?

A    For cooperation?

Q    Yes.

A    Just to speak the truth.

Q    To speak the truth.  Were you supposed to --

Do you know whether you had an obligation to attend interviews, if necessary?

A    Yes.

Q    Were you supposed to respond to all questions truthfully that were asked of you?

A    Yes.

Q    If the Government wanted you to go before the Grand Jury and testify, were you required to do that?

A    Yes.

Q    Okay.  If the Government needed you to testify at a trial, would you have been required to do that?

A    Yes.

Q    Okay.  And you signed -- you reviewed the contents of your Plea Agreement with your attorney?

A    Yes.

Q    You understood it?

A    Yes.

**DRAFT COPY**

Avila - Cross / By Ms. Chahin                185

Q    And you knew that that's what you were obligated to do; is that right?

A    Now, with respect to the assistance that you are going to provide -- I'm sorry, let me withdraw that.

Was a trial date ever set in this district for your case?

A    No.

Q    Okay.  Your case was transferred here with the understanding that you were going to plead guilty; is that right?

A    Yes.

Q    Now, with regard to the meetings that you had with the Government to provide substantial assistance based on that second Plea Agreement that you entered, you were going to provide information about drug cases, correct?

A    Correct.

Q    Okay.  And you met with them.

A    Yes.

Q    Okay.  Were you successful in providing valuable information to the Government?

A    No.

Q    Okay.  By this point you had been in jail for a while, correct?

A    Yes.

Q    Okay.  The information that you had was stale.

**DRAFT COPY**

Avila - Cross / By Ms. Chahin                186

A     Yes.

Q     Okay.  You no longer had any viable drug contacts, correct, that you could provide information on?

A     Yes.

Q     Okay.  And the Government believed that the information that you gave them was not specific enough to warrant further investigation; isn't that right?

A     Yes.

Q     So your attempts to cooperate had been unsuccessful.

A     Yes.

Q     Is that correct?

A     Yes.

Q     Now, if you wanted to get time off of your sentence you would have to find some other information to provide, correct?

A     Excuse me?

Q     Being that the information you had regarding drug trafficking was no longer viable, you would have to find some other information to provide to the Government if you wanted to get some time off your sentence; is that true?

A     Yes.

Q     And, in fact, really the only source that you would have to obtain information would be while you were incarcerated; isn't that true?

A     Yes.

Q     So you were looking for information to provide to the

**DRAFT COPY**

Avila - Cross / By Ms. Chahin                187

Government, correct?

A     No.

Q     When you were at the MDC in May of 2002, you entered into a second cooperation agreement, correct?

A     Correct.

Q     Okay.  And -- let me withdraw that.

One of the other things that you were seeking to avoid through your cooperation was to avoid deportation; is that right?

A     Yes.

Q     Earlier you stated that you had been in this country since you were about three years old; is that right?

A     (No audible response)

Q     Have you ever --

**MR. RUBIN:**  There was no answer to the question.

**THE COURT:**  There was no answer.

**THE WITNESS:**  Yes.

**BY MS. CHAHIN:**

Q     I'm sorry.  Have you ever lived in another country?

A     No.

Q     Would it be fair to say that most of your family ties are in this country?

A     Yes.

Q     Okay.  So it was very important to you, if possible, that one of the benefits that you wanted to obtain through your

**DRAFT COPY**

Avila - Cross / By Ms. Chahin                188

cooperation is to be able to keep your status in this country; is that true?

A    True.

Q    Now, you've talked about some different pieces of information that you say you acquired while you were at the MDC.  I'd like to go through with you in detail as best as you remember where you were housed and the time period during which you acquired the information.

        If you can, please think about the first time that you recall hearing any information related to an escape attempt while you were housed at the MDC.

A    You're asking me when was the first time that I heard of it?

Q    Yes.

A    The first time I heard of it was from an inmate that was there housed in Five South in the same dorm that I was housed in.  His name was Solo.  And then after that I heard it from Marceli (phonetic) himself.

Q    Okay.  When you were housed at the MDC on Five South, do you know Solo's correct name?

A    No, I do not.

Q    Okay.  And then you said you heard it from who else?

A    Marceli.  His name was Noyd (phonetic); his nickname was Noyd.

Q    Do you know Noyd's true name?

**DRAFT COPY**

Avila - Cross / By Ms. Chahin          189

A     It was Gustavo.

Q     And do you recall approximately what period of time this was?

A     It was about I'd say -- it was also around like March 2002.

Q     Now, you've told us that at some point you had a meeting with some DEA agents and provided them some information but they didn't believe you; is that right?

A     Right.

Q     In relation to that meeting, was this information that you acquired from Solo and Noyd before or after that meeting with the DEA agents?

A     That was -- they told me before I met, of course, with the DEA agents.

Q     Okay.  So you acquired information from Noyd and Solo while you were housed on Five South before you met with the DEA agents, correct?

A     Correct.

Q     How much before you met with the DEA agents?

A     It's been so long I would -- if you're asking me to guess, it would probably be a month.

Q     Okay.  From Five South do you recall where you were transferred from Five South?  To what other unit, to what floor?

A     I went to the hole.  It's located on the eighth floor.

**DRAFT COPY**

Avila - Cross / By Ms. Chahin                190

Q    The hole is what's also know as the "SHU" --

A    Right.

Q    -- correct?  And that's --

A    Isolation.

Q    Isolation.

A    Disciplinary action.

Q    And how long were you in the hole?

A    About a week.

Q    Okay.  While you were at the hole, did you acquire information from any other sources regarding this escape plan?

A    No.

Q    No?

A    No.

Q    And I'm sorry, you said you -- how long did you say you were in the hole?

A    About a week.

Q    Okay.  Prior to going to the hole had you acquired any information from anyone else other than Solo and Noyd on the fifth floor?

A    No.

Q    Okay.  Where did you go from there, to what unit?

A    To the ninth floor.

Q    How long were you at the ninth floor?

A    About two weeks.

Q    And during that two-week period of time that's the period

**DRAFT COPY**

Avila - Cross / By Ms. Chahin          191

of time that you said that you were with Mr. Kadamovas; is that correct?

A     Yes.

Q     Okay.  Now, in relation to the meeting that you had with the DEA agents, were you on Nine South before or after you met with the DEA agents?

A     After.

Q     You were -- I'm sorry?

A     After.

Q     Okay.  It's your recollection that you went to Nine South after you met with the DEA agents?

A     Yes.

Q     Do you recall approximately how long after?

A     Oh, everything's all mixed up.  It's been so long.

Q     What prompted you to schedule -- or let me withdraw this.

      How did you decide to contact the DEA agents and inform them that you had some information to provide to them?

A     From my lawyer.

Q     Approximately when?

A     Like I said, I don't remember the exact date, but it was shortly after I had found -- I had actually spoken to Iouri in Five South.

Q     So it's your recollection that shortly after you spoke to Iouri on Five South that's when you went to schedule the meeting with the DEA; is that correct?

**DRAFT COPY**

Avila - Cross / By Ms. Chahin                    192

A      If I remember correctly, yes.

Q      Okay.  Do you think it might refresh your recollection as to these dates if I were to show you a document?

A      Maybe.

        MS. CHAHIN:  Your Honor, if I could have a moment, please.

        (Pause)

        Your Honor, if I could please ask to have Government Exhibit 907 placed before the witness.

        THE COURT:  907?

        MS. CHAHIN:  And this is known as the Inmate History Quarters.

        THE COURT:  907 is in evidence.

        MS. CHAHIN:  Thank you, your Honor.

        (Pause)

        907 purports to be Jose Avila's Inmate History Quarters at the Metropolitan Detention Center.

BY MS. CHAHIN:

Q      Sir, and if I would direct your attention --

        MS. CHAHIN:  Your Honor, maybe it would help if I put this on the Elmo.

        (Pause)

BY MS. CHAHIN:

Q      Sir, if I could ask you to look at the document at approximately this location here, (indicating).

**DRAFT COPY**

Avila - Cross / By Ms. Chahin                    193

Do you see where it says "house, range, bed, 827

add," and it has a range of dates, 9-10-2002 to 9-13-2002?

A     Yes.

Q     Having looked at that document, does that refresh your

recollection as to whether or not you might have been housed in

Unit 827 of the SHU unit during that period of time from

September 10th, 2002 to September 13th of 2002?

A     Yes.

Q     Okay.  Now, I believe that your testimony was that prior

to being sent to the SHU unit you were on Five, correct?

A     Correct.

Q     Maybe it would make more sense -- maybe if you could give

us the chronology of the units you were located just generally

first before we talk about them specifically.

I believe you said that the first place you heard

about the escape plan was when you were on Five from Noyd and

Solo, correct?

A     Yes.

Q     From there you went to Eight?

A     Yes.

Q     The SHU.  From there you went to Nine.

A     Yes.

Q     Which is where you say you were with Mr. Kadamovas,

correct?

A     Iouri?  The ninth floor, yes.

**DRAFT COPY**

Avila - Cross / By Ms. Chahin                194

Q    Let's refer to them as "Ninth Floor Iouri" and "Fifth Floor Iouri" so we can tell them apart.

A    Yes.

Q    From the SHU it's your recollection that you went to ninth floor, and that's where you talked to Ninth Floor Iouri, correct?

A    Correct.

Q    Where did you go from there?

A    From there I believe I went to the sixth floor.

Q    Okay.  Did you have any discussions with anyone when you were on the sixth floor about the escape plan?

A    No.

Q    No one?

A    Oh, yes.  My cellmate.

Q    Who was that?

A    His name was Bad Boy.

Q    Bad Boy.  Is that the same person who you've referred to previously as "Little Boy"?

A    Little Boy.  Little Boy and Bad Boy, they were brothers. Little Boy was Marceli.

Q    Which one was Marceli?

A    Little Boy.

Q    Okay.  And who was it that talked to you about the escape plan when you were on six?

A    I believe it was Little Boy.

**DRAFT COPY**

Avila - Cross / By Ms. Chahin                    195

Q     Where did you go from the sixth floor?

A     I went to the seventh floor.

Q     And as best as you can recall from there -- I'm trying to
determine at what point you went back to the fifth floor after
the time after which you requested to speak with the DEA.

A     I believe I spoke to DEA prior to that.

Q     Okay.  So I'm trying to establish in the timeline during
the sequence of your acquiring information at what point you
asked to speak to the DEA.

        After you were on the fifth floor but before you were
transferred to another unit?

A     No.  While I was on the fifth floor.

Q     Okay.  After you spoke -- okay.  You've told us that you
were on the fifth floor; you spoke to Noyd and Solo.

A     Yes.

Q     From there you went to the SHU.

A     Yes.

Q     By that point you hadn't asked yet to speak to the DEA,
correct?

A     Wrong.

Q     Okay.  When was your recollection that you asked to speak
to the DEA?

A     From what I remember correctly it was while I was on the
fifth floor.

Q     The first time.

Avila - Cross / By Ms. Chahin                    196

A    Yes.

Q    Let's see if we can locate that date here on this, (indicating), chart.

Do you recall what units you were -- I'm sorry -- what cells you were in on the fifth floor?

A    My cell number?

Q    Yes.

A    No, I don't remember it any longer.

Q    Okay.  Well, if you look at the entries in this location here, (indicating).

A    533.

Q    If you look at that date ranges, it appears that -- does this document refresh your recollection as to whether or not you were on the fifth floor starting in December 20th of '01 up through and including September 10th of 2002?

THE COURT:  No, that's not accurate.

MS. CHAHIN:  I'm sorry, your Honor.

THE COURT:  It appears it's December 13th, 2001.

MS. CHAHIN:  I'm sorry.  December 13th, 2001.

THE COURT:  Through September 10th, 2002.

Were you in various cells on the fifth floor during that period of time?

THE WITNESS:  Yes, I was, your Honor.

THE COURT:  And the cells listed are 5 -- it looks like 38L, would be 538 lower; 501U, which means "upper"; and

**DRAFT COPY**

Avila - Cross / By Ms. Chahin          197

then 533L, which means "lower."

THE WITNESS:  Yes, your Honor.

THE COURT:  Are those the three cells on the fifth floor that you were housed in between December 13th, 2001 and September 10th, 2002?

THE WITNESS:  I believe they were, your Honor.

MS. CHAHIN:  Okay.

THE COURT:  And then were you moved to the eighth floor from September 10th, 2002 to September 13th, 2002?

THE WITNESS:  Yes, your Honor.

THE COURT:  When you were on the fifth floor from the period December the 13th, 2001 until September the 10th, 2002, did you meet with the DEA during that period of time?

THE WITNESS:  Yes, your Honor.

BY MS. CHAHIN:

Q    Okay.  Sir, isn't it true that your meeting with the DEA wasn't until later, it was actually in October of 2002?

A    As I said, I believe it was beforehand.  The date I don't remember.

Q    Okay.  Do you think it might refresh your recollection as to what the accurate date was of your meeting if I were to show you a document?

A    Yes.

MS. CHAHIN:  If I could have a moment, your Honor.

(Pause)

**DRAFT COPY**

Avila - Cross / By Ms. Chahin                198

BY MS. CHAHIN:

Q    Sir, if you could please read the first few lines of this, (indicating), document and please let me know when you are finished.

     **(Pause / Witness reads document)**

A    Yes.

Q    Okay.  Sir, having reviewed this document, does it refresh your recollection as to whether or not the date you met with the DEA agents was, in fact, October 10th of 2002?

A    Honestly, no.

Q    You believe it was earlier.

A    Yes.

Q    Okay.  If you had, in fact, met with the agents on October 10th of 2002, where would you have been housed during that period of time looking at the inmate history quarters?

          **MS. MEYER:**  Objection.  Calls for speculation.

          **THE COURT:**  No.  She asked the witness to look at the document and see whether or not that helps him refresh his recollection as to where he would have been housed.

     **(Pause)**

          **THE WITNESS:**  I would have been in the ninth floor.

BY MS. CHAHIN:

Q    On October 10th of 2002?

A    Oh, wait a minute.  The sixth floor.

Q    So on the date of October 10th of 2002 you would have been

**DRAFT COPY**

Avila - Cross / By Ms. Chahin                199

on the sixth floor, and that's in -- I'm sorry.

**(Pause / Counsel confers off the record)**

On October 4th -- I'm sorry -- October 10th of 2002, according to the Inmate History Quarters, that's this line located here, (indicating); is that correct?

A    It's October 10th, isn't it?

Q    October the 10th.

A    No, it's the next line up.

Q    Okay.  And you would have been housed on the -- during both of these entries here, (indicating), indicate that you would have been --

**MS. CHAHIN:**  I'm sorry, your Honor.

**BY MS. CHAHIN:**

Q    You would have been on the sixth floor during that period of time, correct?

A    Correct.

Q    Now, you were only with Mr. Kadamovas for a two-week period of time, correct?

A    About.

Q    The October 10th date -- the date of October 10th when you were housed on the sixth floor is after the two weeks that you were Mr. Kadamovas, correct?

A    Correct.

Q    If you can look at the Inmate History Quarters and see if that refreshes your recollection.

**DRAFT COPY**

Avila - Cross / By Ms. Chahin            200

A     Yes.

Q     Okay.  So can you identify for us here, (indicating) --

and actually, you can circle it on the screen yourself --

indicate for us on the screen the period of time that you were

on the ninth floor.

A     The period of time that I was on the ninth floor?

Q     Yes.

A     Right here, (indicating).

Q     Okay.  And what dates are those?

A     10-04 to 10-17 -- no, to 11-01.

          THE COURT:  Well, doesn't it say September 13th, 2002

through October the 4th, 2002 that you were on the ninth floor?

First in 917 -- I believe that's upper -- and then in 915,

lower?

          THE WITNESS:  Oh, you're right, your Honor.  Right

here, (indicating).  That's right.  Right here, (indicating).

BY MS. CHAHIN:

Q     Is that correct, sir?

A     Uh-huh.

Q     So the three-week period of time would have been from

September the 13th until October the 4th of 2002; is that right?

A     That's right.

Q     Now, at the time you asked to speak to the agents you told

them that you had some information that you thought might be

important to them, correct?

**DRAFT COPY**

Avila - Cross / By Ms. Chahin                    201

A    Correct.

THE COURT:  You're assuming now the DEA agents?

MS. CHAHIN:  Yes, I'm sorry, your Honor.  The DEA agents.

BY MS. CHAHIN:

Q    And you arranged to have a meeting with them through your attorney, correct?

A    Correct.

Q    And you wanted to provide them some information that might help you get some time off of your sentence, correct?

A    I wanted to supply information I thought that maybe people were going to get hurt.

Q    Okay.  So the reason that you called for the meeting with the DEA was because you had some information you were afraid people might get hurt.

A    Right.  I had family members that were going into that building.

Q    And so you wanted to make sure that you told the DEA agents everything you knew, because you didn't want anybody to get hurt.

A    Correct.

Q    Is that true?

A    True.

Q    Okay.  Is that what you did?

A    Yes.

**DRAFT COPY**

Avila - Cross / By Ms. Chahin                    202

Q     Who was present at that meeting, sir?

A     I don't remember both of their names.  It was the prosecuting attorney, Beth Fishman I think was her name.  And Polski (phonetic) was the DEA agent.

Q     Was anybody else present?

A     Like I said, there was another agent there.  I just don't remember his name.

Q     Was your attorney there?

A     Yes -- no.

Q     And so what happened when you went to that meeting?  What did you tell the DEA agents?

A     I told them what I knew.  But he wanted me to give him names, and I told him that I would give him the names if he guaranteed me that he can guarantee me my safety.  I told him that I wanted to be moved out of the building.

Q     Okay.  So you told him that you knew the names; that you would give him the names; but you wanted to guarantee your safety.

A     Correct.

Q     And what information did you tell him?

A     I told him that I had seen pictures of the building from different angles.  I told him that I had also seen like blueprints of the building.

Q     What else?

A     I believe that's it.

**DRAFT COPY**

Avila - Cross / By Ms. Chahin                    203

Q    Did you tell him that you were afraid for people's safety?

A    Yes.

Q    Tell me about that.

A    I just told him that these guys were planning to escape and that they were planning to blow up the side of the building on the visiting area.  And I told him that I had family members that go there frequently, and I told him that I was afraid that people were going to get hurt and that this was serious and that -- at that time he told me that I had to give him more information or something like that -- and I don't remember his exact words -- and that he said that he would speak to his superior or officer.

Q    Sir, isn't it true that you never -- when you met with the DEA agents you never told them that you had seen pictures of the building; isn't that true?

A    No, that's not true.

Q    Isn't it true that you never told them that you had seen blueprints of the building?

A    No, that's not true.

Q    Didn't you tell them that -- you didn't tell them anything about anyone was going to blow up the visiting room.

A    Yes, I did tell them.

Q    Sir, you didn't have any concerns about anybody's safety during that meeting; isn't that true?

A    No, that's not true.

**DRAFT COPY**

Avila - Cross / By Ms. Chahin                204

Q    Sir, in fact, at that meeting, isn't it true that you told the DEA agents that you knew that something was planned for the MDC but you wouldn't give them any further information unless they agreed to give you specific benefits in exchange?  Isn't that true?

A    Not true.

Q    Sir, isn't it true that they explained to you that -- you told them specifically what you wanted.  You didn't ask for your safety.  You asked not to be deported from this country.

Isn't that what you asked for at that meeting?

**MS. MEYER:**  Objection, your Honor.  Asked and answered.

**THE COURT:**  No, overruled.

**THE WITNESS:**  As I said before, I initially told them that I wanted to be moved out of the building.  And we even discussed areas that -- in between them they were discussing where they might be able to move me if it was approved by the superiors.

**BY MS. CHAHIN:**

Q    Sir, at that meeting you did not ask to be moved from the building.  You asked not to be deported, and you refused to give any further information unless they would honor that request; isn't that true?

A    That's not true.

Q    Isn't it true that the Government at that meeting told you

**DRAFT COPY**

Avila - Cross / By Ms. Chahin                     205

that they couldn't promise you those specific benefits?

A    They said they couldn't promise me anything.

Q    They told you that they couldn't promise you not to deport you from this country.

A    Like I said, they couldn't promise me anything.

Q    Sir, isn't it true that because they couldn't make that promise to you at that time you didn't give them any information?

A    Correct.

Q    Okay.  So you didn't tell them about that someone was going to blow up the visiting room.

A    Wrong.

Q    You didn't tell them that you were concerned for people's safety.

A    I did tell them that.

Q    So it's your recollection that at that meeting you told them all of the things that you are testifying here today.

A    I told them everything other than the names.  You know, I may not remember like dates and stuff like that it's been so long.  But as far as things that happened and certain things that were discussed like with the agents or anyone else, I do remember.

Q    Do you recall the DEA agents telling you that even if they had the slightest information about something being amiss at the MDC they were going to have to report it to the U.S.

**DRAFT COPY**

Avila - Cross / By Ms. Chahin                206

Marshals?

A    No, they didn't say anything like that to me.

Q    Do you recall them telling you that they needed at least some specific information about what you knew so they could try and corroborate whether or not it was true?

A    Yes.

Q    Okay.  And you didn't give them any specific information.

A    No.

Q    Isn't that true?

A    As far as like names, no.

Q    I'm not talking about names, in particular.  I'm referring to whether or not you told them that someone was going to blow up the visiting room.

A    Yes, I did tell them that.

Q    Sir, isn't it true that when the DEA told you that they couldn't make those promises to you, you said, "I don't want to talk to you any more"?  You declined to talk to them any further.

A    No.  They ended the meeting.

Q    Okay.  You did not end the meeting, they ended the meeting.

A    Correct.

Q    Now, after that meeting with the DEA agents, did you have any further meetings with them prior to this escape attempt being discovered?

**DRAFT COPY**

Avila - Cross / By Ms. Chahin                    207

A    No.

Q    Okay.  So the next time that you met with them was
after -- well, you tell me.

        When was the next time that you met with the agents
to provide information on this case?

        THE COURT:  Which agents?  The DEA or the FBI?

**BY MS. CHAHIN:**

Q    Either.  Any law enforcement agents.

A    I think it was in March.

Q    Okay.

A    2003.

Q    At that point had you already been sentenced?

A    No.

        THE COURT:  Let's stop a minute.

        Who did you meet with in March of 2003?

        THE WITNESS:  First it was the security out of the
Metropolitan Detention Center.  And then after that, FBI
agents.

        THE COURT:  You testified, I believe it was on direct
examination, that you passed a note out to security after the
escape attempt had been discovered; is that correct?

        THE WITNESS:  That's correct, your Honor.

        THE COURT:  And then after that note was passed out,
is that when you met with the representatives of the MDC?

        THE WITNESS:  Yes, your Honor.

**DRAFT COPY**

Avila - Cross / By Ms. Chahin                  208

THE COURT:  And then subsequent to that meeting you met with the FBI?

THE WITNESS:  That's correct, your Honor.

BY MS. CHAHIN:

Q    So you met with the FBI agents in March 2003, correct?

A    Yes, ma'am.

Q    And at that point you had already been a participant in this escape plan, correct?

A    Correct.

Q    And were you ever charged with the federal offense of assisting in an escape?

A    No.

Q    After you provided information on March 13th of 2003, when were you scheduled to be sentenced?

A    I believe it was July.

Q    Okay.  And --

THE COURT:  Of what year?

THE WITNESS:  2003, your Honor.

BY MS. CHAHIN:

Q    When you were on eight -- I'm sorry, let me withdraw this.

When you were on Five South and the escape attempt was discovered, were you moved to a different location?

A    Yes.

Q    Where were you moved to?

A    To a different floor.

**DRAFT COPY**

Avila - Cross / By Ms. Chahin                209

Q    To what floor?

A    To the sixth floor.

Q    Okay.  Were you ever taken to the Special Housing Unit, to the SHU unit?

A    No.

Q    And how long after --

        THE COURT:  Look at this exhibit --

        MS. CHAHIN:  I'm sorry.

        THE COURT:  -- that's on the board here.  I believe it's 907.  Look at the period March 20th, 2003 to April 1st, 2003.

        Does it indicate that you were placed on the eighth floor, first in Room 820L and then in 818L?

        **(Pause / Witness examines exhibit)**

        THE WITNESS:  Yes.

        THE COURT:  Do you recall why?  Do you recall being placed in the eighth floor during that period?

        THE WITNESS:  Honestly, no, your Honor.  I was moved from so many different floors it's like right now it's been so long I don't really remember.

BY MS. CHAHIN:

Q    So you don't recall being moved to the Eight North after the escape attempt was discovered?

A    No.

Q    Is that correct?

**DRAFT COPY**

Avila - Cross / By Ms. Chahin                210

A     No.

Q     Now --

        THE COURT:  After the escape attempt was discovered, were you ever placed in protective custody?

        THE WITNESS:  Isolated?  No, your Honor.  They told me that I was being placed on the sixth floor for that.

BY MS. CHAHIN:

Q     Now, with regard to the meeting that you had with the FBI on March 13th of 2003...

        MS. CHAHIN:  If I could have one moment, your Honor.

        (Pause)

        Prior to -- let me withdraw that.

        In regards to the information that you provided to the Government, did the Government agree to make a sentencing recommendation on your behalf?

A     Yes.

Q     And what recommendation did they make?

A     They just gave me -- they did give me a downward departure.

Q     And what was the amount of the downward departure that they gave you?

A     Well, out of my sentence in total it was three-and-a-half years.

Q     After you were sentenced, what was the sentence imposed?

A     Seventy-eight months.

**DRAFT COPY**

Avila - Cross / By Ms. Chahin                      211

Q    Okay.  Did you try -- after you were sentenced, did you want to seek a further reduction of your sentence?

A    That's why I signed that affidavit of being deported.

Q    Okay.  Isn't it true that after you were sentenced to 78 months in custody, after you had already gotten your three-and-a-half years off, you wanted to provide the Government with additional information so you could get more time off?

A    No.

Q    Okay.  Sir, isn't it true that you had another meeting with the FBI in June of 2004 after your sentencing in hopes that they would take additional time off of your sentence?

A    No.

Q    It's your recollection that you did not meet with the Government in June of 2004?

A    Not that I remember, no.

Q    Okay.  Well, do you think it might refresh your recollection as to whether or not you had that meeting if I were to show you a document?

A    Probably.

Q    Okay.

        **MS. CHAHIN:**  If I could have a moment, your Honor.

        **(Pause)**

//

//

**DRAFT COPY**

Avila - Cross / By Ms. Chahin                    212

**BY MS. CHAHIN:**

Q    Sir, if I could have you please review that document.

**(Pause / Witness examines document)**

Sir, having reviewed that document, does it refresh your recollection as to whether or not you had another meeting with the FBI agents to provide information in June of 2004?

A    This looks like the same interview that I was given at a different time.  I just has a different date on it.

Q    Sir, I'm not --

A    I think it was just a -- it's pretty much my same statement, my original statement.

**THE COURT:**  The question was:  Does reading that document refresh your recollection as to whether you had another meeting with the FBI?  Either "yes" or "no."

**THE WITNESS:**  No, I don't remember, your Honor.

**BY MS. CHAHIN:**

Q    So it's your recollection that you did not have a meeting with the FBI in June of 2004 to try and get more time off your sentence; is that what you're saying?

A    That is correct.

Q    There was no meeting; that never happened.

A    No.  I was already sentenced.

Q    Okay.  And so if you can review this document here please, the information that you gave in this document here, it's your belief that you gave this information at some time earlier; is

**DRAFT COPY**

Avila - Cross / By Ms. Chahin                    213

that right?

A    Yeah, I believe so.

Q    Okay.  So to the best of your recollection, there was no meeting in June of 2004.

        THE COURT:  Asked and answered.

        THE WITNESS:  No, I don't remember.

        THE COURT:  Wait.  Don't answer.

        MS. CHAHIN:  Thank you, your Honor.

        THE COURT:  It's been asked and answered.

        MS. CHAHIN:  Thank you.

BY MS. CHAHIN:

Q    Sir, in regard to the period of time that you were on the ninth floor, the two-week period of time that you say that you had certain conversations with Mr. Kadamovas, do you recall what cell you were in?

A    No.

Q    Okay.  Did you speak Russian?

A    No.

Q    And you've described an incident that you observed or participated in speaking to someone through the vents while you were housed on the ninth floor; is that correct?

A    Yes.

Q    Can you tell us about that?

A    I spoke to Iouri.  I spoke to Iouri through the vent.

        THE COURT:  Which Iouri?

**DRAFT COPY**

Avila - Cross / By Ms. Chahin                214

**THE WITNESS:**  Iouri on Five South.

**BY MS. CHAHIN:**

Q    And during this period of -- you say you spoke to Iouri through Five South -- on Five South through the vents, correct?

A    Yes.

Q    And in relation to -- if you recall, how long were you on the ninth floor before you state that Mr. Kadamovas started talking to you about this escape plan?

A    Maybe a day or so.

Q    And how did it happen?  Can you describe to me the circumstances of that conversation?

A    If I remember correctly, I was walking towards my cell and then he approached me and told me that his name was Iouri.  And I couldn't really understand him clearly, exactly everything he was trying to tell me because his English was real broken.  But he said that we were -- you know, that from my understanding he was trying to tell from him saying Iouri and that his name was Iouri, too and that Iouri on Five South had told him, you know, to talk to me or to wait up for me.  I don't remember. Something like that.

Q    Okay.  And after you had this conversation with him, in relation to the time that that conversation took place, how soon after that was the first time that you talked to any federal agents about the case?

A    That I was in Nine South?

**DRAFT COPY**

Avila - Cross / By Ms. Chahin                    215

Q    Yeah.

A    I didn't speak to anybody while I was in Nine South.

Q    Okay, no.  But in relation to the time that you had this observation of Mr. Kadamovas, how soon after that did you talk to federal agents?

A    From what I remember correctly, it wasn't 'til after the attempted escape was found out.

Q    So that would be until March of 2003?

A    Correct.

Q    Okay.  At that time during that conversation that you had in March of 2003, did you tell the agents anything about having spoken to Iouri on Five South through the vents?

A    Yes.

Q    So it's your recollection that you told them that you told to Iouri on Five South through the vents.

        MS. MEYER:  Objection.  Asked and answered.

        THE COURT:  Asked and answered.

        MS. CHAHIN:  I'm sorry, your Honor.  I'm sorry.

BY MS. CHAHIN:

Q    Sir, isn't it true that at that time, in fact, what you told them was that Mr. Kadamovas and Mr. Mikhel communicated by using kites, by sending kites to each other?

A    That's correct.

Q    Okay.  You didn't tell them anything about Mr. Mikhel and Mr. Kadamovas communicating through the vents; isn't that true?

**DRAFT COPY**

Avila - Cross / By Ms. Chahin                216

MS. MEYER:  Objection, your Honor.  Same objection.

THE COURT:  No, overruled.

THE WITNESS:  Oh, I told them that they communicated through the vent and through kites.

BY MS. CHAHIN:

Q    It's your recollection that you --

MS. CHAHIN:  I'm sorry, your Honor.  I will not do that.

BY MS. CHAHIN:

Q    What is your recollection as to what you told the agents about observations that you made when you met with them the first time after you were on Nine South, specifically with regard to Mr. Kadamovas?

A    I'm sorry.  Ask that one more time.

Q    That was wordy.  Let me withdraw that.

MS. CHAHIN:  Your Honor, if I could have one moment, please, and if I could have a moment to consult with counsel.

THE COURT:  Let me ask you a question.

Do you think you're going to finish with this witness today?

MS. CHAHIN:  I don't believe so, your Honor.

THE COURT:  All right.  We're going to go to 4:00 o'clock, then we're going to break.  My understanding is the Government is going to rest their case on Tuesday of next week.

MR. DUGDALE:  We have three short witnesses, your

DRAFT COPY

217

Honor.  We may eliminate them.

MS. CHAHIN:  Your Honor, could I ask the Court to indulge me and break now so that I can have a moment to -- an opportunity to --

THE COURT:  All right.  Let's break for the evening because I'll get the jury out of the downtown area before the weekend holiday.

MS. CHAHIN:  Thank you, your Honor.

THE COURT:  I'll bring you back on Tuesday; 9:15 in the jury room, 9:30 in the courtroom.

**(Pause / Jurors exit courtroom at 3:54 p.m.)**

THE WITNESS:  May I be excused, your Honor?  Am I excused?

THE COURT:  You're excused.  We'll see you on Tuesday.

**(This proceeding was adjourned at 3:55 p.m.)**

**DRAFT COPY**