# GOVERNMENT EXHIBIT 34

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

# DRAFT COPY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO:  CR-02-220(B)-DT |
| | ) | |
| Plaintiff, | ) | CRIMINAL |
| | ) | |
| vs. | ) | Los Angeles, California |
| | ) | |
| IOURI MIKHEL, | ) | Wednesday, December 6, 2006 |
| JURIJUS KADAMOVAS, | ) | ( 9:34 a.m. to 11:57 a.m.) |
| | ) | ( 1:54 a.m. to  4:15 p.m.) |
| Defendants. | ) | |

JURY TRIAL (49th DAY)

BEFORE THE HONORABLE DICKRAN TEVRIZIAN,
UNITED STATES DISTRICT JUDGE

EXCEPTIONAL REPORTING SERVICES, INC
14493 SOUTH PADRE ISLAND DRIVE
SUITE A-400
CORPUS CHRISTI, TX 78418-5940
361 949-2988

Parker - Direct / By Ms. Meyer                     25

A      Probably three.

Q      Do you have prior felony convictions for receipt of stolen property?

A      Yes, I do.

Q      About how many?

A      About the same.

Q      Do you have prior felony convictions for possession of a controlled substance?

A      Yes, I do.

Q      About how many?

A      About the same.

Q      Would you say, Mr. Parker, or would it be fair to say that in the last 12 years you've spent most of your time in custody?

A      Yes, I have.

Q      Mr. Parker, in 2002 where were you housed?

A      I was housed at Metropolitan Detention Center in Los Angeles.

Q      Is that right next door to this courthouse?

A      Yes, it is.

Q      What cell were you housed in?

A      I was housed in 517 on A range.

Q      Is that on Unit Five South?

A      Yes, ma'am.

Q      And where is that cell on the floor or on that unit?

A      It would be in the corner of the unit.

**DRAFT COPY**

Parker - Direct / By Ms. Meyer                26

Q     And is it the last cell before you hit the stairwell?

A     Yes, it is.

Q     Mr. Parker, are you aware of an escape attempt at MDC or the Metropolitan Detention Center that was discovered in March of 2003?

A     Yes.

Q     How did you learn about that escape attempt?

A     I heard digging above my cell actually, scraping.  At the time I didn't know it was digging.  Scraping, chipping.  And my toilet was overflowing.  Actually a few toilets on the tier were overflowing.

          And the last time that it overflowed, I discovered that it was chips and rocks of some sort in my toilet making it overflow.

Q     And what did those chips and rocks appear to be made of?

A     At the time when I saw them I didn't know.  But in hindsight, you know, it was concrete.

Q     Mr. Parker, in relation to when the escape attempt was discovered, about how long before that did you hear this chipping and scraping above you?

A     Probably a week, a week and a half.

Q     About what time was this occurring?

A     Nighttime after lockdown, which is -- I think it's 9:45.

Q     Can you explain to the jury --

          **THE COURT:**  9:45 at night?

**DRAFT COPY**

Parker - Direct / By Ms. Meyer                     27

THE WITNESS:  Yes, sir.

MS. MEYER:  Thank you, your Honor.

BY MS. MEYER:

Q       Mr. Parker, could you explain for the jury what lockdown is?

A    All federal inmates are supposed to be locked down at 9:45 at night.  The cells are locked and secured.  And they don't get out until the next morning.

Q    Now, Mr. Parker, you said that the chipping and scraping was coming from above you.

A    Yes.

Q    Can you be more specific about that?

A    The cell above me.

Q    And do you know who was in the cell about you?

A    Yes.  Iouri Mikhel.

Q    Now, can you explain to the jury how exactly the fifth floor is configured?  Is there an upper tier and a lower tier?

A    Yes.  The fifth floor consists of four ranges A, B, C, and D.  And on each side of the building is two ranges, one on top of the other.  On my building it would have been A and D.

Q    So, basically, the cell above you is still on the fifth floor?

A    Yes, ma'am.

Q    Now, you said that this chipping and scraping started at night after lockdown?

**DRAFT COPY**

Parker - Direct / By Ms. Meyer                28

A    Yes.

Q    About how long would it continue?

A    Sometimes all night long.

Q    Did you say anything to any other inmate about the noises that you heard?

A    Yeah.  After the last flood, the real bad flood in my toilet, it flooded basically the whole range of the floor.  And that's when I noticed the rocks.

Jokingly I made a statement to an inmate, Michael Cook -- we also call him Bandit -- that I thought that the guys upstairs from me we're trying to escape.

Q    And how did he respond?

A    He told me that they were.

Q    Did he explain who he met by that?

A    Yeah.  He told me it was Iouri Mikhel.

Q    At some point did you hear from Mr. Mikhel about the escape attempt?

A    Yeah.  Later on Michael Cook told me that Iouri wanted to see me up in his cell.

Q    Did you go to his cell?

A    I went to his cell.  And he told me that they were escaping.  And he knew that I had a long prison term and that if I wanted to I could go with them.

Q    Mr. Parker, at this time, could you take a look around the courtroom and tell us whether you see Mr. Mikhel in the

**DRAFT COPY**

Parker - Direct / By Ms. Meyer                29

courtroom today?

A    Iouri's right there.  Second one on the end.

Q    Could you --

        THE COURT:  For the record, the witness has referred to and identified the Defendant, Mr. Mikhel.

**BY MS. MEYER:**

Q    Now, you said you went up to Mr. Mikhel's cell.  When you met with him was anyone else in the cell besides the two of you?

A    His cellie.  But he left right away as soon as I walked in.

Q    What did Mr. Mikhel tell you about the escape attempt?

A    He told me that they were escaping.  He told me that if I wanted to go I could go, but I would have to work.  He told me that they were going out through the stairwell and that he had already been digging in his cell.  He asked me to look around to see if I could see a hole.  And I could not.  I couldn't see a hole.

        He told me I would have to dig a hole in my wall to get to the stairwell.

Q    Did he say anything about any tools?

A    He said he would give me all the tools needed to do it.

Q    Did he mention what types of tools he had?

A    Bolt cutters.  He actually didn't mention. He showed me bolt cutters and some other tools.  I'm not sure what.  It was

**DRAFT COPY**

Parker - Direct / By Ms. Meyer                    30

real quick.

Q    Mr. Parker, you said that he said that you would have to dig out of your own cell to get into the stairwell.  Did he tell you what was supposed to happen when people dug out into the stairwell?

A    He said that we would get to the stairwell.  He knew that there were cameras on the top floor of the detention center. He knew that there was no cameras on the third floor.  So we would have to get to the third floor and go out that way.

Q    Did he say what would happen if you ran into any guards?

A    He said there was a guard that did regular rounds in the stairwell and that we would have to take them out.

Q    What did you understand him to mean by that?

A    To kill them.

Q    Did Mr. Mikhel say what would be waiting on the third floor?

A    It was supposed to be FBI gear, rain jackets, hats, and weapons.

Q    How many times did you meet with Mr. Mikhel about the escape?

A    One time.

Q    Just that one time?

A    Yes.

Q    Did you ever hear Mr. Mikhel communicate with anyone on nine south?

**DRAFT COPY**

Parker - Direct / By Ms. Meyer                    31

A    I heard him communicate with people in the vents.

Q    Could you describe for the jury how that works at MDC?

A    There's a south side of the building.  There's a north side of the building.  On the south side of the building, all the vents, the air vents are on the same line.  So if you -- to say if you wanted to talk to somebody on the floor above you, you would yell in that vent for the next floor up.  And they would get on the vent, and you could talk through the vent all the way up to the ninth floor.

Q    Did you ever hear Mr. Mikhel go on the vent and shout, "Nine south, nine south"?

A    Yes.

Q    Did you ever hear him speak in a foreign language to somebody on nine south?

A    Yes.

Q    Now, when you said that you would participate, how did Mr. Mikhel respond?

A    Like okay.

Q    Did he tell you when you should start working?

A    The following Saturday.

Q    Did he tell you he would get you your tools by then?

A    They would have to be taken down to my cell.

Q    Now, did he mention anything about preparations for after you'd escape, like IDs or things of that sort?

A    He told me he could take care of that for me, but I'd have

**DRAFT COPY**

Parker - Direct / By Ms. Meyer                    32

to pay for them.

Q    Did he tell you how much you'd have to pay?

A    $25,000.

Q    Now, if you were supposed to start digging the following Saturday out of your cell, did you mention to Mr. Mikhel that you had a cell mate?

A    Yeah.  I had just recently got a new cell mate.  And I told him that I couldn't do anything with him in there.  And he said he would take care of it.

Q    Was your cell mate transferred out of your cell?

A    Uh-huh.  That day.

Q    After your cell mate was transferred out of your cell, what did you do?

A    I got scared actually.  I knew that it was for real, and it was really going to happen.  And I got scared.  And that's when I called my brother.  And I told him I needed to see him to come down and visit me.

Q    Did he come visit?

A    Yes, he did.

Q    What did you tell your brother when he came and visited?

A    I told my brother what was happening, the whole scenario and that I was scared.  I didn't know who all was involved in it, if there were guards involved or what.  And I asked him to call the authorities when he got out.  And he had a friend in the FBI, and that's who he called.

**DRAFT COPY**

Q    Now, were you interviewed by intelligence officers at MDC on March 7th, 2003?

A    Yes.

Q    Could you tell the jury about that?

        MR. RUBIN:  Objection, your Honor.  It's not a question.

        THE COURT:  No.  I'm going to overrule the objection.

        Go ahead.

        THE WITNESS:  I was called to the -- they call it SIS.  It's special investigations in prison.  And they asked me if I knew of such and such person.  I can't remember his name right now, but it was the FBI agent.  And I told them, "No, I didn't know that person."

        Then they asked me if I knew my brother's name.  And I said, "Yes.  That's my brother."  And he said we have word that you may have some information on an escape.  And I said, "Yeah.  There's people trying to escape."  And I told them the story.

BY MS. MEYER:

Q    Now, was this immediately after you had told your brother to call the FBI?

A    Yeah.

Q    This interview?

A    Same day.

Q    After you were interviewed by BOP authorities where did

Parker - Direct / By Ms. Meyer                    34

they take you?

A    They let me go back to my unit for a time.  And then at 5:00 -- excuse me -- four o'clock stand-up count, they raided my cell and took me to suicide watch.

            THE COURT:  All right.  For the record, BOP is Bureau of Prisons.

            MS. MEYER:  Thank you, your Honor.

BY MS. MEYER:

Q    Can you explain to the jury what the 4:00 p.m. stand-up count is?

A    There's a nationwide 4:00 p.m. stand-up count for all federal inmates.  You have to stand in front of your door and be counted.

Q    Now, you said that they came and took you out of your cell and took you to a suicide watch cell; is that right?

A    Yes.

Q    Mr. Parker, were you suicidal?

A    No.

Q    What was your understanding of why they took you to the suicide watch cell?

A    At the time I didn't know.  But later I learned that it was for my own protection.

            MR. RUBIN:  Objection, your Honor.  It's speculation (***).

            THE COURT:  No.  I'm going to overrule the objection.

**DRAFT COPY**

**BY MS. MEYER:**

Q     Mr. Parker, how long were you housed in this suicide watch cell?

A     Approximately two weeks.

Q     And during this period, did you meet with FBI agents?

A     Yes, I did.

Q     What did you tell them?

A     Exactly what I just said here what happened.

Q     Now, Mr. Parker, did you sign a plea agreement with the Government for your underlying offense of drug trafficking with a weapon?

A     Yes, I did.

Q     Do you recall when that was?

A     March of 2004, I believe.

Q     And did that plea agreement provide for the opportunity for you to cooperate with the Government?

A     Yes.

Q     Mr. Parker, were you sentenced for your drug trafficking offense?

A     Yes, I was.

Q     When?

A     June of 2005.

Q     Now, you provided information to authorities related to the escapes attempt.  Did you also provide information against a co-defendant in your underlying drug case?

**DRAFT COPY**

Parker - Cross / By Ms. Chahin                 58

Q    And then he goes on to other areas?

A    That's correct.

Q    So you were going to have to wait until after 10:45 after this guard made his rounds, correct?

A    Not we, him.

Q    Well, the idea was not to have to confront the guard; isn't that right?

A    That's not the way I understood it.

Q    But, again, it was only the fact that you felt that people were going to be hurt.  You didn't -- no one told you people were going to be hurt?

A    No.  Nobody told me people were going to be hurt.  But I was told that we would have to take the guard out in the stairwell.

        (Pause)

            MR. RUBIN:  May I have just a moment, your Honor.

            I have nothing further.  Thank you.

            THE COURT:  Ms. Chahin?

            MS. CHAHIN:  Yes, your Honor.

                            CROSS EXAMINATION

BY MS. CHAHIN:

Q    Mr. Parker, how old are you?

A    Forty-one.

Q    And I believe you indicated that you have approximately nine felony convictions; is that correct?

**DRAFT COPY**

Parker - Cross / By Ms. Chahin                    59

A    I imagine.  Yeah, that's about right.

Q    I'm sorry.  I couldn't hear you.

A    I said that's about right.  Yes.

Q    And your current conviction, I believe you stated is for approximately eight pounds of methamphetamine?

A    That's correct.

Q    Do you know approximately what the street value is of eight pounds of methamphetamine?

A    No.  I know what I was selling it for that day.

Q    What were you selling it for that day?

A    80,000.

Q    80,000 a pound?

A    No.  No.  For all of it.

Q    Now, you've already been sentenced on that case; is that correct?

A    That's correct.

Q    Approximately when were you sentenced?

A    June of 2005.

Q    And I believe that you told us that you've already received somewhat of a reduction for the cooperation that you provided in this case at your sentencing; is that correct?

A    That's correct.

Q    And I believe you stated that you received approximately 14 years off; is that right?

A    Yes, ma'am.

**DRAFT COPY**

Parker - Cross / By Ms. Chahin                    60

Q    And so your sentence went from what to what?

A    From 29 to 15 years.

Q    So you thought you -- up to now, you've managed to basically cut your sentence in half; is that correct?

A    Yes, ma'am.

Q    So your testimony here today is a second opportunity to get some more time off; is that correct?

A    Yes.

Q    And that's what you're hopeful will happen in this case. That based upon what you're telling -- saying here in court today, you're going to get some more time off, correct?

A    That's correct.

Q    Now, in regard to the cooperation that you provided in this case, do you recall how many times you met with the FBI agents?

A    Twice I believe.

Q    Can you tell us approximately when those meetings occurred?

A    The first one was a few days after I reported what was going on. And the next one was maybe two months. I had been transferred. I was down at Santa Anna at the time. And they came down there to see me. I can't be exactly sure of the timeframe.

Q    Okay. In regards to the first meeting, do you recall who was present?

**DRAFT COPY**

Parker - Cross / By Ms. Chahin                61

A     Who was present?

Q     Yes.

A     I know my attorney was there.

Q     In regard to the FBI agents that were present, do you know who was there?

A     Names you mean?

Q     Yes.

A     No.

Q     And, sir, isn't it true that at that first meeting, you did not make any mention of overhearing any conversations or of Mr. Mikhel being at the vent shouting "nine south"?

A     I don't recall.

Q     I'm sorry?

A     I don't recall.

Q     Do you think that if I were to show you a memorandum of that interview it might refresh your recollection as to whether or not you ever made those statements at that meeting?

A     If I didn't make the statements at that meeting, yeah, I'd like to see it.

          **MS. CHAHIN:**  Your Honor, may I approach?

          **THE COURT:**  You may.

          **MS. CHAHIN:**  Your Honor, can I bring a number of memorandums that the witness may need?

          **THE COURT:**  All right.  Let me do this.

          Why don't we take our morning break.  And you can

**DRAFT COPY**

62

look at those over the break.

MS. CHAHIN: Very well. Thank you, your Honor.

THE COURT: Take about 10 minutes.

(Jury exits at 10:49 a.m.)

(Court in recess from 10:49 a.m. to 10:56 a.m.; parties present)

(Outside the presence of the jury)

THE COURT: All right. Outside the presence of the Jury.

The record will indicate all parties and Counsel are present.

Ms. Chahin, how long do you think you're going to be? Just so I can get some kind of idea.

MS. CHAHIN: Your Honor, I think it depends upon how long - It's just about the reports, and then I'm done.

THE COURT: Okay.

And I believe Mr. Parker is concluding reading it now. He'll let me know when he's done.

MR. PARKER: I'm finished, your Honor.

THE COURT: All set?

Then we'll bring the Jury in.

THE CLERK: Okay. Ready to start.

(Jury enters at 10:57 a.m.)

THE COURT: The record will indicate all Jurors are present, all Counsel and parties are present.

**DRAFT COPY**

Parker - Cross / By Ms. Chahin                    63

Mr. Parker, you're still under oath.

Please state your name for the record.

**THE WITNESS:**  Billy Wayne Parker.

**THE COURT:**  Ms. Chahin.

**MS. CHAHIN:**  Thank you, Your Honor.

**CROSS EXAMINATION (CONTINUED)**

**BY MS. CHAHIN:**

Q    Mr. Parker, have you had an opportunity to review those reports?

A    Yes, I went over them.

Q    And now having reviewed those reports, does it refresh your recollection as to the date that you first met with the FBI?

A    No, but I'm sure it's in here.

Can you tell me what page it's on, and I'll look at it.

Q    If you could look at the page numbers on the bottom, 39401.

A    This says '3/8/2003'.

Q    Does that sound approximately like the date that you met with the FBI for the first time?

A    Sounds about right, yeah.

Q    Do you recall how long that meeting was?

A    I don't recall.

Q    And you knew that it was important for you to tell the FBI

**DRAFT COPY**

Parker - Cross / By Ms. Chahin                    64

everything that you knew about this plan, correct?

A    Yes.

Q    During that meeting, did you make any statements to them about overhearing Mr. Mikhel yell at the vents to nine south?

A    I might have.  I don't recall.

Q    Having reviewed the report, does it refresh your recollection as to whether or not you ever made those statements?

A    I didn't see that in here.

Q    My question is whether or not you made the statements at that time?

A    I don't recall if I did or not.

Q    Okay.  And having reviewed the report did not assist you in determining whether or not you made the statements?

A    Is it in here?

Q    That's my question.

A    I'm asking you.  If it is, then -

Q    It is not.

A    It is not.  Okay.  So I guess I didn't make the statements then.

Q    So it's your testimony that on that day when you first met with the FBI, you did not make those statements, is that correct?

A    Yeah.

Q    Okay.  Do you recall when is the next time that you met

**DRAFT COPY**

Parker - Cross / By Ms. Chahin                65

with the FBI?

A     I don't.

Q     And would it refresh your recollection to review the memoranda?

A     Okay.

Q     If I could ask you to please take a look at.  I guess it would be the fourth page of the document that I provided you.

A     Okay.

Q     And can you review that and tell me if it refreshes your recollection as to the second time that you met with the FBI?

A     It'd be 3/12, March 12th.

           THE COURT:  Of what year?

           THE WITNESS:  Of 2003, your Honor.

           THE COURT:  2003.

BY MS. CHAHIN:

Q     Where did that meeting take place?

A     It says here at Metropolitan Detention Center.

Q     Is that what you recall?

A     I only recall meeting with the FBI one time.

Q     So, having reviewed this memoranda, does it refresh your recollection whether or not you had a meeting with the FBI on 3/12/03?

A     I don't recall.

Q     You don't remember?

A     No.  I remember the first one.  I don't remember the

**DRAFT COPY**

Parker - Cross / By Ms. Chahin                66

second meeting.

Q    Very well.

A    I mean, if it's here, then I did it.

Q    If you did it, would you have told the FBI during that meeting about a conversation through a vent with nine south?

        MS. MEYER:  Objection, your Honor.  Lack of foundation.

        THE COURT:  I'll overrule the objection.

        THE WITNESS:  Can you repeat the question?

        MS. CHAHIN:  Yes.

BY MS. CHAHIN:

Q    If you had participated in that meeting, do you recall if you would have said something about having a conversation through the vent with nine south

A    I don't recall.

        MS. MEYER:  Objection, your Honor.

BY MS. CHAHIN:

A    I don't remember.

        MS. MEYER:  Calls for speculation.

        THE COURT:  Well, here's the thing.  That's not a verbatim - the report is not a verbatim transcript of what was said.  It's only somebody's analysis, the writer, the author of that report's analysis.

        He can look at that to see whether or not it refreshes his recollection.  And if it's not in the report,

**DRAFT COPY**

Parker - Cross / By Ms. Chahin                67

that doesn't mean he didn't say it, doesn't mean he did say it, if it's used to refresh his recollection.

Look at the report and tell me whether or not you recall saying anything about what Ms. Chahin is asking you to the interviewer. And if you do, fine; if you don't, that's a valid answer as well.

**BY MS. CHAHIN:**

A    I don't even recall this interview on the 12th with the FBI. I only recall one interview with the FBI. Actually, two. But the other one was in Santa Ana, not Metropolitan Detention Center.

Q    Do you recall if you had a meeting with the FBI on April the 3rd, 2003?

A    In Santa Ana?

Q    Yes.

A    Yes, I recall that.

Q    And do you recall if during that meeting you made any statements to the FBI regarding having observed Mr. Mikhel yelling to nine south through vents?

A    I don't remember.

Q    I'm sorry?

A    I don't remember.

Q    Do you think it would refresh your recollection as to whether or not you made those such statements if you were to review a memorandum of that interview?

**DRAFT COPY**

Parker - Cross / By Ms. Chahin                68

A    If it's in here, I'll review it.

Q    Yes, it is in there, and it would begin at the eighth page of the documents I gave you.

     (Pause)

**BY MS. CHAHIN:**

A    I don't see anything in here.

Q    Sir, having reviewed that report, does it refresh your recollection as to whether or not you told the FBI agents anything about observing Mr. Mikhel yell to nine south during this interview on April the 3rd, 2003?

A    I may not have told them that then.

Q    You may not have told them that?

A    That's correct.

Q    And similarly, do you recall being interviewed by the FBI on April the 9th of 2003, in Santa Ana?

A    No, I don't.

Q    Do you think it might refresh your recollection if I were to show you a memorandum of that interview?

A    I do not remember that interview.  I don't remember.  I only remember two interviews with the FBI.

Q    So you don't remember having a second interview with the FBI?

A    At Santa Ana, no.  I do not.

Q    It didn't happen?

A    I'm not saying it didn't happen.  I'm saying I don't

Parker - Redirect / By Ms. Meyer          69

remember the interview.

Q    Very well.

Now, in regards to the Rule 35 Motion that was discussed earlier.

A    Yes, ma'am.

Q    Is there a hearing pending on that motion?

A    No, not that I know of.

Q    And when are you going to go back to see if you can get more time off of your sentence?

A    I have no idea.

Q    Do you know if it's going to happen after your testimony in this case?

A    I would imagine so.

MS. CHAHIN:  I have nothing further, your Honor.

THE COURT:  Ms. Meyer?

MS. MEYER:  Briefly, your Honor.

REDIRECT EXAMINATION

BY MS. MEYER:

Q    Mr. Parker, the plea agreement that you signed for the underlying offense, you recall signing that agreement, right?

A    Yes, ma'am.

Q    What did that agreement obligate you to do?

A    To tell the truth.

Q    And if you didn't tell the truth, what would have happened to that agreement?

**DRAFT COPY**

inmates.

Q    Okay.  And can you just briefly describe to the Jury what you mean by a pretrial inmate versus a designated inmate?

A    Those inmates that are categorized as 'pretrial' are those inmates awaiting trial and awaiting sentencing.

Those inmates that are 'designated' are inmates that have been convicted and are currently serving their time at MDC.

Q    What is your position with the Metropolitan Detention Center?

A    My position is Special Investigative Agent.

Q    And what are your responsibilities as a Special Investigative Agent?

A    My responsibilities are conducting investigations into staff misconduct, inmate misconduct, whether they be administrative or criminal.

And also acting as an official point of contact for outside law enforcement agencies.

Q    Do you also supervise investigators?

A    Yes, I do.

Q    Approximately how many people do you supervise?

A    Approximately five.

Q    Were you a Special Investigative Agent in March of 2003?

A    Yes, I was acting at the time.

Q    Special Agent Battley, prior to testifying today, did you

**DRAFT COPY**

Battley - Direct / By Ms. DeWitt                    82

**MS. DeWITT:**  Go ahead, Mr. Battley.

**BY MS. DeWITT:**

A    Yes.  Inmate Parker said that - he confirmed what the agent initially said.  That he was in his cell, there was a flood, he noticed some rocks and concrete inside of his toilet, and previously he heard knocking coming from above.

He went upstairs to find out what was going on, and when he walked into the cell, he surprised the occupants of the cell, at the time he said was Iouri, as he described him, and an Asian.  Those were his words.

And while in the cell, he noticed various paraphernalia in the room.  He noticed tools, bolt cutter, camera.

And at the time he was allowed to leave, but he said later on he was asked if he wanted to join them in an escape.

He also told us that he didn't know exactly how many people were involved, but there were other persons involved, and their intent was to escape from the cells and break into the stairwell and escape down to the third floor and escape from the building via the third floor.

Q    Did Mr. Wilson tell you specifically how he learned about this escape?

A    Yes, he did.  He learned of the details of the escape from inmate Iouri.

Q    And you mentioned that he explained that part of the plan

**DRAFT COPY**

Battley - Direct / By Ms. DeWitt          83

was to get into a stairwell.

Can you explain to the Jury, just generally, is there a stairwell at the Metropolitan Detention Center?

A     Yes, there is.  This particular stairwell runs from the entire length of the building, as you were, from the top to the bottom of the building; from the tenth floor all the way down to the first floor.

And there are cells located adjacent to the stairwells.

Q     Okay.  And you mentioned that Mr. Parker said something about the third floor.

Can you explain what's on the third floor?

A     The third floor has basically an open corridor that runs along the south side of the building, from east to west.  And there are a number of windows, approximately six windows in that area, and they're covered with tubular bars.

Q     Are there cells adjacent to this third floor?

A     No.  No cells on the third floor.

Q     Is the third floor accessible from the stairwell?

A     Absolutely.

Q     Okay.  And just so it's clear to the Jury.  This area, the third floor that you're describing, and the stairwell, is this a part of the institution that is separated from where the inmates are housed?

A     It is a secure portion of the institution.  Inmates do not

**DRAFT COPY**

Battley - Direct / By Ms. DeWitt                84

have access to that area.

Q    What was Mr. Parker's demeanor when you interviewed him that day?

A    He appeared to be afraid.  He began to perspire.  And he stated that he was afraid.  And he said that if the Russians found out that he was talking to us, they would kill him.

Q    Mr. Battley, were you in charge of supervising the response to this purported escape plan?

A    Yes, I was.

Q    So what did you do, as the Agent in charge, after you interviewed Harold Wilson?

A    After notifying - After interviewing Wilson and learning of the amount of contraband that could possibly be in the institution, we immediately secured the entire fifth floor of the institution.

After securing the fifth floor, we started to have a staff recall, which required locking down other areas of the institution.  For instance, closing the visiting room, getting the visitors out of the building.

And after staff were made available, staff convened on the third floor, we gave them instructions as to what we were going to do.

They were given instructions to enter the floor.  We were going to conduct a search of every unit, every cell on the floor, and possibly what we were going to be looking for, which

**DRAFT COPY**

Battley - Direct / By Ms. DeWitt                    92

tell the Jury what was found when the search was conducted of Petro Krylov's cell, 616 south?

A    Also when we removed the mirror from the wall in cell 616 south, we removed the mirror, there was a smaller hole than the hole in five south, but there were hacksaw blades inside of the hole.

Q    And was anything done with the inmates in 616 south, Petro Krylov and his roommate?

A    Yes.  They were placed in administrative detention as well.

Q    After you searched the sixth floor, you mentioned that you also searched the ninth floor.

A    Yes, we did.

Q    Did you search that floor generally?

A    Yes, we did.

Q    And did you also search a specific cell within that floor?

A    Yes.  We searched particularly cell 913 assigned to inmate Kadamovas.

Q    Did you find any contraband in defendant Kadamovas's cell in 913 south.

A    Not at that time, no.

Q    Was defendant Kadamovas also placed in administrative segregation at that time?

A    Yes, he was.

Q    Approximately what time of the day on March 7th, 2003, did

**DRAFT COPY**

Battley - Direct / By Ms. DeWitt                    93

you complete this initial search of defendant Kadamovas's cell?

A    It was later in the evening, approximately 9:00, 9:30.

Maybe 10:00 o'clock.

Q    After that point, did the Metropolitan Detention Center

investigate this escape attempt?

A    Yes, we did.  The investigation continued on into the day.

        The next day we continued the investigation.  We were

trying to determine if there were any paraphernalia located

outside on the grounds, or, again, in other areas of the

institution.  Not necessarily in inmates' cells, could have

been in showers or whatever, but we were taking precaution to

ensure that the other areas were not compromised.

Q    Did you obtain any information about inmates being paid in

connection with this escape attempt?

A    Yes.  We received information that there were five

separate payments that had gone to various inmates that may

have been involved in the escape attempt.

Q    And who were those inmates?

A    I believe those inmates were Avilas.  There was money that

went to Krylov, Kadamovas.  And I believe inmate Cook.

Q    What, if anything, did you do in response to obtaining

information that these certain inmates might have received

money that came in in connection with this escape attempt?

A    We proceeded to our business office and did a record

search of the inmates' monetary transactions.  And we learned

**DRAFT COPY**

Battley - Direct / By Ms. DeWitt              94

that all of those inmates had received monies consistent with

the information we received.

Q     Did you also investigate, or attempt to investigate, how

this contraband that you had found had come in to the

institution in the first place?

A     Yes, we did.

Q     And did you receive any additional information in the

course of that investigation about how the contraband might

have come in to the institution in the first place?

A     Yes.  During the interview process, we learned that cells

533 on the south side, on five south, and cell 541 were

utilized to introduce the contraband into the institution via

the windows.

Q     And just generally, can you explain what it is that you

learned, or what you understood was the manner in which the

windows were used on those cells?

A     Each cell window has security screws, and the security

screws were removed from the windows.  The windows were

removed, and we learned that strings, dental floss of some sort

was used to pull contraband from the ground into the cells

through the windows.

Q     Okay.  And when you obtained this information about the

possible use of cells 541 and 533, and the windows in those

cells being used as an entry point for the contraband, what did

you do?  What further investigation did you do?

**DRAFT COPY**

Battley - Direct / By Ms. DeWitt            95

A    We continued our search around the building trying to determine where and how the area was utilized without being seen by our perimeter officers or a passerby.  And we determined to look into an area, a planter box.

Q    Let me back up.  I'm sorry.

Did you actually send somebody to those specific cells to inspect those cells?

A    Yes.  Yes, we did.

Q    Okay.  Explain what they found when they were there.

What was found?

A    There was tampering of both windows.  The security screws were loosened and could be removed with the fingertips.  Didn't need a tool.

And there was also some type of glue or something that was used to replace the windows to act as a cushion.  I believe it was called 'Gorilla Glue', which was also found in the contraband items removed from Mikhel's cell.

Q    Okay.  I'm sorry.

Your initial response was you actually sent somebody to investigate the windows, and they confirmed evidence of tampering, is that right?

A    Yes.  I believe it was on the 10th.  One of the lieutenants looked into cell 533 initially and determined that there was window tampering.

And we were able to locate approximately where the

**DRAFT COPY**

Battley - Direct / By Ms. DeWitt          96

contraband entered through and how it happened.

Q    Now, you were starting to talk about how you then looked in the perimeter to see if you found any additional evidence relating to those windows.

A    Yes.

Q    What did you find when you did that?

A    Inside the planter box we found a large amount of string, approximately 75 feet of string inside the planter box located on the south side and side of the building.

Q    Where was this planter box relative to the cells?

A    It was directly across from cell 533.  It was just between the institution and the Roy Ball Building.

Q    Was any further investigation conducted at that time, or after that time?

A    Yes.  The investigation continued.

      During our interviews, of course, we notified the FBI, so they also were conducting interviews and conversing back and forth with the institution.

      Yes.  And we continued to do interviews inside of the institution also.

Q    At some point did the FBI execute a search warrant at the Metropolitan Detention Center?

A    Yes, they did.  I believe the search warrant was executed on the 14th.

Q    And was that search warrant specific to various cells

**DRAFT COPY**

Battley - Direct / By Ms. DeWitt                    97

within the institution?

A    Yes, it was.  It was specific to 518, Mikhel's cell, and 616 and 913.

Q    As well as items that had been removed by your staff?

A    Yes.

Q    After the FBI completed their search pursuant to federal search warrants, did the Metropolitan Detention Center go back through the property that had been removed from these cells again?

A    Yes, we did.

Q    And was any other additional items of significance found that you're aware of?

A    Yes.  Inside of a shoebox, we located a small Allen wrench inside one of the boxes.

Q    And what cell did the shoebox come from?

A    That came from Mikhel's cell, 518.

Q    Okay.  And can you explain to the Jury what this wrench was that was found?

A    Allen wrench is a small, L-shaped metal instrument that had a hole in the tip of it, which was fashioned to fit perfectly the security screws of the windows.

Q    Did the FBI and investigators at the Metropolitan Detention Center continue to investigate this matter even after that?

A    Yes, they did.

**DRAFT COPY**

Battley - Direct / By Ms. DeWitt          102

A     Yeah, it's just above it.

Q     In a straight line.  And?

A     Cell 913 is the cell -

Q     Whose cell is that?

A     The cell where inmate Kadamovas was quartered at the time.

Q     Okay.  And, again, where is that cell relative to the other two cells?

A     It's directly above Krylov's, which is directly above Mikhel's.

Q     Okay.  And you were talking about earlier in your testimony about a stairwell.

      Does this yellow line that runs along this side of the photograph of the building, does that accurately depict where that stairwell is?

A     Yes, it does.

Q     And that stairwell is adjacent to cells 913, 616, and 518, is that correct?

A     That's correct.

Q     Okay.  And that stairwell leads down to that third floor area that you were talking about earlier?

A     Yes, it does.

Q     And does this, what's now being shown on the overhead, which is basically all of the items that we've discussed, does it accurately depict the floors that you've testified about, the cells that you've testified about, the stairwells, and

**DRAFT COPY**

Battley - Direct / By Ms. DeWitt          113

additional ranges and also inmate cells and showers.

Q    Okay.  So these three floors are basically configured the same; is that right?

A    That's -- yeah, they mirror each other, yes.

Q    Okay.  And, again, does this, where it says 913, does that accurately depict where Mr. Kadamovas, Defendant Kadamovas's, cell was?

A    Yes.  Yes, it does.

Q    Okay.  And what is next to his cell?

A    The south side stairwell.

Q    And just to go to -- does this diagram, what shows a close-up of Cell 913, Defendant Kadamovas's cell, does that accurately depict how that cell looked on March 7th, 2003?

A    Yes.

Q    Okay.  And, again, what's the area that's depicted in this diagram next to the cell?

A    That is the south side stairwell.

Q    Okay.  And, again this stairwell that's depicted on the left side of this diagram:  that runs from basically the ninth floor down to the third floor?

A    Yes.  Yes, it does.

Q    And, finally, what was the relationship of this cell to Petro Krylov's cell and Defendant Kadamovas's -- I mean Defendant Kadamovas's and Defendant Mikhel's cell?

A    It was directly above Krylov's and Mikhel's cell, adjacent

**DRAFT COPY**

Battley - Direct / By Ms. DeWitt          114

to the stairwell.

Q    And going back to the fifth floor just briefly, you testified about a person by the name of Harold Wilson.  You said he had concrete in -- you found concrete in his toilet.

A    Yes.

Q    Where was his cell relative to Defendant Mikhel's cell?

A    His cell was directly below 518.  He was in 517, the lower -- and he was in the lower range.

Q    Okay.  So directly below 518, which is indicated on the screen right now?  Directly below what's indicated on the screen right now?  Below it.

A    Yeah, well, it's difficult to see because it's actually -- I'm going to draw this.  It's underneath that area right there, but it's below, directly below that cell.

Q    Right.  You can't actually see it on this diagram, but it's directly below that?

A    That's correct.

Q    And, again, going back to -- does that accurately depict all of the cells and their relative relationship to each other that you've just testified about?

A    Yes, it does.

Q    Except Billy Barker (phonetic); his -- or Harold Wilson (phonetic); his cell is not indicated on here.

A    That's correct; 517 is not indicated.

Q    Okay.  At this time, Mr. Battley, I'd like to ask you a

**DRAFT COPY**

Battley - Direct / By Ms. DeWitt          115

couple of questions about how inmates at the Metropolitan

Detention Center communicate with each other when they aren't

on the same floor or aren't on the same part of the floor,

they're in the north versus the south.

Based on your experience, your 26-some-odd years of

experience as a correctional officer, and approximately eight,

I believe you said, working at the Metropolitan Detention

Center, have you come to learn about illicit or unofficial ways

that inmates communicate with each other?

A    Yes.  Yes, I have.

Q    And also ways that they can pass items of contraband or

other items to each other?

A    Yes.

Q    Can you explain to the jury how inmates, specifically

within the Metropolitan Detention Center, based on your

experience, have devised ways to communicate with each other

unofficially or illicitly?

A    Okay.  Well, the Metropolitan Detention Center is somewhat

unique in that inmates communicate verbally utilizing the

ventilation system.  The ventilation system runs throughout the

building, and it goes, of course, to each individual cell.  And

inmates communicate through voice recognition, of course.

There is also the plumbing system.  The plumbing

system -- every cell has a toilet, and the way they transfer

contraband is somewhat unique in that the person may be on an

**DRAFT COPY**

Battley - Direct / By Ms. DeWitt          116

upper floor and would place something in the toilet and begin

flushing it and the person who wants to receive it would also

flush simultaneously and would have a makeshift hook, and they

would place it in the toilet, and as the object passes the

cell, it would -- the hook would grab it and it would pull it

through the toilet inside of their cell from another floor.

Also, if they were on the same floor, for instance,

in the special housing unit, they would get makeshift strings

or thread from a sheet, tie it to a battery, and launch it

under the door, under their door, and someone else from another

cell would throw a battery or a makeshift hook out, grab the

battery, pull it in, and as they're pulling the battery and the

string in, the sender would tie something to the other end of

the string, and thereby they would pull it down the hall into

their rooms.

Then there's transfer of notes, "kites."  Well, I say

"kites."  It's a terminology we use simply for notes that

inmates would pass through the laundry, the laundry system,

through the food system, sometimes the food carts, or sometimes

a note is actually under the cornbread or a biscuit or

something like that; a note.  There's a number of ways of

communicating with one another that way.

Q    Are notes --

          THE COURT:  Let me ask a question.

          The term "contraband" has been used generically.

**DRAFT COPY**

Battley - Direct / By Ms. DeWitt          117

What is "contraband" within the --

THE WITNESS:  To an inmate or to --

THE COURT:  To the prison officials.  Give us some examples of contraband.

THE WITNESS:  Okay.  Examples of contraband would be -- actually the terminology is anything that we do not authorize.  And some of the examples would be things from the streets, like if an inmate has in his possession.  It could be anything from a Snickers bar to a pack of cigarettes.  Hard contraband would be considered like drugs.  Hard contraband would also be considered weapons.  Hard contraband, drug paraphernalia.

Then there's nuisance contraband.  For instance, if an inmate has too many magazines.  He may be authorized to have magazines, but not an extraordinary amount of magazines, which makes it nuisance contraband.

So those are the two classes:  nuisance and hard.

THE COURT:  Let me ask a couple of more questions.

Is a cell phone considered contraband?

THE WITNESS:  Absolutely.

THE COURT:  Is string considered contraband?

THE WITNESS:  Yes, it is.

THE COURT:  A camera considered contraband?

THE WITNESS:  Absolutely, your Honor.

THE COURT:  Bolt cutters considered contraband?

**DRAFT COPY**

Battley - Direct / By Ms. DeWitt          118

THE WITNESS:  Yes.  Yes, your Honor.

THE COURT:  Channel lock cutters considered contraband?

THE WITNESS:  Yes.  Yes, your Honor.

THE COURT:  Allen wrenches considered contraband?

THE WITNESS:  Yes, your Honor.

THE COURT:  Hacksaw blades considered contraband?

THE WITNESS:  Absolutely.

BY MS. DeWITT:

Q    You were talking about, in addition to ways that the communication could be made and also items could be moved; let me just ask you a couple of follow-up questions about that.

Is the library sometimes used as a way to leave notes between inmates?

A    Yes.  Yes, quite often.

Q    Can you explain how that works?

A    Because in the library there are so many books and so many small areas, an individual could go into the library, leave a note or a kite in a certain book, a certain page number, and once he leaves the library, that's rather untouched, and the person coming behind him would simply pick up the note and see what it says.  If it has to go to someone else, or that person's cellmate; it happens quite often.  But the library is a very, you know, like I say, high-volume area for notes and kites.

**DRAFT COPY**

Battley - Direct / By Ms. DeWitt                    119

Q    You mentioned the phrase "kites" as sort of a term of art to refer to a note sent from one inmate to another; is that --

A    Yes.  Yes, it is.  It's just an -- it's unofficial, an unofficial note.  It's a note passed from inmate to inmate without -- unbeknownst to staff and without staff authorization.

Q    Are they sometimes sent through magazines as well?

A    As well.  Yes, they are.

Q    And you talked a little bit about the ventilation system. Would somebody who, for example, was on 518 be able to talk to somebody who was on 913 through the ventilation system?

A    Yes, they can.

Q    And you talked about items being passed down through the plumbing system.

     Is there other ways to pass items up floors from a bottom floor to a higher floor?

A    Yes, the same system applies.  Strangely enough, the plumbing system is -- I guess it defies gravity, because when you start to flush, the person on the lower level starts to flush first, the item goes up rather than down.

Q    Okay.  And just a couple of other questions.  The judge asked you about specific items that were contraband.

     Would a jar with, for example, paint in it be considered a contraband item?

A    Absolutely.

**DRAFT COPY**

Battley - Direct / By Ms. DeWitt                132

E is for the fifth floor.

Q    Okay.  That's also indicated right here?

A    Yes, it is.

Q    Okay.  Now, prior to November 4th, 2002, was Iouri Mikhel in a different cell?

A    Yes.

Q    And what dates was he in a different cell prior to being put in 518, Cell 518?

A    Okay, prior to cell 518, he was in cell 536 lower, and he was in that area from May 22nd, 2002, to 11/4/2002.

Q    Just to be clear, so the Jury can follow along, is that --

A    Yes.

Q    -- indicated in this line right here, that's circled?

A    That's correct.

Q    And can you explain, Mr. Battley, how it is that an inmate gets moved or how an inmate can get moved from one cell to another?

A    An inmate can get moved from one cell to the other by simply requesting -- they can request to the Counselor.  And if, on occasions, that doesn't work, an inmate can use other tactics to be moved.  He could say he was either having problems with his cellmate or he would get along better with someone else in another cell.

Q    So an inmate can asked to be moved?

A    Yes.

**DRAFT COPY**

Battley - Direct / By Ms. DeWitt                133

Q    And sometimes inmates move without permission?

A    Yes, that's happened.  That happens quite often too.

Q    And sometimes they get moved because somebody decides to move them for whatever reason?

A    That's correct.

Q    And just to summarize, these records then show that Mikhel was in this cell, 533 -- 536, excuse me and get moved to cell 518?

A    That's correct.

Q    And then after the escape investigation was discovered, he was moved up to the eighth floor which is where administrative segregation is?

A    Yes.

Q    And I'm sorry, what floor is administrative segregation on again?

A    It's on the eighth floor.

Q    Mr. Battley, can you now please take a look at what was previously marked for identification as Government's Exhibit 901, which is again, your Honor, is the self-authenticating document.

        Do you recognize this document, Mr. Battley?

A    Yes, I do.

Q    What is this?

A    This is a quarters or cell assignment history for Inmate Kadamovas.

**DRAFT COPY**

Battley - Direct / By Ms. DeWitt          134

Q    And, again, this is a record that MDC would rely on in terms of its operations, its daily operations?

A    Yes.

        MS. DeWITT:  At this time, your Honor, the Government would move to admit Government's Exhibit 901.

        THE COURT:  Received this date.

        **(Government's Exhibit Number 901 was received in evidence)**

        MS. DeWITT:  And, for the record now, publishing Government's Exhibit 901 so the Jury can see it on the overhead.

**BY MS. DeWITT:**

Q    What room does this inmate record show that Jurijus Kadamovas was assigned to on March 7th, 2003?

A    March 7th, 2003, Inmate Kadamovas was in cell 913.

Q    And, again just so the Jury can follow along, is that the information that's listed on this line right here (indicating)?

A    Yes.

Q    And the room number is 913, that I've circled?

A    That's correct.

Q    And what does the L stand for?

A    The L stands for lower bunk.

Q    What -- for the record, what date was Defendant Kadamovas in room 913L?

A    In room 913?

Q    913, excuse me, not --

**DRAFT COPY**

Battley - Direct / By Ms. DeWitt          135

A    Yes, 913.  Kadamovas entered into cell 913 on October 15th, 2002.  He was in 913 prior to -- prior to that. Let's see, he was there on May 6th, 2002, to 10/11 and he was moved from there to the Special Housing Unit from 10/11 to 10/15.  And on 10/15, he returned to 913.  And he remained in the cell 913 until March 7th, 2003.

Q    And, Mr. Battley, are you aware of whether or not Defendant Kadamovas was sanctioned at some point for being in an unauthorized cell?

A    Yes, he did receive an incident report for being in an unauthorized cell.

Q    What cell was Defendant Kadamovas in without authorization?

A    He was in cell -- actually he was in cell 913.

Q    Okay, so the cell that he was in that he wasn't supposed to be in was actually this same cell that he ultimately was left in?

A    Yes.

Q    And did he receive some punishment for that?

A    Yes, he received extra duty.  He was sanctioned to like 20 hours of extra duty for being in an unauthorized area.

Q    And prior to being in cell 913, was Defendant Kadamovas in a different cell?

A    Yes, he was.  He was assigned to cell 955.

Q    And approximately how long was he in cell 955?

**DRAFT COPY**

Battley - Direct / By Ms. DeWitt          136

A    From March 25th to May 6th, right here (indicating).

THE COURT:  2002?

THE WITNESS:  2002, I'm sorry.

BY MS. DeWITT:

Q    And if you know or if you remember Mr. Battley, was it some time in this period that he was found to be in an unauthorized cell?

A    I'm not sure.  I would have to reflect on the records.

Q    Would it help to refresh -- is there something that would help you refresh your recollection, Special Agent Battley?

A    Yes.

Q    Would the --

MS. DeWITT:  May I approach, your Honor?

THE WITNESS:  Okay.

BY MS. DeWITT:

Q    Does that record help to refresh your recollection as to the approximate date?

A    Yes, it does.

Q    When Defendant Kadamovas was in an unauthorized cell?

A    Yes, it does.

Q    When was that?

A    He received an incident report on May 3rd, 2002.

Q    And, again, does that report that I just showed you help refresh your recollection as to which cell he was in that he wasn't supposed to be in?

**DRAFT COPY**

Battley - Direct / By Ms. DeWitt          137

A    Yes, he was in 955, cell 955, on May 3rd, 2002, when he received the incident report.

Q    Does the report show that he was supposed to be in 955 or that he was in 955?

A    The report shows that he was supposed to be in 913, but he was found in 955.  No, I stand corrected.  He was in 913, he should have been in 955.

Q    Okay.  And that was on May 3rd, 2002?

A    That's right.

Q    And getting back to what the record showed, he was, in fact, in 955 during the period of time that you testified about.  At some point, he got moved to cell 913.  Is that correct?

A    That's correct.

Q    Officially moved?

A    Yes.

Q    And then at some point, he also was moved ultimately to administrative segregation.  Was that a result of the escape investigation?

A    Yes, on March 7th, 2003.

Q    Other than this period here was he was in the SHU, basically, in the -- excuse me, in the administrative segregation, this entire time he was in 913.  Is that right?

A    Yes, except for the time he was in administrative detention, he was in 913 from May 6th, 2002, to March 7th, 2003.

**DRAFT COPY**

Battley - Direct / By Ms. DeWitt                148

THE COURT:  Received this date.

**(Government's Exhibit Number 907 was received in evidence)**

**BY MS. DeWITT:**

Q    Does this inmate quarters record show that Jose Avila was on the same floor as Defendant Mikhel for some period of time?

A    Yes.

Q    And for what period of time was Jose Avila on the same floor with Defendant Iouri Mikhel?

**(Pause)**

A    Okay.  The record shows that Avila was assigned to five south on April -- yeah, April of 2002.  No, I'm sorry.  Uh, December, 2001, April 24th, 2002.  Iouri Mikhel came to the unit earlier.

Q    Are these the records that show the overlap right here?

A    As of March 8th, 2002, to 9/10/2002.

Q    February 11th to -- February 11th, 2003, to -- I'm sorry, February 11th, 2003, to February 7th, 2003?

A    Actually, that should be March 8th, 2002, to September 10th, 2002.

Q    Okay.  March 8th, 2002, to when?

A    February 10th, 2002.  I mean, September 10th, 2002.

Q    So the first period that they overlap is March 8th, 2002, to September 10th, 2002?  Is that correct?

A    Yes.

Q    And the second period that they overlapped was

**DRAFT COPY**

Battley - Direct / By Ms. DeWitt          149

February 11th, 2003, to March 7th, 2003?

A    That's correct.

Q    And comparing this Exhibit was Government's Exhibit 901, does the record show -- does Mr. Avila's record show that he was on the same floor as Jurijus Kadamovas for some period of time?

A    Yes.

Q    And what period of time was Jose Avila and Defendant Kadamovas on the same floor?

A    Avila was on the same floor as Kadamovas, which was nine south from September 13th, 2002, to October 4th, 2002.

Q    And finally, Mr. Battley, can you please take a look at Government's Exhibit 912-A for identification?  Do you recognize that Exhibit?

A    Yes, I do.

Q    And, Mr. Battley, is that essentially an exact copy of the diagram that you've previously testified about before that shows the relationship of all the cells to each other?

A    Yes, it is.

          **MS. DeWITT:**  At this time, your Honor, I'd move to admit Government's Exhibit 912-A.

          **THE COURT:**  Received.

          **(Government's Exhibit Number 912-A was received in evidence)**

          **THE COURT:**  Let's take our afternoon recess,

**DRAFT COPY**

Battley - Cross / By Mr. Callahan          153

approximately three feet in length.

Q    All right.  And you indicated that as you understand from your investigation that in order to have the materials or contraband lifted up to one of those two cells the window had to be removed?

A    That's correct.

Q    All right.  And you indicated that that was done with an Allen wrench on the screws of the window?

A    I indicated that the Allen -- it's possible that an Allen wrench could have been used to loosen the screws.  However, it could have been another tool, yes.

Q    I'm sorry, the last part I didn't hear.

A    It could have been another tool.

Q    And approximately, if you know, how many screws are on one of those windows?

A    I'm not quite sure.

Q    All right.  So once there's a tool to remove these screws, then is the entire window lifted out?  Is that how it works?

A    There's an inner metal frame around the window.  And inside between them, the metal frame and the glass, there's like a gasket, a cushion, to keep the window from rattling. And then there's the window.

Q    And correct me if I'm wrong, but you indicated that your investigation demonstrated that after the contraband had been lifted the windows were replaced with what you call a "gorilla

**DRAFT COPY**

Battley - Cross / By Mr. Callahan                154

glue."  Is that what you said?

A    Yeah.  It's called "gorilla glue" or it's somewhat of a gasket type chemical, a rubber like chemical from a tube.  And it will seal it and it will also prevent the window from rattling when you're doing like a bar tap, yeah.

Q    Now, it's a little difficult to tell from this angle, but can you estimate the length of string or cord it would take to get up to either Cell 541 or 533?

A    Estimate?

Q    Uh-huh.

A    I'd say anywhere from 35 to 45 feet.

Q    Now, the fact that these cells start with the number five, is that the equivalent of the fifth story in an office building, for example?

A    Not exactly.

Q    So it would be a little lower?

A    It could be a little lower, yeah.

Q    All right.  Now, you testified on direct about a number of items that your investigation had determined came through one of those two windows, but again, with the necessity of having the window portion removed.

A    Yes.

Q    Before any of those items were able to be lifted into those cells the window had to be removed with a tool.  Do you know where --

**DRAFT COPY**

Battley - Cross / By Mr. Callahan           155

THE COURT:  Wait, wait.  That assumes a fact not in evidence that the window had to be removed with a tool.  He didn't testify to that.

MR. CALLAHAN:  All right.  Forgive me.

BY MR. CALLAHAN:

Q    Is it your understanding from your investigation the windows would be removed with some sort of a tool?

A    Yes.

Q    And did your investigation discover what that tool was?

A    We calculated it to be the Allen wrench.

Q    And was that wrench ever discovered to your knowledge?

A    Yes.

Q    So going along now, is it your investigation's determination that these items were lifted into these two units at night?

A    Most likely, yes.

Q    And did your investigation determine that these lifting of these items came at any specific time?

A    Not specifically but we did -- the investigation indicated that it was somewhere between 9:00 p.m. and midnight.

Q    And as you understood it, someone in either one of those two cells would take some sort of cable, either a string or something else, and lower it out the window?

A    Yes.

Q    All right.  And what exactly did your investigation

**DRAFT COPY**

Battley - Cross / By Mr. Callahan                    162

where the flood occurred was identified.

Q    Now, you supervised the searches of this cell, as well as

a number of other cells that you believe were involved in this

escape attempt?

A    Yes.

Q    You found no guns in anybody's cell, did you?

A    No, I did not.

Q    Any weapons at all?  Any knives, for example?

A    No.  Not what you would consider an official knife.  But

there were a number of blades, which we would consider weapons

inside of the prison; for instance, box cutter blades.

Q    Okay.  Something that could be used.

A    Yes.

Q    All right.  And could also be used to cut through things.

A    Absolutely.

Q    Now, you talked a little bit about the assignment of cells

and that someone, an inmate, if he is not happy where he is can

request of his counselor for a new location; is that right?

A    Yes.

Q    Was there a time in 2001 and 2002 where an inmate was

actually assigning cells?

A    Not to my knowledge.

Q    Would that be against protocol?

A    Absolutely.

Q    Now, you testified about the location of Mr. Mikhel prior

**DRAFT COPY**

Battley - Cross / By Mr. Callahan          163

to and after this incident was discovered.

Was he sent to what was called "The SHU"?

A    Yes.

Q    All right.  Can you define for the jury what "The SHU" is again, please?

A    SHU is an acronym; S-H-U is an acronym, short for Special Housing Unit.  It's a temporary holding area where individuals requiring a higher level of security are housed pending the outcome of an investigation.

Q    And more security, for example, someone who's in the SHU -- if we can use that -- is not allowed out of the cell more than perhaps one hour a day; is that correct?

A    We're required to give them at least a minimum of one hour a day of recreation, yes.

Q    And if someone's in that unit, are their telephone privileges limited?

A    Yes.

Q    And they are searched on a much more frequent basis than they would be in general population?

A    Yes.

Q    All right.  And that includes body searches and cell searches.

A    Yes.

Q    At least every day?

A    Some days -- it could go a day or so without being

**DRAFT COPY**

Battley - Cross / By Mr. Callahan          164

searched.  It would depend on whether or not the inmate came
out of the cell.

Q    And is it true that every time the inmate leaves the cell
he is searched?

A    That's correct.

Q    Searched before he goes back into the cell.

A    He is searched coming out and going in.

Q    All right.  As a result of this escape attempt were there
any remedial measures taken at the MDC?

A    Yes.  Following the discovery of the amount of contraband
there were gates that have been installed.  The area where
information was obtained where the individual stood to
introduce the contraband, that area was somewhat like a canopy,
a lot of shrubs and trees, those have all been removed and a
locked gate has been placed there so an individual cannot get
as close to the building.  And for security reasons there have
been a number of changes made internally, also.

Q    Can you describe a couple of them?

        **MS. DeWITT:**  Objection, your Honor.  Relevance.

        **THE COURT:**  Sustained.

**BY MR. CALLAHAN:**

Q    Is it still possible for one inmate on Level 5 to
communicate with an inmate on Level 9 through pipes?

A    Yes, it is.

Q    And is it still possible for an inmate on one level to

**DRAFT COPY**

Battley - Cross / By Ms. Chahin                165

pass a note through the toilet plumbing to another inmate?

A     Yes, it is.

Q     Mr. Battley, we thank you.

          MR. CALLAHAN:  Nothing further, your Honor.  Thank you.

          THE COURT:  Ms. Chahin?

          MS. CHAHIN:  Thank you, your Honor.

                    **CROSS EXAMINATION**

**BY MS. CHAHIN:**

Q     Agent Battley, you were asked to review some inmate history quarters and compare whether or not Mr. Kadamovas and Mr. Avila were housed on the same floor at the same time; is that correct?

A     Yes.

Q     And I believe that would be Exhibit 901 and 907.

          Could you take a look at those, please?

          **(Pause / Witness complies)**

A     And the names were Avila and --

Q     And Mr. Kadamovas.

A     And Kadamovas.

Q     Yes, please.

A     Okay.

Q     Sir, did you make a determination that the only time that they were housed together was between the dates of September 13th of 2002 to October the 4th of 2002?

**DRAFT COPY**

Battley - Cross / By Ms. Chahin                166

**(Pause / Witness examines documents)**

A    Yes.

Q    Is that approximately a three-week period of time?

A    Approximately, yes.

Q    Okay.  Can you tell me if at any time during that time period were they ever housed in the same cell?

A    No, they were not.

Q    And can you tell me whether subsequent to that period of time whether at any time they were again housed on the same unit?

A    The records do not indicate they were.

Q    I'm sorry?

A    The records don't indicate that they were.

Q    So based on the records, is it fair to say that subsequent to that time they were not housed on the same unit?

A    That's correct.

Q    Now, if I could please ask you to take a look at -- if I could have one second.

**(Counsel confers off the record)**

A    Excuse me.

Q    Yes?

A    I'm sorry.  They weren't housed in the same unit in general population, to be specific.  But when the inmates did go to administrative detention, which is 8 North --

Q    Correct.

**DRAFT COPY**

Battley - Cross / By Ms. Chahin                    167

A       -- they were housed in the same unit then.

Q       And for what period of time would that have been?

A       According to the documents, inmate Avila was in the Special Housing Unit from 3-20 until -- March 20 of 2003 to April 1 of 2003.

Q       And do the records indicate what range he would have been on?

A       The records indicate that he was on Range 3.

Q       And with respect to Mr. Kadamovas, what range was he on?

A       Kadamovas was also on Range 3.

Q       And he was there during what period of time, with Mr. Avila?

A       From March 7, 2003 to the date of the incident and until the date of this report.  There isn't -- there's no report beyond the March 8th.

Q       Very well.  Thank you.

        And now I would like to have you take a look at the exterior elevation of the MDC, which is on Government's Exhibit 912.  And if I could display...

        I believe that you've indicated that this accurately displays the location of various cells, correct?

A       Yes.

Q       Okay.  Now, with respect to 518, 518 is the cell where Mr. Mikhel was housed on March the 7th, correct, of 2002?

        **(Pause)**

**DRAFT COPY**

Battley - Cross / By Ms. Chahin                    168

I'm sorry, 2003.

A    2003.

Q    I apologize.

A    Okay.

Q    That's where Mr. Mikhel was housed, correct?

A    Yes.

Q    Okay.  And the way that you've described each floor, specifically with respect to the fifth floor, you've described there as having two levels of cells, correct?

A    Yes.

Q    And so 518 is actually the upper cell of the fifth floor, correct?

A    Yes.

Q    Okay.  And the cell below that would be what number?

A    Directly below 518?

Q    Correct.

A    517.

Q    Now, with respect to the remaining floors that are between the fifth floor and the ninth floor, does each of those intermediate floors house inmates?

A    Yes.

        THE COURT:  Let me interrupt a minute.

        On 518, how many cells are in 518?

        THE WITNESS:  518, your Honor, is one cell.  There are two individuals assigned to that one cell.

**DRAFT COPY**

Battley - Cross / By Ms. Chahin            169

THE COURT:  And there's an upper bed and a lower bed.

THE WITNESS:  That's correct.

THE COURT:  So there's two individuals assigned to Cell Number 518.

THE WITNESS:  That's correct.

THE COURT:  And the cell directly beneath 518 is 517?

THE WITNESS:  That's correct.

THE COURT:  And there are how many individuals assigned to that cell?

THE WITNESS:  There are two, also.

THE COURT:  An upper and a lower.

THE WITNESS:  Yes.

THE COURT:  So when you look at the documents and it says "518U," that means 518 upper bunk?

THE WITNESS:  Upper bunk in 518 cell.  518, yes sir.

THE COURT:  And when it says "518L," that means Cell 518, lower bunk.

THE WITNESS:  That's correct.

THE COURT:  You have bunk beds.

THE WITNESS:  Yes, sir.

MS. CHAHIN:  Thank you, your Honor.

BY MS. CHAHIN:

Q    Mr. Battley or Agent Battley, so then on the sixth floor, which is directly above -- let me re-ask the question.

The sixth floor also has two levels of cells?

**DRAFT COPY**

Battley - Cross / By Ms. Chahin                    170

A    Yes.

Q    Is 616 as displayed on this diagram, is that the upper or the lower cell in the sixth floor?

A    That is the upper.

Q    That's the upper.

A    Uh-huh.

Q    So what is the cell below that?

A    I would have to check and find out.  I'm not sure.

Q    I'm sorry?

A    I'm not sure what the cell is directly below that one.

Q    Okay.  But there are two.

A    There are two, yes.

Q    So there would be one additional cell between 616 and 518; is that right?

A    That's correct.  The reason -- just to give you a reasonable deduction, it would be 615.

Q    Okay.  Now, on the seventh floor do you also have two levels of cells?

A    Yes, we do.

Q    And do you know what the cell numbers would be that would be directly above 616 and 615 on the seventh floor?

A    I don't have that information available right now, no.

Q    Okay.  But there would be two levels of cells, correct?

A    That's correct.

Q    Now, on the eighth floor that's the Special Housing Unit.

**DRAFT COPY**

Battley - Cross / By Ms. Chahin                    171

A     Yes.

Q     Is that different?  Does that only have one cell as opposed to two cells on that floor?

A     Only one floor, that's correct.

Q     Okay.  And then if we go up to the ninth floor, 913, is that the upper cell -- let me ask another question first.

      Does that floor have two levels of cells?

A     Yes.

Q     Okay.  And is 913 the upper or the lower?

A     That one would be the upper.

Q     The upper.  So can you tell us how many cells there are between 518 and 913?

A     Could I back up just a second?

Q     Yes.

A     913, that would be lower.

Q     It would be lower.

A     Yes.

Q     Okay.  Could you tell us how many cells there are between 518 and 913?

A     Cells?

Q     Yes.

A     Six.

Q     Now, you were also asked about where Mr. Kadamovas was housed during various periods of time; is that correct?

A     Yes.

**DRAFT COPY**

Battley - Cross / By Ms. Chahin                    172

Q    And, specifically, you referred to Exhibit 901.  And if I
could ask the Government's assistance in putting that on the
board.

     **(Pause)**

          Sir, are you able to see this document?

A    Yes.

Q    Okay.  Now, you've indicated that on May the 3rd of 2002,
Mr. Kadamovas was found in an unauthorized cell; is that right?
And that's referring to another document that you reviewed,
too.

A    Yes.

Q    Okay.  And what cell was he found in?

A    He was found in Cell 913.

Q    And at that time he was assigned to what cell?

A    955.

Q    And I believe that you indicated that it's something that
happens quite often for inmates to be found in cells where
they're not authorized to be; is that correct?

A    No.

Q    That's not correct?

A    Well, often -- what do you mean by "often"?

Q    Well, I believe that you said on your direct examination
that inmates will often move themselves to another cell.

A    It happens from time to time.

Q    And that's what you testified to on your direct

**DRAFT COPY**

Battley - Cross / By Ms. Chahin          173

examination; is that correct?

A    Yes.  It does happen from time to time.

Q    Now, specifically, with respect to Mr. Kadamovas, from what period of time to what period of time did he -- was he assigned to Cell 955?

A    955.

     **(Pause)**

         According to the documents, he was assigned to 955 from March 25th, 2002 to May 6th, 2002.

Q    So would it be fair to say that three days after he was found in 913 where he was not authorized to be he was transferred to 913?

A    The document -- yeah, the roster indicates that, yes.

Q    Okay.  He was not able to assign himself to that cell, correct?

A    That's correct.

Q    So it was done through proper channels.

A    I would think so.

Q    Okay.  And so three days after, starting on May the 6th of 2002, 913 became his cell, correct?

A    Yes.

Q    Okay.  And he remained there from 5-6-2002 until what date?

A    In 913?

Q    913.  And at that point that's when he was taken --

**DRAFT COPY**

Battley - Cross / By Ms. Chahin                    174

A    No, I was only confirming --

Q    I'm sorry.  I'm sorry.

A    -- his cell.  His cell number.

Q    Yes.  Cell 913.

A    Okay.  That was a slight break in the time that he was assigned to Cell 913.  He was there from May 6th, 2002 to October 11th, 2002.  Then, he went to the Special Housing Unit from October 11th, 2002 to October 15th.  And he returned to 9 South on the 15th of October and remained there until March 7th, 2003.

Q    Was the reason he was taken to the Special Housing Unit for those four days because of his unauthorized presence in the cell?  If you know.

A    I'm not sure as to the reason why he was taken to the Special Housing Unit.

Q    Okay.  But, nevertheless, he was in the Special Housing Unit for four days and then he was returned to Cell 913, correct?

A    That's correct.

Q    And so absent -- aside from those four days in the Special Housing Unit he was assigned properly to Cell 913 from May 6th, 2002 to March 7th of 2003; is that correct?

A    Pretty much, yes.

Q    So that's approximately a ten-month period of time, correct?

**DRAFT COPY**

Battley - Redirect / By Ms. DeWitt                    175

A     Approximately, yes.

Q     Okay.  Now, you've indicated that you coordinated some searches of various cells, correct?

A     Yes.

Q     And in that regard I believe you indicated that you selected special personnel who were very adept at conducting searches in order to conduct these searches; is that correct?

A     Yes.

Q     And one of the cells that you had searched was Mr. Kadamovas' Cell Number 913, correct?

A     Correct.

Q     Okay.  In his cell you didn't find any tools, did you?

A     No, I did not.

Q     You didn't find any contraband?

A     On March 7th, no, we did not.

Q     And you didn't find any evidence of digging, did you?

A     No, I did not.

        **MS. CHAHIN:**  I have nothing further, your Honor.

                    **REDIRECT EXAMINATION**

**BY MS. DeWITT:**

Q     Mr. Battley, can an inmate who's housed at the Metropolitan Detention Center request to be moved to a particular room?

A     Absolutely, yes.

Q     And are those requests honored?

**DRAFT COPY**

Sotelo - Direct / By Ms. DeWitt                179

A    They were inmate cells.

Q    And were there also items taken from cells that were searched?

A    Yes.

Q    Okay.  And I just want to direct your attention to two particular cells that you searched that day.

Did you search Cell 518 South and the items taken from 518 South?

A    Yes, I did.

Q    And did you also search Cell 616 South --

A    Yes, I did.

Q    -- and items from that cell?

A    Yes.

Q    And you also searched other cells.

A    Yes, I did.

Q    And other items from other cells.

A    Yes.

Q    When you say that you searched items that had been removed from the cells, these two cells, 518 and 616, can you explain what you mean by that, in addition to the cells themselves?

A    Some of the inmates' property that had been in the cells had already been removed by correctional officers, and it was stored in a warden's conference room, which is a locked room inside of a locked closet.  So I searched those items, also.

Q    And were those items that were removed identified as to

**DRAFT COPY**

Sotelo - Direct / By Ms. DeWitt                    180

which cell they were removed from?

A    Yes.

Q    When you executed the Search Warrant that day at the Metropolitan Detention Center, what were you looking for?

A    Items that would be evidence mostly of an escape attempt.

Q    At the time of the search were you familiar with the underlying escape investigation?

A    Yes, I was.

Q    How is it that you were familiar with that underlying escape investigation?  What was your role?

A    I was also involved in that case, also assisting.

Q    And what was your role in the actual escape investigation?

A    I was the Case Agent.

Q    As the Case Agent what were your responsibilities in connection with that escape investigation?

A    Collecting evidence, doing interviews, writing search warrants, arrest warrants.

Q    Were you also a liaison between the FBI and investigators at the Metropolitan Detention Center?

A    Yes.

Q    Now, you said that you searched, specifically, Cells 518 South and 616 South and items that were removed from those.

         Whose cell did 518 South belong to?

A    It was now empty on the day of the search but a week earlier had been the cell of Iouri Mikhel and Michael Kim.

**DRAFT COPY**

Sotelo - Direct / By Ms. DeWitt                 181

Q    And whose cell had 616 South belonged to?

A    It was the cell of Petro Krylov and I think it was Juan Rosinos (phonetic).

Q    Did you seize any items from Cell 518 South or from the items taken from 518 South?

A    Both, yes.

Q    Ms. Sotelo, I'd like to direct your attention to what has been marked for identification as Government's Exhibit 866. And if Special Agent Davidson can hand that to you.

A    Oh.

     **(Pause)**

     Do you now have Government's Exhibit 866 for identification in front of you, Special Agent Sotelo?

A    Yes, I do.

Q    Okay.  Do you recognize that exhibit?

A    Yes.

Q    What is it?

A    It's a mustard jar full of gray paint.

Q    And was this mustard jar with gray paint one of the items that you seized on March 14th, 2003?

A    Yes, it is.

Q    Where was this item seized from?

A    Cell 518.

     **MS. DeWITT:**  At this time, your Honor, I'd move to admit Government's Exhibit 866.

**DRAFT COPY**

**THE COURT:**  Received this date.

**(Government's Exhibit Number 866 was received in evidence)**

**BY MS. DeWITT:**

Q   And, Ms. Sotelo, can you just show Government's Exhibit 866 to the jury so they can see it?

**(Witness complies)**

Okay.  You can't tell from looking at it, but you said that there was paint inside of that?

A   Uh-huh.

Q   And that was gray colored paint?

A   Yes.

Q   Ms. Sotelo, I'd ask you now to please take a look at what's been marked for identification as Government's Exhibit 867.

Do you have that in front of you?

A   Yes, I do.

Q   Do you recognize that exhibit?

A   Yes, I do.

Q   What is it?

A   A paintbrush.

Q   And is this paintbrush one of the items that you seized on March 14th, 2003?

A   Yes, I did.

Q   Where was this item seized from?

A   Cell 518.

**DRAFT COPY**

Sotelo - Direct / By Ms. DeWitt          183

MS. DeWITT:  And, your Honor, at this time I'd move to admit Government's Exhibit 867.

THE COURT:  Received this date.

(Government's Exhibit Number 867 was received in evidence)

BY MS. DeWITT:

Q    And can you show that to the jury.

(Witness complies)

Ms. Sotelo, what was the significance of the paintbrush, Government's Exhibit 867, and the jar with the gray paint in it that you found in connection with your state investigation?

MR. RUBIN:  Objection.  Speculation, no foundation.

THE COURT:  Overruled.  Go ahead.  You can answer it.

THE WITNESS:  Well, I know that a lot of things in the cells are painted gray, and the correctional officers have access to gray paint and will give them sometimes to inmates if they need to touch up things in their cell.  So in this case I thought that it could have been used to patch up evidence of digging holes in your walls or removing windows, and the paintbrush would have been used to paint up and patch things.

MR. RUBIN:  Objection.  Motion to strike as speculation.

THE COURT:  No, overruled.  It's only her impression of her investigation as to the items that she found and what they could be used for.  She did testify she was familiar with

**DRAFT COPY**

Sotelo - Direct / By Ms. DeWitt                184

the escape plan when she went out to serve the Search Warrant.

**BY MS. DeWITT:**

Q    Ms. Sotelo, based on your experience in doing investigations at the Metropolitan Detention Center, is paint something that an inmate is allowed to keep in their cell?

A    No.  They're allowed to use it and turn it back in.

Q    So this would be an item that you would consider contraband.

A    It is.

Q    Ms. Sotelo, can you now please take a look at what's been marked for identification as Government's Exhibit 868.

         Do you have that in front of you?

A    Yes, I do.

Q    Do you recognize that exhibit?

A    Yes, I do.

Q    What is it?

A    It is green pieces of fabric that are tied together to make a long rope-type.

Q    Are these cloth strips, green cloth strips, items that you seized from Cell 518 on March 14th, 2003?

A    Yes, they are.

         **MR. RUBIN:**  Objection.  Leading.

         **THE COURT:**  It's just foundational.  Overrule the objection.  Technically, it would be correct, but it's foundational and I have a wide latitude on leading questions,

**DRAFT COPY**

Sotelo - Direct / By Ms. DeWitt            185

even on direct examination.

**BY MS. DeWITT:**

Q    Let me just back up.  Was this an item, these green strips of cloth, an item that you seized on March 14th, 2003?

A    Yes.

Q    Where did you seize them from?

A    Cell 518.

        **MS. DeWITT:**  I move to admit Government's Exhibit 868, your Honor.

        **THE COURT:**  Received this date.

    **(Government's Exhibit Number 868 was received in evidence)**

**BY MS. DeWITT:**

Q    And, Special Agent Sotelo, can you show the jury what those look like, those...

    **(Witness complies)**

        And just for the record, there's a lot of strips that are tied together; is that right?

A    Yeah, a lot of strips tied together.

Q    And, Ms. Sotelo, what was the significance of this item in connection with your state investigation?  Why did you seize this item?

A    Because it could be used for many things, but lowering things from the windows or I know they use them also for passing notes through the toilet and plumbing.

Q    Ms. Sotelo, can you please now take a look at what's been

**DRAFT COPY**

Sotelo - Direct / By Ms. DeWitt          186

marked for identification as Government's Exhibit 869.

A     Yes.

Q     Do you recognize this exhibit?

A     I do.

Q     What is it?

A     It is a creamer jar, and inside of it is a clear filament that looks like fishing line.

Q     And is this one of the items that you seized on March 14th, 2003 at the --

A     Yes.

Q     -- Metropolitan Detention Center?

A     Yes.

Q     Okay.  Let me finish.  I'm sorry because --

A     I'm sorry.

Q     Where was this item seized from?

A     Cell 518.

        **MS. DeWITT:**  And at this time, your Honor, I'd move to admit Government's Exhibit 869.

        **THE COURT:**  Received this date.

        **(Government's Exhibit Number 869 was received in evidence)**

**BY MS. DeWITT:**

Q     And, Ms. Sotelo -- excuse me -- Special Agent Sotelo, could you please show Government's Exhibit 869 to the jury?

        **(Witness complies)**

        And just for the record, Ms. Sotelo, you can't see

**DRAFT COPY**

Sotelo - Direct / By Ms. DeWitt                187

it; but is the filament that you were talking about actually inside?

A    Yes.  I can see it if I turn the lid.

Q    What was the significance of this creamer jar, creamer container, with filament inside it in connection to your investigation?

A    The fishing line inside is what's significant, and that could also be used to pull or lift or lower things.

Q    And, Ms. Sotelo, could you now please take a look at what's been marked for identification as Government's Exhibit 870.

A    Yes.

Q    Do you recognize that exhibit?

A    Yes, I do.

Q    What is it?

A    It was a baby powder jar that's been cut, just the flat front of it.

Q    Is this one of the items that you seized on March 14th, 2003?

A    Yes.

Q    Where was this item seized from?

A    Cell 518.

Q    And again, that was the cell of who?

A    Iouri Mikhel and Michael Kim.

        **MS. DeWITT:**  At this time, your Honor, I'd move to

**DRAFT COPY**

Sotelo - Direct / By Ms. DeWitt                    188

admit Government's Exhibit 870.

        THE COURT:  Received this date.

        (Government's Exhibit Number 870 was received in evidence)

BY MS. DeWITT:

Q    And, Special Agent Sotelo, if you could show that to the

jury and explain to them why you seized this particular item.

A    I seized it because it's cut into -- just the front of

it's flat and it has very sharp corners.  So it could be used,

in my opinion, to cut at the wall or as a weapon.

Q    Ms. Sotelo, can you now please take a look at what's been

marked for identification as Government's Exhibit 871.

A    Yes.

Q    What is that exhibit?

A    It is a honey jar with dental floss type string wrapped

around it.

Q    Okay.  Wrapped around the --

A    The bear's neck.  It's a bear honey jar.

Q    Is this one of the items that you seized on March 14th,

2003?

A    Yes, it is.

Q    And what cell did you seize this from?

A    518.

        MS. DeWITT:  At this time, your Honor, I'd move to

admit Government's Exhibit 871.

//

**DRAFT COPY**

Sotelo - Direct / By Ms. DeWitt                189

THE COURT:  Received this date.

**(Government's Exhibit Number 871 was received in evidence)**

BY MS. DeWITT:

Q    And, Ms. Sotelo, if you could show that to the jury.

**(Witness complies)**

Why did you seize this item, Ms. Sotelo?

A    Because of the string wrapped around the neck, which could be used, again, as a fishing line or string to lower things.

Q    Okay.  And can these items, the string and the sharp piece of plastic that was cut, are these all things that you would consider contraband?

A    Yes.  Not the honey jar itself but the string wrapped around it, yeah.

Q    Ms. Sotelo, can you now please take a look at what's been marked for identification as Government's Exhibit 872.

**(Pause)**

A    Yes.

Q    Do you recognize that exhibit?

A    I do.

Q    What is it?

A    A mustard jar with some paint inside of it.

Q    And did you seize this mustard jar on March 14th, 2003?

A    Yes, I did.

Q    Where did you seize this from?

A    From Cell 616.

**DRAFT COPY**

Sotelo - Direct / By Ms. DeWitt                190

Q    I'm sorry.  Was this from the items from 518 or 616?

MR. RUBIN:  Objection, your Honor.  Asked and answered.

THE COURT:  Sustained.  Look at 866 and then look at 872.

Are those items, 872 and 866, were they seized from the same or from different cells?

THE WITNESS:  I'm sorry.  This is from personal property, not from a cell.

BY MS. DeWITT:

Q    Okay.  I'm sorry.  Can you look at it again, Ms. Sotelo -- Special Agent Sotelo, and tell the jury where that particular item came from?

A    This mustard jar came from the property that had already been removed from Cell 518.

Q    Okay.  So --

THE COURT:  Referring to Exhibit 872.

THE WITNESS:  Correct.

BY MS. DeWITT:

Q    And I'm sorry, just to clarify.  Some of the items you seized came from the cell itself.

A    Yes.

Q    And some of the items were items that you seized from items that had been removed from the cell but were identified as coming from that cell.

**DRAFT COPY**

Sotelo - Direct / By Ms. DeWitt                    191

A     Yes.

Q     Okay.   And that was one of the items that came from the items that had been removed from Cell 518?

A     It had already been removed and locked up.

Q     Okay.

        MS. DeWITT:   And, your Honor, at this time I'd move to admit Government's Exhibit 872 into evidence.

        THE COURT:   Received this date.

     **(Government's Exhibit Number 872 was received in evidence)**

BY MS. DeWITT:

Q     And, Ms. Sotelo -- Special Agent Sotelo, if you could show the Government's Exhibit 872 to the jury, please.

     **(Witness complies)**

        And why did you seize this particular item?

A     Because it had the gray paint in it, also.

Q     Can you please now take a look at what's been marked for identification as Government's Exhibit 873.

A     Yes.

Q     Do you recognize that?

A     Yes, I do.

Q     What is it?

A     It's a small address book that I recognize as being issued by the prison to inmates.

Q     And was this one of the items that you seized on March 14th, 2003?

**DRAFT COPY**

Sotelo - Direct / By Ms. DeWitt                192

A    Yes, it is.

Q    Did this particular address book have any foreign writing in it?

A    Yes, it did.

Q    Did you recognize what language the foreign writing was in?

A    I could assume.  I knew what languages it wasn't.

        MR. RUBIN:  Objection, your Honor.  Speculation, no foundation.

        THE COURT:  No, I'm going to overrule the objection. Go ahead.

        THE WITNESS:  It appeared to me to be Russian.

BY MS. DeWITT:

Q    Where was this address book found?

A    In the property that had previously been in Cell 518 that was now separated.

Q    And, Special Agent Sotelo, why did you seize this particular item?

A    Because I wanted to see who -- this is very early on in the investigation and to see who else had helped in this escape attempt and I thought there might be information in there.

        MS. DeWITT:  And, your Honor, at this time the Government would move to admit Government's Exhibit 873.

        THE COURT:  Received this date, 873.

        (Government's Exhibit Number 873 was received in evidence)

DRAFT COPY

Sotelo - Direct / By Ms. DeWitt          193

**BY MS. DeWITT:**

Q    And, Ms. Sotelo, if you could show that to the jury.

       **(Witness complies)**

        Ms. Sotelo, can you now please -- Special Agent Sotelo, can you please now take a look at Government's Exhibit 874.

        Do you recognize that exhibit?

A    Well, there's several things in -- I didn't find 874 yet. Okay.

Q    I'm sorry.  Do you have that in front of you?

A    I do now.

Q    Do you recognize that?

A    Yes, I do.

Q    What is that?

A    A white writing tablet.

Q    And was this writing tablet one of the items that you seized on March 14th, 2003?

A    Yes, it is.

Q    And where was this item found?

A    In the property that had previously been in Cell 518.

Q    Okay.

        **MS. DeWITT:**  At this time, your Honor, the Government would move to admit Government's Exhibit 874 into evidence.

        **THE COURT:**  Received.

        **(Government's Exhibit Number 874 was received in evidence)**

DRAFT COPY

Sotelo - Direct / By Ms. DeWitt                194

**MS. DeWITT:**  And, your Honor, I'm showing on the overhead for the jury to see Government's Exhibit -- a couple of pages from 874.  Actually, let me just speed this up a little bit.

**BY MS. DeWITT:**

Q    If you can look at Government's Exhibit 874, can you take it out of the --

A    It's out.

Q    Okay.  And if you could look at the second page of 874. I'm just going to ask you a couple of questions about that.

Is the name Gitte Lellan listed on that page?

A    Yes, it is.

Q    Is the name Ian Litchfield listed on that page?

A    I. Litchfield is.

Q    Is the name Marina Abramkin (phonetic) listed on that page?

A    Yes.

Q    What about Jeff Dabbs?

A    No.

Q    Right below Marina Abramkin what's the name listed below that?

A    Oh, crossed out Jeff Dabbs.  Right.

Q    Okay.  And is the name Victor Sherman also listed on that page?

A    Yes, it is.

**DRAFT COPY**

Sotelo - Direct / By Ms. DeWitt                    195

Q    And if you could turn two more pages.

          What is the entry at the top of that page?  What does that indicate?

A    The Navy Federal Credit Union Bank.

Q    Okay.  And during the course of your investigation did you determine that the Navy Federal Credit Union Bank was significant?

A    Yes, it was.

Q    How was it significant?  Can you just describe that generally for the jury?

A    Because Sabrina Tynan had an account there because her brother was in the Navy.

Q    And Special Agent Sotelo, if you could turn two more pages, just to ask one more question about this particular document.

          In the middle of that page is there some information relating to a person who's identified as "Safiev"?

A    Yes.

Q    Okay.  And does it list names and phone numbers next to that?

A    Yes, it does.

Q    And, Special Agent Sotelo, can you now please take a look at what's been marked for identification as Government's Exhibit 875.

A    Yes.

**DRAFT COPY**

Sotelo - Direct / By Ms. DeWitt                196

Q    Do you recognize that document?

A    Yes, I do.

Q    What is it?

A    A letter addressed to Iouri Mikhel from Ms. Karogodina.

Q    And was this -- is it a letter or an envelope or both?

A    Both.

Q    Was this envelope containing this letter one of the items that you seized?

A    Yes, it is.

Q    And where was this item found?

A    From the property that had previously been in Cell 518.

        **MS. DeWITT:**  And, your Honor, the Government would move to admit Government's Exhibit 875 into evidence.

        **THE COURT:**  875 is admitted.

        **(Government's Exhibit Number 875 was received in evidence)**

**BY MS. DeWITT:**

Q    And, Ms. Sotelo, can you -- Special Agent Sotelo, if you could show Government's Exhibit 875 to the jury.

        **(Witness complies)**

        And just a couple of questions with respect to this item.

        Who was this letter from?

A    Ms. Karogodina.

Q    And does the letter show where it was mailed from?

A    It has a return address in the UK.

**DRAFT COPY**