# GOVERNMENT

# EXHIBIT 61

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

# DRAFT COPY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO:  CR-02-220(B)-DT |
| | ) | |
| Plaintiff, | ) | CRIMINAL |
| | ) | |
| vs. | ) | Los Angeles, California |
| | ) | |
| IOURI MIKHEL, | ) | Tuesday, December 12, 2006 |
| JURIJUS KADAMOVAS, | ) | ( 9:30 a.m. to 11:55 a.m.) |
| | ) | ( 1:29 p.m. to  1:56 p.m.) |
| Defendants. | ) | |

JURY TRIAL (52nd DAY)
(VOLUME LII)

*** SEALED PORTION FROM 11:17 A.M. to 11:30 A.M. ***
(OMITTED FROM TRANSCRIPTION)

BEFORE THE HONORABLE DICKRAN TEVRIZIAN,
UNITED STATES DISTRICT JUDGE

EXCEPTIONAL REPORTING SERVICES, INC
14493 SOUTH PADRE ISLAND DRIVE
SUITE A-400
CORPUS CHRISTI, TX 78418-5940
361 949-2988

testify.

MR. CALLAHAN:  I agree with that.

THE COURT:  And then when Mr. Callahan --

MR. DUGDALE:  Your Honor, I have a cart over there. It has all the evidence.  I do have a cart.  So --

THE COURT:  I think you should do that, because, you know, I have to ask him I think in this case and I'm going to ask Mr. Kadamovas --

Is Mr. Kadamovas going to testify?

MR. LASTING:  No, your Honor.

THE COURT:  Okay.

I'm going to ask them whether or not they're not testifying because of a decision that has been made strategically and put that in the record as well.

MR. CALLAHAN:  I have one more corollary ex-parte about the benefit of these folks --

THE COURT:  Well, let me do this.  Let me have Ms. Bazelon come back at 1:30.

MR. DUGDALE:  That's fine.

THE COURT:  I don't want to keep her here.

MR. LASTING:  Your Honor, with regard --

THE COURT:  And I'll have Mr. Eidaks at 1:30 as well.

MR. CALLAHAN:  Okay.

MR. LASTING:  Just before I retire back to my seat here, with regard to the testimony of the Russian interpreter,

22

Anna Mahli who's testified a couple of times before, I think she's going to testify as to the contents of the letter that was hidden in the magazine that Mr. Mikhel gave to Officer Schneider who then gave it to Lieutenant Harlien.  And I have -- I'm going to object to the admissibility.

THE COURT:  I understand.

MR. LASTING:  So before that testimony comes up, I don't know if you want to do it before the jury comes in if we could just get that issue resolved as well.  I just wanted the Court to know that's one of the issues.

THE COURT:  Well, let's talk about that.

I would allow it to come in, because I think it is admissible.  It's in furtherance of the conspiracy.  And that is the escape conspiracy.

MR. LASTING:  My position is is that there are three reasons why that document, the contents of the document, should not come in.  I think it's relevant that Mr. Mikhel tried to pass it off to Kadamovas, but I think that it is inadmissible in terms of its contents.  One because I would content to the Court that the conspiracy terminated on March the 7th when the Defendants were -- when the escape plan was revealed and foiled and the Defendants were moved in to a segregated housing unit.

And so at best this is some effort to create a new conspiracy, at best.  It's not part of that conspiracy, because conspiracies end with the frustration or the arrest of the

**DRAFT COPY**

23

conspirators.

THE COURT:  Well, but it wasn't frustrated to that point.  It really reactivated itself at that point.  That's the Government's position.  And I think that's, you know, an accurate assessment.

MR. LASTING:  My position would be that if anything it's an effort to create a new conspiracy.  I would also urge the Court to consider not allowing the contents of the document to come in for two other reasons.  One that the document was never communicated to Kadamovas.  So although it may have been something that under the reasoning of the Government, which the Court agrees with, that if it is in furtherance of the conspiracy, it was never communicated.

THE COURT:  Yeah.  But that's argument.

MR. LASTING:  No.  It's a fact it was never communicated.

THE COURT:  I know, but that's argument that you make to the jury that he never --

MR. LASTING:  I think it's a foundational requirement for the admissibility of a statement that the statement has to be in furtherance of the conspiracy and it has to --

THE COURT:  But a co-conspirator need not know each and every aspect of the conspiracy.

MR. RUBIN:  But I think a statement in furtherance has to be communicated to someone in the conspiracy.  And this

DRAFT COPY

24

statement was only communicated to Lieutenant Harlien. It was intercepted. And I think for that reason, it fails the foundational requirement to be admissible.

THE COURT: No. I'd overrule that and allow it to come in.

All right. Let's go back on the record.

Outside so that the (***).

MR. DUGDALE: I'm sorry. There's just one more. We file a request for judicial notice.

THE COURT: I know.

MR. DUGDALE: This relates to them being in lawful custody.

THE COURT: Yeah. And I was wondering what that's all about?

MR. DUGDALE: Well, the Ninth Circuit actually said this is not an element for a conspiracy to escape. But just about every other circuit and the statute says it is. We're just doing this out of an abundance of caution.

THE COURT: All right. I'll take judicial notice.

MR. RUBIN: There was one -- didn't you have another --

MR. CALLAHAN: Yes. Mr. Rubin indicated that we're doing our best to encourage Mr. Mikhel not to testify. And if we -- I'm not sure this is necessary or not. But it is our strong opposition to him getting up on the stand for a myriad

**DRAFT COPY**

Avila - Cross / By Ms. Chahin                30

Good morning, ladies and gentlemen of the jury.

The record will indicate that all jurors are present. All parties and counsel are present.

When we recessed last week, there was a witness on the stand.  He'll resume the stand at this time.

Please come forward.

Please state your name for the record.

**THE WITNESS:**  Jose Avila.

**THE COURT:**  And, Mr. Avila, you're still under oath.

You may continue with your cross-examination.

**MS. CHAHIN:**  Thank you, your Honor.

**CROSS-EXAMINATION (CONTINUED)**

**BY MS. CHAHIN:**

Q    Mr. Avila, between the time that we broke on Friday afternoon and this morning, have you had an opportunity to speak with Ms. Meyer regarding certain matters related to your testimony?

A    Yes.

Q    Okay.  Now, after having done so, do you now have a -- do you remember having had a meeting with these prosecutors in approximately June of 2004?

A    Yes.

Q    And that was a meeting that you had with them after you were sentenced, correct?

A    With the prosecutor, yes.

**DRAFT COPY**

Avila - Cross / By Ms. Chahin                31

Q    Okay.  And you were sentenced on February 9th of 2004 to a 78 months, correct?

A    Yes.

Q    Okay.  So the purpose for your meeting with them in June of 2004 was so that you could provide them additional information and hopefully obtain their assistance in reducing your sentence, correct?

A    Prior to my sentence?

Q    After your sentencing.

A    No.

Q    Okay.  You were not hopeful they would assist you in obtaining an additional reduction --

A    No.  My understanding --

Q    -- on your 78-month sentence?

A    No.  My understanding at that meeting that took place was they were just questioning me on my previous statements --

Q    Okay.

A    -- about what had happened.  I guess it had to do with the prosecution in this case.

Q    Did they talk to you about whether or not they would file a Rule 35 motion with the Court and possibly give you an additional reduction to your sentence?

A    My lawyer had mentioned it, but I don't think the prosecution had mentioned anything like that.

Q    Did you talk to your lawyer about whether or not that

**DRAFT COPY**

Avila - Cross / By Ms. Chahin                     32

motion was filed?

A    Yes.  I believe that he began to make a motion.  I don't know whether it was filed or not.

Q    But it was discussed with you that you had the opportunity to get additional time off based on the information you are providing after you had been sentenced; is that correct?

A    That's correct.

Q    Now, did you have any hope that you would be able to get their assistance in helping you avoid being deported from this country?

A    Yes.

Q    And is that something you discussed with them in June of 2004?

A    I don't remember.

Q    Now, when we broke on Friday, we were talking about at some point while you were at the MDC you became a participant in the plan to escape, correct?

A    Excuse me?

Q    At some point during your incarceration at the MDC, you became an actual participant in the plan to escape; is that correct?

A    Yes.  Uh-huh.

Q    Okay.  Prior to that point, I believe you told us that you had had discussions with various people about the escape plan, correct?

**DRAFT COPY**

Avila - Cross / By Ms. Chahin                    33

A    Correct.

Q    Okay.  And some of the people that you identified were Solo (phonetic); is that correct?

A    Correct.

Q    Noy (phonetic); is that correct?

A    Correct.

Q    someone known as Little Boy; is that correct?

A    Correct.

Q    And Little Boy's brother; is that correct?

A    No.  I didn't really speak to him about that in regards to the escape plan or that.

Q    What was Little Boy's brother's name?  Or nick name?

A    Bad Boy, I think it was.

Q    Bad boy.  Okay.

Now, once you completed your sentence serving your time, were you transferred into INS custody?

A    Yes.

Q    And at some point, did the Government -- are you currently in custody now?

A    No.

Q    At some point, did the Government assist you in being released on bond?

A    Yes.

Q    And are you currently -- under the conditions of the bond of your release, are you currently able to work?

**DRAFT COPY**

Avila - Cross / By Ms. Chahin                    34

A    I would believe so.

Q    And are you working?

A    Not yet.

Q    Now, are you hopeful that -- so the fact that you were released and pending your testimony in this case has enabled you to stay in this country, correct?

You haven't been deported yet?

A    No, I have not been deported.  Right.

Q    And are you hopeful that based on the testimony that you're providing in this courtroom that the Government will assist you in avoid being deported from this country?

A    No.  I'm just -- like I said, I still have to go to an immigration judge and present my case before him.  If nothing like that was discussed as far as they said they were going to do anything.

Q    Okay.  So you don't have any hope that they're going to help you based on what you're testifying to here in this courtroom today?

A    No.

Q    Is that correct?

A    That's correct.

        **MS. CHAHIN:**  I have nothing further, your Honor.

        **THE COURT:**  Ms. Meyer?

        **MS. MEYER:**  Just briefly, your Honor.

//

**DRAFT COPY**

**REDIRECT EXAMINATION**

**BY MS. MEYER:**

Q    Mr. Avila, did you receive any further reduction in your sentence besides the three and a half years you originally received?

A    No, ma'am.

Q    And by the time you're testifying here today, you've already been released from custody?

A    Correct.

Q    Has the Government promised you anything for testifying here today?

A    Nothing.

Q    Any promise of lawful, permanent resident status?

A    No.

Q    Any promise of citizenship?

A    No.

Q    Any promise of assistance with your immigration?

A    No.

Q    Is the inflammation you're testifying to here today, Mr. Avila, the same as the information you provided to the FBI back in March of 2003?

A    Yes, it is.

        **MS. MEYER:**  No further questions, your Honor.

        **THE COURT:**  Mr. Rubin?

        **MR. RUBIN:**  No questions.

**DRAFT COPY**

Mahli - Direct / By Mr. Dugdale                64

Number 891?

A    I do.

Q    And what is it?

A    It is a translate of the previously introduced letter.

Q    So 891 is an English translation of Government's Exhibit Number 890, is that correct?

A    Correct.

        **MR. DUGDALE:**  Your Honor, the Government would move for the admission of Government's Exhibit Number 891.

        **THE COURT:**  All right.  This is the exhibit that was objected to by Mr. Kadamovas.

        The objection is specifically overruled for the grounds stated on the record outside the presence of the Jury.

        891 is admitted this date.

    **(Government's Exhibit Number 891 was received in evidence)**

        **MR. DUGDALE:**  Thank you, Your Honor.

**BY MR. DUGDALE:**

Q    And Ms. Mahli, I'm publishing on the screen the first page - this is a two-page translation, is that right?

A    Yes.  Yes.

Q    And was this translation an accurate translation of the Russian handwritten letter that defendant Mikhel attempted to send to defendant Kadamovas?

A    It is.

Q    Can you please read this into the record?  I know this

**DRAFT COPY**

Mahli - Direct / By Mr. Dugdale                67

and you're not moved closer, at least to the C-range, then maybe ask your person from 7N to find me, and I'll try to drop him a line in the toilet, and then he can deliver the mail to you.  One problem is that they rarely flush the water.  The flushing is from outside.'

**MR. DUGDALE:**  Thank you, Ms. Mahli.

I have no further questions, your Honor.

**MR. CALLAHAN:**  No questions, your Honor.

**THE COURT:**  Mr. Lasting?

**MR. LASTING:**  No questions, your Honor.

**THE COURT:**  All right.  You may stand down.

**MS. MAHLI:**  Thank you.

**MR. DUGDALE:**  Yes.  Subject to the admission of the exhibits that we talked about just before the Jury came in, the United States of America would rest, your Honor.  Thank you.

**THE COURT:**  All right.  Ladies and Gentlemen of the Jury, we've reached a point now where I have to discuss some matters with the attorneys outside of your presence.

Rather than keep you here, I'm going to let you go home for the day, bringing you back tomorrow at 9:15.

The discussion that I have with counsel may take some time, and I can't put a specific time estimate, and I don't want to keep you unnecessarily here.  So I'll let you go at this time.

I want you to remember the admonition that was given

**DRAFT COPY**