# GOVERNMENT EXHIBIT 63

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

# DRAFT COPY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO:  CR-02-220(B)-DT |
| | ) | |
| Plaintiff, | ) | CRIMINAL |
| | ) | |
| vs. | ) | Los Angeles, California |
| | ) | |
| IOURI MIKHEL, | ) | Wednesday, November 1, 2006 |
| JURIJUS KADAMOVAS, | ) | (9:24 a.m. to 10:54 a.m.) |
| | ) | (1:36 p.m. to  4:20 p.m.) |
| Defendants. | ) | |

JURY TRIAL (35th DAY)
(VOLUME XXXV)


** PARTIAL TRANSCRIPT **
(PORTION OMITTED FROM 10:55 a.m. TO 1:35 p.m.)




BEFORE THE HONORABLE DICKRAN TEVRIZIAN,
UNITED STATES DISTRICT JUDGE

EXCEPTIONAL REPORTING SERVICES, INC
14493 SOUTH PADRE ISLAND DRIVE
SUITE A-400
CORPUS CHRISTI, TX 78418-5940
361 949-2988

4

**Los Angeles, California; Wednesday, November 1, 2006; 9:24 a.m.**

(Interpreter Used for Translation)

(Call to Order)

(Outside presence of the jury)

THE CLERK:  Please remain seated and come to order. This United States District Court is in session.  The Honorable Dickran Tevrizian presiding.

THE COURT:  Good morning.

Outside the presence of the jury, the record will indicate that all parties and counsel are present.

All right.  The clerk informs me that counsel wish to speak to the court outside the presence of the jury.

MS. DeWITT:  Do you need me to move this?

MS. CHAHIN:  No.

MS. DeWITT:  Okay.

MS. CHAHIN:  Yes, your Honor.  Good morning.

Your Honor, with respect to the Natalya diary that I spoke to the Court about yesterday, I just wanted to give to the Court some more information.  The diary is 437 pages written in longhand in Russian.  Okay.  We have summaries, but we don't have a complete review of what those 437 pages are.

I have reviewed the summaries, which the Government has transcribed after listening to cassettes prepared by a court interpreter.  We don't have copies of those tapes.  So I guess the first thing that we would like to do is obtain copies

DRAFT COPY

5

of those tapes from the Government and be able to listen to them.

In addition to that, I think that we need to be able to have an interpreter either read to us or translate for us pertinent portions of the diary.  The Government has characterized this as a diary of the folly of a young girl outside of the time period of this case.  But there are numerous statements in there which go to credibility, bias, and motive.

There are repeated statements of her being involved in frauds, including immigration fraud, including thefts, including attempts to have someone erase information from a computer regarding her participation in government programs. There are repeated statements regarding her hatred of Mr. Kadamovas, and there's even one reference where she says something to the effect of "I'm not going to do him any harm especially.  But if the opportunity arises, I will."

So there are, as I indicate, repeated statements which are relevant for our ability to be able to cross-examine her.

**THE COURT:**  Well, that's not necessarily true.  Let me tell you why.

You will cross-examine her at the conclusion of the Government's case.  But I'll permit you to recall her to complete your cross-examination once you've reviewed the diary.

**DRAFT COPY**

6

So you will have to be prepared to cross-examine her at the conclusion of the Government's direct examination.

**MS. CHAHIN:**  Your Honor, the problem with that is that information contained in the diary may affect the manner in which we structure this cross-examination.

**THE COURT:**  Well, there is nothing I can do about it. That's just the way it's got to be, because of the fact that her attorney is engaged in a capital case before Judge Klausner.  Now, Judge Klausner informs me that they may -- the Government in that case may reconsider its position and not seek the death penalty.  And if that happens, Mr. Crain will be available.  We can then work around that issue.

But right now be prepared to cross-examine her on her direct testimony.  And if you need to recall her after reviewing the diary, you'll be able to recall her.

**MS. CHAHIN:**  Your Honor, Mr. Kadamovas in this case faces the death penalty.

**THE COURT:**  I understand that.

**MS. CHAHIN:**  And I believe that I should be provided an adequate opportunity to provide proper representation for him.

**THE COURT:**  You've made your point.  You've done everything along in this trial, you know, to preserve the record for an appeal.  I understand that.  And that's your responsibility.  So now you move on.  You've made the record.

**DRAFT COPY**

7

We go.

MS. CHAHIN:  Very well, your Honor.

THE COURT:  Anything else?

MS. DeWITT:  I left a message for someone back at my office to make sure that copies of the tapes were being made right now.  Do you mind if I just take one second to make sure that --

THE COURT:  All right.  Those tapes should have been turned over yesterday as well.  You know I'm not a happy camper when the Government at the last minute all of a sudden turns over documentation.

I mean this case --

MS. DeWITT:  Your Honor, I'm not --

THE COURT:  -- again, four years this case has been going on for four years before I even got it.

MS. DeWITT:  Your Honor, I got these documents on Friday.  And I got the tapes on Saturday.  And I had -- I brought people in over the weekend and spent 20 hours typing up these tapes.

THE COURT:  Where did --

MS. DeWITT:  That's the first time I got them.

THE COURT:  Where did these documents come from?

MS. DeWITT:  From her client.  From her attorney.  I didn't get them until then, and I turned them over as quickly as I can.  And this is the first time that they've asked me for

**DRAFT COPY**

8

the actual tapes.  I'm not really sure why they want the tapes, but I'm going to do everything I can to expedite getting them a copy of the tapes.

But they have a transcription of them, which is, you know, a verbatim, to the best of the ability of the people that do it, copy of the tapes.

THE COURT:  I understand.  But see what you have to realize is in these kind of cases, the trial is a very small portion of what takes place.  Because the defense is geared up for whether it's their agenda or for their defense of the defendant to take this case you know step by step through the process, which may take anywhere from eight to ten years. That's just the way it is.

MS. DeWITT:  I understand, your Honor.  And for what it's worth, just two points.  One, I'm as unhappy about getting these at the last minute as the defense is.  And, for the record, I also think that while I appreciate that they need to set a record on this, I think this is much to do about nothing. These are diaries that talk about, you know, the most mundane things.  And they're going to make a big deal about it.  But in the end, I think this is --

THE COURT:  I don't know.  I don't read Russian.  I can't go through it.  I can't skim it.  I don't know anything about the evidence of the case until it unfolds here in the courtroom.

DRAFT COPY

I'm not an advocate for either side in this case.

MS. DeWITT: I understand that. I just want the Court to know that I've done everything I can to get this turned over as quickly as I can.

THE COURT: I've told counsel other times that I've gotten every curve ball, bean ball, duster, slider thrown at me in this case.

MS. CHAHIN: Your Honor, for the record, this was not our doing. This is not something that I did to cause problems for the Court.

THE COURT: It's across the board. It's on this side of counsel table and that side of the counsel table.

MS. CHAHIN: Your Honor, we got these documents yesterday. It seems that we're being punished because --

THE COURT: You're not being punished. I advised you that you will be able to call her back later on and cross-examine her about the material that's contained in the diaries should you believe it's necessary.

MS. DeWITT: We're ready to proceed, your Honor.

THE COURT: All right. Let's have the Clerk check on the availability of the jury.

MR. DUGDALE: Your Honor, if I could be excused I'll deal with the tapes as Ms. DeWitt has the current witness.

(Pause)

THE COURT: Somebody once coined the phrase --

DRAFT COPY

subpoena, but I decided that it was best to check with you first before we did that.

THE COURT:  I appreciate that.  I will have my secretary call their office and tell them that the motion is -- the subpoena is being withdrawn.

MR. RUBIN:  Thank you.

THE COURT:  Jake, tell Amy to call the law firm of Manning & Marder and tell them -- here's the name of the lawyer -- and tell them that they do not have to appear, that the Defendants have withdrawn the subpoena.

THE CLERK:  Okay.

THE COURT:  All right, anything else?

MR. LASTING:  Yes, your Honor.

THE COURT:  Mr. Lasting.

MR. LASTING:  Your Honor, just to revisit the Natalya Solovyeva issue one more time if I might, I have a proposal for the Court that I was hoping that the Court would consider and accept, and that is with regard to the cross examination.  The Court mentioned that it had not had a chance to see the discovery that we were given.  I have it in my hand here.  It's single spaced handwritten notes that cover Bates Pages 8000 -- 82,848 to 83,283.  We're going to try to begin meeting with the Russian interpreter this afternoon after court recesses and see how far we can get through this.  But my request of the Court is if the Court -- if the Government still intends to call her

DRAFT COPY

72

and commence the direct examination of her approximately 3:00 o'clock this afternoon that at whatever point they rest, which if I understood Ms. DeWitt correctly would probably be sometime tomorrow, if we could recess the trial at that point and resume on Tuesday so that we could try to get through this massive amount of material with the Russian interpreter to incorporate it into the cross examination rather than to have to piecemeal this.

**THE COURT:**  Well I'm going to deny your request. First of all, tomorrow we're going to have to break early anyway because of the fact that I have a doctor's appointment in the afternoon.  So I must go to that and we'll probably break here about 3:30 tomorrow.  And I don't know whether or not the Government will even finish tomorrow.

On Friday I have at lunchtime an Executive Committee meeting and the agenda item that -- I'm on the Court's Executive Committee, and the agenda item is the appointment of capital attorneys and their compensation and who should be appointed, who shouldn't, and I'm going to expand that now to include the enlargement of the CJA panel.  So we'll probably have to take a longer lunch hour.

Again, I told you that once we start the examination if you complete it you'll still have an opportunity after you've reviewed the entirety of the information that's in that diary to call her again to complete your cross examination.  So

**DRAFT COPY**

73

I don't see any way that you're prejudiced in that.

MR. LASTING:  Other than that we'd like before it starts to know what areas perhaps not to ask her about as well as areas to ask her about.  I mean the Court mentioned the curve balls and the sliders and the beam balls, but really this one's come at us, because this is a situation out of -- totally not of our making where yesterday morning we were presented with this voluminous amount of material in a foreign language which is extremely critical to the credibility of an important Government witness.  And we're the ones that are being prejudiced by this.

THE COURT:  You've got to remember cross examination is limited to what comes out on direct examination.  And the Government may not even go into any of that information at the present time, so your cross examination would be limited.  Now, if you're going to utilize that to expand the cross examination to go to the issue of credibility you'll have an opportunity to do that.

MR. LASTING:  Well credibility's clearly part of any cross examination, your Honor.  One of the chief issues that the finders of fact have to make is on the witness's credibility.

THE COURT:  Just before lunch I told the Government to take a step back and think about what they're doing.  You take a step back too, and that is that you get a preview of the

74

Government's case and you get an opportunity to see her on cross examination the first time and you'll get an opportunity to expand that cross examination based upon what you look at in the diary.

MR. LASTING:  I appreciate the Court's view and I don't want to belabor the point, but it sounds like --

THE COURT:  You are.

MR. LASTING:  Well, I don't mean to.  But I'm just saying in terms of our ability to effectively represent Mr. Kadamovas this is our request.

THE COURT:  I understand.  And it's noted for the record and denied.

MR. RUBIN:  Your Honor --

THE COURT:  All right?

MR. RUBIN:  -- on your meeting on Friday would you like someone there to give you some input from the defense point of view?

THE COURT:  No.

MR. RUBIN:  I didn't think so.

THE COURT:  This is going to be called a railroad.

MR. RUBIN:  Yeah.  Except that you have a pen that stops that railroad.

THE COURT:  That's right.  Manny Real gave that to me.

All right, let's bring the jury in.

**DRAFT COPY**