# GOVERNMENT EXHIBIT 64

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

# DRAFT COPY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO:  CR-02-220(B)-DT |
| | ) | |
| Plaintiff, | ) | CRIMINAL |
| | ) | |
| vs. | ) | Los Angeles, California |
| | ) | |
| IOURI MIKHEL, | ) | Tuesday, November 7, 2006 |
| JURIJUS KADAMOVAS, | ) | (9:24 a.m. to 11:58 a.m.) |
| | ) | (1:33 p.m. to  4:18 p.m.) |
| Defendants. | ) | |

JURY TRIAL (38th DAY)
(VOLUME XXXVIII)

** PARTIAL TRANSCRIPT **
(PORTION OMITTED FROM 10:41:09 THROUGH 10:45:08)
(DONE BY COURT REPORTER UNDER SEPARATE COVER)

BEFORE THE HONORABLE DICKRAN TEVRIZIAN,
UNITED STATES DISTRICT JUDGE

EXCEPTIONAL REPORTING SERVICES, INC
14493 SOUTH PADRE ISLAND DRIVE
SUITE A-400
CORPUS CHRISTI, TX 78418-5940
361 949-2988

**THE COURT:** I believe when we ended on Friday Mr. Callahan had completed his cross examination of the witness, or did you want time to re-examine the witness after the weekend and having an opportunity to go over the diary?

**MR. CALLAHAN:** No, your Honor. I've completed.

**THE COURT:** All right. Then, Ms. Chahin will start this morning with her cross examination.

**MS. CHAHIN:** Thank you, your Honor.

**THE CLERK:** Shall I bring the jury in?

**THE COURT:** How long do you think you'll be?

**MS. CHAHIN:** Your Honor, I'll have a better idea at lunch once I see how it's going. I think it will be a lengthy examination.

**THE COURT:** All right.

**(Pause / Jurors enter courtroom at 9:27 a.m.)**

Good morning, ladies and gentlemen of the jury. The record will indicate all jurors are present, all parties and counsel are present.

Ms. Solovyeva, you're still under oath. Please state your name for the record.

**THE WITNESS:** Natalya Solovyeva.

**THE COURT:** Ms. Chahin, you're going to start cross examining on behalf of the Defendant Kadamovas.

**MS. CHAHIN:** Thank you, your Honor.

**(Witness Previously Sworn)**

Solovyeva - Cross / By Ms. Chahin                6

**CROSS EXAMINATION**

**(Testimony Translated Through Interpreter)**

**BY MS. CHAHIN:**

Q    Ms. Solovyeva, when did you come to the United States?

A    November 25, 1998.

Q    And how did you enter the United States?  With what status?

A    Tourist visa.

Q    And when you obtained your tourist visa, was it your intention to come and remain in the United States?

A    Yes -- no.

Q    How long was your tourist visa issued for?

A    Half a year.

Q    And what port did you enter through?

A    Through San Francisco.

Q    Where and -- what location was it your intention to come to visit when you entered on your tourist visa?

A    Initially, it was New York.  But my girlfriend met me in Los Angeles and I stayed in Los Angeles.

Q    Did you fly in directly to Los Angeles?

A    From San Francisco to Los Angeles, yes.

Q    And when you came to Los Angeles you indicated you had a girlfriend here; is that correct?

A    Yes.

Q    And what is that girlfriend's name?

Solovyeva - Cross / By Ms. Chahin                    7

A    Svetlana.

Q    Did you stay with Svetlana in Los Angeles?

A    I was staying with her and her boyfriend in Los Angeles.

Q    And for what period of time did you remain in Los Angeles with Svetlana and her boyfriend?

A    Approximately two months later she left and I stayed in Los Angeles.

Q    How much longer after Svetlana left did you remain in Los Angeles?

A    Until my arrest -- I mean up 'til now.

Q    Okay.  Well, I believe you indicated in your testimony that at some point you lived in Las Vegas; isn't that correct?

A    Yes.  I did go to Las Vegas for a month or a month-and-a-half.  I don't remember exactly.

Q    So what month did you go to Las Vegas in?

A    In April 99, if I am -- it seems to me that it was April '99.

Q    And what prompted you to leave from Las Vegas with Svetlana and her boyfriend and go to -- excuse me -- what prompted you to leave Los Angeles with Svetlana and her boyfriend and go to Las Vegas?

        **MS. DeWITT:**  Objection.  Assumes facts not in evidence.

        **THE COURT:**  No.  I'm going to overrule the objection.

//

**DRAFT COPY**

Solovyeva - Cross / By Ms. Chahin                    8

**BY MS. CHAHIN:**

Q    You may answer the question.

A    When Svetlana left I had other friends with whom I went to Las Vegas.

Q    So the reason that you went to Las Vegas is because Svetlana left and went somewhere else; is that correct?

A    Yes.  I went to Las Vegas with my friend.

Q    Okay.  The question I'm asking you is:

         Is the reason that you went to Las Vegas because Svetlana left?

A    No.

Q    Why did you leave Los Angeles and go to Las Vegas?

A    Because at that time I was living with a boyfriend, and he was going to Las Vegas on his business and I went together with him.

Q    And was he going to Las Vegas on business with the intention of staying there or was he just going for a short period of time and returning?

A    He was going to go to Las Vegas for a short period of time.  After that he was planning to leave.

Q    Okay.  When you say "a short period of time," what does that mean to you?

A    Not longer than a month.  Two or three weeks.

Q    Okay.  And when you say he was planning to leave, he was planning to leave from where to where?

**DRAFT COPY**

Solovyeva - Cross / By Ms. Chahin                    9

A     To leave the United States and go either to Europe or to Russia.

Q     And was it your intention to go with him to either Europe or Russia?

A     No.

Q     Okay.  What was your intention at that time with regards to remaining in the United States?

A     To find a job and earn money.

Q     You indicated that you entered on a tourist visa; is that correct?

A     Yes.

Q     Okay.  After you had been here for what period of time did it become your intention to find a job and remain in this country?

A     I had intentions to find a job right away, but it was difficult to find a job.

Q     Did you know whether or not you were entitled to work in this country on a tourist visa?

A     I knew that my girlfriend Svetlana had told me that there were very many Russians here and they would offer me a job without the English language and without papers.

Q     Ms. Solovyeva, the question I'm asking you is whether or not you knew it was a violation of your tourist visa to work in this country.

A     I knew that I didn't have a work permit.

**DRAFT COPY**

Solovyeva - Cross / By Ms. Chahin                10

Q    So did you know that you were not entitled to work in this country at that time?

A    Yes.

Q    It was important for you to work; is that correct?

A    Yes.  I wanted to make money.

Q    So it was important for you to be able to change your status so that you would be able to obtain employment authorization and work in this country; is that correct?

A    Yes.  I wanted to become legal here so that I would get the right to work.

Q    Okay.  How soon after you got here did you determine that it was going to become important for you to become legal here so you could earn the right to work?

A    I don't remember exactly, but I would say in several months, three or four months.

Q    Okay.  So after being here three or four months you determined it would be important for you to obtain employment authorization; is that correct?

A    I wanted to obtain it, the work permit, yes.

Q    Okay.  What is your educational background?

A    I graduated from high school and I have not graduated from a higher education institution.

Q    Prior to coming to this country did you work in Russia?

A    Yes.

Q    And what type of employment did you have there?

**DRAFT COPY**

Solovyeva - Cross / By Ms. Chahin          11

A    I was working as a secretary and manager in the law firm.

Q    And once you arrived in this country, what types of -- let me withdraw that.

Once you arrived in this country in Los Angeles, okay, when you were living with Svetlana and her boyfriend, how did you support yourself?

A    Mainly, Svetlana and her boyfriend were helping me.  At that time I was not working.

Q    When you say mainly they were helping you, did you have some other source of income?

A    Yes.  When I came I had money with me.  But it was not enough to support myself, and that's why it ended very quickly.

Q    And when did you obtain your first employment here in this country?

A    When I met Kadamovas in a restaurant approximately in June '99.

Q    So it's your testimony that from the date you entered this country on November 25th, 1998 until June of 1999 you did not have any employment?

A    I did have a job at that period of time.  One of my friends arranged -- he introduced me to the studio, to the movie studio, movie company.  I had worked there a couple of weeks as a cleaning lady.  And then since I was unable to obtain social security, which was required from me at this place, I had to leave the job.

**DRAFT COPY**

Solovyeva - Cross / By Ms. Chahin                12

Q    Okay.  Where was that job located, in Los Angeles or Las Vegas?

A    In Los Angeles.

Q    And in what month did you obtain that employment?

            **THE INTERPRETER**:  Excuse me?

**BY MS. CHAHIN:**

Q    In what month did you obtain that employment?

A    I don't remember.  At the beginning of '99.  I don't remember.  In January.

Q    Okay.  So aside from those two weeks that you worked at the movie studio company, is it fair to say that you were unable to work because you didn't have your status in this country?

A    I did not have the language and I did not have papers.

Q    The question I asked you is:

            Aside from those two weeks, is it fair to say that you had no other employment in this country up until June of 1999?

A    Yes.  That's what I remember.  I did not have any jobs.

Q    Okay.  During that period of time how did you support yourself?

A    My boyfriend with whom I was living, he was supporting me.

Q    And what was his name?

A    His name was Modar (phonetic).  And, also, friends were helping me.

**DRAFT COPY**

Solovyeva - Cross / By Ms. Chahin                    13

Q    During what period of time was Modar supporting you?

A    From the beginning of '99 until end of April.

Q    And at some point did your relationship with Modar end?

A    Yes.  When he left America.

Q    And when did that happen?

A    Approximately at the end of April or beginning of May.  I don't remember exactly.

Q    Okay.  At the end of April, at that point how were you going to support yourself?

A    At that time I was living with my girlfriends.  They had a house in Las Vegas, and they were supporting me.  That's how I was supporting myself.

Q    So at that point had you made any effort to change your status and obtain employment authorization or legal status in this country?

A    When I was in Las Vegas I renewed my visa for half a year, and I was planning to find employment during this period of time.

Q    How did you renew your visa?

A    I went to the office that renewed visas with my friends. And mainly, it was him who arranged all the papers for me, because at that time I did not speak English.

Q    Was your visa issued legally and with proper authorization?  If you know.

A    From what I know, we renewed visa legally.

**DRAFT COPY**

Solovyeva - Cross / By Ms. Chahin                14

Q    And how much did you pay to have your visa renewed?

A    I don't remember.  He was the one who was paying.  I don't remember how much.

Q    And did your newly renewed visa give you the authorization to work?

A    I don't think so, no.

Q    So you were not going to be able to use that newly renewed visa to obtain employment in this country; is that correct?

A    With the new visa I was planning to go to DMV and obtain social security number so that I would be able to get a work permit.

Q    What type of visa -- let me withdraw that.

         Was the visa that you renewed still a tourist visa?

A    Yes.

Q    Okay.  Was it your understanding that with that tourist visa you were going to be entitled to go to DMV, obtain social security and get work?

A    Yes.  At that time my friends told me that it was possible.

Q    Did you do that?

A    Yes.  We went to DMV.

Q    When did you go to DMV?

A    I think it was already in Los Angeles.  I would say in May or the beginning of June.  I don't remember.

Q    Okay.  Did you fill out any paperwork in order to obtain a

**DRAFT COPY**

Solovyeva - Cross / By Ms. Chahin                15

California identification so that you could obtain a social security card?

A    Yes.  We did fill out something.  We were filling out some papers.  I don't remember.  My girlfriend was helping me.

Q    Okay.  When you say "we," you said you were referring to your girlfriend.

What girlfriend are you referring to?

A    At that time there were Mara (phonetic) and Ira (phonetic).  They were both helping me with the English language.

Q    Were Mara and Ira the persons who were helping you with the paperwork at the DMV?

A    In DMV, yes.

Q    Okay.  Did you make any misrepresentations to the DMV in order to obtain a California identification?

A    No.  At that time I did not, no.

Q    Now, Mara -- I believe that you referred to Mara in your direct testimony; is that correct?

A    Yes.

Q    Okay.  Mara is your girlfriend who brought the illegal credit cards from Las Vegas, is that correct, which you made purchases on?

A    Yes.

Q    Okay.  How long did you live with Mara in Las Vegas before you came to Los Angeles?

**DRAFT COPY**

Solovyeva - Cross / By Ms. Chahin                16

A    I would say a couple -- several weeks, two weeks, several days.  I don't remember exactly.

Q    And did Mara agree to continue supporting you since you were unable to support yourself?

A    Yes.

Q    Okay.  At some point you left Mara's and came to Los Angeles; is that correct?

A    Yes.  At some point we came to Los Angeles, yes.  And here in Los Angeles she told me that I would be much better off staying with Ioura (phonetic) because she was unable to support me any more and that he would help me to find a job.

Q    So Mara asked you to leave, she told you she would no longer support you; is that right?

A    She told me that Ioura was going to help me and it was better for me to stay at that time with Ioura.

Q    You made reference to going to the DMV to get an identification so that you could get a social security card; is that correct?

A    Yes.

Q    Did you, in fact, apply for a social security card?

A    I did fill out the papers, which in my understanding I had to fill out to get the work permit and social security.  I don't know exactly how it was done.

Q    Did you fill them out?

A    I don't remember.  I remember that she was helping me to

**DRAFT COPY**

Solovyeva - Cross / By Ms. Chahin                17

fill out the papers.  Maybe she wrote it for me and I rewrote

or copied it.  I don't remember.

Q    Do you know if any misrepresentations were made on that

paperwork regarding your status in this country in order to

obtain a social security card?

A    I don't remember.

Q    Now, at some point you said that you came here to

Los Angeles.

Can you tell us approximately what date that was?

A    It was the beginning of May 1999.

Q    Okay.  Prior to coming to Los Angeles you had already met

Mr. Kadamovas, correct?

A    Yes.  I met him in Las Vegas.

Q    Okay.  And at the time that you met him, he gave you a

business card; is that correct?

A    Yes.

Q    Okay.  What business was that a business card for?

A    I don't remember the name of the business what's shown on

the business card, but I remember that there was his name and

his home number and his cell number.

Q    Do you know if it was related to his aquarium business?

A    Frankly speaking, I don't remember.  Maybe.

Q    At the time that you met him, did he speak English?

**THE INTERPRETER:**  Did who?

//

**DRAFT COPY**

Solovyeva - Cross / By Ms. Chahin                18

**BY MS. CHAHIN:**

Q    Did Mr. Kadamovas speak English?

A    At that time I didn't know because we spoke in Russian.

Q    At some point did you learn whether or not he spoke English?

A    Yes.  At some point I learned that he was not fluent in English, that he simply knew a few words and a few expressions.

Q    Okay.  And did you know whether -- at some point did you learn whether or not he had the ability to write English?

A    Yes.  I saw him writing checks in English.

Q    Aside from -- let me withdraw that.

When did you see him writing checks in English?

A    When we were already living together in the apartment.

Q    When you were already living together in the apartment, did you write checks, as well?

A    Yes.

Q    Did you consider yourself to be fluent in English at the time that you were writing checks?

A    No.

Q    Okay.  Aside from writing checks, are you aware whether or not he had the ability to read and write English?

A    I did not see him reading or writing in English.  At that time I did not think that he could read and write in English.

Q    Okay.  At any point during your relationship up until the time of your arrest, did you ever see him reading or writing

**DRAFT COPY**

Solovyeva - Cross / By Ms. Chahin                    19

English?

A    I don't remember.

Q    Did you ever hear him speaking in English?

A    Yes, a few words.  He would converse with Jeff.

Q    Okay.  When you say "a few words," did you have an opinion as to whether or not he was able to converse fluently in English?

A    At that time when I was totally unable to speak English the fact that he was able to pronounce a few words in English, yes, to me it seemed that he could speak English.  But not well enough to be fluent.

Q    You indicated that at some point you moved to Los Angeles and moved in with Mr. Kadamovas; is that correct?

A    Yes.

Q    Okay.  He offered to allow you to stay with him; is that right?

A    Yes.

Q    And is that, again, in approximately May of 1999 or is that at some other time?

A    I came to Los Angeles and began living with him approximately in May 1999.

Q    Okay.  At some point after moving in with him, did you and he become a couple?

A    Yes.

Q    And how long was that after you moved in with him?

**DRAFT COPY**

Solovyeva - Cross / By Ms. Chahin                    20

A    We began sleeping together, I would say the next day, and became a couple.

Q    Okay.  In fact --

A    After that.

Q    I'm sorry?

THE COURT:  After that.

THE WITNESS:  After that.

BY MS. CHAHIN:

Q    After that, you became a couple; is that correct?

A    Yes.

Q    Okay.  And at some point you became pregnant, correct?

A    Approximately six months after our living together.  And it was upon our mutual agreement that we had decided to have a child.

Q    So it was a conscious decision for you to have a child with him; is that right?

A    Yes.

Q    Okay.  At the time of your arrest you planned to have a future with him; is that right?

A    Yes.

Q    And it was your intention to marry him.

A    Yes, and to have a family.

Q    Okay.  You knew that he had a wife in Lithuania; is that correct?

A    Yes.

DRAFT COPY

Solovyeva - Cross / By Ms. Chahin                21

Q    And a son there, as well.

A    Yes.

Q    Okay.  And you knew that it was his intention to divorce his wife and marry you; is that right?

A    Yes.  That's what he told me.

Q    Okay.  And, in fact, sometimes his wife -- while you were living with him, sometimes his wife would call the apartment; is that right?

A    Yes.

Q    And you would speak with her.

A    I had spoken with her after the Kadamovas arrest.

Q    Okay.  Is it your testimony that prior to his arrest you never spoke with her?

A    I do not recall.  I doubt that.

Q    Now, in regard to having a child, I believe that you said that you wanted to have a child, it was a mutual decision, correct?

A    Yes, that was the mutual decision.  Kadamovas said that he wanted to have a family with me and have a child.

Q    Okay.  And, in fact, you considered that this would be a way to express your commitment to each other and that you planned to have a future together; is that right?

A    Yes.

Q    Okay.  When was your child born?

A    In July 11th, 2000.

**DRAFT COPY**

Solovyeva - Cross / By Ms. Chahin                    22

Q    And what is your daughter's name?

A    Anastasia (phonetic).

Q    And do you sometimes refer to her as "Nastia" (phonetic)?

A    Yes.  That's a short name.

Q    That's an abbreviation for Anastasia; is that right?

A    Yes.  It's informal, I would say.

Q    And I'm sorry.  You said that Anastasia was born in July 11th, 2000; is that right?

A    On July 11th, 2000.

Q    Okay.  And was Mr. Kadamovas present in the hospital when Anastasia was born?

A    Yes.  Yes, on that day he was there.

Q    Okay.  After Anastasia was born, did he support Anastasia and yourself?

A    Yes.  We were completely dependent on him.  He was supporting us.

Q    Okay.  Prior to Anastasia's birth had you worked at any point?

A    Yes.

Q    Okay.  And where did you work?

A    I had several jobs as a waitress at the restaurant, at the jewelry company, at different restaurants, at the light show, also as a baby sitter several times.  That's what I can recall at this time.

Q    Did you sometimes help Mr. Kadamovas with certain

**DRAFT COPY**

Solovyeva - Cross / By Ms. Chahin                23

employment that he had?

A    There was a time when he would go to his clients to clean aquariums and I would go with him.

Q    Okay.  The employment at the light show, was that employment that you did together jointly with him?

A    Yes.

Q    Okay.  And that was at a restaurant called Beyond the Stars; is that right?

A    Right.

Q    Okay.  And did you also -- are you also aware whether or not he worked selling vacuum cleaners?

A    Yes, yes.  And I tried that, also.

Q    Okay.  And did you ever assist him by trying to set up appointments for him to sell vacuum cleaners?

A    Yes.

Q    Okay.  Now, at the time that you met him, what type of employment did he have?

A    So he had his own aquarium business and he also worked at the moving company.

        THE COURT:  Ms. Chahin, can you move that microphone just a little closer to you?

        MS. CHAHIN:  Yes, your Honor.

        THE COURT:  I'm going to ask the interpreter to do the same, the interpreter.

        THE INTERPRETER:  Sure.

DRAFT COPY

Solovyeva - Cross / By Ms. Chahin                24

THE COURT:  Thank you.  Okay.  Go ahead.

MS. CHAHIN:  Thank you.

BY MS. CHAHIN:

Q    Ms. Solovyeva, please tell me if you are unable to hear me.

Now, you indicated that he had an aquarium business; is that right?

A    Yes.

Q    Okay.  And at that time where was his aquarium business located?

A    It was, basically, at our apartment.  In other words, at his apartment on Mansville (phonetic).

Q    And what was the aquarium business at that time?  What did it involve?

A    So he would order aquariums from the manufacturers.  He would install aquariums for his clients and also once or twice a month he would clean them.

Q    At that time, was he involved in designing aquariums?

A    I remember him designing the waterfall at home.

Q    To your knowledge, did he design and build waterfalls at that time?

A    Yes.

Q    Okay.  At any point do you recall taking any business trips with Mr. Kadamovas related to the aquarium business to Texas?

**DRAFT COPY**

Solovyeva - Cross / By Ms. Chahin          25

A     No.

Q     Okay.  You did not travel with Mr. Kadamovas to Cole Enterprises in Texas regarding aquariums?

A     No, no.

Q     Are you aware -- at the time that the business operated out of the apartment, are you aware how Mr. Kadamovas obtained clients?

A     From what I recall, while he was working at the moving company moving people, he would offer.  So it was, basically, mouth to mouth through friends and acquaintances.  He also had a brochure, a flyer, where various kinds of aquariums were offered.  I also recall him planning to put an ad in a paper about this business.  But I don't recall exactly whether it was about obtaining new clients or new job, new work or finding a partner.

Q     Do you know whether or not he ever placed any advertising in Russian newspapers regarding his aquarium business?

A     There was something about an ad in the Russian paper, but I don't recall exactly.

Q     Okay.  So you've indicated that at the time you met him he worked in his aquarium business but he also had other employment; is that right?

A     Yes.  He worked at the moving company.

Q     And what did he do at the moving company, if you know?

A     He would move people, move things.  Also, he would prepare

**DRAFT COPY**

Solovyeva - Cross / By Ms. Chahin                26

apartments for new tenants, painting, cleaning.  This is what I know.

Q    When you say, "he would move people," are you talking about physically moving furniture from one location to another?

A    Yes.  He would load furniture and things and move people from one place to another.

Q    Okay.  Now, in regard to the employment at the restaurant, the Beyond the Stars, do you know what he did there?

A    He worked alongside with me at the light show.  And also, what I know, that he had also installed the aquarium there.  It was like a decorative palm aquarium.

Q    So there was an aquarium located at the restaurant called Beyond the Stars, which he would maintain; is that correct?

A    Yes.

Q    Okay.  At the time that you met him, what was the name of the aquarium business?

A    Water World.

Q    Okay.  If you know, at some point later did he begin to design aquariums?

A    Yes.  Later.

Q    Approximately when did that happen?

A    After he rented his office and began working at the office.  This was approximately at the end of summer 2000.

Q    Now, during the period of time that the aquarium business operated out of the apartment, did Mr. Kadamovas have a partner

**DRAFT COPY**

Solovyeva - Cross / By Ms. Chahin                27

in the business?

A    From what I knew, he was alone.

Q    Okay.  At some point did you learn whether or not he had a partner?

A    Yes.

Q    And when was that?

A    After he registered Designed Water World and obtained a partner, Mikhel.

Q    Okay.  To your knowledge, was Mr. Kadamovas ever involved with a partner by the name of Michael Turnak (phonetic) prior to the time that Mr. Mikhel became an investor in the company?

A    There was a man named Misha (phonetic) from what I know. This was before Mikhel became his partner.

Q    The question is:  To your knowledge, was this person who you referred to as "Misha" a partner in the business prior to the time Mikhel was a partner?

A    I do not know exactly whether he was a partner.  I know that he was helping him, that he was helping him with the aquariums.

Q    Okay.  When you say, "helping him," do you know what type of help he was providing, whether it was financial or some other type of help?

A    From what I know, it was help in terms of knowledge. Misha knew how to work with the salt water.  At that time he knew how to work with fresh water and fish.  And as soon as he

**DRAFT COPY**

Solovyeva - Cross / By Ms. Chahin                    28

met Misha he began paying more attention, putting more energy into working with salt water.  But as far as finances, I do not know exactly.  I do not know.

Q    Did you ever --

A    I do not recall.

Q    I'm sorry?

A    I do not recall.

Q    Okay.  Did you ever assist Mr. Kadamovas in the business by preparing certain documentation related to the expenses of the business?

        **MS. DeWITT:**  Objection.  Vague as to which business, your Honor.

        **THE COURT:**  Sustained.

**BY MS. CHAHIN:**

Q    With regard to the period of time just prior to Mr. Mikhel becoming a partner, did you assist in the preparation of documentation describing the receipts and expenses that had been put in by Mr. Kadamovas and Misha into the Water World business?

A    Yes.  There was something like that.  I do not remember exactly, but something like that.

Q    Okay.  These were documents that you typed, correct?

A    I do not remember.

Q    Okay.  Would it refresh your recollection if I were to show you a copy of a document so that you could determine

**DRAFT COPY**

Solovyeva - Cross / By Ms. Chahin          29

whether or not this is something that you assisted in typing?

A    I can look at the document; but, again, this is from what I recall.

        MS. CHAHIN:  If I can have a moment, your Honor?

    (Pause)

        Your Honor, I had already pre-marked some other exhibits, so if I could, I would request that these be identified as Defendant's 2035 and 2036 for identification.  I will fill in the gap in the numbers.

        THE COURT:  All right.  2035 and 2036?

    **(Defendants' Exhibits Numbers 2035 and 2036 were marked for identification)**

        MS. CHAHIN:  Yes.  And Mr. Lasting will assist me in providing that to the witness.

        MR. LASTING:  Could I take this up there, your Honor?

        THE COURT:  Please.

    (Pause)

        Remember, the original of the exhibits stays with the Clerk.

        MS. CHAHIN:  Yes, your Honor.

        THE COURT:  All right.  2035 and 2036 for identification before the witness.

BY MS. CHAHIN:

Q    Ms. Solovyeva, if you could please take a look at the document, which I have identified as Exhibit 2035.

**DRAFT COPY**

Solovyeva - Cross / By Ms. Chahin                    30

A     Okay.

Q     Okay.  If you -- looking at this document, does this document refresh your recollection as to whether or not this is a document that you assisted Mr. Kadamovas in typing related to the expenses of the business from February 2000 to May 2000?

A     Yes.

Q     And did you have an understanding as to what the purpose of this document was?

A     I don't recall.  These were some expenses among them.

Q     Okay.  Did you have an understanding of what these expenses related to?

A     To the Water World business.

Q     And did -- with respect to 2036, is that -- can you please look at that document?

        THE INTERPRETER:  Excuse me.  I'm sorry?

        THE COURT:  2036.

        MS. CHAHIN:  2036.

        THE COURT:  Could you please look at that document?

BY MS. CHAHIN:

Q     I'm sorry.  Did you look at that document?

A     Yes, yes.  I'm sorry.

Q     Now, is that -- having looked at that document, does that refresh your recollection as to whether or not that is a document that you assisted in typing?

A     Yes.

**DRAFT COPY**

Solovyeva - Cross / By Ms. Chahin                    31

Q    And with respect to that document, did you have an understanding as to what that document, what that information was describing?

A    These are the expenses and finances of the business.

Q    Okay.

A    Who owes Iouri (phonetic) and what to pay.

Q    Okay.  And did you have an understanding of whether or not those documents were being provided so that the prior partner could be reimbursed for expenses in the business?

A    Yes.

Q    Okay.

         MS. CHAHIN:  Your Honor, I would ask that 2035 and 2036 be received into evidence.

         THE COURT:  Any objection?

         MS. DeWITT:  No, your Honor.

         THE COURT:  Received, 2035 and 2036 this date.

    **(Defendants' Exhibits Numbers 2035, 2036 were received in evidence)**

         MS. DeWITT:  Your Honor, and if I could please ask the Court to put the Elmo on.

         THE COURT:  All right.  You're in the document mode at this time.

         MS. CHAHIN:  I'm sorry, your Honor?

         THE COURT:  You're in the document mode.

         MS. CHAHIN:  Thank you.

**DRAFT COPY**

Solovyeva - Cross / By Ms. Chahin            32

(Pause)

BY MS. CHAHIN:

Q    I understand that this is difficult to read but, Ms. Solovyeva --

MS. DeWITT:  Your Honor, excuse me.  If she's going to refer to this, I think the first page is a translation as opposed to the second page, which is the actual document.  And I would object to referring to the translation.  If she's going to ask her questions (***).

THE COURT:  I can't hear a word you said.

MS. DeWITT:  I believe that this is a two-page document.  The first page that she's got up there, I think, is a translation that was prepared by somebody other than Ms. Solovyeva.

THE COURT:  Well, let's put the first page on the document.

BY MS. CHAHIN:

Q    Ms. Solovyeva, are you able to see this document on the screen, Defendants' 2035?

A    Not very clearly; but, yes.

Q    Okay.  You have the copy in front of you; is that correct?

(Pause)

MS. CHAHIN:  Your Honor, I can clarify this with a couple of questions.

THE COURT:  All right.  The problem that I have is

DRAFT COPY

Solovyeva - Cross / By Ms. Chahin          33

the one that's on the screen is not very clear.  On your Elmo

there's a, I believe, adjustment for light and dark.  If you

could just lighten it up a little bit.

     **(Counsel complies)**

          What I think the problem is, see the shadow that is

there?

          **MS. CHAHIN:**  Yes.

          **THE COURT:**  You eliminate that shadow from the Elmo

by...

     **(Pause / Discussion held off the record)**

          Turn your lamps on.

     **(Pause)**

          **MS. CHAHIN:**  Your Honor, I will zoom in on the

document.

          **THE COURT:**  All right.  Well, okay.  It's much better

now.

          **MS. CHAHIN:**  Thank you.

**BY MS. CHAHIN:**

Q    Ms. Solovyeva, I have on the screen Exhibit 2035, a

document you have before you; is that correct?

A    Yes.

Q    Now, you actually typed this in the Russian language; is

that correct?

A    Something is typed in English here, as well.

Q    Okay.  If I ask you to take a look at the second page,

**DRAFT COPY**

Solovyeva - Cross / By Ms. Chahin                34

Exhibit 2035.

THE INTERPRETER:  May the interpreter ask you to speak into the mike, if possible?

BY MS. CHAHIN:

Q    Now, that's the second page of document 2035.

Is that, in fact, what you typed?

A    Looks like I typed it, yes.

Q    Okay.  And the first page of that document is a translation to the English language; is that correct?

A    Yes, but I did not do it.

Q    It was done by somebody else, correct?

A    Yes, I believe so.

Q    Okay.  The page that you typed is the second page, correct?

A    Yes.

Q    And this document purports to show expenses of the business from February 2000 to May of 2000; is that correct?

A    Yes.

Q    Okay.  And I'd also like you to take a look at Defense Exhibit 2036, if you could, please.  And if you could look at the second page.

MS. CHAHIN:  Your Honor, for the record, I'm putting that on the document camera.

THE COURT:  Okay.

THE WITNESS:  Yes, I have it in front of me.

**DRAFT COPY**

Solovyeva - Cross / By Ms. Chahin          35

**BY MS. CHAHIN:**

Q    Now, this is also a document that you typed in Russian related to expenses of the business; is that correct?

A    Yes.

Q    Okay.  And the first page of this document is an English translation of that document, which was done by someone other than yourself; is that correct?

A    Yes.

        **MS. CHAHIN:**  Your Honor, for the record, I am placing the first page of 2035 on the document camera.

        **THE COURT:**  All right.  That's the translated version.

        **MS. CHAHIN:**  Thank you.

**BY MS. CHAHIN:**

Q    Now, with respect to these two documents that you prepared regarding the business, was it your understanding that these documents were prepared so that the prior partner could be reimbursed for his expenses in the business?

A    From what my understanding was, yes.  To pay him back.

        **(Counsel confers off the record)**

Q    Now, you indicated that at some point a locale was opened, the business was moved to a physical location; is that correct?

A    Yes.

Q    And where was that located?

A    On Ventura Boulevard in Sherman Oaks.

**DRAFT COPY**

Solovyeva - Cross / By Ms. Chahin                    36

Q    And do you have any understanding of when that locale was rented?

A    I don't remember exactly.  I would say in the middle of summer, July or August.  I don't remember exactly.

Q    Okay.  And you've described some renovations, which were undertaken at that location in your direct testimony; is that correct?

A    Yes.

Q    And I believe that you described those renovations as having been -- having involved from the ceiling to the floor of the locale; is that correct?

A    Yes.

Q    Okay.  And did you visit the locale of Designed Water World while those renovations were under way?

A    Yes.

Q    Okay.  How often would you be there?

A    I don't remember.  I don't know.  Once a week, maybe three times a month, maybe more.  I don't know.  I don't remember.

Q    During the period of times that you visited Designed Water World, were you able to see the progression, the progress of the renovations, which were taking place?

A    Yes.

Q    Okay.  And if I could please ask you to look at exhibits, which I have marked as Defense Exhibits 2026, 2027, 2028, 2029 and 2030.

**DRAFT COPY**

Solovyeva - Cross / By Ms. Chahin          37

MS. CHAHIN:  Your Honor, I'm asking Agent Davidson to please place these before the witness.

THE COURT:  All right.  2026 through 2030, for identification.

THE WITNESS:  I have them in front of me.

BY MS. CHAHIN:

Q    And let's begin with Exhibit 2026.

A    Yes.

Q    Do you have that document before you?

A    Yes.

Q    Okay.  And do you recognize this?

A    Yes, I do recognize it.  This is the office.

Q    Okay.  And could you look at the remaining documents identified as Defendants' 2027, 2028 and 2029, and please tell me if you recognize them.

A    Yes, I do.

Q    And can you tell us what those documents are?

A    These are the photographs that were taken in the office at the moment of the remodeling.

MS. CHAHIN:  Your Honor, I would ask that 2026 through 2030 be received into evidence.

THE COURT:  You had her identify 2026, 2027, 2028 and 2029 but not 2030.

MS. CHAHIN:  I apologize, your Honor.  I would ask that Exhibits 2026 through 2029 be received into evidence.

**DRAFT COPY**

Solovyeva - Cross / By Ms. Chahin          38

THE COURT:  Any objection?

MS. DeWITT:  No, your Honor.

THE COURT:  Received this date 2026 through 2029.

(Defendants' Exhibits 2026, 2027, 2028, 2029 were received in evidence)

MS. CHAHIN:  Your Honor, I'm going to put on the camera each exhibit, in turn, beginning with Exhibit 2026.

THE COURT:  All right.

(Pause)

BY MS. CHAHIN:

Q    Ms. Solovyeva, I've put on the screen what is described as Defendants' Exhibit 2026 in evidence.

Can you please tell us what this picture depicts?

A    This is the office at the time of remodeling.

Q    Okay.  And are you able to see that dark square that's in the middle of the wall on the picture?

A    Yes, I can see it.

Q    And what is that?

A    This is the spot where later an aquarium would be installed.

MS. CHAHIN:  Your Honor, now I'm going to put 2027 on the screen.

THE COURT:  All right.

(Pause)

//

**DRAFT COPY**

Solovyeva - Cross / By Ms. Chahin          39

**BY MS. CHAHIN:**

Q    With regard to this picture, does this picture depict the renovations, which were taking place at the Designed Water World location?

A    Yes.

Q    Okay.  Do you have any knowledge of who was doing the physical construction work at the location?

A    Mainly, it was Kadamovas.

Q    Okay.  And, to your knowledge, did he do all of the construction work, including laying the floors and all of the woodwork at the location?

A    No.  From what I know his friend helped him to lay the floor.  He did have --

(Portion from 10:41:09 through 10:45:08 transcribed by Court Reporter under separate cover due to technical difficulties; resume transcription at 10:45:09)

Q    Kadamovas was also involved in installing some waterfalls, is that correct?

A    From what I know he installed one waterfall.

Q    At Designed Water World, is that correct?

A    Besides that he had a client in a restaurant.

Q    Okay.  I'm referring you specifically at this time to the locale of Designed Water World.  Was there a waterfall installed there?

A    Yes.

**DRAFT COPY**

Solovyeva - Cross / By Ms. Chahin                40

Q     Was there a large aquarium behind the bar area?

A     Yes.

Q     And how many aquariums, if you know, of the picture frame type that we saw in the remodeling pictures were maintained at Designed Water World?

A     I would like to -- I would like to make sure I understand. Just the pictures?  The background?  Aquariums with pictures?

Q     Well let's talk about both types of aquariums.  Let's talk about aquariums with pictures first of all.  Do you know how many were maintained at Designed Water World?

A     One big aquarium and approximately three or four -- four or five of those that were hanging on the wall as pictures. And besides that there was one more aquarium which stood like a round column.

Q     Now when you refer to a big aquarium, where was that located?

A     Behind the bar counter.

Q     And when you refer to the picture aquariums, where were those located?

A     They were built into the wall as if pictures, paintings that were hanging on the wall.

Q     Aside from the aquariums that you've described, were there other aquariums there?

A     I have mentioned already there was an aquarium that looked like a round column.  That's all that I remember.

**DRAFT COPY**

Solovyeva - Cross / By Ms. Chahin          41

MS. CHAHIN:  Your Honor, if I could please have the following exhibits placed before the witness for identification:  2030, 2031, 2032, 2033, and 2034 for identification.

THE COURT:  All right, 2030 through 2034 before the witness for identification.

BY MS. CHAHIN:

Q    Ms. Solovyeva, could you please take a look at these pictures and please let me know when you are finished.

(Witness complies)

A    Yes.

Q    With respect to 2030, 2031, and 2032, are you able to identify them?

A    Yes, I recognize them.

MS. CHAHIN:  Your Honor, I would ask that 2030, 2031, and 2032 be received in evidence.

THE COURT:  Any objection?

MS. DeWITT:  No, your Honor.

THE COURT:  Received.

(Defense Exhibits Numbers 2030, 2031, and 2032 were received in evidence)

BY MS. CHAHIN:

Q    Ms. Solovyeva, I'm going to put on the document camera what I have identified as Defense Exhibit 2030.  Will you please take a look at that document?  Can you please describe

DRAFT COPY

Solovyeva - Cross / By Ms. Chahin                42

what that is?

A    This is the background for the big aquarium.  Kadamovas was painting this picture.

Q    To your knowledge was this picture taken during the remodeling reconstruction phase prior to the aquarium's completion?

A    It was taken during the remodeling was in the process.  I don't remember.  I think it was while the remodeling was in process.

Q    Does the aquarium appear to be complete in this picture?

A    No, it was in the process of work.

Q    I'm going to place on the document camera what I've identified as Defense Exhibit 2031.  If you could please take a look at that.

A    Yes.

Q    Can you please describe what is depicted in this photograph?

Q    This is an aquarium of the picture type format which you have described?

A    Yes, one of the pictures.

Q    And is this the type of aquarium that you said Mr. Kadamovas designed?

A    Yes.

        MS. CHAHIN:  Your Honor, I'm going to place on the document camera what I've identified as Defense Exhibit 2032.

**DRAFT COPY**

Solovyeva - Cross / By Ms. Chahin          43

BY MS. CHAHIN:

Q    Ms. Solovyeva, could you please describe what's depicted in this photograph?

A    One of the aquariums that was also called a picture.

Q    Is this also a type of the picture frame aquarium that you've described that Mr. Kadamovas designed?

A    Yes.

          MS. CHAHIN:  Your Honor, I would ask that Defense Exhibits 2033 and 2034 be placed before the witness for identification.

          THE COURT:  We'll do it after our morning break.

          MS. CHAHIN:  Thank you.

          THE COURT:  We'll take our break at this time. Remember the admonition.

     (Jurors exit courtroom at 10:53 a.m.)

     (A recess was taken from 10:53 a.m. to 11:10 a.m.; parties present)

     (Outside the presence of the jury)

          THE COURT:  All right, let's go on the record outside the presence of the jury.  The record will indicate that all counsel and parties are present.

          Anything the Government wishes to bring up?

          MS. DeWITT:  No, your Honor.

          THE COURT:  Anything the Defense wishes to bring up?

          MR. CALLAHAN:  No, sir.

DRAFT COPY

THE COURT:  All right.  Ms. Chahin, I'll bring the jury out, you may continue.

You're going to be putting 2033 and 2034 before the witness?

MS. CHAHIN:  Yes, your Honor.  Thank you.

THE COURT:  Okay.  I'm going to ask the court reporter to bring the jury in.

(Jurors enter courtroom at 11:11 a.m.)

THE COURT:  All right, the record will indicate all jurors are present and all counsel and parties are present.

Ms. Solovyeva, you're still under oath.  Please state your name for the record.

THE WITNESS:  Natalya Solovyeva.

THE COURT:  And, Ms. Chahin, you were in the process of placing Exhibits 2033 and 2034 before the witness for identification.

MS. CHAHIN:  Thank you, your Honor.

(Witness previously sworn)

CROSS EXAMINATION (CONTINUED)

BY MS. CHAHIN:

Q    Ms. Solovyeva, if you'd please take a look at Defense Exhibits 2033 and 2034 for identification.

A    Yes, I'm looking at them.

Q    And do you recognize what's depicted in these pictures?

A    The Exhibit 2033 depicts the office and Kadamovas is

DRAFT COPY

Solovyeva - Cross / By Ms. Chahin          45

polishing the floor.  The Exhibit 2034 depicts the aquarium

that was installed by Kadamovas.  It's the so-called aquarium

picture that was installed by Kadamovas at the Russian

restaurant.

**MS. CHAHIN:**  Your Honor, I would request that Defense

Exhibits 2033 and 2034 be received in evidence.

**THE COURT:**  Received this date.

**MS. CHAHIN:**  Thank you, your Honor.

**(Defense Exhibits Numbers 2033 and 2034 were received in**

**evidence)**

**MS. CHAHIN:**  Your Honor, I'm going to place

Exhibit 2033 on the document camera.

**BY MS. CHAHIN:**

Q    Ms. Solovyeva, with regard to this picture, I believe that

you described that it's Mr. Kadamovas at Designed Water World,

is that correct?

**THE INTERPRETER:**  Could you repeat the second part of

the question, please?

**MS. CHAHIN:**  Yes.

**BY MS. CHAHIN:**

Q    Does the picture depict Mr. Kadamovas at Designed Water

World?  Was that your testimony?

A    Yes.

Q    And if you know was this picture taken at a point close in

time to when the renovations were close to being completed?

**DRAFT COPY**

Solovyeva - Cross / By Ms. Chahin                 46

A     The office was almost done, finished.

          MS. CHAHIN:  And with respect to Defense Exhibit 2034, I'm going to place it on the document camera, your Honor.

BY MS. CHAHIN:

Q     Ms. Solovyeva, what is depicted in this picture?

A     I am depicted on this picture and the aquarium is in the background.

Q     Okay.  And I believe that it was -- where was this aquarium located?

A     In the Russian restaurant.  I remember the old name; I do not remember the new name.

Q     Can you tell us what the old name was?

A     Natalista (phonetic).

Q     Okay.  And did you have an understanding as to whether or not this was an aquarium that Mr. Kadamovas built and designed?

A     From what I understand yes.

Q     And did you have an understanding as to whether or not this was one of the aquariums that he maintained as part of his business?

A     From what I understand yes.

          MS. CHAHIN:  Your Honor, I'm removing that document from the document camera.

//

//

**DRAFT COPY**

Solovyeva - Cross / By Ms. Chahin                    47

**BY MS. CHAHIN:**

Q    Ms. Solovyeva, were you familiar with any checking accounts that the business maintained?

          **MS. DeWITT:**  Objection.  Vague as to business again.

          **THE COURT:**  All right.  What business are we speaking of?

**BY MS. CHAHIN:**

Q    We're speaking of Designed Water World.

A    From what I know there was one account opened at the American Bank.  This was a business account.

Q    And do you know when that account was opened?

A    I don't remember.

Q    And were you a signatory on that account?

A    No.  No.

Q    Did you ever sign checks on that account?

A    I do not remember.  I did sign checks for Kadamovas.  I did write checks for Kadamovas.

Q    When you say you wrote checks, are you referring to writing out who the check was made to and he would sign the check, or are you referring to something else?

A    He already had checks signed and I would just fill out the rest.

Q    Okay.  So when you say he already had checks signed, are you referring to the fact that he would leave blank checks already signed with his name?

**DRAFT COPY**

Solovyeva - Cross / By Ms. Chahin                48

A    Yes, it would take place.

Q    And where were those checks located?

A    At our apartment on Lindley Avenue.

Q    Were any of those checks, if you know, located at Designed Water World, blank signed checks?

A    I do not know.  Not to my knowledge.  I don't remember.

Q    Did you ever sign Mr. Kadamovas's name on a check?

A    Yes.

Q    When did you do that?

A    When Kadamovas was not present in the U.S. and I needed to sign something quickly and Kadamovas had asked me to sign and send the check.

Q    So when he was not present and you needed money you would write his name on the check, is that correct?

A    Yes, when he would tell me to whom to sign the check and where to send it.  If those checks that he already signed were finished, then he would ask me to sign the check for him and fill out the rest.  And he would say, "It's not a big deal, just sign and send."

Q    So what you would do is you would basically forge his signature, is that correct?

A    Yes.

Q    And did that happen, if you recall, after the time he was arrested?

A    I do not remember.

**DRAFT COPY**

Solovyeva - Cross / By Ms. Chahin                 49

Q    Okay.  Do you remember if you forged his signature to take money out of bank accounts after the time that he was arrested?

A    From our joint account I would take money with my signature.  From the credit cards there is no need for the signature, only the pin number is needed.

Q    The question I asked you is whether after his arrest you ever forged his signature on checks to withdraw money from bank accounts.

A    I do not remember.  I don't think so.  From what I know I would take money from our account, but I had a signature there. And I had no business with the business account after the arrest.

Q    Now in regard to the checking account that was maintained at Designed Water World, I believe that you indicated you were not a signatory, is that right?

A    No, I was not a signatory.

Q    Now with respect to your own personal account, I believe you indicated you had a joint account with Mr. Kadamovas, is that right?

A    Yes.

Q    And you also had credit cards, is that right?

A    Yes.

Q    Do you recall ever using either your credit card or your joint bank account to pay expenses for people other than yourselves?

**DRAFT COPY**

Solovyeva - Cross / By Ms. Chahin                50

A    I do not understand the question.

Q    Let's break it down.  With respect to your credit cards
that you had, did you ever use your credit cards to pay
expenses for Mr. Mikhel for which he would later reimburse you?

A    I do not remember.

Q    To your knowledge would Mr. Kadamovas ever use his
personal credit cards to pay for personal expenses of
Mr. Mikhel for which he would be later reimbursed?

A    You said the joint account; do you mean the joint
account -- the checking account or the credit card account?

Q    Well I would like to know about both.  Why don't we begin
initially with the credit cards.

A    Could you please repeat the question?

Q    Yes.  With respect to your credit cards, joint credit
cards, to your knowledge were those joint credit cards ever
used to pay for expenses of Mr. Mikhel for which he would later
reimburse you?

A    From what I recall we used the joint account to pay for
our credit cards with Kadamovas, for Kadamovas's credit cards.

Q    The question I'm asking you is in regard to whether or not
you ever used your credit card to pay expenses that belonged to
somebody else.

A    I do not remember.

Q    Did you have a credit card which was issued from Direct
Merchants Bank, titanium credit card?

**DRAFT COPY**

Solovyeva - Cross / By Ms. Chahin          51

A     In my name?  I do not remember.

Q     Do you recall if Mr. Kadamovas had one in his name?

A     I do not remember.  He had several credit cards.  I do not remember from which banks.

Q     At this time you were not working, is that correct?

        **MS. DeWITT:**  Objection.  Vague as to time.

        **THE COURT:**  What time are we talking about?  Sustain the objection.

**BY MS. CHAHIN:**

Q     Specifically during the period of time say after you moved to Los Angeles.  Let me withdraw that.

        Can you tell us at what point you were no longer working?

A     After the child was born.

Q     And I believe you told us that that was July 11th of 2000, correct?

A     Yes.

Q     So at that time you had no other income other than what Mr. Kadamovas provided for you and the child, correct?

A     Correct.

Q     You maintained your own separate credit cards, is that your testimony?

A     Yes.

Q     And how did you pay for those credit cards?

A     From our joint account.

**DRAFT COPY**

Solovyeva - Cross / By Ms. Chahin          52

Q    Now, are you aware whether or not Mr. Kadamovas ever paid for expenses on his credit cards for people other than himself?

A    I cannot recall.  I do not know.  I do not think so.

Q    Do you recall specifically a purchase of some plumbing fixtures which were maintained at your residence which were purchased for Mr. Mikhel?

A    I do not remember.

Q    With regard to your joint checking account, do you recall if your joint checking account was ever used to pay expenses for anyone other than yourself?

A    I do not recall.  There were accounts.  The account was used to pay the bills, to pay for credit cards.  I don't remember.

Q    Do you recall ever having made payments on your joint checking account for Mr. Mikhel's mortgage?

A    I do not recall.  I don't remember.

Q    Do you recall if you ever made payments from your joint checking account to pay for Mr. Mikhel's condo management fees?

A    I do not remember.

MS. CHAHIN:  Your Honor, I have three documents here which I would ask to mark as Defense Exhibits -- I believe it would be -- 2035 is next, your Honor?

THE COURT:  No, 2035 and 2036 you marked earlier.  So it would be 2037.

MS. CHAHIN:  Thank you.  I'd like to mark documents

**DRAFT COPY**

Solovyeva - Cross / By Ms. Chahin                53

as Exhibits 2037, 2038, and 2039.

THE COURT:  All right, to 2039.

MS. CHAHIN:  If I could have one moment, your Honor.

(Pause)

MS. CHAHIN:  If I may approach, your Honor?

THE COURT:  You may.

**(Defense Exhibits Numbers 2037, 2038, and 2039 marked for identification)**

MS. CHAHIN:  I apologize, your Honor.

(Pause)

Your Honor, I have three documents which I have marked as Defense Exhibits 2037, 2038, and 2039.  I would request that they be placed before the witness for identification.

THE COURT:  Before the witness for identification.

BY MS. CHAHIN:

Q    Ms. Solovyeva, could you please take a look at Document Number 2037.

A    Yes.

Q    And do you recognize what is in this exhibit?

A    Checks.

Q    Are these checks written on your joint account?

A    Yes.

Q    And are they written in your handwriting?

A    Correct.

**DRAFT COPY**

Solovyeva - Cross / By Ms. Chahin          54

Q     Specifically directing your attention to Check Number 2028.

A     Yes.

          THE COURT:  2028 or 2038?

          MS. CHAHIN:  I'm sorry, your Honor, 2038.  Check Number -- no, this is the check number, it's 0228.  I apologize.

**BY MS. CHAHIN:**

Q     Looking at that portion of the document, does this refresh your recollection as to whether or not you ever used your joint account to pay expenses for someone other than yourselves?

A     Yes.  According to this check I paid for Mikhel's rent, we paid from our mutual account.

Q     And do you recall doing that?

          THE INTERPRETER:  Do you recall what?

**BY MS. CHAHIN:**

Q     Do you recall doing that, writing this check?

A     I can see the check, but I don't remember exactly.  I don't remember the date.  I don't remember.

Q     This is your handwriting, correct?

A     Yes.

Q     And you did write this check?

A     Yes.

Q     Now, if I could please ask you to take a look at Defense Exhibit 2037 for identification.

**DRAFT COPY**

Solovyeva - Cross / By Ms. Chahin          55

A     38?

Q     Yes.

A     Yes.

Q     And if I could direct your attention to Check Numbers 0247 and 0248.

A     Yes, I am looking at them.

Q     Having reviewed this document, does it refresh your recollection as to whether or not you ever used your joint account to pay condo management expenses for someone other than yourself?

A     Yes.  According to these checks I wrote these checks to pay for someone else.  But again I don't remember for whom and for what, it was done on Kadamovas's request.

Q     This is your handwriting, correct?

A     Yes.

          MS. CHAHIN:  And if I could have one moment, your Honor?

          THE COURT:  What do you intend to do with 2037 and 2039?

          MS. CHAHIN:  Your Honor, I'm not going to admit them.

          THE COURT:  Okay.

          MS. CHAHIN:  They are being used to refresh her recollection.

BY MS. CHAHIN:

Q     So it is your recollection that these are condo management

Solovyeva - Cross / By Ms. Chahin          56

fees that were paid for someone other than yourself, is that correct?

MS. DeWITT:  Objection.  Misstates her prior testimony.  She said she doesn't recall.

THE COURT:  Sustain the objection as to the characterization of the testimony.

MS. CHAHIN:  Very well, your Honor.

BY MS. CHAHIN:

Q    Is this your handwriting?

A    Yes.

Q    Did you write these checks?

A    Yes.

Q    To your knowledge did you know anyone who lived or owned a condominium?

A    I don't remember.  I do remember that Mikhel had a flat, but whether it was a condominium I don't remember.  Also Mikhel purchased two other flats and I don't know whether they are called condominiums.  Most likely yes.

Q    And do you have an understanding of whether or not these checks were written out to pay for the condominium association fees?

MS. DeWITT:  Objection.  Calls for speculation, your Honor.

THE COURT:  Just ask if she has a recollection, yes or no.

**DRAFT COPY**

Solovyeva - Cross / By Ms. Chahin          57

**BY MS. CHAHIN:**

Q    Do you have a recollection of whether or not these two checks were written to pay out the expense associated with Mr. Mikhel's condominium association fees?

A    It's hard for me to say.  I think yes, because at that time there were no other condominiums.

Q    Now, at any time do you recall ever writing checks from your personal account and giving cash to someone other than Mr. Kadamovas from money from your account?

A    Yes.

Q    And on how many instances -- well, specifically do you recall having done so in August of 2001?

A    I don't recall exactly the date, but according to this check yes, I withdrew cash in August.

Q    Do you recall what you did with that cash that was withdrawn in August?

A    Usually when Kadamovas was not in America or he was absent for some reasons -- yes, sometimes he would ask me to withdraw money and to pay Roma Lotia (phonetic) or, and I don't remember exactly the name, it was Skirma's (phonetic) husband, Robert, he would ask me to pay them for the work that they had done. Because at that time they were helping him with some work in the office and this is how I paid them.  Or I wrote checks.

Q    With regard to this check specifically, do you have a specific recollection of what that money was for?

**DRAFT COPY**

Solovyeva - Cross / By Ms. Chahin                    58

A      I don't remember.

Q      Now, during the period of time that you would visit Designed Water World were you able to observe if there was a computer located there?

A      Yes.

Q      Did you use that computer?

A      Once or twice I wanted to see something there but I was unable because I didn't speak -- no, I could not find anything there.  I don't remember, but I remember that it was on the request either of Kadamovas or Mikhel.  But mainly I was not using this computer; I was using the computer that was at home.

Q      Did this computer require a special password to access it? And specifically I'm referring to the computer at Designed Water World.

A      I don't remember.

Q      Now, you've provided testimony regarding being asked to place a call to Nick Kharabadze, is that correct?

A      Yes.

Q      And you've described making telephone calls to a prepaid cell phone -- I'm sorry -- from a prepaid cell phone to Nick Kharabadze, is that correct?

A      Yes.

Q      Do you recall if you ever received any telephone calls from Nick Kharabadze on that cell phone?

A      I don't remember.  I remember that I was using that

**DRAFT COPY**

Solovyeva - Cross / By Ms. Chahin          59

telephone to place a call to him; but whether he called me on this telephone, that I don't remember.

Q    Do you recall receiving telephone calls from anyone else on that telephone?

A    No.

Q    Directing your attention to the day that you described that you were asked to meet Nick Kharabadze, what time do you recall meeting him?

A    It was on Sunday.  When I was calling him I don't remember exactly.  It was lunchtime.  It was approximately in between 12:00 noon and 3:00 o'clock, but I don't remember exactly.

Q    Do you recall what you had been doing prior to arriving to Designed Water World?

A    Most likely I was at home.  I don't remember exactly now, but I was at home.

Q    Do you recall how you arrived at Designed Water World?

A    By car.

Q    What car?

A    Mikhel's.

Q    When you say it was Mikhel's, what car are you referring to?

A    Jeep Cherokee.

Q    And how did you -- let me withdraw that.

        During the period of time that you were -- during the period of time that you say that you left your house to go to

**DRAFT COPY**

Solovyeva - Cross / By Ms. Chahin          60

Designed Water World, where was Nastia (phonetic) during that period of time?

A    I don't remember exactly whether she was at home or she was at Marina's place.  Marina who is Mikhel's fiancée.

Q    Do you recall taking her to -- taking Nastia to stay with Marina during the period of time you went to Designed Water World?

A    I don't remember exactly.  I don't remember that moment.

Q    Do you recall having someone come over to your house to watch Nastia while you went to Designed Water World?

A    I don't remember.  It might have happened this way, but I don't remember.

Q    As you sit here you have no recollection of where your daughter was during the period of time that you say you were at Designed Water World, is that correct?

A    I don't remember exactly whether she was at home on Lindley Avenue or I took her to Marina to stay in Marina's place.

Q    So as you sit here today you cannot recall who you left her with, is that correct?

A    That's correct.

Q    Approximately what time did you leave Designed Water World?

A    Again, I don't remember, because I came there, I placed the call, all that took approximately 30 minutes, and then I

Solovyeva - Cross / By Ms. Chahin                61

went back home.  That was in the timeframe between 12:00 noon and 3:00 o'clock and I don't remember when exactly I came there and when I left.

Q    So would it be fair to say that at this time you don't have a specific recollection of the time that you left?

A    That's correct.  I don't remember.

Q    How did you leave Designed Water World?

A    By car.  Jeep Cherokee, Mikhel's.

Q    The same car that you arrived in, is that correct?

A    It's my feeling that yes.

Q    When you say it's your feeling that yes, are you saying that you remember having left in a Jeep Cherokee?

A    Yes, I do remember that I left in Mikhel's car, Jeep Cherokee.

Q    Where did you go after you left?

A    I came back to the child.

Q    Where was the child?

A    From what I remember as it seems to me she was at home on Lindley Avenue.  But maybe, as I have mentioned before, she was at Marina's place.  That's why it's hard for me to say now where she was.

Q    Well you said that you went to the child.  Where did you go?

A    I don't remember to where she was at that moment, either at home or with Marina.

**DRAFT COPY**

Solovyeva - Cross / By Ms. Chahin                62

Q    What did you do after you went to the child?

A    I was at home.

Q    What time did you arrive at home?

A    Late afternoon, somewhat around that time.  I don't remember exactly.

Q    And what time did you next see Mr. Kadamovas?

A    The same day in the evening, approximately at 9:00 or 10:00 p.m.  And again I don't remember exactly.

Q    How did he arrive there?

A    I don't remember.  Most likely Nissan Quest, but I don't know.  I did not see him come.

Q    Did you talk to him --

A    By car and I don't remember what car.

Q    Did you talk to him at that time?

A    Yes.

Q    How long was he there?

A    A few minutes.

Q    And after he was there for a few minutes did he leave?

A    Yes.

Q    How did he leave?

A    I did not see how he left, probably the same way he arrived.

Q    And after he left when was the next time you saw him?

A    I don't remember.  Maybe the following day he came to change and to take a shower.  Maybe he came in a day.  Maybe

**DRAFT COPY**

Solovyeva - Cross / By Ms. Chahin                     63

later in the evening.  I don't remember.  But I remember that he came again for a few minutes and then he left back.

Q     And on that instance do you know how he arrived?

A     No.

Q     And do you know how he left?

A     No.  I did not see in what car he came.  I don't remember. I don't know.

Q     Now, you have provided some testimony regarding being asked to do something in regard to a metal box.  Do you have that in mind?

A     Yes.

            **THE COURT:**  All right, this looks like a good time to break.  We'll return at 1:25 in the jury room, 1:30 in the courtroom.  Remember the admonition.

        **(Jurors exit courtroom at 11:58 a.m.)**

        **(Lunch recess from 11:58 a.m. to 1:33 p.m.; parties present)**

        **(Outside the presence of the jury)**

            **THE COURT:**  All right.  Outside the presence of the jury.  The record will indicate all parties and counsel are present.

            How long do you think you'll be, Ms. Chahin?

            **MS. CHAHIN:**  Your Honor, I hope to finish by the end of the day.

            **THE COURT:**  All right.  Let's bring the jury out

**DRAFT COPY**

64

then, unless anybody wants to speak to the Court.

MS. DeWITT:  Your Honor, the only thing is, it's a little hard for us to have the next witness prepared to go on the stand, and so we're operating on the assumption that she's going to last to the end of the day, and if for some reason we need a witness, we may have to scramble a little bit, just to give you a heads up.

THE COURT:  Who would be your next witness, by the way?

MR. DUGDALE:  There's five relatively short witnesses that deal specifically with the time of the disappearance of Mr. Safiev and some more witnesses regarding ATM surveillance at the (***) use of his credit cards.  Those are the next five witnesses, your Honor.

THE COURT:  Okay.

MR. DUGDALE:  And then Mr. Markovskis is the last (***) who should be the last of the witnesses who last for more than a day.

THE COURT:  We'll bring the jury out then.

THE CLERK:  Okay.  We're ready to start.

(Jurors enter the courtroom at 1:34 p.m.)

(All jurors are present)

(All parties and counsel are present)

THE COURT:  All right.  The record will indicate all jurors are present, all counsel and parties are present.

DRAFT COPY

You're still under oath.  Please state your name for the record.

THE WITNESS:  Natalya Solovyeva.

MS. CHAHIN:  May I proceed?

THE COURT:  Please.

MS. CHAHIN:  Thank you.

**CROSS EXAMINATION (CONTINUED)**

BY MS. CHAHIN:

Q    Ms. Solovyeva, during the period of time that you lived with Mr. Kadamovas, did you know him to have any problems with his back?

A    Yes.

Q    Can you describe those problems?

A    Pain in the back.  He had either strained it, strained muscles, or I don't know exactly.  It was either after his work at the office.

Q    Was this the type of back condition that would periodically flare up and give him problems, if you know?

A    Yes.  He would complain.  Either when he carried something heavy.

Q    And do you know if he was receiving any type of treatment for that condition?

A    I know that I had put warming creams on his back.  He went to the chiropractor.  But this was after the accident, after the car accident.  I don't remember him having any special

**DRAFT COPY**

Solovyeva - Cross / By Ms. Chahin                66

treatments for his back.  I do not recall any.

Q    In regard to your describing an accident that took place, do you know when that was?

A    No.  I do not remember.  No.  It's hard for me to say now.

Q    Do you have any idea when that was in relation to the time you started living with him?

A    I would say six to eight months, even a year after.  No, actually, let me correct myself.  I would say more than a year.

Q    And do you know --

A    More than a year.

Q    I'm sorry?

A    More than a year.

Q    Do you know over what period of time he was receiving chiropractic care?

A    Do you mean dates?  What dates?

Q    Approximately, if you remember.

A    I do not remember.  In 2000 or 2001.  I do not remember now.

Q    And do you remember for what period of time that happened, that he received treatment?

A    This was for a few months.  Three to four months.  I do not remember exactly, because he would go out of the country and come back, and these visits were on and off.

Q    Do you remember the frequency of the visits?

A    No, I do not remember.

**DRAFT COPY**

Solovyeva - Cross / By Ms. Chahin                67

Q    Now, you've described some periods of time that you said Mr. Kadamovas did not sleep at home.

A    When he would go out -- night out, trips?  Overnight trips?

Q    Yes, that's what I'm referring to, trips that you've described as overnight trips.

A    Yes.

Q    During these trips you do not recall -- is it correct to say that you don't recall receiving any phone calls from him?

A    I don't think so.  It's hard for me to say now.  I don't remember.  I wouldn't say that.

Q    Okay.  Well, do you remember being asked on a prior occasion during an interview with FBI agents whether or not you received any telephone calls from him when he went on his overnight trips?

A    I remember I was asked whether I had called him. Otherwise I do not remember.

        MS. CHAHIN:  Okay.  If I could have one moment, your Honor.

    (Pause)

BY MS. CHAHIN:

Q    So do you recall being asked during an interview whether or not you recalled making a call to Mr. Kadamovas during one of his overnight trips?

A    Yes.

**DRAFT COPY**

Solovyeva - Cross / By Ms. Chahin                68

Q    Okay.  And would it be fair to say that you do not recall
making any such telephone call to him during one of his
overnight trips?

A    It would be correct to say that I do not recall whether I
had called him.  But most likely during his first trip
overnight I attempted to call him because it was his first trip
and I didn't know where he had disappeared.

Q    Ma'am, is it now your testimony that you do recall making
a telephone call to him while he was gone on this first
overnight trip?

        **MS. DeWITT:**  Objection.  Argumentative and misstates
the testimony.

        **THE COURT:**  Well, I think she's trying to find out
exactly what the position of the witness is now.

        Overrule the objection.

        **THE WITNESS:**  It is hard for me to say.  I'm saying
that I might have made that call.  I do not know.

**BY MS. CHAHIN:**

Q    Do you recall being asked about this -- do you recall
being asked the same question in your interview with the FBI on
May 30th of 2006?

A    Yes.  I remember.

Q    And at that time you told the FBI that you did not recall
making any such telephone call; isn't that correct?

A    I said that I was unable to get in touch with Kadamovas or

**DRAFT COPY**

Solovyeva - Cross / By Ms. Chahin            69

he hasn't called me and I would call Ainar.  I remember saying that I had called Ainar.

Q    So you're saying that it's your recollection that when you met with the FBI on May 30th, 2006, you told them that you did not call Mr. Kadamovas but that you called Ainar?  Is that your testimony?

            **THE COURT:**  I don't think she said that.  I think she said that she doesn't recall whether or not she called Mr. Kadamovas, but she does recall saying to the FBI that she called Ainar Altmanis.  That was my understanding of the testimony.

            Is that correct or incorrect?

            **THE WITNESS:**  Yes.

**BY MS. CHAHIN:**

Q    Would it be a fair characterization to say that during that interview you told the FBI agents that you did not recall making a call at approximately 5:30 in the morning to Mr. Kadamovas?

A    It would be correct to say that I do not recall that I had called.

Q    I'm asking you whether you made that statement to the FBI on that date.

A    From what I recall, yes.

Q    Okay.  And this was the -- what you've described as the interview where you had decided that you were now going to tell

**DRAFT COPY**

Solovyeva - Cross / By Ms. Chahin          70

them the truth; is that right?

A    Yes.  I was telling the truth.

Q    Okay.

A    What I could remember I would say, I would tell.

Q    Okay.  You've testified previously that prior to this interview there were other interviews where you did not tell the truth; is that correct?

A    The first interview, the one that was taken at our apartment, at the time when Kadamovas was arrested; and the second interview was a week later.  During those interviews I did not say everything, and there were moments in time that I would lie.

Q    That you would lie?

A    That I would not say the truth.

Q    Okay.  Were there other interviews as well, besides the two that you've described?

A    From what I recall, besides the interview on April the 11th, beginning on April 11th, starting from that date on and continue on, I started telling the truth, from what I remembered and what I was asked and what I knew.

Q    As you sit here today, is it your recollection that everything you told in the interview on April 11th and every interview thereafter was the truth?

A    Yes.

Q    I'd like to ask you some questions if I could --

**DRAFT COPY**

Solovyeva - Cross / By Ms. Chahin          71

A     Yes.

Q     -- about your immigration status and the efforts you made

to fraudulently obtain a visa in this country.

        In that regard my first question, Ms. Solovyeva, is,

you've described to us that you have a child by the name of

Anastasia; is that correct?

A     That's correct.

Q     Do you have any other children?

A     No.

Q     Do you have any children in Russia?

A     No.

Q     Okay.  When you went to obtain your tourist visa to

initially come to this country, did you represent to the

Russian government that you had a child in Russia?

A     I was getting visa through a company.  I had hired some

people who were helping me to obtain the visa.

Q     My question to you was:

        In obtaining the visa, did you represent, falsely,

that you had a child in Russia?

A     I personally did not do that, but the company that was

helping me had used that for the documentation.  And when the

visa was done, completed, they had told me that they stated

that I had a child in Russia.  But this was after I had

received the visa already, because I was surprised that I

received visa.  It was a special lottery to receive visa to

**DRAFT COPY**

Solovyeva - Cross / By Ms. Chahin                72

America.  And this company, they explained to me that it was temporary; as soon as I returned to Russia, they would remove that.

Q    Well, you knew you didn't have a child, correct?

A    At that moment when they notified me of this, I knew.

Q    And you knew that the information in the passport was false, correct?

A    At that moment, yes.

Q    Okay.  And the reason that you represented or that it was represented that you had the child in Russia would be because you would be more likely to return to Russia if you had a child in Russia; isn't that right?

        **MS. DeWITT:**  Objection.  No foundation.

        **THE COURT:**  Sustained.

    **(The witness speaks; not interpreted)**

        **THE COURT:**  There's no question pending.

**BY MS. CHAHIN:**

Q    At the time that you came to the United States, I believe you stated you paid a company to obtain a visa; is that right?

A    Correct.

Q    How much did you pay?

A    I do not remember.  I do not remember.

Q    Is that the normal manner in which a visa is obtained to come to the United States when you're in Russia?

A    There are many companies that are being opened in Russia

**DRAFT COPY**

Solovyeva - Cross / By Ms. Chahin                73

helping to obtain visa.

Q    And do you have an understanding as to whether or not your visa would have issued if you had told the truth?

        MS. DeWITT:  Speculation, your Honor.

        THE COURT:  Counsel is asking whether or not she has an understanding, so I'll overrule the objection.

        THE WITNESS:  It would be 50/50.

BY MS. CHAHIN:

Q    Now, you made that application for a visa before you had met Mr. Kadamovas, correct?

A    Yes.  This was in Russia.

Q    Okay.  In your direct examination you also told us about some incidents that you were involved in some thefts.  Do you recall that?

A    Thefts?

Q    Thefts, here in this country, from stores.

A    Yes.

Q    Okay.  I believe in one instance you indicated that you stole a cap from a baby bottle; is that right?

A    That's correct.

Q    Was there another instance when you stole a jacket from a Roth's department store?

A    Yes.

Q    Okay.  Mr. Kadamovas was not present when you stole those items, was he?

**DRAFT COPY**

Solovyeva - Cross / By Ms. Chahin          74

A    No.  He was not present.  No, I don't think so.

Q    Why did you want to leave Russia and come to the United States?

A    I wanted to come and see the United States and make money, to work here for about a half a year and go back to Russia.

Q    Ms. Solovyeva, isn't it true that you were involved in some illegal activity in Russia?

A    Not that I recall.  What do you mean?  What do you mean by that?

Q    Isn't it true that you registered an illegal enterprise in Russia and that people were looking for you because of that?

A    The enterprise that was registered in our company, the companies that were registered, they were registered through our company, and everyone who has taken part in the company, they were undergoing interviews; they had to be interviewed.

Q    Ma'am, the question I'm asking you is whether or not you had an understanding that someone in Russia was looking for you because you had been involved in an illegal enterprise.

A    To my knowledge, my mother had told me that someone was looking for me, whether someone -- the representatives from the customs or whatnot, they were looking for me in order to ask me questions about some enterprise, the enterprise that was registered by our company.

Q    And this was an illegal enterprise, correct?

A    As it turned out, and I found out through my girl friends,

**DRAFT COPY**

Solovyeva - Cross / By Ms. Chahin                75

that there were false documents there.

Q    And was it your understanding that the authorities wanted

to question you in regards to those false documents?

A    No.  From my understanding they wanted to ask me who had

come to register the papers.  They wanted to get the

information about the people who wanted to register the

enterprises.

Q    They wanted to talk to you about the enterprise, correct?

A    Yes.  They were asking questions from everyone who was at

that time in our company at the moment of the registration of

the company.

Q    And isn't it true that you told your mother not to give

out any of your personal information so that no one would

contact you about that illegal enterprise?

A    The truth was that as soon as I learned about it from my

mother I was not going to hide my whereabouts.  I shared this

information with Kadamovas telling him that someone was looking

for me there because they wanted to talk to me.  And Kadamovas

told me:  Oh, no, that's not good; you'd rather not give any

contact information.  In other words, don't give any telephone

or anything.  That's why I didn't give my mother anything.

Q    Ma'am, isn't it true that you were keeping a diary during

this period of time wherein you wrote information about not

wanting to give anyone your contact information because of your

involvement in this illegal enterprise?

**DRAFT COPY**

Solovyeva - Cross / By Ms. Chahin                76

A     I don't remember to have said that.  I remember that as Kadamovas told me that I was not to give my contact information to anyone, and I was not going to give anything to anyone. This is what I remember.

          MS. CHAHIN:  If I could have one moment, your Honor.

     (Pause)

BY MS. CHAHIN:

Q     When you were living with Mr. Kadamovas, did you call people in Russia?

A     Yes.

Q     Did you talk to a woman by the name of Natasha Rosicknova (phonetic) regarding the fact that you were being sought because of your involvement in an illegal enterprise?

A     Rosicknova regarding the fact that you were wanted in Russia; I did talk to her many times.  And we spoke about that enterprise about who was asking the questions and who wanted to speak.  But I don't remember exactly.  No, I don't remember.

Q     Did you have the conversation with Ms. Rosicknova that you've described?

A     Yes, we did; several conversations, several times.  And that was not about -- that was about all kinds of news not only.

Q     Well, in addition to talking about the news, did she talk to you about the fact that they were looking for you because of an illegal enterprise?

**DRAFT COPY**

Solovyeva - Cross / By Ms. Chahin                77

A    They also asked about me.  Yes.  They asked everyone.

Q    Did she tell you that there had been phone calls to your home in Russia by the custom agents because of this?

A    Yes.  That someone did make a call to my mother regarding an illegal enterprise in Russia that was registered by our company.

Q    And you told her not to give them any of your contact information, correct?

A    Most likely yes.  After I had spoken to Juri (phonetic), I didn't give anyone my contact information.

Q    Ms. Solovyeva, you did not want to return to Russia; is that correct?

A    At first I did want.

Q    When did you want to return to Russia?

A    When I renewed my tourist visa for half a year, I planned to stay only for another six months and then to go back in order to make money for the tickets and to be able to go back. But later when I began living together with Juri -- I mean later when we were developing our relationship and began making plans to have a family, I was not planning.  I was planning to have a family and to have a child and stay here.

Q    Well, isn't true that one of the reasons you didn't want to go back was because you had learned that you are being sought regarding this illegal enterprise?

A    No.

**DRAFT COPY**

Solovyeva - Cross / By Ms. Chahin           78

Q    Ms. Solovyeva, once you were in this country and made a decision that you wanted to remain here, did you undertake any efforts to try to regain status in this country?

A    Yes.

Q    What did you do?

A    Whatever I could do.  Mainly, I completely relied on Jurijus Kadamovas.  Actually, he was the first one who suggested that he would do a student visa for me.  After I had tried to preserve the student visa myself and at that time we didn't have enough money, he told me, "Don't worry.  I'll arrange a student visa for you."

Q    Prior to meeting Mr. Kadamovas, you had already made some efforts on your own to obtain a student visa; isn't that right?

A    No.  Not before I met him.

Q    Had you already met him -- let me rephrase that.  Prior to moving in with him, had you ever made any efforts on your own to obtain a student visa?

A    Yes.  But it was approximately in November '99.  When my tourist visa almost expired, I was making attempts to obtain a student visa.

Q    And were you making attempts to obtain a student visa legally or were you making attempts to obtain a student visa fraudulently?

A    From what I understood at that moment, it was legal, legally.  And I even went to an attorney's office or she was a

**DRAFT COPY**

Solovyeva - Cross / By Ms. Chahin          79

paralegal that I would be studying at a college.  I had to pay some amount of money.  I don't remember what to begin with. This is what I remember.

Q    Where were you going to be studying?

A    I don't remember.  Either it was LA College or -- I don't remember.

Q    What was the name of the attorney?

A    I don't remember.

Q    What was going to be your course of study?

A    She didn't tell me anything.  She asked me what I graduated from.

Q    So the attorney was going to tell you what you were going to be steadying; is that how it was going to work?

A    At first from what I understood, I was supposed to pay for her services so that she would find a college for me and to start arranging everything for the student visa.  That's why we didn't discuss any courses that I was going to --

No.  I don't remember anything.  I don't remember.

Q    How much did you pay for that?

A    I didn't pay, because we didn't have money.

Q    I believe that you were referring to a period of time in November of 1999.

When you say, "We didn't have money," who are you referring to?

A    Kadamovas and myself.

**DRAFT COPY**

Solovyeva - Cross / By Ms. Chahin                80

Q    And did you make any efforts to procure a fake diploma to assist you in your efforts to obtain a student visa here?

A    Yes.  It was later.

Q    When was that?

A    Approximately at the beginning of 2001, if I remember correctly.

Q    Did you call your relatives in Russia and ask them to obtain a false diploma for you?

A    Yes.  I called them to find out whether it would be possible to arrange a diploma from Russia.

Q    And did they obtain that?  Had you graduated from university or from a school in Russia?

A    I graduated from high school and three years of the university.  But I have not graduated from the university.

Q    Well, the diploma that you were going to purchase in Russia was a fraudulent diploma; isn't that correct?

A    Yes.

Q    Now, I believe that you've indicated that you had received Medical in this country; is that right?

A    Yes.  I did receive it for the baby, for giving the birth, for labor.

Q    And at some point, did you become concerned that because you had received Medical that might affect your ability to obtain status in this country?

A    My concern was related to the information that I gave

**DRAFT COPY**

Solovyeva - Cross / By Ms. Chahin                81

there concerning the father.  That was a lie.  Because Kadamovas didn't want me to mention his name and to put his name as the father.  And that's why I was concerned, because I knew that there was wrong information there.

Q    And at some point, did you call an acquaintance of yours and ask her if she could erase all of the information that you had supplied from the government computers?

A    At that time, I did not speak English, and a friend of mine was helping me.  When I went to purge those documents either from Medical or welfare -- I don't remember exactly now -- again, there was wrong information concerning the father. And when something to the effect that either when I told Juri or he told me that I was not supposed to go there or to say that, because I also mentioned something about the Social Security that at that time was not valid.

        I mean at that time, there was some information that was wrong, and I had a reservation.  I didn't want to get any programs.  I changed my mind, and I asked my girlfriend to call them and to tell them that I changed my mind and that I didn't want any programs and that I asked them to erase me from the computer.

Q    So you had provided false information in order to get government benefits, correct?

A    Yes.

Q    Okay.  And in regard to some schooling that you were

**DRAFT COPY**

Solovyeva - Cross / By Ms. Chahin            82

obtaining, did you also provide any false information to obtain

schooling in this country?

A    The student visa that Kadamovas arranged through a friend

of his.  They did something there.  I don't know what.  I know

that everything was there illegal.  I mean not illegal, but it

was fiction.  I mean at that time when they were processing the

papers, I was in the computer.  And then -- I don't know.  I

don't know the details.

Q    Did you take English classes?

A    Yes, I did.

Q    Okay.  Did you register at the school under a false name?

A    No.  I gave them my name.

Q    Okay.  What was the school called?

A    Oh, I don't remember.  It was -- I went to an American

school.  And, also, there was an Armenian school.  I don't

remember the name.

Q    At some period of time, did you find out that your efforts

to obtain a student visa were not going to be successful?

A    That's correct.  All that was illegal and all that was

wrong.

Q    Did you sometime later file for political asylum?

A    Yes.

Q    When was that?

A    It was at the beginning of 2001.  I don't remember the

month exactly, either March or April.  It was -- I don't

**DRAFT COPY**

Solovyeva - Cross / By Ms. Chahin                    83

remember.  Kadamovas and I went there.  I don't remember when.

Q    Okay.  What efforts did you undertake in order to -- let me withdraw that.

Were the representations that you made in your political asylum application true?

A    The people who put together the whole story, it was wrong.  And I signed what they wrote there.

Q    When you're referring to the people who put the story together; who are you referring to?

A    Sergay (phonetic) and Ganya (phonetic).  I don't know their last names.

Q    And as you understood it, what was the process that you had to go through in order to obtain political asylum in this country?

A    From what I understood, they were supposed to write a story to submit this story to INS.  I was supposed to go to the interview.  And then there will be the results.

Q    And who prepared the story?

A    Ganya and Sergay.

Q    And how was that story prepared?  In writing?  Or how was that story prepared?

A    It was both, orally and in writing.

Q    And what meetings did you have with Sergay and Ganya in preparation of you're being interviewed at the political asylum interview?

**DRAFT COPY**

Solovyeva - Cross / By Ms. Chahin          84

A    I met with them.  They told me, and we discussed that when we went to the interview what was it that I was supposed to say and how I was supposed to act.

Q    And what did they tell you about that?

A    Whatever they wrote, whatever they prepared me.  I mean the story that they wrote.

Q    So did they write the story, or did you write the story?

A    They did.

Q    And did you go to a political asylum interview?

A    Yes.

Q    Were you placed under oath?

A    Yes.

Q    Were you instructed that any statements, false statements that you could made would subject you to the penalty of perjury?

A    Yes.  I worried about that.  I knew about it.  And Kadamovas tell me.  "Don't worry.  That's all right."  And the same, Ganya and Sergay they also calmed me down.

Q    Did you provide false testimony at that interview?

A    Yes.

Q    What did you tell -- let me withdraw that.

     Was your political asylum application approved?

A    Yes.

Q    Okay.  What did you tell the officer about your need to remain in this country that enabled you to gain a status as a

**DRAFT COPY**

Solovyeva - Cross / By Ms. Chahin                85

refugee in this country for political asylum?

A    I don't remember the story exactly now.  I don't remember exactly, but I remember that we were refugees that we were under threat of danger or harm either in Armenia or Azerbaijan, supposedly the whole family, my husband, myself, and the baby and that we were seeking asylum in America.

Q    When you're referring to the baby, are you referring to Anastasia?

A    Yes.  At that moment, yes.

Q    So were you testifying that Anastasia was in fact born in a country other than the United States?

A    No.  Nasta (phonetic) was born in the United States.  But according to the documents, they wanted kind of her to be born in Russia.  They said that the story would be much better this way.

Q    So did you testify and present evidence at that hearing that Nastia (phonetic) was born in Russia?

A    Yes.  Yes, I told them everything according to this story. And if I had forgotten anything, I was supposed to continue talking and she was supposed to translate the way it had to be presented there.

Q    And that interview was that before a judge or was that before a hearing officer?

A    No.  From what I remember when, it was an officer, a hearing officer.

**DRAFT COPY**

Solovyeva - Cross / By Ms. Chahin                    86

Q    Did you describe to that officer the persecution that you
were suffering as a result of your husband being a Chechen
national?

A    Yes.  As I told you, I don't remember the details.  But
the gist of the story was that, yes, we were seeking asylum,
because we were persecuted.

Q    How long did the interview take?

A    I don't remember.

Q    How much detail did you provide to the hearing officer
regarding the level and instances of persecution which you
suffered?

A    Whatever was in the story, whatever was written.

Q    Well, you were there at the interview, correct?

A    Yes.

Q    And you prepared for the interview?

A    Yes.

Q    Because you understood that it was going to be important
for you to be convincing to this officer in order for your
asylum application to be granted; isn't that right?

A    Yes.  I did speak whatever had to be said.

Q    Okay.  And you knew it was important for you to be
convincing in the lies that you were telling them so that your
political asylum application would be granted, correct?

A    I said whatever was written in the story.

Q    Did you know that those things were not true that you were

**DRAFT COPY**

Solovyeva - Cross / By Ms. Chahin                87

saying?

A     Yes.  And that bothered me greatly inside.

Q     Did you know that Nastia was not born in Russia?

A     Yes.

Q     Did you know that you were not work not Azerie or from Azerbaijan?

A     Yes.

Q     And you testified to those things under oath; isn't that true?

A     Yes.

Q     In fact, you made -- you did extensive research so that you be prepared for that interview; isn't that true?

A     Whatever Sergay and Ganya provided me with when I met with them.

Q     Did they provide you with articles about Azerbaijan?

A     They gave me a lot of information.  I don't remember which.

Q     Did they provide you with maps of Azerbaijan?

A     Yes.

Q     Did they provide you with information regarding the history of the country?

A     Yes.

Q     Did they provide you information regarding the types of discrimination that people suffered in those countries?

A     Yes.  They told me the stories of what was happening

**DRAFT COPY**

Solovyeva - Cross / By Ms. Chahin          88

there.

Q    And you studied that information?

A    I read.  I was unable to memorize everything.  That's why Ganya was there to back me up so that in case I say something wrong or incorrect she would be able to fix it.

Q    Well, you've wanted to be as prepared as you could so that your application would be granted; isn't that correct?

A    Yes.

Q    And, in fact, your application was granted; is that true?

A    For the political asylum, yes.

Q    Okay.  So despite the fact that all of the information that you gave the officers were lies, he made a finding that you were credible; is that true?

A    Correct.

Q    Do you recall approximately when your political asylum application was granted?

A    I do not recall exactly.  Approximately in September or October 2001.

Q    And that political asylum application finally provided you the legal status in this country that you'd been trying to obtain, correct?

A    From what I understand after that, after receiving the political asylum status in this country.

Q    And that was based on false information?

A    Correct.

**DRAFT COPY**

Solovyeva - Cross / By Ms. Chahin                89

Q    Okay.  I'd like to ask you some questions now moving forward in time to the point in time when Mr. Kadamovas was arrested.

Do you recall approximately when that occurred?

A    He was arrested on February 19th, 2002.

Q    Were you present when he was rested?

A    Yes.

Q    Okay.  Was there a search warrant executed at that time?

A    Yes.

Q    And were you able to observe whether or not the FBI seized certain items of evidence at that time?

A    Not everything, but some things I had observed.  And other things were already on the list.

Q    Was Nastia in the house at the time that he was arrested?

A    Yes.

Q    How long were the agents there on the day of the arrest?

A    Again, approximately, from 4:00 a.m. until 10:00 or 11:00. I do not remember exactly.

Q    Okay.  When you say 10:00 or 11:00 are you referring to 10:00 or 11:00 in the morning or 10:00 or 11:00 at night?

A    A.m., morning.

Q    Okay.  At any point while the agents were there, did they handcuff you?

A    No.

Q    Okay.  While the agents remained there, what were you and

**DRAFT COPY**

Solovyeva - Cross / By Ms. Chahin          90

Nastia doing?

A    The agents interviewed me, and Nastia was around.

Q    Okay.  Was this the first time that you were interviewed?

A    Yes.

Q    And were you able to observe whether the agents observed any CD ROMs containing photographs?

          MS. DeWITT:  Objection.  Calls for speculation.

          THE COURT:  Sustained.

BY MS. CHAHIN:

Q    Do you know if any CD ROMs were confiscated at that time?

A    I know that -- no, I don't recall.  Most likely I do not remember.

Q    So you don't remember; is that your testimony?

A    I do not remember.  Perhaps or perhaps not, I do not remember.

Q    Now, at the time that the agents arrested Mr. Kadamovas, did they confiscate your vehicles?

A    Yes, two vehicles.

Q    And were your financial accounts frozen?

A    Not at once.  After about a week.

Q    That time you were not working, correct?

A    Correct.

Q    Okay.  Did you have any means of supporting yourself at that time?

A    Kadamovas was supporting me.

**DRAFT COPY**

Solovyeva - Cross / By Ms. Chahin                    91

Q    After his arrest, did you have any way to support yourself?

A    The money that I was able to take out of the account was the money used to support myself.

Q    So once he was arrested, you became concerned about your ability to continue to support yourself; is that correct?

A    Yes.  And where to get the money to hire an attorney for Kadamovas.

Q    Okay.  At that time when he was arrested, were you able to speak English?

A    No.  A few words, "Hi," "bye."  I would say that I was unable to speak English at that time at all.

Q    And I believe you indicated that you were trying to withdraw money from various credit cards after his arrest; is that correct?

A    Yes.  From his credit cards and mine.

Q    And you were doing everything in your power to locate money that could be used to support yourself and to pay for attorneys; is that right?

A    Yes.  Kadamovas said that I should get $300 a day from the accounts.

Q    And you did that?

A    Yes.

Q    Okay.  Now, I believe you indicated that on the day of the arrest, the officers interviewed you; is that right?

**DRAFT COPY**

Solovyeva - Cross / By Ms. Chahin                92

I'm sorry.  Let me withdraw that.

On the day of Mr. Kadamovas' arrest the agents interviewed you?

A    Yes.  The FBI agents had interviewed me.

Q    And did they ask you about your status in this country?

A    Yes.

Q    What did you tell them?

A    I don't remember exactly what I said.  I don't remember.

Q    Did you tell them if you were here illegally?

A    I don't remember.  I remember when I was interviewed in first time, I was frightened.  I don't remember what I said.

Q    Do you have any recollection of them asking for your green card or any papers regarding your status in this country?

A    Yes.  They asked for a passport and a driver's license.

Q    And did you provide them with any information in regard to your political asylum application?

A    When the search was done at the apartment, they found a paper stating that I went through the political asylum interview.  I remember this.

Q    Did they ask you about that paper?

A    I do not remember whether they had asked me about this paper or I offered the information myself.  I don't remember.  But they asked me.  I don't remember at this time.

Q    By the time the interview was concluded, had you conveyed to the agents that the information in your political asylum

DRAFT COPY

Solovyeva - Cross / By Ms. Chahin          93

application was false?

A    I don't remember.  Most likely, it was when they arrested me, at that time.  I don't remember exactly.

Q    At what time are you referring to?

A    When they arrested me on March 4th, when the INS arrested me.

Q    So on the date of Mr. Kadamovas' arrest, you don't recall whether or not you told the agents that you had provided false information in regard to your political asylum application; is that correct?

A    I do not remember.  I do not remember whether I gave that information at the time when Kadamovas was arrested.

Q    Did the agents talk to you at that time about being deported from this country?

A    I don't remember.

Q    Okay.  When was the next time that you recall speaking to either an INS agent or an FBI agent?

A    The next time was one week later I spoke with the FBI agents.  And then the time after that was at the moment of my arrest.

Q    Okay.  In regards to the initial interview, do you know the name of the agent you spoke to?

A    The woman's name was Jeanette George.  It's hard for me to say her last name.

Q    Okay.  The agent's name was Janet?

Solovyeva - Cross / By Ms. Chahin          94

And you believe there was another agent named George?

A    Yes.  No.  There was Jeanette, and her last name was George.  And I do not remember the second Agent.

Q    Okay.  And it was your understanding that she was an agent with the FBI?

A    Yes.  That's what she said.

THE COURT:  All right.  Let's take our afternoon recess.  Approximately 10 minutes.

(Jury exits at 2:50 p.m.)

(Recess taken from 2:50 p.m. to 3:03 p.m.; parties present)

(Outside the presence of the jury)

THE CLERK:  Please remain seated and come to order. This United States District Court is again in session; the Honorable Dickran Tevrizian presiding.

THE COURT:  All right.  Outside the presence of the jury.  The record will indicate all parties and counsel are present.

Anything any counsel wishes to bring up?

MR. CALLAHAN:  No, your Honor.

MS. CHAHIN:  No, thank you.

THE COURT:  How long will you be, Ms. Chahin?

MS. CHAHIN:  I'm going to finish, your Honor, but I can't guarantee it.

THE COURT:  Okay.  Let's bring the jury out.  Are you

**DRAFT COPY**

Solovyeva - Cross / By Ms. Chahin          95

going to be using the overhead anymore?

          MS. CHAHIN:  I may, your Honor; I'm just not

certain -- depending upon --

     **(Jurors enter courtroom at 3:04 p.m.)**

          THE COURT:  All right.  The record will indicate all

jurors are present, all counsel and parties are present.

You're still under oath.  Please state your name for the

record.

          THE WITNESS:  Natalya Solovyeva.

               **CROSS EXAMINATION (CONTINUED)**

**BY MS. CHAHIN:**

Q    Ms. Solovyeva, I had a couple of follow up questions

regarding the asylum application; can you tell us the date of

your interview?

A    I don't remember exactly the date but it was somewhere in

September 2001.

Q    Where did the interview take place?

A    In San Francisco.

Q    Did you travel to San Francisco for purposes of the

interview?

A    Yes.

Q    Now in your asylum application you did not represent your

correct address; is that true?

A    That's correct.

Q    And can you tell us in what city your asylum application

**DRAFT COPY**

Solovyeva - Cross / By Ms. Chahin          96

indicated that you lived?

          THE INTERPRETER:  Just one second.  Could you please repeat the question?

BY MS. CHAHIN:

Q    Can you tell us in what city your asylum application said that you lived?

A    I don't remember maybe in Fresno.  I don't remember.

Q    For purposes of your asylum application were you required to obtain a physical address in the location that you identified in the application?

A    From what I know, yes.

Q    And do you recall having made any telephone calls to the Fresno area in connection with your asylum application or obtaining a place to live?

A    I don't remember to have made any calls there.  And as I have already said the address was given to me by Ganya (phonetic) and Sergai (phonetic).  They found some people there.  They wrote down the address.  I practically now don't remember what was written there.

Q    Ma'am, my question was whether or not you recalled making any telephone calls to the Fresno area in connection with that application.

A    I don't remember.  I don't remember.  I don't know.

Q    In regard to the date of Mr. Kadamovas' arrest when a search was performed at your apartment, were you provided with

**DRAFT COPY**

Solovyeva - Cross / By Ms. Chahin                97

a list of the items that were seized from that location?

A     Yes, there was a list.

Q     Was that list given to you?

A     Yeah, I think so, maybe.  I think they put it somewhere on the table and then they left.  Yes.

Q     Was one of the items seized on that date a digital camera?

A     I don't remember that.  There was something in our car, but I don't remember.  I don't remember.

Q     Ma'am, in regard to your various interviews with the law enforcement authorities, I believe you indicated that the next interview you had after Mr. Kadamovas' arrest was approximately a week later; is that correct?

A     Yes, either on 26th or the 27th.  It seems to me it was on the 26th; I don't remember exactly.

Q     And when you say, "The 26th" of what month and of what year?

A     February 2002.

Q     Can you describe the circumstances that led to that interview?

A     FBI agents came to my apartment and -- and they told me that they wanted to talk to me regarding Kadamovas and about my involvement and about whatever I knew about the crime.

Q     And did you agree to talk to them?

A     Yes.

Q     Who were the FBI agents that you spoke to on that day?

**DRAFT COPY**

Solovyeva - Cross / By Ms. Chahin                98

            **THE INTERPRETER:**  Excuse me?

**BY MS. CHAHIN:**

Q    Who were the FBI agents, if you know, that you spoke to on that day?

A    Again, it was the same woman, Jeanette, the same interpreter and the second agent.  Actually there were several of them.  I don't remember, two or three.

Q    Where did that interview take place?

A    When they came the beginning of the interview took place in their apartment on Linley Avenue and then we went outside into their car.

Q    I'm sorry; into their car?

A    Yes.

Q    Okay.  Where was Nastasia during this interview?

A    Nastasia was at home with Marina.

Q    Okay.  When you refer to it, "Home," are you referring to the Linley apartment?

A    Yes.

Q    Okay.  Approximately how long did that interview last?

A    I don't remember, an hour maybe less, maybe more.  Most likely less, but I don't remember exactly.

Q    During that interview did you talk to the agents about your INS status in this country?

A    I don't remember.

Q    Did you talk to them about whether or not it was your fear

**DRAFT COPY**

Solovyeva - Cross / By Ms. Chahin          99

to be deported from this country?

A     I might have mentioned it.  I don't remember exactly whether it was during that interview or during the interview when I was arrested.

Q     Ms. Solovyeva, I believe that you've indicated that now you're able to read English; is that correct?

A     Yes.

Q     Do you think it would refresh your recollection as to whether or not you told the agents on February 26th of 2002 whether you feared deportation and about your INS status if I were to show you a document regarding that interview?

A     Yes, please show it me.

        MS. CHAHIN:  Your Honor, I'm going to mark this document as Defense Exhibit -- I believe it's 2043.  I have a couple of other items that I've pre-marked.

        THE COURT:  You're not going to seek to introduce this are you?

        MS. CHAHIN:  I'm not, your Honor.  I'm just going to use it to refresh her recollection.

        THE COURT:  All right.  You don't really need it for identification other than the date.

        MS. CHAHIN:  Very well, your Honor.

        THE COURT:  So you don't have to put a number on it.

        MS. CHAHIN:  Thank you, your Honor.  Your Honor, if I may approach?

**DRAFT COPY**

Solovyeva - Cross / By Ms. Chahin          100

THE COURT:  You may.  This is 602?

MS. CHAHIN:  This is 302, your Honor.

THE COURT:  302, all right.  And the date?

MS. CHAHIN:  Yes, it's February 26th, 2002.

THE COURT:  Read that to yourself, please.

(Pause)

THE WITNESS:  I have read it.

BY MS. CHAHIN:

Q    Ms. Solovyeva, after reading this document, does it refresh your recollection as to whether or not on February 26th, 2002 you told the agents who interviewed you that you were worried about your INS status and you feared deportation?

A    As I have already mentioned that during the first and the second interview with FBI agents I didn't say everything or I lied regarding deportation.  I could have said that Kadamovas told me that I had to leave the country immediately or -- I don't remember exactly.

Q    Ma'am, the question I'm asking you is whether or not when you were interviewed by the FBI on February 26th of 2002 you told them that you feared deportation and you were worried about your INS status in this country.

A    I might have told him.  Most likely I told them that I was afraid because of my status, but I don't remember what exactly I told them at that time.

Q    As you sit here today is it your testimony that you don't

**DRAFT COPY**

Solovyeva - Cross / By Ms. Chahin            101

recall them that you were worried about your INS status and you feared your deportation?

MS. DeWITT:  Objection, asked and answered, your Honor.

THE COURT:  It was asked and answered but I'll permit it one more time.

THE WITNESS:  As I -- as I have already mentioned I was afraid because of my immigration status.  I do not remember whether I told them or didn't tell them about the deportation. Also, I was preparing -- I was in the process of preparing the documents for the child to be able to leave the country because Kadamovas told me to leave the country.

BY MS. CHAHIN:

Q    Ms. Solovyeva, you had gone to great efforts to obtain your status in this country; isn't that right?

THE INTERPRETER:  Say it again please.

BY MS. CHAHIN:

Q    You had gone to great efforts to obtain your status in this country.

A    With Kadamovas, yes, whatever Kadamovas wanted, yes, I did.  I wanted very much to stay in this country, so that we --

Q    Ms. Solovyeva -- I'm sorry; are you finished?

A    Yes.

Q    Ms. Solovyeva, it was you who testified under oath to obtain your status here, correct, not Mr. Kadamovas?

**DRAFT COPY**

Solovyeva - Cross / By Ms. Chahin          102

THE COURT:  Wait, that's an argumentative question.

MS. CHAHIN:  Okay.  I'll withdraw it.

BY MS. CHAHIN:

Q    Did you testify under oath falsely to obtain your status in this country?

A    Yes.

Q    Did you learn the history of Azra Bizan (phonetic) and the topographical -- did you learn the history of Azra Bizan in order to obtain your status in this country?

A    I read the information that was provided to me by Ganay and Sergei.

Q    And you learned it, didn't you?

A    I was unable to memorize everything by heart.  I did remember something but there were things that I didn't remember, yes.

Q    The officer you testified falsely to believed you; isn't that true?

THE COURT:  This has all been asked and answered.

MS. CHAHIN:  Very well, your Honor.  We'll move on.

BY MS. CHAHIN:

Q    When you spoke to the officers on February 26th is it fair to say that you did not want to be deported from this country?

A    I was confused at that moment and I don't remember what I said.  I don't remember what was true and what was not true.

Q    Okay.  You don't remember what statements you said were

**DRAFT COPY**

Solovyeva - Cross / By Ms. Chahin          103

true and what statements you said on that date that were not true; is that -- is that -- if I understand you correctly; is that what you're saying?

A    At this moment it is difficult for me to remember what in particular was discussed at that interview.

Q    When was the next interview that you had with the FBI after February 26th of 2002?

A    The next interview took place on the 11th of April 2002.

Q    What date were you arrested?

A    The fourth of March.

Q    Did you give an interview on the date you were arrested?

A    Yes, to INS agents.

Q    Did the INS agents -- tell us about the circumstances of your arrest, if you could?

A    INS agent with an interpreter, I don't remember whether there were two or three agents, INS agents -- and also FBI agent Jeanette who was taking care of the child and who was organizing with the social service to come and to take care of the child.

Q    What time did the arrest occur; if you recall?

        THE INTERPRETER:  Interpreter needs to clarify something, your Honor.

        THE COURT:  Please.

        THE WITNESS:  It was around 2:00 or 3:00 o'clock because the child was sleeping.

**DRAFT COPY**

Solovyeva - Cross / By Ms. Chahin          104

THE COURT:  2:00 and 3:00 o'clock in the afternoon or in the morning?

THE WITNESS:  It was 2:00 or 3:00 p.m. or 4:00.  I don't remember; it was late afternoon.

BY MS. CHAHIN:

Q    Were you and the child the only two people present in the house at the time of the arrest?

A    When they entered at that moment there was just the two of us, but then a few minutes later Marina came.

Q    When the agents entered were you handcuffed?

A    Yes.

THE COURT:  Let me interrupt a minute.  What charges were you arrested on?  Were you arrested for the charges in this case or were you arrested for INS issues?

THE WITNESS:  INS violation.

BY MS. CHAHIN:

Q    And where was the child -- at some point you were handcuffed, correct?

A    Yes.

Q    Okay.  And where was Anastasia when you were handcuffed?

A    She was in her room having a nap.

Q    And how did -- did the agents interview you there at that location or did they interview you somewhere else?

A    At the moment of the arrest, yes.  They asked me questions but it was very quick.  It was about 15 or 20 minutes.

**DRAFT COPY**

Solovyeva - Cross / By Ms. Chahin                105

Q    And did they ask you questions at some point later that day?

A    I don't remember whether it was the same day or the following day.

Q    And did they ask you questions about your INS status or did they ask you questions about Mr. Kadamovas?

A    INS.

Q    Okay.  And did they talk to you about whether or not you had any information pertaining to any of Mr. Kadamovas' activities?

A    I don't remember.  I don't think so.

Q    Okay.  Did they ever tell you that they wanted your assistance?

A    No.  No, not at that moment.

Q    Did they tell you that they wanted your assistance at some moment later?

        MS. DeWITT:  I'm going to object to "They" as vague.

        THE COURT:  I'm going to sustain an objection.

BY MS. CHAHIN:

Q    At what point after -- you've indicated at the moment of your arrest they did not want your assistance; is that correct, or they did not ask for your assistance?

A    No one mentioned anything about help or assistance at the moment of my arrest.

        THE COURT:  And we're talking about the INS arrest

**DRAFT COPY**

Solovyeva - Cross / By Ms. Chahin          106

and not the arrest on these charges; is that correct?

THE WITNESS:  That's correct.

THE COURT:  Were you subsequently arrested for the charges in this case?

THE WITNESS:  Yes, a few months later.

THE COURT:  And what was the arresting agency at that time?

THE WITNESS:  FBI agents came to INS for me.

THE COURT:  All right.

BY MS. CHAHIN:

Q    On the date that you were arrested by the INS agents was there also an FBI agent present?

A    Yes.

Q    Okay.  Did that agent speak to you about your wanting to talk to you about -- obtain your assistance in regard to this case?

A    No.

Q    Okay.  Did the FBI agents threaten you in any manner?

A    No.

Q    Okay.  Did they threaten to deport you?

A    I don't remember.  I don't think so.  I don't remember.  I don't think so.

Q    Did they make any statements to you about taking Anastasia away from you?

A    Yes.  I asked them what they were going to do with the

**DRAFT COPY**

Solovyeva - Cross / By Ms. Chahin          107

child and they told me they were going to take the child to

social services.  At first they asked me whether I had anyone

who could be taking care of her and I said I didn't have any

relatives there and then they said they would take her to the

social services.

          **THE COURT:**  Whoever has a phone on it's making music;

it better go off.

**BY MS. CHAHIN:**

Q    I'm sorry; could you repeat that answer?  No?

          **THE INTERPRETER:**  Yes, I can.

          **THE WITNESS:**  They asked me whether I had anyone to

take care of Anastasia and I told them that I didn't have any

relatives and then they told me that they were -- they would

take the child to social services.

Q    Was there some period of time after that you were arrested

that you did know where Anastasia was?

A    Yes.  The first days I didn't know where she was, with

whom in what kind of home.

Q    Now, Ms. Solovyeva, you -- you are aware that there were

certain telephone conversations after you were arrested that

were recorded; is that correct?

A    Yes.

Q    Okay.  Do you recall having any conversations with persons

after -- let me withdraw that.

          You also had conversations with both Mr. Mikhel and

**DRAFT COPY**

Solovyeva - Cross / By Ms. Chahin          108

Mr. Kadamovas after they were arrested; isn't that true?

A     Yes.  It was before I was arrested, yes.

Q     Yes, before you were arrested you spoke with both Mr. Mikhel and Mr. Kadamovas, correct?

A     Yes.  They called to Linley apartment because Marina was also living there.

Q     I'm sorry; go ahead.

A     No, I'm sorry.

Q     Okay.  And did you also become aware at some point that there was a wiretap in place recording the conversations that were made to and from various telephone -- telephones?

A     Our home telephone?

Q     Yes, your home telephone.

A     I didn't know I could guess that it was, but I didn't know for sure.  Marina and I could -- could be joking or talking to each other that it was dangerous to speak because there could be wiretaps there, but I don't know.

Q     Well, in fact, didn't you tell certain people during phone calls that you would receive at the Linley apartment that everything you said was being recorded?

A     I don't remember.

Q     I know that when Kadamovas called from the jail those conversations were recorded, other than that, I don't remember.

Q     In regard to any conversations that you may have had with Mr. Kadamovas did you have a conversation with him wherein you

**DRAFT COPY**

Solovyeva - Cross / By Ms. Chahin                    109

told him that the FBI was frightening you?

THE INTERPRETER:  What agency you mentioned?

MS. CHAHIN:  The FBI.

THE COURT:  FBI.

THE WITNESS:  I don't remember.  I don't remember.

BY MS. CHAHIN:

Q    Would it refresh your recollection if you were able to review a summary of that -- of a conversation?

A    Yes.  I would like to review it.

MS. CHAHIN:  If I could have a moment, your Honor?  May I approach, your Honor?

THE COURT:  Show it to the government so they know what point of reference you're working from.  Read it to yourself, please.

THE WITNESS:  Okay.

BY MS. CHAHIN:

Q    Ms. Solovyeva, having read that does that refresh your recollection as to whether on February 27th of 2002 you had a conversation with Mr. Kadamovas wherein you told him that the FBI is frightening you?

A    I don't remember in what context I said that.  Maybe I have mentioned it in the context that I was afraid to talk to him, that I was afraid to talk to FBI agents or whether that when they came on the 26th they told me that they wanted to help me that all those people they only want to harm me meaning

DRAFT COPY

Solovyeva - Cross / By Ms. Chahin          110

that they were pressuring me but I don't remember in what context I said that.

Q    So your reference to -- you referred to an incident on February 26th where you indicated someone was telling you they wanted to help you; is that correct?

A    FBI agents mentioned that Marina didn't want to help me or something of the kind and that they did want to help me.

Q    So the FBI agents told you that they wanted to help you; is that correct?

A    From what I remember, yes.  Yes.

Q    So do you recall what you were referring to in this conversation about -- let me withdraw that.

         So is it your recollection that you did not tell Mr. Kadamovas that the FBI was frightening you in a conversation you had on February 27th, 2002?

A    I don't remember what the context was, but I remember that the conversations with FBI were unpleasant and I was afraid of the conversations.

Q    And specifically, are you referring to the conversation on the 26th or some other conversation?

A    26th.

         THE COURT:  That's of February?

         MS. CHAHIN:  Yes, your Honor.

//

//

**DRAFT COPY**

Solovyeva - Cross / By Ms. Chahin            111

**BY MS. CHAHIN:**

Q    Now the date of your arrest on INS charges was the 4th of March of 2002; is that correct?

A    Yes.

Q    Do you recall on that date telling Marina that you did not want to go back to Khabarovsk (phonetic), that you left three years ago and that you could not go back?

A    Actually, it was the opposite.  I was going to leave and I was -- because Kadamovas told me to leave and I was preparing the documents.  And I might have mentioned that because my child was an American I wanted to stay in America.  I might have told her that I didn't want to go Khabarovsk.

Q    Ma'am, my question is whether on the date of your arrest you had a conversation with Marina Kharakadina (phonetic) when you told her that you didn't want to go back, that you left three years ago and you cannot go back.

A    I don't remember this conversation.  First of all, after I was arrested Marina came later.  And actually, they wouldn't let me talk to her.  I -- only about the baby -- I -- I don't remember.  I don't know.

Q    Ms. Solovyeva, would it refresh your recollection as to whether or not you ever had such as conversation if I were to show you a document?

A    Yes, please show it to me.

              **MS. CHAHIN:**  If I can have one moment, your Honor?

**DRAFT COPY**

Solovyeva - Cross / By Ms. Chahin          112

May I approach, your Honor?

     **THE COURT:**  Certainly.

**BY MS. CHAHIN:**

Q    Ms. Solovyeva, if you could please review this document and if I could direct your attention to the second page the third paragraph?

     **(Pause)**

     **THE WITNESS:**  Okay, I've read it.

**BY MS. CHAHIN:**

Q    Ma'am, having reviewed this document does it refresh your recollection as to whether or not on the 4th of March of 2002 you had a conversation with Marina Kharakadina in which you told her that you didn't not want to go back to Khabarovsk and that you left three years and were not going to go back -- could not go back?

A    I have looked through it and again I do not remember in what context I mentioned it and what about we talked -- I mean I don't remember.  I know that I didn't want to go back to Russia because my child is American, but on the other hand, I was going to go back to Russia, so I didn't see any problems in going back to Russia.  I just didn't want to because my child is American.

Q    Ma'am, my question to you is whether or not on the day of your arrest you recall making this statement to Marina Kharakadina?

Solovyeva - Cross / By Ms. Chahin                113

**MS. DeWITT:**  Objection, your Honor, first of all, it's asked and answered.  I think it's an improper attempt to ask her to refresh her recollection with something that's not even her own statement.

**THE COURT:**  I understand but they're asking this witness whether or not she made the statement to Marina, yes or no?  You can answer it yes or no.

**THE WITNESS:**  I don't remember that.

**BY MS. CHAHIN:**

Q    Did you -- did the FBI agents or the INS agents ever tell you that if you admitted that you did something wrong you would be permitted to leave right away?

A    I don't think so.  No, I don't remember.

Q    Okay.  Did you ever have a conversation with Marina Kharakadina wherein you told her that the FBI agents -- that you were told that you would be allowed to leave right away if you admitted you did something wrong?

A    I don't remember that conversation.

Q    Would it refresh your recollection if I were to show you a document?

A    Yes, please.

**MS. CHAHIN:**  If I could have a moment, your Honor?  If I may approach, your Honor?

**THE COURT:**  You may.

//

**DRAFT COPY**

**BY MS. CHAHIN:**

Q    Ms. Solovyeva, if you could please review this document and if I could direct your attention to the second paragraph of the first page.

    **(Pause)**

        **THE WITNESS:**  Okay, I've looked through it.

**BY MS. CHAHIN:**

Q    Ma'am, having reviewed this document does it refresh your recollection as to whether or not on February 4th of 2002 you had a conversation with Marina Kharakadina wherein you told her that you would be allowed to leave right away if you -- admit that you did something wrong?

        **MS. DeWITT:**  I'm going to object again, your Honor. She's asking a question that is not reflected in this document and with the assumption that it is reflected in this document.

        **THE COURT:**  That's not what the purpose of what the document is being used for.  The purpose of the document is to refresh her recollection because the previous question that was asked she said, "I can't recall but if I look at the document it may refresh my recollection."

        **THE COURT:**  Whether or not the statement was made or not made is -- is to be determined and this witness can either look at the document and say it refreshed her recollection under which case she can say, "It refreshed my recollection.  I remember making the statement.  I refreshed my recollection; I

**DRAFT COPY**

don't recall making this statement." Or "I refreshed my recollection and I didn't make the statement."

MS. DeWITT: My only objection, your Honor, is that she's not asking if it refreshes her recollection separate and apart from it. She's asking if it refreshes her recollection with respect to a particular statement that is implicit in her question it is in this document and it's not. If she wants to ask her a separate question I'd have no objection --

THE COURT: Well let me see what it says. Specifically, what paragraph did you ask the witness to look at; paragraph two of the first page?

MS. CHAHIN: Yes, your Honor. And it's about the fifth sentence starting with: "N.S. will be allowed" --

**(Pause)**

THE COURT: Well, it's unclear here because this is not a report it's a telephone call and it's a telephone call I believe that was deciphered by somebody else, but any document can be used to refresh your recollection, so I'd overrule your objection and ask the witness to be specific when you answer the question.

Does it refresh your recollection or it doesn't refresh your recollection?

**BY MS. CHAHIN:**

Q   Ms. Solovyeva, having reviewed that document does it refresh your recollection as to whether or not on March the 4th

Solovyeva - Cross / By Ms. Chahin                116

of 2002 you told Marina Kharakadina that you will be allowed to leave right away if you admit you did something wrong?

A    I have looked through this document and I'm unable to recall.

Q    At some point after you were arrested did you want to -- first of all, to your knowledge did Mr. Kadamovas know that you had been arrested?

A    Sometime later she did learn about it but not on that day.

Q    Was it important to you to convey to him a manner for him to communicate with you in the event that you were deported to Russia?

         THE INTERPRETER:  Could you repeat the question one more time, please?

         MS. CHAHIN:  Yes.

BY MS. CHAHIN:

Q    Was it important for you to communicate to him a manner to contact to you in the event that you were going to be deported to Russia?

A    Yes.

Q    And what efforts did you make to assure that he would know how to contact you in Russia?

A    I wrote a letter to him.  This was the first and the last letter from what I -- from what I recall that I wrote to him in which I said if I -- if I get deported where I will stay, where I will leave.

**DRAFT COPY**

Solovyeva - Cross / By Ms. Chahin          117

Q    And did you give him an address to reach you in Russia?

A    Yes.

Q    Okay.  Did you also ask Marina Kharakadina to convey that information to him if he called?

A    I don't remember exactly, perhaps, it's possible.

Q    And I believe you indicated that that was the only letter you ever wrote to him after your arrest; is that correct?

A    Yes.  Yes, from what I recall.  This was the only letter that I had written to him.

Q    Okay.  Did you write to him any letters when you were incarcerated on these charges as opposed to the INS charges?

A    No.

Q    During the period of time that you were detained in INS custody were you concerned about the whereabouts of Nastasia?

A    Yes.

Q    Were you trying to locate someone who might be able to take her in?

A    Yes.

Q    Were you trying to determine if a friend of yours named "Olga" would be able to take her in?

A    Yes.

Q    And a friend of yours named "Allah (phonetic)" were you trying to determine if she could take her in?

A    Yes.  I was asking many whom I knew.

**DRAFT COPY**

Solovyeva - Cross / By Ms. Chahin          118

Q    Okay.  Were you -- did you also contact your landlady to see if she might be able to take in your child?

A    I don't remember this, perhaps, but I don't remember. Perhaps she had offered her help, maybe but I don't remember.

Q    How old was Nastasia at this time?

A    Nineteen or twenty months.

Q    Okay.  Did you have concerns about her being placed in the foster care system?

A    Yes.

Q    When you were detained in the INS did you make any inquiry of the INS of where the baby was located?

A    Yes.  I made the attempts to find out about where she was.

Q    What did the INS tell you?

A    Oh, I do not remember.  I do not remember.

Q    Do you have any recollection of anyone at the INS telling you that everything is up to the FBI?

A    Maybe this was so, but I do not remember exactly.  I don't recall.

Q    Do you recall having any conversations with anyone wherein you told them that the FBI is trying to blackmail you because they know something about Mr. Kadamovas' case?

A    That I was trying to tell someone?  I do not understand the question.

Q    Yes.  Do you recall having any telephone conversations --

          MS. CHAHIN:  If I can have a moment please?

**DRAFT COPY**

Solovyeva - Cross / By Ms. Chahin          119

**BY MS. CHAHIN:**

Q    Do you recall having a conversation with Marina Kharakadina on March the 6th of 2002 wherein you told her that not only your case is complicated but everything is more complicated because they think that you know something about J.J. and that they are trying to blackmail you with that?

A    I am recalling when we had the conversation that my INS arrest had something to do with the arrest of the Kadamovas because at that moment I was asked whether I had the telephone conversation.  And I knew that I made that telephone conversation.  And this was before the arrest, therefore, when I was arrested somewhere I had an understanding that -- that there was a connection between that arrest and mine.

Q    Okay.  When you say that there was a connection between Mr. Kadamovas' and yours, was it your belief that the FBI was trying to blackmail you because they believed that you knew something about Mr. Kadamovas' case?

A    I don't remember being blackmailed at that time.  I don't remember.

Q    Ma'am, my question to you is whether or not you had a conversation with Marina Kharakadina wherein you told her that you felt -- that that's what you felt.

A    Yes.

Q    Did you ever tell Marina Kharakadina that the arrest had nothing to do with the INS but they wanted to arrest you

**DRAFT COPY**

Solovyeva - Cross / By Ms. Chahin          120

because of Mr. Kadamovas?

A    I could have said that.  I do not recall exactly but it can be possible.

Q    Ms. Solovyeva, at some point did you hire an attorney to represent you in the immigration matter?

A    Yes.

Q    What was that attorney's name?

A    Sandoval.

Q    And was he an immigration attorney or a criminal attorney, if you know?

A    Immigration.

Q    And to your knowledge did he have some association in representing Mr. Markovskis?

A    When I hired him I didn't know.  Marcovskis had hired him a few days later and -- to my knowledge.  I do not remember exactly.

Q    To your knowledge did Mr. Sandoval have an assistant by the name of "Tom Parker?"

          THE INTERPRETER:  Excuse me; what was the name?

          THE COURT:  Did he have an assistant by the name of "Tom Parker."  Did Mr. Sandoval have an assistant by the name of Tom Parker?

          THE WITNESS:  Yes.  Yes.

//

//

**DRAFT COPY**

Solovyeva - Cross / By Ms. Chahin                    121

**BY MS. CHAHIN:**

Q    And Mr. Parker was he involved in discussions with you?

A    Yes.

Q    And did he participate in any interviews that you had with the FBI?

A    Yes.

Q    And what role, if any, did he play in arranging for you to speak with the FBI, if you know?

A    I do not know if he played any role.  I know that Sandoval said that he would be organizing these meetings.

Q    He participated in interviews with you, correct?  I'm referring to Mr. Parker.

A    Before going to the meetings with the city attorneys.

Q    Okay.  When you're referring to the "City attorneys" are you referring to the people who are sitting at this table here?

A    Yes.

Q    And do you know if Mr. Parker played any role or had any association with anyone related to Mr. Safiev's family?

        THE INTERPRETER:  I'm sorry; could you repeat the question I --

        THE COURT:  Do you know if Mr. Parker had any role in dealing with

Mr. Safiev's family?

        THE WITNESS:  I later found out after the second meeting that he was investigating involving Safiev's family.

**DRAFT COPY**

Solovyeva - Cross / By Ms. Chahin          122

Q    Okay.  When you say he was investigating are you referring to investigating during the time that Mr. Safiev was abducted, if you know?

A    I do not know.  I do not know exactly.

Q    Now in your discussions with your immigration attorney at some point did you come to the decision of trying to set up a meeting with the FBI and the U.S. Attorney's?

A    Yes.

Q    And did that happen?

A    Yes.

Q    When did that happen?

A    The first meeting took place on April 11th, 2002.  And the second meeting took place on April 23rd.

Q    So between the date of your arrest and the date of April 11th, 2002, were -- did you remain incarcerated?

A    Yes.

Q    And where was Nastasia during this period of time?

A    At the foster house.  I do not know.

         THE INTERPRETER:  Oh, interpreter's mistake.

         THE WITNESS:  At the foster's house.

BY MS. CHAHIN:

Q    Okay.  When you say the "Foster's House" are you referring to foster care?

A    Yes.  After some time I found out that she was at the home -- at the house, foster's house, and a woman was taking

**DRAFT COPY**

Solovyeva - Cross / By Ms. Chahin              123

care of her.

Q    So would it be fair to say that you were not successful in your attempts to get her placed with either Allah or Olga?

A    Correct.

Q    Were you able to determine the foster care -- let me withdraw that question.

Between the date of your arrest and the date of your first interview with the FBI on April 11th of 2002, were you able to see Nastasia?

A    I don't recall.  I do not remember.

Q    Do you recall when was the -- when was the next time that you recall that you were able to see Nastasia after you were arrested?

A    I don't remember when it happened but it was at the time when I was -- in custody of the INS.  I don't remember exactly.

Q    Did somebody bring Nastasia there to visit you?

A    Yes, foster mom.

Q    Okay.  And on the date prior -- can you describe for us what are the circumstances that led up to your deciding to meet with the U.S. Attorneys on April 11th?

A    I decided that I made the decision to cooperate and I called -- and I called an attorney and I said that I wanted to have a meeting and continue the conversation that had not taken place yet when I had cancelled it.

Q    So the attorney you called was Joseph Sandoval?

**DRAFT COPY**

Solovyeva - Cross / By Ms. Chahin          124

A    Yes.

Q    And did he contact the U.S. Attorneys on your behalf to arrange that meeting?

A    Yes, from what he said to me.

Q    Okay.  So you've indicated that you wanted to continue a conversation you had started previously, correct?

A    Yes, that's what I wanted.

Q    Okay.  You have indicated to the jury that at the initial conversations you were not truthful; is that right?

A    Yes.

Q    And so was it your intention to be completely truthful of this interview that you had with the FBI on April 11th of 2002?

A    Yes.  Yes.  My intention was to meet and tell what I had known and what I had done, what I had seen and what I had heard.

Q    And was it your hope that the FBI would help you as they'd told that they would do earlier?

A    I cannot deny that.  I had that hope.

Q    Were you hopeful that they would help you be able to avoid deportation?

A    I do not know about the deportation.  I do not remember. Basically, I had a hope that I would be able to reunite with my child.

THE COURT:  All right.  I'm going to recess at this time.  Returning tomorrow at 9:15 in the jury room; 9:30 in the

**DRAFT COPY**