# GOVERNMENT EXHIBIT 65

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

# DRAFT COPY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO:  CR-02-220(B)-DT |
| | ) | |
| Plaintiff, | ) | CRIMINAL |
| | ) | |
| vs. | ) | Los Angeles, California |
| | ) | |
| IOURI MIKHEL, | ) | Wednesday, December 13, 2006 |
| JURIJUS KADAMOVAS, | ) | ( 9:28 a.m. to 12:02 p.m.) |
| | ) | ( 1:23 p.m. to  4:14 p.m.) |
| Defendants. | ) | |

JURY TRIAL (53rd DAY)
(VOLUME LIII)

** EX PARTE SIDEBAR AND SEALED PORTION OMITTED **
(FROM 9:34:34 TO 9:40:59)

BEFORE THE HONORABLE DICKRAN TEVRIZIAN,
UNITED STATES DISTRICT JUDGE

EXCEPTIONAL REPORTING SERVICES, INC
14493 SOUTH PADRE ISLAND DRIVE
SUITE A-400
CORPUS CHRISTI, TX 78418-5940
361 949-2988

3

## INDEX

| WITNESSES FOR THE DEFENSE | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Elena Krivohatchemko | | | | |
| By Mr. Rubin | 15/49 | 68 | 72/77/80 | 80 |
| By Mr. Lasting | 52 | | -- | |
| Gary Bennett | | | | |
| By Mr. Rubin | 82 | 102 | 109 | -- |
| Zoya Spivakovsky | | | | |
| By Mr. Callahan | 114 | 120 | -- | -- |
| Louis Perez | | | | |
| By Mr. Callahan | 121 | -- | -- | -- |
| James Davidson | | | | |
| By Mr. Callahan | 127 | 133 | 138 | 141 |
| Patrick Sandoval | | | | |
| By Mr. Lasting | 147 | 159 | 169 | |
| By Mr. Rubin | 157 | | 170 | |
| Adam Simon | | | | |
| By Ms. Chahin | 174 | | -- | |
| By Mr. Callahan | 192 | | -- | |

| GOVERNMENT'S EXHIBIT | RECEIVED |
|---|---|
| Number  1289 | 174 |

| DEFENSE EXHIBITS | MARKED | RECEIVED |
|---|---|---|
| Numbers 2049, 2050, 2051 | | 191 |
| Numbers 2052, 2053 | | 191 |
| Number  2064 | 178 | 191 |
| Number  3002 | 33 | 34 |
| Number  3003 | 37 | 39 |
| Number  3004 | 50 | 51 |
| Number  3005 | | 87 |
| Number  3006 | | 116 |

DRAFT COPY

141

MR. RUBIN: Take a break and then we can just check with our client and make sure he hasn't changed his mind once again. And then we'll rest.

THE COURT: All right.

MR. RUBIN: Thank you.

MR. LASTING: Thank you, Your Honor.

(Sidebar concludes at 2:50 p.m.)

THE COURT: All right. Ladies and Gentlemen, let's take our afternoon recess, 10 minutes.

(Court in recess from 2:51 p.m. to 3:05 p.m.; parties present)

(Outside the Presence of the Jury)

THE COURT: All right. Outside the presence of the jury the record will indicate all parties and counsel are present.

Anything the Government wishes to bring up?

MR. DUGDALE: No, your Honor. Thank you.

THE COURT: Anything the Defense wishes to bring up?

MR. CALLAHAN: Your Honor, I did indicate the status of our defense to Mr. Mikhel and he's all right with the decision.

THE COURT: All right. I want to find out from Mr. Lasting.

You've got witnesses lined up now?

MR. LASTING: I do, your Honor.

DRAFT COPY

142

**THE COURT:**  All right.

**MR. LASTING:**  I have four witnesses here.  Number four on the list is going to be unhappy if we don't get to him today and has --

**THE COURT:**  Well, take him out of order.

**MR. LASTING:**  I can't do that because of the way they go.  But if we don't get to him, I'm going to need the Court to order him back, because he's indicated to me a desire not to return.

**THE COURT:**  Well, he has to return.  There's no choice in the matter.

**MR. LASTING:**  I understand that.  But the Court may have to make that clear.

**THE COURT:**  All right.  Let's bring the jury out.

Incidentally, the Marshal informs me that there was a temporary parking lot attendant on duty from another lot and wasn't familiar with the procedure, so I'm going to inform the jury.

**(Pause / Jurors enter courtroom at 3:07 p.m.)**

All right.  The record will indicate all jurors are present, all counsel are present, all parties are present.

Ladies and gentlemen of the jury, I've been informed that the parking lot attendant that was assigned to the parking lot that took the information was a transfer from another parking lot, was not familiar with the procedure.  Any

**DRAFT COPY**

143

information that you may have given that parking lot attendant

has been retrieved and is in the process of being redacted.  It

was an innocent mistake on that parking lot attendant's part.

You're not to draw any inferences from the conduct of that

parking lot attendant.

All right.  Mr. Callahan, Mr. Rubin?

**MR. CALLAHAN:**  Your Honor, on behalf of Mr. Mikhel

the Defense rests.

**(Defendant Mikhel rests)**

**THE COURT:**  Mr. Lasting, Ms. Chahin?

**MR. LASTING:**  Yes, your Honor.  Thank you very much.

We'll call Joseph Sandoval as a witness.

**THE COURT:**  Please come forward.

**THE CLERK:**  Please come around here to the witness

stand, sir.  Please step up to the witness stand.  Please raise

your right hand.

**(Witness Sworn)**

Thank you.  Please have a seat.  And would you state

your name for the transcript?

**THE WITNESS:**  Patrick Joseph Sandoval.

**THE CLERK:**  Would you please spell your last name?

**THE WITNESS:**  S-a-n-d-o-v-a-l.

**THE CLERK:**  Thank you.

**MR. LASTING:**  Thank you, your Honor.

//

**DRAFT COPY**

Sandoval - Redirect/ By Mr. Rubin          170

Is the secretary an employee or an independent contractor, Mr. Rubin?  That's the --

MR. RUBIN:  Can I do it either way?

THE COURT:  Well, no.  That's the problem.

BY MR. RUBIN:

Q   All right.  I have nothing further.  Thank you, sir.

MS. DeWITT:  Nothing further, your Honor.

THE COURT:  You may stand down.

THE WITNESS:  Thank you.

(Witness Steps Down)

THE COURT:  Mr. Lasting, Ms. Chahin?

MS. CHAHIN:  Yes, your Honor.  At this time we would call Adam Simon.

MR. SPEAKER:  I believe he's in the hallway, your Honor, if I could step out.

(Pause)

THE CLERK:  Please step up to the witness stand. Please raise your right hand.

(Witness Sworn)

Thank you.  Please have a seat.

THE WITNESS:  Thank you.

THE CLERK:  Would you state your name for the transcript, please?

THE WITNESS:  Adam Simon.

THE CLERK:  Would you please spell your last name?

DRAFT COPY

Simon - Direct / By Ms. Chahin              171

THE WITNESS:  S-i-m-o-n.

THE CLERK:  Thank you.

MS. CHAHIN:  Your Honor, before I proceed I have a document, which has been marked as Government's Exhibit 1289. It's a self-authenticating document that the Government has prepared and presented a declaration for.  I would ask that that be received into evidence.

THE COURT:  1289?

MS. CHAHIN:  Yes, your Honor.

THE COURT:  All right.  1289 will be received in evidence at this time.

**(Government's Exhibit Number 1289 was received in evidence)**

MS. CHAHIN:  Your Honor, I also have -- to facilitate the discussion with the witness, I have marked as individual pages of that exhibit various defense exhibits, if I could place them before the witness, please.

THE COURT:  All right.

**(Pause / Exhibits placed before witness)**

**DIRECT EXAMINATION**

BY MS. CHAHIN:

Q    Mr. Simon, what is your occupation?

A    I am a life insurance agent.

Q    And do you sell life insurance policies for one company or do you sell for various companies?

**DRAFT COPY**

Simon - Direct / By Ms. Chahin                 172

A    Various companies.

Q    So you are a broker, in essence.

A    Not really, no.  Do you want me to elaborate or --

Q    Sure, go ahead.

A    Okay.  Northwestern Mutual I'm what's called a "captive agent."  And then I also have contracts with other companies. So I'm not a broker, per se.

Q    Okay.  So you do sell life insurance policies for Northwestern Mutual Insurance Company; is that correct?

A    Yes, I do.

Q    Okay.  And I'd like to direct your attention to the time period of January of 2002.

At that time did you hold the same occupation?

A    I did.

Q    And at that time did you also sell life insurance policies for Northwestern Mutual Life Insurance Company?

A    Yes, I did.

Q    Now, in approximately January of 2002, did you have discussions with an individual by the name of Iouri Mikhel regarding his purchasing one or more life insurance policies?

A    It's been a while so --

Q    If you would like to look at the documents to --

A    Sure.

Q    -- refresh your recollection, please do so.

A    Thank you.

**DRAFT COPY**

Simon - Direct / By Ms. Chahin                173

**(Witness examines documents)**

I'm just looking for a signed document.  Okay.  It looks like it was in 2001, sometimes around there.

Q    I'm sorry?

A    Sometime in December of 2001.

Q    Okay.  So to the best of your recollection after reviewing the documents, it's your recollection that you first had discussions with him in approximately December of 2001; is that correct?

A    To the best of my recollection, yes.

Q    And did Mr. Mikhel end up purchasing any life insurance policies from you?

A    I don't think there was ever a purchase but applications were taken.

Q    So applications -- perhaps you can explain what the process is for obtaining a life insurance policy if you could, please.

A    Sure.  The first part of the process is taking an application; and then from there having the document signed; and then after that there is a medical exam.  An independent examiner comes in, does the medical.  Once I've got all that information, I then send it off to the home office and then they do their underwriting.

Q    So with respect to this case, in particular, how far did that process proceed?

**DRAFT COPY**

Simon - Direct / By Ms. Chahin                    174

A    Applications were taken; the medical was completed; and
the medical, plus the application, was sent off to
Northwestern's home office in Milwaukee.

Q    For review by the underwriting; is that correct?

A    Correct.

Q    Okay.  And did Mr. Mikhel apply for more than one policy
in his own name?

A    Let's see.  According to this, there are two policies:
One for 3.75 million and another one for 6.25.

Q    So what was the total amount of the policies applied for
in Mr. Mikhel's name?

A    It looks like $10 million.

Q    Okay.  Can you tell me what the initial premium was?

A    Sure.  It looks like it was 24, 25 -- it looks like around
$30,000.

Q    And is that an annual premium?

A    Yes, ma'am.

Q    And is that premium paid in installments?

A    It can be paid monthly, semi-annually, quarterly or
annually.

Q    Okay.  If I could direct your attention, please, to
Defense Exhibit 2048.

        MS. CHAHIN:  Your Honor, and if I could have use of
the Elmo.  This is one page of the Exhibit 1289, which has been
received in evidence.

**DRAFT COPY**

Simon - Direct / By Ms. Chahin                    175

THE COURT:  2048 is another exhibit, I believe.

MS. CHAHIN:  I apologize, your Honor.  I thought that was my next number.  Then, I would ask to mark this as --

THE COURT:  2049 is your next.

MS. CHAHIN:  Well, your Honor, I have pre-marked a number of documents.  So if I could please ask to mark this as "2064," I will fill in the interim numbers.

THE COURT:  All right, 2064.

**(Defense Exhibit Number 2064 was marked for identification)**

MS. CHAHIN:  Thank you, your Honor.

BY MS. CHAHIN:

Q    Sir, directing your attention to this document, the first two policies that are indicated here, can you please show us or explain to us if these are the policies that Mr. Mikhel attempted to purchase?

A    I'm sorry, can you just say that one more time?

Q    Yes.

A    Okay.

Q    Directing your attention to Exhibit 2064.

A    Okay.

Q    It indicates "policy number" and the "name of the insured," correct?

A    Yes.

Q    And the status, correct?

**DRAFT COPY**

Simon - Direct / By Ms. Chahin                    176

A     Correct.

Q     Okay.   There were two policies.  And this document

reflects what you've testified to that Mr. Mikhel applied for

two policies in two different amounts; is that correct?

A     That's correct.

Q     Okay.  Could you indicate -- and you can do so just by

touching the screen --

A     Okay.

Q     -- where the amounts of the policy is shown on this

document.

A     Sure.   The first one is 6.25, and then the second one is

3.75.

Q     Okay.   And there were also two policies that were sought

to be purchased on behalf of Mr. Kadamovas; is that correct?

A     That is correct.

Q     And could you please tell us what the amounts of those

policies were?

A     6.25 and 3.75.

Q     Okay.   So there was -- the total amount of the insured

value for each of the individuals was $10 million; is that

correct?

A     That is correct.

Q     Now, after having received the applications I believe you

indicated that you submitted them to underwriting; is that

correct?

**DRAFT COPY**

Simon - Direct / By Ms. Chahin                177

A     That is correct.

Q     And do you know approximately when that happened?  And if
I could direct your attention to Defense Exhibit 2049.

A     Sure.  It was December the 10th of 2001.

        MS. CHAHIN:  And, your Honor, I'm going to place on
the Elmo what I'm marking as Defense 2049.

        THE COURT:  These are all out of Exhibit 1289?

        MS. CHAHIN:  They are, your Honor.  Thank you.

BY MS. CHAHIN:

Q     Sir, and if you could just hit your screen on the bottom
left-hand corner to erase the marks that are on there from the
previous document.

A     The left side?

        THE COURT:  Right side.

        MS. CHAHIN:  I'm sorry, your Honor.  On the bottom
right.

        THE WITNESS:  It's not working.

        THE COURT:  Are you hitting the bottom right?

        THE WITNESS:  Yes, sir.  Right by the star?

    (Discussion held off the record)

        There we go.

BY MS. CHAHIN:

Q     There we go.

A     Thank you.

Q     Sir, now is this the transmittal that you sent, together

**DRAFT COPY**

Simon - Direct / By Ms. Chahin               178

with the applications and the documents, to Northwestern Mutual

for purposes of underwriting review?

A     Yes, it is.

Q     And when in relation to the transmittal being sent, if you

know, is the medical examination conducted?

A     It would have been conducted before this transmittal.

Q     Okay.  So then, the date on this document of the

transmittal is what?

A     Basically, this is just a cover letter.

Q     Yes.

A     Let me just see.

**(Witness examines documents)**

Yeah.  Typically, what happens is a cover letter goes

in with a case that just, basically, lets the underwriter know

that all the information is forthcoming.  And this actually --

I'm sorry.  This comes with the application and the medical.

Q     So the medical information would have been submitted,

together with the application, to be sent to underwriting; is

that correct?

A     That's typically how it works, yes.

Q     So the medical examination would have been completed by

the December 10th date, which is on this document; is that

correct?

A     It's been a while.  But like I said, typically, that's how

it works.  It more than likely happened in this case.

**DRAFT COPY**

Simon - Direct / By Ms. Chahin          179

Q     And by reviewing documents in the file you'd be able to tell when that medical examination actually took place, correct?

A     Absolutely.

Q     Okay.  If I could please ask you to take a look at Defense Exhibit 2050.

A     Okay.

          MS. CHAHIN:  And again, your Honor, this is one page from Government Exhibit 1289.  And I'm going to place it on the Elmo.

BY MS. CHAHIN:

Q     Sir, do you recognize this document?

A     I do.

Q     Can you tell us what it is?

A     Sure.  Basically, what it -- this document talks about on Number 9 what the first policy was -- or is, excuse me -- and then what the second policy is.  So the first one is a ECL -- short for Estate CompLife -- it's just a type of life insurance policy.  And it gives the amount.

          And then the second one is a Level 20, which is a term policy.  And then on Number 15 it names the beneficiaries.

Q     Okay.  So on this document could you please -- there's something referred to as a "direct beneficiary" and a "contingent beneficiary."

          Could you explain that distinction to the jury,

**DRAFT COPY**

Simon - Direct / By Ms. Chahin                    180

please?

A     Sure.  Typically, the direct beneficiary is the husband, a wife, a partner.  And a contingent beneficiary could also be the same.  In this case, the contingent beneficiary is the son. So when it's a minor we usually put the contingent beneficiary as a minor unless there's a trust.  So that's what the...

Q     And can you tell from looking at this document whether this is a document that you filled out or it was filled out by somebody else?  Is this your writing?

A     This is my handwriting, yes.

Q     So that means that you would have assisted Mr. Mikhel with the preparation of this document, correct?

A     I would have filled this out, yes.

Q     Okay.  So the information that's contained in the document is information that you obtained from him, correct?

A     Correct.  What I do is on the application I ask the questions and then based on the answers I fill out the necessary places.

Q     So Mr. Mikhel indicated to you that he wanted to make the direct beneficiary of his policy his wife, Marina Mikhel, correct?

A     That is correct.

Q     And the contingent beneficiary would be his son, Anthony Mikhel, correct?

A     That is correct.

**DRAFT COPY**

Simon - Direct / By Ms. Chahin                    181

Q    Okay.  As part of the application do you also make some computations to calculate what the premium might be for the policy?

A    Basically, the premium amounts are calculated by the home office in the form of a ledger or a proposal.  So I don't personally make those calculations.

Q    So as part of the application process do you review whatever paperwork or documentation you have from the home office, which would indicate to you how much the premium would be for a certain policy?

A    That's correct.

Q    And if I could please ask you to take a look at Defense Exhibit 2051.

        MS. CHAHIN:  Your Honor, I'm going to place this on the Elmo.  It is, again, a single page from Government Exhibit 1289.

BY MS. CHAHIN:

Q    Sir, can you tell me if you recognize that document?

A    I do.

Q    And again, is this a document in your handwriting?

A    Yes, it is.

Q    And is this part of one page of the application?

A    Yes, it is.

Q    And can you indicate for us if you could by circling it what the premiums would be for each of the two policies?

**DRAFT COPY**

Simon - Direct / By Ms. Chahin                 182

A     Sure.

      **(Pause / Witness complies)**

Q     Okay.  And if you could indicate for the record orally what those amounts are.

A     Sure.  The first policy is $24,650.82; and the second policy is $5,297.50.

      **THE COURT:**  That's an annual premium?

      **THE WITNESS:**  Annual premium, sir.

**BY MS. CHAHIN:**

Q     And can you tell us how -- are those premiums charged quarterly or how are they charged?

A     Well, they can be charged -- we annualize the premiums but they can pay monthly, quarterly, semi-annually or annually.

Q     Okay.  Just below this you indicate here, (indicating), that there is an initial payment made.

A     That is correct.

Q     And can you circle where that is and what the amount is of the initial payment?

A     Sure.

      **(Witness complies)**

      And you want to know the amount?

Q     Yes, please.

A     I'm sorry.  It's $2,601.80.

      **MS. CHAHIN:**  Your Honor, if I could please ask for Defense Exhibit -- or actually, I will put on the Elmo Defense

**DRAFT COPY**

Simon - Direct / By Ms. Chahin                183

Exhibit 2045, which has been received into evidence.  I will

place it on the Elmo.

**BY MS. CHAHIN:**

Q    Sir, if you could take a look at this check, please.

          And can you tell us, is this the check that was given

to you to be sent as the initial payment to be submitted with

this application?

A    Well, it's been a long time, so I couldn't say for

certain.  But it looks like it would be.

Q    Okay.  Can you see the date that this check was prepared?

A    I can't read the first part, but it looks like 11 of '02.

Q    And can you tell me what the amount is?

A    Sure.  It's $2,601.80.

Q    And does that amount correspond with the amount that was

indicated as the initial payment that would be made on the

policy?

A    Yes, it is.

          **MS. CHAHIN:**  If I could have one moment, your Honor.

**BY MS. CHAHIN:**

Q    Now, sir, do you make arrangements for the medical

examination to be conducted, or what's the procedure for that

being set up?

A    Two ways.  One, I could ask for a date that would work for

the client; or I would have my office set that up.

Q    And do you have a specific recollection in this case of

**DRAFT COPY**

Simon - Direct / By Ms. Chahin                    184

how that was handled?

A     I really can't remember.

Q     Okay.  Now, if I could go back to what has been marked as Defense Exhibit Number 2064.

          MS. CHAHIN:  And I will place it on the Elmo, your Honor.

          THE COURT:  And you can also remove it from your screen by hitting the bottom right.

          MS. CHAHIN:  Thank you, your Honor.

BY MS. CHAHIN:

Q     Now, sir, we spoke that there was also a policy that was applied for on behalf of Mr. Kadamovas; is that correct?

A     That's correct.

Q     And would the procedure for filling out the application, obtaining the medical exam, be similar to what you've previously described?

A     Yes, it would.

Q     And would the same types of forms need to be prepared and filled out in order to obtain such a policy?

A     Yes, they would.

Q     And with respect to Mr. Kadamovas, there were also two policies applied for, correct?

A     That is correct.

Q     And if I could please --

          MS. CHAHIN:  I'm going to place on the Elmo, your

**DRAFT COPY**

Simon - Direct / By Ms. Chahin                185

Honor, what I've marked as Defense Exhibit 2052.

**BY MS. CHAHIN:**

Q    Sir, can you tell us if you recognize this document?

A    Yes, I do.

Q    And can you explain to us what it is, please?

A    It's, basically, the same as the other one where it describes the type of policies in Box 9, and then it talks about the beneficiaries in -- or the beneficiary in this case in Box 15.

Q    And again, does it indicate in Line 9 information for the first policy and for the second policy?

A    Yes, it does.

Q    And does it indicate who the beneficiary of this policy was?

A    Yes, it does.

Q    And who is that?

A    Iouri Mikhel.

Q    And is there a contingent beneficiary listed?

A    There is not.

Q    Now, does this application -- would another page of the application indicate what the premiums for this policy would be?

A    Yes, there would be.

          **MS. CHAHIN:**  And if I could place on the Elmo, your Honor, what I'm marking as Defense Exhibit 2053, which again is

**DRAFT COPY**

Simon - Direct / By Ms. Chahin                    186

a single page of Government's Exhibit 1289.

**BY MS. CHAHIN:**

Q    Sir, do you recognize this document?

A    Yes, I do.

Q    And can you explain to us what this document is?

A    Sure.  This is a document that points out the client's age, smoking status, the amount of premium for the first policy, the amount of premium for the second policy and whether a check was taken with the application.

Q    And this was also in your handwriting --

A    Yes.

Q    -- is that correct?

A    Yes.

Q    And can you indicate what the annual policy, by circling it and by stating it orally, would be for each of the two policies?

A    Sure.  The first one is $40,666.30; and the second one is $9,547.50.

Q    Sir, and does this also indicate whether or not there was an initial payment that was made with respect to this application?

A    Yes, it does.

Q    And what was that amount of that initial payment?

A    $4,653.18.

          **MS. CHAHIN:**  Your Honor, I'm going to place on the

**DRAFT COPY**

Elmo what has been previously received into evidence as Defense Exhibit 2044.

**BY MS. CHAHIN:**

Q    Sir, does this appear to be the check that was made and provided to you as the initial payment for this policy?

A    Again, it's been a while but it looks like it was, yes.

Q    Are you able to tell from this check what the date is that that was submitted?

A    Again it -- I can't read the first part, but it's 11 of '02.

Q    Okay.  Are you able to see the memorandum in the bottom left-hand corner?

A    I am.

Q    And what does that indicate?

A    Insurance.

Q    And does the amount of this check correspond with the amount on the exhibit previously described as Defense Exhibit 2053, the same amount which corresponds to what would be paid for the initial premium of this policy?

A    Yes.

Q    Now, do recall if both of these applications were submitted to underwriting at the same time?

A    Yes, they were.  They were both submitted on -- it looks like December 10th of '01, 2001.

Q    And so would it be fair to say that the December 10th

Simon - Direct / By Ms. Chahin          188

date, December 10th of 2001 date that you gave us earlier, that Mr. Kadamovas' medical exam also would have been completed by that date?

A     More than likely, yes.

Q     Okay.  Do you know who conducted the medical examination?

A     I didn't remember until I saw the gentleman outside.

Q     And do you know when that examination was conducted?

A     I don't recall the date.

        MS. CHAHIN:  And, your Honor, if I could have a moment with Mr. Lasting, please.

    (Pause / Counsel confer off the record)

        Nothing further, your Honor.  Your Honor, although I would ask that the Defense exhibits referenced be received into evidence.

        THE COURT:  Yes.  That will be 2049 through 2053 and 2064.

    (Defense Exhibits Numbers 2049; 2050; 2051; 2052; 2053; 2064 were received in evidence)

        MS. CHAHIN:  Thank you, your Honor.

        MR. CALLAHAN:  Your Honor, may we have a moment?

        THE COURT:  Certainly.

    (Pause / Counsel confer off the record)

//

//

//

**DRAFT COPY**