# GOVERNMENT EXHIBIT 67

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

# DRAFT COPY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO:  CR-02-220(B)-DT |
| | ) | |
| Plaintiff, | ) | CRIMINAL |
| | ) | |
| vs. | ) | Los Angeles, California |
| | ) | |
| IOURI MIKHEL, | ) | Thursday, December 14, 2006 |
| JURIJUS KADAMOVAS, | ) | ( 9:24 a.m. to 11:59 a.m.) |
| | ) | ( 1:28 p.m. to  4:12 p.m.) |
| Defendants. | ) | |

JURY TRIAL (54th DAY)
(VOLUME LIV)

BEFORE THE HONORABLE DICKRAN TEVRIZIAN,
UNITED STATES DISTRICT JUDGE

EXCEPTIONAL REPORTING SERVICES, INC
14493 SOUTH PADRE ISLAND DRIVE
SUITE A-400
CORPUS CHRISTI, TX 78418-5940
361 949-2988

3

## INDEX

| WITNESSES FOR THE GOVERNMENT | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Adam Simon | | 15 | | 44 |
|   By Ms. Chahin | | | 41 | |
| Victor Hamasaki | | 63 | | -- |
|   By Ms. Chahin | 46 | | -- | |
| Victor Ghassemi | | 78 | | -- |
|   By Ms. Chahin | 70 | | 85 | |
|   By Mr. Rubin | 75 | | -- | |
| Martha Sipos | | 91 | | -- |
|   By Mr. Lasting | 89 | | -- | |
| Neil Smith | | 114 | | -- |
|   By Ms. Chahin | 92 | | -- | |
| Garegin Tsaroukian | | -- | | -- |
|   By Ms. Chahin | 124 | | -- | |
| Veronica Castellanos | | 151 | | -- |
|   By Mr. Lasting | 131 | | 155 | |
| Angela Yanez | | 162 | | -- |
|   By Mr. Lasting | 156 | | -- | |
| Michael Polsky | | 171 | | -- |
|   By Ms. Chahin | 166 | | -- | |
| James Davidson | | 178 | | -- |
|   By Mr. Lasting | 172 | | -- | |
| Chris Nicely | | 207 | | -- |
|   By Mr. Lasting | 200 | | -- | |

| GOVERNMENT'S EXHIBITS | RECEIVED |
|---|---|
| Number 1289-A | 15 |
| Number 1600 | 182 |
| Number 1601 | 192 |
| Number 1602 | 196 |

| DEFENSE EXHIBITS | MARKED | RECEIVED |
|---|---|---|
| Numbers 2065, 2066, 2067 | 132 | 133 |
| Number 2068 | 172 | 173 |
| Number 2069 | 172 | 174 |

DRAFT COPY

Simon - Redirect / By Ms. Chahin          41

A    That would indicate it, yes.

          MS. DeWITT:  No further questions, your Honor.

          THE COURT:  Ms. Chahin?

          MS. CHAHIN:  Yes, your Honor.

                    **REDIRECT EXAMINATION**

**BY MS. CHAHIN:**

Q    Mr. Simon, you were asked some questions in regard to the medical questionnaire?

A    Yes.

Q    Is that a document that you fill about with the applicant, or is that done by the medical examiner?

A    It is done by the medical examiner.

Q    So you were not present when those questions were asked?

A    There are times that I am, and there are times that I'm not.  I can't remember if I was at this particular.

Q    So in regard to this situation, you don't have a specific recollection as to whether or not you were present --

A    That's correct.

Q    -- when those questions were asked; is that correct?

A    That is correct, yes.

Q    Now, do you speak Russian?

A    I do not.

Q    Do you recall whether you had a Russian interpreter present when you discussed these policies with Mr. Mikhel and Mr. Kadamovas?

**DRAFT COPY**

Simon - Redirect / By Ms. Chahin                    42

A     I did not.

Q     And do you have a recollection as to whether one of the two individuals was more proficient in the English language than the other?

A     I'm not so sure about proficient, but there was one speaking more than the other.

Q     Did one speak more English than the other, if you know?

A     I don't know.  They both seemed to understand what I was saying.

Q     And did you have discussions -- were the conversations related to the issuance of the policies primarily held what one of the two individuals?

A     I'm sorry.  Can you say that one more time please?

Q     Yes.

      Were the conversation related to the issuance of the policy, were they primarily held with one of the two individuals?

A     No.  They were both present.  So they were both discussed at the same time.

Q     And in regard to a question that was asked of you -- let me withdraw that question.

      I want to ask you a question about Government Exhibit 1020-B.

      **MS. CHAHIN:**  If I can request the Government's assistance.

**DRAFT COPY**

Simon - Redirect / By Ms. Chahin                43

Second page.

THE WITNESS:  Would that be in this?

MS. CHAHIN:  I'm going to put it on the screen.

And if I could please ask the Government to highlight the portion related to a transaction on 2/21/02.  I believe it would be the next page.

MS. DeWITT:  What is she looking for?

I'm sorry.  What are you looking for, Sonia?

MS. CHAHIN:  The credit.  The portion that displays the credit.

MS. DeWITT:  The deposits?

MS. CHAHIN:  Yes, correct.

MS. DeWITT:  Okay.  I think that's actually a page earlier.

MS. CHAHIN:  I'm sorry.

(Off the record discussion)

BY MS. CHAHIN:

Q    Sir, directing your attention -- you indicated that at some point there was a credit made of the money that was deposited into the ISA; is that correct?

A    According to this document, it looks like there was.  Yes.

Q    Okay.  Can you circle where that is displayed on this document?

A    Credit.  Credit.  It looks like it's here.

Q    Yes.

**DRAFT COPY**

Simon - Recross / By Ms. DeWitt                44

And can you indicate for us the date that those credits were made?

A    It looks like they were posted on 2/21.

Q    And do you know of what year that would be?

A    On the top, it says of '02.

        MS. CHAHIN:  Thank you, your Honor.

        THE COURT:  Mr. Rubin?  Mr. Callahan?

        MR. CALLAHAN:  Nothing, your Honor.  Thank you.

        THE COURT:  Ms. DeWitt?

        MS. DeWITT:  Just one second, your Honor.

                    **RECROSS EXAMINATION**

**BY MS. DeWITT:**

Q    Just two questions, Mr. Simon.  On the medical declaration for Mr. Kadamovas --

        MS. DeWITT:  Your Honor, could you it back to the Elmo mode please.

**BY MS. DeWITT:**

Q    Just so I'm clear about this, Mr. Simon, that's your signature?

A    Yes, it is.

Q    Okay.  And it's dated 1/11/2002?

A    That is correct.

Q    And this is a signature of Mr. Kadamovas at 1/11/2002?

A    It looks like it is, yes.

Q    Okay.  Would he have signed this in front of you,

Simon - Recross / By Ms. DeWitt                    45

basically, in your presence?

A     Yes, he would have.

Q     And if you could look at the one for Mr. Mikhel

A     I guess I can just look at that one.

Q     Do you believe that that was also signed in your presence?

A     Yes.

Q     And, again, that's your signature there?

A     That is correct.

          MS. DeWITT:  Thank you.  No further questions, your Honor.

          MS. CHAHIN:  No, thank you, your Honor.

          MR. CALLAHAN:  Nothing, your Honor.  Thank you.

          THE COURT:  You may stand down.  You're excused. Thank you.

          THE WITNESS:  Thank you, sir.

          THE COURT:  All right.  Your next witness?

          MS. CHAHIN:  Your Honor, at this time we would call Dr. Victor Hamasaki.

     (Pause)

          THE CLERK:  Doctor, if you'd please approach the witness stand.

          And, sir, if you'll remain standing and please raise your right hand.

     (Witness sworn)

          Please be seated.

**DRAFT COPY**

Hamasaki - Direct / By Ms. Chahin                46

And, sir, if you would state your full name, spelling both first and last for the record.

THE WITNESS:  Victor, V-i-c-t-o-r, K. Hamasaki, H-a-m-a-s-a-k-i.

THE COURT:  Go ahead.

MS. CHAHIN:  Thank you, your Honor.

Your Honor, I have some documents that I have marked as defendants' exhibits, which are individual pages of what has previously been admitted as Government's Exhibit Number 1289.

If I could approach and place these before the witness?

THE COURT:  All right.  You may.

MS. CHAHIN:  Thank you.

MS. DeWITT:  Your Honor, if I can approach, I can try to get that out of the way.

THE COURT:  Please.

These documents will be numbered from what to what?

MS. CHAHIN:  Your Honor, they start at number 2054, and they go up through 2063.

**DIRECT EXAMINATION**

BY MS. CHAHIN:

Q    Dr. Hamasaki, what is your occupation?

A    I'm a physician.

Q    And how long have you been a physician?

A    I got my medical degree in 1987.

DRAFT COPY

Hamasaki - Direct / By Ms. Chahin                47

THE COURT:  Doctor, I'm going to ask you to step up. You're quite a ways from the microphone.

BY MS. CHAHIN:

A    I received my medical degree in 1987.

Q    Doctor, could you please describe what type of training and qualifications you have as a physician.

A    After I received my medical degree, I trained at the University of Chicago from '87 to '92 in Internal Medicine and Hematology and Oncology.

Q    And in what year did you become a practicing physician?

A    1992.

Q    If I could direct your attention to the time period approximately of December of 2001.

Can you tell us where you were employed at that time?

A    I was an independent contractor.

Q    And as an independent contractor, did you ever perform any work for a company by the name of Exam One Worldwide, Incorporated?

A    Not directly.  I was working with a company known as Mobile Medical, who, I believe, may have provided services for the company that you named.

Q    And was one of the - Do you work for Mobile Medical?

A    Yes.

Q    Is that correct?

A    I did.

**DRAFT COPY**

Hamasaki - Direct / By Ms. Chahin          48

Q    During that period of time?

A    Yes.

Q    And was one of the services that you performed for Mobile Medical performing medical examinations for purposes of insurance applications?

A    Yes.

Q    And who would hire you to conduct these examinations?

A    That was never explained to me.  I gather that individual insurance agents would make a request for an examination when necessary.

Q    Do you know if -

        THE COURT:  You received -

        MS. CHAHIN:  I'm sorry.

        THE COURT:  - a 1099 as an independent contractor?

        THE WITNESS:  Yes.

        THE COURT:  Who would your 1099 come from?

        THE WITNESS:  Mobile Medical.

BY MS. CHAHIN:

Q    And in conjunction with the work that you performed for Mobile Medical, did you ever perform examinations of people who were seeking life insurance policies from Northwestern Mutual Life Insurance Company?

A    Yes.

Q    And as part of your exam - Well, can you describe for us what would be involved in administering a medical examination

**DRAFT COPY**

Hamasaki - Direct / By Ms. Chahin          49

to someone who is seeking a life insurance policy?

A     Briefly, it takes about 30 minutes.  The parts involved with the exam are about 15 minutes devoted to a medical questionnaire regarding an applicant's health history, doctors, any medications.

The other 15 minutes can be divided into five-minute segments.  The basic physical exam itself, about five minutes. A test commonly asked for is an electrocardiogram, five minutes.  Laboratory, obtaining laboratory samples, blood and urine, five minutes.

Q    And when you are administering these tests to various persons, are you required to fill out certain paperwork and submit it with the results of the examination and the results of the questions and the information that you gather?

A     Yes.  There is a medical exam form that each insurance company - that is filled out for the insurance company.  And there is a laboratory form as well.

Q    Sir, directing your attention to December of 2001.

Do you recall if you performed medical examinations for purposes of the issuance of life insurance policies on Mr. Jurijus Kadamovas and Mr. Iouri Mikhel?

A     I don't recall them by name.

Q    Would reviewing certain documentation that you may have prepared on that date and which may bear your signature refresh your recollection as to whether or not you might have performed

**DRAFT COPY**

Hamasaki - Direct / By Ms. Chahin                50

such examinations?

A    Yes.  These papers refresh my memory.

Q    Sir, if I could -

          MR. RUBIN:  I'm sorry.  These papers are what?

          THE COURT:  Refresh my memory.

          MR. RUBIN:  Oh.  Are they marked?

          THE COURT:  They have been marked 2054 through 2063.

          MR. RUBIN:  Thank you.

          MS. CHAHIN:  Your Honor, and I will refer to them

specifically for the record.

BY MS. CHAHIN:

Q    Sir, if I could please ask you first to take a look at

what I have marked as Defense Exhibit 2054.

          MS. CHAHIN:  And I will place that -

          THE COURT:  All these documents have been received

into evidence as they're part of another exhibit.

          MS. CHAHIN:  Thank you, your Honor.

BY MS. CHAHIN:

A    (witness complying)

Q    Doctor, do you recognize this exhibit?

A    Yes.

Q    Can you tell us what it is, please?

A    This is the second page of the Northwestern Mutual medical

exam.

Q    And does this document bear your signature?

**DRAFT COPY**

Hamasaki - Direct / By Ms. Chahin          51

A     Yes.

Q     Can you indicate for us, if you could, please, on the screen in front of you, you can circle with your finger.  If you could please indicate where your signature is located.

A     (witness complying)

Q     And sir, does this also indicate the date that the examination was administered?

A     Yes.

Q     And what is that date, sir?

A     The 5th of December, 2001.

Q     And if I could ask you now to please take a look at what has been marked as Defense Exhibit 2055.

A     (witness complying)

        **MS. CHAHIN:**  And, your Honor, I'm going to place this on the ELMO.

        **THE COURT:**  These exhibits, 2054 through 2063, are part of Exhibit 1289.

        **MS. CHAHIN:**  Thank you, your Honor.

        **MR. RUBIN:**  Thank you, your Honor.

        **THE COURT:**  Ms. Chahin, if you'll -

        **MS. CHAHIN:**  Yes.

        **THE COURT:**  - tap the right bottom -

        **MS. CHAHIN:**  Thank you.

        **THE COURT:**  - to remove the marking.

//

**DRAFT COPY**

**BY MS. CHAHIN:**

Q    Doctor, do you recognize this exhibit?

A    Yes.

Q    And can you please tell us what it is?

A    It's the next page of the Northwestern exam form.

Q    And is this a document that you would have filled out at the time that you conducted the medical examination?

A    Yes.

Q    Does it indicate - Do you have a recollection of where this examination took place?

A    Yes.

Q    And can you tell us what that is?

A    It was in the valley.  I believe it was Sherman Oaks, Ventura Boulevard.

Q    Do you have a recollection of what time the examination took place?

A    It was in the morning.

Q    Do you have a more specific recollection than that?

A        **(No audible response)**

Q    Okay.

        **THE COURT:**  Wait, wait.

**BY MS. CHAHIN:**

A    No.

        **THE COURT:**  Was this in your office, or was this at a location?

Hamasaki - Direct / By Ms. Chahin                53

THE WITNESS:  It was at a business, the parties' business.

THE COURT:  Mobile Medical that you were contracting with goes out to the business or the home of the individuals applying for the life insurance?

THE WITNESS:  Yes.

BY MS. CHAHIN:

Q    Sir, is this a document that you filled out?  Is this your handwriting on this document?

A    Yes.

Q    And it indicates a time of examination.

Do you see that on this document here?

A    Yes.

Q    And what is the time indicated?

A    10:30.

Q    And when in the process of conducting the examination would this document have been filled out, if you know?  Is this something you do at the beginning stage of the examination?

A    It's done - As I said, an exam takes about 30 minutes. It's done some time in that time frame.  It can vary.  About mid-way in the 30-minute time frame.

THE COURT:  And just for the record, 10:30 is 10:30 a.m.?

THE WITNESS:  Yes.

MS. CHAHIN:  Thank you, your Honor.

**DRAFT COPY**

Hamasaki - Direct / By Ms. Chahin                54

**BY MS. CHAHIN:**

Q    Where it indicates time of examination, in that block do you put the time the examination is scheduled or do you put down the time that you are filling out this form?

A    It states, 'Time of examination'.  And so, again, I usually put about the mid-point of the 30-minute process of the exam.

Q    So based upon what you put on this form, are you able to estimate what time this examination might have begun?

A    That's the best estimate, 10:30.

Q    10:30.  And are you able to estimate how long after filling out this application the examination would have continued?

A    Consistent with what I have said, about 15 minutes.

Q    Sir, if I could please ask you now to take a look at Defense Exhibit 2056.

        **MS. CHAHIN:**  And again, your Honor, this is a single page document which is part of Government's Exhibit 1289.

        **THE COURT:**  I understand.

        **MS. CHAHIN:**  And I'm placing it on the ELMO.

**BY MS. CHAHIN:**

Q    Sir, can you please take a look at this document and tell me if you recognize it?

A    No.  I've never seen this.

Q    Does this - Are you familiar with that 'Lab One'?

**DRAFT COPY**

Hamasaki - Direct / By Ms. Chahin          55

A     Yes.

Q     And what is Lab One?

A     It's a major clinical laboratory that processes samples, laboratory samples, for insurance purposes.

Q     As part of your examination, do you sometimes request or obtain blood samples from individuals?

A     Yes.

Q     And do you submit those blood samples to Lab One for analysis?

A     There are several laboratories.  Lab One is one of the major ones.

Q     As part of the process of your examination, do you fill out paperwork that accompanies the sample which is later sent to Lab One for analysis?

A     Yes.  Whenever laboratories are obtained, the requisite laboratory form is filled out.

Q     And if I could please ask you to take a look at what I've marked as Defense Exhibit 2058.

        Is this the form that you're referring to that would accompany the blood sample that you draw?

A     Yes.  This is the laboratory submission form that accompanies the laboratory samples.

        **MS. CHAHIN:**  And, your Honor, I would ask to place this on the ELMO.  This is Defense Exhibit 2058, which is one page of Government's Exhibit 1289.

**DRAFT COPY**

Hamasaki - Direct / By Ms. Chahin                56

THE COURT:  Anything that's admitted, and all of these have been admitted as part of Exhibit 1289, can be published.  You don't have to ask my permission.

MS. CHAHIN:  Thank you.

THE COURT:  Let me ask you this, though:  What happened to 2057?

MS. CHAHIN:  Your Honor, I will get to 2057.

THE COURT:  Okay.

BY MS. CHAHIN:

Q    Sir, all of the documents that we're reviewed thus far, whose medical examination do those documents pertain to?  What is the name of the individual?

A    Iouri Mikhel.

Q    And on that same date, December 5th of 2001, did you perform an additional examination?

A    I believe so.  Yes.

Q    And I'll ask you questions pertaining to that examination later.

        Referring to this paperwork here for Lab One.  Based on reviewing this paperwork, are you able to determine what time the blood was drawn?

A    Yes.  I recorded the time of the collection as 10:20 a.m.

Q    And does this document, sir, also bear your signature?

A    Yes.

Q    And can you indicate for us please where on this document

**DRAFT COPY**

Hamasaki - Direct / By Ms. Chahin            57

it bears your signature?

A     (witness complying)

Q     And again, the date of this collection would be what date?

A     December 5, 2001.

Q     Sir, as part of your examination, do you also collect a urine sample?

A     Yes.

        MS. CHAHIN:  If I could have one moment, your Honor.

        Your Honor, I'm going to place on the ELMO what has been marked as Defense Exhibit 2057, which is a one-page document which is part of Government's Exhibit 1289.

        **(Pause)**

**BY MS. CHAHIN:**

Q     Doctor, directing your attention to Defense Exhibit 2057.

        Does this appear to be a urine specimen result from Laboratory One?

A     Yes.

Q     And does it appear to be for Iouri Mikhel?

A     Yes.

Q     And does it appear to be for a sample that was collected on December 5th of 2001?

A     Yes.

Q     And can you indicate for us please what the time of collection was for that sample?

A     10:20 am.

**DRAFT COPY**

Hamasaki - Direct / By Ms. Chahin          58

Q    Doctor, I'd like to ask you some questions about the second examination that you performed on that morning.

If I could please ask you to look at Defense Exhibit 2059.

A    (witness complying)

MS. CHAHIN:  And, your Honor, again, for the record, this is one page which is part of Government's Exhibit 1289, and I'm placing it on the ELMO.

BY MS. CHAHIN:

Q    Doctor, can you please again tell us what this document is?

A    Again, this is page two of the Northwestern Mutual medical exam form.

Q    And again, does this bear your signature?

A    Yes.

Q    And does it bear the date of the examination?

A    Yes.  December 5, 2001.

Q    And if you could just indicate for us please where the date of the examination and your signature appears on this document.

A    (witness complying)

Q    And again, doctor, is this information that you collect? Is this document in your writing?

A    Yes.

Q    And if I could now please ask you to take a look at what

**DRAFT COPY**

Hamasaki - Direct / By Ms. Chahin          59

I've marked as Defense Exhibit Number 2060.

MS. CHAHIN:   And this is a single page, part of Government's Exhibit 1289.

**BY MS. CHAHIN:**

A    (witness complying)

Q    And for the record, doctor, if you could again explain what this document is?

A    This is the next page, I believe the third page, of the Northwestern exam form.

Q    And does this document indicate the time that this examination was performed?

A    Yes.  10:45 a.m.

Q    And does this document indicate, again, it bears your signature, is that correct?

A    Yes.

Q    And does it indicate whether or not an interpreter was used for the examination?

A    Yes.  I wrote that Iouri Mikhel was the interpreter.

Q    And when you use an interpreter for the examination, that person acts as the interpreter to translate the information that you're gathering, is that correct?

A    Yes.

Q    And does this document - I apologize if I asked you this previously - but it does bear your signature, is that correct?

A    Yes.

**DRAFT COPY**

Hamasaki - Direct / By Ms. Chahin                60

Q    Okay.  Doctor, if I could please ask you to take a look at what I have marked as Defense Exhibit 2063.

        MS. CHAHIN:  And again, this is a single page which is part of Government's Exhibit 1289.

BY MS. CHAHIN:

A    (witness complying)

Q    Doctor, is this document what you've previously described as the Lab One paperwork that you will fill out to accompany specimens that you gather during the examination process?

A    Yes.

Q    And does it indicate the time that the specimens were collected?

A    Yes.  10:50 a.m.

Q    And again, this is on 12/5/01?

A    Yes.

Q    And this document bears your signature, is that correct?

A    Yes.

        MS. CHAHIN:  And I'm placing on the ELMO, your Honor, what I've marked as Defense Exhibit 2061, which is a single page of Government's 1289.

BY MS. CHAHIN:

Q    Dr. Hamasaki, does this appear to be a blood chemistry profile prepared by Lab One of a specimen that was collected on 12/5/01?

A    Yes.

**DRAFT COPY**

Hamasaki - Direct / By Ms. Chahin                61

Q    And does the time of the blood draw on this document coincide with the paperwork that you prepared and that we previously viewed in the prior exhibit?

A    Yes.

Q    And what time was that specimen drawn?

A    10:50 a.m.

MS. CHAHIN:  Your Honor, I'm now going to place on the ELMO what I've previously marked as Defense Exhibit 2062, part of Government's 1289.

**BY MS. CHAHIN:**

Q    Sir, with respect to Mr. Kadamovas, did you also collect a urine sample as part of your examination process?

A    Yes.

Q    And does this document reflect that a specimen was collected from Mr. Kadamovas on - I'm sorry - at 10:50 a.m.?

A    Yes.

Q    Okay.  Sir, do you see where it says 'Date and time voided'?  It says '10/05/01'?

A    Yes.

Q    Okay.  And can you look at the line right next to it that says, 'Date performed 12/7/01'?

A    Yes.

Q    Do those dates appear to be an error based on the examination that you performed and the paperwork that you filled out?

**DRAFT COPY**

Hamasaki - Direct / By Ms. Chahin                    62

A    The first date is incorrect.  10/5/01 is incorrect.

Q    The date that you performed this examination was actually 12/5/01, correct?

A    That's right.

Q    So that appears to be a typographical error?

A    I think it was a - Yes, it's an error, probably with the reader, the form reader.  It's automated, an automated reader.

And I see on the laboratory form that there's a handwritten correction, so I think that the automated reader had difficulty.

But the date was in fact 12/5/2001.

Q    Sir, after reviewing all of these documents and the times that these examinations were administered, are you now able to estimate the time that you would have been at Design Water World performing these examinations on 12/5/01?

A    I can.  Yes.

Q    And can you tell us what that would be?

A    From start to finish, about 10:00 to 11:00 a.m.

        **MS. CHAHIN:**  I have nothing further, your Honor.

        **MR. CALLAHAN:**  No questions, your Honor.

        **THE COURT:**  Ms. DeWitt?

        **MS. DeWITT:**  Just a couple questions, your Honor.

//

//

//

**DRAFT COPY**

69

**MS. DeWITT:**  I have no further questions, your Honor.

**THE COURT:**  Ms. Chahin?

**MS. CHAHIN:**  No, thank you, your Honor.

**MR. CALLAHAN:**  Nothing, your Honor.

**THE COURT:**  Thank you.  You're excused.

**DR. HAMASAKI:**  Thank you.

**THE COURT:**  Your next witness?

**MS. CHAHIN:**  Your Honor, the next witness is Mr. Victor Ghassemi.

**THE COURT:**  Please come forward.

The Clerk has stepped out.  I'm going to swear you in as a witness.  If you'll raise your right hand.

**(Witness sworn)**

**THE COURT:**  Have a seat, sir, on the witness stand. State your first and last names, spelling both names.

**THE WITNESS:**  Yes, sir.

My name is Victor Ghassemi.  V-i-c-t-o-r.  Last name Ghassemi, G-h-a-

**THE COURT:**  G-h-a --

**THE WITNESS:**  Double s-e-m-i.

**THE COURT:**  -- e-m-i?

**THE WITNESS:**  Yes, your Honor.

//

//

//

**DRAFT COPY**

Ghassemi - Direct / By Ms. Chahin          70

**DIRECT EXAMINATION**

**BY MS. CHAHIN:**

Q    Mr. Ghassemi, what is your present occupation?

A    I'm a senior sales manager for Keyes European Mercedes-Benz.

Q    And directing your attention to the time period of January of 2002.

Where were you employed at that time?

A    With Calabasas Motor Cars.

Q    And what was your position there?

A    I was the sale manager over there.

Q    In January of 2004 (sic), did you negotiate the sales of a 2002 Mercedes-Benz vehicle with an individual known as Mr. Iouri Mikhel?

A    Yes, I did.

        **MR. LASTING:**  Excuse me, your Honor.  I think Ms. Chahin misspoke herself.  She said '2004'.

        **MS. CHAHIN:**  I'm sorry, your Honor.  It was 2002.

        Let me re-ask you the question, sir.

        **THE WITNESS:**  Please.

**BY MS. CHAHIN:**

Q    In January of 2002, did you negotiate the sale of a 2002 Mercedes-Benz vehicle with a Mr. Iouri Mikhel?

A    Yes, I did.

Q    Sir, do you recall approximately what the sales price of

**DRAFT COPY**

Ghassemi - Direct / By Ms. Chahin            71

the vehicle was?

A    Not exactly.  Approximately I can.

Q    Can you tell us approximately?

A    About 60 or $70,000, if I'm not mistaken.

Q    And do you recall how the vehicle was paid for?

A    Wire transfer.

Q    And do you recall approximately what date that wire transfer might have been received by Calabasas Motors?

A    I wouldn't remember exact date.

Q    Sir, did you previously have an interview with the FBI agent, Mr. Davidson, in regard to this transaction?

A    I did talk to an agent, FBI agent.  I don't remember the name.

Q    Do you think that it might refresh your recollection as to some of these dates if I were to show you a memorandum of that interview that you had with Mr. Davidson?

A    Sure it will.

        MS. DeWITT:  Your Honor, if I could approach?

        THE COURT:  You may.

    (Pause)

        THE COURT:  Do you recall this individual as Agent Davidson?

        THE WITNESS:  I don't remember, your Honor.

//

//

**DRAFT COPY**

Ghassemi - Direct / By Ms. Chahin                72

**BY MS. CHAHIN:**

Q    Sir, if I could please have you take a look at this document, directing your attention to the fourth paragraph down.  If you could just read that to yourself and let me know when you're finished.

A    (witness complying)

Q    Sir, having read that document, does the document refresh your recollection as to what the date was that the wire transfer was sent to Calabasas Motors?

A    Yes.  On February 4th, 2004. (sic)

Q    I'm sorry?

A    On February 4th, I believe, of 2004.  2002.  I apologize.

Q    So that would be February 4th of 2002, is that correct?

A    Yes.

Q    And does it also refresh your recollection as to what the amount of money was that was wired to Calabasas Motors?

A    Yes.  $73,673.62.

Q    Sir, subsequent to this date, were you contacted by Mr. Mikhel in an attempt to cancel the transaction?

A    Yes.

Q    Okay.  And do you recall approximately how much later that was after the funds were wired to Calabasas Motor Cars?

A    I believe it was not even wire transferred yet.  The money was supposed to come in.  In the middle of the transaction, the gentleman called and request for a cancellation of the

**DRAFT COPY**

Ghassemi - Direct / By Ms. Chahin          73

transaction.

Q    Sir, did you previously tell Agent Davidson that the funds were received on February 4th of 2002, by Calabasas Motors?

A    I don't remember.

Q    Okay.  Would it refresh your recollection as to whether or not you told that to Mr. Davidson by reviewing your memorandum, the memorandum that's before you?

A    Sure.

Q    And if I could please ask you again to take a look at the fourth paragraph.

A    (witness complying)

     Okay.

Q    Okay, sir.  You having reviewed this document, does it refresh your recollection that the funds were received by Calabasas Motor Cars on February 4th of 2002?

A    Yes.

Q    Now, would it refresh your recollection as to what date you were contacted by Mr. Mikhel, who intended to cancel the contract, by reviewing this memorandum?

A    On February 6th, 2002.

Q    Okay.  So that would be approximately two days later, is that correct?

A    Yes.

Q    Okay.  Do you know a specific recollection as to whether or not, by the time Mr. Mikhel attempted to cancel the

**DRAFT COPY**

Ghassemi - Direct / By Ms. Chahin                74

transaction, had the car already been delivered to him, if you recall?

A    I don't remember.

Q    And how did Mr. Mikhel contact you?  Was it by telephone?

A    By telephone.

Q    And at the time that he contacted you, was he attempting to get a refund of the money?

A    Yes.

Q    Did he specify to you how he would like that money returned to him?

A    Yes.  In the form of basically he wanted us to cut him a check, or even in cash.  I believe it was a check.  He asked to be refunded by the store.

Q    And did you explain to him that you could not refund it to him in that manner?

A    Yes, I did explain that.

Q    And if he wanted a refund, how would the refund have to be given to him?

A    The wire transfer would have been reversed back to the original bank.

MS. CHAHIN:  Thank you, your Honor.

I have nothing further, your Honor.

MR. RUBIN:  Thank you, your Honor.

Good morning, sir.

THE WITNESS:  Good morning to you.

**DRAFT COPY**

Ghassemi - Redirect / By Ms. Chahin          86

Do you see that?

A    Yes.

Q    Okay.  And a date right above it, February 4th, 2002?

A    Yes.

Q    And the amount, $73,648?

A    Yes.

Q    And Mr. Ghassemi, to the best of your recollection, was this car actually picked up by Mr. Kadamovas?  Did he actually take delivery of the car?

A    I believe so.  Yes.

Q    And the car was paid for in full before it was picked up?

A    Yes.

Q    There wasn't a loan for this car?

A    No.

MS. DeWITT:  No further questions, your Honor.

THE COURT:  Ms. Chahin?

REDIRECT EXAMINATION

BY MS. CHAHIN:

Q    Mr. Ghassemi, you were asked some questions in regard to the credit application that was submitted in conjunction with this purchase.

Is that documentation that you fill out, or is that done by somebody else at Calabasas's?

A    It's generally done by me or one of my employees, depending if they're in my office or if they're somewhere else.

DRAFT COPY

Ghassemi - Redirect / By Ms. Chahin          87

Q    With regard to this application, do you have a specific

recollection of whether or not you filled out the information

on this credit application?

A    I don't remember, unfortunately.  I apologize.

Q    Okay.  So you're unable to tell us whether it was

Mr. Kadamovas who provided the information or if it was

provided by someone else, isn't that true?

A    That's true.

Q    And you're also unable to tell us whether it was

Mr. Kadamovas who requested the add-ons, is that correct?

A    I don't remember who requested it.

Q    And do you speak Russian?

A    No, I don't.

Q    Okay.  And at the time, at Calabasas Motor Cars, to your

knowledge, were there any employees who worked there who spoke

Russian?

A    No.  Not that I recall.

Q    Do you know an individual by the name of Sergei Popovsky

(phonetic)?

A    Oh, yes.  I do.

Q    Was Mr. Popovsky working at Calabasas Motor Cars during

the time of this transaction, if you know?

A    I believe so.

Q    And to your knowledge, is Mr. Popovsky a Russian-speaking

person?

**DRAFT COPY**

Ghassemi - Redirect / By Ms. Chahin          88

A      I believe so.

MS. CHAHIN:  Thank you, your Honor.

Your Honor, can I have one moment with counsel, please?

**(No audible response)**

**(Pause)**

MS. CHAHIN:  I have nothing further, your Honor. Thank you.

MR. CALLAHAN:  Nothing, your Honor.

MS. DeWITT:  Nothing further, your Honor.

THE COURT:  You may stand down.  You're excused. Thank you.

Just leave all the documents there.

MR. GHASSEMI:  Okay.

MR. LASTING:  Your Honor, we'd call Special Agent Martha Sipos.

MR. SPEAKER:  I need a break.

THE COURT:  Okay, let's take a short break, biological break.

**(Court in recess from 11:34 a.m. to 11:39 a.m.; parties present)**

**(Outside the presence of the jury)**

THE COURT:  All right, let's go back on the record.

All right, outside the presence of the jury.  The record will indicate that all parties and counsel are present.

**DRAFT COPY**

Smith - Direct / By Ms. Chahin                93

for the record, please.

THE WITNESS:  Neil Smith.

THE CLERK:  Would you spell both your first and last name?

THE WITNESS:  N-E-I-L  S-M-I-T-H.

THE CLERK:  Thank you.

**DIRECT EXAMINATION**

**BY MS. CHAHIN:**

Q    Mr. Smith, what is your occupation?

A    I'm a draftsman.

Q    And what are your training and qualifications to be a draftsman?  Let me withdraw that.

Can you tell us what a draftsman is?

A    A draftsman essentially does architectural drawings.  It's basically an unlicensed architect that may do design and drawings.

Q    And what are your training and qualifications as a draftsman?

A    Well I had previous experience in internships and college. Two years of college, then six years of internship.

Q    Now, directing your attention to the year 2001, were you working as a draftsman at that time?

A    Yes, I was.

Q    And were you working for -- were you self-employed or were you working for someone else at that time?

**DRAFT COPY**

Smith - Direct / By Ms. Chahin                    94

A    I was self-employed?

Q    And at some point during that timeframe were you hired to do some drawings by an individual named Iouri Mikhel?

A    Yes, I was.

Q    And do you recall approximately when that was?

A    I can recollect it was maybe around 2002, 2001.

Q    Do you have a specific recollection of what the duration of your relationship was with Mr. Mikhel?

A    It was approximately nine months.

Q    And do you have a more specific recollection as to when that nine-month period might have started?

A    I think it went from around August to the late winter of that year.  Well, it was -- I guess I can presume perhaps August through about January or February.

        THE COURT:  All right.  Now, we overlap two years.  So it would be August of what year to January or February of what year?

        THE WITNESS:  I believe it was August of 2001 to about February of 2002.  That's my best recollection, however the years I may have some confusion about.

BY MS. CHAHIN:

Q    But as of -- that's your best recollection, is that right?

A    Yes.

Q    And what type of work was it that you were hired to perform?

**DRAFT COPY**

Smith - Direct / By Ms. Chahin                95

A     Design work for construction drawings of swimming pools, guesthouse, remodeling work.  Probably a construction budget of about, for each project, less than $200,000 each project.

Q     And do you recall the locations of where these projects were going to be located?

A     Yes.  One was in Encino.  The other one was in Sherman Oaks I believe.

THE COURT:  Were these residential or commercial engagements?  In other words, was the work to be done at a residence or at a commercial facility?

THE WITNESS:  It was to be done at a residence.

BY MS. CHAHIN:

Q     And specifically with regard to what was going to be done at the house in Sherman Oaks, do you recall what type of work it was that you were going to perform at that location?

A     Yes.  We were going to revise the swimming pool.  We were also going to put in -- we were going to make structural provisions for some large aquariums.

Q     And when you say "make structural provisions for some large aquariums," what does that mean?

A     That means I was going to engage and coordinate with a structural engineer to insure that the dwelling could accommodate a large aquarium.

Q     And do you recall what --

THE COURT:  Is that because of the weight?

**DRAFT COPY**

Smith - Direct / By Ms. Chahin                96

THE WITNESS:  It's because of the weight.  They were to be unusually large aquariums.

BY MS. CHAHIN:

Q    Do you recall the street where that residence was located?

A    No, I do not.

Q    And can you describe the residence to us?

A    It was a mid-century modern contemporary.  It had -- it was probably a less than 2,000 square foot house with views to the north.

MS. CHAHIN:  Your Honor, could I have one moment, please?

(Court nods affirmatively)

(Pause)

MS. CHAHIN:  Thank you, your Honor.

BY MS. CHAHIN:

Q    Now, in regard to the work that you were going to perform at these locations, did you have occasion to meet with Mr. Mikhel?

A    Yes, I did.

Q    And did you also meet with Mr. Kadamovas?

A    Yes, I did.

Q    And did you have an opportunity to visit the locations where the work was going to be performed?

A    Yes, I did.

Q    And can you describe for us, if you recall, the

Smith - Direct / By Ms. Chahin          97

circumstances under which -- or where the meetings would take place with Mr. Mikhel and Mr. Kadamovas.

A    Several meetings took place at their office on Ventura Boulevard and several meetings took place at the residences.

Q    And when you would meet with them did you have an opportunity to observe whether one of the two was more proficient in the English language?

A    Yes, I did.

Q    And what were your observations in that regard?

A    Iouri Mikhel seemed to be the spokesman for both of them.

Q    And did you ever have an opportunity to hear Mr. Kadamovas speaking in a language other than English?

A    Yes.

Q    And did you know what language that was?

A    I presumed it was Russian.

Q    And who did you hear him speaking Russian with?

A    Iouri Mikhel and his other friends.

Q    And did you have conversations with Mr. Kadamovas?

A    Yes, I did.

Q    And what were you able to tell about how fluently he was able to speak English?

A    His English was extremely limited.  He would -- his English was halting.

Q    Now, in regard to the work that you were hired to perform, did you have -- were your dealings primarily with Mr. Mikhel or

**DRAFT COPY**

Smith - Direct / By Ms. Chahin                98

with Mr. Kadamovas?

A    Mr. Kadamovas.

Q    I'm sorry?

A    I'm sorry; Mr. Mikhel.

Q    And so when you were -- for example, who did you negotiate the price of the projects with?

A    Mr. Mikhel.

Q    And did you have an opportunity to observe -- for example, when there were decisions to be made regarding the work that was to be performed who would you confer with regarding these decisions?

A    Mr. Mikhel.

Q    Did you ever, in regard to the work that you were performing, meet with Mr. Kadamovas alone?

A    Never.

Q    And did you ever need to feel with -- did you ever feel the need to confer with him regarding any of the business decisions that were going to be made regarding the Weslin property?

A    No, because I think I only had Mr. Mikhel's phone number.

Q    So you dealt primarily with Mr. Mikhel, is that correct?

A    Yes.

Q    Now, I'd like to ask you some questions about the property itself.

A    Uh-huh.

**DRAFT COPY**

Smith - Direct / By Ms. Chahin                99

Q    Do you recall approximately how many times you were there?

A    The property in Sherman Oaks, I was there probably five or six times at least.

        MS. CHAHIN:  Your Honor, I'm going to place on the Elmo what has been admitted into evidence as Government's Exhibit Number 250.

        THE COURT:  250?

        MS. CHAHIN:  250, your Honor.

BY MS. CHAHIN:

Q    Mr. Smith, directing your picture -- your attention to Government's Exhibit Number 250, does this appear to be the house in Sherman Oaks that you've described?

A    Yes, it does so.

Q    And is this the house that you've described that you visited to us -- that you've described to us that you visited approximately five to six times?

A    That's correct.

Q    And again this would be during the time period that you've described between August of 2001 to February of 2002, is that correct?

A    That's correct.

        MS. CHAHIN:  Your Honor, I'm going to remove this from the Elmo.

//

//

**DRAFT COPY**

Smith - Direct / By Ms. Chahin                100

**BY MS. CHAHIN:**

Q    Sir, from the times that you were able to visit the house did you observe whether or not the house was occupied?

A    The house was not occupied.

Q    Did you see furniture in the house?

A    There was no furnishings.

Q    To your knowledge was anyone living there?

A    No one lived at the house.

Q    And during the times that you went to the house were you sometimes -- were you always accompanied by either Mr. Mikhel or Mr. Kadamovas?

A    No.

Q    Did you have opportunities -- occasions to visit the house alone?

A    Yes, I did.

Q    And when you visited the house without either Mr. Kadamovas or Mr. Mikhel being there how did you gain access to the house?

A    I was able to go around to the back and usually a sliding door was open.

Q    When you say "go around to the back," physically how would you do that?  How would you get into the back of the residence?

A    I would go around, this would be the easterly -- the southeasterly portion of the house I believe, and through the ivy in the pool area and go to the back door.

**DRAFT COPY**

Smith - Direct / By Ms. Chahin                101

Q    Did you need keys to enter the house?

A    No.

Q    And was there -- once you entered into the backyard of the
house, how did you gain entry into the house itself, into the
interior portion of the house?

A    Through an open door.

Q    What type of door was it, if you recall?

A    I believe it was a sliding door.

Q    And on the opportunities that you had to visit the house
was that door locked or unlocked?

A    Unlocked.

Q    And was that the case in each instance that you visited
the house?

A    When I visited the house alone, if I had to gain access to
the house that's the way I would go about it.

Q    And on each time that you visited the house alone you were
able to gain access to the interior of the house through that
back sliding glass door, is that correct?

A    That's correct.

Q    And to your knowledge were there other tradesmen who were
working at the house who were also able to gain access in a
similar fashion?

A    No.

Q    Were you ever present when a roofing contractor --

A    I was -- I escorted a roofing contractor to the property

**DRAFT COPY**

Smith - Direct / By Ms. Chahin                    102

on my last visit.

THE COURT:  Mr. Smith, I'm going to ask you to take your hand away from your mouth, because it's hard to --

THE WITNESS:  Okay.

THE COURT:  -- hear.

BY MS. CHAHIN:

Q    So when you went with the roofing contractor you were both able to gain access in a similar fashion, is that correct?

A    Well at that juncture, at that time, that was my last visit and I believe someone had broken into the house.  And I surmised after a while it was the FBI or something that came in looking for him.

Q    But when you went to the house on that last instance did you go into the interior of the house?

A    I can't recall.

Q    Very well.  Did it seem unusual to you that the house would be kept in an unlocked manner?

A    No.

Q    And why was that?

A    Because there was nothing to steal.

Q    Now, in regard to the work that you performed, how were you paid?

A    I was paid in check and in cash.

Q    And do you recall who paid you?

A    Iouri Mikhel.

**DRAFT COPY**

Smith - Direct / By Ms. Chahin                103

Q     And was the work that you were hired to do ever completed?

A     No, it was not.

Q     And to your knowledge did anyone ever move into the house?

A     I don't believe so.

          MS. CHAHIN:  I have nothing further, your Honor.

          MR. SPEAKER:  I have no questions.

          MR. DUGDALE:  About 15 minutes, your Honor.

          THE COURT:  About 15 minutes?

          MR. DUGDALE:  Yes.

          THE COURT:  I have to bring him -- I have to bring you back, I'm sorry, after lunch.

          We'll take our lunch recess --

          MR. SPEAKER:  That was (***)  Okay, I apologize, your Honor.

          THE COURT:  We'll take our lunch recess, returning at 1:30.

     (Jurors exit courtroom at 11:59 a.m.)

     (Lunch recess from 11:59 a.m. to 1:27 p.m.; parties present)

     (Outside the Presence of the Jury)

          THE COURT:  All right.  Outside the presence of the jury the record will indicate that all counsel and parties are present.

          Mr. Lasting, you indicated that you are going to finish sometime tomorrow?

**DRAFT COPY**

124

Thank you.

**(Witness Excused)**

Your next witness?

**MS. CHAHIN:** Your Honor, at this time we would call Garegin Tsaroukian.

**(Pause)**

**THE COURT:** Please come forward. All right. The Clerk has stepped out. I'm going to swear you as a witness if you'll raise your right hand.

**(Witness Sworn)**

Have a seat on the witness stand. State your first and last names spelling both of your names.

**THE WITNESS:** First name is Garegin, G-a-r-e-g-i-n. Last name Tsaroukian, T-s-a-r-o-u-k-i-a-n.

**THE COURT:** All right. Let's do it one more time. G-a-r, first name.

**THE WITNESS:** G-a-r-e-g-i-n.

**THE COURT:** Wait, wait. G-a-r-e-g --

**THE WITNESS:** I-n.

**THE COURT:** I-n.

**THE WITNESS:** Garegin. Last name Tsaroukian, T-s-a -- T like "Thomas," -- s-a-r-o-u-k-i-a-n.

//

//

//

**DRAFT COPY**

Tsaroukian - Direct / By Ms. Chahin          125

**DIRECT EXAMINATION**

**BY MS. CHAHIN:**

Q    Mr. Tsaroukian, do you know a person by the name of Natalya Solovyeva?

A    Yes, I do.

Q    And directing your attention back to early 2002, at some point did you learn her husband had been arrested?

A    Yes, I did.

Q    And were you asked to provide some assistance on her behalf after her husband had been arrested?

A    Yes, I did.

Q    Okay.  And during that period of time was there a time that you had an occasion to be at her apartment during the early part of 2002?

A    Yes, I was there.

Q    Okay.  And do you recall approximately what date that might have happened?

A    That was -- I cannot recall the date, but it was May or June of 2002.

Q    Okay.  Do you have a -- do you know when Natalya Solovyeva was arrested?

A    Yes, I did.

Q    Okay.  Now, in relation to the time that she was arrested, when was it that you were at the balcony at her Lindley apartment?

**DRAFT COPY**

Tsaroukian - Direct / By Ms. Chahin          126

A    Four days before that.

Q    Okay.  So you recall being there approximately four days before she was arrested; is that correct?

A    Yes.

Q    Now, while you were at Natalya Solovyeva's apartment standing on the balcony, did you have an opportunity to observe her speaking with some FBI agents?

A    Yes, I did.

Q    What did you observe?

A    It was two male FBI agents and one female Russian FBI agent lady.  They had been talking with her -- I mean they called her upstairs, and she came down to talk with her.  Left the kid with me at the house.  She came down to talk.

Q    And where were they standing when you saw them talking to Ms. Solovyeva?

A    Right under the balcony.

Q    Okay.  And --

A    On the sidewalk.  Because the balcony faces to the sidewalk.

Q    And in the position where you were standing, were you able to hear what was being said?

A    Yes, I did.

Q    And what language was that in?

A    The guys they've been asking an English question to the lady, and the lady was translating to Russian.

**DRAFT COPY**

Tsaroukian - Direct / By Ms. Chahin          127

Q    Sir, do you speak Russian?

A    Yes, I do.

Q    And did you understand what the lady was saying in Russian to Ms. Solovyeva?

A    Yes, I did.

Q    And what was she saying?

          MS. DeWITT:  Objection.  Hearsay.

          THE COURT:  Sustained.

          MS. CHAHIN:  Your Honor, could we approach?  I believe this is --

          THE COURT:  Let me see you at the sidebar.

          MS. CHAHIN:  Very well.

     (Sidebar begins at 1:59:14 p.m.)

          THE COURT:  What's this intended to do, impeach her?

          MS. CHAHIN:  Yes, impeach her.

          THE COURT:  Ms. Solovyeva with her trial testimony?

          MS. CHAHIN:  Yes.  She said --

          MS. DeWITT:  That's not inconsistent with her trial testimony.

          THE COURT:  Wait, wait.  I don't know what --

          MS. DeWITT:  I understand.  I'm sorry, your Honor.

          THE COURT:  Why do you keep objecting when I don't even understand what the question is --

          MS. DeWITT:  I apologize, your Honor.

          THE COURT:  -- it hasn't been spit out yet?

**DRAFT COPY**

Tsaroukian - Direct / By Ms. Chahin          128

MS. CHAHIN:  Your Honor, he would testify that he overheard her being threatened by the FBI.  When I examined her in court, she said that she was not threatened by the FBI; either that she was not threatened with deportation or to have her child taken away from her.  This is an individual who was present within earshot and heard those statements being made to her.

THE COURT:  Well, but threats are one thing.  It's, you know, how the threats are made.  If you're asking what the FBI told her, it's hearsay and it's not being offered for the truth of the matter asserted.  It's not Ms. Solovyeva that is speaking; it's the FBI.

MS. CHAHIN:  Your Honor, subsequent to the conversation that he observed he had conversations with Ms. Solovyeva where she related, they discussed the threats that were made to her.  So that would be impeachment of her, because in trial she denied having been threatened.  And she admitted to him that she was threatened.  And I specifically asked her during the trial testimony whether she had conversations with Garegin where she related to him that she had been threatened by the FBI.

MS. DeWITT:  She admitted on the stand, your Honor, about feeling like she was pressured about her deportation issue, about being pressured about having her daughter taken away from her.  I even asked her questions about didn't she say

**DRAFT COPY**

Tsaroukian - Direct / By Ms. Chahin          129

something about that she thought she was being blackmailed.

None of this is inconsistent.  And everything that she is

eliciting is clearly hearsay.  It's intended to buttress their

position, not to contradict the prior testimony.

THE COURT:  Well, the problem that you have,

Ms. Chahin, is the fact that what was said is this witness's

impression of the conversation.  It's not Ms. Solovyeva's

impression of the conversation.  So I'm going to sustain the

objection as to hearsay.

It doesn't even come in under exception to the

hearsay rule with regard to impeaching her trial testimony,

because based upon her trial testimony she did, in fact, feel

for her children.  She testified as to that.

MS. CHAHIN:  Your Honor, but I think she specifically

denied having been threatened by the FBI.  And it's not being

offered for hearsay purpose; it's being offered to impeach.

THE COURT:  I understand that.  And I said it's not

an exception to the hearsay rule.  I'm going to sustain the

objection.

MR. LASTING:  Your Honor, excuse me.

Could we just make an Offer of Proof as to what the

witness would say --

THE COURT:  Wait.  Come back, come back, come back.

MR. LASTING:  Just so the record will be clear --

THE COURT:  All right.  Again, one attorney per side.

**DRAFT COPY**

Tsaroukian - Direct / By Ms. Chahin          130

All right.  I'll let you make an Offer of Proof.

          MS. CHAHIN:  Your Honor, what he would testify if he were permitted to testify was that he was standing within earshot.  He observed the two male agents and one Russian-speaking agent talk to her.  They told her that they wanted her to testify against her husband.  They threatened her with deportation and to take away her child if she didn't do so.

          They, subsequently, had a conversation. Ms. Solovyeva went into the house, had a conversation with him, explained to him again that she had been threatened; and that he observed her demeanor; that she was visibly shaken and upset about the situation.  That's the Offer of Proof.

          THE COURT:  Okay.

     (Sidebar ends at 2:02:45 p.m.)

BY MS. CHAHIN:

Q    Sir, after Ms. Solovyeva had the conversation with the FBI agents, did she come back into the apartment?

A    Yes, she did.

Q    And what was her demeanor?  How did she appear to you at that time?

A    I asked her questions:  What did they want from you?

          MS. DeWITT:  Objection, your Honor.  Move to strike as non-responsive.

          THE COURT:  No.  He can say what he asked.  It's the other side of the conversation that is the objectionable

**DRAFT COPY**

Tsaroukian - Direct / By Ms. Chahin        131

portion.  So just tell us what you said, not what she said.

**BY MS. CHAHIN:**

Q    Go ahead ,sir.

A    I just asked her what they want from you.  And she told me --

THE COURT:  No, not what she told you.  What else did you ask?

THE WITNESS:  Oh.  That's what it was.  And she told me FBI agents...

**BY MS. CHAHIN:**

Q    Sir, did you ask her anything else?

A    Yeah.  I asked her what they want from you.

Q    Can you describe her demeanor?  How did she appear to you?  Was she --

A    She was scared, shaking.

MS. CHAHIN:  Your Honor, based on the Court's ruling I have nothing further at this time.

THE COURT:  Mr. Callahan?

MR. CALLAHAN:  Nothing, your Honor.

MS. DeWITT:  Nothing, your Honor.

THE COURT:  You may stand down.  Thank you.

THE WITNESS:  You're welcome.

(Witness Steps Down)

MR. LASTING:  Your Honor, we call Veronica Castellanos as a witness.

**DRAFT COPY**

also have a map that I'm going to mark as an exhibit.  I'm wondering if there's some way to affix it up there --

THE COURT:  Give it to me and I'll take care -- and I'll think of something while you're taking care of preliminary matters.

Where's the map?

MR. LASTING:  Right here, your Honor.

THE COURT:  Oh, in your hand.

Can't you display this with the relevant portions?

MR. LASTING:  I might be able to, but I was going to ask Mr. Nicely to put some markings on it and identify the spots that are on the map.

THE COURT:  Let's bring the jury out.

(Jurors enter courtroom at 3:06 p.m.)

(Pause)

THE COURT:  All right, the record will indicate all jurors are present, all counsel are present, and all parties are present.

Mr. Lasting, you may call your next witness.

MS. CHAHIN:  Your Honor, at this time we would call Agent Polsky to the stand.

THE COURT:  Please come forward.

(Witness sworn)

THE CLERK:  Please have a seat.  And would you state your name for the transcript?

DRAFT COPY

THE WITNESS:  Michael Polsky, P as in Paul-O-L-S-K-Y.

**DIRECT EXAMINATION**

**BY MS. CHAHIN:**

Q    Agent Polsky, how are you employed?

A    I'm a special agent with the Drug Enforcement Administration.

Q    And directing your attention to October of 2002, was that your occupation at the time?

A    Yes, ma'am.

Q    And in your employment as a special agent of the DEA did you have the opportunity to work on the case of an individual known by the name of Jose Avila?

A    Yes.

Q    And what was your role in that case?

A    I debriefed him at the AUSA's office.

Q    Okay.  When you say you "debriefed him," was that an interview?

A    Yes.

Q    Okay.  Were you assigned as the case agent on his case?

A    I don't believe I was.

Q    And at the time that you participated in interviewing him, are you aware whether or not he had signed a cooperation agreement with the Government at that time?

A    I don't recall either way.

Q    Okay.  In regards to your participation in the meeting,

**DRAFT COPY**

Polsky - Direct / By Ms. Chahin                168

the interview with Mr. Avila, how did it come to your attention

that he wanted to meet with the Government?

            MS. MEYER:  Your Honor, objection.  Vague as to which

interview.

            THE COURT:  All right, I'll sustain an objection.

BY MS. CHAHIN:

Q    With regard to the interview that occurred on October 10th

of 2002, how did it come to your attention that Mr. Avila

wanted to meet with the Government?

A    Can I refer to my notes real quick --

Q    Yes.  Please.

A    -- because I'm not sure about the date.

Q    Please.  If you could, please.  And if the date is

incorrect, please advise me.

A    Okay.  Yes, October 10th, 2002.  AUSA Beth Fishman I

believe contacted me and said that Mr. Avila had some

information and that myself and my partner should probably come

down and talk to him.

Q    And do you recall where that meeting took place?

A    At the AUSA's office.

Q    Do you recall who was present?

A    According to my notes Beth Fishman, myself, and Special

Agent Tony Levy (phonetic).

Q    Do you recall how long the meeting lasted?

A    I do not.

Polsky - Direct / By Ms. Chahin                169

Q    And was the meeting tape-recorded?

A    It was not.

Q    And you've indicated that you referred to your notes.  Did you take notes during the meeting?

A    Yes, I did.

Q    Okay.  And would it be fair to say that one of the reasons that you take notes is so that you can write down any important information that the individual has to give you?

A    Yes, that is true.

Q    And that is so that instances like this, when many years later you're called to testify about those matters, that those notes might be used to aid your -- to refresh your recollection, is that true?

A    Yes.

Q    Now, do you have a specific recollection of what happened during this interview?

A    I do not.

Q    And in regard to the interview, do you recall, I don't recall if I asked you this or not, how long the interview lasted?

A    I don't recall how long it lasted.

Q    At the time that the interview took place was Mr. Avila in custody?

A    I believe he was.

Q    And do you know where he was in custody?

Polsky - Direct / By Ms. Chahin                    170

A    MDC.

Q    Okay.  Was it your understanding that Mr. Avila had some information that he wanted to provide to the Government regarding an escape?

A    Yes.

Q    And did he identify for you at that time who was going to escape?

A    Not specifically, no.

Q    And did he identify for you what the source of his information was?

A    No, he did not.

Q    And do you recall Mr. Avila asking you or inquiring that he wanted specific benefits from the Government in exchange for his information?

A    I don't have any recollection of that.

Q    Do you recall having discussed with him at all his immigration status and the fact that he did not wish to be deported from the country?

A    I have no recollection of that.

Q    Is that something that's reflected in your notes?

A    No, it is not.

Q    Okay.  Did you have any discussions with AUSA Fishman in regard to prior to her preparing any sentencing memorandum that she presented to the Court regarding this issue specifically?

A    On this date?

**DRAFT COPY**

Polsky - Direct / By Ms. Chahin                    171

Q    Or at sometime later --

A    Yes.

Q    -- after this interview took place.

A    Yes.  I did contact her much later.

Q    And did you -- did that conversation relate to whether or
not Mr. Avila was requesting not to be deported from the
country?

A    No.  Not specifically, no.

Q    Did that come up during that conversation?

A    No, it did not.

Q    In regard to what Mr. Avila told you about the information
that he had about something that might happen at the MDC, did
he mention to you anything about cell phones?

A    No, I don't believe he did.

Q    Did he mention anything to you about the visiting room
being blown up?

A    No, he did not.

Q    Okay.  Is that something that -- is that the type of
information that if he had mentioned it to you, you would have
put that in your notes?

A    Yes, I would have.

Q    And did he express to you concern for family members of
his who might get hurt in the visiting room if it were to be
blown up?

A    No, he did not.

**DRAFT COPY**

Polsky - Cross / By Ms. Meyer                    172

Q    Do you recall how the meeting came to an end with Mr. Avila?

A    Not specifically, no.

        MS. CHAHIN:  Your Honor, if I could have a moment with counsel?

    **(Court nods affirmatively)**

    **(Counsel confer)**

        **MS. CHAHIN:**  I have nothing further, your Honor.

        **MR. SPEAKER:**  We have no questions.

                        **CROSS EXAMINATION**

**BY MS. MEYER:**

Q    Agent Polsky, did Mr. Avila say that three Russians were trying to escape?

A    He said about three.

Q    About three Russians?

A    Yes.

Q    And did he tell you that they had a key to the windows?

A    Yes, he did.

        **MS. MEYER:**  No further questions, your Honor.

        **MS. CHAHIN:**  Nothing further.

        **MR. SPEAKER:**  Nothing.

        **THE COURT:**  You may stand down.  Thank you.

        **THE WITNESS:**  Thank you.

    **(Witness excused)**

        **THE COURT:**  Mr. Lasting?

**DRAFT COPY**