# GOVERNMENT EXHIBIT 74

1

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
LOS ANGELES DIVISION

UNITED STATES OF AMERICA,       )
                                )
                Plaintiff,      )
                                )
        VS.                     )        Docket No.
                                )        CR 02-220(B)-NM
IOURI MIKHEL,                   )
                                )        Los Angeles, California
                Defendant.      )        October 18, 2005
_____  )

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE NORA M. MANELLA,
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff:        Robert Dugdale, ESQ.
                          Asst. U.S. Attorney
                          312 N. Spring Street
                          Los Angeles, CA  90012
                          (213) 894-2434

For the Defendant:        Richard Callahan, Esq.
                          230 East Colorado Blvd., Ste. 1200
                          Pasadena, CA  91101
                          (626) 202-4060

                          Richard Lasting, Esq.
                          David Evans, Esq.
                          1717 Fourth St., Third Floor
                          Santa Monica, CA  90401
                          (310) 576-6242

Court Reporter:           Nancy Smith-Wells, CSR, CRR, RMR, C
                          402 U.S. Courthouse
                          312 N. Spring Street
                          Los Angeles, CA  90012
                          (213) 621-2148

Proceedings recorded by mechanical stenography, transcript produced by computer.

FILED
CLERK, U.S. DISTRICT COURT
FEB 10 2006
CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

ENTER ON ICMS
FEB 13 2006



THE COURT:  Mr. Evans, it's probably safer for all concerned.

MR. EVANS:  I feel more secure.

THE COURT:  Yes.  And the lady and gentleman sitting behind, I'll ask you to leave as well.  Oh, is that right, they're with you?

MR. CALLAHAN:  He's with me, and his daughter is with me too.

THE COURT:  Oh.  All right.  All right.  You don't object to their presence in here?

MR. CALLAHAN:  I do not.  I do not.

THE COURT:  Okay.  So the courtroom is now cleared of all but the defense team for Mr. Mikhel.  I assume he works for you in connection with this case.

MR. CALLAHAN:  Yes.

THE COURT:  Not like it's a contract or something.  Not your masseur.

MR. CALLAHAN:  He's coming later.

THE COURT:  We'll all need that.  And Mr. Lasting who's already received the documents.  My law clerk, Ms. Sagar, the court reporter, the courtroom deputy and myself.  All right.

Now, Mr. Callahan, the floor is now yours.

MR. CALLAHAN:  Your Honor, thank you.  I believe I briefed the attorney-client issue in the papers well enough

unless the Court has specific questions.

THE COURT:  I think I understand -- yeah.  I think I understand the argument.  I mean, I think you have something of a tough row to hoe given that the document was not obviously designated for an attorney; and without going into its contents too deeply, even though everyone here has presumably seen the document, does not appear to be a document seeking legal advice.

MR. CALLAHAN:  The foundation for the argument that I raised was primarily to set up the joint defense argument.  I thought they sort of dovetailed into each other; but it was mostly just to set a foundation for that argument, so with the Court's indulgence I can move on to joint defense.

THE COURT:  That's fine.

MR. CALLAHAN:  I think the fundamental hurdle that the Government sees with this document being covered by a joint defense privilege is that there was no attorney ostensibly involved in either its preparation or dissemination.  In this particular case there's no evidence that this document has ever been disseminated.  However, assuming that just for the purposes of this argument, the primary issue is, as it was in the cisneros case before the Circuit sometime ago, that the Circuit eventually sidestepped is inherent in basically setting forth the joint defense privilege that there be an attorney acting as intermediary

between a communication from one defendant to another; and I submit there should not be if there is not.

There are few, if any, cases that even discuss this issue. The only one that I could find is actually the same one that the Government found, Ms. Sagar found which is I believe the Gotti case; and it is, with all due respect, it is a district court case and has little or no analysis involved in making a blanket determination that there must be an attorney present between in these communications.

I think if we look at the purpose of this privilege, Your Honor, the idea of an attorney being necessary for such communication really doesn't seem to make sense. The fact that there are three elements to that privilege, one that it's of a common interest between the players -- and, again, as we set forth, there was, at least at that time, an implicit joint defense relationship between Mr. Mikhel and Mr. Kadamovas. Clearly unless we need to go into the details I would submit, as I did in the papers, that the document is basically a recitation of events that occurred that formed the basis of the underlying lawsuit here.

So from that standpoint a communication from one defendant to another clearly would be in pursuit of a joint interest; and the third element is that the privilege cannot be waived, that I would submit that at the very least the

concept that a document allegedly written to a co-defendant with the words "attorney-client privilege" at least demonstrate an intent that this document be deemed protected.

Those are the three central elements, and nowhere in those elements under the 9th Circuit law do I find the need for an attorney or what the basis of that relationship would have to be.

It seems to me, just from a common sense standpoint, that when you're dealing with a joint defense, who better to participate than the people who are alleged to have been involved.

THE COURT:  Well, that seems to me a small part of the joint defense privilege.  The whole idea is that it falls under the broader category of attorney-client privilege which usually involves two parties; an attorney and a client.

I mean, it seems to me the most obvious response to the question "Do you need to have an attorney present?"  Is if you don't have that requirement; then we're basically just permitting conspiracies to continue, you know, up until the date of trial by allowing defendants to confer amongst themselves and come up with whatever story they want to come up with.

The whole idea of an attorney's presence there seems to be not only do we know that they are talking legal strategy but we hope that the attorney serves to make sure

that co-defendant aren't simply suborning each other's mutual perjury and concocting a defense.

MR. CALLAHAN:  I can understand that, and I would submit to the Court, however, that pragmatically speaking, had this missive been communicated in this case to Mr. Kadamovas in the context of a joint defense meeting, they would be fully protected, there would not even be an issue here.

THE COURT:  But that begs the question.  I mean, that just begs the question of whether this is pursuant to a legal strategy in which lawyers have participated, in which lawyers are advising their client; and the whole idea is if you had a lawyer there -- let's just assume for purposes of argument that one defendant decides to get together with another defendant and concoct a false story and to ensure that their stories match.

If they got together with their lawyer and said here's what we're going to do, now let's talk, presumably the lawyer would be the one to say no-no-no-no-no.

MR. CALLAHAN:  Absolutely true.

THE COURT:  That's right.  So the notion that, hey, if they had done this in the presence of the lawyer, it would have been privileged, it's kind of a false analogy because the whole point of having a lawyer there is that we assume that lawyers are there in part to avoid the subornation of

perjury.

MR. CALLAHAN: Well, in the context of the Court's hypothetical, I think your point is well-taken; but I don't think that situation is the one I'm contemplating. Your situation would be that the lawyer knows going in that this is going to be an attempt to manufacture. I don't think that happens in the real world. It would be simply a case, and we've all had cases, at least on the defense bar where you've got the Defendants sitting around in a room and they're hashing things out. It happens.

My point would be, I'm hoping its an answer to the Court's question, that the ability to manufacture if that's indeed a concern is present whether or not a defense attorney is in the room or not.

THE COURT: Oh, it's -- to say that you cannot eliminate it entirely is not to say that it's still -- that it's unimportant to have an attorney there. There are all sorts of things. You know, frauds could be perpetrated on the courts but we have all sorts of procedures that we nevertheless follow to reduce that likelihood and we are talking about a privilege here. We're talking about something that supersedes a desire to get to the truth and do all sorts of other socially beneficial things because we want to protect the integrity of that relationship; and just as more than one court has commented, when a person provides

information to another without first consulting his own attorney it's typical to see how the information is given as part of a joint defense.

I mean, joint defense suggests that there are -- there's more than one client and at least one attorney seems to me. I mean just seems to me you're kind of dealing with a -- an animal which in this case is sort of missing maybe its arms and legs. I mean, the whole idea, the attorney-client privilege suggests some participation of counsel.

MR. CALLAHAN: Sounds like my old dog by the way.

THE COURT: I was going to say I'm not sure how long he lasted.

MR. CALLAHAN: Well, it's also just to flesh out the Court's argument a little bit. It wouldn't have to be an attorney from my understanding once you get into the context of joint defense, it can be a paralegal, an investigator conducting these meetings as long as there's uniformity and purpose.

So it really boils down to the only thing missing here, and I concur that it's missing from the facts we have, is another body, and I simply don't see why that fact and that fact alone should take this out of the analysis to where it's possible to have a joint defense privilege.

I can understand if this missive began with the phrase, okay, co-defendant, here we go. This is the best

13

story I can come up with. Good luck. Please memorize it for jury trial. I can understand that. But here you have a simple recitation of events to a co-defendant who, at least in theory, was involved in some of these events or at least was present --

THE COURT: Well, at best, I think the document itself, which is quite lengthy, could be certainly construed as the former. Now, you're asking that it not be but I think that reasonable minds could read it as pretty much being what hypothetical you've just set up.

MR. CALLAHAN: But again --

THE COURT: Here we go.

MR. CALLAHAN: I don't see the --

THE COURT: -- I said this and you said that and remember you did that and I did this. Maybe innocent. Maybe a concoction.

MR. CALLAHAN: And that same analysis would take place if every attorney in the case and every paralegal were sitting in the room with them. So, again, I come back with that argument that if it's simply because you're trying to prevent a subornation of perjury or a manufactured defense, I don't see that the simple presence of an attorney or third-party is going to necessarily end that inquiry so I just don't think it should be prohibited.

I think perhaps since there's very little law on

the issue it would be more in the line of a case-by-case analysis but I don't know what else I can say on that issue.

THE COURT:  There actually are some other cases that have at least discussed the issue, cases remarking that it's clear that parties conferring among themselves outside the confines of the group and not for the purpose of collecting information in order to obtain legal advice don't preserve the privilege because in the event they're not seeking legal advice or sharing information to receive -- because in that event they are not seeking legal advice or sharing information to receive legal advice.

I mean, in this -- it's undisputed that in this particular document Mr. Mikhel reports that he's already told that stuff to his lawyer, so he's not -- it's not for the purpose of seeking legal advice.

It also -- there's also a case out of the 1st Circuit refusing to apply the joint defense privilege where no lawyer was present for the conversation or even knew it had occurred.  That's the U.S. vs. Bay State Ambulance case.

You know, in looking at what the commentators say, there's a lengthy law review article in which the author comments really on how important the joint defense privilege is, especially to criminal defendants.  But even that author notes the privilege does not extend to communications among co-defendants in the absence of their lawyers.

So people who have a lot more time than you or I do to ponder these questions, and somebody who obviously was writing an article to emphasize how important it was, even that author said, well, it certainly doesn't extend to sharing of conversations among co-defendants in the absence of counsel.

So, I mean, you can say the only case that seems directly on point is Gotti but I guess I would say to you have you found any case that suggests that the privilege does apply in the absence of any attorney or even representative of the attorney.

MR. CALLAHAN:  No.  The only -- the only little nugget that I will add -- it's in the papers, but just to remind the Court, the Defendants in this case were prohibited from meeting jointly, so to the extent that there's an issue about whether or not this should be deemed joint defense, the fact that this would be their only means of communications I think should play a role too, but with that I'll submit on that issue.

THE COURT:  Okay.  All right.  Let me hear from Ms. Sagar.  Thank you, Mr. Callahan.

MR. CALLAHAN:  Thank you, Your Honor.

MS. SAGAR:  Your Honor, I just want to highlight a couple of points that Mr. Callahan just touched on.  First, the fact that this document doesn't appear to have been

disseminated; and I would strongly suggest that the circumstances under which this document was found suggests that it was disseminated. What was found in Mr. Mikhel's cell was a photocopy of a legal sized letter pad type document, so it's in -- it's a legal size. It's a white photocopy of what could be either a yellow or a white pad; and on the bottom of that -- of every single page of that photocopy are the words "private attorney-client" and that notation, "private attorney-client" appears to be in original black ink on the photocopy.

So it strongly suggests that the original document was in fact disseminated perhaps to its intended recipient, Mr. Kadamovas, and the fact that the original wasn't found during the search of Mr. Kadamovas's cell doesn't mean that he didn't at one point receive it or pass it on and destroy it. And the fact that Mr. Mikhel chose to note "private attorney-client communication" also doesn't, you know, really bear on whether it is in fact a privileged document, rather it appears that he was consciously trying to thwart its examination if found by prison officials or law enforcement by writing that document, and there's case law the Government has cited to that fact.

As the Court pointed out, this is clearly not an attorney-client privilege communication. It's not addressed to Mr. Mikhel's lawyer. It's not just a handwritten document

17

like the one that was upheld in the Bishop vs. Rose case in which it was clear that the attorney had directed his client to set forth details of where he was at the time of the crime so that he could use that to assist in the preparation of his defense.

This is clearly a communication from one defendant to another, and it is really nothing but -- on its face the nature of the document, there's nothing in the document that suggests that it's a privileged communication, that it's being made as part of any kind of joint defense agreement. It's not a question -- it's not a document in which information is imparted to a co-defendant to clarify certain facts to try to figure out what the Government's evidence is; it is what it purports to be. It's a roadmap of the story that these two defendants want to present at trial, and it's a story that, if believed, would portray these two defendants as victims of a scheme concocted by the cooperating co-defendant in this case.

Under those circumstances it cannot be a document that is protected by the joint defense agreement. As the Court has indicated, there is no case that says communications between co-defendants without -- that are not in the presence of an attorney are privileged communications. And here, in addition to there not being an attorney present, there's no indication that an attorney directed this

communication to take place. There's no indication that an attorney told one defendant to author a version of facts for another defendant in furtherance of their common objectives.

So the Government would, on that basis, strongly urge the Court to find that this is not a privileged communication under the attorney-client privilege or the joint defense privilege and that it should be disclosed to the prosecutors in this case for their use at trial.

THE COURT: All right. Thank you, Ms. Sagar. Anything further, Mr. Callahan?

MR. CALLAHAN: Just to clarify, Your Honor. The idea of dissemination is -- was not my -- a strong argument from the standpoint of joint defense. It's anticipated when I made the argument that the document, at least for purposes of argument, had been disseminated so I'm not concerned about that. The language at the bottom, I concur with Ms. Sagar, it's not independent enough to provide attorney-client or related protections. My point was in raising it that it demonstrates for a menevolent (sic) or benevolent purpose the intention of the Defendant to keep that confidential document confidential and --

THE COURT: So you're saying -- it is a factor. You aren't suggesting --

MR. CALLAHAN: I agree. It is a factor. And on that I would submit, Your Honor. Thank you.

19

THE COURT: All right. All right. Let us bring in Mr. Dugdale then for the Government.

(Mr. Dugdale returned to the courtroom.)

THE COURT: All right. We are back on the record in the Mikhel matter and Mr. Dugdale and Special Agent Perez has joined us, Mr. Evans as well. The next issue is whether if the document is not privileged, it is, nevertheless, inadmissible in the Government's case in chief because its seizure violated Mr. Mikhel's 4th Amendment rights.

Again, I think we're all familiar with the facts. There was in, I think March 7th of 2002, the discovery of a suspected escape attempt from MDC. On the 7th I believe the cell of Mr. Mikhel and perhaps some others was searched by MDC officials investigating the reported escape attempt. A number of items were seized from the cell and, forgive me if I'm filling in my memory with evidence from the Tynan case which was the prosecution of the, I think former cellie of Mr. Mikhel, who was subsequently prosecuted for the escape attempt, along with his wife and, I believe, Mr. Tynan's brother.

In any event, I think it's undisputed that evidence of relevance in this case was found in Mr. Mikhel's cell. As I recall, it was the equivalent of a large Ace Hardware store which notwithstanding MDC security the illustrious and industrious members of the escape plot had managed to get

into Mr. Mikhel's and perhaps some other cells.

There were personal items seized as well that were put in a -- in storage in MDC.  One week later those -- the items in storage were again removed and the FBI got a warrant to search those items and to do a second search of the cell, I believe, to look for evidence relevant to the escape attempt.

The 12-page photocopy letter, which is the subject of this hearing, was among the items seized in the first search by MDC officials and put in a locked storage area; removed on the 14th I think, on or about the 14th.  The document is written in Russian, and because it was notated at the bottom, "private attorney-client" my understanding is the document was placed in a sealed envelope.

It was thereafter translated and given to Ms. Sagar as a member of the Taint Team; and upon reviewing the document once translated its relevance not to the escape plot but to the instant case was at that point apparent.

The defense has moved to suppress the document on the grounds that its seizure, with or without a warrant, violated Mr. Mikhel's 4th Amendment rights.  The Government has argued that under Hudson vs. Palmer and 9th Circuit cases the defendant had no 4th Amendment interest in what was seized by prison officials from his cell and that even assuming he had such a right the Government was authorized --

I'm not sure actually I necessarily agree with the defense that suggests that the Government doesn't argue that the search was authorized by the warrant but that the seizure was authorized by the warrant.  The defense suggests the Government isn't making that argument.  I think the Government is making that argument, albeit under plain view theory.

MR. CALLAHAN:  Fair enough.

THE COURT:  Which I'm not sure is the correct theory in that case.

So the question, number one, is:  Did they need a warrant at all?  And question number two is:  If they needed a warrant, was the search justified in pursuance of this warrant?  Mr. Callahan, the floor is, again, yours.

MR. CALLAHAN:  Thank you, Your Honor.

THE COURT:  And I guess the first question I have is, you know, Hudson vs. Palmer and 9th Circuit authority, even preceding Hudson and certainly post Hudson, you know, suggests that a prisoner has no 4th Amendment right of privacy in his prison cell, that once an item is seized what the Government does with that item, provided it hasn't subsequently been returned to the defendant, is of no concern to the 4th Amendment, as Justice O'Connor emphasized in Hudson vs. Palmer and in cases like Burnett and Johnson out of the 9th Circuit, that mantra has been repeated.

The Cohen case doesn't seem to help you because Cohen is the second Circuit case where there was no suggestion that any search was ever done for institutional security purposes, that was just a prosecution team that decided it would like a little more evidence and went in and searched a guy's cell.  That doesn't seem to help you.

And the Clark case, apart from being out of the Southern District of Ohio, which is obviously not binding on this Court, seems to me inconsistent with 9th Circuit precedent in Burnett and Johnson, not to mention arguably inconsistent with Hudson so if you'll address that.

MR. CALLAHAN:  All right.  I think the operative question that I would pose to the Court is how large of a slice out of the 4th Amendment are we going to allow Hudson vs. Palmer to take?  I think that under the circumstances here a warrant was required and it's demonstrated by no better fact than the FBI sought and obtained one.

THE COURT:  But I can't buy that, Mr. Callahan.  I mean to do something out of an abundance of caution and have that held against you?

MR. CALLAHAN:  But under the facts, Your Honor, I think they definitely needed one.  I'm not objecting so much, if you'll notice, to the initial viewing by Mr. Davidson and I believe Special Agent Wilson on the 7th.  They were called in order to assist MDC in investigating what they perceived

to be an escape attempt. They were allowed to look at items at that time, tools, et cetera, and those things were seized at that time on the 7th, without a warrant, and we're not challenging that here.

What's happened in the intervening time, however, I think, is when Hudson vs. Palmer, I think we have to draw that line where Hudson vs. Palmer ends and traditional 4th Amendment dictates our back.

THE COURT: Well, first of all, then you wouldn't have had any problem with their taking the Russian language document on the 7th and translate it. If they waited a week to translate it --

MR. CALLAHAN: I think under the circumstances they did exactly what they should have done which is get a warrant, find that letter and send it to the Taint Unit. I don't think they had a right to take it because it was not evidence of instrumentality or contraband.

THE COURT: How do we know?

MR. CALLAHAN: Because what was provided to them at that time was only those fundamental tangible items that were used to assist the escape. I don't think that letter --

THE COURT: When you say "was provided them," I'm sorry. It was all in the cell; right?

MR. CALLAHAN: Yes.

THE COURT: All seized from the cell.

MR. CALLAHAN: But then everything was dumped in some sort of a conference room except for the personal items that were then put -- locked --

THE COURT: You don't dispute that if the document had written on top of it in English "escape attempt plot" they could have seized it; right?

MR. CALLAHAN: That sounds like it might have been in furtherance of the underlying alleged scheme.

THE COURT: Right. So if it had said that on the top, the fact that it's in writing and that it's not a drill would certainly not have made it any less seizable. It's in Russian which is a problem; and in order even to determine its relevance, doesn't it have to be translated?

MR. CALLAHAN: But I think it does and that's what they did. They did precisely --

THE COURT: Right. I guess back to my question then if on the 7th they could have translated it.

MR. CALLAHAN: I think the Government has a inch stronger argument if that's the case. I, frankly, believe that at the time -- and here's where I get into that issue is how far does Hudson vs. Palmer take us. In the ambit of institutional security, I think the Government has a stronger argument, although I would fight it, that if that letter is presented on the 7th there's much less violation of the 4th Amendment as it is when it's put into personal storage and

25

left in the dark for a week.  The exigency is no longer there which is really what motivates Hudson vs. Palmer in the first place.  It's for institutional security only.  Only and not to give carte blanche to the FBI or any other agency to come in and have a smorgasbord, it's not.

THE COURT:  Well, I understand your theory and just as I understand the Clark Court's reasoning.  But, you know, the 9th Circuit seems -- seems to take a different view.  In Burnett the 9th Circuit said, once an item in an individual's possession has been lawfully seized and searched, subsequent searches for that item, so long as it remains in the legitimate uninterrupted possession of the police may be conducted without a warrant; requiring police to secure a warrant for subsequent searches of an item already lawfully searched but in no way provide additional protection for an individual's legitimate privacy interest.

Contents of an item previously searched are simply no longer private.  And that was the case relied on by Judge Fletcher, Judge Fletcher, Sr. In the Johnson case.  In holding that once -- I think in that case it was currency which had been lawfully seized from a defendant who was being booked, but once that currency was seized, a subsequent examination of the currency to determine serial numbers did not violate the 4th Amendment.  In that case the Court actually rejected the district court's conclusion that it had

26

been an inventory search but they upheld the subsequent search which was certainly more intrusive than the first search so it wasn't a question that the two searches have to be of equal intrusiveness.

Saying, in essence, once you've had something seized it's no longer yours, it's not in your possessory interest. We don't care how many times the Government searches it.

MR. CALLAHAN: Well, let me ask you this, Your Honor, and forgive me because I did not bring that case with me but it seems to me we have a distinction between the search made by the MDC personnel and one made by another federal agency. I think there's a distinction.

THE COURT: I think not for purposes of the Defendant's expectation of privacy. In fact as Justice O'Connor is pretty clear in Hudson vs. Palmer that once the Government has your property your expectation of privacy is no -- is not anymore infringed by the second search or the third search or the fourth search.

MR. CALLAHAN: I would beg to disagree with the conclusion and the theory behind it in that I can understand that philosophy if there is still an institutional concern for security based on that -- on that specific product seized; but here we're just talking what was essentially inventoried property. I can't imagine that with a different

agency involved and await passing in the interim where there's really no exigency remaining that that personal property has no further privacy right ever.  I can't --

THE COURT:  Well, two things.  Number one, the Government disputes that characterization.

MR. CALLAHAN:  I understand.

THE COURT:  Because a week later we still did have concerns about the institution and in fact we hadn't uncovered the plot and in fact it was in until April I think that they got on to Mr. Tynan and that prosecution was pursued.  So factually I think the Government disputes that notion.

But apart from that I don't think that either the Supreme Court or the 9th Circuit has made the distinction that you're asking be made.  The distinction they've made has been, hey, if you -- sure, if you take the property and you seize it and then you return it to somebody, you can't thereafter seize it.  You can't suggest that, you know, because we seized your purse when we arrested you in 1984 we can stop you on the street in 2005 and search your purse; but in the context of otherwise valid searches that are then followed by subsequent, even more intrusive searches the 9th Circuit, both before and after Hudson, have said not a problem.

And in the context of prison cells, you know,

28

Hudson established a pretty bright line.  In fact, that's one of the -- you know, I think it's Justice Brennan's dissent, objects to that bright line but he lost.

MR. CALLAHAN:  The point that I raised in -- by citing the Clark case.  Frankly, this is a very unusual set of facts all in all.  The Clark case was so uncannily close, and what the Clark court said, and I understand it's not the 9th Circuit but again I don't think the 9th Circuit has touched this particular type of issue in this way.  What the Clark Court said, that when you're still talking about institutional security, and I don't begrudge Mr. Harlien from MDC saying that they still had concerns that there might be other individuals but that's not the analysis I think that needs to be taken.  It's institutional security regarding the property involved or the defendant.

And what Clark said --

THE COURT:  Wait, wait, wait, wait.  Why isn't institutional security meaning we need to go through this stuff to see what the extent of this escape plot is?

MR. CALLAHAN:  I think they might have.

THE COURT:  Well, sure.  You got a letter in Russian that may say, for all they know, you know, plans for escape, you know, here are the following individuals who'll be participating.

MR. CALLAHAN:  But that letter, to my recollection,

was found by the FBI, not by the MDC staff.

THE COURT: But wasn't the letter already in the property of the MDC?

MR. CALLAHAN: I believe it was in -- it had been taken along with everything else, clothing, et cetera, and I believe it was in the closet locked.

THE COURT: Right. Right. So it had certainly been seized by the MDC staff pursuant to the first search.

MR. CALLAHAN: All right.

THE COURT: All right.

MR. CALLAHAN: Again, it's a much more difficult question if the MDC staff, in furtherance of their own institutional security, had decided to take another -- take a second look at what they had seized before.

THE COURT: But at that point -- I mean, the FBI is not uninterested in institutional security. It's not as if the FBI must somehow shielded its eyes from evidence of prison break.

MR. CALLAHAN: No. But they are an investigative agency. The MDC has its own security institutional staff for exactly this purpose and they conducted their own investigation without the help of the FBI. And that's why I think it's -- it's not fair, and I think inappropriate to merge the MDC investigation and the FBI investigation. I think they're two wholly separate animals and one is

investigatory, one is for institutional security. Of course there's cross-over, but when there's cross-over it doesn't negate the need for the second agency, the FBI, to get a warrant. That's my problem.

THE COURT: All right. I have not seen in any case the suggestion that the defendant's 4th Amendment rights depend on which government agency is conducting the search. I understand your argument. I mean, I did -- but I haven't seen that recognized in any of the case law. In fact, the cases that I see in the 9th Circuit and in Hudson vs. Palmer don't seem to make that distinction.

MR. CALLAHAN: The Clark Court did, Your Honor.

THE COURT: Right. But I -- I --

MR. CALLAHAN: I understand.

THE COURT: We're still in the 9th Circuit.

MR. CALLAHAN: I understand.

THE COURT: Let's turn then -- I don't want to cut you off if you have other arguments to make, but let's turn to the warrant.

Let me tell you how I see the warrant. The warrant itself authorize -- and I -- I don't think that getting a warrant should be held against the Government. I mean, that's not an indication to me whether they need a warrant. I hate to think what that would encourage the Government to do; but they got a warrant and there's no question that the

31

warrant authorized them to search for evidence of the escape attempt; and there's no question that the warrant itself contemplated that there might be documents written either in code or in foreign language; right?

MR. CALLAHAN: Yes.

THE COURT: I think the warrant actually refers to that in the application. So they come upon this letter, and if -- and while I don't think plain view frankly is the proper analysis; but I think this case is more analogous to those cases where the Government comes upon -- say has probable cause and a warrant to search for -- it often comes up in the context of child pornography, and they find computers or other things that have to be downloaded; and the courts seem to recognize that you're not required to stay on site, bring in a computer team and download the computer on site. You can, in fact, take the computer equipment and download it to determine whether there is evidence that fits within the warrant, assuming you have probable cause to be there in the first place.

MR. CALLAHAN: All right.

THE COURT: I don't think there's any question -- there's no challenge to the underlying probable cause in this case.

I guess the simple question is we're talking about the 4th Amendment. We're talking about what's reasonable.

The Government has said probable cause to believe that he was involved in an escape plot, want to search some of this stuff, recognize that some of it may be in code or may be in Russian. What were they supposed to do when they found this document, get a third warrant? And what would the affidavit for that warrant have said?

MR. CALLAHAN: What they should have done is precisely what they did. Exactly at what point in this continuum do we have a disagreement? They found the document, they didn't know what it was. It appears to be written to a third party. There's no one at the scene who can interpret it, so under those circumstances, except for the words "attorney-client" at the bottom which caused them to put it in a segregated folder, I think they may well have been on, if with good cause, to at least take it to the next step; but it's that next step that I think causes the problem because once that document is interpreted, it shows that it has absolutely no relationship to the escape plot at all --

THE COURT: But isn't its relevance at that point to the current prosecution self-evident?

MR. CALLAHAN: But they weren't seeking that, and it's not -- it's not itemized in what they're seeking in the warrant.

THE COURT: Well, but at that point, and maybe I'm misunderstanding the Government's argument a little bit, but

at that point it's relevant to this prosecution.

MR. CALLAHAN:  Agree.

THE COURT:  Does seem plainly visible or plainly apparent.

MR. CALLAHAN:  That's their argument.

THE COURT:  Okay.  Maybe I misunderstood their argument or maybe I just think they missed a step in it.

MR. CALLAHAN:  My understanding, and correct me if I'm wrong, is that once interpreted and reviewed, it appeared to be unrelated to the escape which formed the basis of the warrant.  They don't challenge that, but what they're arguing now is that it's clearly because of what the contents of it, it's relevant to the underlying case which brings it right back within the purview of plain view doctrine it seems.

THE COURT:  Right.

MR. CALLAHAN:  Okay.

THE COURT:  Well then -- I'm not sure I do disagree with that then.  So where does your disagreement come up?  What were they supposed to do?  You're just saying that it's not clearly relevant to this case?  It's not --

MR. CALLAHAN:  Well, it's arguable.  I can understand their position.  It's relevant, at best, to the underlying case, not to the escape.  So they're lawfully there because of the warrant, but the document they seek, even when translated, has no relationship to the warrant.

The Government's not arguing that it does. They're saying that notwithstanding that we go back to a plain view analysis, and that's where I think they really have problems.

THE COURT: Well, I -- I mean, I don't think anyone would be arguing so vociferously to keep this document out if it weren't so plainly relevant to the instant prosecution. I know we all love being here but -- -- so let's go back. I just want to make sure I understand what you're -- and I think -- I think what you're really saying, maybe what you're saying is, okay, we don't have a problem with them seizing it and translating it, we just don't think that once translated it's all that plainly apparent that it's incriminating document in this case. Is that your argument?

MR. CALLAHAN: It's a two-part argument.

THE COURT: Okay.

MR. CALLAHAN: When translated, it is not in furtherance of the warrant so there has to be an alternative means for admissibility.

THE COURT: Okay. I don't think -- I'm not sure that the Government would dispute that.

MR. CALLAHAN: Okay.

THE COURT: Okay.

MR. CALLAHAN: Then we have to come back into the plain view analysis which is the Government's fundamental point outside of the Hudson vs. Palmer argument but under a

plain view analysis. I think that the requirements here are a little more difficult because with plain view I think we're in a different position than translating a document to see if it's -- it fits within the confines of the warrant. Plain view in a document that's not covered by the warrant has to be immediately apparent. This is different. This is not a document that can be translated unless there is somebody there at the time but there wasn't.

THE COURT: Well, but -- okay. So let's go back to that. Isn't it clear that even an -- here's the proposition.

MR. CALLAHAN: Uh-huh.

THE COURT: You're executing a warrant. You know there may be documents written in Russian or in code. You don't know at the moment you pick up that document whether it falls within the terms of the warrant. Isn't it a given that you can translate it to make that determination?

MR. CALLAHAN: Well, I will say you should be able to translate it under proper safeguards. But I would say in this case, particularly in the fact that there was reference to the idea that many of these documents could be in a foreign language, they have a number of Russian speaking agents who could have been on the scene to avoid a plain view analysis.

THE COURT: Well, actually there's a case by Judge Kazinski called United States vs. Hill. It's an opinion he

wrote while sitting on the district court in which -- which is remarkably on point. He actually raises the question of what happens, and that came up in the context of downloading computer storage media; and the defense objected to the fact that they hauled off the storage media; and -- you know, without knowing whether it had information that was responsive to the warrant.

And Judge Kazinski analogized the situation to one in which officers have reason to believe records may have been in a foreign language; and Judge Kazinski observed; in Los Angeles today finding an officer who reads Spanish may be fairly easy while finding one who can read Portuguese or Russian probably is not. I'm not making this up.

Police are certainly not required to hire an expert translator to bring with them. They're entitled to limit the search team to officers already employed and reasonably available at the time the search is being conducted. As we all can see, or at least I think you can see it in your papers, there's no reason to believe that any of the officers on site spoke Russian.

MR. CALLAHAN: Correct.

THE COURT: Judge Kazinski went on to emphasize that police are free to hire such an expert to help to conduct the search but the 4th Amendment does not require it.

So I recognize that this is just a district court

case and one 9th Circuit judge, but there was nothing to suggest that you do -- just as that case stood for the proposition that you do not have to bring an entire computer team to download the computer on site and determine whether there is child pornography or whatever else might be relevant, you don't need to bring expert translators to the scene.

MR. CALLAHAN: My recollection of that case, and, again, this has been some time since I actually looked at that one, my recollection was that the request for hard drives was in the warrant because it was part of the scheme in which they were --

THE COURT: As in this case the request to seize documents written in foreign languages was contemplated. Seems to be completely analogous.

MR. CALLAHAN: But again --

THE COURT: And in fact in that case, and some cases are different, although I've seen cases in both instances which uphold the warrant, sometimes the warrant itself is broader -- says seize computer stuff; and the defendant has challenged that it's overbroad. And I think it's the 1st Circuit case, Judge Hudine (phonetic), says, you know, how much more specific can they be because you don't know what's on the computer until you download it.

MR. CALLAHAN: That's right.

THE COURT: Then there are other cases which are more specific that say to seize computer images of violations of such and such a title.

And, again, the Court has the same result which says how do you know until you download it? Well, it's the same thing here. How can you determine whether it falls within the warrant until you translate it? And the courts seem to say it seems to be imminently reasonable logic. You sure have to translate it before you know.

I mean, if the agents get to a site where they think there's pornography and they know there are photographs and they come upon a jigsaw puzzle and it's partially completed and they can see from this jigsaw puzzle that part of the image of a photograph as they take photographs now and make them into puzzles and they can see a naked foot here and they can see some lingerie there and they can see a lollipop there -- now, it's possible that it's a photograph of a family at a beach outing and it's possible that it's a photograph of kiddie porn.

Do the agents have to sit there for four days and finish the puzzle?

MR. CALLAHAN: Different issues. One is within the confines of a warrant, and once that determination is made it is not, as is the case here, then you have a plain view analysis.

THE COURT: No-no-no. But you're moving on. You're not disputing then that they can make that -- they can take it to translate. I just want to make sure I understand.

MR. CALLAHAN: I would love to be able to disagree with you but I think because logic dictates that it wasn't a foreign language. They could have had an FBI translator there but at the very least they handled that aspect correctly.

THE COURT: Okay. So your gripe is that once translated -- I'm not being facetious -- I mean your objection, I guess, is that once translated it wasn't plainly viewable enough.

MR. CALLAHAN: Yes. No. No. No.

THE COURT: No?

MR. CALLAHAN: Had they asked -- well --

THE COURT: I mean you can see something in plain view that is relevant to a different crime, right; if you go searching for narcotics proceeds and you find a severed head in the closet, you're not precluded -- say it's kiddie porn and you find a severed adult head, you're not precluded from investigating that or seizing it I guess.

MR. CALLAHAN: Well, it's interesting that your analogy with the Judge Kazinski case dealt with computer pornography because the case that I used to show that this would not be covered by plain view is the same situation, the

Lemons (phonetic) case.

THE COURT:  That's the Lemons case; but Lemons was different because there the Government was arguing -- and I agree with Lemons; I don't have a problem with lemons -- the Government argued that the seizure itself was of something in plain view and the Court said no-no-no, you didn't know what it meant until you downloaded it.  And I agree with you, that's why I said initially, no, I don't think this is a plain view case; not at that stage it's not plain view.  The legitimacy for seizing -- for translating which is all the seizure in this case is about at this point is the translation, we've already got the document.  So the question is whether the document itself, untranslated, fell into the plain view exception; and the answer is, well, of course not, for the same reason that an undownloaded computer doesn't fall into the plain view exception.

The Lemons case ultimately upheld the search as you'll recall.  The Lemons case ultimately addressed the consent and the scope of the consent; but I agree with you, it's not that they could translate it because its incriminating nature was in plain view prior to it being translated and that's all lemons stands for.  Lemons stands for the proposition that you can't rely on plain view to seize a computer when you don't know what's on the computer.  It doesn't contradict those cases that say if you have a

41

warrant to say we can search inter alia computers for evidence of kiddie porn, you can take the computers offsite to determine whether in fact it contains kiddie porn.

MR. CALLAHAN:  If it was asked for specifically in the warrant, but I still think the distinction here is that we still, with the plain view analysis, which we have to come back to now, we have to come to that --

THE COURT:  But that's after it's been translated.

MR. CALLAHAN:  Assuming that situation.

THE COURT:  Okay.

MR. CALLAHAN:  Let's assume, I guess, for purposes of the argument, that the letter is in English when they find it, right.

THE COURT:  Okay.

MR. CALLAHAN:  It is not in furtherance of the warrant specifically and the Government admits that, translated or otherwise.  The only other remaining issue is whether it was seized in plain view.

You know, I would argue then on that point -- let's give the Government everything.  It's written in English and it's typed so that everybody can understand it.  I think even under that circumstance this is not a document that could be seized in plain view.  It takes someone with specific knowledge about the case, the intricacies of the case to be able to make a conclusion that this is somehow incriminating

42

at that time; and the 9th Circuit and other circuits all hold that this has got to be nothing more than a cryptic view in order to fall within the parameters of plain view.

I submit to the Court --

THE COURT: I'm sorry. I didn't understand that statement. Say that again.

MR. CALLAHAN: The review of any document, in order to determine whether it's admissible under a plain view analysis, has to be very cursory, almost immediately incriminating in order for it to be deemed under the plain view doctrine. The 9th Circuit and other circuits say you cannot sit down and peruse these documents. You cannot go and look at other evidence and try to make some sort of a picture that makes it incriminating. It has to literally jump out at you; otherwise you have to ask for it in the warrant.

THE COURT: You don't think it did when Ms. Sagar read it?

MR. CALLAHAN: Not immediately. She would have to read the entire document, and she was not on that case at that time anyway. I'm talking about the people on the scene which is all you can look at for plain view.

THE COURT: I don't think that's true here. I don't think you can do that because obviously the document wasn't in English and we can't -- I don't think you can go

43

back and rewrite history.

MR. CALLAHAN:  We're doing that now by saying it's in English at the scene.  We're --

THE COURT:  But that's -- I don't -- I mean, obviously someone has to know that a document is incriminating at some point, okay.  If there were two agents on the scene and for some reason one of them recognized the incriminating nature of the document, the fact that the other one might not have doesn't make the seizure not in plain view.

MR. CALLAHAN:  As long as one of those agents is on the scene.  Knowledge --

THE COURT:  But as long as one of those agents is reviewing the document when it becomes intelligible.  I mean, it's just silly to say that two non-Russian speaking agents had to be able to determine by looking at what was nothing but a bunch of chicken scratch to them that the document was incriminating; and then let's go back in time and let's pretend it had been translated and let's try to guess what they would have done had they seen the document.  I just don't think that's the analysis.

MR. CALLAHAN:  But I think it is in plain view because otherwise it's not in plain view.  You're able to do additional investigation.  You're able to decipher, decode it.  That takes it out of the plain view doctrine by its very

**44**

nature.  The interpretation, I agree, could have been done in the context of determining whether it's within the confines of the warrant which is issue one.

THE COURT:  Right.

MR. CALLAHAN:  But when you get to issue two, you can't manipulate it and that I think is just like the hard drive in lemons.  You cannot decipher, decode information in order to determine whether it's covered --

THE COURT:  Well, you cannot use plain view to justify deciphering.  That's what lemons stood for the proposition for.

MR. CALLAHAN:  Okay.

THE COURT:  And I don't think anyone disputes that.

MR. CALLAHAN:  No.

THE COURT:  I agree you can't use plain view as a justification for decoding it.  They don't need plain view to do that.  I think they're entitled under not only Judge Kazinski but all the other computer cases to do that.  So then the question really becomes, as I understand your argument, just once it's translated, you simply -- your argument is the fact that it may have been plainly incriminating to the person reading it in English is irrelevant if it wouldn't have been to the agent on the scene doing the search.

MR. CALLAHAN:  It has to be on the scene to my

45

understanding and I think all the cases so hold.  But I would also say I'm not willing to make that leap that this is inherently incriminating.

THE COURT:  Right.  I understand.

MR. CALLAHAN:  A lot of my concern is simply that it provides a possible defense blueprint so that's different than incriminating and that's the key.  It's not whether it might somehow help the Government which I guarantee you it would.  I'm sure they'd love to see it but the issue is whether it's incriminating and that's a whole separate issue and that would not be incriminating on its face as the plain view cases so hold.

THE COURT:  All right.  Anything further for now?

MR. CALLAHAN:  You do get exercise, don't you? Nothing further, Your Honor.  Thank you.

THE COURT:  All right.  Thank you, Mr. Callahan. Mr. Dugdale.

MR. DUGDALE:  Thank you, Your Honor.

THE COURT:  Mr. Dugdale, maybe you can start by clarifying the Government's plain view argument which I think perhaps I misinterpreted but perhaps I think that's because the Government sort of skipped a step, but maybe --

MR. DUGDALE:  I don't want to start there but I will, and I think it's correct that the step that may have been missed, and it was briefly mentioned in the footnote.

46

THE COURT: In a footnote. Right.

MR. DUGDALE: That the translation of this document shouldn't make any difference. And basically the point is -- the point that Your Honor was getting at is what else was the FBI supposed to do when they came across this note? It's written in Russian, they have to be able to make a determination whether or not it fell within the scope of the search warrant or what it said; and the only thing they could do at that point was have it translated so that they could make that determination. First of all to see if it fell within the scope of the search warrant; and secondarily, to see if it didn't fall within the search of the search warrant whether it was evidence of some other kind of criminal activity or some other sort of evidence that it's relevant to this case.

So it's not only that it's written in Russian. It's not that they didn't know anything about this note when they came across it but it was addressed to Yurok and I think that's key as well; that on its face, even though it's written in Russian, it's addressed to a co-defendant of Mr. Mikhel who is implicated in the same escape plot that Mr. Mikhel is implicated in. So the natural assumption at that point, the reasonable suspicion that the agents would have had at that point was that this was something that was likely covered by the warrant. It was likely some sort of

unauthorized communication between Mr. Mikhel and Mr. Kadamovas that may have in fact touched upon the events that they were investigating at the time.

THE COURT:  So you're saying that if they had seen, "Dear Yurok," and no more that they would have seized it.

MR. DUGDALE:  In order to determine its relevancy.

THE COURT:  Okay.  In order to determine its relevancy.

MR. DUGDALE:  Correct.  So that is the step that is missing; and then once the document is translated and it's made available to the people who have knowledge of the case, then it's immediately apparent that it is something that was seizable pursuant to the plain view doctrine.

THE COURT:  And I think that's where Mr. Callahan takes issue with you.  At this point he seems to be acknowledging, okay, the warrant asks for things in Russian; and, yes, maybe you're entitled to at least translate it to determine whether it falls within the scope of the warrant; but his argument would be once you translated it and it didn't fall within the scope of the warrant, i.e., it's not related to the escape plot, it wasn't sufficiently incriminating on its face to be something that could otherwise have been seized pursuant to the plain view doctrine.

MR. DUGDALE:  I'm sort of at a handicap to argue

that point since I don't know what the document says and how incriminating or not incriminating it is.

THE COURT:  Picky, picky, picky.

MR. DUGDALE:  So I have a problem with that, making that argument.  I can guess as to what it says between Mr. Mikhel and Mr. Kadamovas, I can guess having not read it that it may in fact be some sort of effort to fabricate a defense or something of that nature but I have not read it so I do not know what is in it.

THE COURT:  Okay.  What would you say is the standard for just how incriminating something has to be?  Does it have to be -- is it enough that it's relevant?  Is it -- I mean obviously it's -- is it a signed confession or a diary admitting to fraud or things like that?  Is relevance enough?

MR. DUGDALE:  Well, I think that's more than relevance right there.  That is the admission in a criminal activity that becomes --

THE COURT:  No-no.  With that -- I was saying that.

MR. DUGDALE:  Sure.

THE COURT:  That's one end of the spectrum.  If it's a confession, presumably, yes.  If it's relevant evidence, is that enough?

MR. DUGDALE:  Relevant -- it has to be incriminating.

THE COURT:  Uh-huh.

MR. DUGDALE:  In addition to being relevant.  I will concede that point.  And the plain view doctrine, I think it has those three steps and two of 'em are not in dispute.  The agents were lawfully in a place where they were conducting the search, they had a lawful right of access to the document because it was in that box they had a warrant to search but it does have to be of an incriminating nature that has to be immediately apparent and our argument is immediately apparent once it has been translated.

THE COURT:  Okay.

MR. DUGDALE:  I think we also have a dispute with the defense as far as who it has to be immediately apparent to.

THE COURT:  Uh-huh.

MR. DUGDALE:  There are a number of cases.  There's case -- the Government cites in its opposition United States vs. Mennon as well as there's a case that came down during the time we were filing this called United States vs. Waldrop from the 5th Circuit which applies the collective knowledge standard to this basically saying that at a minimum the agents at the scene in more so -- agents just involved in the investigation, it's their collective knowledge that's relevant to make a determination as to whether this is incriminating or not.

THE COURT:  That gets over the problem of what if one agent knows A, B, C and another agent knows --

MR. DUGDALE:  Correct.  And I'm not aware -- I don't believe the 9th Circuit has confronted this issue in the plain view test but they have in other circumstances for instance United States vs. Simmons is a case in which they used the collective knowledge test to determine reasonable suspicion.  I just know the name of the case.  I don't have a cite, Your Honor, but it's United States vs. Simmons.

And they've done under the probable cause standard as well.  So that's basically the plain view argument by the Government -- is basically the FBI acted reasonably.  In fact, the only way they could act when they came across this document given that it was written in Russian and given who it was addressed to; and that they properly seized it as a result.  And once it was translated to determine what relevance it had to the case, what relevance it had to the search warrant, then even though I haven't read the document I must make the argument that it was immediately apparent that it related to criminal activity, in this case the underlying criminal activity.

THE COURT:  I guess Ms. Sagar is really the only one who can make that argument.

MR. DUGDALE:  That's correct.  But I don't even think we have to get there, Your Honor, because I think that

the -- the primary argument made by the Government here is that there was no warrant necessary. And I think Mr. Callahan concedes, has to concede that when the initial search was conducted by MDC on March 7th into Mr. Mikhel's cell that everything in that cell was fair game as far as its seizure, including the personal items which included this note. It's clear that that search was conducted by personnel at the jail. It's also clear that that search was conducted pursuant to a legitimate need to preserve institutional security and to investigate issues that related to institutional security.

And once it's seized by MDC, it's seized; and as the Court noted, and we did not cite this in our papers because this issue kind of comes up after Mr. Callahan cites the Clark case in his papers -- and I'm not sure if Your Honor is a fan of surreplies -- since you put a page limit on Mr. Callahan's papers I was guessing.

THE COURT: Only with prior permission with the Court.

MR. DUGDALE: A surreply probably wasn't going to be well received but the 9th Circuit has recognized that basically once it's in the custody of law enforcement it's in the custody of law enforcement and there's no need here for the FBI to get another warrant. There's no need because legally it's not required by the 9th Circuit.

52

THE COURT: You're talking about Burnett and Johnson.

MR. DUGDALE: Correct. Burnett and Johnson. And it's MDC policy for whatever it's worth. It's MDC policy at that point to hand this material over to the FBI as primary investigative agency who investigates crimes that occur on its premises, that's why the FBI became involved.

Coincidental that they're also investigating this case, but had this been a case that was investigated by purely L.A. Homicide or some other law enforcement agency, FBI would have been involved in the search of this -- these items, in any event, because they're the agency that's responsible for investigating crimes at MDC and this was a crime at MDC, the attempted escape.

So there was no question that when the stuff was seized on March 7th it was legitimate there was no warrant that was needed and that really should be the end of the inquiry.

But even if we go to when the FBI became involved and searched through those personal belongings on March 14th, the Government takes great issue with Mr. Callahan's analysis at that point that there were no legitimate security issues involved at MDC.

Just because Mr. Mikhel was placed in segregation at that point in time as well as some of his co-defendants

there were still, at that point in time, just a week afterwards, a number of questions that MDC had to resolve about this incident.  They had not yet identified all the participants in the incident, including other inmates who were involved, including the people on the outside, and there were obviously people on the outside who were facilitating this crime.  They hadn't fully uncovered yet how Mr. Mikhel had managed to sneak all these items into his cell, they hadn't been able to determine as of yet whether there were any correctional officers involved in this; and they hadn't been able to determine, to a full extent, whether there might be other items such as weapons potentially at MDC.

So given all of those issues that have not been resolved as of March 14th the search of those personal items were still completely related to institutional security, not just gathering additional evidence against Mr. Mikhel and his role in the escape plot but perhaps most importantly gathering information through the search those personal items that might reveal how he did it and who else was involved.

In fact, at that point in time we already had Mr. Mikhel with a giant hole in his wall in the cell and the small Ace Hardware store.  I mean, he was pretty much dead to rights on this charge so searching through the personal belongings was not priority number one as far as getting additional evidence against Mr. Mikhel but it was a priority

to determine who else was involved.

And, in fact, as mentioned in the declaration by lieutenant Harlien the search of those personal items did in fact answer some of those questions.  They found, for instance, the security wrench in the shoe box that let them understand how he got those items into the facility.

THE COURT:  The one that could undo the bolts on the cell.

MR. DUGDALE:  Correct, Your Honor.  The bolts on the small windows that allowed those items to come up through the windows.  And they -- prior to that they had discovered there was a problem with the windows but they had not yet found this -- they didn't know it was related to Mr. Mikhel and when they found the bolt that conclusively demonstrate today them this is how it was accomplished.

THE COURT:  Through the wrench.

MR. DUGDALE:  Through the wrench, correct.  That somehow he got ahold of that wrench and through that wrench was able to undo the bolts on the secured -- well, at that point not secured bolts and at that point able to get the Ace Hardware store into his cell.  Clearly that's a prime example of how this search was completely motivated by still the need to protect institutional security, to find out the how because until they determined how he got that stuff in that was not a safe situation to MDC.  I mean, this was apparently

the biggest incident at MDC as far as attempt to escape outside of an incident that happened I guess in the late '80s where several inmates actually managed to escape. This was a huge deal. The facility was locked down. Every cell in the institution was searched, and despite all those steps still as of March 14th when they searched through his personal belongings they did not know the full extent of what was going on.

And as further related in lieutenant Harlien's declaration one of the key components was discovering who was primarily assisting him, namely the Tynans, and that information did not come to light until April of 2003 and came to light in part because of the search of those personal items revealed the bank account that Mr. Mikhel was sending the money to the Tynans to finance this escape attempt.

So, again, all this relates to institutional security, and as a result -- particularly the Cohen case really has no applicability here. This is not a case where an agency is set loose on MDC just to rifle through the defendant's personal belongings in the hopes that it's going to help the underlying case against the defendant. And even the Clark case is a case where at the time that that search occurs the defendant had been removed from the premises, it was not an escape conspiracy on any means on par with this escape conspiracy here.

56

One defendant with a hacksaw and basically that threat had been completely neutralized at that point in time. The threat here had not been neutralized for reasons that I described and as a result Hudson vs. Palmer would hold there's no 4th Amendment expectation of privacy the defendant had in those personal items that had already been legitimately seized by MDC. Unless the Court has any questions on that particular issue I'll move on although I don't know where I'm moving exactly.

THE COURT: No. I think I understand the Government's argument particularly with respect to Hudson. I agree with you Cohen doesn't advance the argument very much and I understand the distinction you're making in Clark although I think even if there weren't such a distinction it's not entirely clear to me Clark is consistent with 9th Circuit. In fact I think it's probably not consistent with 9th Circuit precedent.

MR. DUGDALE: I could talk about plain view some more but since I haven't reviewed the document it probably would be foolish to dwell too much more on that. I will note that Isaacs and Hilliard, which are two cases the government does cite, do make it apparent that when you're talking about documents that at least the agents have a chance to peruse those documents. It doesn't have to be reading the first line and the first page. They do have a chance to look

through these things to determine whether they fall within the scope of the search warrant or otherwise relevant to criminal activity.

And the last argument the last argument I'll just submit on that. That's the Walder argument that basically even if the Court determines that this item was illegally seized and for the reasons I'll explain I don't think that's the correct analysis still should be disclosed to the prosecution in any event because we can use such evidence to impeach the defendant in the event he takes the stand.

THE COURT: Do you want to address the argument about when it should be disclosed? I think Mr. Callahan's view is that it shouldn't be disclosed now.

MR. DUGDALE: Later.

THE COURT: All right. Later.

MR. DUGDALE: Well, I don't know -- there's no authority cited for that position, that's for sure.

THE COURT: Okay.

MR. DUGDALE: I don't -- I understand that he would like to hide -- hide this from the prosecution for as long as possible; but I mean the Government gets --

THE COURT: Your argument would be it's not like any other case where evidence would have been seized. It would already have been known to the prosecution and even though they can't use it in their case in chief, you know,

they have to wait until someone takes the stand.

MR. DUGDALE:  I mean, I guess the argument is that the truth should play some relevancy in this proceeding and that if this in fact is a communication the defendant wrote down to fabricate some defense, it should be fair game and the Government all the time gets evidence -- not all the time obviously -- but we often come into possession of evidence that should not have been seized and the prosecution is given the task of making sure that we don't utilize that evidence improperly; and we wouldn't in this case.  It wouldn't be used in our case in chief.  It would only be used if the defendant were to take the stand.

But the limits that Mr. Callahan puts on it have not been sanctioned by any court and it really doesn't make any sense to put those limits on the Government here.

THE COURT:  Okay.

MR. DUGDALE:  With that I'll submit, Your Honor.

THE COURT:  I guess my only question is really to Ms. Sagar.  Ms. Sagar, would you like, outside the presence of Mr. Dugdale, to address the argument of the incriminating nature of the document?

MS. SAGAR:  Your Honor, I believe that there were some English language words in the document, and I was actually just looking.

THE COURT:  Okay.  But I don't want you to say

59

anything in Mr. Dugdale's presence.

MS. SAGAR:  If I could just have a moment to see --

THE COURT:  Sure.

MS. SAGAR:  -- if there were any English words.

THE COURT:  I'm not talking about the incriminating nature of it to the agents who picked it up in Russian.  I'm talking about Mr. Callahan's argument that even once translated it doesn't qualify as plainly incriminating, and I don't want you to make that argument before Mr. Dugdale because as Mr. Dugdale has indicated he doesn't know what's in it and doesn't want to know.

MS. SAGAR:  Well I --

MR. DUGDALE:  Well, I want to know.

THE COURT:  Doesn't want to know for another -- yeah.

MS. SAGAR:  I don't think I need to divulge the contents of the document.  The Court has the translation. It's been filed in camera, and I think on its face it's readily apparent that it is an incriminating document.

THE COURT:  Okay.

MS. SAGAR:  And I would just submit on the translation.

THE COURT:  All right.  Mr. Callahan.

MR. CALLAHAN:  Your Honor, a couple of points in response to Mr. Dugdale.  The original letter which he points

out would be perhaps perceived by the agents at the scene to be in furtherance of the escape attempt. It's actually written not to Yurok, it's written to -- the name is I-o-r-o-k, which I guess is some slang for Yurok or some other Russian names, but there's no evidence in the record that anyone in the scene knew what that name was.

THE COURT: Actually I don't -- I have the Russian version in front of me, and I don't recognize that even to be English writing.

MR. CALLAHAN: I'm talking about the name at the top.

THE COURT: Yes. I don't recognize that to be I-o-r-o-k.

MR. CALLAHAN: Well, that's the way it appears and that's the way I saw it, and it's translated Y-o-r-o-k.

THE COURT: I think it's translated Y-u-r-o-k.

MR. CALLAHAN: I've seen it three different ways.

THE COURT: Okay. All I'm saying is that what I see here is a document in a foreign language. I mean, if your point is that they couldn't tell from looking at it that it was probably written to Mr. Kadamovas, I'll grant you that.

MR. CALLAHAN: That's my point. Thank you. A couple of other points. I still repeat when you're dealing with a plain view analysis, you cannot go to a remote

observation location.  It's got to be there.  It's got to be perceived to be plain view there.  The idea that this document is immediately incriminating even if in English I think is just an unfair conclusion.

THE COURT:  Well, but I think you -- I think you're kind of mischaracterizing the Government's argument now.  I don't think they're saying that at the moment the agents picked up this document it was immediately apparent that it was incriminating.  I think the Government's argument is or -- and has to be that in executing this warrant, which authorized them to seize documents that could be in Russian or in code relevant to the escape attempt, they were entitled to translate the document.

The moment at which it was translated and because it had this private attorney-client, it went to Ms. Sagar, it was immediately apparent that once translated into English that this was an incriminating document vis-a-vis this prosecution.  I think that's the argument.

So the fact that even if written in English, whatever the agents investigating the escape attempt might or might not have known, I don't think that's the proper inquiry.

MR. CALLAHAN:  Well, I want to correct something that hopefully answers your question at the same time Mr. Dugdale raised.  There are a couple of cases that I cite

in my reply, the Mennon case, that he refers to as one; the Waldrop case as the other but both -- according to my papers -- I did not bring the -- I did not pull those opinions for todays' hearing -- deal with the collective knowledge of the agents at the scene; so I think even under this sort of fiction that we have to partake in which is to have the document translated I still think we have to go back to the agents at the scene; and whether it was immediately incriminating to them I don't think you can go cherry pick someone who knows about the case if they're not there when you're talking about --

THE COURT:  But the document isn't even analyzable until it's translated.  Suppose that the document was suspected of being written in lemon juice, invisible ink, okay.  And suppose the warrant said it may be written in coded -- we have reason to believe the defendant may be writing it in invisible ink; and so it needs to be treated, chemically treated to bring out this invisible ink, the lemon juice writing; and in the course of whatever the standard treatment is for bringing up lemon juice from documents the same chemical process revealed that the document was covered in blood.

Would the authorities not be allowed to seize that document because the blood was not apparent to the agents who picked up the document?  I think the answer has to be that

63

that's not correct, that once -- that as long as they are doing with the document what they're entitled to do, in this case it was translating it, then to the person reading that document who has every right to read it, no question about that; if the incriminating nature is apparent at that point, then it can be seized.

I don't think the question is what would have been apparent to the people on scene if it had been in English any more than my example of the invisible ink if the incriminating nature comes out in the course of a conceivably proper examination of the document; namely, its chemical treatment to determine what its invisible ink writing actually said.

I think that when that blood stain shows up as a result of the legitimate process of, in essence, translating the document, the Government can say we got a blood stained document now and we're entitled to seize this.

MR. CALLAHAN: And if I may follow up on your question. Does the blood stain relate to the case in which the search warrant was issued for?

THE COURT: I don't think it matters at that point.

MR. CALLAHAN: See I think that's the fundamental distinction because once the document was translated --

THE COURT: I'm sorry to interrupt you.

MR. CALLAHAN: It's all right.

64

THE COURT: We would agree that plain view is not limited to evidence of the crime investigated pursuant to the warrant.

MR. CALLAHAN: No. This is the point I tried to make throughout and I think the Court understands. It's a two-part analysis. Once you get past the idea that this document, the one we're talking about in Mikhel, is not in furtherance of search warrant, then it has to be plain view which a bunch of different factors --

THE COURT: But it can be plain view as to any crime; right?

MR. CALLAHAN: As long as it's immediately apparent.

THE COURT: Okay.

MR. CALLAHAN: Yes.

THE COURT: Okay. I think you understand -- you're really just arguing it's not that incriminating.

MR. CALLAHAN: I think clearly it's not. What it is, as I put in my papers, it, at best, is a different view of the events than the Government believes they're going to be able to show at trial. To me that's not incriminating on its face. And that would take almost a verbatim reading which also plain view doesn't allow whether in English --

THE COURT: Well, but they can read that document to determine whether it's relevant to the warrant and; just

as they can download the computer and look at every picture to determine whether it's kiddie porn, they can read this document to determine whether it falls within the scope of the warrant.

MR. CALLAHAN:  I think at that juncture, and you asked about this before, the proper thing to do was to go get a warrant for that piece of paper; and I think in many ways your hypothetical regarding the lemon juice would be much better handled exactly the same way, and that's what --

THE COURT:  But they have the blood -- so what are they getting?  Now they've got blood.  They've got a blood stained document.  What are they getting a warrant to do?

MR. CALLAHAN:  If the blood was part and parcel of the case in which the search warrant was issued, then perhaps they don't need to get a warrant; but here when we're talking about a totally separate crime than that being investigated and pursuant to the warrant, I think a little more is necessary and I think the cases so hold; and with that, Your Honor, unless the Court has any more questions I will submit it.

THE COURT:  All right.  Thank you, Mr. Callahan.

MR. CALLAHAN:  Thank you.

THE COURT:  Anything further from the Government.

MR. DUGDALE:  No, Your Honor.  Thank you.

THE COURT:  All right.  I would like to consider

all the arguments that were made and go back and read some of the cases which, I think most of which -- most of the cases referred to have been cited in the papers; but do that as well and I will issue a written ruling given the significance of the subject and you'll be the first to know, among the first to know.

We have -- I'm sure we have other deadlines for other motions coming up. I think they're kind of coming up soon, aren't they?

MR. DUGDALE: Your Honor, actually there was -- when the trial was moved from February to July Mr. Callahan filed a stipulation which the Government signed on to, and I believe the next motions hearing is not till February.

THE COURT: Okay.

MR. DUGDALE: We basically tried to kick days to keep them in the same amount of time prior to the trial as when the trial was set in February.

THE COURT: All right.

MR. DUGDALE: Giving us a little more leeway since we have a little more time.

MR. CALLAHAN: Mr. Dugdale is correct.

THE COURT: All right. Thank you very much.

MR. CALLAHAN: Thank you, Your Honor.

MR. DUGDALE: Thank you, Your Honor.

MS. SAGAR: Your Honor, may I just bring up one

67

additional factor with respect to taint issues?  There was a document that was seized from defendant Kadamovas's cell and it was also forwarded to me, and that document was also in Russian and it was translated and Mr. Lasting and I have agreed that that is a -- a document that's covered by the attorney-client privilege and that it will not be disclosed to the prosecution.  And I think Mr. Lasting would like some sort of record of that agreement to be made.

And would the Court -- does the Court have any ideas as to how we should do that?  Should we submit --

THE COURT:  You might want to submit something under seal just identifying the document in a way that is satisfactory to you since I haven't seen it and won't see it. I think that should do it, maybe stipulation filed under seal.

MR. LASTING:  That's fine, Your Honor.

THE COURT:  Speaking of under seal, is there anything that was said -- I'm not sure there was anything that was said at this hearing that should be under seal in terms of talking about the document.

MR. CALLAHAN:  No.  No.

THE COURT:  I don't think so.  All right. Mr. Lasting, yes.

MR. LASTING:  I don't mean to interrupt, this is on a different issue, but I had asked the paralegal, Christine